**NOS. 14-1617 & 14-1619**

## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

─────────────────────

LEXMARK INTERNATIONAL, INC.,

*Plaintiff–Cross-Appellant*

**v.**

IMPRESSION PRODUCTS, INC.,

*Defendant–Appellant*

*(For Continuation of Caption See Inside Cover)*

─────────────────────

*Appeal from the United States District Court for the Southern District of Ohio
in Case No. 10-CV-564, Judge Michael R. Barrett*

─────────────────────

## CORRECTED BRIEF *AMICUS CURIAE* OF REMANUFACTURING
## ASSOCIATIONS IN SUPPORT OF AFFIRMANCE OF CROSS-APPEAL

─────────────────────

Seth D. Greenstein
CONSTANTINE CANNON, LLP
1001 Pennsylvania Avenue, N.W.
Suite 1300N
Washington, D.C. 20004
Telephone: 202.204.3500
Facsimile:  202.204.3501
sgreenstein@constantinecannon.com

Attorneys for *Amicus Curiae*
International Imaging Technology Council,
Auto Care Association, and Automotive
Parts Remanufacturers Association

November 19, 2014

**QUALITY CARTRIDGES, INC., JOHN DOES, 1-20, BLUE TRADING LLC, EXPRINT INTERNATIONAL, INC., LD PRODUCTS, INC., PRINTRONIC CORPORATION, TESEN DEVELOPMENT (HONG KONG) CO. LTD., BENIGNO AVEDA AND HIS COMPANIES,**

*Defendants.*

# <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF CONTENTS ........................................................................... i

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF INTEREST OF *AMICUS CURIAE*............................1

STATEMENT OF RELATED CASES ...................................................5

SUMMARY OF ARGUMENT ...............................................................6

ARGUMENT ...........................................................................................8

I.  THE DISTRICT COURT CORRECTLY HELD LEXMARK'S
    AUTHORIZED CARTRIDGE SALES EXHAUSTED ITS PATENT
    RIGHTS UNDER *QUANTA*. .........................................................8

    A.  Under *Quanta*, Post-Sale Use Restrictions Cannot Revive Patent
        Rights Exhausted by an Authorized Sale. ...........................11

    B.  *Mallinckrodt*'s Conditional Sales Doctrine was
        Overruled by *Quanta*.........................................................14

    C.  The District Court Correctly Held the Return Program Does Not
        Affect the Authority to Sell. ...............................................16

II. PROPER INTERPRETATION OF THE EXHAUSTION DOCTRINE
    MAINTAINS SUPREME COURT PRECEDENTS DISTINGUISHING
    REPAIR FROM RECONSTRUCTION.........................................18

    A.  Lexmark's Narrow View of the Patent Exhaustion Doctrine Thwarts
        the Public's Right to Repair. ...............................................20

    B.  The "Conditional Sales" Cases Create Continued Uncertainty in the
        Courts and the Marketplace, a Trend This Court Should Reverse. ....21

III.   PROPER INTERPRETATION OF THE EXHAUSTION DOCTRINE
       MAINTAINS CRUCIAL ANTITRUST LAW REMEDies AGAINST
       ANTICOMPETITIVE CONDUCT............................................................23

IV.    A CLEAR PATENT EXHAUSTION RULE REMAINS ESSENTIAL
       TO ROBUST COMMERCE. ........................................................................25

CONCLUSION....................................................................................................27

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ....................................28

CERTIFICATE OF SERVICE ............................................................................29

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Adams v. Burke*, 84 U.S. (17 Wall.) 453 (1873) ................................................... 12

*Arizona Cartridge Remanufacturers Ass'n v. Lexmark Int'l Inc.*,
    421 F.3d 981 (9th Cir. 2005) ..................................................... 14

*Aro Mf'g Co. v. Convertible Top Replacement Co.*,
    365 U.S. 336 (1961)......................................................... 19, 20, 21

*B. Braun Med. Inc. v. Abbott Labs.*,
    124 F.3d 1419 (Fed. Cir.1997) ..................................... 11, 12, 14

*Bandag Inc. v. Al Bolser's Tire Stores, Inc.*,
    750 F.2d 903 (Fed. Cir. 1984) ..................................................... 16

*Bauer & Cie v. O'Donnell,* 229 U.S. 1 (1913) ..................................................... 10

*Bloomer v. McQuewan,* 55 U.S. (14 How.) 539 (1852) ....................................... 12

*Bottom Line Mgt., Inc. v. Pan Man, Inc*., 228 F.3d 1352 (Fed. Cir. 2000) .......... 19

*Dana Corp. v. Am. Precision Co., Inc.,* 827 F.2d 755 (Fed. Cir. 1987).............. 19

*Dawson Chem. Co. v. Rohm & Haas Co.*, 448 U.S. 176 (1980) ......................... 21

*Eastman Kodak Co. v. Image Technical Servs. Inc.,*
    504 U.S. 451 (1992)......................................................... 2, 25, 26

*Ergowerx Int'l LLC v. Maxell Corp. of Am.*, No. 13 Civ 5633 (PAE)
    2014 WL 1642970 (S.D.N.Y. Apr. 23, 2014) ........................................... 14

*General Talking Pictures Corp. v. Western Elec. Co.,*
    304 U.S. 175 (1938)......................................................... 13, 14

*Glass Equip. Dev., Inc. v. Besten, Inc.*, 174 F.3d 1337 (Fed. Cir. 1999) ............. 16

*Henry v. A.B. Dick Co.*, 224 U.S. 1 (1912) ...................................................... 10, 21

*Hewlett-Packard Co. v. Repeat-O-Type Stencil Mfg. Corp.*,
    123 F.3d 1445 (Fed. Cir. 1997), *cert. denied*,
    523 U.S. 1022 (1998) ................................................................................ 19

*Heyer v. Duplicator Mfg. Co.*, 263 U.S. 100 (1923) ........................................... 19

*Husky Injection Molding Sys. v. R&D Tool & Eng'g*,
    291 F.3d 780 (Fed. Cir. 2002) .................................................................... 19

*Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006) ......................... 23

*Image Technical Servs., Inc. v. Eastman Kodak Co.*,
    125 F.3d 1195 (9th Cir. 1997) ............................................................... 24, 25

*In re Ciprofloxin Hydrochloride Antitrust Litig.*,
    544 F.3d. 1323 (Fed. Cir. 2008) ................................................................ 23

*Int'l Salt Co. v. U.S.*, 332 U.S. 392 (1947) ........................................................ 23

*ISO Antitrust Litig.*, 203 F.3d 1322 (Fed. Cir. 2000) ......................................... 25

*Jazz Photo Corp. v. Int'l Trade Comm'n*,
    264 F.3d 1094 (Fed. Cir. 2001) .................................................................. 19

*Keeler v. Standard Folding-Bed Co.*, 157 U.S. 659 (1895) ............................... 9, 12

*Kendall Co. v. Progressive Med. Tech.*,
    85 F.3d 1570 (Fed. Cir. 1996) ................................................................ 19, 22

*Keurig, Inc. v. Sturm Foods, Inc.*,
    732 F.3d 1370 (Fed. Cir. 2013) .............................................................. 12, 21

*Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S. Ct. 1351 (2013) ......................... 8, 25

