Nos. 14-1617, -1619

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

LEXMARK INTERNATIONAL, INC.,

*Plaintiff-Cross Appellant*,

v.

IMPRESSION PRODUCTS, INC.,

*Defendant-Appellant,*

QUALITY CARTRIDGES, INC., JOHN DOES, 1–20, BLUE TRADING LLC, EXPRINT INTERNATIONAL, INC., LD PRODUCTS, INC., PRINTRONIC CORPORATION, TESEN DEVELOPMENT (HONG KONG) CO. LTD., BENIGNO ADEVA AND HIS COMPANIES,

*Defendants.*

Appeals from the United States District Court for the
Southern District of Ohio in Case No. 10-CV-564
Judge Michael R. Barrett

## REPLY BRIEF OF PLAINTIFF-CROSS APPELLANT
## LEXMARK INTERNATIONAL INC.

TIMOTHY C. MEECE
V. BRYAN MEDLOCK, JR.
JASON S. SHULL
AUDRA C. EIDEM HEINZE
BANNER & WITCOFF, LTD.
Ten South Wacker Drive
Chicago, IL 60606
Telephone: (312) 463-5420
Facsimile:  (312) 463-5720
tmeece@bannerwitcoff.com

STEVEN B. LOY
STOLL KEENON OGDEN PLLC
300 W. Vine Street
Lexington, KY 40507

CONSTANTINE L. TRELA, JR.
SIDLEY AUSTIN LLP
One South Dearborn St.
Chicago, IL 60603
Telephone: (312) 853-7293
Facsimile: (312) 853-7036
ctrela@sidley.com

BENJAMIN J. BEATON
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005

*Counsel for Lexmark International, Inc.*

# CERTIFICATE OF INTEREST

Counsel for Plaintiff-Cross Appellant certifies the following:

1.      The full name of every party represented by me is:

Lexmark International, Inc.

2.      The name of the real party in interest represented by me is:

Lexmark International, Inc.

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None

4.      The names of all law firms and the partners or associates who appeared for Lexmark International, Inc. in proceedings before the United States District Court for the Southern District of Ohio, or are expected to appear in this Court, are:

SIDLEY AUSTIN LLP
Constantine L. Trela, Jr., Benjamin J. Beaton

BANNER & WITCOFF LTD
Timothy C. Meece, V. Bryan Medlock, Jason S. Shull, Audra C. Eidem Heinze, Matthew P. Becker, Neil C. Trueman

STOLL KEENON OGDEN PLLC
P. Douglas Barr, William J. Hunter, Jr., Steven B. Loy, Anthony J. Phelps


DATE: Dec. 15, 2014                    /s/ Constantine L. Trela, Jr.
                                       CONSTANTINE L. TRELA, JR.

## TABLE OF CONTENTS

CERTIFICATE OF INTEREST ..................................................................i

TABLE OF AUTHORITIES ................................................................ iii

INTRODUCTION ..............................................................................1

ARGUMENT ......................................................................................3

I.      Lexmark's Single-Use Sales Agreements Do Not Exhaust Its Patent
        Rights ...................................................................................3

        A.      The Law of this Circuit Clearly Allows Lexmark's Limited-Use
                Licenses ...............................................................3

        B.      *Quanta* Did Not Silently Overrule *Mallinckrodt* and *General Talking
                Pictures* ..............................................................9

II.     Impression's *Amici*'s Policy Concerns Are Misplaced .................................16

CONCLUSION ....................................................................................24

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page**

C<small>ASES</small>

*B. Braun Med., Inc. v. Abbott Labs.*,
124 F.3d 1419 (Fed. Cir. 1997) ............................................................4

*Conforto v. Merit Sys. Prot. Bd.*,
713 F.3d 1111 (Fed. Cir. 2013) ............................................................8

*Ergowerx Int'l LLC v. Maxell Corp. of Am.*,
18 F. Supp. 3d 430 (S.D.N.Y. 2014) ..................................................12

*Gen. Talking Pictures Corp. v. W. Elec. Co.*,
304 U.S. 175 (1938)....................................................................14, 18

*Jazz Photo Corp. v. ITC*,
264 F.3d 1094 (Fed. Cir. 2001) ............................................................6

*LG Elecs., Inc. v. Bizcom Elecs., Inc.*,
453 F.3d 1364 (Fed. Cir. 2006), *rev'd sub nom. Quanta Computer, Inc. v.
LG Elecs., Inc.*, 553 U.S. 617 (2008)..................................................13

*LifeScan Scotland Ltd. v. Shasta Techs. LLC*,
734 F.3d 1361 (Fed. Cir. 2013) ............................................................4

*Mallinckrodt, Inc. v. Medipart, Inc.*,
976 F.2d 700 (Fed. Cir. 1992) ................................................1, 3, 5, 6

*Mitchell v. Hawley*,
83 U.S. (16 Wall.) 544 (1872)............................................................16

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*,
324 U.S. 806 (1945)............................................................................17

*Princo Corp. v. ITC*,
616 F.3d 1318 (Fed. Cir. 2010) ..............................................4, 5, 21

*Quanta Computer, Inc. v. LG Elecs., Inc.*,
553 U.S. 617 (2008).........................................................1, 10, 11, 13

