# EXHIBIT C

DEALER CONTRACT 1

**Lexmark International, Inc.**
an IBM alliance company

## AUTHORIZED DEALER AGREEMENT

Name and Address of Dealer:

Agreement No.: LAK0112 - 00

Lexmark Office Address:
**1701 GOLF RD TOWER 2, 2ND FL**
**ROLLING MEADOWS    IL 60008**

Lexmark Office No.: GT7

Thank you for selecting Lexmark as a supplier of products, services, and support. Our goal is to be the best in the industry. If at any time you are not completely satisfied, please let us know.

This agreement authorizes you to purchase Products from Lexmark under its terms for marketing to End Users only in the United States and Puerto Rico. Lexmark may issue Bulletins under this Agreement which change the terms of this Agreement. Any Bulletins will become effective on the date Lexmark specifies unless you notify us in writing within 30 days of your receipt of the Bulletin that you do not accept it.

Lexmark may issue administrative, technical and procedural information, announcements, promotions, programs, product and pricing letters, product withdrawal letters, and other kinds of notices in writing from time to time. All such notices are effective on the date Lexmark specifies.

### Table of Contents

| | | | |
|---|---|---|---|
| 1.0 | DEFINITIONS | 19.0 | STATUS CHANGE |
| 2.0 | CONTRACT PERIOD | 20.0 | TRADEMARKS AND TRADE NAMES |
| 3.0 | RELATIONSHIP OF THE PARTIES | 21.0 | PATENTS AND COPYRIGHTS |
| 4.0 | MARKETING TO END USERS | 22.0 | LIMITATION OF REMEDIES |
| 5.0 | DEALER RESPONSIBILITIES | 23.0 | INDEMNIFICATION |
| 6.0 | ORDERS AND CANCELLATIONS | 24.0 | TERMINATION |
| 7.0 | PRICES | 25.0 | DEALER ASSOCIATED REMARKETERS |
| 8.0 | PAYMENT | 26.0 | PS/1 PRINTERS |
| 9.0 | PRICE REDUCTION CREDIT | 27.0 | GENERAL |
| 10.0 | INVENTORY ADJUSTMENTS | 28.0 | DEALER SPECIFIC INFORMATION |
| 11.0 | WARRANTIES | | Aggregator Relationships |
| 12.0 | WARRANTY SERVICE | | Superstores |
| 13.0 | MAINTENANCE PARTS | | Campus Technology Centers |
| 14.0 | ENGINEERING CHANGES | | Eligible Products |
| 15.0 | LICENSED PROGRAMS | | Minimum Renewal Criteria |
| 16.0 | SECURITY INTEREST | | Marketing Coverage Area |
| 17.0 | TITLE AND RISK OF LOSS | | Authorized Locations |
| 18.0 | TAXES | | |

PAGES 2 THROUGH 8 ARE ALSO PART OF THIS AGREEMENT. This Agreement and Bulletins, the Statements of Limited Warranty, and notices are the complete agreement between us, and replace any prior oral or written communications between us. By signing below, each of us agrees to the terms of this Agreement. Once signed, any reproduction of this Agreement made by reliable means (for example, photocopy or facsimile) is considered an original.

Accepted by:
Lexmark International, Inc.

By: _____
    Authorized Signature

_____   12/16/91
Name (Type or Print)        Date

_____   _____
Name (Type or Print)        Date

LXK0101 (10/23/91)

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A2576

## 1.0 DEFINITIONS

Agreement means this Dealer Agreement, Bulletin(s), applicable Statement(s) of Limited Warranty and notices.

Authorized Location means any of your locations approved by Lexmark in writing for the purposes of your performance under the Agreement.

End User means an unaffiliated party who acquires the Products from you for its own use and not for remarketing.

PLA Programs means licensed programs which Lexmark designates as subject to the Lexmark Program License Agreement (PLA).

Products means machines, licensed programs, and other items you can market under the Agreement.

## 2.0 CONTRACT PERIOD

The Agreement has a single 12 month contract period which commences on the first day of the month following the date of your signature on page 1, provided it is accepted by Lexmark. The Agreement can be renewed by the parties for subsequent single 12 month contract periods. Unless Lexmark notifies you otherwise, the renewal of the Agreement shall automatically occur unless either party notifies the other of its desire not to renew at least 90 days prior to the contract period expiration date. Either party can elect not to renew the Agreement with or without cause.

## 3.0 RELATIONSHIP OF THE PARTIES

As an independent contractor, you are not Lexmark's legal representative, franchisee, or agent for any purpose.

You will not make any warranties or representations on Lexmark's behalf other than those specified in the Agreement. Neither party will assume or create any obligations on the other's behalf except as specified in the Agreement.

You will market Products to End Users at such prices and terms and conditions as you determine. Such terms and conditions must not be in conflict with your obligations in the Agreement.

Lexmark reserves the right to market anywhere, including your geographic area, products which are the same as or similar to the Products under the Agreement either directly or through other remarketers.

You reserve the right to market products which are similar or competitive to the Products under the Agreement.

Lexmark may establish annual sales performance objectives for the Products which you are approved to market.

Lexmark may conduct reviews to evaluate your performance and compliance with the provisions of the Agreement.

No information will be given or received in confidence by either party unless it is covered by a separate written agreement.

## 4.0 MARKETING TO END USERS

The Products you market under the Agreement require your high quality individualized pre-sale and post-sale support. This support is necessary to achieve and maintain high End User satisfaction. Your ability to provide this support is a key reason Lexmark selected you as an authorized dealer. You, therefore, will market Products only to End Users. You agree not to market Products to other remarketers, except as agreed to by Lexmark.

Furthermore, in order to ensure End User satisfaction for certain Products, there must be at least one pre-sale face-to-face meeting between you and your prospective End User. Current products requiring such face-to-face meeting are printers and the Personal Typing System.

## 5.0 DEALER RESPONSIBILITIES

You agree to:
1) ensure the Product marketed to the End User is appropriate for the End User's requirements;
2) ensure that the End User is satisfied with all your Product marketing activities, including Product explanation, demonstration, and ongoing support;
3) maintain an End User record for each unit of Product sold or licensed. End User records are not required for Supplies. An End User record will include the name and address of the End User, the date of the sale or license, the Product Type/Model sold or licensed, and the Product's serial number, if applicable. You must retain the End User record for all Products that contain a video display for at least five years after the date of sale, and shall retain End User Records for all other Products, excluding Supplies, for the longest period of time that you customarily retain such records. You must assist Lexmark, upon Lexmark's request, in tracing a Product to an End User to distribute Product information or locate a Product for safety reasons;
4) furnish a sales receipt to the End User upon delivery of the Product indicating the date of sale or license and the serial number, if any, of the Product sold or licensed. You must retain a copy of that sales receipt for one year from the date of sale or license. You must indicate on the sales receipt for the Product any non-Lexmark alterations made to the Product;
5) report your sales performance and inventory as requested by Lexmark;
6) install each Product as specified by Lexmark;
7) market, generate demand for, perform warranty service for, and support Products only at your Authorized Location or at your End User's location; receive and inventory Products only at your Authorized Location unless Lexmark specifies otherwise; and reference only your Authorized Location in your marketing materials or advertising;
8) advertise Products designated as Supplies prominently in your catalogue;
9) maintain a sufficient inventory of Products to satisfy reasonably foreseeable End User demand;
10) provide floor space and related facilities at your Authorized Location(s) to display and demonstrate the Products;
11) maintain a required number of trained management, sales, support and service personnel;
12) report promptly to Lexmark all suspected and actual Product problems;
13) provide a product business plan as required by Lexmark;
14) notify Lexmark of any discrepancies between the Lexmark shipping manifest and the Products received;
15) maintain good financial standing and provide financial information and evidence of financial security upon request;
16) allow Lexmark or its appointed auditor to audit, during normal business hours, the above required records and receipts.

## 6.0 ORDERS AND CANCELLATIONS

Lexmark will describe specific ordering procedures and forecast requirements, if any, in writing.

Lexmark will fill your orders for Products and meet your request for shipment dates subject to the Product's availability and consistent with Lexmark's production and supply schedules.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY  A2577

You may cancel an order for any Product which Lexmark has not shipped to you. Lexmark may charge you a Cancellation Charge of 2% of the cancelled Product's Dealer price. However, you will not be liable for a Cancellation Charge if Lexmark has postponed shipment of the Product for more than 15 days from its estimated shipment date, and you have cancelled your order for the Product before the Product's shipment. Product ordered and cancelled the same day will not be assessed a cancellation charge.

Lexmark will charge you a Handling Charge of 5% if you refuse to accept a Product you ordered. You must prepay all transportation charges for return of the Product to Lexmark.

## 7.0 PRICES

Lexmark will specify its Dealer prices in notices and an electronic file. Dealer prices are F.O.B. destination, unless Lexmark specifies otherwise. Lexmark may change its Dealer prices at any time.

A Dealer price increase for a Product is effective on the date specified. However, a Dealer price increase will not apply to a Product for which Lexmark has received an order prior to the day the increase is effective, provided Lexmark accepts such order.

A Dealer price decrease is effective on the date specified and will apply to Products shipped on or after the effective date of the decrease.

A single unit price reflects the price for single units of Product acquired by End Users directly from Lexmark. A suggested retail price may also be established by Lexmark. Both are subject to change without notice. These prices are for informational purposes only and shall not limit in any way your ability to set your own prices, charges and terms and conditions for Products.

Lexmark may specify any additional fees and allowances in notices. Lexmark may change the fees and allowances at any time. Such changes will become effective on the date Lexmark specifies.

### Printers

Price schedules are based on a single order, with a single shipment to a single location unless Lexmark specifies otherwise.

| | |
|---|---|
| Schedule I | — Invoice value under $3,000 |
| Schedule II | — Invoice value of at least $3,000 and printers can be ordered in any quantities |
| Schedule III | — Invoice value of at least $25,000, and printers must be ordered in full pallet quantities |

Printer features may not be included to meet invoice values.

### Typewriters

Price schedules for typewriters are based on a single order, with a single shipment to a single location unless Lexmark specifies otherwise.

| | |
|---|---|
| Schedule I | — Invoice value under $10,000 |
| Schedule II | — Invoice value of at least $10,000 and less than $25,000 |
| Schedule III | — Invoice value of at least $25,000 |

All typewriter models and IBM Personal Typing Systems may be aggregated for purposes of determining invoice value.

Features and Personal Typing System Printers may not be included for purposes of determining invoice value.

### Supplies

Dealer Prices and minimum order quantities are set forth in notices. Each order for supplies for shipment to a single Authorized Location must be for an amount of at least $500.

## 8.0 PAYMENT

You agree to pay Lexmark upon your receipt of an invoice. If you fail to pay, Lexmark may:

1) impose a finance charge on the balance due; and
2) exercise any of its rights provided in the Agreement or by law.

## 9.0 PRICE REDUCTION CREDIT

If Lexmark announces a Dealer price decrease for a Product, you may be eligible to receive a price reduction credit.

### Printers and Typewriters

The price reduction credit equals the credit amount per Product, as specified by Lexmark, multiplied by your existing inventory and Product in transit on the effective date.

In order to qualify for a price reduction credit, you must:

1) provide a report of your inventory of the Product in a format and time frame specified by Lexmark;
2) have provided such report for at least the two prior months;
3) provide access, during normal business hours, to allow Lexmark to audit applicable records and inventory.

### Printer and Typewriter Features and Supplies

The price reduction credit for features and supplies equals the credit amount per item, as specified by Lexmark, multiplied by the quantity shipped directly from Lexmark to you (minus returns from you) in the prior two months.

## 10.0 INVENTORY ADJUSTMENTS

During a contract period, you may return for credit selected Products which you obtained directly from Lexmark. Lexmark will specify which Products are returnable in notices or an electronic file.

Upon receipt and acceptance of a returned Product, Lexmark will issue you a Product credit as determined by Lexmark. You may use such credit only against sums then or thereafter due Lexmark.

You must return all Products to Lexmark, transportation prepaid, in the original shipping containers which must not have been opened, damaged, marked or labeled. The Products must be in marketable condition as determined by Lexmark.

Any prior passage to you of title to Products will be deemed void from its inception when the returned Products are accepted by Lexmark. You warrant and represent that the returned Products are free of any outstanding liens, security interests or other third party encumbrances.

Lexmark may charge a Handling Charge of 5% multiplied by the Dealer price for any returned Product.

You may return these Products only once a month and you must accompany each shipment of returned Products with a "Returns Authorization Form."

CONFIDENTIAL - OUTSIDE COUNSEL ONLY   A2578

For Products being withdrawn from marketing, guidelines or limitations on returns may be contained in the withdrawal notice.

## Printers and Typewriters

The maximum number of units of a Product you may return in a given month is equal to the number of units of inventory of such Product you reported for the previous month.

## Printer and Typewriter Features

The maximum number of features you may return is equal to the number of features shipped to you by Lexmark in the immediately preceding six months less any returns during that period.

## Supplies

Only two return shipments of supplies are allowed per contract period. The maximum quantity of supplies you may return is equal to the quantity shipped to you by Lexmark in the immediately preceding nine months less any returns during that period.

## 11.0 WARRANTIES

Lexmark will include the applicable Statement of Limited Warranty with machines shipped. Lexmark will provide you a copy of the Statement of Limited Warranty which you are to provide to your End User at the time of sale. Lexmark may revise a Statement of Limited Warranty.

The warranty period will start on the day the End User purchases the Product. You will advise the End User of this start date.

## 12.0 WARRANTY SERVICE

The Service Support Guide is incorporated in the Agreement by reference.

Unless Lexmark specifies otherwise, you will:
1) provide warranty service under the terms of the applicable Statement of Limited Warranty and in accordance with the Service Support Guide;
2) validate all warranty claims presented to you; and
3) maintain the capability to provide warranty service according to the requirements and procedures specified in the Service Support Guide.

Lexmark will:
1) provide, at no fee, either service training in a Lexmark designated classroom or self-education materials for the number of service personnel required;
2) provide, as part of service training, selected service materials;
3) make available to you, for a fee, a) service training for additional service personnel, and b) additional service materials; and
4) honor your valid claims for warranty reimbursement for labor (when applicable) and/or credits for parts or exchange of parts as specified in the Service Support Guide.

## 13.0 MAINTENANCE PARTS

Lexmark or IBM will sell you maintenance parts only for providing warranty and maintenance service or for sale to End Users for the sole purpose of maintaining their machines.

## 14.0 ENGINEERING CHANGES

During the Warranty Period, any engineering changes determined applicable by Lexmark will be controlled by Lexmark and installed as specified by Lexmark on the machines. You or your End User may, by providing notice subject to written confirmation by Lexmark, elect to have only mandatory changes, as determined by Lexmark, installed.

Lexmark may either install a mandatory change at your location without charge or provide you, at no charge, parts and instructions for your installation of such changes on all machines in your inventory or on machines owned by your End Users. If you install the changes, Lexmark will reimburse you for your labor at a rate established by Lexmark.

## 15.0 LICENSED PROGRAMS

Licensed programs may be made available, as determined by Lexmark, to you to market under the provisions of the Agreement and the PLA or a third party agreement.

You agree to ensure that your End User understands and agrees to the PLA.

You agree to accept return of a PLA program, provided it is in its original, unopened package, and refund the money paid by an End User who does not wish to be bound by the PLA. If the PLA permits the return of a PLA program with an accompanying specified Product, you agree to accept the return of the PLA program with the other Product for refund.

Certain programs may be distributed by you only along with the Products with which they are packaged, as set forth in product announcement letters. In addition, certain programs, when distributed to the U.S. or other governments, must be identified as subject to government regulations for software protection of privately developed commercial software, as set forth in product announcement letters.

## 16.0 SECURITY INTEREST

Lexmark reserves and you grant a purchase money security interest in each Product, in your proceeds from the sale of each Product, and in your accounts receivable for such Product. This interest will be satisfied by payment in full.

You agree to sign an appropriate document to permit us to perfect Lexmark's purchase money security interest.

## 17.0 TITLE AND RISK OF LOSS

Title passes to you for each machine on its date of shipment from Lexmark. Title for each copy of a PLA program remains in Lexmark.

Lexmark relieves you of responsibility for all risk of loss of, or damage to, a machine during the period it is in transit from Lexmark up to its initial delivery to you.

## 18.0 TAXES

You agree to pay amounts equal to any taxes resulting from the Agreement or any activities under the Agreement. Such taxes do not include taxes based on Lexmark's net income. You are responsible to bear any personal property taxes assessable on Products on or after delivery to the carrier at the Lexmark ship-from location.

You agree to provide Lexmark with a valid Reseller Exemption Certificate for each taxing jurisdiction to which Products ac-

CONFIDENTIAL - OUTSIDE COUNSEL ONLY   A2579

quired by you for resale will be shipped by Lexmark under the Agreement. If such Certificate(s) is not provided to Lexmark prior to shipment, Lexmark will charge, and you will be required to pay, all applicable state and local taxes.

You agree to notify Lexmark promptly of the revocation or modification of any Reseller Exemption Certificate so provided. You further agree to indemnify and hold Lexmark harmless from any claims and assessments against Lexmark resulting from a refusal by a taxing jurisdiction to recognize any of your Reseller Exemption Certificates.

## 19.0 STATUS CHANGE

To maintain your authorization, you must request Lexmark approval in writing if you anticipate a:

1) sale of your enterprise;
2) transfer of your equity ownership;
3) significant change in your management;
4) merger or acquisition of your enterprise or Authorized Location with or by any other entity;
5) legal name change of your enterprise;
6) relocation of an Authorized Location; or
7) closing of an Authorized Location.

## 20.0 TRADEMARKS AND TRADE NAMES

You may refer to yourself under the Agreement as a Lexmark Authorized Dealer:

1) solely in connection with Products;
2) only during the contract period; and
3) only within the United States and Puerto Rico.

Except as provided for in this Section, Lexmark does not grant you the right to use trademarks or trade names. Lexmark grants you the limited permission to use the trademark "Lexmark" or "IBM" solely to identify the Products acquired from Lexmark under the Agreement. You may use the trademarks "Lexmark" or "IBM" only within the United States and Puerto Rico.

At Lexmark's request, you will provide to Lexmark, for review and written approval, promotional, advertising and other materials that:

1) use a Lexmark, International Business Machines Corporation (IBM) or third party trademark or trade name; or
2) refer to you as a "Lexmark Authorized Dealer".

Lexmark will supply advertising guidelines in writing. At Lexmark's request, you agree to change any materials or use of materials which Lexmark determines to be inaccurate, objectionable, misleading or a misuse of Lexmark or IBM trademarks. You will pay the expenses for such change.

The permission granted relative to the Lexmark or IBM trademarks will terminate with the termination or expiration of the Agreement. In such event, for the affected Products, you will immediately:

1) cease referring to yourself as a "Lexmark Authorized Dealer" or other such term that includes the name of the Products, as applicable;
2) cease referring to yourself as approved by Lexmark to provide warranty services; and
3) return to Lexmark or destroy all materials under your control employing such trademarks.

You may retain materials with Lexmark or IBM trademarks which are required to fulfill your warranty service or support obligations on affected Products. You will return these materials to Lexmark or destroy them upon completion of such obligations.

You recognize Lexmark's ownership and title to its trademarks and the goodwill attaching to them. You also recognize IBM's

ownership and title to its trademarks and the goodwill attaching to them. You agree that any goodwill which accrues because of your use of the trademarks "Lexmark" or "IBM" will become Lexmark's or IBM's property, respectively. You agree not to contest Lexmark or IBM trademarks or trade names. You agree not to use, employ or attempt to register any trademarks or trade names which are confusingly similar to Lexmark or IBM trademarks or trade names. IBM may revoke immediately, without prior notice, any permission to use IBM trademarks granted to you under the Agreement if IBM determines that you are misusing such IBM trademarks or if you place any IBM trademark on any product in violation of any law or IBM's legal rights.

## 21.0 PATENTS AND COPYRIGHTS

Lexmark will, at its expense, defend you against any claim that any machine acquired under the Agreement infringes a patent or copyright in the United States or Puerto Rico. Lexmark will pay all costs, damages and attorney's fees that a court finally awards as a result of such claim. To qualify for such defense and payment, you must 1) give Lexmark prompt written notice of any such claim, and 2) allow Lexmark to control, and fully cooperate with Lexmark in, the defense and all related settlement negotiations.

You agree that if a machine in your inventory, or the operation of a machine while in your inventory, becomes, or Lexmark believes is likely to become, the subject of such a claim, you will permit Lexmark, at its option and expense, either to secure the right for you to continue using the machine or to replace or modify it so that it becomes noninfringing. However, if neither of the foregoing alternatives is available on terms which are reasonable in Lexmark's judgment, you will return the machine upon Lexmark's written request. Lexmark will grant you a credit equal to the price paid by you to Lexmark for the returned machine. However, Lexmark may, for selected machines, grant you a credit equal to such price depreciated. The depreciation shall be an equal amount per year over the life of the machines as Lexmark establishes. Lexmark shall have no obligation with respect to any such claim based upon any non-Lexmark modification of machines or their combination, operation or use with apparatus, data or programs not furnished by Lexmark.

This Section states Lexmark's entire obligation to you for machines regarding infringement or the like.

## 22.0 LIMITATION OF REMEDIES

Lexmark's entire liability and your exclusive remedy for any claims are as this section provides.

Lexmark is not liable for any damages caused by performance or nonperformance of machines or programming located outside the United States and Puerto Rico. In no event will Lexmark be liable for any damages caused by your failure to perform your responsibilities.

Lexmark's entire liability and your exclusive remedy for actual damages from your use of PLA programs are as set forth in the PLA.

Lexmark assumes no liability regarding any claim or action caused by, or directly related to, a non-Lexmark product.

In no event will Lexmark be liable for any lost profits, lost savings, incidental damages, or other consequential damages, even if Lexmark has been advised of the possibility of such damages. Lexmark will not be liable for any damages claimed by you based on any third party claim.

For any claim for any cause whatsoever, other than those provided for in Section 21.0 and the first paragraph of Section 23.0,

CONFIDENTIAL - OUTSIDE COUNSEL ONLY   A2580

Lexmark's liability for actual damages will be limited to $100,000.

## 23.0 INDEMNIFICATION

Lexmark will indemnify and hold you harmless from all claims, including reasonable attorney's fees, (but not including lost profits, lost savings, incidental damages, or other consequential damages), for bodily injury or damage to real property or tangible personal property arising from any acts or omissions for which Lexmark is legally liable.

You will indemnify and hold Lexmark harmless from all claims, including reasonable attorney's fees, by any party resulting directly or indirectly from any acts or omissions by you.

## 24.0 TERMINATION

Either party may terminate the Agreement, with or without cause. Lexmark will provide three month written notice to you of such termination, except as otherwise provided in this Section. You must provide one month written notice to Lexmark.

In the event that Lexmark gives you such notice for cause, Lexmark may provide you with an opportunity to cure deficiencies. In such event, Lexmark will establish a reasonable time, not to exceed three months, in which you must remedy such deficiencies.

In addition, Lexmark considers certain actions so serious and inconsistent with your obligations as a Dealer as to warrant immediate termination. Such breaches will include, but not be limited to, situations in which 1) you made material misrepresentations to Lexmark in your application to become a Dealer, at any later time through oral or written statements, or by submission of any false or fraudulent documentation or claim to Lexmark, or 2) you marketed Products to other than an End User.

In the event of termination of the Agreement by you or Lexmark, all monies due Lexmark will immediately become due and payable.

If you or Lexmark elects to terminate the Agreement, Lexmark may repurchase some or all of the Products in your inventory at a price determined by Lexmark. In such event, return shipping charges will be paid by you. Products returned must be in the original shipping containers, which must not have been opened, damaged, marked or labeled.

A termination of the Agreement may also be only a partial termination of, for example, an Authorized Location, an eligible Product family, a part of a marketing coverage area, or an Aggregator relationship.

## 25.0 DEALER ASSOCIATED REMARKETERS

A Dealer Associated Remarketer (Dealer Associate) is one who obtains Product from you and remarkets the Product to End Users. In the case of Printers, a Dealer Associate is a remarketer who adds significant enhancement to computer systems in function or capability. However, it is not necessary that such Printers be remarketed only with the enhanced computer system.

You may market Products to a Dealer Associate only with the written approval of Lexmark. You retain responsibility to ensure End User satisfaction and, if applicable, provide warranty service to the Dealer Associate's End User. These responsibilities may not be delegated. You may, however, share specific End User technical assistance functions with your Dealer Associate.

Lexmark will identify those Products which you may market to a Dealer Associate. Lexmark reserves the right to withdraw its approval for either the Dealer Associate or such Products which you market to a Dealer Associate.

You must maintain records for those Products you ship to your Dealer Associate. You must have appropriate agreements with your Dealer Associate in place to ensure your Dealer Associate:

1) markets only from its approved location and only to End Users;
2) maintains End User Records in the format and for the required period of retention as described in this Agreement; and
3) assists Lexmark in tracing a specific Product to an End User if required.

## 26.0 PS/1 PRINTERS

The following additional terms apply to PS/1 Printers:

1) You are permitted to market PS/1 Printers only in the contiguous 48 states. If an End User intends to transport the PS/1 Printer outside the 48 states, you must notify such End User that there will not be access to the IBM 800# and on-line services of the PS/1 Printer.
2) As a secondary marketing approach you may utilize mass merchandising techniques directed at parties who are prospects to acquire PS/1 Printers and who you can support directly from your Authorized Locations. You may utilize such techniques only if Lexmark has pre-approved the materials you propose to use. Such materials must clearly indicate how the End User can get technical support or information from you or Lexmark prior to, and after, the sale of PS/1 Printers. Either a copy of the limited warranty document, or a notice of how the End User may readily obtain such document from you prior to the End User's acquisition of PS/1 Printers, must be included in the materials. Utilizing mass merchandising techniques does not eliminate the face-to-face meeting requirement identified under "Marketing to End Users".
3) The "Orders and Cancellations" section is modified for PS/1 Printers by the following. For PS/1 Printers, you may not 1) defer or cancel any purchase order, accepted by Lexmark, whose applicable shipment dates Lexmark confirmed or 2) refuse any shipments made by Lexmark related to such order. In addition, you may not cancel parts of such order. If, however, Lexmark notifies you that it will ship such order later than the date, or that the quantity will be less than, you request, you may modify, defer or cancel such order. You may cancel purchase orders, or parts thereof, not confirmed by Lexmark. If you do not cancel non-confirmed orders, Lexmark will hold them for possible future acceptance, and you agree to provide Lexmark with revised Requested Ship Dates for non-cancelled orders. If Lexmark, without your approval ships such delayed PS/1 Printers, you may return them at Lexmark's expense within ten days of receipt from Lexmark;
4) For the PS/1 Printer, Dealer Prices are F.O.B., Raleigh, NC;
5) For the PS/1 Printer, during the time of transit from the Lexmark shipping location to you, all risks of loss or damage shall be yours;
6) PS/1 Printers do not qualify for Inventory Adjustment. You may not return PS/1 Printers to Lexmark.

## 27.0 GENERAL

Lexmark's waiver of any instance of your noncompliance with the Agreement will not be deemed a waiver of any future noncompliance.

You may not assign the Agreement or any of its rights or duties without Lexmark's prior written consent.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A2581

Lexmark is not responsible for failure to fulfill its obligations under the Agreement due to causes beyond its control.

The Agreement will not be supplemented or modified by any course of dealing or trade usage. Variance from or addition to the terms and conditions of the Agreement in any purchase order or other written notification from you will be of no effect.

The provisions of the Agreement which by their nature extend beyond the termination or expiration of the Agreement will survive and remain in effect until all obligations are satisfied.

Each party agrees to pay the other's reasonable attorney's fees and costs of litigation if the party, for any cause whatsoever,

brings suit against the other party and the other party is finally adjudicated not to have liability.

Neither you nor Lexmark will bring an action, regardless of form, arising out of the Agreement more that two years after the cause of action has arisen. In the case of an action for non-payment, the action may not be brought more than two years from the date the last payment was due.

Both parties agree to comply with all applicable governmental laws and regulations.

The laws of the State of New York will govern the Agreement.

## 28.0  DEALER SPECIFIC INFORMATION

### Aggregator Relationships

The provisions of this Section apply to you only if you have been approved in this Section to receive Products from an Aggregator. Lexmark will indicate its approval of you to receive Products from an Aggregator by naming the Aggregator in this Section.

The term "Aggregator" means a business entity, typically a franchisor, which has been approved by Lexmark under a written agreement, to order and receive Products from Lexmark for redistribution to the Aggregator's members or franchisees. Lexmark must approve such members or franchisees as Dealers.

You may elect to obtain Products through your Aggregator. For such products, you waive your rights and Lexmark waives your responsibilities under the following item and Sections of the Agreement;

    5.0    DEALER RESPONSIBILITIES - item (14);
    6.0    ORDERS AND CANCELLATIONS;
    7.0    PRICES;
    8.0    PAYMENT;
    9.0    PRICE REDUCTION CREDIT;
    10.0   INVENTORY ADJUSTMENTS; and
    18.0   TAXES.

Title to machines, shipped to you by your Aggregator, passes from Lexmark directly to you upon shipment from your Aggregator.

Lexmark does not have responsibility for risk of loss of, or damage to, Products shipped to you by your Aggregator.

Machines your Aggregator ships to you will be identified by serial number. Therefore, in addition to the record and audit requirements described in Section 5.0 of the Agreement, you agree that you will maintain a record of each such machine by serial number. You agree that you will maintain that record for 12 months following your receipt of the machine. You must provide such records to Lexmark upon request. In addition, you hereby authorize your Aggregator to release information to Lexmark regarding machines shipped to you.

For Products you order directly from Lexmark, the waivers described in the third paragraph of this section will not apply.

Name and location of your Aggregator:

    NA

### Superstores

The selection criteria for Superstores shall be defined by Lexmark.

Dealers who are Superstores for specific Products shall be indicated by a "YES" on the appropriate line(s):

    NO    Supplies
    NO    Typewriters
    NO    Printers

CONFIDENTIAL - OUTSIDE COUNSEL ONLY  A2582

**Campus Technology Centers**

Campus Technology Centers are not-for-profit institutions of higher education that may acquire Products for internal use and re-marketing to End Users only, and shall be indicated by a "YES" on this line:    **NO**

If you are a Campus Technology Center, then the term Dealer shall be replaced by Campus Technology Center throughout this Agreement.

The additional following terms shall apply to Campus Technology Centers:

1) End User means a party who a) is staff, faculty or a registered student matriculated in a degree granting program; and b) acquires Product from you for its own use, and not for remarketing.
2) Internal use means use for instruction, academic research and administrative work of your educational institution.
3) You will market Products to End Users as an incidental part of your activities and in furtherance of your educational purposes.
4) You will not sell more than one printer per year to an End User without Lexmark's prior written approval.
5) Prices for Campus Technology Centers shall be set forth in separate notices and/or an electronic file.
6) Lexmark will provide an Education Development Fund for your use in developing and improving your capability to support your End Users.
7) The warranty period for internal use Products will commence on the day you place the Product in use in your educational institution.

**Eligible Products**

You are approved to market the following Product families, as specified with a "YES" or identified portions as designated. Specific Products are listed in notices and an electronic file. Specific certification may also be required for certain Products.

| Supplies | Typewriters | Printers | Other (as listed) |
|----------|-------------|----------|-------------------|
| YES | NO | YES | NO |

**Minimum Renewal Criteria**

Lexmark may establish Minimum Renewal Criteria (MRC) for a contract period for some or all Products. The MRC designates the minimum level of sales performance expected of you.

| Product | Minimum Renewal Criteria |
|---------|--------------------------|
| SUPPLIES | |
| PRINTERS | |

**Marketing Coverage Area**

Your approved marketing coverage area(s), listed by Authorized Location, by county and state, is:

NA

**Authorized Locations**

All Authorized Locations must be approved in writing by Lexmark and listed below or on an attachment to this Agreement. Any change in the location or any significant change in the characteristics of your Authorized Locations must be approved by Lexmark.

**CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A2583**

# DEALER CONTRACT 2

**Lexmark International, Inc.**

## AUTHORIZED DEALER AGREEMENT

Name and Address of Dealer:

███████████████████████████

Lexmark Office Address:
Lexmark International Inc
Six Concourse Pky   Ste 1900
Atlanta, Ga   30328

Agreement No.:   LX00541

Contract Commencement Date:   04-23-99

Lexmark Office No.:   S52

Thank you for selecting Lexmark as a supplier of Products, services, and support.   Our goal is to be the best in the industry.   If at any time you are not completely satisfied, please let us know.

This agreement authorizes you to purchase Products from Lexmark International, Inc., (Lexmark) under its terms for marketing to End Users and your internal use only in the United States and Puerto Rico.   Lexmark may issue Bulletins under this Agreement that change the terms of this Agreement.  Any Bulletins will become effective on the date Lexmark specifies unless you notify us in writing within 30 days of your receipt of the Bulletin that you do not accept it.

Lexmark may issue administrative, technical and procedural information, announcements, promotions, programs, product and pricing letters, product withdrawal letters, and other kinds of notices in writing from time to time.  All such notices are effective on the date Lexmark specifies.

### Table of Contents

| | | | |
|---|---|---|---|
| 1.0 | DEFINITIONS | 19.0 | STATUS CHANGE |
| 2.0 | CONTRACT PERIOD | 20.0 | TRADEMARKS AND TRADE NAMES |
| 3.0 | RELATIONSHIP OF THE PARTIES | 21.0 | PATENTS AND COPYRIGHTS |
| 4.0 | MARKETING TO END USERS | 22.0 | LIMITATION OF REMEDIES |
| 5.0 | DEALER RESPONSIBILITIES | 23.0 | INDEMNIFICATION |
| 6.0 | ORDERS AND CANCELLATIONS | 24.0 | TERMINATION |
| 7.0 | PRICES | 25.0 | DEALER ASSOCIATE REMARKETERS |
| 8.0 | PAYMENT | 26.0 | CONFIDENTIAL INFORMATION |
| 9.0 | PRICE REDUCTION CREDIT | 27.0 | GENERAL |
| 10.0 | PRODUCT RETURNS | 28.0 | DEALER SPECIFIC INFORMATION |
| 11.0 | WARRANTIES | | Eligible Products |
| 12.0 | WARRANTY SERVICE | | Minimum Renewal Criteria |
| 13.0 | MAINTENANCE PARTS | | Marketing Coverage Area |
| 14.0 | ENGINEERING CHANGES | | Authorized Locations |
| 15.0 | LICENSED PROGRAMS | | |
| 16.0 | SECURITY INTEREST | | |
| 17.0 | TITLE AND RISK OF LOSS | | |
| 18.0 | TAXES | | |

**PAGES 2 THROUGH 8 ARE ALSO PART OF THIS AGREEMENT.** This Agreement and Bulletins, the Statements of Limited Warranty, and notices are the complete agreement between us, and replace any prior oral or written communications between us. By signing below, each of us agrees to the terms of this Agreement.  Once signed, any reproduction of this Agreement made by reliable means (for example, photocopy or facsimile) is considered an original.

Accepted by:

**Lexmark International, Inc.**

By _[signature]_____
Authorized Signature

_Charles E. Simon_    4-27-99
Name  (Type or Print)        Date

Accepted by:Carolina Imaging and Computer Products Inc

███████████████████████████

LEX 10/20/97                    Page 1 of 8

CONFIDENTIAL - OUTSIDE COUNSEL ONLY  A2584

## 1.0  DEFINITIONS

Agreement means this Dealer Agreement, Bulletin(s), applicable Statements) of Limited Warranty and notices.

Authorized Location means any of your business locations approved by Lexmark in writing for the purposes of your performance under the Agreement.

End User means a party who acquires the Products for its own use and not for remarketing.

Products means those items identified in section 28.0 which you can market under this Agreement.

## 2.0  CONTRACT PERIOD

The Agreement has a single 12 month contract period which, unless noted otherwise on page 1, commences on the first day of the month following the date of your signature on page 1, provided it is accepted by Lexmark. The Agreement can be renewed by the parties for subsequent single 12 month contract periods. Unless Lexmark notifies you otherwise, the renewal of the Agreement shall automatically occur annually unless either party notifies the other of its desire not to renew at least 90 days prior to the contract period expiration date. Either party can elect not to renew the Agreement with or without cause.

## 3.0  RELATIONSHIP OF THE PARTIES

As an independent contractor, you are not Lexmark's legal representative, franchisee, or agent for any purpose.

You will not make any warranties or representations on Lexmark's behalf other than those specified in the Agreement. Neither party will assume or create any obligations on the other's behalf except as specified in the Agreement.

You will market Products to End Users at such prices and terms and conditions as you determine. Such terms and conditions must not be in conflict with your obligations in the Agreement.

Lexmark reserves the right to market anywhere, including your geographic area, products which are the same as or similar to the Products under the Agreement either directly or through other remarketers.

You reserve the right to market Products which are similar or competitive to the Products under the Agreement.

Lexmark may establish annual sales performance objectives, which modify the Minimum Renewal Criteria, for the Products you are approved to market. Lexmark reserves the right to revise the objectives at any time. Lexmark's assessment of your overall compliance with the provisions of the Agreement will include a review of your attainment of these sales performance objectives.

Lexmark may conduct reviews to evaluate your performance and compliance with the provisions of the Agreement.

## 4.0  MARKETING TO END USERS

The Products you market under the Agreement require your high quality individualized pre-sale and post-sale support. This support is necessary to achieve and maintain high End User satisfaction. Your ability to provide this support is a key reason Lexmark selected you as an authorized Dealer. You, therefore, will market Products only to End Users. You agree not to market Products to other remarketers, except as agreed to by Lexmark.

In order to better ensure End User satisfaction, Lexmark retains the option of issuing or not issuing Letters of Supply (or guarantees of supply) to you when you respond to any particular state, local or federal government procurement request. Likewise, without Lexmark's written consent, you may not issue a Letter of Supply relating to Lexmark Products to any other party in connection with any government procurement

## 5.0  DEALER RESPONSIBILITIES

You agree to:

1) ensure the Product marketed to the End User is appropriate for the End User's requirements;
2) ensure that the End User is satisfied with all your Product marketing activities, including Product explanation, demonstration, and ongoing support;
3) maintain an End User record for each unit of Product sold or licensed. End User records are not required for Supplies. An End User record will include the name and address of the End User, the date of the sale or license, the Product Type/Model sold or licensed, and the Product's serial number, if applicable. You must retain the End User record for all Products that are laser printers or that contain a video display for at least five years after the date of sale, and shall retain End User Records for all other Products, excluding Supplies, for the longest period of time that you customarily retain such records. You must assist Lexmark, upon Lexmark's request, in tracing a Product to an End User to distribute Product information or locate a Product for safety reasons;
4) furnish a sales receipt to the End User upon delivery of the Product indicating the date of sale or license and the serial number, if any, of the Product sold or licensed. You must retain a copy of that sales receipt for one year from the date of sale or license. You must indicate on the sales receipt for the Product any non-Lexmark alterations made to the Product;
5) report your sales performance and inventory as requested by Lexmark;
6) market, generate demand for, and support Products only at your Authorized Location or at your End User's location; receive and inventory Products only at your Authorized Location unless Lexmark specifies otherwise; and reference only your Authorized Location in your marketing materials or advertising;
7) maintain sufficient inventory of Products at each location to promptly satisfy reasonably foreseeable End User demand;
8) maintain trained management, sales, support and service personnel, if applicable;

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A2585

9) report promptly to Lexmark all suspected and actual Product problems;

10) provide a Product business plan as required by Lexmark;

11) notify Lexmark of any discrepancies between the Lexmark shipping manifest and the Products received;

12) maintain good financial standing and provide financial information and evidence of financial security upon request;

13) allow Lexmark or its appointed auditor to audit, during normal business hours, the above required records and receipts.

## 6.0  ORDERS AND CANCELLATIONS

Lexmark will describe specific ordering procedures and forecast requirements, if any, in writing.

Lexmark will fill your orders for Products and meet your request for shipment dates subject to the Product's availability and consistent with Lexmark's production and supply schedules.

You may cancel an order for any Product which Lexmark has not shipped to you. Lexmark may charge you a Cancellation charge of 2% of the canceled Product's Dealer price if the cancellation was requested by you after the Product was released for shipment by Lexmark. A Product is generally released for shipment one or two days before it ships. However, you will not be liable for a cancellation charge if Lexmark has postponed shipment of the Product for more than 15 days from its estimated shipment date, and you have canceled your order for the Product before the Product's shipment.

Lexmark will charge you a handling charge of 5% if you refuse to accept a product you ordered. You must prepay all transportation charges for return of the Product to Lexmark.

Each printer order is required to have a single ship-to-address.

## 7.0  PRICES

Lexmark will specify its Dealer prices in notices and an electronic file. Dealer prices are F.O.B. destination, unless Lexmark specifies otherwise. Lexmark may change its Dealer prices at any time. Lexmark specified prices shall apply in spite of any different pricing contained in Dealer purchase orders, even if such purchase orders are accepted and Product is shipped.

A Dealer price increase for a Lexmark Product is effective on the date specified. Lexmark will announce a price increase a minimum of 30 days prior to the effective date of the increase. A price increase will not apply to a Product for which Lexmark has accepted an order prior to the effective date, provided the order specifies a requested ship date within the time frame stated in the price increase notice.

A Dealer price decrease is effective on the date specified and will apply to Products shipped on or after the effective date of the decrease.

A single unit price reflects the list price for units of Product acquired by End Users directly from Lexmark. A suggested retail price may also be established by Lexmark. Both are subject to change without notice. These prices are for informational purposes only and shall not limit in any way your ability to set your own prices, charges and terms and conditions for Products.

Lexmark may specify any additional fees and allowances in notices. Lexmark may change the fees and allowances at any time. Such changes will become effective on the date Lexmark specifies.

### Printers

Price schedules are based on your annual revenue attainment.

| Schedule | Annual Revenue Attainment |
|----------|---------------------------|
| I | Less than $250 Thousand |
| II | $250 Thousand - $3 Million |
| III | Greater than $3 million |

You may be put on a different price schedule based on actual performance. Lexmark will notify you in writing prior to a change in your price schedule. The above price schedules pertain to printer products only.

The above price schedule reflects full pallet prices. A non-full pallet freight/handling charge of 1% will be added to any non-full pallet order. This charge applies only to printers, not printer features. Mixed pallets do not qualify as full pallets. Lexmark may identify in notices those printer models that are not subject to the 1% non-full pallet charge.

### Typewriters

Price schedules for typewriters are based on a single order, with a single shipment to a single location unless Lexmark specifies otherwise.

| Schedule I -- | Invoice value under $10,000 |
|---------------|------------------------------|
| Schedule II -- | Invoice value of at least $10,000 and less than $20,000 |
| Schedule III -- | Invoice value of at least $20,000 |

All typewriter models may be aggregated for purposes of determining invoice value.

Features may not be included for purposes of determining invoice value.

### Supplies

Dealer Prices and minimum order quantities are set forth in notices. Each order for supplies for shipment to a single Authorized Location must be for an amount of at least $500.

## 8.0  PAYMENT

You agree to pay Lexmark upon your receipt of an invoice, unless otherwise specified by Lexmark. If you fail to pay, Lexmark may:

CONFIDENTIAL - OUTSIDE COUNSEL ONLY   A2586

1) impose a finance charge on the balance due;
2) exercise any of its rights provided in the Agreement or by law;
3) require "cash with order" or "payment on account" prior to accepting your orders; and/or
4) stop shipment of your orders.

## 9.0 PRICE REDUCTION CREDIT

If Lexmark announces a Dealer price decrease for a Product, you may be eligible to receive a price reduction credit.

### Printers and Typewriters

The price reduction credit equals the credit amount per Product, as specified by Lexmark, multiplied by your existing inventory and Product in transit to you from Lexmark on the effective date specified in the notice.

In order to qualify for a price reduction credit, you must:

1) provide a report of your inventory of the Product in a format and time frame specified by Lexmark;
2) provide access, during normal business hours, to allow Lexmark to audit applicable records and inventory.

### Printer and Typewriter Features and Supplies

The price reduction credit for features and supplies equals the credit amount per item, as specified by Lexmark, multiplied by the quantity shipped directly from Lexmark to you (minus returns from you) in the prior two months.

## 10.0 PRODUCT RETURNS

### General Terms - Printers, Typewriters, Printer & Typewriter Features, Supplies

During a contract period, you may return for credit selected Products which you obtained directly from Lexmark. Lexmark will specify which Products are returnable in notices or an electronic file.

Lexmark notices may place limits on the amount of Product that can be returned. All Product must be returned to Lexmark within thirty (30) days after receiving authorization, to ensure proper credit.

Upon receipt and acceptance of a returned Product, Lexmark will issue you a Product credit as determined by Lexmark. You may use such credit only against sums then or thereafter due Lexmark.

You must return all Products to Lexmark, transportation pre-paid, in the original shipping containers which must not have been opened, damaged, marked or labeled. The Products must be in marketable condition as determined by Lexmark. This requirement is not applicable to defective Product.

Product returned without Lexmark's authorization and the appropriate documentation will be returned to you at your expense.

Any prior passage to you of title to Products will be deemed void from its inception when the returned Products are accepted by Lexmark. You warrant and represent that the returned Products are free of any outstanding liens, security interests or other third party encumbrances.

Lexmark may charge a handling charge of 5% multiplied by the Dealer price for any returned Product.

Lexmark may issue notices clarifying Product return policies which shall be effective on the date specified.

For Products being withdrawn from marketing, guidelines of limitations on returns may be contained in the withdrawal notice.

### Printer/Printer Features only - Stock Balance/Inventory Adjustment

One return shipment of any currently-marketed printer Product for stock balancing is allowed per month.

Up to 5% of the prior quarter's purchases (rolling quarter) may be returned per month without a restocking charge. The Product returned must be accompanied by a new order of equal or greater value than the return to avoid a 5% restocking charge.

Replacement orders entered to qualify as a stock balancing Product return must be for normal delivery. Such orders do not qualify for deferred delivery schedules.

Cancellation of an order entered as stock balancing replacement order will result in a restocking charge to the Dealer that equals 5% of the value of the associated return.

Discontinued printer Products may be returned under the stock balancing returns provisions, as long as such return is within the dates specified by the discontinuance notice.

Additional returns above the stock balancing monthly 5% maximum are allowed up to a maximum return of 15% of prior quarter's purchases. These additional returns will be treated as inventory adjustments and charged a 5% restocking charge.

### Printer/Printer Features only - Defective Product

Lexmark will replace printer Products or provide a credit to you for any currently marketed Lexmark printer Product found to be defective by you prior to the sale to the End User customer. In addition, Lexmark will provide credit to you for any Lexmark printer Product returned defective by an End User within 30 days of its purchase.

Defective discontinued printer Products to be eligible for credit must be returned to Lexmark within the dates specified by the discontinuance notice.

### Supplies

Only four return shipments of supplies are allowed per contract period. The maximum quantity of supplies you may return is equal to the quantity shipped to you by Lexmark in the immediately preceding twelve months less any returns during that period.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A2587

## 11.0 WARRANTIES

Lexmark will include the applicable Statement of Limited Warranty with machines shipped. Lexmark will provide you a copy of the Statement of Limited Warranty which you are to provide to your End User at the time of sale. Lexmark may revise a Statement of Limited Warranty.

The warranty period will start on the day the End User purchases the Product. You will advise the End User of this start date.

## 12.0 WARRANTY SERVICE

The Service Support Guide is incorporated in the Agreement by reference.

Providing printer warranty service is optional for printer Dealers.

Unless Lexmark specifies otherwise, for typewriters and supplies you will, and for printers you may:

1) provide warranty service under the terms of the applicable Statement of Limited Warranty and in accordance with the Service Support Guide;
2) validate all warranty claims presented to you; and
3) maintain the capability to provide warranty service according to the requirements and procedures specified in the Service Support Guide.

Lexmark will:

1) provide at no fee, one (1) copy of requested self-education service materials per Authorized Locations.
2) make available to you, for a fee, a) service training for additional service personnel, and b) additional service materials; and
3) honor your valid claims for warranty reimbursement for labor (when applicable) and/or credits for parts or exchange of parts as specified in the Service Support Guide.

## 13.0 MAINTENANCE PARTS

Lexmark will sell you maintenance parts only for providing warranty and maintenance service or for sale to End Users for the sole purpose of maintaining their machines.

## 14.0 ENGINEERING CHANGES

During the Warranty Period, any engineering changes determined applicable by Lexmark will be controlled by Lexmark and installed as specified by Lexmark on the machines. You or your End User may, by providing notice subject to written confirmation by Lexmark, elect to have only mandatory changes, as determined by Lexmark, installed. Lexmark may either install a mandatory change at your location without charge or provide you, at no charge, parts and instructions for your installation of such changes on all machines in your inventory or on machines owned by your End Users. If you install the changes, Lexmark will reimburse you for your labor at a rate established by Lexmark.

## 15.0 LICENSED PROGRAMS

Licensed programs may be made available, as determined by Lexmark, to you to market under the provisions of the Agreement and any accompanying End User License Agreement or a third party agreement.

You agree to accept return of a licensed program, provided it is in its original, unopened package, and refund the money paid by an End User who does not wish to be bound by the license. If the license permits the return of a program with an accompanying specified Product, you agree to accept the return of the program with the other Product for refund.

Certain programs may be distributed by you only along with the Products with which they are packaged, as set forth in Product announcement letters. In addition, certain programs, as identified in their accompanying End User license agreement, when distributed to the U.S. or other governments, must be identified as subject to government regulations for software protection of privately developed commercial software.

## 16.0 SECURITY INTEREST

Lexmark reserves, and you grant a purchase money security interest in each Product, in your proceeds from the sale of each Product and in your accounts receivable for such Product. This interest will be satisfied by payment in full.

You agree to sign an appropriate document to permit us to perfect Lexmark's purchase money security interest.

## 17.0 TITLE AND RISK OF LOSS

Title passes to you for each machine on its date of shipment from Lexmark. Title for each copy of a licensed program remains in Lexmark.

Lexmark relieves you of responsibility for all risk of loss of, or damage to, a machine during the period it is in transit from Lexmark up to its initial delivery to you.

## 18.0 TAXES

You agree to pay amounts equal to any taxes resulting from the Agreement or any activities under the Agreement. Such taxes do not include taxes based on Lexmark's net income. You are responsible to bear any personal property taxes assessable on Products on or after delivery to the carrier at the Lexmark ship-from location.

You agree to provide Lexmark with a valid Reseller Exemption Certificate for each taxing jurisdiction to which Products acquired by you for resale will be shipped by Lexmark under the Agreement. If such Certificate(s) is not provided to Lexmark prior to shipment, Lexmark will charge, and you will be required to pay, all applicable state and local taxes.

You agree to notify Lexmark promptly of the revocation or modification of any Reseller Exemption Certificate so provided. You further agree to indemnify and hold Lexmark harmless from any claims and assessments against Lexmark resulting

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A2588

Lexmark's entire liability and your exclusive remedy for actual damages from your use of licensed programs are as set forth in their accompanying program license agreement.

Lexmark assumes no liability regarding any claim or action caused by, or directly related to, a non-Lexmark Product.
In no event will Lexmark be liable for any lost profits, lost savings, incidental damages, or other consequential damages, even if Lexmark has been advised of the possibility of such damages. Lexmark will not be liable for any damages claimed by you based on any third party claim.

For any claim for any cause whatsoever, other than those provided for in section 21.0 and the first paragraph of section 23.0, Lexmark's liability for actual damages will be limited to $100,000.

## 23.0  INDEMNIFICATION

Lexmark will indemnify and hold you harmless from all claims, including reasonable attorney's fees, (but not including lost profits, lost savings, incidental damages, or other consequential damages), for bodily injury or damage to real property or tangible personal property arising from any acts or omissions for which Lexmark is legally liable.

You will indemnify and hold Lexmark harmless from all claims, including reasonable attorney's fees, by any party resulting directly or indirectly from any acts or omissions by you.

## 24.0  TERMINATION

Either party may terminate the Agreement, with or without cause. Lexmark will provide three month written notice to you of such termination, except as otherwise provided in this Section. You must provide one month written notice to Lexmark.

In the event that Lexmark gives you such notice for cause, Lexmark may provide you with an opportunity to cure deficiencies. In such event, Lexmark will establish a reasonable time, not to exceed three months, in which you must remedy such deficiencies.

In addition, Lexmark considers certain actions so serious and inconsistent with your obligations as a Dealer as to warrant immediate termination. Such breaches will include, but not be limited to, situations in which 1) you made material misrepresentations to Lexmark in your application to become a Dealer, at any later time through oral or written statements, or by submission of any false or fraudulent documentation or claim to Lexmark, or 2) you marketed Products to other than an End User.

Lexmark may also terminate the Agreement immediately in the event that a dealer or its personnel knowingly or negligently engage, directly or indirectly, in the manufacture, sale, resale, brokerage, distribution, storage or handling of counterfeit goods (that is, good bearing the trademark, trade name or trade dress of IBM or Lexmark which have a source other than IBM or Lexmark).

In the event of termination of the Agreement by you or Lexmark, all monies due Lexmark will immediately become due and payable.

If you or Lexmark elects to terminate the Agreement, Lexmark may repurchase some or all of the Products in your inventory at a price determined by Lexmark. In such event, return shipping charges will be paid by you. Products returned must be in the original shipping containers, which must not have been opened, damaged, marked or labeled.

A termination of the Agreement may also be only a partial termination of, for example, an Authorized Location, an eligible Product family, a part of a marketing coverage area, an Aggregator relationship, or the approval to market to Dealer Associates.

## 25.0  DEALER ASSOCIATE REMARKETERS

A Dealer Associate Remarketer is one who obtains Product from you and remarkets the Product to End Users.

You may market Products to a Dealer Associate only with the approval of Lexmark. You retain responsibility to ensure End User satisfaction and, if applicable, provide warranty service to the Dealer Associate's End User. These responsibilities may not be delegated. You may, however, share specific End User technical assistance functions with your Dealer Associate.

Lexmark will identify those Products which you may market to a Dealer Associate. Lexmark reserves the right to withdraw its approval for either the Dealer Associate or such Products which you market to a Dealer Associate.

You must maintain records for those Products you ship to your Dealer Associate. You must have appropriate agreements with your Dealer Associate in place to ensure your Dealer Associate:

   1)  markets only from its approved location and only to End Users;
   2)  maintains End User Records in the format and for the required period of retention as described in this Agreement; and
   3)  assists Lexmark in tracing a specific Product to an End User if required.

## 26.0  CONFIDENTIAL INFORMATION

   1)  Any information concerning IBM or Lexmark customers furnished to you by IBM or Lexmark and identified as confidential, shall be treated and held in confidence by you. You shall not publish, disclose or disseminate it for a period of five years after its receipt, except as may be authorized by Lexmark in writing. You shall not be entitled to use this information for any purposes other than for marketing of Products in furtherance of this Agreement, or as specified in the information provided.
   2)  Upon termination or expiration of this Agreement, you shall deliver to Lexmark all materials, of any kind, containing such confidential information.
   3)  Other than as set forth above, no information will be given or received in confidence by either party unless it is covered by a separate written agreement.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A2589

## 27.0 GENERAL

Either party's waiver of any instance of the other party's noncompliance with the Agreement will not be deemed a waiver of any future noncompliance.

You may not assign the Agreement or any of its rights or duties without Lexmark's prior written consent.

Neither party is responsible for failure to fulfill its obligations under the Agreement due to causes beyond its control.

The Agreement will not be supplemented or modified by any course of dealing or trade usage. Variance from or addition to the terms and conditions of the Agreement in any purchase order or other written notification from you will be of no effect.

The provisions of the Agreement which by their nature extend beyond the termination or expiration of the Agreement will survive and remain in effect until all obligations are satisfied.

Each party agrees to pay the other's reasonable attorney's fees and costs of litigation if the party, for any cause whatsoever, brings suit against the other party and the other party is finally adjudicated not to have liability.

Neither you nor Lexmark will bring an action, regardless of form, arising out of the Agreement more than two years after the cause of action has arisen. In the case of an action for non-payment, the action may not be brought more than two years from the date the last payment was due.

Both parties agree to comply with all applicable governmental laws and regulations.

The laws of the State of Kentucky will govern the Agreement.

## 28.0 DEALER SPECIFIC INFORMATION

### Eligible Products

You are approved to market the following Product families, as specified with a "YES" or identified portions as designated. Specific Products are listed in notices and an electronic file. Specific certification may also be required for certain Products.

| Printers _____ | Supplies ___x___ |
| Typewriters _____ | Other (as listed) |

### Minimum Renewal Criteria

Lexmark may establish Minimum Renewal Criteria (MRC) for a contract period for some or all Products. The MRC designates the minimum level of sales performance expected of you. Sales performance objectives may be established which modify your MRC.

| Product | Minimum Renewal Criteria |
|---------|--------------------------|

### Marketing Coverage Area

Your approved marketing coverage area(s), listed by Authorized Location, by county and state, is:

### Authorized Ship to and Bill to Locations

All Authorized ship to and bill to Locations must be approved in writing by Lexmark and listed below or on an attachment to this Agreement. Any change in the location or any significant change in the characteristics of your Authorized Locations must be approved by Lexmark.

Location

CONFIDENTIAL - OUTSIDE COUNSEL ONLY  A2590

DEALER CONTRACT 3



**Lexmark International, Inc.**
an IBM alliance company

# AUTHORIZED DEALER AGREEMENT

Name and Address of Dealer:

Agreement No.: 1007805

Contract Commencement Date: 12/01/92

Lexmark Office Address:

6301 NW 5TH WAY, 3RD FLOOR
FT. LAUDERDALE      FL 33309

Lexmark Office No.: GT9

Thank you for selecting Lexmark as a supplier of products, services, and support. Our goal is to be the best in the industry. If at any time you are not completely satisfied, please let us know.

This agreement authorizes you to purchase Products from Lexmark International, Inc. (Lexmark) under its terms for marketing to End Users and your internal use only in the United States and Puerto Rico. Lexmark may issue Bulletins under this Agreement which change the terms of this Agreement. Any Bulletins will become effective on the date Lexmark specifies unless you notify us in writing within 30 days of your receipt of the Bulletin that you do not accept it.

Lexmark may issue administrative, technical and procedural information, announcements, promotions, programs, product and pricing letters, product withdrawal letters, and other kinds of notices in writing from time to time. All such notices are effective on the date Lexmark specifies.

**Table of Contents**

| | | | | |
|---|---|---|---|---|
| 1.0 | DEFINITIONS | | 19.0 | STATUS CHANGE |
| 2.0 | CONTRACT PERIOD | | 20.0 | TRADEMARKS AND TRADE NAMES |
| 3.0 | RELATIONSHIP OF THE PARTIES | | 21.0 | PATENTS AND COPYRIGHTS |
| 4.0 | MARKETING TO END USERS | | 22.0 | LIMITATION OF REMEDIES |
| 5.0 | DEALER RESPONSIBILITIES | | 23.0 | INDEMNIFICATION |
| 6.0 | ORDERS AND CANCELLATIONS | | 24.0 | TERMINATION |
| 7.0 | PRICES | | 25.0 | DEALER ASSOCIATED REMARKETERS |
| 8.0 | PAYMENT | | 26.0 | PS/1 PRINTERS |
| 9.0 | PRICE REDUCTION CREDIT | | 27.0 | CONFIDENTIAL INFORMATION |
| 10.0 | INVENTORY ADJUSTMENTS | | 28.0 | GENERAL |
| 11.0 | WARRANTIES | | 29.0 | DEALER SPECIFIC INFORMATION |
| 12.0 | WARRANTY SERVICE | | | Aggregator Relationships |
| 13.0 | MAINTENANCE PARTS | | | Superstores |
| 14.0 | ENGINEERING CHANGES | | | Campus Technology Centers |
| 15.0 | LICENSED PROGRAMS | | | Eligible Products |
| 16.0 | SECURITY INTEREST | | | Minimum Renewal Criteria |
| 17.0 | TITLE AND RISK OF LOSS | | | Marketing Coverage Area |
| 18.0 | TAXES | | | Authorized Locations |

PAGES 2 THROUGH 8 ARE ALSO PART OF THIS AGREEMENT. This Agreement and Bulletins, the Statements of Limited Warranty, and notices are the complete agreement between us, and replace any prior oral or written communications between us. By signing below, each of us agrees to the terms of this Agreement. Once signed, any reproduction of this Agreement made by reliable means (for example, photocopy or facsimile) is considered an original.

Accepted by:
**Lexmark International, Inc.**

By _Ken Brooks_
          Authorized Signature

_Ken Brooks_                    _12/2/92_
Name (Type or Print)                 Date

Name (Type or Print)                 Date

LX01-04 (06/18/92)

CONFIDENTIAL - OUTSIDE COUNSEL ONLY  A2591

## 1.0  DEFINITIONS

Agreement means this Dealer Agreement, Bulletin(s), applicable Statement(s) of Limited Warranty and notices.

Authorized Location means any of your locations approved by Lexmark in writing for the purposes of your performance under the Agreement.

End User means a party who acquires the Products for its own use and not for remarketing.

PLA Programs means licensed programs which Lexmark designates as subject to the Lexmark Program License Agreement (PLA).

Products means machines, licensed programs, and other items you can market under the Agreement.

## 2.0  CONTRACT PERIOD

The Agreement has a single 12 month contract period which, unless noted otherwise on page 1, commences on the first day of the month following the date of your signature on page 1, provided it is accepted by Lexmark. The Agreement can be renewed by the parties for subsequent single 12 month contract periods. Unless Lexmark notifies you otherwise, the renewal of the Agreement shall automatically occur unless either party notifies the other of its desire not to renew at least 90 days prior to the contract period expiration date. Either party can elect not to renew the Agreement with or without cause.

## 3.0  RELATIONSHIP OF THE PARTIES

As an independent contractor, you are not Lexmark's legal representative, franchisee, or agent for any purpose.

You will not make any warranties or representations on Lexmark's behalf other than those specified in the Agreement. Neither party will assume or create any obligations on the other's behalf except as specified in the Agreement.

You will market Products to End Users at such prices and terms and conditions as you determine. Such terms and conditions must not be in conflict with your obligations in the Agreement.

Lexmark reserves the right to market anywhere, including your geographic area, products which are the same as or similar to the Products under the Agreement either directly or through other remarketers.

You reserve the right to market products which are similar or competitive to the Products under the Agreement.

Lexmark may establish annual sales performance objectives, which modify the Minimum Renewal Criteria, for the Products you are approved to market. Lexmark reserves the right to revise the objectives at any time. Lexmark's assessment of your overall compliance with the provisions of the Agreement will include a review of your attainment of these sales performance objectives.

Lexmark may conduct reviews to evaluate your performance and compliance with the provisions of the Agreement.

## 4.0  MARKETING TO END USERS

The Products you market under the Agreement require your high quality individual pre-sale and post-sale support. This support is necessary to achieve and maintain high End User satisfaction. Your ability to provide this support is a key reason Lexmark selected you as an authorized dealer. You, therefore, will market Products only to End Users. You agree not to market Products to other remarketers, except as agreed to by Lexmark.

## 5.0  DEALER RESPONSIBILITIES

You agree to:

1) ensure the Product marketed to the End User is appropriate for the End User's requirements;
2) ensure that the End User is satisfied with all your Product marketing activities, including Product explanation, demonstration, and ongoing support;
3) maintain an End User record for each unit of Product sold or licensed. End User records are not required for Supplies. An End User record will include the name and address of the End User, the date of the sale or license, the Product Type/Model sold or licensed, and the Product's serial number, if applicable. You must retain the End User record for all Products that contain a video display for at least five years after the date of sale, and shall retain End User Records for all other Products, excluding Supplies, for the longest period of time that you customarily retain such records. You must assist Lexmark, upon Lexmark's request, in tracing a Product to an End User to distribute Product information or locate a Product for safety reasons;
4) furnish a sales receipt to the End User upon delivery of the Product indicating the date of sale or license and the serial number, if any, of the Product sold or licensed. You must retain a copy of that sales receipt for one year from the date of sale or license. You must indicate on the sales receipt for the Product any non-Lexmark alterations made to the Product;
5) report your sales performance and inventory as requested by Lexmark;
6) market, generate demand for, perform warranty service for, and support Products only at your Authorized Location or at your End User's location; receive and inventory Products only at your Authorized Location unless Lexmark specifies otherwise; and reference only your Authorized Location in your marketing materials or advertising;
7) maintain a sufficient inventory of Products to satisfy reasonably foreseeable End User demand;
8) provide floor space and related facilities at your Authorized Location(s) to display and demonstrate the Products;
9) maintain trained management, sales, support and service personnel;
10) report promptly to Lexmark all suspected and actual Product problems;
11) provide a product business plan as required by Lexmark;
12) notify Lexmark of any discrepancies between the Lexmark shipping manifest and the Products received;
13) maintain good financial standing and provide financial information and evidence of financial security upon request;
14) allow Lexmark or its appointed auditor to audit, during normal business hours, the above required records and receipts.

## 6.0  ORDERS AND CANCELLATIONS

Lexmark will describe specific ordering procedures and forecast requirements, if any, in writing.

Lexmark will fill your orders for Products and meet your request for shipment dates subject to the Product's availability and consistent with Lexmark's production and supply schedules.

You may cancel an order for any Product which Lexmark has not shipped to you. Lexmark may charge you a Cancellation Charge of 2% of the cancelled Product's Dealer price if the cancellation was requested by you after the Product was released for shipment by Lexmark. A Product is generally released for shipment one or two days before it ships. However, you will not be liable for a Cancellation Charge if Lexmark has postponed shipment of the Product for more than 15 days from its estimated shipment date, and you have cancelled your order for the Product before the Product's shipment.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY  A2592

Lexmark will charge you a Handling Charge of 5% if you refuse to accept a Product you ordered. You must prepay all transportation charges for return of the Product to Lexmark.

## 7.0 PRICES

Lexmark will specify its Dealer prices in notices and an electronic file. Dealer prices are F.O.B. destination, unless Lexmark specifies otherwise. Lexmark may change its Dealer prices at any time.

A Dealer price increase for a Product is effective on the date specified. However, a Dealer price increase will not apply to a Product for which Lexmark has received an order prior to the day the increase is effective, provided Lexmark accepts such order.

A Dealer price decrease is effective on the date specified and will apply to Products shipped on or after the effective date of the decrease.

A single unit price reflects the price for single units of Product acquired by End Users directly from Lexmark. A suggested retail price may also be established by Lexmark. Both are subject to change without notice. These prices are for informational purposes and shall not limit in any way your ability to set your own prices, charges and terms and conditions for Products.

Lexmark may specify any additional fees and allowances in notices. Lexmark may change the fees and allowances at any time. Such changes will become effective on the date Lexmark specifies.

### Printers

Price schedules are based on your annual revenue commitment for printers and printer features.

| Schedule | Annual Revenue Commitment |
|---|---|
| I | Less than $1 million |
| II | $1 - $3 million |
| III | Greater than $3 million |

You may be put on a different price schedule based on actual performance. Lexmark will notify you in writing prior to a change in your price schedule.

Each order is required to have a single ship-to address. Printer orders for less than $5,000 will be assessed a $30 order charge. This minimum order charge only applies to printers. Printer features are not subject to a minimum order charge, but may be aggregated with printers to meet the $5,000 printer order value.

### Typewriters

Price schedules for typewriters are based on a single order, with a single shipment to a single location unless Lexmark specifies otherwise.

| Schedule I | -- | Invoice value under $10,000 |
| Schedule II | -- | Invoice value of at least $10,000 and less than $25,000 |
| Schedule III | -- | Invoice value of at least $25,000 |

All typewriter models and IBM Personal Typing Systems may be aggregated for purposes of determining invoice value.

Features and Personal Typing System Printers may not be included for purposes of determining invoice value.

### Supplies

Dealer Prices and minimum order quantities are set forth in notices. Each order for supplies for shipment to a single Authorized Location must be for an amount of at least $500.

## 8.0 PAYMENT

You agree to pay Lexmark upon your receipt of an invoice. If you fail to pay, Lexmark may:
1) impose a finance charge on the balance due; and
2) exercise any of its rights provided in the Agreement or by law.

## 9.0 PRICE REDUCTION CREDIT

If Lexmark announces a Dealer price decrease for a Product, you may be eligible to receive a price reduction credit.

### Printers and Typewriters

The price reduction credit equals the credit amount per Product, as specified by Lexmark, multiplied by your existing inventory and Product in transit to you from Lexmark on the effective date.

In order to qualify for a price reduction credit, you must:
1) provide a report of your inventory of the Product in a format and time frame specified by Lexmark;
2) have provided such report for at least the two prior months;
3) provide access, during normal business hours, to allow Lexmark to audit applicable records and inventory.

### Printer and Typewriter Features and Supplies

The price reduction credit for features and supplies equals the credit amount per item, as specified by Lexmark, multiplied by the quantity shipped directly from Lexmark to you (minus returns from you) in the prior two months.

## 10.0 INVENTORY ADJUSTMENTS

During a contract period, you may return for credit selected Products which you obtained directly from Lexmark. Lexmark will specify which Products are returnable in notices or an electronic file.

Upon receipt and acceptance of a returned Product, Lexmark will issue you a Product credit as determined by Lexmark. You may use such credit only against sums then or thereafter due Lexmark.

You must return all Products to Lexmark, transportation prepaid, in the original shipping containers which must not have been opened, damaged, marked or labeled. The Products must be in marketable condition as determined by Lexmark.

Any prior passage to you of title to Products will be deemed void from its inception when the returned Products are accepted by Lexmark. You warrant and represent that the returned Products are free of any outstanding liens, security interests or other third party encumbrances.

Lexmark may charge a handling charge of 5% multiplied by the Dealer price for any returned Product.

You may return these Products only once a month and you must accompany each shipment of returned Products with documentation specified by Lexmark.

For Products being withdrawn from marketing, guidelines or limitations on returns may be contained in the withdrawal notice.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY   A2593

### Printers and Typewriters

The maximum number of units of a Product you may return in a given month is equal to the number of units of inventory of such Product you reported for the previous month.

### Printer and Typewriter Features

The maximum number of features you may return is equal to the number of features shipped to you by Lexmark in the immediately preceding six months less any returns during that period.

### Supplies

Only two return shipments of supplies are allowed per contract period. The maximum quantity of supplies you may return is equal to the quantity shipped to you by Lexmark in the immediately preceding nine months less any returns during that period.

### 11.0 WARRANTIES

Lexmark will include the applicable Statement of Limited Warranty with machines shipped. Lexmark will provide you a copy of the Statement of Limited Warranty which you are to provide to your End User at the time of sale. Lexmark may revise a Statement of Limited Warranty.

The warranty period will start on the day the End User purchases the Product. You will advise the End User of this start date.

### 12.0 WARRANTY SERVICE

The Service Support Guide is incorporated in the Agreement by reference.

Unless Lexmark specifies otherwise, you will:
1) provide warranty service under the terms of the applicable Statement of Limited Warranty and in accordance with the Service Support Guide;
2) validate all warranty claims presented to you; and
3) maintain the capability to provide warranty service according to the requirements and procedures specified in the Service Support Guide.

Lexmark will:
1) provide, at no fee, either service training in a Lexmark designated classroom or self-education materials for the number of service personnel required;
2) provide, as part of service training, selected service materials;
3) make available to you, for a fee, a) service training for additional service personnel, and b) additional service materials; and
4) honor your valid claims for warranty reimbursement for labor (when applicable) and/or credits for parts or exchange of parts as specified in the Service Support Guide.

### 13.0 MAINTENANCE PARTS

Lexmark or IBM will sell you maintenance parts only for providing warranty and maintenance service or for sale to End Users for the sole purpose of maintaining their machines.

### 14.0 ENGINEERING CHANGES

During the Warranty Period, any engineering changes determined applicable by Lexmark will be controlled by Lexmark and installed as specified by Lexmark on the machines. You or your End User may, by providing notice subject to written confirmation by Lexmark, elect to have only mandatory changes, as determined by Lexmark, installed.

Lexmark may either install a mandatory change at your location without charge or provide you, at no charge, parts and instructions for your installation of such changes on all machines in your inventory or on machines owned by your End Users. If you install the changes, Lexmark will reimburse you for your labor at a rate established by Lexmark.

### 15.0 LICENSED PROGRAMS

Licensed programs may be made available, as determined by Lexmark, to you to market under the provisions of the Agreement and the PLA or a third party agreement.

You agree to accept return of a PLA program, provided it is in its original, unopened package, and refund the money paid by an End User who does not wish to be bound by the PLA. If the PLA permits the return of a PLA program with an accompanying specified Product, you agree to accept the return of the PLA program with the other Product for refund.

Certain programs may be distributed by you only along with the Products with which they are packaged, as set forth in product announcement letters. In addition, certain programs, when distributed to the U.S. or other governments, must be identified as subject to government regulations for software protection of privately developed commercial software, as set forth in product announcement letters.

### 16.0 SECURITY INTEREST

Lexmark reserves and you grant a purchase money security interest in such Products, in your proceeds from the sale of each Product, and in your accounts receivable for such Product. This interest will be satisfied by payment in full.

You agree to sign an appropriate document to permit us to perfect Lexmark's purchase money security interest.

### 17.0 TITLE AND RISK OF LOSS

Title passes to you for each machine on its date of shipment from Lexmark. Title for each copy of a PLA program remains in Lexmark.

Lexmark relieves you of responsibility for all risk of loss of, or damage to, a machine during the period it is in transit from Lexmark up to its initial delivery to you.

### 18.0 TAXES

You agree to pay amounts equal to any taxes resulting from the Agreement or any activities under the Agreement. Such taxes do not include taxes based on Lexmark's net income. You are responsible to bear any personal property taxes assessable on Products on or after delivery to the carrier at the Lexmark ship-from location.

You agree to provide Lexmark with a valid Reseller Exemption Certificate for each taxing jurisdiction to which Products acquired by you for resale will be shipped by Lexmark under the Agreement. If such Certificate(s) is not provided to Lexmark prior to shipment, Lexmark will charge, and you will be required to pay, all applicable state and local taxes.

You agree to notify Lexmark promptly of the revocation or modification of any Reseller Exemption Certificate so provided. You further agree to indemnify and hold Lexmark harmless from any claims and assessments against Lexmark resulting from a refusal by a taxing jurisdiction to recognize any of your Reseller Exemption Certificates.

### 19.0 STATUS CHANGE

To maintain your authorization, you must request Lexmark approval in writing if you anticipate a:

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A2594

1)' transfer of your equity ownership;
2) merger or acquisition of your enterprise or Authorized Location with or by any other entity;
3) legal name change of your enterprise; or
4) relocation or closing of an Authorized Location.

## 20.0 TRADEMARKS AND TRADE NAMES

You may refer to yourself under the Agreement as a Lexmark Authorized Dealer:
1) solely in connection with Products;
2) only during the contract period; and
3) only within the United States and Puerto Rico.

Except as provided for in this Section, Lexmark does not grant you the right to use trademarks or trade names. Lexmark grants you the limited permission to use the trademark "Lexmark" or "IBM" solely to identify the Products acquired from Lexmark under the Agreement. You may use the trademarks "Lexmark" or "IBM" only within the United States and Puerto Rico.

At Lexmark's request, you will provide Lexmark, for review and written approval, promotional, advertising and other materials that:
1) use a Lexmark, International Business Machines Corporation (IBM) or third party trademark or trade name; or
2) refer to you as a "Lexmark Authorized Dealer".

Lexmark will supply advertising guidelines in writing. At Lexmark's request, you agree to change any materials or use of materials which Lexmark determines to be inaccurate, objectionable, misleading or a misuse of Lexmark or IBM trademarks. You will pay the expenses for such change.

The permission granted relative to the Lexmark or IBM trademarks will terminate with the termination or expiration of the Agreement. In such event, for the affected Products, you will immediately:
1) cease referring to yourself as a "Lexmark Authorized Dealer" or other such term that includes the name of the Products, as applicable;
2) cease referring to yourself as approved by Lexmark to provide warranty services; and
3) return to Lexmark or destroy all materials under your control employing such trademarks.

You may retain materials with Lexmark or IBM trademarks which are required to fulfill your warranty service or support obligations on affected Products. You will return these materials to Lexmark or destroy them upon completion of such obligations.

You recognize Lexmark's ownership and title to its trademarks and the goodwill attaching to them. You also recognize IBM's ownership and title to its trademarks and the goodwill attaching to them. You agree that any goodwill which accrues because of your use of the trademarks "Lexmark" or "IBM" will become Lexmark's or IBM's property, respectively. You agree not to contest Lexmark or IBM trademarks or trade names. You agree not to use, employ or attempt to register any trademarks or trade names which are confusingly similar to Lexmark or IBM trademarks or trade names. IBM may revoke immediately, without prior notice, any permission to use IBM trademarks granted to you under the Agreement if IBM determines that you are misusing such IBM trademarks or if you place any IBM trademark on any product in violation of any law or IBM's legal rights.

## 21.0 PATENTS AND COPYRIGHTS

Lexmark will, at its expense, defend you against any claim that any machine acquired under the Agreement infringes a patent or copyright in the United States or Puerto Rico. Lexmark will pay all costs, damages and attorney's fees that a court finally

awards as a result of such claim. To qualify for such defense and payment, you must 1) give Lexmark prompt written notice of any such claim, and 2) allow Lexmark to control, and fully cooperate with Lexmark in, the defense and all related settlement negotiations.

You agree that if a machine in your inventory, or the operation of a machine while in your inventory, becomes, or Lexmark believes is likely to become, the subject of such a claim, you will permit Lexmark, at its option and expense, either to secure the right for you to continue using the machine or to replace or modify it so that it becomes noninfringing. However, if neither of the foregoing alternatives is available on terms which are reasonable in Lexmark's judgment, you will return the machine upon Lexmark's written request. Lexmark will grant you a credit equal to the price paid by you to Lexmark for the returned machine. However, Lexmark may, for used machines, grant you a credit equal to such price depreciated. The depreciation shall be an equal amount per year over the life of the machines as Lexmark establishes. Lexmark shall have no obligation with respect to any such claim based upon any non-Lexmark modification of machines or their combination, operation or use with apparatus, data or programs not furnished by Lexmark.

This Section states Lexmark's entire obligation to you for machines regarding infringement or the like.

## 22.0 LIMITATION OF REMEDIES

Lexmark's entire liability and your exclusive remedy for any claims are as this section provides.

Lexmark is not liable for any damages caused by performance or nonperformance of Products located outside the United States and Puerto Rico. In no event will Lexmark be liable for any damages caused by your failure to perform your responsibilities.

Lexmark's entire liability and your exclusive remedy for actual damages from your use of PLA programs are as set forth in the PLA.

Lexmark assumes no liability regarding any claim or action caused by, or directly related to, a non-Lexmark product.

In no event will Lexmark be liable for any lost profits, lost savings, incidental damages, or other consequential damages, even if Lexmark has been advised of the possibility of such damages. Lexmark will not be liable for any damages claimed by you based on any third party claim.

For any claim for any cause whatsoever, other than those provided for in section 21.0 and the first paragraph of section 23.0, Lexmark's liability for actual damages will be limited to $100,000.

## 23.0 INDEMNIFICATION

Lexmark will indemnify and hold you harmless from all claims, including reasonable attorney's fees, (but not including lost profits, lost savings, incidental damages, or other consequential damages), for bodily injury or damage to real property or tangible personal property arising from any acts or omissions for which Lexmark is legally liable.

You will indemnify and hold Lexmark harmless from all claims, including reasonable attorney's fees, by any party resulting directly or indirectly from any acts or omissions by you.

## 24.0 TERMINATION

Either party may terminate the Agreement, with or without cause. Lexmark will provide three month written notice to you

CONFIDENTIAL - OUTSIDE COUNSEL ONLY     A2595

of such termination, except as otherwise provided in this Section. You must provide one month written notice to Lexmark.

In the event that Lexmark gives you such notice for cause, Lexmark may provide you with an opportunity to cure deficiencies. In such event, Lexmark will establish a reasonable time, not to exceed three months, in which you must remedy such deficiencies.

In addition, Lexmark considers certain actions so serious and inconsistent with your obligations as a Dealer as to warrant immediate termination. Such breaches will include, but not be limited to, situations in which 1) you made material misrepresentations to Lexmark in your application to become a Dealer, at any later time through oral or written statements, or by submission of any false or fraudulent documentation or claim to Lexmark, or 2) you marketed Products to other than an End User.

Lexmark may also terminate the Agreement immediately in the event that a dealer or its personnel knowingly or negligently engage, directly or indirectly, in the manufacture, sale, resale, brokerage, distribution, storage or handling of counterfeit goods (that is, goods bearing the trademark, trade name or trade dress of IBM or Lexmark which have a source other than IBM or Lexmark).

In the event of termination of the Agreement by you or Lexmark, all monies due Lexmark will immediately become due and payable.

If you or Lexmark elects to terminate the Agreement, Lexmark may repurchase some or all of the Products in your inventory at a price determined by Lexmark. In such event, return shipping charges will be paid by you. Products returned must be in the original shipping containers, which must not have been opened, damaged, marked or labeled.

A termination of the Agreement may also be only a partial termination of, for example, an Authorized Location, an eligible Product family, a part of a marketing coverage area, an Aggregator relationship, or the approval to market to Dealer Associates.

## 25.0 DEALER ASSOCIATED REMARKETERS

A Dealer Associated Remarketer (Dealer Associate) is one who obtains Product from you and remarkets the Product to End Users. In the case of Printers, a Dealer Associate is a remarketer who adds significant enhancement to computer systems in function or capability. However, it is not necessary that such Printers be remarketed only with the enhanced computer system.

You may market Products to a Dealer Associate only with the written approval of Lexmark. You retain responsibility to ensure End User satisfaction and, if applicable, provide warranty service to the Dealer Associate's End User. These responsibilities may not be delegated. You may, however, share specific End User technical assistance functions with your Dealer Associate.

Lexmark will identify those Products which you may market to a Dealer Associate. Lexmark reserves the right to withdraw its approval for either the Dealer Associate or such Products which you market to a Dealer Associate.

You must maintain records for those Products you ship to your Dealer Associate. You must have appropriate agreements with your Dealer Associate in place to ensure your Dealer Associate:

1) markets only from its approved location and only to End Users;

2) maintains End User Records in the format and for the required period of retention as described in this Agreement; and

3) assists Lexmark in tracing a specific Product to an End User if required.

## 26.0 PS/1 PRINTERS

The following additional terms apply to PS/1 Printers.

1) You are permitted to market PS/1 Printers only in the contiguous 48 states. If an End User intends to transport the PS/1 Printer outside the 48 states, you must notify such End User that there will not be access to telephone and on-line services for the PS/1 Printer.

2) The "Orders and Cancellations" section is modified for PS/1 Printers by the following. For PS/1 Printers, you may not 1) defer or cancel any purchase order, accepted by Lexmark, whose applicable shipment dates Lexmark confirmed or 2) refuse any shipments made by Lexmark related to such order. In addition, you may not cancel parts of such order. If, however, Lexmark notifies you that it will ship such order later than the date, or that the quantity will be less than, you request, you may modify, defer or cancel such order. You may cancel purchase orders, or parts thereof, not confirmed by Lexmark. If you do not cancel non-confirmed orders, Lexmark will hold them for possible future acceptance, and you agree to provide Lexmark with revised Requested Ship Dates for non-cancelled orders. If Lexmark, without your approval ships such delayed PS/1 Printers, you may return them at Lexmark's expense within ten days of receipt from Lexmark;

3) For the PS/1 Printer, Dealer Prices are F.O.B., the Lexmark shipping location(s), as determined by Lexmark.

4) For the PS/1 Printer, during the time of transit from the Lexmark shipping location to you, all risks of loss or damage shall be yours.

5) PS/1 Printers do not qualify for Inventory Adjustment. You may not return PS/1 Printers to Lexmark.

## 27.0 CONFIDENTIAL INFORMATION

1) Any information concerning IBM or Lexmark customers furnished to you by IBM or Lexmark and identified as confidential, shall be treated and held in confidence by you. You shall not publish, disclose or disseminate it for a period of five years after its receipt, except as may be authorized by Lexmark in writing. You shall not be entitled to use this information for any purposes other than for marketing of Products in furtherance of this Agreement, or as specified in the information provided.

2) Upon termination or expiration of this Agreement, you shall deliver to Lexmark all materials, of any kind, containing such confidential information.

3) Other than as set forth above, no information will be given or received in confidence by either party unless it is covered by a separate written agreement.

## 28.0 GENERAL

Lexmark's waiver of any instance of your noncompliance with the Agreement will not be deemed a waiver of any future noncompliance.

You may not assign the Agreement or any of its rights or duties without Lexmark's prior written consent.

Lexmark is not responsible for failure to fulfill its obligations under the Agreement due to causes beyond its control.

The Agreement will not be supplemented or modified by any course of dealing or trade usage. Variance from or addition to the terms and conditions of the Agreement in any purchase order or other written notification from you will be of no effect.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A2596

The provisions of the Agreement which by their nature extend beyond the termination or expiration of the Agreement will survive and remain in effect until all obligations are satisfied.

Each party agrees to pay the other's reasonable attorney's fees and costs of litigation if the party, for any cause whatsoever, brings suit against the other party and the other party is finally adjudicated not to have liability.

Neither you nor Lexmark will bring an action, regardless of form, arising out of the Agreement more that two years after the cause of action has arisen. In the case of an action for non-payment, the action may not be brought more than two years from the date the last payment was due.

Both parties agree to comply with all applicable governmental laws and regulations.

The laws of the State of New York will govern the Agreement.

## 28.0 DEALER SPECIFIC INFORMATION

**Aggregator Relationships**

The provisions of this Section apply to you only if you have been approved in this Section to receive Products from an Aggregator. Lexmark will indicate its approval of you to receive Products from an Aggregator by naming the Aggregator in this Section.

The term "Aggregator" means a business entity, typically a franchisor, which has been approved by Lexmark under a written agreement, to order and receive Products from Lexmark for redistribution to the Aggregator's members or franchisees. Lexmark must approve such members or franchisees as Dealers.

You may elect to obtain Products through your Aggregator. For such products, you waive your rights and Lexmark waives your responsibilities under the following item and Sections of the Agreement:

    5.0    DEALER RESPONSIBILITIES - item (12);
    6.0    ORDERS AND CANCELLATIONS;
    7.0    PRICES;
    8.0    PAYMENT;
    9.0    PRICE REDUCTION CREDIT;
    10.0   INVENTORY ADJUSTMENTS; and
    18.0   TAXES.

Title to machines, shipped to you by your Aggregator, passes from Lexmark directly to you upon shipment from your Aggregator.

Lexmark does not have responsibility for risk of loss of, or damage to, Products shipped to you by your Aggregator.

Machines your Aggregator ships to you will be identified by serial number. Therefore, in addition to the record and audit requirements described in Section 5.0 of the Agreement, you agree that you will maintain a record of each such machine by serial number. You agree that you will maintain that record for 12 months following your receipt of the machine. You must provide such records to Lexmark upon request. In addition, you hereby authorize your Aggregator to release information to Lexmark regarding machines shipped to you.

For Products you order directly from Lexmark, the waivers described in the third paragraph of this section will not apply.

Name and location of your Aggregator:

    N/A

**Superstores**

The selection criteria for Superstores shall be defined by Lexmark.

Dealers who are Superstores for specific Products shall be indicated by a "YES" on the appropriate line(s):

    NO    Supplies
    NO    Typewriters
    NO    Printers

CONFIDENTIAL - OUTSIDE COUNSEL ONLY   A2597

**Campus Technology Centers**

Campus Technology Centers are not-for-profit institutions of higher education that may acquire Products for internal use and re-marketing to End Users only, and shall be indicated by a "YES" on this line:    **NO**

If you are a Campus Technology Center, then the term Dealer shall be replaced by Campus Technology Center throughout this Agreement.

The additional following terms shall apply to Campus Technology Centers:

1) End User means a party who a) is staff, faculty or a registered student matriculated in a degree granting program, and b) acquires Product from you for its own use, and not for remarketing.
2) Internal use means use for instruction, academic research and administrative work of your educational institution.
3) You will market Products to End Users as an incidental part of your activities and in furtherance of your educational purposes.
4) You will not sell more than one printer per year to an End User without Lexmark's prior written approval.
5) Prices for Campus Technology Centers shall be set forth in separate notices and/or an electronic file.
6) Lexmark will provide an Education Development Fund for your use in developing and improving your capability to support your End Users.
7) The warranty period for internal use Products will commence on the day you place the Product in use in your educational institution.

**Eligible Products**

You are approved to market the following Product families, as specified with a "YES" or identified portions as designated. Specific Products are listed in notices and an electronic file. Specific certification may also be required for certain Products.

| Supplies | Typewriters | Printers | Other (as listed) |
|----------|-------------|----------|-------------------|
| YES | NO | YES | NO |

**Minimum Renewal Criteria**

Lexmark may establish Minimum Renewal Criteria (MRC) for a contract period for some or all Products. The MRC designates the minimum level of sales performance expected of you. Sales performance objectives may be established which modify your MRC.

| Product | Minimum Renewal Criteria |
|---------|--------------------------|
| SUPPLIES | |

**Marketing Coverage Area**

Your approved marketing coverage area(s), listed by Authorized Location, by county and state, is:

N/A

**Authorized Locations**

All Authorized Locations must be approved in writing by Lexmark and listed below or on an attachment to this Agreement. Any change in the location or any significant change in the characteristics of your Authorized Locations must be approved by Lexmark.



CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A2598

# DEALER CONTRACT 4

**Lexmark International, Inc.**

## AUTHORIZED DEALER AGREEMENT

Name and Address of Dealer:

Agreement No.: **LX00907**

Contract Commencement Date: **08/17/05**

Lexmark Office Address:
**Lexmark International, Inc**
**740 New Circle**
**Lexington, KY 40504**

Lexmark Office No.:

Thank you for selecting Lexmark as a supplier of Products, services, and support.  Our goal is to be the best in the industry.  If at any time you are not completely satisfied, please let us know.

This agreement authorizes you to purchase Products from Lexmark International, Inc., (Lexmark) under its terms for marketing to End Users and your internal use only in the United States.  Lexmark may issue Bulletins under this Agreement that change the terms of this Agreement.  Any Bulletins will become effective on the date Lexmark specifies unless you notify us in writing within 30 days of your receipt of the Bulletin that you do not accept it.

Lexmark may issue administrative, technical and procedural information, announcements, promotions, programs, product and pricing letters, product withdrawal letters, and other kinds of notices in written and electronic form from time to time.  All such notices are effective on the date Lexmark specifies.

### Table of Contents

| | | | |
|---|---|---|---|
| 1.0 | DEFINITIONS | 16.0 | STATUS CHANGE |
| 2.0 | CONTRACT PERIOD | 17.0 | TRADEMARKS AND TRADE NAMES |
| 3.0 | RELATIONSHIP OF THE PARTIES | 18.0 | PATENTS AND COPYRIGHTS |
| 4.0 | MARKETING TO END USERS | 19.0 | LIMITATION OF REMEDIES |
| 5.0 | DEALER RESPONSIBILITIES | 20.0 | INDEMNIFICATION |
| 6.0 | ORDERS AND CANCELLATIONS | 21.0 | TERMINATION |
| 7.0 | PRICES | 22.0 | CONFIDENTIAL INFORMATION |
| 8.0 | PAYMENT | 23.0 | GENERAL |
| 9.0 | PRICE REDUCTION CREDIT | 24.0 | DEALER SPECIFIC INFORMATION |
| 10.0 | PRODUCT RETURNS | | Eligible Products |
| 11.0 | WARRANTIES | | Minimum Renewal Criteria |
| 12.0 | WARRANTY SERVICE | | Marketing Coverage Area |
| 13.0 | SECURITY INTEREST | | Authorized Locations |
| 14.0 | TITLE AND RIGHTS, RISKS AND REWARDS OF OWNERSHIP | | |
| 15.0 | TAXES | | |

**PAGES 2 THROUGH 8 ARE ALSO PART OF THIS AGREEMENT.** This Agreement and Bulletins, the Statements of Limited Warranty, and notices are the complete agreement between us, and replace any prior oral or written communications between us. By signing below, each of us agrees to the terms of this Agreement.  Once signed, any reproduction of this Agreement made by reliable means (for example, photocopy or facsimile) is considered an original.

Accepted by:
**Lexmark International, Inc.**

By

Signature                    Authorized Signature

Joe Jones                    08/17/05
Name (Type or Print)         Date

Accepted by:

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A2599

## 1.0   DEFINITIONS

Agreement means this Dealer Agreement, Bulletin(s), applicable Statements) of Limited Warranty and notices.

Authorized Location means any of your business locations approved by Lexmark in writing for the purposes of your performance under the Agreement.

End User means a party who acquires the Products for its own use and not for remarketing.

Products means those items identified in Section 24.0 which you can market under this Agreement.

## 2.0   CONTRACT PERIOD

The Agreement has a single 12 month contract period which, unless noted otherwise on page 1, commences on the first day of the month following the date of your signature on page 1, provided it is accepted by Lexmark. The Agreement can be renewed by the parties for subsequent single 12 month contract periods. Unless Lexmark notifies you otherwise, the renewal of the Agreement shall automatically occur annually unless either party notifies the other of its desire not to renew at least 90 days prior to the contract period expiration date. Either party can elect not to renew the Agreement with or without cause.

## 3.0   RELATIONSHIP OF THE PARTIES

As an independent contractor, you are not Lexmark's legal representative, franchisee, or agent for any purpose.

You will not make any warranties or representations on Lexmark's behalf other than those specified in the Agreement. Neither party will assume or create any obligations on the other's behalf except as specified in the Agreement.

You will market Products to End Users at such prices and terms and conditions as you determine. Such terms and conditions must not be in conflict with your obligations in the Agreement.

Lexmark reserves the right to market anywhere, including your geographic area, products which are the same as or similar to the Products under the Agreement either directly or through other remarketers.

You reserve the right to market Products which are similar or competitive to the Products under the Agreement.

Lexmark may establish annual sales performance objectives, which modify the Minimum Renewal Criteria, for the Products you are approved to market. Lexmark reserves the right to revise the objectives at any time. Lexmark's assessment of your overall compliance with the provisions of the Agreement will include a review of your attainment of these sales performance objectives.

Lexmark may conduct reviews to evaluate your performance and compliance with the provisions of the Agreement.

## 4.0   MARKETING TO END USERS

The Products you market under the Agreement require your high quality individualized pre-sale and post-sale support. This support is necessary to achieve and maintain high End User

satisfaction. Your ability to provide this support is a key reason Lexmark selected you as an authorized Dealer. You, therefore, will market Products only to End Users. You agree not to market Products to other remarketers, except as agreed to, in writing, by Lexmark.

In order to better ensure End User satisfaction, Lexmark retains the option of issuing or not issuing Letters of Supply (or guarantees of supply) to you when you respond to any particular state, local or federal government procurement request. Likewise, without Lexmark's written consent, you may not issue a Letter of Supply relating to Lexmark Products to any other party in connection with any government procurement.

## 5.0   DEALER RESPONSIBILITIES

You agree to:

1) ensure the Product marketed to the End User is appropriate for the End User's requirements;
2) ensure that the End User is satisfied with all your Product marketing activities, including Product explanation, demonstration, and ongoing support;
3) report your sales performance and inventory as requested by Lexmark;
4) market, generate demand for, and support Products only at your Authorized Location or at your End User's location; receive and inventory Products only at your Authorized Location unless Lexmark specifies otherwise; and reference only your Authorized Location in your marketing materials or advertising;
5) maintain sufficient inventory of Products at each location to promptly satisfy reasonably foreseeable End User demand;
6) maintain trained management, sales, support and service personnel, if applicable;
7) report promptly to Lexmark all suspected and actual Product problems;
8) provide a Product business plan as required by Lexmark;
9) notify Lexmark of any discrepancies between the Lexmark shipping manifest and the Products received;
10) maintain good financial standing and provide financial information and evidence of financial security upon request;
11) allow Lexmark or its appointed auditor to audit, during normal business hours, the above required records and receipts.

## 6.0   ORDERS AND CANCELLATIONS

Lexmark will describe specific ordering procedures and forecast requirements, if any, in writing.

Lexmark will fill your orders for Products and meet your request for shipment dates subject to credit approval and Product availability and consistent with Lexmark's production and supply schedules.

Lexmark will insure for your benefit the order for risk of loss or damage during the period it is in transit from Lexmark or its agent up to its initial delivery to you or your designated ship-to point.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY   A2600

You may cancel an order for any Product which Lexmark has not shipped to you. Lexmark may charge you a Cancellation charge of 2% of the canceled Product's Dealer price if the cancellation was requested by you after the Product was released for shipment by Lexmark. A Product is generally released for shipment one or two days before it ships. However, you will not be liable for a cancellation charge if Lexmark has postponed shipment of the Product for more than 15 days from its estimated shipment date, and you have canceled your order for the Product before the Product's shipment.

Lexmark will charge you a handling charge of 5% if you refuse to accept delivery of any portion of a shipment you ordered. You must prepay all transportation charges for return of the Product to Lexmark.

Each order is required to have a single ship-to-address.

## 7.0  PRICES

Lexmark will specify its Dealer prices in notices and an electronic file. Lexmark may change its Dealer prices at any time. Lexmark specified prices shall apply in spite of any different pricing contained in Dealer purchase orders, even if such purchase orders are accepted and Product is shipped.

A Dealer price increase for a Lexmark Product is effective on the date specified. Lexmark will announce a price increase a minimum of 30 days prior to the effective date of the increase. A price increase will not apply to a Product for which Lexmark has accepted an order prior to the effective date, provided the order specifies a requested ship date within the time frame stated in the price increase notice.

A Dealer price decrease is effective on the date specified and will apply to Products shipped on or after the effective date of the decrease.

The MSRP is Lexmark's suggested resale price and is subject to change without notice. This price is for information purposes only. Lexmark's and our remarketers prices may vary.
Lexmark may specify any additional fees and allowances in notices. Lexmark may change the fees and allowances at any time. Such changes will become effective on the date Lexmark specifies.

Dealer Prices and minimum order quantities are set forth in notices. Each supply Product order for shipment to a single Authorized Location must be for an amount of at least $3,000.

## 8.0  PAYMENT

You agree to pay Lexmark upon your receipt of an invoice, unless otherwise specified by Lexmark. If you fail to pay, Lexmark may:

1) impose a finance charge on the balance due;
2) exercise any of its rights provided in the Agreement or by law;
3) require "cash with order" or "payment on account" prior
4) stop shipment of your orders if your account is past due.

## 9.0  PRICE REDUCTION CREDIT

If Lexmark announces a Dealer price decrease for a Product, you may be eligible to receive a price reduction credit.

### Supplies
The price reduction credit for supplies Products equals the credit amount per item, as specified by Lexmark, multiplied by the quantity shipped directly from Lexmark to you (minus returns from you) in the prior sixty (60) days.

## 10.0  PRODUCT RETURNS

### General Terms -
During a contract period, you may return for credit selected Products which you obtained directly from Lexmark. Lexmark will specify which Products are returnable in notices or an electronic file.

Lexmark may issue notices clarifying Product return policies that shall be effective on the date specified. Lexmark may place limits on the amount of Product that can be returned. All Product must be returned to Lexmark within thirty (30) days after receiving authorization, to ensure proper credit.

Upon receipt and acceptance of a returned Product, Lexmark will issue you a Product credit as determined by Lexmark. You may use such credit only against sums then or thereafter due Lexmark.

For non-defective products, you must return all Products to Lexmark, transportation pre-paid, in the original shipping containers which must not have been opened, damaged, marked or labeled. The Products must be in marketable condition as determined by Lexmark.

Product returned without Lexmark's authorization and the appropriate documentation will be returned to you at your expense.

Any prior passage to you of title to Products will be deemed void from its inception when the returned Products are accepted by Lexmark. You warrant and represent that the returned Products are free of any outstanding liens, security interests or other third party encumbrances.

Lexmark may charge a handling charge of up to twenty percent (20%) multiplied by the then current Lexmark published Dealer price for any returned Product.

Lexmark may issue notices clarifying Product return policies, which shall be effective on the data specified. For Products being withdrawn from marketing, guidelines of limitations on returns may be contained in the withdrawal notice.

### Claims
For all claims that there has been a short ship of ordered Products (not all ordered Products were received) or all of the ordered Products were not received (mis-ship), you must submit a written claim to Lexmark within thirty (30) days of the scheduled/anticipated delivery date of the ordered Products relating to such claim. Any claims after the above referenced thirty (30) days are expressly waived and Lexmark shall not be liable to you for any such claims (regardless of when you learned or could have learned of any of the facts surrounding the transaction or claim).

CONFIDENTIAL - OUTSIDE COUNSEL ONLY   A2601

**Supplies – Stock Balance/Inventory Adjustment**

Only one return shipment of supplies Products is allowed per calendar quarter (Jan to Mar; Apr to June; July to Sept; Oct to Dec) per Lexmark Authorized Reseller Location.

You may return supplies that equal up to two (2%) percent of the prior calendar quarter net revenue you purchased directly from Lexmark without a handling charge based on the then current Lexmark published dealer supply price. If you return more than two (2%) percent and less than five (5%) percent you may be charged, at Lexmark's sole discretion, a handling charge of ten (10%) percent. Any return greater than five (5%) may be assessed, at Lexmark's sole discretion, a twenty (20%) percent handling charge.

The maximum quantity of supplies Products you may return is equal to the quantity shipped to you by Lexmark in the immediately preceding twelve months less any returns during that period.

Any additional supplies Products returns in a calendar quarter will automatically be assessed a twenty (20%) percent handling charge.

**Supplies – Defective Product**

Lexmark will replace supplies Products or provide a credit to you for any found to be defective by you prior to the sale to an End-User. In addition, Lexmark will provide credit to you for any Lexmark supplies Product returned defective by an End User within the warranty period specified by Lexmark in the Statement of Limited Warranty.

Specific warranty process procedures are covered in separate warranty announcement letters.

## 11.0 WARRANTIES

Lexmark will provide you a copy of the Statement of Limited Warranty, which you are to provide to your End User at the time of sale. Lexmark may revise a Statement of Limited Warranty.

The warranty period will start on the day the End User purchases the Product. You will advise the End User of this start date.

## 12.0 WARRANTY SERVICE

**Supplies**

Unless Lexmark specifies otherwise, for supplies Products you will:

1) provide warranty service under the terms of the applicable Statement of Limited Warranty
2) validate all warranty claims presented to you.

## 13.0 SECURITY INTEREST

Lexmark reserves, and you grant a purchase money security interest in each Product, in your proceeds from the sale of each Product and in your accounts receivable for such Product. This interest will be satisfied by payment in full.

You agree to sign an appropriate document to permit us to perfect Lexmark's purchase money security interest.

## 14.0 TITLE AND RIGHTS, RISKS AND REWARDS OF OWNERSHIP

Title and all rights, risks and rewards of ownership transfer to you upon shipment of the product from Lexmark, or its agent. Title for each copy of a licensed program remains with Lexmark.

Lexmark will insure for your benefit the order for risk of loss or damage during the period it is in transit from Lexmark or its agent up to its initial delivery to you.

## 15.0 TAXES

You agree to pay amounts equal to any taxes resulting from the Agreement or any activities under the Agreement. Such taxes do not include taxes based on Lexmark's net income. You are responsible to bear any personal property taxes assessable on Products on or after delivery to the carrier at the Lexmark ship-from location.

You agree to provide Lexmark with a valid Reseller Exemption Certificate for each taxing jurisdiction to which Products acquired by you for resale will be shipped by Lexmark under the Agreement. If such Certificate(s) is not provided to Lexmark prior to shipment, Lexmark will charge, and you will be required to pay, all applicable state and local taxes.

You agree to notify Lexmark promptly of the revocation or modification of any Reseller Exemption Certificate so provided. You further agree to indemnify and hold Lexmark harmless from any claims and assessments against Lexmark resulting from a refusal by a taxing jurisdiction to recognize any of your Reseller Exemption Certificates.

## 16.0 STATUS CHANGE

To maintain your authorization, you must request Lexmark approval in writing if you anticipate a:

1) transfer of your equity ownership;
2) merger or acquisition of your enterprise or Authorized Location with or by any other entity;
3) legal name change of your enterprise; or
4) relocation or closing of an Authorized Location.

## 17.0 TRADEMARKS AND TRADE NAMES

You may refer to yourself under the Agreement as a Lexmark Authorized Dealer:

1) solely in connection with Products;
2) only during the contract period; and
3) only within the United States

Except as provided for in this Section, Lexmark does not grant you the right to use trademarks or trade names. Lexmark grants you the limited permission to use the trademark "Lexmark" solely to identify the Products acquired from Lexmark under the Agreement. You may use the trademarks "Lexmark" only within the United States.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY   A2602

At Lexmark's request, you will provide to Lexmark, for review and written approval, promotional, advertising and other materials that:

1) use a Lexmark or third party trademark or trade name; or
2) refer to you as a "Lexmark Authorized Dealer".

Lexmark will supply advertising guidelines in writing. At Lexmark's request, you agree to change any materials or use of materials which Lexmark determines to be inaccurate, objectionable, misleading or a misuse of Lexmark trademarks. You will pay the expenses for such change.

The permission granted relative to the Lexmark trademarks will terminate with the termination or expiration of the Agreement. In such event, for the affected Products, you will immediately:

1) cease referring to yourself as a "Lexmark Authorized Dealer" or other such term that includes the name of the Products, as applicable;
2) cease referring to yourself as approved by Lexmark to provide warranty services; and
3) return to Lexmark or destroy all materials under your control employing such trademarks.

You may retain materials with Lexmark trademarks which are required to fulfill your warranty service or support obligations on affected Products. You will return these materials to Lexmark or destroy them upon completion of such obligations.

You recognize Lexmark's ownership and title to its trademarks and the goodwill attaching to them. You agree that any goodwill which accrues because of your use of the trademarks "Lexmark" will become Lexmark's property, respectively. You agree not to contest Lexmark trademarks or trade names. You agree not to use, employ or attempt to register any trademarks or trade names which are confusingly similar to Lexmark trademarks or trade names.

## 18.0  PATENTS AND COPYRIGHTS

Lexmark will, at its expense, defend you against any claim that any Product acquired under the Agreement infringes a patent or copyright in the United States. Lexmark will pay all costs, damages and attorney's fees that a court finally awards as a result of such claim. To qualify for such defense and payment, you must 1) give Lexmark prompt written notice of any such claim, and 2) allow Lexmark to control, and fully cooperate with Lexmark in, the defense and all related settlement negotiations. You agree that if Product in your inventory, becomes, or Lexmark believes is likely to become, the subject of such a claim, you will permit Lexmark, at its option and expense, either to secure the right for you to continue using the Product or to replace or modify it so that it becomes noninfringing. However, if neither of the foregoing alternatives is available on terms which are reasonable in Lexmark's judgment, Lexmark may stop shipping affected Product, and you will return the Product in your inventory upon Lexmark's written request. Lexmark will grant you a credit equal to the price paid by you to Lexmark for the returned Product. Lexmark shall have no obligation with respect to any such claim based upon any non-Lexmark modification of Product or their combination, operation or use with apparatus, data or programs not furnished by Lexmark.

This Section states Lexmark's entire obligation to you and your entire remedy for machines regarding infringement or the like.

## 19.0  LIMITATION OF REMEDIES

Lexmark's entire liability and your exclusive remedy for any claims are as this Section provides.

Lexmark is not liable for any damages caused by performance or nonperformance of Products located outside the United States. In no event will Lexmark be liable for any damages caused by your failure to perform your responsibilities.

Lexmark's entire liability and your exclusive remedy for actual damages from your use of licensed programs are as set forth in their accompanying program license agreement.

Lexmark assumes no liability regarding any claim or action caused by, or directly related to, a non-Lexmark Product.

In no event will Lexmark be liable for any lost profits, lost savings, incidental damages, or other consequential damages, even if Lexmark has been advised of the possibility of such damages. Lexmark will not be liable for any damages claimed by you based on any third party claim.

For any claim for any cause whatsoever, other than those provided for in Section 18.0 and the first paragraph of Section 20.0, Lexmark's liability for actual damages will be limited to $100,000.

## 20.0  INDEMNIFICATION

Lexmark will indemnify and hold you harmless from all claims, including reasonable attorney's fees, (but not including lost profits, lost savings, incidental damages, or other consequential damages), for bodily injury or damage to real property or tangible personal property arising from any acts or omissions for which Lexmark is legally liable.

You will indemnify and hold Lexmark harmless from all claims, including reasonable attorney's fees, by any party resulting directly or indirectly from any acts or omissions by you.

## 21.0  TERMINATION

Either party may terminate the Agreement, with or without cause. Lexmark will provide three month written notice to you of such termination, except as otherwise provided in this Section. You must provide one month written notice to Lexmark.

In the event that Lexmark gives you such notice for cause, Lexmark may provide you with an opportunity to cure deficiencies. In such event, Lexmark will establish a reasonable time, not to exceed three months, in which you must remedy such deficiencies.

In addition, Lexmark considers certain actions so serious and inconsistent with your obligations as a Dealer as to warrant immediate termination. Such breaches will include, but not be limited to, situations in which 1) you made material misrepresentations to Lexmark in your application to become a Dealer, at any later time through oral or written statements, or by submission of any false or fraudulent documentation or claim to Lexmark, or 2) you marketed Products to other than an End User.

Lexmark may also terminate the Agreement immediately in the event that a dealer or its personnel knowingly or negligently engage, directly or indirectly, in the manufacture, sale, resale,

CONFIDENTIAL - OUTSIDE COUNSEL ONLY  A2603

brokerage, distribution, storage or handling of counterfeit goods and/or gray market goods (that is, goods bearing the trademark, trade name or trade dress of Lexmark which have been acquired from a source other than Lexmark or an Authorized Lexmark Wholesaler or Distributor in the U.S.).

In the event of termination of the Agreement by you or Lexmark, all monies due Lexmark will immediately become due and payable.

If you or Lexmark elects to terminate the Agreement, Lexmark may repurchase some or all of the Products in your inventory at a price determined by Lexmark. In such event, you will pay return-shipping charges. Products returned must be in the original shipping containers, which must not have been opened, damaged, marked or labeled.

A termination of the Agreement may also be only a partial termination of, for example, an Authorized Location, an eligible Product family, a part of a marketing coverage area, an Aggregator relationship, or the approval to market to Dealer Associates.

## 22.0 CONFIDENTIAL INFORMATION

1) Any information concerning Lexmark customers furnished to you by Lexmark and identified as confidential, shall be treated and held in confidence by you. You shall not publish, disclose or disseminate it for a period of five years after its receipt, except as may be authorized by Lexmark in writing. You shall not be entitled to use this information for any purposes other than for marketing of Products in furtherance of this Agreement, or as specified in the information provided.

2) Upon termination or expiration of this Agreement, you shall deliver to Lexmark all materials, of any kind, containing such confidential information.

3) Other than as set forth above, no information will be given or received in confidence by either party unless it is covered by a separate written agreement.

## 23.0 GENERAL

Lexmark's waiver of any instance of your noncompliance with the Agreement will not be deemed a waiver of any future noncompliance.

You may not assign the Agreement or any of its rights or duties without Lexmark's prior written consent.

Neither party is responsible for failure to fulfill its obligations under the Agreement due to causes beyond its control.

The Agreement will not be supplemented or modified by any course of dealing or trade usage. Variance from or addition to the terms and conditions of the Agreement in any purchase order or other written notification from you will be of no effect.

The provisions of the Agreement which by their nature extend beyond the termination or expiration of the Agreement will survive and remain in effect until all obligations are satisfied.

Each party agrees to pay the other's reasonable attorney's fees and costs of litigation if the party, for any cause whatsoever, brings suit against the other party and the other party is finally adjudicated not to have liability.

Neither you nor Lexmark will bring an action, regardless of form, arising out of the Agreement more than two years after the cause of action has arisen. In the case of an action for non-payment, the action may not be brought more than two years from the date the last payment was due. Any claims you may make for price adjustments or additional marketing program payments made more than 6 months after the date any such activity has occurred are expressly waived.

Both parties agree to comply with all applicable governmental laws and regulations.

This Agreement is governed by the laws of the Commonwealth of Kentucky excluding its choice of law provisions. THE PARTIES AGREE THAT ANY AND ALL ACTIONS, SUITS OR OTHER LEGAL PROCEEDINGS, ARISING UNDER THIS AGREEMENT AND REGARDLESS OF THE LEGAL THEORY UPON WHICH THE CLAIMS ARE BASED, MAY BE BROUGHT AGAINST THE OTHER OR ITS EMPLOYEES OR AGENTS ONLY IN A STATE OR FEDERAL COURT SITUATED WITHIN FAYETTE COUNTY IN THE COMMONWEALTH OF KENTUCKY, AND THE PARTIES CONSENT TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS IN ANY SUCH LEGAL PROCEEDING. THE PARTIES WAIVE ANY OBJECTION IT MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH LEGAL PROCEEDING IN ANY SUCH COURT. THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY ACTION, SUIT OR OTHER LEGAL PROCEEDING, WHETHER OR NOT ARISING UNDER THIS AGREEMENT AND REGARDLESS OF THE LEGAL THEORY UPON WHICH THE CLAIMS ARE BASED.

## 24.0 DEALER SPECIFIC INFORMATION

### Eligible Products

You are approved to market the following Product families, as specified with a "YES" or identified portions as designated. Specific Products are listed in notices and an electronic file. Specific certification may also be required for certain Products.

**Supplies** ___X___       **Other** (as listed) _____

### Minimum Renewal Criteria

Lexmark may establish Minimum Renewal Criteria (MRC) for a contract period for some or all Products. The MRC (Listed below or on attachments) designates the minimum level of sales performance expected of you. Sales performance objectives may be established which modify your MRC.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY   A2604

The minimum renewal requirement for Supplies Product is



**Authorized Ship to and Bill to Locations**

All Authorized ship to and bill to Locations must be approved in writing by Lexmark and listed below or on an attachment to this Agreement. Any change in the location or any significant change in the characteristics of your Authorized Locations must be approved by Lexmark.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A2605

# GSA LETTER AMENDMENT TO LEXMARK AUTHORIZED DEALER AGREEMENT

Date:

Company:
Address:

Reference: *General Services Administration Supply Contract Number GS-25F-0059M*

This letter contains the terms and conditions allowing you to sell off of Lexmark's **General Services Administration Supply Schedule Number GS-25F-0059M.**

Lexmark hereby authorizes you as a non-exclusive representative for the sale of Lexmark imaging supply products under Lexmark's current General Services Administration (GSA) Federal Supply Service Schedule FSC Group 36, GS-25F-0059M. The term of this agreement shall coincide with the period of Lexmark's GSA Schedule Contract and any renewal periods.

Either party may terminate this amendment at will, at any time, with or without cause, by written notice given to the other not less that 30 days prior to the effective date of such notice.

Lexmark may terminate this amendment immediately in the event that you should fail to perform any obligation, duty, or responsibility imposed under Lexmark's GSA Schedule Contract or this amendment.

Lexmark is obligated to report to the government all sales under its GSA Schedule Contract. Failure by the Authorized Government Dealer to provide monthly reports to Lexmark of sales under this GSA Schedule Contract will result in immediate termination of this amendment and your ability to accept any further orders against Lexmark's GSA Schedule Contract.

You agree to the following:

1. Comply with all terms, conditions and pricing of the Lexmark GSA Schedule Contract, for all sales made under the contract;
2. Accept orders referencing Lexmark's GSA Schedule Contract in the name of Authorized Lexmark Dealer
3. Only accept orders at **Lexmark's GSA Schedule Contract pricing or lower.** Orders with prices that are higher than current contract prices are contract violations which can result in contract termination, awards for damage, fines, and other penalties.
4. Indemnify Lexmark for any such damages, fines, and/or penalties resulting from your charging higher or lower prices than set forth on the attached Lexmark GSA Schedule or otherwise breaking the terms of Lexmark's GSA Schedule Contract.
5. Maintain a system of reporting sales under the contract to Lexmark, which includes: a) date of sale; b) agency to which the sale was made; c) the product sold; d) the quantity sold; e) the price at which it was sold, including discounts and f) all other significant sales data. Report monthly sales of all items made under the Lexmark GSA Schedule Contract to Lexmark no later than 5 workdays in the following month after the sales were made. (Documentation should be forwarded to Lexmark International, Inc., Attn: R. Hornak, 740 New Circle Rd, Building 200, Lexington, KY 40550 or email address - dickh@lexmark.com.)
6. Retain the sales records supporting reported sales from item 5 until three years after the date of the last invoice under the Schedule contract (notification of the date of the last invoice will be provided by Lexmark). This requirement shall survive any termination of the GSA Letter Amendment to the Lexmark Authorized Dealer Agreement.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A2606

7. Provide electronically basic business information, capabilities and financial information to the Central Contractor registration (CCR) database maintained by the Defense Logistics Agency (DLA). Lexmark's contract with GSA mandates the use of CCR to comply with enacted regulations that require federal agencies to maintain certain information on all contractors and to pay every contractor through electronic funds transfer. The Authorized Government Reseller is required to provide Lexmark with a confirmation of successful registration from DLA. The Authorized Government Reseller will not be approved as a reseller under Lexmark's contract prior to verification from CCR.
8. Be subject to an audit by the Government, with respect to sales made under the contract and
9. Place orders and accept payment in the name of the contractor in care of the dealer.

Lexmark agrees that during the contract period or any extension thereof, to notify you of any price change, items removed from the contract and addition of products.

**Lexmark International, Inc.**                                  **Authorized Lexmark Dealer**

By: _____
Print Name: _____
Title: _____
Date: _____

CONFIDENTIAL - OUTSIDE COUNSEL ONLY   A2607

## ATTACHMENT 1: Approved RESELLERS



| Dealer Name | Street Address | City | State | Zip |
|---|---|---|---|---|

BSD Reseller exemption October 2011    2

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A2608

### Amendment the Lexmark Authorized Dealer Agreement

This Amendment ("Amendment") amends the Lexmark Authorized Dealer Agreement, effective August 30, 2005 ("Agreement"), between ██████████████████████ and Lexmark International, Inc. ("Lexmark")

This Amendment is effective as of **October 25, 2011**. All capitalized terms used herein have the same meaning as in the Agreement. Except as modified herein, all terms and conditions of the Agreement remain in full force and effect. For good and valuable consideration, the receipt and sufficiency which are hereby acknowledged, Lexmark and ████████ agree as follows:

1. Replace the third paragraph in Section 3, Relationship of the Parties, with the following:

    Subject to the obligations set forth herein, you may market Products at such prices and terms and conditions as you determine. You may market Products to any End Users and to those approved Resellers in support of Lexmark's Federal BSD Program. The list of approved Resellers is attached as **Attachment 1**. You may not market Products to Resellers not listed in Attachment 1.

2. This Amendment is governed by the laws of the Commonwealth of Kentucky excluding its choice of law provisions. The parties agree that any and all actions, suits or other legal proceedings may be brought against the other in a state or federal court in Kentucky and the parties consent to the jurisdiction of such courts. The parties all hereby irrevocably and unconditionally waive trial by jury in any action, suit or other legal proceeding against the other arising under this Amendment.

3. This Amendment may be executed in several counterparts, each of which shall be deemed an original and all of which taken together shall constitute one single amendment between the parties hereto.

Except to the extent specifically modified or amended by this Amendment the remainder of the Agreement shall remain unchanged.

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed by their duly authorized representatives.

**Lexmark International, Inc.**

By: _(Signature)_

Name: J. DENIS GIULIANI

Title: V.P. North American Supplies & MKTG.

Date: 11/6/11

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A2609

DEALER CONTRACT 5

**Lexmark International, Inc.**
an IBM alliance company

## AUTHORIZED DEALER AGREEMENT

Name and Address of Dealer:

Agreement No.: **LBBV158**

Lexmark Office Address:

*Effective 2/1/92*

Lexmark Office No.: **GT2**

2005 MARKET STREET  5TH FLOOR
PHILADELPHIA       PA 19103

Thank you for selecting Lexmark as a supplier of products, services, and support. Our goal is to be the best in the industry. If at any time you are not completely satisfied, please let us know.

This agreement authorizes you to purchase Products from Lexmark under its terms for marketing to End Users only in the United States and Puerto Rico. Lexmark may issue Bulletins under this Agreement which change the terms of this Agreement. Any Bulletins will become effective on the date Lexmark specifies unless you notify us in writing within 30 days of your receipt of the Bulletin that you do not accept it.

Lexmark may issue administrative, technical and procedural information, announcements, promotions, programs, product and pricing letters, product withdrawal letters, and other kinds of notices in writing from time to time. All such notices are effective on the date Lexmark specifies.

### Table of Contents

| | | | |
|---|---|---|---|
| 1.0 | DEFINITIONS | 19.0 | STATUS CHANGE |
| 2.0 | CONTRACT PERIOD | 20.0 | TRADEMARKS AND TRADE NAMES |
| 3.0 | RELATIONSHIP OF THE PARTIES | 21.0 | PATENTS AND COPYRIGHTS |
| 4.0 | MARKETING TO END USERS | 22.0 | LIMITATION OF REMEDIES |
| 5.0 | DEALER RESPONSIBILITIES | 23.0 | INDEMNIFICATION |
| 6.0 | ORDERS AND CANCELLATIONS | 24.0 | TERMINATION |
| 7.0 | PRICES | 25.0 | DEALER ASSOCIATED REMARKETERS |
| 8.0 | PAYMENT | 26.0 | PS/1 PRINTERS |
| 9.0 | PRICE REDUCTION CREDIT | 27.0 | GENERAL |
| 10.0 | INVENTORY ADJUSTMENTS | 28.0 | DEALER SPECIFIC INFORMATION |
| 11.0 | WARRANTIES | | Aggregator Relationships |
| 12.0 | WARRANTY SERVICE | | Superstores |
| 13.0 | MAINTENANCE PARTS | | Campus Technology Centers |
| 14.0 | ENGINEERING CHANGES | | Eligible Products |
| 15.0 | LICENSED PROGRAMS | | Minimum Renewal Criteria |
| 16.0 | SECURITY INTEREST | | Marketing Coverage Area |
| 17.0 | TITLE AND RISK OF LOSS | | Authorized Locations |
| 18.0 | TAXES | | |

**PAGES 2 THROUGH 10 ARE ALSO PART OF THIS AGREEMENT.** This Agreement and Bulletins, the Statements of Limited Warranty, and notices are the complete agreement between us, and replace any prior oral or written communications between us. By signing below, each of us agrees to the terms of this Agreement. Once signed, any reproduction of this Agreement made by reliable means (for example, photocopy or facsimile) is considered an original.

Accepted by:
**Lexmark International, Inc.**

By _____
        Authorized Signature

_____        _____
Name (Type or Print)          Date          Name (Type or Print)          Date

CONFIDENTIAL - OUTSIDE COUNSEL ONLY  A2610

## 1.0 DEFINITIONS

Agreement means this Dealer Agreement Bulletin(s), applicable Statement(s) of Limited Warranty and notices.

Authorized Location means any of your locations approved by Lexmark in writing for the purposes of your performance under the Agreement.

End User means an unaffiliated party who acquires the Products from you for its own use and not for remarketing.

PLA Programs means licensed programs which Lexmark designates as subject to the Lexmark Program License Agreement (PLA).

Products means machines, licensed programs, and other items you can market under the Agreement.

## 2.0 CONTRACT PERIOD

The Agreement has a single 12 month contract period which commences on the first day of the month following the date of your signature on page 1, provided it is accepted by Lexmark. The Agreement can be renewed by the parties for subsequent single 12 month contract periods. Unless Lexmark notifies you otherwise, the renewal of the Agreement shall automatically occur unless either party notifies the other of its desire not to renew at least 90 days prior to the contract period expiration date. Either party can elect not to renew the Agreement with or without cause.

## 3.0 RELATIONSHIP OF THE PARTIES

As an independent contractor, you are not Lexmark's legal representative, franchisee, or agent for any purpose.

You will not make any warranties or representations on Lexmark's behalf other than those specified in the Agreement. Neither party will assume or create any obligations on the other's behalf except as specified in the Agreement.

You will market Products to End Users at such prices and terms and conditions as you determine. Such terms and conditions must not be in conflict with your obligations in the Agreement.

Lexmark reserves the right to market anywhere, including your geographic area, products which are the same as or similar to the Products under the Agreement either directly or through other remarketers.

You reserve the right to market products which are similar or competitive to the Products under the Agreement.

Lexmark may establish annual sales performance objectives for the Products which you are approved to market.

Lexmark may conduct reviews to evaluate your performance and compliance with the provisions of the Agreement.

No information will be given or received in confidence by either party unless it is covered by a separate written agreement.

## 4.0 MARKETING TO END USERS

The Products you market under the Agreement require your high quality individualized pre-sale and post-sale support. This support is necessary to achieve and maintain high End User satisfaction. Your ability to provide this support is a key reason Lexmark selected you as an authorized dealer. You, therefore, will market Products only to End Users. You agree not to market Products to other remarketers, except as agreed to by Lexmark.

Furthermore, in order to ensure End User satisfaction for certain Products, there must be at least one pre-sale face-to-face meeting between you and your prospective End User. Current products requiring such face-to-face meeting are printers and the Personal Typing System.

## 5.0 DEALER RESPONSIBILITIES

You agree to:
1) ensure the Product marketed to the End User is appropriate for the End User's requirements;
2) ensure that the End User is satisfied with all your Product marketing activities, including Product explanation, demonstration, and ongoing support;
3) maintain an End User record for each unit of Product sold or licensed. End User records are not required for Supplies. An End User record will include the name and address of the End User, the date of the sale or license, the Product Type/Model sold or licensed, and the Product's serial number, if applicable. You must retain the End User record for all Products that contain a video display for at least five years after the date of sale, and shall retain End User Records for all other Products, excluding Supplies, for the longest period of time that you customarily retain such records. You must assist Lexmark, upon Lexmark's request, in tracing a Product to an End User to distribute Product information or locate a Product for safety reasons;
4) furnish a sales receipt to the End User upon delivery of the Product indicating the date of sale or license and the serial number, if any, of the Product sold or licensed. You must retain a copy of that sales receipt for one year from the date of sale or license. You must indicate on the sales receipt for the Product any non-Lexmark alterations made to the Product;
5) report your sales performance and inventory as requested by Lexmark;
6) install each Product as specified by Lexmark;
7) market, generate demand for, perform warranty service for, and support Products only at your Authorized Location or at your End User's location; receive and inventory Products only at your Authorized Location unless Lexmark specifies otherwise; and reference only your Authorized Location in your marketing materials or advertising;
8) advertise Products designated as Supplies prominently in your catalogue;
9) maintain a sufficient inventory of Products to satisfy reasonably foreseeable End User demand;
10) provide floor space and related facilities at your Authorized Location(s) to display and demonstrate the Products;
11) maintain a required number of trained management, sales, support and service personnel;
12) report promptly to Lexmark all suspected and actual Product problems;
13) provide a product business plan as required by Lexmark;
14) notify Lexmark of any discrepancies between the Lexmark shipping manifest and the Products received;
15) maintain good financial standing and provide financial information and evidence of financial security upon request;
16) allow Lexmark or its appointed auditor to audit, during normal business hours, the above required records and receipts.

## 6.0 ORDERS AND CANCELLATIONS

Lexmark will describe specific ordering procedures and forecast requirements, if any, in writing.

Lexmark will fill your orders for Products and meet your request for shipment dates subject to the Product's availability and consistent with Lexmark's production and supply schedules.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY   A2611

You may cancel an order for any Product which Lexmark has not shipped to you. Lexmark may charge you a Cancellation Charge of 2% of the cancelled Product's Dealer price. However, you will not be liable for a Cancellation Charge if Lexmark has postponed shipment of the Product for more than 15 days from its estimated shipment date, and you have cancelled your order for the Product before the Product's shipment. Product ordered and cancelled the same day will not be assessed a cancellation charge.

Lexmark will charge you a Handling Charge of 5% if you refuse to accept a Product you ordered. You must prepay all transportation charges for return of the Product to Lexmark.

## 7.0 PRICES

Lexmark will specify its Dealer prices in notices and an electronic file. Dealer prices are F.O.B. destination, unless Lexmark specifies otherwise. Lexmark may change its Dealer prices at any time.

A Dealer price increase for a Product is effective on the date specified. However, a Dealer price increase will not apply to a Product for which Lexmark has received an order prior to the day the increase is effective, provided Lexmark accepts such order.

A Dealer price decrease is effective on the date specified and will apply to Products shipped on or after the effective date of the decrease.

A single unit price reflects the price for single units of Product acquired by End Users directly from Lexmark. A suggested retail price may also be established by Lexmark. Both are subject to change without notice. These prices are for informational purposes only and shall not limit in any way your ability to set your own prices, charges and terms and conditions for Products.

Lexmark may specify any additional fees and allowances in notices. Lexmark may change the fees and allowances at any time. Such changes will become effective on the date Lexmark specifies.

### Printers

Price schedules are based on a single order, with a single shipment to a single location unless Lexmark specifies otherwise.

| | | |
|---|---|---|
| Schedule I | -- | Invoice value under $3,000 |
| Schedule II | -- | Invoice value of at least $3,000 and printers can be ordered in any quantities |
| Schedule III | -- | Invoice value of at least $25,000, and printers must be ordered in full pallet quantities |

Printer features may not be included to meet invoice values.

### Typewriters

Price schedules for typewriters are based on a single order, with a single shipment to a single location unless Lexmark specifies otherwise.

| | | |
|---|---|---|
| Schedule I | -- | Invoice value under $10,000 |
| Schedule II | -- | Invoice value of at least $10,000 and less than $25,000 |
| Schedule III | -- | Invoice value of at least $25,000 |

All typewriter models and IBM Personal Typing Systems may be aggregated for purposes of determining invoice value.

Features and Personal Typing System Printers may not be included for purposes of determining invoice value.

### Supplies

Dealer Prices and minimum order quantities are set forth in notices. Each order for supplies for shipment to a single Authorized Location must be for an amount of at least $500.

## 8.0 PAYMENT

You agree to pay Lexmark upon your receipt of an invoice. If you fail to pay, Lexmark may:

1) impose a finance charge on the balance due; and
2) exercise any of its rights provided in the Agreement or by law.

## 9.0 PRICE REDUCTION CREDIT

If Lexmark announces a Dealer price decrease for a Product, you may be eligible to receive a price reduction credit.

### Printers and Typewriters

The price reduction credit equals the credit amount per Product, as specified by Lexmark, multiplied by your existing inventory and Product in transit on the effective date.

In order to qualify for a price reduction credit, you must:

1) provide a report of your inventory of the Product in a format and time frame specified by Lexmark;
2) have provided such report for at least the two prior months;
3) provide access, during normal business hours, to allow Lexmark to audit applicable records and inventory.

### Printer and Typewriter Features and Supplies

The price reduction credit for features and supplies equals the credit amount per item, as specified by Lexmark, multiplied by the quantity shipped directly from Lexmark to you (minus returns from you) in the prior two months.

## 10.0 INVENTORY ADJUSTMENTS

During a contract period, you may return for credit selected Products which you obtained directly from Lexmark. Lexmark will specify which Products are returnable in notices or an electronic file.

Upon receipt and acceptance of a returned Product, Lexmark will issue you a Product credit as determined by Lexmark. You may use such credit only against sums then or thereafter due Lexmark.

You must return all Products to Lexmark, transportation prepaid, in the original shipping containers which must not have been opened, damaged, marked or labeled. The Products must be in marketable condition as determined by Lexmark.

Any prior passage to you of title to Products will be deemed void from its inception when the returned Products are accepted by Lexmark. You warrant and represent that the returned Products are free of any outstanding liens, security interests or other third party encumbrances.

Lexmark may charge a Handling Charge of 5% multiplied by the Dealer price for any returned Product.

You may return these Products only once a month and you must accompany each shipment of returned Products with a "Returns Authorization Form."

CONFIDENTIAL - OUTSIDE COUNSEL ONLY  A2612

For Products being withdrawn from marketing, guidelines or limitations on returns may be contained in the withdrawal notice.

## Printers and Typewriters

The maximum number of units of a Product you may return in a given month is equal to the number of units of inventory of such Product you reported for the previous month.

## Printer and Typewriter Features

The maximum number of features you may return is equal to the number of features shipped to you by Lexmark in the immediately preceding six months less any returns during that period.

## Supplies

Only two return shipments of supplies are allowed per contract period. The maximum quantity of supplies you may return is equal to the quantity shipped to you by Lexmark in the immediately preceding nine months less any returns during that period.

## 11.0  WARRANTIES

Lexmark will include the applicable Statement of Limited Warranty with machines shipped. Lexmark will provide you a copy of the Statement of Limited Warranty which you are to provide to your End User at the time of sale. Lexmark may revise a Statement of Limited Warranty.

The warranty period will start on the day the End User purchases the Product. You will advise the End User of this start date.

## 12.0  WARRANTY SERVICE

The Service Support Guide is incorporated in the Agreement by reference.

Unless Lexmark specifies otherwise, you will:
1) provide warranty service under the terms of the applicable Statement of Limited Warranty and in accordance with the Service Support Guide;
2) validate all warranty claims presented to you; and
3) maintain the capability to provide warranty service according to the requirements and procedures specified in the Service Support Guide.

Lexmark will:
1) provide, at no fee, either service training in a Lexmark designated classroom or self-education materials for the number of service personnel required;
2) provide, as part of service training, selected service materials;
3) make available to you, for a fee, a) service training for additional service personnel, and b) additional service materials; and
4) honor your valid claims for warranty reimbursement for labor (when applicable) and/or credits for parts or exchange of parts as specified in the Service Support Guide.

## 13.0  MAINTENANCE PARTS

Lexmark or IBM will sell you maintenance parts only for providing warranty and maintenance service or for sale to End Users for the sole purpose of maintaining their machines.

## 14.0  ENGINEERING CHANGES

During the Warranty Period, any engineering changes determined applicable by Lexmark will be controlled by Lexmark and installed as specified by Lexmark on the machines. You or your End User may, by providing notice subject to written confirmation by Lexmark, elect to have only mandatory changes, as determined by Lexmark, installed.

Lexmark may either install a mandatory change at your location without charge or provide you, at no charge, parts and instructions for your installation of such changes on all machines in your inventory or on machines owned by your End Users. If you install the changes, Lexmark will reimburse you for your labor at a rate established by Lexmark.

## 15.0  LICENSED PROGRAMS

Licensed programs may be made available, as determined by Lexmark, to you to market under the provisions of the Agreement and the PLA or a third party agreement.

You agree to ensure that your End User understands and agrees to the PLA.

You agree to accept return of a PLA program, provided it is in its original, unopened package, and refund the money paid by an End User who does not wish to be bound by the PLA. If the PLA permits the return of a PLA program with an accompanying specified Product, you agree to accept the return of the PLA program with the other Product for refund.

Certain programs may be distributed by you only along with the Products with which they are packaged, as set forth in product announcement letters. In addition, certain programs, when distributed to the U.S. or other governments, must be identified as subject to government regulations for software protection of privately developed commercial software, as set forth in product announcement letters.

## 16.0  SECURITY INTEREST

Lexmark reserves and you grant a purchase money security interest in each Product, in your proceeds from the sale of each Product, and in your accounts receivable for such Product. This interest will be satisfied by payment in full.

You agree to sign an appropriate document to permit us to perfect Lexmark's purchase money security interest.

## 17.0  TITLE AND RISK OF LOSS

Title passes to you for each machine on its date of shipment from Lexmark. Title for each copy of a PLA program remains in Lexmark.

Lexmark relieves you of responsibility for all risk of loss of, or damage to, a machine during the period it is in transit from Lexmark up to its initial delivery to you.

## 18.0  TAXES

You agree to pay amounts equal to any taxes resulting from the Agreement or any activities under the Agreement. Such taxes do not include taxes based on Lexmark's net income. You are responsible to bear any personal property taxes assessable on Products on or after delivery to the carrier at the Lexmark ship-from location.

You agree to provide Lexmark with a valid Reseller Exemption Certificate for each taxing jurisdiction to which Products ac-

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A2613

quired by you for resale will be shipped by Lexmark under the Agreement. If such Certificate(s) is not provided to Lexmark prior to shipment, Lexmark will charge, and you will be required to pay, all applicable state and local taxes.

You agree to notify Lexmark promptly of the revocation or modification of any Reseller Exemption Certificate so provided. You further agree to indemnify and hold Lexmark harmless from any claims and assessments against Lexmark resulting from a refusal by a taxing jurisdiction to recognize any of your Reseller Exemption Certificates.

## 19.0  STATUS CHANGE

To maintain your authorization, you must request Lexmark approval in writing if you anticipate a:

1) sale of your enterprise;
2) transfer of your equity ownership;
3) significant change in your management;
4) merger or acquisition of your enterprise or Authorized Location with or by any other entity;
5) legal name change of your enterprise;
6) relocation of an Authorized Location; or
7) closing of an Authorized Location.

## 20.0  TRADEMARKS AND TRADE NAMES

You may refer to yourself under the Agreement as a Lexmark Authorized Dealer:
1) solely in connection with Products;
2) only during the contract period; and
3) only within the United States and Puerto Rico.

Except as provided for in this Section, Lexmark does not grant you the right to use trademarks or trade names. Lexmark grants you the limited permission to use the trademark "Lexmark" or "IBM" solely to identify the Products acquired from Lexmark under the Agreement. You may use the trademarks "Lexmark" or "IBM" only within the United States and Puerto Rico.

At Lexmark's request, you will provide to Lexmark, for review and written approval, promotional, advertising and other materials that:
1) use a Lexmark, International Business Machines Corporation (IBM) or third party trademark or trade name; or
2) refer to you as a "Lexmark Authorized Dealer".

Lexmark will supply advertising guidelines in writing. At Lexmark's request, you agree to change any materials or use of materials which Lexmark determines to be inaccurate, objectionable, misleading or a misuse of Lexmark or IBM trademarks. You will pay the expenses for such change.

The permission granted relative to the Lexmark or IBM trademarks will terminate with the termination or expiration of the Agreement. In such event, for the affected Products, you will immediately:
1) cease referring to yourself as a "Lexmark Authorized Dealer" or other such term that includes the name of the Products, as applicable;
2) cease referring to yourself as approved by Lexmark to provide warranty services; and
3) return to Lexmark or destroy all materials under your control employing such trademarks.

You may retain materials with Lexmark or IBM trademarks which are required to fulfill your warranty service or support obligations on affected Products. You will return these materials to Lexmark or destroy them upon completion of such obligations.

You recognize Lexmark's ownership and title to its trademarks and the goodwill attaching to them. You also recognize IBM's

ownership and title to its trademarks and the goodwill attaching to them. You agree that any goodwill which accrues because of your use of the trademarks "Lexmark" or "IBM" will become Lexmark's or IBM's property, respectively. You agree not to contest Lexmark or IBM trademarks or trade names. You agree not to use, employ or attempt to register any trademarks or trade names which are confusingly similar to Lexmark or IBM trademarks or trade names. IBM may revoke immediately, without prior notice, any permission to use IBM trademarks granted to you under the Agreement if IBM determines that you are misusing such IBM trademarks or if you place any IBM trademark on any product in violation of any law or IBM's legal rights.

## 21.0  PATENTS AND COPYRIGHTS

Lexmark will, at its expense, defend you against any claim that any machine acquired under the Agreement infringes a patent or copyright in the United States or Puerto Rico. Lexmark will pay all costs, damages and attorney's fees that a court finally awards as a result of such claim. To qualify for such defense and payment, you must 1) give Lexmark prompt written notice of any such claim, and 2) allow Lexmark to control, and fully cooperate with Lexmark in, the defense and all related settlement negotiations.

You agree that if a machine in your inventory, or the operation of a machine while in your inventory, becomes, or Lexmark believes is likely to become, the subject of such a claim, you will permit Lexmark, at its option and expense, either to secure the right for you to continue using the machine or to replace or modify it so that it becomes noninfringing. However, if neither of the foregoing alternatives is available on terms which are reasonable in Lexmark's judgment, you will return the machine upon Lexmark's written request. Lexmark will grant you a credit equal to the price paid by you to Lexmark for the returned machine. However, Lexmark may, for selected machines, grant you a credit equal to such price depreciated. The depreciation shall be an equal amount per year over the life of the machines as Lexmark establishes. Lexmark shall have no obligation with respect to any such claim based upon any non-Lexmark modification of machines or their combination, operation or use with apparatus, data or programs not furnished by Lexmark.

This Section states Lexmark's entire obligation to you for machines regarding infringement or the like.

## 22.0  LIMITATION OF REMEDIES

Lexmark's entire liability and your exclusive remedy for any claims are as this section provides.

Lexmark is not liable for any damages caused by performance or nonperformance of machines or programming located outside the United States and Puerto Rico. In no event will Lexmark be liable for any damages caused by your failure to perform your responsibilities.

Lexmark's entire liability and your exclusive remedy for actual damages from your use of PLA programs are as set forth in the PLA.

Lexmark assumes no liability regarding any claim or action caused by, or directly related to, a non-Lexmark product.

In no event will Lexmark be liable for any lost profits, lost savings, incidental damages, or other consequential damages, even if Lexmark has been advised of the possibility of such damages. Lexmark will not be liable for any damages claimed by you based on any third party claim.

For any claim for any cause whatsoever, other than those provided for in Section 21.0 and the first paragraph of Section 23

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A2614

Lexmark's liability for actual damages will be limited to $100,000.

## 23.0 INDEMNIFICATION

Lexmark will indemnify and hold you harmless from all claims, including reasonable attorney's fees, (but not including lost profits, lost savings incidental damages, or other consequential damages) for bodily injury or damage to real property or tangible personal property arising from any acts or omissions for which Lexmark is legally liable.

You will indemnify and hold Lexmark harmless from all claims, including reasonable attorney's fees, by any party resulting directly or indirectly from any acts or omissions by you.

## 24.0 TERMINATION

Either party may terminate the Agreement, with or without cause. Lexmark will provide three month written notice to you of such termination, except as otherwise provided in this Section. You must provide one month written notice to Lexmark.

In the event that Lexmark gives you such notice for cause, Lexmark may provide you with an opportunity to cure deficiencies. In such event, Lexmark will establish a reasonable time, not to exceed three months, in which you must remedy such deficiencies.

In addition, Lexmark considers certain actions so serious and inconsistent with your obligations as a Dealer as to warrant immediate termination. Such breaches will include, but not be limited to, situations in which 1) you made material misrepresentations to Lexmark in your application to become a Dealer, at any later time through oral or written statements, or by submission of any false or fraudulent documentation or claim to Lexmark, or 2) you marketed Products to other than an End User.

In the event of termination of the Agreement by you or Lexmark, all monies due Lexmark will immediately become due and payable.

If you or Lexmark elects to terminate the Agreement, Lexmark may repurchase some or all of the Products in your inventory at a price determined by Lexmark. In such event, return shipping charges will be paid by you. Products returned must be in the original shipping containers, which must not have been opened, damaged, marked or labeled.

A termination of the Agreement may also be only a partial termination of, for example, an Authorized Location, an eligible Product family, a part of a marketing coverage area, or an Aggregator relationship.

## 25.0 DEALER ASSOCIATED REMARKETERS

A Dealer Associated Remarketer (Dealer Associate) is one who obtains Product from you and remarkets the Product to End Users. In the case of Printers, a Dealer Associate is a remarketer who adds significant enhancement to computer systems in function or capability. However, it is not necessary that such Printers be remarketed only with the enhanced computer system.

You may market Products to a Dealer Associate only with the written approval of Lexmark. You retain responsibility to ensure End User satisfaction and, if applicable, provide warranty service to the Dealer Associate's End User. These responsibilities may not be delegated. You may, however, share specific End User technical assistance functions with your Dealer Associate.

Lexmark will identify those Products which you may market to a Dealer Associate. Lexmark reserves the right to withdraw its approval for either the Dealer Associate or such Products which you market to a Dealer Associate.

You must maintain records for those Products you ship to your Dealer Associate. You must have appropriate agreements with your Dealer Associate in place to ensure your Dealer Associate:

1) markets only from its approved location and only to End Users;
2) maintains End User Records in the format and for the required period of retention as described in this Agreement; and
3) assists Lexmark in tracing a specific Product to an End User if required.

## 26.0 PS/1 PRINTERS

The following additional terms apply to PS/1 Printers.

1) You are permitted to market PS/1 Printers only in the contiguous 48 states. If an End User intends to transport the PS/1 Printer outside the 48 states, you must notify such End User that there will not be access to the IBM 800# and on-line services of the PS/1 Printer.
2) As a secondary marketing approach you may utilize mass merchandising techniques directed at parties who are prospects to acquire PS/1 Printers and who you can support directly from your Authorized Locations. You may utilize such techniques only if Lexmark has pre-approved the materials you propose to use. Such materials must clearly indicate how the End User can get technical support or information from you or Lexmark prior to, and after, the sale of PS/1 Printers. Either a copy of the limited warranty document, or a notice of how the End User may readily obtain such document from you prior to the End User's acquisition of PS/1 Printers, must be included in the materials. Utilizing mass merchandising techniques does not eliminate the face-to-face meeting requirement identified under "Marketing to End Users".
3) The "Orders and Cancellations" section is modified for PS/1 Printers by the following. For PS/1 Printers, you may not 1) defer or cancel any purchase order, accepted by Lexmark, whose applicable shipment dates Lexmark confirmed or 2) refuse any shipments made by Lexmark related to such order. In addition, you may not cancel parts of such order. If, however, Lexmark notifies you that it will ship such order later than the date, or that the quantity will be less than, you request, you may modify, defer or cancel such order. You may cancel purchase orders, or parts thereof, not confirmed by Lexmark. If you do not cancel non-confirmed orders, Lexmark will hold them for possible future acceptance, and you agree to provide Lexmark with revised Requested Ship Dates for non-cancelled orders. If Lexmark, without your approval ships such delayed PS/1 Printers, you may return them at Lexmark's expense within ten days of receipt from Lexmark;
4) For the PS/1 Printer, Dealer Prices are F.O.B., Raleigh, NC;
5) For the PS/1 Printer, during the time of transit from the Lexmark shipping location to you, all risks of loss or damage shall be yours.
6) PS/1 Printers do not qualify for Inventory Adjustment. You may not return PS/1 Printers to Lexmark.

## 27.0 GENERAL

Lexmark's waiver of any instance of your noncompliance with the Agreement will not be deemed a waiver of any future noncompliance.

You may not assign the Agreement or any of its rights or duties without Lexmark's prior written consent.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A2615

Lexmark is not responsible for failure to fulfill its obligations under the Agreement due to causes beyond its control.

The Agreement will not be supplemented or modified by any course of dealing or trade usage. Variance from or addition to the terms and conditions of the Agreement in any purchase order or other written notification from you will be of no effect.

The provisions of the Agreement which by their nature extend beyond the termination or expiration of the Agreement will survive and remain in effect until all obligations are satisfied.

Each party agrees to pay the other's reasonable attorney's fees and costs of litigation if the party, for any cause whatsoever, brings suit against the other party and the other party is finally adjudicated not to have liability.

Neither you nor Lexmark will bring an action, regardless of form, arising out of the Agreement more that two years after the cause of action has arisen. In the case of an action for non-payment, the action may not be brought more than two years from the date the last payment was due.

Both parties agree to comply with all applicable governmental laws and regulations.

The laws of the State of New York will govern the Agreement.

## 28.0 DEALER SPECIFIC INFORMATION

### Aggregator Relationships

The provisions of this Section apply to you only if you have been approved in this Section to receive Products from an Aggregator. Lexmark will indicate its approval of you to receive Products from an Aggregator by naming the Aggregator in this Section.

The term "Aggregator" means a business entity, typically a franchisor, which has been approved by Lexmark under a written agreement, to order and receive Products from Lexmark for redistribution to the Aggregator's members or franchisees. Lexmark must approve such members or franchisees as Dealers.

You may elect to obtain Products through your Aggregator. For such products, you waive your rights and Lexmark waives your responsibilities under the following item and Sections of the Agreement;

| | |
|---|---|
| 5.0 | DEALER RESPONSIBILITIES - item (14); |
| 6.0 | ORDERS AND CANCELLATIONS; |
| 7.0 | PRICES; |
| 8.0 | PAYMENT; |
| 9.0 | PRICE REDUCTION CREDIT; |
| 10.0 | INVENTORY ADJUSTMENTS; and |
| 18.0 | TAXES. |

Title to machines, shipped to you by your Aggregator, passes from Lexmark directly to you upon shipment from your Aggregator.

Lexmark does not have responsibility for risk of loss of, or damage to, Products shipped to you by your Aggregator.

Machines your Aggregator ships to you will be identified by serial number. Therefore, in addition to the record and audit requirements described in Section 5.0 of the Agreement, you agree that you will maintain a record of each such machine by serial number. You agree that you will maintain that record for 12 months following your receipt of the machine. You must provide such records to Lexmark upon request. In addition, you hereby authorize your Aggregator to release information to Lexmark regarding machines shipped to you.

For Products you order directly from Lexmark, the waivers described in the third paragraph of this section will not apply.

Name and location of your Aggregator:

N/A
N/A
N/A
N/A
N/A
N/A

### Superstores

The selection criteria for Superstores shall be defined by Lexmark.

Dealers who are Superstores for specific Products shall be indicated by a "YES" on the appropriate line(s):

| NO | Supplies |
|---|---|
| NO | Typewriters |
| NO | Printers |

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A2616

**Campus Technology Centers**

Campus Technology Centers are not-for-profit institutions of higher education that may acquire Products for internal use and re-marketing to End Users only, and shall be indicated by a "YES" on this line:     **NO**

If you are a Campus Technology Center, then the term Dealer shall be replaced by Campus Technology Center throughout this Agreement.

The additional following terms shall apply to Campus Technology Centers:

1) End User means a party who a) is staff, faculty or a registered student matriculated in a degree granting program, and b) acquires Product from you for its own use, and not for remarketing.
2) Internal use means use for instruction, academic research and administrative work of your educational institution.
3) You will market Products to End Users as an incidental part of your activities and in furtherance of your educational purposes.
4) You will not sell more than one printer per year to an End User without Lexmark's prior written approval.
5) Prices for Campus Technology Centers shall be set forth in separate notices and/or an electronic file.
6) Lexmark will provide an Education Development Fund for your use in developing and improving your capability to support your End Users.
7) The warranty period for internal use Products will commence on the day you place the Product in use in your educational institution.

**Eligible Products**

You are approved to market the following Product families, as specified with a "YES" or identified portions as designated. Specific Products are listed in notices and an electronic file. Specific certification may also be required for certain Products.

| Supplies | Typewriters | Printers | Other (as listed) |
|----------|-------------|----------|-------------------|
| YES | NO | NO | NO |

**Minimum Renewal Criteria**

Lexmark may establish Minimum Renewal Criteria (MRC) for a contract period for some or all Products. The MRC designates the minimum level of sales performance expected of you.

| Product | Minimum Renewal Criteria |
|---------|--------------------------|
| SUPPLIES | |

**Marketing Coverage Area**

Your approved marketing coverage area(s), listed by Authorized Location, by county and state, is:

**Authorized Locations**

All Authorized Locations must be approved in writing by Lexmark and listed below or on an attachment to this Agreement. Any change in the location or any significant change in the characteristics of your Authorized Locations must be approved by Lexmark.



LX01-01 (10/22/91)                              Page 8 of 10

CONFIDENTIAL - OUTSIDE COUNSEL ONLY     A2617



CONFIDENTIAL - OUTSIDE COUNSEL ONLY   A2618



CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A2619

# LEXM▲RK



Lexmark International, Inc.
P.O. Box 1001
Dayton, New Jersey 08810-1001

1-800-258-8575
1-800-3FAX-LEX

January 30, 1992

Dear █████████

Lexmark is offering to renew our agreement with you as a dealer for **IBM supplies.**

Lexmark's offer is the result of:

o   A review of your successful performance as a dealer and

o   the understanding of your commitment to effectively fulfill the terms and conditions of the Lexmark Authorized Dealer Agreement.

This renewal offer is subject to the following:

o   You are required to address any issues discussed during your annual performance review or included in a recent letter from your Marketing Representative.

o   You are required to maintain a satisfactory record of payment.

Your credit relationship for the period of this contract renewal will be:

o   **An upper credit limit of** ███████

Your current IBM agreement will soon expire and your new Lexmark agreement documents should be signed and returned to us to ensure continuous authorization.

Please sign, date and return the attached Lexmark agreement documents within five (5) work days of receipt.  This offer to renew your contract will **expire 2/29/92** if not signed and returned.  Please forward all documents to the following address:

     Mike Giletto
     Lexmark
     2005 Market St., 5th fl.
     Phila., PA 19103

An IBM alliance company

D P - 309

CONFIDENTIAL - OUTSIDE COUNSEL ONLY   A2620

# RICOH

**RICOH AMERICAS CORPORATION**
5 Dedrick Place
West Caldwell, NJ 07006
www.ricoh-usa.com

March 2012

Dear Valued Supplier,

I am writing to you today with an exciting update on the IKON brand in the United States. In April 2012, the Ricoh and IKON brands will align and we will go to market as Ricoh moving forward. As you know, IKON Office Solutions became a Ricoh Company in 2008. Moving to a single brand marks three years of integration planning and execution, creating a strong, unified organization.

Effective April 1, 2012, IKON Office Solutions, Inc. will change its name to Ricoh USA, Inc. We will need our suppliers to begin invoicing us as Ricoh USA, Inc. for any contracts written under IKON Office Solutions, Inc. All contracts and legal documents previously signed by IKON Office Solutions, Inc. will remain valid, and the corresponding obligations and rights will remain with the company under its new name, Ricoh USA, Inc.

If for any reason you have questions or concerns, please contact your buyer. Thank you for your continued support.

Sincerely,

*Suzanne C Shenk*

Suzanne Shenk
Vice President, Supply Chain
Ricoh Americas Corporation

cc:  Contract File

CONFIDENTIAL - OUTSIDE COUNSEL ONLY   A2621

# DEALER CONTRACT 6

**Lexmark International, Inc.**

## AUTHORIZED DEALER AGREEMENT

Name and Address of Dealer:

Agreement No.:

Contract Commencement Date:

Lexmark Office Address:
Lexmark International Inc.
740 West New Circle Road
Lexington, KY 40550

Lexmark Office No.:US 1320

Thank you for selecting Lexmark as a supplier of Products, services, and support. Our goal is to be the best in the industry. If at any time you are not completely satisfied, please let us know.

This agreement authorizes you to purchase Products from Lexmark International, Inc., (Lexmark) under its terms for marketing to End Users and your internal use only in the United States. Lexmark may issue Bulletins under this Agreement that change the terms of this Agreement. Any Bulletins will become effective on the date Lexmark specifies unless you notify us in writing within 30 days of your receipt of the Bulletin that you do not accept it.

Lexmark may issue administrative, technical and procedural information, announcements, promotions, programs, product and pricing letters, product withdrawal letters, and other kinds of notices in written and electronic form from time to time. All such notices are effective on the date Lexmark specifies.

### Table of Contents

| | | | |
|---|---|---|---|
| 1.0 | DEFINITIONS | 16.0 | STATUS CHANGE |
| 2.0 | CONTRACT PERIOD | 17.0 | TRADEMARKS AND TRADE NAMES |
| 3.0 | RELATIONSHIP OF THE PARTIES | 18.0 | PATENTS AND COPYRIGHTS |
| 4.0 | MARKETING TO END USERS | 19.0 | LIMITATION OF REMEDIES |
| 5.0 | DEALER RESPONSIBILITIES | 20.0 | INDEMNIFICATION |
| 6.0 | ORDERS AND CANCELLATIONS | 21.0 | TERMINATION |
| 7.0 | PRICES | 22.0 | CONFIDENTIAL INFORMATION |
| 8.0 | PAYMENT | 23.0 | GENERAL |
| 9.0 | PRICE REDUCTION CREDIT | 24.0 | DEALER SPECIFIC INFORMATION |
| 10.0 | PRODUCT RETURNS | | Eligible Products |
| 11.0 | WARRANTIES | | Minimum Renewal Criteria |
| 12.0 | WARRANTY SERVICE | | Marketing Coverage Area |
| 13.0 | SECURITY INTEREST | | Authorized Locations |
| 14.0 | TITLE AND RIGHTS, RISKS AND REWARDS OF OWNERSHIP | | |
| 15.0 | TAXES | | |

**PAGES 2 THROUGH 8 ARE ALSO PART OF THIS AGREEMENT.** This Agreement and Bulletins, the Statements of Limited Warranty, and notices are the complete agreement between us, and replace any prior oral or written communications between us. By signing below, each of us agrees to the terms of this Agreement. Once signed, any reproduction of this Agreement made by reliable means (for example, photocopy or facsimile) is considered an original.

Accepted by:
**Lexmark International, Inc.**

By _____
Signature

Authorized Signature _____

J. DENNIS GRILLIANI    5/9/11
Name (Type or Print)    Date

05/16/10    Page 1 of 8

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A2622

## 1.0 DEFINITIONS

Agreement means this Dealer Agreement, Bulletin(s), applicable Statements of Limited Warranty and notices.

Authorized Location means any of your business locations approved by Lexmark in writing for the purposes of your performance under the Agreement.

End User means a party who acquires the Products for its own use and not for remarketing.

Products means those items identified in Section 24.0 which you can market under this Agreement.

### 2.0 CONTRACT PERIOD

The Agreement has a single 12 month contract period which, unless noted otherwise on page 1, commences on the first day of the month following the date of your signature on page 1, provided it is renewed by Lexmark. The Agreement can be renewed by the parties for subsequent single 12 month contract periods. Unless Lexmark notifies you otherwise, the renewal of the Agreement shall automatically occur annually unless either party notifies the other of its desire not to renew at least 90 days prior to the contract period expiration date. Either party can elect not to renew the Agreement with or without cause.

### 3.0 RELATIONSHIP OF THE PARTIES

As an independent contractor, you are not Lexmark's legal representative, franchisee, or agent for any purpose.

You will not make any warranties or representations on Lexmark's behalf other than those specified in the Agreement. Neither party will assume or create any obligations on the other's behalf except as specified in the Agreement.

You will market Products to End Users at such prices and terms and conditions as you determine. Such terms and conditions must not be in conflict with your obligations in the Agreement.

Lexmark reserves the right to market anywhere, including your geographic area, products which are the same as or similar to the Products under the Agreement either directly or through other remarketers.

You reserve the right to market Products which are similar or competitive to the Products under the Agreement.

Lexmark may establish annual sales performance objectives, which modify the Minimum Renewal Criteria, for the Products you are approved to market. Lexmark reserves the right to revise the objectives at any time. Lexmark's assessment of your overall compliance with the provisions of the Agreement will include a review of your attainment of these sales performance objectives.

Lexmark may conduct reviews to evaluate your performance and compliance with the provisions of the Agreement.

### 4.0 MARKETING TO END USERS

The Products you market under the Agreement require your high quality individualized pre-sale and post-sale support. This support is necessary to achieve and maintain high End User

satisfaction. Your ability to provide this support is a key reason Lexmark selected you as an authorized Dealer. You, therefore, will market Products only to End Users. You agree not to market Products to other remarketers, except as agreed to, in writing, by Lexmark.

In order to better ensure End User satisfaction, Lexmark retains the option of issuing or not issuing Letters of Supply (or guarantees of supply) to you when you respond to any particular state, local or federal government procurement request. Likewise, without Lexmark's written consent, you may not issue a Letter of Supply relating to Lexmark Products to any other party in connection with any government procurement.

### 5.0 DEALER RESPONSIBILITIES

You agree to:

1) ensure the Product marketed to the End User is appropriate for the End User's requirements;
2) ensure that the End User is satisfied with all your Product marketing activities, including Product explanation, demonstration, and ongoing support;
3) report your sales performance and inventory as requested by Lexmark;
4) market, generate demand for, and support Products only at your Authorized Location or at your End User's location; receive and inventory Products only at your Authorized Location unless Lexmark specifies otherwise; and reference only your Authorized Location in your marketing materials or advertising;
5) maintain sufficient inventory of Products at each location to promptly satisfy reasonably foreseeable End User demand;
6) maintain trained management, sales, support and service personnel, if applicable;
7) report promptly to Lexmark all suspected and actual Product problems;
8) provide a Product business plan as required by Lexmark;
9) notify Lexmark of any discrepancies between the Lexmark shipping manifest and the Products received;
10) maintain good financial standing and provide financial information and evidence of financial security upon request;
11) allow Lexmark or its appointed auditor to audit, during normal business hours, the above marked records and receipts.

### 6.0 ORDERS AND CANCELLATIONS

Lexmark will describe specific ordering procedures and forecast requirements, if any, in writing.

Lexmark will fill your orders for Products and meet your request for shipment dates subject to credit approval and Product availability and consistent with Lexmark's production and supply schedules.

Lexmark will insure for your benefit the order for risk of loss or damage during the period it is in transit from Lexmark or its agent up to its initial delivery to you or your designated shipping point.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A2623

You may cancel an order for any Product which Lexmark has not shipped to you. Lexmark may charge you a Cancellation charge of 2% of the canceled Product's Dealer price if the cancellation was requested by you after the Product was released for shipment by Lexmark. A Product is generally released for shipment one or two days before it ships. However, you will not be liable for a cancellation charge if Lexmark has postponed shipment of the Product for more than 15 days from its estimated shipment date, and you have canceled your order for the Product before the Product's shipment.

Lexmark will charge you a handling charge of 5% if you refuse to accept delivery of any portion of a shipment you ordered. You must prepay all transportation charges for return of the Product to Lexmark.

Each order is required to have a single ship-to address.

## 7.0 PRICES

Lexmark will specify its Dealer prices in notices and an electronic file. Lexmark may change its Dealer prices at any time. Lexmark specified prices shall apply in spite of any different pricing contained in Dealer purchase orders, even if such purchase orders are accepted and Product is shipped.

A Dealer price increase for a Lexmark Product is effective on the date specified. Lexmark will announce a price increase a minimum of 30 days prior to the effective date of the increase. A price increase will not apply to a Product for which Lexmark has accepted an order prior to the effective date, provided the order specifies a requested ship date within the time frame stated in the price increase notice.

A Dealer price decrease is effective on the date specified and will apply to Products shipped on or after the effective date of the decrease.

The MSRP is Lexmark's suggested resale price and is subject to change without notice. This price is for information purposes only. Lexmark's and our remarketers prices may vary.
Lexmark may specify any additional fees and allowances in notices. Lexmark may change the fees and allowances at any time. Such changes will become effective on the date Lexmark specifies.

Dealer Prices and minimum order quantities are set forth in notices. Each supply Product order for shipment to a single Authorized Location must be for an amount of at least $3,000.

## 8.0 PAYMENT

You agree to pay Lexmark upon your receipt of an invoice, unless otherwise specified by Lexmark. If you fail to pay, Lexmark may:

1) impose a finance charge on the balance due;
2) exercise any of its rights provided in the Agreement or by law;
3) require "cash with order" or "payment on account" prior
4) stop shipment of your orders if your account is past due

## 9.0 PRICE REDUCTION CREDIT

If Lexmark announces a Dealer price decrease for a Product you may be eligible to receive a price reduction credit.

### Supplies

The price reduction credit for supplies Products equals the credit amount per item, as specified by Lexmark, multiplied by the quantity shipped directly from Lexmark to you (minus returns from you) in the prior sixty (60) days.

## 10.0 PRODUCT RETURNS

### General Terms -

During a contract period, you may return for credit selected Products which you obtained directly from Lexmark. Lexmark will specify which Products are returnable in notices or an electronic file.

Lexmark may issue notices clarifying Product return policies that shall be effective on the date specified. Lexmark may place limits on the amount of Product that can be returned. All Product must be returned to Lexmark within thirty (30) days after receiving authorization, to ensure proper credit.

Upon receipt and acceptance of a returned Product, Lexmark will issue you a Product credit as determined by Lexmark. You may use such credit only against sums then or thereafter due Lexmark.

For non-defective products, you must return all Products to Lexmark, transportation pre-paid, in the original shipping containers which must not have been opened, damaged, marked or labeled. The Products must be in marketable condition as determined by Lexmark.

Product returned without Lexmark's authorization and the appropriate documentation will be returned to you at your expense.

Any prior passage to you of title to Products will be deemed void from its inception when the returned Products are accepted by Lexmark. You warrant and represent that the returned Products are free of any outstanding liens, security interests or other third party encumbrances.

Lexmark may charge a handling charge of up to twenty percent (20%) multiplied by the then current Lexmark published Dealer price for any returned Product.

Lexmark may issue notices clarifying Product return policies which shall be effective on the date specified. For Products being withdrawn from marketing, guidelines of limitations on returns may be contained in the withdrawal notice.

### Claims

For all claims that there has been a short ship of ordered Products (not all ordered Products were received) or all of the ordered Products were not received (mis-ship), you must submit a written claim to Lexmark within thirty (30) days of the scheduled/anticipated delivery date of the ordered Products relating to such claim. Any claims after the above referenced thirty (30) to accepting your orders and/or days are expressly waived and Lexmark shall not be liable to you for any such claims (regardless of when you learned or could have learned of any of the facts surrounding the transaction or claim).

### Supplies – Stock Balance/Inventory Adjustment

Only one return shipment of supplies Products is allowed per calendar quarter (Jan to Mar; Apr to June; July to Sept; Oct to Dec) per Lexmark Authorized Reseller Location.

You may return supplies that equal up to two (2%) percent of the prior calendar quarter net revenue you purchased directly from Lexmark without a a handling charge based on the then current Lexmark authorized dealer supply price. If you return more than two (2%) percent, and less than five (5%) percent you may be charged, at Lexmark's sole discretion, a handling charge of ten (10%) percent. Any return greater than five (5%) may be assessed, at Lexmark's sole discretion, a twenty (20%) percent handling charge.

The maximum quantity of supplies Products you may return is equal to the quantity shipped to you by Lexmark in the immediately preceding twelve months less any returns during that period.

Any additional supplies Products returns in a calendar quarter will automatically be assessed a twenty (20%) percent handling charge.

### Supplies – Defective Product

Lexmark will replace supplies Products or provide a credit to you for any found to be defective by you prior to the sale to an End-User. In addition, Lexmark will provide credit to you for any Lexmark supplies Product returned defective by an End User within the warranty period specified by Lexmark in the Statement of Limited Warranty.

Specific warranty process procedures are covered in separate warranty announcement letters.

### 11.0  WARRANTIES

Lexmark will provide you a copy of the Statement of Limited Warranty, which you are to provide to your End User at the time of sale. Lexmark may revise a Statement of Limited Warranty.

The warranty period will start on the day the End User purchases the Product. You will advise the End User of this start date.

### 12.0  WARRANTY SERVICE

Supplies

Unless Lexmark specifies otherwise, for supplies Products you will:

1) provide warranty service under the terms of the applicable Statement of Limited Warranty
2) validate all warranty claims presented to you.

### 13.0  SECURITY INTEREST

Lexmark reserves, and you grant a purchase money security interest in each Product, in your proceeds from the sale of each Product and in your accounts receivable for such Product. This interest will be satisfied by payment in full.

You agree to sign an appropriate document to permit us to perfect Lexmark's purchase money security interest.

### 14.0  TITLE AND RIGHTS, RISKS AND REWARDS OF OWNERSHIP

Title and all rights, risks and rewards of ownership transfer to you upon shipment of the product from Lexmark, or its agent. Title or first copy of a licensed program remains with Lexmark.

Lexmark will insure for your benefit the order for risk of loss or damage during the period it is in transit from Lexmark or its agent up to its initial delivery to you.

### 15.0  TAXES

You agree to pay amounts equal to any taxes resulting from the Agreement or any activities under the Agreement. Such taxes do not include taxes based on Lexmark's net income. You are responsible to bear any personal property taxes assessable on Products on or after delivery to the carrier at the Lexmark ship from location.

You agree to provide Lexmark with a valid Reseller Exemption Certificate for each taxing jurisdiction to which Products acquired by you for resale will be shipped by Lexmark under the Agreement. If such Certificate(s) is not provided to Lexmark prior to shipment, Lexmark will charge, and you will be required to pay, all applicable state and local taxes.

You agree to notify Lexmark promptly of the revocation or modification of any Reseller Exemption Certificate so provided. You further agree to indemnify and hold Lexmark harmless from any claims and assessments against Lexmark resulting from a refusal by a taxing jurisdiction to recognize any of your Reseller Exemption Certificates.

### 16.0  STATUS CHANGE

To maintain your authorization, you must request Lexmark approval in writing if you anticipate a:

1) transfer of your equity ownership;
2) merger or acquisition of your enterprise or Authorized Location with or by any other entity;
3) legal name change of your enterprise; or
4) relocation or closing of an Authorized Location.

### 17.0  TRADEMARKS AND TRADE NAMES

You may refer to yourself under the Agreement as a Lexmark Authorized Dealer

1) solely in connection with Products;
2) only during the contract period; and
3) only within the United States

Except as provided for in this Section, Lexmark does not grant you the right to use trademarks or trade names. Lexmark grants you the limited permission to use the trademark "Lexmark" solely to identify the Products acquired from Lexmark under the Agreement. You may use the trademarks "Lexmark" only within the United States.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY   A2625

At Lexmark's request, you will provide to Lexmark, for review and written approval, promotional, advertising and other materials that:

1) use a Lexmark or third party trademark or trade name; or

2) refer to you as a "Lexmark Authorized Dealer"

Lexmark will supply advertising guidelines in writing. At Lexmark's request, you agree to change any materials or use of materials which Lexmark determines to be inaccurate, objectionable, misleading or a misuse of Lexmark trademarks. You will pay the expenses for such change.

The permission granted relative to the Lexmark trademarks will terminate with the termination or expiration of the Agreement. In such event, for the affected Products, you will immediately:

1) cease referring to yourself as a "Lexmark Authorized Dealer" or other such term that includes the name of the Products, as applicable;

2) cease referring to yourself as approved by Lexmark to provide warranty services; and

3) return to Lexmark or destroy all materials under your control employing such trademarks.

You may retain materials with Lexmark trademarks which are required to fulfill your warranty service or support obligations on affected Products. You will return these materials to Lexmark or destroy them upon completion of such obligations.

You recognize Lexmark's ownership and title to its trademarks and the goodwill attaching to them. You agree that any goodwill which accrues because of your use of the trademarks "Lexmark" will become Lexmark's property, respectively. You agree not to contest Lexmark trademarks or trade names. You agree not to use, employ or attempt to register any trademarks or trade names which are confusingly similar to Lexmark trademarks or trade names.

## 18.0  PATENTS AND COPYRIGHTS

Lexmark will, at its expense, defend you against any claim that any Product acquired under the Agreement infringes a patent or copyright in the United States. Lexmark will pay all costs, damages and attorney's fees that a court finally awards as a result of such claim. To qualify for such defense and payment, you must 1) give Lexmark prompt written notice of any such claim, and 2) allow Lexmark to control, and fully cooperate with Lexmark in, the defense and all related settlement negotiations. You agree that if Product in your inventory, becomes, or Lexmark believes is likely to become, the subject of such a claim, you will permit Lexmark, at its option and expense, either to secure the right for you to continue using the Product or to replace or modify it so that it becomes noninfringing. However, if neither of the foregoing alternatives is available on terms which are reasonable in Lexmark's judgment, Lexmark may stop shipping affected Product, and you will return the Product in your inventory, upon Lexmark's written request. Lexmark will grant you a credit equal to the price paid by you to Lexmark for the returned Product.    Lexmark shall have no obligation with respect to any such claim based upon any non-Lexmark modification of Product or their combination, operation or use with apparatus, data or programs not furnished by Lexmark.

This Section states Lexmark's entire obligation to you and your entire remedy for machines regarding infringement or the like.

## 19.0  LIMITATION OF REMEDIES

Lexmark's entire liability and your exclusive remedy for any claims are as this Section provides.

Lexmark is not liable for any damages caused by performance or nonperformance of Products located outside the United States. In no event will Lexmark be liable for any damages caused by your failure to perform your responsibilities.

Lexmark's entire liability and your exclusive remedy for actual damages from your use of licensed programs are as set forth in their accompanying program license agreement.

Lexmark assumes no liability regarding any claim or action caused by, or directly related to, a non-Lexmark Product.
In no event will Lexmark be liable for any lost profits, lost savings, incidental damages, or other consequential damages even if Lexmark has been advised of the possibility of such damages.  Lexmark will not be liable for any damages claimed by you based on any third party claim.

For any claim for any cause whatsoever, other than those provided for in Section 18.0 and the first paragraph of Section 20.0, Lexmark's liability for actual damages will be limited to $100,000.

## 20.0  INDEMNIFICATION

Lexmark will indemnify and hold you harmless from all claims, including reasonable attorney's fees, (but not including lost profits, lost savings, incidental damages, or other consequential damages), for bodily injury or damage to real property or tangible personal property arising from any acts or omissions for which Lexmark is legally liable.

You will indemnify and hold Lexmark harmless from all claims, including reasonable attorney's fees, by any party resulting directly or indirectly from your acts or omissions by you.

## 21.0  TERMINATION

Either party may terminate the Agreement, with or without cause. Lexmark will provide three month written notice to you of such termination, except as otherwise provided in this Section. You must provide one month written notice to Lexmark.

In the event that Lexmark gives you such notice for cause, Lexmark may provide you with an opportunity to cure deficiencies. In such event, Lexmark will establish a reasonable time, not to exceed three months, in which you must remedy such deficiencies.

In addition, Lexmark considers certain actions so serious and inconsistent with your obligations as a Dealer as to warrant immediate termination. Such breaches will include, but not be limited to, situations in which 1) you made material misrepresentations to Lexmark in your application to become a Dealer, at any later time through oral or written statements, or by submission of any false or fraudulent documentation or claim to Lexmark, or 2) you marketed Products to other than an End User.

Lexmark may also terminate the Agreement immediately in the event that a dealer or its personnel knowingly or negligently engage, directly or indirectly, in the manufacture, sale, resale,

CONFIDENTIAL - OUTSIDE COUNSEL ONLY   A2626

brokerage, distribution, storage or handling of counterfeit goods and/or gray market goods (that is, goods bearing the trademark, trade name or trade dress of Lexmark which have been acquired from a source other than Lexmark or an Authorized Lexmark Wholesaler or Distributor in the U.S.).

In the event of termination of the Agreement by you or Lexmark, all monies due Lexmark will immediately become due and payable.

If you or Lexmark elects to terminate the Agreement, Lexmark may repurchase some or all of the Products in your inventory at a price determined by Lexmark.  In such event, you will pay return-shipping charges.  Products returned must be in the original shipping containers, which must not have been opened, damaged, marked or labeled.

A termination of the Agreement may also be only a partial termination of, for example, an Authorized Location, an eligible Product family, a part of a marketing coverage area, an Aggregator relationship, or the approval to market to Dealer Associates.

## 22.0  CONFIDENTIAL INFORMATION

1)  Any information concerning Lexmark customers furnished to you by Lexmark and identified as confidential, shall be treated and held in confidence by you. You shall not publish, disclose or disseminate it for a period of five years after its receipt, except as may be authorized by Lexmark in writing. You shall not be entitled to use this information for any purposes other than for marketing of Products in furtherance of this Agreement, or as specified in the information provided.

2)  Upon termination or expiration of this Agreement, you shall deliver to Lexmark all materials, of any kind, containing such confidential information.

3)  Other than as set forth above, no information will be given or received in confidence by either party unless it is covered by a separate written agreement.

## 23.0  GENERAL

Lexmark's waiver of any instance of your noncompliance with the Agreement will not be deemed a waiver of any future noncompliance.

You may not assign the Agreement or any of its rights or duties without Lexmark's prior written consent.

Neither party is responsible for failure to fulfill its obligations under the Agreement due to causes beyond its control.

The Agreement will not be supplemented or modified by any course of dealing or trade usage. Variance from or addition to the terms and conditions of the Agreement in any purchase order or other written notification from you will be of no effect.

The provisions of the Agreement which by their nature extend beyond the termination or expiration of the Agreement will survive and remain in effect until all obligations are satisfied.

Each party agrees to pay the other's reasonable attorney's fees and costs of litigation if the party, for any cause whatsoever, brings suit against the other party and the other party is finally adjudicated not to have liability.

Neither you nor Lexmark will bring an action, regardless of form, arising out of the Agreement more than two years after the cause of action has arisen. In the case of an action for non-payment, the action may not be brought more than two years from the date the last payment was due. Any claims you may make for price adjustments or additional marketing program payments made more than 6 months after the date any such activity has occurred are expressly waived.

Both parties agree to comply with all applicable governmental laws and regulations.

This Agreement is governed by the laws of the Commonwealth of Kentucky excluding its choice of law provisions. THE PARTIES AGREE THAT ANY AND ALL ACTIONS, SUITS OR OTHER LEGAL PROCEEDINGS, ARISING UNDER THIS AGREEMENT AND REGARDLESS OF THE LEGAL THEORY UPON WHICH THE CLAIMS ARE BASED, MAY BE BROUGHT AGAINST THE OTHER OR ITS EMPLOYEES OR AGENTS ONLY IN A STATE OR FEDERAL COURT SITUATED WITHIN FAYETTE COUNTY IN THE COMMONWEALTH OF KENTUCKY, AND THE PARTIES CONSENT TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS IN ANY SUCH LEGAL PROCEEDING. THE PARTIES WAIVE ANY OBJECTION IT MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH LEGAL PROCEEDING IN ANY SUCH COURT. THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY ACTION, SUIT OR OTHER LEGAL PROCEEDING, WHETHER OR NOT ARISING UNDER THIS AGREEMENT AND REGARDLESS OF THE LEGAL THEORY UPON WHICH THE CLAIMS ARE BASED.

## 24.0  DEALER SPECIFIC INFORMATION

**Eligible Products**
You are approved to market the following Product families, as specified with a "YES" or identified portions as designated. Specific Products are listed in notices and an electronic file. Specific certification may also be required for certain Products.

**Supplies __X__**         **Other (as listed) _____**

**Minimum Renewal Criteria**
Lexmark may establish Minimum Renewal Criteria (MRC) for a contract period for some or all Products.  The MRC (Listed below or on attachments) designates the minimum level of sales performance expected of you.  Sales performance objectives may be established which modify your MRC.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A2627

The minimum renewal requirement for Supplies Product is

**Authorized Ship to and Bill to Locations**

All Authorized ship to and bill to Locations must be approved in writing by Lexmark and listed below or on an attachment to this Agreement. Any change in the location or any significant change in the characteristics of your Authorized Locations must be approved by Lexmark.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY  A2629

# DEALER CONTRACT 7

## LEXMARK BUSINESS SOLUTIONS DEALER AGREEMENT
### Between

Lexmark International, Inc.                    **AND**
740 W. New Circle Road
Lexington, Kentucky 40550
(Hereinafter called "Lexmark")                    (Hereinafter called "Dealer")

### TABLE OF CONTENTS

01. Contract Period                    06. Indemnification and Remedies

02. Products and Geographic Coverage   07. Termination

03. Rebates                            08. Confidential Information

04. Dealer Obligations                 09. Lexmark Software Downloads

05. Authorized Service Provider        10. General

### EXHIBITS

A. Territory List

### ATTACHMENTS

A. Authorized Service Provider Application    C. Annual Authorized Service Library

B. Authorized Servicer Agreement                 Subscription Order Form

This Lexmark Business Solutions Dealer Agreement ("Agreement") will identify the respective responsibilities of Lexmark and Dealer as it relates to the program defined herein in terms of discounts off select Lexmark Products, Supplies or Parts purchased by Dealer from authorized Lexmark distributors or rebate programs offered by Lexmark directly to Dealer. By way of overview, the Lexmark Business Solutions Program enables the Dealer to expand offerings to end user customers at competitive price levels.

Lexmark hereby appoints Dealer as its non-exclusive provider and grants to Dealer the non-exclusive, non-transferable right to offer select Lexmark Products, Supplies and/or Parts directly to end user customers in accordance with the terms and conditions of this Agreement. End user customers ("Customers") shall mean entities that acquire the Lexmark Products, Supplies and/or Parts from Dealer in the United States for end-use in the United States. Dealers may not appoint any sub-dealers to enter into this Agreement or other subcontractor agreements of a similar nature. Lexmark may issue bulletins under this Agreement that change the terms of this Agreement. Any bulletins issued by Lexmark will become effective on the date Lexmark specifies unless Dealer notifies Lexmark in writing within 30 days of Dealer's receipt of the bulletin that Dealer does not accept it. Lexmark may issue administrative, technical and procedural information, announcements, promotions, programs, product and pricing letters, product withdrawal letters, and other kinds of notices in written and electronic form from time to time. All such notices are effective on the date Lexmark specifies.



Dealer Initial

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A2630

## 1. CONTRACT PERIOD

The Agreement has a single 12 month contract period which commences on the first day of the month in the month that the Dealer signs this Agreement, provided it is accepted by Lexmark. The Agreement can be renewed by the parties for subsequent single 12 month contract periods. Unless a party notifies the other party otherwise, the renewal of the Agreement shall automatically occur annually unless either party notifies the other of its desire not to renew at least 30 days prior to the contract period expiration date. Either party can elect not to renew the Agreement with or without cause.

## 2. PRODUCTS & GEOGRAPHIC COVERAGE

Lexmark will make available through approved authorized distributors select Products, Supplies and Parts that will be offered for sale to Dealer by an approved Lexmark distributor at discounted prices from Lexmark's suggested dealer prices. Final pricing and delivery terms shall be between Dealer and the approved Lexmark distributor. Lexmark will provide Dealer with notices that identify the approved authorized distributors and the Products, Supplies and Parts that are available for purchase by Dealer. Lexmark may change approved distributors as well as Products, Supplies and Parts offered hereunder including pricing discounts.

Dealer expressly agrees that it, or any of its subsidiaries, affiliates or agents, shall not sell or otherwise market Lexmark Products, Supplies, and Parts to any other entity other than Dealer's Customers. If Dealer sells and/or ships Products, Supplies and Parts to entities other than Dealer's Customers, this Agreement may be immediately terminated by Lexmark and any future Product, Supplies, and/or Parts discounts will not be honored. In addition, in order to receive upfront discounts for select Lexmark Products, Supplies, and Parts from an approved Lexmark distributor, Dealer agrees to only sell Lexmark Products, Supplies, and Parts only to those Customers who have entered into an express written agreement with Dealer that requires these Customers to only use genuine Lexmark Supplies purchased directly from Dealer. Lexmark reserves the right to conduct audits as necessary to confirm compliance with these terms. Should compliance not be met, this Agreement may be immediately terminated by Lexmark and any future Product, Supplies, and/or Parts discounts will not be honored.

As an independent contractor, Dealer is not Lexmark's legal representative, franchisee, or agent for any purpose.

Dealer will not make any warranties or representations on Lexmark's behalf other than those specified in the Agreement. Neither party will assume or create any obligations on the other's behalf except as specified in the Agreement.

Dealer will market Products to Customers at such prices and terms and conditions as Dealer determines. Such terms and conditions must not be in conflict with Dealer's obligations in the Agreement (e.g., mandatory use of genuine Lexmark Supplies).

Lexmark reserves the right to market anywhere, including Dealer's geographic area, Products, Supplies and Parts which are the same as or similar to the Products, Supplies and Parts under the Agreement either directly or through other remarketers.

Dealer reserves the right to market products which are similar or competitive to the Products under the Agreement.

## 3. REBATES

Dealers participating in the Business Solutions Program may be eligible to receive rebates should Lexmark offer rebates for various products and/or services or for sales to certain customers. To be eligible to receive Rebates, Lexmark and Dealer must agree to a separate signed document specifically describing how rebates are to be earned by Dealer. These rebates may be paid to Dealer by Lexmark for the sale of genuine Lexmark Supplies that Dealer makes to its Customers.

In order to be eligible to receive any rebates, Dealer agrees to only use genuine Lexmark Supplies for all Lexmark branded printers and MFPs. Lexmark genuine Supplies means genuine, original Lexmark imaging technology (e.g., toner cartridges, imaging units) purchased directly from Lexmark or directly from a Lexmark approved distributor in the United States whether new or remanufactured by Lexmark. Third party, or Dealer remanufactured toner cartridges are NOT Lexmark Genuine Supplies.

### 3.1. Claiming Rebates

To file for the various rebates, the Dealer agrees to provide proof of purchase as well as other data that may be requested by Lexmark from time to time. Proof of purchase is defined as an invoice containing the Dealer name, invoice number, Lexmark part number, quantity, and ship date.

Dealer Initial

CONFIDENTIAL - OUTSIDE COUNSEL ONLY   A2631

Each request for rebate processing should include a minimum of one month's purchases. Requests for rebates greater than six months old may not be accepted and any claims for money due thereunder are expressly waived.

### 3.2. Rebate Amount

Any rebates provided under this program will be in a form of an authorized Lexmark check to the Dealer. Determination of eligibility for rebates will be based on Lexmark's review and audit of sales out reports, invoices, and other documentation deemed appropriate by Lexmark to validate authenticity and adherence to rebate qualification criteria.

## 4. DEALER OBLIGATIONS

### 4.1. Cartridge Return Program

Dealer is expected to honor ALL Lexmark contractual obligations including marketing of Lexmark supplies only in designated/intended geographies and not purchasing and/or selling gray market (i.e., Lexmark supplies originally sold by Lexmark for use outside of the United States) or counterfeit supplies. Lexmark shall determine in its sole and unfettered discretion whether such goods qualify as gray market or counterfeit supplies. Dealer is also reminded that the "Return Program Cartridge" (formally Prebate) conditions are an essential part of the Return Program Cartridge offering. For this "up-front rebate" from Lexmark, the user agrees that this cartridge will be used only once and that the empty cartridge will be returned only to Lexmark for remanufacturing and recycling. By selling this Return Program Cartridge, Dealer, likewise agrees to comply with these terms and conditions – and Dealer expressly agrees to return an empty Return Program Cartridge only to Lexmark if one comes into Dealer's possession or possession of an agent, affiliate, subsidiary or contractor of Dealer. In addition, Dealer expressly agrees that it, or any of its subsidiaries, affiliates or agents, shall not sell or otherwise market repaired, used or remanufactured Lexmark Return cartridges.

Regular-price cartridges with regular terms and conditions are available for those Customers who do not choose the Return Program Cartridge with its terms.

These conditions are an express obligation of receiving any discounts/rebates/credits. In the event of non-compliance, intentionally or unintentionally, of any of these conditions or any other conditions of

this Agreement, Dealer shall lose any future discounts/rebates/credits immediately upon Lexmark's discovery of such violation unless otherwise agreed in writing by Lexmark in its complete and unfettered discretion. Failure to insist on strict performance of any and all of the conditions of this Agreement shall not operate as a waiver of Lexmark's rights to insist on strict performance in the future.

### 4.2. Promotion

Dealer shall use its best efforts to promote, exhibit, market and sell Lexmark to existing and potential Customers in the Territory. In particular, Dealer shall cooperate with Lexmark to complete the joint marketing activities as requested by Lexmark from time to time.

Dealer agrees to Lexmark's Minimum Advertise Price (MAP) program as published by Lexmark from time to time. Dealer agrees to advertise prices at no less than Lexmark established MAP unless otherwise approved by Lexmark in writing.

## 5. AUTHORIZED SERVICE PROVIDER

The Lexmark Authorized Service Provider (ASP) Program supports a select group of Lexmark resellers with the tools needed to service Lexmark products.

### 5.1. Requirements

Purchases of Hardware and Parts - ASPs must make minimum hardware and parts purchases to participate in the program:
- The minimum annual hardware purchase requirement is ▨▨▨▨
- Parts purchases should be proportional to hardware purchases. See also "Genuine Lexmark Service Parts" below.

Customer Satisfaction - Customer satisfaction is a priority for Lexmark. Lexmark regularly surveys end user customers to evaluate the quality of service repairs performed by ASPs. ASPs must maintain an average score of 4.5 or greater out of a possible score of 5.0 in these surveys. For Lexmark to conduct customer satisfaction surveys, ASPs must provide end-user contact information on each warranty claim form.

Parts Usage Per Claim - Lexmark strives to ensure efficiency in repair of our products and measures parts usage per claim. ASPs are required to

Dealer Initial _____

CONFIDENTIAL - OUTSIDE COUNSEL ONLY   A2632

maintain an average parts usage per claim rate of 1.3 or less.

Product Certification - All technicians that repair Lexmark products must be trained and certified on each product model they repair. Warranty claims may only be submitted for work performed by a certified technician.

Genuine Lexmark Service Parts - Lexmark tests its Genuine Service Parts to stringent quality standards. To provide the highest quality repairs for our customers, ASPs are required to use only Genuine Lexmark Service Parts for all warranty, extended warranty and ASP-offered repairs of Lexmark products. Lexmark may periodically conduct audits with ASPs to evaluate ASP compliance with the parts loyalty requirement.

The Lexmark Service Support Guide (LSSG) and Parts Catalog provide recommended Genuine Lexmark Service Parts stocking levels by product. ASPs must stock the recommended level of commonly used Genuine Lexmark Service Parts in order to provide timely service for the products they support.

ASPs must purchase Genuine Lexmark Service Parts directly from Lexmark. Parts purchased from other sources will not be considered toward the parts purchase requirement.

### 5.2. Participation

If you wish to participate in the ASP Program and can meet the requirements, submit your Authorized Service Provider Application (Attachment A), signed Authorized Servicer Agreement (Attachment B), and Annual Authorized Service Library Subscription Order Form (Attachment C.

## 6. INDEMNIFICATION AND REMEDIES

Lexmark will, at its expense, defend Dealer against any claim that any Lexmark Products, Supplies and Parts acquired by Dealer from an approved Lexmark distributor infringes a patent or copyright in the United States. Lexmark will pay all costs, damages and attorney's fees that a court finally awards as a result of such claim. To qualify for such defense and payment, Dealer must 1) give Lexmark prompt written notice of any such claim, and 2) allow Lexmark to control, and fully cooperate with Lexmark in, the defense and all related settlement negotiations.

Dealer agrees that if Products, Supplies and Parts are in Dealer's inventory, becomes, or Lexmark believes is likely to become, the subject of such a claim, Dealer will permit Lexmark, at its option and expense, either to secure the right for Dealer to continue selling the Products, Supplies and Parts or to replace or modify it so that it becomes noninfringing. However, if neither of the foregoing alternatives is available on terms which are reasonable in Lexmark's judgment, Lexmark may stop shipping affected Products, Supplies and Parts, and Dealer will return the Products, Supplies and Parts in Dealer's inventory upon Lexmark's written request. Lexmark will grant Dealer a credit equal to the price paid by Dealer to the approved Lexmark distributor for the returned items. Lexmark shall have no obligation with respect to any such claim based upon any non-Lexmark modification of Products, Supplies and Parts or their combination, operation or use with apparatus, data or programs not furnished by Lexmark.

This Section states Lexmark's entire obligation to Dealer and Dealer's entire remedy for machines regarding infringement or the like.

Dealer will indemnify and hold Lexmark harmless from any and all claims, losses, expenses, damages, demands, fines, penalties, liabilities, and costs (including, but not limited to, reasonable attorneys' fees) that arise out of or result from personal injury (including death) and/or tangible property damage, or any other claims resulting from performance under this Program.

Dealer and Lexmark shall not have any liability to the other for any indirect, special, incidental, punitive, or consequential damages except such limitation of liability shall not apply to any activities of Dealer that may violate Lexmark's intellectual property rights (e.g., copyrights, patents, trade secrets, trademarks) or Dealer's obligation of confidentiality. These limitations of liability shall cover any and all claims, actions, and suits arising out of or in any way relating to this Agreement regardless of whether the claim alleges or is based upon tortuous conduct (including, but not limited to, negligence) or any other legal theory, including, but not limited to, any matter arising out of or related to the breach or termination of this Agreement ("Disputes").

## 7. TERMINATION

Either party may terminate this Agreement, with or without cause, upon thirty (30) days prior written notice to the other party. Such termination shall not prejudice any other rights or remedies which may be available to either party.

## 8. CONFIDENTIAL INFORMATION

Dealer Initial

Lexmark Initial

Lexmark Confidential

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A2633

Dealer may from time to time have access to or receive directly from Lexmark information and materials that are designated as confidential or proprietary or which are by their nature confidential, proprietary, or sensitive ("Lexmark Confidential Information"). This Lexmark Confidential Information may concern present or future Lexmark products, business strategies, or Customers. Dealer shall hold Lexmark Confidential Information and any additional information developed through its use in confidence, shall not use it except to further its relationship with Lexmark and/or achieve sales on Lexmark' behalf, and shall not disclose them to third parties unless authorized in writing by Lexmark. Dealer's obligations under this paragraph shall survive the termination of this Agreement. Dealer agrees that any violation or threatened violation of this Agreement may cause Lexmark irreparable injury, entitling Lexmark to seek injunctive relief in addition to all legal remedies. Dealer hereby agrees to waive any argument that Lexmark will not incur or suffer irreparable injury by a violation or threatened violation of this Agreement. Dealer also agrees that it will not move or otherwise demand that Lexmark post security or a bond in the granting of any injunctive relief by a Court and will not object to or oppose any security or bond amount that Lexmark may propose.

## 9.  LEXMARK SOFTWARE DOWNLOADS

Lexmark may authorize Dealer to download from Lexmark web platforms software applications for certain Lexmark printers and/or MFPs. Dealer agrees that these software applications are copyrighted material of Lexmark and/or Lexmark's licensors and Dealer will only use the downloaded Lexmark software on Lexmark printers and/or MFPs or otherwise as expressly stated by Lexmark. In addition, Dealer agrees to be bound by any terms and conditions that Lexmark requires to enable any such download and any terms and conditions that accompany the downloaded software (e.g., shrinkwrap or click-wrap software agreements).

## 10. GENERAL

Both parties agree that any Disputes will be decided under Kentucky law, excluding its conflict of law provisions, and through arbitration by a sole arbitrator pursuant to the Commercial Arbitration Rules of the American Arbitration Association then in effect. In undertaking the arbitration, the parties agree that (a) the direct costs of the arbitration shall be shared equally by the parties (with the expenses of each party to be self-funded including filing fees); (b) they shall be limited to taking no more than three (3) depositions each and that no interrogatories shall be permitted; (c) that the arbitration shall be completed within six (6) months from

the date the arbitrator is selected (unless any delays arise that are beyond the control of the parties); (d) that the arbitration shall be governed by the United States Arbitration Act; (e) the venue of the arbitration shall be in Fayette County, Kentucky and Dealer hereby consents to personal jurisdiction in Fayette County and (f) that the resulting arbitration award will be binding upon the parties and may be entered by any court of competent jurisdiction. Any monetary awards shall be limited in accordance with the provisions of this Agreement and, as such, (a) the Arbitrator is specifically prohibited from awarding any punitive damages or other damages excluded by this Agreement, and (b) each party irrevocably waives any right to recover damages outside the scope of these limitations. This arbitration provision shall not prohibit Lexmark from seeking injunctive relief as further described in this Agreement.

This Agreement will not be supplemented or modified by any course of dealing or trade usage. Variance from or addition to the terms and conditions of this Agreement in any purchase order or other written notification from Dealer will be of no effect.

The provisions of this Agreement which by their nature extend beyond the termination or expiration of this Agreement will survive and remain in effect until all obligations are satisfied.

Both parties further agree that neither party may assign, delegate, or transfer any of its rights or obligations hereunder without the prior written consent of the other party. Any such attempted assignment shall be null and void. No delay or failure of any party to exercise any right or remedy hereunder shall be held to constitute a waiver of such right or remedy. A determination that any provision of this Agreement is invalid, in whole or in part, shall not affect the enforceability of any other provision or this Agreement as a whole.

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute but one and the same instrument.

THIS AGREEMENT AND ANY ATTACHMENTS CONSTITUTES THE ENTIRE AGREEMENT BETWEEN THE PARTIES AS TO THE SUBJECT MATTER HEREOF, AND SUPERSEDES ANY AND ALL PRIOR OR CONTEMPORANEOUS ORAL OR WRITTEN UNDERSTANDINGS AND AGREEMENTS AS TO SUCH SUBJECT MATTER.

Dealer Initia

CONFIDENTIAL - OUTSIDE COUNSEL ONLY   A2634

ACCEPTED AND AGREED TO:

LEXMARK INTERNATIONAL, INC.

_____
Authorized Signature

_____
Name

_____
Title

_____
Date

ACCEPTED AND AGREED TO:





Dealer Ini



CONFIDENTIAL - OUTSIDE COUNSEL ONLY  A2635

## EXHIBIT A

### Territory List

**Territory shall mean the following non-exclusive areas:**

| | STATE | COUNTY | | STATE | COUNTY |
|---|---|---|---|---|---|
| 1. | Washington | | 16. | | |
| 2. | Oregon | | 17. | | |
| 3. | Utah | | 18. | | |
| 4. | Arizona | | 19. | | |
| 5. | New Mexico | | 20. | | |
| 6. | | | 21. | | |
| 7. | | | 22. | | |
| 8. | | | 23. | | |
| 9. | | | 24. | | |
| 10. | | | 25. | | |
| 11. | | | 26. | | |
| 12. | | | 27. | | |
| 13. | | | 28. | | |
| 14. | | | 29. | | |
| 15. | | | 30. | | |

☐ Check here if Exhibit A is continued on an attached continuation sheet

Authorized Signature
**LEXMARK**

By: _____
Printed Name: _____
Title: _____
Date: _____

Authorized Signature
**DEALER**



Date: _____

.Dealer Initi

CONFIDENTIAL - OUTSIDE COUNSEL ONLY  A2636

# ATTACHMENT A

## Authorized Service Provider Application

Please complete this application form along with the signed Authorized Servicer Agreement and Order Form.

Lexmark will review your application once we receive all documentation. Please allow 2 - 4 weeks for processing of your application form.

| | |
|---|---|
| Company Name: ████████ | Service Contact: ████████ |
| 5-Digit LOCID: *(current Lexmark ASP)* ████████ | Title: ████████ |
| | Telephone Number (required): ████████ |
| Complete Mailing Address: | Fax Number: ████████ |
| ████████ | Email Address: ████████ |
| ████████ | Company Web Site Address: |
| | ████████ |
| D&B D-U-N-S #: ████████ | |
| Lexmark Sales Representative: *Eric Browning* | |
| Years in Service Business: *31* | Preferred Contact Method: |
| Number of warranty claims filed in previous year: | ____ Email    X Fax |

**Q1**    Do you currently sell Lexmark Products?    ✓ Yes    ____ No

**Q2**    Please indicate your annual hardware sales (please list manufacturer name in Other).

| Lexmark | Other: | Other: | Other: |
|---|---|---|---|
| $0 - $10,000 | $0 - $10,000 | $0 - $10,000 | $0 - $10,000 |
| $11,000 - $25,000 | $11,000 - $25,000 | $11,000 - $25,000 | $11,000 - $25,000 |
| $26,000 - $50,000 | $26,000 - $50,000 | $26,000 - $50,000 | $26,000 - $50,000 |
| $51,000 - $100,000 | $51,000 - $100,000 | $51,000 - $100,000 | $51,000 - $100,000 |
| $101,000 - $250,000 | $101,000 - $250,000 | $101,000 - $250,000 | $101,000 - $250,000 |
| $251,000 - $500,000 | $251,000 - $500,000 | $251,000 - $500,000 | $251,000 - $500,000 |
| $501,000 - $1,000,000 | $501,000 - $1,000,000 | $501,000 - $1,000,000 | $501,000 - $1,000,000 |
| Greater than 1,000,000 | Greater than 1,000,000 | Greater than 1,000,000 | Greater than 1,000,000 |

**Q3**    Where do you purchase Lexmark products?

| | Hardware | Parts | Supplies |
|---|---|---|---|
| Lexmark Direct | | | |
| Distributors (please list) | ████████ | *Lexmark* | ████████ |
| Other (please list) | | | |



Dealer Initial



**CONFIDENTIAL - OUTSIDE COUNSEL ONLY   A2637**

# ATTACHMENT A

## Authorized Service Provider Application

Q4   What geographic areas does your company service (please circle).

**National**   Yes   No

**Regional (Please list states)** *Washington, Oregon, Utah, Arizona, New Mexico*
**Local (Within a 50 miles of your zip code)**   Yes   No

Q5   Total number of employees?

| | |
|---|---|
| Sales | |
| Service | |
| Other (please list) | |

Q6   Please list other manufacturer's that have certified your company to perform warranty work.
*Konica Minolta, Sharp, Ricoh, Toshiba, Xerox, Muratec HP*

Q7   Do you currently sell the following to your Lexmark customers?

| Services | Yes | No |
|---|---|---|
| Lexmark extended warranty renewals | | |
| Lexmark upgrades from Express to OnSite renewals | | |
| Your company's extended warranty renewals | | |
| Your company's upgrades from carry-in to on-site warranty renewals | | |

Q8   What percentage of your sales comes from the following market segments?

| | |
|---|---|
| Fortune 500 | |
| Fortune 1000 | |
| SMB (Small Medium Business) | |
| SOHO (Small Office/Home Office) | |
| Consumer | |

Q9   Do you sell laser printer toner cartridges?   Yes   No

If yes, please check all that apply:

✓ OEM toner cartridges   _____ Remanufactured toner cartridges

Dealer In■
Lexmark Initial 

CONFIDENTIAL - OUTSIDE COUNSEL ONLY   A2638

# ATTACHMENT B

## Authorized Servicer Agreement

Name and Address of Servicer:                    Contract Commencement Date:


Lexmark International, Inc. (Lexmark) authorizes you, per the term of this agreement, as a service provider of Lexmark Products:

1) to offer Lexmark Service Agreements for sale to End-Users, provided you met the requirements set forth in this Agreement and in the Lexmark Service Support Guide (LSSG), and;

2) to act as an Authorized Service Provider in providing warranty, installation and other designated services on Products covered by a Lexmark Service Agreement at Authorized Locations in the United States and Puerto Rico.

All terms used herein, and not otherwise defined in Section 1, shall have the meaning set forth in the LSSG.

Lexmark may issue bulletins, administrative, technical and procedural information, announcements, promotions, programs, product and pricing letters, product withdrawal letters, and other kinds of notices ("Notices") in writing from time to time which change or amend the terms of this Agreement. Such Notices shall be effective on the date Lexmark specifies unless you notify us in writing within 30 days of your receipt of the Notice that you do not accept it.

### TABLE OF CONTENTS

| | | | |
|---|---|---|---|
| 1.0 | DEFINITIONS | 10.0 | PARTS: TITLE AND RISK OF LOSS |
| 2.0 | CONTRACT PERIOD | 11.0 | TAXES |
| 3.0 | MARKETING TO END-USERS | 12.0 | STATUS CHANGE |
| 4.0 | AUTHORIZIED SERVICER RESPONSIBILITIES | 13.0 | TRADEMARKS AND TRADE NAMES |
| 5.0 | WARRANTIES | 14.0 | LIMITATION OF REMEDIES |
| 6.0 | LEXMARK RESPONSIBILITIES | 15.0 | INDEMNIFICATION |
| 7.0 | LEXMARK GENUINE SERVICE PARTS | 16.0 | TERMINATION |
| 8.0 | ENGINEERING CHANGES | 17.0 | CONFIDENTIAL INFORMATION |
| 9.0 | SECURITY INTEREST | 18.0 | GENERAL |

**PAGES 2 THROUGH 7 ARE ALSO PART OF THIS AGREEMENT.** This Agreement, the Statements of Limited Warranty, LSSG (which may be changed by Lexmark in its discretion from time to time) and Notices are the complete agreement between us, and replace any prior oral or written communications between us. By signing below, each of us agrees to the terms of this Agreement.

Accepted by
**Lexmark International, Inc.**                        **Authorized Servicer**

By_____          By_____
　　Authorized Signature

_____      _____      _____      __
Name  (Type or Print)                      Date          Name (Type or Print)                              D



Dealer Initial

CONFIDENTIAL - OUTSIDE COUNSEL ONLY  A2639

# ATTACHMENT B

## Authorized Servicer Agreement

### 1.0 DEFINITIONS

**Agreement** means this Authorized Service Agreement, as amended or modified as provided herein.

**Authorized Location** means any of your locations approved by Lexmark in writing for the purposes of your performance under the Agreement.

**End-User** means a party who acquires Products for its own use and not for resale.

**Lexmark Certified Trained Technician** means a technician in your employ who has successfully completed a Lexmark Training Course, and submitted the required test or form to Lexmark per the instructions contained in the LSSG.

**Lexmark Genuine Service Parts** means genuine Lexmark Parts purchased from Lexmark or a Lexmark Authorized Parts Distributor used to repair or provide preventative maintenance on Lexmark Products. "Used", "Remanufactured" or "Third Party" parts should not be considered to be "Lexmark Genuine Service Parts".

**Lexmark Service Agreement** means a written agreement between Lexmark and certain Lexmark Customers providing for the following types of Warranty Service: LexExpress and Extended Express Warranty Service On Site, Extended On Site and On Site Upgrade Service Installations / Deinstallation Service.

**Lexmark Service Support Guide (LSSG)**, means the service document published by Lexmark which contains the procedures for ordering Parts, submitting warranty claims, information on new products, service tips and general service information. The LSSG is updated and amended via a Lexmark website bulletin board system.

**Authorized Parts Distributor (APD)** means an authorized parts distributor appointed by Lexmark for the ongoing sales of Lexmark Genuine Service Parts.

**Products or Product** means printers, licensed programs, and other Lexmark products that are covered by Lexmark Service Agreements.

**Reseller** means a dealer or distributor with a valid Location ID (LOCID) acting under an Authorized Reseller Agreement from Lexmark or a Reseller of Lexmark Service Agreements or Products.

**Statement of Limited Warranty** means a written statement shipped with each product that defines the

warranties made by Lexmark applicable to a particular Product.

**Valid Claim for Warranty Reimbursement** means a warranty claim presented to Lexmark's Warranty Center that covers service performed during the Warranty Period by a Lexmark Certified Trained Technician, certified on the Product serviced.

**Warranty Period** means the time period during which the warranties for a Product will be effective.

### 2.0 CONTRACT PERIOD

This Agreement is effective for a contract period that commences on the date of your signature, provided it is accepted by Lexmark.    Either party may elect to terminate the Agreement with or without cause.

### 3.0 MARKETING TO END-USERS

You agree to market Products that you obtain either directly or indirectly from Lexmark to End-Users at such prices and terms and conditions as you determine. Such terms and conditions must not be in conflict with your obligations in this Agreement.

Lexmark reserves the right to market anywhere, including your geographic area, products and service offerings which are the same as or similar to the Products under this Agreement either directly or through other remarketers.

As an independent contractor, you are not Lexmark's legal representative, franchisee, or agent for any purpose. You are entirely free to operate your business in accordance with your own marketing plans and system.

You are not authorized to make any warranties or representations on Lexmark's behalf other than those specified in this Agreement. Neither party will assume or create any obligations on the other's behalf except as specified in the Agreement.

Lexmark may periodically conduct reviews to evaluate your performance and compliance with the provisions of the Agreement.

### 4.0 AUTHORIZED SERVICER RESPONSIBILITIES

You agree to:

1) be a Lexmark Authorized Reseller in good standing, including but not limited to, meeting minimum requirements as specified in the

Dealer Initi

Lexmark Confidential

Lexmark Initial

CONFIDENTIAL - OUTSIDE COUNSEL ONLY   A2640

# ATTACHMENT B

## Authorized Servicer Agreement

LSSG. With required reporting of hardware, parts, and extended warranty sales activity quarterly;

2) ensure that the End-User is satisfied with all your products and service marketing activities, including products and service explanation, demonstration, and ongoing support; Customer service will be measured by Lexmark using surveys and other methods. Lexmark, in its sole discretion, shall determine the survey and the results of any such survey. You agree to maintain a minimum 4.5 out of 5 average survey rating, as solely determined by Lexmark, throughout the term of this Agreement and all renewals to ensure continuation in the program and this Agreement. You understand and agree that this percentage is obtained using Lexmark's internal information and accept this percentage as final and not subject to challenge;

3) assist Lexmark, upon Lexmark's request, in tracing a Product to an End-User to distribute product information or locate Products for safety reasons;

4) perform warranty service as specified in the LSSG on Lexmark Products presented to you by End-Users with valid proof of purchase, regardless of point of sale, only at your Authorized Location or at your End-User's location;

5) employ Lexmark Certified Technicians;

6) maintain an effective Parts inventory or logistics process at each Authorized Location to ensure a high level of customer satisfaction;

7) use only Lexmark Genuine Service Parts purchased directly from Lexmark or a Lexmark Authorized Parts Distributor in the United States when providing service (either under warranty, extended warranty or your own service plans) on Lexmark Products while this Agreement is in effect;

8) provide to Lexmark at the end of each calendar quarter a detailed Parts purchasing report. Such report shall be as specified by Lexmark from time to time;

9) report promptly to Lexmark all suspected or actual Product performance or safety problems;

10) maintain a storefront for each Authorized Location;

11) maintain an annual Service Library Subscription;

12) maintain an acceptable Parts usage per claim ratio each calendar month as published and updated from Lexmark from time to time. Acceptable is currently defined as 1.3 parts per claim or less.

## 5.0  WARRANTIES

Lexmark will include the applicable Statement of Limited Warranty with each Product shipped. Lexmark may revise any Statement of Limited Warranty at any time.

## 6.0  LEXMARK RESPONSIBILITIES

Lexmark will:

1) make available to you, a) service training for service personnel, and b) service materials;

2) honor your valid claims for labor reimbursement (when applicable) and/or credits for parts or exchange of parts as specified in the LSSG. Labor reimbursement rates provided in the LSSG may be modified by Lexmark at any time. Any such reimbursement rate may change depending on your performance under the customer satisfaction criteria (Section 5.0.2) and parts per claim measurement (Section 5.0.12).

## 7.0  LEXMARK GENUINE SERVICE PARTS

Lexmark will sell you service parts at prices established by Lexmark with prices of service parts subject to change at any time, only for providing service to End-Users for the sole purpose of maintaining their machines.

Dealer agrees to only use Genuine Lexmark Parts for all Lexmark branded printers and MFPs. Lexmark Genuine Parts means genuine, original Lexmark imaging technology purchased directly from Lexmark or directly from a Lexmark Authorized Distributor in the United States whether new or remanufactured by Lexmark. Third party, or your, remanufactured parts are NOT Lexmark Genuine Parts.

## 8.0  ENGINEERING CHANGES

Dealer Initial

Lexmark Confidential

Lexmark Initial

# ATTACHMENT B

## Authorized Servicer Agreement

During the Warranty Period, any engineering changes deemed mandatory by Lexmark will be installed by you as specified by Lexmark on the machines. You or your End-User may, by providing notice subject to written confirmation by Lexmark, elect to install only mandatory changes.

Lexmark may either install a mandatory change at your location without charge or provide you, at no charge, Parts and instructions for your installation of such changes on all machines in your inventory or on machines owned by your End-Users. If you install the changes, Lexmark will reimburse you for your labor at a rate established by Lexmark.

### 9.0  SECURITY INTEREST

Lexmark reserves and you grant a purchase money security interest in each Part, in your proceeds from the sale of each Part and in your accounts receivable for such Part. This interest will be satisfied by payment in full.

You agree to sign an appropriate document to permit us to perfect Lexmark's purchase money security interest.

### 10.0  PARTS: TITLE AND RISK OF LOSS

Title and all rights, risks and rewards of ownership transfer to you upon shipment of a Lexmark Genuine Service Part from Lexmark, or its agent.

Lexmark will insure for your benefit the order for risk of loss or damage during the period it is in transit from Lexmark or its agent up to its initial delivery to you.

### 11.0  TAXES

You agree to pay amounts equal to any taxes resulting from this Agreement or any activities under this Agreement. Such taxes do not include taxes based on Lexmark's net income. You are responsible to bear any personal property taxes assessable on parts on or after delivery to the carrier at the Lexmark ship-from location.

You agree to provide Lexmark with a valid Reseller Exemption Certificate for each taxing jurisdiction to which Parts acquired by you for resale will be shipped by Lexmark under this Agreement. If such Certificate(s) is not provided to Lexmark prior to shipment, Lexmark will charge, and you agree to pay, all applicable state and local taxes.

You agree to notify Lexmark promptly of the revocation or modification of any Reseller Exemption Certificate so

provided. You further agree to indemnify and hold Lexmark harmless from any claims and assessments against Lexmark resulting from a refusal by a taxing jurisdiction to recognize any of your Reseller Exemption Certificates.

### 12.0  STATUS CHANGE

To maintain your authorization, you must obtain Lexmark's approval in writing prior to a:

1) transfer of the equity ownership in your business;

2) merger or acquisition of your enterprise with or by any other entity;

3) legal name change of your enterprise; or

4) relocation or closing of an Authorized Location.

### 13.0  TRADEMARKS AND TRADE NAMES

You may refer to yourself under the Agreement as a Lexmark Authorized Servicer:

1) solely in connection with service of Products;

2) only during the contract period;

3) only with your name being more prominently mentioned with the reference to being a Lexmark Authorized Servicer and

4) only within the United States and Puerto Rico.

Except as provided for in this Section, Lexmark does not grant you the right to use trademarks or trade names. Lexmark grants you the limited permission to use the trademark "Lexmark" solely to identify the Products you service for End-Users. You may use the trademark "Lexmark" only within the United States and Puerto Rico.

At Lexmark's request, you will provide to Lexmark, for review and written approval, signage, promotional materials, advertising and other materials that:

1) use a Lexmark, or third party trademark or trade name; or

2) refer to you as a "Lexmark Authorized Servicer".

Lexmark will supply advertising guidelines in writing. At Lexmark's request, you agree to change, at your

Dealer Initial

Lexmark Confidential    Lexmark Initial

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A2642

# ATTACHMENT B

## Authorized Servicer Agreement

expense, any materials or use of materials which Lexmark determines to be inaccurate, objectionable, misleading or a misuse of Lexmark trademarks.

The permission granted relative to the Lexmark trademark will terminate with the termination or expiration of this Agreement. In such event, for the affected Products, you will immediately;

1) cease referring to yourself as a "Lexmark Authorized Servicer" or other such term that includes the name of the Products, as applicable;

2) cease referring to yourself as approved by Lexmark to provide warranty services; and

3) return to Lexmark or destroy all materials under your control employing such trademarks.

You may retain materials with Lexmark trademarks that are required to fulfill your warranty service or support obligations on affected Products. You will return these materials to Lexmark or destroy them upon completion of such obligations.

You recognize Lexmark's ownership and title to its trademarks and the good will attaching to them. You agree that any goodwill that accrues because of your use of the trademark "Lexmark" will become Lexmark's property. You agree not to contest Lexmark trademark or trade names. You agree not to use, employ or attempt to register any trademarks or trade names that are confusingly similar to Lexmark trademarks or trade names.

### 14.0  LIMITATION OF REMEDIES

Lexmark's entire liability and your exclusive remedy for any claims are as set forth in this section.

Lexmark is not liable for any damages caused by performance or nonperformance of Products located outside the United States and Puerto Rico.

In no event will Lexmark be liable for any damages caused by your failure to perform your responsibilities under this Agreement.

Lexmark assumes no liability for any loss, liability, claim, expense or action caused by, resulting from, or directly related to, a non-Lexmark product.

Lexmark's total liability and your maximum remedy for any breach or multiple breaches of this Agreement by Lexmark, or for any claim or course of action is limited

to a total of $25,000 of direct damages for the contract period. This limitation does not apply to claims covered by Section 16.

In no event will Lexmark be liable for any lost profits, lost savings, punitive damages, incidental damages, or other consequential damages, even if Lexmark has been advised of the possibility of such damages. These limitations of liability shall cover any and all claims, actions, and suits arising out of or in any way relating to this Agreement or any previous agreement(s) (e.g., service provider, dealer agreements) between the parties regardless of whether the claim alleges or is based upon tortious conduct (including negligence) or any other legal theory, including but not limited to any matter (a) in which one party names one or more employees of the other as individual defendants and (b) arising out of or related to the undertaking, breach, or termination of this Agreement or any previous agreement(s) between the parties ("Covered Disputes"). Lexmark will not be liable for any damages claimed by you based on any third party claim.

### 15.0  INDEMNIFICATION

Lexmark will indemnify and hold you harmless from all third party claims, including reasonable attorney's fees, (but not including lost profits, lost savings, incidental damages, or other consequential damages), for bodily injury or damage to real property or tangible personal property arising from any acts or omissions for which Lexmark is legally liable.

You will indemnify and hold Lexmark harmless from all claims, including reasonable attorney's fees, by any party resulting directly or indirectly from any acts or omissions by you.

### 16.0  TERMINATION

Either party may terminate this Agreement, upon written notice with or without cause. Lexmark will provide three months written notice to you of such termination, except as otherwise provided in this Section.    You must provide one month written notice to Lexmark.

In the event that Lexmark gives you such notice for cause, Lexmark may provide you with an opportunity to cure deficiencies. In such event, Lexmark will establish a reasonable time, not to exceed three months, in which you must remedy such deficiencies.

Lexmark reserves the right to immediately terminate your service authorization, without a cure period, for 1) non payment of renewals/subscriptions; 2) not adhering to the guidelines outlined in the LSSG; 3) failure to

Dealer Initial

Lexmark Confidential        Lexmark Initial

CONFIDENTIAL - OUTSIDE COUNSEL ONLY  A2643

# ATTACHMENT B

## Authorized Servicer Agreement

meet the responsibilities set forth in section 5.0 of this agreement.

In addition, Lexmark considers certain actions so serious and inconsistent with your obligations as an Authorized Servicer as to warrant immediate termination. Such breaches will include, but not be limited to, situations in which 1) you made material misrepresentations to Lexmark in your application to become a Servicer, at any later time through oral or written statements, or by submission of any false or fraudulent documentation or claim to Lexmark; 2) you cease to be an Authorized Dealer or Distributor; 3) you threaten or commence legal proceedings of any type against Lexmark.

Lexmark may also terminate the Agreement immediately in the event that you or your personnel knowingly or negligently engage, directly or indirectly, in the manufacture, sale, resale, brokerage, distribution, storage or handling of counterfeit goods (that is, good bearing the trademark, trade name or trade dress of Lexmark which have a source other than Lexmark).

### 17.0 CONFIDENTIAL INFORMATION

Any information concerning Lexmark Products, business plans or customers furnished to you by Lexmark and identified as confidential, shall be treated and held in confidence by you. You shall not publish, disclose or disseminate it for a period of five years after its receipt, except as may be authorized by Lexmark in writing. You shall not be entitled to use this information for any purposes other than for servicing of Products in furtherance of this Agreement, or as specified in the information provided.

Upon termination or expiration of this Agreement, you shall deliver to Lexmark all materials, of any kind, containing such confidential information.

Other than as set forth above, no information will be given or received in confidence by either party unless it is covered by a separate written agreement.

### 18.0 GENERAL

Either party's waiver of any instance of the other party's noncompliance with this Agreement will not be deemed a waiver or acceptance of any future noncompliance.

You may not assign the Agreement or subcontract any of your rights or duties thereunder without Lexmark's prior written consent.

Neither party is responsible for failure to fulfill its obligations under this Agreement due to acts of God or similar causes beyond its control.

This Agreement will not be supplemented or modified by any course of dealing or trade usage. Variance from or addition to the terms and conditions of this Agreement in any purchase order or other written notification from you will be of no effect. All fees are subject to change by Lexmark without prior notification.

The provisions of this Agreement which by their nature extend beyond the termination or expiration of this Agreement will survive and remain in effect until all obligations are satisfied.

The parties agree that the litigation of any Covered Dispute (including any specific claim covered therein) must be brought within one year from the date such dispute could have first been brought (regardless of when the complaining party learns or could have learned of any particular facts surrounding the dispute). The parties agree to this provision and thereby waive their right to otherwise contest in any forum all Covered Disputes related to this Agreement or any previous agreement(s) between the parties that are outside the scope of this one-year limitation. The parties make this waiver notwithstanding any longer periods generally available for litigating disputes under any otherwise-applicable statutes, common-law, or other authority. Notwithstanding the above, in the case of an action for non-payment by Lexmark, the action may be brought more than one year from the date the last payment was due.

This Agreement is governed by the Laws of the Commonwealth of Kentucky excluding its choice of law provisions. YOU AGREE THAT ANY AND ALL ACTIONS, SUITS OR OTHER LEGAL PROCEEDINGS, WHETHER OR NOT ARISING UNDER THIS AGREEMENT AND REGARDLESS OF THE LEGAL THEORY UPON WHICH THE CLAIMS ARE BASED, MAY BE BROUGHT BY YOU AGAINST LEXMARK OR ITS EMPLOYEES OR AGENTS ONLY IN A STATE OR FEDERAL COURT SITUATED WITHIN THE COMMONWEALTH OF KENTUCKY, AND CONSENTS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS IN ANY SUCH LEGAL PROCEEDING. YOU WAIVE ANY OBJECTION YOU MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH LEGAL PROCEEDING IN ANY SUCH COURT. YOU HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY ACTION, SUIT OR OTHER LEGAL PROCEEDING AGAINST LEXMARK, WHETHER OR NOT ARISING UNDER THIS

Dealer Initi

Lexmark Confidential

Lexmark Initial

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A2644

## ATTACHMENT B

### Authorized Servicer Agreement

AGREEMENT AND REGARDLESS OF THE LEGAL THEORY UPON WHICH THE CLAIMS ARE BASED.

In performing service pursuant to your authorization under this Agreement you agree to comply with all applicable governmental laws and regulations.



Dealer Initial

Lexmark Initial

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A2645

## ATTACHMENT C

### Authorized Library Subscription

Please complete the form below.  Your signature acknowledges your acceptance of the Terms and Conditions of the Lexmark Authorized Service Provider Program.  When both parties approve of this request, your Lexmark Service Provider Authorization will take effect.

| Authorized Reseller Information | |
| --- | --- |
| Reseller Name | |
| LOCID        Required | |
| Address | |
| City | |
| County: | |
| State | Zip Code |
| Phone | Fax |
| Email | |
| Service Manager Name | |
| Service Manager Phone | |
| | |
| | |
| X | |

| Descriptions | Qty Needs |
| --- | --- |
| Annual Service Library Subscription | Each location |
| January 1, 2008 – December 31, 2008 | |

* An Annual Service Library Subscription is required for maintaining eligibility as an Authorized Service Provider
  *Lexmark may terminate or modify this promotion at any time.

☐ If you are registering additional authorized locations, please provide address information.  (please duplicate form and provide the number of additional locations in the box)
  Note:  When registering additional locations, each location is required to have the initial Service Library Subscription.

Please fax questions about the Lexmark Authorized Service Provider Program to 1-888-539-8324.



Dealer Initial

CONFIDENTIAL - OUTSIDE COUNSEL ONLY  A2646



Lexmark Authorized
# Business
## Solutions Dealer

Lexmark International, Inc
740 West New Circle Road NW
Lexington, KY 40550
February 6th, 2014



Mr. ▮

Thank you for choosing Lexmark and the Lexmark Business Solutions Dealer Program. We look forward to doing business with you and hope to enjoy a strong and mutually beneficial business relationship for many years to come. This letter compliments the business policies, terms, and conditions that are specified in the "Lexmark Business Solutions Dealer Agreement". Please keep a copy for your records and return a signed copy.

* In order to participate in, and receive the appropriate pricing under, the Lexmark Business Solutions Dealer Program, you must have a signed Business Solutions Dealer Agreement on file with Lexmark. The Business Solutions Dealer Agreement allows you to buy the unique models, supplies, and other items specified in the Lexmark Business Solutions Dealer Program Price List from our Authorized Business Solutions Distributors.

* An Opening Order must be submitted and shipped in order to participate in the Lexmark Business Solutions Dealer Program. The same is true for each business location that you wish to be fully authorized under the program. Lexmark must approve of each additional business location before submitting your order.

* Establishment of credit line is between the Business Solutions Dealer and the Authorized Business Solutions Distributor. Lexmark will publish a price list for this channel, but please be aware that this pricing is for those Business Solutions Dealers who meet the credit requirements of the Authorized Business Solutions Distributor. The Authorized Business Solutions Distributor will have the right to sell at a higher price should the Business Solutions Dealer not meet their credit requirements. Business Solutions Dealers who use a credit card for purchases also will incur a higher price than listed on the published price list.

* It is with great importance that you make arrangements to be service trained on all Lexmark products that you elect to sell. In order to be eligible for warranty reimbursement for parts and/or labor, all Authorized Business Solutions Dealers technicians performing the warranty work must be certified by Lexmark on the printer/MFP or printer/MFP family.

* You shall be entitled to purchase Lexmark Genuine Service Parts directly from Lexmark or a Program Authorized Parts Distributor (APD) at a ▮ discount from the manufacturer's suggested retail price ("MSRP"). For a select group of Parts, there may be an additional discount as indicated on the Business Solutions Dealer Price List. Where a Part is offered on an exchange basis, the Dealer must purchase the exchange version of the Part. For the Parts that are sold on an exchange basis, the core must be returned to Lexmark within ninety (90) days after the original date of purchase. If the core is not returned within the designated time period, the Dealer will be invoiced for the difference between the price indicated on the Business Solutions Dealer Price List and, up to, the MSRP for the select Part.

* Coop funds are available at ▮ of ALL NET hardware and supplies purchases (net pricing defined as the price paid distribution from the BSD Price List), if on target to attain ▮ net Open Market hardware purchases for the calendar year.
  Open Market hardware excludes: purchases under special pricing and placements in Large Accounts where Lexmark has direct sales representation. Please work with your TSM should you have any questions as to what qualifies as Open Market hardware purchases. Additionally, you may use the Lexmark Large Account search tool available in PartnerNet.
  Coop funds are paid quarterly in arrears and will be used for mutually agreed upon Lexmark marketing programs.
  The Supplies to Hardware ratio applies as defined under VIR. Please work with your TSM concerning Coop opportunities.

* Based on this signed BSD Program Open Market hardware quota assignment, VIR (Volume Incentive Rebate) may be earned for achieving your quarterly and yearly Open Market hardware revenue quota assignment.
  Open Market hardware excludes: purchases under special pricing and placements in Large Accounts where Lexmark has direct sales representation. Please work with your TSM should you have any questions as to what qualifies as Open Market hardware purchases. Additionally, you may use the Lexmark Large Account search tool available in PartnerNet.
  Earned VIR funds are paid quarterly, in arrears, on ALL NET (not just Open Market) hardware and supplies purchases (net pricing defined as the price paid distribution from the BSD Price List), with supplies payout equaling no more than net hardware purchases. VIR payouts will be adjusted to reflect early year or late year quota assignment attainment.

* Based on BSD Program Open Market hardware quota assignment for this year, GIR (Growth Incentive Rebate) may be earned for growth above the assigned quota. The same specifics apply to GIR as with VIR, except that GIR will not be paid until the GIR yearly Open Market hardware purchase level has been attained. At the end of the business year, GIR will be paid retroactively back to dollar one.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A2647

* Based on this signed BSD Program Open Market software quota assignment, SIR (Solution Incentive Rebate) may be earned for achieving your quarterly and yearly Open Market software revenue quota assignment.
  Open Market software excludes: purchases under special pricing and placements in Large Accounts where Lexmark has direct sales representation. Please work with your TSM should you have any questions as to what qualifies as Open Market software purchases. Additionally, you may use the Lexmark Large Account search tool available in PartnerNet.
  Earned SIR funds are paid quarterly, in arrears, on ALL NET Open Market software and solutions purchases (net pricing defined as the price paid distribution from the BSD Solutions Price List as well as invoice price paid direct to Lexmark Solutions Development and Integration for solutions implementations projects*)
  SIR payouts will be adjusted to reflect early year or late year quota assignment attainment.
    * Exceptions may exist for certain 3rd party (non-Lexmark) software and solutions sold either through Lexmark engagement or via reference arrangements with specific software distributors. Your TSM can provide details of any exceptions.

* Based on BSD Program Open Market software quota assignment for this year, SGIR (Solution Growth Incentive Rebate) may be earned for achieving your yearly Open Market software SGIR target. The same specifics apply to SGIR as with SIR, except that SGIR will not be paid until the SGIR yearly Open Market software target has been attained. At the end of the business year, SGIR will be paid retroactively back to dollar one.

* The Business Solutions Dealer or Lexmark may terminate this program at any time for their convenience by providing the other party with thirty days notice.

The Lexmark Demo Program, Loyalty Perks Program, and Virtual Solutions Center are additional program elements available under the BSD Program. Your TSM will provide you with instructions on how to utilize these program elements.

By participating in the Lexmark Business Solutions Dealer Program, Business Solutions Dealers elect not to participate in other Lexmark offerings through other Lexmark Channel Programs. By order of submission of this agreement and the Lexmark Business Solutions Dealer Agreement, all other Lexmark Agreements are superseded.

Thank you for your support of Lexmark and rest assured that Lexmark will continue to develop award-winning products, solutions, and programs to better serve you and your customers.

Sincerely,

Wade Railey
Territory Sales Manager
Lexmark International, Inc.

| BSD Program Open Market hardware quota assignment and VIR payout percentage | Year | Quarter | VIR % |
|---|---|---|---|
| Quota assignment and VIR payout percentage | | | |

| BSD Program Open Market hardware GIR assignment and payout percentages | Year | | GIR % |
|---|---|---|---|
| GIR level 1 target and payout percentage | | | |
| GIR level 2 target and payout percentage | | | |
| GIR level 3 target and payout percentage | | | |

| BSD Program Open Market software quota assignment and SIR payout percentage | Year | Quarter | SIR % |
|---|---|---|---|
| Quota assignment and SIR payout percentage | | | |

| BSD Program Open Market software SGIR assignment and payout percentage | Year | | SGIR % |
|---|---|---|---|
| SGIR target and payout percentage | | | |

DEALER ACCEPTED AND AGREED:



Business:

Address:

City: _____ State: _____ Zip: _____

By: _____ (Dealer)   Title _____   Date: _____

By: _____ (Lexmark)   Title: _____   Date: _____

CONFIDENTIAL - OUTSIDE COUNSEL ONLY   A2648



Lexmark Authorized
**B u s i n e s s**
**Solutions Dealer**

Lexmark International, Inc
740 West New Circle Road NW
Lexington, KY 40550
February 6th, 2014



Mr. ▮▮▮▮▮▮

The following elements have been added to the BSD Program:

**Quarterly Purchase Incentive (QPI)**

For all hardware purchases defined as Open Market hardware purchases which fall between the following brackets,
the corresponding rebate percentage will be paid, quarterly in arrears, for those qualifying hardware purchases.
Open Market hardware excludes: purchases under special pricing and placements in Large Accounts where Lexmark has direct sales
representation. Please work with your TSM should you have any questions as to what qualifies as Open Market hardware purchases.
Additionally, you may use the Lexmark Large Account search tool available in PartnerNet.
QPI is a quarterly program and only hardware shipped during each quarter will qualify for program rebates.

**Quarterly Open Market Hardware Purchase Brackets and QPI payout percentages:**

| From: | To: | Percent Payout: |
|---|---|---|
|  |  |  |

QPI should be used instead of special pricing requests or bid support for large Open Market opportunities.
All Opportunities are subject to Lexmark review and verification.
Quarterly Open Market Hardware Purchase Brackets and QPI payout percentages are subject to change
with a minimum of 30 days advanced notice before the next quarterly program.

**National BSD Inter-Territorial Service Guidelines Program**

Dealers who agree to participate in the National BSD Inter-Territorial Service Guidelines Program will be noted as such on the PartnerNet
BSD Servicing Dealer Locator. Participating dealers will have priority status for selection by other dealers needing to partner for service
on Lexmark products outside of their authorized servicing locations. All other dealers will still be listed, but will not be designated as agreeing to
abide by the published dealer compensation schedule. Overall, this program allows all dealers to use generally accepted compensation
guidelines when negotiating end user services outside of their authorized territory. **Please see attached Program documents for details.**

Will Participate in Program (Yes or No):  Yes _____     Dealer Init ▮▮▮▮▮

CONFIDENTIAL - OUTSIDE COUNSEL ONLY   A2649

# DEALER CONTRACT 8

**Lexmark International, Inc.**

## AUTHORIZED DEALER AGREEMENT

Name and Address of Dealer:

Agreement No.:

Contract Commencement Date:

Lexmark Office Address:
Lexmark International Inc.
740 West New Circle Road
Lexington, KY 40550

Lexmark Office No.:US1320

Thank you for selecting Lexmark as a supplier of Products, services, and support.   Our goal is to be the best in the industry.   If at any time you are not completely satisfied, please let us know.

This agreement authorizes you to purchase Products from Lexmark International, Inc., (Lexmark) under its terms for marketing to End Users and your internal use only in the United States.   Lexmark may issue Bulletins under this Agreement that change the terms of this Agreement.   Any Bulletins will become effective on the date Lexmark specifies unless you notify us in writing within 30 days of your receipt of the Bulletin that you do not accept it.

Lexmark may issue administrative, technical and procedural information, announcements, promotions, programs, product and pricing letters, product withdrawal letters, and other kinds of notices in written and electronic form from time to time.   All such notices are effective on the date Lexmark specifies.

### Table of Contents

| | | | |
|---|---|---|---|
| 1.0 | DEFINITIONS | 16.0 | STATUS CHANGE |
| 2.0 | CONTRACT PERIOD | 17.0 | TRADEMARKS AND TRADE NAMES |
| 3.0 | RELATIONSHIP OF THE PARTIES | 18.0 | PATENTS AND COPYRIGHTS |
| 4.0 | MARKETING TO END USERS | 19.0 | LIMITATION OF REMEDIES |
| 5.0 | DEALER RESPONSIBILITIES | 20.0 | INDEMNIFICATION |
| 6.0 | ORDERS AND CANCELLATIONS | 21.0 | TERMINATION |
| 7.0 | PRICES | 22.0 | CONFIDENTIAL INFORMATION |
| 8.0 | PAYMENT | 23.0 | GENERAL |
| 9.0 | PRICE REDUCTION CREDIT | 24.0 | DEALER SPECIFIC INFORMATION |
| 10.0 | PRODUCT RETURNS | | Eligible Products |
| 11.0 | WARRANTIES | | Minimum Renewal Criteria |
| 12.0 | WARRANTY SERVICE | | Marketing Coverage Area |
| 13.0 | SECURITY INTEREST | | Authorized Locations |
| 14.0 | TITLE AND RIGHTS, RISKS AND REWARDS OF OWNERSHIP | | |
| 15.0 | TAXES | | |

**PAGES 2 THROUGH 8 ARE ALSO PART OF THIS AGREEMENT.** This Agreement and Bulletins, the Statements of Limited Warranty, and notices are the complete agreement between us, and replace any prior oral or written communications between us. By signing below, each of us agrees to the terms of this Agreement.   Once signed, any reproduction of this Agreement made by reliable means (for example, photocopy or facsimile) is considered an original.

Accepted by:
**Lexmark International, Inc.**

By _David C Cardwell_

Signature                                                                   Authorized Signature

_David Cardwell_   11-2-11

Name (Type or Print)                              Date
_Sr. Mgr - U.S. Distribution Channel_

Accepted by:

09/16/10    Page 1 of 8

CONFIDENTIAL - OUTSIDE COUNSEL ONLY   A2650

## 1.0  DEFINITIONS

Agreement means this Dealer Agreement, Bulletin(s), applicable Statements(s) of Limited Warranty and notices.

Authorized Location means any of your business locations approved by Lexmark in writing for the purposes of your performance under the Agreement.

End User means a party who acquires the Products for its own use and not for remarketing.

Products means those items identified in Section 24.0 which you can market under this Agreement.

## 2.0  CONTRACT PERIOD

The Agreement has a single 12 month contract period which, unless noted otherwise on page 1, commences on the first day of the month following the date of your signature on page 1, provided it is accepted by Lexmark. The Agreement can be renewed by the parties for subsequent single 12 month contract periods. Unless Lexmark notifies you otherwise, the renewal of the Agreement shall automatically occur annually unless either party notifies the other of its desire not to renew at least 90 days prior to the contract period expiration date. Either party can elect not to renew the Agreement with or without cause.

## 3.0  RELATIONSHIP OF THE PARTIES

As an independent contractor, you are not Lexmark's legal representative, franchisee, or agent for any purpose.

You will not make any warranties or representations on Lexmark's behalf other than those specified in the Agreement. Neither party will assume or create any obligations on the other's behalf except as specified in the Agreement.

You will market Products to End Users at such prices and terms and conditions as you determine. Such terms and conditions must not be in conflict with your obligations in the Agreement.

Lexmark reserves the right to market anywhere, including your geographic area, products which are the same as or similar to the Products under the Agreement either directly or through other remarketers.

You reserve the right to market Products which are similar or competitive to the Products under the Agreement.

Lexmark may establish annual sales performance objectives, which modify the Minimum Renewal Criteria, for the Products you are approved to market. Lexmark reserves the right to revise the objectives at any time. Lexmark's assessment of your overall compliance with the provisions of the Agreement will include a review of your attainment of these sales performance objectives.

Lexmark may conduct reviews to evaluate your performance and compliance with the provisions of the Agreement.

## 4.0  MARKETING TO END USERS

The Products you market under the Agreement require your high quality individualized pre-sale and post-sale support. This support is necessary to achieve and maintain high End User satisfaction. Your ability to provide this support is a key reason Lexmark selected you as an authorized Dealer. You, therefore, will market Products only to End Users. You agree not to market Products to other remarketers, except as agreed to, in writing, by Lexmark

In order to better ensure End User satisfaction, Lexmark retains the option of issuing or not issuing Letters of Supply (or guarantees of supply) to you when you respond to any particular state, local or federal government procurement request. Likewise, without Lexmark's written consent, you may not issue a Letter of Supply relating to Lexmark Products to any other party in connection with any government procurement.

## 5.0  DEALER RESPONSIBILITIES

You agree to:

1)  ensure the Product marketed to the End User is appropriate for the End User's requirements;
2)  ensure that the End User is satisfied with all your Product marketing activities, including Product explanation, demonstration, and ongoing support;
3)  report your sales performance and inventory as requested by Lexmark;
4)  market, generate demand for, and support Products only at your Authorized Location or at your End User's location; receive and inventory Products only at your Authorized Location unless Lexmark specifies otherwise; and reference only your Authorized Location in your marketing materials or advertising;
5)  maintain sufficient inventory of Products at each location to promptly satisfy reasonably foreseeable End User demand;
6)  maintain trained management, sales, support and service personnel, if applicable;
7)  report promptly to Lexmark all suspected and actual Product problems;
8)  provide a Product business plan as required by Lexmark;
9)  notify Lexmark of any discrepancies between the Lexmark shipping manifest and the Products received;
10)  maintain good financial standing and provide financial information and evidence of financial security upon request;
11)  allow Lexmark or its appointed auditor to audit, during normal business hours, the above required records and receipts.

## 6.0  ORDERS AND CANCELLATIONS

Lexmark will describe specific ordering procedures and forecast requirements, if any, in writing.

Lexmark will fill your orders for Products and meet your request for shipment dates subject to credit approval and Product availability and consistent with Lexmark's production and supply schedules.

Lexmark will insure for your benefit the order for risk of loss or damage during the period it is in transit from Lexmark or its agent up to its initial delivery to you or your designated ship-to point.



CONFIDENTIAL - OUTSIDE COUNSEL ONLY   A2651

You may cancel an order for any Product which Lexmark has not shipped to you. Lexmark may charge you a Cancellation charge of 2% of the canceled Product's Dealer price if the cancellation was requested by you after the Product was released for shipment by Lexmark. A Product is generally released for shipment one or two days before it ships. However, you will not be liable for a cancellation charge if Lexmark has postponed shipment of the Product for more than 15 days from its estimated shipment date, and you have canceled your order for the Product before the Product's shipment.

Lexmark will charge you a handling charge of 5% if you refuse to accept delivery of any portion of a shipment you ordered. You must prepay all transportation charges for return of the Product to Lexmark.

Each order is required to have a single ship-to-address.

## 7.0 PRICES

Lexmark will specify its Dealer prices in notices and an electronic file. Lexmark may change its Dealer prices at any time. Lexmark specified prices shall apply in spite of any different pricing contained in Dealer purchase orders, even if such purchase orders are accepted and Product is shipped.

A Dealer price increase for a Lexmark Product is effective on the date specified. Lexmark will announce a price increase a minimum of 30 days prior to the effective date of the increase. A price increase will not apply to a Product for which Lexmark has accepted an order prior to the effective date, provided the order specifies a requested ship date within the time frame stated in the price increase notice.

A Dealer price decrease is effective on the date specified and will apply to Products shipped on or after the effective date of the decrease.

The MSRP is Lexmark's suggested resale price and is subject to change without notice. This price is for information purposes only. Lexmark's and our remarketers prices may vary.
Lexmark may specify any additional fees and allowances in notices. Lexmark may change the fees and allowances at any time. Such changes will become effective on the date Lexmark specifies.

Dealer Prices and minimum order quantities are set forth in notices. Each supply Product order for shipment to a single Authorized Location must be for an amount of at least $3,000.

## 8.0 PAYMENT

You agree to pay Lexmark upon your receipt of an invoice, unless otherwise specified by Lexmark. If you fail to pay, Lexmark may:

1) impose a finance charge on the balance due;
2) exercise any of its rights provided in the Agreement or by law;
3) require "cash with order" or "payment on account" prior
4) stop shipment of your orders if your account is past due.

## 9.0 PRICE REDUCTION CREDIT

If Lexmark announces a Dealer price decrease for a Product, you may be eligible to receive a price reduction credit.

**Supplies**
The price reduction credit for supplies Products equals the credit amount per item, as specified by Lexmark, multiplied by the quantity shipped directly from Lexmark to you (minus returns from you) in the prior sixty (60) days.

## 10.0 PRODUCT RETURNS
**General Terms -**
During a contract period, you may return for credit selected Products which you obtained directly from Lexmark. Lexmark will specify which Products are returnable in notices or an electronic file.

Lexmark may issue notices clarifying Product return policies that shall be effective on the date specified. Lexmark may place limits on the amount of Product that can be returned. All Product must be returned to Lexmark within thirty (30) days after receiving authorization, to ensure proper credit.

Upon receipt and acceptance of a returned Product, Lexmark will issue you a Product credit as determined by Lexmark. You may use such credit only against sums then or thereafter due Lexmark.

For non-defective products, you must return all Products to Lexmark, transportation pre-paid, in the original shipping containers which must not have been opened, damaged, marked or labeled. The Products must be in marketable condition as determined by Lexmark.

Product returned without Lexmark's authorization and the appropriate documentation will be returned to you at your expense.

Any prior passage to you of title to Products will be deemed void from its inception when the returned Products are accepted by Lexmark. You warrant and represent that the returned Products are free of any outstanding liens, security interests or other third party encumbrances.

Lexmark may charge a handling charge of up to twenty percent (20%) multiplied by the then current Lexmark published Dealer price for any returned Product.

Lexmark may issue notices clarifying Product return policies, which shall be effective on the data specified. For Products being withdrawn from marketing, guidelines of limitations on returns may be contained in the withdrawal notice.

**Claims**
For all claims that there has been a short ship of ordered Products (not all ordered Products were received) or all of the ordered Products were not received (mis-ship), you must submit a written claim to Lexmark within thirty (30) days of the scheduled/anticipated delivery date of the ordered Products relating to such claim. Any claims after the above referenced thirty (30) days are expressly waived and Lexmark shall not be liable to you for any such claims (regardless of when you learned or could have learned of any of the facts surrounding the transaction or claim).



CONFIDENTIAL - OUTSIDE COUNSEL ONLY  A2652

**Supplies – Stock Balance/Inventory Adjustment**

Only one return shipment of supplies Products is allowed per calendar quarter (Jan to Mar; Apr to June; July to Sept; Oct to Dec) per Lexmark Authorized Reseller Location.

You may return supplies that equal up to two (2%) percent of the prior calendar quarter net revenue you purchased directly from Lexmark without a handling charge based on the then current Lexmark published dealer supply price. If you return more than two (2%) percent and less than five (5%) percent you may be charged, at Lexmark's sole discretion, a handling charge of ten (10%) percent. Any return greater than five (5%) may be assessed, at Lexmark's sole discretion, a twenty (20%) percent handling charge.

The maximum quantity of supplies Products you may return is equal to the quantity shipped to you by Lexmark in the immediately preceding twelve months less any returns during that period.

Any additional supplies Products returns in a calendar quarter will automatically be assessed a twenty (20%) percent handling charge.

**Supplies – Defective Product**

Lexmark will replace supplies Products or provide a credit to you for any found to be defective by you prior to the sale to an End-User. In addition, Lexmark will provide credit to you for any Lexmark supplies Product returned defective by an End User within the warranty period specified by Lexmark in the Statement of Limited Warranty.

Specific warranty process procedures are covered in separate warranty announcement letters.

**11.0  WARRANTIES**

Lexmark will provide you a copy of the Statement of Limited Warranty, which you are to provide to your End User at the time of sale. Lexmark may revise a Statement of Limited Warranty.

The warranty period will start on the day the End User purchases the Product. You will advise the End User of this start date.

**12.0  WARRANTY SERVICE**

**Supplies**

Unless Lexmark specifies otherwise, for supplies Products you will:

1) provide warranty service under the terms of the applicable Statement of Limited Warranty
2) validate all warranty claims presented to you.

**13.0  SECURITY INTEREST**

Lexmark reserves, and you grant a purchase money security interest in each Product, in your proceeds from the sale of each Product and in your accounts receivable for such Product. This interest will be satisfied by payment in full.

You agree to sign an appropriate document to permit us to perfect Lexmark's purchase money security interest.

**14.0  TITLE AND RIGHTS, RISKS AND REWARDS OF OWNERSHIP**

Title and all rights, risks and rewards of ownership transfer to you upon shipment of the product from Lexmark, or its agent. Title for each copy of a licensed program remains with Lexmark.

Lexmark will insure for your benefit the order for risk of loss or damage during the period it is in transit from Lexmark or its agent up to its initial delivery to you.

**15.0  TAXES**

You agree to pay amounts equal to any taxes resulting from the Agreement or any activities under the Agreement. Such taxes do not include taxes based on Lexmark's net income. You are responsible to bear any personal property taxes assessable on Products on or after delivery to the carrier at the Lexmark ship-from location.

You agree to provide Lexmark with a valid Reseller Exemption Certificate for each taxing jurisdiction to which Products acquired by you for resale will be shipped by Lexmark under the Agreement. If such Certificate(s) is not provided to Lexmark prior to shipment, Lexmark will charge, and you will be required to pay, all applicable state and local taxes.

You agree to notify Lexmark promptly of the revocation or modification of any Reseller Exemption Certificate so provided. You further agree to indemnify and hold Lexmark harmless from any claims and assessments against Lexmark resulting from a refusal by a taxing jurisdiction to recognize any of your Reseller Exemption Certificates.

**16.0  STATUS CHANGE**

To maintain your authorization, you must request Lexmark approval in writing if you anticipate any:

1) transfer of your equity ownership;
2) merger or acquisition of your enterprise or Authorized Location with or by any other entity;
3) legal name change of your enterprise; or
4) relocation or closing of an Authorized Location.

**17.0  TRADEMARKS AND TRADE NAMES**

You may refer to yourself under the Agreement as a Lexmark Authorized Dealer:

1) solely in connection with Products;
2) only during the contract period; and
3) only within the United States

Except as provided for in this Section, Lexmark does not grant you the right to use trademarks or trade names. Lexmark grants you the limited permission to use the trademark "Lexmark" solely to identify the Products acquired from Lexmark under the Agreement. You may use the trademarks "Lexmark" only within the United States.



CONFIDENTIAL - OUTSIDE COUNSEL ONLY   A2653

At Lexmark's request, you will provide to Lexmark, for review and written approval, promotional, advertising and other materials that:

1) use a Lexmark or third party trademark or trade name; or
2) refer to you as a "Lexmark Authorized Dealer".

Lexmark will supply advertising guidelines in writing. At Lexmark's request, you agree to change any materials or use of materials which Lexmark determines to be inaccurate, objectionable, misleading or a misuse of Lexmark trademarks. You will pay the expenses for such change.

The permission granted relative to the Lexmark trademarks will terminate with the termination or expiration of the Agreement. In such event, for the affected Products, you will immediately;

1) cease referring to yourself as a "Lexmark Authorized Dealer" or other such term that includes the name of the Products, as applicable;
2) cease referring to yourself as approved by Lexmark to provide warranty services; and
3) return to Lexmark or destroy all materials under your control employing such trademarks.

You may retain materials with Lexmark trademarks which are required to fulfill your warranty service or support obligations on affected Products. You will return these materials to Lexmark or destroy them upon completion of such obligations.

You recognize Lexmark's ownership and title to its trademarks and the goodwill attaching to them. You agree that any goodwill which accrues because of your use of the trademarks "Lexmark" will become Lexmark's property, respectively. You agree not to contest Lexmark trademarks or trade names. You agree not to use, employ or attempt to register any trademarks or trade names which are confusingly similar to Lexmark trademarks or trade names.

## 18.0  PATENTS AND COPYRIGHTS

Lexmark will, at its expense, defend you against any claim that any Product acquired under the Agreement infringes a patent or copyright in the United States. Lexmark will pay all costs, damages and attorney's fees that a court finally awards as a result of such claim. To qualify for such defense and payment, you must 1) give Lexmark prompt written notice of any such claim, and 2) allow Lexmark to control, and fully cooperate with Lexmark in, the defense and all related settlement negotiations. You agree that if Product in your inventory, becomes, or Lexmark believes is likely to become, the subject of such a claim, you will permit Lexmark, at its option and expense, either to secure the right for you to continue using the Product or to replace or modify it so that it becomes noninfringing. However, if neither of the foregoing alternatives is available on terms which are reasonable in Lexmark's judgment, Lexmark may stop shipping affected Product, and you will return the Product in your inventory upon Lexmark's written request. Lexmark will grant you a credit equal to the price paid by you to Lexmark for the returned Product. Lexmark shall have no obligation with respect to any such claim based upon any non-Lexmark modification of Product or their combination, operation or use with apparatus, data or programs not furnished by Lexmark.

This Section states Lexmark's entire obligation to you and your entire remedy for machines regarding infringement or the like.

## 19.0  LIMITATION OF REMEDIES

Lexmark's entire liability and your exclusive remedy for any claims are as this Section provides.

Lexmark is not liable for any damages caused by performance or nonperformance of Products located outside the United States. In no event will Lexmark be liable for any damages caused by your failure to perform your responsibilities.

Lexmark's entire liability and your exclusive remedy for actual damages from your use of licensed programs are as set forth in their accompanying program license agreement.

Lexmark assumes no liability regarding any claim or action caused by, or directly related to, a non-Lexmark Product.

In no event will Lexmark be liable for any lost profits, lost savings, incidental damages, or other consequential damages, even if Lexmark has been advised of the possibility of such damages. Lexmark will not be liable for any damages claimed by you based on any third party claim.

For any claim for any cause whatsoever, other than those provided for in Section 18.0 and the first paragraph of Section 20.0, Lexmark's liability for actual damages will be limited to $100,000.

## 20.0  INDEMNIFICATION

Lexmark will indemnify and hold you harmless from all claims, including reasonable attorney's fees, (but not including lost profits, lost savings, incidental damages, or other consequential damages), for bodily injury or damage to real property or tangible personal property arising from any acts or omissions for which Lexmark is legally liable.

You will indemnify and hold Lexmark harmless from all claims, including reasonable attorney's fees, by any party resulting directly or indirectly from any acts or omissions by you.

## 21.0  TERMINATION

Either party may terminate the Agreement, with or without cause. Lexmark will provide three month written notice to you of such termination, except as otherwise provided in this Section. You must provide one month written notice to Lexmark.

In the event that Lexmark gives you such notice for cause, Lexmark may provide you with an opportunity to cure deficiencies. In such event, Lexmark will establish a reasonable time, not to exceed three months, in which you must remedy such deficiencies.

In addition, Lexmark considers certain actions so serious and inconsistent with your obligations as a Dealer as to warrant immediate termination. Such breaches will include, but not be limited to, situations in which 1) you made material misrepresentations to Lexmark in your application to become a Dealer, at any later time through oral or written statements, or by submission of any false or fraudulent documentation or claim to Lexmark, or 2) you marketed Products to other than an End User.

Lexmark may also terminate the Agreement immediately in the event that a dealer or its personnel knowingly or negligently engage, directly or indirectly, in the manufacture, sale, resale,



CONFIDENTIAL - OUTSIDE COUNSEL ONLY   A2654

brokerage, distribution, storage or handling of counterfeit goods and/or gray market goods (that is, goods bearing the trademark, trade name or trade dress of Lexmark which have been acquired from a source other than Lexmark or an Authorized Lexmark Wholesaler or Distributor in the U.S.).

In the event of termination of the Agreement by you or Lexmark, all monies due Lexmark will immediately become due and payable.

If you or Lexmark elects to terminate the Agreement, Lexmark may repurchase some or all of the Products in your inventory at a price determined by Lexmark. In such event, you will pay return-shipping charges. Products returned must be in the original shipping containers, which must not have been opened, damaged, marked or labeled.

A termination of the Agreement may also be only a partial termination of, for example, an Authorized Location, an eligible Product family, a part of a marketing coverage area, an Aggregator relationship, or the approval to market to Dealer Associates.

## 22.0  CONFIDENTIAL INFORMATION

1)  Any information concerning Lexmark customers furnished to you by Lexmark and identified as confidential, shall be treated and held in confidence by you. You shall not publish, disclose or disseminate it for a period of five years after its receipt, except as may be authorized by Lexmark in writing. You shall not be entitled to use this information for any purposes other than for marketing of Products in furtherance of this Agreement, or as specified in the information provided.
2)  Upon termination or expiration of this Agreement, you shall deliver to Lexmark all materials, of any kind, containing such confidential information.
3)  Other than as set forth above, no information will be given or received in confidence by either party unless it is covered by a separate written agreement.

## 23.0  GENERAL

Lexmark's waiver of any instance of your noncompliance with the Agreement will not be deemed a waiver of any future noncompliance.

You may not assign the Agreement or any of its rights or duties without Lexmark's prior written consent.

Neither party is responsible for failure to fulfill its obligations under the Agreement due to causes beyond its control.

The Agreement will not be supplemented or modified by any course of dealing or trade usage. Variance from or addition to the terms and conditions of the Agreement in any purchase order or other written notification from you will be of no effect.

The provisions of the Agreement which by their nature extend beyond the termination or expiration of the Agreement will survive and remain in effect until all obligations are satisfied.

Each party agrees to pay the other's reasonable attorney's fees and costs of litigation if the party, for any cause whatsoever, brings suit against the other party and the other party is finally adjudicated not to have liability.

Neither you nor Lexmark will bring an action, regardless of form, arising out of the Agreement more than two years after the cause of action has arisen. In the case of an action for non-payment, the action may not be brought more than two years from the date the last payment was due. Any claims you may make for price adjustments or additional marketing program payments made more than 6 months after the date any such activity has occurred are expressly waived.

Both parties agree to comply with all applicable governmental laws and regulations.

This Agreement is governed by the laws of the Commonwealth of Kentucky excluding its choice of law provisions. THE PARTIES AGREE THAT ANY AND ALL ACTIONS, SUITS OR OTHER LEGAL PROCEEDINGS, ARISING UNDER THIS AGREEMENT AND REGARDLESS OF THE LEGAL THEORY UPON WHICH THE CLAIMS ARE BASED, MAY BE BROUGHT AGAINST THE OTHER OR ITS EMPLOYEES OR AGENTS ONLY IN A STATE OR FEDERAL COURT SITUATED WITHIN FAYETTE COUNTY IN THE COMMONWEALTH OF KENTUCKY, AND THE PARTIES CONSENT TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS IN ANY SUCH LEGAL PROCEEDING. THE PARTIES WAIVE ANY OBJECTION IT MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH LEGAL PROCEEDING IN ANY SUCH COURT. THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY ACTION, SUIT OR OTHER LEGAL PROCEEDING, WHETHER OR NOT ARISING UNDER THIS AGREEMENT AND REGARDLESS OF THE LEGAL THEORY UPON WHICH THE CLAIMS ARE BASED.

## 24.0  DEALER SPECIFIC INFORMATION

**Eligible Products**
You are approved to market the following Product families, as specified with a "YES" or identified portions as designated. Specific Products are listed in notices and an electronic file. Specific certification may also be required for certain Products.

**Supplies __X____        Other (as listed) _____**

**Minimum Renewal Criteria**
Lexmark may establish Minimum Renewal Criteria (MRC) for a contract period for some or all Products. The MRC (Listed below or on attachments) designates the minimum level of sales performance expected of you. Sales performance objectives may be established which modify your MRC.



CONFIDENTIAL - OUTSIDE COUNSEL ONLY   A2655

The minimum renewal requirement for Supplies Product is

**Authorized Ship to and Bill to Locations**

All Authorized ship to and bill to Locations must be approved in writing by Lexmark and listed below or on an attachment to this Agreement. Any change in the location or any significant change in the characteristics of your Authorized Locations must be approved by Lexmark.



CONFIDENTIAL - OUTSIDE COUNSEL ONLY  A2656



**Lexmark International, Inc.**
an IBM alliance company

# DEALER CONTRACT 9

## AUTHORIZED DEALER AGREEMENT

Name and Address of Dealer:

Agreement No.: **LBDU304 - 00**

Lexmark Office Address:
**200 GALLERIA OFFICE CTR., 3RD FL
SOUTHFIELD        MI 48086**

Commencement 1/1/92

Lexmark Office No.: **GT4**

Thank you for selecting Lexmark as a supplier of products, services, and support. Our goal is to be the best in the industry. If at any time you are not completely satisfied, please let us know.

This agreement authorizes you to purchase Products from Lexmark under its terms for marketing to End Users only in the United States and Puerto Rico. Lexmark may issue Bulletins under this Agreement which change the terms of this Agreement. Any Bulletins will become effective on the date Lexmark specifies unless you notify us in writing within 30 days of your receipt of the Bulletin that you do not accept it.

Lexmark may issue administrative, technical and procedural information, announcements, promotions, programs, product and pricing letters, product withdrawal letters, and other kinds of notices in writing from time to time. All such notices are effective on the date Lexmark specifies.

### Table of Contents

| | | | |
|---|---|---|---|
| 1.0 | DEFINITIONS | 19.0 | STATUS CHANGE |
| 2.0 | CONTRACT PERIOD | 20.0 | TRADEMARKS AND TRADE NAMES |
| 3.0 | RELATIONSHIP OF THE PARTIES | 21.0 | PATENTS AND COPYRIGHTS |
| 4.0 | MARKETING TO END USERS | 22.0 | LIMITATION OF REMEDIES |
| 5.0 | DEALER RESPONSIBILITIES | 23.0 | INDEMNIFICATION |
| 6.0 | ORDERS AND CANCELLATIONS | 24.0 | TERMINATION |
| 7.0 | PRICES | 25.0 | DEALER ASSOCIATED REMARKETERS |
| 8.0 | PAYMENT | 26.0 | PS/1 PRINTERS |
| 9.0 | PRICE REDUCTION CREDIT | 27.0 | GENERAL |
| 10.0 | INVENTORY ADJUSTMENTS | 28.0 | DEALER SPECIFIC INFORMATION |
| 11.0 | WARRANTIES | | Aggregator Relationships |
| 12.0 | WARRANTY SERVICE | | Superstores |
| 13.0 | MAINTENANCE PARTS | | Campus Technology Centers |
| 14.0 | ENGINEERING CHANGES | | Eligible Products |
| 15.0 | LICENSED PROGRAMS | | Minimum Renewal Criteria |
| 16.0 | SECURITY INTEREST | | Marketing Coverage Area |
| 17.0 | TITLE AND RISK OF LOSS | | Authorized Locations |
| 18.0 | TAXES | | |

**PAGES 2 THROUGH 8 ARE ALSO PART OF THIS AGREEMENT.** This Agreement and Bulletins, the Statements of Limited Warranty, and notices are the complete agreement between us, and replace any prior oral or written communications between us. By signing below, each of us agrees to the terms of this Agreement. Once signed, any reproduction of this Agreement made by reliable means (for example, photocopy or facsimile) is considered an original.

Accepted by:
**Lexmark International, Inc.**

By _____
Authorized Signature

Name (Type or Print)                    Date

Name (Type or Print)                    Date

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A2657

## 1.0 DEFINITIONS

Agreement means this Dealer Agreement, Bulletin(s), applicable Statement(s) of Limited Warranty and notices.

Authorized Location means any of your locations approved by Lexmark in writing for the purposes of your performance under the Agreement.

End User means an unaffiliated party who acquires the Products from you for its own use and not for remarketing.

PLA Programs means licensed programs which Lexmark designates as subject to the Lexmark Program License Agreement (PLA).

Products means machines, licensed programs, and other items you can market under the Agreement.

## 2.0 CONTRACT PERIOD

The Agreement has a single 12 month contract period which commences on the first day of the month following the date of your signature on page 1, provided it is accepted by Lexmark. The Agreement can be renewed by the parties for subsequent single 12 month contract periods. Unless Lexmark notifies you otherwise, the renewal of the Agreement shall automatically occur unless either party notifies the other of its desire not to renew at least 90 days prior to the contract period expiration date. Either party can elect not to renew the Agreement with or without cause.

## 3.0 RELATIONSHIP OF THE PARTIES

As an independent contractor, you are not Lexmark's legal representative, franchisee, or agent for any purpose.

You will not make any warranties or representations on Lexmark's behalf other than those specified in the Agreement. Neither party will assume or create any obligations on the other's behalf except as specified in the Agreement.

You will market Products to End Users at such prices and terms and conditions as you determine. Such terms and conditions must not be in conflict with your obligations in the Agreement.

Lexmark reserves the right to market anywhere, including your geographic area, products which are the same as or similar to the Products under the Agreement either directly or through other remarketers.

You reserve the right to market products which are similar or competitive to the Products under the Agreement.

Lexmark may establish annual sales performance objectives for the Products which you are approved to market.

Lexmark may conduct reviews to evaluate your performance and compliance with the provisions of the Agreement.

No information will be given or received in confidence by either party unless it is covered by a separate written agreement.

## 4.0 MARKETING TO END USERS

The Products you market under the Agreement require your high quality individualized pre-sale and post-sale support. This support is necessary to achieve and maintain high End User satisfaction. Your ability to provide this support is a key reason Lexmark selected you as an authorized dealer. You, therefore, will market Products only to End Users. You agree not to market Products to other remarketers, except as agreed to by Lexmark.

Furthermore, in order to ensure End User satisfaction for certain Products, there must be at least one pre-sale face-to-face meeting between you and your prospective End User. Current products requiring such face-to-face meeting are printers and the Personal Typing System.

## 5.0 DEALER RESPONSIBILITIES

You agree to:
1) ensure the Product marketed to the End User is appropriate for the End User's requirements;
2) ensure that the End User is satisfied with all your Product marketing activities, including Product explanation, demonstration, and ongoing support;
3) maintain an End User record for each unit of Product sold or licensed. End User records are not required for Supplies. An End User record will include the name and address of the End User, the date of the sale or license, the Product Type/Model sold or licensed, and the Product's serial number, if applicable. You must retain the End User record for all Products that contain a video display for at least five years after the date of sale, and shall retain End User Records for all other Products, excluding Supplies, for the longest period of time that you customarily retain such records. You must assist Lexmark, upon Lexmark's request, in tracing a Product to an End User to distribute Product information or locate a Product for safety reasons;
4) furnish a sales receipt to the End User upon delivery of the Product indicating the date of sale or license and the serial number, if any, of the Product sold or licensed. You must retain a copy of that sales receipt for one year from the date of sale or license. You must indicate on the sales receipt for the Product any non-Lexmark alterations made to the Product;
5) report your sales performance and inventory as requested by Lexmark;
6) install each Product as specified by Lexmark;
7) market, generate demand for, perform warranty service for, and support Products only at your Authorized Location or at your End User's location; receive and inventory Products only at your Authorized Location unless Lexmark specifies otherwise; and reference only your Authorized Location in your marketing materials or advertising;
8) advertise Products designated as Supplies prominently in your catalogue;
9) maintain a sufficient inventory of Products to satisfy reasonably foreseeable End User demand;
10) provide floor space and related facilities at your Authorized Location(s) to display and demonstrate the Products;
11) maintain a required number of trained management, sales, support and service personnel;
12) report promptly to Lexmark all suspected and actual Product problems;
13) provide a product business plan as required by Lexmark;
14) notify Lexmark of any discrepancies between the Lexmark shipping manifest and the Products received;
15) maintain good financial standing and provide financial information and evidence of financial security upon request;
16) allow Lexmark or its appointed auditor to audit, during normal business hours, the above required records and receipts.

## 6.0 ORDERS AND CANCELLATIONS

Lexmark will describe specific ordering procedures and forecast requirements, if any, in writing.

Lexmark will fill your orders for Products and meet your request for shipment dates subject to the Product's availability and consistent with Lexmark's production and supply schedules.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY   A2658

You may cancel an order for any Product which Lexmark has not shipped to you. Lexmark may charge you a Cancellation Charge of 2% of the cancelled Product's Dealer price. However, you will not be liable for a Cancellation Charge if Lexmark has postponed shipment of the Product for more than 15 days from its estimated shipment date, and you have cancelled your order for the Product before the Product's shipment. Product ordered and cancelled the same day will not be assessed a cancellation charge.

Lexmark will charge you a Handling Charge of 5% if you refuse to accept a Product you ordered. You must prepay all transportation charges for return of the Product to Lexmark.

## 7.0 PRICES

Lexmark will specify its Dealer prices in notices and an electronic file. Dealer prices are F.O.B. destination, unless Lexmark specifies otherwise. Lexmark may change its Dealer prices at any time.

A Dealer price increase for a Product is effective on the date specified. However, a Dealer price increase will not apply to a Product for which Lexmark has received an order prior to the day the increase is effective, provided Lexmark accepts such order.

A Dealer price decrease is effective on the date specified and will apply to Products shipped on or after the effective date of the decrease.

A single unit price reflects the price for single units of Product acquired by End Users directly from Lexmark. A suggested retail price may also be established by Lexmark. Both are subject to change without notice. These prices are for informational purposes only and shall not limit in any way your ability to set your own prices, charges and terms and conditions for Products.

Lexmark may specify any additional fees and allowances in notices. Lexmark may change the fees and allowances at any time. Such changes will become effective on the date Lexmark specifies.

### Printers

Price schedules are based on a single order, with a single shipment to a single location unless Lexmark specifies otherwise.

| | |
|---|---|
| Schedule I | -- Invoice value under $3,000 |
| Schedule II | -- Invoice value of at least $3,000 and printers can be ordered in any quantities |
| Schedule III | -- Invoice value of at least $25,000, and printers must be ordered in full pallet quantities |

Printer features may not be included to meet invoice values.

### Typewriters

Price schedules for typewriters are based on a single order, with a single shipment to a single location unless Lexmark specifies otherwise.

| | |
|---|---|
| Schedule I | -- Invoice value under $10,000 |
| Schedule II | -- Invoice value of at least $10,000 and less than $25,000 |
| Schedule III | -- Invoice value of at least $25,000 |

All typewriter models and IBM Personal Typing Systems may be aggregated for purposes of determining invoice value.

Features and Personal Typing System Printers may not be included for purposes of determining invoice value.

### Supplies

Dealer Prices and minimum order quantities are set forth in notices. Each order for supplies for shipment to a single Authorized Location must be for an amount of at least $500.

## 8.0 PAYMENT

You agree to pay Lexmark upon your receipt of an invoice. If you fail to pay, Lexmark may:
1) impose a finance charge on the balance due; and
2) exercise any of its rights provided in the Agreement or by law.

## 9.0 PRICE REDUCTION CREDIT

If Lexmark announces a Dealer price decrease for a Product, you may be eligible to receive a price reduction credit.

### Printers and Typewriters

The price reduction credit equals the credit amount per Product, as specified by Lexmark, multiplied by your existing inventory and Product in transit on the effective date.

In order to qualify for a price reduction credit, you must:

1) provide a report of your inventory of the Product in a format and time frame specified by Lexmark;
2) have provided such report for at least the two prior months;
3) provide access, during normal business hours, to allow Lexmark to audit applicable records and inventory.

### Printer and Typewriter Features and Supplies

The price reduction credit for features and supplies equals the credit amount per item, as specified by Lexmark, multiplied by the quantity shipped directly from Lexmark to you (minus returns from you) in the prior two months.

## 10.0 INVENTORY ADJUSTMENTS

During a contract period, you may return for credit selected Products which you obtained directly from Lexmark. Lexmark will specify which Products are returnable in notices or an electronic file.

Upon receipt and acceptance of a returned Product, Lexmark will issue you a Product credit as determined by Lexmark. You may use such credit only against sums then or thereafter due Lexmark.

You must return all Products to Lexmark, transportation prepaid, in the original shipping containers which must not have been opened, damaged, marked or labeled. The Products must be in marketable condition as determined by Lexmark.

Any prior passage to you of title to Products will be deemed void from its inception when the returned Products are accepted by Lexmark. You warrant and represent that the returned Products are free of any outstanding liens, security interests or other third party encumbrances.

Lexmark may charge a Handling Charge of 5% multiplied by the Dealer price for any returned Product.

You may return these Products only once a month and you must accompany each shipment of returned Products with a "Returns Authorization Form."

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A2659

For Products being withdrawn from marketing, guidelines or limitations on returns may be contained in the withdrawal notice.

### Printers and Typewriters

The maximum number of units of a Product you may return in a given month is equal to the number of units of inventory of such Product you reported for the previous month.

### Printer and Typewriter Features

The maximum number of features you may return is equal to the number of features shipped to you by Lexmark in the immediately preceding six months less any returns during that period.

### Supplies

Only two return shipments of supplies are allowed per contract period. The maximum quantity of supplies you may return is equal to the quantity shipped to you by Lexmark in the immediately preceding nine months less any returns during that period.

## 11.0 WARRANTIES

Lexmark will include the applicable Statement of Limited Warranty with machines shipped. Lexmark will provide you a copy of the Statement of Limited Warranty which you are to provide to your End User at the time of sale. Lexmark may revise a Statement of Limited Warranty.

The warranty period will start on the day the End User purchases the Product. You will advise the End User of this start date.

## 12.0 WARRANTY SERVICE

The Service Support Guide is incorporated in the Agreement by reference.

Unless Lexmark specifies otherwise, you will:
1) provide warranty service under the terms of the applicable Statement of Limited Warranty and in accordance with the Service Support Guide;
2) validate all warranty claims presented to you; and
3) maintain the capability to provide warranty service according to the requirements and procedures specified in the Service Support Guide.

Lexmark will:
1) provide, at no fee, either service training in a Lexmark designated classroom or self-education materials for the number of service personnel required;
2) provide, as part of service training, selected service materials;
3) make available to you, for a fee, a) service training for additional service personnel, and b) additional service materials; and
4) honor your valid claims for warranty reimbursement for labor (when applicable) and/or credits for parts or exchange of parts as specified in the Service Support Guide.

## 13.0 MAINTENANCE PARTS

Lexmark or IBM will sell you maintenance parts only for providing warranty and maintenance service or for sale to End Users for the sole purpose of maintaining their machines.

## 14.0 ENGINEERING CHANGES

During the Warranty Period, any engineering changes determined applicable by Lexmark will be controlled by Lexmark and installed as specified by Lexmark on the machines. You or your End User may, by providing notice subject to written confirmation by Lexmark, elect to have only mandatory changes, as determined by Lexmark, installed.

Lexmark may either install a mandatory change at your location without charge or provide you, at no charge, parts and instructions for your installation of such changes on all machines in your inventory or on machines owned by your End Users. If you install the changes, Lexmark will reimburse you for your labor at a rate established by Lexmark.

## 15.0 LICENSED PROGRAMS

Licensed programs may be made available, as determined by Lexmark, to you to market under the provisions of the Agreement and the PLA or a third party agreement.

You agree to ensure that your End User understands and agrees to the PLA.

You agree to accept return of a PLA program, provided it is in its original, unopened package, and refund the money paid by an End User who does not wish to be bound by the PLA. If the PLA permits the return of a PLA program with an accompanying specified Product, you agree to accept the return of the PLA program with the other Product for refund.

Certain programs may be distributed by you only along with the Products with which they are packaged, as set forth in product announcement letters. In addition, certain programs, when distributed to the U.S. or other governments, must be identified as subject to government regulations for software protection of privately developed commercial software, as set forth in product announcement letters.

## 16.0 SECURITY INTEREST

Lexmark reserves and you grant a purchase money security interest in each Product, in your proceeds from the sale of each Product, and in your accounts receivable for such Product. This interest will be satisfied by payment in full.

You agree to sign an appropriate document to permit us to perfect Lexmark's purchase money security interest.

## 17.0 TITLE AND RISK OF LOSS

Title passes to you for each machine on its date of shipment from Lexmark. Title for each copy of a PLA program remains in Lexmark.

Lexmark relieves you of responsibility for all risk of loss of, or damage to, a machine during the period it is in transit from Lexmark up to its initial delivery to you.

## 18.0 TAXES

You agree to pay amounts equal to any taxes resulting from the Agreement or any activities under the Agreement. Such taxes do not include taxes based on Lexmark's net income. You are responsible to bear any personal property taxes assessable on Products on or after delivery to the carrier at the Lexmark ship-from location.

You agree to provide Lexmark with a valid Reseller Exemption Certificate for each taxing jurisdiction to which Products ac-

CONFIDENTIAL - OUTSIDE COUNSEL ONLY   A2660

quired by you for resale will be shipped by Lexmark under the Agreement. If such Certificate(s) is not provided to Lexmark prior to shipment, Lexmark will charge, and you will be required to pay, all applicable state and local taxes.

You agree to notify Lexmark promptly of the revocation or modification of any Reseller Exemption Certificate so provided. You further agree to indemnify and hold Lexmark harmless from any claims and assessments against Lexmark resulting from a refusal by a taxing jurisdiction to recognize any of your Reseller Exemption Certificates.

## 19.0  STATUS CHANGE

To maintain your authorization, you must request Lexmark approval in writing if you anticipate a:

1) sale of your enterprise;
2) transfer of your equity ownership;
3) significant change in your management;
4) merger or acquisition of your enterprise or Authorized Location with or by any other entity;
5) legal name change of your enterprise;
6) relocation of an Authorized Location; or
7) closing of an Authorized Location.

## 20.0  TRADEMARKS AND TRADE NAMES

You may refer to yourself under the Agreement as a Lexmark Authorized Dealer:
1) solely in connection with Products;
2) only during the contract period; and
3) only within the United States and Puerto Rico.

Except as provided for in this Section, Lexmark does not grant you the right to use trademarks or trade names. Lexmark grants you the limited permission to use the trademark "Lexmark" or "IBM" solely to identify the Products acquired from Lexmark under the Agreement. You may use the trademarks "Lexmark" or "IBM" only within the United States and Puerto Rico.

At Lexmark's request, you will provide to Lexmark, for review and written approval, promotional, advertising and other materials that:
1) use a Lexmark, International Business Machines Corporation (IBM) or third party trademark or trade name; or
2) refer to you as a "Lexmark Authorized Dealer".

Lexmark will supply advertising guidelines in writing. At Lexmark's request, you agree to change any materials or use of materials which Lexmark determines to be inaccurate, objectionable, misleading or a misuse of Lexmark or IBM trademarks. You will pay the expenses for such change.

The permission granted relative to the Lexmark or IBM trademarks will terminate with the termination or expiration of the Agreement. In such event, for the affected Products, you will immediately:
1) cease referring to yourself as a "Lexmark Authorized Dealer" or other such term that includes the name of the Products, as applicable;
2) cease referring to yourself as approved by Lexmark to provide warranty services; and
3) return to Lexmark or destroy all materials under your control employing such trademarks.

You may retain materials with Lexmark or IBM trademarks which are required to fulfill your warranty service or support obligations on affected Products. You will return these materials to Lexmark or destroy them upon completion of such obligations.

You recognize Lexmark's ownership and title to its trademarks and the goodwill attaching to them. You also recognize IBM's

ownership and title to its trademarks and the goodwill attaching to them. You agree that any goodwill which accrues because of your use of the trademarks "Lexmark" or "IBM" will become Lexmark's or IBM's property, respectively. You agree not to contest Lexmark or IBM trademarks or trade names. You agree not to use, employ or attempt to register any trademarks or trade names which are confusingly similar to Lexmark or IBM trademarks or trade names. IBM may revoke immediately, without prior notice, any permission to use IBM trademarks granted to you under the Agreement if IBM determines that you are misusing such IBM trademarks of if you place any IBM trademark on any product in violation of any law or IBM's legal rights.

## 21.0  PATENTS AND COPYRIGHTS

Lexmark will, at its expense, defend you against any claim that any machine acquired under the Agreement infringes a patent or copyright in the United States or Puerto Rico. Lexmark will pay all costs, damages and attorney's fees that a court finally awards as a result of such claim. To qualify for such defense and payment, you must 1) give Lexmark prompt written notice of any such claim, and 2) allow Lexmark to control, and fully cooperate with Lexmark in, the defense and all related settlement negotiations.

You agree that if a machine in your inventory, or the operation of a machine while in your inventory, becomes, or Lexmark believes is likely to become, the subject of such a claim, you will permit Lexmark, at its option and expense, either to secure the right for you to continue using the machine or to replace or modify it so that it becomes noninfringing. However, if neither of the foregoing alternatives is available on terms which are reasonable in Lexmark's judgment, you will return the machine upon Lexmark's written request. Lexmark will grant you a credit equal to the price paid by you to Lexmark for the returned machine. However, Lexmark may, for selected machines, grant you a credit equal to such price depreciated. The depreciation shall be an equal amount per year over the life of the machines as Lexmark establishes. Lexmark shall have no obligation with respect to any such claim based upon any non-Lexmark modification of machines or their combination, operation or use with apparatus, data or programs not furnished by Lexmark.

This Section states Lexmark's entire obligation to you for machines regarding infringement or the like.

## 22.0  LIMITATION OF REMEDIES

Lexmark's entire liability and your exclusive remedy for any claims are as this section provides.

Lexmark is not liable for any damages caused by performance or nonperformance of machines or programming located outside the United States and Puerto Rico. In no event will Lexmark be liable for any damages caused by your failure to perform your responsibilities.

Lexmark's entire liability and your exclusive remedy for actual damages from your use of PLA programs are as set forth in the PLA.

Lexmark assumes no liability regarding any claim or action caused by, or directly related to, a non-Lexmark product.

In no event will Lexmark be liable for any lost profits, lost savings, incidental damages, or other consequential damages, even if Lexmark has been advised of the possibility of such damages. Lexmark will not be liable for any damages claimed by you based on any third party claim.

For any claim for any cause whatsoever, other than those provided for in Section 21.0 and the first paragraph of Section 23.0,

CONFIDENTIAL - OUTSIDE COUNSEL ONLY   A2661

Lexmark's liability for actual damages will be limited to $100,000.

## 23.0 INDEMNIFICATION

Lexmark will indemnify and hold you harmless from all claims, including reasonable attorney's fees, (but not including lost profits, lost savings, incidental damages, or other consequential damages), for bodily injury or damage to real property or tangible personal property arising from any acts or omissions for which Lexmark is legally liable.

You will indemnify and hold Lexmark harmless from all claims, including reasonable attorney's fees, by any party resulting directly or indirectly from any acts or omissions by you.

## 24.0 TERMINATION

Either party may terminate the Agreement, with or without cause. Lexmark will provide three month written notice to you of such termination, except as otherwise provided in this Section. You must provide one month written notice to Lexmark.

In the event that Lexmark gives you such notice for cause, Lexmark may provide you with an opportunity to cure deficiencies. In such event, Lexmark will establish a reasonable time, not to exceed three months, in which you must remedy such deficiencies.

In addition, Lexmark considers certain actions so serious and inconsistent with your obligations as a Dealer as to warrant immediate termination. Such breaches will include, but not be limited to, situations in which 1) you made material misrepresentations to Lexmark in your application to become a Dealer, at any later time through oral or written statements, or by submission of any false or fraudulent documentation or claim to Lexmark, or 2) you marketed Products to other than an End User.

In the event of termination of the Agreement by you or Lexmark, all monies due Lexmark will immediately become due and payable.

If you or Lexmark elects to terminate the Agreement, Lexmark may repurchase some or all of the Products in your inventory at a price determined by Lexmark. In such event, return shipping charges will be paid by you. Products returned must be in the original shipping containers, which must not have been opened, damaged, marked or labeled.

A termination of the Agreement may also be only a partial termination of, for example, an Authorized Location, an eligible Product family, a part of a marketing coverage area, or an Aggregator relationship.

## 25.0 DEALER ASSOCIATED REMARKETERS

A Dealer Associated Remarketer (Dealer Associate) is one who obtains Product from you and remarkets the Product to End Users. In the case of Printers, a Dealer Associate is a remarketer who adds significant enhancement to computer systems in function or capability. However, it is not necessary that such Printers be remarketed only with the enhanced computer system.

You may market Products to a Dealer Associate only with the written approval of Lexmark. You retain responsibility to ensure End User satisfaction and, if applicable, provide warranty service to the Dealer Associate's End User. These responsibilities may not be delegated. You may, however, share specific End User technical assistance functions with your Dealer Associate.

Lexmark will identify those Products which you may market to a Dealer Associate. Lexmark reserves the right to withdraw its approval for either the Dealer Associate or such Products which you market to a Dealer Associate.

You must maintain records for those Products you ship to your Dealer Associate. You must have appropriate agreements with your Dealer Associate in place to ensure your Dealer Associate:

1) markets only from its approved location and only to End Users;
2) maintains End User Records in the format and for the required period of retention as described in this Agreement; and
3) assists Lexmark in tracing a specific Product to an End User if required.

## 26.0 PS/1 PRINTERS

The following additional terms apply to PS/1 Printers.

1) You are permitted to market PS/1 Printers only in the contiguous 48 states. If an End User intends to transport the PS/1 Printer outside the 48 states, you must notify such End User that there will not be access to the IBM 800# and on-line services of the PS/1 Printer.
2) As a secondary marketing approach you may utilize mass merchandising techniques directed at parties who are prospects to acquire PS/1 Printers and who you can support directly from your Authorized Locations. You may utilize such techniques only if Lexmark has pre-approved the materials you propose to use. Such materials must clearly indicate how the End User can get technical support or information from you or Lexmark prior to, and after, the sale of PS/1 Printers. Either a copy of the limited warranty document, or a notice of how the End User may readily obtain such document from you prior to the End User's acquisition of PS/1 Printers, must be included in the materials. Utilizing mass merchandising techniques does not eliminate the face-to-face meeting requirement identified under "Marketing to End Users".
3) The "Orders and Cancellations" section is modified for PS/1 Printers by the following. For PS/1 Printers, you may not 1) defer or cancel any purchase order, accepted by Lexmark, whose applicable shipment dates Lexmark confirmed or 2) refuse any shipments made by Lexmark related to such order. In addition, you may not cancel parts of such order. If, however, Lexmark notifies you that it will ship such order later than the date, or that the quantity will be less than, you request, you may modify, defer or cancel such order. You may cancel purchase orders, or parts thereof, not confirmed by Lexmark. If you do not cancel non-confirmed orders, Lexmark will hold them for possible future acceptance, and you agree to provide Lexmark with revised Requested Ship Dates for non-cancelled orders. If Lexmark, without your approval ships such delayed PS/1 Printers, you may return them at Lexmark's expense within ten days of receipt from Lexmark;
4) For the PS/1 Printer, Dealer Prices are F.O.B., Raleigh, NC;
5) For the PS/1 Printer, during the time of transit from the Lexmark shipping location to you, all risks of loss or damage shall be yours.
6) PS/1 Printers do not qualify for Inventory Adjustment. You may not return PS/1 Printers to Lexmark.

## 27.0 GENERAL

Lexmark's waiver of any instance of your noncompliance with the Agreement will not be deemed a waiver of any future noncompliance.

You may not assign the Agreement or any of its rights or duties without Lexmark's prior written consent.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A2662

Lexmark is not responsible for failure to fulfill its obligations under the Agreement due to causes beyond its control.

The Agreement will not be supplemented or modified by any course of dealing or trade usage. Variance from or addition to the terms and conditions of the Agreement in any purchase order or other written notification from you will be of no effect.

The provisions of the Agreement which by their nature extend beyond the termination or expiration of the Agreement will survive and remain in effect until all obligations are satisfied.

Each party agrees to pay the other's reasonable attorney's fees and costs of litigation if the party, for any cause whatsoever,

brings suit against the other party and the other party is finally adjudicated not to have liability.

Neither you nor Lexmark will bring an action, regardless of form, arising out of the Agreement more that two years after the cause of action has arisen. In the case of an action for non-payment, the action may not be brought more than two years from the date the last payment was due.

Both parties agree to comply with all applicable governmental laws and regulations.

The laws of the State of New York will govern the Agreement.

## 28.0 DEALER SPECIFIC INFORMATION

### Aggregator Relationships

The provisions of this Section apply to you only if you have been approved in this Section to receive Products from an Aggregator. Lexmark will indicate its approval of you to receive Products from an Aggregator by naming the Aggregator in this Section.

The term "Aggregator" means a business entity, typically a franchisor, which has been approved by Lexmark under a written agreement, to order and receive Products from Lexmark for redistribution to the Aggregator's members or franchisees. Lexmark must approve such members or franchisees as Dealers.

You may elect to obtain Products through your Aggregator. For such products, you waive your rights and Lexmark waives your responsibilities under the following item and Sections of the Agreement;

| | |
|---|---|
| 5.0 | DEALER RESPONSIBILITIES - item (14); |
| 6.0 | ORDERS AND CANCELLATIONS; |
| 7.0 | PRICES; |
| 8.0 | PAYMENT; |
| 9.0 | PRICE REDUCTION CREDIT; |
| 10.0 | INVENTORY ADJUSTMENTS; and |
| 18.0 | TAXES. |

Title to machines, shipped to you by your Aggregator, passes from Lexmark directly to you upon shipment from your Aggregator.

Lexmark does not have responsibility for risk of loss of, or damage to, Products shipped to you by your Aggregator.

Machines your Aggregator ships to you will be identified by serial number. Therefore, in addition to the record and audit requirements described in Section 5.0 of the Agreement, you agree that you will maintain a record of each such machine by serial number. You agree that you will maintain that record for 12 months following your receipt of the machine. You must provide such records to Lexmark upon request. In addition, you hereby authorize your Aggregator to release information to Lexmark regarding machines shipped to you.

For Products you order directly from Lexmark, the waivers described in the third paragraph of this section will not apply.

Name and location of your Aggregator:

NA

### Superstores

The selection criteria for Superstores shall be defined by Lexmark.

Dealers who are Superstores for specific Products shall be indicated by a "YES" on the appropriate line(s):

| | |
|---|---|
| NO | Supplies |
| NO | Typewriters |
| NO | Printers |

CONFIDENTIAL - OUTSIDE COUNSEL ONLY   A2663

**Campus Technology Centers**

Campus Technology Centers are not-for-profit institutions of higher education that may acquire Products for internal use and re-marketing to End Users only, and shall be indicated by a "YES" on this line:     **NO**

If you are a Campus Technology Center, then the term Dealer shall be replaced by Campus Technology Center throughout this Agreement.

The additional following terms shall apply to Campus Technology Centers:

1) End User means a party who a) is staff, faculty or a registered student matriculated in a degree granting program, and b) acquires Product from you for its own use, and not for remarketing.
2) Internal use means use for instruction, academic research and administrative work of your educational institution.
3) You will market Products to End Users as an incidental part of your activities and in furtherance of your educational purposes.
4) You will not sell more than one printer per year to an End User without Lexmark's prior written approval.
5) Prices for Campus Technology Centers shall be set forth in separate notices and/or an electronic file.
6) Lexmark will provide an Education Development Fund for your use in developing and improving your capability to support your End Users.
7) The warranty period for internal use Products will commence on the day you place the Product in use in your educational institution.

**Eligible Products**

You are approved to market the following Product families, as specified with a "YES" or identified portions as designated.  Specific Products are listed in notices and an electronic file.  Specific certification may also be required for certain Products.

| Supplies | Typewriters | Printers | Other (as listed) |
|----------|-------------|----------|-------------------|
| YES      | NO          | YES      | NO                |

**Minimum Renewal Criteria**

Lexmark may establish Minimum Renewal Criteria (MRC) for a contract period for some or all Products.  The MRC designates the minimum level of sales performance expected of you.

| Product | Minimum Renewal Criteria |
|---------|--------------------------|
| PRINTERS | N / A |
| SUPPLIES |  |

**Marketing Coverage Area**

Your approved marketing coverage area(s), listed by Authorized Location, by county and state, is:

NA

**Authorized Locations**

All Authorized Locations must be approved in writing by Lexmark and listed below or on an attachment to this Agreement.  Any change in the location or any significant change in the characteristics of your Authorized Locations must be approved by Lexmark.



CONFIDENTIAL - OUTSIDE COUNSEL ONLY   A2664

05/12/95    10:34    ☎                                    ☒001

# FINAL

*LBD 304*

*OK*
*4ER*

### Lexmark International, Inc.
### GSA Schedule Contract
### Authorized Government Dealer Agreement Supplement

This agreement is an amendment supplementing the existing Lexmark Authorized Dealer Agreement and is made effective and entered into as of ___May 12, 1995_____ by and between Lexmark International, Inc. (hereinafter Lexmark) and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (hereinafter Authorized Government Dealer).

Lexmark hereby appoints Authorized Government Dealer as a non-exclusive representative for the sale of Lexmark products under Lexmark 's General Services Administration (GSA) ADP Schedule Contract, FSC Group 70, Part I, Sections B&C for General Purpose Automatic Data Processing Equipment.

The term of this agreement shall coincide with the period of Lexmark's GSA Schedule Contract and any renewal periods.

Either party may terminate this agreement, at will, at any time, with or without cause, by written notice given to the other via certifiable carrier, return receipt requested, not less than thirty (30) days prior to the effective date of such notice.

Lexmark may terminate this agreement immediately in the event that Authorized Dealer should fail to perform any obligation, duty or responsibility imposed under Lexmark's GSA Schedule Contract or this agreement.

Lexmark is obligated to report to the Government all sales under its GSA Schedule Contract. Failure by Authorized Dealer to provide reports of sales under the GSA Contract to Lexmark will result in immediate termination of this agreement and the right of Authorized Government Dealer to accept any further orders against Lexmark's GSA Schedule Contract.

In consideration of appointment as an Authorized Government Dealer under Lexmark's GSA Schedule Contract, Authorized Government Dealer agrees to the following:

(1) Comply with all terms, conditions and pricing of the Lexmark GSA Schedule Contract, for all sales made under the contract;

(2) Accept orders referencing Lexmark's GSA Schedule Contract in the name of Authorized Government Dealer under option A or B as outlined in this Agreement.

(3) Accept only orders at current GSA Schedule Contract prices. Orders with prices that are higher than current contract prices are contract violations which can result in contract termination, awards for damage, fines, and other penalties.

(4) Indemnify Lexmark for any such damages, fines and / or penalties resulting from Authorized Government Dealer charging higher prices than set forth on Lexmark GSA Schedule, or otherwise breaking the terms of Lexmark's GSA Contract.

(5) Options "A" & "B".

Option "A"

Accept orders for Lexmark under Lexmarks Current GSA Schedule Terms & Prices. Forward orders to Lexmark for processing. Orders placed under option "A" must be made out to Lexmark. Dealer will be paid a fee by Lexmark, equal to ▮▮ of the then current Lexmark Schedule III value of the order for printers and features. Details for order processing and fee payment can found in Lexmark Marketing Announcement Letter XXXXXX.

4/18/95

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A2665

Attn: Ed Cupolo

05/12/95   10:35   ☎                                                    002

# FINAL

Option "B"

Sell Lexmark Products from the Authorized Government Dealer inventory     under
Lexmarks Current GSA  Schedule Terms & Prices.  All orders must be
reported  to Lexmark as defined in the Marketing Announcement Letter XXXXXX .
Lexmark will pay a fee equal to ▮▮▮ of the then current Lexmark Schedule III value of the
printer and feature orders reported,  for providing this data on a timely basis.

The Authorized Government Dealer hereby certifies that its participation in the
performance of the Lexmark GSA Schedule contract will be in accordance with
all terms, conditions, and prices of the GSA Schedule Contract.

However, this agreement does not in any way limit the Dealer from selling to the
Government, products at prices set by the Dealer under it's own contract or on
an off contract / open market basis, but not under Lexmark's GSA Contract.

In witness whereof, the parties hereunto have executed this agreement:

**Lexmark International, Inc.**                         **Authorized Government Dealer**

Bruce Reynolds   By: Ed.Cupolo
M&D               Title: DAR
Bruce Reynolds   Signature EDCupolo
7-17-95           Date: 5/12/95

**Information to be published in Lexmark's GSA Catalog**

Dealer Name:___
Address:_____
          _____
          _____
Phone: _____
Contact: _____

CONFIDENTIAL - OUTSIDE COUNSEL ONLY   A2666

NAME AND ADDRESS

AGREEMENT NUMBER   CUSTOMER NUMBER   LOCID

995-06-02 08.41.00

PAGE 1

CONFIDENTIAL - OUTSIDE COUNSEL ONLY   A2667

DEALER CONTRACT 10

## PURCHASE AGREEMENT

### BETWEEN

████████████████████████

### AND

### LEXMARK INTERNATIONAL INCORPORATED

Dated as of April 17, 1997

CONFIDENTIAL - OUTSIDE COUNSEL ONLY  A2668

**LEXMARK**



*FILE COPY*

Lexmark International. Inc.
740 New Circle Road NW
Lexington. Kentucky 40550

November 25, 1997

Re:    Purchase Agreement between the ███████████
        Company and Lexmark International, Inc.

Dear Ms. ████████

Pursuant to your request, we have asked an officer of our company Mr. Bob Kendrick, Vice
President of U.S. Channel Sales to execute the above-referenced agreement. I trust that his
signature on the agreement will resolve any concerns your legal department may have had with
Mr. Brook's signature. Enclosed for your files is one original signed Agreement.

Sincerely,

Margaret M. Graves

Enclosure

7411247B.SAM

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A2669

## PURCHASE AGREEMENT

THE ████████████████████████████████████ and LEXMARK
INTERNATIONAL INCORPORATED ("Seller") agree as follows:

1. **BACKGROUND.** ██████████ markets data processing systems,
equipment, software, supplies and services. Seller designs,
manufactures, sells, services and supports related products.
████████ wishes to acquire and distribute some of these products,
receive training in their use, marketing, maintenance and support
and secure maintenance, support and service commitments from
Seller. Seller is willing to provide those products and supply
that training, maintenance, support and service to ████████ on the
terms of this Agreement.

2. **DEFINITIONS.** The definitions set forth in Schedule 1 apply to
this Agreement.

3. **ORDERS.**

3.1 **Placement of Orders.** ██████████ may purchase Products from
Seller under this Agreement by submitting to Seller Orders
containing: (A) identity of the Product; (B) quantity purchased;
(C) price under Section 4; (D) general shipping instructions,
including destination address (a drop ship to an end user location
may result in an additional charge, unless necessitated by Seller
delay of an accepted Order); and (E) Delivery Date under Schedule
2. Any other special information may be added at
discretion. This Agreement is not an Order. ████████ may
terminate any Order in whole or in part for any reason and at any
time at least five (5) days prior to shipment by notice to Seller,
except as otherwise agreed between the parties. ████████ has no
obligation to purchase any Products until ████████ has placed an
Order, and then only to the extent of Products covered by that
Order.

3.2 **Acceptance of Orders.** Seller will accept and acknowledge
Orders placed by ████████ subject to Product availability. Any
rejection or proposed change of an Order must be made by written
notice from Seller to ████████ within five (5) days after receipt.

3.3 **Product Discontinuance.** Seller will give ████████ written
notice as soon as practicable but no later than Seller announces
discontinuation of manufacture or distribution of a Product, and in
any event at least ninety (90) days before effectiveness of any
such discontinuance of a Product. For at least ninety (90) days
after the announcement of such discontinuance, Seller will continue
to supply that Product to ████████ on receipt of Orders under this
Section 3 (received no later than one (1) month after the later of:
(a) the announcement of such discontinuance, or (b) receipt by
████████ of an evaluation unit of a successor product (if one is
announced) as contemplated by Section 20 hereof), although the
parties must mutually agree on whether or not any such Order is
cancelable before acceptance by Seller. For at least five (5)

CONFIDENTIAL - OUTSIDE COUNSEL ONLY  A2670

years after the last date that Seller ships the discontinued
Product to ███████████ Seller will continue to supply Parts for the
canceled Product to ████████ on receipt of Orders under this
Section 3.

3.4  Forecasts.  Each year ████████ will submit to Seller a rolling
forecast of ████████ purchases of Products during the twelve (12)
months following the date of such forecast.  These forecasts are
for planning purposes only, and ████████ has no obligation as a
consequence of any such forecast to purchase any Products.

3.5  Minimum Orders for Board Level Repair Rights.  It is
specifically agreed and understood by the parties that,
notwithstanding any suggestion in this Agreement to the contrary,
the board level repair rights and related information for the Optra
R, Rx, Lx and\or Rt+ printers or their successor Products
referenced in Sections 8.1, 12.1 and 13.1 of this Agreement will be
provided to ████████ only if (A) during a two (2) year period
commencing on the date of this Agreement, ████████ purchases at
least 12,000 units of the Optra R, Rx, Lx and\or Rt+ printers or
their successor Products from Seller, (B) ████████ agrees to
perform comparable board level repair for Seller at a competitive
price, (C) ████████ agrees that any board level repair information
provided to ████████ is Confidential Information of Seller within
the scope of Section 14, (D) ████████ agrees to perform this board
level repair only for Seller or for Optra R, Rx, Lx and\or Rt+
printers or their successor Products sold or leased by ████████ to
its customers, and (E) all such board level repair performed by
████████ shall meet Seller's technical and quality work standards.

3.6  Evaluation Units.  At the request of ████████ Seller will
deliver to ████████ up to five (5) units of each new Product for
evaluation purposes. ████████ obligation to pay for such units in
accordance with the terms of Section 2 of Schedule 3 hereto will
commence after a ninety (90) day evaluation period.

4.  PRICES AND PAYMENT.

4.1  Prices and Terms.  Prices and payment terms for Products and
Parts purchased and Services provided under this Agreement are set
forth in Schedule 3.

4.2  Prices to Others.  Seller represents and agrees that at all
times during the Agreement Term the prices charged for Products and
Parts purchased hereunder and Services provided hereunder will be
the lowest prices charged by Seller to resellers (at the same level
of distribution) or dealers in similar circumstances purchasing in
similar or lesser volumes on terms comparable or more favorable to
those of ████████  Seller prices may vary based on volume grids,
per order volumes, and different handling requests (e.g., emergency
orders, air shipments, or end user destination requests).

CONFIDENTIAL - OUTSIDE COUNSEL ONLY  A2671

## 5.    SHIPMENT.

**5.1    Emergency Orders for Products.** Seller will accept emergency orders for Products from ▓▓▓▓ by facsimile, message or verbal communication containing an Order number, and will expedite placement of such emergency orders as if they were formal Orders. Seller will provide ▓▓▓▓ a designated "contact point" (with an individual's name, telephone number and facsimile number) for receipt of emergency orders. Seller will use commercially reasonable efforts to ship the emergency Products to the locations specified by ▓▓▓▓ and to provide notification to ▓▓▓▓ within twenty-four (24) hours after receipt of the Order. Additional charges may be charged for emergency orders, unless necessitated by Seller delay of an accepted Order.

**5.2    Shipment.** All Orders will be shipped freight prepaid. Except for Orders under Section 5.1, Seller will ship all Products purchased under this Agreement for receipt, allowing for normal transit time, by the agreed to Delivery Date. ▓▓▓▓ may request the shipping mode on each Order, but mode and carrier for shipment will be determined by Seller.

**5.3    Delivery of Products After Agreement.** Orders will specify Delivery Dates not later than ninety (90) days after the Agreement Term.

**5.4    Risk of Loss.** Risk of loss and damage, as well as title, will pass from Seller to ▓▓▓▓ on delivery by Seller to the common carrier at the Seller's plant of manufacture; all claims for damage occurring thereafter will be filed by ▓▓▓▓ directly with the carrier.

**5.5    Insurance.** At ▓▓▓▓ request, Seller will supply information required by ▓▓▓▓ to either ▓▓▓▓ or its insurance carrier to ensure that ▓▓▓▓ has timely information to effect insurance coverage.

## 6.    TAXES.

**6.1    Taxes Not Included.** All prices are exclusive of applicable federal, state or local sales, use, property, excise or similar taxes levied on Seller as a result of sale or delivery under this Agreement. All those taxes will be assumed and paid by ▓▓▓▓ At Seller's request, ▓▓▓▓ will furnish Seller with any resale certificate or other document of exemption required to exempt a sale from any such taxes. Unless ▓▓▓▓ otherwise notifies Seller, Seller will assume all Products sold to ▓▓▓▓ under this Agreement are purchased by ▓▓▓▓ for resale.

**6.2    Taxes Paid by Seller.** If Seller is required to pay, or at the request of ▓▓▓▓ pays, any taxes assumed by ▓▓▓▓ under Section 6.1, ▓▓▓▓ will reimburse Seller therefor on being invoiced in the exact amount paid by Seller.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY  A2672

7.    SPECIFICATIONS AND OTHER CHANGES.

7.1    Seller Changes.    If Seller makes any amendment to the Specifications which would require a change to ▮▮▮▮▮ related software, including any change in Parts, Seller agrees to meet with ▮▮▮▮▮ to develop a mutually agreeable resolution to the concern. At a minimum, Lexmark would continue to sell and ship to ▮▮▮▮▮ for ninety (90) days the prior version of the Product (prior to the Specification amendment) while ▮▮▮▮▮ exerted reasonable efforts to modify its software.    ▮▮▮▮▮ may propose changes to the Specifications. Seller will consider the feasibility of any such proposal, and will within thirty (30) days after receipt of the proposal furnish to ▮▮▮▮▮ Seller's written comments regarding such proposed changes, including its willingness to implement the same, the price change, if any, and the time schedule required for implementation.    Prior to any amendment becoming effective, all Products shipped by Seller to ▮▮▮▮▮ will conform to the existing Specifications.    All Products with amended Specifications (including changes required by other provisions of this Section 7) will be subject to new inspection, testing and review in accordance with Section 5.6 of this Agreement. After the effective date of any amendment, all Products shipped by Seller will conform to such amended Specifications, except that Seller will continue to make available, for the period specified in Section 3.3, Parts under all previous Specifications (unless change to the Part does not affect its interchangeability with Parts manufactured before such time). Interchangeability includes form, fit and function.

7.2    Engineering Change Documentation.    At its expense, Seller will provide ▮▮▮▮▮ within ten (10) days after issuance by Seller, with a copy of documentation issued at no charge by Seller to its other resellers during the Agreement Term with respect to operation or maintenance of any Product.

7.3    Field Change Orders.    If Seller determines that field changes are necessary as a result of failure of the Products to perform in accordance with the Specifications, Seller will make such changes to all Products to be delivered to ▮▮▮▮▮ thereafter and will either (as mutually agreed): (A) Ship new Products at no additional cost to ▮▮▮▮▮ and bear the cost of all freight shipments and return of out of Specification Products; or (B) Supply retrofit parts at no cost to ▮▮▮▮▮ for all affected Products within their warranty period in the possession of ▮▮▮▮▮ or its customers, if required, along with appropriate installation instructions. Retrofit parts will be supplied to ▮▮▮▮▮ as soon as practicable, but in any event within thirty (30) days (subject to availability) following incorporation of those parts into production units of Products.    Seller will bear ▮▮▮▮▮ labor costs for retrofitting at Seller's established labor reimbursement rate.

8.    SELLER TECHNICAL ASSISTANCE.

8.1    General Obligation.    At no cost to ▮▮▮▮▮ or its customers except as expressly provided below, on ▮▮▮▮▮ request, Seller

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A2673

will provide ▮▮▮▮▮Seller Technical Assistance and information with respect to installation, support and service of Products in such amounts as normally provided to Seller's other resellers in similar circumstances, including (i) initial and supplemental training with respect to the marketing, installation, maintenance and support of all Products (including as to any special tools or test equipment, which may be at a charge); (ii) second-line support to ▮▮▮▮▮customers (via Seller's technical support hot line); and (iii) during warranty (or as described in Section 9) replacement and/or repair of defective Parts. Seller Technical Assistance and information will be provided by technically competent Seller personnel. It is understood that▮▮▮▮▮may, at its option, perform all repairs to Products distributed by it, including any required board level repairs pursuant to the terms of Section 3.5, if any.

8.2  <u>Support Account Manager</u>.  Seller will appoint a support account manager, acceptable to ▮▮▮▮▮in its reasonable discretion, to assist in the resolution of issues arising from Seller Technical Assistance, including on-site visits, if necessary.

8.3  <u>Training</u>.  Seller will provide training in the marketing, installation, support and maintenance of each of the Products to ▮▮▮▮▮marketing, instruction, home and field service and other personnel, as follows:

A.  Initial training classes at ▮▮▮▮▮offices in▮▮▮▮▮ including "train-the-trainer" classes, for no charge and for as many personnel as ▮▮▮▮▮selects, for marketing, home office, field service and other personnel. Classes will be sufficient to train fully in the applicable subject and in any event, consist of all standard and advanced training generally provided by Seller to its other reseller personnel. This training has already occurred for the initial Products, and will be made available to ▮▮▮▮▮ for any new Products.

B.  Training classes, as required by ▮▮▮▮▮, at the rate, as selected by ▮▮▮▮▮ of either: (i) One Hundred Dollars ($100.00) per student per day; or (ii) Five Hundred Dollars ($500.00) per day for unlimited students. Classes will be held at locations where normally conducted by Seller.

▮▮▮▮▮ will have the right to train additional personnel at its cost. Seller will provide ▮▮▮▮▮with all training manuals and courseware (in all formats) that Seller has available from time to time.

8.4  <u>Technical Support</u>.▮▮▮▮▮ will provide first line support to its customers. Seller will provide all second line support via Seller's technical support hot line for Products that ▮▮▮▮▮may reasonably require to install, support, maintain and repair Products; if appropriate, Seller will make a software engineer available as part of this telephone support. Such support will be

lxmrkntr.a2e                    5                    012097

CONFIDENTIAL - OUTSIDE COUNSEL ONLY  A2674

provided to ███████ personnel. Seller's technical support hot line will not initiate communication with any ███████ customer (with Product installed that customer purchased or leased from ███████ without ███████ prior approval. Second line support will be provided: (i) by phone from 10:00 a.m. to 7:00 p.m. Eastern Time Monday through Friday; (ii) on-site at ███████ customers as mutually agreed by ███████ and Seller; (iii) on-line through any Seller electronic bulletin boards, service reports, electronic data lines or training services; and (iv) otherwise at mutually agreed times and locations.

8.5 ███████ Seller Joint Responsibilities. Once each calendar quarter, representatives of Seller and ███████ will meet in person to consult on, review, discuss and resolve service, quality, administrative, training, installation, marketing, technical development, product plans and programs and priorities for marketing the Products.

9.   OUT-OF-WARRANTY REPAIR. Seller will repair any out-of-warranty Products which ███████ elects to have repaired by it and which are repairable. Seller will update all repaired Products to the latest engineering change, if requested and paid for (if applicable) by ███████ or its customer, which has been approved by ███████ for distribution to its customers. The prices to ███████ for repair are the then current prices as referenced in Seller's then current price list. Seller warrants all repair work on the terms and conditions of Section 10. The foregoing provisions will not restrict ███████ from otherwise repairing or having Products repaired at ███████ expense, and Seller acknowledges that ███████ license under Section 12 extends to such repairs.

10.   WARRANTIES AND LIABILITY.

10.1 General Warranties. Seller warrants that each Product will conform to the Specifications and will comply with the "Warranty" and "Extent of Warranty" sections of Seller's Statement of Limited Warranty, a copy of which is attached hereto as Schedule 5.

10.2 Warranty Repairs. For Products shipped to ███████ after March 1, 1996, Seller agrees to provide ███████ parts and labor reimbursement for all warranty repairs performed by ███████ for a period of one (1) year for each Product commencing with the date of installation, as provided in the Service Support Guide. For Products shipped to ███████ on or prior to March 1, 1996, Seller agrees to provide ███████ parts only reimbursement for all warranty repairs performed by ███████ (and no labor reimbursement) for a period of two (2) years for each Product commencing with the date of installation.

10.3 Agency Requirements. Seller warrants that all Products will comply with all regulations and rules of the certification organizations specified in Schedule 6 (the "Certification Organizations") and all applicable federal, state and other

CONFIDENTIAL - OUTSIDE COUNSEL ONLY   A2675


a version is superseded). Seller will be responsible for copying and distribution costs associated with any Updates which are required due to any breach of any warranty contained herein or any other provision of this Agreement or which results from any safety hazard, design defect or failure to comply with any law or rule of any Certification Organization. ███████will bear the costs of copying and distribution of all other Updates.

13. <u>DOCUMENTATION</u>.

13.1 <u>Documentation</u>.   At its expense (unless Seller's general practice is to charge other resellers), Seller will furnish promptly after execution of this Agreement and thereafter during the Agreement Term as it becomes available, the following documentation, including on-line versions if available: (A) complete adjustment, operation and installation specifications; (B) service test procedures and a list of any special tools and service test equipment needed to repair the Products; (C) part numbers and descriptions for all lubricants and adhesives; (D) service, training, maintenance and operator's manuals; (E) all documentation provided to any end-user of a Product; and (F) any other documentation concerning the operation and maintenance of Products provided to Seller's other resellers. All documentation will be: (X) of the type generally made available to Seller's customers and/or resellers, as applicable; (Y) in a form capable of reproduction; and (Z) updated by new documentation from time-to-time promptly as it becomes available. ███████ will have the right to copy, modify, and use and have copied, modified, and used, all documentation for providing manuals or other documents about Products, provided that any Seller copyrights therein are appropriately safeguarded and provided that such copies are used solely in support of the sale and repair of Products purchased from Seller. ███████may copyright any manuals or other documents developed by ██████ even if constituting derivative works, provided that Seller's copyrights therein are appropriately safeguarded.

In addition, Seller will furnish the same documentation (and in the same manner) it makes available to other board level repair vendors of the same boards (only if and when ██████has qualified for repair rights under Section 3.5 of this Agreement).

13.2 <u>Published Documentation</u>.   Unless otherwise directed by ██████ Seller will include with each Product purchased a complete set of documentation relating to its operation as is customarily supplied to end users.

14. <u>CONFIDENTIALITY</u>.

14.1 <u>Non-Use and Non-Disclosure</u>.   Except as permitted by this Agreement or any other confidential information agreement between the parties, neither party will use the Confidential Information of the other.   Each party will use reasonable efforts, to the extent it does for its own proprietary and confidential information of

CONFIDENTIAL - OUTSIDE COUNSEL ONLY  A2677

like nature, to prevent any Confidential Information of the other party from being disclosed to third parties. Confidential Information will mean a party's proprietary and confidential information which it discloses to the other party in written form marked "CONFIDENTIAL" or the like. Each party acknowledges that all information concerning the other party, its business plans, trade secrets, customers and suppliers (including names, addresses, Product purchases), will be deemed Confidential Information of the other party, whether or not marked "CONFIDENTIAL", and will not be used by such party except in the performance of its obligations under this Agreement.

14.2 No Obligation. Section 14.1 will not apply to any information which: (A) is or becomes public knowledge through no wrongful act of the receiving party; (B) is already known to the receiving party; (C) is rightfully obtained by the receiving party from any third party without similar restriction and without breach of any obligation owed to the disclosing party; (D) is independently developed by the receiving party; (E) is furnished to a third party by the disclosing party without a similar restriction on the third party's rights; (F) is disclosed pursuant to a lawful requirement or request of a governmental agency; (G) is incorporated in a machine or apparatus (including a Product) which has been placed on sale or is otherwise disclosed to the extent necessary to fulfill the business obligations of the receiving party to customers who are purchasers or lessees of the Product; or (H) is approved for release by written authorization of the disclosing party.

In addition, notwithstanding any provision in this Section 14, either party shall be free to use the residuals of such confidential information for any purpose. Residuals shall mean information, ideas, and concepts in non-tangible form which may be retained by a recipient.

14.3 Third Party Contractors. Despite the restrictions of Section 14.1, ███████ will be entitled to provide Confidential Information of Seller to third party contractors of ████████ who have executed a written obligation of confidentiality conforming to this Section 14.

14.4 Existence of Agreement. In addition to their respective obligations under Section 14.1, neither party will disclose the existence of this Agreement or any terms thereof, without the prior written consent of the other party, and then only in strict compliance with the terms and conditions of the consent.

15. TRADEMARKS.

15.1 Seller's Trademarks. Any Product purchased from Seller under this Agreement may be marketed at ████████ option under any ████████ trademark or product name selected by ██████ (so long as it is not confusingly similar to a Lexmark or IBM trademark), either alone or with Seller's trademarks for the Product. A Product may be referred to by ████████ at its option as ████████

lxmrxntr.a2e                    9                    012097

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A2678

product, as Seller's product or as the product of both parties.
During the Agreement Term and for such time as ████████ continues
to sell Products in its inventory, ████████ may publicly indicate
that it is Seller's distributor for Products in advertising and
promoting the sale of Products. ████████ may display and provide:
(A) advertising or promotional materials furnished by Seller, and
(B) with the prior written approval of Seller (not to be
unreasonably withheld), advertising and promotional materials of
████████ creation using Seller's trade name, trademark, service
mark or logo for Products. At ████████ request and upon agreement
by Seller, including agreement on any additional charge for doing
so, Seller will place ████████ trademark or product name selected
by ████████ on the outer surfaces of the Products. ████████ will
provide Seller with instructions as to the design, manner and
layout in which such marks or names should be attached. To the
extent not in conflict, Section 20.0 of Schedule 7 shall also
apply.

    15.2 Reynolds' Trademarks. Seller will not use ████████ name
or any of its trademarks, service marks, trade names or logos,
except with the express prior written consent of ████████ to the
specific use.

16.  ABSENCE OF RESTRICTIONS. ████████ is not restricted as to its
sale or use of Products purchased hereunder, including marketing in
the United States and (except as provided below) Canada to any end
user or remarketers (so long as any such non-affiliated remarketer
is approved as a "Dealer Associate" by Seller in accordance with
Seller's Authorized Dealer Agreement, as it may exist from time to
time, and use by ████████ for the benefit of others. Regarding
████████ selling products in Canada, Seller encourages ████████ to
purchase such Products from Seller's Canadian distributors or from
Lexmark Canada. If this becomes unacceptable to Reynolds, then
such Products can be purchased under this Agreement (for sale in
Canada) at pricing equivalent to dealer pricing for such Products
in Canada. ████████ agrees to track and notify Seller of such
sales made in Canada. Neither this Agreement nor Seller's
responsibilities hereunder will be construed as preventing ████████
from acquiring, marketing, distributing or supporting at any time
products or parts similar or related to, or competitive with, the
Products from any other source, including purchase from any third
party vendors (including suppliers of Seller) or manufacture by
████████ or on its behalf by third parties, or as placing any
limitations on any of the foregoing activities.

17.  TERM AND TERMINATION.

17.1 Agreement Term. The term of this Agreement will continue for
a period of seven (7) years from its effective date, unless notice
of termination for any reason or no reason is given by one party to
the other at any time (and such termination will become effective
one hundred and eighty (180) days after receipt of such notice,
unless earlier terminated under any other provision hereof (the
"Agreement Term"). It will be automatically renewed for successive

lxmrkntr.a2e                    10                         012097

CONFIDENTIAL - OUTSIDE COUNSEL ONLY  A2679

one (1) year periods thereafter unless it has been or is terminated as provided in this Agreement.

17.2 Prior Orders.  The terms of this Agreement, other than Section 3.5 and the pricing provisions, will apply to all Orders placed prior to the date of this Agreement.

17.3 Termination for Default.  A party will be in default under this Agreement if it fails to perform any non-curable obligation hereunder or fails to perform any curable obligation and does not effectuate a cure within thirty (30) days after written notice of such failure from the other party.  A party may terminate this Agreement on written notice if the other party is in default hereunder.  The foregoing will not limit a party's right to any other form of remedy, including damages and specific performance, if a party fails to perform any obligation when due, with or without notice or a right to cure.

17.4 Termination for Other Reasons.  This Agreement will terminate immediately, at the option of one party by notice to the other party, if the other party: (A) ceases to carry on its business; (B) becomes the subject of any proceedings under state or federal law for the relief of debtors or otherwise becomes insolvent, bankrupt, or makes an assignment for the benefit of creditors; (C) has a receiver appointed for it; or (D) is reorganized for the benefit of creditors.  This Agreement will terminate at ███████ option as otherwise provided in this Agreement.

18.  RIGHTS AFTER TERMINATION.

18.1 Other Remedies; Survival.  Termination of this Agreement will not prejudice recovery by a party of any amount due at the time of termination or any other rights or remedies otherwise available under this Agreement, at law or in equity.  On termination, all obligations which are intended to survive termination will continue.  If a specific survival period is stated for an obligation, that obligation will survive only for the stated period.

18.2 Completed Products.  On termination of this Agreement, Seller will, at ███████ option, sell and deliver to ███████ completed Products in Seller's possession on all of the terms of this Agreement, including price and delivery if ███████ had previously ordered those specific Products.  Seller may at its option require payment in advance for such Products.

18.3 Orders Canceled.  On termination of this Agreement for any reason, all outstanding Orders previously issued under this Agreement will, at ███████ sole option, be canceled without penalty or cost, despite any firm order period, cancellation

CONFIDENTIAL - OUTSIDE COUNSEL ONLY   A2680

penalty or maximum cancellation requirement stated under this Agreement.

18.4 <u>Continuation of Rights</u>.    Upon any termination of this Agreement for any reason, ████ will, in addition to any other rights which survive this Agreement by its terms (including license rights under Section 12.4): (A) for an additional period terminating five (5) years following the termination of this Agreement, or the earlier withdrawal from marketing of a Product, have the following rights: (i) the right to purchase Parts for all Products sold by ████ at the then current Seller Parts prices to its resellers; (ii) the right to continue to receive Seller out of warranty repair as set forth in Section 9 and Seller Technical Assistance as provided in Section 8; and (iii) the right to receive and redistribute Updates as provided during the Agreement Term on the prices and on the terms applicable during the Agreement Term.

18.5 <u>Post-Termination Customer Support Obligations</u>.    On any termination of this Agreement for any reason, if requested by ████ Seller will, for all periods in which it provides support, repair and maintenance services to other customers of a Product, provide customers who purchase Products from ████ with such support and services to the extent Seller provides such items to, and on terms and at prices as Seller may from time to time apply to, comparable customers.

19. <u>ASSIGNMENT</u>.    Neither this Agreement, nor any right or obligation hereunder, may be assigned or delegated by either party without the prior written consent of the other party, and any attempted assignment or delegation not in conformity with this Section will be null and void, except that either party may assign this Agreement to a successor in ownership of all or substantially all of its assets without the approval of the other party, so long as the successor assumes all of the rights and duties under this Agreement.    In addition, either party may assign its rights to receive payments under this Agreement to a third party without the approval of the other party.

20. <u>NEW TECHNOLOGY OR PRODUCT</u>. If Seller acquires or develops a type of product like a  Product, or that performs a similar function, or would obsolete the Product due to a new technology, Seller will give ████ written notice as soon as the new Product is announced, or earlier if practicable, and in any event at least ninety (90) days before the first sale by Seller or a distributor of Seller to an end user, and as soon as practicable furnish to ████ the specifications and other pertinent description and, at the request of ████ arrange for an engineering evaluation unit of such product to be sent to ████ upon it becoming available. At its option, ████ may elect to add or substitute such new product (a "New Product") for the Product at a price mutually agreeable between the parties.  Such New Product will thereafter be considered a Product under the terms and conditions of this Agreement as if initially included hereunder. If ████ elects, the original Product will also remain a Product if Seller continues

lxmrkntr.a2e                    12                    012097

CONFIDENTIAL - OUTSIDE COUNSEL ONLY  A2681

to make such Product generally available. The Specifications for the New Product will automatically become Specifications under this Agreement. Prices for any New Product will be provided pursuant to the terms of Section 4 of this Agreement.

## 21. MISCELLANEOUS.

21.1 Notices and Communications. Except as otherwise specifically provided herein, any notice required or permitted to be sent by this Agreement will be in writing and will be (a) delivered by hand, (b) sent by fax (if the receiving machine confirms receipt through answerback and the sending machine prints a paper copy of the answerback message), or (c) mailed by registered, certified mail or other pre-paid, receipted delivery service, return receipt requested, to the address or fax number provided by this Agreement. Complying notices will be effective: (w) when delivered by hand; (x) when sent by fax, (y) three (3) business days after deposited in the mail with proper postage prepaid, or (z) one (1) business day after deposited with the delivery service. Notices will be addressed as follows or as from time to time directed in writing by either party by notice given hereunder:

To 

-with 1st class mail copy to-



To Seller:
    Lexmark International Incorporated
    740 New Circle Road
    Lexington, Kentucky 40511
    Attn: Legal Department

21.2 Excused Performance. Neither party will be liable for delays in or failure of performance required under this Agreement when such delay or failure is due to acts of God, acts of civil or military authority, fire, flood, strikes, war, epidemics, shortage of power or components, or other cause beyond such party's reasonable control and without its fault or negligence, provided such party: (A) uses commercially reasonable efforts to promptly notify the other in advance of conditions which may result in any such delay in or failure of performance; (B) uses commercially reasonable efforts to avoid or remove such conditions; and (C) immediately continues performance when such conditions are removed.

lxmrkntr.a2e                    13                    012097

CONFIDENTIAL - OUTSIDE COUNSEL ONLY  A2682

937 485 2984    P.17/23

21.3 <u>Curtailed Production</u>. If Seller's overall production of Products is curtailed for any reason, Seller will ship ▮▮▮▮▮ a percentage of its orders for Products at least equal to that shipped for similar products to any other customer. If Seller fails to ship an equal percentage, ▮▮▮▮▮ may treat it as non-curable default, immediately entitlin ▮▮▮▮▮ to terminate this Agreement.

21.4 <u>Integration</u>. This Agreement and the Schedules and Exhibits attached hereto constitute the entire agreement of the parties and supersede any other agreement or understanding, written or oral, that may have been made or entered into with regard to the subject matter hereof by Seller or ▮▮▮▮▮ The Schedules and Exhibits attached hereto are a material part of this Agreement and are incorporated herein by this reference as if fully written in this Agreement. A modified copy of Seller's standard Authorized Dealer Agreement is attached to this Agreement as Schedule 7, for purposes of clarifying specific parameters of this relationship; in the event of any inconsistency between the terms contained in this Agreement, including Schedules 1 through 6, and such modified Authorized Dealer Agreement, this Agreement and Schedules 1 through 6 shall govern. No provision of any purchase order from ▮▮▮▮▮ or confirmation by Seller will be effective to modify any terms of any Order or this Agreement.

21.5 <u>Modification</u>. This Agreement may not be altered, amended or modified, except by formal agreement in writing signed by duly authorized representatives of both parties, except as expressly provided herein.

21.6 <u>Waiver or Delay</u>. Any waiver or delay in the exercise by a party of its right to terminate or enforce any provision of this Agreement for any breach by the other party will not prejudice such party's right of termination or enforcement for such breach or any further, continuing or other breach by the other party.

21.7 <u>Severability</u>. If any provision of this Agreement is, for any reason, held unenforceable or invalid in any respect under the laws of any jurisdiction where enforcement is sought, the invalidity or unenforceability will not affect: (i) any other provision of this Agreement and this Agreement will be construed as if such unenforceable or invalid provision were not contained herein; and (ii) enforcement or validity of such provision in any other jurisdiction.

21.8 <u>Governing Law</u>. This Agreement will be construed and enforced in accordance with the laws of Ohio as applied to contracts entered into in and performed in Ohio between Ohio residents.

21.9 <u>Headings</u>. The Section headings of this Agreement are for convenience only and will neither be considered a part of, nor affect the construction or interpretation of, any provision of this Agreement.

lxmrkntr.a2e                    14                    012097

CONFIDENTIAL - OUTSIDE COUNSEL ONLY  A2683

937 485 2984   P.18/23

21.10   **Toxic Materials**.  The Products covered by this Agreement will not contain Polychlorinated Biphenyl (PCB) or Cadmium and will otherwise comply with any applicable rule, regulation, statute, ordinance or court ruling relating to toxic or hazardous materials.

21.11   **Compliance with Laws**.  Seller will comply, in the performance of this Agreement, with all applicable federal, state, local and other governmental laws and regulations.

21.12   **Miscellaneous Warranties**.  Seller and ████████ represent and warrant to each other that each has the right and power to enter into this Agreement.

21.13   **Relationship**.  The relationship of Seller and ████████ established by this Agreement is and at all times will remain one of independent contractors and neither party will at any time or in any way represent itself as being an agent or other representative of the other party or as having authority to assume or create obligations or otherwise act in any manner on behalf of the other party.

21.14   **Arbitration**.  If any dispute occurs between the parties arising out of or related to this Agreement or its negotiation, execution or performance, whether such dispute is in contract, tort or otherwise, and including disputes as to whether a dispute is subject to arbitration, it will be submitted to arbitration, except that disputes related to intellectual property will be resolved by the parties by negotiation or litigation.  The arbitration will be conducted by one arbitrator under the commercial arbitration rules of the American Arbitration Association then in effect.  The arbitrator will be chosen from a panel of persons with a knowledge of industry practices in the applicable industry and admitted to practice law in at least one state.  The arbitrator may award any remedy consistent with the commercial arbitration rules; the arbitrator will not have the authority to award any punitive, exemplary or other non-compensatory damages, any penalties, or any costs or attorneys' fees relating to any dispute arbitrated or litigated.  The decision and award of the arbitrator will be final and binding and the award given may be entered in any court of competent jurisdiction.  The arbitration will be held and the award deemed made in Ohio.  The parties will be entitled to discovery to the same extent provided for civil actions in the Southern District of the State of Ohio.  The parties agree to be bound by the decision of the arbitrator and judgment upon the award rendered thereby may be entered in any court having jurisdiction within the Southern District of the State of Ohio.  The parties hereby submit to the in personam jurisdiction of the courts of the State of Ohio for all purposes of this Section and any disputes arising under this Agreement.  The Federal Arbitration Act (9 U.S.C. Sections

lxmrkntr.a2e                    15                    012097

CONFIDENTIAL - OUTSIDE COUNSEL ONLY   A2684

this Agreement. The Federal Arbitration Act (9 U.S.C. Sections 1-15, not state law, will govern the arbitrability of all claims and all aspects of any arbitration.

The parties have executed this Agreement effective as of the __ day of _____, 1997.

LEXMARK INTERNATIONAL
INCORPORATED

By _Ken Brooks_____

Title _DSM_____

Date _3/27/97_____

By _____

Title _Vice President, U.S. Channel Sales_

Date _____

lxmrkntr.a2e                   16                    012097

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A2685

### Schedule 1 - DEFINITIONS

The terms below (in singular or plural forms) will have the meanings set forth in this Schedule 1.

"**Actions**" any allegations, claims, suits, arbitrations, actions, or proceedings.

"**Agreement Term**" - has the meaning set forth in Section 17.1.

"**Certification Organization**" - has the meaning set forth in Section 10.3.

"**Confidential Information**" - has the meaning set forth in Section 14.1.

"**Delivery Date**" - the date ███ specifies in the applicable Order for receipt at ███████ or its customer's dock.

"**Lead Time**" - the period between the date of the Order and the Delivery Date for the Products specified in the Order.

"**New Product**" - has the meaning set forth in Section 20.

"**Product**" - Each Product described in the Specifications, including any and all modifications, changes and improvements made to such Product during the Agreement Term. "Product" will also include any "New Product". All references to a Product will be deemed to include all Parts for the Product.

"**Part**" - Any component, subassembly or other module of a Product.

"**Order**" - Any purchase order issued by ████████ under this Agreement.

"**Seller Technical Assistance**" - All assistance required to be and/or actually provided to ███████ by Seller in the installation, support and service of the Product.

"**Services**" - any service, support or maintenance to be provided by Seller to ███████ under this Agreement.

"**Specifications**" - The specifications for the Products attached as Attachment A to this Schedule, including all modifications, amendments or changes thereto.

"**Updates**" - all known bug fixes, patch tapes, problem fixes, updates, releases and the like.

lxmrkntr.a2e                    1                    012097

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A2686

Attachment A to Schedule 1

PRODUCTS AND SPECIFICATIONS

(ATTACHED)

lxmrkntr.a2e                          1                          012097

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A2687

Schedule 3
PRICING AND PAYMENT

1.   PRICING FOR PRODUCTS, PARTS AND SERVICES.   Prices (in U.S.
Dollars) for Products, Parts, and Services are set forth in
Schedule 3-1.   Seller may revise prices from time-to-time in
accordance with Section 7.0 of Schedule 7.

2.   PAYMENT.   The payment terms for all Products purchased under
this Agreement will be net forty-five (45) days from the date of
Reynolds' receipt of invoice (which invoice will not be sent until
the Product is shipped or the service rendered).

3.   FAILURE TO MEET ███████ REQUIREMENTS.   If Seller is unable
for any reason to supply any Products required by an Order, those
Products will be considered to have been purchased from Seller for
determining price when price is based on Product quantity purchased
by ███████

lxmrkntr.a2e                        1                              012097

CONFIDENTIAL - OUTSIDE COUNSEL ONLY   A2688

## AMENDMENT TO PURCHASE AGREEMENT (1997)
## (APA-97)

     This is an Amendment ("Amendment") to the Purchase Agreement dated April 17, 1997 (the "Agreement") by and between Lexmark International, Inc. ("Seller") and the ███████████████████████████, as subsequently amended. This Amendment shall be effective July 1, 2008. The parties acknowledge and agree that all surviving terms and conditions contained in Lexmark Special Incentive Bulletins ("SIBS") dated December 19, 2007 and December 18, 2007 are hereby incorporated into this Amendment and therefore the aforementioned SIBs are superseded in their entirety by this Amendment.

The Agreement is hereby modified as follows:

The parties acknowledge and agree that the first amendment to the Purchase Agreement (dated on or before December 22, 1997) is superseded and replaced by this Amendment.

Section 17.1 of the Agreement is deleted and replaced with the following language: "Agreement Term. This term of this Agreement shall commence on the effective date and continue through August 1, 2011, unless earlier terminated as provided in Section 17.3. It will automatically be renewed for successive one (1) year periods unless either party, at least 90 days before the end of the then current renewal term, sends the other written notice of its intent not to renew.

A new Section, 21.15, is hereby added to the Agreement and states: "During the term of this Agreement, unless an exception listed in Section 21.15.1 applies, ███████████ shall purchase from Seller its entire United States resale requirements for laser printers and toner cartridges (whether new or remanufactured). Lexmark represents and warrants that it will not increase the prices listed in Schedule 1, Attachment A before July 1, 2011.

As mutually agreed on a case by case basis, Seller will pay rebates in mutually agreed amounts in situations where ██████ purchases Products listed in Schedule 1, Attachment A from parties other than Lexmark. Eligibility to receive such rebates for the products specified in Attachment "A" is limited to such product acquired by you, upon Lexmark's mutual agreement, from Lexmark Authorized Distributors under this Amendment for resale to automotive (for example automobile, truck, recreational vehicle, motor sports vehicle, motorcycle and marine vehicle) dealerships and end users in related markets located within the United States and Canada. The rebate will be calculated by taking Lexmark's Supplies Best Dealer Price (the price published by Lexmark to Authorized Dealers and Authorized Distributors who purchase product directly from Lexmark) less the ██████ price of product and subject to the following other terms and conditions:

CONFIDENTIAL - OUTSIDE COUNSEL ONLY   A2689

1. To file for such rebate,█████ agrees to provide Proof of purchase. Proof of purchase is defined as an invoice containing the purchase source, invoice number, invoice date, Lexmark part number and quantity. Invoices must be forwarded, along with the other information indicated on Attachment "B" hereto to:

> Lexmark International, Inc.
> 740 New Circle Rd. NW
> Lexington, KY 40550
> Attn: Supplies Special Bids S42U/200-3
> (Fax) 859-232-2933 or 859-232-5439

Attachment "B" is used to verify █████ rebate credit.

Each request for rebate processing should include a minimum of one (1) month's purchases. Requests for rebates greater than six months old may not be accepted and any claims for such money due are expressly waived.

The rebate will be in the form of a billing credit to the above referenced reseller customer number.

If █████ purchases product (as described above) from parties other than Lexmark, Lexmark will not rebate the margin charged by other party.

A new Section, 21.15.1, is hereby added to the Agreement and states: "Notwithstanding Section 21.15 of this Agreement, █████ may, in conjunction with any sale related to its Power™ automobile dealership management software to a automotive (for example automobile, truck, recreational vehicle, motor sports vehicle, motorcycle and marine vehicle) dealerships and end users in related markets located within the United States and Canada, acquire and re-sell non-Seller laser printers and non-Seller related toner cartridges. In addition, as mutually agreed by Lexmark in advance in writing, █████ may purchase Lexmark branded laser printers and toner cartridges from Lexmark Authorized Distributors.

A new Section, 21.16, is hereby added to the Agreement and states: Upon release of future Lexmark branded or █████ co-branded workgroup laser printer offerings, Lexmark will enter an amendment to this Agreement that adds the following laser printer product offerings to this Agreement at the following price points:  45 ppm mono laser printer -- █████; 50 ppm mono laser printer -- █████ 55 ppm mono laser printer - █████ With regard to such future workgroup laser printer Products, specifications for the processor and memory will be equal to or better than those for equivalent existing workgroup laser printer Products.

A new Section, 21.17, is hereby added to the Agreement and states:  Upon

CONFIDENTIAL - OUTSIDE COUNSEL ONLY   A2690

release of the future Lexmark branded ██████co-branded laser printer offerings described in Section 21.16 of this Agreement, with regard to associated toner cartridges (new and remanufactured), Lexmark will price such future associated toner cartridges at a cost per page (calculated according to the ISO industry yield standard) that is either (at Lexmark's sole and absolute discretion) equal to or more favorable than the cost per page pricing for substantially similar currently available equivalent.

A new Section, 22, titled "Order Credit" is hereby added to the Agreement and states: Commencing July 1, 2008, Lexmark will apply a one-time, ██████ credit against future purchases to the account of ██████ Until such credit is expended, upon receipt of each invoice for Product purchases, ██████ shall be entitled to deduct from each invoice for Products the lesser of: (a) the invoice price, or (b) the amount of credit remaining. Lexmark shall issue responding credit memos until such time as future purchases consume the amount of this credit.

The definition of "Product" contained in Schedule 1 of the Agreement is deleted and now states: "'Product' – the laser printers and toner cartridges listed in Attachment A to Schedule 1 of this Agreement, as well as any "New Products" as described in Section 20.0 of the Agreement. Attachment A to Schedule 1 of the Agreement is hereby deleted and replaced with the "Attachment A to Schedule 1" attached hereto.

A new Section, 23, is hereby added to the Agreement and states: ██████ is responsible to review with automotive (for example automobile, truck, recreational vehicle, motor sports vehicle, motorcycle and marine vehicle) dealerships and end users in related markets located within the United States and Canada the terms covering the purchase of Lexmark Return Program Print Cartridges. This review must include the requirement of returning the empty cartridge back to Lexmark utilizing the prepaid information supplied with each Return Program Print Cartridge. Lexmark and ██████ both understand that some empty cartridges will not be returned, despi██████ best efforts to do so.██████ agrees to return all empty part numbers listed in Attachment "A" that they collect to Lexmark. ██████ will make best commercial efforts to ensure that automotive dealerships comply with the terms of this program and that a minimum of 80% of all cartridges shipped are returned to Lexmark. Should the return requirement fall below 80%, Lexmark may require ██████ o provide an action plan to increase the return rate. Lexmark pays shipping of the cartridge to ██████ Normal Lexmark drop ship rules apply. Lexmark also pays for return of empty cartridges from automotive (for example automobile, truck, recreational vehicle, motor sports vehicle, motorcycle and marine vehicle) dealerships and end users in related markets located within the United States and Canada by means of an enclosed UPS mailing label. Lexmark's Statement of Limited Warranty for Supplies shall apply to this product. The parties acknowledge and agree that Lexmark Announcement Letter

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A2691

LEX00-015 dated February 1, 2000, which contains details on the process for
returning a cartridge for replacement, applies. Should a warranty claim be
necessary, the cartridge on which the warranty claim is to be made must be
returned to Lexmark. The returned cartridge will be analyzed upon receipt by
Lexmark. No replacement or credit will be issued if the product is not found to be
defective. A letter will be sent back to ███████ when no defects are found.

AGREED TO AND ACCEPTED:

LEXMARK INTERNATIONAL, INC.
COMPANY

By: _Shawn Brinsley_          By:

Its: _Vice President, US Channels_   By:

Date: _August 12, 2008_       Dat

CONFIDENTIAL - OUTSIDE COUNSEL ONLY  A2692

ATTACHMENT A TO SCHEDULE 1

**LEXMARK BRANDED NEW**

| Printer | Item # | Type of Cartridge | New Cost |
|---------|--------|-------------------|----------|
| Optra T: | LEX12A5845 | Hi-Yld (25K) | |
| Optra T: | LEX12A5840 | Lo-Yld (10K) | |
| Optra T: | 12A6835 | 20K | |
| Optra S: | LEX1382925 | Hi-Yld (17.6K) | |
| Optra S: | LEX1382920 | Lo-Yld (7.5K) | |
| Optra R: | LEX1382150 | Hi-Yld (14K) | |
| Optra R: | 1382100 | 7K | |
| T620 | LEX12A6865 | Hi-Yld (30K) | |
| T620n | LEX12A6860 | Lo-Yld (10K) | |
| Optra SE | LEX12A0825 | Hi-Yld (23K) | |
| T632 | LEX12A7465 | Extra Hi-Yld (32K) | |
| T632 | LEX12A7462 | Hi Yld (21K) | |
| T632 | LEX12A7460 | Lo-Yld (5K) | |
| T640/T644 | LEX64015HA | Hi Yld (21K) | |
| T640/T644 | LEX64015SA | Lo-Yld (6K) | |
| T640/T644 | LEX64415XA | Extra Hi-Yld (32K) | |
| X642e | LEXX644A11A | Hi Yld (10K) | |
| C510 | LEX 20K1400 | Cyan Hi-Yld (6.6K) | |
| C510 | LEX 20K1401 | Mag Hi-Yld (6.6K) | |
| C510 | LEX20K1402 | Yellow Hi-Yld (6.6K) | |
| C510 | LEX20K1403 | Black Hi-Yld (10K) | |
| C524 | LEXC5240CH | Cyan Hi-Yld (5K) | |
| C524 | LEXC5240MH | Mag Hi-Yld (5K) | |
| C524 | LEXC5240YH | Yellow Hi-Yld (5K) | |

CONFIDENTIAL - OUTSIDE COUNSEL ONLY  A2693

| C524 | LEXC5240KH | Black Hi-Yld (8K) |

**LEXMARK BRANDED REMANS**

| Printer | Item # | Type of Cartridge |
|---------|--------|-------------------|
| Optra T: | LEX12A5140 | Reman (25K) |
| Optra S: | LEX12A0150 | Reman (17.6K) |
| Optra R: | LEX1382650 | Reman (12.8K) |
| T620 | LEX12A6160 | Reman (30K) |
| T520 | LEX12A3160 | Reman (20K) |
| T632 | LEX12A7610 | Reman (32K) |
| T632 | LEX12A7612 | Reman (21K) |
| T640/T644 | LEX64080HW | Reman (21K) |
| T644 | LEX64480XW | Reman (32K) |

| | |
|--------|-----------------------------------------------|
| 20G2003 | Lexmark T640n Printer |
| 20G2004 | Lexmark T644n Printer (up to 750 units) Lexmark T644 Printer   (751+ units) |
| 11K2256 | 500 Sheet Drawer - T64x |
| 20G0239 | 2000 Sheet Drawer - T64x |
| 20G0241 | Envelope Feeder - T64x |
| 20G0238 | High Output Stacker (1,850) - T64x |
| 20G0237 | RS232 Serial Adapter (T632) - T64x |
| 22G0489 | T644 Duplex Unit (T644/X642e) |
| 16C0369 | Printer Stand / Cabinet |
| 34A0000 | Lexmark C534n Color Laser Printer |
| 34A0004 | Lexmark C534dn DPLX CLR Laser Printer |
| 36B0004 | C53X 550 Sheet Drawer |
| 22G0488 | Lexmark X642e |

*The ████ pricing applies only to the first 750 units purchased.  All other units purchased shall be priced a ███

In the event that the parties as mutually agreed wish to have █████ purchase laser printer accessory items not included in the above listing, Lexmark will honor a discount of 25% percent off its laser printer accessory Best Dealer price. (i.e., the price published to it's resell channel for end users) In the event that the parties as mutually agreed wish to have █████ purchase mono, color, multifunction laser printer products not included in the above listing, Lexmark will offer a price that is equal to or better than its laser printer Best Dealer Price (i.e., the price published by Lexmark to its resell channel for end users)

CONFIDENTIAL - OUTSIDE COUNSEL ONLY   A2694

### Amendment #16 to Purchase Agreement (1997)
#### (APA-97)

This Amendment #16 ("Amendment") amends the Lexmark Private Label Amendment to the Purchase Agreement, dated April 17, 1997 ("the Agreement") as subsequently amended by Amendment To Purchase Agreement (1997) having an effective date of July 1, 2008, by and between Lexmark International, Inc. ("Seller") and ███████████████████████ ████████████ as subsequently amended.

This Amendment is effective as of **April 1, 2013**. All capitalized terms used herein have the same meaning as in the Agreement. Except as modified herein, all terms and conditions of the Agreement, as previously amended, remain in full force and effect. For good and valuable consideration, the receipt and sufficiency which are hereby acknowledged, Seller and ██████ agree as follows:

1. The sentence in Section 1 that reads: 'The Private Label Products ██████ obtains hereunder may only be sold and/or otherwise distributed by ██████ only to automotive (for example automobile, truck, recreational vehicle, motor sports vehicle, motorcycle and marine vehicle) dealerships and end users in related markets located within the United States and Canada;" is being deleted and replaced with the following : 'The Private Label Products ██████ obtains hereunder may be sold and/or otherwise distributed by ██████ to automotive (for example automobile, truck, recreational vehicle, motor sports vehicle, motorcycle and marine vehicle) dealerships, end users in related markets, and to end-users in the senior care segment of the medical industry (e.g. extended care, assisted living, home health, hospice, close-door pharmacies supporting senior care) located within the United States and Canada;"

2. The second paragraph of Section 21.15 is deleted and replaced with the following:

   As mutually agreed on a case by case basis, Seller will pay rebates in mutually agreed amounts in situations where ██████ purchases Products listed in Schedule 1, Attachment A from parties other than Lexmark. Eligibility to receive such rebates for the products specified in Attachment "A" is limited to such product acquired by you, upon Lexmark's mutual agreement, from Lexmark Authorized Distributors under this Amendment for resale to automotive (for example automobile, truck, recreational vehicle, motor sports vehicle, motorcycle and marine vehicle) dealerships, end users in related markets and to end-users in the senior care segment of the medical industry (e.g., extended care, assisted living, home health, hospice, close-door pharmacies supporting senior care) located within the United States and Canada. The rebate will be calculated by taking Lexmark's Supplies Best Dealer Price (the price published by Lexmark to Authorized Dealers and Authorized Distributors who purchase product directly from Lexmark) less the ██████ price of product and subject to the following other terms and conditions:

3. Section 23 is deleted and replaced with the following:

   ██████████████ is responsible to review with automotive (for example automobile, truck, recreational vehicle, motor sports vehicle, motorcycle and marine vehicle) dealerships, end users in related markets and with end-users in the senior care

*R.D/cr*

CONFIDENTIAL - OUTSIDE COUNSEL ONLY   A2695

segment of the medical industry (e.g., extended care, assisted living, home health, hospice, close-door pharmacies supporting senior care) located within the United States and Canada the terms covering the purchase of Lexmark Return Program Print Cartridges. This review must include the requirement of returning the empty cartridge back to Lexmark utilizing the prepaid information supplied with each Return Program Print Cartridge. Lexmark and ███████████ both understand that some empty cartridges will not be returned, despite ██████████ best efforts to do so. ██████████ agrees to return all empty part numbers listed in Attachment "A" that they collect to Lexmark. ██████████ will make best commercial efforts to ensure that these customers comply with the terms of this program and that a minimum of 80% of all cartridges shipped are returned to Lexmark. Should the return requirement fall below 80%, Lexmark may require ██████████ to provide an action plan to increase the return rate. Lexmark pays shipping of the cartridge to ██████████ Normal Lexmark drop ship rules apply. Lexmark also pays for return of empty cartridges from automotive (for example automobile, truck, recreational vehicle, motor sports vehicle, motorcycle and marine vehicle) dealerships, end users in related markets and for return of empty cartridges from end-users in the senior care segment of the medical industry (e.g., extended care, assisted living, home health, hospice, close-door pharmacies supporting senior care) located within the United States and Canada by means of an enclosed UPS mailing label. Lexmark's Statement of Limited Warranty for Supplies shall apply to this product. The parties acknowledge and agree that Lexmark Announcement Letter LEX00-015 dated February 3, 2000, which contains details on the process for returning a cartridge for replacement, applies. Should a warranty claim be necessary, the cartridge on which the warranty claim is to be made must be returned to Lexmark. The returned cartridge will be analyzed upon receipt by Lexmark. No replacement or credit will be issued if the product is not found to be defective. A letter will be sent back to ██████████ when no defects are found.

4.  This Amendment may be executed in several counterparts, each of which shall be deemed an original and all of which taken together shall constitute one single amendment between the parties hereto.

Except to the extent specifically modified or amended by this Amendment the remainder of the Agreement shall remain unchanged.

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed by their duly authorized representatives.

**Lexmark International, Inc.**

By: _R. Duque_
    (Signature)
Name: _Ricardo Duque_
Title: _Channel Sales & Mktg._
Date: _5/13/13_

2

██████ Amendment #16 April 1  2013

CONFIDENTIAL - OUTSIDE COUNSEL ONLY   A2696

Amendment (#24) to Purchase Agreement (1997)
(APA-97)

This is an amendment ("Amendment") to the Purchase Agreement dated April 17, 1997 (the "Agreement") by and between Lexmark International, Inc. ("Seller") and ███████████████ ████████████████████ s subsequently amended.  This Amendment shall be effective March 15th, 2014.

The Agreement is hereby modified as follows:

The products and prices in the following table shall be added to the existing table of products and prices contained in Attachment A to Schedule 1 of the Agreement.

| Product | Item # | Description | Cost |
|---------|--------|-------------|------|
| C792n | C792X6CG | C792 Cyan Extra HY Return Program Cartridge (20K) | |
| C792n | C792X6MG | C792 Magenta Extra HY Return Program Cartridge (20K | |
| C792n | C792X6YG | C792 Yellow Extra HY Return Program Cartridge (20K) | |

Agreed to and accepted:



Lexmark International, Inc

By: _____
       (signature)

Name: _____

Title: _____

Date: _____

**Lexmark International, Inc.**
an IBM alliance company

## DEALER CONTRACT 11

# AUTHORIZED DEALER AGREEMENT

Name and Address of Dealer:

Agreement No.: **1004946**



Contract Commencement Date: **07/01/91**

Lexmark Office Address:

**1201 W. PEACHTREE ST., N.E 24TH FL
ATLANTA            GA 30367**

Lexmark Office No.: **GT5**

Thank you for selecting Lexmark as a supplier of products, services, and support. Our goal is to be the best in the industry. If at any time you are not completely satisfied, please let us know.

This agreement authorizes you to purchase Products from Lexmark for marketing to End Users only in the United States and Puerto Rico. Lexmark may issue Bulletins under this Agreement which change the terms and conditions of this Agreement. Any Bulletins will become effective on the date Lexmark specifies unless you notify us in writing within 30 days of your receipt of the Bulletin that you do not accept it.

Lexmark may issue administrative, technical and procedural information, announcements, promotions, programs, product and pricing letters and other kinds of notices in writing from time to time. All such notices are effective on the date Lexmark specifies.

## Table of Contents

| | | | |
|---|---|---|---|
| 1.0 | DEFINITIONS | 16.0 | TITLE AND RISK OF LOSS |
| 2.0 | CONTRACT PERIOD | 17.0 | TAXES |
| 3.0 | RELATIONSHIP OF THE PARTIES | 18.0 | STATUS CHANGE |
| 4.0 | MARKETING TO END USERS | 19.0 | TRADEMARKS AND TRADE NAMES |
| 5.0 | DEALER RESPONSIBILITIES | 20.0 | PATENTS AND COPYRIGHTS |
| 6.0 | ORDERS AND CANCELLATIONS | 21.0 | LIMITATION OF REMEDIES |
| 7.0 | PRICES | 22.0 | INDEMNIFICATION |
| 8.0 | PAYMENT | 23.0 | TERMINATION |
| 9.0 | PRICE REDUCTION CREDIT | 24.0 | GENERAL |
| 10.0 | INVENTORY ADJUSTMENTS | 25.0 | DEALER SPECIFIC INFORMATION |
| 11.0 | WARRANTIES | | Aggregator Relationships |
| 12.0 | WARRANTY SERVICE | | Eligible Products |
| 13.0 | MAINTENANCE PARTS | | Minimum Renewal Criteria |
| 14.0 | LICENSED PROGRAMS | | Marketing Coverage Area |
| 15.0 | SECURITY INTEREST | | Authorized Locations |

**PAGES 2 THROUGH 8 ARE ALSO PART OF THIS AGREEMENT.** This Agreement and Bulletins, the Statements of Limited Warranty, and notices are the complete agreement between us, and replace any prior oral or written communications between us. By signing below, each of us agrees to the terms of this Agreement.

Accepted by:
**Lexmark International, Inc.**

By _Kathy J Russo_    _16 Sep 1991_
Authorized Signature

_____    _____
Name (Type or Print)         Date

_____    _____
Name (Type or Print)         Date

LX01-00 (04/01/91)

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A2698

## 1.0 DEFINITIONS

Agreement means this Dealer Agreement, Bulletin(s), applicable Statement(s) of Limited Warranty and notices.

Authorized Location means any of your locations approved by Lexmark in writing for the purposes of your performance under the Agreement.

End User means an unaffiliated party who acquires the Products from you for its own use and not for remarketing.

PLA Programs means licensed programs which Lexmark designates as subject to the Lexmark Program License Agreement (PLA).

Products means machines, licensed programs, and other items you can market under the Agreement.

## 2.0 CONTRACT PERIOD

The Agreement has a single 12 month contract period which commences on the first day of the month following Lexmark's receipt of a signed Agreement, provided it is accepted by Lexmark. The Agreement can be renewed by the parties for subsequent single 12 month contract periods. Unless Lexmark notifies you otherwise, the renewal of the Agreement shall automatically occur unless either party notifies the other of its desire not to renew at least 90 days prior to the contract period expiration date. Either party can elect not to renew the Agreement with or without cause.

## 3.0 RELATIONSHIP OF THE PARTIES

As an independent contractor, you are not Lexmark's legal representative, franchisee, or agent for any purpose.

You will not make any warranties or representations on Lexmark's behalf other than those specified in the Agreement. You will not assume or create any obligations on Lexmark's behalf except as specified in the Agreement.

You will market Products to End Users at such prices and terms and conditions as you determine. Such terms and conditions must not be in conflict with your obligations in the Agreement.

Lexmark reserves the right to market anywhere, including your geographic area, products which are the same as or similar to the Products under the Agreement either directly or through other remarketers.

You reserve the right to market products which are similar or competitive to the Products under the Agreement.

Lexmark may establish annual sales performance objectives for the Products which you are approved to market.

Lexmark may conduct reviews to evaluate your performance and compliance with the provisions of the Agreement.

No information will be given or received in confidence by either party unless it is covered by a separate written agreement.

## 4.0 MARKETING TO END USERS

The Products you market under the Agreement require your high quality individualized pre-sale and post-sale support. This support is necessary to achieve and maintain high End User satisfaction. Your ability to provide this support is a key reason Lexmark selected you as an authorized dealer. You, therefore, will market Products only to End Users. You agree not to market Products to other remarketers, except as agreed to by Lexmark.

Furthermore, in order to ensure End User satisfaction for certain Products, there must be at least one pre-sale face-to-face meeting between you and your prospective End User. Current products requiring such face-to-face meeting are printers and the Personal Typing System.

## 5.0 DEALER RESPONSIBILITIES

You agree to:
1) ensure the Product marketed to the End User is appropriate for the End User's requirements;
2) ensure that the End User is satisfied with all your Product marketing activities, including Product explanation, demonstration, and ongoing support;
3) maintain an End User record for each unit of the Product sold or licensed. End User records are not required for Supplies. An End User record will include the name and address of the End User, the date of the sale or license, the Product Type/Model sold or licensed, and the Product's serial number, if applicable. You must retain the End User record for five years after the date of sale or license. You must assist Lexmark, upon Lexmark's request, in tracing a Product to an End User to distribute Product information or locate a Product for safety reasons;
4) furnish a sales receipt to the End User upon delivery of the Product indicating the date of sale or license and the serial number, if any, of the Product sold or licensed. You must retain a copy of that sales receipt for one year from the date of sale or license. You must indicate on the sales receipt for the Product any non-Lexmark alterations made to the Product;
5) report your sales performance and inventory as requested by Lexmark;
6) install each Product as specified by Lexmark;
7) receive, place in inventory, market, perform warranty service for, and support Products only at your Authorized Location or at your End User's location unless Lexmark specifies otherwise; reference only your Authorized Location in your marketing materials or advertising;
8) advertise Products designated as Supplies prominently in your catalogue;
9) maintain a sufficient inventory of Products to satisfy reasonably foreseeable End User demand;
10) provide floor space and related facilities at your Authorized Location(s) to display and demonstrate the Products;
11) maintain a required number of trained management, sales, support and service personnel;
12) report promptly to Lexmark all suspected and actual Product problems;
13) provide a product business plan as required by Lexmark;
14) notify Lexmark of any discrepancies between the Lexmark shipping manifest and the Products received;
15) maintain good financial standing and provide financial information and evidence of financial security upon request;
16) allow Lexmark or its appointed auditor to audit, during normal business hours, the above required records and receipts.

## 6.0 ORDERS AND CANCELLATIONS

Lexmark will describe specific ordering procedures and forecast requirements, if any, in writing.

Lexmark will fill your orders for Products and meet your request for shipment dates subject to the Product's availability and consistent with Lexmark's production and supply schedules.

You may cancel an order for any Product which Lexmark has not shipped to you. Lexmark may charge you a Cancellation Charge of 2% of the cancelled Product's Dealer price. However, you will not be liable for a Cancellation Charge if Lexmark has postponed shipment of the Product for more than 15 days

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A2699

from its estimated shipment date, and you have cancelled your order for the Product before the Product's shipment. Product, ordered and cancelled the same day will not be assessed a cancellation charge.

Lexmark will charge you a Handling Charge of 5% if you refuse to accept a Product you ordered. You must prepay all transportation charges for return of the Product to Lexmark.

## 7.0 PRICES

Lexmark will specify its Dealer prices in notices and an electronic file. Dealer prices are F.O.B. destination, unless Lexmark specifies otherwise. Lexmark may change its Dealer prices at any time.

A Dealer price increase for a Product is effective on the date specified. However, a Dealer price increase will not apply to a Product for which Lexmark has received an order prior to the day the increase is effective, provided Lexmark accepts such order.

A Dealer price decrease is effective on the date specified and will apply to Products shipped on or after the effective date of the decrease.

A single unit price reflects the prices for single units of Product acquired by End Users directly from Lexmark. A suggested retail price may also be established by Lexmark. Both are subject to change without notice. These prices are for informational purposes only and shall not limit in any way your ability to set your own prices, charges and terms and conditions for Products.

Lexmark may specify any additional fees and allowances in notices. Lexmark may change the fees and allowances at any time. Such changes will become effective on the date Lexmark specifies.

### Printers

Price schedules are based on a single order, with a single shipment to a single location:

Schedule I -- Invoice value under $3,000
Schedule II -- Invoice value of at least $3,000 and printers can be ordered in any quantities
Schedule III -- Invoice value of at least $25,000, and printers must be ordered in full pallet quantities

Printer features may not be included to meet invoice values.

### Typewriters

Price schedules for typewriters are based on a single order, with a single shipment to a single location.

Schedule I -- Invoice value under $7,000
Schedule II -- Invoice value of at least $7,000 and less than $30,000
Schedule III -- Invoice value of at least $30,000

All typewriter models and IBM Personal Typing Systems may be aggregated for purposes of determining invoice value.

Features and Personal Typing System Printers may not be included for purposes of determining invoice value.

### Supplies

Dealer Prices and minimum order quantities are set forth in notices. Each order for supplies for shipment to a single Authorized Location must be for an amount of at least $500.

## 8.0 PAYMENT

You agree to pay Lexmark upon your receipt of an invoice. If you fail to pay, Lexmark may:

1) impose a finance charge on the balance due; and
2) exercise any of its rights provided in the Agreement or by law.

## 9.0 PRICE REDUCTION CREDIT

If Lexmark announces a Dealer price decrease for a Product, you may be eligible to receive a price reduction credit.

### Printers and Typewriters

The price reduction credit equals the credit amount per Product, as specified by Lexmark, multiplied by your existing inventory and Product in transit on the effective date.

In order to qualify for a price reduction credit, you must:

1) provide a report of your inventory of the Product in a format and time frame specified by Lexmark;
2) have provided such report for at least the two prior months;
3) provide access, during normal business hours, to allow Lexmark to audit applicable records and inventory.

### Printer and Typewriter Features and Supplies

The price reduction credit for features and supplies equals the credit amount per item, as specified by Lexmark, multiplied by the quantity shipped directly from Lexmark to you (minus returns from you) in the prior two months.

## 10.0 INVENTORY ADJUSTMENTS

During a contract period, you may return for credit selected Products which you obtained directly from Lexmark. Lexmark will specify which Products are returnable in notices or an electronic file.

Upon receipt and acceptance of a returned Product, Lexmark will issue you a Product credit as determined by Lexmark. You may use such credit only against sums then or thereafter due Lexmark.

You must return all Products to Lexmark, transportation prepaid, in the original shipping containers which must not have been opened, damaged, marked or labeled. The Products must be in marketable condition as determined by Lexmark.

Any prior passage to you of title to Products will be deemed void from its inception when the returned Products are accepted by Lexmark. You warrant and represent that the returned Products are free of any outstanding liens, security interests or other third party encumbrances.

Lexmark may charge a Handling Charge of 5% multiplied by the Dealer price for any returned Product.

You may return these Products only once a month and you must accompany each shipment of returned Products with a "Returns Authorization Form."

For Products being withdrawn from marketing, guidelines or limitations on returns may be contained in the withdrawal notice.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A2700

#### Printers and Typewriters

The maximum number of units of a Product you may return in a given month is equal to the number of units of inventory of such Product you reported for the previous month.

#### Printer and Typewriter Features

The maximum number of features you may return is equal to the number of features shipped to you by Lexmark in the immediately preceding six months less any returns during that period.

#### Supplies

Only two return shipments of supplies are allowed per contract period. The maximum quantity of supplies you may return is equal to the quantity shipped to you by Lexmark in the immediately preceding nine months less any returns during that period.

## 11.0 WARRANTIES

Lexmark will include the applicable Statement of Limited Warranty with machines shipped. Lexmark will provide you a copy of the Statement of Limited Warranty which you are to provide to your End User at the time of sale. Lexmark may revise a Statement of Limited Warranty.

The warranty period will start on the day the End User purchases the Product. You will advise the End User of this start date.

## 12.0 WARRANTY SERVICE

The Service Support Guide is incorporated in the Agreement by reference.

You will:
1) provide warranty service under the terms of the applicable Statement of Limited Warranty and in accordance with the Service Support Guide;
2) validate all warranty claims presented to you; and
3) maintain the capability to provide warranty service according to the requirements and procedures specified in the Service Support Guide.

Lexmark will:
1) provide, at no fee, either service training in a Lexmark designated classroom or self-education materials for the number of service personnel required;
2) provide, as part of service training, selected service materials;
3) make available to you, for a fee, a) service training for additional service personnel, and b) additional service materials; and
4) honor your valid claims for warranty reimbursement for labor (when applicable) and/or credits for parts or exchange of parts as specified in the Service Support Guide.

## 13.0 MAINTENANCE PARTS

Lexmark or IBM will sell you maintenance parts only for providing warranty and maintenance service or for sale to End Users for the sole purpose of maintaining their machines.

## 14.0 LICENSED PROGRAMS

Licensed programs may be made available, as determined by Lexmark, to you to market under the provisions of the Agreement and the PLA or a third party agreement.

You agree to ensure that your End User understands and agrees to the PLA.

You agree to accept return of a PLA program, provided it is in its original, unopened package, and refund the money paid by an End User who does not wish to be bound by the PLA. If the PLA permits the return a PLA program with an accompanying specified Product, you agree to accept the return of the PLA program with the other Product for refund.

## 15.0 SECURITY INTEREST

Lexmark reserves a purchase money security interest in each Product, in your proceeds from the sale of each Product, and in your accounts receivable for such Product. This interest will be satisfied by payment in full.

You agree to sign an appropriate document to permit us to perfect Lexmark's purchase money security interest.

## 16.0 TITLE AND RISK OF LOSS

Title passes to you for each machine on its date of shipment from Lexmark. Title for each copy of a PLA program remains in Lexmark.

Lexmark relieves you of responsibility for all risk of loss of, or damage to, a machine during the period it is in transit from Lexmark up to its initial delivery to you.

## 17.0 TAXES

You agree to pay amounts equal to any taxes resulting from the Agreement or any activities under the Agreement. Such taxes do not include taxes based on Lexmark's net income. You are responsible to bear any personal property taxes assessable on Products on or after delivery to the carrier at the Lexmark ship-from location.

You agree to provide Lexmark with a valid Reseller Exemption Certificate for each taxing jurisdiction to which Products acquired by you for resale will be shipped by Lexmark under the Agreement. If such Certificate(s) is not provided to Lexmark prior to shipment, Lexmark will charge, and you will be required to pay, all applicable state and local taxes.

You agree to notify Lexmark promptly of the revocation or modification of any Reseller Exemption Certificate so provided. You further agree to indemnify and hold Lexmark harmless from any claims and assessments against Lexmark resulting from a refusal by a taxing jurisdiction to recognize any of your Reseller Exemption Certificates.

## 18.0 STATUS CHANGE

To maintain your authorization, you must request Lexmark approval in writing if you anticipate a:

1) sale of your enterprise;
2) transfer of your equity ownership;
3) significant change in your management;
4) merger or acquisition of your enterprise or Authorized Location with or by any other entity;
5) legal name change of your enterprise;
6) relocation of an Authorized Location; or
7) closing of an Authorized Location.

## 19.0 TRADEMARKS AND TRADE NAMES

You may refer to yourself under the Agreement as a Lexmark Authorized Dealer:
1) solely in connection with Products;

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A2701

2) only during the contract period; and
3) only within the United States and Puerto Rico.

Except as provided for in this Section, Lexmark does not grant you the right to use trademarks or trade names. Lexmark grants you the limited permission to use the trademark "Lexmark" or "IBM" solely to identify the Products acquired from Lexmark under the Agreement. You may use the trademarks "Lexmark" or "IBM" only within the United States and Puerto Rico.

At Lexmark's request, you will provide to Lexmark, for review and written approval, promotional, advertising and other materials that:
1) use a Lexmark, International Business Machines Corporation (IBM) or third party trademark or trade name; or
2) refer to you as a "Lexmark Authorized Dealer".

Lexmark will supply advertising guidelines in writing. At Lexmark's request, you agree to change any materials or use of materials which Lexmark determines to be inaccurate, objectionable, misleading or a misuse of Lexmark or IBM trademarks. You will pay the expenses for such change.

The permission granted relative to the Lexmark or IBM trademarks will terminate with the termination or expiration of the Agreement. In such event, for the affected Products, you will immediately:
1) cease referring to yourself as a "Lexmark Authorized Dealer" or other such term that includes the name of the Products, as applicable;
2) cease referring to yourself as approved by Lexmark to provide warranty services; and
3) return to Lexmark or destroy all materials under your control employing such trademarks.

You may retain materials with Lexmark or IBM trademarks which are required to fulfill your warranty service or support obligations on affected Products. You will return these materials to Lexmark or destroy them upon completion of such obligations.

You recognize Lexmark's ownership and title to its trademarks and the goodwill attaching to them. You also recognize IBM's ownership and title to its trademarks and the goodwill attaching to them. You agree that any goodwill which accrues because of your use of the trademarks "Lexmark" or "IBM" will become Lexmark's or IBM's property, respectively. You agree not to contest Lexmark or IBM trademarks or trade names. You agree not to use, employ or attempt to register any trademarks or trade names which are confusingly similar to Lexmark or IBM trademarks or trade names. IBM may revoke immediately, without prior notice, any permission to use IBM trademarks granted to you under the Agreement if IBM determines that you are misusing such IBM trademarks of if you place any IBM trademark on any product in violation of any law or IBM's legal rights.

## 20.0 PATENTS AND COPYRIGHTS

Lexmark will, at its expense, defend you against any claim that any machine acquired under the Agreement infringes a patent or copyright in the United States or Puerto Rico. Lexmark will pay all costs, damages and attorney's fees that a court finally awards as a result of such claim. To qualify for such defense and payment, you must 1) give Lexmark prompt written notice of any such claim, and 2) allow Lexmark to control, and fully cooperate with Lexmark in, the defense and all related settlement negotiations.

You agree that if a machine in your inventory, or the operation of a machine while in your inventory, becomes, or Lexmark believes is likely to become, the subject of such a claim, you

will permit Lexmark, at its option and expense, either to secure the right for you to continue using the machine or to replace or modify it so that it becomes noninfringing. However, if neither of the foregoing alternatives is available on terms which are reasonable in Lexmark's judgment, you will return the machine upon Lexmark's written request. Lexmark will grant you a credit equal to the price paid by you to Lexmark for the returned machine. However, Lexmark may, for selected machines, grant you a credit equal to such price depreciated. The depreciation shall be an equal amount per year over the life of the machines as Lexmark establishes. Lexmark shall have no obligation with respect to any such claim based upon any non-Lexmark modification of machines or their combination, operation or use with apparatus, data or programs not furnished by Lexmark.

This Section states Lexmark's entire obligation to you for machines regarding infringement or the like.

## 21.0 LIMITATION OF REMEDIES

Lexmark's entire liability and your exclusive remedy for any claims are as this Section provides.

Lexmark is not liable for any damages caused by performance or nonperformance of machines or programming located outside the United States and Puerto Rico. In no event will Lexmark be liable for any damages caused by your failure to perform your responsibilities.

Lexmark's entire liability and your exclusive remedy for actual damages from your use of PLA programs are as set forth in the PLA.

Lexmark assumes no liability regarding any claim or action caused by, or directly related to, a non-Lexmark product.

In no event will Lexmark be liable for any lost profits, lost savings, incidental damages, or other consequential damages, even if Lexmark has been advised of the possibility of such damages. Lexmark will not be liable for any damages claimed by you based on any third party claim.

For any claim for any cause whatsoever, other than those provided for in Section 20.0 and the first paragraph of Section 22.0, Lexmark's liability for actual damages will be limited to $100,000.

## 22.0 INDEMNIFICATION

Lexmark will indemnify and hold you harmless from all claims, including reasonable attorney's fees, (but not including lost profits, lost savings, incidental damages, or other consequential damages), for bodily injury or damage to real property or tangible personal property arising from any acts or omissions for which Lexmark is legally liable.

You will indemnify and hold Lexmark harmless from all claims, including reasonable attorney's fees, by any party resulting directly or indirectly from any acts or omissions by you.

## 23.0 TERMINATION

Either party may terminate the Agreement, with or without cause. Lexmark will provide three month written notice to you of such termination, except as otherwise provided in this Section. You must provide one month written notice to Lexmark.

In the event that Lexmark gives you such notice for cause, Lexmark may provide you with an opportunity to cure deficiencies. In such event, Lexmark will establish a reasonable time, not to exceed three months, in which you must remedy such deficiencies.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY   A2702

In addition, Lexmark considers certain actions so serious and inconsistent with your obligations as a Dealer as to warrant immediate termination. Such breaches will include, but not be limited to, situations in which 1) you made material misrepresentations to Lexmark in your application to become a Dealer, at any later time through oral or written statements, or by submission of any false or fraudulent documentation or claim to Lexmark, or 2) you marketed products to other than an End User.

In the event of termination of the Agreement by you or Lexmark, all monies due Lexmark will immediately become due and payable.

If you or Lexmark elects to terminate the Agreement, Lexmark may repurchase some or all of the Products in your inventory at a price determined by Lexmark. In such event, return shipping charges will be paid by you. Products returned must be in the original shipping containers, which must not have been opened, damaged, marked or labeled.

A termination of the Agreement may also be only a partial termination of, for example, an Authorized Location, an eligible Product family, a part of a marketing coverage area, or an Aggregator relationship.

**24.0 GENERAL**

Lexmark's waiver of any instance of your noncompliance with the Agreement will not be deemed a waiver of any future noncompliance.

You may not assign the Agreement or any of its rights or duties without Lexmark's prior written consent.

Lexmark is not responsible for failure to fulfill its obligations under the Agreement due to causes beyond its control.

The Agreement will not be supplemented or modified by any course of dealing or trade usage. Variance from or addition to the terms and conditions of the Agreement in any purchase order or other written notification from you will be of no effect.

The provisions of the Agreement which by their nature extend beyond the termination or expiration of the Agreement will survive and remain in effect until all obligations are satisfied.

Each party agrees to pay the other's reasonable attorney's fees and costs of litigation if the party, for any cause whatsoever, brings suit against the other party and the other party is finally adjudicated not to have liability.

Neither you nor Lexmark will bring an action, regardless of form, arising out of the Agreement more that two years after the cause of action has arisen. In the case of an action for non-payment, the action may not be brought more than two years from the date the last payment was due.

The laws of the State of New York will govern the Agreement.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A2703

## 25.0 DEALER SPECIFIC INFORMATION

### Aggregator Relationships

The provisions of this Section apply to you only if you have been approved in this Section to receive Products from an Aggregator. Lexmark will indicate its approval of you to receive Products from an Aggregator by naming the Aggregator in this Section.

The term "Aggregator" means a business entity, typically a franchisor, which has been approved by Lexmark under a written agreement, to order and receive Products from Lexmark for redistribution to the Aggregator's members of franchisees. Lexmark must approve such members or franchisees as Dealers.

You may elect to obtain Products through your Aggregator. For such products, you waive your rights and Lexmark waives your responsibilities under the following item and Sections of the Agreement;

| 5.0 | DEALER RESPONSIBILITIES - item (14); |
| 6.0 | ORDERS AND CANCELLATIONS; |
| 7.0 | PRICES; |
| 8.0 | PAYMENT; |
| 9.0 | PRICE REDUCTION CREDIT; |
| 10.0 | INVENTORY ADJUSTMENTS; and |
| 17.0 | TAXES. |

Title to machines, shipped to you by your Aggregator, passes from Lexmark directly to you upon shipment from your Aggregator.

Lexmark does not have responsibility for risk of loss of, or damage to, Products shipped to you by your Aggregator.

Machines your Aggregator ships to you will be identified by serial number. Therefore, in addition to the record and audit requirements described in Section 5.0 of the Agreement, you agree that you will maintain a record of each such machine by serial number. You agree that you will maintain that record for 12 months following your receipt of the machine. You must provide such records to Lexmark upon request. In addition, you hereby authorize your Aggregator to release information to Lexmark regarding machines shipped to you.

For Products you order directly from Lexmark, the waivers described in the third paragraph of this section will not apply.

Name and location of your Aggregator:

N/A

### Eligible Products

You are approved to market the following Product families, as specified with a "YES" or identified portions. Specific Products are listed in notices and an electronic file. Specific certification may also be required for certain Products.

| Supplies | Typewriters | Printers | Other (as listed) |
|----------|-------------|----------|-------------------|
| YES | NO | YES | NO |

### Minimum Renewal Criteria

Lexmark may establish Minimum Renewal Criteria (MRC) for a contract period for some or all Products. The MRC designates the minimum level of sales performance expected of you.

| Product | Minimum Renewal Criteria |
|---------|--------------------------|
| PRINTERS | |

CONFIDENTIAL - OUTSIDE COUNSEL ONLY  A2704

**Marketing Coverage Area**

Your approved marketing coverage area(s), listed by Authorized Location, by county and state, is:

**N/A**

**Authorized Locations**

All Authorized Locations must be approved in writing by Lexmark and listed below or on an attachment to this Agreement. Any change in the location or any significant change in the characteristics of your Authorized Locations must be approved by Lexmark.



CONFIDENTIAL - OUTSIDE COUNSEL ONLY  A2705

**Lexmark International, Inc.**
an IBM alliance company

# AUTHORIZED DEALER AGREEMENT

Name and Address of Dealer:

'92 JUL -7 P10 :52

Agreement No.: LWIC074 - 00



PROD. CNTL
DEPT. 63

Contract Commencement Date: **07/01/92**

Lexmark Office Address:

**7900 Xerxes Ave., 3rd Fl
Bloomington        MN 55431**

Lexmark Office No.: **GU4**

Thank you for selecting Lexmark as a supplier of products, services, and support. Our goal is to be the best in the industry. If at any time you are not completely satisfied, please let us know.

This agreement authorizes you to purchase Products from Lexmark International, Inc. (Lexmark) under its terms for marketing to End Users and your internal use only in the United States and Puerto Rico. Lexmark may issue Bulletins under this Agreement which change the terms of this Agreement. Any Bulletins will become effective on the date Lexmark specifies unless you notify us in writing within 30 days of your receipt of the Bulletin that you do not accept it.

Lexmark may issue administrative, technical and procedural information, announcements, promotions, programs, product and pricing letters, product withdrawal letters, and other kinds of notices in writing from time to time. All such notices are effective on the date Lexmark specifies.

## Table of Contents

| | | | |
|---|---|---|---|
| 1.0 | DEFINITIONS | 19.0 | STATUS CHANGE |
| 2.0 | CONTRACT PERIOD | 20.0 | TRADEMARKS AND TRADE NAMES |
| 3.0 | RELATIONSHIP OF THE PARTIES | 21.0 | PATENTS AND COPYRIGHTS |
| 4.0 | MARKETING TO END USERS | 22.0 | LIMITATION OF REMEDIES |
| 5.0 | DEALER RESPONSIBILITIES | 23.0 | INDEMNIFICATION |
| 6.0 | ORDERS AND CANCELLATIONS | 24.0 | TERMINATION |
| 7.0 | PRICES | 25.0 | DEALER ASSOCIATED REMARKETERS |
| 8.0 | PAYMENT | 26.0 | PS/1 PRINTERS |
| 9.0 | PRICE REDUCTION CREDIT | 27.0 | CONFIDENTIAL INFORMATION |
| 10.0 | INVENTORY ADJUSTMENTS | 28.0 | GENERAL |
| 11.0 | WARRANTIES | 29.0 | DEALER SPECIFIC INFORMATION |
| 12.0 | WARRANTY SERVICE | | Aggregator Relationships |
| 13.0 | MAINTENANCE PARTS | | Superstores |
| 14.0 | ENGINEERING CHANGES | | Campus Technology Centers |
| 15.0 | LICENSED PROGRAMS | | Eligible Products |
| 16.0 | SECURITY INTEREST | | Minimum Renewal Criteria |
| 17.0 | TITLE AND RISK OF LOSS | | Marketing Coverage Area |
| 18.0 | TAXES | | Authorized Locations |

**PAGES 2 THROUGH 8 ARE ALSO PART OF THIS AGREEMENT.** This Agreement and Bulletins, the Statements of Limited Warranty, and notices are the complete agreement between us, and replace any prior oral or written communications between us. By signing below, each of us agrees to the terms of this Agreement. Once signed, any reproduction of this Agreement made by reliable means (for example, photocopy or facsimile) is considered an original.

Accepted by:
**Lexmark International, Inc.**

By ~~signature~~

Authorized Signature

Name (Type or Print)   J. D. Brindley   6/30/92

Date

Name (Type or Print)                Date

LX01-04 (06/18/92)

Page 1 of 8

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A2706

## 1.0 DEFINITIONS

Agreement means this Dealer Agreement, Bulletin(s), applicable Statement(s) of Limited Warranty and notices.

Authorized Location means any of your locations approved by Lexmark in writing for the purposes of your performance under the Agreement.

End User means a party who acquires the Products for its own use and not for remarketing.

PLA Programs means licensed programs which Lexmark designates as subject to the Lexmark Program License Agreement (PLA).

Products means machines, licensed programs, and other items you can market under the Agreement.

## 2.0 CONTRACT PERIOD

The Agreement has a single 12 month contract period which, unless noted otherwise on page 1, commences on the first day of the month following the date of your signature on page 1, provided it is accepted by Lexmark. The Agreement can be renewed by the parties for subsequent single 12 month contract periods. Unless Lexmark notifies you otherwise, the renewal of the Agreement shall automatically occur unless either party notifies the other of its desire not to renew at least 90 days prior to the contract period expiration date. Either party can elect not to renew the Agreement with or without cause.

## 3.0 RELATIONSHIP OF THE PARTIES

As an independent contractor, you are not Lexmark's legal representative, franchisee, or agent for any purpose.

You will not make any warranties or representations on Lexmark's behalf other than those specified in the Agreement. Neither party will assume or create any obligations on the other's behalf except as specified in the Agreement.

You will market Products to End Users at such prices and terms and conditions as you determine. Such terms and conditions must not be in conflict with your obligations in the Agreement.

Lexmark reserves the right to market anywhere, including your geographic area, products which are the same as or similar to the Products under the Agreement either directly or through other remarketers.

You reserve the right to market products which are similar or competitive to the Products under the Agreement.

Lexmark may establish annual sales performance objectives, which modify the Minimum Renewal Criteria, for the Products you are approved to market. Lexmark reserves the right to revise the objectives at any time. Lexmark's assessment of your overall compliance with the provisions of the Agreement will include a review of your attainment of these sales performance objectives.

Lexmark may conduct periodic reviews to evaluate your performance and compliance with the provisions of the Agreement.

## 4.0 MARKETING TO END USERS

The Products you market under the Agreement require your high quality individualized pre-sale and post-sale support. This support is necessary to achieve and maintain high End User satisfaction. Your ability to provide this support is a key reason Lexmark selected you as an authorized dealer. You, therefore, will market Products only to End Users. You agree not to market Products to other remarketers, except as agreed to by Lexmark.

## 5.0 DEALER RESPONSIBILITIES

You agree to:
1) ensure the Product marketed to the End User is appropriate for the End User's requirements;
2) ensure that the End User is satisfied with all your Product marketing activities, including Product explanation, demonstration, and ongoing support;
3) maintain an End User record for each unit of Product sold or licensed. End User records are not required for Supplies. An End User record will include the name and address of the End User, the date of the sale or license, the Product Type/Model sold or licensed, and the Product's serial number, if applicable. You must retain the End User record for all Products that contain a video display for at least five years after the date of sale, and shall retain End User Records for all other Products, excluding Supplies, for the longest period of time that you customarily retain such records. You must assist Lexmark, upon Lexmark's request, in tracing a Product to an End User to distribute Product information or locate a Product for safety reasons;
4) furnish a sales receipt to the End User upon delivery of the Product indicating the date of sale or license and the serial number, if any, of the Product sold or licensed. You must retain a copy of that sales receipt for one year from the date of sale or license. You must indicate on the sales receipt for the Product any non-Lexmark alterations made to the Product;
5) report your sales performance and inventory as requested by Lexmark;
6) market, generate demand for, perform warranty service for, and support Products only at your Authorized Location or at your End User's location; receive and inventory Products only at your Authorized Location unless Lexmark specifies otherwise; and reference only your Authorized Location in your marketing materials or advertising;
7) maintain a sufficient inventory of Products to satisfy reasonably foreseeable End User demand;
8) provide floor space and related facilities at your Authorized Location(s) to display and demonstrate the Products;
9) maintain trained management, sales, support and service personnel;
10) report promptly to Lexmark all suspected and actual Product problems;
11) provide a product business plan as required by Lexmark;
12) notify Lexmark of any discrepancies between the Lexmark shipping manifest and the Products received;
13) maintain good financial standing and provide financial information and evidence of financial security upon request;
14) allow Lexmark or its appointed auditor to audit, during normal business hours, the above required records and receipts.

## 6.0 ORDERS AND CANCELLATIONS

Lexmark will describe specific ordering procedures and forecast requirements, if any, in writing.

Lexmark will fill your orders for Products and meet your request for shipment dates subject to the Product's availability and consistent with Lexmark's production and supply schedules.

You may cancel an order for any Product which Lexmark has not shipped to you. Lexmark may charge you a Cancellation Charge of 2% of the cancelled Product's Dealer price if the cancellation was requested by you after the Product was released for shipment by Lexmark. A Product is generally released for shipment one or two days before it ships. However, you will not be liable for a Cancellation Charge if Lexmark has postponed shipment of the Product for more than 15 days from its estimated shipment date, and you have cancelled your order for the Product before the Product's shipment.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A2707

Lexmark will charge you a Handling Charge of 5% if you refuse to accept a Product you ordered. You must prepay all transportation charges for return of the Product to Lexmark.

## 7.0 PRICES

Lexmark will specify its Dealer prices in notices and an electronic file. Dealer prices are F.O.B. destination, unless Lexmark specifies otherwise. Lexmark may change its Dealer prices at any time.

A Dealer price increase for a Product is effective on the date specified. However, a Dealer price increase will not apply to a Product for which Lexmark has received an order prior to the day the increase is effective, provided Lexmark accepts such order.

A Dealer price decrease is effective on the date specified and will apply to Products shipped on or after the effective date of the decrease.

A single unit price reflects the price for single units of Product acquired by End Users directly from Lexmark. A suggested retail price may also be established by Lexmark. Both are subject to change without notice. These prices are for informational purposes only and shall not limit in any way your ability to set your own prices, charges and terms and conditions for Products.

Lexmark may specify any additional fees and allowances in notices. Lexmark may change the fees and allowances at any time. Such changes will become effective on the date Lexmark specifies.

### Printers

Price schedules are based on your annual revenue commitment for printers and printer features.

| Schedule | Annual Revenue Commitment |
|----------|---------------------------|
| I | Less than $1 million |
| II | $1 - $3 million |
| III | Greater than $3 million |

You may be put on a different price schedule based on actual performance. Lexmark will notify you in writing prior to a change in your price schedule.

Each order is required to have a single ship-to address. Printer orders for less than $5,000 will be assessed a $30 order charge. This minimum order charge only applies to printers. Printer features are not subject to a minimum order charge, but may be aggregated with printers to meet the $5,000 printer order value.

### Typewriters

Price schedules for typewriters are based on a single order, with a single shipment to a single location unless Lexmark specifies otherwise.

| Schedule I | -- Invoice value under $10,000 |
| Schedule II | -- Invoice value of at least $10,000 and less than $25,000 |
| Schedule III | -- Invoice value of at least $25,000 |

All typewriter models and IBM Personal Typing Systems may be aggregated for purposes of determining invoice value.

Features and Personal Typing System Printers may not be included for purposes of determining invoice value.

### Supplies

Dealer Prices and minimum order quantities are set forth in notices. Each order for supplies for shipment to a single Authorized Location must be for an amount of at least $500.

## 8.0 PAYMENT

You agree to pay Lexmark upon your receipt of an invoice. If you fail to pay, Lexmark may:
1) impose a finance charge on the balance due; and
2) exercise any of its rights provided in the Agreement or by law.

## 9.0 PRICE REDUCTION CREDIT

If Lexmark announces a Dealer price decrease for a Product, you may be eligible to receive a price reduction credit.

### Printers and Typewriters

The price reduction credit equals the credit amount per Product, as specified by Lexmark, multiplied by your existing inventory and Product in transit to you from Lexmark on the effective date.

In order to qualify for a price reduction credit, you must:
1) provide a report of your inventory of the Product in a format and time frame specified by Lexmark;
2) have provided such report for at least the two prior months;
3) provide access, during normal business hours, to allow Lexmark to audit applicable records and inventory.

### Printer and Typewriter Features and Supplies

The price reduction credit for features and supplies equals the credit amount per item, as specified by Lexmark, multiplied by the quantity shipped directly from Lexmark to you (minus returns from you) in the prior two months.

## 10.0 INVENTORY ADJUSTMENTS

During a contract period, you may return for credit selected Products which you obtained directly from Lexmark. Lexmark will specify which Products are returnable in notices or an electronic file.

Upon receipt and acceptance of a returned Product, Lexmark will issue you a Product credit as determined by Lexmark. You may use such credit only against sums then or thereafter due Lexmark.

You must return all Products to Lexmark, transportation prepaid, in the original shipping containers which must not have been opened, damaged, marked or labeled. The Products must be in marketable condition as determined by Lexmark.

Any prior passage to you of title to Products will be deemed void from its inception when the returned Products are accepted by Lexmark. You warrant and represent that the returned Products are free of any outstanding liens, security interests or other third party encumbrances.

Lexmark may charge a handling charge of 5% multiplied by the Dealer price for any returned Product.

You may return these Products only once a month and you must accompany each shipment of returned Products with documentation specified by Lexmark.

For Products being withdrawn from marketing, guidelines or limitations on returns may be contained in the withdrawal notice.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A2708

Printers and Typewriters

The maximum number of units of a Product you may return in a given month is equal to the number of units of inventory of such Product you reported for the previous month.

**Printer and Typewriter Features**

The maximum number of features you may return is equal to the number of features shipped to you by Lexmark in the immediately preceding six months less any returns during that period.

**Supplies**

Only two return shipments of supplies are allowed per contract period. The maximum quantity of supplies you may return is equal to the quantity shipped to you by Lexmark in the immediately preceding nine months less any returns during that period.

## 11.0 WARRANTIES

Lexmark will include the applicable Statement of Limited Warranty with machines shipped. Lexmark will provide you a copy of the Statement of Limited Warranty which you are to provide to your End User at the time of sale. Lexmark may revise a Statement of Limited Warranty.

The warranty period will start on the day the End User purchases the Product. You will advise the End User of this start date.

## 12.0 WARRANTY SERVICE

The Service Support Guide is incorporated in the Agreement by reference.

Unless Lexmark specifies otherwise, you will:
1) provide warranty service under the terms of the applicable Statement of Limited Warranty and in accordance with the Service Support Guide;
2) validate all warranty claims presented to you; and
3) maintain the capability to provide warranty service according to the requirements and procedures specified in the Service Support Guide.

Lexmark will:
1) provide, at no fee, either service training in a Lexmark designated classroom or self-education materials for the number of service personnel required;
2) provide, as part of service training, selected service materials;
3) make available to you, for a fee, a) service training for additional service personnel, and b) additional service materials; and
4) honor your valid claims for warranty reimbursement for labor (when applicable) and/or credits for parts or exchange of parts as specified in the Service Support Guide.

## 13.0 MAINTENANCE PARTS

Lexmark or IBM will sell you maintenance parts only for providing warranty and maintenance service or for sale to End Users for the sole purpose of maintaining their machines.

## 14.0 ENGINEERING CHANGES

During the Warranty Period, any engineering changes determined applicable by Lexmark will be controlled by Lexmark and installed as specified by Lexmark on the machines. You or your End User may, by providing notice subject to written confirmation by Lexmark, elect to have only mandatory changes, as determined by Lexmark, installed.

Lexmark may either install a mandatory change at your location without charge or provide you, at no charge, parts and instructions for your installation of such changes on all machines in your inventory or on machines owned by your End Users. If you install the changes, Lexmark will reimburse you for your labor at a rate established by Lexmark.

## 15.0 LICENSED PROGRAMS

Licensed programs may be made available, as determined by Lexmark, to you to market under the provisions of the Agreement and the PLA or a third party agreement.

You agree to accept return of a PLA program, provided it is in its original, unopened package, and refund the money paid by an End User who does not wish to be bound by the PLA. If the PLA permits the return of a PLA program with an accompanying specified Product, you agree to accept the return of the PLA program with the other Product for refund.

Certain programs may be distributed by you only along with the Products with which they are packaged, as set forth in product announcement letters. In addition, certain programs, when distributed to the U.S. or other governments, must be identified as subject to government regulations for software protection of privately developed commercial software, as set forth in product announcement letters.

## 16.0 SECURITY INTEREST

Lexmark reserves and you grant a purchase money security interest in each Product, in your proceeds from the sale of each Product, and in your accounts receivable for such Product. This interest will be satisfied by payment in full.

You agree to sign an appropriate document to permit us to perfect Lexmark's purchase money security interest.

## 17.0 TITLE AND RISK OF LOSS

Title passes to you for each machine on its date of shipment from Lexmark. Title for each copy of a PLA program remains in Lexmark.

Lexmark relieves you of responsibility for all risk of loss of, or damage to, a machine during the period it is in transit from Lexmark up to its initial delivery to you.

## 18.0 TAXES

You agree to pay amounts equal to any taxes resulting from the Agreement or any activities under the Agreement. Such taxes do not include taxes based on Lexmark's net income. You are responsible to bear any personal property taxes assessable on Products on or after delivery to the carrier at the Lexmark ship-from location.

You agree to provide Lexmark with a valid Reseller Exemption Certificate for each taxing jurisdiction to which Products acquired by you for resale will be shipped by Lexmark under the Agreement. If such Certificate(s) is not provided to Lexmark prior to shipment, Lexmark will charge, and you will be required to pay, all applicable state and local taxes.

You agree to notify Lexmark promptly of the revocation or modification of any Reseller Exemption Certificate so provided. You further agree to indemnify and hold Lexmark harmless from any claims and assessments against Lexmark resulting from a refusal by a taxing jurisdiction to recognize any of your Reseller Exemption Certificates.

## 19.0 STATUS CHANGE

To maintain your authorization, you must request Lexmark approval in writing if you anticipate a:

LX01-04 (06/18/92)                          Page 4 of 8

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A2709

1) transfer of your equity ownership;
2) merger or acquisition of your enterprise or Authorized Location with or by any other entity;
3) legal name change of your enterprise; or
4) relocation or closing of an Authorized Location.

## 20.0 TRADEMARKS AND TRADE NAMES

You may refer to yourself under the Agreement as a Lexmark Authorized Dealer:
1) solely in connection with Products;
2) only during the contract period; and
3) only within the United States and Puerto Rico.

Except as provided for in this Section, Lexmark does not grant you the right to use trademarks or trade names. Lexmark grants you the limited permission to use the trademark "Lexmark" or "IBM" solely to identify the Products acquired from Lexmark under the Agreement. You may use the trademarks "Lexmark" or "IBM" only within the United States and Puerto Rico.

At Lexmark's request, you will provide to Lexmark, for review and written approval, promotional, advertising and other materials that:
1) use a Lexmark, International Business Machines Corporation (IBM) or third party trademark or trade name; or
2) refer to you as a "Lexmark Authorized Dealer".

Lexmark will supply advertising guidelines in writing. At Lexmark's request, you agree to change any materials or use of materials which Lexmark determines to be inaccurate, objectionable, misleading or a misuse of Lexmark or IBM trademarks. You will pay the expenses for such change.

The permission granted relative to the Lexmark or IBM trademarks will terminate with the termination or expiration of the Agreement. In such event, for the affected Products, you will immediately:
1) cease referring to yourself as a "Lexmark Authorized Dealer" or other such term that includes the name of the Products, as applicable;
2) cease referring to yourself as approved by Lexmark to provide warranty services; and
3) return to Lexmark or destroy all materials under your control employing such trademarks.

You may retain materials with Lexmark or IBM trademarks which are required to fulfill your warranty service or support obligations on affected Products. You will return these materials to Lexmark or destroy them upon completion of such obligations.

You recognize Lexmark's ownership and title to its trademarks and the goodwill attaching to them. You also recognize IBM's ownership and title to its trademarks and the goodwill attaching to them. You agree that any goodwill which accrues because of your use of the trademarks "Lexmark" or "IBM" will become Lexmark's or IBM's property, respectively. You agree not to contest Lexmark or IBM trademarks or trade names. You agree not to use, employ or attempt to register any trademarks or trade names which are confusingly similar to Lexmark or IBM trademarks or trade names. IBM may revoke immediately, without prior notice, any permission to use IBM trademarks granted to you under the Agreement if IBM determines that you are misusing such IBM trademarks of if you place any IBM trademark on any product in violation of any law or IBM's legal rights.

## 21.0 PATENTS AND COPYRIGHTS

Lexmark will, at its expense, defend you against any claim that any machine acquired under the Agreement infringes a patent or copyright in the United States or Puerto Rico. Lexmark will pay all costs, damages and attorney's fees that a court finally

awards as a result of such claim. To qualify for such defense and payment, you must 1) give Lexmark prompt written notice of any such claim, and 2) allow Lexmark to control, and fully cooperate with Lexmark in, the defense and all related settlement negotiations.

You agree that if a machine in your inventory, or the operation of a machine while in your inventory, becomes, or Lexmark believes is likely to become, the subject of such a claim, you will permit Lexmark, at its option and expense, either to secure the right for you to continue using the machine or to replace or modify it so that it becomes noninfringing. However, if neither of the foregoing alternatives is available on terms which are reasonable in Lexmark's judgment, you will return the machine upon Lexmark's written request. Lexmark will grant you a credit equal to the price paid by you to Lexmark for the returned machine. However, Lexmark may, for used machines, grant you a credit equal to such price depreciated. The depreciation shall be an equal amount per year over the life of the machines as Lexmark establishes. Lexmark shall have no obligation with respect to any such claim based upon any non-Lexmark modification of machines or their combination, operation or use with apparatus, data or programs not furnished by Lexmark.

This Section states Lexmark's entire obligation to you for machines regarding infringement or the like.

## 22.0 LIMITATION OF REMEDIES

Lexmark's entire liability and your exclusive remedy for any claims are as this section provides.

Lexmark is not liable for any damages caused by performance or nonperformance of Products located outside the United States and Puerto Rico. In no event will Lexmark be liable for any damages caused by your failure to perform your responsibilities.

Lexmark's entire liability and your exclusive remedy for actual damages from your use of PLA programs are as set forth in the PLA.

Lexmark assumes no liability regarding any claim or action caused by, or directly related to, a non-Lexmark product.

In no event will Lexmark be liable for any lost profits, lost savings, incidental damages, or other consequential damages, even if Lexmark has been advised of the possibility of such damages. Lexmark will not be liable for any damages claimed by you based on any third party claim.

For any claim for any cause whatsoever, other than those provided for in section 21.0 and the first paragraph of section 23.0, Lexmark's liability for actual damages will be limited to $100,000.

## 23.0 INDEMNIFICATION

Lexmark will indemnify and hold you harmless from all claims, including reasonable attorney's fees, (but not including lost profits, lost savings, incidental damages, or other consequential damages), for bodily injury or damage to real property or tangible personal property arising from any acts or omissions for which Lexmark is legally liable.

You will indemnify and hold Lexmark harmless from all claims, including reasonable attorney's fees, by any party resulting directly or indirectly from any acts or omissions by you.

## 24.0 TERMINATION

Either party may terminate the Agreement, with or without cause. Lexmark will provide three month written notice to you

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A2710

of such termination, except as otherwise provided in this Section. You must provide one month written notice to Lexmark.

In the event that Lexmark gives you such notice for cause, Lexmark may provide you with an opportunity to cure deficiencies. In such event, Lexmark will establish a reasonable time, not to exceed three months, in which you must remedy such deficiencies.

In addition, Lexmark considers certain actions so serious and inconsistent with your obligations as a Dealer as to warrant immediate termination. Such remedies will include, but not be limited to, situations in which 1) you made material misrepresentations to Lexmark in your application to become a Dealer, at any later time through oral or written statements, or by submission of any false or fraudulent documentation or claim to Lexmark, or 2) you marketed Products to other than an End User.

Lexmark may also terminate the Agreement immediately in the event that a dealer or its personnel knowingly or negligently engage, directly or indirectly, in the manufacture, sale, resale, brokerage, distribution, storage or handling of counterfeit goods (that is, goods bearing the trademark, trade name or trade dress of IBM or Lexmark which have a source other than IBM or Lexmark).

In the event of termination of the Agreement by you or Lexmark, all monies due Lexmark will immediately become due and payable.

If you or Lexmark elects to terminate the Agreement, Lexmark may repurchase some or all of the Products in your inventory at a price determined by Lexmark. In such event, return shipping charges will be paid by you. Products returned must be in the original shipping containers, which must not have been opened, damaged, marked or labeled.

A termination of the Agreement may also be only a partial termination of, for example, an Authorized Location, an eligible Product family, a part of a marketing coverage area, an Aggregator relationship, or the approval to market to Dealer Associates.

## 25.0 DEALER ASSOCIATED REMARKETERS

A Dealer Associated Remarketer (Dealer Associate) is one who obtains Product from you and remarkets the Product to End Users. In the case of Printers, a Dealer Associate is a remarketer who adds significant enhancement to computer systems in function or capability. However, it is not necessary that such Printers be remarketed only with the enhanced computer system.

You may market Products to a Dealer Associate only with the written approval of Lexmark. You retain responsibility to ensure End User satisfaction and, if applicable, provide warranty service to the Dealer Associate's End User. These responsibilities may not be delegated. You may, however, share specific End User technical assistance functions with your Dealer Associate.

Lexmark will identify those Products which you may market to a Dealer Associate. Lexmark reserves the right to withdraw its approval for either the Dealer Associate or such Products which you market to a Dealer Associate.

You must maintain records for those Products you ship to your Dealer Associate. You must have appropriate agreements with your Dealer Associate in place to ensure your Dealer Associate:

1) markets only from its approved location and only to End Users;

2) maintains End User Records in the format and for the required period of retention as described in this Agreement; and

3) assists Lexmark in tracing a specific Product to an End User if required.

## 26.0 PS/1 PRINTERS

The following additional terms apply to PS/1 Printers.

1) You are permitted to market PS/1 Printers only in the contiguous 48 states. If an End User intends to transport the PS/1 Printer outside the 48 states, you must notify such End User that there will not be access to telephone and on-line services for the PS/1 Printer.

2) The "Orders and Cancellations" section is modified for PS/1 Printers by the following. For PS/1 Printers, you may not 1) defer or cancel any purchase order, accepted by Lexmark, whose applicable shipment dates Lexmark confirmed or 2) refuse any shipments made by Lexmark related to such order. In addition, you may not cancel parts of such order. If, however, Lexmark notifies you that it will ship such order later than the date, or that the quantity will be less than, you request, you may modify, defer or cancel such order. You may cancel purchase orders, or parts thereof, not confirmed by Lexmark. If you do not cancel non-confirmed orders, Lexmark will hold them for possible future acceptance, and you agree to provide Lexmark with revised Requested Ship Dates for non-cancelled orders. If Lexmark, without your approval ships such delayed PS/1 Printers, you may return them at Lexmark's expense within ten days of receipt from Lexmark;

3) For the PS/1 Printer, Dealer Prices are F.O.B., the Lexmark shipping location(s), as determined by Lexmark.

4) For the PS/1 Printer, during the time of transit from the Lexmark shipping location to you, all risks of loss or damage shall be yours.

5) PS/1 Printers do not qualify for Inventory Adjustment. You may not return PS/1 Printers to Lexmark.

## 27.0 CONFIDENTIAL INFORMATION

1) Any information concerning IBM or Lexmark customers furnished to you by IBM or Lexmark and identified as confidential, shall be treated and held in confidence by you. You shall not publish, disclose or disseminate it for a period of five years after its receipt, except as may be authorized by Lexmark in writing. You shall not be entitled to use this information for any purposes other than for marketing of Products in furtherance of this Agreement, or as specified in the information provided.

2) Upon termination or expiration of this Agreement, you shall deliver to Lexmark all materials, of any kind, containing such confidential information.

3) Other than as set forth above, no information will be given or received in confidence by either party unless it is covered by a separate written agreement.

## 28.0 GENERAL

Lexmark's waiver of any instance of your noncompliance with the Agreement will not be deemed a waiver of any future noncompliance.

You may not assign the Agreement or any of its rights or duties without Lexmark's prior written consent.

Lexmark is not responsible for failure to fulfill its obligations under the Agreement due to causes beyond its control.

The Agreement will not be supplemented or modified by any course of dealing or trade usage. Variance from or addition to the terms and conditions of the Agreement in any purchase order or other written notification from you will be of no effect.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A2711

The provisions of the Agreement which by their nature extend beyond the termination or expiration of the Agreement will survive and remain in effect until all obligations are satisfied.

Each party agrees to pay the other's reasonable attorney's fees and costs of litigation if the party, for any cause whatsoever, brings suit against the other party and the other party is finally adjudicated not to have liability.

Neither you nor Lexmark will bring an action, regardless of form, arising out of the Agreement more that two years after the cause of action has arisen. In the case of an action for non-payment, the action may not be brought more than two years from the date the last payment was due.

Both parties agree to comply with all applicable governmental laws and regulations.

The laws of the State of New York will govern the Agreement.

## 29.0 DEALER SPECIFIC INFORMATION

**Aggregator Relationships**

The provisions of this Section apply to you only if you have been approved in this Section to receive Products from an Aggregator. Lexmark will indicate its approval of you to receive Products from an Aggregator by naming the Aggregator in this Section.

The term "Aggregator" means a business entity, typically a franchisor, which has been approved by Lexmark under a written agreement, to order and receive Products from Lexmark for redistribution to the Aggregator's members or franchisees. Lexmark must approve such members or franchisees as Dealers.

You may elect to obtain Products through your Aggregator. For such products, you waive your rights and Lexmark waives your responsibilities under the following item and Sections of the Agreement;

      5.0    DEALER RESPONSIBILITIES - item (12);
      6.0    ORDERS AND CANCELLATIONS;
      7.0    PRICES;
      8.0    PAYMENT;
      9.0    PRICE REDUCTION CREDIT;
     10.0    INVENTORY ADJUSTMENTS; and
     18.0    TAXES.

Title to machines, shipped to you by your Aggregator, passes from Lexmark directly to you upon shipment from your Aggregator.

Lexmark does not have responsibility for risk of loss of, or damage to, Products shipped to you by your Aggregator.

Machines your Aggregator ships to you will be identified by serial number. Therefore, in addition to the record and audit requirements described in Section 5.0 of the Agreement, you agree that you will maintain a record of each such machine by serial number. You agree that you will maintain that record for 12 months following your receipt of the machine. You must provide such records to Lexmark upon request. In addition, you hereby authorize your Aggregator to release information to Lexmark regarding machines shipped to you.

For Products you order directly from Lexmark, the waivers described in the third paragraph of this section will not apply.

Name and location of your Aggregator:

      na

**Superstores**

The selection criteria for Superstores shall be defined by Lexmark.

Dealers who are Superstores for specific Products shall be indicated by a "YES" on the appropriate line(s):

      **NO**      Supplies
      **NO**      Typewriters
      **NO**      Printers

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A2712

**Campus Technology Centers**

Campus Technology Centers are not-for-profit institutions of higher education that may acquire Products for internal use and re-marketing to End Users only, and shall be indicated by a "YES" on this line:     **NO**

If you are a Campus Technology Center, then the term Dealer shall be replaced by Campus Technology Center throughout this Agreement.

The additional following terms shall apply to Campus Technology Centers:

1) End User means a party who a) is staff, faculty or a registered student matriculated in a degree granting program, and b) acquires Product from you for its own use, and not for remarketing.
2) Internal use means use for instruction, academic research and administrative work of your educational institution.
3) You will market Products to End Users as an incidental part of your activities and in furtherance of your educational purposes.
4) You will not sell more than one printer per year to an End User without Lexmark's prior written approval.
5) Prices for Campus Technology Centers shall be set forth in separate notices and/or an electronic file.
6) Lexmark will provide an Education Development Fund for your use in developing and improving your capability to support your End Users.
7) The warranty period for internal use Products will commence on the day you place the Product in use in your educational institution.

**Eligible Products**

You are approved to market the following Product families, as specified with a "YES" or identified portions as designated.  Specific Products are listed in notices and an electronic file.  Specific certification may also be required for certain Products.

| Supplies | Typewriters | Printers | Other (as listed) |
|----------|-------------|----------|-------------------|
| YES | NO | NO | NO |

**Minimum Renewal Criteria**

Lexmark may establish Minimum Renewal Criteria (MRC) for a contract period for some or all Products. The MRC designates the minimum level of sales performance expected of you.  Sales performance objectives may be established which modify your MRC.

| Product | Minimum Renewal Criteria |
|---------|--------------------------|
| SUPPLIES | |

**Marketing Coverage Area**

Your approved marketing coverage area(s), listed by Authorized Location, by county and state, is:

na

**Authorized Locations**

All Authorized Locations must be approved in writing by Lexmark and listed below or on an attachment to this Agreement.  Any change in the location or any significant change in the characteristics of your Authorized Locations must be approved by Lexmark.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY   A2713