# EXHIBIT L

# SUPERSTORE CONTRACT 1

**EXECUTION COPY**

## TRADE VENDOR PURCHASING AGREEMENT

**VENDOR #**6229, 3173          **DEPARTMENT:** 65, 14, 16          **MERCHANT:** SCOTT HAMBLEN

**VENDOR TYPE:**     X  PURCHASE

**VENDOR STATUS:**  X  EXISTING VENDOR

## 1.0 INTRODUCTION & TERM

1.1    **Introduction.** This Trade Vendor Purchasing Agreement (the "Agreement") is entered into by and between ███████ a Delaware corporation, doing business at ███████████ and the undersigned vendor ("Vendor"). For purposes herein, ███████ shall include all affiliates, subsidiaries, and parent companies as may exist from time to time. This Agreement shall remain in full force and effect until terminated in accordance with the terms herein. This Agreement, including all attachments, addenda, schedules and exhibits hereto, is between ███████ and Vendor for the sale by Vendor and purchase by ███████ of certain products ("Products"). The parties expressly agree that all orders placed under this Agreement, after the date of execution, shall be subject to the terms and conditions of this Agreement, as amended from time to time.

1.2    **Term and Termination.**

   a.    **Term.** If Vendor is designated as a "NEW VENDOR" above, this Agreement is effective as of the last signature date below and shall remain in full force and effect until terminated in accordance with the terms hereof. If Vendor is designated as an "EXISTING VENDOR" above, this Agreement is effective as of September 1, 2013 and shall remain in full force and effect until terminated in accordance with the terms hereof.  Notwithstanding any provision to the contrary contained in this Agreement or in the below-referenced Marketing Program Letter of Intent and Amendment, the parties expressly acknowledge and agree that the terms and conditions set forth in that certain Marketing Program Letter of Intent and Amendment effective as of January 7, 2013, by and between Vendor and ███████ shall govern the parties' program-related terms and conditions and remain in effect through September 28, 2013. Effective September 29, 2013, the terms and conditions set forth in Section 3.0 of this Agreement (as supplemented by Exhibit A hereto) shall govern the parties' program-related terms and conditions until this Agreement in terminated in accordance with the terms hereof.

   b.    **Termination without cause.** Either party will have the right to terminate this Agreement at any time, without cause, on the delivery of sixty (60) days prior written notice.

   c.    **Termination with cause.** Each party will have the right to terminate this Agreement upon written notice if the other party is in breach of any material term, condition, warranty or covenant of this Agreement.

## 2.0 CONTACT INFORMATION

**VENDOR NAME:** LEXMARK INTERNATIONAL. INC.
PARENT COMPANY: LEXMARK INTERNATIONAL. INC.
ADDRESS 740 WEST NEW CIRCLE ROAD  CITY LEXINGTON STATE KY ZIP 40550
PHONE (859)232-2000          TOLL FREE (800)539-6275          FAX (    )    -
WEBSITE www.lexmark.com
**DUN-BRADSTREET #** _____

**FEDERAL TAX IDENTIFICATION** ███████

**CHIEF EXECUTIVE OFFICER:** PAUL ROOKE
ADDRESS 740 WEST NEW CIRCLE ROAD
CITY LEXINGTON. STATE KY ZIP 40550
PHONE       (859)232-2000
TOLL FREE (    )    -
FAX          (__ ) __ . ____
E-MAIL       Paul.Rooke@lexmark.com

**PRESIDENT:** MARTY CANNING
ADDRESS 740 WEST NEW CIRCLE ROAD
CITY LEXINGTON. STATE KY ZIP 40550
PHONE       (859)232-2000
TOLL FREE (    )    -
FAX          (    )    -
E-MAIL       Marty.Canning@lexmark.com

**CHIEF FINANCIAL OFFICER:** JOHN GAMBLE
ADDRESS 740WEST NEW CIRCLE ROAD
CITY LEXINGTON. STATE KY ZIP 40550
PHONE       (859)232-2000
TOLL FREE (    )    -
FAX          (__ ) __ . ____
E-MAIL       jaamble@lexmark.com

**VICE PRESIDENT OF SALES:** MIKE JOHNSON
ADDRESS 2211 MICHELSON DRIVE SUITE 600
CITY IRVINE. STATE CA ZIP 92612
PHONE       (949)517-1214
TOLL FREE (    )    -
FAX          (__ ) __ . ____
E-MAIL       mjohnson@lexmark.com

███████ **ACCOUNT MANAGER:** KIMBERLY POLEO
COMPANY NAME LEXMARK
ADDRESS 2502 EAGLE WATCH LANE

CITY WESTON. STATE FL ZIP 33327
PHONE       (954)385-0954
TOLL FREE (    )    -

CONFIDENTIAL - OUTSIDE COUNSEL ON A3129

FAX        ( __ ) __ . ____
E-MAIL     Poleo@lexmark.com

**VENDOR PORTAL SUPERUSER:** SAM AMBURGEY
ADDRESS 740 NEW CIRCLE ROAD
CITY LEXINGTON. STATE KY ZIP 40550
PHONE        (859-232-3828
TOLL FREE ( __ ) __ -
FAX           ( __ ) __ . ____
E-MAIL        amburgey@lexmark.com

CONFIDENTIAL - OUTSIDE COUNSEL ONLA3130

## 3.0 PROGRAM TERMS

Rebates and allowances for any purchase tiers achieved will be computed back to dollar one ($1). All Vendor program funds will be collected quarterly, via debit memo and reconciled at the end of each ▮▮▮▮▮ fiscal year. Monthly purchase reports are due from the Vendor by the tenth (10th) day of each month and shall be emailed to:

This Section 3.0 is further supplemented by the Supplemental Program Terms attached hereto as **Exhibit A** to this Agreement and incorporated by reference herein. Notwithstanding any provision to the contrary contained in this Agreement or in the below-referenced Marketing Program Letter of Intent and Amendment, the parties expressly acknowledge and agree that the terms and conditions set forth in that certain Marketing Program Letter of Intent and Amendment effective as of January 7, 2013, by and between Vendor and ▮▮▮▮▮ shall govern the parties' program-related terms and conditions and remain in effect through September 28, 2013. Effective September 29, 2013, the terms and conditions set forth in Section 3.0 of this Agreement (as supplemented by Exhibit A hereto) shall govern the parties' program-related terms and conditions until this Agreement in terminated in accordance with the terms hereof.

### 3.1 PROGRAM FUNDS - REBATES A.

#### VOLUME REBATE

**0.00%** OF NET PURCHASES
OR ☐ TIERED

| TIER FLOOR | | PERCENTAGE |
|---|---|---|
| $ - | $ | % |
| $ - | $ | % |
| $ - | $ | % |
| $ - | $ | % |

GUARANTEED MINIMUM DOLLAR AMOUNT FOR THIS REBATE IS **$0**

#### B. MARKETING/ADVERTISING REBATE

**0.00%** OF NET PURCHASES
OR ☐ TIERED

| TIER FLOOR | | PERCENTAGE |
|---|---|---|
| $ - | $ | % |
| $ - | $ | % |
| $ - | $ | % |
| $ - | $ | % |

GUARANTEED MINIMUM DOLLAR AMOUNT FOR THIS REBATE IS **$0**

#### C. GROWTH REBATE

**0.00%** OF NET PURCHASES

| TIER FLOOR | | PERCENTAGE |
|---|---|---|
| $ - | $ | % |
| $ - | $ | % |
| $ - | $ | % |
| $ - | $ | % |

GUARANTEED MINIMUM DOLLAR AMOUNT FOR THIS REBATE IS **$0**

### 3.2 PROGRAM FUNDS - ALLOWANCES [NOT APPLICABLE TO VIRTUAL VENDORS]

#### A. DISPLAY ALLOWANCE

**0.00%** OF NET PURCHASES
**0.00%** OF INITIAL ORDER - Will be approved and collected through Vendor Funded Application
**$0.00** FLAT DOLLAR AMOUNT

#### B. NEW / RELOCATED / REMODELED STORE ALLOWANCE ("Store Allowance")

CONFIDENTIAL - OUTSIDE COUNSEL ON A3131

## 4.0 SUPPLY CHAIN TERMS

### 4.1 DAMAGED & DEFECTIVE PRODUCT OPTION
ONLY ONE (1) OPTION CAN BE SELECTED PER VENDOR NUMBER. SECTION 4.1 DOES NOT APPLY TO BUYBACK OR END OF LIFE INVENTORY.

|  | SELECTION | VENDOR #(S) |
|---|---|---|
| 1 - RETURN TO VENDOR - CONTACT FOR RETURNED GOODS AUTHORIZATION ('RGA') # | X | **6229** |
| 2 - RETURN TO VENDOR - USE PERMANENT RGA # _____ | ☐ | ___ |
| 73 - AUTOMATIC DESTROY; DEDUCT 100% FROM PAYMENT | ☐ | ___ |
| 74 - DESTROY WITHOUT CREDIT (ALLOWANCE IS REQUIRED)* | X | **3173 Dept. 14** |

DESTROY ALLOWANCE ▓▓ OF NET PURCHASES

*Option **74** may not be selected by Scan-Based Vendors

### 4.2 VENDOR RETURNS LOCATION (REQUIRED FOR SECTION 4.1 OPTIONS 1 & 2)

ATTENTION:                                    **LEXMARK RETURNS CENTER**
                                              **c/o Unicomp**
RETURN ADDRESS (NO P.O. BOXES) **510 Henry Clay Blvd.**
CITY, STATE AND ZIP CODE       **Lexington, KY  4050**
TELEPHONE                      **(859)233-2130**
APPOINTMENT PHONE # (REQUIRED) (   ) -
FAX                            (   ) -
EMAIL ADDRESS                  ___

**VIRTUAL VENDORS SHALL SUPPLY A RETURN ADDRESS SHIPPING LABEL WITH ALL SHIPMENTS.**

### 4.3 RETURN CONSOLIDATION ALLOWANCE [NOT APPLICABLE TO VIRTUAL VENDORS]
▓▓▓▓ covers freight for defective and damage returns

In connection with the return of defective products, Vendor agrees to a quarterly deduction of ▓▓ per unit on all Damaged and Defective merchandise returned to Vendor via ▓▓▓▓ Returns Consolidation Program, up to a maximum aggregate amount of ▓▓ Deductions shall be calculated by ▓▓ with supporting documentation (upon request), based solely upon ▓▓ records.

As a reminder, the returns consolidation program offers the following benefits to Vendor:
(1) Significant reduction in the number of shipments to a Vendor
(2) Higher shipment quality
(3) Professionally packed shipments with barcode labels on each handling unit as well as pallet level manifests listing each barcode
(4) Simplified dispute process for Vendor.

### 4.4 FREIGHT MANAGEMENT
ONLY ONE (1) OPTION CAN BE SELECTED PER VENDOR NUMBER.

#### X FREIGHT COLLECT PROGRAM
**FOB ORIGIN** ▓▓ plans, schedules, pays carrier freight. Freight Allowance applies.)

VENDOR NUMBER #(S) **6229**    FREIGHT ALLOWANCE: ▓▓
VENDOR NUMBER #(S) **3173**    FREIGHT ALLOWANCE: ▓▓

All collect (PUP) customers take possession, title, and risk of loss at the shipment point of origin.

**The terms and conditions of ▓▓ Freight Collect Program are set forth in Exhibit C attached hereto, which are expressly incorporated herein by reference.**

CONFIDENTIAL - OUTSIDE COUNSEL ON A3132

☐ **FREIGHT PREPAID**

    **FOB DESTINATION** (Vendor plans, schedules, and pays all freight to carrier.)

        VENDOR NUMBER#(S) _____

☐ **FREIGHT PREPAID - BILLED TO THIRD PARTY [FOR VIRTUAL VENDORS ONLY]**

    **FOB ORIGIN:** Freight for orders shipped via UPS Ground will be billed directly to ▮▮▮▮▮ from UPS utilizing 3rd party billing account number provided by ▮▮▮▮▮ All claims for UPS shipments shall be between ▮▮▮▮▮ and UPS.

    Vendor is expected to ship all products on time and complete within seventy-two (72) hours of receipt of order. Backorders shall be communicated via email to ▮▮▮▮▮▮▮▮▮▮ providing the purchase order number, backordered item(s), and estimated product availability date.

        VENDOR NUMBER(S) _____

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3133

███████████████████████

## 5.0  ACCOUNTS PAYABLE TERMS

### 5.1 NON-SCAN-BASED VENDORS
PAYMENT TERMS FOR NON-SCAN-BASED VENDORS ARE DETERMINED USING INVOICE DATE.

| | DISCOUNT % | DISCOUNT DAYS | NET DAYS |
|---|---|---|---|
| PAYMENT TERMS | ███████ | 0 | 60 |
| SEASONAL TERMS* | | | |
| | | *BEGIN DATE: | *END DATE: |

### 5.2 SCAN-BASED VENDORS
INITIAL PAYMENT IS MADE THIRTY (30) DAYS AFTER THE WEEK ENDING PRODUCT SALE DATE. THEREAFTER, A WEEKLY CHECK WILL BE ISSUED.

### 5.3 FINANCIAL TERMS

**5.3.1**  **Post Audit Period:** Any claims arising under this Agreement as a result of any audit (whether conducted internally or by third party auditor) and any claims arising from program or accounts payable transactions hereunder (including without limitation RTV's, short shipments, pricing and all other claims related to merchandise procurement) must be presented within fifteen (15) months following the end of ████ fiscal year in which the claim arose. If a claim is not brought within the aforementioned fifteen (15) month period, such claim shall be deemed waived. This Section 5.3.1 shall apply to claims of both parties. If a post-audit claim is properly tendered by a party, the other party shall have ninety (90) days to refute the claim in writing and provide supporting documentation. If after the ninety (90) day period no written response is received, the claiming party may debit the other party's account without notice.

**5.3.2**  **Debit Balances;** Vendor shall be deemed to carry a "debit balance" when Vendor's account balance shows that Vendor owes ████ funds. Vendor agrees to remit a check or send a wire transfer for all debit balances within sixty (60) days of notice of such debit balance. In the event Vendor fails to satisfy any debit balance within such sixty (60) day period, ████████ shall be entitled to charge Vendor interest at the rate of 1.5% per month or the maximum amount allowed under law, whichever is less.

**5.3.3**  **Deductions. Set Off and Recoupment:** Each party agrees that any invoices or sums of money alleged to be owed by the other party are subject to all claims and defenses of the first party and the first party may, in its sole and absolute discretion, set off and deduct against any such sums all present and future claims against the other party.

## 6.0  COST OF PRODUCTS

The parties agree that as of the effective date of this Agreement, the cost of all Products purchased by ████████ pursuant to this Agreement shall be as set forth in **Exhibit 1** attached hereto and incorporated herein by reference. From time to time during the term of this Agreement, the cost of Products may be revised. In the event that cost information is revised pursuant to the terms of this Agreement, or in the event there is no **Exhibit 1** attached to this Agreement, the cost of all Products purchased by ████ pursuant to this Agreement shall be as set forth in the "Cost and List Information" section of the Vendor Portal located at ████████████████████.

**Cost Increases:** ████████ shall be given at least ninety (90) days written notice from the Vendor for all cost increases. Notwithstanding the foregoing,

CONFIDENTIAL - OUTSIDE COUNSEL ON A3134

## 7.0  INSURANCE

During the term of this Agreement, Vendor is required to carry insurance as set forth below with a carrier acceptable to ███
Vendor shall include ███████ as an additional insured under Vendor's liability insurance policy and shall provide evidence
thereof. No such insurance policy shall be cancelable or materially modified without ████████ receiving at least thirty (30) days
prior written notice. Vendor shall provide ████████ a copy of Vendor's Certificate of Insurance ("COI") and shall provide proof of
its compliance with this Section 7.0 upon ████████ reasonable request. The COI shall include the following:

7.1  Commercial General Liability including Product Liability/Completed Operations Hazard with minimum limits of $2,000,000
per occurrence / $5,000,000 aggregate minimum.

7.2  Broad form Vendor's endorsement naming ████████ its subsidiaries, and affiliates as additional insureds.

7.3  Mandatory thirty (30) day prior notice of cancellation or material modification to: Insured Company(ies): ██████
███████████████

7.4  Product liability claims shall be sent to the following address:

COMPANY NAME: Lexmark International Inc.
ADDRESS: 740 W New Circle Rd._____
CITY, STATE, ZIP: Lexington, KY 40550
ATTENTION: Attn: Risk Management_____
PHONE NUMBER: _____

## 8.0  VENDOR DIVERSITY INFORMATION

### CHECK ALL THAT APPLY:

- ☐ MBE -MINORITY OWNED BUSINESS ENTERPRISE
- ☐ DVB - DISABLED VETERAN BUSINESS ENTERPRISE
- ☐ LBC - LARGE BUSINESS CONCERN
- ☐ WBE -WOMAN OWNED BUSINESS ENTERPRISE
- ☐ SBC - SMALL BUSINESS CONCERN

### MAJORITY OWNERSHIP (51%>) CHECK ALL THAT  APPLY:

- ☐ BBI    AFRICAN AMERICAN
- ☐ BBM    AFRICAN AMERICAN MALE
- ☐ BBF    AFRICAN AMERICAN FEMALE
- ☐ AIA    ASIA INDIAN AMERICAN
- ☐ AIM    ASIA INDIAN AMERICAN MALE
- ☐ AIF    ASIA INDIAN AMERICAN FEMALE
- ☐ CAC    CAUCASIAN
- ☐ CAM    CAUCASIAN MALE
- ☐ CAF    CAUCASIAN FEMALE
- ☐ APA    ASIAN PACIFIC AMERICAN
- ☐ APF    ASIAN PACIFIC AMERICAN FEMALE
- ☐ APM ASIAN PACIFIC AMERICAN MALE
- ☐ HIA  HISPANIC AMERICAN
- ☐ HIM  HISPANIC AMERICAN MALE
- ☐ HIF  HISPANIC AMERICAN FEMALE
- ☐ NAA  NATIVE AMERICAN
- ☐ NAM NATIVE AMERICAN MALE
- ☐ NAF  NATIVE AMERICAN FEMALE
- ☐ FO   FOREIGN-OWNED
- ☐ FOF  FOREIGN-OWNED FEMALE
- ☐ FOM FOREIGN-OWNED MALE

Please check any of the following certifications that your business has and provide the affiliate and certification #s:

|_| WBENC - Women's Business Enterprise National Council #_____
|_| NMSDC - National Minority Supplier Development Council #_____
|~| SBA - Small Business Administration - Pronet/CCR #_____
|_| Other Certifications (s) Please List:_____

CONFIDENTIAL - OUTSIDE COUNSEL ONl A3135

## KEY TERMS AND DEFINITIONS FOR SECTION 8.0

1. Ownership. For a sole proprietorship or partnership to be determined a minority enterprise, at least 51% of the company or the company's assets or interest must be owned by a minority person. For a corporation to be considered a minority business enterprise, legal and equitable ownership of at least 51% of all classes of stocks, bonds, and other securities issued by the corporation must be owned by a minority person or minority persons. Any ownership interest held by a minority person which is subject to an option or security interest held by a non-minority person or business entity affecting the incidence of operation and control of shares in the profits of the enterprise, shall not qualify as being interest held by such minority person. ▮▮▮ requires third-party certification to verify ownership status. Please refer to the Supply Chain Diversity section of ▮ or e-mail ▮▮▮▮ or additional information on what certification we accept. Before applying for certification, please review our Supply Chain Diversity Program. Also, having certification does not guarantee business.

2. Control. This term requires that the primary power, direct or indirect, to influence the day-to-day management of a business enterprise shall rest with minority person. In addition, this term is construed to mean that the business enterprise is not subject to any formal or informal restrictions such as lease, by-laws, corporate charter, or loan agreement, which would limit the customary discretion of the minority owner.

3. Operated. Means being involved in the day-to-day company decisions concerning the business operations in an active and internal capacity of the business performance.

4. Minority-Owned, Small Disadvantaged Business Concern. The term, "small disadvantaged business concern owned and controlled by socially and economically disadvantaged individuals" shall mean a small business concern which is at least 51% owned by one or more socially and economically disadvantaged individuals or, in the case of any publicly-owned business, at least 51% of the stock which is owned by one or more socially and economically disadvantaged individuals and whose management and daily business operations are controlled by one or more of such individuals. Socially and economically disadvantaged individuals include African American, Hispanic Americans, Native Americans, Asian-Pacific Americans, Asian-Indian Americans, and other minorities or individuals found to be disadvantaged by federal government agencies empowered to make this determination. The term "Native American" includes American Indians, American Eskimos, American Aleuts, and Native Hawaiians. The term "Asian-Pacific American" includes United States citizens whose origins are Japan, China, the Philippines, Vietnam, Korea, Samoa, Guam, and the U.S. Trust territories of the Pacific, Northern Marianas, Laos, Cambodia, and Taiwan. The term "Asian- Indian American" includes United States citizens whose origins are in India, Pakistan, and Bangladesh.

5. Women-Owned Business Concern. The term "women-owned business" is a business that is at least 51 % owned by a woman or women who also control and operate it. "Control" in this context means exercising the power to make policy decisions. "Operate" in this context means actively involved in day-to-day management.

6. Disabled Veteran Business Concern. The term "disabled veteran business" is a business that is at least 51% owned by a disabled veteran who also controls and operates it. "Control" in this context means actively involved in day-to-day management.

7. Small Business Concern. The term "small business concern" is a business concern that is independently owned and operated, not dominant in its field, and meets employment and/or sales standards developed by the Small Business Administration as set forth in Title 13, Code of Federal Regulations, Section 121.

## 9.0 ▮▮▮▮ OPERATING GUIDELINES

This Agreement is subject to the ▮▮▮▮ Terms and Conditions attached as **Exhibit B** hereto, which are expressly incorporated herein by reference. These Terms and Conditions may be amended from time to time by mutual agreement of the parties. The parties acknowledge and agree to the terms and conditions, as applicable to the parties. In the event of a conflict between the terms and conditions of this Agreement and the Legal Terms and Conditions attached hereto, the terms and conditions of this Agreement shall control.

The signing party hereby acknowledges that he/she is an authorized representative of the Vendor named below, and, by such signature the terms and conditions contained herein are hereby ratified and confirmed as a valid and legally binding obligation of said Vendor.

VENDOR: LEXMARK INTERNATIONAL, INC.

NAME _Ronnie Pinkeus Hes_

SIGNATURE _Ronnie Pinkeus Hes_

TITLE _VP_ _dm_ TITLE _Nupp/Menia_

DATE _8/11/2011_           DATE _____

CONFIDENTIAL - OUTSIDE COUNSEL ONA3136

████████████████████

# EXHIBIT 1

## PRODUCT COST*

*If no Exhibit 1 is included, then cost information shall be as set forth in the "Cost and List Information" section of the Vendor Portal located at ████████████████ Any Marketing Bulletins issued by Lexmark will take priority over the prices set forth in the Vendor Portal.

## EXHIBIT A
## ADDITIONAL TERMS AND CONDITIONS

This Section describes all programs starting 9/1/13 and ending 12/31/2014 for Lexmark branded laser printers, toner and ink supplies sold through ████████ retail stores, online and ████████ contract sales organization within the United States. Laser printers and Supplies 1) not sold directly to ████████ by Lexmark, 2) sold through distribution by ████████ or 3) identified by Lexmark as being sold as net pricing are not eligible for these programs.

Notwithstanding any provision to the contrary contained in this Agreement or in the below-referenced Marketing Program Letter of Intent and Amendment, the parties expressly acknowledge and agree that the terms and conditions set forth in that certain Marketing Program Letter of Intent and Amendment effective as of January 7, 2013, by and between Vendor and ████████, shall govern the parties' program-related terms and conditions and remain in effect through September 28, 2013. Effective September 29, 2013, the terms and conditions set forth in Section 3.0 of this Agreement (as supplemented by Exhibit A hereto) shall govern the parties' program-related terms and conditions until this Agreement in terminated in accordance with the terms hereof.

All promotional program dollars described below are subject to and conditioned upon all guidelines, terms, conditions and program requirements provided by Lexmark. Failure to observe any and/or all of such requirements waives any and/or all program funds, including but not limited to those listed here and in Exhibit A to Trade Vendor Agreement vendor numbers 6229 and 3173 regardless of the product and/or program in connection with which such support is paid. Further special promotions may be given, but will be negotiated on a promotion by promotion basis.

### Definitions

"Total Net Shipments" (sometimes "Net Shipments") is defined as the eligible products sold by Lexmark directly to ████████ less any returns, price protection, and special bid customer rebates. "Total Net Sell Out" (sometimes "Net Sell Out") is defined as the Lexmark invoice price for eligible products sold by ████████ to end users, less customer returns, price protection and special bid customer rebates. For purposes of clarity, for both Total Net Shipments and Total Net Sell Out, "price protection" as used in the Agreement includes Over and Above "O&A" claims for promotional rebates and  pricing, which shall be deducted from the invoice price before a program allowance is calculated.

| Vendor Number | Vendor Type | Current Product Mix | Basis for Rebate Calculation |
|---|---|---|---|
| 6229 Lexmark Int. | Purchase | Toner | Total Net Sell Out |
| 3173 Lexmark Int. | Purchase | Ink & Printers | Total Net Shipments |

### Lexmark Net Sell Out Toner Vendor #6229 Program:

This program applies only for Lexmark branded toner supplies purchased directly from Lexmark by ████████ Up to ████ payments for Lexmark reported Net Sell Out of Lexmark branded toner supplies, calculated as follows: Earned percentage of (Lexmark invoice price to ████████ irst adjusted downwards by any return credits, price protection and special bid customer rebates).

### Activities for up to ████ MDF on Toner Vendor #6229 Net Sell Out:
- Toner Growth Goal
- Lexmark Laser Hardware Annual Net Sell Out Goal
- End User Reporting
- Toner Loyalty
- MDF (capped at ████, MDF for catalog, online ████████ websites and sales reps salesforce.com tool: Representation of full line in the above-referenced media (up to ████ of underperforming

CONFIDENTIAL - OUTSIDE COUNSEL ONA3137

SKUs can be omitted). Lexmark ink and toner supplies, six Laser printer features (with images) and one full page ad in all Big Book Catalogs.

