# EXHIBIT M

# OEM CONTRACT 1

## MASTER PURCHASE AGREEMENT

THIS MASTER PURCHASE AGREEMENT is entered into as of November 1, 2008 (the "Effective Date") by and between ███████████████████████████████████████████████ on behalf of itself and its worldwide affiliates (collectively, █████), Lexmark International, Inc., a Delaware corporation ("LII"), and Lexmark International Technology, S.A., a Swiss company and LII's subsidiary ("LITSA")(LII and LITSA being hereinafter collectively referred to as "Lexmark").

## 1.0    DEFINITIONS AND SCOPE

1.1    "Agreement" shall mean this Master Purchase Agreement (including without limitation the Schedules (including Attachments to Schedules hereto) as may from time to time be amended.

1.2    All capitalized terms used in this Agreement shall have the meanings assigned to them in the glossary attached hereto as Schedule M (Glossary) or in another Schedule to this Master Purchase Agreement; provided, however, that terms capitalized in any such other Schedule shall have the alternate meanings assigned to them in such Schedule or in a glossary attached to such Schedule if such alternate meaning is clearly indicated therein; in such event, such alternative meanings shall apply only for purposes of such other schedule.

1.3    Additional rights and obligations of the Parties pursuant to this Agreement are detailed in Schedules to this Master Purchase Agreement. Additional terms and conditions that apply to the sale of inkjet printer Products are contained in Schedule D (Inkjet) (including Attachments) hereto. Additional terms and conditions that apply to the sale of laser printer Products Schedule E (Laser) (including Attachments) hereto. For reference only and not for purposes of construing this Agreement, Schedule A (List of Schedules) contains a listing of existing and prospective Schedules to this Agreement. The Parties acknowledge and agree that additional Schedules may be added to this Agreement and shall become effective as specified in such Schedules upon mutual signature thereto by authorized representatives of each Party. In the event of a conflict between the terms of a Schedule and the terms of this Master Purchase Agreement, the terms of such Schedule shall govern.

1.4    Without limitation of Section 1.3, from time to time, the Parties may add Products to this Master Purchase Agreement by mutually executing a revised Schedule B to this Master Purchase Agreement. Schedule B may include additional terms and conditions including but not limited to pricing, compensation, delivery schedules, technical contacts and other information related to the Products. In the event of a conflict between this Agreement and Schedule B, Schedule B shall govern.

1.5    Lexmark may delegate to its subsidiaries certain of Lexmark's responsibilities hereunder and/or delegate to such subsidiaries the right to exercise certain rights of Lexmark under this Agreement; provided, that Lexmark shall cause each such subsidiary to comply with all of Lexmark's obligations under this Agreement and shall be fully responsible for such compliance by each such subsidiary.

1

CONFIDENTIAL - OUTSIDE COUNSEL ONLA3194

1.6    The terms and conditions of this Agreement apply worldwide unless modified or replaced by country specific terms and conditions contained in a country-specific Schedule to this Agreement.

## 2.0    TERM AND TERMINATION

2.1    This Agreement commences on the Effective Date and lasts until June 30, 2017 unless terminated earlier or renewed thereafter as provided herein.  This Agreement will automatically renew for additional successive 3-year terms unless one Party informs the other of its intent to let the Agreement expire one hundred and eighty (180) days before the end of the then-current term.

2.2    Either Party may, at its option and upon written notice to the other Party, terminate this Agreement: (a) if a material breach of this Agreement by the other Party is not remedied within forty-five (45) days after the breaching Party's receipt of written notice of the breach; (b) if the other Party admits in writing its inability to pay its debts generally as they become due, files a petition for bankruptcy or executes an assignment for the benefit of creditors or similar document; (c) if a receiver, trustee in bankruptcy or similar officer is appointed for the other Party's property; or (d) in the event of an assignment as described in Section 12.5.

2.2.1    Either Party may terminate this Agreement for convenience on twelve (12) months  advance written notice.

2.3    In the event of any expiration or termination of this Agreement, Lexmark shall:

(a) Manufacture, sell and support, through the end of life date set by the Parties in the Alliance Plan of Record documents (See Attachments 1.1 to Schedules D and E), plus or minus three months, all standard printer Products that were offered for sale by ▮▮▮ at the time of termination or have been included in a  mutually executed Product Plan of Record document as described in Section 4.3 of Attachments 1.1 to Schedule D (Inkjet) and Schedule E (Laser) respectively. Notwithstanding the foregoing, Lexmark's obligation to supply such yet to be released Products included in such mutually executed Product Plan of Record document  is contingent upon payment by ▮▮▮, in a lump sum, of an up front payment of NRE associated with such Products; and the terms and conditions of this Agreement shall continue to apply to such sales;

(b) Provide all related service parts (new or used) for three (3) years after the date of marketing withdrawal for the corresponding Lexmark branded ink jet product; and five (5) years after the date of marketing withdrawal for the corresponding Lexmark branded laser product.

(c) Provide all related Supplies for seven (7) years after the date of marketing withdrawal of the corresponding Lexmark branded product.

These service parts will be supplied at a predetermined cost mutually agreed by the Parties but consistent with Section 3.1.

2.4    In the event of a termination of this Agreement as described in Section 2.2, the provisions of this Agreement will continue to apply to all Product orders accepted by Lexmark prior to the effective

2

date of such termination.  In addition, the applicable provisions of this Agreement will continue to apply to post termination sales of Products Lexmark is obligated to make pursuant to Section 2.3 above.   Upon termination by either Party for cause, any monies due to the other Party hereunder will become promptly due and payable and any tooling, loaned equipment, or test fixtures provided by ▮▮ to Lexmark (or paid for by ▮▮ ) must be promptly returned unless requested in writing by ▮▮  Except in the case of a material breach, termination of this Agreement will not relieve either Party of any obligation to make payments that may be owed to the other Party under the terms of this Agreement or any other provisions of this Agreement that survives pursuant to Section 12.1. Termination will not exclude other remedies for failure of a Party to perform its obligations.

## 3.0    PRICING AND PAYMENT

3.1    Product pricing (including, but not limited to NRE and other pricing elements) will be per Schedule B, which the Parties shall revise from time to time as new Products are introduced. Lexmark and ▮▮ have worked to create an alliance pricing methodology that is reflected in Schedule I.   The Parties will be engaged on an ongoing basis to monitor industry activities and determine the appropriate actions in the respective manners for inkjets and lasers as described in Schedule I.   Lexmark will publish revised Schedule Bs when prices change.

The following will be key elements of the ongoing business process focused on maintaining communication and ongoing alignment.

- Marketing Face-Off Sessions
    Content
    - Positioning plans (BDP & ▮▮ review)
    - Primary & Secondary competition
    - Consumer research
    - Feature value adjustments
    - Future map of industry price trends and relative BDP
    - Review of price bands vs.industry segments
    Timing
    - Quarterly sessions (focusing on changes from prior session)
    - Annual (total portfolio review)

3.2    General (Non-Opt Out) Escalation Process
    With regard to Alliance Laser Printers and related  Supplies,  an escalation process will apply in those circumstances:   Where ▮▮ in good faith deems the market analysis is taking too long to complete or if the price dictated by Lexmark's BDP adjustment does not in ▮▮ reasonable, good faith belief enable ▮▮ to effectively compete as indicated by ▮▮▮ strategy (See Schedule I, Section 3.0).
    During the escalation, the parties will in good faith discuss any implications of the ▮▮ strategy with regard to: (a) whether a mutually agreed pricing adjustment according to Lexmark's  discount methodology would result (See Schedule I, Section 2.0); (b) some other adjustment (e.g., rebate on a single model) outside the BDP discount methodology would as mutually agreed be warranted.  In considering whether such adjustment is

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A3196

warranted, the parties shall take into account situations involving different models in which a prior BDP move has in Lexmark's good faith belief created gross margins for ███ in excess of its ░░░ percent laser printer lifetime gross margin objective.

As mutually agreed when market circumstances dictate (i.e., the collapse of a segment profit umbrella) the parties may revise the pricing methodology through a written amendment to Schedule I.  As mutually agreed, the parties may revise the inkjet printer Product pricing methodology described in Schedule I to a market-based pricing methodology (e.g., mutually agreed competitive benchmark, escalation procedure).

3.3     Lexmark will provide most favored customer pricing to ███ (same or less volumes, essentially the same terms) for the life of the printer Products, spare parts, accessories and Supplies purchased from Lexmark (including post-end of life transactions).  If at any time during the term of this Agreement Lexmark accords more favorable prices to any such other customer as set forth above, Lexmark will immediately offer to sell the Products to ███ at equivalent prices accorded to such other customer.

3.5     Unless otherwise agreed in writing, all prices will be stated (and payments made) in United States dollars.  ███ will be responsible for all taxes, including but not limited to sales and use tax, customs and excise duties, turnover or withholding taxes, value added tax, property tax, corporate, state, or local income tax associated with the purchase and delivery of Products except for those taxes assessed on the income of Lexmark which shall be Lexmark's responsibility.  All prices under this Agreement are exclusive of any tax.  In addition, for any shipments to countries (e.g., Brazil) that may have material landing costs (e.g., tariffs), the Parties will work together to minimize such landing costs but all Product pricing will be negotiated to include such costs.  ███ will have no liability for any tax for which it has an appropriate exemption.  Unless otherwise specified in an applicable Schedule hereto, Lexmark shall serve as the importer of record for all Products sold hereunder.

3.6     All invoices for Products received by ███ at an SLC will be accumulated, upon receipt, for a period from the 16th day of a month to the 15th day of the following month (the "Accumulation Period").  ███ will pay invoices received during the Accumulation Period net 50 days from the end of such Accumulation Period (EOAP 50).  No invoice can be dated prior to the date the Products reflected in such invoice are received.  Invoicing and payment shall take place using a mutually agreed electronic funds transfer on the 50th day. Payment terms for Products purchased by ███ for internal use are net 30 days from invoice date.

## 4.0     SUPPLIER'S REPRESENTATIONS AND WARRANTIES

4.1     Lexmark represents and warrants on an ongoing basis that:

CONFIDENTIAL - OUTSIDE COUNSEL ONLY   A3197

(a)    Printer Products shall be free from defects in design, materials and workmanship, including but not limited to cosmetic defects, and shall conform to Lexmark's specifications for thirteen (13) months from the date Product title transfers to ▒▒   The Parties acknowledge and agree that notwithstanding the foregoing, in the event a warranty replacement Product provided by Lexmark fails when initially opened, ▒▒ shall have an additional 45 days past the warranty period for a warranty replacement of such unit;

(b)    ▒▒ shall acquire good and marketable title to the Products, and that all Products shall be free and clear of all liens, claims, encumbrances and other restrictions;

(c)    All Products (except spare parts) shall be new and unused and shall not contain used or repaired parts unless requested by ▒▒ in writing, in which case such Products shall be clearly labeled as refurbished;

(d)    It has all the rights and licenses in the Products necessary to design, develop, manufacture, market and sell the Products as well as allow ▒▒ to distribute and resell the Products without restriction or additional charge;

(e)    All Products shall comply with applicable laws, applicable government regulations;

(f)    All advertising claims, specifications, or other information supplied by  Lexmark for purposes of publication by ▒▒ with regard to the Products are accurate and substantiated; and

(g)    All Supplies, including inkjet cartridges and toner cartridges, will be free from material defects in design, materials and workmanship for twenty-five (25) months from the date of manufacture.  The following process will be followed in the US only:

> Supplies, including inkjet cartridges and toner cartridges, must be returned to Lexmark for testing and validation. ▒▒ will collect the Supplies, including inkjet cartridges and toner cartridges, and itemize by part number. ▒▒ will ship the Supplies to Lexmark using the RMA process.  This will include notification prior to return shipment.  This process will be weekly, unless the failure rate is abnormal, as determined by the Parties, thus driving the need for a quicker turnaround of the testing.  Further, ▒▒ will debit the Lexmark account equal to the ▒▒ the price ▒▒ paid for a Supply, including inkjet cartridges and toner cartridges("Projected Returns Actually Defective" or "PRAD") until so modified as per Sections 4.6 and 4.7.  For example, if ▒▒ returns one-hundred Supplies under and approved Lexmark RMA, ▒▒ will debit the Lexmark account for ▒▒ of the acquisition value of those one-hundred Supplies.

4.2    Lexmark's warranty obligations do not apply to Product prototypes and samples, to the extent provided as mutually agreed.

4.3    An "Epidemic Failure" shall mean a condition whereby three percent (3%) or more (for future printer models, this percentage may be modified and shall be agreed upon prior to listing the new printer model under this Agreement) of the total field population of a Printer Product in any calendar quarter demonstrates defects in design, materials and/or workmanship and such defects result from the same root cause.  In the event of an Epidemic Failure during the term of the OEM agreement occurs within two years of the installation date of an affected Printer Product, Lexmark shall at its expense repair or replace all of the Printer Products affected by  the Epidemic Failure.

5

4.4     In the event an Epidemic Failure occurs in a Product, ██ will as soon as practicable identify to Lexmark in writing any dissatisfied end user customers owning 500 (or, as mutually agreed, less) or more of the same model Product who desire proactive field replacement or fleet repair of all potentially affected systems for such model Product. Lexmark will as soon as practicable perform a root cause analysis for the failure. In connection with the receipt of such analysis, ██ will promptly provide to Lexmark all necessary information requested concerning such Products owned or leased by such end user customers (e.g., serial numbers, options features, repair history, consumables, locations, usage). Within 30 days after receipt of all requested information from ██, Lexmark will provide a detailed, written root cause report to ██, including an assessment of which Products owned by such identified end user customer(s) could, based on this root cause analysis, potentially experience the Epidemic Failure. In addition, Lexmark will, at its expense, within 90 days of such report, repair or replace all such potentially affected Products identified in Lexmark's analysis.

4.5     Unless otherwise set forth in a Product Schedule, the Field Product Return Warranty Obligations included as part of Schedule C (Service Requirements) shall govern the return of all defective product, which for purposes of this Agreement shall mean any Products that fail to meet any of the warranties set forth in this Section 4.0.

4.6     For warranted toner cartridges only, Lexmark will test entire quantities of returned warranted Supplies and apply a confirmed defect rate to the returned quantities. At the end of each ██ fiscal quarter beginning after the third ██ fiscal quarter of 2008, Lexmark and ██ will mutually reconcile actual confirmed defect rates and apply that confirmed defect rate to the future ██ fiscal quarter's warranted Supply return quantities. An actual defect rate, with data, will be communicated to ██ and the amount of dollars owed to either Lexmark or ██ (per the ██ rate above) will be invoiced or credited to the other Party based on the actual defect rate found. This actual defect rate will be applied to the next ██ fiscal quarter returns from ██ for warranty credit. Further, Lexmark will provide ██ access to returned testing procedures. Payment from Lexmark to ██ will be in the form of additional credit and payment, if any, to Lexmark from ██ will be net 60 from end of the applicable calendar quarter. By way of example, at the end of a ██ fiscal quarter, Lexmark testing finds that 60% of the ██ returned warranted laser cartridge Supplies were defective during the ██ fiscal quarter, Lexmark would credit ██ for the acquisition cost of an additional 10% of the warranted laser cartridge Supplies returned. For the next ██ fiscal quarter, the monthly PRAD would be set at 60%.

4.7     For warranted inkjet or all-in-one inkjet cartridges, Lexmark will test lot samples, as selected randomly by Lexmark, and apply this sample defect rate to all returned quantities. At the end of each ██ fiscal quarter beginning after the second ██ fiscal quarter of 2003, Lexmark and ██ will mutually reconcile the Lexmark proposed defect rates and apply that defect rate to the future ██ fiscal quarter's warranted cartridge return quantities. The first ██ fiscal quarter will utilize a ██ defect rate. An actual defect rate, with data, will be communicated to ██. This actual defect rate will be applied to the next ██ fiscal quarter returns from ██ for warranty credit. Further, Lexmark will provide ██ access to returned testing procedures.

CONFIDENTIAL - OUTSIDE COUNSEL ON A3199

4.8    Power Cords. ███ may source power cords for printers directly from certain Lexmark vendors approved in writing by Lexmark.  Removal of Lexmark required barcode labeling identified in the drawings is not authorized.  Current approved suppliers are ██████████. Lexmark may remove a supplier upon written notice to ███ Such written notice shall become effective the later of: 1) 90 days after receipt by ██, or 2) the supplier order lead time and order cancellation policy in effect at time of receipt by ███ Lexmark is responsible for providing ██ specifications and related documentation which designate the Lexmark power cord appropriate for a specific model of printer. ███ agrees to supply Lexmark power cords to its customers consistent with the specification and related documentation provided it by Lexmark.  The parties acknowledge and agree that such power cords described in this Section 4.8, although included in Product packaging, do not comprise Products (or components of Products) pursuant to this Agreement and are provided AS IS, WITHOUT WARRANTIES OF ANY KIND, INCLUDING BUT NOT LIMITED TO THOSE OF MERCHANTABILITY AND FITNESS FOR PARTICULAR PURPOSE, AND THE WARRANTY AGAINST INFRINGEMENT.  The parties further acknowledge and agree that Lexmark obligations in Sections 4 (Supplier's Representations and Warranties, 5 (Indemnification), and 8 (Product Safety) of the Agreement do not apply in connection with any incident, claim, and/or occurrence arising out of or relating to such power cords.

## 5.0    INDEMNIFICATION

5.1    Lexmark agrees to defend, indemnify and hold harmless ██████ and all its respective directors, officers, employees, agents, customers and distributors (the "██ Indemnified Parties)" from and against any third party claim that the Products, or any of the components included within the Products, infringe any intellectual property right (i.e., copyright, patent or trade secret) of a third party. ███ shall promptly notify Lexmark of any such claim, and cooperate fully with Lexmark. Lexmark shall have control of the defense against such claim, except that ███ shall have the right to retain counsel and participate in the defense or settlement, at ████ expense.

5.1.1    Lexmark's obligation under this Section 5.1.1 is conditioned on ███ agreement that, if the Products or their use, become, or in Lexmark's opinion may become, the subject of such a claim, or a related claim comes to Lexmark's attention, Lexmark may, at Lexmark's option, and notwithstanding any other provision of this Agreement, either procure the right for ██ to continue marketing, selling and using units of the Product, or replace or modify them so they become non-infringing, or, as a last resort in the event the preceding alternatives are commercially unfeasible, stop shipping affected Products to ███ but only if Lexmark has stopped shipment on the similar Lexmark branded product(s). Upon Lexmark's written request, ███ will return affected Products in ███ inventory and make reasonable efforts to arrange for the return to Lexmark of the affected Products in ███ distributors' inventory.  Lexmark agrees to grant ███ a credit equal to the net unit price paid to Lexmark by ███ for the returned units of Product.

5.1.2    Notwithstanding the foregoing, Lexmark shall have no obligation with respect to any claim based upon or related to:  (a) non-Lexmark modification of units of Product, or (b) the combination, operation or use of Products with apparatus, data or programs not furnished by Lexmark provided that the acts constituting the claim of infringement are inconsistent with a Product's specifications. Specifications are defined as Product documentation, including technical specifications, reference

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3200

manuals and end user documentation. Lexmark's entire liability and ▆▆▆ exclusive remedies for any infringement claims are as provided in this Section 5.1.2.

5.2    In addition, Lexmark agrees to defend, indemnify and hold harmless the ▆▆▆ Indemnified Parties from and against any third party claim for personal injury or real or tangible personal property damage caused by any defect in design, manufacture, materials or workmanship of the Products or by Lexmark's negligent act, omission or willful misconduct.

5.3    Lexmark also agrees to defend, indemnify and hold harmless ▆▆▆▆▆▆▆ and its respective directors, officers, employees (for purposes of this Section 5.3, these parties shall be collectively referred to as ▆▆▆, from and against third party deceptive trade practices claims (e.g., California Business and Professions Code Sections 17200 and 17500, Texas Deceptive Trade Practices Act, Lanham Act) filed against ▆▆▆ in the United States for damages arising solely from allegations that the contents of documentation provided by Lexmark, and not modified or altered by ▆▆▆ gives rise to such a claim (e.g., ACRA v. Lexmark, Case Number 324287). Notwithstanding the foregoing, Lexmark shall have no liability or indemnification obligations for any other claims arising from or related to Lexmark documentation or marketing practices including, but not limited to, state or federal antitrust laws. ▆▆▆ shall promptly notify Lexmark of any such deceptive trade practices claim asserted against ▆▆▆ and cooperate fully with Lexmark. Lexmark shall have control of the defense, at its expense, against such claim, except that ▆▆▆ shall have the right to retain counsel and participate in the defense or settlement, at ▆▆▆ expense.

5.3.1    In the event of mixed third party claims (i.e., a claim arising out of acts and/or omissions of both Lexmark and ▆▆▆) asserted against ▆▆▆ in the United States alleging violation of deceptive trade practices by the contents of Lexmark documentation and any other claim (e.g., violation of antitrust laws), ▆▆▆ shall be responsible for the defense of such claims, at its expense except as noted below, and Lexmark agrees to cooperate fully with ▆▆▆▆▆▆ shall promptly notify Lexmark of any such mixed third party claims. To assist ▆▆▆ in ▆▆▆▆ defense, Lexmark agrees to pay to ▆▆▆ the legal fees incurred by ▆▆▆, and not covered by ▆▆▆ insurance, for the defense of such mixed claims up to ▆▆▆▆ in the aggregate for all such mixed third party claims. As long as Lexmark is responsible for the payment of legal expenses, the Parties shall agree on the selection of the defense counsel as well as the hourly rate of such defense counsel. If the Parties are unable to agree, ▆▆▆ shall have the right to select the defense counsel of its choice under ▆▆▆ normal retention terms. Lexmark, however, shall only be obligated to pay to ▆▆▆ the hourly rate that Lexmark would have paid if the defense counsel of its choice was selected (but in no event less than the billable rate of ▆▆▆▆ an hour for the services of a partner in a law firm) and, as stated above, only up to the maximum amount of ▆▆▆▆ in the aggregate. In addition, Lexmark shall have the right to retain counsel and participate in the defense or settlement, at Lexmark's expense. In the event of an adverse finding, ▆▆▆ shall be responsible for any judgment that may result therein, at its expense.

5.3.2    In the event of any claims asserted against Lexmark alleging violation of deceptive trade practices by the contents of Lexmark documentation and any other similar claims, Lexmark shall be responsible for the defense of any and all such claims, and any judgment that may result therein, at its expense.

CONFIDENTIAL - OUTSIDE COUNSEL ON A3201

5.3.3 Notwithstanding, Sections 5.3 and 5.3.1 shall in no way reduce or limit Lexmark's warranty representations or obligations under Section 4.1g.

5.4 Lexmark shall at its expense defend, indemnify and hold harmless the applicable ███Indemnified Parties against all government fines and penalties arising out of an alleged failure of the Products to conform to applicable government regulations and/or certifications.

5.5 ███ shall at its expense defend, indemnify and hold Lexmark and all their respective directors, officers, employees, agents, harmless against any claims of any kind based upon ███ trademarks or tradedress.

## 6.0    LIABILITY

Except for the parties' respective obligations and liabilities under Section 5.0 (Indemnification), Section 12.2 (Confidential Information), and Section 14.1 (Supplies Obligations), NEITHER PARTY SHALL BE LIABLE FOR ANY DIRECT OR INDIRECT LOST PROFITS, LOST SAVINGS OR ANY    INCIDENTAL, INDIRECT, PUNITIVE, SPECIAL, OR CONSEQUENTIAL DAMAGES UNDER ANY PART OF THIS AGREEMENT EVEN IF ADVISED OR AWARE OF THE POSSIBILITY OF SUCH DAMAGES.

## 7.0    COMPLIANCE

7.1 ███ is an Affirmative Action/Equal Opportunity Employer and transacts business with the United States Government. The Equal Opportunity Clauses at 41 CFR sections 60-1.4(a), 60-250.5(a) and 60-741.5(a) are hereby incorporated.

7.2 Each Party shall comply with all applicable laws (inside and outside the United States of America), orders and regulations of any governmental authority with jurisdiction over that Party's activities in connection with this Agreement.

7.3 Lexmark acknowledges and agrees that the Products licensed or sold under this Agreement, and the transactions contemplated by this Agreement, which may include technology and software, are subject to the customs and export control laws and regulations of the United States and may also be subject to the customs and export laws and regulations of the countries in which the Products are manufactured and received.  Lexmark must abide by those laws and regulations, to the extent they apply to Lexmark's activities hereunder.  For Product prototypes and samples that shall be shipped directly to ███████ destination named by ███ from a non-U.S. location, ███is designated as importer of record ("IOR") for U.S. customs clearance purposes.  Lexmark shall process shipping documentation to reflect the transfer of the no cost prototype or sample to ██. Lexmark shall include an invoice for customs clearance which must reflect the fair market value of the prototype or sample.  For Product prototypes and samples shipped to ███from within the United States, or to a third-party provider prior to delivery to a ███facility, the Lexmark shall be the IOR.  In addition, Lexmark shall fully cooperate with ███to configure the Products as specified by ███to minimize or reduce U.S. customs duties.

9

7.4    Upon ▮▮▮ request, Lexmark shall provide ▮▮▮ with an appropriate certification stating the country of origin for Products sufficient to satisfy the requirements of: (a) the customs authorities of the country of receipt; and (b) any applicable export licensing regulations, including without limitation those of the United States.  Lexmark shall mark the Products with the appropriate country of origin marking sufficient to satisfy the requirements of the customs authorities of the country of receipt to prove importation and to transfer duty drawback rights to ▮▮▮

7.5    Supplier shall use reasonable commercial efforts to complete and send the Import/Export questionnaires, examples of which are contained at Attachments 10 to Schedule D (Inkjet) and Schedule E (Laser) by 4 weeks RTS.

## 8.0    PRODUCT SAFETY

8.1    If either Lexmark or ▮▮▮ becomes aware of any information that reasonably supports a conclusion that a hazard may exist in any Product and the defect could cause death or bodily injury to any person or property damage (a "Hazard"), the Party becoming aware of this information shall promptly notify the other of the potential Hazard.  Whenever possible, notification to the other Party will precede notice to any governmental agency, unless required by law.  Lexmark and ▮▮▮ shall promptly exchange all relevant data and then, if practical, as promptly as possible, meet to review and discuss the information, tests, and conclusions relating to the alleged Hazard.  At this meeting the parties shall discuss the plan for any action, including without limitation any and all legal obligations of  the Parties pursuant to Section 15 of the United States Consumer Product Safety Act and/or similar requirements under the applicable laws of another country,, and the origin or causation of the alleged Hazard.   Each Party shall, on request, provide to the other reasonable assistance in: (a) determining how best to deal with the Hazard; and (b) preparing for and making any presentation before any governmental agency which may have jurisdiction over Hazards involving Products.  Should it be determined by either Party or governmental agency that a Hazard may exist in a Product, Lexmark shall be responsible for all reasonable costs and expenses in repairing, replacing, or recalling any Products that contain or may contain such Hazard.  In the event of a conflict between this Section 8.1 and Section 4.3, this Section 8.1 shall govern.  Relative to product safety data and information, Lexmark agrees to keep such data and information for at least five (5) years.

## 9.0    CONTINUITY OF SUPPLY

9.1    If Lexmark is unable to deliver any Printer model(s) or parts or Supplies for a Printer model(s) to ▮▮▮ hereunder due to (i) acts of war for a period of twenty (20) days after the delivery date for such Printer model(s), or (ii) loss or destruction of Lexmark's, or Lexmark's third party manufacturer's facility, due to fire, earthquake or other acts of God for a period of twenty (20) days after the delivery date for such Printer model(s) or parts or Supplies for a Printer model(s).  Lexmark agrees to cooperate with ▮▮▮ in ▮▮▮ providing a ▮▮▮ Lexmark qualified third party manufacturer for such affected Printer model(s) or parts or Supplies for a Printer model(s); provided, (i) that ▮▮▮ is not in breach of this Agreement and/or (ii) has not selected another vendor as set forth in Section 2 of this Agreement but only as to those products equivalent to those being purchased by ▮▮▮ under the OEM.  Lexmark will work with such third party manufacturer

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A3203

to assist in obtaining the necessary technical expertise and tooling to manufacture the affected Products for Lexmark. Lexmark will acquire such Products to resell to ▇▇ from this qualified third party manufacturer at a cost to be negotiated which may result in the pricing to ▇▇ under the OEM Agreement to be adjusted, higher or lower, as a result of the change of manufacturing. This qualified third party manufacturer may also manufacture such Products for sales by Lexmark to parties other than ▇▇  The cost of such manufacturing transition shall be negotiated and agreed upon prior to the transition.

## 10.0    OFFSET CREDIT

Products purchased by ▇▇ pursuant to this Agreement may allow ▇▇ or its designated assignees to earn credit with any governmental authorities of the territory where the Product is produced or purchased. ▇▇ may use such credit to offset its obligations to such governmental authorities which are the result of ▇▇ being awarded business by such governmental authorities. Lexmark shall use commercially reasonable efforts to assist ▇▇ or its designated assignees in their efforts to secure such offset credits from these governmental authorities in an amount equal to the value of the local content of the Products purchased by ▇▇ under this Agreement.

## 11.0    DISPUTE RESOLUTION

11.1    Before initiating a lawsuit against the other relating to this Agreement, the parties agree to work in good faith to resolve between them all disputes and claims arising out of or relating to this Agreement. To this end, either Party may request that each Party designate an officer or other management employee with authority to bind the Party to meet to resolve the dispute. During their discussions, each Party will honor the other's reasonable requests for non-privileged and relevant information. This paragraph will not apply if: (i) the expiration of the statute of limitations for a cause of action is imminent, or (ii) injunctive or other equitable relief is necessary to mitigate damages.

11.2    This Agreement will be governed and construed in accordance with the laws of the State of Texas, U.S.A., exclusive of any provisions of the United Nations Convention on the International Sale of Goods and without regard to its principles of conflicts of law. Lexmark International, Inc. hereby irrevocably submits to the jurisdiction of the federal and state courts of the State of Texas U.S.A.

11.3    Except as may be otherwise provided in this Agreement, the rights or remedies of the parties hereunder are not exclusive, and either Party shall be entitled alternatively or cumulatively, subject to the other provisions of this Agreement, to damages for breach, to an order requiring specific performance, or to any other remedy available at law or in equity.

## 12.0    MISCELLANEOUS

12.1    The provisions of Sections 1.0, 2.3, 3.5, 3.6, 4.0, 5.0, 6.0, 7.0, 8.0, 9.0, 12.0, 13.0, and 14.0 (including subsections thereof) shall survive any termination or expiration of this Agreement and shall continue to bind the parties and their permitted successors and assigns.

CONFIDENTIAL - OUTSIDE COUNSEL ONl A3204

12.2    Any confidential information that shall be disclosed by either Party related to this Agreement (including without limitation this Agreement) shall be disclosed pursuant to the terms and conditions of the Non-disclosure Agreement contained in Schedule N.   The terms and conditions of this Agreement will be deemed to be confidential information. Notwithstanding the foregoing, either Party may release a copy of this Agreement to any third party financial institution for financing purposes, provided such institution has entered an agreement to preserve the confidentiality of this information that is no less stringent than Schedule N.    In addition, notwithstanding Schedule N, Lexmark agrees that ▆▆ may provide information related to the Alliance Plan of Record to certain ▆▆ customers subject to Lexmark's prior written agreement, but only if such ▆▆ customers have executed a non-disclosure agreement with ▆▆ that requires the customer not to disclose the information to a third party and Lexmark and ▆▆ agree on the specific content of the confidential information to be disclosed and the dates of such disclosure. Neither Party may publicly release any information relating to this Agreement (except that either Party may confirm the existence of this Agreement), or use the other Party's name or names of its officials, without first receiving the prior written approval of such other Party.  For ▆▆ this approval must come from ▆▆ Corporate Communications department.   No other department within ▆▆ is authorized to consent to public releases of information.

12.3    Lexmark shall maintain accurate and legible records with respect to Lexmark's performance under this Agreement for as long as Lexmark retains such records for the corresponding Lexmark branded products and shall grant to ▆▆ reasonable access to and copies of any information reasonably requested by ▆▆ with respect to Lexmark's performance under this Agreement (including without limitation quality programs and test documentation) during Lexmark's business hours, at ▆▆ cost, provided that individuals selected by ▆▆ for such access are bound to confidentiality provisions similar to those contained in the NDA but that allow use of information for purposes of determining Lexmark's compliance with its obligations under this Agreement.

12.4    The parties are independent contractors and neither Party is an agent, servant, representative, partner, joint venturer or employee of the other or has any authority to assume or create any obligation or liability of any kind on behalf of the other.

12.5    No waiver of any term or condition is valid unless in writing and signed by an authorized representative(s) of the Party to be charged thereby, and shall be limited to the specific situation for which it is given.  No amendment or modification to this Agreement shall be valid unless set forth in writing specifically referencing this Agreement and signed by an authorized representative of each Party. No other action or failure to act (including without limitation inspection, failure to inspect, acceptance of late deliveries, or acceptance of or payment for any Products) shall constitute a waiver of any rights. This Agreement may not be assigned by either Party in whole or in part, even by operation of law, in a merger, in a sale of  the majority of the interests in the equity of a Party  or in an asset sale, without the prior written consent of the other Party;  provided, however, that (i) such consent shall not be required in connection with an assignment by a Party of all of such Party's rights and obligations under this Agreement to a Permitted Affiliate of such Party who assumes all of such rights and obligations in writing (provided that and (x) the assignor shall give notice to the other Party promptly thereafter; and (ii) such consent shall not be required in connection with an

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3205

assignment of all of a Party's rights and obligations under this Agreement to a third party who acquires substantially all of the assets or equity securities of such Party and who agrees in writing to assume such rights and obligations (provided that (x) the assignor shall give notice to the other Party promptly thereafter; and (z) such an assignment shall give the other Party the right to terminate this Agreement upon thirty (30) days written notice to the assigning Party). In addition, Lexmark may assign its accounts receivable under this Agreement to a third party financial institution for financing purposes only.  Any attempt to assign this Agreement other than in accordance with this section shall be null and void.

12.6 ██████ shall have full freedom and flexibility in its decisions concerning the distribution and marketing of the Products, or identical or similar products purchased from third parties (excluding products substantially equivalent to Supplies, which may not be purchased by ████ from anyone other than Lexmark, per the requirements of Section 14 of this Agreement), including without limitation the decision of whether or not to distribute or discontinue distribution of the Products. ████ does not guarantee that its marketing, if any, of the Products will be successful. ████ may distribute and sell the Products on a stand-alone basis or in conjunction with a system sale or lease.

12.7 Any and all written notices, communications and deliveries between the Lexmark and ████ with reference to this Agreement shall be deemed made on the date of mailing if sent by registered or certified mail to the respective address of the other Party as follows:

In the case of ████

With a copy to:

13

A3206

In the case of Lexmark:    Lexmark International, Inc.
740 New Circle Road NW
Lexington, Kentucky 40550
Attn:  General Manager, WW PS&SD Alliances
Cc:  General Counsel

Lexmark International Technology, S.A.
World Trade Center II, 29 Route de Pre-Bois,
Case Postale 508, CH 1215
Geneva 15 Switzerland
Attn:  President

12.8    Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law.  If any provision of this Agreement or a Product Schedule or an agreement referencing this Agreement (which Product Schedule or agreement for purposes of this Section 12.8 and Sections 12.9 and 12.10 below shall be referred to as an "Attachment") is held by final judgment of a court of competent jurisdiction to be invalid, illegal or unenforceable, such invalid, illegal or unenforceable provision shall be severed from the remainder of this Agreement or Attachment (as the case may be), and the remainder of this Agreement or Attachment (as the case may be) shall be enforced.  In addition, the invalid, illegal or unenforceable provision shall be deemed to be automatically modified, and, as so modified, to be included in this Agreement or Attachment (as the case may be), such modification being made to the minimum extent necessary to render the provision valid, legal and enforceable. Notwithstanding the foregoing, however, if the severed or modified provision concerns all or a portion of the essential consideration to be delivered under this Agreement or Attachment (as the case may be) by one Party to the other, the remaining provisions of this Agreement or  Attachment (as the case may be) shall also be modified to the extent necessary to equitably adjust the parties' respective rights and obligations hereunder.

12.9    The section headings in this Agreement or in any Attachment are solely for convenience and will not be considered in its interpretation.   Any Attachments to this Agreement are hereby incorporated herein as if set forth herein in full and may be executed without any further amendment to this Agreement.  This Agreement and any Attachment has been reviewed and negotiated by the parties, and each Party has had the opportunity to review this Agreement and such Attachment with counsel of its own choosing; accordingly, neither this Agreement nor any Attachment shall be construed strictly for or against either Party.  If a conflict arises between the terms of this Agreement and any Attachment, the terms of this Agreement shall control unless such Attachment expressly states that it controls. This Agreement and any Attachment may be executed in two or more counterparts, each of which shall be deemed an original for all purposes, and together shall constitute one and the same document. Telecopied signatures shall be relied on as original signatures in all respects.

12.10   This Agreement, together with any Attachments executed in accordance herewith, constitute the entire agreement between the parties with respect to the subject matter hereof, and supersede and replace all prior and contemporaneous understandings and agreements, written or oral, regarding

CONFIDENTIAL - OUTSIDE COUNSEL ONLYA3207

such subject matter, including without limitation the OEM Master Purchase Agreement dated July 3, 2002, as amended (provided, the terms and conditions of such prior OEM Master Purchase Agreement shall continue to apply to the sale of those products that were being sold pursuant to it on and before the effective date of this Agreement). The use of preprinted forms, such as POs or acknowledgments, is for convenience only and all terms and conditions stated thereon, except as specifically set forth in this Agreement, are void and of no effect.

12.11   If the performance of this Agreement or of any obligation hereunder is prevented by reason of fire; hurricanes, earthquakes, floods or other Acts of God; war, riot, work stoppage, or any law, order, proclamation, regulation, ordinance, demand or requirement of any governmental agency or intergovernmental body ("Force Majeure") hereto, the Party so affected, upon promptly giving notice to the other Party (in any event within fifteen (15) days of discovery thereof) and using its best efforts to cure the delay, will be excused from such performance to the extent of such prevention, restriction or interference. In the event of such Force Majeure, the time for performance or cure will be extended for a period equal to the duration of the Force Majeure but not in excess of forty-five (45) days.

12.12   Notwithstanding any other provision of this Agreement, if either Party files a claim or suit against the other whether based on a breach of this Agreement or for any other reason, the other Party may terminate this Agreement immediately, and only outstanding accepted orders will be fulfilled (and Lexmark may require payment prior to shipment). In addition, neither Party may bring an action, regardless of form, arising out of this Agreement, more than two (2) years after the cause of action has arisen.

## 13.0    ADDITIONAL LICENSE TERMS

13.1    For Printer Products, Lexmark will sell new Supplies to ██ as either Regular Supplies, Return Program Supplies, or as otherwise identified Supplies that are subject to other "use once and return" license terms, if available for similar Lexmark branded printers.  It is Lexmark's desire to make available both versions of Supplies.  ██ shall purchase and make available to its distributors and/or end users equivalent Regular Supplies whenever Return Program Supplies are purchased (the foregoing does not require ██ to purchase Regular Supplies in equal quantities).  ██ understands that the Return Program Supplies may contain a chip that is designed to allow the Supply to be used only once, thus helping to enforce the Return Program terms.  ██ will also make available the regular versions of the Supplies, and will inform the marketplace of the existence of both the regular and Return Program versions (and the terms of the Return Program cartridge) by labels, inserts in Printer and Supply packaging, and appropriate sales literature, announcements, and training.  The Return Program license terms are an essential part of the Return Program offering.  For the "up-front rebate," the end-user agrees that this Supply will be used one time only, and will be returned only to Lexmark after its initial use.  The Return Program license terms (or other license terms described in this Section 13.1) will identify Lexmark (not necessarily by name) as the developer/manufacturer of the Product, and will otherwise read essentially the same as Lexmark's terms for Lexmark branded Products.  The Return Program Supplies label, and its packaging, will instruct the user to return the Return Program Supplies (after use) to Lexmark's (not necessarily by name) collection point.  In addition, ██ acknowledges and agrees that for

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A3208

some Printer Products, Lexmark may sell them subject to the condition that only Supplies made by Lexmark (whether newly made or remanufactured) or authorized by Lexmark to be reused with the Printer Product will operate with such Printer Products, and that Lexmark may include technology in such Printers and Supplies designed to enforce such condition. ██ acknowledges and agrees that Lexmark shall be entitled to include all the terms and conditions described in this Section 13.1 on the external packaging, user manuals, and drivers of Products sold hereunder subject to such terms and conditions.

## 14.0    SUPPLIES OBLIGATIONS

14.1    For all inkjet cartridges and/or toner cartridges, all service parts, and selected features (excluding items such as memory, HDD, and printer cables), for use on the printer Products, all ██ requirements (for ██ use or sale) whether new or remanufactured, ██ irrevocably commits to purchase from Lexmark for the life of the corresponding printer Product (i.e., 7 years after the date of marketing withdrawal of the printer Product).

{remainder of page intentionally left blank}

CONFIDENTIAL - OUTSIDE COUNSEL ONLYA3209

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement by their respective duly authorized officers to be effective as of the Effective Date.

**LEXMARK INTERNATIONAL, INC.**

By: _Paul Rooke_

Title: _EVP_

Date: _11/3/08_

Date: _Nov/2/2008_

**LEXMARK INTERNATIONAL TECHNOLOGY, S.A.**

By: _____

Title: _MANAGING DIRECTOR_

Date: _11/25/08_

17

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3210

THIS SCHEDULE A (this "Schedule") is entered into as of November 1, 2008 (the "Schedule Effective Date") by and between ██████████████████████ the ██████████████████████ on behalf of itself and its worldwide affiliates (collectively, ██████), Lexmark International, Inc., a Delaware corporation ("LII"), and Lexmark International Technology, S.A., a Swiss company and LII's subsidiary ("LITSA")(LII and LITSA being hereinafter collectively referred to as the "Supplier" or "Lexmark").

All terms and conditions of the Agreement apply to this Schedule.  As used in this Schedule, the term "Lexmark" means Supplier.  Defined terms used herein but not otherwise defined herein shall have the meanings given such terms in the Agreement.

This Schedule A contains a list of the Schedules that are included in the Agreement as of the Effective Date, or as mutually agreed subsequently will be included, is provided here solely for the convenience of the parties, and shall not be resorted to in construing the Agreement.  Schedules listed in brackets "[ . . . ]" are not included as of the Effective Date.

### List of Schedules

A:    List of Schedules
B:    Initial Product Prices
C:    Service, Warranty, FRU, Technical Support
D:    Inkjet Products
E:    Laser Products
F:    Software
G:    Alliance Governance
H:    Business Reviews and Governing Body
I:    Pricing Methodology
J:    [Reserved for EMEA Schedule]
K:    [Reserved for Asia Pacific Schedule]
L:    ████████████████ Addendum
M:    Glossary
N:    Confidentiality

THIS SCHEDULE B (this "Schedule") is entered into as of November 1, 2008 (the "Schedule Effective Date") by and between ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ on behalf of itself and its worldwide affiliates (collectively, ▮▮▮▮ Lexmark International, Inc., a Delaware corporation ("LII"), and Lexmark International Technology, S.A., a Swiss company and LII's subsidiary ("LITSA")(LII and LITSA being hereinafter collectively referred to as "Lexmark").

This Schedule B provides additional terms and conditions to the Master Purchase Agreement having an effective date of November 1, 2008 between ▮▮▮ and Lexmark (the "Agreement"). All terms and conditions of the Agreement apply to this Schedule B, and the terms and conditions of this Schedule B are hereby incorporated by reference into the Agreement. Defined terms used herein but not otherwise defined herein shall have the meanings given such terms in the Agreement. In the event of a conflict between this Schedule B and the Agreement, this Schedule B shall govern.



SCHEDULE B 061103

**DIRECT HW Pricing**
v6.0

Geo

Effective

**Hardware**

Contract Price

Always Offer Holder for Supplies – Alliance Discount

Cost Addition:

Retail Distribution
Retail Outbound Shipping
Retail Packaging
UCD (2d) Labeling
Direct Distribution
Direct Outbound Shipping
Direct Distribution NRE
Direct Service Fulfillment
Deviations from "same as Lexmark" (i.e. factory install)

NRE credit for Level 1 (redesign logo only)
NRE credit for Level 1 (Level 0 + unique ID Integrated)
NRE Amortized
NRE Recovery for Level 1 Cancellation
BOM savings for Lexmark original & system
FSA R-Source (HW returns box as Lexmark)
Removal of Duplex
Packaging & Parts Reduction

Revised Contract Price

MDF

Gross Invoice Price

Notes:
...

CONFIDENTIAL - OUTSIDE COUNSEL ONLY



SCHEDULE B

**RETAIL HW Pricing**
22-Oct-08
v8.0

| | (single head) | (non-wireless) | (non-wireless) | Wireless | Wireless | Wireless | Wireless | US Retail | US Retail | Wireless | Wireless | US Retail |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Geo | US | US Retail | US Retail | US Retail | US Retail | US Retail | US Retail | US Retail | US Retail | US Retail | US Retail | US Retail |
| Effective | | Launch | After 500k units | Launch | After 250k units | Launch | After 280K units | Launch | After 90K units | Launch | After 250k units | Launch |

**Hardware**

Contract Price                $

Alliance Offer (% for Supplies + Alliance Discount)   $
11/03/08   Cost Reduction   $
11/03/08

**Cost Additions:**

| | |
|---|---|
| Retail Distribution | $ |
| Retail Outbound Shipping | $ |
| Retail Packaging | $ |
| UCC128 Labelling | $ |
| Direct Distribution | $ |
| Direct Outbound Shipping | $ |
| Distribution NRE | $ |
| Direct Service Fulfillment | |
| Deviations from "same as Lexmark" (i.e. factory install) | |

**Cost Subtractions:**

| | |
|---|---|
| NRE credit for Level 0 (rebadge logo only) | $ |
| NRE credit for Level 1 (Level 0 + unique ID language) | $ |
| NRE Amortized | |
| NRE Recovery for ... Cancellation | $ |
| BCM savings for ... as "Lexmark" engine & system | |
| FSA ® Source | |
| Removal of Duplex | |
| Packaging & Pubs Reduction | |

Revised Contract Price        $

MDF

Gross Invoice Price           $

Notes:
All Notes on primary "Hardware" tab apply to "Hardware Retail" tab as well.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY



Lex **A3214** all

SCHEDULE B

3-Nov-06

DIRECT HW Promo Pricing

v10.0



| | Promo Option A | Promo Option B | Pre Alliance (for LexInt distribution) | Promo Option C | Promo Option D | Promo Option E | Promo Option F |
|---|---|---|---|---|---|---|---|
| **Product Name:** | | | | | | | |
| **Product Description:** | 1 Color Cart., 90 Day Wty, FOB HK | 1 Color/1Photo, up to 2 SW Titles, 90 Day Wty, FOB HK | | Add'l Terms below, FOB US | Add'l Terms below, soft-bundle promo only, FOB US | Add'l Terms below, FOB HK | Add'l Terms below, soft-bundle promo only, FOB HK |
| **Country:** | US | US | US | US | US | US | US |
| **Lex Part:** | TBD | TBD | | TBD | TBD | TBD | TBD |
| **Lex Part:** | TBD | TBD | | TBD | TBD | TBD | TBD |
| **Effective:** | | | | | | | |
| Gross Product Price | | | | | | | |
| Contract Pricing | MDF | | | | | | |
| **Subtractions** | | | | | | | |
| Warranty | | | | | | | |
| Other | | | | | | | |
| Other | | | | | | | |
| Total Subtractions | | | | | | | |
| **Structural Cost Initiative** | | | | | | | |
| Promo Adjustments* | | | | | | | |
| Additional Promo Items | | | | | | | |
| Other | | | | | | | |
| Total Structural Cost Initiative | | | | | | | |
| **Cost Additions** | | | | | | | |
| WW Cost Additions | | | | | | | |
| Packaging | | | | | | | |
| Name Tech Sheet | | | | | | | |
| Pubs kit | | | | | | | |
| Color/ld Changes | | | | | | | |
| Other | | | | | | | |
| Other | | | | | | | |
| Total Cost Adders | | | | | | | |
| Revised Contract Price | | | | | | | |
| MDF | | | | | | | |
| **Revised Gross price** | | | | | | | |
| Net Price | | | | | | | |

*Add'l Promo Terms and Conditions:*
- may choose only one of the promo options listed
- Value-added software titles (Option B) will be selected from a list provided by Lexmark
- Value-added software titles are only being offered for Option B.
- may order up to 4 times per year, minimum purchase order qty is _____ units
- Maximum annual volume for promo is _____ units
- Promo printers are sold while supply lasts
- Printers are sold with a 90 day warranty
- Advanced Purchase orders (approx 13 weeks) will be issued to supplier for fixed quantities _____ to be produced and delivered in a given period
- Box size may be minimized and closed at source (Lexmark's discretion).
- FOB Point of Printers are as stated in Product Description above.
- Payment terms are Net 45 Days
- No Market-Based Pricing applies to Promos
- Option C and E "soft-bundle" promos, meaning the printer is included with a laptop or desktop purchase
- Option D and F are 'soft-bundle' promos, meaning the end-user customer has a choice to to take the printer at a discounted rate when buying a PC, but can opt out if they do not want a printer
- All options assume brown box cartons

CONFIDENTIAL - OUTSIDE COUNSEL ONLY

Lex **A3215**tial

**Supplies Pricing**
22-Oct-08
v6.0

**Effective Date:**

| Supplies | | Americas Newman SY Tank RPC Mono | Americas Newman SY Tank Standard Mono | Americas Newman SY Tricolor RPC Color | Americas Newman SY Tricolor Standard Color | Americas Newman HY Tank RPC Mono | Americas Newman HY Tank Standard Mono | Americas Newman HY Tricolor RPC Color | Americas Newman HY Tricolor Standard Color | Americas Newman HY Tank RPC Mono | Americas Newman HY Tank Standard Mono | Americas Newman HY Tricolor RPC Color | Americas Newman HY Tricolor Standard Color |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

Contract Pricing

Alliance Offer (Hdwe for Supplies)
11/03/08

Cost Additions
Retail Distribution
Retail Shipping
Distribution NRE
Retail Packaging

Cost Subtractions

Laser and Ink Alliance Discount

Revised Contract Price

MDF

Revised Gross Product Price

Notes:
- ALL INKJET CONSUMABLES FOR PRODUCTS PRIOR TO ▮▮▮ WILL BE INCREASED BY ▮▮▮ EFFECTIVE FEBRUARY 1ST, 2009 THROUGH EOL
- In Exchange for the ▮▮▮ all inkjet Consumables for products prior to ▮▮▮ will be increased by an additional ▮▮▮ effective Aug 1st, 2009 through May 31st, 2010
- Pricing above does not include Geo specific cost adders and subtractions outside of DRO
- Retail packaging adder assumes same SKU for Retail and Direct.
- Pricing above does not include multiple hub management
- Pricing is based on full portfolio award to Lexmark
- Where zero is shown for Retail Distribution and shipping cost adder, it is assumed that those cartridge will not ship to retail. If cartridges do ship to retail, the adder will be applied for packaging.
- If any HY cartridges are placed in retail we would need to add the distribution and shipping adders

Alliance Discount conditions:
- Award of the full inkjet line and mono laser line of products and signing of the multiple year agreement
- Teams will work toward completing and documenting the agreed to terms of the alliance
- Laser and Ink Alliance Discount above is for signing the 7-year mono laser agreement

CONFIDENTIAL – OUTSIDE COUNSEL ONLY

Lex-**A3216**-rtial



NRE and Tooling is guaranteed recovery and will be initially based on ▮▮▮ volume ▮▮▮ n Schedule B
- NRE and TOOLING based on Level 1 designs
- If ▮▮ fails to achieve a minimum of ▮▮▮ units in the Good category, ▮▮▮ n Better/Best (combined) or ▮ ▮▮ Ultimate in their expected life.  For every unit that ▮▮ falls short of this minimum, ▮▮ will pay Lexmark ▮▮▮ per unit up to a minimum of ▮▮▮▮ (excluding ▮▮

CONFIDENTIAL - OUTSIDE COUNSEL ONA3217

# SCHEDULE C: SUPPORT

| | |
|---|---|
| **Introduction** | **2** |
| **1.0 Purpose** | **2** |
| **2.0 Definitions** | **2** |
| **3.0 Product Launch** | **3** |
|     **3.1 Warranty** | **3** |
|     **3.2 Pricing** | **4** |
|     **3.3 Recommended Spares List (RSL)** | **5** |
|     **3.4 Service Product Inventory** | **5** |
|     **3.5 Training and Materials** | **6** |
|     **3.6 Technical Support** | **9** |
| **4.0 Service Logistics Processes** | **9** |
|     **4.1 Logistics** | **9** |
|     **4.2 Service Quality** | **11** |
|     **4.3 Service Packaging and Labeling** | **11** |
|     **4.4 Transportation** | **11** |
|     **4.5 Forecasting and Purchasing** | **12** |
|     **4.6 Service Level Agreement** | **12** |
|     **4.7 Less than 30 Day Returns/Customer Remorse Returns (Printers)** | **12** |
|     **4.8 Escalation** | **13** |
| **5.0 Extended and Out of Warranty** | **13** |
|     **5.1 Extended Warranty** | **13** |
|     **5.2 Out of Warranty** | **14** |
| **6.0 Technical Support Center** | **14** |
|     **6.1 Support Definitions** | **14** |
|     **6.2 Lexmark Support Incident Response by Severity** | **15** |
|     **6.3 Technical Support Procedures** | **16** |
|     **6.4 Support Collaboration Guidelines and Targets** | **17** |
| **7.0 Mutual Travel Agreement** | **18** |
| **8.0 End of Service Life** | **19** |
| **9.0 Business Meetings** | **19** |
| **10.0 New Alliance** | **20** |
| **11.0 Engineering Change Order Process** | **20** |
| **Attachment C-1 ▉▉▉ Laser Features/Options Service Support Program** | **21** |
| **Attachment C-2 Service Terms Matrix per Global Regions** | **22** |
| **Attachment C-3 Service Parts Pricing Pro Forma Document** | **23** |
| **Attachment C-4 Warranty and Out of Warranty Pricing** | **24** |
| **Attachment C-5 Recommended Spares Lists (RSL) Pro Forma Document** | **25** |
| **Attachment C-6 CID and NFD Cost** | **26** |
| **Attachment C-7 End of Service Life Matrix** | **27** |
| **Attachment C-8 Substitution Matrix** | **28** |
| **Attachment C-9 Service Strategy** | **29** |
| **Attachment C-10 ECO Process Flow** | **30** |
| **Attachment C-11 Warranty Entitlement Data Project** | **31** |

8/27/08

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A3218

**Introduction**

THIS Support Schedule C (this "Schedule") is entered into as of November 1, 2008 (the “Schedule Effective Date”) by and between [redacted], on behalf of itself and its worldwide affiliates (collectively, [redacted]), Lexmark International, Inc., a Delaware corporation ("LII"), and Lexmark International Technology, S.A., a Swiss company and LII's subsidiary ("LITSA")(LII and LITSA being hereinafter collectively referred to as the “Supplier

This Schedule provides additional terms and conditions to the Master Purchase Agreement having an effective date of November 1, 2008_ between [redacted] and the Supplier (the “Agreement”). All terms and conditions of the Agreement apply to this Schedule and the terms and conditions of this Schedule are hereby incorporated by reference into the Agreement. As used in this Schedule, the term "Lexmark" means Supplier. Defined terms used herein but not otherwise defined herein shall have the meanings given such terms in the Agreement. In the event of a conflict between this Schedule and the Agreement, this Schedule shall govern.

Both Parties will work together to create a separate support agreement for any stand alone software application products that Lexmark sells to [redacted]

**1.0 Purpose and Scope**

This document has been developed to communicate the service logistics terms and conditions, and the Product support and training terms and conditions required by [redacted] Service. The terms and conditions of this Schedule C (except for Section 4.0, including subparts) apply worldwide. Section 4.0 applies only to the U.S., Canada, and Latin America. A separate Attachment containing geography-specific terms for the subject matter described in Section 4.0 will be created once mutually agreed by the Parties.

**2.0 Definitions**

2.1. The terms below as used in this Schedule have the following meanings:

a. Warranty

i. **Base Warranty** – refers to the express warranty described in Section 6.1 (a) of the Agreement. [redacted] may elect to purchase printer products on an “as-is” basis, without such Base Warranty. Such purchases shall be noted next to the applicable Product on Schedule B.

ii. **Extended Warranty** - refers to an agreement between [redacted] and its customers for a multi-year warranty commitment. The maximum extended warranty for laser printers is 4 years and for A4 inkjet printers is 2 years. For laser printers, the 4th year of extended warranty is available only through a special bid.

iii. **No Service Parts Warranty** – Service Parts will be sold to [redacted] AS IS, WITHOUT WARRANTIES OF ANY KIND, INCLUDING BUT NOT LIMITED TO THOSE OF MERCHANTIBILITY, FITNESS FOR PARTICULAR PURPOSE, AND THE WARRANTY AGAINST INFRINGEMENT. Notwithstanding, the above warranty disclaimer shall not limit or reduce the applicable system level warranties and/or indemnities. In the event that an Epidemic Failure as defined in Section 6.3 of the Agreement is due to defects in design, materials and/or workmanship of a Service Part, feature or option and such defects result from the same root cause and the Epidemic Failure during the term of the OEM agreement occurs within two (2) years of the installation date of an affected Printer Product, Lexmark shall at its expense repair or replace all of the Printer Products affected by the Epidemic Failure.

b. **Service Parts** – refers to parts used to repair defective installed printers, including component parts, and subassemblies, and wear items such as maintenance kits, fusers, rollers, etc.

c. **Service Printers** – refers to printers used to replace defective installed printers.

d. **Missing, Wrong and Damaged (MWD)** – refers to items that are included in the marketing printer package but are either missing, incorrect or damaged when the printer arrives at [redacted] customer location. The items will be included in the Recommended Spares List and provided at no charge to [redacted] up to of the printer install base.

e. **Could Not Duplicate/No Defect Found/No Fault Found/No Trouble Found (CND/NDF/NFF/NTF)** – Lexmark Service is unable to reproduce the failure reported by the customer. All terms mean essentially the same and are treated identically.

f. **Recommended Spares List (RSL)** – a [redacted] managed document that identifies [redacted] Service Parts items. The list is divided into several sections which correspond to the various groups within Lexmark that provide support

for these items (i.e. printers, parts, MWD, features/options accessories, ink cartridges, toner cartridges, cables, line cords, documentation kits, packaging, etc.).

g. **Training** - refers to Lexmark support of ███ new product launch activity where Lexmark either trains ███ trainers or acts as a subject matter expert during ███ Technical Support Center and break fix/train-the-trainer (TTT) training.

h. **Training Materials** - refers to any/all documentation in paper, or electronic format that Lexmark generates to provide ███ with knowledge about Technical Support Center (TSC) support and or printer service (break fix /TTT).

i. **Service Inventory** - refers to inventory of either Service Parts or Service Printers

j. Service strategies –

    i. **Advanced Exchange** – defined as a warranty replacement procedure in which a new or refurbished Service Printer is dispatched in advance to a ███ customer to replace the ███ diagnosed defective printer. The defective printer is returned by the customer after the replacement is received.

    ii. **Replace Only** – defined as a warranty replacement procedure in which a new or refurbished Service Printer is dispatched in advance to a ███ customer to replace the ███ diagnosed defective printer. Lexmark does not require the defective printer to be returned by the customer.

k. **Parts Only Warranty** – defective printers are repaired at the customer location by ███ using Lexmark Genuine Parts and ███ is reimbursed by Lexmark only for parts required to repair. Wear parts that fail during the warranty period will only be replaced if the customer is using genuine ███ supplies.

l. **End of Service Life (EOSL)** - refers to the point in time when a printer model and/or any of its various parts or other service items are no longer supported by Lexmark Service

m. **Field Replaceable Units (FRUs)** – Service Part requiring authorized service technician installation.

n. **Customer Replaceable Units (CRUs)** – Service Part that the end user or an authorized service technician can install (typically no tools are required)

o. **Ready to Ship (RTS)** – refers to the date on which a model family of printer products will be made commercially available by ███

p. **Customer Remorse Return** – printer(s) returned as a result of ███ customer deciding that they do not want the printer(s).

q. **Wear Parts** – parts with a yield or duty cycle less than that of the printer (e.g. fusers, rollers, internal transfer units, autodocument feeders, etc)

## 3.0 Product Launch

3.1. Warranty

a. For printers sold subject to the Base Warranty, before printer model family RTS, Lexmark will inform ███ regarding the service support strategy that Lexmark has selected. Lexmark has the option to provide service support for defective A4 inkjet printers within the warranty period by either whole unit replacement or depot repair. For A4 inkjet printers purchased without Base Warranty, Lexmark will make available spare parts listed on the RSL until the end of printer manufacturing, at which time the last time buy process described in Section 8.0 (f) will apply.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3220

b. Defective laser printers within the warranty period at Lexmark's option may be supported by whole unit replacement or depot repair; unless ▮ has opted to take such printers in an "as-is" condition without the Base Warranty; in that case, Lexmark will provide Service Part support only.

c. Features and options obtained by ▮ from Lexmark Service are sold to ▮ AS IS, WITHOUT WARRANTIES OF ANY KIND, INCLUDING BUT NOT LIMITED TO THOSE OF MERCHANTIBILITY, FITNESS FOR PARTICULAR PURPOSE, AND THE WARRANTY AGAINST INFRINGEMENT. Support for features and options is documented in Attachment C-1 to this Schedule. Feature/options sold with warranty, by the Lexmark Hardware team, will be supported by Lexmark Service.

d. For A4 inkjet and/or laser printer Products purchased without Base Warranty, Lexmark will offer additional discounted pricing. In addition, if ▮ takes this option, ▮ commits to fulfill its entire requirements for Service Parts (if available) from Lexmark with genuine Lexmark Service Parts. After printer RTS, on a case by case basis for laser printers that were originally sold to ▮ sold "as-is," ▮ may choose to "buy back" the Base Warranty (at a price quoted by Lexmark), provided that this buy back occurs prior to the sale of the printer(s) to the customer by ▮.

e. For worldwide printer models beginning with 2010 product launches ▮ may elect to purchase a Parts Only Warranty for laser printers. Pricing for the Parts Only Warranty will include process set-up, execution and ongoing administrative costs that are unique to ▮ The process must be designed such that claims made under the warranty are verifiable by Lexmark. Prices for the Parts Only Warranty must not be less favorable than Lexmark's prices to any other customer purchasing like quantities of comparable Parts Only Warranties under similar terms and conditions. If at any time during the term of this Agreement Lexmark accords to any other customer more favorable prices, Lexmark shall immediately offer to sell the Parts Only Warranty to ▮ at such price. Upon mutual agreement of both Parties to the Alliance Plan of Record Document(s) as described in Schedules D and B; Attachments 1.1, at Section 4.3, and once ▮ has selected the Parts Only Warranty option, Lexmark will begin a process definition project and will provide ▮ an expected implementation date. Lexmark expects that ▮ diagnostics and repair will be comparable to Lexmark and will limit reimbursement for parts usage to ▮ higher than the Lexmark usage rate. Lexmark and ▮ will work together to identify and resolve matters which are driving the higher rate. Should the usage rate exceed the ▮ due to Lexmark not providing the same material to ▮ which Lexmark provides to Lexmark's TSC, Lexmark will be responsible for the higher rate. Each Party will make commercially reasonable efforts to correct the factors contributing to the ▮ higher rate.

f. The Base Warranty for printers applies to all A4 inkjet printers and mono laser printers with the exception of printers purchased by ▮ with no warranty. Attachment C-9 Service Strategy defines the service strategy for each product and will be updated quarterly, if needed. If there is a service strategy change after RTS, the two Parties will mutually agree to the new strategy. Should there be mutual agreement to change this strategy, the new base warranty period and price changes will be identified in Schedule B. Such changes must be made with a mutually agreed upon timeline in advance of implementation.

g. ▮ shall establish its own warranty terms with its customers and, through ▮ technical support call center, shall receive, diagnose and determine a course of action to resolve customers' concerns. The warranties in the Agreement and the Product Schedules (including without limitation this Schedule C) are Lexmark's only obligation to ▮ for warranty service on printers, and Lexmark shall have no direct obligation for warranty service to a ▮ customer. ▮ may, at its discretion and sole expense, offer additional services for ▮ branded printers.

h. To support Lexmark's warranty obligations to ▮ Lexmark shall perform the warranty fulfillment model listed in Section 4.0 for the Americas. Lexmark's warranty fulfillment for Asia Pacific (AP) and Europe/Middle East/Africa (EMEA) is documented in Attachment C-2.

i. Lexmark shall sell ▮ branded Service Parts only to ▮ or to Lexmark depot center(s) for repair of ▮ printers. Lexmark will offer to sell ▮ branded Service Parts to one (1) ▮ Third Party Logistics provider (TPL) per geographic region (Americas, EMEA, and AP) after receipt of ▮ written request. Service Part pricing to the TPL will be distributor pricing, based on that TPL's annual purchase dollar volume.

j. Lexmark will assist ▮ in the development of an out of warranty Request For Proposal (RFP) and will submit a response to such RFP, which may be conducted up to one time per year and per region.

3.2. Pricing

a. Lexmark will provide Service Parts pricing to ▮ no less than ▮ days prior to planned RTS date in substantially the same format as the pro forma document set forth in Attachment C-3. If Lexmark is unable to provide final pricing to ▮ prior to RTS, Lexmark will provide its best estimate of pricing at that

**CONFIDENTIAL - OUTSIDE COUNSEL ON** A3221

time and agrees that any subsequent changes prior to RTS will be limited to price decreases. Lexmark will provide ▮ with individual product pricing files for Service Parts with respect to items on the RSL list and managed by Lexmark Service.

b. Lexmark will provide ▮ with a worldwide Master Pricing file for Extended Warranty and out of warranty/per call pricing as set forth in Attachment C-4, which Lexmark will update with each new product launch. Extended Warranty and out of warranty pricing for the Americas region will be provided to ▮ at the time the Alliance Plan of Record Road Map is agreed upon by both Parties. AP and EMEA Extended Warranty and out of warranty pricing for new products, will be provided within 30 days after Plan of Record Road Map if agreed upon by both Parties

c. Lexmark may change Service Parts pricing no more frequently than once per calendar year, and will provide ▮ with 60 days notice of such change. Lexmark will provide a review to ▮ to explain any pricing actions and the drivers behind the actions. Final pricing will be set by Lexmark.

d. Service part pricing in effect as of September 15, 2008 is based on service parts, MWD, and features/options being sold by Lexmark Service to be without warranty. Service pricing for A4 inkjet printer features/options may differ from Hardware pricing for the same items.

e. For ▮ specified suppliers where Lexmark has identified a lower-cost alternative and ▮ has not authorized Lexmark to change to the lower-cost alternative, ▮ will be responsible for any difference in cost. For Lexmark-specified suppliers where ▮ has identified a lower-cost alternative and Lexmark has not changed to the lower-cost alternative, Lexmark will be responsible for any difference in cost. When these instances occur, the Parties will work together and resolve.

f. Prices for Service Parts must not be less favorable than Lexmark's prices to any other customer purchasing like quantities of comparable Service Parts under similar terms and conditions. If at any time during the term of this Agreement Lexmark accords to any other customer more favorable prices, under such similar terms and conditions Lexmark shall immediately offer to sell the Service Parts to ▮ at such price.

g. Pricing terms are per the MPA, Section 3.5. Freight charges are covered in Section 4.2 of this Schedule C. ▮ shall provide Lexmark with applicable tax documentation (e.g. value-added tax, exemption or withholding information).

h. Invoicing terms are per the MPA, Section 3.6.

i. ▮ may not negotiate directly with Lexmark Service Part suppliers and/or warranty service contractors without the express written consent of Lexmark Customer Support Services (CSS) OEM Business Development Management.

3.3. Recommended Spares List (RSL)

a. Lexmark will offer ▮ the same set of Service Parts as released for Lexmark branded equivalent printer, in substantially the same format as the pro forma document set forth in Attachment C-5.

    i. The Parties must agree on which Service Parts will be bundled into kits (parts kitting) for ▮

b. The RSL list will be provided to ▮ 120 days prior to RTS. In general, the list will consist of FRUs, CRUs, MWD, options/features, supplies and Service Printers. The list will be divided into several sections which correspond to the various groups within Lexmark that provide support for these items and from which ▮ will purchase them.

c. Lexmark will send a representative from Lexmark, (Singapore office), to the ▮ office to participate in a printer teardown. Lexmark Lexington personnel will participate via video conference to aid in the development of the RSL. The printer used in the teardown at the ▮ facility will be provided by ▮ If required, ▮ may participate in a product teardown at the Lexmark Lexington location, with ▮ responsible for any associated travel expenses.

3.4. Service Product Inventory

Prior to the RTS of a new printer, Lexmark shall do the following:

CONFIDENTIAL - OUTSIDE COUNSEL ON A3222

a. Lexmark shall arrange for delivery of Service Printers and relevant Service Parts to the ███ Third Party Logistics Supplier (TPL) at least five (5) business days prior to RTS. Lexmark will put forth best efforts to arrange for delivery ten (10) business days prior to RTS

b. Lexmark will provide to ███ the following information:
    i. Part number for Service Printers and Service Parts (Lexmark and ███ P/N)
    ii. Price of Service Printers and Service Parts which shall be made an attachment to this Schedule

c. Service Printer seed stock for RTS will be new.  Service parts may be new or used.

d. Lexmark Service will provide support for A4 inkjet and laser base printers, line cords, power adapters, spare parts, pub kits, and laser and A4 inkjet printer features/options.

e. As an interim solution for ███ Asia Pacific Japan region, Lexmark Asia Pacific will support options for current products (██████████████████).  ███ will issue purchase orders for options to the Lexmark Parts Hub in Australia. Lexmark Service will provide Service pricing for these features/options, and pricing may be different than the historically used Lexmark Hardware price.

3.5. Training and Materials

a. Delivery

For current and future product line launches and updates comprising new functionality or features to current product lines, Lexmark shall at ███ discretion (i) include up to two (2) ███ representative(s) on Lexmark's internal training (pre-GA General Availability) team to facilitate continuity as product line launches or updates occur; (ii) for product launches or updates comprising new functionality or features for which Lexmark utilizes instructor-led training, make available to ███ appropriate training (up to twenty (20) free seats but all seats may not be available at the same time)  with such training at a designated Lexmark facility and ███ shall be responsible for cost of travel, accommodations and other expenses; and (iii) for product launches or updates comprising new functionality or features for which Lexmark utilizes web-based training, Lexmark shall make such web-based training available to ███ at no charge and ███ shall be responsible for obtaining or providing the necessary facilities and equipment.

Lexmark will provide ███ with the worldwide training schedule that will include the training date by region.

All technical training will be made available to ███ under circumstances substantially similar to that used with Lexmark's own technical support personnel and ███ trainers shall be permitted to mirror the training Lexmark provides to their technical support resources.

b. Training Plan

Lexmark shall use commercially reasonable efforts to provide a written Technical Support Training Plan to ███ representative(s) on their internal training (pre-GA) team under circumstances substantially similar to that used with Lexmark's own technical support personnel.  This plan will mirror the material Lexmark provides to their training resources.

c. Training Content

Lexmark shall use commercially reasonable efforts to provide a softcopy of a written Technical Support Training Courseware to the ███ representative under circumstances substantially similar to that used with Lexmark's own technical services personnel.  Lexmark shall use commercially reasonable efforts to achieve the dates set forth in this paragraph.  If the ███ product has only minor variations from the Lexmark product (i.e. different logo or cover set color), Lexmark shall provide a draft softcopy of Technical Support Training Courseware not less than 60 days prior to ███ or Lexmark's RTS date whichever is earlier.  Updated draft softcopies with all updates and changes noted will be delivered to ███ weekly until 30 days prior to ███ or Lexmark's RTS date whichever is earlier.  If the ███ product has significant variations from the Lexmark product Lexmark shall provide a draft softcopy of Technical Support Training Courseware not less than 60 days prior to ███ RTS date and update draft softcopies with all updates and changes notes on a weekly basis until 30 days prior to ███ RTS date. Lexmark will deliver to ███ a final draft soft copy of the Technical Support Training Courseware for new printers not later than 30 days prior to ███ RTS date

Lexmark agrees to allow ███ to reproduce and distribute the Training Materials to ███ employees and authorized third party ███ service providers.

CONFIDENTIAL - OUTSIDE COUNSEL ON A3223

Lexmark will provide to ▮▮ at substantially the same time as such changed materials are first made available to Lexmark's own organizations, any changes or updates to its courseware with changes documented.
- Lexmark will provide all applicable updates.
- Lexmark will provide any applicable product FAQ's as they apply to training (i.e. based on common trends)

In addition, at Lexmark's discretion, Lexmark will update training courseware with additional topics such as feedback on historical or active product brought forth by ▮▮ o improve the courseware.

d. Training Support for Launch

Lexmark shall participate in one (1) Training session for laser printers to be conducted at one US location when it makes such Training available to its own technical services personnel, and shall use reasonable commercial efforts to deliver Training no later than ▮▮ RTS minus 30 days. Lexmark shall assume all costs for travel and expense for Lexmark personnel and ▮▮ will provide training materials and printers. The Training session will consist of two (2) classes:
- Lexmark personnel will deliver a service break-fix Train the Trainer ("TTT") class for laser printer product.
- Lexmark personnel will be subject matter experts and will assist ▮▮ trainers in a ▮▮ Technical Support Center training class. Lexmark personnel are not expected to deliver the Technical Support Center training class.

For A4 inkjet printers, for new and changing technologies, Lexmark will provide either Webinar, On-line training courses, or appropriate reference documents to provide TSC level training at the same level provided to Lexmark's TSC agents supporting corresponding products.

▮▮ may participate at ▮▮ expense in TTTs that Lexmark offers in any/all three (3) regions, the Americas, AP, and EMEA.

Lexmark will provide the same training and/or documentation to ▮▮ for all new and existing Lexmark-supported Operating Systems and applications such as, but not limited to Microsoft / Linux/ Unix-based/Apple/ Mac OS /OMPM/Universal Print Driver and other software applications sourced from Lexmark as is provided to Lexmark service personnel. The typical training/documentation includes, i.) driver install, ii.) driver deinstall and iii.) feature/function, if applicable.

e. Video Presentation

▮▮ may videotape, at ▮▮ expense, mutually agreed upon training sessions that pertain to Lexmark printers. ▮▮ may use such videotapes for any additional training of ▮▮ personnel, assuming proper releases can be obtained, during the term of the Agreement.

f. Subject Matter Expert

Lexmark shall make reasonably available to ▮▮ a subject matter expert (SME), at Lexmark's discretion, who will be available to participate in ▮▮ Training classes, decision tree review, review modified printer documentation and/or editing of videos regarding the printer(s) for technical and informational accuracy.

g. Service /Enhanced Diagnostic Manual

Lexmark will provide a service manual for each laser printer and an enhanced diagnostic manual for each A4 inkjet printer. This documentation must reference ▮▮ part numbers and must be available in soft copy version. This is required in English only.

h. Decision Tree Development

▮▮ has an automated tool used by tech support to help diagnose customer failure symptoms. ▮▮ is responsible to develop its Decision Tree and define the troubleshooting steps that will help guide Tech Support

CONFIDENTIAL - OUTSIDE COUNSEL ON A3224

from failure symptoms to problem resolution (either the correct hardware/software dispatch or walking the customer through a resolution), using Training Material, service manuals and other technical information provided by Lexmark. Lexmark's subject matter experts (SME) will participate via teleconference in a Decision Tree review on tree content prior to RTS (date to be determined for each printer).

Lexmark does not currently and has no plans to develop Decision Trees for its service personnel. However, if in the future Lexmark does develop Decision Trees, Lexmark will share this information with ██

i. Lexmark KnowledgeBase
   Lexmark will provide ██ access to Lexmark TSC agent level KnowledgeBase articles via the repository or some other method, which may be, but is not limited to a flat file transfer prior to the launch of the monochrome laser product by ██ currently scheduled for calendar year 2010.  Lexmark will propose an interim process for providing the Lexmark TSC agent level current KnowledgeBase articles.  Any costs related to access to KnowledgeBase will be included in the Product cost.

   In addition, at Lexmark's discretion, Lexmark will update the Lexmark TSC agent level KnowledgeBase articles with additional topics such as feedback on historical or active product brought forth by ██ to improve the KnowledgeBase articles.

3.6. Technical Support
   a. Lexmark's technical experts (SME) will participate in the analysis and resolution of customer issues in one of ██ call centers for one (1) week.  This will typically occur within one (1) month after product launch but may be adjusted to accommodate multiple product launches.
   b. A 'hard' call is a call that requires further service intervention.  A 'soft' call is a call that can be resolved directly by the ██ technical support center without further intervention.  Prior to the initial RTS date, the Parties will agree to a matrix listing the expected amount of total calls, the amount of hard and soft calls (not including calls related to software problems).
   c. If the repeat dispatch or repeat call rate for a particular failure mode is not within acceptable level, Lexmark and ██ will work together using commercially reasonable efforts to identify the cause and take mutually agreed to corrective action.  Should both Parties mutually agree whole printer replacement may be an interim solution for repeat dispatch.

## 4.0 Service Logistics Processes

4.1. Logistics
   a. ██ will perform an Advanced Exchange warranty fulfillment process which includes Next Business Day (NBD) delivery to ██ customers as described below (subject to carrier capabilities).  Advanced Exchange is defined as a warranty replacement procedure in which a new or refurbished Service Printer is dispatched in advance to a ██ customer to replace a ██ diagnosed defective printer.  For printers with a depot repair strategy, the defective printer will be returned by the customer to ██ and then ██ will return defective printers to Lexmark at Lexmark's expense.    For printers with a Replace Only service strategy, Lexmark does not require that the defective printer be returned by the customer.  Lexmark will not pay return shipping for defective printers subject to the Replace Only warranty service fulfillment option. Embedded warranty cost for printers with a Replace Only service strategy exclude return logistics costs. Costs associated with a replace only service strategy, should ██ require the return of the printer from the customer, will be the responsibility of ██  If the Lexmark disposal process is more cost effective than the ██ disposal process, Lexmark will allow ██ to use the Lexmark process at ██ cost.
   b. ██ will provide an advance ship notification to Lexmark for each defective printer that will include the return purchase order number, part number, quantity, price and value of the shipment.
   c. Lexmark's warranty obligations for Service Printers continue for the remainder of the original warranty period or 30 days, whichever is longer.
   d. Lexmark will be responsible for managing and owning (i.e., title and risk of loss) all Service Printer inventory for providing advanced exchange warranty service for defective printers under warranty and shall pay all storage costs associated therewith at Lexmark's depot center(s) and parts distribution warehouse(s), as mutually agreed

**CONFIDENTIAL - OUTSIDE COUNSEL ON A3225**

upon by both parties.  Title and risk of loss will not pass to ███ until the Service Printers are shipped and ███ or ███ agent (e.g. carrier) takes physical possession and control of the Service Printers and Service Parts. Service Printers will meet or exceed specifications for returned printers.  Lexmark will provide ███ with a Substitution Matrix (see Attachment C-8), which will be updated within thirty (30) days of each printer launch and will be mutually agreed to.  Lexmark will be responsible for ensuring that Service Printers will make the customers' exchanges Whole or Complete.  Whole or Complete shall be defined as an exchange situation in which the replacement printer is sent with accessories that match it, with the exception of supply items.

e. Lexmark will test each returned printer and periodically report the results to ███ This report will contain failure analysis information and will be provided weekly.  Lexmark will complete extended testing on any returned printer to be repurchased by ███ and will ensure that printers meet the latest applicable Product Specifications.

f. Supplier is solely responsible for the performance, supervision and direction of disposal services for returned printers.  Printer disposal will conform to applicable industry standards and will be in compliance with all applicable environmental laws and regulations, including without limitation all applicable waste disposal and waste management regulations.  Lexmark will use its best efforts to recycle all returned printers, maintain a comprehensive environmental management system certified as ISO 14001 compliant, prevent the shipping of environmentally sensitive materials to landfills or incinerators for disposal or energy recovery, and promptly inform ███ of any compliance issues identified by government regulators.  Supplier will provide reporting information reasonably requested by ███ from time to time.

g. With every shipment of a Service Printer, at ███ discretion, the shipping carton shall contain a pre-paid return ship label addressed to ███ or ███ designated Third Party Logistics (TPL) supplier.  Lexmark will be responsible for the freight per the terms in Section 4.2.  Lexmark shall have no obligations in regards to obtaining delinquent returned printers.  Lexmark agrees to purchase ███ owned printer products, including, but not limited to, Customer Remorse Returns (CRR) at agreed upon prices, as needed to maintain Service Printer supply, before acquiring new printers from Lexmark finished goods stock for purposes of replenishing Service Printer stock.

h. For each shipment of a Service Printer, Lexmark will invoice ███ for the Service Printer at the Service Printer price.  Price per unit shall be the Service Printer price as set forth in Attachment C-3 to this Schedule.  When an Advanced Exchange printer with the repair strategy is returned to Lexmark, Lexmark will issue a credit to ███ For any defective printer under the repair strategy not returned to Lexmark within 60 calendar days from the date of the outbound shipment of the corresponding Service Printer, the Service Printer will be considered to have been purchased by ███ When the printer exchange is an Advanced Exchange with the Replace Only strategy, Lexmark will issue a credit to ███ based on the number of printers pulled from the Lexmark SLC. ███ will issue a weekly PO, which will authorize Lexmark to invoice ███ for the exchange printers shipped to ███ for the prior week.  Credits will be applied on a monthly basis.  Lexmark and ███ will use commercially reasonable efforts to eliminate the invoicing and credit activity for printers with a Replace Only service strategy.

i. If for any reason or circumstance either Party will not be able to execute the warranty relationship as described and depicted in section 4(a) ███ Ready-to-Ship (RTS) date, ███ and Lexmark will develop an interim warranty fulfillment solution that will satisfy ███ business requirements in order to meet ███ RTS date.  The interim plan will be based on the warranty relationship as listed within this Schedule and Master Purchase Agreement.  Financial responsibility for all transactional costs, including, but not limited to, transportation, material handling, storage fees and so forth, with necessary agreed upon deviations the cost will be borne by the responsible Party(ies).  Deviations could include, but not limited to, location of warranty fulfillment center, and so forth.  Lexmark will be required to have in place the necessary resources to execute the mutually agreed upon interim plan fifteen (15) calendar days before ███ RTS date.

j. ███ shall be responsible for the cost of repairing or replacing, including shipping costs for any printer that is found to be damaged or destroyed by customer abuse/misuse ("CID"). ███ and Lexmark shall mutually agree upon a process that will include a specific identifiable CID problem list and ███ shall be liable for the agreed upon single unit depot repair cost, as set forth in Attachment C-6 to this Schedule for each printer, plus the cost of shipping the printer. ███ and Lexmark will review the data and settle on financial adjustments quarterly. If in any calendar quarter the amount of CID Products is greater than ███ of the total amount of FG Products shipped during the applicable calendar quarter, the Parties agree to share the above cost on a ███ basis for all amounts that ███ has not collected from such customers (with ███ paying Lexmark the above costs for each CID Product where it has collected amounts from ███ customers).

k. ███ liability for Could Not Duplicate (CND), No Trouble Found (NTF), and No Fault Found (NFF) for printers and CRUs returns shall be limited to any activity (rate to be measured at the Lexmark Facility) that

8/27/08

**CONFIDENTIAL - OUTSIDE COUNSEL ON** A3226

exceeds the CND/NTF/NFF rate for the comparable Lexmark branded printers by ▮, measured each calendar quarter. By way of example, if the CND/NTF/NFF rate for the Lexmark branded E250 Printer is ▮ in a calendar quarter, the comparable ▮ branded printer ▮ CND/NTF/NFF is covered up to ▮ in that calendar quarter. ▮ shall be liable for the agreed upon single unit depot repair cost for each printer model, plus the cost of shipping the printer and/or CRU for that portion of the returns which exceeds the ▮ Lexmark CND/NTF/NFF rate. ▮ and Lexmark will review the data and settle on financial adjustments quarterly.

l.  ▮ is responsible for Customer Remorse Returns (CRR) (exceptions are called out in Section 4.5 (a) of this document). ▮ will retain title and risk of loss to the CRR's with CRR's being returned to ▮ TPL. ▮ and Lexmark will work together to develop a process and cost structure where CRR products, owned by ▮ may be transferred back to Lexmark for use as depot seed stock and/or for strip and salvage to obtain Service Parts for use in the Lexmark depot. ▮ has the final right in deciding the CRR disposal solution of repair or scrap.

m.  If ▮ decides to offer additional or different warranty or service offerings to its customers, Lexmark and ▮ will work in good faith to modify this agreement to meet the warranty or service fulfillment needs that will logistically complement such new or modified customer warranty or service offerings in a reasonable time period

### 4.2. Service Quality

a. Resource Commitment

Lexmark shall maintain a quality/technical project manager, with supporting infrastructure, who will be responsible for ▮ Service's new product depot activities and depot repair quality in depot centers managed by Lexmark in the United States. This individual must attend ▮ Service's operational review and shall be responsible for the quality section of each Quarterly Business Review (QBR) if applicable.

b. Service Quality Management Plan

Lexmark and ▮ will develop a global RQMP (Repair Quality Management Plan) that supports ▮ Service with mutually agreed upon quality goals. Any RQMP in existence today will be replaced by the co-developed plan.

c. Periodic Audits

Lexmark agrees to permit ▮ Service to conduct planned periodic quality audits to ensure process conformance with the RQMP, not to exceed two (2) per calendar year.

d. Data Reporting

Lexmark shall provide a regular repair quality report, in a standard template as mutually agreed to by ▮ SQE and Lexmark, and incorporated into the RQMP, to recognize quality issues and identify opportunities to drive repair quality improvement.

e. Service Level Commitment

At ▮ request, if Lexmark's repair capacity is insufficient to meet the agreed upon Service Level Commitment, after a reasonable period of time to correct such performance deficiency, Lexmark agrees to work diligently with ▮ to certify a third-party repair center and agrees to authorize such center to perform in-warranty repairs on Lexmark's behalf and at Lexmark's expense until such time that Lexmark increases capacity to meet the Service Level Commitments. In order to meet this SLA, ▮ must provide a rolling six (6) month forecast of depot repair requirements. ▮ may request a change in either service requirements or SLA. The implementation date for such change must be mutually agreed upon. After a printer has reached its End of Production (EOP) date, all exchanged printers must continue to meet the EOP specification revisions.

### 4.3. Service Packaging and Labeling

a. Packaging

Lexmark will handle, pack, mark and ship Service Printers and Service Parts in accordance with ▮ packing specifications as mutually agreed upon by both Parties. Lexmark shall be responsible for paying all packaging costs including, but not limited to, equipment, stocking, and management as defined at RTS. For subsequent changes in cost due to changes in the packing specifications, the Parties will mutually determine responsibility.

b. Service Spares Labeling

All Service Parts must be labeled by the Lexmark in accordance with ▮ Labeling Specification; as mutually agreed upon by both Parties. If it is impractical to label spare parts because of their size and those parts are packaged together, that package must be labeled with the ▮ part number. For subsequent changes in cost due to changes in the labeling specifications, the Parties will mutually determine responsibility.

c. Bulk Packaging

8/27/08

CONFIDENTIAL - OUTSIDE COUNSEL ON A3227

Service Parts may be shipped to ▓▓▓ in bulk packaging. Where required, piece parts will be individually packaged before being placed in bulk packaging.

4.4. Transportation

   a. The party that has financial responsibility for the freight will nominate the carrier for the shipment.

   b. The party originating the shipment is responsible for the security of the shipment, and is accountable for providing adequate packaging to point of destination. Failure to provide adequate packaging will render shipper liable for all damages caused by the carrier.

   c. The party that is financially responsible for the freight will also be responsible for the liability of the product during transit. Claims for loss or damage caused by the carrier must be filed by the party holding loss or damage responsibility for the shipment.

   d. The party originating the shipment will schedule carrier pickups with the consent of the other party. Only the party financially responsible for the shipment shall authorize the addition of Declared Value Insurance for a shipment.

   e. ▓▓▓ shall be responsible for the shipping costs for all Service Parts orders (FRUs and CRUs) that are being purchased by ▓▓▓ to support their service on ▓▓▓ Branded printers for which Lexmark does not provide service support. This includes the freight cost of normal orders and emergency orders. Title and risk of loss will transfer to ▓▓▓ upon shipment from Lexmark's designated shipping point. . Lexmark is responsible for the freight costs to ▓▓▓ service hub for parts used in support of a Parts Only Warranty strategy.

   f. All emergency (expedite) orders for Service Parts purchased by ▓▓▓ to support their service on ▓▓▓ Branded printers that Lexmark does not provide service support, received by Lexmark from ▓▓▓ by 5 P.M. local customer time, will be processed for next day delivery. A $25 expedite fee will be assessed for all expedited orders processed. Expedite orders will be limited to five line items per expedite order. Freight is not included in the $25 expedite charge.

   g. Service Printers and Service Parts

      i. Service Printers

- For printers with a repair service strategy, Lexmark is responsible for freight costs to and from the customer.
- For printers with a replace only service strategy, Lexmark is responsible for replacement printer freight costs to the customer.
- For Service Printers used to support regions other than the US (e.g. Canada), ▓▓▓ is responsible for freight costs to move the printers from the region to the US and back. For non-US Service Printers, ▓▓▓ is the exporter/importer of record.

      ii. Service Parts

- Lexmark and ▓▓▓ will work together to manage parts deliveries to the ▓▓▓ requested delivery date and to maximize month end stocking conditions. Lexmark is obligated to send purchase order receipt notification to ▓▓▓ five (5) business days after receipt of the order.
- Minimum PO order quantity is the number of pieces needed to support a ▓▓▓ supply of ten business days.

4.5. Forecasting and Purchasing

   a. ▓▓▓ will provide Lexmark a six month rolling forecast for Service Parts, including laser and A4 inkjet features/options. The quantity of forecasted Service Parts, laser and A4 inkjet features/option within 90 days is committed to be purchased by ▓▓▓ agrees to take possession of all Service Parts, laser and A4 inkjet features/options forecasted within leadtime no later than 90 days from original forecasted delivery date. For example, if the ▓▓▓ forecast is dated January 1 with a forecasted delivery date of March 31, ▓▓▓ agrees to take possession of the forecasted quantities by June 30 (for a total of 180 days after the original forecast date.)

   b. Purchase orders for Service Parts, laser and A4 inkjet features/options cannot be altered within seven (7) business days of target ship date.

   c. Lexmark will invoice ▓▓▓ for Service Parts, laser and A4 inkjet features/options at time of shipment.

   d. Service Parts purchased hereunder may only be used to perform services on ▓▓▓ branded printers.

4.6. Service Level Agreement

   a. Lexmark will use commercially reasonable efforts to ship Service Printers same day, 98% of the orders herein on time, for orders sent to Lexmark call center by 5:30 PM customer local time in the Americas. ▓▓▓ target is for

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3228

Lexmark to hold two (2) weeks of inventory of Service Printers at the SLC; Lexmark will make commercially reasonable effort achieve the two (2) weeks inventory target.

    b. If service levels are not met, corrective action plans will be provided to ███ in a timely manner. This may actually include daily reviews until service levels are achieved.

4.7. Less than 30 Day Returns/Customer Remorse Returns (Printers)

    a. Lexmark agrees to purchase printers replaced by ███ during the first 30 days of customer ownership that were replaced as a result of ███ 30 day defect policy and that had a warranty defect or due to Customer Remorse Returns under the following conditions and values:

        i. The returned printer was not damaged or destroyed due to customer abuse, shipping damage by the carrier or due to improper packaging by the customer. ███ will sort out these customer-damaged units from the pool of printers being returned to Lexmark and scrap.

        ii. The individual printers being returned to Lexmark are appropriately packaged in their original shipping material or repackaged in service printer packaging.

        iii. The printers are appropriately packaged for bulk shipping to Lexmark facilities per ███ pallet packaging specifications.

        iv. For A4 inkjet printers, Lexmark will pay ███ of the ███ printer acquisition value for each A4 inkjet printer received in a Lexmark facility that meets the above conditions.

        v. For laser printers, excluding printers that ███ has sold with on-site service, Lexmark will pay ███ of the ███ printer acquisition cost for each laser printer received in a Lexmark facility that meets the above conditions.

    b. Lexmark will pay the bulk shipping costs to transport the printers from the ███ facilities to the Lexmark Facility.

    c. Lexmark reserves the right to reject any printers that were found to be destroyed or defective as described in Section 4.5 (a)(i) or not packaged appropriately as described in Sections 4.5 (a)(ii) and (iii) above.

    d. ███ will transfer title of returned printers free of any liens or encumbrances to Lexmark.

    e. Lexmark agrees to purchase printers returned through the ███████████████ that are determined to have a valid warranty problem at the rates and under the same conditions as defined in the above 8 points. At Lexmark's discretion, Lexmark may purchase printers returned through the ███ Customer Remorse Return program that do not have a valid warranty problem.

    f. All remaining CRR printers remain the responsibility of ███ Lexmark will have the ability to bid on CRR printers for use in the Lexmark service operation whenever ███ decides to broker their excess CRR printers, at a rate to be agreed to by the Parties.

4.8. Escalation

Lexmark Worldwide Service will provide Level 2 escalation support to ███████ for those matters, both in and out of warranty, for which primary support responsibility resides outside of Lexmark Service. ███ will have pursued resolution of such matters with the business area within Lexmark that have primary support responsibility prior to escalation to Lexmark Worldwide Service

## 5.0 Extended and Out of Warranty Coverage

5.1. Extended Warranty

    a. Extended Warranty coverage will be executed in the same fashion as the Base Warranty as provided by Lexmark to ███ shall provide Lexmark with all reasonably requested information to ensure each printer unit is properly entitled for Extended Warranty coverage by Lexmark. Extended Warranty coverage may only be offered for printer for which a Base Warranty was also purchased and the Extended Warranty sale must be completed within ninety (90) days of Base Warranty purchase from Lexmark.

    b. At the pricing for each printer model listed in Attachment C-4 and determined by Lexmark Service, Lexmark will provide warranty service coverage to ███ to cover all ███ customers that have entered into a year or multi-year warranty commitment warranty service with ███ ("Extended Warranty") for a period of five (5) years for laser printers and three (3) years for A4 inkjet printers after the last date of manufacture of each printer model provided such Extended Warranty coverage has been continuously provided by Lexmark. Future products will have their Service Life and Extended Warranty options detailed in amendments to the EOSL Matrix in Attachment C-7, and may differ from the periods outlined above.

8/27/08

CONFIDENTIAL - OUTSIDE COUNSEL ON A3229

c. On a weekly basis, ███ will issue a PO which will authorize Lexmark to invoice for Extended Warranties sold to ███ customers. If volumes decline such that it is not cost effective for the Parties to issue a PO and invoice on a weekly basis, the Parties will review the order activity and adjust the frequency.

5.2. Out of Warranty

a. When units of a printer model are not covered under the original printer warranty from Lexmark to ███ and ███ continues to provide technical support as per the Agreement, Lexmark will offer, in the United States (other geographies to be agreed upon) out of warranty service to ███ for that printer model for a period of four (4) years for laser printers and two (2) years for A4 inkjet printers after the last date of manufacture of each printer model provided as listed in Attachment C-4. Future products will have their out of warranty periods detailed in amendments to the EOSL Matrix in Attachment C-7, and may differ from the periods outlined above.

b. ███ commits to pay Lexmark for out of warranty activity. On a daily basis, ███ will report the printer exchange transactions activity. On a monthly basis, Lexmark will reconcile this activity to determine warranty status and invoice ███ for out of warranty service. The process described herein is a short term process, ███ and Lexmark will work together to define the long term solution.

## 6.0 Technical Support Center

The working relationship between ███ and Lexmark in addressing different levels of customers' problems (severity incidents) should be a consistent, smooth, understandable process. ███ customers should perceive a seamless and efficient supporting organization that can meet their expectations on all levels of support issues with:

- A sense of urgency
- A timely resolution
- Concern for the customer's situation

6.1. Support Definitions

a. Level 1 Technical Support

███ Level 1 technical support consists of ███ personnel that are trained to take the first contact from the ███ customer, make an initial determination that the problem is printer related, and if so, pass the call to ███ Level 2 technical support personnel.

b. Level 2 Technical Support

███ Level 2 technical support consists of technical support personnel located in the field or at the ███ centralized support center, who will respond to contact from ███ Level 1, ███ field personnel, or ███ call center directions, on a 7X24 basis. They use significant product knowledge, procedural knowledge, product documentation, support notes, ███ tag driven database (DPS) and knowledge base information to address field installation and break/fix issues. They gather information on the problem environment, check for correct configurations and apply standard solutions to problems. They perform iterative procedures with field service personnel to understand and correct problems. They escalate to ███ Level 3 or ███████████████████ ███ as appropriate if available solutions do not solve the customer problem by utilizing established escalation procedures and guidelines. ███ Level 2 and Level 3 support personnel will receive continuous training on printer products from ███ to minimize escalation to Level 3 support from Lexmark and minimize unnecessary printer product warranty service.

c. Level 3 Technical Support

███ Level 3 technical support consists of personnel that handle escalations from ███ Level 2. They are call center based, are available on-call 7x24, and have substantial product, technology, or system environment knowledge. ███ Level 3 personnel are experts in one or more subject areas. They may advise ███ Level 2 personnel or work directly with field service specialist level resources. They perform problem isolation, gather problem data for internal characterization, analysis, and, after exhausting their resources and capabilities, contact IPS.

d. ███ IPS

███ IPS consists of personnel that handle escalations from ███ Level 2 and Level 3. They are available on-call, and have substantial product, technology, or system environment knowledge. They may advise ███ Level

CONFIDENTIAL - OUTSIDE COUNSEL ON A3230

2 or Level 3 personnel or work directly with field service specialist level resources. They perform problem isolation or gather problem data for internal characterization and analysis. After exhausting their resources and capabilities, ███ will contact a select Lexmark call-center designated for ███ escalations.

e. <u>Lexmark Select Call Center</u>

Lexmark shall establish a select call center group that will be designated for ███ escalations via a unique path that will identify to Lexmark that the call is from ███ This support will be provided during normal Lexmark call center hours of operation (9am–9pm Mon–Fri; 12pm–6pm Sat). Access to the Lexmark Select Call Center will be limited to ███ personnel and specified Level 3 technicians. ███ shall provide a list of ███ personnel and Level 3 technicians that have access to the Lexmark Select Call Center by the date the printers will be made commercially available by ███ and shall maintain the list current as personnel change. The list shall be limited to 12 ███ personnel as described in Section 6.1 (d) of this Schedule C. Off-hour escalation processes shall be jointly developed by the Parties.

Lexmark Select Call Center technicians consist of senior personnel who will subsequently examine problem causes and, when necessary, escalate to and work with Lexmark OEM Level 3 personnel who will engage with Lexmark engineering personnel. If travel to customer sites is deemed necessary, responsibility for travel and other incidental charges will be determined by the Parties.

Lexmark Select Call Center support is provided for printers sold to ███ under the Agreement independent of the warranty purchased with the individual printers. By way of example, printers with respect to which ███ sells an on-site service agreement to their customer and deletes the Lexmark to ███ warranty will not be excluded from this Lexmark call center and L3 support.

Lexmark shall provide Select Call Center support for hardware and software for a particular model of printer until the end of service for that particular model of printer. End of service shall occur when Lexmark ends service on its Lexmark branded similar model of printer. Service life of the printer will be defined in the EOSL Matrix in Attachment C-7, which Lexmark shall update annually.

6.2. Lexmark Support Incident Response by Severity

The Incident Severity levels defined below are utilized in establishing the problem impact to the customer upon problem receipt and will be used to set expectations between the Parties. These levels are used to describe incidents that are different from typical repair or support requirements. A ███ customer shall be entitled to establish the initial interpretation of the severity of the problem, but Lexmark reserves the right to revise such designation based on Lexmark's reasonable determination of the severity factors described below and after it has initially responded according to the customer's initial interpretation of the severity.

a. Severity 1: Immediate Response Required

This is considered to be a critical business situation for the end customer or ███ where a stoppage has occurred, a deadline passed or a critical process has failed. Immediate and extraordinary effort must be put forth by involved Parties to provide appropriate support and escalation within the guidelines in Section 6.4. (a) of this Schedule C.

b. Severity 2: Urgent Response Required

This is considered a major business situation for the end customer or ███ where a primary area is impacted, a deadline is approaching, there is a competitive threat or a process is producing marginal output. Support will be consistently provided as outlined in Section 6.4. (a) of this Schedule C.

c. Severity 3: Timely Response Required

This is considered a minor business situation for the end customer or ███ where a secondary area is impacted, customer needs assistance to gain a competitive advantage, there is a need to meet a periodic reporting cycle or a need to improve current process quality levels. Normal support resources are appropriate to provide a solution within the stated guidelines.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3231

6.3. Technical Support Procedures

███ will provide Installation Support, Level One, Level Two and Level Three technical support to Customers. When a Customer contacts ███ for support services, ███ support personnel will first work with the Customer on problem identification and verification of known issues or problems and escalate such issues or problems up through ███ team before contacting Lexmark Select Call Center for support services. ███ personnel and specified Level 3 technicians will be given access to the Lexmark call center as described in section 6.1 of this Schedule to assist the ███ call center for typical repair and support issues that they are having difficulty solving. Lexmark's Select Call Center should only be contacted when ███ support or specified Level 3 technicians are unable to resolve a customer's problem. When the Lexmark Select Call Center is unable to resolve an issue when contacted by ███ they will escalate the issue to the Lexmark OEM Level 3 personnel. When Lexmark's OEM Level 3 personnel become engaged, Lexmark will respond according to the support collaboration targets and guidelines in Section 6.4 Severity Table below. ███ will provide a list of ███ Support Employees authorized to initiate support requests from Lexmark not to exceed 12 with any other additions thereto to be established at the weekly information exchanges described in Section 6.4 (c) below. Both ███ and Lexmark will specify Technical Escalation Contacts in accordance with Section 6.4 (c) below.

a. Technical Support Engagement

To ensure a smooth transition during technical collaboration or escalation, it is essential that all Parties remain engaged until the next level is fully engaged, including access to all relevant contact information and technical activity to date.

Weekly Information Exchanges: Lexmark agrees to correspond with ███ Technical Support organizations in a weekly session to exchange status regarding product call rates, status on open issues and technical information relevant to printers. ███ and Lexmark will define single point of contact for weekly information exchanges.

███ will provide a single point of contact for all escalated Severity 1 issues. Lexmark will also provide a single point of contact once an escalation is submitted.

With reasonable notification, Lexmark agrees to allow ███ employees reasonable access to their technical support facilities for the purposes of knowledge transfer related to technical support for the printers, reasonable access to technical equipment at Lexmark's technical support facilities, debug of current customer problems, and/or collaboration on resolution of issues involving third party products supported by Lexmark. It is anticipated that ███ would send no more than three employee resources at any one time. Exceptions will be mutually agreed upon by the Parties.

Lexmark agrees to refer customers to ███ toll free number for technical support who mistakenly call Lexmark for any technical support.

b. Solution Delivery

███ will be the primary source for communication with the end customer.

Lexmark agrees to participate as required in direct communication with ███ customers (conference call or in person) in support of critical problem resolution.

Lexmark agrees to provide ███ with access to information that Lexmark maintains for the printers (for Level 1 and Level 2 technical support of hardware and software) that are generally available to all of Lexmark's worldwide Level 1 and Level 2 support personnel. Examples would include technical bulletins, knowledge cases, and Engineering Change Orders (that impact service and support).

After reasonable notification, Lexmark agrees to provide reasonable access to all of Lexmark's existing third party equipment located at its technical support facility as available, in an effort to resolve ███ customer issues. With regards to software, Lexmark will make available manufacturer's names and versions/specifications (and grant permission to obtain, if necessary) of standard tools used in the Lexmark Technical Support Centers to ███ for use in their technical support centers.

Progress updates should be provided in accordance with guidelines set forth in this Schedule C. All updates on ███ initiated support requests should be visible via the ███ value chain web-based tool.

CONFIDENTIAL - OUTSIDE COUNSEL ON A3232

6.4. Support Collaboration Guidelines and Targets

This section describes the collaboration target times. These targets (timeframe) ensure that additional resources are obtained in a consistent, timely manner. These targets are intended to minimize customer impact and incident resolution time. ▮ will provide Severity definition to the Lexmark Select Call Center.

The following chart (the "Incident Severity Chart") indicates, by severity, the technical collaboration/incident resolution targets (timeframes) Lexmark must follow in addressing customer incidents:

a. Incident Severity Chart

| Incident by Severity | SEVERITY 1 | SEVERITY 2 | SEVERITY 3 |
|---|---|---|---|
| ▮ Engages Lexmark: | If needed, within 2 hours<br><br>*Escalate when ▮ support resources are exhausted** | *Escalate when ▮ support resources are exhausted** | *Escalate when ▮ support resources are exhausted** |
| Initial Lexmark Response: | 90% of all calls answered, and responded to within one hour.<br><br>Case opened within 30 minutes.<br><br>Total time – 30 minutes Monday – Friday : (5x12) and Saturday : (1x6) | 80% of all calls answered and responded to within one hour.<br><br>Case opened within one hour.<br><br>Total time – 1 hr Monday-Friday : (5x12) and Saturday : (1x6) | Within 1 business day |
| Joint Action Plan | After exhausting all resources as set forth in Section 6.0, ▮ will engage Lexmark's OEM L3 engineering group | After exhausting all resources as set forth in Section 6.0, will engage Lexmark's OEM L3 engineering group | After exhausting all resources as set forth in Section 6.0, ▮ will engage Lexmark's OEM L3 engineering group |
| Status Updates (phone and/or Clarify) | Twice per day | Every 1 business day | As necessary or status change |
| Level of Effort | Monday-Friday : 5x12 and Saturday : 1x6 continuous effort until interim fix provided | Monday-Friday : 5x12 and Saturday : 1x6 mutually agreed upon effort until interim fix provided | As required to meet resolution target |
| Customer Acceptable Resolution Target for Incident** | Within 12 hours | Within 2 business days | Within 5 business days |

*Note: The italicized entries in this table represent event-driven activities, not time-driven milestones.

**Note: This is a target timetable for resolution. Actual resolution will depend on the nature of the problem but both Parties agree to use their mutual resources to work towards a satisfactory resolution.

b. Status Updates

▮ requires status updates from Lexmark based on incident severity. The update should include next defined action.

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3233

Unless otherwise agreed to, the schedule for status updates are as follows.
Severity 1 (S1) = A minimum of twice per business day
Severity 2 (S2) = Once per business day
Severity 3 (S3) = As needed or as status changes

These are recommended feedback intervals.  Updating of Severity incidents for customer review may inhibit the speed of resolution of the incident.  ██ and Lexmark may agree on an alternative update time, per incident.

For all incidents, status will include *what* the next action will constitute and *when* it will occur.  If the next action is not delivered as committed, a new status will be sent, prior to the deadline, to reset the expectations.  Some additional clarification of roles/responsibilities is as follows:

- In Severity 1 situations, ██ will engage Lexmark if a clear resolution plan is not available.

- The current ██ incident owner is responsible for escalating to Lexmark. ██ will always retain ownership of the incident. Lexmark will provide validation to the current resolution plan or technical assistance as necessary.

- The ██ Escalation Lead is responsible for resource coordination and effective incident resolution for Severity 1 situations after hours.  During normal business hours, the ██ Team Manager, who owns the resolution for that S1 problem, takes care of these responsibilities.

- The Lexmark Escalation Manager is engaged if ██ needs to escalate to Lexmark when normal guidelines fail to respond to customer's need or:

  1. ██ is not clear to whom ██ should escalate within Lexmark organization, or

  2. The standard escalation between ██ and Lexmark does not occur within targeted timeframes and/or the Lexmark response does not meet the need of the critical customer situation, or

  3. The ██ Escalation Manager requires assistance in negotiating resources and priorities with Lexmark organization.
- All escalations to Lexmark should come from the assigned ██ Escalation contacts

c. Support Management Escalation (Notification)
Thirty (30) days prior to RTS, the Parties shall agree on procedures and contacts for unresolved problems

6.5. Diagnostic Tools Sharing
To the extent that Lexmark has the right, Lexmark will make commercially reasonable efforts to  provide ██ the TSC level access to diagnostic tools, including but not limited to Nevis, for Lexmark equivalent products prior to 2009 A4 inkjet product launch.  Prior to execution both Parties will work together to  mutually agree how the implementation costs will be allocated.

**7.0 Mutual Travel Agreement**
██ and Lexmark, subject to mutual agreement, may jointly travel on-site to a customer environment experiencing a problem that cannot be isolated or duplicated remotely, if customer circumstances so warrant. Lexmark will provide its expertise on-site in these situations, or other technical support resources as deemed appropriate by Lexmark.  Each Party agrees to bear its own costs that might arise in case of on-site travel. The frequency and necessity of on-site travel will be reviewed during the quarterly business reviews, if determined to be excessive, the Parties shall implement a corrective action plan.

**8.0 End of Service Life**
a. Lexmark agrees to manufacture, sell and support all standard and ██ unique Service Parts (new or used) as purchased by ██ for Service Parts through the End of Service Life (EOSL).  Beginning with 2009 product launches, EOSL is defined as a period of five (5) years after the laser printer end of production and for a period of three (3) years after ink jet end of production. If thereafter Lexmark elects to discontinue providing Service

17                                    8/27/08

CONFIDENTIAL - OUTSIDE COUNSEL ONL A3234

Parts, Lexmark shall so notify ███ Within thirty (30) days of such notice of discontinuance, ███ will provide Lexmark a 100% committed, non-cancelable purchase order, subject to availability, for Service Parts that will be discontinued. There will be no upside flexibility on these Service Parts. ███ must purchase and take possession of these last buy Service Parts orders within ninety (90) days of Lexmark receiving and confirming receipt of parts with ███

b. If a service supplier cannot support Service Parts through the end of the above described end of life periods, Lexmark shall notify ███ of opportunities to procure these Service Parts on behalf of ███ and Lexmark shall purchase and maintain an inventory of such Service Parts as mutually agreed in writing by ███ and Lexmark. ███ will provide Lexmark a 100% committed, non-cancelable purchase order for Service Parts that will be discontinued. There will be no upside flexibility on these Service Parts. ███ must purchase and take possession of these last buy Service Parts by end of service life.

c. Lexmark will provide at least one hundred twenty (120) days notice prior to the last date of manufacture of any printer or component in support of any printer made for ███ Lexmark shall hold and own appropriate printers to support warranty exchanges of laser printers for a minimum of five (5) years and a minimum of three (3) years for A4 inkjet printers from the end of production date. Printers will be equal to or better than returned printers regarding revision levels and product specifications. Within thirty (30) days of such notice of discontinuance, ███ will provide Lexmark a 100% committed, non-cancelable purchase order, subject to availability, for FRUs that will be discontinued. There will be no upside flexibility on these FRUs. ███ must purchase and take possession of these last buy FRU orders within ninety (90) days of Lexmark receiving and confirming receipt of order with ███

d. Service life of printers will be defined in the EOSL Matrix in Attachment C-7, which Lexmark shall update annually. Lexmark Service will provide ███ Service with End of Service Life and Last Time Buy notification for features/options and consumables.

e. MWDs will be withdrawn at end of printer manufacturing. Lexmark shall so notify ███ Within thirty (30) days of such notice of discontinuance, ███ will provide Lexmark a 100% committed, non-cancelable purchase order, subject to availability, for MWDs that will be discontinued. There will be no upside flexibility on these MWDs. ███ must purchase and take possession of these last buy MWD orders within 90 days of Lexmark receiving and confirming receipt of parts with ███

f. A4 inkjet printer features/options will be withdrawn at end of printer manufacturing. Lexmark shall so notify ███ Within thirty (30) days of such notice of discontinuance, ███ will provide Lexmark a 100% committed, non-cancelable purchase order, subject to availability, for A4 inkjet printer features/options that will be discontinued. There will be no upside flexibility on these A4 inkjet features/options. ███ must purchase and take possession of these last buy A4 inkjet printer feature/option orders within 90 days of Lexmark receiving and confirming receipt of parts with ███

## 9.0 Business Meetings

9.1. Quarterly Operational reviews shall be held by representatives from both Parties as follows: once per year face-to-face and 3 times per year via teleconference. .

9.2. The agenda for each quarterly review shall include but not be limited to:
   a. New product launch
   b. Service strategy changes
   c. Technical support issues
   d. Process improvements

9.3. Either Party can request a special meeting or may call for a Root Cause Analysis using the mutually agreed upon ███ process (Closed Loop Corrective Action) in the event that such Party has substantial concerns regarding a Party's performance under this Schedule C or results are not meeting the service levels described in Section 4.0 or Section 6.0 above.

9.4. Lexmark Service will participate in the ███ Lexmark Quarterly Business Reviews (QBRs) as follows: once per year face-to-face, 3 times per year via teleconference. The agenda for each QBR shall include
   a. Account Management
   b. Delivery
   c. Quality
   d. Cost

CONFIDENTIAL - OUTSIDE COUNSEL ONL A3235

**10.0 New Alliance**

    a. As the Lexmark and ██ relationship evolves based on new alliance projects, both Parties agree to make reasonable efforts to move towards implementing the lowest cost (for both Parties) processes.  This may include utilizing standard Lexmark processes for service delivery to maximize cost savings for both Parties.

    b. As the Lexmark and ██ relationship evolves based on new alliance projects, both Parties agree to update and maintain this Schedule C as current with business processes.

    c. Alliance projects will be mutually agreed upon by the Parties and will be updated from time to time.  Current projects include, but are not limited to :

      – Spare Parts Warranty
      – ██ Format for Training Content
      – America Direct Ship Direct Return (DSDR)
      – PPID/Date of Manufacture as Warranty Tracking Mechanism
      – Web portal for ██ access to Lexmark TSC agent level KnowledgeBase articles.
      – Investigate feasibility of animation of key technical problems or technologies

**11.0** Engineering Change Order Process

    The ECO process will be addressed in Attachment 6.1, Sustaining Engineering Engagement of Schedules D and E.  See Attachment C-10 for the EC process flow.  The purpose for its inclusion in this Schedule C is to describe the role of Lexmark Service in the EC process.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY

A3236

Attachment C-1

■ Laser Features/Options Service Support Program

■ Features Support.doc



CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3237

## ▮Features/Options Service Support Program

Elements:
- Scope
- Warranty
- Feature/Option Identification
- Demand Planning, Forecast, Lead-time
- Unique Part Numbers
- End of Service Life
- Product List
- Known Exclusions

**Scope**
Features/options will be supported by Lexmark Service for laser products only. Inkjet product features/options support will be specifically excluded for 2008 and prior product, with the exception of Asia Pacific which will provide inkjet support..

**Warranty**
Features and options obtained by ▮ from Lexmark Service are sold to ▮ AS IS, WITHOUT WARRANTIES OF ANY KIND, INCLUDING BUT NOT LIMITED TO THOSE OF MERCHANTIBILITY, FITNESS FOR PARTICULAR PURPOSE, AND THE WARRANTY AGAINST INFRINGEMENT.

**Feature/Option Identification**
Lexmark will work in good faith with ▮ to provide such features and options as necessary to support ▮ customers. One hundred twenty days (120) prior to RTS, Lexmark and ▮ will jointly identify the features/options that can be made available after end of printer manufacturing. Lexmark will make reasonable efforts to support those items provided there are no supplier limitations that prevent offering the item(s).

**Demand Planning, Forecast, Lead-time**
For all new program launches, ▮ will be required to purchase its service-demand products from Lexmark Service from the point of product announcement. This is necessary to establish an ongoing service demand from Lexmark's suppliers. If these are not purchased from Lexmark Service, ongoing support after product withdrawal cannot be assured. ▮ must provide a forecast of demand for each geography where the features/options are purchased, in compliance with the forecast process described in Section 4.5 of Exhibit B. Lexmark will make every attempt to meet ▮ requirements as forecasted, however, if actual demand varies from forecast, product delivery will be subject to unique Lexmark supplier restrictions. Lead times will be based upon Lexmark supplier constraints. Minimum order quantities may be required on a part by part or geography by geography basis.

**Unique Part Numbers**
▮ must provide unique part numbers for the service-ordered features/options.

**Pricing**
Lexmark will provide pricing for service-ordered features/options 70 days prior to RTS

**End of Service Life**
Lexmark will support features/options through Service in a process that is similar to the EOSL process used for service parts.  If a Lexmark supplier cannot support features/options through then EOSL, the terms of Exhibit B, Section 8.2 and 8.6 apply.

**Product List**
This list constitutes the current list of features/options supported by Lexmark Service.  Any item not identified cannot be supported by Lexmark.

| Product Name | Launch Date | HWD P/N | PN | DESCRIPTION |
|---|---|---|---|---|
| | Mar-03 | | | BASE W/TRAY BLK |
| | Mar-03 | | | TRAY 2 ALONE |
| | Mar-03 | | | 250 SHEET OPTION |
| | Mar-03 | | | 500 SHEET OPTION |
| | Mar-03 | | | 500 SHEET TRAYOPTION |
| | Mar-03 | | | 250 SHEET TRAY 1 ASM |
| | Jun-04 | | | 550 SHT DRAWER ASM |
| | Jun-04 | | | OPTIONAL DRW WO TRAY |
| | Jun-04 | | | PRIMARY PAPER TRAY |
| | Jun-04 | | | OPTIONAL TRAY2 |
| | Oct-05 | | | 550 SHT DRAWER ASM |
| | Oct-05 | | | OPTIONAL PAPER |
| | Oct-05 | | | MAIN |
| | Oct-05 | | | OPTIONAL TRAY2 |
| | May-06 | | | 500 SHEET COMPLETE |
| | May-06 | | | DUPLEX ASM 500 |
| | May-06 | | | ENVELOPE |
| | May-06 | | | OPTION 500 SHEET |

CONFIDENTIAL - OUTSIDE COUNSEL ONA3239

**Known exclusions**
All inkjet product features/options are excluded.

Described below is a list of known laser feature/option exclusions.  Any unintended omissions are not evidence of support by Lexmark Service.

| Product Name | Launch Date | HWD P/N | ███ PN | DESCRIPTION |
|---|---|---|---|---|
| ██████ | Jun-04 | ████ | ███ | 550 SHT DRAWER ASM |
| | Oct-05 | | | 550 SHT DRAWER ASM |
| | Oct-03 | | | Ethernet Card |
| | May-06 | | | OUTPUT EXPANDER |
| | May-06 | | | Wireless Card, DAO, 5210N/5310N |
| | May-06 | | | Wireless Card, EMEA, 5210N/5310N |
| | May-06 | | | GIGABIT INA |
| | Feb-07 | | | 500 SHEET DRAWER |
| | Feb-07 | | | OPTIONAL  (W/O TRAY) |
| | Feb-07 | | | DUPLEX |
| | Feb-07 | | | OPTIONAL (W/O DWR) |
| | Feb-07 | | | PRIMARY MEDIA |
| | 4-Nov | | | External network adapter |
| | Oct-03 | | | 500 SHEET DRAWER |
| | Oct-03 | | | 250 SHEET DRAWER |
| | Oct-03 | | | 500 DUPLEX |
| | Oct-03 | | | ENVELOPE FEEDER |
| | Oct-03 | | | 500 SHEET INT TRAY |
| | Oct-03 | | | 250 SHEET INT. TRAY |

CONFIDENTIAL - OUTSIDE COUNSEL ON A3240

Attachment C-2

Service Terms Matrix Per Global Region (Advanced Exchange ONLY)

Svc Terms Matrix Version 20080829.xls



8/27/08

CONFIDENTIAL - OUTSIDE COUNSEL ONLY

A3241

**Service Terms Matrix**

**Service Terms Matrix Per Global Region (Advanced Exchange Only)**

| | US | Canada | Latin & South America | EMEA | Japan | China | Korea, Singapore, Malaysia, Australia, New Zealand |
|---|---|---|---|---|---|---|---|
| | Lexmark | Lexmark | Lexmark | Lexmark | Lexmark | Lexmark | Lexmark |
| **Inventory Ownership** | | | | | | | |
| FGs @ Lexmark | | | | | | | |
| CRUs @ Lexmark | | | | | | | |
| FRUs (Repair Only) | Lex Depot (US) | Lex Depot (US) | Lexmark | | | | |
| Toner/Cartridges | LXK Supplies Supply Chain | LXK Supplies Supply Chain | LXK Supplies Supply Chain | | | | |
| TPL Ownership | Lexmark - service printers | Lexmark - service printers | Lexmark - service printers | | | | |
| From/to Canada | service parts | Yes | service parts | | | | |
| **Freight - Service Printers** | | | | | | | |
| Depot from Customer | Yes | Yes | N/A | | | | |
| Depot to Customer | Yes | Yes | Yes | | | | |
| From/to Canada | Yes | Yes | | | | | |
| Replace Only Printers - to Customer | Yes | Yes | Yes | | | | |
| Replace Only Printers - from Customer | Yes | Yes | Yes | | | | |
| **Service Parts** | | | | | | | |
| Making Customer Complete (Accessories) | Yes | Yes | Yes | | | | |
| Service Level - service printer | 98% | 98% | 98% | | | | |
| Grace Period - service printer return (Lex to Lex) | 60 Calendar days | 60 Calendar days | 60 Calendar days | | | | |
| Monthly Transaction Reconciliation | Yes | Yes | Yes | | | | |
| CID Responsibility (Section 4.1.1) | Mainly [Lexmark] see contract for details | Mainly [Lexmark] see contract for details | Mainly [Lexmark] see contract for details | | | | |
| NFFC/NDNTF Responsibility (Section 4.1.k) | [Lexmark] responsible for returns | [Lexmark] responsible for returns | [Lexmark] responsible for returns | | | | |
| Out of Warranty Coverage by Lexmark Section 5.2.a | 4 years after last date of manufacture for Laser; 2 years after last date of manufacture for Ink Jet Products | 4 years after last date of manufacture for Laser; 2 years after last date of manufacture for Ink Jet Products | 4 years after last date of manufacture for Laser; 2 years after last date of manufacture for Ink Jet Products | | | | |
| FRUs/CRUs coverage (Section 6.1) | 5 years after end of printer manufacturing for Laser; 3 years after end of printer manufacturing for Ink Jet Products | 5 years after end of printer manufacturing for Laser; 3 years after end of printer manufacturing for Ink Jet Products | 5 years after end of printer manufacturing for Laser; 3 years after end of printer manufacturing for Ink Jet Products | | | | |
| Out of Warranty (Using Lexmark as Repair House) | Yes | Yes | Yes | | | | |
| OOW charge paid by | [Lex] | per Attachment B-3 | per Attachment B-3 | | | | |
| Inventory Ownership after OOW fee paid | Customer | Customer | Customer | | | | |
| FRU/Parts Charge | Per Attachment B-3 | Per Attachment B-3 | Per Attachment B-3 | | | | |
| Out of Warranty (Using a 3rd Party Repair House) | No Lexmark support | No Lexmark support | No Lexmark support | | | | |
| Availability of FRUs to TP RH from Lex at [__] cost (Section 5.1.h) | Sell only to [__] | Sell only to [__] | Sell only to [__] | | | | |
| EOL Service Coverage (Replace/Repair of FGs and CRUs through Lexmark) (Section 8.3) | 5 years after EOP for Laser; 3 years after EOP for Inkjet Products | 5 years after EOP for Laser; 3 years after EOP for Inkjet Products | 5 years after EOP for Laser; 3 years after EOP for Inkjet Products | | | | |

Attachment C-3

Service Parts Pricing Pro Forma Document

██████████ Price 06.27.08 Share.xls



██████████Price
06.27.08 Share .xls

8/27/08

CONFIDENTIAL - OUTSIDE COUNSEL ON A3243

Attachment C-4

Warranty and Out of Warranty Pricing

Warranty Pricing Master Share 08.07.21. xls



**Warranty Pricing
Master Share 08.07.2**

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3244

Attachment C-5

Recommended Spares List (RSL) Pro Forma Document

 RSL_08 Jan 07 updated.xls


**RSL_08 Jan 07 updated .xls**

8/27/08

**CONFIDENTIAL - OUTSIDE COUNSEL ON** A3245

Attachment C-6

CID and NDF Cost

TBD

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3246

Attachment C-7

End of Service Life Master File

█████████ Table 2008.08.04.xls



█████████Table
**2008.08.04 .xls**

8/27/08

CONFIDENTIAL - OUTSIDE COUNSEL ONL A3247

Attachment C-8

Substitution Matrix

Substitution and MSR Matrix.xls



Substitution and MSR
Matrix.xls

8/27/08

CONFIDENTIAL - OUTSIDE COUNSEL ONLY

A3248

Attachment C-9

Service Strategy



Imaging
Warranty_LXK Summa

8/27/08

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3249

Attachment C-10

ECO Process Flow



**EC Quality Hold
Process – Laser Inkjet**

8/27/08

CONFIDENTIAL - OUTSIDE COUNSEL ONL A3250

Attachment C-11

**Warranty Entitlement Data Project**

Regarding warranty entitlement tracking, the parties agree to undertake a project to improve tracking ability.  The primary tracking mechanism is service tag for both ██ and Lexmark.  Lexmark agrees to provide a not to exceed NRE price and approximate schedule within 60 days of contract signing to add PPID (Piece Parts Identification) to the tracking mechanism.  The project completion shall not exceed 18 months as Lexmark is in the process of an ERP upgrade; rolling PPID tracking into the ERP upgrade will result in less NRE.

8/27/08

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3251

# INKJET SCHEDULE D
## Table of Contents

**PRODUCT SCHEDULE D (INKJET) TO MASTER PURCHASE AGREEMENT** ........................................ 1

  **1.0**    **SCOPE AND SPECIFICATIONS** ....................................................................1

  **2.0**    **PRICING** ...........................................................................................................1

  **3.0**    **PRODUCT DEVELOPMENT & TECHNICAL ENGAGEMENT** .................2

      3.1     MODEL 0, MODEL 1 DEFINITION: ....................................... 2

      3.2     EVALUATION UNITS: ............................................................ 2

      3.3     STRATEGIC ENGAGEMENT ................................................. 2

  **4.0**    **LOGISTICS: DELIVERY, FORECASTING, FLEXIBILITY** .................2

      4.1     DELIVERY OF PRODUCTS AND PO MANAGEMENT ........ 2

      4.2     FORECASTING ....................................................................... 6

      4.3     FLEXIBILITY ......................................................................... 6

  **5.0**    **MARKETING and SALES ENGAGEMENT** ....................................8

      5.1     MARKETING DEVELOPMENT FUNDS (MDF) ................... 8

  **6.0**    **QUALITY AND SUSTAINING ENGAGEMENT** ...............................8

  **7.0**    **TERM AND TERMINATION** ..........................................................8

  **8.0**    **EMERGING COUNTRIES** .............................................................9

  **9.0**    **OTHER** ..............................................................................................9

**Attachment 1.0, PRODUCT PLAN OF RECORD (POR)** ...................................... 11

**Attachment 1.1, PLAN OF RECORD PROCESS** .................................................. 12

**Attachment 1.2, Product Plan of Record (POR) SAMPLE** ................................... 17

**Attachment 3.0, DEVELOPMENT PROCESS** ....................................................... 26

**Attachment 3.1, ▆▆▆▆ PRODUCT DEFINITION** ............................................... 28

**Attachment 3.2, INKJET DEVELOPMENT EVALUATION UNITS** .................... 35

**Attachment 3.3, STRATEGIC ENGAGEMENT** ................................................... 36

**Attachment 3.4, NON-RECURRING EXPENSE** .................................................. 37

**Attachment 4.0, SLC LOCATIONS** ....................................................................... 38

**Attachment 4.1, DISTRIBUTION COLLABORATION** ....................................... 39

**Attachment 4.2, LAST-TIME-BUY PROCESS** ..................................................... 40

**Attachment 4.3, RETAIL AND SPECIAL PRODUCT REQUEST LOGISTICS TERMS** ......................... 42

**Attachment 5.0, SALES & MARKETING ENGAGEMENT** ................................ 43

**Attachment 5.1, MDF PROGRAM** ........................................................................ 44

**Attachment 6.0, QUALITY AGREEMENT** .......................................................... 47

**Attachment 6.1, SUSTAINING ENGINEERING ENGAGEMENT** ..................... 52

**Attachment 6.2, QUALITY GOALS** ...................................................................... 54

**Attachment 8.0, EMERGING COUNTRIES SCHEDULE** .................................... 55

**Attachment 9.0, DATA COLLECTION** ................................................................. 56

**Attachment 10.0, SAMPLE IMPORT/EXPORT QUESTIONNAIRES** ................. 60

**Attachment 11.0, ALLIANCE FUNCTIONAL OWNERS** .................................... 65

PRODUCT SCHEDULE D (INKJET) TO MASTER PURCHASE AGREEMENT

This Product Schedule D (Inkjet) to Master Purchase Agreement (this "Product Schedule") is entered into as of November 1, 2008 (the "Schedule Effective Date") by and between █████ on behalf of itself and its worldwide affiliates (█████ and such worldwide affiliates being hereinafter collectively referred to as █████), Lexmark International, Inc., a Delaware corporation ("LII"), and Lexmark International Technology, S.A. a Swiss company and LII's subsidiary ("LITSA") (LII and LITSA being hereinafter collectively referred to as Lexmark).  As used in this Product Schedule, the term "Party" means Lexmark or █████ and the term "Parties" means Lexmark and █████.

This Product Schedule provides additional terms and conditions to the Master Purchase Agreement having an effective date of November 1, 2008 between █████ and Lexmark (the "Agreement").  All terms and conditions of the Agreement apply to this Product Schedule and the terms and conditions of this Product Schedule are hereby incorporated by reference into the Agreement.  Defined terms used herein but not otherwise defined herein shall have the meanings given such terms in the Agreement.  In the event of a conflict between this Product Schedule and the Agreement, this Product Schedule shall govern.

All of the products described in this Product Schedule shall be deemed "Products" under the Agreement.

## 1.0    SCOPE AND SPECIFICATIONS

The terms and conditions of this Schedule D (Inkjet) apply only to inkjet printer Products and their related Supplies.  As used in this Schedule D (Inkjet), the term "Products" excludes laser printers and toner Supplies, as well as the options, features, and spare parts thereto.  Descriptions and specifications for Products shall be listed in a mutually executed Product Plan of Record document, a sample template of which may be found at Attachment 1.2 to this Schedule D.  As used in this Agreement, and notwithstanding their inclusion in a Final Product Plan of Record document, this term "Products" also excludes software, web applications, and support for web applications.  Terms and conditions relating to software are contained in Schedule F.

The Products will be either Model 0 or Model 1 class products as defined in Attachment 3.1 to this Schedule D (Inkjet).Lexmark

In the planning and development stages, preliminary Product specifications will be discussed and identified through the process described in Attachment 1.1 to this Schedule D (Inkjet).

## 2.0    PRICING

(a)    Initial pricing for the Products shall be determined as set forth on Schedule B to the Master Purchase Agreement.

A3253

(b)      Product transfer pricing methodology is described in Schedule I to the Agreement.

## 3.0      PRODUCT DEVELOPMENT & TECHNICAL ENGAGEMENT

With respect to each of the Products, Lexmark shall follow Lexmark's process of development, testing, delivery and acceptance requirements, and where mutually agreed, bridge to ██ processes as described in Attachment 3.0.  Without limitation of the foregoing, Lexmark shall ensure that reasonable volumes of Products meeting the requirements of this Product Schedule and the Agreement are available for purchase and resale by ██ and delivery to ██ customers worldwide no later than thirty (30) days after Lexmark's availability of the related Lexmark-branded Product, dependent upon ██ adherence with the Product Specifications and Development Engagement Model.

### 3.1      MODEL 0, MODEL 1 DEFINITION:

Future product definitions are to be aligned with Lexmark branded products and will follow one of the development models described in Attachment 3.1.

### 3.2      EVALUATION UNITS:

Lexmark shall provide to ██ for each printer Product  model, the number of printer units listed in Attachment 3.2 of this Schedule D (Inkjet), to be used by ██ only for purposes of evaluation.

### 3.3      STRATEGIC ENGAGEMENT

Lexmark and ██ shall comply with the requirements of Attachment 3.3 attached to this Schedule D (Inkjet).

## 4.0      LOGISTICS: DELIVERY, FORECASTING, FLEXIBILITY

### 4.1      DELIVERY OF PRODUCTS AND PO MANAGEMENT

4.1.1    The parties acknowledge and agree that Products may be provided to ██ in two ways: (a) from an approved Supplier Logistics Center ("SLC"); or (b) directly to ██ without use of an SLC.  The parties recognize that some terms and conditions will be the same in both situations and others terms may vary depending on the method by which ██ receives the Products.  The following terms and conditions shall apply whether or not Products are delivered to ██ using a SLC:

2

CONFIDENTIAL - OUTSIDE COUNSEL ON A3254

(a)     Lexmark shall fill all ▮ purchase orders (or pull orders, in the case of an SLC) (each may sometimes be referred to herein as a "PO") that specify quantities that do not exceed the forecast and acceleration uplifts permitted in Sections 4.2 and 4.3 of this Schedule D (Inkjet) and shall use commercially reasonable efforts to reduce the lead-time during the term of this Agreement.  If Lexmark believes any shipment may not be delivered on schedule (and without waiver of any rights by either party), Lexmark must provide advance notification to ▮, and Lexmark and ▮ will mutually agree on a corrective action plan which may include shipping the Product by airfreight or other expedited routing at Lexmark's expense. ▮ may cancel or reschedule any past-due deliveries on ▮ PO(s) unless delayed shipment is mutually agreed in advance.  If only a portion of the Products are available for shipment to meet the delivery date, Lexmark shall notify ▮ as soon as practicable and ship the available Products unless otherwise directed by ▮. ▮ may return any unauthorized under-shipment or any over-shipment or any portions thereof, at Lexmark's expense upon prior notification to Lexmark.  Failure or delay by ▮ carrier to pick up Products is not deemed to be a late delivery.

(b)     Lexmark Product Packaging and Labeling.  Lexmark will handle, pack, mark and ship the Products in accordance with Lexmark's standard packaging.  For spare parts, ▮ will use Lexmark's generic parts packaging.  Product labeling shall be per ▮ specification if required by Attachment 3.1 to this Schedule D. Lexmark may consider deviations from Lexmark standard packaging, as necessary, to support ▮ business needs.

(c)     Lexmark must test, verify and qualify Products in accordance with Attachment 6.0, Quality.

(d)     ▮ shall transmit ▮ PO(s) by facsimile or other agreed upon means to cover ▮ forecasted requirements for the Products for the two (2) months following the transmittal of the PO (unless such other time period is specified in a Product Schedule).  Such ▮ PO(s) will be continually updated to reflect ▮ next two (2) month forecast (unless such other time period is specified in a Product Schedule). Lexmark shall send ▮ an acknowledgement within two (2) business days of receipt of the ▮ PO confirming the quantity, delivery date and delivery location(s).  Lexmark may not reject any ▮ PO if the quantity reflected therein is consistent with ▮ most recent rolling six (6) month forecast.

(e)     ▮ transmission of a PO is Lexmark's only authorization to deliver Products to ▮ and invoice ▮ for the part numbers and quantities set forth in the ▮ PO. Title and risk of loss to Products shall not pass to ▮ until ▮ takes physical possession and control at the applicable ▮ manufacturing facility (▮ applicable ▮ manufacturing facility, ▮); provided, however, that if ▮ elects to contract with a third party common carrier for the transportation of Products from the SLC or other ▮ specified location to the applicable manufacturing facility, ▮ assumes risk of loss upon physical possession and control of Products by such common carrier.

3

911767v10 11/3/2008

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3255

(f)    Except as expressly set forth in this Agreement, any expenditures or commitments by Lexmark in anticipation of ▮▮▮ requirements shall be at Lexmark's sole risk and expense.

4.1.2  The following terms and conditions shall apply when Products are delivered to ▮▮▮ using a SLC:

(a)    Unless ▮▮▮ specifically requests that Products be delivered directly to ▮▮▮ all Products delivered under this Agreement to ▮▮▮ for manufacturing and service shall come from inventory held by Lexmark at an approved SLC (such Lexmark inventory is hereinafter referred to as "Revolver Inventory"), or Lexmark may use its own facilities, or contractor facilities, ("Lexmark Facilities") to meet the inventory and delivery requirements of the Agreement.  Lexmark agrees to maintain an SLC at the locations listed in Attachment 4.0.  Any changes or additions to a SLC location shall be approved by the Parties.

(b)    Lexmark shall maintain Revolver Inventory at each SLC in quantities equal to (a) for the first two months of ▮▮▮ fiscal quarter, ▮▮▮ most recent ten (10) day forecasted demand requirements for the applicable ▮▮▮ location unless otherwise agreed to in writing by the applicable ▮▮▮ region; or (b) for the third month of ▮▮▮ fiscal quarter, ▮▮▮ most recent (14) day forecasted demand requirement for the applicable ▮▮▮ location. Lexmark shall replenish the Revolver Inventory as necessary to ensure the required Revolver Inventory level is available on hand at all times thru End of Marketing Life of any Product. ▮▮▮ and Lexmark shall meet periodically for an inventory pipeline assessment.  At such meeting, inventory status at both ▮▮▮ and Lexmark shall be reviewed, along with any changes in ▮▮▮ demand for the Products.  Placement of Revolver Inventory by Lexmark in conformance with ▮▮▮ forecast does constitute a commitment by ▮▮▮ to acquire such Products.

(c)    In the event that ▮▮▮ requests that Supplier utilize used or repaired parts to meet the needs of ▮▮▮ service department, such used or repaired parts shall be clearly marked as used or refurbished.

4.1.3  The following terms and conditions shall apply when Products are delivered to ▮▮▮ without using a SLC:

(a)    Lexmark shall schedule delivery of each Product to the delivery location on the delivery date listed in the ▮▮▮ PO. Delivery shall not be deemed to be complete until all Products have been actually delivered to the applicable delivery location. Lexmark shall not make deliveries more than three (3) days earlier than the delivery date.  If Products are delivered more than three (3) days early, ▮▮▮ may, at its option: (i) refuse to take possession of all or some of the Products in which case Products that are returned shall be redelivered only upon ▮▮▮ instructions; or (ii) store the Products at Lexmark's risk and expense and delay processing the corresponding invoice until the agreed to delivery date.

4

911767v10 11/3/2008

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3256

    (b)    For delivery of Products to a location other than a SLC by Lexmark, all ▮ PO's are subject to acceptance by Lexmark with Lexmark's response provided to ▮ within two business days of receipt of such PO's.

4.1.4    With respect to the Products purchased by ▮ under the terms of this Agreement, unless expressly stated in a Product Schedule, the following provisions shall apply: ▮ may (a) increase the quantities scheduled to be delivered to ▮ upon five (5) days advance notice; (b) reschedule the delivery of Products upon seven (7) days advance notice; or (c) cancel ▮ POs with fifteen (15) days advance notice, with the exception of Last-Time-Buy purchase orders.

4.1.5    Lexmark and ▮ have agreed to work on a project of Distribution Collaboration, further defined in Attachment 4.1.  As a result of this project some of the above terms could be revised, as mutually agreed.  In that event, an amendment to this Schedule D (Inkjet) will be mutually executed.

4.1.6    The following provision shall not limit or reduce Lexmark's obligations herein with respect to providing the forecasted Products to ▮ but shall be applicable only for determining whether ▮ may be excused from its obligations under 1.7.1 and 1.7.2 of Schedule G. The Parties will track the accuracy, expressed as percentage, of ▮ MRP each month as forecast two months earlier (i.e., the absolute value of one, minus total pull orders received for that month divided by quantities specified by ▮ MRP for such month submitted two months earlier) (the "▮ MRP Accuracy" or the "MRP Accuracy") as described in footnote 1 below.  In the event that Lexmark, in relation to all pull orders received during any consecutive 30-day period that are consistent with the forecasting provisions of Section 4.2 of this Schedule D (Inkjet) and the acceleration tolerances of Section 4.3 of this Schedule D (Inkjet), with regard to any Product model(s) ordered, provides less than ninety percent of such Product quantities that are indicated by an average ▮ MRP Accuracy during the immediately preceding six-month period for such Product model(s),[1] then ▮ shall be entitled to send Lexmark written notice within

---

[1] ▮ must issue a ▮ MRP each month, or the last issued ▮ MRP will be used for purposes of tracking Lexmark's obligations in Section 4.1.6 above.  Each ▮ MRP will forecast pull orders for several time periods, including pulls to occur two months following issuance of the ▮ MRP.  By way of illustration:  Assume ▮ MRPs issue from January to June forecasting the following pull orders for the period two months later:  Jan ▮ MRP:  1100 units per Product model to be pulled on 3/1; Feb. ▮ MRP:  1100 units per Product model to be pulled 4/1; March ▮ MRP:  1100 units per Product model to be pulled on 5/1; April ▮ MRP:  1100 units per Product model to be pulled on 6/1; May ▮ MRP:  1100 units per Product model to be pulled on 7/1; June ▮ MRP:  : 1100 units per Product model to be pulled on 8/1.  Assume further that all of the foregoing forecasts are within the tolerances permitted in Section 4 above.  Assume further that ▮ actual pull orders for the months forecast occur as follows:  March pulls: 1000 units per model; April pulls:  500 units per model; May pulls:  1200 units per model; June pulls:  500 units per model; July pulls:  1200 units per model; August pulls:  500 units per model.  ▮ MRP accuracy for each month  forecast is as follows:   March:  91%; April:  45%; May 91%; June:  45%; July 91%; August:  45%.  ▮ average MRP accuracy for the months of March-August is thus 68%.  ▮ July MRP for September delivery is 1100 units.  Sixty eight percent of 1100 units is 748 units.  Ninety percent of 748 units is 673 units.  Accordingly, to avoid the notice described in Section 4.6 above, Lexmark need have available for pulling during the month of September no more than 673 units per model, plus its DSI requirement for each model.

911767v10 11/3/2008

CONFIDENTIAL - OUTSIDE COUNSEL ON A3257

14 days.  Such notice shall specify any Product model(s) for which Lexmark failed to achieve such average ▮▮MRP accuracy.  Lexmark shall have 30 days time after receipt of the notice to formulate and implement a corrective action plan.  If, during the next 30 consecutive days following the implementation of such corrective action plan, Lexmark fails to supply ordered Product in quantities equal to or greater than an average ▮▮ MRP Accuracy during the immediately preceding six-month period, then ▮▮ shall be excused from the obligations of Section 1.7.1 and 1.7.2  of Schedule G with regard only to the Product model(s) specified in ▮▮ notice described in this Section.  Notwithstanding the foregoing, ▮▮ shall not be excused from the obligations of Sections 1.7.1 and 1.7.2 of Schedule G (and Lexmark shall not be required to implement any corrective action plan) if:  (a) any pull order(s) described above specified Product quantities in excess of amounts forecast as permitted by Section 4.2 of this Schedule D (Inkjet), and/or (b) any pull order(s) described above ordered Product quantities in excess of the acceleration tolerances permitted in Section 4.3 of this Schedule D (Inkjet).

## 4.2    FORECASTING

4.2.1    On approximately a weekly basis, ▮▮ shall provide rolling thirteen (13) week forecasts of projected purchases of Products for specified locations.  On approximately a monthly basis, ▮▮ shall provide rolling six (6) month forecasts of projected purchases of Products for specified delivery locations (including without limitation SLCs) (the "▮▮ MRP" as posted in ▮▮▮▮ system).  The Parties acknowledge and agree Lexmark will rely on such forecasts for ordering component parts and scheduling production. On a quarterly basis, ▮▮ shall provide a twelve (12) month forecast of projected purchases of Products by region.   Such forecasts are for planning purposes only and shall not constitute a commitment of any type by ▮▮ (except as stated in the LTB Process defined in Attachment 4.2, or as stated in section 4.3.2).  No later than five (5) days after receipt of the ▮▮ six (6) month forecast, Lexmark agrees to confirm supply for a rolling three (3) month period (current month plus two (2)).  Confirmation of the forecast by Lexmark shall constitute a commitment by Lexmark to provide the forecasted quantities of Products to ▮▮ if ordered by ▮▮ ▮▮ and Lexmark shall meet periodically for an inventory pipeline assessment.   At such meeting, inventory status at both ▮▮ and Lexmark shall be reviewed, along with any changes in ▮▮ demand for the Products.

4.2.2 Lexmark agrees to use commercially reasonable efforts to fulfill ▮▮ upside demands from the forecasted quantities and the Acceleration requirements provided in Section 4.3.1. Lexmark must accept any ▮▮ PO consistent with these commitments, but for commercially reasonable reasons, Lexmark may reject any ▮▮PO if the quantity reflected therein is inconsistent with these commitments.

## 4.3    FLEXIBILITY

### 4.3.1    ACCELERATION:

6

911767v10 11/3/2008

CONFIDENTIAL - OUTSIDE COUNSEL ONA3258

██ may, without cost or liability (except as set forth in Section 4.1, 4.2, or Attachment 4.2), increase the quantities scheduled to be delivered to ██ or a third party from amounts forecast in the ██ MRP as follows:

| Days from planned delivery to ██ | Acceleration Amount from ██ MRP |
|---|---|
| 0 – 30 | |
| 31 – 60 | |
| 61+ | |

This upside flexibility is in addition to the Revolver Inventory requirement indicated in Section 4.1.2b, and is not cumulative. All acceleration capability will be contingent and capped upon tooling and capacity available for each program. Lexmark will routinely provide ██ a view of product capacity profiles to jointly assess any decisions needed surrounding capacities.

Lexmark will provide, per ██ request, its factory production flexibility. This may be different by supplier and product family. ██ intends to use this information to better manage its processes to align processes to Lexmark and Lexmark suppliers' production capabilities.

### 4.3.2    RESCHEDULE AND CANCELLATION:

Lexmark will work with ██ in any instances where demand is not materializing as anticipated which would require deferment of the supply flow. Each case will be handled individually, but ultimately the LTB "Last Time Buy" process, as defined in Attachment 4.2, will be utilized to establish inventory and long lead component liabilities and requirements between parties at the end of each program. If the position presents itself that would require cancellation of supply, then Lexmark will work in good faith to cancel finished good production, where possible, with the manufacturing ODM. As in the case of re-schedule, the LTB "Last Time Buy" process described in Attachment 4.2 will be utilized in firming-up final liabilities and requirements between parties at the end of each program. In the event that ██ MRP (or, with regard to liability for long lead time parts (e.g., ASICS, xxxx), ██ 12-month forecast described in Section 4.2 of this Schedule D (Inkjet)) is reduced, or ██ elects to discontinue a Product before the "Last Time Buy" opportunity described in Attachment 4.2, and such would result in excess Product inventory and/or long lead time component inventory (whether on hand or as a result of commitments made to Lexmark's suppliers) for Lexmark because of actions taken to satisfy prior ██ forecasts and/or acceleration requirements (section 4.3.1), then Lexmark will identify any such resulting inventory and/or commitments, and ██ shall be responsible for ordering such inventory and purchasing such components. Lexmark will in good faith search for means to minimize excess inventory and components by exploring opportunities to use excess parts and materials in other existing or future programs.

### 4.3.3    EXCESS INVENTORY:

911767v10 11/3/2008

CONFIDENTIAL - OUTSIDE COUNSEL ON A3259

In the event any inventory on any specific Product grows to an inventory level that exceeds fifty (50) days of ▇▇ most recent forecasted demand requirements, due to ▇▇ underachieving forecasted demands, then ▇▇ will provide a plan to reduce the inventory level within the following 30 days to an acceptable level mutually agreed upon by both parties.

### 4.3.4   RETAIL & SPECIAL PRODUCT REQUESTS

Any special Product request may have special logistics terms applicable, as defined in Attachment 4.3 hereto.

## 5.0     MARKETING and SALES ENGAGEMENT

Lexmark and ▇▇ shall comply with the requirements of Attachment 5.0 attached to this Schedule D (Inkjet).

## 5.1     MARKETING DEVELOPMENT FUNDS (MDF)

The Lexmark shall pay to ▇▇ and/or certain ▇▇ affiliates designated by ▇▇ from time to time, an amount of ▇▇ of Product purchases, less amounts for Product returns, price protection, other marketing support, and/or any other credits.  This effectively equals ▇▇ calculated as ▇▇ of the total amount of purchases made by ▇▇ (whether purchased for resale directly to ▇▇ customers, for resale to resellers, or for other purposes, but excluding Internal Use) under this Product Schedule during any ▇▇ fiscal quarter. Lexmark shall pay such amounts (collectively, the Section 5.1 Amounts") within forty-five (45) days after invoice by ▇▇ affiliates.  Except as may be otherwise specifically designated by ▇▇ and/or the relevant ▇▇ affiliate from time to time, all amounts payable to ▇▇ or any ▇▇ affiliate under this Section 5.1 shall be paid by wire transfer of immediately available funds to such accounts as ▇▇ may designate from time to time.  The parties will execute one or more MDF Schedules substantially in the form attached as Attachment 5.1 to this Product Schedule (each an "MDF Schedule") with respect to the Section 5.1 Amounts.  The additional provisions of the relevant MDF Schedules shall apply to such Section 5.1 Amounts.

## 6.0     QUALITY AND SUSTAINING ENGAGEMENT

With respect to the products, Lexmark shall provide Quality and Sustaining support through end of Product manufacturing.. Lexmark is responsible to set and communicate quality targets for each product, and engage in activities to ensure products meet those targets.  ▇▇ and Lexmark will meet on a regular basis to provide status of the currently shipping products, to include Quality metrics and Sustaining activities, including primarily Engineering Changes, Customer Escalations, Special Bids and Corrective Actions in response to Quality issues. Processes governing these activities are in Attachments 6.0 (Quality) and 6.1 (Sustaining Engagement).

## 7.0     TERM AND TERMINATION

## 7.1     GENERAL:

911767v10 11/3/2008

CONFIDENTIAL - OUTSIDE COUNSEL ON A3260

Unless this Product Schedule is early terminated as provided herein, and subject to earlier expiration or termination of the Agreement, the term of this Product Schedule shall begin on the Schedule Effective Date and shall continue until June 30, 2014  provided, however, that this Schedule D shall be automatically extended for additional three (3) year renewal terms, upon the expiration of the initial term or any such renewal term, unless either Party provides notice of non-renewal to the other parties at least  one hundred and eighty (180) days before the end of such initial term or any such renewal term.

**7.2    Termination.**    Either party may terminate this Schedule, with or without cause, on 12 months' advance written notice..

7.3    **Program Survival:**  ██and Lexmark agree that upon termination of the Agreement, or any related Schedule, including, but not limited to this Product Schedule, or any ongoing program or business award, all of the terms and conditions of this Agreement and any related schedule shall survive until the end of life date ("EOL") of any and all programs affected by such termination, including Products currently in production or in development.  In addition, all service and support terms, including the manufacture, sale and support of systems, cartridges, parts, and supplies, for such programs shall survive for the period of time specified in Section 2.3 of the Agreement.

## 8.0    EMERGING COUNTRIES

Lexmark and  ██ shall comply with the requirements of Attachment 8.0 attached to this Schedule D (Inkjet).

## 9.0    OTHER

(a) With prior Lexmark approval, and subject to their written agreement to abide by all workplace conduct and safety requirements of Lexmark, ██ personnel, from time to time, may work at Lexmark's premises and/or the product manufacturing/repair locations, and Lexmark will provide any such personnel with reasonable assistance related to the relationship established by this Program Schedule, including a safe and efficient workspace and access to appropriate personnel and other resources of Lexmark.

b)    DATA COLLECTION:
Lexmark and  ██ shall comply with the requirements of Attachment 9.0 attached to this Program Schedule.

{Remainder of page intentionally left blank}

9

CONFIDENTIAL - OUTSIDE COUNSEL ONLA3261

IN WITNESS WHEREOF, the parties hereto have duly executed this Product Schedule by their respective duly authorized officers to be effective as of the Effective Date as first written above.

████████████████████████

By:

Title:

Date:


**LEXMARK INTERNATIONAL, INC.**

By:

Title:

Date:


**LEXMARK INTERNATIONAL TECHNOLOGY, S.A.**

By:

Title:

Date:

10

911767v10 11/3/2008

CONFIDENTIAL - OUTSIDE COUNSEL ONLYA3262

## Attachment 1.0, PRODUCT PLAN OF RECORD (POR)
## Schedule D

Each Product will be defined by a specific Plan of Record (POR) document. This document should be completed at development kick-off and signed by all parties. Any POR changes should be documented and retained. The POR management process is defined per Attachment 1.1.

The POR should contain all of the specifications, features, functions (including corresponding consumables and features) necessary to develop and deliver the Product. A sample POR is included as Attachment 1.2 for reference.

The following Table 1.0a will be completed and maintained to track Printer Products that have, or will have, a POR document.

| Table 1.0a – INKJET Products | | | | | |
|---|---|---|---|---|---|
| **Product Code Name** | **Product Category** | **Predecessor Product** | **Estimated RTS** | **POR Complete?** | **Comments** |
| | Entry | | Jun-08 | Y | |
| | Good | | Aug 09 | Y | |
| | Good | | Aug 09 | Y | |
| | Better (Productivity) | | Aug 09 | Y | |
| | Better (Photo) | | Sep 09 | Y | |
| | Best (Photo) | | Oct 09 | Y | |
| | Best (Productivity) | | Sep 09 | Y | |
| | Ultimate (Photo) | | N/A | Y | Canceled |
| | Ultimate (Photo) | | N/A | N | Canceled |

11

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3263

**Attachment 1.1, PLAN OF RECORD PROCESS**
**Schedule D**

Schedule G to the Agreement, among other things, defines the Alliance Plan of Record and an information sharing process between the Parties concerning their respective future product roadmaps. This Attachment 1.1 to Schedule D (Inkjet) provides additional detail regarding the information to be shared, the time frame in which ▮ must exercise its rights contained in Section 2.0 (including subparts) of Schedule G, and the point at which NRE expenses will be incurred by ▮ in the event that a future product program is canceled (i.e., ▮ makes a decision to abandon such industry segment serviced by the Product or to terminate the Agreement and or this Schedule D (Inkjet)).

Joint future product planning will proceed through four phases: (1) Early engagement, (2) Schedule G Escalation, (3) Product definition, (4) Development kickoff.

Unless expressly stated otherwise in this Attachment 1.1 to Schedule D (Inkjet), in the event of a conflict between this Attachment 1.1 to Schedule D (Inkjet) and Schedule G, Schedule G shall govern.

Notwithstanding any language to the contrary in this Attachment 1.1 to Schedule E or in Schedule G, the Parties acknowledge and agree that in the event Lexmark concedes a prospective Product does not substantially conform to ▮ requirements for purposes of Section 1.7.1 of Schedule G, then Lexmark shall so inform ▮ only in writing and only from either its: (a) Director of Alliances; (b) Vice President of Alliances; or (c) Consumer Printer Division President. The parties acknowledge and agree such communication from any other Lexmark employee(s) shall be invalid.

**1.0    Early Engagement**

1.1    As required by Schedule G, the Parties shall develop and exchange, on a regular and timely basis, their respective product roadmaps, including the specifications described in Schedule G and other information described in this Attachment 1.1 to Schedule D (Inkjet). Notwithstanding any language to the contrary in Schedule G, ▮ product roadmap shall include ▮ expected ready to ship date ("RTS") for each product listed in ▮ roadmap, as well as the expected end of life date.

1.2    Notwithstanding any language to the contrary in Schedule G, during this early engagement phase, the Parties also shall share the following information with regard to future product planning:

1.2.1    Marketing members from both ▮ and Lexmark shall share information on industry research, industry trends and opportunities, customer/user needs, product requirements etc to so align on marketing strategy.

1.2.2    Top level features should be discussed, such as speeds, features, planned RTS, retail and direct strategy, as well as localization and distribution plans. New initiatives (i.e. RED and emerging countries) shall be shared where available.

12

CONFIDENTIAL - OUTSIDE COUNSEL ON A3264

1.2.3   In addition, in support of the product engagement discussions delineated above, engineering members from both ▉ and Lexmark shall meet in product engagement sessions to discuss specific needs for the next generation of products. These discussions should  cover Product Technology, features & solutions, speeds, yields, print quality, industrial design, software, firmware, etc.

1.3   The information exchanged as described in Section 1.1 and 1.2 above will be used by the Parties to prepare a preliminary joint roadmap describing the future Products. ▉ team shall then present to executives for approval in the ▉ (▉ process, called ▉▉▉▉) session.

1.4   For each future Product, the early engagement phase should end 18 months before the first RTS identified by ▉ for such future Product.

**2.0   Schedule G Escalation**

2.1   Notwithstanding any language in this Attachment 1.1 or in Schedule G to the contrary, ▉shall exercise its rights contained in Section 2.0 (including all subparts) of Schedule G no later than 18 months before the RTS  first identified by ▉ for such future Product. No NRE liability will be incurred until the NRE lock described in Section 4.3 below.

**3.0   Product definition**

3.1   At conclusion of the early engagement phase with respect to each future Product per the Alliance POR Roadmap, Lexmark will prepare a "Preliminary Product Plan of Record Document v0.1." ▉ shall exercise any rights described in Section 5.2.1 of Schedule I no later than 30 days after Lexmark presents such Preliminary Product Plan of Record Document v0.1.  This document shall include a description of the specifications for the Product, details regarding expected industry positioning, expected yields and sales volumes for the related Supplies, expected printer sales volumes, any other necessary information reasonably required for product definition and analysis, expected RTS, and expected end of life.   Preliminary Product Plan of Record Document v0.1 should be targeted for completion no later than 18 months before RTS.

**3.1.1**   In addition, Between 18 and 17 months before the RTS described in Section 2.1 above, Lexmark will prepare and submit to ▉ a preliminary plan of record roadmap (i.e., a reference document that lists those future Products expected to be  included in the Alliance Plan of Record at the conclusion of the development kickoff meeting described in Section 4.0 below).

**4.0   Development Kickoff**

4.1   As soon as practicable after creation of last Preliminary Product Plan of Record Document v0.1 for any future Products identified in the early engagement process, the Parties shall hold a development kick-off meeting.  Before this meeting, Lexmark will provide, for each such future Product, a "POR Document v 1.0", "SW Specs/Statement of Work v0.1" (this document shall comprise a preliminary software specification for the prospective Products), and "FW Specification v0.1" (this document shall comprise a preliminary firmware specification for the prospective Products).

13

CONFIDENTIAL - OUTSIDE COUNSEL ON A3265

4.2     By the end of the development kick-off meeting, the Parties should complete the following objectives:

    a)     Creation of the industrial design for each future Product;

    b)     Work items identified for closure based on ███ review of POR Document v1.0 will be listed in a gap sheet, which both teams will work to resolve to reach Plan Phase Exit (per ████ process);

    c)     Product quality goals should be established;

    d)     Closure on Service Requirements per Schedule C;

    e)     Closure on financial position (refer to Section 2.0 Pricing of Schedule), including cartridge yield analysis;

    f)     Mutual execution of the Final Alliance Plan of Record;

    g)     Changes made after the agreement at Kick-off meeting will require POR change process described in section 5.0 of this document.

## 4.3     NRE Lock

4.3.1   On the last day of the kickoff meeting described in Section 4.2 above, the Parties shall mutually agree upon an Alliance Plan of Record document(s) sufficient to describe the entire future Product portfolio.  The Alliance Plan of Record document may comprise a single listing of products and/or a series of mutually executed documents referring to individual Products (each a "Product Plan of Record").

4.3.2   The mutually executed Alliance Plan of Record documents, whether collective or individual, should contain information regarding expected a description of and the specifications for each product, details regarding expected market positioning, expected yields and sales volumes for the related Supplies, expected printer sales volumes, RTS, expected end of life date, and any other information mutually agreed by the parties.

4.3.3   The Alliance Plan of Record documents:

    a)     Shall be executed only by the Program Manager for LXK/███ Marketing Representative for LXK and ████ and Engineering Representatives for LXK and ████

    b)     Two original versions will be executed and retained by each PM.

    c)     The signed documents will be considered part of Attachment 1.0 of the product schedule, and the POR Tracking Table should be updated accordingly.

    d)     After mutual execution of the documents, NRE will begin to be incurred

    e)     If ████ cancels a Product or category entirely that is within the mutually executed Alliance Plan of Record document(s), ███ will reimburse Lexmark for any and all incurred development expenses.

## 5.0     Product Plan of Record Change Process

14

911767v10 11/3/2008

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3266

5.1    After execution of the Alliance Plan of Record document(s) described in Section 4.3 above, no changes to prospective Product design shall occur except through the following process:  Proposed design changes shall be communicated by ▮▮ through the POR change request system (Web Based database managed by LXK).  Key contacts for this process are the LXK Business Manager and the ▮▮▮▮▮.  These are the only individuals who can initiate and give final approval to any Product POR change request.  Any resulting costs and expenses resulting from the change shall be borne by ▮▮; Lexmark will communicate such resulting costs and expenses to the ▮▮▮▮▮ before approving/implementing the change.

5.2    The Figure 1 below describes the planning process in a graphic manner, is provided for purposes of illustration only, and shall not be resorted to in construing the Agreement.**Figure 1:**



CONFIDENTIAL - OUTSIDE COUNSEL ONlA3267



16

911767v10 11/3/2008

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3268

**Attachment 1.2, Product Plan of Record (POR) SAMPLE**
**Schedule D**

## 1.0 Product Specifications

| Industry Specifications | | | | | | |
|---|---|---|---|---|---|---|
| **Product Segmentation:** | | ◆ "Good" Flatbed 3-in-1 AIO with internal network adapter available as factory install and non-network adapter version. | | | | |
| **Geographies:** | | ◆ US, Canada, EMEA (includes Export Division), LA, EDB, AP | | | | |
| **First Ship Date:** | | ◆ Worldwide: July 2009 | | | | |
| **Product Life Cycle:** | | ◆ 1 Year | | | | |
| Base Printer Part Number (not top bill) | Machine Type | ■ MODEL NUMBER | ■ P/N | Operator Panel | Wireless Adapter | LOT ID |
| **TBD** | TBD | TBD | **TBD** | English | None | TBD |
| **TBD** | TBD | TBD | **TBD** | English Wireless | ROW | TBD |
| **TBD** | TBD | TBD | **TBD** | Icon | None | TBD |
| **TBD** | TBD | TBD | **TBD** | Icon Wireless | EMEA | TBD |
| **TBD** | TBD | TBD | **TBD** | Icon Wireless | ROW | TBD |
| **Product Name & Model Number:** | | ◆ MFG: ■ <br> ◆ Class: Printer <br> ◆ Product Name/Des: ■ (non-wireless) ■ (wireless) <br> ◆ Vendor ID: 0x413C <br> ◆ Product ID: TBD <br> ◆ Model configured at factory only. | | | | |
| **Basic Description:** | | • 4800 dpi Print <br><br> • 48 bit scan; 19200 enhanced dpi <br><br> • Standalone Copy <br><br> • Standalone photo printing with cardslots & proof sheet <br><br> • Mono 2-Line LCD <br><br> • Borderless print & copy <br><br> • Simplex printing only | | | | |
| **Printhead Specifications** | | | | | | |

17

911767v10 11/3/2008

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3269

| | |
|---|---|
| **Cartridge Keying** | ◆ Electronically keyed to prevent non-█ branded mono and tricolor ink tank use. |
| **Printhead:** | ◆ Semi-permanent printhead and disposable ink tanks<br>◆ Printhead P/N -<br>◆ Mono Ink Tank P/N and yield:<br>    Standard yield - P/N TBD  180 pages<br>    High Yield  - P/N TBD  360 pages<br>◆ Tricolor Ink Tank P/N and yield:<br>    Standard yield - P/N TBD   170 pages<br>    High yield  - P/N TBD   340 pages<br><br>Note: Printer will ship with standard yield. |
| **Ink:** | ◆ Black: Pigment<br>Color Ink: Dye based |
| **Archivability** | ▪ TBD |
| **Color Standards:** | ◆ sRGB (default driver color matching)<br>◆ ICM 2.0 (Windows) |
| **Dual Head Printing** | ◆ Yes |
| **Printhead and Ink Tank  Installation:** | Semi-permanent printhead and ink tanks to be installed by customer.<br><br>Printer will not start a print job with the carrier in the install position |

| **Print Specifications** | | |
|---|---|---|
| **Print Speed** | | |
| **Maximum Print Speeds** | **"Claim"/ "Test"** (spdtst5.doc, spdtstc5.doc) | |
| | ◆   Quick Print:  30 ppm mono / 27 ppm color | |
| **Print Modes** | ▪ TBD | |
| **Standalone Photo Printing Functions/Features:** | ▪ Color or black (grayscale) photo printing<br>▪ Photo Menu options pop up at card insert<br>▪ Print All Photos<br>▪ Save Photos to PC<br>▪ Print Photos from USB Drive<br>▪ Print proof sheet<br>▪ Print from PictBridge camera<br>▪ Red- eye Reduction via Proof Sheet<br>▪   Photo Effects:<br>    ▪ Auto Image Enhance or<br>    ▪ Antiquing (Gray or brown) or<br>    ▪ Sepia | |

18

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3270

| Card Reader Support | • Multi Media Card (MMC) |
|---|---|
| | • Secure Digital (SD) |
| | • Mini SD (with customer supplied adapter) |
| | • Memory Stick (MS) |
| | • Memory Stick Pro |
| | • Memory Stick Duo (with customer supplied adapter) |
| | • Memory Stick Duo Pro (with customer supplied adapter) |
| | • XD |
| | • XD type M and H |
| | • Micro SD (Transflash) (with customer supplied adapter) |
| | • MMC Mobile (with customer supplied adapter) |
| | • RS-MMC (with customer supplied adapter) |
| | • SDHC (high capacity) |

## Scanner Specifications

| | |
|---|---|
| **Scanner Type:** | • Flatbed – CIS, 1200 ppi |
| | • Bulb Type – LED |
| | • Mercury Content of bulb (by mass) – None |
| **Scan Modes** | True Color: |
| | 36 Bit Internal |
| | 24 Bit External |
| | Gray Mode: |
| | 12 Bits Internal |
| | 8 Bits External |
| | Text/Line Art: |
| | 1 Bit Per Pixel |
| **Scan Method:** | One pass |
| **Scan Area (Flatbed)** | • 8.5 x 11.7 inches |
| | • 216 x 297 mm |
| **Scan Resolution:** | • Horizontal:     1200 ppi |
| | • Vertical:       2400 ppi |
| **Illuminated Registration Corner** | • No |
| **Lamp Warm–up Time** | • None |
| **Scan resolution/Quality:** | Selectable via Driver |

## Copy Specifications

| | |
|---|---|
| Resolution / Quality: | |
| Copy Function | Standalone Only |
| **Copy Modes** | **Mono Copy** |
| • | • Quick:  300 x 600 dpi Print;  150 x 150 ppi Scan |
| | • Normal:  600 x 600 dpi Print;  300 x 300 ppi Scan |
| | • Photo:  1200 x 1200 dpi Print;  600 x 600 ppi Scan |
| | |
| | **Color Copy** |
| | • Quick: 300 x 600 dpi Print; 150 x 150 ppi Scan |
| | • Normal:  600 x 600 dpi Print; 300 x 300 ppi Scan |
| | Photo:1200 x 1200 dpi Print;  300 x 300 ppi Scan |
| **Copy speeds:** | |

19

911767v10 11/3/2008

CONFIDENTIAL - OUTSIDE COUNSEL ONLY     A3271

| | **Standalone** |
|---|---|
| | **"Claim"** (spdtst5.doc, spdtstc5.doc ) |
| | Quick Copy |
| | • 1st Copy:            5 ppm mono target, 5 ppm color |
| | • Additional Copies:   17 ppm mono, 11 ppm color |
| **Additional Copy Information** | |
| **Media Type (for printed output):** | • **Standalone (selectable via op-panel)** |
| | • Limited number of selected printer supported media types (Plain, Heavyweight Matte, Transparency, Glossy/Photo) |
| **Supported Media Sizes** | Standalone: |
| | • Letter |
| | • Legal |
| | • A4 |
| | • B5 |
| | • A5 |
| | • A6 |
| | • 3 x 5 in |
| | • 3.5 x 5 in |
| | • 4 x 6 in |
| | • 5 x 7 in |
| | • 10 x 15 cm |
| | • 13 x 18 cm |
| | • L |
| | • 2L |
| | • Hagaki |
| **Copy Features:** | • **Standalone** |
| | • One touch copy (defaults to color) |
| | • Borderless Copying |
| | • Repeat Image |
| | • N-Up |
| | • Collate |
| **Borderless Copy:** | • All supported borderless paper sizes selectable via printer driver. |
| | • Standalone borderless support  -  All sizes listed above excluding Legal and 3 x 5 |

## Media Specifications

| Paper Capacities: | | |
|---|---|---|
| | **Input Tray** | |
| | Plain | Up to 100 sheets |
| | Envelope | Up to 10 envelopes |
| | Banner | Up to 20 sheets |
| | Heavyweight Matte | Up to 25 sheets |
| | Photo/Glossy | Up to 25 sheets |
| | Transparency | Up to 50 sheets |
| | Iron-on Transfer | Up to 10 sheets |
| | Card Stock | Up to 25 sheets |
| | Labels | Up to 25 sheets |
| | | |
| | **Exit Tray** | Up to 25 sheets |
| | Paper | 1 sheet |
| | Transparencies | 1 sheet |

911767v10 11/3/2008

CONFIDENTIAL - OUTSIDE COUNSEL ONLY   A3272

| | | |
|---|---|---|
| | Photo/Glossy | Up to 20 sheets |
| | Envelopes | Up to 10 envelopes |
| | Heavyweight Matte | Up to 25 sheets |
| | Banner | Up to 20 sheets |
| | Iron-on Transfer | Up to 10 sheets |
| | Card Stock | Up to 15 Sheets |

| | |
|---|---|
| • Additional Information: | <ul><li>10 mm stack height</li><li>Media basis weight 20-150 lbs.</li></ul> |
| Exit tray: | <ul><li>Sheets stack neatly and remain in the exit tray until removed by user</li></ul> |
| Paper Handling | L-path  (Centerfeed) |
| Out of paper detection | Yes, via Media Sense |
| Edge Detection: | No |
| Media Sizes (via Driver): | <ul><li>**Envelopes**<ul><li>6 ¾ (3 5/8 x 6 ½ in)</li><li>7 ¾ (3 22/25 x 7 ½ in)</li><li>9       (3 7/8 x 8 7/8 in)</li><li>10     (4 1/8 x 9 ½ in)</li><li>DL   (110 x 220 mm)</li><li>C5   (162 x 229 mm)</li><li>C6   (114 x 162 mm)</li><li>B5   (176 x 250 mm)</li><li>A2 Baronial (111 x 146 mm)</li><li>Custom Size</li></ul></li><li>**Japanese Envelopes**<ul><li>Chokei 3 – 120 x 235 mm</li><li>Chokei 4 – 90 x 205 mm</li><li>Chokei 40 – 90 x 225 mm</li><li>Kakugata 3 – 216 x 277 mm</li><li>Kakugata 4 – 197 x 267 mm</li><li>Kakugata 5 – 190 x 240 mm</li><li>Kakugata 6  - 162 x 229 mm</li></ul></li><li>**Bottom margin with no print quality degradation**<ul><li>¾ " for color images/text</li></ul></li></ul> |
| Borderless Media Support(Via Driver) | <ul><li>Letter  (8 1/2 x 11 in)</li><li>Legal  (8 1/2 x 14 in)</li><li>A4  (210 x 297 mm)</li><li>A5  (148 x 210 mm)</li><li>A6 Card (105 x 148 mm)</li><li>4 x 6 in</li><li>4 x 8 in</li><li>10 x 15 cm</li><li>10 x 20 cm</li><li>3.5 x 5 in</li><li>5 x 7 in</li><li>13 x 18 cm</li><li>L  (89 x 127mm)</li><li>2L  (127 x 178 mm)</li><li>Hagaki  (100 x 148 mm)</li><li>B5  (182 x 257 mm)</li></ul><ul><li></li></ul> |

21

911767v10 11/3/2008

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3273

| | |
|---|---|
| **Borderless Media Support (Standalone)** | • Yes<br><br>• All sizes listed above excluding Legal and  3 x 5 , 3.5 x 5 , B5 |
| **Duplex** | • No |
| **Media Sense** | • Yes |

## Other Product Specifications

| | | |
|---|---|---|
| **Display** | | |
| | **LED** | • 2 line text LCD |
| **Usage** | | |
| | **Hardware Life** | ▪ Power On Hours (lifetime): 26,280 hours for the system board and power supply<br>▪ Printer: 12K pages<br>▪ Scanner:  12K scans<br>▪ Duty Cycle:  3K pages / month |
| | **Power Supply** | ▪ 25w Universal Supply (P/N 21Y0925) with separate line cord<br>▪ Pre-installed |
| | **Energy Star Compliant, 1 Watt** | TBD |
| **Processor / Memory** | | |
| | **Controller** | Digital: Windu<br>Analog: Hercules (x2) |
| | **RAM** | 64 MB SD-RAM (DDR1)<br>64 Mbit serial flash<br>* Please see Electrical Schematics for latest memory sizes |

## Dimensions and Op Panel Specifications

| | |
|---|---|
| **Physical Dimensions:** | With paper support & exit tray retracted:<br>Width: 486 mm<br>Depth: 337 mm<br>Height: 179 mm<br>With paper support & exit tray extended:<br>Width: xxx mm<br>Depth: xxx mm<br>Height: xxx mm |
| **Weight:** | ▪ xx lbs<br>▪ With installed power supply & excluding printheads |
| **Acoustics Target:** | • Printing  - 40dBA (600  dpi in Normal Quality)<br><br>• Scanning – 50dBA (300 dpi)<br><br>Copying – 40dBA (300 dpi scan/600 dpi Normal Quality) |
| **Op Panel functions:** | ▪ Same as Lexmark |

22

911767v10 11/3/2008

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3274

| Cartridge Management | |
|---|---|
| Cartridge Alignment | Auto-alignment |
| Drop Count Reset: | Automatic |
| Cartridge Install | Printer will not start a print job with the carrier in the install position. |
| **Other** | |
| **Printhead ID Detection** | Yes (recognizes ink fill and part number information on the cartridge) |
| **Cartridge Return Program Support:** | Yes |
| **Printhead Analysis Tool** | Yes (Same as Lexmark) |

| System Requirements | | | |
|---|---|---|---|
| Operating System | Processor Speed (Mhz) | RAM (MB) | Hard Disk (MB) |
| Windows 2000 SP 3 / XP 32 and 64 bit | 800 MHz or higher | 256 | 500 |
| Windows Vista | 1 GHZ 32/64-bit or higher | 512 | 800 |
| Mac OS X 10.3.9 thru 10.5.x | Power PC G3 500 MHz or higher | 256 | 500 |
| Mac OS X 10.4.4 thru *10.5.x | Intel | 512 | 500 |

| Networking and Connectivity | |
|---|---|
| **Networking** | |
| | |
| **Internal Wireless 802.11:** | b - Yes |
| | g - Yes |
| | n - No |
| **N4000e:** | No |
| **N4050e:** | No |
| **N7000e:** | No |
| **N7020e:** | No |
| **Connectivity** | |
| **Bluetooth** | Yes with dongle (No XTHML) |
| PC Interface | ▪ USB 2.0 HS certified |
| PictBridge™ Port | Yes, (high speed) |
| **Quick Connect Laptop port** | • No |

23

911767v10 11/3/2008

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3275

| | |
|---|---|
| **AutoPrint** | Yes |
| **Datastreams** | 600 dpi, 2 bit/pixel Host Based Printing Datastream |

| **Software** | |
|---|---|
| | |

| **Certifications** | |
|---|---|
| **Microsoft Certification** | Yes, Windows XP,  Vista (HCT latest available from Microsoft) |
| **USB Certification** | Yes, Windows, as defined in the following: http://www.usb.org/developers/compliance USB 2.0 High Speed |
| **Environmental Certifications** | Yes, same as Lexmark |
| **PictBridge ™ Certifications** | Yes |
| **EMC and Safety Certifications** | Yes, same as Lexmark |

| **POR Document Changes** | |
|---|---|
| **0.1** | Initial Draft for quote purposes. |
| | |
| | |
| | |

AGREED TO AND ACCEPTED:

███████████████

By: _____
      (Authorized Signature)                                   )

_____
      Name (Type or Print)

_____
      Title

_____
      Date

24

911767v10 11/3/2008

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3276

LEXMARK INTERNATIONAL
TECHNOLOGY, S.A.

LEXMARK INTERNATIONAL, INC.

By: _____
　　　　(Authorized Signature)

By:_____
　　　　　(Authorized Signature)

_____
　　Name (Type or Print)

_____
　　Name (Type or Print)

_____
　　　　Title

_____
　　　　Title

_____
　　　　Date

_____
　　　　Date

25

911767v10 11/3/2008

CONFIDENTIAL - OUTSIDE COUNSEL ONLYA3277

## Attachment 3.0, DEVELOPMENT PROCESS
### Schedule D

█████and Lexmark agree to cooperatively decide on frequency and content to be covered during development reviews. The three (3) tables in this attachment highlight the basic Development Process framework to be followed.  Lexmark will follow its delivery process in order to develop, accept and launch the █████products.  Whenever possible, Lexmark will provide █████ with information necessary for █████ to exit its █████ phases.

Table 1 below covers the basic high level milestones for the development process that require confirmation from both parties and how they align with the █████████ process.



911767v10 11/3/2008

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3278

Table 3 below is a merge of the ████ and the Lexmark Development/Delivery Process for Ink Printers.  Below timeline is not to scale and is a grid that explains the content expected at each build level for Ink printers.



27

CONFIDENTIAL - OUTSIDE COUNSEL ON A3279

**Attachment 3.1, ▮▮▮ PRODUCT DEFINITION**

**Schedule D**

1. Background and Purpose

Lexmark offers a broad portfolio of printing products across mono laser and inkjet. Under the Alliance, ▮▮▮ will leverage Lexmark's products and core strengths.

To facilitate this design concept, focus will be placed on **Early Engagement** and **Interoperability**. These processes will allow the opportunity for Lexmark and ▮▮▮ to collaborate in the development of future product roadmaps and specific product performance and feature specifications.

These design concepts are known as Model 0 and Model 1 engagement. The purpose of this document is to define these concepts (models) for ▮▮▮ Products. It is to be used in preparing Plan of Record (POR) documents for the ▮▮▮ branded products that are awarded as part of the Alliance. Further, once a product is designated as Model 0 or Model 1, any additional ▮▮▮ specific changes to such Product design will result in an increase to the transfer price to ▮▮▮ Lexmark will communicate such increased transfer price to ▮▮▮ before implementing any requested ▮▮▮ specific changes.

When an initial product quote for either BOM/PO cost or NRE is provided, it should be fully based on the definitions/specifications revealed in this document. All ▮▮▮ requests outside of this definition would be considered as Deviations. ▮▮▮ and Lexmark as mutually agreed will implement a plan to manage the process for communicating and establishing Deviations.

2. Scope

    a. This document covers all printer products and options produced by Lexmark for ▮▮▮ that will be sold under the ▮▮▮ logo, on or after the effective date of the Agreement. It is intended that this document refer to details surrounding the product and its associated Hardware, Software, Firmware, packaging and publications. Other aspects of the development program will be captured in the Product Delivery Process Document (MPA Schedule D and/or E, Section 3.0 and related attachments).

3. Definitions and notes

    a. Model 0: A Model 0 product is one that is designed identically to the Lexmark product in all facets, with the exception of branding, which will be unique to ▮▮▮ ID will be Lexmark Industrial Design (ID) with modifications per Section 5 of this document. All Software (SW), Firmware (FW), User Interface (UI) dialogues, publications, packaging, etc <span style="color:red">that supports basic product function</span> will be designed the same as Lexmark, except that the name "▮▮▮" will be substituted for the name "Lexmark." In cases where full artwork is required (packaging, etc) then ▮▮▮-unique artwork will be used.

28

CONFIDENTIAL - OUTSIDE COUNSEL ONL A3280

      b. Model 1: A Model 1 product is a Model 0 product, but with ██ ID language, per the details outlined in section 5.  The same renaming strategy as above will apply.

4.  Documentation

Lexmark will provide POR documents per section 1.0 of the Schedules D and/or E and per Attachment 1.1 (POR Process).

5.  Industrial Design

      a. Whenever use of a ██ Logo or its color(s) is necessary, the Logo and coloring used will be that as defined by ██ corporate specifications.

      b. Model 0: The ██ products will be molded in ██ colors, but using all Lexmark cover parts, with the exception of the part(s) that will hold the ██ logo part ("badge").

          i. Some products may not have designs that are conducive to implementation of the ██ badge.  In these cases, Lexmark will work with ██ on a solution and provide cost effective alternatives.

          ii. Any parts with "Lexmark" on them will be redesigned such that "Lexmark" will be removed or covered permanently (with respect to this reference, "permanently" is defined as having a cover part that is substantial in nature, i.e. made of a plastic material, not simply a label or placard).

      c. Model 1:  for the Model 1 products, Lexmark will design the cover set to best match the ██ ID Language, while maintaining, when possible, the Lexmark Packaging scheme, to allow for best product and shipping cost.  The ID should be designed in a manner to not have any impact to the underlying printer components with the exception of frame attach points.

      d. ██ is to supply color chips (or provide a method for doing so) for each color in each material to be used for said color.  Lexmark is responsible to approve the colors used by its suppliers.  When colors are being used for the first time by Lexmark for ██ Lexmark will inform ██ of final approval and will be provided Lexmark color match results and samples.

6.  Hardware

      a. The internal mechanism of the product will be identical to the Lexmark product, including internal part colors, with the exception of customer touch points.  These parts (including but not limited to Paper guides, Jam release handles, latch/unlatch buttons, etc) are typically colored in a green color for Lexmark, but for ██ products they may follow ██ ID Language specifications.

      b. External user-interface (UI) points (Operator Panel, cable connections, card slots, paper trays, etc) will use the Lexmark Design, with ██ logo added (and Lexmark logo deleted or covered permanently) where necessary.

7.  Supplies

29

CONFIDENTIAL - OUTSIDE COUNSEL ONl A3281

Supplies yield will be established pursuant to the following guidelines:  Any proposed Deviations from the below must be proposed during the early engagement process described in Schedule D Attachment 1.1, and any agreements are documented in a specific product plan of record (POR) and Schedule B.

    a.   For Model 0 printer Supplies, ███ will utilize the same yield cartridges for their equivalent products as offered by Lexmark

 For Model 1 printer Supplies, ███ will utilize either a) existing ███ yields or b) existing Lexmark yields, or c)if it is a new Supplies  family being launched, ███ may select one (1) mid-level mono fill, and one (1) mid-level color fill. ███ will use reasonable commercial  efforts to minimize the number of Supplies SKUs in any event.

8.   Software

    a.   The Software for Model 0 and Model 1 provided to work in conjunction with the ███ product will have the same flow and dialogue screens as the Lexmark branded equivalent product, however all Lexmark branding will be replaced by ███ branding per ███ Corporate logo style-guide requirements.

        i.   Product specific images and bitmaps contained within the Software will be modified using the same manner as the Lexmark equivalent product(s).  For example, the Software sometimes supports multiple products with a single driver and as such there might not be printer specific bitmaps/images used.  It can be a generic bitmap to represent all of supported products.

        ii.   Third party software EULA to be provided by ███ Lexmark will inform of any EULA requirements or changes resulting from Third-party agreements being managed by Lexmark

        iii.   Software Licensing and Distribution agreements will be provided by ███ for any SW not provided by Lexmark.

    b.   Drivers/OS Support

        i.   Drivers supplied for the ███ product will be the same as what is provided for Lexmark product.  All Operating Systems supported by Lexmark will be supported in the ███ product as well, to the same level of support afforded the Lexmark product per Schedule F of the Agreement.

    c.   CD-Based Applications

        i.   Lexmark Software which is necessary for printer function that contains the Lexmark name will have that name replaced with ███ (AIO Center, Toolbox, etc).

        ii.   Third party software (3P SW) can be the same as Lexmark. ███ will pay any royalty or licensing fees for its use, replication and distribution.  Optionally, ███ may choose to source its own 3P SW.  In that event ███ is responsible for all fees for use, replication and distribution for any ███ provided 3P SW.  Further, ███ must ensure that the package fits on the CD space available (as

30

CONFIDENTIAL - OUTSIDE COUNSEL ONlA3282

communicated by Lexmark), and is fully responsible for quality of the product and the relationship with the supplier. Under the same general guidelines, ▮ may opt to provide a 3P SW package on a CD separate from the main Driver set. Any SW or installation process provided by Lexmark will be tested by Lexmark.

d.  Installation/Setup

  i.  (Ink) For USB, Network and wireless setup, ▮ product will follow Lexmark processes, with renaming where applicable.

  ii.  All file names and registry entries will have Lexmark removed from them.

  iii.  All system certifications earned by the equivalent Lexmark product will be applicable to the ▮ product as well at the same release level (Citrix/SAP etc.).

    1.  ▮ will be expected to handle Verisign and cat file submission to Microsoft.

  iv.  Lexmark will provide a Factory Install (FI) Package for each product to be distributed by ▮ to its PC manufacturing locations.

e.  Supplies Management and Reordering

  i.  For Inkjet Printers, both parties will work at early engagement to define and develop an applicable ▮ Consumable Management System.  The Software will direct the user to a generic ▮ defined URL.

  ii.  The Embedded Web Server (EWS), when applicable, will contain a link to the re-order process.

f.  Other software/firmware

  i.  Lexmark will provide other SW features that are released in mainstream Lexmark products.  Examples of this for Inkjets are HAL, NEVIS, and ▮▮▮▮

  ii.  The Parties acknowledge and agree that there are four categories of software and applications included in Lexmark branded products:  Category 1 (included within printer packaging); Category 2 (generic applications); Category 3 (web services); Category 4 (custom applications).  Items that fall into Categories 1 and 2 would include, but are not limited to, items such drivers, firmware, non-third party software, OEM Markvision, and OEM universal print drivers. Category 1 and Category 2 items are included in Model 0 and Model 1 Products.  If ▮ seeks unique customization of any of these applications, ▮ will be responsible for any increased cost.  Lexmark will determine the feasibility and timeline and quote the related NRE for such customization. Items that fall into Categories 3 and 4 would include, but not be limited to, widgets, workflows, customs solutions and applications written for unique customer needs.  Notwithstanding any other language to the contrary in the

31

911767v10 11/3/2008

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3283

Agreement, any Schedule thereto, and/or any Attachment to any Schedule thereto, items within Categories 3 and 4 are not inlcued within Model 0 and/or Model 1.  The parties acknowledge and agree that in order to make Category 3 items available to ███ mutually agreed division of labor with respect to IT infrastructure and applications engineering would be required.  If availability is requested by ███ then after mutually agreed division of labor and pricing are reached, Category 3 items shall be made available.  The parties acknowledge and agree that in order to make Category 4 items available to ███ mutually agreed division of labor with respect to field discovery teams, applications architects, field deployment and maintenance teams would be required.  If availability is requested by ███ then after mutually agreed division of labor and pricing are reached, Category 4 items shall be made available.  Notwithstanding the foregoing, Lexmark shall not be required to make available to ███ Category 4 items in which Lexmark does not have sufficient ownership rights to transfer.

iii.  Lexmark reserves the right to conduct a "limited release" (i.e., limited to Lexmark branded product(s)) of certain product software and/or firmware features in order to evaluate their technical feasibility and/or acceptance in the marketplace.  Once such limited release software/firmware feature is designated in Lexmark's product roadmap to recur in a follow-on generation Lexmark branded product, it will be offered to ███ Lexmark will communicate these deviations starting from the planning phase of a given generation, when they exist and also at any time during the development phase of the program.

9.  Firmware (FW)

   a.  The printer name (e.g. ███ ), model will be loaded into the Firmware of each ███ printer.

   b.  The service tag will be loaded into the product memory.

   c.  Lexmark Firmware will be used and any reference to Lexmark will be replaced with ███

   d.  EWS and any demo page or printed report will carry the ███ name     .

10. Publications

   a.  CDs will contain the ███ specific SW package and will be marked with ███ artwork.

   b.  ███ Publication strategy shall be the same as Lexmark with respect to what specific items are in the finished goods Bill of Material (BOM) per the published publications plan, provided by Lexmark. Modifications to the placemat to accommodate Factory Install procedures are allowed

32

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3284

c.  All manuals, pamphlets, technical sheets, etc. will be relabeled with the ███name, logo (for Model 1 and 0) and artwork (for Model 1), otherwise content, scope, and size is the same the Lexmark branded product.

d.  Any ███ required documents outside the typical Lexmark publications plan will be allowed as Deviations

11. Packaging/Labeling

a.  For the Model 1 product, the final ID design is to be such that it is able to be packaged in the dimensionally same/similar boxes using the same/similar internal packaging design and concepts as the Lexmark Product. This optimization is a primary goal of the ID and is considered achieved if container density is same for ███ as Lexmark.

b.  Product labeling shall be per ███specifications provided such specifications do not incur increased costs versus the packaging specifications for equivalent Lexmark branded products.  Exceptions to this will be managed within the product delivery process.  This requirement applies to originally produced printers, options and Supplies. Service part requirements will be managed within the Service definition agreement.

c.  ███ is expected to have Logo Agreements in place, when needed, for logos that are present on their packaging, pubs, etc. (e.g. Microsoft Windows Logo).

d.  ███ shall engage Lexmark to get the packaging box ready for retail based on ███ provided template and style guide.

12. Regulatory, Environmental, and Safety

a.  ███ products will be certified to the same degree as the equivalent Lexmark product with respect to environmental, regulatory, safety and regional/national certifications.

b.  All certifications for the countries where Lexmark sells its equivalent product will be applied for by Lexmark.  In countries where Lexmark sells the same type (Ink or Laser) but where the product distributed is not the equivalent to that of ███ Lexmark shall assist in the application for ███ Lexmark's activities with regard to products shall be regarded as a deviation, and any costs incurred are borne by ███ ███ is responsible to attain the certifications for those countries outside the Lexmark "country ship-to list". If resources allow, Lexmark may, at ███ cost, provide certifications for these countries.

c.  Lexmark Specifications related to environmental, safety, and regulatory mandates will govern the ███products.

13. Localization and Certifications

33

CONFIDENTIAL - OUTSIDE COUNSEL ONLA3285

a. Lexmark will provide ███ products with the same localization plan as the equivalent Lexmark Product.  This includes: SW, FW, op panel, and pubs.

b. For ███ products, the same regulatory, environmental, and safety certifications will be provided as Lexmark-branded equivalent products.

34

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3286

**Inkjet Schedule D**

**Attachment 3.2, INKJET DEVELOPMENT EVALUATION UNITS**

Inkjet Printers / All-One-Printers:

20 Pre-production units (X-rev samples)
80 validation units (A-rev, pre-mass production units)
100 Total units (includes ship with cartridges)

(These units, at ▮▮▮▮ discretion, may be 110 volt or 220 volt (if available)).

25 additional sets of cartridges will be provided during the development phase

10 items identified as "options" (able to be purchased separately and installed by the customer) for each applicable product shall be provided

35

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3287

**Attachment 3.3, STRATEGIC ENGAGEMENT**

**Schedule D**

Recognizing a ▮ key initiative of "works better together" and Lexmark's reliance on PC attachments for its products, it is in both party's interest to take full advantage of our Alliance relationship.  In the area of interoperability, Lexmark anticipates structuring a lab environment whereby Lexmark and ▮ personnel can work together on this key strategic initiative.  ▮ will provide ▮ current shipping platform information twice yearly. The joint teams should focus on identifying interoperability test environments and coverage for current and new / upcoming technologies with the latest PC and OS platforms. This should be an ongoing effort with identified owners within Lexmark and ▮  These owners should discuss efforts no less than on a quarterly basis.

In the area of sustainability, Lexmark and ▮ will meet two times per year to discuss their respective environmental and regulatory roadmaps and any recent changes.  The goal is to align on strategies and identify areas of disconnect.  Sustainability should also be a topic during Early Engagement to identify related market opportunities and messages.  Each party should identify a key owner and contact point for this effort.  Those individuals should be in contact no less than quarterly and maintain both a short term (<12 month) and a long term (12 months and beyond) list of focus items. Considering that key development decisions are made more than 12 months in advance, the primary focus should be on long-term sustainability (i.e. 12+ months).

36

911767v10 11/3/2008

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3288

**Attachment 3.4, Non-Recurring Expense**
**Schedule D**

## 1.0 NRE CONTENT

In addition to the cost of each product, ███ will pay the supplier for Non-Recurring Expenses (NRE). NRE payment and pricing is explained in the pricing section of the MPA. This NRE will cover the development activities that are unique to the ███ product, per the appropriate Model definition, in the following areas, including but not limited to, hardware, software, firmware, packaging, publications, evaluation units, assembly process, certifications, etc. NRE also includes all necessary tooling for the defined development Model. The NRE per product will be based on the development models per attachment 3.1, where all necessary details are explained. Any changes to the Model definition will be treated and quoted separately as product "Deviations."

Regarding tooling NRE, anytime ███ forecast dictates multiple sets of tools be put in place, Lexmark will inform ███ of this situation and the teams will discuss the capacity levels based on different numbers of tools.

Unless otherwise agreed to in writing, applicable NRE will be identified prior to, or at the time of Product Plan of Record (POR) completion. Any POR change requests from ███ after POR completion may result in additional NRE. All NRE will be reflected in the Schedule B pricing.

## 2.0 DEVELOPMENT MODEL BY PRODUCT CATEGORY

Lexmark and ███ have defined the expected development Model by product category. These are shown in table 2.2 below. This may change in the future as ███ may choose a different development Model and/or categories may be added to or revised.

Table 2.2 – Inkjet Printer Development Model by Category

|          | *Single Function* | *Multi Function* |
|----------|----------------|----------------|
| Entry    | N/A            | 0              |
| Good     | N/A            | 1              |
| Better   | N/A            | 1              |
| Best     | N/A            | 1              |
| Ultimate | N/A            | 1              |

37

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3289

**Schedule D**
**Attachment 4.0, SLC LOCATIONS**

For ▮ branded printer Products, Supplies, and Features, Lexmark shall hold Revolver Inventory in a minimum of 1 location for each region (DAO, EMEA, and APJ). As mutually agreed by Lexmark and ▮ Lexmark may place Revolver Inventory in more than one location within a region, however, by nominating additional hubs, ▮ agrees to accept the costs incurred by Lexmark in normal operation of these additional locations and those additional costs will be reflected as an adder in Schedule B of the MPA. Lexmark may choose to utilize Lexmark Facilities, or locations specified by ▮ as SLC locations (whereby 3rd-party contractors and locations are specified and managed by ▮. Any changes in ▮ designated SLC normal operating costs (whether increased or decreased), and paid by Lexmark will be passed to ▮ as an adder in Schedule B.

The list below contains all current locations in each region in which Lexmark holds Revolver Inventory. For locations not mentioned in this Attachment, the hub structure and associated costs would be subject to mutually acceptable terms as agreed upon by the Parties, and the terms would be recorded in an Amendment applicable to business operations within the related country of the additional location.

**Current WW Locations:**

| s/n | Geo | Country | Location | Products | SLC or Other? |
|-----|------|-------------|----------|-----------------------|------------------|
| 1 | DAO | USA | ▮ | H/W, Supplies | Lexmark Facility |
| 2 | DAO | USA | ▮ | H/W | SLC |
| 3 | DAO | USA | ▮ | Supplies, Feat | SLC |
| 4 | EMEA | UK | ▮ | H/W, Supplies, Feat | SLC |
| 5 | EMEA | Denmark | ▮ | H/W, Supplies, Feat | SLC |
| 6 | EMEA | Spain | ▮ | H/W, Supplies, Feat | SLC |
| 7 | EMEA | Ireland | ▮ | H/W, Supplies, Feat | SLC |
| 8 | EMEA | Cze | ▮ | H/W, Supplies, Feat | SLC |
| 9 | EMEA | Netherlands | ▮ | H/W, Supplies, Feat | SLC |
| 10 | APJ | PRC | ▮ | H/W, Supplies, Feat | SLC |
| 11 | APJ | PRC | ▮ | H/W, Supplies, Feat | SLC |
| 12 | APJ | PRC | ▮ | H/W, Supplies, Feat | SLC |
| 13 | APJ | Korea | ▮ | H/W, Supplies, Feat | SLC |
| 14 | APJ | Malaysai | ▮ | H/W, Supplies, Feat | SLC |
| 15 | APJ | Australia | ▮ | H/W, Supplies, Feat | SLC |
| 16 | APJ | Japan | ▮ | H/W | SLC |
| 17 | APJ | Japan | ▮ | Feat | SLC |
| 18 | APJ | Japan | ▮ | Supplies | SLC |
| 19 | APJ | Japan | ▮ | H/W | SLC |

Based on the above listed locations, the resulting geo cost adders from the US contract price and multiple hub adders are included in Schedule B.

911767v10 11/3/2008

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3290

**Schedule D (Inkjet)**
**Attachment 4.1, DISTRIBUTION COLLABORATION**

As part of a list of cost reduction activities developed during the ▮/Lexmark Alliance discussions, Lexmark and ▮ have agreed to pursue the most efficient and cost effective distribution process leveraging Lexmark's existing order fulfillment processes and service level agreements.  The strategic objective will be to eliminate redundant touch-points between Lexmark and ▮, where possible, and minimize total cost to deliver product to ▮ end-users and resellers.

As mutually agreed, ▮ branded printer Products and Supplies may be shipped from Lexmark directly to ▮ retailers, resellers, or channel partners.   In addition, as mutually agreed, Lexmark may ship all printer Products to ▮ end-users to fulfill orders received via ▮ on-line (direct) channel.  Fulfillment of Supplies received via ▮ direct channel will continue to be fulfilled by ▮ and/or ▮ 3rd-party provider.

In implementing the above strategy, the Parties will first focus on larger scale projects that are capable of being implemented with fewer challenges (logistical, systems compatibilities, etc.) than other available opportunities.   Thus, priority will be given to shipments in the United States.  Priority within the United States will be shipments to ▮ retailers, resellers, and/or channel partners first, and then considerations for shipments in the direct channel.  Elements of this project may include order management, warehousing, distribution, shipping, and reverse logistics.

▮ will retain all customer interactions and financial transactions with ▮ retailers, resellers, channel partners, and end-users.

The price for the above services will be as mutually agreed and will be listed in an amended Schedule B pricing document.  Any non-recurring expenses related to this effort will be identified to ▮ and will be paid by ▮ to Lexmark within the first 12 months after implementation.

39

911767v10 11/3/2008

CONFIDENTIAL - OUTSIDE COUNSEL ONLYA3291

**Schedule D (Inkjet)**
**Attachment 4.2, LAST-TIME-BUY PROCESS**

The joint objective through the last time buy process is to minimize or eliminate any excesses of Products and/or their components.  Thus both parties will follow the below process with an objective of $0 of excess and obsolete materials.  In addition to the process below, both parties will regularly monitor any and all situations that may have an impact on excess and obsolete.

NOTIFICATION:    Lexmark will in most cases provide  with written notice of discontinuance of Products approximately 210 days prior to end of marketing life  The end of marketing life will be determined at the launch of such Product.  This timing assumes marketing end of life will be within sixty (60) days of end of manufacturing.  Within thirty (30) days of such notice of discontinuance, ████must provide Lexmark a 100% committed, non-cancelable purchase order for such discontinued Products, and notwithstanding any other language to the contrary in this Schedule, any other Schedule, and/or the Agreement (as well as any Attachment to any and all of the foregoing):  (a) such order shall specify a lead time to delivery that is no greater than ninety (90) days after the RTS for the follow-on Product (If no follow-on product exists, then a date will be determined by the parties at the time of the LTB Lock (see heading below));  (b) such order shall not be subject to cancellation;  and (c) in no event shall ████be excused from this requirement., Any upside flexibility on these Products will have to be determined and negotiated on a case-by-case basis.  ████ shall pull such inventory by the above specified date.

Both parties will hold a LTB checkpoint 150 days prior to end of marketing life. If ████desires to increase or decrease the LTB quantity, Lexmark will work within its abilities to accommodate all, or a portion, of the request.  In the case of a request to decrease the LTB quantity, ████ will be liable for any related components that are non-cancelable as a result of this action.  This activity's objective would be to reduce the quantity of shorter lead time components and finished goods thus minimizing total expenses, and ████ liability, of any LTB reductions requested by ████

Special circumstances may exist where Lexmark may need to provide ████ with written notice of discontinuance of Products up to 240 days prior to end of marketing life.  The end of marketing life will be determined at the launch of such Product.  This timing assumes marketing end of life will be within sixty (60) days of end of manufacturing.  Within thirty (30) days of such notice of discontinuance, ████ will provide Lexmark a 100% committed, non-cancelable purchase order for the discontinued Products. Any upside flexibility on these Products will have to be determined and negotiated on a case-by-case basis.

In extreme cases where end of marketing life may be in excess of sixty (60) days from the last date of manufacture or is unknown, Lexmark may provide ████ with written notice of discontinuance Products at least one hundred twenty (120) days prior to the last date of manufacture of any Product. Within thirty (30) days of such notice of discontinuance, ████ will provide Lexmark a 100% committed, non-cancelable purchase order for the discontinued

40

911767v10 11/3/2008

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3292

Products. Any upside flexibility on these Products will have to be determined and negotiated on a case-by-case basis.

With each written notice of discontinuance, Lexmark will make every reasonable effort to include with the notice a preliminary view of any liability for finished goods and component excess based upon the 6-month ▮▮MRP available at that time. Lexmark will also provide analyses of why excesses exist. Forecast waterfall analyses using ▮▮ provided 13-week MRPs plus ▮▮ provided monthly sales actual reports will be the primary tools utilized to determine where liabilities fall between parties. In addition, each notification will include a last pull date of ninety (90) days post RTS of the follow on product. If no follow-on product exists, then a date will be determined by the parties at the time of the LTB Lock.

LAST-TIME-BUY LOCK: The ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮will review Lexmark's analysis of excesses and report any discrepancies, if any, back to Lexmark. The goal will be to have agreement between Lexmark and the ▮▮▮▮▮ within 10 days of ▮▮▮▮ initial receipt of the LTB written notification.

Within thirty (30) days of initial receipt of the LTB written notification, each ▮▮ region will submit purchase orders, which will constitute their LTB (Last Time Buy) Lock. When doing so, each ▮▮region will take into consideration any excesses presented from the pre-excess report generated as part of the LTB notification.

RE-ASSESSMENT OF EXCESS: After receipt of ▮▮▮LTB purchase orders, Lexmark will re-assess any excesses that may still exist and target to revert back to ▮▮within ten (10) days any changes from the preliminary view. If excesses still exist, ▮▮regions will confirm LTB upside plan to drive excess depletion, if applicable, or a plan for disposition of excess parts.

DISPOSITION: It will be ▮▮ & Lexmark's joint goal to, in good faith, make all efforts to minimize excesses by exploring opportunities to use any excess materials in other existing or future programs.

Once the final lock of last time buy at EOL has been established, ▮▮will ensure to drive a sales path for depletion of the finished good units by the notification date of last pull. On a case by case basis, Lexmark will review requests by ▮▮to work out special arrangements, which may include ▮▮ paying an inventory carrying cost for Lexmark to continue to hold the inventory.

41

CONFIDENTIAL - OUTSIDE COUNSEL ONlA3293

**Schedule D**
**Attachment 4.3,  RETAIL AND SPECIAL PRODUCT REQUEST LOGISTICS TERMS**

**General Retail Terms:**
1. ███ will negotiate all contracts with the retailer regarding logistics, pricing, charge-backs, etc. prior to shipment of product. ███ will manage all requests from the customer (i.e. no direct calls from the retailer to Lexmark regarding ███ products).  Lexmark is not responsible for any fee structures related to logistics and/or deliveries to the retailer.
2. The retailer will return defective Product to ███ and will be managed per the standard terms of the agreement.  As per the terms, Lexmark will not accept unopened or stock balance retail returns as these are considered the same as customer remorse.


**Additional terms applicable to all special product requests (SPR) which are deviations from the standard combined direct and retail models:**

Lexmark will work in good faith to support ███ SPR needs.  Examples of SPRs include products with alternative color parts (i.e. "red"), uniquely packaged retail SKUs, etc.  Due to the historical level of ███ forecast error, splitting the forecasting across multiple SKUs is expected to further exacerbate this issue.  The higher risk involved in these added SKUs requires additional terms to in order to minimize potential expense.

1. Lexmark will size ███ SPRs on a case by case basis through the POR change request process.  Additional SKUs and changes to SKUs may include NRE, material and logistics costs. These costs will be provided to ███ in response to ███ SPRs and once approved will be added to Schedule B.
2. ███ recognizes it has EOL liability for these unique SKUs and their contents. The teams will mutually agree if these SKUs should be considered EOL prior to the product's program EOL.  If any parts are ordered and no forecast exists for this SKU, the teams will work to utilize these parts as quickly as possibly on other product or Lexmark may need to impose an inventory carrying cost.  If any part is capable of being reworked to another product, ███ will also bear any related cost of this effort – ███ will initiate payment for this scrap within 30 days of receiving the final bill from Lexmark.
3. ███ will pay expediting expenses for this product if expediting is determined by ███ (i.e. Lexmark will not be responsible for air freight or expediting on these unique SKUs unless Lexmark failed to deliver to its commitments where Lexmark will remedy the situation)
4. ███ will adhere to minimum factory order quantities defined by unique SKU. The teams will work out the timing of builds and deliveries. For SLC pull minimum order quantities, ███ will adhere to minimum pulls of 1 pallet per SKU.
5. Unique SKUs will not have 10,10,14 Revolver Inventory and not have the acceleration terms described in Section 4.3.1 of this Product Schedule.
    Service requirements will be reviewed, sized, and agreed to on a case-by-case basis.

42

911767v10 11/3/2008

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3294

**Schedule D (INKJET),**
**Attachment 5.0, SALES & MARKETING ENGAGEMENT**

Given key elements of the Alliance whereby ▮ intends to source all of their Inkjet products (within the Alliance Category) from Lexmark, and those products will be very similar to Lexmark's Branded products (under Model 0 or Model 1 development processes), Lexmark agrees to support ▮ in their Marketing and Sales activities.

Lexmark will provide standard Lexmark product marketing material and training materials for the products equivalent to ▮ which ▮ can modify for their use. Lexmark offers to conduct one "Train the Trainer" session for ▮ in each region (Americas, EMEA, APJ), for each program cycle. All travel expenses for this session will be absorbed by each respective company.

Additionally, Lexmark and ▮ agree to conduct regional sales reviews quarterly, where the companies will review recent sales results and upcoming sales forecasts and activities. Additionally, the teams will review Consumables sales activities and usage, and will explore opportunities to increase consumables sales. A summary of these sales reviews will be included in all Executive Business Reviews (EBR).

Lexmark shall be entitled to eliminate this sales support if ▮ exercises rights specifically granted in Schedule G, Schedule I, Section 4.1.6 of this Schedule D, or Attachment 6.0 to this Schedule D to source an Alliance Plan of Record Product from a supplier other than Lexmark.

911767v10 11/3/2008

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A3295

**Attachment 5.1, MDF PROGRAM**
**Schedule D**

This MDF Program Schedule supplements the terms and conditions of the Master Purchase Agreement dated as of June ____, 2008 (as may be amended or supplemented from time to time, the "MPA") among ████████████████████████████████████████████, on behalf of itself and its worldwide affiliates (████████████████████ and such worldwide affiliates being hereinafter collectively referred to as "████"), Lexmark International, Inc., a Delaware corporation ("LII") and Lexmark International Technology, S.A., a Singapore company and LII's subsidiary ("LITSA") (LII and LITSA being hereinafter collectively referred to as "Lexmark") and Product Schedule D (Inkjet) and E (Mono Laser) to Master Purchase Agreement dated June ____, 2008 among ████ LII and LITSA (the "Product Schedule"). To the extent that there is any conflict or inconsistency between the terms and conditions contained in this MDF Program Schedule and the MDF portion of the MPA, then, except to the extent specifically provided in a mutually agreed and signed agreement or amendment to this MDF Program Schedule, the terms of this MDF Program Schedule shall prevail.

| **MDF Terms and Conditions:** | |
|---|---|
| A. | Unless otherwise agreed by the parties, the Marketing Development Funds (the "MDF") provided under this MDF Program Schedule shall only be used to support the Program Deliverables set forth below. |
| B. | The parties shall meet quarterly to determine the subsequent period marketing activities to which the MDF shall be applied. The MDF may only be applied to marketing activities approved by Lexmark. |
| C. | ████ will make available at Lexmark's request backup documentation supporting ████ reimbursement request. Lexmark may only request backup documentation consistent with the Proof of Compliance section below and relative to ████ current or past immediate quarter's marketing activities. Lexmark reserves the right to deny any claims where required documentation for reimbursement is not available or is incomplete. |
| D. | The marketing development program ("Program") shall be run at the sole discretion of Lexmark and may be cancelled at any time on reasonable notice to ████ For the avoidance of doubt, any such cancellation shall only affect the status of amounts as marketing development funds, and shall not affect the other obligations of the parties under the MPA, including without limitation Lexmark's other obligations under the MDF Section of the Program Schedule. |
| E. | Lexmark reserves the right to audit, upon reasonable notice and at its sole expense, the Program, to the extent such documentation relates to Lexmark's payment of MDF. The audit shall be conducted by a third party auditor from a national firm, which has been agreed to by the parties and shall be limited to ████ current or immediate past quarter's marketing activities. |

| *A.   Fiscal Year:* | *B.   FY__* |
|---|---|

44

911767v10 11/3/2008

| C. | *Fiscal Quarter:* | **D.** |
|---|---|---|
| E. | *Segment:* | **F.    *See attached Marketing Plan and Program Detail Form*** |
| G. | *Program Description:* | To provide services at the request and sole discretion of Lexmark for Lexmark funded reimbursements. |

| | |
|---|---|
| **Program Objective:** | To provide reimbursable marketing services for Lexmark as specified in program deliverables below. |
| **Program Deliverables:** | The Program will include several events and activities to be executed by ▮ between _____ 2008 and _____ 2009 (▮ Fiscal Quarter _____). <br><br> MDF are intended for the following events / activities (see attached Marketing Plan and Program Detail Form for a listing of specific deliverables), which may be replaced by other mutually agreed upon events/activities per any future amendments to this document. |
| **Partner Payment Details:** | Lexmark shall pay forty-five (45) days after invoice by ▮ |
| **Proof of Compliance (POC) Details:** | See attached Program Detail Form for Proof of Compliance details |

Q_____                                Fax to:        ▮
May 2008 – _____ 2009
▮Branded Lexmark Printers/Consumables Marketing Plan

Lexmark Contact Information:

| Participant Address: | | |
|---|---|---|
| City | State | Zip |
| Marketing Contact: | | Phone |
| Marketing Contact Title: | | Fax |
| | | Email |

Lexmark Bill To Information:

| Bill to Address | | |
|---|---|---|
| City | State | Zip |
| Accounting Contact | | Bill to Phone |
| | | Bill to Fax |
| Is PO # required for invoicing?  YES    NO    If yes, please provide PO#: | | |

45

911767v10 11/3/2008

**CONFIDENTIAL - OUTSIDE COUNSEL ON**|A3297

**Program Name:  Quarterly** ██ **Branded Lexmark Printer/Consumables S&P Marketing Program**

**MDF:**

_____

██ **Contact:**

---

IN WITNESS WHEREOF, the parties hereto have caused this MDF Program Schedule to be executed by their duly authorized representatives.

AUTHORIZED SIGNATURES (Lexmark):    LEXMARK INTERNATIONAL, INC.

By: _____

_____
(Print Name)

_____
(Print Title)

LEXMARK INTERNATIONAL TECHNOLOGY, S.A.

By: _____

_____
(Print Name)

_____
(Print Title)

██████████████████████████

By: _____

_____
(Print Name)

_____
(Print Title)

46

911767v10 11/3/2008

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3298

**Attachment 6.0, QUALITY AGREEMENT**
**Schedule D**

- Purpose: To documents the basic agreement between ███ and Lexmark regarding Quality Management of ███ Products supplied by Lexmark

- Scope: Applies to all ███ printer products and options produced by Lexmark with a ███ Logo. Applicability is from the Early Engagement phase through End of Service Life (EOSL).  This document is intended to provide guidance for all products and eliminate the need for submission of a Quality Management Plan for each product. This document will apply to the products listed in Attachment 6.2

- Lexmark will have a person assigned to ███ as the Global Quality Account Manager (GQAM) that will be responsible to implement the quality processes contained herein.

- Phases of Quality Engagement

    a) Early Engagement

During this period, Preliminary Field Incident Rate (FIR) and Initial FIR (IFIR) goals are established for each product based on predecessor product performance and expected feature and technology enhancements. Goals for each product will be documented in attachment 6.2. For those products with different options (Base, Network, Wireless, etc) the goals will be unified into one for each metric for all offerings of the same product

    b) Design Quality

Supplier shall work with ███ to ensure design quality that meets ███ Engineering specifications. In the event that a business disruption (delayed RTS, stop ship, field excursion, safety incidents, etc) caused by lack of engineering rigor or due diligence on the part of Lexmark occurs, Lexmark agrees to take aggressive action to address/remedy the situation and re-instate the continuity of supply in the shortest time possible. These actions may consist of on-site support, improved warranty terms, or other actions that will improve the customer experience and ability to meet customer demand.

    c) Kickoff

    i) At Kickoff, as the Product Plan of Record (POR) is communicated, the FIR/IFIR goals are reviewed and documented, taking into account any changes to predecessor product performance and added features.

    ii) In the event that the predecessor product is not yet launched, the goals will be set by the current product that most resembles the product in question, based on market placement and technical similarities

47

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3299

      iii) Development team shall provide Risk Analysis to cover new elements of product, process, production site etc ( ███████████ )

d)  Development

    i) Occasionally FIR/IFIR goals may need to be updated to accommodate POR changes that occur after Development Kickoff

    ii)  During the later development builds (Proto 3, PMP, etc), Factory quality is monitored using a "Safe Launch" methodology per Lexmark process.  Lexmark and ███ core teams will review manufacturing quality data as it becomes available, typically within 5 working days of the build.  Data should include First Pass Yield (FPY) and yield for post-production testing. Top issues should have corrective actions identified

    iii)  Printer Factory Audits will be conducted per Lexmark Process. Lexmark will report satisfactory completion of the audit and a summary report based on ███ QPA requirements prior to Pre Mass Pro build.

       (1)  ███ may audit a new printer factory supplier at their request, with a minimum of **30** days notice, in writing to the Lexmark Program Manager

e)  Supplier and Sub Tier Supplier Management

    SUPPLIER is responsible for quality management of its suppliers, with the exception of ███ managed parts and commodities.  SUPPLIER shall actively implement a Sub-Tier Supplier Management program to meet the requirements of the Sub-Tier Supplier Management Audit Checklist per Supplier Quality Management Plan.

f)  SOP (Mass Production)

Lexmark is responsible to test and validate production level products per its established factory testing and validation processes. When products are found to be deficient, Lexmark is responsible to carry out corrective action measures to correct the root cause, when possible.

    i) Factory Quality Reporting

       (1)  Early Phase (Safe Launch): During this period, Lexmark will provide factory quality reporting on a weekly basis which will include FPY and post production testing status, including a summary of  fallout and corrective action plans for top issues

       (2)  Steady State. Factory Quality data will be maintained per Lexmark standard process.  Lexmark will maintain this data per ISO guideline and will provide for review when needed

       (3)  Manufacturing Quality and Test (MQT) Plan

          Supplier shall be responsible for their manufacturing quality and test plan completion prior Qualification build and shall contain the following elements:

          a)  In Process Quality Checks

          b)  End of line test procedures

911767v10 11/3/2008

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3300

    c)  Out of Box Audit process and failure criteria

    d)  Pre Ship Audit process and failure criteria

    e)  Corrective Action and reporting process

  ii)  Traceability

Lexmark will apply its traceability process for ▮ products and will maintain the data, and shall provide on an "as-needed" basis

g)  Post-RTS Quality Maintenance

  i) War Room (RTS to RTS +90 or until on path to goal)

Lexmark will meet with ▮ on a weekly basis to review data and corrective action summary of top issues.

The SUPPLIER is responsible for its obligations specified in Section 6.3 of the Agreement, regardless of whether such Epidemic Failure occurs within or outside the warranty period described in Section 4.1(a) of the Agreement.

The SUPPLIER must meet product quality goals mutually agreed, for the designated program or product. ▮ will provide SUPPLIER with quality failure data. Failure Incident Rate (FIR) data includes all ▮customer dispatches/ replacements regardless of subsequent failure analysis classification. Data related to ▮customer calls and contacts may be provided for product trend analysis and issue resolution.

SUPPLIER will analyze data, implement statistical triggers to identify trends and quality excursions, drive to root cause and implement corrective actions with approval from ▮ Quality Engineering.

  ii)  Steady State

Quality reporting for Products not performing to goal (>20% above IFIR goal and/or over goal for two consecutive months), will be provided at a frequency of weekly and for products performing at goal or past End of Production Life, Lexmark will provide updates at a frequency of once monthly until End of Marketing Life.

SUPPLIER should expect to identify the root cause with substantiating data and act on the corrective action plan to an agreed timeline to correct the situation. Supplier will provide parts and resource necessary to support and remedy the situation.

  iii)  Failure Analysis (FA)

Lexmark shall be responsible for conducting printer FA. Because of a high level of product similarity, Lexmark branded FA can be used to subsidize that of ▮branded.

The FA function must provide timely and competent services inclusive onsite at ▮ facility. FA results and trends are to be reported to ▮on a weekly basis. Based on findings, the supplier is responsible for initiating issue containment and taking closed loop corrective action. Failure

<div align="center">49</div>

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3301

Analysis may include (but not be limited to): warranty service parts, reliability excursions and spare parts repair excursions.

FA on consumables will utilize both ███ and Lexmark returns. Reporting will be on an as-needed basis.

Unless mutually agreed otherwise, Lexmark will provide a dedicated engineer on site at ███ facilities in ███ for purposes of failure analysis support.

iv) Closed Loop Corrective Action

In the event of a stop ship or significant line-down situation, Lexmark will inform ███ as quickly as possible, typically within 24 hours, providing the basics of the issue and current plans for containment.

Lexmark will then provide Containment action plan within the next 24 hrs. Action toward containment will be implemented as quickly as possible.

Though each case is unique, this process will typically involve problem validation, root cause analysis, leading to a corrective action plan. This plan will be provided in the subsequent 24-48 hrs and will contain appropriate action to contain and correct the issue as needed

In addition, regular updates to ███ by the Lexmark Quality and Sustaining team will be part of this process.

v) Ongoing Reliability Testing

Lexmark will perform ORT per standard Lexmark process and will provide test results upon completion of each round of testing. Test results may involve Lexmark branded product where leveraging is possible

H) End of Marketing Life (EOML)

Upon EOML, all quality reporting will cease. In the event that a customer issue is identified after EOML, but during the standard warranty period, Lexmark will be required to respond to address and correct the issue, if necessary and reasonable

I) Change Management

Refer to sustaining engagement and support: schedule 6.1

5) Other

The following provision shall not limit or reduce Lexmark's obligations herein with respect to quality goals, requirements and commitment, but shall be applicable only for determining whether ███ may be excused from its obligations under 1.7.1 of Schedule G. If the ███ field incident rate (i.e., confirmed failure) ("FIR") with regard to a specific Alliance Ink Jet Printer is greater than ████ ████ of the FIR for the previous generation model of such printer or

50

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3302

the initial FIR goals for such printer if there were no previous generation model, █████ will send Lexmark written notice thereof.  Within thirty (30) days of such written notice, Lexmark shall formulate and begin implementation of a corrective action plan designed to reduce the FIR for such printer to a rate that is better than or equal to the FIR of the previous generation model or the initial FIR goal if there were no previous generation model.  Should Lexmark fail to formulate and begin implementation of a corrective action plan within such 30-day period, and should ███ wish to be excused from the obligations contained in Section 1.7.1 of Schedule G, then ███ shall within 30 days send written notice of its intent to be excused from such requirements.  Upon Lexmark's receipt of such written notice, the Parties will utilize the escalation process set forth in such Alliance Schedule.  If, however, at the conclusion of the escalation process the Parties have not reached agreement, ████ shall be excused from the obligations of Sections 1.7.1 for such printer.

51

911767v10 11/3/2008

CONFIDENTIAL - OUTSIDE COUNSEL ONLYA3303

**Attachment 6.1, SUSTAINING ENGINEERING ENGAGEMENT**
### Schedule D

1) At RTS (for ████████) the product moves into the "Sustaining Phase. This phase has 4 key focus areas:

   a) Response to technical issues in the field, including IFIR/FIR rates and Quality excursions

   b) Engineering Change Notifications and Management

   c) Customer Technical Escalation Management

   d) Special Product Request Response

2) Technical Field Issues

   a) IFIR Response

   Lexmark is responsible to implement Failure Analysis and, when needed, corrective action to reduce IFIR and FIR.  Priority is given to products that are not achieving IFIR goal

   b) Quality Excursions/Product Holds

   Lexmark will communicate product hold and stop-ship information to ████ and will drive action to contain product in Lexmark Inventory.  When necessary, ████ core team will drive containment actions for products in ████ possession. Lexmark will be fully responsible for all activities necessary to correct the issue, using Lexmark internal processes.  Necessary communications between Lexmark and ████ Engineering will be per an agreed methodology and will follow Lexmark's corrective action process (8D, 5C, etc)

3) Bill of Material (BOM) and Engineering Change (EC) Management

Lexmark is responsible for maintaining the BOM and the corresponding Revision Level to each product.  Lexmark will manage Engineering changes for ████ products in parallel with those of the equivalent Lexmark branded products.  All changes will be processed per current Lexmark process. Details regarding specific changes will be made available on request.

   a) Critical changes, defined as those which result in a change in the product revision level, will be communicated to ████ through their change management system, ████ Lexmark will still maintain ownership and responsibility of the EC and, as such, ████ approval will not gate implementation.  This includes changes to the following:

   i) Changes to Part numbers of the printer, pub kit or Service parts

   ii) Changes to any safety related items or other items that affect regulatory and/or certification requirements

   iii) Changes that are as a result of a "major" IFIR issue.  These should be very limited in nature (less than 1 per product), meant to track an urgent change brought about by a large upward trend in IFIR

911767v10 11/3/2008

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3304

b) Supplier Declaration of Conformity (SDOC) PN lists will be updated as needed to attach to the SDOC provided during the development phase

c) For EC implementations, the ▮ service parts disposition should be the same as Lexmark's service parts disposition for the equivalent Lexmark branded products.  When the EC is  unique to ▮ product, ▮ will be consulted to develop a mutually agreed to appropriate service implementation / disposition strategy.  For any mutually agreed to non- Use As Is  (UAI) EC implementations due to design or manufacturing error, Lexmark will rework or scrap,  at Lexmark's expense, the ▮ Service inventory impacted by the change.  ▮ will support this activity by consolidating and moving inventory to designated locations at Lexmark's cost.  Good inventory quantities will be mutually agreed upon, and may require a full inventory exchange based upon severity of Lexmark design or manufacturing error or component quality problem.  The service EC process is defined in Schedule C: Support Attachment C-10 ECO Process Flow.
**Minimum Ship Revision:**  Lexmark shall ensure that all printers and spare parts, new and repaired/reworked, conform to the Minimum Ship Revision level for both hardware and firmware.  MSR is to be established during the EC Process and will be based on that of the equivalent Lexmark product.  Further, service products should achieve service readiness such that no change in Printers and Spare Parts is required prior to shipment to the field.

4) Customer Technical Escalation Management

a) Lexmark will subscribe to ▮▮ system and respond to customer escalations from ▮ Technical Support.

b) Lexmark is open to direct engagement with ▮customers involved in escalations, including travel to customer sites if needed

5) Special Product Request (SPR) Management

a) Lexmark agrees to assist ▮with SPRs for large accounts that require more technical information than usually provided to a customer

b) SPRs that result in modifications to product and/or process may result in additional NRE, in accordance with Attachment 3.4 of this Schedule

6) Engagement

a) Lexmark will be responsible to maintain the Sustaining Action Item list

b) Lexmark commits to Sustaining engagement a minimum of twice monthly to review the Sustaining Action Items

911767v10 11/3/2008

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3305

**Schedule D**
**Attachment 6.2, QUALITY GOALS**

| Product | IFIR Goal | FIR 90 | 1 Year FIR | 2 Year FIR | 3 Year FIR |
|---|---|---|---|---|---|
| ██████ | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | Canceled by ██ | | |
| | | | Canceled by ██ | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

54

911767v10 11/3/2008

CONFIDENTIAL - OUTSIDE COUNSEL ONLY

A3306

**Attachment 8.0, EMERGING COUNTRIES SCHEDULE**
**Schedule D**

Each company desires to sell printers in Emerging Countries in a profitable way.  Both companies recognize that the current economics in these markets for a lifetime printer placement are weak.

Therefore, mutually the two companies set the following targets for these countries:

a) Both companies must be profitable over the lifetime of an Emerging Countries printer placement. ██ recognizes that Emerging Countries financial returns are not figured into ██ overall profit targets for the printer business.  In other words, when ██ is calculating their overall margin for their respective printing businesses, Emerging Countries revenue and margin will not be part of measuring themselves against the target.

b) Support ██ corporate priority of selling ██ printers into Emerging Markets.

Given overall weak economics in these countries, the two companies must engage to develop specific business models and/or product sets to accomplish these targets.  This unique business model may include

a) Unique products or product configurations that drive a lower cost
b) Unique product or support offerings (ie 90 day warranty) that drive a lower cost
c) Unique consumables or consumables programs that may drive improve loyalty and/or profit
d) Focused marketing efforts to target higher usage segments (Govt., SMB…)
e) Lexmark and ██ will work to define a  fulfillment and service and service strategy for each emerging country in which Products are launched

Emerging Countries include, but are not limited to:

Brazil
Russia
India
PRC
Argentina
Mexico
Columbia
Turkey
Ukraine
South Africa
Indonesia
Philippines
Thailand

55

911767v10 11/3/2008

CONFIDENTIAL - OUTSIDE COUNSEL ON A3307

**Attachment 9.0, DATA COLLECTION**

Schedule D

**TO THE
███ / LEXMARK
MASTER PURCHASE AGREEMENT**

a)     ███ and Lexmark have agreed, as stated herein, to a collaborative effort to collect user data for certain ███ branded inkjet printer products.  ███ branded printer models supplied by Lexmark to ███ may be added by mutual agreement of the parties and, once added, will be considered "Enabled Printers". The parties may add  future Enabled Printers by adopting the terms and conditions of this Attachment through an express reference to this Attachment in an amended Inkjet Schedule B document (or other Product related Schedule, or a specific Product Plan of Record document as defined in Attachment 1.1 of this Schedule D) relating to such new Products.    Lexmark will endeavor to have the data recording software program created by Lexmark substantially meet the requirement set forth in **Exhibit 1,** ███ ███ Functional Summary.  As part of the installation process of the printer drivers for Enabled Printers, those end-user customers electing to voluntarily participate in this program will have the option to opt-in for this data collection effort and will have the program loaded onto their system.  Lexmark may modify the terms of such opt-in and not accept, or no longer accept or collect, any information if in its reasonable opinion that such collection may be adverse to Lexmark and/or ███ interests (e.g., change in country/state laws regarding privacy rights).  For customers of Enabled Printers whose printer usage data is collected, the installed program is intended to automatically collect certain data about their Enabled Printer usage and send it via the internet to Lexmark.  The parties agree that the main purpose of collecting this data is data aggregation to better understand user requirements.  On a monthly basis, Lexmark will move the collected Enabled Printer data into a database and Lexmark will provide the database to ███ via a link (https://secure.lexmark.com/███).  The database format could be modified, from time to time, as cartridge technology changes, or other needs arise.  Once in the database, Lexmark will maintain 3 months (rolling) of data via the link above, but only ███ will have the ability to run reports on the data to categorize and summarize how ███ users operate their Enabled Printers.

(b)     Lexmark agrees that it will only access the individual Enabled Printer database specifically compiled for ███ and referenced in section a), in order for a database administrator to be able to see the data records in order to fix material problems with the database.  There will be no additional charge to fix material problems with database data.  For example, if ███ runs a report that queries all users that replaced ink in February, and the report comes back empty, the data base administer will need to look at the ███ data to see why it is not showing up on the report.  The cost of any additional services will be agreed upon by the parties.

(c)     ███ will provide aggregated, non-customer specific data to Lexmark on a quarterly basis.  This aggregated, non-customer specific data will contain the data listed in **Exhibit 2** to this Attachment, and may be updated from time to time with mutual agreement between Lexmark and ███

(d)     The parties agree that ███ shall own the data collected from Enabled Printer customers and Lexmark shall only have access to the aggregated, non-customer specific data in sub-section (c) above. Except for the aggregated, non-customer specific data as provided in sub-section (c), the individual Enabled Printer data will be considered ███ confidential information.  Lexmark shall protect this ███ confidential information in the same manner as it protects its own confidential customer data.  In the

56

911767v10 11/3/2008

CONFIDENTIAL - OUTSIDE COUNSEL ONLY   A3308

event ▮ requests it, Lexmark shall reasonably assist ▮ in returning or destroying any or all such individual Enabled Printer data per ▮ requirements.

(e)     While ▮ may use the Enabled Printer data in any legal manner not restricted below, the parties intent is for ▮ to use the Enabled Printer data to assist ▮ in the sale of ▮ branded products supplied by Lexmark. ▮ shall expressly not use the Enabled Printer data for any service-based offering that is competitive to Lexmark's Managed Print Service offerings and solutions including, but not limited to, using the Enabled Printer data as part of a paid for service or solution to provide consulting services or cost based billing. However, this restriction shall not prevent ▮ from using the Enabled Printer data in engaging any end-user in a consumable marketing program (i.e., marketing program for replacement of ink-jet or laser supplies). This restriction shall survive the termination of this Attachment.

(f)     Notwithstanding anything else in the Agreement or this Attachment, THE ENABLED PRINTER DATA COLLECTION EFFORT IS PROVIDED "AS-IS". LEXMARK MAKES NO WARRANTIES, WHETHER EXPRESS OR IMPLIED, WITH RESPECT TO THE ENABLED PRINTER DATA COLLECTION EFFORT UNDERTAKEN UNDER THIS ATTACHMENT INCLUDING BUT NOT LIMITED TO ANY WARRANTIES OF MERCHANTABILITY, NON-INFRINGEMENT OR FITNESS FOR A PARTICULAR PURPOSE. LEXMARK DOES NOT WARRANT THAT THIS ENABLED PRINTER DATA COLLECTION EFFORT WILL MEET ▮ REQUIREMENTS, OR THAT THE ENABLED PRINTER DATA WILL BE ERROR-FREE OR USABLE FOR ▮ REQUIREMENTS. THIS ATTACHMENT SETS FORTH THE ENTIRE OBLIGATION OF LEXMARK WITH RESPECT TO THE DATA COLLECTION. EXCEPT FOR INDEMNIFIED MATTERS, IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR LOSS OF PROFITS, INDIRECT, SPECIAL, INCIDENTAL, PUNITIVE, CONSEQUENTIAL, OR EXEMPLARY DAMAGES ARISING OUT OF OR IN CONNECTION WITH THIS ATTACHMENT OR ANY ACTS OR OMISSIONS ASSOCIATED THEREWITH OR RELATING TO THE USE OF THE ENABLED PRINTER DATA, WHETHER SUCH CLAIM IS BASED ON BREACH OF WARRANTY, CONTRACT, TORT OR OTHER LEGAL THEORY AND REGARDLESS OF THE CAUSE OF SUCH LOSS OR DAMAGE OR WHETHER ANY OTHER REMEDY PROVIDED HEREIN FAILS. EXCEPT FOR INDEMNIFIED MATTERS. EACH PARTY'S TOTAL LIABILITY FOR ANY DAMAGES, HOWEVER BASED SHALL NOT BE IN EXCESS OF ▮

(g)     ▮ agrees to indemnify, defend and hold Lexmark, its subsidiaries and its employees harmless from and against any and all claims (including costs of litigation and attorney fees) asserted against any of them which arise out of (i) ▮ use of the Enabled Printer data, or (ii) for violation of any law or regulation, or (iii) the acts or omissions of ▮ The foregoing indemnification obligations shall not apply to claims, actions or suits resulting from Lexmark's negligence.

(h)     Lexmark agrees to indemnify, defend and hold ▮ its subsidiaries and its employees harmless from and against any and all claims (including costs of litigation and attorney fees) asserted against any of them which arise out of (i) Lexmark's use of the Enabled Printer data, or (ii) for violation of any law or regulation, or (iii) the acts or omissions of Lexmark. The foregoing indemnification obligations shall not apply to claims, actions or suits resulting from ▮ negligence.

(i)     This Attachment shall continue until the Agreement is terminated or either party terminates this Attachment for convenience upon ninety (90) days written notice to the other. Upon termination of this



57

911767v10 11/3/2008

CONFIDENTIAL - OUTSIDE COUNSEL ONLY   A3309

Attachment, Lexmark will no longer collect Enabled Printer data, Lexmark will destroy all copies of any individual Enabled Printer data that it may posses and cease providing ███ with Enabled Printer data.

This Attachment is the complete and exclusive statement of the terms herein and supersedes any and all prior oral or written communications between the parties relating to the subject matter hereof.

IN WITNESS WHEREOF, the parties hereto have caused this Attachment to be executed by their duly authorized representatives as of the day and year first written herein.

**Lexmark International, Inc.:**                   ████████████████████

By: _____          By:_____
         (Authorized Signature)                        (Authorized Signature)

Title: _____          Title: _____

Date: _____          Date: _____


**Lexmark International Technology, S.A.:**

By: _____
         (Authorized Signature)

Title: _____

Date: _____

58

911767v10 11/3/2008

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3310

**Exhibit 1 to Attachment 9.0**

██████████████ Functional Summary

System Description

██████████████ records and manages information captured during customer use of ███ CPD printer and AIO products. Current information can be archived at programmable intervals to capture historical "snapshots" of usage patterns over an extended period of time. Current and archived information is saved on the customer system and periodically uploaded to a server for detailed statistical analysis. The intervals between data retrievals to the Internet are programmable and updated during each data retrieval operation.

██████████████ consists of a Data Recorder component, a Data Retriever component, and "instrumentation hooks" in the host software and standalone AIO firmware. The host software "instrumentation hooks" use APIs supported by the Data Recorder to record/count some customer activity information. The Data Recorder encapsulates the format of the customer activity information stored on the customer PC, controls the historical archive "snapshots," fetches customer activity information from the standalone AIO firmware, and "exports" customer activity information to the Data Retriever component. The Data Retriever component controls the uploading of customer activity information to the server, launches customer surveys, and tracks the time intervals required between archival "snapshots" and data retrieval operations. The Data Retriever component also captures customer system information and, optionally Statistics File information, for inclusion in the customer activity information uploaded to the server.

**Exhibit 2 to Attachment 9.0**

AGGREGATED DATA PROVIDED BY █████ TO LEXMARK.

1) Product usage (pages) by product, over time
2) In the event █████ aggregate sales volumes for Alliance Inkjet Printers and/or Alliance Laser Printers respectively is allocated to at least 30 percent in the retail channel, Page usage data (over time) from retail sales by retail store type MM,CES, OSS

59

911767v10 11/3/2008

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3311

**Attachment 10.0**
**Sample Import/Export Questionnaires**

## 1.  Encrypted Software Export Controls

In accordance with the U.S. Export Administration Regulations, certain software and items possessing encryption capabilities may require formal export licenses before they can be exported and/or re-exported from the United States.

It is essential that you complete the questions on the following page in order to make proper licensing determinations of your software and/or commodity.

Please send an e-mail to the ███████████████████ mailbox if you need assistance or have questions.

If your software has not been classified and you have questions on how to classify your software, refer to the BIS (Bureau of Industry and Security) Website at http://www.bis.doc.gov  for guidance.

If you are unable to provide the information required, please forward this questionnaire to your Export Controls or Legal department.

This is a legal matter which deals with regulations on export controls and compliance. We trust we can count on your maximum cooperation in providing us with the requested information by return fax to ████████

Yours truly,

████████████████████████

60

911767v10 11/3/2008

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3312

II.

III.      SOFTWARE QUESTIONNAIRE

     **A.**      Company Name**:**

_____

     B.      Product name & version number: _____ Country of Origin: _____

     C.      Export Commodity Control Number (ECCN): _____ License Exception: _____

     D.

     E.      If the License Exception is ENC, has the one time review for Retail Exemption occurred? YES NO

**CCAT number: _____**
**If the product is 5D002 - ENC, please provide a copy of the BIS classification verification (CCAT).**

1. What is the functionality of your software (i.e.: word processing, engineering/design, communication, operating system, etc.)? _____

2. What type of equipment is the software used to support (i.e.: telecommunications, manufacturing/test, computers, etc.)? Please be specific._____

3. Is your software available to the public via sales from stock at retail selling points by means of "over–the-counter" transactions, mail order, or telephone call transactions (Mass Market)? _____ **If yes, please forward a copy of BIS approval.**

4. Is your software designed for installation by the user without further substantial support (substantial support does not include telephone (voice only) help line services for installation or basic operation, or basic operation training provided by the supplier? _____

5. Does your software or commodity have encryption capabilities? _____

     **If the answer to question 5 above is "No", you do not need to complete the remaining questions on this form.**

911767v10 11/3/2008

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3313

6.  What function does the encryption provide (i.e.: password protection, data encryption, etc.? Please be specific.

    _____

7.  Does the data encryption algorithm exceed a key space of 64 bits?

    _____

8.  What is the specific bit level of encryption?

    _____

9.  Does your software or commodity allow the alteration of the data encryption mechanism and its associated key spaces by the user?

    _____

10. Please provide a brief written summary of the encryption technology used in the design of the software or commodity in question.  Please be sure to identify the type of algorithm used.

    _____
    _____

    _____
    ___

11. Is there an **EXPORT** version of the software named above?

    _____

**This form Completed by:**

Name:     _____    Title:    _____    Signature:
_____

(Please print name)

Date:     _____    Phone    #:    _____    Email:
_____

    _____

62

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3314

# HARDWARE QUESTIONNAIRE (Please complete 1 questionnaire for each item.  Attach additional pages if necessary)

**F.**    Company Name & Address**:**_____

_____

_____

**G.**

**H.**    Vendor product name & vendor part #: _____

**I.**    ███ part #(if available): _____*If a kit, please fill out for entire kit. Please provide an HTS for each component of the kit.

**J.**    Country of Origin: _____ Address of Origin: _____

**K.**    Harmonized Tariff Schedule Number (HTS): _____

**L.**    FCC #: _____ FDA model #: _____    Export Commodity Control Number (ECCN): _____

**License Exception: _____ If ENC, does the product qualify for Unrestricted status? Yes____ NO____**

**CCAT#: _____(if applicable)**

12. Please provide the functionality of your product.
_____
- If there are drivers, diagnostic or application software, please provide classification below:
- ECCN_____    License Exception (if Applicable):_____

13. If product is a CRT (cathode ray tube) monitor or flat panel monitor?   If so please include dot pitch.
_____

14. If product is a NIC/Ethernet Card, is it integrated on the motherboard?  If so, please include the vendor information.
_____

15. Power Supplies, please provide voltage/ Amps / period of hours / current output.
_____

16. Internal/External Drives: please provide maximum bit transfer rate (mb/s) as stated under the Export Administration Regulations §774 category 4. _____

17. If the product is an Adapter/Controller Card: please specify bit to Fiber, bit PCI to Ultra3 SCSI, or if embedded as stated under the Export Administration Regulations §774 category 4.
_____

911767v10 11/3/2008

CONFIDENTIAL - OUTSIDE COUNSEL ONLA3315

18. Does your product contain Encryption?  Yes___  NO___  If yes, please provide encryption key size and if it is an asymmetric algorithm or symmetric algorithm as stated under the Export Administration Regulations §774 category 5 part 2.
_____

19. Monitors:  Please provide the number of resolvable  elements per centimeter in the direction of the maximum pixel density:
_____

20. Batteries:

| Project (Cell Type) | ▮Part Number | 75 Cycle Capacity (Wh) | Weight (g) | Energy Density (Wh/kg) |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

**This form Completed by:**

Name (printed) _____ Title _____

Signature: _____Date _____ Phone #_____ Email_____

64

911767v10 11/3/2008

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3316

**Attachment 11.0, ALLIANCE FUNCTIONAL OWNERS**

| FUNCTION | |  | Lexmark |
|---|---|---|---|
| Legal | | | Andy Logan |
| Logistics/Supply Chain | | | Thomas Morrison |
| Sales Support | USA | | Ken Kerkhoff |
| Sales Support | EMEA | | Francis Rogard |
| Sales Support | APJ | | Wendy White |
| Technical Collaboration | Inkjet | | Mike Wilson |
| Technical Collaboration | Laser | | Rob Marshall |
| Pricing Methodology | | | Joseph O'Nan |
| ECO management | | | Bryan Tauzer |
| Service (call center) | | | Phillip King |
| Quality | | | Bryan Tauzer |
| Forecast (demand/supply) | | | Kelly Tyler |
| Product road map | Inkjet | | Jane Lloyd |
| Product road map | Laser | | Marty DeGraff |
| | | | |
| Relationship Mgmt | | | Chris White |
| Alliance Mgmt | | | Terry Samuel |

65

911767v10 11/3/2008

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3317

PRODUCT SCHEDULE E (LASER)
# Table of Contents

**PRODUCT SCHEDULE E (LASER) TO MASTER PURCHASE AGREEMENT** ...........................1

**1.0 SCOPE AND SPECIFICATIONS** ...................................................1

**2.0 PRICING** ...................................................................1

**3.0 PRODUCT DEVELOPMENT & TECHNICAL ENGAGEMENT** .......................2

    3.1    MODEL 0, MODEL 1 DEFINITION:........................................2

    3.2    EVALUATION UNITS: ..................................................2

    3.3    STRATEGIC ENGAGEMENT ...............................................2

**4.0 LOGISTICS: DELIVERY, FORECASTING, FLEXIBILITY** ..................2

    4.1    DELIVERY OF PRODUCTS AND PO MANAGEMENT ...........................2

    4.2    FORECASTING........................................................5

    4.3    FLEXIBILITY .......................................................6

**5.0 MARKETING and SALES ENGAGEMENT** ...............................7

    5.1    MARKETING DEVELOPMENT FUNDS (MDF) ................................7

**6.0 QUALITY AND SUSTAINING ENGAGEMENT** ............................8

**7.0 TERM AND TERMINATION** ........................................8

    7.1    GENERAL: ..........................................................8

    7.2    TERMINATION........................................................8

    7.3    PROGRAM SURVIVAL: ................................................8

**8.0 EMERGING COUNTRIES** ..........................................9

**9.0 OTHER** .......................................................9

**Attachment 1.0, PRODUCT PLAN OF RECORD (POR)** ...................11

**Attachment 1.1, PLAN OF RECORD PROCESS** ........................12

**Attachment 1.2, PRODUCT PLAN OF RECORD (POR) SAMPLE** ...........17

**Attachment 3.0, DEVELOPMENT PROCESS** ...........................17

**Attachment 3.1, ▮▮▮ PRODUCT DEFINITION**........................19

**Attachment 3.2, LASER DEVELOPMENT EVALUATION UNITS** ............25

**Attachment 3.3, STRATEGIC ENGAGEMENT** ..........................26

**Attachment 3.4, NON-RECURRING EXPENSE**..........................27

**Attachment 4.0, SLC LOCATIONS** .................................29

**Attachment 4.1, DISTRIBUTION COLLABORATION**.....................30

**Attachment 4.2, LAST-TIME-BUY PROCESS** .........................31

**Attachment 4.3, RETAIL AND SPECIAL PRODUCT REQUEST LOGISTICS TERMS** ...............31

**Attachment 5.0, SALES & MARKETING ENGAGEMENT** ..................34

**Attachment 5.1, MDF PROGRAM** ...................................35

**Attachment 6.0, QUALITY AGREEMENT** .............................38

**Attachment 6.1, SUSTAINING ENGINEERING ENGAGEMENT** .............42

**Attachment 6.2, QUALITY GOALS** .................................44

**Attachment 8.0, EMERGING COUNTRIES SCHEDULE** ...................45

**Attachment 9.0, TONER, CARTRIDGE COLLECTION AMENDMENT** .........46

**Attachment 10.0, SAMPLE IMPORT/EXPORT QUESTIONNAIRES** ..........55

**Attachment 11.0, ALLIANCE FUNCTIONAL OWNERS** ...................60

**CONFIDENTIAL - OUTSIDE COUNSEL ONLY**
A3318

PRODUCT SCHEDULE E (LASER) TO MASTER PURCHASE AGREEMENT

This Product Schedule E (Laser) to Master Purchase Agreement (this "Product Schedule") is entered into as of November 1, 2008 (the "Schedule Effective Date") by and between ███ ██████████████████████████████████████████████████████████████████ on behalf of itself and its worldwide affiliates ██████ and such worldwide affiliates being hereinafter collectively referred to as █████ Lexmark International, Inc., a Delaware corporation ("LII"), and Lexmark International Technology, S.A. a Swiss company and LII's subsidiary ("LITSA") (LII and LITSA being hereinafter collectively referred to as Lexmark). As used in this Product Schedule, the term "Party" means Lexmark or ████ and the term "Parties" means Lexmark and ████

This Product Schedule provides additional terms and conditions to the Master Purchase Agreement having an effective date of November 1, 2008 between ████ and Lexmark (the "Agreement"). All terms and conditions of the Agreement apply to this Product Schedule and the terms and conditions of this Product Schedule are hereby incorporated by reference into the Agreement. Defined terms used herein but not otherwise defined herein shall have the meanings given such terms in the Agreement. In the event of a conflict between this Product Schedule and the Agreement, this Product Schedule shall govern.

All of the products described in this Product Schedule shall be deemed "Products" under the Agreement.

## 1.0    SCOPE AND SPECIFICATIONS

The terms and conditions of this Schedule E (Laser) apply only to laser printer Products and their related Supplies. As used in this Schedule E (Laser), the term "Products" excludes inkjet printers and inkjet Supplies, as well as the options, features, and spare parts thereto. Descriptions and specifications for Products shall be listed in a mutually executed Product Plan of Record document as described in Section 4.3.1 of Attachment 1.1 to this Schedule E (a sample template of the Product Plan of Record document may be found at Attachment 1.2 to this Schedule E). As used in this Agreement, and notwithstanding their inclusion in a mutually executed Product Plan of Record document, this term "Products" also excludes software, web applications, and support for web applications. Terms and conditions relating to software are contained in Schedule F.

The Products will be either Model 0 or Model 1 class products as defined in Attachment 3.1 to this Schedule E (Laser).

In the planning and development stages, preliminary Product specifications will be discussed and identified through the process described in Attachment 1.1 to this Schedule E (Laser).

## 2.0    PRICING

(a)      Initial pricing for the Products shall be determined as set forth on Schedule B to the Master Purchase Agreement.

(b)      Product transfer pricing methodology is described in Schedule I to the Agreement.

## 3.0     PRODUCT DEVELOPMENT & TECHNICAL ENGAGEMENT

With respect to each of the Products, Lexmark shall follow Lexmark's process of development, testing, delivery and acceptance requirements, and where mutually agreed, bridge to ██ processes as described in Attachment 3.0.  Without limitation of the foregoing, Lexmark shall ensure that reasonable volumes of Products meeting the requirements of this Product Schedule and the Agreement are available for purchase and resale by ██ and delivery to ██ customers worldwide no later than thirty (30) days after Lexmark's availability of the related Lexmark-branded Product, dependent upon ██ adherence with the Product Specifications and Development Engagement Model.

## 3.1     MODEL 0, MODEL 1 DEFINITION:

Future product definitions are to be aligned with Lexmark branded products and will follow one of the development models described in Attachment 3.1.

## 3.2     EVALUATION UNITS:

Lexmark shall provide to ██ for each printer Product  model, the number of printer units listed in Attachment 3.2 of this Schedule E (Laser), to be used by ██ only for purposes of evaluation.

## 3.3     STRATEGIC ENGAGEMENT

Lexmark and ██ shall comply with the requirements of Attachment 3.3 attached to this Schedule E (Laser).

## 4.0     LOGISTICS: DELIVERY, FORECASTING, FLEXIBILITY

## 4.1     DELIVERY OF PRODUCTS AND PO MANAGEMENT

4.1.1   The parties acknowledge and agree that Products may be provided to ██ in two ways: (a) from an approved Supplier Logistics Center ("SLC"); or (b) directly to ██ without use of an SLC.  The parties recognize that some terms and conditions will be the same in both situations and others terms may vary depending on the method by which ██ receives the Products.  The following terms and conditions shall apply whether or not Products are delivered to ██ using a SLC:

2

A3320

(a)  Lexmark shall fill all ███ purchase orders (or pull orders, in the case of an SLC) (each may sometimes be referred to herein as a "PO") that specify quantities that do not exceed the forecast and acceleration uplifts permitted in Sections 4.2 and 4.3 of this Schedule E (Laser) and shall use commercially reasonable efforts to reduce the lead-time during the term of this Agreement.  If Lexmark believes any shipment may not be delivered on schedule (and without waiver of any rights by either party), Lexmark must provide advance notification to ███ and Lexmark and ███ will mutually agree on a corrective action plan which may include shipping the Product by airfreight or other expedited routing at Lexmark's expense.  ███ may cancel or reschedule any past-due deliveries on ███ PO(s) unless delayed shipment is mutually agreed in advance.  If only a portion of the Products are available for shipment to meet the delivery date, Lexmark shall notify ███ as soon as practicable and ship the available Products unless otherwise directed by ███ may return any unauthorized under-shipment or any over-shipment or any portions thereof, at Lexmark's expense upon prior notification to Lexmark.  Failure or delay by ███ carrier to pick up Products is not deemed to be a late delivery.

(b)  Lexmark Product Packaging and Labeling.  Lexmark will handle, pack, mark and ship the Products in accordance with Lexmark's standard packaging.  For spare parts, ███ will use Lexmark's generic parts packaging.  Product labeling shall be per ███ specification if required by Attachment 3.1 to this Schedule E. Lexmark may consider deviations from Lexmark standard packaging, as necessary, to support ███ business needs.

(c)  Lexmark must test, verify and qualify Products in accordance with Attachment 6.0, Quality.

(d)  ███ shall transmit ███ PO(s) by facsimile or other agreed upon means to cover ███ forecasted requirements for the Products for the two (2) months following the transmittal of the PO (unless such other time period is specified in a Product Schedule).  Such ███ PO(s) will be continually updated to reflect ███ next two (2) month forecast (unless such other time period is specified in a Product Schedule).  Lexmark shall send ███ an acknowledgement within two (2) business days of receipt of the ███ PO confirming the quantity, delivery date and delivery location(s).  Lexmark may not reject any ███ PO if the quantity reflected therein is consistent with ███ most recent rolling six (6) month forecast.

(e)  ███ transmission of a PO is Lexmark's only authorization to deliver Products to ███ and invoice ███ for the part numbers and quantities set forth in the ███ PO.  Title and risk of loss to Products shall not pass to ███ until ███ takes physical possession and control at the applicable ███ manufacturing facility (███, applicable ███ manufacturing facility, ███); provided, however, that if ███ elects to contract with a third party common carrier for the transportation of Products from the SLC or other ███ specified location to the applicable manufacturing facility, ███ assumes risk of loss upon physical possession and control of Products by such common carrier.

(f)  Except as expressly set forth in this Agreement, any expenditures or commitments by Lexmark in anticipation of ███ requirements shall be at Lexmark's sole risk and expense.

4.1.2  The following terms and conditions shall apply when Products are delivered to ███ using a SLC:

3

A3321

(a)    Unless ███ specifically requests that Products be delivered directly to ███ all Products delivered under this Agreement to ███ for manufacturing and service shall come from inventory held by Lexmark at an approved SLC (such Lexmark inventory is hereinafter referred to as "Revolver Inventory"), or Lexmark may use its own facilities, or contractor facilities, ("Lexmark Facilities") to meet the inventory and delivery requirements of the Agreement. Lexmark agrees to maintain an SLC at the locations listed in Attachment 4.0. Any changes or additions to a SLC location shall be approved by the Parties.

(b)    Lexmark shall maintain Revolver Inventory at each SLC in quantities equal to (a) for the first two months of ███ fiscal quarter, ███ most recent ten (10) day forecasted demand requirements for the applicable ███ location unless otherwise agreed to in writing by the applicable ███ region; or (b) for the third month of ███ fiscal quarter, ███ most recent (14) day forecasted demand requirement for the applicable ███ location. Lexmark shall replenish the Revolver Inventory as necessary to ensure the required Revolver Inventory level is available on hand at all times thru End of Marketing Life of any Product. ███ and Lexmark shall meet periodically for an inventory pipeline assessment. At such meeting, inventory status at both ███ and Lexmark shall be reviewed, along with any changes in ███ demand for the Products. Placement of Revolver Inventory by Lexmark in conformance with ███ forecast does constitute a commitment by ███ to acquire such Products.

(c)    In the event that ███ requests that Supplier utilize used or repaired parts to meet the needs of ███ service department, such used or repaired parts shall be clearly marked as used or refurbished.

4.1.3    The following terms and conditions shall apply when Products are delivered to ███ without using a SLC:

(a)    Lexmark shall schedule delivery of each Product to the delivery location on the delivery date listed in the ███ PO. Delivery shall not be deemed to be complete until all Products have been actually delivered to the applicable delivery location. Lexmark shall not make deliveries more than three (3) days earlier than the delivery date. If Products are delivered more than three (3) days early, ███ may, at its option: (i) refuse to take possession of all or some of the Products in which case Products that are returned shall be redelivered only upon ███ instructions; or (ii) store the Products at Lexmark's risk and expense and delay processing the corresponding invoice until the agreed to delivery date.

(b)    For delivery of Products to a location other than a SLC by Lexmark, all ███ PO's are subject to acceptance by Lexmark with Lexmark's response provided to ███ within two business days of receipt of such PO's.

4.1.4    With respect to the Products purchased by ███ under the terms of this Agreement, unless expressly stated in a Product Schedule, the following provisions shall apply: ███ may (a) increase the quantities scheduled to be delivered to ███ upon five (5) days advance notice; (b) reschedule the delivery of Products upon seven (7) days advance notice; or (c) cancel ███ POs with fifteen (15) days advance notice, with the exception of Last-Time-Buy purchase orders.

4

4.1.5   Lexmark and ██ have agreed to work on a project of Distribution Collaboration, further defined in Attachment 4.1.  As a result of this project some of the above terms could be revised, as mutually agreed.  In that event, an amendment to this Schedule E (Laser) will be mutually executed.

4.1.6   The following provision shall not limit or reduce Lexmark's obligations herein with respect to providing the forecasted Products to ██ but shall be applicable only for determining whether ██ may be excused from its obligations under Section 1.7.2 of Schedule G. The Parties will track the accuracy, expressed as percentage, of ██ MRP each month as forecast two months earlier (i.e., the absolute value of one, minus total pull orders received for that month divided by quantities specified by ██ MRP for such month submitted two months earlier) (the "██ MRP Accuracy" or the "MRP Accuracy") as described in footnote 1 below.  In the event that Lexmark, in relation to all pull orders received during any consecutive 30-day period that are consistent with the forecasting provisions of Section 4.2 of this Schedule E (Laser) and the acceleration tolerances of Section 4.3 of this Schedule E (Laser), with regard to any Product model(s) ordered, provides less than ninety percent of such Product quantities that are indicated by an average MRP Accuracy during the immediately preceding six-month period for such Product model(s),[1] then ██ shall be entitled to send Lexmark written notice within 14 days.  Such notice shall specify any Product model(s) for which Lexmark failed to achieve such average MRP accuracy.  Lexmark shall have 30 days time after receipt of the notice to formulate and implement a corrective action plan.  If, during the next 30 consecutive days following the implementation of such corrective action plan, Lexmark fails to supply ordered Product in quantities equal to or greater than an average MRP Accuracy during the immediately preceding six-month period,  then ██ shall be excused from the obligations of Section 1.7.1 and 1.7.2 of Schedule G with regard only to the Product model(s) specified in ██ notice described in this Section.  Notwithstanding the foregoing, ██ shall not be excused from the obligations of Sections 1.7.1 and 1.7.2 of Schedule G (and Lexmark shall not be required to implement any corrective action plan) if:  (a) any pull order(s) described above specified Product quantities in excess of amounts forecast as permitted by Section 4.2 of this Schedule E (Laser), and/or (b) any pull order(s) described above ordered Product quantities in excess of the acceleration tolerances permitted in Section 4.3 of this Schedule E (Laser).

## 4.2   FORECASTING

---

[1] ██ must issue a ██ MRP each month, or the last issued ██ MRP will be used for purposes of tracking Lexmark's obligations in Section 4.1.6 above.  Each ██ MRP will forecast pull orders for several time periods, including pulls to occur two months following issuance of the ██ MRP.  By way of illustration:  Assume ██ MRPs issue from January to June forecasting the following pull orders for the period two months later:  Jan MRP:  1100 units per Product model to be pulled on 3/1; Feb. ██ MRP:  1100 units per Product model to be pulled 4/1; March ██ MRP:  1100 units per Product model to be pulled on 5/1; April ██ MRP:  1100 units per Product model to be pulled on 6/1; May ██ MRP:  1100 units per Product model to be pulled on 7/1; June ██ MRP:  : 1100 units per Product model to be pulled on 8/1.  Assume further that all of the foregoing forecasts are within the tolerances permitted in Section 4 above.  Assume further that ██ actual pull orders for the months forecast occur as follows:  March pulls: 1000 units per model; April pulls:  500 units per model; May pulls:  1200 units per model; June pulls:  500 units per model; July pulls:  1200 units per model; August pulls:  500 units per model.  ██ MRP accuracy for each month  forecast is as follows:   March:  91%, April:  45%; May 91%; June:  45%; July 91%; August:  45%.  ██ average MRP accuracy for the months of March-August is thus 68%.  ██ July MRP for September delivery is 1100 units.  Sixty eight percent of 1100 units is 748 units.  Ninety percent of 748 units is 673 units.  Accordingly, to avoid the notice described in Section 4.6 above, Lexmark need have available for pulling during the month of September no more than 673 units per model, plus its DSI requirement for each model.

5

4.2.1    On approximately a weekly basis, ███ shall provide rolling thirteen (13) week forecasts of projected purchases of Products for specified locations.  On approximately a monthly basis, ███ shall provide rolling six (6) month forecasts of projected purchases of Products for specified delivery locations (including without limitation SLCs) (the "███ MRP" or "███ MRP," as posted on ███████ system).  The Parties acknowledge and agree Lexmark will rely on such forecasts for ordering component parts and scheduling production. On a quarterly basis, ███ shall provide a twelve (12) month forecast of projected purchases of Products by region.  Such forecasts are for planning purposes only and shall not constitute a commitment of any type by ███ (except as stated in the LTB Process defined in Attachment 4.2, or as stated in section 4.3.2).  No later than five (5) days after receipt of the ███ six (6) month forecast, Lexmark agrees to confirm supply for a rolling three (3) month period (current month plus two (2)).  Confirmation of the forecast by Lexmark shall constitute a commitment by Lexmark to provide the forecasted quantities of Products to ███ if ordered by ███████ and Lexmark shall meet periodically for an inventory pipeline assessment.  At such meeting, inventory status at both ███ and Lexmark shall be reviewed, along with any changes in ███ demand for the Products.

4.2.2 Lexmark agrees to use commercially reasonable efforts to fulfill ███ upside demands from the forecasted quantities and the Acceleration requirements provided in Section 4.3.1.  Lexmark must accept any ███ PO consistent with these commitments, but for commercially reasonable reasons, Lexmark may reject any ███ PO if the quantity reflected therein is inconsistent with these commitments.

## 4.3    FLEXIBILITY

### 4.3.1    ACCELERATION:

███ may, without cost or liability (except as set forth in Section 4.1, 4.2, or Attachment 4.2), increase the quantities scheduled to be delivered to ███ or a third party  from amounts forecast in the ███ MRP as follows:

| Days from planned delivery to ███ | Acceleration Amount from ███ MRP |
|---|---|
| 0 – 30 | |
| 31 – 60 | |
| 61+ | |

This upside flexibility is in addition to the Revolver Inventory requirement indicated in Section 4.1.2b, and is not cumulative. All acceleration capability will be contingent and capped upon tooling and capacity available for each program.  Lexmark will routinely provide ███ a view of product capacity profiles to jointly assess any decisions needed surrounding capacities.

Lexmark will provide, per ███ request, its factory production flexibility.  This may be different by supplier and product family.  ███ intends to use this information to better manage its processes to align processes to Lexmark and Lexmark suppliers' production capabilities.

6

4.3.2   **RESCHEDULE AND CANCELLATION:**

Lexmark will work with ▆▆ in any instances where demand is not materializing as anticipated which would require deferment of the supply flow.  Each case will be handled individually, but ultimately the LTB "Last Time Buy" process, as defined in Attachment 4.2, will be utilized to establish inventory and long lead component liabilities and requirements between parties at the end of each program.  If the position presents itself that would require cancellation of supply, then Lexmark will work in good faith to cancel finished good production, where possible, with the manufacturing ODM. As in the case of re-schedule, the LTB "Last Time Buy" process described in Attachment 4.2 will be utilized in firming-up final liabilities and requirements between parties at the end of each program.  In the event that ▆▆ MRP (or, with regard to liability for long lead time parts (e.g., ASICS, xxx), ▆▆ 12-month forecast described in Section 4.2 of this Schedule E (Laser)) is reduced, or ▆▆ elects to discontinue a Product before the "Last Time Buy" opportunity described in Attachment 4.2, and such would result in excess Product inventory and/or long lead time component inventory (whether on hand or as a result of commitments made to Lexmark's suppliers) for Lexmark because of actions taken to satisfy prior ▆▆ forecasts and/or acceleration requirements (section 4.3.1), then Lexmark will identify any such resulting inventory and/or commitments, and ▆▆ shall be responsible for ordering such inventory and purchasing such components. Lexmark will in good faith search for means to minimize excess inventory and components by exploring opportunities to use excess parts and materials in other existing or future programs.

4.3.3   **EXCESS INVENTORY:**

In the event any inventory on any specific Product grows to an inventory level that exceeds fifty (50) days of ▆▆ most recent forecasted demand requirements, due to ▆▆ underachieving forecasted demands, then ▆▆ will provide a plan to reduce the inventory level within the following 30 days to an acceptable level mutually agreed upon by both parties.

4.3.4   **RETAIL & SPECIAL PRODUCT REQUESTS**

Any special Product request may have special logistics terms applicable, as defined in Attachment 4.3 hereto.

5.0   **MARKETING and SALES ENGAGEMENT**

Lexmark and ▆▆ shall comply with the requirements of Attachment 5.0 attached to this Schedule E (Laser).

5.1   **MARKETING DEVELOPMENT FUNDS (MDF)**

The Lexmark shall pay to ▆▆, and/or certain ▆▆ affiliates designated by ▆▆ from time to time, an amount of ▆▆ of Product purchases, less amounts for Product returns, price protection, other marketing support, and/or any other credits.  This effectively equals ▆▆ calculated as ▆▆ of the total amount of purchases made by ▆▆ (whether purchased for resale directly to ▆▆ customers, for resale to resellers, or for other purposes, but excluding Internal Use) under this Product Schedule during any ▆▆ fiscal quarter. Lexmark shall pay such amounts (collectively, the Section 5.1 Amounts") within forty-five (45) days after invoice by ▆▆ and/or such ▆▆ affiliates.  Except as may be otherwise specifically designated by ▆▆ and/or the relevant ▆▆ affiliate from time to time, all amounts payable to

7

██████ or any ████ affiliate under this Section 5.1 shall be paid by wire transfer of immediately available funds to such accounts as ████ may designate from time to time.  The parties will execute one or more MDF Schedules substantially in the form attached as Attachment 5.1 to this Product Schedule (each an "MDF Schedule") with respect to the Section 5.1 Amounts.  The additional provisions of the relevant MDF Schedules shall apply to such Section 5.1 Amounts.

**5.1.1**   In addition to the MDF described in Section 5.1, Lexmark will pay to ████ a flat rate MDF payment according to the table below for each below specified laser printer unit sold through by ████ to end users, net of returns, price protection, and other credits.  MDF will be paid quarterly upon receipt of sell-through documentation that must be provided by ████.

<div align="center">MDF Table</div>

| Category | MDF Amount |
| --- | --- |
| Entry | |
| Mainstream | |
| Advanced | |
| Performance | |
| Performance Plus | |

## 6.0    QUALITY AND SUSTAINING ENGAGEMENT

With respect to the products, Lexmark shall provide Quality and Sustaining support through end of Product manufacturing.. Lexmark is responsible to set and communicate quality targets for each product, and engage in activities to ensure products meet those targets. ████ and Lexmark will meet on a regular basis to provide status of the currently shipping products, to include Quality metrics and Sustaining activities, including primarily Engineering Changes, Customer Escalations, Special Bids and Corrective Actions in response to Quality issues. Processes governing these activities are in Attachments 6.0 (Quality) and 6.1 (Sustaining Engagement).

## 7.0    TERM AND TERMINATION

### 7.1    GENERAL:

Unless this Product Schedule is early terminated as provided herein, and subject to earlier expiration or termination of the Agreement, the term of this  Product Schedule shall begin on the Schedule Effective Date and shall continue until June 30, 2017  provided,  however, that this Schedule E shall be automatically extended for additional three (3) year renewal terms, upon the expiration of the initial term or any such renewal term, unless either Party provides notice of non-renewal to the other parties at least  one hundred and eighty (180) days before the end of such initial term or any such renewal term.

### 7.2    TERMINATION.

Either party may terminate this Schedule, with or without cause, on 12 months' advance written notice.

### 7.3    PROGRAM SURVIVAL:

████ and Lexmark  agree  that  upon  termination  of  the  Agreement,  or  any  related  Schedule,

<div align="center">8</div>

including, but not limited to this Product Schedule, or any ongoing program or business award, all of the terms and conditions of this Agreement and any related schedule shall survive until the end of life date ("EOL") of any and all programs affected by such termination, including Products currently in production or in development.  In addition, all service and support terms, including the manufacture, sale and support of systems, cartridges, parts, and supplies, for such programs shall survive for the period of time specified in Section 2.3 of the Agreement.

## 8.0    EMERGING COUNTRIES

Lexmark and ▮▮▮ shall comply with the requirements of Attachment 8.0 attached to this Schedule E (Laser).

## 9.0    OTHER

(a) With prior Lexmark approval, and subject to their written agreement to abide by all workplace conduct and safety requirements of Lexmark, ▮▮ personnel, from time to time, may work at Lexmark's premises and/or the product manufacturing/repair locations, and Lexmark will provide any such personnel with reasonable assistance related to the relationship established by this Program Schedule, including a safe and efficient workspace and access to appropriate personnel and other resources of Lexmark.

{Remainder of page intentionally left blank}

9

IN WITNESS WHEREOF, the parties hereto have duly executed this Product Schedule by their respective duly authorized officers to be effective as of the Effective Date as first written above.

███████████████████████

By:

Title:

Date:


**LEXMARK INTERNATIONAL, INC.**

By:

Title:

Date:


**LEXMARK INTERNATIONAL TECHNOLOGY, S.A.**

By:

Title:

Date:

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3328

## Attachment 1.0, PRODUCT PLAN OF RECORD (POR)
### Schedule E

Each Product will be defined by a specific Plan of Record (POR) document.  This document should be completed at development kick-off and signed by all parties.  Any POR changes should be documented and retained.  The POR management process is defined per Attachment 1.1.

The POR should contain all of the specifications, features, functions (including corresponding consumables and features) necessary to develop and deliver the Product.  A sample POR is included as Attachment 1.2 for reference.

The following Table 1.0b will be completed and maintained to track Printer Products that have, or will have, a POR document.

| Table 1.0b -- MONO LASER Products | | | | | |
|---|---|---|---|---|---|
| Product Code Name | Product Category | Predecessor Product | Estimated RTS | POR Complete? | Comments |
| | Entry (SF) | | Mar 10 | N | |
| | Entry (SF) | | Mar 10 | N | |
| | Entry (MF) | | N/A | N | |
| | Mainstream (SF) | | 4Q 10 | N | |
| | Mainstream (SF) | | 4Q 10 | N | |
| | Advanced (SF) | | 4Q 10 | N | |
| | Mainstream (MF) | | 4Q 09 | N | |
| | Mainstream (MF) | | N/A | N | |
| | Performance (SF) | | 4Q 09 | N | |
| | Performance (SF) | | 4Q 10 | N | |
| | Advanced (MF) | | 4Q 09 | N | Complementary class, Plus Product |
| | Performance + (SF) | | 4Q 09 | N | Complementary class, Plus Product |
| | Performance (MF) | | 2Q 10 | N | Complementary class, Plus Product |

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3329

**Attachment 1.1, PLAN OF RECORD PROCESS**

**Schedule E**

Schedule G to the Agreement, among other things, defines the Alliance Plan of Record and an information sharing process between the Parties concerning their respective future product roadmaps.  This Attachment 1.1 to Schedule E (Laser) provides additional detail regarding the information to be shared, the time frame in which ▮▮▮ must exercise its rights contained in Section 2.0 (including subparts) of Schedule G, and the point at which NRE expenses will be incurred by ▮▮ in the event that a future product program is canceled (i.e., ▮▮▮ makes a decision to abandon such industry segment serviced by the Product or to terminate the Agreement and or this Schedule E (Laser)).

Joint future product planning will proceed through four phases:  (1) Early engagement, (2) Schedule G Escalation, (3) Product definition, (4) Development kickoff.

Unless expressly stated otherwise in this Attachment 1.1 to Schedule E (Laser), in the event of a conflict between this Attachment 1.1 to Schedule E (Laser) and Schedule G, Schedule G shall govern.

Notwithstanding any language to the contrary in this Attachment 1.1 to Schedule E or in Schedule G, the Parties acknowledge and agree that in the event Lexmark concedes a prospective Product does not substantially conform to ▮▮▮ requirements for purposes of Section 1.7.2 of Schedule G, then Lexmark shall so inform ▮▮ only in writing and only from either its:  (a) Director of Alliances; (b) Vice President of Alliances; or (c) Printing Solutions Services Division President.  The parties acknowledge and agree such communication from any other Lexmark employee(s) shall be invalid.

## 1.0    Early Engagement

1.1    As required by Schedule G, the Parties shall develop and exchange, on a regular and timely basis, their respective product roadmaps, including the specifications described in Schedule G and other information described in this Attachment 1.1 to Schedule E (Laser).  Notwithstanding any language to the contrary in Schedule G, ▮▮▮ product roadmap shall include ▮▮▮ expected ready to ship date ("RTS") for each product listed in ▮▮▮roadmap, as well as the expected end of life date.

1.2    Notwithstanding any language to the contrary in Schedule G, during this early engagement phase, the Parties also shall share the following information with regard to future product planning:

1.2.1    Marketing members from both ▮▮▮and Lexmark shall share information on industry research, industry trends and opportunities, customer/user needs, product requirements etc to so align on marketing strategy.

1.2.2    Top level features should be discussed, such as speeds, features, planned RTS, retail and direct strategy, as well as localization and distribution plans. New initiatives (i.e. RED and emerging countries) shall be shared where available.

1.2.3    In addition, in support of the product engagement discussions delineated above, engineering members from both ▮▮▮ and Lexmark shall meet in product engagement sessions to discuss specific needs for the next generation of products. These discussions

12

should cover Product Technology, features & solutions, speeds, yields, print quality, industrial design, software, firmware, etc.

1.3    The information exchanged as described in Section 1.1 and 1.2 above will be used by the Parties to prepare a preliminary joint roadmap describing the future Products. ███team shall then present to executives for approval in the ████████process, called ████████████████████) session.

1.4    For each future Product, the early engagement phase should end 18 months before the first RTS identified by ████for such future Product.

## 2.0    Schedule G Escalation

2.1    Notwithstanding any language in this Attachment 1.1 or in Schedule G to the contrary, ████shall exercise its rights contained in Section 2.0 (including all subparts) of Schedule G no later than 18 months before the RTS first identified by ████for such future Product. No NRE liability will be incurred until the NRE lock described in Section 4.3 below.

## 3.0    Product definition

3.1    At conclusion of the early engagement phase with respect to each future Product per the Alliance POR Roadmap, Lexmark will prepare a "Preliminary Product Plan of Record Document v0.1." This document shall include a description of the specifications for the Product, details regarding expected industry positioning, expected yields and sales volumes for the related Supplies, expected printer sales volumes, any other necessary information reasonably required for product definition and analysis, expected RTS, and expected end of life. Preliminary Product Plan of Record Document v0.1 should be targeted for completion no later than 18 months before RTS.

**3.1.1**    In addition, Between 18 and 17 months before the RTS described in Section 2.1 above, Lexmark will prepare and submit to ████a preliminary plan of record roadmap (i.e., a reference document that lists those future Products expected to be included in the Alliance Plan of Record at the conclusion of the development kickoff meeting described in Section 4.0 below).

## 4.0    Development Kickoff

4.1    As soon as practicable after creation of last Preliminary Product Plan of Record Document v0.1 for any future Products identified in the early engagement process, the Parties shall hold a development kick-off meeting. Before this meeting, Lexmark will provide, for each such future Product, a "POR Document v 1.0", "SW Specs/Statement of Work v0.1" (this document shall comprise a preliminary software specification for the prospective Products), and "FW Specification v0.1" (this document shall comprise a preliminary firmware specification for the prospective Products).

4.2    By the end of the development kick-off meeting, the Parties should complete the following objectives:

   a)    Creation of the industrial design for each future Product;

   b)    Work items identified for closure based on ████review of POR Document v1.0 will be listed in a gap sheet, which both teams will work to resolve to reach Plan Phase Exit (per ████████████);

   c)    Product quality goals should be established;

   d)    Closure on Service Requirements per Schedule C;

13

e)  Closure on financial position (refer to Section 2.0 Pricing of Schedule), including cartridge yield analysis;

f)  Mutual execution of the Final Alliance Plan of Record;

g)  Changes made after the agreement at Kick-off meeting will require POR change process described in section 5.0 of this document.

## 4.3    **NRE Lock**

4.3.1  On the last day of the kickoff meeting described in Section 4.2 above, the Parties shall mutually agree upon an Alliance Plan of Record document(s) sufficient to describe the entire future Product portfolio.  The Alliance Plan of Record document may comprise a single listing of products and/or a series of mutually executed documents referring to individual Products (each a "Product Plan of Record").

4.3.2  The mutually executed Alliance Plan of Record documents, whether collective or individual, should contain information regarding expected a description of and the specifications for each product, details regarding expected market positioning, expected yields and sales volumes for the related Supplies, expected printer sales volumes, RTS, expected end of life date, and any other information mutually agreed by the parties.

4.3.3  The Alliance Plan of Record documents:

a)  Shall be executed only by the Program Manager for LXK/█████ Marketing Representative for LXK and ████ and Engineering Representatives for LXK and ████

b)  Two original versions will be executed and retained by each PM.

c)  The signed documents will be considered part of Attachment 1.0 of the product schedule, and the POR Tracking Table should be updated accordingly.

d)  After mutual execution of the documents, NRE will begin to be incurred

e)  If ████ cancels a Product or category entirely that is within the mutually executed Alliance Plan of Record document(s), ████ will reimburse Lexmark for any and all incurred development expenses.

## 5.0    **Product Plan of Record Change Process**

5.1  After execution of the Alliance Plan of Record document(s) described in Section 4.3 above, no changes to prospective Product design shall occur except through the following process:  Proposed design changes shall be communicated by ████ through the POR change request system (Web Based database managed by LXK).  Key contacts for this process are the LXK Business Manager and the ████████  These are the only individuals who can initiate and give final approval to any Product POR change request.  Any resulting costs and expenses resulting from the change shall be borne by ████  Lexmark will communicate such resulting costs and expenses to the ████████ before approving/implementing the change.

5.2  The Figure 1 below describes the planning process in a graphic manner, is provided for purposes of illustration only, and shall not be resorted to in construing the Agreement.

CONFIDENTIAL - OUTSIDE COUNSEL ONlA3332

**Figure 1:**

Early Engagement Process
Marketing and Technology Sharing & Interlock sessions
[redacted] Product Roadmap
Lexmark Product Roadmap
Preliminary joint roadmap
Escalation
Alliance POR Roadmap
Product POR v0.1 established and shared
Pricing and Financials communicated
[redacted] presents Product Portfolio for APP approval
Triggers work on Final POR preparation
Kick-Off Meeting
POR established (PRD 1.0)
Program Schedule to RTS
ID / color confirmed
IFIR goals established
Gap sheet established
ALLIANCE POR DOCUMENTS EXECUTED

**Attachment 1.2, Product Plan of Record (POR) SAMPLE**
**Schedule E**

**[INSERT SAMPLE POR DOC HERE]**

AGREED TO AND ACCEPTED:

By: _____
　　　(Authorized Signature)　　　　　　　　　　　　　　)

_____
　　　Name (Type or Print)

_____
　　　　　　Title

_____
　　　　　　Date


LEXMARK INTERNATIONAL　　　　　LEXMARK INTERNATIONAL, INC.
TECHNOLOGY, S.A.

By: _____　　　By:_____
　　　(Authorized Signature)　　　　　　　　　　(Authorized Signature)

_____　　　　　_____
　　　Name (Type or Print)　　　　　　　　　Name (Type or Print)

_____　　　　　_____
　　　　　　Title　　　　　　　　　　　　　　　　Title

_____　　　　　_____
　　　　　　Date　　　　　　　　　　　　　　　　Date

16

CONFIDENTIAL - OUTSIDE COUNSEL ONLA3334

## Attachment 3.0, DEVELOPMENT PROCESS
### Schedule E

███ and Lexmark agree to cooperatively decide on frequency and content to be covered during development reviews. The three (3) tables in this attachment highlight the basic Development Process framework to be followed.  Lexmark will follow its delivery process in order to develop, accept and launch the ███ products.  Whenever possible, Lexmark will provide ███ with information necessary for ███ o exit its ███ phases.

Table 1 below covers the basic high level milestones for the development process that require confirmation from both parties and how they align with the ███ process.



CONFIDENTIAL - OUTSIDE COUNSEL ONL **A3335**

Table 2 below is a merge of the ▮▮▮▮ and the Lexmark Development/Delivery Process for Laser Printers.  Below that is a grid that explains the content expected at each build level for Laser printers. The weeks marked "Prior RTS" in the development cycle is for reference only. It is expected that for Model 0/1, this timeline shall be shorter than those seen in products for calendar year 2008.



| LXK Build | Lxk Development Build | EVT | DVT | Pilot 1 | SOP | SOP |
|---|---|---|---|---|---|---|
| ▮ Build | Proto 1 | Proto 2 | Proto 3 | Proto 4 | Qual | Mass Pro |
| Target Build Date @ Factory | Dependent on LXK Build Schedule | 12 to 16 Weeks after tooling release | SOP - 22 Weeks | SOP - 9 Weeks | SOP | |
| Firmware | Lexmark Version | Lexmark Version | ▮ Alpha Version | ▮ Gold Candidate | Final Production | Final Production |
| Software | Lexmark Version | Lexmark Version | ▮ English-Only Handcrafted CD | ▮ Translated Handcrafted CD | Final Production | Final Production |
| Pubs (Placemat/Owner's Manual) - English | NA | NA | ▮ English-Only Handcrafted CD | ▮ English, French, Spanish Handcrafted | Final Production | Final Production |
| Pubs (Placemat/Owner's Manual) - include translations | NA | NA | NA | ▮ English, French, Spanish Handcrafted | Final Production | Final Production |
| Packaging | Lexmark Version | 1st pass for Cushion | Updated Cushions  No final artwork | Final pass for Cushion  No final artwork + c/w PPID | Final Production | Final Production |
| Tooling / Hardware | Lexmark Version | T0 Covers | T2 w/o texture | Final Textured Parts | Final Production | Final Production |
| Build - Type | Lexmark Factory Build | Factory Build | Factory Build | Factory Build | Factory Build | Factory Build |
| Build - Location | China | China | China | China | China | China |
| Regulatory | NA | NA | NA | Some early certifications required for factory are received | Key certifications completed (with some exceptions - like ▮▮▮) | Key certifications completed (with some exceptions - like ▮▮▮) |
| EMC | NA | NA | Full Test | Full test | Final Production | Final Production |
| Lead Free Status | Yes | Yes | Yes | Yes | Yes | Yes |

18

**Attachment 3.1, ████PRODUCT DEFINITION**

**Schedule E**

1.  Background and Purpose

Lexmark offers a broad portfolio of printing products across mono laser and inkjet.  Under the Alliance, ████will leverage Lexmark's products and core strengths.

To facilitate this design concept, focus will be placed on **Early Engagement** and **Interoperability**.  These processes will allow the opportunity for Lexmark and ████to collaborate in the development of future product roadmaps and specific product performance and feature specifications.

These design concepts are known as Model 0 and Model 1 engagement. The purpose of this document is to define these concepts (models) for ████Products.  It is to be used in preparing Plan of Record (POR) documents for the ████branded products that are awarded as part of the Alliance. Further, once a product is designated as Model 0 or Model 1, any additional specific changes to such Product design will result in an increase to the  transfer price to ████Lexmark will communicate such increased transfer price to ████before implementing any requested ████ specific changes.

When an initial product quote for either BOM/PO cost or NRE is provided, it should be fully based on the definitions/specifications revealed in this document.  All ████requests outside of this definition would be considered as Deviations.  ████and Lexmark as mutually agreed will implement a plan to manage the process for communicating and establishing Deviations.

2.  Scope

    a.  This document covers all printer products and options produced by Lexmark for ████ that will be sold under the ████logo, on or after the effective date of the Agreement. It is intended that this document refer to details surrounding the product and its associated Hardware, Software, Firmware, packaging and publications. Other aspects of the development program will be captured in the Product Delivery Process Document (MPA Schedule D and/or E, Section 3.0 and related attachments).

3.  Definitions and notes

    a.  Model 0: A Model 0 product is one that is designed identically to the Lexmark product in all facets, with the exception of branding, which will be unique to ████ID will be Lexmark Industrial Design (ID) with modifications per Section 5 of this document.   All Software (SW), Firmware (FW), User Interface (UI) dialogues, publications, packaging, etc that supports basic product function will be designed the same as Lexmark, except that the name "████ will be substituted for the name "Lexmark."  In cases where full artwork is required (packaging, etc) then ████unique artwork will be used.

    b.  Model 1: A Model 1 product is a Model 0 product, but with ████ID language, per the details outlined in section 5.  The same renaming strategy as above will apply.

4.  Documentation

CONFIDENTIAL - OUTSIDE COUNSEL ONLYA3337

Lexmark will provide POR documents per section 1.0 of the Schedules E and per Attachment 1.1 (POR Process).

5.  Industrial Design

    a.  Whenever use of a ▮▮▮ Logo or its color(s) is necessary, the Logo and coloring used will be that as defined by ▮▮▮ corporate specifications.

    b.  Model 0: The ▮▮▮ products will be molded in ▮▮▮ colors, but using all Lexmark cover parts, with the exception of the part(s) that will hold the ▮▮▮ logo part ("badge").

        i.  Some products may not have designs that are conducive to implementation of the ▮▮▮ badge.  In these cases, Lexmark will work with ▮▮▮ on a solution and provide cost effective alternatives.

        ii.  Any parts with "Lexmark" on them will be redesigned such that "Lexmark" will be removed or covered permanently (with respect to this reference, "permanently" is defined as having a cover part that is substantial in nature, i.e. made of a plastic material, not simply a label or placard).

    c.  Model 1:  for the Model 1 products, Lexmark will design the cover set to best match the ▮▮▮ ID Language, while maintaining, when possible, the Lexmark Packaging scheme, to allow for best product and shipping cost.  The ID should be designed in a manner to not have any impact to the underlying printer components with the exception of frame attach points.

    d.  ▮▮▮ is to supply color chips (or provide a method for doing so) for each color in each material to be used for said color.  Lexmark is responsible to approve the colors used by its suppliers.  When colors are being used for the first time by Lexmark for ▮▮▮ Lexmark will inform ▮▮▮ of final approval and will be provided Lexmark color match results and samples.

6.  Hardware

    a.  The internal mechanism of the product will be identical to the Lexmark product, including internal part colors, with the exception of customer touch points.  These parts (including but not limited to Paper guides, Jam release handles, latch/unlatch buttons, etc) are typically colored in a green color for Lexmark, but for ▮▮▮ products they may follow ▮▮▮ ID Language specifications.

    b.  External user-interface (UI) points (Operator Panel, cable connections, card slots, paper trays, etc) will use the Lexmark Design, with ▮▮▮ logo added (and Lexmark logo deleted or covered permanently) where necessary.

7.  Supplies

Supplies yield will be established pursuant to the following guidelines:  Any proposed Deviations from the below must be proposed during the early engagement process described in Schedule E Attachment 1.1, and any agreements are documented in a specific product plan of record (POR) and Schedule B.

    a.  For Model 0 printer Supplies, ▮▮▮ will utilize the same yield cartridges for their equivalent products as offered by Lexmark

    b.   For Model 1 printer Supplies, ▮▮▮ will utilize either a) existing ▮▮▮ yields or b) existing Lexmark yields, or c)if it is a new Supplies  family being launched, ▮▮▮ may

CONFIDENTIAL - OUTSIDE COUNSEL ONLYA3338

select one (1) mid-level mono fill, and one (1) mid-level color fill. ██ will use reasonable commercial efforts to minimize the number of Supplies SKUs in any event.

c. For laser printers under Model 0 and Model 1, ██ has the right, subject to technical and/or cost constraints identified by Lexmark, to select ██ unique toner cartridge fill level and Lexmark shall support with all necessary testing as long as this request is within the Lexmark-determined capacity of the toner cartridge and does not comprise a Deviation. Should there be a technical constraint, Lexmark will highlight the constraint for ██ consideration. ██ agrees to approach this with the intent of reducing SKU complexity. Yield requests greater than 15% from the Lexmark equivalent offerings will be treated as Deviations. Costs for such Deviations are not included in the Pricing Table figure 1 in Schedule I, section 2.1.

8. Software

a. The Software for Model 0 and Model 1 provided to work in conjunction with the ██ product will have the same flow and dialogue screens as the Lexmark branded equivalent product, however all Lexmark branding will be replaced by ██ branding per ██ Corporate logo style-guide requirements.

   i. Product specific images and bitmaps contained within the Software will be modified using the same manner as the Lexmark equivalent product(s). For example, the Software sometimes supports multiple products with a single driver and as such there might not be printer specific bitmaps/images used. It can be a generic bitmap to represent all of supported products.

   ii. Third party software EULA to be provided by ██ Lexmark will inform ██ of any EULA requirements or changes resulting from Third-party agreements being managed by Lexmark

   iii. Software Licensing and Distribution agreements will be provided by ██ for any SW not provided by Lexmark.

b. Drivers/OS Support

   i. Drivers supplied for the ██ product will be the same as what is provided for Lexmark product. All Operating Systems supported by Lexmark will be supported in the ██ product as well, to the same level of support afforded the Lexmark product per Schedule F of the Agreement.

c. CD-Based Applications

   i. Lexmark Software which is necessary for printer function that contains the Lexmark name will have that name replaced with ██ (AIO Center, Toolbox, etc).

   ii. Third party software (3P SW) can be the same as Lexmark. ██ will pay any royalty or licensing fees for its use, replication and distribution. Optionally, ██ may choose to source its own 3P SW. In that event, ██ is responsible for all fees for use, replication and distribution for any ██ provided 3P SW. Further, ██ must ensure that the package fits on the CD space available (as communicated by Lexmark), and is fully responsible for quality of the product and the relationship with the supplier. Under the same general guidelines, ██ may opt to provide a 3P SW package on a CD separate from the main Driver

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3339

set. Any SW or installation process provided by Lexmark will be tested by Lexmark.

   d. Installation/Setup

     i. (Ink) For USB, Network and wireless setup, ███ product will follow Lexmark processes, with renaming where applicable.

     ii. (Laser Model 0 and Model1) The Initial Driver installation flow will be the Lexmark Flow with ███ logo and images replacing that of Lexmark.

     iii. All file names and registry entries will have Lexmark removed from them.

     iv. All system certifications earned by the equivalent Lexmark product will be applicable to the ███ product as well at the same release level (Citrix/SAP etc.).

        1. ███ will still be expected to handle Verisign and cat file submission to Microsoft.

     v. Lexmark will provide a Factory Install (FI) Package for each product to be distributed by ███ o its PC manufacturing locations.

   e. Supplies Management and Reordering

     i. For Mono Laser Printers, Lexmark will provide ███████████████ ████████████ , or an equivalent shared toner management system.

     ii. The Embedded Web Server (EWS), when applicable, will contain a link to the re-order process.

   f. Other software

     i. Lexmark will provide other SW features that are released in mainstream Lexmark products. Examples of this for Inkjets are HAL, NEVIS, and ██████████ and for Mono Lasers, generic OEM versions of Universal Print Drivers (UPD), and Markvision.

     ii. The Parties acknowledge and agree that there are four categories of software and applications included in Lexmark branded products: Category 1 (included within printer packaging); Category 2 (generic applications); Category 3 (web services); Category 4 (custom applications). Items that fall into Categories 1 and 2 would include, but are not limited to, items such drivers, firmware, non-third party software, OEM Markvision, and OEM universal print drivers. Category 1 and Category 2 items are included in Model 0 and Model 1 Products. If ███ seeks unique customization of any of these applications, ███ will be responsible for any increased cost. Lexmark will determine the feasibility and timeline and quote the related NRE for such customization. Items that fall into Categories 3 and 4 would include, but not be limited to, widgets, workflows, customs solutions and applications written for unique customer needs. Notwithstanding any other language to the contrary in the Agreement, any Schedule thereto, and/or any Attachment to any Schedule thereto, items within Categories 3 and 4 are not inlcued within Model 0 and/or Model 1. The parties acknowledge and agree that in order to make Category 3 items available to ███ mutually agreed division of labor with respect to IT infrastructure and applications engineering would be required. If availability

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3340

is requested by ███ then after mutually agreed division of labor and pricing are reached, Category 3 items shall be made available.  The parties acknowledge and agree that in order to make Category 4 items available to ███ mutually agreed division of labor with respect to field discovery teams, applications architects, field deployment and maintenance teams would be required.  If availability is requested by ███ then after mutually agreed division of labor and pricing are reached, Category 4 items shall be made available.

    iii.  Lexmark reserves the right to conduct a "limited release" (i.e., limited to Lexmark branded product(s)) of certain product software and/or firmware features in order to evaluate their technical feasibility and/or acceptance in the marketplace.  Once such limited release software/firmware feature is designated in Lexmark's product roadmap to recur in a follow-on generation Lexmark branded product, it will be offered to ███ Lexmark will communicate these deviations starting from the planning phase of a given generation, when they exist and also at any time during the development phase of the program.

9. Firmware (FW)

    a.  The printer name (e.g. ███████ ), model will be loaded into the Firmware of each ███ printer.

    b.  The service tag will be loaded into the product memory.

    c.  Lexmark Firmware will be used and any reference to Lexmark will be replaced with ███

    d.   EWS and any demo page or printed report will carry the ███ name   .

10. Publications

    a.  CDs will contain the ███ specific SW package and will be marked with ███ artwork.

    b.  ███ Publication strategy shall be the same as Lexmark with respect to what specific items are in the finished goods Bill of Material (BOM) per the published publications plan, provided by Lexmark. Modifications to the placemat to accommodate Factory Install procedures are allowed

    c.  All manuals, pamphlets, technical sheets, etc. will be relabeled with the ███ name, logo (for Model 1 and 0) and artwork (for Model 1), otherwise content, scope, and size is the same the Lexmark branded product.

    d.  Any ███ required documents outside the typical Lexmark publications plan will be allowed as Deviations.

11. Packaging/Labeling

    a.  For the Model 1 product, the final ID design is to be such that it is able to be packaged in the dimensionally same/similar boxes using the same/similar internal packaging design and concepts as the Lexmark Product. This optimization is a primary goal of the ID and is considered achieved if container density is same for ███ as Lexmark.

    b.  Product labeling shall be per ███ specifications provided such specifications do not incur increased costs versus the packaging specifications for equivalent Lexmark

23

A3341

branded products.  Exceptions to this will be managed within the product delivery process.  This requirement applies to originally produced printers, options and Supplies. Service part requirements will be managed within the Service definition agreement.

    c.    ███ is expected to have Logo Agreements in place, when needed, for logos that are present on their packaging, pubs, etc. (e.g. Microsoft Windows Logo).

    d.    ███ shall engage Lexmark to get the packaging box ready for retail based on ███ provided template and style guide.

12. Regulatory, Environmental, and Safety

    a.    ███ products will be certified to the same degree as the equivalent Lexmark product with respect to environmental, regulatory, safety and regional/national certifications.

    b.    All certifications for the countries where Lexmark sells its equivalent product will be applied for by Lexmark.  In countries where Lexmark sells the same type (Ink or Laser) but where the product distributed is not the equivalent to that of ███ Lexmark shall assist in the application for ███ Lexmark's activities with regard to products shall be regarded as a deviation, and any costs incurred are borne by ███ ███ is responsible to attain the certifications for those countries outside the Lexmark "country ship-to list". If resources allow, Lexmark may, at ███ cost, provide certifications for these countries.

    c.    Lexmark Specifications related to environmental, safety, and regulatory mandates will govern the ███ products.

13. Localization and Certifications

    a.    Lexmark will provide ███ products with the same localization plan as the equivalent Lexmark Product.  This includes: SW, FW, op panel, and pubs.

    b.    For ███ products, the same regulatory, environmental, and safety certifications will be provided as Lexmark-branded equivalent products.

24

CONFIDENTIAL - OUTSIDE COUNSEL ONLY

**Laser Schedule E**

**Attachment 3.2, LASER DEVELOPMENT EVALUATION UNITS**

<u>Base Laser Printers:</u>

15 Pre-production units (X-rev samples)
<u>40</u> validation units (A-rev, pre-mass production units)
55 Total units

(These units, at ███ discretion, may be 110 volt or 220 volt (if available.)

5 High Yield Versions of Cartridge Supply

<u>Network version of Base Laser Printers:</u>

10 Pre-production units (X-rev samples)
<u>25</u> validation units (A-rev, pre-mass production units)
35 Total units

(These units, at ███ discretion, may be 110 volt or 220 volt (if available)).

5 High Yield Versions of Cartridge Supply

For each categories above, 10 items identified as "options" (able to be purchased separately and installed by the customer) for each applicable product shall be provided

CONFIDENTIAL - OUTSIDE COUNSEL ONLYA3343

**Attachment 3.3, STRATEGIC ENGAGEMENT**

**Schedule E**



Recognizing a ▮ key initiative of "works better together" and Lexmark's reliance on PC attachments for its products, it is in both party's interest to take full advantage of our Alliance relationship.  In the area of interoperability, Lexmark anticipates structuring a lab environment whereby Lexmark and ▮ personnel can work together on this key strategic initiative. ▮ will provide ▮ current shipping platform information twice yearly. The joint teams should focus on identifying interoperability test environments and coverage for current and new / upcoming technologies with the latest PC and OS platforms. This should be an ongoing effort with identified owners within Lexmark and ▮  These owners should discuss efforts no less than on a quarterly basis**.**

In the area of sustainability, Lexmark and ▮ will meet two times per year to discuss their respective environmental and regulatory roadmaps and any recent changes.  The goal is to align on strategies and identify areas of disconnect.  Sustainability should also be a topic during Early Engagement to identify related market opportunities and messages.  Each party should identify a key owner and contact point for this effort.  Those individuals should be in contact no less than quarterly and maintain both a short term (<12 month) and a long term (12 months and beyond) list of focus items. Considering that key development decisions are made more than 12 months in advance, the primary focus should be on long-term sustainability (i.e. 12+ months).

CONFIDENTIAL - OUTSIDE COUNSEL ONLYA3344

**Attachment 3.4, Non-Recurring Expense**
**Schedule E**

## 1.0 NRE CONTENT

In addition to the cost of each product, █████ will pay the supplier for Non-Recurring Expenses (NRE). NRE payment and pricing is explained in the pricing section of the MPA. This NRE will cover the development activities that are unique to the ████ product, per the appropriate Model definition, in the following areas, including but not limited to, hardware, software, firmware, packaging, publications, evaluation units, assembly process, certifications, etc. NRE also includes all necessary tooling for the defined development Model. The NRE per product will be based on the development models per attachment 3.1, where all necessary details are explained. Any changes to the Model definition will be treated and quoted separately as product "Deviations."

Regarding tooling NRE, anytime ██████ forecast dictates multiple sets of tools be put in place, Lexmark will inform █████ of this situation and the teams will discuss the capacity levels based on different numbers of tools.

Unless otherwise agreed to in writing, applicable NRE will be identified prior to, or at the time of Product Plan of Record (POR) completion. Any POR change requests from █████ after POR completion may result in additional NRE. All NRE will be reflected in the Schedule B pricing.

## 2.0 DEVELOPMENT MODEL BY PRODUCT CATEGORY

Lexmark and █████ have defined the expected development Model by product category. These are shown in Table 2.1 below. This may change in the future as █████ may choose a different development Model and/or categories may be added to or revised.

Table 2.1   Mono Laser Printer Development Model by Category

|  | *Single Function* | *Multi Function* |
|---|---|---|
| Entry | 0 | 0 |
| Mainstream | 1 | 1 |
| Advanced | 1 | 0 |
| Performance | 1 | 0 |
| Performance Plus | 0 | 0 |

## 3.0 ESTIMATED IMPACT OF CHANGING DEVELOPMENT MODEL

27

On follow on products ▮ may elect to change development levels in a particular Product category.  To facilitate this, Lexmark has estimated the relative financial impact of this change. This estimate is based on the projected FY11 mono laser portfolio of Products and may or may not represent future product lines.  It is meant to serve as a guide for decision making based on the relative NRE between Model 0 and Model 1.  As a general rule of thumb for mono laser printer Products, Model 1 NRE is approximately ▮▮▮▮▮ the amount of Model 0 NRE over a full program.

Table 3.1 – Mono Laser Development Model Program NRE Illustration

| Product Category | Reference | Model O Estimate | Model 1 Estimate | Approx. Multiplier |
|---|---|---|---|---|
| Entry SF | | | | |
| Entry MFP | | | | |
| Mainstream/Advanced SF | | | | |
| Mainstream MFP | | | | |
| Advanced/Performance MFP | | TBD | N/A | |
| Performance SF | | | | |
| Performance Plus SF/MFP | TBD | TBD | N/A | |

Notes:
(1) Although these values correspond to the subsidized NRE values quoted to ▮ and referenced on an annualized basis based on expected life of each product segment in the Pricing attachment, this table is meant for illustrative purposes only
(2) Based on the product line definition for FY11, there are areas where items, such as select tools, are leveraged across categories (i.e. Mainstream SF and Advanced SF).
(3) Bold items indicate the selected development Models for the future portfolio and align to Table  2.1 above
(4) Categories noted as Advanced MFP and Performance Plus SF and MFP are considered Complementary Plus products and are expected to follow either a Model 0 or a Traditional OEM Model and the NRE will be quoted accordingly.  These are products are generally low volume and were excluded from the core alliance modeling, but are available to ▮ for the purposes of offering a full line portfolio.

28

**Schedule E**
**Attachment 4.0, SLC LOCATIONS**

For ▮▮branded printer Products, Supplies, and Features, Lexmark shall hold Revolver Inventory in a minimum of 1 location for each region (DAO, EMEA, and APJ). As mutually agreed by Lexmark and ▮▮ Lexmark may place Revolver Inventory in more than one location within a region, however, by nominating additional hubs, ▮▮agrees to accept the costs incurred by Lexmark in normal operation of these additional locations and those additional costs will be reflected as an adder in Schedule B of the MPA. Lexmark may choose to utilize Lexmark Facilities, or locations specified by ▮▮as SLC locations (whereby 3rd-party contractors and locations are specified and managed by ▮▮ Any changes in ▮▮designated SLC normal operating costs (whether increased or decreased), and paid by Lexmark will be passed to ▮▮as an adder in Schedule B.

The list below contains all current locations in each region in which Lexmark holds Revolver Inventory. For locations not mentioned in this Attachment, the hub structure and associated costs would be subject to mutually acceptable terms as agreed upon by the Parties, and the terms would be recorded in an Amendment applicable to business operations within the related country of the additional location.

**Current WW Locations:**

| s/n | Geo | Country | Location | Products | SLC or Other? |
|-----|------|------------|----------|----------------------|------------------|
| 1 | DAO | USA | ▮ | H/W, Supplies | Lexmark Facility |
| 2 | DAO | USA | ▮ | H/W | SLC |
| 3 | DAO | USA | ▮ | Supplies, Feat | SLC |
| 4 | EMEA | UK | ▮ | H/W, Supplies, Feat | SLC |
| 5 | EMEA | Denmark | ▮ | H/W, Supplies, Feat | SLC |
| 6 | EMEA | Spain | ▮ | H/W, Supplies, Feat | SLC |
| 7 | EMEA | Ireland | ▮ | H/W, Supplies, Feat | SLC |
| 8 | EMEA | Cze | ▮ | H/W, Supplies, Feat | SLC |
| 9 | EMEA | Netherlands | ▮ | H/W, Supplies, Feat | SLC |
| 10 | APJ | PRC | ▮ | H/W, Supplies, Feat | SLC |
| 11 | APJ | PRC | ▮ | H/W, Supplies, Feat | SLC |
| 12 | APJ | PRC | ▮ | H/W, Supplies, Feat | SLC |
| 13 | APJ | Korea | ▮ | H/W, Supplies, Feat | SLC |
| 14 | APJ | Malaysai | ▮ | H/W, Supplies, Feat | SLC |
| 15 | APJ | Australia | ▮ | H/W, Supplies, Feat | SLC |
| 16 | APJ | Japan | ▮ | H/W | SLC |
| 17 | APJ | Japan | ▮ | Feat | SLC |
| 18 | APJ | Japan | ▮ | Supplies | SLC |
| 19 | APJ | Japan | ▮ | H/W | SLC |

Based on the above listed locations, the resulting geo cost adders from the US contract price and multiple hub adders are included in Schedule B.

CONFIDENTIAL - OUTSIDE COUNSEL ONLA3347

**Schedule E (Laser)**
**Attachment 4.1, DISTRIBUTION COLLABORATION**

As part of a list of cost reduction activities developed during the ███ Lexmark Alliance discussions, Lexmark and ███ have agreed to pursue the most efficient and cost effective distribution process leveraging Lexmark's existing order fulfillment processes and service level agreements.  The strategic objective will be to eliminate redundant touch-points between Lexmark and ███ where possible, and minimize total cost to deliver product to ███ end-users and resellers.

As mutually agreed, ███ branded printer Products and Supplies may be shipped from Lexmark directly to ███ retailers, resellers, or channel partners.   In addition, as mutually agreed, Lexmark may ship all printer Products to ███ end-users to fulfill orders received via ███ on-line (direct) channel.  Fulfillment of Supplies received via ███ direct channel will continue to be fulfilled by ███ and/or ███ 3rd-party provider.

In implementing the above strategy, the Parties will first focus on larger scale projects that are capable of being implemented with fewer challenges (logistical, systems compatibilities, etc.) than other available opportunities.   Thus, priority will be given to shipments in the United States.  Priority within the United States will be shipments to ███ retailers, resellers, and/or channel partners first, and then considerations for shipments in the direct channel.  Elements of this project may include order management, warehousing, distribution, shipping, and reverse logistics.

███ will retain all customer interactions and financial transactions with ███ retailers, resellers, channel partners, and end-users.

The price for the above services will be as mutually agreed and will be listed in an amended Schedule B pricing document.  Any non-recurring expenses related to this effort will be identified to ███ and will be paid by ███ to Lexmark within the first 12 months after implementation.

CONFIDENTIAL - OUTSIDE COUNSEL ONL|A3348

**Schedule E (Laser)**
**Attachment 4.2, LAST-TIME-BUY PROCESS**

The joint objective through the last time buy process is to minimize or eliminate any excesses of Products and/or their components. Thus both parties will follow the below process with an objective of $0 of excess and obsolete materials. In addition to the process below, both parties will regularly monitor any and all situations that may have an impact on excess and obsolete.

NOTIFICATION:    Lexmark will in most cases provide ███ with written notice of discontinuance of Products approximately 210 days prior to end of marketing life  The end of marketing life will be determined at the launch of such Product. This timing assumes marketing end of life will be within sixty (60) days of end of manufacturing. Within thirty (30) days of such notice of discontinuance, ███ must provide Lexmark a 100% committed, non-cancelable purchase order for such discontinued Products, and notwithstanding any other language to the contrary in this Schedule, any other Schedule, and/or the Agreement (as well as any Attachment to any and all of the foregoing):  (a) such order shall specify a lead time to delivery that is no greater than sixty days after the RTS for the follow-on Product (If no follow-on product exists, then a date will be determined by the parties at the time of the LTB Lock (see heading below)); (b) such order shall not be subject to cancellation;  and (c) in no event shall ███ be excused from this requirement. Any upside flexibility on these Products will have to be determined and negotiated on a case-by-case basis. ███ shall pull such inventory by the above specified date.

Both parties will hold a LTB checkpoint 150 days prior to end of marketing life. If ███ desires to increase or decrease the LTB quantity, Lexmark will work within its abilities to accommodate all, or a portion, of the request. In the case of a request to decrease the LTB quantity, ███ will be liable for any related components that are non-cancelable as a result of this action. This activity's objective would be to reduce the quantity of shorter lead time components and finished goods thus minimizing total expenses, and ███ liability, of any LTB reductions requested by ███

Special circumstances may exist where Lexmark may need to provide ███ with written notice of discontinuance of Products up to 240 days prior to end of marketing life. The end of marketing life will be determined at the launch of such Product. This timing assumes marketing end of life will be within sixty (60) days of end of manufacturing. Within thirty (30) days of such notice of discontinuance, ███ will provide Lexmark a 100% committed, non-cancelable purchase order for the discontinued Products. Any upside flexibility on these Products will have to be determined and negotiated on a case-by-case basis.

In extreme cases where end of marketing life may be in excess of sixty (60) days from the last date of manufacture or is unknown, Lexmark may provide ███ with written notice of discontinuance Products at least one hundred twenty (120) days prior to the last date of manufacture of any Product. Within thirty (30) days of such notice of discontinuance, ███ will provide Lexmark a 100% committed, non-cancelable purchase order for the discontinued Products. Any upside flexibility on these Products will have to be determined and negotiated on a case-by-case basis.

With each written notice of discontinuance, Lexmark will make every reasonable effort to include with the notice a preliminary view of any liability for finished goods and component excess based upon the 6-month ███ MRP available at that time. Lexmark will also provide

31

analyses of why excesses exist.  Forecast waterfall analyses using ▮ provided 13-week MRPs plus ▮ provided monthly sales actual reports will be the primary tools utilized to determine where liabilities fall between parties.  In addition, each notification will include a last pull date of 60 days post RTS of the follow on product.  If no follow-on product exists, then a date will be determined by the parties at the time of the LTB Lock.

LAST-TIME-BUY LOCK:  The ▮▮▮▮▮ will review Lexmark's analysis of excesses and report any discrepancies, if any, back to Lexmark.  The goal will be to have agreement between Lexmark and the ▮▮ within 10 days of ▮ initial receipt of the LTB written notification.

Within thirty (30) days of initial receipt of the LTB written notification, each ▮ region will submit purchase orders, which will constitute their LTB (Last Time Buy) Lock.  When doing so, each ▮ region will take into consideration any excesses presented from the pre-excess report generated as part of the LTB notification.

RE-ASSESSMENT OF EXCESS: After receipt of ▮ LTB purchase orders, Lexmark will re-assess any excesses that may still exist and target to revert back to ▮ within ten (10) days any changes from the preliminary view. If excesses still exist, ▮ regions will confirm LTB upside plan to drive excess depletion, if applicable, or a plan for disposition of excess parts.

DISPOSITION:  It will be ▮ & Lexmark's joint goal to, in good faith, make all efforts to minimize excesses by exploring opportunities to use any excess materials in other existing or future programs.

Once the final lock of last time buy at EOL has been established, ▮ will ensure to drive a sales path for depletion of the finished good units by the notification date of last pull.  On a case by case basis, Lexmark will review requests by ▮ to work out special arrangements, which may include ▮ paying an inventory carrying cost for Lexmark to continue to hold the inventory.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3350

**Schedule E,**
**Attachment 4.3,  RETAIL AND SPECIAL PRODUCT REQUEST LOGISTICS TERMS**

**General Retail Terms:**

1. ███ will negotiate all contracts with the retailer regarding logistics, pricing, charge-backs, etc. prior to shipment of product. ███ will manage all requests from the customer (i.e. no direct calls from the retailer to Lexmark regarding ███ products).  Lexmark is not responsible for any fee structures related to logistics and/or deliveries to the retailer.

2. The retailer will return defective Product to ███ and will be managed per the standard terms of the agreement.  As per the terms, Lexmark will not accept unopened or stock balance retail returns as these are considered the same as customer remorse.

**Additional terms applicable to all special product requests (SPR) which are deviations from the standard combined direct and retail models:**

Lexmark will work in good faith to support ███ SPR needs.  Examples of SPRs include products with alternative color parts (i.e. "red"), uniquely packaged retail SKUs, etc.  Due to the historical level of ███ forecast error, splitting the forecasting across multiple SKUs is expected to further exacerbate this issue.  The higher risk involved in these added SKUs requires additional terms to in order to minimize potential expense.

1. Lexmark will size ███ SPRs on a case by case basis through the POR change request process.  Additional SKUs and changes to SKUs may include NRE, material and logistics costs. These costs will be provided to ███ in response to ███ SPRs and once approved will be added to Schedule B.

2. ███ recognizes it has EOL liability for these unique SKUs and their contents. The teams will mutually agree if these SKUs should be considered EOL prior to the product's program EOL.  If any parts are ordered and no forecast exists for this SKU, the teams will work to utilize these parts as quickly as possibly on other product or Lexmark may need to impose an inventory carrying cost.  If any part is capable of being reworked to another product, ███ will also bear any related cost of this effort – ███ will initiate payment for this scrap within 30 days of receiving the final bill from Lexmark.

3. ███ will pay expediting expenses for this product if expediting is determined by ███ (i.e. Lexmark will not be responsible for air freight or expediting on these unique SKUs unless Lexmark failed to deliver to its commitments where Lexmark will remedy the situation)

4. ███ will adhere to minimum factory order quantities defined by unique SKU. The teams will work out the timing of builds and deliveries. For SLC pull minimum order quantities, ███ will adhere to minimum pulls of 1 pallet per SKU.

5. Unique SKUs will not have 10,10,14 Revolver Inventory and not have the acceleration terms described in Section 4.3.1 of this Product Schedule.

6. Service requirements will be reviewed, sized, and agreed to on a case-by-case basis.

33

CONFIDENTIAL - OUTSIDE COUNSEL ONLY

**Schedule E (LASER),**
**Attachment 5.0,  SALES & MARKETING ENGAGEMENT**

Given key elements of the Alliance whereby ▓▓ intends to source all of their Mono Laser products (within the Alliance Category) from Lexmark, and those products will be very similar to Lexmark's Branded products (under Model 0 or Model 1 development processes),  Lexmark agrees to support ▓▓ in their Marketing and Sales activities.

Lexmark will provide standard Lexmark product marketing material and training materials for the products equivalent to ▓▓ which ▓▓ can modify for their use.  Lexmark offers to conduct one "Train the Trainer" session for ▓▓ in each region (Americas, EMEA, APJ), for each program cycle.  All travel expenses for this session will be absorbed by each respective company.

Lexmark and ▓▓ will define and implement processes whereby Lexmark and ▓▓ will work together in large Mono Laser printer opportunities where the competition is a mutual competitor of ▓▓ and Lexmark.  These processes include (a) a Special Bids process whereby ▓▓ requests Special Bids support and Lexmark will work in good faith to respond in a timely manner within the bid response requirements and (b) a regional marketing support process whereby ▓▓ requests specific technical, account or field support, and Lexmark will work in good faith to respond in a timely manner to provide reasonable support in ▓▓ sales activities.

Additionally, Lexmark and ▓▓ will define and implement a process with the focus on Consumables sales activities to drive increased usage and/or loyalty, especially in large corporate and government accounts.

Additionally, Lexmark and ▓▓ agree to conduct regional sales reviews quarterly, where the companies will review recent sales results and upcoming sales forecasts and activities. Additionally, the teams will review Consumables sales activities and usage, and will explore opportunities to increase consumables sales.  A summary of these sales reviews will be included in all Executive Business Reviews (EBR).

Lexmark shall be entitled to eliminate this sales support if ▓▓ exercises rights specifically granted in Schedule G,  Schedule I, Section 4.1.6 of this Schedule D, or Attachment 6.0 to this Schedule D to source an Alliance Plan of Record Product from a supplier other than Lexmark.

34

A3352

**Attachment 5.1, MDF PROGRAM**
**Schedule E**

| MDF Terms and Conditions: | |
|---|---|
| A. | Unless otherwise agreed by the parties, the Marketing Development Funds (the "MDF") provided under this MDF Program Schedule shall only be used to support the Program Deliverables set forth above. |
| B. | The parties shall meet quarterly to determine the subsequent period marketing activities to which the MDF shall be applied.  The MDF may only be applied to marketing activities approved by Lexmark. |
| C. | ▇ will make available at Lexmark's request backup documentation supporting ▇ reimbursement request. Lexmark may only request backup documentation consistent with the Proof of Compliance section below and relative to ▇ current or past immediate quarter's marketing activities.  Lexmark reserves the right to deny any claims where required documentation for reimbursement is not available or is incomplete. |
| D. | The marketing development program ("Program") shall be run at the sole discretion of Lexmark and may be cancelled at any time on reasonable notice to ▇ For the avoidance of doubt, any such cancellation shall only affect the status of amounts as marketing development funds, and shall not affect the other obligations of the parties under the MPA, including without limitation Lexmark's other obligations under the MDF Section of the Program Schedule. |
| E. | Lexmark reserves the right to audit, upon reasonable notice and at its sole expense, the Program, to the extent such documentation relates to Lexmark's payment of MDF.  The audit shall be conducted by a third party auditor from a national firm, which has been agreed to by the parties and shall be limited to ▇ current or immediate past quarter's marketing activities. |

| | |
|---|---|
| A.  Fiscal Year: | B.  FY__ |
| C.  Fiscal Quarter: | D. |
| E.  Segment: | F.  See attached Marketing Plan and Program Detail Form |
| G.  Program Description: | To provide services at the request and sole discretion of Lexmark for Lexmark funded reimbursements. |

| | |
|---|---|
| **Program Objective:** | To provide reimbursable marketing services for Lexmark as specified in program deliverables below. |
| **Program Deliverables:** | The Program will include several events and activities to be executed by ▇ between _____ 2008 and _____ 2009 (▇ Fiscal Quarter _____). <br><br> MDF are intended for the following events / activities (see attached Marketing Plan and Program Detail Form for a listing of specific deliverables), which may be replaced by other mutually agreed upon events/activities per any future amendments to this document. |
| **Partner Payment** | Lexmark shall pay forty-five (45) days after invoice by ▇ |

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3353

| Details: | |
|---|---|
| **Proof of Compliance (POC) Details:** | See attached Program Detail Form for Proof of Compliance details |

Q____                                     Fax to:        S&P Partner Programs
May 2008 – _____ 2009            ████████████ or ████████████
████ Branded Lexmark Printers/Consumables Marketing Plan

Lexmark Contact Information:

| Participant Address: | | |
|---|---|---|
| City | State | Zip |
| Marketing Contact: | | Phone |
| Marketing Contact Title: | | Fax |
| | | Email |

Lexmark Bill To Information:

| Bill to Address | | |
|---|---|---|
| City | State | Zip |
| Accounting Contact | | Bill to Phone |
| | | Bill to Fax |
| Is PO # required for invoicing?  YES      NO      If yes, please provide PO#: | | |

| |
|---|
| **Program Name:  Quarterly** ████ **Branded Lexmark Printer/Consumables S&P Marketing Program**<br><br>**MDF:**<br><br>_____<br><br>████ **Contact:** |

**IN WITNESS WHEREOF, the parties hereto have caused this MDF Program Schedule to be executed by their duly authorized representatives.**

**AUTHORIZED SIGNATURES (Lexmark):    LEXMARK INTERNATIONAL, INC.**

**By:** _____

_____
**(Print Name)**

_____
**(Print Title)**

**LEXMARK INTERNATIONAL TECHNOLOGY, S.A.**

**By:** _____

_____
**(Print Name)**

_____
**(Print Title)**

36

A3354

By: _____

_____
**(Print Name)**

_____
**(Print Title)**

CONFIDENTIAL - OUTSIDE COUNSEL ONLYA3355

## Attachment 6.0, QUALITY AGREEMENT
## Schedule E

1) Purpose: To documents the basic agreement between ▮ and Lexmark regarding Quality Management of ▮ Products supplied by Lexmark

2) Scope: Applies to all ▮ printer products and options produced by Lexmark with a ▮ Logo. Applicability is from the Early Engagement phase through End of Service Life (EOSL). This document is intended to provide guidance for all products and eliminate the need for submission of a Quality Management Plan for each product. This document will apply to the products listed in Attachment 6.2

3) Lexmark will have a person assigned to ▮ as the Global Quality Account Manager (GQAM) that will be responsible to implement the quality processes contained herein.

4) Phases of Quality Engagement

   a) Early Engagement

During this period, Preliminary Field Incident Rate (FIR) and Initial FIR (IFIR) goals are established for each product based on predecessor product performance and expected feature and technology enhancements. Goals for each product will be documented in attachment 6.2. For those products with different options (Base, Network, Wireless, etc) the goals will be unified into one for each metric for all offerings of the same product

   b) Design Quality

Supplier shall work with ▮ to ensure design quality that meets ▮ Engineering specifications. In the event that a business disruption (delayed RTS, stop ship, field excursion, safety incidents, etc) caused by lack of engineering rigor or due diligence on the part of Lexmark occurs, Lexmark agrees to take aggressive action to address/remedy the situation and re-instate the continuity of supply in the shortest time possible. These actions may consist of on-site support, improved warranty terms, or other actions that will improve the customer experience and ability to meet customer demand.

   c) Kickoff

   i) At Kickoff, as the Product Plan of Record (POR) is communicated, the FIR/IFIR goals are reviewed and documented, taking into account any changes to predecessor product performance and added features.

   ii) In the event that the predecessor product is not yet launched, the goals will be set by the current product that most resembles the product in question, based on market placement and technical similarities

   iii) Development team shall provide Risk Analysis to cover new elements of product, process, production site etc (▮ term : NUDD)

   d) Development

38

CONFIDENTIAL - OUTSIDE COUNSEL ON A3356

i) Occasionally FIR/IFIR goals may need to be updated to accommodate POR changes that occur after Development Kickoff

ii) During the later development builds (Proto 3, PMP, etc), Factory quality is monitored using a "Safe Launch" methodology per Lexmark process. Lexmark and ██████ core teams will review manufacturing quality data as it becomes available, typically within 5 working days of the build. Data should include First Pass Yield (FPY) and yield for post-production testing. Top issues should have corrective actions identified

iii) Printer Factory Audits will be conducted per Lexmark Process. Lexmark will report satisfactory completion of the audit and a summary report based on ████ QPA requirements prior to Pre Mass Pro build.

    (1) ████ may audit a new printer factory supplier at their request, with a minimum of **30** days notice, in writing to the Lexmark Program Manager

e) Supplier and Sub Tier Supplier Management

SUPPLIER is responsible for quality management of its suppliers, with the exception of ████ managed parts and commodities. SUPPLIER shall actively implement a Sub-Tier Supplier Management program to meet the requirements of the Sub-Tier Supplier Management Audit Checklist per Supplier Quality Management Plan.

f) SOP (Mass Production)

Lexmark is responsible to test and validate production level products per its established factory testing and validation processes. When products are found to be deficient, Lexmark is responsible to carry out corrective action measures to correct the root cause, when possible.

i) Factory Quality Reporting

    (1) Early Phase (Safe Launch): During this period, Lexmark will provide factory quality reporting on a weekly basis which will include FPY and post production testing status, including a summary of fallout and corrective action plans for top issues

    (2) Steady State. Factory Quality data will be maintained per Lexmark standard process. Lexmark will maintain this data per ISO guideline and will provide for review when needed

    (3) Manufacturing Quality and Test (MQT) Plan

    Supplier shall be responsible for their manufacturing quality and test plan completion prior Qualification build and shall contain the following elements:

        a) In Process Quality Checks

        b) End of line test procedures

        c) Out of Box Audit process and failure criteria

        d) Pre Ship Audit process and failure criteria

        e) Corrective Action and reporting process

ii) Traceability

39

A3357

Lexmark will apply its traceability process for ▮▮ products and will maintain the data, and shall provide on an "as-needed" basis

g) Post-RTS Quality Maintenance

i) War Room (RTS to RTS +90 or until on path to goal)

Lexmark will meet with ▮▮ on a weekly basis to review data and corrective action summary of top issues.

The SUPPLIER is responsible for its obligations specified in Section 6.3 of the Agreement, regardless of whether such Epidemic Failure occurs within or outside the warranty period described in Section 4.1(a) of the Agreement.

The SUPPLIER must meet product quality goals mutually agreed, for the designated program or product. ▮▮ will provide SUPPLIER with quality failure data. Failure Incident Rate (FIR) data includes all ▮▮ customer dispatches/ replacements regardless of subsequent failure analysis classification. Data related to ▮▮ customer calls and contacts may be provided for product trend analysis and issue resolution.

SUPPLIER will analyze data, implement statistical triggers to identify trends and quality excursions, drive to root cause and implement corrective actions with approval from ▮▮ Quality Engineering.

ii) Steady State

Quality reporting for Products not performing to goal (>20% above IFIR goal and/or over goal for two consecutive months), will be provided at a frequency of weekly and for products performing at goal or past End of Production Life, Lexmark will provide updates at a frequency of once monthly until End of Marketing Life.

SUPPLIER should expect to identify the root cause with substantiating data and act on the corrective action plan to an agreed timeline to correct the situation. Supplier will provide parts and resource necessary to support and remedy the situation.

iii) Failure Analysis (FA)

Lexmark shall be responsible for conducting printer FA. Because of a high level of product similarity, Lexmark branded FA can be used to subsidize that of ▮▮ branded.

The FA function must provide timely and competent services inclusive onsite at ▮▮ facility. FA results and trends are to be reported to ▮▮ on a weekly basis. Based on findings, the supplier is responsible for initiating issue containment and taking closed loop corrective action. Failure Analysis may include (but not be limited to): warranty service parts, reliability excursions and spare parts repair excursions.

FA on consumables will utilize both ▮▮ and Lexmark returns. Reporting will be on an as-needed basis.

Unless mutually agreed otherwise, during one week of each calendar month, Lexmark will provide a dedicated engineer on site at ▮▮ facilities in Austin for purpose of failure analysis support.

h) Closed Loop Corrective Action

In the event of a stop ship or significant line-down situation, Lexmark will inform ▮▮ as quickly as possible, typically within 24 hours, providing the basics of the issue and current plans for containment.

Lexmark will then provide Containment action plan within the next 24

40

A3358

hrs. Action toward containment will be implemented as quickly as possible.

Though each case is unique, this process will typically involve problem validation, root cause analysis, leading to a corrective action plan. This plan will be provided in the subsequent 24-48 hrs and will contain appropriate action to contain and correct the issue as needed

In addition, regular updates to ███ by the Lexmark Quality and Sustaining team will be part of this process.

i)   Ongoing Reliability Testing

Lexmark will perform ORT per standard Lexmark process and will provide test results upon completion of each round of testing. Test results may involve Lexmark branded product where leveraging is possible

j)  End of Marketing Life (EOML)

 Upon EOML, all quality reporting will cease.  In the event that a customer issue is identified after EOML, but during the standard warranty period, Lexmark will be required to respond to address and correct the issue, if necessary and reasonable

k)   Change Management

Refer to sustaining engagement and support: schedule 6.1

5)   Other

The following provision shall not limit or reduce Lexmark's obligations herein with respect to quality goals, requirements and commitment, but shall be applicable only for determining whether ███ may be excused from its obligations under Section 1.7.2 of Schedule G.  If the ███ field incident rate (i.e., confirmed failure) ("FIR") with regard to a specific Alliance Laser Printer is greater than fifty percent ( ███ ) of the FIR for the previous generation model of such printer or the initial FIR goals for such printer if there were no previous generation model, ███ will send Lexmark written notice thereof.  Within thirty (30) days of such written notice, Lexmark shall formulate and begin implementation of a corrective action plan designed to reduce the FIR for such printer to a rate that is better than or equal to the FIR of the previous generation model or the initial FIR goal if there were no previous generation model.  Should Lexmark fail to formulate and begin implementation of a corrective action plan within such 30-day period, and should ███ wish to be excused from the obligations contained in Section 1.7.2 of the Schedule G, then ███ shall within 30 days send written notice of its intent to be excused from such requirements.  Upon Lexmark's receipt of such written notice, the Parties will utilize the escalation process set forth in such Alliance Schedule.  If, however, at the conclusion of the escalation process the Parties have not reached agreement, ███ shall be excused from the obligations of Section .1.7.2 for such printer.

41

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3359

**Attachment 6.1, SUSTAINING ENGINEERING ENGAGEMENT**

**Schedule E**

1) At RTS (for ███████████) the product moves into the "Sustaining Phase. This phase has 4 key focus areas:

   a) Response to technical issues in the field, including IFIR/FIR rates and Quality excursions

   b) Engineering Change Notifications and Management

   c) Customer Technical Escalation Management

   d) Special Product Request Response

2) Technical Field Issues

   a) IFIR Response

   Lexmark is responsible to implement Failure Analysis and, when needed, corrective action to reduce IFIR and FIR.  Priority is given to products that are not achieving IFIR goal

   b) Quality Excursions/Product Holds

   Lexmark will communicate product hold and stop-ship information to ████ and will drive action to contain product in Lexmark Inventory.  When necessary, ████ core team will drive containment actions for products in ████ possession. Lexmark will be fully responsible for all activities necessary to correct the issue, using Lexmark internal processes.  Necessary communications between Lexmark and ████ Engineering will be per an agreed methodology and will follow Lexmark's corrective action process (8D, 5C, etc)

3) Bill of Material (BOM) and Engineering Change (EC) Management

Lexmark is responsible for maintaining the BOM and the corresponding Revision Level to each product.  Lexmark will manage Engineering changes for ████ products in parallel with those of the equivalent Lexmark branded products.  All changes will be processed per current Lexmark process. Details regarding specific changes will be made available on request.

   a) Critical changes, defined as those which result in a change in the product revision level, will be communicated to ████ through their change management system, ████ Lexmark will still maintain ownership and responsibility of the EC and, as such, ████ approval will not gate implementation.  This includes changes to the following:

      i) Changes to Part numbers of the printer, pub kit or Service parts

      ii) Changes to any safety related items or other items that affect regulatory and/or certification requirements

      iii) Changes that are as a result of a "major" IFIR issue.  These should be very limited in nature (less than 1 per product), meant to track an urgent change brought about by a large upward trend in IFIR

   b) Supplier Declaration of Conformity (SDOC) PN lists will be updated as needed to attach to the SDOC provided during the development phase

   c) For EC implementations, the ████ service parts disposition should be the same as Lexmark's service parts disposition for the equivalent Lexmark branded products.  When the EC is  unique to ████ product, ████ will be consulted to develop a mutually agreed to

42

appropriate service implementation / disposition strategy.  For any mutually agreed to non- Use As Is  (UAI) EC implementations due to design or manufacturing error, Lexmark will rework or scrap,  at Lexmark's expense, the ██ Service inventory impacted by the change.  ██will support this activity by consolidating and moving inventory to designated locations at Lexmark's cost.  Good inventory quantities will be mutually agreed upon, and may require a full inventory exchange based upon severity of Lexmark design or manufacturing error or component quality problem.  The service EC process is defined in Schedule C: Support Attachment C-10 ECO Process Flow.

4) Minimum Ship Revision (MSR) for Repaired/Reworked and New Buy Printers and Spare Parts:  Lexmark shall ensure that all printers and spare parts, new and repaired/reworked, conform to the Minimum Ship Revision level for both hardware and firmware.  MSR is to be established during the EC Process and will be based on that of the equivalent Lexmark product.  Further, service products should achieve service readiness such that no change in Printers and Spare Parts is required prior to shipment to the field.

5) Customer Technical Escalation Management

   a) Lexmark will subscribe to ██████system and respond to customer escalations from ██Technical Support.

   b) Lexmark is open to direct engagement with ██customers involved in escalations, including travel to customer sites if needed

6) Special Product Request (SPR) Management

   a) Lexmark agrees to assist ██with SPRs for large accounts that require more technical information than usually provided to a customer

   b) SPRs that result in modifications to product and/or process may result in additional NRE, in accordance with Attachment 3.4 of this Schedule

7) Engagement

   a) Lexmark will be responsible to maintain the Sustaining Action Item list

   b) Lexmark commits to Sustaining engagement a minimum of twice monthly to review the Sustaining Action Items

CONFIDENTIAL - OUTSIDE COUNSEL ON A3361

**Schedule E**
**Attachment 6.2, QUALITY GOALS**

| Product | IFIR Goal | FIR 90 | 1 Year FIR | 2 Year FIR | 3 Year FIR |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3362

## Attachment 8.0, EMERGING COUNTRIES SCHEDULE
## Schedule E

Each company desires to sell printers in Emerging Countries in a profitable way.  Both companies recognize that the current economics in these markets for a lifetime printer placement are weak.

Therefore, mutually the two companies set the following targets for these countries:
a) Both companies must be profitable over the lifetime of an Emerging Countries printer placement.  ██████ recognizes that Emerging Countries financial returns are not figured into ██████ overall profit targets for the printer business.  In other words, when ████ is calculating their overall margin for their respective printing businesses, Emerging Countries revenue and margin will not be part of measuring themselves against the target.
b) Support ██████ corporate priority of selling █████ printers into Emerging Countries.

Given overall weak economics in these countries, the two companies must engage to develop specific business models and/or product sets to accomplish these targets.  This unique business model may include
a) Unique products or product configurations that drive a lower cost
b) Unique product or support offerings (ie 90 day warranty) that drive a lower cost
c) Unique consumables or consumables programs that may drive improve loyalty and/or profit
d) Focused marketing efforts to target higher usage segments (Govt., SMB…)
e) Lexmark and █████ will work to define a  fulfillment and service strategy for each emerging market country in which Products are launched.


Emerging Countries include, but are not limited to:
     Brazil
     Russia
     India
     PRC
     Argentina
     Mexico
     Columbia
     Turkey
     Ukraine
     South Africa
     Indonesia
     Philippines
     Thailand

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3363

**Attachment 9.0, Toner Cartridge Collection Amendment**
**Schedule E**

This Attachment sets forth certain terms regarding the collection and recycling of non-Lexmark technology ████ branded toner cartridges (e.g., toner cartridges sold under the ████ brand name manufactured by ████████████████ or others). These terms shall only apply to the collection and recycling of non-Lexmark technology ████ branded toner cartridges.

Now, in consideration of the mutual promises and covenants herein made, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree to the following:

(a)      ████ and its worldwide subsidiaries/affiliates, and Lexmark, and its worldwide subsidiaries/affiliates, have agreed, as stated herein, to a collaborative effort whereby Lexmark will collect and recycle all used ████ branded toner cartridges manufactured by an entity other than Lexmark ("████ Branded Toner Cartridges") in accordance with Exhibit 2 that are sold in certain regions of the world described on Exhibit 1 (used ████ branded toner cartridges supplied by Lexmark will continue to be collected and recycled as per the terms of the Agreement), ████ will notify Lexmark of any new non-Lexmark technology ████ branded toner cartridges as ████ introduces new part numbers (per Exhibit 3). The purpose of this collection and recycle effort is to utilize Lexmark's existing process and experience in order to provide ████ with a cost effective, and proper disposal of this waste in accordance with Lexmark Recycling Policy. For purposes of this Attachment 9.0, the parties will utilize Lexmark's current processes and infrastructure as much as possible to minimize costs and maximize proper disposal methods. The type of service and charge for toner recycling services are defined in Exhibit 1 for each supported country. Lexmark reserves the right to make modifications to its process at any time. In addition, the parties will continue to review and analyze the recycling of ████ branded inkjet cartridges by Lexmark. This review and analysis will include collection process, efficient recycling disposition of ████ branded inkjet cartridges and costs involved.

(b)      ████ will, for all ████ Branded Toner Cartridges sold by ████ include in all boxes/packaging containing ████ Branded Toner Cartridges return instructions (which may include a return label in certain geographies if such geographies are either set forth in Exhibit 1 or are otherwise agreed to by ████ and Lexmark in writing) with a Lexmark, or a designated Lexmark sub-contractor, address. The parties shall agree on appropriate return instructions for each participating country but such instructions shall be similar to those return instructions currently used by Lexmark for its Lexmark branded cartridges or by ████ for its ████ branded Lexmark manufactured toner cartridges (any exceptions to these instructions (e.g., one page ████ recycling letter to see the ████ website for return information paid directly by ████ will be agreed upon by the parties in advance prior to any changes). Labels in use shall be designed to conform to published logistic provider minimum specifications provided that the same are reasonable. Lexmark will accept collection of all ████ Branded Toner Cartridges it receives at its collection facility in each country of the five designated regions (United States, Canada, AP, Latin America, and EMEA ("Regions")) using this return process and will be responsible for the initial shipping cost for the ████ Branded Toner Cartridges Lexmark receives unless otherwise agreed. ████ (or its manufacturers) will be responsible for the cost of preparing the return instructions (including labels), any marketing or promotional materials and any cost associated with placing such instructions on or in the ████ Branded Toner Cartridge box.

(c)      For all ████ Branded Toner Cartridges collected/received directly by ████ and/or its agents or contractors or if ████ uses and pays its freight carriers to collect/receive/forward ████ Branded Toner Cartridges as an agreed upon exception as described in Section (b) above, ████ shall have such ████ Branded Toner Cartridges sent to the designated Lexmark, or Lexmark sub-contractor, recycling ("processing / disposal") facility location at ████ cost and Lexmark shall not assess ████ a collection and freight charge as set forth in Exhibit 1. The parties anticipate that ████ Branded Toner Cartridges

46

provided to Lexmark directly by ▮ in each of five Regions will be less than ▮ of all of the ▮ Branded Toner Cartridges received by Lexmark in any given calendar quarter measured individually in each of the five Regions ("Maximum Amount"). All toner cartridges received directly from ▮ must be clearly labeled with the sender identified on the packing list upon arrival at the recycling center. In the event that ▮ Branded Toner Cartridges provided to Lexmark directly by ▮ become greater than such Maximum Amount in any of the five Regions, the processing/disposition cost as stated in Exhibit 1 of this Attachment 9.0 will be renegotiated for all ▮ Branded Toner Cartridges provided to Lexmark directly by ▮ above the Maximum Amount in that Region. The approximate ▮ Branded Toner Cartridges in the United States that were sent to Lexmark in the United States for recycling as agreed 6/28/05 will not be considered in any calculation of the Maximum Amount. ▮ will be responsible for all costs involved in transporting and storing these ▮ Branded Toner Cartridges to the Lexmark recycling facility in El Paso, Texas.

(d)    For all ▮ Branded Toner Cartridges received by Lexmark, or Lexmark designated contractor, in each country of the five Regions, Lexmark, or its contractor, will recycle such ▮ Branded Toner Cartridges in accordance with the Lexmark Recycling Policy (e.g., material separation and processing as shown in Exhibit 2).

(e)    Lexmark agrees that it will document all ▮ Branded Toner Cartridges received by Lexmark each month in each of the five Regions by individual part number unless undeterminable and provide ▮ with a monthly report of received ▮ Branded Toner Cartridges. This report of receipt of ▮ Branded Toner Cartridges by Lexmark will not be deemed Lexmark confidential and ▮ may use this report at its discretion. This Agreement, including its content, all reports (except as stated above) and the collection/recycling process utilized by Lexmark will be subject to Section 12.2 of the Agreement, and for such purposes the collection/recycling process used by Lexmark will be deemed Lexmark confidential information. The parties also agree to work in good faith on a document that may be generally released to the public that describes the recycling and environmental benefits of this environmental initiative.

(f)    For the services provided under this Attachment 9.0, ▮ shall pay Lexmark the amounts set forth in Exhibit 1 with respect to cartridges received under (b) above. Payment terms are as set forth in section 3.6 of the Agreement.

(g)    Lexmark will indemnify, defend and hold ▮ and ▮ and its officers, directors, employees, agents and customers harmless from any loss, damage, claim, demand, suit, liability, civil penalties, cost or expense arising out of claims by third parties from (except for claims arising out or related to ▮ indemnification obligations described in Section (h) below):

I.    any and all claims caused by Lexmark's or Lexmark's subcontractors' failure to comply with laws or regulations applicable to the recycling and/or disposition of toner and toner cartridges, or proximately caused by a breach of this Attachment 9.0 by Lexmark or any of Lexmark's subcontractors (or any of their employees, officers and/or directors);

II.    any and all claims that are proximately caused by a breach of this Attachment 9.0 by Lexmark or any of the subcontractors, or any of their employees, officers and/or directors, of Lexmark's that resulted in loss, damage to, theft or destruction of tangible property and/or illness, injury or death to any person, including but not limited to customers, suppliers, agents, employees or invitees of ▮ and/or

III.    any and all claims by or on behalf of Lexmark's employees, officers and/or directors, subcontractors, including, but not limited to, assertions under Worker's Compensation or similar acts, made by persons employed or furnished by Lexmark or any of Lexmark's subcontractors or by reason of any injuries to any such persons in performing the services under Lexmark' direction;



47

A3365

 will promptly notify Lexmark of each claim of which ▮ has knowledge. Subject to prior written approval of ▮ Lexmark will have the responsibility and authority to defend against or settle the claim and ▮ will provide Lexmark with all reasonably available information ▮ may have concerning such claim.  Lexmark will assume the defense of claim until resolved and pay any amount in settlement and all costs and damages awarded against or incurred by ▮ or any other person or entity indemnified hereunder.  ▮ may hire counsel to monitor such litigation at ▮ cost and expense.  Lexmark will keep ▮ informed at all times as to the status of Lexmark's efforts, defense and any settlement and consult with ▮ concerning same.   The foregoing indemnification obligations shall not apply to claims, actions or suits to the extent resulting from the negligence of ▮ or ▮ carriers/hubs or Lexmark's handling of hazardous materials.

(h)      ▮ agrees to indemnify, defend and hold Lexmark, its subsidiaries and its employees harmless from and against any and all claims (including costs of litigation and attorney fees) asserted against any of them which arise out of claims that ▮ Branded Toner Cartridges contain hazardous materials as defined under any United States (including individual state laws) or foreign laws.  The foregoing indemnification obligations shall not apply to claims, actions or suits to the extent resulting from the negligence of Lexmark or Lexmark's carriers/hubs.

(i)      Each party acknowledges that the other party's sub-contractors are critical to the other party's business.  During the term of this Attachment 9.0 and during the 12 months following its termination neither Party shall directly or indirectly solicit, hire, seek or procure the services of any employee of the other Party or of the subcontractor(s) of the other Party, or solicit, contract with or procure the services of such subcontractors themselves for the same type of service, who was at the time of such action known by the first party to be such an employee or subcontractor and known by the first party to be directly involved in the supply, receipt or administration of any services hereunder without the prior consent of and upon such terms as specified by the other Party; provided, however, that each Party shall be at liberty to employ or engage such an individual (but not a subcontractor) as a result of any public advertisements or public recruitment campaigns or as a result of an unsolicited approach from the employee concerned.

**LEXMARK WARRANTS THAT ITS SERVICES WILL BE PERFORMED BY LEXMARK PERSONNEL, OR LEXMARK DESIGNATED SUBCONTRACTORS, PROMPTLY AND IN A GOOD AND WORKMANLIKE MANNER IN ACCORDANCE WITH THE STANDARD IN THE INDUSTRY. LEXMARK MAKES NO OTHER WARRANTIES OR REPRESENTATIONS OF ANY KIND REGARDING THE SERVICES.**

(j)      **INSURANCE REQUIREMENTS.**

During the term of this Attachemnt 9.0, Lexmark shall maintain the following insurance coverage in at least the following amounts:

1.  Workers' Compensation with statutory limits required by each state exercising jurisdiction over the Lexmark associates engaged in performing services under this agreement.
2.  Employer's Liability coverage with a minimum limit of $500,000 for bodily injury by accident or disease.
3.  Commercial General Liability coverage (including products and completed operations, blanket or broad form contractual, personal injury liability and broad form property damage) with minimum limits of one million dollars ($1,000,000) per occurrence for

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3366

bodily injury/property damage and one million dollars ($1,000,000) for personal injury and products/completed operations.

4. Business Automobile Liability coverage (covering the use of all owned, non owned and hired vehicles) with minimum limits (combined single limit) of one million dollars ($1,000,000) for bodily injury and property damage.

5. Excess or Umbrella Liability coverage with a minimum limit of two million dollars ($2,000,000) coverage in excess of the coverage as set forth in items 2, 3, and 4 above.

6. Employee Dishonesty (Fidelity) and Computer Crime coverage (for losses arising out of or in connection with any fraudulent or dishonest acts committed by employees of Lexmark, acting alone or in collusion with others) with a minimum limit of ten million dollars ($10,000,000).

7. Errors & Omissions coverage in the amount of ten million dollars ($10,000,000).

Subject to Lexmark's right to self-insure coverage as set forth below, the foregoing coverages shall be maintained with insurers which have an A.M. Best rating of A- or better and /or an equivalent rating from a recognized insurance company rating agency.

Notwithstanding the foregoing, Lexmark reserves the right to self-insure coverage, in whole or in part, in the amounts and categories designated above, in lieu of Lexmark's obligations to maintain insurance as set forth above, at any time.  Promptly upon ▮▮▮ written request for same, Lexmark shall deliver certificates of insurance to confirm what coverage is in place.

This section does not replace or otherwise amend, in any respect, the limitations on Lexmark's liability as set forth elsewhere in this Agreement.

(k)     In providing disposal and/or recycling services, Lexmark shall comply with the following: (i) Lexmark shall use reasonable commercial efforts to recycle all ▮▮▮ Branded Toner Cartridges and all compounds therein, and minimize disposal (i.e., landfills) of ▮▮▮ Branded Toner Cartridges; (ii)  Lexmark shall have its subcontractors performing recycling services for Lexmark under this Attachment 9.0 to work towards a goal of obtaining ISO 14001 certification within two (2) years of the Effective Date, (iii) Lexmark shall ensure that it and its subcontractors, either directly or through intermediaries, comply with the process flowchart attached as Exhibit 2 to prevent the shipping of ▮▮▮ Branded Toner Cartridges to solid waste (non-hazardous waste) landfills or incinerators for disposal or energy recovery; and (iii) Lexmark shall not export ▮▮▮ Branded Toner Cartridges from developed to developing countries for disposal (i.e., landfill).  Reporting information shall be in the format agreed between the parties and as shown in Exhibit 2.

(l)     AUDIT AND INSPECTION.   ▮▮▮ via a mutually agreed third party (who shall sign a confidentiality agreement with Lexmark prior to performing any verification services described in this section), shall have the right at from time to time, but no more than two times per calendar

CONFIDENTIAL - OUTSIDE COUNSEL ONLYA3367

year (unless a deficiency is found then more frequently until the deficiency is corrected), during the term of this Attachement 9.0, to enter onto Lexmark's or its subcontractors' premises, with reasonable notice, during normal business hours, for the purpose of verifying Lexmark's compliance with the terms and conditions of this Agreement and the processes shown in Exhibit 2.  This will be done at ██████ expense.  If a deficiency is acknowledged by Lexmark to be corrected, but is not satisfactorily corrected, then reasonable costs of unscheduled follow-up audits resulting from the uncorrected deficiency shall be paid by Lexmark.  Lexmark shall make available to the mutually agreed third party for purposes of such verification its facilities and records directly related to the process described in Exhibit 2.



(m)    This Attachment 9.0 shall continue until the Agreement is terminated or either party terminates this Attachemnt 9.0 for convenience upon one-hundred eighty (180) days written notice to the other.  Upon termination of this Attachment 9.0, (i) ████ Branded Toner Cartridges boxes will no longer use Lexmark, or its contractor's, address; (ii) ████ will cease using Lexmark marketing materials (e.g., brochures) and other Lexmark materials; (iii) Lexmark will no longer accept ████ Branded Toner Cartridges at its facilities but, if such ████ Branded Cartridges are received using Lexmark's paid-for return shipping, ████ shall pay Lexmark the collection and freight charge for such cartridges at the price in effect upon the termination of this Agreement; and (iv) Lexmark shall promptly forward any ████ Branded Toner Cartridges sent to Lexmark to ████ in each of the Regions where such ████ Branded Toner Cartridges are received at ████ expense which shall include shipping costs except, if Lexmark terminates this Attachement 9.0 for convenience, Lexmark shall be responsible for the shipping costs for forwarding ████ Branded Toner Cartridges sent to Lexmark to ████ in a Region where such ████ Branded Toner Cartridges was received as long as ████ has complied with items (i) and (ii) above or, at Lexmark's discretion, Lexmark may continue to recycle the ████ Branded Toner Cartridges at the price in effect upon the termination of the Agreement.

This Attachment is the complete and exclusive statement of the terms herein and supersedes any and all prior oral or written communications between the parties relating to the subject matter hereof.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3368

Schedule E
Attachment 9.0, Exhibit 1

## SUPPORT AND CHARGES FOR COLLECTION, FREIGHT, PROCESSING, & DISPOSAL

| REGION | COUNTRY | SUPPORT | PHONE # | FAX # | PH# Service Hrs (excluding holidays) | Collection & Freight charge per ▮ Branded Toner Cartridge Received by Lexmark using a Lexmark freight carrier in the return process. | Processing / Disposal Charge |
|---|---|---|---|---|---|---|---|
| United States | United States | Waybill | - | - | - | | |
| Canada | Canada | Waybill | - | - | - | | |
| Latin America | Puerto Rico | Waybill | - | - | - | | |
| Asia | Australia | Waybill | - | - | - | | |
| Asia | China (PRC) | Phone# | ▮ | - | Mon-Fri, 9-12 and 1-5:30 | | |
| Asia | Japan | Phone# | ▮ | - | Mon-Fri, 9-5 | ▮ | ▮ |
| Asia | Malaysia | Phone#(g) | ▮ | - | Mon-Fri, 9-5 | | |
| Asia | Singapore | Phone#(g) | ▮ | - | Mon-Fri, 9-5 | | |
| EMEA | Austria | Waybill | - | - | - | | |
| EMEA | Belgium | Waybill | - | - | - | | |
| EMEA | Denmark | Waybill | - | - | - | | |
| EMEA | Finland | Waybill | - | - | - | | |
| EMEA | France | Waybill | - | - | - | | |
| EMEA | Germany | FAX Label | - | ▮ | - | | |
| EMEA | Ireland | Waybill | - | - | - | | |
| EMEA | Italy | Phone# (g) | ▮ | - | Mon-Fri, 9-12:30 and 2-6 | ▮ | ▮ |
| EMEA | Luxembourg | Waybill (website) | | - | - | | |
| EMEA | Netherlands | Waybill | - | - | - | | |
| EMEA | Norway | Waybill | - | - | - | | |
| EMEA | Portugal | Phone# (g) | ▮ | - | Mon-Fri, 9-1 and 2-6 | | |
| EMEA | Spain | Phone# (g) | ▮ | - | Mon-Th, 8:30-12:30 and 3-6 | | |
| EMEA | Sweden | Waybill | - | - | - | | |
| EMEA | Switzerland | Waybill | - | - | - | | |
| EMEA | United Kingdom | Waybill | - | - | - | | |

If the parties agree to an exception where ▮ pays for customer returns of a ▮ Branded Toner Cartridge to a Lexmark collection recycling center in a country (as opposed to sending it directly to one of the three Lexmark processing/disposal facilities), the parties will agree on the freight charge for the transportation and handling of the ▮ Branded Toner Cartridge from the collection recycling center to a processing/disposal facility.

Pricing is in United Stated dollars.  Pricing may be changed by mutual agreement or by Lexmark upon sixty days notice at any time after April 1, 2007.

Lexmark agrees to amend this Exhibit as changes in phone numbers, fax numbers or service hours occur and communicate these changes to ▮ Lexmark is open to considering alternative collection methods, alternative disposal methods or alternative partners which are mutually beneficial to the ▮ and Lexmark toner cartridge recycling efforts.

51

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3369

Lexmark agrees to jointly develop, with ███ a process in Mexico and Columbia to support toner recycling activities in these countries, subject to local regulations.  Lexmark may change pricing for Latin America depending on the Mexico /Columbia solution developed.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3370

**Schedule E**

**Attachment 9.0, Exhibit 2**



CONFIDENTIAL - OUTSIDE COUNSEL ONL**A3371**

**Schedule E**
**Attachment 9.0, Exhibit 3**

██ part number list:

██ **PN**          **Description**

Item Number    Item Description

CONFIDENTIAL - OUTSIDE COUNSEL ONL A3372

**Attachment 10.0**
**Sample Import/Export Questionnaires**

<u>**Hardware Export Controls**</u>

In accordance with the U.S. Export Administration Regulations, components possessing encryption capabilities may require formal export licenses before they can be exported and/or re-exported from the United States.

In order to make proper licensing determinations of your software and/or commodity it is essential that you complete the questions on the following page.

If you need assistance or have questions, please contact the ████████████████████mailbox.

If your software has not been classified and you have questions on how to classify your software, refer to the BIS (Bureau of Industry & Security) Website at http://www.bis.doc.gov.  Under the category of Getting Help and Contacting us, click on the General Fact Sheets.  Then click on Explanation of what commodity classifications are or Guidance on requesting a commodity classification.

If you are unable to provide the information required, please forward this questionnaire to your Export Controls or Legal department.

This is a legal matter which deals with regulations on export controls and compliance. We trust we can count on your maximum cooperation, in providing us with the requested information by return fax to ████████████ or ████████████.

Yours truly,

████████████████████████

CONFIDENTIAL - OUTSIDE COUNSEL ONLA3373

# HARDWARE QUESTIONNAIRE (Please complete 1 questionnaire for each item.  Attach additional pages if necessary)

**A.** Company Name & Address**:**_____

_____

_____

**B.**

**C.** Vendor product name & vendor part #: _____

**D.** ██ part #(if available): _____*If a kit, please fill out entire kit. Please provide an HTS for each component of the kit.

**E.** Country of Origin: _____ Address of Origin: _____

**F.** Harmonized Tariff Schedule Number (HTS): _____

**G.** FCC #: _____ FDA model #: _____     Export Commodity Control Number (ECCN): _____

## License Exception: _____ If ENC, does the product qualify for Unrestricted status? Yes___ NO___
## CCAT#: _____(if applicable)

1. Please provide the functionality of your product.
_____
   - If there are drivers, diagnostic or application software, please provide classification below:
   - ECCN_____     License Exception (if Applicable):_____

2. If product is a CRT (cathode ray tube) monitor or flat panel monitor?  If so please include dot pitch.
_____

3. If product is a NIC/Ethernet Card, is it integrated on the motherboard?  If so, please include the vendor information.
_____

4. Power Supplies, please provide voltage/ Amps / period of hours / current output.
_____

5. Internal/External Drives: please provide maximum bit transfer rate (mb/s) as stated under the Export Administration Regulations §774 category 4. _____

6. If the product is an Adapter/Controller Card: please specify bit to Fiber, bit PCI to Ultra3 SCSI, or if embedded as stated under the Export Administration Regulations §774 category 4.
_____

7. Does your product contain Encryption? Yes___  NO___  If yes, please provide encryption key size and if it is an asymmetric algorithm or symmetric algorithm as stated under the Export Administration Regulations §774 category 5 part 2.
_____

8. Monitors:  Please provide the number of resolvable  elements per centimeter in the direction of the maximum pixel density: _____

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3374

9.  Batteries:

| Project (Cell Type) | ▮Part Number | 75 Cycle Capacity (Wh) | Weight (g) | Energy Density (Wh/kg) |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

**This form Completed by:**

Name (printed) _____ Title _____

Signature: _____Date _____ Phone #_____ Email_____

---

# 1.    Encrypted Software Export Controls

In accordance with the U.S. Export Administration Regulations, certain software and items possessing encryption capabilities may require formal export licenses before they can be exported and/or re-exported from the United States.

It is essential that you complete the questions on the following page in order to make proper licensing determinations of your software and/or commodity.

Please send an e-mail to the ▮▮▮▮▮▮▮▮▮▮▮ mailbox if you need assistance or have questions.

If your software has not been classified and you have questions on how to classify your software, refer to the BIS (Bureau of Industry and Security) Website at http://www.bis.doc.gov  for guidance.

If you are unable to provide the information required, please forward this questionnaire to your Export Controls or Legal department.

This is a legal matter which deals with regulations on export controls and compliance. We trust we can count on your maximum cooperation in providing us with the requested information by return fax to (▮▮▮▮▮▮▮▮▮

Yours truly,



57

CONFIDENTIAL - OUTSIDE COUNSEL ONLYA3375

II.

III.    SOFTWARE QUESTIONNAIRE

    **A.**    Company Name**:**

_____

    B.    Product name & version number: _____ Country of
Origin: _____

    C.    Export Commodity Control Number (ECCN): _____ License
Exception: _____

    D.

    E.    If the License Exception is ENC, has the one time review for Retail Exemption
occurred? YES  NO

**CCAT number: _____**
**If the product is 5D002 - ENC, please provide a copy of the BIS classification verification (CCAT).**

10.  What is the functionality of your software (i.e.: word processing, engineering/design, communication,
operating system, etc.)? _____

11.  What type of equipment is the software used to support (i.e.: telecommunications, manufacturing/test,
computers, etc.)?  Please be specific._____

12. Is your software available to the public via sales from stock at retail selling points by means
of "over–the-counter" transactions, mail order, or telephone call transactions (Mass Market)?
_____    **If yes, please forward a copy of BIS**
**approval.**

13. Is your software designed for installation by the user without further substantial support
(substantial support does not include telephone (voice only) help line services for installation
or basic operation, or basic operation training provided by the supplier?
_____

14. Does your software or commodity have encryption capabilities?
_____

    **If the answer to question 5 above is "No", you do not need to complete the remaining**
**questions on this form.**

15. What function does the encryption provide (i.e.: password protection, data encryption, etc.?
Please be specific.
_____

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3376

16. Does the data encryption algorithm exceed a key space of 64 bits?

_____

17. What is the specific bit level of encryption?

_____

18. Does your software or commodity allow the alteration of the data encryption mechanism and its associated key spaces by the user?

_____

19. Please provide a brief written summary of the encryption technology used in the design of the software or commodity in question.  Please be sure to identify the type of algorithm used.

_____

_____

_____

____

20. Is there an **EXPORT** version of the software named above?

_____

**This form Completed by:**

Name:        _____     Title:      _____     Signature:

_____

(Please print name)

Date:        _____     Phone        #:        _____     Email:

_____

CONFIDENTIAL - OUTSIDE COUNSEL ONLA3377

## Attachment 11.0, ALLIANCE FUNCTIONAL OWNERS

| FUNCTION | | ██████ | Lexmark |
|---|---|---|---|
| Legal | | | Andy Logan |
| Logistics/Supply Chain | | | Thomas Morrison |
| Sales Support | USA | | Ken Kerkhoff |
| Sales Support | EMEA | | Francis Rogard |
| Sales Support | APJ | | Wendy White |
| Technical Collaboration | Inkjet | | Mike Wilson |
| Technical Collaboration | Laser | | Rob Marshall |
| Pricing Methodology | | | Joseph O'Nan |
| ECO management | | | Bryan Tauzer |
| Service (call center) | | | Phillip King |
| Quality | | | Bryan Tauzer |
| Forecast (demand/supply) | | | Kelly Tyler |
| Product road map | Inkjet | | Jane Lloyd |
| Product road map | Laser | | Marty DeGraff |
| | | | |
| Relationship Mgmt | | | Chris White |
| Alliance Mgmt | | | Terry Samuel |

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3378

THIS SCHEDULE F (this "Schedule") is entered into as of November 1, 2008 (the "Schedule Effective Date") by and between ████████████████ the ████████████████ on behalf of itself and its worldwide affiliates (collectively, █████), Lexmark International, Inc., a Delaware corporation ("LII"), and Lexmark International Technology, S.A., a Swiss company and LII's subsidiary ("LITSA")(LII and LITSA being hereinafter collectively referred to as "Lexmark").

This Schedule F provides additional terms and conditions to the Master Purchase Agreement having an effective date of November 1, 2008 between ████ and Lexmark (the "Agreement"). All terms and conditions of the Agreement apply to this Schedule F, and the terms and conditions of this Schedule F are hereby incorporated by reference into the Agreement. Defined terms used herein but not otherwise defined herein shall have the meanings given such terms in the Agreement. In the event of a conflict between this Schedule F and the Agreement, this Schedule F shall govern.

This Schedule F includes:

A.    Attachment 1.1, Lexmark Software Distribution License.
B.    Attachment 1.2, Software Support Agreement, originally executed on October 25, 2005.
C.    Attachment 1.3, ████ Software Distribution License.

Schedule F Attachment 1.1
**LEXMARK PRINTER/AIO DRIVER SOFTWARE DISTRIBUTION LICENSE**

| | | | |
|---|---|---|---|
| | ████████████████ on behalf of itself and its Affiliates | Attn: | ████████ |
| Address: | ████████████ | Telephone: | ██ ████ |

Lexmark International, Inc. and its subsidiaries ("Lexmark") agree to grant to Licensee and Licensee accepts a license to the Licensed Software listed below on the terms and conditions specified in this License.

| Licensed Software | | | | | |
|---|---|---|---|---|---|
| Description | Version / Part No. | Format | License Fee | Authorized Number of Copies | Bundled Distribution |
| Print and Scan driver software; install software, including web packages; communications software, such as wireless software; and applications software, such as Lexmark's web browser and Lexmark's Device Center, all as provided by Lexmark to Licensee for redistribution | **Original and all subsequent versions delivered to Licensee** | **Executable Format only** | **None** | **Unlimited unless otherwise indicated by Lexmark at time of delivery** | **No unless otherwise indicated by Lexmark at time of delivery** |
| | | | | | |
| | | | | | |

| Modified Materials for Licensee Distribution | | | | | |
|---|---|---|---|---|---|
| Title | Version / Part No. | Format | License Fee | Authorized Number of Copies | Bundled Distribution |
| **None** | **N/A** | **N/A** | **N/A** | **N/A** | **N/A** |

| Licensee Modifiable Materials | | |
|---|---|---|
| Title | Version / Part No. | Format |
| **None** | **N/A** | **N/A** |

## 1. DEFINITIONS

1.1   "Licensed Software" means the above identified Licensed software of the specified version and format, including error corrections, updates, and end user documentation, in any medium, such as magnetic tape, electronic download, disks, CDs or optical media which is provided to Licensee by Lexmark.  Licensed Software designated as Bundled Distribution in the Licensed Software table is subject to additional restrictions on distribution.

1.2   "Licensee Modifiable Materials" means software files or documentation including pictures, graphics and text files identified above in the specified version and format, including any software tools, installation software, any error corrections and updates, in any medium, such as magnetic tape, electronic download, disks, CDs or optical media which is or may be provided to Licensee by Lexmark at Lexmark's option.

1.3   "Modified Materials" means derivative works or materials created by or for Licensee that are derived from, based upon or incorporate any portion of the Licensee Modifiable Materials licensed under this Schedule. Modified Materials for distribution by Licensee in executable format are designated in the Modified Materials for Licensee Distribution table above and if designated as Bundled Distribution are subject to additional restrictions on distribution.

1.4   "Applicable Equipment" means the ████ printer /multifunction devices purchased from Lexmark which incorporates the customized Lexmark printer/multifunction device software.

1.5   "Licensed Territory" means the world.

1.6   "Effective Date" means the Effective Date of the Agreement executed concurrently with this Schedule, and

**CONFIDENTIAL - OUTSIDE COUNSEL ON** **A3380**

to which this Schedule is attached.

## 2. LICENSE GRANT

2.1   Notwithstanding anything to the contrary in this Schedule, for any pre-release or test version of Licensed Software and for Licensee Modifiable Material that is designated as a source code, pre-release or test version, Lexmark grants to Licensee a personal, nonexclusive, non-transferable license to load such source code, pre-release or test version of the Licensed Software and Licensee Modifiable Materials on its internal computer system(s) for electronic copying for internal use only and with respect to Licensee Modifiable Materials for developing Modified Materials in source code form for use only for internal purposes. Licensee shall have no right or license to copy and distribute to any third party or to license any end user: (i) source code, pre-release or test versions of Licensed Software, (ii) source code, pre-release or test versions of Licensee Modifiable Materials; and (iii) source code for Modified Materials.

2.2   Subject to the Licensee's obligations under this Schedule, Lexmark grants to Licensee a personal, nonexclusive, non-transferable license in the Licensed Territory to: (i) load the Licensed Software or Modified Materials not designated as Bundled Distribution in executable format on Licensee's internal computer system(s) for copying and distribution through Licensee's channels of distribution as preinstalled in the Applicable Equipment, as preinstalled in systems including the Applicable Equipment, on physical media provided with the Applicable Equipment or systems incorporating Applicable Equipment or by electronic distribution to its end users for use only with the Applicable Equipment; and (ii) load the Licensed Software or Modified Materials designated as Bundled Distribution in executable format on Licensee's internal computer system(s) for copying and distribution through Licensee's channels of distribution for bundled distribution and use only with the Applicable Equipment including preinstalled on the Applicable Equipment, preinstalled on systems incorporating the Applicable Equipment, or on physical media provided in the package with the Applicable Equipment or systems incorporating Applicable Equipment. Licensed Software or Modified Materials designated as Bundled Distribution shall not be distributed to end users by any electronic distribution method, such as from a website via the internet or on any media that is not distributed in the packaging with the Applicable Equipment or systems incorporating the Applicable Equipment. This license allows Licensee to make the maximum number of copies of the Licensed Software or Modified Materials specified in the above tables. Reproduction, distribution and use of the Licensed Software and Modified Materials outside of the Licensed Territory is prohibited.

2.3   Licensee shall sublicense the Licensed Software and Modified Materials in executable format only to end users under Licensee's standard end user software licensing agreement. Licensee's end user software licensing agreements shall be in the name of Licensee and provide at least the same rights and protections as those provided in this Schedule. End users may assign their end user software licensing agreement to any bona fide successor in interest who first agrees in writing to be bound by the terms of their end user software licensing agreement. Lexmark and any third party beneficiaries of this Schedule shall be third party beneficiaries in any such agreements.

2.4   Notwithstanding the terms and conditions of this Schedule, all or any portion of the Licensed Software or Modified Materials that constitutes software provided under public license by third parties ("Freeware") is licensed to Licensee subject to the terms and conditions of the software license agreement accompanying such Freeware, whether in the form of a discrete agreement, shrink-wrap license, or electronic license terms at the time of download. Use and distribution of the Freeware by Licensee shall be governed entirely by the terms and conditions of such license.

2.5   Should Licensee install the Licensed Software or Modified Materials in executable formats using a single click installation process, the install screen shall contain the following elements: (i) an on-screen statement stating substantially as follows: "Click Install to install all software and documentation, and accept the End User License Agreement"; (ii) a click-on link to enable the end user to view the End User License Agreement prior to beginning installation; (iii) a click-on link to enable installation of the Licensed Software or Modified Materials and optionally provide a click-on link to indicate acceptance of the terms of the End User License Agreement when the software has been preinstalled; and (iv) a click-on link allowing the end user to cease installation of or uninstall the Licensed Software or Modified Materials if the end user does not agree to accept the terms of the end user license agreement.

2.6   Licensee agrees not to reverse engineer or decompile any of the Licensed Software that is not in source code format. Although it is not obligated to do so, in the event Lexmark provides any error corrections or updates to the Licensed Software or Licensee Modifiable Materials, Licensee agrees to install such error corrections or updates and to provide the same to its end users.

2.7   If Licensee translates or makes any modification to the Licensed Software or Licensee Modifiable Materials, Licensee agrees to indemnify, defend and hold Lexmark harmless from any errors or omissions due to such

2

CONFIDENTIAL - OUTSIDE COUNSEL ONLA3381

modifications and/or translations, and for any damages claims, causes of action and expenses (including attorneys' fees) arising from or related directly or indirectly to such modifications or translations.

2.8 All copyrights in the Licensed Software and Modified Materials, exclusive of original contributions of Licensee to the Modified Materials, and Licensee Modifiable Materials are and shall remain the exclusive property of Lexmark and its suppliers. No license other than that specifically stated herein is granted to Licensee, or any right under any patent, trademark, copyright, trade secret or other intellectual property of Lexmark other than that expressly granted by this Schedule. Licensee agrees to notify its employees that Lexmark and its suppliers are the copyright holders of the Licensed Software and Licensee Modifiable Materials.

2.9 Licensee shall not remove any copyright or other proprietary notices of Lexmark or third parties found in or on the Licensed Software or Licensee Modifiable Materials.

## 3. ADDITIONAL LICENSED SOFTWARE

3.1 Lexmark may from time to time provide additional Licensed Software and/or Licensee Modifiable Materials to Licensee under this Schedule. Licensee agrees that any use of such additional Licensed Software or Licensee Modifiable Materials or the accessing of Lexmark's server and downloading of any additional Licensed Software or Licensee Modifiable Materials from Lexmark's server shall constitute Licensee's acceptance of the terms of this Schedule with respect to such additional Licensed Software and Licensee Modifiable Materials used or downloaded by Licensee and any Modified Materials derived from such additional Licensee Modifiable Materials.

## 4. PROTECTION AND SECURITY

4.1 For Licensed Software designated as a source code, pre-release or test version and for any Licensee Modifiable Materials, Licensee represents that its employees having access to such source code, pre-release or test version of Licensed Software or Licensee Modifiable Materials are or shall be party to written agreements acknowledging a duty to protect any of Lexmark's confidential materials contained in the source code, pre-released and test versions of Licensed Software and Licensee Modifiable Materials.

4.2 Licensee shall keep electronic copies of source code, pre-release or test version of Licensed Software and Modified Materials as well as Licensee Modifiable Materials (including archival copies, if any), in a secure environment and shall take all steps reasonably necessary to protect electronic copies of the source code, pre-release and test versions of Licensed Software and Modified Materials, Licensee Modifiable Materials, or any part thereof from unauthorized release or modification.

4.3 Licensee expressly agrees that a breach of this Schedule will cause irreparable harm to Lexmark and that Lexmark shall have the right to obtain injunctive relief against any unauthorized use, disclosure, copying or transfer of any part of Licensed Software, Modified Materials or Licensee Modifiable Materials. Licensed Software or Licensee Modifiable Materials may contain software from third parties who are intended to be third party beneficiaries of this Schedule.

## 5. DISCLAIMER & WARRANTIES

5.1 Unless otherwise provided in a separate written agreement with Licensee, Lexmark warrants that the Licensed Software and Licensee Modifiable Materials, as provided, shall conform to the specifications of Lexmark. During the thirty (30) days after the date of delivery of the Licensed Software and Licensee Modifiable Materials, Lexmark shall, in its sole opinion, use reasonable commercial efforts to correct errors detected in the Licensed Software and Licensee Modifiable Materials, as provided, after receiving notification of such errors from Licensee. In the event that any modifications are made to the Licensed Software which have not been authorized by Lexmark, any and all warranty and other obligations of Lexmark shall immediately cease with respect to such software.

5.2 Unless otherwise provided in a separate written agreement with Licensee, Lexmark is under no obligation to provide Licensee with any modifications, updates, additions or revisions to the Licensed Software and Licensee Modifiable Materials, or to maintain the Licensed Software and Licensee Modifiable Materials in any manner.

5.3 EXCEPT FOR THE WARRANTIES SET FORTH IN THIS SCHEDULE OR AS OTHERWISE PROVIDED FOR IN A SEPARATE WRITTEN AGREEMENT WITH LICENSEE, LICENSED SOFTWARE AND LICENSEE MODIFIABLE MATERIALS ARE PROVIDED "AS-IS". LEXMARK MAKES NO WARRANTIES, WHETHER EXPRESS OR IMPLIED, WITH RESPECT TO ANY LICENSED SOFTWARE AND LICENSEE MODIFIABLE MATERIALS PROVIDED UNDER THIS SCHEDULE INCLUDING, BUT NOT LIMITED, TO ANY WARRANTIES OF MERCHANTABILITY OR

**CONFIDENTIAL - OUTSIDE COUNSEL ON**|A3382

FITNESS FOR A PARTICULAR PURPOSE. LEXMARK DOES NOT WARRANT THAT THE LICENSED SOFTWARE AND LICENSEE MODIFIABLE MATERIALS WILL MEET THE LICENSEE'S REQUIREMENTS, OR THAT THE LICENSED SOFTWARE AND LICENSEE MODIFIABLE MATERIALS WILL BE ERROR-FREE. LEXMARK MAKES NO WARRANTY OF NONINFRINGEMENT, EXPRESS OR IMPLIED.

5.4 THIS SCHEDULE SETS FORTH THE ENTIRE OBLIGATION OF LEXMARK WITH RESPECT TO THE LICENSED SOFTWARE AND LICENSEE MODIFIABLE MATERIALS. IN NO EVENT SHALL LEXMARK BE LIABLE TO LICENSEE FOR LOSS OF PROFITS, INDIRECT, SPECIAL, INCIDENTAL, PUNITIVE, CONSEQUENTIAL, OR EXEMPLARY DAMAGES ARISING OUT OF OR IN CONNECTION WITH THIS SCHEDULE OR ANY ACTS OR OMISSIONS ASSOCIATED THEREWITH OR RELATING TO THE USE OF ANY LICENSED SOFTWARE OR LICENSEE MODIFIABLE MATERIALS, WHETHER SUCH CLAIM IS BASED ON BREACH OF WARRANTY, CONTRACT, TORT OR OTHER LEGAL THEORY AND REGARDLESS OF THE CAUSE OF SUCH LOSS OR DAMAGE OR WHETHER ANY OTHER REMEDY PROVIDED HEREIN FAILS.

5.5 IN NO EVENT SHALL LEXMARK'S TOTAL LIABILITY FOR ANY DAMAGES, HOWEVER BASED, BE IN EXCESS OF THE GREATER OF THE LICENSE FEES PAID OR

## 6. TERM AND TERMINATION

6.1 This Schedule shall commence on the Effective Date and continue until the expiration or termination of the Agreement unless sooner terminated in accordance with this Section 6.1. Lexmark may terminate this Agreement or any part thereof on thirty (30) days written notice in the event that, due to termination or expiration of other license rights, it no longer has the rights necessary maintain this license. Either party may terminate for convenience upon thirty (30) days notice to the other. This Schedule may be terminated by Lexmark immediately upon thirty (30) days written notice to Licensee if Licensee is in breach of any of its obligations hereunder.

6.2 Immediately after termination or expiration, Licensee shall cease all use of the Licensee Modifiable Materials and all distribution of the Licensed Software and Modified Materials, destroy all copies and provide Lexmark with its written certification that it has retained no copies. End user software license agreements shall remain in effect, provided such end users remain in compliance with the terms of their end user software license agreement.

## 7. MISCELLANEOUS

7.1 Except for taxes based on Lexmark's income, Lexmark shall not be responsible for any federal, state or local taxes based upon Licensee's purchase, possession, distribution or use of Licensed Software, Licensee Modifiable Materials, or Modified Materials or upon any charges payable hereunder.

7.2 This Schedule shall be construed and enforced in accordance with the laws of the State of Texas, United States of America, excluding any conflict of laws provisions. The UN Convention on Contracts for the International Sale of Goods shall not apply. Licensee will not export or re-export the Licensed Software and Licensee Modifiable Materials except in compliance with all applicable laws and regulations.

7.3 This Schedule comprises the full and final understanding between Lexmark and Licensee, and merges and supersedes any and all other agreements except as expressly set forth herein, and any and all other understandings or representations, written or oral, with respect to the subject matter hereof. It may not be modified except by a writing signed by authorized representatives of both Lexmark and Licensee, and referring specifically to this Schedule. Any attempt by Licensee to assign this Schedule shall be void.

7.4 Waiver by any party of the breach of a provision of this Schedule by the other party shall not be construed as a continuing waiver of such provision or waiver of any other breach of any other provision of this Schedule. All rights and remedies, whether conferred hereby or by any other instrument or by law shall be cumulative, and may be exercised singularly or concurrently. If any provision of this Schedule is held invalid by any law, rule, order or regulation of any government or by the final determination of any state or federal court, such invalidity shall not affect the enforceability of any other provisions not held to be invalid.

IN WITNESS WHEREOF, Lexmark and Licensee have caused this Schedule to be executed by their duly authorized representatives effective as of the above-listed Effective Date.

**LEXMARK INTERNATIONAL, INC.**          **LEXMARK INTERNATIONAL TECHNOLOGY SA**

By: _____

By: _____

Printed Name: _____        Printed Name: _____

Title: _____        Title: _____

Date: _____        Date: _____

**LICENSEE**

By: _____

Printed Name: _____

Title: _____

Date: _____

## Software Support Agreement

This Software Support Agreement ("Agreement") is made and entered into this 25th day of October, 2005 ("Effective Date"), by and between Lexmark International, Inc., ("LII"), a Delaware corporation with its principal office at 740 New Circle Road, Lexington, Kentucky 40550; Lexmark International Technology, S.A., a Swiss company and LII's subsidiary with its principal office at ICC, 20 Route de Pre-Bois, Case Postale 508, CH 1215 Geneva 15 Switzerland ("LITSA") (hereinafter LII and LITSA are collectively referred to as "Lexmark") and ████████████ ████████

WHERAS, LII has entered into an agreement with ████████████████████ for the distribution of certain software (the ████████████ );

WHEREAS ████ desires that Lexmark provide certain software, as specified in an exhibit to this Agreement, (the "Software") to ██████ under the terms of the ██████████ and

WHEREAS Lexmark agrees to provide the Software to ██████ on the terms and conditions specified in this Agreement:

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are acknowledged, the parties hereby agree as follows:

**1.      ██████ OBLIGATIONS**

1.1      ██████ acknowledges and accepts that ██████ has the sole discretion in determining when to remove the Software from the ██████ products.

1.2      ██████ acknowledges and accepts that the terms and conditions set forth in this Agreement shall be binding on ████ until all Software is removed from th ██████ products.

**2.      LEXMARK OBLIGATIONS**

2.1      The initial Software covered by this Agreement is contained in Exhibit A.  The parties may add Software to this Agreement by executing an additional Exhibit A-__ substantially in the same form as Exhibit B, numbered successively (e.g., Exhibit A-1, A-2, etc.), listing such additional Software and its associated products.

2.2      As may be required by ██████ pursuant to the ██████ Agreement, Lexmark shall (a) provide to ██████ the Software, including any corrections and enhancements; (b) use reasonable efforts to promptly correct any errors or defects in the Software reported by ██████ and deliver such Software corrections to ██████ in accordance with the terms of the ██████ Agreement; and (c) support the Software (collectively, the "Services").

**3.      COMPENSATION**

3.1      Notwithstanding anything to the contrary contained herein, Lexmark shall perform the Services in accordance with the terms of the ████ Lexmark OEM Master Purchase Agreement

1

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3385

between ███████████ and Lexmark dated July 3, 2002, as amended (the "Master Purchase Agreement"), as long as the schedule between Lexmark and ████████████ for the product associated with the Software (the "Underlying Agreement") and the Master Purchase Agreement remain in effect.

3.2    In the event that (a) the Underlying Agreement expires or is terminated or (b) the Master Purchase Agreement expires or is terminated, Lexmark shall invoice ███ at reasonable rates for the actual work performed in connection with the Services.

3.3    ███ shall reimburse Lexmark for any actual third-party costs, including but not limited to, Microsoft certification costs, incurred by Lexmark in performance of the Services. Upon ███ request, Lexmark shall provide ███ with copies of the third-party invoices.

3.4    Lexmark shall invoice ███ for the Services after Services have been completed. All invoices for Services provided to ███ will be accumulated, upon receipt, for a period from the 16th day of a month to the 15th day of the following month (the "Accumulation Period"). ███ will pay invoices received during the Accumulation Period net 50 days from the end of such Accumulation Period (EOAP 50). Lexmark agrees to invoice Dell within thirty (30) days after it has the right to invoice under the terms of this Agreement.

3.5    ███ payment obligations under this Agreement are non-cancelable, and payments are non-refundable.

3.6    Lexmark will retain the records for the Services for a period of three (3) years. Upon fifteen (15) days prior written notice, Lexmark will grant to ███ reasonable access to Lexmark's records related to the Services no more than once annually during Lexmark's normal business hours and at ███ s expense. ███ warrants that individuals selected by ███ for such access shall be bound to confidentiality provisions similar to those contained in the Non-Disclosure Agreement referenced in Section 6.

## 4.    DISCLAIMER OF WARRANTIES

4.1    Lexmark warrants to ███ that, for a period of thirty (30) days from the performance of the applicable Service, the Service shall be of a professional quality conforming to generally accepted industry standards. For any breach of this warranty, ███ exclusive remedy and Lexmark's entire liability shall be to re-perform, at no charge, the non-conforming Services.

4.2    EXCEPT FOR THE WARRANTY SET FORTH ABOVE AND TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, LEXMARK MAKES NO OTHER WARRANTIES, WHETHER EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NONINFRINGEMENT.

4.3    THIS AGREEMENT SETS FORTH THE ENTIRE OBLIGATION OF LEXMARK WITH RESPECT TO THE SERVICES. IN NO EVENT SHALL LEXMARK BE LIABLE TO ███ FOR LOSS OF PROFITS, INDIRECT, SPECIAL, INCIDENTAL, PUNITIVE, CONSEQUENTIAL, OR EXEMPLARY DAMAGES ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY ACTS OR OMISSIONS ASSOCIATED

2

THEREWITH OR RELATING TO THE SERVICES, WHETHER SUCH CLAIM IS BASED ON BREACH OF WARRANTY, CONTRACT, TORT OR OTHER LEGAL THEORY AND REGARDLESS OF THE CAUSE OF SUCH LOSS OR DAMAGE OR WHETHER ANY OTHER REMEDY PROVIDED HEREIN FAILS.

4.4    IN NO EVENT SHALL LEXMARK'S TOTAL INDEMNIFICATION OBLIGATIONS AND TOTAL LIABILITY FOR ANY DAMAGES, HOWEVER BASED, BE IN EXCESS OF THE GREATER OF THE SERVICE FEES PAID TO LEXMARK UNDER THIS AGREEMENT IN THE TWELVE (12) MONTHS PRECEDING THE EVENT GIVING RISE TO THE ALLEGED CLAIM OR ███████████████████████████████████████

## 5.    INDEMNIFICATION

5.1    Lexmark agrees to defend, indemnify and hold harmless ███ from and against any third party claim that the Software infringes any intellectual property right of a third party, provided that ███ promptly notifies Lexmark in writing of any allegation of such infringement and gives Lexmark full cooperation and information.  Lexmark shall have sole control of the defense against and settlement of such claim, except that ███ shall have the right to retain counsel and participate in the defense or settlement, at ███ expense.  Notwithstanding the foregoing, Lexmark shall have no obligation with respect to any claim based upon or related to: (a) non-Lexmark modification of the Software; or (b) the combination, operation or use of the Software with apparatus, data or programs not furnished by Lexmark (a "Combination"), provided such Combination has other non-infringing uses.  ███ exclusive remedies for any infringement claims are as provided in this Section 5.1.

5.2    Lexmark agrees to defend and hold harmless ███ from and against any third party claim for personal injury or real or tangible property damage caused by any defect in design of the Software.

5.3    ███ shall indemnify, defend at its expense, and hold harmless Lexmark and shall pay all costs and expenses, including reasonable attorney's fees, incurred by Lexmark and all damages finally awarded against Lexmark or its designees or employees for all claims by ███ arising from or related to a breach of this Agreement by ███

## 6.    CONFIDENTIALITY

███ and Lexmark agree that the terms and conditions of this Agreement are confidential, and that neither party shall disclose the existence or contents of this Agreement without the prior written consent of the other.  All Confidential Information disclosed in conjunction with this Agreement shall be held in confidence in accordance with the terms of Non-Disclosure Agreement ("NDA") # 01111202 between ███ and Lexmark, effective as of November 15, 2001.  This NDA is incorporated herein by reference and shall remain in effect for the duration of this Agreement.

## 7.    TERM AND TERMINATION

7.1    This Agreement shall commence on the Effective Date and continue until ███ removes the Software from al ███ products.

## 8.    NOTICES

All notices shall be in writing and shall be effective when actually served by personal delivery or

3

CONFIDENTIAL - OUTSIDE COUNSEL ONLA3387

upon receipt via United States mail, return receipt requested, postage prepaid, or sent by facsimile transmission to the addresses set forth below, or to such other address a party may designate from time to time pursuant hereto:

If to Lexmark:                                   Lexmark International, Inc.
                                                740 West New Circle Road
                                                Lexington, KY 40550
                                                Attn: Darcy Clarkson
                                                Facsimile: (859)232-5538

If to ███                                       

## 9.    MISCELLANEOUS

9.1    This Agreement shall be construed and enforced in accordance with the laws of the State of Texas, United States of America, excluding any conflict of laws provisions. The UN Convention on Contracts for the International Sale of Goods shall not apply. Lexmark will not export or re-export the Licensed Software except in compliance with all applicable laws and regulations.

9.2    This Agreement comprises the full and final understanding between ███ and Lexmark, and merges and supersedes any and all other agreements except as expressly set forth herein, and any and all other understandings or representations, written or oral, with respect to the subject matter hereof. It may not be modified except by a writing signed by authorized representatives of both ███ and Lexmark, and referring specifically to this Agreement.

9.3    This Agreement shall not be assignable by either party without the written consent of the other party.

9.4    Waiver by any party of the breach of a provision of this Agreement by the other party shall not be construed as a continuing waiver of such provision or waiver of any other breach of any other provision of this Agreement. All rights and remedies, whether conferred hereby or by any other instrument or by law shall be cumulative, and may be exercised singularly or concurrently. If any provision of this Agreement is held invalid by any law, rule, order of regulation of any government or by the final determination of any state or federal court, such invalidity shall not affect the enforceability of any other provisions not held to be invalid.

9.5    The relationship of Lexmark and ███ including their respective employees and agents, shall be that of independent contractors. Nothing in this Agreement shall be construed as making either party or any of their employees an agent, legal representative, employee or servant of the other for any purpose whatsoever. Neither party shall have any responsibility for or obligations to the employees of the other. Neither party shall have any authority, either express or implied, to create or assume any agency or obligation on behalf of or in the name of the other.

4

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A3388

9.6    The section headings of this Agreement are to facilitate reference only, do not form a part of this Agreement and shall not in any way affect the interpretation of this Agreement.

9.7    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constituted one and the same instrument.

IN WITNESS WHEREOF ███████ and Lexmark have caused this Agreement to be executed by their duly authorized representatives.



LEXMARK INTERNATIONAL, INC.

By: _____

Name: F.T. SAMUEL, JR

Title: VP, WW ALLIANCES

Date: 27 OCTOBER, 2005

LEXMARK INTERNATIONAL
     TECHNOLOGY, S.A.

By: _____

Name: L. GIANNICHI

Title: MANAGING DIRECTOR

Date: 11 / 2 / 2005

CONFIDENTIAL - OUTSIDE COUNSEL ONA3389

**EXHIBIT A**

SOFTWARE
In-box PCL Print Driver

In-box PCL Print Driver

In-box PCL Print Driver

In-box PCL Print Driver

In-box PCL Print Driver

In-box PCL Print Driver

In-box PCL Print Driver

In-box PCL Print Driver

In-box PCL Print Driver

In-box PCL Print Driver

ASSOCIATED PRODUCT

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3390

**EXHIBIT B**

**EXHIBIT A-** ____

Pursuant to the Software Support Agreement dated_____, between ▮ and Lexmark, the parties hereby add the following Software:

SOFTWARE                                    ASSOCIATED PRODUCT

IN WITNESS WHEREOF, ▮ and Lexmark have caused this Exhibit A-__ to be executed by their duly authorized representatives.

▮▮▮▮▮▮▮▮                                    LEXMARK INTERNATIONAL, INC.

By:_____                        By:_____

Name:_____                        Name:_____

Title:_____                       Title:_____

Date:_____                        Date:_____

                                            LEXMARK INTERNATIONAL
                                               TECHNOLOGY, S.A.

                                            By:_____

                                            Name: L .GiANNiCM

                                            Title: MANAGiNG DiRETOR

                                            Date: 11/2/ 2005

7

**Attachment 1.3**

**Software Distribution License Agreement**

This Software Distribution License Agreement ("Agreement") is made and entered into this 1st day of November, 2008 ("Effective date"), by and between Lexmark International, Inc., a Delaware corporation, ("Lexmark") and ██████████████████████ branch entity of a ████████ corporation ████.

WHEREAS ████ desires provide certain software as specified by version and format in attached Exhibit A, ("Software"), together with related documentation ("Documentation") to Lexmark for inclusion with the products specified in attached Exhibit B which are manufactured by Lexmark for ██ (the "Products"); and

WHEREAS Lexmark agrees to include the Software and Documentation with the Products on the terms and conditions specified in this Agreement;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are acknowledged, the parties hereby agree as follows:

**1.     LICENSE**

1.1     ████ grants to Lexmark a royalty-free, world-wide, nonexclusive license to reproduce the Software and Documentation solely in connection with the Products.

1.2     All copyrights in the Licensed Software are and shall remain the exclusive property of ████ or its suppliers.  No license other than that specifically stated herein is granted to Lexmark, or any right under any patent, trademark, copyright, trade secret or other intellectual property of ████ other than that expressly granted by this Agreement.

**2.     WARRANTIES & DISCLAIMER**

2.1     ████ warrants that (i) it has the right to grant Lexmark the license enumerated in this Agreement; (ii) it has the right to enter into this Agreement, and no other agreement has been or will be made with any third party which will interfere with its performance under this Agreement; (iii) the Software shall be free from known viruses; (iv) the Software and Documentation do not infringe upon, misuse, or misappropriate any intellectual property rights of any third party; (v) the combination of the Software and/or Documentation with the Products do not infringe upon, misuse, or misappropriate any intellectual property rights of any third party; and (vi) there are no threatened or pending intellectual property infringement actions against the Software or Documentation.

2.2     Unless otherwise provided in a separate written agreement with Lexmark, Lexmark is under no obligation to provide any modifications, updates, additions or revisions to the Software or to maintain the Software in any manner.

**3.     CONFIDENTIALITY**

████ and Lexmark agree that the terms and conditions of this Agreement are confidential, and that neither party shall disclose the existence or contents of this Agreement without the prior written consent of the other.  All Confidential Information disclosed in conjunction with this Agreement shall be held in confidence in accordance with the terms of Schedule N to the Agreement.

1

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3392

## 4.    INDEMNIFICATION

4.1    ██████ shall indemnify, defend at its expense, and hold harmless Lexmark and shall pay all costs and expenses, including reasonable attorney's fees, incurred by Lexmark and all damages finally awarded against Lexmark or its employees for all claims relating to the Software and/or Documentation, including any claim that Software and/or Documentation, or any of their parts, infringes any patent or copyright or is a misappropriation of a trade secret of a third party.

4.2    Lexmark shall have the right to cease immediate reproduction of the Software and/or Documentation in the event Lexmark, in its sole opinion, believes an infringement claim appears likely or is made about the Software or Documentation.

## 5.    TERM AND TERMINATION

5.1    This Agreement shall commence on the Effective Date and continue until terminated in accordance with this Section 5.

5.2    Either party may terminate this Agreement due to a breach by the other party of any of the provisions hereof if such breach remains uncured thirty (30) days after written notice of such breach.

5.3    Either party may terminate for convenience upon thirty (30) days' notice to the other.

5.4    Licenses granted to end users and the rights and/or obligations expressed in Sections 3, 4, and 7 of this Agreement shall survive the termination of this Agreement.

## 6.    NOTICES

All notices shall be in writing and shall be effective when actually served by personal delivery or upon receipt via United States mail, return receipt requested, postage prepaid, or sent by facsimile transmission to the addresses set forth below, or to such other address a party may designate from time to time pursuant hereto:

If to Lexmark:

Lexmark International, Inc.
740 West New Circle Road
Lexington, KY 40550
Attn: _____
Facsimile: (859)_____

If to ██████

████████████████████████████
████████████████████████████
████████████████████████████

Attn: Legal Director
Facsimile:  (██ _____

2

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3393

## 7.    MISCELLANEOUS

7.1    This Agreement shall be construed and enforced in accordance with the laws of the Commonwealth of Kentucky, United States of America, excluding any conflict of laws provisions. The UN Convention on Contracts for the International Sale of Goods shall not apply. Lexmark will not export or re-export the Licensed Software except in compliance with all applicable laws and regulations.

7.2    This Agreement comprises the full and final understanding between ▮▮ and Lexmark, and merges and supersedes any and all other agreements except as expressly set forth herein, and any and all other understandings or representations, written or oral, with respect to the subject matter hereof. It may not be modified except by a writing signed by authorized representatives of both ▮▮ and Lexmark, and referring specifically to this Agreement.

7.3    This Agreement shall not be assignable by either party without the written consent of the other party.

7.4    Waiver by any party of the breach of a provision of this Agreement by the other party shall not be construed as a continuing waiver of such provision or waiver of any other breach of any other provision of this Agreement. All rights and remedies, whether conferred hereby or by any other instrument or by law shall be cumulative, and may be exercised singularly or concurrently. If any provision of this Agreement is held invalid by any law, rule, order of regulation of any government or by the final determination of any state or federal court, such invalidity shall not effect the enforceability of any other provisions not held to be invalid.

7.5    The relationship of Lexmark and ▮▮ including their respective employees and agents, shall be that of independent contractors.  Nothing in this Agreement shall be construed as making either party or any of their employees an agent, legal representative, employee or servant of the other for any purpose whatsoever.  Neither party shall have any responsibility for or obligations to the employees of the other.  Neither party shall have any authority, either express or implied, to create or assume any agency or obligation on behalf of or in the name of the other.

7.6    The section headings of this Agreement are to facilitate reference only, do not form a part of this Agreement, and shall not in any way affect the interpretation of this Agreement.

7.7    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constituted one and the same instrument.

IN WITNESS WHEREOF, ▮▮ and Lexmark have caused this Agreement to be executed by their duly authorized representatives.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮                    LEXMARK INTERNATIONAL, INC.

By:_____            By:_____

Name:_____            Name:_____

Title:_____           Title:_____

3

Date:_____          Date:_____

CONFIDENTIAL - OUTSIDE COUNSEL ONLYA3395

## EXHIBIT A

| | SOFTWARE | | VERSION |
|---|---|---|---|
| 1. | Data Collection Software code named ███████ | | |
| 2. | ██████ from ████ | | 8.0 |
| 3. | ████████ from ████ | | |

CONFIDENTIAL - OUTSIDE COUNSEL ON A3396

**EXHIBIT B**

**Products**



CONFIDENTIAL - OUTSIDE COUNSEL ONLY

A3397

## Schedule F Attachment 1.4
## LEXMARK PRINTER/AIO DRIVER SOFTWARE DISTRIBUTION LICENSE

| Licensee: | ██████████████████████████ of a company incorporated in ████████████ with limited liability, on behalf of ████████ and its subsidiaries and affiliates (together ██████ | Attn: | ████████ |
|---|---|---|---|
| Address: | ████████████████ | Telephone: | ████ ████ |

WHEREAS, Lexmark owns all right, title and interest in and to certain software and/or has the right to license such software and any documentation accompanying or related to such software;

WHEREAS, Licensee is desirous of licensing such software; and

WHEREAS Lexmark is willing to grant a non-exclusive and non-transferable (other than to subsidiaries and affiliates of ██████) right and license to use and distribute the Licensed Software in accordance with this Schedule;

NOW, THEREFORE, Lexmark International, Inc. and its subsidiaries ("Lexmark") agree to grant to Licensee and Licensee accepts a license to the Licensed Software listed below on the terms and conditions specified in this License.

| Licensed Software | | | | | |
|---|---|---|---|---|---|
| Description | Version / Part No. | Format | License Fee | Authorized Number of Copies | Bundled Distribution |
| Clinical Assistant (██ Healthcare Station or ██ Healthcare Print Station) | ███████ | .fls | Per Schedule B of the Agreement <br> Unlimited | No |
| Legal Partner (██ Legal Station or ██ Legal Print Station) | | .fls | Per Schedule B of the Agreement | Unlimited | No |
| Education Station (██ Classroom Station or ██ Classroom Print Station) | | .fls | Per Schedule B of the Agreement | Unlimited | No |
| Education Station Server Component | N/A | Executable Format Only | Included in Education Station | | |
| Scan to Network (Basic) | All versions delivered to Licensee | Executable Format only | None | Unlimited | No |
| Remote Copy | All versions delivered to Licensee | Executable Format only | None | Unlimited | No |

| Modified Materials for Licensee Distribution | | | | | |
|---|---|---|---|---|---|
| Title | Version / Part No. | Format | License Fee | Authorized Number of Copies | Bundled Distribution |
| Derivative works of ClinicalAssistant.ai | All | ALL | None | Unlimited | None |
| Derivative works of So-EducationStation.ai | All | ALL | None | Unlimited | None |
| Derivative works of So-LegalPartner.ai | All | ALL | None | Unlimited | None |

| Licensee Modifiable Materials | | |
|---|---|---|
| Title | Version / Part No. | Format |
| | | |
| So-ClinicalAssistant.ai (file name) | Current version as of March 9, 2010. | Adobe Illustrator |
| So-EducationStation.ai (file name) | Current version as of March 9, 2010. | Adobe Illustrator |
| So-LegalPartner.ai (file name) | Current version as of March 9, 2010. | Adobe Illustrator |

1

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3398

## 1. DEFINITIONS

1.1 "Licensed Software" means the above identified Licensed software of the specified version and format, including error corrections, updates, and end user documentation, in any medium, such as magnetic tape, electronic download, disks, CDs or optical media which is provided to Licensee by Lexmark. Licensed Software designated as Bundled Distribution in the Licensed Software table is subject to additional restrictions on distribution.

1.2 "Licensee Modifiable Materials" means software files or documentation including pictures, graphics and text files identified above in the specified version and format, including any software tools, installation software, any error corrections and updates, in any medium, such as magnetic tape, electronic download, disks, CDs or optical media which is or may be provided to Licensee by Lexmark at Lexmark's option.

1.3 "Modified Materials" means derivative works or materials created by or for Licensee that are derived from, based upon or incorporate any portion of the Licensee Modifiable Materials licensed under this Schedule. Modified Materials for distribution by Licensee in executable format are designated in the Modified Materials for Licensee Distribution table above and if designated as Bundled Distribution are subject to additional restrictions on distribution.

1.4 "Applicable Equipment" means the ▇▇▇▇ printer /multifunction devices purchased from Lexmark which incorporates the customized Lexmark printer/multifunction device software.

1.5 "Licensed Territory" means the world.

1.6 "Effective Date" means May 26, 2010.

## 2. LICENSE GRANT

2.1 Notwithstanding anything to the contrary in this Schedule, for any pre-release or test version of Licensed Software and for Licensee Modifiable Material that is designated as a source code, pre-release or test version, Lexmark grants to Licensee a personal, nonexclusive, non-transferable license to load such source code, pre-release or test version of the Licensed Software and Licensee Modifiable Materials on its internal computer system(s) for electronic copying for internal use only and with respect to Licensee Modifiable Materials for developing Modified Materials in source code form for use only for internal purposes. Licensee shall have no right or license to copy and distribute to any third party or to license any end user: (i) source code, pre-release or test versions of Licensed Software, (ii) source code, pre-release or test versions of Licensee Modifiable Materials; and (iii) source code for Modified Materials.

2.2 Subject to the Licensee's obligations under this Schedule, Lexmark grants to Licensee a personal, nonexclusive, non-transferable license in the Licensed Territory to: (i) load the Licensed Software or Modified Materials not designated as Bundled Distribution in executable format on Licensee's internal computer system(s) for copying and distribution through Licensee's channels of distribution as preinstalled in the Applicable Equipment, as preinstalled in systems including the Applicable Equipment, on physical media provided with the Applicable Equipment or systems incorporating Applicable Equipment or by electronic distribution to its end users for use only with the Applicable Equipment; and (ii) load the Licensed Software or Modified Materials designated as Bundled Distribution in executable format on Licensee's internal computer system(s) for copying and distribution through Licensee's channels of distribution for bundled distribution and use only with the Applicable Equipment including preinstalled on the Applicable Equipment, preinstalled on systems incorporating the Applicable Equipment, or on physical media provided in the package with the Applicable Equipment or systems incorporating Applicable Equipment. Any methods of installation or delivery other than those set forth above including, but not limited to, installations and/or delivery by Licensee subcontractors who are identified by Licensee, must be agreed upon in advance and in writing by Lexmark and Licensee. Licensed Software or Modified Materials designated as Bundled Distribution shall not be distributed to end users by any electronic distribution method, such as from a website via the internet or on any media that is not distributed in the packaging with the Applicable Equipment or systems incorporating the Applicable Equipment. This license allows Licensee to make the maximum number of copies of the Licensed Software or Modified Materials specified in the above tables. Reproduction, distribution and use of the Licensed Software and Modified Materials outside of the Licensed Territory is prohibited.

2.3 Except for the server component of the Education Station Licensed Software, Licensee shall sublicense the Licensed Software and Modified Materials in executable format only to end users under Licensee's standard end user software licensing agreement. Licensee's end user software licensing agreements shall be in the name of Licensee and provide at least the same rights and protections as those provided in this Schedule.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3399

End users may assign their end user software licensing agreement to any bona fide successor in interest who first agrees in writing to be bound by the terms of their end user software licensing agreement. Lexmark and any third party beneficiaries of this Schedule shall be third party beneficiaries in any such agreements.

2.4    Licensee shall sublicense the server component of the Education Station Licensed Software in executable format only to end users under Lexmark's end user license agreement applicable to such component which is attached to and made a part of this Schedule as Exhibit A.

2.5    Notwithstanding the terms and conditions of this Schedule, all or any portion of the Licensed Software or Modified Materials that constitutes software provided under public license by third parties ("Freeware") is licensed to Licensee subject to the terms and conditions of the software license agreement accompanying such Freeware, whether in the form of a discrete agreement, shrink-wrap license, or electronic license terms at the time of download.  Use and distribution of the Freeware by Licensee shall be governed entirely by the terms and conditions of such license.

2.6    Should Licensee install the Licensed Software or Modified Materials in executable formats using a single click installation process, the install screen shall contain the following elements:  (i) an on-screen statement stating substantially as follows: "Click Install to install all software and documentation, and accept the End User License Agreement"; (ii) a click-on link to enable the end user to view the End User License Agreement prior to beginning installation; (iii) a click-on link to enable installation of the Licensed Software or Modified Materials and optionally provide a click-on link to indicate acceptance of the terms of the End User License Agreement when the software has been preinstalled; and (iv) a click-on link allowing the end user to cease installation of or uninstall the Licensed Software or Modified Materials if the end user does not agree to accept the terms of the end user license agreement.

2.7    Licensee agrees not to reverse engineer or decompile any of the Licensed Software that is not in source code format.  Although it is not obligated to do so, in the event Lexmark provides any error corrections or updates to the Licensed Software or Licensee Modifiable Materials, Licensee agrees to install such error corrections or updates and to provide the same to its end users.

2.8    If Licensee translates or makes any modification to the Licensed Software or Licensee Modifiable Materials, Licensee agrees to indemnify, defend and hold Lexmark harmless from any errors or omissions due to such modifications and/or translations, and for any damages, claims, causes of action and expenses (including attorneys' fees) arising from or related directly or indirectly to such modifications or translations.

2.9    In addition, and except for product performance, marketing claims and statements specifying the features and functions of the Licensed Software (collectively, "Licensed Software Claims") which are provided to Licensee by Lexmark in writing, Licensee agrees to indemnify, defend and hold Lexmark harmless from any damages, claims, causes of action and expenses (including attorney's fees) arising from or related directly or indirectly to any product performance or other marketing claim made by Licensee about the Licensed Software inconsistent with or contrary to the Licensed Software Claims.

2.10    Lexmark agrees to indemnify, defend and hold harmless Licensee from any damages, claims, causes of action and expenses (including attorney's fees) arising from Licensee's use of or reliance on the Licensed Software Claims.

2.11    Each party shall promptly notify the other party of any such claims and cooperate fully with the indemnifying party. The indemnifying party shall have sole control of the defense, at its expense, of such claim, except that the party being indemnified shall have the right to retain counsel and participate in the defense or settlement, at such party's expense.

2.12    All copyrights in the Licensed Software and Modified Materials, exclusive of original contributions of Licensee to the Modified Materials, and Licensee Modifiable Materials are and shall remain the exclusive property of Lexmark and its suppliers.  No license other than that specifically stated herein is granted to Licensee, or any right under any patent, trademark, copyright, trade secret or other intellectual property of Lexmark other than that expressly granted by this Schedule.  Licensee agrees to notify its employees that Lexmark and its suppliers are the copyright holders of the Licensed Software and Licensee Modifiable Materials.

2.13    Licensee shall not remove any copyright or other proprietary notices of Lexmark or third parties found in or on the Licensed Software or Licensee Modifiable Materials.

2.14    The fee arrangement offered by Lexmark to Licensee herein is conditioned on compliance with the Alliance Schedule G of the Master Purchase Agreement having an effective date of November 1, 2008, which has previously been entered into by the parties.  If Licensee fails to comply with the Alliance Schedule G, either through instance or audit, Lexmark will notify Licensee in writing of such noncompliance.  If the

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A3400

noncompliance is not remedied to Lexmark's satisfaction within sixty (60) days from the notice date Lexmark may, at its sole and absolute option, raise the fees set forth herein to correspond to one lower installs pricing tier.  If subsequent to the written notice there are additional instances of noncompliance, senior management for both parties will meet and develop a plan to remedy the noncompliance and/or adjust the pricing of the licensed software. If the Alliance Schedule G is terminated (as set forth under its terms and conditions), the terms of this Schedule shall survive, however, Lexmark may at its sole and absolute discretion raise the fees set forth herein. On a semi-annual basis (June/December), Licensee will audit its MPS activities and will furnish the results of the prior six (6) month's audit to Lexmark for informational purposes only.  The results of the audit will include, at a minimum, the ███branded hardware overall install percentage and the ███branded mono laser hardware install percentage.

## 3.  ADDITIONAL LICENSED SOFTWARE

3.1     Lexmark may from time to time provide additional Licensed Software and/or Licensee Modifiable Materials to Licensee under this Schedule by executing additional Attachments to this Schedule, substantially in the same form as the Licensed Software description set forth above, and identified successively starting with Attachment B (e.g., Attachment B, Attachment C, etc.). Additional Attachments to this Schedule shall become effective and a part of this Schedule upon execution by both parties.  Licensee agrees that any use of such additional Licensed Software or Licensee Modifiable Materials or the accessing of Lexmark's server and downloading of any additional Licensed Software or Licensee Modifiable Materials from Lexmark's server shall constitute Licensee's acceptance of the terms of this Schedule with respect to such additional Licensed Software and Licensee Modifiable Materials used or downloaded by Licensee and any Modified Materials derived from such additional Licensee Modifiable Materials.

## 4.  FEES AND AUDIT RIGHTS

4.1     Licensee shall pay Lexmark the License Fees set forth in the Licensed Software table above for each copy of Licensed Software used in its business or business of a third party, or sold, distributed, or otherwise transferred to a third party. The License Fees due under this Schedule are based upon a tiered pricing structure under which the current top tier pricing is obtained if and when Licensee's total installations of the Clinical Assistant, Legal Partner and Education Station components in any combination exceed ██████ ██████units in a twelve (12) month period. No installations of the Scan to Network or Remote Copy components or any minimal or no-fee Licensed Software components or solutions added to this Schedule by agreement of the parties which are identified by Lexmark as "basic" solutions will be credited toward this annual amount. In order to assess the status of Licensee under this tiered pricing structure, the parties shall, every three (3) months from the Effective Date of this Schedule, if requested in writing by Licensee, review the number of Licensee's installations in aggregate through the previous twelve (12) month period and make appropriate pricing modifications based upon Lexmark's then-current tiered pricing structure for the same components of Licensed Software. Lexmark reserves the right to change its tiered pricing structure for Licensed Software in response to dynamics in the solutions market environment.

4.2     All license unit count, and service tags shall be reported monthly by Licensee at the end of each calendar month.

4.3     Lexmark will submit invoices to Licensee on a monthly basis. Payment terms shall be in accordance with the Master Purchase Agreement between Lexmark and Licensee.

4.4     Licensee shall keep records and books in sufficient detail to permit the determination of all License Fees payable hereunder.

4.5     Licensee shall also pay the following one-time fees to Lexmark, which such fees shall be due and payable on or before December 31, 2010:

　　　　Development Fee (NRE):   ██████
　　　　Scan-to-Network and Remote Copy Fees:   ██████ for web posting, unlimited licenses, and support in accordance with Section 6 for the Scan-to-Network and Remote Copy Licensed Software.

## 5.  PROTECTION AND SECURITY

5.1     For Licensed Software designated as a source code, pre-release or test version and for any Licensee Modifiable Materials, Licensee represents that its employees having access to such source code, pre-release or test version of Licensed Software or Licensee Modifiable Materials are or shall be party to written agreements acknowledging a duty to protect any of Lexmark's confidential materials contained in the source code, pre-released and test versions of Licensed Software and Licensee Modifiable Materials.

4

CONFIDENTIAL - OUTSIDE COUNSEL ONLA3401

5.2 Licensee shall keep electronic copies of source code, pre-release or test version of Licensed Software and Modified Materials as well as Licensee Modifiable Materials (including archival copies, if any), in a secure environment and shall take all steps reasonably necessary to protect electronic copies of the source code, pre-release and test versions of Licensed Software and Modified Materials, Licensee Modifiable Materials, or any part thereof from unauthorized release or modification.

5.3 Licensee expressly agrees that a breach of this Schedule will cause irreparable harm to Lexmark and that Lexmark shall have the right to obtain injunctive relief against any unauthorized use, disclosure, copying or transfer of any part of Licensed Software, Modified Materials or Licensee Modifiable Materials.  Licensed Software or Licensee Modifiable Materials may contain software from third parties who are intended to be third party beneficiaries of this Schedule.

## 6. LICENSED SOFTWARE SUPPORT

6.1 Subject to Licensee's obligations under this Schedule and for a period of three (3) years from the date of Licensee's distribution of the Licensed Software, Lexmark will provide Licensee with technical support through its existing TSC support mechanism for Licensed Software only in the event that a bug or error directly attributable to an issue with the Licensed Software as provided by Lexmark has been identified and verified by Licensee during its internal troubleshooting process and can be replicated by Lexmark.  For clarification, issues with network topology, application configuration, or security configuration are not bugs or errors with the Licensed Software.

6.2 Except for support provided in accordance with Section 6.1 above, Licensee agrees to pay a fee of [          ] U.S. dollars [          ] for each support request to Lexmark or its support agent in addition to the actual costs, if any, associated with Lexmark's resolution of the issue.

6.3 Except as provided in this Section 6, Licensee shall provide all other technical support for Licensed Software and will serve as the sole point of contact for end users for all installation and technical support issues, technical advice and assistance regarding the operation and use of any Licensed Software.

6.4 Licensee shall designate a properly trained technical resource as the contact with Lexmark for purposes of requesting and receiving support services in accordance with this Section 6.

6.5 Licensee shall retain (under its standard record retention policy) and provide to Lexmark upon request log files and other pertinent diagnostic information reasonably necessary to assist Lexmark in fulfilling its obligations under this Section 6.

6.6 Lexmark will hold a one-time, two-day technical training event for up to ten (10) Licensee representatives to prepare them to provide the Licensed Software support required of them under this Section 6.

6.7 Except for charges assessed pursuant to Section 6.2 above, Lexmark will provide bug fixes and error corrections for the Licensed Software in accordance with and subject to the limitations set forth in Section 6.1 at no charge for a period of three (3) years from the date of Licensee's distribution of the Licensed Software.

## 7. DISCLAIMER & WARRANTIES

7.1 Unless otherwise provided in a separate written agreement with Licensee, Lexmark warrants that the Licensed Software and Licensee Modifiable Materials, as provided, shall conform to the specifications of Lexmark.  During the thirty (30) days after the date of delivery of the Licensed Software and Licensee Modifiable Materials, Lexmark shall, in its sole opinion, use reasonable commercial efforts to correct errors detected in the Licensed Software and Licensee Modifiable Materials, as provided, after receiving notification of such errors from Licensee.  In the event that any modifications are made to the Licensed Software which have not been authorized by Lexmark, any and all warranty and other obligations of Lexmark shall immediately cease with respect to such software.

7.2 Except as set forth in Section 6.7 or unless otherwise provided in a separate written agreement with Licensee, Lexmark is under no obligation to provide Licensee with any modifications, updates, additions or revisions to the Licensed Software and Licensee Modifiable Materials, or to maintain the Licensed Software and Licensee Modifiable Materials in any manner.

7.3 EXCEPT FOR THE WARRANTIES SET FORTH IN THIS SCHEDULE OR AS OTHERWISE PROVIDED FOR IN A SEPARATE WRITTEN AGREEMENT WITH LICENSEE, LICENSED SOFTWARE AND LICENSEE MODIFIABLE MATERIALS ARE PROVIDED "AS-IS". LEXMARK MAKES NO WARRANTIES, WHETHER EXPRESS OR IMPLIED, WITH RESPECT TO ANY LICENSED SOFTWARE AND LICENSEE MODIFIABLE MATERIALS PROVIDED UNDER THIS SCHEDULE INCLUDING, BUT NOT LIMITED, TO ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.  LEXMARK DOES NOT WARRANT THAT THE LICENSED SOFTWARE

5

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3402

AND LICENSEE MODIFIABLE MATERIALS WILL MEET THE LICENSEE'S REQUIREMENTS, OR THAT THE LICENSED SOFTWARE AND LICENSEE MODIFIABLE MATERIALS WILL BE ERROR-FREE.  LEXMARK MAKES NO WARRANTY OF NONINFRINGEMENT, EXPRESS OR IMPLIED.

7.4     THIS SCHEDULE SETS FORTH THE ENTIRE OBLIGATION OF LEXMARK WITH RESPECT TO THE LICENSED SOFTWARE AND LICENSEE MODIFIABLE MATERIALS.  IN NO EVENT SHALL EITHER PARTYBE LIABLE TO THE OTHER PARTY FOR LOSS OF PROFITS, INDIRECT, SPECIAL, INCIDENTAL, PUNITIVE, CONSEQUENTIAL, OR EXEMPLARY DAMAGES ARISING OUT OF OR IN CONNECTION WITH THIS SCHEDULE OR ANY ACTS OR OMISSIONS ASSOCIATED THEREWITH OR RELATING TO THE USE OF ANY LICENSED SOFTWARE OR LICENSEE MODIFIABLE MATERIALS, WHETHER SUCH CLAIM IS BASED ON BREACH OF WARRANTY, CONTRACT, TORT OR OTHER LEGAL THEORY AND REGARDLESS OF THE CAUSE OF SUCH LOSS OR DAMAGE OR WHETHER ANY OTHER REMEDY PROVIDED HEREIN FAILS.

7.5     EXCEPT FOR LIABILITY UNDER SECTION 2.10, IN NO EVENT SHALL LEXMARK'S TOTAL LIABILITY FOR ANY DAMAGES, HOWEVER BASED, BE IN EXCESS OF THE GREATER OF THE LICENSE FEES PAID OR

7.6     IN NO EVENT SHALL LEXMARK'S TOTAL LIABILITY FOR DAMAGES UNDER SECTION 2.10 OR LICENSEE'S TOTAL LIABILITY FOR DAMAGES UNDER SECTIONS 2.4 OR 2.9 OF THIS AGREEMENT BE IN EXCESS OF

## 8.  TERM AND TERMINATION

8.1     This Schedule shall commence on the Effective Date and continue until the expiration or termination of the Agreement unless sooner terminated in accordance with this Section 6.1. Lexmark may terminate this Schedule or any part thereof on thirty (30) days written notice in the event that, due to termination or expiration of other license rights, it no longer has the rights necessary to maintain this license. Either party may terminate for convenience upon thirty (30) days notice to the other.  This Schedule may be terminated by Lexmark immediately upon thirty (30) days written notice to Licensee if Licensee is in breach of any of its obligations hereunder.

8.2     In the event Lexmark determines to stop offering to any and all parties or licensees a portion or component of the Licensed Software, Lexmark may, at its option, terminate Licensee's distribution rights under this Schedule for such portion or component of the Licensed Software upon at least one hundred twenty (120) days written notice to Licensee. Lexmark's support obligations set forth in Section 6 shall continue for a period of three (3) years from the date of termination or expiration of this Licensed Software Distribution License.

8.3     Immediately after termination or expiration, Licensee shall cease all use of the Licensee Modifiable Materials and all distribution of the Licensed Software and Modified Materials, destroy all copies and provide Lexmark with its written certification that it has retained no copies. End user software license agreements shall remain in effect, provided such end users remain in compliance with the terms of their end user software license agreement.

## 9.  MISCELLANEOUS

9.1     Except for taxes based on Lexmark's income, Lexmark shall not be responsible for any federal, state or local taxes based upon Licensee's purchase, possession, distribution or use of Licensed Software, Licensee Modifiable Materials, or Modified Materials or upon any charges payable hereunder.

9.2     This Schedule shall be construed and enforced in accordance with the laws of the State of Texas, United States of America, excluding any conflict of laws provisions. The UN Convention on Contracts for the International Sale of Goods shall not apply.  Licensee will not export or re-export the Licensed Software and Licensee Modifiable Materials except in compliance with all applicable laws and regulations.

9.3     This Schedule comprises the full and final understanding between Lexmark and Licensee, and merges and supersedes any and all other agreements except as expressly set forth herein, and any and all other understandings or representations, written or oral, with respect to the subject matter hereof.  It may not be modified except by a writing signed by authorized representatives of both Lexmark and Licensee, and referring specifically to this Schedule.  Any attempt by Licensee to assign this Schedule shall be void.

9.4     Waiver by any party of the breach of a provision of this Schedule by the other party shall not be construed as a continuing waiver of such provision or waiver of any other breach of any other provision of this Schedule.  All rights and remedies, whether conferred hereby or by any other instrument or by law shall be cumulative, and may be exercised singularly or concurrently.  If any provision of this Schedule is held invalid by any law, rule, order or regulation of any government or by the final determination of any state or

6

 A3403

federal court, such invalidity shall not affect the enforceability of any other provisions not held to be invalid.

IN WITNESS WHEREOF, Lexmark and Licensee have caused this Schedule to be executed by their duly authorized representatives effective as of the above-listed Effective Date.

**LEXMARK INTERNATIONAL, INC.**                **LEXMARK INTERNATIONAL TECHNOLOGY SA**

By: _____                By: _____

Printed Name: _____      Printed Name: _____

Title: _____             Title: _____

Date: _____              Date: _____

**LICENSEE**

By: _____

Printed Name: _____

Title: _____

Date: _____

7

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3404

# EXHIBIT A

## LEXMARK SOFTWARE LICENSE AGREEMENT

PLEASE READ CAREFULLY BEFORE SELECTING THE "YES " OR "AGREE" BUTTON ON THIS PAGE:  This Software License Agreement ("**License Agreement**") is a legal agreement between you (either an individual or a single entity) and Lexmark International, Inc. ("**Lexmark**") that, to the extent your Lexmark product or Software Program is not otherwise subject to a written software license agreement between you and Lexmark or its suppliers, governs your use of any Software Program installed on or provided by Lexmark for use in connection with your Lexmark product.  The term "Software Program" includes machine-readable instructions, audio/visual content (such as images and recordings), and associated media, printed materials and electronic documentation, whether incorporated into, distributed with or for use with your Lexmark product.

BY SELECTING THE "YES" OR "AGREE" BUTTON OR BY USING THIS PRODUCT, YOU AGREE TO BE BOUND BY ALL THE TERMS AND CONDITIONS OF THIS LICENSE AGREEMENT.  IF YOU DO NOT SO AGREE, SELECT THE "NO" OR "DISAGREE" BUTTON ON THIS PAGE AND DO NOT INSTALL, COPY, DOWNLOAD, OR OTHERWISE USE THE SOFTWARE PROGRAM.  IF YOU DO NOT AGREE WITH THE TERMS OF THIS LICENSE AGREEMENT, PROMPTLY RETURN THE PRODUCT UNUSED AND REQUEST A REFUND OF THE AMOUNT YOU PAID.  IF YOU ARE INSTALLING THIS SOFTWARE PROGRAM FOR USE BY OTHER PARTIES, YOU AGREE TO INFORM THE USERS THAT USE OF THE SOFTWARE PROGRAM INDICATES ACCEPTANCE OF THESE TERMS.

1.     **STATEMENT OF LIMITED WARRANTY**.  Lexmark warrants that the media (e.g., diskette or compact disk) on which the Software Program (if any) is furnished is free from defects in materials and workmanship under normal use during the warranty period.  The warranty period is ninety (90) days and commences on the date the Software Program is delivered to the original end-user. This limited warranty applies only to Software Program media purchased new from Lexmark or an Authorized Lexmark Reseller or Distributor.  Lexmark will replace the Software Program should it be determined that the media does not conform to this limited warranty.

2.     **DISCLAIMER AND LIMITATION OF WARRANTIES**.  EXCEPT AS PROVIDED IN THIS LICENSE AGREEMENT AND TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, LEXMARK AND ITS SUPPLIERS PROVIDE THE SOFTWARE PROGRAM "AS IS" AND HEREBY DISCLAIM ALL OTHER WARRANTIES AND CONDITIONS, EITHER EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, TITLE, NON-INFRINGEMENT, MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, AND ABSENCE OF VIRUSES, ALL WITH REGARD TO THE SOFTWARE PROGRAM.  LEXMARK AND ITS SUPPLIERS MAKE NO WARRANTIES AS TO THE CAPABILITIES, SPEED, ACCURACY OR PERFORMANCE OF THE SOFTWARE PROGRAM. This Agreement is to be read in conjunction with certain statutory provisions, as that may be in force from time to time, that imply warranties or conditions or impose obligations on Lexmark that cannot be excluded or modified.  If any such provisions apply, then to the extent Lexmark is able, Lexmark hereby limits its liability for breach of those provisions to one of the following: replacement of the Software Program or reimbursement of the price paid for the Software Program.

3.     **LICENSE GRANT.**  Lexmark grants you the following rights provided you comply with all terms and conditions of this License Agreement:

a.     **Use**.  You may Use one (1) copy of the Software Program.  The term "Use" means storing, loading, installing, executing, or displaying the Software Program.  If Lexmark has licensed the Software Program to you for concurrent use, you must limit the number of authorized users to the number specified in your agreement with Lexmark.  You may not separate the components of the Software Program for use on more than one computer.  You agree that you will not Use the Software Program, in whole or in part, in any manner that has the effect of overriding, modifying, eliminating, obscuring, altering or de-emphasizing the visual appearance of any trademark, trade name, trade dress or intellectual property notice that appears on any computer display screens normally generated by, or as a result of, the Software Program.

b.     **Copying**. You may make one (1) copy of the Software Program solely for purposes of backup, archiving, or installation, provided the copy contains all of the original Software Program's proprietary notices.  You may not copy the Software Program to any public or distributed network.

c.     **Reservation of Rights**. The Software Program, including all fonts, is copyrighted and owned by Lexmark International, Inc. and/or its suppliers.  Lexmark reserves all rights not expressly granted to you in this License Agreement.

d.     **Freeware**.  Notwithstanding the terms and conditions of this License Agreement, all or any portion of the Software Program that constitutes software provided under public license by third parties ("Freeware") is licensed to you subject to the terms and conditions of the software license agreement accompanying such Freeware, whether in the form of a discrete agreement, shrink-wrap license, or electronic license terms at the time of download.  Use of the Freeware by you shall be governed entirely by the terms and conditions of such license.

8

**CONFIDENTIAL - OUTSIDE COUNSEL ONLY** A3405

4.    **TRANSFER**.  You may transfer the Software Program to another end-user.  Any transfer must include all software components, media, printed materials, and this License Agreement and you may not retain copies of the Software Program or components thereof.  The transfer may not be an indirect transfer, such as a consignment.  Prior to the transfer, the end-user receiving the transferred Software Program must agree to all these License Agreement terms.  Upon transfer of the Software Program, your license is automatically terminated.  You may not rent, sublicense, or assign the Software Program except to the extent provided in this License Agreement.

5.    **UPGRADES**.  To Use a Software Program identified as an upgrade, you must first be licensed to the original Software Program identified by Lexmark as eligible for the upgrade.  After upgrading, you may no longer use the original Software Program that formed the basis for your upgrade eligibility.

6.    **LIMITATION ON REVERSE ENGINEERING**.  You may not alter, decrypt, reverse engineer, reverse assemble, reverse compile or otherwise translate the Software Program, except as and to the extent expressly permitted to do so by applicable law for the purposes of inter-operability, error correction, and security testing.  If you have such statutory rights, you will notify Lexmark in writing of any intended reverse engineering, reverse assembly, or reverse compilation.  You may not decrypt the Software Program unless necessary for the legitimate Use of the Software Program.

7.    **ADDITIONAL SOFTWARE**.  This License Agreement applies to updates or supplements to the original Software Program provided by Lexmark unless Lexmark provides other terms along with the update or supplement.

8.    **LIMITATION OF REMEDIES**.  To the maximum extent permitted by applicable law, the entire liability of Lexmark, its suppliers, affiliates, and resellers, and your exclusive remedy shall be as follows:  Lexmark will provide the express limited warranty described above.  If Lexmark does not remedy defective media as warranted, you may terminate your license and your money will be refunded upon the return of all of your copies of the Software Program.

9.    **LIMITATION OF LIABILITY**.  To the maximum extent permitted by applicable law, for any claim arising out of Lexmark's limited warranty, or for any other claim whatsoever related to the subject matter of this Agreement, Lexmark's and its suppliers' liability for all types of damages, regardless of the form of action or basis (including contract, breach, estoppel, negligence, misrepresentation, or tort), shall be limited to the greater of $5,000 or the money paid to Lexmark or its Authorized remarketers for the license hereunder for the Software Program that caused the damages or that is the subject matter of, or is directly related to, the cause of action.

IN NO EVENT WILL LEXMARK, ITS SUPPLIERS, SUBSIDIARIES, OR RESELLERS BE LIABLE FOR ANY SPECIAL, INCIDENTAL, INDIRECT, EXEMPLARY, PUNITIVE, OR CONSEQUENTIAL DAMAGES (INCLUDING BUT NOT LIMITED TO LOST PROFITS OR REVENUES, LOST SAVINGS, INTERRUPTION OF USE OR ANY LOSS OF, INACCURACY IN, OR DAMAGE TO, DATA OR RECORDS, FOR CLAIMS OF THIRD PARTIES, OR DAMAGE TO REAL OR TANGIBLE PROPERTY, FOR LOSS OF PRIVACY ARISING OUT OR IN ANY WAY RELATED TO THE USE OF OR INABILITY TO USE THE SOFTWARE PROGRAM, OR OTHERWISE IN CONNECTION WITH ANY PROVISION OF THIS LICENCE AGREEMENT), REGARDLESS OF THE NATURE OF THE CLAIM, INCLUDING BUT NOT LIMITED TO BREACH OF WARRANTY OR CONTRACT, TORT (INCLUDING NEGLIGENCE OR STRICT LIABILITY), AND EVEN IF LEXMARK, OR ITS SUPPLIERS, AFFILIATES, OR REMARKETERS HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, OR FOR ANY CLAIM BY YOU BASED ON A THIRD-PARTY CLAIM, EXCEPT TO THE EXTENT THIS EXCLUSION OF DAMAGES IS DETERMINED LEGALLY INVALID.  THE FOREGOING LIMITATIONS APPLY EVEN IF THE ABOVE-STATED REMEDIES FAIL OF THEIR ESSENTIAL PURPOSE.

10.    **TERM**.  This License Agreement is effective unless terminated or rejected.  You may reject or terminate this license at any time by destroying all copies of the Software Program, together with all modifications, documentation, and merged portions in any form, or as otherwise described herein.  Lexmark may terminate your license upon notice if you fail to comply with any of the terms of this License Agreement.  Upon such termination, you agree to destroy all copies of the Software Program together with all modifications, documentation, and merged portions in any form.

11.    **TAXES**.  You agree that you are responsible for payment of any taxes including, without limitation, any goods and services and personal property taxes, resulting from this Agreement or your Use of the Software Program.

12.    **LIMITATION ON ACTIONS**.  No action, regardless of form, arising out of this Agreement may be brought by either party more than two years after the cause of action has arisen, except as provided under applicable law.  Lexmark's suppliers, affiliates, and resellers are third party beneficiaries of this Agreement, entitled to the benefit and enforcement of the provisions herein.

13.    **APPLICABLE LAW**.  This Agreement is governed by the laws of the Commonwealth of Kentucky, United States of America.  No choice of law rules in any jurisdiction shall apply.  The UN Convention on Contracts for the International Sale of Goods shall not apply.

CONFIDENTIAL - OUTSIDE COUNSEL ONLYA3406

14.    **UNITED STATES GOVERNMENT RESTRICTED RIGHTS.**  The Software Program has been developed entirely at private expense.  Rights of the United States Government to use the Software Program is as set forth in this Agreement and as restricted in DFARS 252.227-7014 and in similar FAR provisions (or any equivalent agency regulation or contract clause).

15.    **CONSENT TO USE OF DATA**.  You agree that Lexmark, its affiliates, and agents may collect and use information you provide in relation to support services performed with respect to the Software Program and requested by you.  Lexmark agrees not to use this information in a form that personally identifies you except to the extent necessary to provide such services.

16.    **EXPORT RESTRICTIONS**.  You may not (a) acquire, ship, transfer, or reexport, directly or indirectly, the Software Program or any direct product therefrom, in violation of any applicable export laws or (b) permit the Software Program to be used for any purpose prohibited by such export laws, including, without limitation, nuclear, chemical, or biological weapons proliferation.

17.    **AGREEMENT TO CONTRACT ELECTRONICALLY**.  You and Lexmark agree to form this License Agreement electronically.  This means that when you click the "Agree" or "Yes" button on this page or use this product, you acknowledge your agreement to these License Agreement terms and conditions and that you are doing so with the intent to "sign" a contract with Lexmark.

18.    **CAPACITY AND AUTHORITY TO CONTRACT**.  You represent that you are of the legal age of majority in the place you sign this License Agreement and, if applicable, you are duly authorized by your employer or principal to enter into this contract.

19.    **ENTIRE AGREEMENT**.  This License Agreement (including any addendum or amendment to this License Agreement that is included with the Software Program) is the entire agreement between you and Lexmark relating to the Software Program.  Except as otherwise provided for herein, these terms and conditions supersede all prior or contemporaneous oral or written communications, proposals, and representations with respect to the Software Program or any other subject matter covered by this License Agreement (except to the extent such extraneous terms do not conflict with the terms of this License Agreement, any other written agreement signed by you and Lexmark relating to your Use of the Software Program).  To the extent any Lexmark policies or programs for support services conflict with the terms of this License Agreement, the terms of this License Agreement shall control.

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3407

Schedule F Attachment 1.4

## LEXMARK PRINTER/AIO DRIVER SOFTWARE DISTRIBUTION LICENSE

| Licensee: | ███████████████████████ | Attn: | ███████ |
|-----------|--------|-------|------|
| Address: | ████████████ | Telephone: | ██████████ |

WHEREAS, Lexmark owns all right, title and interest in and to certain software and/or has the right to license such software and any documentation accompanying or related to such software;

WHEREAS, Licensee is desirous of licensing such software; and

WHEREAS Lexmark is willing to grant a non-exclusive and non-transferable (other than to subsidiaries and affiliates of  right and license to use and distribute the Licensed Software in accordance with this Schedule;

NOW, THEREFORE, Lexmark International, Inc. and its subsidiaries ("Lexmark") agree to grant to Licensee and Licensee accepts a license to the Licensed Software listed below on the terms and conditions specified in this License.

| Licensed Software | | | | | |
|---|---|---|---|---|---|
| Description | Version / Part No. | Format | License Fee | Authorized Number of Copies | Bundled Distribution |
| Clinical Assistant ███ Healthcare Station o███████████████) | ████████ | .fls | Per Schedule B of the Agreement | Unlimited | No |
| Legal Partner ██████████████████ | | .fls | Per Schedule B of the Agreement | Unlimited | No |
| Education Station (██████████ or ████████████████ | ████████ | .fls | Per Schedule B of the Agreement | Unlimited | No |
| Education Station Server Component | N/A | Executable Format Only | Included in Education Station | | |
| Scan to Network (Basic) | All versions delivered to Licensee | Executable Format only | None | Unlimited | No |
| Remote Copy | All versions delivered to Licensee | Executable Format only | None | Unlimited | No |

| Modified Materials for Licensee Distribution | | | | | |
|---|---|---|---|---|---|
| Title | Version / Part No. | Format | License Fee | Authorized Number of Copies | Bundled Distribution |
| Derivative works of ClinicalAssistant.ai | All | ALL | None | Unlimited | None |
| Derivative works of So-EducationStation.ai | All | ALL | None | Unlimited | None |
| Derivative works of So-LegalPartner.ai | All | ALL | None | Unlimited | None |

| Licensee Modifiable Materials | | |
|---|---|---|
| Title | Version / Part No. | Format |
| So-ClinicalAssistant.ai (file name) | Current version as of March 9, 2010. | Adobe Illustrator |
| So-EducationStation.ai (file name) | Current version as of March 9, 2010. | Adobe Illustrator |
| So-LegalPartner.ai (file name) | Current version as of March 9, 2010. | Adobe Illustrator |

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3408

## 1. DEFINITIONS

1.1    "Licensed Software" means the above identified Licensed software of the specified version and format, including error corrections, updates, and end user documentation, in any medium, such as magnetic tape, electronic download, disks, CDs or optical media which is provided to Licensee by Lexmark. Licensed Software designated as Bundled Distribution in the Licensed Software table is subject to additional restrictions on distribution.

1.2    "Licensee Modifiable Materials" means software files or documentation including pictures, graphics and text files identified above in the specified version and format, including any software tools, installation software, any error corrections and updates, in any medium, such as magnetic tape, electronic download, disks, CDs or optical media which is or may be provided to Licensee by Lexmark at Lexmark's option.

1.3    "Modified Materials" means derivative works or materials created by or for Licensee that are derived from, based upon or incorporate any portion of the Licensee Modifiable Materials licensed under this Schedule. Modified Materials for distribution by Licensee in executable format are designated in the Modified Materials for Licensee Distribution table above and if designated as Bundled Distribution are subject to additional restrictions on distribution.

1.4    "Applicable Equipment" means the ███ printer /multifunction devices purchased from Lexmark which incorporates the customized Lexmark printer/multifunction device software.

1.5    "Licensed Territory" means the world.

1.6    "Effective Date" means May 26, 2010.

## 2. LICENSE GRANT

2.1    Notwithstanding anything to the contrary in this Schedule, for any pre-release or test version of Licensed Software and for Licensee Modifiable Material that is designated as a source code, pre-release or test version, Lexmark grants to Licensee a personal, nonexclusive, non-transferable license to load such source code, pre-release or test version of the Licensed Software and Licensee Modifiable Materials on its internal computer system(s) for electronic copying for internal use only and with respect to Licensee Modifiable Materials for developing Modified Materials in source code form for use only for internal purposes. Licensee shall have no right or license to copy and distribute to any third party or to license any end user:  (i) source code, pre-release or test versions of Licensed Software, (ii) source code, pre-release or test versions of Licensee Modifiable Materials; and (iii) source code for Modified Materials.

2.2    Subject to the Licensee's obligations under this Schedule, Lexmark grants to Licensee a personal, nonexclusive, non-transferable license in the Licensed Territory to: (i) load the Licensed Software or Modified Materials not designated as Bundled Distribution in executable format on Licensee's internal computer system(s) for copying and distribution through Licensee's channels of distribution as preinstalled in the Applicable Equipment, as preinstalled in systems including the Applicable Equipment, on physical media provided with the Applicable Equipment or systems incorporating Applicable Equipment or by electronic distribution to its end users for use only with the Applicable Equipment; and (ii) load the Licensed Software or Modified Materials designated as Bundled Distribution in executable format on Licensee's internal computer system(s) for copying and distribution through Licensee's channels of distribution for bundled distribution and use only with the Applicable Equipment including preinstalled on the Applicable Equipment, preinstalled on systems incorporating the Applicable Equipment, or on physical media provided in the package with the Applicable Equipment or systems incorporating Applicable Equipment.  Any methods of installation or delivery other than those set forth above including, but not limited to, installations and/or delivery by Licensee subcontractors who are identified by Licensee, must be agreed upon in advance and in writing by Lexmark and Licensee. Licensed Software or Modified Materials designated as Bundled Distribution shall not be distributed to end users by any electronic distribution method, such as from a website via the internet or on any media that is not distributed in the packaging with the Applicable Equipment or systems incorporating the Applicable Equipment.  This license allows Licensee to make the maximum number of copies of the Licensed Software or Modified Materials specified in the above tables. Reproduction, distribution and use of the Licensed Software and Modified Materials outside of the Licensed Territory is prohibited.

2.3    Except for the server component of the Education Station Licensed Software, Licensee shall sublicense the Licensed Software and Modified Materials in executable format only to end users under Licensee's standard end user software licensing agreement.  Licensee's end user software licensing agreements shall be in the name of Licensee and provide at least the same rights and protections as those provided in this Schedule.

2

CONFIDENTIAL - OUTSIDE COUNSEL ONLY

End users may assign their end user software licensing agreement to any bona fide successor in interest who first agrees in writing to be bound by the terms of their end user software licensing agreement. Lexmark and any third party beneficiaries of this Schedule shall be third party beneficiaries in any such agreements.

2.4 Licensee shall sublicense the server component of the Education Station Licensed Software in executable format only to end users under Lexmark's end user license agreement applicable to such component which is attached to and made a part of this Schedule as Exhibit A.

2.5 Notwithstanding the terms and conditions of this Schedule, all or any portion of the Licensed Software or Modified Materials that constitutes software provided under public license by third parties ("Freeware") is licensed to Licensee subject to the terms and conditions of the software license agreement accompanying such Freeware, whether in the form of a discrete agreement, shrink-wrap license, or electronic license terms at the time of download. Use and distribution of the Freeware by Licensee shall be governed entirely by the terms and conditions of such license.

2.6 Should Licensee install the Licensed Software or Modified Materials in executable formats using a single click installation process, the install screen shall contain the following elements: (i) an on-screen statement stating substantially as follows: "Click Install to install all software and documentation, and accept the End User License Agreement"; (ii) a click-on link to enable the end user to view the End User License Agreement prior to beginning installation; (iii) a click-on link to enable installation of the Licensed Software or Modified Materials and optionally provide a click-on link to indicate acceptance of the terms of the End User License Agreement when the software has been preinstalled; and (iv) a click-on link allowing the end user to cease installation of or uninstall the Licensed Software or Modified Materials if the end user does not agree to accept the terms of the end user license agreement.

2.7 Licensee agrees not to reverse engineer or decompile any of the Licensed Software that is not in source code format. Although it is not obligated to do so, in the event Lexmark provides any error corrections or updates to the Licensed Software or Licensee Modifiable Materials, Licensee agrees to install such error corrections or updates and to provide the same to its end users.

2.8 If Licensee translates or makes any modification to the Licensed Software or Licensee Modifiable Materials, Licensee agrees to indemnify, defend and hold Lexmark harmless from any errors or omissions due to such modifications and/or translations, and for any damages, claims, causes of action and expenses (including attorneys' fees) arising from or related directly or indirectly to such modifications or translations.

2.9 In addition, and except for product performance, marketing claims and statements specifying the features and functions of the Licensed Software (collectively, "Licensed Software Claims") which are provided to Licensee by Lexmark in writing, Licensee agrees to indemnify, defend and hold Lexmark harmless from any damages, claims, causes of action and expenses (including attorney's fees) arising from or related directly or indirectly to any product performance or other marketing claim made by Licensee about the Licensed Software inconsistent with or contrary to the Licensed Software Claims.

2.10 Lexmark agrees to indemnify, defend and hold harmless Licensee from any damages, claims, causes of action and expenses (including attorney's fees) arising from Licensee's use of or reliance on the Licensed Software Claims.

2.11 Each party shall promptly notify the other party of any such claims and cooperate fully with the indemnifying party. The indemnifying party shall have sole control of the defense, at its expense, of such claim, except that the party being indemnified shall have the right to retain counsel and participate in the defense or settlement, at such party's expense.

2.12 All copyrights in the Licensed Software and Modified Materials, exclusive of original contributions of Licensee to the Modified Materials, and Licensee Modifiable Materials are and shall remain the exclusive property of Lexmark and its suppliers. No license other than that specifically stated herein is granted to Licensee, or any right under any patent, trademark, copyright, trade secret or other intellectual property of Lexmark other than that expressly granted by this Schedule. Licensee agrees to notify its employees that Lexmark and its suppliers are the copyright holders of the Licensed Software and Licensee Modifiable Materials.

2.13 Licensee shall not remove any copyright or other proprietary notices of Lexmark or third parties found in or on the Licensed Software or Licensee Modifiable Materials.

2.14 The fee arrangement offered by Lexmark to Licensee herein is conditioned on compliance with the Alliance Schedule G of the Master Purchase Agreement having an effective date of November 1, 2008, which has previously been entered into by the parties. If Licensee fails to comply with the Alliance Schedule G, either through instance or audit, Lexmark will notify Licensee in writing of such noncompliance. If the

CONFIDENTIAL - OUTSIDE COUNSEL ONLA3410

noncompliance is not remedied to Lexmark's satisfaction within sixty (60) days from the notice date Lexmark may, at its sole and absolute option, raise the fees set forth herein to correspond to one lower installs pricing tier. If subsequent to the written notice there are additional instances of noncompliance, senior management for both parties will meet and develop a plan to remedy the noncompliance and/or adjust the pricing of the licensed software. If the Alliance Schedule G is terminated (as set forth under its terms and conditions), the terms of this Schedule shall survive, however, Lexmark may at its sole and absolute discretion raise the fees set forth herein. On a semi-annual basis (June/December), Licensee will audit its MPS activities and will furnish the results of the prior six (6) month's audit to Lexmark for informational purposes only. The results of the audit will include, at a minimum, the ▇▇ branded hardware overall install percentage and the ▇▇ branded mono laser hardware install percentage.

## 3. ADDITIONAL LICENSED SOFTWARE

3.1   Lexmark may from time to time provide additional Licensed Software and/or Licensee Modifiable Materials to Licensee under this Schedule by executing additional Attachments to this Schedule, substantially in the same form as the Licensed Software description set forth above, and identified successively starting with Attachment B (e.g., Attachment B, Attachment C, etc.). Additional Attachments to this Schedule shall become effective and a part of this Schedule upon execution by both parties. Licensee agrees that any use of such additional Licensed Software or Licensee Modifiable Materials or the accessing of Lexmark's server and downloading of any additional Licensed Software or Licensee Modifiable Materials from Lexmark's server shall constitute Licensee's acceptance of the terms of this Schedule with respect to such additional Licensed Software and Licensee Modifiable Materials used or downloaded by Licensee and any Modified Materials derived from such additional Licensee Modifiable Materials.

## 4. FEES AND AUDIT RIGHTS

4.1   Licensee shall pay Lexmark the License Fees set forth in the Licensed Software table above for each copy of Licensed Software used in its business or business of a third party, or sold, distributed, or otherwise transferred to a third party. The License Fees due under this Schedule are based upon a tiered pricing structure under which the current top tier pricing is obtained if and when Licensee's total installations of the Clinical Assistant, Legal Partner and Education Station components in any combination exceed ▇▇▇▇▇ ▇▇▇▇ units in a twelve (12) month period. No installations of the Scan to Network or Remote Copy components or any minimal or no-fee Licensed Software components or solutions added to this Schedule by agreement of the parties which are identified by Lexmark as "basic" solutions will be credited toward this annual amount. In order to assess the status of Licensee under this tiered pricing structure, the parties shall, every three (3) months from the Effective Date of this Schedule, if requested in writing by Licensee, review the number of Licensee's installations in aggregate through the previous twelve (12) month period and make appropriate pricing modifications based upon Lexmark's then-current tiered pricing structure for the same components of Licensed Software. Lexmark reserves the right to change its tiered pricing structure for Licensed Software in response to dynamics in the solutions market environment.

4.2   All license unit count, and service tags shall be reported monthly by Licensee at the end of each calendar month.

4.3   Lexmark will submit invoices to Licensee on a monthly basis. Payment terms shall be in accordance with the Master Purchase Agreement between Lexmark and Licensee.

4.4   Licensee shall keep records and books in sufficient detail to permit the determination of all License Fees payable hereunder.

4.5   Licensee shall also pay the following one-time fees to Lexmark, which such fees shall be due and payable on or before December 31, 2010:

  Development Fee (NRE): ▇▇▇▇▇
  Scan-to-Network and Remote Copy Fees: ▇▇▇▇▇ for web posting, unlimited licenses, and support in accordance with Section 6 for the Scan-to-Network and Remote Copy Licensed Software.

## 5. PROTECTION AND SECURITY

5.1   For Licensed Software designated as a source code, pre-release or test version and for any Licensee Modifiable Materials, Licensee represents that its employees having access to such source code, pre-release or test version of Licensed Software or Licensee Modifiable Materials are or shall be party to written agreements acknowledging a duty to protect any of Lexmark's confidential materials contained in the source code, pre-released and test versions of Licensed Software and Licensee Modifiable Materials.

4

CONFIDENTIAL - OUTSIDE COUNSEL ONLY      A3411

5.2 Licensee shall keep electronic copies of source code, pre-release or test version of Licensed Software and Modified Materials as well as Licensee Modifiable Materials (including archival copies, if any), in a secure environment and shall take all steps reasonably necessary to protect electronic copies of the source code, pre-release and test versions of Licensed Software and Modified Materials, Licensee Modifiable Materials, or any part thereof from unauthorized release or modification.

5.3 Licensee expressly agrees that a breach of this Schedule will cause irreparable harm to Lexmark and that Lexmark shall have the right to obtain injunctive relief against any unauthorized use, disclosure, copying or transfer of any part of Licensed Software, Modified Materials or Licensee Modifiable Materials. Licensed Software or Licensee Modifiable Materials may contain software from third parties who are intended to be third party beneficiaries of this Schedule.

## 6. LICENSED SOFTWARE SUPPORT

6.1 Subject to Licensee's obligations under this Schedule and for a period of three (3) years from the date of Licensee's distribution of the Licensed Software, Lexmark will provide Licensee with technical support through its existing TSC support mechanism for Licensed Software only in the event that a bug or error directly attributable to an issue with the Licensed Software as provided by Lexmark has been identified and verified by Licensee during its internal troubleshooting process and can be replicated by Lexmark. For clarification, issues with network topology, application configuration, or security configuration are not bugs or errors with the Licensed Software.

6.2 Except for support provided in accordance with Section 6.1 above, Licensee agrees to pay a fee of ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ for each support request to Lexmark or its support agent in addition to the actual costs, if any, associated with Lexmark's resolution of the issue.

6.3 Except as provided in this Section 6, Licensee shall provide all other technical support for Licensed Software and will serve as the sole point of contact for end users for all installation and technical support issues, technical advice and assistance regarding the operation and use of any Licensed Software.

6.4 Licensee shall designate a properly trained technical resource as the contact with Lexmark for purposes of requesting and receiving support services in accordance with this Section 6.

6.5 Licensee shall retain (under its standard record retention policy) and provide to Lexmark upon request log files and other pertinent diagnostic information reasonably necessary to assist Lexmark in fulfilling its obligations under this Section 6.

6.6 Lexmark will hold a one-time, two-day technical training event for up to ten (10) Licensee representatives to prepare them to provide the Licensed Software support required of them under this Section 6.

6.7 Except for charges assessed pursuant to Section 6.2 above, Lexmark will provide bug fixes and error corrections for the Licensed Software in accordance with and subject to the limitations set forth in Section 6.1 at no charge for a period of three (3) years from the date of Licensee's distribution of the Licensed Software.

## 7. DISCLAIMER & WARRANTIES

7.1 Unless otherwise provided in a separate written agreement with Licensee, Lexmark warrants that the Licensed Software and Licensee Modifiable Materials, as provided, shall conform to the specifications of Lexmark. During the thirty (30) days after the date of delivery of the Licensed Software and Licensee Modifiable Materials, Lexmark shall, in its sole opinion, use reasonable commercial efforts to correct errors detected in the Licensed Software and Licensee Modifiable Materials, as provided, after receiving notification of such errors from Licensee. In the event that any modifications are made to the Licensed Software which have not been authorized by Lexmark, any and all warranty and other obligations of Lexmark shall immediately cease with respect to such software.

7.2 Except as set forth in Section 6.7 or unless otherwise provided in a separate written agreement with Licensee, Lexmark is under no obligation to provide Licensee with any modifications, updates, additions or revisions to the Licensed Software and Licensee Modifiable Materials, or to maintain the Licensed Software and Licensee Modifiable Materials in any manner.

7.3 EXCEPT FOR THE WARRANTIES SET FORTH IN THIS SCHEDULE OR AS OTHERWISE PROVIDED FOR IN A SEPARATE WRITTEN AGREEMENT WITH LICENSEE, LICENSED SOFTWARE AND LICENSEE MODIFIABLE MATERIALS ARE PROVIDED "AS-IS". LEXMARK MAKES NO WARRANTIES, WHETHER EXPRESS OR IMPLIED, WITH RESPECT TO ANY LICENSED SOFTWARE AND LICENSEE MODIFIABLE MATERIALS PROVIDED UNDER THIS SCHEDULE INCLUDING, BUT NOT LIMITED, TO ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. LEXMARK DOES NOT WARRANT THAT THE LICENSED SOFTWARE

5

 A3412

AND LICENSEE MODIFIABLE MATERIALS WILL MEET THE LICENSEE'S REQUIREMENTS, OR THAT THE LICENSED SOFTWARE AND LICENSEE MODIFIABLE MATERIALS WILL BE ERROR-FREE. LEXMARK MAKES NO WARRANTY OF NONINFRINGEMENT, EXPRESS OR IMPLIED.

7.4    THIS SCHEDULE SETS FORTH THE ENTIRE OBLIGATION OF LEXMARK WITH RESPECT TO THE LICENSED SOFTWARE AND LICENSEE MODIFIABLE MATERIALS. IN NO EVENT SHALL EITHER PARTYBE LIABLE TO THE OTHER PARTY FOR LOSS OF PROFITS, INDIRECT, SPECIAL, INCIDENTAL, PUNITIVE, CONSEQUENTIAL, OR EXEMPLARY DAMAGES ARISING OUT OF OR IN CONNECTION WITH THIS SCHEDULE OR ANY ACTS OR OMISSIONS ASSOCIATED THEREWITH OR RELATING TO THE USE OF ANY LICENSED SOFTWARE OR LICENSEE MODIFIABLE MATERIALS, WHETHER SUCH CLAIM IS BASED ON BREACH OF WARRANTY, CONTRACT, TORT OR OTHER LEGAL THEORY AND REGARDLESS OF THE CAUSE OF SUCH LOSS OR DAMAGE OR WHETHER ANY OTHER REMEDY PROVIDED HEREIN FAILS.

7.5    EXCEPT FOR LIABILITY UNDER SECTION 2.10, IN NO EVENT SHALL LEXMARK'S TOTAL LIABILITY FOR ANY DAMAGES, HOWEVER BASED, BE IN EXCESS OF THE GREATER OF THE LICENSE FEES PAID OR

7.6    IN NO EVENT SHALL LEXMARK'S TOTAL LIABILITY FOR DAMAGES UNDER SECTION 2.10 OR LICENSEE'S TOTAL LIABILITY FOR DAMAGES UNDER SECTIONS 2.4 OR 2.9 OF THIS AGREEMENT BE IN EXCESS OF

## 8. TERM AND TERMINATION

8.1    This Schedule shall commence on the Effective Date and continue until the expiration or termination of the Agreement unless sooner terminated in accordance with this Section 6.1. Lexmark may terminate this Schedule or any part thereof on thirty (30) days written notice in the event that, due to termination or expiration of other license rights, it no longer has the rights necessary to maintain this license. Either party may terminate for convenience upon thirty (30) days notice to the other. This Schedule may be terminated by Lexmark immediately upon thirty (30) days written notice to Licensee if Licensee is in breach of any of its obligations hereunder.

8.2    In the event Lexmark determines to stop offering to any and all parties or licensees a portion or component of the Licensed Software, Lexmark may, at its option, terminate Licensee's distribution rights under this Schedule for such portion or component of the Licensed Software upon at least one hundred twenty (120) days written notice to Licensee. Lexmark's support obligations set forth in Section 6 shall continue for a period of three (3) years from the date of termination or expiration of this Licensed Software Distribution License.

8.3    Immediately after termination or expiration, Licensee shall cease all use of the Licensee Modifiable Materials and all distribution of the Licensed Software and Modified Materials, destroy all copies and provide Lexmark with its written certification that it has retained no copies. End user software license agreements shall remain in effect, provided such end users remain in compliance with the terms of their end user software license agreement.

## 9. MISCELLANEOUS

9.1    Except for taxes based on Lexmark's income, Lexmark shall not be responsible for any federal, state or local taxes based upon Licensee's purchase, possession, distribution or use of Licensed Software, Licensee Modifiable Materials, or Modified Materials or upon any charges payable hereunder.

9.2    This Schedule shall be construed and enforced in accordance with the laws of the State of Texas, United States of America, excluding any conflict of laws provisions. The UN Convention on Contracts for the International Sale of Goods shall not apply. Licensee will not export or re-export the Licensed Software and Licensee Modifiable Materials except in compliance with all applicable laws and regulations.

9.3    This Schedule comprises the full and final understanding between Lexmark and Licensee, and merges and supersedes any and all other agreements except as expressly set forth herein, and any and all other understandings or representations, written or oral, with respect to the subject matter hereof. It may not be modified except by a writing signed by authorized representatives of both Lexmark and Licensee, and referring specifically to this Schedule. Any attempt by Licensee to assign this Schedule shall be void.

9.4    Waiver by any party of the breach of a provision of this Schedule by the other party shall not be construed as a continuing waiver of such provision or waiver of any other breach of any other provision of this Schedule. All rights and remedies, whether conferred hereby or by any other instrument or by law shall be cumulative, and may be exercised singularly or concurrently. If any provision of this Schedule is held invalid by any law, rule, order or regulation of any government or by the final determination of any state or

6

federal court, such invalidity shall not affect the enforceability of any other provisions not held to be invalid.

IN WITNESS WHEREOF, Lexmark and Licensee have caused this Schedule to be executed by their duly authorized representatives effective as of the above-listed Effective Date.

**LEXMARK INTERNATIONAL, INC.**

By: _____

Printed Name: F.T. SAMUEL JR

Title: VP, WW OEM & ALLIANCES

Date: 23 JULY, 2010

**LEXMARK INTERNATIONAL TECHNOLOGY SA**

By: _____

Printed Name: _____

Title: _____

Date: Sept 22, 2010

7

CONFIDENTIAL - OUTSIDE COUNSEL ONA3414

# EXHIBIT A

### LEXMARK SOFTWARE LICENSE AGREEMENT

PLEASE READ CAREFULLY BEFORE SELECTING THE "YES " OR "AGREE" BUTTON ON THIS PAGE:  This Software License Agreement ("**License Agreement**") is a legal agreement between you (either an individual or a single entity) and Lexmark International, Inc. ("**Lexmark**") that, to the extent your Lexmark product or Software Program is not otherwise subject to a written software license agreement between you and Lexmark or its suppliers, governs your use of any Software Program installed on or provided by Lexmark for use in connection with your Lexmark product. The term "Software Program" includes machine-readable instructions, audio/visual content (such as images and recordings), and associated media, printed materials and electronic documentation, whether incorporated into, distributed with or for use with your Lexmark product.

BY SELECTING THE "YES" OR "AGREE" BUTTON OR BY USING THIS PRODUCT, YOU AGREE TO BE BOUND BY ALL THE TERMS AND CONDITIONS OF THIS LICENSE AGREEMENT.  IF YOU DO NOT SO AGREE, SELECT THE "NO" OR "DISAGREE" BUTTON ON THIS PAGE AND DO NOT INSTALL, COPY, DOWNLOAD, OR OTHERWISE USE THE SOFTWARE PROGRAM.  IF YOU DO NOT AGREE WITH THE TERMS OF THIS LICENSE AGREEMENT, PROMPTLY RETURN THE PRODUCT UNUSED AND REQUEST A REFUND OF THE AMOUNT YOU PAID.  IF YOU ARE INSTALLING THIS SOFTWARE PROGRAM FOR USE BY OTHER PARTIES, YOU AGREE TO INFORM THE USERS THAT USE OF THE SOFTWARE PROGRAM INDICATES ACCEPTANCE OF THESE TERMS.

1.    **STATEMENT OF LIMITED WARRANTY**.  Lexmark warrants that the media (e.g., diskette or compact disk) on which the Software Program (if any) is furnished is free from defects in materials and workmanship under normal use during the warranty period.  The warranty period is ninety (90) days and commences on the date the Software Program is delivered to the original end-user. This limited warranty applies only to Software Program media purchased new from Lexmark or an Authorized Lexmark Reseller or Distributor.  Lexmark will replace the Software Program should it be determined that the media does not conform to this limited warranty.

2.    **DISCLAIMER AND LIMITATION OF WARRANTIES**.  EXCEPT AS PROVIDED IN THIS LICENSE AGREEMENT AND TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, LEXMARK AND ITS SUPPLIERS PROVIDE THE SOFTWARE PROGRAM "AS IS" AND HEREBY DISCLAIM ALL OTHER WARRANTIES AND CONDITIONS, EITHER EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, TITLE, NON-INFRINGEMENT, MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, AND ABSENCE OF VIRUSES, ALL WITH REGARD TO THE SOFTWARE PROGRAM.  LEXMARK AND ITS SUPPLIERS MAKE NO WARRANTIES AS TO THE CAPABILITIES, SPEED, ACCURACY OR PERFORMANCE OF THE SOFTWARE PROGRAM. This Agreement is to be read in conjunction with certain statutory provisions, as that may be in force from time to time, that imply warranties or conditions or impose obligations on Lexmark that cannot be excluded or modified.  If any such provisions apply, then to the extent Lexmark is able, Lexmark hereby limits its liability for breach of those provisions to one of the following: replacement of the Software Program or reimbursement of the price paid for the Software Program.

3.    **LICENSE GRANT.**  Lexmark grants you the following rights provided you comply with all terms and conditions of this License Agreement:

a.    **Use**.  You may Use one (1) copy of the Software Program.  The term "Use" means storing, loading, installing, executing, or displaying the Software Program.  If Lexmark has licensed the Software Program to you for concurrent use, you must limit the number of authorized users to the number specified in your agreement with Lexmark.  You may not separate the components of the Software Program for use on more than one computer.  You agree that you will not Use the Software Program, in whole or in part, in any manner that has the effect of overriding, modifying, eliminating, obscuring, altering or de-emphasizing the visual appearance of any trademark, trade name, trade dress or intellectual property notice that appears on any computer display screens normally generated by, or as a result of, the Software Program.

b.    **Copying**. You may make one (1) copy of the Software Program solely for purposes of backup, archiving, or installation, provided the copy contains all of the original Software Program's proprietary notices.  You may not copy the Software Program to any public or distributed network.

c.    **Reservation of Rights**. The Software Program, including all fonts, is copyrighted and owned by Lexmark International, Inc. and/or its suppliers.  Lexmark reserves all rights not expressly granted to you in this License Agreement.

d.    **Freeware**.  Notwithstanding the terms and conditions of this License Agreement, all or any portion of the Software Program that constitutes software provided under public license by third parties ("Freeware") is licensed to you subject to the terms and conditions of the software license agreement accompanying such Freeware, whether in the form of a discrete agreement, shrink-wrap license, or electronic license terms at the time of download.  Use of the Freeware by you shall be governed entirely by the terms and conditions of such license.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY   A3415

4.     **TRANSFER**.  You may transfer the Software Program to another end-user.  Any transfer must include all software components, media, printed materials, and this License Agreement and you may not retain copies of the Software Program or components thereof.  The transfer may not be an indirect transfer, such as a consignment.  Prior to the transfer, the end-user receiving the transferred Software Program must agree to all these License Agreement terms.  Upon transfer of the Software Program, your license is automatically terminated.  You may not rent, sublicense, or assign the Software Program except to the extent provided in this License Agreement.

5.     **UPGRADES**.  To Use a Software Program identified as an upgrade, you must first be licensed to the original Software Program identified by Lexmark as eligible for the upgrade.  After upgrading, you may no longer use the original Software Program that formed the basis for your upgrade eligibility.

6.     **LIMITATION ON REVERSE ENGINEERING**.  You may not alter, decrypt, reverse engineer, reverse assemble, reverse compile or otherwise translate the Software Program, except as and to the extent expressly permitted to do so by applicable law for the purposes of inter-operability, error correction, and security testing.  If you have such statutory rights, you will notify Lexmark in writing of any intended reverse engineering, reverse assembly, or reverse compilation.  You may not decrypt the Software Program unless necessary for the legitimate Use of the Software Program.

7.     **ADDITIONAL SOFTWARE**.  This License Agreement applies to updates or supplements to the original Software Program provided by Lexmark unless Lexmark provides other terms along with the update or supplement.

8.     **LIMITATION OF REMEDIES**.  To the maximum extent permitted by applicable law, the entire liability of Lexmark, its suppliers, affiliates, and resellers, and your exclusive remedy shall be as follows:  Lexmark will provide the express limited warranty described above.  If Lexmark does not remedy defective media as warranted, you may terminate your license and your money will be refunded upon the return of all of your copies of the Software Program.

9.     **LIMITATION OF LIABILITY**.  To the maximum extent permitted by applicable law, for any claim arising out of Lexmark's limited warranty, or for any other claim whatsoever related to the subject matter of this Agreement, Lexmark's and its suppliers' liability for all types of damages, regardless of the form of action or basis (including contract, breach, estoppel, negligence, misrepresentation, or tort), shall be limited to the greater of ▮▮▮▮ or the money paid to Lexmark or its Authorized remarketers for the license hereunder for the Software Program that caused the damages or that is the subject matter of, or is directly related to, the cause of action.

IN NO EVENT WILL LEXMARK, ITS SUPPLIERS, SUBSIDIARIES, OR RESELLERS BE LIABLE FOR ANY SPECIAL, INCIDENTAL, INDIRECT, EXEMPLARY, PUNITIVE, OR CONSEQUENTIAL DAMAGES (INCLUDING BUT NOT LIMITED TO LOST PROFITS OR REVENUES, LOST SAVINGS, INTERRUPTION OF USE OR ANY LOSS OF, INACCURACY IN, OR DAMAGE TO, DATA OR RECORDS, FOR CLAIMS OF THIRD PARTIES, OR DAMAGE TO REAL OR TANGIBLE PROPERTY, FOR LOSS OF PRIVACY ARISING OUT OR IN ANY WAY RELATED TO THE USE OF OR INABILITY TO USE THE SOFTWARE PROGRAM, OR OTHERWISE IN CONNECTION WITH ANY PROVISION OF THIS LICENCE AGREEMENT), REGARDLESS OF THE NATURE OF THE CLAIM, INCLUDING BUT NOT LIMITED TO BREACH OF WARRANTY OR CONTRACT, TORT (INCLUDING NEGLIGENCE OR STRICT LIABILITY), AND EVEN IF LEXMARK, OR ITS SUPPLIERS, AFFILIATES, OR REMARKETERS HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, OR FOR ANY CLAIM BY YOU BASED ON A THIRD-PARTY CLAIM, EXCEPT TO THE EXTENT THIS EXCLUSION OF DAMAGES IS DETERMINED LEGALLY INVALID.  THE FOREGOING LIMITATIONS APPLY EVEN IF THE ABOVE-STATED REMEDIES FAIL OF THEIR ESSENTIAL PURPOSE.

10.    **TERM**.  This License Agreement is effective unless terminated or rejected.  You may reject or terminate this license at any time by destroying all copies of the Software Program, together with all modifications, documentation, and merged portions in any form, or as otherwise described herein.  Lexmark may terminate your license upon notice if you fail to comply with any of the terms of this License Agreement.  Upon such termination, you agree to destroy all copies of the Software Program together with all modifications, documentation, and merged portions in any form.

11.    **TAXES**.  You agree that you are responsible for payment of any taxes including, without limitation, any goods and services and personal property taxes, resulting from this Agreement or your Use of the Software Program.

12.    **LIMITATION ON ACTIONS**.  No action, regardless of form, arising out of this Agreement may be brought by either party more than two years after the cause of action has arisen, except as provided under applicable law.  Lexmark's suppliers, affiliates, and resellers are third party beneficiaries of this Agreement, entitled to the benefit and enforcement of the provisions herein.

13.    **APPLICABLE LAW**.  This Agreement is governed by the laws of the Commonwealth of Kentucky, United States of America.  No choice of law rules in any jurisdiction shall apply.  The UN Convention on Contracts for the International Sale of Goods shall not apply.

**CONFIDENTIAL - OUTSIDE COUNSEL ON A3416**

14.    **UNITED STATES GOVERNMENT RESTRICTED RIGHTS.**  The Software Program has been developed entirely at private expense.  Rights of the United States Government to use the Software Program is as set forth in this Agreement and as restricted in DFARS 252.227-7014 and in similar FAR provisions (or any equivalent agency regulation or contract clause).

15.    **CONSENT TO USE OF DATA**.  You agree that Lexmark, its affiliates, and agents may collect and use information you provide in relation to support services performed with respect to the Software Program and requested by you.  Lexmark agrees not to use this information in a form that personally identifies you except to the extent necessary to provide such services.

16.    **EXPORT RESTRICTIONS**.  You may not (a) acquire, ship, transfer, or reexport, directly or indirectly, the Software Program or any direct product therefrom, in violation of any applicable export laws or (b) permit the Software Program to be used for any purpose prohibited by such export laws, including, without limitation, nuclear, chemical, or biological weapons proliferation.

17.    **AGREEMENT TO CONTRACT ELECTRONICALLY**.  You and Lexmark agree to form this License Agreement electronically.  This means that when you click the "Agree" or "Yes" button on this page or use this product, you acknowledge your agreement to these License Agreement terms and conditions and that you are doing so with the intent to "sign" a contract with Lexmark.

18.    **CAPACITY AND AUTHORITY TO CONTRACT**.  You represent that you are of the legal age of majority in the place you sign this License Agreement and, if applicable, you are duly authorized by your employer or principal to enter into this contract.

19.    **ENTIRE AGREEMENT**.  This License Agreement (including any addendum or amendment to this License Agreement that is included with the Software Program) is the entire agreement between you and Lexmark relating to the Software Program.  Except as otherwise provided for herein, these terms and conditions supersede all prior or contemporaneous oral or written communications, proposals, and representations with respect to the Software Program or any other subject matter covered by this License Agreement (except to the extent such extraneous terms do not conflict with the terms of this License Agreement, any other written agreement signed by you and Lexmark relating to your Use of the Software Program).  To the extent any Lexmark policies or programs for support services conflict with the terms of this License Agreement, the terms of this License Agreement shall control.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3417

**ALLIANCE SCHEDULE G**

THIS ALLIANCE SCHEDULE G (this "Schedule") is entered into as of November 1, 2008 (the "Alliance Schedule Effective Date") by and between ███████████ ██████████████████████ company, on behalf of itself and its worldwide affiliates (collectively, ████, Lexmark International, Inc., a Delaware corporation ("LII"), and Lexmark International Technology, S.A., a Swiss company and LII's subsidiary ("LITSA")(LII and LITSA being hereinafter collectively referred to as "Lexmark").

This Alliance Schedule G provides additional terms and conditions to the Master Purchase Agreement having an effective date of November 1, 2008 between ████and Lexmark (the "Agreement").  All terms and conditions of the Agreement apply to this Alliance Schedule and the terms and conditions of this Alliance Schedule are hereby incorporated by reference into the Agreement.  Defined terms used herein but not otherwise defined herein shall have the meanings given such terms in the Agreement.  In the event of a conflict between this Alliance Schedule and the Agreement, this  Alliance Schedule shall govern.

**Recitals**

A.    It is Lexmark and ████intention to enter a long-term alliance, whereby the Parties employ a more streamlined, faster and efficient product development process that combines Lexmark's marketing, development and supply-chain scale and strengths with ████IT marketing and sales scale and strengths.

B.    The intention of the alliance is for ████and Lexmark to better plan and optimize product and processes to produce more compelling products, increase sales and improve profitability for both companies.

C.    Key elements of the alliance process surround the definition and development of inkjet and monochrome laser products.  Lexmark intends to include ████ earlier and more completely in the product definition process.  ████intends to defer more frequently to Lexmark's standard product and processes during the development of alliance products, limiting product differences.  Lexmark intends to assist ████in preparing for sales, by providing standard Lexmark product marketing material for equivalent products, which ████can modify for use in marketing the similar ████branded Products.

**Terms**

1.0  **Alliance Governance Process**

1.1    **Product Roadmaps.**  Each Party will in good faith establish and,  to the extent its anticipated future requirements in good faith change, revise and update written future inkjet and monochrome laser printing product plans  (each a "Product Roadmap"), in reasonable detail, that project such Party's good faith estimate of all of its future inkjet printing and monochrome laser printing product sale or resale requirements (which, in the

case of the Lexmark Product Roadmap, will include all Lexmark-branded inkjet and monochrome laser printers) during a rolling 24-month period; provided, that within 24 months of the end of any current term of Inkjet Schedule D and/or Laser Schedule E, such rolling period shall comprise only the time remaining until the end of such term. ████ future requirements as reflected in each ████ Product Roadmap will reflect product offerings that ████ based upon future product release data received from printing industry participants, in good faith, reasonably believes will be available during such time frame. The first such 24-month period commences January 1, 2009.

1.2    **Included Elements.**  Each Party's Product Roadmap will include, but not be limited to, the following information with regard to each such future printing product included in such Product Roadmap:

a.    anticipated street price segment and industry segment for the product
b.    desired paper size
c.    desired printing speed
d.    desired print quality metric (e.g., dots per inch)
e.    for laser printers, Trade Agreements Act Compliance (████ currently does not plan to seek TAA compliance for Alliance Inkjet Printer Products)
f.    any and all other desired elements  (by way of illustration and without in any way limiting the foregoing:  scan/copy/print and/or fax capability, memory card slots, wireless capability)

1.2.1    If, with regard to any such future printing product described in a ████ Product Roadmap, ████ good faith requirements for any included element described in subparts (a) through (e) change, ████ will notify Lexmark of such revised requirement  in writing as soon as practicable.

1.3    **Exclusive Disclosure.** ████ will not disclose the ████ Product Roadmap in its entirety to any third party printer manufacturers and/or developers of printing technology (e.g., Epson, Kodak, Hewlett Packard, Samsung, Canon) other than Lexmark and its affiliates.   In addition, ████ will not disclose to such third party printer manufacturers and/or developers of printing technology (other than Lexmark and its affiliates) any information that is sufficient to substantially inform such competitor regarding the details of the ████ Product Roadmap in its entirety, or a substantial portion thereof.

1.4    **Information Exchange.**  No later than the last business day of the first month of each calendar quarter:  (a) ████ will provide to Lexmark the ████ Product Roadmap; and (b) Lexmark will provide to ████ the Lexmark Product Roadmap that corresponds to the 24 month period covered by ████ provided Product Roadmap.

1.4.1    **Offering.**  Subject to payment by ████ of non-recurring development expenses calculated according to the formula specified in Inkjet Printer Schedule

Attachment 3.1 and Laser Printer Schedule Attachment 3.1 respectively, Lexmark will offer to sell to ██ pursuant to the Agreement, for distribution by ██ under the ██ brand instead of the Lexmark brand, Lexmark's entire line of Lexmark-branded inkjet and monochrome laser printers, together with their related replacement parts and Supplies.

1.5    **Quarterly Meetings.**  At least once each calendar quarter, and on other occasions as mutually agreed, ██ and Lexmark will meet to discuss in good faith the requirements described in ██ current Product Roadmap and Lexmark's corresponding Product Roadmap.

1.6    **Non-Alliance Category Priority – Inkjet and Laser.**  For inkjet printers and monochrome laser printers reflected in ██ Product Roadmap that is not an Alliance Inkjet Printer (the "Non-Alliance Inkjet Products") or an Alliance Laser Printer (the "Non-Alliance Laser Products"), Lexmark understands that ██ may, based on the principles of industry competitiveness (e.g. sound economics, financial requirements, technology requirements and operational requirements), source  such products from one or more other suppliers. If, with respect to any Non-Alliance Inkjet or Laser Product, the standards of these principles are met by Lexmark as well as they are met by other suppliers (as determined by ██ will approach Lexmark  to discuss the sourcing opportunity for such product(s) before committing to other suppliers for the sourcing of such product(s).

1.7    **Entire Requirements**

1.7.1    **Inkjet.**  For any and all Alliance Inkjet Printer products that Lexmark in good faith demonstrates substantially conform to ██ requirements as reflected in ██ Product Roadmap, ██ will source from Lexmark its entire resale requirements for such products.   An offered Lexmark product that, while comprising technology different than that specified by ██ uses substantially equivalent technology or meets substantially equivalent performance metrics as the technology specified (e.g., printing speed), is deemed to substantially conform within the meaning of this Section, provided that use of the Lexmark technology is not otherwise disadvantageous to ██ by reason of compatibility issues, increased training costs, increased warranty, service, support costs, or customer acceptance.  If ██ in good faith reasonably disagrees that an offered Lexmark product substantially conforms to the requirements in the ██ Product Roadmap, then the escalation procedure described in Section 2.2 shall apply.

1.7.2    **Laser.**  For any and all Alliance Laser Printers that Lexmark in good faith demonstrates substantially conform to ██ requirements as reflected in ██ Product Roadmap, ██ will source from Lexmark its entire resale requirements for such products. An offered Lexmark product that, while comprising technology different than that specified by ██ uses substantially equivalent technology or meets substantially equivalent performance metrics as the technology specified (e.g., printing speed), is deemed to substantially conform within the meaning of this Section, provided that use of the Lexmark technology is not otherwise disadvantageous to ██ by reason of

**CONFIDENTIAL - OUTSIDE COUNSEL ONLY** A3420

compatibility issues, increased training costs, increased warranty, service, or support costs, or customer acceptance. If ▓▓ in good faith reasonably disagrees that an offered Lexmark product substantially conforms to the requirements in the ▓▓Product Roadmap, then the escalation process described in Section 2.2 shall apply.

**1.7.3    Exceptions.**  Notwithstanding Section 1.7.1 and Section 1.7.2, the following ▓▓branded products are excluded from the requirements of this Alliance Schedule: ▓▓▓▓▓▓ product and ▓▓▓▓▓▓AIO product.  Any and all derivative (e.g., "follow-on") products to such products shall be subject to the requirements of Section 1.7.1 and Section 1.7.2.

**1.7.4  Segment or Product Abandonment**.  Lexmark shall not unilaterally abandon an Alliance Plan of Record segment or inkjet or laser printer product on the Lexmark Product Roadmap without first providing ▓▓ with 12-months written notice (in the case of an inkjet printer) or 18 months written notice (in the case of a laser printer), unless a shorter notice period is mutually agreed otherwise.

**2.0    Escalation Process.**

2.1    In the event of:  (a) a disagreement between the Parties regarding whether an offered Lexmark product substantially conforms to requirements in the ▓▓Product Roadmap pursuant to Section 1.7.1 and/or Section 1.7.2 above; and/or (b) Lexmark provides notice under Section 1.7.4 that it plans to abandon either an Alliance Plan of Record segment or an inkjet or laser printer product from the Lexmark Product Roadmap, and ▓▓ disagrees, then the Parties must first attempt to resolve the disagreement pursuant to the following escalation procedure:

2.2    In the event of a disagreement described in Section 2.1(a):

2.2.1    ▓▓will provide written notice of ▓▓disagreement.  This notice will include ▓▓good faith basis for concluding that Lexmark's offering does not substantially conform to ▓▓requirements.

2.2.2    If requested by Lexmark in writing within two (2) business days after Lexmark's receipt of such notice, managers from both companies (of at least the vice president level) will meet within fourteen (14) days after Lexmark's receipt of such notice to discuss such disagreement in good faith.

2.2.3    If such meeting fails to produce agreement between the Parties, then Lexmark shall be afforded thirty (30) days time in which to deliver to ▓▓a revised offering that Lexmark in good faith believes substantially corrects the deficiencies specified in ▓▓notice.

2.2.4    If ▓▓in good faith reasonably disagrees that Lexmark's revised offering substantially corrects the deficiencies, then ▓▓within thirty (30) days after ▓▓

receipt of such revised offering, will send Lexmark written notice that such deficiency has not been cured.

2.2.5    If requested by Lexmark in writing within two (2) business days after Lexmark's receipt of such notice, senior executives (e.g., Lexmark division president and ███ equivalent officer) for both companies will meet within fourteen (14) days after receipt by Lexmark of the notice described in Section 2.2.4 to discuss in good faith the disagreement.  In addition, if Lexmark expects to exercise its rights described in Section 2.2.6 hereto, Lexmark will inform ███ in such written request that it reserves the option to exercise such rights.

2.2.6    If the meeting described in 2.2.5 is held, but fails to produce consensus between the Parties and ███ declines to purchase the Lexmark product offering in dispute,  then Lexmark shall be entitled to revise pricing for any and all Products within the Alliance Plan of Record.

2.2.7    If (i) Lexmark fails to request a meeting under Section 2.2.2 within the time specified in that Section or requests but subsequently withdraws its request for such meeting or requests but fails to attend such requested meeting within such 14-day period (unless such failure to attend was due to a Force Majeure Event), (ii) Lexmark fails to deliver to ███ a revised offering in accordance with Section 2.2.3 within the time specified in that Section, (iii) Lexmark fails to request a meeting under Section 2.2.5 within the time specified in that Section or requests but subsequently withdraws its request for such meeting or requests but fails to attend such requested meeting within such 14-day period (unless such failure to attend was due to a Force Majeure Event), or (iv) the good faith meeting described in Section 2.2.5 fails to produce consensus between the parties, then ███ shall be excused from the requirements of Section 1.7.1 and/or Section 1.7.2 with regard to the disputed Lexmark offering only; provided, however, that ███ shall also be excused with respect to follow-on models of such offering if they were included in the above referenced executive level discussions.  For the avoidance of doubt, such excused offering (and, to the extent provided above, such follow-on models) will no longer be included within the  Alliance Plan of Record.

2.3    In the event of a disagreement described in Section 2.1(b):

2.3.1    Lexmark will provide ███ with written notice as set forth in Section 1.7.4.of its intent to withdraw such product by removing such offering from the Lexmark Product road map.

2.3.2    If requested by ███ in writing within two (2) business days after ███ receipt of such notice, managers from both companies (of at least the vice president level) will meet within fourteen (14) days after ███ receipt of such notice to discuss such disagreement in good faith.

2.3.3    If such meeting fails to resolve the disagreement, then  if requested by ███ in writing within two (2) business days after such meeting, senior executives (e.g.,

Lexmark division president and █████ equivalent officer) for both companies will meet within fourteen (14) days after receipt by Lexmark of ██████ written request.  If such meeting fails to result in a written commitment from Lexmark to supply the withdrawn product, then █████ shall be excused from the requirements of Section 1.7.1 and 1.7.2 with regard to such withdrawn product and related supplies and any follow-on products and related supplies only.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY

**Schedule G**
**Attachment 1.0**
**Inkjet Alliance Plan of Record Roadmap**

The Alliance Plan of Record for inkjet printer Products and their related Supplies comprises market segments and individual products, including the product categories in the related category street price bands reflected in Table 1.1 below, the current generation Products (reflected by code name) in Table 1.1 below, and any follow-on products thereto.

| Table 1.0 -- INKJET POR ROADMAP | | | | | |
|---|---|---|---|---|---|
| **Category Street Price Band** | **Product Category** | **Current Generation Product Code Name** | **Next Generation Product Code name** | **Predecessor Product Code name** | **Comments** |
|  | Entry |  |  |  |  |
|  | Good |  |  |  |  |
|  | Good |  |  |  |  |
|  | Better (Productivity) |  |  |  |  |
|  | Better (Photo) |  |  |  |  |
|  | Best (Photo) |  |  |  |  |
|  | Best (Productivity) |  |  |  |  |
|  |  |  |  |  | Category removed from ▮ Roadmap Sept 2008 then added back Sept 2008 |
|  | Ultimate (Photo) |  |  |  |  |

The parties acknowledge and agree the individual products contained in Table 1.1b below are not included within the Alliance Plan of Record.

| Table 1.0b -- ▮ INKJET ROADMAP NOT CONTAINED IN THE ALLIANCE ROADMAP | | | | |
|---|---|---|---|---|
| **Product Code Name** | **Product Category** | **Predecessor Product** | **Category Price Band** | **Comments** |
|  | Ultimate (Productivity) | None |  | Off-carrier HY 2k pg mono/2.6k color yield requirement which was revised downward to 1.2K. Lexmark can provide this product in Q4 2010 |

The Parties acknowledge and agree the Alliance Plan of Record includes any individual Product (as well as the market segment served by such Product) that is subsequently added by the Parties as evidence by the mutual execution of a Product Plan of Record document as described in Attachment 1.1 to Schedule D (Inkjet).

## Schedule G
## Attachment 1.1
## Alliance Plan of Record (Laser)

The Alliance Plan of Record for laser printer Products and their related Supplies comprises market segments and individual products, including the product categories in the related category street price bands reflected in Table 1.1 below, the current generation Products (reflected by code name) in Table 1.1 below, and any follow-on products thereto.

| Table 1.1 -- MONO LASER POR ROADMAP | | | | | |
|---|---|---|---|---|---|
| Estimated Category Street Price Band | Category(s) | Current Generation Product Code Name | Next Generation Product Code Name | Predecessor Product | Comments |
| **Single Function** | | | | | |
| | Entry | █ | | None | Complementary Products |
| | Mainstream | █ | | █ | |
| | Advanced | █ | | None | Core Products |
| | Performance | █ | | █ | |
| | Performance + | TBD | | | Complementary Plus Products |
| **Multi Function** | | | | | |
| | Entry | █ | | | Complementary Products |
| | Mainstream | █ | | None | Core Products |
| | Advanced | █ | | None | Complementary Plus Products |
| | Performance | TBD | | | |
| | Performance + | N/A | | | |

The parties acknowledge and agree the individual products contained in Table 1.1b below are not included within the Alliance Plan of Record.

| Table 1.1b -- █ MONO LASER ROADMAP NOT CONTAINED IN THE ALLIANCE ROADMAP | | | | | |
|---|---|---|---|---|---|
| LXK Category | Estimated Price Band (Street) | Category(s) | Product Code Name | Predecessor Product | Comments |
| | | A3 (MF) | None | █ | Awarded prior to Alliance |
| | | | | | |

The Parties acknowledge and agree the Alliance Plan of Record includes any individual Product (as well as the market segment served by such Product) that is subsequently added by the Parties as evidence by the mutual execution of a Product Plan of Record document as described in Attachment 1.1 to Schedule E (Laser).

CONFIDENTIAL - OUTSIDE COUNSEL ONl

Schedule H:  Business Review Process

THIS SCHEDULE H (this "Schedule") is entered into as of November 1, 2008 (the "Schedule Effective Date") by and between ███████████████████████ the ████████████████████company, on behalf of itself and its worldwide affiliates (collectively, "████"), Lexmark International, Inc., a Delaware corporation ("LII"), and Lexmark International Technology, S.A., a Swiss company and LII's subsidiary ("LITSA")(LII and LITSA being hereinafter collectively referred to as "Lexmark").

This Schedule H provides additional terms and conditions to the Master Purchase Agreement having an effective date of November 1, 2008 between ████ and Lexmark (the "Agreement").  All terms and conditions of the Agreement apply to this Schedule H, and the terms and conditions of this Schedule H are hereby incorporated by reference into the Agreement.  Defined terms used herein but not otherwise defined herein shall have the meanings given such terms in the Agreement.  In the event of a conflict between this Schedule H and the Agreement, this  Schedule H shall govern.

An important part of a successful alliance is regular communications at all levels of each company.  Scheduling regular communications facilitates business alignment and allows for communication at times beyond the "escalation path".

Therefore, mutually the two companies set the following schedule and basic goals and agenda for key business meetings:

<u>CEO Level</u>
      Frequency:      Twice annual meetings
      Attendees:      Company CEOs (other staff as appropriate)
      Agenda:
            Industry update and trends
            Current Status of Alliance
                  Technology / Product
                  Sales
            Key focus areas and initiatives

<u>Executive Level</u>
      Frequency:      Communication every eight weeks
            Call/Call/EBR Meeting
                  Two face-to-face EBRs per year (███████ & Lexington)
                  Four calls per year
      Attendees:      ███████████ VP/GM and senior team;
                  Lexmark: Division Presidents, Alliance VP/GM and senior team
      Agenda:
            Industry update and trends
            Operational Updates
                  Technology / Product
                  Sales
                  Other (Supply Chain, Inventory, Quality)
            Key focus areas and initiatives

Schedule H:  Business Review Process

Quarterly Roadmap Meetings
      Frequency:    Quarterly for Mono Laser
                      Quarterly for Inkjet
      Attendees:    ███████ Marketing, Procurement, Development
                      Lexmark: Alliance Business Mgt, Division Marketing, Dvlpt.
      Agenda:
              Industry update and trends
              ████ Alliance Category Roadmap for next 24 months
              Lexmark Alliance Category Roadmap for next 24 months

Quarterly Business Reviews (QBR)
      Frequency:    Quarterly
      Attendees:    Alliance Functional Leads from each company plus Alliance
                      Business Leads from each company
      Agenda:
              Supply Chain, Demand Forecasting, Inventory positioning
              Quality review (IFIR, FIR, EC management)
              TBD….

Note – the QBR may be broken into functional meetings, not all occurring on the same schedule.  The most effective process may be to hold these functional meetings independently.  However, it is critical that each functional meeting happen on a regular schedule, and that the Alliance Business Leads from each company be present for continuity.

Regular Alliance Discussions
      Frequency:    Weekly
      Attendees:    Alliance Business Leads from each company
      Agenda:
              Overall alliance operational issues

The above list is not intended to be complete; existing meetings, discussions, conference calls, etc between all levels of the organization and across functions must continue.

CONFIDENTIAL - OUTSIDE COUNSEL ON

## PRODUCT PRICING METHODOLOGY SCHEDULE I

THIS PRODUCT PRICING METHODOLOGY SCHEDULE I (this "Pricing Schedule") is entered into as of November 1, 2008 (the "Schedule Effective Date") by and between ███████████████████████████████████████ ███ company, on behalf of itself and its worldwide affiliates (collectively, ███), Lexmark International, Inc., a Delaware corporation ("LII"), and Lexmark International Technology, S.A., a Swiss company and LII's subsidiary ("LITSA")(LII and LITSA being hereinafter collectively referred to as the "Supplier").

This Pricing Schedule provides additional terms and conditions to the Master Purchase Agreement having an effective date of November 1, 2008 between ███ and the Supplier.   All terms and conditions of the Agreement apply to this Schedule and the terms and conditions of this Schedule are hereby incorporated by reference into the Agreement.   As used in this Schedule, the term "Lexmark" means Supplier.  Defined terms used herein but not otherwise defined herein shall have the meanings given such terms in the Agreement.  In the event of a conflict between this Schedule and the Agreement, this Schedule shall govern.

Inkjet and Laser Product pricing shall be respectively set according to the methods below.  Specific product pricing and NRE are reflected and communicated in Schedule B, which the Parties shall revise from time to time as new Products are introduced.

## 1.0    INKJET LGM:

**1.1**    The Parties acknowledge that ███ stated aim for the Alliance Plan of Record is to achieve the LGM Target (as described in Section 5.1) for inkjet printing.  As new Products are introduced into the Alliance Plan of Record, Lexmark and ███ should in good faith share information and engage in pre-launch transfer price modeling that, subject to each Party's independent business objectives, and subject to unchanged economic variables outside Lexmark's control (e.g., ███ overhead, ███ cost adders, transportation costs, mix of portfolio selected by ███ usage) supports ███ efforts to meet such LGM Target.

- 1 -

 A3428

## 2.0    PRODUCT PRICING:

**2.1.1  Laser:**        Alliance Laser Printers and related Supplies pricing shall be reflected as either a discount off or, as illustrated in Figure 1 below, an addition to Lexmark's U.S. best dealer price.  This pricing methodology is intended to keep ▮ competitive with the industry.  This methodology leverages Lexmark's monitoring of the industry leaders and industry reactions.  As Lexmark reacts to market  changes to remain competitive (e.g., reacts to Primary Printer Industry Leader list changes or  adjusts its industry wide best dealer pricing) or otherwise alters the discount structure, ▮ will realize a corresponding Product pricing adjustment.  Figure 1 shows the initial discount table for Alliance Laser Printers and related  Supplies and is subject to change.

**Figure 1:**



**2.1.2  Inkjet:** ▮ has been provided Schedule B for the ▮ portfolio corresponding to the portfolio product awards to Lexmark.  The current Product specific ▮ pricing is shown in "▮ Schedule B 081103".  The Parties may mutually agree to make Product or logistics changes which result in cost additions

CONFIDENTIAL - OUTSIDE COUNSEL ON A3429

and subtractions to Schedule B.  For each follow on generation, the Parties will utilize Marketing Face-Off Sessions (See Master Purchase Agreement Section 3.2) to accomplish the following:

A) Discuss generation to generation price moves within each category by the Primary Printer Industry Leader.

B) Based on these category trends, the parties will discuss follow-on Product pricing at launch price based upon pricing for the prior generation Product.

C) This process will result in a revised Schedule B that includes such follow on Products.

D) The parties may discuss and jointly agree on a different methodology in the future.

**2.1.3**   The Parties acknowledge that ▮▮▮ stated aim for the Alliance Plan of Record is to achieve a ▮▮ gross margin for inkjet printing as measured over the lifetime of hardware and all inkjet Supplies, options, service and any other affiliated revenue.  As new Products and or Product revisions are introduced into the Alliance Plan of Record, Lexmark and ▮▮ should in good faith share information and engage in pre-launch transfer price modeling that, subject to each Party's independent business objectives, and subject to unchanged economic variables outside Lexmark's control (e.g., ▮▮ overhead, ▮▮ cost adders, transportation costs, mix of portfolio selected by ▮▮ usage) supports ▮▮ efforts to meet such gross margin objective.

**2.1.4**   Related to inkjet Supplies, this process will occur when new inkjet Supplies items are released and will not impact historical supplies installations.

**2.2**   **Laser LGM:**  The Parties acknowledge that ▮▮ stated aim for the Alliance Plan of Record is to achieve the LGM Target (as described in Section 5.1) for laser printing.  As new Products are introduced into the Alliance Plan of Record, Lexmark and ▮▮ should in good faith share information and engage in pre-launch transfer price modeling that, subject to each Party's independent business objectives, and subject to unchanged economic variables outside Lexmark's control (e.g., ▮▮ overhead, ▮▮ cost adders, transportation costs, mix of portfolio selected by ▮▮ usage), supports ▮▮ efforts to meet such LGM Target.

CONFIDENTIAL - OUTSIDE COUNSEL ONLYA3430

**3.0** ██████████:

**3.1**    The Parties acknowledge that ██████ internal objective with regard to laser printer Product and related Supplies pricing is to evaluate pricing according to a ████████████████████████████████████ strategy. ██████ will disclose its ████████ metrics as part of the Marketing Face-Off Sessions and the Parties will jointly review this as well as a future projection of ████████ ████████████ objectives for laser printer Products and related Supplies are shown in Figure 2.

**Figure 2:  Laser** ████████████

████████ priority is meeting Primary Strategy first then Secondary Strategy.

**Mono SF / MFP**

| Category | Model | HW List | Mono Toner Price | Mono CPP | Warranty | TCOP |
|---|---|---|---|---|---|---|
| Entry | ██████ | 1.1 | 1.1 | 1.0 | ██ | NA |
| Mainstream | ██████ | 1.3 | 1.0 | 1.1 | ██ | 1.13 |
|  | ██████ | 1.3 | 1.0 | 1.1 | ██ | 1.13 |
| Advance |  | 1.2 | 1.0 | 1.2 | ██ | 1.25 |
| Performance Ultra Highend | ██████ | 1.2 | 1.0 | 1.2 | ██ | 1.25 |

Pri Strategy
Sec Strategy

**4.0    INDUSTRY PRICE MOVES (Laser):**

**4.1**    Lexmark and ██████ will study permanent printer and related supplies price moves by the Primary Printer Industry Leader for laser printers. A permanent price move occurs when the Primary and Secondary Printer Industry Leaders for laser printers, based on publicly available information confirmed by independent third party analysis, have made a permanent price move (i.e., a price reduction in two or more channels that the Parties mutually agree are indicative for purposes of a permanent price move, such price move remaining unchanged after three (3) weeks from the initial reduction and made under circumstances where the discounters gave no indication the reduction was for a limited time) as opposed to a short-term promotional price adjustment (e.g., seasonal discount, product end of life discount) ("Permanent Price Move").

CONFIDENTIAL - OUTSIDE COUNSEL ONLYA3431

**4.2** With regard to Alliance Laser Printers and related Supplies, Lexmark will notify ▮ of the Permanent Price Move and provide any responsive pricing actions no more than two (2) weeks from the time the Parties identify the price move as a Permanent Price Move. The joint objective is for this reaction to take no longer than one (1) week. If longer than one (1) week is required, any responsive pricing action shall be retroactive as to Alliance Laser Printers sold by ▮ during each day past such one-week objective. The foregoing retroactive pricing shall not apply to price reductions made by Lexmark independently of a Permanent Price Move.

**4.3** Any revised pricing will be reflected back to ▮ in a new Schedule B and will be immediately effective on purchases irrespective of Lexmark's inventory position.

## 5.0    INKJET AND LASER PRICE COMPETITIVENESS

**5.1    Laser and Inkjet:** As used in this Agreement, the terms "LGM" and "Lifetime Gross Margin" refer to the aggregate gross margin from Product launch until end of life and includes all printer Product sales and associated Supplies sales for such printers. ▮ has independently established separate Lifetime Gross Margin targets of ▮ percent for the first generation suite of Alliance Laser Printers and related Supplies (excluding high end Complementary Products described in Figure 1) and ▮ for the first generation suite of Alliance Inkjet Printers and related Supplies. These LGM calculations include specific metrics with respect to transfer pricing, ▮ overhead, ▮ cost adders, volumes sold via third party channels, percentage discounts off ▮ Product list pricing and the frequency at which such discounts are offered by ▮ transportation costs, AMPV, Product portfolio sales mix, ▮ position per Product and other variables within ▮ control. As used in this Schedule I, "LGM Target" means ▮ initially estimated LGM for all first generation Alliance Inkjet Printers and related Supplies or all first generation Alliance Laser Printers and related Supplies (as applicable), including all of the above described metrics. As used in this Schedule, "Portfolio LGM" and "Portfolio Lifetime Gross Margin" means ▮ ongoing, calculated LGM for Alliance Inkjet Printers and related Supplies or Alliance Laser Printers and related Supplies (as applicable), including all of the above described metrics. During the Quarterly Business Reviews, ▮ will provide Lexmark with the preceding quarter's results for the current Portfolio LGM (including all relevant metrics used in its calculation)) for the Alliance Inkjet Printers and related Supplies and the Alliance Laser Printers and related Supplies.

CONFIDENTIAL - OUTSIDE COUNSEL ONLA3432

**5.2  Laser:**  At any time during the term of the Agreement, provided ▮ has provided the reporting described in Section 5.1 above, if Lexmark either: (a) increases the transfer price for an existing Alliance Laser Printer Product and/or its related  Supplies or a proposed printer Product and/or its associated Supplies under circumstances that do not comprise a response to an upward Permanent Price Move by the Primary Printer industry leader (as described in Section 4.1 above,); or (b) for any Alliance Laser Printer Product and/or its related Supplies transfer pricing, fails to respond to a downward Permanent Price Move by the Primary Printer Industry Leader (as described in Section 4.1 above) of printer and/or associated supplies list pricing; and, in addition, such actual/proposed increase (as described in (a) above) or failure to respond (as described in (b) above) is the sole cause for a "Substantial Failure" (i.e., ▮▮▮▮▮▮▮▮ for the Alliance Laser Printers and related Supplies) by ▮ to achieve the last reported Portfolio LGM and ▮ initiates the escalation procedure described in Section 5.4 below, and Lexmark fails within the thirty-day period described in Section 5.4 below to provide a revised transfer price that is in good faith intended to improve the Portfolio LGM to a level that does not comprise a Substantial Failure, then ▮ (unless otherwise prohibited as described in Section 5.5 below) shall be excused from the requirements of Section 1.7.2 of Schedule G with regard only to such Product (or proposed Product). Notwithstanding any language to the contrary in this Section 5.2, no Substantial Failure shall exist under circumstances where ▮ Portfolio LGM for Alliance Laser Printers is equal to or greater than ▮▮▮▮▮

**5.2.1  Inkjet:**    If ▮ has provided the reporting described in Section 5.1 above, and if the transfer price for a proposed Product(s) described by Lexmark in a Preliminary Product Plan of Record document v0.1 (as described in Section 3.1 of Attachment 1.1 to Schedule D (Inkjet)), if implemented, would comprise the sole cause for a "Substantial Failure" (i.e., ▮▮▮▮▮▮ or more for the Alliance Inkjet Printers and related Supplies) of  all proposed Alliance Inkjet Printers, on a portfolio basis, by ▮ to achieve the LGM Target (for the avoidance of doubt, the LGM Target includes all original assumptions by ▮ described in Section 5.1 above), and ▮ within 30 days of receipt of such Preliminary Product Plan of Record document, initiates the escalation procedure described in Section 5.4 below, and Lexmark fails within the thirty-day period described in Section 5.4 below to provide a revised proposed transfer price that is in good faith intended to improve the next generation Portfolio LGM to a level that does not comprise such Substantial Failure to achieve the LGM Target, then ▮ (unless otherwise prohibited as described in Section 5.5 below) shall be excused from the requirements of Section 1.7.1 of Schedule G with regard only to such Product (or proposed Product).

- 6 -

**5.3**    In the event that ▮▮ exercises its right to be excused from the requirements of Sections 1.7.1 and/or 1.7.2 of Schedule G, as described in Section 5.2 above, then Lexmark shall be entitled to revise pricing in the same manner as set forth in Section 2.2.6 of Schedule G.

**5.4**    To initiate an escalation procedure with regard to an increased transfer price (as described in Section 5.2(a) above) and/or a failure to respond to a downward permanent price move as described in Section 5.2(b) above, ▮▮ must send written notice to Lexmark requesting a meeting to discuss any resulting Substantial Failure. As part of the meeting, the Parties will exchange all relevant information regarding ▮▮ actual gross margin calculations and all underlying assumptions affecting actual gross margin. Managers from both companies (of at least the vice president level) will meet within fourteen (14) days after Lexmark's receipt of such notice to discuss such gross margin calculations and Lexmark's transfer pricing in good faith. Lexmark shall then be afforded an additional thirty (30) days time in which Lexmark, at its discretion, may elect to offer ▮▮ revised transfer pricing intended in good faith to enable ▮▮ to improve the Portfolio LGM to a level that does not comprise a Substantial Failure.

**5.5**    Notwithstanding any language in the Agreement, this Schedule (including but not limited to any Attachments hereto and/or Section 5.3 above), and/or any other Schedule to the Agreement (including, but not limited to, Attachments thereto), to the contrary, the Parties acknowledge and agree that in the event of a prerequisite Substantial Failure (as described in Section 5.4 above) results in whole in or part from changes to, ▮▮ overhead, cartridge usage and/or any factor other than Lexmark transfer pricing (as described in Section 5.2 above), ▮▮ shall not be entitled to initiate the escalation procedure described in Section 5.4 above (unless otherwise permitted in Section 5.6), and ▮▮ shall not in such event be excused from the requirements of Section 1.7.1 and/or 1.7.2 of Schedule G.

**5.6**    Notwithstanding any language in the Agreement, this Schedule (including but not limited to any Attachments hereto and/or Section 5.3 above), and/or any other Schedule to the Agreement (including but not limited to Attachments thereto), to the contrary, the Parties acknowledge and agree that in the event ▮▮ initiates the escalation procedure described in Section 5.4 above under circumstances where a Substantial Failure results in whole in or part from a ▮▮ Product sales mix that is materially different than the sales mix target included in the LGM Target, ▮▮ shall not in such event be excused from the requirements of Section 1.7.1 and/or 1.7.2 of Schedule G, but the Parties as mutually agreed in their independent discretion and subject to their independent business objectives, may elect to implement a mutually acceptable downward revision in Lexmark's transfer

- 7 -

A3434

price for the affected Product(s); provided, in no event shall such revision occur under circumstances where such variation in Product sales mix is attributable in whole or in part to ███ pricing and/or promotions that are substantially below levels practiced by the Printer Industry Leader(s) (as that term is used in Section 4.1 above) for competing products.

## 7.0    NON-RECURRING EXPENSES ("NRE"):

**7.1**    Except as set forth below, specific NRE amounts, allocations thereof, and method of payments will be as mutually agreed by the Parties and reflected in Schedule B.

## 7.2    Laser NRE

**7.2.1**  For the below Laser Product categories and corresponding development levels, ███ has agreed to pay ████████████ per year in NRE charges (See Laser Product Schedule E Attachment 3.1).  This annual ████████████ includes NRE for the following product categories:

Entry SF (2 products)        -            Model 0 (Lexmark ID & Subsystem)
Entry AIO (1 product) -          Model 0 (Lexmark ID & Subsystem)
Mainstream SF (3 products) -          Model 1 (███D & Lexmark Subsystem)
Mainstream AIO (2 products -   Model 1 (███D & Lexmark Subsystem)
Performance SF (2+2 products) -        Model 1 (███ID & Lexmark Subsystem)

Level 1 and Level 0 Products are defined in Laser Product Schedule E Attachment 3.1.

**7.2.2**  Should ███ change the number of Products in these categories or the required development models, Lexmark will revise the NRE numbers upwards or downwards accordingly to ███ This would include ███ eliminating or adding products or requesting that a Level 1 product to shift to Level 0 or vice versa.

**7.2.3**  All high end Complementary Products ("Performance plus" SF & AIO; Advanced AIO) offered to ███ are currently assumed to fall under the level 0 or traditional OEM development model to minimize NRE.  Once these determinations are made by ███ Lexmark will provide the NRE related to any of these Complementary products.

CONFIDENTIAL - OUTSIDE COUNSEL ONLA3435

## 8.0    PRODUCT PRICING REVISIONS:

**8.1**    In the event that ▆▆▆ breaches Section 14.0 (Supplies Obligations) of the Agreement, all Product pricing shall immediately revert to ▆▆▆▆▆▆▆▆▆ for the corresponding Lexmark branded products (in the case of Alliance Laser Printers  and related Supplies; otherwise, as in the case of Alliance Inkjet Printers and related Supplies, to Lexmark's customary reseller invoice price, before promotional programs are applied).

CONFIDENTIAL - OUTSIDE COUNSEL ONLYA3436

THIS SCHEDULE L (this "Schedule") is entered into as of November 1, 2008 (the "Schedule Effective Date") by and between ███████████████████████████████ ████████████████████████████ on behalf of itself and its worldwide affiliates (collectively, ████████ Lexmark International, Inc., a Delaware corporation ("LII"), and Lexmark International Technology, S.A., a Swiss company and LII's subsidiary ("LITSA")(LII and LITSA being hereinafter collectively referred to as "Lexmark").

This Schedule L provides additional terms and conditions to the Master Purchase Agreement dated November 1, 2008 between ██████ and Lexmark (the "Agreement"). All terms and conditions of the Agreement apply to this Schedule L, and the terms and conditions of this Schedule L are hereby incorporated by reference into the Agreement. Defined terms used herein but not otherwise defined herein shall have the meanings given such terms in the Agreement. In the event of a conflict between this Schedule L and the Agreement, this Schedule L shall govern.

This Schedule L includes:

    A. July 11, 2005 letter from ████████████ regarding ████████████

CONFIDENTIAL - OUTSIDE COUNSEL ONLY

██████████████

July 11, 2005

Lexmark International, Inc.
740 New Circle Road, NW
Lexington, KY 40550
USA

RE: ████████████

This is to confirm the relationship between ████████████████████████████████████

████████████ is wholly owned by ████ or ████ wholly-owned subsidiaries. ████ has absolute confidence in and fully supports the management of ████████████████████ is a critical operating subsidiary of ████████ and ████ intends to exercise its influence on the management of ████████████, if necessary, to comply fully with all of its financial obligations and will assume the obligations therefore in the event that ████████████ fails to cure a material breach of any and all agreements with Lexmark International, Inc., or its affiliated companies (e.g., fails to pay invoices when due without proper cause).  This letter shall continue in effect during the term, and any extensions thereof, of any and all purchase agreements between ████████ and Lexmark International, Inc. and/or its affiliated companies.

Sincerely,

████████████

By:
Name:
Title:

CONFIDENTIAL - OUTSIDE COUNSEL ON

THIS GLOSSARY SCHEDULE M (this "Glossary Schedule") is entered into as of November 1, 2008 (the "Schedule Effective Date") by and between ███████████ ████████████████████████████████████ company, on behalf of itself and its worldwide affiliates (collectively, ███████ Lexmark International, Inc., a Delaware corporation ("LII"), and Lexmark International Technology, S.A., a Swiss company and LII's subsidiary ("LITSA")(LII and LITSA being hereinafter collectively referred to as the "Supplier" or "Lexmark").

This Glossary Schedule provides additional terms and conditions to the Master Purchase Agreement having an effective date of November 1, 2008 between ███ and Lexmark. All terms and conditions of the Agreement apply to this Schedule and the terms and conditions of this Schedule are hereby incorporated by reference into the Agreement. As used in this Schedule, the term "Lexmark" means Supplier. Defined terms used herein but not otherwise defined herein shall have the meanings given such terms in the Agreement. In the event of a conflict between this Schedule and the Agreement, this Schedule shall govern.

**Agreement** means the Master Purchase Agreement having an effective date of November 1, 2008 (including without limitation the Schedules (including Attachments to Schedules hereto) as may from time to time be amended.

**Alliance Inkjet Printers** means inkjet printers sized A4 and smaller, as well as inkjet printers that are added by mutual agreement of the parties through a revised Attachment 1.0 to Schedule G of the Agreement and/or that are listed in a mutually executed Product Plan of Record document as described in Section 1.0 of Schedule D (Inkjet).

**Alliance Laser Printers** means monochrome Laser Printers sized A3 and A4, as well as laser printers that are added by mutual agreement of the parties through a revised Attachment 1.0 to Schedule G of the Agreement and/or that are listed in a mutually executed Product Plan of Record document as described in Section 1.0 of Schedule E (Laser).

**Alliance Plan of Record** means the listing of the mutually agreed industry inkjet and laser segments, as well as the Alliance Inkjet Printers and Alliance Laser Printers (including their respective related Supplies), and follow-on products to such, reflected in Attachments 1.0 and 1.1 to Schedule G.

**Attachments** means documents that contain additional terms and conditions of the Agreement and that are attached to Schedules.

**AMPV, or Average Monthly Page Volume** means, with respect to a given printer Product, the average number of pages printed on it each month.

**Effective Date** means November 1, 2008.

**Epidemic Failure** has the meaning defined in Section 4.3 of the mutually executed Master Purchase Agreement.

**Force Majeure Event** has the meaning given that term in Section 12.11 of the mutually executed Master PurchaseAgreement.

**LGM** and **Lifetime Gross Margin** mean the aggregate gross margin from Product launch until end of life and includes  all printer Product sales and associated Supplies sales for such printers; each LGM calculation expressly includes specific metrics with respect to transfer pricing, ███ overhead, ███ cost adders, volumes sold via third party channels, percentage discounts off ███ Product list pricing and the frequency at which such discounts are offered by ███ transportation costs, AMPV, Product portfolio sales mix, ███ position per Product and other variables within ███ control.

**LGM Target** means ███ initially estimated LGM for all first generation Alliance Inkjet Printers and related Supplies or all first generation Alliance Laser Printers and related Supplies (as applicable); each LGM Target calculation expressly includes specific metrics with respect to transfer pricing, ███ overhead, ███ cost adders, volumes sold via third party channels, percentage discounts off ███ Product list pricing and the frequency at which such discounts are offered by ███ transportation costs, AMPV,  Product portfolio sales mix, ███ position per Product and other variables within ███ control.

**NRE** means one time (i.e., "non-recurring") expenses incurred during the development of an individual product; provided, the Parties acknowledge and agree that with respect to mono laser printer Products, the annual ███ NRE to be paid by ███ reflects an aggregate number for multiple products.

**Party** or **Parties** means, respectively or collectively as applicable, ███ ███ company, on behalf of itself and its worldwide affiliates (collectively, "███, Lexmark International, Inc., a Delaware corporation ("LII"), and Lexmark International Technology, S.A., a Swiss company and LII's subsidiary.

**Product** means ███ branded laser printers and related Supplies and/or (as applicable) ███ branded inkjet printers and related Supplies; that are listed on Schedule B to the Agreement; provided, the term expressly excludes software (the terms and conditions that apply to software may be found in Schedule F to the Agreement), web applications, and related support for web applications.

**Primary Printer Industry Leader** means the overall printer industry leader expressed in laser printer and/or inkjet printer (as applicable) industry share.

**Secondary Printer Industry Leader** means the next largest competitor (as compared to the Primary Printer Industry Leader) having an overall industry share that is greater than or equal to one third of the Primary Printer Industry Leader's overall industry share for the applicable laser and/or inkjet printer products.

**Schedules** means documents containing additional terms and conditions of the Agreement, that are specifically referenced by the Parties as being part of the Agreement (except in the case of Schedule B, such specific reference shall not be required)and that are either attached to the Agreement on the date of its execution or are subsequently mutually executed by the Parties.

**Supplies** means ███ branded toner cartridges and/or ███ branded inkjet cartridges (as applicable); that are listed on Schedule B to the Agreement.

███████ means ██████ weighted average price performance, as listed in the tables contained in Schedule I.

## SCHEDULE N (CONFIDENTIALITY)

THIS SCHEDULE N (this "Schedule") is entered into as of November 1, 2008 (the "Alliance Schedule Effective Date") by and between ███████████████████████████████████████████ on behalf of itself and its worldwide affiliates (collectively, ███████, Lexmark International, Inc., a Delaware corporation ("LII"), and Lexmark International Technology, S.A., a Swiss company and LII's subsidiary ("LITSA")(LII and LITSA being hereinafter collectively referred to as "Lexmark").

This Schedule N provides additional terms and conditions to the Master Purchase Agreement having an effective date of November 1, 2008 between ██████ and Lexmark (the "Agreement"). All terms and conditions of the Agreement apply to this Schedule N and the terms and conditions of this Schedule N are hereby incorporated by reference into the Agreement. Defined terms used herein but not otherwise defined herein shall have the meanings given such terms in the Agreement. In the event of a conflict between this Schedule N and the Agreement, this Schedule N shall govern.

This Schedule N includes:

    A.    ████  Standard Non-Disclosure Agreement Number 01111202 between ██████ and Lexmark.

## STANDARD NON-DISCLOSURE AGREEMENT    NDA #01111202

In order to protect certain Confidential Information (as defined below), ▮▮▮▮ for itself and its subsidiaries and affiliate ▮▮▮▮ and Lexmark International Inc., for itself and its subsidiaries and affiliates ("Participant"), individually referred to as a "Party" and collectively referred to as the "Parties," agree that:

1. The Effective Date of this Non-Disclosure Agreement ("Agreement") is 11/15/2001.

2. The Agreement shall apply to all Confidential Information disclosed between the Parties.

3. In addition to this Agreement, the parties may agree in additional matters in the form of Addenda that incorporate the terms of this Agreement (e.g. Product Evaluation).

4. A. The Confidential Information disclosed under this Agreement ("Confidential Information") is described generally as any and all current and future product and roadmap information, marketing plans, financial information, customer and vendor related data, services and support, procedures, and other business information including, but not limited to software, strategies, plans, documents, techniques, drawings, designs, specifications, technical or know-how data, research and development, ideas, inventions, patent disclosures that may be disclosed between the parties whether in written, oral, electronic, website-based, or other form. This Agreement also includes Confidential Information acquired during any facilities tours.

4. B. Additionally, without the prior written consent of the other party, both parties agree not to issue or release any articles, advertising, publicity or other matter relating to any Confidential Information (including the fact that a meeting or discussion has taken place between the parties) or mentioning or implying the name of the other party, except as may be required by law and then only after providing the other party with an opportunity to review and comment thereon.

5. This Agreement shall remain in effect until it is terminated by either Party with thirty (30) days prior written notice. The terms and conditions of this Agreement shall survive any such termination with respect to Confidential Information that is disclosed prior to the effective date of termination. The term "Recipient" as used herein shall mean the Party receiving Confidential Information, the term "Discloser" as used herein shall mean the Party disclosing Confidential Information.

6. Unless the Parties otherwise agree in writing, a Recipient's duty to protect Confidential Information expires (3) years from the date of disclosure. A Receipt, upon Discloser's written request, will promptly return all Confidential Information received from the Discloser, together with all copies, or certify in writing that all such Confidential Information and copies thereof have been destroyed.

7. A Recipient will use the same degree of care, but no less than a reasonable degree of care, as the Recipient uses with respect to its own similar information to protect the Confidential Information and to prevent (a) dissemination of Confidential Information to any employee of Recipient without a need to know, (b) communication of Confidential Information to any third party or (c) publication of Confidential Information.

8. A Recipient will have a duty to protect Confidential Information (a) if it is marked or accompanied by documents clearly and conspicuously designating them as "confidential" or the equivalent:  or (b) if it is identified by the Discloser as confidential before, during or promptly after the presentation or communication.

9. This Agreement imposes no obligation upon a Recipient with respect to Confidential information which (a) the Recipient can demonstrate was already in its possession before receipt from the Discloser; (b) is or becomes publicly available through no fault of the Recipient; (c) is rightfully received by the Recipient from a third party without a duty of confidentiality; (d) is disclosed by the Discloser to a third party without a duty of confidentiality on the third party; (e) is independently developed by the Recipient without a breach of this Agreement; or (f) is disclosed by the Recipient with the Discloser's prior written approval. If a Recipient is required by a government body or court of law to disclose Confidential Information, the Recipient agrees to give the Discloser reasonable advance notice so that Discloser may contest the disclosure or seek a protective order.

10. EACH DISCLOSER WARRANTS THAT IT HAS THE RIGHT TO DISCLOSE ITS CONFIDENTIAL INFORMATION.  NO OTHER WARRANTIES ARE MADE AND NO RESPONSIBILITY OR LAIBILIT IS OR WILL BE ACCEPTED BY EITHER PARTY

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3443

███ STANDARD NON-DISCLOSURE AGREEMENT    NDA #01111202

IN RELATION TO OR AS TO THE ACCURACY OR COMPLETENESS OF THE CONFIDENTIAL INFORMATION, ALL CONFIDENTIAL INFORMATION IS PROVIDED "AS IS."

11. This Agreement imposes no obligation on a Party to exchange Confidential Information or to purchase, sell, license, transfer or otherwise make use of any technology, services or products.

12. A Recipient will adhere to all applicable laws and regulation of the U.S. Export Administration and will not export or re-export any technical data or products received from a Discloser, or the direct product of such technical data, to any prescribed country listed in the U.S. Export Administration regulations, or foreign national thereof, unless properly authorized by the U.S. government.

13. No Party acquires any intellectual property rights under this Agreement except the limited rights necessary to carry out the purposes as set forth in this Agreement. Subject to the obligations of this Agreement, no Party will be precluded from independently developing technology or pursuing business opportunities similar to those covered by this Agreement. Each Party retains sole discretion to assign or reassign the job responsibilities of its employees.

14. Each Party acknowledges that damages for improper disclosure of Confidential Information may be irreparable; therefore, the injured Party may be entitled to seek equitable relief, including injunction and preliminary injunction, in addition to all other remedies available at law or in equity.

15. The obligations and duties imposed by this Agreement with respect to any Confidential Information may be enforced by the Discloser of such Confidential Information against any and all Recipients of such Confidential Information.

16. THIS AGREEMENT IS MADE UNDER, AND WILL BE CONSTRUED ACCORDING TO, THE LAWS OF THE STATE OF TEXAS.

17. This Agreement does not create any agency or partnership relationship. This Agreement will not be assignable or transferable without the prior written consent of the other Party. All additions or modifications to this Agreement must be made in writing and must be signed by all Parties.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A3444

**STANDARD NON-DISCLOSURE AGREEMENT    NDA #01111202**



**Lexmark International, Inc.**
By: _____
Name: _F.T. SAMUEL JR_____
Title: VP, Worldwide Marketing
Address: 740 West New Circle Road NW
City, State, Zip: Lexington, Kentucky 40550
Date: _3 NOVEMBER, 2008_____

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3445

# AMENDMENT TO ALLIANCE SCHEDULE A

THIS AMENDMENT TO ALLIANCE SCHEDULE A (this "Amendment") is entered into this 3rd day of August 2009 (the "Effective Date"), by and between ██████████████████████ incorporated in the ████████████████ on behalf of itself and the subsidiaries and affiliates of ████████ (together ██████ Lexmark International, Inc., a Delaware corporation ("LII"), and Lexmark International Technology, S.A., a Swiss company and LII's subsidiary ("LITSA")(LII and LITSA being hereinafter collectively referred to as the "Supplier" or "Lexmark").

## RECITALS

WHEREAS ████ and supplier are parties to the Master Purchase Agreement (the "MPA") entered into on November 1st, 2008; and

WHEREAS ████ and Supplier now desire to amend the Schedule A to the MPA as set forth hereinbelow.

NOW, THEREFORE, in consideration of the mutual covenants and promises contained in this MPA, ████ and Supplier agree to amend the Schedule A as follows:

## AGREEMENT

1.    Definitions.   Unless otherwise indicated herein, all capitalized terms used in this Amendment shall have the definitions assigned to them in the MPA.

2.    Amendment to the Schedule A.   This Amendment constitutes an amendment to the Schedule A and is hereby merged into and shall be considered a part of the MPA.  In the event of any conflict or inconsistency between the terms of this Amendment and the terms of the MPA and Schedule A, the terms of this Amendment shall control.

3.    Amendments:

**Entry SF** ████████ – Lexmark agrees that ████ may seek an alternative source on Entry Single Function Mono Laser and Single Function Network Mono Laser printers for the term of one product generation.  Entry is classified during this exclusion period of being less than 25ppm and at the entry price points for their respective segment of single function or multi function.  The one product generation refers to ████ FY '10/'1 ████████ generation.  This exclusion applies to ████ worldwide demand for such Products.

**Entry AIO** ████████████ – Lexmark agrees that ████ may seek an alternative source on Entry 3 Function (print, scan, copy) and Entry 4 Function (print, scan, copy & fax) Mono Laser Printers for sale worldwide for the term of one product generation.  Entry is classified during this exclusion period of being less than 25ppm and at the entry price points for their respective segment of single function or multi function.  The one product generation refers to ████ FY '10/'11 ████ generation.  ████ will incur a one-time cancellation expense on the Entry 4fx Product.  Both ████ and Lexmark agree that this

A3446

one-time cancellation expense shall not exceed ███████████

**Performance SF** ██████ — ████ will formally add █████ and launch the product in DAO & EMEA as soon as Lexmark can deliver in Calendar Q2 2010.

In addition to products already for sale including ██████████████████████████ the remaining products to be delivered to ███ by Lexmark in 2009 and 2010 include: ████████████████

   4.   <u>Other Terms and Conditions of the MPA</u>.  Except as modified hereinabove, all other terms, conditions, and provisions of the MPA shall remain in full force and effect.

   5.   <u>Waiver</u>.  Nothing contained in this Amendment shall be deemed a waiver of any rights or release of any obligations that shall have accrued under the MPA prior to the Effective Date of this Amendment.

   6.   <u>Entire Agreement; Integration</u>.  This Amendment and the MPA constitutes the entire and exclusive agreement between the parties with respect to the subject matter hereto.  All previous discussions and agreements with respect to this subject matter are superseded by the MPA and this Amendment.

   7.   <u>Ratification; Execution</u>.  The parties hereby confirm and ratify the MPA, as modified by this Amendment, as their valid and legally binding agreement and obligation.  This Amendment may be executed in any number of counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which shall together constitute one and the same instrument.

**LEXMARK INTERNATIONAL, INC.**

By: _[signature]_

Title: VP, WW OEM & ALLIANCES

Date: 30 OCTOBER, 2009

**LEXMARK INTERNATIONAL TECHNOLOGY, S.A.**

By: _[signature]_

Title:

Date:

SCHEDULE G ATTACHMENT 2.1
AMENDMENT TO ALLIANCE SCHEDULE G

THIS AMENDMENT TO ALLIANCE SCHEDULE G (this "Amendment") is entered into this 1st day of September 2010 (the " Effective Date"), by and between █████████████████ ███████, incorporated in the ██████████ with limited liability, on behalf of itself and the subsidiaries and affiliates of ██████ (Together █████) and Lexmark International, Inc., a Delaware corporation ("LII"), and Lexmark International Technology, S.A., a Swiss company and LII's subsidiary ("LITSA") (LII and LITSA being hereinafter collectively referred to as the "Supplier" or "Lexmark").

RECITALS

WHEREAS. ████ and supplier are parties to the Master Purchase Agreement (the "MPA") entered into on November 1, 2008: and

WHEREAS. ████ and Supplier now desire to amend the Schedule G to the MPA as set forth herein below.

NOW, THEREFORE, in consideration of the mutual covenants and promises contained in this MPA, ████ and Supplier agree to amend the Schedule G as follows:

AGREEMENT

I. Definitions. Unless otherwise indicated herein, all capitalized terms used in this Amendment shall have the definitions assigned to them in the M PA.

2. Amendment to the Schedule G. This Amendment constitutes an amendment to the Schedule G and is hereby merged into and shall be considered a part of the MPA. In the event of any conflict or inconsistency between the terms of this Amendment and the terms of the MPA and Schedule G the terms of this Amendment shall control.

3. Amendments:

Lexmark hereby grants ████ a limited waiver of its obligations to source from Lexmark its entire requirement of Alliance Inkjet Printer Products.   The waiver period shall begin on the Effective Date of this Amendment and continue for a period of one calendar year.  The intent is to allow ████ to pursue a non-████ branded inkjet printer solution for select emerging market geographies. Accordingly, this waiver is expressly limited to non-████ branded inkjet printer solutions that are sold by ████ in the countries listed below.  This waiver shall not affect the obligation of ████ to comply with the requirements of Schedule G for all other geographies.

| | | |
|---|---|---|
| Russia | China | Brazil |
| South Africa | India | Columbia |
| Turkey | Indonesia | Argentina |
| Ukraine | Philippines | Chile |
| Poland | Thailand | |
| | Vietnam | |

CONFIDENTIAL - OUTSIDE COUNSEL ONLYA3448

4. <u>Other Terms and Conditions of the</u> MPA - Except as modified hereinabove, all other terms, conditions and provisions of the MPA shall remain in full force and effect.

5. <u>Waiver</u>. Nothing contained in this Amendment shall be deemed a waiver of any rights or release of any obligations that shall have accrued under the MPA prior to the Effective Date of this Amendment.

6. <u>Entire Agreement: Integration.</u> This Amendment and the MPA constitutes the entire and exclusive agreement between the parties with respect to the subject matter hereto. All previous discussions and agreements with respect to this subject matter are superseded by the MPA and this Amendment.

7. <u>Ratification: Execution</u>. The parties hereby confirm and ratify the MPA, as modified by this Amendment as their valid and legally binding agreement and obligation. This Amendment may be executed in any number of counterparts, each of which, when executed and delivered, shall be deemed to be an original and all of which shall together constitute one and the same instrument.

████████████████████████                    **LEXMARK INTERNATIONAL, INC.**

By:                                          By:

Title:                                       Title:

Date:                                        Date

                                             **LEXMARK INTERNATIONAL TECHNOLOGY, S.A.**

                                             By:

                                             Title:

                                             Date:

CONFIDENTIAL - OUTSIDE COUNSEL ONl|A3449

**AMENDMENT NO. 1**
to
**SOFTWARE SUPPORT AGREEMENT**
between
**LEXMARK INTERNATIONAL, INC.**
and
**LEXMARK INTERNATIONAL TECHNOLOGY, S.A.**
and
██████████████.

This Amendment No. 1 to the Software Support Agreement ("Amendment"), effective as of September 23, 2011, is entered into by and between Lexmark International, Inc. ("LII"), a Delaware corporation, having a place of business at 740 West New Circle Road, Lexington, KY 40550, United States of America, and Lexmark International Technology, S.A., a Swiss company and LII's subsidiary with its principal office at ICC, 20 Route de Pre-Bois, Case Postale 508, CH 1215 Geneva 15 Switzerland ("LITSA") (hereinafter LII and LITSA are collectively referred to as "Lexmark") and ██████ ████ branch of a company incorporated in ██████ ██████ with limited liability, on behalf of ██████ and ██████ subsidiaries and affiliates (together "████.

WHEREAS, Lexmark and ████ desire to amend and to modify a certain Software Support Agreement, effective as of October 25, 2005, by and between Lexmark and ████ (the "Agreement") and Schedule F Attachment 1.2 of the Master Purchase Agreement between ████ and Lexmark dated November 1, 2008, as amended (the "Master Purchase Agreement");

NOW, THEREFORE, in consideration of the mutual authorizations and obligations contained herein, the parties agree as follows:

1.      Unless otherwise stated to the contrary herein, all capitalized terms used in this Amendment shall have the meaning ascribed to them in the Agreement. The term "Agreement", as used in the Agreement, and all other instruments and agreements executed thereunder, shall for all purposes refer to the Agreement as amended by this Amendment.

2.      A new Subsection 1.3 is hereby added as follows:

"████ shall use any compatibility ID drivers that are provided by Lexmark in connection with the performance of Services under the Agreement exclusively with products supplied to ████ by Lexmark and otherwise in accordance with any written instructions provided by Lexmark."

3.      A new Subsection 2.3 is hereby added as follows:

"Lexmark shall perform the Services in accordance with the terms of the Master Purchase Agreement, as long as the schedule between Lexmark and ████ for the product associated with the Software (the "Underlying Agreement") and the Master Purchase Agreement remain in effect. In the event of a conflict between any applicable terms of the Master Purchase Agreement and the terms of the Agreement, the terms of the Agreement as amended by this Amendment shall govern with respect to its subject matter."

1

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3450

4.      Subsection 3.1 is hereby deleted in its entirety and will be intentionally left blank to preserve the numbering of subsequent subsections.

5.      Subsection 3.2 of the Agreement is hereby replaced in its entirety with the following:

        "Unless Lexmark and ████ mutually agree to add Services provided under this Agreement to an existing Master Purchase Agreement schedule or otherwise mutually establish a separate schedule for Services pricing, Lexmark shall invoice ████ at reasonable rates for the actual work performed in connection with the Services."

6.      "████████ in Exhibit A of the Agreement is hereby amended to read ████████

7.      In accordance with Section 2.1 of Schedule F, the attached Exhibit A-1 is hereby added to Exhibit A of the Agreement.

8.      Except as expressly amended by this Amendment, the Agreement shall remain unchanged and shall continue in full force and effect in accordance with its terms.

9.      This Amendment may be executed in several counterparts, each of which shall be deemed an original and such counterparts shall together constitute one and the same amendment.

**IN WITNESS HEREOF**, the parties hereto have executed this Amendment as of the date first above written.

████████████████

By: _____

Name: _____

Title: _____

Date: _____

**LEXMARK INTERNATIONAL, INC.**

By: _____

Name: _____

Title: _____

Date: _____

**LEXMARK INTERNATIONAL TECHNOLOGY, S.A.**

By: _____

Name: _____

Title: _____

Date: _____

2

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3451

**EXHIBIT A-1**

**SOFTWARE:    In-Box PCL Print Class Driver**

ASSOCIATED PRODUCT:



Laser Printer          Laser Printer

Laser Printer          Laser Printer

**SOFTWARE:   In-Box XPS Print Class Driver**

ASSOCIATED SOFTWARE:



Laser MFP          aser Printer          Laser Printer

Laser Printer          Laser MFP

**SOFTWARE:   In-box WIA Scan Driver 1**          **SOFTWARE: In-box WIA Scan Driver 2**

ASSOCIATED PRODUCT:          ASSOCIATED PRODUCT:



Laser MFP          aser MFP

Laser MFP          Laser MFP

Laser MFP

**SOFTWARE:    In-box PCL Print Color Class Driver and associated Compat ID**
**In-box PCL Print Mono Class Driver and associated Compat ID**
**In-box XPS Print Color Class Driver and associated Compat ID**
**In-box XPS Print Mono Class Driver and associated Compat ID**

ASSOCIATED PRODUCT:



Laser Printer          Laser Printer          Laser MFP

Laser MFP          Laser Printer          aser Printer

Laser MFP

3

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3452

**EXHIBIT B**
**EXHIBIT A-2**

Lexmark and ██████████████████████ (Hereafter refer to as ████ desire to amend and to modify a certain Software Support Agreement, effective as of October 25, 2005, by and between Lexmark and ████ (the "Agreement") and Schedule F Attachment 1.2 of the Master Purchase Agreement between ████ and Lexmark dated November 1, 2008, as amended (the "Master Purchase Agreement"). The parties hereby add following Software.

**SOFTWARE: In-box WIA Scan Driver 3**

ASSOCIATED PRODUCT:

████████████████        ████████████████

**SOFTWARE: In-box PCL Print Color Class Driver and associated Compat ID**
**In-box PCL Print Mono Class Driver and associated Compat ID**
**In-box XPS Print Color Class Driver and associated Compat ID**
**In-box XPS Print Mono Class Driver and associated Compat ID**

ASSOCIATED PRODUCT:

████████████████        ████████████████

IN WITNESS WHEREOF, ████ and Lexmark have caused this Exhibit A-_2__ to be executed by their duly authorized representatives.

████████████████████████        LEXMARK INTERNATIONAL, INC.

By:_____        By:_____

Name:_____        Name:_____

Title:_____        Title:_____

Date:_____        Date:_____


LEXMARK INTERNATIONAL
TECHNOLOGY, S.A.

By:_____

Name:_____

Title:_____

Date:_____

**EXHIBIT B**

**EXHIBIT A-3**

Lexmark and ██████████████████████████████████ of a company incorporated in ██████████████ with limited liability, on behalf of ████████ and ████ subsidiaries and affiliates (together ████) desire to amend and to modify a certain Software Support Agreement effective as of October 25, 2005, by and between Lexmark and ██ (the "Agreement") and Schedule F Attachment 1.2 of the Master Purchase Agreement between ██ and Lexmark dated November 1, 2008, as amended (the "Master Purchase Agreement"). The parties hereby add the following Software:

**SOFTWARE:   In-box PCL Print Class Driver**

ASSOCIATED PRODUCT:

██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████

**SOFTWARE:   In-box XPS Print Class Driver**

ASSOCIATED PRODUCT:

██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████

**SOFTWARE:   In-box WIA Scan Driver 1**       **SOFTWARE: In-box WIA Scan Driver 2**

ASSOCIATED PRODUCT:                    ASSOCIATED PRODUCT:

██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████

**SOFTWARE:   In-box WIA Scan Driver 3**

ASSOCIATED PRODUCT:

████████████████████████████████

██████ and Lexmark Confidential

1

IN WITNESS WHEREOF, ███ and Lexmark have caused this Exhibit A-_2_ to be executed by their duly authorized representatives.

███████

By:_____

Name:_____

Title:_____

Date:_____

LEXMARK INTERNATIONAL, INC.

By:_____

Name:_____

Title:_____

Date:_____

LEXMARK INTERNATIONAL
    TECHNOLOGY, S.A.

By:_____

Name:_____

Title:_____

Date:_____

███ and Lexmark Confidential

CONFIDENTIAL - OUTSIDE COUNSEL ONLY

A3455

**AMENDMENT NO. 1**
to
**SOFTWARE SUPPORT AGREEMENT**
between
**LEXMARK INTERNATIONAL, INC.**
and
**LEXMARK INTERNATIONAL TECHNOLOGY, S.A.**
and

████████████████████████████████████

This Amendment No. 1 to the Software Support Agreement ("Amendment"), effective as of September 23, 2011, is entered into by and between Lexmark International, Inc. ("LII"), a Delaware corporation, having a place of business at 740 West New Circle Road, Lexington, KY 40550, United States of America, and Lexmark International Technology, S.A., a Swiss company and LII's subsidiary with its principal office at ICC, 20 Route de Pre-Bois, Case Postale 508, CH 1215 Geneva 15 Switzerland ("LITSA") (hereinafter LII and LITSA are collectively referred to as "Lexmark") and ████████████ ████████████████████ branch of a company incorporated in ████████████ with limited liability, on behalf of ████████████ subsidiaries and affiliates (together ████████)

WHEREAS, Lexmark and ████ desire to amend and to modify a certain Software Support Agreement, effective as of October 25, 2005, by and between Lexmark and ████ the "Agreement") and Schedule F Attachment 1.2 of the Master Purchase Agreement between ████ and Lexmark dated November 1, 2008, as amended (the "Master Purchase Agreement");

NOW, THEREFORE, in consideration of the mutual authorizations and obligations contained herein, the parties agree as follows:

1.  Unless otherwise stated to the contrary herein, all capitalized terms used in this Amendment shall have the meaning ascribed to them in the Agreement. The term "Agreement", as used in the Agreement, and all other instruments and agreements executed thereunder, shall for all purposes refer to the Agreement as amended by this Amendment.

2.  A new Subsection 1.3 is hereby added as follows:

    ████ shall use any compatibility ID drivers that are provided by Lexmark in connection with the performance of Services under the Agreement exclusively with products supplied to ████ by Lexmark and otherwise in accordance with any written instructions provided by Lexmark."

3.  A new Subsection 2.3 is hereby added as follows:

    "Lexmark shall perform the Services in accordance with the terms of the Master Purchase Agreement, as long as the schedule between Lexmark and ████ for the product associated with the Software (the "Underlying Agreement") and the Master Purchase Agreement remain in effect. In the event of a conflict between any applicable terms of the Master Purchase Agreement and the terms of the Agreement, the terms of the Agreement as amended by this Amendment shall govern with respect to its subject matter."

4.  Subsection 3.1 is hereby deleted in its entirety and will be intentionally left blank to preserve the numbering of subsequent subsections.

1

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3456

5. Subsection 3.2 of the Agreement is hereby replaced in its entirety with the following:

"Unless Lexmark and ███ mutually agree to add Services provided under this Agreement to an existing Master Purchase Agreement schedule or otherwise mutually establish a separate schedule for Services pricing, Lexmark shall invoice ███ at reasonable rates for the actual work performed in connection with the Services."

6. ███████ n Exhibit A of the Agreement is hereby amended to read ███████

7. The attached Exhibit A-1 is hereby added to Exhibit A of the Agreement.

8. Except as expressly amended by this Amendment, the Agreement shall remain unchanged and shall continue in full force and effect in accordance with its terms.

9. This Amendment may be executed in several counterparts, each of which shall be deemed an original and such counterpart shall together constitute one and the same amendment.

**IN WITNESS HEREOF**, the parties hereto have executed this Amendment as of the date first above written.

███████████████

Date: _Dec 09, 2011_

**LEXMARK INTERNATIONAL, INC.**

By: _____

Name: _F.T. SAMUEL JR_

Title: _VP, WW OEM & ALLIANCES_

Date: _16 JANUARY, 2012_

**LEXMARK INTERNATIONAL TECHNOLOGY, S.A.**

By: _____

Name: _BERDOU Michel_

Title: _Managing Director_

Date: _08/02/2012_

**EXHIBIT A-1**

**SOFTWARE:  In-Box PCL Print Class Driver**

2

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3457

ASSOCIATED PRODUCT:

**SOFTWARE:  In-Box XPS Print Class Driver**

ASSOCIATED SOFTWARE:

**SOFTWARE:  In-box WIA Scan Driver 1**   **SOFTWARE: In-box WIA Scan Driver 2**

ASSOCIATED PRODUCT:   ASSOCIATED PRODUCT:

**SOFTWARE:**   **In-box PCL Print Color Class Driver and associated Compat ID**
             **In-box PCL Print Mono Class Driver and associated Compat ID**
             **In-box XPS Print Color Class Driver and associated Compat ID**
             **In-box XPS Print Mono Class Driver and associated Compat ID**

ASSOCIATED PRODUCT:

3

**EXHIBIT B**

**EXHIBIT A-2**

Lexmark and ███████████████████████ branch of a company incorporated in ███ ███████████ with limited liability, on behalf of ████████ subsidiaries and affiliates (together ███████ desire to amend and to modify a certain Software Support Agreement, effective as of October 25, 2005, by and between Lexmark and ███ (the "Agreement") and Schedule F Attachment 1.2 of the Master Purchase Agreement between ████ and Lexmark dated November 1, 2008, as amended (the "Master Purchase Agreement"). The parties hereby add following Software.

**SOFTWARE: In-box WIA Scan Driver 3**

ASSOCIATED PRODUCT:

███████ Series    ███████ Series

**SOFTWARE: In-box PCL Print Color Class Driver and associated Compat ID**
**In-box PCL Print Mono Class Driver and associated Compat ID**
**In-box XPS Print Color Class Driver and associated Compat ID**
**In-box XPS Print Mono Class Driver and associated Compat ID**

ASSOCIATED PRODUCT:

███████ Series    ███████ Series

IN WITNESS WHEREOF, ████ and Lexmark have caused this Exhibit A-_2__ to be executed by their duly authorized representatives.

LEXMARK INTERNATIONAL, INC.

By: _[signature]_

Name: F.T. SAMUEL JR

Title: VP, WW OEM & ALLIANCES

Date: Jan 09, 2012

Date: 16 JANUARY, 2012

LEXMARK INTERNATIONAL
TECHNOLOGY, S.A.

By: _[signature]_

Name: BERDOU Michel

Title: Managing Director

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A3459

Date: 07/12/2012

CONFIDENTIAL - OUTSIDE COUNSEL ONLY

## EXHIBIT A-3

Lexmark International, Inc., ("LII"), a Delaware corporation with its principal office at 740 New Circle Road, Lexington, Kentucky 40550, Lexmark International Technology, S.A., a Swiss company and LII's subsidiary with its principal office at ICC, 20 Route de Pre-Bois, Case Postale 508, CH 1215 Geneva 15 Switzerland ("LITSA") (hereinafter LII and LITSA are collectively referred to as "Lexmark") and ███████ ███████████ branch of a company incorporated in ██████████ with limited liability, on behalf of ████████ and █████████ subsidiaries and affiliates (together ████████ desire to amend and to modify a certain Software Support Agreement effective as of October 25, 2005, by and between Lexmark and ████ (the "Software Support Agreement") and forming Attachment 1.2 of Schedule F of the Master Purchase Agreement between ████ and Lexmark effective as of November 1, 2008(the "Master Purchase Agreement").

Pursuant to the Software Support Agreement between ████ and Lexmark, the parties hereby add the following Software:

**SOFTWARE:  In-box PCL Print Class Driver**

ASSOCIATED PRODUCT:

**SOFTWARE:  In-box XPS Print Class Driver**

ASSOCIATED PRODUCT:

**SOFTWARE:  In-box WIA Scan Driver 1 2**         **SOFTWARE: In-box WIA Scan Driver**

ASSOCIATED PRODUCT:              ASSOCIATED PRODUCT:



**SOFTWARE:   In-box WIA Scan Driver 3**

<u>ASSOCIATED PRODUCT</u>:

IN WITNESS WHEREOF, ███ and Lexmark have caused this Exhibit A-3 to be executed by their duly authorized representatives.

LEXMARK INTERNATIONAL, INC.

By: _CHRIS LANSE_

Name: _____

Title: _Director_

Date: _16 Apr 2013_                    Date: _MAY 22, 2013_

LEXMARK INTERNATIONAL
TECHNOLOGY, S.A.

By: ___Mike R. Rueschenbaum___
___Vice President and General Manager___
___Europe, Middle East & Africa___
Name: ___Lexmark International Technology S.A.___
___Case postale 508___
Title: _____CH - 1215 Genève 15_____

Date: _____

To: █████████████████

RE: 2012 Laser Portfolio Special Pricing Request

Date: September 23, 2011

    In response to █████ request for special pricing considerations regarding the 2012 ████████████ Lexmark is prepared to accept the pricing changes listed below. We have carefully evaluated █████ requests and have incorporated them as much as possible. Lexmark feels we have exceeded all of our obligations for full mono laser exclusivity under the 2008 Alliance agreement. In addition to fully meeting and exceeding the Alliance model obligations, the pricing provided also delivers the requested result in ██████ business model. I hope you will also find that it begins to immediately address some of ██████ strategic needs.

**Portfolio Offering:**

    The pricing and conditions contained within represent a complete portfolio offering. The pricing is not valid if at any time prior to or during the product life █████ makes portfolio changes that are not mutually agreed to. The products contained in this portfolio represent █████ full and complete mono laser product requirements outside of entry and A3. Our joint expectation needs to be to have all POR's of the relevant products signed by October 7th, 2011 to avoid any further delays in launching the portfolio. To address █████ strategic needs, as well as off-set some of the lost revenue impact of the concessions provided across the portfolio, the portfolio also includes one solutions-capable color laser MFP as described below.

**Special Pricing Summary:**

    Lexmark has taken the following actions to help meet █████ request for special pricing. Additional details are provided in the attached Schedule B.

- All HW pricing discounts are offered at █████ net price discount off of Lexmark BDP. This represents a significant decrease off of all MFPs and all Complementary Products.

- Additional pricing reductions were added in the following areas:
    - Mainstream SF HW ████████████ pricing has been held approximately at current █████ pricing and is considered fixed (i.e. not indexed to BDP)
    - Mainstream MFP HW █████ pricing is now reduced and the toner offering is common to the Mainstream SF products to allow SKU reduction in this segment as well as improved █████ margins.
    - Advanced SF has an additional concession applied as well

- With the exception of the lowest 2.1k yield, all toner, is offered at a net price discount of █████ off BDP (█████% to P.O. price). This represents a significant decrease off of all MFPs and all Complementary Products.

- Per prior discussions, any further confirmed actions by HP and subsequent actions taken by Lexmark will self correct as BDP moves. █████should not be modeling current Lexmark BDP vs. potential unconfirmed HP announcements as this is the full reason for a discount off of BDP type market based pricing. This is especially the case regarding ██████████and HP's potential pricing actions / supplies compatibility on the

CONFIDENTIAL - OUTSIDE COUNSEL ONA3463

HP601. If we confirm extension of their higher yields down to the HP601, we will likely take further action which █████ would benefit from. As noted later in the document, we have already listed one adjustment in Schedule B on ██████████ toner due to the higher confidence level of the HP602 positioning.

- The Mainstream MFP █████ will have additional solutions capabilities available at an up-charge fee of ███ per unit. The teams will jointly construct the agreement for this in the coming weeks. At any time if Lexmark permanently reduces our actual list price from ██████████ this fee will be waived going forward.

- There is no change to base MDF for Hardware & Toner ██████████ and it will continue to be paid per the MPA. Since the last proposal we have reinstated standard Hardware MDF and adjusted pricing accordingly as shown in Schedule B. HW OPEX MDF outlined in the 2008 MPA, Schedule E, Sections 5.1.1, will not apply for this Portfolio.

- NRE is not included in PO price at this time. Both parties will determine how this is to be paid by █████ prior to product launch. The total NRE estimate for the full portfolio listed below is ██████████ as shown in Schedule B. As previously agreed, all products contained in the portfolio will be developed using a Model 0 development approach.

**Color MFP Offering:**

█████ and Lexmark have been in discussions of how to extend solutions capability into ██████████ color MFP portfolio. Lexmark has reviewed █████ product roadmap and has received input from █████ organizations. To accomplish █████ objective, we recommend the Lexmark follow-on to the X548de. This would enable a common UI and common solutions across the portfolio. We recognized that this is critical to many enterprise customers. In consideration of the pricing concessions offered by Lexmark, █████ will launch a Color Laser MFP product as part of the ██████████ portfolio, and as soon as the development schedules would allow. Aggressive pricing has been provided by Lexmark as part of the Portfolio, and we would need a POR signed by █████ prior to November 1, 2011 so we can tie the launch of this product as closely as possible to the mono products.

This portfolio pricing is valid on this portfolio of products only. We will revisit the follow-on portfolio in a similar manner to determine the appropriate actions needed by both parties.

**Other Requests:**

In response to █████ requests dated 9/22/2011:

1) Adding Lexmark's █████ class product as an option in the portfolio as ██████████ Pricing has been included in Schedule B.

CONFIDENTIAL - OUTSIDE COUNSEL ONl

2) Extending the ███████████ down to ██████████████ This is now our current plan of record given our current information on HP's upcoming launch. This is reflected in schedule B, but is subject to change based on HP's actual launch.

3) Duty cycle of 250K for ██████████████ This is a new requirement provided by ██ in the past 48 hours. We ask that ████ please assist in providing all of the relevant competitive information as to why the spec for this product does not conform to the market needs. We need to take this information back to the WW marketing teams internally for evaluation. We are currently planning to have a duty cycle of 225K on the ██████ class products and are reviewing any necessary changes due to the HP coming products launches. This is the reason we constructed the Alliance to have matching and fluid PORs so as we respond to competitive spec changes, you get the result of that action.

4) Additional memory Request in ████████████████: This is also a new requirement provided by ████ in the past 48 hours in response to HPs anticipated products. We are currently reviewing this request in conjunction with our assessment of the anticipated HP coming products. The current line of thinking is to increase our branded as well, but this is not yet confirmed. We will keep you informed as to the progress, but I expect us to make sure that the total product offering remains competitive. This is the reason we constructed the Alliance to have matching and fluid PORs so as we respond to competitive spec changes, you get the result of that action.

5) ████████ class dual packs: Lexmark is currently reviewing dual pack positioning both for ████ and Lexmark and analyzing all of HPs dual pack alternatives to ensure we have alignment. The pricing provided for individual cartridges meets your request to hold CPP flat in this segment so any dual pack additions will be a further benefit. The yields provided by ████ for the dual packs do not exist in Lexmark's next generation portfolio thus need to be revisited to get within the tolerance of Lexmark's toner.

Chris C. White

Director, Global OEM & Alliances

Frank T. Samuel

Vice President, Global OEM & Alliances

CONFIDENTIAL - OUTSIDE COUNSEL ONLA3465

██████████████         ████████████████████

September 29, 2011

To:     Lexmark International

████████████████████████ incorporated in ████████ with limited liability, on behalf of itself and the affiliates and subsidiaries of █████ (together ████) is pleased to announce that Lexmark has been selected as the supplier for the following products:

1. █████ Single Function Mono Laser Printer
2. █████ Network Single Function Mono Laser Printer
3. █████ Single Function Mono Laser Printer
4. █████ Multi Function Mono Laser printer (Note: We are investigating changing this platform from ████████ to ████████. To be finalized at Kickoff)
5. █████ Single Function Mono Laser printer
6. █████ Multi Function Mono Laser Printer

This business award will support worldwide demand and is subject to the following conditions:

a. The pricing offered incorporates the following:
   i. All HW prices are discounted at ████ from BDP
   ii. All toner with the exception of the 2.1k toner is discounted at ████████ BDP
   iii. Mainstream toner is common between SF and MF products
   iv. ████████ is priced at the current level of ████████

b. The pricing will be per the attached Schedule B ████████ Business Award. ████ and Lexmark agree to review this pricing 3 months prior to RTS to adjust for market conditions at that time. Any such adjustments will yield the same product and Portfolio Gross Margins as shown in The Financial Summary, attached.

c. Section 4.3 of the Master Purchase Agreement is revised as below:

   Lexmark is responsible for all loss, liability, cost and expense (whether inside or outside the warranty period and including any recall and field service costs) with respect to resolving Epidemic Defects. A defect is an Epidemic Defect when found in one point five percent(1.5%) or more of the units delivered to ████ or its customers during any consecutive thirty (30) day period and due to the same root cause.
   .

d. NRE costs as detailed in Schedule B ████████ Business Award shall be funded by an incremental cost applied to all Toner products effective as of the RTS of the ████████ Products listed above. Specific adder amount to be determined 3 months prior to RTS. Total amount to be paid vis this funding shall not exceed

CONFIDENTIAL - OUTSIDE COUNSEL OA3466

    e.   Program Kickoff meetings will be held the week of October 3, 2011 with the Plan of Record (POR) documents for each product agreed and signed.

    f.   Lexmark will provide Service Parts Warranty for the printer that ███ offered Onsite Service.

    g.   Lexmark to provide free Train the Trainer (TTT) at 3 ███ keys region: i.e. 1 class session in DAO, 1 class session in EMEA, 1 class session in APJ.

    h.   Lexmark agrees to support ███ requirements for the following

        i.   Vinyl Label printing for Advanced and Performance products
        ii.   CAC solutions for Performance products
        iii.   Commons Criteria (CC) certification for ███ and ███████
        iv.   eSF solutions to be documented in a POR covering ███████ products, including SDK and API development
        v.   Access to vertical solutions same as Lexmark Branded.

The ███████ product is not included in this award. ███ strategy for this product requires device based solutions with Customer focused deployment. Lexmark's proposal for solutions via an Up Sell approach delivered through their MarkVision process does not support ███ strategy. ███ is open to continuing discussion to resolve the issues before making a final decision on ███████.

Lexmark's request to launch a Color MFP will be discussed separately. ███ will not consider this as part of the Mono Laser business award.

The award is contingent on Lexmark's formal acceptance by signature of this award letter.

Signature:_____           Signature:_____

███████████                  Lexmark International

CONFIDENTIAL - OUTSIDE COUNSEL O A3467

# Financial Summary



CONFIDENTIAL - OUTSIDE COUNSEL ONLY

A3468

**Preliminary Schedule B for 2012 Alliance Laser Products**

LEXMARK CONFIDENTIAL

**Laser Hardware**
**Americas**

| Lexmark Product Name: | Mainstream SF | Mainstream SF | Advanced SF | Advanced MF | Performance SF | Performance MF |
|---|---|---|---|---|---|---|
| Product Name: | | | | | | |
| Product Code Name: | TBD | TBD | TBD | TBD | TBD | TBD |
| Country: | USA | USA | USA | USA | USA | USA |
| SWE Yield (same as LXK) | 2.1K | 2.1K | 2.1K | 6K | 10K | 25K |
| Los Fast#: | TBD | TBD | TBD | TBD | TBD | TBD |
| Los Fast#: | TBD | TBD | TBD | TBD | TBD | TBD |
| LXK Base Warranty Offering | TBD | TBD | No LXK Warranty | No LXK Warranty | No LXK Warranty | No LXK Warranty |
| Warranty Adder (USA) | TBD | TBD | TBD | TBD | TBD | TBD |
| Status/Effective Date: | Pending | Pending | Pending | Pending | Pending | Pending |

Lexmark US BDP (Estimated)
Discount %
**Net Contract Price**
**Net Contract Price**

Subtractions
Add'l Lxk Portfolio Concessions
Total Subtractions

Cost Additions
WW Cost Additions
Geo Cost Additions
Total Cost Adders

Adjusted Net Contract Price
MDF

Revised Contract Price
MDF

**Adjusted Gross price (P.O. Price)**

**Adjusted Net/Net Price**

-- All Prices above represent deviation from Alliance prices and may be considered floor prices. Prices are subject to change based on Lexmark BDP and reviewed on a case-by-case basis.
-- HW OPEX MDF will not be paid to ... as required by Schedule E, Section 5.1.1 for this portfolio. MDF on Toner and Standard Hardware will continue as per the MPA Section 5.1 of Schedule E.
-- NRE has not been added to PO Cost at this time, but an estimate has been provided separately
-- This pricing assumes same packaging and container density as Lexmark. Any Deviations will be assessed during development.
-- Deviations from the Lexmark-branded products may result in additional adders or subtractors
-- Mainstream SF pricing is not tied to BDP

**CONFIDENTIAL - OUTSIDE COUNSEL ONLY**

A3469



**Preliminary Schedule B for 2012 Laser Products**
**Laser Supplies**

These cartridges are still under review pending the HP launch

| Americas | SFP/MFP | | | | SFP | | SFP/MFP | SFP/MFP | | | | SFP | | SFP/MFP | MFP | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Product Name:** | SY Std | SY U&R | HY Std | HY U&R | XXHY Std | XXHY U&R | DRUM | SY Std | SY U&R | HY Std | HY U&R | XXHY Std | XXHY U&R | DRUM | XXHY Std | XXHY U&R | XXHY Std | XXHY U&R |
| **Product Code Name:** | | | | | | | | | | | | | | | | | | |
| **Country:** | | | | | | | | | | | | | | | | | | |
| **Lex Part#:** | | | | | | | | | | | | | | | | | | |
| [redacted]**Part#:** | | | | | | | | | | | | | | | | | | |
| Status/Effective Date: | | | | | | | | | | | | | | | | | | |
| Lexmark Reference Part | | | | | | | | | | | | | | | | | | |
| Lexmark BDP | | | | | | | | | | | | | | | | | | |
| Lexmark Yield | | | | | | | | | | | | | | | | | | |
| Lexmark US BDP per Page | | | | | | | | | | | | | | | | | | |
| Discount | | | | | | | | | | | | | | | | | | |
| [redacted] Net Contract Price per Page | | | | | | | | | | | | | | | | | | |
| Yield | | | | | | | | | | | | | | | | | | |
| **Net Contract Price** | | | | | | | | | | | | | | | | | | |
| Gross Product Price | | | | | | | | | | | | | | | | | | |
| MDF | | | | | | | | | | | | | | | | | | |
| Contract Pricing | | | | | | | | | | | | | | | | | | |
| MDF | | | | | | | | | | | | | | | | | | |
| [redacted] **Net Price** | | | | | | | | | | | | | | | | | | |
| Cost Additions | | | | | | | | | | | | | | | | | | |
| *WW Cost Additions* | | | | | | | | | | | | | | | | | | |
| Other | | | | | | | | | | | | | | | | | | |
| Other | | | | | | | | | | | | | | | | | | |
| Other | | | | | | | | | | | | | | | | | | |
| Other | | | | | | | | | | | | | | | | | | |
| Other | | | | | | | | | | | | | | | | | | |
| *Geo Cost Additions* | | | | | | | | | | | | | | | | | | |
| Other | | | | | | | | | | | | | | | | | | |
| Other | | | | | | | | | | | | | | | | | | |
| Other | | | | | | | | | | | | | | | | | | |
| Other | | | | | | | | | | | | | | | | | | |
| Other | | | | | | | | | | | | | | | | | | |
| Other | | | | | | | | | | | | | | | | | | |
| Other | | | | | | | | | | | | | | | | | | |
| Other | | | | | | | | | | | | | | | | | | |
| Other | | | | | | | | | | | | | | | | | | |
| Other | | | | | | | | | | | | | | | | | | |
| Total Cost Adders | | | | | | | | | | | | | | | | | | |
| Adjusted [redacted] Net Price | | | | | | | | | | | | | | | | | | |
| MDF | | | | | | | | | | | | | | | | | | |
| Adjusted Contract Price | | | | | | | | | | | | | | | | | | |
| MDF | | | | | | | | | | | | | | | | | | |
| **Adjusted Gross Price (P.O. Price)** | | | | | | | | | | | | | | | | | | |

All Prices above represent deviation from Alliance prices and may be considered floor prices. Prices are subject to change based on Lexmark BDP and reviewed on a case-by-case basis.

Lexmark Yields & Dealer Pricing are subject to change
Pricing Assumes [redacted] Yield will match Lexmark Yield
Standard (non return Program) Cartridge Pricing is not yet known, will provide as soon as possible
No Geo Adders/Subtractors included at this time
Based on current information on HP's upcoming launch, Current POR is to have [redacted] cartridges [redacted], however, this is subject to change.



All cost are subject to change based on changes to the Model 0 assumptions

CONFIDENTIAL - OUTSIDE COUNSEL O A3471

Comment

BLUE: Basic cost of General Development for the assumed portfolio - pay this regardless of how many individual products.  May change if the portfolio is drastically changed

Basic Cost of Developing the family of products - Pay this for taking any product in the family

Unique Model Costs. Pay this cost if the model is selected

████████████████████

RE: 2012 Laser Portfolio
Date: October 21, 2011

Lexmark agrees to:

A) Move forward with the portfolio of ████████████████████████ and ████████ This includes changing ████ to ██████ In parallel the teams are working to close any open items related to ██████ and the Lexmark expectation is to proceed with the product in approximately 30 days. We are working this per the timeline that Terry had laid out in his email yesterday. Our engineering teams have continued to work business as usual on the full portfolio while our discussions occur in parallel.

B) Provide the pricing discount structure changes listed below for the ████████ eneration of products.

C) Revise terms for the epidemic clause as listed below.

Lexmark feels we have exceeded all of our obligations for full mono laser exclusivity under the 2008 Alliance agreement. In addition to fully meeting and exceeding the Alliance model obligations, the pricing provided meets or exceeds the requested result in ██████ business model.

**Special Pricing Summary:**
Additional details are provided in the attached Schedule B.

- All HW pricing discounts for this portfolio are offered at ████ net price discount off of Lexmark BDP.

- Additional pricing reductions were added in the following areas and are shown in Schedule B:
  - Mainstream SF HW (████████████ pricing is considered fixed and is not indexed to BDP.
  - On Mainstream, per ████ request a unique ████ yield of 8.5k has been added.
  - Advanced SF has an additional concession applied.

- With the exception of the lowest 2.1k yield, all toner, is offered at a net price discount of ████ off BDP (████ to P.O. price), which is a deviation from the MPA terms for this ████████ generation of products.

- ██████ erms will be finalized at the time of closure of this specific product as discussed above. Until such time, Lexmark is proceeding under the expectation that we can solve the identified solutions delivery concerns in a satisfactory manner to move forward with this product.

- There is no change to base MDF for Hardware & Toner (████████ and it will continue to be paid per the MPA. HW OPEX MDF outlined in the 2008 MPA, Schedule E, Sections 5.1.1, will not apply for this Portfolio.

- NRE is not included in PO price at this time. Both parties will determine how this is to be paid by ████ prior to product launch. The total NRE estimate for the full portfolio is ████████ as shown in Schedule B. As previously agreed, all products contained in the portfolio will be developed using a Model 0 development approach.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3473

The pricing discount structures are valid on the ▮▮▮▮▮ generation of products only. We will revisit the follow-on portfolio in a similar manner to determine the appropriate actions needed by both parties.

**Epidemic Failure Clause:**

For this ▮▮▮▮▮ generation, Lexmark has agreed to revise the Epidemic Failure clause of the MPA (section 4.3) as follows:

Lexmark is responsible for reasonable direct loss, third-party liability, cost and expense required to resolve Epidemic Defects within two years of the installation date of the affected printer (whether inside or outside the warranty period and including reasonable recall and field service costs). An Epidemic Failure shall mean a condition whereby one and one half percent (1.5%) or more of the total field population of a Printer Product delivered to ▮▮▮ r its customers is found defective from the same root cause during any two consecutive thirty (30) day periods and which impacts at least one thousand (1000) units shipped. Failure Analysis will be performed by Lexmark to confirm root cause and the existence of an Epidemic Failure condition immediately after 1st 30 day period. Any failure that can be fixed remotely will not be considered for recall. The teams will jointly work to determine magnitude, exposure and overall business impact to determine the correct plan of action. Any recall or requirement that would require an expense greater than ▮▮▮ shall require a VP level meeting between both companies unless waived by Lexmark.

All terms of the 2008 MPA not specifically called out as a change to the MPA above will remain unchanged. Any items called out as a specific revision to the MPA will need to be formalized with an amendment.


Chris C. White

Director, Global OEM & Alliances


Frank T. Samuel

Vice President, Global OEM & Alliances

To: ███████████.

RE:  Lexmark ██████ Response to HP M600 Announcement

Date:  October 25, 2011

Pending confirmation of HP's pricing and availability of the M600 series of devices on November 1st, 2011, Lexmark is providing ████ the following promotional PO discounts to be effective from 11/7/2011 until 1/31/2012:



| Model | PO Discount |
| --- | --- |
|  |  |

This discount is consistent with how Lexmark is currently planning to respond with promotional dollars versus a change in BDP.  The following terms will apply:

1. Lexmark reserves the right to adjust the promo amount if a change to the BDP is made by Lexmark during, or prior to, the defined promo period.
2. Around the first week of January, 2012, Lexmark will review the promotional amounts and timeframe for possible extension beyond 1/31/2012.
3. Products that have been sold to ████ under Special Bid pricing for specific deals will not be eligible for this additional promotional discount.

A revised Schedule B has been provided which reflects the discount.

Chris C. White

Director, Global OEM & Alliances

CONFIDENTIAL - OUTSIDE COUNSEL ONL

**Technology Support Agreement**

This Technology Support Agreement ("Agreement") is made and entered into this 24th day of May, 2012 ("Effective Date"), by and between Lexmark International, Inc. ("LII"), a Delaware corporation with its principal office at 740 New Circle Road, Lexington, Kentucky 40550; Lexmark International Technology, S.A., a Swiss company and LII's subsidiary with its principal office at ICC, 20 Route de Pre-Bois, Case Postale 508, CH 1215 Geneva 15 Switzerland ("LITSA") (hereinafter LII and LITSA are collectively referred to as "Lexmark"); and ██████ ████████████████████████ branch of a company incorporated in ██████████ with limited liability, on behalf of ███████ and ████████ subsidiaries and affiliates (collectively, ████).

WHEREAS, Lexmark and ████ have signed a Master Purchase Agreement as of November 1, 2008 (as amended and supplemented from time to time, the "Master Purchase Agreement"); and

WHEREAS, Lexmark has entered into an agreement with ████████████ for the development, manufacturing and distribution of printing devices incorporating certain ████████████ technology (the "Licensed Technology"). The aforementioned agreement between ████████ and Lexmark shall hereinafter be referred to as the ████████ License"; and

WHEREAS ████ desires that Lexmark submit certain ████ branded products manufactured by or for Lexmark especially for ████ (the "Products") to ████ for certification under the terms of the ██████ License; and

WHEREAS Lexmark agrees to submit the Products and associated documentation specified in this Agreement to ██████ on the terms and conditions specified in the Master Purchase Agreement and this Agreement; and

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are acknowledged, the parties hereby agree as follows:

This Agreement supplements and incorporates all of the terms and conditions of the Master Purchase Agreement.

## 1. LEXMARK OBLIGATIONS

1.1 As may be required by ████ pursuant to and in the manner specified in the ██████ License, Lexmark shall submit to ████ for testing and approval (a) the Products, including any Product information, specifications, corrections, modifications and enhancements required by ████ in conjunction with the testing and certification of the Products; and (b) proposed packaging for the Products.

1.2 Lexmark shall use reasonable efforts to promptly correct any errors or defects in the Products, proposed packaging and user's guides that may be identified and reported by ████ and deliver such corrections to ████ in accordance with the terms of the ██████ License (collectively, the "Services").

1.3 Lexmark will notify ████ promptly in writing (a) when the Products have been approved and certified by ████ and (b) of any notices received from ████ that could affect ████ rights to distribute Products containing the Licensed Technology.

1.4 Within 45 days of the Stop Date (as defined in Section 2.4), Lexmark will perform all modifications and removals of the Licensed Technology from printing devices within its control.

**2.**  **OBLIGATIONS**

2.1 ███ acknowledges and accepts that ███ has the sole and absolute discretion to (a) determine the certification process for Licensed Technology, including which Products shall be approved and certified to contain the Licensed Technology; and (b) revise and/or require the removal of the Licensed Technology from the Products at any time. No such decisions or actions by ███ with respect to the Licensed Technology will cause Lexmark to be in material breach under the Master Purchase Agreement.

2.2 ███ will use its commercially reasonable efforts to provide all reasonably requested assistance and cooperation to Lexmark within any timeframes set forth by ███ including the provision of any materials, specifications or other information required by ███ that are unique to Products, in conjunction with Lexmark's submissions described in Section 1.1 above and/or ███ testing and certification process and requirements.

2.3 ███ will be solely responsible for any direct submissions of information it makes to ███ without the use of Lexmark resources and/or Lexmark's assigned portal for submission of materials to ███ including, without limitation, any and all ███ marketing and other materials not submitted to ███ by Lexmark in conjunction with the provision of Services under this Agreement as more specifically identified in Sections 1.1 and 1.2 above.

2.4 ███ agrees that it shall not sell or otherwise distribute any Product containing the Licensed Technology to any customer, reseller or distributor unless and until Lexmark notifies ███ in writing that such Product(s) have been approved and certified by ███ further agrees that it will take commercially reasonable steps to stop the continued sale or distribution of Products containing the Licensed Technology that are within ███ Possession within a commercially reasonable time, but not less than 30 days, from its receipt of a written certification from an officer of Lexmark representing that ███ requires such action (such date, the "Stop Date"). For the purpose of this Agreement, ███ "Possession" means being held in inventory by ███ in a designated hub, ███ controlled vehicle, or other ███ controlled location.

**3.** **COMPENSATION AND REWORK COSTS**

3.1 Except for ███ and Lexmark's reimbursement obligations for Rework Costs set forth in this Section 3, or if the parties agree otherwise in writing, compensation for Services performed by Lexmark under this Agreement shall be in accordance with the terms of the Master Purchase Agreement.

3.2 Rework Costs shall mean labor, shipping and other actual and direct costs and expenses associated with the modification or removal of the Licensed Technology which Lexmark is obligated to perform under its agreement with ███ provided, however, that Rework Costs will not include the costs and expenses required to modify or remove Licensed Technology from products that are not within ███ Possession. For purposes of clarity, Rework Costs will not be considered to be incidental, indirect or consequential damages that would otherwise be excluded pursuant to the limitations of liability set forth in the Master Purchase Agreement.

3.3 Lexmark shall be responsible to pay Rework Costs for all products, however branded, that contain the Licensed Technology, except as provided in Section 3.4.

3.4 If Rework Costs arise from a failure by ███ to comply with its obligations under Section 2 of this Agreement, and not due to Lexmark's actions or omissions, then ███ shall be responsible to pay the Rework Costs: (a) for Products that contain the Licensed Technology, and (b) for any Lexmark-branded products that contain the Licensed Technology that are purchased by ███ for resale. In addition, if Lexmark provides ███ with satisfactory documentation that ███ terminated Lexmark's right to develop, manufacture and distribute all Lexmark-branded printing devices incorporating the Licensed Technology as a result of ███ failure to comply with Section 2 of this Agreement, and not due to Lexmark's actions or omissions, then

2

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3477

shall be responsible to pay the Rework Costs for the Lexmark-branded products that contain the Licensed Technology.

3.5    Notwithstanding anything in this License or the Master Purchase Agreement to the contrary, in no event shall either party's liability for Rework Costs arising from a failure by ▓ to comply with its obligations under this Agreement exceed ▓▓▓▓▓▓.

## 4.    CONFIDENTIALITY

4.1    ▓ and Lexmark agree that the terms and conditions of this Agreement are confidential and are subject to Section 12.2 of the Master Purchase Agreement.

4.2    Notwithstanding any non-disclosure agreements or confidentiality provisions within existing agreements between ▓ and Lexmark which may be in force as of the Effective Date of this Agreement and any confidentiality notices or similar legends on documentation supplied by ▓ to Lexmark under this Agreement, ▓ acknowledges and accepts that any and all information and documentation provided by ▓ and submitted by Lexmark in conjunction with the provision of Services under this Agreement shall be received from ▓ and transmitted to ▓ on a non-confidential basis and shall not be subject to Section 12.2 of the Master Purchase Agreement.

## 5.    TERM AND TERMINATION

5.1    This Agreement shall commence on the Effective Date and continue for so long as the ▓ License and the Product Schedule remain in effect and unless terminated in accordance with this Section 5.

5.2    This Agreement may be immediately terminated by Lexmark, at its sole option, either in its entirety or with respect to any affected Product Schedule, in the event that (a) the ▓ License, the Master Purchase Agreement and/or the Product Schedule expires or is terminated; or (b) ▓ is in material breach of any of its obligations hereunder. Subject to Section 7.8, such termination shall be without liability to Lexmark.

5.3    This Agreement may be terminated by ▓ with 30 days' notice at any time for its convenience.  Subject to Section 7.8, such termination shall be without liability to ▓.

## 6.    NOTICES

All notices shall be made as specified in Section 12.7 of the Master Purchase Agreement.

## 7.    MISCELLANEOUS

7.1    This Agreement shall be construed and enforced in accordance with the laws of the State of Texas, United States of America, excluding any conflict of laws provisions. The UN Convention on Contracts for the International Sale of Goods shall not apply. Lexmark will not export or re-export the Licensed Software except in compliance with all applicable laws and regulations.

7.2    This Agreement and the Master Purchase Agreement, along with any product schedules and other attachments and exhibits thereto, comprises the full and final understanding between ▓ and Lexmark, and merges and supersedes any and all other agreements except as expressly set forth herein, and any and all other understandings or representations, written or oral, with respect to the subject matter hereof. It may not be modified except by a writing signed by authorized representatives of both ▓ and Lexmark, and referring specifically to this Agreement.  If there is any conflict between the Master Purchase Agreement and this Agreement, this Agreement shall control only with respect to the Licensed Technology.  Except as may be specifically amended  or supplemented herein, all other terms and conditions of the Master Purchase Agreement shall

3

CONFIDENTIAL - OUTSIDE COUNSEL ONI A3478

remain in full force and effect.

7.3    This Agreement shall not be assignable by either party without the written consent of the other party.

7.4    Waiver by any party of the breach of a provision of this Agreement by the other party shall not be construed as a continuing waiver of such provision or waiver of any other breach of any other provision of this Agreement. All rights and remedies, whether conferred hereby or by any other instrument or by law shall be cumulative, and may be exercised singularly or concurrently. If any provision of this Agreement is held invalid by any law, rule, order of regulation of any government or by the final determination of any state or federal court, such invalidity shall not affect the enforceability of any other provisions not held to be invalid.

7.5    The relationship of Lexmark and ██ including their respective employees and agents, shall be that of independent contractors. Nothing in this Agreement shall be construed as making either party or any of their employees an agent, legal representative, employee or servant of the other for any purpose whatsoever. Neither party shall have any responsibility for or obligations to the employees of the other. Neither party shall have any authority, either express or implied, to create or assume any agency or obligation on behalf of or in the name of the other.

7.6    The section headings of this Agreement are to facilitate reference only, do not form a part of this Agreement and shall not in any way affect the interpretation of this Agreement.

7.7    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constituted one and the same instrument.

7.8    The rights and obligations of the parties under this Agreement which, by their nature, would continue beyond the termination, cancellation or expiration of this Agreement or any portion thereof (including, but not limited to Section 3 ("Compensation and Rework Costs") only with respect to products containing the Licensed Technology in ██ Possession prior to termination, cancellation or expiration of this Agreement , Section 4 ("Confidentiality") and Section 7 ("Miscellaneous")) shall survive termination, cancellation or expiration of this Agreement and shall thereafter bind the parties and their successors and assigns as specified in the Agreement.

4

IN WITNESS WHEREOF, ███ and Lexmark have caused this Agreement to be executed by their duly authorized representatives.

███████████████

By: _____

Printed
Name: _____

Title: _____

Date: _____

**LEXMARK INTERNATIONAL, INC.**

By: _____

Printed
Name: _____

Title: _____

Date: _____

**Lexmark International Technology, S.A.**

By: _____

Printed
Name: _____

Title: _____

Date: _____

5

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3480

**Technology Support Agreement**

This Technology Support Agreement ("Agreement") is made and entered into this 24th day of May, 2012 ("Effective Date"), by and between Lexmark International, Inc. ("LII"), a Delaware corporation with its principal office at 740 New Circle Road, Lexington, Kentucky 40550; Lexmark International Technology, S.A., a Swiss company and LII's subsidiary with its principal office at ICC, 20 Route de Pre-Bois, Case Postale 508, CH 1215 Geneva 15 Switzerland ("LITSA") (hereinafter LII and LITSA are collectively referred to as "Lexmark"); and ███████████ ████████████████████████ branch of a company incorporated in ██████████████████████████ on behalf of ████ and ██████s subsidiaries and affiliates (collectively, ██████

WHEREAS, Lexmark and ███ have signed a Master Purchase Agreement as of November 1, 2008 (as amended and supplemented from time to time, the "Master Purchase Agreement"); and

WHEREAS, Lexmark has entered into an agreement with ███████████████ for the development, manufacturing and distribution of printing devices incorporating certain ████████ technology (the "Licensed Technology"). The aforementioned agreement between ███ and Lexmark shall hereinafter be referred to as the ████ License"; and

WHEREAS ███ desires that Lexmark submit certain ███ branded products manufactured by or for Lexmark especially for ███ (the "Products") to ███ for certification under the terms of the ███ License; and

WHEREAS Lexmark agrees to submit the Products and associated documentation specified in this Agreement to ███ on the terms and conditions specified in the Master Purchase Agreement and this Agreement; and

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are acknowledged, the parties hereby agree as follows:

This Agreement supplements and incorporates all of the terms and conditions of the Master Purchase Agreement.

## 1.    LEXMARK OBLIGATIONS

1.1    As may be required by ███ pursuant to and in the manner specified in the ███ License, Lexmark shall submit to ███ for testing and approval (a) the Products, including any Product information, specifications, corrections, modifications and enhancements required by ███ in conjunction with the testing and certification of the Products; and (b) proposed packaging for the Products.

1.2    Lexmark shall use reasonable efforts to promptly correct any errors or defects in the Products, proposed packaging and user's guides that may be identified and reported by ███ and deliver such corrections to ███ in accordance with the terms of the ███ License (collectively, the "Services").

1.3    Lexmark will notify ███ promptly in writing (a) when the Products have been approved and certified by ███ and (b) of any notices received from ███ that could affect ███ rights to distribute Products containing the Licensed Technology.

1.4    Within 45 days of the Stop Date (as defined in Section 2.4), Lexmark will perform all modifications and removals of the Licensed Technology from printing devices within its control.

CONFIDENTIAL - OUTSIDE COUNSEL ONl A3481

**2.**    ▮▮▮ **OBLIGATIONS**

2.1    ▮▮▮ acknowledges and accepts that ▮▮▮ has the sole and absolute discretion to (a) determine the certification process for Licensed Technology, including which Products shall be approved and certified to contain the Licensed Technology; and (b) revise and/or require the removal of the Licensed Technology from the Products at any time.   No such decisions or actions by ▮▮▮ with respect to the Licensed Technology will cause Lexmark to be in material breach under the Master Purchase Agreement.

2.2    ▮▮▮ will use its commercially reasonable efforts to provide all reasonably requested assistance and cooperation to Lexmark within any timeframes set forth by ▮▮▮ including the provision of any materials, specifications or other information required by ▮▮▮ that are unique to Products, in conjunction with Lexmark's submissions described in Section 1.1 above and/or ▮▮▮ esting and certification process and requirements.

2.3    ▮▮▮ will be solely responsible for any direct submissions of information it makes to ▮▮▮ without the use of Lexmark resources and/or Lexmark's assigned portal for submission of materials to ▮▮▮ including, without limitation, any and all ▮▮▮ marketing and other materials not submitted to ▮▮▮ by Lexmark in conjunction with the provision of Services under this Agreement as more specifically identified in Sections 1.1 and 1.2 above.

2.4    ▮▮▮ agrees that it shall not sell or otherwise distribute any Product containing the Licensed Technology to any customer, reseller or distributor unless and until Lexmark notifies ▮▮▮ in writing that such Product(s) have been approved and certified by ▮▮▮ further agrees that it will take commercially reasonable steps to stop the continued sale or distribution of Products containing the Licensed Technology that are within Possession within a commercially reasonable time, but not less than 30 days, from its receipt of a written certification from an officer of Lexmark representing that ▮▮▮ requires such action (such date, the "Stop Date").  For the purpose of this Agreement, "▮▮▮ Possession" means being held in inventory by ▮▮▮ in a ▮▮▮ designated hub, ▮▮▮ controlled vehicle, or other ▮▮▮ controlled location.

**3.**    **COMPENSATION AND REWORK COSTS**

3.1    Except for ▮▮▮ s and Lexmark's reimbursement obligations for Rework Costs set forth in this Section 3, or if the parties agree otherwise in writing, compensation for Services performed by Lexmark under this Agreement shall be in accordance with the terms of the Master Purchase Agreement.

3.2    Rework Costs shall mean labor, shipping and other actual and direct costs and expenses associated with the modification or removal of the Licensed Technology which Lexmark is obligated to perform under its agreement with ▮▮▮ provided, however, that Rework Costs will not include the costs and expenses required to modify or remove Licensed Technology from products that are not within ▮▮▮ Possession.  For purposes of clarity, Rework Costs will not be considered to be incidental, indirect or consequential damages that would otherwise be excluded pursuant to the limitations of liability set forth in the Master Purchase Agreement.

3.3    Lexmark shall be responsible to pay Rework Costs for all products, however branded, that contain the Licensed Technology, except as provided in Section 3.4.

3.4    If Rework Costs arise from a failure by ▮▮▮ to comply with its obligations under Section 2 of this Agreement, and not due to Lexmark's actions or omissions, then ▮▮▮ all be responsible to pay the Rework Costs:  (a) for Products that contain the Licensed Technology, and (b) for any Lexmark-branded products that contain the Licensed Technology that are purchased by ▮▮▮ for resale.  In addition, if Lexmark provides ▮▮▮ with satisfactory documentation that Apple terminated Lexmark's right to develop, manufacture and distribute all Lexmark-branded printing devices incorporating the Licensed Technology as a result of ▮▮▮ failure to comply with Section 2 of this Agreement, and not due to Lexmark's actions or omissions, then ▮▮▮

2

shall be responsible to pay the Rework Costs for the Lexmark-branded products that contain the Licensed Technology.

3.5    Notwithstanding anything in this License or the Master Purchase Agreement to the contrary, in no event shall either party's liability for Rework Costs arising from a failure by ▮▮▮ o comply with its obligations under this Agreement exceed ▮▮▮▮▮▮▮.

## 4.    CONFIDENTIALITY

4.1    ▮▮▮ and Lexmark agree that the terms and conditions of this Agreement are confidential and are subject to Section 12.2 of the Master Purchase Agreement.

4.2    Notwithstanding any non-disclosure agreements or confidentiality provisions within existing agreements between ▮▮▮ and Lexmark which may be in force as of the Effective Date of this Agreement and any confidentiality notices or similar legends on documentation supplied by ▮▮▮ to Lexmark under this Agreement ▮▮▮ acknowledges and accepts that any and all information and documentation provided by ▮▮▮ and submitted by Lexmark in conjunction with the provision of Services under this Agreement shall be received from ▮▮▮ and transmitted to ▮▮▮ on a non-confidential basis and shall not be subject to Section 12.2 of the Master Purchase Agreement.

## 5.    TERM AND TERMINATION

5.1    This Agreement shall commence on the Effective Date and continue for so long as the ▮▮▮ License and the Product Schedule remain in effect and unless terminated in accordance with this Section 5.

5.2    This Agreement may be immediately terminated by Lexmark, at its sole option, either in its entirety or with respect to any affected Product Schedule, in the event that (a) the ▮▮▮ License, the Master Purchase Agreement and/or the Product Schedule expires or is terminated; or (b) ▮▮▮ s in material breach of any of its obligations hereunder. Subject to Section 7.8, such termination shall be without liability to Lexmark.

5.3    This Agreement may be terminated by ▮▮▮ with 30 days' notice at any time for its convenience. Subject to Section 7.8, such termination shall be without liability to ▮▮▮.

## 6.    NOTICES

All notices shall be made as specified in Section 12.7 of the Master Purchase Agreement.

## 7.    MISCELLANEOUS

7.1    This Agreement shall be construed and enforced in accordance with the laws of the State of Texas, United States of America, excluding any conflict of laws provisions. The UN Convention on Contracts for the International Sale of Goods shall not apply. Lexmark will not export or re-export the Licensed Software except in compliance with all applicable laws and regulations.

7.2    This Agreement and the Master Purchase Agreement, along with any product schedules and other attachments and exhibits thereto, comprises the full and final understanding between ▮▮▮ nd Lexmark, and merges and supersedes any and all other agreements except as expressly set forth herein, and any and all other understandings or representations, written or oral, with respect to the subject matter hereof. It may not be modified except by a writing signed by authorized representatives of both ▮▮▮ and Lexmark, and referring specifically to this Agreement. If there is any conflict between the Master Purchase Agreement and this Agreement, this Agreement shall control only with respect to the Licensed Technology. Except as may be specifically amended or supplemented herein, all other terms and conditions of the Master Purchase Agreement shall

3

CONFIDENTIAL - OUTSIDE COUNSEL ONlA3483

remain in full force and effect.

7.3    This Agreement shall not be assignable by either party without the written consent of the other party.

7.4    Waiver by any party of the breach of a provision of this Agreement by the other party shall not be construed as a continuing waiver of such provision or waiver of any other breach of any other provision of this Agreement. All rights and remedies, whether conferred hereby or by any other instrument or by law shall be cumulative, and may be exercised singularly or concurrently. If any provision of this Agreement is held invalid by any law, rule, order of regulation of any government or by the final determination of any state or federal court, such invalidity shall not affect the enforceability of any other provisions not held to be invalid.

7.5    The relationship of Lexmark and █████ including their respective employees and agents, shall be that of independent contractors. Nothing in this Agreement shall be construed as making either party or any of their employees an agent, legal representative, employee or servant of the other for any purpose whatsoever. Neither party shall have any responsibility for or obligations to the employees of the other. Neither party shall have any authority, either express or implied, to create or assume any agency or obligation on behalf of or in the name of the other.

7.6    The section headings of this Agreement are to facilitate reference only, do not form a part of this Agreement and shall not in any way affect the interpretation of this Agreement.

7.7    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constituted one and the same instrument.

7.8    The rights and obligations of the parties under this Agreement which, by their nature, would continue beyond the termination, cancellation or expiration of this Agreement or any portion thereof (including, but not limited to Section 3 ("Compensation and Rework Costs") only with respect to products containing the Licensed Technology in █████ Possession prior to termination, cancellation or expiration of this Agreement , Section 4 ("Confidentiality") and Section 7 ("Miscellaneous")) shall survive termination, cancellation or expiration of this Agreement and shall thereafter bind the parties and their successors and assigns as specified in the Agreement.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3484

IN WITNESS WHEREOF, ███ and Lexmark have caused this Agreement to be executed by their duly authorized representatives.

| By: | |
|---|---|
| Printed Name: | |
| Title: | |
| Date: | 21st June 2012 |

**LEXMARK INTERNATIONAL, INC.**

| By: | F.T. SAMUEL JR |
|---|---|
| Printed Name: | |
| Title: | VP, WW OEM + ALLIANCES |
| Date: | 11 July, 2012 |

**Lexmark International Technology, S.A.**

| By: | Mike R. Rueschenbaum |
|---|---|
| Printed Name: | Vice President and General Manager Europe, Middle East & Africa Lexmark International Technology S.A. |
| Title: | Case postale 508 CH - 1215 Genève 15 |
| Date: | |

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3485

GLOBAL THIRD PARTY SUPPLIER AGREEMENT
FOR LEXMARK-BRANDED HARDWARE SOLD TO █████

This Third Party Supplier Agreement by and between Lexmark International, Inc., a Delaware corporation ("LII"), and Lexmark International Technology, S.A., a Swiss company and LII's subsidiary ("LITSA") (collectively "Provider") and ███████████████████████ *of a company incorporated in* ████ *████████ with limited liability, on behalf of* █████ *and* ████████ *subsidiaries and affiliates (████)* is effective as of the 1st day of June 2012 ("Effective Date").

1.0    Agreement Structure.

1.1 In order to induce ████ to: purchase Lexmark-branded laser and inkjet printers and multifunction devices and their accompanying features and supplies  including, but not limited to, any software embedded in the equipment, maintenance kits, extended warranties and related documentation (collectively "Hardware"), from Provider through Provider's authorized distributors ("Distributors") for ultimate resale by ████ to ████ customers and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the parties, the parties hereby enter in this Third Party Supplier Agreement ("TPSA"). ████ purchase of Hardware directly from Provider shall have additional terms applicable and are attached hereto as Addendum 1 (Terms and Conditions For Direct Sales of Lexmark-Branded Hardware).  The TPSA and all attachments ("Attachments"), shall be collectively referred to as the "Agreement." The Agreement merges all prior discussions, both oral and written, between the parties related to the subject matter of the Agreement. Each ████ Entity (as defined in Section 1.3) will have the benefits, rights and remedies set forth in this Agreement and may enforce any such benefit, right and remedy.

1.2 The Hardware shall also be referred to as "Deliverables." The parties acknowledge that the Deliverables will be purchased by ████ through Provider's Distributors for ultimate re-sale to ████ customers under Provider's purchase/license terms and conditions ("Provider's End User Agreement"). As between ████ and Provider, the terms and conditions of this Agreement shall apply to all Deliverables purchased/licensed by ████ from Provider's Distributors.

1.3    "████ Entity," for purposes of the Agreement, shall include ██████ and each direct and indirect subsidiary of ████ including all branch offices and representative offices of those subsidiaries.

2.0    Term and Termination.

2.1 Subject to the termination provisions in this TPSA, the initial term of this TPSA is for three (3) years beginning on the Effective Date.  This TPSA will automatically renew for additional, successive, one-year terms unless a party provides written notice of non-renewal to the other party at least one hundred and eighty (180) days before the end of the then current term.

2.2 Either party may terminate the Agreement for cause in the event of a material breach by the other party if such breach is not cured within forty-five (45) days of receipt of written notice.

2.3    To the extent necessary to implement the termination provisions of the Agreement, the parties hereby waive any right or obligation it may have under any applicable laws or regulations of any jurisdiction to request or obtain the approval, order, or decision of any court of law to terminate the Agreement.

3.0    Warranty.

Provider represents, warrants and covenants that:

(a)  All Deliverables will conform to Provider's published specifications and documentation and will be free from defects in design, materials and workmanship as set forth in Provider's Statement of Limited Warranty [for EMEA "Statement of Limited Commercial Guarantee"] shipped with the Deliverables ("Provider's End User Agreement");

(b)  ████ customers will acquire good and marketable title to the Hardware, and all Hardware will be free and clear of all liens, claims, encumbrances and other restrictions;

████ **Lexmark Confidential**

(c)   Provider will comply with all of its obligations contained in Provider's End User Agreement and Provider agrees to honor all replacement requests received from ███ or ███ customers under the terms of Provider's End User Agreement pertaining to the Deliverable. Provider will be responsible for any representations, warranties or covenants Provider makes to ███ customers as well as compliance with Provider's published policies including but not limited to Provider's data destruction policies;

(d)   Provider has all the rights and licenses in the Deliverables necessary to allow ███ to use, market, license, and/or resell such Deliverables without restriction or additional charge; and/or

(e)   Provider's entry into this Agreement and grant of rights under this Agreement do not breach any other Agreement to which Provider is a party or bound.

## 4.0   Indemnification.

4.1 Notwithstanding any potential rights of action that ███ may have against a Distributor or other party involved in the manufacture, procurement or distribution of the Deliverables, Provider will defend, indemnify, and hold harmless ███ and their respective directors, officers, employees, representatives, agents, customers and distributors (collectively "Indemnitees") from and against any and all third-party claims, actions, demands, and legal proceedings (collectively "Claims") and all third-party liabilities, damages, losses, judgments, authorized settlements, fines, costs and expenses including, without limitation, reasonable legal support costs and expenses (collectively "Damages"), arising out of or in connection with: (a) any alleged or actual acts or omissions of Provider or failure to perform or comply with the terms and conditions of the Agreement; (b) any alleged or actual infringement and/or misappropriation by Provider and/or the Deliverables, either alone or in combination with other hardware or software (unless the combination was performed by or at the direction of ███ and there was no other commercially available alternatives to the subject Hardware that could have avoided the liability, in which case Lexmark shall have no indemnification obligation), of any copyright, patent, trademark, trade secret, moral rights or other proprietary or intellectual property right of any third party; (c) any Claim that Provider and/or the Deliverables provided under the Agreement have caused bodily injury including, without limitation, death or has damaged real or tangible personal property; (d) violation by Provider and/or the Deliverables of any governmental laws, rules, ordinances, or regulations; (e) any Claim by or on behalf of Provider's subcontractors, suppliers, or employees for salary, wages, benefits or other compensation that arises from this Agreement or the sale of Deliverables by Provider hereunder; (f) any breach of the terms and conditions of Information Privacy and Security Agreement and/or the NDA; (g) breach of any warranty set forth in the Agreement; and/or (h) any third party claims that the Deliverables or the Lexmark-provided maintenance and support, arising from the Deliverables supplied by the Provider do not comply with or meet all of the requirements of applicable laws, regulations, ordinances or any local consumer code.

4.2  Providers obligations above shall apply even if the Claim and/or Damages are due, or alleged to be due, in part to any Indemnitee's concurrent negligence or other fault, breach of contract or warranty, or strict liability without regard to fault; provided, however, that Provider's contractual obligations shall apply only to the percentage of the third party claimant's Damages that are not attributable to the Indemnitee's negligence or fault.

4.3  In addition to Provider's obligations and liabilities above, if an infringement claim is made or appears likely to be made about the Deliverables, Provider shall, at Provider's option, either: procure for ███ the right to continue to exercise its rights under the Agreement with respect to the applicable Deliverables; modify the Deliverables so that they are no longer infringing; or replace them with non-infringing Deliverables.  If none of these alternatives is commercially reasonable and ███ will not incur a negative, material impact to its business operations, ███ shall cease its distribution of any affected Deliverables or return or destroy any affected Deliverables in its possession, for a full refund of the purchase price.

4.4 In Provider's indemnification obligation is conditioned on the following: ███ will: (a) promptly notify Provider, (b) at Provider's expense, reasonably cooperate with Provider in the defense thereof, and (c) not settle any such Claims without Provider's consent which Provider agrees not to unreasonably withhold.  Provider will keep informed at all times as to the status of Provider's efforts and consult with ███ (or ███ counsel) concerning Provider's efforts; and Provider will not settle the claim without ███ prior written consent, such consent not to be unreasonably withheld.

CONFIDENTIAL - OUTSIDE COUNSEL ON A3487

4.5. In the event of a recall or withdrawal of a Deliverable from the market (collectively, a "Recall Event"), Provider will defend, indemnify and hold harmless the Indemnitees as set forth above in this Section 4.0 for all Claims related to the Recall Event. In addition to paying all related Damages, Provider shall reimburse ▮▮ for: (a) all reasonable costs and expenses of notifying customers of said Recall Event; (b) all reasonable freight charges actually incurred by ▮▮ or paid by ▮▮ to its customers for retrieval of the Deliverables; and (c) all reasonable costs arising as a direct result of the Recall Event including costs of investigation. Provider will either replace the recalled Deliverables with conforming Deliverables free of charge, or in lieu of replacement, at Provider's option, Provider may refund the purchase price of such Deliverables.

## 5.0 Limitation of Liability.

EXCEPT FOR PROVIDER'S AND ▮▮▮ OBLIGATIONS AND LIABILITIES UNDER SECTION 4.0 ("INDEMNIFICATION"), SECTION 8.0 (SUPPLIES OBLIGATIONS), AND/OR PROVIDER'S AND ▮▮▮ CONFIDENTIALITY/NON-DISCLOSURE OBLIGATIONS AND LIABILITIES INCLUDING WITHOUT LIMITATION, THOSE CONTAINED IN THE NDA, NEITHER PARTY WILL BE LIABLE FOR ANY LOST PROFITS, INDIRECT, INCIDENTAL, SPECIAL, PUNITIVE OR CONSEQUENTIAL DAMAGES OF ANY TYPE INCLUDING, WITHOUT LIMITATION, LOST SALES, ARISING OUT OF OR IN CONNECTION WITH THE AGREEMENT EVEN IF ADVISED OR AWARE OF THE POSSIBILITY OF SUCH DAMAGES AND EVEN IF A PARTY ASSERTS OR ESTABLISHES A FAILURE OF THE ESSENTIAL PURPOSE OF ANY LIMITED REMEDY PROVIDED IN THIS AGREEMENT.

## 6.0   Product Safety and Regulatory Compliance

6.1   Regulatory Compliance.  Each Party shall comply with all applicable laws orders and regulations of any governmental authority with jurisdiction over that Party's activities in connection with this Agreement. ▮▮ reserves the right to require Provider to provide appropriate documentation verifying conformance of Provider's Hardware with applicable laws, regulations, rules, standards and ordinances. Provider and all Hardware shall comply with applicable laws, and applicable government regulations and all mandatory rules, ordinances or regulations.

6.2   Product Safety.  If either Provider or ▮▮ becomes aware of information that reasonably supports a conclusion that a hazard may exist in any Deliverable that could cause death or bodily injury to any person or property damage (a "Hazard"), the party becoming aware of this information will promptly notify the other of the potential Hazard. Whenever possible, notification to the other party will precede notice to any governmental agency, unless otherwise required by law.  Provider and ▮▮ will promptly exchange all relevant data and then, if practical, promptly meet to review and discuss the information, tests, and conclusions relating to the alleged Hazard.  At this meeting the parties shall discuss the plan for any action, including without limitation any and all legal obligations of  the Parties pursuant to Section 15 of the United States Consumer Product Safety Act and/or similar requirements under the applicable laws of another country, and the origin or causation of the alleged Hazard.   Each Party shall, on request, provide to the other reasonable assistance in: (a) determining how best to deal with the Hazard; and (b) preparing for and making any presentation before any governmental agency which may have jurisdiction over Hazards involving Hardware.  Should it be determined by either Party or governmental agency that a Hazard may exist in Hardware, Provider shall be responsible for all reasonable costs and expenses in repairing, replacing, or recalling any Hardware that contain or may contain such Hazard and shall Indemnify ▮▮ or any such costs, losses, damages and expenses reasonably incurred by ▮▮ as a result of such a recall, as set forth in Section 4.5 of this Agreement.  Relative to product safety data and information, Provider agrees to keep such data and information for at least five (5) years.

## 7.0  Pricing

Prices and rebates for Hardware are as set forth in Attachment 1 to this Agreement.

Price increase to published prices for Hardware (such as e.g. a best dealer price in the U.S.) is effective on the date specified.  Provider will announce a price increase a minimum of 30 days prior to the effective date of the increase, to the exception of the EMEA countries.  A price decrease is effective on the date specified and will

apply to Hardware shipped on or after the effective date of the decrease.

The MSRP is Provider's suggested resale price and is subject to change without notice. This price is for information purposes only. Provider's and ▮▮ prices may vary.

## 8.0  Supplies Obligations

8.1      With regard to all Lexmark-branded printers acquired by ▮▮ hereunder, all cartridges and spare parts whether new or remanufactured for use on such printers will be purchased by ▮▮ from Provider. ▮▮ shall not promote, sell or offer to sell on its website any cartridges or spare parts that are compatible with Lexmark-branded printers.   In the event of a failure by ▮▮ to comply with the obligations of this paragraph, Provider shall notify ▮▮ of such failure and ▮▮ shall have thirty (30) days to cure.  If ▮▮ fails to cure within thirty (30) days, then such failure by ▮▮ shall not be considered a breach of this Agreement by ▮▮ and as its sole remedy under this agreement for such failure by ▮▮ Lexmark shall be entitled to: (a) terminate this agreement; and/or (b) discontinue the Hardware discount and/or discontinue the payment of MDF.

8.2  The parties agree that for managed print services wherein ▮▮ may purchase Provider-branded Deliverables directly or indirectly from Provider for sale to end users, a managed print services agreement will be established ("MPS Agreement(s)").  These MPS Agreements may have terms that conflict with the terms and conditions herein. Any MPS agreement subsequently entered into for the sale of Provider-branded Deliverables by ▮▮ shall be incorporated as an attachment to this Agreement and labeled as an MPS Attachment.  The terms of this Agreement shall apply to the MPS Agreements, except to the extent where there is a conflict between the terms of this Agreement and the MPS Agreement terms, in which case the MPS Agreement terms will govern for that specific MPS opportunity.

8.3  Provider acknowledges that in some cases, ▮▮ may need lower supplies pricing in order to compete in a MPS opportunity.  ▮▮ agrees to provide Provider with information regarding the competitive nature of the toner pricing and in return, Provider will make a good faith effort to provide competitive toner pricing to avoid ▮▮ having to consider a non-Provider remanufactured toner cartridge.

8.4  In the event that this Agreement terminates prior to the termination of an MPS Agreement, the applicable terms and conditions of this Agreement shall survive termination and continue to apply to the incorporated MPS Agreements.

## 9.0  <u>General</u>.

9.1  Except as expressly set forth below, Provider and ▮▮ irrevocably submit and consent to the jurisdiction of the federal and state courts of the State of Texas, U.S.A. This Agreement will be governed by and construed in accordance with the laws of the State of Texas, exclusive of any provisions of the United Nations Convention on the International Sale of Goods and without regard to principles of conflicts of law.  In all cases, before either party initiates a lawsuit against the other relating to a dispute under this Agreement, the parties agree to work in good faith to resolve between them all disputes and claims arising out of or relating to this Agreement, the party's performance under it, or its breach. Either party may request, after informal discussions have failed to resolve a dispute or claim, that each party designate an officer or other management employee with authority to bind the party to meet in a good faith attempt to resolve the dispute. During their discussions, each party will honor the other's reasonable requests for information relating to the dispute or claim.

9.1.1  <u>Canada.</u>  If the dispute is solely between Provider and a ▮▮ entity located in Canada, PROVIDER AND ▮▮ IRREVOCABLY SUBMIT AND CONSENT TO THE EXCLUSIVE JURISDICTION OF THE COURTS LOCATED IN TORONTO, ONTARIO AND HEREBY AGREE THAT SUCH COURTS SHALL BE THE EXCLUSIVE PROPER FORUM FOR THE DETERMINATION OF ANY DISPUTE ARISING IN CONNECTION WITH THE AGREEMENT. THE AGREEMENT WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE PROVINCE OF ONTARIO AND THE FEDERAL LAWS OF CANADA, EXCLUSIVE OF ANY PROVISIONS OF THE UNITED NATIONS CONVENTION ON THE INTERNATIONAL SALE OF GOODS AND WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.

9.1.2   <u>EU.</u>  If the dispute is solely between Provider and a ███ entity located in the EU region, PROVIDER AND ███ IRREVOCABLY SUBMIT AND CONSENT TO THE EXCLUSIVE JURISDICTION OF THE ENGLISH COURTS, AND HEREBY AGREE THAT SUCH COURTS SHALL BE THE EXCLUSIVE PROPER FORUM FOR THE DETERMINATION OF ANY DISPUTE ARISING IN CONNECTION WITH THE AGREEMENT. THE AGREEMENT WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH ENGLISH LAW, EXCLUSIVE OF ANY PROVISIONS OF THE UNITED NATIONS CONVENTION ON THE INTERNATIONAL SALE OF GOODS AND WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.  PROVIDER AGREES TO TAKE ALL ACTIONS NECESSARY IN ORDER TO COMPLY WITH APPLICABLE LAW, INCLUDING BUT NOT LIMITED TO WEEE LEGISLATION (AS REGULATED IN APPENDIX A TO THE AGREEMENT).

9.1.3   <u>Brazil.</u>  If the dispute is solely between Provider and a ███ entity located in Brazil, PROVIDER AND ███ IRREVOCABLY SUBMIT AND CONSENT TO THE EXCLUSIVE JURISDICTION OF THE COURTS IN PORTO ALEGRE, RS, BRAZIL. THE AGREEMENT WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF BRAZIL, EXCLUSIVE OF ANY PROVISIONS OF THE UNITED NATIONS CONVENTION ON THE INTERNATIONAL SALE OF GOODS AND WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.

9.1.4   <u>Governing Law, Asia Pacific Region.</u>  If the dispute is solely between Provider and a ███ entity located in Australia, Hong Kong, India, Indonesia, Japan, New Zealand, People's Republic of China, Republic of Korea, Taiwan, Malaysia, Pakistan, the Philippines, Singapore, Thailand or Vietnam and the parties are unable to settle the dispute within the thirty-day (30) period, then either party may submit the dispute to a Board of Arbitration under the arbitration rules of the Singapore International Arbitration Centre (the "Rules"). The arbitration will be conducted in the English language in Singapore, and the Board of Arbitration shall be composed of three arbitrators.  Notwithstanding the provisions of Section 7.9, any notice of arbitration, response or other communication given to or by a party to the arbitration must be given and deemed received as provided in the Rules.

Except as provided in this <u>Section</u>, none of the parties shall be entitled to commence or maintain any action in a court of law upon any matter in dispute arising from or in relation to this Agreement except for the enforcement of an arbitral award granted pursuant to this <u>Section</u>.

To the extent deemed applicable by any forum, each of the Parties hereby renounces its right to appeal from the decision of the Board of Arbitration.

The Parties expressly agree (i) that the decisions must be made based on majority votes of the arbitrators, (ii) that the Board of Arbitration must state the reasons for its decisions in writing and must make the decisions entirely on the basis of applicable laws and not on the basis of the principle of ex aequo et bono, and (iii) that the mandate of the Board of Arbitration duly constituted in this Agreement will remain in effect until a final arbitration award has been issued by the Board of Arbitration.

For purposes of this Section, this Agreement shall be governed by and construed in accordance with the laws of Singapore.

9.2   Regardless of the circumstances of termination or expiration of the Agreement, or portion thereof, the provisions of Sections 3 ("Warranty"), 4 ("Indemnification"), 5 ("Limitation of Liability"), 6.0 ("Product Safety and Regulatory Compliance"), Section 8.0 (Supplies Obligations) and Section 9 (General) will survive the termination or expiration of the Agreement and continue according to their terms. All licenses and sublicenses granted to customers and other licensees under this Agreement shall also survive and expiration or termination of this Agreement.

9.3 Any confidential information disclosed by either party related to this Agreement is governed by the terms and conditions of the Confidential Disclosure Agreement (#01111202) executed in November 2008 between ███ and Provider ("NDA").

9.4 Provider will not use the name of ███ or any ███ trademarks, trade names, or service marks; or quote the

opinion of any ▬ employee in any advertising, presentations or otherwise without obtaining the prior written consent of ▬ Corporate Communications Department. ▬ may refer to itself under this Agreement as a Lexmark Authorized Dealer: 1)  solely in connection with Hardware; and 2) only during the contract period. Except as provided for in this Section, Provider does not grant ▬ the right to use trademarks or trade names. Provider grants ▬ the limited permission to use the trademark "Lexmark" solely to identify the Hardware acquired from Distributors under the Agreement. At Provider's request, ▬ will provide to Provider, for review and written approval, representative samples of promotional, advertising and other materials that:

1)   use a Lexmark trademark or trade name; or
2)   refer        to        ▬        as        a        "Lexmark        Authorized        Dealer".

Provider will supply advertising guidelines in writing.  At Provider's request and upon reasonable notice, ▬ agrees to change any materials or use of materials which Provider determines to be inaccurate, objectionable, misleading or a misuse of Provider trademarks and that had not been previously approved by Provider or were at the time published in compliance with Provider's advertising guidelines. ▬ will pay the expenses for such change. The permission granted relative to the Provider trademarks will terminate with the termination or expiration of this Agreement. In such event, for the affected Hardware, ▬ will promptly: 1) cease referring to itself as a "Lexmark Authorized Dealer"; 2) return to Provider or destroy all materials under ▬ control employing such trademarks. ▬ recognizes Provider's ownership and title to its trademarks and the goodwill attaching to them. ▬ agrees not to use, employ or attempt to register any trademarks or trade names which are confusingly similar to Provider trademarks or trade names All goodwill generated by such marketing and distribution will inure exclusively to the benefit of Provider.

9.5 Insurance.

9.5.1.   Provider shall maintain Commercial General Liability insurance with limits, inclusive of umbrella liability insurance if necessary, of not less than $1,000,000 each occurrence for bodily injury and property damage liability, $2,000,000 general aggregate, and $2,000,000 products/completed operations aggregate.   The commercial general liability insurance shall include but not be limited to coverage for premises/operations liability, products/completed operations, independent contractor's liability, and broad form and blanket contractual liability. This insurance shall be primary and non-contributory to any insurance or self-insurance maintained by ▬ with regard to the products and services provided by the Provider under this Agreement, and it shall add ▬ as an Additional Insured with regard to such products and services.   This policy shall include a waiver of subrogation provision in favor of ▬ and either a cross-liability or severability of interest clause unless prohibited by local law.

9.5.2   To the extent Provider is based in or performing Services in the U.S., Provider shall maintain statutory workers' compensation insurance in the state(s) or jurisdiction(s) in which Provider's employees perform services for ▬ and employer's liability insurance with limits of not less than $500,000:  (i) for each accident; and (ii) for each employee for occupational disease; or (iii) policy limit for disease. Provider hereby waives all claims and causes of action against ▬ its officers, directors and employees for any and all injuries suffered by Provider's employees.  To the extent Provider is based or performing Services outside of the U.S., Provider shall maintain employers liability insurance with limits of not less than 10,000,000 GBP for the United Kingdom and Ireland and €500,000 for all other countries.

9.5.3    Limits shown are in United States ("U.S.") Dollars unless otherwise specified. If Provider obtains the required insurance coverage outside of the country(ies) or region(s) where the stated currency is applicable, insurance obtained in equivalent local currency shall meet the stated requirement

9.6 The parties are independent contractors and neither party is an employee, agent, servant, representative, partner, or joint venturer of the other or has any authority to assume or create any obligation or liability of any kind on behalf of the other.

9.7  No waiver of any term or condition is valid unless in writing and signed by authorized representatives of both parties, and will be limited to the specific situation for which it is given. No amendment or modification to the Agreement will be valid unless set forth in writing and signed by authorized representatives of both parties.   This Agreement may not be assigned by either Party in whole or in part, even by operation of law, in a merger, in a

**Third Party Supplier Agreement**                          ▬Confidential                          *rev 05212012*

sale of the majority of the interests in the equity of a Party or in an asset sale, without the prior written consent of the other Party; provided, however, that (i) such consent shall not be required in connection with an assignment by a Party of all of such Party's rights and obligations under this Agreement to an affiliate of such Party who assumes all of such rights and obligations in writing and (x) the assignor shall give notice to the other Party promptly thereafter; and (ii) such consent shall not be required in connection with an assignment of all of a Party's rights and obligations under this Agreement to a third party who acquires substantially all of the assets or equity securities of such Party and who agrees in writing to assume such rights and obligations (provided that (x) the assignor shall give notice to the other Party promptly thereafter; and (z) such an assignment shall give the other Party the right to terminate this Agreement upon thirty (30) days written notice to the assigning Party). In addition, Provider may assign its accounts receivable under this Agreement to a third party financial institution for financing purposes only. Any attempt to assign this Agreement other than in accordance with this section shall be null and void.

9.8 Any notice required or permitted by the Agreement must be in writing in English and delivered by certified or registered mail, return receipt requested, postage prepaid and addressed as follows or to such other addresses as may be designated by notice from one party to the other, all such notices being effective on the date received: If to ██████████████████████████████████████████████ Attn: VP, General Procurement, cc: General Counsel; and, If to Provider:

      Lexmark International, Inc.
      740 New Circle Road NW
      Lexington, Kentucky 40550
      Attn: General Manager, WW PS&SD Alliances
      Cc: General Counsel

      Lexmark International Technology, S.A.
      Immeuble ICC, 20 Route de Pre-Bois,
      Case Postale 508, CH 1215
      Geneva 15 Switzerland
      Attn: President

If the notice is required under a schedule or addendum executed by a ██ entity located in one of the following regions/countries, notice should also be provided to ██ at the address provided:



| Region/ Country | Address |
|---|---|
| Canada | ████████████ |
| Asia Pacific/ Japan | ████████████ |



9.9 Whenever possible, each provision of this Agreement will be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement is found to violate a law, it will be severed from the rest of the Agreement and ignored and a new provision deemed added to the Agreement to accomplish, to the extent possible, the intent of the parties as evidenced by the provision so severed.  The headings used in the Agreement have no legal effect.

9.10 Nothing in this Agreement requires ▆ to purchase Deliverables from Provider or its Distributors any or all of its requirements for Deliverables that are the same or similar to the Deliverables provided hereunder.  Provider will cooperate and work with ▆ and any other providers that ▆ may engage in connection with the provision of the Deliverables.  ▆ will have full freedom and flexibility in its decisions concerning the distribution and marketing of the Deliverables, or same or similar products purchased from third parties, including without limitation the decision of whether or not to distribute or discontinue distribution of the Deliverables.  ▆ does not guarantee that its marketing, if any, of the Deliverables will be successful.  ▆ may distribute and sell the Deliverables on a stand-alone basis or in conjunction with other offerings.  Notwithstanding the foregoing, ▆ shall not make any warranties or representations on Provider's behalf without written authorization from Provider.  Neither party will assume or create any obligations on the other's behalf unless authorized by the other party in writing.  Nothing in this Agreement shall be interpreted to limit Provider's ability to market the same or similar products as Deliverables either directly or through other remarketers in the same geographic areas as ▆.

9.11  Except as may be otherwise provided in the Agreement, the rights or remedies of the parties hereunder are not exclusive, and either party is entitled alternatively or cumulatively, subject to the other provisions of the Agreement, to damages for breach, to an order requiring specific performance, or to any other remedy available at law or in equity.

9.12 This Agreement may be signed in original or facsimile counterparts, each of which will be deemed an original, but which together will constitute one and the same instrument.  Provider will forward the original executed hard copy agreement to ▆ once executed.

9.13    Notwithstanding Attachment 1 Provider represents and warrants that where  Provider and ▆ will  agree in writing upon exceptional pricing for Deliverables (e.g., a special bid) Provider shall ensure that the prices for Deliverables that are provided to ▆ Distributor will not be more than the price provided to ▆ in the applicable RFQ or RFP ("▆ Price").  Provider further agrees to immediately correct any pricing with ▆ Distributor that is not the same as the ▆ Price and shall immediately credit to ▆ Distributor any difference between the ▆ Price and the price at which Deliverables were supplied to ▆ Distributor by Provider with specific instruction that such amount should be credited to ▆ by the Distributor.  Provider reserves the right to propose additional terms and conditions in the context of special bid business.

9.14 Provider agrees to maintain adequate books and records in connection with its ▆ activity under this Agreement for a minimum of  five years  (ten years with respect to Schedules executed by a ▆ entity located in the Asia Pacific/Japan region and the EU region) or the period prescribed by applicable law or regulation if longer.   If there is reasonable cause, and in any event no more frequently than once per calendar year unless required by a customer, ▆ may elect to utilize a third party to audit, at ▆ expense, all relevant books and records of Provider to confirm compliance with the terms of this Agreement.  Any such audit will be conducted during regular business hours at Provider's offices and will not interfere unreasonably with Provider's business activities.  If an audit reveals that Provider has overcharged ▆ Distributor, and ▆ Distributor has passed the overcharge to ▆ then Provider will credit to ▆ the overcharged amount.  If an audit reveals that the overcharge was greater than 5% of what ▆ Distributors should have been charged, and ▆ Distributor has passed the overcharge to ▆ then Provider shall also pay to ▆ its reasonable costs for conducting the audit.

9.17    Statutory References:  Reference to any statute or statutory provision is, except where stated otherwise,

**Third Party Supplier Agreement**               **Confidential**                              *rev 05212012*

to a statute or statutory provision under the governing law that applies.  Such reference includes any consolidation or re-enactment, modification or replacement of the same, any statute or statutory provision of which it is a consolidation, re-enactment, modification or replacement and any subordinate legislation in force under any of the same from time to time.

9.18  The Agreement merges and supersedes all prior or contemporaneous understandings, agreements, negotiations and discussions, whether oral or written, between the parties concerning this subject matter and constitutes the entire agreement between the parties with regard to this subject matter.  The parties have not relied upon any promises, representations, warranties, agreements, covenants or undertakings, other than those expressly incorporated or set forth in this Agreement.

By signing below, the parties are agreeing to the terms and conditions contained in this Third Party Supplier Agreement.

███████████████████████████

By: _____

Printed Name: _____

Title: _____

Date:_____

**LEXMARK INTERNATIONAL, INC.**

By: _____

Printed Name: _____

Title: _____

Date:_____

**LEXMARK INTERNATIONAL TECHNOLOGY, S.A.**

By: _____

Printed Name: _____

Title: _____

Date:_____

**Third Party Supplier Agreement**          **Confidential**          *rev 05212012*

**CONFIDENTIAL - OUTSIDE COUNSEL ONLY** A3494

## APPENDIX A- PROVIDER'S STATUTORY RESPONSIBILITIES

The following terms and conditions shall apply where a Lexmark subsidiary or a Lexmark authorized Distributor registered in a EU member state act as importer of record for the goods sold to ██ in a EU member state. In case ███ or a ██ subsidiary would act as importer of record, the parties will mutually agree on different processes and communication in order to ensure compliance with the WEEE Legislation.

1.    In relation to Hardware supplied under this Agreement and at its sole expense Provider shall, unless otherwise released from this warranty (in whole or in part) by ████

Carry out, or (as the parties agree) procure the performance by an approved third party ("Contractor") of all processes required to ensure compliance with the WEEE Legislation.

Register with the relevant authority as a producer/ importer in any EU country where placing Hardware, falling within the scope of the WEEE Legislation, onto the market for the first time and demonstrate to ██ promptly on request, proof of its:
(a) WEEE registration number,
(b) WEEE statutory returns,
(c) End of life take-back programs and, if a reseller,
(d) Product line WEEE marking compliance audit programs.

Finance the cost of collection, treatment, recovery and environmentally sound disposal of WEEE in accordance with its individual producer obligations as determined by the relevant administrative authority;

meet all obligations relating to reporting collection, treatment, recovery of WEEE and other required annual data and provision of evidence relating to treatment of WEEE to the relevant authority and in accordance with its individual producer obligations as determined by the relevant administrative authority;

ensure Hardware is appropriately marked and that information relating to treatment and an explanation of such marking is included in product user guides and tech sheets and a web link is provided where the Provider will provide information in relation to treatment for the individual countries where the Hardware will be sold, in accordance with the Legislation in order to assist parties engaged in treatment, recovery and recycling of WEEE;

Meet all other responsibilities introduced by legislation (including the WEEE Legislation), codes of practice or other formal guidance (of any nature whether national or European, primary or secondary) from time to time;

Comply and ensure, when relevant, compliance by its suppliers with all applicable laws, rules, ordinances or regulations, including, but not limited to:
(a) any applicable industry safety standards, and
(b) any applicable product environmental energy regulations; and

complete any declarations or tests in relation to hazardous substances as ██ may require at such times and in such manner as ██ may designate from time to time.

2.    In the event that Provider procures performance of its obligations by a third party ("Contractor"), the identity of such Contractor shall be agreed in advance by the parties and any agreement entered into between Provider and Contractor shall be subject to prior review and approval by █████ shall be provided with copies of all documentation, correspondence and other information that is made available to Provider under the terms of the Contractor promptly upon receipt of the same by Provider.

3.    ██ shall assist Provider in its fulfillment of Provider's obligations under this clause as reasonably required by Provider and at Provider's sole expense; however ultimate responsibility shall remain with Provider.

4.    Provider shall review either (a) its own performance or (b) the performance by a Contractor on a quarterly basis and provide a performance report to ██ setting out the parameters and results of such review.  Provider shall notify ██ immediately in the event of non-compliance and ██ shall give all reasonable assistance to

Provider to remedy non-compliance at Provider's sole cost.

CONFIDENTIAL - OUTSIDE COUNSEL ONL**A3496**

Attachment 1 to Global Third Party Supplier Agreement

## I.    Pricing of Provider-Branded Hardware in the U.S. , Canada, and APJ

1. As long as the terms of this Agreement remain in force (i.e., Agreement  has not expired or terminated), Provider will price all Provider-branded laser and inkjet printers and multifunction devices for resale by ▐ to End Users in the United States, Canada, and APJ at published ▐▐▐▐▐▐ (with the discounts described below).  Provider-branded supplies will be priced  for resale to End-Users in the United States, Canada, and APJ at published ▐▐▐▐ Price.  A ▐▐▐▐▐▐reflects the purchase price of a Distributor when buying from Provider or its affiliate in connection with the sale of Hardware and does not include the Distributors' mark-up.  Distributor markups shall be negotiated, agreed upon and satisfied by ▐ and the Distributor. The right of ▐ and the Distributor to renegotiate prices or any other terms and conditions of their transactions shall remain unaffected by this Attachment 1.

2. In the U.S.,  Canada, and APJ ▐ will receive a sixteen percent (▐ discount off of the ▐▐▐▐▐ ▐ for Provider-branded laser printers and laser multifunction devices, and those Provider-branded inkjet printers and inkjet multifunction devices having a MSRP greater than ▐▐▐  The discount will be provided either directly from Provider, or indirectly through Provider's Distributor.  Discounts provided under this Agreement will not be stackable with any other Provider discounts or rebates.

3. In the U.S., Canada, and APJ, ▐ will receive an additional ▐▐ MDF allowance for Provider-branded laser printers and laser multifunction devices and will abide by the same process as ▐branded MDF in accordance with the terms of Schedule E, Section 5.1 of the 2008 Master Purchase Agreement, provided marketing programs have been mutually agreed by the parties and ▐ has provided proof of execution of those programs.  Schedule E, Section 5.1.1, of the 2008 Master Purchase Agreement shall not apply to Provider-branded Hardware.

4. Future unannounced products whose cost structure prohibits the full discounts represented above shall be identified and disclosed to ▐ before product announcement and a distinct pricing structure will apply.

5. ▐▐▐▐▐ are F.O.B. Distributor location, unless Provider specifies otherwise.

## II.    EMEA Specific Pricing Terms

1. This Attachment 1 provides common pricing terms and conditions for the sale of Deliverables and supplies distributed by PROVIDER in EMEA to ▐ in EMEA.  PROVIDER intends to sell the Deliverables and supplies through local affiliates (where applicable) to a network of authorized Distributors. Provider or its local affiliate publishes ▐▐▐▐▐▐in the countries listed in Exhibit A for Provider branded hardware, and ▐▐▐▐▐ for Provider branded supplies.  A ▐▐▐▐▐ or a ▐▐▐▐▐is the price Provider or its local affiliate grants to first level of distribution for  respectively  Provider-branded hardware and Provider-branded supplies. The ▐▐▐▐▐ and the ▐▐▐▐ reflect the purchase price of a Distributor when buying from Provider or its local affiliate in connection with the sale of hardware products and supplies and does not include the Distributors´ mark-up. Any mark-up shall be negotiated, agreed upon and paid by ▐to the Distributor. The right of ▐ and the Distributor to negotiate prices or any other terms and conditions shall remain unaffected.

2. In EMEA, ▮ will receive a ▮ MDF allowance for Provider-branded laser printers and laser multifunction devices and will abide by the same process as ▮ branded MDF in accordance with the terms of Schedule E, Section 5.1 of the 2008 Master Purchase Agreement, provided marketing programs have been mutually agreed by the parties and ▮ has provided proof of execution of those programs.  Schedule E, Section 5.1.1, of the 2008 Master Purchase Agreement shall not apply to Provider-branded Hardware.

3. Each EMEA ▮ country affiliate shall claim such MDF amounts to the Provider affiliate in the considered country.   Future generation products whose cost structure does not allow the same discount as defined above shall be identified and disclosed to ▮ before product announcement. In such case ▮ and Provider shall agree to a separate pricing structure for such products.

4. Any prices communicated by Provider or its local affiliates to ▮ including but not limited to ▮ shall be net prices and shall not include statutory value-added taxes or statutory fees provided for by local Copyright Acts (copyright fees) nor duties, freight or any other type of local taxes.  From time to time ▮ may qualify for tax exemptions, in which case ▮ will provide Provider a certificate of exemption or other appropriate documentary proof of exemption.

GLOBAL THIRD PARTY SUPPLIER AGREEMENT
FOR LEXMARK-BRANDED HARDWARE SOLD TO ███

This Third Party Supplier Agreement by and between Lexmark International, Inc., a Delaware corporation ("LII"), and Lexmark International Technology, S.A., a Swiss company and LII's subsidiary ("LITSA") (collectively "Provider") and ███████████████████████████████████████ company incorporated in ███ ███████ *with limited liability, on behalf of* ███, and ███████ *s subsidiaries and affiliates* ███████ is effective as of the 1ˢᵗ day of June 2012 ("Effective Date").

1.0  Agreement Structure.

1.1 In order to induce ████ o: purchase Lexmark-branded laser and inkjet printers and multifunction devices and their accompanying features and supplies including, but not limited to, any software embedded in the equipment, maintenance kits, extended warranties and related documentation (collectively "Hardware"), from Provider through Provider's authorized distributors ("Distributors") for ultimate resale by ████ o ████ customers and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the parties, the parties hereby enter in this Third Party Supplier Agreement ("TPSA"). ████ purchase of Hardware directly from Provider shall have additional terms applicable and are attached hereto as Addendum 1 (Terms and Conditions For Direct Sales of Lexmark-Branded Hardware). The TPSA and all attachments ("Attachments"), shall be collectively referred to as the "Agreement." The Agreement merges all prior discussions, both oral and written, between the parties related to the subject matter of the Agreement. Each ████ Entity (as defined in Section 1.3) will have the benefits, rights and remedies set forth in this Agreement and may enforce any such benefit, right and remedy.

1.2 The Hardware shall also be referred to as "Deliverables." The parties acknowledge that the Deliverables will be purchased by ████ hrough Provider's Distributors for ultimate re-sale to ████ customers under Provider's purchase/license terms and conditions ("Provider's End User Agreement"). As between ████ and Provider, the terms and conditions of this Agreement shall apply to all Deliverables purchased/licensed by ████ from Provider's Distributors.

1.3 ██████████ for purposes of the Agreement, shall include ██████ and each direct and indirect subsidiary of ██████ ncluding all branch offices and representative offices of those subsidiaries.

2.0  Term and Termination.

2.1 Subject to the termination provisions in this TPSA, the initial term of this TPSA is for three (3) years beginning on the Effective Date. This TPSA will automatically renew for additional, successive, one-year terms unless a party provides written notice of non-renewal to the other party at least one hundred and eighty (180) days before the end of the then current term.

2.2 Either party may terminate the Agreement for cause in the event of a material breach by the other party if such breach is not cured within forty-five (45) days of receipt of written notice.

2.3     To the extent necessary to implement the termination provisions of the Agreement, the parties hereby waive any right or obligation it may have under any applicable laws or regulations of any jurisdiction to request or obtain the approval, order, or decision of any court of law to terminate the Agreement.

3.0     Warranty.

Provider represents, warrants and covenants that:

(a)  All Deliverables will conform to Provider's published specifications and documentation and will be free from defects in design, materials and workmanship as set forth in Provider's Statement of Limited Warranty [for EMEA "Statement of Limited Commercial Guarantee"] shipped with the Deliverables ("Provider's End User Agreement");

(b) ████ ustomers will acquire good and marketable title to the Hardware, and all Hardware will be free and clear of all liens, claims, encumbrances and other restrictions;

**Global Third Party Supplier Agreement**                    ████ **Lexmark Confidential**

(c)  Provider will comply with all of its obligations contained in Provider's End User Agreement and Provider agrees to honor all replacement requests received from▇▇▇ or ▇▇▇ customers under the terms of Provider's End User Agreement pertaining to the Deliverable. Provider will be responsible for any representations, warranties or covenants Provider makes to▇▇▇ customers as well as compliance with Provider's published policies including but not limited to Provider's data destruction policies;

(d)  Provider has all the rights and licenses in the Deliverables necessary to allow▇▇▇o use, market, license, and/or resell such Deliverables without restriction or additional charge; and/or

(e)  Provider's entry into this Agreement and grant of rights under this Agreement do not breach any other Agreement to which Provider is a party or bound.

4.0  Indemnification.
4.1 Notwithstanding any potential rights of action that▇▇▇may have against a Distributor or other party involved in the manufacture, procurement or distribution of the Deliverables, Provider will defend, indemnify, and hold harmless▇▇▇nd their respective directors, officers, employees, representatives, agents, customers and distributors (collectively "Indemnitees") from and against any and all third-party claims, actions, demands, and legal proceedings (collectively "Claims") and all third-party liabilities, damages, losses, judgments, authorized settlements, fines, costs and expenses including, without limitation, reasonable legal support costs and expenses (collectively "Damages"), arising out of or in connection with: (a) any alleged or actual acts or omissions of Provider or failure to perform or comply with the terms and conditions of the Agreement; (b) any alleged or actual infringement or misappropriation by Provider and/or the Deliverables, either alone or in combination with other hardware or software (unless the combination was performed by or at the direction of▇▇▇nd there was no other commercially available alternatives to the subject Hardware that could have avoided the liability, in which case Lexmark shall have no indemnification obligation), of any copyright, patent, trademark, trade secret, moral rights or other proprietary or intellectual property right of any third party; (c) any Claim that Provider and/or the Deliverables provided under the Agreement have caused bodily injury including, without limitation, death or has damaged real or tangible personal property; (d) violation by Provider and/or the Deliverables of any governmental laws, rules, ordinances, or regulations; (e) any Claim by or on behalf of Provider's subcontractors, suppliers, or employees for salary, wages, benefits or other compensation that arises from this Agreement or the sale of Deliverables by Provider hereunder; (f) any breach of the terms and conditions of Information Privacy and Security Agreement and/or the NDA; (g) breach of any warranty set forth in the Agreement; and/or (h) any third party claims that the Deliverables or the Lexmark-provided maintenanceand support, arising from the Deliverables supplied by the Provider do not comply with or meet all of the requirements of applicable laws, regulations, ordinances or any local consumer code.

4.2  Providers obligations above shall apply even if the Claim and/or Damages are due, or alleged to be due, in part to any Indemnitee's concurrent negligence or other fault, breach of contract or warranty, or strict liability without regard to fault; provided, however, that Provider's contractual obligations shall apply only to the percentage of the third party claimant's Damages that are not attributable to the Indemnitee's negligence or fault.

4.3  In addition to Provider's obligations and liabilities above, if an infringement claim is made or appears likely to be made about the Deliverables, Provider shall, at Provider's option, either: procure for▇▇▇he right to continue to exercise its rights under the Agreement with respect to the applicable Deliverables; modify the Deliverables so that they are no longer infringing; or replace them with non-infringing Deliverables. If none of these alternatives is commercially reasonable and▇▇▇will not incur a negative, material impact to its business operations,▇▇▇shall cease its distribution of any affected Deliverables or return or destroy any affected Deliverables in its possession, for a full refund of the purchase price.

4.4 In Provider's indemnification obligation is conditioned on the following:▇▇▇will: (a) promptly notify Provider, (b) at Provider's expense, reasonably cooperate with Provider in the defense thereof, and (c) not settle any such Claims without Provider's consent which Provider agrees not to unreasonably withhold.  Provider will keep▇▇▇ informed at all times as to the status of Provider's efforts and consult with▇▇▇ (or▇▇▇counsel) concerning Provider's efforts; and Provider will not settle the claim without▇▇▇rior written consent, such consent not to be unreasonably withheld.

**Third Party Supplier Agreement**                    ▇▇▇Confidential                    *rev 05212012*

4.5. In the event of a recall or withdrawal of a Deliverable from the market (collectively, a "Recall Event"), Provider will defend, indemnify and hold harmless the Indemnitees as set forth above in this Section 4.0 for all Claims related to the Recall Event. In addition to paying all related Damages, Provider shall reimburse███ for: (a) all reasonable costs and expenses of notifying customers of said Recall Event; (b) all reasonable freight charges actually incurred by███ or paid by███ to its customers for retrieval of the Deliverables; and (c) all reasonable costs arising as a direct result of the Recall Event including costs of investigation. Provider will either replace the recalled Deliverables with conforming Deliverables free of charge, or in lieu of replacement,  at Provider's option, Provider may refund the purchase price of such Deliverables.

5.0  <u>Limitation of Liability</u>.

EXCEPT FOR PROVIDER'S AND ███OBLIGATIONS AND LIABILITIES UNDER SECTION 4.0 ("INDEMNIFICATION"), SECTION 8.0 (SUPPLIES OBLIGATIONS),   AND/OR PROVIDER'S AND ███ CONFIDENTIALITY/NON-DISCLOSURE OBLIGATIONS AND LIABILITIES INCLUDING WITHOUT LIMITATION, THOSE CONTAINED IN THE NDA, NEITHER PARTY WILL BE LIABLE FOR ANY  LOST PROFITS, INDIRECT, INCIDENTAL, SPECIAL, PUNITIVE OR CONSEQUENTIAL DAMAGES OF ANY TYPE INCLUDING, WITHOUT LIMITATION, LOST SALES, ARISING OUT OF OR IN CONNECTION WITH THE AGREEMENT EVEN IF ADVISED OR AWARE OF THE POSSIBILITY OF SUCH DAMAGES AND EVEN IF A PARTY ASSERTS OR ESTABLISHES A FAILURE OF THE ESSENTIAL PURPOSE OF ANY LIMITED REMEDY PROVIDED IN THIS AGREEMENT.

6.0     <u>Product Safety and Regulatory Compliance</u>

6.1     <u>Regulatory Compliance</u>.  Each Party shall comply with all applicable laws orders and regulations of any governmental authority with jurisdiction over that Party's activities in connection with this Agreement. ███reserves the right to require Provider to provide appropriate documentation verifying conformance of Provider's Hardware with applicable laws, regulations, rules, standards and ordinances. Provider and all Hardware shall comply with applicable laws, and applicable government regulations and all mandatory rules, ordinances or regulations.

6.2     <u>Product Safety</u>.  If either Provider or ███ becomes aware of information that reasonably supports a conclusion that a hazard may exist in any Deliverable that could cause death or bodily injury to any person or property damage (a "Hazard"), the party becoming aware of this information will promptly notify the other of the potential Hazard. Whenever possible, notification to the other party will precede notice to any governmental agency, unless otherwise required by law. Provider and ███ will promptly exchange all relevant data and then, if practical, promptly meet to review and discuss the information, tests, and conclusions relating to the alleged Hazard.  At this meeting the parties shall discuss the plan for any action, including without limitation any and all legal obligations of  the Parties pursuant to Section 15 of the United States Consumer Product Safety Act and/or similar requirements under the applicable laws of another country, and the origin or causation of the alleged Hazard.  Each Party shall, on request, provide to the other reasonable assistance in: (a) determining how best to deal with the Hazard; and (b) preparing for and making any presentation before any governmental agency which may have jurisdiction over Hazards involving Hardware. Should it be determined by either Party or governmental agency that a Hazard may exist in Hardware, Provider shall be responsible for all reasonable costs and expenses in repairing, replacing, or recalling any Hardware that contain or may contain such Hazard and shall indemnify ███ for any such costs, losses, damages and expenses reasonably incurred by ███ as a result of such a recall, as set forth in Section 4.5 of this Agreement. Relative to product safety data and information, Provider agrees to keep such data and information for at least five (5) years.

7.0  <u>Pricing</u>

Prices and rebates for Hardware are as set forth in Attachment 1 to this Agreement.

Price increase to published prices for Hardware (such as e.g. a best dealer price in the U.S.) is effective on the date specified.  Provider will announce a price increase a minimum of 30 days prior to the effective date of the increase, to the exception of the EMEA countries.  A price decrease is effective on the date specified and will

**CONFIDENTIAL - OUTSIDE COUNSEL OA3501**

apply to Hardware shipped on or after the effective date of the decrease.

The MSRP is Provider's suggested resale price and is subject to change without notice. This price is for information purposes only. Provider's and ███████ prices may vary.

8.0 Supplies Obligations

8.1     With regard to all Lexmark-branded printers acquired by ███████ hereunder, all cartridges and spare parts whether new or remanufactured for use on such printers will be purchased by ███ from Provider. ███ shall not promote, sell or offer to sell on its website any cartridges or spare parts that are compatible with Lexmark-branded printers.  In the event of a failure by ███ to comply with the obligations of this paragraph, Provider shall notify ███ of such failure and ███████ shall have thirty (30) days to cure.  If ███ fails to cure within thirty (30) days, then such failure by ███ shall not be considered a breach of this Agreement by ███ and as its sole remedy under this agreement for such failure by ███████ Lexmark shall be entitled to: (a) terminate this agreement; and/or (b) discontinue the Hardware discount and/or discontinue the payment of MDF.

8.2  The parties agree that for managed print services wherein ███ may purchase Provider-branded Deliverables directly or indirectly from Provider for sale to end users, a managed print services agreement will be established ("MPS Agreement(s)").  These MPS Agreements may have terms that conflict with the terms and conditions herein. Any MPS agreement subsequently entered into for the sale of Provider-branded Deliverables by ███ shall be incorporated as an attachment to this Agreement and labeled as an MPS Attachment.  The terms of this Agreement shall apply to the MPS Agreements, except to the extent where there is a conflict between the terms of this Agreement and the MPS Agreement terms, in which case the MPS Agreement terms will govern for that specific MPS opportunity.

8.3  Provider acknowledges that in some cases, ███ may need lower supplies pricing in order to compete in a MPS opportunity.  ███ agrees to provide Provider with information regarding the competitive nature of the toner pricing and in return, Provider will make a good faith effort to provide competitive toner pricing to avoid ███ having to consider a non-Provider remanufactured toner cartridge.

8.4  In the event that this Agreement terminates prior to the termination of an MPS Agreement, the applicable terms and conditions of this Agreement shall survive termination and continue to apply to the incorporated MPS Agreements.

9.0  General.

9.1  Except as expressly set forth below, Provider and ███ irrevocably submit and consent to the jurisdiction of the federal and state courts of the State of Texas, U.S.A. This Agreement will be governed by and construed in accordance with the laws of the State of Texas, exclusive of any provisions of the United Nations Convention on the International Sale of Goods and without regard to principles of conflicts of law.  In all cases, before either party initiates a lawsuit against the other relating to a dispute under this Agreement, the parties agree to work in good faith to resolve between them all disputes and claims arising out of or relating to this Agreement, the party's performance under it, or its breach. Either party may request, after informal discussions have failed to resolve a dispute or claim, that each party designate an officer or other management employee with authority to bind the party to meet in a good faith attempt to resolve the dispute. During their discussions, each party will honor the other's reasonable requests for information relating to the dispute or claim.

9.1.1  Canada.  If the dispute is solely between Provider and a ███ entity located in Canada, PROVIDER AND ███████ IRREVOCABLY SUBMIT AND CONSENT TO THE EXCLUSIVE JURISDICTION OF THE COURTS LOCATED IN TORONTO, ONTARIO AND HEREBY AGREE THAT SUCH COURTS SHALL BE THE EXCLUSIVE PROPER FORUM FOR THE DETERMINATION OF ANY DISPUTE ARISING IN CONNECTION WITH THE AGREEMENT. THE AGREEMENT WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE PROVINCE OF ONTARIO AND THE FEDERAL LAWS OF CANADA, EXCLUSIVE OF ANY PROVISIONS OF THE UNITED NATIONS CONVENTION ON THE INTERNATIONAL SALE OF GOODS AND WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.

CONFIDENTIAL - OUTSIDE COUNSEL OA3502

9.1.2   EU.  If the dispute is solely between Provider and a ▉ entity located in the EU region, PROVIDER AND ▉ IRREVOCABLY SUBMIT AND CONSENT TO THE EXCLUSIVE JURISDICTION OF THE ENGLISH COURTS, AND HEREBY AGREE THAT SUCH COURTS SHALL BE THE EXCLUSIVE PROPER FORUM FOR THE DETERMINATION OF ANY DISPUTE ARISING IN CONNECTION WITH THE AGREEMENT.  THE AGREEMENT WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH ENGLISH LAW, EXCLUSIVE OF ANY PROVISIONS OF THE UNITED NATIONS CONVENTION ON THE INTERNATIONAL SALE OF GOODS AND WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.  PROVIDER AGREES TO TAKE ALL ACTIONS NECESSARY IN ORDER TO COMPLY WITH APPLICABLE LAW, INCLUDING BUT NOT LIMITED TO WEEE LEGISLATION (AS REGULATED IN APPENDIX A TO THE AGREEMENT).

9.1.3   Brazil.  If the dispute is solely between Provider and a ▉ entity located in Brazil, PROVIDER AND ▉ IRREVOCABLY SUBMIT AND CONSENT TO THE EXCLUSIVE JURISDICTION OF THE COURTS IN PORTO ALEGRE, RS, BRAZIL. THE AGREEMENT WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF BRAZIL, EXCLUSIVE OF ANY PROVISIONS OF THE UNITED NATIONS CONVENTION ON THE INTERNATIONAL SALE OF GOODS AND WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.

9.1.4   Governing Law, Asia Pacific Region.  If the dispute is solely between Provider and a ▉ ntity located in Australia, Hong Kong, India, Indonesia, Japan, New Zealand, People's Republic of China, Republic of Korea, Taiwan, Malaysia, Pakistan, the Philippines, Singapore, Thailand or Vietnam and the parties are unable to settle the dispute within the thirty-day (30) period, then either party may submit the dispute to a Board of Arbitration under the arbitration rules of the Singapore International Arbitration Centre (the "Rules"). The arbitration will be conducted in the English language in Singapore, and the Board of Arbitration shall be composed of three arbitrators.  Notwithstanding the provisions of Section 7.9, any notice of arbitration, response or other communication given to or by a party to the arbitration must be given and deemed received as provided in the Rules.

Except as provided in this Section, none of the parties shall be entitled to commence or maintain any action in a court of law upon any matter in dispute arising from or in relation to this Agreement except for the enforcement of an arbitral award granted pursuant to this Section.

To the extent deemed applicable by any forum, each of the Parties hereby renounces its right to appeal from the decision of the Board of Arbitration.

The Parties expressly agree (i) that the decisions must be made based on majority votes of the arbitrators, (ii) that the Board of Arbitration must state the reasons for its decisions in writing and must make the decisions entirely on the basis of applicable laws and not on the basis of the principle of ex aequo et bono, and (iii) that the mandate of the Board of Arbitration duly constituted in this Agreement will remain in effect until a final arbitration award has been issued by the Board of Arbitration.

For purposes of this Section, this Agreement shall be governed by and construed in accordance with the laws of Singapore.

9.2   Regardless of the circumstances of termination or expiration of the Agreement, or portion thereof, the provisions of Sections 3 ("Warranty"), 4 ("Indemnification"), 5 ("Limitation of Liability"), 6.0 ("Product Safety and Regulatory Compliance"), Section 8.0 (Supplies Obligations) and Section 9 (General) will survive the termination or expiration of the Agreement and continue according to their terms. All licenses and sublicenses granted to customers and other licensees under this Agreement shall also survive and expiration or termination of this Agreement.

9.3 Any confidential information disclosed by either party related to this Agreement is governed by the terms and conditions of the Confidential Disclosure Agreement (#01111202) executed in November 2008 between ▉ nd Provider ("NDA").

9.4 Provider will not use the name of ▉ r an ▉ rademarks, trade names, or service marks; or quote the



**Third Party Supplier Agreement**                          ▉ Confidential                          *rev 05212012*

opinion of any ▇ employee in any advertising, presentations or otherwise without obtaining the prior written consent of ▇ Corporate Communications Department. ▇ may refer to itself under this Agreement as a Lexmark Authorized Dealer: 1) solely in connection with Hardware; and 2) only during the contract period. Except as provided for in this Section, Provider does not grant ▇ the right to use trademarks or trade names. Provider grants ▇ the limited permission to use the trademark "Lexmark" solely to identify the Hardware acquired from Distributors under the Agreement. At Provider's request, ▇ will provide to Provider, for review and written approval, representative samples of promotional, advertising and other materials that:

1) use a Lexmark trademark or trade name; or
2) refer to ▇ as a "Lexmark Authorized Dealer".

Provider will supply advertising guidelines in writing. At Provider's request and upon reasonable notice, ▇ agrees to change any materials or use of materials which Provider determines to be inaccurate, objectionable, misleading or a misuse of Provider trademarks and that had not been previously approved by Provider or were at the time published in compliance with Provider's advertising guidelines. ▇ will pay the expenses for such change. The permission granted relative to the Provider trademarks will terminate with the termination or expiration of this Agreement. In such event, for the affected Hardware, ▇ will promptly: 1) cease referring to itself as a "Lexmark Authorized Dealer"; 2) return to Provider or destroy all materials under ▇ control employing such trademarks. ▇ recognizes Provider's ownership and title to its trademarks and the goodwill attaching to them ▇ agrees not to use, employ or attempt to register any trademarks or trade names which are confusingly similar to Provider trademarks or trade names All goodwill generated by such marketing and distribution will inure exclusively to the benefit of Provider.

9.5 Insurance

9.5.1. Provider shall maintain Commercial General Liability insurance with limits, inclusive of umbrella liability insurance if necessary, of not less than $1,000,000 each occurrence for bodily injury and property damage liability, $2,000,000 general aggregate, and $2,000,000 products/completed operations aggregate. The commercial general liability insurance shall include but not be limited to coverage for premises/operations liability, products/completed operations, independent contractor's liability, and broad form and blanket contractual liability. This insurance shall be primary and non-contributory to any insurance or self-insurance maintained by ▇ with regard to the products and services provided by the Provider under this Agreement, and it shall add ▇ as an Additional Insured with regard to such products and services. This policy shall include a waiver of subrogation provision in favor of ▇ and either a cross-liability or severability of interest clause unless prohibited by local law.

9.5.2    To the extent Provider is based in or performing Services in the U.S., Provider shall maintain statutory workers' compensation insurance in the state(s) or jurisdiction(s) in which Provider's employees perform services for ▇ and employer's liability insurance with limits of not less than $500,000: (i) for each accident; and (ii) for each employee for occupational disease; or (iii) policy limit for disease. Provider hereby waives all claims and causes of action against ▇ its officers, directors and employees for any and all injuries suffered by Provider's employees. To the extent Provider is based or performing Services outside of the U.S., Provider shall maintain employers liability insurance with limits of not less than 10,000,000 GBP for the United Kingdom and Ireland and €500,000 for all other countries.

9.5.3    Limits shown are in United States ("U.S.") Dollars unless otherwise specified. If Provider obtains the required insurance coverage outside of the country(ies) or region(s) where the stated currency is applicable, insurance obtained in equivalent local currency shall meet the stated requirement

9.6 The parties are independent contractors and neither party is an employee, agent, servant, representative, partner, or joint venturer of the other or has any authority to assume or create any obligation or liability of any kind on behalf of the other.

9.7 No waiver of any term or condition is valid unless in writing and signed by authorized representatives of both parties, and will be limited to the specific situation for which it is given. No amendment or modification to the Agreement will be valid unless set forth in writing and signed by authorized representatives of both parties.   This

CONFIDENTIAL - OUTSIDE COUNSEL OA3504

Agreement may not be assigned by either Party in whole or in part, even by operation of law, in a merger, in a sale of the majority of the interests in the equity of a Party or in an asset sale, without the prior written consent of the other Party; provided, however, that (i) such consent shall not be required in connection with an assignment by a Party of all of such Party's rights and obligations under this Agreement to an affiliate of such Party who assumes all of such rights and obligations in writing and (x) the assignor shall give notice to the other Party promptly thereafter; and (ii) such consent shall not be required in connection with an assignment of all of a Party's rights and obligations under this Agreement to a third party who acquires substantially all of the assets or equity securities of such Party and who agrees in writing to assume such rights and obligations (provided that (x) the assignor shall give notice to the other Party promptly thereafter; and (z) such an assignment shall give the other Party the right to terminate this Agreement upon thirty (30) days written notice to the assigning Party). In addition, Provider may assign its accounts receivable under this Agreement to a third party financial institution for financing purposes only. Any attempt to assign this Agreement other than in accordance with this section shall be null and void.

9.8 Any notice required or permitted by the Agreement must be in writing in English and delivered by certified or registered mail, return receipt requested, postage prepaid and addressed as follows or to such other addresses as may be designated by notice from one party to the other, all such notices being effective on the date received: If to ██████████████████████████████████████ Attn: VP, General Procurement, cc: General Counsel; and, If to Provider:

Lexmark International, Inc.
740 New Circle Road NW
Lexington, Kentucky 40550
Attn: General Manager, WW PS&SD Alliances
Cc: General Counsel

Lexmark International Technology, S.A.
Immeuble ICC, 20 Route de Pre-Bois,
Case Postale 508, CH 1215
Geneva 15 Switzerland
Attn: President

If the notice is required under a schedule or addendum executed by a ██████ entity located in one of the following regions/countries, notice should also be provided to ████ at the address provided:



| Region/ Country | Address |
|---|---|
| Canada | |
| Asia Pacific/ Japan | |

**Third Party Supplier Agreement**

████ Confidential

*rev 05212012*

| Europe/ Middle East/ Africa | ███████████████████ | |

9.9 Whenever possible, each provision of this Agreement will be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement is found to violate a law, it will be severed from the rest of the Agreement and ignored and a new provision deemed added to the Agreement to accomplish, to the extent possible, the intent of the parties as evidenced by the provision so severed. The headings used in the Agreement have no legal effect.

9.10 Nothing in this Agreement requires ████ to purchase Deliverables from Provider or its Distributors any or all of its requirements for Deliverables that are the same or similar to the Deliverables provided hereunder. Provider will cooperate and work with ████ and any other providers that ████ may engage in connection with the provision of the Deliverables. ████ will have full freedom and flexibility in its decisions concerning the distribution and marketing of the Deliverables, or same or similar products purchased from third parties, including without limitation the decision of whether or not to distribute or discontinue distribution of the Deliverables. ████ does not guarantee that its marketing, if any, of the Deliverables will be successful. ████ may distribute and sell the Deliverables on a stand-alone basis or in conjunction with other offerings. Notwithstanding the foregoing ████ shall not make any warranties or representations on Provider's behalf without written authorization from Provider. Neither party will assume or create any obligations on the other's behalf unless authorized by the other party in writing. Nothing in this Agreement shall be interpreted to limit Provider's ability to market the same or similar products as Deliverables either directly or through other remarketers in the same geographic areas as ████

9.11 Except as may be otherwise provided in the Agreement, the rights or remedies of the parties hereunder are not exclusive, and either party is entitled alternatively or cumulatively, subject to the other provisions of the Agreement, to damages for breach, to an order requiring specific performance, or to any other remedy available at law or in equity.

9.12 This Agreement may be signed in original or facsimile counterparts, each of which will be deemed an original, but which together will constitute one and the same instrument. Provider will forward the original executed hard copy agreement to Dell once executed.

9.13    Notwithstanding Attachment 1 Provider represents and warrants that where Provider and ████ will agree in writing upon exceptional pricing for Deliverables (e.g., a special bid) Provider shall ensure that the prices for Deliverables that are provided to ████ Distributor will not be more than the price provided to ████ in the applicable RFQ or RFP ("████ Price"). Provider further agrees to immediately correct any pricing with ████ Distributor that is not the same as the ████ Price and shall immediately credit to ████ Distributor any difference between the ████ Price and the price at which Deliverables were supplied to ████ Distributor by Provider with specific instruction that such amount should be credited to ████ by the Distributor. Provider reserves the right to propose additional terms and conditions in the context of special bid business.

9.14 Provider agrees to maintain adequate books and records in connection with its activity under this Agreement for a minimum of five years (ten years with respect to Schedules executed by a ████ entity located in the Asia Pacific/Japan region and the EU region) or the period prescribed by applicable law or regulation if longer. If there is reasonable cause, and in any event no more frequently than once per calendar year unless required by a ████ customer, ████ may elect to utilize a third party to audit, at ████ expense, all relevant books and records of Provider to confirm compliance with the terms of this Agreement. Any such audit will be conducted during regular business hours at Provider's offices and will not interfere unreasonably with Provider's business activities. If an audit reveals that Provider has overcharged ████ Distributor, and ████ Distributor has passed the overcharge to ████ then Provider will credit to ████ the overcharged amount. If an audit reveals that the overcharge was greater than 5% of what ████ Distributors should have been charged, and ████ Distributor has passed the overcharge to ████ then Provider shall also pay to ████ its reasonable costs for conducting the audit.

**CONFIDENTIAL - OUTSIDE COUNSEL O A3506**

9.17     Statutory References:  Reference to any statute or statutory provision is, except where stated otherwise, to a statute or statutory provision under the governing law that applies.  Such reference includes any consolidation or re-enactment, modification or replacement of the same, any statute or statutory provision of which it is a consolidation, re-enactment, modification or replacement and any subordinate legislation in force under any of the same from time to time.

9.18 The Agreement merges and supersedes all prior or contemporaneous understandings, agreements, negotiations and discussions, whether oral or written, between the parties concerning this subject matter and constitutes the entire agreement between the parties with regard to this subject matter.  The parties have not relied upon any promises, representations, warranties, agreements, covenants or undertakings, other than those expressly incorporated or set forth in this Agreement.

By signing below, the parties are agreeing to the terms and conditions contained in this Third Party Supplier Agreement.

Title: _____

Date: _____ *August 21 / 2012* _____

**LEXMARK INTERNATIONAL, INC.**

By: _____

Printed Name: _____ *F.T. SAMUEL JR* _____

Title: _____ *VP, WW OEM & ALLIANCES* _____

Date: _____ *27 JULY, 2012* _____

**LEXMARK INTERNATIONAL TECHNOLOGY, S.A.**

By: _____ *P. Dullaghan* _____

Printed Name: _____ *PAUL DULLAGHAN* _____

Title: _____ *MANAGING DIRECTOR* _____

Date: _____ *09 AUGUST 2012* _____

**Third Party Supplier Agreement**    ███ **Confidential**    *rev 05212012*

**CONFIDENTIAL - OUTSIDE COUNSEL O A3507**

Third Party Supplier Agreement Confidential                    *rev 05212012*

CONFIDENTIAL - OUTSIDE COUNSEL O A3508

## APPENDIX A- PROVIDER'S STATUTORY RESPONSIBILITIES

The following terms and conditions shall apply where a Lexmark subsidiary or a Lexmark authorized Distributor registered in a EU member state act as importer of record for the goods sold to ▉ in a EU member state. In case ▉ r a ▉ subsidiary would act as importer of record, the parties will mutually agree on different processes and communication in order to ensure compliance with the WEEE Legislation.

1.    In relation to Hardware supplied under this Agreement and at its sole expense Provider shall, unless otherwise released from this warranty (in whole or in part) by ▉

Carry out, or (as the parties agree) procure the performance by an approved third party ("Contractor") of all processes required to ensure compliance with the WEEE Legislation.

Register with the relevant authority as a producer/ importer in any EU country where placing Hardware, falling within the scope of the WEEE Legislation, onto the market for the first time and demonstrate to ▉ promptly on request, proof of its:
(a) WEEE registration number,
(b) WEEE statutory returns,
(c) End of life take-back programs and, if a reseller,
(d) Product line WEEE marking compliance audit programs.

Finance the cost of collection, treatment, recovery and environmentally sound disposal of WEEE in accordance with its individual producer obligations as determined by the relevant administrative authority;

meet all obligations relating to reporting collection, treatment, recovery of WEEE and other required annual data and provision of evidence relating to treatment of WEEE to the relevant authority and in accordance with its individual producer obligations as determined by the relevant administrative authority;

ensure Hardware is appropriately marked and that information relating to treatment and an explanation of such marking is included in product user guides and tech sheets and a web link is provided where the Provider will provide information in relation to treatment for the individual countries where the Hardware will be sold, in accordance with the Legislation in order to assist parties engaged in treatment, recovery and recycling of WEEE;

Meet all other responsibilities introduced by legislation (including the WEEE Legislation), codes of practice or other formal guidance (of any nature whether national or European, primary or secondary) from time to time;

Comply and ensure, when relevant, compliance by its suppliers with all applicable laws, rules, ordinances or regulations, including, but not limited to:
(a) any applicable industry safety standards, and
(b) any applicable product environmental energy regulations; and

complete any declarations or tests in relation to hazardous substances a ▉ may require at such times and in such manner as ▉ ay designate from time to time.

2.    In the event that Provider procures performance of its obligations by a third party ("Contractor"), the identity of such Contractor shall be agreed in advance by the parties and any agreement entered into between Provider and Contractor shall be subject to prior review and approval by ▉ shall be provided with copies of all documentation, correspondence and other information that is made available to Provider under the terms of the Contractor promptly upon receipt of the same by Provider.

3.    ▉ shall assist Provider in its fulfillment of Provider's obligations under this clause as reasonably required by Provider and at Provider's sole expense; however ultimate responsibility shall remain with Provider.

4.    Provider shall review either (a) its own performance or (b) the performance by a Contractor on a quarterly basis and provide a performance report to ▉ setting out the parameters and results of such review. Provider shall notify ▉ mmediately in the event of non-compliance and ▉ shall give all reasonable assistance to

**Third Party Supplier Agreement**                    ▉onfidential                    *rev 05212012*

Provider to remedy non-compliance at Provider's sole cost.

Third Party Supplier Agreement          ████Confidential                    *rev 05212012*

CONFIDENTIAL - OUTSIDE COUNSEL OA3510

**Attachment 1 to Global Third Party Supplier Agreement**

I.    **Pricing of Provider-Branded Hardware in the U.S. , Canada, and APJ**

1. As long as the terms of this Agreement remain in force (i.e., Agreement has not expired or terminated), Provider will price all Provider-branded laser and inkjet printers and multifunction devices for resale b██████to End Users in the United States, Canada, and APJ at published ████████████████ (with the discounts described below). Provider-branded supplies will be priced for resale to End-Users in the United States, Canada, and APJ at published ██████████████████████ reflects the purchase price of a Distributor when buying from Provider or its affiliate in connection with the sale of Hardware and does not include the Distributors' mark-up. Distributor markups shall be negotiated, agreed upon and satisfied by █████ and the Distributor. The right of █████ nd the Distributor to renegotiate prices or any other terms and conditions of their transactions shall remain unaffected by this Attachment 1.

2. In the U.S., Canada, and APJ ██████ will receive a sixteen percent ████████ discount off of the ██████████ ████ or Provider-branded laser printers and laser multifunction devices, and those Provider-branded inkjet printers and inkjet multifunction devices having a MSRP greater than █████████ The discount will be provided either directly from Provider, or indirectly through Provider's Distributor. Discounts provided under this Agreement will not be stackable with any other Provider discounts or rebates.

3. In the U.S., Canada, and APJ ██████ will receive an additional ████████ MDF allowance for Provider-branded laser printers and laser multifunction devices and will abide by the same process as █████ branded MDF in accordance with the terms of Schedule E, Section 5.1 of the 2008 Master Purchase Agreement, provided marketing programs have been mutually agreed by the parties and █████ has provided proof of execution of those programs. Schedule E, Section 5.1.1, of the 2008 Master Purchase Agreement shall not apply to Provider-branded Hardware.

4. Future unannounced products whose cost structure prohibits the full discounts represented above shall be identified and disclosed to █████ before product announcement and a distinct pricing structure will apply.

5. ███████████ re F.O.B. Distributor location, unless Provider specifies otherwise.


II.   **EMEA Specific Pricing Terms**

1. This Attachment 1 provides common pricing terms and conditions for the sale of Deliverables and supplies distributed by PROVIDER in EMEA t█████ n EMEA. PROVIDER intends to sell the Deliverables and supplies through local affiliates (where applicable) to a network of authorized Distributors. Provider or its local affiliate publishes ████████████████ in the countries listed in Exhibit A for Provider branded hardware, and ██████████ for Provider branded supplies. A ████████████████ or a ████████████████ is the price Provider or its local affiliate grants to first level of distribution for respectively Provider-branded hardware and Provider-branded supplies. The ████████████████ and the ████████████████ reflect the purchase price of a Distributor when buying from Provider or its local affiliate in connection with the sale of hardware products and supplies and does not include the Distributors' mark-up. Any mark-up shall be negotiated, agreed upon and paid by █████ o the Distributor. The right of █████ and the Distributor to negotiate prices or any other terms and conditions shall remain unaffected.

██████onfidential

CONFIDENTIAL - OUTSIDE COUNSEL OA3511

2.  In EMEA ██ will receive a ████ MDF allowance for Provider-branded laser printers and laser multifunction devices and will abide by the same process as ██ branded MDF in accordance with the terms of Schedule E, Section 5.1 of the 2008 Master Purchase Agreement, provided marketing programs have been mutually agreed by the parties and ███ as provided proof of execution of those programs.  Schedule E, Section 5.1.1, of the 2008 Master Purchase Agreement shall not apply to Provider-branded Hardware.

3.  Each EMEA ██ country affiliate shall claim such MDF amounts to the Provider affiliate in the considered country.  Future generation products whose cost structure does not allow the same discount as defined above shall be identified and disclosed t ██ before product announcement. In such case ██ and Provider shall agree to a separate pricing structure for such products.

4.  Any prices communicated by Provider or its local affiliates to ███ including but not limited to ██████ shall be net prices and shall not include statutory value-added taxes or statutory fees provided for by local Copyright Acts (copyright fees) nor duties, freight or any other type of local taxes. From time to time ██ may qualify for tax exemptions, in which case ██ will provide Provider a certificate of exemption or other appropriate documentary proof of exemption.



CONFIDENTIAL - OUTSIDE COUNSEL OA3512

OEM CONTRACT 2

OEM Development and Purchase Agreement

## OEM PURCHASE AND DEVELOPMENT AGREEMENT

Contract #: _____

Effective Date: June 1, 2009

This OEM Purchase and Development Agreement ("This Agreement") is entered into by and between, as referenced below, ▇▇▇▇▇▇▇▇▇▇▇▇ on behalf of itself and its Affiliates, as purchaser ("▇▇▇▇▇ hereinafter), and Lexmark International, Inc., Lexmark International (China) Ltd., Lexmark Printer (Shenzhen) Co. Ltd., and Lexmark International (Australia) Pty Ltd. as sellers, on behalf of themselves respectively and their respective Affiliates (collectively **"Lexmark"** hereinafter).

The followings are attached hereto and incorporated herein by reference:

| | |
|---|---|
| 1 | **Cover Page/Terms and Conditions** |
| 2 | **Exhibit A Business Terms** |
| 3 | **Exhibit B Product Specification** |
| 4 | **Exhibit C Software License Agreement** |
| 5 | **Exhibit D Support Service** |
| 6 | **Exhibit E Marketing Commitment** |
| 7 | **Exhibit F Product Acceptance Criteria** |
| 8 | **Exhibit G Reserved** |
| 9 | **Exhibit H Development of Product** |

CONFIDENTIAL - OUTSIDE COUNSEL OA3513

OEM Development and Purchase Agreement

By signing below for our companies, each of us agrees to the terms of this Agreement. When signed, (1) both parties agree any reproduction of the Agreement made by reliable means (for example, photocopy or facsimile) is considered an original and (2) all products, services are subject to it.

| Agreed to: | Agreed to: |
|---|---|
| ▮▮▮▮▮ | **Lexmark International, Inc.** |
| Signature: ▮▮▮▮▮ | Signature: |
| Printed Name: ▮▮▮▮▮ | Printed Name: ~~Terry Samuel~~  F.T. SAMUEL JR |
| Title: CPO | Title: VP & GM, Worldwide OEM & Alliances |
| Date: | Date: |
| Contact Person: ▮▮▮ | Contact Person: Jared K. Bryan |
| Tel.: ▮▮▮ | Tel.: +1-859-232-6742 |
| Fax: | Fax: +1-859-232-5009 |
| Address: ▮▮▮▮▮ | Address: 740 New Circle Road NW Lexington, KY 40550 USA |
| Agreed to: | Agreed to: |
| **Lexmark International (China) Ltd** | **Lexmark International (Australia) Pty Ltd** |
| Signature: | Signature: |
| Printed Name: Bo King Wu | Printed Name: Alexander Kitchin |
| Title: Director | Title: Director |
| Date: | Date: |
| Contact Person: Jared K. Bryan | Contact Person: Jared K. Bryan |
| Tel.: +1-859-232-6742 | Tel.: +1-859-232-6742 |
| Fax: +1-859-232-5009 | Fax: +1-859-232-5009 |
| Address: Unit A, 24/F, Manulife Tower, 169 Electric Road, North Point, Hong Kong | Address: 13b Narabang Way, Belrose NSW 2085, Australia |
| Agreed to: | |
| **Lexmark Printer (Shenzhen) Co. Ltd.** | |
| Signature: | |
| Printed Name: R.L. Bandy | |
| Title: Legal Representative | |
| Date: | |
| Contact Person: Jared K. Bryan | |
| Tel.: +1-859-232-6742 | |
| Fax: +1-859-232-5009 | |
| Address: South Zone, Block 1, Dragon Town, Industrial Park, Longgang Town, Shenzhen, Guangdong 518172 P.R.China | |

Confidential

CONFIDENTIAL - OUTSIDE COUNSEL OA3514

OEM Development and Purchase Agreement

<div align="center">

**Term and Conditions**

</div>

**RECITALS**

**WHEREAS,** Lexmark manufactures and sells or licenses certain hardware and software products;

**WHEREAS,** ████████ s manufacturer of computer related hardware and software products;

**WHEREAS,** ████████ now desires to have the option to purchase, and Lexmark desires to grant ████████ he option to purchase, the Product(s), as defined below, from Lexmark on the terms and subject to the conditions set forth in this Agreement.

**NOW, THEREFORE,** in consideration of the mutual promises contained herein the parties agree as follows:

**TERMS AND CONDITIONS**

**1    DEFINITIONS**

**1.1** "**Affiliate**" means any person, company or entity that directly controls or is directly or indirectly controlled by, or is under common control with one of the parties. The term "control" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of management of company or entity in question whether through the ownership or voting shares, by contract, or otherwise.

**1.2** "**Epidemic Failure**" means Products or Services that experience one or more of the following: (a) the same or similar defect at a rate of five percent (5%) or more (unless a different rate is specified in Exhibit D) in any thirty (30) day period; (b) the same or similar defect at a rate of five percent (5%) or more of the total Product purchased under this Agreement; (c) one or more safety concerns created by the Products or Services;

**1.3** "**Non-Binding Forecasts**" means the minimum shipment numbers listed in Exhibit A and used in conjunction with procedures outlined in exhibit A.

**1.4** "**Product(s)**" means the products set forth in Exhibit A attached hereto. Product(s) shall include any updates to or enhancements of the Product(s) as well as any product introduced by Lexmark during the term of this Agreement, which is a new version of, or functional replacement for (regardless of price or performance) any Product.

**1.5** "**Specifications**" means specifications and other requirements for the Product(s) as set forth in Exhibit B attached hereto and other part of this Agreement.

**1.6** "████████ means ████████ and all its present and future subsidiaries and affiliated companies. In exchange for Lexmark's agreement to sell Products to ████████ hereby undertakes to guarantee unconditionally that ████████ performance with respect to such purchases of Product shall in all respects conform to all obligation o ████████ as purchaser under this Agreement.    To the extent that ████████ does not conform to the terms and conditions of this Agreement with respect to the purchase of Products, ████████ shall perform said obligations and hold Lexmark harmless against any loss or liability arising from or related to such purchases by ████████ provided that ████████ will not be liable for any duties or taxes relating to said transactions except as provided for in Section 5.2 of this Agreement.

**1.7** "**Lead Time**" means the period of time between the actual ordering of Product(s) and Spare Parts and the delivery of the same.

**1.8** ████████**Trademarks**" means any and all trademarks, trade names, logos, designs, trade dress and other markings and identification used or held by ████████

**1.9** "**Unique Component**" means a component that is sold by Lexmark exclusively to ████████ on behalf of ████████ or is only included in a Product which is exclusively sold to ████████ n behalf of ████████ A Unique Component is one which Lexmark has purchased exclusively for resale to ████████ on behalf of ████████ whether individually or as part of a Product) and is not purchased by any of Lexmark's other customers.

**1.10** "**Software Programs**" shall mean computer-programming code in machine-readable form provided to ████████ by Lexmark for use with the Products provided by Lexmark under this Agreement.    Software also includes any pictorial, graphic, or audiovisual works generated by execution of the code and any programming interfaces, languages or protocols implemented in the code form.

**1.11** "**Services**" means work which Lexmark performs under this Agreement.

**1.12** "**Work In Progress**" means Product(s) which has started manufacture at Lexmark or Lexmark's subcontractor(s) but is not yet shipped to ████████ or held in Safety Stock

**1.13** "**Replenishment Cycle Time**" means the time from arrival of all materials at Lexmark or Lexmark's manufacturer, to completion of fully packaged product on Lexmark's shipping dock ready for shipment t ████████

---

Final December 10, 2009

<div align="center">

Confidential

</div>

**CONFIDENTIAL - OUTSIDE COUNSEL O A3515**

OEM Development and Purchase Agreement

**1.14** ████████ **Unique Material**" means the components listed in Exhibit A (if needed) which are not used on Lexmark products and are used to build the Product(s) to ████ Specifications.

**1.15 "Spare Parts"** means replacement parts for the Product defined in this Agreement. A list of Spare Parts will be supplied by Lexmark for each printer product.

**1.16 "Lexmark Genuine Service Parts"** means genuine Lexmark Spare Parts purchased from Lexmark used to repair or provide preventative maintenance on Lexmark printer products provided by Lexmark to ████ under this Agreement. "Used", "Tear Down", "Remanufactured" or "Third Party/Clone" parts are not considered to be "Lexmark Genuine Service Parts."

**1.17 "Supplies"** means toner cartridges, Imaging kits, etc.

## 2 PURCHASE OF PRODUCTS; SOFTWARE LICENSE; SUPPORT SERVICES

2.1    **PURCHASE OF PRODUCTS.** Lexmark agrees to sell the Product(s) to ████ and to accept purchase orders for the Product(s) from ████ under the terms and conditions of this Agreement. Except for unused Unique Components and Purchase Orders issued by ████ it is expressly understood that ██████ has no obligation to purchase any Product(s) hereunder. Further, nothing in this Agreement shall prevent ████ from manufacturing or procuring from other sources like or comparable products.

2.2    **SOFTWARE LICENSE.** Software licensing terms are set forth in Exhibit C.

2.3    **SUPPORT SERVICES.** Training and support services for the Product(s) shall be provided as set forth in Exhibit D.

2.4    **TRADEMARK RIGHTS.** ████ requests and Lexmark agrees to provide certain markings and identification, which includes the trademark(s) and/or trade name of ████ on the Product(s) ordered by and delivered to ████ Such markings and identification shall be strictly in accordance with the requirements of ████ as set forth in ████ Trademark Guidelines or other similar documents, as provided to Lexmark and as may be updated from time to time by ████ Lexmark is not authorized to use the trademark(s) and trade-names of ████ on any products, other than Product(s) ordered by and delivered to ████ or for any other purpose. Lexmark is hereby granted a limited trademark license with respect to the ████ trademarks set out in the above-mentioned markings and identification, solely for the above-mentioned use. All other use is prohibited. This license shall terminate on the termination of this Agreement. Lexmark shall obtain no rights to or interest of any kind in any ████ trademarks or trade-names other than the limited right to use set out above.

2.5    **OWNERSHIP OF PRODUCTS DEVELOPED UNDER THIS AGREEMENT.** To the extent the parties decide to undertake development of unique products at the request of ████ under the Agreement, the parties will confirm the ownership of intellectual property rights of such works in a separate written agreement specific for such works prior to the development of such works. Any such writing shall become a part of and be incorporated by reference into this Agreement.

## 3 ORDER FORECAST

3.1    **FORECASTS.** No later than the third to last work day of each month ████ will provide to Lexmark a six (6) month worldwide rolling monthly forecast of its anticipated requirements for Printers, Options and Supplies (reference sample forecast form in Exhibit A). The forecasts provided by ████ will be by part number for each major country or geography, and shall be used by Lexmark for planning purposes only. Further, Lexmark shall view all Order Forecasts as Confidential Information in accordance with Section 18 below.

## 4 PURCHASE ORDERS

4.1    **LEAD-TIME.** Standard shipment schedule for Lexmark's current production model is within sixty (60) days after the receipt date of ████ Purchase Order. Lexmark will notify ████ immediately upon any changes in lead-time and will get ████ written approval prior to any change of the lead time. Notwithstanding the foregoing, if ████ does not reply in writing to Lexmark within three (3) Business Day, such changes in lead-time shall be deemed accepted without need for Lexmark to receive a written approval from ████

4.2    **PURCHASE ORDERS.** Purchases shall be initiated by ████ facsimile or electronically dispatched purchase orders referencing the quantity, the Product(s) description and ████ Part Number, , the Lexmark Part Number (which will not be shown in Part Number column), Ship-to Address, applicable price, ████ Purchase Order Number, shipping instructions and requested in-house delivery dates. All purchase orders for Product(s) placed by ████ hereunder shall be governed by the terms and conditions of this Agreement.

4.3    **ORDER ACKNOWLEDGEMENT.** Lexmark shall acknowledge receipt of a purchase order by e-mail or facsimile within one (1) business day of receipt. Lexmark shall confirm acceptance or denial (stating the reason(s) for a denial) of a purchase order by e-mail or facsimile within three (3) business day after receipt,

CONFIDENTIAL - OUTSIDE COUNSEL OA3516

OEM Development and Purchase Agreement

or the purchase order is deemed accepted.

4.4 **CHANGE ORDERS.** ▮ shall transmit change orders to a purchase order by e-mail or facsimile. Lexmark shall acknowledge receipt of a change order by e-mail or facsimile within one (1) business day of receipt. Lexmark shall confirm acceptance or denial (stating reason(s) for a denial) as soon as possible. If Lexmark does not accept or deny a Change Order within three (3) business days of receipt, the change order is deemed accepted.

4.5 **CANCELLATION.**

4.5.1 ▮ may cancel any purchase order up to thirty (30) days prior to ship date necessary to meet the original requested delivery date upon written notice to Lexmark with liability for such cancellation limited to the value of Work In Progress and Unique Components only. Rescheduled orders may not be cancelled.

4.5.2 In the event ▮ terminates this Agreement; or (ii) notifies Lexmark in writing that ▮ will not any longer purchase a particular Product(s) ("Terminated Product(s)"), then ▮ shall be liable to Lexmark up to a maximum amount equal to the cost of any applicable Unique Components, whether in the form of raw materials or Work In Progress, in Lexmark's inventory or on order as of the effective date of such termination or notification, less any such Unique Components in Lexmark's inventory or on order which are in excess of the Order Forecast based on Lexmark's Replenishment Cycle Time and the Unique Components Lead Time, set forth in Exhibit A.

4.5.3 Lexmark agrees to minimize ▮ liability hereunder by utilizing the Order Forecast to proactively adjust Lexmark's inventory and production schedules and to reschedule and/or cancel future deliveries of Unique Components on a monthly basis. Prior to ▮ payment of any sums hereunder, Lexmark will use its best efforts to cancel any outstanding orders for Unique Components and return any Unique Components to Lexmark's suppliers or sell or otherwise dispose of any Unique Components and otherwise to mitigate its costs and losses, for which ▮ may be liable. To the extent Lexmark is unsuccessful, Lexmark shall work with ▮ to negotiate termination liability damages based upon Lexmark's good faith adherence to this Section 4.5 and Lexmark's purchase, disposal and handling of Unique Components. In no event will ▮ be liable for any purchases of Unique Components by Lexmark in excess of applicable Order Forecast based on Lexmark's Replenishment Cycle Time and Unique Component Lead Time.

4.6 **RESCHEDULING.** ▮ shall be entitled to reschedule delivery of Product(s) at any time up to a maximum of thirty (30) days from original delivery date. Lexmark shall accommodate a request to expedite the ship date, if reasonably able to do so. Subject to Section 6.6, Lexmark may ship before the scheduled shipment date, but not to arrive earlier than ▮ requested delivery date.

## 5 PRICING; TAXES

5.1 **PRICES.** The prices charged by Lexmark for the Product(s) shall be those set forth as Exhibit A. All prices are based on the trade terms defined in Exhibit A. The trade terms shall be governed and construed under and by Incoterms 2000. ▮ shall pay for all agreed upon tooling cost and Non-Recurring Expenses (NRE).

5.2 **TAXES AND DUTIES.** For all appointed territories listed in Exhibit A ▮ will be responsible for all taxes, including but not limited to sales and use tax, customs and excise duties, turnover or withholding taxes, Value Added Tax, property tax, corporate, state or local income tax associated with the purchase and delivery of the Products, except for those taxes assessed on the income of Lexmark which shall be Lexmark's responsibility. ▮ shall be exclusively responsible for all statutory fees provided for by local Copyright Acts (copyright levies). ▮ shall indemnify and hold harmless Lexmark and its affiliates from and against any and all claims for the payment of copyright levies and/or for the disclosure of information made by any third parties (including, without limitation, any collection societies) in any country. The foregoing shall apply even, and in particular, if Lexmark or any of its affiliates are liable -- or jointly liable with ▮ for copyright levies under the statutes applicable in any country. All prices quoted by Lexmark will not include any tax and/or copyright levies unless otherwise stated by Lexmark. If applicable law requires ▮ to withhold any taxes levied by the proper Governmental Body or Governmental Authorization on payments to be made pursuant to this Agreement ("Withholding Tax"), ▮ shall be entitled to withhold such Withholding Tax; provided that ▮ shall in every event be obligated to pay Lexmark the agreed Product price.

5.3 **MOST FAVORED PURCHASER.** For purposes of this section, "Comparable Customer" is defined as a customer that: (i) has signed an agreement with Lexmark with terms and conditions substantially the same as this agreement; (ii) has purchased similar products, under equivalent terms, conditions, and quantities. Lexmark will evaluate its OEM customers on each anniversary date of the applicable agreement to determine if any its customer qualifies as a Comparable Customer. If Lexmark has sold Product(s) listed

CONFIDENTIAL - OUTSIDE COUNSEL OA3517

in Exhibit A or other substantially the same product(s) to a Comparable Customer at prices more favorable than those listed in Exhibit A, then the prices in Exhibit A will be adjusted to these more favorable prices for all purchase orders issued by ▉▉▉ subsequent to the Evaluation Period. If in a subsequent Evaluation Period it is determined that no Lexmark's customer qualifies as a Comparable Customer, then the original pricing in Exhibit A will be reinstated.

**6    DELIVERY TERMS**

6.1    **Delivery Point**. Risk of loss shall pass to ▉▉▉ in accordance with the Trade Term specified in Exhibit A. Title shall pass to ▉▉▉ upon Supplier's tender of delivery to the common carrier or ▉▉▉ or ▉▉▉ designee at the Delivery Point as specified in Exhibit A.

6.2    **Shipping**.    Lexmark may ship partial orders provided Lexmark notifies ▉▉▉ and ▉▉▉ agrees prior to shipment. When ▉▉▉ is responsible for shipment, ▉▉▉ purchase order shall specify the carrier or means of transportation or routing, and Lexmark will comply with ▉▉▉ instructions. If ▉▉▉ fails to provide shipping instructions, Lexmark shall select the best available carrier, on a commercially reasonable basis.

6.3    **Packing Instructions**. All Product(s) and Spare Parts shall be packaged and prepared for shipment in a manner which: (i) follows the requirements set forth in Exhibit B and ▉▉▉ purchase order; (ii) follows good commercial practice; (iii) is acceptable to common carriers for shipment; and (iv) is adequate to ensure safe arrival. Lexmark shall mark the outside of each shrink wrapped pallet of Product(s) with the applicable ▉▉▉ part numbers and any necessary lifting and handling information. Each shipment of Product(s) shall be accompanied by a packing slip which will include ▉▉▉ part numbers, purchase order number, Lexmark's part number and the quantity shipped.

6.4    **Responsibility for Export Licensing**.    Subject to the terms of this Agreement, Lexmark will be responsible for obtaining the appropriate licenses or permits necessary to export Product(s) from the country of origin. If necessary, ▉▉▉ shall furnish Lexmark with the information necessary for Lexmark to timely obtain all required export and import documentation.

6.5    **Delivery Schedule**.    Delivery shall be pursuant to the schedule agreed by both Parties so long as it is no sooner than the standard lead-time contained in this agreement, unless agreed to in writing in advance by Lexmark. Lexmark shall make a good faith effort to meet agreed to delivery schedules, and will immediately notify ▉▉▉ in writing of any anticipated delay in meeting the delivery schedule, stating the reasons for the delay. If Lexmark's delivery fails to meet the committed delivery schedule, then Lexmark, upon ▉▉▉ request, shall expedite the routing at Lexmark's expense.    In the event Lexmark's delivery fails to meet the schedule in excess of twenty (20) days, then ▉▉▉ at its sole option and without penalty or any additional expense, may: (i) require Lexmark to expedite the routing by the fastest available commercial carrier; (ii) reschedule the delivery; or (iii) cancel the delivery in whole or in part; provided that ▉▉▉ right to cancel a delivery in whole or part under clause 6.5(iii) is conditioned upon the following:

(a) Lexmark has accepted ▉▉▉ PO in accordance with Section 4.3;

(b) The late delivery does not result from a quality hold (i.e., the late delivery results from causes including but not limited to production capacity issues or component shortages);

(c) In the event a quality hold is in effect at the time ▉▉▉ issues a PO, Lexmark will advise ▉▉▉ of the hold and discuss scheduling of the delivery or revocation of the PO

(d) In the event quality hold comes into effect after delivery has been scheduled, but before the delivery is 20 days late, Lexmark will advise ▉▉▉ of the status of the hold and any effect on delivery schedules.

For the avoidance of doubt, for any late delivery resulting from a quality hold ▉▉▉ shall make commercially reasonable efforts to reschedule such PO, provided however, if the delivery is more than 20 days late, ▉▉▉ is still entitled to cancel such PO in whole or in part, up to the extent the ultimate customer(s) has cancelled a relevant order with ▉▉▉ ▉▉▉ will also provide evidence of the customer's cancellation to Lexmark.

6.6    **Early Delivery**.    Lexmark shall not deliver any Product(s) earlier than three (3) business days prior to the scheduled delivery date, without ▉▉▉ written consent, and ▉▉▉ may return early or excess shipments to Lexmark at Lexmark's sole risk and expense.

6.7    **Country/Territory of Manufacturer**.    Lexmark represents and warrants that the Product(s) are manufactured in the Country(ies) or Territory(ies) as set forth in relevant Exhibit. Lexmark shall promptly advise ▉▉▉ at least ninety (90) days prior to a change in country of manufacture or any addition to manufacturing locations.

6.8    **Manufacturing Changes**.    In the event Lexmark changes its supplier for Products, and/or components of

CONFIDENTIAL - OUTSIDE COUNSEL OA3518

OEM Development and Purchase Agreement

Products, or in the event that material changes in Lexmark's agreement(s) with its existing supplier for such necessitate changes to the forecasting or other terms of this Agreement, Lexmark shall give ████ 60 days prior written notice of such changes. In the event ████ cannot agree to such changes, then the parties acknowledge and agree that either party shall be entitled to terminate this Agreement on 60 days advance written notice. Concurrent with termination notice Lexmark agrees to provide ████ with a "Last Time Buy" opportunity to meet its anticipated Product needs. The "Last Time Buy" order must be received by Lexmark within ten (10) working days of written notice of Agreement termination. Termination of the agreement under above circumstance shall not relieve Lexmark from any liabilities or obligations which have been incurred to Lexmark with respect to those Products provided from Lexmark to ████ before such termination.

**7    INVOICING AND PAYMENT**

7.1    Lexmark will issue invoices on the date of shipment of Product(s) and Spare Parts. Subject to acceptance of the Product(s) as provided in Section 8, ████ will make payment via electronic transfer within TT45 days weekly payment terms, measured from the date for said invoice. Lexmark reserves the right to withhold shipping if ████ account is delinquent. Payment shall not constitute acceptance of the Product(s) by ████ All payments hereunder shall be in US Dollars except otherwise set forth in Exhibit A.

**8    QUALITY ACCEPTANCE**

8.1    **At ████ Facility**. All Product(s) are subject to ████ inspection and test at ████ facility. Within thirty (30) days after receipt of Product(s) according to the criteria as defined in relevant Exhibit at ████ facility, ████ shall inspect the Product(s). Product(s) will be presumed accepted upon shipment unless ████ rejects in writing any such product within the same timeframe as a result of any Product(s) delivered hereunder (i) failing to conform to the Specifications set forth in Exhibit B   or (ii) with ████ relevant testing and acceptance criteria set forth in Exhibit F. Any return of such defective Product(s) are subject to the Return Material Authorization ("RMA") procedures set forth in Exhibit D. Lexmark shall deliver to ████ conforming Product(s) within a period as set forth in Exhibit D. If Lexmark fails to deliver conforming Product(s) within such period, ████ shall have the right, without liability, to either cancel purchase orders for that Product(s) and any other Product(s), the acceptance of which is impractical in ████ reasonable opinion, as a result of Lexmark's failure to meet the Specifications or other ████ requirements hereunder defined, or require expedited shipping of the conforming Product(s) at Lexmark's sole cost.

8.2    **At Lexmark's Facility**. With reasonable notice, ████ shall have the right to perform vendor qualifications and/or on-site source inspections at Lexmark's manufacturing facilities and Lexmark shall reasonably cooperate with ████ in that regard. If an inspection or test is made on Lexmark's premises, Lexmark shall provide ████ inspectors with reasonable facilities and assistance at no additional charge.

8.3    **ISO 9001 Certified Supplier**. Lexmark represents that any sub-contractors used by Lexmark in the manufacture of Product(s) presently have ISO 9001 certification. Should Lexmark's sub contractors lose the ISO 9001 certification, Lexmark will notify ████ immediately. Lexmark's sub contractors will then have sixty (60) days to be recertified.

8.4    **Epidemic Failure**. See Section 15.2.

**9    COMPLIANCE WITH SPECIFICATIONS**

9.1    All Product(s) delivered hereunder shall fully comply with: (i) the Product(s) Specifications and other requirements as agreed to in Exhibit B and relevant part of this Agreement; (ii) the End User documentations; and (iii) all applicable laws, rules and regulations of Chinese Mainland and other jurisdictions, such as but not limited to, Hong Kong, Macao and Taiwan.

**10    REGULATORY AGENCY COMPLIANCE**

10.1    All Product(s) delivered hereunder shall fully comply with the regulatory agency requirements listed in Exhibit B [Product(s) Specifications]. Lexmark will obtain all required agency certifications and approvals for the Product(s) in ████ name, except otherwise prior agreed by ████ Lexmark will further ensure that the Product(s) remains compliant with those regulatory agency requirements ████ agrees to work with Lexmark in obtaining these certifications and approvals, and will supply model numbers of ████ products to Lexmark whenever appropriate. Prior to shipment of production units, Lexmark will submit to ████ sufficient proof of the certifications and approvals.

**11    COMPLIANCE WITH ENVIRONMENTAL LAWS**

11.1    Lexmark represents and warrants that in all respects, the manufacture and sale of the Product(s) comply and

Confidential

CONFIDENTIAL - OUTSIDE COUNSEL OA3519

Lexmark will make commercially reasonable efforts to ensure the Products will throughout the term of this Agreement comply with all applicable environmental laws, regulations and other regulatory requirements, including but not limited to, EU RoHS directive or it's counterpart in China.

11.2 If Lexmark discovers a breach of any of the representations and warranties in this Section 11, it shall immediately notify ███████ of such breach in writing, explaining the circumstances constituting the breach and identifying the Product(s) involved. Further, Lexmark shall defend, indemnify and hold harmless ███████ and its officers, directors, employees, agents, representatives, successors and assigns from any liabilities, losses, demands, claims or judgments arising from the breach of any of Lexmark's representations.

## 12 PRODUCT CHANGES

12.1 **Lexmark Initiated Engineering Change Requests (ECR) and Engineering Change Notices (ECN).** For changes that affect form, fit or function, Lexmark will submit a written request to ███████ with details of the Engineering Change (EC). Details will include the reason for the EC, description of the EC, part drawings (unrevised and revised) only if the part is a ███████ specific part, test data effecting form, fit, function, reliability and implementation date if applicable. Changes that do not affect form, fit or function do not require an ECN. ███████ will respond within twenty (20) working days upon receipt of the ECN/ECR with either an acceptance or rejection. No response from ███████ is the same as an acceptance. Lexmark may make Safety Changes without prior notice to ███████ Lexmark will make reasonable effort to provide an ECN to notify ███████ of Safety Changes.

12.2 ███████ **Initiated ECR.** ███████ may submit a written request to Lexmark with details of the requested EC. Details must include reason for the EC, description of the EC, test data/part drawings (if applicable) and quality data. Lexmark will respond within twenty (20) working days with the impact on cost (if applicable), test data affecting form, fit or function, reliability (if applicable). ███████ will respond back within ten (10) working days upon receipt of Lexmark's ECR response with an acceptance or rejection. No response from ███████ is the same as a rejection.

12.3 **Rejection of Engineering Change Requests.** Upon rejection of any proposed ECR, ███████ shall be entitled to: (i) terminate in whole or in part, without cost or penalty, any affected product remaining undelivered under accepted purchase orders or at Lexmark's sole discretion ███████ may request delivery by Lexmark of some or all of such unchanged Product. –

12.4 **Unauthorized Engineering Change.** If an EC is implemented without the written approval of ███████ Lexmark shall be liable for repair and/or rework of all Product(s) affected, including to, but not limited to, product in transit, Product in finished good inventory, and any Product(s) located with a reseller or at an end user location.

## 13 EXPORT LAW COMPLIANCE; COMMODITY CLASSIFICATION

13.1 Neither party will export/re-export, directly or indirectly, any Product(s) or technical data acquired under this Agreement or the "direct product" of software programs or such technical data to any country for which the United States Government or any agency thereof, at the time of export, requires an export license or other governmental approval, without first obtaining such license or approval. The term "direct product" as used herein means the immediate product (including processes and services) produced directly by the use of the technical data or software programs. Both parties will cooperate, to effect compliance with all applicable import and/or export regulations. In addition, the parties agree to comply with all applicable local country import and/or export laws or regulations in the country(ies) or territory(ies) of procurement, production and/or end destination of the Product(s). Both parties understand that the foregoing obligations are legal requirements and agree that they shall survive any term or termination of this Agreement.

13.2 Lexmark shall provide ███████ with a copy of the U.S. Department of Commerce, Bureau of Export Administration, Commerce Control List classification (ECCN, Export Control Classification Number) for all products, software and technical data contemplated under this Agreement with ███████ If this confirmation of classification was not obtained for the Product(s), or, if this is not available, Lexmark shall provide ███████ with the ECCN self certified by a knowledge technical/regulatory resource with sufficient supporting technical parameters for ███████ o confirm the classification. A copy of the Commerce issued Commodity Classification is required for any Product containing a security or encryption technology. In addition, Lexmark shall advise ███████ as to qualifying criteria for the Product(s) for any license exception or "mass market" qualification under which the Product(s) may be exported. Lexmark shall provide ███████ with the Harmonized Tariff Schedule Classification for the Product (s) and a Certificate of Manufacture certifying to the country of origin of the Product(s) subject to this Agreement.

CONFIDENTIAL - OUTSIDE COUNSEL OA3520

OEM Development and Purchase Agreement

**14   ON-GOING WARRANTIES AND REPRESENTATIONS**

Product Warranty. Lexmark warrants that the Printers, Features and Supplies shall be free from defects in design, material and workmanship, including but not limited to cosmetic defects, and will conform to the Lexmark Product Specifications within ninety (90) days.  The warranty period will commence upon the date ▇▇▇▇ initially ships Product to Customer and will end ninety (90) days from that date (which in no event can exceed thirteen (13) months from the date of Product shipment from Lexmark). ▇▇▇▇ inspection or acceptance of, or payment for, any Printer, Feature or Supply shall not constitute a waiver of any breach of warranty.   For the avoidance of doubt, such time period does not limit Supplier's obligations under Section 16 ("Indemnification") of this Agreement.

14.1   The procedure to be followed by ▇▇▇▇ and Lexmark in the event of a Printer, Feature or Supply failure under this warranty is set forth in Section 15.1.

14.2   Liens, Encumbrances, and Security Interests.  Lexmark warrants that title to all Products delivered to ▇▇▇▇ under this Agreement will be free and clear of all liens, encumbrances, security interests or other claims.

14.3   Euro Ready.   Lexmark hereby represents and warrants that the Products and services which interact in any capacity with monetary data are Euro ready such that when used in accordance with their associated documentation they are capable of correctly printing monetary data in the Euro denomination and respecting the Euro currency formatting conventions (including the Euro sign).

14.4   To the best of Lexmark's knowledge, the products do no infringe any intellectual property of a third party;

14.5   The Products comply with all applicable laws, including safety laws.

14.6   Lexmark shall obtain and maintain relevant licenses and Product certifications for ▇▇▇▇ and ▇▇▇▇ affiliates to sell and for ▇▇▇▇ and its customers to use the Products worldwide, and Lexmark shall pay all fees required;

14.7   License Warranty.   Lexmark hereby represents and warrants that it has the full power and right to grant to ▇▇▇▇ each of the licenses set forth in this Agreement.

14.8   Environmental and Safety Regulations.   Lexmark hereby represents and warrants that to the best of Lexmark's knowledge the Products comply with applicable U.S. environmental and safety laws, including without limitation, Section 602 of the United States Federal Clean Air Act Amendments of 1990 (as amended) governing use of ozone depleting substances and Part 1910 of the Occupational Safety and Health Standards (29 CFR 1910) and California Safe Drinking Water and Toxic Enforcement Act of 1986, each governing toxic chemicals, and the applicable comparable laws and regulations worldwide.   If at any time it comes to Lexmark's attention that the Products do not so comply, Lexmark will notify ▇▇▇▇ (except in those cases where the non-compliance does not represent a safety or environmental risk) and develop a plan to bring the Products into compliance or otherwise address the non-compliance, which could include a delay in shipment or a withdrawal of the Products, in which case Lexmark will notify ▇▇▇▇ and will reimburse ▇▇▇▇ all reasonable and actual out of pocket costs to mitigate the non-compliance.

14.9   New Parts. Lexmark hereby represents and warrants that, except for a) remanufactured Supplies, b) Printers, Features and Supplies returned to ▇▇▇▇ or End Users pursuant to Section 15.1 or other sections of this Agreement c) Spare Parts, and d) other exceptions which Lexmark will inform ▇▇▇▇ of in advance, the Products are new and do not contain used or reconditioned parts.

14.10   Limitation of Warranties.   THE FOREGOING WARRANTIES, TERMS OR CONDITIONS ARE EXCLUSIVE AND ARE IN LIEU OF ALL OTHER WARRANTIES, TERMS OR CONDITIONS. EXPRESS OR IMPLIED, EITHER IN FACT OR BY OPERATION OF LAW, STATUTORY OR OTHERWISE, INCLUDING WARRANTIES, TERMS OR CONDITIONS OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.   LEXMARK SHALL NOT BE LIABLE UNDER THIS WARRANTY IF THE TESTING AND EXAMINATION CONDUCTED BY AN INDEPENDENT THIRD PARTY APPOINTED AND PAID FOR EQUALLY BY BOTH PARTIES DISCLOSES THAT THE ALLEGED DEFECT IN THE PRODUCT(S) DOES NOT EXIST OR WAS CAUSED BY ▇▇▇▇ OR ITS END USER'S MISUSE, NEGLECT, IMPROPER INSTALLATION OR TESTING, OPERATION OF A PRODUCT BEYOND THE LIMIT OF ITS DUTY CYCLE, UNAUTHORIZED ATTEMPTS TO REPAIR, OR BY ACCIDENT, FIRE. LIGHTNING OR OTHER HAZARD UNSUITABLE PHYSICAL OR OPERATING ENVIRONMENT, IMPROPER MAINTENANCE OR FAILURE CAUSED BY SPARE PARTS, FEATURES, OR SUPPLIES NOT SUPPLIED BY LEXMARK (E.G., A THIRD-PARTY REMANUFACTURED SUPPLY).

**15   REMEDIES FOR BREACH OF WARRANTY**

15.1   Remedies for Breach of Warranty for Printers, Options, Supplies.   In the event of a breach of the warranty

---

Confidential

CONFIDENTIAL - OUTSIDE COUNSEL OA3521

OEM Development and Purchase Agreement

during the warranty period set forth in Subsection 14.1, the nonconforming Products shall be remedied in accordance with the following:

(a)    Printers, Options:   In the event there is non-conforming or defective Product(s), Lexmark shall credit or refund the purchase price ███ has paid for the Product(s). In addition, Lexmark shall reimburse ███ for those pre-agreed costs incurred to ███ during the process of such credit, refund or replacement. ███ will provide Lexmark with sufficient documentation, including serial number, model, non-conforming symptom(s), and proof of shipment and return or repair with appropriate dates to validate that the non-conforming or defective product claimed for breach of warranty met the warranty period as described in Section 14. At Lexmark's request and expense, ███ ill return non-conforming or defective Product to Lexmark.

(b)    Supplies:   In the event a Supply item does not conform to Product Specifications when the item is initially unboxed and installed (which in no event can exceed thirteen (13) months from the date of product shipment from Lexmark), the non-conforming Supplies that ███ purchased from Lexmark will be replaced free of charge, or a credit applied to ███ account at Lexmark's option. There are no Spare Parts for Supplies.   Upon request, ███ must return Supplies claimed for breach of warranty to a designated Lexmark location.

(c)    Spare parts:   Except as set forth in Section 15.2, there is no warranty for Spare Parts and therefore no remedy for breach of warranty.

15.2    Epidemic Failures. In the event of an Epidemic Failure or Lexmark initiated safety recalls, Lexmark shall, at ███ request, and at Supplier's expense, after both parties agreed ; (i) sort, screen, and/or replace Products held by ███ Customers, distributors, Supplier, and others; (ii) implement corrective actions that are suggested by either Lexmark or ███ and approved by both parties ; (iii) as mutually agreed, accept the return of affected Products for a full credit or replacement; (iv) reimburse ███ for pre-agreed actual ███ expenses which may include, but is not limited to, the cost of notifying and servicing Customers, including service calls to Customer locations, transporting and storing Products that have been required to undergo Corrective Action and their replacements, repairing Products, concessions, rework, logistics, problem diagnosis, costs incurred by third parties retained by ███ o perform some or all of these responsibilities, and other costs incurred by ███ address Customer satisfaction. Lexmark will make credits to ███ forty-five (45) days after receiving an invoice along with supporting expense documentation from ███ for such costs.   Remedies for Breach of Other Warranties.   In the event of a breach of any of the warranties set forth in Subsections 14.2, 14.3, 14.4, 14.5, and 14.6 ███ may exercise all remedies to which it is entitled at law, in equity and under this Agreement.   .

## 16   INDEMNIFICATION; INSURANCE

16.1    Patent, Copyright, Trademark Indemnification

16.1.1    Indemnity.   At its expense, Lexmark shall defend, indemnify, and hold harmless ███ and its officers, employees, agents and direct or indirect customers, from and against any third party claims, suits, losses, liabilities, damages, court judgments and/or awards (notwithstanding Section 17) and the reasonably related costs and expenses (including reasonable attorney's fees incurred by ███ or for which ███ s judged liable), incurred because of actual or alleged infringement by a Product supplied hereunder of any patent, copyright, trade secret, trademark, mask work right or other proprietary right(s) of a third party in the Territory. Upon its receipt of notice of such claim, suit or action, ███ shall promptly tender said defense to Lexmark, and thereafter, upon Lexmark's request ███ shall render reasonable assistance to Lexmark for defense of same. Lexmark shall undertake said defense with counsel reasonably experienced in such matters; at its option, ███ may obtain separate counsel at its expense in such proceedings. Notwithstanding the foregoing, Lexmark shall have no obligation(s) described above in this Section 0 with respect to any claim of infringement if: (a) ███ or any end-user has modified the Product(s) originally delivered by Lexmark to ███ or if said Product(s) has been combined, operated, or used contrary to its specifications or with other than its recommended equipment, and (b) no such infringement would have occurred absent such combination, operation, or use.

16.1.2    Additional Obligations.   If the use of any Product(s) by ███ or its customers is actually, or is threatened to be, enjoined, or if Lexmark so decides, then at its option and expense, Lexmark may: (i) substitute a fully equivalent non-infringing replacement unit for the Product(s); (ii) modify the infringing Product(s) so that it no longer infringes but remains functionally equivalent; (iii) obtain for ███ or its customers the right to continue use of such Product(s); or (iv) if none of the foregoing choices is selected, then Lexmark may refund to ███ the purchase price previously paid for such infringing Product(s) units in exchange for return by ███ of all such previously delivered units.

Confidential

CONFIDENTIAL - OUTSIDE COUNSEL OA3522

OEM Development and Purchase Agreement

16.1.3    Exclusions. Lexmark's indemnification obligations shall not apply to infringement arising from changes made to the Product(s) by ███ in such case ███ shall defend, indemnify, and hold harmless Lexmark and Lexmark's officers, employees, and agents from and against any claims, suits, losses, liabilities, damages, court judgments and/or awards (notwithstanding Section 17) and the reasonably related costs and expenses (including reasonable attorney's fees incurred by Lexmark or for which Lexmark is judged liable), incurred because of actual or alleged infringement by a Product so changed by ███ all on the same terms and conditions as set forth above under Section 0 with Lexmark's and ███ respective rights and obligations correspondingly reversed.

16.2    Lexmark's Indemnity.    Lexmark shall defend, indemnify, and hold harmless ███ from and against any and all third party claims, suits, and/or causes of action for losses, liabilities or damages (including reasonable attorneys fees incurred if Lexmark shall not assume the defense of same) suffered by ███ arising out of Lexmark's: (i) breach of warranty as to Product specifications ; (ii) any actual Product design defect; or (iii) or any intentional or negligent act of Lexmark's officers, employees, representatives or agents in discharge of Lexmark's duties under this Agreement. ███ shall promptly tender defense of such claim upon receipt thereof to Lexmark, provided, however, that if the specifications were furnished by ███ and such specifications result in such losses, liabilities or damages. then Lexmark shall have no such indemnification obligations hereunder, and in such case, if Lexmark shall suffer a third party claim, suit or cause of action which results in a loss, liability or damage, then ███ shall indemnify Lexmark on the aforementioned terms.

16.3    ███ Indemnity. ███ shall at its expense defend, indemnify, and hold harmless Lexmark against any claims of any kind based on ███ trademarks or trade dress.

16.4    Insurance.    Lexmark shall carry and maintain, under commercially reasonable terms, liability insurance coverage. Upon ███ request. Lexmark shall provide ███ with a Certificate of Insurance evidencing such coverage.

## 17    LIMITATION OF LIABILITY

IN NO EVENT, WHETHER BASED IN CONTRACT OR TORT (INCLUDING NEGLIGENCE) SHALL EITHER PARTY BE LIABLE FOR INCIDENTAL, CONSEQUENTIAL, INDIRECT OR SPECIAL DAMAGES OF ANY KIND OR FOR LOSS OF PROFITS, REVENUE, OR DATA, OR LOSS OF BUSINESS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE BREACH THEREOF, WHETHER OR NOT THE PARTY WAS ADVISED OF THE POSSIBILITY OF SUCH DAMAGE. ANY DAMAGES OF EITHER PARTY TO THE OTHER ARE LIMITED TO THE VALUE OF THE PRODUCTS PURCHASED DURING THE FIRST YEAR OF THE TERM OF THIS AGREEMENT TO A MAXIMUM OF ███ ███ WITH THE EXCEPTION OF DAMAGES ARISING FROM: (i) A BREACH OF SECTION 18, RELATING TO CONFIDENTIALITY, (ii) DEATH OR PERSONAL INJURY OR TANGIBLE PROPERTY DAMAGE, (iii) A BREACH OF SECTION 16.1 RELATING TO INTELLECTUAL PROPERTY INDEMNIFICATION. (iv) A BREACH OF SECTION 15.2 RELATING TO EPIDEMIC DEFECTS.

## 18    CONFIDENTIALITY

18.1    Confidential Information.    Information that is transmitted by one party to the other in connection with the performance or implementation of this Agreement and, if in written form, is marked "confidential" or with a similar legend by the disclosing party before being furnished to the other, or if disclosed orally or visually is identified as such prior to disclosure and summarized, in writing, by the disclosing party to the receiving party within thirty (30) days shall be deemed to be confidential information of the disclosing party. Each party agrees that it shall use the same degree of care and means that it utilizes to protect its own information of a similar nature, but in any event not less than reasonable care and means, to prevent the unauthorized use or the disclosure of such confidential information to third parties. The confidential information may be disclosed only to employees or contractors of a recipient with a "need to know" who are instructed and agree not to disclose the confidential information. Recipient shall have appropriate written agreements with any such employees or contractors sufficient to allow the recipient to comply with the provisions of this Agreement. The obligations of confidentiality and restricted use set forth in this Section 18 shall survive the expiration or any earlier termination of this Agreement for a period of three (3) years.

18.2    Exceptions.    The confidential information of a party shall not include and the foregoing obligation shall not apply to data or information which: (i) was in the public domain at the time it was disclosed or falls within the public domain, except through the fault of the receiving party, (ii) was known to the receiving party at the time of disclosure without an obligation of confidentiality; (iii) was disclosed after written approval of the disclosing party; (iv) becomes known to the receiving party from a source other than the disclosing party without breach of this Agreement by the receiving party; (v) is furnished to a third party by the disclosing party without an obligation of confidentiality; or (vi) was independently developed by the receiving party without the benefit of confidential information received from the disclosing party. Nothing

Confidential

CONFIDENTIAL - OUTSIDE COUNSEL OA3523

in this Agreement shall prevent the receiving party from disclosing confidential information to the extent the receiving party is legally compelled to do so by any governmental investigative or judicial agency pursuant to proceedings over which such agency has jurisdiction; provided, however, that prior to any such disclosure, the receiving party shall: (a) assert the confidential nature of the confidential information to the agency; (b) immediately notify the disclosing party in writing of the agency's order or request to disclose; and (c) cooperate fully with the disclosing party in protecting against any such disclosure and/or obtaining a protective order narrowing the scope of the compelled disclosure and protecting its confidentiality.

**19    PUBLICITY**
Neither party shall disclose, advertise, or publish the existence or the terms or conditions of this Agreement, financial or otherwise, without the prior written consent of the other party, except as required under the rules and regulations of the Securities Exchange Commission with connection to any filings made by Lexmark at its discretion.

**20    SUPPLIER AND SUPPLIER PERSONNEL**
Lexmark is an independent contractor and this Agreement does not create an agency relationship between ▮▮▮ and Lexmark or ▮▮▮ and Lexmark Personnel ▮▮▮ ssumes no liability or responsibility for Lexmark Personnel and Lexmark is responsible for all aspects of its Personnel, including: (1) ensuring Lexmark Personnel performing Services on ▮▮▮ premises comply with ▮▮▮ rules for visitors and vendors-on-premises and upon request, provide ▮▮▮ for export evaluation purposes, the country of citizenship and permanent residence and immigration status of those persons ▮▮▮ etains the right to refuse to accept persons made available by Lexmark for export control reasons; and (2) not discriminating against any employees, applicants for employment, or any entity engaged in its procurement practices because of race, color, religion, sex, age, national origin, or any other legally protected status.

**21    TERM AND TERMINATION**
21.1    Term. This Agreement shall commence on the Effective Date and shall continue for three (3) years thereafter, unless otherwise specified herein or unless terminated sooner under the provisions set forth herein. Thereafter, this Agreement shall automatically be renewed for successive one (1) year terms, unless one party request in writing at least one hundred eighty (180) days prior to the expiration of the then current term, that this Agreement not be so renewed.
21.2    Termination for Cause. With the exception of the continuing obligations, as set forth in Section 21.3, herein, either party shall have the right to terminate this Agreement for cause as a result of:

21.2.1    The failure of the other party to perform any material term or condition of this Agreement and to remedy such failure within thirty (30) days after written notice of such failure given by the non-defaulting party;
21.2.2    The filing by or against the other party of a petition for reorganization or liquidation under bankruptcy or corresponding laws or procedures of any applicable jurisdiction;
21.2.3    The filing by or against the other party of any other proceeding concerning bankruptcy, insolvency, dissolution, cessation of operations, reorganization of indebtedness, or the like by the other party. If such proceeding is involuntary and is contested in good faith, this Agreement shall terminate only after the passage of one hundred twenty (120) days without the dismissal of such proceedings;
21.2.4    The voluntary or involuntary execution upon; the assignment or conveyance to a liquidating agent, trustee, mortgages or assignee of whatever description; or the making of any judicial levy against a substantial percentage of the other party's assets, for the benefit of its creditors;
21.2.5    The appointment of a receiver, keeper, liquidator or custodian of whatever sort of description, for all or a substantial portion of the other party's assets; or
21.2.6    The termination, dissolution, insolvency or failure in business of the other party, the distribution of a substantial portion of its assets, or its cessation to continue all or substantially all of its business affairs.

21.3    Rights and Obligations Upon Termination or Expiration. The termination or expiration of this Agreement shall in no way relieve either party from its obligations to pay the other any sums accrued hereunder prior to such termination or expiration. The parties agree that their respective rights, obligations and duties under Sections 2.21, 2.3, 2.4, 13, 14, 17, 18, 19, 21, 24 and 25 for events occurring prior to contract termination, as well as any rights, obligations and duties which by their nature extend beyond the expiration or termination of this Agreement shall survive any expiration or termination and remain in effect for a period of three (3) years thereafter or the specific period specified in this Agreement, whichever is longer.

CONFIDENTIAL - OUTSIDE COUNSEL OA3524

OEM Development and Purchase Agreement

## 22   Supplies Terms

22.1   ▮▮▮ irrevocably commits to purchase from Lexmark for the life of the printer products sold under this Agreement, ▮▮▮ entire requirements (for ▮▮▮ use or sale) for toner cartridges used or usable (and whether new or re-manufactured), for said printers. This commitment includes ▮▮▮ not directly or indirectly promoting and/or selling (outright or on a charge per image/print basis) any non-Lexmark manufactured consumable supplies for the Printers (whether refilled/remanufactured cartridges, new cartridge clones, refill kits, or other equivalent kits). While this Agreement is in effect and for a period of three (3) years thereafter, ▮▮▮ shall not directly or indirectly compromise or seek to compromise the installed base of the Printers.

22.2   Lexmark will sell new Supplies to ▮▮▮ either with regular Supplies ("regular Supplies"), or as "Use and Return" Supplies ("Return Program") subject to "use once and return" patent license/agreement. It is Lexmark's desire to make available both versions of Supplies. If ▮▮▮ elects to purchase the Return Program Supplies, ▮▮▮ also agrees to purchase regular Supplies. ▮▮▮ understands that the Return Program Supplies may contain a chip that is designed to allow the Supply to be used only once, thus helping to enforce the Return Program terms. ▮▮▮ will also make available the regular versions of the Supplies, and will inform the marketplace of the existence of both the regular and Return Program Supplies versions (and the terms of the Return Program Supply) by labels, inserts in printer Products, labels on Supply packaging, and appropriate sales literature, announcements, and training.

22.3   The Return Program license terms are an essential part of the Return Program Supply offering. Lexmark hereby grants ▮▮▮ under Lexmark's patent rights in the Return Program Supplies, the limited right to sell Return Program Supplies subject to the limitation the ▮▮▮ only sell such Return Program Supplies by agreement with end-user customers, with such agreement limiting the use of the Return Program Supplies to one use and then returning the Return Program Supplies only to Lexmark (not necessarily by name) for recycling after their initial use. This agreement with the end-user customer shall be, at a minimum, a license/agreement on the top of the Return Program Supplies packaging that the customer must 'open' to accept (similar fashion to Lexmark's own Return Program toner cartridges license/agreement). For Return Program Supplies shipped with printer Products, the outside of the printer Program box shall provide notification that the printer Product contains a Return Program toner cartridge that is licensed for a single-use and then is to be returned only to Lexmark (not necessarily by name). The inside of the Printer box shall have the complete license/agreement terms to be accepted by the end-user customer. The Return Program license terms will identify Lexmark (not necessarily by name) as the developer/manufacturer of the cartridges, and will otherwise read essentially the same as Lexmark's terms for Lexmark branded Return Program toner cartridges. The Return Program Supplies label, and its packaging, will instruct the user to return the Return Program Supplies (after use) to Lexmark's (not necessarily by name) collection point.

## 23   Spare Parts Terms

23.1   For Spare Parts, used or usable with Products sold under this Agreement, all ▮▮▮ requirements (for ▮▮▮ use or sale) whether new or re-manufactured ▮▮▮ irrevocably commits to purchase Lexmark Genuine Service Parts from Lexmark for the life of the Products. This commitment includes ▮▮▮ not directly or indirectly promoting and/or selling (outright or on a charge per image/print basis) any non-Lexmark Genuine Service Parts for the Products. While this Agreement is in effect and for a period of three (3) years thereafter, ▮▮▮ shall not directly or indirectly compromise or seek to compromise the installed base of the Products. To avoid serious customer satisfaction consequences, in an emergency situation when Lexmark Genuine Service Parts are not readily available, Lexmark will allow ▮▮▮ to "tear down" a new or used Product to obtain the necessary part to resolve the emergency; provided that before ▮▮▮ will resort to tearing down a Product to obtain such part (i) ▮▮▮ use of parts obtained by tearing down Products is solely at ▮▮▮ expense and risk, (ii) Lexmark shall have no liability under warranty or otherwise with respect the use by ▮▮▮ of such a part, and, (iii) ▮▮▮ shall provide a quarterly report to Lexmark including model and serial number of the Product(s) dismantled and salvaged for spare part(s).

## 24   DISPUTES, GOVERNING LAW AND ARBITRATION

24.1   THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH, AND ALL DISPUTES HEREUNDER SHALL BE GOVERNED BY, THE APPLICABLE LAWS OF   HONGKONG

24.2   In the event of a dispute relating to or arising out of this Agreement, including any question regarding its existence, validity or termination, the account managers for each party will meet to resolve the dispute. If

CONFIDENTIAL - OUTSIDE COUNSEL O A3525

the account manager cannot resolve the dispute, they shall immediately escalate the matter to a senior manager for each party. If the senior managers cannot resolve the matter within twenty (20) days after escalation, shall be referred to and finally resolved by Arbitration under the auspices of the International Center for Commercial Arbitration, in accordance with its rules ("Rules"). The tribunal shall consist of three arbitrators. Each party shall appoint one arbitrator. The third arbitrator shall be appointed in accordance with the Rules. The arbitration shall take place in Hong Kong unless the parties otherwise mutually agree. The arbitration shall be conducted in English.

24.3    Procedure. The rules of procedure not expressly provided for by the Rules shall be determined in accordance with the laws of Hong Kong, whether or not mandatory.

24.4    Survival. This Section 21 shall survive if this Agreement should be adjudged void or should be cancelled, annulled, or terminated. Initiation of arbitration proceedings shall not affect either party's rights then existing. Judgment upon the award rendered may be entered in any court having jurisdiction or application may be made to such court for a judicial acceptance of the award and an order of enforcement, as the case may be.

24.5    Exclusive Remedy. No party may bring a civil action seeking enforcement or any other remedy founded on this Agreement.

24.6    Injunctive Relief. Any party may seek injunctive relief to preserve the status quo pending completion of arbitration under this Agreement.

## 25  GENERAL

25.1    Relationship of the Parties. Each of the parties shall at all times during the term of this Agreement act as, and shall represent itself to be, an independent contractor, and not an agent or employee of the other.

25.2    Entire Agreement. This Agreement and Exhibits hereto are intended as the complete, final and exclusive statement of the terms of the agreement between the parties regarding the subject matter hereof and supersedes any and all other prior or contemporaneous agreements or understandings, whether written or oral, between them relating to the subject matter hereof. This Agreement may not be modified except in writing executed by both parties.

25.3    Force Majeure. Neither party shall be liable to the other for any alleged loss or damages resulting from failure to perform due to acts of God, natural disasters, acts of civil or military authority, government priorities, fire, floods, epidemics, quarantine, energy crises, war or riots. Each party shall promptly notify the other party of such event. If Lexmark is unable to deliver in accordance with agreed delivery schedule, ▬▬▬ may either: (i) extend the time of performance; or (ii) cancel the uncompleted portion of the purchase order at no cost to ▬▬▬

25.4    Notices. Except for purchase orders which may be sent by normal carrier, all notices and communications hereunder are required to be sent to the address or facsimile number stated in below (or such other address or facsimile number as subsequently notified in writing to the other party): (i) by facsimile with confirmation of transmission; (ii) personal same or next day delivery; or (iii) sent by commercial overnight courier with written verification of delivery. All notices so given shall be deemed given upon the earlier of receipt or one (1) day after dispatch.

Any notices sent to ▬▬▬ hereunder should be sent to:



Confidential

CONFIDENTIAL - OUTSIDE COUNSEL OA3526

OEM Development and Purchase Agreement

Any notices sent to Lexmark hereunder should be sent to:

Lexmark International, Inc.

740 New Circle Road NW
Lexington, KY 40550, USA
Attn:   Jared K. Bryan
Fax No. 1-859-232-4438

With copy to:

Lexmark Legal Department
740 New Circle Road NW
Lexington, KY 40550, USA
Attn: General Counsel

25.5   Waiver.   A waiver of any default hereunder or of any of the terms and conditions of this Agreement shall not be deemed to be a continuing waiver or a waiver of any other default or of any other term or condition, but shall apply solely to the instance to which such waiver is directed. The exercise of any right or remedy provided in this Agreement shall be without prejudice to the right to exercise any other right or remedy provided by law or equity, except as expressly limited by this Agreement.

25.6   Severability.   In the event any provision of this Agreement is found to be invalid, illegal or unenforceable, the validity, legality and enforceability of any of the remaining provisions shall not in any way be affected or impaired.

25.7   Assignment.   Neither party may assign its rights or obligations under this Agreement without the prior written consent of the other, which consent shall not be unreasonably withheld.   Notwithstanding the above, each party may, without the prior written consent of the other, assign its rights and obligations hereunder to a successor in ownership of all or substantially all of the assets of the assigning party, whereupon such assignee will assume this Agreement and will automatically be deemed to have replaced the assignor for all purposes hereof, provided however, either Party is entitled to terminate the Agreement if in its opinion the other Party's assignment of the Agreement will materially impact the performance of the Agreement.   In addition, either Party may assign accounts receivable from the other Party (without the other Party's prior written consent) to a third party financial organization for financing purposes.

25.8   The Agreement will not be supplemented or modified by any course of dealing or trade usage.   Variance from or addition to the terms and conditions of the Agreement in any purchase order or other written notification from either party will be of no effect.   This Agreement shall not under any circumstances be effective until it is signed by both parties.

25.9   Photocopy of Original.   Neither party shall object to the use of a photocopy of the original of this Agreement for the purpose of making any required or allowed public filings.

25.10   Attorney's Fees.   In any action to enforce this Agreement, the prevailing party shall be awarded all arbitration costs or courts costs and reasonable attorney's fees incurred, including such costs and attorneys' fees incurred in enforcing and collecting any judgment.

25.11   Counterparts.   This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

25.12   Choice of Language.   The original of this Agreement has been written in English and the governing language of this Agreement shall be English. <End>

Confidential

CONFIDENTIAL - OUTSIDE COUNSEL OA3527

OEM Development and Purchase Agreement

**EXHIBIT A:  BUSINESS TERMS**

**PRODUCT LIST-PRICES**

All prices are based on the following trade terms:
- Printers/MFP:   DDU Hong Kong
- Expendables (Supplies):   DDU Hong Kong
- Lexmark Options:   DDU Hong Kong

Title passes when Lexmark delivers Product to ███ designated delivery point in Hong Kong, or such other delivery point in the P.R.C. as designated by Lexmark.

All prices are subject to change with 30 days notice.   Pricing is derived from U.S. Distributor Pricing and will adjust whenever U.S. Distributor prices change.

**PRODUCT SHIPMENT SCHEDULE**

Standard shipment schedule is within sixty (60) days after the receipt date of ███ Purchase Order.   Earlier ship dates may be requested, subject to Lexmark's ability to fulfill on a faster schedule.

**PAYMENT AND INSTRUCTION OF LETTER OF CREDIT**

Notwithstanding any other specifies in this Agreement on the contrary, the parties agree that the payment will be made by ███ subject to the below terms:
- Payment will be made by electronic payment TT45 weekly
- Documents that shall be presented include:
  - Commercial Invoice

**MINIMUM ORDER QUANTITIES**

All products have a minimum order quantity as specified in pricing table below.

**SAFETY INVENTORY**

Lexmark is not obligated to maintain an inventory of ███ customized Product.   All customized Product is built to order.

**APPOINTED TERRITORY(IES)**

Greater China (PRC, Hong Kong, Macao, Taiwan).

Confidential

CONFIDENTIAL - OUTSIDE COUNSEL OA3528

OEM Development and Purchase Agreement



| Lexmark Product Code (Order PN) | Internal Part Number | Product Name | MOQ (Full Pallet Qty Order Increments) | U.S. MSRP (USD) | U.S. Distributor Price (USD) | Discount off U.S. Dist. Price | Price per Unit* (USD) | |
|---|---|---|---|---|---|---|---|---|
| | | **Printers & MFPs** | | | | | | |
| | | (equivalent to Lexmark E260d) | | | | | | 42 pallets may be combined to make full container |
| | | (equivalent to Lexmark E260dn) | | | | | | |
| | | Lexmark C540n | | | | | | 41 pallets may be combined to make full container |
| | | (equivalent to Lexmark C544dn) | | | | | | |
| | | (equivalent to Lexmark X543dn) | | | | | | 40 pallets per container |
| * Price includes | | quest to add USB cable in carton | | | | | | |
| | | **OPTIONS** | | | | | | |
| | | *250 sheet drawer* | | | | | | |
| | | *550 sheet drawer* | | | | | | |
| | | *Lexmark Simplified Chinese font card for* | | | | | | |
| | | *Lexmark Traditional Chinese font card for* | | | | | | |
| | | **OPTIONS** | | | | | | |
| | | *(550 + 100) sheet Dual Drawer* | | | | | | |
| | | *Lexmark 128MB DDR SDRAM DIMM Memory Option* | | | | | | |
| | | *Lexmark 256MB DDR SDRAM DIMM Memory Option* | | | | | | |
| | | *Lexmark 512MB DDR SDRAM DIMM Memory Option* | | | | | | |
| | | *Lexmark 64MB Flash Memory Card for* | | | | | | |
| | | *Lexmark Simplified Chinese font card for* | | | | | | |
| | | *Lexmark Traditional Chinese font card for* | | | | | | |
| | | *Note: Italics indicates an unbranded item with Lexmark order PN* | | | | | | |

CONFIDENTIAL - OUTSIDE COUNSEL OA3529

OEM Development and Purchase Agreement

| Lexmark Product Code (Order PN) | Internal Part Number | Product Name/ PN | MOQ (Full Pallet Qty Order Increments Unless Otherwise Noted) | U.S. MSRP (USD) | U.S. Distributor Price (USD) | Discount off U.S. Dist. Price | Price per Unit (USD) |
|---|---|---|---|---|---|---|---|
| | | **CONSUMABLES/EXPENDABLES (SUPPLIES)** | | | | | |
| | | tandard Yield Return Program Cartridge (3.5K) | | | | | |
| | | Standard Yield Cartridge (3.5K) | | | | | |
| | | hotoconductor Kit (30K) | | | | | |
| | | Black Standard Return Program Toner Cartridge (2.5K) | | | | | |
| | | Cyan Standard Return Program Toner Cartridge (2K) | | | | | |
| | | Magenta Standard Return Program Toner Cartridge (2K) | | | | | |
| | | Yellow Standard Return Program Toner Cartridge (2K) | | | | | |
| | | Black High Yield Return Program Toner Cartridge (6K) | | | | | |
| | | Cyan High Yield Return Program Toner Cartridge (4K) | | | | | |
| | | Magenta High Yield Return Program Toner Cartridge (4K) | | | | | |
| | | Yellow High Yield Return Program Toner Cartridge (4K) | | | | | |
| | | Black Standard Toner Cartridge (2.5K) | | | | | |
| | | Cyan Standard Toner Cartridge (2K) | | | | | |
| | | Magenta Standard Toner Cartridge (2K) | | | | | |
| | | Yellow Standard Toner Cartridge (2K) | | | | | |
| | | Black High Yield Toner Cartridge (6K) | | | | | |
| | | Cyan High Yield Toner Cartridge (4K)-- | | | | | |
| | | Magenta High Yield Toner Cartridge (4K) | | | | | |
| | | Yellow High Yield Toner Cartridge (4K) | | | | | |
| | | Black Imaging Kit | | | | | |
| | | Black & Color Imaging Kit | | | | | |
| | | Toner Waste Bottle | | | | | |

*Note: Italics indicates an unbranded item with Lexmark order PN*

---

Confidential

CONFIDENTIAL - OUTSIDE COUNSEL OA3530

### NON-BINDING FORECAST

Forecasts must include a minimum of six month rolling forecasts for all items currently offered by Lexmark to ███████ (Printers, MFPs, Options, and Supplies). ███████ may use its own forecasting format which must include Lexmark part numbers and descriptions in addition any detail desired by ███████ Forecasts are due by the next to the last workday of each month. Forecasting is for planning purposed only. Custom ███████ Product will be built-to-order only.

CONFIDENTIAL - OUTSIDE COUNSEL OA3531

OEM Development and Purchase Agreement

## EXHIBIT B:   PRODUCT SPECIFICATIONS

### PRODUCT SPECIFICATIONS

| Product Code (LXK/ ████) | Product Name | Specification |
|---|---|---|
| ████ | ████ | Equivalent to Lexmark E260d with unique ████ supplies, publications, packaging & logos as agreed |
| | | Equivalent to Lexmark E260dn with unique ████ supplies, publications, packaging & logos as agreed |
| | | Equivalent to Lexmark C540n with unique ████ supplies, publications, packaging & logos as agreed |
| | | Equivalent to Lexmark C544dn with unique ████ supplies, publications, packaging & logos as agreed |
| | | Equivalent to Lexmark X543dn with unique ████ supplies, publications, packaging & logos as agreed |

Specifications for ████ shall include any and all standards and/or criteria applicable to the Lexmark equivalent product. In all cases, the latest issue level signed and approved by ████ and Lexmark is applicable.

### PRODUCT BASE AFR



| ████ Model | Full Year Base AFR |
|---|---|
| | |

### PRODUCT PACKAGING SPECIFICATIONS

Packaging is standard Lexmark generic OEM packaging with mutually agreed upon custom ████ labeling or artwork. Packaging specifications meet ████ Packaging Spec 41A0612

Notwithstanding the foregoing, Product(s) will comply with all the regulatory and material requirements set forth below:
–   41A7731, Baseline Environmental Requirements for Materials, Parts, and Product(s) for ████ Hardware Product(s)
–   41A7733, ████ Engineering Specification
–   RoHS Readiness Checklist, Guidance document located at
    < ████ >>
–   ████ "Supplier Packaging and Materials Handling Specification"
–   GA21-9261-10FAA Certification: Lexmark certifies that Product(s) and their packages shipped directed by Lexmark do not contain explosives, hazardous materials, incendiaries and/or destructive devices as defined by the FAA.

In general, Lexmark follows the guidelines set forth in the standards below:
–   ISO 2859, Sampling Procedures for Inspection by Attributes
–   ISO 3951, Sampling Procedures for Inspection by Variables
–   EIA - 599 - A, Continuous Improvement
–   EIA - 659 - A, Failure, Mechanism, Driven Reliability Monitoring
–   EIA - 670, Quality System Assessment
–   EIA - 671- A, Problem Analysis and Corrective Actions
–   EIA - JESD - 38, Standard for Failure Analysis Report Format

Confidential

CONFIDENTIAL - OUTSIDE COUNSEL O A3532

OEM Development and Purchase Agreement

- EIA - JESD - 46, Product Change Notice
- EIA - JESD - 50, Maverick Product Elimination
- Lexmark's published specifications, catalogs, marketing materials, and other documentation, including references in such materials to future upgrades or performance;
- All Product claims, descriptions, specifications, and other requirements described in the Product bill of material, elsewhere in this Agreement, and via other written or electronic communications sent from or approved by

CONFIDENTIAL - OUTSIDE COUNSEL OA3533

OEM Development and Purchase Agreement

**EXHIBIT C:  SOFTWARE LICENSE AGREEMENT**
Provided in separate document: ███████ **OEM Software Distribution License – June 3, 2009**

CONFIDENTIAL - OUTSIDE COUNSEL OA3534

OEM Development and Purchase Agreement

**EXHIBIT D: SUPPORT SERVICES**

## A. DEFINITIONS

**Authorized Caller.** "Authorized Caller" means a person or persons designated by ▇▇▇ as the technical/engineering support interface for the Product(s).

**Designated Support Engineer.** "Designated Support Engineer" means a person or persons designated by Lexmark as the technical/engineering support interface for the Product(s).

**End User.** "End User" means a natural person or a Supplier or organization that uses ▇▇▇Product for personal purpose or in the operation of their business.

**Dead on Arrival (DOA).** "DOA" means a Product that fails to meet the Product specifications within thirty (30) days after initial Product unboxing and installation (which in no event can exceed thirteen (13) months from the date of Product shipment from Lexmark to ▇▇▇

**Failure.** "Failure" means a defect in the Product which is reproducible and which causes such Product not to function substantially in conformance with the Specifications, end user documentation, or other related documentation, including without limitation any functional specifications or other engineering documentation for the Product, or commonly accepted operating principles as defined by industry standards. Failures are classified according to the Problem severity.

**Incident.** "Incident" means a situation which necessitates an End User to contac▇▇▇or assistance.

**Problem.** "Problem" means any error, or any actual failure or functional impairment that causes reduced functionality to the Product. Problems are assigned a classification at the time of ▇▇▇ initial contact with Lexmark. Problem classifications may be changed based upon new information or customer situation. Problems are classified by ▇▇▇ according to Severity level, based upon Technical and/or Customer Sensitivity as follows:

- **Severity 1**: Technical: Production network failure which results in a critical impact to business operations. No viable workaround is known. Customer Sensitivity: Customer account is in jeopardy, and there is risk of losing business.
- **Severity 2**: Technical: Critical production network service interruption or degradation creating difficulty in the execution of a network function which results in a critical impact to business operations. Customer acceptable workaround is available. Customer Sensitivity: There is potential risk of losing actual or future business.
- **Severity 3**: Technical: Significant system problems which prevent some network functions from meeting the production specifications or cause particular features or functionality to be inoperative. Some business operations are impaired, but the network continues to function. Customer acceptable workaround is available. Customer Sensitivity: The problem is impacting the customer's day to day business; there is no risk of losing business.
- **Severity 4**: Technical: Enhancement requests for hardware, software, manuals or electronic services. Customer Sensitivity: The problem is not currently impacting the customer's day to day business, but may in the future; there is no risk of losing business.

**Repair.** "Repair" means the repair or replacement of a Product or part.

**Software Patch.** "Software Patch" refers to executable Software created and made available to correct a Failure or malfunction identified in a specific version of Software.

**Software Update.** "Software Update" means a formal software release (i) which provides functionality enhancements, reliability enhancements, and other modifications to the Software or (ii) that is a maintenance release that corrects deficiencies and/or bugs affecting performance to the published specifications.

**Warranty Services.** "Warranty Services" means the replacement of defective parts or exchange of defective printer, at Lexmark's discretion, during the applicable warranty period. .

**Out of Warranty Services** "Out of Warranty Services" means repair, replacement and return services provided by Lexmark to Lenovo or Lenovo's customers out of the period and/or scope of Warranty.

**Services.** "Services" means a customer or product-related business function such as design/manufacturing error correction, maintenance, customer education, sale of service parts, or programming assistance.

**Technical Support Levels.** "Level" means a certain class of service provided to authorized resellers and end users. Definitions are as follows:

- **Level One**: First call support on all customer calls, technical support staff answers technical inquiries regarding Product(s), and provides problem diagnostics services for identifying Problems and generic application faults, analysis, and where possible, Problem resolution.
- **Level Two**: Specialist level technical support, technical support/escalation staff performs Problem isolation and replication, lab simulations and interoperability testing, provides remote diagnostics capabilities and on-site troubleshooting, if required, and implements a solution for a Problem that is not the result of a Product Failure. In the case of a Product Failure, the technical staff is able to identify the source of the Failure, create a reproducible test case, and document the details of the Failure for escalation to Lexmark.
- **Level Three**: Backup engineering and technical support; staff isolates a Problem/Failure and implements a solution, including, but not limited to, a Product change.

**Workaround.** A "Workaround" is a feasible change in operating procedures whereby an end user can avoid any deleterious effects of a Failure.

Confidential

CONFIDENTIAL - OUTSIDE COUNSEL OA3535

OEM Development and Purchase Agreement

### B.   WARRANTY

**Hardware Warranty**.
Warranty period shall be for ninety (90) days after ███ ships Product to customer, and in no event can exceed thirteen (13) months from the date of Product shipment from Lexmark to ███
**Software Warranty**
In no event shall the warranty period of the software be less than ninety (90) calendar days after delivery to an end user.

### Remedies for Breach of Warranty
Section 15.1(a), Remedies for Breach of Warranty for Printers, Features, Supplies, of this Agreement apply.

### Epidemic failure
See Section 15.2

### C.   TECHNICAL SUPPORT

**Backup Technical Support**
███ shall reasonably attempt to resolve customer problems for the Product(s) prior to contacting Lexmark. Lexmark will not contact or provide direct support to ███ customers with respect to the Product(s) pursuant to this Agreement without ███ prior approval. Lexmark will provide an initial response to all ███ support inquiries according to the following:

- Four (4) hour for **Severity 1 Problems**.
- Six (6) hours for **Severity 2 Problems**,
- One (1) business day for **Severity 3 Problems,** and
- Two (2) business days for **Severity 4 Problems**.

If unable to resolve, ███ and Lexmark will agree, in good faith, what additional information and/or documentation will be required for resolution. Lexmark shall work with ███ in attempting to reproduce any such problem. Problem resolution shall be managed in accordance with (Problem Resolution/Failure Correction).

**Work Division**
███ shall provide **Level One** and **Level Two** support services to its authorized resellers and End Users. Lexmark shall provide **Level Three** back-up technical support t███ and shall make support available to ███ via telephone or web site access to ███ Authorized Caller(s). Lexmark will provide such support during normal business hours (8:30-5:30 Beijing Time), excluding holidays. Lexmark will provide support via web chat outside of normal business hours for **Severity 1** and **Severity 2** Problems. ███ will have direct access to Lexmark's **Level Two** and **Level Three** technical support, as well as to Lexmark's technical management support as required for escalation purposes. The support shall commence as of the Effective Date and shall be provided at no cost t███

The Authorized Callers and Designated Support Engineers will be the primary contacts between ███ and Lexmark's technical support and/or escalation centers. ███ will provide a list of Authorized Callers including names, address, phone numbers, and internet e-mail address. Lexmark will provide a list of Designated Support Engineers. These lists will be reviewed quarterly and updated as required. ███ will be permitted to register up to ten (10) Authorized Callers; all Authorized Callers shall receive training as set forth in this Exhibit.

Lexmark will make available to ███ web-based access to information that Lexmark maintains for the products that are generally available for all of Lexmark's field service technicians.     Examples would include technical bulletins, knowledge cases, and Engineering Change Orders (that impact service and support).

**Emergency Technical Support**
Except as set forth in the relevant Section of this Agreement (relating to Epidemic Failure), and in this exhibit (relating to Support Services), Lexmark shall have no responsibility for providing technical support directly to ███ authorized resellers and end users.

However, for **Severity 1 Problems** deemed by ███ to require emergency, on-site support that would be significantly facilitated by Lexmark assistance and such support is requested by ███ Lexmark agrees to use its best efforts to

CONFIDENTIAL - OUTSIDE COUNSEL OA3536

OEM Development and Purchase Agreement

provide such emergency support within two (2) business days.

████████ will attempt to manage the Incident, such that Lexmark's assistance will be transparent to the customer and shall reimburse Lexmark for its time at mutually agreeable and reasonable rates, plus other reasonable expenses approved in advance by ████████ In situations where the site visit was precipitated by a known (but unresolved) or acknowledged Lexmark problem, ████████ shall not reimburse Lexmark for costs, labor or other expenses.

**Problem Resolution/Failure Correction**
████████ and Lexmark shall promptly agree in good faith to any information and/or documentation which may be required to permit Lexmark to identify and resolve Product Problems, including but not limited to Failures.

Lexmark agrees to respond to identified Problems based on the following correction periods:

-   **Severity 1**. Lexmark shall use its best efforts to resolve or reduce the severity via Workaround and/or Software Patch within two (2) business days of receipt of notice of such Failure. Lexmark shall use its best efforts to provide its action plan within three (3) business days, including a final resolution and conduct regular status updates. ████████ and Lexmark problem managers shall review incident after two (2) business days.
-   **Severity 2**. Lexmark shall use its best efforts to resolve or reduce the severity via Workaround and/or patch within five (5) business days of receipt of notice of such Failure. Lexmark shall use its best efforts provide an action plan within three (3) business days, and regular status updates. ████████ and Lexmark problem managers shall review incident after five (5) business days. A final engineering resolution shall be identified in the action plan.
-   **Severity 3**. Lexmark shall use its best efforts to acknowledge the Problem within ten (10) business days of receipt of notice. Lexmark shall use its best efforts to provide a final engineering resolution within three (3) months or next scheduled release, whichever is sooner.
-   **Severity 4**. Lexmark shall use its best efforts to acknowledge the Problem within thirty (30) business days of receipt of notice. A final engineering resolution will be determined and scheduled through mutual agreement between ████████ and Lexmark Engineering and Marketing management.

The prescribed correction periods above may be extended as mutually agreed, e.g., if resolution of problem requires timely hardware certification or test, or if resolution represents significant risk to the essential functions.

**Support Tools**
At no charge to ████████ Lexmark shall provide the same diagnostic software tools and procedures and a list/description of test/diagnostic equipment necessary to troubleshoot Problems and assist in Problem identification, isolation and resolution as are provided to Lexmark's own service technicians. Lexmark shall also provide the following additional support tools, if available: (i) troubleshooting guide, (ii) technical tips, (iii) compatibility/inter-operability matrix and (iv) supported and not supported configurations statement. Lexmark shall further promptly provide to ████████ when available, all modifications or other revisions to such support tools.

**Documentations**
Lexmark will provide all Support Services relating documentation for the support service of the Product(s), including, but not limited to, services manual, troubleshooting guides, etc. Documentation will be provided within seven (7) day after Effective Date.   Lexmark shall provide ████████ as a common business practice, a mechanism by which ████████ may receive a monthly status report of all Problems reported to and/or resolved by Lexmark's Third Level Support. This report shall contain known Product Problems, Workarounds, fixes and open Failures /Bugs.

**D.   SOFTWARE SUPPORT SERVICES**
During the term of this Agreement and within five (5) years from the date of last shipment of the affected Product, ████████ is entitled to receive or access all Software Updates and Upgrades for the Product, as provided for in this Agreement, and as required under Section 12 of this Agreement (relating to Product Changes), ████████ has the right to duplicate both the Software and associated documentation and distribute to customers according to ████████ entitlement process. Lexmark shall not charge ████████ or such upgrades or updates unless Lexmark generally charges its customers for such upgrades and updates.
In the event the appointed operating system, as the Software performing circumstance, updated or upgraded by its vender, Lexmark shall make its best effort to update or upgrade the Software within a commercial reasonable period from the date the updated or upgraded appointed operation system released so as to make the Software compatible with the updated or upgraded operating system.

**E.   HARDWARE SUPPORT SERVICES**
████████ shall have the right to purchase Product spare parts as applicable during the term of this Agreement, and thereafter, for a period of five (5) years after the last shipment of the affected Product hereunder, notwithstanding the

CONFIDENTIAL - OUTSIDE COUNSEL OA3537

OEM Development and Purchase Agreement

expiration of this Agreement. Such purchases shall be governed by the applicable terms and conditions set forth herein. The prices charged for such Product Repair, spare parts and upgrade kits shall be at the lowest prices then charged by Lexmark to any other customer for similar quantities of the same or comparable items under the same or similar terms and conditions.

## Lead-Time

Lexmark's estimated or targeted lead-times for shipping Spare Parts shall be provided with the list of Spare Parts during new product launch.    Lexmark will notify ███████ immediately upon any changes in lead-time. Lead time shall not exceed sixty (60) days

## Purchase Orders

Purchase Orders for Spare Parts must be consolidated, with delivery to one location, and placed within Lead-Time. Purchase Orders must reference, ship-to location, ███████ part number, part description (which must include the Lexmark part number), quantity, applicable price, ███████ shipping instructions and requested ship date.

## Freight and Title Transfer

███████ shall be responsible for the shipping costs for all Spare Parts orders. This includes the freight cost of normal orders and emergency orders. Title and risk of loss will transfer to ███████ upon shipment from Lexmark's designated shipping point.

## Inventory Management Requirements

Lexmark will provide failure analysis data for the Product(s). The data shall include failure rates for the whole unit assembly and individual subassemblies (FRUs/Field Replaceable Units). Lexmark will also provide a spares inventory recommendation, based on the failure rates. This data will provided within ten (10) days after Effective Date.

## Product Repairs

Lexmark is willing to engage in future discussions with ███████ to provide Out of Warranty Services.

## Return Material Authorization (RMA)

- Lexmark shall provide ███████ with an RMA procedure for DOA Product if Lexmark requires a return of the defective Product or Spare Parts. Should Lexmark and ███████ agree that Lexmark will provide Out of Warranty Services, a process will be mutually developed.

## F.    TRAINING SERVICES

## Technical Training

- If Lexmark provides any training for comparable Lexmark branded Products to its personnel or other service providers, such training shall be made available to ███████    Lexmark shall conduct T3 training (Train the Trainer) classes for ███████ service support trainers if it provides any hands on training for its comparable Lexmark branded products. T3 training should be held in Beijing. .    Computer based training shall also be provided when available.

## Training Courses and Materials

- During the term of this Agreement, Lexmark shall provide ███████ with all materials utilized to provide training in connection with the Product(s). Training shall include, but is not limited to, customer reseller and End-User courses. Training materials shall also include, but are not limited to, instructor guides, overheads, student workbooks, and manual/guides. Lexmark shall provide masters of such training materials in both hard copy and electronic media. Lexmark shall further provide copies of all modifications or other revisions to such training materials as they become available ███████s permitted to use such material for its internal use only in training sales and support staff on the Product(s).
- Lexmark hereby grants to ███████ royalty-free non-exclusive, worldwide license to use, modify or create derivative works based upon, reproduce, display, demonstrate and distribute the training materials (whether modified or unmodified but excepting proprietary technical information relating to the products) for course development use solely in connection with the Product(s) distributed under the terms of the Agreement.
- Other than the license granted in this section, Lexmark retains all copyright rights in the materials, and ███████ agrees to assist Lexmark to enforce those rights against infringers.   In response to inquiries related to copyright rights in all materials subject to copyright, and in which Lexmark has copyright rights, ███████ will identify Lexmark as the owner of some or all of the copyright rights, as appropriate, or direct such inquiry to Lexmark

---

Confidential

CONFIDENTIAL - OUTSIDE COUNSEL OA3538

OEM Development and Purchase Agreement

### G.  PRODUCT DOCUMENTATION
Lexmark will provide all documentation for the Product(s), including, but not limited to, specifications, user manual, troubleshooting guides, etc.

### H.  MANUFACTURING DISCONTINUED AND SUPPORT AFTER TERMINATION.
For Product(s) that have been deemed "manufacturing discontinued" and following termination of the Agreement, Lexmark agrees to provide Support Services, as defined in this Exhibit D, to ▮▮▮▮ or a period of five (5) years to enable ▮▮▮▮ to support its customers.

CONFIDENTIAL - OUTSIDE COUNSEL OA3539

OEM Development and Purchase Agreement

## EXHIBIT E:  MARKETING COMMITMENTS

### JOINT PR ACTIVITIES
Left blank intentionally; insert content if needed.

### VAR CHANNEL ACTIVITIES
Left blank intentionally; insert content if needed.

### WWW ACTIVITIES
Left blank intentionally; insert content if needed.

### TRADE SHOW/DEMO ACTIVITIES
Left blank intentionally; insert content if needed.

### MISCELLANEOUS
Left blank intentionally; insert content if needed.

CONFIDENTIAL - OUTSIDE COUNSEL OA3540

OEM Development and Purchase Agreement

## EXHIBIT F:   PRODUCT ACCEPTANCE CRITERIA [TBD]

### 1.   PURPOSE
This Exhibit F establishes the Quality and Reliability provisions which shall apply to all Product(s) shipped under this Agreement.

### 2.   SCOPE
- Quality Requirements
- Reliability Requirements
- Workmanship Standard
- Quality System Requirements
- Electrical Overstress/Electrostatic Discharge Protection
- Annual Failure Rate
- Quality Assurance Documentation
- DOA Rate

### 3.   QUALITY REQUIRMENTS
#### (a)   ACCEPTANCE CRITERIA
Qualification for initial and on-going shipments, including spares, shall require inspection to a mutually agreed upon specification for major defects per relevant Section of this Exhibit. Inspections shall be performed by ▮▮▮▮ personnel or by ▮▮▮▮ designated representative at ▮▮▮▮ or Lexmark's facility. ▮▮▮▮ reserves the right to witness on-going qualification tests as long as witnessing does not cause delay in meeting program goals.

Product will be considered acceptable for shipment if it does not contain a major defect as defined per relevant Section of this Exhibit and Exhibit G Product Acceptance Criteria. ▮▮▮▮ incoming inspection will be conducted in light of GB/T2828-2003 or MIL-STD-105E. If during the process of inspection, it is determined that the defective Product(s) number of an arrived batch falls below the Acceptance Quality Level/AQL of (1.0 for major defect; 2.5 for slight defect), ▮▮▮▮ will have the right to reject the batch entirely. But notwithstanding the foregoing, the acceptance of the arriving batch will not affect ▮▮▮▮ right to pursue remedies for the defective Product(s) contained in the accepted batch.

#### (b)   REMEDIES FOR EXCEEDING THE ACCEPTABLE DEFECT RATE
For remedies for defective product see Sections 14 and 15 in base agreement.

#### (c)   MAJOR DEFECT DEFINITIONS
1) A system failure when tested to mutually agreed upon test specifications:
2) A major cosmetic defect or serious violation of workmanship standards e.g., plastic or sheet metal deformities that are readily visible to end user;
3) Failure to meet the safety standards identified in Exhibit B or other part of this Agreement.
4) Materially reduces the usability of the products for its intended purpose per the Product Specifications.
5) Failure to comply with the EMC standards identified in Exhibit B or other part of this Agreement.

#### (d)   TESTING BY LEXMARK
Should ▮▮▮▮ identify a major defect (as defined above) in Product(s) held in ▮▮▮▮ stock or shipped to ▮▮▮▮ customers, and Lexmark and ▮▮▮▮ mutually agree that this defect is not detected under Lexmark's then current manufacturing test procedures, Lexmark agrees to put an action plan in place within five (5) business days to modify its test procedure to adequately test for that defect in the future.

### 4.   RELIABILITY REQUIREMENTS
#### (a)   RELIABILITY DEMONSTRATION TESTING
Reliability demonstration may be accomplished by ▮▮▮▮ or its designated representative. The demonstration shall use either field data from an installed base of production version product or data collected from a Reliability Demonstration Test (RDT).

#### (b)   RELIABILITY MATURITY TESTING
A Reliability Maturity Test (RMT) may be performed by ▮▮▮▮ or its designated representative on a continuing basis. MTBF must be equal to or greater than that specified in the Specifications.

### 5.   ELECTRICAL OVERSTRESS/ELECTROSTATIC DISCHARGE PROTECTION
Protection for all components and assemblies shall be accomplished in a manner to prevent damage by ESD /Electro-Static Discharge. All field replaceable board level assembles shipped to ▮▮▮▮ must be contained in a

Confidential

CONFIDENTIAL - OUTSIDE COUNSEL OA3541

OEM Development and Purchase Agreement

conductive ESD package.

Reasonable precautions must be taken regarding the ESD protection of all other subassemblies.

## 6.    QUALITY SYSTEM REQUIREMENTS

**(a)    NOTIFY OF MAJOR PROCESS CHANGE**

Lexmark shall notify ▇▇▇ of any major changes in process, process locations and quality practices employed by Lexmark that affect this Agreement and that occur after this Agreement is signed.

**(b)    BURN-IN**

All assemblies including field replaceable units shipped under this Agreement require dynamic testing as per product specification.

**(c)    MINIMUM INSPECTION REQUIREMENTS**

▇▇▇ requires Lexmark's inspection of all product. Revisions to this requirement may be accomplished by mutual written agreement between ▇▇▇ and the Lexmark at any time.

**(d)    CORRECTIVE ACTION CONTROL**

Lexmark will be responsible for implementation of a Corrective Action Control procedure for all process and component related failure mechanisms. The procedure must cover as a minimum the following:

1) Problem Identification
2) Assignment of responsibility
3) Schedule of completion
4) Tracking of corrective actions
5) Verification of effectiveness of corrective action.

*NOTE: All in-process corrective action information will be available to ▇▇▇ upon request.*

**(e)    COMPLIANCE TO DESIGN STANDARDS**

Lexmark is responsible for on going conformance to the Design Standards (Drop & Vibration, Environmental Cooling, Structure and Packaging, Acoustic Noise Limits, Transportation, Electrostatic Discharge & Primary Power Limits, etc.) for all products supplied hereunder.

**(f)    INSPECTION AND AUDIT**

Lexmark shall subject all Product(s) to the quality inspection testing procedures prior to delivery to ▇▇▇ Lexmark shall provide ▇▇▇ with access to its quality inspection testing results upon request.

▇▇▇ shall have the right to make periodic on-site audits to ensure Lexmark's compliance with its quality assurance program and quality inspection procedures.

Upon at least twenty-four (24) hour notice, ▇▇▇ or its designated representative may audit the manufacturing process and products in such a manner as not to be disruptive to normal productions. Any mutually agreed upon out-of-control condition at Lexmark's facility will trigger the need for the above audit process. Corrective action is to follow all items listed in section VI item D of this Exhibit.

**(g)    DOCUMENTATION CONTROL AND RECORD**

Lexmark shall ensure that all documents such as software/firmware, engineering drawings, specifications, contracts, policies, procedures, manufacturing process flow chart, and work instructions (including test procedures) are under revision control and are available to all necessary ▇▇▇ and/or Lexmark Personnel in the manufacturing environment. Lexmark shall a have a system for the effective updating/removal of any obsolete documentation from all manufacturing areas. Lexmark will establish and maintain procedures for identification, collection, indexing, filing, storage, maintenance, and disposition of all Product related records, including but not limited to, Statistical Process Control data, test and inspection records, customer pricing records, and all other records required by ▇▇▇ Lexmark shall maintain a history file for all Product(s), by part number, that tracks changes to the Product or Product component designs, materials, and/or manufacturing source. Lexmark shall track and retain, for at least <<four (4) years>> after termination of this Agreement, records which reflect, among other things, any certificates required by law or under this Agreement, all necessary and pertinent documentation that may substantiate pricing, as well as, any other obligation hereunder, such as, not by way of limitation, the date of Lexmark's purchase from a third party supplier, if any, quality test data and Lexmark's source selection process documentation. Lexmark shall make available any and all of the aforementioned documentations and records to ▇▇▇ or ▇▇▇ quality representative.

**(h)    PRODUCT TRACEABILITY REQUIREMENTS.**

Lexmark shall establish and maintain procedures and processes for the identification and lot traceability of critical Product items during all stages of production, delivery, and installation per applicable ISO, EIA and other applicable standards. Lexmark will maintain both forward and backward traceability capabilities and ensure that its response time

---

Final December 10, 2009

Confidential

CONFIDENTIAL - OUTSIDE COUNSEL OA3542

OEM Development and Purchase Agreement

for traceability requests from Buyer does not exceed <<seventy-two (72) hours>>.

## 7.  QUALITY ASSURANCE DOCUMENTATIONS

(a)  Prior to the first delivery of the Product(s), Lexmark shall provide to ▮▮▮▮ all the necessary demonstration reports and/or certifications issued by governmental agency or other authoritative institutions as listed below but not limited to:

- Certification Bodies' Schemer or CB test report.
- Electromagnetic Compatibility/EMC test report
- Reliability Demonstration Testing report;
- Compatibility test report;
- CCC/China Compulsory Certification
- Verification report of the Product from a telecommunication equipment verification agency recognized by Telecommunication Equipment Certification Center, MII.
- License for network connection of telecommunication equipment.

Supplier will notify ▮▮▮▮ before it changes countries of origin or locations where Products are manufactured.   If the change is approved by ▮▮▮ and such change will result in a new application of CCC/China Compulsory Certification, then Supplier will, at Supplier's expense, obtain a new CCC for ▮▮▮ n a timely manner.

(b)  Other Documentations

Lexmark will provide ▮▮▮ upon ▮▮▮ request, all the documentations (in English language) required, including but not limited to the following:

- Inspection certificate of quality of each lot.
- Safety Test Report for each Power Adapter (AC-DC) and other components which may involve safety concerns;
- Other ▮▮▮ request quality assurance related documentations.

## 8.  DOA RATE

DOA is not treated separately from other failures addressed in base agreement sections 14 and 15 and AFR definition and control in section 9 below.

## 9. Annual Failure Rate (AFR)

(a)  AFR Definition

AFR shall mean the failure rate of Product(s) within any twelve (12) consecutive months after providing to end-user. AFR shall be counted according to the follow formula: [AFR = (Number of Failures of Product(s) during any 12 consecutive months, beginning no sooner than the third month after ▮▮▮ offering to end-users (N3 to N14), divided by total amounts of Product(s) offered by ▮▮▮ to its customers during the corresponding twelve months (N1 to N12) as indicated in the example below.   Any failures covered under the Epidemic Failure terms of this agreement shall be excluded from the ▮▮▮ AFR calculations.

### ANNUAL FAILURE RATE (AFR) CALCULATION EXAMPLE



(b)  AFR Control

The Annual Failure Rate/AFR of any Product model should not exceed the Base AFR set forth in Exhibit B. ("Base AFR").

At the end of each calendar quarter following the effective date of this Agreement, Lexmark and ▮▮▮ will review the actual ▮▮▮ AFR (preliminary AFR prior to month 14 of Product offering) for each Product model.   If a model's actual AFR exceeds the Base AFR ▮▮▮ and Lexmark shall work together to implement a Corrective Action(s) as agreed to by both parties at that time. At the end of the fourth full calendar quarter following the effective date of this Agreement, Lexmark and ▮▮▮ will review the AFR for each model of Product sold for in the latest four full quarters. The AFR review will take place during this period each year during the term of the Agreement ("Annual AFR Review

---

Confidential

CONFIDENTIAL - OUTSIDE COUNSEL OA3543

OEM Development and Purchase Agreement

Period"). If a Product model's actual AFR exceeds the applicable Base AFR, Lexmark will provide ██████ a credit calculated as the value of the full year's parts purchases for that model represented by the percentage by which the actual AFR exceeded the Base AFR for each applicable model. Credit will be capped at ██████ actual AFR or Lexmark's actual AFR for the similar Lexmark-branded product model sold in the United States ("Reference AFR"), whichever is lower. ██████ actual AFR will be mutually agreed upon by both parties after consideration of any failures caused by factors deemed exclusive to the ██████ models. By "exclusive to the ██████ models",  the parties mean factors that are the sole causes of the failures and said causes are not found in the similar products sold by Lexmark. Lexmark will have no liability for corrective action, parts, labor, repair, reimbursement, and any other costs or expense related to the AFR of a Product model to the extent the actual AFR of the ██████ Product exceeds the Reference AFR during the relevant Annual AFR Review Period.

CONFIDENTIAL - OUTSIDE COUNSEL OA3544

OEM Development and Purchase Agreement

**EXHIBIT G:  RESERVED**

HERE FILL IN (ESCROW AGREEMENT) IF NEEDED

CONFIDENTIAL - OUTSIDE COUNSEL OA3545

OEM Development and Purchase Agreement

**EXHIBIT H:  DEVELOPMENT OF THE PRODUCT**

<u>**Non-Recurring Engineering (NRE)**</u>

NRE for current products is covered under separate Memorandum of Understanding with Lexmark China.   Subsequent products are subject to separate NRE that will be defined and negotiated independently from this agreement. ▮▮▮▮ shall pay for all agreed upon tooling and NRE expenses.

<u>**Works Developed For**</u> ▮▮▮▮



CONFIDENTIAL - OUTSIDE COUNSEL O A3546

LEXMARK/████ CONFIDENTIAL                    20/208/520/5

# AMENDMENT NUMBER 1 TO OEM DEVELOPMENT AND PURCHASE AGREEMENT

This Amendment Number 1 ("Amendment 1") to the OEM Development and Purchase Agreement ("Agreement"), dated December 10, 2009, is entered into and is effective as of the 10th day of July, 2012 ("Amendment 1 Effective Date") by and between Lexmark International, Inc. ("Lexmark"), a Delaware corporation having its principal place of business at 740 West New Circle Road, Lexington, Kentucky 40550 U.S.A. and ████████████████████ a corporation, having its principal place of business at ████████████████████████ ████ (Collectively "the Parties")

WHEREAS, the Parties wish to amend the Agreement to expand the scope of the OEM Purchase Agreement to include the sale of certain enterprise laser printers and related options and supplies, from Lexmark to ████ for resale by ████ only in ████████████████████████████████ under its designated logo. Parties agree to discuss exceptions on a case by case basis.

NOW, THEREFORE, in consideration of the mutual covenants and promises in the Agreement as amended hereunder, and for other good and valuable consideration, the receipt, sufficiency and adequacy of which are hereby acknowledged, the Parties hereby agree as follows:

1.0    The additional products are listed in **Exhibit A-1-1** hereto ("Amendment 1 Products). All initial releases will be high volt (230V) products with simplified Chinese support.

2.0    Lexmark agrees, subject to execution of this Amendment 1, to offer an initial pricing for Amendment 1 Products as detailed in **Exhibit A-1-2.**

3.0    Lexmark will engage in certain non-recurring development and engineering activities and will incur related expenses (collectively "NRE Activities") in producing the Amendment 1 Products. In consideration of Lexmark performing the NRE Activities, ████ agrees to pay Lexmark ████████████ ("NRE Fee").

4.0    The NRE fee will be paid by ████ to Lexmark International (China) Limited as described in Section 5.0. Lexmark International (China) Limited will remit the NRE fee to Lexmark International, Inc. Lexmark International (China) Limited has the following bank account information:

> Bank: Citibank N.A. Hong Kong Branch
> Bank Address: Citibank Tower, Citibank Plaza, 3 Garden Road, Central, HKSAR

1

LEXMARK/LENOVO CONFIDENTIAL

HKD A/C No.: ███████████
USD A/C No.: ███████████
SWIFT Code : ███████████

5.0    The total NRE Fee will be amortized into the prices of hardware and consumables Product purchased by ██████ under the Agreement as follows:

   a.    ███████ will pay ████████ of the NRE Fee by issuing a purchase order in Q3 2012 for ████ units of ██████████ printer products with ████████ added to the purchase price of each printer.

   b.    The balance of the NRE Fee ████████████ NRE will be amortized over the purchase prices of all printer hardware and consumables by adding a ████ adder onto the product prices. This ████ adder will be applied on all purchase orders received after the purchase order for the ████ described in Section 5.0(a).

   c.    If the balance of the NRE Fee ███████████ is not completely recovered by LXK before 31 March 2014, ████████ will issue Lexmark a one-time payment to cover the outstanding NRE Fee amount.

6.0    In the event whereby special bid prices have been approved for ████████ the amortized NRE Fee will be applied to the approved special bid prices.

7.0    Lexmark will cease to apply the amortized NRE Fee when Lexmark has received the cumulative amount of █████████████ in NRE Fees on Product purchases by ████████

8.0    The target date for shipment of the First Volume Shipment ("FVS") of the Amendment 1 Products from Lexmark is January 25th, 2013.

9.0    The proposed preliminary printer development / manufacturing schedule for the Amendment 1 Products is listed in **Exhibit A-1-3.**

10.0   The Cooperation Agreement portion and Profit Sharing proposal portions of the OEM Purchase Agreement shall not apply to the sales of the Amendment 1 Products covered by this Amendment 1.

11.0   Upon request, Lexmark will cooperate with ████████ in determining whether mutually acceptable exceptions to the pricing for Amendment 1 Products as described in Exhibit A-1-2 in customer special bid situations.

2

LEXMARK ███████ CONFIDENTIAL

12.0   The Parties agree that the Agreement shall be amended by the addition, following existing Exhibit A, of the attached new **Exhibit A-1-1**, **Exhibit A-1-2**, and **Exhibit A-1-3**.

13.0   Except as set forth herein, all other provisions of the Agreement remain in full force and effect. To the extent any provision of this Amendment 1 is deemed inconsistent with the terms of the Agreement, the terms of this Amendment 1 shall control with respect to the subject matter hereof.

IN WITNESS WHEREOF, the Parties hereto have duly executed this Amendment 1 by their respective duly authorized representatives to be effective as of the Amendment 1 Effective Date.


**LEXMARK INTERNATIONAL, INC.**

By: _____

Name: Ben M. Streepey

Title: VP+GM Business Development

Date: 10-4-2012


**LEXMARK INTERNATIONAL (CHINA) LIMITED**

By: _____

Name: Masaaki Yasukawa

Title: Country GM

Date: 10-19-2012

3

CONFIDENTIAL - OUTSIDE COUNSEL O A3549

LEXMARK ███████ CONFIDENTIAL

EXHIBIT A-1-1

PRELIMINARY AMENDMENT 1 PRODUCT SPECIFICATIONS

Mono Laser Printers

| Program Name | ████ | ███ | ████ | ███ |
|---|---|---|---|---|
| Print Speed | 35 | 35 | 50 | 45 |
| MP Feeder | 50 | 50 | 100 | 100 |
| Input Capacity (Std.) | 300 | 300 | 650 | 350 |
| Input Capacity (Max) | 850 | 850 | 2300 | 2000 |
| Output Capacity | 150 | 150 | 250 | 150 |
| Processor | Dual-Core 800 MHz | Dual-Core 800 MHz | Dual-Core 800 MHz | Dual-Core 800 MHz |
| Memory (Std/Max) | 128/128 | 128/128 | 256/1280 | 512/2560 |
| Ethernet | 10/100 | 10/100 | Gigabit | Gigabit |
| Operator Panel | LED | LED | 2.4" Color Display | 4.3" Color Touch Screen |
| 'Ship With' Toner | 1.5k | 1.5k | 6k | 5k |
| Genuine Toner Supplies | 1.5k 5k | 1.5k 5k | 1.5k, 5k 10k, 20k | 2.5k, 10k 20k |
| Dimensions | 15.7x15.0x10.4 in | 15.7x15.0x10.4 in | 15.7x15.0x12.0 in | 19.3x17.8x19.8 in |
| Weight | 30.9 lb | 30.9 lb | 34.6 lb | 48.1 lb |
| Imaging Unit Yield | 60K | 60K | 60K | 60K |

4

LEXMARK ███████ CONFIDENTIAL

**Color Laser Printers**

| | Program Name | ██████ | ██████ |
|---|---|---|---|
| **Performance** | Speed (half speed) | 25/25 ppm (16ppm) | 32/32 ppm (16ppm) |
| | TTFP (sec) (mono) | <10 | <9 |
| | Processor (6170) | 800 MHz | 800 MHz |
| | Memory std/max (MB) | 256 / **2304** | 256 / **2304** |
| **Print Quality** | 1200 dpi | yes | yes |
| | 4800CQ | yes | yes |
| **Media Handling** | Std In | 250 | 250 |
| | Slot | yes | yes |
| | Opt 650 Duo Drawer | yes | yes |
| | Opt 550 | no | yes |
| | Max in | 950 | 1450 |
| | Output | 125 | 125 |
| | Duplex | manual | yes |
| **Supplies** | Type | Toner Bottle | Toner Bottle |
| | SWE (k/cmy) | Ln:750/750, | 1.4K/1.4K |
| | AM (k/cmy) | 8K/4K | 8K/4K |
| | Imaging Unit | 40K / 40K | 40K / 40K |
| **Duty Cycle** | Average/Max | 500 / 60K | 900 / 85K |
| **Connectivity** | USB high speed 2.0 | yes | yes |
| | 10/100 Ethernet | yes | yes |
| | Gigabit Ethernet | no | no |
| | Wireless Option | yes | yes |
| | Front USB-A | no | yes |
| | Rear USB-A | no | no |
| **OP Panel** | | 2-line APA | 2.4" Color APA w/ numpad |
| **eSF** | | no | no |
| **Flash/Font Card** | | no | yes |
| **DLEs** | | no | no |
| **Emulation** | | PCL6, PS3, PDF 1.6, XPS | PCL6, PS3, PDF 1.6,  XPS |

5

CONFIDENTIAL - OUTSIDE COUNSEL OA3551

LEXMARK █████ CONFIDENTIAL

*The ████ OEM products are leveraged off Lexmark branded equivalent products. Therefore the ████ product configuration is similar to the Lexmark branded equivalent products.*

### Standard OEM Configuration

- LXK standard colors
- Front cover piece pad printed with █████ model name and company logo in predetermined location on front cover piece
- Logo'd back cover label
- OEM Driver/Pubs/Utilities CD for █████ and █████
- █████ **unique model via drop-down list. Other OEM Manufacture names will coexist with █████ manufacture name on the installers for █████ and █████ models**
- Windows and Linux operating system support for █████ and █████ models. No Mac OS support included in scope of program.
- █████ branded Driver/Pubs/Utilities CD for █████ and █████
- Setup Sheet
- █████ unique voltage/safety label
- Standard control panel
- █████ unique supplies label
- OEM generic supplies carton
- OEM generic printer carton for █████ and █████
  Printer cartons with █████ artwork for all █████ and █████
- █████ model name on test page
- 220 VAC
- DBCS support using download fonts

6

LEXMARK ███ CONFIDENTIAL

EXHIBIT A-1-2

PRELIMINARY AMENDMENT 1 PRODUCT PRICING

| Mono SFP | HARDWARE Pricing (US$) | Use and Return SUPPLIES Pricing (US$) | Cartridge Yield (pages) | | |
|---|---|---|---|---|---|
| ██ ██ | | | 5000 | 10000 | 20000 |
| | | | 1500 | 5000 | |
| | | | 1500 | 5000 | |
| Mono MFP | | | | | |
| ██ ██ | | | 2500 | 10000 | 20000 |

| Color SFP | HARDWARE Pricings (US$) | Use and Return SUPPLIES Pricings(US$) | Cartridge Yield (pages) | | | |
|---|---|---|---|---|---|---|
| ██ ██ | | | 8000 | 4000 | 4000 | 4000 |
| | | | 8000 | 4000 | 4000 | 4000 |

*Note: Each printer is shipped with cartridges as specified Exhibit A-1-1, Amendment 1 Product Specifications. Seller can change cartridge pricing on one (1) month written notice. Buyer can only sell cartridges for use in Products purchased by Buyer hereunder.

NOTES:

1. Prices listed are FCA Hong Kong (2010 Incoterms) and are in United States dollars, for initial twelve (12) month delivery. Listed prices are subject to change to take into consideration the benefit of any reductions that may be obtained through reduction or elimination of Custom Duty or Value-Added Tax on the importation of these products into China. Seller will notify Buyer of such price changes and changes in the aforementioned taxes and duties. Title and risk of loss or damage will pass to Buyer on delivery to carrier. The Buyer is responsible for obtaining sufficient insurance to cover the value of goods and transportation for shipment. Should the shipment be lost or damaged in transit, it is the Buyer's responsibility to file claim with his insurer. Pricing excludes all applicable taxes, duties, and import/export fees

2. The above prices apply only to Lexmark manufactured and/or supplied Amendment 1 Product per Exhibit A-1-1, Preliminary Amendment 1 Product Specification.

3. Pricing assumes ███ best efforts to attain a minimum total purchase quantity of ███ combined printers for the initial twelve (12) months and may be re-negotiated if initial twelve month purchase quantity falls below ███ units.

CONFIDENTIAL - OUTSIDE COUNSEL O A3553

LEXMARK/ ██████ CONFIDENTIAL

4.    A minimum order quantity for printers should be in increments of standard pallet quantities of approximately ██ units for each device.

5.    Seller can change pricing of spare parts on one (1) month notice to keep pricing equivalent to Seller's standard dealer/distributor spare parts pricing.

6.    Parties agree to meet as needed to discuss pricing and changes in the competitive environment. Any Printer price change by Seller will be after mutual review of such changes.

8

CONFIDENTIAL - OUTSIDE COUNSEL O

 LEXMARK/ CONFIDENTIAL

## EXHIBIT A-1-3

### PRELIMINARY PRINTER DEVELOPMENT / MANUFACTURING SCHEDULE FOR AMENDMENT 1 PRODUCTS

| Milestones | Target Schedule* |
|---|---|
| Amendment 1 to OEM Agreement Signed | Jul 13, 2012 |
| Development & Testing - Windows (CD) Complete | Dec 14, 2012 |
| Development & Testing – Firmware Complete | Oct. 26, 2012 |
| Development & Testing – Unix/Linux Complete | Jan 15, 2013 (Web release only) |
| Development & Testing – Macintosh Complete | Jan 15, 2013 (Web release only) |
| Provide Certification Document - safety and energy | Oct 26, 2012 |
| Supplies setup complete | Sept 14, 2012 |
| Supplies Readiness | Dec14, 2012 |
| Tooling Complete | Oct 26, 2012 |
| Launch Readiness | Jan 18, 2013 |
| Ready to Ship/ General Availability | Jan 25, 2013 |

*Note: All target dates depended upon Amendment 1 being signed by July 13, 2012.  If the signature date is delayed, other dates will be adjusted.



CONFIDENTIAL - OUTSIDE COUNSEL O A3555

Lexmark-███████ Confidential

## AMENDMENT NUMBER 2 TO OEM DEVELOPMENT AND PURCHASE AGREEMENT

This Amendment Number 2 ("Amendment 2") to the OEM Development and Purchase Agreement ("Agreement"), dated December 10, 2009, is entered into and is effective as of the 4th day of April, 2013 ("Amendment 2 Effective Date") among **Lexmark International, Inc.** ("Lexmark"), a Delaware corporation having its principal place of business at 740 West New Circle Road, Lexington, Kentucky 40550 U.S.A., **Lexmark International (Australia)Pty Ltd** at Level 7, 15 Talavera Road, Macquarie Park , NSW 2113, Australia, **Lexmark International (China) Ltd** at Unit A, 24/F, Convey, 169 Electric Road, North Point, Hong Kong, **Lexmark Printer (Shenzhen) Co. Ltd.** at 6/F, Office, WeiGuangLian Building, No.2 Binglang Dao, Futian Free Trade Zone, Shenzhen, P.R. China and ████████████████████████ a corporation, having its principal place of business at ████████████████ ████████████████████████ (Collectively "the Parties")

WHEREAS, Lexmark Printer (Shenzhen) Co. Ltd. (利盟打印机（深圳）有限公司) has been officially renamed to Lexmark Information Technology (China) Co. Ltd. (利盟信息技术（中国）有限公司) without any change of its qualification as a legal entity.

The Agreement is modified as follows:

1.0 All references to 'Lexmark Printer (Shenzhen) Co. Ltd.' shall be changed to 'Lexmark Information Technology (China) Co. Ltd.' under the Agreement. Lexmark Information Technology (China) Co. Ltd. (利盟信息技术（中国）有限公司) shall bound by the Agreement as usual and continue performing all the obligations of Lexmark Printer (Shenzhen) Co. Ltd (利盟打印机（深圳）有限公司) under the subject Agreement.

2.0 Except as set forth herein, all other provisions of the Agreement remain in full force and effect.

IN WITNESS WHEREOF, the Parties hereto have duly executed this Amendment 2 by their respective duly authorized representatives to be effective as of the Amendment 2 Effective Date.

**LEXMARK INTERNATIONAL, INC.**    ████████████████████

By: _(signature)_                   By:

Name: CHRIS C WHITE                 Name:

Title: DIRECTOR                     Title:

Date: JUNE 20, 2013                 Date:

CONFIDENTIAL - OUTSIDE COUNSEL ON A3556

Lexmark- ██ onfidential

**LEXMARK INFORMATION TECHNOLOGY (CHINA) COMPANY LIMITED**

By:

Name:

Title:

Date:

**LEXMARK INTERNATIONAL (CHINA) LIMITED**

By:

Name:

Title:

Date:

**LEXMARK INTERNATIONAL (AUSTRALIA) PTY LTD**

By: *Abhijit*

Name: Abhijit Patwardhan

Title: Acting General Manager (Australia)

Date: 13/06/2013

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3557

Lexmark- █████ Confidential    20130625 0072

# AMENDMENT NUMBER 3 TO OEM DEVELOPMENT AND PURCHASE AGREEMENT

This Amendment Number 3 ("Amendment 3") to the OEM Development and Purchase Agreement ("Agreement"), dated December 10, 2009, is entered into and is effective as of the 29th day of April, 2013 ("Amendment 3 Effective Date") by and between Lexmark International, Inc. ("the Seller"), a Delaware corporation having its principal place of business at 740 West New Circle Road, Lexington, Kentucky 40550 U.S.A. and ████████████████ ("the Buyer") a corporation, having its principal place of business at ████████████████ ████ (Collectively "the Parties")

The Agreement is modified as follows:

1.0 Exhibit A of the Agreement is modified to include the products and prices identified in Attachment 1.1  appended to this Amendment 3.

2.0 For each unit of printer hardware purchased, Buyer agrees to order on the same Purchase Order the quantity of toner cartridges specified in Attachment 1.2 appended to this Amendment 3.  The simultaneous purchase of printer  hardware and toner cartridges enables the Seller to offer the printer and supplies at the prices set forth in Attachment 1.1

| Model | Leveraged from LXK Models | | Cartridges To Be Purchased At The Same Time With Printer HW Purchase | |
|---|---|---|---|---|
| | | | Quantity | Cartridge Type/Yields |
| | MS610 | dn | 2 | 5 000 pages |
| | MS310 | dn | 2 | 5 000 pages |
| | MS310 | d | 2 | 5 000 pages |
| | MX511 | de | 1 | 10 000pages |
| | CS310 | n | 3 mono and 6 color | mono 4 000 page/color 3 000 page |
| | CS410 | dn | 3 mono and 3 color | mono 4 000 page/color 3 000 page |

3.0 Except as set forth herein, all other provisions of the Agreement remain in full force and  effect. To the extent any provision of this Amendment 3 is deemed inconsistent with the terms of the Agreement, the terms of this Amendment 3 shall control with respect to the subject matter thereof.

CONFIDENTIAL - OUTSIDE COUNSEL ONLA3558

Lexmark ▮▮▮▮ Confidential

IN WITNESS WHEREOF, the Parties hereto have duly executed this Amendment 3 by their respective duly authorized representatives to be effective as of the Amendment 3 Effective Date.

**LEXMARK INTERNATIONAL, INC.**

By: _Chris_____

Name: _CHRIS C WHITE_____

Title: _DIRECTOR_____

Date: _July 15, 2013_____

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A3559

Lexmark-███ Confidential

## Attachment 1.1 To The OEM Purchase Agreement

**2013 New Portfolio**



CONFIDENTIAL - OUTSIDE COUNSEL ONlA3560

Lexmark-▮▮▮Confidential



**LEXMARK PRICING (Laser) - End of Life Printer Hardware**

| Product Code (Order PN) | | Product Name/▮▮▮PN CONSUMABLES/EXPENDABLES (SUPPLIES) | US$ |
|---|---|---|---|
| | | | |

| | | HARDWARE OPTIONS | |
|---|---|---|---|
| | | | |

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3561

Lexmark-███████Confidential

## ████████LEXMARK PRICING
**(End of Life Inkjet Printer Hardware)**

| P/N | New P/N | Description | ███████Code | US$ | |
|-----|---------|-------------|-------------|-----|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**CONFIDENTIAL - OUTSIDE COUNSEL ON|A3562**

Lexmark ███ Confidential

## Attachment 1.2 To The OEM Purchase Agreement

| Model | Leveraged from LXK Models | | Cartridges To Be Purchased At The Same Time With Printer HW Purchase | |
|---|---|---|---|---|
| | | | Quantity | Cartridge Type/Yields |
| | MS610 | dn | 2 | 5 000 pages |
| | MS310 | dn | 2 | 5 000 pages |
| | MS310 | d | 2 | 5 000 pages |
| | MX511 | de | 1 | 10 000pages |
| | CS310 | n | 3 mono and 6 color | mono 4 000 page/color 3 000 page |
| | CS410 | dn | 3 mono and 3 color | mono 4 000 page/color 3 000 page |



CONFIDENTIAL - OUTSIDE COUNSEL ON|A3563

OEM CONTRACT 3

████ MPA -- 2010-12-29 Final.doc                   Lexmark / ████ Confidential

| contract number |
| --- |
|  |

# MASTER PURCHASE AGREEMENT

## Between

████████████████████

## And

# LEXMARK INTERNATIONAL, INC.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3564

## TABLE OF CONTENTS

ARTICLE 1. DEFINITIONS    5

1.1    Definitions    5

ARTICLE 2. SCOPE    5

2.1    Purchase and Sale of Products    5

2.2    Exclusion    6

2.3    Exclusivity    6

ARTICLE 3. PRODUCTS    6

3.1    Changes to Products    6

3.2    Service Parts    6

3.3    Supplies Products    7

3.4    Limited Exceptions    8

3.5    Remedies    8

ARTICLE 4. FORECASTS AND PURCHASE ORDERS    8

4.1    Forecasts    8

4.2    Purchase Orders    10

4.3    Month to Month Variations    10

ARTICLE 5. DELIVERY    12

5.1    Term of Delivery    12

5.2    Date of Delivery    12

5.3    Invoice    12

5.4    Delivery Note    12

5.5    Packing    12

5.6    Excess in Quantity    12

5.7    Title and Risk of Loss    12

5.8    Late Delivery    13

ARTICLE 6. PRICE AND PAYMENT    13

6.1    Price    13

6.2    Payment Terms    13

6.3    Taxes and Levies    13

ARTICLE 7. PRODUCT WITHDRAWAL AND EOL MANAGEMENT    14

7.1    Product Withdrawal at End of Life (EOL)    14

7.2    Last Time Buy Purchase Orders after EOL Notice    14

2

ARTICLE 8. INSPECTION AND WARRANTY                              15

8.1    Inspections                                             15
8.2    Warranty                                                18
8.3    Exclusion of Warranties                                 19
8.4    Epidemic Failure                                        19
8.5    Addition to Statutory Conditions                        21

ARTICLE 9. INDEMNIFICATION                                     21

9.1    Lexmark Indemnification                                 21
9.2    Indemnification Procedures                              22
9.3    Limitation on Indemnities                               22
9.4    ██ Indemnification                                      23
9.5    Environmental Regulations                               23

ARTICLE 10. INTELLECTUAL PROPERTY & OTHERS                     23

10.1   Use of Trademark                                        23
10.2   Obligation of Lexmark                                   25
10.3   Laws                                                    26
10.4   Product Liability Insurance                             26
10.5   Access to Premises                                      26

ARTICLE 11. TERM AND TERMINATION                               26

11.1   Term                                                    26
11.2   Termination for Convenience                             27
11.3   Termination for Breach                                  27
11.4   Termination for Financial Instability                   27
11.5   Immediate Termination                                   27
11.4   Effects of Termination                                  28

ARTICLE 12. GOVERNING LAW AND SETTLEMENT OF DISPUTE            28

12.1   Governing Law                                           28
12.2   Negotiation before Arbitration / Litigation            28
12.3   Settlement of Dispute                                   29
12.4   Waiver of Jury                                          29
12.5   Exclusion of CISG                                       29

ARTICLE 13. ADDITIONAL LICENSING TERMS                         29

14.1   Software Distribution Agreement                         29
14.2   Printer and Cartridge License Agreements                29

3

CONFIDENTIAL - OUTSIDE COUNSEL ONA3566

ARTICLE 14. GENERAL PROVISIONS                                          30

14.1    Notice                                                         30

14.2    Survival                                                       31

14.3    Entire Agreement                                               31

14.4    Assignment                                                     32

14.5    Amendment                                                      32

14.6    Waiver                                                         32

14.7    Severability                                                   32

14.8    Headings                                                       32

14.9    Counterparts                                                   33

14.10   Language                                                       33

14.11   Force Majeure                                                  33

14.12   Limitation of Liability                                        33

14.13   Compliance with Laws                                           33

14.14   Publicity                                                      33

14.15   Business Review                                                34

14.16   Order of Precedence                                            34


Schedule A:     Products

Schedule B:     Prices

Schedule C:     Service Parts

Schedule D:     Schedule Intentionally Left Blank

Schedule E:     Software Distribution Agreement

Schedule F:     Quality Agreement

Schedule G:     Service Agreement

Schedule H      Supplies Warranty Policies

CONFIDENTIAL - OUTSIDE COUNSEL ONlA3567

## ARTICLE 1. DEFINITIONS

### 1.1    Definitions

In addition to such capitalized terms that are defined elsewhere in this Agreement, when used herein the following terms shall have the respective meanings ascribed to them in this Article 1.

(a) Agreement shall mean this Master Purchase Agreement and any Schedules and/or Attachments between ████ and Lexmark.

(b) Effective Date - The Effective Date is January 1, 2010.

(c) Lexmark shall mean Lexmark International, Inc. at 740 West New Circle Road, Lexington, Kentucky, U.S.A and its affiliates and subsidiaries.

(d) ████ shall mean ███████████████████████████████████████████████ ████████████████

(e) Purchase Order shall mean ██████ written instruction to supply the Products.

(f) Products shall mean Printer Products, Supplies Products, Service Parts, Features and Options.

(g) Printer Products ("Printers") shall be identified in Schedule A and shall mean ████ versions of Lexmark laser and / or inkjet printers and / or AIO's and / or multi-function devices and / or print engines, as well as Features and Options.

(h) Supplies Products ("Supplies") shall be identified in Schedule A and shall mean toner cartridges, inkjet print cartridges and / or ink tanks or other consumables required for the operation of Printer Products.

(i) Genuine Lexmark Service Parts shall mean parts and components purchased from Lexmark for use with Printer Products. Used or tear-down parts or remanufactured or new parts purchased from a third party shall not be considered to be Genuine Lexmark Service Parts.

(j) Service Parts shall be identified in Schedule C and shall mean Genuine Lexmark Service Parts purchased from Lexmark and required for the repair and / or preventive maintenance of the Printer Products.

## ARTICLE 2. SCOPE

### 2.1    Purchase and Sale of Products

During the term and subject to the terms and conditions of this Agreement, ████ shall purchase from Lexmark, and Lexmark shall sell to ████ the Products for ████ resale in South Korea or in other geographies as expressly agreed to by the parties in writing.

### 2.2    Exclusion

All purchases for Products placed by ████ under this Agreement shall be governed by the terms and conditions of this Agreement and the accepted Purchase Orders to the entire exclusion of all other terms or conditions. No terms or condition endorsed upon, delivered with or contained

5

in either party's quotation, acknowledgement or acceptance of an Order, invoice, purchase order, specification or similar document shall form part of the accepted Purchase Order and the parties both waive any right which they otherwise might have to rely on such terms and conditions. These conditions apply to all transactions under this Agreement and any variation to these conditions shall have no effect unless expressly agreed in writing by both parties.

2.3    Exclusivity

Except as otherwise agreed in writing by ███ Lexmark shall not sell, deliver, distribute or otherwise make available to third parties anywhere in the world, except to ███ the Product bearing ███ branding and trademarks and trade names.

## ARTICLE 3. PRODUCTS

3.1    Changes to Products

Lexmark may make changes to the Products without notifying ███ i) if the changes do not have any effect on the model, form, function, or specifications of the Products, and / or ii) if the changes fall under the non-critical changes described in Schedule F. As described in Schedule F, Lexmark should seek to notify ███ of major changes prior to implementation. After making the changes, details regarding specific changes on all major quality issues will be provided to ███ upon availability.

Except as described below, Lexmark shall notify ███ before making changes to Products that change the model, form, function, or specifications of the Products. If ███ fails to accept the changes, the end of life (EOL) provisions outlined in Article 7 shall apply.

Lexmark agrees to evaluate any ███ requested changes submitted pursuant to procedures specified in Exhibit F and will advise ███ of any effect on the Product specifications and any effect on Product prices that would result from such changes. No such ███ requested changes will be implemented until the resulting specification and price changes are mutually agreed upon.

Notwithstanding the foregoing, Lexmark shall have no obligation to obtain the consent of ███ prior to making changes to the Product to address safety or product defect issues or to comply with law.

3.2 Service Parts

During the term of this Agreement and for a period of 5 years after its expiration or termination, ███ a) will not directly or indirectly sell and will not directly or indirectly promote (whether in advertising or otherwise) non-Lexmark service parts and/or service parts substitutes that are compatible with Printer Products sold hereunder (including but not limited to new service parts, service parts not newly made or not remanufactured by Lexmark that are compatible with Printer Products sold hereunder); and, b) agrees that Service Parts will be sold by ███ only for use with Printers approved by Lexmark in writing.

6

Lexmark shall ensure that Service Parts for a laser Product shall be available for sale to ███ for a period of five (5) years from the Withdrawal Date of the equivalent Lexmark laser Product.

Lexmark will ensure that Service Parts for an inkjet Product shall be available for sale to ███ for a period of three (3) years from the Withdrawal Date of the equivalent Lexmark inkjet Product.

███ agrees to commit to purchase directly from Lexmark all of its requirements for Service Parts (as well as products essentially equivalent to Service Parts) compatible with Printer Products sold hereunder.

### 3.3  Supplies Products

███ agrees that (a) Supplies Products shipped with Printer Products sold hereunder; and, (b) Supplies Products purchased separately hereunder will be sold by ███ only for use with Printers approved by Lexmark in writing.

Lexmark shall not sell any uniquely ███ keyed Supplies Products that can be used for the Printer Products to a third party.

Accordingly, during the term of this Agreement and for a period of 5 years after its expiration or termination,

Lexmark:   a) shall not sell any uniquely ███ keyed Supplies Products that can be used for the Printer Products to a third party; and, b) will not directly or indirectly sell and will not directly or indirectly promote (whether in advertising or otherwise) Lexmark supplies and/or supplies substitutes (including but not limited to new cartridges, cartridge refilling technology, cartridges not newly made by Lexmark or cartridges not remanufactured by Lexmark) that are compatible with Printer Products sold for ███ hereunder.

███ a) agrees to commit to purchase directly from Lexmark all of its requirements for Service Parts and Supplies Products (as well as products essentially equivalent to Supplies products (including but not limited to new cartridges, refilled and/or remanufactured cartridges, and cartridge refilling technology) compatible with Printer Products sold hereunder; and, b) will not directly or indirectly sell and will not directly or indirectly promote (whether in advertising or otherwise) non-Lexmark supplies and/or supplies substitutes (including but not limited to new cartridges, cartridge refilling technology, cartridges not newly made by Lexmark or cartridges not remanufactured by Lexmark) that are compatible with Printer Products sold hereunder.

### 3.4  Limited Exceptions

3.4.1  Notwithstanding the terms of Sections 3.2 and 3.3, Lexmark shall not be liable for breach of obligations set forth in Sections 3.2 and 3.3 in the following events:

a.  If ███ does not purchase directly from Lexmark all of its requirements for Supplies Products and Service Parts; or,

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3570

b.  I██ directly or indirectly sells or promotes non-Lexmark supplies and / or supplies substitutes that are compatible with Printer Products sold hereunder or,

c.  I██ fails to make commercially reasonable efforts to market and sell Supplies Products and Service Parts to the installed base of Printer Products (or any portion thereof) sold under this Agreement.

    3.4.2    Notwithstanding the terms of Sections 3.2 and 3.3██ shall not be liable for breach of obligations set forth in Sections 3.2 and 3.3 in the following events:

a.  If Lexmark stops manufacturing Supplies Products ("EOL") in contravention of Section 7 of this Agreement, provided that Lexmark shall be considered to have breached its obligation only with respect to the particular part numbers of Supplies Products that go EOL without following the procedures in Section 7 and ██ shall be relieved of its obligations under Section 3.3 only with respect to those same part numbers of Supplies Products; or,

b.  If Lexmark sells Supplies Products compatible with Printer Products to a third party in contravention of Lexmark's obligations under Section 3.3.

3.5    Remedies

    Subject to the terms of Section 3.4, in the event either party has reason to believe the other party, or subsidiary or affiliate of the other party, has defaulted with respect to, or is not in compliance with, its respective obligations under Section 3.2 or 3.3, the non-defaulting party may avail itself of the remedies set forth in Section 11.5.

<center>ARTICLE 4. FORECASTS AND PURCHASE ORDERS</center>

4.1    Forecasts

    On a monthly basis, ██ agrees to provide a six (6) month rolling forecast of Product requirements, by no sooner than the 15th and no later than the 25th of each month.  Forecasted volumes are to be shown by Lexmark part number in the month██ is requesting them to be delivered t██ freight forwarder and in integer multiples of the minimum order increments (MOI) as specified in Schedule B.

    A Forecast example is given below. In this example the forecast was provided in December and the 6 month forecast begins with January:

| LXK P/N | ██ P/N | MOI | Example - Six (6) Month Rolling Forecast | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Jan-10 | Feb-10 | Mar-10 | Apr-10 | May-10 | Jun-10 |
| LXK IJ-A | ██ | 100 | Nov PO | Dec PO | 100 | 600 | 500 | 600 |
| LXK LBP-A | ██ | 10 | Nov PO | Dec PO | 40 | 30 | 10 | 60 |

    Forecasts may vary from month to month as set forth below in this Article 4.3  If a new forecast is not received by the due date, the volumes forecasted in the prior month's forecast will

<center>8</center>

be used as the recognized forecast for the then current month; and, the new forecast for the 6th Month will set to zero.

The following is an example of the above December Forecast which has been revised as the result of █ not having provided a Forecast update in either January or February.

| LXK P/N | █ P/N | MOI | Example - Six (6) Month Rolling Forecast | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Mar-10 | Apr-10 | May-10 | Jun-10 | Jul-10 | Aug-10 |
| LXK IJ-A | █ | 100 | Jan PO | Feb PO | 500 | 600 | 0 | 0 |
| LXK LBP-A | █ | 10 | Jan PO | Feb PO | 10 | 60 | 0 | 0 |

█ forecasts are used by Lexmark to procure and stock long lead time (LLT) components (i.e. components such as ASICs and █ molded cover parts) with a lead time of greater than 8 weeks so that Lexmark factories have necessary LLT component inventory to allow them to accept █ Purchase Orders that are consistent with the forecasts described in this Agreement for Products with an order lead time of only 8 weeks.

In the event that █ forecast is reduced, or █ elects to discontinue a Product before the "Last Time Buy" opportunity described in Article 7.2; and, such reduction would result in excess Product inventory and / or excess long lead time component inventory (whether on hand or as a result of commitments made to Lexmark's suppliers) for Lexmark because of actions taken to satisfy prior █ forecasts then Lexmark will identify any such resulting inventory and / or commitments, and █ shall be responsible for issuing a Purchase Order for such inventory. Lexmark will in good faith search for means to minimize excess inventory and components by exploring opportunities to use excess parts and materials in other existing or future Products. Lexmark will not act as a broker or attempt to sell such excess inventories on the open market.

4.2    Purchase Orders

█ may purchase the Products during the term of this Agreement by the issuance of a Purchase Order.

█ agrees to place non-cancelable Purchase Orders by the 25th of each month with a minimum lead time to shipment of two (2) months (8 calendar weeks) from the date the Purchase Order is received at Lexmark (e.g. Purchase Orders received by the 25th of January must be for Products with ship dates beginning March 25th or later).

Lexmark will accept and schedule non-cancelable Purchase Orders subject to Product availability, credit approval, and other legitimate business considerations and will inform █ of shipment schedules within seven (7) business days of the Purchase Order receipt.

Lexmark will also use reasonable efforts to fulfill Purchase Orders with requested lead times that are shorter than the minimum 8 weeks as described above in Article 4.1.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3572



Failure by ████ timely to issue a Purchase Orders shall not diminish or otherwise modify █████ obligations under this Agreement to purchase LLT components procured by Lexmark to support ██████ forecasts as provided for above in Article 4.1.

In the last example under 4.1 above, if P.O.'s were not submitted in January and February for the quantities previously forecasted for, respectively, March and April, then the P.O. quantities are assumed to be zero. However, ████ would be obligated for any LLT components that were previously ordered to satisfy those forecasts in the event those components are not ultimately consumed by future P.O.'s.

Purchase Orders quantities must comply with the month to month variation ranges as outlined below; and, may not be lower than the applicable MOIs specified by Product in Schedule B.

4.3     Month-to-Month Variations

The Figure below shows an example of the Forecasts and Purchase Order lead times as they are submitted month to month according to the permissible variations described below.



CONFIDENTIAL - OUTSIDE COUNSEL ONLY   A3573

The following month-to-month variations are permissible in the Forecasting process.

| | |
|---|---|
| Months 1-2: | Purchase Orders have already been submitted. |
| Month 3: | Newly submitted Purchase Order is firm and non-cancelable. Quantity of units ordered may vary not more than + 20% / - 50% from prior forecast for this month and must be an integer multiple of the applicable MOI. |
| Month 4: | Forecast may vary not more than ± 100% from prior forecast for this month and must be an integer multiple of the applicable MOI. |
| Month 5: | Forecast may vary not more than ± 100% from prior forecast for this month and must be an integer multiple of the applicable MOI. |
| Month 6 | Forecast is new and may be any integer multiple of the applicable MOI. |

## ARTICLE 5. DELIVERY

### 5.1   Term of Delivery

Unless otherwise agreed in the Purchase Order, sale and delivery of Products sold hereunder will be according to the Incoterms 2000 as specified in Schedule B.

### 5.2   Date of Delivery

Unless otherwise agreed in writing by Lexmark, delivery shall take place in accordance with the lead times as provided for under Article 4.2 and the terms of the Delivery Note issued by Lexmark pursuant to Article 5.4.

### 5.3   Invoice

Lexmark shall invoice ████ upon shipment of Products to ████ ██ ████ freight forwarder.

### 5.4   Delivery Note

Lexmark shall ensure that each delivery is accompanied by a delivery note which shows, Purchase Order number, Lexmark's part number ████ part number and number of packages.

### 5.5   Packing

The Products will be packaged consistent with industry standards; and in a manner that is intended to adequately protect the Products from deterioration and physical damage during shipping. The package quantities (carton over packs), pallet quantities and container quantities are determined by Lexmark to ensure the most efficient shipping method possible.

The ████ packaging design is based off the Lexmark carton and package configuration. Although this is the normal starting point Lexmark shall consider ████ special requests on packaging during the development phase and-shall make reasonable efforts to accommodate ████ requests."

### 5.6   Excess in Quantity

If the Products are delivered to ████ in excess of the quantities indicated in the relevant

CONFIDENTIAL - OUTSIDE COUNSEL ONl̲A3574

Purchase Order ██ shall not be obligated to purchase the excess quantities and any such excess quantities shall be and shall remain at Lexmark's risk and shall be returnable at Lexmark's expense.

5.7    Title and Risk of Loss

Unless otherwise provided for in Schedule B, title to Products shall pass from Lexmark to ██ at the time of delivery to ██s designated freight forwarder.

Lexmark warrants to ██ that there is no restriction on or impediment against the passing of the title to the Products to ██

Unless otherwise provided for in Schedule B, risk of loss or damage to the Products shall pass from Lexmark to ██ at the time the goods are delivered to ██ designated freight forwarder.

5.8    Late Delivery

Lexmark shall make commercially reasonable efforts to deliver Products to ██ on the agreed delivery date as set forth in the Purchase Order.

Where Products are to be delivered to ██ more than five (5) business days after the scheduled delivery date during a verified "insufficient stock" inventory situation for that Product at ██ then, Lexmark will, at Lexmark's expense, expedite the delivery of such orders to replenish the ██ inventory to an "acceptable level" inventory situation via Air shipment; provided that (i) such orders are in full compliance with all the agreed to lead time and flexibility parameters in Section 4.3; and, (ii) the delivery delay is due solely to Lexmark's negligence.

An "insufficient stock" inventory situation is defined as less than two (2) weeks of inventory based on current sales rates; and, an "acceptable level" inventory level is defined as more than four (4) weeks of inventory based on current sales rates.

If air shipment is required as described above the parties will work together to ensure that the Air shipment is delivered to ██ as quickly as is commercially reasonable.

ARTICLE 6. PRICE AND PAYMENT

6.1    Price

Unless otherwise agreed in the accepted Purchase Order, the price shall be as stipulated in Schedule B Prices.

6.2    Payment Terms

Unless otherwise agreed in the accepted Purchase Order, ██ payment terms will be sixty (60) days from the date of invoice by telegraphic transfer. The invoice date will not be earlier than the shipment date of Products invoiced.

6.3    Taxes and Levies

██ will be responsible for all taxes, including but not limited to sales and use tax, customs

12

and excise duties, turnover or withholding taxes, Value Added Tax, property tax, corporate, state or local income tax associated with the purchase and delivery of Lexmark's products except for those taxes assessed on the income of Lexmark which shall be Lexmark's responsibility. ██ shall be exclusively responsible for paying directly all statutory fees and copyright levies imposed under laws in countries where the Product is sold.

### ARTICLE 7. PRODUCT WITHDRAWAL AND END OF LIFE MANAGEMENT

7.1     Product Withdrawal at End of Life (EOL)

At the time ██ agrees to purchase a Product model, Lexmark will inform ██ of Lexmark's then current target date for the Product's withdrawal at end-of-life (EOL); and, such target EOL date will be documented in Schedule B.

Lexmark will have the option to withdraw a Product from the business at any time; ██ will be provided written notification of any such Product withdrawal a minimum of six (6) months prior to the effective date of the Product withdrawal.

If the notified Product withdrawal date is prior to the target withdrawal date communicated when ██ agreed to purchase the Product and ██ desires to continue purchasing beyond the new EOL date, then:

a) If Lexmark determines it is commercially viable to continue manufacturing the Product for ██ until the original EOL date, then Lexmark will continue to supply the Product to ██ until the original EOL date; or,

b) If Lexmark determines it is not commercially viable to continue manufacturing the Product until the original EOL date then one of the following will occur:

i) If ██ commits to launching and actively marketing the successor Product, then Lexmark will apply an NRE credit to the successor Product NRE in an amount equal to a prorated amount of the total NRE ██ paid to Lexmark for the Product being withdrawn; or,

ii) If ██ does not commit to launching the successor Product, then Lexmark will offer ██ a last time buy of the Product as of the new EOL date and will discontinue selling the Product to ██ after that.

As an example of b-ii) above, if the total period of time from launch to Product EOL was to have been 20 months, and Lexmark has revised its EOL date such that the total period from launch to Product EOL is 15 months, and ██ is committed to launching and actively marketing the successor Product then Lexmark will apply a credit to the successor Product NRE equal to ██ of the total NRE ██ paid to Lexmark for the Product being withdrawn.

7.2     Last Time Buy Purchase Orders after EOL Notice

13

Upon Lexmark's written notification to ██ of Product Withdrawal at EOL or upon either party's notification to the other party of its desire not to renew this Agreement, Lexmark agrees to offer ██ a "last time buy" of the affected Products to meet ██ requirements.

Within thirty (30) days after receipt of a Lexmark Product EOL notice, ██ must submit one final 6 month forecast in the agreed format (see Section 4.3). Each of the months in this final 6 month forecast will be represented by a non-cancelable firm "last time buy" Purchase Order quantity for that month. The P.O. quantities in this final 6 month forecast may be modified from the prior 6 month's forecast as follows:

Months 3-5 may vary one final time in accordance with the variation parameters set forth under Section 4.3; however, ██ must submit a firm (non-cancelable) P.O. for the quantities to be delivered in each of those 3 months.

Month 6 – a firm P.O. for the Month 6 quantity will be submitted and represent ██ final purchase quantity for the Product at EOL; and, Lexmark will accept and schedule this final non-cancelable Purchase Order subject to component availability, credit approval, and other legitimate business considerations. The diagram below shows an example of the above final order process after the EOL notice.



Figure – Final Purchase Orders after EOL Notice

The prices for these "last time buy" Products shall be in accordance with the then current prices in Schedule B of this Agreement.

## ARTICLE 8. INSPECTION AND WARRANTY

### 8.1  Inspections

#### 8.1.1  Pre-Production and First Article Inspections

During the final development and testing phases (DVT) Lexmark will supply ██ with a minimum of two (2) machine samples per Product model and their aftermarket supply items for ██ to verify conformance to the Product functional specification.  ██ will perform internal functional testing to confirm such samples meet the Product functional specifications; and, if any functional issues are identified as a result of such pre-production inspection, ██ will promptly notify Lexmark in writing of such functional issues.  When all such functional issues (if any)

14

have been resolved, Lexmark will proceed with the pilot build. Lexmark will provide ███ photos and other information about the pilot build. An FAI checklist will be agreed to prior to the actual FAI activities. ███ may participate in the First Article Inspection (FAI) activities by visiting the manufacturing site of the Product. Upon satisfactory inspection of such initial production samples ███ will provide FAI approval to Lexmark; and, Lexmark will then proceed with the Start of Production (SOP) and will commence with the initial shipment of Products to ███.

8.1.2    <u>Shipping Inspections</u>

Promptly after the receipt of Products, ███ shall, or cause its qualified agent to, inspect the Products at its own cost for any packaging damage or other defects which may have been introduced during the shipping process ███ shall immediately notify Lexmark if, during the inspection, any of Products is found not to be in compliance with quality standards, which will be agreed to in writing by the both parties. Defects may include: i) a defect in the product packaging including any error in design, color and content, etc.; ii) damage to products in the carton.

Upon receipt of such notification, Lexmark reserves the right to inspect the defective Products at ███ inspection site within five (5) business days. In such case, ███ shall have the option to: (i) request Lexmark to replace the defective Products with conforming Products; (ii) request Lexmark to repair the defective Products; (iii) request to repair the defective Products itself, for which Lexmark shall bear all costs incurred by ███ or (iv) request refund in part or whole. Lexmark will choose the repair, replace or refund option considering ███ request and depending on other pertinent circumstances.

All claims for errors, damages, defects, shortages and non-conformities in any shipment of Products discovered by the inspection shall be made in writing to Lexmark and be dispatched by ███ with full particulars at the time of the inspection of the Products. Failure to make such claim within 20 days of receipt of the Products by ███ freight forwarder shall constitute acceptance of the shipment and agreement that such shipment fully complies with the quality standards and any other applicable terms and conditions, <u>provided however,</u> that any such acceptance will in no event limit, modify, waive or otherwise restrict ███ rights under the terms, including without limitation the warranty provisions, of this Agreement.

Lexmark shall submit a written proposal of the replace, refund and / or repair process to ███ within ten (10) business days from the request for replace, refund or repair. Such process shall be subject to written approval by ███.

8.1.3    <u>Functional Issues Discovered After FAI Approval</u>

Upon receipt of FAI Approval by ███ Lexmark will begin shipment of Products. If, after the receipt of Products by ███ end-user customers, a functional defect is discovered or a functional change is desired then ███ can bring such defect or change request to Lexmark's attention for

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3578



investigation and / or evaluation and resolution. Lexmark will investigate and provide a corrective action plan for verified functional issues.

Lexmark will perform testing on the manufacturing lines prior to product shipments. Testing will consist of activities such as Source Inspection, End of line inspection, Out of Box audits, etc. Reports on this testing will be provided to ███s specified in Schedule F.

8.1.4     Receiving Inspection

8.1.4.1     Lexmark Standard Quality Processes

Lexmark's standard manufacturing quality processes includes periodic inspections prior to Product shipment to confirm the on-going production is resulting in products that meet the Product and quality specifications. These manufacturing quality processes are described in Schedule F – Quality Agreement. The quality reports created during these manufacturing quality processes are available for review by ███

8.1.4.2     ███ Receiving Inspection

In the event that ███ deems it necessary to perform an inspection of Printer products to verify product quality, ███ shall perform the inspection in accordance with ANSI/ ASQ Z1.4 and a ███ sole expense.   Printer tests and inspections will be to ensure printers meet ███ Product Specifications.

At ███ request, Lexmark will seek to support ███ to establish receiving inspection at factory / Asia sites.

8.1.4.2.1     Rejection of Non-Conforming Products

███ may, within fifteen (15) days of receipt from Lexmark, reject any Printer that is not in compliance with the Product Specifications.

8.1.4.2.2     Effect of Rejection.

All printers identified by ███ as non-conforming during ███ inspection must be verified by Lexmark. Upon receipt of such notification, Lexmark shall inspect the defective Products at ███ inspection site within five (5) business days unless Lexmark provides a written waiver of its right to inspect.

8.1.4.2.2.1     In the event that an inspection performed meets the following "lot reject" criteria: 0.75% AOQL for Ink Jet Printers and 0.25% AQL for Laser Printers, Lexmark shall handle the claim in the following manners.

1.   ███ returns the non-conforming Printer lots to Lexmark and Lexmark will replace the lot.     Expenses such as return costs and all costs associated with the emergency procedure are to be paid by Lexmark.

2.   On an exception bases, product lot may be sorted or reworked to remove non-conforming product.   Lexmark and ███ will mutually agree on the implementation and expenses for such a sort.

16

CONFIDENTIAL - OUTSIDE COUNSEL ONLA3579

██MPA -- 2010-12-29 Final.doc                    Lexmark / ██ Confidential

8.1.4.2.2.2  In the event a less-than lot-size quantity of Printers has been rejected by ██ and confirmed by Lexmark as non-conforming, the Printers can be either:

a)    Returned to Lexmark for repair, replacement or a refund of the original purchase price; or,

b)    Repaired by ██/Lexmark at Lexmark's expense, if mutually agreed to in advance by Lexmark.

The decision of disposition will be mutually agreed by ██ and Lexmark.

8.2    <u>Warranty</u>

(a)    Subject to the provisions of Sections 8.3 and 8.4, Lexmark warrants that the Printer Products shall: i) be free from defects, including any latent defects, in design, material and workmanship applicable thereto for a period of fifteen (15) months from the date of invoice; ii) conform to specifications, if any; iii) be new, unused and not contain used or repaired parts; iv) be free and clear of all liens, claims, encumbrances and other restrictions; v) be merchantable as goods of that kind; vi) be suited for ██ intended use; vii) conform (as to type and quality) to the Product Specifications set forth in Schedule A; and viii) not violate or infringe any property rights, including intellectual property rights, of any person or entity.

(b)    Lexmark warrants that the Supplies Products shall: i) be free from defects, including any latent defects, in design, material and workmanship as described in Schedule A and applicable thereto for a period of twenty-four (24) months from the date of manufacture; ii) be new, unused and not contain used or repaired parts; iii) be free and clear of all liens, claims, encumbrances and other restrictions; and, iv) not violate or infringe any property rights, including intellectual property rights, of any person or entity.,

(c)    If the Printer Products fail to meet warranties given in Article 8.2 (a), at Lexmark's option, Lexmark shall repair, replace, or refund the purchase price of the defective Products in question. ██ reserves the right to suspend payment for the Products concerned until such non-compliance have been rectified or eliminated.

(d)    If the Supplies Products fail to conform to the warranties given in Article 8.2 (b), ██ agrees to return defective Supplies upon request from Lexmark for Failure Analysis. Lexmark agrees, at Lexmark's option, to replace or credit ██ account, for such defective Supplies that Lexmark confirms to be nonconforming. Detailed descriptions of Lexmark's complete warranty policies for Supplies are contained in Schedule H Supplies Warranty Policies: i) "Lexmark / OEM Customer Quality

17

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3580

Overview and Warranty Policy for Inkjet Cartridge Products"; and, ii) "Lexmark / OEM Customer Quality Overview and Warranty Policy for Laser Cartridges".

(e)     Service Parts do not have warranty coverage apart from the warranty (if any) applicable to the Printer Products in which they are installed.   A Service Part, once installed, is covered by the warranty terms of the Printer Product and for the duration (if any) of said warranty.

(f)     Notwithstanding any contrary terms in the Agreement, Lexmark shall have no liability or obligation at any time to repair or replace, or issue a credit in relation to, any Product that contains or is combined with any non-Lexmark Genuine Service Parts or non-genuine Supplies Products not purchased from Lexmark.

8.3    Exclusion of Warranties

The foregoing warranties are in lieu of all other warranties, express or implied, including but not limited to the implied warranties of merchantability and fitness for a particular purpose.

The above mentioned warranties do not cover failures caused by misuse, accidents, damage in transit, attachments, alterations or modifications to Products, unsuitable operation, applications, or usage environment, or failure caused by non-Lexmark (including █ product (e.g. 3rd party supplies items), part, designs, code, microcode programs, or inventions even if the foregoing is included or embodied in Products.

8.4    Epidemic Failure

"Epidemic Failure" means a failure which existed at the time of manufacture of the Printer but was not then active, discernable or evident and could not have been reasonably detected at the time of delivery using industry standard quality and acceptance tests; and, such failure results in recurrent material failure to conform to Product Specifications; and, provided that such failures shall not include those that are the result of a defect or bug in the software image created by Lexmark; and, provided that the conditions set forth above must arise out of a "common failure" which occurs, during the warranty period, in greater than 3.75 percent (3.75%) of the Printers manufactured during any three (3) consecutive months. A Product lot is considered all production in any one month. The period measured is three (3) months of production.

These rates and method of calculation shall also apply to Supplies with the rates of 3.75 percent (3.75%). A "common failure" is defined to the specific part defect (e.g. "fuser roll burr") not to the symptom (e.g. "paper jam").

█ will record and track failure data by month of manufacture and perform all Epidemic Failure rate calculations for the three consecutive month periods based on such data. Lexmark will support █ and help to verify such tracking data and calculations.

For both laser and inkjet Products, the minimum quantity in any three (3) consecutive month

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3581

period must be a minimum of one (1) full container per model for Epidemic Failure calculations. If the total production quantity in any three (3) consecutive month period does not meet this minimum then the successive lots will be added until such minimum is met.

Where product failure statistics suggest that an Epidemic Failure may exist, the parties will cooperate in evaluating the failure condition. The Epidemic Failure provisions described in this Section 8.4 can only be implemented after both ████ and Lexmark have verified that all applicable Epidemic Failure criteria have been met.

In the event of an Epidemic failure, Lexmark and ████ shall immediately cooperate to find appropriate countermeasures, and, ████ may, at its sole option, in addition to and without waiving any other rights or remedies that it may have at law or in equity, or pursuant to this Agreement, take any or all of the following action after verification of an Epidemic failure by both ████ and Lexmark: (i) cancel or suspend any outstanding accepted Purchase Order for the affected Products; (ii) return all affected Products, including any Products purchased hereunder that are compatible with or used in connection with the defective Products, and to the extent ████ has paid Lexmark for the returned Products, Lexmark shall reimburse ████ the price paid and return costs for the Products, which shall be payable by Lexmark within thirty (30) days after the receipt of the returned Products; and, (iii) request rework of potentially impacted units.. The Epidemic Failure remedies described in the immediately preceding sentence shall not be available to ████ to the extent Lexmark verifies that Products under an accepted Purchase Order or delivered to ████ as the case may be) do not contain the Epidemic defect that causes the Epidemic Failure. In the event ████ elects to cancel or suspend any accepted Purchase Order in accordance with this Article, and afterwards ████ wishes to reinstate such accepted Purchase Order, then such accepted Purchase Order shall be automatically reinstated in accordance with the original terms and conditions of such accepted Purchase Order (including, without limitation, the applicable schedule but taking into consideration the period of time that such orders or deliveries were suspended) upon a written notice from ████ o Lexmark.

In the event an Epidemic Failure occurs in a Product ████ will as soon as practical identify to Lexmark in writing any dissatisfied end user customers who desire proactive field replacement or fleet repair of all potentially affected systems.   Lexmark will as soon as practical perform a root cause analysis for the failure.   In connection with the receipt of such analysis, ████ will promptly provide to Lexmark all necessary information requested concerning such products owned or leased by such end user customers (e.g. serial numbers, options features, repair history, locations, usage).   Within 30 days after receipt of all requested information from ████ Lexmark will provide a detailed, written root cause report to ████ including an assessment of which Products owned by such identified end user customer (s) could, based on this root cause analysis, potentially experience the Epidemic Failure.   In addition, Lexmark will, at its expense, within 90

19



days of such report, repair or replace (Lexmark's option) all such potentially affected Products identified in Lexmark's analysis.

In the event such an Epidemic Defect occurs, Lexmark shall also at its sole cost and expense and in conjunction with ███ immediately proceed to notify all of the appropriate subgroups of the affected and potentially affected end-users of the defect potential, and the availability of the repair or replacement remedies if the end-users experience the problem. If repair (or replacement with the exact same model) cannot be achieved, the Lexmark shall provide replacements with equivalent or higher-priced models of Products at no additional charge to the end-users, or lower-priced models with appropriate credits towards purchase of any other Lexmark Product at the end-user's option.

███ Ink Jet printers are purchased from Lexmark without warranty; and, therefore, Lexmark has no inkjet Printer warranty cost obligations except for a potential verified Epidemic Failure as described above ███ aser printers are purchased with parts-only warranty and Lexmark has no warranty cost obligation other than for parts replacement during the applicable warranty period or for those costs associated with a verified Epidemic Failure as described above.

8.5    Addition to Statutory Conditions

███ rights under this ARTICLE 8. INSPECTION AND WARRANTY are in addition to the statutory conditions implied in favor of ███ y any governing laws.

<p align="center">ARTICLE 9. INDEMNIFICATION</p>

9.1    Lexmark Indemnification

Lexmark shall defend, hold harmless and indemnify, including attorneys fees, ███ and all their respective directors, officers, employees, agents, customers and distributors against any and all third-party claims, actions, demands, legal proceedings, liabilities, damages, losses, judgments, authorized settlements that arise or are alleged to have arisen as a result of, arising out of or in connection with:

(a)    Infringement by a Product(s) of a copyright, patent, trademark, trade secret or other intellectual property right of any third party;

(b)    Bodily injury (including death) or damage to real or tangible personal property;

(c)    i) the Products provided by Lexmark, ii) negligent or intentional acts or omissions of Lexmark or iii) breach by Lexmark of any terms of this Agreement.

9.2    Indemnification Procedures

Promptly, upon becoming aware of any matter which is subject to the Article 9.1, (a "Claim"), ███ eeking indemnification must give notice of the Claim to Lexmark, accompanied by a copy of any written documentation regarding the Claim received by ███

CONFIDENTIAL - OUTSIDE COUNSEL ONA3583

██MPA -- 2010-12-29 Final.doc                    Lexmark / ██Confidential

(a) Lexmark will, at its option, settle or defend, at its own expense and with its own counsel, the Claim. Lexmark will not enter into any settlement that imposes any liability or obligation on ████ without ████ prior written consent, which shall not be unreasonably withheld or delayed. The parties will cooperate in the settlement or defense and give each other full access to all relevant information.

(b) Lexmark will reimburse ████ on demand for all damages incurred by ████ n defending or settling the Claim.

9.3    Limitations on Indemnities

Lexmark's obligation under this Article 9 is conditioned on ████ agreement that if units of Product in the inventory of ████ or the operation thereof while in ████ inventory, become, or in Lexmark's opinion are likely to become, the subject of such a claim, ████ will permit Lexmark (notwithstanding any other provision of this Agreement), with ████ written consent, to:,

(a) Stop shipping such Product, and upon written request, ████ will return such units of Product to Lexmark; or

(b) Procure the right for ████ to continue marketing and using units of Product; or

(c) Replace or modify them so that they become non-infringing.

Notwithstanding the foregoing, Lexmark shall have no obligation whatsoever with respect to any claim based upon (a) an Engineering Change requested or initiated by ████ (b) Non-Lexmark modification of, or content in, units of Product, including any technology provided directly or indirectly by ████ (c) non-Lexmark originated portions of Product, (d) the combination, operation or use of Products with apparatus, data or programs not furnished by Lexmark; or (e) the combination, operation or use of Products with either (i) other products and/or (ii) other items sold or otherwise furnished by Lexmark, under circumstances where Lexmark did not perform such combination:   in which cases (a) through (e), inclusive ████ shall defend Lexmark from any such claims and pay resulting damages, costs, and attorneys fees finally awarded by a tribunal for such claim or agreed to in a settlement by ████ as long as Lexmark provides prompt written notice and allows ████ control of the defense and cooperates in the same manner as provided in Article 9.2.

This Article 9 states Lexmark's entire obligation and ████ entire remedy relating to infringement.

9.4    ████ Indemnification

████ shall indemnify, defend, and hold harmless Lexmark from any and all claims made within jurisdictions where the Products are sold by ████ including reasonable attorneys fees, by any party arising from any acts or omissions for which, and to the extent that, ████ is legally liable under the applicable law, except that ████ will not be liable for any lost profits, lost savings,

21

incidental damages or other consequential or indirect damages arising out of or relating to the foregoing.

## 9.5    Environmental Regulations

### 9.5.1    Representations and Warranties

Lexmark represents and warrants that Products comply with the environmental, health or safety laws and the regulations of Korea applicable to the Products including those relating to the presence or use of chemicals, hazardous substances or materials in the Products.

### 9.5.2    Cooperation

In the event that a Product supplied by Lexmark to ████ becomes the subject of a government audit relating to environmental, health or safety laws then Lexmark shall cooperate with ████ and make available to such governing authority such records (as described in Section 9.5.3) as are in Lexmark's custody and are responsive to the government's request.

### 9.5.3    Records

Lexmark shall and shall obligate Lexmark's ODM development partners to:

(a) prepare and keep records identifying and describing the regulated materials or chemicals used or included in the development or manufacture of the Products and submit them to ████ as described in Section 9.5.2,

(b) provide the complete and accurate Material Safety Data Sheets (MSDS) for the ink and toner materials contained in or used by Supplies Products to ████ upon request of ████ or as required by applicable laws; and,

(c) Maintain records such as Lexmark Supplier Declaration / Product Substance Information Report by homogeneous material and the results of testing performed during the development or manufacture of the Products regarding the regulated chemicals or materials contained in or used by the Products. These records must be submitted to ████ as described in Section 9.5.2; and,

(d) Furnish ████ any of the above information reasonably requested by ████ to confirm compliance with applicable laws or to determine the environmental, health or safety effects of materials or chemicals contained in or used by a Product or its packaging.

### 9.5.4    Accuracy of Records

Lexmark represents and warrants that the Lexmark developed materials, record of chemicals, various test results and all other information and documents submitted to ████ pursuant to this Section 9.5 are true and accurate; and, to the best of its knowledge, materials, records and test results provided by third parties pursuant to this Section 9.5 are true and accurate.

### 9.5.5    Corrective Action

In the event a government audit determines that a Product does not comply with applicable

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3585

environmental, health or safety laws ███ may request a corrective action from Lexmark. In the event the Product does not comply after Lexmark has taken the corrective action, ███ may, in addition to whatever rights it may have under this Agreement or relevant laws cancel any unfulfilled Purchase Orders for the non-complying Product.

9.5.6    <u>Notification</u>

In the event either ███ or Lexmark become aware of any of the following it shall immediately notify the other party in writing where:

(a) it becomes known that the Products are or could be dangerous to human health or the environment; or

(b) A government, regulatory authority or other public institution, or consumer or other non-governmental group, in the area where the Products are sold has provided written notice to ███ or Lexmark alleging that the Products or the components are or may be in violation of the laws and/or regulations relating to human health, safety or the environment.

9.5.7    <u>Governmental Body</u>

Neither party may notify a governmental body or consumer group as to the existence of situations in Korea where a party determines that Products are or may be not complying with the environmental, health or safety laws and regulations of Korea without first obtaining written consent from the other party.

9.5.8    <u>Recall</u>

In the event a Product is subject to an audit for noncompliance with a hazardous substance regulation claimed by the Product and such audit determines that the Product is not in compliance then Lexmark, after any appeals which may be permitted by law, will comply with the directives issued by the authority governing the audit. If such directives require the installed base of Products to comply, then Lexmark shall, at Lexmark's option and at Lexmark's expense either: i) cause such installed base of Products to comply; or, ii) recall the installed base of Products not in compliance for repair or for exchange for an equivalent or higher value Product; or, refund the purchase price to affected customers.

9.5.9    <u>Inspection</u>

Lexmark from time to time performs materials analysis of current Products to confirm the Product's are maintaining compliance with all claimed hazardous substance regulations. If ███ wishes to review a written report of such analysis then ███ may make such a request to Lexmark identifying the Product and the reason for wanting to review the report; and, Lexmark shall make the then most recent report (if any) available to ███ within a reasonable amount of time.

23

## ARTICLE 10. INTELLECTUAL PROPERTY & OTHERS

**10.1    Use of trademark**

The Products shall bear only such names and trademarks as are specified in writing by █ to Lexmark. Any such names and trademarks shall remain the sole and exclusive property of, and any rights which may accrue from such trade name/trademark usage shall inure to the sole benefit of █ or its customers if the designated trademark and /or trade name is owned (or licensed) by █ customers.

**10.2    Obligation of Lexmark**

Lexmark agrees to use the names and trademarks of █ or its customers only on and in connection with Products manufactured for █ pursuant to this Agreement and only in forms and arrangements approved in advance in writing by █ Except to the extent necessary to comply with Article 10.3, Lexmark shall not in any way directly or indirectly refer to itself as the manufacturer of Products in advertising or otherwise and shall not sell or dispose of any Products bearing any of █ or its customer's trademarks or trade names to any person or entity other than █ unless expressly authorized to do so in writing by █ Lexmark shall take all reasonable steps to prevent the use of any of █ or its customers trademarks or trade names by any dealer or distributor in connection with the sale of its own products. It is understood and agreed that money damages would not be a sufficient remedy for any breach of this provision and that █ shall be entitled to equitable relief, including injunction and specific performance, as a remedy for any such breach. Such remedies shall not be deemed to be the exclusive remedies for a breach by Lexmark of this provision but shall be in addition to all other remedies available to █ at law or in equity.

**10.3    Laws**

If any statute, law, rule or regulation of any jurisdiction in which the Products are sold require that the name of the manufacturer of Products be indicated thereon, sufficient identification for compliance shall be placed on those Products.

**10.4    Product Liability Insurance**

(a)  Lexmark shall carry at its expense during the entire term of this agreement product liability insurance written on an occurrence basis, worldwide jurisdiction if commercially available, with a limit of not less than One Million Dollar (USD 1,000,000) per occurrence and Two Million Dollar (USD 2,000,000) in the aggregate.  Such insurance shall be issued by a commercially sound insurance carrier with an A.M. Best rating of "A-" or other equivalent regulator. Lexmark shall cause its insurers to endorse the required insurance hereunder to waive any rights of subrogation against █ Such insurance to the extent permissible by applicable

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3587

laws shall name ███ as additional insured's, shall be primary over any insurance maintained by ███ and shall endeavor to provide that ███ will be given at least thirty (30) days' prior written notice of any cancellation.

(b)  Upon execution of this agreement, and thereafter ten (10) days prior to any renewals, Lexmark shall provide ███ with a Certificate of Insurance evidencing the coverage's herein required.

(c)  ███ shall notify Lexmark of any ███ insurance claims within 30 days of becoming aware of such claims and in accordance with Section 14.1

10.5    Access to Premises

Lexmark will give ███ access to both its sites and buildings with at least a five (5) day prior notice, required to verify that Lexmark is in adherence with this Agreement.

ARTICLE 11. TERM AND TERMINATION

11.1    Term

The term of this Agreement shall be two (2) years beginning on the Effective Date. The terms of this Agreement remain in effect for any accepted Purchase Order that is outstanding at the time of expiration or termination of the Agreement. This Agreement will be automatically renewed for additional twelve (12) month periods unless either party notifies the other of its desire not to renew six (6) months prior to expiration.

11.2    Termination for Convenience

Either party may terminate this Agreement by providing at least one-hundred twenty (120) days prior written notice to the other party.

11.3    Termination for Breach

If a party commits a substantial breach or repudiation of this Agreement, the other party may provide written notice of the breach and that it intends to give notice of termination if the breach is not cured within 30 days.   If the breach is not cured by the end of cure period, the non-breaching party may terminate this Agreement upon providing sixty days advance notice of its intent to terminate.   .

11.4    Termination for Financial Instability

This Agreement may be terminated by a notice in writing with immediate effect, without prior recourse to any judicial or other authority, given by the other party to the party in question upon the occurrence of any of the following events:

(a)      The party becomes bankrupt, insolvent, or has its business placed in the hand of a receiver, assignee or trustee, whether by voluntary act or otherwise; or

(b)      The party makes any composition or enters into an arrangement with his creditors;

25

or

(c)     an order is made or a resolution is passed for the winding up of the other party, or an order is made for the appointment of an administrator to manage the affairs, business and property of the other party, or such an administrator is appointed, or documents are filed with the court for the appointment of an administrator, or notice of intention to appoint an administrator is given by the other party or its directors or by a qualifying charge holder, or a receiver is appointed of any of the other party's assets or undertaking, or circumstances arise which entitle the court or a creditor to appoint a receiver or manager or which entitle the court to make a winding-up order, or the other party takes or suffers any similar or analogous action in consequence of the debt; or

(d)     The party ceases, or threatens to cease, to carry on business.

11.5     Immediate Termination

Subject to the terms of Section 3.4, in the event either party has reason to believe the other party, or subsidiary or affiliate of the other party, has defaulted with respect to, or is not in compliance with its respective obligations under Sections 3.2 and 3.3, the non-defaulting party may immediately provide a written notice of its intent to terminate this Agreement.

Upon receipt of such written notice the alleged defaulting party will be allowed a 30-day grace period to mutually discuss the notice; and, either i) submit information substantiating to the sole and absolute discretion of the party providing the notice that they are not in default; or ii) propose a compensation payment to remedy the default. After such 30-day grace period if the party providing the notice is not satisfied with the information submitted or the proposed compensation payment then the non-defaulting party providing the notice may immediately terminate the Agreement.

Notwithstanding any other provision of this Agreement, termination pursuant to this Section 11.5 shall cancel and discharge all of the non-defaulting party's obligations, covenants, representations, and warranties hereunder. This remedy shall be in addition to any other remedies available to the non-defaulting party.

11.6     Effects of Termination

If Lexmark terminates for █default █shall pay Lexmark for all Products produced and in work in process, plus all components and material in inventory or ordered which cannot be reasonably cancelled, returned or diverted to other Lexmark products. If █terminates for Lexmark's default, █must pay for Products shipped prior to the effective date of termination. █may choose to, but is not obligated to, accept on a prepayment basis Products on order on the effective date of termination subject to their availability from Lexmark

Notwithstanding any other provision of this Agreement, if either party files a claim or suit

26



against the other, whether based on a Default of this Agreement, or for any other reason, the other party may terminate this Agreement immediately, upon written notice to the filing party and only outstanding accepted Purchase Orders will be fulfilled (and Lexmark may, at its option, require payment prior to shipment) provided, however, that such termination shall not prejudice either parties' rights with regard to the claim or suit filed by the filing party.

## ARTICLE 12. GOVERNING LAW AND SETTLEMENT OF DISPUTE

12.1    Governing law

This Agreement shall be interpreted and governed by the laws of the Republic of Singapore, without reference to its choice of laws.

12.2    Negotiation before Arbitration / Litigation

Any party may give the other party written notice of any dispute not resolved in the normal course of business. Within thirty (30) business days after delivery of the disputing party's notice, the executives or any persons authorized to resolve the dispute of both parties will meet at a mutually acceptable time and place, and hereafter as often as they reasonably deem necessary, to attempt to amicably resolve the dispute in good faith. All reasonable requests for information made by one party to the other will be honored. All negotiations pursuant to this clause are confidential. If the parties continue to be unable to resolve the dispute within thirty (30) business days from the first meeting, either party may initiate arbitration or litigation in accordance with the provisions of Article 12.3.

12.3    Settlement of Disputes

All disputes, controversies or disagreements which may arise between the parties, in relation to or in connection with this Agreement, or for the breach hereof shall be finally settled by arbitration. The arbitration shall be conducted in English by three (3) arbitrators in the Republic of Singapore, in accordance with the Commercial Arbitration Rules of the Singapore Commercial Arbitration Centre. The award rendered by the arbitrators shall be final and binding upon both parties.

12.4    Waiver of Jury

Each party, to the extent permitted by law, knowingly, voluntarily, and intentionally waives, its right to a trial by jury in any action or other legal proceeding arising out of or relating to this Agreement and the transactions it contemplates. This waiver applies to any action or legal proceeding, whether sounding in contract, tort, or otherwise. Each party acknowledges that the provisions of this Article are a material consideration in executing and delivering this Agreement and consummating the transaction it contemplates.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3590

12.5    Exclusion of CISG

The United Nations Convention on Contracts for the International Sale of Goods is expressly and entirely excluded.

ARTICLE 13.    ADDITIONAL LICENSE TERMS

13.1    Software Distribution Agreement

Additional software and firmware license terms relating to the Products are set forth in Schedule E, Software Distribution Agreement.

13.2    Printer and Cartridge License Agreements

███ shall cause the following license language to appear on Printer Products and Supplies Products when offered for sale by ███

(a) Inkjet Printer License Agreement

I agree that this patented printer is licensed for, and designed to work with only genuine Lexmark ink cartridges for the life of the patented printer. I agree to: (1) use only genuine Lexmark ink cartridges with this printer (except I may use replacement cartridges made by Lexmark but sold without single use terms as described in the below cartridge license agreement), and (2) pass this printer license/agreement to any subsequent user of this printer.

(b) Inkjet Cartridge License Agreement

I agree that the patented print cartridge(s) shipped with this printing device are sold subject to the following license/agreement: The patented print cartridge(s) contained inside is/are licensed for a single use only and is/are designed to stop working after delivering a fixed amount of ink. A variable amount of ink will remain in the cartridge when replacement is required. After this single use, the license to use the print cartridge terminates, and the used cartridge must be returned only to Lexmark for remanufacturing, refilling or recycling. If I buy another cartridge in the future that is sold subject to the above terms, I accept such terms as to that cartridge. If you do not accept the terms of this single use license/agreement; return this product in its original packaging to your point of purchase. A replacement cartridge sold without these terms is available at www.lexmark.com.

(c) Laser Device License Agreement

The patented printer is licensed for, and designed to work with only genuine toner cartridges and developer components made by the manufacturer of this printer for the life of the patented printer. Under this patent license, you agree to: (1) use only genuine toner cartridges and developer components, made by the manufacturer of this printer, with this licensed printer except as otherwise provided below, and (2) pass this license/agreement to any subsequent user of this licensed printer. The patented toner cartridges and developer components inside are licensed subject to a restriction that they may be used only once. Following their initial use, you agree to

28

return them only to us or the manufacturer for recycling.  Please contact us for information regarding free empty toner cartridge returns. The genuine toner cartridges are designed to stop working after delivering a fixed amount of toner.  A variable amount of toner may remain in them when replacement is required.  Replacement toner cartridge(s) sold without these terms are available.  Please contact us or your place of purchase for more information regarding the availability of these regular cartridges.  Please be aware that a regular cartridge, that is cartridges not sold subject to this single use patent license, may be refilled by you, or a third party, as the only cartridge alternative to be used with the licensed printer.

<div align="center">ARTICLE 14. GENERAL PROVISIONS</div>

14.1    Notice

   Any notice required or permitted to be given hereunder shall be in writing, and may be given by personal service, registered airmail, or facsimile (if confirmed on the same day in writing by registered airmail), with postage prepaid to the following addresses:

| | |
|---|---|
| To ███ | |
| CC: | ██████████████ |
| Address: | ██████████████ |
| | ██████████████ |
| Telephone: | ██████████████ |
| Fax: | |
| To Lexmark | John Decker |
| CC: | Office of the General Counsel; and, |
| | Office of Risk Management |
| Address: | 740 West New Circle Road, Lexington, Kentucky, U.S.A. 40550 |
| Telephone: | +1 859-232-5124 |
| Fax: | +1 859-232-5538 |

   Any notice so given shall be deemed to be received, if sent by airmail, upon receipt or ten (10) days after posting, whichever is earlier, or if sent by facsimile, twenty-four (24) hours after dispatch.

14.2    Survival

   The parties' rights and obligations which, by their nature, would continue beyond the termination, cancellation, or expiration of this Agreement, including but not limited to those rights and obligations of the parties set forth in ARTICLE 7. PRODUCT WITHDRAWAL AND END OF LIFE MANAGEMENT, ARTICLE 8. INSPECTION AND WARRANTY, ARTICLE 9.

CONFIDENTIAL - OUTSIDE COUNSEL ONLA3592



INDEMNIFICATION, ARTICLE 10. INTELLECTUAL PROPERTY & OTHERS, and ARTICLE 12. GOVERNING LAW AND SETTLEMENT OF DISPUTE will survive such termination, cancellation or expiration.

14.3    Entire Agreement

This Agreement constitutes the final agreement between the parties. It is the complete and exclusive expression of the parties' agreement on the matters contained in this Agreement. All prior and contemporaneous negotiations and agreements between the parties on the matter contained in this Agreement are expressly merged into and superseded by this Agreement. The provisions of this Agreement may not be explained, supplemented, or qualified through evidence of trade usage or a prior course of dealings. In entering into this Agreement, neither party has relied upon any statement, representation, warranty, or agreement of the other party except for those expressly contained in this Agreement. There are no conditions precedent to the effectiveness of this Agreement other than those expressly stated in this Agreement.

14.4    Assignment

Without the prior written consent of the other party, neither party may assign any of its rights or obligations under this Agreement voluntarily or involuntarily, provided however, that (a) a party may assign its entire rights to any lender providing financing with a prior written notice to the other party and (b) a party may assign its entire rights and obligations under this Agreement to a third party (which shall be obligated in writing to assume the obligations of said party under this Agreement) with which the party merges or that acquires all or substantially all of the party's assets. Without the prior written consent of the other party, neither party may delegate any performance under this Agreement voluntarily or involuntarily. Any purported assignment of rights or delegation of performance in violation of this Article is void.

14.5    Amendment

The parties may not amend this Agreement, except by written agreement of the parties.

14.6    Waiver

No failure or delay in i) exercising any right or remedy; or ii) requiring the satisfaction of any condition under this Agreement, and no course of dealing between the parties, operates as a waiver or estoppel of any right, remedy or condition. A waiver made in writing on one occasion is effective only in that instance and only for the purpose that it is given and is not to be construed as a waiver on any future occasion or against any other person. To the extent any course of dealing, act, omission, failure or delay in exercising any right or remedy under this Agreement constitutes the election of an inconsistent right or remedy, that election does not i) constitute a waiver of any right or remedy; or ii) limit or prevent the subsequent enforcement of any contract provision. No single or partial exercise of any right or remedy under this Agreement precludes the

30

CONFIDENTIAL - OUTSIDE COUNSEL ONLA3593

 

simultaneous or subsequent exercise of any other right or remedy. The rights and remedies of the parties set forth in this Agreement are not exclusive of, but are cumulative to, any rights or remedies now or subsequently existing at law, in equity, or by statute.

14.7    Severability

If any one or more of the provisions contained in this Agreement shall be declared invalid, illegal or unenforceable in any respect under any applicable law, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired, and in such case, the parties hereto oblige themselves to reach the purpose of the invalid provision by a new, valid and legal stipulation.

14.8    Headings

The headings herein are included for the purposes of convenience only and do not affect the construction or interpretation of any provision of this Agreement.

14.9    Counterparts

This Agreement may be executed in any number of counterparts. Any single counterpart or set of counterparts signed by the parties hereto shall constitute one original agreement for all purpose.

14.10    Language

For the purpose of communication, this Agreement may be translated into another language, but this Agreement, which is executed in the English language, shall be the only binding version.

14.11    Force Majeure

Neither party shall be liable to the other party for non-performance or delay in performance of any of its obligation under this Agreement due to causes reasonably beyond its control including, but not limited to, fire, flood, epidemic, natural disasters, unavoidable accidents, governmental regulations, war, riots and insurrections, The list of force majeure events set forth in the previous sentence is not exhaustive, and the principle of *ejusdem generis* is not to be applied in determining whether a particular act or event qualifies as a force majeure event. Upon the occurrence of such a force majeure condition, the affected party shall immediately notify the other party with as much detail as possible and shall promptly inform the other party of any further developments. Immediately after the cause is removed, the affected party shall perform such obligations with all due speed. Should any event of force majeure continue for sixty (60) days or more, one party may terminate this Agreement upon notice to the other party.

14.12    Limitation of Liability

(1) In no event will either party be liable for any lost profits, lost savings, lost data, incidental damages, or other consequential damages, even if such party has been advised of the possibility of such damages.

31

CONFIDENTIAL - OUTSIDE COUNSEL ONl A3594

 MPA -- 2010-12-29 Final.doc                    Lexmark / Confidential

(2) For any claim for any cause whatsoever, other than those provided for in Article 9.1 (b), either party's liability is limited to actual direct damages.

14.13   Compliance with Laws

Each party agrees to comply with all applicable governmental laws and regulations, including U.S. laws and regulations relating to the export of technical data and products covered by this Agreement.

14.14   Publicity

Press releases and other publicity or advertising which mentions the other party by name shall be agreed upon by both parties prior to release.   This Agreement, and its terms and pricing, shall be held in confidence for two (2) years from the expiration or termination of this Agreement, except that either party can disclose it to a third party financial organization for financing purposes, if such third party agrees to hold it in confidence.   No other information shall be considered confidential unless it is covered by separate written Confidential Exchange Agreement, #5894, dated February 6, 2009, which is hereby incorporated in this Agreement, and which shall continue in full force and effect throughout the contract period of this Agreement.

14.15   Business Review

All parties agree to meet quarterly to review market trends, product plans, and product pricing relative to year-to-date volumes.

14.16   Order of Precedence

The terms and conditions contained in the Schedules attached to this Agreement take precedence in case of a conflict with the terms and conditions in this Agreement.

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3595

By signing below, the Parties, and each of them, signify their agreement with this Agreement.

For ████████████████

By ████████████████

(I have the authority to bind the corporation)

Name: ████████████████.

(Print or Type)

Title: ████████████████

(Print or Type)

Date: _Dec 29, 2010_

(Print or Type)

For LEXMARK INTERNATIONAL, INC.

By: _____

(I have the authority to bind the corporation)

Name: _F.T. SAMUEL JR_

(Print or Type)

Title: _VP, OEM & ALLIANCES_

(Print or Type)

Date: _4 JANUARY, 2011_

(Print or Type)

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3596

MPA Schedule C - Spare Parts v1.2 Share.xls

| | | | | | | | Discount Effective January 1, | Discount |
|---|---|---|---|---|---|---|---|---|
| Schedule C - Model E260 & E360 Service Part Pricing At | | | | | | | | Discount |
| Lexmark P/N | Part Name | Description | # Per Machine | | Required for E260 | Required for E360 | 2010 | Effective TBD |
| 0040X0280 | POWER CORD | KOREA | 1 | | E260d/dn | E360d/dn | | |
| 0040X0344 | COVER | ST E260DN LV NMPL | 1 | | E260dn | | | |
| 0040X0346 | COVER | ST REAR COVER & DOOR | 1 | | E260dn | | | |
| 0040X0347 | BEZEL | E260 BEZEL ICONS ST | 1 | | E260dn | | | |
| 0040X0407 | GUIDE | LEFT ASM GUIDE CART | 1 | | E260d/dn | E360d/dn | | |
| 0040X1367 | CABLE | PACKAGED PAR CABLE | 1 | | E260d/dn | E360d/dn | | |
| 0040X1368 | CABLE | PACKAGED USB CABLE | 1 | | E260d/dn | E360d/dn | | |
| 0040X1455 | CARD ASM | 64MB FLASH | 1 | | | E360 | | |
| 0040X1515 | CARD ASM | KOREAN FONT | 1 | | E260d/dn | E360d/dn | | |
| 0040X2855 | STRIP | TRAY 250-SHEET | 1 | | E260d/dn | E360d/dn | | |
| 0040X5345 | FUSER | E260V FUSER | 1 | | E260d/dn | E360d/dn | | |
| 0040X5347 | PCBA | CONTROLLER BOARD LD | | | E260d | | | |
| 0040X5348 | PCBA | CONTROLLER BOARD LDN | | | E260dn | | | |
| 0040X5349 | PCBA | CONTROLLER BOARD MDN | 1 | | | E360dn | | |
| 0040X5352 | LED | OP PANEL ASM (L) | 1 | | E260d | | | |
| 0040X5353 | COVER | BEZEL OP PANEL (LD) | | | E260d | | | |
| 0040X5354 | LCD | OP PANEL ASM (M) | 1 | | | E360d/dn | | |
| 0040X5355 | COVER | BEZEL OP PANEL (MD) | | | | E360d | | |
| 0040X5358 | TRAY | MPF ASM & GUIDE | 1 | | | E360d/dn | | |
| 0040X5359 | COVER | NAMEPLATE | 1 | | E260d/dn | E360d/dn | | |
| 0040X5360 | SENSOR | ACCESS COVER OPEN | 1 | | E260d/dn | E360d/dn | | |
| 0040X5362 | POWER SUPL | 220V LVPS / HVPS | 1 | | E260d/dn | E360d/dn | | |
| 0040X5363 | KIT (MEC) | DPLX GEAR INTERFACE | 1 | | E260d/dn | E360d/dn | | |
| 0040X5364 | ROLL CBM | TRANSFER ROLL | 1 | | E260d/dn | E360d/dn | | |
| 0040X5365 | SENSOR | DPLX/PAPER INPUT ASM | 1 | | E260d/dn | E360d/dn | | |
| 0040X5366 | SENSOR | MANUAL INPUT ASM | 1 | | E260d/dn | E360d/dn | | |
| 0040X5367 | GEARBOX | MAIN DRIVE W/MOTOR | 1 | | E260d/dn | E360d/dn | | |
| 0040X5368 | CLUTCH | MANUAL FEED | 1 | | E260d/dn | E360d/dn | | |
| 0040X5369 | SOLENOID | MANUAL FEED | 1 | | E260d/dn | E360d/dn | | |
| 0040X5370 | CLUTCH | MEDIA FEED (ACM) | 1 | | E260d/dn | E360d/dn | | |
| 0040X5371 | CLUTCH | MPF FEED CLUTCH | 1 | | | E360d/dn | | |
| 0040X5372 | REDRIVE | EXIT GUIDE W/SENSOR | 1 | | E260d/dn | E360d/dn | | |
| 0040X5373 | COVER | TOP ASM | 1 | | E260d/dn | E360d/dn | | |
| 0040X5374 | COVER | LEFT SIDE | 1 | | E260d/dn | E360d/dn | | |
| 0040X5375 | COVER | RIGHT SIDE | 1 | | E260d/dn | E360d/dn | | |
| 0040X5377 | COVER | REAR UPPER & LOWER | 1 | | E260d/dn | E360d/dn | | |
| 0040X5378 | COVER | ACCESS COVER ASM | 1 | | E260d/dn | E360d/dn | | |
| 0040X5379 | COVER | FRONT DOOR | 1 | | E260d/dn | E360d/dn | | |
| 0040X5380 | DUPLEX | COMPLETE ASM | 1 | | E260d/dn | E360d/dn | | |
| 0040X5381 | TRAY | PRIMARY | 1 | | E260d/dn | E360d/dn | | |
| 0040X5382 | STRIP | TRAY (PRIMARY) WEAR | 1 | | E260d/dn | E360d/dn | | |
| 0040X5383 | FRAME | FRONT GUIDE ASM | 1 | | | E360d/dn | | |
| 0040X5385 | SENSOR | TONER LEVEL | 1 | | | | | |
| 0040X5386 | LASER PH | LSU (L) | 1 | | E260d/dn | | | |
| 0040X5387 | LASER PH | LSU (M/H) | 1 | | | E360d/dn | | |
| 0040X5388 | LCD | OP PNL DBCS ASM (M) | 1 | | | E360d/dn | | |
| 0040X5389 | COVER | BEZEL OP PANEL LDN | 1 | | E260dn | | | |
| 0040X5390 | COVER | BEZEL OP PANEL MDN | 1 | | | E360dn | | |
| 0040X5392 | FAN | COOLING FAN AND SCRE | 1 | | E260d/dn | E360d/dn | | |
| 0040X5394 | TRAY | TRAY 2 250 SHEET | 1 | | E260d/dn | E360d/dn | | |
| 0040X5395 | TRAY | TRAY 2 550 SHEET | 1 | | E260d/dn | E360d/dn | | |
| 0040X5396 | SCREW | MISC SCREWS | 1 | | E260d/dn | E360d/dn | | |
| 0040X5397 | MOUNT | FRONT COVER HINGES | 1 | | E260d/dn | E360d/dn | | |
| 0040X5398 | DRAWER | 250-SHEET OPTION | 1 | | E260d/dn | E360d/dn | | |
| 0040X5399 | DRAWER | 550-SHEET OPTION | 1 | | E260d/dn | E360d/dn | | |
| 0040X5440 | ROLLER | PICK TIRES OPT. T2 | 1 | | E260d/dn | E360d/dn | | |
| 0040X5451 | ROLLER | ACM TIRE KNOBBY/HUB | 1 | | E260d/dn | E360d/dn | | |
| 0040X5452 | ROLLER | ACM TIRE SERATED/HUB | 1 | | | E360d/dn | | |
| 0040X5453 | FEEDER | MEDIA ACM ASM | 1 | | E260d/dn | E360d/dn | | |
| 0040X5937 | DIMM | 128MB DDR1 DIMM | 1 | | E260d/dn | E360d/dn | | |
| 0040X5938 | DIMM | 256MB DDR1 DIMM | 1 | | | E360d/dn | | |
| 0040X5969 | CARD ASM | KOREAN FONT | 1 | | E260d/dn | E360d/dn | | |

Lexmark Confidential

## Schedule C - C544dn Service Part Pricing at ▮ Discount

| Lexmark P/N | Part Name | Description | # Per Machine | | Discount Effective January 1, 2010 | Discount Effective TBD |
|---|---|---|---|---|---|---|
| 0040X1455 | CARD ASM | 64MB FLASH | 1 | | | |
| 0040X1525 | PRINTED CI | CONTROLLER H | 1 | | | |
| 0040X1557 | PICK | 250-SHEET PICK/MOTOR | 1 | | | |
| 0040X1638 | CABLE | USB 2-METER | 1 | | | |
| 0040X1792 | POWER CORD | 8 ft (KOREA | 1 | | | |
| 0040X5168 | PAPER FEED | AUTOCOMP TIRES | 2 | | | |
| 0040X5403 | ITU | IMAGE TRANSFER UNIT | 1 | | | |
| 0040X5404 | PRINTED CI | TONER METER CYCLE | 1 | | | |
| 0040X5405 | POWER SUPP | HVPS | 1 | | | |
| 0040X5407 | FUSER | 230V | 1 | | | |
| 0040X5409 | POWER SUPP | LVPS UNIVERSAL | 1 | | | |
| 0040X5411 | LASER PRIN | LSU | 1 | | | |
| 0040X5412 | GEARBOX | MAIN DRIVE W/MOTORS | 1 | | | |
| 0040X5413 | SENSOR | FUSER EXIT | 1 | | | |
| 0040X5414 | SENSOR | TONER DENSITY | 2 | | | |
| 0040X5415 | MOTOR | FUSER DRIVE | 1 | | | |
| 0040X5416 | COVER | RIGHT SIDE | 1 | | | |
| 0040X5417 | COVER | LEFT SIDE | 1 | | | |
| 0040X5418 | COVER | TOP | 1 | | | |
| 0040X5419 | TRAY | PRIMARY | 1 | | | |
| 0040X5421 | CONTACT | IU SPRING CONTACTS | 1 | | | |
| 0040X5422 | SUBFRAME | BOTTOM LT & RT | 1 | | | |
| 0040X5423 | WIRE | MISC ELECTRICAL | 1 | | | |
| 0040X5424 | SCREW | MISC SCREWS | 1 | | | |
| 0040X5425 | SOCKET | USB (THUMBDRV) | 1 | | | |
| 0040X5426 | SENSOR | DUPLEX, TRAY 1, EXIT | 3 | | | |
| 0040X5429 | THERMISTOR | PAPER PATH/TDS | 1 | | | |
| 0040X5430 | COVER | FRT W/DUPLEX | 1 | | | |
| 0040X5431 | OPERATOR P | LCD, FRT TOP COVER | 1 | | | |
| 0040X5432 | COVER | LOGO, DISPLAY BEZELS | 1 | | | |
| 0040X5433 | DEFLECTOR | EXIT BIN FULL & DEFL | 1 | | | |
| 0040X5434 | DRAWER | 650 OPTION | 1 | | | |
| 0040X5435 | TRAY | 650-SHEET | 1 | | | |
| 0040X5436 | OPERATOR P | DBCS OP PANEL | 1 | | | |
| 0040X5441 | COVER | DUST COVER | 1 | | | |

Lexmark Confidential

CONFIDENTIAL - OUTSIDE COUNSEL ON A3598

| | | | | | | | New Part or Refurbished |
|---|---|---|---|---|---|---|---|

## Schedule C - Model E260 & E360 Service Part Pricing -

| Lexmark P/N | Part Name | Description | # Per Machine | | | Required for E260 | Required for E360 |
|---|---|---|---|---|---|---|---|
| 0040X0280 | POWER CORD | KOREA | 1 | | | E260d/dn | E360d/dn |
| 0040X0344 | COVER | ST E260DN LV NMPL | 1 | | | E260dn | |
| 0040X0346 | COVER | ST REAR COVER & DOOR | 1 | | | E260dn | |
| 0040X0347 | BEZEL | E260 BEZEL ICONS ST | 1 | | | E260dn | |
| 0040X0407 | GUIDE | LEFT ASM GUIDE CART | 1 | | | E260d/dn | E360d/dn |
| 0040X1367 | CABLE | PACKAGED PAR CABLE | 1 | | | E260d/dn | E360d/dn |
| 0040X1368 | CABLE | PACKAGED USB CABLE | 1 | | | E260d/dn | E360d/dn |
| 0040X1455 | CARD ASM | 64MB FLASH | 1 | | | | E360 |
| 0040X1515 | CARD ASM | KOREAN FONT | 1 | | | E260d/dn | E360d/dn |
| 0040X2855 | STRIP | TRAY 250-SHEET | 1 | | | E260d/dn | E360d/dn |
| 0040X5345 | FUSER | E260V FUSER | 1 | | | E260d/dn | E360d/dn |
| 0040X5347 | PCBA | CONTROLLER BOARD LD | | | | E260d | |
| 0040X5348 | PCBA | CONTROLLER BOARD LDN | 1 | | | E260dn | |
| 0040X5349 | PCBA | CONTROLLER BOARD MDN | 1 | | | | E360dn |
| 0040X5352 | LED | OP PANEL ASM (L) | 1 | | | E260d/dn | |
| 0040X5353 | COVER | BEZEL OP PANEL (LD) | | | | E260d | |
| 0040X5354 | LCD | OP PANEL ASM (M) | 1 | | | | E360d/dn |
| 0040X5355 | COVER | BEZEL OP PANEL (MD) | | | | | E360d |
| 0040X5358 | TRAY | MPF ASM & GUIDE | 1 | | | | E360d/dn |
| 0040X5359 | COVER | NAMEPLATE | 1 | | | E260d/dn | E360d/dn |
| 0040X5360 | SENSOR | ACCESS COVER OPEN | 1 | | | E260d/dn | E360d/dn |
| 0040X5362 | POWER SUPL | 220V LVPS / HVPS | 1 | | | E260d/dn | E360d/dn |
| 0040X5363 | KIT (MEC) | DPLX GEAR INTERFACE | 1 | | | E260d/dn | E360d/dn |
| 0040X5364 | ROLL CBM | TRANSFER ROLL | 1 | | | E260d/dn | E360d/dn |
| 0040X5365 | SENSOR | DPLX/PAPER INPUT ASM | 1 | | | E260d/dn | E360d/dn |
| 0040X5366 | SENSOR | MANUAL INPUT ASM | 1 | | | E260d/dn | E360d/dn |
| 0040X5367 | GEARBOX | MAIN DRIVE W/MOTOR | 1 | | | E260d/dn | E360d/dn |
| 0040X5368 | CLUTCH | MANUAL FEED | 1 | | | E260d/dn | E360d/dn |
| 0040X5369 | SOLENOID | MANUAL FEED | 1 | | | E260d/dn | E360d/dn |
| 0040X5370 | CLUTCH | MEDIA FEED (ACM) | 1 | | | E260d/dn | E360d/dn |
| 0040X5371 | CLUTCH | MPF FEED CLUTCH | 1 | | | | E360d/dn |
| 0040X5372 | REDRIVE | EXIT GUIDE W/SENSOR | 1 | | | E260d/dn | E360d/dn |
| 0040X5373 | COVER | TOP ASM | 1 | | | E260d/dn | E360d/dn |
| 0040X5374 | COVER | LEFT SIDE | 1 | | | E260d/dn | E360d/dn |
| 0040X5375 | COVER | RIGHT SIDE | 1 | | | E260d/dn | E360d/dn |
| 0040X5377 | COVER | REAR UPPER & LOWER | 1 | | | E260d/dn | E360d/dn |
| 0040X5378 | COVER | ACCESS COVER ASM | 1 | | | E260d/dn | E360d/dn |
| 0040X5379 | COVER | FRONT DOOR | 1 | | | E260d/dn | E360d/dn |
| 0040X5380 | DUPLEX | COMPLETE ASM | 1 | | | E260d/dn | E360d/dn |
| 0040X5381 | TRAY | PRIMARY | 1 | | | E260d/dn | E360d/dn |
| 0040X5382 | STRIP | TRAY (PRIMARY) WEAR | 1 | | | E260d/dn | E360d/dn |
| 0040X5383 | FRAME | FRONT GUIDE ASM | 1 | | | | E360d/dn |
| 0040X5385 | SENSOR | TONER LEVEL | 1 | | | | E360d/dn |
| 0040X5386 | LASER PH | LSU (L) | 1 | | | E260d/dn | |
| 0040X5387 | LASER PH | LSU (M/H) | 1 | | | | E360d/dn |
| 0040X5388 | LCD | OP PNL DBCS ASM (M) | 1 | | | | E360d/dn |
| 0040X5389 | COVER | BEZEL OP PANEL LDN | 1 | | | E260dn | |
| 0040X5390 | COVER | BEZEL OP PANEL MDN | 1 | | | | E360dn |
| 0040X5392 | FAN | COOLING FAN AND SCRE | 1 | | | E260d/dn | E360d/dn |
| 0040X5394 | TRAY | TRAY 2 250 SHEET | 1 | | | E260d/dn | E360d/dn |
| 0040X5395 | TRAY | TRAY 2 550 SHEET | 1 | | | E260d/dn | E360d/dn |
| 0040X5396 | SCREW | MISC SCREWS | 1 | | | E260d/dn | E360d/dn |
| 0040X5397 | MOUNT | FRONT COVER HINGES | 1 | | | E260d/dn | E360d/dn |
| 0040X5398 | DRAWER | 250-SHEET OPTION | 1 | | | E260d/dn | E360d/dn |
| 0040X5399 | DRAWER | 550-SHEET OPTION | 1 | | | E260d/dn | E360d/dn |
| 0040X5440 | ROLLER | PICK TIRES OPT. T2 | 1 | | | E260d/dn | E360d/dn |
| 0040X5451 | ROLLER | ACM TIRE KNOBBY/HUB | 1 | | | E260d/dn | E360d/dn |
| 0040X5452 | ROLLER | ACM TIRE SERATED/HUB | 1 | | | | E360d/dn |
| 0040X5453 | FEEDER | MEDIA ACM ASM | 1 | | | E260d/dn | E360d/dn |
| 0040X5937 | DIMM | 128MB DDR1 DIMM | 1 | | | E260d/dn | E360d/dn |
| 0040X5938 | DIMM | 256MB DDR1 DIMM | 1 | | | | E360d/dn |
| 0040X5969 | CARD ASM | KOREAN FONT | 1 | | | E260d/dn | E360d/dn |

Lexmark Confidential

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3599

| Schedule C - C544dn Service Part Pricing | | | | | New Part or Refurbished |
|---|---|---|---|---|---|
| **Lexmark P/N** | **Part Name** | **Description** | **# Per Machine** | **Failure Rate** | **Price (US $)** |
| 0040X1455 | CARD ASM | 64MB FLASH | 1 | | |
| 0040X1525 | PRINTED CI | CONTROLLER H | 1 | | |
| 0040X1557 | PICK | 250-SHEET PICK/MOTOR | 1 | | |
| 0040X1638 | CABLE | USB 2-METER | 1 | | |
| 0040X1792 | POWER CORD | 8 ft (KOREA | 1 | | |
| 0040X5168 | PAPER FEED | AUTOCOMP TIRES | 2 | | |
| 0040X5403 | ITU | IMAGE TRANSFER UNIT | 1 | | |
| 0040X5404 | PRINTED CI | TONER METER CYCLE | 1 | | |
| 0040X5405 | POWER SUPP | HVPS | 1 | | |
| 0040X5407 | FUSER | 230V | 1 | | |
| 0040X5409 | POWER SUPP | LVPS UNIVERSAL | 1 | | |
| 0040X5411 | LASER PRIN | LSU | 1 | | |
| 0040X5412 | GEARBOX | MAIN DRIVE W/MOTORS | 1 | | |
| 0040X5413 | SENSOR | FUSER EXIT | 1 | | |
| 0040X5414 | SENSOR | TONER DENSITY | 2 | | |
| 0040X5415 | MOTOR | FUSER DRIVE | 1 | | |
| 0040X5416 | COVER | RIGHT SIDE | 1 | | |
| 0040X5417 | COVER | LEFT SIDE | 1 | | |
| 0040X5418 | COVER | TOP | 1 | | |
| 0040X5419 | TRAY | PRIMARY | 1 | | |
| 0040X5421 | CONTACT | IU SPRING CONTACTS | 1 | | |
| 0040X5422 | SUBFRAME | BOTTOM LT & RT | 1 | | |
| 0040X5423 | WIRE | MISC ELECTRICAL | 1 | | |
| 0040X5424 | SCREW | MISC SCREWS | 1 | | |
| 0040X5425 | SOCKET | USB (THUMBDRV) | 1 | | |
| 0040X5426 | SENSOR | DUPLEX, TRAY 1, EXIT | 3 | | |
| 0040X5429 | THERMISTOR | PAPER PATH/TDS | 1 | | |
| 0040X5430 | COVER | FRT W/DUPLEX | 1 | | |
| 0040X5431 | OPERATOR P | LCD, FRT TOP COVER | 1 | | |
| 0040X5432 | COVER | LOGO, DISPLAY BEZELS | 1 | | |
| 0040X5433 | DEFLECTOR | EXIT BIN FULL & DEFL | 1 | | |
| 0040X5434 | DRAWER | 650 OPTION | 1 | | |
| 0040X5435 | TRAY | 650-SHEET | 1 | | |
| 0040X5436 | OPERATOR P | DBCS OP PANEL | 1 | | |
| 0040X5441 | COVER | DUST COVER | 1 | | |

Lexmark Confidential

Lexmark-MPA

Schedule F - Service Agreement

This Service Agreement provides additional terms and conditions to the Master Purchase Agreement with an Effective Date of January 1, 2010 between █████ and Lexmark (the "Agreement").  All terms and conditions of the Agreement apply to this Schedule and the terms and conditions of this Schedule are hereby incorporated by reference into the Agreement.  Defined terms used herein but not otherwise defined herein shall have the meanings given such terms in the Agreement.  In the event of a conflict between this Schedule and the Agreement, this Schedule shall govern.

1. Warranty
   a. Base Warranty – refers to the express warranty described in Section 8.2 (a) of the MPA.
   b. Service Parts Warranty – Service Parts will be sold to █████ AS IS, WITHOUT WARRANTIES OF ANY KIND, INCLUDING BUT NOT LIMITED TO THOSE OF MERCHANTIBILITY, FITNESS FOR PARTICULAR PURPOSE, AND THE WARRANTY AGAINST INFRINGEMENT. Notwithstanding, the above warranty disclaimer shall not limit or reduce the applicable system level warranties and/or indemnities.
   c. Features/Options - Features and options obtained by █████ from Lexmark Service are sold to █████ AS IS, WITHOUT WARRANTIES OF ANY KIND, INCLUDING BUT NOT LIMITED TO THOSE OF MERCHANTIBILITY, FITNESS FOR PARTICULAR PURPOSE, AND THE WARRANTY AGAINST INFRINGEMENT.
   d. Conditions that Invalidate Warranty – Minor defects (e.g., serviceability or warranted quality are compromised only to a limited degree) or normal wear and tear do not give rise to warranty claims, nor are such claims recognized if the underlying defect is the result of:
      i. External mechanical or chemical impact;
      ii. The printer having been treated or used improperly, incorrectly or excessively;
      iii. The █████ customer, █████ or a third party having repaired, used or modified the printer improperly without Lexmark's consent;

CONFIDENTIAL - OUTSIDE COUNSEL ONLY

    iv.  Parts, accessories, consumables or software having been installed in the printer without Lexmark's consent

    v.  Non-compliance with Lexmark's instructions as to printer installation, operation, maintenance and care, especially in terms of service intervals (e.g., maintenance kits).

e.  Lexmark expects that ▉ diagnostics and resulting warranty claim rate will be comparable to Lexmark and will therefore reimburse for warranty up to ▉ higher than the Lexmark usage rate. Lexmark and ▉ will work together to identify and resolve matters if the ▉ warranty claim rate is more than ▉ higher than Lexmark rate. Each Party will make commercially reasonable efforts to correct the factors contributing to the ▉ higher rate.

2.  Lexmark Genuine Service Parts

Lexmark Genuine Service Parts ("Service Parts") means genuine Lexmark Parts purchased from Lexmark used to repair or provide preventative maintenance on Lexmark laser printer Products.

For Service Parts, used or usable with Products sold under the MPA, all ▉ requirements (for ▉ use or sale) whether new or re-manufactured, ▉ irrevocably commits to purchase from Lexmark for the life of the Products. This commitment includes ▉ not directly or indirectly promoting and/or selling (outright or on a charge per image/print bases) any non-Lexmark Genuine Service Parts for the Products. While the MPA is in effect and for a period of three (3) years thereafter, ▉ shall not directly or indirectly compromise or seek to compromise the installed base of the Products.

Upon request, ▉ shall make its premises, books and records available to Lexmark for purposes of an audit to verify the foregoing and, in the event the audit reveals non-compliance by ▉ with any requirement herein, ▉ shall, in addition to any remedies available to Lexmark at law, be responsible for and bear the expense of the audit.

a.  Lexmark agrees to provide or to make available to ▉ common Service Parts, as ▉ shall reasonably request, for all laser printer Products that are purchased by ▉ during the Term of the Agreement and for a period of five (5) years after the equivalent Lexmark-branded laser printer end of production. Service Parts may be new or like new.

b.  Lexmark reserves the right, without liability to ▉ to change Service Parts specifications, discontinue Lexmark Parts, announce new or

CONFIDENTIAL - OUTSIDE COUNSEL ONl A3602

replacement Service Parts at any time.  Lexmark will provide 30 days notice to ▮▮ of such changes. However, if a change is to be made to an ▮▮unique part, Lexmark will obtain ▮▮ approval prior to implementation.

c. Lexmark will sell Service Parts to ▮▮ at ▮▮▮▮ less than Lexmark's Asia Pacific Manufacturer's Suggested Retail Price (MSRP) to only support Printers in Korea, as of the date of the order. Lexmark will provide ▮▮ with 60 days notice of any change in the Service Parts discount.

d. Lexmark will provide a Recommended Spares List (RSL) to ▮▮ 120 days prior to laser product launch. In general, the list will consist of Field Replaceable Units (FRUs), Customer Replaceable Units (CRUs), and Service Printers.

e. Service Part pricing and lead-times for shipping Service Parts shall be provided with the RSL.

f. Lexmark may change Service Parts pricing no more frequently than once per calendar year, and will provide ▮▮ with 60 days notice of such change.

g. ▮▮ shall stock initial spare parts for new products, based in general on usage parts by demand and provided in the RSL document. Lexmark shall stock all parts in the Asia Pacific (AP) Distribution Centre.

h. ▮▮ shall provide a monthly forecast and submit non-cancellable monthly purchase orders to Lexmark AP Spares.  Lexmark will fill the order through the AP distribution centre (Sydney, AU) in approximately 5 days, if the parts are in stock.  For any parts not in stock, the order delivery date will revert to the Lexmark USA 90 day lead time.

i. In the event of a customer-down situation ▮▮ may issue an emergency order to expedite delivery.  The expedite process will defined and agreed to by both Parties.

j. Any purchase order for Service Parts must reference the Lexmark Part Number, quantity, description, Ship-to Address, applicable price, ▮▮ Purchase Order Number, shipping instructions and requested in-house delivery dates. All purchase orders for Service Parts placed by ▮▮ hereunder shall be governed by the terms and conditions of the MPA. Except otherwise regulated herein, in the event of a conflict between the provisions of the MPA and the terms and conditions of ▮▮ purchase

CONFIDENTIAL - OUTSIDE COUNSEL ONLY

order or Lexmark's acknowledgment or other written communications, the provisions of the MPA shall prevail.

k. ▮▮▮ shall be responsible for shipping costs related to the shipment of Service Parts, Service Printers, Features, and Options (per INCOTERMS 2000)Delivery terms are FCA (INCOTERMS 2000) Lexmark's designated distribution facility. The delivery terms apply to both normal orders and emergency orders. Title and risk of loss will transfer to ▮▮▮upon delivery to ▮▮▮nominated carrier at Lexmark's designated distribution facility.

l. Lexmark will invoice▮▮▮ for parts at the time of shipment.▮▮▮shall provide Lexmark with all applicable tax documentation (e.g. value-added tax, exemption or withholding information).

3. Documentation and Service Training

a. Documentation - Lexmark shall furnish to▮▮▮ on an ongoing basis during the term of the MPA, free of charge, such materials (that Lexmark may have available for Lexmark's own customer brochures or literature) as ▮▮▮ may reasonably request for use by▮▮▮ to prepare brochures and other product literature, including, but not limited to, operators, maintenance and parts manuals, catalogs, specification sheets and other data necessary or appropriate for the sale of printer Products. Lexmark grants to▮▮▮the royalty-free, worldwide, non-exclusive, non-transferable right and license to reproduce all or any part of such documentation for use with printer Products and Supplies purchased from Lexmark. ▮▮▮is further given the right to modify any or all parts of the documentation to reflect changes made to the printer Products or Supplies or consistency in style with other documentation used by▮▮▮

b. Lexmark shall provide to▮▮▮ all documentation necessary or appropriate for▮▮▮to fulfil▮▮▮ service and support obligations for the printer Products provided, however, that such documentation is available for Lexmark's own authorized service providers. Lexmark shall provide service manuals for the equivalent Lexmark-branded printer Products, which includes a parts catalog. Lexmark grants to▮▮▮ a royalty-free worldwide, non-exclusive, non-transferable license to (a) use, modify, reproduce and distribute such documentation integrated or not into the appropriate▮▮▮ documentation under the▮▮▮name; (b) to prepare localization's based on such documentation; and (c) to authorize third parties to undertake some or all of the activities above, all solely for the

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3604

express limited purpose of marketing, selling, and providing technical support for the printer Products and Supplies sold hereunder.

c. Publications or derivative works prepared by or for ███ under the license granted in this Section may include an appropriate ███ copyright notice in lieu of any Lexmark copyright notice. Other than the license granted in this Section, Lexmark retains all copyright rights in the documents and ███ agrees to provide Lexmark all reasonable necessary assistance, at Lexmark's expense, to enforce those rights against infringers.

d. Service Training - If Lexmark provides any training for comparable Lexmark-branded Products to its personnel or other service providers, such training shall be made available to ███ Supplier shall conduct T3 training (Train the Trainer) classes for ███ service support trainers if it provides any hands on training for its comparable Lexmark-branded products. T3 training may be held in Hong Kong, Singapore and/or Australia. ███ is responsible for its own travel and living expenses. Computer based training shall also be provided when available.

4. Technical Support
   a. Support Levels



Level 1 Technical Support

██████Level 1 technical support consists of ████ personnel that are trained to take the first contact from the ████customer, make an initial determination that the problem is ██Specific Printer related, and if necessary, pass the call to ████Level 2 technical support personnel.

Level 2 Technical Support

██████Level 2 technical support consists of technical support personnel located in the field or at an ████centralized support center, who will respond to contact from ████Level 1, ████field personnel, or ████call center directions, on a 7X24 basis. They use significant product knowledge, procedural knowledge, product documentation, support notes and knowledge base information to address field installation and break/fix issues. They gather information on the problem environment, check for correct configurations and apply standard solutions to problems. They perform iterative procedures with field service personnel to understand and correct problems. They escalate to Lexmark Level 3 as appropriate if available solutions do not solve the customer problem by utilizing established escalation procedures and guidelines. ██████Level 2 support personnel will receive continuous training on printer products from ████to minimize escalation to Level 3 support from Lexmark and minimize unnecessary printer product warranty service.

Level 3 Technical Support

Lexmark shall establish a select call center group that will be designated for ████escalations via a unique path that will identify to Lexmark that the call is from ████Level 2 Technical Support. This support will be provided during normal Lexmark call center hours of operation (9am–6pm, Mon–Fri and 9am–12pm, Sat). Access to the Lexmark Select Call Center will be limited to specified ████Level 3 technicians. ████ shall provide a list of Level 2 technicians that have access to the Lexmark Select Call Center and shall maintain the list current as personnel change. The list shall be limited to 2 ████personnel. Off-hour escalation processes shall be jointly developed by the Parties. Lexmark shall respond to any escalated claims from ████Level 2 Technical Support within two (2) business days.

Lexmark Select Call Center technicians consist of senior personnel who will subsequently examine problem causes and, when necessary, escalate to and work with Lexmark OEM Level 3 personnel who will engage with Lexmark engineering personnel. If travel to customer sites is deemed

necessary, responsibility for travel and other incidental charges will be determined by the Parties.

Lexmark Select Call Center support is provided for printers sold to █████ under the MPA independent of the warranty purchased with the individual printers. By way of example, printers with respect to which █████ sells an on-site service agreement to their customer and deletes the Lexmark to █████ warranty will not be excluded from this Lexmark call center and L3 support.

Lexmark shall provide Select Call Center support for hardware and software for a particular model of printer until the end of service for that particular model of printer. End of service shall occur when Lexmark ends service on its Lexmark branded similar model of printer.

b. Supplier will make available to █████ web-based access to information that Supplier maintains for the products (for Level 1 and Level 2 technical support of hardware and software) that are generally available to all of Supplier's worldwide Level 1 and Level 2 support personnel. Examples would include technical bulletins, knowledge cases, and Engineering Change Orders (that impact service and support).

5. Service Support Strategy
   a. In general, the Service Support Strategy for inkjet printers is Self Warranty and for laser printers is Parts Only. Prior to product launch the service support strategy will be mutually agreed to by Lexmark and █████
   b. Laser Product is entitled to its warranty based on the Product part number and serial number.
   c. Self Warranty
      Self-Warranty is defined as a process whereby Lexmark will reduce the hardware prices by the Warranty Service Price Component. This pricing will be the financial equivalent of a number of "free" printers in each container of printers received by █████ to be used as service printers for warranty replacement.
   d. Parts Only Process
      i. Defined as a warranty replacement procedure in which defective printers are repaired by █████ using Lexmark Genuine Parts and Lexmark replenishes █████ only for parts required to repair. Wear parts that fail during the warranty period will only be replaced if the customer is using genuine █████ Lexmark supplies.

     ii.  On a monthly basis, ▇ will provide a warranty parts usage report to Lexmark with the following information: printer part number and serial number, part number(s) used for repair, date of repair action and printer diagnostic code.

     iii.  At Lexmark's discretion, some repair parts must be returned to Lexmark. These parts will be so noted in the Lexmark Return Parts List to be provided prior to product launch. ▇ must store return parts until Lexmark has validated the warranty claims made by ▇ ▇ will dispatch the return parts to Lexmark upon request, using the RMA provided by Lexmark. Any part used for repair that is not on the Return Parts List must be scrapped by ▇

     iv.  Once Lexmark receives the return parts and matched them to the warranty parts usage report, Lexmark will dispatch replenishment parts to ▇

6. Laser End of Service Life
   a. In general, End of Service Life (EOSL) is defined as a period of five (5) years after the equivalent Lexmark-branded laser printer end of production. Lexmark will provide one hundred twenty (120) days notice prior to the last date of manufacture of any printer or component in support of any printer made for ▇
   b. If Lexmark discontinues providing Service Parts, Lexmark shall so notify ▇ Within thirty (30) days of such notice of discontinuance, ▇ will provide Lexmark a 100% committed, non-cancelable purchase order, subject to availability, for Service Parts that will be discontinued. There will be no upside flexibility on these Service Parts. ▇ must purchase and take possession of these last buy Service Parts orders within ninety (90) days of Lexmark receiving and confirming receipt of parts with ▇
   c. If a service supplier cannot support Service Parts through the end of the above described end of life periods and ▇ purchases and takes possession of a last buy, Lexmark shall discount such parts by ▇ to be negotiated at the time of purchase.

7. Contacts
   a. Each Party shall provide the other with a list of contact names and information for operational issues.

b. Each Party shall provide an escalation path to the other Party for Service issues.

8. Business Meetings

   a. Quarterly Operational reviews shall be held by representatives from both Parties as follows: 4 times per year via teleconference. .

   b. The agenda for each quarterly review shall include but not be limited to:

      i.   New product launch

      ii.  Service strategy changes

      iii. Technical support issues

      iv.  Process improvements

   c. Either Party can request a special meeting in the event that such Party has substantial concerns regarding a Party's performance under this Schedule or results are not meeting the service levels described in Section 5.0 above.

   d. If requested Lexmark WW Service will participate in an annual business review. The agenda for shall include

      i.   Account Management

      ii.  Delivery

      iii. Quality

      iv.  Price

CONFIDENTIAL - OUTSIDE COUNSEL ONlA3609

# OEM Purchase Agreement

Between

And

# Lexmark International, Inc.

THIS AGREEMENT made and entered into this _____ day of _____, 2010 (hereinafter "Effective Date") by and between Lexmark International, Inc., having its principal place of business at 740 West New Circle Road, Lexington, KY 40550 and its subsidiaries and affiliates (hereinafter "Lexmark") and ████████████ with a place of business at ████████████████████ (hereinafter ██████)

## WITNESSETH

WHEREAS, ████ desires to purchase from Lexmark and Lexmark desires to sell ████ branded Products and related Options, Supplies, and Spare Parts to be resold by ████ and it's Subsidiaries and Intermediaries as defined below; and

WHEREAS, Lexmark claims to own or have license to certain proprietary rights relating to the Products; and

WHEREAS, Lexmark is willing to license ████ and its Subsidiaries and Intermediaries to market and distribute such proprietary rights in connection with the sale and support of the Products;

NOW, THEREFORE, in consideration of the mutual promises and covenants herein contained, the parties hereto agree as follows:

1.    DEFINITIONS

"First Level Support" shall mean a direct response by ████ Customer Support personnel to resolve a problem or issue related to Products, Options, Supplies, and Spares.

"Intermediaries" shall mean ████ authorized dealers, distributors, and service partners.

"Options" shall mean accessories and other items for the Products as listed in Appendix 1.

"Products" shall mean the MFP units that are listed in Appendix 1.

" Second Level Support" shall mean a direct response by ████ Technical  Support personnel to resolve a problem or issue related to Products, Options, Supplies, and Spares that can not be addressed by First Level Support.

"Spares" shall mean spare parts for maintenance and repair of Products, purchased directly from Lexmark, including parts for preventive maintenance ("PM Parts"), as listed in Appendix 4.  "Used", "Tear Down", "Remanufactured" parts not purchased directly from Lexmark, or "Third Party/Clone" parts are not considered to be genuine spare parts.

"Software" shall mean application executable computer code including applications, drivers and utilities, provided by Lexmark for use with the Products.

"Specifications" shall mean the physical, technical, performance, packaging, regulatory and customization requirements for the Products, Options, Supplies, and Spares as indicated in Appendix 3.

"Subsidiaries" shall mean (a) with respect to ████ subsidiaries known as ████████████ ████████████████ and (b) with respect to Lexmark, any subsidiary or affiliate of Lexmark.

"Supplies" shall mean Toner for Products as listed in Appendix 1 and other consumable items as agreed by the parties from time to time.

"Territory" shall mean all countries located within the areas indicated in Appendix 2.

2.    AGREEMENT TO SELL &     RIGHTS/LICENSES

2.1    Agreement to Sell: Lexmark hereby agrees to sell Products, Spares, Supplies, and Options to
for     use, resale, distribution and servicing of same in the Territory, either directly or through
Subsidiaries and Intermediaries.

2.2     Resale and Distribution Rights:    and its Subsidiaries and Intermediaries shall have a
perpetual and royalty free right and license to market, resell, and distribute in the Territory, Products (and
updates, modifications, and enhancements thereof), Supplies, Options, and Spares purchased under this
Agreement.

    2,2.1 Software Distribution  - With respect to Software    and its Subsidiaries and
    Intermediaries may distribute Software for use with the Products that are purchased under this
    Agreement subject to the Software Distribution License Agreement entered into by the parties as of
    September 14, 2010 ("SWDA"), a copy of which is indicated in Appendix 9.

    2.2.2 Additional License Terms.    shall not sell or offer for sale any Products or Supplies that
    do not bear the licensing terms affixed by Lexmark to the packaging and or Products or Supplies
    themselves. Said licensing terms are set forth in the sections of Appendix 1 relating to the
    respective Products and Supplies.

2.3    Other Software    may develop, or have developed other software for Products to enable
specific additional functionality such as remote printer monitoring, page counts, job accounting, etc. At
     request, Lexmark may, in its sole and absolute discretion, assist    with implementation of such
other software by providing (i) information and settings in Products which may be available for such other
software and additional functionality and (ii) consulting services based on mutual agreement as to any charges
that may be applicable; provided that, (a) the provisions of this Section 2.3 shall not be construed to authorize
     to create any derivative works of any  Software or other Lexmark materials covered by the SWDA and
(b) to the extent the terms of this Section 2.3 conflict with any terms of the SWDA, the terms of the SWDA
shall control.

If the other software    proposes to develop consists of embedded software solutions, prior to Lexmark
rendering any information or consulting services for same, the parties shall enter into a separate license
agreement for same that shall include provisions on confidentiality as necessary for the protection of each
party's software and other intellectual property.

3.    TERM OF AGREEMENT

The Initial Term of this Agreement shall be for three (3) years beginning on the Effective Date, unless
terminated as provided in Sections 15.1 or 15.2. After the Initial Term, this Agreement shall automatically be
extended for additional one (1) year periods unless one party provides the other with ninety (90) days written
notice of its intent not to extend the Agreement prior to the end of the Initial Term or any then current
extension period.

4.    ORDERS: FORECASTS, PLACEMENT, LEAD TIMES, FLEXIBILITY

4.1    Forecast of Products:  By the 14th day of each month    shall provide Lexmark with a non-
binding forecast of its requirement for Products, Supplies, and Options for the ensuing six (6) month period.

CONFIDENTIAL - OUTSIDE COUNSEL ONl A3612

4.2    <u>Purchase Orders</u> ████ shall purchase Products, Supplies, Options, and Spares by issuing written purchase orders ("Orders") to Lexmark by electronic data interchange ("EDI"), fax or email. Lexmark shall, subject to credit approval, provide an Order acknowledgement notice to ████ within two (2) working days of receiving an Order indicating Lexmark's acceptance of the Order's terms or if there are any issues with the Order that require resolution before acceptance. Except for the provision of Section 5.4, each Order placed by ████ is non-cancelable and will specify the quantity and required delivery dates for items being ordered, which delivery dates shall be in accordance with the Order lead time specified below. The terms and conditions of this Agreement shall govern all Orders. Any other terms and conditions indicated in Orders or Lexmark's acknowledgements thereof that are at variance with, purport to modify, or are additional to the terms of this Agreement shall be void and of no effect unless mutually agreed in writing by authorized representatives of ████ and Lexmark.

4.3    <u>Order Lead Times:</u>  Orders for Products, Supplies, Options  shall be placed with Lexmark at least sixty (60) days prior, and orders for spares at least ninety (90) days prior to the ████ required delivery date. It is understood and agreed that Order quantities in excess of the forecasted quantities for the related delivery month may not be deliverable by Lexmark in accordance with the sixty day lead time requirement. Lexmark agrees to notify ████ of such cases and indicate when such excess quantity can be delivered. Notwithstanding the provision of Section 4.2 regarding Orders being non-cancelable ████ may then, with notice to Lexmark within two business days of Lexmark's notification to ████ cancel such excess quantity if the deliver date indicated by Lexmark for same is not acceptable.

4.4    <u>Exclusive Supplier of Consumables & Spares</u>

4.4.1    During the term of this Agreement and for a period of 5 years after its expiration or termination, ████ agrees and covenants (a) to purchase directly, and only, from Lexmark all of its requirements for Supplies and Spares for Products sold hereunder and (b) not to sell or promote supplies or spares for the Products that are not purchased directly from Lexmark. Orders received after the date of termination or expiration of this Agreement shall be subject to the terms of this Agreement as of the date of termination or expiration.

4.4.2    Notwithstanding the terms of Section 4.4.1, if, after receiving written notice from ████ regarding chronic and recurring failure by Lexmark to provide a specific item of Supplies and Spares in accordance with accepted Orders, Lexmark, after a thirty (30) day period from such notice, continues with such failure ████ will have the right to (i) purchase only such specific item of Supplies and Spares from sources other than Lexmark, in quantities determined by ████ to be used or resold by ████ for Products ("Alternate Source Item"), or (ii) purchase  non-genuine items of such specific Supplies or Spares  that are compatible with Products ("Non-genuine Item"), in quantities determined by ████ from sources who supply same to be used or resold by ████ Non-genuine Items are any supplies or spares compatible with Products that were not originally sold by Lexmark.

4.4.3    ████ agrees that  (i) except for the terms of Section 4.4, Alternate Source Items and Non-genuine Items are not covered by this Agreement, (ii) Lexmark shall bear no liability in relation to or arising from ████ purchase, use or resale any Non-genuine Item (iii) ████ shall make no claim against Lexmark in relation to any Non-genuine  Item used, resold, or purchased by ████ and (iv) ████ shall indemnify, defend, and hold harmless Lexmark against any claims arising from or related to ████ purchase, use or resale of any Non-genuine Item.

4.4.4    Notwithstanding any other term of Section 4.4 ████ obligations to source Supplies and Spares exclusively from Lexmark after termination or expiration of this Agreement (as set forth in Section 4.4.1) shall cease to apply if (i) Lexmark is adjudicated bankrupt or (ii) Lexmark makes an assignment for the benefit of its creditors, or (iii) Lexmark is the subject of a receivership or similar actions placing the assets of Lexmark in the control of a trustee, or (iv) if Lexmark acquires or is acquired by a direct competitor of ████

4.4.5    Lexmark may, in its sole and absolute discretion, require cash with Order on any post-termination or post-expiration Order for Spares or Supplies if █████ i) is adjudicated bankrupt or (ii) makes an assignment for the benefit of its creditors, or (iii) is the subject of a receivership or similar actions placing the assets of █████ in the control of a trustee.

4.4.6    Lexmark may, in its sole and absolute discretion  reject any post-termination or post-expiration Order for Spares or Supplies if █████ acquires or is acquired by a direct competitor of Lexmark. In such event, █████ may procure Alternative Sourced Items and Non-genuine Items from other sources to be used or resold by █████ r Products, subject to the provisions of Section 4.4.3.

5    DELIVERY

5.1    Delivery Term: Lexmark shall deliver all Products, Supplies, Options, and Spares to █████ based on the UCC delivery term F.O.B. Lexmark's Distribution Location, with the added requirement that such delivery will be deemed complete when the items are loaded on to the carrier vehicle by Lexmark at no additional charge to █████ Upon such delivery, title and risk of loss of the goods shall pass to █████ who will then be responsible for the cost of transportation and insurance, if any, to its designated sites.

5.2    Defective Packaging: Notwithstanding Section 5.1 herein, Lexmark shall be liable for any damage to Products, Supplies, Options, and Spares during shipment and transit, including █████ shipment to its customers, due to Lexmark's improper packaging. Lexmark shall provide a remedy for damage due to improper packaging by either (i) replacing the damaged Products, Supplies, Options, and Spares at no additional cost or charge to █████ r (ii) refunding to █████ he purchase price for the damaged Products, Supplies, Options, and Spares. Except for improper packaging, Lexmark shall not be liable or responsible for any damage occurring during any freight or transportation of Products, Supplies, Options, and Spares. In addition, the provisions of this Section 5.2 shall not apply if Lexmark's packaging of same has been opened by █████ after delivery by Lexmark.

5.3    Delivery Date: The delivery dates specified on Orders issued by █████ and accepted by Lexmark through its acknowledgement as referenced in Section 4.2 shall comply with the lead time requirement indicated in Section 4.3 herein and shall be the date that Lexmark delivers same per the delivery term indicated in Section 5.1 herein. Lexmark shall notify █████ if Products, Supplies, Options, and Spares become available for delivery prior to the delivery date indicated in Orders, in which case █████ will indicate if it can accept such early delivery and the applicable date. Lexmark will also provide █████ with a monthly Delivery Report indicating the status of current Orders including projected delivery dates and all other matters affecting delivery performance.

5.4    Delays: Lexmark shall notify █████ of any matters which have or could delay any scheduled delivery and also indicate when the delivery will be made. Except for Orders accepted by Lexmark for expedited delivery with less than the lead times referenced in Section 4.3, in the event any delivery is delayed more than five days past the delivery date indicated in Lexmark's acceptance of an Order and, as a result of this delay, █████ misses a sales opportunity and provides documentation substantiating the loss of sales directly related to that order, █████ reserves the right to cancel the number of units related to the missed sales opportunity from other Orders already placed by █████ that are in process of delivery.

6.    PRICES, CHARGES & TAXES

6.1    Prices for Products, Supplies and Options: Prices and discounts for Products, Supplies and Options are set forth in Appendix 1 and are based on (i) the provisions of Section 6.4, and (ii) the delivery term indicated in Section 5.1 herein.  Such prices include all hardware, firmware, Software, documentation, packaging, and Lexmark manufacturing and customizations for same (including █████ branding) required

under this Agreement. Discounts shall always be maintained, however, Lexmark reserves the right to increase it standard distributor prices and with at least thirty (30) days advance written notice to █████ can increase █████ pricing accordingly, and provided such increase applies to all Lexmark OEM customers purchasing similar products, supplies, options and spares in similar volumes based on similar terms and conditions of purchase. During this thirty (30) day notice period, █████ may not order quantities in excess of 20% over previously forecasted quantities.

6.2    Prices of Spares: Prices for Spares are set forth in Appendix 4 and are based on (i) the provisions of Section 6.4, (ii) the delivery term indicated in Section 5.1 herein and (ii) a █████████████ discount off of Lexmark manufactured suggested retail price ("MSRP"). Such discount shall always be maintained, however, Lexmark reserves the right to increase its standard distributor prices with at least forty-five (45) days advance written notice to █████ and provided such increase applies to all Lexmark OEM customers purchasing similar products, supplies, options and spares in similar volumes based on similar terms and conditions of purchase. During this forty-five (45) day notice period, █████ may not orders quantities in excess of ████ over previously forecasted quantities.

6.3    Prices for Packaging Materials: ████ may purchase stand alone packaging materials for Products (extra boxes, packing foam and materials, etc., that the Products are shipped in) from Lexmark as may be needed by ████ from time to time at prices and other terms and conditions to be negotiated by the parties.

6.4    Price Parity: Lexmark agrees that the prices of Products, Supplies, Options, and Spares hereunder are and will be no higher than the prices that Lexmark extends to its other OEM customers purchasing the same products, supplies, options, and spares in similar volumes based on similar terms and conditions of purchase. Lexmark agrees that it shall offer to ████ on a timely basis, any lower prices that Lexmark may offer to its other OEM customers purchasing similar products, supplies, options, and spares in similar volumes based on similar terms and conditions of purchase.

6.5    Market Review Meetings ████ and Lexmark agree to meet on a semi-annual basis to review market conditions for Products, Supplies, Options including the price and/or performance features for competitive products, supplies, and options. Lexmark shall not be compelled to take any pricing actions as a result of such meetings.

6.6    Special Bid Support Pricing ████ shall issue a request to Lexmark to support special bid opportunities that ████ may have with major customers for Products, Supplies, and Options by completing and submitting a Bid Request Form as indicated in Appendix 7. Lexmark shall provide a response to ████ special bid requests as soon as possible, and Lexmark will make reasonable efforts to accommodate indicated bid response deadlines. In cases where ████ requested pricing for the special bid can not be met, Lexmark will propose its best alternative pricing which may or may not be a discount off the current contractual price. Lexmark may decline to offer special bid pricing to ████ n cases where (i) the opportunity is with an existing Lexmark account or (ii) with a prospect already qualified by Lexmark prior to receiving █████ request for Special Bid Pricing in which case Lexmark shall provide ████ with the date and/or explanation for such Lexmark pre-qualified prospect.

6.7    Non-Recurring Engineering Charges (NRE): Lexmark NRE charges to ████ for Product development and customization in accordance with the Specifications, along with ████ payment schedule for same are as indicated in Appendix 8. Lexmark shall provide invoices to ████ or all NRE charges and scheduled payments.

6.8    Taxes: All prices described in this Agreement are exclusive of any federal, state, and local excise, sales, use, and similar taxes. ████ represents that all Products, Supplies, Options or Spares purchased under this Agreement are for resale. Accordingly ████ shall not be responsible or pay for any such taxes and Lexmark shall not invoice ████ for same. Each party shall bear the responsibility of taxes placed upon their

own net income. ███ shall be exclusively responsible and liable for paying directly all statutory fees and copyright levies imposed under laws or instruments having the effect of law in the Territory.

7.    **INVOICING & PAYMENTS**

7.1    <u>Invoicing:</u> Lexmark shall invoice ███ for Products, Supplies, Options, and Spares on or after delivery, and each such invoice shall indicate the applicable Order numbers. Lexmark shall invoice ███ for NRE charges according to the payment schedule indicated in Appendix 8. Each Lexmark invoice shall be addressed to ███ as follows:

For Products Supplies, Options, and Spares:

For NRE Charges:

7.2    <u>Payments:</u> ███ shall make payment to Lexmark on invoices for Products, Supplies, Options, and Spares within 30 days of invoice date.

8.    **PRODUCT DISCONTINUANCE**

8.1    <u>Notice Period:</u> During the Initial Term of this Agreement or any extensions thereto, Lexmark may not discontinue the manufacturing of any Products without providing ███ with at least one hundred eighty (180) days advance written notice.

8.2    <u>All Time Buy:</u> If and when ███ receives written notice as stated above on any Product discontinuance ███ shall, in addition to regular Orders, have the right to place a special, non-cancelable "All Time Buy Order" for such Product during the notice period at the prices set forth in Appendix 1. The quantity of Product ordered under the All Time Buy Order shall not, without Lexmark consent, exceed the total quantity of Product ordered through regular Orders over the prior twelve (12) month period. Deliveries against the All Time Buy Order must be scheduled for delivery during the notice period.

9.    **MANUFACTURING OF PRODUCTS, SUPPLIES, OPTIONS AND SPARES**

9.1    <u>New, Reusable, and Refurbished Parts:</u> Unless otherwise agreed by ███ and Lexmark, all Products, Options, Supplies, and Spares manufactured for and delivered to ███ shall be made of new parts and components, except that Supplies and Spares may contain recycled components, provided that Lexmark clearly indicates same on its labeling of such Supplies and Spares. Lexmark warranties on Supplies and Spares containing such recycled components shall be the same as if Supplies and Spare Parts contain all new parts and components.

9.2    <u>Compliance With Specifications:</u> All Products, Supplies, Options, and Spares manufactured for and delivered to ███ shall fully comply with the Specifications indicated in Appendix 3.

9.3    <u>Sample Product Testing:</u> Lexmark shall offer for sale to ███ sample Product units to ███ for testing and inspection. Such sample units shall have been pre-tested by Lexmark and, except for ███

CONFIDENTIAL - OUTSIDE COUNSEL ONl A3616

branding, Lexmark represents that such samples are functionally equal to similar product models that Lexmark sells and distributes under its own brand, and that such samples conform to the Specifications. Along with such sample units, Lexmark shall provide ████ with the related Specification documents that ████ will test against. ████ will then complete its testing and inspection in a timely manner and notify Lexmark of its findings. If the sample units pass ████ testing and inspection, Lexmark may produce Products for ████ based on Orders. If the sample units are found to be defective or do not conform to the Specifications, Lexmark shall implement corrections in a timely manner and then provide corrected samples back to ████ for retesting and inspection. Any ████ advisement that the sample units have passed its testing and inspection shall not be deemed as acceptance of Products to be delivered under Orders issued to Lexmark, or as varying, altering or modifying ████ right to inspect, accept or reject incoming Products in accordance with Section 11.5 herein.

10.    PRODUCT & ENGINEERING CHANGES

10.1    <u>Changes to Correct Defects</u>: If the Products delivered by Lexmark are found to be defective or fail to meet the Specifications then ████ will require corrective action. In addition to the remedies stated in Section 11.5 herein, Lexmark agrees to define, schedule and implement any Product or Engineering Change that may be required for such correction at no cost to ████ and in accordance with the ████ Quality Assurance Plan & Requirements indicated in Appendix 5.

10.2    <u>Lexmark Initiated Changes</u>:

   10.2.1 <u>Notifications & Approvals</u> - Lexmark shall provide written notification to ████ before making any Product or Engineering Change affecting form, fit, or function of Products on a global basis (meaning that Lexmark is making such change for all similar products being manufactured and supplied for Lexmark itself and all other Lexmark OEM customers) in accordance with the ████ Quality Assurance Plan & Requirements document reference in Appendix 5. Along with such notification, Lexmark shall describe the nature of such changes, including point of incorporation into production, and effect on maintenance, repair, support, and interchangeability of Spares. Lexmark understands and agrees that, except for Product or Engineering Changes made for reasons of safety, any Product or Engineering Changes affecting form, fit, or function that Lexmark is not making on a global basis  and wishes to make solely for Products supplied to ████ will require ████ approval. Where ████ approval is required, ████ shall notify Lexmark of its approval or rejection within thirty (30) days of receiving Lexmark's notification. In the event ████ rejects an ████ specific change, the parties shall take up to ninety (90) days to discuss and negotiate such rejection. If, after such ninety (90) period, the parties have failed to resolve the issue, Lexmark may implement the Product Discontinuance procedure set forth in Section 8 with respect to the affected Product.

   10.2.2 <u>Effect on Spares</u>  - In the event that any Lexmark initiated Product or Engineering Change makes ████ stock of Spares obsolete or unusable, Lexmark agrees to take back such stock at current prices and grant credit for same against the ████ purchase of replacement stock.

10.3    ████ <u>Requested Changes</u> ████ may request a Product or Engineering Change for purposes of changing the Specifications or Product functionality. Such ████ requests shall be handled in writing and in accordance with the ████ Quality Assurance Plan & Requirements indicated in Appendix 5 and Lexmark agrees to inform ████ within thirty (30) days regarding: (i) if the Product or Engineering Change can be implemented, (ii) charges, if any, for such Product or Engineering Change, (iii) the point of incorporation into production, and (iv) the effect on maintenance, repair, support and Spares for Products.

10.4    <u>Documentation</u>: Lexmark shall provide ████ with documentation regarding all Product or Engineering Changes affecting form, fit, function, and interchangeability of Spares, as may be required to

update or supplement ▮ support and servicing manuals. ▮ shall have the right to make unlimited copies of such documentation and distribute same as deemed necessary in connection with Product sales, marketing, maintenance, and support.

10.5    New Models:  If, during the Initial Term of this Agreement or any extension thereto, Lexmark develops and manufactures new products that are similar in design and intended use as the Products being supplied under this Agreement, but may be more efficient and/or less expensive, and Lexmark intends to offer such new products to its OEM customers, then Lexmark may make such new products available to ▮ based on negotiated terms as soon as they are available for distribution.

11.    QUALITY ASSURANCE REQUIREMENTS

11.1    ▮ Quality Assurance Plan & Requirements: Lexmark agrees to establish and maintain a quality control and assurance system that meets the requirements of (i) the ▮ Quality Assurance Plan & Requirements indicated in Appendix 5, and (ii) all ISO 9001 requirements.

11.2    Lexmark Single Point of Contact: Within ten (10) working days of the execution of this Agreement Lexmark shall designate and communicate to ▮ he name of a qualified person who will act as a Single Point of Contact ("SPOC") for all quality and reliability issues. Lexmark's agrees to notify ▮ as soon as possible in the event that a new SPOC is designated from time to time by Lexmark.

11.3    ▮ Source Inspection & Audits: With reasonable written notice to Lexmark ▮ may periodically audit Lexmark's quality assurance, inspection and test procedures by (i) observation of tests being conducted, (ii) review of test documentation, or (iii) conducting its own inspection and tests at Lexmark's designated manufacturing location. If ▮ elects to conduct its own inspection and tests at Lexmark's manufacturing location, Lexmark will provide desk space and telephone equipment as reasonably required by ▮ at the manufacturing location during regular business hours.

11.4    Lexmark Outgoing Inspection and Testing: Prior to shipment of Products and Options, Lexmark will inspect and test each unit for conformity to the Specifications and quality assurance.  Test files and records of the outgoing inspection data shall be retained and made available t▮ for a minimum of three (3) years from date of test or inspection.

11.5    ▮ Incoming Inspection, Remedies, and Acceptance:

    11.5.1 Within sixty (60) days of Lexmark delivery of Products, Supplies, Options, and Spares, ▮ shall have the right to perform an out-of-box inspection to ensure compliance with the Specifications and all other applicable quality requirements. Upon request, Lexmark test files related to its outgoing inspection shall also be provided to ▮ to provide for a basis of comparison with ▮ incoming inspection.

    11.5.2 ▮ may reject any defective or nonconforming Products, Supplies, Options, or Spares identified during such inspection by providing Lexmark with written notice, by facsimile or e-mail, within said sixty (60) day period ("Notice of Rejection"). Upon ▮ s issuance of a Notice of Rejection, the parties shall discuss the situation as soon as possible and typically within three (3) business days. If both parties agree there is a defective or non-conforming item, Lexmark will then repair or replace rejected Products, Supplies, Options, and Spares at no cost to ▮.  All Products, Supplies, Options, and Spares replaced by Lexmark as a result of a Notice of Rejection shall be subject to re-inspection and acceptance by ▮ Lexmark shall also bear the shipping cost to (i) return rejected Products, Supplies, Options, and Spares to Lexmark and (ii) provide ▮ with replacements for same.

11.5.3 Acceptance of Products, Supplies, Options, and Spares delivered to ▇ shall be deemed to occur if no Notice of Rejection is provided to Lexmark within said sixty (60) day period. ▇ acceptance of Supplies, Options, and Spares in no way diminishes Lexmark's obligations as indicated in Section 12.4 herein ▇ acceptance of Products in no way diminishes Lexmark's obligations for Epidemic Failure as indicated in Section 12.4 herein or for correction of Product quality problems as indicated in the ▇ Quality Assurance Plan & Requirements referenced in Appendix 5.

## 12.    LEXMARK WARRANTIES

12.1    Lexmark represents and warrants that it has sufficient right, title and interest to the Products, Supplies, Options, and Spares being supplied hereunder and such units will be delivered to ▇ free and clear of any liens and encumbrances.

12.2    Lexmark warrants that the Products, Supplies, Options, and Spares delivered to ▇ comply with all applicable health, safety and environmental laws, and the Regulatory Requirements for the Territory as referenced in Section 13.

12.3    For a period of four (4) months after delivery to ▇ Lexmark warrants that Supplies, Options, and Spares will conform to the Specifications and be free from defects in materials and workmanship ▇ remedy for breach of this warranty will be as indicated in Section 11.5.2 herein ▇ will provide Lexmark with a dated customer proof-of-purchase receipt for any claims against this warranty.

12.4    Epidemic Failure

Epidemic Failure hereby defined as the same material defect found in the applicable installed base of Products according to the following table:

| Deployment Period | Measurement - Same material defect found in |
| --- | --- |
| Over First 3 Months | Not Applicable |
| Over First 4 Months | 12% or more of the installed base |
| Over First 5 Months | 10% or more of the installed base |
| Over First 6 Months | 8% or more of the installed base |
| Over First 7 Months | 6% or more of the installed base |
| After First 7 Months – the most recent rolling six (6) month period | 4% or more of the installed base |

In the event of an Epidemic Failure, the parties will discuss the nature of the Epidemic Failure and the statistics and calculation determining the Epidemic Failure. After Lexmark's verifies nature of the defect and the accuracy of the statistics and calculation used to determine the Epidemic Failure, Lexmark at its own expense shall determine the root cause of the problem and implement any fix required in the production of Products. In this regard Lexmark shall provide ▇ with the following information, where applicable:

- Full details of the fix and the appropriate drawings and change notification
- Cut in serial number for Products that will include the fix

Regarding affected Products that have already been delivered to ▇ and either held in ▇ stock or installed at ▇ customer sites, Lexmark shall indicate any fix or repair that can be provided for such Products. Lexmark at its option and expense shall then either: (i) fix or repair such Products, or (ii) replace such Products, or (iii) if ▇ agrees to perform the fix or repair on such Products, Lexmark shall provide all required technical support and replacement parts and reimburse ▇ for travel and labor cost, based on mutually negotiated and agreed rates, for performing the fix or repairs, or (iv) refund to ▇ the original

purchase price paid for the affected Products. All defective Products or parts thereof replaced by Lexmark shall become the property of Lexmark. Lexmark will arrange and pay for all required transportation to move such defective Products or parts back to Lexmark. If Lexmark wishes to scrap or dispose of such defective Products or parts rather than return to Lexmark, and if ███ agrees to perform same for Lexmark, then the parties shall negotiate and agree on applicable ███ charges for this service.

13.    REGULATORY APPROVALS & COMPLIANCE

13.1    <u>Regulatory Agency Approvals & Requirements:</u> Lexmark shall, at its expense, obtain, maintain, and insure compliance with the applicable Regulatory Specifications indicated in Appendix 3.3 for all Products, Supplies, Options, and Spares, including related permits, licenses, and registrations required for operation and distribution in the Territory. Lexmark shall provide ███ with documentation including testing data and reports to evidence Lexmark's acquisition of required permits, licenses, and registrations and compliance with such Regulatory Agency Approvals (to the extent the relevant authority requires the creation of, and requests production of, said documentation and reports). In cases where ███ may actually be the party that needs to file for any permits, licenses, and registrations for such Regulatory Agency Approvals, Lexmark will provide ███ with all required information and assistance to do so.

13.2    <u>US Toxic Substance and Clean Air Acts:</u> Lexmark certifies that all Products, Supplies, Options, and Spares (and the packaging of these units) do not contain any substance, compound, or mixture regulated or restricted under The U.S Toxic Substance Control Act and The U.S. Clean Air Act.

13.3    <u>United States FDA Requirement for Laser Products:</u> With respect to the United States Food and Drug Administration ("FDA") regulation related to Title 21 CFR Part 1040 for laser products, Lexmark certifies that the Products comply in all ways with the applicable standards and reporting requirements. Lexmark will label or tag the appropriate warnings on Products and Lexmark will include the warnings and instructions for safe use and maintenance of Products in the user manual. Lexmark fully recognizes that before Products may enter the US, it must file a "Declaration for Imported Electronic Products Subject to Radiation Control Standards (hereinafter "Declaration") by completing and submitting FDA Form FD 2877. In filing the Declaration, Lexmark will: (i) ensure that the Products meet the FDA standards and requirements, (ii) file the necessary Radiation Safety Product Report with the FDA per specification 21 C.F.R. 1002.10, and (iii) supplement the Radiation Safety Product Report annually or as necessary to reflect Product updates and modifications per specification 21 C.F.R 1002.13 and 1040.10. Lexmark hereby agrees to indemnify, defend, and hold ███ harmless against any liability as a result of any claim, suit, or action taken by the FDA or any other government agency, party or person arising from Lexmark's failure to comply with the FDA standards and requirements or resulting from false, incomplete, or misleading information for making Declarations and Lexmark shall pay or reimburse ███ for any penalties and fines levied against ███ or any losses, expense, damages, or cost (including but not limited to all legal and attorney fees) incurred by ███ as a result of Lexmark's failure or noncompliance with same.

13.4    <u>RoHS:</u> With respect to the European Unions Directive on the Restriction on the Use of Certain Hazardous Substances in Electrical and Electronic Equipment (RoHS), within ten (10) days of the execution of this Agreement Lexmark shall provide ███ with a letter listing and declaring that the specific Products, Supplies, Options, and Spares supplied by Lexmark, and any parts or components thereto comply with RoHS.

13.5    <u>California Proposition 65:</u> With respect to California Proposition 65, the Safe Drinking Water and Toxic Enforcement Act (Prop 65), within ten (10) days of the execution of this Agreement Lexmark shall provide ███ with a letter listing and declaring that the Products, Supplies, Options, and Spares, supplied by Lexmark, and any parts or components thereto, do not contain any substances that are in violation of Prop 65.

14.    USE OF BRANDNAME(S) & TRADEMARK(S)

14.1    ███ shall supply Lexmark with all photographs, colors, and instructions on the placement and appearance of the ███ brand name on any Products, Supplies, Options, and Spares and their applicable

documentation and packaging boxes. Each box will be labeled according to ▮▮ requirements. Except to where ▮▮ has previously agreed to in writing, the Lexmark brand name(s) shall not appear on the Products, Supplies, Options, and Spares or their applicable documentation, packaging, and boxes.

14.2     Lexmark agrees to affix the ▮▮ brand names and trademarks on Products and not to affix or allow to be affixed the ▮▮ brand names and trademarks on any other product manufactured or supplied by Lexmark. Neither ▮▮ nor Lexmark will use or publicize the name of the other without such party's prior written consent.

14.3     Lexmark agrees that, except for affixing the ▮▮ brand names or trademarks to the Products, nothing in this Agreement grants or transfers to Lexmark any right or interest in such ▮▮ brand names or trademarks. Lexmark shall not in any manner represent that it has any ownership interest in the ▮▮ brand names or trademarks or registrations thereof. Lexmark further agrees not to use or register any ▮▮ brand names or trademarks or any other word or device likely to be confused with the ▮▮ brand names or trademarks, except as permitted in writing by ▮▮.

14.4     ▮▮ Warranty ▮▮ represents and warrants that the use of ▮▮ brand name, trademark, or logo or other marks of ▮▮ (hereinafter ▮▮▮▮) in accordance with ▮▮ instructions on the Products or any Supplies, Spares, and Options shall not infringe on the copyright any third party.

14.5     ▮▮ agrees not to use the Lexmark brand name, trademarks, or logo in any manner without the written consent of Lexmark.

15.     TERMINATION

15.1     In the event of a material default under this Agreement, the non-defaulting party may give written notice ("Default Notice") to the defaulting party setting forth the specific nature of the default and allowing the defaulting party thirty (30) days to cure the default. If the default is not cured to the non-defaulting party's reasonable satisfaction within the time stated in the Default Notice, the non-defaulting party may immediately terminate the Agreement and/or any Orders issued hereunder, by providing a second written notice (the "Termination Notice") to the defaulting party.

15.2     This Agreement, or any Orders issued hereunder, may be terminated immediately at the option of a party if the other party (i) is adjudicated bankrupt or (ii) makes an assignment for the benefit of its creditors, or (iii) is the subject of a receivership or similar actions placing the assets of the party in the control of a trustee.

15.3     With 60 days written notice, this Agreement may be terminated by ▮▮ or Lexmark, if the other party acquires or is acquired by a direct competitor of ▮▮ or Lexmark.

15.4     The following provisions shall apply upon the expiration or termination of this Agreement:

a). Except if this Agreement is terminated by reason of default, the parties shall be bound by the terms of this Agreement with respect to all Orders accepted by Lexmark prior to the date of such expiration or termination.

b). Subject to the terms of the SWDA, ▮▮ and its affiliate companies and authorized dealers shall retain all licenses granted by Lexmark and a continuing right to market and distribute Products in the Territory.

c). Except if this Agreement is terminated by reason of default, in the even ▮▮ is committed to supplying Products to its customers beyond such termination or expiration date, during the sixty

(60) day notice period Lexmark and ▮▮ agree to negotiate, in a timely manner, Lexmark's continued supply of Products to allow ▮▮ to fulfill such commitments.

d). Each party shall immediately return to the other all materials, property, or Confidential Information and all copies thereof provided or disclosed to the other party pursuant to this Agreement. However, ▮▮ will not be required to return such information to the extent that it is reasonably required by ▮▮ to fulfill its obligations to service and support Products up to seven (7) years after the contract expires or is terminated.

e). Lexmark shall continue to supply ▮▮ with Technical Support for the period indicated in Section 16.3 herein and Spares for the period indicated in Section 16.4 herein.

15.5    The exercise of the right of termination by either party shall be in addition to any other rights or remedies available to it under law unless limited or precluded by this Agreement and shall not have the effect of waiving other rights to which such party may otherwise be entitled.

## 16.    LEXMARK PRODUCT SUPPORT

16.1    <u>User and Service Documentation:</u> Lexmark shall provide to ▮▮ at no cost, and in electronic form, legible and reproducible User and Service documentation (same as provided to Lexmark servicing personnel) including drawings, photographs, and narrative text (where applicable) for all hardware, firmware, and Software, and any modifications or engineering changes thereto, necessary and suitable for use in editing, translating, reformatting, reproducing and distributing such documentation in technical manuals, parts catalogs, Spares lists, and other literature relating to Products . Lexmark hereby grants ▮▮ and its affiliated companies and authorized dealers the right to use and copy such documentation.

16.2    <u>Training for Product Launch:</u> If "Train the Trainer (T3")" classes are offered by Lexmark for comparable Products, Lexmark will provide ▮▮ with technical T3 training. Lexmark will reserve three (3) seats for ▮▮ Any additional training class requested by ▮▮ shall be provided by Lexmark based on mutual agreement as to venue and cost. ▮▮ will be responsible for the travel expense of its training and key support personnel to attend training classes.

16.3    <u>Third Level Support:</u> During the Initial Term of this Agreement and any extensions thereto, and for a period of seven (7) years after Lexmark's End of Marketing Life notice on Lexmark's comparable Product or as long as Lexmark provides service support for comparable Products, whichever is shorter, Lexmark shall maintain a qualified and English speaking support group to provide Third Level Support to ▮▮ as set forth below, to address problems and issues with Products, Options, Supplies, and Spares including installation, operation, maintenance, and repair problems or issues that ▮▮ is unable to resolve through its own First Level Support and Second Level Support:

a). <u>Remote Technical Support:</u> Such support shall be provided to ▮▮ Second Level Support personnel at no cost or charges to ▮▮ In providing such support Lexmark shall acknowledge ▮▮ requests within twenty-four (24) hours and then provide a resolution within three (3) business days via facsimile, email, or telephone call. If a resolution cannot be practically achieved within said period then Lexmark will discuss and reach agreement with ▮▮ on a reasonable plan and schedule for addressing the issue or correcting the problem. Any oral solution given to ▮▮ shall be promptly confirmed in writing by Lexmark.

b). <u>On-Site Technical Support:</u> In the event that a problem cannot be resolved through Remote Technical Support as indicated above, the parties agree to discuss the situation and a solution that may include Lexmark providing, upon mutually agreeable terms, On-Site Technical Support at ▮▮ designated site(s).

16.4     Spares Support:  During the Initial Term of this Agreement and any extensions thereto, and for a period of seven (7) years after Lexmark's End of Marketing Life notice on Lexmark's corresponding Lexmark-brand  Product or as long as Lexmark provides service support for the  corresponding Lexmark-brand  Product, whichever is shorter, Lexmark will continue to supply███with Spares. In the event that Lexmark discontinues service support for the corresponding Lexmark-brand Product prior to said seven (7) year period, Lexmark shall provide███with at least one hundred eighty (180) day advance written notice of same and also provide███with an "All Time Buy" opportunity for such Spares, based on current prices. Deliveries against such All Time Buy Order must be scheduled for delivery during the notice period.

17.     INDEMNIFICATIONS

17.1     Lexmark Indemnification Against Infringement: Lexmark will indemnify, hold harmless, defend at its sole expense, and  pay the costs and damages made in settlement or finally awarded as a result of any action brought against███its parent and affiliated companies, officers, directors, employees, Subsidiaries, Intermediaries, assigns and successors (collectively███Indemnified Parties") based on a claim that the Products, Supplies, Options, and Spares infringe any third party patent, copyright, trade secret, or intellectual property right. If a final injunction is obtained against use of the Products Supplies, Options, and Spares by reason of such infringement, or, if in Lexmark's opinion, the same are likely to become the subject of a claim of such infringement, Lexmark will then, at its option and at its expense provide one of the following remedies:

> a). Procure for Indemnified Parties the right to continue using the Products, Supplies, Options, and Spares; or

> b). Replace or modify the same so that they become non-infringing; or,

> c). if (a) or (b) are not feasible, repurchase███inventory of infringing Products Supplies, Options, or Spares from███based on original price.

17.2     Lexmark Indemnification Against Defects: Lexmark will indemnify, hold harmless, defend at its sole expense, and pay the costs and damages made in settlement or finally awarded as a result of any third-party action brought against███and/or the███Indemnified Parties as referenced in Section 17.1 herein based on a claim that defects in the Products Supplies, Options, and Spares have caused any injuries or death to persons, or damage to real or personal property.

17.3     ███Indemnification Against Infringement:███will indemnify, hold harmless, defend at its sole expense, and  pay the costs and damages made in settlement or finally awarded as a result of any action brought against Lexmark, its parent and affiliated companies, officers, directors, employees, Subsidiaries, Intermediaries, assigns, and successors (collectively "Lexmark Indemnified Parties") based on a claim that (i) Lexmark's use (as set forth in Section 14) of the███Marks herein infringes any third party patent, copyright, trade secret, or intellectual property right or (ii) any other software as referenced in Section 2.3 herein infringes any third party patent, copyright, trade secret, or intellectual property right.

17.4     ███Indemnification on Servicing of Products███will indemnify, hold harmless, defend at its sole expense, and pay the costs and damages made in settlement or finally awarded as a result of any action brought against a Lexmark Indemnitee based on a third party claim that███or███agents servicing of or failure to service Products has caused any injuries or death to persons, or damage to real or personal property.

18.     PRODUCT LIABILITY INSURANCE

███ /Lexmark – OEM Purchase Agreement

18.1    Requirement on Lexmark: Lexmark shall maintain, at its expense, Product Liability Insurance that will fully protect ███ and its officers, agents and employees, from claims relating to defects in Products, Supplies, Options, and Spares. The amount of coverage for this insurance shall be at least ten million dollars US ($10,000,000) per loss for bodily injury, death, or property damage. Such insurance shall also (i) list ███ as additionally insured, (ii) carry an endorsement that the insurance is primary and in excess of any such insurance that may be maintained by ███ and (iii) be maintained by Lexmark during this Agreement and for five (5) years thereafter.

18.2    Certificate of Insurance: A Certificate of Insurance showing compliance with the foregoing requirements shall be provided by Lexmark to ███ The Certificate of Insurance shall state that the policy or policies have (i) been issued and are in full force at the time, and (ii) shall not expire, lapse, be canceled or changed until after thirty (30) days written notification to ███ Certificates of Insurance shall be sent to:



18.3    Requirement on ███ shall maintain, at its expense, Product Liability and Completed Operations Insurance that will fully protect Lexmark and its officers, agents and employees, from claims relating to servicing or failure to service Products, Supplies, Options, and Spares. The amount of coverage for this insurance shall be at least ten million dollars US ($10,000,000) per loss for bodily injury, death, or property damage. Such insurance shall also (i) list Lexmark as additionally insured, (ii) carry an endorsement that the insurance is primary and in excess of any such insurance that may be maintained by Lexmark, and (iii) be maintained by ███ during this Agreement and for five (5) years thereafter.

18.4    Certificate of Insurance: A Certificate of Insurance showing compliance with the foregoing requirements shall be provided by ███ o Lexmark. The Certificate of Insurance shall state that the policy or policies have (i) been issued and are in full force at the time, and (ii) shall not expire, lapse, be canceled or changed until after thirty (30) days written notification to Lexmark. Certificates of Insurance shall be sent to:

> Lexmark International, Inc.
> 740 West New Circle Road
> Lexington, KY 40550
> Attn: Corporate Risk Manager

19.    LIMITATION ON LIABILITIES

NEITHER PARTY TO THIS AGREEMENT SHALL BE LIABLE TO EACH OTHER FOR ANY INCIDENTAL, SPECIAL, INDIRECT, PUNITIVE OR CONSEQUENTIAL DAMAGES, OR LOSS OF PROFITS OR DATA OF ANY KIND UNDER THIS AGREEMENT.

LEXMARK WILL NOT BE LIABLE FOR ANY DAMAGES CAUSED BY THE PERFORMANCE OR NONPERFORMANCE OF PRODUCTS OR SOFTWARE PROGRAMS LOCATED OUTSIDE THE TERRITORY, PROVIDED THE CLAIMANT PROVIDES EVIDENCE SUFFICIENT TO SHOW THAT AT THE TIME THE CLAIM AROSE THE PRODUCTS OR SOFTWARE MET ALL THE ORIGINAL SPECIFICATIONS AS INDICATED IN THIS AGREEMENT.

LEXMARK ASSUMES NO LIABILITY REGARDING ANY CLAIM OR ACTION CAUSED BY, OR DIRECTLY RELATED TO, A PRODUCT NOT SOLD OR PROVIDED BY LEXMARK.

CONFIDENTIAL - OUTSIDE COUNSEL ONA3624

TO THE EXTENT PERMITTED BY LAW, ANY LOSS, LIABILITY, CLAIM OR DAMAGE
RESULTING FROM ANY CAUSE WHATSOEVER, IN NO EVENT WILL EITHER PARTY'S TOTAL
LIABILITY FOR DAMAGES EXCEED AN AMOUNT EQUAL TO ███████

20.    ASSIGNMENT

Neither party hereto may assign any of its rights or obligations under this Agreement without the express
written consent of the other party; provided that, Lexmark may assign (without ████ prior written consent)
to a third party financial organization for financing purposes accounts receivable from ███

21.    PROPRIETARY AND CONFIDENTIAL INFORMATION

21.1    Lexmark and ███ agree that the Confidential Exchange Agreement # 5737 between the parties
dated 12/1/08 (the "CEA"), a copy of which is proved in Appendix 6, shall be deemed incorporated herein by
this reference and shall apply to the disclosure or exchange of Confidential Information of either party in
connection with this Agreement. It is further understood and agreed that this Agreement and all documents
transmitted by one party to the other during the term of this Agreement and identified on their face by the
transmitting party as confidential shall be regarded as "Confidential Information" as defined in the NDA.

21.2    Notwithstanding anything in the CEA to the contrary, it is agreed that to the extent the CEA by its
terms may expire prior to the expiration or termination of this Agreement, the term of the CEA shall be
extended until such time as this Agreement expires or is terminated.

22.    NOTICE

Any notice that may be or is required to be given under this Agreement shall be in writing and in the English
language.  All such notices shall be sent by courier services (such as FedEx, DHL, UPS, etc.) or registered or
certified airmail (postage prepaid and return receipt requested), and shall be deemed to have been given upon
receipt.  Notices shall be addressed in the manner indicated below or to such other addresses as the parties
may from time to time notify each other of:



To Lexmark:
Lexmark International, Inc.
740 West New Circle Road
Lexington, KY 40550
Attention: General Counsel

23.    INDEPENDENT CONTRACTOR

All Products, Supplies, Options, Spares and services are rendered by Lexmark as an independent contractor
and this Agreement does not create any employer-employee relationship between ████ and Lexmark. Neither
party will in any way represent itself as being an agent, representative, or in a joint venture of the other party.

24.    SEVERABILITY

If any provision of this Agreement shall be found by arbitration or court of competent jurisdiction to be invalid or unenforceable, the invalidity or unenforceability of such provision shall not affect the other provisions of this Agreement which shall remain in full force and effect.

25.    SURVIVAL OF PROVISIONS

Those provisions in this Agreement which by their nature extend beyond the Initial Term or any extensions thereto shall survive termination of this Agreement and continue in full force and effect. Such surviving provisions shall include, but shall not be limited to what is contained in Sections 2.2, 5.2, 7.2, 9.2, 11.5, 12, 13, 14,  15.4, 16.3, 16.4, 17, 18, 19, 21, 25, 28, 29 and 30 and all subsections thereof.

26.    FORCE MAJEURE

26.1    Neither party shall be liable for any loss or damages suffered by the other or be deemed to be in default for any delays or failures in performance hereunder resulting from acts or causes beyond its  control such as (i) acts of God or of a public enemy, (ii) acts of any country, state or political subdivision thereof, (iii) fires, floods, explosions or other catastrophes, (iv) epidemics and quarantine restrictions, (v) strikes, slowdowns, or labor stoppages of any kind, (vi) embargoes, (vii) unusually prolonged severe weather, (viii) acts of war or terrorism,  (ix) general shortages of raw materials or labor generally affecting the printer industry or severe disruption of Lexmark's manufacturing or supply chain that impacts the supply of Lexmark products corresponding to the Products, Supplies, or Spares purchased under this Agreement, and (x) any other similar causes.  In such event, the party being hindered shall give notice as soon as reasonably possible to the other party and shall diligently use all reasonable efforts to remove the cause of such force majeure as soon as practical.

26.2    The party affected by the force majeure event shall notify the other party without undue delay after such occurrence. The affected party shall be excused from such of its obligations hereunder as it is thereby disabled from performing for the duration of the force majeure event; provided, however, that such affected party must promptly and diligently take reasonable actions, if any, to cure any cause of such disability as are within the affected party's control.

26.3    If Lexmark should fail to perform any part of an Order by reason of any of the above causes ██████ may at its discretion suspend or cancel such Order without liability to Lexmark.

27.    ENTIRE AGREEMENT

This Agreement and its appendices attached hereto which are incorporated herein by reference constitute the entire Agreement and understanding between the parties and supersedes any prior agreements or negotiations. In case of discrepancies between the appendices and this Agreement, this Agreement shall prevail. This Agreement may not be modified or amended unless in writing signed by duly authorized representatives of each of the parties hereto.  Failure of either party at any time to require performance of any provisions of this Agreement shall not affect the right to require full performance at any time thereafter.  Any waiver by either party of a breach of any provision shall not be taken or held to be a waiver of any subsequent breach hereof as nullifying the effectiveness of such provision.

28.    GOVERNING LAW

This Agreement shall be construed in accordance with and governed by the laws of the State of New York, USA, excluding its conflict of laws provisions.

29.    UNITED NATIONS CONVENTION

It is understood and agreed that the United Nations Convention for International Sale of Goods ("C.I.S.G") will not in any way apply to this Agreement.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3626

30.    DISPUTE RESOLUTION

30.1    <u>Internal Mediation</u>: The parties shall first attempt in good faith to resolve any disputes arising out of or relating to this Agreement by negotiations between their respective Project Managers and Senior Executives as follows:

> If a dispute should arise, then the assigned Project Managers for █████ and Lexmark will, within a ten (10) day period, attempt to resolve the matter. Such negotiations may be conducted by teleconference or face-to-face meetings at a mutually agreed location, date, and time.

> If the dispute is not resolved by the Project Managers it shall be referred to a Senior Executive of each party who has the authority to settle the dispute. The Senior Executives will within a twenty (20) day period conduct meetings by teleconference or face-to-face to settle the dispute.

30.2    <u>Arbitration</u>: If the dispute has not been settled by the Senior Executives within a twenty (20) day period, the dispute shall be settled by arbitration under the rules of the Commercial Arbitration Rules of the American Arbitration Association. Judgment upon the award rendered by the arbitrator may be entered by any court having jurisdiction thereof. The place of arbitration shall be █████████ if a claim is made against █████ or Lexington, KY if a claim is made against Lexmark. The arbitrator shall have no power or authority to award damages in excess of compensatory damages or to award damages waived under the Limitation of Liabilities provision in Section 19 of this Agreement. Each party expressly waives and foregoes any right to punitive, exemplary or similar damages.  There shall be one arbitrator appointed by the American Arbitration Association.  The award shall be made within nine months of the filing of the notice of intention to arbitrate, and the arbitrator shall agree to comply with this schedule before accepting appointment. However, this time limit may be extended by agreement of the parties or by the arbitrator if necessary.  At the request of a party, the arbitrator shall have the discretion to order examination by deposition of witnesses to the extent the arbitrator deems such additional discovery relevant and appropriate. Depositions shall be limited to a maximum of three per party and shall be held within 30 days of the making of a request. Additional depositions may be scheduled only with the permission of the arbitrator, and for good cause shown. Each deposition shall be limited to a maximum of three hours duration. All objections are reserved for the arbitration hearing except for objections based on privilege and proprietary or confidential information. Consistent with the expedited nature of arbitration, each party will, upon the written request of the other party, promptly provide the other with copies of documents relevant to the issues raised by any claim or counterclaim on which the producing party may rely in support of or in opposition to any claim or defense. Any dispute regarding discovery, or the relevance or scope thereof, shall be determined by the [arbitrator, which determination shall be conclusive. All discovery shall be completed within 45 days following the appointment of the arbitrator.

IN WITNESS WHEREOF, the parties hereto have caused their duly authorized officers to execute this Agreement as of the day and year shown below.

|  | For Lexmark |
|---|---|
| ███████████ | |
| By ████████ | By _(signature)_ |
| Name ███████ | Name F.T. SAMUEL, JR |
| Title ███████ | Title VP, WW OEM & ALLIANCES |
| Date ███████ | Date 30 OCTOBER, 2010 |

CONFIDENTIAL - OUTSIDE COUNSEL ONLY

█████ Lexmark – OEM Purchase Agreement

## Appendix 1 – Description and Pricing for Products, Supplies and Options

**Products**

| Lexmark Part # | Description | MOI Pallet Qty. | Lexmark MSRP | Lexmark Distributor Price | Discount % | Price (Per Unit) |
|---|---|---|---|---|---|---|
| ████ | ████ - 55 PPM Mono 4-in 1, Multifunction Laser Duplex Printer US/CAN/LAD LV | 1 | | | | |
| | ████ - 55 PPM Mono 4-in 1, Multifunction Laser Duplex Printer Argentina HV | 1 | | | | |
| | ████ - 55 PPM Mono 4-in 1, Multifunction Laser Duplex Printer Chile/Uruguay/Paraguay/Peru HV | 1 | | | | |
| | ████ - 55 PPM Mono 4-in 1, Multifunction Laser Duplex Printer with 4-bin Mailbox US/CAN/LAD LV | 1 | | | | |
| | ████ - 55 PPM Mono 4-in 1, Multifunction Laser Duplex Printer with 4-bin Mailbox Argentina HV | 1 | | | | |
| | ████ - 55 PPM Mono 4-in 1, Multifunction Laser Duplex Printer with 4-bin Mailbox Chile/Uruguay/Paraguay/Peru HV | 1 | | | | |
| | ████ - 55 PPM Mono 4-in 1, Multifunction Laser Duplex Printer with StapleSmart 11 Finisher US/CAN/LAD LV | 1 | | | | |
| | ████ 55 PPM Mono 4-in 1, Multifunction Laser Duplex Printer with StapleSmart 11 Finisher Argentina HV | 1 | | | | |
| | ████ 55 PPM Mono 4-in 1, Multifunction Laser Duplex Printer with StapleSmart 11 Finisher Chile/Uruguay/Paraguay/Peru HV | 1 | | | | |

Products to include:
- Standard colors (same as Lexmark)
- Front cover piece pad printed w/ model name and company logo in predetermined location on front cover piece
- Logo'd back cover label
- OEM Driver/Pubs/Utilities CD
  - Generic model (Option 1) and/or delayed ████ unique model (Option 2) via drop-down list
  - Generic softcopy publications
- Generic quick reference card
- Standard voltage/safety label (Lexmark)
- Standard control panel
- OEM generic printer carton
- Generic printer driver with ████ specific model name added and customized ████ installer.
- 110 VAC and 230V VAC

█████ Lexmark – OEM Purchase Agreement

- License language affixed to the Product carton: "Please read before opening.  Opening this package or using the patented cartridge included with this product confirms your acceptance of the following license agreement.  The patented toner cartridge sold with this product is provided subject to the restriction that it be used only once.  Following this initial use, you agree to return the empty cartridge only to us for remanufacturing and recycling.  A prepaid return label is provided in every replacement cartridge package.  If you don't accept these terms, return this unopened package to your point of purchase."

**Supplies**

| Lexmark Part # | Description | MOI Pallet Qty. | Lexmark MSRP | Lexmark Distributor Price | Discount % | Price (Per Unit) |
|---|---|---|---|---|---|---|
| ███ | 36K Return Program Cartridge for ███ | 70 | | | | |
| | 36K Cartridge for ███ | 70 | | | | |

Supplies to include:
- Unique ███ electronic cartridge key for aftermarket supplies
- Unique ███ supplies label artwork
- OEM generic supplies carton
- License language affixed to Return Program Cartridge: "Patented cartridge sold at a special price subject to a restriction that it may be used only once, and you agree to then return the empty cartridge only to the address provided for recycling."
- License language affixed to Return Program Cartridge carton: "Please read before opening.  Opening the package or using the patented cartridge inside confirms your acceptance of the following license/agreement with the developer.  This cartridge is sold at a special price subject to a restriction that it may be used only once.  Following this initial use, you agree to return the empty cartridge only to the address provided for recycling.  If you don't accept these terms, return the unopened package to your point of purchase.  A regular price cartridge without these terms is available."

**Options**

| Lexmark Part # | Description | MOI Qty. | Lexmark MSRP | Lexmark Distributor Price | Discount % | Price (Per Unit) |
|---|---|---|---|---|---|---|
| ███ | Parallel 1284-B Interface Card | 1 | | | | |
| | Gigabit Ethernet Print Server | 1 | | | | |
| | Wireless Print Server | 1 | | | | |
| | (ONLY) 550-Sheet Input Drawer | 1 | | | | |
| | (ONLY) Envelope Feeder | 1 | | | | |
| | (ONLY) 2000-Sheet Input Drawer | 1 | | | | |
| | (ONLY) 550-Sheet Lockable Drawer | 1 | | | | |
| | (ONLY) 5-inch Spacer | 1 | | | | |
| | Bar Code Card | 1 | | | | |
| | PDS Emulation Card | 1 | | | | |
| | Decryption Card | 1 | | | | |

██████ Lexmark – OEM Purchase Agreement

| | | |
|---|---|---|
| ██████ Hard Disk Drive 80+GB | 1 | |
| ██████ (ONLY) 550-Sheet Input Drawer | 1 | |
| ██████ 512MB DDR II SDRAM DIMM | 1 | |
| ██████ 1GB DDR II SDRAM DIMM | 1 | |
| ██████ 256MB User Flash Memory | 1 | |
| ██████ ONLY) Caster Base | 1 | |
| ██████ (ONLY) Staple Cartridge 3-Pack | 20 | |

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3630

## Appendix 2 – █████ Territory

**United States**
**Canada**
**Argentina**
**Bermuda**
**Bolivia**
**Brazil**
**Chile**
**Columbia**
**Dominican Republic**
**Ecuador**
**El Salvador**
**Guatemala**
**Haiti**
**Honduras**
**Jamaica**
**Mexico**
**Nicaragua**
**Panama**
**Paraguay**
**Peru**
**Trinidad/Tobago**
**Uruguay**
**Venezuela**

CONFIDENTIAL - OUTSIDE COUNSEL ONl**A3631**

## Appendix 3 - Specifications

### 3.1 Product Specification

Click on below Icon



F:\Lexmark\OEM
Purchase Agree\PDD

### 3.2 – Packaging Specifications

Document 1 --  Packaging Specifications for Finished & Semi-Finished Goods

Click on below Icon



F:\Lexmark\OEM
Purchase Agree\QSI

Document 2 – Package Performance Test Specification

Click on below Icon



F:\Lexmark\OEM
Purchase Agree\QSI

Document 3 – Packaging Design & Test Specification

Click on below Icon



F:\Lexmark\OEM
Purchase Agree\QSI

### 3.3 Regulatory Requirements & Specifications

Click on below Icon



F:\Lexmark\OEM
Purchase Agree\

# Product Definition Document

████████████████████████████

# Products for the Americas

May 10, 2010

Author: Chuck Henry,
Lexmark International, Inc.
PS&SD OEM Engineering

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3633

# Change History

| Date | Version | Changes/Comments |
|------|---------|------------------|
| 1/25/2010 | V0 | Initial draft |
| 1/29/2010 | V1 | Made several revisions/additions throughout (in red) |
| 2/17/2010 | V2 | Made several revisions/additions throughout (in red) |
| 3/26/2010 | V3 | Made several revisions/additions throughout (in red) |
| 5/10/2010 | V4 | Removed ▮▮▮▮ Added LAD ▮▮▮▮ & ▮▮▮▮▮▮ Removed Peru fax homologation for launch requirements;  Drop 25K cartridge;  Added description of eSF support for Ringdale app; |
| 5/10/2010 | V5 | Identified position of ▮▮ Serial Number;  Reworded language requirements for cartridge labels;  Simplified documentation description; |

CONFIDENTIAL - OUTSIDE COUNSEL ONA3634

# Table of Contents

1.0 Purpose ...................................................................................................................................... 4
2.0 General ...................................................................................................................................... 4
3.0 Product Hardware ...................................................................................................................... 5
4.0 Part Numbering for Orderable Parts (TLIs, Supplies, Options/Features, Service Parts) ......... 6
5.0 Certifications ............................................................................................................................. 6
6.0 Supplies & Associated Packaging ............................................................................................ 7
7.0 Documentation .......................................................................................................................... 7
8.0 Driver CD ................................................................................................................................. 8
9.0 Product Packaging .................................................................................................................... 8
10.0 Options/Features ..................................................................................................................... 9
11.0 Service Parts ........................................................................................................................... 9
12.0 Other ....................................................................................................................................... 9
13.0 Definition Approval .............................................................................................................. 10

CONFIDENTIAL - OUTSIDE COUNSEL ON A3635

# 1.0 Purpose

The purpose of this Product Description Document (PDD) is to capture the basic "agreed to" product description between Lexmark and ███ It is not a definition of every component as one would see in an actual bill of material. Customer requested changes to an approved PDD will require Lexmark to evaluate the impact of such requests in terms of cost, schedule, and/or resources.

It is assumed, unless specifically addressed, a particular aspect of a product is the same as that of the Lexmark branded equivalent product.

# 2.0 General

| ███ Model | ███ | ███ | ███ |
|---|---|---|---|
| Similar Lexmark Model | X654 | X658dme | X658dfe |

List of countries for launch in Americas:

- United States
- Canada
- Argentina
- Bermuda
- Brazil
- Chile
- Columbia
- Dominican Republic
- Ecuador
- El Salvador
- Guatemala
- Haiti
- Honduras
- Mexico
- Nicaragua
- Panama
- Paraguay
- Peru
- Puerto Rico
- Trinidad/Tobago
- Uruguay
- Venezuela

CONFIDENTIAL - OUTSIDE COUNSEL ONlA3636

# 3.0 Product Hardware
*Company and model names on front of machines*

- ███████
  - Blank display bezel
  - Company name and model name pad printed on upper front cover
- ███████
  - Company name on upper front cover (similar to ███████
  - Model name pad printed on nameplate just above operator panel key buttons
    - Nameplate to show specific models: ███████ and ███████

*Company name on rear of machines*
Company name applied to back of rear cover.

*Serial Number Label*
A label under the front cover will display the machine's serial number, Lexmark's manufacturing part number, the config ID, and the machine type – model number. The serial number scheme includes 12 characters (different from Lexmark's). Serial Number scheme defined by ███ documentation. Serial number to appear under front cover on SN-TLI label.

*Power Rating Label*
On the rear of the machine the power rating label will be applied. The artwork for these labels will be unique to ███ and will contain ███ branding and machine type identification for regulatory purposes.

*Print Menu Pages*
Customers can initiate the printing of pages showing the status of internal settings, installed options, and other useful information. The heading for these pages will show the ███ models as follows:

███████████

*Power Cords and Phone Adapters*
To minimize SKUs and support the country groupings listed in the next section the following assumptions have been made:

- The Chile, Uruguay, Paraguay, Peru SKUs will contain 3 power cords
- The Argentina SKUs will contain one power cord
- All LV SKUs will contain the US power cord.
- ███ agrees to do the following for product sold in Brazil:
  1) Remove the US power cord.
  2) Procure & add the Lexmark-defined Brazil power cord obtained only from Lexmark's source.

All SKUs ship with an RJ-11 phone cord. An adapter is needed in some country installations to attach to the local phone system. At ███ request no phone adapters are included in any SKU.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3637

## 4.0 Part Numbering for Orderable Parts

Following are the Lexmark part numbers and ▮ part numbers for each of the machines and options to be orderable from Lexmark by ▮

| OKI Customer PN | LXK Internal PN | | Title |
|---|---|---|---|
| | | | US/Can/LAD LV |
| | | | Argentina HV |
| | | | Chile, Uruguay, Paraguay, Peru HV |
| | | | US/Can/LAD LV |
| | | | Argentina HV |
| | | | Chile, Uruguay, Paraguay, Peru HV |
| | | | US/Can/LAD LV |
| | | | Argentina HV |
| | | | Chile, Uruguay, Paraguay, Peru HV |

Products defined in this document are not suitable for sale to the US government – not TAA compliant. Lexmark does have a process to produce such machines but they are outside the scope of the current definition.

## 5.0 Certifications

Following is a list of certifications and homologations based on the countries in which ▮ has chosen to market the product:

*Product Safety*
- Lexmark to obtain the following with associated NRE charged:  CB , IRAM S-Mark (Argentina), cULus (US/Cananda).
- ▮ to act locally to obtain:  INMETRO (Brazil), NOM (Mexico)

*Fax Homologation*
- **Existing fax homologation supports the following countries ("*" denotes countries where Lexmark believes no homologation is required):**  Argentina, Chile, Uruguay*, Paraguay, Canada, Dominican Republic, Ecuador*, El Salvador*, Guatemala*, Honduras*, Mexico, Nicaragua*, Panama*, Puerto Rico, Trinidad/Tobago*, US, Colombia*, Venezuela.
- **Lexmark to obtain fax approval for the following countries with associated NRE charged:** Brazil, Bermuda & Haiti (LXK to investigate requirement and pursue approval if needed). To be added later if ▮ requests:  Peru (for Gov only)

*Wireless Certification (supporting wireless option purchased separately)*

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3638

- **Existing certification support the following countries:** Argentina, Chile, Uruguay, Peru, Brazil, Canada, Mexico, Puerto Rico, Trinidad/Tobago, US, Venezuela,
- **Countries where wireless certification does not exist and there is no plan to pursue:** Paraguay, Bermuda, Dominican Republic, Ecuador, El Salvador, Guatemala, Haiti, Honduras, Nicaragua, Panama, Colombia

Lexmark will apply the Energy Star logo to the products as ███ does plan to apply for Energy Star.  Lexmark will supply needed technical information for ███ to make application.

# 6.0 Supplies & Associated Packaging

| Aftermarket Supply Item Description | Yield | Similar US/Can Lexmark PN | ███████ | (X654) | (X658) |
|---|---|---|---|---|---|
| Extra High Yield Print Cartridge | 36K | X654X21A | | Yes | Yes |
| Extra High Yield Return Program Print Cartridge | 36K | X654X11A | | Yes | Yes |
| Staple Cartridge 3-Pack | | 25A0013 | | ███ | ███ |

In addition to the aftermarket supply items above, the machines ship with an ███ branded return program cartridge installed.

All aftermarket print cartridges will be keyed to work exclusively with ███ models only.  All print cartridges will have an ███ branded "load label", a generic return label(12A0488), a generic tamper-evident label (12A0060), and a (generic) license label (12A9077) for return program cartridges.  Space is limited on the "load label" which is to include all necessary languages for worldwide ███ support.

Aftermarket cartridges will be packaged in plain brown kraft cartons with ███ unique carton labels showing identifying information on two sides of the carton.  Information on the carton labels will be all necessary languages for worldwide ███ support.  Cartons will contain a generic return brochure (12A8386) which provides shipping instructions and labels for return of either "Return Program" or "Business as Usual" cartridges.  The exterior of the carton is to have a generic license label which must be cut upon opening the carton (12A5316).

# 7.0 Documentation

All products include the following Lexmark-generated hard copy documentation:
- Generic Setup sheet ███████████████ )
- Safety Information sheet (3015500)
- Return License sheet - located in paper input tray (PN tbd)

It is assumed these documents meet ███ language requirements without change.

A generic User Guide is included on the CD with the Driver.

CONFIDENTIAL - OUTSIDE COUNSEL ONA3639

██ Unique Documents:

██ is to provide other physical documents or printable source files for inclusion with machines. These documents are:

- ██ provided Product Safety Warranty Document – Softcopy and specs to be provided by ██ Lexmark to source. 4 Languages. Content to include safe configuration information to be provided by Lexmark and formatted to suite by ██
- Other documents?

## 8.0 Driver CD

The ██ driver CD is to be the same as Lexmark's generic OEM CD with the following differences:

- Screen printed face of the CD to be ██ unique artwork
- Only ██ and ██ models is to appear in the installer drop-down list
- OEM generic User's Guide as is subject to some answers to outstanding power saver questions.
- EULA to be ██ provided with Lexmark-provided "Freeware" verbiage added and Microsoft notice to cover embedded XPS drivers. Lexmark to review final version.
- EULA translations supported in driver: English, French, Italian, German, Spanish, Brazilian Portuguese, Polish, Russian, Turkish, Romanian, Japanese KJ, Traditional. Chinese, Simplified Chinese, Korean. ██ to provide translation for each or define alternate language EULA to be displayed. Also need to confirm this EULA for worldwide use.)
- Will include Linux support on the CD.

Support for all existing driver and User Guide languages will remain on the CD.

The following are the "friendly" model names used in the driver. They are seen during Plug-and-Play, in the Print Queue, and under "Printers and Faxes" in the Control Panel of Windows.

██

## 9.0 Product Packaging

These products will be packaged in OEM generic cartons which are brown kraft cartons with single color line drawings of the product, storage/handling instructions, and wordless unboxing instructions. A generic description of "Multifunction Printer" in several languages is also on the carton. ██ ██ art)

A 6 x 6 inch carton label is applied to the carton (to be jointly defined by Lexmark and ██ containing ██ unique product information (described in ██ packaging spec) as well as "manufacturer's use" information. Label to have UL and NOM marks as long as sufficient space is available.

A second 6 x 6 inch label is applied to the carton containing generic supplies license information for the customer to see prior to opening the carton (3048329). (The specific content should be reviewed to confirm generic wording is acceptable.) It is assumed that existing translations of the generic text are sufficient.

CONFIDENTIAL - OUTSIDE COUNSEL ON A3640

The carton is to be sealed with standard, off-the-shelf packing tape.

Pallet labeling to include ■■ unique part number, product description, human readable country of origin, pallet gross and net weights. ■■ purchase order number is requested. This may be applied via a separate label.

## 10.0 Options/Features
Options to be offered by ■■ are as follows:
(Need option list from ■ here including ■■ part numbers.)

All options are to be physically the same as for Lexmark except that an appropriately sized carton label with an ■■ part number and description information will be applied to the carton. The content and layout of these labels is to be jointly defined by Lexmark and ■■ ISSUE: ■■ requesting unique warranty documentation with each option (not supported by existing Lexmark processes).

## 11.0 Service Parts
■■ will use Lexmark common service parts "as is", to include using Lexmark's service part numbering. Only ■■ uniquely logo'd parts will be carried as ■■ unique service parts.

## 12.0 Other

*eSF Support*
- Existing Lexmark or third party eSF Applications (other than those available at no charge from Lexmark.com) are NOT supported. Upon confirmation of agreements with Ringdale, Lexmark will take necessary steps to enable the Ringdale eSF application to operate in ■■ models manufactured by Lexmark.

*Demo Page*
The demo page available for printing from the operator panel of Lexmark branded products is not available and hidden for ■■ branded products.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3641

# 13.0 Definition Approval

Customer Approval                                    Lexmark Approval

_____                              _____
Name (Print)                                         Name (Print)

_____                              _____
Signature                                            Signature

_____                              _____
Date                                                 Date

████████████                                         Lexmark International, Inc.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3642

| | **QUALITY SYSTEM INSTRUCTION** |
|---|---|
| **QSI 7.3.4.8** | Product Realization - Design And Development<br>MANUFACTURING ENGINEERING<br>PACKAGING SPECIFICATIONS FOR SUPPLIERS OF FINISHED AND SEMI-FINISHED GOODS |

## 1.0 PURPOSE

This specification has been developed to establish recommendations and basic requirements for packaging, including cartons, labels, pallets, etc., applied to products sent to ▮▮▮▮▮ by suppliers. This document pertains to packaging of finished and semi-finished goods for product, consumables, options/accessories, etc.

The packaging requirements are designed to promote expedient flow and storage of materials, while providing effective protection.

## 2.0 RESPONSIBILITIES

2.1 The Manufacturing Engineering Department is responsible for providing suppliers with this specification.

2.2 The Materials Planning Department is responsible for placing all initial receipts of new items on "Q" in SAP until inspected for compliance with specifications. (Reference: QSI 7.4.3.1 – Q-Block Process for New Products)

2.3 Compliance with this specification will be assessed after initial receipt and/or through design drawings provided by the supplier.

2.4 Q.A. and Manufacturing Engineering are responsible for initiating and following up on corrective actions in the event a supplier is not complying with this specification.

2.5 Manufacturing Engineering is responsible for maintaining and changing this specification, as required.

## 3.0 DEFINITIONS

3.1 **Finished Good** – Any product, option, or consumable shipped to ▮▮▮▮▮ in a complete, ready for sale condition. The item includes final packaging, labeling, documentation, software, accessory items, etc. and requires no further action by ▮▮▮▮ other than shipment to the customer.

3.2 **Semi-finished Good** – Any product, option, or consumable shipped in final packaging, but requiring additional work by ▮▮▮▮ prior to completing the product as a ready for sale item. Requirements to add documentation, power cords, network cards, instruction sheets, etc. are examples.

3.3 **ISTA** – International Safe Transit Association
3.4 **IATA** – International Air Transport Association
3.5 **DOT** – U.S. Department of Transportation
3.6 **IMDG** – International Maritime Dangerous Goods Code
3.7 **ISPM** – International Standards for Phytosanitary Measures
3.8 **CONEG** – Coalition of Northeastern Governors

If printed or downloaded, verify that this is the correct revision before use @ Lotus Notes ISO 9001 Document Repository

No. QSI 7.3.4.8    Rev F  03/17/10          printed 04/21/10                    Page 1 of 16

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3643



### QUALITY SYSTEM INSTRUCTION
Product Realization - Design And Development
MANUFACTURING ENGINEERING
PACKAGING SPECIFICATIONS FOR SUPPLIERS OF FINISHED AND SEMI-
FINISHED GOODS

## 4.0 SIZE AND WEIGHT LIMITATIONS

### 4.1 NON-PALLETIZED PACKAGES

4.1.1 Size must not exceed 30" (762mm) in any dimension.

4.1.2 Weight may not exceed 40 lbs (18kg) per package.

4.1.3 All containers that exceed these sizes and weight requirements, must be palletized to provide for mechanical handling with forklift trucks or pallet jacks.

### 4.2 PALLETIZED PACKAGING

4.2.1 Unitized Loads must be received on solid wood pallets.

4.2.2 The size of the loads must not exceed 49" (1245mm) in the stringer dimension and 45" (1143mm) across the face dimension. **The primary and desired pallet (and mandatory pallet for consumable products) for all product deliveries is the 40"x 48" (1016mm x 1219mm) GMA specific pallet per ▇▇▇▇▇ drawing # 53453509 as shown in appendix 14.1.**

4.2.3 If for any reason the below limitation can not be met, exceptions must be approved by Manufacturing Engineering in writing prior to first shipment.

| Pallet Face Dimension Not To Exceed | Maximum Height / Floor to Top of Load | Maximum Gross Pallet Weight |
|---|---|---|
| A          B<br>45"(1143mm) x 49"(1245mm) | 51" (1295mm) | 1500 lbs. (675kg) |

4.2.4 The height of a unitized or pallet load must not exceed 51" (1295mm) from floor, if stackable, or 60" (1524mm) if not stackable.

4.2.5 Pallet Overhang / Underhang - Overhang is NOT ALLOWED. For underhang, the pallet may not exceed the size of the load by 3" (76.2mm)on each side which includes packaging material.

If printed or downloaded, verify that this is the correct revision before use @ Lotus Notes ISO 9001 Document Repository

No. QSI 7.3.4.8    Rev F  03/17/10          printed 04/21/10                    Page 2 of 16

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3644

| | **QUALITY SYSTEM INSTRUCTION** |
|---|---|
| **QSI 7.3.4.8** | Product Realization - Design And Development<br>MANUFACTURING ENGINEERING<br>PACKAGING SPECIFICATIONS FOR SUPPLIERS OF FINISHED AND SEMI-FINISHED GOODS |

## 5.0 PALLET CONSTRUCTION

5.1 There must be at least 3.5" (89mm) clearance between the upper and lower deck boards. Skids without lower deck boards are NOT acceptable. See examples below.



**NOT ACCEPTABLE**

**ACCEPTABLE**

5.2 Preferred pallet design is stringer type. Use of block pallet designs is discouraged.



5.3 Pallets must be constructed of solid wood per specifications provided in Appendix 14.1 and 14.2. Alternative sizes may be acceptable, but must be approved by ████ Materials <u>NOT</u> accepted include metal (steel, aluminum, etc.), plastic, corrugate, plywood, wood composites, etc.

If printed or downloaded, verify that this is the correct revision before use @ Lotus Notes ISO 9001 Document Repository

CONFIDENTIAL - OUTSIDE COUNSEL ONA3645

| | **QUALITY SYSTEM INSTRUCTION** |
|---|---|
| **QSI 7.3.4.8** | Product Realization - Design And Development<br>MANUFACTURING ENGINEERING<br>PACKAGING SPECIFICATIONS FOR SUPPLIERS OF FINISHED AND SEMI-<br>FINISHED GOODS |

5.4 All pallets containing solid wood must be treated and marked in accordance with ISPM publication #15 published by the International Plant Protection Convention.

## 6.0 PALLET LOAD PACKAGING

6.1 Unitized pallet loads must have a stacking ability of at least 4 pallets high. Manufacturing Engineering must approve any palletized product specifications that cannot be stacked four high. If a deviation is granted, then the pallets must be labeled with the maximum number that can be stacked, or labeled "**No Stacking Allowed**". The font size must be visible up to a distance of 20 feet.

6.2 Single product or multiple containers on a pallet may be secured using one or all of the following:

    6.2.1 Banding- Plastic Only
    6.2.2 Shrink Film
    6.2.3 Stretch Film
        Material: Low Density Polyethylene

6.3 Solid Fiberboard Edge Protectors are required at all four vertical load edges.
    [Minimum = 1.75" x 1.75" x .16" thick (44.5mm x 44.5mm x 4mm thick)]

    **EXCEPTION:** If the pallet contains a single layer (tier) of product, edge protectors may be omitted.

6.4 Corrugate or paperboard trays are required on the top and bottom of pallet load. A corrugated minimum ECT 32 and 2.75" (70mm) depth [or paperboard minimum 50 point (0.05" or 1.27mm caliper) and 2.75" (70mm) depth]. Bottom tray must be secured to pallet with nails or staples if plastic banding is not utilized.

6.5 If any pallet fillers are required to fill voids, the material must be 100% recyclable and must maintain the strength of the load.

6.6 Packaged product must be stacked in columnar configuration.

6.7 All packaging methods must be consistent with the size and weight limitations outlined.

6.8 **ALL CONSUMABLE products must be palletized using a GMA pallet (40" x 48" or 1015mm x 1220mm) per    specification 53453509 (Appendix 14.1). This includes ribbons, toner cartridges, image drums, etc.**

If printed or downloaded, verify that this is the correct revision before use @ Lotus Notes ISO 9001 Document Repository

CONFIDENTIAL - OUTSIDE COUNSEL ONA3646

| | **QUALITY SYSTEM INSTRUCTION** |
|---|---|
| **QSI 7.3.4.8** | Product Realization - Design And Development<br>MANUFACTURING ENGINEERING<br>PACKAGING SPECIFICATIONS FOR SUPPLIERS OF FINISHED AND SEMI-FINISHED GOODS |

## Standard Pallet Load Requirements



## 7.0 INDIVIDUAL PACKAGE DESIGN REQUIREMENTS

7.1 Must meet ▮▮▮▮ package integrity testing requirements as outlined in the Quality System Procedure- QSP 7.3.4 Design Control - Product Packaging Design & Testing and Quality System Instruction – QSI 7.3.4.4 – Package Performance Test Specification. Please reference current ISTA test procedures 1A and 1B. NOTE: ▮▮▮▮ requires that ALL drop tests be conducted at a test height six inches (152mm) higher than that prescribed by ISTA.

7.2 Corrugated Carton Must Be:

  7.2.1 If Packaged Product Weight ≤ 20 lbs. (9.07 Kg)
      7.2.1.1 Minimum ECT 32 , or burst strength of 200 lbs./sq. in. (14.1 Kg/cm$^2$ )
      7.2.1.2 Single wall "B" or "C" flute construction
      7.2.1.3 Preferred Style:  Regular Slotted Carton (RSC)
  7.2.2 If Packaged Product Weight 20 lbs. (9.07 Kg) ≤ 40 lbs. (18.14 Kg)
      7.2.2.1 Minimum ECT 44 , or burst strength of 275 lbs./sq. in. (19.3 Kg/cm$^2$ )
      7.2.2.2 Single wall "B" or "C" flute construction
      7.2.2.3 Preferred Style:  Regular Slotted Carton (RSC)
  7.2.3 If Packaged Product Weight  > 40 lbs. (18.14 Kg)
      7.2.3.1 Minimum ECT 48 , or burst strength of 275 lbs./sq. in. (19.3 Kg/cm$^2$ )
      7.2.3.2 Double wall "B-C" flute construction

If printed or downloaded, verify that this is the correct revision before use @ Lotus Notes ISO 9001 Document Repository

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3647

| | **QUALITY SYSTEM INSTRUCTION** |
|---|---|
| **QSI 7.3.4.8** | Product Realization - Design And Development<br>MANUFACTURING ENGINEERING<br>PACKAGING SPECIFICATIONS FOR SUPPLIERS OF FINISHED AND SEMI-FINISHED GOODS |

7.3 Each individually shippable product carton must have a "Certificate of Box Maker" printed on the bottom flaps per "Rule 41" of the <u>National Railroad Freight Committee</u> "Uniform Freight Classification 6000-H".

7.4 Various product cushioning materials/systems are acceptable provided they meet the environmental criteria outlined in section 11.0 of this document and performance criteria outlined in QSP 7.3.4.

7.5  Pressure sensitive carton sealing tape:
    7.5.1 Specifications of tape should be appropriate for the sealing application.
    7.5.2 Basic physical description: Tape should be a clear polypropylene (PP) film, have an acrylic adhesive, and have a minimum width of 1.89 inches (48mm).
    7.5.3 Must be first run, first grade quality only.
    7.5.4 The tape should wrap onto the next panel at a minimum of 3 inches (76mm).



7.6 Any special handling requirements or limitations require printed pictorial symbols per ISO Standard 780 "Packaging – Pictorial Marking for Handling of Goods"

7.7 Graphics requirements to be provided by ▮▮▮▮▮

If printed or downloaded, verify that this is the correct revision before use @ Lotus Notes ISO 9001 Document Repository

No. QSI 7.3.4.8    Rev F  03/17/10    printed 04/21/10    Page 6 of 16

CONFIDENTIAL - OUTSIDE COUNSEL ON A3648

| | **QUALITY SYSTEM INSTRUCTION** |
|---|---|
| **QSI 7.3.4.8** | Product Realization - Design And Development<br>MANUFACTURING ENGINEERING<br>PACKAGING SPECIFICATIONS FOR SUPPLIERS OF FINISHED AND SEMI-FINISHED GOODS |

## 8.0 INDIVIDUAL PACKAGE LABEL (for PRODUCT AND OPTIONS / ACCESSORIES)

8.1 Each product package shall have an individual product identification label unique to each unit. The label shall conform to <u>Computing Technology Industry Association</u> (CompTIA) guidelines and shall include:

    8.1.1 Supplier part number
- 8 numeric digit ▮▮▮▮ part number (assigned by ▮▮▮▮)

    8.1.2 Product serial number
- 12 alpha-numeric digit ▮▮▮▮ serial number

            **FORMAT:**   <u>AE</u> <u>5</u> <u>2</u> <u>030888</u> <u>A0</u>

                                 REVISION (alpha + numeric)

                                 6 DIGIT SERIAL NUMBER (numeric)

                                 PRODUCTION MONTH  (1 - 9, A – C for October – December)

                                 PRODUCTION YEAR (last digit)

                                 PRODUCTION FACTORY CODE (alpha) (assigned by ▮▮▮▮)

    8.1.3 Supplier part description (human readable text – defined by ▮▮▮▮)
    8.1.4 Supplier UPC bar code: UPC-A assigned by ▮▮▮▮

- 0-51851-XXXXX-X
- Bar codes shall conform to the Uniform Code Council, Inc. guidelines.

    8.1.5 Supplier name with address (human readable text – defined by ▮▮▮▮)
    8.1.6 Country of origin (human readable text)
    8.1.7 Production date code (human readable text – format yy/mm/dd)

NOTES: 1) Reference ▮▮▮▮ p/n 52095001 "ABCD" label (blank) for detailed label specification.
        (L x W = 5" x 4" or 127mm x 102mm; color = white; adhesive = permanent.)
    2) Additional supplier information may be included on label, but must be reviewed and approved by ▮▮▮▮
    3) Serial number field is mandatory for Product, but noncompulsory for Accessories / Options.

If printed or downloaded, verify that this is the correct revision before use @ Lotus Notes ISO 9001 Document Repository

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3649

| | **QUALITY SYSTEM INSTRUCTION** |
|---|---|
| | Product Realization - Design And Development |
| **QSI 7.3.4.8** | MANUFACTURING ENGINEERING |
| | PACKAGING SPECIFICATIONS FOR SUPPLIERS OF FINISHED AND SEMI-FINISHED GOODS |

8.1.8 Sample Box Label



1) **8 Digit ▮▮▮ Part Number** *(numeric)*: Code 39 bar code w/start & stop characters and "CompTIA" data identifier (1P)
   - ⇒ Human Readable: 62423504
   - ⇒ Bar Code: *1P62423504*
2) **12 Digit ▮▮▮ Serial Number** *(alpha-numeric)*: Code 39 bar code w/start & stop characters and "CompTIA" data identifier (S)
   - ⇒ Human Readable: AE52030888A0
   - ⇒ Bar Code: *SAE52030888A0*
3) **Supplier Part Description:** Text description
4) **Uniform Product Code** *(numeric)*: UPC-A [conforms to the Uniform Code Council, Inc. guidelines].
   - ⇒ Human Readable: 051851156828
   - ⇒ Bar Code: 0-5185115682-8
5) **Supplier with address:** Text
6) **Country of Origin:** Text
7) **Production Date Code:** Text (Year/Month/Day) → Date product was configured, tested, and/or packaged at factory.

NOTES: 1) Human readable characters = 12 point font size minimum
   2) Bar code = 1/2" high (13mm) minimum
   3) 1P and S are data identifiers per CompTIA guidelines

If printed or downloaded, verify that this is the correct revision before use @ Lotus Notes ISO 9001 Document Repository

CONFIDENTIAL - OUTSIDE COUNSEL ON A3650

| | **QUALITY SYSTEM INSTRUCTION** |
|---|---|
| **QSI 7.3.4.8** | Product Realization - Design And Development<br>MANUFACTURING ENGINEERING<br>PACKAGING SPECIFICATIONS FOR SUPPLIERS OF FINISHED AND SEMI-FINISHED GOODS |

8.2 If for any reason the label specification above can not be met, exceptions must be approved by ▓▓ ▓▓ Manufacturing Engineering in writing prior to shipment.

8.3 Accessory / Option cartons containing multiple quantities of the same part number: 1) requires a unique UPC code (assigned by ▓▓▓ and 2) must have quantity clearly indicated.

8.4 For any other parts, semi-finished options or semi-finished consumables, ▓▓▓ requires labeling on each carton containing the following **minimum information: 1) part number, 2) description, 3) quantity.**

# 9.0 ADDITIONAL REQUIREMENTS SPECIFIC TO CONSUMABLES (RIBBONS, TONER CARTRIDGES, IMAGE DRUMS, ETC.)

9.1 All consumables must be palletized using GMA specific pallet (Appendix 14.1)

9.2 Individual packaging

    9.2.1 Printing artwork to be provided by ▓▓▓

    9.2.2 Printed UPC code must meet Uniform Code Council, Inc. guidelines and legibility requirements for UPC Version A.

    9.2.3 Requires date code label or stamp indicating date of manufacture. Preferred format: yy/mm/dd. Other supplier formats may be acceptable provided they are defined and submitted to ▓▓▓

9.3 Multiple quantity cartons

    9.3.1 Printing artwork and / or label requirements will be provided by ▓▓▓ See example of printed graphics below:



If printed or downloaded, verify that this is the correct revision before use @ Lotus Notes ISO 9001 Document Repository

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3651

| | **QUALITY SYSTEM INSTRUCTION** |
|---|---|
| **QSI 7.3.4.8** | Product Realization - Design And Development<br>MANUFACTURING ENGINEERING<br>PACKAGING SPECIFICATIONS FOR SUPPLIERS OF FINISHED AND SEMI-<br>FINISHED GOODS |

9.3.2 If label is specified by █████ label must be applied to two adjacent sides and one side must be visible on the exterior of the pallet.  See example of box label below:



9.3.3 Bar code format required is Interleaved 2 of 5 assigned by █████

9.3.4 Requires date code indicating date of manufacture Preferred format: yy/mm/dd. Other supplier formats may be acceptable provided they are defined and submitted to █████ Date code may be applied by separate label, stamp, or as a field in the identification label if method 9.3.2 is employed.

## 10.0 PALLET IDENTIFICATION AND MARKING

10.1 All palletized loads considered finished or semi-finished goods upon receipt must have a proper pallet identification label.  This label shall be affixed to the pallet without causing physical or cosmetic damage to product packaging.   Preference is for the label to be applied to the top tray of the unit load on all four sides. As an alternative, labels may also be applied to stretch wrap.

10.2 LABEL INFORMATION – The label(s) must include the following minimum detail.  All bar codes should be a minimum height of 1/2" (13mm).  Bar code format should be Code 39.  Human readable minimum size is 12 point.

    10.2.1 PART NUMBER (barcode and human readable) – The part number shall be the ████ eight (8) digit drawing number as it appears on the purchase order.

    10.2.2 PURCHASE ORDER NUMBER (barcode and human readable) – The purchase order number shall be the complete █████ purchase order number as it appears on the purchase order.

    10.2.3 PALLET QUANTITY (bar code and human readable) – Total number of packaged product on skid.

    10.2.4 NET & GROSS WEIGHTS – Total weights for palletized product.

If printed or downloaded, verify that this is the correct revision before use @ Lotus Notes ISO 9001 Document Repository

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A3652

| | QUALITY SYSTEM INSTRUCTION |
|---|---|
| **QSI 7.3.4.8** | Product Realization - Design And Development<br>MANUFACTURING ENGINEERING<br>PACKAGING SPECIFICATIONS FOR SUPPLIERS OF FINISHED AND SEMI-<br>FINISHED GOODS |

10.2.5 SERIAL NUMBERS  (barcode and human readable) – A list of all serial numbers for product, either a range or listed individually.  Required for printer, multi-function, or fax products only.

10.2.6 SHELF LIFE, DATE CODE, LOT CODE – Any relevant expiration dates or date/lot code information.

10.2.7 COUNTRY OF ORIGIN

10.2.8 LABEL QUALITY – Labels shall have a light background color with durable marking in a dark color as required to meet regulation concerning the shipment of hazardous substances or electronic devices.  Label back adhesive should be adequate to remain in position location throughout shipping and storage environment.

10.2.9 See sample pallet label below.



10.3 PACKING SLIP – Pallet on which the packing list is enclosed must be conspicuously marked by label or be printed.  Pencil marking is <u>NOT ACCEPTABLE</u>.  If different part numbers of finished / semi-finished goods are received mixed as part of a palletized or unitized load, the packing slip must be on the outside and easily accessible and clearly state the contents of the load.  If overpack cartons are necessary, each one must bear the individual contents and have a packing list.

If printed or downloaded, verify that this is the correct revision before use @ Lotus Notes ISO 9001 Document Repository

No. QSI 7.3.4.8     Rev F  03/17/10                printed 04/21/10                          Page 11 of 16

CONFIDENTIAL - OUTSIDE COUNSEL ONLA3653

| | **QUALITY SYSTEM INSTRUCTION** |
|---|---|
| **QSI 7.3.4.8** | Product Realization - Design And Development<br>MANUFACTURING ENGINEERING<br>PACKAGING SPECIFICATIONS FOR SUPPLIERS OF FINISHED AND SEMI-<br>FINISHED GOODS |

## 11.0 SPECIAL HANDLING REQUIREMENTS

11.1 Lithium Metal and Lithium Ion Cells, Batteries, and Battery Packs

11.1.1 All Lithium Batteries, including products that contain Lithium Batteries, must meet battery-specific requirements of the IATA Part 1 Packing Instructions 965, 966, 967, 968, 969, and 970 as well as Special Provision 188 of the U.S. DOT Hazardous Material Regulations (Title 49 of the U.S. Code of Federal Regulations) and the IMDG issued by the International Maritime Organization.

11.1.2 Each Lithium Battery or product containing Lithium Batteries must meet testing requirements defined in the most recent version of the UN Manual of Tests and Criteria, Part III, Subsection 38.3. Supplier is required to provide proof that test requirements have been met.

11.1.3 Labeling must meet the requirements set forth in the IATA Dangerous Goods Regulations. (Ref. ████ document for Lithium Battery Package Labels 52538400)

## 12.0 ENVIRONMENTAL CRITERIA

12.1 Materials shall be recyclable (or, made of recycled material) and should be encoded with recycling symbols per standard practice for the prescribed materials.

12.2 Packaging materials shall not contain any heavy metals as per "CONEG" legislation in the United States.

12.3 Packaging materials shall not contain, nor be made with ozone depleting chemicals (chlorinated fluorocarbons- CFC's and HCFC's).

12.4 Proposed alternative materials with positive environmental properties will be reviewed and evaluated by ████ Manufacturing Engineering Department.

12.5 Pallets must be treated and marked in accordance with ISPM Publication #15 published by the International Plant Protection Convention.

## 13.0 EXCEPTIONS

13.1 Permission for Non-Conformance – Prior approval must be granted by Manufacturing Engineering before product is shipped for any packaging method, material, or design that does not meet the requirements set forth in these specifications.

If printed or downloaded, verify that this is the correct revision before use @ Lotus Notes ISO 9001 Document Repository

No. QSI 7.3.4.8    Rev F  03/17/10              printed 04/21/10                    Page 12 of 16

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3654

| | **QUALITY SYSTEM INSTRUCTION** |
|---|---|
| ████ ██████ | Product Realization - Design And Development |
| **QSI 7.3.4.8** | MANUFACTURING ENGINEERING |
| | PACKAGING SPECIFICATIONS FOR SUPPLIERS OF FINISHED AND SEMI-FINISHED GOODS |

## 14.0 REFERENCES

14.1 ████████ Standard Design Specification – 57608700

14.2 QSP 7.3.4 Design Control - Product Packaging Design & Testing

14.3 ISTA Integrity Test Procedures 1A and 1B

14.4 QSI 7.3.4.4 Package Performance Test Specification

14.5 QSI 7.3.4.5 Molded Foam Cushion Specification – M-105

14.6 QSI 7.3.4.6 Wood Pallet Specification – M-106

14.7 QSI 7.3.4.7 Packaging Design and Test Specification Heavy And/Or Large Units – M-107

14.8 QSI 7.4.3.1 – Q-Block Process for New Products

14.9 ISPM PUBLICATION NO. 15 – Guidelines for Regulating Wood Packaging Material in International Trade

14.10 ISO 780 – PACKAGING – Pictorial marking for handling of goods

14.11 Lithium Caution Label – Document No. 52538400

14.12 IATA Dangerous Goods Regulations

14.13 IATA Packing Instructions 965-970 (Lithium Batteries)

14.14 U.S. Code of Federal Regulations – Title 49

14.15 U.S. Dot Hazardous Materials Regulations – Special Provision 188

14.16 International Maritime Dangerous Goods (IMDG) Code issued by the International Maritime Organization

If printed or downloaded, verify that this is the correct revision before use @ Lotus Notes ISO 9001 Document Repository

CONFIDENTIAL - OUTSIDE COUNSEL ONLA3655

| | **QUALITY SYSTEM INSTRUCTION** |
|---|---|
| **QSI 7.3.4.8** | Product Realization - Design And Development<br>MANUFACTURING ENGINEERING<br>PACKAGING SPECIFICATIONS FOR SUPPLIERS OF FINISHED AND SEMI-FINISHED GOODS |

## 15.0 APPENDIX

15.1 53453509 – 40" X 48" (1016mm x 1219mm) STANDARD GMA PALLET



If printed or downloaded, verify that this is the correct revision before use @ Lotus Notes ISO 9001 Document Repository

CONFIDENTIAL - OUTSIDE COUNSEL ONL A3656

| | QUALITY SYSTEM INSTRUCTION |
|---|---|
| **QSI 7.3.4.8** | Product Realization - Design And Development<br>MANUFACTURING ENGINEERING<br>PACKAGING SPECIFICATIONS FOR SUPPLIERS OF FINISHED AND SEMI-<br>FINISHED GOODS |

15.2 53453508 – 45"x 49" (1143mm x 1245mm) PALLET



Notes:
1) MUST CONFORM TO WOOD PALLET SPECIFICATION M-106 (QSI 7.3.4.6)
2) PAINT COLOR CODE: YELLOW

TITLE: 49" X 45" PALLET (YELLOW)
DRAWING NO.: 53453508    SCALE: 1"=1'-0"    SIZE: A
DRAWN BY: D. RINCK    DATE: 12/21/92

If printed or downloaded, verify that this is the correct revision before use @ Lotus Notes ISO 9001 Document Repository

CONFIDENTIAL - OUTSIDE COUNSEL ON A3657

| | **QUALITY SYSTEM INSTRUCTION** |
|---|---|
| **QSI 7.3.4.8** | Product Realization - Design And Development<br>MANUFACTURING ENGINEERING<br>PACKAGING SPECIFICATIONS FOR SUPPLIERS OF FINISHED AND SEMI-FINISHED GOODS |

## REVISION HISTORY

| REV | EFFECTIVE | DESCRIPTION | ORIGINATOR | APPROVED | APPROVED | APPROVED | APPROVED |
|---|---|---|---|---|---|---|---|
| A | 04/29/2002 | Created procedure | Mfg. Eng.<br>4/24/2002 | Mfg. Eng.<br>04/25/02 | N/A | N/A | N/A |
| B | 07/14/03 | Conversion into ISO 9001:2000 from previous document QSI 4.4.4.8 | 06/10/03 | 07/08/03 | N/A | N/A | N/A |
| C | 02/01/06 | DCR#671<br>Revised procedure | 01/23/06 | 01/24/06 | N/A | N/A | N/A |
| D | 04/28/08 | DCR#832 – Major revision. Modified responsibilities, pallet requirements, package design & test requirements. | 04/17/08 | 05/01/08 | 05/01/08 | 05/01/08 | N/A |
| E | 03/09/09 | DCR#983<br>Revised steps 2.2 and 2.3 | 03/02/09 | 03/04/09 | 03/03/09 | 03/05/09 | N/A |
| F | 04/01/10 | DCR#1072 – Added new section "Special Handling Requirements" (ref. Section 11.0) pertaining to Lithium Batteries; Included additional Definitions (3.0) and References (14.0) | 03/17/10 | 04/20/10 | 04/20/10 | 04/20/10 | N/A |

If printed or downloaded, verify that this is the correct revision before use @ Lotus Notes ISO 9001 Document Repository

CONFIDENTIAL - OUTSIDE COUNSEL ON A3658

| | **QUALITY SYSTEM INSTRUCTION** |
|---|---|
| | Product Realization – Design and Development |
| **QSI 7.3.4.4** | MANUFACTURING ENGINEERING |
| | PACKAGE PERFORMANCE TEST SPECIFICATION |

## 1.0 PURPOSE

This specification has been developed to establish package design qualification methods that ensure economical and safe transport of product throughout the distribution cycle. This document pertains to all finished goods packaging.

## 2.0 DEFINITIONS

2.1 **Finished Good** – Any product, option, or consumable shipped in a complete, ready for sale condition. The item includes final packaging, labeling, documentation, software, accessory items, etc.

2.2 **ISTA** – International Safe Transit Association

2.3 **ICAO** – International Civil Aviation Organization

2.4 **IATA** – International Air Transport Association

2.5 **DOT** – U.S. Department of Transportation

## 3.0 REQUIRED PACKAGE ACCEPTANCE TESTING

Each of the following procedures shall be conducted using untested package samples and a production level, or equivalent, unit.

### 3.1 VIBRATION TEST

Vibration testing will be conducted using the test equipment, parameters and sequence detailed in the most recent (January 2001 or current) version of ISTA procedure.

An acceptance report shall be issued stating the package weight & external dimensions, testing method and results of evaluation after testing.

NOTE: Manufacturing Engineering may, at its discretion, permit omission of this test based on a review of the product and shipping history.

### 3.2 DROP (SHOCK) TEST

3.2.1 ▮▮▮ **Standard Testing -** Shock testing will be conducted using the equipment, test parameters and sequence detailed in the most recent (January 2001 or current) version of the ISTA procedure. The drop height shall be 6" (152mm) higher than that specified by ISTA. All prescribed impacts must be performed prior to opening the package for inspection.

If printed or downloaded, verify that this is the correct revision before use @ Lotus Notes ISO 9001 Document Repository

QSI 7.3.4.4   Rev C 03/22/10   printed 03/25/10   Page 1 of 5

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3659



**QUALITY SYSTEM INSTRUCTION**
Product Realization – Design and Development
MANUFACTURING ENGINEERING
PACKAGE PERFORMANCE TEST SPECIFICATION

**QSI 7.3.4.4**

3.2.2 **Special Requirements Testing (Lithium Batteries)** – Per IATA Dangerous Goods Regulations, IATA Part 1 Packing Instructions 965, 966, 968, and 969 as well as Special Provision 188 of the U.S. DOT Hazardous Material Regulations (Title 49 of the U.S. Code of Federal Regulations), all Lithium Batteries, including products that contain Lithium Batteries, must be tested to a 1.2 meter (47.25") drop height level.

**NOTE:** A specific test procedure has not been accepted by the ICAO or IATA. ▉ requires adherence to Document DGP-WG/09-WP/27 "Technical Instructions for the Safe Transport of Dangerous Goods by Air (Doc 9284)" {See Section 7.3 - **Special Testing for Packages Containing Lithium Batteries**}

An acceptance report shall be issued stating the package weight & external dimensions, testing method and results of evaluation after testing.

### 3.3 COMMERCIAL CARRIER CERTIFICATION/TEST

In addition to the required testing in 3.1 and 3.2, ▉ Manufacturing Engineering may, at its discretion, require that package certification be obtained from a commercial carrier such as United Parcel Service or Federal Express, to further qualify the package design.

### 3.4 ACTUAL TRANSPORT TEST

In addition to the required testing in 3.1 and 3.2, ▉ Manufacturing Engineering may, at its discretion, require that an actual transportation test(s) be performed to further qualify the package design. This test is designed to make an assessment of the package design in an actual transportation environment. The package will be shipped to a continental United States site and back again.

### 4.0 EVALUATION BEFORE TESTING

### 4.1 PRODUCT

Prior to *each* of the tests from section 3, the product shall be visually inspected and functionally tested by knowledgeable personnel in accordance with standard testing guidelines.

### 4.2 PACKAGE

After the product has been inspected and tested, it shall be packaged in its standard shipping configuration.

If printed or downloaded, verify that this is the correct revision before use @ Lotus Notes ISO 9001 Document Repository

QSI 7.3.4.4    Rev C 03/22/10          printed 03/25/10                          Page 2 of 5

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3660



| | **QUALITY SYSTEM INSTRUCTION** |
|---|---|
| | Product Realization – Design and Development |
| | MANUFACTURING ENGINEERING |
| **QSI 7.3.4.4** | PACKAGE PERFORMANCE TEST SPECIFICATION |

## 5.0 EVALUATION AFTER TEST

### 5.1   PACKAGE

After *each* of the tests from section 3, the package will be determined acceptable if all of the following conditions are met:

5.1.1   The foam cushions show no sign of separation, degradation and/or excessive damage. (i.e. they still afford a reasonable level of protection)

5.1.2   Accessories and/or shipkit items included with printer are damage free and in original orientation.

5.1.3   Product is determined to have passed both visual and functional tests, per section 5.2.

### 5.2   PRODUCT

After *each* test, the product will be visually inspected and functionally tested by knowledgeable personnel in exact manner as conducted in section 4.1.

## 6.0 FINAL ACCEPTANCE

The final package shall be considered acceptable after it has successfully passed **all** of the required testing.

NOTE: For any product shipped to ▮ in final packaging, ▮ reserves the right to confirm all test results by conducting its own tests on samples provided by the supplier.

If printed or downloaded, verify that this is the correct revision before use @ Lotus Notes ISO 9001 Document Repository

QSI 7.3.4.4     Rev C 03/22/10          printed 03/25/10          Page 3 of 5

CONFIDENTIAL - OUTSIDE COUNSEL ONA3661

| | QUALITY SYSTEM INSTRUCTION |
|---|---|
| ▮▮ PRINTING SOLUTIONS<br>QSI 7.3.4.4 | Product Realization – Design and Development<br>MANUFACTURING ENGINEERING<br>PACKAGE PERFORMANCE TEST SPECIFICATION |

## 7.0 APPENDIX – Package Test Levels

### 7.1 Packaged Products Weighing < 100 lbs. (45.36 kg) – Shipped without individual pallets

7.1.1   Non-operating vibration with packaging

The product shall withstand vibration as specified in ISTA (International Safe Transit Association) Procedure 1A (January 2001 or current) when in a packaged, non-operating state.

7.1.2   Packaged Drop (Shock) Test (Referenced in 57608700 ▮ Data Standard Design Spec.")

The test shall be executed per ISTA Procedure 1A (January 2001 or current) specifications at the following ▮▮▮▮ drop height standards:

| Packaged Weight | | Drop Test Height | |
|---|---|---|---|
| lbs. | Kg | in. | mm |
| 0 – 20.99 | 0 – 9.52 | 36 | 914 |
| 21 – 40.99 | 9.53 – 18.59 | 30 | 762 |
| 41 – 60.99 | 18.60 – 27.66 | 24 | 610 |
| 61 – 99.99 | 27.67 – 45.35 | 18 | 457 |

This test is executed for one corner, three radiating edges from the corner and all six carton faces per the ISTA test procedure at a height specified above. All prescribed impacts must be performed prior to opening the package for inspection.

### 7.2 Packaged Products Weighing ≥ 75 lbs. (34 kg) and shipped on individual pallets

7.2.1   Non-operating vibration with packaging

The product shall withstand vibration as specified in ISTA (International Safe Transit Association) Procedure 1B (January 2001 or current) when in a packaged, non-operating state.

7.2.2   Packaged Drop (Shock) Test (Referenced in 57608700 ▮ Data Standard Design Spec.")

The test shall be executed per ISTA Procedure 1B (January 2001 or current) specifications. The drop height will be 12" (305mm) or an impact velocity of 8.0 ft/s (2.4m/s) if a horizontal or incline impact tester is utilized. Per ISTA Procedure 1B (January 2001 or current), all prescribed impacts faces except the top face must be performed prior to opening the package for inspection. However, it is recommended that all impacts faces must be performed prior to opening the package for inspection.

If printed or downloaded, verify that this is the correct revision before use @ Lotus Notes ISO 9001 Document Repository

QSI 7.3.4.4    Rev C 03/22/10    printed 03/25/10    Page 4 of 5

CONFIDENTIAL - OUTSIDE COUNSEL ONLA3662

| ████ | **QUALITY SYSTEM INSTRUCTION** |
|---|---|
| | ██████ Product Realization – Design and Development |
| | MANUFACTURING ENGINEERING |
| QSI 7.3.4.4 | PACKAGE PERFORMANCE TEST SPECIFICATION |

### 7.3     Special Testing for Packages Containing Lithium Batteries

7.3.1     Packaged Drop (Shock) Test (Reference ICAO DGO-WG/09-WP/27)

The test shall be executed per the proposed "Technical Instructions for the Safe Transport of Dangerous Goods by Air (Doc 9284)". The drop height will be 47.25" (1.2 meters) and the package shall be dropped five (5) times → One drop on top surface, bottom surface, long side, short side, and corner. All prescribed impacts must be performed prior to opening the package for inspection. A "Pass" result is based on the following:

⇒ No damage, leakage, or excessive temperature rise to cells or batteries

⇒ No shifting of the contents so as to allow battery to battery (or cell to cell) contact or short-circuit

⇒ No release of contents

## REVISION HISTORY

| REV | EFFECTIVE DATE | DESCRIPTION | ORIGINATOR | APPROVED | APPROVED | APPROVED | APPROVED |
|---|---|---|---|---|---|---|---|
| A | 04/21/08 | DCR#899 Created procedure | ████ 4/17/08 | ████ 04/18/08 | N/A | N/A | N/A |
| B | 04/27/09 | DCR#998 Revised 7.2 | ████ 04/17/09 | ████ 04/17/09 | N/A | N/A | N/A |
| C | 04/01/10 | DCR#1082 – Added Section 3.2.2 and 7.3 related to packages with Lithium batteries | 03/22/10 | ████ 03/25/10 | N/A | N/A | N/A |

If printed or downloaded, verify that this is the correct revision before use @ Lotus Notes ISO 9001 Document Repository

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3663

| ▉ | **QUALITY SYSTEM INSTRUCTION** |
|---|---|
| | ▉ Product Realization - Design And Development |
| **QSI 7.3.4.7** | MANUFACTURING ENGINEERING |
| | PACKAGING DESIGN AND TEST SPECIFICATION HEAVY AND/OR LARGE |
| | UNITS M-107 |

## 1.0 SCOPE

This specification defines package design requirements and integrity testing parameters for all ▉ finished or semi-finished good products with a gross packaged weight of 75 lbs. (34 kg) or greater.

## 2.0 OBJECTIVE

The package will provide damage-free handling of the product throughout its entire distribution environment from the shipper to the final customer site, including shipment from the factory.

## 3.0 REFERENCED DOCUMENTS

3.1    ISTA Integrity Test Procedure Projects 1A & 1B (January 2001 or Current)
3.2    QSI 7.3.4.4 – Package Performance Test Specification
3.3    ISPM PUBLICATION NO. 15 – Guidelines for Regulating Wood Packaging Material in International Trade
3.4    ISO 780 – PACKAGING – Pictorial marking for handling of goods
3.5    Lithium Caution Label – ▉ Document No. 52538400
3.6    IATA (International Air Transport Association) Dangerous Goods Regulations
3.7    IATA Packing Instructions 965-970 (Lithium Batteries)
3.8    U.S. Code of Federal Regulations – Title 49
3.9    U.S. DOT (Department of Transportation) Hazardous Materials Regulations – Special Provision 188
3.10   International Maritime Dangerous Goods (IMDG) Code issued by the International Maritime Organization

## 4.0 DESIGN REQUIREMENTS AND CONSIDERATIONS

### 4.1    CUSHION DESIGN
The cushioning shall be constructed from resilient material such as expanded polyethylene, expanded polypropylene, or an expanded polystyrene copolymer. Unmodified expanded polystyrene will <u>not</u> be accepted.

If printed or downloaded, verify that this is the correct revision before use @ Lotus Notes ISO 9001 Document Repository

CONFIDENTIAL - OUTSIDE COUNSEL ONLY  A3664

| | **QUALITY SYSTEM INSTRUCTION** |
|---|---|
| | Product Realization - Design And Development |
| | MANUFACTURING ENGINEERING |
| **QSI 7.3.4.7** | PACKAGING DESIGN AND TEST SPECIFICATION HEAVY AND/OR LARGE UNITS M-107 |

### 4.2 PACK DESIGN

**Packaged Product weight ≥ 100 lbs. (45.36 kg)** - The packaged product shall be unitized, with a definite skid bottom. The packaged product will be securely fastened to the individual pallet. Packaging materials shall provide sufficient strength to enable four (4) pallet high stacking in any environment and shall be marked in accordance with ISO 780.

**Packaged Product weight 75 lbs. (34kg) < 100 lbs. (45.36 kg)** – It is strongly recommended that the packaged product shall be unitized, with a definite skid bottom. The packaged product will be securely fastened to the individual pallet. Packaging materials shall provide sufficient strength to enable four (4) pallet high stacking in any environment and shall be marked in accordance with ISO 780.

### 4.3 PALLET CONSTRUCTION

4.3.1    The pallet shall be:
1. Constructed of solid wood
2. Of adequate size to prevent the unit load packaging from over hanging the pallet edges.
3. Treated and marked in accordance with ISPM publication #15 published by the International Plant Protection Convention

4.3.2    Preferred pallet design is stringer type. Use of block pallet designs is discouraged.



4.3.3    The following are NOT acceptable pallet materials:
- Corrugate
- Metal (Steel, Aluminum, etc.)
- Plastic

If printed or downloaded, verify that this is the correct revision before use @ Lotus Notes ISO 9001 Document Repository

No. QSI 7.3.4.7    Rev D 03/22/10    printed 03/25/10    Page 2 of 4

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3665

| | **QUALITY SYSTEM INSTRUCTION** |
|---|---|
| **QSI 7.3.4.7** | Product Realization - Design And Development<br>MANUFACTURING ENGINEERING<br>PACKAGING DESIGN AND TEST SPECIFICATION HEAVY AND/OR LARGE<br>UNITS M-107 |

### 4.4 DISTRIBUTION ENVIRONMENT

The packaged product is expected to be handled at least 3 different times involving some, if not all, of the following scenarios:

- Manual handling:         Palletization/de-palletization, packing/unpacking, loading/unloading, deliveries
- Mechanical handling:   Palletization/de-palletization, conveyance, sorting
- Fork trucks:                 Warehousing and distribution centers
- Truck:                         Overland transportation, full truckload and less than truckload shipments, mixed loads
- Air:                            Transportation between major distribution points, mixed loads

## 5.0 REQUIRED ACCEPTANCE TESTING

Please refer to QSI 7.3.4.4 – Package Performance Test Specification

NOTE: For any product shipped to ████ in final packaging, ████ reserves the right to confirm all test results by conducting its own tests on samples provided by the supplier.

## 6.0 SPECIAL HANDLING REQUIREMENTS

6.1   Lithium Metal and Lithium Ion Cells, Batteries, and Battery Packs

6.1.1   All Lithium Batteries, including products that contain Lithium Batteries, must meet battery-specific requirements of the IATA Part 1 Packing Instructions 965, 966, 967, 968, 969, and 970 as well as Special Provision 188 of the U.S. DOT Hazardous Material Regulations (Title 49 of the U.S. Code of Federal Regulations) and the IMDG issued by the International Maritime Organization.

6.1.2   Each Lithium Battery or product containing Lithium Batteries must meet testing requirements defined in the most recent version of the UN Manual of Tests and Criteria, Part III, Subsection 38.3. Supplier is required to provide proof that test requirements have been met.

6.1.3   Labeling must meet the requirements set forth in the IATA Dangerous Goods Regulations. (Ref. ████ document for Lithium Battery Package Labels 52538400)

If printed or downloaded, verify that this is the correct revision before use @ Lotus Notes ISO 9001 Document Repository

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3666

| | **QUALITY SYSTEM INSTRUCTION** |
|---|---|
| | Product Realization - Design And Development |
| **QSI 7.3.4.7** | MANUFACTURING ENGINEERING |
| | PACKAGING DESIGN AND TEST SPECIFICATION HEAVY AND/OR LARGE UNITS M-107 |

## 7.0 EXCEPTIONS

Permission for Non-Conformance – Prior approval must be granted by Manufacturing Engineering before product is shipped for any packaging method, material, or design that does not meet the requirements set forth in these specifications.

## REVISION HISTORY

| REV | EFFECTIVE DATE | DESCRIPTION | ORIGINATOR | APPROVED | APPROVED | APPROVED | APPROVED |
|---|---|---|---|---|---|---|---|
| A | 2/14/02 | Converted from Pre-ISO procedure | 2/14/02 | Mfg. Eng. 02/18/02 | N/A | N/A | N/A |
| B | 07/14/03 | Conversion into ISO 9001:2000 from previous document QSI 4.4.4.7 | 06/10/03 | 07/08/03 | N/A | N/A | N/A |
| C | 04/21/08 | DCR#831 – Major revision. Modified weight limits for palletization, added test spec. reference, and added pallet construction requirements. | 04/17/08 | 04/18/08 | N/A | N/A | N/A |
| D | 04/01/10 | DCR#1083 – Added Section 6.0 related to requirements for packages containing Lithium batteries | 03/22/10 | 03/25/10 | N/A | N/A | N/A |

If printed or downloaded, verify that this is the correct revision before use @ Lotus Notes ISO 9001 Document Repository

No. QSI 7.3.4.7    Rev D 03/22/10         printed 03/25/10                Page 4 of 4

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3667

**Product Safety - All Devices**
UL / CSA: CAN/CSA C22.2 No. 60950-1 UL 60950-1
American Disabilities Act, Section 508 Compliance
CE Declaration & Mark, Low Voltage Directive 2006/95/EC + Amending Directives where applicable
UL or TUV Argentina S Mark, Resolution 92-98
NOM-016
California Perchlorate Handling Notification

**Product Safety - Laser Devices**
FDA 21, Chapter 1, Subpart J

**Product Safety - Batteries**
█████████ equires information concerning all types of batteries. In this case it is so that ████ can comply with IATA (International Air Transport Association) and U.S. DOT (Department of Transportation) rules and regulations concerning the transportation of lithium batteries.

**EMC - Unintentional Radiators (All Devices)**
FCC Part 15B, Class B
Industry Canada ICES-003, Class B

**EMC - Intentional Radiators (RFID, Wi-Fi, Bluetooth)**
FCC Part 15C
COFETEL Certification
ANATEL Certification
Industry Canada RSS-210
CNC Certification

**Telecom Devices**
FCC Part 68, TIA 968-A-3
Industry Canada CS-03
ANATEL Certification
NOM-151

**Environmental**
EPA Energy Star Program Requirements for Imaging Equipment
RoHS Directive Compliance and Declaration
California Proposition 65, including VOCs
Energy Efficiency for Single-voltage AC-to-DC and AC-to-AC External Power Supplies
PFOS Substance Ban
PBDE Substance Restriction (Minn)
Lacey Act Compliance
California's Airborne Toxic Control Measure to Reduce Formaldehyde - Emissions From Composite Wood Products Regulations

**Hazardous Substances**
OSHA CFR 29, 1800.1200, MSDS containing full disclosure of all Toxic/Hazardous ingredients
Canadian Hazardous Products Act, WHIMIS compliant MSDS in GHS (Globally Harmonized System of Classification and Labeling of Chemicals) format
AMES Series Test Report (like to have mutagenicity test data - not required)
EPA TSCA (Toxic Substances Control Act) Compliance

CONFIDENTIAL - OUTSIDE COUNSEL ONA3668

██ Lexmark – OEM Purchase Agreement

# Appendix 4 – Spares Listing and Prices

Click on Icon Below



F:\Lexmark\OEM
Purchase Agre██

Worksheet in D: DOCUME~1 /bryan LOCALS~1 / Temp notes86CC5-~7464956.DOC

| RSPL section | Assembly | Index | Part Number | Basic name | DESCRIPTION | test PNs | Part Number | Basic name | DESCRIPTION | Failure Rate | | Pricing in US $ | Parts per Machine | MFP or Option sort | 12/07 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Covers (x651, x652, x654 & x656) | 1 | 1 | | COVER | L SCANNER REAR PLUG (x651) | TRUE | | COVER | L SCANNER REAR PLUG | X654 | | | 1 | M | |
| | 1 | 2 | | COVER | LM SCANNER REAR | TRUE | | COVER | LM SCANNER REAR | X654 | | | 1 | M | |
| | 1 | 3 | | COVER | LM SCANNER RIGHT | TRUE | | COVER | LM SCANNER RIGHT | X654 | | | 1 | M | |
| | 1 | 4 | | COVER | LM SCANNER MOUNTING | TRUE | | COVER | LM SCANNER MOUNTING | X654 | | | 1 | M | |
| | 1 | 5 | | COVER | LM MEDIA CAP | TRUE | | COVER | LM MEDIA CAP | X654 | X658 | | 1 | M | |
| | 3 | 6 | | DOOR | H REAR - OXI Unique | FALSE | | DOOR | H REAR | X654 | X658 | | 1 | M | |
| | 3 | 7 | | RAIL | MEDIA OUTPUT | TRUE | | RAIL | MEDIA OUTPUT | X654 | | | 1 | M | |
| | 1 | 8 | | COVER | FUSER WIPER | TRUE | | COVER | FUSER WIPER | X654 | | | 2 | M | |
| | 1 | 9 | | COVER | LM LASER | TRUE | | COVER | LM LASER | X654 | | | 1 | M | |
| | 1 | 10 | | DOOR | MH REAR LOWER | TRUE | | DOOR | MH REAR LOWER | X654 | | | 1 | M | |
| | 1 | 11 | | COVER | MH REAR BEZEL | TRUE | | COVER | MH REAR BEZEL | X654 | X658 | | 1 | M | |
| | 1 | 12 | | COVER | LM PRINTER RT SIDE | TRUE | | COVER | LM PRINTER RT SIDE | X654 | | | 1 | M | |
| | 1 | 13 | | COVER | LM RIGHT INNER | TRUE | | COVER | LM RIGHT INNER | X654 | | | 1 | M | |
| | 1 | 14 | | CABLE | LM OP PANEL | TRUE | | CABLE | LM OP PANEL | X654 | | | 1 | M | |
| | 1 | 15 | | COVER | MPF TRAY | TRUE | | COVER | MPF TRAY | X654 | | | 1 | M | |
| | 1 | 16 | | SPRING | LM COUNTERBALANCE | TRUE | | SPRING | LM COUNTERBALANCE | X654 | | | 2 | M | |
| | 1 | 17 | | SPRING | CONNECTOR | TRUE | | SPRING | CONNECTOR | X654 | | | 1 | M | |
| | 1 | 18 | | COVER | OP PANEL-OXI M8780 | FALSE | | COVER | OP PANEL | X654 | | | 1 | M | |
| | 1 | 19 | | PANEL | USB cable assembly | TRUE | | PANEL | M OPERATOR | X654 | | N/A | 1 | M | |
| | 1 | 20 | | PANEL | L OPERATOR (x651, x652) | TRUE | | PANEL | M OPERATOR | X654 | | | 1 | M | |
| | 1 | 21 | | BEZEL | OP PANEL - OEM | TRUE | | BEZEL | M4504E OP PANEL | X654 | X658 | | 1 | M | |
| | 1 | 21 | | | x654de touch screen bezel | | | | | | | | | M | |
| | 1 | 21 | | | x656de touch screen bezel | | | | | | | | | M | |
| | 1 | 21 | | | x656e touch screen bezel | | | | | | | | | M | |
| | 1 | 21 | | | x651e touch screen bezel | | | | | | | | | M | |
| | 1 | 21 | | | x652e touch screen bezel | | | | | | | | | M | |
| | 1 | 22 | | COVER | LM LEFT INNER | TRUE | | COVER | LM LEFT INNER | X654 | | | 1 | M | |
| | 1 | 23 | | COVER | LM PRINTER LEFT SIDE | TRUE | | COVER | LM PRINTER LEFT SIDE | X654 | | | 1 | M | |
| | 1 | 24 | | DOOR | COVER-SYSTEMCARD-M | TRUE | | DOOR | COVER-SYSTEMCARD-M | X654 | | | 1 | M | |
| | 1 | 25 | | COVER | LM MEDIA SUPPORT | TRUE | | COVER | LM MEDIA SUPPORT | X654 | | | 1 | M | |
| | 1 | 26 | | CB | LM SMART CARD | TRUE | | CB | LM SMART CARD | X654 | | | 1 | M | |
| | 1 | 27 | | CB | PROXIMITY2 SMART | TRUE | | CB | PROXIMITY2 SMART | X654 | X658 | | 1 | M | |
| | 1 | 27 | | CB | CONTACT SMART | TRUE | | CB | CONTACT SMART | X654 | X658 | | | M | |
| | 1 | 28 | | ED | PROXIMITY1 SMART | TRUE | | ED | PROXIMITY1 SMART | X654 | | | 1 | M | |
| | 1 | 29 | | ED | H OUTPUT BIN | TRUE | | ED | H OUTPUT BIN | X654 | | | 1 | M | |
| | 1 | 30 | | ABLE | LM OUPUT BIN | TRUE | | ABLE | LM OUPUT BIN | X654 | | | 1 | M | |
| | 1 | 31 | | OVER | LM SMART CARD | TRUE | | OVER | LM SMART CARD | X654 | | | 1 | M | |
| | 1 | 32 | | OVER | LM SCANNER FRONT | TRUE | | OVER | LM SCANNER FRONT | X654 | | | 1 | M | |
| | 1 | 1 | | OVER | LM SCANNER LEFT | TRUE | | OVER | LM SCANNER LEFT | X654 | | | 1 | M | |
| Covers 1 (x656) | 2 | 1 | | OVER | H LASER | TRUE | | OVER | H LASER | X658 | | | 1 | M | |
| | 2 | 2 | | OVER | H MEDIA EXIT CAP | TRUE | | OVER | H MEDIA EXIT CAP | X658 | | | 1 | M | |
| | 2 | 3 | | OOR | H REAR - OXI Unique | FALSE | | OOR | H REAR | X658 | | | 1 | M | |
| | 2 | 4 | | AIL | MEDIA OUTPUT | TRUE | | AIL | MEDIA OUTPUT | X658 | | | 1 | M | |
| | 2 | 5 | | OOR | MH REAR LOWER | TRUE | | OOR | MH REAR LOWER | X658 | X654 | | 1 | M | |
| | 2 | 6 | | OVER | MH REAR CORNER | TRUE | | OVER | MH REAR CORNER | X658 | X654 | | 1 | M | |
| | 2 | 7 | | OVER | H RIGHT REAR CORNER | TRUE | | OVER | H RIGHT REAR CORNER | X658 | | | 1 | M | |
| | 2 | 8 | | OVER | H RIGHT PRINTER SIDE | TRUE | | OVER | H RIGHT PRINTER SIDE | X658 | | | 1 | M | |
| | 2 | 9 | | OVER | H LOWER RIGHT TRAY | TRUE | | OVER | H LOWER RIGHT TRAY | X658 | | | 1 | M | |

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    HPA3670

Worksheet in D_DOCUME~1\Bryan\LOCALS~1\Temp\notesB96CC5~746A999.DOC

Page 2

| Media path & ducts | mers 2 (x658) | | Type | Description | Flag | Type | Code | Qty | UoM |
|---|---|---|---|---|---|---|---|---|---|
| 2 | 10 | | SUPPORT | H MPF TRAY CVR STRAP | TRUE | SUPPORT | X658 | 2 | M |
| 2 | 11 | | COVER | H RIGHT INNER | TRUE | COVER | X658 | 1 | M |
| 2 | 12 | | GUIDE | MPF MEDIA | TRUE | GUIDE | X658 | 1 | M |
| 2 | 13 | | COVER | MPF TRAY | TRUE | COVER | X658 | 1 | M |
| 2 | 14 | | BEZEL | H DOOR - OKI Unique | FALSE | BEZEL | X658 | 1 | M |
| 2 | 15 | | COVER | H LEFT INNER | TRUE | COVER | X658 | 1 | M |
| 2 | 16 | | COVER | H LEFT SIDE | TRUE | COVER | X658 | 1 | M |
| 2 | 17 | | COVER | H LOWER LEFT TRAY | TRUE | COVER | X658 | 1 | M |
| 2 | 18 | | DOOR | H LEFT SIDE | TRUE | DOOR | X658 | 1 | M |
| 2 | 19 | | DOOR | H SYSTEM CARD ACCESS | TRUE | DOOR | X658 | 1 | M |
| 2 | 20 | | SPRING | H PRINT CART | TRUE | SPRING | X658 | 2 | M |
| 2 | 21 | | SUPPORT | H PRT CART RECOIL | TRUE | SPRING | X658 | 1 | M |
| 3 | 1 | | SUPPORT | H MEDIA SUPPORT | TRUE | SUPPORT | X658 | 1 | M |
| 3 | 2 | | COVER | H SCANNER REAR | TRUE | COVER | X658 | 1 | M |
| 3 | 3 | | COVER | H SCANNER RIGHT | TRUE | COVER | X658 | 1 | M |
| 3 | 4 | | COVER | H SCANNER FRONT | TRUE | COVER | X658 | 1 | M |
| 3 | 5 | | COVER | H SCANNER SUPP LR | TRUE | COVER | X658 | 1 | M |
| 3 | 6 | | COVER | H SCANNER SUPP R | TRUE | COVER | X658 | 1 | M |
| 3 | 7 | | COVER | H SCANNER SUPP L | TRUE | COVER | X658 | 1 | M |
| 3 | 8 | | COVER | H SCANNER SUPP LF | TRUE | COVER | X658 | 1 | M |
| 3 | 9 | | COVER | H SCANNER SUPP RR | TRUE | COVER | X658 | 1 | M |
| 3 | 10 | | LENS | LED-CAP-OP | TRUE | LENS | X658 | 1 | M |
| 3 | 11 | | CABLE | H OUTPUT BIN LED | TRUE | CABLE | X658 | 1 | M |
| 3 | 12 | | PANEL | H OPERATOR | TRUE | PANEL | X658 | 1 | M |
| 3 | 13 | | COVER | H OP PANEL FRONT w/ card reader | TRUE | COVER | X654 | 1 | M |
| 3 | 14 | | COVER | H FRONT OP PANEL | TRUE | COVER | X658 | 1 | M |
| 3 | 15 | | PCB | PROXIMITY SMART | TRUE | PCB | X654 | 1 | M |
| 3 | 16 | | PCB | CONTACT SMART | TRUE | PCB | X658 | 1 | M |
| 3 | 17 | | PCB | PROXIMITY SMART | TRUE | PCB | X658 | 1 | M |
| 3 | 17 | | BEZEL | H OP PANEL - OKI MB790m | FALSE | BEZEL | X654 | 1 | M |
| 3 | 18 | | BEZEL | H OP PANEL - OKI MB790f | FALSE | BEZEL | X658 | 1 | M |
| 3 | 18 | | BEZEL | H ASSEMBLY PANEL | TRUE | BEZEL | X654 | 1 | M |
| 3 | 19 | | CABLE | H OP PANEL | TRUE | CABLE | X658 | 1 | M |
| 3 | 20 | | CABLE | H USB INTERFACE | TRUE | CABLE | X658 | 1 | M |
| 3 | 21 | | CABLE | H SMART CARD | TRUE | CABLE | X654 | 1 | M |
| 3 | 22 | | COVER | H SCANNER LEFT | TRUE | COVER | X658 | 1 | M |
| 4 | 1 | | DUCT | EP COOLING FAN | TRUE | DUCT | X658 | 1 | M |
| 4 | 2 | | HOLDER | PRINT CART | TRUE | HOLDER | X658 | 1 | M |
| 4 | 3 | | PAD | HOLDER | TRUE | PAD | X658 | 4 | M |
| 4 | 4 | | DEFLECTOR | MACHINE | TRUE | MACHINE | X658 | 2 | M |
| 4 | 5 | | DEFLECTOR | TRANSFER | TRUE | DEFLECTOR | X658 | 1 | M |
| 4 | 6 | | DEFLECTOR | FRONT MEDIA TURN | TRUE | FRONT MEDIA TURN | X658 | 1 | M |
| 4 | 7 | | ROLL | MH INNER | TRUE | MH INNER | X658 | 1 | M |
| 4 | 8 | | ROLL | PC CART SUPPORT | TRUE | PC CART SUPPORT | X658 | 1 | M |
| 4 | 9 | | ROLL | COIL | TRUE | COIL | X658 | 1 | M |
| 4 | 10 | | SPRING | MEDIA TRAY CATCH | TRUE | MEDIA TRAY CATCH | X658 | 1 | M |
| 4 | 11 | | SHIELD | SPRING | TRUE | SPRING | X658 | 1 | M |
| 4 | 12 | | GEAR | Envelope feeder if cover x658 | TRUE | ESD | X658 | 1 | M |
| 4 | 13 | | DUCT | GEAR | TRUE | GEAR | X658 | 1 | M |
| 4 | 13 | | DUCT | LPVS | TRUE | LPVS | X658 | 1 | M |
| 4 | 13 | | DUCT | Main COOLING FAN duct x658 | TRUE | DUCT | X658 | 1 | M |
| 4 | 13 | | DUCT | MAIN COOLING duct x654 | TRUE | MH MAIN COOLING FAN | X654 | 1 | M |

CONFIDENTIAL - OUTSIDE COUNSEL ONA3671

Worksheet in D:\DOCUME~1\bryan\LOCALS~1\Temp\notesB96CC5-~7464999.DOC

| Assembly | | | Part | Description | | TRUE | Part | Description | X654 | X658 | Qty | M |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Pick arm & media tray assemblies | 4 | 14 | DOOR | 500 FUSER ACCESS | | TRUE | DOOR | 500 FUSER ACCESS | X654 | X658 | 1 | M |
| | 5 | 1 | DEFLECTOR | MPF LIFT plate x654 | MPF lift plate w/ spring x658 | TRUE | DEFLECTOR | MH MPF LIFT | X654 | X658 | 1 | M |
| | 5 | 2 | FEEDER | MPF PICK SOLENOID | | TRUE | FEEDER | H MPF LOWER | X654 | X658 | 1 | M |
| | 5 | 3 | ROLL | PICK | | TRUE | ROLL | MPF PICK SOLENOID | X654 | X658 | 1 | M |
| | 5 | 4 | GEAR | MPF CAM | | TRUE | GEAR | PICK | X654 | X658 | 1 | M |
| | 5 | 5 | TRAY | 550 MEDIA x654 | | TRUE | TRAY | MPF CAM | X654 | X658 | 1 | M |
| | 5 | 6 | TRAY | INT 550 SHEET x658 | | TRUE | TRAY | 550 MEDIA | X654 | X658 | 1 | M |
| | 5 | 5 | SENSOR | MEDIA SIZE | | TRUE | SENSOR | INT 550 SHEET | X654 | X658 | 1 | M |
| | 5 | 6 | SPRING | 500 BELLCRANK | | TRUE | SPRING | MEDIA SIZE | X654 | X658 | 1 | M |
| | 5 | 7 | ROLL | PICK | | TRUE | ROLL | 500 BELLCRANK | X654 | X658 | 0 | M |
| | 5 | 8 | ACTUATOR | 500 MEDIA OUT | | TRUE | ACTUATOR | PICK | X654 | X658 | 0 | M |
| | 5 | 10 | FEEDER | Pick arm sensor cable assembly w/ spring inc. 5, 7, 8 & 9 | | TRUE | FEEDER | 500 PICK ARM | X654 | X658 | 0 | M |
| Drive motor assembly, redrive & duplx | 5 | 11 | MOTOR | REDRIVE | | TRUE | MOTOR | H REDRIVE | X654 | X658 | 1 | M |
| | 6 | 1 | REDRIVE | H REDRIVE | | TRUE | REDRIVE | DUPLEX MEDIA DRIVE | X654 | X658 | 1 | M |
| | 6 | 2 | MOTOR | DUPLEX MEDIA DRIVE | | TRUE | MOTOR | DUPLEX | X654 | X658 | 1 | M |
| | 6 | 10 | SENSOR | Duplex input | | TRUE | SENSOR | MH FRONT DUPLEX | X654 | X658 | 0 | M |
| | 6 | 8 | SPRING | FR LF DUPLEX GUIDE | | TRUE | SPRING | MH FRONT DUPLEX | X654 | X658 | 0 | M |
| | 6 | 9 | GUIDE | MH FRONT DUPLEX | | TRUE | GUIDE | MH FRONT DUPLEX | X654 | X658 | 0 | M |
| | 6 | 8 | SPRING | MH FRONT DUPLEX | | TRUE | SPRING | MH REAR DUPLEX | X654 | X658 | 0 | M |
| | 6 | 7 | GUIDE | MH REAR DUPLEX | | TRUE | GUIDE | MH REAR DUPLEX | X654 | X658 | 0 | M |
| | 6 | 6 | SPRING | MH REAR DUPLEX | | TRUE | SPRING | MH R DUPLEX GUIDE | X654 | X658 | 0 | M |
| | 6 | 5 | GUIDE | MH R DUPLEX GUIDE | | TRUE | GUIDE | MH R DUPLEX GUIDE | X654 | X658 | 1 | M |
| | 6 | 4 | HANDLE | MH R DUPLEX GUIDE | | TRUE | HANDLE | MH | X654 | X658 | 1 | M |
| | 6 | 3 | SENSOR | DUPLEX | Duplex assembly w/ 2 holes & 3 pulleys inc. 3, 4, 5, 6, 7, 8 & 9, 10 & 11 | TRUE | SENSOR | DUPLEX | X654 | X658 | 1 | M |
| | 6 | 10 | GEAR | BEVEL GEAR 43H0304 | | TRUE | GEAR | BEVEL GEAR 43H0304 | X654 | X658 | M | M |
| | 6 | 11 | SHAFT | MH LOWER OPT DRIVE | | TRUE | SHAFT | MH LOWER OPT DRIVE | X654 | X658 | M | M |
| | 6 | 12 | ALIGNER | 500 FEED | | TRUE | ALIGNER | 500 FEED | X654 | X658 | M | M |
| | 6 | 13 | BELT | MH UP DUPLEX DRIVE | | TRUE | BELT | MH UP DUPLEX DRIVE | X654 | X658 | M | M |
| | 6 | 14 | BELT | MH LOWR DUPLEX DRIVE | | TRUE | BELT | MH LOWR DUPLEX DRIVE | X654 | X658 | M | M |
| | 6 | 15 | SENSOR | DUPLEX MEDIA PATH | | TRUE | SENSOR | DUPLEX MEDIA PATH | X654 | X658 | M | M |
| | 6 | 16 | MOTOR | MH REDRIVE | | TRUE | MOTOR | STD BIN EXIT | X654 | X658 | M | M |
| | 6 | 17 | LINK | FUSER DRIV RELEASE | | TRUE | LINK | FUSER DRIV RELEASE | X654 | X658 | M | M |
| | 6 | 18 | MOTOR | MH REDRIVE | | TRUE | MOTOR | MH REDRIVE | X654 | X658 | M | M |
| | 6 | 19 | GEAR | MAIN DRIVE | | TRUE | GEAR | MAIN DRIVE | X654 | X658 | M | M |
| | 7 | 1 | PRINTHEAD | MH POLYGON MIRROR w/ cable assembly inc 2,3 | | TRUE | PRINTHEAD | MH POLYGON MIRROR | X654 | X658 | 1 | M |
| | 7 | 2 | CABLE | MH PRINT HEAD | | TRUE | CABLE | MH PRINT HEAD | X654 | X658 | 1 | M |
| | 7 | 3 | SPRING | RIGHT CHARGE ROLL | | TRUE | SPRING | RIGHT CHARGE ROLL | X654 | X658 | 1 | M |
| | 7 | 4 | ARM | RIGHT CHARGE ROLL | | TRUE | ARM | RIGHT CHARGE ROLL | X654 | X658 | M | M |
| | 5 | 5 | BRACKET | RIGHT TRANSFER ROLL | | TRUE | BRACKET | RIGHT TRANSFER ROLL | X654 | X658 | M | M |
| | 7 | 6 | ROLL | TRANSFER | | TRUE | ROLL | TRANSFER | X654 | X658 | M | M |
| | 7 | 7 | BRACKET | LEFT TRANSFER ROLL | | TRUE | BRACKET | LEFT TRANSFER ROLL | X654 | X658 | M | M |

CONFIDENTIAL - OUTSIDE COUNSEL ON  A3672

Worksheet in D: DOCUME~1 Jbryan LOCALS~1 Temp notes896CC5 ~7464969.DOC

| Section | No.1 | No.2 | Type | Description | Flag | Description 2 | Model | Qty | Mfg |
|---|---|---|---|---|---|---|---|---|---|
| System card, controller card assemblies | 7 | 8 | ROLL | CHARGE ROLL | TRUE | CHARGE ROLL | X654 / X658 | 1 | M |
| | 7 | 9 | ARM | LEFT CHARGE ROLL | TRUE | LEFT CHARGE ROLL | X654 / X658 | 1 | M |
| | 7 | 10 | SPRING | LEFT CHARGE ROLL | TRUE | LEFT CHARGE ROLL | X654 / X658 | 1 | M |
| | 7 | 11 | CABLE | PRT CART ID CONN | TRUE | PRT CART ID CONN | X654 / X658 | 1 | M |
| | 7 | 12 | MOTOR | MH FUSER CODUIN FAN | TRUE | MH FUSER CODUN FAN | X654 / X658 | 1 | M |
| | 7 | 14 | SENSOR | Standard bin exit | TRUE | STD BIN EXIT | X654 / X658 | 1 | 0 |
| | 7 | 13 | SENSOR | STD BIN EXT actuator assembly inc 314R | TRUE | H STD BIN EXIT | X654 / X658 | 1 | 1 |
| | 8 | 1 | CONTACT | CLEANING BLADE | TRUE | CLEANING BLADE | X654 | 1 | M |
| Fuser & LVPS cards | 9 | 1 | FUSER | 100V, type 1 | TRUE | 100V | X654 | 1 | M |
| | 9 | 1 | FUSER | 110V, type 1 | TRUE | 110V | X654 | 1 | M |
| | 9 | 1 | FUSER | 220V, type 1 | TRUE | | X654 | 1 | M |
| | 9 | 1 | FUSER | 100V, type 2 FULL CONTACT | TRUE | 100V FULL CONTACT | X654 | 1 | M |
| | 9 | 1 | FUSER | 110V, type 2 FULL CONTACT | TRUE | 110V FULL CONTACT | X654 | 1 | M |
| | 9 | 1 | FUSER | 220V, type 2 FULL CONTACT | TRUE | | X654 | 2 | M |
| | 8 | 1 | CABLE | FUSER INTERFACE | TRUE | FUSER INTERFACE | X654 | 1 | M |
| | 8 | 1 | FUSER | LVPS COOLING FAN | TRUE | LPS COOLING FAN | X654 | 1 | M |
| | 8 | 17 | CABLE | Output option if cable assembly x658 | TRUE | CABLE | X654 / X658 | 1 | M |
| | 8 | 16 | PCB | UMH SCANNER CONT x654 - x658 | TRUE | LMH SCANNER CONT | X654 | 1 | M |
| | 8 | 15 | CABLE | L SCANNER CONTROLLER 4651 - x652 | TRUE | L SCANNER CONTROLLER | X658 | 2 | M |
| | 8 | 15 | PCB | SCANNER CD POWER | TRUE | SCANNER CD POWER | X658 | 1 | M |
| | 8 | 14 | CABLE | FAX MODEM | TRUE | FAX MODEM | X658 | 1 | M |
| | 8 | 13 | PCB | HDD (TAA) | TRUE | HDD | X658 | 1 | M |
| | 8 | 12 | HARD DRIVE | HDD | TRUE | HARD | X658 | 1 | M |
| | 8 | 11 | CABLE | SCANNER CD | TRUE | FAN | X658 | 1 | M |
| | 8 | 10 | CABLE | FAN HDD 40X20 | TRUE | FAN HDD 40X20 | X658 | 1 | M |
| | 8 | 9 | PCB | FAN SYSTEM | TRUE | FAN SYSTEM | X654 | 1 | M |
| | 8 | 8 | PCB | MH SYSTEM | TRUE | MH SYSTEM | X654 | 1 | M |
| | 8 | 7 | CABLE | ENV OPT TRAY X654 | TRUE | ENV OPT TRAY | X654 | 1 | M |
| | 8 | 6 | CABLE | LOWER OPT INTERFACE X658 | TRUE | LOWER OPT INTERFACE | X654 | 1 | M |
| | 8 | 5 | SENSOR | INPUT | TRUE | INPUT | X654 | 1 | M |
| | 9 | 1 | CABLE | HVPS SENSOR | TRUE | HVPS SENSOR | X654 | 1 | M |
| | 9 | 1 | SUPPLY | HVPS POWER | TRUE | HVPS POWER | X654 | 1 | M |
| | 9 | 1 | SENSOR | HVPS POWER | TRUE | HVPS POWER | X654 | 1 | M |
| | 9 | 1 | PCB | TONER EMPTY | TRUE | TONER EMPTY | X654 | 1 | M |
| | 9 | 1 | CONTACT | PRINT CART HV | TRUE | PRINT CART HV | X654 | 1 | M |
| | 9 | 1 | CONTACT | DRUM GROUNDING | TRUE | DRUM GROUNDING | X654 | 1 | M |
| | 9 | 2 | SUPPLY | LM LVPS POWER | TRUE | LM LVPS POWER | X654 | 1 | M |
| | 9 | 3 | SUPPLY | H LVPS POWER x658 | TRUE | H LVPS POWER | X654 | 1 | M |
| | 9 | 4 | MOTOR | DUPLEX FAN | TRUE | DUPLEX FAN | X654 | 1 | M |
| | 9 | 5 | MOTOR | PRINT CART FAN | TRUE | PRINT CART FAN | X654 | 1 | M |
| | 9 | 6 | CABLE | DUPLEX FAN | TRUE | DUPLEX FAN | X654 | 1 | M |
| | 9 | 7 | CABLE | DUPLEX FAN | TRUE | DUPLEX FAN | X654 | 1 | M |
| | 9 | 8 | SHIELD | SHIELD ASSY | TRUE | SHIELD ASSY | X654 | 1 | M |
| | 9 | 9 | CABLE | TONER DENSITY | TRUE | TONER DENSITY | X658 | 1 | M |
| | 9 | 10 | SENSOR | TONER DENSITY | TRUE | TONER DENSITY | X658 | 1 | M |
| Flatbed Scanner | 10 | 10 | SENSOR | FLATBED x658 | TRUE | TONER DENSITY | X658 | 1 | M |
| | 10 | 1 | CANNER | FLATBED x658 | TRUE | FLATBED | X658 | 1 | M |
| | 10 | 2 | ASSEMBLY | SCAN COVER | TRUE | SCAN COVER | | 1 | M |

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3673

Worksheet in D_DOCUME~1 jbryan LOCALS~1 Temp notes896CC5 ~7464669.DOC

| Section | # | Type | Description | Flag | Type | Description | Model | Qty | UoM |
|---|---|---|---|---|---|---|---|---|---|
| 10 | 3 | CABLE | SCAN PLATEN SENSOR | TRUE | CABLE | SCAN PLATEN SENSOR | X654 | 1 | M |
| 10 | 4 | TUBE | Lamp ASM | TRUE | TUBE | Lamp ASM | X654 | 1 | M |
| 10 | 5 | PCB | FALTBED CCD | TRUE | PCB | FALTBED CCD | X654 | 1 | M |
| 10 | 6 | SENSOR | SCAN PLATEN LENGTH | TRUE | SENSOR | SCAN PLATEN LENGTH | X654 | 1 | M |
| 10 | 8 | CABLE | LM SCANNER INT | TRUE | CABLE | LM SCANNER INT | X654 | 1 | M |
| 10 | | BELT | SCANNER CARRIAGE | TRUE | BELT | SCANNER CARRIAGE | X654 | 1 | M |
| 10 | | MOTOR | SCANNER INTERFACE | TRUE | MOTOR | SCANNER INTERFACE | X654 | 1 | M |
| 10 | | PCB | SCANNER CARR DRIVE | TRUE | PCB | SCANNER CARR DRIVE | X654 | 1 | M |
| 10 | 9 | PCB | 2P FB ARROW LED | TRUE | PCB | 2P FB ARROW LED | X654 | 1 | M |
| 10 | 11 | MOTOR | 2P FB INDICATOR | TRUE | MOTOR | 2P FB INDICATOR | X654 | 1 | M |
| 10 | 12 | CABLE | SCANNER HP | TRUE | CABLE | SCANNER HP | X654 | 1 | M |
| 10 | 14 | CABLE | SCANNER HP SENSOR | TRUE | CABLE | SCANNER HP SENSOR | X654 | 1 | M |
| 10 | 13 | SENSOR | SCANNER CARR BELT | TRUE | SENSOR | SCANNER CARR BELT | X654 | 1 | M |
| 10 | 15 | CABLE | SCANNER FAN | TRUE | CABLE | SCANNER FAN | X654 | 1 | M |
| 10 | 16 | ROLLER | SCANNER FAN | TRUE | ROLLER | SCANNER FAN | X654 | 1 | M |
| 10 | 17 | MOTOR | FLATBED FILTER | TRUE | MOTOR | FLATBED FILTER | X654 | 1 | M |
| 10 | 18 | FILTER | FLATBED FILTER | TRUE | FILTER | SCANNER FAN | X654 | 1 | M |
| 10 | 19 | COVER | FLATBED SCAN CCD X654 | TRUE | COVER | FLATBED SCAN CCD | X654 | 1 | M |
| 10 | 19 | CABLE | H FLATBED SCAN CCD X654 | TRUE | CABLE | H FLATBED SCAN CCD | X654 | 1 | M |
| 10 | | CABLE | LM FLATBED SCAN CCD | TRUE | CABLE | LM FLATBED SCAN CCD | X654 | 1 | M |
| 11 | 1 | FEEDER | ADF unit assembly inc 12, 13 & 14 | TRUE | FEEDER | FEEDER | | 0 | M |
| 13 | 1 | DOOR | ADF unit assembly x651, x652 inc 12, 13 & 14 | TRUE | DOOR | LADF | X658 | 1 | M |
| 12 | 1 | HINGE | ADF LEFT | TRUE | HINGE | ADF LEFT | X658 | 1 | M |
| 12 | 2 | COVER | L REAR CABLE CAP x651 - x652 | TRUE | COVER | L REAR CABLE CAP | X658 | 1 | M |
| 12 | 3 | HINGE | ADF RIGHT | TRUE | HINGE | ADF RIGHT | X658 | 1 | M |
| 12 | 4 | COVER | ADF REAR | TRUE | COVER | ADF REAR | X658 | 1 | M |
| 12 | 5 | PAD | ADF MEDIA TRAY | TRUE | PAD | ADF MEDIA TRAY | X658 | 1 | M |
| 12 | 6 | EXTENSION | ADF PLATEN | TRUE | EXTENSION | ADF PLATEN | X658 | 1 | M |
| 12 | 7 | PAD | ADF lower door assembly X653 - x658 | TRUE | PAD | ADF PLATEN | X658 | 1 | M |
| 12 | 8 | GUIDE | ADF lower door assembly X653 - x658 | TRUE | GUIDE | MH BOTTOM DOOR | X658 | 1 | M |
| 12 | 8 | COVER | ADF MEDIA PINCH | TRUE | COVER | ADF MEDIA PINCH | X658 | 1 | M |
| 12 | 10 | GUIDE | ADF FRONT | TRUE | GUIDE | ADF FRONT | X658 | 1 | M |
| 12 | 11 | TURN | TURN | TRUE | TURN | TURN | X658 | 1 | M |
| 12 | 12 | GUIDE | SEP ROLL MEDIA | TRUE | GUIDE | SEP ROLL MEDIA | X658 | 1 | M |
| 13 | 1 | ROLL | ADF PICK | TRUE | ROLL | ADF PICK | X658 | 1 | M |
| 13 | 2 | SPRING | TRANS MTR TENSION | TRUE | SPRING | SPRING | X658 | 1 | M |
| 13 | 3 | MOTOR | ADF FEED ASM W/CABLE | TRUE | MOTOR | ADF FEED ASM W/CABLE | X658 | 1 | M |
| 13 | 4 | GEAR | ADF TRANS BRACKET | TRUE | GEAR | ADF TRANS BRACKET | X658 | 1 | M |
| 13 | 5 | CLUTCH | KIT PULLEY - GUIDE R | TRUE | CLUTCH | KIT PULLEY - GUIDE R | X658 | 1 | M |
| 13 | 6 | ROLL | BEARING AND GEAR | TRUE | ROLL | BEARING AND GEAR | X658 | 1 | M |
| 13 | 7 | GEAR | ADF REG PINCH | TRUE | GEAR | ADF REG PINCH | X658 | 1 | M |
| 13 | 8 | SOLENOID | KIT PULLEY - GUIDE F | TRUE | SOLENOID | KIT PULLEY - GUIDE F | X658 | 1 | M |
| 13 | 9 | CAM | MPF PICK | TRUE | CAM | MPF PICK | X658 | 1 | M |
| 13 | 10 | ROLLER | PICK ROLL POSITION | TRUE | ROLLER | PICK ROLL POSITION | X658 | 1 | M |
| 13 | 11 | ROLLER | ADF SEPERATOR | TRUE | ROLLER | ADF SEPARATOR | X658 | 1 | M |
| 13 | 13 | LUTCH | ADF SEPARATOR | TRUE | LUTCH | ADF SEPARATOR | X658 | 1 | M |
| 13 | 12 | COLLER | GCM TORQUE LIMITER | TRUE | ROLLER | GCM TORQUE LIMITER | X658 | 1 | M |
| 13 | 13 | COL | 6MM | TRUE | COL | 6MM | X658 | 1 | M |
| 13 | 14 | BUSHING | | TRUE | BUSHING | | X658 | 1 | M |
| 14 | 1 | SPACER | ADF TRAY | TRUE | SPACER | | X654 | 1 | M |
| 14 | 2 | TRAY | ADF DOC TRAY | TRUE | TRAY | ADF DOC TRAY | X658 | 1 | M |

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A3674

Worksheet in D: DOCUME~1 jbryan LOCALS~1 Temp notes896C5 ~7464699.DOC

| A#1 | MFP | Type | Description | Flag | BRAC | X654 | X658 | N | M |
|---|---|---|---|---|---|---|---|---|---|
| 14 | 3 | CABLE | ADF TRAY LENGTH | TRUE | CABLE – ADF TRAY LENGTH | | | | M |
| 14 | 4 | CABLE | ADF | TRUE | ADF | | | | M |
| 14 | 5 | SENSOR | MH ADF EXIT BRAC assembly a6b3 | TRUE | SENSOR | X654 | X658 | 1 | M |
| 14 | 6 | SENSOR | L ADF EXIT BRAC | TRUE | L ADF EXIT BRAC | | | | M |
| 19 | 1 | FINISHER | CONSUMER FINISHER MACHINE inc 20, 21 & 22 | TRUE | STAPLER MACHINE | X654 | X658 | 0 | M |
| 20 | 1 | COVER | HANDLE | TRUE | HANDLE | X654 | X658 | 1 | M |
| 20 | 2 | COVER | REAR | TRUE | REAR | X654 | X658 | 1 | M |
| 20 | 3 | COVER | STAPLER | TRUE | STAPLER | X654 | X658 | 1 | M |
| 20 | 4 | COVER | HOLLOW | TRUE | HOLLOW | X654 | X658 | 1 | M |
| 20 | 5 | COVER | RIGHT | TRUE | RIGHT | X654 | X658 | 1 | M |
| 20 | 6 | SENSOR | BIN FULL RECEIVE | TRUE | BIN FULL RECEIVE | X654 | X658 | 1 | M |
| 20 | 7 | SPRING | FINISHER BIN | TRUE | FINISHER BIN | X654 | X658 | 1 | M |
| 20 | 8 | PCB | STD OUTPUT BIN LED | TRUE | STD OUTPUT BIN LED | X654 | X658 | 1 | M |
| 20 | 9 | LIGHT PIPE | LED CLEAR LENS | TRUE | LED CLEAR LENS | X654 | X658 | 1 | M |
| 20 | 10 | COVER | LED SENSOR | TRUE | LED SENSOR | X654 | X658 | 1 | M |
| 20 | 11 | COVER | FINISHER BIN | TRUE | FINISHER BIN | X654 | X658 | 1 | M |
| 20 | 12 | EXTENSION | MEDIA OUTPUT BIN | TRUE | EXTENSION | X654 | X658 | 1 | M |
| 20 | 13 | TRAY | MEDIA OUTPUT BIN | TRUE | MEDIA OUTPUT BIN | X654 | X658 | 1 | M |
| 20 | 14 | SENSOR | BIN FULL SEND | TRUE | BIN FULL SEND | X654 | X658 | 1 | M |
| 20 | 15 | PCB | OFFSET STACKER CONT | TRUE | OFFSET STACKER CONT | X654 | X658 | 1 | M |
| 20 | 16 | ROLLER | ATTACH | TRUE | ATTACH | X654 | X658 | 1 | M |
| 20 | 17 | COVER | LEFT | TRUE | LEFT | X654 | X658 | 1 | M |
| 20 | 18 | COVER | TOP | TRUE | TOP | X654 | X658 | 1 | M |
| 20 | 19 | SENSOR | PASS THROUGH | TRUE | PASS THROUGH | X654 | X658 | 0 | M |
| 21 | 1 | FLAP | MEDIA STACK | TRUE | MEDIA STACK | | X658 | 1 | M |
| 21 | 2 | SENSOR | media stack | TRUE | MEDIA STACK | | X658 | 1 | M |
| 21 | 3 | SENSOR | | TRUE | STD BIN EXIT | | X658 | 1 | M |
| 21 | 4 | MOTOR | LEFT TAMPER | TRUE | LEFT TAMPER | | X658 | 1 | M |
| 21 | 5 | MOTOR | RIGHT TAMPER | TRUE | RIGHT TAMPER | | X658 | 1 | M |
| 21 | 6 | SPRING | TAMPER RECOIL | TRUE | TAMPER RECOIL | | X658 | 1 | M |
| 21 | 7 | SENSOR | tamper HP right | TRUE | SENSOR | | X658 | 1 | M |

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3675

Worksheet in D: DOCUME~1 jbryan LOCALS~1 Temp notesB96CC5~7464969.DOC

| Assembly | No | Sub | Type | Description | Status | Type | Description | X658 | Qty | M |
|---|---|---|---|---|---|---|---|---|---|---|
| MFP stapler assembly #4 | 21 | 8 | SENSOR | tamper HP left | TRUE | SENSOR | STD BIN EXIT | | 1 | M |
| | 21 | 9 | BELT | TAMPER DRIVE | TRUE | BELT | TAMPER DRIVE | | 1 | M |
| | 21 | 10 | SENSOR | paddle HP | TRUE | SENSOR | STD BIN EXIT | | 1 | M |
| | 21 | 11 | MOTOR | PADDLE | TRUE | MOTOR | PADDLE | | 1 | M |
| MFP stapler assembly #3 | 22 | 1 | STAPLER | Stapler assembly | TRUE | STAPLER | FINISHER | X658 | 1 | M |
| | 22 | 2 | SENSOR | media in stapler | TRUE | SENSOR | SENSOR | X658 | 1 | M |
| MFP offset stacker | 23 | 1 | FINISHER | Complete OFFSET STACKER inc 24 & 25 | TRUE | FINISHER | OFFSET STACKER MACH | X658 | 0 | M |
| MFP offset stacker assembly #2 | 24 | 1 | COVER | HANDLE | TRUE | COVER | HANDLE | | 1 | M |
| | 24 | 2 | COVER | REAR | TRUE | COVER | REAR | | 1 | M |
| | 24 | 3 | COVER | STAPLER | TRUE | COVER | STAPLER | | 1 | M |
| | 24 | 4 | COVER | RIGHT | TRUE | COVER | RIGHT | | 1 | M |
| | 24 | 5 | SENSOR | BIN FULL RECEIVE | TRUE | SENSOR | BIN FULL RECEIVE | | 1 | M |
| | 24 | 6 | SPRING | FINISHER BIN | TRUE | SPRING | FINISHER BIN | | 1 | M |
| | 24 | 7 | PCB | STD OUTPUT BIN LED | TRUE | PCB | STD OUTPUT BIN LED | | 1 | M |
| | 24 | 8 | LIGHT PIPE | LED CLEAR LENS | TRUE | LIGHT PIPE | LED CLEAR LENS | | 1 | M |
| | 24 | 9 | COVER | LED SENSOR | TRUE | COVER | LED SENSOR | | 1 | M |
| | 24 | 10 | SENSOR | FINISHER BIN | TRUE | SENSOR | FINISHER BIN | | 1 | M |
| | 24 | 11 | EXTENSION | MEDIA OUTPUT BIN | TRUE | EXTENSION | MEDIA OUTPUT BIN | | 1 | M |
| | 24 | 12 | TRAY | MEDIA OUTPUT BIN | TRUE | TRAY | MEDIA OUTPUT BIN | | 1 | M |
| | 24 | 13 | SENSOR | BIN FULL SEND | TRUE | SENSOR | BIN FULL SEND | | 1 | M |
| | 24 | 14 | PCB | OFFSET STACKER CONT | TRUE | PCB | OFFSET STACKER CONT | | 1 | M |
| | 24 | 15 | ROLLER | ATTACH | TRUE | ROLLER | ATTACH | | 1 | M |
| | 24 | 16 | COVER | LEFT | TRUE | COVER | LEFT | | 1 | M |
| | 24 | 17 | COVER | TOP | TRUE | COVER | TOP | | 1 | M |
| | 24 | 18 | SENSOR | PASS THROUGH | TRUE | SENSOR | PASS THROUGH | | 1 | M |
| MFP offset stacker assembly #3 | 25 | 1 | FLAP | MEDIA STACK | TRUE | FLAP | MEDIA STACK | | 1 | M |
| | 25 | 2 | SENSOR | MEDIA STACK | TRUE | SENSOR | MEDIA STACK | | 1 | M |
| | 25 | 3 | SENSOR | media stack | TRUE | | STD BIN EXIT | | 1 | M |
| | 25 | 4 | MOTOR | LEFT TAMPER | TRUE | MOTOR | LEFT TAMPER | | 1 | M |
| | 25 | 5 | MOTOR | RIGHT TAMPER | TRUE | MOTOR | RIGHT TAMPER | | 1 | M |
| | 25 | 6 | SPRING | TAMPER RECOIL | TRUE | SPRING | TAMPER RECOIL | | 1 | M |
| | 25 | 7 | SENSOR | tamper HP left | TRUE | SENSOR | STD BIN EXIT | | 1 | M |
| | 25 | 8 | SENSOR | tamper HP right | TRUE | SENSOR | STD BIN EXIT | | 1 | M |
| | 25 | 9 | BELT | TAMPER DRIVE | TRUE | BELT | TAMPER DRIVE | | 1 | M |
| | 25 | 10 | SENSOR | paddle HP | TRUE | SENSOR | STD BIN EXIT | | 1 | M |
| | 25 | 11 | MOTOR | PADDLE | TRUE | MOTOR | PADDLE | | 1 | M |
| MFP 4-bin mailbox assembly #1 | 26 | 1 | MAILBOX | Complete 4 bin mailbox assembly inc 27 & 28 | TRUE | MAILBOX | MAILBOX A/O | X658 | 0 | M |
| MFP 4-bin mailbox assembly #2 | 27 | 1 | BAIL | TOP MEDIA BIN | TRUE | BAIL | TOP MEDIA BIN | | 1 | M |
| | 27 | 2 | COVER | TOP | TRUE | COVER | TOP | | 1 | M |
| | 27 | 3 | BAIL | 1-3 MEDIA BIN | TRUE | BAIL | 1-3 MEDIA BIN | | 1 | M |
| | 27 | 4 | COVER | LEFT | TRUE | COVER | LEFT | | 1 | M |
| | 27 | 5 | COVER | LEFT REAR INNER | TRUE | COVER | LEFT REAR INNER | | 1 | M |
| | 27 | 6 | SENSOR | deflector gate HP | TRUE | SENSOR | STD BIN EXIT | | 1 | M |
| | 27 | 7 | DOOR | REAR | TRUE | DOOR | REAR | | 1 | M |
| | 27 | 8 | COVER | RIGHT REAR INNER | TRUE | COVER | RIGHT REAR INNER | | 1 | M |
| | 27 | 9 | COVER | RIGHT | TRUE | COVER | RIGHT | | 1 | M |

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A3676

Worksheet in D: DOCUME~1 bryan LOCALS~1 Temp notes896CC5 ~7464989 DOC

| | | | | Description | | TRUE | | | | X654 | X658 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 27 | 10 | | PCB | LED CARD | MEDIA DIVERTER | | PCB | LED CARD | MEDIA DIVERTER | | | | |
| 27 | 11 | | LIGHT PIPE | MEDIA OUTPUT | | TRUE | LIGHT PIPE | MEDIA OUTPUT | | | X658 | | M |
| 28 | 1 | SPRING | SPRING | MEDIA DIVERTER | | TRUE | SPRING | MEDIA DIVERTER | | | X658 | 4 | M |
| 28 | 2 | | SENSOR | PASS THROUGH | | | SENSOR | PASS THROUGH | | X654 | X658 | 2 | M |
| 28 | 3 | | SOLENOID | DIVERTER GATE | | TRUE | SOLENOID | DIVERTER GATE | | X654 | X658 | 3 | M |
| 28 | 4 | | ROLLER | ATTACH | | TRUE | ROLLER | ATTACH | | X654 | X658 | 0 | M |
| 28 | 5 | | PCB | STD OUTPUT BIN LED | | TRUE | PCB | STD OUTPUT BIN LED | | X654 | X658 | 1 | M |
| 28 | 6 | | LIGHT PIPE | LED CLEAR LENS | | TRUE | LIGHT PIPE | LED CLEAR LENS | | X654 | X658 | 1 | M |
| 28 | 7 | | COVER | OUTPUT BIN LED BRACK | | TRUE | COVER | OUTPUT BIN LED BRACK | | X654 | X658 | 1 | M |
| 28 | 8 | | ACTUATOR | MEDIA BIN FULL | | TRUE | ACTUATOR | MEDIA BIN FULL | | X654 | X658 | 1 | M |
| 28 | 9 | | SENSOR | MEDIA BIN FULL | | TRUE | SENSOR | MEDIA BIN FULL | | X654 | X658 | 4 | M |
| 28 | 10 | | SOLENOID | TRANSPORT | | TRUE | SOLENOID | TRANSPORT | | X654 | X658 | 1 | M |
| 28 | 11 | | PCB | 4 BIN MAILBOX CONT | | TRUE | PCB | 4 BIN MAILBOX CONT | | X654 | X658 | 1 | M |
| 28 | 12 | | DIVERTER | MEDIA BIN FULL | | TRUE | DIVERTER | MEDIA BIN FULL | | X654 | X658 | 4 | M |
| 31 | NS | PWR CORD | PWR CORD | STRT ULCAN,ARG,LAD | | TRUE | PWR CORD | STRT ULCAN,ARG,LAD | | X654 | X658 | 1 | M |
| 31 | NS | | PWR CORD | STRAIGHT,JP,ARGENTINA | | TRUE | PWR CORD | STRAIGHT,JP,ARGENTINA | | X654 | X658 | 0 | M |
| 31 | NS | | PWR CORD | HV, Chile, Uruguay | | TRUE | PWR CORD | STRAIGHT,ITALY | | X654 | X658 | 0 | M |
| 31 | NS | | PWR CORD | HV, Paraguay, EU | | TRUE | PWR CORD | SPAIN 8FT STRAIGHT | | X654 | X658 | 0 | M |
| 31 | NS | | PWR CORD | Brazil PPB kits | | TRUE | PWR CORD | | | X654 | X658 | 0 | M |
| 31 | NS | | PWR CORD | HV, Asian | | TRUE | PWR CORD | STRAIGHT,UK | | X654 | X658 | 0 | M |
| 31 | NS | | PWR CORD | HV, Australia & New Zealand | | TRUE | PWR CORD | 8FT STRAIGHT | | X654 | X658 | 0 | M |
| 31 | NS | | PWR CORD | STRAIGHT, JAPAN | | TRUE | PWR CORD | STRAIGHT, JAPAN | | X654 | X658 | 0 | M |
| 31 | NS | | PWR CORD | KOREA 8' ST | | TRUE | PWR CORD | KOREA 8' ST | | X654 | X658 | 0 | M |
| 31 | NS | | PWR CORD | HV, PRC | | TRUE | PWR CORD | 2-4M STRAIGHT | | X654 | X658 | 0 | M |
| 31 | NS | | PWR CORD | TAIWAN 8' ST | | TRUE | PWR CORD | TAIWAN 8' ST | | X654 | X658 | 0 | M |
| 31 | NS | | PWR CORD | DENMARK 8' | | TRUE | PWR CORD | DENMARK 8' | | X654 | X658 | 0 | M |
| 31 | NS | | PWR CORD | STRAIGHT,ISREAL | | TRUE | PWR CORD | STRAIGHT,ISREAL | | X654 | X658 | 0 | M |
| 31 | NS | | PWR CORD | SOUTH AFRICA 8' | | TRUE | PWR CORD | SOUTH AFRICA 8' | | X654 | X658 | 0 | M |
| 31 | NS | | PWR CORD | SWITZERLAND 8' | | TRUE | PWR CORD | SWITZERLAND 8' | | X654 | X658 | 0 | M |
| 15 | 1 | SPRING | SPRING | SSD BELLCRANK | | TRUE | SPRING | SSD BELLCRANK | | X658 | X658 | 0 | 0 |
| 16 | 2 | | Complete SSD Sheet option tray assembly x658 | | TRUE | | TRAY (OPTION) | M 550 OPTION | | X658 | 1 | 0 | |
| 3 | 3 | | SSD sheet pod arm feeder assembly incl 15.3, 15.4, 15.5, 15.6 & 15.7 | | | | | | | X658 | 0 | 0 | |

Power Cords

MFP 4-bin mailbox (option tray assembly #3)

SSD Sheet option tray assembly (x658)

Needs to be HW Purchase Price

Total:

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A3677

Worksheet in D: DOCUME~1 jbryan LOCALS~1 Temp notes8B9CC5 ~7464969.DOC

| Group | | | Type | Description | Flag | Type | Description | Code | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 250 Sheet option tray assembly (x651, x652, x654 & x656) | 16 | 1 | FEEDER | Complete 250 Sheet option tray assembly | TRUE | FEEDER | 250 OPTION | X654 | 1 | 0 |
| | 16 | 2 | | 250 SHEET pick arm bracket ies 16-3, 16-4, 16-5, 16-6 & 16-7 | | | 250 SHEET PA BRACKET | X654 | 1 | 0 |
| | 16 | 3 | SPRING | 250 BELLCRANK RECOIL | TRUE | SPRING | 250 BELLCRANK RECOIL | X654 | 0 | 0 |
| | 16 | 4 | ROLL | PICK | TRUE | ROLL | PICK | X654 | 0 | 0 |
| | 16 | 5 | SENSOR | media low | TRUE | SENSOR | STD BIN EXIT | X654 | 0 | 0 |
| | 16 | 6 | SENSOR | media out | TRUE | SENSOR | STD BIN EXIT | X654 | 0 | 0 |
| | 16 | 7 | ACTUATOR | 250 Sheet media out actuator x652 | FALSE | SENSOR | STD BIN EXIT | X654 | 0 | 0 |
| | 16 | 8 | | Anti-tip latch assembly | TRUE | TRAY | 250 OPTION | X654 | 1 | 0 |
| | 16 | 9 | DRAWER | 250 SHEET OPTION | TRUE | DRAWER | 250 SHEET OPTION | X654 | 2 | 0 |
| | 16 | 10 | SPRING | MEDIA TRAY CATCH | TRUE | SPRING | MEDIA TRAY CATCH | X654 | 1 | 0 |
| | 16 | 11 | ROLL | MEDIA TRAY CATCH | TRUE | ROLL | PICK | X654 | 1 | 0 |
| | 16 | 12 | TRAY | 250 Sheet media tray assembly | TRUE | ROLL | 63X TRAY ASM | X654 | 1 | 0 |
| | 16 | 13 | SENSOR | PASS THROUGH with cable | TRUE | RAY | 63X TRAY ASM | X654 | 1 | 0 |
| | 16 | 14 | SHAFT | Lower opt drive | TRUE | SENSOR | PASS THROUGH | X654 | 1 | 0 |
| | 16 | 15 | ROLLER | Lower opt drive assembly | TRUE | SHAFT | LOWER OPT DRIVE | X654 | 1 | 0 |
| | 16 | 16 | ROLLER | Media size actuator | TRUE | ROLLER | MEDIA TRAY CATCH | X654 | 1 | 0 |
| | 16 | 17 | PCB | 250 SHEET CONT CARD | TRUE | CB | 250 SHEET CONT CARD | X654 | 1 | 0 |
| | 16 | 18 | CABLE | UPPER INTERFACE | TRUE | ABLE | UPPER INTERFACE | X654 | 1 | 0 |
| 550 Sheet option tray assembly (x651, x652, x654 & x656) | 17 | 1 | TRAY (OPTION) | Complete 550 Sheet option tray assembly ies 17-3, 17-4, 17-5, 17-6 & 17-7 | TRUE | TRAY (OPTION) | 550 OPTION | X654 | 1 | 0 |
| | 17 | 2 | | 550 Sheet option tray assembly | | | 250 OPTION | X654 | 1 | 0 |
| | 17 | 3 | PRING | 500 BELLCRANK | TRUE | PRING | 250 BELLCRANK | X654 | 1 | 0 |
| | 17 | 4 | OLL | PICK | TRUE | OLL | PICK | X654 | 0 | 0 |

Worksheet in D: DOCUME~1\bryan.LOCALS~1\Temp\notes896CC5~7464999.DOC

| | | Part | Description | Flag | | Part | Option Part | Model | | Qty | Qty |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 17 | 5 | SENSOR | media low | TRUE | | SENSOR | STD BIN EXIT | X654 | | 1 | 0 |
| 17 | 6 | SENSOR | media out | TRUE | | SENSOR | STD BIN EXIT | X654 | | 1 | 0 |
| 17 | 7 | ACTUATOR | 500 MEDIA OUT | TRUE | | ACTUATOR | 500 MEDIA OUT | X654 | | 1 | 0 |
| 17 | 8 | DRAWER | Anti-tip latch assembly | TRUE | | DRAWER | 250 OPTION | X654 | | 2 | 0 |
| 17 | 9 | SPRING | 550 SHEET OPTION | TRUE | | SPRING | 550 SHEET OPTION | X654 | | 1 | 0 |
| 17 | 10 | ROLL | MEDIA TRAY CATCH | TRUE | | ROLL | MEDIA TRAY CATCH | X654 | | 1 | 0 |
| 17 | 11 | TRAY | 550 MEDIA x654 | TRUE | | TRAY | 550 MEDIA | X654 | | 1 | 0 |
| 17 | 12 | SENSOR | PASS THROUGH with cable | TRUE | | SENSOR | PASS THROUGH | X654 | | 1 | 0 |
| 17 | 13 | SHAFT | Option drive shaft w/ spring | TRUE | | SHAFT | MH LOWER OPT DRIVE | X654 | | 1 | 0 |
| 17 | 14 | SENSOR | Lower P cable assembly | TRUE | | SENSOR | 250 SHEET CONT CARD | X654 | | 1 | 0 |
| 17 | 15 | PCB | Media size actuator | TRUE | | PCB | 250 SHEET CONT CARD | X654 | | 1 | 0 |
| 17 | 16 | ROLLER | Media tray catch | TRUE | | ROLLER | MEDIA TRAY CATCH | X654 | | 1 | 0 |
| 17 | 17 | PCB | 550 SHEET CONT CARD | TRUE | | PCB | 550 SHEET CONT CARD | X654 | | 1 | 0 |
| 17 | 18 | CABLE | UPPER INTERFACE | TRUE | | CABLE | UPPER INTERFACE | X654 | | 1 | 0 |
| 18 | 1 | TRAY (OPTION) | Complete HCT option tray assembly | TRUE | | TRAY (OPTION) | HCF OPTION | X654 | | 1 | 0 |
| 18 | 2 | BRACKET | HCT PICK ARM bracket assembly (inc 18-3, 18-4, 18-5, 18-6, 18-7 & 18-8) | TRUE | | BRACKET | HCF PICK ARM | X654 | | 1 | 0 |
| 18 | 3 | CABLE | Pick arm sensor cable assembly | TRUE | | CABLE | HCF BELLCRANK RECOIL | X654 | | 1 | 0 |
| 18 | 4 | SPRING | HCF BELLCRANK RECOIL | TRUE | | SPRING | HCF BELLCRANK RECOIL | X654 | | 1 | 0 |
| 18 | 5 | ROLL | PICK | TRUE | | ROLL | PICK | X654 | | 1 | 0 |
| 18 | 6 | SENSOR | media low | TRUE | | SENSOR | STD BIN EXIT | X654 | | 1 | 0 |
| 18 | 7 | SENSOR | media out | TRUE | | SENSOR | STD BIN EXIT | X654 | | 1 | 0 |
| 18 | 8 | ACTUATOR | 500 MEDIA OUT | TRUE | | ACTUATOR | 500 MEDIA OUT | X654 | | 1 | 0 |
| 18 | 9 | SENSOR | media empty | TRUE | | SENSOR | STD BIN EXIT | X654 | | 1 | 0 |
| 18 | 10 | COVER | HCF REAR | TRUE | | COVER | HCF REAR | X654 | | 1 | 0 |
| 18 | 11 | SENSOR | Anti-tip latch assembly | TRUE | | TRAY | 250 OPTION | X654 | | 2 | 0 |
| 18 | 12 | COVER | HCF right | TRUE | | COVER | HCF TRAY RAISED | X654 | | 1 | 0 |
| 18 | 13 | MOTOR | HCF TRAY LIFT DRIVE | TRUE | | HCF FRONT | HCF FRONT | X654 | | 1 | 0 |
| 18 | 14 | LATCH | HCF TRAY CLOSED w/ spring | TRUE | | MOTOR | HCF TRAY LIFT DRIVE | X654 | | 1 | 0 |
| 18 | 15 | SLIDE | HCF DRAWER | TRUE | | LATCH | HCF TRAY CLOSED | X654 | | 1 | 0 |
| 18 | 16 | TRAY | HCF media tray assembly inc 18-17 | TRUE | | SLIDE | HCF DRAWER | X654 | | 1 | 0 |
| 18 | 17 | COVER | HCF FRONT | TRUE | | TRAY | HCF | X654 | | 2 | 0 |
| 18 | 18 | SENSOR | HCF PASS THRU w/ cable | TRUE | | COVER | HCF FRONT | X654 | | 1 | 0 |
| 18 | 19 | CABLE | HCF INTERFACE | TRUE | | SENSOR | HCF PASS THRU | X654 | | 1 | 0 |
| 18 | 20 | PCB | HCF CONT CARD | TRUE | | CABLE | HCF INTERFACE | X654 | | 1 | 0 |
| 18 | 21 | TRAY | HCF media size actuator assem | TRUE | | PCB | HCF CONT CARD | X654 | | 1 | 0 |
| 18 | 22 | COVER | HCF LEFT | TRUE | | SLIDE | SLIDE W/SPRING ASM | X654 | | 1 | 0 |
| 29 | 1 | OPTION PART | Complete ENVELOPE feeder ass'y | FALSE | | COVER | HCF LEFT | X654 | | 1 | 0 |
| 30 | NS | RELO KIT | Relocation kit x651, x652 & x654 | TRUE | | OPTION PART | ENVELOPE | X658 | | 0 | 1 |
| 30 | NS | RELO KIT | Relocation kit x654 | TRUE | | RELO KIT | | X654 | | 1 | 0 |
| 30 | NS | RELO KIT | Relocation kit x658 | TRUE | | RELO KIT | | X651, X652, X654 | | 1 | 0 |
| 30 | NS | MAINT KIT | 100V TYPE 1 FUSER | FALSE | | RELO KIT | | X658 | | 0 | 1 |
| 30 | NS | MAINT KIT | 110V TYPE 1 FUSER0 | TRUE | | MAINT KIT | 110V TYPE 1 FUSER0 | X658 | | 0 | 1 |
| 30 | NS | MAINT KIT | 220V TYPE 1 FUSER0 | FALSE | | | | X654 | | 0 | 0 |
| 30 | NS | MAINT KIT | 100V TYPE 2 FUSER | FALSE | | | | X654 | | 0 | 0 |
| 30 | NS | MAINT KIT | 110V TYPE 2 FUSER0 | TRUE | | MAINT KIT | 110V TYPE 2 FUSER0 | X654 | | 0 | 0 |
| 30 | NS | MAINT KIT | 220V TYPE 2 FUSER0 | FALSE | | | | X654 | | 0 | 0 |

**HCT Sheet option tray (assembly) x651, x654 & x658)**

**Miscellaneous**

**Envelope feeder**

CONFIDENTIAL - OUTSIDE COUNSEL ON A3679

Worksheet in D:\DOCUME~1\jbryan\LOCALS~1\Temp\notesB96CC5~7464089.DOC

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 30 | NS | ADF | ADF | TRUE | MAINT KIT | ADF | | | o |
| 30 | NS | MEMORY | DDR2 256MB | TRUE | MEMORY | DDR2 256MB | X654 | 1 | o |
| 30 | NS | MEMORY | DDR2 512MB | TRUE | MEMORY | DDR2 512MB | X654 | 1 | o |
| 30 | NS | MEMORY | DDR2 1GB | TRUE | MEMORY | DDR2 1G | X654 | 1 | o |
| 30 | NS | OPTION | 256MB User Flash | TRUE | OPTION | 256MB User Flash | X654 | 1 | o |
| 30 | NS | HARD DRIVE | HDD (TAA) | TRUE | DRIVE | HARD | X654 | 1 | o |
| 30 | NS | CARD | PRINTCRYPTION | TRUE | CARD | PRINTCRYPTION | X654 | 1 | o |
| 30 | NS | CARD | T65X KOREAN FONT | TRUE | CARD | T65X KOREAN FONT | X654 | 1 | o |
| 30 | NS | CARD | T65X SC FONT | TRUE | CARD | T65X SC FONT | X654 | 1 | o |
| 30 | NS | CARD | T65X TC FONT CARD | TRUE | CARD | T65X TC FONT CARD | X654 | 1 | o |
| 30 | NS | CARD | T65X JAPAN FONT CRD | TRUE | CARD | T65X JAPAN FONT CRD | X654 | 1 | o |
| 30 | NS | CARD | X65xe F+BC | TRUE | CARD | X65xe F+BC | X654 | 1 | o |
| 30 | NS | CARD | X65xe IPDS | TRUE | CARD | X65xe IPDS | X654 | 1 | o |
| 30 | NS | PCB | FORMS | TRUE | CARD | FORMS | X654 | 1 | o |
| 30 | NS | parts pack | ISP thumbscrew and standoff | TRUE | PCB | | X654 | | o |
| 30 | NS | CABLE | 14 PIN J5T-FOR ISP | TRUE | CABLE | 14 PIN J5T-FOR ISP | X654 | 1 | o |
| 30 | NS | card | N8120 GB ethernet | TRUE | FEATURE | M02Z (FIBER) TLI | X654 | 1 | o |
| 30 | NS | card | N8130 fiber ethernet | TRUE | FEATURE | | X654 | 1 | o |
| 30 | NS | TOP ASM | N8150 80211 BGN CARD-US | TRUE | TOP ASM | 80211 BGN CARD-US | X654 | 1 | o |
| 30 | NS | TOP ASM | N8150 80211 BGN CARD-EMEA | TRUE | TOP ASM | 80211 BGN CARD-EMEA | X658 | 1 | o |
| 30 | NS | ADAPTER | N400GE PRT SERVER RD | TRUE | ADAPTER | N400GE PRT SERVER RD | X658 | 1 | o |
| 30 | NS | ADAPTER | N40GSE WIRELESS (US) | TRUE | ADAPTER | N40GSE WIRELESS (US) | X658 | 1 | o |
| 30 | NS | ADAPTER | N70GDe PRNT SRVR 1PORT USB | TRUE | ADAPTER | PRNT SRVR 1PORT USB | X658 | 1 | o |
| 30 | NS | ADAPTER | N70GDe PRNT SRVR 4PORT USB | TRUE | ADAPTER | PRNT SRVR 4PORT USB | X658 | 1 | o |
| 30 | NS | ADAPTER | PRNT SRVR PARALLEL | TRUE | ADAPTER | PRNT SRVR PARALLEL | X658 | 1 | o |
| 30 | NS | ADAPTER | RS232C SERIAL | TRUE | ADAPTER | RS232C SERIAL | X658 | 1 | o |
| 30 | NS | ADAPTER | Parallel 1284-B If card | TRUE | ADAPTER | MXLIII (PARAI) TLI | X658 | 1 | o |
| 30 | NS | FEATURE | 1U PAR CABLE ROHS | TRUE | ADAPTER | 1U PAR CABLE ROHS | X658 | 1 | o |
| 30 | NS | FEATURE | USB 2M CABLE ROHS | TRUE | ADAPTER | USB 2M CABLE ROHS | X658 | 1 | o |
| 30 | NS | PCB | FAX MODEM | TRUE | FEATURE | FAX MODEM | X658 | 1 | o |
| 30 | NS | | Fax If Card assembly | TRUE | PCB | | X658 | | o |
| 30 | NS | WIPER | ASM.OIL BLK HOUSING | TRUE | CABLE | | X658 | | o |
| 30 | NS | WIPER | ASM.WAX GRAY HOUSING | TRUE | WIPER | ASM.OIL BLK HOUSING | X658 | 3 | o |
| 30 | NS | DRAWER OPT | 200 SHT UNI ADJ LOCK | TRUE | WIPER | ASM.WAX GRAY HOUSING | X658 | 3 | o |
| 30 | NS | DRAWER OPT | 550 SHT LOCKABLE | TRUE | DRAWER OPT | 200 SHT UNI ADJ LOCK | X658 | 3 | o |
| 30 | NS | DRAWER OPT | 400 UAT LOCKABLE | TRUE | DRAWER OPT | 550 SHT LOCKABLE | X658 | 3 | o |
| 30 | NS | DRAWER OPT | | | DRAWER OPT | 400 UAT LOCKABLE | X658 | | o |
| 32 | NS | DRAWER | 200 SHEET UA DRAWER | TRUE | DRAWER | 200 SHEET UA DRAWER | X654 | 1 | o |
| 32 | NS | TRAY | 200 SHEET UA DRAWER | TRUE | TRAY | 200 SHEET UA TRAY | X654 | 1 | o |
| 32 | NS | DRAWER | 400 SHEET UA DRAWER | TRUE | DRAWER | 400 SHEET UA DRAWER | X654 | 1 | o |
| 32 | NS | TRAY | 400 SHEET UA TRAY | TRUE | TRAY | 400 SHEET UA TRAY | X654 | 1 | o |
| 32 | NS | TOP ASM | WEAR.250 sheet smooth | TRUE | TOP ASM | WEAR | X654 | 1 | M |
| 32 | NS | STRIP | WEAR.250 sheet crimpled | TRUE | STRIP | 250 DINXY DAM | X654 | 1 | o |
| 32 | NS | STRIP | 250WXBAR SMT 3RWS DMP | TRUE | STRIP | 250WXBAR SMT 3RWS DMP | X654 | 1 | M |
| 32 | NS | TRIP | 250 DINXY DAM | TRUE | STRIP | WEAR 250 SMT 4RWS DM | X654 | 2 | M |
| 32 | NS | TRIP | WEAR 250 SMT 4RWS DM | TRUE | STRIP | WEAR | X654 | 1 | o |
| 32 | NS | TRIP | WEAR STRIP - S50 | TRUE | STRIP | WEAR STRIP - S50 | X658 | 1 | M |
| 32 | NS | TRIP | WEAR 500 SMT 3RWS DM | TRUE | STRIP | WEAR 500 SMT 3RWS DM | X658 | 1 | o |
| 32 | NS | TRIP | WEAR500 SMT 4RWS DMP | TRUE | STRIP | WEAR500 SMT 4RWS DMP | X658 | 1 | M |
| 32 | NS | 250 REPLACEMENT | 250 REPLACEMENT | TRUE | | | | | |
| 32 | NS | 550 REPLACEMENT | 550 REPLACEMENT | TRUE | | | | | |
| 32 | NS | TRIP | Klear screen wipe | TRUE | STRIP | 550 REPLACEMENT | X658 | M | |

Universal trays and accessories

CONFIDENTIAL - OUTSIDE COUNSEL ONLY   A3680

Worksheet in D: DOCUME~1 /Jbrjan /LOCALS~1 /Temp notes8f6CCS ~7464968.DOC

Not listed in service manual

| Type | Description | | Type | Description | X654 | X658 | Qty | M | $ | $ | $ | $ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PWR CORD | STRAIGHT,BRAZIL | TRUE | PWR CORD | STRAIGHT,BRAZIL | X654 | X658 | 0 | M | $ | $ | $ | $ |
| PCBA | USB-A | TRUE | PCBA | USB-A | X654 | X658 | 1 | | | | | |
| ROLL | TRANSFER ROLL BANNER | TRUE | ROLL | TRANSFER ROLL BANNER | X654 | X658 | 1 | | | | | |
| BELT | TRANS DRIVE | TRUE | BELT | TRANS DRIVE | X654 | X658 | 1 | | | | | |
| CABLE | TOP OPTION | TRUE | CABLE | TOP OPTION | X654 | X658 | 1 | | | | | |
| STANDOFF | TEE W/ THUMBSCREW | TRUE | STANDOFF | TEE W/ THUMBSCREW | X654 | X658 | 1 | | | | | |
| PCBA | SYS CARD ASM L-H-M | TRUE | PCBA | SYS CARD ASM L-H-M | X654 | X658 | 1 | | | | | |
| SCREW | SHIP-WITH ISP (2PER) | TRUE | SCREW | SHIP-WITH ISP (2PER) | X654 | X658 | 1 | | | | | |
| PCBA | SHIP-WITH ISP (2PER) | TRUE | PCBA | SHIP-WITH ISP (2PER) | X654 | X658 | 1 | | | | | |
| SCREW | SCREW | TRUE | SCREW | SCREW | X654 | X658 | 1 | | | | | |
| KIT | SCREW | TRUE | KIT | SCREW | X654 | X658 | 1 | | | | | |
| REDRIVE | SCOTT TRADE X658 | TRUE | REDRIVE | SCOTT TRADE X658 | X654 | X658 | 1 | | | | | |
| PCBA | SCANNER LED CCD MOD | TRUE | PCBA | SCANNER LED CCD MOD | X654 | X658 | 1 | | | | | |
| SCANNER | SCANNER LED ASM L&M | TRUE | SCANNER | SCANNER LED ASM L&M | X654 | X658 | 1 | | | | | |
| SCANNER | SCANNER LED ASM H | TRUE | SCANNER | SCANNER LED ASM H | X654 | X658 | 1 | | | | | |
| CARD | PRESCRIBM CARD X65X | TRUE | CARD | PRESCRIBM CARD X65X | X654 | X658 | 1 | | | | | |
| CABLE | PICK ARM | TRUE | CABLE | PICK ARM | X654 | X658 | 1 | | | | | |
| PARTS PACK | MICS E-CLIP | TRUE | PARTS PACK | MICS E-CLIP | X654 | X658 | 1 | | | | | |
| MOTOR | MAIN DRIVE ASM | TRUE | MOTOR | MAIN DRIVE ASM | X654 | X658 | 1 | | | | | |
| COVER | M DP PANEL FRONT | TRUE | COVER | M DP PANEL FRONT | X654 | X658 | 1 | | | | | |
| CABLE | LM USB INTERFACE | TRUE | CABLE | LM USB INTERFACE | X654 | X658 | 1 | | | | | |
| CABLE | LM DP PANEL COVER | TRUE | CABLE | LM DP PANEL COVER | X654 | X658 | 1 | | | | | |
| LATCH | KIOSK-ADAPTER | TRUE | LATCH | KIOSK-ADAPTER | X654 | X658 | 1 | | | | | |
| PAPER HAN | PAPER HAN | TRUE | PAPER HAN | PAPER HAN | X654 | X658 | 1 | | | | | |
| CARD | H SYSTEM | TRUE | CARD | H SYSTEM | X654 | X658 | 1 | | | | | |
| CABLE | H SCAN INTERFACE | TRUE | CABLE | H SCAN INTERFACE | X654 | X658 | 1 | | | | | |
| HINGE | H DP PANEL RIGHT | TRUE | HINGE | H DP PANEL RIGHT | X654 | X658 | 1 | | | | | |
| HINGE | H DP PANEL LEFT | TRUE | HINGE | H DP PANEL LEFT | X654 | X658 | 1 | | | | | |
| DOOR | H MPF TRAY | TRUE | DOOR | H MPF TRAY | X654 | X658 | 1 | | | | | |
| PCBA | FIBER | TRUE | PCBA | FIBER | X654 | X658 | 1 | | | | | |
| CABLE | F+BC LIBDC X655 | TRUE | CABLE | F+BC LIBDC X655 | X654 | X658 | 1 | | | | | |
| FEATURE | DUPLEX GROUNDING | TRUE | FEATURE | DUPLEX GROUNDING | X654 | X658 | 1 | | | | | |
| FEEDER | DUPLEX | TRUE | FEEDER | DUPLEX | X654 | X658 | 1 | | | | | |
| FEEDER | COMPLETE ADF ASM | TRUE | FEEDER | COMPLETE ADF ASM | X654 | X658 | 1 | | | | | |
| PCBA | ADJ MEDIA STACKER | TRUE | PCBA | ADJ MEDIA STACKER | X654 | X658 | 1 | | | | | |
| FEEDER | ADF LED CCD M&H | TRUE | FEEDER | ADF LED CCD M&H | X654 | X658 | 1 | | | | | |
| FEEDER | ADF ASM M&H | TRUE | FEEDER | ADF ASM M&H | X654 | X658 | 1 | | | | | |
| TRAY | 550 MEDIA | TRUE | TRAY | 550 MEDIA | X654 | X658 | 1 | | | | | |
| COVER | 500 LASER | TRUE | COVER | 500 LASER | X654 | X658 | 1 | | | | | |
| TRAY | 400 SPECIAL MED | TRUE | TRAY | 400 SPECIAL MED | X654 | X658 | 1 | | | $ | | |
| TRAY | 400 SPECIAL MED | TRUE | TRAY | 400 SPECIAL MED | X654 | X658 | 1 | | | | | |
| TRAY | 400 SPECIAL MED | TRUE | TRAY | 400 SPECIAL MED | X654 | X658 | 1 | | | | | |
| TRAY | 400 SPECIAL MED | TRUE | TRAY | 400 SPECIAL MED | X654 | X658 | 1 | | | | | |
| DRAWER | 400 SPECIAL MED | TRUE | DRAWER | 400 SPECIAL MED | X654 | X658 | 1 | | | | | |
| DRAWER | 400 SPECIAL MED | TRUE | DRAWER | 400 SPECIAL MED | X654 | | 1 | | | | | |
| ACTUATOR | 250 MEDIA OUT | TRUE | ACTUATOR | 250 MEDIA OUT | X654 | | 1 | | | | | |
| DRAWER | 200 SPECIAL MED | TRUE | DRAWER | 200 SPECIAL MED | X654 | | 1 | | | | | |
| DRAWER | 200 SPECIAL MED | TRUE | DRAWER | 200 SPECIAL MED | X654 | | 1 | | | | | |
| DRAWER | 200 SPECIAL MED | TRUE | DRAWER | 200 SPECIAL MED | | | 1 | | | | | |
| DRAWER | 200 SPECIAL MED | TRUE | DRAWER | 200 SPECIAL MED | | | 1 | | | | | |

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A3681

## Appendix 5 - ███ Quality Assurance Plan & Requirements

Click on below Icon



F:\Lexmark\OEM
Purchase Agree██

**Quality Assurance Plan & Requirements**

## Purpose

To establish the quality requirements with respect to the Products manufactured by Lexmark for ███

## Definitions

Agreement - The OEM Agreement executed by the parties

Category 'A' Problem - Any field problem resulting in

- Actual or potential safety hazard.
- Inability to use the product as intended as the result of Lexmark quality issues for which there is no workaround solution available
- Epidemic Failure as defined in <mark>Section 12.5</mark> of the Agreement.

Category 'B' Problem - Any field problem occurring more than one time which requires a fix, that at the time of reporting, has not impacted ███ business or resulted in excessive field warranty failure and for which a "workaround" provides ability to use the product. A single occurrence of any such problem shall not be considered a Category "B" Problem

Category 'C' Problem - Any low level field failure.

Manufacturing Lot - A variant of a model which is manufactured as a batch.

Epidemic Failure - Lexmark's actions and remedies for any Epidemic Failure shall be as defined in Section 12.5 of the Agreement.

Major Design Change – Any change affecting functionality, method of operation, safety, quality, reliability, service and maintenance, regulatory compliance, interchangeability of Spares, user documentation, consumables, packaging, or appearance.

Other Design Change – Any change that does not affect the above noted items

## Lexmark Responsibility

Ensure that all Product supplied to ███ are in full compliance with the Specifications and Regulatory Requirements as indicated in Appendix 3 of the Agreement. Prior to the start of production Lexmark shall:

- Provide a copy of their test reports pertaining to all Regulatory Requirements contained in the Agreement.
- Demonstrate the continuous compliance with such Regulatory Requirements.
- Provide a copy of certifications of any other approval marks placed on the Products.

## Product Configuration

Prior to the start of production of Products, Lexmark shall provide a "Configuration Specification", indicating the part number, drawing, and a sample for the following:

- All labels placed on the Products including Regulatory Markings.
- All consumable and accessories to be shipped with the Products.
- All documentation to be shipped with the Products.
- All markings to be placed on the unitary boxes and shipping pallets for Products.

## Outgoing Inspection

Pursuant to <mark>Section 11.4</mark> of the Agreement, prior to shipment of any Products, Lexmark shall conduct an Outgoing Inspection, in accordance with JISZ9015-1,Table S-3 Single Sampling Plans For Reduced Inspection, for An AQL of ███ Exhibit 1 of this document indicates the Product Inspection Guide to be observed by Lexmark in conducting the Outgoing Inspection. One (1) uncovered defect in a lot shall be cause for inspection of the entire lot. Upon completion of Lexmark's inspection process, Lexmark shall, within two days, submit the results for the first two contemplated shipments to ███'s Quality Assurance Department by means of

**Quality Assurance Plan & Requirements**

completing and sending a Quality Check (QC) Report via email. Lexmark shall not ship these Products until ███ Quality Assurance Department provides formal approval of the QC Report to Lexmark via e-mail within two working days. From the third shipment and beyond, Lexmark shall submit the QC Report via mail to ███ Quality Assurance Department within 5 working days. From the third shipment and beyond, Lexmark can ship the Products without formal approval of the QC Report by ███ Quality Assurance Department.

### Source Inspection

Pursuant to Section 11.3 of the Agreement, ███ reserves the right to conduct a Source Inspection of the Products. Accordingly, Lexmark shall advise ███ of their planned production schedule on a monthly basis. Prior to any Source Inspection ███ shall notify Lexmark in writing of the proposed inspection date(s). Lexmark shall then provide ███ with adequate support to allow completion of such inspection in a timely manner.

### Corrective Action

When a problem has been identified during an Outgoing Inspection or Source Inspection that results in rejection of a Product lot, Lexmark shall:

- rework the entire lot prior to shipment.
- as necessary, analyze the possible impact of such problem on previously shipped lots and notify ███ of any required action to be implemented.
- within ten (10) working days, submit a corrective action plan to ███ aimed at preventing recurrence of the problem.

### Incoming Inspection

███ reserves the right to conduct an Incoming Inspection of a Products in accordance with JISZ9015-1, Table S-3 Single Sampling Plans For Reduced Inspection, for An AQL of ███ A Product lot will be accepted based on zero defects uncovered or rejected based on one (1) defect uncovered.

### Manufacturing Audit

███ reserves the right to audit Lexmark's manufacturing facility in accordance with internationally recognized Quality Management System BS EN ISO 9002. Any problems uncovered in such audit shall be addressed by Lexmark within a mutually agreed time period.

### Stop Shipment & Release

Upon identification of a major problem by ███ Lexmark shall be notified in writing to stop shipment of all Products. Upon receipt of such notification, Lexmark shall inform ███ of an effective fix to be implemented in:
- all Products in transit, in the field (at customer sites), or at ███ warehouses.
- all Products held at Lexmark's warehouse for shipment to ███

Upon implementation and verification of the fix, ███ shall notify Lexmark in writing to resume shipment of Products.

### Field Quality Problem Reporting and Fixes

███ shall inform Lexmark of all field quality problems trends (recurring problems in greater frequency than expected). Upon receipt of such formal notification, Lexmark shall:

- For all category 'A' problems, acknowledge the receipt of problem details within 2 working days. Thereafter Lexmark shall endeavor to investigate, identify and implement an effective corrective action within 2 working weeks.

- For all category 'B' problems, acknowledge the receipt of problem details within 2 working days. Thereafter Lexmark shall endeavor to investigate, identify and implement an effective corrective action within 4 working weeks.

- For all category 'C' problems, acknowledge the receipt of problem details within 2 working days. Thereafter Lexmark shall endeavor to investigate, identify and implement an effective corrective action within 8 working weeks.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3684

**Quality Assurance Plan & Requirements**

- For any of the above problems, Lexmark shall at its own expense determine and establish the root cause. Upon identification and implementation of a corrective action, Lexmark shall provide ███ with the following information:

    Full details of Fix, and where applicable the appropriate drawings and change notification.

    Cut in serial number from which the corrective action will be effective.

    As applicable, full details of a fix that can easily be employed on Products currently at customer sites or held in stock.

### Technical Change Control Management Process (for implementation of any Product changes as requested by Lexmark or by ███

Process Summary:

- Product change request initiated by Lexmark or ███
- Lexmark registers the request
- Lexmark coordinates the request between its Design Engineering/Manufacturing and ███
- Lexmark issues a Technical Change Notice (TCN)
- ███ notifies Lexmark if the Product change is approved
- Lexmark implements the Product change and provides ███ with factory cut-in and other relevant information regarding the Product change

Required Notice & Approval

For Major Design Changes, Lexmark will:

    1. Issue an Engineering Change Request (ECR) to ███ describing the change and expected implementation date.
    2. Implement the change upon receiving approval from ███
    3. Provide ███ with information on all Products and Options receiving the change. Such information to include (i) cut in serial numbers for Products and for Options that bear a serial number, (ii) service documents that will be affected by the change, and (iii) compatibility between new and old parts affected by the change.

    Lexdmark  shall prepare the ECR, including expected timing for implementing the change, and send it to ███ by e-mail. ███ shall indicate its approval or disapproval of the ECR via email to Lexmark within 30 days after receiving the ECR. If ███ does not indicate its approval or disapproval within 30 days, the ECR shall be deemed to be approved by ███

For Other Design Changes, Lexmark will:

    1. Notify ███ of the change and expected implementation date via a TCN.
    2. Implement the change without approval from ███
    3. Provide ███ with information on all Products and Options receiving the change.

### Quality Review Meeting

As necessary a Quality Review Meeting shall be conducted by the parties as necessary to discuss the effectiveness of this Quality Assurance Plan.

### Quality Plan Amendment

The parties shall mutually agree to any changes to this Quality Assurance Plan.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY

Quality Assurance Plan & Requirements

# EXHIBIT 1 - PRODUCT INSPECTION GUIDE

|  | Description | Defect |
|---|---|---|
| **A** | **Packaging** | |
| A.1 | Power Cord | Incorrect or missing |
| A.2 | | |
| A.3 | Manual | Incorrect or missing |
| A.4 | Other Accessories | Incorrect or missing |
| A.5 | Unitary box and cushions | Incorrect, torn or Damaged. |
| A.6 | Unitary label | Incorrect or missing |
| A.7 | Serial number on product and unitary box. | Not Matching |
| **B** | **Appearance** | |
| B.1 | Burrs | More Than 3 not effecting safety |
| B.2 | Scratches | More than 10 mm long and 0.5 mm width/depth |
| B.3 | Cover fit | Gap at each side greater than 0.5 mm. |
| B.4 | Labels | Incorrect or missing |
| B.5 | Safety/ Mandatory markings | Incorrect or missing |
| B.6 | Function sheet/ operation panel | Incorrect or missing |
| B.7 | Colour | Incorrect / mismatch |
| B.8 | Cleanliness ( internal/external ) | |
| **C** | **Mechanical** | |
| C.1 | Assemblies Covers open smoothly | Can't open |
| C.2 | Button's, keys, APF/ ADF guides | Can't operate, missing,  wrong |
| C.3 | Sensor levers | Not functional |
| C.4 | Rollers | Not functional |
| C.5 | Feet | Missing |
| C.6 | DIP Switch | Incorrect setting |
| **D** | **Electrical / Functional** | |
| D.1 | Menu and Default setting/ Prints | Incorrect |
| D.2 | LED's & Alarm | Not functional or bad alignment |
| D.3 | | |
| D.4 | ADF Feed and APF Feed | Not functional |
| D.5 | | |
| D.6 | ROM Version | Incorrect |

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3686

## Appendix 6 – Confidential Information Exchange Agreement

Click on below Icon



F:\Lexmark\OEM
Purchase Agree\CEA

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3687



Lexmark International, Inc.
740 West New Circle Road
Lexington, KY 40550
USA

12/1/08



## CONFIDENTIAL EXCHANGE AGREEMENT #5737

Lexmark International, Inc. (Lexmark) and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ wish to enter into an agreement which will permit each to disclose to the other, during the term of this Agreement, information, some of which may be considered confidential, regarding Lexmark's and ▮▮▮▮ products, technology and business information. The Parties are exchanging each other's Confidential Information to discuss the possibility of entering into a business transaction or relationship (Purpose).

This Agreement sets forth the terms and conditions under which such information, including that information considered to be confidential, will be disclosed.

1.      Information disclosed by the disclosing party ("Discloser") will be considered Confidential Information by the receiving party ("Recipient"), only if such information is conspicuously identified as "Confidential": (i) in writing, if communicated in writing, or (ii) confirmed in writing within thirty (30) days of disclosure if disclosed orally or visually.  Recipient agrees to use reasonable care, but in no event less than the same degree of care that it uses to protect its own confidential and proprietary information of similar importance, to prevent the unauthorized disclosure, publication or dissemination of Confidential Information.

2.      Recipient's duty to protect Discloser's Confidential Information expires five (5) years from the date of disclosure of the Confidential Information.

3.      Recipient will (i) only disclose Confidential Information to those of its employees, officers, directors, consultants, agents, and contractors who are required to have the Confidential Information in connection with the Purpose, and (ii) not decompile, disassemble, decode, reproduce, redesign, or reverse engineer Confidential Information or any part thereof. Except with respect to rights under valid patents and copyrights, Recipient shall be free to use any such Confidential Information provided by Discloser subject only to the obligation not to disclose, publish or disseminate such Confidential Information during the foregoing specified period of confidentiality.

CONFIDENTIAL - OUTSIDE COUNSEL ONLA3688

Page 2
CEA# 5737

4.    Disclosure of such Confidential Information shall not be precluded if such disclosure is:

   (a) in response to a valid order of a court or other governmental body of the United States or any political subdivision thereof; provided, however, that the disclosing party shall first have given notice to the other party and made a reasonable effort to obtain a protective order requiring that the Information and/or documents so disclosed be used only for the purposes for which the order was issued; or
   (b) otherwise required by law.

5.    Notwithstanding any other provisions of this Agreement, the obligations specified in Paragraph 1 above will not apply to any Information that:

   (a) is already in the possession of Recipient or any of its Subsidiaries without obligation of confidence;
   (b) is independently developed by Recipient or any of its Subsidiaries;
   (c) is or becomes publicly available without breach of this Agreement;
   (d) is rightfully received by Recipient from a third party having a right to disclose the Confidential Information; or
   (e) is released for disclosure by Discloser with its written consent; or
   (f) is inherently disclosed in the use, lease, sale or other distribution of, or publicly available supporting documentation for, any present or future product or service by or for Recipient or any of its Subsidiaries.

6.    "Subsidiary" shall mean a corporation, company, or other entity (i) where more than fifty percent (50%) of its outstanding shares or securities (representing the right to vote for the election of directors or other managing authority) are now or hereafter, owned or controlled, directly or indirectly, by a party; or (ii) which does not have outstanding shares or securities, as may be the case in a partnership, joint venture or unincorporated association, but more than fifty percent (50%) of those ownership interest (representing the right to make the decisions for such corporation, company or other entity) are now or hereafter, owned or controlled, directly or indirectly, by a party. Such corporation, company or other entity shall be deemed to be a Subsidiary only so long as such ownership or control by a party exists.

7.    No license or immunity is granted by this Agreement by either party to the other, either directly or by implication, estoppel, or otherwise, under any patents or copyrights. None of the information which may be disclosed shall constitute any representation, warranty, assurance or guarantee, by either party to the other with respect to the infringement of patents, copyrights or other rights of others.

8.    Each party agrees to comply, and do all things necessary for the other party to comply, with all applicable Federal, State and local laws, regulations and ordinances, including but not limited to the Regulations of the United States Department of Commerce relating to the Export of Technical Data, insofar as they relate to the activities to be performed under this Agreement. Each party assures the other that it and any of its agents or employees will not re-export to, provide to or discuss with others any Confidential Information, specifications, drawings, data or any product of such data contrary to United States Government Export regulations or re-export to any country specified as a prohibited destination in the Regulations of the United States Department of Commerce relating to the export of Technical Data, without first obtaining U.S. Government approval, by application through Lexmark (in the case of Lexmark Confidential Information) or by application through ▓▓▓ in the case of ▓▓▓ Confidential Information).  .

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A3689

Page 3
CEA# 5737

9.      This Agreement will terminate three (3) year(s) from the date accepted and agreed to below.

10.     This Agreement shall be construed in accordance with the law of the State of Delaware exclusive of its conflict of laws provisions. In the event that any term of this Agreement is found to be unenforceable or rendered void by a court of competent jurisdiction or other governmental body having appropriate jurisdiction, the remaining terms of this Agreement shall continue in effect.

**Agreed To:**

Lexmark International, Inc

By: _____
        Gary Kiesler

Title: VP Supply Base Management

Date: _Dec 2, 2008_

Date: _12/2/08_

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3690

## Appendix 7 – Bid Request Form

Click on below Icon

F:\Lexmark\OEM
Purchase Agree\LXK



**LEXMARK**™

## ████ Bid Support Request / Requirements

Date of Request:     XX/XX/XXXX

**Field / Customer Data**

| 1 | | |
|---|---|---|
| | Group / Division: | |
| | Bid Submission By: | |
| | Email Address: | |
| | Phone Number: | |
| | End Customer Industry: | |
| | End Customer Location: | |
| | Customer Name (optional): | |
| | Please indicate if this is a New or Existing ████ Customer: | |
| | If Existing Customer, also indicate if new for this/these product(s): | |

**Product Data**

| 2 | | Equipment/Options/Supplies | Quantity | Est. AMPV |
|---|---|---|---|---|
| | Product(s) for Bid: | 1. | | |
| | | 2. | | |
| | | 3. | | |
| | | 4. | | |
| | Option(s) for Bid: | 1. | | |
| | | 2. | | |
| | | 3. | | |
| | | 4. | | |
| | Supplies for Bid: | 1. | | |
| | | 2. | | |
| | | 3. | | |
| | | 4. | | |

**Application Data**

| 3 | | |
|---|---|---|
| | Customer Job Applications: | |
| | Unique Customer / Job Requirements: | |

**Anticipated Sale Type**

| 4 | | |
|---|---|---|
| | Method of Sale to End User Account (e.g., purchase, lease, MPS, etc.): | |
| | Please comment on any supplies loyalty plans or risks: | |

Lexmark and ████ Confidential




## ████Bid Support Request / Requirements

### Competitive Data

5

| | |
|---|---|
| Known competition (brand(s)/model(s): | |
| If known, expected competitive pricing: | |
| What existing brand/models are used for this application now: | |

### Other Bid Information

6

| | |
|---|---|
| Value Proposition: | |
| Total Bid only or by Product: | |
| Bid Decision Date: | |
| Bid WIN Confidence %: | |
| What will it take to win?: | |
| Additional Customer Opportunity: | |
| Interim Feedback / Updates | |

7

| Bid Proposal: | Equipment | Options | Supplies |
|---|---|---|---|
| Proposed Bid Pricing: (% off list) | | | |
| Requested Supplier Bid Support: | | | |

8  ### Delivery Information / Roll-Out

| | |
|---|---|
| Delivery Agent: | |
| First Delivery Date & Qty: | |
| On-Going Delivery Schedule: | |

Lexmark and ████ Confidential



**LEXMARK**

███ **Bid Support Request / Requirements**

**9    Lexmark response to Bid Support Request** (To Be Completed by Lexmark)

| | |
|---|---|
| Bid ID: | |
| Date Responded: | |
| Lexmark Offer: | |
| Offer Expiration Date: | |

**10    Bid Acceptance** (To Be Completed By Customer after Final Decision is Made)

By copy of this document, I verify that our company has won the bid.

Approved by:                    Date:

Reason for Win/Loss (Customer Input):

**Important Note for customer:  Upon accepting the Lexmark offer, please complete Section 10 and email this form back to your Lexmark Account Business Manager to ensure proper credit issuance and accounting.**

**11    Credit Memo Information (if bid won):** (To Be Completed By Lexmark when Customer provides verification of sales/installs for this bid )

| | |
|---|---|
| Credit Issue Amount: | |
| Credit Issue Date: | |
| Credit Note Number: | |
| Credit Issued to Whom: | |

**12    Shipment Information**
(To Be Completed By Lexmark Account Business Manager – Referenced by Accounting)

| Ship Date | PO # | Part # | Quantity | Status |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

 

 **Bid Support Request / Requirements**

## HOW TO FILL OUT THIS FORM

**(This document serves as an important accounting record for Lexmark auditors.)**

Process:
- ❖ Customer fills out Sections 1 through 8 for requesting Lexmark bid support.
- ❖ Upon review, Lexmark ABM mails the formal bid proposal letter to customer. Lexmark ABM records the date of response and expiration in Section 9.
- ❖ Customer completes Section 10 and emails the form back to ABM upon winning a business and accepting Lexmark bid proposal.
- ❖ Lexmark ABM completes Sections 11 & 12. (This information is particularly important for Accounting.)

### *Bid Support Request Definitions*

1. Field / Customer Data
   - Customer Group / Division – name of internal group/department responsible for bid
   - Bid Submission by – Responsible sales person's name, email and phone number
   - End Customer Information – Industry and Location (name is optional)
   - Is the Bid account an existing customer or customer is a new supplier to this account?
2. Products, Options and Supplies included in the Bid, quantity of each and "Average Monthly Print Volume" (AMPV) estimate for the printers.
3. Customer Job Applications
   - What print job application will be the primary use for the printer? In particular please note if any are high coverage that would accelerate aftermarket supplies sales.
   - Are there any unique customer or job application requirements?
4. Anticipated Sale Type: How is the customer paying for the products?
5. Competitive Data: What you know about current equipment and installed for this requirement, and what other brands/models/pricing you expect to be competing with for this bid.
6. Other Bid Information
   - Value Proposition: Key element(s) for customer in Bid proposal. e.g.: TCO (Total Cost of Ownership), Cost per Print, Cost of Service, Price Quote, etc.
   - Total Bid or by Product – Is this an "all or nothing" bid or by individual product?
   - Bid Decision Date(s) – i.e.: 1st round, 2nd round, final decision date
   - Bid Competition – Who else is bidding for this business?
   - Bid WIN Confidence % - How confident are you in the ability to win the bid?
   - What will it take to win? – Your best estimate on what is needed to <u>win</u> the bid.
   - Additional customer opportunity – Total sales opportunity over the life of the Bid products
   - Interim Feedback / Updates – Results of each round of bidding, changes to the bid, competition updates, etc.
7. Proposed Bid Pricing for Equipment, Options and Supplies
8. Delivery Information
   - Delivery Agent – i.e.: Channel, Distributor, Direct, Resale.
   - First Delivery Date & Qty – Date customer requires first delivery of bid products
   - On-Going Delivery Schedule – remaining timeframe for delivery, after initial shipment
9. Lexmark response to Bid Support Request (To be completed by Lexmark)
10. Bid Acceptance (To be completed by customer upon accepting Lexmark's offer).
    - Customers electronically sign and date the acceptance.
    - Reason(s) for Win/Loss – explanation for why ▮▮▮ won, or lost, the bid with Lexmark products
11. Credit Memo Information (To be completed by Lexmark upon bid won)
12. Shipment Information (To be completed by Lexmark upon bid won)

Lexmark and ▮▮▮ Confidential

## Appendix 8 – NRE Charge & Payment Schedule

|  | NRE Amount | Payment Date |
|---|---|---|
| Initial Payment | | Apr. 20, 2010 |
| 2nd Payment | | Jun. 1, 2010 |
| 3rd Payment | | Jul. 15, 2010 |
| 4th Payment | | Sep. 1, 2010 |
| Total | | |

The above NRE charge is for development and customizations for Products in accordance with the Specifications. A summary of this NRE Charge is as follows.

| | | |
|---|---|---|
| | | Lexmark Project Management |
| | | Software development and testing |
| | | Microsoft Certification  (all Product models on one CD) |
| | | Safety testing and certifications for North America |
| | | Safety testing and certifications for Latin America |
| | | Homologation testing and certifications for Latin America |
| | | Environ/Energy testing and certifications for North America |
| | | Tooling Clichés for X651de Product model |
| | | Tooling Clichés for X654de Product model |
| | | Tooling Clichés for X658dfe Product model |
| | | Tooling Clichés for X658me Product model |
| | | Total |

 Lexmark – OEM Purchase Agreement

**Appendix 9 - Software Distribution License Agreement**

Click on below icon:



D:\Documents and
Settings\jbryan\My D

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3697

## LEXMARK PRINTER/AIO DRIVER SOFTWARE DISTRIBUTION LICENSE

| Licensee: | | Attn: | |
|---|---|---|---|
| Address: | | Telephone: | **856-222-8292** |

In consideration of the mutual promises and undertakings set forth herein, Lexmark International, Inc. and its subsidiaries ("Lexmark") agree to grant to Licensee and Licensee accepts a license to the Licensed Software listed below on the terms and conditions specified in this Software Distribution License ("Agreement").

| Licensed Software | | | | | |
|---|---|---|---|---|---|
| Title | Version / Part No. | Format | License Fee | Authorized Number of Copies | Bundled Distribution |
| **Print and Scan driver software; install software, including web packages; communications software, such as wireless software; and applications software, such as Lexmark's web browser and Lexmark's Device Center, all as provided by Lexmark to Licensee for redistribution** | **Original and all subsequent versions delivered to Licensee** | **Executable Formats only** | **None** | **Unlimited** | **No unless otherwise indicated by Lexmark at time of delivery** |
| **Software Documentation, User Guides, white pages, help files, KnowledgeBase Articles** | **Original and all subsequent versions delivered to Licensee** | **txt, doc., or pdf** | **None** | **Unlimited** | **No unless otherwise indicated by Lexmark at time of delivery** |

| Licensee Modifiable Materials | | |
|---|---|---|
| Title | Version / Part No. | Format |
| **None** | **N/A** | **N/A** |

| Modified Materials for Licensee Distribution | | | | | |
|---|---|---|---|---|---|
| Title | Version / Part No. | Format | License Fee | Authorized Number of Copies | Bundled Distribution |
| **None** | **N/A** | **N/A** | **N/A** | **N/A** | **N/A** |

### 1. DEFINITIONS

**1.1** "Licensed Software" means the above identified Licensed Software of the specified version and format, including error corrections, updates, and end user documentation, in any medium, such as magnetic tape, electronic download, disks, CDs or optical media which is provided to Licensee by Lexmark. Licensed Software designated as Bundled Distribution in the Licensed Software table is subject to additional restrictions on distribution.

**1.2** "Licensee Modifiable Materials" means software files or documentation including pictures, graphics and text files identified above in the specified version and format, including any software tools, installation software, any error corrections and updates, in any medium, such as magnetic tape, electronic download, disks, CDs or optical media which is or may be provided to Licensee by Lexmark at Lexmark's option.

**1.3** "Modified Materials" means derivative works or materials created by or for Licensee that are derived from, based upon or incorporate any portion of the Licensee Modifiable Materials licensed under this Agreement. Modified Materials for distribution by Licensee in executable format are designated in the Modified Materials for Licensee Distribution table above and if designated as Bundled Distribution are subject to additional restrictions on distribution.

**1.4** "Bundled Distribution" means the Licensed Software or Modified Materials which must be distributed and used only in combination with the Applicable Equipment.

**1.5** "Applicable Equipment" means Lexmark the ▮▮▮▮▮▮ printer/multifunction devices purchased from Lexmark which incorporates the customized Lexmark printer/multifunction device software.

**1.6** "Licensed Territory" means the countries listed in Appendix 2, ▮▮▮▮ Territory, of the OEM Purchase Agreement ("OEM Purchase Agreement") signed by the parties and which incorporates by reference this Agreement.

**1.7** "Effective Date" means August 30, 2010.

### 2. LICENSE GRANT

**2.1** Notwithstanding anything to the contrary in this Agreement, for any pre-release, beta or test version of Licensed Software and for Licensee Modifiable Material that is designated as a source code, pre-release, beta or test version, Lexmark grants to Licensee a personal, nonexclusive, non-transferable license to load such source code, pre-release, beta or test version of the Licensed Software and Licensee Modifiable Materials on its internal computer system(s) for electronic copying for internal use only and with respect to Licensee Modifiable Materials for developing Modified Materials in source code form for use only for internal

**LEXMARK CONFIDENTIAL**
v.8.26.10

1

purposes. Licensee shall have no right or license to copy and distribute to any third party or to license any end user: (i) source code, pre-release, beta or test versions of Licensed Software, (ii) source code, pre-release, beta or test versions of Licensee Modifiable Materials; and (iii) source code for Modified Materials.

**2.2** Subject to the Licensee's obligations under this Agreement, Lexmark grants to Licensee a personal, nonexclusive, non-transferable license in the Licensed Territory to: (i) load the Licensed Software or Modified Materials not designated as Bundled Distribution in executable format on Licensee's internal computer system(s) for copying and distribution through Licensee's channels of distribution as preinstalled in the Applicable Equipment, as preinstalled in systems including the Applicable Equipment, on physical media provided with the Applicable Equipment or systems incorporating Applicable Equipment or by electronic distribution to its end users for use only with the Applicable Equipment; and (ii) load the Licensed Software or Modified Materials designated as Bundled Distribution in executable format on Licensee's internal computer system(s) for copying and distribution through Licensee's channels of distribution for bundled distribution and use only with the Applicable Equipment including preinstalled on the Applicable Equipment, preinstalled on systems incorporating the Applicable Equipment, or on physical media provided in the package with the Applicable Equipment or systems incorporating Applicable Equipment. Licensed Software or Modified Materials designated as Bundled Distribution shall not be distributed to end users by any electronic distribution method, such as from a website via the internet or on any media that is not distributed in the packaging with the Applicable Equipment or systems incorporating the Applicable Equipment. This license allows Licensee to make the maximum number of copies of the Licensed Software or Modified Materials specified in the above tables. Reproduction, distribution and use of the Licensed Software and Modified Materials outside of the Licensed Territory is prohibited.

**2.3** Licensee shall sublicense the Licensed Software and Modified Materials in executable format only to end users under Licensee's standard clickwrap or shrinkwrap end user software licensing agreement. Licensee's end user software licensing agreements shall be in the name of Licensee and provide at least the same rights and protections as those provided in this Agreement. End users may assign their end user software licensing agreement to any bona fide successor in interest who first agrees in writing to be bound by the terms of their end user software licensing agreement. Lexmark and any third party beneficiaries of this Agreement shall be third party beneficiaries in any such agreements. Licensee shall provide a statement in its end user software licensing agreement stating "Licensee's suppliers are intended to be a third party beneficiary of this License Agreement."

**2.4** Notwithstanding the terms and conditions of this Agreement, all or any portion of the Licensed Software, Licensee Modifiable Materials or Modified Materials that constitutes software provided under public license by third parties ("Freeware") is licensed to Licensee subject to the terms and conditions of the software license agreement accompanying such Freeware, whether in the form of a discrete agreement, shrink-wrap license, electronic license terms at the time of download or the master CD given at the time of delivery of the Licensed Software or Licensee Modifiable Materials. Use and distribution of the Freeware by Licensee shall be governed entirely by the terms and conditions of such license.

**2.5** Should Licensee install the Licensed Software or Modified Materials in executable formats using a single click installation process, the install screen shall contain the following elements: (i)

an on-screen statement stating substantially as follows: "Click Install to install all software and documentation, and accept the End User License Agreement; (ii) a click-on link to enable the end user to view the End User License Agreement prior to beginning installation; (iii) a click-on link to enable installation of the Licensed Software or Modified Materials and optionally provide a click-on link to indicate acceptance of the terms of the End User License Agreement when the software has been preinstalled; and (iv) a click-on link allowing the end user to cease installation or uninstall the Licensed Software or Modified Materials if the end user does not agree to accept the terms of the end user license agreement.

**2.6** Licensee agrees not to reverse engineer or decompile any of the Licensed Software that is not in source code format or assist or otherwise facilitate others to do so, except as and only to the extent expressly permitted to do so by applicable law for the purposes of inter-operability, error correction, and security testing. If Licensee has such statutory rights, Licensee will notify Lexmark in writing of any intended reverse engineering or reverse compilation. Although it is not obligated to do so, in the event Lexmark provides any error corrections or updates to the Licensed Software or Licensee Modifiable Materials, Licensee agrees to install such error corrections or updates and to provide the same to its end users.

**2.7** If Licensee translates or makes any modification to the Licensed Software or Licensee Modifiable Materials, Licensee agrees to indemnify, defend and hold Lexmark harmless from any errors or omissions due to such modifications and/or translations, and for any damages claims, causes of action and expenses (including attorneys' fees) arising from or related directly or indirectly to such modifications or translations.

**2.8** Licensee shall indemnify, defend and hold Lexmark harmless against all claims, causes of action, costs (including attorney's fees) and damages incurred because of (i) Licensee's failure to provide an end user license agreement to its End Users in compliance with Section 2.3 of this Agreement; or (ii) the terms and conditions contained in Licensee's end user software licensing agreement.

**2.9** All copyrights in the Licensed Software and Modified Materials, exclusive of original contributions of Licensee to the Modified Materials, and Licensee Modifiable Materials are and shall remain the exclusive property of Lexmark and its suppliers. No license other than that specifically stated herein is granted to Licensee, or any right under any patent, trademark, copyright, trade secret or other intellectual property of Lexmark other than that expressly granted by this Agreement. Licensee agrees to notify its employees that Lexmark and its suppliers are the copyright holders of the Licensed Software, Licensee Modifiable Materials.

**2.10** Licensee understands and agrees that its use of Lexmark's trademarks, trade name and logos does not create any right, title or interest, in or to the use of such trademark, trade name or logo and that all such use and goodwill associated with the trademarks, trade name or logo will inure to the benefit of Lexmark. Licensee further agrees that no right, title or interest in and to any trademarks, trade names or logos of Lexmark's suppliers is granted hereunder.

**2.11** Licensee shall not remove any copyright or other proprietary notices of Lexmark or third parties found in or on the Licensed Software or Licensee Modifiable Materials.

**2.12** Licensee shall not (a) acquire, ship, transfer, or reexport, directly or indirectly, the Licensed Software, Licensee Modifiable Materials, or Modified Materials or any direct product there from, in violation of any applicable export laws or (b) permit the

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3699

Licensed Software, Licensee Modifiable Materials, or Modified Materials to be used for any purpose prohibited by such export laws, including, without limitation, nuclear, chemical, or biological weapons proliferation.

## 3.  ADDITIONAL LICENSED SOFTWARE

Lexmark may from time to time provide additional Licensed Software and/or Licensee Modifiable Materials to Licensee under this Agreement.  Licensee agrees that any use of such additional Licensed Software or Licensee Modifiable Materials or the accessing of Lexmark's server and downloading of any additional Licensed Software or Licensee Modifiable Materials from Lexmark's server shall constitute Licensee acceptance of the terms of this Agreement with respect to such additional Licensed Software and Licensee Modifiable Materials used or downloaded by Licensee and any Modified Materials derived from such additional Licensee Modifiable Materials.

## 4.  FEEDBACK

Licensee may, at its sole option, give Lexmark suggestions, comments or other feedback relating to the Licensed Software ("Feedback").  However, Licensee agrees that: (i) Lexmark may freely use, disclose, reproduce, license, distribute and otherwise commercialize the Feedback in any Lexmark product, technology, service, specification or other documentation offered, manufactured, sold or distributed by Lexmark ("Offering"); (ii) Licensee also grants third parties, without charge, only those patent rights necessary to enable their products, technologies or services to use or interface with any specific parts of a Lexmark product, technology or service that incorporates the Feedback; and (iii) Licensee will not give Lexmark Feedback that is subject to license terms that seek to require any Offering incorporating or derived from such Feedback, or other Lexmark intellectual property, to be licensed to or otherwise shared with a third party.

## 5.  PROTECTION AND SECURITY

**5.1** For Licensed Software designated as a source code, pre-release, beta or test version and for any Licensee Modifiable Materials, Licensee represents that its employees having access to such source code, pre-release, beta or test version of Licensed Software or Licensee Modifiable Materials are or shall be party to written agreements acknowledging a duty to protect any of Lexmark's confidential materials contained in the source code, pre-released, beta and test version of Licensed Software and Licensee Modifiable Materials.

**5.2** Licensee shall keep electronic copies of source code, pre-release, beta or test version of Licensed Software and Modified Materials as well as Licensee Modifiable Materials (including archival copies, if any), in a secure environment and shall take all steps reasonably necessary to protect electronic copies of the source code, pre-release, beta and test versions of Licensed Software and Modified Materials, Licensee Modifiable Materials, or any part thereof from unauthorized release or modification.

**5.3** Licensee agrees that the terms and conditions of this Agreement are confidential, and Licensee shall not disclose the contents of this Agreement without the prior written consent of Lexmark. Except as specifically enumerated in Section 5.4 below, all Lexmark Confidential Information disclosed in conjunction with this Agreement shall be held in confidence in accordance with the terms of Lexmark Confidential Exchange Agreement ("CEA") No. 5737, a copy of which is attached to this Agreement as Exhibit "A".  Notwithstanding anything to the contrary contained in the CEA, its terms and conditions shall remain in full force and effect

for purposes of this Agreement with respect to disclosures of Lexmark Confidential Information related to this Agreement made throughout the entire term of this Agreement, as if it were set out fully herein.

**5.4** All Licensed Software that is designated as pre-release, beta or test version, shall be (1) considered Confidential Information, regardless of whether they are so marked; and (2) held in confidence until publicly released by Lexmark or for a period of twenty years, whichever is shorter.

**5.5** Licensee expressly agrees that a breach of this Agreement will cause irreparable harm to Lexmark and that Lexmark shall have the right to obtain injunctive relief against any unauthorized use, disclosure, copying or transfer of any part of Licensed Software, Modified Materials or Licensee Modifiable Materials.  Licensed Software or Licensee Modifiable Materials may contain software from third parties who are intended to be third party beneficiaries of this Agreement.

## 6.  DISCLAIMER & WARRANTIES

**6.1** Unless otherwise provided in a separate written agreement with Licensee, Lexmark warrants that the Licensed Software and Licensee Modifiable Materials, as provided, shall conform to the specifications of Lexmark.  During the thirty (30) days after the date of delivery of the Licensed Software and Licensee Modifiable Materials, Lexmark shall, in its sole opinion, use reasonable commercial efforts to correct errors detected in the Licensed Software and Licensee Modifiable Materials, as provided, after receiving notification of such errors from Licensee.  In the event that any modifications are made to the Licensed Software which have not been authorized by Lexmark, any and all warranty, indemnification and other obligations of Lexmark shall immediately cease with respect to such software.

**6.2** Unless otherwise provided in a separate written agreement with Licensee, Lexmark is under no obligation to provide Licensee with any modifications, updates, additions or revisions to the Licensed Software and Licensee Modifiable Materials, or to maintain the Licensed Software and Licensee Modifiable Materials in any manner.

**6.3** EXCEPT FOR THE WARRANTIES SET FORTH IN THIS AGREEMENT OR AS OTHERWISE PROVIDED FOR IN A SEPARATE WRITTEN AGREEMENT WITH LICENSEE AND TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, LICENSED SOFTWARE AND LICENSEE MODIFIABLE MATERIALS ARE PROVIDED "AS-IS". LEXMARK MAKES NO WARRANTIES, WHETHER EXPRESS OR IMPLIED, WITH RESPECT TO ANY LICENSED SOFTWARE AND LICENSEE MODIFIABLE MATERIALS PROVIDED UNDER THIS AGREEMENT INCLUDING, BUT NOT LIMITED, TO ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.  LEXMARK DOES NOT WARRANT THAT THE LICENSED SOFTWARE AND LICENSEE MODIFIABLE MATERIALS WILL MEET THE LICENSEE'S REQUIREMENTS, OR THAT THE LICENSED SOFTWARE AND LICENSEE MODIFIABLE MATERIALS WILL BE ERROR-FREE.  LEXMARK MAKES NO WARRANTY OF NONINFRINGEMENT, EXPRESS OR IMPLIED.

**6.4** Lexmark shall defend Licensee and shall pay all costs and damages finally awarded against Licensee or its employees to the extent based upon a claim that Licensed Software or Licensee Modifiable Materials, as supplied, infringes the patent or copyright right of a third party (except claims arising from or related to Lexmark incorporation of features, operations or algorithms at the direction of Licensee), provided that Lexmark is notified promptly in writing of any allegation of such infringement and given full cooperation, information, and authority to settle such claim and to defend or control the defense of any suit based upon such claim.

CONFIDENTIAL - OUTSIDE COUNSEL ONA3700

**6.5** In the event that the Licensed Software or Licensee Modifiable Materials, as supplied, is likely to or does become the subject of a claim of infringement, or is held to infringe, Lexmark shall, at its option and expense, procure for Licensee the right to continue using the Licensed Software or Licensee Modifiable materials; or, modify the Licensed Software or Licensee Modifiable materials to make it non-infringing but functionally equivalent; or, substitute other software of similar capabilities; or, remove the Licensed Software or Licensee Modifiable Materials and refund the licensee fees less depreciation.  This Section 5 sets forth the entire liability of Lexmark to Licensee with respect to infringement.

## 7.  TERM AND TERMINATION

**7.1** This Agreement shall commence on the Effective Date and shall be coterminous with the OEM Purchase Agreement unless sooner terminated in accordance with this Section 7.1. Lexmark may terminate this Agreement or any part thereof on thirty (30) days written notice in the event that, due to termination or expiration of license rights granted by third parties, it ceases to have the right to grant Licensee the license rights set forth in Section 2.  This Agreement may be terminated by Lexmark immediately if Licensee fails to cure its breach of this Agreement within thirty (30) days of receiving from Lexmark written notice of said breach. .

**7.2** If this Agreement is terminated pursuant to Section 7.1 due to Licensee's breach or because Lexmark no longer has the rights necessary to maintain this license, all of Licensee's rights under this Agreement shall terminate in accordance with the terms of Lexmark's termination notice.  Any End User License Agreement referenced in Sections 2.3 and 2.5 entered into between Licensee and an end user shall remain in effect, provided such end users remain in compliance with the terms of their end user software license agreement.

**7.3** In the event that this Agreement expires or is terminated for reasons other than a breach of this Agreement or because Lexmark no longer has the rights necessary to maintain this license, immediately after expiration or termination, Licensee shall have the right to distribute any inventory of the Licensed Software and Modified Materials existing at the time of expiration or termination for a "Work Down Period" of six (6) months and to continue electronic distribution of the Licensed Software or Modified Materials not designated as Bundled Distribution during the Work Down Period.  Licensee's obligations and Lexmark's rights under Section 2 shall continue with respect to all copies made and distribute during the Work Down Period.  At the end of the Work Down Period, Licensee shall cease all distribution of the Licensed Software and Modified Materials, destroy all remaining copies of the Licensed Software and Modified Materials and provide Lexmark with its written certification that it has retained no copies.  Any End User License Agreement referenced in Sections 2.3 and 2.5 entered into between Licensee and an end user shall remain in effect, provided such end users remain in compliance with the terms of their end user software license agreement.

## 8.  MISCELLANEOUS

**8.1** Except for taxes based on Lexmark's income, Lexmark shall not be responsible for any federal, state or local taxes based upon Licensee's purchase, possession, distribution or use of Licensed Software, Licensee Modifiable Materials, or Modified Materials or upon any charges payable hereunder.

**8.2** This Agreement shall be construed and enforced in accordance with the laws of the Commonwealth of Kentucky,

excluding any conflict of laws provisions. The UN Convention on Contracts for the International Sale of Goods shall not apply. Licensee will not export or re-export the Licensed Software and Licensee Modifiable Materials except in compliance with all applicable laws and regulations.

**8.3** This Agreement comprises the full and final understanding between Lexmark and Licensee, and merges and supersedes any and all other agreements except as expressly set forth herein, and any and all other understandings or representations, written or oral, with respect to the subject matter hereof.  It may not be modified except by a writing signed by authorized representatives of both Lexmark and Licensee, and referring specifically to this Agreement.  Any attempt by Licensee to assign this Agreement shall be void.

**8.4** Waiver by any party of the breach of a provision of this Agreement by the other party shall not be construed as a continuing waiver of such provision or waiver of any other breach of any other provision of this Agreement.  All rights and remedies, whether conferred hereby or by any other instrument or by law shall be cumulative, and may be exercised singularly or concurrently.  If any provision of this Agreement is held invalid by any law, rule, order of regulation of any government or by the final determination of any state or federal court, such invalidity shall not affect the enforceability of any other provisions not held to be invalid.

**8.5** Facsimile signatures of the parties shall be considered binding on the parties.

**8.6** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument.

**8.7** Each party acknowledges that it has had the opportunity to review this Agreement with legal counsel of its choice and agrees that in the event that this Agreement or any other documents delivered in connection with the transactions contemplated by this Agreement contain any ambiguity, such ambiguity shall not be construed or interpreted against the drafting party.

IN WITNESS WHEREOF, Lexmark and Licensee have caused this Agreement to be executed by their duly authorized representatives effective as of the above-listed Effective Date.

**LEXMARK INTERNATIONAL, INC.**

By: _____

**Michael D. Bender**

**Director, Device Software Development**

Date: _____ _Sept 10, 2010_ _____

**LICENSEE**

By: _____

Printed
Name: _____

Title: _____

Date: _____

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3701



**LEXMARK**

Lexmark International, Inc.
740 West New Circle Road
Lexington, KY 40550
USA

12/1/08

$E_{XHIBIT}$ A

## CONFIDENTIAL EXCHANGE AGREEMENT #5737

Lexmark International, Inc. (Lexmark) and ████████████████████ wish to enter into an agreement which will permit each to disclose to the other, during the term of this Agreement, information, some of which may be considered confidential, regarding Lexmark's and ████ products, technology and business information. The Parties are exchanging each other's Confidential Information to discuss the possibility of entering into a business transaction or relationship (Purpose).

This Agreement sets forth the terms and conditions under which such information, including that information considered to be confidential, will be disclosed.

1.    Information disclosed by the disclosing party ("Discloser") will be considered Confidential Information by the receiving party ("Recipient"), only if such information is conspicuously identified as "Confidential": (i) in writing, if communicated in writing, or (ii) confirmed in writing within thirty (30) days of disclosure if disclosed orally or visually. Recipient agrees to use reasonable care, but in no event less than the same degree of care that it uses to protect its own confidential and proprietary information of similar importance, to prevent the unauthorized disclosure, publication or dissemination of Confidential Information.

2.    Recipient's duty to protect Discloser's Confidential Information expires five (5) years from the date of disclosure of the Confidential Information.

3.    Recipient will (i) only disclose Confidential Information to those of its employees, officers, directors, consultants, agents, and contractors who are required to have the Confidential Information in connection with the Purpose, and (ii) not decompile, disassemble, decode, reproduce, redesign, or reverse engineer Confidential Information or any part thereof. Except with respect to rights under valid patents and copyrights, Recipient shall be free to use any such Confidential Information provided by Discloser subject only to the obligation not to disclose, publish or disseminate such Confidential Information during the foregoing specified period of confidentiality.

CONFIDENTIAL - OUTSIDE COUNSEL ON A3702

Page 2
CEA# 5737

4.    Disclosure of such Confidential Information shall not be precluded if such disclosure is:

    (a) in response to a valid order of a court or other governmental body of the United States or any political subdivision thereof; provided, however, that the disclosing party shall first have given notice to the other party and made a reasonable effort to obtain a protective order requiring that the Information and/or documents so disclosed be used only for the purposes for which the order was issued; or

    (b) otherwise required by law.

5.    Notwithstanding any other provisions of this Agreement, the obligations specified in Paragraph 1 above will not apply to any Information that:

    (a) is already in the possession of Recipient or any of its Subsidiaries without obligation of confidence;

    (b) is independently developed by Recipient or any of its Subsidiaries;

    (c) is or becomes publicly available without breach of this Agreement;

    (d) is rightfully received by Recipient from a third party having a right to disclose the Confidential Information; or

    (e) is released for disclosure by Discloser with its written consent; or

    (f) is inherently disclosed in the use, lease, sale or other distribution of, or publicly available supporting documentation for, any present or future product or service by or for Recipient or any of its Subsidiaries.

6.    "Subsidiary" shall mean a corporation, company, or other entity (i) where more than fifty percent (50%) of its outstanding shares or securities (representing the right to vote for the election of directors or other managing authority) are now or hereafter, owned or controlled, directly or indirectly, by a party; or (ii) which does not have outstanding shares or securities, as may be the case in a partnership, joint venture or unincorporated association, but more than fifty percent (50%) of those ownership interest (representing the right to make the decisions for such corporation, company or other entity) are now or hereafter, owned or controlled, directly or indirectly, by a party. Such corporation, company or other entity shall be deemed to be a Subsidiary only so long as such ownership or control by a party exists.

7.    No license or immunity is granted by this Agreement by either party to the other, either directly or by implication, estoppel, or otherwise, under any patents or copyrights. None of the information which may be disclosed shall constitute any representation, warranty, assurance or guarantee, by either party to the other with respect to the infringement of patents, copyrights or other rights of others.

8.    Each party agrees to comply, and do all things necessary for the other party to comply, with all applicable Federal, State and local laws, regulations and ordinances, including but not limited to the Regulations of the United States Department of Commerce relating to the Export of Technical Data, insofar as they relate to the activities to be performed under this Agreement. Each party assures the other that it and any of its agents or employees will not re-export to, provide to or discuss with others any Confidential Information, specifications, drawings, data or any product of such data contrary to United States Government Export regulations or re-export to any country specified as a prohibited destination in the Regulations of the United States Department of Commerce relating to the export of Technical Data, without first obtaining U.S. Government approval, by application through Lexmark (in the case of Lexmark Confidential Information) or by application through ▮▮▮▮▮ n the case of ▮▮▮▮▮ Confidential Information).  .

Page 3
CEA# 5737

9.    This Agreement will terminate three (3) year(s) from the date accepted and agreed to below.

10.    This Agreement shall be construed in accordance with the law of the State of Delaware exclusive of its conflict of laws provisions. In the event that any term of this Agreement is found to be unenforceable or rendered void by a court of competent jurisdiction or other governmental body having appropriate jurisdiction, the remaining terms of this Agreement shall continue in effect.

**Agreed To**:

Lexmark International, Inc.

By: _____
        Gary Kiesler

Title: VP Supply Base Management

Date: ___Dec 2, 2004___

CONFIDENTIAL - OUTSIDE COUNSEL ONLY

# OEM CONTRACT 5

<div align="center">

**LEXMARK -** ▮▮▮▮▮▮▮▮

**MASTER PURCHASE AGREEMENT**

</div>

This is an Agreement by and among Lexmark International, Inc. ("LII"), a Delaware corporation having its principal place of business at 740 West New Circle Road, Lexington, KY 40550, USA and Lexmark International Technology, S.A., ("LITSA") a Swiss company and Lexmark's Subsidiary with its principal place of business at ICC-Bloc A, 20, Route de Pre-Bois, Case Postale 508, CH 1215 Geneve 15, Switzerland and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ regarding the sale of the Products from Lexmark to ▮▮▮▮ which ▮▮▮ will integrate into or sell as printing solutions. LII and LITSA are collectively referred to throughout this Agreement as "Lexmark".

1.0   Definitions

As used in this Agreement, the following terms have the meanings specified below:

1.1   "Agreement" means this Master Purchase Agreement ("MPA") and any Schedules and Attachments to it.

1.2   "Effective Date" means October 11, 2011.

1.3   "Default" means a material breach by either party of any portion of this Agreement.

1.4   "PO" means Purchase Order - ▮▮▮▮▮ written instruction to supply the Products.

1.5   "Hardware Products," and/or "Supplies Products" and/or "Service Parts" and/or "Features" and/or "Options" are defined through the Product Descriptions contained in Attachment 1. Additional Products may be added to this Agreement by amending Attachment 1. Existing Products may be modified by Lexmark; and, such modifications shall result in Lexmark issuing a revised Attachment 1.

1.6   "Service Parts" shall mean service parts for maintenance and repair of Products, purchased directly from Lexmark, including parts for preventive maintenance. Used, tear down, remanufactured parts not purchased directly from Lexmark, or third party / clone parts are not considered genuine Service Parts.

1.7   "Products" means Hardware Products, Supplies Products, Features and Options.

Lexmark ▮▮▮ Confidential

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3705

2.0    Term

This Agreement shall commence on the Effective Date and continue for twelve (12) months' provided, however, that in the event that Lexmark and ▮▮▮ agree to renew this Agreement three (3) months prior to the expiration, this Agreement may be renewed for an additional agreed period.

3.0    Territories

3.1    ▮▮▮ shall resell the Products to its subsidiaries, affiliated companies, distributors, dealers or end-users everywhere in the world.

4.0    Forecasts and Purchase Orders

4.1    On a monthly basis, ▮▮▮ agrees to provide a twelve (12) month rolling forecast of the Products requirements, by no sooner than the 15th and no later than the 25th of each month. Forecasted quantities are to be shown by both Lexmark assigned part number and ▮▮▮ part number in the month ▮▮▮ is requesting them to be available for pickup by ▮▮▮ at a Lexmark designated distribution point in Southaven, MS; or in Geel, Belgium or other locations as agreed by the parties. Forecast quantities are to be shown in multiples of the minimum order increments (MOI) as specified in Attachment 2.

4.2    ▮▮▮ agrees to place non-cancelable POs by the 25th of each month with a lead time to availability for delivery to a ▮▮▮ designated location from two (2) to three (3) months (eight (8) to ten (10) calendar weeks) from the date the PO is received at Lexmark (e.g. POs received by the 25th of December must be for Products with delivery dates beginning March 1st or later). Figure 1 depicts this timeline.

| Forecast & Order Lead Time | Lexmark Production Schedule | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Month 1 | Month 2 | Month 3 | M4 | M5 | M6 | M7 | M8 | M9 | M10 | M11 | M12 |
| Monthly 0 Update - 15th - 25th:<br>- M4 thru M12 - Non-binding F/C<br>- Month 3 - Binding F/C<br>- M2 - P.O. (w/Flex on M3 F/C):<br>··· Qty - +/- 34% & Mix - +/- 50%<br>- M1 - Flex +/- 10% on X4 Mix | Prior P.O.<br>Rec'd Last<br>Month | Firm P.O.<br>w/Flex<br>Terms:<br>Qty +/- 34%<br>Mix +/- 50% | Binding<br>Forecast<br>Quantity | | | Non-Binding Forecast<br>for Months 4 thru 12 | | | | | | |

Lexmark / ▮▮▮ Confidential                                    Page 2

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3706

4.3    Lexmark will accept and schedule non-cancelable POs subject to the Products availability, credit approval, and other legitimate business considerations and will inform ▇▇▇ of shipment schedules within seven (7) business days of the PO receipt. Lexmark will also make commercially reasonable and good faith efforts to attempt to fulfill POs with requested lead times that are less than that specified above. The minimum monthly order increments and the minimum SKU order increments are set forth in Attachment 2.

4.4    ▇▇▇ during and after the term of this Agreement, agrees to commit to purchase from Lexmark all of its requirements for the Supplies Products (as well as products essentially equivalent to the Supplies Products including, but not limited to, new cartridges, refilled and/or remanufactured cartridges, and cartridge refilling technology) and the Service Parts. In the event that Lexmark reasonably suspects noncompliance by ▇▇▇ with the obligations of this section Lexmark may request an audit. Upon such request, ▇▇▇ shall make its premises, books, and records available to Lexmark for purposes of an audit to confirm ▇▇▇ compliance with the terms and conditions of this Agreement. In the event this audit reveals instances of noncompliance, ▇▇▇ shall be responsible, in addition to any and all other remedies available to Lexmark at law or in equity, to bear the sole cost and expense of such audit.

4.5.    ▇▇▇ during the first twelve (12) month period of this Agreement, agrees that the total quantity of Hardware Products purchased shall be equal to or greater than ▇▇▇▇▇▇▇ This first twelve (12) month period shall begin upon ▇▇▇ initial receipt of Hardware Products.

4.6    Lexmark shall make commercially reasonable efforts to deliver Products to ▇▇▇ on the agreed delivery date as set forth in the accepted Purchase Order.

In case Lexmark foresees a trouble or any other occurrence that is likely to cause a delay, Lexmark shall promptly notify ▇▇▇ s soon as it becomes known.

If delivery is delayed fourteen (14) days or more, and if the Purchase Order was in full compliance with agreed lead-time and flexibility parameters, and if ▇▇▇

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3707

has a demonstrable insufficient stock situation then Lexmark will, at Lexmark's expense, expedite the delivery of such orders in a commercially reasonable manner.

If delivery is delayed for more than one (1) month, and if the Purchase Order was in full compliance with agreed lead-time and flexibility parameters, then ███ will reserve right to either cancel part of or all of the Purchase Order, or delay the delivery. Quantities cancelled in this manner will not count against the total quantity purchase commitment in Section 4.5, unless ███ can establish that Lexmark's delay in delivering product resulted in the cancellation of an existing purchase order between ███ and its customer.

5.0    Pricing, Payment, and Modifications

5.1    Unless otherwise agreed in an accepted PO, the Product price shall be established on an Ex Works Southaven, MS or Ex Works Geel, Belgium basis as stipulated in Attachment 2 Pricing.  Service Parts prices shall be established on an Ex Works location as listed in Attachment 4 – Service Support Plan.

5.2    Invoices will be provided on the date of shipment. ███ will make payment End of Month 30 Days (Average 45 Days) in US dollars. This means that ███ payment for all invoices dated during any one month will be received by Lexmark via electronic funds transfer prior to the end of the following month. Lexmark reserves the right to withhold shipping if ███ account is delinquent.

5.3    ███ will be responsible for all taxes, including but not limited to sales and use tax, customs and, if applicable, excise duties, turnover or withholding taxes, Value Added Tax, property tax, corporate, state or local income tax associated with the purchase and delivery of Lexmark's products except for those taxes assessed on the income of Lexmark, which shall be Lexmark's responsibility.

███ shall be exclusively responsible for all statutory fees provided for by local Copyright Acts (copyright levies). ███ shall indemnify and hold harmless Lexmark and its affiliates from and against any and all claims for the payment of copyright levies and/or for the disclosure of information made by any third parties

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3708

(including, without limitation, any collection societies) in any country. The foregoing shall apply even, and in particular, if Lexmark or any of its affiliates are liable - or jointly liable with ███████ for copyright levies under the statutes applicable in any country. All prices quoted by Lexmark will not include any tax and/or copyright levies unless otherwise stated by Lexmark.

5.4    In the event Lexmark changes its supplier for the Products and/or components of the Products, or in the event that material changes in Lexmark's agreement(s) with its existing supplier for such necessitate changes to the forecasting or other terms of this Agreement, Lexmark shall notify ███████ of such changes upon reasonable advance notice. In the event ██████ cannot agree to such changes, then the parties acknowledge and agree that Lexmark shall be entitled to terminate this Agreement on 30 days advance written notice.

5.5    ██████ agrees to assume the financial obligations, up to a maximum of ██████ per order, of any of its subsidiary companies that purchase a good, part or service from Lexmark under this or any other agreement between Lexmark and ██████ or its subsidiaries. In the event of nonpayment by any subsidiary, Lexmark shall issue a written notice of nonpayment to the subsidiary entity that incurred the obligation and shall copy ██████ on the written notice. The written notice will include a 30-day opportunity to cure. If payment is not received by Lexmark within the 30-day cure period, ██████ shall assume the responsibility for the payment and shall satisfy the financial obligation within 15-days of the expiration of the cure period. In the event of termination of this Agreement, ██████ shall remain liable as guarantor for any nonpayment by any ██████ subsidiary that remains unpaid as of the termination date.

6.0    Representations and Limited Warranty

6.1    Lexmark warrants that all Products shipped under this Agreement:
    a)    are free from liens or other defects in title when shipped; and,
    b)    are newly manufactured when shipped.

Lexmark further warrants that all Products, if not modified, and subject to Section 6.4 below, conform to the Product specifications contained in Attachment 1 until

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3709

either the time they are unboxed or ninety (90) days from date of invoice whichever occurs first.

6.2    THE FOREGOING WARRANTIES ARE IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, THE WARRANTY AGAINST INFRINGEMENT AND THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. Lexmark does not represent or warrant that the Products are compatible with and/or will function when used with a non-Lexmark toner.

6.3    The above warranty is provided to ▇▇▇ only. ▇▇▇ must establish its own warranty for its sale of ▇▇▇ end products to its end users. Lexmark will not be obligated to provide any installation, warranty, maintenance, or customer support for ▇▇▇ end users or remarketers.

6.4    In order for ▇▇▇ to provide any installation, warranty, maintenance, or customer support for its end users or remarketers as set forth in the previous paragraph 6.3, Lexmark shall provide ▇▇▇ technical training as well as technical information and materials including, but not limited to, an operational manual, service manual, parts catalogue, diagrams, security whitepaper, when they exist and quality information of the Products, necessary for such installation, warranty, maintenance or customer support. However, if ▇▇▇ requests special materials, Lexmark may charge reasonable costs for such materials. Both parties agree that ▇▇▇ may be free to use such information and materials provided by Lexmark hereunder and make any manuals for sales and service of the Products based on such information and materials. Refer to Attachment 4 – Service Support Plan.

6.5    The above mentioned warranties do not cover failures caused by misuse, accidents, damage in transit, attachments, alterations or modifications to Products, unsuitable operation, applications, or usage environment, or failure caused by non-Lexmark (including ▇▇▇ toner, product, part, designs, code, microcode programs, and/or inventions even if the foregoing is included or embodied in the Products.

7.0    Remedies

Lexmark ▇▇▇ Confidential                                    Page 6

7.1   If a Supplies Product within the prescribed warranty period does not meet the warranty condition described in the second sentence of Section 6.1 of this Agreement ███████ agrees at its own expense to return such Supplies Products upon request from Lexmark for failure analysis. ███████ at this time also shall provide sufficient supporting documentation demonstrating the alleged Product failure.  Lexmark agrees, as ███████ sole and exclusive remedy, to replace, or credit ███████ account, for such defective print cartridges and to reimburse ███████ for all shipping costs related to the return of such defective print cartridges and, as applicable, the shipment of replacement print cartridges.

7.2   If a Hardware Product within the prescribed warranty period does not meet the warranty condition described in the second sentence of Section 6.1 of this Agreement, ███████ shall make the necessary repairs to the non-conforming Printers or the Features during the warranty period with Lexmark providing either free Service Parts or a credit for non-conforming parts, all pursuant to procedures to be mutually agreed to by the parties.

7.3   In addition to the above sections, the quality management plan of the Products shall be set forth in Attachment 5.

8.0   Indemnity

8.1   Lexmark will indemnify and hold ███████ harmless from any and all claims, including reasonable attorney's fees, for bodily injury or damage to real property or tangible personal property, caused by a Product sold hereunder, except that Lexmark will not be liable for any lost profits, lost savings, incidental damages or other consequential damages arising out of or relating to the foregoing.

8.2   ███████ will indemnify and hold Lexmark harmless from any and all claims, including reasonable attorney's fees, by any party relating to ███████, modifications or ███████ representations, arising from any acts or omissions for which, and to the extent that, ███████ is legally liable, except that ███████ will not be liable for any lost profits, lost savings, incidental damages or other consequential damages arising out of or relating to the foregoing.

CONFIDENTIAL - OUTSIDE COUNSEL ON A3711

8.3    Lexmark will, at its expense, defend ████ against any claim that a Hardware or Supplies Product supplied hereunder directly infringes a patent or copyright or any other intellectual property rights in a country set forth in Section 8.3.3 of this Agreement, and Lexmark will pay resulting costs and damages finally awarded by a court for such claim or agreed to in a settlement and attorney's fees incurred by ████ To qualify for such defense and payment, ████ must:

8.3.1    Give Lexmark prompt written notice of any such claim; and

8.3.2    Allow Lexmark to control the defense, and fully cooperate with Lexmark in the defense and all related settlement negotiations.

8.3.3    Patent Copyright Country Indemnification List

| | | | |
|---|---|---|---|
| Albania | Croatia | Indonesia | Romania |
| Argentina | Czech Republic | Israel | Russia |
| Aruba | Denmark | Italy | Scotland |
| Australia | Dominican Republic | Japan | Serbia |
| Austria | Dubai | Korea | Singapore |
| Bangladesh | Ecuador | Malaysia | Slovakia |
| Belgium | El Salvador | Mexico | Slovenia |
| Bermuda | Finland | Nepal | South Africa |
| Bolivia | France | Netherlands | Spain |
| Brazil | Germany | New Zealand | Sri Lanka |
| Brunei | Greece | Nicaragua | Sweden |
| Bulgaria | Guatemala | Norway | Switzerland |
| Canada | | Panama | Taiwan |
| Chile | Honduras | Paraguay | Thailand |
| China | Hong Kong | Peru | Trinidad |
| Columbia | Hungary | Philippines | Turkey |
| Costa Rica | Iceland | Poland | United Kingdom |
| Curacao | India | Portugal | United States |

Lexmark ████ Confidential                                     Page 8

CONFIDENTIAL - OUTSIDE COUNSEL ON A3712

8.4    Lexmark's obligation under this Section 8 is conditioned on ████ agreement that if units of Product in the inventory of ████ or the operation thereof while in ████ inventory, become, or in Lexmark's opinion are likely to become, the subject of such a claim, ████ will permit Lexmark (notwithstanding any other provision of this Agreement), at Lexmark's option, to:

a) stop shipping such Product, and upon written request, ████ will return such units of the Product to Lexmark; or

b) procure the right for ████ to continue marketing and using units of the Product or to replace or modify them so that they become non-infringing.

Lexmark agrees to grant ████ a credit ████████ to Lexmark by ████ for the returned units of the Products adjusted for the value of use if such item has been used or partly consumed and assume ████████ ████.

8.5    Notwithstanding the foregoing, Lexmark shall have no obligation whatsoever with respect to any claim based upon (a) non-Lexmark modification of, or content in, units of the Products, including any technology and/or toner provided directly or indirectly by ████ (b) non-Lexmark originated portions of the Products, (c) the combination, operation or use of the Products with apparatus, data or programs not furnished by Lexmark; or (d) the combination, operation or use of the Products with either (i) other products and/or (ii) other items sold or otherwise furnished by Lexmark, under circumstances where Lexmark did not perform such combination; in which cases (a) through (d), inclusive, ████ shall defend Lexmark from any such claims and pay resulting costs, damages, and attorney's fees finally awarded by a Court for such claim, or agreed to in a settlement agreed to by ████ as long as Lexmark provides prompt written notice and allows ████ control of the defense and cooperates in the same manner as provided in Section 8.4 above.

8.6    This Section 8 states the parties entire obligations and entire remedies relating to infringement.

8.7    ████ will at its expense, defend Lexmark against any claim that any items other than the Products supplied hereunder directly or indirectly infringe a patent or copyright in a country set forth in Section 8.3.3 of this Agreement, and ████

CONFIDENTIAL - OUTSIDE COUNSEL ON A3713

will pay resulting costs, damages and attorney's fees finally awarded by a court for such claim. To qualify for such defense and payment, Lexmark must:

a)      Give ███ prompt written notice of any such claim; and

b)      Allow ███ to control the defense, and fully cooperate with ███ in the defense and all related settlement negotiations.

9.0     Product Withdrawal and End of Life (EOL) Management

9.1     Lexmark will have the option to withdraw a Product from the business at any time. ███ will be provided written notification of any such Product withdrawal a minimum of six (6) months prior to the effective date of the Product withdrawal.

9.2     Upon Lexmark's notification to ███ of Lexmark's desire not to renew this Agreement or upon Lexmark's written notification to ███ of Product withdrawal, Lexmark agrees to offer ███ a "last buy" of the affected Products to meet ███ requirements, subject to product availability and credit approval. ███ must submit "last buy" purchase orders to Lexmark within ninety (90) days after such notification. Any "last buy" purchase orders cannot be canceled or changed. Lexmark has no obligation to build units to meet ███ last buy request. All "last buy" Products must be manufactured prior to the effective withdrawal date and will be shipped within thirty (30) days after that date. The prices for these "last buy" Products shall be in accordance with the then current prices in Attachment 2 of this Agreement.

10.0    Termination

10.1    Either party can terminate this Agreement in the event of a Default by the other party that is not cured within thirty (30) days after written notice. However, the parties agree that prior to any issuance of a written notice of default, they both will negotiate in good faith to resolve any dispute or default, and such negotiations will include at least one meeting between executives of each party. If Lexmark terminates for ███ default, ███ shall pay Lexmark for all Products produced and in work in process, plus all components and material in

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3714

inventory or ordered which cannot be reasonably canceled, returned or diverted to other Lexmark products. If ▉▉▉ terminates for Lexmark's default, ▉▉▉ must pay for Products shipped prior to the effective date of termination. ▉▉▉ may choose to, but is not obligated to, accept on a prepayment basis Products on order on the effective date of termination subject to their availability from Lexmark.

10.1.1 Lexmark can terminate this Agreement in its sole and absolute discretion, with or without cause (and in the event of cause, without any opportunity for cure), on ninety (90) days advance written notice.

10.2   Notwithstanding any other provision of this Agreement, if either party files a claim or suit against the other, whether based on a Default of this Agreement, or for any other reason, the other party may terminate this Agreement immediately, upon written notice to the filing party and only outstanding accepted orders will be fulfilled provided, however, that such termination shall not prejudice either party's' rights with regard to the claim or suit filed by the filing party.

11.0   Resale and Supply Requirements

11.1   ▉▉▉ agrees that the Supplies Products and the Service Parts will be sold or otherwise distributed by ▉▉▉ or its subsidiaries only for use with printers approved by Lexmark in writing.

11.2   Lexmark will sell supplies to ▉▉▉ as either Regular supplies, Return Program supplies, or as otherwise identified supplies that are subject to single-use license restrictions, if available for similar Lexmark branded printers. It is Lexmark's desire to make available both versions of supplies. ▉▉▉ shall purchase and make available to its distributors and/or end-users equivalent Regular supplies whenever Return Program supplies are purchased (the foregoing does not require ▉▉▉ to purchase Regular supplies in equal quantities). ▉▉▉ understands that the Return Program supplies may contain a chip that is designed to allow the supply to be used only once, thus helping to enforce the Return Program terms. ▉▉▉ will also make available the Regular versions of the supplies, and will inform the marketplace of the existence of both the Regular and Return Program versions (and the terms of the Return Program

CONFIDENTIAL - OUTSIDE COUNSEL ONA3715

cartridge) by labels, inserts in printer and supply packaging, and appropriate sales literature, announcement and training.

The Return Program license terms are essential parts of the Return Program offering. For the "up-front rebate," the end-user agrees that the supply will be used one time only, and will be returned to Lexmark after its initial use. The Return Program license terms will identify Lexmark (not necessarily by name) as the developer/manufacturer of the product, and will otherwise read essentially the same as Lexmark's terms for Lexmark-branded products. The Return Program supplies label and its packaging, will instruct the user to return the Return Program supplies (after use) to Lexmark's (not necessarily by name) collection point. In addition, █████ acknowledges and agrees that for some printer products, Lexmark may sell them subject to the condition that only supplies made by Lexmark (whether new or remanufactured) or authorized by Lexmark to be reused with the printer product will operate with such printer products, and that Lexmark may include technology in such printers and supplies designed to enforce such condition. █████ acknowledges and agrees that Lexmark shall be entitled to include all the terms and conditions described herein on the external packaging, user manuals, and drivers of products sold hereunder subject to such terms and conditions.

11.3    █████ will purchase from Lexmark its entire requirements for the Supplies Products (toner and compatible toner cartridges and/or compatible tanks) and the Service Parts for the Products sold to █████ hereunder.

11.4    Lexmark agrees to sell to █████ the Supplies Products for a period of █████ from the date of █████ last purchase of the Product on which such Supplies Products function.

Lexmark agreed to sell to █████ the Service Parts for the Products purchased from Lexmark either for a period of █████ from the date of █████ last purchase of the Product on which such Service Parts function or for as long as Lexmark continues to sell its comparable service parts for the Lexmark branded version, whichever period is shorter. If Lexmark no longer offers a Service Part then █████ can purchase an equivalent part substitute elsewhere.



CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3716

12.0    General

12.1    Neither this Agreement nor the sale of the Products hereunder shall give either party the right to use the other party's trademarks.

12.2    If either party's performance of any obligations hereunder is prevented or restricted by reason of fire or other casualty, strikes or labor disputes, industry wide shortage of raw materials (not a Lexmark-only shortage), war or other violence, or governmental law, regulation, or requirement, or such other situation that is out of the control of such party, then that party shall be excused from performance to the extent of the prevention or restriction.

12.3    Lexmark assumes no liability regarding any claim or action caused by, or directly related to, a non-Lexmark product and/or non-Lexmark toner.

12.4    In no event will Lexmark be liable for any lost profits, lost savings, incidental damages, or other consequential damages, even if Lexmark has been advised of the possibility of such damages.  Lexmark will not be liable for any damages (except to the extent provided expressly by Sections 5 and 6 of this Agreement) claimed by ▮▮▮ based on any third party claim.

12.5    For any claim for any cause whatsoever, other than those provided for in the Indemnification Section, Lexmark's liability for actual damages will be limited to ▮▮▮ for all claims and/or causes of action that accrue in the same calendar year.

12.6    All obligations of Sections 4.4, 5, 6, 7, 8, 11, 12.3, 12.4, 12.5, 12.12 and 12.13 which by their nature survive any expiration or termination of this Agreement and shall remain in effect.

12.7    Press releases and other publicity or advertising which mentions the other party by name shall be agreed upon by both parties prior to release.  This Agreement, and its terms and pricing, shall be held in confidence for two (2) years from the expiration or termination of this Agreement, except that either party can disclose it to a third party financial organization for financing purposes, if such third party agrees to hold it in confidence.  No other information shall be

CONFIDENTIAL - OUTSIDE COUNSEL ONLY  A3717

considered confidential unless it is covered by separate written Mutual Non-Disclosure Agreement number ▮▮▮▮▮ which is hereby incorporated in this Agreement, and which shall continue in full force and effect throughout the contract period of this Agreement.

12.8  Each party agrees to comply with all applicable governmental laws and regulations, including US laws and regulations relating to the export of technical data and products covered by this Agreement, and all applicable OSHA regulations.

12.9  Either party's waiver of any instance of the other's noncompliance with the Agreement will not be deemed a waiver of any future non-compliance.

12.10 Neither party may assign its rights or obligations under this Agreement without the prior written consent of the other, which consent shall not be unreasonably withheld. Notwithstanding the above, each party may, without the prior written consent of the other, assign its rights and obligations hereunder to a successor in ownership of all or substantially all of the assets of the assigning party, whereupon such assignee will assume this Agreement and will automatically be deemed to have replaced the assignor for all purposes hereof.

In addition, Lexmark can assign accounts receivable (A/R) from ▮▮▮▮ (without ▮▮▮▮ prior written consent) to a third party financial organization for financing purposes. In the event Lexmark assigns an A/R such A/R is actually being used as collateral; and, is still owned and controlled by Lexmark. In the event such assignment would result in the receivable being transferred to a 3rd party then Lexmark will obtain ▮▮▮▮ prior written consent before such transfer, such consent will not be unreasonably withheld.

12.11 The Agreement will not be supplemented or modified by any course of dealing or trade usage. Variance from or addition to the terms and conditions of the Agreement in any purchase order or other written notification from ▮▮▮▮ will be of no effect. This Agreement shall not under any circumstances be effective until it is signed by both parties.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3718

12.12 This Agreement, including its Attachments, which shall be governed by the laws of Kentucky, without regard to its choice of law principles, is the complete agreement between the parties, replacing any purchase order or invoice terms and all prior written and verbal communications or agreements between the parties on this subject matter. Notwithstanding any other language in this Agreement to the contrary, the provisions of the UN Convention on Contracts with International Sale of Goods shall not apply to this Agreement. This Agreement can be modified only by written amendment mutually agreed to by both parties.

12.13 In the event any provision of this Agreement is deemed unenforceable by a court of competent jurisdiction, such determination shall not affect the enforceability of any other provisions of this Agreement.

12.14 Lexmark's standard manufacturing quality processes include periodic inspections prior to Product shipment to confirm the on-going production is resulting in products that meet the Product specifications. These manufacturing quality processes are described in Attachment 5 – Product Quality.

12.15 Headings in this Agreement are used for convenience only and shall not be resorted to when construing it.

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3719

AGREED TO AND ACCEPTED:

LEXMARK INTERNATIONAL, INC.

By: _____          By: _____
    (Authorized Signature)

F.T. SAMUEL, JR
Name (Type or Print)

VP, WW OEM & ALLIANCES
Title

1 NOVEMBER, 2011          Oct 14, 2011

Date                      Date

LEXMARK INTERNATIONAL TECHNOLOGY, S.A.

By: _____
    (Authorized Signature)

Michel Berdou
Name (Type or Print)

Managing Director
Title

22 November 2011

Date

CONFIDENTIAL - OUTSIDE COUNSEL ON A3720

ATTACHMENT 1

<u>PRODUCT DESCRIPTIONS</u>

See separate document: "Product Description Guide; July 29, 2011"

CONFIDENTIAL - OUTSIDE COUNSEL ONlA3721

ATTACHMENT 2

<u>PRICING & MOI</u>

See separate document for Pricing File.



CONFIDENTIAL - OUTSIDE COUNSEL ON\A3722

ATTACHMENT 3

## ███ PRODUCT RESPONSIBILITIES

A. Design, develop, provide and install as required if not included in Product Specifications:

1. Design and artwork for unique logo plugs (if applicable)

2. All packaging logos and labels (parts or artwork) not included in Product Specifications

3. EMC testing, approval, and certification if ███ modifies Product

4. Environmental testing, vibration testing, etc. if ███ modifies Product

5. Safety approval & certification if ███ modifies Product (Lexmark support)

6.   Product Safety Certification and approval if ███ modifies Product (Lexmark   support)

7. FCC approval if ███ modifies Product (Lexmark support)

8. Prepare the modified Service Manual and modified User Reference Guide



CONFIDENTIAL - OUTSIDE COUNSEL ON|A3723

ATTACHMENT 4

<u>SERVICE SUPPORT PLAN</u>

See separate document for Service Support Plan.



CONFIDENTIAL - OUTSIDE COUNSEL ON|A3724

ATTACHMENT 5

QUALITY PLAN

See separate document for Quality Plan.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3725

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3726

# Product Description
# Guide
July 29, 2011

Author: Dave Corlyon, ISS OEM Engineering

# Table of Contents

1.0 Purpose .................................................................................................................. 3
2.0 General .................................................................................................................. 3
3.0 Industrial Design .................................................................................................. 3
4.0 Supplies & Associated Packaging/Labeling ...................................................... 3
7.0 Localization ........................................................................................................... 4
8.0 Publications .......................................................................................................... 4
9.0 Software ................................................................................................................ 4
10.0 Firmware ............................................................................................................. 4
11.0 Product Packaging & Associated Labeling ..................................................... 4
12.0 Options/Features ................................................................................................ 4
13.0 Regulatory ........................................................................................................... 4
14.0 Service Parts ....................................................................................................... 5
15.0 Customer Orderable Part Numbers ................................................................. 5
16.0 Other .................................................................................................................... 5
16.0 Revision History ................................................................................................. 6
Appendix 1: Product Description Cover ................................................................... 8
Appendix 2: Orderable Part Numbers ................................................................... 10

Product Description  V1.0

Lexmark Confidential

X46x

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3728

# 1.0 Purpose

The purpose of a Product Definition (PD) is to capture the basic "agreed to" product description (agreed to between Lexmark and ███ i.e., at a minimally acceptable level (i.e., not a definition of every component as one would see in an actual bill of material). Customer requested changes to an approved PD will require Lexmark to evaluate the impact of such requests in terms of cost, schedule, and/or resources.

It is assumed that unless specifically addressed, a particular aspect of a product is the same as that of the Lexmark branded equivalent product.

# 2.0 General

These are the models that will be launched.

X463de - ██████████ LV and HV models – Machine type/model number ████
X464de - ██████████ - LV and HV models – Machine type/model number ████
X466de - ████████ LV and HV models – Machine type/model number █

**NOTE:** See Appendix 1 for PD cover format.

# 3.0 Industrial Design

These are the items that will be unique for ████
OP Bezel – Pad printed with ████ model number SP ████████████

Front cover –
USA - Will have a ████ supplied logo label ████ applied.
Europe – Will be blank. A kit of company logo labels will be shipped loose in the printer carton.

Back Cover – Will have a back cover label with generic content.
Cartridge- Will be labeled with ████ specific reorder information.
Voltage label – Will be ████ specific and have a specific ████ serial number.
NVRAM – ████ model name will be programmed in NVRAM.
TLI/SN label – This label will be located inside the front cover. The top level indicator (TLI) is Lexmark's part number for the MFP. The serial number (SN) will be Lexmark's original one.

# 4.0 Supplies & Associated Packaging/Labeling

These are the supply items that will be available for all models.
Ship with Equipment (SWE) cartridge – Yield 7K – Will be labeled ████ specific

Aftermarket (AM) – 9K (prebate), 18K (prebate and non prebate). All cartridges will be labeled ████ specific. This consists of a ████ carton label on a plain kraft carton.

PC unit - SWE will be labeled ████ specific. The AM version will be in a plain kraft carton and ████ carton label

OEM generic return brochure will be included in the AM cartridge.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3729

## 7.0 Localization

The LV models will be sold in USA and Canada. The HV models will be sold in Europe which includes South Africa, Russia and Israel. The following languages will be supported in the drivers/pubs – English, French, German, Italian, Brazilian Portuguese, Spanish, Polish, Russian, Japanese (drivers only), Traditional Chinese, Simplified Chinese and Korean.

## 8.0 Publications

A generic Setup guide will ship with the MFP.

When Energy Star is obtained a hard copy Energy Star logo sheet will ship with MFP.

Generic safety sheet.

## 9.0 Software

A generic drivers CD will be included with the product. This is for Windows only. A Linux and MAC web version will be provided to ███ The CD artwork will have ███ specified artwork.

For plug and play these are the names that will be programmed into NVRAM.

███

## 10.0 Firmware

A unique firmware will be provided that returns the ███ unique serial number when @Remote queries prtGeneralSerialNumber(1.3.6.1.2.1.43.5.1.1.17.1)

## 11.0 Product Packaging & Associated Labeling

An OEM generic MFP carton will be used with two Ricoh unique shipping labels.

## 12.0 Options/Features

The following options/electronic features will launch with the product. All of these will be labeled ███ specific.
250 sheet drawer
550 sheet drawer
128Mb memory card
Hard Disk
Wireless Lan card (US and rest of the world versions)

## 13.0 Regulatory

The cUL, GS and CB safety certifications will be obtained by Lexmark for ███
EMC Doc's for Europe and FCC will be obtained by Lexmark for ███

Certifications that ███ is responsible for getting are Energy Star, Israel, South Africa and Russia.

███
X46x

CONFIDENTIAL - OUTSIDE COUNSEL ONLA3730

## 14.0 Service Parts
The unique FRUs/CRUs will be OP bezel, front cover and back cover. There may be a unique RIP card FRU depending on the solution for @remote issue.

## 15.0 Customer Orderable Part Numbers
See Appendix 2.

## 16.0 Other
MFP will be assigned a unique ███ serial number. This serial number will not be available via the web page or on the printed menus page.



CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3731

## 16.0 Revision History

| Version | Date | Comments |
|---------|---------|------------------|
| 001 | 7/29/11 | Document created |
| | | |
| | | |
| | | |
| | | |



CONFIDENTIAL - OUTSIDE COUNSEL ON|A3732

## Customer Approval

## Lexmark Approval

_____
Name (Print)

_____
Name (Print)

_____
Signature

_____
Signature

_____
Date

_____
Date

_____
Company Name

Lexmark International, Inc.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3733

# Appendix 1: Product Description Cover

**OP bezel**



CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3734

# Appendix 1 Con't: Product Description Cover

**Front cover (LV US models only)**



**Front cover for Europe HV models will be blank**



*Information Security*
This document contains proprietary information and is classified Lexmark Confidential. No information contained within shall be divulged to persons other than Lexmark employees authorized by the nature of their duties to receive such information. Information is being transmitted under the terms and conditions of the Confidential Disclosure Agreement.

Product Description  V1.0                                          Lexmark Confidential

X46x

# Appendix 2: Orderable Part Numbers

| Customer Part No. | Lexmark Part No. | Machine Type-Model | Description |
|---|---|---|---|
| ██████ | ██████ | ████ | ██████ |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | Paper feed unit ████ |
| | | | Paper feed unit |
| | | | Hard disk drive option type ████ |
| | | | IEEE802.11 b/g/n Interface unit type ████ (USA) |
| | | | IEEE802.11 b/g/n Interface unit type ████ (rest of world) |

Product Description  V1.0

Lexmark Confidential

X46x

CONFIDENTIAL - OUTSIDE COUNSEL ONl A3736

# ████████ Lexmark MPA
# Attachment 2
# Prices
### *Effective September 6, 2012*

## Contents
- Factory Lasers
- Customization Center Lasers
- Supplies - Laser
- Options - Laser

Lexmark and ███ Confidential

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3737

██ MPA - Attachment 2 - Prices v1 7          Factory Lasers          5/1/2014

| LXK Model | Lexmark P/N | Assigned LXK P/N ██ | Sales Territory | LXK Plant of MFG / Location | INCO TERMS | Minimum Order Increment * | Monthly Order Volume (Total - all Models) | LXK U.S. BDP | U.S. BDP Discount **** | Self Warranty Discount ***** | MPA Unit Price ** & **** |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | **Laser Hardware** | | | | | |
| X466de Low Volt | 13C1265 | █ | North America & Europe | Liteon / Guangzhou | FCA; Long Beach, CA *** | ██ mixed all X46x models) | | | | | |
| X466de High Volt | 34S7904 | █ | North America & Europe | Guangzhou, China | FCA; Antwerp, Belgium *** | ██ (mixed all X46x models) | | | | | |
| X464de Low Volt | 13C1101 | █ | North America & Europe | Guangzhou, China | FCA; Long Beach, CA *** | ██ (mixed all X46x models) | | | | | |
| X464de High Volt | 34S7902 | █ | North America & Europe | Guangzhou, China | FCA; Antwerp, Belgium *** | ██ (mixed all X46x models) | | | | | |
| X463de Low Volt | 13D1100 | █ | North America & Europe | Guangzhou, China | FCA; Long Beach, CA *** | ██ (mixed all X46x models) | | | | | |
| X463de High Volt | 34S7900 | █ | North America & Europe | Guangzhou, China | FCA; Antwerp, Belgium *** | ██ (mixed all X46x models) | | | | | |

* Laser Hardware MOI is in full container quantity per ██ ship location ██ - container may be mixed; but, individual model SKU quantities must be in full pallet multiples (8 units per pallet).

** Laser HW Prices are based on ██ self warranty on hardware (mainframe), supplies (consumables) and options (features) = and 45 day payment terms

*** Lexmark Port of Entry

**** & ***** Unit Prices are based on a discount off LXK U.S. BDP Price plus an additional discount for ██ self warranty described above. When LXK U.S. BDP Prices change ██ will be notified of the change and its effective date; and, all ██ P.O.s issued after the effective date will be issued at the new / changed price.

Lexmark and ██ Confidential

███ MPA - Attachment 2 - Prices v1 7         Customization Center Lasers                    5/1/2014

| LXK Model | Lexmark P/N | Assigned LXK P/N | Sales Territory | LXK Plant of MFG / Location | INCO TERMS | Minimum Order Increment * | Monthly Order Volume (Total - all Models) | LXK U.S. BDP | U.S. BDP Discount **** | Self Warranty Discount ***** | MPA Unit Price ** & **** |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | **Laser Hardware** | | | | | | |
| X466de Low Volt | 13C1265 | ███ | North America & Europe | Liteon / Guangzhou | Ex Works, LXK Distribution Center *** | ███ (mixed - all X46x models) | | | | | |
| X466de High Volt | 34S7904 | ███ | North America & Europe | Guangzhou, China | Ex Works, LXK Distribution Center *** | ███ (mixed - all X46x models) | | | | | |
| X464de Low Volt | 13C1101 | ███ | North America & Europe | Guangzhou, China | Ex Works, LXK Distribution Center *** | ███ (mixed - all X46x models) | | | | | |
| X464de Low Volt TAA Model | 13C1258 | ███ | USA | Southaven, MS | Ex Works, LXK Distribution Center *** | ███ | | | | | |
| X464de Low Volt TAA/CAC Model | 13C0084 | ███ | USA | Southaven, MS | Ex Works, LXK Distribution Center *** | ███ | | | | | |
| X464de High Volt | 34S7902 | ███ | North America & Europe | Guangzhou, China | Ex Works, LXK Distribution Center *** | ███ (mixed - all X46x models) | | | | | |
| X463de Low Volt | 13D1100 | ███ | North America & Europe | Guangzhou, China | Ex Works, LXK Distribution Center *** | ███ (mixed - all X46x models) | | | | | |
| X463de High Volt | 34S7900 | ███ | North America & Europe | Guangzhou, China | Ex Works, LXK Distribution Center *** | ███ (mixed - all X46x models) | | | | | |

\* Laser Hardware MOI is in full container quantity per ███ ship location ███ units) - container may be mixed; but, individual model SKU quantities must be in full pallet multiples (8 units per pallet).

\*\* Laser HW Prices are based on ███ self warranty on hardware (mainframe), supplies (consummables) and options (features) - and 45 day payment terms.

\*\*\* LXK Distribution Centers: No. America (Southhaven, MS); Europe (Geel, Belgium)

\*\*\*\* & \*\*\*\*\* Unit Prices are based on a discount off LXK U.S. BDP Price plus an additional discount for ███ self warranty described above. When LXK U.S. BDP Prices change ███ will be notified of the change and its effective date; and, all ███ P.O.s issued 90 days or more after the stated effective date will be issued at the new / changed price.

# - TAA Model w/CAC Feature Price includes: CAC eSF Software License; CAC Reader and Pod; 5 Yr. SW maintenance & Support; and, a 128MB memory option.

Lexmark and ███ Confidential

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3739

MPA - Attachment 2 - Prices v1 7      Supplies - Laser      5/1/2014

| LXK Model | Lexmark P/N | Assigned LXK P/N | Sales Territory | LXK Plant of MFG / Location | Lexmark Distribution Centers | INCO TERMS | Minimum Order Increment | LXK U.S. BDP | LXK U.S. BDP CPP | U.S. BDP Discount | MPA Unit Price * |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Laser Supplies - Return Program Cartridges** | | | | | | | | | | | |
| High Yield Return Program Cartridge - 9K | X463H11G | | North America & Europe | Mexico | Southhaven, MS; or, Geel, Belgium | Ex Works, LXK Distribution Center | | | | | |
| Extra High Yield Return Program Cartridge - 14K | E462U11A | | North America & Europe | Mexico | Southhaven, MS; or, Geel, Belgium | Ex Works, LXK Distribution Center | | | | | |
| Extra High Yield Return Program Cartridge - 15K | X463X11G | | N/A | Mexico | N/A | N/A | | | | | |
| Extra High Yield Return Program Cartridge - 18K | E462U11A | | North America & Europe | Mexico | Southhaven, MS; or, Geel, Belgium | Ex Works, LXK Distribution Center | | | | | |
| **Laser Supplies - Regular Cartridges** | | | | | | | | | | | |
| Extra High Yield Regular Cartridge - 14K | E462U21G | | North America & Europe | Mexico | Southhaven, MS; or, Geel, Belgium | Ex Works, LXK Distribution Center | | | | | |
| Extra High Yield Regular Cartridge - 18K | X463X21G | | North America & Europe | Mexico | Southhaven, MS; or, Geel, Belgium | Ex Works, LXK Distribution Center | | | | | |
| **Laser Supplies - Other** | | | | | | | | | | | |
| Photoconductor Kit - 30K | E260X22G | | North America & Europe | China | Southhaven, MS; or, Geel, Belgium | Ex Works, LXK Distribution Center | | | | | |

* Unit Prices are based on a discount off LXK U.S. BDP Price. When LXK U.S. BDP Prices change ▮▮▮ will be notified of the change and its effective date; and, all ▮▮▮ P.O.s issued after the effective date will be issued at the new / changed price.

** European Prices for the 15K Cartridge are: ▮▮▮ BGP in U.K. and ▮▮▮ EUR in other European countries.

Lexmark and ▮▮▮ Confidential

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3740

██ MPA - Attachment 2 - Prices v1 7            Options - Laser                    5/1/2014

| LXK Model | Lexmark P/N | Assigned LXK P/N ██ | ██ Sales Territory | LXK Plant of MFG / Location | INCO TERMS | Minimum Order Increment | LXK U.S. BDP | U.S. BDP Discount | MPA Unit Price ** |
|---|---|---|---|---|---|---|---|---|---|
| **Laser Options** | | | | | | | | | |
| 128 MB DRAM | 1022298 | ██ | No. Amer & Europe | China | Ex Works, LXK Distribution Center * | | | | |
| 80GB Hard Drive | 14F0102 | ██ | No. Amer & Europe | China | Ex Works, LXK Distribution Center * | | | | |
| 2nd Drawer (550) | 34S0550 | ██ | No. Amer & Europe | China | Ex Works, LXK Distribution Center * | | | | |
| 2nd Drawer (250) | 34S0250 | ██ | No. Amer & Europe | China | Ex Works, LXK Distribution Center * | | | | |
| 802.11g Wireless Card (Americas) | 14F0040 | ██ | US / Americas | China | Ex Works, LXK Distribution Center * | | | | |
| 802.11g Wireless Card (ROW) | 14F0045 | ██ | Europe | China | Ex Works, LXK Distribution Center * | | | | |

* LXK Regional Distribution Centers: No. America (Southhaven, MS); Europe (Geel, Belgium).

** Unit Prices are based on a discount off LXK U.S. BDP Price. When LXK U.S. BDP Prices change ██ will be notified of the change and its effective date; and, all ██ P.O.s issued after the effective date will be issued at the new / changed price.

Lexmark and ██ Confidential

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3741



**Lexmark – ███ MPA**
**Attachment 4**
**Service Support**

## 1.0    Definitions:

1.1  "Customer Replaceable Units (CRUs)" are Service Part(s) that the end user or an authorized service technician can install (typically no tools are required)

1.2  "Designated Support Engineer" means a person or persons designated by Lexmark as the technical/engineering support interface for the Product(s).

1.3  "End User" means a natural person or organization that uses ███ Product for personal purpose or in the operation of their business.

1.4  "Dead on Arrival (DOA)" means a Product that fails to meet the Product specifications after initial Product unboxing and installation (which in no event can exceed six (6) months from the date of Product shipment from Lexmark to ███

1.5  "Failure" means a defect in the Product which is reproducible and which causes such Product not to function substantially in conformance with the Specifications, end user documentation, or other related documentation, including without limitation any functional specifications or other engineering documentation for the Product, or commonly accepted operating principles as defined by industry standards.

1.6  "Field Replaceable Units (FRUs)", are Service Part(s) requiring authorized service technician installation.

1.7  "Incident" means a situation which necessitates an End User to contact ███ for assistance.

1.8  "Intermediaries" shall mean ███ authorized dealers, distributors, subsidiaries and service partners.

1.9  "Out of Warranty Services" means repair, replacement and return services provided by Lexmark to ███ or ███ End Users out of the period and/or scope of Warranty.

1.10  "Parts Only Warranty" means, defective Products are repaired at the customer location by Ricoh or Intermediaries using Lexmark Genuine Service Parts and ███ is reimbursed by Lexmark only for parts required to repair Product. Wear Parts are not included.

1

CONFIDENTIAL - OUTSIDE COUNSEL ONLYA3742

1.11 ████ Certified Trained Technician" means a technician in ████ or Intermediaries' employ who has successfully completed a ████ training course on a Lexmark manufactured Product.

1.12 "Repair" means the repair or replacement of a Product or part.

1.13 "Technical Support Level" means a certain class of service provided by ████ Level 1 & 2 technical support representatives and/or Lexmark's Level 3 support to ████ Defined in more detail in Section 3.0: Technical Support

1.14 "Valid Claim for Warranty Reimbursement" means a completed warranty claim presented to Lexmark's warranty claim center that covers Warranty Services performed by a ████ Certified Trained Technician, certified on the Product serviced.

1.15 "Warranty Services" means the replacement of defective parts, during the applicable warranty period.

1.16 "Wear Parts" Service Parts with a yield or duty cycle less than that of the printer (e.g. fusers, rollers, internal transfer units, auto document feeders, etc) and are the customer's responsibility to replace.

## 2.0 ████ Hardware Warranty

2.1 ████ shall establish its own warranty terms with its customers and, through ████ technical support call center, shall receive, diagnose and determine a course of action to resolve customers' concerns. The warranties in the Attachments and the Master Purchase Agreement (including without limitation this Attachment 4) are Lexmark's only obligation to ████ for warranty service on Products, and Lexmark shall have no direct obligation for warranty service to a ████ customer. ████ may, at its discretion and sole expense, offer additional services for ████ branded printers.

2.2 Failures due to service performed by a non-Certified ████ Trained Technician or non-Certified ████ Intermediary Trained Technician are not covered under the specified warranty.

2.3 Failure due to End User inappropriate usage of the product or due to negligence and damage are not covered under the specified warranty.

## 3.0   Technical Support

3.1 Level 1 Technical Support – ████ shall provide Level 1 support services to its End Users and Intermediaries. ████ technical support staff answers

2

technical inquiries regarding Product(s), Options, Supplies and Service Parts and provides problem diagnostics services for identifying Failures and generic application faults, analysis, and where possible, Failure resolution. If necessary, passes the call to ▇▇ Level 2 technical support personnel

3.2   Level 2 Technical Support - ▇▇▇ Level 2 technical support consists of ▇▇▇ technical support personnel who will respond to contact from ▇▇▇ Level 1, ▇▇▇ field personnel, or ▇▇▇ Intermediaries. They use significant product knowledge, procedural knowledge, product documentation, support notes and knowledge base information to address field installation and break/fix issues. They gather information on the problem environment, check for correct configurations and apply standard solutions to problems. They perform iterative procedures with field service personnel to understand and correct problems. They escalate to Lexmark Level 3 as appropriate if available solutions do not solve the customer problem by utilizing established escalation procedures and guidelines. ▇▇▇ Level 2 support personnel will receive continuous training on printer Products from ▇▇▇ to minimize escalation to Level 3 support from Lexmark and minimize unnecessary Product Warranty Service.

3.3   Level 3 Technical Support

3.3.1    Remote Technical Support: Such support shall be provided by Lexmark directly to ▇▇▇ Level 2 support at no costs or charges to ▇▇▇ Lexmark and ▇▇▇ will establish a support process that will identify to Lexmark that the call is from ▇▇▇ personnel. In providing such support Lexmark shall acknowledge ▇▇▇ requests within twenty-four (24) business hours and then provide a resolution within three (3) business days via a mutually agreed upon process. If a resolution cannot be practically achieved within said period then Lexmark will discuss and reach agreement with ▇▇▇ on a reasonable plan and schedule for addressing the issue or correcting the Failure. This support will be provided during normal Lexmark local geography's center hours of operation Monday through Friday, excluding local geography's holidays. Lexmark Level 3 Support will subsequently examine Failure causes and, when necessary, escalate to and work with Lexmark OEM Level 3 personnel who will engage with Lexmark engineering personnel.

3.3.2    On-Site Technical Support: In the event that a Failure cannot be resolved through Remote Technical Support as indicated above, the

3

A3744

parties agree to discuss the situation and a solution that may include Lexmark providing, upon mutually agreeable terms, On-Site Technical Support at ▮▮▮▮ designated site(s).

3.4   Except as set forth in the relevant Section of Attachment 5 – Quality Plan (relating to Epidemic Failure), and in this Attachment 4 – Service Support, Lexmark shall have no responsibility for providing technical support directly to ▮▮▮▮ End Users or Intermediaries.

3.5   Lexmark will make available to ▮▮▮▮ web-based access to Product information that Lexmark maintains for the equivalent Lexmark products that are generally available for all of Lexmark's field service technicians. Examples would include technical bulletins, knowledgebase cases, and Engineering Changes (that impact service and support).

## 4.0   Training

4.1   Training for Product Launch – If Train the Trainer, "T3" classes are offered by Lexmark for comparable Lexmark branded products, Lexmark will provide ▮▮▮▮ with technical T3 training. Lexmark will reserve five (5) seats for ▮▮▮▮ in each location. Such training class shall be conducted at Lexmark's facility in Lexington, KY and in Europe. ▮▮▮▮ will be responsible for the travel expenses of its training and key support personnel to attend training classes. On-line training courses and webinars shall also be provided when available. Any additional training requested by ▮▮▮▮ shall be provided by Lexmark based upon mutual venues and cost.

4.2   Training Courses and Materials - During the term of this Agreement, Lexmark shall provide ▮▮▮▮ with all available materials utilized to provide training in connection with the equivalent Lexmark product(s). Training materials may include, but are not limited to, instructor guides, overheads, student workbooks, and manual/guides. Lexmark shall provide masters of such training materials in electronic media or softcopy format. ▮▮▮▮ is permitted to use such material for its internal use only in training ▮▮▮▮ sales and support staff on the Product(s).

4.3   Lexmark hereby grants to ▮▮▮▮ a royalty-free non-exclusive, worldwide license to use, modify or create derivative works based upon, reproduce, display, demonstrate and distribute the training materials (whether modified or unmodified but excepting proprietary technical information relating to the

4

A3745

products) for course development use solely in connection with the Product(s) distributed under the terms of the Agreement. Lexmark's grant to ▓▓▓ of the right and license to use the materials is not intended to convey any ownership interest to ▓▓▓ Lexmark retains all rights in the intellectual property contained in these materials. Materials that are derivative works prepared by or for ▓▓▓ under this license granted in this section may include an appropriate ▓▓▓ copyright notice in lieu of any Lexmark copyright notice. Other than the license granted in this section, Lexmark retains all copyright rights in the materials, and ▓▓▓ agrees to assist Lexmark to enforce those rights against infringers. In response to inquiries related to copyright rights in all materials subject to copyright, and in which Lexmark has copyright rights, ▓▓▓ will identify Lexmark as the owner of some or all of the copyright rights, as appropriate, or direct such inquiry to Lexmark.

## 5.0    Part Only Warranty Process

5.1    Service Parts inventory will be managed and owned by ▓▓▓ for ▓▓▓ Product support. Lexmark will assist in a list of recommended Service Parts for ▓▓▓ to maintain per Product per major geography.

5.2    Inventory adjustment returns – Prior to a Product going End of Marketing Life, EOML, Lexmark will accept inventory adjustment returns from ▓▓▓ for Service Parts purchased directly from Lexmark. The following conditions apply: 1)Service Parts returned are free from defects and damage, are unopened in original packaging, and are otherwise in merchantable condition; 2) a maximum of ▓▓▓ of the prior 90 day's net purchases may be returned per quarter; 3) ▓▓▓ must request, receive and mark return shipment with a Return Authorization (RA) and RA number from Lexmark prior to any returns; 4) a restocking fee of ten percent ▓▓▓ of the return will be charged. No restocking fee will be assessed on warranty and DOA returns; 5) ▓▓▓ shall pay all return freight charges for returned Service Parts; and 6) Service Parts must be returned and arrive at Lexmark forty-five (45) days after receiving RA.

5.3    Parts claims will be submitted by ▓▓▓ to Lexmark on Lexmark's Warranty Claim Website, any or all of the following fields may be required; Lexmark Service Part Number(s), Quantity of Service Parts used, ▓▓▓ Product serial number, (as defined in Section 7.0 of this Attachment), Machine Type,

CONFIDENTIAL - OUTSIDE COUNSEL ONlA3746

and/or Warranty Claim Number (obtained on the Lexmark E-Service web page). Return of defective service part(s) to Lexmark, verification of a Product's warranty entitlement, and confirmation that ███ Service Parts purchases exceed or are equal to ███ Service Part claim rate at Lexmark are required before a Service Part credit or a reimbursement Service Part is provided to ███ Returned Service Parts become the property of Lexmark.

5.4 Service Parts Usage Per Claim Ratio – ███ technicians and their Intermediaries' technicians are expected to use their Product knowledge to replace as few parts as necessary to perform the repair of the Product. Service Parts usage per Claim represents the number of Service Parts used per Claim and will be calculated by Lexmark monthly. The Service Parts usage average is calculated as the average total number of Service Parts used during a given period divided by the total number of Claims accepted by Lexmark, in which Service Parts have been used, performed during that same period. ███ Service Parts Usage per Claim Ratio should not exceed Lexmark's Service Parts usage average by more than ███ and will limit reimbursement for parts usage to ███ higher than the Lexmark usage rate. Lexmark and ███ will work together to identify and resolve matters which are driving the higher rate. Should the usage rate exceed the ███ due to Lexmark not providing the same material to ███ which Lexmark provides to Lexmark's TSC, Lexmark will be responsible for the higher rate. Each Party will make commercially reasonable efforts to correct the factors contributing to the ███ higher rate.

## 6.0    Service Part Purchases

6.1 Service Part prices are based upon Lexmark's local geography retail prices and are Ex Works Lexmark's Service Parts distribution centers. Lexmark reserves the right to change ███ prices with at least a thirty (30) day written notice to ███ Service Parts discount is ███ off of local retail. Service Part discount applies to Service Parts used for ███ branded Product under this Master Purchase Agreement. Lexmark will provide ███ with separate pricing files for Service Parts for Product(s) purchased under this Agreement.

6.2 Purchase Orders for inventory stocking purposes must be placed ninety (90) days prior to the required delivery date. Lexmark will make best effort to fulfill ███ Purchase Orders placed inside the ninety (90) day lead-time.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3747

6.3   Emergency orders will receive special handling.  They will be pulled and shipped same day, pending stock availability.  Each emergency order may contain a maximum of two (2) pieces of one part number or two (2) part numbers with a quantity of one (1) each.  Lexmark will be responsible for the picking and packing costs of the emergency order and ▮▮▮▮ will be responsible for the shipping cost. At Lexmark's discretion, orders may ship in multiple shipments.

6.4   Purchase Orders must reference ship-to-location, ▮▮▮▮ part number, part description, Lexmark part number, quantity, applicable price, requested ship date and ▮▮▮▮ Lexmark account number.

6.5   ▮▮▮▮ and ▮▮▮▮ subsidiaries will consider implementing an Electronic Data Interchange (EDI) link with Lexmark to submit Service Parts orders.

**7.0     ▮▮▮▮ Unique Product Serial Number**

7.1   Mandatory Serial Numbering Specifications shall include: 1) Product serial number will be no longer than 13 alpha numeric characters; 2) Serial number will be unique for a given Product in the machine type; 3) No duplication of serial number will occur within a given machine type no matter how many models are offered in that machine type; 4) The serial number label must be non-removable or made in such that if the label was attempted to be removed it would be destroyed. Failure by ▮▮▮▮ to adhere to these requirements will result in a void of that Product's warranty entitlement from Lexmark.

**8.0     Product Repairs**

8.1 Lexmark is willing to engage in future discussions with ▮▮▮▮ to provide Out of Warranty Services.

7

## ATTACHMENT 5

## QUALITY MANAGEMENT PLAN

1.  Purpose: To document the basic agreement between█████and Lexmark regarding Quality Management of █████Products supplied by Lexmark.

2.  Scope:    Applies to all█████printer products and options (unless otherwise indicated) produced by Lexmark with a█████Logo. This document is intended to provide guidance for all printer products and eliminate the need for submission of a Quality Management Plan for each product.   This document is intended for█████primarily for basic re-badging of Lexmark products.  Products that require more unique█████customizations (such as unique product designs) may require additional sections to reflect the█████development process.

3.  Lexmark will have a person(s) to coordinate with█████regarding quality. The Lexmark OEM/Sustaining team will have primary responsibility for quality of the items that are unique to the█████products. The Lexmark PE teams will have primary responsibility for quality of the items that are similar to the Lexmark branded product.

4.  Phases and Descriptions of Quality Engagement

a) Development Kickoff

   At Development Kickoff, as the Initial Product Specification is communicated, Lexmark will share with█████the equivalent Lexmark branded product's Field Warranty Claim Rate (FWCR). The FWCR is based upon Lexmark's unique customer printing environments, technical processes and service strategies.  The FWCR targets are provided as guidance only.    Lexmark is not responsible for internal█████processes that adversely affect the FWCR.  During this period, preliminary█████FWCR targets are established for each Product based on the Lexmark predecessor product's performance (if any) and expected feature and technology enhancements. These targets will be provided in a separate document.

   i)  Occasionally FWCR targets may need to be updated to accommodate Product Specification changes that occur after Development Kickoff

   ii)  █████products will be developed and delivered per Lexmark Development Process.  All development gates and phases will be managed internally and all

1

CONFIDENTIAL - OUTSIDE COUNSEL ONLA3749

specifications for █████ products will be the same as that of the Lexmark Branded Product.

b) First Article Inspection (FAI)

    i) Lexmark will provide █████ photographs and other information from the first articles from the assembly process to allow approval of product and packaging without █████ needing to travel to the manufacturing location.

    ii) █████ may implement Buyer FAI by visiting the manufacturing location for printers.

    iii) Both parties will review and agree upon the FAI checklist in advance of the build. SOP should be fulfilled only after approval of FAI done by █████

c) Start of Production (SOP)

    i) Lexmark is responsible to test and validate production level products per its established factory testing and validation processes. When products are found to be deficient, Lexmark is responsible to carry out corrective action measures to correct the root cause, when possible.  A detailed description of these processes can be found in Attachment 5.1 "Quality Process Flow".

    ii) Traceability Lexmark will apply its traceability process for █████ products and will maintain the data, and shall provide such data on an "as-needed" basis to █████

d) Post-General Availability (GA) Quality Maintenance

    i) Early Launch Phase (Typically Announce Day to Announce + 90 days)

Lexmark will meet with █████ on a regular basis to review data and corrective action summary of top issues specific to the █████ product.

Data related to █████ field calls and contacts by █████ Customer should be provided to Lexmark for product trend analysis and issue resolution.

Lexmark will use █████ field quality data and Lexmark brand data (where applicable) to identify trends and quality excursions, and to determine root causes and appropriate corrective actions.

    ii) Failure Analysis (FA)

CONFIDENTIAL - OUTSIDE COUNSEL ONLA3750

Lexmark shall be responsible for conducting printer FA on Lexmark branded product Because of a high level of product similarity, Lexmark branded FA can be used to supplement that of the ███ Product. FA units from ███ may be provided to Lexmark (location as determined by Lexmark) in proper packaging and with sufficient symptom information or identification to sufficiently enable Lexmark to complete FA for ███ partner specific issues.

FA results and trends are to be reported to ███ Based on findings, Lexmark is responsible for initiating issue containment and taking closed loop corrective action on future builds if necessary.

iii) Closed Loop Corrective Action

(1) In the event of a stop ship or significant line-down situation, Lexmark will inform ███ as quickly as possible, providing the basics of the issue and current plans for containment. Significant line-down implies a potential quality issue that impacts shipment or continuity of supply.

(a) Lexmark will then provide containment action plan within the next 24 hours or as soon as the action plan is available for the equivalent Lexmark branded product. Action toward containment will be implemented as quickly as possible.

(b) Though each case is unique, this process will typically involve problem validation and root cause analysis leading to a corrective action plan. This initial plan will be provided in the subsequent 24 - 48 hours, or as soon as the equivalent Lexmark branded product correction plan is available, and will describe appropriate actions to contain and correct the issue as needed. Updates on plans / status will be provided as necessary to ███

(c) In addition, regular updates, via a mutually agreed process to be setup by Lexmark Quality and ███ will be used in the process.

(2) Quality Excursions / Product Holds

(a) Lexmark will communicate product hold and stop-ship information to ███ and will drive action to contain product in Lexmark Inventory. When necessary, the OEM team will drive containment actions for products in ███ possession. Lexmark will be responsible to identify activities necessary to correct the issue, using Lexmark internal

3

processes. However, support from █████ may be required to accomplish actions on products that are in █████ possession. Necessary communications between Lexmark and █████ Engineering will be performed in accordance with an agreed methodology to be determined by Lexmark and █████

e)  Sustaining Engineering Engagement

At GA + 90 for █████ the product moves into the Sustaining Phase.  This phase has four key focus areas:

   a)  Customer Quality Escalation Management

   b)  Engineering Change Notifications and Management

   c)  Special Product Request Response

   d)  Product Withdrawal

1) Customer Quality Escalation Management

   a)  Failure Response

   Lexmark is responsible to implement Failure Analysis and, when needed, corrective action to reduce Field Warranty Claim Rates.  Priority is given to products that are not achieving their target. █████ will provide as much information as possible to support understanding of the issues such as: Printer SN, Cartridge SN/bar code number, specific error codes, etc, to support full understanding of the issue.  For Software issues, █████ will try to get from the customer information on the customers operating environment (i.e. operating systems, printer code levels, error logs, menu pages, etc.)

   b) Quality Excursions / Product Holds

   Lexmark will communicate product hold and stop-ship information to █████ and will drive action to contain product in Lexmark Inventory.   When necessary, the OEM team will drive containment actions for products in █████ possession. Lexmark will be responsible to identify appropriate activities necessary to correct the issue, using Lexmark internal processes. However, support from █████ may be required to accomplish actions on product that is in █████ possession. Necessary communications between Lexmark and █████ Engineering will be

4

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3752

performed in accordance with an agreed methodology to be determined by Lexmark and ████

### c) Steady State

Quality reporting for Products not performing to target will be provided. For products performing at target or past end of production life, Lexmark will provide updates monthly until End of Marketing Life.

Should ████ Product not meet agreed to quality targets for a sustained period, Lexmark and ████ quality teams will meet to review necessary corrective actions. Sustained period will be considered as more than two consecutive months at ████ or more above agreed to targets or one month at ████ or move above targets (typical 2 standard deviations). Details of this alignment shall be discussed and agreed to by the respective quality teams.

**If ████ volumes are not sufficient to support the above proposed methods to monitor product quality, ████ and Lexmark will meet to develop a process to best monitor product quality or changes in product quality.**

### d) Customer Quality Escalation Controls

If Lexmark and ████ do not agree on the handling of a quality issue and resolution is not occurring using the normal communication channels then escalation of the issue should be made in a timely manner to:

Quality Manager at Lexmark and Quality Manager a ████

## 2) Engineering Change (EC) Notification and Management

Lexmark will manage ECs for ████ products in parallel with those of the equivalent Lexmark branded products. All changes will be processed per current Lexmark process. Lexmark may make changes to the Products without notifying ████ i) if the changes do not have any effect on the model, form, function, or specifications of the Products, and /or ii) if the changes fall under the non-critical changes. Details regarding specific changes on major quality issues will be provided to ████ when available. Details will include the reason for the EC, description of the EC, part drawing (unrevised and revised), target implementation date, etc. If the part is a ████ specific / unique part potentially test data affecting form, fit,

5

CONFIDENTIAL - OUTSIDE COUNSEL ONLY  A3753

function, reliability and implementation date could be provided (if applicable).

a) Critical changes, defined as those that result in a change in the product part number or SKU, or are visually obvious, or impact the ███████ / Technical Support operations will be communicated to ████ For safety or other items that affect regulatory and/or certification requirements of product, ████ will be informed in advance of impact. Documentation will be provided to █████ as needed for ██████ or Lexmark to apply for the necessary government certifications / amendments.

These critical /major ECs include changes to the following:

   i. Changes to Part numbers of the printer, pub kit or service parts.

   ii. Changes to any safety related items or other items that affect regulatory and / or certification requirements.

   iii. Changes that are as a result of a major field warranty claims issue. These should be very limited in nature, meant to track an urgent change brought about by a large upward trend in claims rate.

b) Lexmark Declaration of Conformity PN lists (used for declaring conformity to RoHS requirements, if needed by █████ will be updated as needed

c) EC Process Timeline:

   For██████nique parts,██████will respond within (5) working days upon receipt of the Engineering Change Notice (ECN) with either an acceptance or rejection. No ECs shall be unreasonably refused provided it does not affect the conformance of the product to the specifications set out in the appropriate Product specific requirements. If there is no response from ██████ within the allotted time prior to EC implementation, Lexmark is authorized to proceed with EC implementation.

   Should██████reject such ECN, then Lexmark shall, within 20 days of such rejection, provide██████with a written notice specifying the impact on Product costs, forecasting, and deliveries associated with such rejection, and the pricing, forecasting, and delivery provisions.

When required (and requested), Lexmark will provide the serial number of

6

the initial units that incorporate the change to ███ when the ECN has been implemented.

d) ███ nitiated EC Request

███ will submit a written request to Lexmark with details of the requested EC. Details must include reason for the EC, description of the EC, test data/part drawings (if applicable) and quality data.

Lexmark will respond within (20) working days with the impact on cost (if applicable), test data affecting form, fit or function, reliability (if applicable). If impact cannot be determined in that time frame Lexmark will provide a target for a response to ███

███ will respond back within (10) working days upon receipt of the ECR with an acceptance or rejection. No response from ███ s the same as a rejection.

e) For EC implementations ███ service parts disposition should be the same as Lexmark's service parts disposition for the equivalent Lexmark branded products. When the EC is unique to ███ product, ███ will be consulted to develop a mutually agreed to appropriate service implementation / disposition strategy. ███ may be requested to support rework by consolidating and moving inventory to designated locations. In specific cases, Lexmark may request support from ███ in performing rework of product at ███ possession. If needed, Lexmark will negotiate appropriate costs reimbursement to ███ for their rework support.

3) Special Product Request (SPR) Management:

SPRs that result in modifications to product and / or process may result in additional NRE. ███ will submit SPR request to Lexmark in a similar manner as ECN request.

4) Product Withdrawal

Upon Lexmark's Product Withdrawal notification to ███ all quality reporting documented above will cease 60 (sixty) days after ███ "last buy" purchase order is shipped from Lexmark. In the event that a customer issue is identified after this specified time , but during the standard warranty period, a

7

Lexmark response will be required to address and correct the issue, if necessary and reasonable.

5. Receiving Inspection

Lexmark's standard manufacturing quality processes include inspections prior to Product shipment to confirm the on-going production is resulting in Products that meet the product and quality specifications. The quality reports created during these manufacturing quality processes are available for review by ████ and, a subsequent Receiving Inspection by ████ is not required. Receiving Inspection by ████ may result in damage to the units; and, thus is not recommended. Should ████ elect to implement a RI process, ████ must notify Lexmark.

Should Lexmark product not meet agreed to quality targets for a sustained period, Lexmark and ████ quality teams will meet to review necessary corrective actions. Actions may include actions by Lexmark and in addition could include specified receiving inspections by ████ Details of this alignment shall be discussed and agreed to by the respective quality teams.

6.   Epidemic Failure An Epidemic Failure is hereby defined as the same material defect found in five percent (5%) or more (for future printer models, this percentage may be modified and shall be agreed upon prior to listing the new printer model under this Agreement) of the installed base of Products over the most recent rolling three(3) month period; provided that, during the first 12 months following the Epidemic date, an Epidemic Failure shall be determined in accordance with the following model:

- In the event of an Epidemic Failure, the parties will discuss the nature of the Epidemic Failure and the statistics and calculation determining the Epidemic Failure. After Lexmark's verification of the defect and of the accuracy of the statistics and calculation used to determine the Epidemic Failure, Lexmark at its own expense shall determine the root cause of the problem and implement a fix required in the production of Products within 14 (fourteen) days or as soon as available for the Lexmark branded product. In this regard Lexmark shall provide ████ with the following, where applicable: Full details of the fix and the appropriate drawings and change notification

8

CONFIDENTIAL - OUTSIDE COUNSEL ONl A3756

- Cut in serial number for Products that will include the fix

Regarding affected Products that have already been delivered t███and either held in ███ stock or installed a███customer sites, Lexmark shall, within 30 (thirty) days after the determination of the Epidemic Failure by the parties, indicate any fix or repair that can be provided for such Products. Lexmark at its option and expense shall then either: (i) fix or repair such Products, or (ii) replace such Products, or (iii) if ███agrees to perform the fix or repair on such Products, Lexmark shall provided all required technical support and replacement parts and reimburse ███ for reasonable travel and labor costs, based upon mutually negotiated and agreed rates, for performing the fix or repairs, or (iv) refund t███ the original purchase price paid for the said Products, All defective Products or parts thereof replaced by Lexmark shall become the property of Lexmark. Lexmark will arrange and pay for all required transportation to move such Products or parts back to Lexmark. If Lexmark wishes to scrap or dispose of such defective Products or parts rather than to return to Lexmark, and if ███agrees to perform same for Lexmark, then the parties shall negotiate and agree on applicable Ricoh charges for this service.

Use of non-genuine Lexmark parts or supplies is not included in the defects counted towards epidemic failure.

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3757

OEM CONTRACT 6

# OEM PURCHASE AGREEMENT

This Agreement is entered into by and between Lexmark International (Korea), Inc. (hereinafter referred to as "Seller"), incorporated under the laws of the Republic of Korea and ███████ ████████. (hereinafter referred to as "Buyer"), incorporated under the laws of the ████████ ███████ for the sale of Products from Seller to Buyer for resale by Buyer under its designated logo.   The contract period of this Agreement shall commence on the execution of this Agreement and continue for twenty-four (24) months after Products are first shipped in production quantities. This Agreement will be automatically renewed for additional twelve (12) month periods unless either party notifies the other of its desire not to renew three (3) months prior to expiration.

Lexmark International (Korea), Inc. will ensure performance under this Agreement. In addition, Lexmark, Lexmark International, Inc. and Lexmark International Technology, SA (LITSA) or their Affiliated Companies may from time to time carry out Lexmark's obligations hereunder and/or exercise certain of its rights.

## 1.0  PRODUCTS

1.1  The Products include Printers, Engines, Image Cartridges and Accessories as specified in Attachment 1.0. These Products are being produced by Buyer for Seller under a separate Production Agreement #2837-6A4 which includes the General Terms and Condition that are incorporated by reference into the Production Agreement # 2837-6A4 ("Production Agreement"). Buyer agrees to make a significant effort to establish a marketing and sales presence in the Republic of Korea ("Korea") market with the Products using its own brand name.  In support of this effort, Seller agrees to sell the Products (in quantities not exceeding ████ of total production of such individual Products), to Buyer solely and exclusively (except as described below) for distribution by Buyer and its distributors within Korea for use solely in Korea, and any other country to which Seller agrees, in its sole discretion, in a signed agreement. Seller agrees that Buyer may, to the extent set forth below, be Seller's exclusive reseller in Korea of the Printer.  As part of its efforts to establish a market presence for the Products in Korea, Buyer agrees to use its best efforts to sell Products to Seller's OEM customers for sale in Korea and provide a high level of service and responsiveness to such customers. Furthermore, Buyer warrants that the terms and conditions of sale to Seller's OEM customers will not be less favorable than those offered to any Buyer customer except for the government of Korea. If at any time, ████████ shall offer more favorable terms to another Buyer customer, Seller's OEM customers shall immediately be offered the benefit of such more favorable terms and conditions. Notwithstanding this grant of exclusivity under this Agreement, Seller shall retain the right to sell for distribution and use in Korea any Printers for which ████ has obtained such exclusivity (1) to existing customers which Seller has a contractual obligation to sell printer products in Korea and (2.) to current and future Seller customers, including OEM customers, that are not primarily located in Korea, but which may distribute and/or use the Printer in Korea.  In consideration of the foregoing, during the terms of this Agreement Buyer agrees that it will purchase from Seller all of Buyer's (and all of Buyer's subsidiaries' and affiliates') requirements for all Products and derivatives for resale or lease by Buyer or its subsidiaries or affiliates.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3758

1.2 Products can be added by mutual written agreement amending Attachment 1.0. Seller can also withdraw individual models of Printers, Accessories or Image Cartridges on six (6) months prior written notice to Buyer and Buyer may submit a non-cancelable 'final buy' purchase order during the six (6) month period for Buyer's anticipated Product requirements, which Seller will fulfill subject to Product availability or, Seller may withdraw Products if they are withdrawn sooner under the terms of the Production Agreement without offering a last time buy. Buyer agrees that Buyer will use spare parts purchased from Seller only for performing warranty or maintenance service for Products purchased hereunder. Seller agrees to provide spare parts for the period of time agreed by Buyer under the Production Agreement.

1.3 The Product Specifications have been agreed to by Buyer and Buyer shall be notified of any engineering changes as per the terms of the Production Agreement.

## 2.0 Forecasts

2.1 On a monthly basis, Buyer agrees to provide a six (6) month rolling forecast of Product requirements, by the 20th of each month. Forecasted volumes are to be shown, by Seller part number, in the month requested to be manufactured. Forecasts can change as allowed by the table shown below. If a new forecast is not received by the due date, the volumes forecasted in the prior month's forecast will be used as the recognized forecast for the current month. If for a second consecutive month Buyer does not provide a forecast by the due date, all volumes beyond month 5 (as described below) will be reduced to zero (0), and volumes within the first five (5) months will be reduced to the lower allowable limits as described below.

## 3.0 Orders

3.1 Buyer agrees to place non-cancelable purchase orders (PO) by the 20th of each month with a minimum lead time to delivery of two (2) months (e.g. purchase orders received by the 20th of January must be for Products with delivery on the 20th of March). POs must be issued to comply with the allowable variation limits from prior forecasts as set forth in the table below and subject to manufacturing and tooling capacity.

Firm PO for Month 3  PO can increase not more than       from prior forecast for this month

Month 4   Forecast can vary not more than      from prior forecast for this month

Month 5   Forecast can vary not more than      from prior forecast for this month

After Month 5

3.2 Seller will accept and schedule non-cancelable POs based on Product availability, and will inform Buyer of shipment schedules within fourteen (14) calendar days of the PO receipt. Lexmark will also attempt to fulfill POs with requested lead times that are less than that specified above. Seller will deliver Product to Buyer as specified in this Agreement and in Attachment 2.0.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3759

3.3 Notwithstanding anything in this Agreement, in no event shall Seller be liable or have responsibility for late delivery.

3.4 Seller agrees to comply with BPD Buy/Sell Transaction Process as specified in Attachment 3.0 including, but not limited to, preparing and providing to Seller a monthly production report in a format specified by Seller on a monthly basis. Attachment 3 has an example of the current requirements of a monthly production report.

## 4.0 PRICING AND PAYMENT

4.1 Pricing for Products is as specified in Attachment 2.0.

4.2 Delivery of the Products to Buyer from Seller shall occur upon the date and time that Buyer submits to Seller, under the terms of the Production Agreement, an invoice to the identified Products that Buyer manufacturers for Seller to be sold back to Buyer under the terms of this Agreement. Delivery shall be at Buyer's manufacturing location in ████████████████ (or other manufacturing location approved in writing by Buyer and Seller). Upon delivery, title to the Products shall pass to Buyer. Since Buyer is the manufacturer of the Products for Seller under the Production Agreement, Buyer shall has the risk of loss and damage at all times (i.e., while the Products are being manufactured, stored prior to delivery and after title is transferred).

4.3 Invoices will be provided on the date of delivery and payment is due within 30 days of such delivery date. Seller reserves the right to withhold payments under the Production Agreement until all amounts owed by Buyer under this Agreement are paid.

4.4 Prices listed are delivery at Buyer's manufacturing location ████████████████ ████████ Should the Products be lost or damaged, it is the Buyer's responsibility to file claim with its insurer.

4.5 Any duties, tariffs, taxes and other charges (collectively "duties") imposed on Seller shall be paid by Seller. Any duties imposed on Buyer relating to the purchase of the Products shall be paid by Buyer.

## 5.0 LIMITED WARRANTY AND REMEDIES

5.1 The Products are sold by Seller to Buyer without any warranty of any kind except, Seller warrants the products are being sold free and clear of any liens or encumbrances. SELLER MAKES NO EXPRESS OR IMPLIED WARRANTIES (INCLUDING BUT NOT LIMITED TO THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT) AND SHALL NOT BE SUBJECT TO INDIRECT, CONSEQUENTIAL, OR PUNITIVE DAMAGES.

## 6.0 INDEMNIFICATION

6.1 All indemnification rights and responsibilities shall be as stated in the Production Agreement. The parties agree that there are no further indemnification rights under this Agreement.

## 7.0 DOCUMENTATION

7.1 Seller shall furnish to Buyer, on an ongoing basis during the term hereof, free of charge, such materials (that Seller may have available for Seller's own purposes) as Buyer may reasonably request in camera ready form for use by Buyer to prepare brochures and other product literature, including, but not limited to, operators, maintenance and parts manuals, catalogs, specification sheets, and other data necessary or appropriate for the sale of Products. Seller grants to Buyer the royalty-free right and license to reproduce all or any part of such documentation for use with Products purchased from Seller. Buyer is further given the right to modify any or all parts of the documentation to reflect changes made to the Products or consistency in style with other documentation used by Buyer or to satisfy legal or customers requirements. In no event shall Buyer release Seller's confidential information pursuant to this paragraph. Seller's grant to Buyer of the right and license to use the materials is not intended to convey any ownership interest to Buyer; Seller retains all rights in the intellectual property contained in the above referenced materials.

7.2 Seller shall provide to Buyer, at no cost, all documentation which, in Buyer's reasonable opinion, are necessary or appropriate for Buyer to fulfill Buyer's service obligations for the Products provided, however, that such documentation is available for Seller's own purpose. Seller grants to Buyer the royalty-free right and license to reproduce all or any part of such documentation for use with Products purchased from Seller. Buyer is further given the right to modify any or all parts of the documentation to reflect either changes made to the Products, or to reflect consistency in style with other documentation used by Buyer or to satisfy legal or customer requirements. In no event shall Buyer release Seller's confidential information pursuant to this paragraph. Seller's grant to Buyer of the right and license to use the materials is not intended to convey any ownership interest to Buyer; Seller retains all rights in the intellectual property contained in the above referenced materials.

7.3 Publications, which are derivative works prepared by or for Buyer under the license granted in this Section, may include an appropriate Buyer copyright notice in lieu of any Seller copyright notice. Other than the license granted in this Section, Seller retains all copyright rights in the documents and Buyer agrees to provide Seller all necessary assistance, at Seller's expense to enforce those rights against infringement.

7.4 In response to inquiries related to copyright rights in fonts, publications and other material subject to copyright, and in which Seller holds copyright rights, Buyer will identify Seller as the owner of some or all of the copyright rights, as appropriate, or direct such an inquiry to Seller.

## 8.0 TERMINATION

8.1 Either party can terminate this Agreement for default of a material provision by the other not cured within thirty (30) days after written notice. However, the parties agree that prior to any issuance of a written notice of default, they both will negotiate in good faith to resolve any dispute or default, and such negotiations will include at least one meeting between senior executives of each party. If Seller terminates for Buyer's default, Buyer shall pay Seller for all Products produced and in work in process, plus all components and material in inventory or ordered which cannot be reasonably canceled, returned or diverted to other Seller products. If Buyer terminates for Seller's default, Buyer must pay for Products shipped prior to the effective date of termination. Product on order on the effective date of termination, subject to their availability from Seller. In addition, if either party files a claim or suit against the other, whether based on a default of this Agreement, or for any other reason, the other party may terminate this Agreement immediately, and only outstanding accepted orders will be fulfilled (and Seller may, at its option, require payment prior to shipment). Finally, if the Production Agreement is terminated, this Agreement will be terminated upon the same date as the Production Agreement and Lexmark shall have no obligation to sell Products after such termination.

## 9.0 GENERAL

9.1 Notwithstanding any other provisions of this Agreement, neither party shall have the right to use the names, trade names, trademarks or other designations of the other party (or its subsidiaries or parent) directly or indirectly, in connection with any product, promotion or publications without the prior written approval of the other party.

9.2 If either party's performance of any obligations hereunder is prevented or restricted by reason of fire or other casualty, strikes or labor disputes, inability to timely obtain required labor, materials, or parts, war or other violence, or governmental law, regulation, or requirement, or such other situation that is out of the control of such party, then that party shall be excused from performance to the extent of the prevention or restriction.

9.3 (a) All claims for damages arising under, or by virtue of this Agreement or otherwise in connection with the Product specified or its design or manufacture, which are not promptly settled by mutual agreement of the parties hereto, except those set forth in subsection (c) of this section, shall be finally settled under the Rules of Conciliation and Arbitration of the International Chamber of Commerce by a single arbitrator appointed by mutual agreement of the parties, or, if the parties cannot agree, the arbitrator shall be selected by the secretary general of the International Chamber of Commerce.

(b) The parties agree that the arbitration shall take place in Paris, France. The arbitrator shall be governed in rendering an award or judgement strictly by the express terms of this Agreement; the language of both notification and arbitration will be English; and the findings and decision of the arbitrator shall be in writing and shall be final and binding upon both parties hereto.

(c) The arbitrator's power does not extend to (1) issues relating to any of the parties' own Intellectual Property Rights or (2) the award of indirect or consequential damages suffered by a party to this Agreement except to the extent provided for as remedies in this Agreement (excluding any such damages that may be suffered by a third party) and except

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3762

as such damages may relate to a party's indemnification obligation, or (3) the award of punitive damages.

(d) With respect to the enforcement of any such arbitrator's award or any judgment or order made by a court referred to above, each of the parties waives objections to and irrevocably submits to the jurisdiction of courts in the location of the other party's principal place of business

9.4  Seller assumes no liability regarding any claim or action caused by, or directly related to, a non-Seller product.  In no event will Seller be liable for any lost profits, lost savings, incidental damages, or other consequential damages, even if Seller has been advised of the possibility of such damages.  Seller will not be liable for any damages claimed by Buyer based on any third party claim. For any claim for any cause whatsoever, Seller's liability for actual damages will be limited to

9.5  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together shall constitute the same instrument. In the event the parties hereto execute this Agreement in the form of a facsimile transmission, the parties agree promptly thereafter to execute identical non-facsimile counterparts dated as of the execution date of the facsimile version.

9.6  All obligations of the parties, which by their nature survive any expiration or termination, shall remain in effect. Either party's waiver of any instance of the other's noncompliance with the Agreement will not be deemed a waiver of any future non-compliance.

9.7  Press releases and other publicity or advertising that mentions the other party by name shall be agreed upon by both parties prior to release. This Agreement, and its terms and pricing shall be held in confidence for 2 years, except that either party can disclose it to a third party financial organization for financing purposes, if such third party agrees to hold it in confidence.  No other information shall be considered confidential unless it is covered by separate written Confidential Agreement Number 9823 which is hereby incorporated into this Agreement, and which shall continue in full force and effect throughout the contract period of this Agreement.

9.8  Each party agrees to comply with all applicable governmental laws and regulations, including US laws and regulations relating to the export of technical data and Products covered by this Agreement

9.9  Seller shall have the right to conduct, at its expense, an audit of Product production activities at Buyer's manufacturing site.  All such source verification activities shall be scheduled by providing written notice to Buyer.  In addition hereto, Seller, Buyer and HMP&J financial records relating to the purchase and sale of Products between the companies must be reconciled on a quarterly basis and to include a yearly audit conducted by Seller to close all issues.

9.10  Neither party may assign its rights or obligations under this Agreement without the prior written consent of the other, which consent shall not be unreasonably withheld. Notwithstanding the above, each party may, without the prior written consent of the other, assign its rights and obligations hereunder to a successor in ownership of all or substantially all of the assets of the assigning party, whereupon such assignee will assume

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3763

this Agreement and will automatically be deemed to have replaced the assignor for all purposes hereof.

9.11 The Agreement will not be supplemented or modified by any course of dealing or trade usage. Variance from or addition to the terms and conditions of the Agreement in any purchase order or other written notification from Buyer will be of no effect. This Agreement does not constitute an offer by Seller and it shall not under any circumstances be effective until both parties sign it.

9.12 This Agreement, including its Attachments, which shall be governed by the law of the state of New York, is the complete agreement between the parties replacing any purchase order or invoice terms and all prior written and verbal communications or agreements between us on this subject matter. It can be modified only by written amendment mutually agreed to by both parties.

Agreed:

**LEXMARK INTERNATIONAL (Korea), INC**

By: _James Power_

Name: _JAMES POWER_

Title: _MANAGING DIRECTOR_

Date: _1/10/2002_

Date: _12 - 21 - 01_

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3764

CONFIDENTIAL - OUTSIDE COUNSEL ON A3765

## ATTACHMENT 2.0

## PRICING FOR INITIAL PERIOD



| Lexmark Part # | Description | Lexmark Sell Price To ▮ | Lexmark Part # | Description | Lexmark Sell Price To ▮ |
|---|---|---|---|---|---|
| 08A0045 | E322 | | 08A0900 | E320 | |
| | Purchase price | | | Purchase price | |
| | Tooling | | | Tooling | |
| | Royalty | | | Royalty | |
| | NRE | | | NRE | |
| | Sub Total | | | Sub Total | |
| | OEM Overhead | | | OEM Overhead | |
| | Sub Total | | | Sub Total | |
| | Profit | | | Profit | |
| | Total | | | Total | |
| | Total in Korean Won | | | Total in Korean Won | |

| Lexmark Part # | Description | Lexmark Offer | Lexmark Part # | Description | Lexmark Sell Price To ▮ |
|---|---|---|---|---|---|
| 08A0046 | E322n | | 08A476S | 3K AM Prebate Cartridge | |
| | Purchase price | | | Purchase price | |
| | Tooling | | | Tooling | |
| | Royalty | | | Royalty | |
| | NRE | | | NRE | |
| | Sub Total | | | Sub Total | |
| | OEM Overhead | | | OEM Overhead | |
| | Sub Total | | | Sub Total | |
| | Profit | | | Profit | |
| | Total | | | Total | |
| | Total in Korean Won | | | Total in Korean Won | |

| Lexmark Part # | Description | Lexmark Offer | Lexmark Part # | Description | Lexmark Sell Price To ▮ |
|---|---|---|---|---|---|
| 08A0047 | E322 w/o controller | | 08A478S | 6K AM Prebate Cartridge | |
| | Purchase price | | | Purchase price | |
| | Tooling | | | Tooling | |
| | NRE | | | NRE | |
| | Sub Total | | | Sub Total | |
| | OEM Overhead | | | OEM Overhead | |
| | Sub Total | | | Sub Total | |
| | Profit | | | Profit | |
| | Total | | | Total | |
| | Total in Korean Won | | | Total in Korean Won | |

CONFIDENTIAL - OUTSIDE COUNSEL ONI A3766



| Lexmark Part # | Description | Lexmark Offer | Lexmark Part # | Description | Lexmark Sell Price To ▮ |
|---|---|---|---|---|---|
| 08A0048 | Engine only for MFP Base | | 08A4080 | 250 Sheet 2nd Drawer | |
| | Purchase price | | | Purchase price | |
| | Tooling | | | Tooling | |
| | NRE | | | NRE | |
| | Sub Total | | | Sub Total | |
| | OEM Overhead | | | OEM Overhead | |
| | Sub Total | | | Sub Total | |
| | Profit | | | Profit | |
| | Total | | | Total | |
| | Total in Korean Won | | | Total in Korean Won | |
| 08A475S | 3K AM Cartridge | | | | |
| | Purchase price | | | | |
| | Tooling | | | | |
| | NRE | | | | |
| | Sub Total | | | | |
| | OEM Overhead | | | | |
| | Sub Total | | | | |
| | Profit | | | | |
| | Total | | | | |
| | Total in Korean Won | | | | |
| 08A477S | 6K AM Cartridge | | | | |
| | Purchase price | | | | |
| | Tooling | | | | |
| | NRE | | | | |
| | Sub Total | | | | |
| | OEM Overhead | | | | |
| | Sub Total | | | | |
| | Profit | | | | |
| | Total | | | | |
| | Total in Korean Won | | | | |

*Note:

1. Each printer is shipped with toner cartridges as specified on attached Product Specification pages.
2. ▮▮▮▮▮▮▮▮▮ per P/N and purchase order.

The above prices are the initial prices for the Products in Won. The pricing throughout the term of this Agreement shall be based off the overall price paid by Seller to Buyer (i.e., the Purchase Price line of the above pricing chart) for the corresponding Products purchased under the Production Agreement plus (i) the tooling, NRE, and/or Royalty charge(s) described in the pricing table and (ii) the percentage in the OEM Overhead line as detailed above. This total amount in U.S. dollars is then converted by the Base Exchange Rate ("BER") as described below to obtain the price in Won to Buyer. Since the Products will by sold to Buyer by Seller in Won, for Products that are purchased by Seller from Buyer for resale to Buyer, Seller shall purchase, and Buyer shall sell, such Products in Won rather than U.S. dollars using the

CONFIDENTIAL - OUTSIDE COUNSEL ONl A3767

identical currency exchange as described in this Agreement. In addition, the tooling, NRE, and/or Royalty charge described in the pricing table shall be converted to Won, using the same BER, to calculate Buyer's purchase price.

By way of example, Seller will pay Buyer for a E322 Printer the amount of ▮▮▮▮▮ The current currency exchange is 1200 Won so Seller shall pay Buyer under the Purchase Agreement the amount of ▮▮▮▮▮ for the E322 Printer. The tooling charge is ▮▮▮ exchanged into Won to be ▮▮▮ The Royalty charge is ▮▮▮ exchanged into Won to be ▮▮▮ The OEM Overhead is multiplied by ▮▮▮

▮▮▮▮▮▮▮▮ Buyer shall pay Seller for the purchase of the E322 the amount of ▮▮▮▮▮▮

## Currency Calculation

The foregoing pricing for all Product are based on the current BER of 1200 South Korean Won per U.S. $ and will include a "Edge Window Rate" with a lower limit of 1000 South Korean Won per U.S. $ and a upper limit of 1400 South Korean Won per U.S. $. A new BER may be established if, by using the published Won to U.S. dollar exchange rate published in the Eastern edition of the Wall Street Journal the first business day after the end of each calendar quarter ("New BER"), the New BER is outside the Edge Window Rate. If the New BER is outside the Edge Window Rate (e.g., BER increases from 1200 Won to 1500 Won), the Won rate in the above table (i.e., 1200 Won) shall change to 1500 Won so that all purchases by Seller from Buyer and all subsequent sales by Seller to Buyer are similarly affected (i.e., no Products shall by purchased by Seller from Buyer (for sale back to Buyer) and sold to Buyer from Seller at a different exchange rate). If in any calendar quarter a New BER is used and the subsequent calendar quarter establishes a BER inside the Edge Window Rate, in this case the BER for the calendar quarter will be 1200 Won (e.g., 3rd calendar quarter the BER is 1500 with the first business day of the 4th calendar quarter showing a New BER of 1350 Won, the BER used in the 4th calendar quarter will be 1200 Won).

By way of example, Seller will purchase from Buyer an E322 Printer for ▮▮▮▮▮ The current currency exchange in that quarter is no longer 1200 Won but 1500 Won so Seller shall pay Buyer under the Purchase Agreement the amount of ▮▮▮▮ for the E322 Printer. The tooling charge is ▮▮▮ exchanged into Won at 1500 Won to be ▮▮▮ The Royalty charge is ▮▮▮ exchanged into Won at 1500 to be 10,650 Won. The ▮▮▮ OEM Overhead is multiplied by ▮▮▮

▮▮▮▮▮▮ Buyer shall pay Seller for the purchase of the E322 the amount of ▮▮▮▮▮

NOTES:

1. Prices listed are delivery an Buyer's manufacturing plant, currently at ▮▮▮▮▮▮▮▮ and are in United States dollars, for initial twelve (12) month delivery. Risk of loss or damage will pass upon the transfer of title at Buyer's manufacturing plant. The Buyer is responsible for obtaining sufficient insurance to cover the value of goods and transportation for shipment.

2. The above pricing do not includes a warranty. The Products are sold without warranty of any kind.

CONFIDENTIAL - OUTSIDE COUNSEL ONA3768

3. The above prices apply only to Lexmark manufactured and/or supplied Product per Attachment 1.0, Product Specification.

4. Above prices do not include incremental non-recurring expenses (NRE) for these projects.

5. Seller can change pricing of spare parts on one (1) month notice to keep pricing equivalent to Seller's standard dealer/distributor spare parts pricing.

6. For Printers, Seller is offering new cartridges to Buyer with regular terms ("regular supplies"), and as Prebate supplies subject to "use once and return" license terms. It is Seller's corporate policy to make available both versions of cartridges. If Buyer elects to purchase the Prebate cartridges, Buyer also agrees to purchase and make available to its customers the regular supplies. The Prebate license terms are an essential part of the Prebate offering. For the "up-front rebate," the end user agrees that the cartridge will be used one time only, and will be returned only to Buyer after its initial use. The Prebate supplies label, and its packaging, will instruct the user to return the Prebate supplies (after use) to Buyer's collection point.

CONFIDENTIAL - OUTSIDE COUNSEL ONIA3769

OEM CONTRACT 7

# OEM  PURCHASE AGREEMENT

**between**

**Buyer:**



**and**

**Seller:**

**Lexmark International, Inc.**
**740 New Circle Road NW**
**Lexington, KY  40550**

09/08/00

Lexmark Confidential

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3770

## OEM PURCHASE AGREEMENT

This Agreement is between **Lexmark International, Inc.** of Lexington, KY, USA (Lexmark or Seller) and ███████████████████████████ or Buyer) for the sale of Products from Seller to Buyer for resale by Buyer in the USA (and other countries where mutually agreed) under Buyer's designated logo. ███████ agrees that all Products, prior to resale, shall incorporate substantial value add modifications so that they are differentiated from Lexmark's branded printer products.  Such value adds shall consist of one or more for the following: 1) MICR cartridges, 2) unique Simm, or 3) unique ███████ software, unique ███████ connectivity solutions or other changes or options that are not Lexmark logo'd product and which Lexmark approves in writing as being a significant value add.  Lexmark will evaluate on a case by case basis whether to allow ███████ o sell non-value added ███████ go'd printers.  The contract period of this Agreement shall commence on the execution of this Agreement and continue for twenty-four (24) months after the date of execution.  This Agreement will be automatically renewed for additional twelve (12) month periods unless either party notifies the other of its desire not to renew five (5) months prior to expiration.

Based on Lexmark maintaining full responsibility for the Agreement, Lexmark may have LexTech and other Lexmark Affiliated Companies fulfill certain of Lexmark's responsibilities hereunder and/or exercise certain of its rights.

███████ existing Authorized Dealer Agreement and the Amendment for ███ compatible MICR Print Cartridges with Lexmark remain in place pursuant to its terms, under which ███████ can order Lexmark branded products under those dealer terms, except that all amendments related to MICR printing and MICR cartridges are superceded and replaced by this OEM Agreement as of its effective date.

## 1.0 PRODUCTS

1.1 The Products include Printers and Features as specified in Attachment 1.0 and Supplies (MICR cartridges) as specified in attachment 5.0.  Printers come in two versions, tonerless and with a Lexmark logo Prebate cartridge.  Buyer will purchase separately MICR cartridges and insert a MICR cartridge in each tonerless printer prior to sale to a customer.  For the Printer version that ships with a Lexmark logo Prebate cartridge, Buyer agrees that the cartridges will remain in the printer and be sold as a part of it, and not removed and sold separately.   Products can be added by mutual written agreement, amending Attachment 1.0.  Seller can also withdraw products on six (6) months prior written notice to Buyer and Buyer may submit a non-cancelable 'final buy' purchase order during the six (6) month period for Buyer's anticipated Product requirements which Seller will fulfill subject to Product availability.  Buyer agrees that Buyer will use spare parts purchased from Seller only for performing warranty or maintenance service for Products purchased hereunder.  Seller agrees to provide spare parts for five (5) years from date of final shipment of related Printer Products to Buyer.  Features offered at OEM price can be sold for use only on Printers purchased under this OEM Purchase Agreement.

1.2 The Product Specifications have been agreed to by Buyer.  Per the terms of Attachment 3.0, Engineering Change Procedure, Seller agrees to notify Buyer of any changes by Seller affecting the form, fit, or specification of a Product, except for safety changes which can be made without prior notice.  Seller agrees to evaluate Buyer requested changes and

CONFIDENTIAL - OUTSIDE COUNSEL ON A3771

advise Buyer of any effect on the Product Specifications and prices of such changes. No such Buyer requested changes will be implemented until the Product Specifications and price changes are mutually agreed upon.

1.3 In order to ensure optimal functioning of Products, and in order to facilitate Seller's planning, manufacturing, and availability of Supplies and regular cartridges, Buyer agrees to purchase from Seller its entire requirement for supplies, both MICR and regular, that function on Products. Seller agrees to sell such Supplies to Buyer for five (5) years after the final shipment of the related printer Product.

1.4 Seller agrees to provide one (1) training session of three (3) days to Buyer's technicians, without charge, regarding corrective and preventive maintenance of the Products purchased hereunder. Such instruction will be conducted at a location to be designated by Buyer. Each party shall pay its own travel and living expenses incurred by the employees assigned to give or receive such instruction. Additional training sessions may be held at Buyer's expense at a price, location and date to be mutually agreed to by the parties.

1.5 Additional terms related to MICR cartridges are attached as <u>Attachment 5.0.</u>

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3772

## 2.0  ORDERS

2.1   Buyer agrees to provide, by the 25th day of each month, a rolling six (6) month forecast of Products with allowable variations as set forth below:

F= Firm P/O
V= Variable

**30 Day Lead-Time**

|  | Sept | Oct | Nov | Dec | Jan | Feb |
|---|---|---|---|---|---|---|
| 1st forecast Due by 25th of September | F | 20% + or - | 50% + or - | V | V | V |
| 2nd forecast Due by 25th of October |  | F | 20% + or - | 50% + or - | V | V |
| 3rd forecast Due by 25th of November |  |  | F | 20% + or - | 50% + or - | V |
| 4th forecast Due by 25th of December |  |  |  | F | 20% + or - | 50% + or - |

**60 Day Lead-Time**

|  | Sept | Oct | Nov | Dec | Jan | Feb | Mar |
|---|---|---|---|---|---|---|---|
| 1st forecast Due by 25th of September | F | F | 20% + or - | 50% + or - | V | V | V |
| 2nd forecast Due by 25th of October |  | F | F | 20% + or - | 50% + or - | V | V |
| 3rd forecast Due by 25th of November |  |  | F | F | 20% + or - | 50% + or - | V |
| 4th forecast Due by 25th of December |  |  |  | F | F | 20% + or - | 50% + or - |

**90 Day Lead-Time**

|  | Sept | Oct | Nov | Dec | Jan | Feb | Mar | April |
|---|---|---|---|---|---|---|---|---|
| 1st forecast Due by 25th of September | F | F | F | 20% + or - | 50% + or - | V | V | V |
| 2nd forecast Due by 25th of October |  | F | F | F | 20% + or - | 50% + or - | V | V |
| 3rd forecast Due by 25th of November |  |  | F | F | F | 20% + or - | 50% + or - | V |
| 4th forecast Due by 25th of December |  |  |  | F | F | F | 20% + or - | 50% + or - |

CONFIDENTIAL - OUTSIDE COUNSEL ON A3773

2.2  Buyer will place purchase order requests with a maximum lead time to shipment as set forth below:

| Lexmark Product | Minimum Order Quantity | Lexmark Ship Point (US) | Distribution Terms (US) | | Maximum Lead Time to Shipment After Purchase Order is Received |
|---|---|---|---|---|---|
| Printers | | | Freight Terms | Title Passes | |
| Optra T | | Seymour, IN | FOB Origin, Seymour, IN | Pt of shipment, Sey, IN | 45 Days for the initial 3 month period from date that first PO is rec'd. Thereafter 30 days |
| Optra M | | Seymour, IN | FOB Origin, Seymour, IN | Pt of shipment, Sey, IN | 90 Days |
| Supplies | | | | | |
| Optra T | | Seymour, IN | FOB Origin, Seymour, IN | Pt of shipment, Sey, IN | 30 Days |
| Optra M | | Seymour, IN | FOB Origin, Seymour, IN | Pt of shipment, Sey, IN | 90 Days |
| Features † | N/A | Seymour, IN | FOB Origin, Seymour, IN | Pt of shipment, Sey, IN | 10 Days |

*  Exception: T614n, T616, T616n
†  Exception: Unique SIMMS – 30 days
Lead times are subject to change

2.3  Seller will accept and schedule non-cancelable purchase orders based on Product availability, and will inform Buyer of shipment schedules within five (5) days of the purchase order request. Seller will also attempt to fulfill orders with requested lead times that are less than that specified above. Minimum incremental order quantities are set forth in Section 2.2. Buyer may cancel non-scheduled orders, on an exception basis, with Seller's approval.

2.4  OEM Product is not returnable unless defective, (as described on Section 4.1 and Attachment 5.0), in which case, defective Product will be replaced. Any Product returned to Seller that is not defective will be returned to Buyer at Buyer's expense. To receive credit for defective Product:

•  A Return Material Authorization (RMA) must be requested by Buyer and approved by Seller.

•  Product must be returned to the address indicated on the RMA.

•  Product part number and quantity returned must be as approved in the RMA.

Lexmark Confidential

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3774

## 3.0  PRICING AND PAYMENT

3.1  Pricing for Products is as specified in Attachment 2.0. Prices for Printers will not be increased during the initial twelve (12) months of Product shipment, unless mutually agreed to by the parties, but is subject to change thereafter. For the initial twelve (12) months, Buyer's price will be based on Buyer's initial forecast of ▮▮▮ Printers. Buyer's applicable volume and related prices will be reset prior to the next twelve (12) month period during the contract period, based on Buyer's prior year's volume attainment, current purchase orders, and forecasts. Any Printer price change by Seller will be after a mutual review of changes in the competitive environment and/or changes to Seller's prices to its US dealers of its comparable printers. Parties agree to meet as needed, at least quarterly, to discuss changes in the competitive environment.

3.2  Invoices will be provided on the date of shipment, and payment is due within thirty (30) days. Seller reserves the right to withhold shipping if Buyer's account is delinquent.

3.3  Prices listed are FOB Seller's location, in United States dollars. Risk of loss or damage and title will pass at Seller's shipping dock. The Buyer is responsible for obtaining sufficient insurance to cover the value of goods and transportation for shipment. Should the shipment be lost or damaged in transit, it is the Buyer's responsibility to file claim with his insurer. Shipping costs will be invoiced to Buyer and will be payable under invoice terms and conditions. The Buyer pays for shipping costs.

3.4  Buyer will be responsible for all taxes, including but not limited to sales and use tax, customs and excise duties, turnover or withholding taxes, Value Added Tax, property tax, corporate, state or local income tax associated with the purchase and delivery of Seller's products except for those taxes assessed on the income of the Seller which shall be the Seller's responsibility. All prices quoted per this contract will be exclusive of any tax unless otherwise stated by the Seller.

3.5  The parties agree that the Products purchased by Buyer are dependent upon the market success of each Product and that the market success is dependent upon the Seller's competitive prices and the Buyer's competitive positioning. The parties agree to meet periodically, no less frequently than once per year, to review the competitiveness of these prices and positioning; and, where appropriate, to negotiate in good faith any appropriate adjustments to such prices.

3.6  Non-Recurring Expenses (NRE) remain to be negotiated on an individual project basis and included in Attachment 6.

3.7  No Dealer programs apply to Products purchased under this agreement, except the existing Dealer rebate grid for MICR cartridges in Attachment 7 and other programs that are mutually agreed to by both companies.

## 4.0  LIMITED WARRANTY AND REMEDIES

4.1  Seller warrants that all <u>Printers and Features (not including items or material consigned or otherwise provided by Buyer to Seller)</u> shipped under this Agreement:

1) is free from liens or other defects in title,

09/08/00

Lexmark Confidential

CONFIDENTIAL - OUTSIDE COUNSEL ON A3775

2) will be newly manufactured,
3) shall conform to Seller's Product Specifications when Buyer's Product is initially unboxed and installed (which shall in no event exceed 120 days from date of shipment from Seller).

4.2   MICR cartridge warranty terms are included in Attachment 5.0.

4.3   In the event a Printer or Feature does not conform to Seller's Product Specifications when Buyer's Product is unboxed and installed (not to exceed one hundred twenty (120) days from shipment from Seller, Buyer agrees to perform maintenance service and replace the defective parts (and return the defective parts to Seller upon Seller's request), and Seller shall provide a replacement part (at Seller's expense) and ship them to Buyer with Buyer's next monthly shipment, or Seller may, at its option, credit Buyer's account with the part's price.  Any parts returned to Seller that are not defective shall be returned to Buyer at Buyer's expense.

4.4   This warranty does not cover failures caused by misuse, accidents, damage in transit, attachments, alterations or modifications to Printers and Features, unsuitable operation, applications or usage environment, or failure caused by non-Seller product or part, including Buyer's.

4.5   THE FOREGOING IS IN LIEU OF ALL OTHER WARRANTIES, EXPRESSED OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, THE WARRANTY AGAINST INFRINGEMENT AND THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

4.6   The above warranty is provided to Buyer only.  Buyer must establish its own warranty for its sale of Buyer Products to its end users.  Seller will not be obligated to provide any installation, warranty, maintenance, or customer support for Buyer's end users or remarketers. 

4.7   Epidemic Failure means that more than five percent (5%) of the installed base of Printers or Features suffer within one year from their shipment date to Buyer from the same defect or same failure to satisfy the Product Specifications (Attachment 1.0).  If an Epidemic Failure exists, for those printers in excess of the five percent (5%), Seller shall provide the replacement parts as set forth in Section 4.2 above, and also shall pay Buyer for Buyer's reasonable labor costs, at Seller's ordinary and customary rates charged to independent third parties, which were or are required to correct such Epidemic Failure.

## 5.0  INDEMNIFICATION

5.1   Indemnification terms related to MICR cartridges are located in Attachment 5. Indemnification for other Products is provided below.

5.2   Seller will indemnify and hold Buyer harmless from any and all claims, suits, actions, liabilities, and costs of any kind, including reasonable attorney's fees, for bodily injury or damage to real property or tangible personal property, arising from any acts or omissions for which, and to the extent that, Seller is legally liable, except that in no event will Seller be liable for any lost profits, lost savings, incidental damages or other consequential damages.

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3776

5.3 Buyer will indemnify and hold Seller harmless from any and all claims, suits, actions, liabilities, and costs of any kind, including reasonable attorney's fees, for any and all claims by any party relating to Buyer's modifications, Buyer's consigned or provided items or material, and Buyer's representations, arising from any acts or omissions for which, and to the extent that, Buyer is legally liable, except that in no event will Buyer be liable for any lost profits, lost savings, incidental damages or other consequential damages.

## 6.0  PATENTS AND COPYRIGHTS

6.1 Seller will, at its expense, defend Buyer against any claim that Printers and Features (for purposes of this section, Printers and Features shall not include items or material consigned or otherwise provided by Buyer to Seller) supplied hereunder infringes a US patent or copyright and Seller will pay resulting costs, damages and attorney's fees finally awarded by a court for such claim.

6.2 To qualify for such defense and payment, Buyer must:

   a) Give Seller prompt written notice of any such claim; and

   b) Allow Seller to control the defense, and fully cooperate with Seller in the defense and all related settlement negotiations.

6.3 Seller's obligation under this Section is conditioned on Buyer's agreement that if units of Printers and Features in the inventory of Buyer, or the operation thereof while in Buyer's inventory, become, or in Seller's opinion are likely to become, the subject of such a claim, Buyer will permit Seller, at Seller's option to stop shipping Printers and Features, and/or to procure the right for Buyer to continue marketing and using units of Printers and Features or to replace or modify them so that they become non-infringing; and upon written request, Buyer will return such units of Printers and Features in its inventory to Seller. Seller agrees to grant Buyer a credit equal to the Unit Price paid to Seller by Buyer for the returned units of Product adjusted for the value of use if such item has been used or partly consumed and assume all cost of freight to and from Buyer.

6.4 Notwithstanding the foregoing, Seller shall have no obligation whatsoever with respect to any claim based upon (a) an Engineering Change requested or initiated by Buyer, (b) Non-Seller modification of units of Printers and Features, (c) the combination, operation or use of Printers and Features with items or material consigned or otherwise provided by Buyer to Seller or apparatus, data or programs not furnished by Seller.

## 7.0 DOCUMENTATION

7.1 Seller shall furnish to Buyer, on an ongoing basis during the term hereof, free of charge, such materials (that Seller may have available for Seller's own purposes) as Buyer may reasonably request in camera ready form for use by Buyer to prepare brochures and other product literature, including, but not limited to, operators, maintenance and parts manuals, catalogs, specification sheets, and other data necessary or appropriate for the sale of Products. Seller grants to Buyer the royalty-free right and license to reproduce all or any part of such documentation for use with Products purchased from Seller. Buyer is further given the right to modify any or all parts of the documentation to reflect changes made to the Products or consistency in style with other documentation used by Buyer or to satisfy legal or customer requirements. In no event shall Buyer release Seller's confidential

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3777

information pursuant to this paragraph. Seller's grant to Buyer of the right and license to use the materials is not intended to convey any ownership interest to Buyer; Seller retains all rights in the intellectual property contained in the above referenced materials.

7.2 Seller shall provide to Buyer, at no cost, all documentation which, in Buyer's reasonable opinion, is necessary or appropriate for Buyer to fulfill Buyer's service obligations for the Products provided, however, that such documentation is available for Seller's own purpose. Seller grants to Buyer the royalty-free right and license to reproduce all or any Authorized Servicers' part of such documentation for use with Products purchased from Seller. Buyer is further given the right to modify any or all parts of the documentation to reflect either changes made to the Products, or to reflect consistency in style with other documentation used by Buyer or to satisfy legal or customer requirements. In no event shall Buyer release Seller's confidential information pursuant to this paragraph. Seller's grant to Buyer of the right and license to use the materials is not intended to convey any ownership interest to Buyer; Seller retains all rights in the intellectual property contained in the above referenced materials.

7.3 Publications, which are derivative works prepared by or for Buyer under the license granted in this Section, may include an appropriate Buyer copyright notice in lieu of any Seller copyright notice. Other than the license granted in this Section, Seller retains all copyright rights in the documents and Buyer agrees to provide Seller all necessary assistance, at Seller's expense to enforce those rights against infringement.

7.4 In response to inquiries related to copyright rights in fonts, publications and other material subject to copyright, and in which Seller holds copyright rights, Buyer will identify Seller as the owner of some or all of the copyright rights, as appropriate, or direct such an inquiry to Seller.

## 8.0  GENERAL

8.1 Either party can terminate this Agreement for default of a material provision by the other not cured within thirty (30) days after written notice. However, the parties agree that prior to any issuance of a written notice of default, they both will negotiate in good faith to resolve any dispute or default, and such negotiations will include at least one meeting between senior executives of each party. If Seller terminates for Buyer's default, Buyer shall pay Seller for all Products produced and work in process, plus all components and material in inventory or ordered which cannot be reasonably canceled, returned or diverted to other Seller products. If Buyer terminates for Seller's default, Buyer must pay for Products shipped prior to the effective date of termination. Buyer may choose to, but is not obligated to, accept on a prepayment basis Products on order on the effective date of termination subject to their availability from Seller. In addition, if either party files a claim or suit against the other, whether based on a default of this Agreement, or for any other reason, the other party may terminate this Agreement immediately, and only outstanding accepted orders will be fulfilled (and Seller may, at its option, require payment prior to shipment).

8.2 Neither this Agreement nor the sale of Products hereunder shall give either party the right to use the other party's trademarks.

8.3 If either party's performance of any obligations hereunder is prevented or restricted by reason of fire or other casualty, strikes or labor disputes, inability to timely obtain required

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3778

labor, materials, or parts, war or other violence, or governmental law, regulation or requirement, or such other situation that is out of the control of such party, then that party shall be excused from performance to the extent of the prevention or restriction.

8.4  Seller assumes no liability regarding any claim or action caused by, or directly related to, a non-Seller product.

8.5  In no event will Seller be liable for any lost profits, lost savings, incidental damages, or other consequential damages, even if Seller has been advised of the possibility of such damages. Seller will not be liable for any damages claimed by Buyer based on any third party claim.

8.6  For any claim for any cause whatsoever, other than those provided for in the Indemnification Section, and Patents and Copyrights Section, Seller's liability for actual damages will be limited to

8.7  All obligations of the parties that by their nature survive any expiration or termination shall remain in effect.

8.8  Press releases and other publicity or advertising that mentions the other party by name shall be agreed upon by both parties prior to release. This Agreement, and its terms and pricing, shall be held in confidence for two (2) years, except that either party can disclose it to a third party financial organization for financing purposes, if such third party agrees to hold it in confidence. No other information shall be considered confidential unless it is covered by separate written Confidential Exchange Agreement Number OEM #6122 dated 01/20/99 which is hereby incorporated into this Agreement, and which shall continue in full force and effect throughout the contract period of this Agreement.

8.9  Each party agrees to comply with all applicable governmental laws and regulations, including US laws and regulations relating to the export of technical data and products covered by this Agreement, and all applicable OSHA regulations.

8.10 Either party's waiver of any instance of the other's noncompliance with the Agreement will not be deemed a waiver of any future non-compliance.

8.11 Neither party may assign its rights or obligations under this Agreement without the prior written consent of the other, which consent shall not be unreasonably withheld. Notwithstanding the above, each party may, without the prior written consent of the other, assign its rights and obligations hereunder to a successor in ownership of all or substantially all of the assets of the assigning party, whereupon such assignee will assume this Agreement and will automatically be deemed to have replaced the assignor for all purposes hereof. Seller can assign its accounts receivable under this Agreement to a financial organization for financing purposes.

8.12 The Agreement will not be supplemented or modified by any course of dealing or trade usage. Variance from or addition to the terms and conditions of the Agreement in any purchase order or other written notification from Buyer will be of no effect. This Agreement does not constitute an offer by Seller and it shall not under any circumstances be effective until both parties sign it.

CONFIDENTIAL - OUTSIDE COUNSEL ON A3779

8.13 This Agreement, including its Attachments, shall be governed by the law of the state of New York, is the complete agreement between the parties replacing any purchase order or invoice terms and all prior written and verbal communications or agreements between Seller or Buyer on this subject matter. It can be modified only by written amendment mutually agreed to by both parties.

Agreed:

**LEXMARK INTERNATIONAL, INC**

By: _Brad Lawless_

Name:    Brad Lawless

Title:    General Manager, OEM & Alliances

Date: ___9/11/00___



Date: ___9/11/00___

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3780

## ATTACHMENT 1.0

## OEM PRODUCT SPECIFICATIONS

This spec addresses the configuration and performance of the █████████
branded printers based on the Lexmark M410 and M412

### *Standard Configuration / Features*
- Standard colors
- 110 VAC Models
- ███████████████████████ Logo and ████ Model No.████████ on 12ppm; █████████
- on 17ppm (Cover-up labels are to be placed over the "Lexmark" and Lexmark Model
- Number information on a Lexmark branded printer )
- Standard Control Panel (2 line x 16 character LCD, 6 button-keys, 1 LED)
- Standard Lexmark Voltage / Safety Label
- "Printing Technology by Lexmark" Label on the front cover
- Generic Publications and Generic MarkVision CD-ROM
- Generic OEM driver CD
- Customized Menu Page██████████████████████████ for the 12ppm and
  ███████████████████ for the 17ppm printer)
- Generic Printer Carton with unique ███████████████ Carton Label
- Energy Star compliant


### Toner Cartridge (Shipped With Equipment)

- No lockout
- █████████████████████████ shipped with 5K page Lexmark Cartridge
- █████████████████████████ shipped with 5K page Lexmark Cartridge
- Page Yields based on 5% coverage at  toner darkness setting 8
- Operation Resource (cartridge return policy) provided

NOTE: The following printers are shipped without a cartridge to facilitate insertion of a
MICR Cartridge at eithe ███████ r their customer's location:
███████████████ and █████████████████ 12ppm printers
███████████████ and █████████████████ 17ppm printers

CONFIDENTIAL - OUTSIDE COUNSEL ON A3781

**ATTACHMENT 1.0**
**(Continued)**

Speed / Performance

|  | 17 ppm printer | 12 ppm printer |
|---|---|---|
| Letter/A4 | 17 | 12 |
| Time to first print (from standby) | <12 sec | <16 sec |

*Resolution / Image Quality*
- **1200 Image Quality**
- **600 dpi**
- **300 dpi**
- **10 levels of toner darkness at all resolutions (default setting is 8)**
- **Toner darkness setting of 1 provides savings up to 50%**

*Controller*

|  | 17ppm(network) | 12ppm |
|---|---|---|
| Processor | Toshiba 3927 133 MHz | Toshiba 3907A 74MHz |
| Std RAM (MB) | 4(8) | 4 |
| Extra memory and flash slots | 2 | 2 |
| Optional Ram DIMMS (MB) | 4, 8, 16, 32, 64 (compatible with OptraT) | |
| Total RAM (MB) | 132 | 132 |
| Optional Flash (MB) | 2, 4, 8, 16 (compatible with OptraT) | |
| Code/Font ROM size (MB) | 8 | 8 |
| Internal solutions ports | 1 | 1 |
| On-board ports | Parallel, USB | Parallel, USB |

*Standard Datastreams*
- **PostScript 3 Emulation**
- **HP PCL6 Emulation**
- **PPDS migration tool**

*Fonts*

| Emulation | # Scalable fonts | # Bitmapped fonts |
|---|---|---|
| PCL6 | 84 | 2 |
| PostScript | 89 | 0 |
| PPDS | 39 | 5 |

Lexmark Confidential

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3782

## ATTACHMENT 1.0
### (Continued)

### *Paper Handling*

**Standard**
- 250 sheet tray: paper, occasional labels, transparencies
- 100 sheet MPF: paper, occasional labels, envelopes, transparencies, card stock
- 250 sheet std output
- 20 sheet rear exit
- Media sizes: A4, JIS B5, letter, legal, executive, (MPF- 2.75"x5" min, 8.5"x14" max)

**Optional**
- 500 sheet drawer (new- discontinued tray not compatible with 17ppm printer)
- 500 sheet tray: paper only
- 250 sheet tray
- 250 sheet label tray

**Sensors**
- Paper Empty (MPF)
- Tray 1 inserted (only when Tray 2 option installed)
- Tray 2 option installed
- Rear door open

**Options**
- MarkNet N2000 Series Internal Print Servers- Token Ring, Ethernet 10/100Base TX, 10Base2/T
- MarkNet X2000 External Print Servers- Token Ring, Ethernet 10/100Base TX, 10Base 2/T
- Tri-Port Adapter
- Hard Disk Adapter
- Hard Disk 2.1+ GB
- Optra Forms Hard Disk
- Parallel/USB card
- Coax/Twinax Adapter for SCS
- External Serial Adapter

**Duty Cycle**

|         | Avg monthly | Max per month | Life |
|---------|-------------|---------------|------|
| 17 ppm  | 2K          | 40K           | 200K |
| 12 ppm  | 750         | 20K           | 150K |

Lexmark Confidential

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3783

**ATTACHMENT 1.0**
**(Continued)**

*Dimensions / Weight (base printer)*

|        | Height        | Width         | Depth         | Weight           |
|--------|---------------|---------------|---------------|------------------|
| 17 ppm | 12.4", 314 mm | 15.9", 405 mm | 17.1", 435 mm | 32.6 lb, 14.8 kg |
| 12 ppm | 12.4", 314 mm | 15.9", 405 mm | 17.1", 435 mm | 32.6 lb, 14.8 kg |

**Acoustics**

|        | Printing (dBA) | Idle (dBA) |
|--------|----------------|------------|
| 17 ppm | 50             | 30         |
| 12 ppm | 48             | 30         |

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3784

## ATTACHMENT 1.0
### (Continued)

This spec addresses the configuration and performance of the ███████████████ branded printers based on the Lexmark Optra T Family

### Configuration / Features

- Standard Colors
- 110 VAC Models
- MICR Transfer Roll and MICR Transfer Roll FRU Label
- ████████████ Logo and ████████████████ on 15ppm; ████████ on 25ppm; "ST935 on the 35ppm) on the upper front cover
- Standard Control Panel ( 2 line x 16 character LCD, 5 button-keys, 1 LED power-on/status indicator )
- Same Display Language Support as Optra S
- Standard Lexmark Voltage / Safety Label
- Standard Serial Number Label with "Type:███████ "Type:███████ or "Type ██████
- "Printing Technology by Lexmark" Label on the lower left corner of the MPF cover
- Generic English Setup Guide with ████████ Cover
- Generic soft copy publications on CD and generic MarkVision CD-ROM
- Generic OEM driver CD
- Customized Menus Page ██████████████████ " ███████ " ...
- Generic printer carton with unique Source Technologies Carton Label
- Energy Star compliant

### EP- Toner Cartridge (Shipped With Equipment)

- Electronic, Lexmark Keyed Cartridges using a "signature button" memory device
- ██████████ 15ppm printers shipped with 10K page Lexmark Cartridge
- █████████████ 25ppm printers shipped with 10k page Lexmark Cartridge
- █████████████ printer shipped with 25k page Lexmark Cartridge
- █████████████ 35ppm printers shipped with 25K page Lexmark Cartridge
- Page Yields based on 5% coverage at toner darkness setting 5

NOTE: The following printers are shipped with a cartridge frame only to facilitate insertion of a MICR Cartridge at **_either_** ██████ **_or their_** customer**_'s location_**
████████ and ██████████ 15ppm printers
████████ and ██████████ 25ppm printers
████████ and ██████ 35ppm printers.

CONFIDENTIAL - OUTSIDE COUNSEL ON A3785

## ATTACHMENT 1.0
### (Continued)

### Speed / Performance

|  | 35 ppm printer | | 25 ppm printer | | 15 ppm printer | |
|---|---|---|---|---|---|---|
|  | 300, 600, 1200IQ | True 1200 | 300, 600, 1200IQ | True 1200 | 300, 600, 1200IQ | True 1200 |
| Letter | 35.0 | 18.6 | 25.0 | 12.0 | 15.8 | 8.0 |
| A4 | 33.2 | 17.6 | 23.7 | 11.3 | 15.0 | 7.6 |
| First Copy Time | <13 sec | | 9 sec | | <12 sec | |

### *Resolution / Image Quality*
- **Print quality enhancement technology (PQET) at 300 & 600 dpi resolutions**
- **PictureGrade selectable at all resolutions**
- **10 levels toner of darkness at all resolutions (default setting is 7)**

### *Controller*

|  | 35          (n= network) | 25 (n and nl= network light) | 15 (n) |
|---|---|---|---|
| Processor | QED RM5231-200 | QED RM5231-200 | NEC VR4310-133 |
| Std RAM (MB) | 16 (16) | 8 (16) | 4 (8) |
| Extra memory and flash slots | 3 | 3 | 2 |
| Optional RAM DIMMS (MB) | 4, 8, 16, 32, 64, 128 (not compatible with OptraS) | | |
| Total RAM (MB) | 400 (400) | 392 (400) | 260 (264) |
| Optional Flash (MB) | 2, 4, 8, 16 (not compatible with OptraS) | | |
| Code/Font ROM size (MB) | 8 | 8 | 8 |
| Internal solutions ports | 2 | 2 | 1 |
| On-board ports | Parallel (Par+Ethernet) | Parallel (Par+Ethernet) | Parallel (Par+Ethernet) |

### *Standard Datastreams*
- **PCL6 emulation is compatible with the HP LaserJet 4000/8000 family**
- **PostScript 3 (backward compatibility mode for compatibility with the Optra S family)**
- **PPDS (must be activated by PJL command or front panel)**

CONFIDENTIAL - OUTSIDE COUNSEL ONLA3786

**ATTACHMENT 1.0**
**(Continued)**

*Fonts*

| Emulation | # Scalable fonts | # Bitmapped fonts |
|---|---|---|
| PCL6 | 84 | 2 |
| PostScript | 156 | 0 |
| PPDS | 39 | 5 |

*Paper Handling*

**Standard**

| | 35 | 25nl and 25 (n) | 15 |
|---|---|---|---|
| **Input** | | | |
| Primary tray capacity | 500 | 500 | 250 |
| Additional tray capacity | 500 | 0 (500) | 0 |
| Multipurpose tray capacity | 100 | 100 | 100 |
| Total standard capacity | 1100 | 600 (1100) | 350 |
| **Output** | 500 | 500 | 250 |

**Optional**

| | 35 | 25 | 15 |
|---|---|---|---|
| **Input** | | | |
| 250 sheet drawer | Yes | Yes | Yes |
| 500 sheet drawer | Yes | Yes | Yes |
| 2000 sheet drawer | Yes | Yes | Yes |
| Envelope feeder | Yes | Yes | Yes |
| Max input sources (incl. Env feeder) | 7 | 7 | 6 |
| Max input capacity | 4100 | 4100 | 3350 |
| **Output** | | | |
| Output expanders (650 sheets) | 3 | 3 | 0 |
| High Capacity Output Stackers (1850 sheets) | 1 | 1 | 0 |
| 5 Bin Mailboxes (100 sheets/bin) | 2 | 2 | 0 |
| Combine expander & mailbox | Yes | Yes | No |
| Combine expander and HCOS | Yes | Yes | No |
| Max output capacity | 3000 | 3000 | 250 |
| **Other** | | | |
| 250 Duplex Option | No | No | Yes |
| 500 Duplex Option | Yes | Yes | No |
| Vertical Kiosk Presenter | Yes | Yes | Yes |
| Horizontal Kiosk Presenter | Yes | Yes | Yes |

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3787

## ATTACHMENT 1.0
### (Continued)

Options available

v  Hard Disk adapter with optional Hard Disk
v  Ethernet 10/100 Base Tx
v  Ethernet  10 base 2/ 10 base T (combo card)
v  Token Ring  (4Mbps or 16Mbps)
v  Triport Card with 25 pin Serial  RS232C/E, RS422,  9 pin IR (1.152 MB) connector,  8 pin LocalTalk (mini DIN)
v  Parallel 1284-C Adapter
v  Coax/Twinax
v  USB card (includes a parallel port as well)
v  IPDS SIMM
v  Web SIMM
v  TIFF SIMM
v  Prescribe SIMM
v  Bar Code SIMM
v  External Network Adapters also available
v  OptraImage (convenient copy, fax, scan)
v  Low profile printer stand
v  Standard printer stand

Printer Usage

|  | Avg monthly | Max per month | Test Life |
|---|---|---|---|
| 35 ppm | 10K | 200K | 1M |
| 25 ppm | 5.5K | 130K | 1M |
| 15 ppm | 3K | 65K | 250K |

v  Service interval= 300k Pages
v  Maintenance kit includes transfer roll, charge roll and fuser (all are CRUs)

*Dimensions / Weight (base printer - no options)*

|  | Height | Width | Depth | Weight |
|---|---|---|---|---|
| 35, 35n, and 25n | 15.9", 404.3 mm | 16.5", 418.1 mm | 20.2", 513 mm | 20.4 kg |
| 25 and 25nl | 15.9", 404.3 mm | 16.5", 418.1 mm | 20.2", 513 mm | 20.4 kg |
| 15 ppm | 13.4", 340 mm | 15.8", 400.3 mm | 19.6", 498.1 mm | 19.8 kg |

*Lexmark Confidential*

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3788

**ATTACHMENT 1.0**
**(Continued)**

**Acoustics**

|         | Printing (dBA) | Idle (dBA) |
|---------|----------------|------------|
| 35 ppm  | 53             | 30         |
| 25 ppm  | 50             | 30         |
| 15 ppm  | 47             | 29         |

Lexmark Confidential

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3789

## ATTACHMENT 2.0

## PRICING FOR INITIAL 12 MONTHS DELIVERY

### UNIT PRICE (US$)



| PRINTERS | Note 1 | Part Number | Note 2 | Part Number |

**Note 1:** ▮▮▮▮ logo'd printers without cartridge.
**Note 2:** ▮▮▮▮ logo'd printers shipped with Lexmark SWE standard cartridge.

## OPTIONS AND FEATURES

Pricing for the following five (5) options and features is based on a ▮▮▮▮▮▮▮
attach rate to the ▮▮▮▮ branded printers listed above.

Part Number          Unit Price (US$)
11K0681   250 sheet drawer
11K0688   500 sheet drawer
11K0721   250 sheet duplex
11K0722   500 sheet duplex
17G0180   500 sheet drawer

All other options and features, except the SIMMS listed below sold in packages of ten (10), will
be priced at ▮▮▮▮▮▮ percent off Schedule III Dealer Pricing and are to be sold for use only
with printers sold hereunder.

**SIMMS          PACKAGE 10 PRICE (US$)**

Part Number                                                          Unit Pkg. Price (US$)
44H0016 Optra S MICR SIMM chip for 1250/1620/1650/2420/2450
44H0062 Optra S MICR SIMM chip for 1255/1625/1855/2455/3455
5K00052 Optra M410 MICR SIMM chip for M410
5K00048 Optra T MICR SIMM chip for 610/612/614/616 without Rip code
5K00054 Optra T MICR SIMM chip for 610/612/614/616 w/RIP code

CONFIDENTIAL - OUTSIDE COUNSEL ON A3790

## ATTACHMENT 2.0
### (Continued)

Options and features have been listed for reference.

**Memory Options**

| | Part Number |
|---|---|
| 4MB DRAM Memory DIMM | 5K00013 |
| 8MB DRAM Memory DIMM | 5K00014 |
| 16MB DRAM Memory DIMM | 5K00015 |
| 32MB DRAM Memory DIMM | 5K00016 |
| 64MB DRAM Memory DIMM | 5K00017 |
| 128MB DRAM Memory DIMM | 5K00119 |
| 2MB Flash DIMM | 5K00115 |
| 4MB Flash DIMM | 5K00116 |
| 8MB Flash DIMM | 5K00117 |
| 16MB Flash DIMM | 5K00118 |
| Optra Forms 2MB Flash DIMM | 5K00215 |
| Optra Forms 4MB Flash DIMM | 5K00216 |
| Optra Forms 8MB Flash DIMM | 5K00217 |
| Optra Forms 16MB Flash DIMM | 5K00218 |
| 2.1GB Hard Drive w/ adapter (Optra S xxx5, M, T,C710) | 43H5494 |
| Hard Drive Adapter | 45H0001 |
| Optra Forms 2.1GB Disk(Optra S 1255,1625,1855,2455, M, T  Series) | 43H5589 |

**Paper Handling Options**

| | |
|---|---|
| 2000-Sheet Drawer(letter) | 11K0718 |
| 2000-Sheet Drawer(A4) | 11K0719 |
| 250-Sheet Tray | 11K1059 |
| 500-Sheet Tray | 11K1060 |
| 250 Sheet Tray | 4K00145 |
| 250 Sheet Label Tray | 4K00293 |
| 500 Sheet Tray | 4K00146 |
| 250-Sheet Special Media Tray | 11K1572 |
| 250-Sheet Special Media Tray & Drawer | 11K1573 |
| 250-Sheet Universally Adjustable Tray | 11K1574 |
| 250-Sheet Universally Adjustable Tray & Drawer | 11K1878 |
| 500-Sheet Special-Media Tray | 11K1921 |
| 500-Sheet Special-Media Tray & Drawer | 11K1922 |

Lexmark Confidential

CONFIDENTIAL - OUTSIDE COUNSEL ONlA3791

**ATTACHMENT 2.0**
**(Continued)**

| | |
|---|---|
| 400-Sheet Universally Adjustable Tray | 11K1941 |
| 400-Sheet Universally Adjustable Tray & Drawer | 11K1942 |
| Envelope Feeder | 11K0720 |
| 650-Sheet Output Expander | 11K0723 |
| 1850-Sheet High Capacity Output Stacker | 11K1440 |
| 5-Bin Mailbox | 11K0724 |
| Vertical Kiosk Presenter (T610, 610n, 612) | 11K1343 |
| Horizontal Kiosk Presenter (T610, 610n, 612) | 11K1356 |

**Other Options**

| | |
|---|---|
| MarkNet N2001e for 10/100BaseTx (Optra M/T/W) | 44D0000 |
| MarkNet N2002e for 10BaseT/2 (Optra M/T/W) | 44D0050 |
| MarkNet N2000t for Token-Ring (Optra M/T/W) | 44D0020 |
| MarkNet X2031e 10/100BaseTx - 3 Port | 46D0020 |
| MarkNet X2011e 10/100BaseTx - 1 Port | 46D0060 |
| MarkNet X2012e 10/100BaseT, 10Base2 - 1 Port | 46D0040 |
| MarkNet X20300t TokenRing - 3 Port | 46D0000 |
| UNIX Systems and Intranet Servers - New product | 10MV023 |
| Sun Systems and Intranet Servers - New product | 10MV028 |
| USB Interface Card (Optra S/Se/T/W/Color 45/C710) | 44H0034 |
| Bar Code SIMM (Optra T) | 5K00042 |
| IPDS SIMM (Optra T) | 5K00070 |
| TIFF SIMM (Optra T) | 11K1963 |
| Web SIMM (Optra T) | 44H0070 |
| External Serial Adapter | 1368705 |
| Parallel 1284-C Adapter | 43H5174 |
| MarkNet S INA Tri-port Adapter (Optra S/Se/T/W/K/M/SC1275/Color 1200/45/C710) | 44H0008 |
| Coax/Twinax Adapter for SCS (Optra S/T/SC/Color 45, 1200/K/C710) | 44H0011 |
| Standard Printer Stand with Storage Bin | 43H2950 |

Lexmark Confidential

CONFIDENTIAL - OUTSIDE COUNSEL ONLA3792

**ATTACHMENT 2.0**
**(Continued)**

| | |
|---|---|
| Low Profile Printer Stand | 43H5250 |
| Standard Printer Stand w/o Storage Bin | 11K2036 |
| 1284 A-C Cable (9.8 ft.) | 43H5171 |
| High-Speed Parallel Printer Cable (20 ft.) | 1427498 |
| High-Speed Parallel Printer Cable (10 ft.) | 1329605 |
| Serial Printer Cable (50 ft.) | 1038693 |
| USB Cable (2 meters) | 12A2405 |

## MICR TONER CARTRIDGES

| Description | Part Number | Unit Price (US$) |
|---|---|---|
| Optra T MICR 14K cartridge | 12A5689 | |
| Optra T MICR 14K cartridge with label | 12A5500 | |
| Latin America Optra T MICR 14K cartridge with label | 12A5398 | |
| Optra S MICR 7K cartridge | 12A5789 | |
| Optra S MICR 13.5K cartridge | 1382289 | |
| Optra S MICR 13.5K cartridge with label | 43H6189 | |
| Latin America Optra S MICR 13.5 cartridge with label | 12A5368 | |
| Optra M MICR 8K cartridge | 4K00274 | |
| Optra N cartridge for MICR conversion | 1382140 | |
| 4039 MICR cartridge | 1380995 | |
| 4049 MICR cartridge | 1382850 | |

All prices are subject to change on notice from Lexmark

NOTES:

1. The above prices apply only to Lexmark manufactured and/or supplied Product per Attachment 1.0 and 5.0.

2. Above prices do not include incremental non-recurring expenses (NRE) for these projects.

3. Buyer's ship-to location is:

4. Seller can change pricing of spare parts on one (1) month notice to keep pricing equivalent to Seller's standard dealer/distributor spare parts pricing. Spare parts are to be ordered from Lexmark Parts Center.

5. MICR Cartridge pricing includes warranty described in Attachment 5.0. Seller can change pricing of MICR cartridges on sixty (60) day's notice.

6. MICR Cartridge pricing is FOB delivered to Buyer's location.

CONFIDENTIAL - OUTSIDE COUNSEL ONlA3793

## ATTACHMENT 3.0

## ENGINEERING CHANGE PROCEDURE

1.0    PURPOSE

This Attachment describes the guidelines to be followed when changes, which are not safety changes, (see Products Section) are made by Seller which impact the design of the Product.

2.0    DEFINITION

2.1    FORM - PRODUCT EXTERNAL APPEARANCE

2.2    FIT - PRODUCT INTERCHANGEABILITY

2.3    FUNCTION - PRODUCT SPECIFICATION AS DEFINED IN ATTACHMENT 1.0

2.4    MAINTAINABILITY - RELIABILITY, SERVICEABILITY, AND FIELD SUPPORT

2.5    CATEGORY 1 CHANGES - CHANGES WHICH AFFECT FORM, FIT, FUNCTION   OR MAINTAINABILITY

2.6    CATEGORY 2 CHANGES - CHANGES WHICH DO NOT AFFECT FORM, FIT, FUNCTION OR MAINTAINABILITY.

3.0    PROCEDURE

3.1    CATEGORY 1 CHANGES - Buyer will be provided advanced notice, on a best effort basis, of changes that are Category 1 with the opportunity to influence the implementation of the change.    Known details of the change will be provided at that time.  Except in emergency production line  down situations, this contact will be after Seller's engineering change review board meeting which formally initiates a change. After Seller's EC Review Board, and prior to the Seller's Engineering Design Review Committee (EDRC) meeting, where the change is finalized, Buyer will have the final opportunity for input as to details of the change concerning the Product.  At that time, pertinent information concerning the EC will be provided including, nature of  the change and justification of the change.  This information will be provided to Buyer no greater than thirty (30) days and no less than three (3) working days prior to the EDRC meeting.

To the extent practicable, Buyer's preferences will be taken into account and incorporated. However, due to the possible restrictions on the Printer and its follow-on's, Seller reserves the final right to make any changes deemed necessary by Seller. In the event that Seller must make a change that affects the Buyer's Product in a manner that is contrary to Buyer's preferences, then Seller and Buyer will negotiate a mutually agreeable corrective action plan. If a mutually agreeable  plan  cannot  be achieved, then this Agreement will be terminated by mutual consent.

Lexmark Confidential

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3794

## ATTACHMENT 3.0
### (Continued)

3.2   CATEGORY 2 CHANGES - Seller will make reasonable effort to notify Buyer of Category 2 changes.

3.3   FIELD CHANGE - Mandatory Field Engineering Changes may be required to correct design defects which cause the Product, in Seller's determination to meet the Product Specifications as listed in Attachment 1.0. On units of Product which have already been shipped, Seller may designate Category 1 Engineering Changes, and any prerequisite or co-requisite changes will be shipped free of charge to a single Buyer designated location and implemented in a manner similar to Safety Changes (see Products Section).

3.4   BUYER REQUESTED ENGINEERING CHANGES - Buyer may request changes in the Product and Seller agrees to either 1) Inform Buyer within sixty (60) days of such request, the price effect, the projected point of incorporation into production and the effect on maintenance, repair, and support of the Product of the requested engineering change, or 2) Inform Buyer of Seller's decision not to implement the requested engineering change.

If any change is made to the Product as a result of a request by Buyer or if Buyer makes any change to the Product, and any such change causes spare parts on order or spare parts in Buyer's inventory or Buyer's unique spare parts in Seller's inventory to become obsolete, Buyer shall, upon written notice from Seller, pay a reasonable amount to modify or replace the quantity desired by Seller within ninety (90) days after Seller's request so that such spare parts are compatible with the Product as changed. Buyer may request and shall pay for Field Change Order (FCO) kits, each including components, instructions and necessary materials to undertake modification of spare parts instead of having them modified or replaced by Seller. Buyer shall pay transportation costs and have the risk of loss, destruction or damage to the FCO Kits.

3.5   DOCUMENTATION - Seller shall provide Buyer with documentation covering Category 1 Engineering Changes.

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3795

## ATTACHMENT 4.0

## BUYER PRODUCT RESPONSIBILITIES

A. Design, develop, provide and install as required if not included in Product Specifications:

    1. Any unique mechanical, electrical, or microcode hardware not specified in Product Specifications

B If Buyer modifies the Product, Buyer must perform and/or obtain:

    1. Any required regulatory approvals.

    2. Design and performance verification testing.

    3. EMC testing, approval, and certification.

    4. Environmental testing, vibration testing, etc.

    5. Safety approval & certification.

    6. Product Safety Certification and approval.

    7. FCC approval.

Lexmark Confidential

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3796

## ATTACHMENT 5.0
## TO OEM PURCHASE AGREEMENT

### MICR CARTRIDGES

Lexmark and ███████ agree to the following additional terms to their OEM Purchase Agreement related to MICR Cartridges.

These terms will replace and supercede any other terms in the OEM Purchase Agreement. In addition, on the effective date of the OEM Purchase Agreement and this Attachment, the Amendment to the Authorized Dealer Agreement for MICR Cartridges shall be deemed to be terminated.

The following additional items are added to the products you can purchase under the OEM Purchase Agreement.

- Optra T print cartridges containing Lexmark MICR toner (non-Prebate version)
- Optra S print cartridges containing Lexmark MICR toner (non-Prebate version)
- Optra M print cartridges containing Lexmark MICR toner
- 4049 high-yield print cartridges containing Lexmark MICR toner
- 4039 high-yield print cartridges containing MICR toner (toner consigned from ████ ██████████ to Lexmark)
- Optra N print cartridges containing toner. ████████ replaces standard toner with ██████ MICR toner
- No Lexmark logos on Optra T/S/M//4039/4049 MICR toner cartridges
- White or kraft box (no logos on packaging), Operation Resource Return Program description and label will be on the box
- All necessary fuser wipers in box
- Cartridges to be purchased in multiples of full pallet quantities
- Orders placed minimum thirty (30) days prior to desired date of shipment from Lexmark

The terms of Lexmark's Limited Warranty for MICR Supplies (Exhibit A) will apply only to ███████ and not to end users for the Optra T, Optra S, Optra M, and 4049 MICR toner cartridges. It is Source's responsibility to formulate and communicate its warranty to its end users.

"As is" – no cartridge warranty of any kind from Lexmark is provided on the 4039 MICR cartridge and the Optra N cartridge.

In marketing the MICR toner cartridges, ██████ agrees to:

- Identify them as ██████ MICR cartridges

- Not identify it or refer to it as a Lexmark cartridge

- Sell each of the identified cartridges for use only with compatible printers

- Provide all end user support for these cartridges and the printers relating to MICR applications

CONFIDENTIAL - OUTSIDE COUNSEL ONlA3797

## ATTACHMENT 5.0
### (Continued)

Provide Lexmark with a Material Safety Data Sheet (MSDS) for the MICR toner that ████ provides Lexmark for the 4039 MICR cartridge and alert Lexmark of any changes in the toner that would affect the MSDS.

Indemnify Lexmark from, and defend Lexmark against, any claims (including reasonable attorney fees) that the printer and/or cartridges or documents printed by them do not meet ANSI (or other applicable countries) standards or a claim that documents printed by the printer and/or cartridges are not readable by MICR document processing equipment. In addition, for the 4039 MICR cartridge, indemnify Lexmark from any claims relating to any cartridge returns caused by the 4039 MICR cartridges.

Develop a procedure to minimize any such returns or claims to Lexmark described above.

Provide reader/sorter testing as reasonably requested by Lexmark.

Provide ████ developed end user warranty statement directing end users to send all warranty claims and returned cartridges to Source.

Provide a monthly cartridge quality report showing warranty returns and defect analysis information.

Provide Lexmark with a cartridge sales forecast as referenced in Section 2.1.

Provide users with Operational Guidelines (see Exhibit B) that instruct the user regarding timely replacement of fuser wipers, removal of the cartridge at first "toner low" indication, font design verification paper stock selection, operator training, and any other information which is considered critical to successful use of the ████ application.

Provide prospective customer with a copy of the "Important MICR Information" statement, Exhibit B, prior to selling a Lexmark printer or a MICR cartridge for use in a MICR environment, and include a copy of the statement with each printer and each MICR cartridge when shipped.

Encourage users to return empty cartridges to Lexmark by utilizing the Operation Resource packaging. ████ is not obligated to have its own used cartridge return program, but ████ agrees that all used MICR cartridges obtained by ████ will be returned to Lexmark, utilizing the Lexmark used cartridge program announced in May of 1997, which sets forth a $5 per cartridge payment from Lexmark to ████ and other terms.

For sales of MICR toner cartridges in Latin America (including South America, Central America and the Caribbean – including Puerto Rico), ████ agrees to sell to Lexmark MICR cartridges, (which have previously been purchased from Lexmark at prices and terms set forth in Attachment 2.0, pursuant to procedures and prices mutually agreed to between the parties. ████ will be responsible for providing all warranty and support for such cartridges sold by Lexmark in Latin America. The cartridges will be identified as ████ cartridges and the important MICR Operational Guidelines attached as Exhibit D shall be translated into Spanish and Portuguese and shall be included with each such cartridge shipped. ████ other obligations, including indemnification, shall apply to these cartridges.

CONFIDENTIAL - OUTSIDE COUNSEL ON A3798

## ATTACHMENT 5.0
### (Continued)

Based on our past mutual testing and marketing of laser MICR toner cartridges, both parties agree to a mutually exclusive MICR cartridge relationship, as set forth below. Lexmark agrees to sell new or remanufactured MICR toner cartridges for Lexmark laser printers (with listed speeds of between 10 and 35 ppm) only to ▮▮▮▮ (except for sales of 4019/4029/MICR toner cartridges to ▮▮▮ and ▮▮▮ agrees to sell new or remanufactured MICR toner cartridges for laser printers (with listed speeds of between 10 and 35ppm) only if such toner cartridges were purchased from Lexmark (except for sales of ▮▮▮ MICR toner cartridges for use in existing non-Lexmark printers installed as of 02/07/00 in the accounts listed in Exhibit C). This exclusivity applies only in the USA and Puerto Rico, and shall continue in effect for the term of this OEM Purchase Agreement, except that the exclusivity is subject to termination by either party for any reason on twelve (12) months prior written notice.

Rebate grids for MICR toner purchases will be established independently on an annual basis, and will be subject to mutual agreement.

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3799

**ATTACHMENT 5.0**

**EXHIBIT A**

## Statement of Warranty for Optra S, Optra T, Optra M and 4049 MICR Supplies

Lexmark International, Inc. (Lexmark) gives you the following limited warranty for MICR supplies Products as if they were originally purchased by you directly from Lexmark.

The warranty period for each MICR Supply is one year and starts on the date of original purchase from Lexmark.

Lexmark warrants that on the date of original purchase, this Product will be free from defects in material or workmanship. If, during the Warranty Period, this Product is found to be defective in material or workmanship it will be exchanged or repaired at Lexmark's option, with no additional charge. Warranty service does not include repair or exchange when the problem results from accident, disaster, misuse, abuse, non-Lexmark modification, improper storage, malfunctioning equipment, normal wear and tear, or printing with a MICR Supply in duplex or 1200 dpi. Character or page yield is also not covered by warranty service as it is influenced by customer application, printer contrast settings, operating environment, printer condition and paper type.

In addition, Lexmark does not warrant that MICR documents printed with this cartridge will be readable by MICR document processing equipment. All other disclaimers of warranty responsibility contained in "Important MICR Information" in Attachment B modify and limit the warranty coverage of this Limited Warranty.

To obtain warranty service, you must, during the Warranty Period, return the Product, along with the proof of original purchase, to Lexmark. You must insure it or bear the risk of loss or damage in transit, prepay the shipping charges, and use the original shipping container or equivalent. Lexmark will pay return shipping charges within the United States and Puerto Rico.

Product supplied to you on an exchange basis under warranty service becomes your property at the time of exchange. At the same time, Product returned becomes the property of Lexmark when it is received by Lexmark.

This limited warranty applies only to Product purchased and located in the United States and/or Puerto Rico.

All express and implied warranties for this Product, including the implied warranties of merchantability and fitness for a particular purpose, are limited in duration to the warranty period and no warranties, whether express or implied, will apply after this period.

Some states do not allow limitations on how long an implied warranty lasts, so the above limitations may not apply to you. This warranty gives you specific legal rights, and you may also have other rights, which vary from state to state.

CONFIDENTIAL - OUTSIDE COUNSEL ON A3800

**ATTACHMENT 5.0**
**EXHIBIT A**
**(Continued)**

Limitation of Remedies:

Your sole remedy under this Statement of Limited Warranty shall be Lexmark's performance of warranty service.  For any claim concerning performance or nonperformance by Lexmark under this Statement, for any other claim related to this product, you shall be entitled to recover actual damages up to the limits indicated in the following paragraph.

Lexmark's liability for damages to you for any cause whatsoever, arising out of this Statement of Limited Warranty, for any other claim related to this product, shall be limited to the amount that you paid for this product at the time of original purchase.  This limitation of liability will not apply to claims for personal injury or damage or real property or tangible personal property caused by Lexmark's negligence.  In no event will Lexmark be liable to you for any lost profits, lost savings or other incidental or consequential damages, even if Lexmark has been advised of the possibility of such damages, or for any claim by you based o a third-party claim.

Some states do not allow the exclusion of limitation of incidental or consequential damages, so the above limitation or exclusion may not apply to you.

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3801

**ATTACHMENT 5.0**
**EXHIBIT B**

████████████████

**OPERATIONAL GUIDELINES**

███████████████████████

This Cartridge contains a special toner formulation for generating Magnetic Ink Character Recognition (MICR) documents such as Checks, Deposit Slips, and other negotiable instruments.

When used properly, the MICR Toner formulation should produce QUALITY MICR documents. In choosing a paper stock for MICR printing, generally paper classified as MICR Bond or MOCR Bond,
24 lb. Weight can produce satisfactory results. **Selected paper stock should be tested prior to production by you and your financial institution to ensure you get acceptable results.** You should also be aware of and consider including anti-fraud features for your selected paper. Consult your sales representatives, ██████████ distributor, or paper supplier for assistance. ██████████████ offers a "MICR GUARANTEE" on certain paper stock that has been pre-tested by ███ Consult your sales representative for additional information.

We do recommend the following operational guidelines be utilized in addition to the normal cartridge handling procedures:

- STORE cartridges in a normal office-like environment in terms of temperature and humidity. The storage environment should be maintained on weekends and holidays.

- CLEAN the printer, per printer's users guide. Every operator should be familiar with the cleaning procedures.

- LIGHTLY SHAKE the cartridge prior to inserting into the printer. This will aid the even distribution of toner, which could have shifted somewhat during storage.

- REPLACE the cartridge at the first LOW TONER indication, DO NOT shake and re-insert.

- If the cartridge is frequently REMOVED and EXCHANGED with regular toner cartridges, every operator must clearly understand when and why the exchange occurs AND can clearly identify regular and MICR cartridges.

- The TONER ALARM (if applicable) should be set to Single or Continuous. See printer's Users Guide.

- If additional fuser cleaner pad is included with the cartridge, it should be used to replace the original at around 6,000 to 7,000 documents. This will vary with the amount of toner coverage per document. The cleaning procedures should again be followed.

CONFIDENTIAL - OUTSIDE COUNSEL ONLA3802

**ATTACHMENT 5.0**
**EXHIBIT B**
**(Continued)**

### "Important MICR Information"

███████████████████ AND LEXMARK RECOMMEND THAT SAMPLES OF YOUR MICR DOCUMENTS BE TESTED THOROUGHLY BEFORE ACTUAL USE FOR VOLUME PROCESSING. Although testing has been conducted on ████████████ MICR toner cartridges, neither ████████████ nor Lexmark can warrant that your MICR documents printed on Lexmark printers will be readable by MICR document processing equipment. Use o this MICR toner cartridge will NOT change the terms or conditions of Lexmark's standard printer warranty.

The USER is responsible for ensuring that all MICR encoded documents meet the guidelines established by (1) the American National Standards Instituted Accredited Standards Committee X98 on Paper Based Transactions in the United States (or the appropriate standards outside the U.S.); (2) the banking industry; and (3) the financial institution with which the USER conducts business.

Please note that when using a Lexmark printer in a MICR environment, the USER assumes the responsibility for prevention of improper use of the printer. ████████████ and Lexmark recommend that appropriate security be employed, such as:

- Securing the MICR font and signature files

- Using FULL account reconcilement and Stop Payment services available from your financial institution

- Employing proper software-security measures (e.g., passwords)

For any additional information or recommendations regarding MICR, special font requirements, usage and handling, or other questions related to your MICR applications, please contact ████████████

Reference material is also available from the American Bankers Association. The following Standards and Technical Guidelines can be ordered:

Specifications for Check Endorsements – ANSI X9.3 (1989)
Specifications for Bank Check Background and Convenience Amount Field – ANSI X9.7 (1988)
Specifications for Placement and Location of MICR Printing – ANSI X9.13 (1989)
Paper Specifications for Checks – ANSI X9.18 (1992)
Print Specifications for Magnetic Inc. Character Recognition – ANSI X9.27 (1988)
Understanding and Designing Checks – X9/TG-2 (1990)
Quality control of MICR Documents – X9/TG-3 (Proposed)

These may be ordered from:
American Bankers Association (ABA)
Processing Department
10 Jay Gould Court
Walford, MD  20602-2725

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3803

**ATTACHMENT 5.0**
**EXHIBIT B**
**(Continued)**

*MICR TONER CARTRIDGE WARRANTY*

████ warrants its MICR toner cartridges against defects in materials and workmanship for a period of one (1) year from date of sale to Customer. In the event of failure during the warranty period, the Customer is responsible for returning the toner cartridge properly packaged to ████████████ The return will be authorized and a RMC number issued upon reporting the failure, including the serial number of the cartridge and a description of the problem. Print quality related failures **must** be supported by print samples on customer paper stock. Check stock paper should be marked "void" or "non-negotiable" by the customer (prior to submitting with the cartridge). Any postage, insurance, or shipping cost incurred in sending the product for warranty service is the sole responsibility of the Customer. Upon receipt of the failed cartridge, ███████████ will verify the warranty claim and issue a credit to the Customer for the price of the toner cartridge as well as freight as stated on the original invoice. ██████████ reserves the right to return the cartridge to the Customer if the warranty claim cannot be verified.

This warranty only applies if the product fails to function properly under normal use and within the manufacturer's specifications. The RMC number must be clearly displayed on the outside of the cartridge box. For additional Warranty information please call ████████████

**THIS WARRANTY IS GIVEN IN LIEU OF ALL OTHER WARRANTIES, EXPRESSED OR IMPLIED, INCLUDING THE WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. THIS WARRANTY DOES NOT COVER ANY DAMAGE OR MALFUNCTION DUE TO ACCIDENT, MISUSE, ABUSE, NEGLIGENCE, OR MODIFICATION OF THE CARTRIDGE, INCLUDING REFILLING OR REMANUFACTRIING. IN NO EVENT SHALL ███████████ OR LEXMARK INTERNATIONAL BE LIABLE UNDER ANY CIRCUMSANCES FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES, INCLUDING LOST PROFITS. LEXMARK OFFERS NO WARRANTY OF ANY KIND ON THIS MICR TONER CARTRIDGE.**

43H088 EC 250306

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3804

**ATTACHMENT 5.0**
**EXHIBIT C**



CONFIDENTIAL - OUTSIDE COUNSEL ONLA3805



**ATTACHMENT 5.0**
**EXHIBIT D**

## OPERATIONAL GUIDELINES

**LA ENGLISH VERSION**

This Cartridge contains a special toner formulation for generating Magnetic Ink Character Recognition (MICR) documents such as Checks, Deposit Slips, and other negotiable instruments, subject to the terms and information in this Operational Guidelines, the Important MICR Information, and the Warranty.

When used properly with proper types of paper and with the proper Lexmark printer, the MICR Toner formulation should produce acceptable MICR documents. **THE PAPER STOCK SHOULD BE TESTED PRIOR TO PRODUCTION OF CHECKS BY YOU AND YOUR FINANCIAL INSTITUTION TO ENSURE YOU GET ACCEPTABLE RESULTS. In some jurisdictions, local regulations or industry standards may require the fulfillment of certain requisites such as submission of samples to banking authorities, etc, in which case you are required to comply with such requirements.** You should also be aware of and consider including anti-fraud features for your selected paper, printer and toner cartridge. For additional information, consult ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ or e-mail ▮▮▮▮▮▮▮▮.

We do recommend the following operational guidelines be utilized in addition to the normal cartridge handling procedures:

❖ STORE cartridges in a normal office-like environment in terms of temperature and humidity. The storage environment should be maintained on weekends and holidays.

❖ CLEAN the printer, per printer's users guide. Every operator should be familiar with the cleaning procedures.

❖ LIGHTLY SHAKE the cartridge prior to inserting into the printer. This will aid the even distribution of toner, which could have shifted somewhat during storage.

❖ REPLACE the cartridge at the first LOW TONER indication. DO NOT shake and re-insert.

❖ If the cartridge is frequently REMOVED and EXCHANGED with regular toner cartridges, every operator must clearly understand when and why the exchange occurs AND be able to clearly identify regular and MICR cartridges.

❖ The TONER ALARM should be set to Single or Continuous. See the printer's User Guide.

The additional fuser cleaner pad included with the cartridge should be used to replace the original at around 6,000 to 7,000 documents. This will vary with the amount of toner coverage per document. The cleaning procedures should again be followed.

*PLEASE REVIEW THE ADDITIONAL INFORMATION ON THE BACK OF THIS DOCUMENT*

CONFIDENTIAL - OUTSIDE COUNSEL ONLYA3806

ATTACHMENT 5.0
EXHIBIT D
(LA ENGLISH VERSION Continued)

## IMPORTANT MICR INFORMATION

█████████████████████ AND LEXMARK INTERNATIONAL RECOMMEND THAT SAMPLES OF YOUR MICR DOCUMENTS BE TESTED THOROUGHLY BEFORE ACTUAL USE FOR VOLUME PROCESSING. In some jurisdictions, you might be required to submit samples of those tests to appropriate governmental or banking authorities.

THE USER IS RESPONSIBLE FOR ENSURING THAT ALL MICR ENCODED DOCUMENTS MEET THE GUIDELINES OR REGULATIONS ESTABLISHED BY (1) the appropriate controlling authorities; (2) the banking industry in your jurisdiction; and/or (3) the financial institution with which the USER conducts business.

PLEASE NOTE THAT WHEN USING LEXMARK PRINTER IN A MICR ENVIRONMENT, THE USER ASSUMES EXCLUSIVE RESPONSIBILITY FOR PREVENTION OF THE IMPROPER USE OF THE PRINTER AND THE CARTRIDGE. NEITHER █████████ NOR LEXMARK SHALL BE LIABLE FOR THE IMPROPER USE OF THE PRINTER OR THE CARTRIDGE.

███████████████ recommends that appropriate security procedures be employed, such as:
- Securing the MICR font and signature files
- Using FULL account reconcilement and Stop Payment services available from you financial institution, and
- Employing proper software security measures (i.e., passwords)

For any additional information or recommendations regarding MICR, special font requirements, usage and handling or other questions related to your MICR application, please contact ██████████████████████
or █

Reference material is available from the American Bankers Association. The following Standards and Technical Guidelines can be ordered. (In your jurisdiction, you should contact your local controlling authority or banking industry agency to obtain relevant reference material.)
Specifications for Bank Check Background and Convenience Amount Field – ANS X9.7
Specifications for Placement and Locations of MICR Printing – ANS X9.13
*Paper specifications for checks – ANS X9.18*
Print specifications for Magnetic and Character Recognition – ANS X9.27
Understanding and Designing Checks – X9/TG-2
Quality Control of MICR Documents – X9/TG-6
These may be ordered from: American Bankers Association (ABA) Customer Service Center, 001-202-663-5087

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3807

**ATTACHMENT 5.0**
**EXHIBIT D**
**(LA ENGLISH VERSION Continued)**

## MICR TONER CARTRIDGE WARRANTY

warrants its MICR toner cartridges against defects in materials and workmanship -- until the MICR cartridge is depleted -- for a period of one (1) year from date of sale to Customer. In the event of failure during the warranty period, the Customer is responsible for returning the toner cartridge properly packaged to                    to the following address:                                  The return will be authorized and a RMC number issued upon reporting the failure, including the serial number of the cartridge and a description of the problem. Print quality related failures **must** be supported by print samples on customer paper stock. Check stock paper should be marked "void" or "non-negotiable" by the customer (prior to submitting with the cartridge). Any postage, insurance or shipping cost incurred in sending the product for warranty service shall be credited by                            unless the warranty claim cannot be verified by                              as indicated below. Upon receipt of the failed cartridge,                        will verify the warranty claim and issue a credit to the Customer for the price of the toner cartridge, as well as freight.                            reserves the right to return the cartridge to the Customer and not pay any credit if the warranty claim cannot be verified.

**Although testing is conducted on                             MICR toner cartridge, neither**
**nor Lexmark warrants that your MICR encoded documents printed on a Lexmark printer will be readable by**
**MICR document processing equipment.** Use of this MICR toner cartridge will not change the terms and conditions of Lexmark's standard printer warranty.

This                        MICR Toner Cartridge warranty only applies if the product fails to function properly under normal use and within the manufacturer's specifications. The RMC number must be clearly displayed on the outside of the cartridge box. For an RMC number or for additional Warranty information please call                    or e-mail

**THIS WARRANTY IS GIVEN IN LIEU OF ALL OTHER WARRANTIES, EXPRESSED OR IMPLIED, INCLUDING THE WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. THIS WARRANTY DOES NOT COVER ANY DAMAGE DUE TO ACCIDENT, MISUSE, ABUSE, AND/OR NEGLIGENCE. IN NO EVENT SHALL                            OR LEXMARK INTERNATIONAL BE LIABLE UNDER ANY CIRCUMSTANCES FOR ANY INCIDENTAL, CONSEQUENTIAL, SPECIAL, INDIRECT, PUNITIVE OR EXEMPLARY DAMAGES OR LOST PROFITS FROM ANY BREACH OF THIS WARRANTY OR OTHERWISE.**

**LEXMARK OFFERS NO WARRANTY OF ANY KIND ON THIS MICR TONER CARTRIDGE.**

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3808

## ATTACHMENT 6.0

### NRE

Non-Recurring Expenses (NRE) remain to be negotiated on an individual project basis.

CONFIDENTIAL - OUTSIDE COUNSEL ONl**A3809**

**ATTACHMENT 7.0**

**MICR CARTRIDGE REBATE AGREEMENT**

**Optra T, Optra S, Optra M, 4049, and 4039 MICR Toner Cartridges
Rebate Grid for**

Lexmark agrees to pay the following rebates to ▮▮▮▮▮▮▮▮▮ for their purchases in the year 2000 of Optra T/S/M/4049/4039 MICR toner cartridges from Lexmark. Rebates will be paid one month after the end of each quarter for purchase in the prior quarter.

**Volume**          **Rebates**

Example:

If the total volume of Optra T/S/M/4049/4039 MICR toner cartridges purchased in 2000 was ▮▮▮▮▮▮ The total rebate payment would be: ▮▮▮▮▮▮▮▮

CONFIDENTIAL - OUTSIDE COUNSEL ONL A3810

# OEM CONTRACT 8

## LEXMARK - ███████

## MASTER OEM PURCHASE AGREEMENT

This OEM Purchase Agreement ("Agreement"), made this 18th day of May 2012 ("Effective Date"), by and among Lexmark International, Inc., a company formed and existing under the laws of the State of Delaware and having its principal place of business at 740 West New Circle Road, Lexington, Kentucky 40550 U.S.A., Lexmark International Technology S.A., a company formed and existing under the laws of Switzerland and having its principal place of business at ICC, 20 Route de Pre-Bois, CH 1215 Geneva 15, Switzerland (singly and collectively "Lexmark"), and ████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████████████ sets forth the terms and conditions under which Lexmark agrees to sell and ██████ agrees to purchase Products for resale in the territory defined below. As used throughout the Agreement, ██████ shall include the ██████ and any of its Affiliates (defined below) or representatives performing services pursuant to this Agreement.

### 1.0    Definitions

As used in this Agreement, the following terms have the meanings specified below:

"**Agreement**" means this contract, including all attachments.
"**Affiliates**" means, with respect to a party, any person or entity a corporation or other entity that owns or controls, is controlled by directly, more than fifty (50) % of the stock or other equity interests entitled to vote for the election of directors or equivalent governing body.
"**Default**" means any material breach of this Agreement by either Party.
"**Effective Date**" means the date first written above.
"**EOL**" means end of life (i.e., the date on which a Product will no longer be manufactured and sold.).
"**PO**" means purchase order.
"**Products**" means Hardware Products, Supplies Products, Service Parts, and Options.

CONFIDENTIAL - OUTSIDE COUNSEL ON A3811

**"Hardware Products"** and / or **"Supplies Products"** and / or **"Options"** are defined through Product Descriptions contained in Attachment 1.

"**Service Parts**" means parts for maintenance and repair of Products, which parts are purchased directly from Lexmark, and includes parts for preventive maintenance. Used, tear-down, and remanufactured parts not purchased directly from Lexmark, as well as any third-party or clone parts, are not considered genuine Service Parts.

"**Software Programs**" means software, firmware, and all other computer code (in any format or medium and whether or not incorporated into Products) provided by Lexmark under this Agreement.

"**Supplies Products**" means toner cartridges, imaging units, and fusers for Products.

### 2.0    Territory

⬛ shall sell Products only within Territory specified in Attachment 6.0.

### 3.0    Term

This Agreement shall commence on the Effective Date and continue for thirty-six (36) months. This Agreement will be automatically renewed for successive twelve (12) month periods unless either party notifies the other of its desire not to renew three (3) months prior to expiration.

### 4.0    Products

4.1    Products.    The Products that are the subject of this Agreement are specified in Attachment 1.0.    Attachment 1.0 may be amended by written agreement by the parties to add, delete, or modify the specified Products.

4.2    Sale of Products.    ⬛ agrees that Supplies Products, Service Parts, and Options purchased hereunder, will be sold or otherwise distributed by ⬛ and its affiliates only for use with Hardware Products purchased hereunder. Other ⬛ responsibilities are detailed in Attachment 3.0.

### 5.0    Forecasts and Purchase Orders

Lexmark / ⬛ Confidential                                                      Page 2

CONFIDENTIAL - OUTSIDE COUNSEL ONA3812

5.1    Monthly Forecasts.  On a monthly basis, ███ agrees to provide a six (6) months rolling forecast of the Products requirements, by no sooner than the 15th and no later than the 20th of each month.  Products must be identified by both Lexmark part number and ███ part number.  The forecast must also indicate the desired date by which the Products are to be made available for pickup by ███ at a Lexmark designated distribution point in Geel, Belgium or for delivery to another location as agreed by the parties and described in Attachment 2.0. Forecast quantities are to be shown in multiples of the minimum order increments (MOI) as specified in Attachment 2.0.

If Lexmark does not receive a forecast by the due date, the volumes forecast in the prior month's forecast will be used as the recognized forecast for the then-current month and the new forecast for the ~~fourth~~ sixth month will be reset to zero. The same process will be followed in the event forecasts are not received for consecutive months.

5.2    Purchase Orders.  ███ agrees to place non-cancelable POs by the 20th day of each month with a minimum lead time to product availability of eight (8) calendar weeks and a maximum lead time to product availability of ten (10) calendar weeks, measured from the date Lexmark receives a PO (e.g., POs received by the 20th of December must be for Products with delivery dates beginning February 20th or later).  PO unit quantities and product mix must conform to the forecast provided by ███ in accordance with the terms of this Section 5 and MOI set forth in Attachment X.2.

In the event ███ fails timely to submit a PO, Lexmark may follow the same procedure, set forth in Section 5.1, to be used if ███ ails to submit a forecast when due.  Failure to submit a PO will not, however, diminish or modify ███ obligation to purchase Products in accordance with its monthly forecasts.

5.3    Forecast Flexibility.  The following month-to-month variations in the forecasting process are permissible:

Month 1:            Purchase orders have already been submitted.

CONFIDENTIAL - OUTSIDE COUNSEL ON A3813

Month 2            Newly submitted PO is firm and non cancelable.  Quantity of units ordered may not vary more than ▮ from prior month forecast; Products model mix - within SF and MFP types - may not vary than ▮

Month 3:            Forecast is new and may be any integer multiple of the applicable MOI. Within the Month 2 flexibility rule, a portion of this forecast will be binding.

Months 4-12:       Forecast is new and may be any integer multiple of the applicable MOI. Forecast is non-binding.

Figure 1 depicts the timeline for forecasts and POs and flexibility model.

| Forecast & Order Lead Time | Lexmark Production Schedule | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Month 1 | Month 2 | Month 3 | M4 | M5 | M6 | M7 | M8 | M9 | M10 | M11 | M12 |
| Monthly 0 Update - 15th - 20th:<br>- M4 thru M12 - Non-binding F/C<br>- Month 3 - Binding F/C<br>- M2 - P.O. (w/Flex on M3 F/C):<br>--- Qty - +/- 15% & Mix - +/- 25% | Prior P.O. Rec'd Last Month | Firm P.O. w/Flex Terms: Qty +/- 15% Mix +/- 25% | Binding Forecast Quantity | Non-Binding Forecast for Months 4 thru 12 | | | | | | | | |

Note:  Total Lead Time (P.O. Submission to Product Delivery in Geo) is approx 8-10 Weeks

1. M2 P.O. Quantity & Model Mix is Based On Prior Month M3 Forecast (Qty +/- 15% / Mix - +/- 25%)

2. P.O. Submitted at End of Month 0 for Lexmark Production in M2 & ▮ Delivery in M3

3. The Mixed Order is Built During 1st Half of Month 2 and Shipped to Geo

4. Order Customizaed and Delivered to ▮ Location 1st Half of Month 3

5.3    Subject to the Products availability, credit approval, and other legitimate business considerations, Lexmark will accept and schedule non-cancelable POs and will inform ▮ of shipment schedules within seven (7) business days of receiving a PO.  Lexmark may in its sole and absolute discretion fulfill POs with requested lead times that are shorter than specified in this Section 5.  . The minimum monthly order increments and the minimum SKU order increments are set forth in Attachment 2.0.

5.4.    ▮ during the first twelve (12) month period of this Agreement, targets the purchasing equal to or greater than ▮ of the total quantity of Hardware Products. This first twelve (12) month period shall begin upon ▮ initial receipt of Hardware Products. The total number of Hardware Products may be comprised of the combination of those Hardware Products listed in Attachment 2 and the successors to those products.

CONFIDENTIAL - OUTSIDE COUNSEL ONA3814

5.5    <u>Product Withdrawal and End of Life Management</u>.

5.5.1 Lexmark will have the option at any time to withdraw Products from availability for purchase by ▮▮▮▮ ("Product Withdrawal"). Lexmark will provide ▮▮▮▮ written notification of any such Product Withdrawal a minimum of six (6) months prior to the effective date of a Product Withdrawal.

5.5.2 Upon Lexmark's notification to ▮▮▮▮ of its desire not to renew this Agreement (see Section 3.0 of this Agreement) or upon Lexmark's written notification to ▮▮▮▮ of a Product Withdrawal, Lexmark agrees, subject to Products availability and credit approval, to offer ▮▮▮▮ a "last buy" of the affected Products. Within thirty (30) days after receiving Lexmark's Product Withdrawal notification, ▮▮▮▮ will submit a "last buy" forecast ("Last Buy Forecast") The order unit quantities in the Last Buy Forecast must be consistent (in relation to the immediately preceding monthly forecast) with the forecast deviation allowances described in Section 5.2. ▮▮▮▮ shall not be required to submit subsequent forecasts for such "last buy" Products. The Last Buy Forecast will be considered final and cannot be changed or cancelled by ▮▮▮▮ ▮▮▮▮ will issue monthly purchase orders (each a "Last Buy PO") consistent with the Last Buy Forecast. A Last Buy PO cannot be canceled or changed. Lexmark has no obligation to build units to fulfill a ▮▮▮▮ Last Buy P.O. that has not been submitted in accordance with this Section 5.5.2. All "last buy" Products must be manufactured prior to the effective withdrawal date and will be shipped within thirty (30) days after that date. The prices for these "last buy" Products shall be in accordance with the then-current prices in Attachment 2.0 of this Agreement.

## 6.0    Pricing, Payment, and Modifications

6.1    Pricing for Products is specified in Attachment 2.0. Product pricing is subject to change (increase or decrease) on ninety (90) days written notice from Lexmark. Prices will change only when Lexmark's best wholesale price for the corresponding Lexmark-branded product model changes. Any change in the price of a Product shall be equivalent on a percentage basis to the change in the best wholesaler price of the Lexmark-branded product.

CONFIDENTIAL - OUTSIDE COUNSEL ONI A3815

6.2    Lexmark (or its affiliates) will issue ▓ invoices on the date of shipment. ▓ will make payment via electronic transfer within thirty (30) days from date of said invoice.  Lexmark reserves the right to withhold shipping if ▓ account is delinquent.

6.3    ▓ will be responsible for all taxes, including but not limited to sales and use tax, customs and excise duties, turnover or withholding taxes, Value Added Tax, property tax, corporate, state, or local income tax associated with the purchase and delivery of Lexmark's products (except for those taxes assessed on the income of Lexmark which shall be Lexmark's responsibility).

▓ shall be exclusively responsible for all statutory fees provided for by applicable copyright laws and instruments having similar legal effect ("Copyright Levies"). Notwithstanding any other provision of this Agreement, ▓ shall indemnify and hold harmless Lexmark and its affiliates from and against any and all claims for the payment of Copyright Levies and/or for the disclosure of information made by any third parties (including, without limitation, any collection societies) in any country. The foregoing shall apply even, and in particular, if Lexmark or any of its affiliates is liable (or jointly liable with ▓ to pay Copyright Levies under the statutes applicable in any country.  All prices quoted by Lexmark are exclusive of any tax and/or Copyright Levies unless otherwise stated by Lexmark.

6.4    In the event Lexmark changes a supplier for Products and/or components of Products, or in the event that material changes in Lexmark's agreement(s) with an existing supplier necessitate changes to the forecasting or other terms of this Agreement, Lexmark shall notify ▓ of such changes upon reasonable advance notice.  In the event ▓ does not agree to such changes, then the parties acknowledge and agree that either party may to terminate this Agreement on 30 days advance written notice.

6.5    ▓ agrees to assume the financial obligations of any of its subsidiary companies or Affiliates that purchase a good, part or service (i.e. Product) from Lexmark under this Agreement.  In the event of nonpayment by any ▓ subsidiary or Affiliate, Lexmark shall issue a written notice of nonpayment to the ▓ subsidiary or Affiliate entity that incurred the obligation and shall copy

███ on the written notice. The written notice will include a 30-day opportunity to cure. If payment is not received by Lexmark within the 30-day cure period, ███ shall assume the responsibility for the payment and shall satisfy the financial obligation within 30 days of ███ receipt of the Invoice originally submitted to the defaulting subsidiary or Affiliate. In the event of termination of this Agreement, ███ shall remain liable as guarantor for any nonpayment by any ███ subsidiary that remains unpaid as of the termination date. Failure by ███ to honor such a payment obligation in accordance with the terms of this Section 6 shall be considered a material breach by ███

## 7.0    Delivery

7.1    <u>Delivery Term</u>.  Products pricing is based on the Incoterms specified in Attachment 2.0 – Pricing.

7.2    <u>Title and Risk of Loss</u>.  Title to the products and risk of loss of or damage to the Products shall pass from Lexmark to ███ at the time of delivery by Lexmark to ███ designated freight forwarder/carrier.

7.3    Lexmark shall make commercially reasonable efforts to deliver Products to ███ on the agreed delivery date as set forth in the accepted Purchase Order. Lexmark will promptly notify ███ in the event Lexmark foresees a likely delivery delay the agreed delivery date as set forth in the accepted Purchase Order with the reason therefor. And Lexmark will promptly notify the accordingly revised delivery schedule by using the fastest communication measure available. In case such revised delivery schedule cannot satisfy ███ (e.g. causes a ███ but of stock situation) and the Purchase Order was in full compliance with agreed Lead Time and Flex Terms, then ███ may indicate to Lexmark a schedule acceptable to ███ require air shipment or other rapid transport method. In case that Lexmark failure to delivery in accordance with the revised delivery schedule agreed by the both parties, such Lexmark's failure shall be the Lexmark's Default.

## 8.0    Entire Requirements

8.1    <u>Requirements Purchases</u>.  ███ during the term of this Agreement, agrees to purchase and acquire directly from Lexmark all of its requirements for

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3817

Supplies Products (as well as products essentially equivalent to the Supplies Products including, but not limited to, new cartridges, refilled and/or remanufactured cartridges, and cartridge-filling technology), Consumables Products, and Service Parts; provided that ███ shall not be obligated to purchase memory and cabinet directly from Lexmark.

8.2    Verification.  Upon request, ███ shall make its premises, books and records available to Lexmark for purposes of an audit to verify ███ compliance with the terms of this Section 8.  In the event the audit reveals non-compliance by ███ shall, in addition to any remedies available to Lexmark at law, be responsible for and bear the expense of the audit.

## 9.0    Licensing and Resale Requirements

9.1    Software Licenses.  Any Software Programs (whether or not incorporated in Products) provided to ███ by Lexmark pursuant to this Agreement shall be subject solely to the terms of separate license agreement(s) attached or incorporated by reference into this Agreement.

9.2    Lexmark will sell Supplies Products  to ███ as either Regular supplies, Return Program supplies, or as otherwise identified supplies that are subject to single-use license restrictions, if such products are available for similar Lexmark branded printers. It is Lexmark's desire to make available both versions of supplies. ███ shall purchase and make available to its distributors and/or end-users equivalent Regular supplies whenever Return Program supplies are purchased (the foregoing does not require ███ to purchase Regular supplies in equal quantities). ███ understands that the Return Program supplies may contain a chip that is designed to allow the supply to be used only once, thus helping to enforce the Return Program terms. ███ will also make available the Regular versions of the supplies, and will inform the marketplace of the existence of both the Regular and Return Program versions (and the terms of the Return Program cartridge) by labels, inserts in printer and supply/consumable packaging, and appropriate sales literature, announcement and training.

The Return Program license terms are essential parts of the Return Program offering.  For the "up-front rebate," the end-user agrees that the Return Program

CONFIDENTIAL - OUTSIDE COUNSEL ONA3818

item will be used one time only, and will be returned to Lexmark after its initial use. The Return Program license terms will identify Lexmark (not necessarily by name) as the developer/manufacturer of the product, and will otherwise read essentially the same as Lexmark's terms for Lexmark-branded products. The Return Program item's label and its packaging will instruct the user to return the Return Program item (after use) to Lexmark's (not necessarily by name) collection point. In addition, ███ acknowledges and agrees that for some printer products, Lexmark may sell them subject to the condition that only supplies/consumables made by Lexmark (whether new or remanufactured) or authorized by Lexmark to be reused with the printer product will operate with such printer products, and that Lexmark may include technology in such printers and supplies/consumables designed to enforce such condition. ███ acknowledges and agrees that Lexmark shall be entitled to include all the terms and conditions described herein on the external packaging, user manuals, and drivers of products sold hereunder subject to such terms and conditions.

9.3    Lexmark agrees to sell to ███ a Supplies Product for a period of seven (7) years from the date of ███ last purchase of the Hardware Product on which the Supplies Product functions.

9.4    Lexmark agrees to sell to ███ a Service Part for a Hardware Product purchased from Lexmark either for a period of seven (7) years from the date of ███ last purchase of the Hardware Product of last buy described in Section 5.5.2 on which the Service Part functions or for as long as Lexmark continues to see its comparable service parts for the Lexmark brand version, whichever is sooner. If Lexmark no longer offers a Service Part then ███ can purchase an equivalent substitute from another source.

## 10.0    Representations and Limited Warranty

10.1    Product Warranties. Lexmark warrants that Products  shipped under this Agreement as follows:

(a)    all Products are free from liens or other defects in title when shipped,

(b)    all Products (excluding Software Products and Service Parts) are newly manufactured when shipped, and

(c)    all Products if not modified, will conform to the Products specifications appearing in Attachment 1.0 until the sooner of either (a) the time when the Products is unboxed; or, (b) ninety (90) days from the date of the Product invoice.

10.2    <u>Software Warranties</u>.  Software Programs shall conform to the warranty contained in the separate software license agreement applicable to the Software Program.

10.3    The above warranties are provided solely to ███████ must establish its own warranty for its sale of ████ end products to its end users and other customers.  Lexmark will not be obligated to provide any installation, warranty, maintenance, or ████ support for ████ end users or remarketers.

In order for ████ o provide any installation, warranty, maintenance, or customer support for its end users or remarketers as set forth in the previous paragraph , Lexmark shall provide ████ technical training as well as technical information and materials including, but not limited to, an operational manual, service manual, parts catalogue, diagrams, security whitepapers, when they exist and quality information of the Products, necessary for such installation, warranty, maintenance or customer support.  However, i████ requests special materials, Lexmark may charge reasonable costs for such materials.  Both parties agree that ████ may be free to use such information and materials provided by Lexmark hereunder and make any manuals for sales and service of the Products based on such information and materials. Refer to Attachment 4– Service Support Plan.

10.4    The above mentioned warranties do not cover failures caused by misuse, accidents, damage in transit, attachments, alterations or modifications to Products, unsuitable operation, applications, or usage environment, installation, repair or maintenance not performed by Lexmark, or failure caused by non-Lexmark (including ████ product, part, designs, computer code or programs, or inventions even if the foregoing are included or embodied in Products.

CONFIDENTIAL - OUTSIDE COUNSEL ON A3820

10.5  THE FOREGOING WARRANTIES ARE IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, THE WARRANTY AGAINST INFRINGEMENT AND THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.  FOR AVOIDANCE OF DOUBT, LEXMARK HEREBY DISCLAIMS AND EXCLUDES ANY REPRESENTATION OR WARRANTY THAT THE PRODUCTS ARE COMPATIBLE WITH, OR WILL FUNCTION WHEN USED WITH, NON-LEXMARK SUPPLIES, OR SERVICE PARTS.

10.6  <u>Warranty Remedies</u>.  If a Supplies Product does not meet the warranty term described in Section 10.1(c), ▮▮▮▮ agrees at its own expense to return such Supplies Products upon request to Lexmark for failure analysis.  ▮▮▮▮ at this time also shall provide sufficient supporting documentation demonstrating the alleged Product failure.  Lexmark agrees, as ▮▮▮▮ sole and exclusive remedy, to replace, or credit ▮▮▮▮ account, for such defective print cartridges and to reimburse ▮▮▮▮ for all shipping costs related to the return of such defective print cartridges and, as applicable, the shipment of replacement print cartridges.

If a Hardware Product fails to meet the warranty term described in Section 10.1(c), (a) ▮▮▮▮ will make the necessary repairs to the non-conforming Printers or the Features during the warranty period and (b) Lexmark will provide either free Service Parts or a credit for non-conforming parts, all pursuant to procedures to be mutually agreed to by the parties.

The quality management plan applicable to the Products is set forth as Attachment 5.

## 11.    Indemnity

11.1  <u>Lexmark General Indemnities</u>. Lexmark shall indemnify and hold harmless ▮▮▮▮ from and against any and all third-party claims and costs (including reasonable attorney's fees) resulting from personal injuries, or property damage caused by Lexmark and a Product sold under this Agreement, <u>provided that</u> Lexmark is otherwise liable for such damages under applicable law despite the limitations of liability contained in this Agreement.

CONFIDENTIAL - OUTSIDE COUNSEL ON A3821

11.2 ███ General Indemnities. ███ shall indemnify and hold harmless LEXMARK from and against any and all third-party claims and costs (including reasonable attorney's fees) resulting from ███ modification of Products (including TTEC's addition of power cords not supplied by Lexmark), ███ representations relating to Products, and personal injuries or property damage for which Lexmark is not liable under applicable law.

11.3 Lexmark IP Indemnities. Lexmark will, at its expense, defend ███ against any claim that a Product supplied hereunder infringes a third-party's patent, utility model, copyright, trade secret right or right of layout-designs of integrated circuit in the Territory. Lexmark will pay resulting costs and damages (a) finally awarded by a court for such claim or (b) agreed to in a settlement agreement in relation to such claim, and will pay attorney's fees incurred by Lexmark in relation thereto. To qualify for such defense and payment, ███ must:

(a) Give Lexmark prompt written notice of any such claim; and
(b) Allow Lexmark to control the defense, and reasonably cooperate with Lexmark in the defense and all related settlement negotiations.

11.3.1 Lexmark's obligations under this Section 11.3 are conditioned on ███ agreement that if units of Product in the inventory of ███ or the operation thereof while in ███ possession, become, or in Lexmark's opinion are likely to become, the subject of an infringement claim, Lexmark and ███ will mutually agree to:

a) stop shipping such Product, and upon written request ███ will return such units of Product to Lexmark; or
b) to procure the right for ███ to continue marketing and using units of Product or to replace or modify them so that they become non-infringing.

Lexmark agrees to grant ███ a credit equal to the unit price paid to Lexmark by ███ for affected returned units of Products adjusted for the value of use if such item has been used or partly consumed and assume all cost of freight to and from ███

CONFIDENTIAL - OUTSIDE COUNSEL ONA3822

11.3.2 Notwithstanding the foregoing, Lexmark shall have no obligation whatsoever with respect to any claim based upon (a) an Engineering Change requested or initiated by ████ (b) non-Lexmark modification of, or content in, units of Product, including any technology provided directly or indirectly by ████ (c) non-Lexmark originated portions of Product, (d) the combination, operation or use of Products with apparatus, data or programs not furnished by Lexmark; or (e) the combination, operation or use of Products with either (i) other products and/or (ii) other items sold or otherwise furnished by Lexmark, under circumstances where Lexmark did not perform such combination; in which cases (a) through (d), inclusive, ████ shall defend Lexmark from any such claims and pay resulting costs, damages, and attorney's fees finally awarded by a Court for such claim, or agreed to in a settlement agreed to by ████ as long as Lexmark provides prompt written notice and allows ████ control of the defense and cooperates in the same manner as provided in Section 11.3 above.

11.3.3 This Section 11.3 states Lexmark's entire obligation and ████ entire remedy relating to infringement.

11.4 ████ P Indemnities.

████ will at its expense, defend Lexmark against any claim that any items other than Products supplied hereunder infringe a patent or copyright and ████ will pay resulting costs and damages (a) finally awarded by a court or (b) agreed to in a settlement agreement by Customer in relation to such claim, and will pay attorney's fees incurred by Lexmark in relation thereto.  To qualify for such defense and payment, Lexmark must:

a)    Give ████ prompt written notice of any such claim; and
b)    Allow ████ o control the defense, and fully cooperate with ████ in the defense and all related settlement negotiations.

11.5 ████ Brand Names and Trademarks

11.5. ████ shall, at its expense, supply Lexmark with all photographs, colors, and instructions on the placement and appearance of the ████ brand name

CONFIDENTIAL - OUTSIDE COUNSEL ON A3823

on any Products and their applicable documentation, packaging, and boxes. Each box will be labeled according to Specifications.   Lexmark shall remove the Lexmark brand name(s) from products, documentation, packaging and boxes; however, some instances may exist in documentation where required for notices or incidentals like copyright statements or in places (e.g. electronic cards) not normally noticed by an end-user. Cartons and carton labels for Products, which receive final review and approval by ▮▮▮ should have no mention of Lexmark brand.

11.5.2 Lexmark agrees to affix the ▮▮▮▮ brand names and trademarks on Products and not to affix or allow to be affixed the ▮▮▮▮ brand names and trademarks on any other product manufactured or supplied by Lexmark. Lexmark will not use or publicize the name of the other without such ▮▮▮ prior written consent.

11.5.3 Lexmark agrees that, except for affixing the ▮▮▮▮ brand names or trademarks to the Products, nothing in this Agreement grants or transfers to Lexmark   any right or interest in such ▮▮▮▮ brand names or trademarks. Lexmark shall not in any manner represent that it has any ownership interest in the ▮▮▮▮ brand names or trademarks or registrations thereof. Lexmark further agrees not to use or register any ▮▮▮▮ brand names or trademarks or any other word or device likely to be confused with the ▮▮▮▮ brand names or trademarks, except as permitted in writing by ▮▮▮.

## 12.0   Limitations of Liability and Remedy

12.1   Limitation of Remedy.   UNLESS OTHERWISE PROVIDED FOR BY APPLICABLE LAW, LEXMARK'S TOTAL LIABILITY TO ▮▮▮ IN ANY CALENDAR YEAR DURING THE TERM OF THIS AGREEMENT SHALL FOR ANY CLAIMS, INCLUDING, WITHOUT LIMITATION, TORT CLAIMS, CLAIMS FOR BREACH OF CONTRACT, OR ANY OTHER CLAIMS FOR DAMAGES OR COMPENSATION BY COMPANY (EXCEPT FOR THOSE PROVIDED FOR IN SECTIONS 11 OR 14.5), BE LIMITED TO THE AMOUNT PAID BY ▮▮▮ TO PURCHASE THE LEXMARK PRODUCTS THAT DIRECTLY CAUSED THE DAMAGES.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3824

12.2  <u>Limitation of Liability</u>.  EXCEPT FOR THE DAMAGE RESULTING FROM PERSONAL INJURIES AND INFRINGMEMT OF A THIRD-PARTY'S PATENT , UTILITY MODEL, COPYRIGHT, TRADE SECRET RIGHT OR RIGHT OF LAYOUT-DESIGNS OF INTEGRATED CIRCUIT, IN NO EVENT WILL LEXMARK BE LIABLE FOR ANY LOST PROFITS, LOST SAVINGS, INCIDENTAL DAMAGES, CONSEQUENTIAL DAMAGES, OR OTHER INDIRECT DAMAGES ARISING OUT OF OR RELATING TO THIS AGREEMENT.  LEXMARK ASSUMES NO LIABILITY REGARDING ANY CLAIM OR ACTION CAUSED BY, OR DIRECTLY RELATED TO, A NON-LEXMARK PRODUCT.

### 13.0  Termination

13.1  <u>Upon Default</u>.  Either party can terminate this Agreement in the event of a Default by the other party that is not cured within thirty (30) days after written notice by the non-Defaulting party.  The parties agree, however, that prior to any issuance of a written Default notice of Default, they both will negotiate in good faith to resolve any dispute or default, and such negotiations will include at least one meeting between executives of each party. If Lexmark terminates for ███████ Default, ██████ shall pay Lexmark for Products produced with ██████████ ogo and all components and material ordered which cannot be reasonably canceled, returned or diverted to other Lexmark products.  If ██████ terminates for Lexmark's Default, ██████ must pay for Products shipped prior to the effective date of termination. . █████ may choose to, but is not obligated to, accept on a prepayment basis Products on order on the effective date of termination subject to their availability from Lexmark.

13.2  <u>Upon Filing of Claim</u>.   Notwithstanding any other provision of this Agreement, if either party files a claim or suit against the other, whether based on a Default of this Agreement, or for any other reason, the non-filing party may terminate this Agreement immediately, upon written notice to the filing party. In case either party terminates this Agreement in accordance with foregoing reason, Lexmark will be obligated to fulfill only accepted outstanding orders.   Any such termination shall not prejudice either party's' rights with regard to such claim or suit.

CONFIDENTIAL - OUTSIDE COUNSEL ONA3825

13.3    The party can terminate this Agreement in its sole and absolute discretion, with or without cause, on ninety (90) days advance written notice.

## 14.0    General

14.1    <u>Trademarks</u>.  Neither this Agreement nor the sale of Products hereunder shall give either party the right to use the other party's trademarks.

14.2    <u>Force Majeure</u>.  If either party's performance of any obligations hereunder (other than payment obligations) is prevented or restricted by reason of acts of God, fire or other casualty, strikes or labor disputes, shortage of parts or labor, war or other violence, or governmental law, regulation, or requirement, or such other situation that is beyond the reasonable control of such party (each a force majeure event), then that party shall be excused from performance to the extent of and for the duration the force majeure event prevents, restricts, or delays the affected party's performance.

14.3    <u>Survival</u>.  All obligations of the parties which by their nature survive any expiration or termination of this Agreement shall remain in effect.

14.4    <u>Publicity</u>.    Press releases and other publicity or advertising which mentions the other party by name shall be agreed upon by both parties prior to release.

14.5    <u>Confidentiality</u>.  This Agreement, and its terms and pricing, shall be held in confidence for two (2) years from the expiration or termination of this Agreement, except that either party can disclose it to a third party financial organization for financing purposes, if such third party agrees to hold it in confidence.  No other information shall be considered confidential unless it is covered by separate written Mutual Non-Disclosure Agreement (MNDA) No. MA-00949-LXK-2011, which is hereby incorporated by reference into this Agreement, and which shall continue in full force and effect throughout the contract period of this Agreement.

14.6    <u>Compliance with Laws</u>.  Each party agrees to comply with all applicable governmental laws and regulations, including United States laws and regulations



CONFIDENTIAL - OUTSIDE COUNSEL ON A3826

relating to the export of technical data and products covered by this Agreement, and all applicable data protection laws and instruments having the effect of law.

14.7    <u>Regulatory Agency Approvals & Requirements.</u>  Lexmark shall obtain, maintain, and insure compliance with the ▉▉▉ Regulatory Agency Approvals listed in Attachment 1.0 for the Products. Lexmark shall provide ▉▉▉ upon request, with documentation including testing data and reports to evidence Lexmark's acquisition and compliance such Regulatory Agency Approvals. If a Regulatory Approval not listed in Attachment 1.0 is required for ▉▉▉ to sell Products in the Territory then Lexmark and ▉▉▉ will negotiate in good faith and separately agree to cover the performance and funding of the work required to insure compliance with such Regulation.

14.8    <u>RoHS.</u> With respect to the European Unions Directive on the Restriction on the Use of Certain Hazardous Substances in Electrical and Electronic Equipment (RoHS), before the first delivery of the Products to ▉▉▉ Lexmark shall provide ▉▉▉ with a letter listing and declaring that the specific Products by Lexmark, and any parts or components thereto comply with RoHS, so long as they are not supplied or designated by ▉▉▉

14.9    <u>No Waiver</u>.    Neither party's waiver of any instance of the other's noncompliance with the Agreement will be deemed a waiver of any future non-compliance.

14.10 <u>Assignment</u>.  Neither party may assign its rights or obligations under this Agreement without the prior written consent of the other, which consent shall not be unreasonably withheld.  Notwithstanding the above, each party may, without the prior written consent of the other, assign its rights and obligations hereunder to a successor in ownership of all or substantially all of the assets of the assigning party, whereupon such assignee will assume this Agreement and will automatically be deemed to have replaced the assignor for all purposes hereof. In addition, Lexmark can assign accounts receivable ("A/R") from ▉▉▉ (without ▉▉▉ prior written consent) to a third party financial organization for financing purposes. In the event Lexmark assigns an A/R, such A/R shall be deemed to be used as collateral and, as such, is still owned and controlled by Lexmark. In the

CONFIDENTIAL - OUTSIDE COUNSEL ON A3827

event such assignment would result in the receivable being transferred to a third party, then Lexmark will obtain ▮▮▮ prior written consent before such transfer, which consent will not be unreasonably withheld.

14.11 <u>Headings</u>.   The headings herein are included only for purposes of convenience and do not affect the construction or interpretation of any provision of this Agreement.

14.12 <u>Order of Precedence</u>.   The terms and conditions contained in the Attachments to this Agreement take precedence in case of a conflict with the terms or conditions of this Agreement.

14.13 <u>Modification only by Writing</u>.  This Agreement will not be supplemented or modified by any course of dealing or trade usage.  Variance from or addition to the terms and conditions of the Agreement in any purchase order or other written notification from ▮▮▮ will be of no effect.  This Agreement shall not under any circumstances be effective until it is signed by both parties.   Except for Product pricing as provided for in Section 6.1, this Agreement can be modified only by written amendment mutually agreed to by both parties.

14.14 <u>Governing Law and Dispute Resolution</u>.  This Agreement, including its Attachments, shall be governed by and construed in accordance with the laws of the Commonwealth of Kentucky, without regard to its choice of law principles, is the complete agreement between the parties, replacing any purchase order or invoice terms and all prior written and verbal communications or agreements between the parties on this subject matter. Notwithstanding any other language in this Agreement to the contrary, the provisions of the U.N. Convention on Contracts with International Sale of Goods shall not apply to this Agreement. Any disputes arising from or in connection with this Agreement shall be determined exclusively by a court of competent jurisdiction in Geneva, Switzerland, and the parties hereby waive the defenses relating to lack of personal jurisdiction or improper venue as against such a proceeding.

14.15 <u>Personal Data</u>.  The party hereby consents to the storage and processing of any data received by the other party in the course of this Agreement, to the extent necessary for the performance of this Agreement and as described herein.

CONFIDENTIAL - OUTSIDE COUNSEL ON A3828

The party expressly accepts that the other party may collect, process and store some or all of the following personal data that the party has provided or will provide to the other party in relation to this Agreement, including but not limited to: employee contact names and corresponding business postal addresses, business e-mail addresses, business phone numbers, job titles and/or job functions (hereafter called "Personal Data"). The data, including Personal Data, shall be stored in each party's company. The Personal Data shall be used exclusively for the purposes of facilitating communication with your company.

14.16 Counterparts.  This Agreement shall be executed in the English language and may be executed in two or more counterparts. Any translation of this Agreement into another language shall serve only for purpose of convenience. The English version shall govern in all cases, including any cases involving questions of contractual interpretation.

14.17 Integration.  This Agreement, including its Attachments, is the complete agreement relating to the subject matter hereof between the parties, replacing any purchase order or invoice terms and all prior or contemporaneous written and verbal communications or agreements between the parties on this subject matter.

To document their agreement to be bound by the terms of this Agreement, the parties have caused their respective, authorized representatives to sign below.

LEXMARK INTERNATIONAL, INC.

By: _____

Name:  F.T. SAMUEL JR          Name:

Title:  VP, WW OEM & ALLIANCES  Title:

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3829

LEXMARK INTERNATIONAL TECHNOLOGY S.A..

By: _____

Name: _____
Mike R. Rueschenbaum
Vice President and General Manager
Europe, Middle East & Africa
Lexmark International Technology S.A.
Case postale 508
CH - 1215 Genève 15

Title: _____

Lexmark ▮ Confidential

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3830

# Product Definition Document

██████████████████████████████████

# Products for Europe

May 9, 2012

Author: Chuck Henry,
Lexmark International, Inc.
ISS OEM Engineering

CONFIDENTIAL - OUTSIDE COUNSEL ONL A3831

# Change History

| Date | Version | Changes/Comments |
|------|---------|------------------|
| 4/17/2012 | v0 | Initial draft |
| 4/19/2012 | v1 | Added WEEE sheet PN |
| 4/30/2012 | v2 | -Added German phone adapter<br>-Revised statement of supported countries<br>-Added supported country list with power cords<br>-Revised Certification section to include Fax/Wireless country list and support for additional certifications.<br>- Revised eSF application support description |
| 5/9/2012 | v3 | - Added documentation for RoHS compliance<br>- Added documentation support for █████ application for █████ |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

Product Definition Document  Page

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3832

## Table of Contents

1.0 Purpose.............................................................................................................................................................. 4
2.0 General.............................................................................................................................................................. 4
3.0 Product Hardware ............................................................................................................................................ 4
4.0 Part Numbering for Orderable Parts (TLIs, Supplies, Options/Features, Service Parts)................................ 5
5.0 Certifications..................................................................................................................................................... 6
6.0 Supplies & Associated Packaging.................................................................................................................... 6
7.0 Documentation.................................................................................................................................................. 7
8.0 Driver CD.......................................................................................................................................................... 7
9.0 Product Packaging............................................................................................................................................ 8
10.0 Options/Features ............................................................................................................................................ 8
11.0 Service Parts................................................................................................................................................... 9
12.0 Other ............................................................................................................................................................... 9
13.0 Definition Approval ....................................................................................................................................... 10

Product Definition Document  Page

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3833

# 1.0 Purpose

The purpose of this Product Description Document (PDD) is to capture the basic "agreed to" product description between Lexmark and ▮▮▮▮▮ It is not a definition of every component as one would see in an actual bill of material. Customer requested changes to an approved PDD will require Lexmark to evaluate the impact of such requests in terms of cost, schedule, and/or resources.

It is assumed, unless specifically addressed, a particular aspect of a product is the same as that of the Lexmark branded equivalent product.

# 2.0 General

| Model | | | | |
|---|---|---|---|---|
| **Similar Lexmark Model** | T650dn | T654dn | X652de | X656dte |

Countries supported by the shipping configuration are determined by the power cords and phone adapters included and certifications. See section *3.0 Product Hardware* for specific power cords and adapters currently provided. See section *5.0 Certifications* for certifications and homologation.

# 3.0 Product Hardware

*Company and model names on front of machines*
- Blank operator panel display bezel
- Company name ▮▮▮▮▮ pad printed on the front face of the upper front cover on the left side
- Model name pad printed on the front face of the upper front cover on the right side

*Company name on rear of machines*
Company name applied to back of rear cover with adhesive label.

*Serial Number Label*
A label under the front cover will display
- The machine's Lexmark part number in human readable and bar code format.
- The Type used for certification purposes(example ▮▮▮▮▮ for ▮▮▮▮▮
- The factory serial number in human readable and bar code format,
- Two configuration codes used by Lexmark's

*Power Rating Label*
On the rear of the machine the power rating label will be applied. The artwork for these labels will be unique to ▮▮▮▮▮ and will contain Toshiba branding and machine type identification for regulatory purposes.

*Print Menu Pages*
Customers can initiate the printing of pages showing the status of internal settings, installed options, and other useful information. The heading for these pages will show the ▮▮▮▮▮ models as follows:

Product Definition Document  Page

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3834

*Power Cords and Phone Adapters*

At [redacted] request machines will ship with two power cords.  Listed are the countries where this cord could be used (as of 3/28/2011)

1339520 – Albania, Algeria, Andorra, Angola, Armenia, Aruba, **Austria**, Azerbaijan, Azores(Portugal), Balearic Islands, Belarus, **Belgium**, Bosnia & Herzegovina, Brazil, Bulgaria, Burkina Faso, Burundi, Cambodia, Cameroon, Canary Islands(Sp.), Cape Verde (Rep of), Central African Republic, Chad, Comoros, Dem Rep of the Congo (Zaire), Rep of the Congo, Cote d'Ivoire (Ivory Coast), Croatia, Curacao Is., Czech Republic, **Denmark**, Djibouti, East Timor, Egypt, Equatorial Guinea, Eritrea, Estonia, Ethiopia, Faroe Islands, **Finland**, France, French Guiana (Guyana), Gabon, Georgia, **Germany**, Greece, Guadeloupe, Guinea, Guinea-Bissau, Hungary, Iceland, Indonesia, Iran, **Italy**, Jordan, Kazakhstan, Kyrgyzstan, Laos, Latvia, Lettonia, Lithuania, Luxembourg, Macedonia, Madagascar (Malagasy), Majorca, Mali, Martinique, Mauritania, Mayotte, Moldavia, Moldova, Monaco, Mongolia, Morocco, Mozambique, Nether. Antilles, **Netherlands**, New Caledonia, Niger, **Norway**, Paraguay, Poland, French Polynesia, Portugal, Reunion, Romania, Russia, Rwanda, Samoa, San Marino, Sao Tome & Principe, Senegal, Serbia & Montenegro, Slovakia, Slovenia, Solomon Is., Somalia, Spain/Catalan, St. Helena, Sudan, Suriname, Svalbard (Norway), **Sweden**, Syria, Tahiti, Tajikistan, Togo, Tunisia, Turkey, Turkmenistan, Ukraine, Uzbekistan, Vanuatu, Vietnam, Wallis & Futuna, Western Sahara, Yugoslavia (Serbia & Montenegro)

1339519 – Anguilla (UK), Antigua & Barbuda, Bahrain, Botswana, Brunei, Burma (Myanmar), Channel Islands, Cyprus, Dominica, Falkland Islands, Gambia, Ghana, Gibraltar, Grenada, Guyana, Hong Kong, Iraq, Ireland, Isle of Man, Jordan, Kenya, Kuwait, Lebanon, Liberia, Malawi, Malaysia, Malta, Mauritius, Montserrat, Nigeria, Oman, Pakistan, Pitcairn Is. (UK), Qatar, Saudi Arabia, Scotland, Seychelles, Sierra Leone, **Singapore**, Sri Lanka (Ceylon), St. Kitts & Nevis, St. Lucia, St. Vincent & Grenadines, Sudan, Tanzania, Trinidad & Tobago, Uganda, United Arab Emir., **United Kingdom**, Vanuatu, Wales, Yemen, Zambia, Zimbabwe

At [redacted] request MFPs will include the following phone adapters with the standard RJ11 phone cord:
14B5104 – France
14B5111 – UK
80D1888 - Germany

# 4.0 Part Numbering for Orderable Parts

Following are the Lexmark part numbers and [redacted] part numbers for each of the machines to be ordered from Lexmark by Toshiba.

| Lexmark PN | Customer Part Number | Product Description |
|---|---|---|
| ███ | ███ | |
| ███ | ███ | |
| ███ | ███ | |
| ███ | ███ | |

Product Definition Document  Page

CONFIDENTIAL - OUTSIDE COUNSEL ONl A3835

# 5.0 Certifications

Following is a list of certifications and homologations:

*Product Safety*
- Lexmark to obtain the following with associated NRE charged:  CB, CE, GS, cULus

*Fax Homologation*
- **Existing fax homologation supports the following countries from ▓▓▓▓Territory list as of 4/30/2012:** Austria, Belgium, Bulgaria, Cyprus, Czech Republic, Denmark, Estonia, Finland, France, Germany, Greece, Hungary, Iceland, Ireland, Italy, Latvia, Lithuania, Luxembourg, Malta, Netherlands, Norway, Poland, Portugal, Romania, Slovakia, Slovenia, Spain, Sweden, Switzerland, United Kingdom

*Wireless Certification (supporting wireless option purchased separately)*
- **Existing wireless certification supports the ~~stated~~ same countries as shown above for *Fax Homolgation.***

If ▓▓▓ wishes to sell product not covered by the Product Safety, Fax, and Wireless certifications listed above, ▓▓▓ is responsible for obtaining them.  Lexmark may provide existing data to assist, but any new Lexmark certification effort will require additional agreements and NRE.

*Energy Star*
Lexmark will apply the Energy Star logo to the products as ▓▓▓ does plan to apply for Energy Star. Lexmark will supply needed technical information for ▓▓▓ to make application.

*RoHS*
RoHS compliance documentation will be provided to ▓▓▓ for these products.

*Blue Angel*
Documentation to support ▓▓▓ application for ▓▓▓ will be provided to ▓▓▓

# 6.0 Supplies & Associated Packaging

| Lexmark PN | Customer Part Number | Product Description | Lexmark Proprietary Yield |
|---|---|---|---|
| ▓▓ | ▓▓ | ▓▓ | 25K |
|  |  |  | 25K |
|  |  |  | 30K |
|  |  |  | 30K |
|  |  |  | 30K |
|  |  |  | 30K |
|  |  |  |  |
| 22X1569 | ▓▓ | ▓▓ | 15K - 5K per pack |

Product Definition Document  Page

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3836

In addition to the aftermarket supply items above, the machines ship with a ███ branded return program cartridge installed.

All aftermarket print cartridges will be keyed to work exclusively with ███ models only. All print cartridges will have an ███ branded "load label", a generic return label(12A0488), a generic tamper-evident label (12A0060), and a (generic) license label (12A9077) for return program cartridges. Space is limited on the "load label" which is to include all necessary languages for ███ support.

Aftermarket cartridges will be packaged in plain brown kraft cartons with ███ unique carton labels showing identifying information on two sides of the carton. Cartons will contain a generic return brochure (12A8386) which provides shipping instructions and labels for return of either "Return Program" or "Business as Usual" cartridges. The exterior of the carton is to have a generic license label which must be cut upon opening the carton (12A5316).

## 7.0 Documentation
All products include the following Lexmark-generated hard copy documentation:
- Generic Setup sheet ███ - 30G0915; ███ 16M1321)
- Safety Information sheet (3015500)
- Return License sheet - located in paper tray (3062793)
- Class A Emissions sheet ███ - 3062794)
- Option Install sheet ███ – 3073483; ███ – 3045901)

It is assumed these documents meet ███ language requirements without change.

A generic User Guide is included on the CD with the Driver.


███ Unique Documents:
- Stability Pointer sheet (3073484)
- Authorized Representative sheet (3073485)
- WEEE sheet(s) (3073687)

Note: No documentation has been provided or defined to support ███ provide warranty documentation, or provide technical support contact information.

## 8.0 Driver CD
The ███ Microsoft Certified Windows driver CD will contain the following:
- OEM Generic Universal Print Driver, scan, and utility executable files
  ███ models in this document are included
- ███ branded Universal Print Driver Whitepaper
- Readme file briefly describing Driver files included and their use
- OEM Generic User Guides and Quick References in multiple languages
- Directory with required open source information

The CD will be screen printed with ███ unique artwork.

Product Definition Document  Page

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3837

The OEM generic EULAs provided by Lexmark will be presented to the user during the install.
Manufacturers other than ███ will appear during the install process.
These drivers do not support local scan from the ██████
These drivers and the printers do NOT default to duplex.
During installation Lexmark will be listed as the publisher.

The files on the CD support only the Windows operating systems. Mac, Linux, Unix will be provided in a format suitable for web posting and download on a delayed schedule.

## 9.0 Product Packaging

These products will be packaged in OEM generic cartons which are brown kraft cartons with single color line drawings of the product, storage/handling instructions, and wordless unboxing instructions. A generic description of "Printer" or "Multifunction Printer" in several languages is also on the carton.

| Model | Carton |
|---|---|
| ███ – | 3016694 |
| ███ – | 3016995 |
| ███ – | 3048571 |
| ███ - | 3048573 |

A 6 x 6 inch carton label is applied to the carton (to be jointly defined by Lexmark and ███ containing ███ unique product information as well as "manufacturer's use" information.

A second 6 x 6 inch label is applied to the carton containing generic supplies license information for the customer to see prior to opening the carton (3048329). (The specific content should be reviewed to confirm generic wording is acceptable.) It is assumed that existing translations of the generic text are sufficient.

The carton is to be sealed with standard, off-the-shelf packing tape.

## 10.0 Options/Features

Options to be offered by ███ are as follows:

| Paper Handling | | |
|---|---|---|
| 30G0804 | ███ | 2000 Sheet Feeder for ██████ |
| 30G0800 | ███ | 250 Sheet Drawer for ██████ |
| 30G0802 | ███ | 550 Sheet Drawer for ██████ |
| 30G0849 | ███ | 550 Sheet Drawer - Lockable for ██████ |
| 30G0854 | ███ | 5" Spacer for ██ |
| 30G0807 | ███ | Envelope Feeder for ██ |
| 30G0852 | ███ | 5 Bin Mailbox for ██ |
| 30G0853 | ███ | Hi-Capacity Output Stacker for ██████ |
| 30G0851 | ███ | Output Expander for ██ |
| 30G0850 | ███ | Staple- Finisher for ██ |
| Furniture | | |
| 3052765 | ███ | Swivel Cabinet for ██████ |
| 16M1207 | ███ | Caster Base for ██████ |
| Connectivity / Print Servers | | |

Product Definition Document  Page

CONFIDENTIAL - OUTSIDE COUNSEL ONl A3838

| 14F0037 | ████████ | Gigabit Ethernet for ████████ |
| 14F0045 | | 802.11 B/G/N Wireless ████████ |

All options are to be physically the same as for Lexmark except that an appropriately sized carton label with a ████████ art number and description information will be applied to the carton. The content and layout of these labels is to be jointly defined by Lexmark and ████████

## 11.0 Service Parts

████████ will use Lexmark common service parts "as is". It is OK for Lexmark information to appear on the service part packaging.

## 12.0 Other

*eSF Support*
Existing Lexmark eSF Applications (other than those available at no charge from Lexmark.com) are NOT currently (as of 4/30/2012) supported. Modifications of existing eSF applications to enable their use with these ████████ machines is possible, but outside the scope of this document.

*Demo Page*
The demo page available for printing from the operator panel of Lexmark branded products is not available and hidden for ████████ branded products.

*Label Printing*
Printing of labels on these machines is limited to occasional paper label printing only.

Product Definition Document Page

CONFIDENTIAL - OUTSIDE COUNSEL ONlA3839

13.0 Definition Approval

Customer Approval

Lexmark Approval

_____
Name (Print)

_____
Name (Print)

_____
Signature

_____
Signature

_____
Date

_____
Date

███████████████

Lexmark International, Inc.

Product Definition Document  Page

CONFIDENTIAL - OUTSIDE COUNSEL ONLA3840

# Lexmark MPA

# Attachment 2

# Prices

### Effective April 26, 2012

## Contents

- Hardware
- Supplies
- Options

CONFIDENTIAL - OUTSIDE COUNSEL ONlA3841

| LXK Model | Lexmark P/N | Assigned LXK P/N for ■ | P/N | ■ Sales Territory | LXK Plant of MFG / Location | Lexmark Distribution Center | INCO TERMS | Minimum Order Increment | MPA Unit Price | MPA Unit Price Effective April 17th |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | **Laser Hardware** | | | | | | |
| T650dn | 30G0135 | | | Europe - Germany, France & U.K. | China | Geel, Belgium | Ex Works, LXK Distribution Center | | | |
| T654dn | 30G0335 | | | Europe - Germany, France & U.K. | China | Geel, Belgium | Ex Works, LXK Distribution Center | | | |
| X652de | 16M1650 | | | Europe - Germany, France & U.K. | China | Geel, Belgium | Ex Works, LXK Distribution Center | | | |
| X656dte | 16M1652 | | | Europe - Germany, France & U.K. | China | Geel, Belgium | Ex Works, LXK Distribution Center | | | |

Supplies



| LXK Model | Lexmark P/N | Assigned LXK P/N for | P/N | Sales Territory | LXK Plant of MFG / Location | Lexmark Distribution Center | INCO TERMS | Minimum Order Increment | MPA Unit Price | MPA Unit Price Effective April 20th |
|---|---|---|---|---|---|---|---|---|---|---|
| **Laser Supplies - Return Program Cartridges** | | | | | | | | | | |
| T650 Return Program Cartridge - 25K | T650H11A | | | Europe - Germany, France & U.K. | China | Geel, Belgium | Ex Works, LXK Distribution Center | | | |
| T654 Return Program Cartridge - 30K | 24B5880 | | | Europe - Germany, France & U.K. | China | Geel, Belgium | Ex Works, LXK Distribution Center | | | |
| X65x Return Program Cartridge - 30K | 24B5875 | | | Europe - Germany, France & U.K. | China | Geel, Belgium | Ex Works, LXK Distribution Center | | | |
| **Laser Supplies - Staples for Staplesmart II Finisher** | | | | | | | | | | |
| Staples Cartridge 3-Pack | 25A0013 | | | Europe - Germany, France & U.K. | China | Geel, Belgium | Ex Works, LXK Distribution Center | | | |
| **Laser Supplies - Regular Cartridges** | | | | | | | | | | |
| T650 Regular Cartridge - 25K | T650H21A | | | Europe - Germany, France & U.K. | China | Geel, Belgium | Ex Works, LXK Distribution Center | | | |
| T654 Regular Cartridge - 30K | n/a | | | Europe - Germany, France & U.K. | China | Geel, Belgium | Ex Works, LXK Distribution Center | | | |
| X65x Regular Cartridge - 30K | n/a | | | Europe - Germany, France & U.K. | China | Geel, Belgium | Ex Works, LXK Distribution Center | | | |

CONFIDENTIAL - OUTSIDE COUNSEL ONl A3843

Options

| LXK Model | Lexmark P/N | Assigned LXK P/N for | P/N | Sales Territory | LXK Plant of MFG / Location | LXK Distribution Center | INCO TERMS | Minimum Order Increment | MPA Unit Price |
|---|---|---|---|---|---|---|---|---|---|
| **Paper Handling** | | | | | | | | | |
| 2000 Sheet Feeder | 30G0804 | | | Europe - Germany, France & U.K. | China | Geel, Belgium | Ex Works, LXK Distribution Center | | |
| 250 Sheet Drawer | 30G0800 | | | Europe - Germany, France & U.K. | China | Geel, Belgium | Ex Works, LXK Distribution Center | | |
| 550 Sheet Drawer | 30G0802 | | | Europe - Germany, France & U.K. | China | Geel, Belgium | Ex Works, LXK Distribution Center | | |
| 550 Sheet Drawer - Lockable | 30G0849 | | | Europe - Germany, France & U.K. | China | Geel, Belgium | Ex Works, LXK Distribution Center | | |
| 5" Spacer | 30G0854 | | | Europe - Germany, France & U.K. | China | Geel, Belgium | Ex Works, LXK Distribution Center | | |
| Envelope Feeder | 30G0807 | | | Europe - Germany, France & U.K. | China | Geel, Belgium | Ex Works, LXK Distribution Center | | |
| 5 Bin Mailbox | 30G0852 | | | Europe - Germany, France & U.K. | China | Geel, Belgium | Ex Works, LXK Distribution Center | | |
| Hi-Capacity Output Stacker | 30G0853 | | | Europe - Germany, France & U.K. | China | Geel, Belgium | Ex Works, LXK Distribution Center | | |
| Output Expander | 30G0851 | | | Europe - Germany, France & U.K. | China | Geel, Belgium | Ex Works, LXK Distribution Center | | |
| Staplesmart II Finisher | 30G0850 | | | Europe - Germany, France & U.K. | China | Geel, Belgium | Ex Works, LXK Distribution Center | | |
| **Furniture** | | | | | | | | | |
| Swivel Cabinet | 3052765 | | | Europe - Germany, France & U.K. | China | Geel, Belgium | Ex Works, LXK Distribution Center | | |
| T65x/X65x Caster Base | 16M1207 | | | Europe - Germany, France & U.K. | China | Geel, Belgium | Ex Works, LXK Distribution Center | | |
| **Connectivity / Print Server** | | | | | | | | | |
| Marknet N8120 Gigabit Ethernet | 14F0037 | | | Europe - Germany, France & U.K. | China | Geel, Belgium | Ex Works, LXK Distribution Center | | |
| Marknet N8150 802.11 B/G/N Wireless | 14F0045 | | | Europe - Germany, France & U.K. | China | Geel, Belgium | Ex Works, LXK Distribution Center | | |

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3844

### Attachment 3.0

### ▮▮▮ Product Responsibilities

Design, develop, provide and install as required if not included in Product Specifications:

1. Design and artwork for unique logo plugs (if applicable)

2. All packaging logos and labels (parts or artwork) not included in Product Specifications

3. EMC testing, approval, and certification if ▮▮▮ modifies Product

4. Environmental testing, vibration testing, etc. if ▮▮▮ modifies Product

5. Safety approval & certification if ▮▮▮ modifies Product (Lexmark support)

6. Product Safety Certification and approval if ▮▮▮ modifies Product (Lexmark support)

7. Other applicable regulatory approvals if ▮▮▮ modifies Product (Lexmark support)

8. Prepare and produce the modified Service Manual by ▮▮▮ (as required)

CONFIDENTIAL - OUTSIDE COUNSEL ONLA3845

 MPA - Service Support Plan - Attachment 4 - 8Mar12.docx

**Lexmark – ▮▮▮ MPA**

### Attachment 4 – Service Support Plan

1.0 Definitions:

    1.1 "End User" means a natural person or organization that uses ▮▮▮ Product for personal purpose or in the operation of their business.

    1.2 "Failure" means a defect in the Product which is reproducible and which causes such Product not to function substantially in conformance with the Specifications, end user documentation, or other related documentation, including without limitation any functional specifications or other engineering documentation for the Product, or commonly accepted operating principles as defined by industry standards.

    1.3 "Field Replaceable Units (FRUs)", are Service Part(s) requiring authorized service technician installation.

    1.4 "Incident" means a situation which necessitates an End User to contact ▮▮▮ for assistance.

    1.5 "Intermediaries" shall mean ▮▮▮ authorized dealers, distributors, subsidiaries and/or service partners.

    1.6 "Out of Warranty Services" means repair, replacement and return services provided by Lexmark to ▮▮▮ or ▮▮▮ End Users out of the period and/or scope of Warranty.

    1.7 ▮▮▮ Certified Trained Technician" means a technician in ▮▮▮ or Intermediaries' employ who has successfully completed a ▮▮▮ training course on a Lexmark manufactured Product.

    1.8 "Repair" means the repair or replacement of a Product or part.

    1.9 "Technical Support Level" means a certain class of service provided by ▮▮▮ Level 1 & 2 technical support representatives and/or Lexmark's Level 3 support to ▮▮▮ Defined in more detail in Section 3.0: Technical Support

    1.10 "Wear Parts" Service Parts with a yield or duty cycle less than that of the printer (e.g. fusers, rollers, internal transfer units, auto document feeders, etc) and are the customer's responsibility to replace.

2.0 ▮▮▮ Hardware Warranty

    2.1 ▮▮▮ shall establish its own warranty terms with its customers and, through ▮▮▮ technical support call center, shall receive, diagnose and determine a course of action to resolve customers' concerns. The warranties in the Attachments and the Master Purchase Agreement (including without limitation

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3846



MPA - Service Support Plan - Attachment 4 - 8Mar12.docx

this Attachment 4) are Lexmark's only obligation to ▮▮ for warranty service on Products, and Lexmark shall have no direct obligation for warranty service to a ▮▮ customer ▮▮ may, at its discretion and sole expense, offer additional services for ▮▮ branded printers.

2.2 Failures due to service performed by a non-Certified ▮▮ Trained Technician or non-Certified ▮▮ Intermediary Trained Technician are not covered under the specified warranty.

2.3 Failure due to End User inappropriate usage of the product or due to negligence and damage are not covered under the specified warranty.

3.0 Technical Support

3.1 Level 1 Technical Support - ▮▮ shall provide Level 1 support services to its End Users and Intermediaries. ▮▮ technical support staff answers technical inquiries regarding Product(s), Options, Supplies and Service Parts and provides problem diagnostics services for identifying Failures and generic application faults, analysis, and where possible, Failure resolution. If necessary, passes the call to ▮▮ Level 2 technical support personnel

3.2 Level 2 Technical Support - ▮▮ Level 2 technical support consists of ▮▮ technical support personnel who will respond to contact from ▮▮ Level 1, ▮▮ field personnel, or ▮▮ Intermediaries. They use significant product knowledge, procedural knowledge, product documentation, support notes and knowledge base information to address field installation and break/fix issues. They gather information on the problem environment, check for correct configurations and apply standard solutions to problems. They perform iterative procedures with field service personnel to understand and correct problems. They escalate to Lexmark Level 3 as appropriate if available solutions do not solve the customer problem by utilizing established escalation procedures and guidelines. ▮▮ Level 2 support personnel will receive continuous training on printer Products from ▮▮ to minimize escalation to Level 3 support from Lexmark and minimize unnecessary Product Warranty Service.

3.3 Level 3 Technical Remote Support - Such support shall be provided by Lexmark directly to ▮▮ Level 2 support. Lexmark and ▮▮ will establish a support process that will identify to Lexmark that the communication is from ▮▮ personnel. In providing such support Lexmark shall acknowledge ▮▮ requests within twenty-four (24) business hours. If a resolution cannot be practically achieved within said period then

██ MPA - Service Support Plan - Attachment 4 - 8Mar12.docx

Lexmark will discuss and reach agreement with ██ on a reasonable plan and schedule for addressing the issue or correcting the Failure. This support will be provided during normal Lexmark local geography's center hours of operation Monday through Friday, excluding local geography's holidays.

3.4 Except as set forth in the relevant Section of Attachment 5 – Quality Plan (relating to Epidemic Failure), and in this Attachment 4 – Service Support, Lexmark shall have no responsibility for providing technical support directly to ██ End Users or Intermediaries.

3.5 Lexmark will make available to ██ web-based access to Product information that Lexmark maintains for equivalent Lexmark products that are generally available for all of Lexmark's field service technicians. Examples would include technical bulletins, knowledgebase cases, and Engineering Changes (that impact service and support).

4.0 Training

4.1 Training for Product Launch – If Train the Trainer, "T3" classes are offered by Lexmark for comparable Lexmark branded products, Lexmark will provide ██ with technical T3 training. Lexmark will reserve three (3) seats for ██ n each location. Such training class shall be conducted at Lexmark's facility in Europe. ██ will be responsible for the travel expenses of its training and key support personnel to attend training classes. On-line training courses and webinars shall also be provided when available. Any additional training requested by ██ shall be provided by Lexmark based upon mutual venues and cost.

4.2 Training Courses and Materials - During the term of this Agreement, Lexmark shall provide ██ with all available materials utilized to provide training in connection with the equivalent Lexmark product(s). Lexmark shall provide masters of such training materials in electronic media or softcopy format. ██ s permitted to use such material for its internal use only in training ██ sales and support staff on the Product(s).

4.3 Lexmark hereby grants to ██ royalty-free non-exclusive, worldwide license to use, modify or create derivative works based upon, reproduce, display, demonstrate and distribute the training materials (whether modified or unmodified but excepting proprietary technical information relating to the products) for course development use solely in connection with the Product(s) distributed under the terms of the Agreement. Lexmark's grant to ██ of the right and license to use the materials is not intended to convey any ownership



MPA - Service Support Plan - Attachment 4 - 8Mar12.docx

interest to  Lexmark retains all rights in the intellectual property contained in these materials. Materials that are derivative works prepared by or for ████ under this license granted in this section may include an appropriate ████ opyright notice in lieu of any Lexmark copyright notice. Other than the license granted in this section, Lexmark retains all copyright rights in the materials, and ████ agrees to assist Lexmark to enforce those rights against infringers. In response to inquiries related to copyright rights in all materials subject to copyright, and in which Lexmark has copyright rights, ████ will identify Lexmark as the owner of some or all of the copyright rights, as appropriate, or direct such inquiry to Lexmark.

5.0 Service Parts

5.1 Service Parts inventory will be managed and owned by ████ for ████ Product support. Upon request, Lexmark will assist in a list of recommended Service Parts for ████ to maintain per Product per major geography.

5.2 Service Part prices are based upon Lexmark's local geography retail prices and are Ex Works Lexmark's Service Parts distribution centers. Lexmark reserves the right to change ████ prices with at least a thirty (30) day written notice to ████ Service Parts discount is ████ off of local retail. Service Part discount applies to Service Parts used for ████ randed Product under this Master Purchase Agreement. Lexmark will provide ████ with separate pricing files for Service Parts for Product(s) purchased under this Agreement.

5.3 Purchase Orders for inventory stocking purposes must be placed ninety (90) days prior to the required delivery date. Lexmark will make best effort to fulfill ████ Purchase Orders placed inside the ninety (90) day lead-time. Lexmark will be responsible for the picking and packing costs of the standard order and ████ will be responsible for the shipping cost. At Lexmark's discretion, orders may ship in multiple shipments.

5.4 Emergency orders will receive special handling. They will be pulled and shipped same day, pending stock availability. Each emergency order may contain a maximum of two (2) pieces of one part number or two (2) part numbers with a quantity of one (1) each. Lexmark will be responsible for the picking and packing costs of the emergency order and ████ will be responsible for the shipping cost. At Lexmark's discretion, orders may ship in multiple shipments.

5.5 Purchase Orders must reference ship-to-location, Lexmark part number, part description, quantity, applicable price, requested ship date and ████

██████MPA - Service Support Plan - Attachment 4 - 8Mar12.docx

Lexmark account number.

5.6 Service Parts can be new or equivalent to new at Lexmark's discretion.

5.7 ██████ will consider implementing an Electronic Data Interchange (EDI) link with Lexmark to submit Service Parts orders.

███████ MPA – Attachment 5 – Quality Plan – 24 February 2012

## ATTACHMENT 5

## QUALITY MANAGEMENT PLAN

1. Purpose: The purpose of this Quality Management Plan is to document the basic agreement between ███████ and Lexmark regarding the Quality Management of ███████ Products supplied by Lexmark.

2. Scope:    This Quality Management Plan applies to all ███████ printer Products and options (unless otherwise indicated) produced by Lexmark with a ███████ Logo. This document is intended to provide guidance for all printer Products and eliminate the need for submission of a Quality Management Plan for each Product.    This document is intended for ███████ primarily for basic re-badging of Lexmark Products. Products that require more unique ███████ customizations (such as unique Product designs) may require additional sections to reflect the ███████ development process.

3. Quality Management Responsibility:  Lexmark will have a person(s) to coordinate with ███████ regarding the management of the quality of ███████ Products. The Lexmark OEM/Sustaining team will have primary responsibility for the quality of the items unique to ███████ Products. The Lexmark PE teams will have primary responsibility for the quality of the items that are similar to the Lexmark branded Product.

4. Phases and Descriptions of Quality Engagement

   a) Development Kickoff

      At Development Kickoff, as the Initial Product Specification is communicated, Lexmark will share with ███████ he equivalent Lexmark branded Product's Field Warranty Claim Rate (FWCR). The FWCR is based upon Lexmark's unique customer printing environments, technical processes and service strategies. The FWCR targets are provided as guidance only.    Lexmark is not responsible for internal ███████ processes that adversely affect the FWCR.  During this period, preliminary ███████ FWCR targets are established for each Product based on the Lexmark predecessor Product's performance (if any) and expected feature and technology enhancements. These targets will be provided in a separate document.

      i) Occasionally FWCR targets may need to be updated to accommodate Product Specification changes that occur after Development Kickoff

CONFIDENTIAL - OUTSIDE COUNSEL ONLA3851

████ MPA – Attachment 5 – Quality Plan – 24 February 2012

ii)   ████ Products will be developed and delivered per Lexmark Development Process.   All development gates and phases will be managed internally and all specifications for ████ Products will be the same as that of the Lexmark Branded Product.

b)  First Article Inspection (FAI)

i)   Lexmark will provide ████ photographs and other information from the first articles from the assembly process to allow approval of Product and packaging without ████ needing to travel to the manufacturing location.

ii)  ████ may implement Buyer FAI by visiting the manufacturing location for printers.

iii) Both parties will review and agree upon the FAI checklist in advance of the build. SOP should be fulfilled only after approval of FAI done by ████

c)  Start of Production (SOP)

i)   Lexmark is responsible to test and validate production level Products per its established factory testing and validation processes. When Products are found to be deficient, Lexmark is responsible to carry out corrective action measures to correct the root cause, when possible.  A detailed description of these processes can be found in Attachment 5.1 "Quality Process Flow".

ii)  Traceability: Lexmark will apply its traceability process for ████ Products and will maintain the data, and shall provide such data on an "as-needed" basis to ████

d)  Post-General Availability (GA) Quality Maintenance

i)   Early Launch Phase (Typically Announce Day to Announce + 90 days)

Lexmark will meet with ████ on a regular basis to review data and corrective action summary of top issues specific to the ████ Product.

Data related to ████ field calls and contacts by ████ Customer should be provided to Lexmark for product trend analysis and issue resolution.

Lexmark will use ████ field quality data and Lexmark brand data (where applicable) to identify trends and quality excursions, and to determine root causes and appropriate corrective actions.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3852

███ MPA – Attachment 5 – Quality Plan – 24 February 2012

ii) Failure Analysis (FA)

Because ███ Products are re-badged Lexmark Products, FA of the Lexmark branded Product will provide the majority of the data for monitoring field performance and product quality improvement efforts. The field performance of the ███ Products will be monitored to ensure their performance is consistent with the field performance of the Lexmark branded Products. If differences are noted, Lexmark will request ███ Products be captured for FA. Any requested FA units from ███ must provided to Lexmark (location as determined by Lexmark) in proper packaging and with sufficient symptom information or identification to sufficiently enable Lexmark to complete FA for ███ partner specific issues.

FA results and trends will be reported to ███ by Lexmark. Based on findings, Lexmark is responsible for initiating issue containment and taking closed loop corrective action on future builds if necessary.

iii) Closed Loop Corrective Action

(1) In the event of a stop ship or significant line-down situation, Lexmark will inform ███ as quickly as possible providing the basics of the issue and current plans for containment. Significant line-down implies a potential quality issue that impacts shipment or continuity of supply.

(a) Lexmark will then provide containment action plan within the next 24 hours or as soon as the action plan is available for the equivalent Lexmark branded Product. Action toward containment will be implemented as quickly as possible.

(b) Though each case is unique, this process will typically involve problem validation and root cause analysis leading to a corrective action plan. This initial plan will be provided in the subsequent 24 - 48 hours, or as soon as the equivalent Lexmark branded Product correction plan is available and will describe appropriate actions to contain and correct the issue as needed. Updates on plans / status will be provided as necessary to ███

(c) In addition, regular updates, via a mutually agreed process to be setup by Lexmark Quality and ███ will be used in the process.

██████ MPA – Attachment 5 – Quality Plan – 24 February 2012

    (2) Quality Excursions / Product Holds

Lexmark will communicate product hold and stop-ship information to ████ and will drive action to contain Product in Lexmark Inventory. When necessary, the OEM team will drive containment actions for Products in ████ possession. Lexmark will be responsible to identify activities necessary to correct the issue, using Lexmark internal processes. However, support from ████ may be required to accomplish actions on Products that are in ████ possession. Necessary communications between Lexmark and ████ Engineering will be performed in accordance with an agreed methodology to be determined by Lexmark and ████

e) Sustaining Engineering Engagement

At GA + 90 for ████ the product moves into the Sustaining Phase. This phase has four key focus areas which are discussed below:

- Customer Quality Escalation Management

- Engineering Change Notifications and Management

- Special Product Request Response

- End of Marketing Life (EOML)

    (1) Customer Quality Escalation Management

      (a) Failure Response

Lexmark is responsible implementing Failure Analysis and, when needed, corrective action to reduce Field Warranty Claim Rates. Priority is given to Products that are not achieving their target. ████ will provide as much information as possible to support full understanding of the issues such as: Printer SN, Cartridge SN/bar code number, specific error codes, etc. For Software issues ████ will make an effort to obtain information on the customers operating environment (i.e. operating systems, printer code levels, error logs, menu pages, etc.)

      (b) Quality Excursions / Product Holds

Lexmark will communicate product hold and stop ship information to ████ and will drive action to contain Product in Lexmark

Inventory. When necessary, the Lexmark OEM team will drive containment actions for Products in ████ possession. Lexmark will be responsible to identify appropriate activities necessary to correct the issue, using Lexmark internal processes. However, support from ████ may be required to accomplish actions on Product that is in ████ possession. Necessary communications between Lexmark and ████ Engineering will be performed in accordance with an agreed methodology to be determined by Lexmark and ████

(c) Steady State

Quality reporting for Products not performing to target will be provided. For Products performing at target or past end of production life, Lexmark will provide updates monthly until End of Marketing Life.

Should ████ Products not meet agreed to quality targets for a sustained period, Lexmark and ████ quality teams will meet to review necessary corrective actions. Sustained period will be considered as more than two consecutive months at 10% or more above agreed to targets or one month at  20% or move above targets (typical 2 standard deviations).  Details of this alignment shall be discussed and agreed to by the respective quality teams.

**If ████ volumes are not sufficient to support the above proposed methods to monitor product quality, ████ and Lexmark will meet to develop a process to best monitor product quality or changes in product quality.**

(d) Customer Quality Escalation Controls

If Lexmark and ████ do not agree on the handling of a quality issue and resolution is not occurring using the normal communication channels then escalation of the issue should be made in a timely manner to:

Quality Manager at Lexmark and Quality Manager at ████

CONFIDENTIAL - OUTSIDE COUNSEL ONLY

██████MPA – Attachment 5 – Quality Plan – 24 February 2012

(2) Engineering Change (EC) Notification and Management

Lexmark will manage ECs for ██████Products in parallel with those of the equivalent Lexmark branded Products.   All changes will be processed per current Lexmark process. Lexmark may make changes to the products without notifying██████

i)   If the changes do not have any effect on the model, form, function, or specifications of the Products, and /or

ii)   If the changes fall under the non-critical changes.

Details regarding specific changes on major quality issues will be provided to ██████ when available. Details will include the reason for the EC, description of the EC, part drawing (unrevised and revised), target implementation date, etc.

a)   Critical changes, defined as those that result in a change in the product part number or SKU, or are visually obvious, or impact the ███████████/ Technical Support operations will be communicated to ██████ For safety or other items that affect regulatory and/or certification requirements of Product ██████will be informed in advance of impact.  Documentation will be provided to ██████as needed for ██████ or Lexmark to apply for the necessary government certifications / amendments.

These critical / major EC's include changes to the following:

i)      Changes to Part numbers of the printer, pub kit or service parts.

ii)      Changes to any safety related items or other items that affect regulatory and / or certification requirements.

iii)      Changes that are as a result of a major field warranty claims issue.  These should be very limited in nature, meant to track an urgent change brought about by a large upward trend in claims rate.

b)   Lexmark Declaration of Conformity PN lists (used for declaring conformity to RoHS requirements, if needed by ██████will be updated as needed.

6



▮PA – Attachment 5 – Quality Plan – 24 February 2012

    c) EC Process Timeline:

For ▮ unique parts, ▮ will respond within (5) working days upon receipt of the Engineering Change Notice (ECN) with either an acceptance or rejection. No EC's shall be unreasonably refused provided it does not affect the conformance of the Product to the specifications set out in the appropriate product specific requirements. If there is no response from ▮ within the allotted time prior to EC implementation, Lexmark is authorized to proceed with EC implementation.

Should ▮ reject such ECN, then Lexmark shall, within 20 days of such rejection, provide ▮ with a written notice specifying the impact on Product costs, forecasting, and deliveries associated with such rejection, and the pricing, forecasting, and delivery provisions

When required (and requested), Lexmark will provide the serial number of the initial units that incorporate the change to ▮ when the ECN has been implemented.

    d) ▮ nitiated EC Request

▮ will submit a written request to Lexmark with details of the requested EC. Details must include reason for the EC, description of the EC, test data/part drawings (if applicable) and quality data.

Lexmark will respond within (20) working days with the impact on cost (if applicable), test data affecting form, fit or function, reliability (if applicable). If impact cannot be determined in that time frame Lexmark will provide a target for a response to ▮

▮ will respond back within (10) working days upon receipt of the ECR with an acceptance or rejection. No response from ▮ is the same as a rejection.

    e) For EC implementations, ▮ service parts disposition should be the same as Lexmark's service parts disposition for the equivalent Lexmark branded Products. When the EC is unique to ▮ Product, ▮ will be consulted to develop a mutually agreed to appropriate service implementation / disposition strategy. ▮ may be requested to support rework by consolidating and moving

CONFIDENTIAL - OUTSIDE COUNSEL ONA3857

inventory to designated locations. In specific cases, Lexmark may request support from █████ in performing rework of Product at █████ possession. If needed, Lexmark will negotiate appropriate costs reimbursement to █████ for their rework support.

(3) Special Product Request (SPR) Management:

SPRs that result in modifications to Product and / or process may result in additional NRE. █████ will submit SPR request to Lexmark in a similar manner as ECN request.

(4) End of Marketing Life (EOML)

Upon Lexmark's Product Withdrawal notification to █████ all quality reporting documented above will cease 60 (sixty) days after █████ "last buy" purchase order is shipped from Lexmark. In the event that a customer issue is identified after this specified time , but during the standard warranty period, a Lexmark response will be required to address and correct the issue, if necessary and reasonable.

5. Receiving Inspection:

Lexmark's standard manufacturing quality processes include inspections prior to product shipment to confirm the on-going production is resulting in Products that meet the product and quality specifications. The quality reports created during these manufacturing quality processes are available for review by █████ and, a subsequent Receiving Inspection by █████ s not required. Receiving Inspection by █████ may result in damage to the units; and, thus is not recommended. Should █████ elect to implement a RI process, █████ must notify Lexmark.

Should Lexmark Product not meet agreed to quality targets for a sustained period, Lexmark and █████ quality teams will meet to review necessary corrective actions. Actions may include actions by Lexmark and in addition could include specified receiving inspections by █████ Details of this alignment shall be discussed and agreed to by the respective quality teams.

6. Epidemic Failure:

An Epidemic Failure is defined as the same material defect found in five percent (5%) or more (for future printer models, this percentage may be modified and shall be agreed upon prior to listing the new printer model under this Agreement) of the installed base of Products over the most recent rolling three (3) month period;

8



provided that, during the first 12 months following the Epidemic date, an Epidemic Failure shall be determined in accordance with the following model:

- In the event of an Epidemic Failure, the parties will discuss the nature of the Epidemic Failure and the statistics and calculation determining the Epidemic Failure.  After Lexmark's verification of the defect and of the accuracy of the statistics and calculation used to determine the Epidemic Failure, Lexmark at its own expense shall determine the root cause of the problem and implement a fix required in the production of Products within 14 (fourteen) days or as soon as available for the Lexmark branded Product.  In this regard Lexmark shall provide ▮▮▮ with the following, where applicable: Full details of the fix and the appropriate drawings and change notification.

- Cut in serial number for Products that will include the fix

Regarding affected Products that have already been delivered to ▮▮▮ and either held in ▮▮▮ stock or installed at ▮▮▮ customer sites, Lexmark shall, within 30 (thirty) days after the determination of the Epidemic Failure by the parties, indicate any fix or repair that can be provided for such Products.  Lexmark at its option and expense shall then either:

- (i)   Fix or repair such Products, or
- (ii)  Replace such Products, or
- (iii) If ▮▮▮ agrees to perform the fix or repair on such Products, Lexmark shall provided all required technical support and replacement parts and reimburse ▮▮▮ for reasonable travel and labor costs, based upon mutually negotiated and agreed rates, for performing the fix or repairs, or
- (iv) Refund to ▮▮▮ the original purchase price paid for the said Products,

All defective Products or parts thereof replaced by Lexmark shall become the property of Lexmark.  Lexmark will arrange and pay for all required transportation to move such Products or parts back to Lexmark.  If Lexmark wishes to scrap or dispose of such defective Products or parts rather than to return to Lexmark, and if ▮▮▮ agrees to perform same for Lexmark, then the parties shall negotiate and agree on applicable ▮▮▮ charges for this service.

Use of non-genuine Lexmark parts or supplies is not included in the defects counted towards epidemic failure.

CONFIDENTIAL - OUTSIDE COUNSEL ON▮A3859

## Attachment 6.0

### Territory

1. Albania
2. Algeria
3. Armenia
4. Austria
5. Azerbaijan
6. Belarus
7. Belgium
8. Benin
9. Bosnia
10. Bulgaria
11. Burkina Fasso
12. Cameroun
13. Central African Rep.
14. Chad
15. Congo
16. Cote d'ivoire
17. Croatia
18 Cyprus
19. Czech Republic
20. Denmark
21. Djibouti
22. Estonia
23. Finland
24. France
25. Gabon
26. Georgia
27. Germany
28. Gibraltar
29. Greece
30. Guinee
31. Hungary

32. Italy
33. Iceland
34. Ireland
35. Kazakhstan
36. Kosovo
37. Kyrgyzstan
38. Latvia
39. Lithuania
40. Luxembourg
41. Republic of
Macedonia / FYROM
42. Madagascar
43. Mali
44. Malta
45. Mauritania
46. Mauritius/Seychelles
47. Moldova
48. Morocco
49. Netherlands
50. Niger
51. Norway
52. Poland
53. Portugal
54. Romania
55. Russia
56. Senegal
57. Serbia
58. Slovakia
59. Slovenia
60. Spain
61. Sweden

62. Switzerland
63. Tajikistan
64. Togo
65. Tunisia
66. Turkmenistan
67. Ukraine
68. United Kingdom
69. Uzbekistan

CONFIDENTIAL - OUTSIDE COUNSEL ONA3860


CONFIDENTIAL - OUTSIDE COUNSEL ONLYA3861

<u>AMENDMENT to Lexmark -</u> ███ <u>Master OEM Purchase Agreement</u>

This Amendment **to Lexmark -** ███ **Master OEM Purchase Agreement** ("Amendment") made and entered into this October 1, 2013("Effective Date") by and between Lexmark International, Inc., a company formed and existing under the laws of the State of Delaware and having its principal place of business at 740 West New Circle Road, Lexington, Kentucky 40550 U.S.A., Lexmark International Technology S.A., a company formed and existing under the laws of Switzerland and having its principal place of business at ICC, 20 Route de Pre-Bois, CH 1215 Geneva 15, Switzerland (singly and collectively "Lexmark"), and ███████████████████████████████████████

███████████████████████████████████████████████████████████████████

WHEREAS, the parties have entered into the Lexmark ███████ Master OEM Purchase Agreement dated May 18th, 2012 ("MPA"), under which ██████ purchases Products specified in Attachment 1.0 to the MPA from Lexmark for resale in the Territory specified in Attachment 6.0 to the MPA;

WHEREAS, the parties wish to add the new products so-called " ██████████████████████ to the Products; and

WHEREAS, the parties wish to add the new attachment to and amend the MPA as provided for in this Amendment to meet the new transaction between the parties described above;

NOW, THEREFORE, the parties hereby agree as follows:

1.  Capitalized terms used but not otherwise defined herein shall have the same meanings ascribed to them in the MPA.

2.  Attachment 1.1 and Attachment 2.1 attached to this Amendment shall be added to the MPA. Notwithstanding the foregoing, Attachment 1.0 and Attachment 2.0 to the MPA shall continue in full force and effect.

3.  Section 14.3 of the MPA shall be amended in its entirety to read as follows:

    14.3  <u>Survival</u>.  The provision of Licensing and Resale Requirement as stipulated in Section 9, the provision of Representations and Limited Warranty as stipulated in Section 10, the provision of Indemnity as stipulated in Section 11, the provision of Limitations of Liability and Remedy as stipulated in Section 12, the provision of Survival as stipulated in this Section 14.3, the provision of Confidentiality as stipulated in Section 14.5, the provision of Compliance with Laws as stipulated in Section 14.6 and the provision of RoHS as stipulated in Section 14.8 shall survive the expiration or termination of this Agreement. All other obligations of the parties that by their nature survive any expiration or termination of this Agreement shall remain in effect.

4.  Except as explicitly modified, all terms, conditions and provisions of the MPA shall continue in full force and effect.

1

5.  In the event of any inconsistency or conflict between the MPA and this Amendment, the terms, conditions and provisions of this Amendment shall govern and prevail.

6.  This Amendment shall take effect as of Effective Date and continue until the termination or expiration of the MPA.

7.  This Amendment and the MPA constitute the entire and exclusive agreement between the parties with respect to this subject matter. All previous discussions and agreements with respect to this subject matter are superseded by this Amendment and the MPA.

IN WITNESS WHEREOF, the parties have caused this Amendment to be signed by their duly authorized representatives on the Effective Date above written.

Lexmark International, Inc.

By: 

Ben Streepey

VP & GM, Business Development, Imaging Solutions & Services

Lexmark International Technology, S.A.

By: _____

Mike Rueschenbaum

VP and GM Lexmark International Technology, SA

2

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A3863

**Attachment 1.1**

**Product Descriptions**

Lexmark  Confidential

# Product Definition Document

## Products for Europe

September 26, 2013

Author: Chuck Henry,
Lexmark International, Inc.
ISS OEM Engineering

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3865

## Change History

| Date | Version | Changes/Comments |
|------|---------|------------------|
| 8/13/2013 | v0 | Initial draft |
| 9/16/2013 | v1 | Added wireless option for ████ |
|  |  | Revised Toshiba-unique documents to be included |
| 9/19/13 | v2 | Remove Firmware Update sheet 40G0999 from ████ |
| 9/26/2013 | v3 | Add ship with equipment cartridge and I.U. yields |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

Product Definition Document                    Page 2 of 10

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3866

# Table of Contents

1.0 Purpose......................................................................................................................................4
2.0 General.......................................................................................................................................4
3.0 Product Hardware........................................................................................................................4
4.0 Part Numbering for Orderable Parts (TLIs, Supplies, Options/Features, Service Parts)............4
5.0 Certifications...............................................................................................................................5
6.0 Supplies & Associated Packaging...............................................................................................5
7.0 Documentation............................................................................................................................6
8.0 Driver CD....................................................................................................................................7
9.0 Product Packaging.......................................................................................................................7
10.0 Options/Features........................................................................................................................8
11.0 Service Parts..............................................................................................................................8
12.0 Other.........................................................................................................................................9
13.0 Definition Approval...................................................................................................................9
..................................................................................................................................................10

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3867

# 1.0 Purpose

The purpose of this Product Description Document (PDD) is to capture the basic "agreed to" product description between Lexmark and ██████ It is not a definition of every component as one would see in an actual bill of material. Customer requested changes to an approved PDD will require Lexmark to evaluate the impact of such requests in terms of cost, schedule, and/or resources.

It is assumed, unless specifically addressed, a particular aspect of a product is the same as that of the Lexmark branded equivalent product.

# 2.0 General

| ████████████████████████████ | | |
|---|---|---|
| **Similar Lexmark Model** | MS610dn | MS810dn |

Countries supported by the shipping configuration are determined by the power cords and phone adapters included and certifications. See section *3.0 Product Hardware* for specific power cords and adapters currently provided. See section *5.0 Certifications* for certifications and homologation.

# 3.0 Product Hardware

*Company and model names on front of machines*

- Blank operator panel bezel
- Company name ██████ pad printed on the front face of the upper front cover on the left side
- Model name pad printed on the front face of the upper front cover on the right side

*Company name on rear of machines*

Company name ██████ applied to back of rear cover with adhesive label.

*Serial Number Label*

A label under the front cover will display
- The machine's Lexmark part number in human readable and bar code format.
- The Type used for certification purposes(example ████████████
- The factory serial number in human readable and bar code format,

*Power Rating Label*

On the rear of the machine the power rating label will be applied. The artwork for these labels will be unique to ██████ and will contain ██████ branding and machine type identification for regulatory purposes. Marking includes TGIS name and address.

*Print Menu Pages*

Customers can initiate the printing of pages showing the status of internal settings, installed options, and other useful information. The heading for these pages will show the ██████ models as follows:

██████████████████████

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3868

*Power Cords and Phone Adapters*

At ███████ request machines will ship with two power cords.  Listed are the countries where this cord could be used (as of 3/28/2011)

1339520 — Albania, Algeria, Andorra, Angola, Armenia, Aruba, **Austria**, Azerbaijan, Azores(Portugal), Balearic Islands, Belarus, **Belgium**, Bosnia & Herzegovina, Brazil, Bulgaria, Burkina Faso, Burundi, Cambodia, Cameroon, Canary Islands(Sp.), Cape Verde (Rep of), Central African Republic, Chad, Comoros, Dem Rep of the Congo (Zaire), Rep of the Congo, Cote d'Ivoire (Ivory Coast), Croatia, Curacao Is., Czech Republic, **Denmark**, Djibouti, East Timor, Egypt, Equatorial Guinea, Eritrea, Estonia, Ethiopia, Faroe Islands, **Finland**, France, French Guiana (Guyana), Gabon, Georgia, **Germany**, Greece, Guadeloupe, Guinea, Guinea-Bissau, Hungary, Iceland, Indonesia, Iran, **Italy**, Jordan, Kazakhstan, Kyrgyzstan, Laos, Latvia, Lettonia, Lithuania, Luxembourg, Macedonia, Madagascar (Malagary), Majorca, Mali, Martinique, Mauritania, Mayotte, Moldavia, Moldova, Monaco, Mongolia, Morocco, Mozambique, Nether. Antilles, **Netherlands**, New Caledonia, Niger, **Norway**, Paraguay, Poland, French Polynesia, Portugal, Reunion, Romania, Russia, Rwanda, Samoa, San Marino, Sao Tome & Principe, Senegal, Serbia & Montenegro, Slovakia, Slovenia, Solomon Is., Somalia, Spain/Catalan, St. Helena, Sudan, Suriname, Svalbard (Norway), **Sweden**, Syria, Tahiti, Tajikistan, Togo, Tunisia, Turkey, Turkmenistan, Ukraine, Uzbekistan, Vanuatu, Vietnam, Wallis & Futuna, Western Sahara, Yugoslavia (Serbia & Montenegro)

1339519 — Anguilla (UK), Antigua & Barbuda, Bahrain, Botswana, Brunei, Burma (Myanmar), Channel Islands, Cyprus, Dominica, Falkland Islands, Gambia, Ghana, Gibraltar, Grenada, Guyana, Hong Kong, Iraq, Ireland, Isle of Man, Jordan, Kenya, Kuwait, Lebanon, Liberia, Malawi, Malaysia, Malta, Mauritius, Montserrat, Nigeria, Oman, Pakistan, Pitcairn Is. (UK), Qatar, Saudi Arabia, Scotland, Seychelles, Sierra Leone, **Singapore**, Sri Lanka (Ceylon), St. Kitts & Nevis, St. Lucia, St. Vincent & Grenadines, Sudan, Tanzania, Trinidad & Tobago, Uganda, United Arab Emir., **United Kingdom**, Vanuatu, Wales, Yemen, Zambia, Zimbabwe

# 4.0 Part Numbering for Orderable Parts

Following are the Lexmark part numbers and ███████ part numbers for each of the machines to be ordered from Lexmark by ███████

| Lexmark PN | Customer Part Number | Product Description | |
|---|---|---|---|
| ████████ | | | |
| | | | |

# 5.0 Certifications

Following is a list of certifications and homologations:

*Product Safety*

- Lexmark to obtain the following with associated NRE charged:  CB, CE, GS, cULus

CONFIDENTIAL - OUTSIDE COUNSEL ONA3869

*Wireless Certification (supporting wireless option purchased separately)*
- **Existing wireless certification supports the following countries from** ▮▮▮▮ **Territory list:** Austria, Belgium, Bosnia, Bulgaria, Croatia, Cyprus, Czech Republic, Denmark, Estonia, Finland, France, Georgia, Germany, Gibraltar, Greece, Hungary, Iceland, Ireland, Italy, Latvia, Lithuania, Luxembourg, Malta, Netherlands, Norway, Poland, Portugal, Romania, Slovakia, Slovenia, Spain, Sweden, Switzerland, United Kingdom.

If ▮▮▮▮ wishes to sell product not covered by the Product Safety and Wireless certifications listed above, ▮▮▮▮ is responsible for obtaining them. Lexmark may provide existing data to assist, but any new Lexmark certification effort will require additional agreements and NRE.

*Energy Star*
Lexmark will apply the Energy Star logo to the products as ▮▮▮▮ does plan to apply for Energy Star. Lexmark will supply needed technical information for ▮▮▮▮ to make application for Energy Star V2.0.

*RoHS*
RoHS compliance documentation will be provided to ▮▮▮▮ for these products.

▮▮▮▮
Documentation to support ▮▮▮▮ application for ▮▮▮▮ will be provided to ▮▮▮▮ as soon as it is available. Projected schedule provided separately.

*ErP Lot 4*
Products comply with ErP Lot 4 and documentation can be provided.

*Other Environmental*
Lexmark will provide ▮▮▮▮ with available information and reports regarding packaging, batteries, power consumption, noise, chemical emission and ECMA370 information.

# 6.0 Supplies & Associated Packaging

| Lexmark PN for ▮▮▮▮ | ▮▮▮▮ PN | Product Description | | Model Compatibility and LXK Proprietary Yield | |
|---|---|---|---|---|---|
| | | | Use and Return Cartridge | | 16K UAR |
| | | | Toner Cartridge | | 16K BAU |
| | | | Use and Return Imaging Unit | | 60K UAR |
| | | | Imaging Unit | | 60K BAU |
| | | | Use and Return Cartridge | | 35K UAR |
| | | | Toner Cartridge | | 35K BAU |
| | | | Use and Return Imaging Unit | | 100K UAR |
| | | | Imaging Unit | | 100K BAU |
| | | Staple Cartridge 3-Pack for e- ▮▮▮▮ (Released in 2012) | | Use with Finisher (15K - 5K per pack) | |

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A3870

In addition to the aftermarket supply items above, the machines ship with a ▮▮▮-branded return program cartridge and imaging unit installed.

Yields for supplies shipping with the printers are the same as for Lexmark models:

- Toner Cartridge - ▮▮▮ "Up to 6000 pages" ▮▮▮ "Up to 10,000 pages"
  (Average continuous black cartridge yield is standard pages as listed. Declared yield value in accordance with ISO/IEC 19752. Actual yield will vary considerably based upon many factors.)

- Imaging Unit - ▮▮▮ "Up to 60,000 pages" ▮▮▮ "Up to 100,000 pages"
  (Based on 3 average Letter/A4-size pages per print job at approximately 5% coverage. Actual Yield will vary considerably based on other factors such as device speed, paper size and feed orientation, toner coverage, tray source and print job complexity.)

All aftermarket print cartridges and imaging units will be keyed to work exclusively with ▮▮▮ models only. All print cartridges and imaging units will have an ▮▮▮ branded "load label" and a generic return label.

Aftermarket cartridges will be packaged in plain brown kraft cartons with ▮▮▮ unique carton labels showing identifying information on two sides of the carton. Cartons will contain a generic return brochure (12A8386) which provides shipping instructions and labels for return of either "Return Program" or "Business as Usual" cartridges and imaging units. The exterior of the carton is to have a generic license label which must be cut upon opening the carton.

## 7.0 Documentation

All products include the following Lexmark-generated hard copy documentation:
- Generic Setup sheet ▮▮▮ - 3069887; ▮▮▮ - 3067235)
- Safety Information sheet (3015500)

It is assumed these documents meet ▮▮▮ language requirements without change.

A generic User Guide is included on the User's Guide CD.

▮▮▮ Unique Documents:
- Stability Pointer sheet (3079736  point to same URL as before in sheet 3073484) ▮▮▮ only
- Authorized Representative sheet (3073486)
- WEEE sheet(s)  (3073687)
- EuP Lot4 Vol Agreement Sheet (3079460) provided by ▮▮▮

Note: No documentation has been provided or defined to support ▮▮▮ provide warranty documentation, or provide technical support contact information.

## 8.0 Driver

The ▮▮▮ Microsoft Certified Windows driver CD will contain the OEM Generic Universal Print Driver. Driver content is similar to Lexmark BSD UPD.

CONFIDENTIAL - OUTSIDE COUNSEL ONLA3871

Driver will default to duplex in EU as per EuP Lot4 VA.
The OEM generic EULAs provided by Lexmark will be presented to the user during the install.
Manufacturers other than ████ may appear during the install process.
During installation "Unknown" will be listed as the publisher.
The files on the CD support only the Windows operating systems.  Mac, Linux, Unix will be provided in a format suitable for web posting and download prior to the product launch.
The CD will be screen printed with ████-unique artwork.

*SAP Device Types for* ████ *Models*
This ████ request is currently under review and negotiation as a new added requirement.  Additional NRE, delivery schedule and specific terms are TBD.

*Citrix Ready Certification of* ████ *Models*
This ████ request is currently under review and negotiation as a new added requirement.  Additional NRE, delivery schedule and specific terms are TBD.

## 9.0 Product Packaging

These products will be packaged in OEM generic cartons which are brown kraft cartons with single color line drawings of the product, storage/handling instructions, and wordless unboxing instructions.  A generic description of "Printer" in several languages is also on the carton.  License words will be shown on the top flaps of the carton.

A 6 x 6 inch carton label is applied to the carton (to be jointly defined by Lexmark and ████ containing ████ unique product information as well as "manufacturer's use" information.

The carton is to be sealed with standard, off-the-shelf packing tape.

## 10.0 Options/Features

Options to be offered by ████ are as follows:

| LXK Branded Equivalent | Lexmark PN for ████ | ████ PN | Product Description | Compatibility |
|---|---|---|---|---|
| Paper Handling | | | | |
| 35S0267 | | | 250-Sheet Tray | |
| 35S0567 | | | 550-Sheet Tray | |
| 40G0800 | | | 250-Sheet Tray | |
| 40G0802 | | | 550-Sheet Tray | |
| 40G0804 | | | 2100-Sheet Tray | |
| 40G0820 | | | 250-Sheet Lockable Tray | |
| 40G0822 | | | 550-Sheet Lockable Tray | |
| 40G0854 | | | Spacer | |
| 40G0850 | | | Staple Finisher | |
| 40G0851 | | | Output Expander | |
| 40G0852 | | | 4-Bin Mailbox | |

CONFIDENTIAL - OUTSIDE COUNSEL ONlA3872

| | | | |
|---|---|---|---|
| 40G0853 | ███████ | High Capacity Output Expander | ███████ |
| **Memory/Storage** | | | |
| 27X0200 | ███████ | Hard Disk Drive (160GB+) | ███████ |
| **Furniture** | | | |
| 35S8502 | ███████ | Adjustable Printer Stand | ███████ |
| 3073173 | | Swivel Cabinet | |
| 40G0855 | | Caster Base | |
| **Application Solutions** | | | |
| 35S2992 | ███████ | Forms and Bar Code Card | ███████ |
| 35S2993 | | IPDS Card | |
| 40G0830 | | Forms and Bar Code Card | |
| 40G0831 | | IPDS Card | |
| **Connectivity / Print Servers** | | | |
| 27X0128 | ███████ | 802.11b/g/n Wireless Print Server | ███████ |
| 27X0225 | | 802.11b/g/n Wireless Print Server | |
| 14F0000 | | Parallel 1284-B Interface Card | |
| 14F0100 | | RS-232C Serial Interface Card | |

All options are to be physically the same as for Lexmark except that an appropriately sized carton label with ███████ part number and description information will be applied to the carton. The content and layout of these labels is to be jointly defined by Lexmark and ███████.

## 11.0 Service Parts

The ███████ printer ships with a Return Program Fuser that will be generically labeled.

███████ will use Lexmark common service parts "as is". It is OK for Lexmark information to appear on the service part packaging.

## 12.0 Other

*eSF Support*
eSF applications are not supported by these model printers.

*Demo Page*
The demo page available for printing from the operator panel of Lexmark branded products is not available and hidden for ███████ branded products.

CONFIDENTIAL - OUTSIDE COUNSEL ONLY  A3873

13.0 Definition Approval

Customer Approval                          Lexmark Approval


_____          _____
Name (Print)                              Name (Print)


_____          _____
Signature                                 Signature


_____          _____
Date                                      Date

███████████████                           Lexmark International, Inc.

████████████████

CONFIDENTIAL - OUTSIDE COUNSEL ONlA3874

2013/10/10

Title Page

# Lexmark MPA
## Attachment 2.1
## Prices
*Effective October 1, 2013*

## Contents
- Hardware
- Supplies
- Options

Lexmark and  Confidential

MPA - Attachment 2.1 - Prices v1.9

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3875



2013/10/10

Hardware

MPA - Attachment 2.1 - Prices v1.9

Lexmark and Confidential

| XM Model | Lexmark P/N | Assigned LXK P/N for | P/N | Sales Territory | LXK Plant of MFG / Location | Lexmark Distribution Center | INCO TERMS | Minimum Order Increment | MPA Unit Price | MPA Unit Price *Effective on* |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | **Laser Hardware** | | | | | |
| | 35S0400 | | | Europe - Germany, France & U.K. | | Geel, Belgium | Ex Works, LXK Distribution Center | | | |
| | 40G0110 | | | Europe - Germany, France & U.K. | | Geel, Belgium | Ex Works, LXK Distribution Center | | | |

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A3876

Supplies

2013/10/10

| LXK Model | Lexmark P/N | Assigned LXK P/N fo... | P/N | Sales Territory | LXK Plant of MFG / Location | Lexmark Distribution Center | INCO TERMS | Minimum Order Increment | MPA Unit Price | MPA Unit Price Effective on |
|---|---|---|---|---|---|---|---|---|---|---|
| **Laser Supplies - Return Program Cartridges** | | | | | | | | | | |
| Return Program Cartridge - 16K | 24B186_ | | 6B00000613 | Europe - Germany, France & U.K. | China | Geel, Belgium | Ex Works, LXK Distribution Center | | | |
| Return Program Cartridge - 35K | 24B6015 | | 6B00000619 | Europe - Germany, France & U.K. | China | Geel, Belgium | Ex Works, LXK Distribution Center | | | |
| **Laser Supplies - Regular Cartridges** | | | | | | | | | | |
| Regular Cartridge - 16K | N/A | | 6B00000610 | Europe - Germany, France & U.K. | China | Geel, Belgium | Ex Works, LXK Distribution Center | | | |
| Regular Cartridge - 35K | N/A | | 6B00000617 | Europe - Germany, France & U.K. | China | Geel, Belgium | Ex Works, LXK Distribution Center | | | |
| **Laser Supplies - Use and Return Imaging Units** | | | | | | | | | | |
| Use and Return Imaging Unit - 60K | 24B6040 | | 6B00000627 | Europe - Germany, France & U.K. | China | Geel, Belgium | Ex Works, LXK Distribution Center | | | |
| Use and Return Imaging Unit - 100K | 24B6025 | | 6B00000604 | Europe - Germany, France & U.K. | China | Geel, Belgium | Ex Works, LXK Distribution Center | | | |
| **Laser Supplies - Regular Imaging Units** | | | | | | | | | | |
| Regular Imaging Unit - 60K | N/A | | 6B00000601 | Europe - Germany, France & U.K. | China | Geel, Belgium | Ex Works, LXK Distribution Center | | | |
| Regular Imaging Unit - 100K | N/A | | 6B00000607 | Europe - Germany, France & U.K. | China | Geel, Belgium | Ex Works, LXK Distribution Center | | | |

Lexmark and LXK Confidential

MPA - Attachment 2.1 - Prices v1.9

CONFIDENTIAL - OUTSIDE COUNSEL ONLY LXK-CA3877...

███ MPA - Attachment 2.1 - Prices v2.0                    Options                                    2013/10/17

| LXK Model | Lexmark P/N | Assigned LXK P/N for ███ | ███ P/N | ███ Sales Territory | LXK Plant of MFG / Location | LXK Distribution Center | INCO TERMS | Minimum Order Increment | MPA Unit Price |
|---|---|---|---|---|---|---|---|---|---|
| **Paper Handling Options** | | | | | | | | | |
| 250-Sheet Tray | 35S0267 | | | Europe - Germany, France & U.K. | China | Geel, Belgium | Ex Works, LXK Distribution Center | | |
| 550-Sheet Tray | 35S0567 | | | Europe - Germany, France & U.K. | China | Geel, Belgium | Ex Works, LXK Distribution Center | | |
| 250-Sheet Tray | 40G0800 | | | Europe - Germany, France & U.K. | China | Geel, Belgium | Ex Works, LXK Distribution Center | | |
| 550-Sheet Tray | 40G0802 | | | Europe - Germany, France & U.K. | China | Geel, Belgium | Ex Works, LXK Distribution Center | | |
| ███ 250-Sheet Lockable Tray | 40G0820 | | | Europe - Germany, France & U.K. | China | Geel, Belgium | Ex Works, LXK Distribution Center | | |
| 550-Sheet Lockable Tray | 40G0822 | | | Europe - Germany, France & U.K. | China | Geel, Belgium | Ex Works, LXK Distribution Center | | |
| ███ Spacer | 40G0854 | | | Europe - Germany, France & U.K. | China | Geel, Belgium | Ex Works, LXK Distribution Center | | |
| 2100-Sheet Tray | 40G0804 | | | Europe - Germany, France & U.K. | China | Geel, Belgium | Ex Works, LXK Distribution Center | | |
| Staple Finisher | 40G0850 | | | Europe - Germany, France & U.K. | China | Geel, Belgium | Ex Works, LXK Distribution Center | | |
| Output Expander | 40G0851 | | | Europe - Germany, France & U.K. | China | Geel, Belgium | Ex Works, LXK Distribution Center | | |
| 4-Bin Mailbox | 40G0852 | | | Europe - Germany, France & U.K. | China | Geel, Belgium | Ex Works, LXK Distribution Center | | |
| High Capacity Output Expander | 40G0853 | | | Europe - Germany, France & U.K. | China | Geel, Belgium | Ex Works, LXK Distribution Center | | |
| Swivel Cabinet | 3073173 | | | Europe - Germany, France & U.K. | China | Geel, Belgium | Ex Works, LXK Distribution Center | | |
| MS610 Adjustable Printer Stand | 35S8502 | | | Europe - Germany, France & U.K. | China | Geel, Belgium | Ex Works, LXK Distribution Center | | |
| ███ Caster Base | 40G0855 | | | Europe - Germany, France & U.K. | China | Geel, Belgium | Ex Works, LXK Distribution Center | | |
| **Connectivity / Print Server** | | | | | | | | | |
| 802.11b/g/n Wireless Print Server ███ | 27X0225 | | | Europe - Germany, France & U.K. | China | Geel, Belgium | Ex Works, LXK Distribution Center | | |
| 802.11b/g/n Wireless Print Server ███ | 27X0128 | | | Europe - Germany, France & U.K. | China | Geel, Belgium | Ex Works, LXK Distribution Center | | |
| Parallel 1284-B Interface Card | 14F0000 | | | Europe - Germany, France & U.K. | China | Geel, Belgium | Ex Works, LXK Distribution Center | | |
| RS-232C Serial Interface card | 14F0100 | | | Europe - Germany, France & U.K. | China | Geel, Belgium | Ex Works, LXK Distribution Center | | |
| **Memory Storage** | | | | | | | | | |
| Hard Disk Drive(160 GB+) | 27X0200 | | | Europe - Germany, France & U.K. | China | Geel, Belgium | Ex Works, LXK Distribution Center | | |
| **Application / Solutions** | | | | | | | | | |
| Forms and Barcode Card | 40G0830 | | | Europe - Germany, France & U.K. | China | Geel, Belgium | Ex Works, LXK Distribution Center | | |
| IPDS Card ███ | 40G0831 | | | Europe - Germany, France & U.K. | China | Geel, Belgium | Ex Works, LXK Distribution Center | | |

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3878

## Services Items

| LXK Model | Lexmark P/N | Assigned LXK P/N for | P/N | Sales Territory | LXK Plant of MFG / Location | LXK Distributio n Center | INCO TERMS | Minimum Order Increment | MPA Unit Price |
|---|---|---|---|---|---|---|---|---|---|
| ...ser Maintenance | 40X8435 | | | Europe - Germany, France & U.K. | China | Geel, Belgium | Ex Works, LXK Distribution Center | | |
| ...oller Maintenance | 40X7706 | | | Europe - Germany, France & U.K. | China | Geel, Belgium | Ex Works, LXK Distribution Center | | |
| ...Return Fuser Maintenance Kit | 40X8421 | | | Europe - Germany, France & U.K. | China | Geel, Belgium | Ex Works, LXK Distribution Center | | |
| n - Return Fuser ...intenance Kit | 40X8426 | | | Europe - Germany, France & U.K. | China | Geel, Belgium | Ex Works, LXK Distribution Center | | |

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3879

OEM CONTRACT 9

04-05 ▇▇

▇▇▇▇ CORPORATE PRICING AGREEMENT

AND

LEXMARK INTERNATIONAL, INC.

April 2005

1

███████ CORPORATE PRICING AGREEMENT NUMBER ___
LEXMARK INTERNATIONAL INC. AGREEMENT NUMBER ___

SECTION 1.0   UTILIZATION OF PRODUCT ........................................................................................ 4
SECTION 2.0   AGREEMENT PERIOD............................................................................................... 5
SECTION 3.0   PRODUCT QUANTITIES AND FORECASTS ........................................................... 5
SECTION 4.0   PURCHASE ORDERS.............................................................................................. 5
SECTION 5.0   OEM PRICING ......................................................................................................... 6
SECTION 6.0   SPECIAL TONER CARTRIDGE TERMS.................................................................. 7
SECTION 7.0   SHIPMENT/RISK OF LOSS OR DAMAGE ............................................................. 7
SECTION 8.0   INVOICING, PAYMENT TERMS, TAXES ................................................................ 8
SECTION 9.0   TERMINATION ......................................................................................................... 8
SECTION 10.0   ENGINEERING TOPICS.......................................................................................... 9
SECTION 11.0   DOCUMENTATION AND SERVICE TRAINING ...................................................... 10
SECTION 12.0   INSPECTION AND ACCEPTANCE......................................................................... 11
SECTION 13.0   LIMITED WARRANTY ............................................................................................. 12
SECTION 14.0   MAINTENANCE PARTS.......................................................................................... 13
SECTION 15.0   SUPPLIER TRADEMARKS AND TRADE NAMES .................................................. 14
SECTION 16.0   PATENTS AND COPYRIGHTS................................................................................ 14
SECTION 17.0   CONFIDENTIAL INFORMATION ............................................................................. 15
SECTION 18.0   COMPETITIVE PRODUCTS AND SERVICES ........................................................ 15
SECTION 19.0   LIMITATION OF REMEDIES ................................................................................... 16
SECTION 20.0   RELATIONSHIP OF THE PARTIES ........................................................................ 16
SECTION 21.0   NOTICES ................................................................................................................ 16
SECTION 22.0   PRODUCT WITHDRAWAL...................................................................................... 17
SECTION 23.0   "LAST BUY" OF PRODUCT .................................................................................... 17
SECTION 24.0   GENERAL PROVISIONS......................................................................................... 17

<u>LIST OF ATTACHMENTS</u>

"A"   SPECIAL SUPPLIES TERMS
"B"   RESTRICTED TERRITORY LIST
"C"   ENGINEERING CHANGE PROCEDURE
"D"   PATENT COUNTRY LISTING

2

CONFIDENTIAL - OUTSIDE COUNSEL ON A3881

███████CORPORATE PRICING AGREEMENT NUMBER ___
LEXMARK INTERNATIONAL INC. AGREEMENT NUMBER ___


███████████████████                                    DATE: April 11, 2005
████████████████████
████████████████████

LEXMARK INTERNATIONAL, INC.
740 NEW CIRCLE ROAD N.W.
LEXINGTON, KY  40550

This Agreement made and entered into as of April 11, 2005 (Effective Date), by and between █████████████ hereinafter referred to as ██████████, and LEXMARK INTERNATIONAL, incorporated under the laws of the State of Delaware and LEXMARK INTERNATIONAL TECHNOLOGY SA, incorporated under laws of Switzerland and a wholly owned subsidiary of LEXMARK (together hereinafter referred to as LEXMARK). This Agreement replaces the original ████████Corporate Pricing Agreement with IBM dated July 1, 1990 and all Amendments thereto.

█████████ agrees that it may from time to time purchase and LEXMARK agrees to sell the Product and Supplies, in accordance with the terms and conditions stated in this Agreement and its Attachments "A" through "C", which Attachments are attached hereto and made a part hereof.  Product and Supplies may be ordered for shipment from LEXMARK by ████████ issuing Purchase Orders from time to time as provided herein.

Based on Lexmark International, Inc. maintaining full responsibility for this Agreement, LEXMARK may have Lexmark International Technology, SA (LITSA) and other Lexmark Subsidiaries fulfill certain of Lexmark International, Inc.'s responsibilities hereunder and/or exercise certain of its rights.

Words will have their normally accepted meanings as employed in this Agreement.  The terms "herein" and "hereof", unless specifically limited, shall have reference to the entire Agreement. The word "shall" is mandatory, the word "may" is permissive, the word "or" is not exclusive, the words "includes" and "including" are not limiting and the singular includes the plural.   The following terms shall have the described meanings:

Agreement -    The term "Agreement" means this Agreement document and its Attachments.

Subsidiaries - The term "Subsidiaries" as used herein shall mean any company or other entity more than fifty percent (50%) of whose shares of voting stock outstanding as of the date of this Agreement, or more than fifty percent (50%) of whose capital determined as of the date of this Agreement is owed or controlled by █████████ or LEXMARK, directly or indirectly, or more than fifty percent (50%) of the voting stock or capital is directly or indirectly acquired by █████████ or LEXMARK at any time during the terms of this Agreement.

End User -    The term "End User" means any party who 1) is unaffiliated with ██████████ enterprise and 2) acquires the Product from ████████ directly or indirectly.  An End User does not remarket, sell, license, rent or lease or otherwise dispose of the Product to other parties in the regular course of the End User's business.

Product -    The term "Product" in this Agreement means the Printers, and Features .

3

CONFIDENTIAL - OUTSIDE COUNSEL ON\A3882

CORPORATE PRICING AGREEMENT NUMBER \_\_\_
LEXMARK INTERNATIONAL INC. AGREEMENT NUMBER \_\_\_

Supplies-    The term "Supplies" means toner cartridges "

Best Dealer
Pricing( BDP)    The price offers by Lexmark to its distributors for subsequent resale to Lexmark Authorized dealers. This is the reference point used as the base for developing prices.

Product
Forecast-    The term "Product Forecast" means the quantity of Printers, Features and Supplies, which    agrees to forecast by Printer, Feature and Supplies, by the 20th day of each month for a rolling six (6) month non-binding window.

Days -    The term "Days" means calendar days unless otherwise specifically stated in the Agreement.

Order -    The term "Order" shall mean, individually or collectively,    Procurement personnel's purchase orders and changes thereto, in written or electronic format for Product and Supplies

Price Quote
Letter-    The term "Price Quote Letter" means a standard letter, which provides prices, terms and conditions for specific Product or Supplies part numbers.

Maintenance
Kit –    The term "Maintenance Kit" means a package of items that are needed for periodic maintenance of the printers that are not considered to be a Supply.

FRU-    Field Replacement Unit

Constrained
Product    Product is designated constrained when Lexmark formally acknowledges And notifies    in writing that such condition exists. Lexmark will    promptly notify    of changes to product shipment schedules and quantities that deviate from Lexmark's prior commitments of such actions

## SECTION 1.0    UTILIZATION OF PRODUCT

1.1    shall have the right to distribute    branded Product and Supplies anywhere in the world where such distribution is not prohibited by government laws or regulations, or LEXMARK exclusive distribution contracts in effect. For sales to    outside the US the parties must first agree on modifications to the terms of this Agreement specific to those marketing geographies. Such modifications will be added to Attachment B.

1.2    represents that it may need to utilize Products for internal use, and LEXMARK agrees that    may utilize Products for internal use.

1.3    branded toner cartridges purchased by    may be resold by    solely for use with    branded Printer Products purchased by    from LEXMARK. Lexmark may not sell Lexmark branded toner cartridges directly to a customer for use with    branded Lexmark Printer Products that are not installed with Lexmark branded printers.    may not sell    branded toner cartridges directly or indirectly to a customer for use with Lexmark branded printer/multi-functional products (or printer/multifunctional products that Lexmark has supplied to OEM customers).

1.4    All    customized Supplies and their packaging sold to    will prominently display the    logo applied by LEXMARK in a manner as mutually agreed.

4

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3883

███████ CORPORATE PRICING AGREEMENT NUMBER ___
LEXMARK INTERNATIONAL INC. AGREEMENT NUMBER ___

███████ will purchase its entire requirement of ███ branded Lexmark Supplies that function on ███ branded Printers from LEXMARK. In no event will ██████ sell, market or otherwise recommend 3rd party remanufactured supplies for the ███ branded Printers from Lexmark. ███ may sell, market, or recommend remanufactured supplies for ███ branded printers after receiving written notice from Lexmark of Lexmark's intention to withdraw both new and remanufactured supplies identified by part number from Marketing. The written notice will contain the withdrawal effectivity date and last buy opportunity. The net prices from Lexmark to ███ for ███ branded Lexmark Supplies will be ███ below Best Distributor Price ( BDP). The net price for ███ branded Lexmark Products will be ███ below BDP for each Product. Lexmark will attempt to provide price discounts greater than ███ below BDP when justified by a business case analysis for each Product. Lexmark agrees to offer such ███ branded Supplies to ███ for purchase for five    (5) years after the Marketing withdrawal of Printers under the same terms.

1.5    ███████ agrees to require its Subsidiaries and remarketers to understand and act in a Manner consistent with the provision of this Section.

## SECTION 2.0    AGREEMENT PERIOD

2.1    The term of this Agreement shall commence on the Effective Date listed on Page 1 of this Agreement and ending three years later.

2.2    This Agreement period shall be automatically renewed for successive one (1) year periods thereafter, unless written notice of non-renewal is given by one party to the other at least one hundred and twenty (120) days prior to the termination date of the Agreement period or the termination date of any yearly renewal, unless terminated earlier under any other provision of this Agreement.

## SECTION 3.0    PRODUCT FORECASTS

███████ agrees to provide LEXMARK with the rolling non-binding six-month forecast for Product and Supplies on a monthly basis.  The forecast is due not later than the twentieth day of each month for the term of the Agreement.

## SECTION 4.0    PURCHASE ORDERS

4.1    ███████ has the option to issue Purchase Orders for Product at any time during the term of this Agreement, and ███ assumes no liability for Lexmark's costs associated with the Product beyond the quantities authorized by ███████ Purchase Orders, except as set forth in Section 9.0 entitled "Termination".

4.2    Product order lead times will vary depending on geography and type of Product: i.e., Supply or Printer and where Supply or Printer is manufactured. Details will be set forth in Attachments or Price Quote Letters and any modifications thereto that may be mutually agreed in writing by authorized representatives of the parties.

5

CONFIDENTIAL - OUTSIDE COUNSEL ONL A3884

██████ CORPORATE PRICING AGREEMENT NUMBER ___
LEXMARK INTERNATIONAL INC. AGREEMENT NUMBER ___

4.3   Purchase Orders for ██████ branded product issued to LEXMARK shall include the following:
   a)   ██████ part number, LEXMARK part number, Product description and quantity ordered;
   b)   Unit price
   c)   Ship-to location at ██████ and carrier selection, if any,
   d)   Full pallet Purchase Order increments will be accepted.
   e)   Lexmark will try to accommodate reasonable requests by ██████ for orders of smaller quantities. Purchase Orders issued under the Agreement are subject to the terms and conditions of this Agreement, LEXMARK shall acknowledge receipt of each Order on Weekly Status Report and shall ship ordered units of Product in accordance with shipment schedules indicated on the Weekly Status Report provided such dates are in accordance with forecast and lead times. LEXMARK will accept Purchase Orders subject to Product availability. The only time LEXMARK may not accept a Purchase Order is obsolete Product or constrained Product outside of lead time or pricing discrepancies. ██████ Purchase Order terms and conditions and terms and conditions on Lexmark order acknowledgements shall not be a part of this Agreement, unless specifically agreed to in advance by the parties in writing.

4.4   Any quantity change for Product that has been ordered on a ██████ Purchase Order and been accepted by LEXMARK will be set forth in a Change Order to the original Purchase Order which must also be accepted by LEXMARK. LEXMARK shall accept requests for additional quantities of Product above the quantities that have been ordered or ██████ Purchase Order and been accepted by LEXMARK. ██████ cannot reduce quantities if product has already been customized for ██████

4.5
      LEXMARK shall notify ██████ of any matters that delay or will probably delay any scheduled shipment of Product deviating from Lexmark's Weekly Order Status Report.

4.6   It is agreed that mutually agreed upon Subsidiaries may purchase Product under this Agreement, and that such purchases are considered purchases by ██████ for the purpose of determining applicable prices and determining the satisfaction by ██████ of its purchase obligations hereunder.

4.7   Requests for special handling (E.G., drop shipments or expedited shipments) will be subject to additional charges as mutually agreed, order by order.

4.8   Maintenance/Service Parts may be ordered from the LEXMARK Parts Center at 1-800-553-9727. Refer to section 14.


SECTION 5.0      OEM PRICING
5.1   ██████ may purchase from time to time Product and Supplies where they are a fit for its business. In consideration for such purchases, LEXMARK agrees to sell, manufacture and deliver such quantities of the Product and Supplies as ██████ may order from time to time during the Agreement Period ". LEXMARK and ██████ to monitor pricing conditions for this type of Product and Supplies in the marketplace. LEXMARK shall provide ██████ at least thirty (30) days written notice of any price increase to the Products and Supplies detailed on Lexmark Price Quote Letter,or attachment "A". Date specified in Quote Letter shall become effective on thirty-first day after the date of the written notice. The amount of Price increases for Products and Supplies shall be no higher and occur no more frequently than the price increases to the BDP. All orders submitted by ██████ nd accepted by LEXMARK prior to the effective date of the price increase, and with a requested ship date within 30 days of the effective date of price

6

███ CORPORATE PRICING AGREEMENT NUMBER ___
LEXMARK INTERNATIONAL INC. AGREEMENT NUMBER ___

increase shall be exempt from the pending price increase. LEXMARK further agrees that special discounts may be negotiated for specific bid opportunities, as required, subject to mutual written agreement of the parties

5.2 Non-recurring engineering (NRE) costs may be incurred by LEXMARK and paid for by ███ as mutually agreed by the parties in advance of the costs being incurred.

## SECTION 6.0 SPECIAL SUPPLIES TERMS

6.1 See Attachment "A" for Special Supplies Terms

## SECTION 7.0 SHIPMENT/RISK OF LOSS OR DAMAGE

7.1 LEXMARK shall load for shipment all units of Product and Service Parts FOB Domestic/FCA International shipments at Lexmark's designated ship point. The mode of shipment shall be surface transportation with the carrier designated by ███ for domestic shipments to ███ Domestic Distribution Center. ███ hereby authorizes the use of Lexmark's carrier for International shipments. International shipments shall be made by Lexmark's freight forwarder to the ███ authorized carrier at the port of entry. If air transportation is required by ███ or international shipments, ███ will inform LEXMARK.
   (a) Units of Product shall be packed and packaged conforming to good commercial practices (same as Lexmark's) for the protection of the Product and Supplies under normal shipping modes.
   (b) Product shall be described on Bills of Lading in accordance with ███ instructions. ███ part numbers and model numbers, as applicable, must be plainly marked on all invoices, inner-packages and packing lists.

7.2 For ███ shipments to all U.S. and non-U.S. locations, title, risk of loss or damage to each unit of PRODUCT and supplies passes to ███ immediately upon delivery to the carrier. ███ is responsible for obtaining sufficient insurance to cover the value of the goods and transportation for each shipment. Should the shipment be lost or damaged in transit, it is ███ responsibility to file a claim with its insurer.

7.3 LEXMARK shall follow the shipping instructions (date/quantity/location) as listed on the LEXMARK accepted Purchase Order. Printer models may not be mixed on a single pallet.

7.4 ███ may in its sole discretion direct the use of specific carriers or premium modes of transportation and arrange for direct billing of freight charges to ███ In the event LEXMARK fails to deliver any Product or Supply within the agreed upon lead time, except for Product or Supply availability constraints, and where the delay exceeds fifteen (15) calendar days for domestic orders and thirty (30) calendar days for international orders and such delay does not qualify under section 9.2.d, Lexmark agrees upon ███ request to ship such delayed Product or Supply using a premium mode of transportation and to bear any resulting increase in the cost of transportation and packing

## SECTION 8.0 INVOICING, PAYMENT TERMS, TAXES

7

CONFIDENTIAL - OUTSIDE COUNSEL ONl A3886



CORPORATE PRICING AGREEMENT NUMBER ___
LEXMARK INTERNATIONAL INC. AGREEMENT NUMBER ___

8.1    Invoices for Products and Supplies may be submitted by LEXMARK upon shipment to ▆▆▆▆▆▆ shall pay all undisputed invoiced amounts to LEXMARK within thirty (30) days after receipt of invoice.    Should ▆▆▆▆ account become delinquent, LEXMARK reserves the right to stop shipments until the account is current again.

8.2    ▆▆▆▆ will be responsible for all taxes, including but not limited to sales and use tax, customs, and excise duties, Value Added Tax, property tax associated with the purchase and delivery of LEXMARK's products except, for those taxes assessed on the gross or net income of LEXMARK or other taxes for which Lexmark is legally responsible which shall be LEXMARK'S responsibility.  All prices quoted per this contract will be exclusive of any tax unless otherwise stated by LEXMARK.

8.3    ▆▆▆▆ hereby certifies that it holds a valid Resellers Exemption Certification for Products purchased for resale in each applicable taxing jurisdiction. Based on this certification, LEXMARK agrees, where the law permits, to treat ▆▆▆▆ as exempt from applicable state or local sales tax for Product purchased hereunder.

8.4    Where required by state or local law, ▆▆▆▆ agrees to provide LEXMARK with a valid Resellers Exemption Certificate for each taxing jurisdiction to which Product will be shipped from LEXMARK under this Agreement.  ▆▆▆▆ agrees to notify LEXMARK promptly in writing of any additions, modifications, deletions, or revocation of its exempt status.  ▆▆▆▆ further agrees to reimburse LEXMARK for any or all assessments resulting from a refusal by a taxing jurisdiction to recognize any of ▆▆▆▆ exemption certificates or from ▆▆▆▆ failure to have a valid certificate or from ▆▆▆▆ internal use of Product.  In the event it shall be determined that the tax was not required to be paid, LEXMARK shall notify ▆▆▆▆ and if ▆▆▆▆ reimbursed LEXMARK for the tax, and LEXMARK paid the tax, LEXMARK shall make prompt application for the refund and pay the refund to ▆▆▆▆

## SECTION 9.0    TERMINATION

9.1    TERMINATION BY MUTUAL CONSENT
This Agreement may be terminated at any time by the mutual written consent of both parties.  In the event of such termination, the parties shall agree whether any payment shall be due to LEXMARK for Lexmark's inventory of Products, Supplies and parts, if any, and the amount of any agreed-upon payment.  The parties shall also agree on the applicable Prices for Product and Supplies shipped prior to such termination.

9.2    TERMINATION FOR DEFAULT
Either party's failure to perform any of its material obligations under this Agreement shall be default.  If either party defaults, the other party may give the defaulting party a written notice of termination, which if not cured within thirty (30) days, shall become effective. The termination notice shall state the reason for the termination and its effective date.
    a. The non-defaulting party may agree to continue this Agreement rather than terminating it. To do so, that party shall send a written notice of default to the defaulting party instead of a notice of termination.  The written notice of default shall state the nature of the default, and the conditions under which the non-defaulting party will agree to continue this Agreement.  By agreeing to continue this Agreement in this manner, the non-defaulting party does not waive its right to later terminate this Agreement for default based on the event of default that is the subject of the notice, if the default has not been cured.

8

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3887

█████ CORPORATE PRICING AGREEMENT NUMBER ___
LEXMARK INTERNATIONAL INC. AGREEMENT NUMBER ___

b. In addition to any other rights and remedies that Lexmark may have under the Agreement, if LEXMARK terminates this Agreement for default by █████ shall pay LEXMARK all payments due fo█████ Ordered Product and Supplies already shipped. LEXMARK shall make every reasonable effort to cancel commitment for, resell or divert materials and work-in-process.

c. If █████ terminates this Agreement for default by LEXMARK, █████ must pay LEXMARK for all undisputed invoices for conforming Product and Supplies shipped by LEXMARK in response to █████ Purchase Orders prior to the effective date of termination. In addition to any other rights and remedies that █████ may have under this Agreement or otherwise, █████ may choose to accept and pay for additional Product and Supplies, but it is not obligated to do so. LEXMARK shall deliver to █████ such additional Product subject to availability that █████ chooses to accept.

d. Neither party shall be liable to the other in any manner due to any delay, or impossibility in delivery or other inability to perform its obligations under the Agreement, caused by acts of God, a public enemy, fire, floods, explosions, other similar catastrophes, strikes, or other causes beyond Lexmark's control and delays or impossibility of a supplier due to such cause or causes.

SECTION 10.0          ENGINEERING TOPICS

10.1    ENGINEERING CHANGES
These changes are defined as a mechanical, firmware, chemical or electrical changes to the Product or Supply which affects form, fit, function and/or maintainability.  See Attachment "C" for Engineering Change Procedure.

10.2    SAFETY CHANGES
Safety Changes are those Engineering Changes so defined by LEXMARK as Safety Changes for its customers of the corresponding LEXMARK Product or Supply. LEXMARK reserves the right prior to delivery to █████ to make any Safety Changes deemed necessary by LEXMARK. However, with respect to the Product or Supply in █████ nventory and installed with █████ End Users, █████ has the responsibility to install any Safety Changes and agrees to install such Safety Changes in a manner specified by LEXMARK and within the time period specified by LEXMARK for its customers. Lexmark will notify █████ in writing with the request for safety changes to be completed by █████ within 60 days from notification date.   Unless an earlier date is specified by Lexmark.

10.3    ENGINEERING DOCUMENTATION
Concurrent with the delivery of first production units, LEXMARK shall supply █████ with two (2) complete sets of legible and reproducible documentation in sufficient detail to permit █████ o perform engineering support and inspection of the Product and Maintenance Parts. Lexmark will provide material Safety Data Sheets for new products.

10.4    ENGINEERING TRANSFER OF INFORMATION (T of I)
LEXMARK agrees to provide, at no cost and within thirty (30) days after request, a one-time transfer of information session fo█████ Engineering personnel to acquaint them in the design and operation of the Product. This transfer of information session shall be provided by LEXMARK at the █████ LEXMARK grants █████ the right to reproduce, modify, translate and distribute these Engineering documents furnished by LEXMARK in accordance with the OEM Confidential Disclosure Agreement 6015 and dated 02/25/02.

10.5    FIELD ENGINEERING SUPPORT

9

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3888

████████████████ PRICING AGREEMENT NUMBER ___
LEXMARK INTERNATIONAL INC. AGREEMENT NUMBER ___

a. LEXMARK shall maintain a qualified support group to provide the following technical liaison and support to ███████ Printer and Terminal Development and Support Engineering Services.

b. LEXMARK shall, at ████████ Printer and Terminal Development and Support Engineering Services personnel request, and provided that LEXMARK has received from ████ all of the relevant data needed to duplicate such problems, investigate the performance of the Product or Supply to determine the cause of problems that have been reported by ████ concerning performance of the Products and the Supplies in "A". LEXMARK agrees to promptly resolve defects and errors in the Product or Supply and provide information to enable ████ to correct errors or inconsistencies in the documentation.

c. LEXMARK shall, during its normal business hours, have available to ████ LEXMARK designated personnel to respond to facsimile, e-mail, or telephone requests from ████ Printer and Terminal Development and Support Engineering Services personnel for assistance in resolving technical issues.

d. LEXMARK shall, upon request and on a best effort basis, promptly furnish technical assistance to ████ or on-site support at ████ or SUBSIDIARIES, AFFILIATES, THIRD PARTIES, or end users site. LEXMARK personnel shall provide support until such support is no longer necessary.

e. LEXMARK shall make ████ f all Product problems which may affect ████ end users and shall promptly provide ████ with field service bulletins, avoidance procedures, solutions, or other appropriate methods of communication utilized by LEXMARK to notify customers of problems.

SECTION 11.0                DOCUMENTATION AND SERVICE TRAINING

LEXMARK shall furnish to ████ on an ongoing basis during the term hereof, free of charge, such materials (that LEXMARK may have available for LEXMARK's own customer brochures or literature) as ████ may reasonably request for use by ████ to prepare brochures and other product literature, including, but not limited to, operators, maintenance and parts manuals, catalogs, specification sheets, and other data necessary or appropriate for the sale of Products. LEXMARK grants to ████ the royalty-free, worldwide, non-exclusive, non-transferable right and license to reproduce all or any part of such documentation for use with Products and Supplies purchased from LEXMARK. ████ s further given the right to modify any or all parts of the documentation to reflect changes made to the Products or Supplies or consistency in style with other documentation used by ████ r to satisfy legal or customers requirements writing within 20 days.

CONFIDENTIAL - OUTSIDE COUNSEL ON A3889

████████ CORPORATE PRICING AGREEMENT NUMBER ___
LEXMARK INTERNATIONAL INC. AGREEMENT NUMBER ___

11.1    LEXMARK shall provide to ████ all documentation necessary or appropriate for ████ to fulfill ████' service and support obligations for the Products provided, however, that such documentation is available for LEXMARK's own authorized service providers. LEXMARK grants to ████ a royalty-free worldwide, non-exclusive, non-transferable license to (a) use, modify, reproduce and distribute such documentation, integrated or not into the appropriate ████ documentation under the ████ name; (b) to prepare localization's based on such documentation; and (c) to authorize third parties to undertake some or all of the activities above, all solely for the express limited purpose of marketing, selling, repairing, maintaining and providing technical support for the Products and Supplies sold hereunder.

11.2    Publications which are derivative works prepared by or for ████ under the license granted in this Section may include an appropriate ████ copyright notice in lieu of any LEXMARK copyright notice. Other than the license granted in this Section, LEXMARK retains all copyright rights in the documents and ████ agrees to provide LEXMARK all reasonable necessary assistance, at Lexmark's expense to enforce those rights against infringers.

11.3    In response to inquiries related to copyright rights in fonts, publications and other material subject to copyright, and in which LEXMARK holds copyright rights, ████ will identify LEXMARK as the owner of some or all of the copyright rights, as appropriate, or direct such an inquiry to LEXMARK.

## SECTION 12.0          INSPECTION AND ACCEPTANCE

12.1    LEXMARK shall utilize the same workmanship and quality assurance procedures for the Product and Supplies as LEXMARK utilizes for the corresponding LEXMARK products.

12.2    LEXMARK shall inspect and test Product in accordance with current Product or Supplies specifications (which have been provided to and accepted by ████ prior to shipment to ████ to ensure conformance. ████ may test Product received from LEXMARK prior to its installation and within one hundred twenty (120) days from date of shipment and may return all defective FRU's from Products or Supplies which fail to meet Product or Supplies Specifications. Returned FRU's shall be handled in accordance with Section 13.0 entitled "Limited Warranty". If a sufficient number of Products are found to be defective during the test ████ will contact LEXMARK to implement an alternate means of resolving the defect problem.

12.3    Should questions pertaining to Product quality and testing arise; the parties agree to meet at a mutually agreed-upon location and date, at their own expense, for the purpose of reviewing Lexmark's quality system and testing procedures for the Product.

12.4    LEXMARK agrees that all Product delivered to ████ in accordance with the Product Specifications, shall:

   a.    Have Underwriters Laboratories 1950 Third Edition listing. This is a unified standard between UL and CSA;

   b.    Have Canadian Standards Association C22.2, #950-M95 Third Edition;

   c.    Have certification of compliance with Federal Communications Commission, Class B requirements for printers not attached via Local Area Network (LAN) and Class A requirements that are connected via LAN.

   d.    Conform to the requirements of the European Norm 60950 Commission including a CB Report to IEC 60950 with Amendments 1 through 4 with all country deviations listed

   e.    Item C and our CISPER 22 data supports the CE mark

   f.    Will meet the requirements for FIMKO and SEMKO;

   g.    Will meet the requirements for the TUV, GS mark; and

11

CONFIDENTIAL - OUTSIDE COUNSEL ONIA3890

██████ CORPORATE PRICING AGREEMENT NUMBER ___
LEXMARK INTERNATIONAL INC. AGREEMENT NUMBER ___

h.   In order to promote and expand the sale of the Product, it may be necessary to comply with the standards of other certifying agencies (hereinafter "Other Agencies"), as it is necessary for safety certification or "listing" in all of ██████ markets. LEXMARK shall provide reasonable support and cooperation to ██████ in achieving these new certifications. Cost of meeting these new certifications will be negotiated between ██████ and LEXMARK when the actual cost details are made available.

12.5   LEXMARK shall take all actions necessary to obtain and retain UL, CSA, FCC, EN60950, CE, FI and S mark, N mark, GS mark, and where applicable in accordance with paragraph 12.4 h) above. Other Agencies approval for Product, including prompt incorporation of all changes required to retain such approval, and to obtain subsequent approvals necessitated by any changes in such Product or modifications of UL, CSA, FCC, EN60950, CE mark, N mark, (FI and S) GS (TUV Rhineland), F, S mark, or Other Agencies standards, rules and regulations along with a CB Report.

12.6   LEXMARK agrees to pay all costs associated with obtaining agency approvals multiple listings and annual fees associated with maintaining the agency listings described in 12.4 above that LEXMARK obtains for its own products.

## SECTION 13.0         LIMITED WARRANTY

13.1   LEXMARK warrants that units of the Product or Supply shipped hereunder shall be free from any liens or other defects in title free of design and manufacturing defects, and free of defects in material and workmanship. Products and Supplies, when shipped, shall conform to ██████ product Specifications as provided to and accepted by ██████

13.2   Except where explicitly noted, Product will be newly manufactured from parts that are new or equivalent to new as used in Lexmark's standard process.

13.3   LEXMARK will not have any installation, warranty or maintenance responsibilities for Product or Supplies except as are referred to in Section 10 and Section 13. In the event the Product or Supply does not meet the ██████ accepted Specification, when unboxed and first installed, ██████ will replace any defective field replacement units (FRU's) required to put the Product in compliance with ██████ Product Specifications. The replaced FRU' will be returned by ██████ to a LEXMARK designated location in a bulk shipment, shipped most efficient way and bill LEXMARK. LEXMARK shall, give ██████ a credit at the then current replacement FRU price or repair or replace the FRUs and return them to ██████ in the next shipment of Maintenance Parts from LEXMARK to ██████ and the FRU's shall be considered newly shipped for warranty purposes. If LEXMARK replaces the FRU's, the exchange FRU's become the property of LEXMARK.

13.4   "Latent Defect" is defined as a defect (condition where Product is not in good working order or not in conformance with Product and Supply Specifications) and that meets all of the following criteria:

a)   such defect was not detected by LEXMARK or ██████ during customary manufacturing or quality testing and inspection;

b)   such defects result solely from defective materials, workmanship, construction or design and is not caused by misuse or misapplication of the Product or Supply; ██████ agrees that at any time during the term of this Agreement, it will notify LEXMARK of any latent defect which comes to the attention of ██████ and LEXMARK agrees to thoroughly review the information provided by ██████ and also review Lexmark's manufacturing processes and designs which could be the cause of such a latent defect. If an engineering change is required it will be handled in accordance with Section 10 and Attachment "C".

12

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3891

███████CORPORATE PRICING AGREEMENT NUMBER ___
LEXMARK INTERNATIONAL INC. AGREEMENT NUMBER ___

13.5  LEXMARK shall indemnify and hold █████ harmless from all costs, expenses and liabilities arising out of or related to injury to persons, or real or tangible property damage caused by any defect in design, manufacture, material or workmanship of the Product and Supplies as delivered by LEXMARK. At ████ request, LEXMARK shall provide satisfactory evidence of product liability insurance or certificate of self-insurance.

13.6  This warranty does not include damage or malfunction resulting from damage in transit, accident, disaster, negligence, abuse, misuse, alteration, installation of attachments or accessories not manufactured or authorized by LEXMARK, installation or connection to products of █████ or any other party, or failure to provide a suitable installation environment as specified per Product or Supply specification.

13.7  The warranty as described in this Section is granted to █████ only and is not transferable to an End User or any third party.

13.8  THE FOREGOING ARE IN LIEU OF ALL OTHER WARRANTIES, EXPRESSED OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

## SECTION 14.0        MAINTENANCE PARTS

14  Lexmark agrees to provide or make available to ████ common Spare Parts, as █████ shall reasonably request, for all Equipment that is purchased by ████ during the term and for a minimum of four (4) years after the date of the last shipment of the Printers pursuant to this Agreement. Such Spare Parts shall be priced in accordance with Lexmark's then current published price list, to its US authorized dealers. At the end of such four-year period, █████ may elect to make a final purchase on all Spare Parts with full delivery to be taken one hundred (100) days after the related P.O. is accepted subject to product availability. █████ will make reasonable commercial efforts to return spare parts removed from product as requested by Lexmark.

14.1  █████ agrees that █████ will use all Maintenance Parts purchased from LEXMARK only for performing Warranty service and maintenance service with prior LEXMARK approval, exceptions may be made.

14.2  LEXMARK shall have Emergency Maintenance Parts Ordering Services available to █████ 9:00AM to 5:00PM Eastern Time Zone, Monday through Friday (excluding Lexmark's observed holidays), and shall also provide a twenty-four (24) hours per day, seven (7) days a week, telecommunications access (facsimile) for █████ Emergency Purchase Orders. █████ may place Emergency Purchase Orders for Maintenance Parts verbally but shall give LEXMARK prompt written confirmation thereof. LEXMARK shall promptly notify █████ of shipping information (i.e., air or way-bill numbers, routing, etc.) when Emergency Maintenance Parts are delivered to the carrier. This Emergency Service is only for reasonable order quantities and will have a service charge of twenty-five dollars ($25.00) charged to the Purchase Order.

14.4  LEXMARK shall deliver Maintenance Parts in accordance with █████ Purchase Order schedules and subject to Lexmark's acceptance of Purchase Order quantities and delivery dates; provided such schedules allow LEXMARK at least the following lead times, after receipt of █████ Purchase Orders (A.R.O.) to complete shipments of the Maintenance Parts.

MAXIMUM LEAD TIME FOR MAINTENANCE PARTS SHIPMENTS TO █████
TYPE OF PURCHASE ORDER      SHIPMENT COMPLETION A.R.O

13

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3892

██████ CORPORATE PRICING AGREEMENT NUMBER ___
LEXMARK INTERNATIONAL INC. AGREEMENT NUMBER ___

| | |
|---|---|
| Emergency Orders | 24 Hours- Common; 60 Days – Unique |
| Initial Provisioning | 30 Days or prior to delivery of FCS units. |
| Replenishment Orders | 30 Days- Common; 60 Days – Unique |

Schedules for deliveries of Maintenance Parts, other than the lead-time set forth above, are subject to mutual agreement between the two parties. For purposes of this Agreement, Common parts shall be those parts that are identical to parts in Lexmark's corresponding product.

## SECTION 15.0     TRADEMARKS AND TRADE NAMES

15.1    Neither this Agreement nor the sale of Product or Supplies hereunder shall be deemed to give either party any right to use the other's trademarks or any of the other's trade names without the other party's specific, written consent. LEXMARK will ship no units of Product or Supplies containing LEXMARK trademarks or trade names to ██████ without ██████ prior consent.

15.2    ██████ recognizes Lexmark's ownership and title to the trademark, all other trademarks and trade names of LEXMARK, and the goodwill attaching thereto and agrees that any goodwill which accrues because of ██████ use of the trademark "LEXMARK" and any other trademarks and trade names of LEXMARK shall vest in and become the property of LEXMARK. ██████ further agrees not to contest, or take any action to contest, the trademarks or trade names of LEXMARK, or use, employ or attempt to register any trademark or trade name which is confusingly similar to the trademarks or trade names of LEXMARK.

15.3    ██████ further agrees that if any of ██████ advertising, promotional or related materials are an inaccurate or misleading use or misuse of LEXMARK trademarks or trade names, ██████ will, upon notice from LEXMARK, change or correct such material at its own expense.

## SECTION 16.0     PATENTS AND COPYRIGHTS

16.1    LEXMARK will, at its expense, defend and indemnify ██████ against any claim that units of Product and Supplies are supplied hereunder infringe a patent, copyright or other intellectual property right in the United States or Puerto Rico and any country listed in Attachment "D" and LEXMARK will pay resulting costs, damages and attorney's fees finally awarded by a court for such claim or agreed via settlement.

16.2    To qualify for such defense and payment ██████ must:
   a)    give LEXMARK prompt written notice of any such claim; and
   b)    allow LEXMARK to control the defense, and fully cooperate with LEXMARK in the defense and all related settlement negotiations.

16.3    If units of Product or Supplies in the inventory of ██████ or the operation thereof while in ██████ inventory, become, or in LEXMARK's opinion are likely to become, the subject of such a claim, LEXMARK's obligation under this Section, in addition to its defense and indemnification obligations under Section 16.1 above, will be, at LEXMARK's option, to stop shipping Product and Supplies, and to procure (at LEXMARK's expense) the right for ██████ to continue marketing and using units of Product or Supplies or to replace or modify them so that they become non-infringing; and if neither of the foregoing alternatives is available on terms which are mutually agreed to by both parties, upon written request, ██████ will return such units of Product or Supplies in its inventory to LEXMARK. LEXMARK agrees to grant ██████ a credit equal to the Unit Price paid to LEXMARK by ██████ or the returned unused units of Product or Supplies.

14

CONFIDENTIAL - OUTSIDE COUNSEL ONlA3893

█████ CORPORATE PRICING AGREEMENT NUMBER ___
LEXMARK INTERNATIONAL INC. AGREEMENT NUMBER ___



16.4  LEXMARK shall have no obligation with respect to any claim based upon █████ trademarks or trade names, modification of units of Product or Supplies or the combination, operation or use of units of Product or Supplies with equipment, data or programs not furnished or authorized by LEXMARK.

16.5  This states each party's entire obligation to each other regarding infringement or the like.

16.6  █████ will, at its expense, defend LEXMARK against any claim that units of Product or Supplies supplied hereunder infringe a patent or copyright in the United States or Puerto Rico and any country listed in Attachment "D" and █████ will pay resulting costs, damages, and attorney's fees finally awarded by a court for such claim; provided, however, that the basis for such alleged infringement relates to that portion of the Product which has been made or modified according to specifications or designs, provided to LEXMARK by █████ or specifically developed or created according to such specifications or designs; and, such infringement would not have occurred but for such modification or compliance. Lexmark shall provide █████ prompt written notice of such claim and █████ shall have control over the defense and or settlement of such claim. Lexmark shall be entitled to participate in such defense at its own expense.

16.7  LEXMARK hereby grants to █████ a worldwide, non-exclusive, non-transferable, paid-up license to reproduce or have reproduced the documents listed in Sections 11.1 entitled "Documentation" and 11.2 entitled "Service Training" in whole or in part and to make or have made Derivative Works thereof or any part thereof, provided that such reproductions are for use by █████ or for sale or distribution by █████ for use with Product and Supplies. █████ will require that, with regard to any such reproductions or Derivative Works prepared for █████ by a third party, the third party will not use the documents listed in Sections 11.1 and 11.2 or the reproductions or Derivative Works for any purpose other than to supply the reproductions or Derivative Works to █████. Publications which are Derivative Works prepared by or for █████ under the license granted in this Section may include an appropriate █████ copyright notice in lieu of any LEXMARK copyright notice.  Other than the license granted in this Section, LEXMARK retains all copyright rights in the documents listed in Sections 11.1 and 11.2, and █████ agrees to provide LEXMARK assistance, at Lexmark's expense, to enforce those rights against infringers.

16.8  In response to inquiries related to copyright rights in fonts, publications and other material subject to copyright, and in which LEXMARK holds copyright rights, █████ will identify LEXMARK as the owner of some or all of the copyright rights, as appropriate, or direct such an inquiry to LEXMARK.

SECTION 17.0          CONFIDENTIAL INFORMATION

17.1  No information shall be deemed to be given or received in confidence by either party unless and to the extent such information is covered by Confidential Disclosure Agreement #OEM 6015, dated 02/25/02 which is hereby incorporated herein and shall remain in full force and effect throughout the term of this agreement. Each party shall keep the existence of and the terms of this Agreement confidential unless by mutually agreed by both parties to the content and time of release. Either party may disclose the terms and conditions of this Agreement to a third party who may become a permitted assignee pursuant to paragraph 26.5, provided such third party agrees in writing to maintain the confidentiality of such information.

SECTION 18.0          COMPETITIVE PRODUCTS AND SERVICES

18.1  Other than as specifically stated herein, neither this Agreement nor any activities will impair any right of LEXMARK or █████ to market, directly or indirectly, other products

15

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3894

or services competitive with those offered by LEXMARK or ▓▓▓ nor require LEXMARK or ▓▓▓ to disclose any planning information other than the non-binding Product and Supply forecast.

18.2 LEXMARK shall be free to market, directly or indirectly, units of the corresponding LEXMARK Products and Supplies (corresponding to ▓▓▓ Products and Supplies) and derivatives thereof to other buyers.

18.3 LEXMARK agrees not to sell to others or license others to manufacture Product and Supplies with ▓▓▓ trademarks unless ▓▓▓ grants its specific written consent thereto.

## SECTION 19.0        LIMITATION OF REMEDIES

19.1 Each party's entire liability and the other party's exclusive remedy are set forth in this Section.

19.2 In all situations involving performance or nonperformance of Product or Supplies furnished under this Agreement ▓▓▓ remedy for the warranties provided in Section 13 of this Agreement is repair or replacement of the FRU's by LEXMARK. If LEXMARK is unable to repair or replace the FRU's as warranted, ▓▓▓ shall be entitled to recover the price paid for the Product or Supply for any other claim concerning performance or nonperformance by LEXMARK pursuant to, and cover damages in any other way related to the subject matter of the Agreement, or any Purchase Order under the Agreement, ▓▓▓ shall be entitled to recover actual damages to the limits set forth in this Section.

19.3 LEXMARK'S liability for damages to ▓▓▓ for any cause whatsoever, except as otherwise stated in this Section, and regardless of the form of action, shall be limited to the lesser of 1) ▓▓▓ or 2) the applicable Unit Price for the specific units or Products that caused the damages or that are the subject matter of, or are directly related to, the cause of action. The foregoing limitation of liability will not apply to the payment of costs, damages and attorneys' fees referred to in Section 16.0 entitled "Patents and Copyrights" and claims for personal injury and tangible property damage .

19.4 In no event will either party be liable to the other for any damages for any lost profits, lost savings, incidental damages, or other consequential damages, regardless of the form of action, even if the party has been advised of the possibility of such damages.    In addition, neither party will be liable for any such claim by the other based on any third party claim, except as provided in Section 16.0 entitled "Patents and Copyrights". In addition, LEXMARK has no liability when Product is used in conjunction with nuclear materials or other extra-hazardous activities.

## SECTION 20.0        RELATIONSHIP OF THE PARTIES

Each party is an independent contractor and is not an agent of the other party for any purpose whatsoever ▓▓▓ agrees that it will not make any warranties or representations on LEXMARK's behalf, nor will it assume or create any other obligations on LEXMARK's behalf.

## SECTION 21.0        NOTICES

All notices required under this Agreement shall be in writing and sent postage prepaid to the other party's contract coordinators as set forth below:

16

CORPORATE PRICING AGREEMENT NUMBER ___
LEXMARK INTERNATIONAL INC. AGREEMENT NUMBER ___

FOR UNISYS                    FOR LEXMARK



Mr. Earl Wright
Lexmark International, Inc.
740 New Circle Road
Lexington, KY 40550

SECTION 22.0          PRODUCT WITHDRAWAL

LEXMARK reserves the right to discontinue production of any Product (not Supplies) at any time by giving ▓▓▓▓ written notice of Three (3) months. LEXMARK will ship Product and Supplies for Purchase Orders that LEXMARK accepted before the effective discontinuance date including Purchase Orders for delivery for an additional thirty (30) days after the discontinuance date. All such Purchase Orders may not be canceled or changed. LEXMARK agrees to provide periodic reviews as mutually agreed of plans relating to Product or Supplies.

SECTION 23.0          "LAST BUY" OF PRODUCT and SUPPLIES

LEXMARK agrees to offer to ▓▓▓▓ at the end of the Agreement period, or prior to discontinuance of production of a "last buy" of Product to meet ▓▓▓▓ requirements subject to Product availability The then current prices for these "last buy" Products and Supplies shall be the then current prices being charged to ▓▓▓▓ by Lexmark for the Products and Supplies as of the date such notice is issued.

SECTION 24.0          GENERAL PROVISIONS

24.1    This agreement shall be governed by the laws of the state of Delaware.
24.2    If any Section or subsection of this Agreement is found by competent authority to be invalid, illegal or unenforceable in any respect for any reason, the validity, legality and enforceability of any such Section or subsection in every other respect and the remainder of this Agreement shall continue in effect so long as it still expressed the intent of the parties. If the intent of the parties cannot be preserved, this Agreement shall be either renegotiated or terminated.
24.3    This Agreement may be modified only by a written Amendment duly signed by persons authorized to sign agreements on behalf of ▓▓▓▓ and LEXMARK and shall not be supplemented or modified by any course of dealing or trade usage. Variance from or additions to the terms and conditions of this Agreement in any Purchase Order or other written notification from ▓▓▓▓ or LEXMARK or Lexmark to ▓▓▓▓ will be of no effect. The term "this Agreement" as used herein includes any applicable Attachments, the referenced Confidential Disclosure Agreement and any future written Amendments made in accordance herewith or documents referred to herein.
24.4    All obligations and duties, which by their nature survive the expiration or termination of this Agreement, shall remain in effect beyond any expiration or termination.
24.5    Neither party shall assign this Agreement or any rights hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld, whereupon in the case of an assignment, the assignee shall assume this Agreement and shall automatically be deemed to have replaced the assignor for all purposes hereof. Seller may assign its accounts receivable under this Agreement to a third party financing organization.

17

CONFIDENTIAL - OUTSIDE COUNSEL ONLA3896

███████ CORPORATE PRICING AGREEMENT NUMBER ___
LEXMARK INTERNATIONAL INC. AGREEMENT NUMBER ___

24.6   Press releases and other like publicity or advertising which mentions the other party by name, shall be agreed upon by both parties in writing prior to any release.

24.7   The waiver by either party of any instance of the other party's noncompliance with any obligation or responsibility herein shall not be deemed a wavier of subsequent instances and either party's remedies for such noncompliance as described within.

24.8   Each party agrees to comply with all applicable federal, state and local laws, regulations and ordinances including, but not limited to, the regulations of the U.S. Government relating to the export of technical data, machines and commodities insofar as they relate to the activities to be performed under this Agreement. Each party agrees that machines, commodities, and technical data provided under this Agreement are subject to restrictions under the export control laws and regulations of the United States of America, including but not limited to the U.S. Export Administration Act and the U.S. Export Administration Regulations. Each party hereby gives its written assurance that neither technical data as provided under this Agreement, nor the direct Product or Supplies thereof, is intended to be shipped, directly or indirectly, to prohibited countries. Lexmark agrees it is responsible for obtaining required government documents and approvals, foreign or U.S., prior to export of any machine, commodity or technical data. ███████ shall require any subsidiary, dealer or remarketer of ███████ that buys a product from ███████ that ███████ purchases from LEXMARK under this Agreement to comply with all applicable foreign, federal, state and local laws, regulations and ordinances including, but not limited to, the regulations of the U.S. Government relating to the export of technical data, machines and commodities insofar as they relate to the activities to be performed under this Agreement.

18

CONFIDENTIAL - OUTSIDE COUNSEL ONA3897

██████ CORPORATE PRICING AGREEMENT NUMBER ___
LEXMARK INTERNATIONAL INC. AGREEMENT NUMBER ___

THE PARTIES ACKNOWLEDGE THAT EACH HAS READ THIS AGREEMENT AND ITS ATTACHMENTS, UNDERSTANDS THEM, AND AGREES TO BE BOUND BY THEIR TERMS AND CONDITIONS, FURTHER, THE PARTIES AGREE THAT THIS AGREEMENT, ITS ATTACHMENTS AND ANY REFERENCED CONFIDENTIAL DISCLOSURE AGREEMENTS ARE THE COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT BETWEEN THE PARTIES, WHICH SUPERSEDES ALL PROPOSALS OR ALL PRIOR AGREEMENTS, ORAL OR WRITTEN, AND ALL OTHER COMMUNICATIONS BETWEEN THE PARTIES RELATING TO THE SUBJECT MATTER HEREOF.

Agreed to:  LEXMARK INTERNATIONAL, INC.

By: _____

Name:  E.R. Noel

Title: VP & General Manager, OEM & Alliances
       PS&SD

Date: ___4/11/05_____

Agreed to: ████████████

By: ████████████

Nam █████████████

Title █████████████

Date: ___4/19/05_____

19

CONFIDENTIAL - OUTSIDE COUNSEL ONLY A3898

███████ CORPORATE PRICING AGREEMENT NUMBER ___
LEXMARK INTERNATIONAL INC. AGREEMENT NUMBER ___

20

█████ CORPORATE PRICING AGREEMENT NUMBER ___
LEXMARK INTERNATIONAL INC. AGREEMENT NUMBER ___

ATTACHMENT "A"
SPECIAL SUPPLIES TERMS
Product Offering: LEXMARK Use and Return program. (LURP)

1.1    LEXMARK will sell new toner cartridges to █████ either with regular terms, or as LURP toner cartridges subject to "use and return" license terms. If █████ elects to purchase the LURP toner cartridges, █████ also agrees to make available to its customers the toner cartridges with regular terms. The LURP license terms are an essential part of the LURP offering. For the LURP, the end user agrees with LEXMARK that this toner cartridge will be used one time only, and then returned only to LEXMARK. The LURP toner cartridge label, and its packaging, will instruct the user to return the LURP toner cartridge (after use) to LEXMARK's collection point.

1.2    █████ likewise agrees to comply with these license terms – to not resell, reuse, refill, or remanufacture a used LURP toner cartridge. If █████ does resell, reuse, refill, or remanufacture a used LURP cartridge, or if █████ in any way encourages or facilitates the reselling, reusing, refilling or remanufacturing of a used LURP toner cartridge by a third party, it may be subject to legal liability and termination of the this Agreement with LEXMARK.

1.3    LEXMARK agrees to submit language for customer brochures and other customer information for mutual approval to ensure requirements for LURP license terms are met.

1.4    Artwork for cartridge shipping cartons and labels shall be mutually agreed upon. Cartons will include shipping instructions for return to LEXMARK's collection point. Cartridge carton license label shall identify LURP licensor as "Developer" and the carton itself will display the words "Developed for █████ by LEXMARK International, Inc."

1.5    As █████ customers use cartridges, they will return empties as indicated below by one of two routes (and █████ agrees to so inform any customers inquiring of █████ how used cartridges are to be handled):

    a.    Return directly to LEXMARK's collection point via the prepaid shipping label on carton (U.S.), or by using country postal label placed inside carton (Europe).

2.0    PRODUCT OFFERING █████ branded Remanufactured Toner Cartridges and HP Compatible Cartridges. Following subsections describe the special terms and conditions that apply to the sale of █████ branded remanufactured and HP compatible toner cartridges.

2.1    The products are █████ branded remanufactured toner cartridges that are sold to be used only on █████ branded printers and other printers currently under an existing contract within the █████ customer base. Incidental sales of █████ branded toner cartridge which happen to be used on LEXMARK-branded printers will not be considered a breach of contract, as long as no █████ personnel or written materials are actively soliciting and promoting such sales. █████ will cease such selling in particular situations brought to █████ attention by LEXMARK. Remanufactured cartridges for each product family carry the same warranty as new LEXMARK manufactured toner cartridges with █████ logo.

2.2    █████ agrees that LEXMARK will be the sole source of all toner cartridge requirements supporting the LEXMARK manufactured █████ branded printers.

2.3    █████ agrees to provide a six (6) month non-binding rolling monthly forecast for all cartridges. Order lead-time is sixty (60) days from receipt of order within the range of most recent forecast. Orders must be placed in minimum order quantities.

21

CONFIDENTIAL - OUTSIDE COUNSEL ON A3900

████████ CORPORATE PRICING AGREEMENT NUMBER ___
LEXMARK INTERNATIONAL INC. AGREEMENT NUMBER ___

2.4    All artwork and labels shall be mutually agreed upon. Cartons will include shipping instructions for return to LEXMARK's collection point.

2.5    Channel Statement: All toner cartridges, new or remanufactured, which are supplied to ██████ by LEXMARK may only be resold though ██████ Direct to ██████ installed base. Exceptions must be approved by LEXMARK.

2.6    Product warranty: Limited warranty  (Attachment B.3.9).  LEXMARK's limited warranty is between LEXMARK and ████████████ must establish its own warranty with its customers.

2.7    All prices are FOB LEXMARK's plant of manufacture in U.S. dollars.

2.8    For purposes only of the Products covered in this Attachment B.3, the following changes to the Agreement terms apply:

22

CONFIDENTIAL - OUTSIDE COUNSEL ON|A3901

███ CORPORATE PRICING AGREEMENT NUMBER ___
LEXMARK INTERNATIONAL INC. AGREEMENT NUMBER ___

Reseller Name:       ███                           Date:_____

Address:      _____

City/State/Zip   _____

Phone:        _____    Submitter's Name:_____

*Replacement Requested:* **Yes**

| Part Number | Reason for Return | Qty |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

23

CONFIDENTIAL - OUTSIDE COUNSEL ON A3902

████████ CORPORATE PRICING AGREEMENT NUMBER ___
LEXMARK INTERNATIONAL INC. AGREEMENT NUMBER ___

## ATTACHMENT "B"

In the countries listed below, Seller has executed distribution contracts.  Buyer's request to distribute product in these areas must be reviewed separately.  The list can be updated by Seller on ninety (90) days notice.

ATTACHMENT B.1 –

| EUROPE | MIDDLE EAST | AFRICA | ASIA PACIFIC |
|---|---|---|---|
| Cyprus | Bahrain | South Africa | Korea |
| Romania | Kuwait | Algeria | India |
| Czech Republic | Iran | Morocco | China |
| CIS (all countries) | Iraq | Tunisia | |
| Poland | Qatar | Benin | |
| Turkey | Saudi Arabia | Burkina-Faso | |
| Slovakia | United Arab Emirates | Central African Republic | |
| | Israel | Chad | |
| | Egypt | Congo | |
| | Jordan | Djibouti | |
| | Lebanon | Equatorial Guinea | |
| | Libya | Gabon | |
| | Oman | Gambia | |
| | Sudan | Guinea | |
| | Syria | Ivory Coast | |
| | | Mali | |
| | | Mauritania | |
| | | Namibia | |
| | | Niger | |
| | | Senegal | |
| | | Togo | |
| | | Comores | |
| | | Madagascar | |
| | | Mauritius | |
| | | Mayotte | |
| | | Seychelles | |

24

CONFIDENTIAL - OUTSIDE COUNSEL ON A3903

█████ CORPORATE PRICING AGREEMENT NUMBER ___
LEXMARK INTERNATIONAL INC. AGREEMENT NUMBER ___

ATTACHMENT "C"
ENGINEERING CHANGE PROCEDURE

1.0    PURPOSE

This Attachment describes the guidelines to be followed when changes which are not safety changes (see Products Section) are made by Seller which impact the design of the Product.

2.0    DEFINITION

2.1    FORM - PRODUCT EXTERNAL APPEARANCE

2.2    FIT - PRODUCT INTERCHANGEABILITY

2.3    FUNCTION - PRODUCT SPECIFICATION AS DEFINED IN ATTACHMENT 1.0

2.4    MAINTAINABILITY - RELIABILITY, SERVICEABILITY, AND FIELD SUPPORT

2.5    CATEGORY 1 CHANGES - CHANGES WHICH AFFECT FORM, FIT, FUNCTION OR MAINTAINABILITY

2.6    CATEGORY 2 CHANGES - CHANGES WHICH DO NOT AFFECT FORM, FIT, FUNCTION OR MAINTAINABILITY.

3.0    PROCEDURE

3.1    CATEGORY 1 CHANGES - Buyer will be provided advanced notice, on a best effort basis, of changes that are Category 1 with the opportunity to influence the implementation of the change. Known details of the change will be provided at that time. Except in emergency production line down situations, this contact will be after Seller's engineering change review board meeting which formally initiates a change.    After Seller's EC Review Board, and prior to the Seller's Engineering Design Review Committee (EDRC) meeting, where the change is finalized, Buyer will have the final opportunity for input as to details of the change concerning the Product.    At that time, pertinent information concerning the EC will be provided including, nature of the change and justification of the change.    This information will be provided to Buyer no greater than thirty (30) days and no less than three (3) working days prior to the EDRC meeting.

To the extent practicable, Buyer's preferences will be taken into account and incorporated. However, due to the possible restrictions on the Printer and its follow-on versions, Seller reserves the final right to make any changes deemed necessary by Seller. In the event that Seller must make a change that affects the Buyer's Product in a manner that is contrary to Buyer's preferences, then Seller and Buyer will negotiate a mutually agreeable corrective action plan.    If a mutually agreeable plan cannot be achieved, then this Agreement will be terminated by mutual consent.

3.2    CATEGORY 2 CHANGES - Seller will make reasonable effort to notify Buyer of Category 2 changes.

25

██████████ CORPORATE PRICING AGREEMENT NUMBER ___
LEXMARK INTERNATIONAL INC. AGREEMENT NUMBER ___

3.3    FIELD CHANGE - Mandatory Field Engineering Changes may be required to correct design defects which cause the Product, in Seller's determination to meet the Product Specifications as listed in Attachment 1.0. On units of Product which have already been shipped, Seller may  designate Category 1 Engineering Changes, and any prerequisite or corequisite changes will be shipped free of charge to a single Buyer designated location and implemented in a manner similar to Safety Changes (see Products Section).

3.4    BUYER REQUESTED ENGINEERING CHANGES - Buyer may request changes in the Product and Seller agrees to either 1) Inform Buyer within sixty (60) days of such request, the price effect, the projected point of incorporation into production and the effect on maintenance, repair, and support of the Product of the requested engineering change, or 2) Inform Buyer of Seller's decision not to implement the requested engineering change.

If any change is made to the Product as a result of a request by Buyer or if Buyer makes any change to the Product, and any such change causes spare parts on order or spare parts in Buyer's inventory or Buyer's unique spare parts in Seller's inventory to become obsolete, Buyer shall, upon written notice from Seller, pay a reasonable amount to modify or replace the quantity desired by Seller within ninety (90) days after Seller's request so that such spare parts are compatible with the Product as changed. Buyer may request and shall pay for Field Change Order (FCO) kits, each including components, instructions and necessary materials to undertake modification of spare parts instead of having them modified or replaced by Seller. Buyer shall pay transportation costs and have the risk of loss, destruction or damage to the FCO Kits.

3.5    DOCUMENTATION - Seller shall provide Buyer with documentation covering Category 1 Engineering Changes.

26

CONFIDENTIAL - OUTSIDE COUNSEL ONlA3905

████████ CORPORATE PRICING AGREEMENT NUMBER ___
LEXMARK INTERNATIONAL INC. AGREEMENT NUMBER ___

ATTACHMENT "D"
Patent Country Listing

| Europe | Middle East | Africa | Asia | North America | South America | Central America |
|--------|-------------|--------|------|---------------|---------------|-----------------|
| Austria | | Angola | Australia | Canada | All countries | All countries |
| Belgium | | Cameroon | Hong Kong | Puerto Rico | | |
| Denmark | | Ethiopia | Indonesia | USA | | |
| Finland | | Ghana | Japan | | | |
| France | | Kenya | Malaysia | | | |
| Germany | | Malawi | New Zealand | | | |
| Greece | | Nigeria | Pakistan | | | |
| Hungary | | Reunion | Singapore | | | |
| Holland | | Sierra Leone | Sri Lanka | | | |
| Iceland | | Tanzania | Thailand | | | |
| Ireland | | Uganda | Taiwan | | | |
| Italy | | Zaire | | | | |
| Norway | | Zambia | | | | |
| Russia | | Zimbabwe | | | | |
| Spain | | | | | | |
| Sweden | | | | | | |
| Switzerland | | | | | | |
| United Kingdom | | | | | | |

27

CONFIDENTIAL - OUTSIDE COUNSEL ON A3906

# CONTRACT APPROVAL REQUEST

| Date Originated 4/11/2005 | Originator | Organization | Location | Telephone |
|---|---|---|---|---|
| Supplier Lexmark | | Product or Service OEM Printers and Consumables | | Agreement Type Corporate Pricing |
| Actual Commitment | Volume | | Total Commitment | Volume |

Description of Purchase Commitment and Explanation:

Approval is request to enter into an agreement with Lexmark to replace the original ██████ agreement with IBM dated July 1, 1990. This agreement is to distribute/resell ████ branded product and supplies. The net prices from Lexmark to ████ for the ████ branded LEXMARK Supplies will be ████ below best distributor pricing ("BDP"). The net price for ████ branded Lexmark Products will be ████ below BDP for each product, with price discounts greater than ████ below BDP when justified by a business case analysis for each Product. Lexmark agrees to offer such ████ branded Supplies to ████ for purchase for ████, after the Marketing withdrawal of Printers. This agreement specifically supports ████ Direct.

Please signify your acceptance or rejection in the appropriate box below and initial and date.

| Name / Organization | Initials | Date | Remarks |
|---|---|---|---|
| Procurement Originator Maria Leidy ☑ Approved  ☐ Disapproved | _ML_ | 4/11/05 | |
| ████ ☑ Approved  ☐ Disapproved | | 4/13/05 | |
| ████ ☐ Approved  ☐ Disapproved | | 4/13 | |
| ████ ☑ Approved  ☐ Disapproved | | 4/15/05 | |
| ████ ☑ Approved  ☐ Disapproved | | 4/13/05 | |

The above signature of the Vice President of Global Procurement authorizes the warranted originator to sign the agreement on behalf of ████ if not signed by the Vice President of Global Procurement.

RETURN TO ORIGINATOR UPON COMPLETION

CONFIDENTIAL - OUTSIDE COUNSEL ONLY    A3907