No. 2014-1617

# United States Court of Appeals
## for the Federal Circuit

---

### LEXMARK INTERNATIONAL, INC.,

*Plaintiff-Cross-Appellant*

v.

### IMPRESSION PRODUCTS, INC.,

*Defendant-Appellant*

(*Caption Continued on Inside Cover*)

---

*Appeal from the United States District Court for the Southern District of Ohio,
Case No. 10-CV-564, Judge Michael R. Barrett*

---

## BRIEF OF *AMICUS CURIAE*
## AMERICAN INTELLECTUAL PROPERTY LAW ASSOCIATION
## IN SUPPORT OF NEITHER PARTY

---

LISA K. JORGENSON
*Executive Director*
AMERICAN INTELLECTUAL PROPERTY
LAW ASSOCIATION
241 18th Street South, Ste. 700
Arlington, Virginia 22202
703.415.0480

KRISTIN L. YOHANNAN
  *Counsel of Record*
TIHUA HUANG
DOUGLAS A. BEHRENS*
CADWALADER, WICKERSHAM &
TAFT LLP
700 Sixth Street, N.W.
Washington, D.C. 20001
202.862.2200

*Counsel for Amicus Curiae
American Intellectual Property
Law Association*

June 5, 2015

*admission pending

**QUALITY CARTRIDGES, INC., JOHN DOES, 1-20, BLUE TRADING LLC,
EXPRINT INTERNATIONAL, INC., LD PRODUCTS, INC.,
PRINTRONIC CORPORATION, TESEN DEVELOPMENT (HONG KONG) CO. LTD.,
AND BENIGNO ADEVA AND HIS COMPANIES,**

*Defendants.*

## <u>CERTIFICATE OF INTEREST</u>

Pursuant to Fed. Cir. R. 47.4 and Fed. R. App. P. 26.1, counsel for the

*Amicus Curiae* the American Intellectual Property Law Association certifies the

following:

1.     The full name of every party represented by me is: **American**

**Intellectual Property Law Association**.

2.     The name of the real party in interest represented by me is: **N/A**.

3.     All parent corporations and any publicly held companies that own 10

percent or more of the stock of the parties represented by me are: **NONE**.

4.     The names of all law firms and the partners or associates that

appeared for the party now represented by me and that are expected to appear in

this court are:

Cadwalader, Wickersham & Taft LLP – Kristin L. Yohannan, Tihua Huang,

Douglas A. Behrens

American Intellectual Property Law Association – Lisa K. Jorgenson

/s/ *Kristin L. Yohannan*

Kristin L. Yohannan
CADWALADER, WICKERSHAM & TAFT LLP
700 Sixth Street, N.W.
Washington, D.C.  20001
Telephone:  202.862.2200

*Counsel of Record for Amicus Curiae*
*American Intellectual Property*
*Law Association*

# TABLE OF CONTENTS

**PAGE**

CERTIFICATE OF INTEREST ................................................................. i

TABLE OF AUTHORITIES ..................................................................... iv

STATEMENT OF INTEREST OF *AMICUS CURIAE* ................................. 1

SUMMARY OF THE ARGUMENT ............................................................. 2

ARGUMENT ............................................................................................. 4

I.     THIS COURT SHOULD NOT OVERRULE *JAZZ PHOTO*'S
BAR ON INTERNATIONAL PATENT EXHAUSTION ................. 4

      A.     *Kirtsaeng* Is Not Controlling Precedent For Patent
Exhaustion ................................................................... 4

      B.     The Significant Differences Between The Patent And
Copyright Acts Require Different Judicial Treatment For
Exhaustion ................................................................... 8

      C.     Overruling *Jazz Photo* Would Require A Change In
Foreign Policy That Only Congress Should Effect ................. 12

      D.     Upholding *Jazz Photo* Is Consistent With Public Policy ........ 15

II.     THIS COURT SHOULD NOT OVERRULE *MALLINCKRODT*
BECAUSE IT FOLLOWS SUPREME COURT PRECEDENT ....... 17

      A.     The Federal Circuit's Treatment Of The Patent
Exhaustion Doctrine Is Consistent With Supreme Court
Precedent ................................................................... 17

**PAGE**

B. *Quanta* Did Not Explicitly Overrule *Mallinckrodt* ................. 23

C. *Quanta* Did Not Implicitly Overrule *Mallinckrodt* ................. 24

D. Enforcing Properly Conditioned Sales Or Licenses
Makes Good Policy Sense ........................................................ 26

CONCLUSION ........................................................................................... 30

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# <u>TABLE OF AUTHORITIES</u>

<u>PAGE(S)</u>

## <u>CASES:</u>

*Adams v. Burke,*
　　84 U.S. (17 Wall.) 453 (1873) .................................................... 18, 26-27

*B. Braun Med., Inc. v. Abbott Labs.,*
　　124 F.3d 1419 (Fed. Cir. 1997) .................................................. 19-20, 29

*Bloomer v. McQuewan,*
　　55 U.S. (14 How.) 539 (1852) .............................................................. 21

*Bobbs-Merrill Co. v. Straus,*
　　210 U.S. 339 (1908)................................................................................ 7

*Boesch v. Graff,*
　　133 U.S. 697 (1890)................................................................................ 6

*Bowman v. Monsanto,*
　　133 S. Ct. 1761 (2013)......................................................................... 29

*Brown v. Duchesne,*
　　60 U.S. (19 How.) 183 (1856) .......................................................... 11-12

*Gen. Talking Pictures Corp. v. W. Elec. Co.,*
　　305 U.S. 124 (1938)..................................................................... 20, 22-23

*Int'l Rectifier Corp. v. Samsung Elecs. Co.,*
　　361 F.3d 1355 (Fed. Cir. 2004) ............................................................ 12

*Jazz Photo Corp. v. Int'l Trade Comm'n,*
　　264 F.3d 1094 (Fed. Cir. 2001) .................................................... 2, 6, 8, 9

*John D. Park & Sons Co. v. Hartman,*
　　153 F. 24 (6th Cir. 1907) ..................................................................... 6-7

**PAGE(S)**

*Kirtsaeng v. John Wiley & Sons, Inc.*,
    133 S. Ct. 1351 (2012)........................................................................ 2, 5

*Lexmark Int'l, Inc. v. Ink Techs. Printer Supplies*,
    9 F. Supp. 3d 830 (S.D. Ohio 2014) ........................................... 7

