**2014-1617, -1619**

# United States Court of Appeals
# for the Federal Circuit

LEXMARK INTERNATIONAL, INC.,

*Plaintiff-Cross-Appellant*

*v.*

IMPRESSION PRODUCTS, INC.,

*Defendant-Appellant*

QUALITY CARTRIDGES, INC., JOHN DOES, 1-20, BLUE TRADING LLC,
EXPRINT INTERNATIONAL, INC., LD PRODUCTS, INC.,
PRINTRONIC CORPORATION, TESEN DEVELOPMENT (HONG KONG)
CO. LTD., and BENIGNO ADEVA AND HIS COMPANIES,

*Defendants.*

*Appeal from the United States District Court for the Southern District of
Ohio in Case No. 1:10-CV-00564-MRB, Judge Michael R. Barrett*

## BRIEF FOR DEFENDANT-APPELLANT
## IMPRESSION PRODUCTS, INC. ON *EN BANC* REVIEW

EDWARD F. O'CONNOR, ESQ.
AVYNO LAW P.C.
6345 Balboa Boulevard
Suite 190
Encino, California 91316
(818) 488.8140

*Counsel for Appellant*

JUNE 12, 2015

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

*Lexmark International, Inc. v. Ink Technologies Printer*, 2014-1617, -1619

## CERTIFICATE OF INTEREST

Counsel for the Appellant, Impression Products, Inc. certifies the following (use "None" if applicable; use extra sheets if necessary):

1. The full name of every party or amicus represented by me is:

      Impression Products, Inc.

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

      None

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

      None

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

      Edward F. O'Connor
      AVYNO LAW P.C.
      (Previously with THE ECLIPSE GROUP LLP)

| | |
|---|---|
| Juen 12, 2015 | /s/ Edward F. O'Connor |
| Date | Edward F. O'Connor |
| | Counsel for Appellant |

i

# TABLE OF CONTENTS

*Page*

CERTIFICATE OF INTEREST ............................................................. i

TABLE OF CONTENTS ...................................................................... ii

TABLE OF AUTHORITIES ............................................................... iv

STATEMENT OF RELATED CASES ................................................ vii

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF ISSUES ....................................................................1

STATEMENT OF FACTS .....................................................................2

SUMMARY OF ARGUMENTS ............................................................2

    *Jazz Photo* .........................................................................................2

    *Mallinckrodt* .....................................................................................3

STANDARD OF REVIEW ....................................................................4

ARGUMENTS .......................................................................................4

  I.  INTRODUCTION ..........................................................................4

  II.  JAZZ PHOTO .................................................................................4

    A. *KIRTSAENG* EFFECTIVELY OVERTURNED THE *JAZZ PHOTO* EXCEPTION TO THE FIRST SALE EXTINGUISHMENT OF PATENT RIGHTS DOCTRINE ....................4

    B. *JAZZ PHOTO* WAS INCORRECTLY DECIDED IN THE FIRST INSTANCE. ........................................................................10

    C. *KIRTSAENG* DID NOT BASE ITS DECISION REGARDING OVERSEAS SALES ON LANGUAGE IN THE COPYRIGHT STATUTE ..........................................................................11

    D. THE POTENTIAL ABILITY OF A PATENTEE, SELLER, TO DIFFERENTIATE PRICE BASED ON GEOGRAPHY IS OF NO RELEVANCE TO THE FIRST SALE EXHAUSTION OF PATENT RIGHTS RESULTING FROM OVERSEAS SALES. ...........13

    E. *JAZZ PHOTO* LEADS TO ABSURD AND UNFAIR RESULTS AND PRACTICAL PROBLEMS .............................................................15

    CONCLUSION.........................................................................................16

  III. MALLINCKRODT ................................................................................17

    A. THIS CASE PRESENTS A WELCOME OPPORTUNITY TO CLARIFY THE STATE OF THE LAW REGARDING POST SALE USE RESTRICTIONS ..................................................................17

    B. *MALLINCKRODT* WAS WRONGLY DECIDED IN THE FIRST INSTANCE ............................................................................................17

    C. THE ISSUES IN *MALLINCKRODT* AND *QUANTA* WERE ESSENTIALLY THE SAME ..................................................................21

    CONCLUSION.........................................................................................23

ADDENDUM .....................................................................................................A1

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Adams v. Burke,*
    84 U.S. (17 Wall) 453 (1873) ........................................................ 5, 11

*Bauer v. O'Donnell,*
    229 U.S. 1 (1913) ...................................................................13

*Bloomer v. McQuewan*
    55 U.S. 539, 14 L. Ed. 532 (1853) ......................................................20

*Bobbs-Merrill Co. v. Straus,*
    210 U.S. 339 (1908) .................................................................6, 7

*Boesch v. Graff,*
    133 U.S. 697 (1890) ............................................................... 10-11

*Curtiss Aeroplane & Motor Corp. v. United Aircraft Engineering Corp.,*
    266 F. 71 (2d Cir. 1920) ..............................................................11

*Dickersen v. Matheson,*
    57 F. 524 (2d Cir. 1893) ..............................................................11

*General Talking Pictures,*
    304 US 175, 58 S.Ct. 849 (1938) ................................................... 18, 19

*Hewlett-Packard v. Repeat-O-Type Stencil Manufacturing Corporation, Inc.,*
    123 F.3d 1445 (Fed. Cir. 1997) ..........................................................5

*Hollidayv. Matteson,*
    24 F. 185 (CCSDNY 1885) ..............................................................11

*Jazz Photo Corp. v. International Trade Commission,*
    264 F.3d 1094 (Fed. Cir. 2001).................................. 1-4, 7, 10-11, 13, 15-16, 20

*John D. Park & Sons Co. v. Hartman,*
    153 F. 24 (6th Cir. 1907) .............................................................13

*K Ma11 Corp . v. Cartier. Inc.*,
486 U.S. 281, 108 S. Ct. 1811, 100 L. Ed. 2d 313 (1988).....................................9

*Kabushiki Kaisha Hattori Seikoo v. Refac Tech. Corp.*,
690 F. Supp. 1339 (SDNY 1988) ......................................................................11

*Kirtsaeng v. John Wiley & Sons, Inc.*,
133 S. Ct. 1351 (2012) ............................................... 1-5, 9-12, 14-16

*Lifescan Scotland v. Shasta Technologies, LLC*,
734 F.3d 1361 (Fed. Cir. Nov. 4, 2013)............................................ 11, 13, 15-16

*Mallinckrodt, Inc. v. Medi-part, Inc.*,
976 F.2d 700 (Fed. Cir. 1992)..............................................................2-4, 17-23

*Ninestar v. ITC*,
667 F.3d 1373 (Fed. Cir. 2012)........................................................................16

*Palmer v. BRG of Ga., Inc.*,
498 U. S. 46 (1990) ........................................................................................15

*Princo Corporation v. International Trade Commission*,
616 F. 3d 1318 (Fed Cir 2010)........................................................................22

*Quality King Distributors, Inc. v. L'Anja Research International, Inc.*,
523 U.S. 135 (1998), 118 S.Ct. 1125 ................................................................8

*Quanta Computer, Inc. v. LG Electronics, Inc.*,
553 U.S. 617 (2008) ................................................1-4, 10, 17, 19-23

*Straus v. Victor Talking Mach. Co.*,
243 U.S. 490 (1917) ......................................................................................12

*Tessera, Inc. v. Int'l Trade Comm'n*,
646 F.3d 1357 (Fed. Cir. 2011).......................................................................13

*United States v. Univis Lens Co.*,
316 U.S. 241, 62 S.Ct. 1088, 86 L.Ed. 1408 (1942)..........................................19

**Statutes**

U.S. Const. Art. I, §8, cl. 8...................................................................14

17 U.S.C. § 109(a) .................................................................. 7, 9, 12

28 U.S.C. § 271(a) ...........................................................................8

28 U.S.C. § 1295(a)(1)....................................................................1

28 U.S.C. § 1331 .............................................................................1

28 U.S.C. § 1338.............................................................................1

28 U.S.C. § 1367.............................................................................1

**Rules**

Federal Circuit Rule 28(a)(4)...................................................... vii

Federal Circuit Rule 47.5(a) ....................................................... vii

**Other Authorities**

1 E. Coke, Institutes of Laws of England § 360 (1623) .................................... 6, 12

Copyright Law Revision, pt. 2,
    (statement of Barbara Ringer, Copyright Office)................................14

Letter from James Madison to Thomas Jefferson (Oct. 17, 1788)
    (J. Boyd ed. 1958)............................................................14

Letter from Thomas Jefferson to James Madison (July 31, 1788) ..........................14

**STATEMENT OF RELATED CASES**

Pursuant to FCR 28(a)(4) and 47.5(a), there is no other appeal in or from the same civil action in the lower court that was previously before this or any other appellate court.  There is no other case known to counsel to be pending in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.

# JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction under 28 U.S.C. §§ 1331, 1338, and 1367, as Plaintiff Lexmark International, Inc. ("Lexmark") asserted patent infringement.  Under 28 U.S.C. § 1295(a)(1), this Court has jurisdiction over this appeal, which is timely based on the final judgment dated June 24, 2014, and subsequent Notices of Appeal.

# STATEMENT OF ISSUES

The issues as determined by this Court are:

(a)   The case involves certain sales, made abroad, of articles patented in the United States.  In light of *Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S. Ct. 1351 (2012), should this Court overrule *Jazz Photo Corp. v. International Trade Commission*, 264 F.3d 1094 (Fed. Cir. 2001), to the extent it ruled that a sale of a patented item outside the United States never gives rise to United States patent exhaustion?

(b)   The case involves (i) sales of patented articles to end users under a restriction that they use the articles once and then return them and (ii) sales of the same patented articles to resellers under a restriction that resales take place under the single-use-and-return restriction.  Do any of those sales give rise to patent exhaustion?  In light of *Quanta Computer, Inc. v. LG Electronics, Inc.*, 553 U.S. 617

1

(2008), should this Court overrule *Mallinckrodt, Inc. v. Medi-part,*

*Inc.,* 976 F.2d 700 (Fed. Cir. 1992), to the extent it ruled that a sale of

a patented article, when the sale is made under a restriction that is

otherwise lawful and within the scope of the patent grant, does not

give rise to patent exhaustion?

## STATEMENT OF FACTS

There are no controverted issues of fact.  Pursuant to this Court's order,

there are only issues of law presented.

## SUMMARY OF ARGUMENTS

### *Jazz Photo*

This Court's decision in *Jazz Photo* created an unprecedented exception to

the first sale, patent extinguishment doctrine.  Under *Jazz Photo*, if a patented

product is first sold outside of the United States, the patent rights are not

extinguished.   As a matter of logic, there is no reason why first sales outside the

United States should not have the same legal impact as sales within the United

States.  Under *Jazz Photo*, a person who buys an automobile in Canada, which is

covered by hundreds of US patents, becomes an infringer as soon as that car is

driven across the border into the United States, regardless of the fact that the US

patent holder authorized the sale in Canada.

In its decision in *Kirtsaeng*, the United States Supreme Court addressed the

same issue in the context of copyright rights.  It determined that there was no

2

legitimate reason that copyright rights should not be extinguished upon first sale outside of the United States.  It's reasoning is equally applicable to patent cases, and  this Court should apply the reasoning in *Kirtsaeng* to overturn *Jazz Photo*.

### *Mallinckrodt*

*Mallinckrodt* involved a patented product that was sold with a so-called "label license."  Under the terms of that license, which was printed on the packaging of the product, the user was required to return the product to the seller after a single use.  The defendant did not comply with that requirement and was sued for patent infringement.

This Court decided that the type of label license involved in that case prevented the extinguishment of patent rights that would normally be involved after a first sale of the patented products.  In short, it upheld the validity of the license, subject only to the antitrust issues, which are not directly involved in the issues being briefed herein.

In *Quanta Computer, Inc. v. LG Electronics, Inc.*, 553 U.S. 617 (2008), the United States Supreme Court effectively determined that such restrictive use licenses are invalid.  It determined that if the seller has the right to sell the product under the patent, then the sale of that product extinguishes all patent rights, regardless of any attempts by the patentee to impose use restrictions.  It left open the possibility that a patentee may still have a cause of action under state law.

3

## STANDARD OF REVIEW

Because this is strictly an issue of law, the standard of review is de novo.

## ARGUMENTS

## I.    INTRODUCTION

While the issues to be briefed are separate and distinct, they also have

overlapping features. What both *Jazz Photo* and *Mallinckrodt* have in common is

that both cases weaken the doctrine of first sale extinguishment of patent rights.  In

both cases, the CAFC has created exceptions to the general rule, which exceptions

have no underlying support in previous United States Supreme Court law.

In both *Kirtsaeng* and *Quanta*, the United States Supreme Court has issued

decisions that push back against the exceptions to first sale created by this Court.

Because the issues, which this Court has ordered briefed, are not specific to

the facts of this case (which facts are not in dispute), this brief will be directed

exclusively to the legal issues.

The first portion of the brief will be directed to the *Jazz Photo* issues and the

second portion of the brief will be directed to the *Mallinckrodt*  issues.

