Nos. 14-1617, -1619

# United States Court of Appeals
# for the Federal Circuit

LEXMARK INTERNATIONAL, INC.,

*Plaintiff-Cross-Appellant*,

v.

IMPRESSION PRODUCTS, INC.,

*Defendant-Appellant*

QUALITY CARTRIDGES, INC., JOHN DOES, 1-20, BLUE TRADING LLC, EXPRINT INTERNATIONAL, INC., LD PRODUCTS, INC., PRINTRONIC CORPORATION, TESEN DEVELOPMENT (HONG KONG) CO. LTD., BENIGNO ADEVA AND HIS COMPANIES,

*Defendants.*

Appeal from the United States District Court for the Southern District of Ohio in Case No. 1:10-cv-00564-MRB, Judge Michael R. Barrett

## BRIEF FOR COSTCO WHOLESALE CORPORATION AND RETAIL LITIGATION CENTER, INC. AS AMICI CURIAE SUPPORTING DEFENDANT-APPELLANT

Matthew J. Moore
J. Scott Ballenger
Melissa Arbus Sherry
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC  20004
Tel:  (202) 637-2200
Fax:  (202) 637-2201

June 19, 2015                    *Counsel for Amici Curiae*

## CERTIFICATE OF INTEREST

Counsel for amici curiae Costco Wholesale Corporation and Retail Litigation Center, Inc. certifies the following pursuant to Fed. R. App. P. 26.1 and Fed. Cir. R. 29(a) and 47.4:

1. The full name of every party or amicus represented by me is:

   Costco Wholesale Corporation and Retail Litigation Center, Inc.

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

   Costco Wholesale Corporation and Retail Litigation Center, Inc.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

   None.

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this Court are:

   **Latham & Watkins LLP**:  Matthew J. Moore, J. Scott Ballenger, Melissa Arbus Sherry.


June 19, 2015                               /s/ *Matthew J. Moore*
                                            Matthew J. Moore
                                            LATHAM & WATKINS LLP
                                            555 Eleventh Street, NW
                                            Suite 1000
                                            Washington, DC  20004

                                            *Counsel for Amici Curiae*

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTEREST ...................................................................i

TABLE OF AUTHORITIES ................................................................... iii

INTEREST OF AMICI CURIAE ...........................................................1

INTRODUCTION .................................................................................2

ARGUMENT ........................................................................................4

I.    PATENT EXHAUSTION TURNS ON WHETHER THE
      PATENTEE AUTHORIZED THE FIRST SALE OF THE
      PATENTED ARTICLE, NOT ON WHERE THAT FIRST SALE
      OCCURRED...................................................................................4

      A.    The Supreme Court has always described the patent exhaustion
            doctrine in terms that admit of no territorial limitations ......................4

      B.    *Boesch* does not hold otherwise ..........................................................7

II.   THE SUPREME COURT'S REASONING IN *KIRTSAENG* AND
      *QUALITY KING* APPLIES EVEN MORE FORCEFULLY UNDER
      PATENT LAW THAN UNDER COPYRIGHT LAW ...................................9

III.  THE PANEL DECISIONS IN *JAZZ PHOTO* SHOULD BE
      OVERRULED ...........................................................................17

IV.   PUBLIC POLICY CONSIDERATIONS PROVIDE NO REASON
      TO DEPART FROM TRADITIONAL PATENT EXHAUSTION
      PRINCIPLES ...........................................................................20

V.    *MALLINCKRODT* SHOULD ALSO BE OVERRULED ...........................23

CONCLUSION ..................................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Adams v. Burke*,
  84 U.S. (17 Wall.) 456 (1873) ......................................................5, 7

*Albright v. Teas*,
  106 U.S. 613 (1883) ...................................................................26

*Bailey v. Baker Ice Machine Co.*,
  239 U.S. 268 (1915) ...................................................................26

*Bauer & Cie v. O'Donnell*,
  229 U.S. 1 (1913) .............................................................6, 10, 11, 13

*Bement v. National Harrow Co.*,
  186 U.S. 70 (1902) .....................................................................24

*Bloomer v. McQuewan*,
  55 U.S. (14 How.) 539 (1853) .........................................................4

*Bloomer v. Millinger*,
  68 U.S. (1 Wall.) 340 (1863) .........................................................4

*Bobbs-Merrill Co. v. Straus*,
  210 U.S. 339 (1908) ..............................................................9, 10, 12

*Boesch v. Graff*,
  133 U.S. 697 (1890) ..................................................................7, 8

*Bowman v. Monsanto Co.*,
  133 S. Ct. 1761 (2013) .............................................................5, 14

*Conway's Executors v. Alexander*,
  11 U.S. (7 Cranch) 218 (1812) .......................................................26

*Costco Wholesale Corp. v. Omega, S.A.*,
  562 U.S. 40 (2010) ......................................................................1

**Page(s)**

*Curtiss Aeroplane & Motor Corp. v. United Aircraft Engineering Corp.*,
266 F. 71 (2d Cir. 1920) ....................................................................8

*Fosdick v. Schall*,
99 U.S. (9 Otto) 235 (1879)..............................................................26

*Fuji Photo Film Co. v. Jazz Photo Corp.*,
394 F.3d 1368 (Fed. Cir. 2005) (*Jazz Photo II*) ..........................17, 18

*General Talking Pictures Corp. v. Western Electric Co.*,
304 U.S. 175 (1938)..........................................................................24

*Harkness v. Russell*,
118 U.S. 663 (1886)..........................................................................26

*Henry v. A.B. Dick Co.*,
224 U.S. 1 (1912)..............................................................................24

*Hewlett-Packard Co. v. Repeat-O-Type Stencil Manufacturing Corp.*,
123 F.3d 1445 (Fed. Cir. 1997) .......................................................27

*Jazz Photo Corp. v. International Trade Commission*,
264 F.3d 1094 (Fed. Cir. 2001) (*Jazz Photo I*)...................2, 17, 18, 19

*Keeler v. Standard Folding Bed Co.*,
157 U.S. 659 (1895)....................................................................passim

*Kirtsaeng v. John Wiley & Sons, Inc.*,
133 S. Ct. 1351 (2013)................................................................passim

