No. 2014-1617

# United States Court of Appeals
# for the Federal Circuit

LEXMARK INTERNATIONAL, INC.,

*Plaintiff-Cross-Appellant*

v.

IMPRESSION PRODUCTS, INC.,

*Defendant-Appellant*

*(Caption Continued on Inside Cover)*

*Appeal from the United States District Court for the Southern District of Ohio, Case No. 10-CV-564, Judge Michael R. Barrett*

## BRIEF OF *AMICUS CURIAE* LICENSING EXECUTIVES SOCIETY (U.S.A. AND CANADA), INC. IN SUPPORT OF NEITHER PARTY

BRIAN P. O'SHAUGHNESSY
*Regional Vice President, USA*
LICENSING EXECUTIVES SOCIETY
(USA AND CANADA), INC.
1250 I St., NW
Suite 1000
Washington, DC 20005
202.808.7365

DANIEL S. STRINGFIELD
  *Counsel of Record*
KATHERINE H. JOHNSON
STEPTOE & JOHNSON, LLP
115 South LaSalle Street
Suite 3100
Chicago, IL 60603
312.577.1300

*Counsel for Amicus Curiae
Licensing Executives Society
(U.S.A. and Canada), Inc.*

June 19, 2015

**QUALITY CARTRIDGES, INC., JOHN DOES, 1-20, BLUE TRADING LLC,
EXPRINT INTERNATIONAL, INC., LD PRODUCTS, INC.,
PRINTRONIC CORPORATION, TESEN DEVELOPMENT (HONG KONG) CO. LTD.,
AND BENIGNO ADEVA AND HIS COMPANIES,**

*Defendants.*

## <u>CERTIFICATE OF INTEREST</u>

Pursuant to Fed. Cir. R. 47.4 and Fed. R. App. P. 26.1, counsel for the

*Amicus Curiae* the Licensing Executives Society (U.S.A. and Canada), Inc. certifies

the following:

1.    The full name of every party represented by me is: **Licensing**

**Executives Society (U.S.A. and Canada), Inc.**

2.    The name of the real party in interest represented by me is: **N/A**.

3.    All parent corporations and any publicly held companies that own 10

percent or more of the stock of the parties represented by me are: **NONE**.

4.    The names of all law firms and the partners or associates that

appeared for the party now represented by me and that are expected to appear in

this court are:

Steptoe & Johnson LLP – Daniel S. Stringfield and Katherine H. Johnson

Licensing Executives Society (U.S.A. and Canada), Inc. – Brian P. O'Shaughnessy

*/s/ Daniel S. Stringfield*

Daniel S. Stringfield

STEPTOE & JOHNSON, LLP

115 South LaSalle Street

Suite 3100

Chicago, IL 60603

Telephone: 312.577.1300

*Counsel of Record for Amicus Curiae*
*Licensing Executives Society*
*(U.S.A. and Canada), Inc.*

i

# TABLE OF CONTENTS

**PAGE**

CERTIFICATE OF INTEREST ...............................................................i

TABLE OF AUTHORITIES ................................................................ iii

STATEMENT OF INTEREST OF *AMICUS CURIAE*............................1

SUMMARY OF THE ARGUMENT .....................................................2

ARGUMENT ......................................................................................4

I.    BRIEF BACKGROUND ON THE VALUE OF PATENTS AND
      PATENT LICENSING.................................................................4

II.   MAINTAINING THE STATUS QUO BY REAFFIRMING *JAZZ
      PHOTO* AND *MALLINCKRODT* ALLOWS FOR MORE
      TAILORED, THOUGH POTENTIALLY MORE COMPLEX,
      PATENT-RIGHTS TRANSACTIONS............................................8

      A.    This Court's *Jazz Photo* and *Mallinckrodt* Decisions...........8

      B.    Applying the Teachings of *Mallinckrodt*, Companies are Able
            to Craft Efficient License Arrangements ............................10

      C.    Under *Jazz Photo*, Companies Need Not be Concerned About
            Exhaustion from Foreign Sales .........................................13

III.  INCREASING THE SCOPE OF PATENT EXHAUSTION BY
      OVERRULING EITHER OR BOTH OF *JAZZ PHOTO* AND
      *MALLINCKRODT* MAY PROVIDE MORE CERTAINTY AND
      SIMPLICITY AT THE EXPENSE OF EFFICIENCY................................15

