No. 2014-1617

# United States Court of Appeals
# for the Federal Circuit

**LEXMARK INTERNATIONAL, INC.,**

*Plaintiff-Cross-Appellant*

v.

**IMPRESSION PRODUCTS, INC.,**

*Defendant-Appellant*

(*Caption Continued on Inside Cover*)

*Appeal from the United States District Court for the Southern District of Ohio, Case No. 1:10-CV-00564-MRB, Judge Michael R. Barrett*

**BRIEF OF *AMICUS CURIAE*
RECYCLING TIMES MEDIA CORPORATION
IN SUPPORT OF DEFENDANT-APPELLANT
IMPRESSION PRODUCTS, INC.**

MERRITT R. BLAKESLEE
**THE BLAKESLEE LAW FIRM**
1250 Connecticut Ave., N.W., Suite 700
Washington, D.C. 20036
(202) 419-1535
mrb@blakeslee-law.com

*Counsel to* Amicus Curiae *Recycling Times Media Corporation*

June 18, 2015

**QUALITY CARTRIDGES, INC., JOHN DOES, 1-20, BLUE TRADING LLC,
EXPRINT INTERNATIONAL, INC., LD PRODUCTS, INC.,
PRINTRONIC CORPORATION, TESEN DEVELOPMENT (HONG KONG) CO. LTD.,
AND BENIGNO ADEVA AND HIS COMPANIES,**

*Defendants*

## <u>CERTIFICATE OF INTEREST</u>

Counsel for the *amicus curiae* Recycling Times Media Corporation certifies the following:

1. The full name of every party or amicus represented by me is:

     **Recycling Times Media Corporation**.

2. The name of the real party in interest represented by me is:

     **Not applicable**.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

     **None**.

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

     **Merritt R. Blakeslee**
     **R. Austin Blakeslee**
     **The Blakeslee Law Firm**

                           _____/s/ Merritt R. Blakeslee_____
                           Merritt R. Blakeslee
                           THE BLAKESLEE LAW FIRM
                           1250 Connecticut Ave., N.W., Suite 700
                           Washington, D.C. 20036
                           (202) 419-1535
                           mrb@blakeslee-law.com

                           *Counsel to* amicus curiae *Recycling Times Media Corporation*

i

# **TABLE OF CONTENTS**

**Page**

CERTIFICATE OF INTEREST ............................................................... i

TABLE OF AUTHORITIES ................................................................. iii

IDENTITY AND INTEREST OF THE *AMICUS CURIAE* ................................... vii

SUMMARY OF THE ARGUMENT ........................................................1

ARGUMENT ...................................................................................4

  A.  This Court's 2001 decision in Jazz Photo was a radical, unexplained departure from the century-old rule that the patent exhaustion doctrine is not territorially limited.................................................................4

    1.  Prior to *Jazz Photo*, no decision by this Court or by the Supreme Court imposed a territorial limitation on the patent exhaustion doctrine. ...................4

    2.  The *Jazz Photo* panel incorrectly applied *Boesch v. Graff.* .......................7

    3.  Since *Jazz Photo*, this Court has twice applied the pre-*Jazz Photo* rule that patent exhaustion is not territorially restricted. .........................................11

    4.  *Jazz Photo* is fundamentally at odds with the patent exhaustion doctrine because it permits the patentee of a patented article to be exercise its rights in that same article twice......................................................................14

  B.  The fundamental purpose of the patent exhaustion doctrine – encouraging innovation while avoiding monopolies – requires exhaustion of the U.S. patentee's rights in a patented article sold outside of the United States, no less than exhaustion of his rights in that same article if sold within the United States…...............................................................................16

  C.  This Court should reject Lexmark's argument that it requires protection against legal parallel imports in order to engage profitably in market division and discriminatory pricing. ......................................................................21

CONCLUSION...................................................................................25

CERTIFICATE OF COMPLIANCE........................................................26

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Adams v. Burke,*
    84 U.S. 453 (1873) ................................................................................4

*Bloomer v. McQuewan,*
    55 U.S. 539 (1852) ................................................................................6

*Bloomer v. Millinger,*
    68 U.S. 340 (1864) ........................................................................ 14, 19

*Boesch v. Graff,*
    133 U.S. 697 (1890) ....................................................................... 7, 8, 9

*Carborundum Co. v. Molten Metal Equip. Innovations,*
    72 F.3d 872 (Fed. Cir. 1995) ...............................................................22

*Certain Semiconductor Chips with Minimized Chip Package Size and Products*
    *Containing Same (III),*
    USITC Inv. No. 337-TA-630, USITC Pub. 4209 (Comm'n Op., Dec. 2010).....13

*Curtiss Aeroplane & Motor Corp. v. United Aircraft Eng'g Corp.,*
    266 F. 71 (2d Cir. 1920) .................................................................6, 20

*Dickerson v. Mattheson,*
    57 F. 524 (2d Cir. 1893) ........................................................................6

*Dickerson v. Tinling,*
    84 F. 192 (8th Cir. 1897) .......................................................................6

*Fuji Photo Film Co. v. ITC,*
    474 F.3d 1281 (Fed. Cir. 2007) ...........................................................11

*Fuji Photo Film Co. v. Jazz Photo Corp.,*
    394 F.3d 1368 (Fed. Cir. 2005) ...........................................................11

*Fujifilm Corp. v. Benun,*
    605 F.3d 1366 (Fed. Cir. 2010) ...........................................................11

*General Talking Pictures Corp. v. Western Elec. Co.*,
  305 U.S. 124 (1938) ........................................................................22

*Goodyear v. Beverly Rubber Co.*,
  1 Cliff. 348 (C.C.D. Mass. 1859) ..................................................5

*Hewlett-Packard Co. v. Repeat-O-Type Stencil Mfg. Corp.*,
  123 F.3d 1445 (Fed. Cir. 1997) ....................................................19

*Hobbie v. Jennison*,
  149 U.S. 355 (1893) ........................................................................4

*Holiday v. Mattheson,*
  24 F. 185 (C.C.S.D.N.Y. 1885)........................................................5

*Hormel v. Helvering*,
  312 U.S. 552 (1941) ......................................................................13

*Intel Corp. v. ULSI Sys. Technology, Inc.*,
  995 F.2d 1566 (Fed. Cir. 1993)....................................................19

*Jazz Photo Corp. v. International Trade Commission*,
  264 F.3d 1094 (Fed. Cir. 2001) ........................................... vi, 1, 7

*Kabushiki Kaisha Hattori Seiko* v. *Refac Tech. Dev. Corp.*,
  690 F. Supp. 1339 (S.D.N.Y. 1988)............................................6, 7

