Appeal Nos. 2014-1617 and 2014-1619

# United States Court of Appeals

## *for the*

# Federal Circuit

———— ◆ ————

LEXMARK INTERNATIONAL, INC.,

*Plaintiff-Cross-Appellant,*

– v. –

IMPRESSION PRODUCTS, INC.,

*Defendant-Appellant,*

QUALITY CARTRIDGES, INC., JOHN DOES, 1-20, BLUE TRADING LLC,
EXPRINT INTERNATIONAL, INC., LD PRODUCTS, INC., PRINTRONIC
CORPORATION, TESEN DEVELOPMENT (HONG KONG) CO. LTD.,
BENIGNO ADEVA AND HIS COMPANIES,

*Defendants.*

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN
DISTRICT OF OHIO, NO. 1:10-CV-00564-MRB, JUDGE MICHAEL R. BARRETT

# BRIEF OF *AMICUS CURIAE* THE NEW YORK INTELLECTUAL PROPERTY LAW ASSOCIATION IN SUPPORT OF NEITHER PARTY

WALTER HANLEY
*President-Elect*
NEW YORK INTELLECTUAL PROPERTY
   LAW ASSOCIATION
   C/O KENYON & KENYON LLP
One Broadway
New York, New York 10004
(212) 425-7200

DAVID F. RYAN
*Co-Chair, Committee on Amicus Briefs*
1214 Albany Post Road
Croton-on-Hudson, New York 10520
(914) 271-2225

NOAH M. LEIBOWITZ
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
(212) 455-2000

*Counsel for Amicus Curiae*

## CERTIFICATE OF INTEREST

Pursuant to Fed. Cir. R. 29 and 47.4, counsel for *amicus curiae* New York Intellectual Property Law Association certifies the following:

1.      The full name of the parties I represent: New York Intellectual Property Law Association

2.      The name of the real parties in interest I represent: New York Intellectual Property Law Association

3.      All parent corporations and any publicly held companies that own 10 percent of more of the stock of the parties I represent: N/A

4.      The names of all law firms and the partners or associates that appeared for the party now represented by me who appeared in the trial court or are expected to appear in this Court:

Simpson Thacher & Bartlett LLP – Noah M. Leibowitz

Kenyon & Kenyon LLP – Walter Hanley

Law Offices Of David F. Ryan – David F. Ryan

Dated: June 19, 2015

/s/ *Noah M. Leibowitz*_____
Noah M. Leibowitz
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
(212) 455-2000

# TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ................................................................ 1

FACTS AND PROCEDURAL HISTORY ................................................... 3

SUMMARY OF THE ARGUMENT ............................................................ 6

ARGUMENT ................................................................................................ 7

I.    This Court's *Mallinckrodt* Decision Should Not Be Overturned ................ 7

    A.    *Mallinckrodt* Is Consistent With *Quanta* ............................................ 7

    B.    *Mallinckrodt* Is Consistent With The 1952 Codification Of
          Contributory Infringement ...................................................................... 9

          1.    The Terms Of The 1952 Statute ................................................. 9

          2.    The 1988 Amendments ............................................................ 10

          3.    Congress Authorized Recoveries By The Patent
              Owner At Separate Levels of the Distribution Chain .............. 11

    C.    *Mallinckrodt* Is Consistent With The Pre-*Quanta*
          Controlling Supreme Court Precedent On Exhaustion And
          Misuse .................................................................................................. 12

    D.    *Mallinckrodt* Provides Principled And Coherent Guidance
          At The Crucially Important Patent-Antitrust Interface ..................... 14

          1.    *Xerox/ISO* As Issued In 2000 ................................................. 15

          2.    *U.S. Philips* As Issued In 2005 ............................................... 16

          3.    *Ciprofloxacin* As Issued In 2008 ........................................... 16

          4.    *Princo* As Issued In 2010 ....................................................... 17

II.   *Kirtsaeng* Does Not Compel Overruling *Jazz Photo* With Respect
     To All Extraterritorial Sales In The Patent Context .................................... 17

    A.    Despite Their Common Constitutional Underpinning,
          Copyright And Patent Rights Are Creatures Of Different
          Statutes ................................................................................................ 17

    B.    To The Extent That *Jazz Photo* Stands For The Proposition
          That Foreign Sales Do Not Necessarily Exhaust United
          States Patent Rights, It Should Remain Good Law ............................ 19

    C.    *Jazz Photo*'s Categorical Rule Does Not, However,
          Universally Comport With The Principles Underlying
          Exhaustion .......................................................................................... 20

1. *Jazz Photo* Leaves No Room For Extraterritorial Sales Or Licenses That Intend To Authorize Downstream U.S. Sales ................................................................ 20

2. *Kirtsaeng* Teaches That Concerns Over Extraterritorial Application of United States Laws May Not Be Dispositive .......................................................... 22

3. The Common Law Principles Underlying Copyright First Sale Relied On In *Kirtsaeng* Are Aligned With Those Underlying Patent Exhaustion ........................................ 26

D. Any Modification to *Jazz Photo* Should Be Carefully Applied In Light of Policy Considerations ........................................ 29

CONCLUSION ................................................................................ 30

## TABLE OF AUTHORITIES

### Cases

*Adams v. Burke*, 84 U.S. (17 Wall.) 453 (1873) .................................... 12, 14, 27, 28

*Bement v. National Harrow Co.*,
  186 U.S. 70 (1902) ................................................................ 12, 14

*Bloomer v. McQuewan*,
  56 U.S. (14 How.) 539 (1853) .................................................... 13, 27

*Bloomer v. Millinger*,
  68 U.S. (1 Wall.) 340 (1863) ......................................................... 13

*Bobbs-Merrill Co. v. Straus*,
  210 U.S. 339 (1908) .............................................................. 17, 18, 26

*Boesch v. Graff*,
  133 U.S. 697 (1890) ................................................................ 19, 20

*Dawson Chem Co. v. Rohm & Haas Co.*,
  448 U.S. 176 (1980) ................................................................... 11

*Decca Ltd. v. United States*,
  210 F.2d 1070 (Ct. Cl. 1976) .......................................................... 24

*Deepsouth Packing Co., Inc. v. Laitram Corp.*,
  406 U.S. 518 (1972) ............................................................... 23, 24

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
  504 U.S. 451 (1992) ................................................................... 16

*Ethyl Gasoline Corp. v. United States*,
  309 U.S. 436 (1940) ................................................................... 27

*FTC v. Actavis*,
   133 S. Ct. 1310 (2013) ....................................................................... 15

*General Talking Pictures Corp. v. Western Elec. Co.*,
   304 U.S. 175, *modified on reh'g*, 305 U.S. 124 (1938) ....................... 13

