No. 14-1617, 14-1619

## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

LEXMARK INTERNATIONAL, INC.,

*Plaintiff-Cross-Appellant*,

− v. −

IMPRESSION PRODUCTS, INC.,

*Defendant-Appellant*,

QUALITY CARTRIDGES, INC., JOHN DOES, 1-20,
BLUE TRADING LLC, EXPRINT INTERNATIONAL, INC.,
LD PRODUCTS, INC., PRINTRONIC CORPORATION,
TESEN DEVELOPMENT (HONG KONG) CO. LTD.,
BENIGNO ADEVA AND HIS COMPANIES,

*Defendants*.

Appeal from the U.S. District Court for the Southern District of Ohio
No. 1:10-cv-564-MRB, The Honorable Michael R. Barrett

## BRIEF OF LG ELECTRONICS, INC., DELL INC.,
## GOOGLE INC., INTEL CORPORATION, L BRANDS INC.,
## NEWEGG INC., NINESTAR IMAGE TECH LIMITED,
## QVC, INC., SAMSUNG ELECTRONICS CO., LTD.,
## SAS INSTITUTE, INC., and XILINX, INC.
## AS *AMICI CURIAE* IN SUPPORT OF APPELLANT

James Suh
LG Electronics Inc.
Intellectual Property Center
19, Yangjae-daero 11gil,
Seocho-gu
Seoul, Korea 137-130
+82 (0)2 6912 6515

*Counsel for LG Electronics, Inc.*

Andrew J. Pincus
Jamie B. Beaber
Kfir B. Levy
Paul W. Hughes
Mayer Brown LLP
1999 K Street, N.W.
Washington, D.C. 20006
(202) 263-3000

*Counsel for* amici curiae

Matthew R. Hulse
Intel Corporation
2200 Mission College Blvd,
RNB-4-150
Santa Clara, CA 95054
(408) 653-6570

*Counsel for Intel Corporation*

# CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rule 47.4, Andrew J. Pincus, counsel for *Amici Curiae*, certifies the following:

1.    The full name of every party or amicus we represent is:

LG Electronics, Inc.; Dell Inc.; Google Inc.; Intel Corporation; L Brands Inc.; Newegg Inc.; Ninestar Image Tech Limited; QVC, Inc.; Samsung Electronics Co., Ltd.; SAS Institute, Inc.; and Xilinx, Inc.

2.    The name of the real party in interest (if not named in the caption) that we represent is:

Not applicable.

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party that we represent are:

LG Corporation owns more than 10% of LG Electronics, Inc.'s stock. No other publicly held corporation owns 10% or more of LG Electronics, Inc.'s stock.

Dell Inc. is a privately held corporation and its direct parent company is Denali Intermediate Inc. No publicly held corporation owns 10% or more of Denali Intermediate Inc.'s stock.

Google Inc. has no parent company. No publicly held corporation owns 10% or more of Google's stock.

Intel Corporation has no parent company. No publicly held corporation owns 10% or more of Intel's stock.

L Brands Inc. has no parent company. No publicly held corporation owns 10% or more of L Brands' stock.

Newegg Inc. has no parent company. No publicly held corporation owns 10% or more of Newegg Inc.'s stock.

Ninestar Image Tech Limited is owned by Zhuhai Seine Technology Co., Ltd. No publicly held corporation owns 10% or more of Zhuhai Seine Technology Co., Ltd.'s stock.

QVC, Inc. is a wholly owned subsidiary of Liberty Interactive Corporation. It is attributed to the QVC Group tracking stock (NASDAQ: QVCA, QVCB).

Samsung Electronics Co., Ltd. has no parent company. No publicly held corporation owns 10% or more of Samsung Electronics Co., Ltd.'s stock.

SAS Institute Inc. has no parent company. No publicly held corporation owns 10% or more of SAS Institute's stock.

Xilinx, Inc. has no parent company. No publicly held corporation owns 10% or more of Xilinx's stock.

4.  The names of all law firms and the partners and associates that appeared for appellants in the trial court or are expected to appear in this Court are:

Mayer Brown LLP; Andrew J. Pincus; Jamie B. Beaber; Kfir B. Levy; Paul W. Hughes.

/s/ Andrew J. Pincus

June 19, 2015

Andrew J. Pincus
Attorney for *Amici Curiae*

# TABLE OF CONTENTS

Certificate of Interest ......................................................................... i

Table of Authorities ......................................................................... iv

Interests of *Amici Curiae* ............................................................... 1

Summary of Argument ...................................................................... 2

Argument ........................................................................................... 3

I.    Territorial Limits on Patent Exhaustion Produce Inefficient
      Markets, Harming Businesses and Consumers Alike. ....................... 3

      A.    In today's globalized marketplace, a territorial approach to
            patent exhaustion creates substantial inefficiency,
            increasing costs to consumers. ........................................... 4

      B.    International patent exhaustion enables innovation. ............... 9

      C.    The same exhaustion doctrine should apply to copyrights
            and patents. ......................................................................... 9

II.   A Sale Authorized by a U.S. Patentee Exhausts U.S. Patent
      Rights, Regardless of Where the Sale Occurs. ............................ 10

      A.    *Kirtsaeng* and *Quanta* require international patent
            exhaustion. ........................................................................ 11

      B.    The common law—which was adopted by the Patent Act of
            1952—requires international patent exhaustion ..................... 19

      C.    The "single reward" principle forecloses the domestic-only
            rule. ................................................................................... 23

III.  After Authorizing the First Sale of an Article, a Patentee May Not
      Subsequently Enforce Patent-Based Restrictions on that Article. ... 24

      A.    The Supreme Court's patent exhaustion jurisprudence
            forecloses the "conditional sale" doctrine. ........................... 26

      B.    *General Talking Pictures* does not support the conditional
            sale doctrine. ..................................................................... 30

Conclusion ...................................................................................... 33

# TABLE OF AUTHORITIES

## Cases

*Amini Innovation Corp. v. Anthony California, Inc.,*
439 F.3d 1365 (Fed. Cir. 2006) .................................................. 10

*B. Braun Med., Inc. v. Abbott Labs.,*
124 F.3d 1419 (Fed. Cir. 1997) ................................................. 24

*Bauer & Cie v. O'Donnell,*
229 U.S. 1 (1913) ..............................................................24, 28

*Becton, Dickinson & Co. v. Eisele & Co.,*
86 F.2d 267 (6th Cir. 1936) ..................................................... 21

*Betts v. Willmott,*
[1871] 6 L.R. 239 (Ch. App.) (Eng.) ....................................20, 21

*Bloomer v. Millinger,*
68 U.S. (1 Wall.) 340 (1863) ..................................................... 8

*Boesch v. Graff,*
133 U.S. 697 (1890) ............................................11, 21, 22, 23

*Boston Store v. Am. Graphophone Co.,*
246 U.S. 8 (1918) .................................................................. 28

*Bowman v. Monsanto Co.,*
133 S. Ct. 1761 (2008) .......................................................25, 30

*Brown v. Allen,*
344 U.S. 443 (1953) ............................................................... 11

*Creative Tech. Ltd. v. Aztech Sts. Pte Ltd.,*
[1997] 1 SLR 621 (Sing.) ........................................................ 21

*Curtiss Aeroplane & Motor Corp. v. United Aircraft Eng'g Corp.,*
266 F. 71 (2d Cir. 1920) ......................................................21, 22

