Appeal Nos. 2014-1617 and 2014-1619

# United States Court of Appeals

## *for the*

# Federal Circuit

———————————◆———————————

LEXMARK INTERNATIONAL, INC.,

*Plaintiff-Cross-Appellant,*

– v. –

IMPRESSION PRODUCTS, INC.,

*Defendant-Appellant,*

QUALITY CARTRIDGES, INC., JOHN DOES, 1-20, BLUE TRADING LLC, EXPRINT INTERNATIONAL, INC., LD PRODUCTS, INC., PRINTRONIC CORPORATION, TESEN DEVELOPMENT (HONG KONG) CO. LTD., BENIGNO ADEVA AND HIS COMPANIES,

*Defendants.*

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO IN CASE NO. 1:10-CV-00564-MRB MICHAEL R. BARRETT, UNITED STATES DISTRICT JUDGE

## *EN BANC* BRIEF FOR *AMICUS CURIAE* ASSOCIATION OF THE BAR OF THE CITY OF NEW YORK IN SUPPORT OF NEITHER PARTY

JAMES R. KLAIBER
*Chair, Committee on Patents*
  *The Association of the Bar of*
  *the City of New York*
PRYOR CASHMAN LLP
7 Times Square
New York, New York 10036
(212) 421-4100
jklaiber@pryorcashman.com

AARON L.J. PEREIRA
BUCHANAN INGERSOLL & ROONEY PC
1290 Avenue of the Americas, 30th Floor
New York, New York 10104
(212) 440-4400
aaron.pereira@bipc.com

*Attorneys for Amicus Curiae Association of the Bar of the City of New York*

June 19, 2015

## CERTIFICATE OF INTEREST

Counsel for the amicus curiae Association of the Bar of the City of New York, certifies the following:

1.    The full name of every party or amicus represented by me is:

Association of the Bar of the City of New York

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

Association of the Bar of the City of New York

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the amicus curiae represented by me are:

None

4.    The names of all law firms and the partners or associates that appeared for the amicus now represented by me in the trial court or are expected to appear in this court are:

JAMES R. KLAIBER
PRYOR CASHMAN LLP
7 Times Square
New York, NY 10036

AARON L. J. PEREIRA
BUCHANAN INGERSOLL &
ROONEY PC
1290 Avenue of the Americas
New York, NY 10104

TIMOTHY P. HEATON
TROUTMAN SANDERS LLP
875 Third Avenue
New York, New York 10022
(212) 704-6417

/s/ James R. Klaiber

James R. Klaiber
*Counsel for Amicus Curiae Association of
the Bar of the City of New York*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................iv

QUESTIONS PRESENTED ...............................................................1

I.   STATEMENT OF *AMICUS CURIAE* ...........................................1

II.  SUMMARY OF ARGUMENT ......................................................2

III. ARGUMENT ...............................................................................5

   A.   Pre-1994 U.S. Law Relating To Parallel Importation And
        Exhaustion Applies, As That Authority Was Expressly Not
        Modified When The Patent Statute Was Amended To Include
        An Exclusive Right To "Import" ...........................................5

   B.   Pre-1994 Law Indicates That The Authorized Unrestricted
        Sale Of A Product Abroad Exhausts U.S. Patent Rights
        Therein .............................................................................9

   C.   *Jazz Photo*'s Reliance On *Boesch* Is Misplaced, Because The
        Latter Involved An "Allowed" – But Not "Authorized" –
        Foreign Sale ......................................................................14

   D.   The Supreme Court's Rationale In *Kirtsaeng* Supports
        Abrogation Of *Jazz Photo*, Notwithstanding The Statutory
        Codification Of The First Sale Doctrine In The Copyright
        Context ..............................................................................20

   E.   *Jazz Photo* Leads to Unworkable Results .............................24

IV.  CONCLUSION ..........................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*AK Steel v. U.S.,*
    226 F.3d 1361 (Fed. Cir. 2000) .................................................................8

*Bloomer v. McQuewan,*
    55 U.S. 539 (1852)............................................................................16, 17

*Boesch v. Graff,*
    133 U.S. 697 (1890).............................................................................*passim*

*Chaffee v. Boston Belting Co.,*
    63 U.S. 217 (1859).................................................................................10

*Curtiss Aeroplane & Motor Corp. v. United Aircraft Eng'g Corp.,*
    266 F. 71 (2d Cir. 1920) ...........................................................3, 9, 10, 14

*Featherstone v. Ormonde Cycle Company,*
    53 F. 110 (C.C.N.Y. 1892) ...................................................................12

*Holiday v. Mattheson,*
    24 F. 185 (C.C.N.Y. 1885) .............................................................11, 12

*Jazz Photo Corp. v. International Trade Commission,*
    264 F.3d 1094 (Fed. Cir. 2001) ...........................................................*passim*

*Kabushiki Kaisha Hattori Seiko v. Refac Tech. Dev. Corp.,*
    690 F. Supp. 1339 (S.D.N.Y. 1988) ....................................3, 12, 13

*Keeler v. Standard Folding Bed Co.,*
    157 U.S. 659 (1895)............................................................................17, 18

*Kirtsaeng v. John Wiley & Sons, Inc.,*
    133 S. Ct. 1351 (2012)...........................................................................*passim*

*Palmer v. BRG of Ga., Inc.,*
    498 U.S. 46 (1990).................................................................................23

*PCI Parfums et Cosmetiques Int'l v. Perfumania, Inc.,*
    35 U.S.P.Q.2d (BNA) 1159 (S.D.N.Y. 1995) .................................................3

*Quanta Computer, Inc. v. LG Electronics, Inc.,*
    553 U.S. 617 (2008)............................................................................16, 18

iv

*Sanofi, S.A. v. Med-Tech Veterinarian Prods., Inc.*,
      565 F. Supp. 931 (D.N.J. 1983)............................................................*passim*

**Statutes & Other Authorities:**

U.S. Const. Art. I, § 8, cl. 8....................................................................23

