APPEAL NO. 2014-1617, 2014-1619

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

LEXMARK INTERNATIONAL, INC.,

*Plaintiff-Cross-Appellant*,

v.

IMPRESSION PRODUCTS, INC.,

*Defendant-Appellant*.

*(Caption Continued on Inside Cover)*

APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF OHIO IN NO. 1:10-CV-00564-MRB
JUDGE MICHAEL R. BARRETT

BRIEF OF AMICI CURIAE HTC CORPORATION and
HTC AMERICA, INC. IN SUPPORT OF IMPRESSION PRODUCTS

OWAIS SIDDIQUI
HTC AMERICA, INC.
13920 SE EASTGATE WAY #200
BELLEVUE, WA 98005
(425) 679-5318

*Attorney for Amici Curiae HTC
Corporation and HTC America, Inc.*

JOHN R. ALISON
GINO CHENG
WINSTON & STRAWN
1700 K STREET, NW
WASHINGTON, DC 20006-3817
(202) 282-5000

*Attorneys for Amici Curiae HTC
Corporation and HTC America, Inc.*

June 19, 2015

**QUALITY CARTRIDGES, INC., JOHN DOES, 1-20, BLUE
TRADING LLC, EXPRINT INTERNATIONAL, INC., LD
PRODUCTS, INC., PRINTRONIC CORPORATION, TESEN
DEVELOPMENT (HONG KONG) CO. LTD., BENIGNO ADEVA
AND HIS COMPANIES,**

*Defendants.*

# CERTIFICATE OF INTEREST

Counsel for amici curiae HTC Corporation and HTC America, Inc., certify the following:

1.      The full name of every party or amicus represented by me is:

HTC Corporation; HTC America, Inc.

2.      The name of the real party in interest represented by me is:

HTC Corporation; HTC America, Inc.

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are:

HTC Corporation

4.      The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this Court are:

Owais Siddiqui
HTC AMERICA, INC.

John R. Alison
Gino Cheng
WINSTON & STRAWN

/s/ John R. Alison
John R. Allison
WINSTON & STRAWN
1700 K Street , NW
Washington, DC 20006-3817
(202) 282-5000

*Attorney for Amici Curiae HTC Corporation and HTC America, Inc.*

# **TABLE OF CONTENTS**

**Page(s)**

I.   STATEMENT OF IDENTITY AND INTEREST OF AMICI
     CURIAE...................................................................................................1

     A.   HTC Corporation and HTC America, Inc. ("HTC") ...........................1

          1.   HTC Creates Innovative Smartphones Used by
               Consumers Worldwide...............................................................1

          2.   HTC Smartphones Contain Integrated Circuits Made
               Worldwide and That Are Sold to HTC by Vendors
               Worldwide for Use in Smartphones Purchased by
               Consumers Worldwide...............................................................1

          3.   Component Suppliers Make Fully Authorized Sales to
               HTC Worldwide..........................................................................3

          4.   Patent Exhaustion Principles Protect Smartphone
               Manufacturers and Consumers Worldwide ...............................4

II.  SOURCE OF AUTHORITY TO FILE ...........................................................5

III. SUMMARY OF ARGUMENT.......................................................................6

     A.   Should *Jazz Photo* be Overruled? ...........................................................6

     B.   Do Sales of Patented Goods to End-Users or Resellers Give
          Rise to Patent Exhaustion and Should *Mallinckrodt* be
          Overruled?.................................................................................................8

IV.  ARGUMENT.................................................................................................11

     A.   After *Kirtsaeng*, No Basis Exists to Support a Geographical
          Restriction on Patent Exhaustion Where the U.S. Patent
          Holder Has Authorized a First Sale ....................................................11

          1.   The "First Sale" Doctrine Makes No Geographical
               Distinctions ..............................................................................11

2.    The Common-Law Analysis of *Kirtsaeng* Applies to Patents, Not Just Copyright........................................................13

    a.    The "Impeccable Historic Pedigree" of the Common-Law Doctrine of Exhaustion ..........................13

    b.    No Statute Restrains Application of the Common Law to Patent Exhaustion ...............................15

3.    Under *Quanta* and Its Progeny, Authorization—Not Geography—Determines Patent Exhaustion ............................16

B.    *Mallinckrodt* Stands Apart from the Vast Body of Supreme Court Case Law Speaking to Patent Exhaustion, Especially in Light of *Quanta* .................................................................18

1.    *Mallinckrodt* Runs Counter to Precedent and Should be Overruled..............................................................................18

2.    The Supreme Court has Examined Post-Sale Restrictions and Held that They Do Not Save the Embodied Patent from Exhaustion ...........................................20

3.    *Quanta* Further Confirms that an Unsatisfied Condition-Subsequent is No Basis for Denying the Application of Exhaustion where the U.S. Patent Holder has Already Authorized a First Sale .............................24

4.    *Mallinckrodt* Relies Erroneously on *General Talking Pictures*, which is Distinguishable and Does Not Provide a Basis for *Mallinckrodt*'s Ruling ...............................27

C.    Retroactively Revoking Authorization Based on Subjective Intent or Would Undermine the Strong Public Interest Against Post-Sale Restrictions and Windfall Recoveries ..................29

V.    CONCLUSION................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Burke*,
    84 U.S. 453 (1873)................................................................14, 18, 19

*American Cotton-Tie Supply Co. v. Bullard*,
    4 Ban. & A. 520 (2d. Cir. 1879) ....................................................22, 23

*Bloomer v. McQuewan*,
    55 U.S. 539 (1853)........................................................................17, 18

*Bobbs-Merrill Co. v. Straus*,
    210 U.S. 339 (1908)..............................................................................12

*General Talking Pictures Corp. v. Western Electric Co.*,
    304 U.S. 175 (1938)....................................................9, 25, 27, 28

*Helferich Patent Licensing, LLC v. New York Times Co.*,
    778 F.3d 1293 (Fed. Cir. 2015) .........................................................15

*Henry v. A.B. Dick Co.*,
    224 U.S. 1 (1912).........................................................................passim

*Honeywell Int'l, Inc. v. United States*,
    609 F.3d 1292 (Fed. Cir. 2010) .........................................................10

*Jazz Photo Corp. v. Int'l Trade Comm'n*,
    264 F.3d 1094 (Fed. Cir. 2001) ...........................................6, 7, 8, 30

*John D. Park & Sons Co. v. Hartman*,
    153 F. 24 (6th Cir. 1907) ...................................................................14

*Keeler v. Standard Folding Bed Co.*,
    157 U.S. 659 (1895)........................................................................14, 19