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    387 F.3d 522 (6th Cir. 2004) .................................................................... 18

*LG Elecs., Inc. v. Bizcom Elecs., Inc.*,
    453 F.3d 1364 (Fed. Cir. 2006) ..........................................................*passim*

*LifeScan Scotland, Ltd. v. Shasta Techs., LLC*,
    734 F.3d 1361 (Fed. Cir. 2013) .............................................................. 8, 15

*Mallinckrodt, Inc. v. Medipart, Inc.*,
    976 F.2d 700 (Fed. Cir. 1992) .............................................................*passim*

*Mitchell v. Hawley*, 83 U.S. (16 Wall.) 544 (1873) ............................................. 13

*Motion Picture Patents Co. v. Universal Film Mfg. Co.*,
    243 U.S. 502 (1917)........................................................................ 10, 21, 25

*Omega, S.A. v. Costco Wholesale Corp.*, CV 04-05443 TJH,
    2011 WL 8492716 (E.D. Cal. Nov. 9, 2011) ............................................ 22

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*,
    324 U.S. 806 (1945)................................................................................. 23

*Princo Corp. v. Int'l Trade Comm'n*, 563 F.3d 1301 (Fed. Cir. 2009) ................ 15

*Princo Corp. v. Int'l Trade Comm'n*, 616 F.3d 1318 (Fed. Cir. 2010) ................ 15

*Quanta Computer, Inc. v. LG Elecs., Inc.*,
    553 U.S. 617 (2008).............................................................................*passim*

*Sage Prods. Inc. v. Devon Indus. Inc.*, 45 F.3d 1575 (Fed. Cir. 1995)................. 22

*Simpson v. Union Oil Co. of Cal.*, 377 U.S. 13 (1964)........................................ 24

*Square D Co. v. Niagara Frontier Tariff Bureau*, 476 U.S. 409 (1986) .............. 24

*Static Control Components, Inc. v. Lexmark Int'l, Inc.*,
    487 F. Supp. 2d 830 (E.D. Ky. 2007)........................................................ 18

*Static Control Components, Inc. v. Lexmark Int'l, Inc.*,
    615 F. Supp. 2d 575 (E.D. Ky. 2009).................................. 6, 11, 14, 16, 17

*Static Control Components, Inc. v. Lexmark Int'l Inc.*,
    697 F.3d 387 (6th Cir. 2012) ........................................................ 5, 16, 17

*Surfco Hawaii v. Fin Control Sys. Pty. Ltd.,* 264 F.3d 1062 (Fed. Cir. 2001)*,*
    *cert. denied sub nom. Fin Control Sys. Pty. Ltd. v. Surfco Hawaii,*
    536 U.S. 939 (June 24, 2002) ...................................................................... 19

*U.S. v. Masonite Corp.,* 316 U.S. 265 (1942) ........................................................ 24

*U.S.* v. *Univis Lens Co.*, Inc., 316 U.S. 241 (1942) ............................................... 24

*Wilbur-Ellis Co. v. Kuther*, 377 U.S. 422 (1964) .................................................. 20

*Wilson v. Simpson,* 50 U.S. 109 (1850) ................................................................ 19

**Statutes**

Ohio Rev. Code § 1302-42 ..................................................................................... 17

Ohio Rev. Code § 1302.42(D) ............................................................................... 17

**Regulations**

40 C.F.R. § 247.11 (2012) ..................................................................................... 18

**Other Authorities**

Alfred C. Server and William J. Casey, *Contract-Based*
    *Post-Sale Restrictions on Patented Products Following Quanta*,
    64 Hastings L.J. 561 (Apr. 2013) ................................................................. 14

Herbert Hovenkamp, *Post-Sale Restraints and Competitive Harm:*
    *The First Sale Doctrine in Perspective*,
    66 N.Y.U. Ann. Surv. Am. L. 487 (2011) ................................................... 14

Thomas G. Hungar, *Observations Regarding the Supreme Court's*
    *Decision in Quanta*, ("*Mallinckrodt*'s 'conditional sale'
    rationale is no longer good law.")
    49 IDEA – Intell. Prop. L. Rev. 517 (2009) ................................................. 14

U.S. Census Bureau, 2012 Annual Services Report, Table 2:
    Estimated Revenue by Tax Status for Employer Firms: 2007
    through 2012, http://www.census.gov/services/index.html ......................... 3

U.S. Environmental Protection Agency, *Comprehensive Procurement Guidelines – Toner Cartridges*, http://www.epa.gov/osw/conserve/ tools/cpg/ products/nonpaperoffice.htm#toner .......................................... 18

# STATEMENT OF INTEREST OF *AMICUS CURIAE*[1]

*Amici* submit this brief in support of appellant/cross-appellee to address the issue presented in Lexmark's cross-appeal: that under *Quanta Computer, Inc. v. LG Elecs., Inc.,* 553 U.S. 617 (2008), post-sale use conditions do not prevent patent exhaustion where the sales are authorized.

*Amici* are not-for-profit associations that, *inter alia*, represent the interests of companies that compete against original equipment manufacturers ("OEMs") for sale of replacement parts and consumable goods, and provision of services that that constitute lawful repair under the patent laws.[2]

Auto Care Association ("ACA") is a national trade organization of 2,000 members representing more than 150,000 independent businesses that manufacture, distribute, and sell motor vehicle parts, accessories, tools, equipment, materials, and supplies, and perform vehicle service and repair. This independent aftermarket industry contributes more than 2.3 percent to the U.S. gross domestic product ("GDP"). Following expiration of a new car warranty, over 75 percent of car owners patronize independent repair shops rather than new car dealers.

Automotive Parts Remanufacturers Association ("APRA") is the trade association for companies that collect used motor vehicle parts and restore them to

---

[1] The parties consent to filing of this brief. No counsel for a party authored this brief in whole or in part, or made a monetary contribution intended to fund preparation or submission of this brief. No person other than *amicus curiae*, its members, or its counsel made a monetary contribution to its preparation or submission.

[2] In various industries these repair activities also may be called "rebuilding," "recharging," "reconditioning," "customization," or "remanufacturing."

functionality. APRA represents over 1000 companies that remanufacture motor vehicle parts and their suppliers. Parts remanufactured by APRA members are used in automobiles, trucks, buses, and off-highway vehicles such as construction and industrial equipment and farm machinery.

International Imaging Technology Council ("I-ITC") represents the interests of the imaging supplies industry, including companies that buy used cartridges, recharge used toner and inkjet cartridges, retail remanufactured cartridges, and all related industry suppliers.

Products such as automobiles, computers, and computer printers contain removable and consumable parts that can be repaired or refurbished many times. By procuring parts and repair services, consumers extend the useful life of these products and enhance the value of their investments. Members of the *amici* satisfy this consumer demand by providing alternative sources of consumable goods, replacement parts, and services at lower cost and of as good or better quality than the OEM. These companies' replacement products often include enhanced features compatible with, but not available on, the original equipment. This aftermarket competition constrains OEMs from increasing prices to supracompetitive levels, and spurs higher quality and innovation in new and aftermarket products.