*Rodriguez de Quijas v. Shearson/American Express, Inc.*,
    490 U.S. 477 (1989) ............................................................................. 15

*Troy v. v. Samson Mfg. Corp.*,
    758 F.3d 1322 (Fed. Cir. 2014) ...................................................... 1, 9

## SCHOLARLY AUTHORITY

Yina Dong, *A Patent Exhaustion Exposition: Situating* Quanta v. LGE *in the
    Context of Supreme Court Jurisprudence*, 2010 Stan. Tech. L.
    Rev. N2 ................................................................................. 15, 16, 20

# INTRODUCTION

Appellant Impression Products and its *Amici* do not dispute that, under the law of this Circuit, patent rights are not exhausted when products are sold subject to contractual use restrictions that do not expand the scope of the patent. *See Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700 (Fed. Cir. 1992). Nor do Impression or its *Amici* attempt to distinguish Lexmark's sale of single-use toner cartridges from the sale of single-use medical devices in *Mallinckrodt*. *Id.* at 702. They identify no antitrust or contract-law violation that might render *Mallinckrodt*'s rule inapplicable here. And they accept that this rule of Circuit law applies unless it is "clearly irreconcilable" with Supreme Court authority. *Troy v. v. Samson Mfg. Corp.*, 758 F.3d 1322, 1326 (Fed. Cir. 2014).

Thus, Lexmark's cross-appeal turns on a single question: is this Court's *Mallinckrodt* decision clearly irreconcilable with the Supreme Court's decision in *Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617 (2008)? Certainly, they are readily distinguishable: *Mallinckrodt*, like this case, addressed a restricted sale, while *Quanta* concerned an unrestricted sale. And, in fact, the two decisions are perfectly consistent. Both recognize that an authorized, unconditional sale exhausts patent rights, but that a contractually restricted sale does not. Despite the efforts of Impression and its *Amici* to muddy the waters, neither can change the undisputed and *stipulated* fact that, in this case, Lexmark sold its toner cartridges

subject to contracts that limited those cartridges to a single use. Impression, therefore, cannot raise exhaustion as a defense to infringement liability for its unauthorized remanufacture and resale of Lexmark's single-use cartridges.

Impression's *Amici*, however, refuse to accept this case for what it is. Their brief repeatedly mischaracterizes the facts of the Return Program and the nature of Lexmark's arguments. Contrary to *Amici*'s insinuations, a ruling in Lexmark's favor would not limit existing antitrust remedies, or restrict other parties' right to lawfully repair purchased goods, or spawn unwitting infringement liability among consumers. None of these concerns is implicated by the facts of this case — and if the pernicious effects of limited-use licenses are as pervasive as *Amici* imply, they will surely manifest themselves in other cases subject to this Court's review.

In this case, however, the rule set forth in *Mallinckrodt* merely recognizes the rights of parties to tailor their transactions to define the precise scope of any patent rights transferred in a given sale. The parade of horribles imagined by *Amici* hardly cries out for this Court's intervention — certainly not where *Amici* have identified no countervailing efficiencies or competition benefits that would justify restricting the freedom of parties like Lexmark and its Return Program resellers and users to contract *within* the scope of the patent grant. Any concerns rooted in antitrust and contract law are already accounted for in this Circuit's exhaustion case law, which plainly controls this case.

## ARGUMENT

### I.    Lexmark's Single-Use Sales Agreements Do Not Exhaust Its Patent Rights.

#### A.    The Law of this Circuit Clearly Allows Lexmark's Limited-Use Licenses.

Lexmark's Opening Brief explained how the law of this Circuit and the undisputed facts of this case compel the conclusion that sales under the Lexmark Return Program do not exhaust Lexmark's patent rights in Return Program cartridges.  The responses — or lack thereof — to Lexmark's Opening Brief are telling.  Impression and its *Amici* leave unchallenged most of Lexmark's arguments: the applicability of *Mallinckrodt*'s conditional-sales rule, the absence of antitrust grounds for avoiding that rule, the contractual requirement that Lexmark resellers offer Return Program cartridges only subject to the single-use restriction, and the high threshold for treating controlling precedent as tacitly overruled.  In conceding these critical points (as they must), Impression and its *Amici* reveal the narrow and straightforward nature of the question before this Court.

1.    No party disputes that, under the law of this Circuit, "the sale of patented goods, like other goods, can be conditioned" on compliance with a "single use" restriction. *Mallinckrodt*, 976 F.2d at 706.  So long as such conditions are

embodied in a valid contract, and do not expand the scope of the patent, exhaustion does not follow from such a restricted sale.  (*See* Lexmark Br. 22–23.)

This Court has therefore declined to bar parties from bargaining for and transferring limited use rights, inferring reasonably that a "negotiated price reflects only the value of the 'use' rights conferred by the patentee." *Princo Corp. v. ITC*, 616 F.3d 1318, 1328 (Fed. Cir. 2010) (en banc).  Thus, the "'exhaustion' doctrine does not apply … to a conditional sale or license." *Id.  See also LifeScan Scotland Ltd. v. Shasta Techs. LLC,* 734 F.3d 1361, 1375 n.8 (Fed. Cir. 2013) (distinguishing between an "unconditional transfer of ownership as opposed to a conditional sale or license" for purposes of exhaustion); *B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1426 (Fed. Cir. 1997) ("an expressly conditional sale" subject to a "'restrictive license'" did not exhaust the seller's patent rights).