## Lexmark Net Shipments Ink Vendor #3173 Program:

This program applies only for Lexmark branded ink supplies purchased directly from Lexmark by ███████ Up to ████ payments for Lexmark reported Net Shipments of Lexmark branded ink supplies, calculated as follows: Earned percentage of (Lexmark invoice price to █████████ first adjusted downwards by any return credits, price protection and special bid customer rebates).

### Activities for up to ████ on Ink Vendor #3173 Net Shipments:

- ████ Ink Assortment (see below)
- ████ for maintaining current plan-o-gram in all stores of Lexmark ink supplies, unless change initiated by Lexmark

Additional ████████ can earn an additional ████ of the total net shipments of ink supplies (Lexmark invoice price to ████████ first adjusted downwards by any return credits, price protection and special bid customer rebates) in 3Q2013 and 4Q2013 by purchasing and shipping a minimum of ████████ of Lexmark-branded toner cartridges in 3Q2013 and a minimum of ████████ of toner cartridges in 4Q2013. To qualify for this additional ████████ must achieve these purchase goals in both quarters. ████████ shall not receive this additional ████ if either quarterly goal is missed.

**Toner Growth Goal** paid quarterly based on "Net Sell Out" (Lexmark invoice price to ████████ first adjusted downwards by any return credits, price protection and special bid customer rebates) of Lexmark-branded toner supplies in all channels. If any quarter is missed, but the total year is made, then all quarters will be paid.

| Quarter | 2013 Toner Net Sell Out Goal | |
|---------|------------------------------|---|
| 1 | | |
| 2 | | |
| 3 | | |
| 4 | | |
| Year | | |

These goals include all reductions from ████████

CONFIDENTIAL - OUTSIDE COUNSEL ON  A3138

**Laser Hardware Annual Goal** paid quarterly based on sell-thru (COGS) of Lexmark laser printers from all [redacted] selling channels (including [redacted]) and paid out on Net Sell Out of toner cartridges, calculated as follows: Earned percentage of (Lexmark invoice price to [redacted] first adjusted downwards by any return credits, price protection and special bid customer rebates). The table below establishes the Laser hardware annual goal.

| 2013 Laser Hardware Annual Goal | Payout |
|---|---|
| | |
| | |
| | |
| | |

| 2014 Laser Hardware Annual Goal | Revenue Goal | Payout |
|---|---|---|
| | $ | |
| | $ | |
| | $ | |
| | $ | |

**Ink Assortment:**

Ink Assortment program amounts shall be paid quarterly based on Net Shipments (Lexmark invoice price to [redacted] first adjusted downwards by any return credits, price protection and special bid customer rebates) of Lexmark branded ink cartridges to all [redacted] channels. To earn the Ink Assortment program amount, [redacted] must:

1. Stock mutually agreed upon Lexmark ink SKUs at all current retail locations based off store Plan-o-grams dated September 1, 2013.
2. [redacted] shall request no consignment.
3. [redacted] shall assert no non-compliance fines against Lexmark
4. [redacted] shall adhere to Lexmark MAP pricing policy
5. [redacted] shall return no ink cartridges to Lexmark, except for damaged/defective ink cartridges and customer returns.

**Additional Program Eligibility Requirements:**

To be entitled to any program amounts set forth in this Exhibit A, [redacted] shall comply with all of the following requirements:

- All Lexmark laser printer promotional pricing, according to Lexmark promotional calendar, must be advertised on all internal and external [redacted] websites, including but not limited to [redacted] and Business [redacted] In addition, all Lexmark laser printer promotional pricing must be sent to all TSR & BDM sales reps and all retail locations where applicable.
- [redacted] must adhere to minimum advertised price policy.
- [redacted] shall not assess any non-compliance fees for any Lexmark product for the term of Trade Vendor Purchase Agreement.
- Promotions or markdowns on printers identified by Lexmark as having net net pricing will be funded solely by [redacted] No further promotional or markdown funding will be provided by Lexmark
- [redacted] must provide monthly sales reporting and provide access to [redacted] vendor portal and Market Bridge portal (and all similar portals).
- Maintain a Lexmark brand store/showcase through Web Collage
- Maintain permanent Lexmark URL and (1) per quarter advertisement of Lexmark laser printers on all internal and external [redacted] websites, including but not limited to [redacted] and [redacted]
- Representation of full line of Lexmark supplies and printers on all internal and external [redacted] websites, including but not limited to [redacted]
- Bi-Monthly face to face onsite meetings with BSD and Austin ISO sales reps
- Bi-weekly reporting and continuous visibility to Lexmark MPS opportunities in salesforce.com

**End User Reporting** paid quarterly calculated by taking Net Sell Out of Lexmark branded toner supplies multiplied by (Net Sell Out is defined as the Lexmark invoice price for eligible products sold by [redacted] to end users,

less customer returns, price protection and special bid customer rebates) ▓▓▓▓ must provide monthly inventory data and monthly sell out data by end user via a mutually agreed electronic format; End user data must include the following at a minimum: End user name, Ship to address (Street, city, state, zip), Lexmark PN, quantity and date of transaction.

**Toner Loyalty** paid quarterly calculated by taking Net Sell Out of Lexmark branded toner supplies multiplied by ▓▓▓ .(Net Sell Out is defined as the Lexmark invoice price to ▓▓▓▓ first adjusted downwards by any return credits, price protection and special bid rebates) ▓▓▓▓ must only offer to sell, market, endorse, and/or arrange for the shipment of genuine Lexmark branded ink and toner supplies or compliant supplies from a Lexmark-approved third party supplier (e.g. ▓▓▓▓ must work with Lexmark Sales Management to maximize Lexmark toner loyalty by transitioning any customers that ▓▓▓▓ has under contract that are currently using third-party supplies to Lexmark-branded supplies, ▓▓▓▓ supplies sourced from Lexmark, or compliant supplies from a Lexmark-approved third party supplier. In addition, ▓▓▓▓ must not sell or market third party remanufactured toner supplies that are remanufactured using Lexmark Return Program cartridges. Finally, ▓▓▓▓ will use reasonable commercial efforts not to target, market, and/or offer to sell Lexmark-compatible supplies sourced from any third-party to any customer that currently uses Lexmark-branded cartridges (new or remanufactured).

**Warehouse Allowance** paid quarterly based on Net Shipments of Lexmark branded printers, toner and ink supplies, calculated as follows: Earned percentage of (Lexmark invoice price to ▓▓▓▓ first adjusted downwards by any return credits, price protection and special bid rebates). The warehouse allowance payment shall be up to ▓▓ for vendor # 3173 and up to ▓▓ for vendor # 6229.

**Lexmark reserves the right to:**

- Modify or withdraw the terms and conditions of any of the foregoing programs with sixty (60) day notice. In the event the program is terminated by Lexmark, for reasons other than non-compliance, any rebates earned up until the effective date of such program withdrawal or termination shall be paid within sixty (60) days of the effective date of such termination.
- Select the month in any calendar quarter against which product returns will be deducted from purchases.
- Audit compliance with the terms and conditions ▓▓▓▓ shall make its' premises, and records available upon request for the purpose of such audit.
- Reject a transaction or disqualify ▓▓▓▓ from participation in the program should Lexmark determines (based on documentation) there to be non-compliance with the terms and conditions of this program and/or if ▓▓▓▓ is in material breach of a Trade Vendor Purchasing Agreement obligation and has not cured such breach in accordance with the terms thereof.
- Lexmark and its fulfillment companies shall not be liable for any injury, damage, loss, expense, accident, delay, inconvenience or irregularity arising from ▓▓▓▓ use of any funds earned in the program.  IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR ANY LOST PROFITS, LOST SAVINGS OR ANY INCIDENTAL, INDIRECT, PUNITIVE, SPECIAL OR CONSEQUENTIAL DAMAGES ARISING FROM A PROGRAM EVEN IF ADVISED OR AWARE OF THE POSSIBILITY OF SUCH DAMAGES
- Lexmark reserves the right to verify all claims and request additional performance documentation at any time. We also reserve the right to reject a claim or to otherwise refuse advertising reimbursement if any claim or any advertising (or both): (a) does not meet any guideline, term, and/or condition of the program, (b) is submitted under circumstances where the goods sold were advertised in a manner inconsistent with Lexmark's minimum Advertised Price Guidelines; (c) is based on conduct that occurred simultaneously with, or reasonably contemporaneously in time to, another claim and/or advertising for a different Lexmark product that did not adhere to Lexmark's Minimum Advertised Price Guidelines; and/or (d) is false and/or misleading.

**ELIGIBLE EXPENSES**
Lexmark will provide reimbursement for eligible expenses only.

**CLAIM REQUIREMENTS**
Lexmark will credit your account based upon the applicable percentage (as detailed above) of your prior months' Net Shipments and or Net Sell Out of eligible Lexmark products. Program payments will be processed quarterly. To receive credit for any other promotional payments not described herein, you must first submit a Debit Memo no later than forty five (45) days from the last date of the promotion or ending quarter (whichever occurs first), which shall be specified by Lexmark in writing when the promotion or program commences.  Any promotions or programs not expressly described herein must first be agreed upon in writing by both parties.  If the Debit Memo for a promotion or program is not received within forty five (45) day window, ▓▓▓▓ will forfeit any right to these  promotion or program payments. This includes post-audit claims.

CONFIDENTIAL - OUTSIDE COUNSEL ON A3140

Lexmark reserves the right to request proof of performance, as needed, to ensure compliance with any and all of its promotions and programs. If your claim is approved, Lexmark will credit the claim against your accounts receivable balance. No checks will be issued for promotion or program claims. If you submit a claim and do not have sufficient funds to cover the claim, Lexmark will issue a credit to your account receivable balance up to the amount approved by Lexmark. If the claim exceeds the approved amount, ███████████ will be required to pay back any excess claimed. Any claims submitted by ███████████ to Lexmark that have not been verified and approved by Lexmark within twelve (12) months of the date of the promotion or program the claim was made (or could have been made in the case of claims filed after the fact) shall be forfeited. Lexmark will not accept post-audit adjustments for claims that were or could have been submitted within this twelve month period. All program reimbursement is subject to compliance with Lexmark's then existing minimum advertised price (MAP) policy.

**CLAIM VERIFICATION REQUIREMENTS**
Lexmark reserves the right to verify all claims and request additional performance documentation at any time. We also reserve the right to reject a claim or to otherwise refuse advertising reimbursement if any claim or any advertising (or both): (a) the claim or advertising submitted either does not meet either the guidelines of the program or adhere to Lexmark's Minimum Advertised Price Guidelines (b) the claim or advertising submitted is based on conduct that occurred simultaneously with, or reasonably close in time to, another claim or advertising for an identical or completely different product, that did not adhere to Lexmark's Minimum Advertised Price Guidelines; and/or (c) if the claim or the advertising is false or misleading.

**DEDUCTIONS**
Invoice deductions taken without full compliance with all the terms and conditions described here and/or without Lexmark's consent will not be allowed. Lexmark reserves the right to withhold earned payments if you are not in compliance with Lexmark payment terms.

**TERMINATION**
The payments and programs, collectively or in any individual part, may be terminated immediately by Lexmark for convenience on written notice.

Any exceptions, extensions or modifications to this program must be agreed to in writing between ███████ and Lexmark to be valid. You signify your acceptance of the terms and conditions of this program through invoice deductions for such coop funds. If you have any questions please contact your National Sales Manager.

Program rebates apply to only to sales located within the United States.

CONFIDENTIAL - OUTSIDE COUNSEL ONІA3141

## EXHIBIT B

█████████████ **TERMS AND CONDITIONS**

These Terms and Conditions are made a part of the Agreement (as defined on the cover page of the Trade Vendor Purchasing Agreement between the parties and referenced therein):

**1. Warranty.**

    **a.** In addition to any end-user warranties provided by Vendor, Vendor hereby expressly warrants to ████████ that all of the Products to be provided by it pursuant to this Agreement:

        (i) are merchantable and fit for their intended purposes;

        (ii) are free from defects in design, materials or workmanship;

        (iii) are duly marked with all legally-required patent, trademark, copyright or other markings;

        (iv) are duly marked with the proper country of origin with respect to Products wholly or partially made outside the United States or containing components wholly or partially made outside the United States;

        (v) INTENTIONALLY LEFT BLANK

        (vi) comply in all respects with all applicable laws, statutes, ordinances and regulations;

        (vii) have not been manufactured using child or prison labor

        (viii) are in compliance with all specifications and requirements specified by ████

        (ix) conform to all samples, models or specimens of such Products provided to ████████

        (x) conform to Vendor's specifications in Vendor's written materials;

        (xi) bear warnings, labels and markings required by all applicable laws, rules and regulations; and

        (xii) are free from liens and encumbrances.

    **b.** All written warranties provided by Vendor with respect to consumer products shall comply with all applicable laws, rules and regulations, including without limitation, all labeling requirements and the Magnuson-Moss Warranty Federal Trade Commission Improvement Act. EXCEPT AS OTHERWISE WARRANTED IN THIS SECTION 1, THE PARTIES ACKNOWLEDGE AND AGREE THAT THE PRODUCTS SOLD BY VENDOR ARE SOLD AS IS, WITHOUT WARRANTIES, WHETHER EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO THOSE OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE AND THE WARRANTY AGAINST INFRINGEMENT.

    **c.** Vendor confirms, represents and warrants that neither Vendor nor the production facilities used to manufacture the Products employ neither any workers less than sixteen (16) years of age, nor any forced, prison, or conscripted labor. Vendor agrees ████████ representatives may inspect any employment records if there is an appearance of breach of this warranty and ████████ shall be immediately entitled, without right of recourse by Vendor to cancel all pending purchase orders, and return any Products previously accepted for full refund.

**2. Indemnity.** With respect to any and all of the Products covered by this Agreement, Vendor agrees to defend, indemnify and hold harmless ████ (inclusive of ████████ subsidiaries and affiliates, their successors and assigns) at Vendor's expense from and against any claim, charge, demand, proceeding, suit, liability, loss, cost, expense, order, decree, attorneys fees, court costs, trial or appeal and judgments including damages of any kind owed to a third-party and resulting from, arising out of or in connection with: (a) any actual or claimed personal injury (including death), property damage or loss of any nature whatsoever alleged to have occurred as a result of the use of any of the Products covered by this Agreement, (b) any defect in material, workmanship or design, (c) patent, trademark or copyright infringement or trade secret misappropriation with respect to any of the Products covered by this Agreement, the Vendor's advertising associated with the Products, and the Vendor's packaging of the Product, (d) any false or deceptive advertising claims made by Vendor with respect to any of the Products covered by this Agreement or any Vendor-supplied packaging or Vendor advertising associated therewith; (e) any negligent or wrongful act or omission committed by Vendor; or (f) Vendor's breach of any representations, warranties or covenants in this Agreement, including without limitation the warranties set forth in Section 1 hereof. ████ shall have the right to participate and be represented in any such action, suit or proceeding by its own attorneys at its own expense. Notwithstanding the foregoing, Vendor shall have no liability whatsoever for any unauthorized warranties, representations or advertisements made by ████ Further, Vendor assumes no liability for any claim, cause of action or judgment caused, directly or indirectly, by a non-Vendor product or the combination of Vendor's product with a non-Vendor product.

**4. Limitation of Liability.** EXCEPT FOR CLAIMS FOR INDEMNIFICATION, IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR CONSEQUENTIAL, SPECIAL, INDIRECT, PUNITIVE OR INCIDENTAL DAMAGES, INCLUDING BUT NOT LIMITED TO ANY DAMAGES RESULTING FROM LOSS OF USE OR PROFITS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, WHETHER IN AN ACTION BASED ON CONTRACT, TORT (INCLUDING NEGLIGENCE) OR ANY OTHER LEGAL THEORY, EVEN IF THE PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

**5. Patent Infringement.** In the event that ████████ receives a communication asserting that any of the Products covered by this Agreement infringe one or more patents ████████ will promptly provide such communication to Vendor. Vendor agrees to promptly notify the sender of such letter that Vendor is the supplier of such Product and that all questions and issues related to such product are to be directed to Vendor (or to Vendor's supplier, if applicable). Vendor shall provide indemnity and defense to protect ████████ as provided above in Section 2. Vendor's obligations to ████████ in this paragraph and in Section 2 are conditioned on ████████ providing prompt written notice of any claim asserted against it for which Vendor may be liable. Vendor agrees to cooperate with and provide to ████████ written assurances that such Product(s) is/are not infringing, the patent at issue is invalid, or such similar defense, within six (6) weeks of its receipt of such letter. If Vendor does not provide such written assurances to ████████ within such six (6) week period, then ████████ may return or destroy, at Vendor's option and expense, and any allegedly infringing Product, and Vendor shall refund, in full, the purchase price of any returned or destroyed Product.

**6. Statutory Compliance.** Vendor agrees and certifies that unless specifically exempted by law, it:

Page 14 of 23

CONFIDENTIAL - OUTSIDE COUNSEL ONLY

a. Complies with the requirements of Executive Order 11246 as amended by Executive Order 11375, 41 C.F.R. 60-1.4, and agrees that the Equal Opportunity Clause (non-discrimination based on race, color, religion, sex, or national origin) and other applicable contractual clauses of this regulation are incorporated in and made a part of all contracts or purchase orders awarded to Vendor.

b. Complies with the requirements of Section 503 of the Rehabilitation Act of 1973 and 41 C.F.R. 60-741.5 and agrees that the Equal Opportunity Clause for Workers with Disabilities and other applicable contractual clauses of this regulation are incorporated in and made a part of all contracts or purchase orders awarded to Vendor.

c. Complies with the requirements of Section 402 of the Vietnam Era Veterans Readjustment Act of 1974 and 41 C.F.R. 60-250.4 and agrees that the Affirmative Action Clause for Disabled Veterans and Veterans of the Vietnam Era and other applicable clauses of this regulation are incorporated in and made a part of all contracts or purchase orders awarded to Vendor.

**7. Country of Origin Information.** Vendor shall provide ▮▮▮▮ with accurate Country of Origin information for each existing or new item, article, or good (identified separately by SKU) in accordance with the Country of Origin definition and standard set forth in the Trade Agreements Act, 19 U.S.C. 2501, et seq., and its implementing regulations, 48 C.F.R. 52.225.5. Vendor shall promptly revise such disclosures to reflect a Country of Origin change for an item as each such change occurs. Vendor shall utilize the Vendor Portal Program to provide and revise Country of Origin disclosures.

**8. Confidentiality.** In the performance of or otherwise in connection with this Agreement, one party ("*Discloser*") may disclose to the other party ("*Recipient*") certain confidential information ("Confidential Information"). "Confidential Information" shall mean all written, electronic, oral, visual or intangible information disclosed during the term of this Agreement concerning Discloser's products, services, technology, business, finances, strategy, customers, end-users, employees or contract personnel, which is marked or otherwise identified in writing as "Confidential" at the time of disclosure or that would otherwise be considered confidential or proprietary to a reasonable business person, excluding, however, any information that: (i) was known by Recipient prior to disclosure hereunder, (ii) is independently developed by Recipient, (iii) is or becomes publicly available without breach of this Agreement, or (iv) is rightfully received by Recipient from a third party without accompanying confidentiality obligations, (v) is released for disclosure by Recipient with its written consent. The Recipient will treat such Confidential Information as confidential and proprietary of the Discloser and for a period of two (2) years from the date of first disclosure will: (a) use the Confidential Information of the Discloser solely for the purposes set forth in this Agreement; (b) take suitable precautions and measures to maintain the confidentiality of the Confidential Information of the Discloser; and (c) not disclose or otherwise furnish the Confidential Information of the Discloser to any third party other than employees or independent contractors of the Recipient who have a need to know the Confidential Information to perform its obligations under this Agreement, provided such employees or independent contractors are obligated to maintain the confidentiality of the Confidential Information. The obligations of this Section shall survive termination of this Agreement.

**9. Cooperation.** Each party agrees to promptly cooperate with the other party with regard to any reasonable request for information or other assistance related to compliance with any regulatory issues, laws, or requirements concerning the merchandise or its packaging, labeling, markings, or contents.

**10. Images.** Vendor hereby grants t ▮▮▮▮ (including its affiliates and subsidiaries) during the term of this Agreement a non-exclusive, limited, worldwide, non-sub licensable license to reproduce, prepare derivative works, distribute, and display photographs, images, and any marketing descriptions of the Product.

**11. Miscellaneous.**

a. **Choice of Law.** This Agreement, its interpretation, performance or any breach thereof, shall be construed in accordance with, and all questions with respect thereto shall be determined by the laws of the State of New York, excluding its conflict of law provisions.

b. **Amendments and Waiver.** No amendment to any provision of this Agreement shall be effective unless in writing and signed by both parties. The waiver by either party of a breach or a default of any provision of this Agreement by the other party shall not be construed as a waiver of any succeeding breach of the same or any other provision, nor shall any delay or omission on the part of either party to exercise or avail itself of any right, power or privilege that it has, or may have hereunder, operate as a waiver of any right, power or privilege by such party.

c. **Notices.** All notices required to be given under this Agreement must be given in writing and delivered either in hand, by certified mail, return receipt requested, postage pre-paid, or by recognized overnight delivery service, all delivery charges pre-paid, and sent to the addresses set forth in the first page of this Agreement. Any notice to ▮▮▮▮ shall be sent to:
▮▮▮▮

d. **Assignment.** Neither party may assign this Agreement or any of its rights or delegate any of its duties under this Agreement without the prior written consent of the other party.

e. **Force Majeure.** If performance hereunder is prevented, restricted or interfered with by any act or condition whatsoever beyond the reasonable control of a party, the party so affected, upon giving prompt notice to the other party, shall be excused from such performance to the extent of such prevention, restriction or interference. However, if either party is prevented due to such force majeure event from performing a material obligation under this Agreement for more than ninety (90) days, then the other party shall be entitled to terminate this Agreement.

f. **Entire Agreement.** This Agreement, together with all exhibits, schedules and attachments hereto, constitutes the entire agreement between the parties with respect to the subject matter hereof. This Agreement supersedes, and the terms of this Agreement govern, any invoices, bills of lading or prior agreements with respect to the subject matter hereof. To the extent applicable, the parties expressly agree that any Vendor funded rebate agreement currently in effect between the parties shall not be superseded by operation of this Section E.10.f. Any terms and conditions in a purchase order which adds to or contradicts the terms and conditions contained in this Agreement shall be void and have no effect.

g. **Dispute Resolution.** Each party commits that in the event a dispute should arise under this Agreement or relating in any manner thereto, the parties agree to attempt to mediate their dispute prior to the commencement of formal litigation (i.e., the filing of a lawsuit or other legal proceeding), using a third party mediator Any mediation shall take place in a mutually agreed upon location; provided, however, that if the parties cannot agree upon a location, such mediation shall take place in the location determined by the third party mediator. The

CONFIDENTIAL - OUTSIDE COUNSEL ON A3143

costs of such mediation shall be equally divided between the parties. Such mediation shall be conducted by each party designating a duly authorized officer or other representative to represent the party, with authority to bind the party, and that the parties agree to exchange informally such information as is reasonably necessary and relevant to the issues being mediated. If such mediation is unsuccessful, than either party shall have the right to initiate litigation in accordance with subsection (h) below. All mediation proceedings shall be confidential, and no information exchanged in such mediation shall be discoverable or admissible in any litigation involving the parties. In the event a party seeks equitable relief (such as injunctive relief or specific performance), or in the event of an approaching deadline prescribed by an applicable statute of limitation, then there shall be no requirement that such party utilize the mediation process referred to herein.

**h. Litigation and Waiver of Jury Trial.** In the event the parties are unable to mediate their dispute to a satisfactory resolution, the parties are permitted to litigate in any court having jurisdiction over the parties and the subject matter. **IN ANY SUCH PROCEEDINGS AND TO THE EXTENT PERMITTED BY LAW, EACH OF THE PARTIES HEREBY KNOWINGLY AND WILLINGLY WAIVES AND SURRENDERS SUCH PARTY'S RIGHT TO TRIAL BY JURY AND AGREES THAT SUCH LITIGATION SHALL BE TRIED TO A JUDGE SITTING ALONE AS THE TRIER OF BOTH FACT AND LAW, IN A BENCH TRIAL, WITHOUT A JURY.**

**i. Attorneys Fees.** In the event of any litigation between the parties hereto with respect to the Agreement, the prevailing party (the party entitled to recover costs of suit, at such time as all appeals have been exhausted or the time for taking such appeals has expired) shall be entitled to recover reasonable attorney's fees, including fees incurred at the appellate level, in addition to such other relief as the court may award.

**j. Severability.** Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

**k. Successors and Assigns.** This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, successors and assigns.

**l. Relationship of Parties.** Each party, in all matters relating to this Agreement, will act as an independent contractor. Neither party will have authority and will not represent that it has any authority to assume or create any obligation, express or implied, on behalf of the other, or to represent the other as an agent, employee or in any other capacity. Neither execution nor performance of this Agreement shall be construed to have established any agency, joint venture or partnership. Neither party shall make any warranties or representations on behalf of the other party.

**m. Conflicting Provisions.** In the event of a conflict between two or more provisions of this Agreement, the terms in the main body of this Agreement shall take precedence over any conflicting terms in any exhibit, schedule or attachment.

**n. Counterparts and Facsimile Signatures.** This Agreement may be executed in multiple counterparts and via facsimile, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.
Updated 6/9/09 Page 3 of 4

**12. TERMS AND CONDITIONS APPLICABLE ONLY TO PRODUCTS SOLD IN THE COMMONWEALTH OF PUERTO RICO.**

**a.** All written warranties provided by Vendor with respect to consumer products shall comply with the applicable laws, rules and regulations of the jurisdiction of Puerto Rico, particularly, those by the Department of Consumer Affairs (known in Spanish by the acronym "D.A.C.O."); and, Law No. 93 of June 24, 1971, or the Law Prohibiting the Sale in Puerto Rico of any Consumer Product or Home Appliance with Warranties that Fail to Include Puerto Rico in the Coverage.

**b.** With respect to any and all of the Products covered by the Agreement, Vendor agrees to defend, indemnify and hold harmless ███████ ██████ arising out of or in connection with any false or deceptive advertising claims made by Vendor with respect to any of the Products or any packaging or advertising created Updated 6/9/09 Page 4 of 4 therewith, pursuant to D.A.C.O.'s Rules and Regulations Against Deceptive Practices and Advertising, pursuant to Law No. 5 of April 23, 1973; Law No. 148 of June 27, 1968; Law 97 of June 19, 1953; and, Law No. 228 of May 12, 1942, as amended; and, Law No. 95 of May 16, 2006 and Law No. 42 of January 27, 2006, as amended.