*LifeScan Scot., Ltd. v. Shasta Techs., LLC*,
    734 F.3d 1361 (Fed. Cir. 2013) ................................................. 7

*Mallinckrodt, Inc. v. Medipart, Inc.*,
    976 F.2d 700 (Fed. Cir. 1992) ........................................... *passim*

*Mitchell v. Hawley*,
    83 U.S. (16 Wall.) 544 (1872) ...................................... 20-21, 22

*Motion Picture Patents Co. v. Universal Film Mfg. Co.*,
    243 U.S. 502 (1917)...................................................... 20, 21

*Quanta Computer, Inc. v. LG Electronics, Inc.*,
    553 U.S. 617 (2008)......................................................... *passim*

*U.S. v. G.E. Co.*,
    272 U.S. 476 (1926).......................................... 17, 18-19, 26

*U.S. v. Univis Lens Co.*,
    316 U.S. 241 (1942)............................................... 18, 21-22

**STATUTES & OTHER AUTHORITIES:**

17 U.S.C.:
    § 106 .................................................................... 9-10
    § 109(a) ................................................................. 4, 9

**PAGE(S)**

35 U.S.C.:
  § 154(a)(1) ........................................................................ 18
  § 271(a) ........................................................................... 11
  § 271(f) ........................................................................... 11
  § 271(g) ........................................................................... 11

Patent Act of April 10, 1790, 1 Stat. 109 .................................... 10

Patent Act of July 4, 1836, 5 Stat. 117 ....................................... 10

Patent Act of July 8, 1870, 16 Stat. 198 ..................................... 10

Patent Act of July 19, 1952, 66 Stat. 792 ................................... 11

Paris Convention for the Protection of Industrial Property,
  Mar. 20, 1883, 21 U.S.T. 1583,
  revised, July 14, 1967, 6 I.L.M. 806 ...................................... 13

Agreement on Trade-Related Aspects of Intellectual Property Rights,
  Apr. 15, 1994, 33 I.L.M. 1197 ............................................... 13

Morocco Free Trade Agreement, U.S.-Morocco,
  June 15, 2004, 44 I.L.M. 544 ................................................ 14

Frederick M. Abbott, *First Report (Final) to the Committee
  on International Trade Law of the International Law
  Association on the Subject of Parallel Importation*,
  1 J. INT'L ECON. L. 607 (1998) ......................................... 15-16

Carl Baudenbacher, *Trademark Law and Parallel Imports in a
  Globalized World – Recent Developments in Europe with
  Special Regard to the Legal Situation in the United States*,
  22 FORDHAM INT'L L.J. 645 (1999) ....................................... 13

**PAGE(S)**

Vincent Chiappetta, *The Desirability of Agreeing to Disagree:*
   *The WTO TRIPS, International IPR Exhaustion and*
   *a Few Other Things*, 21 MICH. J. INT'L L. 333 (2000) ...................... 12, 14

*Discussion After the Speeches of Joseph Papovich and Allen Hertz*,
   23 CAN.-U.S. L.J. 327 (1997) ................................................................ 14

2 David Epstein, *Eckstrom's Licensing in Foreign and*
   *Domestic Operations* (2015) .................................................................. 27

Ben Hirschler, *J&J Says it Won't Enforce AIDS Drug Patent in Africa*,
   REUTERS (Nov. 29, 2012), http://www.reuters.com/article/2012/11/
   29/us-aids-jj-africa-idUSBRE8AS0PN20121129 .................................. 15

*NIH: Moving Research from the Bench to the Bedside – Hearings*
   *Before the Subcomm. on Health of the H.R. Comm. on Energy*
   *and Commerce*, 108th Cong. 46 (2003), http://www.gpo.gov/
   fdsys/pkg/CHRG-108hhrg88429/pdf/CHRG-108hhrg88429.pdf...... 28-29

## STATEMENT OF INTEREST OF *AMICUS CURIAE*

The American Intellectual Property Law Association is a national bar association of approximately 15,000 members who are primarily lawyers engaged in private or corporate practice, in government service, and in the academic community.  AIPLA members represent a wide and diverse spectrum of individuals, companies, and institutions involved directly or indirectly in the practice of patent, trademark, copyright, trade secret, and unfair competition law, as well as other fields of law affecting intellectual property.  Our members represent both owners and users of intellectual property.[1]  Our mission includes providing courts with objective analysis to promote an intellectual property system that stimulates and rewards invention while balancing the public's interest in healthy competition, reasonable costs, and basic fairness.[2]

---

[1]  AIPLA states that this brief was not authored in whole or in part by counsel to a party, and that no monetary contribution to the preparation or submission of this brief was made by any person or entity other than AIPLA and its counsel. Specifically, after reasonable investigation, AIPLA believes that (i) no member of its Board or Amicus Committee who voted to file this brief, or any attorney in the law firm or corporation of such a member, represents a party to this litigation in this matter; (ii) no representative of any party to this litigation participated in the authorship of this brief; and (iii) no one other than AIPLA, or its members who authored this brief and their law firms or employers, made a monetary contribution to the preparation or submission of this brief.

[2]  This brief is filed upon the invitation of the Court for *amicus* briefs as stated in the April 14, 2015 *en banc* briefing order.  *See* ECF No. 83.

# SUMMARY OF THE ARGUMENT

This case presents two fundamental but distinct questions on the doctrine of patent exhaustion.  First, whether *Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S. Ct. 1351 (2012) overruled *Jazz Photo Corp. v. International Trade Commission*, 264 F.3d 1094 (Fed. Cir. 2001) to the extent *Jazz Photo* held that a sale of a patented item outside the United States never gives rise to U.S. patent exhaustion.  Second whether *Quanta Computer, Inc. v. LG Electronics, Inc.*, 553 U.S. 617 (2008) overruled *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700 (Fed. Cir. 1992) to the extent *Mallinckrodt* held that a sale of a patented article, made under an otherwise lawful restriction, does not give rise to patent exhaustion.