## II.    JAZZ PHOTO

### A.    *KIRTSAENG* EFFECTIVELY OVERTURNED THE *JAZZ PHOTO* EXCEPTION TO THE FIRST SALE EXTINGUISHMENT OF PATENT RIGHTS DOCTRINE

It is long and well-established law that when a person sells a product, which

is patented, it loses its rights to further assert its patents against anyone who makes

4

use of that product, including selling it and repairing it. *Adams v. Burke*, 84 U.S. (17 Wall) 453, 21 Law Ed. 700 (1874). The case that specifically applied that the doctrine to the ink jet cartridge industry is *Hewlett-Packard v. Repeat-O-Type Stencil Manufacturing Corporation, Inc.*, 123 F.3d 1445 (Fed. Cir. 1997). Accordingly, under *Repeat-O-Type*, the use and sale of remanufactured products is perfectly legal and cannot be patent infringement.

In *Kirtsaeng v. John Wiley and Sons, Inc.*, 133 S. Ct. 1351 (2012), the United States Supreme Court ruled that the first sale extinguishment of copyright rights is not limited to sales in the United States. The question, as it relates to this case, is whether the decision relating to first sale extinguishment of copyright rights, based on foreign sales, is also applicable to the extinguishment of patent rights, because of first sales in other countries.

A clear reading of the language and the rationale applied by the Supreme Court makes it clear that there is no reason to distinguish between patent rights, copyright rights, or any other rights in the products sold, as far as first sale extinguishment is concerned.

The United States Supreme Court grounded its decision on writings by Lord Coke in early 17th century England, long before there were any patent or copyright laws in the United States. (Mainly because there was no United States.) It then

5

went on to discuss the case of *Bobbs-Merrill Co. v. Straus,* 210 U.S. 339 (1908).

The Court, in its opinion p. 1363, stated:

> A relevant canon of statutory interpretation favors a non-geographic reading. [W]hen a statute covers an issue previously governed by the common law, we must presume that "Congress intended to retain the substance of the common law ('Statutes which invade the common law…are to be read with a presumption favoring the retention of long established and familiar principles, **except when a statutory purpose to the contrary is evident.'**)…

> The 'first sale' doctrine is a common-law doctrine with an impeccable historic pedigree. In the early 17th century Lord Coke explained the common law's refusal to permit **restraints on the alienation of chattels.** Referring to Littleton, who wrote in the 15th century, Gray, Two Contributions to Coke Studies, *72 U. Chi. L. Rev.* 1127, 1135 (2005), Lord Coke wrote:

>> '[If] a man be possessed of …a horse, or of any other chattel…and give or sell his whole interest…therein upon condition that the Donee or Vendee shall not alien[ate] the same, the [condition] is voi[d], because **his who interest…is out of him, so as he hath no possibilit[y] of a Reverter, and it is against Trade and Traffi[c], and bargaining and contracting betwee[n] man and man: and it is within the reason of our Author that it should ouster him of all power given to him.'** 1 E. Coke, Institutes of Laws of England § 360, p. 223 (1623).

> A law that permits a copyright holder to control the resale or other disposition of a chattel once sold is **similarly** 'against Trade and Traffi[c]. and bargaining and contracting.' *Ibid.* (emphasis added.)

> With these last few words, Coke emphasizes the importance of leaving buyers of goods free to compete with each other when reselling or otherwise disposing of those goods….

**The common-law doctrine makes no geographical distinctions;** nor can we find any in *Bobbs-Merrill* (where this Court first applied the "first sale" doctrine) or in §109(a)'s predecessor provision, which Congress enacted a year later. See *supra,* at 12. Rather, as the Solicitor General acknowledges, **"a straightforward application of *Bobbs-Merrill* would not preclude the "first sale" defense from applying to authorized copies made overseas."** (emphasis added.)

There is no reason, in logic, that overseas first sale extinguishment that should apply to copyright rights, and rights in horses (Lord Coke) and yet not apply to patent rights.

Essentially, the Court said that first sale extinguishment applies, regardless of whether or not the first sale occurs outside the United States, unless there is a specific provision in the statutory scheme that would limit the sales to U.S. sales. *John Wiley* argued that there was in fact language in the copyright statute, which limited first sale extinguishment to U.S. sales. The Court rejected that argument, after extensive analysis, and then applied the fundamental first sale extinguishment doctrine, which makes no distinction between U.S. and overseas sales.

The Court's reliance on Lord Coke is telling, because Lord Coke was not addressing copyright law in particular. He was addressing all property rights, which would apply equally to patent rights as to copyright or any other rights in the property being sold.

**There is nothing in the patent statutes that states that first sales outside the U.S. are to be treated differently than any other sales.** *Jazz Photo* **does not**

7

**rely on, nor is it in any way based on, anything in the patent statutes on**

**overseas first sales.[1]**

---

[1] Some commentators have posited that the addition of importation as an infringing activity 28 USC 271(a) (effective in 1996) created a separate right which is not extinguished upon first sale. That proposition ignores the clear and express language in Quanta (four years after the effective date of the importation addition) p.625 that "The long-standing doctrine of patent exhaustion provides that the initial authorized sale of a patented item terminates **all** patent rights to that item," (emphasis added)

There is nothing in that statutory amendment, nor in the legislative history, nor in the President's Statement of Administrative Action which in any way indicates that the addition of importation was, in any way, intended to impact the first sale doctrine. This is discussed at length in the amicus brief submitted by Prof. Margaret Barrett of the University of California Hastings College of Law and by Prof. Frederick M Abbott of Florida State University College of Law. See pp. 11 through 13 of their brief.

In fact, in TRIPS (Agreement on Trade-Related Aspects of Intellectual Property Rights) art 6, Apr. 15, 1995, 33 ILM 1197 it states ("For purposes of dispute settlement…nothing in this Agreement shall be used to address the issue of the exhaustion of intellectual property rights")  TRIPS was the basis for 28 USC 271(a).

In its Amicus brief, the AIPLA raises the discredited argument of extraterritoriality.

That issue was addressed by the U.S. Supreme Court in *Quality King Distributors, Inc. v. L'Anja Research International, Inc.*, 523 U.S. 135 (1998) 118 S.Ct. 1125.  While that was a copyright case the principal is the same in the patent context and the AIPLA provides no legal authority for the proposition that overseas first sales should be treated any differently for patents than for copyrights.

On p. 145 the Court in *Quality King* stated:

> After the first sale of a copyrighted item 'lawfully made under
> this title,' any subsequent purchaser, whether from a domestic or from

8

The reasoning in *Kirtsaeng* applies equally to patent rights as it does to copyright rights and all other property rights.

---

a foreign reseller, is obviously an 'owner' of that item. Read literally, § 109(a) unambiguously states that such an owner 'is entitled, without the authority of the copyright owner, to sell' that item. Moreover, since § 602(a) merely provides that unauthorized importation is an infringement of an exclusive right 'under section 106,' **and since that limited right does not encompass resales by lawful owners**, the literal text of § 602(a) is simply inapplicable to both domestic and foreign owners of L'anza's products who decide to import them and resell them in the United States.[14]

[14]Despite L'anza's contention to the contrary, see Brief for Respondent 26-27, **the owner of goods lawfully made under the Act is entitled to the protection of the first sale doctrine in an action in a United States court even if the first sale occurred abroad.** Such protection **does not require the extraterritorial application of the Act** any more than § 602(a)'s ' acquired abroad" language does.

On p. 153 the Court stated:

The parties and their amici have debated at length the wisdom or unwisdom of governmental restraints on what is sometimes described as either the "gray market" or the practice of "parallel importation."  In K Ma11 Corp . v. Cartier. Inc., 486 U.S. 281 . 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988), we used those terms to refer to the importation of foreign-manufactured goods bearing a valid United States trademark without the consent of the trademark holder. ld . at 285-286, 108 S.Ct., at '1814-1815. We are not at all sure that those terms appropriately describe the consequences of an American manufacturer's decision to limit its promotional efforts to the domestic market and to sell its products abroad at discounted prices that are so low that its foreign distributors can compete in the domestic market. **But even if they do, whether or not we think it would be wise policy to provide statutory protection for such price discrimination is not a matter that is relevant to our duty to interpret the text of the Copyright Act.** (emphasis added.)

## B.    *JAZZ PHOTO* WAS INCORRECTLY DECIDED IN THE FIRST INSTANCE.

While this Court has ordered briefing on the question of whether *Kirtsaeng* has overturned *Jazz Photo*, it is important to understand the underlying basis upon which *Jazz Photo* was decided.  Among the reasons given by the District Court for not concluding that *Kirtsaeng* overturned *Jazz Photo* was the need to consider the context of *Jazz Photo*, including the precedent on which *Jazz Photo* relies. (Appendix page 26).  The court then proceeded to ignore the precedent upon which *Jazz Photo* relied, apparently concluding that that analysis was better suited to this Court.

The entire discussion in *Jazz Photo* relating to first sale extinguishment from sales in the United States, versus sales abroad, is contained in a single sentence within a paragraph. That sentence reads as follows p. 1105:

> …To invoke the protection of the first sale doctrine, the authorized first sale must have occurred under the United States patent.  See *Boesch v. Graff*, 133 U.S. 697, 707-703 (1890) (a lawful foreign purchase does not obviate the need for license from the United States patentee before importation into and sale in the United States).

*Boesch* had nothing to do with first sale extinguishment. As stated by this Court in  *Quanta*  p. 636, " Exhaustion is triggered only by a sale authorized by the patent holder."

In *Boesch*, the sales were made in Germany by a company that was not authorized to make the sale by the patent holder, and therefore had nothing to do with the first sale doctrine, which by that time was firmly established in U.S. law (*Adams v. Burke,* 84 U.S. (17 Wall) 453 (1873).

The law that holds that first sale elimination of patent rights is limited to U.S. sales originated with *Jazz Photo*. There were no previous cases so holding, and the first United States Supreme Court case to deal with this issue at all is *Kirtsaeng*, which held that the first sale extinguishment of rights generally does not depend at all on the sale being made in the United States.[2]

## C.    *KIRTSAENG* DID NOT BASE ITS DECISION REGARDING OVERSEAS SALES ON LANGUAGE IN THE COPYRIGHT STATUTE

*Kirtsaeng* makes clear that the rule of first sale extinguishment is based upon the common law as enunciated by Lord Coke, well before the existence of any copyright statutes, and in fact well before the existence of the United States. As noted by this Court in *Lifescan Scotland v. Shasta Technologies, LLC,* 734 F.3d 1361, 1376 (Fed. Cir. Nov. 4, 2013):

> …In the Supreme Court's recent decision in *Kirtsaeng v. John Wiley & Sons, Inc.,* the Court held that the first sale doctrine in copyright law **comparable to the patent exhaustion doctrine** applies

---

[2]   In fact, cases dealing with this issue, prior to *Jazz Photo*, held that foreign sales extinguish U.S. patent rights.  *Hollidayv. Matteson,* 24 F. 185 (CCSDNY 1885); *Dickersen v. Matheson,* 57 F. 524 (2d Cir. 1893); *Curtiss Aeroplane & Motor Corp. v. United Aircraft Engineering Corp.*, 266 F. 71 (2d Cir. 1920); *Kabushiki Kaisha Hattori Seikoo v. Refac Tech. Corp.*, 690 F. Supp. 1339 (SDNY 1988).

11

equally whether the copyrighted work is manufactured in the United States or abroad.  133 S. Ct. 1351, 1355-56 (203).  Although copyrights first sale doctrine, unlike patent exhaustion, has been codified by statute.  See 17 U.S.C. § 109(a), **the Supreme Court looked to the doctrine's common law roots to interpret that provision**.  *Kirtsaeng* 133 S. Ct. at 1363 ('The 'first sale' doctrine is a common-law doctrine with an impeccable historic pedigree.')  The Court explained that the first sale doctrine was traceable to 'the common law's refusal to permit restraints on the alienation of chattels.'  *Id.* To elaborate on that common-law policy, the Court quoted at length from Lord Coke's Institutes of the Laws of England, stating:

> [If] a man be possessed of . . . a horse, or of any
> other chattell . . . and give or sell his whole interest
> . . . therein upon condition that the Donee or
> Vendee shall not alien[ate] the same, the [condition]
> is voi[d], because his whole interest . . . is out
> of him, so as he hath no possibilit[y] of a Reverter,
> and it is against Trade and Traffi[c], and bargaining
> and contracting betwee[n] man and man: and
> it is within the reason of our Author that it should
> ouster him of all power given to him.

*Id.* (quoting 1 E. Coke, *Institutes of the Laws of England* § 360, p. 223 (1628)) (omissions and alterations in original) (emphases added). Thus, the policy underlying the first sale doctrine draws no distinction between gifts and sales. **The same policy undergirds the doctrine of patent exhaustion.** *See Straus v. Victor Talking Mach. Co.*, 243 U.S. 490, 500–01 (1917) (explaining that a patentee's attempt "to place restraints upon [a patented product's] further alienation [was] such as have been hateful to the law from Lord Coke's day to ours"). (emphasis added.)[3]

---

[3] While the above quote discusses the fact that there is no distinction between gifts and sales, that determination was made because of the general principles enunciated, and not because of any statements in *Kirtsaeng* regarding gifts as opposed to sales. There are no such statements in *Kirtsaeng*. The point being made by this Court was that the general prohibition on restraints on alienation of chattels applies equally to patents as it does to copyrights.

In footnote 9, on p. 26, the Court in *Lifescan* stated:

> [9] The Supreme Court has frequently explained that copyright cases inform similar cases under patent law. *See, e.g., Bauer v. O'Donnell*, 229 U.S. 1, 13-14 (1913).