*LifeScan Scotland, Ltd. v. Shasta Technologies, LLC*,
734 F.3d 1361 (Fed. Cir. 2013) .....................................10, 11, 20, 21

*Mallinckrodt, Inc. v. Medipart, Inc.*,
976 F.2d 700 (Fed. Cir. 1992) .............................................2, 25, 27

*Mitchell v. Hawley*,
83 U.S. (16 Wall.) 544 (1873) ......................................................25, 26

*Motion Picture Patents Co. v. Universal Film Manufacturing Co.*,
243 U.S. 502 (1917)..............................................................6, 17, 24

**Page(s)**

*Quality King Distribs., Inc. v. L'Anza Research International, Inc.*,
  523 U.S. 135 (1998)................................................................1, 9, 18

*Quanta Computer, Inc. v. LG Electronics, Inc.*,
  553 U.S. 617 (2008)...................................................................*passim*

*Sanofi, S.A. v. Med-Tech Veterinarian Products, Inc.*,
  565 F. Supp. 931 (D.N.J. 1983) ............................................................9

*Sony Corp. of America v. Universal City Studios*,
  464 U.S. 417 (1984)............................................................................9

*Southard v. Russell*,
  57 U.S. (16 How.) 547 (1854) ............................................................26

*Straus v. Victor Talking Machine Co.*,
  243 U.S. 490 (1917)............................................................................5

*United Dictionary Co. v. G. & C. Merriam Co.*,
  208 U.S. 260 (1908)..........................................................................19

*United States v. General Electric Co.*,
  272 U.S. 476 (1926)..........................................................................24

*United States v. Univis Lens Co.*,
  316 U.S. 241 (1942)............................................................................6

## STATUTES

17 U.S.C. § 109(a) .................................................................................12

17 U.S.C. § 602(a) .................................................................................12

35 U.S.C. § 154(a)(1)...............................................................................4

Pub. L. No. 103-465, 108 Stat. 4809 (1994).........................................13

## OTHER AUTHORITIES

Agreement on Trade-Related Aspects of Intellectual Property Rights,
  Marrakesh Agreement Establishing the World Trade Organization,
  33 I.L.M. 1125 ..................................................................................13

**Page(s)**

1 E. Coke, Institutes of the Laws of England (1628)................................................5

James B. Kobak, Jr., *Contracting Around Exhaustion: Some Thoughts
  About the CAFC'S* Mallinckrodt *Decision*, J. Pat. & Trademark
  Off. Soc'y 550 (1993)............................................................................25

4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright*
  (Matthew Bender rev. ed. 2009)........................................................19

Richard H. Stern, *The Unobserved Demise of the Exhaustion Doctrine
  in U.S. Patent Law:* Mallinckrodt v. Medipart, 15 Eur. Intell. Prop.
  Rev. 460 (1993)..................................................................................25

## INTEREST OF AMICI CURIAE[1]

Costco Wholesale Corporation ("Costco") operates a chain of more than 670 membership-warehouse clubs in the United States and abroad. With annual sales in the last fiscal year of more than $110 billion, Costco is the second-largest retailer and the largest membership-warehouse club in the United States. Nearly 80 million cardholders shop at its warehouse locations.

Costco is known for selling genuine brand-name merchandise to its members at lower prices than its competitors. The patent exhaustion doctrine plays an important role in Costco's ability to do so. In the course of its business, Costco often sells patented products that, although genuine, were not purchased directly from the patent holder. Some of those products were first sold outside of the United States and some purport to impose post-sale restrictions enforceable under the patent laws. Costco filed an amicus brief in support of the prevailing parties in *Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S. Ct. 1351 (2013), and *Quality King Distribs., Inc. v. L'Anza Research Int'l, Inc.*, 523 U.S. 135 (1998), and it was the petitioner when an analogous copyright first sale question was first presented to the Supreme Court in *Costco Wholesale Corp. v. Omega, S.A.*, 562 U.S. 40 (2010).

---

[1]  No counsel for any party authored this brief in whole or in part. No party, party's counsel, or any person other than amici curiae, its members, or its counsel made a monetary contribution intended to fund the preparation or submission of this brief. This Court's April 14, 2015 order authorized the filing of any amicus briefs "without consent" or "leave of court." Order at 4 ("Apr. 2015 Order").

The Retail Litigation Center, Inc. ("RLC") is a public policy organization that identifies and participates in legal proceedings that affect the retail industry. The RLC's members include many of the country's largest and most innovative retailers. The member entities whose interests the RLC represents employ millions of people throughout the United States, provide goods and services to tens of millions more, and account for tens of billions of dollars in annual sales. The RLC provides courts with retail-industry perspectives on important legal issues to highlight the potential industry-wide consequences of significant pending cases.

Amici have a substantial interest in the proper resolution of this appeal.

## INTRODUCTION

The Court granted en banc review to consider two questions: (1) whether it should overrule *Jazz Photo Corp. v. International Trade Commission*, 264 F.3d 1094 (Fed. Cir. 2001) (*Jazz Photo I*), in light of *Kirtsaeng*, "to the extent [*Jazz Photo I*] ruled that a sale of a patented item outside the United States never gives rise to United States patent exhaustion"; and (2) whether it should overrule *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700 (Fed. Cir. 1992), in light of *Quanta Computer, Inc. v. LG Electronics, Inc.*, 553 U.S. 617 (2008), "to the extent [*Mallinckrodt*] ruled that a sale of a patented article, when the sale is made under a restriction that is otherwise lawful and within the scope of the patent grant, does

2

not give rise to patent exhaustion." Apr. 2015 Order at 2-3. This Court should answer both questions in the affirmative.

As the Supreme Court has repeatedly reaffirmed, patent exhaustion turns on whether there has been an authorized sale of a patented article. If there has, all of the patentee's rights with respect to that article are extinguished and the patentee can no longer control the future use or disposition of that article. It becomes, for all intents and purposes, the personal property of the lawful purchaser. *Jazz Photo* departs from that traditional understanding by qualifying "authorized sale" with "in the United States"; *Mallinckrodt* effectively adds "unless the patent holder says otherwise." Both modifications rest on flawed reasoning and a misunderstanding of the relevant case law. And Supreme Court decisions such as *Kirtsaeng*, *Quanta*, and *Quality King* demonstrate why they are no longer tenable today.