CONCLUSION ..................................................................................18

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## <u>CASES</u>

*B. Braun Med. Inc. v. Abbott Labs.*
   124 F.3d 1419 (Fed. Cir. 1997) ..............................................................9

*Fujifilm Corp. v. Benum*
   605 F.3d 1366 (Fed. Cir. 2010) ............................................................13

*Jazz Photo Corp. v. Int'l Trade Comm'n*
   264 F.3d 1094 (Fed. Cir. 2001) .........................................................2, 9

*Kirtsaeng v. John Wiley & Sons, Inc.*
   133 S. Ct. 1351 (2012). ..........................................................................2

*Lexmark Int'l, Inc. v. Ink Techs. Printer Supplies, LLC*
   No. 1:10-cv-564, 2014 U.S. Dist. LEXIS 41045 (S.D. Ohio Mar. 27, 2014) .....13

*Mallinckrodt, Inc. v. Medipart, Inc.*
   976 F.2d 700 (Fed. Cir. 1992)............................................................2, 9

*Quanta Computer, Inc. v. LG Electronics, Inc.*
   553 U.S. 617 (2008) ................................................................... 2, 8, 16

## <u>STATUTES & OTHER AUTHORITIES</u>

U.S. Const., art. I, § 8, cl. 8 .........................................................................5

35 U.S.C. § 261 (2006) ...............................................................................5

Strong Patents Act of 2015
   S632, 114th Cong. (2015) ....................................................................5

Adam Mossoff, *A Simple Conveyance Rule for Complex Innovation*, 44 Tulsa L.
   Rev. 707 (2009)........................................................................................6

Anne Layne-Farrar, *An Economic Defense of Flexibility in IPR Licensing:*
   *Contracting around First Sale in Multilevel Production Settings*, 51 Santa Clara
   L. Rev. 1149 (2011) ............................................................. 12, 14, 15

AUTM, *Tech Transfer Industry Shows Gains*, 2013, *available at*
http://www.autm.net ......................................................................................7

Brief for Petitioners, *Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617
(2008) (No. 06-937) ...................................................................................16

Brief of Qualcomm Inc. as *Amicus Curiae* in Support of Respondent, *Quanta
Computer, Inc. v. LG Elecs, Inc.*, 553 U.S. 617 (2008) (No. 06-937)......... passim

Donald S. Chisum, Chisum On Patents (2015) ...................................................6, 17

Internet.org Platform, https://internet.org/platform .................................................13

Making the internet affordable, https://internet.org/about......................................14

Restatement (Second) of Contracts (1981)..........................................................5, 17

Roger Milgrim & Eric Bensen, Milgrim on Licensing (2015)..................................6

Terry Ludlow, *Trends In Technology IP Licensing*, IPO Law J., Dec. 10, 2014,
*available at* http://www.ipo.org...........................................................................7

U.S. Dep't of Justice & Fed. Trade Comm'n, Antitrust Guidelines for the
Licensing of Intellectual Property (1995)..............................................................6

Writings of Thomas Jefferson
(H. Washington ed. 1871)......................................................................................5

## STATEMENT OF INTEREST OF *AMICUS CURIAE*

The Licensing Executives Society (U.S.A. and Canada), Inc. ("LES") is the global leader in the business applications of intellectual property ("IP") rights and their management, and it is devoted to standards development, education, and certification.  It is an independent, non-profit, professional society that promotes best practices in IP transactions, IP protection, and IP strategy.  LES counts among its members lawyers as well as experts in the IP strategy, business management, accounting, business development, supplier management, program management, sales, marketing, and IP valuation fields.[1]  Among these are representatives of innovation oriented companies from all business sectors, government agencies, and university labs.  LES is a community of approximately 4,000 IP management professionals, and it is part of a world-wide network (LES International or LESI) of more than 9,000 IP management practitioners in 32 sister societies.[2]

---

[1] LES states that this brief was not authored in whole or in part by counsel to a party, and that no monetary contribution to the preparation or submission of this brief was made by any person or entity other than LES and its counsel. Specifically, after reasonable investigation, LES believes that (i) no member of its Board or Amicus Committee who voted to file this brief, or any attorney in the law firm or corporation of such a member, represents a party to this litigation in this matter; (ii) no representative of any party to this litigation participated in the authorship of this brief; and (iii) no one other than LES, or its members who authored this brief and their law firms or employers, made a monetary contribution to the preparation or submission of this brief.