*Keeler v. Standard Folding Bed Co.*,
  157 U.S. 659 (1895) ............................................... 4, 5, 9, 14

*Keurig, Inc. v. Sturm Foods, Inc.*,
  732 F.3d 1370 (Fed. Cir. 2013).....................................................15

*Kirtsaeng v. John Wiley & Sons, Inc.*,
  133 S. Ct. 1351 (2013) ........................... vi, 1, 7, 10, 17, 18, 21, 24, 25

*LG Elecs., Inc. v. Bizcom Elecs., Inc.*,
  453 F.3d 1364 (Fed. Cir. 2006) ....................................................14

*LifeScan Scot., Ltd. v. Shasta Techs., LLC*,
  734 F.3d 1361 (Fed. Cir. 2013) ........................................ 2, 3, 22, 23

*McCoy v. Mitsuboshi Cutlery*,
  67 F.3d 917 (Fed. Cir. 1995) ........................................................14

iv

*Microsoft Corp. v. AT&T Corp.*,
    550 U.S. 437 (2007) ....................................................................................10

*Microsoft Corp. v. i4i Ltd. P'ship*,
    131 S. Ct. 2238 (2011) .................................................................................6

*Mitchell v. Hawley*,
    83 U.S. (16 Wall.) 544 (1872)....................................................................19

*Ninestar Tech Co. v. ITC*,
    133 S. Ct. 1656 (U.S. 2013) .......................................................................11

*Ninestar Tech. Co. v. ITC*,
    667 F.3d 1373 (Fed. Cir. 2012)..................................................................11

*Powertech Tech. Inc. v. Tessera Inc.*,
    660 F.3d 1301 (Fed. Cir. 2011) ............................................................ 12, 14

*Quanta Computer Inc. v. LG Electronics, Inc*.
    553 U.S. 617 (2008). .......................................................................... 8, 11, 14

*Sanofi S.A. v. Med-Tech Veterinarian Products, Inc.,*
    565 F. Supp. 931 (S.D.N.J. 1983) ...............................................................6

*Tessera, Inc. v. Int'l Trade Comm'n,*
    646 F.3d 1357 (Fed. Cir. 2011) ............................................................ 12, 13, 15

*U.S. Nat'l Bank of Oregon v. Indep. Ins. Agents of America, Inc.,*
    508 U.S. 439 (1993) ....................................................................................13

*United States v. Masonite Corp*.,
    316 U.S. 265 (1942) ....................................................................................18

*United States v. Univis Lens Co*.,
    316 U.S. 241 (1942) .......................................................................... 8, 18, 19, 20

**Statutes**

35 U.S.C. § 154(a)(2) (2011) ................................................................................19

**Other Authorities**

Daniel Erlikhman, Note, Jazz Photo *and the Doctrine of Patent Exhaustion*, 25
    Hastings Comm. & Ent. L.J. 307 (2003)...............................................9

John A. Rothchild, *Exhausting Extraterritoriality*, 51 Santa Clara L. Rev. 1187 (2011)......................................................................................................................9

**Constitutional Provisions**

U.S. Const., art. I, § 8, cl. 8....................................................................................17

**Treatises**

1 E. Coke, *Institutes of the Laws of England* § 360, p. 223 (1628)........................17

5 Donald S. Chisum, *Chisum on Patents* § 16.05[3][a][ii] (1997)............................6

# IDENTITY AND INTEREST OF THE *AMICUS CURIAE*

*Amicus curiae* Recycling Times Media Corporation submits this brief in support of Defendant/Appellant Impression Products, Inc. to address the issue presented in Defendant/Appellant's appeal:   whether, in light of *Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S. Ct. 1351 (2013), this Court should overrule *Jazz Photo Corp. v. International Trade Commission*, 264 F.3d 1094 (Fed. Cir. 2001), to the extent it ruled that a sale of a patented item outside the United States never gives rise to United States patent exhaustion.

Recycling Times Media Corporation is a privately held media organization that organizes events and publishes publications, particularly events and publications relating to the imaging supplies industry, including companies that buy used toner and inkjet cartridges and refurbish and resell them.  The subscribers to and readers of its publications, and the attendees, sponsors, and exhibitors at its events, include companies that refurbish and resell used toner and inkjet cartridges.

The ink and toner cartridges used in computer and facsimile printers can be refurbished and reused many times, significantly extending their useful life.  Such recycling is beneficial both to the environment and to consumers, who have the option of purchasing a high-quality, lower-cost recycled cartridge instead of being obliged to purchase a new cartridge each time the ink/toner supply is exhausted.  In some cases, these refurbished cartridges include enhanced features compatible with

the printers in which they are used but not available in the cartridges supplied by the original equipment manufacturer.  This vigorous aftermarket competition prevents original equipment manufacturers from charging supracompetitive prices for replacement cartridges while encouraging innovation in these products.

No counsel for a party authored the brief in whole or in part.  No party or party's counsel contributed money that was intended to fund preparing or submitting the brief.  No person – other than the *amicus curiae* – contributed money that was intended to fund preparing or submitting the brief.

This brief is filed upon the invitation of the Court for *amicus* briefs as stated in its April 14, 2015 *en banc* briefing order.

## SUMMARY OF THE ARGUMENT

In its opinion below, the District Court declined to hold that the patent exhaustion doctrine applied to Plaintiff-Cross-Appellant Lexmark's sales of patented inkjet cartridges outside of the United States.  In so holding, the District Court relied on *Jazz Photo Corp. v. International Trade Commission,* 264 F.3d 1094 (Fed. Cir. 2001), which it treated as controlling authority for its decision. The District Court considered, but refused to follow, the Supreme Court's rejection of territorial limits on copyright exhaustion in *Kirtsaeng v. John Wiley & Sons, Inc.,*__ U.S.__, 133 S.Ct. 1351 (2013).

In its April 14, 2015 order, this Court authorized the submission of amicus briefs addressing, *inter alia*, whether, in light of *Kirtsaeng* , it should overrule *Jazz Photo*, to the extent it ruled that a sale of a patented item outside the United States never gives rise to United States patent exhaustion.

In *Kirtsaeng*, the Supreme Court held that the first sale doctrine in copyright law is not subject to a territoriality requirement.[1]  This brief does not argue that the *Kirtsaeng* decision, which dealt with the first sale doctrine under the Copyright Act, is controlling precedent for this Court on the *Jazz Photo* issue, which involves the common law doctrine of patent exhaustion.  It argues rather that *Kirtsaeng*

---

[1] *Kirtsaeng*, 133 S. Ct. at 1371.

provides crucial and specific guidance to this Court as it decides whether *Jazz Photo* was wrongly decided.