*Illinois Tool Works, Inc. v. Independent Ink*,
   547 U.S. 28 (2006) .............................................................................. 15

*In re Ciprofloxacin Hydrochloride Antitrust Litig.*,
   544 F.3d 1323 (Fed. Cir. 2008) ........................................................... 16

*In re Indep. Servs. Org. Antitrust Litig.*,
   203 F.3d 1322 (Fed. Cir. 2000) (*Xerox/ISO*) ..................................... 15

*In re Yarn Processing Patent Validity Litig.*,
   541 F.2d 1127 (5th Cir 1976) ................................................................ 8

*Jazz Photo Corp. v. Int'l Trade Comm'n*,
   264 F.3d 1094 (Fed. Cir. 2001) .................................................... passim

*Kirtsaeng v. John Wiley & Sons, Inc.*,
   133 S. Ct. 1351 (2013) ................................................................. passim

*Lear, Inc. v. Adkins*,
   395 U.S. 653 (1969) ............................................................................ 16

*Mallinckrodt, Inc. v. Medipart, Inc.*,
   976 F.2d 700 (Fed. Cir. 1992) ..................................................... passim

*Mercoid Corp v. Minneapolis-Honeywell Regulator Co.*,
   320 U.S. 680 (1944) ............................................................................ 11

*Mercoid Corp v. Mid-Continent Investment Co.*,
   320 U.S. 661 (1944) ............................................................................ 11

*Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437 (2007) ........................... 22

*Mitchell v. Hawley*,
   83 U.S. (16 Wall.) 544 (1872) ....................................................... 12, 13

*Multimedia Patent Trust v. Apple, Inc.*,
   No. 10-CV-2618-H (KSC), 2012 WL 6863471 (S.D. Cal. Nov. 9,
   2012) .................................................................................................... 21

*NTP, Inc. v. Research in Motion, Ltd.*,
   418 F.3d 1282 (Fed. Cir. 2005) ........................................................... 24

*Princo Corp. v. Int'l Trade Comm'n*,
   616 F.3d 1318 (Fed. Cir. 2010) ..................................................... 17, 27

*Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus. Inc.*,
   508 U.S. 49 (1993) ............................................................................... 15

*Quanta Computer, Inc. v. LG Electronics, Inc.*,
   553 U.S. 617 (2008) ..................................................................... passim

*San Disk Corp. v. Round Rock Research LLC*.,
   No. C 11-5243RS, 2014 WL 2700762 (N.D. Cal. June 13, 2014) ..................... 21

*Tessera Inc. v. Int'l Trade Comm'n*,
   646 F.3d 1357 (Fed. Cir. 2011) ............................................................. 21

*U.S. Philips Corp. v. Int'l Trade Comm'n*,
   424 F.3d 1179 (Fed. Cir. 2005) ............................................................ 16

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
   395 U.S. 100 (1969) ........................................................................... 16

**Statutes**
17 U.S.C. § 109(a) .................................................................................... 28
35 U.S. C. §271(d) .................................................................................... 9
35 U.S.C. § 271(c) .................................................................................... 9
35 U.S.C. § 271(c) .................................................................................... 11
35 U.S.C. § 271(d) .................................................................................... 11
America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011) ......................... 23
Patent Law Amendments Act of 1984, Pub. L. No. 98-622, § 101, 98
   Stat. 3383 (1984) ................................................................................ 23
Patent Misuse Reform Act of 1988, Pub. L. No. 100-703, title II, § 202,
   102 Stat. 4676 (1988) .......................................................................... 10

**Other Authorities**
Brief for the United States as Amicus Curiae Supporting Petitioners,
   *Quanta Computer, Inc. v. LG Electronics, Inc.*, 553 U.S. 617 (2008)
   (No. 06-937) ...................................................................................... 7

Brief in Opposition, *Kirtsaeng v. John Wiley Sons, Inc*., 133 S. Ct. 1351
   (2013) (Nos. 11-697 and 11-708) .......................................................... 25

Brief of American Intellectual Property Law Association in Support of
   Neither Party, *Lexmark Int'l, Inc. v. Impression Products, Inc*., Nos.
   2014-1617 and 2014-1619 (Fed. Cir. June 5, 2015) .................................. 28

Marianne Buckley, Comment, *Looking Inward: Regional Parallel Trade as a Means of Bringing Affordable Drugs to Africa*, 41 SETON HALL L. REV. 625 (2011) ................................................................................... 29

Opening Brief of Plaintiff-Cross Appellant Lexmark Int'l, Inc., *Lexmark Int'l, Inc. v. Impression Products, Inc.*, Nos. 2014-1617 and 2014-1619 (Fed. Cir. Oct. 21, 2014) .............................................................. 4, 27

V.K. Unni, *The Global Impact and Implementation of Human Rights Norms: Indian Patent Law and TRIPS: Redrawing the Flexibility Framework in the Context of Public Policy and Health*, 25 PAC. MCGEORGE GLOBAL BUS. & DEV. L.J. 323, 341 (2012)...................................... 29

## INTEREST OF *AMICUS CURIAE*

The New York Intellectual Property Law Association (the "NYIPLA" or "Association") respectfully submits this brief *amicus curiae* in support of neither party.

NYIPLA is a professional association of more than 1,500 attorneys whose interests and practices lie in the area of patent, copyright, trade secret, privacy, and other intellectual property law. The Association's members include a diverse array of attorneys specializing in patent law, from in-house counsel for businesses that own, enforce, and challenge patents, to attorneys in private practice who represent inventors in various proceedings before the United States Patent and Trademark Office ("USPTO").

A substantial percentage of the Association's member attorneys participate actively in patent litigation, representing both patent owners and accused infringers. NYIPLA members also frequently engage in patent licensing matters on behalf of their clients, representing both patent licensors and licensees.

The entities served by the Association's members include inventors, entrepreneurs, venture capitalists, businesses, universities, and industry and trade associations. Many of these entities are involved in research, financing, and other commercial activity relating to patented inventions, and a significant number are

involved in such activities relating to the sale or licensing for sale of patented products, both in the United States and internationally.

NYIPLA's members have a strong interest in this case because their day-to-day activities depend on the consistently-applied and longstanding principles of patent exhaustion. Because of the vital and increasing importance of patents in the global economy and the increasingly important debate over the patent-antitrust interface, moreover, the NYIPLA and its members have a particularly strong interest in ensuring that their reasonable expectations regarding patent exhaustion principles continue to be consistently applied in those important areas.