*Deepsouth Packing Co. v. Laitram Corp.,*
406 U.S. 518 (1972) ............................................................... 19

iv

# TABLE OF AUTHORITIES
## (continued)

*Dickerson v. Matheson,*
  57 F. 524 (2d Cir. 1893) .................................................. 21, 23

*Dickerson v. Tinling,*
  84 F. 192 (8th Cir. 1897) ................................................. 21

*Ergowerx Int'l, LLC v. Maxell Corp.,*
  18 F. Supp. 3d 430, 448 (S.D.N.Y. 2014) ................................. 29

*Fuji Photo Film Co. v. Jazz Photo Corp.,*
  394 F.3d 1368 (Fed. Cir. 2005) ........................................... 14

*Fujifilm Corp. v. Benun,*
  605 F.3d 1366 (Fed. Cir. 2010) ........................................... 16

*Gemmy Indus. Corp. v. Chrisha Creations Ltd.,*
  452 F.3d 1353 (Fed. Cir. 2006) ........................................... 10

*General Talking Pictures Corp. v. Western Electric Co.,*
  305 U.S. 124 (1938) ............................................ 25, 30, 31, 32

*Hazeltine Research, Inc. v. Automatic Radio Mfg. Co.,*
  77 F. Supp. 493 (D. Mass. 1948) .......................................... 31

*Helferich Patent Licensing, LLC v. New York Times Co.,*
  778 F.3d 1293 (Fed. Cir. 2015) ........................................ 13, 19

*Holiday v. Mattheson,*
  24 F. 185 (C.C.S.D.N.Y. 1885) ......................................... 20, 21

*In re Indep. Serv. Orgs. Antitrust Litig.,*
  203 F.3d 1322 (Fed. Cir. 2000) ........................................... 10

*Interstate Parcel Express Co. Proprietary Ltd. v. Time-Life Int'l (Nederlands) B.V.,*
  [1977] 138 CLR 534, 540-41 (Austl.) ...................................... 21

*Jazz Photo Corp. v. International Trade Commission,*
  264 F.3d 1094 (Fed. Cir. 2001) ...................................... *passim*

*Kabushiki Kaisha Hattori Seiko v. Refac Tech. Dev. Corp.,*
  690 F. Supp. 1339 (S.D.N.Y. 1988) ....................................... 21

# TABLE OF AUTHORITIES
## (continued)

*Keeler v. Standard Folding Bed Co.,*
  157 U.S. 659 (1895) .......................................................... 22, 23

*Keurig, Inc. v. JBR, Inc.,*
  2013 WL 2304171 (D. Mass. 2013)........................................ 29

*Keurig, Inc. v. Sturm Foods, Inc.,*
  2012 WL 4049799 (D. Del. 2012)........................................... 29

*Kirtsaeng v. John Wiley & Sons, Inc.,*
  133 S. Ct. 1351 (2013) .................................................. *passim*

*LG Elecs., Inc. v. Bizcom Elecs., Inc.,*
  453 F.3d 1364 (Fed. Cir. 2006) ............................................. 16

*LG Elecs., Inc. v. Hitachi, Ltd.,*
  655 F. Supp. 2d 1036 (N.D. Cal. 2009)........................ 16, 18, 23

*LifeScan Scotland, Ltd. v. Shasta Technologies, LLC,*
  734 F.3d 1361 (Fed. Cir. 2013) ............................................. 13

*Mallinckrodt, Inc. v. Medipart, Inc.,*
  976 F.2d 700 (Fed. Cir. 1992) ......................................... *passim*

*Microsoft Corp. v. i4i Ltd. P'ship,*
  131 S. Ct. 2238 (2011) ....................................................... 19

*Mitchell v. Hawley,*
  83 U.S. 544 (1872) ............................................................ 32

*Monsanto Co. v. Bowman,*
  657 F.3d 1341 (Fed. Cir. 2011) ............................................. 30

*Motion Picture Patents Co. v. Universal Film Mfg. Co.,*
  243 U.S. 502 (1917) ........................................................... 28

*Ninestar Technology Co. v. ITC,*
  133 S. Ct. 1656 (2013) ........................................................ 11

*Quanta Computer, Inc. v. LG Electronics, Inc.,*
  553 U.S. 617 (2008) ..................................................... *passim*

vi

# TABLE OF AUTHORITIES
## (continued)

*San Disk Corp. v. Round Rock Research LLC,*
  2014 WL 2700583 (N.D. Cal. 2014) .................................................... 6, 18

*Sanofi, S.A. v. Med-Tech Veterinarian Prods., Inc.,*
  565 F. Supp. 931 (D.N.J. 1983) ........................................................ 21, 23

*Static Control Components, Inc. v. Lexmark Int'l, Inc.,*
  615 F. Supp. 2d 575 (E.D. Ky. 2009) ............................................ 18, 29, 32

*Straus v. Victor Talking Mach. Co.,*
  243 U.S. 490 (1917) ........................................................................ 12, 28

*United Dictionary Co. v. G. & C. Merriam Co.,*
  208 U.S. 260 (1908) ............................................................................... 17

*United States v. Line Material Co.,*
  333 U.S. 287 (1948) ............................................................................... 32

*United States v. Masonite Corp.,*
  316 U.S. 265 (1942) ........................................................................ 23, 24

*United States v. Univis Lens Co.,*
  316 U.S. 241 (1942) .................................................................... *passim*

## Statutes

17 U.S.C. § 109(a) ..................................................................................... 11

21 U.S.C. § 381(d)(1) .................................................................................. 8

## Miscellaneous

5 Donald S. Chisum, *Chisum on Patents* (1997) ......................................... 21

Bronwyn H. Hall & Rosemarie Ham Ziedonis, *The Patent
  Paradox Revisited: An Empirical Study of Patenting in
  the U.S. Semiconductor Industry, 1979–1995,*
  32 Rand J. Econ., No. 1 (2001) ................................................................ 4

D. Patrick O'Reilly & Seiji Ohno, *International Patent
  Exhaustion Licensing May Be a Remedy,*
  SF24 ALI-ABA 395 (2000). ..................................................................... 19

# TABLE OF AUTHORITIES
## (continued)

Fed. Trade Comm'n, *To Promote Innovation: The Proper Balance of Competition and Patent Law and Policy, Executive Summary* (Oct. 2003) ................................................................. 4

Gene M. Grossman & Edwin L.C. Lai, *Parallel Imports and Price Controls*, 39 Rand J. Econ. 378 (2008) ..................................... 9

Ian Barker, *The Global Supply Chain Behind the iPhone* ............................ 4

John Rothchild, *Exhausting Extraterritoriality*, 51 Santa Clara L. Rev. 1187 (2011) ....................................................... 23

Margot E. Kaminski, *The Capture of International Intellectual Property Law Through the U.S. Trade Regime*, 87 S. Cal. L. Rev. 977 (2014) ........................................................ 7

Melvin F. Jager, *Licensing Law Handbook* § 1:24 (2014) ........................... 18

Michael J. Meurer, *Copyright Law and Price Discrimination*, 23 Cardozo L. Rev. 55 (2001) .................................................... 8

# INTERESTS OF *AMICI CURIAE*

*Amici* are leading technology companies, consumer electronics manufacturers, and retailers.[1] *Amici* depend on efficient operation of the first sale doctrine. Manufacturers, for example, require certainty regarding their ability to incorporate into their products the components duly acquired by their supply chain. Retailers, likewise, depend on the ability to resell products that they lawfully purchase from U.S. patentees and authorized licensees. All *amici* recognize the importance of precluding abusive practices that seek to extract a second royalty for domestic sales, following a first sale authorized by a U.S. patentee. *Amici* are:

| | |
|---|---|
| LG Electronics, Inc. | Dell Inc. |
| Google Inc. | Intel Corporation |
| L Brands Inc. | Newegg Inc. |
| Ninestar Image Tech Limited | QVC, Inc. |
| Samsung Electronics Co. | SAS Institute Inc. |
| Xilinx, Inc. | |

---

[1] Pursuant to Fed. R. App. P. 29(c)(5), *amici* affirm that no counsel for a party authored this brief in whole or in part and that no person other than *amici* and their counsel made a monetary contribution to its preparation or submission. The Court granted permission for the filing of *amicus* briefs in its order of April 14, 2015.