17 U.S.C. § 106(1)-(6) ...........................................................................23

35 U.S.C. § 154......................................................................................23

35 U.S.C. § 154(a)(1) ...............................................................................5

35 U.S.C. § 271(a) ..........................................................................5, 7, 23

1994 U.S.C.C.A.N. at 4280 .....................................................................7

Final Act Embodying the Results of the Uruguay Round of Multilateral
      Trade Negotiations, Agreement on Trade-Related Aspects of
      Intellectual Property Rights, December 15, 1993 ("TRIPs"), Part II,
      Art. 28 (1994) .................................................................................6

Fed. R. App. P. 29(a) ................................................................................1

Fed. R. App. P. 29(c)(5)............................................................................2

H.R. Rep. No. 94-1476 at 61 ..................................................................23

H.R. Rep. 103-316, at 312 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040 ...........3, 6

Clark D. Asay, *Kirtsaeng and the First-Sale Doctrine's Digital Problem*,
      66 Stan. Rev. Online 17 (2013) .....................................................23

Daniel R. Cahoy, *Patent Fences and Constitutional Fence Posts: Property
      Barriers to Pharmaceutical Importation*, 15 Fordham Intell. Prop.
      Media & Ent. L.J. 623 (2005)........................................................18

Harold C. Wegner, *Post-Quanta, Post-Sale Patentee Controls*,
      7 J. Marshall Rev. Intell. Prop. L. 682 (2008)................................19

Jodi LeBolt, *Sales Gone Wrong: Implications of Kirtsaeng for the Federal
      Circuit's Stance on International Exhaustion*,
      24 Fed. Circuit B.J. 131 (2014) .....................................................19

John A. Rothchild, *Exhausting Extraterritoriality*,
      51 Santa Clara L. Rev. 1187 (2011) ..............................................19

John Murphy, *Toyota Builds Thicket of Patents Around Hybrid to Block
      Competitors*, Wall St. J. (July 1, 2009).......................................24

Michele L. Vockrodt, *Patent Exhaustion and Foreign First Sales: An Analysis and Application of the Jazz Photo Decision*, 33 AIPLA Q.J. 189 (2005) ............................................................................................... 19

Omnibus Trade and Competitiveness Act of 1988, P.L. 100-418 ........................... 5

Troy Petersen, *U.S. Infringement Liability for Foreign Sellers of Infringing Products*, 2003 Duke L. & Tech. Rev. 32 (2003) ......................... 5

U.S. Dept. of Commerce, *U.S. International Trade in Goods and Services*, 1 (May 2015) .............................................................................................. 25

Uruguay Round Agreement Act, P.L. 103-465, Stat 4809, § 533 (1994) ................ 5

## QUESTIONS PRESENTED[1]

By Order dated April 14, 2015, this Court requested briefing on, *inter alia*, the following issue:

(a) The case involves certain sales, made abroad, of articles patented in the United States. In light of *Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S.Ct. 1351 (2012), should this court overrule *Jazz Photo Corp. v. International Trade Commission*, 264 F.3d 1094 (Fed. Cir. 2001), to the extent it ruled that a sale of a patented item outside the United States never gives rise to United States patent exhaustion.

## I.    STATEMENT OF AMICUS CURIAE

The Association of the Bar of the City of New York (the "Association"), through its Committee on Patents, submits this *amicus curiae* brief in response to the Court's April 14, 2015 *sua sponte* Order granting *en banc* review of two questions, one of which is presented above. The Association submits this brief in accordance with Fed. R. App. P. 29(a), and supports the position of neither party. Based upon the Court's Order, the parties' consent and leave are not required.

The Association is a private, non-profit organization of more than 24,000 members who are professionally involved in a broad range of law-related activities. Founded in 1870, the Association is one of the oldest bar associations in

---

[1] This brief addresses only issue (a) regarding foreign patent exhaustion.

the United States. The Association seeks to promote reform in the law and to improve the administration of justice at the local, state, federal and international levels through its more than 150 standing and special committees. The Committee on Patents ("Committee") is a long-established standing committee of the Association, and its membership reflects a wide range of corporate, private practice and academic experience in patent law. The participating members of the Committee are dedicated to promoting the Association's objective of improving the administration of the patent laws.

With regard to the inquiries raised by Fed. R. App. P. 29(c)(5), no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person – other than the *amicus curiae*, its members, or its counsel – contributed money that was intended to fund preparing or submitting the brief.

## II.    <u>SUMMARY OF ARGUMENT</u>

The Association respectfully recommends that this Court overrule its decision in *Jazz Photo Corp. v. Int'l Trade Commission*, 264 F.3d 1094, 1101 (Fed. Cir. 2001), and hold instead that an authorized and unrestricted sale of a patented product abroad exhausts the patent owner's exclusive right to exclude others from importing the product.

This exclusive right to prevent importation was made explicit in the patent laws via amendments enacted in 1994. The legislative history of these amendments, as reflected in a Statement of Administrative Action from President Clinton to Congress, makes clear that no change to the "law or practice relating to parallel importation of products protected by intellectual property rights" was intended. H.R. REP. 103-316, at 312 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4280. Thus, the 1994 amendments purport to have left unchanged the then-existing body of law regarding parallel importation, which strongly suggested that an authorized and unrestricted sale of a patented product abroad should exhaust the patent owner's right to preclude importation. *See, e.g.*, *Curtiss Aeroplane & Motor Corp. v. United Aircraft Eng'g Corp.*, 266 F. 71, 80 (2d Cir. 1920); *Sanofi, S.A. v. Med-Tech Veterinarian Prods., Inc.*, 565 F. Supp. 931, 938, (D.N.J. 1983); *Kabushiki Kaisha Hattori Seiko v. Refac Tech. Dev. Corp.*, 690 F. Supp. 1339, 1344, (S.D.N.Y. 1988); *PCI Parfums et Cosmetiques Int'l v. Perfumania, Inc.*, 35 U.S.P.Q.2d (BNA) 1159, 1160 (S.D.N.Y. 1995).