*Kirtsaeng v. John Wiley & Sons, Inc.*,
    133 S. Ct. 1351 (2013)..................................................................passim

*LG Elecs., Inc. v. Hitachi, Ltd.*,
    655 F. Supp. 2d 1036 (N.D. Cal. 2009)............................................16

*LifeScan Scotland, Ltd. v. Shasta Techs., LLC*,
    734 F.3d 1361 (Fed. Cir. 2013) .......................................................10, 13, 15, 29

*Mallinckrodt, Inc. v. Medipart, Inc.*,
    976 F.2d 700 (Fed. Cir. 1992) ....................................................................passim

*Mitchell v. Hawley*,
    83 U.S. (16 Wall.) 544 (1872) .............................................................................19

*Motion Patent Pictures Co. v. Universal Film Mfg. Co.*,
    243 U.S. 502 (1917).....................................................................................passim

*Quanta Computer, Inc. v. LG Elecs., Inc.*,
    553 U.S. 617 (2008).....................................................................................passim

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
    464 U.S. 417 (1984).............................................................................................15

*Straus v. Victor Talking Mach. Co*.,
    243 U.S. 490 (1917)......................................................................................13, 20

*Tessera, Inc. v. Int'l Trade Comm'n*,
    646 F.3d 1357 (Fed. Cir. 2011) ...................................................................17, 23

*Tessera, Inc. v. Int'l Trade Comm'n*,
    No. 11-903, 2011 WL 7084986 (Dec. 28, 2011)................................................17

*TransCore, LP v. Elec. Transaction Consultants Corp.*,
    563 F.3d 1271 (Fed. Cir. 2009) .........................................................................29

**Statutes**

17 U.S.C. § 109(a) ..........................................................................................13, 16

**Rules**

Fed. R. App. P. 29(c)(5)..............................................................................................5

**Other Authorities**

1 E. Coke, *Institutes of the Laws of England* § 360 (1628) ..................................6, 13

2 William Blackstone, *Commentaries* *288 .............................................................14

## I.    STATEMENT OF IDENTITY AND INTEREST OF AMICI CURIAE

### A.    HTC Corporation and HTC America, Inc. ("HTC")

#### 1.    HTC Creates Innovative Smartphones Used by Consumers Worldwide

HTC Corporation began operations in 1997 as a behind-the-scenes designer and manufacturer of many of the most popular brand-name mobile devices then available in the worldwide market. Among its many firsts, HTC created the first 4G smartphone in the U.S. (2010), the first Android smartphone (2008), the first Microsoft 3G phone (2005), the first Microsoft-powered smartphone (2002), and the first touch-screen Microsoft and Palm smartphones and PDAs (2000-2004).

By February 17, 2010, Fast Company ranked HTC as the 31st most innovative company in the world. By 2013, HTC held 9.3% of the U.S. smartphone market, according to comScore, Inc.

#### 2.    HTC Smartphones Contain Integrated Circuits Made Worldwide and That Are Sold to HTC by Vendors Worldwide for Use in Smartphones Purchased by Consumers Worldwide

HTC builds innovative smartphones using integrated circuits ("ICs") made internationally by (or for) U.S. manufacturers. Such ICs are commonly protected by both U.S. and international patents and are sold, through authorized vendors, for use by consumers in the U.S. and worldwide. For example, over the past ten years, HTC has built most (if not all) of its smartphones using Qualcomm's

telecommunications chipsets. The Qualcomm model, discussed below, provides a paradigm of how at least some U.S. companies make and sell, in Asia, technologies invented and patented in the U.S. for use by consumers in the U.S. and in countries worldwide.

Qualcomm relies on independent third-party suppliers to perform the manufacturing and assembly, and most of the testing, of its ICs, based primarily on Qualcomm designs and test programs. *Id.* For instance, Qualcomm's primary foundry manufacturers include international companies such as Global Foundries Inc. (Germany, Singapore, and New York); Samsung Electronics Co., Ltd. (South Korea, Texas); SMIC (Shanghai, Beijing, Tianjin); TSMC (Taiwan, China, Washington State); and UMC (Taiwan and Singapore). *Id.*

Qualcomm also contracts "assembly" and "test" services from a worldwide network of partners who transform Qualcomm's manufactured silicon wafers into functioning IC processors, including: ASE (Japan, South Korea, China, Taiwan, and the U.S.) and Amkor Technology (Japan, South Korea, China, Taiwan, Philippines, Malaysia, Singapore, France, and the U.S.). *Id.*

Qualcomm's CDMA Technologies ("QCT") Business Segment develops and supplies ICs and system software, which Qualcomm sells and licenses to product manufacturers, such as HTC, who use Qualcomm's ICs in wireless devices

sold to consumers. [1] Qualcomm's Technology Licensing ("QTL") Business Segment grants licenses or otherwise provides rights to product manufacturers, such as HTC, who use portions of Qualcomm's intellectual property portfolio, including patent rights essential to or useful in the manufacture of wireless handset devices that implement multiple wireless standards and their derivatives. [2]

### 3.    Component Suppliers Make Fully Authorized Sales to HTC Worldwide

Pursuant to licenses and other rights provided by its component manufacturers, HTC issues purchase orders for finished component chipsets, which are drop-shipped to HTC in Taiwan. HTC incorporates these chipsets and software code updates into an ever-evolving portfolio of HTC smartphones assembled in Taiwan. Finally, HTC ships and delivers finished HTC smartphones from Taiwan to commercial customers worldwide, including the U.S. The benefits of such international commerce would be impossible but for clear "authorization" to make, use, sell, offer for sale, and to import such finished products into the U.S.

As semiconductor technology has advanced, chipset manufacturers have increasingly migrated from supplying multiple chipsets to providing a single, denser chipset—such as the ICs now used in the HTC's flagship "One M9"

---

[1]    *See id.* at 6.

[2]    *See id.* at 7.

wireless handset—that embody an all-in-one processor design that places multiple elements on a single tiny chip, regardless of the countries into which they eventually are sold and used. Such "mobile heterogeneous computing" features enable HTC's customers to operate HTC's smartphones both within a single country and from country to country, wherever wireless standards (*e.g.*, CDMA2000, WCDMA, OFDMA) are available to consumers.

### 4.    Patent Exhaustion Principles Protect Smartphone Manufacturers and Consumers Worldwide

HTC's freedom to purchase smartphone ICs subject to broad *international* patent exhaustion principles remains critical to HTC's ability to satisfy the global market's ever-increasing demand for smartphones products. The processors sold to HTC and used to build modern smartphones are not national in character. To the contrary, they remain inherently *international* in their origins, *international* in their intended modes of operation, and *international* in how they are used by consumers.