Lawful repair contributes substantially to the American economy.[3] The motor vehicle aftermarket industry, encompassing products and services purchased for light, medium and heavy duty vehicles after the original sale, employs more

---

[3] *See Eastman Kodak Co. v. Image Technical Servs. Inc.,* 504 U.S. 451, 462 & n.6 (1992).

2

than four million people in the United States. Overall domestic aftermarket sales of automotive products totaled $318.2 billion in 2013. *Amici* estimate more than 10,000 companies in the United States rebuild motor vehicle parts.

In 2012 consumers spent more than $16 billion for repair and maintenance of electronic and precision equipment, of which more than $8 billion was spent for computer and office machine repair and maintenance.[4] Approximately 2,000 domestic businesses recondition and repair office imaging supplies—such as toner cartridges for laser printers—employing approximately 70,000 workers. Industry observers estimate that aftermarket refurbished printer supplies in North America comprise approximately 25-30 percent of the market for monochrome laser printer toner cartridges, up to 10 percent of the market for color laser printer toner cartridges, and approximately 14 percent of the aftermarket for refilled ink jet cartridges, with total annual aftermarket sales of some $3.4 billion.

Remanufacturing promotes sound environmental policies and conserves resources such as precious metals and petroleum-based plastics. Rebuilding automotive parts typically re-uses 88 percent of the raw material from the original parts, and rebuilding engines saves 50 percent of the energy required to produce a new engine. Reconditioning ink and toner cartridges will keep some 84,000 tons of industrial-grade plastics and metals out of landfills this year.

---

[4] U.S. Census Bureau, 2012 Annual Services Report, Table 2: Estimated Revenue by Tax Status for Employer Firms: 2007 through 2012, http://www.census.gov/services/index.html  (last visited Nov. 3, 2014).

3

Companies represented by *amici* run the gamut from large, technologically-sophisticated entities with substantial intellectual property portfolios to small operators that service local customers. What unites these companies in this case is their stake in access to original equipment free of downstream patent restraints on alienation or repair asserted by the manufacturer as post-sale conditions on the purchase of patented goods. Without access to OEM products to repair or refurbish, these companies cannot provide choices to consumers or competition to OEMs based on price, quality, and features. The *amici* respectfully submit this brief so the Court may consider the impact, on commerce generally and on these aftermarket industries in particular, of any narrowing of the exhaustion rule.

Following the Supreme Court's reaffirmation of breadth of the patent exhaustion doctrine in *Quanta*, and despite the opinions of two district courts rejecting Lexmark's arguments, Lexmark continues to threaten the cartridge remanufacturing industry with patent infringement suits based on claims that post-sale use restrictions can trump patent exhaustion after an authorized sale by Lexmark to its customers. Lexmark continues to apply restrictive terms to the packaging of products it sells to retailers and consumers in an attempt to exercise downstream post-sale control over what consumers can do with products they own. Though ostensibly positioned as a "patent license" agreement with the end-user, Lexmark deploys its post-sale strategem to lock out otherwise-lawful competition for aftermarket products and services by attempting to re-assert exhausted patent rights over cartridges that can lawfully be repaired under the patent laws.

4

*Amici's* perspectives and experience place in sharp relief the harmful consequences of Lexmark's contentions. If post-sale conditions could prevent exhaustion, both consumers and aftermarket competitors could face patent infringement liability for any article repaired other than by the patentee. Patent law and competition best will be served by a bright-line holding, consistent with Supreme Court precedents, that rejects Lexmark's "conditional sales" theory, and reaffirms that an authorized sale exhausts the patent owner's interest in the vended article. Any purported downstream post-sale restrictions on use or disposition of that article cannot be enforced by patent law, and only may be imposed to the extent consistent with contract and antitrust law.

## STATEMENT OF RELATED CASES

Lexmark's Statement of Related Cases contains a salient omission. *Static Control Components, Inc. v. Lexmark Int'l Inc.*, 697 F.3d 387 (6th Cir. 2012) also resolved patent law questions pertinent to this appeal. It affirmed that remanufacturers of Lexmark cartridges did not as a class infringe Lexmark patents, and that Static Control's sale of replacement computer chips and parts that enabled remanufacture of Lexmark toner cartridges did not actively induce patent infringement. Additional pertinent holdings of *Static Control* will be discussed in later sections of this brief.

## SUMMARY OF ARGUMENT

Under long-standing Supreme Court precedents, an authorized sale of a patented article exhausts a patentee's right to restrict otherwise-permissible uses of that article. *Quanta*'s exhaustion rule properly balances the patent owner's exclusive rights with the consumer's right to reuse, resell, repair, and improve lawfully-acquired property, and the public interest to prevent unfair competition.

Lexmark's argument to this Court muddies these clear principles, and threatens to upend this balance. The line of this Court's "conditional sales" cases cited by Lexmark begins with *Mallinckrodt*,[5] but terminates with the decision[6] reversed by *Quanta*. The district courts in this case and in *Static Control*[7] distinguished Lexmark's unenforceable post-sale restraints against a purchaser from cases in which the Supreme Court upheld a patent owner's right to restrict the ability of a licensee that manufactures a product to sell it. They concluded correctly that Lexmark's post-sale conditions were indistinguishable in kind from the purported "licenses" in *Bizcom* and *Mallinckrodt* that could not be enforceable under patent law after *Quanta*, and so rejected Lexmark's attempt to revive a "conditional sales" exception to patent exhaustion.

Accepting Lexmark's argument would encroach upon precedents defining lawful repair. Remanufacturing industries provide valuable service to consumers

---

[5] *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700 (Fed. Cir. 1992).
[6] *LG Elecs., Inc. v. Bizcom Elecs., Inc.*, 453 F.3d 1364, 1369 (Fed. Cir. 2006) ("*Bizcom*").
[7] *Static Control Components v. Lexmark Int'l, Inc.*, 615 F. Supp. 2d 575 (E.D. Ky. 2009).

6

and contribute billions of dollars to our economy. The post-sale restrictions Lexmark advocates could prevent commonplace activities such as repair and upgrading personal computers or automobiles. Consumers and aftermarket competitors targeted by such downstream post-sale restrictions may not know whether the restriction exists or is valid or enforceable. But if Lexmark succeeds here, consumers and aftermarket competitors would be exposed to patent infringement liability solely for fixing broken products they own. Such threats chill competition and pose intolerable risks for small entrepreneurial ventures.

Reaffirming patent exhaustion over post-sale use conditions restores the proper symmetry between patent and antitrust law. Post-sale use restrictions inevitably target the patentee's aftermarket competitors, not the end-users who ostensibly agree to the terms. Allowing downstream post-sale patent restrictions to limit exhaustion necessarily proscribes lawful aftermarket competition and limits antitrust defenses—restricting consumer choice, increasing consumer price, and stifling innovation.

Finally, a clear rule finding exhaustion upon an authorized sale best serves modern commerce. Products such as cars and computers may be sold and resold repeatedly during their useful life. Millions of businesses and consumers use online commerce to resell everything from small used parts to fleets of cars. Sellers and purchasers are entitled to know they have the right to resell, purchase, and use what they buy, free from the threat of infringement suits.