Neither Impression nor its *Amici* deny that *Mallinckrodt,* by its terms, applies.  Nor can they explain away the recent and on-point decisions of this Court discussed in Lexmark's Opening Brief (at 23, 25–26).[1]  They accept, as they must,

---

[1] *Amici* characterize *Princo* as "not determin[ative]" in this case because that *en banc* decision addressed exhaustion in the context of a patent-pool license rather than an authorized sale.  (*Amicus* Br. 15 n.19.)  *Amici*'s footnote offers no reason, principled or otherwise, why limited-use licenses might be permissible in the context of the pool license agreements at issue in *Princo,* which required licensees to pay royalties, but not in the context of the sales agreements at issue here and in *Mallinckrodt.*  616 F.3d at 1322–23.  *Amici* also fault the *en banc* Court for failing to distinguish *Quanta,* but as discussed below (*see infra* at 9–16), that is because *Quanta*'s holding that license restrictions must be embodied in a binding contract

that the rule of *Mallinckrodt* applies to contracts like Lexmark's that transfer less than all of the rights to a particular patented item.  (*See* Impression Response Br. 5–6 ("*Mallinckrodt* purported to hold that attempts to restrict the use of patented products, sold in the ordinary stream of commerce, were enforceable."); *see also Amicus* Br. 14–15 (describing "conditional sales" theory of *Mallinckrodt*).)

2.     Nor is there any allegation that Return Program sales fall outside the rule of *Mallinckrodt* because they extend the scope of the patent.  976 F.2d at 708. A restrictive license may harm competition by, for example, requiring the consumer to use unpatented items in conjunction with the patented product.  *See id.* at 704–05 (discussing *Motion Picture Patents Co. v. Universal Film Mfg. Co.*, 243 U.S. 502, 515–16 (1917)).  If such a restriction enlarges the scope of the patent *and* produces unreasonable anticompetitive effects, it would not be given effect under this Circuit's exhaustion doctrine.  *Id.* at 708–09.  (*See infra* at 17–18.)

But, as Lexmark explained, this case involves no purported anticompetitive conduct.  (*See* Lexmark Br. 29–30.)  Nor could such a claim plausibly be leveled at Lexmark, which lacks market power, offers both single- and unlimited-use cartridges, and does not "leverage" the patents at issue in the Return Program license for any other price or product considerations.  (*Id. at* 30.)  Indeed,

---

is perfectly consistent with the binding licensing agreements at issue in *Princo*, *see* 616 F.3d at 1323, 1327–28.

Impression has stipulated that Lexmark customers have advance notice of the

Return Program and the option to choose an unlimited-use cartridge instead.  (*Id.* at

29 n.7.)  And the *Amici*, though insinuating an improper anticompetitive purpose

on the part of Lexmark (*see Amicus* Br. 24), nowhere contend that Return Program

licenses are actually expanding the scope of Lexmark's patents.  Therefore, no

antitrust considerations alter the applicability of *Mallinckrodt* to Lexmark's Return

Program.

    3.    Likewise, no contract-law considerations are before the Court.  An

authorized, *unrestricted* sale would clearly exhaust patent rights in a transferred

product.  *See, e.g., Mallinckrodt*, 876 F.2d at 709.  Similarly, a license restriction

that does not amount to a contractual obligation would not prevent exhaustion.

*See, e.g., Jazz Photo Corp. v. ITC*, 264 F.3d 1094, 1107–08 (Fed. Cir. 2001).

    It is clear, however, that Lexmark's single-use license restrictions *are*

imposed as a condition of its sales agreements with its customers — both resellers

and end users alike.  (*See* Lexmark Br. 7–9, 31–32.)  Impression agrees, and indeed

stipulated, that Lexmark sells Return Program cartridges to authorized resellers

under "an express and enforceable contract" "that bind[s] each [reseller] to the

Return Program condition," and to end-user customers "subject to express

contractual conditions and a conditional single-use license for which Lexmark

receives reduced compensation."  (A2559(¶ 8); A2562–64(¶¶ 16–23)).)  And the

U.S. Court of Appeals for the Ninth Circuit, as well as the U.S. District Court for the Eastern District of Kentucky, have each sustained Return Program agreements against charges of contractual invalidity.  (Lexmark Br. 8–9.)  There is no question but that Lexmark's licenses satisfy the contractual prerequisites of the *Mallinckrodt* rule.[2]

Despite the parties' agreement on this point, Impression's *Amici* ignore the stipulation and contend that Lexmark operated without contracts that bound authorized resellers to the Return Program terms.  (*See Amicus* Br. 10 ("initial sales were authorized and *unrestricted*") (emphasis added); *id.* at 17 ("Lexmark's terms address only post-sale *use* not the authority to *sell*.") (emphases in original).)  This is wrong, and obviously so.  Lexmark's Opening Brief described in detail how the district court made the same mistake of fact, which caused the parties to enter into the stipulation that governs this case.[3]  The Return Program is a restriction on both

---

[2] Impression is wrong to characterize the Return Program as a restriction on use only, and not a condition of sale.  (*See* Impression Response Br. 5 ("post sale label license use restrictions"); *see also Amicus* Br. 7 ("post-sale use restrictions").)  The single-use restriction — a combination patent license and contract — is a term of sale and, indeed, inherent in the product itself.  (*See infra* at 21.)