**c.** Except for claims for indemnification, in no event shall either party be liable to the other party, even if the party has been advised of the possibility of damages under the Civil Code of Puerto Rico, Title 31 L.P.R.A., on Contracts, Section 3371, et seq.; the Civil Code of Puerto Rico, Title 31 L.P.R.A., on Tort Liability, Section 5141; and, the Commercial Code of Puerto Rico, Title 10, L.P.R.A., on Purchase-Sale Agreements, Section 1701, et seq.; and, such other applicable authority and statute.

**d.** If Vendor is required by law or regulation to reduce the prices specified on any order, Vendor shall adjust its billings accordingly and refund any excess payments, particularly, but not limited to, when required by Executive Order pertaining to emergency price controls, prohibition against price gouging and such other measures based on necessity or public policy.

**e.** In the event that a court or regulatory agency or body finds that the prices on an order are in excess of that allowed by any law or regulation of any governmental agency, the prices shall be automatically revised to equal a price which is not in violation of said law or regulation, Executive Order, or pursuant to Law No. 278 of August 31, 2000, know as the Insular Provisions Emergency Law Complementary to Law No. 211 of 1999 and the DACO Law.

**f.** Vendor recognizes that all transactions with ███████ represent a sale for resale, and as such, state sales and use taxes are not due on such transactions, and in furtherance thereof, Vendor shall obtain a Business Registration Number and provide proof of same to ███████ by means of Vendor's registering with the local taxing authority, specifically, with the Department of Public Revenue (known in Spanish as "El Departamento de Hacienda"), and or any of its divisions, offices or dependencies as directed, to obtain these taxation benefits and exemptions.

**g.** As may be required by a taxing authority, ███████ shall report the Scan-Based Trading inventory to the proper taxing authorities or, specifically, to the Department of Public Revenue (known in Spanish as "El Departamento de Hacienda"), and or any of its divisions, offices or dependencies as directed.

**h.** The parties agree to comply with all applicable laws and regulations and, if challenged, will work together to investigate and confirm such compliance. Such laws and regulations may include, if applicable, those applicable to the environment as promulgated and enforced by federal authorities (including and not limited to the Environmental Protection Agency and O.S.H.A.) and authorities in the

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3144

Commonwealth of Puerto Rico, and local laws and regulations regarding sales representatives, particularly, pursuant to Law 21 of December 5 1990, and such other applicable law, regulation and statute.

I The parties agree to comply with all applicable laws and regulations and, if challenged, will work together to investigate and confirm such compliance. Such laws and regulations may include, if applicable, the provisions of the Foreign Corrupt Practices Act; and, all local export control legislation of the Commonwealth of Puerto Rico, including and not limited to Law No. 75 of June 24, 1964, known as the Dealership and Termination Act, and such other applicable law, regulation and statute.

## 13. Material Safety Data Sheets.

**a.** It is the responsibility of the manufacturer, supplier, or importer to provide the proper Material Safety Data Sheet ("MSDS") at the time of the first shipment to ▮▮▮▮▮ n addition, the manufacturer, supplier, or importer shall provide updated MSDS information within 24 hours of any formulation change to the product, or if the current MSDS is found to contain inaccurate information. In addition to MSDS, the manufacturer, supplier, or importer is responsible for providing to ▮▮▮▮▮ such hazardous material information as is required by Title 49 Code of Federal Regulations (CFR) Parts 100 through 185. Products with hazard classes other than "Other Regulated Materials – Domestic" or "ORM-D" shall not be sold to ▮▮▮▮▮

**b.** The transportation information for each product falling within the terms of this section must be provided to ▮▮▮▮▮ before any such products are placed in ▮▮▮▮▮ nventory. This information must include the following:
  (i) DOT proper shipping description, including technical names, if required for generic descriptions.
  (ii) Specific packaging requirements, if necessary
  (iii) DOT Exemptions if required (DOT-E Numbers)

**c.** All information is subject to review and confirmation.

## 14. Delivery and Acceptance.

**a.** Time of delivery and quantities ordered are not of the essence. ▮▮▮▮▮ reserves the right to cancel an order any time before shipment. ▮▮▮▮▮ reserves the right to cancel any portion of any shipment that does not conform to the order placed. In addition, Products delivered in excess of the quantity ordered may, at the sole discretion of ▮▮▮▮▮ result in immediate rejection of the Products and return of the Products at Vendor's expense and title and risk of loss shall remain with Vendor at all times prior to and upon rejection. Approval of any samples by ▮▮▮▮▮ shall not excuse Vendor from exact compliance with specifications. Acceptance of any part of a shipment shall not bind ▮▮▮▮▮ to accept the remainder of that shipment or any future shipments or constitute a waiver of ▮▮▮▮▮ right to revoke acceptance of Products and/or to return any Products accepted. No over-shipments will be accepted against any order without written approval of ▮▮▮▮▮ n the event of a shipment shortage, the parties shall investigate and reconcile the basis for the shortage prior ▮▮▮▮▮ aking any deduction.

**b.** Products must be shipped by the particular route, method and carrier stated in this Agreement unless otherwise agreed.

**c.** Defects in the Products (but not defects in shipping), apparent or hidden, are not waived by ▮▮▮▮▮ acceptance of all or any part of the Products. ▮▮▮▮▮ retains the right to cancel any portion of a remaining order, to return any portion of Products delivered and accepted in addition to all of ▮▮▮▮▮ other remedies provided by law. In particular, Vendor agrees to be responsible for all outbound transportation costs associated with permitted returns ("RTVs"), provided the terms of Section 4.3 are followed. Should Vendor and ▮▮▮▮▮ negotiate a different freight arrangement, the parties shall jointly execute a written confirmation explaining the revised policy.

**d.** Each shipment and each order shall be separately billed and shall include a packing slip listing all part numbers and quantities of Products shipped. Each package, packing slip and tag covered by a particular order shall bear that purchase order number. All items shipped at the same time shall be covered by a single bill of lading.

**e.** ▮▮▮▮▮ shall not be charged for packaging, boxing, crating, or cartage. Vendor shall promptly refund the full amount of any deposits made by ▮▮▮▮▮ on Vendor's drums, pallets, boxes, reels, and other special containers immediately upon return of such items to Vendor.

**f.** Vendor agrees to notify ▮▮▮▮▮ at least sixty (60) days in advance of any package changes that impact shipping, additions or changes in UPC, bar codes or associated container quantities, including but not limited to pack size, master pack, bar code, package dimensions, and product description.

## 15. Pricing and Taxation.

**a.** If any Products furnished under any order are composed of more than one part, Vendor shall furnish ▮▮▮▮▮ such quantities of component parts as Vendor shall order at reasonable prices proportionate to the prices specified for the complete assembly. ▮▮▮▮▮ right to order additional component parts hereunder shall survive completion of any order.

**b.** In the event price is not specified on an order, the order is not to be filled at prices higher than the last previously quoted or charged price without ▮▮▮▮▮ written consent. If Vendor establishes lower prices on Products prior to shipment, ▮▮▮▮▮ shall benefit from same when invoice is rendered. If Vendor is required by law or regulation to reduce the prices specified on any order, Vendor shall adjust its billings accordingly and refund any excess payments.

**c.** Vendor shall guarantee its prices against Vendor's own price declines, including a protection of ▮▮▮▮▮ owned inventories (subject to a look back period specified by Vendor in a price reduction announcement), by credit memo. In the event that prior to the final shipment under any order, Vendor sells to others purchasing in aggregate annual quantities that are equal to or fewer than the aggregate annual quantities purchased by ▮▮▮▮▮ goods of the same kind as ordered at lower prices than those offered to ▮▮▮▮▮ the prices shall be deemed automatically revised to equal the lowest prices at which Vendor shall have sold or shall have offered such goods and payment shall be made accordingly. In the event ▮▮▮▮▮ shall become entitled to such lower prices, but shall have made payment at any prices in excess thereof, Vendor will promptly refund the difference in price to ▮▮▮▮▮ The prices to ▮▮▮▮▮ include all taxes whether or not set forth separately. If any manufacturer's excise or other similar or different taxes are paid on the Products and if such tax, or any part thereof, is refunded to Vendor, then Vendor shall immediately pay ▮▮▮▮▮ he amount of such

CONFIDENTIAL - OUTSIDE COUNSEL ON A3145

refund. In the event that a court or regulatory agency or body finds that the prices on an order are in excess of that allowed by any law or regulation of any governmental agency, the prices shall be automatically revised to equal a price which is not in violation of said law or regulations. If ████ shall have made payment before it is determined that there has been a violation, Vendor shall promptly refund an amount of money equal to the difference between the price paid for the Products and that price which is not in violation of said regulations.

**d.**     Vendor recognizes that all transactions with ████ represent a sale for resale and, as such, state sales and use taxes are not due on such transactions. ████ will provide Vendor with appropriate state and provincial resale certificates to substantiate its claim of resale. However, it is the responsibility of Vendor to report all owned personal property to the property appraiser for each county citing the address where the property is located. This report shall be filed using the acceptable tax returns published by the particular property appraiser's office. Should ████ receive any tax bill and/or penalty associated with Vendor's property, Vendor will be liable for tax and penalties along with any expenses incurred by ████ administering the matter with the relevant taxing authority.

**e.**     As may be required by a taxing authority, ████ shall report the Scan-Based Trading inventory to the proper taxing authorities, as Scan-Based Trading property within ████ possession, owned by Vendor. When reported, ████ agrees to provide the reported inventory amounts to Vendor. ████ agrees not to pay any property taxes on Scan-Based Trading inventory, nor to seek reimbursement for any such property taxes from Vendor subject to the exception set forth in subsection (f) below. Vendor shall directly pay the required taxing authorities all necessary and valid property taxes pertaining to the Scan-Based Trading inventory in ████ possession.

**f.**     In the event the taxing authority has the lawful right to assess and levy the resident taxpayer (i.e. ████ and the resident taxpayer is directed to return all such property for taxation within the taxing jurisdiction ████ will lawfully comply and remit payment of said property taxes. In such event, Vendor shall reimburse ████ within thirty (30) days of payment to the taxing authority.

**16. Code of Conduct.** This Supplier Code of Conduct applies to Vendor and Vendor employees that produce goods or services for ████ or any of its subsidiaries, affiliates, divisions or agents ████. Although suppliers to ████ are from many different countries, nationalities and cultures, the Supplier Code of Conduct represents ████ commitment to source goods and services only from persons and firms that achieve internationally recognized standards and practices in dealing with their workers and their working environment.

All Suppliers to ████ currently meet and will continue to meet, so long as they act as a Supplier to ████ each of the following standards:

**a.**     **Prohibition of Forced Labor.** No prison, indentured or forced labor of any kind is used by the Supplier. Foreign workers hired by the Supplier are not required to remain in employment at any time against their will.

**b.**     **Prohibition of Child Labor.** No person below the age of 16 is employed by the Supplier. If the local legal minimum age for work is higher than 16, the Supplier employs no one younger than the legal minimum age.

**c.**     **Compliance with Local Law.** The Supplier will comply with all laws and regulations to which it is subject, including those applicable to the environment.

**d.**     **Working Hours.** The Supplier will insure that employee working hours are in compliance with local law, but in no event shall an employee be required to work more than sixty (60) hours per week, or more than six (6) days during any seven (7) day period. All employees of the Supplier shall be free to refuse to work any requested overtime without threat of termination, punishment or penalty.

**e.**     **Wages and Benefits.** All employees of the Supplier shall receive the greater of the legal minimum wage and benefits or the prevailing wage and benefits in the industry, with a written accounting given to the Employee during each pay period clearly indicating the employee's compensation and indicating any deductions from the employee's pay. Supplier agrees to pay higher hourly rates for late shifts than for normal shifts. The Supplier may not deduct penalties for disciplinary infractions from employee wages.

**f.**     **Non-Discrimination.** The Supplier will make hiring decisions solely on the basis of the employee's qualifications to perform the specific job. The Supplier must not make any decisions relating to hiring, salary, benefits, advancement, discipline, termination or advancement on the basis of the employee or potential employee's race, color, gender, nationality, religion, age, maternity, or marital status.

**g.**     **Working Environment.** The Supplier must maintain a working environment in its facilities which is safe and healthy, and at all times in full compliance with all applicable laws and regulations relating to working conditions.

**h.**     **Compliance with Applicable U.S. Laws.** The Supplier will comply with all laws and regulations of the United States of America which may be applicable to its relationship with ████ including, without limiting the generality of the foregoing, the provisions of the Foreign Corrupt Practices Act and all applicable export control legislation.

**i.**     **Inspection Right.** The Supplier shall maintain reasonable records and documentation of its compliance with this Code of Conduct, and shall permit representatives of ████ to inspect (with or without notice) all such records and documentation, and the facilities of the Supplier, to independently confirm compliance with this Code of Conduct.

Vendor agrees to post a copy of a notice of this policy in at least two prominent positions where it is likely to be read by the employees. This notice must be in English as well as in the local language spoken by a majority of Supplier's employees.

**17. Vendor Compliance.** Vendor acknowledges policies and procedures outlined in the ████ Vendor Partnership Program manual (the "Manual") which may be accessed via the Vendor Portal at ████. It is the responsibility of the Vendor to provide and maintain valid email contact information for compliance chargeback notifications. Such contact information must be included for **_each_** active ████ vendor number and addressed to ████ Failure to do so will inhibit vendor's opportunity for dispute of the deduction. Notwithstanding the foregoing ████ agrees to waive noncompliance fees arising out of or relating to any failure by Vendor to adhere to requirements and/or guidelines contained in the Manual.

CONFIDENTIAL - OUTSIDE COUNSEL ON A3146

**18. Code of Ethical Behavior.** Vendor agrees to comply wit▮▮▮▮▮▮▮ Code of Ethical Behavior as it pertains to Gifts and Entertainment, included in the DOCUMENTS section of the Vendor Portal, located a▮▮▮▮▮▮▮ If you know of any Code violations, call▮▮▮▮ ▮▮▮▮ or contact us a▮▮▮▮▮▮▮▮▮▮▮

**19. Social Accountability.** ▮▮▮▮▮▮▮ has made value-based management the framework around which our global business strategy is constructed. In doing so, we have committed ourselves to uphold the highest ethical, social and environmental standards in the conduct of our supply chain. That means we will balance the needs and concerns of our stakeholders – those who impact, are impacted by, or have a legitimate interest in ▮▮▮▮ ctions and performance. Accomplishing this requires a comprehensive set of policies and programs integrated throughout our business operations.

**All vendors who supply private brand product to** ▮▮▮▮ **will be required to:**

a. Disclose all manufacturing locations where private brand product is produced.
b. For U.S. manufacturing locations, complete a Self-Assessment Survey. If a high-level of risk is indicated, submit to a third party factory assessment (see below for fees).
c. For non-U.S. manufacturing locations where private brand is produced, submit payment in advance to ▮▮▮▮ ▮▮▮▮ designated third party factory audit service provider, (or any other third party designated by▮▮▮▮, for factory assessments (vendor pre-pay). Cost for the initial factory evaluation if $1,250/factory, and $1,050 for re-audit(s) as required.
d. All program details are found in the Vendor Manual available on the Vendor Portal.

**20. Quality Assurance- Product Testing.** We know that you share in the commitment of ▮▮▮▮ to provide quality merchandise to our customers. To safeguard the quality of purchases and ensure that merchandise will meet our customers' expectations, we have partnered with ▮▮▮▮ to operate a comprehensive product-testing program for private brand merchandise. All private brand merchandise purchased by ▮▮▮▮ must be tested by▮▮▮▮ or any other third party designated by▮▮▮▮ o meet all applicable laws and regulatory requirements as well as all quality assurance product specifications.

**All vendors who supply private brand product to** ▮▮▮▮ **will be required to:**

- Submit samples of ALL private brand products to▮▮▮▮ for pre-production laboratory testing.
- ALL testing expense is the responsibility of the vendor.
- Testing fees vary and are dependent on the complexity of the product category.
- All program details are found in the Vendor Manual available on the Vendor Portal.

CONFIDENTIAL - OUTSIDE COUNSEL ON A3147

## Accounts Payable Procedures

To process your invoices in a timely manner and resolve disputed items, it is important that you adhere to the following procedures:

I. ▮▮▮▮ Invoicing Instructions.

II. To initiate the resolution of open issues, please submit a monthly electronic (via email) statement or aging including all open invoices, disputes and credits. If you are disputing open items, please notify us in writing and submit the following:

A. **Open Invoices:**
1. An electronic summary (MS Excel) of the outstanding invoices including invoice number, invoice date, P.O. #, location number and amount.
2. Upon request, please provide a clear copy of the invoice and a Proof of Delivery signed by an ▮▮▮ representative.
3. Open unpaid invoices should only be disputed 30 days after the invoice due date and no later than 60 days.

B. **Shortage and Pricing Deductions (chargebacks):**
1. ▮▮▮ is responsible to provide a copy of the ▮▮▮ debit memo and a copy of the original invoice and proof of delivery signed by an ▮▮▮ representative must be submitted for all shortages.
2. Shortage and Pricing deductions must be disputed within 90 days from the check remittance date, or after written notification by ▮▮ of a balance due .

C. **Return to Vendor (RTV) Deductions (chargebacks):**
1. A copy of the ▮▮▮ RTV debit memo and a clear explanation of the discrepancy.
2. All RTV disputes must be received within 90 days from the date of the check.

## ▮▮▮▮ Invoicing Instructions

I. ▮▮▮ requires an EDI ANSI X-12 810 Invoice (Version 4010).

II. Each invoice must be billing for a single purchase order. It is not acceptable under any circumstances to combine purchase orders on a single invoice.

III. The invoice must include the following information.

- Unique Purchase Order Number (7 characters) followed by the store number or Consolidator (4 characters)
- Delivery Address
- Invoice Number (numeric characters preferred)
- Invoice Date (greater than or equal to ship date)
- ▮▮▮ SKU Number
- VPC (Vendor Product Code)
- Unit of Measure for Item(s) (i.e. each, dozen) with the same value as on the P.O.
- Payment Terms
- Freight Charges (if specified on the P.O.)

IV. Invoice pricing must be identical to the purchase order. Any differences should be resolved with merchandising before invoicing occurs.

V. For DFI, all charges or allowances that are not reflected in individual item prices on the P.O. must be clearly identified, as to type and reason, after the merchandise subtotal. Cash discount is calculated on the merchandise total.

VI. Failure to comply may result in additional handling charges and fines.

VII. Our billing address is:

VIII. For questions on the dispute resolution process, please call one of our Senior Technical Leads at:

Page 20 of 23

CONFIDENTIAL - OUTSIDE COUNSEL ON A3148

## EDI Implementation Guidelines

████████ has made a commitment to respond quickly to our customer's needs. We would like to work with you to meet this goal which will benefit both our businesses through increased sales, productivity and ultimately profit. Involved in this strategy is electronic data interchange (EDI), which requires the development of a partnership between us. We expect that you will meet our request to partner with us in this area and will have all the necessary requirements in place when we begin doing business together.

████████████ SPECIFICATIONS
████████ supports American National Standards Institute (ANSI) X12 (Version 4010).

*Invoice 810* – Your electronic transmission of the invoice translates into our accounts payable system, bridges data from receiving and is translated to the payment system. Improved speed and accuracy are key benefits.

*Organizational Relationships 816* – Provides location address information from ████████ to you, which eliminates the need to send the same information on a purchase order or any other documents. We expect you will maintain a file in your system of our location addresses to match to our location numbers in the purchase order transaction. We do not send address information with this transaction.

*Payment Order/Remittance Advice 820* - An 820 Payment Order/Remittance Advice provides the supplier direct payments and remittance advice directly to suppliers banking institution via EFT (Electronic Funds Transfer). This is set up by request only from the ████████ ████████ Please e-mail directly a█████████████████

*Purchase Order 850* - All purchase orders will be transmitted to you electronically, which we expect will automatically translate to your order entry system. This process saves mail time, saves labor by eliminating manual processing, improves accuracy by reducing keying errors, and ultimately increases business by creating higher turns and quicker reorders.

*Product Activity Data 852* - An 852 Product Activity Data provides information by vendor product code, ████████ SKU and UPC. Data provided includes quantity on hand, quantity on order, quantity sold and quantity in transit. ████████ does not pay for the communication costs for this transaction, please refer to the 852 specifications and the hyperlinks below for the reverse billing option procedures. **The 852 Activity report is mandatory for Scan-Based Trading vendors.**

*Advanced Ship Notice 856* – The Advanced Ship Notice ("ASN") notifies us that your shipment has been made. It includes carrier, purchase order UCC128 barcode values, and item level details, and is integrated to our merchandising and receiving systems, resulting in more efficient and accurate replenishment and receiving processes.

*Receiving Advice 861* - An 861 Receiving Advice provides the supplier any adjustments from the 856 ASN on shortages or damaged goods received only at cross dock and csc locations.

### EDI IMPLEMENTATION

Please refer to the Vendor Portal Website ████████████ o obtain our EDI Implementation Guide. The three programs listed are:
1. Retail/Trade
2. Scan-Based Trading
3. Virtual Warehouse

If you are unsure as to which program describes your relationship with us, please contact your merchandising contact prior to downloading any documentation.

You do not need to be a participant of the Portal or require a password to obtain the EDI documentation. The EDI guide explains the EDI processing details, provides specifications and start-up procedures. Questions? Please email the EDI department a█████████████
**COMMUNICATIONS:**

You must have VAN (Value Added Network) & AS2 capabilities to exchange EDI with ████████ We will be migrating off the VAN (value Added Network) and only AS2 will be the accepted means of communication.

## EDI testing must be completed prior to initiating any orders via EDI

CONFIDENTIAL - OUTSIDE COUNSEL ON A3149

## EXHIBIT C

## FREIGHT COLLECT PROGRAM TERMS

The following shall apply to vendors participating in ▓▓▓▓▓▓ **Freight Collect Program** pursuant to which ▓▓▓▓▓▓ pays for freight and arranges for transportation of products via ▓▓▓▓▓ s designated carriers.

### Collect Freight Program Description

1. Vendors that participate in this program will provide ▓▓▓▓▓ a prepaid freight item price t ▓▓▓▓▓ distribution locations, taking into account all ▓▓▓▓ destinations.
2. **Freight Allowance Calculation**: Not applicable
3. ▓▓▓▓▓ reserves the right to renegotiate the existing freight allowance no more than twice per calendar year based on any changes that have a direct impact on the cost of transportation. Examples are, but not limited to, increased fuel costs, change in product mix, relocation of distribution points, & additional ship to points. If ▓▓▓▓ desires such renegotiation, ▓▓▓▓▓ shall first provide Lexmark with shipment history by location for Lexmark's analysis and review, and the parties will negotiate in good faith and will document any change in writing.
4. **Freight Allowance**: Freight allowance will be calculated as a percentage of the total cost of goods ordered from a specified eligible Vendor ID or location to all ▓▓▓▓ distribution points, and will be measured by ▓▓▓▓ eligible Purchase Orders.
   a. **Eligible Vendor ID**: Any vendor ID or location that participates on ▓▓▓▓ reight program.
   b. **Eligible Purchase Orders**: All purchase orders placed under an eligible vendor ID or location that are addressed to an ▓▓▓ sh ▓▓▓ cross dock or DC. . Any purchase order shipped prepaid by Vendor is not eligible for freight allowance
   c. **Allowance Exemption**: Eligible Purchase orders will be excluded from freight allowance only if authorized and approved by ▓▓▓▓ Any requests to ship prepaid or exclude purchase orders from allowance deduction need to be submitted by Vendor to ▓▓▓▓ for approval at least 24 hours prior to shipment by Vendor
   d. **Allowance Disputes**: Any disputes or discrepancies between Vendor's records and ▓▓▓▓ deduction must be identified and presented to ▓▓▓▓ Programs and Supply Chain within 60 days of the deduction date. Any claims outside of this period will be invalid and not eligible for credit or repayment.
   e. **Allowance Deduction**: ▓▓▓▓ will perform a monthly debit for the freight allowance amount based on the criteria outlined within this document. The Freight Allowance will be calculated by ▓▓▓▓ s described in this Section and supported by purchase order information.

## Terms And Conditions: COLLECT FREIGHT PROGRAM

   a. **FOB Origin (Pallet Count Level** ▓▓▓▓ will take ownership of shipments moved through the ▓▓▓▓ Collect Freight Program at the pallet level once transferred from the Lexmark's dock to the ▓▓▓ assigned carrier. Lexmark is responsible for all concealed carton level shortage claims through delivery to ▓▓▓▓ final PO destination cross dock or DC. (Note: Shipments may be unloaded and reloaded at an intermediate consolidation point. This consolidation point is not considered the final destination of the PO.) In the event a shortage occurs, Lexmark will notify ▓▓▓▓ Transportation with a specific PO claim, ▓▓▓▓ Transportation will obtain a signed POD (Transplace/ ▓▓▓▓ master manifest) for each tendered shipment within a reasonable amount of time. In the event a pallet shortage is discovered, ▓▓▓▓ will file a claim with the carrier or facility involved and will promptly provide payment to Lexmark (in accordance with the payment terms). Lexmark is responsible for correctly notating the master manifest with pallet counts for each PO on the manifest and the total pallet count on the manifest when product is transferred to the assigned carrier. Failure to provide PO specific and total pallet counts on the manifest will void any shortage claims.
   b. **Alternative Sourcing:** The vendor is responsible for coordination of transportation and payment of all freight expenses if product is shipped from a point that does not align with Vendor locations as specified in the agreement.
   c. **Backorders, Special Orders, Rush Orders, Drop Ships to Customers, Direct to Stores:** Unless otherwise agreed, Vendor shall be responsible for the shipping and payment of backorders, special orders, rush orders, drop ships to customer and direct to store orders. Any orders shipped prepaid are not eligible for freight allowance. ▓▓▓▓ shall be responsible for picking up the merchandise specified in the purchase order to be fulfilled from a previously identified Vendor location to a valid ▓▓▓ istribution location.
   d. Shipments of special orders such as seasonal product, promotional merchandise, displays, etc, that are not part of the regular assortment will be subject to additional freight allowance if shipped through the freight program if additional expense is incurred by ▓▓▓▓ based on these special circumstances.
      1. Prepaid and Add Freight (both together) is not allowed.
   e. **Pallet count only:** If a carrier is present during loading, a pallet count will be performed. No carton count will occur. Concealed carton shortage shall be the responsibility of Vendor, provided, however, that if Vendor can establish that the cartons were, in fact, included with the shipment ▓▓▓▓ hall bear responsibility for the carton shortage.
   f. **Shipper, Load & Count (SLC):** Any carrier representing ▓▓▓▓ will sign the bill of lading SL&C if such carrier is unable to observe loading. Any shortage at time of delivery shall be the responsibility of ▓▓▓▓
   g. **Ship Date and Time Determination:** ▓▓▓▓ will make reasonable efforts to assign a "preferred" ship date that would apply to any purchase order.
   h. **Shipment Confirmation:** ▓▓▓▓ will provide a purchase order list confirmation to Vendor at least 24-48 hours before ship date, which will include the carrier handling the transportation and the date product will ship.
   i. **Carton/Pallet Labeling:** The vendor agrees to label each pallet with the PO number, final ▓▓▓▓ ocation number, and sequence of pallets (i.e. Pallet ___ of ___).
   j. **Shipping Documents:** The vendor will be required to provide a shipping manifest for each purchase order and a master bill of lading for consolidated movement. Reference the Current Vendor Logistics Guide, Appendix A, B for examples.