As to the first question, *Kirtsaeng* does not compel this Court to overturn its long-standing, common law precedent for at least four reasons.  First, *Jazz Photo* is a patent case addressing the issue of patent exhaustion, whereas *Kirtsaeng* is a copyright case that interprets a copyright statute setting out the rights of an owner of a copy under the copyright "first sale" doctrine.  *Kirtsaeng* therefore is not controlling precedent.  Second, the Patent and Copyright Acts are teeming with differences, ranging from the requirements to obtain protection to the enforcement mechanisms offered.  These differences require each statute to be analyzed separately and suggest the exercise of caution against readily applying copyright precedent to patent issues.  Third, Congress' resources and proficiency in

international relations make it better positioned than the judiciary to weigh the relevant issues in this matter and to assess their effect on U.S. foreign policy. Finally, upholding the common law rule against international patent exhaustion is consistent with numerous public policy goals, such as ensuring access to patented pharmaceutical, medical, and agricultural products in developing nations.

As to the second issue, the Supreme Court's decision in *Quanta* that sale limitations contained in a Master Agreement rather than in a patent license failed to avoid patent exhaustion requires no change to the Federal Circuit's jurisprudence about conditional sales under *Mallinckrodt*. First, the holding of *Mallinckrodt*, recited nothing more than the historical norm. The Supreme Court has long recognized that patentees and their contracting parties should be free to sell products or enter into licenses that reflect the bargain they have reached for the particular rights they wish to offer and accept. Faithful to Supreme Court precedent, *Mallinckrodt* held that an expressly conditional sale or license of a patented product does not exhaust all rights conferred by the patent covering that product. Second, *Quanta* did not mention, much less overrule, *Mallinckrodt*. Third, and more to the point, *Quanta* purposefully distinguished cases that involved effective conditional sales, thus, the Court confirmed that only unrestrictive sales exhaust patent rights. Finally, the Federal Circuit's conditional sale jurisprudence is also supported by sound policy and economics. Nothing in

either the patent statute or in judicial decisions suggests that a patentee parts with all patent rights in the first sale of a patented article if the transfer is explicitly restricted in a way that does not violate other substantive law.  The realities of the market and the nature of patented rights also require flexible sale and licensing arrangements.  A patent system that allows for more flexibility will not only facilitate innovation but also will produce efficient commercial results.

To ensure the effective use of intellectual property and the adequate protection of patent rights, AIPLA urges this Court to reaffirm its precedent on U.S. patent exhaustion and on conditional sales and license agreements containing lawful conditions.

## **ARGUMENT**

## I.   **THIS COURT SHOULD NOT OVERRULE *JAZZ PHOTO*'S BAR ON INTERNATIONAL PATENT EXHAUSTION**

### A.   ***Kirtsaeng* Is Not Controlling Precedent For Patent Exhaustion**

The Supreme Court's interpretation of Section 109(a) of the Copyright Act in *Kirtsaeng* announced a rule of international exhaustion for copyrights only. Section 109(a), which reflects the first sale doctrine, grants the owner of a particular copy "lawfully made under this title" the right to dispose of that copy without the copyright owner's permission.  17 U.S.C. § 109(a).

The *Kirtsaeng* decision found no geographical limitation in the statutory phrase "lawfully made under this title" or in the statute's history and in its common law development. The Court compared Section 109(a)'s language with that of its pre-amendment predecessor and found that the amendment reflected in Section 109(a) provided no indication that Congress sought to introduce a geographic restriction into Section 109(a). *Kirtsaeng*, 133 S. Ct. at 1360-61.

The Court examined the common law development of the first sale doctrine, noting the presumption that Congress intended to preserve the common law's substance when it is codified by statute. *Id.* at 1363. The Court traced the first sale doctrine's "impeccable historic pedigree" back to Lord Coke's 17th-century refusal to allow restraints on the alienation of chattel. *Id.* Finding no geographic restriction in either the Court's last decision before the Copyright Act's 1909 codification or Section 109(a)'s predecessor, the Court determined that Lord Coke's principles were still followed at the time of codification.

Absent from the Court's *Kirtsaeng* opinion on Section 109(a)'s scope is an analysis of patent exhaustion, and rightfully so as the case dealt with a copyright-specific question. The Court did not refer to the Patent Act or to any of its provisions, either directly or by analogy. Nor did it suggest in any way that its holding should be applied outside the context of the Copyright Act.

In contrast, *Jazz Photo* directly addressed international patent exhaustion. Most of the opinion distinguished between permissible repair and prohibited reconstruction of a patented product, but it turned to patent exhaustion to decide whether the patentee's right to block certain imports was lost as a result of foreign sales and patent exhaustion.  *Jazz Photo*, 264 F.3d at 1105.

> United States patent rights are not exhausted by products of foreign provenance.  To invoke the protection of the first sale doctrine, the authorized first sale must have occurred under the United States patent.

*Id.* (citing *Boesch v. Graff*, 133 U.S. 697, 701-03 (1890)).  This ruling announced a doctrine of *national* patent exhaustion.  In applying this doctrine, the Federal Circuit concluded, "[i]mported [products] of solely foreign provenance are not immunized from infringement of United States patents."  *Id*.  The rules governing exhaustion for patents, therefore, stand in stark contrast with the copyright first sale doctrine announced in *Kirtsaeng*.

Not only does *Kirtsaeng* interpret copyright law's first sale doctrine instead of patent law's exhaustion doctrine, but it is clear that copyright cases are not controlling for patent issues, and vice versa.  Support for the distinction between copyright and patent law dates back to at least 1907, when the Sixth Circuit recognized:

> There are such wide differences between the right of multiplying and vending copies of a production protected by the copyright statute and the rights secured to an

> inventor under the patent statutes that the cases which
> relate to the one subject are not altogether controlling as
> to the other.

*John D. Park & Sons Co. v. Hartman*, 153 F. 24, 28 (6th Cir. 1907).  The Supreme

Court endorsed this distinction between patents and copyrights the following year,

stating:

> If we were to follow the course taken in the argument,
> and discuss the rights of a patentee, under letters patent,
> and then, by analogy, apply the conclusions to
> copyrights, we might greatly embarrass the consideration
> of a case under letters patent, when one of that character
> shall be presented to this court.

*Bobbs-Merrill Co. v. Straus*, 210 U.S. 339, 345 (1908).  The Federal Circuit also

recently confirmed that, although copyright cases can reinforce conclusions

regarding patent law, they are not "controlling."  *LifeScan Scot., Ltd. v. Shasta

Techs., LLC*, 734 F.3d 1361, 1375-76 (Fed. Cir. 2013).  Therefore, even if

*Kirtsaeng* discussed patent exhaustion—which it did not—it still would not be

controlling precedent for patent issues.