### D.     THE POTENTIAL ABILITY OF A PATENTEE, SELLER, TO DIFFERENTIATE PRICE BASED ON GEOGRAPHY IS OF NO RELEVANCE TO THE FIRST SALE EXHAUSTION OF PATENT RIGHTS RESULTING FROM OVERSEAS SALES.

It is anticipated that Lexmark and various Lexmark amici will argue that first sale exhaustion overseas will negatively impact their ability to charge lower prices in other countries. This is also related to their arguments that this will impact their ability to receive an adequate reward for their patents. The issue was also referenced in *Jazz Photo* in the paragraph before the paragraph where it set forth its holding regarding overseas first sale.

This Court expressly addressed that issue in *Lifescan*, pp. 1376-1377:

> The common policies underlying patent exhaustion and the first sale doctrine would be significantly undermined by the rule LifeScan advocates in this case. Absent a valid contractual restriction, restraints upon the downstream use or sale of a patented product "offend against the ordinary and usual freedom of traffic in chattels," *see John D. Park & Sons Co. v. Hartman*, 153 F. 24, 39 (6th Cir. 1907), and that is so regardless of the amount of consideration demanded by the patentee when it originally parted with the product. **Indeed, conditioning patent exhaustion on the adequacy of the patentee's reward 'would cast a cloud of uncertainty' over every transaction and every patented product**. *Tessera, Inc. v. Int'l Trade Comm'n*, 646 F.3d 1357, 1370 (Fed. Cir. 2011) (holding that patent exhaustion applied even though the seller failed to pay promised royalties to the patentee). That result would be 'wholly inconsistent with the

13

fundamental purpose of patent exhaustion—to prohibit post[-]sale restrictions on the use of a patented article.'

In summary, we hold that patent exhaustion principles apply equally to **all authorized transfer of title** in property, regardless of whether the particular transfer at issue constituted a gift or a sale. (Emphsis added.)

That same issue was expressly addressed in *Kirtsaeng,* p. 1370:

*Third*, Wiley and the dissent claim that a nongeographical interpretation will make it difficult, perhaps impossible, for publishers (and other copyright holders) to divide foreign and domestic markets. **We concede that is so**. A publisher may find it more difficult to charge different prices for the same book in different geographic markets. But we do not see how these facts help Wiley, for we can find no basic principle of copyright law that suggests that publishers are especially entitled to such rights. (emphasis added.)

The Constitution describes the nature of American copyright law by providing Congress with the power to"secur[e]" to "[a]uthors" "for limited [t]imes" the "*exclusive [r]ight to their . . . [w]ritings*." Art. I, §8, cl. 8. The Founders, too, discussed the need to grant an author a limited right to exclude competition. Compare Letter from Thomas Jefferson to James Madison (July 31, 1788), in 13Papers of Thomas Jefferson 440, 442–443 (J. Boyd ed. 1956)(arguing against any monopoly) with Letter from James Madison to Thomas Jefferson (Oct. 17, 1788), in 14 *id.,* at 16, 21 (J. Boyd ed. 1958) (arguing for a limited monopoly to secure production). But the Constitution's language nowhere suggests that its limited exclusive right should include a right to divide markets or a concomitant right to charge different purchasers different prices for the same book, say to increase or to maximize gain. Neither, to our knowledge, did any Founder make any such suggestion.We have found no precedent suggesting a legal preference for interpretations of copyright statutes that would provide for market divisions. Cf. Copyright Law Revision, pt. 2, at 194 (statement of Barbara Ringer, Copyright Office) (division of territorial markets was "primarily a matter of private contract").

To the contrary, Congress enacted a copyright law that(through the "first sale" doctrine) limits copyright holders'ability to divide domestic markets. And that limitation is consistent with antitrust laws that ordinarily forbid market divisions. Cf. *Palmer* v. *BRG of Ga., Inc.,* 498 U. S. 46, 49–50 (1990) (*per curiam*) ("[A]greements between competitors to allocate territories to minimize competition areillegal"). Whether copyright owners should, or should not, have more than ordinary commercial power to divide international markets is a matter for Congress to decide. We do no more here than try to determine what decisionCongress has taken.

The *Kirtsaeng* analysis (copyright) and the *LifeScan* analysis (patent) are

essentially the same.  Adequacy of reward is irrelevant to first sale exhaustion.

### E.    *JAZZ PHOTO* LEADS TO ABSURD AND UNFAIR RESULTS AND PRACTICAL PROBLEMS

In *Kirtsaeng*, p. 136 the Court set forth a number of practical problems

which results from excluding overseas sales from copyright first sale

extingushment.

Technology companies tell us that "automobiles, microwaves, calculators, mobile phones, tablets, and personal computers" contain copyrightable software programs or packaging. Brief for Public Knowledge et al. as *Amici Curiae* 10. See also Brief for Association of Service and Computer Dealers International, Inc., et al. as *Amici Curiae* 2. Many of these items are made abroad with the Amctrerican copyright holder's permission and then sold and imported (with that permission) to the United States. Brief for Retail Litigation Center, Inc., et al. as *Amici Curiae* 4. A geographical interpretation would prevent the resale of, say, a car, without the permission of the holder of each copyright on each piece of copyrighted automobile software. Yet there is no reason to believe that foreign auto manufacturers regularly obtain this kind of permission from their software component suppliers, and Wiley did not indicate to the contrary when

asked. See Tr. of Oral Arg. 29–30. **Without that permission a foreign car owner could not sell his or her used car**.[4]

Retailers tell us that over $2.3 trillion woth of foreign goods were imported in 2011. American retailers buy many of these goods after a first sale abroad. And many of these items [have copyrighted aspects]. A geographical interpretation would subject many, if not all, of them to the disruptive impact of the threat of infringement suits. (emphasis added)

Those same problems equally apply to patented automobile components and other previously sold imported patented products. For example, this Court upheld an $11 million ITC fine against Ninestar for the importation of previously sold spent inkjet cartridges. *Ninestar v. ITC,* 667 F.3d 1373 (Fed. Cir. 2012)

## CONCLUSION

There is simply no intellectually consistent way to reconcile *Jazz Photo* with *Kirtsaeng* and *Lifescan*. The general rule enunciated in both of those cases and applied in particular to patents in *Lifescan* is that first sale extinguishment of property rights in general, and copyright and patent rights in particular, are extinguished upon first sale, regardless of the country in which that first sale is made.

---

[4] In fact the owner of an American car who purchased it in Montreal and drove it across the border into the U.S. would be a patent infringer. This is absurd.

16

## III.   MALLINCKRODT

### A. THIS CASE PRESENTS A WELCOME OPPORTUNITY TO CLARIFY THE STATE OF THE LAW REGARDING POST SALE USE RESTRICTIONS

It is well-known that attempts to reconcile the United States Supreme Court decision in *Quanta* with this Court's decision in *Mallinckrodt* have caused widespread confusion among the patent community and the business community. If this Court follows the lead of the District Court in this case, as well as the District Court in the Lexmark case in Kentucky, that should put an end to the confusion.  If *Mallinckrodt* is effectively overturned, there will be no further confusion about the ability of patentees to control the use of a product, which is sold for use in the ordinary pursuits of life. This will put an end to this practice of patentee, sellers attempting to control their products, for their own financial gain, after those products have been placed into the stream of commerce and purchased by people for use in the ordinary pursuits of life.

### B.   *MALLINCKRODT* WAS WRONGLY DECIDED IN THE FIRST INSTANCE

The fundamental problem with the analysis of the Court in *Masllinckrodt* was that it ignored the distinction between patent law on the one hand and state contract law on the other.  State contract law obviously cannot overturn federal patent law.  In *Mallinckrodt*, the Court determined that a contract under state law can restrict the right of a purchaser in the ordinary channels of trade.  Such a

17

restriction is a violation of the first sale extinguishment of patent rights doctrine under federal patent law.

In its opinion, the Court in *Mallinckrodt* cited to *General Talking Pictures*, 304 US 175, 58 S.Ct. 849 (1938). On p. 705 of its opinion the Court stated:

> In General Talking Pictures the patentee had authorized the licensee to make and sell amplifiers embodying the patented invention for a specified use (home radios). The defendant had purchased the patented amplifier from the manufacturing licensee, with knowledge of the patentee's restriction on use. The Supreme Court stated the question as "whether the restriction in the license is to be given effect" against a purchaser who had notice of the restriction. The Court observed that a restrictive license to a particular use was permissible, and treated the purchaser's unauthorized use as infringement of the patent, deeming the goods to be unlicensed as purchased from the manufacturer.

> [ 4] The Court, in its opinion on rehearing, stated that it [did not] consider what the rights of the parties would have been if the amplifier had been manufactured under the patent and had passed into the hands of a purchaser in the ordinary channels of trade.

> 305 U.S. at 127, 59 S.Ct. at 117, 39 USPQ at 330. The district court interpreted this reservation as requiring that since the hospitals purchased the Ultra Vent device from the patentee Mallinckrodt, not from a manufacturing licensee, no restraint on the purchasers' use of the device could be imposed under the patent Jaw. However, in General Talking Pictures the Court did not hold that there must be an intervening manufacturing licensee before the patent can be enforced against a purchaser with notice of the restriction. The Court did not decide the situation where the patentee was the manufacturer and the device reached a purchaser in ordinary channels of trade. 305 U.S. at 127, 59 S.Ct. at 117, 39 USPQ at 330.

18

On page 708 of its opinion the Court in *Mallinckrodt* stated its basis for its

conclusion as follows:

> Viewing the entire group of these early cases, it appears that the Court simply applied, to a variety of factual situations, the rule of contract law that sale may be conditioned.  Adams v. Burke and its kindred cases do not stand for the proposition that no restriction or condition may be placed upon the sale of a patented article. It was error for the district court to derive that proposition from the precedent. Unless the condition violates some other law or policy (in the patent field, notably the misuse or antitrust law, e.g., United States v. Univis Lens Co., 316 U.S. 241, 62 S.Ct. 1088, 86 L.Ed. 1408 (1942)), private parties retain the freedom to contract concerning conditions of sale. As we have discussed, the district court cited the price-fixing and tying cases as reflecting what the court deemed to be the correct policy, viz., that no condition can be placed on the sale of patented goods, for any reason. However, this is not a price-fixing or tying case, and the per se antitrust and misuse violations found in the Bauer trilogy and Motion Picture Patents are not here present. The appropriate criterion is whether Mallinckrodt's restriction is reasonably within the patent grant, or whether the patentee has ventured beyond the patent grant and into behavior having an anticompetitive effect not justifiable under the rule of reason.

> Should the restriction be found to be reasonably within the patent grant, i.e., that it relates to  subject matter within the scope of the patent claims, t**hat ends the inquiry.** (emphasis added.)

In reality, the Supreme Court's decision in *General Talking Pictures*

supports the conclusion that *Quanta* refutes *Mallinckrodt*.  On page 180 it states:

> Petitioner puts its first question in affirmative form: "The owner of a patent cannot, by means of the patent, restrict the use made of a device manufactured under the patent after the device has passed into the hands of a purchaser in the ordinary channels of trade and full consideration paid therefor." But that proposition ignores controlling facts. The patent owner did not sell to petitioner the amplifiers in

19

question or authorize the Transformer Company to sell them or any amplifiers for use in theaters or any other commercial use. **The sales made by the Transformer Company to petitioner were outside the scope of its license and not under the patent. Both parties knew that fact at the time of the transactions. There is no ground for the assumption that petitioner was "a purchaser in the ordinary channels of trade."** (emphasis added.)

Notably, nowhere does the Court in *Mallinckrodt* cite to a case that deals specifically with the issue presented in that case; in *Quanta*; or the case at bar, to wit, whether a state law based contract can circumvent the first sale extingishment doctrine. [5]

In short, the Court did in *Mallinckrodt* essentially what it did in *Jazz Photo*, which was to create a legal doctrine that had no support under any Supreme Court precedent, and which was contrary to the well-established doctrine of patent exhaustion. It essentially determined that a private contract, between two parties, which is only effective under state law, can undermine the well-established doctrine of first sale patent exhaustion.

On page 5 of its well-reasoned opinion, the District Court in this case quoted from *Bloomer v. McQuewan* 55 U.S. 539, 549, 14 L. Ed. 532 (1853) (A008):

> But the purchaser of the implement or machine for the purpose of using it in the ordinary pursuits of life, stands on different ground. In using it, he exercises no rights created by the act of Congress, nor does he derive title to it by virtue of the franchise or exclusive

---

[5] One of the problems with *Mallinckrodt* is that it creates a legal underpinning for undermining first sale by the simple expedient of slapping a label on a product.

privilege granted to the patentee. The inventor might lawfully sell it to him, whether he had a patent or not, if no other patentee stood in his way. And when the machine passes to the hands of the purchaser, it is no longer within the limits of the monopoly. It passes outside of it, and is no longer under the protection of the act of Congress. And if his right to the implement or machine is infringed, he must seek redress in the courts of the State, according to the laws of the State and not in the courts of the United States, nor under the law of Congress granting the patent. **The implement or machine becomes his private, individual property, not protected by the laws of the United States, but by the laws of the State in which it is situated.** (emphasis added.)