Patent holders have complete control over whether (or how) to first dispose of a patented article. And no judicial expansion of patent rights is needed to afford patentees control over downstream use or resale. A patentee can impose conditions on use and resale by contract and have his remedies under private law. What a patent holder cannot do is use the patent law to exercise perpetual control over a piece of personal property once he has sold it into the global stream of commerce.

**ARGUMENT**

## I. PATENT EXHAUSTION TURNS ON WHETHER THE PATENTEE AUTHORIZED THE FIRST SALE OF THE PATENTED ARTICLE, NOT ON WHERE THAT FIRST SALE OCCURRED

### A. The Supreme Court has always described the patent exhaustion doctrine in terms that admit of no territorial limitations

Patent law grants the patentee the "right to exclude others from making, using, offering for sale, or selling the invention throughout the United States or importing the invention into the United States." 35 U.S.C. § 154(a)(1). "For over 150 years," however, the Supreme Court "has applied the doctrine of patent exhaustion to limit the patent rights that survive the initial authorized sale of a patented item." *Quanta*, 553 U.S. at 621. When an "inventor . . . lawfully sell[s] it to him," the patented invention "passes to the hands of the purchaser" and it is "no longer within the limits of the monopoly." *Bloomer v. McQuewan*, 55 U.S. (14 How.) 539, 549 (1853). "[H]e has then to that extent parted with his monopoly, and ceased to have any interest whatever in the machine so sold." *Bloomer v. Millinger*, 68 U.S. (1 Wall.) 340, 350 (1863).

That rule simply reflects the ordinary legal meaning and consequences of a "sale" (or, in prior versions of the Patent Act, a "vend[ing]") of goods. In its recent decision in *Kirtsaeng*, the Supreme Court quoted Lord Coke on the "impeccable historic pedigree" of the principle that personal property, once sold, belongs to the purchaser free of any restrictions or servitudes:

'[If] a man be possessed of . . . a horse, or of any other chattel . . . and give or sell his whole interest . . . therein upon condition that the Donee or Vendee shall not alien[ate] the same, the [condition] is voi[d] because his whole interest . . . is out of him, so as he hath no possibilit[y] of a Reverter, and it is against Trade and Traffi[c], and bargaining and contracting betwee[n] man and man: and it is within the reason of our Author that it should ouster him of all power given to him.'

*Kirtsaeng*, 133 S. Ct. at 1363 (quoting 1 E. Coke, Institutes of the Laws of England § 360, p. 223 (1628)); *see Straus v. Victor Talking Mach. Co.*, 243 U.S. 490, 500-01 (1917) (servitudes that purport to run with personal property "have been hateful to the law from Lord Coke's day to ours"). Or, as the exhaustion precedents put it, "*in the essential nature of things*, when the patentee, or the person having his rights, sells a machine or instrument whose sole value is in its use, he receives the consideration for its use and he parts with the right to restrict that use." *Adams v. Burke*, 84 U.S. (17 Wall.) 456, 456 (1873) (emphasis added).

The law has never distinguished between domestic and foreign sales for exhaustion purposes. Rather, the Supreme Court has said, over and over again, that exhaustion results from *any* sale authorized by the patentee. *E.g.*, *Bowman v. Monsanto Co.*, 133 S. Ct. 1761, 1764 (2013) ("Under the doctrine of patent exhaustion, the authorized sale of a patented article gives the purchaser, or any subsequent owner, a right to use or resell that article."); *Quanta*, 553 U.S. at 630 (reaffirming "the longstanding principle that, when a patented item is 'once lawfully made and sold, there is no restriction on [its] use to be implied for the

5

benefit of the patentee'" (alterations in original) (emphasis and citation omitted));

*United States v. Univis Lens Co.*, 316 U.S. 241, 249-50 (1942) ("[T]he authorized sale of an article . . . exhausts the monopoly in that article and the patentee may not thereafter, by virtue of his patent, control the use or disposition of the article."); *Motion Picture Patents Co. v. Universal Film Mfg. Co.*, 243 U.S. 502, 516 (1917) ("[T]he right to vend" is exhausted by an authorized sale, "the article sold being thereby carried outside the monopoly of the patent law and rendered free of every restriction which the vendor may attempt to put upon it."); *Bauer & Cie v. O'Donnell*, 229 U.S. 1, 17 (1913) ("[A] patentee who has parted with a patented machine by passing title to a purchaser has placed the article beyond the limits of the monopoly secured by the patent act."); *Keeler v. Standard Folding Bed Co.*, 157 U.S. 659, 666 (1895) ("[T]he payment of a royalty once, or, what is the same thing, the purchase of the article from one authorized by the patentee to sell it, emancipates such article from any further subjection to the patent throughout the entire life of the patent.").[2]

Indeed, the early cases that addressed attempts by patent owners to place territorial limits on where a purchaser could use or resell goods invoked the

---

[2]   There is no dispute that the patent holder here, Lexmark International, Inc. ("Lexmark"), itself sold "the patented inkjet cartridges at issue" and, thus, authorized the foreign sales.    Addendum to Impression Products, Inc. ("Impression") En Banc Br. at A017; *see* Lexmark Panel Br. 2 ("Lexmark initially sold these cartridges . . . in another country.").

exhaustion doctrine to *invalidate* those limits.  *See Adams*, 84 U.S. (17 Wall.) at 456-57 (license authorizing first seller to sell only within ten miles of Boston could not prevent authorized purchaser from reselling outside of that area).  And in *Keeler*, the Supreme Court held that "one who buys patented article[s] of manufacture from one authorized to sell them becomes possessed of an absolute property in such articles, unrestricted in time *or place*."  157 U.S. at 666 (emphasis added); *see id.* (territorial restriction in license could not prevent authorized purchaser from using patented article outside that area even when licensee knew of purchaser's intent).

### B.    *Boesch* does not hold otherwise

To the extent Lexmark continues to rely on *Boesch v. Graff*, 133 U.S. 697 (1890), to impose territorial limits on the traditional exhaustion doctrine (*see* Lexmark Panel Br. 46), it misreads that decision.  *Boesch*, like the cases that came before and after, reaffirms that the patent monopoly is exhausted "only by a sale authorized by the patent holder."  *Quanta*, 553 U.S. at 636.  There was no exhaustion in *Boesch* because the sale was not authorized by the patent owner, not because of where the sale occurred.