[2] This brief is filed upon the invitation of the Court for amicus briefs as stated in the April 14, 2015 *en banc* briefing order. *See* ECF No. 83.

1

## SUMMARY OF THE ARGUMENT

This case presents two questions pertaining to possible expansion of the doctrine of patent exhaustion.  First, this Court will consider whether its holding in *Jazz Photo Corp. v. Int'l Trade Comm'n*, 264 F.3d 1094 (Fed. Cir. 2001), that foreign sales of patented articles do not exhaust United States patent rights, remains viable in the wake of the Supreme Court's copyright exhaustion decision in *Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S. Ct. 1351 (2012).  Second, this Court will consider whether its holding in *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700 (Fed. Cir. 1992), that lawfully restricted sales of a patented article do not exhaust patent rights, was overruled by *Quanta Computer, Inc. v. LG Electronics, Inc.*, 553 U.S. 617 (2008).

Other *amici* have already sufficiently summarized various aspects of the legal analysis surrounding these questions.  As a professional society dedicated to promotion of best practices in IP transactions, IP protection, and IP strategy, *amicus* Licensing Executives Society (U.S.A. and Canada), Inc. ("LES") might be particularly suited to assist the Court with evaluation of the practical impact its decision.

At a high level, both questions ask whether the Court should expand the scope of patent exhaustion, by overruling either or both of *Jazz Photo* and *Mallinckrodt*, or maintain the status quo, by reaffirming the continued vitality of

their holdings.  As this brief focuses on the practical impact of the Court's decision, it will treat the questions together and frame the possible outcomes of the Court's decision as two scenarios: Status Quo or Increased Patent Exhaustion.

Under the Status Quo scenario, where the Court reaffirms the holdings of *Jazz Photo* and *Mallinckrodt*, the nature and scope of the patent rights conveyed in a transaction may be controlled more flexibly by the parties to that transaction. Among the benefits of the Status Quo is the ability to create more tailored and economically-efficient exchanges where the patent rights holder conveys the minimum amount of rights desired (be it in terms of territory, term, use, etc.) and the rights acquirer only pays for that minimum-desired amount of rights.

Of course, the flexibility appurtenant to the Status Quo scenario sometimes comes at the cost of complexity, in terms of both the instrument governing the exchange and the negotiation of the exchange.  Increased complexity generally means increased costs.  And increased complexity might have an unfair result in the event of disparate bargaining power between parties, particularly in the situation where an acquiring party is a lay purchaser of an article who might not understand the scope of the rights that he acquires.

In the event that the Court overrules either or both of *Jazz Photo* and *Mallinckrodt*, the Increased Patent Exhaustion scenario would result.  Potential benefits of Increased Patent Exhaustion are simplicity and certainty.  In each

3

situation where patent rights are mandatorily exhausted by the sale of an article embodying the patent, the acquirer knows that his future use or disposition of the article is not subject to a patent-based claim (though it may be subject to other lawful restrictions).

Increased simplicity and certainty, however, often means increased license royalty costs.  When rights holders and rights acquirers are no longer allowed the flexibility to tailor a crafted exchange, the exchange is reduced to "all or nothing."  If the patent holder knows that she will be completely divested of her rights as part of the exchange, she might charge a premium for her loss, if she pursues the transaction at all.  The fully-divested patent holder also loses the ability to parse her rights amongst multiple acquirers, decreasing diversity of access to the rights, as well as the intrinsic value of the rights themselves.  A decrease in patent-rights transactions, whether due to increased royalty costs, decreased diversity, decreased value or decreased desirability, could prevent rights acquirers from gaining access to technology and prevent patent holders from maximizing the value of their rights, potentially stifling innovation.