Since *Kirtsaeng* was handed down two years ago, this Court has twice turned to that decision for guidance in resolving difficult patent exhaustion issues. In each, this Court has cited the *Kirtsaeng* decision's emphasis on the common law origins of the copyright first sale doctrine as directly relevant to issues of patent exhaustion.

In deciding whether a patentee's gift of a patented article exhausted its patent rights, this Court declared in *LifeScan Scotland v. Shasta Techs* that *Kirtsaeng*'s exposition of the common law origins of the copyright first sale doctrine, which this Court found "comparable to the patent exhaustion doctrine," "further reinforce[s] our conclusion that patent exhaustion applies to gifts."[2] Earlier this year, this Court again acknowledged the relevance of *Kirtsaeng* to patent exhaustion, citing *Kirtsaeng* in holding that "role that the [patent] exhaustion doctrine has played to date – avoiding re-imposition of section 271 constraints on an authorized acquirer – reflects the doctrine's origin in common-law rules limiting servitudes, and specifically alienability restrictions, on personal

---

[2] *LifeScan Scot., Ltd. v. Shasta Techs., LLC*, 734 F.3d 1361, 1375-76 (Fed. Cir. 2013) ("[T]he [*Kirtsaeng*] Court held that the first sale doctrine in copyright law (comparable to the patent exhaustion doctrine) applies equally whether the copyrighted work is manufactured in the United States or abroad.") (citations omitted).

property."[3]  As in *LifeScan* and *Helferich*, *Kirtsaeng* provides crucial and highly

specific guidance for this Court as it considers the issue of territorial limitations on

patent exhaustion, the very issue that *Kirtsaeng* decided for copyright law.[4]

The present brief argues that this Court should overrule *Jazz Photo* to the

extent it ruled that a sale of a patented item outside the United States never gives

rise to United States patent exhaustion.  It argues first that *Jazz Photo* was a

radical, unexplained departure from the century-old rule that the patent exhaustion

doctrine is not territorially limited.  It argues further that, by grafting a new

territoriality requirement onto the patent exhaustion doctrine, *Jazz Photo*

established a rule that is sharply at odds with the foundational principle of the

doctrine – encouraging innovation while carefully limiting the anticompetitive

effects of the patent grant as to individual patented articles.  Finally, it argues that

this Court should reject Lexmark's argument that a territorially limited patent

exhaustion rule is needed to provide Lexmark with protection against legal parallel

imports in order that it can engage profitably in market division and discriminatory

pricing.

---

[3] *Helferich Patent Licensing, LLC v. New York Times Co.*, 778 F.3d 1293, 1305
(Fed. Cir. 2015) (citing *Kirtsaeng* for the proposition that the copyright first sale
doctrine is "rooted in the common law's refusal to allow the seller of property to
'control the resale or other disposition of a chattel once sold'").

[4] *LifeScan,* 734 F.3d at 1376 n.9 ("The Supreme Court has frequently explained
that copyright cases inform similar cases under patent law.") (citations omitted).

## **ARGUMENT**

### **A. This Court's 2001 decision in Jazz Photo *was a radical, unexplained departure from the century-old rule that the patent exhaustion doctrine is not territorially limited.***

#### **1. Prior to *Jazz Photo*, no decision by this Court or by the Supreme Court imposed a territorial limitation on the patent exhaustion doctrine.**

Well over a century ago, the Supreme Court confronted – and decided – the question whether post-sale territorial restrictions on the resale of a patented article are valid in the face of the patent exhaustion doctrine.  Since then, it has been settled law that patent exhaustion is not subject to a territorial restriction.

The early territorial restriction cases dealt with restrictions within the United States.  In 1873 in *Adams v. Burke,* the Supreme Court struck down a claim of patent infringement against a reseller of patented articles (improved coffin lids) that he purchased from a seller licensed to sell them only within a restricted territory but who sold them outside of that territory.[5]  Two decades later, the Supreme Court in *Keeler v. Standard Folding Bed* explained that *Adams* stands for the proposition that "a person who buys patented articles from a person who has a right to sell, though within a restricted territory, has a right to use and sell such articles in all and any part of the United States."[6]  In *Keeler*, the Court, resting on its prior decisions in *Adams* and *Hobbie*, declared that "one who buys patented

---

[5] *Adams v. Burke,* 84 U.S. 453, 455 (1873); *accord Hobbie v. Jennison*, 149 U.S. 355 (1893).

[6] *Keeler v. Standard Folding Bed Co*., 157 U.S. 659, 664 (1895).

4

article[s] of manufacture from one authorized to sell them becomes possessed of an absolute property in such articles, unrestricted in time *or place*."[7]  This is so, *Keeler* explained, because, "'[h]aving . . . sold [the article] for a satisfactory compensation. . . , the patentee, so far as that quantity of the product of his invention is concerned, has enjoyed all the rights secured to him by his letters patent.'"[8]  Thus, "the payment of a royalty once, or, what is the same thing, the purchase of the article from one authorized by the patentee to sell it, emancipates such article from any further subjection to the patent throughout the entire life of the patent. . . ."[9]

The principle that the patent exhaustion doctrine is not territorially limited passed into patent jurisprudence, where, since the last quarter of the Nineteenth Century, the doctrine has routinely been found to apply to sales made outside of the United States with the authorization of the U.S. patentee.[10]  Congress' 1952

---

[7] *Keeler,* 157 U.S. at 666 (emphasis added) (holding "that defendants, having purchased the patented articles in Michigan from the assignee of the patent for the territory included in that State, had a right to sell them anywhere within the United States, including Massachusetts, where the patent rights had been assigned to another assignee.").

[8] *Id.* at 661, *quoting Goodyear v. Beverly Rubber Co.*, 1 Cliff. 348, 354 (C.C.D. Mass. 1859).

[9] *Keeler,* 157 U.S. at 666.