The arguments set forth in this brief *amicus curiae* were approved on June 18, 2015, by an absolute majority of the officers and members of the Board of Directors of the NYIPLA, including any officers or directors who did not vote for any reason, including recusal, but do not necessarily reflect the views of a majority of the members of the Association, or of the law or corporate firms with which those members are associated. After reasonable investigation, the NYIPLA believes that no officer or director or member of the Amicus Briefs Committee who voted in favor of filing this brief, nor any attorney associated with any such officer, director, or committee member in any law or corporate firm, represents a party in this litigation. Some officers, directors, committee members, or associated

2

attorneys may represent entities, including other *amici curiae*, which have an interest in other matters that may be affected by the outcome of this litigation.

## FACTS AND PROCEDURAL HISTORY

Lexmark International, Inc. ("Lexmark") sells "Return Program" or "Prebate" toner cartridges for its laser printers both in the United States and abroad under a label setting forth what can be characterized as either (1) a conditional sales agreement, (2) a license that sets forth a "single use" restriction, or (3) both. A0004. If purchasers do not wish to accept the discounted terms of the conditional sale-restricted license as set forth on the label, they are informed that the toner cartridges are also available on an unconditional sale/unrestricted license basis at a higher price—generally about 20% higher than the "discounted" Prebate Price.

In 2010, Lexmark sued several companies, including Appellant Impression Products, Inc. ("Impression"), in the Southern District of Ohio, alleging that the companies infringed its patents on printer cartridges. Lexmark's suit targeted two types of infringement: the sale of unauthorized copies of its toner cartridges and the sale of remanufactured cartridges that were refilled, repackaged, and resold. In separate motions, Impression moved to dismiss the infringement claims against sales made abroad and domestically.

On March 27, 2014, the district court denied the first motion to dismiss the infringement claims based on cartridges sold abroad and granted the

3

second motion, dismissing the infringement claims based on cartridges sold domestically. A00015–16, A0028. On June 23, 2014, the court entered a Stipulated Final Judgment of infringement, in favor of Lexmark, with respect to cartridges first sold outside the United States, and of non-infringement, in favor of Impression, with respect to cartridges first sold in the United States. A0001–3.

Impression appealed the district court's ruling on the first motion, arguing that Lexmark's patent rights were exhausted by sales of cartridges first sold outside the United States. Lexmark cross-appealed the ruling on the second motion, arguing that the agreement printed on the packaging of its printer cartridges effectively preserved its patent rights with respect to cartridges first sold inside the United States.

Following briefing and oral argument to the panel, this court *sua sponte* ordered that this case be heard en banc. *See* ECF No. 83. The court requested that the parties file new briefs and invited briefs from *amici* addressing two questions:

(a) The case involves certain sales, made abroad, of articles patented in the United States. In light of *Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S. Ct. 1351 (2013), should this court overrule *Jazz Photo Corp. v. Int'l Trade Comm'n*, 264 F.3d 1094 (Fed. Cir. 2001), to the extent it ruled that a sale of a patented item outside the United States never gives rise to United States patent exhaustion?

4

(b) The case involves (i) sales of patented articles to end users under a restriction that they use the articles once and then return them and (ii) sales of the same patented articles to resellers under a restriction that resales take place under the single-use-and-return restriction. Do any of those sales give rise to patent exhaustion?  In light of *Quanta Computer, Inc. v. LG Electronics, Inc*., 553 U.S. 617 (2008), should this court overrule *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700 (Fed. Cir. 1992), to the extent it ruled that a sale of a patented article, when the sale is made under a restriction that is otherwise lawful and within the scope of the patent grant, does not give rise to patent exhaustion?

This brief is filed upon the invitation of the Court for *amicus* briefs as stated in the April 14, 2015, en banc briefing order.  *See* ECF No. 83.

## SUMMARY OF THE ARGUMENT

This appeal presents two separate, but related, issues for consideration by the en banc Court of Appeals. Both questions involve the judicially created doctrine of patent exhaustion, which holds generally that "the initial authorized sale of a patented item terminates all patent rights to that item." *Quanta Computer, Inc. v. LG Electronics, Inc.*, 553 U.S. 617, 625 (2008).

This *amicus* respectfully submits that resolution of both questions turns on the word "authorized." The court asks whether, in light of *Quanta*, it should overrule *Mallinckrodt*'s holding that sale of a patented article under a restriction that is otherwise lawful does not give rise to patent exhaustion. But *Quanta* did not address *Mallinckrodt* or the situation in which a patentee properly conditions or restricts its sale (or license) such that subsequent sales would be *un*authorized. Indeed, the *Quanta* Court found that "[n]o conditions limited Intel's authority to sell products substantially embodying the patents" and that "Intel was authorized to sell its products to Quanta." *Id.* at 637. As shown below, to the extent that *Mallinckrodt* allows patentees to impose restrictions that are not otherwise anticompetitive or unlawful, such that subsequent sales would be unauthorized and therefore not immunized by exhaustion, *Mallinckrodt* has a firm foundation in statutory and case law and over twenty years of settled expectations, and is not in conflict with *Quanta*.

6

The court also asks whether, in light of *Kirtsaeng*, it should overrule *Jazz Photo*'s holding that sale of a patented item outside the United States *never* gives rise to United States patent exhaustion.  Again, this *amicus* respectfully submits that the proper focus should be on whether subsequent sales have been "authorized," regardless of where the initial sale takes place.  In certain circumstances, it will be apparent that an extraterritorial sale does not "authorize" subsequent sales under the United States; it would therefore be incongruous to apply exhaustion.  In other circumstances, however, subsequent sales of a patented article under the United States patent may clearly be intended and "authorized" even though the initial sale took place outside the United States.  To the extent *Jazz Photo*'s categorical rule would hold that even these sales *never* give rise to exhaustion, it stretches too far.

## ARGUMENT

### I.    This Court's *Mallinckrodt* Decision Should Not Be Overturned

#### A.    *Mallinckrodt* Is Consistent With *Quanta*

*Quanta* did not criticize or even explicitly address *Mallinckrodt* despite numerous invitations to do so from *amici,* including the Government.  *See* Brief for the United States as Amicus Curiae Supporting Petitioners at 18–24, *Quanta Computer, Inc. v. LG Electronics, Inc.*, 553 U.S. 617 (2008) (No. 06-937). Rather, *Quanta* determined narrowly that LGE failed to "condition" its agreement with Intel in a way that would avoid exhaustion.  As the *Quanta* Court explained,

7

exhaustion applied because "[n]o conditions limited Intel's authority to sell products substantially embodying the patents" and, therefore, "Intel was authorized to sell its products to Quanta." *Quanta*, 553 U.S. at 637.

It stands to reason that the *Quanta* Court would not have focused on the absence of restrictions or conditions in LGE's license to Intel if their presence would have made no difference to the outcome. By pointing out that LGE's license was deficient, *Quanta* implies that had it been different—if, for example, LGE had employed the template of *Yarn Processing*[1] in drafting its license to Intel—the restriction on the sale of Intel microprocessors and chipsets to downstream computer manufacturers would have been upheld, Intel would not have been "authorized" to make those sales, and exhaustion would have been avoided. In this sense, there is no conflict at all between *Quanta* and *Mallinckrodt*.