## SUMMARY OF ARGUMENT

I.  International patent exhaustion best comports with the policies underlying patent law. It provides manufacturers with needed certainty regarding patent rights in the components they incorporate into their products and retailers with confidence that they may resell goods lawfully. And international patent exhaustion promotes innovation, because the development of new products frequently involves new combinations of existing components and technologies from around the world.

The domestic-only patent exhaustion rule supported by Lexmark benefits the few U.S. patentees engaging in impermissible rent-seeking, *i.e.*, those who wish to extract multiple payments for the very same product. Domestic-only exhaustion creates substantial compliance costs, as modern devices include components from dozens—if not hundreds—of suppliers; permitting each patentee to attach conditions on the resale or importation of goods would hamper commerce and increase prices. For these reasons, domestic-only exhaustion skews the careful balance that exists between patentees and other market participants.

II.  This Court's holding in *Jazz Photo Corp. v. International Trade Commission*, 264 F.3d 1094, 1105 (Fed. Cir. 2001)—that sales authorized by a patentee or licensee outside the United States do not exhaust U.S.

patent rights—cannot stand in light of the Supreme Court's subsequent rulings in *Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S. Ct. 1351 (2013), and *Quanta Computer, Inc. v. LG Electronics, Inc.*, 553 U.S. 617 (2008). It is contrary to over a century of prior precedent. And it is incompatible with the "single reward" principle that animates the "first-sale" doctrine. The Court should overrule *Jazz Photo*.

III. The Court's holding in *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700, 705-06 (Fed. Cir. 1992)—that a patentee may circumvent the patent exhaustion doctrine via a putative "conditional sale" or a "restrictive license"—is also wrong. The Supreme Court has made clear that the exhaustion doctrine operates irrespective of any contractual limitations a party seeks to impose. The Court should overrule *Mallinckrodt*.

## ARGUMENT

### I.    Territorial Limits on Patent Exhaustion Produce Inefficient Markets, Harming Businesses and Consumers Alike.

International patent exhaustion—the rule that a first sale authorized by a U.S. patentee exhausts the U.S. patent rights in that good regardless of where in the world the first sale occurs—is critical to the modern economy. Lexmark's contrary rule, the principle of domestic-only exhaustion, creates significant practical inefficiencies, hinders innovation,

and presents an intolerable disparity with the overlapping copyright regime.

### A. In today's globalized marketplace, a territorial approach to patent exhaustion creates substantial inefficiency, increasing costs to consumers.

Goods of all kinds—computers, smart-phones, automobiles, and even medicines—incorporate components made throughout the world. One report tracking iPhone production identified 785 different suppliers in 31 countries. Ian Barker, *The Global Supply Chain Behind the iPhone 6*, http://goo.gl/ehweyR. The iPhone is not unique: "computer hardware and software contain an incredibly large number of incremental innovations." Fed. Trade Comm'n, *To Promote Innovation: The Proper Balance of Competition and Patent Law and Policy*, *Executive Summary*, at 6 (Oct. 2003) (FTC Report), http://goo.gl/auSnUJ. Even "a given semiconductor product . . . will often embody hundreds if not thousands of 'potentially patentable' technologies," and that is just one part of a consumer device. Bronwyn H. Hall & Rosemarie Ham Ziedonis, *The Patent Paradox Revisited: An Empirical Study of Patenting in the U.S. Semiconductor Industry, 1979–1995*, 32 Rand J. Econ., No. 1, 101, 110 (2001).

Given the complexity of the modern supply chain, the domestic-only approach to patent exhaustion fosters enormous complication, uncertainty,

and inefficiency. The ultimate effect is to raise costs for consumers. As the district court observed, the domestic-only exhaustion rule "create[s] significant uncertainty for downstream purchasers and end users who may continue to [be] liable for infringement even after an authorized sale to the consumer has occurred." A15.

To begin with, under the domestic-only exhaustion rule, in order to import products into the United States, the manufacturer must trace the patent rights of *every* component it purchases and then negotiate appropriate license arrangements with the component manufacturer (as well as any sub-component manufacturer) *over and above* the purchase contract itself.

Consider, for example, a manufacturer of SDRAM chips that owns patents covering those chips. It sells its chips, outside the United States, to a manufacturer of solid-state drives. The solid-state drive manufacturer incorporates those chips into its drives and, in turn, sells them to a laptop manufacturer, also outside the United States, that incorporates the drives into laptop computers. The laptop manufacturer then sells its products to a U.S.-based retailer for importation and sale in the United States. Under the domestic-only exhaustion rule, even though the SDRAM chip manufacturer voluntarily sold its chips to the drive manufacturer, the SDRAM chip

manufacturer can nonetheless sue the laptop manufacturer and the U.S. retailer for direct or indirect patent infringement, *unless* those parties negotiate a specific license for U.S. importation.[2]

Because supply chains involve dozens, if not hundreds, of suppliers and sub-manufacturers, the impracticality of the domestic-only exhaustion rule is manifest. Product manufacturers should be able to rely on an authorized first sale of a component as duly exhausting all patent rights to that component held by the component maker. This includes the component maker's own rights as well as rights exhausted by the component maker's purchases of sub-components in prior authorized sales.

In addition to substantial compliance costs, the domestic-only exhaustion rule gives a patentee the power to coerce, through threatened (or actual) litigation, payments far beyond what the market, efficiently operating, would bear. If, as we contend, the initial authorized sale of a component exhausts *all* patent rights, the manufacturer must price that article to include the value of its patent rights; but that pricing is con-

---

[2] Under the domestic-only rule, the same unfairness can result when a patent owner licenses its patent rights to a manufacturer. *See San Disk Corp. v. Round Rock Research LLC*, 2014 WL 2700583, at *4 (N.D. Cal. 2014).

strained by competitive, market forces—including the prices of substitutes.

Under a domestic-only exhaustion rule, however, the patentee may attempt to extract second (and even third) royalties at some downstream point, after the component has been incorporated into a product that has been imported to the United States. At this point, when the components at issue have *already* been incorporated into end-products, meaning that the end-product manufacturer (or purchaser) is "locked in," the patentee holds far greater power. The cost of litigation and the threat of judicially-imposed royalties and injunctions—over and above the original purchase price—would allow a patentee to extract value at levels that the market would not have permitted had the patentee been required to incorporate that royalty level into the component's initial price.