Moreover, the rule in *Jazz Photo*, that a foreign sale cannot exhaust a patent owner's rights under U.S. patent law, was based on an over-extension of the Supreme Court's decision in *Boesch v. Graff*, 133 U.S. 697 (1890). *Boesch* dealt with sales made in Germany that – while "lawful" under a German law that protected the rights of prior users – were in no way "authorized" or consented to by

the patent owner. *Id*. at 701-703. Moreover. *Boesch* had been distinguished by pre-1994 decisions dealing with parallel importation. *See*, *e.g.*, *Sanofi*, 565 F. Supp. at 937-38. The decision in *Boesch* thus offers little support for the rule in *Jazz Photo*, and the latter's reliance on *Boesch* has been widely criticized.

Additionally, the rationale underlying the Supreme Court's decision in *Kirtsaeng v. John Wiley & Sons*, 133 S.Ct. 1351 (2013), counsels abrogation of the *Jazz Photo* rule. In *Kirtsaeng*, the Supreme Court interpreted the statutorily-codified first-sale provision of copyright law as consonant with the "impeccibl[y] ... pedigree[d]" common-law doctrine to hold that authorized foreign sales must effectuate domestic copyright exhaustion. In so holding, the Court found that while allowing such rights to remain unexhausted by a foreign sale would give the rights holder the ability to achieve market segmentation and maximize gain by charging different purchasers different prices for the same copyrighted work, nothing in the copyright laws or precedent suggests a legal basis for such a right.

Finally, the rule in *Jazz Photo* leads to unworkable results, such as where an American expatriate who purchases a car abroad and wishes to bring it back home with him would be subjected to patent infringement liability for attempting such an importation. Such results are counterintuitive, and underscore the need for abrogating *Jazz Photo* in the interests of "Trade and Traffic, and bargaining and contracting." *Kirtsaeng*, 133 S.Ct. at 1363.

4

## III.  ARGUMENT

### A.    Pre-1994 U.S. Law Relating To Parallel Importation And Exhaustion Applies, As That Authority Was Expressly Not Modified When The Patent Statute Was Amended To Include An Exclusive Right To "Import"

Before 1988, the Patent Act made no reference to any exclusive right of a patentee to bar the importation of products covered by her U.S. patent, although a body of case law had by that time developed regarding issues of parallel importation and exhaustion.[2]

The first inclusion of "importation" in Title 35 was through the 1988 Process Patent Amendment Act, which "added section 271(g) to the Patent Act," and only made "the importation of a product made by a patented process an act of infringement."[3] In 1994, however, the Uruguay Round Agreement Act further amended the Patent Act to explicitly "grant to the patentee … the right to exclude others from … importing the invention into the United States," thereby making such importation an act of infringement of the patentee's exclusive rights. Uruguay Round Agreement Act ("URAA"), P.L. 103-465, Stat 4809, § 533 (1994) (amending 35 U.S.C. §§ 154(a)(1) & 271(a)).

---

[2] For a discussion of this case law, see Section III.B, *infra*.

[3] Omnibus Trade and Competitiveness Act of 1988, P.L. 100-418. *See* Troy Petersen, U.*S. Infringement Liability for Foreign Sellers of Infringing Products*, 2003 DUKE L. & TECH. REV. 32, 2 n.3 (2003) ("This amendment closed a loophole in §271 that had allowed foreign manufacturers to make products abroad using a process patented in the United States and then import and sell the products in the U.S. without committing infringement.").

These 1994 amendments arose out of the Agreement on Trade-Related Aspects of Intellectual Property Rights ("TRIPS"), which was negotiated as part of the Uruguay Round of the General Agreement on Tariffs and Trade ("GATT").[4] TRIPS article 28 provided "a patent shall confer on its owner the following exclusive rights: (a) where the subject matter of a patent is a product, to prevent third parties <u>not having the owner's consent</u> from the acts of: making, using, <u>offering for sale</u>, selling, or <u>importing</u> … for these purposes that product … ."[5] In addition, TRIPS Article 6, entitled "Exhaustion," expressly provided that "nothing in this Agreement shall be used to address the issue of the exhaustion of intellectual property rights," and the importation right set forth in Article 28 was expressly made "subject to the provisions of Article 6." TRIPs, Articles 6, 28.

President Clinton transmitted the URAA to Congress on September 27, 1994 along with a short message and a Statement of Administrative Action. H.R. REP. 103-316, at 312 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040 ("SAA"). Reflecting the language of TRIPS, the President's SAA stated that, "[t]he Agreement requires few changes in U.S. law and regulations and <u>does not affect U.S. law or practice</u>

---

[4] GATT got its start as series of trade negotiations that began after the Second World War, and from 1948 to 1994 provided the rules for much of the world's trade; the Uruguay rounds were the eighth round of negotiations and the one that successfully let to a multilateral treaty. *See* https://www.wto.org/english/thewto_e/whatis_e/tif_e/fact4_e.htm.

[5] Final Act Embodying the Results of the Uruguay Round of Multilateral Trade Negotiations, Agreement on Trade-Related Aspects of Intellectual Property Rights, December 15, 1993 ("TRIPs"), Part II, Art. 28 (1994) (emphasis added).

relating to parallel importation of products protected by intellectual property rights." SAA, 1994 U.S.C.C.A.N. at 4280 (emphasis added). With regard to the changes to the definition of infringement in 35 U.S.C. § 271(a), the SAA included, as Section 7.b, a discussion entitled "Scope of Patent Rights," which reads in its entirety as follows:

> Article 28 [of TRIPS] specifies that a patent must include the right to exclude others from making, using, offering for sale, selling, or importing the product. The Agreement permits limited exceptions to the exclusive rights conferred by a patent if certain conditions are met. United States law contains some such exceptions, such as those set out in section 271(e) of the Patent Act (35 U.S.C. 271(e)).