In the absence of a robust international patent exhaustion doctrine, each time HTC purchases ICs or other components from a licensor/rights-owner located outside of the U.S., it risks a potential demand from that licensor/rights-owner seeking additional fees if the same part is sold/used in, or imported into, the U.S. For example, a domestic licensor/rights-owner could decide, unilaterally, to identify a single point of delivery in Asia for its ICs. Moreover, even when approached by a manufacturer, that domestic licensor/rights-owner could refuse,

unilaterally, to deliver its ICs in the U.S. Thereafter, having received payment for the very same ICs it obligated the manufacturer to purchase in Asia, the domestic licensor/rights-owner might still, upon importation of those ICs, demand from the manufacturer an additional fee, amounting to a windfall "double recovery."

In addition, without clearly delineating exhaustion as occurring at the initial point of sale of a component—whether within or outside of the U.S.—HTC and its partner ecosystem can be unfairly encumbered by post-sale restrictions that a licensor/rights-owner might unilaterally impose. For example, the licensor/rights-owner might decide to impose conditions of use or to restrict the number of uses, the duration of use, the class of users, the manner of disposal or recycling, upon threat of additional payments or infringement litigation. Such acts, if permitted, would deprive manufactures and consumers of the intended benefits of patent exhaustion under the common law, thereby unfairly restraining trade; introducing uncertainty into completed actions; obstructing the public's enjoyment of technology they have purchased; inflating information and transaction costs; and unfairly profiting from the evasion of well-settled exhaustion principles.

## II.    SOURCE OF AUTHORITY TO FILE

Amici file this brief pursuant to this Court's order. *See* ECF No. 83. Pursuant to Fed. R. App. P. 29(c)(5), Amici affirm that no counsel to any party authored this brief in whole or in part, and that no person other than HTC

Corporation, HTC America, and their counsel has made a monetary contribution to this brief's preparation or submission.

## III.  SUMMARY OF ARGUMENT

### A.    Should *Jazz Photo* be Overruled?

Yes, this Court's prior decision in *Jazz Photo Corp. v. Int'l Trade Comm'n*, 264 F.3d 1094 (Fed. Cir. 2001), should be overruled. The doctrines of "domestic" and "international" exhaustion arise from a common spring and drive to the same common law goal: to prohibit "the alienation of chattels against Trade and Traffi[c], and bargaining and contracting." *See Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S. Ct. 1351, 1363 (2013). For at least four centuries, the common law has protected the right of consumers to resell legally purchased products.[3] The twin doctrines of patent exhaustion and "first sale" in copyright continue today to apply this common-law rule to articles that embody intellectual property.

The Supreme Court recently reaffirmed in *Kirtsaeng* the common-law origin of these doctrines, holding that the "first sale" doctrine applies to the importation of copyrighted works lawfully made and sold (*i.e.*, authorized) abroad. The same ancient rule that the Supreme Court held controlling in *Kirtsaeng* has equal—if not greater—force when viewed in the context of U.S. patent law, in which the exhaustion doctrine arises wholly from common-law principles rather than from

---

[3] 1 E. Coke, *Institutes of the Laws of England* § 360, at 223 (1628).

6

statute. *Kirtsaeng* maintains the delicate balance between the prerogatives due to intellectual-property rights-holders and the rights inherent to downstream customers, entitling a rights-holder to a single reward upon the sale of an article that embodies that IP while releasing customers from improper restraints on the use and resale of that article. The contrary rule advocated by Lexmark—that a foreign sale authorized by a U.S. patent holder *never* exhausts—cannot be reconciled with reasoning set forth in the Supreme Court's *Kirtsaeng* decision or with the common-law doctrine that "makes no geographical distinctions." *Id.* at 1363. To the extent this Court's prior decision in *Jazz Photo* authorizes the unilateral imposition of geographical distinctions unhinged from an authorization-based analysis of patent exhaustion, *Jazz Photo* no longer represents good law and should be overturned by this Court en banc. *See infra* § IV.A.

The wisdom of common-law exhaustion ensures clarity in negotiating licenses, particularly in an increasingly borderless world. Despite this centuries-old, bedrock principle, Lexmark and Amici AIPLA now urge this Court to endorse a relatively new territorial restriction on patent exhaustion that ignores the realities of the worldwide marketplace, undermines predictability in commercial transactions, and runs contrary of the Supreme Court's recapitulation of the

common law in *Kirtsaeng*.[4] Such a restriction on common law exhaustion principles would permit patentees to extract multiple rewards on consumers' use and/or resale of *the same article*, thereby providing the very type of windfall "double recovery" previously rejected by the Supreme Court in *Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 630 (2008).

### B. Do Sales of Patented Goods to End-Users or Resellers Give Rise to Patent Exhaustion and Should *Mallinckrodt* be Overruled?

Yes, this Court's prior decision in *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700 (Fed. Cir. 1992), should be overruled. Direct sales to the end-user, as well as to resellers, are consummated by the rights-holder and accordingly constitute "authorized" sales, thereby giving rise to patent exhaustion regardless of whether the sale is made under a restrictions "that is otherwise lawful and within the scope of the patent grant." The initial sales having been authorized by the rights-holder for a negotiated amount of remuneration, the transacted goods pass from its monopoly into the stream of commerce. Thereafter, to the extent a downstream acquirer breaches a condition subsequent in the sales terms, such as a post-sale use restriction, the appropriate remedy does not lie in patent law, but in contract or other legally enforceable obligation or restriction.

---

[4] Amici AIPLA admits that "national patent exhaustion" was "introduced … later in the 20th century" by *Jazz Photo* and its progeny.  *See* ECF No. 99 at 17.

This conclusion comports with the doctrinal aim of over a century's worth of Supreme Court case law striking down post-sale conditions and resisting encumbrances on chattel. Indeed, in *Motion Patent Pictures Co. v. Universal Film Mfg. Co.*, 243 U.S. 502 (1917), the Supreme Court addressed and overruled *Henry v. A.B. Dick Co.*, 224 U.S. 1 (1912)—a case involving post-sale restrictions directly analogous to the restrictions now advanced in Lexmark's brief. The Supreme Court's decision in *General Talking Pictures Corp. v. Western Electric Co.*, 304 U.S. 175 (1938) is similarly inapposite. Thus, to the extent that *Mallinckrodt* endorses post-sale restrictions as vehicles through which patent owners may claim infringement, it is at odds with controlling precedent and the broader principles animating "first sale" doctrine and should be overruled.