## ARGUMENT

## I. THE DISTRICT COURT CORRECTLY HELD LEXMARK'S AUTHORIZED CARTRIDGE SALES EXHAUSTED ITS PATENT RIGHTS UNDER *QUANTA*.

The exhaustion doctrine traces back its roots nearly 400 years to the time of Lord Coke and the common-law abhorrence of restraints on alienation of chattels.[8] In *Quanta*, the Supreme Court held that an authorized sale exhausts the patent-holder's rights in the vended article, such that downstream restrictions on post-sale uses of such article cannot be enforced under patent law. The bolded text below from the Court's opinion drives home, unmistakably, that the touchstone for exhaustion is a sale authorized by the patentee:

> "For over 150 years this Court has applied the doctrine of patent exhaustion to limit the patent rights that survive the initial ***authorized sale*** of a patented item." *Id.,* 553 U.S. at 621.

> "[B]ecause the license ***authorizes the sale*** of components that substantially embody the patents in suit, the sale exhausted the patents." *Id.*

> "The longstanding doctrine of patent exhaustion provides that the initial ***authorized sale*** of a patented item terminates all patent rights to that item." *Id.* at 625.

> "[*U.S.* v. *Univis Lens Co.*, Inc., 316 U.S. 241, 249 (1942)] held that 'the ***authorized sale*** of an article which is capable of use only in practicing the patent is a relinquishment of the patent monopoly with respect to the article sold.'" *Id.* at 631.

---

[8] *Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S. Ct. 1351, 1363 (2013) (exhaustion at common law has "an impeccable historic pedigree"); *LifeScan Scotland, Ltd. v. Shasta Techs., LLC*, 734 F.3d 1361, 1376 (Fed. Cir. 2013).

"Exhaustion is triggered only by a ***sale authorized*** by the patent holder." *Id.* at 636.

"No conditions limited Intel's authority to sell products substantially embodying the patents. Because Intel was ***authorized to sell*** its products to Quanta, the doctrine of patent exhaustion prevents LGE from further asserting its patent rights with respect to the patents substantially embodied by those products." *Id.* at 637.

"We note that the ***authorized nature of the sale*** to Quanta does not necessarily limit LGE's other contract rights." *Id.* n.7.[9]

"The ***authorized sale*** of an article that substantially embodies a patent exhausts the patent holder's rights and prevents the patent holder from invoking patent law to control postsale use of the article." *Id.* at 638.

"Intel's ***authorized sale*** to Quanta thus took its products outside the scope of the patent monopoly, and as a result, LGE can no longer assert its patent rights against Quanta." *Id.*

---

[9] *Quanta* left open the possibility that a patent owner might retain *contract law* remedies for breach of post-sale conditions, while making clear that *patent law* remedies are unavailable. *Quanta* is only the most recent reflection of the Court's hostility to attempts to use patent law, rather than contract law, to enforce post-sale restrictions:

"[O]ne who buys patented articles of manufacture from one authorized to sell them becomes possessed of an absolute property in such articles, unrestricted in time or place. Whether a patentee may protect himself and his assignees by special contracts brought home to the purchasers is not a question before us, and upon which we express no opinion. It is, however, obvious that such a question would arise as a question of contract, and not as one under the inherent meaning and effect of the patent laws."

*Keeler v. Standard Folding-Bed Co.*, 157 U.S. 659, 666 (1895).

Given the Supreme Court's repeated emphasis on "authorized sale" as the governing principle, it is telling that Lexmark repeatedly mischaracterizes *Quanta* as addressing "unrestricted" sales—*a phrase never once used in that unanimous 21-page opinion.*[10] The reason is obvious. Lexmark's cartridge sales to its customers were all authorized sales by Lexmark. The district court here found that Lexmark's resellers had "full authority to sell the Return cartridges that practiced Lexmark's patents"; and held the notices of a restriction on the end user "do not prevent patent rights from being exhausted given that the initial sales were authorized and unrestricted."[11] Lexmark does not contest these findings as clearly erroneous. Applying these facts to the correct standard from *Quanta*, Lexmark cannot use patent law to prevent otherwise-lawful post-sale use.

Attempting to avoid this result, Lexmark misdirects this Court to a line of cases, overturned in *Quanta*, that look not to whether a sale was authorized but to whether, *despite* an authorized sale, the seller imposed downstream post-sale conditions on use (a so-called "conditional sale"). But Supreme Court teaching is clear: an authorized sale renders downstream post-sale use conditions

---

[10] While Lexmark contends exhaustion under *Quanta* requires an "unconditional" sale, that opinion uses the term only twice—when quoting past Supreme Court opinions proscribing anticompetitive attempts to leverage patent rights to compel purchase of unpatented articles. *Id.*, 553 U.S. at 626 & n.2, *citing Motion Picture Patents Co. v. Universal Film Mfg. Co.*, 243 U.S. 502, 516 (1917), *Bauer & Cie v. O'Donnell*, 229 U.S. 1, 14-17 (1913), and *Henry v. A.B. Dick Co.*, 224 U.S. 1, 26 (1912) (*overruled by Motion Picture Patents*).

[11] Lexmark Br. Addendum, Op. and Order (Oct. 20, 2014) (hereinafter "Opinion") A00014. The district court in *Static Control* also held all Lexmark's cartridge sales were authorized. 615 F. Supp. 2d at 584-585, 588.

unenforceable under patent law. The district court therefore correctly held: "[T]he fully authorized sales of the Return Program cartridges to consumers for use in the ordinary pursuits in life took the cartridges outside the scope of the patent monopoly despite the notices contained on those cartridges, and Lexmark may not now rely on patent law to hold Impression Products liable for infringement."[12]

### A.    Under *Quanta*, Post-Sale Use Restrictions Cannot Revive Patent Rights Exhausted by an Authorized Sale.

*Quanta* turned on the fundamental distinction between licenses restricting the right to *sell* and post-sale conditions on *use*. Patentholder LG Electronics ("LGE") had not restricted Intel's authority to sell chips to computer manufacturers, but attempted by written notices to impose downstream post-sale use restrictions on those manufacturers. This Court, following its prior rulings that patent exhaustion is not triggered by a "conditional" sale,[13] held that LGE's notice made Intel's sales conditional and no exhaustion occurred. *Bizcom*, 453 F.3d at 1369 (emphasis added). The Supreme Court reversed. Reaffirming that exhaustion occurs upon an authorized sale, *Quanta* precluded enforcement of LGE's post-sale use restrictions under patent law because the restrictions did not affect Intel's authority to sell.

---

[12]  Opinion at A0015. *See also Static Control*, 615 F. Supp. 2d at 584 ("Lexmark attempts to reserve patent rights in its products through post-sale restrictions on use imposed on its customers. This is what *Quanta* says Lexmark cannot do.").