[3] *See* Lexmark Br. 16:

> The district court's [initial] opinion rested on its (mistaken) understanding that Lexmark resellers possess blanket authority to sell Return Program cartridges without restriction on their subsequent use…. Both Lexmark and Impression, however, recognized that the district court had misunderstood the facts concerning Lexmark's domestic sales, and that Lexmark's contracts and licenses did in fact restrict the resale of Return Program

use and sale, and Lexmark's authorized resellers and end-user customers agreed to contracts incorporating the Return Program terms. *Amici*'s mischaracterization of these facts has no impact on the validity and effectiveness of Lexmark's actual agreements.[4]

4.    Thus, *Mallinckrodt*'s no-exhaustion rule plainly applies to this case as a matter of fact[5] and Circuit law. That precedential decision, and the many decisions that have applied its holding (*see supra* at 4), bind this Court, just as they bound the district court below. Lexmark's Opening Brief explained that courts "may not disregard" controlling precedent unless "'the circuit's precedent is expressly overruled by statute or by a subsequent Supreme Court decision.'" (Lexmark Br. 19–20 (quoting *Strickland v. United States*, 423 F.3d 1335, 1338 n.3 (Fed. Cir. 2005)).) Absent subsequent Supreme Court authority that "bear[s] on the precise question" at issue, *Conforto v. Merit Sys. Prot. Bd.*, 713 F.3d 1111, 1119 (Fed. Cir. 2013), or stands in "clearly irreconcilable" conflict with applicable

---

cartridges….[T]he parties submitted a joint motion asking the court to supplement the record with stipulated facts [which the court did].

*See also id.* at 31–32 (describing district court's mistaken view of the facts); A34–35 (excising erroneous sentences from initial district court opinion).

[4] Impression's *Amici* also object that Lexmark did not "contest these [district court] findings as clearly erroneous." (*Amicus* Br. 10; *cf. id.* at 17 n.23.) This makes no sense. There was nothing for Lexmark to contest in light of the district court's acceptance of the stipulation on reconsideration, which struck the erroneous statements from the court's order. (*See* Lexmark Br. 32 (citing A34–35).)

[5] *See* Impression Response Br. 2 ("The facts in this case are not in dispute.").

law of the Circuit, *Troy*, 758 F.3d at 1326, that authority continues to govern

unless overturned by this Court sitting *en banc*.

Neither Impression nor its *Amici* challenge the "clearly irreconcilable"

standard.  Impression, in fact, acknowledges its applicability in the context of its

own appeal.  (*See* Impression Response Br. 7 ("[T]he decision in *Jazz Photo* is in

fact clearly irreconcilable with the Supreme Court decision in *Kirtsaeng*….").)

Thus, this panel need not (indeed cannot) treat the exhaustion question as open for

*de novo* consideration or reconsideration, but must apply the law of this Circuit

absent direct conflict with subsequent Supreme Court authority.

## B. *Quanta* Did Not Silently Overrule *Mallinckrodt* and *General Talking Pictures*.

Because *Mallinckrodt* so clearly applies, only one question remains for this

Court: Whether *Quanta* tacitly overruled *Mallinckrodt*.  As explained in Lexmark's

Opening Brief (at 32–36), the Supreme Court's decision in *Quanta* is entirely

consistent with this Court's exhaustion case law, which itself simply reflects the

Supreme Court's own longstanding precedents.  The only disagreement between

this Court and the Supreme Court in *Quanta* concerned the meaning of the specific

contracts at issue there — not the legal rule that governed them.

Impression and its *Amici*, however, see in *Quanta* something much broader:

a blanket patent-law rule against *all* post-sale use restrictions, regardless of the

terms under which a product was licensed and sold.  On this view, any use

9

restriction that affects a product "in the ordinary stream of commerce" (Impression Response Br. 4–6), or that follows an "authorized sale" (*Amicus* Br. 8),[6] is without effect. The law of exhaustion, according to Impression and its *Amici*, rests on a supposedly bright-line distinction between restrictions on sales and restrictions on usage.

This expansive reading cannot be right. It ignores the Supreme Court's reasoning in *Quanta* — almost all of which would be rendered pure surplusage by the approach advanced by Impression and its *Amici*. And it cannot be reconciled with other Supreme Court precedent that *Quanta* treated as good law.

1.     *Quanta* concerned agreements between a patentee, LGE, and its licensee, Intel, that authorized Intel to practice LGE's patents in making and selling computer chips. 553 U.S. at 623. (*See* Lexmark Br. 33–34.) The agreements, as interpreted by the Supreme Court, did not restrict Intel's ability to sell LGE products, so long as Intel gave notice to its customers that they were not licensed to combine Intel-LGE products with non-Intel products. 553 U.S. at 623–

---

[6] Impression accuses Lexmark of trying to hide the ball by omitting what Impression considers the key phrase: "ordinary stream of commerce." This is peculiar, because those words appear, in quotation marks, in the first sentence of Lexmark's first argument. (Lexmark Br. 22.) Impression's *Amici* similarly disparage Lexmark's use of a term — "unrestricted sales" — "never once used" in *Quanta*. (*Amicus* Br. 10 (emphasis omitted).) Yet they note, only a few lines later, that the district court, quite properly, equated "authorized" and "unrestricted."