CONFIDENTIAL - OUTSIDE COUNSEL ON A3150

k. **Communication of Changes:** The vendor is required to notify ▮▮▮▮▮ within 24 hours of shipping if there are any changes in the ability to ship a purchase order complete.  Changes may include not being able to ship on a particular day or not being able to fulfill a purchase order completely.

l. **Pallet Building Per Purchase Order:** When a Purchase Order is greater than 80 cubic feet, Vendor agrees to build pallets with a minimum of 80 cubic feet (72 H x 40 W x 48 L), but not to exceed 2000 lbs per pallet.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3151

# SUPERSTORE CONTRACT 2

████████████████████

### DOMESTIC VENDOR AGREEMENT
### (Must accompany the Vendor Agreement Data Form)

For purposes of this agreement, ████████ shall include ████████ its subsidiary ████████
and all of their current and future respective owned or controlled affiliates and subsidiaries.

### PLEASE READ BEFORE COMPLETING THIS DOCUMENT

This Agreement is not valid until signed by an Officer of ████████ and an authorized representative of Vendor. This Agreement may be amended or
modified only by a supporting instrument in writing signed by Vendor and an Officer of ████████ referencing this Agreement. This Agreement and the
attachments and other agreements referred to herein represent the entire understanding and agreement between ████████ and Vendor and supersede
all prior oral or written agreements between the parties. The undersigned acknowledges and agrees that the undersigned has carefully reviewed the
terms of this Agreement and the Terms and Conditions of ████████ purchase order and agrees to abide by these terms.

Vendor is aware of the ████████ Code of Business Partners Standards attached hereto as Exhibit B and Vendor agrees that Vendor shall comply with
such Standard to the extent such Standards apply to Vendor.

By signing this Agreement, the representative of Vendor represents and warrants that he/she has the power and authority to legally
bind Vendor.

### PAYMENTS
### (See Section 4 of the Vendor Agreement Data Form)

**ALL CHECKS** must be sent to our
Corporate lock box at:

████████████████

**ALL CREDIT MEMOS** must be sent to:

████████████████

**ALL INVOICES** must be sent via EDI to:

████████████████

**INVOICES** for ████████████████

### SUPPLY CHAIN REQUIREMENTS

**Shipment Requirements:**

████████ Supply Chain Guide, dated January 1, 2013 and attached hereto as Exhibit A (the "Supply Chain Guide"), is hereby
incorporated by reference and sets forth the definitive requirements for shipment of Vendor's product to any ████████ customer,
customer fulfillment center, ████████ facility. ████████ may update the Supply Chain Guide at any time by
providing Vendor with (i) at least 30 days' prior written notice of any update and (ii) a copy of the updated Supply Chain Guide.
Vendor will make commercially reasonable efforts to meet all requirements and standards as set forth in ████████ Supply Chain Guide
for shipments to all "points of delivery" including directly to ████████ customers, customer fulfillment centers ████████ stores and/or
████████ facilities. ████████ maintains inventory levels, among other things, based on Vendor's compliance with ████████ shipping
requirements and standards. .

**EDI Capable:**

Purchase Order (850); Purchase Order Change (860); Invoice (810); ASN (856); UCC 128 (Pallet Level); UCC 128 (Case Level);
Product Activity Date (852); Functional Acknowledgement (997); Payment (820).

### FREIGHT & MINIMUM ORDER TERMS
### (See Section 5 of the Vendor Agreement Data Form)

**TERMS ARE: F.O.B. ORIGIN, FREIGHT PREPAID.**

- This requirement applies to North America, Hawaii, Puerto Rico and Virgin Islands.
- Title and all rights, risks and rewards of ownership shall transfer to ████████ upon shipment. Title for each copy of a licensed
  program remains with Vendor. Vendor shall insure for ████████ benefit the order for risk of loss or damage during
  the period it is in transit from Vendor or its agent up to its initial delivery to ████████
- Shipping terms are F.O.B. Origin. The Method of Payment will be "Bill Back" which ████████ will deduct from the next scheduled
  payment to the Vendor.
- The Vendor's ████████ allowance will be applied against gross purchases. Contract locations (non-retail locations) are not
  entitled to allowances for freight or warehouse cost reimbursement.

Vendor Name: Lexmark International_____

Rev: 10/28/13

CONFIDENTIAL - OUTSIDE COUNSEL ON A3152

## RETURN POLICY

**STOCK BALANCING**
Any returns to vendor are at the sole discretion of Vendor. In cases where returns are the result of Vendor's error, Vendor bears the responsibility for the freight back to Vendor's designated location.    Any freight charges associated with all other approved stock balance returns is the responsibility of ▮▮▮

**NON-STOCK MERCHANDISE**
Any returns of non-stocking customer returns will be at the sole discretion of the Vendor and ▮▮▮▮ shall pay freight charges.

**DROP-SHIP MERCHANDISE**
Any return of Drop-Ship Merchandise will be at the sole discretion of the Vendor. ▮▮▮ will pay freight charges.

**DAMAGED/DEFECTIVE: (See Section 6 of the Vendor Agreement Data Form)**
▮▮▮ buys on a 100% no defective basis. Vendor assumes responsibility to reimburse ▮▮▮ 100% of the invoice amount for all defective product as well as the freight associated with the return, provided ▮▮▮ complies with the freight requirements as set forth in the associated Vendor return authorization. Notwithstanding the foregoing, ▮▮▮ shall not return more product than it purchased within the prior four (4) months.
   **NOTE:** Notwithstanding anything to the contrary in this Agreement, in addition to any other remedies ▮▮▮ may have, if Vendor ceases to support its products in breach of its support obligations, including any applicable warranties, and/or Vendor goes out of business, Vendor shall be responsible for all product markdowns that have been approved by Vendor in writing.

**• LIST AND RETURN**
   • ▮▮▮ panies will list and return all merchandise to Vendor. ▮▮▮ will debit Vendor for the amount of merchandise received by the Vendor after notice from Vendor that the ▮▮▮ account has been credited. Deductions for merchandise not received by Vendor will be denied. All ▮▮▮ return requests require a separate return authorization number for each return Vendor will pay return freight charges for damage and defective products only, provided ▮▮▮ complies with the freight requirements as set forth in the associated Vendor return authorization.

## REBATES/MARKETING FUNDS
### (See Section 9 of the Vendor Agreement Data Form)

**PHOTOGRAPHY FEE**
Vendors will be charged for all in-house photography that has been approved in writing by Vendor at a minimum fee of $200 per shot with a 3 shot minimum. If more complex room scenes or photos including models are needed and are approved by Vendor in writing, the Vendor will be charged the actual costs incurred by ▮▮▮ Samples must be provided at no cost. Additional charges for errors and re-shoots that are the result of inaccurate Vendor provided data will be debited back to Vendor.

**VENDOR-PROVIDED ART**
Vendors will make all commercially reasonable efforts to submit 3 individual product images for all SKUs carried by ▮▮▮ 3 images are left, right and front facing views). All vendor-provided art must meet the ▮▮▮ standards listed in the Photography Guidelines section of the Vendor Packet located on the ▮▮▮ vendor portal at ▮▮▮ If images do not meet the standards, vendor will be charged $100 per image for ▮▮▮ to modify the art to meet standards, provided this $100 fee shall not be charged unless Vendor has agreed to the charge in writing.

## POLICIES AND PROCEDURES

**PRICE INCREASES    (This is NOT optional.)**
   • ▮▮▮ will not accept any cost or list price increases:
      1) Without written notification of the proposed changes to the appropriate ▮▮▮ merchandising associate a minimum of ninety (90) days prior to the price action.

**COUNTRY OF ORIGIN**
   • Vendor shall provide country of origin information for all products sold under this Agreement and shall promptly provide updated information to ▮▮▮ writing in the event the country of origin changes for any such products.

**ACCOUNT DISCREPANCIES AND DISPUTES**
   • Any discrepancies and account disputes (except product returns) must be submitted in writing by the party asserting the discrepancy to the other party within 3 months from the deduction date of occurrence to be considered for resolution by the other. Any discrepancies or disputes submitted after 3 months shall be considered waived.
   • Vendor disputes relating to the return of product must be submitted by Vendor to ▮▮▮ n writing within 60 days of the applicable check date in which the deduction was taken. Any disputes submitted after 60 days shall be considered waived.

**RESALE PRICE**
   • ▮▮▮ hall set the resale price to its customers in its sole discretion, regardless of the applicable business channel.

Vendor Name: Lexmark International_____                    Rev: 10/28/13

CONFIDENTIAL - OUTSIDE COUNSEL ON A3153

## POLICIES AND PROCEDURES (cont'd)

**PAYMENT TERMS / INVOICE PRICING**

- Terms are calculated based on the gross merchandise value before reduction for any off invoice allowance deductions excluding negotiated unbundled cost reduction given, if applicable.
- Calculation of payment date begins the date of invoice. Invoices must not be dated or issued prior to the shipment of product. ████████████ will pay the current invoice price.

All pricing discrepancies must be resolved prior to invoicing; however, shipments cannot be held if pricing adheres to Lexmark's current published best dealer prices (BDP) or special bid pricing (Special Bid PO's must include special bid number).

- Vendor must issue one invoice per ████████ purchase order number per shipment. A purchase order shipped from multiple locations must be invoiced per shipment from each location.

████████ will receive **price protection** for price-sensitive inventory in the event of price decrease by Lexmark. The price protection credit for products shall equal the credit amount per item, as specified by Vendor, multiplied by the quantity shipped directly from Vendor to ████████ (minus returns) in the prior sixty (60) days. Vendor shall notify ████████ of price decreases promptly.

**ALLOWANCE TERMS**

- All Allowance Dollars not received as a reduction off invoice, will be deducted, via ████████ debit memo, from the next scheduled payment.

**PRODUCT SAMPLES / STORE DISPLAY SAMPLES / POINT OF PURCHASE MATERIALS**

- Contract Business will take product samples from local inventory and debit Vendor for specific customer requests, provided Vendor first approves of such action in writing.
- Retail business requires samples to be provided at no charge for store displays, provided Vendor first approves of such action in writing.
- Retail point of purchase materials must be provided to stores at no charge, provided Vendor first approves of such action in writing.

### EXHIBIT A
### ADDITIONAL TERMS AND CONDITIONS

This Section describes all programs starting 9/29/13 and ending 12/31/2013 for Lexmark branded laser printers, toner and ink supplies sold through ████████ retail stores ████████ websites and ████████ contract sales organization within the United States and Canada. Laser printers and Supplies 1) not sold directly to ████████ by Lexmark, 2) sold through distribution by ████████, or 3) identified by Lexmark as being sold as net pricing are not eligible for these programs.

Notwithstanding any provision to the contrary contained in this Agreement or in the below-referenced Marketing Program Letter of Intent and Amendment, the parties expressly acknowledge and agree that the terms and conditions set forth in that certain Marketing Program Letter of Intent and Amendment effective as of January 1, 2012, by and between Vendor and ████████ shall govern the parties' program-related terms and conditions and remain in effect through September 28, 2013. Effective September 29, 2013, the terms and conditions set forth in this Agreement (as supplemented by Exhibit A hereto) shall govern the parties' program-related terms and conditions until this Agreement is terminated in accordance with the terms hereof.

All promotional program dollars described below are subject to and conditioned upon all guidelines, terms, conditions and program requirements provided by Lexmark. Failure to observe any and/or all of such requirements waives any and/or all program funds, including but not limited to those listed here and in Exhibit A to Trade Vendor Agreement vendor numbers 688 and 4735 regardless of the product and/or program in connection with which such support is paid. Further special promotions may be given, but will be negotiated on a promotion by promotion basis.

**Definitions**

"Total Net Shipments" (sometimes "Net Shipments") is defined as the eligible products sold by Lexmark directly to ████████ less any returns, price protection, and special bid customer rebates. "Total Net Sell Out" (sometimes "Net Sell Out") is defined as the Lexmark invoice price for eligible products sold by ████████ to end users, less customer returns, price protection and special bid customer rebates. For purposes of clarity, for both Total Net Shipments and Total Net Sell Out, "price protection" as used in the Agreement includes Over and Above "O&A" claims for promotional rebates and pricing, which shall be deducted from the invoice price before a program allowance is calculated.

| Vendor Name | Vendor Type | Current Product Mix | Basis for Rebate Calculation |
|---|---|---|---|
| Lexmark Int. | Purchase | Toner Supply Cartridges | Total Net Sell Out |
| Lexmark Int. | Purchase | Ink Supply Cartridges | Total Net Shipments |

Vendor Name: Lexmark International_____                                    Rev: 10/28/13

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A3154

**Lexmark Net Sell Out Toner Vendor #688 and 4735 Program:**
This program applies only for Lexmark branded toner supplies purchased directly from Lexmark by ▓▓▓▓▓ up to ▓▓▓▓▓ payments for Lexmark reported Net Sell Out of Lexmark branded toner supplies, calculated as follows: Earned percentage of (Lexmark invoice price to ▓▓▓▓ first adjusted downwards by any return credits, price protection and special bid customer rebates).

**Activities for up to** ▓▓▓▓▓ **MDF on Toner Vendor #688 and 4735 Net Sell Out:**
- Toner Growth Goal
- Lexmark Laser Hardware Annual Net Sell Out Goal
- End User Reporting
- Toner Loyalty
- MDF (capped at ▓▓▓▓ (prorated for Q4 2013) MDF for ▓▓▓▓▓▓▓ program for catalog, online ▓▓▓▓▓▓▓▓▓▓▓▓ websites and sales reps ▓▓▓▓▓▓▓ ool: Representation of full line in the above-referenced media (up to ▓▓▓ of underperforming SKUs can be omitted). Lexmark ink and toner supplies, six Laser printer features (with images) and one full page ad in all Catalogs.

**Lexmark Net Shipments Ink Vendor #688 and 4735 Program:**
This program applies only for Lexmark branded ink supplies purchased directly from Lexmark by ▓▓▓▓▓ up to ▓▓▓▓▓ payments for Lexmark reported Net Shipments of Lexmark branded ink supplies, calculated as follows: Earned percentage of (Lexmark invoice price to ▓▓▓ first adjusted downwards by any return credits, price protection and special bid customer rebates).

**Activities for up to** ▓▓▓▓ **on Ink Vendor #688 and 4735 Net Shipments:**
- Ink Assortment (see below)
- ▓▓▓▓▓ for maintaining current plan-o-gram in all stores of Lexmark ink supplies, unless change agreed upon by the parties in writing.

**Toner Growth Goal** paid quarterly based on "Net Sell Out" (Lexmark invoice price to ▓▓▓▓▓ first adjusted downwards by any return credits, price protection and special bid customer rebates) of Lexmark-branded toner supplies in all channels. If any quarter is missed, but the total year is made, then all quarters will be paid. In the event a lost account causes ▓▓▓▓▓ o miss its target ▓▓▓▓▓ may request an adjustment to these goals. But any adjustment shall remain at the sole discretion of Lexmark.

| Quarter | 2013 Toner Net Sell Out Goal |
|---------|------------------------------|
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| Year | |

**Laser Hardware Annual Goal** paid quarterly based on sell-thru (COGS) of Lexmark laser printers from all ▓▓▓ selling channels and paid out on Net Sell Out of toner cartridges, calculated as follows: Earned percentage of (Lexmark invoice price to ▓▓▓▓▓ first adjusted downwards by any return credits, price protection and special bid rebates). The table below establishes the Laser hardware annual goal.

| 2013 Laser Hardware Annual Goal | Payout |
|---------------------------------|--------|
| | |
| | |
| | |
| | |
| | |

Vendor Name: Lexmark International_____

Rev: 10/28/13

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A3155

**Lexmark reserves the right to:**

- Modify or withdraw the terms and conditions of any of the foregoing programs with sixty (60) day notice. In the event the program is terminated by Lexmark, for reasons other than non-compliance, any rebates earned up until the effective date of such program withdrawal or termination shall be paid within sixty (60) days of the effective date of such termination.
- Select the month in any calendar quarter against which product returns will be deducted from purchases.
- Audit compliance with the terms and conditions ▮▮▮▮▮▮ shall make its' premises, and records available upon request for the purpose of such audit.
- Reject a transaction or disqualify ▮▮▮▮ from participation in the program should Lexmark determine (based on documentation) there to be non-compliance with the terms and conditions of this program and/or it ▮▮▮▮ is in material breach of a Trade Vendor Purchasing Agreement obligation and has not cured such breach in accordance with the terms thereof.
- Lexmark and its fulfillment companies shall not be liable for any injury, damage, loss, expense, accident, delay, inconvenience or irregularity arising from ▮▮▮▮ use of any funds earned in the program. IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR ANY LOST PROFITS, LOST SAVINGS OR ANY INCIDENTAL, INDIRECT, PUNITIVE, SPECIAL OR CONSEQUENTIAL DAMAGES ARISING FROM A PROGRAM EVEN IF ADVISED OR AWARE OF THE POSSIBILITY OF SUCH DAMAGES
- Lexmark reserves the right to verify all claims and request additional performance documentation at any time. We also reserve the right to reject a claim or to otherwise refuse advertising reimbursement if any claim or any advertising (or both): (a) does not meet any guideline, term, and/or condition of the program, (b) is submitted under circumstances where the goods sold were advertised in a manner inconsistent with Lexmark's minimum Advertised Price Guidelines; (c) is based on conduct that occurred simultaneously with, or reasonably contemporaneous in time to, another claim and/or advertising for a different Lexmark product that did not adhere to Lexmark's Minimum Advertised Price Guidelines; and/or (d) is false and/or misleading.

**ELIGIBLE EXPENSES**

Lexmark will provide reimbursement for eligible expenses only.

**CLAIM REQUIREMENTS**

Lexmark will credit your account based upon the applicable percentage (as detailed above) of your prior months' Net Shipments and or Net Sell Out of eligible Lexmark products. Program payments will be processed quarterly. To receive credit for any other promotional payments not described herein, you must first submit a Debit Memo no later than forty five (45) days from the last date of the promotion or ending quarter (whichever occurs first), which shall be specified by Lexmark in writing when the promotion or program commences. Any promotions or programs not expressly described herein must first be agreed upon in writing by both parties. If the Debit Memo for a promotion or program is not received within forty five (45) day window, ▮▮▮▮ will forfeit any right to these promotion or program payments. This includes post-audit claims.

Lexmark reserves the right to request proof of performance, as needed, to ensure compliance with any and all of its promotions and programs. If your claim is approved, Lexmark will credit the claim against your accounts receivable balance. No checks will be issued for promotion or program claims. If you submit a claim and do not have sufficient funds to cover the claim, Lexmark will issue a credit to your account receivable balance up to the amount approved by Lexmark. If the claim exceeds the approved amount ▮▮▮▮ will be required to pay back any excess claimed. Any claims submitted by ▮▮▮▮ to Lexmark that have not been verified and approved by Lexmark within twelve (12) months of the date of the promotion or program the claim was made (or could have been made in the case of claims filed after the fact) shall be forfeited. Lexmark will not accept post-audit adjustments for claims that were or could have been submitted within this twelve month period. All program reimbursement is subject to compliance with Lexmark's then existing minimum advertised price (MAP) policy.

**CLAIM VERIFICATION REQUIREMENTS**

Lexmark reserves the right to verify all claims and request additional performance documentation at any time. We also reserve the right to reject a claim or to otherwise refuse advertising reimbursement if any claim or any advertising (or both): (a) the claim or advertising submitted either does not meet either the guidelines of the program or adhere to Lexmark's Minimum Advertised Price Guidelines (b) the claim or advertising submitted is based on conduct that occurred simultaneously with, or reasonably close in time to, another claim or advertising for an identical or completely different product, that did not adhere to Lexmark's Minimum Advertised Price Guidelines; and/or (c) if the claim or the advertising is false or misleading.

**DEDUCTIONS**

Invoice deductions taken without full compliance with all the terms and conditions described here and/or without Lexmark's consent will not be allowed. Lexmark reserves the right to withhold earned payments if you are not in compliance with Lexmark payment terms.

Vendor Name: Lexmark International_____                    Rev: 10/28/13

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3156

Ink Assortment.
Ink Assortment program amounts shall be paid quarterly based on Net Shipments (Lexmark invoice price ███████ first adjusted downwards by any return credits, price protection and special bid customer rebates) of Lexmark branded ink cartridges to a███████ channels.

To earn the Ink Assortment program amount ███████ must:
1. Stock mutually agreed upon Lexmark ink SKUs at all current retail locations based off store Plan-o-grams dated September 1, 2013 (plus add 155, 200 ink SKUs back into POG)
2. Lexmark will make reasonable commercial efforts to comply with the ███████ but shall assess no non-compliance fines against Lexmark in the event of any non-compliance by Lexmark. The parties will work together in good faith to address any supply chain issues that may arise.
3. ███████ shall adhere to Lexmark MAP pricing policy
4. ███████ shall return no ink cartridges to Lexmark, except for damaged/defective ink cartridges and customer returns unless the parties mutually agree to other returns in a subsequent written document that expressly references this Exhibit A.

**Additional Program Eligibility Requirements:**
To be entitled to any program amounts set forth in this Exhibit A, ███████ shall comply with all of the following requirements:

- ███████ must make best efforts to execute all Lexmark laser printer promotional pricing, according to Lexmark promotional calendar, on all internal and externa███████ websites, including but not limited to ███████. In addition, all Lexmark laser printer promotional pricing must be sent to all Technology, MPS and General Line sales reps and all retail locations where applicable. ███████ must adhere to minimum advertised price policy.
- ███████ will use reasonable commercial efforts not to target, market, and/or offer to sell Lexmark-compatible supplies sourced from any third-party to any customer that currently uses Lexmark-branded cartridges. Lexmark must be notified in advance of any customer that is transitioned from Lexmark branded cartridges to non-Lexmark branded cartridges.
- Lexmark will make reasonable commercial efforts to comply with the ███████ but ███████ shall not assess any non-compliance fees for any Lexmark product for the term of Trade Vendor Purchase Agreement in the event of any non-compliance by Lexmark.
- Promotions or markdowns on printers identified by Lexmark as having net net pricing will be funded solely by ███████. No further promotional or markdown funding will be provided by Lexmark.
- ███████ must provide monthly sales reporting and provide access to ███████ vendor portal and ███████ sales data portal (and all similar portals).
- Maintain a Lexmark brand store/showcase through Web Collage (to be hosted by Lexmark)
- Maintain permanent Lexmark URL and (1) per quarter advertisement of Lexmark laser printers on all internal and external ███████ ebsites, including but not limited to ███████
- Representation of full line of Lexmark supplies and printers on all internal and external ███████ websites, including but not limited t███████ unless the parties mutually agree to exceptions to this requirement in a subsequent written document that expressly references this Exhibit A.
- Monthly face to face onsite meetings with Technology, MPS and General Line sales reps
- Bi-weekly reporting and continuous visibility to Lexmark MPS opportunities.

**End User Reporting** paid quarterly calculated by taking Net Sell Out of Lexmark branded toner supplies multiplied by ███. (Net Sell Out is defined as the Lexmark invoice price for eligible products sold by ███████ end users, less customer returns, price protection and special bid customer rebates) ███████ must provide monthly inventory data and monthly sell out data by end user via a mutually agreed electronic format; End user data must include the following at a minimum: End user name, Ship to address (Street, city, state, zip), Lexmark PN, quantity and date of transaction.

**Toner Loyalty** paid quarterly calculated by taking Net Sell Out of Lexmark branded toner supplies multiplied by ███.(Net Sell Out is defined as the Lexmark invoice price t███ rst adjusted downwards by any return credits, price protection and special bid rebates) ███████ must only offer to sell, market, endorse, and/or arrange for the shipment of genuine Lexmark branded ink and toner supplies or compliant supplies from a Lexmark-approved third party supplier (e.g. ███████ ust work with Lexmark Sales Management to maximize Lexmark toner loyalty by transitioning any customers tha███ has under contract that are currently using third-party supplies to Lexmark-branded supplies ███████ supplies sourced from Lexmark, or compliant supplies from a Lexmark-approved third party supplier. In addition, ███████ must not sell or market third party remanufactured toner supplies that are remanufactured using Lexmark Return Program cartridges. Finally ███████ ill use reasonable commercial efforts not to target, market, and/or offer to sell Lexmark-compatible supplies sourced from any third-party to any customer that currently uses Lexmark-branded cartridges. Lexmark must be notified in advance of any customer that is transitioned from Lexmark branded cartridges to non-Lexmark branded cartridges.

**TERMINATION**

The payments and programs, collectively or in any individual part, may be terminated immediately by Lexmark for convenience on written notice.

Any exceptions, extensions or modifications to this program must be agreed to in writing between ████ and Lexmark to be valid. You signify your acceptance of the terms and conditions of this program through invoice deductions for such coop funds. If you have any questions please contact your National Sales Manager.

Program rebates apply to only to sales located within the United States and Canada.