   More is required before this Court should radically alter its precedent on the

basis of nothing more than an alleged *sub silentio* reversal of *Jazz Photo* by

*Kirtsaeng*.  *Lexmark Int'l, Inc. v. Ink Techs. Printer Supplies*, 9 F. Supp. 3d 830,

835-36 (S.D. Ohio 2014).  Retreat from a well-reasoned common law doctrine is

not warranted absent a more explicit directive from the Supreme Court.

### B.    The Significant Differences Between The Patent And Copyright Acts Require Different Judicial Treatment For Exhaustion

Patent law contains no analogous provision to Section 109(a) of the Copyright Act, the statutory interpretation of which formed the foundation for the Court's opinion in *Kirtsaeng*.  Instead of a statutory provision, patent exhaustion is a creature of judge-made common law.  *Jazz Photo*, 264 F.3d at 1105.  The common law on this issue has continued to evolve over the last century, something that the first sale doctrine could not do because the Copyright Act codified Lord Coke's principles in 1909.  *Jazz Photo* and its progeny introduced national patent exhaustion later in the 20th century and represent an integral part of the evolution.  Transporting an analysis of copyright's first sale doctrine, which is frozen in 1909, to the still-evolving law of patent exhaustion is incongruous.  This is especially so because revising the patent laws did not provide Congress the opportunity to address the common law doctrine of patent exhaustion in the same way amending the Copyright Act afforded it the chance to change copyright's first sale provision.

There are also significant differences in the legal protections offered by the patent and copyright laws that countenance against uniform treatment on the issue of exhaustion.  A copyright exists in any country once fixed in a tangible medium.  Because of this framework, the rights arise from the work itself.  Patent protection, however, is not even available in every country.  The scope of protection for a

patent's claims vary widely depending on the jurisdiction. Copyrights are also spared from the jurisdiction-specific examination process that patent applications must undergo in most countries.

Moreover, the doctrines of first sale and patent exhaustion are not directly aligned. Section 109(a) conveys certain rights to *buyers/owners* of a copy of a copyrighted work. 17 U.S.C. § 109(a) ("owner of a particular copy . . . lawfully made . . . is entitled, without the authority of copyright owner, to sell or otherwise dispose of the possession of that copy"). In contrast, patent exhaustion evaluates whether the *patentee* (not the purchaser) has been adequately compensated by the sale of her invention. *Jazz Photo*, 264 F.3d at 1105 (exhaustion of patent right depends on whether patentee has received reward for use of article upon sale). The rationale for a statutory provision protecting the rights of downstream users of intellectual property is unlikely to be analogous to a common law doctrine ensuring proper compensation for the producer of intellectual property. This Court should avoid adopting carte blanche the analysis of a statutory provision that is not parallel to that of patent exhaustion.

In addition to the substantives difference between the two doctrines, territoriality in patent statutes has "an impeccable historic pedigree" of its own that does not favor a scheme of international exhaustion. The history of territoriality distinguishes patent law from the Copyright Act, whose provision granting

exclusive rights is silent on geographic restrictions.  17 U.S.C. § 106.  Contrary to the Copyright Act, as early as 1790, Congress specifically included a geographic restriction on infringement in the patent laws.  Patent Act of April 10, 1790, ch. 7, § 4, 1 Stat. 109, 111 ("That if any person or persons shall devise . . . or vend *within these United States*, any art, manufacture, engine, machine or device . . . the sole and exclusive right of which shall be so as aforesaid granted by patent to any person or persons . . . without the consent of the patentee . . . every person so offendin[g] shall forfeit and pay to the said patentee . . . such damages as shall be assessed by a jury.") (emphasis added).  Congress removed this provision in 1836, but the law continued to restrict assignments of exclusive rights to the territorial boundaries of the United States.  Patent Act of July 4, 1836, ch. 357, § 11, 5 Stat. 117, 121.  In the 1870 amendments, Congress reinserted the geographic limitation on infringement.  Patent Act of July 8, 1870, ch. 230, § 22, 16 Stat. 198, 201 ("[E]very patent shall . . . grant to the patentee, his heirs or assigns, for the term of seventeen years, of the exclusive right to make, use, and vend the said invention or discovery *throughout the United States and the Territories thereof*.") (emphasis added).  Removing the territoriality requirement and then unequivocally adding it back in demonstrates Congress' intent that the patent laws be geographically confined within the borders of the United States.

Congress' commitment to territoriality has not waivered since. Both the Patent Act of 1952 and the America Invents Act place geographic restrictions on the patentee's right to exclude. Patent Act of July 19, 1952, ch. 950, § 271(a), 66 Stat. 792, 811; 35 U.S.C. § 271(a). Other sections of the Patent Act also reinforce patent law's territorial limitation. Section 271(f), for example, creates liability for entities who supply *from the United States* certain uncombined components of a patented invention in a way that induces their combination in a manner that would be infringing if it occurred within the United States. 35 U.S.C. § 271(f). Section 271(g) contemplates liability for importing *into the United States* a product made abroad by a process patented in the United States. 35 U.S.C. § 271(g).

Courts have also recognized patent law's territorial limits for over a century. Beginning in 1856, the Supreme Court noted the geographic boundaries of patent law's reach: "The power thus granted [by the Constitution to establish the patent laws] is domestic in its character, and necessarily confined within the limits of the United States." *Brown v. Duchesne*, 60 U.S. (19 How.) 183, 195 (1856). With this understanding, the Court noted that the patentee could not recover from the defendant because the accused sailing rig was installed on a French vessel in France and was not in use while the ship was docked in Boston:

> [T]hese acts of Congress do not, and were not intended to, operate beyond the limits of the United States; and as the patentee's right of property and exclusive use is derived from them, they cannot extend beyond the limits

> to which the law itself is confined.  And the use of it
> outside of the jurisdiction of the United States is not an
> infringement of his rights, and he has no claim to any
> compensation for the profit or advantage the party may
> derive from it.

*Id.* at 195-96; *see Int'l Rectifier Corp. v. Samsung Elecs. Co.*, 361 F.3d 1355, 1360

(Fed. Cir. 2004) (reinforcing lack of extraterritorial effect).

If a claim of infringement of a U.S. patent does not apply to extraterritorial

uses, and the patentee is not entitled to receive a royalty under the U.S. patent for a

non-U.S. sale, then an extraterritorial sale by the patentee cannot eviscerate its U.S.

patent rights by triggering exhaustion.  The Court in *Jazz Photo* recognized this

injustice when it held that sales of foreign provenance did not affect U.S. patent

rights.  Given Congress' longstanding support of patent territoriality, now is not

the time to change course.