## C.    THE ISSUES IN *MALLINCKRODT* AND *QUANTA* WERE ESSENTIALLY THE SAME

In *Quanta,* the patent holder attempted to restrict the use of products manufactured pursuant to its license with Intel. The Supreme Court concluded that the patentee had no authority, whatsoever, to restrict the use of its products once they were sold by Intel, which had no restrictions on its right to sell.  On page 638 of its decision, it stated "The authorized sale of an article that substantially embodies a patent exhausts the patent holder's rights and prevents the patent holder from invoking patent law to control post sale use of the article."

In  *Quanta*, as in *Mallinckrodt*, the defendants were made aware of the purported restrictions on their rights to use the patented products.  In *Mallinckrodt*, the restriction was placed on the products as sold.  In *Quanta*, Intel made its customers aware of the purported restrictions.  In spite of this fact, the Supreme

Court in *Quanta* held that the patent rights of LG Electronics had been exhausted after the first unrestricted authorized sale by its licensee Intel. [6]

The Supreme Court has made it very clear, in *Quanta* ,that the right of a purchaser of a patented product, pursuant to a sale by one authorized to sell that product cannot be restricted under U.S. patent law.  While there may be a cause of action under state law, that cause of action cannot be used as an instrument for eliminating  the defense of first sale extinguishment of patent rights. To the extent that *Mallinckrodt* is inconsistent with of that clear and unambiguous statement of the law, it has been effectively overturned by *Quanta*.

---

[6] Subsequent to *Quanta* this Court decided the case of *Princo Corporation v. International Trade Commission,* 616 F. 3d 1318 (Fed Cir 2010),.cert denied,2011 U.S. LEXIS 3703 (May 16, 2011). In its decision this Court cited to *Mallinckrodt.* As was noted by the District Court, in the case at bar, that case concerned license restrictions that limited the use of the patent to manufacture and produce the product in accordance with certain standards." It did not concern products that had been placed into the stream of commerce for use in ordinary pursuits in life. *Princo's* reliance on *Mallinckrodt* thus does not demonstrate a continued endorsement of it in regards to the type of post-sale restrictions at issue in this case." A015

## CONCLUSION

As has been recognized throughout the patent bar, *Mallinckrodt* has caused a great deal of confusion in the past. Hopefully this Court will now take the opportunity to eliminate  this confusion by adopting the bright line test of *Quanta*.

Dated:  June 12, 2015

Respectfully submitted,

/s/ Edward F. O'Connor
Edward F. O'Connor, Esq.
AVYNO LAW P.C.
6345 Balboa Blvd., Suite 190
Encino, California 91316

# ADDENDUM

## ADDENDUM TABLE OF CONTENTS

| Dated | Docket No. | Description | Page |
|-------|-----------|-------------|------|
| 06/24/2014 | 670 | Stipulated Final Judgment | A001 |
| 03/27/2014 | 615 | Order granting **395** Motion to Dismiss for Failure to State a Claim as to Defendant Impression Products | A004 |
| 03/27/2014 | 617 | Order denying **335** Motion to Dismiss for Failure to State a Claim as to Defendant Impression Products | A017 |
| 06/24/2014 | 668 | Stipulated Permanent Injunction as to Impression Products, Inc. | A029 |
| 06/24/2014 | 669 | ORDER granting **661** SEALED MOTION filed by Impression Products, Inc., Lexmark International, Inc. | A034 |

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**CINCINNATI DIVISION**

LEXMARK INTERNATIONAL, INC.

    Plaintiff,

       v.

INK TECHNOLOGIES PRINTER SUPPLIES, LLC, ET AL.

    Defendants.

Civil Action No.
1:10-CV-564-MRB

## STIPULATED FINAL JUDGMENT

    This matter is before the Court on Plaintiff Lexmark International, Inc.'s ("Lexmark's") and Defendant Impression Products, Inc.'s ("Impression's") Joint Motion For Entry Of Stipulated Order Regarding Supplementation Of Record, Limited Reconsideration To The Extent Necessary To Preserve Appellate Rights, For Non-Infringement With Respect To Toner Cartridges First Sold Inside The United States, For Infringement For Toner Cartridges First Sold Outside The United States, And For Entry Of Final Judgment ("Joint Motion"), and the Court having considered the Joint Motion and being otherwise sufficiently advised,

    **IT IS HEREBY FOUND, ORDERED, ADJUDGED** that:

    1.    Judgment is entered in favor of Lexmark and against Impression on Count I of Lexmark's Second Amended Complaint with respect to accused cartridges first sold outside of the United States.

    2.    Judgment is entered in favor of Impression and against Lexmark on Count I of Lexmark's Second Amended Complaint with respect to accused cartridges that are subject to the Return Program condition (*i.e.*, Return Program Cartridges) and first sold in the United States.

3.      This Stipulated Entry of Final Judgment resolves all questions of liability as between Lexmark and Impression and is final, ~~except for an accounting within the meaning of 28 U.S.C.§ 1292(c)(2).~~

4.      Any claims Lexmark may have against unidentified John Doe Defendants are hereby dismissed without prejudice.

5.      Subject to paragraph 3 *supra*, all claims against each of the named Defendants in this action are now resolved.

6.      This Stipulated Entry of Final Judgment is subject to any appeal that Impression or Lexmark may take based on the Court's Opinions and Orders of March 27, 2014 (ECF Nos. 615, 617), regarding whether Lexmark's United States patent rights are exhausted in (1) accused cartridges first sold outside of the United States and (2) accused cartridges that are subject to the Return Program condition (*i.e.*, Return Program cartridges) and first sold inside the United States.

7.      Lexmark and Impression make this Stipulated Entry of Final Judgment to promote judicial economy and expressly reserve all of their applicable rights (including all claims and defenses) on remand, if any.


Date: June 23, 2014                          s/ Michael R. Barrett
      _____                    _____
                                             United States District Judge

HAVING BEEN SEEN AND AGREED TO ON MAY 29 2014, by:

_____                   Edward O'Connor w/p/s _____

P. Douglas Barr (Ohio Bar No. 20868)        Edward F. O'Connor
Steven B. Loy                               *ADMITTED PRO HAC VICE*
Anthony J. Phelps                           THE ECLIPSE GROUP LLP
STOLL KEENON OGDEN PLLC                      2020 Main Street, Suite 600
300 West Vine Street, Suite 2100            Irvine, California 92614
Lexington, KY 40507                         Phone: (619) 239-4340

2

Telephone: (859) 231-3000
Facsimile: (859) 253-1093

William J. Hunter, Jr.
STOLL KEENON OGDEN PLLC
2000 PNC Plaza
500 West Jefferson Street
Louisville, KY 40202
Telephone: (502) 333-6000
Facsimile: (502) 333-6099

Timothy C. Meece
V. Bryan Medlock
Jason S. Shull
Audra Eidem Heinze
BANNER & WITCOFF LTD.
10 South Wacker Drive, Suite 3000
Chicago, Illinois 60606
Telephone: (312) 463-5000

*Attorneys for Plaintiff,*
*Lexmark International, Inc.*

Fax: (619) 239-0116
Email: efo@eclipsegrp.com

Crystal L. Maluchnik (0077875)
George H. Carr (0069372)
JANIK L.L.P.
3200 South Hill Blvd., Suite 300
Cleveland, Ohio 44147
440.838.7600
Fax: 440.838.7601
crystal.maluchnik@janiklaw.com
george.carr@janiklaw.com

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## CINCINNATI DIVISION

LEXMARK INTERNATIONAL, INC.              Civil Action No.1: 10-CV-564

        Plaintiff,                    Judge Michael R. Barrett

     v.

INK TECHNOLOGIES PRINTER SUPPLIES,
LLC, ET AL.

        Defendants.

## OPINION AND ORDER

This matter is before the Court on Defendant Impression Products, Inc.'s Second Motion to Dismiss. (Doc. 395). Plaintiff Lexmark International, Inc. has filed a response in opposition (Doc. 431), and Defendant Impression Products, Inc. has filed a reply (Doc. 434). Plaintiff Lexmark International, Inc. also has filed a surreply (Doc. 440-1), and Defendant Impression Products, Inc. has filed a response to the surreply (Doc. 450).[1] This matter is now ripe for review.

## I.      BACKGROUND

This case concerns the alleged infringement of Plaintiff Lexmark International, Inc.'s ("Lexmark") patented toner cartridges. Lexmark contends that the infringement includes cartridges offered under its Return Program, although the allegations in the Second Amended Complaint do not specifically identify the Return Program cartridges as being at issue.

In its opposition brief, Lexmark claims that it offers customers two options when purchasing a cartridge: (1) a cartridge subject to a combination single-use patent and contract license (a "Return Program cartridge," previously referred to as a "Prebate cartridge"), or (2) a

---

[1] The Court previously granted the motion for leave to file a surreply, deeming the surreply and the opposition filed. (*See* Doc. 440-1; Doc. 450).

A004

regular cartridge without any restrictions on its use.  According to Lexmark, the purchasers of the Return Program cartridge receive an up-front discount on the purchase price of the cartridge in exchange for agreeing to use the cartridge only once, and to return the empty cartridge to Lexmark for remanufacturing or recycling.

Instead of focusing on the lack of specific allegations in the Second Amended Complaint, Defendant Impression Products, Inc. ("Impression Products") seeks dismissal of the claims on the basis that the Return Program is invalid under patent law.

## II.    LEGAL STANDARD

In reviewing a motion to dismiss for failure to state a claim, this Court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff."  *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (quoting *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007)).  "[T]o survive a motion to dismiss[,] a complaint must contain (1) 'enough facts to state a claim to relief that is plausible,' (2) more than 'a formulaic recitation of a cause of action's elements,' and (3) allegations that suggest a 'right to relief above a speculative level.'"  *Tackett v. M&G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1965, 1974, 167 L. Ed. 2d 929 (2007)).  A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  *Ashcroft v. Iqbal*, 556 U.S. 662, 663, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009).  Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556).

## III.    PARTIES' ARGUMENTS

A005

Impression Products contends that the Return Program is invalid under patent law.  In support, it relies upon *Static Control Components, Inc. v. Lexmark International, Inc.*, 615 F. Supp. 2d 575 (E.D. Ky. Mar. 31, 2009) ("*Static Control II*"), where the Eastern District of Kentucky reversed its prior decision, holding that the Supreme Court's decision in *Quanta Computer, Inc. v. LG Electronics, Inc.*, 553 U.S. 617, 128 S. Ct. 2109, 170 L. Ed. 2d 996 (2008), now required it to find that Lexmark's Return Program (then known as the Prebate Program) is invalid.  Impression Products contends that the Court should follow that decision.

In response, Lexmark contends that *Static Control II* was erroneously decided because *Quanta*, 553 U.S. 617, did not determine that all post-sale restrictions were invalid.  Lexmark contends that its single-use licenses granted to consumers under the Return Program are enforceable, relying on multiple cases including *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700 (Fed. Cir. 1992).

In its reply, Impression Products argues that Lexmark is attempting to enforce a single-use restriction intended solely for the purpose of preventing competition, and it does not indicate that the consuming public is ever made aware of the fact that purchasing products are subject to a single-use restriction.  *Static Control II* is the only decision post-*Quanta* to consider the validity of the Return Program, and in that case, the district court found the Return Program invalid. Impression Products claims that all of the cases relied upon by Lexmark are distinguishable and do not make the Return Program valid and enforceable.

Lexmark argues in its surreply that Impression Products concedes that *Mallinckrodt*, 976 F.2d 700, controls in regards to use-based restrictions, that there is no Federal Circuit precedent indicating *Mallinckrodt* was overruled, that Impression Products improperly relies on matters

A006

outside the pleadings, and that Impression Products improperly speculates as to the reasons Lexmark implemented its Return Program.

Impression Products argues in its opposition to the surreply that *Mallinckrodt*, 976 F.2d 700, does not stand for the proposition that any and all post-sale restrictions are legal and enforceable. It argues that Lexmark's Return Program is plainly implemented for improper purposes.

## IV.   ANALYSIS

The issue presented is whether the Return Program is invalid as a matter of law. Having considered the relevant caselaw and the briefings of the parties, the Court finds that Lexmark's patent infringement claims are barred as a matter of law by the doctrine of patent exhaustion and must be dismissed.

The issue of patent exhaustion in regards to conditional sales and licenses is not a new one. Courts have been grappling with the issue since as the mid-19th Century when the Supreme Court rendered its decision on patent exhaustion in *Bloomer v. McQuewan*, 55 U.S. 539, 549, 14 L. Ed. 532 (1853). The question before the Supreme Court was whether purchasers of licenses to sell or use the planning machines for the duration of the original patent term could continue to use the licenses through the extended term. *Id.* at 548. The Supreme Court held that the extension of the patent term did not affect the rights already secured by purchasers who bought the item for use "in the ordinary pursuits of life." *Id.* at 549; *see also Quanta*, 553 U.S. at 625. In reaching that decision, the Supreme Court recognized the distinction between purchasers of the right to manufacture and sell patents articles and end users of those articles. It explained:

> The franchise which the patent grants, consists altogether in the right to exclude every one from making, using, or vending the thing patented, without the permission of the patentee. This is that he obtains by the patent. And when he sells the exclusive privilege of making or vending it for use in a particular place, the purchaser buys a portion of the franchise which the

4

patent confers. He obtains a share in the monopoly, and that monopoly is derived from, and exercised under, the protection of the United States. And the interest he acquires, necessarily terminates at the time limited for its continuance by the law which created it. The patentee cannot sell it for a longer time. And the purchaser buys with reference to that period; the time for which exclusive privilege is to endure being one of the chief elements of its value. He therefore has no just claim to share in a further monopoly subsequently acquired by the patentee. He does not purchase or pay for it.