The "exact question" before the Court in *Boesch* was "whether a dealer residing in the United States can purchase in another country articles patented there, from a person authorized to sell them, and import them to and sell them in

the United States, *without the license or consent of the owners of the United States patent*." 133 U.S. at 702 (emphasis added). The italicized language is critical and reflects the unique facts of that case. At the time of suit, the plaintiffs in *Boesch* held patents on their invention (lamp-burners) in both the United States and Germany. *Id.* at 698-99. But before they applied for the German patent, a manufacturer in Germany had already made preparations to make and sell the burners. *Id.* at 701. Under German law, "'the patent does not affect persons who, at the time of the patentee's application, have already commenced to make use of the invention in the country, or made the preparations requisite for such use.'" *Id.* (citation omitted). Because the manufacturer's right to sell derived from that exception in German law, and not from authority granted by the owners of the U.S. patent, the purchaser was not "authorized to sell the articles in the United States in defiance of the rights of patentees under a United States patent." *Id.* at 703.

The Court ascribed no significance to the fact that the sale happened to occur in Germany. Rather, the exhaustion doctrine was inapplicable in *Boesch* because "neither the [United States] patentee or any assignee had ever received any royalty or given any license to use the patented article in any part of the United States." *Keeler*, 157 U.S. at 664-65; *see Curtiss Aeroplane & Motor Corp. v. United Aircraft Eng'g Corp.*, 266 F. 71, 77 (2d Cir. 1920) (explaining that the foreign sale in *Boesch* involved "no participation whatever by the owner of the patent, either as

a party or as a privy"); *Sanofi, S.A. v. Med-Tech Veterinarian Prods., Inc.*, 565 F. Supp. 931, 937-38 (D.N.J. 1983) ("In *Boesch*, it was not the patentee who made the sale abroad.  In fact, it was not even a licensee of the patentee who made the sale.  Rather, the seller was one who had a right to sell by operation of the patent laws of Germany.").  *Boesch* was thus a routine application of traditional exhaustion rules.

## II.   THE SUPREME COURT'S REASONING IN *KIRTSAENG* AND *QUALITY KING* APPLIES EVEN MORE FORCEFULLY UNDER PATENT LAW THAN UNDER COPYRIGHT LAW

In two cases decided over the last 15 years, the Supreme Court held that the first sale doctrine applies equally to copies of a copyrighted work lawfully made outside the United States and copies first sold outside the United States.  *See Kirtsaeng*, 133 S. Ct. at 1355-56 (first sale doctrine applies to copies lawfully made outside the United States); *Quality King*, 523 U.S. at 138, 145 (first sale doctrine applies to copies lawfully made in the United States but first sold abroad).

While copyright precedents are not "'altogether controlling'" in cases arising under the patent laws, *Bobbs-Merrill Co. v. Straus*, 210 U.S. 339, 346 (1908) (citation omitted), they are informative.  *Sony Corp. of Am. v. Universal City Studios*, 464 U.S. 417, 439 (1984) (noting the "historic kinship" of copyright and patent law).  That is particularly true for issues arising under the "first sale" and "exhaustion" doctrines—which serve parallel statutory purposes and derive from

9

similar statutory language, informed by the same rich common-law history. *See, e.g.*, *Bauer & Cie*, 229 U.S. at 12-17 (noting the "strong similarity between and identity of purpose in the [copyright and patent] statutes" when it comes to the rightsholder's exclusive right to sell); *LifeScan Scot., Ltd. v. Shasta Techs., LLC*, 734 F.3d 1361, 1376 & n.9 (Fed. Cir. 2013) (recognizing that the same common-law principles "undergird[]" both patent exhaustion and the copyright first sale doctrine).

In *Bobbs-Merrill*, the Supreme Court considered whether "the sole right to vend" in the Copyright Act would permit the copyright holder to enforce, by infringement suits, a purported restriction inserted into the copies themselves that the books could not be resold for less than a dollar. 210 U.S. at 350. The Court held that enforcing such a restriction "would give a right not included in the terms of the statute, and, in our view, extend its operation, by construction, beyond its meaning." *Id.* at 351; *see id.* at 350 (noting that the issue of post-sale restrictions was "purely a question of statutory construction"). When it faced the identical issue under the patent laws five years later, the Court looked to *Bobbs-Merrill* and explained that "the protection intended to be secured" by the respective rights to "vend" (in the patent statute) and "vending" (in the copyright statute) is "substantially identical." *Bauer & Cie*, 229 U.S. at 12-13. The Court held that "Congress had no intention to use the term 'vend' in one sense in the patent act and

10

'vending' in another in the copyright law," and that, "[i]n both instances[,] it was the intention of Congress to secure an exclusive right to sell, and there is no grant of a privilege to keep up prices and prevent competition by notices restricting the price at which the article may be resold." *Id.* at 13, 17.

Just as in *Bauer & Cie*, the Supreme Court has already decided the analogous question under the copyright first sale doctrine—in *Kirtsaeng* and *Quality King*. And, here too, the Court's reasoning extends to the patent exhaustion context.

The Court in *Kirtsaeng* concluded in no uncertain terms that "[t]he common-law doctrine makes no geographical distinctions" and that no "geographical distinctions" can be found "in *Bobbs-Merrill* (where th[e] Court first applied the 'first sale' doctrine)." 133 S. Ct. at 1363. The Court explained that any rule "permit[ting] a copyright holder to control the resale or other disposition of a chattel once sold" would be inconsistent with ancient common-law principles, and emphasized "the importance of leaving buyers of goods free to compete with each other when reselling or otherwise disposing of those goods." *Id.* As explained above, the patent exhaustion doctrine derives directly from the same common-law property principles the Court discussed in *Kirtsaeng*. *See LifeScan*, 734 F.3d at 1376 ("The same policy undergirds the doctrine of patent exhaustion."). The Supreme Court's holding that "[t]he common-law doctrine makes no geographical

11

distinctions" (and that neither does *Bobbs-Merrill*) therefore applies with full force here.