## **ARGUMENT**

### I.    **BRIEF BACKGROUND ON THE VALUE OF PATENTS AND PATENT LICENSING**

Patent rights are valuable.  At a societal level, this value is recognized in the constitutional foundation of our Country's patent system: "The Congress shall

have Power . . . To promote the progress of science and useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries . . . ." U.S. CONST., art. I, § 8, cl. 8. The Founding Fathers believed that "ingenuity should receive a liberal encouragement." 5 WRITINGS OF THOMAS JEFFERSON 75–76 (H. Washington ed. 1871). The strength of the patent system continues to be a significant public policy concern and is the focus of significant legislative activity. *See* Strong Patents Act of 2015, S632, 114th Cong. (2015). A strong patent system encourages innovation, is essential to economic success, promotes the chances of success for small companies, provides jobs and economic revenue in patent-intensive industries and allows the United States to maintain its status as the world's innovation leader. *Id*. § 101.

Patents rights are akin to personal property. 35 U.S.C. § 261 (2006) ("[P]atents shall have the attributes of personal property."). The property rights conferred by a patent are often described as a diverse "bundle of sticks," and patent licenses are narrowly tailored to suit the business arrangement of the parties by parsing out "sticks" from the patent owner's bundle of rights. *See* RESTATEMENT (SECOND) OF CONTRACTS § 72 (1981) (explaining public policy benefit of freedom to contract and enforcement of same). As a result, licenses vary widely in the types and extent of restraints included therein. Patent licensing plays a crucial role in encouraging competition and commercially leveraging patent rights, both of

which promote further innovation.  *See* U.S. DEP'T OF JUSTICE & FED. TRADE COMM'N, ANTITRUST GUIDELINES FOR THE LICENSING OF INTELLECTUAL PROPERTY (1995) ("Field-of-use, territorial, and other limitations on intellectual property licenses may serve procompetitive ends by allowing the licensor to exploit its property as efficiently and effectively as possible.").

Despite being defined as personal property, patent rights were historically viewed as being characterized as both real property and chattels.  *See* Adam Mossoff, *A Simple Conveyance Rule for Complex Innovation*, 44 TULSA L. REV. 707 (2009).  Accordingly, patent rights can be transferred in the same way real property rights can be transferred—either as an unrestricted conveyance, i.e., an outright assignment, or with geographic or field-of-use restraints, i.e., a geographically restricted assignment or a mere license.  *See* 1 DONALD S. CHISUM, CHISUM ON PATENTS § 1-OV (2015); 1 ROGER MILGRIM & ERIC BENSEN, MILGRIM ON LICENSING §§ 2.32, 2.33 (2015).[3]  A thorough consideration of the proper scope of the patent exhaustion doctrine, which limits the scope of patent rights, should not exclude the real property attributes of patents.

The economic benefits of patent rights are indisputable.  Intellectual property-intensive industries support 40 million jobs and contribute $5.06 trillion

---

[3] For a more in depth discussion of the real property characteristics of patent rights and case law development thereof, *see* Adam Mossoff, *A Simple Conveyance Rule for Complex Innovation*, 44 TULSA L. REV. 707 (2009).

dollars to the U.S. economy, over one-third of U.S. gross domestic product. U.S.
DEP'T OF COMMERCE, INTELLECTUAL PROPERTY AND THE U.S. ECONOMY:
INDUSTRIES IN FOCUS at vi-vii (2013). Companies also derive tremendous value
from licensing their patents. It is reported that Microsoft and Ericsson generate
more than $2 Billion in annual licensing revenue, and Qualcomm, regarded as a
leader in patent licensing, reportedly generates more than $6.6 Billion in annual
licensing revenue. *See* Terry Ludlow, *Trends In Technology IP Licensing*, IPO
LAW J., Dec. 10, 2014, at 4, *available at* http://www.ipo.org.

Private industry is not alone in deriving significant value from patents and
patent licensing. According to the 2013 survey (the most recent available) by the
Association of University Technology Managers ("AUTM"), there were almost
5,200 new patent licenses executed by U.S. universities, hospitals and research
institutions in 2013 (an increase of 1.3% over 2012). AUTM, *Tech Transfer
Industry Shows Gains*, 2013, at 6, *available at* http://www.autm.net. That AUTM
survey cites to a study by the Biotechnology Industry Organization ("BIO"), which
estimates the economic impact of university and nonprofit patent licensing from
1996 to 2010 was as much as $388 Billion on the U.S. gross domestic product and
$836 Billion on the U.S. gross industrial output, while creating as many as 3
million jobs. *Id.*

7

Patents, and the licensing thereof, are an important part of the United States economy. The promotion of strong patent rights is vital to the continued economic success of our nation. It is with this background that LES submits the following analysis of the possible practical outcomes of the Court's decision.