[10] *Holiday v. Mattheson,* 24 F. 185, 186 (C.C.S.D.N.Y. 1885) (deciding in the negative "the question whether the owner of a patent in the United States for an invention, who has sold the patented article in England without restriction or conditions, can treat as an infringer one who has purchased the article in England

codification of patent law in its present form without including a specific provision on patent exhaustion constituted "an implicit authorization to continue applying the doctrine within its familiar boundaries."[11]

---

of a vendee of the patentee, and can restrain him from using or selling the article here"); *Dickerson v. Mattheson,* 57 F. 524, 527 (2d Cir. 1893) ("A purchaser in a foreign country, of an article patented in that country and also in the United States, from the owner of each patent, or from a licensee under each patent, who purchases without any restrictions upon the extent of his use or power of sale, acquires an unrestricted ownership in the article, and can use or sell it in this country."); *Dickerson v. Tinling*, 84 F. 192, 195 (8th Cir. 1897) (assuming, without having to decide, "that one who buys a patented article without restriction in a foreign country from the owner of the United States patent has the right to use and vend it in this country"); *Curtiss Aeroplane* & *Motor Corp. v. United Aircraft Eng'g Corp.,* 266 F. 71, 78-79 (2d Cir. 1920) (the unrestricted license by the U.S. patentee to a foreign manufacturer of the right to manufacture the patented article outside of the United States divested the U.S. patentee of the right to bar the importation of products made pursuant to that license); *Sanofi S.A. v. Med-Tech Veterinarian Products, Inc.,* 565 F. Supp. 931, 938 (S.D.N.J. 1983) ("The court will . . . not grant to Sanofi an injunction against distribution in this country of the product that it sold in France without restriction."); *Kabushiki Kaisha Hattori Seiko* v. *Refac Tech. Dev. Corp*., 690 F. Supp. 1339, 1344 (S.D.N.Y. 1988) ("[T]he first authorized sale of a patented article exhausts the patent monopoly in the article, even if that sale takes place abroad. . . ."); *see also* 5 Donald S. Chisum, *Chisum on Patents* § 16.05[3][a][ii] (1997) ("[Exhaustion m]ay occur if a sale in a foreign country is unrestricted and the seller holds the patent rights to sell in the United States as well as in the foreign country.").

[11] *Helferich*, 778 F.3d at 1305 ("Patent exhaustion is a judicially fashioned doctrine without a specific source in congressionally enacted text stating the terms of this limitation on patent rights. We presume, from Congress's refusal to disturb the existing decisional law of this doctrine (which predated the 1952 Act by nearly a century), an implicit authorization to continue applying the doctrine within its familiar boundaries.") (citing *Bloomer v. McQuewan*, 55 U.S. 539, 549-50 (1853)); *see also Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2254 (2011) (Thomas, J., concurring) (noting that where the Patent Act "is silent" as to a particular issue, "it did not alter the common-law rule").

## 2.  The *Jazz Photo* panel incorrectly applied *Boesch v. Graff.*

In 2001, a panel of this Court held in *Jazz Photo Corp. v. ITC* that "United

States patent rights are not exhausted by products of foreign provenance."[12]  The

panel offered no discussion of or explanation for its newly-announced rule, which

departed sharply from more than a century of patent exhaustion jurisprudence.  The

panel cited as the sole authority for its holding the Supreme Court's 1890 decision

in *Boesch v. Graff,*[13] on which it relied for the proposition that "a lawful foreign

purchase does not obviate the need for license from the United States patentee

before importation into and sale in the United States."[14]  On this basis, the panel

held that Fuji Photo Film Company, the U.S. patentee,[15] retained its right to bar the

importation of refurbished "single-use" cameras (called "lens-fitted film packages"

---

[12] *Jazz Photo Corp. v. ITC*, 264 F.3d 1094, 1105 (Fed. Cir. 2001) ("To invoke the protection of the first sale doctrine, the authorized first sale must have occurred under the United States patent.").  Compare *Jazz Photo's* use of the phrase "sale . . . occur[ing] under the United States patent" with the holding in *Kirtsaeng*, which construed the phrase of the Copyright Act "lawfully made under this title" and concluded that "the considerations supporting Kirtsaeng's nongeographical interpretation of the words 'lawfully made under this title' are the more persuasive." *Kirtsaeng*, 133 S. Ct. at 1371.  *See also Seiko*, 690 F. Supp. at 1343 (rejecting argument that a U.S. patentee's rights were not exhausted by an authorized foreign sale of a product on the purported ground that "a product is not 'within the scope of' a United States patent when it is being sold abroad").

[13] *Boesch v. Graff,* 133 U.S. 697 (1890).

[14] *Jazz Photo*, 264 F.3d at 1105.

[15] Throughout, we use the term "U.S. patentee" to mean the holder of a U.S. patent, whatever the patentee's nationality.

or "LFFPs") that Fuji manufactured under its U.S. patent and first sold outside of the United States.

   *Boesch* does not support the rule for which *Jazz Photo* cited it. Patent exhaustion is triggered by the sale of a patented article by, or under the authority of, the U.S. patentee.[16] In *Jazz Photo*, the U.S. patentee itself first sold the articles in question outside of the United States. In *Boesch,* on the other hand, the foreign-made articles whose importation was held to infringe a U.S. patent were not sold first (or at any other time) by, or under the authority of, the U.S. patentee but by an entirely unrelated third party who made no claim to hold any rights under the U.S. patent or to have been authorized by the U.S. patentee to manufacture those articles.[17] Crucially, the U.S. patentee received no reward from the first sale of the imported articles outside of the United States. *Boesch* holds that a foreign sale *unauthorized* by a U.S. patentee does not exhaust his U.S. patent rights. But *Jazz Photo*, relying solely on *Boesch*, held that where a U.S. patentee *authorizes* the foreign sale of a patented article, that sale does not exhaust his U.S. patent rights in the article.

---

[16] *United States v. Univis Lens Co*., 316 U.S. 241, 251 (1942); *Quanta Computer, Inc. v. LG Electronics, Inc.,* 553 U.S. 617, 625 (2008) ("The longstanding doctrine of patent exhaustion provides that the initial authorized sale of a patented item terminates all patent rights to that item.").

[17] *Boesch,* 133 U.S. at 701-02.

The *Boesch* Court held simply that the seller's German patent rights did not trump those of the U.S. patentee when the German seller's goods were offered for sale in the United States. Thus, the Court found no occasion to apply the patent exhaustion doctrine to the facts before it, not because the articles in question were first sold outside of the United States but because they were not first sold *by the U.S. patentee*, who never received the reward to which he was entitled under his U.S. patent.