---

[1] In the Fifth Circuit's *In re Yarn Processing Patent Validity Litig.* case, 541 F.2d 1127, 1135 (5th Cir 1976), a patent owner had licensed a number of textile machinery manufacturers to make otherwise infringing machinery and sell only to those customers who agreed to execute a royalty-bearing use license. That restriction was upheld as enforceable:

> There is no real question that under the terms of the machinery manufacturing licenses, the manufacturers were not allowed to sell to a thowster [an industry term for a firm that twists silk into thread] not licensed by [patent owner] Leesona. We fail to see how this is an illegal extension of the patent monopoly . . . . Absent the restriction on sales to unlicensed throwsters, manufacturers who knowingly sold machinery to unlicensed throwsters would be liable for contributory infringement.

**B.     *Mallinckrodt* Is Consistent With The 1952 Codification Of Contributory Infringement**

With the lone exception of its codification of the doctrine of contributory infringement in 1952, Congress has never enacted any statute which affected, either directly or indirectly, the appropriate scope of the common law doctrine of exhaustion.[2] *Mallinckrodt*'s rule is consistent with the 1952 codification of 35 U.S.C. § 271(c) and (d), which permits patent licensing and separate infringement recoveries at different levels of the distribution chain, specifically from direct and contributory infringers.

**1.     The Terms Of The 1952 Statute**

Section 271(c) of the 1952 statute defined those non-staple goods that, even if not patented, are subject to suits for contributory infringement as follows:

> (c) Whoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

---

[2] In contrast, as will be discussed in Part II of this Argument, the Supreme Court's ruling on the first sale doctrine in *Kirtsaeng* required construction of several different portions of the Copyright Act.

Sections 271(d)(1) through (3) of the 1952 statute identify three species of

activities that the patent owner is explicitly authorized to conduct, either separately

or in combination:

> (d)  No patent owner otherwise entitled to relief for
> infringement or contributory infringement of a patent
> shall be denied relief or deemed guilty of misuse or
> illegal extension of the patent right by reason of his
> having done one or more of the following: (1) derived
> revenue from acts which if performed by another without
> his consent would constitute contributory infringement of
> the patent; (2) licensed or authorized another to perform
> acts which if performed without his consent would
> constitute contributory infringement of the patent; (3)
> sought to enforce his patent rights against infringement
> or contributory infringement.

## 2.     The 1988 Amendments

In 1988, Congress added to Section 271(d) as originally enacted in

1952 two additional numbered subsections as follows:

> (4) refused to license or use any rights to the patent; or
> (5) conditioned the license of any rights to the patent or
> the sale of the patented product on the acquisition of a
> license to rights in another patent or purchase of a
> separate product, unless, in view of the circumstances,
> the patent owner has market power in the relevant market
> for the patent or patented product on which the license or
> sale is conditioned.

Patent Misuse Reform Act of 1988, Pub. L. No. 100-703, title II, § 202, 102 Stat.

4676 (1988). The preamble of Section 271(d) was not altered in any way by the

1988 amendment.  *See id.*

10

### 3.    Congress Authorized Recoveries By The Patent Owner At Separate Levels of the Distribution Chain

The enactment of 35 U.S.C. §§ 271(c) and (d) resolved the question of whether a patentee has the right to sue for contributory infringement.  It also set forth and described certain specific actions that a patentee is permitted to take without running afoul of the patent misuse doctrine or the antitrust laws.  As the Supreme Court made clear in *Dawson Chem Co. v. Rohm & Haas Co.*, 448 U.S. 176, 203–12 (1980), the legislative history leading up to the 1952 codification of Sections 271(c) and (d) establishes that the statute did more than merely authorize suits for contributory infringement.  Congress intended to and did overrule the *Mercoid* cases[3]—at least to the extent those cases held that attempts by a patentee to enjoin or obtain damages predicated upon contributory infringement could form the basis for an antitrust claim or counterclaim, or an affirmative defense of patent misuse.

The "acts" authorized under Section 271(d)(1) include sales and licenses by the patent owner of non-staple components, materials or machines. Section 271(d)(2) contemplates licenses and other authorized arrangements in respect of the manufacture, use, or sale of such non-staple elements.  In addition, on the assumption that the formalities or "conditioning" of the sale or licensing of

---

[3] *Mercoid Corp v. Mid-Continent Investment Co.*, 320 U.S. 661, 668 (1944) (*Mercoid I*) and *Mercoid Corp v. Minneapolis-Honeywell Regulator Co.*, 320 U.S. 680 (1944) (*Mercoid II*).

11

non-staple elements under Sections 271(d)(1) and (2) have been carried out properly, Section 271(d)(3) permits the patent owner to sue for "infringement or contributory infringement."  By explicitly authorizing the payment of compensation to the patent owner by those who otherwise would be both direct and contributory infringers, Congress authorized the collection of separate royalties for direct and for contributory infringement at separate levels of the distribution chain, and thereby endorsed the notion of conditional sales and conditional licenses contemplated by earlier Supreme Court decisions such as *Mitchell v. Hawley*, 83 U.S. (16 Wall.) 544 (1872), *Adams v. Burke*, 84 U.S. (17 Wall.) 453, 455–56 (1873), and *Bement v. National Harrow Co.*, 186 U.S. 70, 91 (1902) (discussed further in Part I.C. below).

   *Mallinckrodt*'s holding that sale of a patented article under a restriction that is otherwise lawful does not give rise to patent exhaustion, gives life to Sections 271(c) and (d), and allows patentees to exercise the degree of control over their inventions that Congress intended.

**C.    *Mallinckrodt* Is Consistent With The Pre-*Quanta* Controlling Supreme Court Precedent On Exhaustion And Misuse**

   *Mallinckrodt* is firmly grounded in the Supreme Court's pre-*Quanta* decisions on both patent misuse and patent exhaustion.

   *Mitchell v. Hawley*, an 1872 case not discussed in *Quanta*, apparently was the first case in which the Supreme Court gave effect to a condition agreed

12

upon by the parties—in that case to a transfer of less than all rights under a patent relating to hat felting machines.  The Court determined that the temporal limitation to which the parties had agreed should be enforced despite the fact that the term of the patent had been extended for an additional seven years.  Despite full awareness of *Bloomer v. McQuewan*, 56 U.S. (14 How.) 539 (1853), and *Bloomer v. Millinger*, 68 U.S. (1 Wall.) 340 (1863), the *Hawley* Court determined that their rule should be applied only where "the sale is absolute and without any conditions."  *Hawley*, 83 U.S. at 548. Indeed, the Court went on to hold that:

> Persons, therefore, who buy goods from one not the owner, and who does not lawfully represent the owner, however innocent they may be, obtain no property whatever in the goods, as no one can convey in such a case any better title than he owns . . .