The motivation for those who seek a domestic-only exhaustion rule is not hard to deduce: "Rent-seeking industries would prefer the absence of patent exhaustion rules." Margot E. Kaminski, *The Capture of International Intellectual Property Law Through the U.S. Trade Regime*, 87 S. Cal. L. Rev. 977, 1020 (2014). When costs of production increase through imposition of improper, artificial rules that complicate the patent system—and provide a patentee the opportunity for multiple bites at the

same royalty apple—it is consumers who suffer most directly through higher prices.[3]

The international patent exhaustion approach, by contrast, is fair not just to consumers, but also to patentees, who are "entitled to but one royalty for a patented machine*." Bloomer v. Millinger*, 68 U.S. (1 Wall.) 340, 350 (1863). A patentee must simply price its components to account for whatever value its patent rights bring to the goods it sells.

Lexmark's domestic-only exhaustion rule also creates a perverse incentive for U.S. patentees to manufacture their goods outside the United States. If a patentee manufactures a good within the U.S. and then sells it, that constitutes a patent-exhausting first sale. Under the domestic-only exhaustion approach, a manufacturer can avoid this result by shifting production and first sales overseas—"an inefficient incentive to shift domestic production abroad." Michael J. Meurer, *Copyright Law and Price Discrimination*, 23 Cardozo L. Rev. 55, 142 n.380 (2001).

---

[3] Lexmark raises the specter that an international exhaustion rule could make it difficult for pharmaceutical manufacturers to price discriminate, which they assert could disadvantage developing countries. Lexmark Panel Br. 54 & n.17. AIPLA suggests third parties will unsafely import drugs. AIPLA Br. 15-16. These concerns are misguided: federal law specifically bars reimportation of drugs into the United States by entities other than the manufacturer. 21 U.S.C. § 381(d)(1).

**B.    International patent exhaustion enables innovation.**

In addition to creating substantial compliance costs, the domestic-only exhaustion rule hinders the development of new technology. New products often result from novel ideas regarding combinations of existing components—but creating these new combinations requires confidence that the patent rights underlying the components have been exhausted by the initial sale. For this reason, a recent study concluded that "deregulation of parallel imports"—that is, goods imported on the secondary market—"generates both an increase in consumer surplus in the innovative country and an *increase* in the world pace of innovation." Gene M. Grossman & Edwin L.C. Lai, *Parallel Imports and Price Controls*, 39 Rand J. Econ. 378, 380 (2008).

**C.    The same exhaustion doctrine should apply to copyrights and patents.**

Overturning *Jazz Photo* is also necessary to harmonize patent and copyright law. In *Kirtsaeng*, 133 S. Ct. 1351, the Supreme Court held that a foreign sale exhausts a U.S. copyright. Manufacturers often protect the same products through both patents and copyrights; indeed, *Kirtsaeng* acknowledged the use of copyrights in "automobiles, microwaves, calculators, mobile phones, tables, and personal computers"—products plainly subject to patent rights. *Id*. at 1365. In practice, parties routinely assert

9

copyright and patent interests in the same product. *See, e.g., Amini Innovation Corp. v. Anthony California, Inc.*, 439 F.3d 1365 (Fed. Cir. 2006); *Gemmy Indus. Corp. v. Chrisha Creations Ltd.*, 452 F.3d 1353, 1356 (Fed. Cir. 2006); *In re Indep. Serv. Orgs. Antitrust Litig.*, 203 F.3d 1322 (Fed. Cir. 2000).

Disparate exhaustion rules for copyright and patent would yield bizarre and intolerable results, where sales abroad exhaust some U.S. rights but not others. Such a regime would encourage further gamesmanship in the use of intellectual property rights in order to restrict secondary markets. Rather, because of the significant overlap between copyright and patent protections, the same exhaustion doctrine should govern.

## II.    A Sale Authorized by a U.S. Patentee Exhausts U.S. Patent Rights, Regardless of Where the Sale Occurs.

The Supreme Court's holdings in *Kirstsaeng* and *Quanta* compel the conclusion that a first sale of an article that substantially embodies the patent and that is authorized by the U.S. patentee exhausts U.S. patent rights, regardless of whether that sale occurs inside or outside the United States. The pre-1952 common law, which the Patent Act did not displace, requires this same result. And this rule accords with the theory animating patent exhaustion: a patentee is entitled to one—and only one—reward for a sale of its patented article. The Court should therefore overrule *Jazz*

*Photo Corp. v. International Trade Commission*, 264 F.3d 1094 (Fed. Cir. 2001).

### A. *Kirtsaeng* and *Quanta* require international patent exhaustion.

*Kirtsaeng* and *Quanta* rejected the two rationales this Court has advanced in favor of a domestic-only exhaustion rule—the common law and geographic limitations on the applicability of the Patent Act's infringement provisions.[4]

**The common law.** *Jazz Photo* rested the domestic-only view of patent exhaustion on a misinterpretation of the applicable common law rule:

> To invoke the protection of the first sale doctrine, the authorized first sale must have occurred under the United States patent. *See Boesch v. Graff*, 133 U.S. 697, 701-703 (1890).

264 F.3d at 1105.[5]

*Kirstaeng* fatally undermined this analysis. There, in interpreting the scope of 17 U.S.C. § 109(a), the Copyright Act's exhaustion provision,

---

[4]  Lexmark is wrong to suggest (Panel Br. 49 n.14) that the Supreme Court's denial of certiorari in *Ninestar Technology Co. v. ITC*, 133 S. Ct. 1656 (2013), has bearing here. The Supreme Court has "frequently said that the denial of certiorari 'imports no expression of opinion upon the merits of a case.'" *Brown v. Allen*, 344 U.S. 443, 456 (1953). And respondents in *Ninestar* raised alternative reasons to deny certiorari, including waiver. Br. in Opp. at 13-16, *Ninestar Tech.*, No. 12-552 (U.S. Feb. 4, 2013), 2013 WL 476274.

[5]  As discussed below, *infra* 21-23, this understanding of *Boesch* was plainly inaccurate even prior to *Kirtsaeng*.

the Court considered at length the common law's treatment of the first-sale doctrine. Because the "'issue [was] previously governed by the common law,'" the Court "presume[d] that 'Congress intended to retain the substance of the common law.'" *Kirtsaeng*, 133 S. Ct. at 1363. Examining the common law's "impeccable historic pedigree," the Court concluded that the "'first-sale' doctrine" "makes no geographical distinctions." *Id*. Common law, the Court held, "refus[es] to permit restraints on the alienation of chattels." *Id*.

In reaching this decision, the Supreme Court analyzed the common-law first-sale doctrine as a general matter and did not rest on any principles or authority specific to copyright law. For example, the Court relied on Lord Coke's statements in *Institutes of the Laws of England* § 360 (1628), which involved property generally—not copyrights. *Kirtsaeng*, 133 S. Ct. at 1363 ("Coke emphasizes the importance of leaving buyers of goods free to compete with each other when reselling or otherwise disposing of those goods.").