> The Agreement on TRIPs puts stringent conditions on use of a patented invention without the authorization of the right holder. This includes situations involving use of the invention by the government or use by a third party authorized by the government under a "compulsory" license. These conditions, including special conditions applicable to semiconductor technology, will also apply to compulsory licensing of rights protecting integrated circuit layout designs. Many foreign countries will be required to eliminate provisions that now subject patents to compulsory licenses if the patented invention is not produced locally.

*Id.* at 4284.

Congress passed the URAA without amendment. Notably, Congress expressly approved the President's SAA in Section 101(a)(2):

> APPROVAL OF AGREEMENTS AND STATEMENT OF
> ADMINISTRATIVE ACTION.—Pursuant to section 1103 of the
> Omnibus Trade and Competitiveness Act of 1988 (19 U.S.C. 2903)
> and section 151 of the Trade Act of 1974 (19 U.S.C. 2191), the
> Congress approves— . . . the statement of administrative action
> proposed to implement the agreements that was submitted to the
> Congress on September 27, 1994.

URAA at § 101(a). And Congress made the President's SAA – not Congress's

internal deliberations, nor the negotiation or text of TRIPS – dispositive in any

interpretation of the URAA's provisions:

> The statement of administrative action approved by the Congress
> under section 101(a) shall be regarded as an authoritative expression
> by the United States concerning the interpretation and application of
> the Uruguay Round Agreements and this Act in any judicial
> proceeding in which a question arises concerning such interpretation
> or application.

*Id.* at § 102(d). Significantly, in recognition of "the authoritative weight given the

SAA in the statute," this Court has explicitly premised previous interpretation of

the URAA in light of the SAA. *See AK Steel v. U.S.*, 226 F. 3d 1361-69 (Fed. Cir.

2000).[6]

It is thus clear that in adding the exclusive importation right to the definition

of infringement in 1994, Congress made no change to the then-existing "U.S. law

or practice relating to parallel importation of products protected by intellectual

---

[6] "When confronted with a change in statutory language, we would normally
assume Congress intended to effect some change in the meaning of the statute.
Here [i.e. the URAA], however, the SAA prevents us from making such an
assumption …." 226 F. 3d at 1368-69 (citation omitted).

property rights." Accordingly, the interpretation of the statutory exclusive importation right (and the question of whether an unrestricted foreign sale, authorized by the owner of a U.S. patent, of a product covered by that patent, exhausts the patent owner's right to bar importation of that product) should turn, not on the specific phrasing of the amended statute or the inclusion of a nominally separate importation right, but on the pre-1994 state of the law relating to whether the patentee's authorized sale of a patented product exhausts its ability to assert its exclusive rights.

### B.    Pre-1994 Law Indicates That The Authorized Unrestricted Sale Of A Product Abroad Exhausts U.S. Patent Rights Therein

Pre-1994 case law on parallel importation and exhaustion developed out of a series of decisions, each of which turned on whether and to what extent an authorized unrestricted foreign sale (or exclusive license) by the holder of a U.S. patent affected that patent holder's ability to enjoin an allegedly infringing resale in the U.S.

In *Curtiss Aeroplane & Motor Corp. v. United Aircraft Engineering Corp.*, the seminal case in this area, the plaintiff was an aircraft manufacturing company that held U.S. patents related to its airplanes. 266 F. 71, 72 (2d. Cir. 1920). During World War I, plaintiff sold these airplanes to the British government. *Id*. Following the war, the British government decommissioned and sold off some of the airplanes to defendant who, in turn, resold them in the U.S. without the plaintiff's

authorization, culminating in a patent infringement suit. *Id*. at 72-73. Finding that the British government acquired full ownership of the airplanes by an authorized unrestricted sale, the airplanes became "the absolute property of the British government." *Id*. at 75. Therefore, the issue became, similar to that in the case at bar, whether defendant had the right to bring the airplanes into the U.S. for resale.

The *Curtiss* court was unequivocal: "By a valid sale and purchase, the patented machine becomes the individual property of the purchaser, and is no longer protected by the laws of the United States," including the statutory right to prevent infringement conferred by the patent laws. *Id*. at 77 (quoting *Chaffee v. Boston Belting Co.*, 63 U.S. 217, 223 (1859)). Thus, under the *Curtiss* rule, a patent owner's authorized and unrestricted sale of a product abroad should exhaust his patent rights therein, ending his or her ability to prevent others from making, using, selling and, post-1994, offering for sale and importing into the U.S.

*Sanofi, S.A. v. Med-Tech Veterinarian Products, Inc.*, further developed the law of parallel importation. 565 F.Supp. 931 (D.N.J. 1983). In *Sanofi*, the plaintiff French company (Sanofi) sought to enjoin the sale of its patented veterinary product by a defendant who had purchased the product in bulk (through a broker) from plaintiff's wholly-owned subsidiary in France. 565 F.Supp. at 934. The court denied Sanofi an injunction, holding that it had sold the product in France "without restriction," and that "if Sanofi were permitted to impose restrictions upon the

resale of its patented product, the expectations of the purchaser would be defeated." *Id*. at 938.

However, Sanofi had previously conveyed to American Home (a co-plaintiff in the action) a license to sell the product in the U.S., which the court found to be an exclusive license. *Id*. at 937. Thus, the court held that because Sanofi itself did not possess the right to sell the product in the United States (because this right had been granted to American Home), and because "defendants took possession of the patented product subject to the outstanding license," American Home would likely succeed on the merits. *Id*. at 939-943.

In so holding, the *Sanofi* court cited *Holiday v. Mattheson*, 24 F. 185 (C.C.N.Y. 1885), for the proposition that "the unrestricted sale of a patented article by the owner of the patent conveys to the purchaser the right of unrestricted ownership as against the seller." *Id*. at 939. In *Holiday*, a U.S. patent holder had sold a patented product to a party in England without restrictions or conditions, and a subsequent purchaser then sought to resell the products in the United States. *Id*. The *Holiday* court denied the patent owner an injunction, holding that:

> When the owner sells an article without any reservation respecting its use, or the title which is to pass, the purchaser acquires the whole right of the vendor in the thing sold: the right to use it, to repair it, and to sell it to others; and second purchasers acquire the rights of the seller, and may do with the article whatever the first purchaser could have lawfully done had he not parted with it.