*Quanta* is instructive of the opposite and intended trajectory of the common law exhaustion doctrine. *E.g.*, 553 U.S. at 638 ("The authorized sale of an article that substantially embodies a patent exhausts the patent holder's rights and *prevents the patent holder from invoking patent law to control postsale use of the article*.") (emphasis added). *Quanta* roundly rejected manufacturers' ability to restrain end-users' freedom to use and enjoy authorized purchases or to impose running servitudes on articles beyond the point of sale. The sounder course lies in dispelling the viability of post-sale restrictions through patent remedies. *See id.* at 626 ("'the right to vend is exhausted by a single, unconditional sale, the article sold

being thereby carried out-side the monopoly of the patent law and rendered free of every restriction which the vendor may attempt to put upon it.'") (*citing Motion Patent Pictures*, 243 U.S. at 516). Indeed, as this Court recently affirmed in *LifeScan Scotland, Ltd. v. Shasta Techs., LLC*, 734 F.3d 1361 (Fed. Cir. 2013), "[t]he basic principle underlying the Supreme Court's exhaustion cases is that the authorized transfer of ownership in a product embodying a patent carries with it the right to engage in that product's contemplated use." (*Citing Quanta*, 553 U.S. at 631). These fundamental common law protections cannot be abridged.

Indeed, it is irrelevant to patent exhaustion whether a sale of an embodying article is accompanied by a condition-subsequent. Simply put, a sale is either authorized or it is not. *See Honeywell Int'l, Inc. v. United States*, 609 F.3d 1292, 1304 (Fed. Cir. 2010) (holding that authorization is assessed "at the time of the sale"). *Quanta* confirms that "[t]he longstanding doctrine of patent exhaustion provides that the initial authorized sale of a patented item *terminates all patent rights* to that item" such that patent-law remedies cannot be used to enforce post-sale restrictions. *Quanta*, 553 U.S. at 625 (emphasis added). For these reasons, *Mallinckrodt* no longer represents good law and should be overturned by this Court en banc. *See infra* § IV.B.

## IV.  ARGUMENT

### A.  After *Kirtsaeng*, No Basis Exists to Support a Geographical Restriction on Patent Exhaustion Where the U.S. Patent Holder Has Authorized a First Sale

#### 1.  The "First Sale" Doctrine Makes No Geographical Distinctions

In *Kirtsaeng*, the petitioner obtained low-priced but *authorized* foreign editions of English-language textbooks first purchased in Thailand, which he resold in the U.S. *Kirtsaeng*, 133 S. Ct. at 1356. Wiley, the publisher, sued Kirtsaeng for copyright infringement for importation and domestic sale of the foreign-edition textbooks. *Id.* at 1357. Wiley argued that, despite the authorized sale of the foreign-edition textbooks, one who buys such textbooks cannot resell or otherwise dispose of them in international commerce without further permission. *Id.* at 1358.

The Supreme Court rejected Wiley's argument, holding that the "first sale" doctrine applies to the creation and sale of copyrighted works that have been lawfully purchased (*i.e.*, authorized) abroad. *Id.* at 1355-56. The question before the Supreme Court was not whether that rule should exist, but what effect the Copyright Act had upon its application.

Citing Lord Coke, the Supreme Court relied on the "common-law doctrine with an impeccable historic pedigree" that prevents restraints on the "disposition of a chattel once sold." *Id.* at 1363. With respect to foreign first sales, the Supreme

11

Court was emphatic that "[t]he common-law doctrine makes no geographical distinctions." [5] *Id.* The Court further remarked that "American law too has generally thought that competition, including freedom to resell, can work to the advantage of the consumer." *Id.* Nothing in the copyright statute has altered these foundational principles. *Id.* at 1363-64. Thus, the Supreme Court held that the "first sale" doctrine applies to *authorized* (*i.e.*, with the permission of the U.S. copyright holder) copies of a copyrighted work made abroad. *Id.*

Noteworthy here, the Supreme Court specifically observed that "automobiles, microwaves, calculators, *mobile phones*, *tablets*, *and personal computers* contain copyrightable software programs or packaging," and that "[m]any of these items are made abroad with the American copyright holder's *permission* and then sold and imported (with that permission) to the United States." *Id.* at 1365 (emphases added) (internal quotation omitted). The Court held that "[a] geographical interpretation would subject many, if not all, of them to the disruptive impact of the threat of infringement suits." *Id.* That holding directly applies here.

---

[5] Nor could the Supreme Court find any geographical distinction in *Bobbs-Merrill Co. v. Straus*, 210 U.S. 339 (1908), where it first applied the "first sale" doctrine. *Kirtsaeng*, 133 S. Ct. at 1363-64.

### 2.    The Common-Law Analysis of *Kirtsaeng* Applies to Patents, Not Just Copyright

The common-law analysis of *Kirtsaeng* applies to the analogous doctrine of patent exhaustion. This Court's recent decision in *LifeScan* explicitly confirms that the Supreme Court's reasoning in *Kirtsaeng* applies to patent law:

> In the Supreme Court's recent decision in *Kirtsaeng v. John Wiley & Sons, Inc.*, the Court held that the first sale doctrine in copyright law (comparable to the patent exhaustion doctrine) applies equally whether the copyrighted work is manufactured in the United States or abroad. … Although copyright's first sale doctrine, unlike patent exhaustion, has been codified by statute, *see* 17 U.S.C. § 109(a), the Supreme Court looked to the doctrine's common law roots to interpret that provision. *Kirtsaeng*, 133 S.Ct. at 1363 ("The 'first sale' doctrine is a common-law doctrine with an impeccable historic pedigree."). The Court explained that the first sale doctrine was traceable to "the common law's refusal to permit restraints on the alienation of chattels." *Id.*

*LifeScan*, 734 F.3d at 1375-76 (also quoting and discussing 1 Coke, *supra* note 11, § 360, at 223). The significance of *LifeScan*'s endorsement of *Kirtsaeng* is only enhanced where, as here, this Court has determined to reconsider the very issue at the heart of *Kirtsaeng*—the effect of international first sales.