[13] *B. Braun Med. Inc. v. Abbott Labs.*, 124 F.3d 1419 (Fed. Cir.1997); *Mallinckrodt, Inc.*

11

Despite *Quanta*'s clear statement of the law, Lexmark contends exhaustion occurs only where a sale has no attached conditions on downstream post-sale use (here, the "Return Program" terms), despite an authorized sale. That argument is untenable.  If Lexmark's view were correct, *Quanta* would have affirmed rather than reversed *Bizcom*.[14]

Lexmark attempts to blur crucial distinctions in Supreme Court precedents between restrictions on the authority of a licensee to sell and on post-sale use of a product. The Supreme Court first articulated the patent exhaustion doctrine in *Bloomer*, holding that a patentee could not claim infringement during an extended patent term against one who had purchased patented machines from a licensee authorized to make, use, and sell the machine. That authorized sale, the Supreme Court reasoned, fully exhausted the patentee's right and interest: "when the machine passes to the hands of the purchaser, it is no longer within the limits of the monopoly. It passes outside of it, and is no longer under the protection of the act of Congress." *Bloomer*, 55 U.S. (17 Wall.) at 549.  The Court re-affirmed that rule in *Adams v. Burke*, and held that a restriction circumscribing a licensee's right to sell could not restrict the purchaser's post-sale right to use. *See Quanta*, 553 U.S. at 625, *citing Adams*, 84 U.S. at 455.

---

[14]  *Quanta* rejects the *Bizcom* (and *Mallinckrodt/B. Braun*) rationale that a patent owner may claim additional royalties at multiple points in the usage chain.  Had that been the law, the Supreme Court also would not have found exhaustion in *Bloomer v. McQuewan,* 55 U.S. (14 How.) 539 (1852), *Adams v. Burke*, 84 U.S. (17 Wall.) 453 (1873), *Keeler, supra* note 9, at 9, and *Univis Lens, supra*. *Cf. Keurig, Inc. v. Sturm Foods, Inc.*, 732 F.3d 1370, 1375 (Fed. Cir. 2013).

The case principally relied upon by Lexmark, *General Talking Pictures Corp. v. Western Electric Co.*, 304 U.S. 175 (1938), is consistent with *Bloomer*, *Quanta*, and the holding of the district court here, but reached a different result on distinguishable facts. In *General Talking Pictures*, a license to manufacture patented amplifiers restricted the manufacturer's right to sell. *Id.* at 179-180. Any sale by the licensee to commercial users violated the license field of use, so by definition was an unauthorized sale that could not trigger exhaustion. Accordingly, *General Talking Pictures* illustrates the distinction between authorized and unauthorized sales; not, as Lexmark suggests, whether post-sale conditions can survive exhaustion after an authorized sale to a purchaser. [15]

Further evidence that *General Talking Pictures* addressed the authority of a manufacturer/licensee to sell and not the post-sale right to use is found in its discussion of another case involving unauthorized sales by a licensee, *Mitchell v. Hawley*, 83 U.S. (16 Wall.) 544 (1873). That license explicitly provided that licensee "*shall* not, *in any way, or form, dispose of, sell, or grant* any license to use the said machines" beyond the initial patent term. *Id.* at 549 (emphasis added). The manufacturer/licensee "*never had any power to sell a machine* so as to withdraw it indefinitely from the operation of the franchise secured by the patent." *Id.* at 551 (emphasis added). Accordingly, no exhaustion occurred in *Mitchell* because the licensee lacked authority to sell: "[Respondent in *Mitchell*] could not

---

[15]   That Court declined to address whether a post-sale use condition can restrict a purchaser's rights after an authorized sale, inasmuch as the sales were unauthorized. *Id.*, 304 U.S. at 177.

13

convey to petitioner what both knew it was not authorized to sell." *Gen. Talking Pictures,* 304 U.S. at 181 (citation omitted). Thus, Lexmark can find no support in *General Talking Pictures* for its "conditional sales" theory.

### B. *Mallinckrodt*'s Conditional Sales Doctrine was Overruled by *Quanta*.

Both courts to directly consider the question[16] and the majority of commentators[17] recognize that *Quanta* overruled the "conditional sales" theory of *Mallinckrodt*.[18] By squarely reversing the "conditional sales" exception in *Bizcom*, *Quanta* necessarily rejected the same holding in the cases upon which *Bizcom* relied—*Mallinckrodt* and *B. Braun*—and upon which Lexmark erroneously

[16]   Opinion, A0015; *Static Control,* 615 F. Supp. 2d at 585-586 ("*Quanta* overruled *Mallinckrodt sub silentio*. The Supreme Court's broad statement of the law of patent exhaustion simply cannot be squared with the position that the *Quanta* holding is limited to its specific facts. Further, the Federal Circuit relied in part on *Mallinckrodt* in reaching its decision in … the decision the Supreme Court reversed in *Quanta*"); *see also Ergowerx Int'l LLC v. Maxell Corp. of Am.*, No. 13 Civ. 5633 (PAE) 2014 WL 1642970, at *12-13 (S.D.N.Y. Apr. 23, 2014).

[17]   *See,* Alfred C. Server and William J. Casey, *Contract-Based Post-Sale Restrictions on Patented Products Following Quanta*, 64 Hastings L.J. 561, 596 (Apr. 2013); Herbert Hovenkamp, *Post-Sale Restraints and Competitive Harm: The First Sale Doctrine in Perspective*, 66 N.Y.U. Ann. Surv. Am. L. 487, 490 n.18 (2011) (noting *Mallinckrodt*, the basis of the "conditional sales" theory, "was subsequently overruled in *Quanta*"); Thomas G. Hungar, *Observations Regarding the Supreme Court's Decision in Quanta Computer, Inc. v. L.G. Electronics, Inc.* ("*Mallinckrodt*'s 'conditional sale' rationale is no longer good law.") 49 IDEA – Intell. Prop. L. Rev. 517, 533 (2009).

[18]   The Ninth Circuit found the Lexmark label was a valid contract under California unfair competition and false advertising law. That appellant neither challenged the validity of *Mallinckrodt* nor contended that Lexmark acted outside the scope of the patent grant. *Arizona Cartridge Remanufacturers Ass'n v. Lexmark Int'l Inc.*, 421 F.3d 981, 987 (9th Cir. 2005).

continues to rely in this appeal.[19] That rejection is evident when applying *Quanta*'s exhaustion rule to the facts of *Mallinckrodt*: the authorized sale to the hospitals would exhaust the patentee's right and render that downstream "single use only" use restriction unenforceable under patent law. Given that *Quanta* rejected the "conditional sales" theory at the heart of *Bizcom* and *Mallinckrodt*, the district court here correctly applied *Quanta*, not *Mallinckrodt*, to hold Lexmark's authorized sales exhausted its patent rights and precluded enforcement of post-sale use restrictions under patent law.

It also is irrelevant that *Quanta* did not reverse *Mallinckrodt* by name. *Quanta* reversed *Bizcom* also on the issue of exhaustion of method patents,[20] thereby overruling (though not by name) this Court's pre-*Bizcom* cases that held

---

[19] The brief of the United States in *Quanta* agreed *Mallinckrodt* could not be squared with Supreme Court precedents governing exhaustion. Brief for the United States as Amicus Curiae Supporting Petitioners, *Quanta Computer Inc. v. L.G. Elecs.* No. 06-937, at 20-24 (U.S., Nov. 2007), http://www.justice.gov/osg/briefs/2007/3mer/1ami/2006-0937.mer.ami.pdf. Even LGE's attorney conceded the inconsistencies between *Mallinckrodt* and Supreme Court precedents on exhaustion. *Quanta*, Tr. of Oral Arg. pp. 33-34 (Jan. 16, 2008), http://www.supremecourt.gov/oral_arguments/argument_transcripts/06-937.pdf.  While Lexmark points to this Court's subsequent citation of *B. Braun* and *Mallinckrodt* in *Princo Corp. v. Int'l Trade Comm'n*, 616 F.3d 1318 (Fed. Cir. 2010)(*en banc*), that case does not determine the outcome here. *Princo* concerns patent misuse in a patent pool license, not patent exhaustion upon authorized sales. References to exhaustion in that en banc opinion are dictum; notably, the panel opinion did not discuss exhaustion at all. *Princo Corp. v. Int'l Trade Comm'n*, 563 F.3d 1301 (Fed. Cir. 2009). *Princo* does not cite *Bizcom* or its reversal in *Quanta*, or attempt to distinguish *Quanta* in any way. Ultimately, *Quanta*—not *Princo* or *Mallinckrodt*—governs this case, and demonstrates why the district court's analysis remains correct.