24.  When Intel customer Quanta produced just such a combination, LGE sued for infringement, and Quanta raised exhaustion as a defense.

As explained in Lexmark's Opening Brief (at 34–36), the Supreme Court's resolution of the exhaustion question focused expressly and exclusively on whether the restriction against combining LGE and non-Intel products was a binding condition of the parties' agreements.  *Quanta* did not call into question the *Mallinckrodt* line of cases, and indeed reaffirmed that an "authorized" and "unconditional sale" was necessary to exhaust LGE's patent rights.  553 U.S. at 625–26.  Under this framework, the Court interpreted the LGE-Intel agreements *not* to impose this prohibition as a condition of Intel's license.  As a matter of contract interpretation, the question of exhaustion "turn[ed] … on Intel's own license."  *Id.* at 637.  The Court explained, in language quoted, but not understood, by Impression's *Amici*, that "'Intel was authorized to sell its products to Quanta,'" because "'[n]o conditions limited Intel's ability to sell products substantially embodying the patents.'"  (*Amicus* Br. 9 (quoting *Quanta*, 553 U.S. at 637) (emphasis omitted).)

Impression and its *Amici* make no pretense of interpreting or applying *Quanta*'s analysis of the exhaustion question, 553 U.S. at 636–38.  Rather, *Amici* are content to cherry pick references to "authorized sales" from the opinion's general description of exhaustion precedents and Intel contracts.  (*Amicus* Br. 8–9.)

But repeating labels is a poor substitute for examining the Court's careful analysis of the limits of Intel's authority to sell. And Impression, for its part, offers only a few conclusory statements about its understanding of *Quanta*. (Impression Response Br. 6.) Neither Impression nor its *Amici* address the crux of the Supreme Court's holding: "*Quanta* embraced the distinction between restricted and unrestricted sales that underlies *Mallinckrodt* and *General Talking Pictures* — confirming that only unrestricted sales exhaust patent rights." (Lexmark Br. 33.)[7]

Applying *Mallinckrodt*'s conditional-sales rule is the only way to make sense of the Supreme Court's analysis in *Quanta*. If Impression and its *Amici* were correct, and LGE were legally barred from imposing *any* post-sale restriction, that would have ended the matter; under this view, because Quanta itself was an end user, it could not be affected by a post-sale use restriction regardless of the restriction's terms or structure or how it was imposed. The Court would have had no occasion to consider whether Intel's authority to sell turned on adherence to LGE's limited license. An entire section of the opinion, which interpreted the

---

[7] The district court ruling cited by Impression's *Amici* (at 14 n.16) likewise does not confront the express basis for the Supreme Court's holding: that LGE *could* have avoided exhaustion, but did not because it failed to bargain for a contract that conditioned Intel's license and resale authority on the non-Intel-combination restriction. *Ergowerx Int'l LLC v. Maxell Corp. of Am.*, 18 F. Supp. 3d 430, 448–49 (S.D.N.Y. 2014) (discussing *Quanta*, 553 U.S. at 637–38). In any event, this consideration of *Quanta* was admittedly *dicta*, as the court noted "[i]t is *undisputed* that Smartfish's sale of its patented products to Maxell was authorized." *Id.* at 449 (emphasis added).

contracts in light of exhaustion principles, would be nothing more than an advisory opinion. *See* 553 U.S. at 635–37 (Part III.C).

Unable to find their preferred rule in *Quanta* itself, Impression's *Amici* turn to the decision of this Court that *Quanta* reviewed. *LG Elecs., Inc. v. Bizcom Elecs., Inc.*, 453 F.3d 1364 (Fed. Cir. 2006). The Supreme Court's "squar[e] revers[al]" of "the 'conditional sales' exception in *Bizcom*," *Amici* contend, "necessarily rejected the same holding in…*Mallinckrodt* and *B. Braun*." (*Amicus* Br. 14.) But this simply assumes *Amici*'s preferred reading of *Quanta*, which did not even mention — much less "squarely revers[e]" — *Mallinckrodt* or its "conditional sales" rule of exhaustion.[8] It would have been straightforward for the Supreme Court to simply reject, as a matter of law, this Court's statement that the "exhaustion doctrine…does not apply to an expressly conditional sale or license." *Bizcom*, 453 F.3d at 1369. As noted, however, *Quanta* instead interpreted the LGE-Intel contracts as not "expressly conditional," *id.*; it did not reject the legal relevance of that fact.

---

[8] The opinion never mentioned *Mallinckrodt*, despite the invitation of several *amici* — including two of the *Amici* in this case — to expressly overturn it. *See, e.g.,* Br. for *Amicus Cur*iae Automotive Engine Rebuilders Ass'n *et al.*, *Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617 (2008) (No. 06-937), 2007 WL 3440938, at *8–12. This *Quanta amicus* brief, filed by two of the same three remanufacturing associations that filed in this case, advances many of the same points — *verbatim* — as in their *amicus* brief in support of Impression. This Court should hesitate to adopt arguments already passed over by the Supreme Court.