## ████ GENERAL TERMS AND CONDITIONS

1) **INSURANCE COVERAGE AND INDEMNITY**

At all times while Vendor continues to be a Vendor t████ Vendor shall purchase and maintain a commercial general liability (occurrence) policy, which policy shall include coverage for premises and operations; products and completed operations; contractual liability; broad form property damage, and personal injury liability. The policy shall have a combined single limit for bodily injury and property damage of $5,000,000 each occurrence; $5,000,000 aggregate for products/completed operations; and $5,000,000 general aggregate. Umbrella/Excess limits may be used to comply with the general liability limit requirements. Vendor's insurance company must have a minimum A.M. best Rating of A-VII or better. Insurance carried by Vendor will be primary to any insurance carried by ████ Any other insurance or self-insurance maintained by the Vendor shall be in excess of and not contribute to the Vendor's insurance.

As soon as possible (January 1 for all succeeding years), Vendor shall deliver t████ (email: ████ a Certificate of Insurance from Vendor's insurer evidencing the required coverage and naming ████ its subsidiaries, affiliates, corporate parent, directors, officers, and employees as additional insured's with respect to liability or any claims of liability arising out of the sale of products t████ including the design and manufacture thereof. ████ will review the Certificate of Insurance and contact the vendor if it is unacceptable. The certificate shall provide on its face that the policies it represents contains a severability of interests clause, generally providing, "the insurance afforded applies separately to each insured against whom claim is made or suit is brought, except with respect to the limits of the company's liability". Failure of ████ to demand such certificate or other evidence of full compliance with these insurance requirements or failure o████ to identify a deficiency from evidence that is provided shall not be construed as a waiver of Vendor's obligation to maintain such insurance.

Vendor further agrees to defend, indemnify and hold harmles████ s subsidiaries, affiliates, corporate parent, directors, officers, and employees from and against all causes of action, claims, liabilities, costs, and expenses of any kind, whether actual or alleged, including court costs and attorneys fees, arising out of or related to any products or goods sold by Vendor to ████ except where such claim is wholly attributable to the fault o████

## ████ GENERAL TERMS AND CONDITIONS (cont'd)

2) **SETOFF**

All debts and obligations o████ and Vendor to each other are mutual and subject to set off; for purposes of this sentence, ████ nd "Vendor" shall be deemed to include the parties' respective parents, subsidiaries and affiliates which directly or indirectly control or are controlled by that party through 100% equity ownership.

3) **CONFIDENTIALITY INFORMATION**

The Mutual Nondisclosure Agreement dated, January 15, 2013, by and betwee████ nd Vendor, is hereby incorporated by reference and shall govern the exchange of Confidential Information, as that term is defined therein, between the parties.

4) **INTEGRATION**

This instrument, along with the provisions of any drawings, prints, plans, descriptions, specifications, samples, data, and other documents expressly referred to herein and hereby adopted by reference contains the entire agreement between Vendor and ████ ncerning the subject matter hereof and supersedes all prior negotiations, proposed agreements and agreements, written or oral. This Agreement may not be supplemented, modified, or amended in any manner except in writing agreed to by Vendor an████

5) **CONTROLLING TERMS**

Each party objects to the inclusion of any different or additional terms by the other in either th████ urchase order or Vendor's acceptance of this Agreement including Vendor's acceptance o████ purchase orders. If either party includes or attaches any different or additional terms in a purchase order or in Vendor's acceptance, if Vendor commences performance, or if Vendor tenders goods t████ a contract for sale will result upon the terms and conditions as stated in this Agreement, without inclusion of any different or additional terms and conditions.

Vendor Name: Lexmark International_____                          Rev: 10/28/13

CONFIDENTIAL - OUTSIDE COUNSEL ONLY                    A3158

**6) QUALITY AND WARRANTY**

All goods furnished by Vendor must strictly conform to the quality specified. No deviation or substitution is permitted without the prior written consent of ████████ In the event no quality is specified, the goods must be at least equal to the best standards of the industry. ████████ shall have the right at all times during the term of this Agreement to conduct such tests and inspections as it deems necessary to assure Vendor's compliance with this Agreement.   Vendor's failure to conform to the required specifications, any defects in the goods, apparent or hidden, and breach of express warranty are not waived by ████████ acceptance of all or any part of the goods. In the event of Vendor's breach of this Agreement, including but not limited to breach of any warranties and/or non-conformance to a required specification or quality standard ████████ains the right, in its sole discretion, to cancel any portion of the remaining order, to return any portion of the affected goods delivered and accepted and to recover the purchase price and all resulting damages suffered by ████████ all in addition to ████████ her remedies provided by law.

THE WARRANTIES SET FORTH IN THIS AGREEMENT ARE IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

**7) DELAY**

. At the outset of any delay from any cause, including Force Majeure, Vendor shall promptly notify ████████ n writing of the delay and shall undertake to shorten the delay by all reasonable means. ████████ serves the right to reject any goods and to cancel all or any portion of any purchase orders in the event of vendor's failure to deliver in accordance with the specifications and delivery. Acceptance of any part of a shipment shall not bind ████████ accept the remainder of that shipment or future shipment or constitute a waiver of ████████ right to return any Goods accepted.

**8) FORCE MAJEURE**

Neither party shall be liable for any delay or failure to deliver or accept any or all of the Goods where such delay or failure is caused by fire, flood, other act of God, act of war, labor disturbance or other event beyond such party's control ("Force Majeure"), provided such Force Majeure was unforeseeable. Where only a portion of Vendor's capacity to perform is so impaired, Vendor shall make a fair allocation of its remaining production among the various customers then under contract for similar Goods during the period.

████████ GENERAL TERMS AND CONDITIONS (cont'd)

**9) LAWS**

Vendor shall, in its performance of this Agreement, comply with all applicable federal, state, and local statutes, rules of law, ordinances, regulations, and regulatory orders, including, but not limited to, the Fair Labor Standards Act of 1938, as amended, Walsh-Healy Act, Robinson-Patman Act, applicable State Workers' Compensation laws, state and federal Occupational Safety and Health Acts, and all rules and regulations passed pursuant thereto, which are incorporated herein by this reference. Vendor agrees to be subject to all applicable contract clauses required by federal, state, or local law, rule or regulation to be included in this Agreement, including, but not limited to, the following clauses, which are incorporated herein by this reference. Equal Opportunity Clause (41 CFR 60.1.4); Affirmative Action Clause for Disabled Veterans and Veterans of the Vietnam Era (41 CFR 60-250.4); Affirmative Action clause for Handicapped Workers (41 CFR 60-741.4); and the Certification of Non-Segregated Facilities Clause (41 CFR 60.1.8; 41 CFR 1-2.803.10). In addition, Vendor agrees and certifies, if applicable, that it has developed a written affirmative action compliance program (41 CFR 60-1.40(a)) and annually files Standard Form 100 (EEO-1) (41 CFR 60-1.7(A)). Further, Vendor warrants that it complies with the Standard Elements of SA 8000.

**10) HAZARD COMMUNICATION STANDARD**

If the goods sold hereunder are subject to the OSHA Hazard Communication Standard, 29 CFR Part 1910, or to such other state hazard communications laws, regulations, or standards (the "Standard"), Vendor shall make available to ████████ a complete and accurate Material Safety Data Sheet for each of the goods sold hereunder and shall label each of the goods as required by the Standard.

**11) CONSUMER PRODUCT SAFETY AND PROPOSITIONS 65**

Vendor warrants that all goods sold hereunder are incompliance with and will not, under normal conditions of shipment, storage, or use, cause any person to be exposed to a chemical which is a carcinogen or a reproductive toxin listed under the California Safe Drinking Water and Toxic Enforcement Act of 1986 in quantities which would require that a warning be given prior to such exposure under the Act. All goods provided to ████████ shall comply with all applicable laws and regulations which govern the manufacture, distribution and sale of such goods and that the goods comply with federal, state, and local consumer product safety laws, regulations, and standards.

**12) INTELLECTUAL PROPERTY**

Vendor shall, at its expense, defend ████████ d its subsidiaries and affiliates against any claim, suit or proceedings alleging that products sold by Vendor hereunder  infringe any intellectual property rights of any third party ("IP Claim"), and Vendor shall indemnify and hol ████████ nd its subsidiaries and affiliates harmless from any liability, damages, costs, or expense of any kind (including, but not limited to, all damages and costs finally awarded by a court for such IP Claim or settlement amount, and reasonable attorney fees) arising from the  IP Claim, provided that ████████ must: (1) give Vendor prompt written notice of any such IP Claim; (2) allow Vendor to control the defense, and (3) fully cooperate with Vendor in the defense and all related settlement negotiations. ████████ hall be free to retain its own counsel a ████████ ole expense.

Vendor Name: Lexmark International_____

Rev: 10/28/13

CONFIDENTIAL - OUTSIDE COUNSEL ONA3159

Attachment B

█████████ BUSINESS PARTNER STANDARDS

█████████ seeks to establish mutually beneficial, sustainable relationships with its suppliers and vendors and prefers to work with business partners who share our values. The following Business Partner Standards define the minimum standards for █████████ business partners.

**1.    Employment Practices and Human Rights**

*Child Labor*
Business partners shall not employ persons under the age of 14 or under the age for completing compulsory education or the minimum age for employment in their country, whichever is greater.

*Forced Labor*
Business partners shall not use forced labor, including prison labor, bonded labor or indentured labor.

*Prohibition of Discrimination, Harassment and Abuse*
Business partners shall not discriminate based on personal characteristics or beliefs. Business partners shall treat every employee with respect and dignity, and shall not subject any employee to physical, verbal, sexual or psychological harassment or abuse, nor use physical violence or punishment as a form of discipline.

*Compensation*
Business partners shall comply, at a minimum, with all applicable wage and hour laws, including those relating to minimum wages as applicable to their country. Additionally, business partners shall compensate employees for overtime hours at the applicable premium rate in their country. In countries with no overtime premium rate, employees shall not be paid at less than their regular hourly rate for overtime work.

*Freedom of Association and Collective Bargaining*
Business partners shall recognize and respect the right of employees to freedom of association. Further, business partners shall recognize the lawful rights of their employees to choose or not choose collective bargaining representation.

*Safety and Health*
Business partners shall comply with all applicable health and safety laws and regulations and provide a healthy and safe work environment, conducting operations in a manner designed to prevent injuries and illnesses. Where applicable, this also pertains to housing and eating facilities.

*Hours of Work*
Business partners will comply with all local laws and regulations regarding work hours. Generally, employees should not be required to work in excess of sixty hours in a week, except due to unusual and infrequent business circumstances, and employees should have at least one day of each seven-day period.

**2.    Environment**
Business partners are expected, at a minimum, to comply with all applicable environmental protection laws and regulations and are encouraged to exceed legal requirements to reduce their operations' environmental impact.

**3.    Conflicts of Interest**
Business partners should avoid situations where personal or other, non-business-related interests conflict or appear to conflict with the best interests of █████████ or otherwise cast doubt whether the decision is made objectively based on the business relationship. Conflicts of interest may arise when doing business with an entity that employs, is owned, in whole or part, by an associate or an associate's close relative or someone with whom an associate has a close personal relationship.

**4.    Gifts and Entertainment**
While gifts and entertainment can be an appropriate way to build goodwill and develop a business relationship, they also

raise the potential for a conflict of interest or create the perception that a business decision is based on something other than service, quality, or price. As a result, █████████ associates may not accept gifts, unless the gift is unsolicited, nominal in value (less than $75 USD or $6 in China/Asia), in line with local business practices, infrequent, and not in cash or cash equivalents. Meals, travel and entertainment are appropriate where unsolicited, infrequent, in the ordinary course of business, reasonable in value, in a setting that is appropriate and fitting for its business purpose, and attended by both the giver and recipient. In no case shall any gift, favor or entertainment be provided or accepted if it would obligate or appear to obligate the recipient.

**5.    Anti-Corruption**
█████████ industry complies with all applicable laws relating to anti-corruption, fraud and bribery, including the Foreign Corrupt Practices Act. Business partners are expected to do so as well. Consistent with this commitment, gifts to government officials are prohibited.

**6.    Fair Competition**
Suppliers must comply with all applicable laws and regulations regarding fair competition and antitrust.

**7.    Disruption of █████████ Information**
█████████ confidential and proprietary information such as its strategies, plans, technology, supply chain information, customers, financial information, and products is critical to █████████ business and success. Business partners shall safeguard █████████ confidential information.

**8.    Accuracy of Business Records**
Business partners shall record and report information accurately and honestly.

**9.    Communication of These Standards**
Business partners shall communicate these standards to their employees and business partners as is necessary to guarantee compliance.

**10.   Legal Compliance**
Business partners must comply with all applicable laws.

**11.   Reporting and Monitoring**
Business partners shall report to █████████ if they become aware of any instances of non-compliance with these Standards and then develop and put in place steps necessary to correct them. Further, █████████ reserves the right to monitor and audit compliance, including conducting inspections through independent third parties.

**12.   Doing the Right Thing**
█████████ expects its associates and its business partners to do the right thing every time. Business partners are expected to meet the letter and spirit of these Standards. Non-compliance may cause █████████ to terminate the business relationship.

*Contact*
To request additional information or guidance on these standards, or to report any instances of violations, you may contact the █████████████████ or █████████████ contact the confidential hotline at █████████████████ or █████████████

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3160

13) **ASSIGNMENT**

Neither party may assign this Agreement without the prior express written consent of the other party, such consent not to be unreasonably withheld. For the purposes of this Section, the transfer or sale of essentially all of the assets of a party, as pertaining to the goods sold under this Agreement shall be deemed an assignment. Any assignment of this Agreement without the non-assigning party's prior, written consent shall be deemed void and of no effect.

14) **GOVERNING LAW**

Except where inconsistent with the terms and conditions contained herein, this Agreement shall be governed by the Uniform Commercial Code provisions applicable to transactions in goods ("UCC"), regardless of whether this Agreement is characterized as a transaction in goods or a transaction in services. This Agreement shall be governed and construed according to the laws of the State of Delaware, without regard to its choice of law provisions.

15) **LIMITATION OF LIABILITY**

Neither party shall be liable for indirect, incidental, special or consequential damages (including, but not limited to, loss of revenue or profit) whether such claim alleges breach of contract, tortuous conduct, negligence or any other theory.

16) **PROMOTION AND MARKETING**

Vendor shall not implement any marketing, advertising, promotional, or media activity, including press releases, utilizing any of ████████trademarks, copyrights, logos, slogans, or any other proprietary interests, or make any mention of ████████ involvement in this Agreement or the terms or subject matter of this Agreement without first obtaining ████████ prior written approval in each instance. Vendor agrees that ████████ may use images and/or logos of the goods in its advertising and marketing materials without Vendor's prior written consent, provided ████████ follows any established brand guidelines communicated in advance by Vendor to ████████.

By signing this agreement, the undersigned representative of vendor represents and warrants that he/she has the power to legally bind the vendor.

Vendor Signature _Cono Berhandt_

Print Name _Romin Berhardier_

Title _VP Gm North America_

Date _10/29/20__

Signature _____

Print Name _____

CONFIDENTIAL - OUTSIDE COUNSEL ON A3161

# Amendment One to Domestic Vendor Agreement

This Amendment One is effective November 1, 2013 ("Amendment Effective Date") and amends the Domestic Vendor Agreement entered into by ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ and Lexmark International, Inc. ("Lexmark") effective as of November 1, 2013 ("DVA"). Capitalized terms used but not otherwise defined herein shall have the same meanings ascribed to them in the DVA.

1. **Conditional Amendment to Exhibit A – Additional Terms And Conditions.**

   **A.**  Exhibit A of the DVA states, in part, as follows:

**Laser Hardware Annual Goal** paid quarterly based on sell-thru (COGS) of Lexmark laser printers from all ▆▆▆▆ selling channels and paid out on Net Sell Out of toner cartridges, calculated as follows: Earned percentage of (Lexmark invoice price to ▆▆▆▆ first adjusted downwards by any return credits, price protection and special bid customer rebates). The table below establishes the Laser hardware annual goal.

| 2013 Laser Hardware Annual Goal | Payout |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |

   **B.**  If the conditions set forth in Section 1(C) are satisfied, the text referenced in Section 1(A) shall be deleted and replaced with the text below. If any of the conditions in Section 1(C) are not satisfied, the text referenced in Section 1(A) is not deleted and continues to apply.

**Laser Hardware Annual Goal** paid quarterly based on Net Purchases (gross purchases less returns and price protection) of Lexmark laser printers by ▆▆▆▆ either directly from Lexmark or through Lexmark distribution partners) and paid out on Net Sell Out of toner cartridges, calculated as follows: Earned percentage of (Lexmark invoice price to ▆▆▆▆ first adjusted downwards by any return credits, price protection and special bid customer rebates). The table below establishes the Laser hardware annual goal.

| 2013 Laser Hardware Annual Goal | Payout |
|---|---|
|  | ▆▆ or Q1, Q2, Q3 and ▆▆ for Q4 |

   **C.**  The following conditions must be satisfied by ▆▆▆▆ in order for this amendment to Exhibit A to take effect:

   1.  ▆▆▆▆ must purchase a minimum of ▆▆▆▆▆▆▆▆▆▆ of laser hardware from Lexmark during the calendar year 2013. Once ▆▆▆▆ places purchases orders and Lexmark accepts those purchases orders and confirms to ship the laser hardware, this requirement will be considered complete.

1

2. ███████ shall return no hardware or supplies to Lexmark except for damaged or defective product or customer returns.

3. Lexmark has offered special bid net net pricing on █████████████ of laser hardware purchases to ███████ Accordingly ███████ will not be eligible for additional special bids, national programs, or MPS Printer and Supplies rebates on these specific products.

4. ███████ ust adhere to Lexmark MAP policy.

## 2. All Other Terms and Conditions Unaffected.

All terms and conditions not specifically addressed in this Amendment One will be as stated in the DVA. The terms and conditions of the DVA are incorporated herein by reference.

**Lexmark International, Inc.**                    ████████████████

Name: _____          Name: _____
Signature_____          Signature_____
Title: _____          Title: _____
Date: _____          Date: _____

2

CONFIDENTIAL - OUTSIDE COUNSEL ON A3163

# SUPERSTORE CONTRACT 3

VENDOR INITIALS _EN_

CONFIDENTIAL - OUTSIDE COUNSEL ON A3164

## STANDARD TERMS AND CONDITIONS

### 1  GENERAL

(a)  Vendor Agreement    These terms and conditions ("Standard Terms and Conditions") together with the terms contained in the Global Vendor Program Agreement (the Program Agreement"), any ███████ purchase order the ███████ Routing and Shipping Requirements Guide ("Routing Guide ) any New Item Sheet any Freight Agreement signed by Vendor and ███████ Logistics Department ("Freight Agreement"), any Rider attached hereto initialed by Vendor and ███████ together with any amendments thereto signed by Vendor and ███████ after the date of execution of this agreement, together with any amendments thereto signed by Vendor and ███████ shall govern ███████ purchase of Vendor's products ("Products"). (collectively "the Vendor Agreement")

(b)  ███████ Brand Products and Contracted Manufacturing Products    If any Product sold to ███████ under this Vendor Agreement is a ███████ Brand Product or Contracted Manufacturing Product (each as defined below) Vendor and ███████ shall enter into a Manufacturing Addendum to this Vendor Agreement Notwithstanding the foregoing the November 27 2007 Manufacturing Agreement and the Private Label Toner Cartridge Agreement effective as of August 19 2005 by and between the parties shall govern the manufacture and sale ███████ private label inkjet cartridges and ███████ vate label toner cartridges, respectively    The terms of this Vendor Agreement shall not apply to purchase and sales of such products specified therein

(c)  ███████ upplier Code of Conduct    If any Product sold to ███████ under this Vendor Agreement is a ███████ Brand Product Vendor shall comply with the ███████ Supplier Code of Conduct attached hereto (the "Supplier Code")    With respect to other Products sold t ███████ hereunder ███████ strongly recommends that Vendor comply with the Supplier Code (or a similar code of its own) in the manufacture of such Products, and ███████ reserves the right to terminate this Vendor Agreement if it determines that such Products are not manufactured in accordance with the Supplier Code (or a similar code), such termination being ███████ sole remedy for such non-compliance (unless a breach of this Vendor Agreement arises out of the same facts)

(d)  Certain Definitions

(      ███████ rand Product" means any Product, including all labeling and packaging, that is marked with a brand name belonging t ███████ r one of its Affiliates that Vendor is authorized to produce pursuant to one or more valid written purchase orders from ███████

(ii)  Contracted Manufacturing Product" means any Product in connection with which ███████ or its Affiliates owns tangible or intangible property used in the production process such as molds equipment patents etc

(e)  Purchase Orders    Any purchase orders sent to Vendor by any other ███████ Affiliate shall be treated by the Parties as though the purchase order was issued b ███████    Each purchase order constitutes ███████ offer to purchase Product and Vendor's acceptance is expressly limited to these terms and conditions notwithstanding any contrary provisions in Vendor's invoices acknowledgment forms or other documents Any terms and conditions in a purchase order which contradict or supplement the terms and conditions contained in this Vendor Agreement shall be void and have no effect    Any of the following acts by Vendor shall constitute acceptance of a purchase order signing and returning a copy of a purchase order or returning Vendor's own form of acknowledgment, informing ███████ of commencement of performance or delivery of Product    No order may be changed or terminated without the prior written consent of ███████

(f)  EDI Format    The electronic data interface (EDI) format shall be used for the transmission of purchase orders under this 2010

Vendor Agreement.    Such purchase orders shall meet the standards and shall use the forms for electronic purchase orders as set forth by the American National Standards Institute    Each party shall adopt as its signature an electronic identification consisting of a unique identifier which is to be contained in each ISA Segment and which is sufficient to uniquely identify the originating and receiving parties    Each party shall supply and maintain its own equipment software, services, security procedures and testing necessary to ensure the integrity of all EDI transmissions and shall use security and access limitation software and/or procedures sufficient to reasonably ensure that all transmissions are secure    All EDI submissions shall create binding purchase and sale obligations identical to those evidenced by a paper writing    Paper reproductions of EDI orders if introduced as evidence in any judicial, arbitration, mediation or administrative proceedings shall be admissible to the same extent and under the same conditions as the like documents originating and maintained in paper Vendor shall acknowledge the receipt of each functional group of purchase orders within twenty-four hours of said receipt Acknowledgment shall consist in the receipt by ███████ of the ANSI 997 Functional Acknowledgment transaction set    A Functional Acknowledgment shall constitute evidence that a purchase order (850) or a group of purchase orders (group of 850s) has been received

### 2  PRECEDENCE OF DOCUMENTS    The documents comprising this Vendor Agreement are intended to create a complete and comprehensive agreement    If there are conflicting provisions in any of the separate documents the documents shall be construed in such a way as to make the provisions non-conflicting    If conflicting provisions cannot be so construed the documents shall be given priority in the following order    Riders to the Program Agreement, Amendments to the Program Agreement, Program Agreement, Freight Agreement, Amendments to Standard Terms and Conditions, Standard Terms and Conditions, Purchase Order, New Item Sheet, Price Change/Cost Sheet and Routing Guide Notwithstanding any provision in this Vendor Agreement to the contrary, if there is a conflict between this Vendor Agreement and the Manufacturing Addendum then with regard to ███████ Brand Products or Contracted Manufacturing Products the terms of the Manufacturing Addendum shall govern    This Vendor Agreement will not be modified by any course of dealing or trade usage

### 3  TERRITORY    Vendor's Products may be sold by ███████ and any ███████ t any location

### 4  PRICING

(a)  Price    All Product prices must be specified on a New Item Sheet agreed to by Vendor and ███████ Vendor shall provide ███████ with a list price for all Products (excluding ███████ Brand Products)    All Product price changes must be done in accordance with the Price Changes section on the first page of the Program Agreement ███████ shall issue purchase orders based on the most current Product prices on file    Vendor shall be responsible for verifying all information on purchase orders ███████ hall pay based upon the lower of purchase order price or invoice price as issued by Vendor If a purchase order includes an incorrect price Lexmark shall accept the purchase order and place the order on price hold pending the resolution of the pricing discrepancy    All deadlines for fulfilling the purchase order shall be tolled while the order is on price hold

(b)  Most Favored Nation    In addition, ███████ hall pay the lowest price (or more favorable terms and conditions) offered by Vendor to any third party who has purchased substantially the same or lesser quantities of product in the same functional level of trade as ███████ and in the same geographical region  for all product for which a purchase order has been issued or which is in transit as of the date the product was offered to such third party for such lower price (or more favorable terms and conditions) ███████ shall notify Lexmark if it believes that Lexmark has offered more favorable terms to a comparable third-party in violation of this provision and Lexmark shall provide ███████ with an appropriate credit against future purchases if Lexmark determines a violation has occurred

1

CONFIDENTIAL - OUTSIDE COUNSEL ONA3165

5    **PRICE PROTECTION**  If there is a reduction in the price offered to ▮▮▮▮ or other third parties in the same functional level of trade as ▮▮▮▮ for any Product ▮▮▮ shall be entitled to a credit from Vendor for the difference between the new lower price and the original price for each unit of Product on hand in inventory at the time of the price reduction  Notwithstanding the foregoing  in order to receive such price protection ▮▮▮▮ shall issue a debit memo to Vendor showing a calculation of the number of units on hand and the total reduction in price due for such units no later than 90 days after Vendor announces a price decrease  and shall deduct the amount due from the next amounts owing Vendor

6    **PRODUCT ALLOCATION**  Vendor shall notify ▮▮▮▮ as soon as Vendor knows that it is likely that it will not be able to timely ship to ▮▮▮▮ the full quantity of any Product in a purchase order

7    **VENDOR PRODUCT CHANGES**  Vendor shall use commercially reasonable efforts to notify ▮▮▮ of all new releases and product replacements as soon as practicable prior to public announcement  Such information shall be confidential until public announcement  If Vendor receives a purchase order for Product for which a new version, replacement or other change is planned to be introduced within 60 days of a scheduled ship date or if the Vendor intends to discontinue the ordered items within 60 days of a scheduled ship date  Vendor shall promptly notify ▮▮▮▮ and ▮▮▮▮ shall have the option of accepting the original product, or revising or canceling any purchase order containing these items without liability or penalty

8    ▮▮▮▮ **PRODUCT AND QUANTITY MODIFICATIONS** ▮▮▮▮ shall have the right prior to shipment of the Products to make changes in quantities and/or delivery dates set forth in a purchase order  If any such changes cause an increase or decrease in cost or delivery time, Vendor shall notify ▮▮▮ in writing immediately and explain the amount and basis for any such adjustment in cost or delivery time  If ▮▮▮▮ accepts such adjustments, the parties shall execute an amendment to the purchase order to evidence such adjustments or ▮▮▮▮ shall issue a revised purchase order  If ▮▮▮▮ rejects such adjustments ▮▮▮▮ shall have the right to cancel all or any portion of such purchase order without liability or penalty  provided that ▮▮▮▮ notifies Vendor of such cancellation or modification prior to shipment  No cancellations or modifications of purchase orders shall be permitted after shipment