### C. Overruling *Jazz Photo* Would Require A Change In Foreign Policy That Only Congress Should Effect

For years, the United States has staunchly advocated against international

exhaustion in international agreements, often overcoming stiff resistance.  Vincent

Chiappetta, *The Desirability of Agreeing to Disagree: The WTO, TRIPS,*

*International IPR Exhaustion and a Few Other Things*, 21 MICH. J. INT'L L. 333,

350-51 (2000).  But international exhaustion would be viable if this Court were to

overrule *Jazz Photo*.

In the late 19th century, the United States acceded to the Paris Convention for the Protection of Industrial Property, which is one of the most widely adopted treaties in intellectual property. The Paris Convention contains a provision explicitly retaining national patent rights:

> When a product is imported into a country of the Union where there exists a patent protecting a process of manufacture of the said product, the patentee shall have all the rights, with regard to the imported product, that are accorded to him by the legislation of the country of importation. . . .

Paris Convention for the Protection of Industrial Property, art. 5*quater*, Mar. 20, 1883, 21 U.S.T. 1583, revised, July 14, 1967, 6 I.L.M. 806. Indeed, the issue of exhaustion became so contentious during certain international negotiations that the countries included a provision memorializing their inability to reach a consensus. Agreement on Trade-Related Aspects of Intellectual Property Rights, art. 6, Apr. 15, 1994, 33 I.L.M. 1197 ("For the purposes of dispute settlement . . . nothing in this Agreement shall be used to address the issue of the exhaustion of intellectual property rights."); Carl Baudenbacher, *Trademark Law and Parallel Imports in a Globalized World – Recent Developments in Europe with Special Regard to the Legal Situation in the United States*, 22 FORDHAM INT'L L.J. 645, 677 n.135 (1999) (noting strong negative reaction to Australia and New Zealand's legislation favoring parallel imports).

The United States takes the same stance on exhaustion in regional and bilateral agreements.  In negotiations on the North American Free Trade Agreement, the United States defeated Mexico's proposal seeking regional exhaustion for NAFTA members.  Instead, the agreement leaves exhaustion as a question for national law—which in the United States is based on national exhaustion.  Chiappetta, *supra*, at 354-55; *Discussion After the Speeches of Joseph Papovich and Allen Hertz*, 23 CAN.-U.S. L.J. 327, 329-30 (1997).  The United States also frequently insists on provisions guaranteeing national exhaustion of intellectual property rights in its bilateral agreements.  *See, e.g.*, Morocco Free Trade Agreement, U.S.-Morocco, art. 15.9(4), June 15, 2004, 44 I.L.M. 544 ("Each Party shall provide that the exclusive right of the patent owner to prevent importation of a patented product, or a product that results from [a] patented process, without the consent of the patent owner shall not be limited by the sale or distribution of that product outside its territory.").

A decision by this Court overruling *Jazz Photo* has the potential to undo more than a century's worth of precedent in the position that the United States consistently takes in international treaties.  Such a seismic shift in diplomacy and trade should be left to Congress, if such a shift is warranted.[3]  International

---

[3]  It is also worth noting that nothing in *Jazz Photo* limits a party's freedom to contract, for example, via worldwide cross-licenses.

diplomacy is not the role of this Court, nor is it in a position to appropriately evaluate the potential impact on the United States. Therefore, the Court should refrain from overruling *Jazz Photo* and disturbing the status quo.

### D.    Upholding *Jazz Photo* Is Consistent With Public Policy

A decision of this Court overruling *Jazz Photo* would radically alter the behavior of multi-national corporations and would cast into doubt the ability of people in developing nations to access patented pharmaceutical, agricultural, and medical products. Companies are willing to supply patented products at steep discounts in these countries partly because the products cannot be reimported into higher-priced markets where the product is patented without the patentee's consent. Ben Hirschler, *J&J Says it Won't Enforce AIDS Drug Patent in Africa*, REUTERS (Nov. 29, 2012), http://www.reuters.com/article/2012/11/29/us-aids-jj-africa-idUSBRE8AS0PN20121129 (reporting Johnson & Johnson's decision not to enforce patent on its HIV drug in Africa and instead to partner with company to offer drug at discount). Without this protection, companies would likely be forced to either charge the same price to all consumers worldwide or not offer the product in developing nations at all, neither of which is desirable. Frederick M. Abbott, *First Report (Final) to the Committee on International Trade Law of the International Law Association on the Subject of Parallel Importation*, 1 J. INT'L ECON. L. 607, 619 (1998).

International exhaustion could also undermine a patentee's ability to ensure product quality, as well as pre- and post-sale services. *Id.* at 629. For example, imagine a customer seeking to profit from the differential prices between Thailand and the United States for a patented pharmaceutical. The customer purchases large quantities of the drug at cheaper prices in Thailand and imports them into the United States for resale. If the customer failed to store and ship the drug at the proper temperature, this could harm people and the public would blame the patentee. This represents a significant threat to public welfare not present in the copyright context, and therefore not considered by the Court in *Kirtsaeng*. Maintaining a scheme of national exhaustion for patents would continue to prevent the resale gamesmanship and accompanying health risks that can arise when patented products are offered at differential prices in various markets.

In sum, given patent law's "impeccable historic pedigree" of territoriality, it is logical for a U.S. patent to be exhausted only by a sale that would otherwise give rise to infringement of the U.S. patent—*i.e.*, a sale within the United States. The patentee in this situation exercises her right *under the U.S. patent* and receives just reward for her invention. This is well-settled law. Why, though, should a patentee's decision to avail herself of the very different German patent laws by selling her patented product in Germany under a German patent strip the patentee of her U.S. patent rights? She has exercised no rights under the U.S. patent

through the German sale and received no compensation from the U.S. patent. This Court in *Jazz Photo* recognized the fundamental unfairness that international patent exhaustion would impose on patentees. It should continue to stand by this well-reasoned precedent.