But the purchaser of the implement or machine for the purpose of using it in the ordinary pursuits of life, stands on different ground. In using it, he exercises no rights created by the act of Congress, nor does he derive title to it by virtue of the franchise or exclusive privilege granted to the patentee. The inventor might lawfully sell it to him, whether he had a patent or not, if no other patentee stood in his way. And when the machine passes to the hands of the purchaser, it is no longer within the limits of the monopoly. It passes outside of it, and is no longer under the protection of the act of Congress. And if his right to the implement or machine is infringed, he must seek redress in the courts of the State, according to the laws of the State and not in the courts of the United States, nor under the law of Congress granting the patent. The implement or machine becomes his private, individual property, not protected by the laws of the United States, but by the laws of the State in which it is situated.

*McQuewan*, 55 U.S. at 549-50.

Numerous decisions concerning patent exhaustion in relation to sales and licenses have followed *McQuewan*. Rather than revisiting every one of those relevant opinions here, the Court briefly summarizes only the most relevant of the cases relied upon by the parties in their briefings.

The first post-*McQuewan* case to consider is *General Talking Pictures Corporation v. Western Electric Company*, 304 U.S. 175, 58 S. Ct. 849, 82 L. Ed. 1273 (1938). In that case, a patent owner licensed another company the right to manufacture and sell patented sound amplifiers only for private, non-commercial use. *Id.* The licensee, however, knowingly sold the amplifiers to a commercial user, who also was aware that the sale was outside the scope of the license. *Id.* at 180. The Supreme Court explained that patentees may restrict their licensees to certain uses of licensed technology as long as the restrictions do not "extend the scope of the

5

monopoly." *Id.* at 181.  Given that the licensee sold the patented product in violations of the field-of-use restriction, the sale was unauthorized and did not result in patent exhaustion.  *Id.* Both the licensee and the purchasers were thus found to be bound by the restriction.  *Id.* at 180-81.

Although multiple cases followed *General Talking Pictures*, the Court moves forward in time to the decision in *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700, 701 (Fed. Cir. 1992), which is central to the parties' dispute.  There, the Federal Circuit held that a "single use only" restriction, which  accompanied the first sale of a device from the patent owner directly to hospitals and that required disposal of the device after the first use, was a valid and enforceable license.  *Id.*  It reasoned that generally, "any conditions which are not in their very nature illegal with regard to this kind of property, imposed by the patentee and agreed to by the licensee for the right to manufacture or use or sell the [patented] article, will be upheld by the courts."  *Id.* at 703. In reaching that decision, the circuit court considered multiple prior cases.  *Id.* at 704-07.  Based upon the totality of those cases, the circuit court determined the fact that "a restrictive license is legal seems clear."  *Id.* at 704 (citing *Mitchell v. Hawley*, 83 U.S. 544, 21 L. Ed. 322).  "[T]he patentee may grant a license upon any condition the performance of which is reasonably within the reward which the patentee by the grant of the patent is entitled to secure."  *Id.* at 704-05 (internal quotations omitted).  "Unless the condition violates some other law or policy (in the patent field, notably the misuse or antitrust law), private parties retain the freedom to contract concerning conditions of sale."  *Id.* at 708 (internal citation omitted).   Thus, according to the Federal Circuit, if the restriction is found to "be reasonably within the patent grant, *i.e.*, that it relates to subject matter within the scope of the patent claims, that ends the inquiry."  *Id.* at 708. If the inquiry leads "to the conclusion that there are anticompetitive effects extending beyond the

A009

patentee's statutory right to exclude, these effects do not automatically impeach the restriction" as anti-competitive effects that are not *per se* violations of law "are reviewed in accordance with the rule of reason." *Id.*[2]

The Ninth Circuit's decision in *Arizona Cartridge Remanufacturers Association Inc. v. Lexmark International, Inc.*, 421 F.3d 981 (9th Cir. 2005) that followed *Mallinckrodt* specifically concerned Lexmark's Prebate Program.  In that case, the circuit court considered whether Lexmark's advertising of its Prebate Program under which it gave purchasers an up-front discount in exchange for an agreement to return the empty cartridge to Lexmark for remanufacturing mislead customers into thinking the post-sale restriction was enforceable.  *Id.* The plaintiff did not challenge the district court's holding that Lexmark's patent rights were not exhausted because it "could condition the use of its patented Prebate cartridges by consumers under the principle articulated by the Federal Circuit in *Mallinckrodt, Inc. v. Medipart, Inc.*, which held that a restriction on a patented good is permissible as long as it is 'found to be reasonably within the patent grant, *i.e.*, that it relates to subject matter within the scope of the patent claims.'" *Arizona Cartridge*, 421 F.3d at 986 (quoting *Mallinckrodt*, 976 F.2d at 708). Nor did it argue that Lexmark acted beyond the scope of its patent.  *Id.*  Instead, it challenged whether Lexmark had a valid contract with the consumers of its product.  *Id.* at 987.  The circuit court determined that Lexmark presented sufficient unrebutted evidence that it had a facially valid contract because the language on the outside of the cartridge package specified the terms under which the consumer could purchase the item, which the consumer could read prior to

---

[2] This is the concept of patent misuse.  The *Mallinckrodt* court noted that the defense requires a factual determination as to whether the overall effect of the license tends to restrain competition unlawfully in an appropriately defined relevant market.  976 F.2d at 706 (citing *Windsurfing Int'l v. AMF, Inc.*, 782 F.2d 995 (Fed. Cir.), *cert. denied*, 477 U.S. 905, 106 S. Ct. 3275, 91 L. Ed. 2d 565 (1986)).

determining whether to purchase the product.  *Id.*  It distinguished that case from instances in which the consumer did not have notice of the condition at the time of purchase.  *Id.* at 987 n. 6.

The Lexmark Prebate Program next was addressed in *Static Control Components, Inc. v. Lexmark International, Inc.*, 487 F. Supp. 2d 830, 846-48 (E.D. Ky. 2007) ("*Static Control I*"), where the district court held that Lexmark's Prebate Program survived summary judgment due to the valid restrictive licenses contained on the packaging of the prebate cartridges.   In so holding, it rejected the notion that the sale of the cartridges to the middlemen before the end user who is bound by the Prebate Program agreement constituted an unrestricted sale that exhausted the patent rights of Lexmark.  *Id.* at 847.  The district court relied, in part, on the Federal Circuit's guidance in *Mallinckrodt* that the legality of restrictive licenses "seems clear."  *Id.* at 848-49 (citing *Mallinckrodt*, 976 F.2d at 704).

Following *Static Control I*, the Supreme Court granted certiorari in *Quanta Computer, Inc. v. LG Electronics, Inc.*, 553 U.S. 617, 128 S. Ct. 2109, 170 L. Ed. 2d 996 (2008), to consider whether the license agreement for computer technology patents of LG Electronics precluded exhaustion of the patent rights of LG Electronics.  LG Electronics had prevailed before the Federal Circuit on the basis that the agreement between LG Electronics and Intel imposed express conditions on the licensed products, that Quanta had express notice that Intel's sales were conditional, and that the conditions survived exhaustion under *Mallinckrodt*.  *See LG Elecs., Inc. v. Bizcom Elecs., Inc.*, 453 F.3d 1364, 1370-71 (Fed. Cir. 2006).  The Supreme Court, however, did not expressly reference *Mallinckrodt* in its decision, holding that the License Agreement and Master Agreement between LGE and Intel were dispositive.  *Quanta*, 553 U.S. 636-38.  It reasoned that the License Agreement and the Master Agreement were independent instruments, and the requirement that Intel notify its customers of use restrictions appeared only in the Master

Agreement. *Id.* at 636. That restriction thus did not affect Intel's rights under the License Agreement, which imposed no conditions on Intel's ability to sell to consumers. *Id.* at 636-37. As such, the Supreme Court determined that the agreements broadly authorized Intel to sell the licensed products without restrictions or conditions such that the patent rights were exhausted, even though Quanta was aware of the condition. *Id.* at 637-38. In so holding, the Supreme Court stated: "The authorized sale of an article that substantially embodies a patent exhausts the patent holder's rights and prevents the patent holder from invoking patent law to control postsale use of the article." *Id.* at 638.

After *Quanta*, the *Static Control I* decision was reconsidered by the district court. In *Static Control II,* 615 F. Supp. 2d at 582, the district court held that *Quanta* represented a change in the law of patent exhaustion that broadened the understanding of patent exhaustion, and whereby a patent-based use restriction through post-sale prebate terms was invalidated. In reaching its decision, the district court considered *Quanta* as well as numerous other Supreme Court cases concerning patent exhaustion. *Id.* at 578-84. Upon consideration, the district court believed that the caselaw "reveals that the Court has consistently held that patent holders may not invoke patent law to enforce restrictions on the post-sale use of their patented products" and that after "the first authorized sale to a purchaser who buys for use in the ordinary pursuits in life, a patent holder's patent rights have been exhausted." *Id.* at 582. Applying those concepts to the Prebate Program, the district court determined that Lexmark "attempts to reserve patent rights in its products through post-sale restrictions on use imposed on its customers[,]" which is "what *Quanta* says Lexmark cannot do." *Id.* at 584. The district court noted a distinction between a condition on the right to sell, as was at issue in *Quanta*, and a post-sale condition on use, like the Prebate Program, stating that the sales of Lexmark cartridges exhausted Lexmark's patent rights

9

and stripped its ability to control post-sale use of the cartridges through patent law. *Id.* at 585. Based upon that analysis, the district court noted its belief that *Quanta* overruled *Mallinckrodt* sub silentio. *Id.* On appeal, however, the Sixth Circuit declined to decide the validity of the Prebate Program, noting that the question was extremely complex and unsettled, and that its resolution would not be relevant to the outcome of the appeal. *Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 697 F.3d 387, 421 (6th Cir. 2012).

In *Princo Corporation v. International Trade Commission*, 616 F.3d 1318 (Fed. Cir. 2010), *cert. denied*, 2011 U.S. LEXIS 3703 (May 16, 2011), the Federal Circuit considered the doctrine of patent misuse in the context package licenses containing field-of-use restrictions for recordable compact discs and rewritable compact discs. Philips and Sony offered patent licenses to make the CD-R or CD-RW discs with a field-of-use restriction that limited the licensees to using the licensed patents to produce discs according to the Orange Book standards. *Id.* at 1322. Explaining that patent misuse in the licensing context is a doctrine that limits a patentee's right to impose conditions on a licensee that exceed the scope of the patent, the circuit court determined that it did not bar the intervenor from enforcing patent rights against Princo. *Id.* at 1322, 1328. In reaching its decision, the circuit court relied upon *B. Braun Medical, Inc. v. Abbott Laboratories*, 124 F.3d 1419 (Fed. Cir. 1997) and *Mallinckrodt*, 976 F.2d 700, in explaining the rationale underlying the doctrine:

> As a general matter, the unconditional sale of a patented device exhausts the patentee's right to control the purchaser's use of the device thereafter, on the theory that the patentee has bargained for, and received, the full value of the goods. That "exhaustion" doctrine *does not apply, however, to a conditional sale or license*, where it is more reasonable to infer that a negotiated price reflects only the value of the "use" rights conferred by the patentee. Thus, express conditions accompanying the sale or license of a patented product, such as field of use limitations, are generally upheld. . . . . When those contractual conditions violate public policy, however, as in the case of price-fixing conditions and tying restraints, the underlying patents

10

> become unenforceable, and the patentee loses its right to sue for infringement or breach of contract.

*Princo*, 616 F.3d at 1328.  The circuit court further recognized that the scope of the patent misuse doctrine is narrow because "the patent grant entitles the patentee to impose a broad range of conditions in licensing the right to practice the patent[.]"  *Id.* at 1329.[3]

Here, the Court is persuaded to follow the reasoning of the district court in *Static Control II*.  Consistent with the *Static Control II* court's analysis, this Court's review of the relevant caselaw does not reflect an endorsement by the Supreme Court of post-sale use restrictions once goods are placed into the ordinary stream of commerce.  *See Static Control II*, 615 F. Supp. 2d at 578-83 (explaining relevant caselaw).  Further, the Court cannot square the *Quanta* decision with the facts alleged by Lexmark as to its Return Program.  In *Quanta*, the consumers had notice of the conditions of the sale, yet the Supreme Court still held that the patent rights of LG Electronics had been exhausted after the first unrestricted authorized sale by its licensee Intel. Those facts parallel this case.  Lexmark does not allege that the authority of the sellers of the Return Program cartridges were restricted or conditioned in any way.  In other words, the facts alleged by Lexmark do not suggest that the sellers had anything other than full authority to sell the Return Cartridges that practiced Lexmark's patents.  Instead, Lexmark alleges only that the Return Program cartridges contained notices of a license restriction which bound the ultimate purchaser.  Under *Quanta*, those post-sale use restrictions do not prevent patent rights from being exhausted given that the initial sales were authorized and unrestricted.  Thus, to the extent that

---

[3] Although Lexmark also cites *Monsanto Company v. Bowman*, 657 F.3d 1341, 1347 (Fed. Cir. 2011) and *Fujifilm Corp. v. Benum*, 605 F.3d 1366, 1371-72 (Fed. Cir. 2010), those cases are not helpful to the analysis of this issue. *Monsanto* cited *Mallinckrodt* only when explaining the Federal Circuit's reasoning in two cases decided pre-*Quanta*. *Monsanto*, 657 F.3d at 1347.  Its decision, however, did not endorse those principles, holding that even if the patents had been exhausted as to the first generation self-replicating seeds, no authorized sale had occurred to exhaust the right in the second generation seeds.  *Id.*  As for *Fujifilm*, it considered *Quanta* in regards to the territorial requirement for patent exhaustion, which is not the issue presently before the Court.  *Fujifilm*, 605 F.3d at 1371-72.