Indeed, the Court's reasoning in *Kirtsaeng* applies even more forcefully under patent law. In the copyright context, the absence of "geographical distinctions" under the common law and *Bobbs-Merrill* did not resolve the issue before the Court because there were subsequent amendments to the copyright statute suggesting, some argued, that Congress had *departed* from the common law. Congress had subsequently codified the first sale doctrine in Section 109(a) of the Copyright Act and had expanded the exclusive right to import copies of copyrighted works to include non-piratical copies in Section 602(a). *See* 17 U.S.C. §§ 109(a), 602(a). The copyright owner in *Kirtsaeng* argued that the statutory language "lawfully made under this title," and the legislative history of the exclusive right to import in Section 602(a), reflected Congress's intent to authorize market segmentation agreements enforceable under copyright law. *See* 133 S. Ct. at 1357-60, 1369-70; *id.* at 1376-83 (Ginsburg, J., dissenting). Neither of those statutory arguments are available here.

There is nothing in the Patent Act comparable to the "lawfully made *under this title*" language in Section 109(a) of the Copyright Act, which made possible the (failed) arguments against exhaustion in *Kirtsaeng*. Congress has not codified the patent exhaustion doctrine at all, except in the sense that it has always been

embodied in the plain meaning of the word "vend" (now "sell"), which the Court has already held is indistinguishable (for exhaustion purposes) from the concomitant "vending" (now "distribute") right in the copyright statute. *See Bauer & Cie*, 229 U.S. at 12-17.[3]

And while Congress recently amended the Patent Act to add an exclusive right to import, there is no legislative history suggesting that this amendment was intended to facilitate international price discrimination for patented articles. The exclusive right to import was added to the patent statute in 1994 in response to the TRIPS Agreement, which required member nations to provide a right to prevent importation of patented articles and which, notably, left the scope of the exhaustion doctrine to be decided by member nations. *See* Uruguay Round Agreements Act, Pub. L. No. 103-465, §§ 532, 533, 108 Stat. 4809, 4983-90 (1994); Agreement on Trade-Related Aspects of Intellectual Property Rights arts. 6, 28, Apr. 15, 1994, Marrakesh Agreement Establishing the World Trade Organization, Annex 1C, 33 I.L.M. 1125, 1200, 1208 & n.28. And any contention that the right to block importation must be immune from exhaustion to be meaningful would run squarely contrary to *Kirtsaeng*. *See* 133 S. Ct. at 1355-56, 1368 (applying first sale doctrine

---

[3] In its panel briefing, Lexmark argued that "judicial precedent" in the patent exhaustion context has departed from the common law. Lexmark Panel Br. 51-52. But the only two cases it cites are this Court's decision in *Jazz Photo* (which the Court granted en banc review to reconsider) and the Supreme Court's decision in *Boesch* (which, for the reasons explained above, did no such thing).

to copies made overseas even though it would give the importation ban "less significance"); *id.* at 1372 (Kagan, J., concurring) (acknowledging that the Court's interpretation would limit the importation ban "to a fairly esoteric set of applications"); *id.* at 1378 (Ginsburg, J., dissenting) (arguing that, under the Court's decision, the import provision would apply only in instances where the importer "merely ha[s] possession of, but do[es] not own, the imported copies").[4]

In sum, the argument that Congress codified the exhaustion doctrine in a way that distinguishes between sales in the United States and sales outside of the United States is not available here. And, in *Kirtsaeng* and *Quality King*, where those arguments were available and were made (by the copyright holders, the United States, and the dissent), the Court rejected them anyway.

The *Kirtsaeng* Court also concluded that a "geographical interpretation" of the first sale doctrine would impose an "administrative burden," lead to "selective enforcement," cause "practical problems," and lead to "intolerable consequences"

---

[4] Some have noted that in copyright law unauthorized importation is an infringement of the exclusive right to distribute, whereas in patent law it is a distinct act of infringement. But the fact that the exclusive right to import is distinct from the right to sell does not establish or imply that it somehow survives exhaustion after an authorized sale. The exclusive rights of "using" and "offering for sale" the patented article are similarly distinct, but it is well settled that an authorized purchaser can use and offer to resell the patented article. As the Supreme Court reaffirmed most recently in *Bowman*, "'the initial authorized sale of a patented item terminates all patent rights to that item.'" 133 S. Ct. at 1766 (quoting *Quanta*, 553 U.S. at 625).

and "absurd result[s]." 133 S. Ct. at 1363-66. Those observations apply with similar force in the patent context.

Like the first sale doctrine, patent exhaustion "frees courts from the administrative burden of trying to enforce restrictions upon difficult-to-trace, readily movable goods." *Kirtsaeng*, 133 S. Ct. at 1363. It also "avoids the selective enforcement inherent in any such effort." *Id.* "'[A]utomobiles, microwaves, calculators, mobile phones, tablets, and personal computers'" contain "copyrightable software programs or packaging" and that "[m]any of these items are made abroad with the American copyright holder's permission." *Id.* at 1365 (citation omitted). The Court thought any construction that would permit copyright owners to interfere with free commerce in such goods would be "intolerable." *Id.* at 1366. These and other common consumer products are also covered by thousands of U.S. patents, including patents that read on the products' design and on methods practiced by every commercially reasonable use.

For example, Impression's panel brief noted that, if patent exhaustion were limited to domestic sales, "a person who buys an automobile in Canada, which is covered by hundreds of US patents, becomes an infringer as soon as that car is driven across the border into the United States." Impression Panel Br. 3; *see also* Impression En Banc Br. 2. Lexmark responded that patents generally are not "enforced against unsuspecting American buyers (as opposed to dealers) of foreign

15

used cars." Lexmark Panel Br. 54. But history and common sense suggest no reason to believe that patent owners will decline to enforce their rights. And, as the Supreme Court explained in *Kirtsaeng*, a law "that can work in practice only if unenforced is not a sound" law; it "would create uncertainty, would bring about selective enforcement, and, if widely unenforced, would breed disrespect" for the law "itself." 133 S. Ct. at 1366.