## II. MAINTAINING THE STATUS QUO BY REAFFIRMING *JAZZ PHOTO* AND *MALLINCKRODT* ALLOWS FOR MORE TAILORED, THOUGH POTENTIALLY MORE COMPLEX, PATENT-RIGHTS TRANSACTIONS

### A. This Court's *Jazz Photo* and *Mallinckrodt* Decisions

Patent rights are valuable, as discussed above. And the value of those rights is greatly enhanced when the rights holder is able to narrowly parse out its patent rights to maximize the number of rights acquirers. *See supra* § I.

It is understood that unconditional sales of patented articles within the United States completely exhaust patent rights. *See Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 625 (2008) ("[T]he initial authorized sale of a patented item terminates all patent rights to that item."). Thus, in order to effectively parse their rights, patent rights holders often find it useful to structure their patent rights conveyances in ways that avoid patent exhaustion under the precedent of this Court.

First, a rights holder may simply sell their goods outside the United States. This Court has recognized that because the benefits and rights conferred by a United States patent are territorially limited to the United States, so too is the

8

exhaustion of those rights from the sale of an article. *Jazz Photo Corp. v. Int'l Trade Comm'n*, 264 F.3d 1094, 1105 (Fed. Cir. 2001).

Second, a rights holder may sell their patent article within the United States, but subject to a use restriction (sometimes referred to as a conditional sale). *See Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700, 707 (Fed. Cir. 1992). This Court noted in *Mallinckrodt*: "[u]nless the condition violates some other law or policy (in the patent field, notably the misuse or antitrust law . . .), private parties retain the freedom to contract concerning conditions of sale." *Id.* at 708. In a subsequent decision, this Court further explained the *Mallinckrodt* holding:

> As a general matter, we explained that an unconditional sale of a patented device exhausts the patentee's right to control the purchaser's use of the device thereafter. The theory behind this rule is that in such a transaction, the patentee has bargained for, and received, an amount equal to the full value of the goods. This exhaustion doctrine, however, does not apply to an expressly conditional sale or license. In such a transaction, it is more reasonable to infer that the parties negotiated a price that reflects only the value of the "use" rights conferred by the patentee. As a result, express conditions accompanying the sale or license of a patented product are generally upheld.

*B. Braun Med. Inc. v. Abbott Labs.*, 124 F.3d 1419, 1426 (Fed. Cir. 1997) (citations omitted).

By avoiding mandatory patent exhaustion through the first sale of a patented article under *Jazz Photo* and *Mallinckrodt*, patent rights holders gain greater flexibility in setting the royalty rate for the use of their patented technology.

**B.**      **Applying the Teachings of *Mallinckrodt*, Companies are Able to Craft Efficient License Arrangements**

To illustrate the potential licensing efficiency that companies have gained by applying the *Jazz Photo* and *Mallinckrodt* decisions, the Court should consider real-world licensing scenarios and their impact—for example, the scenario detailed by one of the *amici* in the Supreme Court's *Quanta* decision. *See* Brief of Qualcomm Inc. as *Amicus Curiae* in Support of Respondent, *Quanta Computer, Inc. v. LG Elecs, Inc.*, 553 U.S. 617 (2008) (No. 06-937) ("Qualcomm Amicus").

In this example, a company that holds rights in numerous patents related to wireless communication technology grants royalty-bearing licenses of its patented technology. *See id.* at 4-5, 6-7. Because the rights holder has spent, and continues to spend, great sums of money on research and development, it desires to license its patented technology at a royalty rate commensurate with the contribution of its technology. *Id.* at 22. ("[I]nsufficiently compensating innovators for the actual research and development required to produce cutting edge technologies [would] slow the introduction of new technologies into the industry, and frustrate the goals of the Patent Act.").