Five years later, when the defendant in *Keeler* invoked *Boesch* in an effort to avoid the reach of the patent exhaustion doctrine, the *Keeler* Court expressly rejected that the notion that *Boesch* carved out an exception to the patent exhaustion doctrine, declaring that *Boesch* "is not out of line with the [Supreme Court's] previous cases" because in *Boesch* "neither the [U.S.] patentee or any assignee had ever received any royalty or given any license to use the patented article in any part of the United States."[18]

In its panel brief, Lexmark attempts to rehabilitate the *Jazz Photo* panel's reading of *Boesch* by arguing that "the lack of extraterritorial reach of patent law is 'embedded in the Patent Act itself,'" and, thus, that the U.S. patent exhaustion

---

[18] *Keeler*, 157 U.S. at 664-665. *See also* John A. Rothchild, *Exhausting Extraterritoriality*, 51 Santa Clara L. Rev. 1187, 1211 (2011) (arguing that *Jazz Photo* misread *Boesch*); Daniel Erlikhman, Note, Jazz Photo *and the Doctrine of Patent Exhaustion*, 25 Hastings Comm. & Ent. L.J. 307, 323 (2003) (same).

doctrine is necessarily territorially limited.[19]  But Lexmark confuses the reach of the U.S. patent laws *outside* of the United States with the effect of an authorized sale outside of the United States on the reach of the U.S. patent laws *within* the United States, and Lexmark's reliance on *Microsoft v. AT&T* is misplaced. *Microsoft* restates the unremarkable general principle that acts occurring on the soil of a foreign sovereign cannot be reached by one seeking to enforce its rights under the U.S. intellectual property laws.[20]  *Microsoft* does not contradict the principle that conduct occurring outside of the United States may affect a U.S. rights holder's intellectual property rights within the United States; indeed, the Supreme Court's *Kirtsaeng* decision makes clear that this *is* the law.[21]

In short, far from representing "an integral part of the evolution" of the patent exhaustion doctrine, as one *amicus* contends,[22] *Jazz Photo* is an inorganic departure from more than a century of established patent exhaustion jurisprudence, an outlier which, as discussed below, even this Court has not always followed.

---

[19] Lexmark Initial Panel Brief at 50 (Oct. 21, 2014) (citing *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 455 (2007)).

[20] *Microsoft*, 550 U.S. at 455 ("[O]ur legislation 'd[oes] not, and [was] not intended to, operate beyond the limits of the United State.'") (citation and internal quotation marks omitted).

[21] *Kirtsaeng* , 133 S. Ct. at 1355-56 ("We hold that the 'first sale' doctrine applies to copies of a copyrighted work lawfully made abroad.").

[22] AIPLA amicus brief at 8 (Jun. 5, 2015).

### 3. Since *Jazz Photo*, this Court has twice applied the pre-*Jazz Photo* rule that patent exhaustion is not territorially restricted.

Since 2001, the panels of this Court have pursued divergent paths in their international patent exhaustion decisions.  In 2005 in *Fuji Photo Film v. Jazz Photo*, a panel of this Court discussed and elaborated on the *Jazz Photo* decision, stating that "this court does not read *Boesch* or the ["solely foreign provenance"] language to limit the exhaustion principle to *unauthorized* sales."[23]  In 2010 in *Fujifilm Corp. v. Benun*, a panel of this Court revisited the territoriality issue following the Supreme Court's *Quanta* decision and concluded that *Quanta* "did not eliminate the [patent] first sale rule's territoriality requirement,"[24] in spite of *Quanta*'s unequivocal and unqualified statement that "[e]xhaustion is triggered only by a sale *authorized* by the patent holder."[25]

The following year, however, two panels of this Court held that the patent exhaustion doctrine applied to imported goods that were the subject of an authorized first sale outside of the United States.  In *Tessera, Inc. v. International*

---

[23] *Fuji Photo Film Co. v. Jazz Photo Corp.*, 394 F.3d 1368, 1376 (Fed. Cir. 2005) (emphasis added); *accord Fuji Photo Film Co. v. ITC*, 474 F.3d 1281, 1294 (Fed. Cir. 2007).

[24] *Fujifilm Corp. v. Benun*, 605 F.3d 1366, 1371 (Fed. Cir. 2010); *accord Ninestar Tech. Co. v. ITC*, 667 F.3d 1373 (Fed. Cir. 2012), *cert. denied,* 133 S. Ct. 1656 (U.S. 2013).

[25] *Quanta Computer Inc. v. LG Electronics, Inc*. 553 U.S. 617, 636 (2008) (emphasis added).

*Trade Commission*,[26] Tessera, Inc., whose "primary business is licensing its technology" and which "licensed the patents-in-suit to more than sixty semiconductor technology companies,"[27] brought suit at the U.S. International Trade Commission to bar the importation of packaged semiconductor chips manufactured outside of the United States by Tessera's licensees and subsequently sold to respondent-importers.  When the ITC declined to bar such importation, Tessera appealed to this Court.

Respondent-importer Elpida Memory, Inc. ("Elpida") purchased packaged semiconductor chips practicing the relevant Tessera patent from a Tessera-licensed manufacturer and then sought to import them into the United States.[28]  The Tessera licensee that supplied Elpida was Powertech Technology Inc. ("PTI"), a Taiwanese entity.[29]  Neither the Tessera licensee PTI, which manufactured and sold the accused product abroad, nor Tessera, the patentee, made an authorized sale to Elpida *in the United States*.

---

[26] *Tessera, Inc. v. Int'l Trade Comm'n,* 646 F.3d 1357, 1369-70 (Fed. Cir. 2011) (affirming Commission's determination that patentee's patent rights were exhausted as to all products accused of infringing the '106 patent that were purchased from patentee's licensees and subsequently imported into the United States).

[27] *Tessera,* 646 F.3d at 1362.

[28] *Id.* at 1363.

[29] *Powertech Tech. Inc. v. Tessera Inc.*, 660 F.3d 1301, 1303, 1304 (Fed. Cir. 2011).

The ITC determined that the chips imported by Elpida infringed the relevant patent-in-suit but ruled that Tessera's U.S. patent rights in the Elpida chips were exhausted by Tessera's licensees' sales of those chips to Elpida. As these sales were authorized and occurred abroad, the Tessera panel necessarily concluded that the foreign sale by a licensee triggered patent exhaustion. Accordingly, it affirmed the ITC's exhaustion ruling,[30] which was the sole issue presented on appeal.[31] The *Tessera* panel's failure to follow *Jazz Photo* was no mere oversight: the ITC's decision that the *Tessera* panel reviewed stated clearly that Tessera had raised *Jazz Photo* as a defense to patent exhaustion during the ITC investigation.[32] Later in 2011, in *Powertech Technology v. Tessera*, which was based on the same underlying facts as the earlier *Tessera* case, another panel of this Court reinstated a

---

[30] *Tessera,* 646 F.3d at 1363 ("Tessera's patent rights are exhausted as to those accused products purchased from Tessera's licensees.").

[31] *Tessera,* 646 F.3d at 1367 ("The finding of infringement is not challenged on appeal, but the Commission's determination of patent exhaustion is. Because Elpida is the only importer of the accused [#x3bc]BGA products, it is the only party affected by this determination.").