*Id.* at 550 & n.4.  The rule of *Mitchell v. Hawley* has never been abandoned or overruled by the Supreme Court and has provided the linchpin for the reasoning of the Court in the seminal *General Talking Pictures* decisions,[4] which upheld the general enforceability of field-of-use restrictions.  *Mallinckrodt*'s rule that a sale made under an otherwise lawful restriction does not give rise to patent exhaustion is a natural corollary of the principle that "no one can convey . . . any better title than he owns."

---

[4] *General Talking Pictures Corp. v. Western Elec. Co.*, 304 U.S. 175 (*General Talking Pictures I*), *modified on reh'g*, 305 U.S. 124 (1938) (*General Talking Pictures II*).

Similarly, *Mallinckrodt* finds support in *Adams v. Burke*, 84 U.S. (17 Wall.) 453 (1873), which held that:

> The right to manufacture, the right to sell, and the right to use are each substantive rights, and may be granted or conferred separately by the patentee.

*Id.* at 456. The ability of a patent holder to separately convey use rights to a machine or device supports *Mallinckrodt*'s rule that a restricted sale will avoid an exhaustion claim.

*Mallinckrodt* likewise comports with *Bement v. National Harrow Co.*, 186 U.S. 70 (1902), another early case in which the Supreme Court observed that:

> [T]he rule is, with few exceptions, that any conditions which are not in their very nature illegal with regard to this kind of property, imposed by the patentee and agreed to by the licensee for the right to manufacture or use or sell the [patented] article, will be upheld by the courts.

*Id.* at 91. *Mallinckrodt* itself, of course, goes on to specify in some detail the nature of the burden that must be discharged before a licensee or purchaser with notice can establish that a given condition is unenforceable. And *Mallinckrodt*'s general rule is a natural extension of these Supreme Court precedents.

### D.    *Mallinckrodt* Provides Principled And Coherent Guidance At The Crucially Important Patent-Antitrust Interface

The Supreme Court has never articulated how to reconcile conflicts between antitrust law and the common law and statutory limitations on patent law. To the contrary, the Supreme Court has deferred when presented with the

14

opportunity to clarify the relationship between antitrust law and the patent laws.
This trend is evident in *Illinois Tool Works, Inc. v. Independent Ink,* 547 U.S. 28
(2006), where, in construing Section 271(d)(5), the Court backed away from the
breadth of its prior analysis in *Dawson*. And it has continued through *FTC v.
Actavis*, 133 S. Ct. 1310 (2013), where the Court found that reverse payment
settlements are not *per se* anticompetitive and must be evaluated under the rule-of-
reason approach.

With *Mallinckrodt* as a foundation, this Court has issued many
important and influential decisions at the cutting edge of the patent-antitrust
interface. The following four decisions have been selected to exemplify the ways
in which *Mallinckrodt* has enabled this court to provide helpful guidance to the
district courts.

### 1.    *Xerox/ISO* As Issued In 2000

Controversial when first issued, *In re Indep. Servs. Org. Antitrust
Litig.*, 203 F.3d 1322 (Fed. Cir. 2000) (*Xerox/ISO*), held that refusals to sell
patented replacement parts in the copier service market could be justified under
Section 271(d)(4). The court also invoked *Prof'l Real Estate Investors, Inc. v.
Columbia Pictures Indus. Inc.*, 508 U.S. 49 (1993) (*PRE*), in refusing to follow the
Ninth Circuit's willingness to permit a jury to determine intent on remand from the

Supreme Court's decision in *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504

U.S. 451 (1992).

### 2.    *U.S. Philips* As Issued In 2005

*U.S. Philips Corp. v. Int'l Trade Comm'n*, 424 F.3d 1179 (Fed. Cir.

2005), represented the most comprehensive examination of the antitrust

significance of package licensing since the Supreme Court's 1969 decision in

*Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100 (1969).  Important

aspects of the court's decision included both (1) acceptance of the notion that non-

exclusive licenses represent nothing more than covenants not to sue, and (2)

recognition that the Supreme Court's decision in *Lear, Inc. v. Adkins*, 395 U.S. 653

(1969), had initiated a paradigm shift.

### 3.    *Ciprofloxacin* As Issued In 2008

Although the reasoning of this court in *In re Ciprofloxacin*

*Hydrochloride Antitrust Litig.*, 544 F.3d 1323 (Fed. Cir. 2008) (*Ciprofloxacin*),

was ultimately rejected by the Supreme Court in *Actavis*, the Association

respectfully submits that the issue of what evidence, if any, can suffice to establish

that a reverse payment has created an unreasonable anticompetitive effect in a

properly defined relevant product market has not been resolved, and may well be

before the Supreme Court again when the remanded cases percolate up through the

appellate courts.

### 4.    *Princo* As Issued In 2010

The en banc determination of this court in *Princo Corp. v. Int'l Trade Comm'n*, 616 F.3d 1318, 1328 (Fed. Cir. 2010) (en banc), was an important decision on a number of grounds.  As the first federal appellate court to reject the FTC's proposal for quick-look treatment of an alleged patent misuse, this court paved the way for a similar ruling by the Supreme Court in *Actavis*.

\*     \*     \*

Until the Supreme Court crafts a comprehensive rule of its own, this court should continue to apply the principles of *Mallinckrodt* to assist the district courts in applying the law in this difficult area.  Indeed, *Mallinckrodt* should be deemed to control this appeal.

## II.    *Kirtsaeng* Does Not Compel Overruling *Jazz Photo* With Respect To All Extraterritorial Sales In The Patent Context

### A.    Despite Their Common Constitutional Underpinning, Copyright And Patent Rights Are Creatures Of Different Statutes

The Court's decision in *Kirtsaeng* does not control the outcome here. *Kirtsaeng* neither discussed nor purported to overturn *Jazz Photo*, and the cases certainly are not impossible to reconcile.  Indeed, in *Bobbs-Merrill Co. v. Straus*, 210 U.S. 339 (1908), the Court's first application of the "first sale" doctrine, the Court refused to import patent exhaustion principles to a case involving an attempt to set a minimum resale price for copyrighted books, reasoning that "[t]here are such wide differences between the right of multiplying and vending copies of a

17

production protected by the copyright statute and the rights secured to an inventor under the patent statutes that the cases which relate to the one subject are not altogether controlling as to the other." *Id*. at 346.