There is little doubt that the same law governs patent exhaustion. Indeed, the Supreme Court previously referenced Lord Coke to guide the contours of patent exhaustion. *See Straus v. Victor Talking Mach. Co.,* 243 U.S. 490, 500-01 (1917) (explaining a patentee's attempt "to place re-

straints upon [a patented product's] further alienation . . . have been hateful to the law from Lord Coke's day to ours").[6]

And this Court has already applied *Kirtsaeng* to patent exhaustion. In *LifeScan Scotland, Ltd. v. Shasta Technologies, LLC*, 734 F.3d 1361, 1375 (Fed. Cir. 2013), the Court considered whether "patent exhaustion applies to gifts." *Kirtsaeng* controlled because the Supreme Court "looked to the doctrine's common law roots," and, moreover, the "same policy undergirds the doctrine of patent exhaustion" as copyright exhaustion. *Id.* at 1376; *see also Helferich Patent Licensing, LLC v. New York Times Co.*, 778 F.3d 1293, 1305 (Fed. Cir. 2015) (citing *Kirtsaeng* in consideration of patent exhaustion's "origin in common-law rules limiting servitudes, and specifically alienability restrictions, on personal property").

*Jazz Photo* cannot be reconciled with *Kirtsaeng*'s holding that the common law exhaustion doctrine is triggered by a sale outside the United States.

---

[6] Lexmark's assertion, without authority, that the exhaustion doctrine in patent law "has continued to develop through judicial precedent in a way that makes older and more general pronouncements like Lord Coke's far less relevant" (Panel Br. 51-52) is mistaken. So, too, is AIPLA's suggestion that the Court should rely on "the still-evolving law of patent exhaustion." AIPLA Br. 8. The common-law rule is governed by long-standing precedent. *See infra*, 20-21. Common law does not authorize a court, as Lexmark and AIPLA appear to suggest, to legislate policy preferences.

**Extraterritoriality.** *Kirtsaeng* and *Quanta* also eliminated the other rationale this Court had advanced to support the domestic-only exhaustion rule—that foreign sales do not exhaust U.S. patent rights because "foreign sales can never occur under a United States patent" since "the United States patent system does not provide for extraterritorial effect." *Fuji Photo Film v. Jazz Photo Corp.*, 394 F.3d 1368, 1376 (Fed. Cir. 2005).

*Quanta* rejected this argument. In *Quanta*, LG Electronics, Inc. ("LGE") licensed to Intel certain method patents relating to the interaction between microprocessors and chipsets in a computer. 553 U.S. at 623. Intel produced microprocessors and chipsets that, when integrated into a computer system, practiced these patents. *Id*. at 624. Intel sold these products to Quanta, which integrated the microprocessors and chipsets into its computers. *Id*.

LGE brought an infringement action against Quanta's sales of those computers in the United States, and Quanta asserted patent exhaustion as a defense. *Id*. at 624-25. The Supreme Court addressed two questions: whether patent exhaustion applies to method patents (it does, the Court held); and whether Intel's sale of the microprocessors and chipsets substantially embodied the method patents such that the sale exhausted LGE's patent rights (they did, the Court held). *Id*. at 621.

14

In addressing the second question, Quanta argued, in part, that "the only apparent object" of Intel's sales of the microprocessors and chipsets was their incorporation into computers "that would practice the patents." *Id.* at 632. LGE's license of the patents to Intel therefore exhausted its patent rights as to all downstream uses. LGE, however, argued that it had not exhausted its patent rights for all subsequent uses because Intel's products "would not infringe its patents if they were *sold overseas*." *Id.* at 632 n.6 (emphasis added). In other words, sales by Intel of products embodying LGE's patents did not exhaust U.S. patent rights when Intel sold the products abroad.

The Court rejected LGE's contention and determined that sales abroad may exhaust U.S. patent rights. Significantly, the Court explained that patent exhaustion turns on whether "the product is 'capable of use only in *practicing* the patent,' not whether those uses are infringing." *Id.* at 632 n.6 (quoting *United States v. Univis Lens Co.,* 316 U.S. 241, 249 (1942)). Articles sold "***outside the country***," the Court held, would nonetheless "still be *practicing* the patent, even if not infringing it." *Id.* (emphasis added).

This holding thus rejected *Fuji Photo Film*'s argument in favor for domestic-only exhaustion grounded in the territorial limits of the Patent

Act: because a good sold abroad *practices* the patent even if not *infringing* it, a foreign sale necessarily exhausts U.S. patent rights without requiring an extraterritorial application of U.S. patent law.

To be sure, a panel of this Court declined to revisit *Jazz Photo* following *Quanta*. In *Fujifilm Corp. v. Benun*, 605 F.3d 1366, 1371 n.* (Fed. Cir. 2010) (per curiam), the panel cited the relevant language from *Quanta*'s footnote 6—that parts "would still be *practicing* the patent, even if not infringing it" when sold "outside the country"—and then tersely dismissed its significance, as "support[ing] . . . the exhaustion doctrine's territoriality requirement." *Id*. at 1371-72. If that analysis were correct, however, the Supreme Court would have reached the opposite conclusion in *Quanta*. Instead, the Court clearly held that (1) a patented good sold abroad still *practices* a U.S. patent; and (2) the non-U.S. sale of a good that practices the patent, authorized by the U.S. patent holder, exhausts the patentee's rights. *Benun* does not, accordingly, provide any meaningful basis for avoiding the conclusion that *Quanta* requires international exhaustion.[7]

---

[7]  The *Benun* panel also suggested that *Quanta* "did not involve foreign sales." *Benun*, 605 F.3d at 1371. That statement is inaccurate. As LGE had argued to this Court (*see* Br. for Plaintiff-Appellant at 31 n.5, *LG Elecs., Inc. v. Bizcom Elecs., Inc.*, 453 F.3d 1364 (Fed. Cir. 2006) (No. 05-1261), 2005 WL 1397821), and as a district court later determined (*see LG*

*Kirtsaeng* confirmed that the territorial limitation of the Patent Act's infringement provisions has no bearing on the scope of exhaustion. As the *Kirtsaeng* dissent explained, "[t]he Copyright Act, it has been observed time and again, does not apply extraterritorially." *Kirtsaeng*, 133 S. Ct. at 1376 (Ginsburg, J., dissenting) (citing *United Dictionary Co. v. G. & C. Merriam Co.*, 208 U.S. 260, 264 (1908)). The *Kirtsaeng* majority accepted this premise. *Id.* at 1359. But notwithstanding the clear territorial limitations on the Copyright Act, the *Kirtsaeng* majority concluded that the first-sale doctrine applies to sales outside the United States. There is no basis to draw a different conclusion in the context of patent exhaustion.[8]

**Pragmatic considerations.** *Kirtsaeng* also rested on the enormous costs imposed by a domestic-only approach to the first sale doctrine: these "practical problems," the Court found, "are too serious, too extensive, and too likely to come about for [the Court] to dismiss them as insignificant— particularly in light of the ever-growing importance of foreign trade to

---

*Elecs., Inc. v. Hitachi, Ltd.,* 655 F. Supp. 2d 1036, 1045 (N.D. Cal. 2009)), Intel *did* sell some of the products at issue to Quanta abroad.

[8] *Amicus* AIPLA protests that it would be an "injustice" for a foreign sale to exhaust U.S. patent rights because the U.S. patentee lacks the ability to police foreign sales via an infringement suit. AIPLA Br. 12. But the international exhaustion rule turns on "the initial *authorized* sale of a patented item"—*Quanta* repeated the phrase initial "*authorized* sale" seven times. *Quanta*, 553 U.S. at 621 (emphasis added). The U.S. patentee has full mastery as to what initial sales it authorizes.