*Id*.

The *Sanofi* court also cited *Featherstone v. Ormonde Cycle Company*, 53 F. 110 (C.C.N.Y. 1892), for the proposition that "the purchaser does not acquire any rights greater than those possessed by the owner of the patent." *Sanofi*, 565 F.Supp. at 939. In *Featherstone*, an inventor had secured both U.S. and British patent protection for his bicycle tires. 53 F. 110, 111 (C.C.N.Y. 1892). While the U.S. patents at issue in *Featherstone* were assigned to the plaintiff, the British patents had been licensed to the defendants, who used the tires on their cycles made in England and then sought to sell the tires in the U.S. The plaintiff sued for patent infringement, and the court found for the plaintiff, stating:

> It is well settled that the unrestricted sale of a patented article by the owner of the patent conveys to the purchaser the right of unrestricted ownership as against the vendor. But the purchaser does not acquire any right greater than those possessed by the owner of the patent.

*Id.* at 111. Taken together, both *Holiday* and *Featherstone* dictated the outcome of *Sanofi* – namely, that because American Home held the exclusive right to sell Sanofi's veterinarian product in the U.S., Sanofi could not itself sell the drug in the U.S. or enjoin any sale by way of an action for infringement, but American Home could. *Sanofi*, 565 F.Supp. at 939-942.

In *Kabushiki Kaisha Hattori Seiko v. Refac Technology Development Corp.*, another pre-1994 case of international exhaustion, the court was required to construe a settlement agreement from a prior lawsuit between the same parties. 690 F. Supp. 1339, 1341 (S.D.N.Y. 1988). Refac, which owned both U.S. and foreign

patents, granted to Hattori a license to make and sell articles embodying several of its patents, including one on electronic timepieces. *Id.* Hattori sold patented watch components to Advance Watch Co. at a location outside the United States. Refac sued Advance for patent infringement, claiming that the license permitted Hattori to sell patented goods in the United States only. *Id*. Hattori in turn brought a separate action against Refac seeking, among other things, a declaration that the license permitted Hattori to make sales worldwide and a determination that Hattori's sales abroad did not make it contributorily liable for Advance's sales in the U.S. *Id*. at 1341-42.

The *Hattori* court construed the license in Hattori's favor, holding that it permitted Hattori to sell the patented items both in the U.S. and abroad. *Id*. at 1343. The court went on to hold that Hattori's first sale abroad of patented articles exhausted the patent as to those articles:

> In general, the first sale of a product by a patentee or licensee exhausts the patent monopoly, and deprives the holder of patent rights of any further control over resale of the product. This principle applies to an authorized first sale abroad by a patentee or licensee who also has the right to sell in the U.S. Following such a sale, the holder of the U.S. patent rights is barred from preventing resale in the U.S. or from collecting a royalty when the foreign customer resells the article here.

*Id.* at 1342. Refac's patent rights were therefore exhausted by the first sale of the articles abroad by Hattori, and "Refac may not claim royalties on Hattori products purchased abroad and resold in the United Stated by third parties." *Id.* at 1342.

13

Thus, under the law regarding parallel importation as developed prior to the 1994 amendments to the Patent Act, an unrestricted sale abroad, authorized by the patent owner, would effect patent exhaustion. Because the 1994 amendments purported to leave this law unchanged, the import of the cases above should have remained similarly unchanged, i.e., an authorized unrestricted sale abroad should exhaust a patent holder's rights such that "the patented machine becomes the individual property of the purchaser, and is no longer protected by the laws of the United States." *Curtiss Aeroplane & Motor Corp.*, 266 F. at 77.

### C. *Jazz Photo*'s Reliance On *Boesch* Is Misplaced, Because The Latter Involved An "Allowed" – But Not "Authorized" – Foreign Sale

In *Jazz Photo*, the defendants purchased expended disposable film cameras manufactured by Fuji (called lens-fitted film packages ("LFFPs")) overseas, loaded them with new film and other worn parts, and imported the remanufactured cameras into the United States.[7] *Jazz Photo Corp. v. Int'l Trade Commission*, 264 F.3d 1094, 1101 (Fed. Cir. 2001). The panel decision in *Jazz Photo* made explicit the rule now challenged, i.e. that a foreign first sale of a product covered by a U.S. patent could never exhaust a patentee's right to preclude importation, in the following brief discussion and holding:

---

[7] The Defendants successfully argued that the remanufactured cameras were noninfringing under the repair doctrine. *Id.* at 1110-1111.

14

> To invoke the protection of the first sale doctrine, the authorized first sale must have occurred under the United States patent. *See Boesch v. Graff*, 133 U.S. 697, 701-703 (1890) (a <u>lawful</u> foreign purchase does not obviate the need for license from the United States patentee before importation into and sale in the United States). Our decision applies only to LFFPs for which the United States patent right has been exhausted by first sale in the United States. Imported LFFPs of solely foreign provenance are not immunized from infringement of United States patents by the nature of their refurbishment.

*Id*. at 1105 (emphasis added)(parallel citations omitted). As explained below, however, the distinction between the sale in *Boesch*, characterized by the panel as "lawful," and an "authorized" sale sufficient to satisfy the traditional formulation of the patent exhaustion doctrine, explained below, reveals *Boesch* to offer little support for the proposition at bar. Rather, *Boesch* is consistent with the notion that a foreign sale authorized <u>by the U.S. patent owner</u> of a product covered by a U.S. patent exhausts the patentee's right to bar that product's importation into the U.S.

In *Boesch*, the defendants had acquired the accused products in Germany from a vendor "who had the right to make and sell them there." 133 U.S. at 701. However, the vendor had obtained this right not from the U.S. patentee but rather under a German law which provided that a patent "does not affect persons who, at the time of the patentee's application, have already commenced to make use of the invention in the country, or made the preparations requisite for such use." *Id*. The Supreme Court concluded that "[t]he right which [the vendor] had to make and sell the burners in Germany was <u>allowed him under the laws of that country</u>, and

15

purchasers from him could not be thereby <u>authorized</u> to sell the articles in the

United States in defiance of the rights of patentees under a United States patent."