### a.    The "Impeccable Historic Pedigree" of the Common-Law Doctrine of Exhaustion

As this Court has recognized, the common law roundly rejects impermissible restraints on the alienation of chattels. *See LifeScan*, 734 F.3d at 1376 (*citing Straus v. Victor Talking Mach. Co.*, 243 U.S. 490, 500-01 (1917) (a patentee's

attempt "to place restraints upon [a patented product's] further alienation [was] such as have been hateful to the law from Lord Coke's day to ours" (alterations in original)). Courts for centuries have thus resisted limitations on downstream use and resale of personal property because "they offend against the ordinary and usual freedom of traffic in chattels." *John D. Park & Sons Co. v. Hartman*, 153 F. 24, 39 (6th Cir. 1907); *cf.* 2 William Blackstone, *Commentaries* *288 ("[E]xperience has shown, that property best answers the purposes of civil life, especially in commercial countries, when its transfer and circulation are totally free and unrestrained." (spelling modernized)).

Commensurate with the common law's rejection of territorial restrictions, the Supreme Court has held that "one who buys patented articles of manufacture from one authorized to sell them becomes possessed of an absolute property in such articles, *unrestricted in time or place*." *Keeler v. Standard Folding Bed Co.*, 157 U.S. 659, 666 (1895) (emphasis added); *cf. Adams v. Burke*, 84 U.S. 453, 456 (1873) (striking down a geographical restriction on the use of a sold article because, "in the essential nature of things, when the patentee, or the person having his rights, sells a machine or instrument whose sole value is in its use, he receives the consideration for its use and he parts with the right to restrict that use."). Accordingly, a patent-exhaustion rule that discriminates against personalty interests based on the location of an authorized sale contradicts the long arc of

precedent. *Kirtsaeng* only reinforces these time-tested notions of "impeccable historic pedigree."

### b.     No Statute Restrains Application of the Common Law to Patent Exhaustion

*Kirtsaeng*'s impact on patent law, moreover, cannot be disregarded merely because the decision does not mention patents. *See LifeScan*, 734 F.3d at 1375 n.9 (explaining that "copyright cases inform similar cases under patent law"); *see also Helferich Patent Licensing, LLC v. New York Times Co.*, 778 F.3d 1293, 1305-06 (Fed. Cir. 2015).[6] The Supreme Court has recognized "the historic kinship between patent law and copyright law," and has acknowledged that, in appropriate cases, it is "appropriate to refer" to a concept in one to inform an analogous concept in the other. *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 439 (1984) (looking to vicarious liability in patent law to inform vicarious liability in copyright law).[7] Imposing a territorial restriction on the doctrine of patent exhaustion creates the same "administrative burden" and "disruptive impact" on

---

[6] Indeed, the lack of mention is hardly surprising as the Court's analysis draws from a much older and deeper well encompassing the common law's general treatment of the freedom to enjoy *all* chattels.

[7] This Court routinely assesses whether the copyright law is germane to its analysis of similar issues in patent law. The common origin of first-sale precepts in both patent and copyright renders the *Kirtsaeng* holding highly relevant here. *See, e.g.*, *LifeScan*, 735 F.3d at 1375-76 *and Helferich*, 778 F.3d at 1305-06.

the free flow of difficult-to-trace, readily moveable components rejected in *Kirtsaeng*. 133 S. Ct. at 1363.

Unlike the "first sale" doctrine codified in the Copyright Act, the analogous rule of patent exhaustion has no statute—it derives wholly from common law. *Kirtsaeng* considered and resolved a critical question: whether language in the statutory codification of the common-law "first sale" doctrine requiring that copies be "lawfully made under this title" meant that foreign acts could not exhaust a U.S. copyright. 17 U.S.C. § 109(a). And notably, in *Kirtsaeng*, the Supreme Court ultimately agreed that the statutory language or Title 17 did not rewrite or otherwise alter the common-law tradition that rejects territorial restraints on authorized sales. *Kirtsaeng*, 133 S. Ct. at 1358.

### 3.     Under *Quanta* and Its Progeny, Authorization—Not Geography—Determines Patent Exhaustion

The *Quanta* rule on patent exhaustion is clear: "the initial authorized sale of a patented item terminates all patent rights to that item." 553 U.S. at 625. Significantly, no territorial limitation whatsoever was added by the Court.[8] Where

---

[8] Though not addressed as such, *foreign sales* were at issue in *Quanta*. As the District Court observed, "the [Supreme] Court was **aware of foreign sales** of the Intel parts, yet declined to limit its holding to sales in the United States, suggest[ing] that interpreting *Quanta* so as to impose such a limitation would be incorrect." *LG Elecs., Inc. v. Hitachi, Ltd.*, 655 F. Supp. 2d 1036, 1045 (N.D. Cal. 2009) (emphasis added) (analyzing the same license agreement at issue in *Quanta*, and applying it to a different defendant to also find exhaustion).

(continued…)

16

sales to downstream customers are fully authorized, based on *Quanta*, the patent-exhaustion analysis ends without further embellishments.

Likewise, in *Tessera, Inc. v. Int'l Trade Comm'n*, 646 F.3d 1357 (Fed. Cir. 2011), this Court adopted *Quanta*'s authorization-based analysis, holding that the patentee's rights were exhausted because "[t]he proper focus is on whether the sales were authorized." *Id.* at 1370. It was undisputed that the relevant sales in *Tessera* were also non-U.S. sales. *See id.* at 1369-70; *see also* Petition for a Writ of Certiorari, *Tessera, Inc. v. Int'l Trade Comm'n*, No. 11-903, 2011 WL 7084986, at *2 (Dec. 28, 2011) ("Respondent Elpida . . . *purchased products practicing the patent from an overseas manufacturer* that had signed a license agreement with Tessera, and imported the products into the United States . . . ." (emphasis added)). These cases confirm the correct rule is to find exhaustion when a U.S. patent licensor/rights-holder or licensee lawfully authorizes the sale, regardless of locale.

---

(…continued)

 The Supreme Court could not have decided *Quanta* as it did if Lexmark's "no international exhaustion" argument were to prevail here.

**B.**    ***Mallinckrodt* Stands Apart from the Vast Body of Supreme Court Case Law Speaking to Patent Exhaustion, Especially in Light of *Quanta***

**1.**    ***Mallinckrodt* Runs Counter to Precedent and Should be Overruled**

*Mallinckrodt* passed over a century's worth of precedent that had been and continues to be hostile to patent holders' attempts to profit from conditional sales. Since *Bloomer v. McQuewan*, 55 U.S. 539 (1853), a long history of cases have established that an authorized sale of an invention exhausts the patent owner's monopoly. After sale, title passes, and the patent owner's rights to control the future use of the patented invention come to an end. As a result, purchasers are entitled to take the sold article free of conditions and restraints, for use "in the ordinary pursuits of life." *Bloomer*, 55 US at 549.