[20] *See, LifeScan Scotland, Ltd., supra* note 8, at 8.

method patents could not be exhausted.[21] The same is true for *Mallinckrodt*'s "conditional sales" theory as applied to post-sale uses.

Finally, Lexmark erroneously contends the Sixth Circuit "abrogated" the district court's opinion finding exhaustion in *Static Control.* To the contrary, the Sixth Circuit <u>affirmed</u> the judgment against Lexmark on all patent law issues in that appeal. 697 F.3d at 395. The Sixth Circuit found it unnecessary to address exhaustion because the jury had found no inducement of infringement even under the legally-erroneous assumption, pre-*Quanta*, that post-sale use restrictions could prevent exhaustion.

### C.    The District Court Correctly Held the Return Program Does Not Affect the Authority to Sell.

Both district courts that reviewed Lexmark's claims held that Lexmark made authorized cartridge sales to its resellers and customers. Opinion A0014; *Static Control,* 615 F. Supp. 2d at 585. Lexmark does not appeal that finding as clearly erroneous. Thus, the district court correctly concluded that the Return terms are downstream post-sale use restrictions that are exhausted upon these authorized sales and cannot be enforced under patent law.

First, Lexmark's authorized sale occurs before purchasers purportedly accept the use restrictions. By its terms, a new "agreement" comes into existence *after* the sale, when a consumer opens the box or uses the cartridge: "Opening this package or using the patented cartridge inside confirms your acceptance of the following

---

[21] *See*, *Glass Equip. Dev., Inc. v. Besten*, *Inc.*, 174 F.3d 1337 (Fed. Cir. 1999); *Bandag Inc. v. Al Bolser's Tire Stores*, *Inc.*, 750 F.2d 903 (Fed. Cir. 1984).

license agreement." Lexmark Br. 8. Purchasers pay for and own full title to a cartridge before the box is opened or the cartridge is installed.[22] Thus, Lexmark's terms are a post-sale condition that does not pertain until after authorized sale to resellers or end-users.[23]

Second, Lexmark's terms address only post-sale *use* not the authority to *sell*. They purport to limit only what the end-user can do with a used cartridge; specifically, that a consumer wishing to recycle a used cartridge should return it to Lexmark.[24] Thus, the district court correctly concluded Lexmark's terms did not affect the authority to sell, and the Return Program post-sale use restriction, like the notices in *Bizcom* or *Mallinckrodt*, is unenforceable under patent law.

---

[22]  Ohio Rev. Code § 1302-42 (2012).  If a purchaser rejects the additional terms and returns the unopened box, title re-vests in the seller.  *Id.*, § 1302.42(D).

[23] *Accord, Static Control,* 615 F. Supp. 2d at 585:

> Sales of Lexmark Prebate cartridges were unconditional. Anyone could walk into a store carrying Lexmark Prebate cartridges and purchase one. Anyone could purchase Lexmark Prebate cartridges directly from Lexmark through its website. No potential buyer was required to agree to abide by the Prebate terms before purchasing a cartridge.

[24] Lexmark Br. 8 ("RETURN EMPTY CARTRIDGE TO LEXMARK FOR RECYCLING. … Following this initial use, you agree to return the empty cartridge only to Lexmark for recycling"). Lexmark amended the terms to address only recycling and not "remanufacturing." *Compare Static Control*, 697 F.3d at 396; *Static Control*, 615 F. Supp. 2d at 577 n.3. Under the current narrowed scope of the Return terms, remanufacturing would not be infringement even under Lexmark's theory.

## II.   PROPER INTERPRETATION OF THE EXHAUSTION DOCTRINE MAINTAINS SUPREME COURT PRECEDENTS DISTINGUISHING REPAIR FROM RECONSTRUCTION.

Lexmark spills much ink attempting to smear its competitors and their products as "hackers" selling "knock-offs." The courts have ruled to the contrary: aftermarket competitors engage in lawful repair, and provide consumers with high quality products and services at competitive prices. Inherent in the district court's conclusion of noninfringing exhaustion is that the defendants engage in lawful repair. *Static Control* explicitly held that remanufacture of used Lexmark cartridges constituted lawful repair, not infringing reconstruction—a holding Lexmark did not appeal.[25] Moreover, the marketplace has spoken for the quality of replacement cartridges. Acquisition guidelines of federal agencies, state and municipal governments, and corporations express preferences for purchase of refurbished and recycled products.[26] In all likelihood, the printers used by this Court run on remanufactured toner cartridges such as those produced by members of the *amici*.

The doctrine of noninfringing repair is nearly as old as the American industrial revolution. "Since [1850], it has been the established law that a patentee

---

[25] *Id.*, 487 F. Supp. 2d 830 (E.D. Ky. 2007). Following the first appeal in *Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 387 F.3d 522 (6th Cir. 2004), the district court granted summary judgment that Static Control's manufacture and sale of replacement computer chips for Lexmark cartridges was lawful under Title 17 of the U.S. Code. Lexmark never alleged Static Control's chips infringed any Lexmark patents.

[26]   *See* 40 C.F.R. § 247.11 (2012); U.S. Environmental Protection Agency, *Comprehensive Procurement Guidelines – Toner Cartridges*, http://www.epa.gov/osw/conserve/tools/cpg/ products/nonpaperoffice.htm#toner (last visited Nov. 3, 2014).

18

has not 'a more equitable right to force the disuse of the machine entirely, on account of the inoperativeness of a part of it, than the purchaser has to repair, who has, in the whole of it, a right of use.'"[27] Permissible repair has been found across the breadth of commerce, including automobiles,[28] surfboards,[29] medical devices,[30] injection molding machines,[31] cooking devices,[32] disposable cameras,[33] and computer printers.[34]

In *Aro*, the Supreme Court distinguished permissible repair from infringing reconstruction. "Mere replacement of [broken or worn-out] parts, whether of the same part repeatedly or of different parts successively, is no more than the lawful

---

[27] *Heyer v. Duplicator Mfg. Co.*, 263 U.S. 100, 101 (1923) (machine owner could buy replacement bands other than from patent owner), citing *Wilson v. Simpson,* 50 U.S. (9 How.) 109, 123 (1850) (owner of a patented planing machine could replace worn-out cutting blades).

[28] *See Aro Mf'g Co. v. Convertible Top Replacement Co. 365 U.S. 336 (1961)* (replacement fabric convertible tops); *Dana Corp. v. Am. Precision Co., Inc.,* 827 F.2d 755 (Fed. Cir. 1987) (rebuilding automobile clutches using new parts and used parts from many disassembled worn clutches).