2.     *Amici*'s reading of *Quanta* is flawed for a second reason: it assumes, implausibly, that the Supreme Court silently overruled not only authoritative precedent of this Court, but also longstanding Supreme Court precedent.  In reality, as Lexmark explained in its Opening Brief, the *Quanta* Court "discussed — with approval — its own decisions in *General Talking Pictures*, which authorized conditional patent licenses that impose post-sale use restrictions."  (Lexmark Br. 34 (citing *Quanta*, 553 U.S. at 636).)

*General Talking Pictures* is irreconcilable with the position of Impression and its *Amici* that infringement liability cannot lie based on a post-sale use restriction.  *First*, the suit in *General Talking Pictures v. Western Electric Co.* was prosecuted against the end user, not the manufacturer that exceeded the scope of its license by selling amplifiers for commercial (as opposed to private) use.  *See* 304 U.S. 175, 180 (1938).  If no usage restrictions survived the sale, the buyer could have used the amplifiers however it chose, without fear of liability under patent law.  *Second*, Impression's *Amici* contend that the sale was not authorized, for purposes of exhaustion, because it exceeded the licensee's right to sell.  (*Amicus* Br. 13.)  But in *General Talking Pictures*, as in *Mallinckrodt* and this case, the scope of the authority to *sell* depended on the *use* of the product sold.  304 U.S. at 179–80.  It is not enough, therefore, to repeat (as *Amici* do) that exhaustion occurs because a sale was "authorized" in the sense that a seller had some authority to sell

14

a given product on some terms; the real question is the *limit* of that authority, which is often defined by the product's use.[9]  Therefore, no bright line can distinguish between sales and use for purposes of determining which transactions trigger exhaustion and which do not.  (*Contra Amicus* Br. 5, 20, 27.)  Exhaustion is rather, as *Quanta* makes clear, a function of the particular contracts at issue.  *See* Yina Dong, *A Patent Exhaustion Exposition: Situating* Quanta v. LGE *in the Context of Supreme Court Jurisprudence*, 2010 Stan. Tech. L. Rev. N2 ¶ 51 ("It is not at all clear that there is really such a bright-line distinction between restrictions on sale and restrictions on use.").

In any event, there is no warrant for assuming that *Quanta* overruled *General Talking Pictures*.  As Lexmark explained in its Opening Brief (at 20–21), the Supreme Court has set a high bar that must be cleared before lower courts may infer that the Court has overruled one of its own decisions.  If a Supreme Court precedent "appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions."  *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989).  And if *General Talking Pictures* remains good law, it is impossible to conclude that

---

[9] Indeed, if Impression's and *Amici*'s expansive definition of "authorization" were correct, it would be hard to imagine sales that would *not* avoid exhaustion.  Almost any sale—except a transfer of stolen property—is "authorized" on some level.

*Quanta* implicitly rejected *Mallinckrodt* on the basis that *no* use restrictions may be enforced following a sale that is in some sense an "authorized" sale.  (Lexmark Br. 36.)  *See also Mitchell v. Hawley*, 83 U.S. (16 Wall.) 544, 548 (1872) (recognizing permissibility of sales conditioned on compliance with a use restriction); Dong, *supra* ¶ 25 ("[L]icense restrictions that are within the scope of patent rights have always been allowed" under decisions predating *Quanta*.).

## II.    Impression's *Amici's* Policy Concerns Are Misplaced.

Unburdened by the facts of this case, Impression's *Amici* advance a number of arguments that Impression did not, because it could not, in light of the reality of this litigation and Lexmark's Return Program.  As noted above, Impression's *Amici* flatly ignore the stipulation to which Impression agreed, which cabins the issues presented in this appeal.  (*See supra* at 7–8.)  This leads the *amicus* brief to raise a smorgasbord of policy concerns that would allegedly be exacerbated by a decision recognizing the validity of the Return Program contracts.  To the limited extent those concerns are valid at all, they are not implicated in this case.  The *Amici*'s attempt to secure an advisory opinion should not affect the Court's application of sound and settled precedent.[10]

---

[10] The *Amici*'s focus on inapplicable policy considerations and disregard for the stipulated facts of this case may be explained by the fact that their counsel also represents the plaintiff, a microchip producer, in a pending lawsuit against Lexmark over its toner cartridges.  *See Static Control Components, Inc. v. Lexmark Intl., Inc.,* Nos. 02-571, 04-84 (E.D. Ky.).

1.      Impression's *Amici* contend that parties' ability, under *Mallinckrodt*, to bargain for limited-use patent licenses serves to shield anticompetitive activity from antitrust remedies. (*Amicus* Br. 23–25.) As an initial matter, antitrust considerations are not pertinent to this case. This appeal offers no occasion to reconsider Circuit law in light of any competition concerns because (among other reasons) it involves no purported antitrust violation or anticompetitive effect. (*See supra* at 5–6.) Moreover, *Amici*'s claim that *Mallinckrodt* precludes antitrust remedies is true but misleading: a failure to exhaust patent rights shields conduct from antitrust liability only insofar as patent rights *always* operate to exclude business activity from market competition. This limited immunity from antitrust law is, of course, the point of patent law. *See, e.g., Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co*., 324 U.S. 806, 816 (1945) (patent rights are an exception to ordinary antitrust rules).