9    **FREIGHT AND RECEIVING**  Vendor shall ship Products to ▮▮▮▮ locations  Unless otherwise specified on the Program Agreement, all freight and shipping charges shall be prepaid by Vendor and included in the price of Product  If requested to do so, Vendor shall negotiate with ▮▮▮▮ in good faith pricing for Product based on direct import terms  Vendor agrees to comply with ▮▮▮▮ requirements in effect at the time of shipment regarding packing, marking, palletizing, and shipping  Shipments made by Vendor which are in violation of these rules shall incur penalties as set forth in ▮▮▮▮ vendor policies and procedures, including the Routing Guide, in effect from time to time and communicated to Vendor  Notwithstanding anything to the contrary in Section 24, ▮▮▮▮ shall have the right to unilaterally modify Routing Guide, provided it notifies Vendor in writing  Notification of such a modification may be given by ▮▮▮▮ at ▮▮▮▮ election, via regular mail, electronic mail online at ▮▮▮▮ Vendor partners website  facsimile or any method specified in Section 25 below  Vendor's acceptance of a purchase order issued by ▮▮▮▮ more than 30 days after ▮▮▮▮ as provided such notification to Vendor shall constitute Vendor's acceptance of such modifications

10    **DELIVERY AND ACCEPTANCE OF ITEMS**  The time specified for delivery is of the essence to this Vendor Agreement.  Vendor may change delivery dates only with the written consent of

    (a)  Late Delivery  If Vendor determines that it cannot deliver the Product timely as provided in an accepted purchase order, Vendor shall  immediately notify ▮▮▮▮ and the parties will determine whether expedited shipping is necessary in light of the 2010

then-existing product availability  If the parties determine in good faith that expedited is required  Vendor shall pay the additional transport cost to expedite the shipment to ▮▮▮▮ Lexmark's obligation to pay for expedited shipping shall be limited to shipment to ▮▮▮▮ designated distribution center  Any additional fees or costs for shipping after ▮▮▮▮ has accepted delivery of the shipment (e g , shipment from the ▮▮▮▮ distribution center to its retail stores) shall be borne by ▮▮▮▮ ▮▮▮▮ shall alternatively have the right in its sole discretion to accept late delivery or terminate the purchase order without liability or penalty

    (b)    Delivery Prior to Delivery Date  If the Product is delivered to ▮▮▮▮ or is available to be picked up by ▮▮▮▮ before the specified or requested delivery date ▮▮▮▮ shall make reasonable efforts (i e  without incurring any additional cost or disruption) to accept the Product when available to be delivered  If ▮▮▮▮ cannot reasonably accept the Product before the specified or requested delivery date, Vendor shall arrange to have it properly stored and then redelivered on the specified or requested delivery date or ship-to date as the case may be  all at Vendor's sole cost and expense

    (c)    Rejection of Product  ▮▮▮▮ may reject any Product which is defective, differs from specifications  is shipped contrary to instruction (including, without limitation  those contained in the Routing Guide), is not in temporary approved containers  or is not delivered within one week of specified shipping dates  ▮▮▮▮ shall have no obligation to inspect Product prior to resale and neither retention nor resale of Product shall constitute acceptance of Product that is subject to rejection by ▮▮▮▮ in accordance with the foregoing

11    **INVOICING**  Vendor shall provide separate invoices for each shipment (i e  bill of lading)  All cash discount terms shall be calculated based on invoice date  Any net credits due to ▮▮▮▮ shall be applied against future invoices  At any time (including without limitation at such time as ▮▮▮▮ ceases doing business with Vendor) ▮▮▮▮ may withhold from and offset against amounts otherwise due Vendor by ▮▮▮▮ for any ▮▮▮▮, an amount actually due to ▮▮▮▮ ▮▮▮▮ as a result of rebates co-op/MDF  or returns

12    **RETURNS**  Returns of Product shall be shipped pre-paid by ▮▮▮▮ and Vendor shall be charged back for shipping costs unless otherwise specifically agreed to by ▮▮▮▮ in writing  All returns shall be governed by the return instructions as noted on the Vendor Data Sheet, the Program Agreement, the Lexmark Returns Policy attached hereto as **Schedule A** which is incorporated herein, and the following

    Defective Product/Out-of-Box Failures  All defective product returns shall occur only if permitted by, and as specified by Vendor's Product Returns Policy set forth as Schedule A  In no event will any returns be accepted unless Vendor has issued a Returns Authorization number for such return  Vendor shall accept the return of all Product that is defective for immediate credit or refund the return amount in cash at ▮▮▮▮ option

    Stock Balancing/Excess Product  Stock Balancing returns may be approved by Vendor on a case by case basis in accordance with Schedule A

13    **ADVERTISING AND MARKETING EFFORTS**

    (a) Vendor Responsibilities  Vendor is authorized to include in its advertising that Products are available at all of ▮▮▮▮ distribution channels  Notwithstanding the foregoing, ▮▮▮▮ shall have the right to pre-approve in accordance with Section 14 any use of its trade names or logos in order to maintain its trademarks and image

    (b)    Co-op/MDF  Vendor shall pay to ▮▮▮▮ a percentage of ▮▮▮▮ purchases of Products to be comprised of co-operative marketing ("Co-op") and market development funds ("MDF") as detailed in an annual Marketing Program attached hereto as **Schedule B** and incorporated herein  Such Marketing Program

2

shall be updated each year upon signed agreement by the parties

(c) Catalog Errors [REDACTED] relies on the accuracy of Vendor supplied Product information including list prices and Product specifications in preparing its catalogs Accordingly in the event that [REDACTED] is required to correct or update any information in its catalogs because of errors in Vendor supplied Product information Vendor and [REDACTED] shall meet to discuss a fair solution to the problem taking into account the materiality of the error and the costs to correct [REDACTED] shall provide Vendor the opportunity to review catalog proof pages prior to printing

**14   USE OF TRADE NAMES AND TRADEMARKS**   Vendor hereby grants to [REDACTED] a non-exclusive irrevocable, worldwide, transferable, royalty-free and fully paid up right and license to use sell lease or otherwise dispose of Product and to use Vendor's Marks (as defined below) solely in the advertising and marketing thereof Such use shall be in accordance with Vendor's written guidelines if provided to [REDACTED] upon [REDACTED] request   Vendor retains all right title and interest in and to its Marks   "Marks" means trade names, logos, trademarks, trade devices, trade dress, service marks, symbols, abbreviations or registered marks, or contractions or simulations thereof or any other indicia of ownership   Vendor shall not use any [REDACTED] without [REDACTED] prior written consent

**15   VENDOR'S WARRANTIES, ENVIRONMENTAL CLAIMS, LIMITATION OF LIABILITY**

(a) Warranties   Vendor represents and warrants that (a) upon delivery all Product is manufactured from new parts (unless otherwise stated) (b) upon delivery, all Product is free from defects in material and workmanship and conforms to Lexmark's official published specifications and other descriptions provided by Vendor, (c) title to Product shall be delivered to [REDACTED] free and clear of all liens and claims, (d) Vendor shall perform its obligations hereunder in compliance with all applicable laws and (e) Vendor has the full right power and capacity to perform its obligations under this Vendor Agreement, and in connection with the performance of its obligations under this Vendor Agreement has obtained all authorizations required from third parties

(b) Environmental Claims   If Vendor is required by law to possess proper substantiation for any claims about the environmental attributes of the Product or its packaging, promptly upon [REDACTED] request it shall provide to [REDACTED] at [REDACTED] option, either such substantiation or satisfactory evidence of such substantiation

(c) Limitation of Liability   To the extent permitted by applicable law neither party shall be liable to the other party for any special indirect, incidental, consequential multiple, or punitive damages of any kind, including, without limitation, lost profits, even if advised of the possibility thereof   The foregoing limitation shall not apply to amounts payable by a party pursuant to its indemnification obligations hereunder, but shall apply in all other instances regardless of the cause of action under which damages are sought   For any claim for any cause whatsoever, other than those provided for in the Indemnification Section of this Vendor Agreement and except for damages arising out of a breach of confidentiality, Vendor's liability shall be limited to [REDACTED] actual damages

**16   RIGHT OF INSPECTION**   As part of [REDACTED] continuing effort to ensure the highest levels of customer satisfaction, and conformity of goods provided by its vendors with applicable quality and packaging specifications, [REDACTED] or its designee may but has no obligation to undertake affirmative measures, such as on-site inspection of production facilities   Any such measures shall not diminish Vendor's warranties or obligations hereunder

**17   FINANCIAL DISCLOSURE AND AUDIT RIGHTS**   Vendor shall maintain, in accordance with generally accepted accounting practices accurate and complete records that enable [REDACTED] to verify full compliance with the Vendor Agreement   Vendor shall make all its books, accounts vouchers, memoranda and other

2010

records relative to this Vendor Agreement available for inspection and audit by [REDACTED] and its authorized representatives and agents at all reasonable times during the term of this Vendor Agreement and for a period of two (2) years after the final payment under this Vendor Agreement during which period [REDACTED] will complete any audit that may be desired   If discrepancies or questions arise, the records shall be preserved until an agreement is reached [REDACTED] shall be entitled to a refund for all amounts that the audit report finds [REDACTED] overpaid to Vendor   [REDACTED] shall bear the cost of these audits unless it is determined that Vendor overcharged [REDACTED] for Product during the period of time for which the records were audited in which case Vendor shall pay the cost of that audit.

[REDACTED] shall provide to Vendor any audited financial statements that are created for [REDACTED] within thirty days of the completion of the audit   In the absence of audited financial statements, [REDACTED] shall provide to Vendor unaudited financial statements (including, at a minimum a profit and loss statement, and a balance sheet) sufficient to permit Vendor to analyze the financial health and creditworthiness of [REDACTED]   The unaudited financial statements shall be provided to Vendor no later than forty-five days after the end of [REDACTED] fiscal quarter and every quarter thereafter

[REDACTED] shall maintain, in accordance with generally accepted accounting practices   accurate and complete records that enable Vendor to verify full compliance with this Vendor Agreement   [REDACTED] shall make all its books, accounts vouchers, memoranda, and other records relative to this Vendor Agreement available for inspection and audit by Vendor and its authorized representatives and agents at all reasonable times during the term of this Vendor Agreement   If discrepancies or questions arise the records shall be preserved until an agreement is reached   Vendor shall bear the cost of these audits unless it is determined that the financial statements provided to Vendor were inaccurate or misleading, in which case [REDACTED] shall pay the cost of that audit

Any and all audits pursuant to this Section 17 and/or inspections pursuant to Section 16 shall not occur more than twice per year and shall occur during the audited party's normal business hours at a mutually agreeable time

**18   PRODUCT COUNTRY OF ORIGIN**   Within 30 days after the execution of this Vendor Agreement and quarterly thereafter, Vendor shall provide to [REDACTED] accurate and complete country of origin data for each Product in a format reasonably required by [REDACTED]   In addition, Vendor shall report to [REDACTED] any changes to the country of origin of each Product prior to shipping such Product to [REDACTED]

**19   INDEMNITY**

(a) Indemnity   Vendor shall at its own expense defend [REDACTED] including [REDACTED] directors, officers employees agents, and Affiliates (collectively [REDACTED] Indemnified Parties") from and against any and all third party claims, demands, suits or actions resulting from, arising out of or relating to (i) any alleged or actual harm caused by Products, (ii) alleged or actual failure of Product to have been manufactured, imported, sold shipped packaged, labeled and marketed in accordance with all applicable laws   (iii) Vendor's (including its employees and anyone acting on its behalf) alleged or actual breach of this Vendor Agreement or (iv) alleged or actual infringement of any third party's intellectual property or other rights resulting from arising out of or relating to any Products (collectively, a "Claim")   With respect to each Claim Vendor shall indemnify and hold harmless the [REDACTED] Indemnified Parties from and against any and all damages judgments awards, fines penalties expenses, and costs (including without limitation attorneys fees and expenses) that are awarded to the third party by a court or other authority that are assessed by a governmental authority or that are payable to the third party in a settlement made by Vendor Notwithstanding the foregoing Vendor shall not be liable to [REDACTED] for any unauthorized warranties or representations made by [REDACTED] relating to any Products   Vendor assumes no liability regarding any Claim or action caused by or directly related to a

3

non Vendor product

(b)  Procedures  ███████ shall give Vendor prompt written notice of any Claim  Vendor shall have sole control of the defense of the Claim  ████████ shall reasonably cooperate (at Vendor's expense) in the defense or settlement of such Claim  Any settlement by Vendor which creates an obligation or liability for ██████████ is subject to █████████ written approval not to be unreasonably withheld, delayed or conditioned If Vendor fails to defend and indemnify as required when given notice then (i) Vendor shall reimburse ██████████ for all reasonable expenses and costs of successfully enforcing these indemnity obligations and defending or settling the Claim  (ii) shall be bound by any judgment or settlement of the Claim  and (iii) shall indemnify ████████ for all damages judgments awards fines penalties expenses and costs (including without limitation attorneys fees and expenses) that are awarded by a court or other authority to the third party who brought the Claim, that are assessed by a governmental authority or that are payable to the third party pursuant to a settlement

(c)  Correction of Impeded Use  If the use by ████████ or any of its customers of any Product becomes, or may become  impeded in any way due to any actual or anticipated Claim, then at ██ request Vendor shall  at Vendor's option and at its expense either (i) obtain for ████████ and its customers the right to continue to use it (ii) replace or modify it so that it is no longer subject to such claim, and continues to perform in a functionally equivalent manner in compliance with ████████ specifications for a purchase order or (iii) if neither of the foregoing is commercially practicable, accept for return from ████████ if all such Products in ████████ inventory and credit such amount against invoices

20  INSURANCE  Vendor shall at its own expense procure and maintain (i) commercial general liability insurance including products liability coverage covering Vendor's liability for any personal and bodily injury and property damage caused by Vendor or Vendor's Product with limits of at least $1,000,000 combined single limit per occurrence, identifying ████████ and its Affiliates ATIMA (As Their Interests May Appear) as additional insureds  (ii) if deliveries are to be made by Vendor to any ████████ facility automobile bodily injury and property damage liability insurance covering owned  non-owned and hired automobiles, the limits of which shall not be less than $1,000,000 combined single limit per occurrence identifying ████████ and its Affiliates ATIMA as additional insureds  (iii) employer's liability insurance, the limits of which shall not be less than $1,000,000 per accident  $1,000,000 per employee disease and $1,000 000 policy limit for disease,  (iv) workers compensation insurance as prescribed by applicable law and (v) umbrella/excess coverage in the amount of $4,000,000 each occurrence  Vendor shall comply with all warranties, declarations and conditions in each policy  All such required insurance shall (a) provide primary coverage and not call upon any other party's insurance (including ████████ for defense payment subrogation or contribution,  (b) be with insurance companies of recognized standing rated A VIII or better by A M Best that are authorized to do business in the state in which the Products are sold  (c) provide that the insurer give ████████ 30 days' prior written notice before cancellation, non-renewal or material change in coverage or deductible amounts, and (d) be made on an occurrence rather than claims made basis (but if any such coverage is only available on a claims made basis then the dates of coverage (including the retroactive date) and the time period for filing any claim shall continue during this Vendor Agreement and for a period of 3 years thereafter (which shall be stated on the insurance certificate) and Vendor shall not permit any gaps in coverage to occur  Payment of invoice is conditioned upon Vendor supplying to ████████ satisfactory evidence of the foregoing insurance and ████████ shall continue to be entitled to any and all discounts and shall not otherwise be penalized due to any delay in payment attributable to failure to comply with the foregoing insurance requirements

21  FORCE MAJEURE  Except for payment obligations  neither party shall be liable for any delays or other non-performance due to causes beyond its reasonable control, including without limitation fire or other casualty, act of God war terrorism or other violence any law  order or requirement of any governmental authority or 2010

other causes beyond its reasonable control, provided that such party informs the other party of such force majeure event promptly (including a reasonable estimate of time required for performance to the extent determinable) and such party uses reasonable commercial efforts to perform as soon as reasonably practicable  Any delay or non-performance excused by this provision shall not excuse performance of any other obligation unless also directly prevented by the force majeure condition  except that payment for obligations delayed or not performed due to force majeure may be delayed until such obligations are performed

22  INDEPENDENT CONTRACTOR  Each of the parties is an independent contractor and shall not be considered to be an agent distributor or representative of the other  Neither party shall act or represent itself, directly or by implication  as an agent of the other or in any manner assume or create any obligation on behalf of, or in the name of, the other

23  ASSIGNMENT, SUCCESSORS, MAJOR TRANSACTIONS  This Vendor Agreement shall inure to the benefit of, and shall be binding upon, the parties and their respective heirs, permitted successors and permitted assigns  Vendor shall not assign this Vendor Agreement or any rights hereunder or delegate any obligations hereunder to any third party without ████████ prior written consent (which consent shall not relieve Vendor of any obligations hereunder or of full responsibility for any assignees, subcontractors or delegates that are so approved)  Any assignment or delegation in contravention hereof shall be null and void  In addition ████████ shall have the right in its discretion to terminate this Vendor Agreement if there is any assignment or delegation in violation of the foregoing restrictions  No third party, other than such heirs legal representatives, successors and assigns shall be entitled to enforce any or all of the provisions of this Vendor Agreement or shall have any rights hereunder whatsoever other than ████████ Affiliates who shall be third party beneficiaries to this Vendor Agreement  In the event ████████ engages in a major transaction, including but not limited to an acquisition or disposition of assets  a merger, joint venture or business expansion  the parties shall renegotiate the significant financial terms of this Vendor Agreement.

24  ENTIRE  AGREEMENT, AMENDMENT, WAIVER, INTERPRETATION  This Vendor Agreement together with any other document referenced as being attached or incorporated by reference  sets forth the entire agreement and understanding of the parties with respect to the subject matter hereof and supersedes any other agreements, discussions, proposals, representations or warranties, written or oral  with respect to the subject matter hereof  Each party acknowledges that it has participated in negotiating this Vendor Agreement, and agrees that contractual ambiguities are not to be construed in favor of or against any party based on its role in drafting this Vendor Agreement  Subject to Section 9, any changes to this Vendor Agreement must be in writing and signed by each party (faxed signatures are sufficient for these purposes but electronic or digital signatures are not)  No waiver of any part of this Vendor Agreement shall be valid unless in writing signed by the party to be charged  and no waiver on one occasion shall be deemed a waiver on any other occasion unless expressly stated in the written waiver  Any terms in purchase orders and/or other documents not expressly referenced herein that contradict  modify or add to the terms and conditions of this Vendor Agreement shall be void and of no effect (other than an amendment entered into after the date hereof signed by both parties)

25  NOTICES  Except as otherwise expressly provided in this Vendor Agreement, all notices or demands shall be in writing, and shall be sent (a) by courier or in person with signed receipt or (b) by nationally recognized overnight delivery service, prepaid, with signature required and in each case shall be sent to the other party at its address set forth in the Program Agreement or to such other addresses designated from time to time in accordance with this Section  Notices shall be deemed received upon actual receipt or refusal of delivery

26  CONFIDENTIALITY AND PUBLICITY

(a)  Proprietary Information  During the term of this Vendor

4

Agreement and for a period of 2 years following expiration or termination of this Vendor Agreement for any reason neither party shall disclose to any third party Proprietary Information" that may be made available to it by the other party unless specifically authorized in writing by the disclosing party    Notwithstanding the foregoing any Proprietary Information constituting a trade secret under applicable law shall be kept confidential for the duration of its status as such and any Proprietary Information constituting personally identifiable information relating to customers of a party shall be kept confidential in perpetuity (and only used to fulfill each party s obligations hereunder) unless such customer separately and directly provides such information to the receiving party in which case it may use such information in accordance with its own privacy policies and applicable law    "Proprietary Information" means and includes (a) all information that is furnished by the other party that is marked "Proprietary" or "Confidential" and (b) all nonpublic business information of each party whether oral or written and whether or not marked and in any form whatsoever, including without limitation that relating to customer names and information and pricing and sales information    [Proprietary Information does not include information that (i) is at the time of disclosure or subsequently becomes part of the public domain through no fault of the receiving party (ii) prior to disclosure is within the legitimate possession of the receiving party, (iii) is disclosed to the receiving party from a third party source that the receiving party has no knowledge or reason to know has violated any law or confidentiality obligation or (iv) is independently developed by the receiving party without using the disclosing party s Proprietary Information

(b)   Publicity    In addition to all other obligations in this Vendor Agreement Vendor shall not advertise, market or disclose (other than to Vendor's employees who are performing Vendor's obligations under this Vendor Agreement) any information relating to the existence or terms of this Vendor Agreement or the existence of a relationship with ▮▮▮ (including (unless otherwise expressly permitted in this Vendor Agreement) mentioning or implying the name of ▮▮▮ or any of its Affiliates or personnel, without the prior written consent of ▮▮▮ which may be withheld in ▮▮▮ sole discretion    However Vendor may disclose information as expressly required under applicable law without such consent provided that Vendor promptly (prior to disclosure to the extent possible) notifies ▮▮▮ in writing of such required disclosure including any related notices or demands received by Vendor

27   TERM, TERMINATION, SURVIVAL    Notwithstanding the Effective Dates set forth in the Program Agreement, these Standard Terms and Conditions unless otherwise agreed to by the parties in writing, shall remain in effect as long as ▮▮▮ purchases Product from Vendor    In addition to other rights provided by law, ▮▮▮ reserves the right to cancel at any time, without Vendor authorization and without any liability, charge cost or expense to ▮▮▮ any unshipped portion of a purchase order    No orders may

be cancelled after shipment    If a party breaches this Agreement including any document that this Agreement references as being attached or incorporated by reference, the other party has the right to terminate this Agreement by providing written notice of termination    if the breach has not been cured within 30 days following receipt of written notice of the breach    Vendor's failure to fulfill any purchase order accepted by Vendor shall be deemed a breach of this Vendor Agreement    The non-breaching party is not obligated to pay for any time or resources to cure any breach    Either party may refuse to continue to do business with and immediately cancel all outstanding purchase orders if the other party fails or refuses to comply with a provision of this Vendor Agreement or breaches a representation or warranty made herein    Unless otherwise provided herein all sections of this Vendor Agreement required for enforcement of a party s rights hereunder or for interpretation of this Vendor Agreement including but not limited to Sections 12 14, 15, 17, 19 21, 22 23, 24 25, 26 28 and the last sentence of Section 27 shall survive termination of this Vendor Agreement

28   GOVERNING   LAW,   JURISDICTION   AND   VENUE, REMEDIES    This Vendor Agreement shall be construed in accordance with the laws of the State of New York excluding its conflict of law provisions    The UN Convention on Contracts for the International Sale of Goods shall not apply to this Vendor Agreement    Except as expressly provided in this Vendor Agreement, any right or remedy hereunder or under applicable law is not exclusive and shall not preclude such party from exercising any other right or remedy that may be available to it

29   COUNTERPARTS, SIGNATURES This Vendor Agreement may be executed in separate counterparts, each of which shall be deemed an original, and all of which shall be deemed one and the same instrument    The parties faxed signatures are effective to bind them to this Vendor Agreement

30   RIDERS   ▮▮▮ Standard Software Rider, Guaranteed Sale Rider  Paper Supplier and Direct Import Rider are hereby deleted as inapplicable



VENDOR

SIGNATURE

BY (PRINT)

TITLE

DATE



2010

CONFIDENTIAL - OUTSIDE COUNSEL ON A3169

## ████ **Supplier Code of Conduct**

At ████ we strive to work with suppliers who treat their workers with dignity and respect, adhere to applicable laws and regulations, and make their products in an environmentally sustainable manner. Accordingly, we require each supplier providing us with ████ brand products to comply with the following Supplier Code of Conduct ("our Code"). We strongly recommend that our other suppliers comply with our Code or similar standards.

1  **Forced Labor** Suppliers shall not use forced labor, whether in the form of prison labor, indentured labor, bonded labor, or otherwise

2  **Child Labor** Suppliers shall not employ people younger than 14, or the minimum age for completing compulsory education in the country of manufacture, whichever is higher

3  **Harassment and Abuse** Suppliers shall treat every employee with respect and dignity, and shall not subject any employee to physical, sexual, psychological, or verbal harassment or abuse

4  **Nondiscrimination.** Suppliers shall not subject any person to discrimination in employment (including hiring, salary, benefits, advancement, discipline, termination, or retirement) on the basis of gender, race, religion, age, disability, sexual orientation, nationality, political opinion, or social or ethnic origin

5  **Health and Safety** Suppliers shall comply with applicable environmental laws and regulations and provide a safe and healthy working environment to prevent accidents and injury to health occurring within or arising out of the course of work, or as a result of the operation of employer facilities

6  **Freedom of Association and Collective Bargaining** Suppliers shall recognize and respect the right of employees to freedom of association and collective bargaining

7  **Wages and Benefits** Suppliers shall pay employees at least the minimum wage required by local law, or the prevailing industry wage if no minimum wage law applies, and shall provide legally mandated benefits

8  **Hours of Work** Employees should not be required to work more than 60 hours a week except in extraordinary business circumstances. Employees should be granted at least one day off in every seven-day period

9  **Overtime Compensation.** In addition to their compensation for regular hours of work, suppliers shall compensate employees for overtime hours at the applicable premium rate in their country. In countries that have not established premium overtime rates, suppliers shall not pay employees less than their regular hourly rate for overtime hours

### Monitoring and Compliance

To ensure compliance with our Code, ████ shall have the right to monitor factories producing ████ brand products through audits by third parties and visits by ████ personnel. We seek relationships with suppliers that are committed to manufacturing ████ brand products under fair and safe labor conditions and sound environmental practices. If we determine that a particular factory does not comply with our Code, we typically strive to work with the supplier to develop and implement an appropriate corrective action plan. Nevertheless, depending upon the circumstances ████ may elect to end its relationship with a supplier that produces ████ brand products at any time for failing to adhere to our Code

2010

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3170

███████ brand products are products  Including all labeling and packaging, which are marked with a brand name belonging to ████ or one of its Affiliates

CONFIDENTIAL - OUTSIDE COUNSEL ON A3171

# GLOBAL VENDOR PROGRAM AGREEMENT
## EXTENSION AND AMENDMENT

Year: 2014

Vendor Name:  Lexmark International Inc

Effective Dates: 1/1/2014 to 12/31/2014

Vendor Number: ████ ████

The following constitutes an extension and amendment to the agreement (the "Vendor Agreement") for the purchase and sale of Products by ████████ and its Affiliates ████████ from the above-named vendor ("Vendor"). Any capitalized terms not defined herein shall have the meanings as set forth in the Vendor Agreement.