## II.   THIS COURT SHOULD NOT OVERRULE *MALLINCKRODT* BECAUSE IT FOLLOWS SUPREME COURT PRECEDENT

### A.   The Federal Circuit's Treatment Of The Patent Exhaustion Doctrine Is Consistent With Supreme Court Precedent

There is no conflict between *Mallinckrodt* and the Supreme Court's patent exhaustion precedent. The Court has for many years instructed that upon the first *authorized* sale—by the patent owner or by a licensee—of a patented article, the patent owner's statutory right to exclude is exhausted as to that article. *U.S. v. G.E. Co.*, 272 U.S. 476, 489 (1926). As a result of this first sale, any subsequent use or sale of the patented article is not an infringement of the corresponding patent. *Id*. The rationale underlying the exhaustion doctrine is that the patent owner, having received due consideration, passes full title to the purchaser and ceases to have rights in the future use or distribution of the invention. The Supreme Court, however, has never held that rights specifically withheld in a transaction were nonetheless transferred and exhausted.

Drawing on earlier Supreme Court precedent, *Mallinckrodt* held that an unauthorized sale or conditional sale can bar patent exhaustion. *Mallinckrodt*, 976

F.2d at 703.  The fundamental teaching of *Mallinckrodt* is that a patent owner may place restrictions on a license or sale and can enforce such restrictions with patent infringement claims, as long as these restrictions are within the scope of the patent grant and do not contravene another body of law.  *Id.*  This Court's refusal in *Mallinckrodt* to construe the exhaustion doctrine as applying indiscriminately to all restrictions on the sale of patented articles does not conflict with precedent.

Rather, the Federal Circuit's approach is in accord with patent law principles declared by the Supreme Court's exhaustion decisions.  The law grants a patent holder the "right to exclude others from making, using, offering for sale, or selling the invention . . . ." 35 U.S.C. § 154(a)(1).  As the Supreme Court indicated in *U.S. v. Univis Lens Co.*, 316 U.S. 241 (1942), "[t]he declared purpose of the patent law is to promote the progress of science and the useful arts by granting to the inventor a limited monopoly, the exercise of which will enable him to secure the financial rewards for his invention." *Id.* at 250.  As such, the Supreme Court has long recognized a patent owner's freedom to contract to receive the full value of its patent rights. *Adams v. Burke*, 84 U.S. (17 Wall.) 453, 456 (1873) (stating that the "right to manufacture, the right to sell, and the right to use are each substantive rights, and may be granted or conferred separately by the patentee.").

Consistent with these general principles, however, the Court has also stated that a patentee's restrictions upon a licensee's sales are valid "provided the

conditions of sale are normally and reasonably adapted to secure pecuniary reward for the patentee's monopoly." *G.E.*, 272 U.S. at 490 (conditions imposed by the patentee and agreed to by the licensee that are not illegal will be upheld).

This Court's development of the patent exhaustion doctrine reflects these principles. *Mallinckrodt* held that a "single-use-only" restriction on the use of patented nebulizers could theoretically be enforced via a patent infringement suit against parties that reconditioned and reused the nebulizers. *Mallinckrodt*, 976 F.2d at 709. The Court reasoned that, because the patent grants the patentee the right to exclude others, the patentee may choose to waive only a portion of that exclusive right. *Id*. at 703.

Building upon *Mallinckrodt*, the Federal Circuit rejected the claim that a license could not limit a purchaser's authority to resell or use patented valves in specific articles that did not compete with patentee Braun's own product lines. *B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1426 (Fed. Cir. 1997). The Court explained that "an unconditional sale of a patented device exhausts the patentee's right to control the purchaser's use of the device thereafter." *Id*. "The theory behind this rule is that in such a transaction, the patentee has bargained for, and received, an amount equal to the full value of the goods." *Id*. But where a patentee has expressly limited a licensee's rights, "it is more reasonable to infer

that the parties negotiated a price that reflects only the value of the 'use' rights conferred by the patentee." *Id.*

Moreover, because *Mallinckrodt* and its line of cases favor the enforcement of express restrictions not in restraint of trade, it correctly aligns with Supreme Court decisions that have enforced such restrictions. As the Supreme Court explained, patent rights are exhausted only after authorized and *unconditional* sales. *Mitchell v. Hawley*, 83 U.S. (16 Wall.) 544, 548 (1872) (purchaser may use article until worn out or may repair or improve just as with any other kind of property where sale is without any conditions); *Motion Picture Patents Co. v. Universal Film Mfg. Co.*, 243 U.S. 502, 516 (1917) (right exhausted by a "single, unconditional sale").

Exhaustion, however, does not apply where a sale is conditional and thus further resale is unauthorized. Indeed, the Court has historically permitted patent owners to enter into restricted, conditional licenses that grant only limited authority without exhausting all rights in the licensed patents. *Gen. Talking Pictures Corp. v. W. Elec. Co.*, 305 U.S. 124, 126-27 (1938) (upholding enforcement of field-of-use restrictions through licenses divided between those who could sell for commercial purposes and those who could sell for home purposes); *Mitchell*, 83 U.S. at 549-50 (recognizing patent owner might grant manufacturer license to

make patented invention limited to the original patent term and expressly

excluding any extension of the term).

Contrast *Mitchell* with *Bloomer v. McQuewan*, 55 U.S. (14 How.) 539

(1852), which illustrates the relationship between exhaustion and conditional

licenses.  In *Bloomer*, the unconditioned license gave rise to exhaustion.  *Id.* at  549

(1852) (holding Congress' extension of a patent term did not affect the rights of

purchasers from a patent licensee who took title without any restriction).  In

*Mitchell*, the conditioned license prevented exhaustion.  83 U.S. at 549 (holding

that Mitchell could enjoin purchaser from using patented machines during

extended term because license was limited to original patent term).

Further, because *Mallinckrodt* implies that a restriction is not enforceable to

the extent it is a *per se* violation of antitrust laws, *Mallinckrodt* is also compatible

with previous decisions that dismissed *per se* anticompetitive express restrictions.

976 F.2d at 708.  Courts have occasionally held express restrictions unenforceable.

The reasoning for such decisions was not the mere existence of those restrictions,

but the restrictions' flagrant anticompetitive nature.  For example, the Supreme

Court relied on the patent exhaustion doctrine to conclude that patentees could not

tie the sale of unpatented articles to the use of patented ones.  *Motion Picture*, 243

U.S. at 518.  Similarly, the Court held that price fixing conditions in the licensing

arrangement imposed by the patent owner for the resale of the patented products were outside the scope of the patent monopoly.  *Univis*, 316 U.S. at 252-54.