A014

*Mallinckrodt* holds that such post-sale use restrictions preclude patent exhaustion after an authorized sale, the Court agrees with the *Static Control II* court that *Mallinckrodt* was overruled by *Quanta* sub silentio.  *See Ninestar Tech. Co. v. Int'l Trade Comm'n*, 667 F.3d 1373, 1378 (Fed. Cir. 2012) (suggesting that an appellate court decision should not be found overturned by new Supreme Court precedent unless it is plainly inconsistent with that precedent); *Fujifilm Corp. v. Benum*, 605 F.3d 1366, 1371 (Fed. Cir. 2010) (similar to *Ninestar*); *Static Control II*, 615 F. Supp. 2d 575 (E.D. Ky. 2009) (similar to *Ninestar*).  Although the Court recognizes that *Princo* cited to *Mallinckrodt* with approval in considering the doctrine of patent misuse, that case concerned license restrictions that limited the use of the patent to manufacture and produce the product in accordance with certain standards. It did not concern products that had been placed into the stream of commerce for use in ordinary pursuits in life. *Princo*'s reliance on *Mallinckrodt* thus does not demonstrate a continued endorsement of it in regards to the type of post-sale use restrictions at issue in this case.

A contrary holding would not only be inconsistent with *Quanta*, but would also create significant uncertainty for downstream purchasers and end users who may continue to liable for infringement even after an authorized sale to the consumer has occurred.  Therefore, the Court is persuaded that the fully authorized sales of the Return Program cartridges to consumers for use in the ordinary pursuits in life took the cartridges outside the scope of the patent monopoly despite the notices contained on those cartridges, and Lexmark may not now rely on patent law to hold Impression Products liable for infringement.

## V.    CONCLUSION

For the foregoing reasons, Impression Products' Second Motion to Dismiss (Doc. 395) is **GRANTED**.   The infringement claims against Impression Products based upon the Return Program cartridges are hereby **DISMISSED**.

12

**IT IS SO ORDERED**.

s/Michael R. Barrett
Michael R. Barrett, Judge
United States District Court

A016

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

LEXMARK INTERNATIONAL, INC.                         CASE NO.: 1:10-cv-564

        Plaintiff,                                     Judge Michael R. Barrett

   v.

INK TECHNOLOGIES PRINTER SUPPLIES,
LLC, et al.,

        Defendants.

## OPINION AND ORDER

    This matter is before the Court on the Motion to Dismiss of Defendant Impression Products, Inc.   (Doc. 335).   Plaintiff Lexmark International, Inc. has filed a response in opposition (Doc. 367) and Defendant Impression Products, Inc. has filed a reply (Doc. 368).[1] Defendant Impression Products, Inc. subsequently filed a Notice of Additional Authority (Doc. 485) to which Plaintiff Lexmark International, Inc. filed a response (Doc. 488).   Defendant Impression Products, Inc. then filed a reply in support of its notice of additional authority.  (Doc. 491).  This matter is now ripe for review.

## I.     BACKGROUND

    This case concerns the alleged infringement of Plaintiff Lexmark International, Inc.'s ("Lexmark") patented toner cartridges.   Lexmark alleges that it first sold the patented inkjet cartridges at issue outside of the United States.   It claims that those patented inkjet cartridges were acquired and remanufactured by one or more foreign defendants that then sold the remanufactured inkjet cartridges to other defendants.   Those defendants, in turn, sold the

---

[1] Plaintiff Lexmark International, Inc. subsequently filed a motion for leave to file a surreply (Doc. 378), which Defendant Impression Products, Inc. opposed (Doc. 379).  That motion for leave has been denied.

remanufactured inkjet cartridges to others, including customers in the United States.  Lexmark contends that Defendant Impression Products, Inc. ("Impression Products") was one of those defendants that sold in the United States remanufactured inkjet cartridges that had originally been sold outside of the United States thereby infringing Lexmark's patent.

## II.    LEGAL STANDARD

In reviewing a motion to dismiss for failure to state a claim, this Court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (quoting *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007)). "[T]o survive a motion to dismiss[,] a complaint must contain (1) 'enough facts to state a claim to relief that is plausible,' (2) more than 'a formulaic recitation of a cause of action's elements,' and (3) allegations that suggest a 'right to relief above a speculative level.'" *Tackett v. M&G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1965, 1974, 167 L. Ed. 2d 929 (2007)).  A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 663, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009).  Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556).  However, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L.Ed. 2d 209 (1986); *see also In re Sofamor Danek Grp.*, 123 F.3d 394, 400 (6th Cir. 1997) (stating that a court "'need not accept as

2

true legal conclusions or unwarranted factual inferences'") (quoting *Morgan v. Church's Fried Chicken*, 829 F.3d 10, 12 (6th Cir. 1987)).

## III.   ANALYSIS

The patent exhaustion doctrine generally provides that once a patentee has made an unrestricted sale of a patented article, the patentee loses its right to control the sale, offer for sale, or use of the article. *Bowman v. Monsanto Co.*, __ U.S. __, 133 S. Ct. 1761, 1764, 185 L. Ed. 2d 931 (2013); *Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 128 S. Ct. 2109, 170 L. Ed. 2d 996 (2008).   According to a 2001 decision of the Federal Circuit, the patent exhaustion doctrine is territorial.   *Jazz Photo Corporation v. International Trade Commission*, 264 F.3d 1094, 1105 (Fed. Cir. 2001).   That means that in order for patent exhaustion to apply, the authorized first sale must have occurred in the United States.   *Id.* ("United States patent rights are not exhausted by products of foreign provenance.   To invoke the protection of the first sale doctrine, the authorized first sale must have occurred under the United States patent.").   The *Jazz Photo* decision relies upon a United States Supreme Court decision from 1890 in which the Court held that an authorized sale of a good patented by another under the laws of a foreign country does not exhaust the patent rights of the United States patentee, and the United States patentee may sue for infringement when that good is imported into the United States for sale.   *Id.* (citing *Boesch v. Graff*, 133 U.S. 697, 701-03, 10 S. Ct. 378, 33 L. Ed. 787 (1890)).   Thus, under *Jazz Photo*, an initial authorized sale of a patented product outside of the United States would not exhaust the patent rights of the patent holder.   *See id.*

Recently, the Supreme Court addressed the parallel "first sale" doctrine under copyright law.   *Kirtsaeng v. John Wiley & Sons, Inc.*, __ U.S. __, 133 S. Ct. 1351, 1354, 185 L. Ed. 2d 392 (2012).   The Supreme Court's decision was rooted in interpretation of a statutory provision of

A019

copyright law.  *Id.* at 1357-71.  Specifically, the Supreme Court considered whether the phrase "lawfully made under this title" restricts the scope of the first sale doctrine geographically.  *Id.* at 1357 (citing 17 U.S.C. 109(a)).  The plaintiff contended that "lawfully made under this title" imposed a geographical limitation that prevented the first sale provision from applying to its books first manufactured and sold overseas.  *Id.* at 1357-58.  The defendant, however, read the phrase as imposing a non-geographical limitation that required only that the book be made in compliance with the Copyright Act such that a first manufacture and sale abroad would extinguish the rights of the copyright owner.  *Id.* at 1358.  The Supreme Court determined that the plain language of the provision said nothing about geography and that interpreting the provision not to provide a geographical limitation made linguistic sense and did not present the same difficulties as an interpretation that included a geographical limitation.  *Id.* at 1358-71.

However, the Supreme Court's analysis did not end there.  It next considered the context of the statutory provision.  *Kirtsaeng*, 133 S. Ct. at 1360.  According to the Supreme Court, the legislative history of the statutory provision indicates that Congress did not have geography in mind when writing the present version of section 109(a).  *Id.*  Additionally, it determined that other provisions of the current statute supported a non-geographical interpretation.  *Id.* at 1361-62.  For example, the "manufacturing clause," which limited importation of many copies printed outside the United States, was phased out in an effort to equalize treatment of copies made in America and copies made abroad.  *Id.*  The Supreme Court had difficulty squaring that "equal treatment" principle with a first sale doctrine that imposed geographical limitations.  *Id.* at 1362.

The Supreme Court also considered whether canons of statutory interpretation favored a geographical limitation.  In particular, it considered the common law history of the first sale doctrine by applying the cannon of statutory interpretation that "[w]hen a statute covers an issue

4

previously governed by the common law," it is presumed that "Congress intended to retain the substance of the common law." *Kirtsaeng*, 133 S. Ct. at 1363 (citing *Samantar v. Yousuf*, 560 U.S. 305, n. 13, 130 S. Ct. 2278, 176 L. Ed. 2d 1047 (2010)).   Applying that canon, the Supreme Court traced the doctrine back to the Seventeenth Century where Lord Coke explained the common law's refusal to permit restraints on the alienation of chattels.   *Id.*   The Supreme Court noted that a law permitting a copyright holder to control the resale or other disposition of a chattel once sold is "'against Trade and Traffi[c], and bargaining and contracting."   *Id.* (quoting L. E. Coke, Institutes of the Laws of England, § 360, p. 223 (1628)).   It further recognized the same principle of freedom to resell can work to the advantage of the consumer and frees the courts from the administrative burden of trying to enforce restrictions upon difficult-to-trace, readily movable goods, and avoids selective enforcement inherent in any such effort.   *Id.* (citing *Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S 877, 127 S. Ct. 2705, 168 L. Ed. 2d 623 (2007)).   Accordingly, the Supreme Court determined that common law of the first sale doctrine "makes no geographical distinctions."   *Id.*

The Supreme Court then considered the practical difficulties of placing geographical limitations on the first sale doctrine.   *Kirtsaeng*, 133 S. Ct. at 1364.   The libraries, in particular, would have difficulty maintaining their collections of foreign books that do not contain a copyright holder's present address or in negotiating fees for those copyrights after first sale.   *Id.* at 1365-66.   Other manufacturers and retailers of goods would face similar restrictions.   *Id.* at 1365.   A geographical limitation would prevent the resale of a car without the permission of the holder of each copyright on each piece of copyrighted automobile software, and it also would prevent retailers from buying and selling goods packaged abroad that contain copyrighted logos, labels, and instructions.   *Id.*   Similarly, museums would have to obtain the permission of a

5

copyright owner to display a foreign work, even if the copyright owner already sold or donated the work to a foreign museum. *Id.* Also of some importance was that many had relied on the first sale doctrine's protection in their businesses due to the unsettled nature of the doctrine. *Id.* at 1366.

Finally, the Supreme Court considered the defendant's arguments that a geographical interpretation was favored. *Kirtsaeng*, 133 S. Ct. at 1367-71. One particular issue addressed was the division of markets. *Id.* at 1370. The Supreme Court determined that there was "no basic principle of copyright law that suggests that publishers are especially entitled to such rights." *Id.* at 1370. Rather, "Congress enacted a copyright law that (through the 'first sale' doctrine) limits copyright holders' ability to divide domestic markets." *Id.* at 1371. That limitation is consistent with antitrust laws. *Id.* In the Supreme Court's view, "[w]hether copyright owners should, or should not, have more than ordinary commercial power to divide international markets is a matter for Congress to decide . . . [and the Supreme Court does] no more here than try to determine what decision Congress has taken." *Id.*

Based on the entirety of its analysis, the Supreme Court held that "[i]n our view, § 109(a)'s language, its context, and the common-law history of the first sale doctrine, *taken together*, favor a non-geographical interpretation. We also doubt that Congress would have intended to create the practical copyright-related harms with which a geographical interpretation would threaten ordinary scholarly, artistic, commercial and consumer activities." *Id.* at 1358 (emphasis added).

Here, the core dispute between Lexmark and Impression Products is whether the United States Supreme Court's March 19, 2013 decision in *Kirtsaeng*, 133 S. Ct. 1351, overturns the Federal Circuit's decision in *Jazz Photo*, 264 F.3d 1094, such that Lexmark's patent rights were

A022

exhausted upon the first authorized sale abroad.[2]  Other courts that have considered the continuing validity of an appellate court decision in light of new Supreme Court precedent have suggested that an appellate court decision should not be overturned unless it is plainly inconsistent with the Supreme Court precedent.  *See Ninestar Tech. Co.  v. Int'l Trade Comm'n*, 667 F.3d 1373, 1378 (Fed. Cir. 2012); *Fujifilm Corp. v. Benun*, 605 F.3d 1366, 1371 (Fed. Cir. 2010); *Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 615 F. Supp. 2d 575 (E.D. Ky. 2009).