In many respects, the burdens and problems of a geographically limited exhaustion doctrine would be even more "intolerable" under the patent laws than in copyright. In the copyright context, the threat was to a purchaser's right to *resell*. But unlike the owner of a copyright, a patentee also has the exclusive right to "use" the patented article—raising the specter that an overseas purchaser could not even continue using what he had paid for. Moreover, the dissent and the losing parties in *Kirtsaeng* pointed to a variety of copyright defenses and exceptions (*e.g.*, fair use, importation of a small number of copies for personal use, exceptions for libraries) that would have mitigated some of the practical concerns expressed by the Court. *See Kirtsaeng*, 133 S. Ct. at 1388-89 & n.25 (Ginsburg, J., dissenting). Patent law provides no such relief.

In the end, the "intolerable consequences" outlined by the Court in *Kirtsaeng* do not abate by substituting the word "patent" for "copyright." *See* 133 S. Ct. at 1366. And the "ever-growing importance of foreign trade" and e-

commerce, as well as the greater ease of cross-border transactions, further exacerbates those consequences. *See id.* at 1365, 1367 (noting that "$2.3 trillion worth of foreign goods were imported in 2011" and that "American retailers buy many of these goods after a first sale abroad"). Here too, the "practical problems . . . are too serious, too extensive, and too likely to come about." *Id.* at 1367. Or, in the words of the patent exhaustion case law, "[t]he inconvenience and annoyance to the public that an opposite [rule] would occasion are too obvious to require illustration." *Keeler*, 157 U.S. at 667; *see Motion Picture Patents Co.*, 243 U.S. at 516.

## III. THE PANEL DECISIONS IN *JAZZ PHOTO* SHOULD BE OVERRULED

In *Jazz Photo I* and *Fuji Photo Film Co. v. Jazz Photo Corp.*, 394 F.3d 1368 (Fed. Cir. 2005) (*Jazz Photo II*), this Court held that patent rights can only be exhausted by a first sale in the United States. Those decisions have, for a variety of reasons, earned their retirement.

In *Jazz Photo I*, the Court offered three rationales for its conclusion that patent exhaustion would apply only to products "for which the United States patent right has been exhausted by first sale in the United States." 264 F.3d at 1105. None provide any reason for adopting different principles under patent law than the Supreme Court adopted, in *Kirtsaeng* and *Quality King*, under copyright law.

*First*, the Court stated that "United States patent rights are not exhausted by products of foreign provenance." *Jazz Photo I*, 264 F.3d at 1105. But that is a *non sequitur*. The place of manufacture has no obvious connection to the place of sale. A product may be of "foreign provenance" (*i.e.*, manufactured overseas), but first sold in the United States—or of domestic "provenance" (*i.e.*, manufactured in the United States), but first sold outside the United States. *Cf. Quality King*, 523 U.S. at 138, 145 (copies were manufactured in the United States but first sold overseas).

*Second*, the Court explained that, "[t]o invoke the protection of the first sale doctrine, the authorized first sale must have occurred under the United States patent." *Jazz Photo I*, 264 F.3d at 1105. In *Jazz Photo II*, the Court elaborated that "foreign sales can never occur under a United States patent because the United States patent system does not provide for extraterritorial effect." 394 F.3d at 1376. But the question for decision was whether the U.S. patent laws give to U.S. patent holders certain rights *in the United States*, with respect to goods that have arrived *in the United States*. Neither answer to the exhaustion question would have involved any extraterritorial application of U.S. law—*i.e.*, the imposition of liability for conduct occurring outside the United States. Indeed, the Supreme Court summarily dismissed a virtually identical argument in *Quality King*. *See* 523 U.S. at 145 n.14 ("[T]he owner of goods lawfully made under the [Copyright] Act is entitled to the protection of the first sale doctrine in an action in a United States

18

court even if the first sale occurred abroad" and "[s]uch protection does not require the extraterritorial application of the Act."); *cf. Quanta*, 553 U.S. at 632 n.6 (explaining that products can "practic[e] the patent" "outside the country" even though there would be no infringement). *Kirtsaeng* eliminated any doubt, by holding unequivocally that a copy made outside the United States *can* be made "under" the Copyright Act, 133 S. Ct. at 1358-60—even though it is well established that the Copyright Act does not apply outside the United States. *See, e.g.*, *United Dictionary Co. v. G. & C. Merriam Co.*, 208 U.S. 260, 264-65 (1908); 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 17.02, at 17-19 (Matthew Bender rev. ed. 2009).

*Third*, the *Jazz Photo I* panel cited *Boesch* for the proposition that "a lawful foreign purchase does not obviate the need for license from the United States patentee before importation into and sale in the United States." 264 F.3d at 1105. That is an accurate summary of the holding in *Boesch*, but it does not support the Court's conclusion. As discussed above, the foreign sale was "lawful" overseas (in that it was permitted by German law), but it was not authorized by the United States patent holder. For that reason, and not because of where the sale occurred, the patent exhaustion doctrine did not immunize importation or subsequent sales.

Whether or not correct when decided, intervening Supreme Court decisions leave no doubt that the *Jazz Photo* decisions cannot be given continuing force on the subject of patent exhaustion.

## IV. PUBLIC POLICY CONSIDERATIONS PROVIDE NO REASON TO DEPART FROM TRADITIONAL PATENT EXHAUSTION PRINCIPLES

A number of policy arguments have been made in favor of retaining the *Jazz Photo* rule. Several of those arguments have already been rejected by intervening decisions of the Supreme Court and the others fail on their own terms.