The rights holder desires to license its patented technology to semiconductor chip manufacturers, among other entities. *Id.* at 7-8. The chip made under this license embodies multiple facets of the rights holder's patented technology. *See id.* at 22. This chip might be installed into basic handsets that use relatively few

10

aspects of the patented technology and sell for a low price ($100), or the chip might be installed into feature-rich handsets that use more aspects of the patented technology (such as Internet connectivity) and therefore, sell at a higher price ($400). *Id.* Because the more-expensive, Internet-connected devices use more aspects of the patented technology, the rights holder might want a higher royalty on its technology as implemented in those devices than it desires on the basic devices. *See id.* at 22-23.

Under *Mallinckrodt*, the rights holder is free to unpack its "bundle" of patent rights, granting the chip manufacturer the right to *make* the chip embodying the patented technology (with a royalty based on the price of the chip)[4] and granting the handset manufacturer the rights to *make*, *use* and *sell* handsets embodying the patented technology (with a royalty based on the price of the handsets). *See id.* at 8, 22. Thus, by strategically implementing *Mallinckrodt* restrictions on the licenses it grants, the rights holder in this example has the flexibility to allocate the royalty for its patented technology among the various players in the production chain. *See id.* at 22. The rights holder finds such an arrangement to be an efficient way to "spread[] the financial obligations of patent licensing across the production chain, such that all parties benefiting from the license bear a share of the financial

---

[4] The chip maker also receives a limited license to sell the chip but only to authorized handset manufacturers. *See* Qualcomm Amicus at 8. The chip maker is expressly not granted a license to *use* the chips. *Id.*

burden proportional to the benefits they themselves derive." *Id.*; *accord* Anne Layne-Farrar, *An Economic Defense of Flexibility in IPR Licensing: Contracting around First Sale in Multilevel Production Settings*, 51 SANTA CLARA L. REV. 1149, 1155 (2011) ("Layne-Farrar") ("Since [intellectual property rights] can embody a bundle of rights, the other pivotal economic concept in [intellectual property rights] licensing: economic efficiency is implicated."). Notably, the licensing arrangement in the example above is structured such that the patent rights are exhausted before the handsets reach the ultimate downstream purchaser of the handsets. *See* Qualcomm Amicus at 9.

Under the presumed bargain between the rights holder and the ultimate downstream purchaser of the handsets incorporating the patented technology, there is a premium placed on certain advanced features of the patented technology, as at least partially evidenced by the price disparity between the low-featured and higher-featured handsets. *See id.* at 22. Some downstream purchasers are willing to pay the premium for the advanced features and others are not. The lack of exhaustion in the production chain allows that premium to be allocated between the high-featured and low-featured handsets, and therefore, among the downstream purchasers who desire the features without unfairly burdening (or pricing out) those who do not.

12

There may be other transactions where the acquiring party does not want any patent rights beyond a single-use right, such as the case of consumable products like the toner cartridges at issue in the instant case or the disposable cameras at issue in *Fujifilm Corp. v. Benum*, 605 F.3d 1366 (Fed. Cir. 2010).  In these instances, the acquiring party may be quite willing to surrender future use of the disposable articles in exchange for the lower acquisition cost allowed for by patent exhaustion.  Of course, if the acquiring party desired to purchase the product with completely exhausted rights, they could pay a bargained-for premium.  *See Lexmark Int'l, Inc. v. Ink Techs. Printer Supplies, LLC*, No. 1:10-cv-564, 2014 U.S. Dist. LEXIS 41045, at *4 (S.D. Ohio Mar. 27, 2014) (explaining that Lexmark offered customers non-discounted printer cartridges with no use restrictions).

### C.    Under *Jazz Photo*, Companies Need Not be Concerned About Exhaustion from Foreign Sales

In addition to wishing to strategically price the royalty on its patented technology via a *Mallinckrodt* restriction, as discussed above, a rights holder may wish to price its technology differently based on geography.

For example, there exists a desire to make Internet-enabled devices available in developing nations.  *See, e.g.*, Internet.org Platform, https://internet.org/platform (last visited June 15, 2015) ("Through Internet.org, we've been able to offer free basic internet services to hundreds of millions of people across Asia, Africa and

Latin America."). Therefore, the wireless communication rights holder discussed in the above example may desire to make its patented technology available for inclusion in devices at little (or no cost) in developing nations. *See* Making the internet affordable, https://internet.org/about (listing said rights holder, Qualcomm, as a participant) (last visited June 15, 2015).