[32] *Certain Semiconductor Chips with Minimized Chip Package Size and Products Containing Same (III)*, USITC Inv. No. 337-TA-630, USITC Pub. 4209 at 27, n.6 (Comm'n Op., Dec. 2010) (holding that Tessera had waived its *Jazz Photo* argument). The mere fact that the ITC found that Tessera had waived its *Jazz Photo* defense to patent exhaustion did not oust this Court of the authority to consider the applicability of *Jazz Photo* had it chosen to do so. *See U.S. Nat'l Bank of Oregon v. Indep. Ins. Agents of America, Inc.,* 508 U.S. 439, 447-48 (1993) ("a court may consider an issue 'antecedent to . . . and ultimately dispositive of' the dispute before it, even an issue the parties fail to identify and brief") (citations omitted); *Hormel v. Helvering*, 312 U.S. 552, 557 (1941).

declaratory judgment action on the authority of the exhaustion ruling in *Tessera*.[33]

In short, the conscious decision of the *Tessera* and *Powertech* panels not to follow

*Jazz Photo* substantially weakens any precedential authority it might otherwise

enjoy.

> **4.  *Jazz Photo* is fundamentally at odds with the patent exhaustion doctrine because it permits the patentee of a patented article to be exercise its rights in that same article twice.**

In determining when patent exhaustion is triggered, U.S. courts have, since

the middle of the Nineteenth Century, followed the rule that a patentee is entitled

to receive only one reward for the sale of a particular patented article; for, were he

to receive a second reward for that same article, this would constitute a second

sale, which the patent exhaustion doctrine prohibits.[34]  As this Court has held, "[i]t

is axiomatic that the patent exhaustion doctrine . . . is triggered by an unconditional

sale. . . .  The theory behind this rule is that in such a transaction, the patentee has

bargained for, and received, an amount equal to the full value of the goods."[35]  The

prohibition against double recovery is judicial short-hand for the patent exhaustion

---

[33] *Powertech*, 660 F.3d at 1307 (vacating dismissal of declaratory judgment action, stating "resolution of that controversy is governed by our decision in *Tessera* [where] we ruled that 'Tessera's patent rights [were] exhausted as to all products accused of infringing the '106 patent purchased from Tessera's licensees'").

[34] *Bloomer v. Millinger*, 68 U.S. 340, 350 (1864) ("Patentees . . . are entitled to but one royalty for the patented machine. . . ."); *see also Keeler*, 157 U.S. at 663; *McCoy v. Mitsuboshi Cutlery*, 67 F.3d 917, 921 (Fed. Cir. 1995).

[35] *LG Elecs., Inc. v. Bizcom Elecs., Inc.*, 453 F.3d 1364, 1369 (Fed. Cir. 2006) (citations omitted), *rev'd on other grounds, Quanta Computer, Inc. v. LG Elecs., Inc.*, 128 S. Ct. 2109 (2008).

doctrine's broader prohibition against permitting a patentee to exercise a second time the rights in a patented article that he has relinquished by selling it.[36]

Thus, it matters not that the second reward takes the form of a royalty imposed for asserted infringement. "Once such an item is sold, . . . further exaction of royalties from an owner's use of that item would be deemed a 'double recovery.'"[37] Nor does it matter that, following his first sale of the article, the patentee seeks to bar its resale by the purchaser on grounds of patent infringement rather than seeking a second reward for that article in the form of a royalty.[38]

The *Jazz Photo* rule is directly at odds with the prohibition against permitting a patentee to exercise a second time his rights in a patented article that he has sold to another, either by extracting two monetary rewards for the same article or by reaping a first reward and then acting to bar the purchaser from the full enjoyment of his purchase.

---

[36] *Helferich*, 778 F.3d at 1308 ("[T]he principle of limiting a patentee to one royalty for an embodiment of an invention expresses an underlying goal that is achieved, indirectly, by reliance on other standards that define when exhaustion applies based on the sale of certain items. . . .  Something other than 'double recovery,' however, must supply the tests to justify ultimately using that language as a conclusion.").

[37] *Helferich*, 778 F.3d at 1308; *accord Keurig, Inc. v. Sturm Foods, Inc.*, 732 F.3d 1370, 1375 (Fed. Cir. 2013).

[38] *Tessera*, 646 F.3d at 1371 (affirming ITC's determination not to bar the importation of Elpida's accused products).

Thus, because *Jazz Photo* represents a radical divergence from more than a century of established jurisprudence, because the rule announced in *Jazz Photo* is not supported by its cited authority, because the panels of this Court have honored the *Jazz Photo* rule as often in the breach as in the observance, and because the panels of this Court are increasingly turning to *Kirtsaeng*, which rejected territorial limits on the copyright first sale doctrine, for guidance on questions of patent exhaustion, this Court, guided by *Kirtsaeng*, should overrule *Jazz Photo* and restore the full reach of the patent exhaustion doctrine.

### B. The fundamental purpose of the patent exhaustion doctrine – encouraging innovation while avoiding monopolies – requires exhaustion of the U.S. patentee's rights in a patented article sold outside of the United States, no less than exhaustion of his rights in that same article if sold within the United States.

Not only does *Jazz Photo* depart from well-settled precedent. By grafting a new territoriality requirement onto the patent exhaustion doctrine, *Jazz Photo* also departs from the foundational principle of the doctrine – encouraging innovation while limiting the anticompetitive effects of the patent grant as to individual patented articles.

The Supreme Court's *Kirtsaeng* decision provides crucial guidance on this point. The rationale set forth in *Kirtsaeng* for holding that the first sale doctrine in copyright law is not territorially limited applies with equal force in patent law, notwithstanding the other differences between these two bodies of intellectual

property law.  In *Kirtsaeng,* the Court emphasized the origins of the copyright first sale doctrine in the age-old English "common law's refusal to permit restraints on the alienation of chattels."[39]  The common law's aversion to such restraints as being "'against Trade and Traffi[c], and bargaining and contracting'" arose, the Court explained, from the understanding that such restraints compromise the ability of "buyers of goods . . . to compete with each other when reselling or otherwise disposing of those goods."[40]  Accordingly, *Kirtsaeng* found that "[t]he common-law [copyright first sale] doctrine makes no geographical distinctions."[41]

The copyright and patent grants have their origin in the same clause of the Constitution, where their common goal is to "promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries."[42]  In American law, twin doctrines – the first sale doctrine in copyright law and the patent exhaustion doctrine in patent law – developed with goal of circumscribing the anticompetitive effects of these innovation-promoting limited monopolies.  Because the pro-competition goal of the copyright first sale doctrine is the same as that of the patent exhaustion doctrine, the Supreme Court's *Kirtsaeng* holding as to the copyright

---

[39] *Kirtsaeng*, 133 S. Ct. at 1363 (quoting 1 E. Coke, Institutes of the Laws of England § 360, p. 223 (1628)).