Moreover, in reaching its decision in *Kirtsaeng*, the Court relied in significant part on the particular language of the Copyright Act's "first sale" provision. The Court framed its discussion in *Kirtsaeng* as a question of statutory construction: "[W]hether the words 'lawfully made under this title' restrict the scope of § 109(a)'s 'first sale' doctrine geographically." *Kirtsaeng*, 133 S. Ct. at 1357. The Court went on to consider the competing constructions of the phrase "lawfully made under this title" proffered by the Second Circuit, the Ninth Circuit, Wiley, the Solicitor General, and Kirtsaeng, concluding in the first instance that "[t]he language of § 109(a) read literally favors Kirtsaeng's nongeographical interpretation," while "[t]he geographical interpretation, however, bristles with linguistic difficulties." *Id.* at 1358–62.

The Court then focused on the legislative history of § 109(a), finding that "Congress, when writing the present version of § 109(a), did not have geography in mind," *id.* at 1360, and that it is "unlikely that Congress would have intended" the "surprising consequences" that a geographically restricted interpretation of § 109(a) would occasion, *id.* at 1362. As a creature of judicial precedent, patent exhaustion does not share common (or any) statutory language

18

with the first sale provision, and, of course, there is no legislative record from

which to glean Congressional intent.

**B.    To The Extent That *Jazz Photo* Stands For The Proposition That Foreign Sales Do Not Necessarily Exhaust United States Patent Rights, It Should Remain Good Law**

*Jazz Photo* reflects the understanding that in certain circumstances a

United States patentee may receive no reward from extraterritorial sales of the

patented article.  For example, consider the situation before the Supreme Court in

*Boesch v. Graff*, 133 U.S. 697 (1890), upon which the relevant holding of *Jazz*

*Photo* was based.  In *Boesch*, non-party Hecht made and sold patented burners in

Germany.  Hecht had the right to do so under German law because its operations,

which began before the patent was applied for by Boesch, were "grandfathered" by

German law, which at the time allowed one "who, at the time of the patentee's

application, ha[d] already commenced to make use of the invention in the

country  . . ." to continue making and selling the product.  *Id.* at 701.  Boesch, the

United States patentee, had no relations or privity with Hecht and received no

compensation for Hecht's sales, which it did not authorize.  Therefore, to hold that

Boesch's United States patent rights exhausted by virtue of Hecht's sales outside

the United States—which were not authorized by Boesch because they had no need

to be—would make little sense.

19

Likewise, in circumstances where a patentee makes explicit that extraterritorial sales are not intended to compensate it for rights under its United States patents—for example, where a pharmaceutical maker sells product at low (or no) cost outside the United States for humanitarian reasons, with an explicit restriction that importation into the United States or resale for that purpose would infringe the United States patents, the rationale for exhaustion is inapplicable.

### C.   *Jazz Photo*'s Categorical Rule Does Not, However, Universally Comport With The Principles Underlying Exhaustion

To the extent that *Jazz Photo* presents a rigid and categorical rule holding that sales outside the United States can *never* give rise to exhaustion, however, it seemingly stretches too far.  Indeed, rather than requiring a complete overturning of *Jazz Photo*, the analysis in *Kirtsaeng* would support an appropriate tempering of *Jazz Photo*'s rule.

### 1.   *Jazz Photo* Leaves No Room For Extraterritorial Sales Or Licenses That Intend To Authorize Downstream U.S. Sales

*Jazz Photo* decided that "United States patent rights are not exhausted by products of foreign provenance" in a single paragraph with little substantive analysis other than a citation to the 1890 Supreme Court decision in *Boesch v. Graff*, 133 U.S. 697 (1890).  But *Boesch* did not hold that sales made outside the United States can *never* exhaust patent rights.  Rather, as discussed above, *Boesch* held that purchasing the product from an entity permitted to sell it in Germany (Hecht, which had the right to make and sell the patented burners in Germany

20

because of the German law's "grandfathering" provision, despite the subsequent issuance of the patent to Boesch), did not entitle the purchaser to import or use the product in the United States without the permission of the United States patentee. In this sense then, *Boesch* was dealing with a situation in which the United States patentee was not compensated for intrusion on the United States patent rights even once—and its holding is therefore unremarkable.

Perhaps the most salient counter-example to *Boesch* is the case where a patentee grants an unfettered license under its worldwide patent rights explicitly authorizing its licensee to sell covered products without restriction or condition. It is difficult to argue in this circumstance that the patentee has not been fully compensated under the United States patents, even where the products may first be sold outside and then imported into the United States. *See Tessera Inc. v. Int'l Trade Comm'n*, 646 F.3d 1357 (Fed. Cir. 2011); *San Disk Corp. v. Round Rock Research LLC.*, No. C 11-5243RS, 2014 WL 2700762 (N.D. Cal. June 13, 2014); *Multimedia Patent Trust v. Apple, Inc.*, No. 10-CV-2618-H (KSC), 2012 WL 6863471 (S.D. Cal. Nov. 9, 2012). And the same principles discussed above apply to limit the patentee's rights as against downstream purchasers pursuant to authorized sales by its worldwide licensee, regardless of whether those sales take place within or without the United States.

Similarly, in circumstances where the patentee him or herself makes an unconditional sale of a product embodying the patented invention with an affirmative acknowledgement that the sale is made pursuant to the United States patents (for example, by marking the product with United States patent numbers or by including a statement to that effect in literature accompanying the sale), the rationale for exhaustion would seemingly apply whether the sale is made inside or outside the United States.

In at least these circumstances—subsequent sales by authorized licensees under an unconditional worldwide patent license and unconditional sale by the patentee coupled with affirmative acknowledgement—the categorical and rigid rule of *Jazz Photo* requires exception.

## 2.  *Kirtsaeng* Teaches That Concerns Over Extraterritorial Application of United States Laws May Not Be Dispositive

The argument that extending exhaustion to sales made outside the United States impermissibly lends extraterritorial effect to the United States patent laws is exaggerated.  *First*, although the United States patent laws carry a "presumption against extraterritoriality," *Microsoft Corp. v. AT&T Corp*., 550 U.S. 437, 454 (2007), this does not mean that actions taken outside the United States are necessarily immaterial to the application of the patent laws.

For example, prior to the America Invents Act ("AIA"),[5]

Sections 102(a) and (b) precluded the award of a United States patent if "the

invention was . . . patented or described in a printed publication in this *or a foreign*

*country*" before the invention by the applicant (§ 102(a)), or more than one year

before patent filing (§ 102(b)).  Although the AIA modified Section 102, the

legislative changes did not eliminate foreign prior art as a basis for rejecting United

States patent protection.  To the contrary, the post-AIA Section 102 precludes

patentability where the invention is patented, described in a printed publication, in

public use, on sale, or otherwise available to the public anywhere in the world.