America." 133 S. Ct. at 1367. Those same "practical problems" apply fully here. *See supra*, 3-10.

*    *    *

Following *Quanta* and *Kirtsaeng*, courts have broadly noted that *Jazz Photo* is bad law. One court, for example, summarized that "*Quanta*'s holding—that exhaustion is triggered by the authorized sale of an article that substantially embodies a patent—applies to authorized foreign sales as well as authorized sales in the United States." *LG Elecs., Inc. v. Hitachi, Ltd.*, 655 F. Supp. 2d 1036, 1047 (N.D. Cal. 2009); *see also San Disk*, 2014 WL 2700583, at \*4 ("*Kirtsaeng* provides at least some additional support for the notion that it would be inconsistent with the theoretical underpinnings of the exhaustion doctrine to apply a territorial limitation."); *Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 615 F. Supp. 2d 575, 588 (E.D. Ky. 2009) (noting that, after *Quanta*, the court would be inclined to find that sales abroad exhaust U.S. patent rights). Commentators agree. *See, e.g.*, Melvin F. Jager, *Licensing Law Handbook* § 1:24 (2014) (*Jazz Photo* is "inconsistent with Quanta.").[9]

---

[9] For this reason, any "reliance interests that have built up around the territorial patent regimes" (Lexmark Panel Br. 54) are limited and misinformed.

**B.    The common law—which was adopted by the Patent Act of 1952—requires international patent exhaustion.**

Pre-1952 common law also requires rejection of the domestic-only exhaustion rule. Where the Patent Act of 1952 "is silent," "it did not alter the common-law rule." *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2254 (2011) (Thomas, J., concurring in judgment). Thus, in the context of patent exhaustion, this Court "presume[s], from Congress's refusal to disturb the existing decisional law of this doctrine (which predated the 1952 Act by nearly a century), an implicit authorization to continue applying the doctrine within its familiar boundaries." *Helferich*, 778 F.3d at 1305.

Adherence to the common law is especially important because, in determining the reach of a patent grant, the Supreme Court "require[s] a clear and certain signal from Congress" before finding that "the beachhead of privilege is wider, and the area of public use narrower, than courts had previously thought." *Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518, 531 (1972). *Jazz Photo* expanded the patent right far beyond its scope at common law, but there was no "signal" from Congress whatsoever—much less a "clear and certain" one.

Prior to *Jazz Photo*, international patent exhaustion "ha[d] been consistently applied in the United States for over 100 years." D. Patrick O'Reilly & Seiji Ohno, *International Patent Exhaustion Licensing May Be*

*a Remedy*, SF24 ALI-ABA 395, 421 (2000). This long-standing common law rule, left unchanged by Congress in the Patent Act of 1952, controls.

*Holiday v. Mattheson*, 24 F. 185, 185 (C.C.S.D.N.Y. 1885), considered whether a U.S. patentee, "who has sold the patented article in England without restriction or conditions," "can treat as an infringer one who has purchased the article in England of a vendee of the patentee, and can restrain him from using or selling the article here." The court found that, irrespective of the location of the purchase, the purchaser "acquire[d] the right of unrestricted ownership in the article he buys as against the vendor," which includes "the right to use and enjoy it, and to transfer his title to others." *Id.* at 186.

*Holiday* derived, in substantial part, from English common law. *See* 24 F. at 186. In *Betts v. Willmott,* [1871] 6 L.R. 239, 245 (Ch. App.) (Eng.), the Court of Appeal in Chancery held that a holder of both a French and English patent, who manufactured and sold an item in France, granted the purchaser of the good in France an implicit license to use and sell the item in England; "inasmuch as [the patentee] has the right of vending the goods in *France* or *Belgium* or *England*, or in any other quarter of the

globe, he transfers with the goods necessarily the license to use them wherever the purchaser pleases."[10]

In the United States, *Holiday* was the governing rule for more than a century. *See, e.g.*, *Kabushiki Kaisha Hattori Seiko v. Refac Tech. Dev. Corp.*, 690 F. Supp. 1339, 1342 (S.D.N.Y. 1988); *Sanofi, S.A. v. Med-Tech Veterinarian Prods., Inc.*, 565 F. Supp. 931, 939 (D.N.J. 1983); *Becton, Dickinson & Co. v. Eisele & Co.*, 86 F.2d 267, 268-70 (6th Cir. 1936); *Curtiss Aeroplane & Motor Corp. v. United Aircraft Eng'g Corp.*, 266 F. 71, 78 (2d Cir. 1920); *Dickerson v. Tinling*, 84 F. 192, 194-95 (8th Cir. 1897); *Dickerson v. Matheson*, 57 F. 524, 527 (2d Cir. 1893). Commentators confirmed this long-standing principle of patent exhaustion. *See* 5 Donald S. Chisum, *Chisum on Patents* § 16.05[3][a][ii] (1997).[11]

*Jazz Photo* departed from this established common law by mischaracterizing *Boesch v. Graff*, 133 U.S. 697, 701-03 (1890). It incorrectly

---

[10] Courts outside the United Kingdom have called this principle of *Betts* "well established in patent law" (*Interstate Parcel Express Co. Proprietary Ltd. v. Time-Life Int'l (Nederlands) B.V.,* [1977] 138 CLR 534, 540-41 (Austl.)) and a "well founded proposition in patent law" (*Creative Tech. Ltd. v. Aztech Sts. Pte Ltd.,* [1997] 1 SLR 621 (Sing.)).

[11] Because international patent exhaustion controlled for more than a hundred years, AIPLA is flatly wrong (Br. 14) to assert that "[a] decision by this Court overruling *Jazz Photo* has the potential to undo more than a century's worth of precedent." It is *Jazz Photo* that grossly departed from established common law.

21

summarized *Boesch* as holding that "a lawful foreign purchase does not obviate the need for license from the United States patentee before importation into and sale in the United States." *Jazz Photo*, 264 F.3d at 1105.

The *Boesch* plaintiffs, licensees of the U.S. patent rights, alleged that the defendants imported infringing products. 133 U.S. at 698-99. The defendants purchased the products in Germany not from a licensee or patentee, but instead from a third party whose sales in Germany were lawful because of a prior use defense under German law. *Id.* at 701-02. The Supreme Court concluded that, because the third party was neither a U.S. patentee nor licensee, "purchasers from him could not be thereby authorized to sell the articles in the United States in defiance of the rights [of] patentees under a United States patent." *Id.* at 703. In *Boesch*, the U.S. patentee had received no reward from the sale—"neither the patentee nor any assignee had ever received any royalty." *Keeler v. Standard Folding Bed Co.*, 157 U.S. 659, 665 (1895).

*Boesch* thus addressed *unauthorized* foreign sales; it said nothing about a foreign sale *authorized* by the U.S. patentee. Indeed, subsequent cases found *Boesch* entirely consistent with international patent exhaustion. The Second Circuit in *Curtiss Aeroplane*, 266 F. at 77, for example, explained that *Boesch* applies only where "there has been no participation

whatever by the owner of the patent, either as a party or as a privy, in the putting out of the article which is alleged to infringe." *See also Dickerson*, 57 F. at 527; *Sanofi*, 565 F. Supp. at 937.