*Id*. at 703 (emphasis added). Therefore, "[t]he sale of articles in the United States

under a United States patent cannot be controlled by foreign laws" *Id*. Appellant's

proffered grounds for reversal – an argument that it could not be held liable for

import and sale into the U.S. of burners purchased abroad – was rejected. *Id.*

It is noteworthy that *Boesch* distinguished between sales that were "allowed"

under foreign law, and sales "authorized" by the patentee – the latter being the

touchstone of patent exhaustion. *See, e.g., Quanta Computer, Inc. v. LG

Electronics, Inc*., 553 U.S. 617, 621 (2008) ("For over 150 years this Court has

applied the doctrine of patent exhaustion to limit the patent rights that survive the

initial authorized sale of a patented item."). The ruling in *Boesch* is thus largely

inapposite to the traditional formulation of patent exhaustion doctrine, because the

defendants in *Boesch* were strangers to the patent and took under a first sale that

was in no way "authorized" by the U.S. patent owner.

That the *Boesch* court would likely have found exhaustion if the German

sale had been authorized by the U.S. patentee is telegraphed by its quotation of the

following language from its holding in *Bloomer v. McQuewan*:

> [T]he purchaser of the implement or machine … exercises no rights
> created by the act of Congress, nor does he derive title to it by virtue
> of the franchise or exclusive privilege granted to the patentee. The

inventor might lawfully sell it to him, whether he had a patent or not,[8] if no other patentee stood in his way. And when the machine passes to the hands of the purchaser it is no longer within the limits of the monopoly. It passes outside of it, and is no longer under the protection of the act of Congress.

*Boesch* at 702, quoting *Bloomer*, 55 U.S. 539, 549 (1852). Thus, in *Boesch,* the issue of whether the U.S. patentee's exclusive sale and importation rights were infringed was determined by <u>who</u> authorized the first sale – not <u>where</u> that sale took place. The Court made this distinction clear when it summarized *Boesch* in *Keeler v. Standard Folding Bed Co.*, decided five years later:

> The exact question presented [in *Boesch*] was whether a dealer residing in the United States could purchase in another country articles patented there from a person authorized [under foreign law] there to sell them, and import them to and sell them in the United States without the license or consent of the owners of the United States patent, and the Court held that the sale of articles in the United States under a United States patent cannot be controlled by foreign laws. In this case, neither the patentee nor any assignee had ever received any royalty or given any license to use the patented article in any part of the United States.

*Keeler*, 157 U.S. 659, 664-665 (1895). The Court's holding in *Keeler* was accompanied by a review of the then-current state of patent exhaustion law, which concludes with this summary of the patent exhaustion doctrine:

> Upon the doctrine of these cases, we think it follows that one who buys patented articles of manufacture from one authorized to sell them

---

[8] The "whether he had a patent or not" language of *Bloomer* suggests, consistent with the rest of the Court's opinion in *Boesch*, that the presence or absence of the patentee's German patent on the burner sold in Germany was irrelevant to its determination of whether a first sale had occurred.

> becomes possessed of an absolute property in such articles, <u>unrestricted in time or place</u>.

*Keeler* at 666 (emphasis added).[9] This statement from *Keeler* appears to be in direct contradiction with the holding of *Jazz Photo* – although it is consistent with both the holding and discussion in *Boesch*. Put more succinctly, nothing in the Supreme Court's jurisprudence suggests that a first sale of a product authorized by the patentee was subject to any geographical restrictions on its later sale – or importation – by the purchaser. Accordingly, the *Jazz Photo* court erred, not only in mischaracterizing the holding of *Boesch*, but in failing to consider the Supreme Court's own discussion of the geographically unrestricted nature of patent exhaustion in *Keeler*.

Commentators are vocal – if not absolutely unanimous – in chiding the *Jazz Photo* panel in relying on *Boesch* to announce the rule that a foreign sale authorized by a patentee does not exhaust the patentee's right to bar importation into the U.S.[10] Even in lauding the *Jazz Photo* ruling, one commentator recognized

---

[9] The Supreme Court's formulation in *Keeler* of the absolute nature of the patent exhaustion doctrine is echoed in the Court's most recent formulation in *Quanta Computer*: "The longstanding doctrine of patent exhaustion provides that the initial authorized sale of a patented item terminates <u>all patent rights</u> to that item. *Quanta Computer*, 533 U.S.at 625 (emphasis added).

[10] *See, e.g.,* Daniel R. Cahoy, *Patent Fences and Constitutional Fence Posts: Property Barriers to Pharmaceutical Importation*, 15 Fordham Intell. Prop. Media & Ent. L.J. 623, 663 (2005) ("An intriguing aspect of Judge Newman's opinion in *Jazz Photo* is that she articulated the national exhaustion rule with such brevity. One could be forgiven for wondering if the powerful effect attributed to that one

that "the majority of courts that had addressed this issue prior to *Jazz Photo* had interpreted *Boesch* to apply only where the U.S. patentee did not authorize the sale abroad."[11]

Thus, in holding that a foreign sale of a product covered by a U.S. patent, authorized by the patentee, did not exhaust the patentee's right to prevent the later importation and sale of that product, the *Jazz Photo* panel cut across the grain of the Supreme Court's view of the unrestricted nature of patent exhaustion, as well as the prevailing view of the lower courts that had directly faced the issue at bar.