In *Adams v. Burke*, the Court confirmed that a lawfully sold item, once placed in the stream of commerce, exhausted the patent claims it embodied. There, the Court affirmed the dismissal of an infringement suit against an undertaker who had purchased a patented coffin lid from an assignee who was restricted to making, selling, and using such lids within a geographic area, the undertaker having subsequently used the coffin lid outside of that area.  Reasoning that "[t]he true ground on which [the Supreme Court's early exhaustion cases] rest is that the sale by a person who has the full right to make, sell, and use such a machine carries with it the right to the use of that machine to the full extent to which it can be

used…", the Court held that "in the class of machines or implements we have described, when they are once lawfully made and sold, there is no restriction on their use to be implied for the benefit of the patentee or his assignees or licensees." *Adams*, 84 U.S. at 455-56. *See also Quanta*, 553 U.S. at 625 (characterizing the arrangement in *Adams* as a post-sale restriction).

Similar to the present case, Lexmark and its authorized resellers, like the rights-holding coffin lid seller in *Adams*, had full authority to sell the patented goods. *Adams* lays to rest any uncertainty as to whether the authorized sale exhausted the patent holder's rights at the point of sale to render inert any restrictions governing the subsequent use of the article. *See also, e.g.*, *Keeler*, 157 U.S. at 666 (in a suit against authorized acquirer, reasoning that "one who buys patented articles of manufacture from one authorized to sell them becomes possessed of an absolute property in such articles, unrestricted in time or place"). Temporal limitations or those limiting the number of uses—such as that covering Lexmark's Prebate Program cartridges—are no different than geographic limitations and do not warrant a different result.

Despite this history, Lexmark urges this Court to endorse a post-sale restriction on patent exhaustion that runs contrary to the Supreme Court's

articulation of the common law. *See Quanta*, 553 U.S. at 625 (discussing *Adams*).[9]

Such a restriction allows the retroactive revocation of authorization and runs

contrary to the ultimate purpose of patent exhaustion—*i.e.*, preventing "restraints

upon further alienation" of chattel (*see Victor Talking Machine*, 243 U.S. at 500-01

(describing such restraint as "obnoxious to the public interest.")) and prohibiting

patentees who have made authorized sales from thereafter extracting multiple

rewards from "downstream purchasers" for their use and/or resale of *the same

article* (*Quanta*, 553 U.S. at 630).[10]

> ### 2.     The Supreme Court has Examined Post-Sale Restrictions and Held that They Do Not Save the Embodied Patent from Exhaustion

In light of the Supreme Court's repeated disapproval of overreaching tactics

by patent holders who have already made the first sale, it is unsurprising that when

---

[9] Amici AIPLA relies on *Mitchell v. Hawley*, 83 U.S. (16 Wall.) 544 (1872) for the proposition that a conditional sale of an article saves the embodied patent from exhaustion (*see* ECF No. 99 at 29-31). That case is inapposite, however, because it involved a limited grant to the licensee of the exclusive right to make, use and sublicense the use of patented machinery, but not the right to sell. *See* 83 U.S. at 548. The Court relied on the express prohibition against the licensee's selling or sublicensing another's use beyond a certain term to determine that the licensee had exceeded his authority. *See id.* at 550. Hence, the allowance of infringement claims against the end-users turned on the lack of an authorized sale, rather than on the authorization of a conditional sale.

[10] Although there may be situations in which a single-use restriction is enforceable and the breach thereof actionable, recovery for such conduct in the secondary market should be addressed under contract and/or trademark law, rather than patent law. *See, e.g.*, *Quanta*, 553 U.S. at 648 n.7.

the Supreme Court confronted a post-sale restriction similar to Lexmark's, the Court struck it down. *See A.B. Dick*, 224 U.S. 1 (1912), *overruled by Motion Patent Pictures*, 243 U.S. at 518.

Lexmark's "single-use only" restriction is designed to prevent a purchaser of the Prebate printer cartridge from merely refilling the spent cartridge with third-party ink, in lieu of purchasing a new cartridge from Lexmark or its resellers. The ink is not novel (nor could it be) and is not an element in the asserted patent claims the cartridges embody. Yet, the practical effect of Lexmark's post-sale restriction, if taken at face value, is that purchasers may not put their own ink into the Lexmark Prebate cartridges that they have purchased, paid for, and started using.

By contractually prohibiting the purchaser from independently procuring an ink supply to use with the embodying cartridge, Lexmark attempts to extend the leverage from its patents on the cartridge to the unpatented ink (a complementary, staple good) that is outside of its monopoly. From this perspective, Lexmark's "single-use only" restriction on its cartridge's use and the post-sale restriction on the copier's use in *A.B. Dick* are flip sides of the same coin. *Cf. A.B. Dick*, 224 U.S. at 11 ("LICENSE RESTRICTION: This machine is sold by the A. B. Dick Company with the license restriction that it may be used only with the stencil paper, ink, and other supplies made by A. B. Dick Company, Chicago, U.S.A.").

In *A.B. Dick*, the rights-owner sold mimeograph copy machines, attached to each of which was a license notice stipulating that the machine could be used only with ink (among other perishable supplies) that the rights-owner also made and sold. The end-user of the purchased mimeograph was not saved from claims of direct infringement when she turned to an alternative source of ink. *See id*. at 49.

The facts of this case are closely aligned. Lexmark's post-sale restriction prohibits Prebate cartridge end-users from replenishing the perishable supply of ink, just as A.B. Dick's post-sale restriction prohibits the mimeograph end-users from going elsewhere for ink. As both patent holders sought to condition the sale on the purchaser's continued observance of the restriction limiting the user to the original supply (or supplier) of ink, the restrictions should rise and fall together. *Cf. A.B. Dick*, 224 U.S. at 35 ("The conclusion we reach is that there is no difference, in principle, between a sale subject to specific restrictions as to the time, place, or purpose of use and restrictions.").

Shortly thereafter, the Supreme Court overruled the *A.B. Dick* decision and its reliance on post-sale restrictions, holding that "the right to vend is exhausted by a single, unconditional sale, the article sold being thereby carried outside the monopoly of the patent law and rendered free of every restriction which the vendor may attempt to put upon it." *Motion Patent Pictures*, 243 US at 516; *see also id*. at 518 ("It is obvious that the conclusions arrived at in this opinion are such that the

decision in *Henry v. A. B. Dick Co.*, *supra*, must be regarded as overruled."). We further note that the *A.B. Dick* case relied on and accepted *American Cotton-Tie Supply Co. v. Bullard*, 4 Ban. & A. 520 (2d. Cir. 1879) (upholding single-use restriction on iron buckles and bands meant to bind up bales of cotton and to be cut once the cotton was to be removed). That the Supreme Court repudiated *A.B. Dick* casts further doubt as to the propriety of *American Cotton-Tie*-type single-use restrictions for preserving patent remedies.