[29] *Surfco Hawaii v. Fin Control Sys. Pty. Ltd.*, 264 F.3d 1062 (Fed. Cir. 2001), *cert. denied sub nom. Fin Control Sys. Pty. Ltd. v. Surfco Hawaii*, 536 U.S. 939 (June 24, 2002) (replacing fins).

[30] *Kendall Co. v. Progressive Med. Tech.,* 85 F.3d 1570, 1576 (Fed. Cir. 1996) (replacement of unspent parts for purposes of hygiene).

[31] *Husky Injection Molding Sys. v. R&D Tool & Eng'g*, 291 F.3d 780 (Fed. Cir. 2002). (injection molding systems).

[32] *Bottom Line Mgt., Inc. v. Pan Man, Inc*., 228 F.3d 1352, 1355 (Fed. Cir. 2000) (resurfacing cooking plates).

[33] *Jazz Photo Corp. v. Int'l Trade Comm'n*, 264 F.3d 1094, 1098-99 (Fed. Cir. 2001) (approving eight-step repair process).

[34] *Hewlett-Packard Co. v. Repeat-O-Type Stencil Mfg. Corp.*, 123 F.3d 1445 (Fed. Cir. 1997), *cert. denied*, 523 U.S. 1022 (1998) (modifying ink jet cartridges for resale).

19

right of the owner to repair his property"; and such replacement constitutes lawful repair regardless of how "essential [each nonpatented part] may be to the patented combination and no matter how costly or difficult replacement may be." *Id.,* 365 U.S. at 345-346. This distinction protects the patent owner against only those who re-make the invention anew,[35] while promoting the paramount public interest in commerce pertaining to patented goods.

### A.    Lexmark's Narrow View of the Patent Exhaustion Doctrine Thwarts the Public's Right to Repair.

Automotive parts businesses commonly repair hundreds of reusable parts (*e.g.*, transmissions, alternators, brakes, clutches, and controlled velocity joints), and repair shops customize and upgrade car engines using aftermarket parts. Suppliers in the imaging industry repair toner and ink-jet cartridges for business and home office use with specialized mechanical parts and computer chips that regulate and upgrade printing operations. Consumers upgrade computers by adding storage, memory, and graphics processing and gaming boards. Consumers benefit from this competition through lower prices, higher quality, and competitive features.

The thousands of businesses that customize and repair products and supply replacement parts, including those represented by *amici*, provide vital services to the domestic economy.  But they need bright-line rules to avoid the "disastrous or even lethal consequences" of patent infringement suits:

---

[35]  *See Wilbur-Ellis Co. v. Kuther*, 377 U.S. 422, 424 (1964) ("'reconstruction' in this context has the special connotation of those acts which would impinge on the patentee's right 'to exclude others from making,' 35 U.S.C. 154, the article.").

20

[B]usinessmen are certainly entitled to know when they are committing an infringement.… But to what avail these congressional precautions if this Court, by its opinions, would subject small businessmen to the devastating uncertainties of nebulous and permissive standards of infringement under which courts could impose treble damages upon them….[36]

The patent exhaustion doctrine preserves the right to repair against unlawful anticompetitive restraints. Lexmark's attempt to revive the "conditional sales" doctrine trammels the rights of a patentee's competitors and the public to repair patented articles and replace unpatented components. Preserving the right to repair provides another reason to give *Quanta* its full effect, and to affirm the district court's holding of patent exhaustion.

## B.   The "Conditional Sales" Cases Create Continued Uncertainty in the Courts and the Marketplace, a Trend This Court Should Reverse.

Predictably,[37] the sea change worked by *Mallinckrodt* spawned more intrusive efforts by patent owners to stymie aftermarket competition. *Quanta* should have laid all those concerns to rest. But Lexmark has continued to argue for patent-based intrusions upon lawful repair, to the detriment of consumers and competition.[38]

---

[36]  *Aro*, 365 U.S. at 358-359 (Black, J., concurring).
[37]  *See Dawson Chem. Co. v. Rohm & Haas Co.*, 448 U.S. 176, 190 (1980), describing the rapid adoption of conditional licensing, and the ensuing corrosive effects on commerce arising from *Henry v. A.B. Dick Co.* – a result promptly reversed by the Court in *Motion Picture Patents,* 243 U.S. at 515.
[38] *See also, Keurig v. Sturm Foods*, 732 F.3d at 1374 (describing attempted restriction on use of competing coffee cartridges as an "end-run around exhaustion").

21

Post-sale use restrictions like Lexmark's block the wheels of commerce. Repair and supplies businesses can use patents to evaluate whether their activities constitute repair and not reconstruction, but cannot know whether products and components are subject to post-sale restrictions. As this Court's decisions illustrate, even where articles are marked with a restrictive legend nearly identical to the notice in *Mallinckrodt*, the mere existence of such a "notice" does not make it *per se* valid or enforceable at law.[39] Regardless of whether consumers and aftermarket competitors actually see purported post-sale restrictions, they cannot know whether or how those terms affect their right under patent law to repair devices they lawfully own. Yet, Lexmark's argument would subject these consumers and businesses to liability for patent infringement.

Such attempts to invoke patent law to impose post-sale use restrictions should be considered null and void, and in certain cases patent misuse.[40] But until this issue is settled, those who supply and repair products with replaceable parts will unjustly be subjected to threats of infringement litigation, and consumers will bear the costs of this market confusion sown by the patent owner.

---

[39] *See, e.g., Kendall Co. v. Progressive Med. Tech. Inc.*, 85 F.3d at 1575 (finding permissible repair by replacing with aftermarket parts a pressure sleeve sold in packaging marked "FOR SINGLE PATIENT USE ONLY"); *Sage Prods. Inc. v. Devon Indus. Inc.*, 45 F.3d 1575, 1578 (Fed. Cir. 1995) (finding repair by aftermarket replacement of used, but not spent, containers marked "single use only").

[40] *Cf. Omega, S.A. v. Costco Wholesale Corp.*, CV 04-05443 TJH, 2011 WL 8492716 (E.D. Cal. Nov. 9, 2011) (Order and J.) (granting summary judgment, on remand of case involving copyright first sale doctrine, that plaintiff committed copyright misuse by engraving a copyrighted image on the reverse of a watch solely to enforce against unauthorized importation).

Aftermarket competitors need a bright-line test for exhaustion to stimulate investment and promote lawful commerce. If suppliers and servicers—including many small, family-owned enterprises—cannot reasonably assess risks associated with their business plan, then the threat of patent litigation, increased damages, attorney fee awards, and injunctions will stifle investment and chill competition. *Quanta* supplies that clear test:  post-sale restrictions sound only in contract, and as such business owners can compete in the repair and customization aftermarkets with confidence. Affirmance of the Supreme Court's long-standing patent exhaustion rule will provide needed certainty to aftermarket repair industries, promote consumer benefits from competition in the supplies market, and reduce the risk of unwarranted patent infringement litigation–without depriving the patent owner of remuneration from the authorized sale.