More fundamentally, however, *Amici*'s concerns are misplaced because *Mallinckrodt* and this Court's other exhaustion precedents plainly *do* take into account concerns that restrictive patent licenses might in some circumstances adversely affect competition. This Circuit's exhaustion doctrine expressly recognizes that a restrictive license might, in a given case, have an anticompetitive effect. As explained previously, that limited-use licenses are *generally* effective in patent law does not mean they are always enforceable. (Lexmark Br. 29–30.) "A

17

specific restriction may be set aside on a showing that it expands the scope of the patent monopoly." (*Id.* at 29.) *See, e.g., Gen. Talking Pictures Corp.*, 304 U.S. at 181; *see also Mallinckrodt*, 976 F.2d at 706, 709.

*Amici* offer no explanation of why this existing body of law is insufficient to address the purported risks of competitive harm to which they point. Indeed, *Amici* elsewhere acknowledge that the law before *Quanta* already policed "pretextual" assertions of patent rights or unwarranted expansion of a patent's area of exclusivity. (*Amicus* Br. 24–25 & n.44 (citing *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1216 (9th Cir. 1997) (citing, *inter alia*, *Mallinckrodt*)).) Nevertheless, when addressing Lexmark's position, *Amici* never even acknowledge the *existence* of this limit on the ability of patentees to offer limited-use licenses, despite its obvious relevance to their argument. Much less do they respond to Lexmark's showing that this limitation adequately protects consumers and competitors. (Lexmark Br. 29–30.) The appropriate safeguard, as this Court has long recognized, is not the blunt instrument of eliminating all limited-use patent licenses.

2.    A consumer's right to repair her own patented goods, according to *Amici*, is also threatened by limited-use licensing. Again, this is a concern that is not implicated by the facts or allegations in this case — which plainly address wide-scale third-party remanufacturing and resale, not end-user repair.

Impression's *Amici* repeatedly imply that a decision for Lexmark would allow *all* patentees to threaten *all* end users with unanticipated infringement liability. (*See, e.g., Amicus* Br. 21 ("Lexmark's attempt to revive the 'conditional sales' doctrine trammels the rights of … the public to repair patented articles and replace unpatented components.").) That is wrong and misleading. The rule of *Mallinckrodt* and *General Talking Pictures* addresses only parties and products subject to a restrictive license. Recognizing that contracts may transfer less than all of the patent rights in a product will not affect customers who buy a product free and clear of license restrictions.

Lexmark did not file this lawsuit to prevent its customers from repairing toner cartridges (or cars, surfboards, cooking plates, or injection molding machines (*see Amicus* Br. 19)). It is simply acting to enforce a restriction on the unauthorized sale and use of Return Program cartridges by third parties.[11] Lexmark sued unauthorized remanufacturers and resellers — not its customers or any other end users — after the defendants facilitated large-scale infringement and violations of Lexmark contracts.[12] Multiple courts have recognized the validity of

---

[11] Indeed, Impression's *Amici* concede that "[p]ost-sale use restrictions inevitably target the patentee's aftermarket competitors, *not the end-users* who ostensibly agree to the terms." (*Amicus* Br. 7 (emphasis added).)

[12] Impression and its *Amici* contend that breach-of-contract suits alone are available to enforce patentees' post-sale rights. (*E.g.*, *Amicus* Br. 23–24.) That is incorrect. Limiting patentees to contract-law remedies would contradict *General*

those contracts, and no allegation of contractual invalidity is present in this case. (*See supra* at 6–8.)  Indeed, it is undisputed that the relevant customers had notice of the single-use restriction.  (*See id.*; Lexmark Br. 29 n.7.)  Thus, this suit does not involve users who would prefer to repair a product but, by virtue of a license of which they were unaware, must replace the product instead.  That would be a different case — not to mention a sure-fire way for a company to alienate its customers.[13]

    3.    Finally, Impression's *Amici* posit that uncertainty regarding the enforceability of limited-use licenses chills competition and harms commerce. (*Amicus* Br. 21–23, 25–27.)  It is quite plain, however, that remanufacturers like Impression — whose entire business model is designed to exploit the limits of patent protection and enforcement — know full well the ways in which the law limits their activities.  (*See id.* at 26.)

---

*Talking Pictures* and *Mitchell v. Hawley*, *see supra* at 14–16, two cases in which license violations resulted in injunctions under patent law.  Dong, *supra* ¶ 64.  And from a practical perspective, the sprawling scope of this very litigation illustrates the error of the Impression position; even without the need to sue individual end users and establish privity, this case has lasted years and involved dozens of parties without even reaching summary judgment.

[13] Impression's *Amici* (but not Impression) assert that the district court's order granting Impression's motion to dismiss — one of the orders on appeal — means that Impression has engaged only in lawful repair.  (*See Amicus* Br. 18.)  This reads far too much into a decision at the pleadings stage, especially when that order simply relied on a mechanical application of *Quanta* as interpreted in *Static Control* (*see* Lexmark Br. 37–39), and said nothing either explicitly or implicitly about repair.