Vendor and ██████ hereby agree that during the Effective Dates the purchase and sale of Products by ██████ from Vendor shall be governed by the Vendor Agreement in effect between the parties in 2013 and all other documents referenced therein, except as amended below:

**A.**   Amendments to Program Agreement:

The Program portion of the Vendor Agreement (pages 1-7) is hereby deleted and replaced with the attached Exhibit A.

**B.**   Other changes to the Vendor Agreement:

1.   Any Section 16 of Standard Terms and Conditions regarding ██████ rights for inspection of Vendor facilities in the Vendor Agreement shall be deleted and replaced with the following:

"RIGHT OF INSPECTION AND TESTING. As part of ██████ continuing effort to ensure high levels of customer satisfaction and that Products conform with applicable Product quality and packaging specifications, ██████ or its designee may, but has no obligation to, undertake affirmative measures it deems necessary to do so, such as on-site inspection of production facilities or Product testing. Any such inspections or testing shall not diminish Vendor's warranties or obligations hereunder."

If the Vendor Agreement does not contain such provision, the provision set forth above shall be added to the Vendor Agreement.

2.   Any Vendor warranty in the Vendor Agreement regarding the environmental attributes of a Product and any obligations related thereto shall include any claims Vendor makes regarding the Product, and shall not be limited to environmental attributes only.

3.   The following changes are agreed upon with respect to Direct Import Product, if applicable: "Upon request, Vendor agrees to provide ██████ a reasonable means to access test reports and any certifications required under applicable law, and any subsequent modifications thereto, for each Direct Import Product prior to importation."

4.   Other changes to the Vendor Agreement: [List below and attach additional pages as necessary]

The attached Schedule B ██████ Marketing Program supercedes all prior Marketing Program Letters

Acknowledged and agreed to:
VENDOR                                         ██████ ITSELF AND ITS AFFILIATES ON BEHALF OF

Authorized Signature: _____      Authorized Signature: _____
Print Name & Title: Ronald Binkauskas  VP & GM, NA      Print Name & Title: ████
*(PERSON SIGNING ABOVE REPRESENTS HE/SHE IS AN AUTHORIZED OFFICER OF THE VENDOR)*

OTHER SIGNATURES AS REQUIRED
Buyer Signature: ████
Print Buyer Name: ████
Authorized Signature: ____
By (Print Name & Title): ████
Authorized Signature: ____
By (Print Name & Title): ████
Authorized Signature: ____
By (Print Name & Title): _____

Buying Team Approved ████

CONFIDENTIAL - OUTSIDE COUNSEL ONA3172

## EXHIBIT A

## PROGRAM TERMS

**A. PAYMENT TERMS**

1. Standard Payment Terms:          ☐          Other: _NET 45 DAYS_____
2. Incremental Payment Terms (if applicable):

| | | |
|---|---|---|
| OPENING ORDER DATING _____ | NEW STORE DATING _____ |
| BACK TO SCHOOL DATING _____ | NEW FC DATING _____ |
| TAX TIME DATING _____ | HOLIDAY DATING _____ |
| SPRING/BTB _____ | OTHER: _____ |

**ALL PAYMENT TERMS ARE BASED ON LATER OF INVOICE DATE OR RECEIPT OF GOODS.**

**B. DEDUCTIONS**

Method of Payment on Rebates & Allowances: ▉▉▉  **Deducts Monthly**
Exceptions: _____

**C. PRICING**

Product price quotes for one-time orders shall be valid for 30 days. . Vendor shall notify ▉▉▉ 20 days in advance of any price increases . All price increases must be submitted using a ▉▉▉ approved form. In the event of a Product price increase, Vendor shall provide to ▉▉▉ together with the notice of the price increase, a letter noting such Product price increase in a form suitable for ▉▉▉ distribute to its business-to-business customers if required.

**D. RECEIVABLE TERMS**

Vendor funded coupon and rebate redemptions are valid on the dates specified by Vendor. Payment for these redemptions is due 15 days from invoice date and the method of collection is a deduction from AP invoices.

**ALL REBATES ARE PAYABLE FROM DOLLAR ONE AND CALCULATED ON NET PURCHASES**

**A. SIMPLE VOLUME REBATE**

| ☐ Global ▉ | OR | EXCEPTIONS ONLY (if not "Global ▉▉▉ | | | |
|---|---|---|---|---|---|
| | | US Retail | US Delivery* | Canada** | Europe |
| % | | % | % | % | % |

**B. OTHER VOLUME REBATES**

**PURCHASE VOLUME REBATE**
*Based on Net Purchase gates back to dollar one*

| GATE VOLUMES | | REBATE |
|---|---|---|
| From: | Up To: | $ OR % |
| $ | $ | |
| $ | $ | |
| $ | $ | |
| $ | $ | |

**GROWTH REBATE**
*Based on percent growth in net purchases*
*over prior year back to dollar one*

*Base prior year purchases for determining growth*
Rebate $ _____

| GROWTH IN PURCHASES | | REBATE |
|---|---|---|
| From: | Up To: | $ OR % |
| $ | $ | |
| $ | $ | |
| $ | $ | |
| $ | $ | |

Payment Frequency on Gates:  ☐ MONTHLY     ☐ OTHER: _____

*(PLEASE CHECK THE BOXES BELOW TO INDICATE WHICH CHANNEL'S PURCHASES WILL BE USED TO CALCULATE THE PURCHASE VOLUME AND GROWTH REBATES. IF NO BOXES ARE CHECKED PURCHASES FOR ▉▉▉ & ALL AFFILIATES WILL BE USED.)*

☐ Global ▉▉▉     OR     ☐ US Retail     ☐ US Delivery *     ☐ Canada * *     ☐ Europe

**C. GLOBAL/NORTH AMERICAN REBATE (IF APPLICABLE)**          Description

| Global | Rebate $ or % _____ | _____ |
| North American | Rebate $ or % _____ | _____ |
| Other | Rebate $ or % _____ | _____ |

*(PLEASE CHECK THE BOXES BELOW TO INDICATE WHICH CHANNEL'S PURCHASES WILL BE USED TO CALCULATE THE GLOBAL/NORTHAMERICAN REBATES. IF NO BOXES ARE CHECKED PURCHASES FOR ▉▉▉ & ALL AFFILIATES WILL BE USED.)*

☐ Global ▉▉▉     OR     ☐ US Retail     ☐ US Delivery *     ☐ Canada * *     ☐ Europe

* US Delivery includes all US business units except US Retail
* *Canada includes ▉▉▉ Retail Canada, .com Canada and Contract Canada

| Comments: |
|---|
| *Any cooperative advertising, rebates and promotional programs (if any) shall be contained in Vendors annual marketing letter – 2014 Marketing Program Letter is attached as Schedule B* |

1

CONFIDENTIAL - OUTSIDE COUNSEL ONA3173

ALL AMOUNTS CALCULATED ON NET PURCHASES, ANY EXCEPTIONS MUST BE NOTED IN COMMENTS

**A. % CO-OP ADVERTISING ALLOWANCE:**

| Global | OR | EXCEPTIONS ONLY (if not ▓) | | | | |
|---|---|---|---|---|---|---|
| | | US Retail | US Delivery* | Contract Canada | ▓ Retail Canada & .com Canada | Europe |
| ▓ % | | % | % | % | % | % |

\* US Delivery includes all US business units except US Retail

**B. % ALLOWANCES/FUNDS:**

| | Global | OR | EXCEPTIONS ONLY (if not ▓) | | | | |
|---|---|---|---|---|---|---|---|
| | | | US Retail | US Delivery* | Contract Canada | ▓ Retail Canada & .com Canada | Europe |
| MARKET DEVELOPMENT FUNDS | % | | % | % | % | % | % |
| CATALOG/ WEB SUPPORT | N/A | | % | % | % | % | % |
| ELECTRONIC COMMERCE | N/A | | N/A | % | % | % | % |
| NET PRICED CATALOG | N/A | | N/A | % | % | % | % |
| KEY SUPPLIER FUNDS | N/A | | % | % | % | % | % |
| WHOLESALER ALLOWANCE | N/A | | % | % | % | % | % |
| NEW STORE ALLOWANCE | N/A | | % | % | % | % | % |
| OFFSHELF SPACE ALLOWANCE | N/A | | % | N/A | N/A | % | % |
| DISPLAY ALLOWANCE | N/A | | % | N/A | N/A | % | % |
| OTHER _____ | % | | % | % | % | % | % |
| OTHER _____ | % | | % | % | % | % | % |
| OTHER _____ | % | | % | % | % | % | % |

**C. $ ALLOWANCES/FUNDS:**

| | US Retail | ▓ | Contract | Quill/MAP | Contract Canada | ▓ Retail Canada & .com Canada | Europe |
|---|---|---|---|---|---|---|---|
| CO-OP/MDF | $ | $ | $ | $ | $ | $ | $ |
| CATALOG/ WEB SUPPORT | N/A | $ | $ | $ | $ | $ | $ |
| ELECTRONIC COMMERCE | N/A | $ | $ | $ | $ | $ | $ |
| NET PRICED CATALOG | N/A | $ | $ | $ | N/A | N/A | N/A |
| KEY SUPPLIER FUNDS | N/A | $ | $ | $ | $ | $ | $ |
| WHOLESALER ALLOWANCE | $ | $ | $ | $ | $ | $ | $ |
| NEW STORE ALLOWANCE ($ per new store) | $ | N/A | N/A | N/A | N/A | $ | $ |
| OFFSHELF SPACE ALLOWANCE | $ | N/A | N/A | N/A | N/A | $ | $ |
| DISPLAY ALLOWANCE | $ | N/A | N/A | N/A | N/A | $ | $ |
| DEMO / NEW ITEM SAMPLE DISPLAY | $ | $ | $ | $ | $ | $ | $ |
| FIXTURING | $ | N/A | N/A | N/A | N/A | $ | $ |
| STORE SIGNAGE | $ | N/A | N/A | N/A | N/A | $ | $ |
| SATELLITE TRAINING | $ | $ | $ | $ | $ | $ | $ |
| GIVEAWAYS | $ | $ | $ | $ | $ | $ | $ |
| OTHER _____ | $ | $ | $ | $ | $ | $ | $ |
| OTHER _____ | $ | $ | $ | $ | $ | $ | $ |

*Comments:*
*Any cooperative advertising, rebates and promotional programs (if any) shall be contained in Vendors annual marketing letter – 2014 Marketing Program Letter is attached as Schedule B*

CONFIDENTIAL - OUTSIDE COUNSEL ONA3174

### A. TYPES OF RETURNS

Vendor shall accept all Product returns unless otherwise noted below:

Only one stock balance is allowed per calendar quarter. Return requires approval from Vendor provided by a Return Material Authorization approval form.

### B. STOCKED PRODUCT ONLY RETURNS

(Select Option 1 or 2 below, then fill in RA info. if applicable)

| | | EXCEPTIONS ONLY (if not "Global ▮ | | | | |
|---|---|---|---|---|---|---|
| | | US Retail | US Delivery | Contract Canada | ▮▮▮▮ Canada & .com Canada | Europe |

**1. RETURN TO VENDOR FOR CREDIT**
(Check boxes that apply)

| | | | US Retail | US Delivery | Contract Canada | Canada & .com | Europe |
|---|---|---|---|---|---|---|---|
| Returns sent Direct Store to Vendor | ☐ | OR | ☐ | ☐ | ☐ | ☐ | ☐ |
| Returns Sent DC/FC to Vendor | ☐ | OR | ☒ | ☒ | ☐ | ☐ | ☐ |

Return Authorization:    ☐ Blanket RA#: _____
                         ☒ Call for RA#

**2. DESTROY IN FIELD (Choose option a, b or c)**

| | | | US Retail | US Delivery | Contract Canada | Canada & .com | Europe |
|---|---|---|---|---|---|---|---|
| a. Immediate Chargeback | ☐ | OR | ☐ | ☐ | ☐ | ☐ | ☐ |
| b. Quarterly Chargeback (credit memo issued to Vendor quarterly) | ☐ | OR | ☐ | ☐ | ☐ | ☐ | ☐ |
| c. Allowance Given (%): | ___% | OR | ___% | ___% | ___% | ___% | ___% |

### C. DROP-SHIP PRODUCT ONLY RETURNS FOR US DELIVERY (IF APPLICABLE)

(Select Option 1 or 2 below, then fill in RA info. if applicable)

1. RETURN TO VENDOR FOR CREDIT    ☒
   Return Authorization #: _____

2. DONATE OR DESTROY IN FIELD (Chose option a, b or c)

   a. Immediate Chargeback    ☐
   b. Quarterly Chargeback (credit memo issued to Vendor quarterly)    ☐
   c. Allowance Given (%):    ___%

FOR ▮▮▮▮ DROP SHIP PRODUCT:
1) UNLESS PAYING A DAMAGE/DEFECTIVE ALLOWANCE, VENDOR MUST ACCEPT ALL REQUESTS TO RETURN PRODUCT AND VENDOR MUST PROVIDE RETURN AUTHORITY WITHIN 48 HOURS OF REQUEST.
2) GOODS REFUSED BY CUSTOMER AT POINT OF DELIVERY MUST BE RETURNED TO (AND ACCEPTED BY) THE VENDOR. VENDOR MUST NOTIFY ▮▮▮▮ SSIGNED REPRESENTATIVE WITHIN 24 HOURS OF RECEIPT OF REFUSED ITEMS.

**D.** Please list ALL locations where ▮▮▮▮ should forward Product returns in the "Product Return Shipment Information" Section on the ▮▮ Vendor Data Sheet on page 5.

Comments:
All returns must be approved by Vendor and must include a Returns Authorization reference number attached to the returned material. Credit will not be issued for material returned without appropriate reference number.

3

LOGISTICS ALLOWANCES ARE PAID ON GROSS PURCHASE VOLUME

| | Global | | EXCEPTIONS ONLY: (if not | | | | |
|---|---|---|---|---|---|---|---|
| | | | US Retail | US Delivery (excludes STS*) | Contract Canada | Canada & .com Canada | Europe |
| A. **WAREHOUSE ALLOWANCE** | | OR | | | | | |
| B. **CENTRAL RETURNS ALLOWANCE** | | OR | | | | | |

C. **STOCKED PRODUCT ONLY FREIGHT OPTIONS**

| | US Retail | US Delivery (excludes ▮ | Contract Canada | Canada & .com Canada | Europe |
|---|---|---|---|---|---|
| 1. PREPAID *(Vendor selects and pays carrier directly)* | ☒ | ☒ | ☒ | ☐ | ☐ ☐ |
| 2. COLLECT *(Must attach Freight Agreement)* | | | | | |
| Option 1 – Collect and Allowed ▮ *selects and pays carrier directly,* ▮ *charges a negotiated allowance back to Vendor as per Freight Agreement)* | ☐ | ☐ | ☐ | ☐ | ☐ ☐ |
| Option 2- Collect ▮ *selects and pays carrier directly)* | ☐ | ☐ | ☐ | ☐ | ☐ ☐ |

C.   **DROP-SHIP PRODUCT ONLY RETURNS FOR US DELIVERY (IF APPLICABLE)**
*(Select Option 1 or 2 below)*

1. PREPAID  ☐
   *(Standard delivery included in product cost)*

2. COLLECT  ☐
   ▮ *pays freight. Vendor shall use* ▮ *freight accounts at* ▮ *request.*
   *Freight Agreement must be attached to this Vendor Agreement.)*

D. **STANDARD FREIGHT TERMS**

1.  STANDARD TERMS ARE F.O.B. DESTINATION.
2.  DROP SHIP PRODUCTS AND DISPLAYS ARE EXCLUDED FROM STANDARD COLLECT FREIGHT PROGRAM UNLESS SPECIFIED IN THE ATTACHED FREIGHT AGREEMENT.
3.  VENDOR IS RESPONSIBLE FOR FREIGHT EXPENSE ON BACK ORDERS.
4.  PREPAID VENDORS ARE RESPONSIBLE FOR FILING ALL OVER/SHORT AND DAMAGED CLAIMS.
5.  ▮ REQUIRES ALL PRODUCT QUOTES TO BE BOTH COLLECT AND PREPAID. IT WILL BE ▮ DECISION WHETHER FREIGHT WILL BE COLLECT OR PREPAID.

Comments:

☒    N/A

☐    The product identified below shall be considered "Guaranteed Sale Product" which shall be sold by ▮ within _____ days of taking delivery (the "Sell-Through Date"). If such product remains unsold after the Sell-Through Date, ▮ expressly reserves the right to return any then unsold product to Vendor, and Vendor agrees to accept the return of all such unsold product, freight collect, upon return thereof to Vendor. Vendor agrees to reimburse ▮ r all costs associated with consolidating all such unsold product to a centralized ▮ Distribution Center and preparing this product for return to Vendor.

Notwithstanding anything to the contrary in this Vendor Agreement, Vendor agrees to allow ▮ to withhold up to _____ % of the product purchase price until _____ days after the Sell-Through Date. Upon the return of unsold product to Vendor after the Sell-Through Date, ▮ shall be entitled to deduct from the remaining amounts owed to Vendor the price of all unsold product returned to Vendor. If the amounts owing to Vendor are not sufficient to credit ▮ for the cost of returned product, Vendor agrees to immediately pay to ▮ he balance of the return amount.

4

CONFIDENTIAL - OUTSIDE COUNSEL ONA3176

Guaranteed Sale Product includes:

# VENDOR DATA SHEET

Date: _____                                    Vendor #: ████████ ████

Vendor's Full Legal Name: _____

## Corporate Information (required):

Company President:   Paul Rooke _____

Company CFO:   John Gamble _____

Headquarters Address:   740 West New Circle Road – Lexington, KY  40550

Headquarters Ph#:   (859) 232- 2000 _____

Headquarters Fax#:   (    ) _____

Toll Free Number:   (800)  539-6275 _____

Website Domain Name:   www.lexmark.com _____

## Sales Contact (required):

Name:   Kimberly Poleo _____

Title:   Director OSS, E-commerce, Retail  North America Business
         Partner Channel

Address:   2502 Eagle Watch Lane – Weston, FL  33327

Phone: (954) 385-0954 _____   Toll free number: (    ) _____

Fax#:   please call _____

Email Address:   poleo@lexmark.com _____

## Finance Contact (required):

Name:   Cherie Flueck _____

Title:   Finance Planning & Analysis Manager _____

Address:   740 West New Circle Road – Lexington, KY  40550

Phone: (859) 232-2829 _____   Toll free number: (    ) _____

Fax#:   (859) 232-6698 _____

Email Address:   cflueck@lexmark.com _____

## Customer Service Contact (primary) (required):

Name:   Rick Dunn _____

Title:   Customer Sales Operations Manager _____

Address:   740 West New Circle Road – Lexington, KY  40550

Phone: (859) 232-3850 _____   Toll free number: (    ) _____

Fax#:   (859) 232-5513 _____

Email Address:   rickvad@lexmark.com _____

## Logistics Contact (required):

Name:   Rick Dunn _____

Address: :   740 West New Circle Road – Lexington, KY  40550

Phone: (859) 232-3850 _____   Toll free number: (    ) _____

Fax#:   (859) 232-5513 _____

Email Address:   rickvad@lexmark.com _____

## Customer Service Contact (secondary) (if applicable):

Name:   Order Management ████████

Title: _____

Address: 740 West New Circle Road – Lexington, KY  40550

Phone: (    ) _____   Toll free number: (    ) _____

Fax#:   (    ) _____

Email Address:   sploe@lexmark.com _____

## Vendor's Representative (if applicable):

Co. Name: _____

Address: _____

Phone: (    ) _____   Toll free number: (    ) _____

Fax#:   (    ) _____

Email Address: _____

Sales Contact:_____   Cust. Serv. Contact _____

## Order Tracking Information (required):

Web Address:   email:  sploe@lexmark.com _____

Password  (if applicable): _____

## Payment Information (required):

"Remit to" Name: :   Terre Bartley _____

"Remit  to" Address:   740 West New Circle Road
                       Lexington, KY  40550

## EDI Contact (required):

Name:   Bedaparna Dev (bedev@lexmark.com) _____

Phone: (    ) _____   Toll free number: (    ) _____

Fax#:   (    ) _____

Email Address:   edi@lexmark.com _____

## Product Liability Insurance (required):

Name of Insurance Co:
         Travelers _____

Amount of Coverage $:   See Cert _____

Certificate of Insurance Attached? ☐  Yes

(Note: Vendor must provide certificate of insurance as required by Vendor Agreement naming ████ an
Additional Insured, Broad Form Liability)

# PRODUCT RETURN SHIPMENT INFORMATION (if applicable)

Contact Name:   Lexmark c/o Unicomp _____

Vendor's return address (no PO Boxes): :
   510 Henry Clay Blvd. – Lexington, KY  40505

Contact Name: _____

Vendor's return address (no PO Boxes): : _____

5

CONFIDENTIAL - OUTSIDE COUNSEL ONA3177

Phone: (____)_____    Toll free number: (____)_____
Fax#: (____)_____    Delivery Hours: _____ to _____
General Shipping Comments: _splsrt@lexmark.com_

Phone: (____)_____    Toll free number: (____)_____
Fax#: (____)_____    Delivery Hours: _____ to _____
General Shipping Comments: _____

**VENDOR AGREES TO KEEP THE ABOVE INFORMATION CURRENT AND NOTIFY S████ IMMEDIATELY OF ANY CHANGES HEREIN. FAILURE TO COMPLETE ALL REQUIRED SECTIONS MAY RESULT IN LATE OR NON-PAYMENT.**

## Supplier Order Processing Time

SOPT information is required so that ████ can systemically calculate appropriate ship date for collect vendors, and delivery date for prepaid vendors. ████ will measure vendor performance to these dates accordingly.

*SOPT is defined as the number of business days required to fulfill a ████ order to the point it is ready to ship, assuming inventory is available. For example, if a PO is received on Monday, and you are ready to ship the Product on Friday, the SOPT is 3 days (Tuesday, Wednesday & Thursday). Order create date and ship date are not included in SOPT.*

## SOPT FOR STOCKED PRODUCT ONLY:

| Ship Points ☐ Check if info provided in first blank applies to All | SOPT Days ☐ Check if info provided in first blank applies to All | Retail DC Serviced | Retail DC Number |
|---|---|---|---|
| | 3 | Killingly/Dayville, CT | 799 |
| | 3 | Hagerstown, MD | 994 |
| | 2 | Terre Haute, IN | 499 |
| | 6 | Rialto, CA | 964 |
| | 3 | Wauregan, CT | 993 |
| | 4 | Anchorage, AK | 129 |
| | 3 | Putnam, CT | 472 |
| | 3 | Plainfield CT | 9472 |
| | 3 | Charlotte, NC | 489 |
| | 3 | Fort Mill SC | 9489 |
| | 3 | Beloit, WI | 580 |
| | 3 | Lithia Springs, GA | 675 |
| | 3 | Chambersburg, PA | 682 |
| | 3 | Montgomery, NY | 683 |
| | 3 | London, OH | 684 |
| | 3 | Arden Hills, MN | 688 |
| | 6 | Ontario, CA | 692 / 885 |
| | 3 | Henderson, NC | 694 |
| | 2 | Kansas City, MO | 716 / 9716 |
| | 6 | Stockton, CA | 748 |
| | 4 | Portland, OR | 805 / 9805 |
| | 4 | Brighton, CO | 807 |
| | 2 | Memphis, TN | 812 |
| | 5 | Tolleson, AZ | 834 |
| | 3 | Coppell, TX | 839 / 961 |
| | 4 | Orlando, FL | 895 |
| | 3 | Sudbury, MA | 906 |
| | 3 | Clinton, MA | 9906 |
| | 3 | Austell, GA | 922 |
| | 3 | Rochester, NY | 925 / 9925 |
| | 3 | Southfield, MI | 926 |
| | 3 | Lebanon, PA | 950 |
| | 3 | Houston, TX | 972 |
| | 4 | Auburn, WA | 973 |
| | 6 | La Mirada, CA | 974 |
| | 5 | Idaho Falls, ID | 976 |
| | 3 | Hanover, MD | 981 |
| | 3 | Secaucus, NJ | 983 |

6

CONFIDENTIAL - OUTSIDE COUNSEL ONA3178

| | 4 | Oak Creek, WI | 985 |
| | 3 | Minneapolis MN | 12 |

**SOPT FOR DROP-SHIP PRODUCT ONLY:**

SOPT DAYS*:      ☐ Next day ship      ☐ Other: _____
SHIP POINT(S):      _____

\* If neither box is checked, default SOPT for Drop-Ship Product is next day ship.

7

CONFIDENTIAL - OUTSIDE COUNSEL ONA3179

**Schedule B**
██████████
**2014 Marketing Program**

This program document describes your 2014 Marketing Program ("Program") from Lexmark International Inc ("Lexmark"). This Program supersedes all prior agreements regarding Lexmark marketing programs and is subject to the conditions described in this Program. Further special promotions may be given, but will be negotiated on a promotion by promotion basis. This Program is effective from January 1, 2014 through December 31, 2014, unless terminated earlier as described in Attachments 1 and/or 2

Attachment 1 describes promotional support in connection with the marketing and sale of laser printers and certain requirements that must be met in order for that support to be paid by Lexmark to ██████

Attachment 2 describes promotional support in connection with the marketing and sale of inkjet and toner cartridges and certain requirements that must be met in order for that support to be paid by Lexmark to ██████

Attachment 3 contains certain additional requirements that must be met in order for the promotional support described in both Attachments 1 and 2 to be paid by Lexmark to ██████

Except with respect to Lexmark product ██████ urchases directly from one or more distributors (which purchases shall be governed via a separate vendor agreement with such distributor(s)), this Program is meant to supplement the Global Vendor Program Agreement entered into by and between the parties with the effective dates of 1/1/2010 to 12/31/2010 (the "Vendor Agreement"). The promotional support provided by Lexmark for such purchases of Lexmark Product by ██████ ia distributors shall be referred to herein as "Indirect Purchases" and is detailed further in Attachment 1, Section 1(B) of this Program.