Finally, while *Mallinckrodt* involves a restricted sale to an "end purchaser" of the patented article rather than a restricted license to an intermediate manufacturer, Supreme Court cases suggest that the manufacturing licensee versus purchaser distinction is not dispositive with regard to application of the exhaustion doctrine.  *Mitchell*, 83 U.S. at 550; *Gen. Talking Pictures*, 305 U.S. at 127.  If a patentee can temporally divide rights to make and sell its invention by express restrictions in a licensing agreement, it should also be able to sell limited use rights by express provisions in a sales contract.  In other words, a patentee should not have fewer options when selling its invention itself than when it goes through an intermediate manufacturer or licensee.

Indeed, the Supreme Court expressly held that those conditions or restrictions pass on to purchasers of the licensed products and has allowed infringement suits against purchasers.  In *Mitchell*, which involved a suit by the assignee of patent rights against a purchaser, the Court found that a licensee is not empowered to convey a license to purchasers beyond the limits of its own license grant.  83 U.S. at 550.  *Mitchell* unquestionably upholds the right of patent owners to place conditions on the sale of patented machines, either directly themselves or indirectly through their licensees.  In *General Talking Pictures*, it was the ultimate

purchaser as well as the licensee who were found to have infringed the patent. 305

U.S. at 127. The Court upheld "home use only" restrictions placed on the ultimate

purchaser, holding that it was "in no better position than if it had manufactured the

amplifiers itself without a license. It is liable because it has used the invention

without [a] license to do so." *Id*.

Accordingly, there is nothing in *Mallinckrodt* that conflicts with Supreme

Court precedent. This Court should continue this line of authority supporting the

freedom of a patent owner, either directly or indirectly through its licensees, to

condition the sale of a patented article.

### B.    *Quanta* Did Not Explicitly Overrule *Mallinckrodt*

*Quanta* does not mention *Mallinckrodt* even though the United States and

several *amici* briefs strongly urged the Supreme Court to use the case to overturn

*Mallinckrodt* and the entire line of Federal Circuit cases that rested upon it. Nor

does *Quanta* address the conditional sale issue generally despite the parties'

extensive briefing on the issue, which had been a basis for the decision below.

Rather, the Court held that LGE's patent rights were exhausted due to an

unconditional license. *Quanta*, 553 U.S. at 636-37. The Court thus declined the

opportunity to speak on general principles of exhaustion in favor of a narrow

contract-based ruling.

The framing of the question presented suggests how the Court viewed the facts of the case and the issues to be decided: "[i]n this case, we decide whether patent exhaustion applies to the sale of components of a patented system that must be combined with additional components in order to practice the patented methods." *Id.* at 621. Following the logic of *Univis*, in which the "sufficient embodiment" test for exhaustion was first developed, the Court held that Intel's authorized sale of components that "sufficiently embodie[d]" LGE's patents terminated LGE's patent rights. *Id.* at 630-35. Hence, LGE could not enforce the limitations against Quanta and the other computer manufacturers as patent infringement claims. *Id.* The Court's decision not to discuss the conditional sale doctrine suggests that the Court did not believe that the doctrine needed to be explicitly overruled but rather that it should remain intact per Federal Circuit jurisprudence.

## C.    *Quanta* Did Not Implicitly Overrule *Mallinckrodt*

Upon close inspection, *Quanta* can be reconciled with *Mallinckrodt*. *Quanta* does not stand for a broad rule that all post-sale use restrictions are prohibited once goods are placed into the ordinary stream of commerce. The Court spent considerable time examining the details of the LGE–Intel transactions to see if any conditions existed. *Quanta*, 553 U.S. at 636-37. "Exhaustion is triggered only by a sale authorized by the patent holder." *Id.* at 636. Finding that no

conditions were placed on the sale, it was easy for the Court to rule that the license authorized Intel's sale and therefore exhausted LGE's patent rights. *Id.* at 637. Because the Court's conclusion depended on the *absence* of a condition limiting Intel's ability to sell its products, the *presence* of such a condition would have allowed LGE to assert its patent rights against Quanta, which is consistent with *Mallinckrodt*'s fundamental teaching.

In addition, the Court's analysis of the LGE-Intel licensing agreement suggests that future licenses can be drafted in ways that avoid patent exhaustion and preserve a licensor's right to sue. *Quanta* makes clear that conditions drafted to avoid patent exhaustion must be explicitly described in the body of the licensing agreement. *Id.* at 636-37 ("[n]othing in the License Agreement restricts Intel's right to sell its microprocessors and chipsets to purchasers who intend to combine them with non-Intel parts"; "provision requiring notice to Quanta appear[s] only in the Master Agreement, and LGE does not suggest that a breach of that agreement would constitute a breach of the License Agreement"; "exhaustion turns only on Intel's own license to sell products practicing the LGE Patents").

More importantly, *Quanta*'s exhaustion analysis suggests that it considered this Court's conditional sale doctrine and purposefully distinguished that line of cases. Although the Court did not expressly address the *Mallinckrodt* decision, it discussed its own precedent, *General Talking Pictures*, on which *Mallinckrodt* is

based.  *Id.* at 636.  *Quanta* did not overrule *General Talking Pictures*, which authorized conditional patent licenses that impose post-sale use restrictions.  *Id.*  Rather, the Court pointed out that unlike the license at issue in *General Talking Pictures*, LGE's license did not place conditions on Intel's sales.  *Id.*  In doing so, the Court embraced the distinction between restricted and unrestricted sales that underlies *Mallinckrodt* and *General Talking Pictures,* confirming that only unrestricted sales exhaust patent rights.

This approach suggests that the Supreme Court did not want to disrupt that existing body of law.  Rather than considering cases such as *General Talking Pictures* as being in tension with the line of patent exhaustion cases, the Court recognized them as a separate, contrasting, and complementary line of precedent.  Because *Quanta* does not overrule or even question *General Talking Pictures* but rather distinguishes it, the conditional sale doctrine should still be viewed as good law.

## D.    Enforcing Properly Conditioned Sales Or Licenses Makes Good Policy Sense

Sound public policy supports enforcing conditioned sales or limited licenses of patented goods.  First, holders of a patent can sell distinct "sticks" from their "bundle" of property interests without losing the remainder of the "sticks."  *G.E.*, 272 U.S. at 489-90.  It is well-settled that a patentee is not required to convey the

totality of its patent rights in any single transaction.  *Adams*, 84 U.S. at 456.  From the purchaser's perspective, if it neither needs nor wants to pay for the patentee's entire patent monopoly, no rule should require it.