In this instance, the balance of considerations weighs in favor of finding that *Kirtsaeng* is not plainly inconsistent with *Jazz Photo*.  An obvious distinction between the two cases is that *Jazz Photo* involved patent law whereas *Kirtsaeng* involved only copyright law.  Indeed, nowhere in *Kirtsaeng* is there any express mention or consideration of patents, the patent exhaustion doctrine, or patent exhaustion's territoriality requirement.  Although a lack of express mention or consideration of the patent exhaustion doctrine does not automatically preclude application of *Kirtsaeng* to patent law, the Federal Circuit recently has reinforced that copyright cases are not "controlling" regarding patent issues.  *Lifescan Scotland, Ltd. v. Shasta Techs., LLC*, 734 F.3d 1361, 2013 U.S. App. LEXIS 22332, at *38 (Fed. Cir. Nov. 4, 2013) (citing *Bobbs-Merrill Co. v. Straus*, 210 U.S. 339, 346, 28 S. Ct. 722, 52 L. Ed. 1086 (1908)).  In fact, the Supreme Court historically has been reluctant to readily consider copyright cases and patent cases interchangeably, noting that the protections afforded by copyright law and patent law are different.  *See Bobbs-Merrill*, 210 U.S. at 346.[3]  Moreover, the Federal Circuit has acknowledged

[2] In the context of patents, courts have used the term "patent exhaustion" interchangeably with "first sale." For clarity purposes, the Court primarily will refer to "first sale" in the context of copyrights and to "exhaustion" in the context of patents, except where otherwise necessary or appropriate.

[3] In *Bobbs-Merrill*, the Supreme Court was reluctant to accept patent law cases on first sale as being directly binding for copyright law. 210 U.S. at 345-46.  There, the copyright owner relied on prior patent cases as supporting a right to impose conditions on sale.  *Id.* at 342.  The Supreme Court recognized that there were

7

that the patent exhaustion doctrine does not squarely align with first sale provision of the Copyright Act, even though they are similar doctrines. *Fuji Photo Film Co., Ltd. v. Int'l Trade Comm'n*, 474 F.3d 1281, 1294 (Fed. Cir. 2007) (acknowledging that patent rights are exhausted through a first sale <u>in the United States</u> whereas "[a] different rule applies in the copyright context"). In that respect, the law weighs against finding that *Kirtsaeng* overturned *Jazz Photo* sub silentio.

Other factors also weigh against a finding that *Kirtsaeng* overturned *Jazz Photo*. The decision in *Kirtsaeng* is rooted in statutory and legislative interpretation of section 109(a) of the Copyright Act. 17 U.S.C. § 109(a). Noticeably absent from patent law is a codification of the exhaustion doctrine. Rather, the patent exhaustion doctrine, including its territoriality requirement, is grounded in judicial precedent. *See Jazz Photo*, 264 F.3d at 1105. As such, unlike in *Kirtsaeng*, there is no statutory provision or legislative history of the exhaustion doctrine that favors a non-geographical interpretation. Thus, the core statutory text that weighed in favor of a non-geographical interpretation is non-existent in the context of patent law.

The lack of a codified patent exhaustion doctrine means that there may be more leeway for understanding and interpreting the doctrine. While Lord Coke's policy provides a natural starting place since that policy undergirds the patent exhaustion doctrine, it is not the only factor to be considered. *See Lifescan Scotland,* 2013 U.S. App. LEXIS 22332, at *39-40 (recognizing that the same policy underlying the first sale doctrine also undergirds the doctrine of patent exhaustion) (citing *Straus v. Victor Talking Mach. Co.*, 243 U.S. 490, 500-01, 37 S. Ct. 412, 61 L. Ed. 866 (1917)). Importantly, the patent exhaustion doctrine's history differs from the history

---

differences in the extent of protections granted by copyright law and patent law. *Id.* at 346. As such, *Bobbs* teaches that the common law on patent exhaustion does not automatically transfer to copyright law. The contrary presumably also is true – that is, that law on copyright's first sale doctrine does not automatically transfer to patent law's exhaustion doctrine.

A024

of the first sale doctrine addressed in *Kirtsaeng*.  In *Kirtsaeng,* the Supreme Court considered what common law of the first sale doctrine existed prior to the codification of the doctrine in the Copyright Act of 1909, which subsequently was superseded by the Copyright Act of 1976. *Kirtsaeng*, 133 S. Ct. at 1363.  In doing so, it looked to the last Supreme Court decision prior to the 1909 codification to determine if it indicated any intent to impose a geographical restriction. *Id.* at 1353.  Finding no geographical restriction in that Supreme Court precedent, the Supreme Court concluded that the common law principles set forth by Lord Coke still were followed at the time of codification and had never been modified by Congress.  *Id.* at 1363.  Since the doctrine of patent exhaustion is not codified, the same reasons for considering and applying Lord Coke's principles are not present.

In contrast to the first sale doctrine, the patent exhaustion doctrine has evolved through Supreme Court and lower court decisions, and it remains premised upon those decisions.  In particular, *Jazz Photo*, 264 F.3d 1094, is a decision that interprets the prior Supreme Court precedent on patent exhaustion to determine how it applies in the context of first sales abroad. The Supreme Court in *Kirtsaeng* did not specifically consider the evolution of a common law principle through Supreme Court decisions on patent exhaustion and the subsequent interpretations thereof.  It also did not foreclose the possibility that the first sale principles articulated by Lord Coke could be and were modified by the Supreme Court and lower courts in the patent context. *See Kirtsaeng*, 133 S. Ct. at 1353 (considering whether a geographical distinction could be found in the Supreme Court case that first applied the first sale provision one year prior to its codification).

Moreover, *Kirtsaeng* suggests that Lord Coke's principles should not be applied in a vacuum.  Rather, it is necessary to consider the context, history and practical considerations to

A025

determine the proper application of the patent exhaustion doctrine to first sales abroad. *See Kirtsaeng*, 133 S. Ct. at 1358. Part of that context and history is *Jazz Photo* and its progeny, the Supreme Court precedent on which *Jazz Photo* relies, other judicial decisions concerning the patent exhaustion doctrine, and the practical patent-specific implications of a territoriality requirement for patent exhaustion. Those particular considerations were not addressed in *Kirtsaeng* nor were they thoroughly explained or analyzed by Impression Products.

While the Federal Circuit's recent decision in *Lifescan*, 2013 U.S. App. LEXIS 22332, may provide guidance as to how the Federal Circuit may apply *Kirtsaeng* upon reconsideration of *Jazz Photo*, it does not conclusively demonstrate that *Jazz Photo* is no longer good law. *Lifescan* did not concern the territoriality requirement of patent exhaustion. *See Lifescan*, 2013 U.S. App. LEXIS 22332. Instead, it raised a matter of first impression for the Federal Circuit – whether patent exhaustion applied to a product distributed for free. *Id.* at *33. Since there was no Supreme Court guidance directly on point, the Federal Circuit looked to prior Supreme Court precedent on the patent exhaustion doctrine in reaching its decision. *Id.* at *32-38 (citing *Bowman v. Monsanto Co.*, __ U.S. __, 133 S. Ct. 1761, 1766, 185 L. Ed. 2d 931 (2013); *United States v. Univis Lens Co.*, 316 U.S. 241, 62 S. Ct. 1088, 86 L. Ed. 1408 (1942); *Adams v. Burke*, 84 U.S. (17 Wall.) 453, 21 L. Ed. 700 (1873); *Bloomer v. McQuewan*, 55 U.S. (14 How.) 539, 14 L. Ed. 532 (1852)). After determining that the Supreme Court had never limited the patent exhaustion doctrine to sales only, it then looked to the holding in *Kirtsaeng* merely to <u>reinforce</u> its conclusion that the doctrine was not so limited, even though *Kirtsaeng* was not controlling on issues of patent law. *Id.* at *38. In particular, the Federal Circuit recognized that Lord Coke's principles undergird the patent exhaustion doctrine and do not draw any distinction between gifts and sales. *Id.* at *39-40. Therefore, considering the totality of the circumstances, the Federal

A026

Circuit determined a patentee cannot "circumvent the application of patent exhaustion principles by distributing a product embodying a patent for free."  *Id.* at *42.

Here, in contrast to *Lifescan*, the Federal Circuit has determined in *Jazz Photo* that Supreme Court precedent supports a territoriality requirement for patent exhaustion.  Thus, Lord Coke's principles are not as easily relied upon as they are in regards to the matter before the Federal Circuit in *Lifescan*.  While it is possible that upon revisiting *Jazz Photo* and its cursory reasoning, the Federal Circuit will now give more weight to Lord Coke's policy and the reasoning set forth in *Kirtsaeng*, it is not a foregone conclusion that the policy or the reasoning will be strictly applied.  This Court adheres to the view that copyright law and patent law are not identical and offer different protections.  Thus, it would be amiss to overlook the distinctions by adopting Impression Products' position that Lord Coke's principles, as applied to the Copyright Act's first sale provision, conclusively demonstrate that *Kirtsaeng* overrules *Jazz Photo* sub silentio.

Reinforcing this Court's reluctance to apply *Kirtsaeng* to patent law is the Supreme Court's denial of certiorari in a case that raised the precise issue currently before this Court. *Ninestar Technology Co., Ltd. v. International Trade Commission*, 667 F.3d 1373 (Fed. Cir. 2012), *cert. denied*, 2013 U.S. LEXIS 2409 (U.S., Mar. 25, 2013).[4]  That denial of certiorari was issued on the same day the Supreme Court remanded two others copyright cases to be considered in light of its decision in *Kirtsaeng*.  *See Kumar v. Pearson Educ., Inc.*, __ U.S. __, 133 S. Ct. 1631, 185 L. Ed. 2d 614 (2013); *Liu v. Pearson Educ. Inc.*, __ U.S. __, 133 S. Ct. 1630, 185 L.

---

[4] The Federal Circuit had relied upon *Jazz Photo* in holding that United States patent rights are not exhausted by products of foreign provenance.  *Ninestar Tech. Co. v. ITC*, 667 F.3d 1373, 1378 (Fed. Cir. 2012).  In so holding, it rejected the argument that *Jazz Photo* had been overruled by *Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 632 n.6, 128 S. Ct. 2109, 170 L. Ed. 2d 996 (2008) because neither the facts nor the law in *Quanta* concerned the importation into the United States of a product not made or sold under a United States patent. *Id.*  Thus, while the principles of *Quanta* may be subject to application for products first sold domestically, the Federal Circuit has rejected their application for products first sold overseas.

A027

Ed. 2d 613 (2013).  That denial of certiorari, while not conclusive, certainly suggests that *Jazz Photo* remains for now the controlling case on whether patent rights are exhausted by a first authorized sale abroad.

In so ruling, however, the Court does not intend to determine that *Jazz Photo* ultimately should stand in light of *Kirtsaeng*.  The Court is cognizant that many of the reasons for rejecting a territoriality requirement for copyright law may apply equally to patent law.  Nevertheless, given the complete lack of consideration of the context, history and practical implications of international patent exhaustion in *Kirtsaeng*, the Court concludes that the Supreme Court did not intend to implicitly overrule *Jazz Photo* and that *Jazz Photo* remains controlling precedent on patent exhaustion abroad.

## IV.    CONCLUSION

Accordingly, Impression Products' Motion to Dismiss (Doc. 335) is **DENIED**.

**IT IS SO ORDERED**.

s/Michael R. Barrett
Michael R. Barrett, Judge
United States District Court

12

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### CASE NO. 1:10-cv-00564-MRB

LEXMARK INTERNATIONAL, INC.
Plaintiff

v.

INK TECHNOLOGIES PRINTER SUPPLIES, LLC
*et al*
Defendants

## STIPULATED PERMANENT INJUNCTION

This matter is before the Court on the stipulated motion of Plaintiff Lexmark International, Inc. ("Lexmark") and Defendant Impression Products, Inc. ("Impression") for entry of this Stipulated Permanent Injunction. (Doc. 661).