First, some have argued that exhaustion should not attach after an overseas sale because the patentee has not received any benefit *from the U.S. patent*. That assumption is flawed and circular. The price a patentee can charge reflects whatever rights the purchaser receives, so if exhaustion law gives the purchaser the right to bring the goods into the United States, that value will be reflected in the price. In *Quanta*, the patentee and its amici contended vigorously that the price Intel paid for the right to make and sell microchip components did not fairly reflect the value of the invention as implemented in downstream products. The Supreme Court was not persuaded, noting that an authorized sale exhausts the patent and the patentee must take its reward at that time. Or, as this Court recently explained, "a patentee has a choice as to how to secure its reward." *LifeScan*, 734 F.3d at 1375. But once "a patentee unconditionally parts with ownership of an article, it cannot

20

later complain that the approach that it chose results in an inadequate reward and that therefore ordinary principles of patent exhaustion should not apply." *Id.*

Second, Lexmark has expressed concern about the impact "an international exhaustion regime would have for low-income countries, whose consumers likely could not afford a single worldwide price." Lexmark Panel Br. 54 & n.17. The same argument was made and rejected in *Kirtsaeng*—and it is no more persuasive here. *See* 133 S. Ct. at 1370; *id.* at 1390 n.27 (Ginsburg, J., dissenting) (noting that "the ability to prevent importation of foreign-made copies encourages copyright owners . . . to offer copies of their works at reduced prices to consumers in less developed countries who might otherwise be unable to afford them"). As even the dissent in *Kirtsaeng* recognized, "[i]nternational exhaustion subjects copyright-protected goods to competition from lower priced imports and, to that extent, benefits [American] consumers." *Id.* at 1384 (Ginsburg, J., dissenting). Sellers of patented goods may charge different prices in different places just like sellers of unpatented goods, and subject to the same limitations—most importantly, the risk that resale arbitrage may erode the effectiveness of the scheme. As with copyright, there is no "basic principle" of patent law suggesting that patentees are entitled to "divide markets" or "charge different purchasers different prices" in a manner that

is immune from those ordinary commercial forces facing all sellers. *Id.* at 1370-71.[5]

In any event, a consistent and non-geographic exhaustion doctrine does not prevent patent owners from seeking to limit resale, importation, or arbitrage—it just prevents those consequences from occurring in the dark, by default. Exhaustion requires patent owners to be up front and obtain actual, contractually enforceable promises from purchasers. *See Keeler*, 157 U.S. at 666 (noting that the question "[w]hether a patentee may protect himself and his assignees by special contracts brought home to the purchasers" was not before the Court, but "such a question" would "obvious[ly] . . . arise as a question of contract, and not as one under the inherent meaning and effect of the patent laws"). Qualcomm, in its amicus brief, explained to the Supreme Court in *Quanta* that it authorized its manufacturing licensees to sell chips only to purchasers that had previously signed an agreement with Qualcomm, making various promises about their own use or resale of the chips. Brief of Qualcomm Inc. as Amicus Curiae in Support of Respondent at 7-10, *Quanta*, 553 U.S. 617 (2008) (No. 06-937), 2007 U.S. S. Ct. Briefs LEXIS 1927, at *9-13. A sale to anyone else would be unauthorized, and

---

[5]   If anything, arguments in favor of market segmentation were considerably stronger in the copyright context given the hypothetical set forth in *Quality King* and the related legislative history. *See Kirtsaeng*, 133 S. Ct. at 1368 (discussing "dictum" in *Quality King*); *id.* at 1380-83 (Ginsburg, J., dissenting) (discussing legislative history).

would not exhaust the patent. And a violation of the agreed terms could subject the purchaser to suit for breach. Lexmark similarly could insist that purchasers sign contracts agreeing to use ink jet cartridges only in certain geographic regions, and to resell only to persons who agree to do likewise. Of course, Lexmark would have to comply with all of the usual rules of contract law, including actual offer-and-acceptance, and would be limited to contract (rather than patent) damages.

Patent owners who want to achieve a similar result through *the patent laws*, by limiting the exhaustive effect of an authorized sale, are seeking judicial assistance in sending goods out into the stream of commerce burdened by potential infringement suits that downstream purchasers have no reason to expect and may have no fair opportunity to avoid. The patent owner can lurk in the background while potentially infringing products move throughout the world, and then emerge and demand a royalty effectively measured by the downstream purchasers' sunk costs or desire to avoid litigation, rather than by the *ex ante* value of the patent. This is precisely the "inconvenience and annoyance to the public" that the Supreme Court anticipated and condemned in the foundational patent exhaustion precedents more than a century ago. *Keeler*, 157 U.S. at 667.

## V. *MALLINCKRODT* SHOULD ALSO BE OVERRULED

Others will address these issues in greater depth, but for similar reasons *Mallinckrodt* should also be overruled. As numerous commentators have pointed

out, *Mallinckrodt* essentially resurrected the rule of *Henry v. A.B. Dick Co.*, 224 U.S. 1 (1912), which the Supreme Court overruled almost a hundred years ago—observing that the unfortunate deviation from sound exhaustion principles had proved to be a "perfect instrument of favoritism and oppression" by patentees in the half-decade that it was briefly tolerated. *Motion Picture Patents Co.*, 243 U.S. at 515-18.

The *Mallinckrodt* decision rests on several important misconceptions. First, it derives a principle that a sale may carry "conditions" enforceable against purchasers from cases holding that a manufacturing *license* may impose limits or conditions on the licensee's right to make and sell under the license. *See, e.g., Bement v. Nat'l Harrow Co.*, 186 U.S. 70, 91 (1902); *United States v. Gen. Elec. Co.*, 272 U.S. 476, 489-90 (1926); *Gen. Talking Pictures Corp. v. W. Elec. Co.*, 304 U.S. 175, 181 (1938). But that does not follow. Just as a patent owner who manufactures its own product may decide to whom it will sell, a patent owner may (within limits imposed by antitrust and misuse law) tell its licensees which customers they may sell to—and may enforce knowing violations of such restrictions through infringement suits. But no one can *sell* a patented article, with authority from the patent owner, without triggering exhaustion.

Second, *Mallinckrodt* distinguishes the Supreme Court's patent exhaustion cases by suggesting that the post-sale "conditions" were invalidated because they

24

were anticompetitive, and that the Court's discussion of exhaustion was dicta. 976 F.2d at 708. But "[w]hen the *Mallinckrodt* panel says that this is dictum, it is merely saying in a peculiar manner that it does not like the Supreme Court's reasoning and thinks that the Court should have held something else—that it should have reached its end result by a different conceptual route." Richard H. Stern, *The Unobserved Demise of the Exhaustion Doctrine in U.S. Patent Law: Mallinckrodt v. Medipart*, 15 Eur. Intell. Prop. Rev. 460, 465 (1993). The idea that post-sale "conditions" are fairly within the patent monopoly unless they are anticompetitive also turns the relationship between patent and antitrust law upside down. Rights genuinely conferred by the Patent Act are generally exempt from antitrust scrutiny. *See* James B. Kobak, Jr., *Contracting Around Exhaustion: Some Thoughts About the CAFC's* Mallinckrodt *Decision*, 75 J. Pat. & Trademark Off. Soc'y 550, 560-61 (1993).