Under *Jazz Photo*, the rights holder has the ability to permit its technology to be used in low-cost devices sold in these developing nations without concern that its patent rights in those devices become exhausted. If its patent rights were exhausted, those devices might be imported back into the United States, potentially cannibalizing sales or harming the rights holder's reputation. *Cf.* ECF No. 96, Brief of *Amicus Curiae* Am. Intellectual Prop. Law Ass'n in Support of Neither Party, at 15-16 (Fed. Cir. June 5, 2015) (exploring consequences of international patent exhaustion on patented pharmaceuticals).

As can be seen from the above examples, *Mallinckrodt* and *Jazz Photo* allow patent licensing flexibility to maximize the efficiency of the transaction, both in terms of use and geography. The downside to the flexibility described above is the potential for complexity in the transaction and a lack of certainty over the true price of goods when limits are placed on use of the product. Such uncertainty may "hinder the exchange of goods and the dissemination of the innovations underlying those goods." Layne-Farrar, *supra*, at 1155-56. Moreover, the negotiation for (and

14

later, enforcement of) patent rights, particularly in the case of a multi-layered manufacturing and distribution chain, might become extremely complex and costly. *See id.* at 1164- 67.

Thus, in deciding whether to reaffirm its decisions in *Mallinckrodt* and *Jazz Photo*, this Court should consider the potentially pro-innovation and economic efficiencies described above.

## III. INCREASING THE SCOPE OF PATENT EXHAUSTION BY OVERRULING EITHER OR BOTH OF *JAZZ PHOTO* AND *MALLINCKRODT* MAY PROVIDE MORE CERTAINTY AND SIMPLICITY AT THE EXPENSE OF EFFICIENCY

As briefly alluded to above, lack of certainty as to the presence of patent protection over an article is one of the principal policy arguments favoring reversal of *Mallinckrodt* and *Jazz Photo*. Indeed, such concerns have been voiced by the other *amici* in the instant case. *See, e.g.*, ECF No. 51, Corrected Brief *Amicus Curiae* of Remanufacturing Ass'ns in Support of Affirmance of Cross-Appeal at 7, 22 (Fed. Cir. Nov. 25, 2014). These *amici* claim that only a "bright-line," mandatory patent exhaustion rule, would provide the certainty they require. *Id.* at 23.

In addition to increased certainty as to the absence of patent rights in sold articles, proponents of patent exhaustion cite simplicity and lower transaction costs as another principal benefit of increased exhaustion scope. For example, the Petitioners in the Supreme Court *Quanta* case asserted that patent exhaustion

15

"minimizes transaction costs by forcing the patent owner to exact the full value of its patent rights in one negotiation with the first purchaser, which can then share the burden with the rest of the distribution chain by charging a higher price." Brief for Petitioners at 15, *Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617 (2008) (No. 06-937).

These pro-exhaustion benefits are attractive, but they are imperfect. First, the "notice" justification for exhaustion seemingly overlooks the Supreme Court's express statement that "the authorized nature of the sale does not necessarily limit [the rights holder's] other contract rights." *Quanta*, 553 U.S. at 637 n.7. In this footnote, the Court signaled that even though patent rights will be exhausted as part of authorized unconditional sales of patented goods, those goods may still be subject to contract claims that might prevent free alienability of the goods without the purchaser necessarily having knowledge.

The "simplicity" argument likewise fails to account for contractual restrictions that may still be imparted on goods. Indeed, the wireless communications rights holder discussed above appears to have a complex series of interrelated contractual arrangements in place to restrict the ability of the downstream parties in the production chain to freely alienate the chips embodying the patented technology. *See* Qualcomm Amicus at 7-8.