[40] *Kirtsaeng*, 133 S. Ct. at 1363.

[41] *Id.*

[42] U.S. Const., art. I, § 8, cl. 8.

first sale doctrine – that "[t]he common-law doctrine makes no geographical

distinctions"[43] – bears directly on the question whether the sale of a patented item

outside the United States gives rise to U.S. patent exhaustion.

As the Supreme Court declared in *Bonito Boats,* the Patent Clause, which

"contains both a grant of power and certain limitations upon the exercise of that

power," "reflects a balance between the need to encourage innovation and the

avoidance of monopolies which stifle competition without any concomitant

advance in the 'Progress of Science and useful Arts.'"[44]  Thus, the patent laws

incentivize the inventor to innovate by granting him (or her) "a limited monopoly,

the exercise of which will enable him to secure the financial rewards for his

invention."[45]  In granting this limited monopoly, patent law carves out a narrow

exception to the law's general aversion to restraints on the alienation of personal

property, with their concomitant anticompetitive effects.[46]  However, it tempers

these anticompetitive effects by placing strict limits on the patentee's monopoly.[47]

---

[43] *Kirtsaeng*, 133 S. Ct. at 1363.

[44] *Bonito Boats, Inc.* v. *Thunder Craft Boats, Inc.*, 489 U.S. 141, 146 (1989).

[45] *Univis*, 316 U.S. at 250.

[46] *Kirtsaeng*, 133 S. Ct. at 1363 (noting that in explaining "the common law's
refusal to permit  restraints on the alienation of chattels," "[Lord] Coke emphasizes
the importance of leaving buyers of goods free to compete with each other when
reselling or otherwise disposing of those goods.").

[47] *United States v. Masonite Corp.*, 316 U.S. 265, 280 (1942) ("Since patents are
privileges restrictive of a free economy, the rights which Congress has attached to

The limits that patent law places upon patent rights are of two types.  First, the duration of the entire bundle of rights granted under a patent is time-limited.[48] Second, while the patent remains in force, patent law decrees that when a patentee has been compensated for the value of an individual article produced under its patent by selling, or by authorizing the sale of, that article, "the purpose of the patent law is fulfilled," and its patent monopoly in that particular article is at an end.[49]  This "authorized sale of a patented product places that product beyond the reach of the patent,"[50] divesting the patentee of the right to interfere further with the purchaser's full enjoyment of that article.[51]  This judicially-created doctrine, referred to variously as "patent exhaustion" or "the patent first sale doctrine," lies at the very heart of patent law, where it mediates between the Constitution's goal of nurturing innovation and the competing objective of promoting competition.

Because the authorized sale of a patented article outside the United States, like the sale of the same article within the United States, "enable[s the inventor] to

---

them must be strictly construed so as not to derogate from the general law beyond the necessary requirements of the patent statute.").

[48] 35 U.S.C. § 154(a)(2) (2011).

[49] *Univis*, 316 U.S. at 251.

[50] *Intel Corp. v. ULSI Sys. Technology, Inc.*, 995 F.2d 1566, 1568 (Fed. Cir. 1993), *cert. denied*, 114 S. Ct. 923 (U.S. 1994) (citing *Bloomer v. Millinger*, 68 U.S. 340, 350-51 (1864)).

[51] *Hewlett-Packard Co. v. Repeat-O-Type Stencil Mfg. Corp.*, 123 F.3d 1445, 1451 (Fed. Cir. 1997), *cert. denied*, 523 U.S. 1022 (1998) (citing *Mitchell v. Hawley*, 83 U.S. (16 Wall.) 544, 548 (1872)).

secure the financial rewards for his invention,"[52] the foreign sale, no less than the

domestic sale, fulfills patent law's objective of promoting "the Progress of Science

and useful Arts."[53]  Once the sale of the patented article is consummated and the

inventor has received his reward for that article, "the [innovation-promoting]

purpose of the patent law is fulfilled."[54]  This sale triggers the patent exhaustion

doctrine, which steps in to fulfill its role of circumscribing the patent monopoly's

anti-competitive effects as to that particular article.  It does so by removing further

restraints on the disposition of that article *within the United States*, whether the

first sale of the article occurred within or outside of the United States.[55]

Exempting articles sold abroad with the authorization of the U.S. patentee from

patent exhaustion *when they enter the commerce of the United States* would

frustrate patent law's interest in "the avoidance of monopolies which stifle

---

[52] *Univis*, 316 U.S. at 250.

[53] *Curtiss Aeroplane,* 266 F. at 78-79; *id.*  at 75 (finding exhaustion in a case that "deals with nothing but the right to bring into the United States certain [patented articles first sold outside of the United States] which the [U.S. patentee] gave permission to make, and . . . for every one of which it has been compensated").

[54] *Univis*, 316 U.S. at 251.

[55] *Univis*, 316 U.S. at 251-52 ("In construing and applying the patent law so as to give effect to the public policy which limits the granted monopoly strictly to the terms of the statutory grant, the particular form or method by which the monopoly is sought to be extended is immaterial.  The first vending of any article manufactured under a patent puts the article beyond the reach of the monopoly which that patent confers.") (internal citations omitted).

competition without any concomitant advance in the 'Progress of Science and useful Arts.'"[56]

If, as *Jazz Photo* holds, the patent exhaustion doctrine were territorially restricted, a patentee could restrain competition within the United States by controlling the purchaser's subsequent use in the United States of an article first sold outside the United States by, or under the authority of, the patentee, even though the patentee would be barred from doing the same with the patented article's twin that was first sold within the United States. The anticompetitive effects of permitting the patentee to exercise control over his patented article within the United States, once sold, are identical, no matter where that first sale occurred. The rule laid down in *Jazz Photo* is inimical to the patent exhaustion doctrine's goal of preserving competition while encouraging innovation and should be overturned.

### C. This Court should reject Lexmark's argument that it requires protection against legal parallel imports in order to engage profitably in market division and discriminatory pricing.

In its panel brief, Lexmark laments that "extending [patent] exhaustion to foreign sales would 'make it difficult, perhaps impossible' to sell at different prices in different foreign markets, according to demand and purchasing power."[57] The

---

[56] *Bonito Boats*, 489 U.S. at 146.