Moreover, foreign acts may, under certain circumstances, even

contribute to infringement under United States patents.  For instance,

Section 271(g) provides that importing a product made outside the United States

by a process that is patented in the United States is an act of infringement.

Similarly, Section 271(f), enacted in response to the Supreme Court's decision in

*Deepsouth Packing Co., Inc. v. Laitram Corp.*, 406 U.S. 518 (1972),[6] expanded the

definition of infringement to include exporting domestically made components of a

---

[5]  The America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284 (2011), is
effective for patents that have an effective filing date on or after March 16, 2013,
and so the prior version of Section 102 applies to the patents at issue in this case.
[6] *See* Patent Law Amendments Act of 1984, Pub. L. No. 98-622, § 101, 98 Stat.
3383 (1984).

patented machine for eventual assembly abroad.[7]  This court, in *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282 (Fed. Cir. 2005), found infringement of system claims even though a part of the infringing system was located in Canada. *Id*. at 1289–90 (citing *Decca Ltd. v. United States*, 210 F.2d 1070 (Ct. Cl. 1976)).

      *Second*, in the case of an extraterritorial sale, the issue of exhaustion arises only if the article sold outside the United States makes its way into the United States, thereby implicating United States patent laws.  In this respect, exhaustion is not concerned with *applying* United States patent law outside the United States, *i.e.*, imposing liability under United States patent law for conduct occurring in some foreign country, but rather with whether the right to apply United States patent law *within* the United States has been extinguished by virtue of conduct outside the United States.  This is analogous to deciding whether to grant United States patent protection at all on the basis of foreign prior art under Sections 102(a) and (b).

---

[7] In *Deepsouth Packing Co., Inc. v. Laitram Corp*., 406 U.S. 518 (1972), the Supreme Court held that United States patent law did not prohibit the export of unpatented components for assembly into a patented machine abroad.  Relying on the territoriality of the patent laws, the Court reasoned that Section 271 "makes it clear that it is not an infringement to make or use a patented product outside of the United States," *id.*, at 527, and that the United States patent system "makes no claim to extraterritorial effect." *Id.* at 531.  But the Court did recognize that actions outside of the United States could have implications for indirect infringement of United States patents, observing that if conduct was "intended to lead to use of patented [material] inside the United States its production and sales activity would be subject to injunction as an induced or contributory infringement." *Id.* at 526.

*Third*, the same territoriality concerns that exist with respect to patent law exist with respect to copyright law, but were not determinative in *Kirtsaeng*. Indeed, in *Kirtsaeng*, Wiley argued that because the copyright laws do not apply outside the United States, it would be anachronistic to apply the first sale doctrine to sales made outside the United States:

> It has long been established that the Copyright Act does not apply outside the United States, and thus the foreign production of a copy for distribution exclusively abroad does not implicate any of the exclusive rights granted by the Copyright Act. *See, e.g., United Dictionary Co. v. G. & C. Merriam Co.*, 208 U.S. 260, 264 (1908). There is, accordingly, no basis for "ascrib[ing] legality under the Copyright Act to conduct that occurs entirely outside the United States." *Costco*, 541 F.3d at 988. Instead, the legality of a copy produced in a foreign country is governed by that country's own copyright laws; a foreign copy is either lawfully or unlawfully made *under the law of the particular foreign country* . . . . Petitioners never explain how a foreign copy could be "made in compliance with" a statute that does not have any extraterritorial application; in those circumstances, there is nothing to "compl[y] with."

Brief in Opposition, *Kirtsaeng v. John Wiley Sons, Inc.*, 133 S. Ct. 1351 (2013) (Nos. 11-697 and 11-708); *see also Kirtsaeng*, 133 S. Ct. at 1376 ("The Copyright Act, it has been observed time and again, does not apply extraterritorially.") (Ginsburg, J., dissenting) (citing authorities). The majority of the Court, however, did not find the concern over extraterritorial application of the law dispositive, reasoning that "The [Copyright] Act does not instantly protect an American

copyright holder from unauthorized piracy taking place abroad.  But that fact does not mean the Act is inapplicable to copies made abroad." *Id.* at 1353.  Likewise, applying exhaustion on the basis of authorized sales made outside the United States does not necessarily conflict with the presumption that manufacture, use, or sale of a patented article entirely outside the United States does not give rise to liability for infringement.

> **3.    The Common Law Principles Underlying Copyright First Sale Relied On In *Kirtsaeng* Are Aligned With Those Underlying Patent Exhaustion**

*Kirstaeng* was a case decided as a matter of statutory construction under the Copyright Act, and it would be dangerous precedent to indiscriminately import principles derived from statutory copyright law into the patent context.  In this instance, however, the common law principles underlying both the copyright first sale doctrine and patent exhaustion are aligned.

As the Court explained in *Kirtsaeng*, the first sale doctrine emanates from the common law's "refusal to permit restraints on the alienation of chattels." *Kirtsaeng*, 133 S. Ct. at 1363.  As explicated by Lord Coke, once a rights holder "give[s] or sell[s] his whole interest . . . his whole interest . . . is out of him, so as he hath no possibilit[y] of Reverter."  *Id.*; *see also Bobbs-Merrill,* 210 U.S. at 350 ("It is not denied that one who has sold a copyrighted article, without restriction, has parted with all right to control the sale of it.")

The rationale for patent exhaustion is on all fours. *See, e.g.*, *Adams v. Burke* 84 U.S. (17 Wall.) 453, 455–56 (1873) ("[W]hen the patentee, or the person having his rights, sells a machine or instrument whose sole value is in its use, he receives the consideration for its use and he parts with the right to restrict that use. The article, in the language of the Court, passes without the limit of the monopoly."); *Bloomer v. McQuewan*, 56 U.S. (14 How.) 539 (1853); *Ethyl Gasoline Corp. v. United States*, 309 U.S. 436, 456–457 (1940); *United States v. Univis* Lens, 316 U.S. 241, 250 (1942) ("[S]ale of [an article] exhausts the monopoly in that article, and the patentee may not thereafter, by virtue of his patent, control the use or disposition of the article."); *Princo Corp. v. Int'l Trade Comm'n*, 616 F.3d 1318, 1328 (Fed. Cir. 2010) (en banc) ("As a general matter, the unconditional sale of a patented device exhausts the patentee's right to control the purchaser's use of the device thereafter, on the theory that the patentee has bargained for, and received, the full value of the goods.").