More recently, a district court concluded that, contrary to *Jazz Photo*'s analysis, "*Boesch* does not speak to" whether "an *authorized* sale made pursuant to a license under a United States patent" exhausts U.S. patent rights. *Hitachi*, 655 F. Supp. 2d at 1047; *see also* John Rothchild, *Exhausting Extraterritoriality*, 51 Santa Clara L. Rev. 1187, 1188 (2011).

## C. The "single reward" principle forecloses the domestic-only rule.

The principle underlying patent exhaustion is straightforward: "The test has been whether or not there has been such a disposition of the article that it may fairly be said that the patentee has received his reward for the use of the article." *United States v. Masonite Corp.*, 316 U.S. 265, 278 (1942). Thus, "the payment of a royalty once, or, what is the same thing, the purchase of the article from one authorized by the patentee to sell it, emancipates such article from any further subjection to the patent." *Keeler*, 157 U.S. at 666.

The single reward principle stems from patent law's balance between the welfare of the community and private incentives to inventors. "[T]he promotion of the progress of science and the useful arts is the 'main ob-

23

ject'" of patent law, whereas "reward of inventors is secondary and merely a means to that end." *Masonite*, 316 U.S. at 278. It also derives from the common law's antipathy toward restraints on the alienation of chattels, because secondary markets are essential to free commerce. *See Bauer & Cie v. O'Donnell*, 229 U.S. 1, 17 (1913).

The *Jazz Photo* rule impermissibly allows a patentee to obtain multiple rewards from the same product—at the time of the first sale abroad, and then again at the point of importation into the United States. The domestic-only approach to exhaustion is thus flatly incompatible with the "single reward" doctrine.

### III. After Authorizing the First Sale of an Article, a Patentee May Not Subsequently Enforce Patent-Based Restrictions on that Article.

Additionally, the Court should overrule the so-called "conditional sale" doctrine of *Mallinckrodt*, 976 F.2d at 706, and its progeny. In this line of cases, the Court has held that "an expressly conditional sale or license" functions as an exception to the "exhaustion doctrine." *B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1426 (Fed. Cir. 1997). Under this view, not only can a party enforce license restrictions via a breach of contract action, but a patentee is entitled to the significantly different remedies afforded patent infringement. *Id.*

24

*Mallinckrodt* is incorrect: a patentee cannot use a putative conditional sale or restrictive license to circumvent the common-law patent exhaustion doctrine. Once a patentee has authorized the sale of an article embodying its patent, it can no longer use patent law to recover royalties from downstream users. It has exhausted all patent-based claims to that article. The United States has repeatedly endorsed this conclusion, seeking to overturn *Mallinckrodt*. *See* U.S. Br. at 23, *Quanta*, 553 U.S. 617 (No. 06-937), 2007 WL 3353102 ("The test adopted by the Federal Circuit in *Mallinckrodt* thus reflects a fundamental misunderstanding of the role and scope of the patent-exhaustion doctrine."); U.S. Br. at 29, *Bowman v. Monsanto Co.*, 133 S. Ct. 1761 (2008) (No. 11-796), 2013 WL 137188 ("[T]he Federal Circuit's 'conditional sale' doctrine is erroneous and inconsistent with *Quanta*.").

The Supreme Court's patent exhaustion jurisprudence compels the conclusion that a patentee may not assert a patent-based claim to restrict an article following an authorized sale. To arrive at a different result, *Mallinckrodt* misinterpreted *General Talking Pictures Corp. v. Western Electric Co.*, 305 U.S. 124, 125 (1938).

**A.    The Supreme Court's patent exhaustion jurisprudence forecloses the "conditional sale" doctrine.**

The patent exhaustion doctrine is triggered by an "authorized sale of an article that substantially embodies a patent," as that sale "exhausts the patent holder's rights and prevents the patent holder from invoking patent law to control postsale use of the article." *Quanta*, 553 U.S. at 638.

A putative conditional sale or restrictive license accompanying the product does not defeat this common-law operation of exhaustion. The Supreme Court held so expressly in *Univis*. There, Univis Corporation licensed to the Lens Company the right to manufacture lens blanks and the right to sell those blanks to designated licensees. 316 U.S. at 243. Univis Corporation also issued three classes of licenses (to wholesalers, finishing retailers, and prescription retailers) that granted differing rights as to the lens blanks that those entities purchased from the Lens Company. *Id*. at 244-45. These licenses prescribed certain prices that were to be charged for the resale of the lenses, as well as other restrictions. *Id*.

After the government brought antitrust claims, Univis Corporation and the Lens Company asserted that their sale of lenses was "excluded" from the operation of the Sherman Act by virtue of their "patent monopoly." *Id*. at 243. The Supreme Court disagreed, finding that patent exhaustion precluded Univis Corporation and the Lens Company from

attempting to assert restrictions on the lens blanks once they were duly sold. Because these articles were "capable of use only in practicing the patent," the "[s]ale of a lens blank by the patentee or by his licensee is thus in itself both a complete transfer of the ownership of the blank, which is within the protection of the patent law, and a license to practice the final stage of the patent procedure." *Id.* at 249.

The Court made clear that, notwithstanding the efforts to impose a conditional sale or a restrictive license, "sale of [an article] exhausts the monopoly in that article and the patentee may not thereafter, by virtue of his patent, control the use or disposition of the article." *Id.* at 250. Accordingly, "the patentee cannot control the resale price of patented articles which he has sold . . . by resort to an infringement suit." *Id.* In no uncertain terms, the Supreme Court thus rejected the notion of a conditional or restricted sale.

*Univis* was not an innovation; the Supreme Court has long held that a litigant may not restrict the sale of goods following the first authorized sale. Nearly a century ago, the Supreme Court explained that once a patentee sells "a patented machine and received the price," the patentee has "placed the machine so sold beyond the confines of the patent law" and cannot "by qualifying restrictions as to use keep under the patent monopo-

ly a subject to which the monopoly no longer applied." *Boston Store v. Am. Graphophone Co.*, 246 U.S. 8, 25 (1918); *see also Motion Picture Patents Co. v. Universal Film Mfg. Co.*, 243 U.S. 502 (1917); *Bauer & Cie v. O'Donnell*, 229 U.S. 1 (1913); *Straus*, 243 U.S. at 500-01.

*Mallinckrodt* disregarded *Univis*, as well as *Bauer*, *Boston Store*, and *Motion Picture Patents* (which the panel referred to as the "*Bauer* trilogy") because, in the panel's view, these holdings were limited to circumstances where the imposed "condition violates some other law or policy," principally "the misuse of antitrust law." 976 F.3d at 708. Thus, the panel held that *Univis* is largely inapplicable outside "a price-fixing or tying case." *Id*. But in *Quanta*, the Supreme Court confirmed that *Univis* "governs" patent exhaustion as a general matter. 553 U.S. at 631. *Quanta* thus established that *Univis*'s understanding of the exhaustion doctrine—including its holding that the patent exhaustion doctrine does not tolerate post-sale control of articles via putative conditional sales or restrictive licenses— applies in *all* cases.