---

sentence in her opinion has been inflated or simply misinterpreted."); Harold C. Wegner, *Post-Quanta, Post-Sale Patentee Controls*, 7 J. Marshall Rev. Intell. Prop. L. 682, 698 (2008) ("*Boesch* has nothing to do with patent exhaustion because there was no patent right, German or otherwise, that was exercised. *Boesch* dealt with the right of a party to import and sell in the United States a patent-protected stove from Germany where the manufacturer of the German stove was exempt from patent infringement under German law due to the operation of a prior user right statute."); John A. Rothchild, *Exhausting Extraterritoriality*, 51 Santa Clara L. Rev. 1187 (2011) ("*Boesch* is not properly interpreted as standing for the proposition that a foreign sale cannot exhaust U.S. patent rights. The Court's subsequent opinion in *Keeler* indicates that the outcome in *Boesch* resulted from the fact that the patentee had not received any reward from the initial sale abroad ...."); Jodi LeBolt, *Sales Gone Wrong: Implications of Kirtsaeng for the Federal Circuit's Stance on International Exhaustion*, 24 Fed. Circuit B.J. 131, 140-41 (2014). ("Offering little in the way of explanation, the Federal Circuit went on to refuse to recognize an international first sale as exhausting the patent holder's rights in that article ....").

[11] Michele L. Vockrodt, *Patent Exhaustion and Foreign First Sales: An Analysis and Application of the Jazz Photo Decision*, 33 AIPLA Q.J. 189, 194 (2005); *see id.* at 195-96 (collecting cases). For example, the *Sanofi* court noted that "[i]n *Boesch*, it was not the patentee who made the sale abroad ... [or] even a licensee," and "the patentee neither received compensation for the use of his invention, nor consented to its importation." *Sanofi*, 565 F. Supp. at 937-38. See the discussion in Section III.B, *supra*.

**D.    The Supreme Court's Rationale In *Kirtsaeng* Supports Abrogation Of *Jazz Photo*, Notwithstanding The Statutory Codification Of The First Sale Doctrine In The Copyright Context**

In *Kirtsaeng*, the Supreme Court resolved a long-simmering circuit split, by holding that "the first sale doctrine, as codified in the Copyright Act, applies to copies of copyrighted works lawfully made abroad." *Kirtsaeng v. John Wiley & Sons*, 133 S.Ct. 1351, 1355-56 (2013). As noted by that holding statement, the first sale doctrine in copyright law – unlike that in patent law – is statutorily codified.[12] In this regard, the fact that the Supreme Court described the exhaustion-triggering sale in *Kirtsaeng* as involving works "lawfully made" is not especially noteworthy, because the Supreme Court was admittedly engaged primarily in statutory interpretation, and the phrase "lawfully made" is found in the statute. *Kirtsaeng,* 133 S.Ct. at 1358. Moreover, because the statutory provision in the Copyright Act extends the first sale safe harbor to "owner[s]" without qualification, the statutory interpretation aspect of *Kirtsaeng*, in itself, is unavailing in resolving the present dispute. Nevertheless, *Kirtsaeng* contains significant analysis applicable to the analogous question in patent law, and this analysis counsels abrogation of the rule of *Jazz Photo*.

---

[12] Section 109(a) of the Copyright Act provides for the "first sale" doctrine and reads as follows: "Notwithstanding the provisions of section 106(3) [the section that grants the owner exclusive distribution rights], the owner of a particular copy or phonorecord lawfully made under this title … is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord."

The *Kirtsaeng* majority considered the relationship between the first sale defense and the Copyright Act's importation ban, which generally prohibits the importation into the U.S. of copies of a work acquired abroad "without the authority of the owner of copyright." *Kirtsaeng*, 133 S.Ct. at 1356. In *Kirtsaeng*, the defendant tested the overlap between these two provisions by importing into the United States textbooks that had lawfully been made and purchased in Asia, and subsequently reselling them domestically, thereby profiting from the arbitrage made possible by the differences in price. *Id*. Plaintiff Wiley, the publisher, filed suit for copyright infringement in 2008, and the district court held that Kirtsaeng's scheme infringed Wiley's copyrights, which had not been exhausted by the foreign sale. *Id*. at 1357. Following affirmance by the Second Circuit, the Supreme Court granted *certiorari*. *Id*. A divided Supreme Court sided with Kirtsaeng, concluding that the first sale defense "applies to copies of a copyrighted work lawfully made abroad." *Id*.

Although engaged in statutory interpretation,[13] the Supreme Court examined several practical implications of exhaustion raised by the parties and *amici*. For example, the Court considered and ultimately rejected Wiley's argument that

---

[13] The Court concluded that it must presume that Congress intended to "retain the substance of the common law" first sale doctrine in the Copyright Act, a doctrine having an "impeccable historical pedigree" without geographical restrictions. *Id.* at 1363-64.

adopting international exhaustion would make it more difficult to geographically segment markets for copyrighted works and would preclude the practice of charging different prices in different markets. *Id*. at 1370. In so doing, the Court recognized that although "[a] publisher may find it more difficult to charge different prices for the same book in different geographical locations," there is "no basic principle of copyright law that suggests that publishers are entitled to such rights." *Id*.

The Court's analysis began with the constitutional provision "secur[ing] to authors for limited [t]imes the exclusive [r]ight to their...[w]ritings." *Id* at 1370. Acknowledging that "[t]he Founders, too, discussed the need to grant an author a limited right to exclude competition," the Court ultimately found that "the Constitution's language nowhere suggests that its limited exclusive right should include a right to divide markets or a concomitant right to charge different purchasers different prices for the same book, say to increase or maximize gain." *Id.* at 1370-71. Finding "no precedent suggesting a legal preference for interpretations of copyright statutes that would provide for market divisions," the Court held that Congress enacted a copyright law that actually limits copyright holders' ability to divide domestic markets. *Id.* at 1371.

In other words, the Court aligned with the school of thought that the primary purpose of a copyright is to enrich society, not copyright holders, and that a

copyright thus serves as an incentive rather than a remuneration right.[14] That

limitation is consistent with antitrust laws that ordinarily forbid market divisions.

*Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49-50 (1990) (*per curium*) (holding that

"agreements between competitors to allocate territories to minimize competition

are illegal").