In *Motion Patent Pictures*, the licensed manufacturer was required to and indeed sold patented projectors each affixed with a plate that gave notice to purchasers that the projector was to be used only with film supplied by the same rights-holder, who held the rights to another patent covering the film. 243 U.S. 506-07 (1917). While invalidating the post-sale restriction, the Court denounced the paradigm whereby a patent owner could:

> "send its machines forth into the channels of trade of the country subject to conditions as to use or royalty to be paid, to be imposed thereafter at the discretion of such patent owner. The patent law furnishes no warrant for such a practice, and the cost, inconvenience, and annoyance to the public which the opposite conclusion would occasion forbid it."

*Id*. at 516.

Although the Supreme Court's *Motion Patent Pictures* decision may not have foreseen the massively complex and international nature of the production, assembly, and distribution chain of today's consumer electronic products, the

Court's decision remained wary of the significant, incremental, and practically impossible burden that a rule upholding post-sale restrictions would place on those farther and farther down the stream of commerce and with less and less bargaining power. *See id*. at 516. Contrary to such laudable caution, Lexmark's proposed rule would lead to the very same scenario that this Court criticized in *Tessera*. 646 F.3d at 1370 ("That absurd result would cast a cloud of uncertainty over every sale, and every product in the possession of a customer of the licensee, and would be wholly inconsistent with the fundamental purpose of patent exhaustion—to prohibit postsale restrictions on the use of a patented article.").

### 3. *Quanta* Further Confirms that an Unsatisfied Condition-Subsequent is No Basis for Denying the Application of Exhaustion where the U.S. Patent Holder has Already Authorized a First Sale

*Quanta* deals with a patent holder's unsuccessful attempt to control the manner in which a purchaser can use an embodying good—a post-sale restriction prohibiting its combination with other parts from an alternative supplier. *See Quanta*, 553 U.S. at 638. There, LGE licensed Intel to make and sell chips that substantially embodied LGE's patents and required, in a separate agreement, Intel to notify its customers that LGE's license "does not extend, expressly or by implication, to any product that you make by combining an Intel product with any non-Intel product." *Id*. at 623-24. Despite receiving Intel's notice, Quanta combined the Intel chips it purchased with non-Intel component parts and raised

patent exhaustion as a defense. *Id*. at 624. The Supreme Court held that the ultimate inquiry was whether the first sale was authorized (*see* 553 U.S. at 636 (internal citation omitted)), and ruled that LGE's patent rights were exhausted by Intel's authorized sales to Quanta. *Id*.

The analysis in *Quanta* starts with a retrospective tracing patent exhaustion doctrine's development from its 19th century common law, during which it tellingly omits even a single case that both upheld the validity of a post-sale restriction and was not overruled. *See Quanta*, 553 U.S. at 625-28 ("The longstanding doctrine of patent exhaustion provides that the initial authorized sale of a patented item terminates all patent rights to that item"). Instead, frowning upon attempts by patent holders to contract around exhaustion following *A.B. Dick*, the *Quanta* court emphasized that "[t]he authorized sale of an article that substantially embodies a patent exhausts the patent holder's rights and prevents the patent holder from invoking patent law to control postsale use of the article."). 553 U.S. at 638. *Quanta*'s framing of the common law backdrop indicates the Supreme Court's aversion to approaches that undermine the first sale doctrine and hints that the broader application of exhaustion principles is warranted.

Near the end of its opinion, *Quanta* raises *General Talking Pictures*, but only to distinguish it on the grounds that there was no authorized sale in the latter

because the licensee exceeded its authority to sell under the terms of the license.[11]

To the contrary, the Court concluded that Intel had been authorized by LGE to

make and sell chips that embodied LGE's patents without further condition. 553

U.S. at 636-37. Thus, LGE's patent rights were exhausted.

The facts in *Quanta* parallel those in the present case and its outcome is

instructive. First, Intel was authorized to sell its chips to any customer, including to

Quanta. Similarly, Lexmark's sales of the Prebate cartridges to end-users directly

or to its resellers are clearly authorized, it being the patent holder. Going one step

further, its reseller's sales of Prebate cartridges to end-users are also authorized, as

Lexmark has imposed no condition(s) on how those resellers are to make the

sale.[12] Second, it did not matter for the outcome that Quanta received notice from

Intel that combining Intel's chips with non-Intel parts could lead to a lawsuit for

infringement. Similarly here, while notice was provided to end-users on the

cartridge's shrinkwrap, the single-use restriction described thereon does not change

the ultimate conclusion. Lexmark's attempted post-sale restriction does not and

---

[11] *Quanta* expressed no opinion on whether *General Talking Pictures* was correctly decided, but even tacit acceptance of *General Talking Pictures* does not advance Lexmark's position or resuscitate *Mallinckrodt*, as explained *infra* in § IV.B.4.

[12] But with the first sale by Lexmark having been an authorized one, in the case of resellers, the patent rights to the cartridges are exhausted even before the resellers make the sale to the end-user.

cannot revive, post hoc, its purported patent rights because exhaustion occurred at the point of sale from the authorized seller—Lexmark itself.

Because *Mallinckrodt* conflicts with the authorization-based analysis of exhaustion in *Quanta*, this court should overrule its earlier decision.[13]

### 4. *Mallinckrodt* Relies Erroneously on *General Talking Pictures*, which is Distinguishable and Does Not Provide a Basis for *Mallinckrodt*'s Ruling

That *Mallinckrodt* was decided contrary to the thrust of a century's worth of Supreme Court precedent may be explained by its misplaced reliance on *General Talking Pictures* for the proposition that conditional sales from a patent holder to a purchaser are a valid means to prevent exhaustion (*see, e.g.*, 976 F.2d at 701), the latter being distinguishable on various grounds.