## III.  PROPER INTERPRETATION OF THE EXHAUSTION DOCTRINE MAINTAINS CRUCIAL ANTITRUST LAW REMEDIES AGAINST ANTICOMPETITIVE CONDUCT.

Affirming the district court's opinion also preserves the equilibrium between patent and antitrust law. A patent "by its very nature is anticompetitive";[41] in effect, a limited monopoly to exclude others from manufacture, use, and sale of an invention.[42] As an exception to policies favoring free competition, the right to

---

[41]  *In re Ciprofloxin Hydrochloride Antitrust Litig.*, 544 F.3d. 1323, 1333 (Fed. Cir. 2008).  *Accord, Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 816 (1945) ("a patent is an exception to the general rule against monopolies and to the right to access to a free and open market").

[42]  *Illinois Tool Works Inc. v. Indep. Ink, Inc.,* 547 U.S. 28, 44 (2006), quoting *Int'l Salt Co. v. U.S.*, 332 U.S. 392, 395 (1947).

exclude should be construed to the limits of patent law, but no further. "Since patents are privileges restrictive of a free economy, the rights which Congress has attached to them must be strictly construed so as not to derogate from the general law beyond the necessary requirements of the patent statute."[43]

Lexmark's attempt to override patent exhaustion through post-sale conditions, after full title to the articles passes to the purchaser, impermissibly constrains the operation of antitrust law. It condones the exclusion of otherwise-lawful competition and eliminates antitrust remedies against a patentee's otherwise-unlawful conduct.[44] If post-sale conditions may be enforced under only contract law, a patent owner remains free to remedy breaches of a valid agreement, but cannot raise patent law to shield its anticompetitive conduct.

To illustrate the significance of the patent exemption in the antitrust context, consider the result in another case involving aftermarket services in the reprographics industry. In *Image Technical Services v. Eastman Kodak*, Kodak adopted policies to deprive independent companies of parts needed to compete for printer repair services. The Ninth Circuit recognized that a patentee's right to

---

[43] *U.S. v. Masonite Corp.,* 316 U.S. 265, 280 (1942) (citing *Univis Lens,* decided the same day); *see also, Simpson v. Union Oil Co. of Cal.,* 377 U.S. 13, 24 (1964) ("The patent laws which give a 17-year monopoly on 'making, using, or selling the invention' are *in pari materia* with the antitrust laws and modify them *pro tanto*"); *Square D Co. v. Niagara Frontier Tariff Bureau,* 476 U.S. 409, 421 (1986) (exemptions from antitrust laws are "strongly disfavored").

[44] *See Image Technical Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1216 (9th Cir. 1997) ("Nor does the right of exclusion [under patent law] protect an attempt to extend a lawful monopoly beyond the grant of a patent.").

exclude others could presumptively justify restrictive business practices, but Kodak's assertion of that justification was subjectively pretextual. Protecting patent rights played no part in Kodak's actual decision to withhold sales of parts, and that sales ban applied to thousands of parts though only 65 were patented. 125 F.3d at 1219-1220.[45] Accordingly, the Ninth Circuit held, hypothetical patent justifications do not prevent liability for actual anticompetitive conduct. Lexmark's "conditional sales" theory would revive that same conflict with antitrust law.

Post-sale use restrictions may further the pecuniary interests of the patent owner, but profit maximization is not the ultimate aim of the patent laws.[46] Just as *Quanta* precludes patent owners from seeking multiple royalties on the same articles, Lexmark cannot rewrite its rules of exhaustion to eliminate competition for aftermarket supplies. Lexmark's attempt to constrain patent exhaustion would override antitrust safeguards, with no countervailing benefit to competition or the public interest.

## IV.    A CLEAR PATENT EXHAUSTION RULE REMAINS ESSENTIAL TO ROBUST COMMERCE.

The previous sections showed how Lexmark's argument steers the "conditional sales" doctrine on a collision course with the law of patent exhaustion,

---

[45]    Kodak had not claimed its exclusive patent right as justification for its conduct when it initially sought summary judgment against ISOs. *See Eastman Kodak,* 504 U.S. at 461; *ISO Antitrust Litig.,* 203 F.3d 1322, 1327 (Fed. Cir. 2000).

[46]    *See*, *e.g.*, *Motion Picture Patents Co.*, 243 U.S. at 510-511. *Cf. Kirtsaeng,* 133 S. Ct. at 1370-1371 ("no basic principle of copyright law" entitles copyright owners to discriminatorily price in different geographic markets).

permissible repair, and antitrust. But given the omnipresence of patented articles in today's society, re-affirming *Quanta*'s clear rule is equally as vital to modern commerce. Ecommerce facilitates consumer opportunities to resell and repair their goods. Used products from small auto parts to cars and trucks are sold and resold directly to other consumers through ecommerce sites such as ebay.com and Craig's List. Post-sale restrictions that divest consumers of their right to repair or resell the articles they lawfully purchase ripple through this downstream economy. They also deprive consumers of point-of-purchase information as to the costs of repair and upgrade, further abetting unfair competition over sound economic policy. Total cost information in the hands of the purchaser supports robust competition in both primary markets and aftermarkets, while imperfect information tends to be exploited by would-be monopolists.[47]

As a matter of public policy, lawful aftermarket commerce thrives only if the patent exhaustion doctrine leaves room for robust competition, where consumers and competitors can know in advance whether their conduct is lawful.  Any other result discourages investment in noninfringing complementary products and services, and denies consumers the benefits of fair and open competition: lower prices and innovation.

From the mid-19th century through *Quanta*, the Supreme Court defined in the exhaustion doctrine a clear demarcation between patent rights and commercial

---

[47]  *See Eastman Kodak,* 504 U.S. at 473-476 (describing how the inability to ascertain total cost of ownership at the time of purchase renders end users vulnerable to supracompetitive pricing).

freedom. Businesses and consumers will benefit from reaffirmation of the Supreme Court's bright-line rule that patent rights cannot be revived by post-sale conditions.

## CONCLUSION

The district court's holding of patent exhaustion should be affirmed.

Dated: November 19, 2014                    Respectfully submitted,


                                            /s/ Seth D. Greenstein
                                            Seth D. Greenstein
                                            CONSTANTINE CANNON, LLP
                                            1001 Pennsylvania Avenue, N.W.
                                            Suite 1300N
                                            Washington, D.C. 20004
                                            202.204.3500

                                            Attorneys for *Amicus Curiae*
                                            International Imaging Technology Council,
                                            Auto Care Association, and Automotive
                                            Parts Remanufacturers Association

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,976 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

/s/ Seth D. Greenstein
SETH D. GREENSTEIN
CONSTANTINE CANNON LLP
1001 Pennsylvania Ave., N.W.
Suite 1300N
Washington, D.C. 20004
(202) 204-3500

*Counsel for Amicus Curiae*

November 19, 2014

# CERTIFICATE OF SERVICE

I certify that on November 19, 2014 the foregoing Corrected document was

served on all parties or their counsel of record through the CM/ECF system.

/s/ Seth D. Greenstein
_____
SETH D. GREENSTEIN
CONSTANTINE CANNON LLP
1001 Pennsylvania Ave., N.W.
Suite 1300N
Washington, D.C. 20004
(202) 204-3500

*Counsel for Amicus Curiae*

November 19, 2014