The customers who buy and employ Lexmark's cartridges can hardly plead surprise, either. Impression has stipulated that end users have advance notice of the single-use condition, and have the option to purchase an unlimited-use cartridge instead. (Lexmark Br. 29 n.7.) Yet they often choose a cartridge that is labeled for single use, priced for single use, and — but for the actions of microchip producers like Static Control — performs for only a single use. Much as Impression's *Amici* would like to pretend otherwise, Return Program cartridges are not unlimited-use cartridges that Lexmark, through legal fine print, tries to transform into a single-use product. They are simply single-use cartridges.

Impression and its *Amici* do not dispute that Lexmark may lawfully design a toner cartridge that functions only once — just as manufacturers are free to produce throwaway razors or daily-use contact lenses. (*See* Lexmark Br. 41.) Nor do they contest any of the reasons set forth by Lexmark in support of its Return Program (*id.* at 10–11), despite an unsupported insinuation that these were pretextual (*Amicus* Br. 25). The reality is that consumer choice ultimately drives the utilization of limited-use licenses. Lexmark's customers can opt for a more expensive cartridge with no use limitations, but most choose the single-use option because they have no interest in paying for more of the product than they want to use. *See Princo*, 616 F.3d at 1328 (noting that the agreed price of limited use products reflects the value acquired by the purchaser). These products are forced

on no one — though the blanket rule advanced by Impression would essentially force patentees to offer products to *all* consumers on an unlimited-use basis, and at an unlimited-use price. Impression and its *Amici* offer no justification for this one-size-fits-all regime.

The *amicus* brief also suggests that limited-use licenses expose unwitting third parties to infringement liability. (*Amicus* Br. 22–23.) But this case has nothing to do with any risk that a user was or might be misled by Lexmark's single-use label. It involves no allegation of confusion, and in fact the parties stipulated that users were notified of the limit on their use of Return Program cartridges. (*See supra* at 6, 20–21.) Neither Impression nor its *Amici* offer any response to Lexmark's common-sense observation that any risk of confusion applies equally, if not more so, in the case of "clone" cartridges, which are indisputably subject to infringement liability. (Lexmark Br. 42.) Ample remedies exist to address spurious or bad-faith litigation meant to dissuade parties from exercising their rights — which is certainly not the case here. (*See supra* at 18–20.) In any event, *Amici*'s cure would not resolve the symptoms that supposedly concern them. As noted above, to the extent the solution for any uncertainty is a bright-line rule of exhaustion, the Impression proposal would not fit the bill. Courts and litigants would still be required to parse the contractual limits of sales

restrictions and use rights before knowing whether exhaustion applies. (*See supra* 14–15.)

In any event, if the legal confusion and instability is as prevalent as Impression's *Amici* imply, then other disputes will present this Court with opportunities to address the broad and varied policy questions *Amici* raise. Given the vastness of the aftermarket industries, at least as quantified by *Amici* (*see Amicus* Br. 2–3 (4 *million* people employed by automotive aftermarket industry)), it is clear that this Court's 1992 decision in *Mallinckrodt* and the series of cases following it did not choke off business. Thus, even if this Court were not bound by Circuit law, there would be no need to reach out to address these questions now, given the posture and facts of this case.

## CONCLUSION

The Court should reverse the judgment of non-infringement with respect to the Return Program cartridges sold in the United States, and remand for entry of judgment in favor of Lexmark.

Dated:  December 15, 2014                    Respectfully submitted,

                                         /s/ Constantine L. Trela, Jr.

TIMOTHY C. MEECE                        CONSTANTINE L. TRELA, JR.
V. BRYAN MEDLOCK, JR.                  SIDLEY AUSTIN LLP
JASON S. SHULL                              One South Dearborn St.
AUDRA C. EIDEM HEINZE               Chicago, IL 60603
BANNER & WITCOFF, LTD.               Telephone: (312) 853-7293
Ten South Wacker Drive               Facsimile: (312) 853-7036
Chicago, IL 60606                          ctrela@sidley.com
Telephone: (312) 463-5420
Facsimile: (312) 463-5720
tmeece@bannerwitcoff.com


STEVEN B. LOY                              BENJAMIN J. BEATON
STOLL KEENON OGDEN PLCC           SIDLEY AUSTIN LLP
300 W. Vine Street                        1501 K Street, NW
Lexington, KY 40507                      Washington, DC 20005
Telephone: (859) 231-3000            Telephone: (202) 736-8344
                                                 Facsimile: (202) 736-8711

*Counsel for Lexmark International, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 15th day of December, 2014, I caused the

foregoing Reply Brief of Plaintiff-Cross Appellant to be electronically filed with

the Clerk of the Court for the United States Court of Appeals for the Federal

Circuit through the Court's CM/ECF system.


/s/ Constantine L. Trela, Jr.
CONSTANTINE L. TRELA, JR.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 28.1(e)(2)(B) and the Rules of this Court, because it contains 5,702 words as determined by the Microsoft 2007 word-processing system used to prepare the brief, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using the Microsoft Word 2007 word-processing system in 14-point Times New Roman font.

/s/ Constantine L. Trela, Jr.
CONSTANTINE L. TRELA, JR.