The support funding described in connection with this Program is expressly conditioned on adherence by ██████ o the conditions described herein. Failure by ██████ o strictly comply with any requirement or condition described herein shall result in a waiver of all program funds and/or all rebates. Lexmark will reimburse ██████ es provided herein in the form of a credit rebate (hereinafter a "Rebate"). Rebates shall mean amounts (in U.S. dollars) credited to ██████ which ██████ may then deduct from current invoices in accordance with the Vendor Agreement.

Any exceptions, extensions or modifications to this Program must be agreed to in writing between ██████ and Lexmark. Any invoice deductions taken by ██████ n connection with the Promotional amounts described in this marketing letter confirms acceptance by ██████ f the Program terms and conditions and the attachments hereto.

If you have any questions please contact your National Sales Manager.

1

CONFIDENTIAL - OUTSIDE COUNSEL ONA3180

By signing below, the parties acknowledge receipt of and express their agreement to this ██████
2014 Marketing Program

███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████

Lexmark International, Inc

By    Ron Binkauskus

Title    Vice President and General Manager, ISS North America

2

### ATTACHMENT 1 Printer Marketing Program

The Lexmark Printer Marketing Program ("Printer Program") is designed as a competitive offering to support ████ or you as the case may be) in selling more Lexmark printers. Under the Printer Program, attainment of Program dollars will be calculated based on the revenue from Eligible Lexmark Printers (as described below) purchased by ████ from Lexmark Authorized Distributors plus purchases by ████ direct from Lexmark, less any returns, price protection, rebates and other credits and month end reported on hand inventory.

Eligible Lexmark Printers: For purposes of the Printer Program, Eligible Lexmark Printers means:
- new Laser Single Function and Multifunction Printers - all current retail channel models and future announcements.  Used or refurbished devices will not be considered Eligible Lexmark Products.

Co-op, MDF, incentives and other promotional support dollars are only given Eligible Lexmark Printers sold to ████ customers and not on Eligible Lexmark Printers that have been deemed by Lexmark for ████ internal use. Co-op dollars will only be earned for Eligible Lexmark Printers if ████ provides evidence satisfactory to Lexmark that establishes the devices were resold to customers.

Co-op MDF, incentives, and any other promotional support dollars may only be used for co-operative advertising and market development.  As long as ████ remains in strict compliance with the requirements set forth in Attachment 1 and in Attachment 3, Lexmark will reimburse up to 100% of ████ Eligible Expenses (defined below), not to exceed the available program funds in ████ account.

1.    **PROMOTIONAL SUPPORT**

    *A.*    ***Program for Indirect Purchases (through distribution) of Eligible Lexmark Printers***

(All payments are expressly conditioned on ████ compliance with the Program Requirements contained in Attachment 3, the Program Requirements specified below, and any additional support specific requirements contained herein).

Lexmark Laser printer models Lexmark shall provide a ████ Rebate on purchases of all laser Eligible Lexmark Printers purchased by ████ from an Authorized Lexmark Distributor. This Rebate shall be  calculated as follows ████ of Authorized Lexmark Distributor price to ████ first adjusted downwards for any returns, price protection, rebates, and any other credits.

Other Marketing Opportunities Lexmark also as mutually agreed in writing will invest in marketing activities for Dot.com/Contract such as
- Banner ads
- Home page exposure
- Search terms
- Digital marketing
- Training
- Sales incentives
- Spiffs
- Direct Mail Marketing
- Database marketing

Demo units When products are transitioned out of retail, demo units are ineligible for physical return to Lexmark and shall be sold by ████ in accordance with the following ████ automatic markdown process:

3

CONFIDENTIAL - OUTSIDE COUNSEL ONA3182

1) *First Markdown* Salvage is determined by multiplying the cost of the Sku by its Salvage Rate (Cost x Salvage Rate) = Salvage [the Salvage Rate for the printing classes 321, 322, 323, 462, 463, 464, 465, and 466 is ▮▮▮▮]

2) *Number of Mark*downs The retail price of the consigned demo units at the time they are being inactivated determines how many permitted markdowns ("MKD's) Staples may take to get to Salvage

     Skus w/ retail below ▮ 2 MKD's
     Skus w/ retail between ▮▮▮▮▮▮ - 3 MKD s
     Skus w/ retail greater than ▮▮▮ - 4 MKD s

3) *Subsequent Markdowns* The new markdown is determined by the following formula
     Current Retail - ((First F - Salvage) /# of MKDs )= New Markdown

4) Lexmark agrees to provide ▮▮▮▮ a margin of ▮▮▮ f any subsequent markdown price for sales of marked-down products.

**B.      Program for Purchases of Lexmark Laser Printers by ▮▮▮▮ Directly From Lexmark for Resale.**

Lexmark Laser Printers Lexmark shall provide a ▮▮ margin enhancement for Lexmark Laser Printers purchased directly from Lexmark. This back-end margin enhancement shall be calculated as follows: ▮▮ of Lexmark's published reseller price, first adjusted downwards by any returns, price protection, rebates and any other credits.

Laser Printer Rebate Lexmark shall provide a ▮▮ Rebate for Lexmark Laser Printers purchased directly from Lexmark. This back-end Rebate shall be calculated as follows: ▮▮ of the Lexmark published reseller price, first adjusted downwards by the above-referenced margin enhancement payment, returns, price protection, rebates and any other credits.

CO-OP advertising on Lexmark Laser Printers Lexmark shall provide a ▮▮ co-op advertising approval for Lexmark Laser Printers purchased directly from Lexmark. This back-end co-op advertising approval shall be calculated as follows: ▮▮ of the Lexmark published reseller price, first adjusted downwards by the above-referenced margin enhancement payment, returns, price protection, rebates, and any other credits.

Summary of Above Program Components for the Direct Purchase of Laser Printers
- Laser Printer margin enhancement = ▮▮ x Lexmark published reseller price
- Laser Printer program Rebate = ▮▮ x (Lexmark published reseller price - margin enhancement)
- Co-op Advertising = ▮▮ x (Lexmark published reseller price - margin enhancement)

A table of the calculated values by product is available from your National Sales Manager.

4

CONFIDENTIAL - OUTSIDE COUNSEL ONA3183

2.    **ADDITIONAL REQUIREMENTS FOR THE PRINTER MARKETING PROGRAM**

A.    ▮▮▮▮ must allow, in a reasonable manner, Lexmark field sales representatives to interact at all regional, district and store locations, with store managers and with ▮▮▮▮ store associates to allow the building of Lexmark sales and knowledge.

B.    ▮▮▮▮ must allow, in a reasonable manner, Lexmark field sales representatives to interact at all regional, district and sales office locations, with ▮▮▮▮ account managers in order to allow the building of Lexmark sales and knowledge.

C.    Lexmark will credit your account with program dollars on a quarterly basis.

D.    All marketing claims for the 2014 calendar year must be submitted to Lexmark within twelve months of the end of the calendar year in which the claim arises. No post audits will be accepted after December 31, 2015.

E.    Printer Program rebates apply only to U.S. sales by ▮▮▮▮ and its wholly-owned subsidiaries located within the United States. A separate program will address sales in areas outside the United States.

3.    **ELIGIBLE EXPENSES**

For purposes of the Printer Program, Eligible Expenses means (subject to the below claim verification requirements) mutually-agreed upon magazine, newspaper, billboard, radio, end caps, television advertising, direct mail, promotional merchandise, Lexmark sales literature, and Co-op advertising activity. These expenses, however, require no prior approval before implementation if below $100. Other special events may be eligible if pre-approved in writing by Lexmark Advertising, provided such special events must occur in the calendar year in which the Co-op Program funds were earned. Advertising must relate to an Eligible Lexmark Printers. ▮▮▮▮ shall comply with applicable guidelines for its Lexmark logos and trademarks as per the Vendor Agreement. Improper use or a failure to use Lexmark logos and trademarks may result in a violation of legal trademark requirements as well as non-payment of the Co-op Program claim.

4.    **CLAIM REQUIREMENTS**

Lexmark will credit ▮▮▮▮ account based upon the appropriate percentage of ▮▮▮▮ program attainment. To receive credit for this and any other promotional payments, ▮▮▮▮ must submit a debit memo within 3 months of the end of the calendar year in which the last date of the promotion arises (the last date will be specified by Lexmark in writing when the program commences). Claims not received by Lexmark within such time will be forfeited. No detailed proof of performance is required with the debit memo if the claim in below ▮▮▮▮ Lexmark reserves the right to request proof of performance, as needed, to ensure compliance with the Printer Program. Lexmark Accounts Receivable will credit any claims against ▮▮▮▮ accounts receivable balance. No checks will be issued for Co-op claims. If ▮▮▮▮ submits a claim and does not have sufficient funds, Lexmark will credit ▮▮▮▮ Account Receivable balance up to the amount available in ▮▮▮▮ program fund. Claims not cleared after twelve months will be charged back to ▮▮▮▮ account. All advertising reimbursement is subject to compliance with Lexmark's then-existing MAP policy as provided to ▮▮▮▮

5.    **CLAIM VERIFICATION REQUIREMENTS**

Lexmark reserves the right to verify all claims and request additional performance documentation at any time. We also reserve the right to reject a claim or to otherwise refuse advertising reimbursement if the

5

claim or the advertising (or both): (a) do not meet either the guidelines of the Printer Program or Lexmark's Manufacturer's Advertised Price Guidelines, or (b) if the claim is based upon combined offers or it appears that ███████ s otherwise impermissibly taking advantage of the benefit of two Lexmark offers simultaneously, and/or (c) if the claim or the advertising by ███████ s determined to be false or misleading and/or was not approved in writing by Lexmark.

## 6.    DEDUCTIONS

███████ may not take invoice deductions unless it is in strict compliance with all applicable terms and conditions described herein. Lexmark reserves the right to withhold earned program funds if ███████ is not in complete compliance with the payment terms of the Vendor Agreement.

## 7.    TERMINATION

The payments and programs, collectively or in any individual part, described in this Attachment 1, may be terminated by Lexmark for convenience on 30 days written notice. Notwithstanding such termination, ███████ shall be entitled to receive any program funding for which it qualified prior to such notice.

6

CONFIDENTIAL - OUTSIDE COUNSEL ONA3185

**ATTACHMENT 2 Supplies Marketing Program**

The Lexmark Supplies Marketing Program ("Supplies Program") is designed as a competitive offering to support ▮▮▮▮▮ in selling more Lexmark-branded inkjet and toner cartridges (' Supplies"). Under the provisions of the program ▮▮▮▮ earns program dollars on Net Sell Out of Supplies. "Net Sell Out" for the purposes of this Attachment 2 is defined as sales to end user customers minus returns, minus price protections and minus other pricing adjustments such as contract special bids. Under the Supplies Program, Lexmark will reimburse ▮▮▮▮ or Eligible Expenses (defined below) arising from advertising and promoting Lexmark-branded supplies products. As used in this Attachment 2, the term "Business Supplies" means only Lexmark-branded toner cartridges.

Co-op, MDF, Rebates, and any other promotional support dollars are only given on Supplies sold to ▮▮▮▮ customers and not on Supplies that have been deemed by Lexmark for internal use by ▮▮▮. Any amounts payable to ▮▮▮▮ pursuant to this Attachment 2, will only be paid to the extent ▮▮▮ provides evidence satisfactory to Lexmark of ▮▮▮ ell through to its customers.

Co-op, MDF, Rebates, and any other promotional support dollars may be used only for co-operative advertising and management development. Lexmark will reimburse up to ▮▮▮ of Eligible Expenses, not to exceed the available funds in ▮▮▮ account, provided ▮▮▮ strictly complies with the requirements in this Program letter and all of the Attachments thereto. All marketing activities must be mutually agreed upon in writing in advance to be considered for reimbursement.

PROMOTIONAL SUPPORT

(All payments are expressly conditioned on ▮▮▮ ompliance with the Program Requirements specified below, the requirements contained in Attachment 3 and any additional support specific requirements contained herein).

- ▮▮▮ margin on Net Sell Out of Lexmark-branded inkjet and Business Supplies sold in retail stores (See note 1 below).
- Up to ▮▮▮ rebate on Net Sell Out of Business Supplies, subject to the additional requirements specified in note 2 below.
- ▮▮▮ Co-op/MDF accrual of Net Sell Out of Business Supplies (capped at ▮▮▮ to be applied toward the Gold Sponsorship in the ▮▮▮▮▮▮
- ▮▮▮ rebate on Net Sell Out of genuine Lexmark-branded ink supplies, subject to the conditions in Attachment 3.
- ▮▮▮ rebate on Net Sell Out of genuine Lexmark-branded ink supplies in exchange for a complete waiver of First Time Fill Rate Fines that might apply, provided that Lexmark maintains a ▮▮▮ reliability score
- ▮▮▮ rebate on Net Sell Out of genuine Lexmark-branded ink supplies in exchange for a complete waiver of any and all other compliance fines that might be applied to Lexmark or its products in all FC's and DC's in the ▮▮▮ Network
- ▮▮▮ Co-op/MDF accrual on Net Sell Out of genuine Lexmark ink supplies per the following formula : ▮▮▮ of Lexmark published reseller price first adjusted downwards by returns, price protection, rebates and any other credits, subject to the conditions in Attachment 4.

**Program Requirements**

▮▮▮▮ must work with the Lexmark National Sales Manager to establish a plan of business for 2014. The plan will include, at a minimum, sales education and training, promotional loyalty growth activities, competitive winback programs, and sales representative incentive programs. ▮▮▮▮ shall provide Lexmark with reasonable access to its sales force for training, promotions and incentives.

▮▮▮▮ must honor all Lexmark contractual obligations between the parties including, without limitation, marketing of Lexmark supplies only in the United States and the prohibition against knowingly purchasing and/or selling gray-market (i e , Lexmark supplies originally sold by Lexmark for use outside of the United

7

States) or counterfeit supplies. Lexmark shall determine whether such goods qualify as gray-market or counterfeit supplies. If gray market or counterfeit Lexmark-branded product purchased from Lexmark authorized distributors or wholesalers are found in ███████ inventory, said product does not constitute a violation of this agreement.

███████ shall return to Lexmark all empty Lexmark-branded cartridges that are returned to ███████ y customers who have obligations under their bid contracts with Lexmark to return such cartridges to Lexmark. ███████ must fulfill all empty cartridge return requirements defined in Lexmark special bid contracts. As a participating reseller ███████ agrees to return any empty Return Program Cartridge only to Lexmark if such cartridge comes into ███████ possession. In addition ███████ agrees that it, or any of its subsidiaries, affiliates or agents shall not sell or otherwise market repair, used or remanufactured Lexmark Return Program cartridges (other than remanufactured Lexmark cartridges sold directly by Lexmark to ███████ Unlicensed, Lexmark Regular cartridges without the Return Program restrictions are available for those customers who do not choose the Return Program cartridge with its terms.

## 8.   ADDITIONAL REQUIREMENTS FOR THE SUPPLIES MARKETING PROGRAM

• ███████ must allow, in a reasonable manner, Lexmark field sales representatives to interact at all regional, district and store locations, with store managers and with ███████ store associates in order to allow the building of Lexmark sales and knowledge.
███████ must allow, in a reasonable manner, Lexmark field sales representatives to interact at all regional, district and sales office locations, with ███████ account managers in order to allow the building of Lexmark sales and knowledge.
• All marketing claims for the 2014 calendar year must be submitted to Lexmark within twelve months of the end of the calendar year in which the claim arises. Claims not submitted within such time will be forfeited. No post audits will be accepted after December 31, 2015.
• Program rebates apply only to U.S. sales by ███████ and its wholly owned subsidiaries located within the United States.

• Any and all information provided by ███████ hereunder, including without limitation all sell-through reporting as described below, is confidential and proprietary to ███████ and may only be disclosed to the Lexmark National Account Manager, Supplies Operations Manager and Lexmark Channel Management servicing ███████ d may not be disclosed to any other party within Lexmark or otherwise, without the prior written consent of ███████ Lexmark will use data provided to assess end user customer usage, loyalty and allow for compensation of Lexmark sales representative.

███████ must continue to provide, as they currently do, monthly sell-thru and inventory reports weekly in order to receive any earned program funds. The preferred process for this data exchange is via EDI. Sell-thru information must include transmission date, transaction date or invoice date, sold to name, sold to address (street, city, state, zip), invoice number or order number or purchase order number, ship to name if different from sold to name, ship to address (street, city, state, zip) if different from sold to address, Lexmark part number and quantity sold, shipped or returned. Inventory reports must include transmission date, Lexmark part number and on hand quantity as of the date reporting.

• ███████ business will also provide the following reports:

- A monthly Top 500 customer report – no ties to current platform, just a static list of the top 500 customers and Lexmark will pull data accordingly from whichever system this list is generated from
- Data points include: Customer Division, Company Name, RSD Name, Lexmark part numbers and quantity by part number, containing the following TY Units, LY Units, Unit Comp, TY COGs, LY COGs, COGs comp
- A monthly sales by zip code report which will include Cogs and Units by sku and Lexmark part number.

8

CONFIDENTIAL - OUTSIDE COUNSEL ONA3187

9.    **ELIGIBLE EXPENSES**

For purposes of this Supplies Program, Eligible Expenses means (subject to the below claim verification requirements) mutually-approved magazine, newspaper, billboard, radio, end caps, television advertising direct mail, promotional merchandise Lexmark sales literature, and sales incentives. Eligible Expenses, however, require no prior approval before implementation if below $100. Other special events may be eligible if pre-approved in writing by Lexmark Advertising, provided such special events must occur in the calendar year in which the Co-op Program funds were earned. Advertising must relate to an Eligible Product. Proper use of Lexmark logos and trademarks is required. Improper use or a failure to use Lexmark logos and trademarks may result in a violation of legal trademark requirements as well as non-payment of program payments.

10.    **CLAIM REQUIREMENTS**

To receive credit for any  promotional payments ▮▮▮▮▮▮ must submit a debit memo within 1 year of the end of the calendar year in which the last date of the promotion (the last date will be specified by Lexmark in writing when the program commences). Claims not submitted within such time will be forfeited. No detailed proof of performance is required with the debit memo if the claim is below ▮▮▮▮ Lexmark reserves the right to request proof of performance, as needed, to ensure compliance with its program. Lexmark Accounts Receivable will credit any claim again ▮▮▮▮▮▮ ccounts receivable balance. No checks will be issued for Co-op claims. If ▮▮▮▮ ubmits a claim and does not have sufficient funds, Lexmark will credit ▮▮▮▮ ccount Receivable balance up to the amount available in ▮▮▮▮ rogram fund. Claims not cleared after twelve months will be charged back to ▮▮▮▮ ccount. All advertising reimbursement is subject to compliance with Lexmark's then existing MAP policy.

11.    **CLAIM VERIFICATION REQUIREMENTS**

Lexmark reserves the right to verify all claims and request additional performance documentation at any time. We also reserve the right to reject a claim or to otherwise refuse advertising reimbursement if the claim or the advertising (or both): (a) do not meet either the Supplies Program requirements or Lexmark's Manufacturer s Advertised Price Guidelines, and/or (b) submitted is based on conduct that occurred simultaneously with, or reasonably close in time to another claim or advertising for an identical or completely different product that did not adhere to Lexmark's Minimum Advertised Price Guidelines, and/or (c) the claim b ▮▮▮▮ s determined to be false or misleading and/or was not approved by Lexmark in writing.

12.    **DEDUCTIONS**

▮▮▮▮ may not take invoice deductions unless it is in strict compliance with all applicable terms and conditions described herein. Lexmark reserves the right to withhold earned payments if ▮▮▮▮ not in complete compliance with the payment terms in the Vendor Agreement.

13.    **TERMINATION**

The payments and programs, collectively or in any individual part, described in this Attachment 2 may be terminated by Lexmark for convenience on 30 days written notice. Notwithstanding such termination, ▮▮▮▮ hall be entitled to receive any funding for which it qualified prior to such notice.

9

CONFIDENTIAL - OUTSIDE COUNSEL ONA3188

**Notes**

1. Margin is calculated on the difference from Lexmark's published web price and invoice price. Incentive program percentages are based on net shipments at invoice price

2. Activities for up to ████ on Net Sell Out of Business Supplies calculated as follows: Earned percentage times (reported units sold out x Lexmark invoice price to ████ rst adjusted downwards by any return credits, price protection and special bid rebates).

Lexmark Laser Hardware growth (total of All Channels)–must achieve ████ n purchases of Eligible Lexmark Printers for FY 2014 or ████ quarterly target, including purchases of Eligible Lexmark Printers by ████ rom Lexmark Authorized Distributors and purchases by ████ rectly from Lexmark for resale to third-parties (less any returns, credits, price protection, rebates and month end reported on hand inventory). If a quarter is missed but the full year goal is made, the missed quarter(s) will be paid at the time full year goal is attained.

Achieve the Business Supplies Net Sell Out annual revenue goal of Supplies Revenue gate- Annual Target of ████ or FY2014 or ████ quarterly target for Net Sell Out calculated as (reported units sold out x Lexmark invoice price to Staples first adjusted downwards by any return credits price protection and special bid rebates).

Toner Targets/Supplies Revenue gate- Net Sell Through

*Lost/gain large account shifts may be considered at Lexmark's discretion; a minimum of ████ annually in volume per account is required for an adjustment to be considered. This will be reviewed quarterly and any adjustments will be made by Lexmark at that time. If a quarter is missed but the full year goal is made, the missed quarter(s) will be paid at the time full year goal is attained.

Ink and Toner loyalty

- ████ and all subsidiaries and affiliates o ████ must only offer to sell, market, endorse, and/or arrange for the shipment of genuine Lexmark-branded ink cartridges or ████ ink cartridges that work with Lexmark inkjet printers that are supplied by Lexmark, or non-Lexmark branded compliant ink cartridges purchased from a supplier authorized by Lexmark to sell compliant cartridges. Any breach of the Private Label Agreement between Lexmark and ████ all comprise a breach of this requirement. A list of Compliant Ink Cartridge suppliers is available from Lexmark upon request.

████ and all subsidiaries and affiliates o ████ ust only offer to sell, market endorse and/or arrange for the shipment of genuine Lexmark-branded toner cartridges, ████ branded cartridges that work with Lexmark laser printers that are sold by Lexmark directly to ████ or non-Lexmark branded Compliant Toner Cartridges purchased by ████ from a supplier

10

CONFIDENTIAL - OUTSIDE COUNSEL ONA3189

authorized by Lexmark to sell compatible cartridges. Any breach of the Private Label Agreement between Lexmark and ████ shall comprise a breach of this requirement. A list of Compliant Toner Cartridge suppliers is available from Lexmark upon request.

11

CONFIDENTIAL - OUTSIDE COUNSEL ONA3190

Attachment 5. Ink Planogram

| SKU | Description | Transition Plan |
|---|---|---|
| 819532 | lexmark 100xl cyan ink | Sept |
| 819531 | lexmark 100xl magenta ink | Sept |
| 819544 | lexmark 100xl yellow ink | Sept |
| 819560 | lexmark 105xl black ink | Sept |
| 779034 | lexmark 14 black ink | Sept |
| 364970 | lexmark 150xl cyan ink | Sept |
| 364972 | lexmark 150xl magenta ink | Sept |
| 364975 | lexmark 150xl yellow ink | Sept |
| 364983 | lexmark 155xl black ink | Sept |
| 364082 | lexmark 17 black ink | Sept |
| 677119 | Lexmark 23 Black Ink Cartridge | Sept |
| 677118 | lexmark 24 color ink cartridge | Sept |
| 562144 | lexmark 34 black ink | Sept |
| 742165 | lexmark 37xl hy color ink | Sept |
| 775741 | lexmark 4 black ink | Sept |
| 709017 | lexmark 42 black ink | Sept |
| 664015 | lexmark 44 black ink | Sept |
| 632440 | lexmark 82/83 blk/clr ink 2pk | Sept |
| 461583 | lexmark 16 black ink | June |
| 562142 | lexmark 33 color ink | June |
| 438491 | lexmark 50 black ink | June |
| 331670 | lexmark 70 black ink | June |
| 482037 | lexmark 82 black ink | June |
| 609466 | lexmark 1 ink | 2014 |
| 815730 | lexmark 100 black ink | 2014 |
| 815046 | lexmark 100 color ink 3pk | 2014 |
| 819538 | lexmark 100xl black ink | 2014 |
| 819542 | lexmark 100xl color ink 3pk | 2014 |
| 815047 | lexmark 105xl black ink 2pk | 2014 |
| 798123 | lexmark 14/15 blk/clr ink 2pk | 2014 |
| 364966 | lexmark 150 black ink | 2014 |
| 364968 | lexmark 150 color ink 3pk | 2014 |
| 364984 | lexmark 150xl black ink | 2014 |
| 365063 | lexmark 150xl black ink 2pk | 2014 |
| 364854 | lexmark 150xl color ink 3pk | 2014 |
| 365065 | lexmark 155xl black ink 2pk | 2014 |
| 563420 | lexmark 17/27 blk/clr ink 2pk | 2014 |

14

CONFIDENTIAL - OUTSIDE COUNSEL ONA3191

| 775739 | lexmark 2/3 blk/clr ink 2pk | 2014 |
| 364985 | lexmark 200 color 3 pack ink | 2014 |
| 364987 | lexmark 200xl black ink | 2014 |
| 683751 | lexmark 23/24 blk/clr ink 2pk | 2014 |
| 683752 | lexmark 28/29 blk/clr ink 2pk | 2014 |
| 562141 | lexmark 32 black ink | 2014 |
| 563422 | lexmark 32/33 blk/clr ink 2pk | 2014 |
| 563423 | lexmark 34/35 blk/clr ink 2pk | 2014 |
| 798128 | lexmark 36/37 blk/clr ink 2pk | 2014 |
| 742188 | lexmark 36xl hy black ink | 2014 |
| 775745 | lexmark 4/5 blk/clr ink 2pk | 2014 |
| 709019 | lexmark 41/42 blk/clr ink 2pk | 2014 |
| 675854 | lexmark 43/44 blk/clr ink | 2014 |

15

CONFIDENTIAL - OUTSIDE COUNSEL ONA3192