In addition, allowing parties significant freedom to contract regarding rights to make, use, or sell patented inventions permits more efficient pricing schemes as well as greater quality control over the use of the patented technology.  Today's economy is complex and increasingly disaggregated.  By affording an innovator the flexibility to negotiate patent licenses directly with various commercial entities or end purchasers to obtain the full reward to which it is entitled, patent exhaustion encourages coordination between the patent holder and the ultimate beneficiary of the patented technology.  For example, field-of-use restrictions can facilitate the ability of the patentee to exploit its patent rights in different markets, technologies, or applications, with end users benefiting from this wider exploitation.  2 David Epstein, *Eckstrom's Licensing in Foreign and Domestic Operations* § 8E:22 (2015) (describing pro-competitive effects of field-of-use licensing).

Providing the patentee with greater quality control in finished products incorporating the patentee's technology also has advantages.  Poor quality or defective end products that are introduced into the consumer market may harm the desirability of the patentee's technology in the marketplace.  Allowing the patentee to exercise quality control over the end product through contractual limitations in

licensing agreements or sale contracts can guide the use of its technology and how that technology develops. Because of these benefits, the law should allow parties freedom of contract with regard to the right to use patented inventions.

Further, there is a broad practice among owners of intellectual property in different industries relying on the ability to condition sales of patented goods without exhausting their patent rights. This Court should not lightly disregard industry custom and economically efficient practices. For example, in the electronics industry, a patentee may wish to sell a patented microprocessor at its highest price for its optimal use in high-end research computers and charge a lower price for home use computers. Not allowing the patentee to charge differential prices based on use would either increase the costs of all systems using the technology or decrease the incentive to develop new and better processors because the patentee would have to forego compensation for the full value of the innovation.

Developments in biotechnology present another reason to allow patentees to sell restricted rights to use a patented invention. Patent protection of biotech inventions is often desirable because it has the potential to bring important developments to fields such as agriculture and medicine. *NIH: Moving Research from the Bench to the Bedside - Hearings Before the Subcomm. on Health of the H.R. Comm. on Energy and Commerce*, 108th Cong. 46-53 (2003),

http://www.gpo.gov/ fdsys/pkg/CHRG-108hhrg88429/pdf/CHRG-108hhrg

88429.pdf (statement of Phyllis Gardner, Senior Associate Dean, Stanford

University).  The self-replicating abilities of living organisms raise concerns about

how a patentee can recapture the cost of bringing a new biotech invention to the

market. *Bowman v. Monsanto,* 133 S. Ct. 1761, 1768-69 (2013).  Allowing the

sale of restricted rights to use patented biotech inventions, such as genetically

modified crop seeds or biological medicines, is one way to encourage investment

in these areas while providing access to, for example, small scale farmers or

individual patients who could not afford to pay large fees for unlimited use rights.

Finally, under this Court's interpretation of the exhaustion doctrine, there is

no risk of surprise and no unfairness to downstream companies or end purchasers.

A sale of a patented article to a downstream entity or end purchaser can be

conditional only if there has been an express notice to the purchaser.  *B. Braun*,

124 F.3d at 1426 (the exhaustion doctrine does not apply to an *expressly*

conditional sale).  Courts have long recognized a host of legal and equitable

doctrines to protect purchasers of patented goods from unfair surprise and charges

of infringement when patentees have led the purchasers to reasonably believe that

no patent infringement will lie.

This Court should not disregard industry custom and economically efficient

practices, as well as over one hundred years of patent exhaustion precedent.  It

should leave the scope of the conditional sale doctrine intact because it is the most efficient legal framework and will serve the core purposes of patent law, while helping to "promote the progress of science and the useful arts."

## <u>CONCLUSION</u>

For the foregoing reasons, neither *Jazz Photo* nor *Mallinckrodt* should be overruled by this Court.

Dated:    June 5, 2015

/s/ *Kristin L. Yohannan*
Kristin L. Yohannan
  *Counsel of Record*
Tihua Huang
Douglas A. Behrens (admission pending)

Lisa K. Jorgenson
*Executive Director*
AMERICAN INTELLECTUAL PROPERTY
LAW ASSOCIATION
241 18th Street South, Ste. 700
Arlington, Virginia 22202
Telephone: 703.415.0480

CADWALADER, WICKERSHAM & TAFT LLP
700 Sixth Street, N.W.
Washington, D.C. 20001
Telephone: 202.862.2200

*Counsel for Amicus Curiae*
*American Intellectual Property*
*Law Association*

**Form 19**

**FORM 19.  Certificate of Compliance With Rule 32(a)**

---

### CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.    This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e).

☑    The brief contains [        *6,899*        ] words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), or

☐    The brief uses a monospaced typeface and contains [ *state the number of* ] lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

☑    The brief has been prepared in a proportionally spaced typeface using [                *Microsoft Word 2010*                ] in [                *Times New Roman 14 pt*                ], or

☐    The brief has been prepared in a monospaced typeface using [        *state name and version of word processing program*        ] with [ [        *state number of characters per inch and name of type style*        ].

*/s/ Kristin L. Yohannan*

_____

(Signature of Attorney)

Kristin L. Yohannan

_____

(Name of Attorney)

Amicus Curiae American Intellectual Property Law Ass'n

_____

(State whether representing appellant, appellee, etc.)

June 5, 2015

_____

(Date)

Form 30

**FORM 30. Certificate of Service**

# UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

# CERTIFICATE OF SERVICE

I certify that I served a copy on counsel of record on by:
June 5, 2015

☐ US mail
☐ Fax
☐ Hand
☒ Electronic Means
   (by email or CM/ECF)

Kristin L. Yohannan

/s/ Kristin L. Yohannan

Name of Counsel                            Signature of Counsel

Law Firm   Cadwalader, Wickersham & Taft LLP

Address   700 Sixth Street, N.W.

City, State, ZIP   Washington, D.C.  20001

Telephone Number   202.862.2200

FAX Number   202.862.2400

E-mail Address   kristin.yohannan@cwt.com

NOTE: For attorneys filing documents electronically, the name of the filer under whose log-in and password a document is submitted must be preceded by an "/s/" and typed in the space where the signature would otherwise appear. Graphic and other electronic signatures are discouraged.