**IT IS HEREBY FOUND, ORDERED, ADJUDGED WITH CONSENT OF THE PARTIES** that:

1.   Impression, is or has been, among other things, selling remanufactured and compatible toner cartridges in the United States and in foreign countries for use in Lexmark laser printers, including E120, E220, E230, E232, E234, E238, E240, E250, E260, E320, E322, E321, E323, E330, E332, E340, E342, E350, E352, E360, E450, E460, E460, T520, T522, X520, X522, T610, T612, T614, T616, T620, T622, X620, T630, T632, T634, T640, T642, T644, T650, T652, T654, T656, X650, X651, X652, X653, X654, X655, and X656 series printers, and the equivalent monochrome laser printers sold under private label, including the Dell 1700, Dell 1700N, Dell 1710, Dell 1720, Dell 2230, Dell 2330, Dell 2350, Dell 3330, Dell 3333, Dell 3335, Dell 5200, Dell 5210, Dell 5300, Dell 5310, Dell 5230, Dell 5350, Dell 5530, Dell 5535, Dell E220, IBM 1116, IBM 1312, IBM 1412, IBM

1

1512, IBM 1512N, IBM infoPrint 1120, IBM InfoPrint 1125, IBM Infoprint 1130, IBM Infoprint 1140, IBM InfoPrint 1332, IBM Infoprint 1352, IBM Infoprint 1372, IBM InfoPrint 1532, IBM Infoprint 1552, IBM Infoprint 1572, IBM Infoprint 1832, IBM Infoprint 1850, IBM Infoprint 1852, IBM Infoprint 1860, IBM Infoprint 1870, IBM Infoprint 1872, IBM Infoprint 1880, IBM Infoprint 1892, InfoPrint 1601, InfoPrint 1602, InfoPrint 1612, InfoPrint 1622, Infoprint 1822, IBM Infoprint 1823, IBM Infoprint 1930, IBM Infoprint 1940, Lenovo LI3900, LG 3510, LG 3350, LG 3850, LG 4010, Nashuatec P6220, Nashuatec P6225, Nashuatec P6230, Nashuatec 6240, Okidata MB780, Okidata MB790, Okidata 5500, Okidata 7180, Okidata 7190, Ricoh Afficio SP 4400, Ricoh Afficio SP 4410, Ricoh Afficio SP 4420, Sindoricoh 5000, Sindoricoh 5005, Sindoricoh 5050, Sindoricoh 4450, Sindoricoh 4550, Sindoricoh 4555, Sindoricoh 5450, Sindoricoh 5550, Source Technologies 9116, Source Technologies 9130,  Source Technologies 9140, Source Technologies 9325, Source Technologies 9335, Source Technologies 9340, Source Technologies 9530n, Source Technologies 9550, Source Technologies 9552, Source Technologies 9630, Source Technologies 9650, Source Technologies 9620, Source Technologies 9622, Source Technologies ST 9120, Source Technologies 9125, Toshiba e-Studio 20P, Toshiba e-Studio 25P, Toshiba e-Studio 30P, Toshiba e-Studio 40P, Toshiba e-Studio 400P, Toshiba e-Studio430, Toshiba e-Studio 530, Toshiba e-Studio 450P, Toshiba e-Studio 500P, Toshiba e-Studio 500P, Unisys 134, Unisys 136, Unisys UDS 130, Unisys UDS 132, Unisys UDS 640n, Unisys UDS 650n, Unisys UDS 140, Unisys UDS 142, Unisys UDS 540n, Unisys UDS 544n, Unisys UDS 630, Unisys UDS 635dn series printers (the "Accused Cartridges").

2

2.     Lexmark owns and has standing to sue for infringement of United States Patent Nos. 5,337,032; 5,634,169; 5,758,231; 5,758,233; 5,768,661; 5,802,432; 5,875,378; 5,995,772; 6,009,291; 6,078,771; 6,397,015; 6,459,876; 6,487,383; 6,496,662; 6,678,489; 6,816,692; 6,871,031; 6,879,792; 7,139,510; 7,233,760; and 7,305,204 (the "Lexmark Patents");

3.     The Lexmark Patents are valid and enforceable against Impression.

4.     The following table identifies the patent claims of the Lexmark Patents that are satisfied literally by the Accused Cartridges:

| Patents-in-Suit | Accused Cartridges* | | | | | | |
|---|---|---|---|---|---|---|---|
| | E120 | E23X/E24X/E33X/E34X | E260/E360/E460 | E25X/E35X/E45X | T52X/T61X/T62X/T63X/T64X/T65X/X651/X652/X654/X656 | E320/E322 | E220 and E321/E323 |
| 5,337,032 | | | | | 1,5,6 | | |
| 5,634,169 | | | 32,36,42 | | 1-3,32-34, 36, 42 | 32,36,42 | 32,36,42 |
| 5,758,231 | | 1-16 | 1-16 | 1-16 | | 1-16 | 1-16 |
| 5,758,233 | | | | | 1-4 | | |
| 5,768,661 | | | | | 1,2,3,6 | | |
| 5,802,432 | | | | | 1-3, 7-9 | | |
| 5,875,378 | | | | | 1-3,12-14,24 | | |
| 5,995,772 | | | 14,15,22, 32-34 | | 1-3,5,7-9, 12,14-18,20,21 | 14,15,22, 32-34 | 14,15,22, 32-34 |
| 6,009,291 | 1-2 | 1-2 | 1-2 | 1-2 | 1-2 | | |
| 6,078,771 | 1,5,6,10, 12,13,15 | 1,5,6,10, 12,13,15 | 1,5,6,10, 12,13,15 | 1,5,6,10, 12,13,15 | 1,2,5,6,10, 12,13,15 | | |
| 6,397,015 | | | 1,2,4, 9,17,19 | | 1-4,7-12, 14-19,22-24 | 1,2,4, 9,17,19 | 1,2,4, 9,17,19 |
| 6,459,876 | | | | | 1-28 | | |
| 6,487,383 | 1,2,6, 10,15,19 | 1,2,6, 10,15,19 | 1,2,6, 10,15,19 | 1,2,6, 10,15,19 | 1,2,6,10, 11,15,19 | 19 | 19 |
| 6,496,662 | | 1,3,5,7 | | 1,3,5,7 | | | |
| 6,678,489 | | 5, 6 | 5, 6 | 5, 6 | | | |
| 6,816,692 | 1-13 | 1-13 | 1-13 | 1-13 | | | |
| 6,871,031 | | 1-6,8-12 | 1-6,8-12 | 1-6,8-12 | | | |
| 6,879,792 | | 1-11 | 1-11 | 1-11 | | | |
| 7,139,510 | | 1-10 | 1-10 | 1-10 | | | |
| 7,233,760 | 1-10, 11,12,14 | 1-10, 11,12,14 | 1-10, 11,12,14 | 1-10, 11,12,14 | | | |
| 7,305,204 | | 1-20 | 1-20 | 1-8,10-13 | | | |

3

\* The private label models corresponding to the Accused Cartridges identified in Table 1 are likewise covered by the respective Patents-in-Suit.

5.      Except as permitted in Paragraph 6, this Court permanently enjoins Impression, as well as those persons or companies in active concert or participation with Impression who receive actual notice of the order by personal service or otherwise, from making, using, selling, offering for sale or importing into the United States Accused Cartridges that infringe any of the above-identified patent claims or are not colorably different from the Accused Cartridges.

6.      Nothing herein limits or shall be construed to limit in any way Impression's activities with respect to toner cartridges in which Lexmark's patent rights have been exhausted or to redesigned toner cartridges that do not infringe Lexmark's patents.  Further, nothing herein limits or shall be construed to limit in any way Impression's activities with respect to any Lexmark Patents that have expired, lapsed, are no longer enforceable, or have found to be invalid by a court of competent jurisdiction.  Finally, nothing herein limits or shall be construed to limit in any way Impression's activities outside the United States.

7.      This Court retains jurisdiction over Lexmark and Impression to the extent necessary to enforce the terms of this Stipulated Permanent Injunction.

8.      This Stipulated Permanent Injunction shall be binding upon and shall inure to the benefit of Lexmark and Impression, as well as each of their respective subsidiaries, corporate parents, affiliates, and/or successors and assigns.


Date: June 23, 2014                           s/ Michael R. Barrett
                                              United States District Judge


4

HAVING BEEN SEEN AND AGREED TO ON MAY 29, 2014, by:

P. Douglas Barr (Ohio Bar No. 20868)
Steven B. Loy
Anthony J. Phelps
STOLL KEENON OGDEN PLLC
300 West Vine Street, Suite 2100
Lexington, KY 40507
Telephone: (859) 231-3000
Facsimile: (859) 253-1093

William J. Hunter, Jr.
STOLL KEENON OGDEN PLLC
2000 PNC Plaza
500 West Jefferson Street
Louisville, KY 40202
Telephone: (502) 333-6000
Facsimile: (502) 333-6099

Timothy C. Meece
V. Bryan Medlock
Jason S. Shull
Audra Eidem Heinze
BANNER & WITCOFF LTD.
10 South Wacker Drive, Suite 3000
Chicago, Illinois 60606
Telephone: (312) 463-5000

*Attorneys for Plaintiff,*
*Lexmark International, Inc.*

Edward F. O'Connor
*ADMITTED PRO HAC VICE*
THE ECLIPSE GROUP LLP
2020 Main Street, Suite 600
Irvine, California 92614
Phone: (619) 239-4340
Fax: (619) 239-0116
Email: efo@eclipsegrp.com

Crystal L. Maluchnik (0077875)
George H. Carr (0069372)
JANIK L.L.P.
3200 South Hill Blvd., Suite 300
Cleveland, Ohio 44147
440.838.7600
Fax: 440.838.7601
crystal.maluchnik@janiklaw.com
george.carr@janiklaw.com

5

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### CINCINNATI DIVISION

LEXMARK INTERNATIONAL, INC.

     Plaintiff,

       v.

INK TECHNOLOGIES PRINTER SUPPLIES, LLC, ET AL.

     Defendants.

Civil Action No.
1:10-CV-564-MRB

## ORDER ON JOINT MOTION FILED UNDER SEAL ON MAY 29, 2014

This matter is before the Court on the Joint Motion, filed under seal on May 29, 2014, by Plaintiff Lexmark International, Inc. ("Lexmark") and Defendant Impression Products, Inc. ("Impression Products"), for Entry of Stipulated Order Regarding Supplementation of Record, Limited Reconsideration to the Extent Necessary to Preserve Appellate Rights, for Non-Infringement with respect to Toner Cartridges First Sold Outside the United States, and for Entry of Final Judgment ("Joint Motion").  (Doc. 661).

**IT IS HEREBY FOUND, ORDERED, ADJUDGED** that:

1.     The Joint Motion is granted.

2.     In accordance with the Joint Motion, the district court record is hereby supplemented with the stipulations and agreements contained in the Joint Motion as well as the documents attached thereto (collectively, "the Supplemented Record").

3.     Lexmark's and Impression Products' joint motion for reconsideration—of the Court's order (Doc. 615) regarding Impression Products' Second Motion to Dismiss regarding the invalidity of Lexmark's Return Program under patent law—is granted based on the Supplemented Record.

4.      As stated in the Court's order, the "issue presented" in Impression Products' Second Motion to Dismiss was "whether the Return Program is invalid as a matter of law. Having considered the relevant caselaw and briefings of the parties, the Court finds that Lexmark's patent infringement [based on the Return Program] are barred as a matter of law by the doctrine of patent exhaustion and must be dismissed."  (Doc. 615, p. 4).

5.      Based on the Supplemented Record, the following portion of the Court' order (Doc. 615, p. 11) is vacated.

> Lexmark does not allege that the authority of the sellers of the Return Program cartridges were restricted or conditioned in any way. In other words, the facts alleged by Lexmark do not suggest that the sellers had anything other than full authority to sell the Return Cartridges that practiced Lexmark's patents.

6.      After reconsidering Impression Products' Second Motion to Dismiss (Doc. 615) in view of the Supplemented Record, the Court again finds that Lexmark's patent infringement claims based on its Return Program are barred as a matter of law by the doctrine of patent exhaustion and must be dismissed based on the same analysis of patent law set forth in the Court's order of March 27, 2014.  (Doc. 615)

                                        s/Michael R. Barrett
Date: June 23, 2014                     MICHAEL R. BARRETT, Judge
                                        United States District Court

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
## 𝔣𝔬𝔯 𝔱𝔥𝔢 𝔉𝔢𝔡𝔢𝔯𝔞𝔩 𝔆𝔦𝔯𝔠𝔲𝔦𝔱

*Lexmark International, Inc. v. Ink Technologies Printer*, 2014-1617, -1619

## CERTIFICATE OF SERVICE

I, Robyn Cocho, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by AVYNO LAW P.C., Attorneys for Appellant to print this document. I am an employee of Counsel Press.

On **June 12, 2015,** counsel has authorized me to electronically file the foregoing **Brief for Defendant-Appellant** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to all counsel registered as CM/ECF users, including any of the following:

Timothy Colin Meece
(principal counsel)
Auda Carol Eidem Heinze
Bryan Medlock, Jr.
Jason S. Shull
Banner & Witcoff, Ltd.
Ten South Wacker Drive
Chicago, IL 60606
312-463-5420
tmeece@bannerwitcoff.com
aheinze@bannerwitcoff.com
bmedlock@bannerwitcoff.com
jshull@bannerwitcoff.com

Benjamin Beaton
Sidley Austin LLP
1501 K Street, NW
Washington, DC 20005
202-736-8000
bbeaton@sidley.com

Steven B. Loy
Stoll, Keenon & Park, LLP
300 West Vine Street, Suite 2100
Lexington, KY 40507-1380
859-231-3000
steven.loy@skofirm.com

Constantine L. Trela, Jr.
Sidley Austin LLP
Bank One Plaza
1 South Dearborn Street
Chicago, IL 60603
312-853-7000
ctrela@sidley.com

Two paper copies will also be mailed to the above principal counsel on this

date. Any counsel for Amici Curiae appearing at the time of this filing will be

served only via the email notice from the CM/ECF systsem.

Upon acceptance by the Court of the e-filed document, 31 paper copies will

be filed with the Court within the time provided in the Court's rules.

June 12, 2015                          /s/Robyn Cocho
                                       Counsel Press

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).

__X__ The brief contains 6,266 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii),or

_____ The brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

__X__ The brief has been prepared in a proportionally spaced typeface using MS Word 2013 in a 14 point Times New Roman font or

_____ The brief has been prepared in a monospaced typeface using _____ _____ in a ___ characters per inch_____ font.

May 27, 2015 _____                     /s/ Edward F. O'Connor _____
                                           Edward F. O'Connor, Esq.
                                           AVYNO LAW P.C.
                                           Counsel for Appellant