Third, the *Mallinckrodt* opinion misunderstands language in some of the old cases like *Mitchell v. Hawley* that "[s]ales of the kind may be made by the patentee with or without conditions, as in other cases." 83 U.S. (16 Wall.) 544, 548 (1873). As the United States explained to the Supreme Court in *Quanta*, at the time *Mitchell* was decided a "'conditional sale'" was an "agreement to sell," in which a party does not convey title to the buyer until performance of a condition

precedent.[6]  Brief of the United States as Amicus Curiae Supporting Petitioners at

20-21 & n.8, *Quanta*, 553 U.S. 617 (2008) (No. 06-937), 2007 U.S. S. Ct. Briefs

LEXIS 2124, at *32-34 & n.8.  "Conditional sales" language did not authorize the

enforcement of "conditions" *after* the sale—which would have been inconsistent

with the actual holdings in the classic patent exhaustion cases.    *Mitchell*

emphasized that patentees can engage in "conditional sales" only in the "same

manner as if dealing with property of any other kind," 83 U.S. at 548, making clear

that a patent confers no special rights inconsistent with ordinary property law—

which, of course, has never permitted sellers to impose and enforce servitudes

running with chattels.

---

[6] *See also, e.g.*, *Harkness v. Russell*, 118 U.S. 663, 666 (1886) (a conditional sale is "a mere agreement to sell upon a condition, to be performed"); *Fosdick v. Schall*, 99 U.S. (9 Otto) 235, 250-51 (1879) (a conditional sale is one "'with a right of rescission on the part of the vendor in case the purchaser shall fail in payment of his installments'" (citation omitted)).  Title vests, and the sale becomes "absolute," only upon the occurrence of a condition precedent. *See, e.g.*, *Conway's Ex'rs v. Alexander*, 11 U.S. (7 Cranch) 218, 240-41 (1812) (a deed with an option to repurchase was a conditional sale, which became absolute once the option period expired); *Southard v. Russell*, 57 U.S. (16 How.) 547, 566 (1854) (transaction could either be "a conditional sale to become absolute on the failure to refund the purchase-money within the time, or a security for the loan of money"); *Albright v. Teas*, 106 U.S. 613, 617 (1883) (party could not sue for patent infringement because he had sold "all his title and interest in the inventions covered by his patents" making "[t]he transfer . . . absolute and unconditional"); *Bailey v. Baker Ice Mach. Co.*, 239 U.S. 268, 271 (1915) (in a conditional sale the vendor remains the owner, subject to the vendee's right to acquire the title by complying with the stipulated condition, while in an absolute sale, the vendee immediately becomes the owner, subject to any lien created by the mortgagee).

Fourth, *Mallinckrodt* suggested that its holding was consistent with "the rule of contract law that sale may be conditioned," and that absent some limitation imposed by antitrust or misuse law "private parties retain the freedom to contract concerning conditions of sale." 976 F.2d at 708. The Court failed, however, to acknowledge the actual requirements and limits of contract law. In a footnote, *id.* at 707 n.6, *Mallinckrodt* acknowledges the care the Supreme Court took to distinguish potential contract remedies in *Keeler*, but declines to follow the Supreme Court's actual holding by suggesting that patent remedies should also be available. *Cf. Quanta*, 553 U.S. at 637 n.7 (similarly emphasizing that the patentee may have contract rights even though patent remedies are unavailable).

Finally, the *Mallinckrodt* decision collapses the important distinction between patent exhaustion and the separate doctrine of "implied license"—which presumptively gives purchasers the right to use the product in any way the parties might reasonably contemplate, but can be disclaimed. *See Hewlett-Packard Co. v. Repeat-O-Type Stencil Mfg. Corp.*, 123 F.3d 1445, 1451 (Fed. Cir. 1997). Exhaustion is not a matter of license but of the legal effect of a sale. It cannot be disclaimed, but it conveys a narrower set of rights—including the right to resell the product and to use it for its only commercially reasonable use. *See, e.g., Quanta*, 553 U.S. at 630-35, 637 (noting that "the question whether third parties received

implied licenses is irrelevant because Quanta asserts its right to practice the patents

based not on implied license but on exhaustion").

## CONCLUSION

The en banc Court should overrule the panel decisions in *Jazz Photo* and

*Mallinckrodt*.

June 19, 2015                                    Respectfully submitted,

                                                 /s/ *Matthew J. Moore*
                                                 Matthew J. Moore
                                                 J. Scott Ballenger
                                                 Melissa Arbus Sherry
                                                 LATHAM & WATKINS LLP
                                                 555 Eleventh Street, NW, Suite 1000
                                                 Washington, DC  20004
                                                 Tel:  (202) 637-2200
                                                 Fax:  (202) 637-2201

                                                 *Counsel for Amici Curiae*

28

## CERTIFICATE OF SERVICE

I hereby certify that on June 19, 2015, I caused a copy of the foregoing Brief for Costco Wholesale Corporation and Retail Litigation Center, Inc. as Amici Curiae Supporting Defendant-Appellant to be served by electronic means through the Court's CM/ECF system on counsel for all parties, who are registered CM/ECF users.

I further certify that this same day hard copies of the foregoing were served via U.S. mail, postage prepaid, upon the following counsel who are not registered CM/ECF users:

Frederick M. Abbott
Florida State University College of Law
425 West Jefferson Street
Tallahassee, FL  32301

Margreth Barrett
University of California - Hastings College of Law
PO Box 347
The Sea Ranch, CA  95497

/s/ *Matthew J. Moore*
Matthew J. Moore

## CERTIFICATE OF COMPLIANCE WITH RULE 32

1.      I certify that this brief complies with the type-volume limitations of Fed. R. App. P. 29(d) and 32(a)(7)(B) because it contains 6,891 words, excluding the parts exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Fed. Cir. R. 32(b).

2.      I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally-spaced typeface using Microsoft Office Word in Times New Roman 14-point font.


June 19, 2015                                    */s/ Matthew J. Moore*
                                                 Matthew J. Moore