16

Of course, the obvious downside to relying on only contract law to achieve the above-described patent licensing flexibility benefits presently available under *Mallinckrodt* and *Jazz Photo* is that contract remedies generally require contractual privity to be enforceable.  RESTATEMENT (SECOND) OF CONTRACTS § 302 (1981) (explaining that third parties to the contract have a basis for recovery only where they were an intended beneficiary).  Patent rights, on the other hand, do not require privity to be enforceable against an infringer.  1 DONALD S. CHISUM, CHISUM ON PATENTS § 16.01 (2015) (explaining that the right to exclude flows from the making, using, selling or offering for sale "the invention defined by a patent's claims").

Moreover, the inability to control the use of their patented technology beyond the first step of the production chain may deprive rights holders of the flexibility to allocate the patent royalty amongst the various players in the production chain.  Qualcomm Amicus at 22.  In this case, because the rights holder must secure their entire royalty from the first-step manufacturer (such as the chip manufacturer in the above example), the value of the royalty must be based on that first-step product (e.g., the chip) and not on the value of the downstream product (e.g., the handset).  *See id.* at 22-23.  Thus, in the above scenario, unless the rights holder was inclined to undercompensate itself for the chips installed into the high-end handsets (potentially disincentivizing the rights holder from further

17

innovating), the royalty it charges to the chip manufacturer might overburden the cost of the low-end handsets. *See id.* An unintended consequence of this scenario might be that the low-end handsets are no longer available for consumers because the uniformly-higher royalty charged on the chips for both the high-end and low-end handsets renders the low-end handsets unprofitable. *Id.* at 23.

Thus, simplicity and certainty are benefits of Increased Patent Exhaustion, and this Court's decision should thoroughly weigh those important public policy considerations.

## CONCLUSION

As can be seen from the above, the Court's decision in this case is likely to have a significant impact on the development and commercialization of patented technology. The Court must consider whether the economic and efficiency benefits of the Status Quo's freedom to contract are outweighed by the increased certainty and simplicity provided by Increased Patent Exhaustion.

Dated:  June 19, 2015

/s/ Daniel S. Stringfield

Daniel S. Stringfield
    *Counsel of Record*
Katherine H. Johnson

Brian P. O'Shaughnessy

STEPTOE & JOHNSON, LLP

*Regional Vice President, USA*

115 South LaSalle Street

LICENSING EXECUTIVES SOCIETY

Suite 3100

(USA AND CANADA), INC.

Chicago, IL 60603

1250 I St., NW

Telephone: 312.577.1300

Suite 1000

Washington, DC 20005

*Counsel for Amicus Curiae*

202.808.7365

*Licensing Executives Society*
*(U.S.A. and Canada), Inc.*

Form 19

**FORM 19. Certificate of Compliance With Rule 32(a)**

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

1.   This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e).

☑   The brief contains 4,433 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), or

☐   The brief uses a monospaced typeface and contains [ *state the number of* ] lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.   This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

☑   The brief has been prepared in a proportionally spaced typeface using
[   *Microsoft Word 2010*   ] in
[   *Times New Roman 14 pt*         ], or

☐   The brief has been prepared in a monospaced typeface using
[   *state name and version of word processing program* ]  with
[ *state number of characters per inch and name of type style*        ].

*/s/Daniel S. Stringfield*
(Signature of Attorney)
Daniel S. Stringfield
(Name of Attorney)
*Amicus Curiae* Licensing Executives Society (U.S.A. & Canada)
(State whether representing appellant, appellee, etc.)
June 19, 2015
(Date)

**Form 30 FORM 30. Certificate of Service**

# UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

# CERTIFICATE OF SERVICE

I certify that  served a copy on counsel of record on June 19, 2015 by:

       ☐  US mail
       ☐  Fax
       ☐  Hand
       ☑  Electronic Means
          (by email or CM/ECF)

Daniel S. Stringfield                        */s/ Daniel S. Stringfield*
Name of Counsel                            Signature of Counsel

Law Firm  Steptoe & Johnson, LLP

Address     115 South LaSalle Street, Suite 3100

City, State, ZIP     Chicago, IL  60603

Telephone Number        312.577.1300

FAX Number     312.577.1370

E-mail Address     dstringfield@steptoe.com

NOTE: For attorneys filing documents electronically, the name of the filer under whose log-in and password a document is submitted must be preceded by an "/s/" and typed in the space where the signature would otherwise appear. Graphic and other electronic signatures are discouraged.