[57] Lexmark Initial Panel Brief at 53 (quoting *Kirtsaeng*, 133 S. Ct. at 1370).

only impediment, however, to Lexmark's charging higher prices to consumers in the United States and lower prices to those in other world markets is one of Lexmark's own making: such discriminatory pricing exposes its U.S. market to legal parallel importation of its lower-priced foreign-sold cartridges. While Lexmark contends that such discriminatory pricing is both good business for Lexmark and good public policy,[58] it fails to offer any principled legal argument why the patent exhaustion doctrine should be conscripted to serve its business objectives or policy aspirations. Here again *Kirtsaeng* provides valuable guidance.

A patentee is, of course, "generally entitled to determine how it wishes to commercialize its invention in order to optimize its economic benefit from the patent grant."[59] Consistent with this right, the patentee may choose to sell its patented article in different international markets where the article commands different prices, just as he may choose not to sell or to license his patented article at all. But the patentee is fully rewarded for his invention when he bargains for, and obtains, an agreed-upon price for that article, whatever the price that the patentee chooses to accept.[60] Thus, when the patentee chooses to sell a patented article outside of the United States for the market value of the product in that market, he

---

[58] Lexmark Initial Panel Brief at 54.

[59] *Carborundum Co. v. Molten Metal Equip. Innovations,* 72 F.3d 872, 880 (Fed. Cir. 1995) (citing *General Talking Pictures Corp. v. Western Elec. Co.*, 305 U.S. 124, 127 (1938)).

[60] *LifeScan*, 734 F.3d at 1375 ("At bottom, a patentee has a choice as to how to secure its reward.").

fully exhausts his rights in that article, even if he could have received a higher price for the same article if sold in the U.S. market. As this Court has held, "[w]here a patentee unconditionally parts with ownership of an article, it cannot later complain that the approach that it chose results in an inadequate reward and that therefore ordinary principles of patent exhaustion should not apply."[61] No principle of law entitles the patentee to receive the U.S. market price for his article in other international markets, any more than it entitles him to recover a second time in the United States, though exaction of a royalty, for a patented article that he first sold, or authorized for sale, elsewhere.[62]

Thus, a straightforward application of the patent exhaustion doctrine bars Lexmark from choosing to sell its patented cartridges outside of the United States and later (a) seeking to be rewarded a second time by claiming royalties for patent infringement when those cartridges, having been refurbished, are resold within the United States or (b) seeking to enjoin subsequent purchasers from importing and selling them.

Lexmark offer no legal explanation why patent law, grounded in the same article of the Constitution as copyright law, should afford Lexmark protection from

---

[61] *LifeScan*, 734 F.3d at 1375.

[62] Indeed, as this Court has recently held, patent exhaustion may occur even where the patentee receives *no* monetary reward for the transfer of its patented article. *LifeScan*, 734 F.3d at 1375.

market forces that copyright law does not provide.  As the *Kirtsaeng* Court noted,

"*the Constitution's language* nowhere suggests that its limited exclusive

[copyright] right should include a right to divide markets or a concomitant right to

charge different purchasers different prices for the same book, say to increase or to

maximize gain."[63]

While Lexmark can lawfully sell its cartridges at different prices in different

international markets, what it cannot do is point to a provision of U.S. patent law

that protects it from the consequences of its discriminatory international pricing –

opening the U.S. market to legal parallel importation of its foreign-sold cartridges.

It may be true, as one *amicus* asserts, that "[w]ithout this protection [*i.e.*, of a

territoriality requirement], companies would likely be forced to either charge the

same price to all consumers worldwide or not offer the product in developing

nations at all. . . ."[64]  But this profit-maximization maxim is hardly a legal

argument for requesting this Court to upset established law.  Indeed, as Lexmark

itself concedes, "[e]ven if these [incentives to . . . divide markets] militated in

favor of an adjustment in the patent exhaustion regime, it is abundantly clear that

Congress, rather than the courts, is best positioned to act."[65]  In fact, the *Kirtsaeng*

Court squarely rejected the argument that companies engaging in differential

---

[63] *Kirtsaeng*, 133 S. Ct. at 1370 (emphasis supplied).

[64] AIPLA brief at 15, *Lexmark*, No. 2014-1617.

[65] Lexmark Initial Panel Brief at 53, *Lexmark*, No. 2014-1617.

pricing across international markets are entitled to the protection of a territorially limited first sale rule.[66]  Accordingly, this Court should reject Lexmark's attempt to rewrite the patent exhaustion doctrine to afford it protection against the natural consequences of its discriminatory pricing.

## CONCLUSION

For the foregoing reasons, this Court should reverse *Jazz Photo* and hold that a U.S. patentee's sale of a patented article outside the United States exhausts the patentee's U.S. patent rights in that article when it later enters the United States.

Dated:  June 18, 2015

_____/s/ Merritt R. Blakeslee_____
Merritt R. Blakeslee
THE BLAKESLEE LAW FIRM
1250 Connecticut Ave., N.W., Suite 700
Washington, D.C. 20036
(202) 419-1535
mrb@blakeslee-law.com

*Counsel to* amicus curiae *Recycling Times Media Corporation*

---

[66] *Kirtsaeng*, 133 S. Ct. at 1390, n.27 ("The Court's holding, however, prevents copyright owners from barring the importation of such low-priced copies into the United States, where they will compete with the higher priced editions copyright owners make available for sale in this country.") (Ginsburg, J., dissenting).

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e).

   The brief contains [  6,992  ] words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), or

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

   The brief has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in Times New Roman 14 pt.

_____/s/ Merritt R. Blakeslee_____
(Signature of Attorney)
_____Merritt R. Blakeslee_____
(Name of Attorney)
__Amicus Curiae Recycling Times Media Corporation__
(State whether representing appellant, appellee, etc.)
_____June 18, 2015_____
(Date)

**Form 30**

**FORM 30. Certificate of Service**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

# CERTIFICATE OF SERVICE

I certify that I served a copy on counsel of record on | Jun 18, 2015 |
by:

- ☐ US mail
- ☐ Fax
- ☐ Hand
- ☒ Electronic Means
  (by email or CM/ECF)

| Merritt R. Blakeslee | | /s/Merritt R. Blakeslee |
| Name of Counsel | | Signature of Counsel |

Law Firm | The Blakeslee Law Firm |

Address | 1250 Connecticut Ave., N.W., Suite 700 |

City, State, ZIP | Washington, D.C. 20036 |

Telephone Number | (202) 419-1535 |

FAX Number | |

E-mail Address | mrb@blakeslee-law.com |

NOTE: For attorneys filing documents electronically, the name of the filer
under whose log-in and password a document is submitted must be preceded
by an "/s/" and typed in the space where the signature would otherwise appear.
Graphic and other electronic signatures are discouraged.