Lexmark and amicus American Intellectual Property Law Association contend that Section 109 of the Copyright Act confers an entitlement on purchasers to an extent different than does common law patent exhaustion. Opening Brief of Plaintiff-Cross Appellant Lexmark Int'l, Inc. at 50–51, *Lexmark Int'l, Inc. v. Impression Products, Inc.*, Nos. 2014-1617 and 2014-1619 (Fed. Cir. Oct. 21, 2014); Brief of American Intellectual Property Law Association in Support of

Neither Party at 9, *Lexmark Int'l, Inc. v. Impression Products, Inc*., Nos. 2014-1617 and 2014-1619 (Fed. Cir. June 5, 2015); *see* 17 U.S.C. § 109(a) ("Notwithstanding the provisions of section 106(3), the owner of a particular copy or phonorecord lawfully made under this title . . . *is entitled*, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord.") (emphasis added).  But the Court's patent exhaustion cases similarly speak of conferring a "right" on the purchaser of a patented article to engage in otherwise infringing acts without liability.  *See Adams v. Burke*, 84 U.S. (17 Wall.) 453, 455–56 (1873) ("[T]he sale by a person who has the full right to make, sell, and use such a machine *carries with it the right* to the use of that machine to the full extent to which it can be used in point of time.") (emphasis added).

In reaching its holding, *Kirtsaeng* examined the text of the Copyright Act (*i.e*., the "lawfully made under this title" language) to determine whether Congress intended to *modify* the common law rule that an unconditional sale extinguishes property rights.  Finding no such modification, the Court grounded its decision in "the common-law history of the 'first sale' doctrine," and "the practical copyright-related harms with which a geographical interpretation would threaten ordinary scholarly, artistic, commercial, and consumer activities."  *Kirtsaeng*, 133

S. Ct. at 1358. Likewise, there is no principle categorically limiting the common law exhaustion doctrine or its rationale to sales made in the United States.

**D.    Any Modification to *Jazz Photo* Should Be Carefully Applied In Light of Policy Considerations**

The court should be legitimately concerned with the policy implications of extending the exhaustion doctrine, which is a creature of judicial construct, to extraterritorial sales made by patentees or their authorized licensees. For example, although a number of countries (China, India, and Taiwan) apply extraterritorial exhaustion to extinguish domestic patent rights based on sales outside the relevant jurisdiction, many (most European countries, except among EU members) do not. *See* Marianne Buckley, Comment, *Looking Inward: Regional Parallel Trade as a Means of Bringing Affordable Drugs to Africa*, 41 SETON HALL L. REV. 625, 633–34 (2011); V.K. Unni, *The Global Impact and Implementation of Human Rights Norms: Indian Patent Law and TRIPS: Redrawing the Flexibility Framework in the Context of Public Policy and Health*, 25 PAC. MCGEORGE GLOBAL BUS. & DEV. L.J. 323, 341 (2012). Extinguishing United States patent rights on the basis of sales made outside the United States could therefore put United States patentees at a competitive disadvantage vis-à-vis their foreign competitors whose foreign patent rights are not extinguished by sales in the United States.

Such concerns would largely be mitigated, however, were the court to adopt the coherent position set out in Point I of this brief—upholding *Mallinckrodt* and continuing to allow patentees to establish valid contractual restrictions (so long as they are not independently anticompetitive or otherwise unlawful), on sales they or their licensee's make, to avoid exhaustion.  Allowing patentees to impose restrictive conditions and thereby to contract around the default rule that an unconditional authorized sale exhausts a patentee's rights to further enforce its patent balances the rights of patentees against those of downstream customers, reflects the realities of global commerce in the 21st century, and best upholds the principles underlying the exhaustion doctrine.

## CONCLUSION

For the foregoing reasons, this Court should reaffirm the rule in *Mallinckrodt* and appropriately temper the categorical rule of *Jazz Photo*.

Respectfully submitted,

Dated:       June 19, 2015

/s/ *Noah M. Leibowitz*_____
Noah M. Leibowitz
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
(212) 455-2000

WALTER HANLEY
*PRESIDENT-ELECT*
NEW YORK INTELLECTUAL PROPERTY
   LAW ASSOCIATION
C/O KENYON & KENYON LLP
One Broadway
New York, New York 10004
(212) 425-7200

DAVID F. RYAN
*Co-Chair, Committee on Amicus
Briefs*
1214 Albany Post Road
Croton-on-Hudson, New York 10520
(914) 271-2225


*Counsel for Amicus Curiae New York
Intellectual Property Law Association*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B). The brief contains 6,987 words, excluding parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b). The word count includes the words counted by the Microsoft Word 2010 function.

This brief also complies with the typeface requirements of Fed. R. App. P.32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point font of Times New Roman.

Dated: June 19, 2015

<u>  /s/ Noah M. Leibowitz</u>
Noah M. Leibowitz
*Counsel for Amicus Curiae*

## CERTIFICATE OF FILING AND SERVICE

## United States Court of Appeals
## for the Federal Circuit

*Lexmark International, Inc. v. Impression Products, Inc., et al.,* 2014-1617,-1619

## <u>CERTIFICATE OF SERVICE</u>

I, Maryna Sapyelkina, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by SIMPSON THACHER & BARTLETT LLP, Attorneys for *Amicus Curiae* The New York Intellectual Property Law Association to print this document. I am an employee of Counsel Press.

On the **19th Day of June, 2015**, counsel for Amicus Curiae has authorized me to electronically file the within **Brief of *Amicus Curiae* The New York Intellectual Property Law Association** with the Clerk of the Court using the CM/ECF System, which will serve via e-mail notice of such filing to any of the following counsel registered as CM/ECF users:

Banner & Witcoff, Ltd.
Timothy Colin Meece
Audra Carol Eidem Heinze
Bryan Medlock Jr.
Jason Steven Shull
Ten South Wacker Drive
Chicago, IL 60606
312-463-5420
tmeece@bannerwitcoff.com
aheinze@bannerwitcoff.com
bmedlock@bannerwitcoff.com
jshull@bannerwitcoff.com

Sidley Austin LLP
Benjamin Beaton
1501 K Street, NW
Washington, DC 20005
202-736-8000
bbeaton@sidley.com

Sidley Austin LLP
Constantine L. Trela Jr.
Bank One Plaza
1 South Dearborn Street
Chicago IL 60603
312-853-7000
ctrela@sidley.com

Stoll, Keenon & Park, LLP
Steven B. Loy
300 West Vine Street Suite 2100
Lexington KY 40507-1380
859-231-3000
steven.loy@skofirm.com

Avyno Law, P.C.
Edward F. O'Connor I
6345 Balboa Boulevard Suite 190
Encino CA 91316
949-291-2894
eoconnor@avynolaw.com

Upon acceptance by the Court of the e-filed document, six paper copies of the brief will be filed with the Court, via Federal Express, within the time provided in the Court's rules.

June 19, 2015                                    /s/ Maryna Sapyelkina
                                                Maryna Sapyelkina
                                                Counsel Press