Indeed, *Quanta* endorsed a broad understanding of exhaustion that leaves no room for such restrictions. Notwithstanding the presence of putative conditional sales, the *Quanta* Court explained that the "longstanding doctrine of patent exhaustion provides that the initial au-

thorized sale of a patented item terminates all patent rights to that item." 553 U.S. at 625. And it quoted *Univis* for the conclusion "that 'the authorized sale of an article which is capable of use only in practicing the patent is a relinquishment of the patent monopoly with respect to the article sold.'" *Id.* at 631.

Courts and commentators have observed that *Mallinckrodt* is inconsistent with *Quanta*. One court held that "*Quanta* overruled *Mallinckrodt sub silentio*" (*Static Control Components*, 615 F. Supp. 2d at 585), while another, recognizing that "'[a] majority of commentators' have adopted the view that *Quanta* overturned the conditional sales doctrine," explained that there "is a substantial argument that *Quanta sub silentio* overruled *Mallinckrodt*." *Ergowerx Int'l, LLC v. Maxell Corp.*, 18 F. Supp. 3d 430, 448 (S.D.N.Y. 2014).

More generally, courts have concluded that "a review of Supreme Court precedent on the law of patent exhaustion 'reveals that the Court has consistently held that patent holders may not invoke patent law to enforce restrictions on the postsale use of their patented products.'" *Keurig, Inc. v. Sturm Foods, Inc.*, 2012 WL 4049799, at *6 (D. Del. 2012); *see also Keurig, Inc. v. JBR, Inc.*, 2013 WL 2304171, at *15 (D. Mass. 2013).

Following *Quanta*, this Court relied on *Mallinckrodt* to hold that a restrictive license barred a farmer from planting the progeny of genetically altered seeds covered by patents. *Monsanto Co. v. Bowman*, 657 F.3d 1341, 1347-48 (Fed. Cir. 2011). But the Supreme Court decided the case on different grounds, avoiding this Court's conditional sale law. *See Bowman v. Monsanto Co.*, 133 S. Ct. 1761 (2013).

**B.    *General Talking Pictures* does not support the conditional sale doctrine.**

*Mallinckrodt*, 976 F.2d at 704-05, reached the wrong result by misunderstanding the import of *General Talking Pictures*'s statements that "a restrictive license is legal seems clear" and that "[t]he practice of granting licenses for a restricted use is an old one" and "its legality has never been questioned." 305 U.S. at 127. Lexmark repeats that same mistake. *See* Lexmark Panel Br. 23-27.

*General Talking Pictures* addressed whether a patentee, who has licensed its patents to a manufacturer, may limit the circumstances in which the manufacturer is authorized to sell goods embodying the patents. 305 U.S. at 125. There, the patentee granted one company a license to produce patented amplifiers for use in commercial applications; it had granted different companies, including the Transformer Company, a license to produce patented amplifiers for home use. *Id*. at 125-26.

30

The patentee, accordingly, did not authorize the Transformer Company to make and sell amplifiers for commercial use. *General Talking Pictures*, 305 U.S. at 127. When the Transformer Company did so anyway, its "amplifiers were made and sold outside the scope of the license." *Id*. "[T]he effect is precisely the same," the Court explained, as "if no license whatsoever had been granted." *Id*. The Court approved of the "common practice" where a patentee "grant[s] written licenses to *manufacture* . . . restricted to one or more of the several fields of use." *Id*. (emphasis added; quotation omitted). *General Talking Pictures* thus considered a field-of-use restriction imposed on a manufacturer—it did not approve *post-sale* restrictions on authorized purchasers.

In fact, *General Talking Pictures* expressly acknowledged as much. As the Court explained, it had granted rehearing, in part, on the question of whether "a patent owner, merely by a 'license notice' attached to a device made under the patent, and sold in the ordinary channels of trade," may "place an enforceable restriction on the purchaser thereof as to the use to which the purchaser may put the device." 305 U.S. at 125. But the Court specifically noted that it need not "answer[]" this "question" to resolve the case. *Id*.; *see also Hazeltine Research, Inc. v. Automatic Radio Mfg. Co.*, 77 F. Supp. 493, 497 (D. Mass. 1948) (noting that the Court "ex-

pressly left open" the issue). Indeed, just ten years later, the Supreme Court reiterated the issue addressed in *General Talking Pictures*—a restriction "upon the licensee to *manufacture* and to sell the patented article for certain uses only." *United States v. Line Material Co.*, 333 U.S. 287, 348 (1948) (emphasis added).

At bottom, *General Talking Pictures* considered the circumstances in which a patentee may restrict a licensee's authority to manufacture and vend an article embodying the licensed patent.[12] It has no bearing on the different question here: whether a patentee may exercise patent-based rights in an article following an authorized sale. *See Static Control Components*, 615 F. Supp. 2d at 582 (*General Talking Pictures* "concerns a restriction on the sale of patented products, as opposed to a restriction on post-sale use"). *Univis* holds expressly that a patentee may not do so, notwithstanding any putative conditional sale or restrictive license.

---

[12] AIPLA's invocation (at 20-22) of *Mitchell v. Hawley*, 83 U.S. 544 (1872), is equally off the mark. *Mitchell* also considered a restriction placed on a licensee's authority to manufacture and vend. *Id*. at 548-50. Such a license, the Court concluded, may restrict who "lawfully represents the owner" and thus may "convey a valid title" to an article embodying the patent. *Id*. at 550. But *Mitchell* confirms the principle that governs here: "the machine, when it rightfully passes from the patentee to the purchaser, ceases to be within the limits of the monopoly." *Id*. at 548.

## CONCLUSION

The Court should conclude that a first sale of an article that sub-stantially embodies the patent and that is authorized by the U.S. patentee exhausts U.S. patent rights, regardless of whether that sale occurs inside or outside the United States, and regardless of whether a patentee frames the sale as "conditional" or "limited."

Respectfully submitted,

/s/ Andrew J. Pincus
James Suh                              Andrew J. Pincus
LG Electronics Inc.                    Jamie B. Beaber
Intellectual Property Center           Kfir B. Levy
19, Yangjae-daero 11gil,               Paul W. Hughes
Seocho-gu,                             Mayer Brown LLP
Seoul, Korea  137-130                  1999 K Street, N.W.
+82 (0)2 6912 6515                     Washington, D.C. 20006
                                       (202) 263-3000
*Counsel for LG Electronics*
                                       *Counsel for* amici curiae
Matthew R. Hulse
Intel Corporation
2200 Mission College Blvd,
RNB-4-150
Santa Clara, CA 95054
(408) 653-6570

*Counsel for Intel Corporation*


Dated: June 19, 2015

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), the undersigned counsel certifies that this brief:

(i)    complies with the type-volume limitation of Rule 29(d) because it contains 6,978 words, including footnotes and excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii); and

(ii)    complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word 2007 and is set in Century Schoolbook font in a size equivalent to 14 points or larger.

Respectfully submitted,

/s/ Andrew J. Pincus
Andrew J. Pincus
MAYER BROWN LLP
1999 K Street, N.W.
Washington, D.C. 20006
(202) 263-3000

June 19, 2015

# CERTIFICATE OF SERVICE

I hereby certify that on June 19, 2015, I served the foregoing brief on

all counsel of record via the Court's CM/ECF system.

Respectfully submitted,

/s/ Andrew J. Pincus
Andrew J. Pincus
MAYER BROWN LLP
1999 K Street, N.W.
Washington, D.C. 20006
(202) 263-3000

June 19, 2015