The same can be said for patents, which derive from the same constitutional

provision as copyright, a structure that further militates in favor of overruling *Jazz*

*Photo*. Art. I, § 8, cl. 8. Indeed, the language of the Patent Act is unequivocal that a

patent, in effect, confers only the right to exclude others from infringement, in

contrast to the Copyright Act's affirmative grant of a "bundle of rights."  *Compare*

35 U.S.C. § 271(a) *with* 17 U.S.C. § 106(1)-(6); *see also*, H.R. Rep. No. 94-1476 at

61 (describing the "exclusive rights, which comprise the so-called 'bundle of

rights' that is a copyright"). As a result, a patent holder need not make, use, sell,

offer to sell, or even import the invention in order to have a cause of action for

infringement. 35 U.S.C. § 271(a).

In this way, a patent is not an affirmative right to commercially exploit an

invention, but instead is only the right to prevent others from doing so with the end

goal of incentivizing innovation for the public benefit. 35 U.S.C. § 154.

---

[14] *See, e.g.*, Clark D. Asay, Kirtsaeng *and the First-Sale Doctrine's Digital Problem*, 66 STAN. REV. ONLINE 17, 22 (2013).

Accordingly, just as the *Kirtsaeng* Court found that market segmentation is not a right inhering in a copyright, so too should this Court find that the ability to geographically divide markets does not inhere in a patent. *Jazz Photo* should, therefore, be overruled to the extent that it conflicts with this fundamental aspect of the patent right, case law of both this Court and the Supreme Court, Congressional authority, and the realities of a global commercial market for patented goods.

### E.    *Jazz Photo* Leads to Unworkable Results

In *Kirtsaeng*, the Supreme Court raised the hypothetical of a person who lawfully purchases a car abroad and brings to the U.S. with him, only to be subjected to the threat of suit domestically because the sale – although fully authorized by the holder of relevant intellectual property rights – was consummated abroad. 133 S.Ct. at 1365. While this hypothetical may have been somewhat strained in the copyright context, because it relied on "copyrighted automobile software" to bring the car within the ambit of the copyright laws, the hypothetical is striking in the patent context given the large number of automobile patents.[15]  Under the *Jazz Photo* rule, an American expatriate who buys a car abroad would be subjected to patent infringement liability by bringing home his or

---

[15] For example, a 2013 commercial for the Mercedes-Benz E-Class touted the "80,000 patents" held by the car's creators. http://www.ispot.tv/ad/7dVm/2013-mercedes-benz-e-350-patents. *See also* John Murphy, *Toyota Builds Thicket of Patents Around Hybrid to Block Competitors*, WALL ST. J. (July 1, 2009), available at http://www.wsj.com/articles/SB124640553503576637 (stating that Toyota holds about 2,100 patents on its Prius hybrid vehicle technology).

her car purchased through authorized channels abroad: a counterintuitive and largely unworkable result.

A patent owner may, presuming there are no blocking patents owned by others, create and disseminate patented products in commerce. The rights relating to the creation of a patented product cannot be exhausted through sale, because if they were, any purchaser could duplicate (i.e., "make" copies of) the product after an authorized first sale. On the other hand, it makes intuitive sense for the rights relating to dissemination to be exhausted by a first sale, because if such rights were not exhausted then a patent owner could sell to a purchaser and then turn around and sue said purchaser for "using" the product. The right to importation hews qualitatively closer to dissemination than to creation, because a product cannot be said to be created anew simply from its passing from without our borders to within. This conclusion is even more compelling in this era of global supply chains, where a large proportion of products are manufactured abroad and then imported as a routine facet of the chain of commerce.[16] Thus, it makes intuitive sense for an authorized first sale to exhaust the importation right, a result that comports with Lord Coke's justification of the first sale doctrine as necessary for "Trade and Traffic, and bargaining and contracting." *Kirtsaeng*, 133 S.Ct. at 1363.

---

[16] In 2014, almost $ 2.4 trillion worth of goods were imported into the United States. U.S. Dept. of Commerce, *U.S. International Trade in Goods and Services*, 1 (May 2015).

## IV.  <u>CONCLUSION</u>

For the reasons set forth above, the Association respectfully recommends

that this Court overturn the rule of *Jazz Photo*, and instead hold that an authorized

unrestricted first sale exhausts the patent owner's exclusive right to import,

irrespective of where that sale is consummated.

Dated:  June 19, 2015                    Respectfully submitted,


                                  By:    /s/ James R. Klaiber
                                         JAMES R. KLAIBER
                                         PRYOR CASHMAN LLP
                                         7 Times Square
                                         New York, New York 10036
                                         (212) 326-0425
                                         *Chair, Committee on Patents,*
                                         *Association of the Bar of the*
                                         *City of New York*
                                         *Principal Attorney of Record*

                                         AARON L. J. PEREIRA
                                         BUCHANAN INGERSOLL &
                                         ROONEY PC
                                         1290 Avenue of the Americas
                                         New York, New York 10104
                                         (212) 440-4468

                                         TIMOTHY P. HEATON
                                         TROUTMAN SANDERS LLP
                                         875 Third Avenue
                                         New York, New York 10022
                                         (212) 704-6417

                                         *Attorneys for Amicus Curiae*
                                         *Association of the Bar of the*
                                         *City of New York*

# United States Court of Appeals
## for the Federal Circuit

## CERTIFICATE OF SERVICE

I, Simone Cintron, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by Counsel for Amicus Curiae Association of the Bar of the City of New York to print this document.  I am an employee of Counsel Press.

On June 19, 2015, Counsel for Amicus Curiae authorized me to electronically file the foregoing *En Banc* Brief for Amicus Curiae Association of the Bar of the City of New York in Support of Neither Party with the Clerk of Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

Upon acceptance by the Court of the e-filed document, thirty paper copies will be filed with the Court, via Federal Express, within the time provided in the Court's rules.

/s/ Simone Cintron
Simone Cintron

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).

__X__  The brief contains  6,637 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii),or

____  The brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

__X__  The brief has been prepared in a proportionally spaced typeface using MS Word in a 14 point Times New Roman font or

____  The brief has been prepared in a monospaced typeface using _____ in a ___ characters per inch_____ font.

June 19, 2013                          /s/ James R. Klaiber_____
Date