First, *General Talking Pictures* presented a field-of-use limitation on the licensed manufacturer and seller, which limited the market segment the licensee was permitted to supply—only to home theatres, not commercial theatres. *See* 304 U.S. at 179. In contrast, *Mallinckrodt* dealt with a direct, authorized sale by the patent holder to a bona fide purchaser, rather than a sale by a licensee to a purchaser that exceeded the licensee's limited authorization to sell to the home

---

[13] Regardless of the "single-use only" notice provision that the hospital or the patient received, the nebulizer having been sold by Mallinckrodt, and therefore authorized, Mallinckrodt would have received compensation for its first sale and found exhausted any rights to pursue infringement for subsequent use.

theatre market. In other words, in *Mallinckrodt*, a lawful, authorized transaction directly between the patent holder and purchaser occurred at the point of sale (*i.e.*, between Mallinckrodt and its customers); whereas in *General Talking Pictures*, the transaction was between a licensee and a distributor and further lacked the patent holder's authorization.[14]

A second distinguishing ground relates to what the Supreme Court stressed was another "controlling fact[]" in its rejection of the exhaustion defense, *i.e.*, that the purchaser—a commercial procurer for the motion picture industry—was not "a purchaser in the ordinary channels of trade," from which the Court concluded that the amplifier was never placed in the stream of commerce for downstream consumers to use in the ordinary pursuits of life. *Id.* at 180-81. In contrast, the assemblies in *Mallinckrodt* were sold to hospitals that would pass the cost of the kits to its patients—end-users—or their insurance companies. Further, the nebulizers, at least the refurbished ones at issue, had been placed into the stream of commerce for their intended use and had passed into the hands of the patients who used them.

---

[14] Likewise, here, the sale in each of these three instances is authorized and—at the point of sale—no single-use restriction has yet been violated: (a) by Lexmark to purchasers directly; (b) by Lexmark to its resellers; and (c) by Lexmark's resellers to the purchasers.

In conclusion, the expansive rule articulated by *Mallinckrodt* is not supported by *General Talking Pictures*, deviates from the Supreme Court's ruling in *Quanta* and earlier Supreme Court precedent, and should be removed from the existing body of law governing the exhaustion defense.[15]

### C.    Retroactively Revoking Authorization Based on Subjective Intent or Would Undermine the Strong Public Interest Against Post-Sale Restrictions and Windfall Recoveries

To the extent Lexmark or other Amici suggest that patentees are entitled to collect downstream double recovery if they did not intend to exhaust rights in a first sale, arguing that their contracts envision obtaining additional incremental revenue through multiple levels of international and domestic sales. This Court has previously held, however, that "the parties' intent with respect to downstream customers is of no moment in a patent exhaustion analysis." *TransCore, LP v. Elec. Transaction Consultants Corp.*, 563 F.3d 1271, 1275 (Fed. Cir. 2009). Indeed, in *LifeScan*, this court clearly and unequivocally stated that patent exhaustion applies equally to all authorized transfers, "*regardless of the amount of*

---

[15] If the Court were to leave *Mallinckrodt* intact, it should take care to distinguish *Mallinckrodt* on its specific facts. This inquiry likely would necessitate a carve-out from the general proscription against post-sale restrictions, animated only when there is a countervailing public interest against unfettered use—such as the risk of noxious effects or cross-infection from repeat uses. In this rare situation, a post-sale restriction might not be so "gravely injurious to th[e] public interest" (*Motion Picture Patents*, 243 U.S. at 519) that it could not be sustained.

consideration demanded by the patentee when it originally parted with the product." *LifeScan*, 734 F.3d at 1376-77 (emphasis added).[16]

The public interest would be irreparably harmed if patentees were permitted to extract multiple monopoly rewards from the sale of an article *after* the authorized first sale, which amounts to retroactively revoking authorization with respect to the downstream consumers. In contrast, the rule advocated by Defendant-Appellant would prohibit double recovery, would provide market certainty, and would further the public interest.

## V.    CONCLUSION

Amici respectfully request that this Court overrule en banc its prior holdings as to patent exhaustion in the *Jazz Photo* and *Mallinckrodt* cases.

---

[16] In *LifeScan*, this Court found exhaustion even where the patented meters were either sold at below-cost or given away for free (*see* 734 F.3d at 1365), bolstering the proposition that the public interest in alienation of property outweighs that of ensuring profits to the individual inventor.

Date: June 19, 2015                    Respectfully submitted,


 /s/ John R. Alison


Owais Siddiqui                        John R. Alison
HTC AMERICA, INC.                     Gino Cheng
13920 SE Eastgate Way #200            WINSTON & STRAWN
Bellevue, WA 98005                    1700 K Street, NW
(425) 679-5318                        Washington, DC 20006-3817
                                      (202) 282-5000

*Attorney for Amici Curiae HTC*       *Attorneys for Amici Curiae HTC*
*Corp. and HTC America, Inc.*         *Corp. and HTC America, Inc.*

## CERTIFICATE OF SERVICE

I certify that on June 19, 2015, this Brief of Amici Curiae HTC Corporation and HTC America, Inc., in Support of Impression Products was filed electronically using the CM/ECF system and served via the CM/ECF system on counsel of record as follows:

Timothy C. Meece
Banner & Witcoff, Ltd.
Ten South Wacker Drive
Suite 3000
Chicago, Ill. 60606

Benjamin J. Beaton
Sidley Austin LLP
1501 K Street, NW
Washington, D.C. 20005

Steven Brian Loy
Stoll Keenon Ogden PLLC
300 West Vine St.
Suite 2100
Lexington, Ky. 40507-1801

Constantine L. Trela Jr.
Sidley Austin LLP
One South Dearborn
Chicago, Ill. 60603

Edward F. O'Connor
The Eclipse Group LLP
2020 Main Street
Suite 600
Irvine, Ca. 92614

Margreth Barrett
University of California-Hastings
College of Law
PO Box 347
The Sea Ranch, CA 95497

Frederick M. Abbott,
Florida State University College of Law
425 West Jefferson Street
Tallahassee, FL 32301

Kristin Leigh Yohannan Moore
Cadwalader, Wickersham & Taft LLP
700 6th Street NW
Washington, DC 20001

Melissa N. Patterson
Department of Justice
Appellate Staff, Civil Division
950 Pennsylvania Avenue, NW
Washington, DC 20530

Seth David Greenstein
Constantine Cannon LLP
Suite 1300N
1001 Pennsylvania Avenue, NW
Washington, DC 20004

/s/ John R. Alison
John R. Allison
WINSTON & STRAWN
1700 K Street , NW
Washington, DC 20006-3817
(202) 282-5000

*Attorney for Amici Curiae HTC Corporation and HTC America, Inc.*

## CERTIFICATE OF COMPLIANCE

I certify that this Brief complies with the type-volume limitations of Federal Rules of Appellate Procedure 29(d) and 32(a)(7)(B), because it contains 6,947 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii); and that it complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman.

/s/ John R. Alison
John R. Allison
WINSTON & STRAWN
1700 K Street , NW
Washington, DC 20006-3817
(202) 282-5000

*Attorney for Amici Curiae HTC Corporation and HTC America, Inc.*