2014-1617, -1619

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

LEXMARK INTERNATIONAL, INC.

*Plaintiff- Cross Appellant,*

v.

IMPRESSION PRODUCTS, INC.,

*Defendant-Appellant.*

QUALITY CARTRIDGES, INC., JOHN DOES, 1-20, BLUE TRADING LLC, EXPRINT INTERNATIONAL, INC. LD PRODUCTS, INC., PRINTRONIC CORPORATION, TESEN DEVELOPMENT (HONG KING) CO. LTD., BENIGNO AVEDA AND HIS COMPANIES,

*Defendants.*

Appeal from the United States District Court for the
Southern District of Ohio in Case No. 10-CV-564,
United States District Judge Michael R. Barrett.

## BRIEF OF *AMICUS CURIAE* SK HYNIX INC. IN SUPPORT
## OF DEFENDANT-APPELLANT IMPRESSION PRODUCTS, INC.

CHARLES C. LIFLAND
O'MELVENY & MYERS LLP
400 S. Hope Street
Los Angeles, CA 90071
Telephone: (213) 430-6000

SUSAN VAN KEULEN
SUSAN ROEDER
O'MELVENY & MYERS LLP
2765 Sand Hill Road
Menlo Park, CA 94025
Telephone: (650) 473-2600

*Counsel for Amicus Curiae SK hynix Inc.*

## CERTIFICATE OF INTEREST

Counsel for *amicus curiae* SK hynix Inc. certifies the following:

1.    The full name of every party or *amicus curiae* represented by me is*:*

SK hynix Inc.

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

Not applicable

3.    All parent corporations and any publicly held companies that own 10 percent or more of stock of the party or *amicus curiae* represented by me are:

SK telecom Co., Ltd.

4.    The names of all law firms and the partners or associates that appeared for the party or *amicus curiae* now represented by me in trial court or agency or are expected to appear in this court are:

O'Melveny & Myers LLP:   Charles C. Lifland, Susan van Keulen, Susan Roeder

Respectfully submitted,

Dated: June 19, 2015

By: */s/ Charles C. Lifland*
Charles C. Lifland

Counsel for Amicus Curiae *SK hynix Inc.*

# TABLE OF CONTENTS

**Page**

STATEMENT OF IDENTITY AND INTEREST OF *AMICUS CURIAE* ..............1

SOURCE OF AUTHORITY TO FILE ................................................4

QUESTIONS PRESENTED...................................................................4

SUMMARY OF ARGUMENT ...............................................................5

ARGUMENT ......................................................................................8

I.    THE COURT'S *JAZZ PHOTO* LINE OF CASES HAS
      CREATED UNCERTAINTY THAT THREATENS THE
      UTILITY OF WORLDWIDE LICENSING
      ARRANGEMENTS .....................................................................8

II.   THE FIRST AUTHORIZED SALE OF A PATENTED
      ARTICLE UNDER A WORLDWIDE LICENSE SHOULD
      TERMINATE ALL U.S. PATENT RIGHTS IN THAT
      ARTICLE NO MATTER WHERE THE SALE OCCURS ..............12

      A.    Worldwide patent licensing is a necessary and desirable
            feature of today's global electronics industry..........................12

            1.    International "patent thickets" surrounding
                  electronics products make worldwide licensing
                  essential............................................................12

            2.    Worldwide licenses benefit patent owners,
                  licensees, and the public and foster development of
                  patented technologies ...................................................13

            3.    Under worldwide licenses, patent owners are
                  compensated for all licensed articles, regardless of
                  location ......................................................................16

      B.    A rule that a non-U.S. sale made under a worldwide
            license does not exhaust the patent owner's U.S. patent
            rights would disrupt the licensing bargain, increase costs
            and inefficiencies, and incentivize NPEs and other patent
            holders to encroach on licensees' rights and expectations ......20

            1.    To give effect to the bargain struck in worldwide
                  licenses, patent exhaustion should be triggered
                  regardless of the location of the first sale......................20

# TABLE OF CONTENTS
### (continued)

**Page**

2.     A non-exhaustion rule would increase costs to American companies and consumers ...........................22

3.     A non-exhaustion rule would inefficiently elevate form over substance......................................................24

4.     A rule that authorized non-U.S. sales do not trigger exhaustion would incentivize patent owners—particularly NPEs—to seek duplicative royalties..........26

CONCLUSION.................................................................................28

CERTIFICATE OF SERVICE ..........................................................30

CERTIFICATE OF COMPLIANCE...................................................31

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Bowman v. Monsanto Co.*,
133 S. Ct. 1761 (2013) ................................................................16

*Carl Schenck, A.G. v. Norton Corp.*,
713 F.2d 782 (Fed. Cir. 1983) .........................................................21

*Datatreasury Corp. v. Wells Fargo & Co.*,
522 F.3d 1368 (Fed. Cir. 2008) .......................................................27

*eBay Inc. v. MercExchange, L.L.C.*,
547 U.S. 388 (2006) .........................................................................26

*Gen. Talking Pictures Corp. v. W. Elec. Co.*,
305 U.S. 124 (1938) .........................................................................21

*Intel Corp. v. ULSI Sys. Tech.*,
995 F.2d 1566 (Fed. Cir. 1993) .......................................................22

*Jazz Photo Corp. v. Int'l Trade Comm'n*,
264 F.3d 1094 (Fed. Cir. 2001) ............................................... passim

*Kirtsaeng v. John Wiley & Sons*,
133 S. Ct. 1351 (2012) ............................................. 4, 10, 11, 12, 13

*LG Elecs., Inc. v. Hitachi, Ltd.*,
655 F. Supp. 2d 1036 (N.D. Cal. 2009) ....................................... 9, 11

*LifeScan Scotland, Ltd. v. Shasta Techs., LLC*,
734 F.3d 1361 (Fed. Cir. 2013) .......................................................19

*Mallinckrodt, Inc. v. Medipart, Inc.*,
976 F.2d 700 (Fed. Cir. 1992) ...........................................................4

*Multimedia Patent Trust v. Apple Inc.*,
No. 10-CV-2618-H (KSC), 2012 U.S. Dist. LEXIS 167479 (S.D.
Cal. Nov. 9, 2012) ..............................................................................9

*Quanta Computer, Inc. v. LG Elecs., Inc.*,
553 U.S. 617 (2008) ................................................................ passim

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*SanDisk Corp. v. Round Rock Research LLC*,
  No. C 11–5243 RS, 2014 WL 2700583 (N.D. Cal. June 13, 2014) ..................11

*ST Microelectronics, Inc. v. SanDisk Corp.*,
  No. 4:05CV45, 2007 U.S. Dist. LEXIS 21226 (E.D. Tex. Mar. 26,
  2007) ...............................................................................................................9

*United States v. Masonite Corp.*,
  316 U. S. 265 (1942).......................................................................................25

*United States v. Univis Lens Co.*,
  316 U.S. 241 (1942).......................................................................................18

## STATUTES

35 U.S.C. § 261 ...................................................................................................20

## OTHER AUTHORITIES

Dennis Crouch, *International Patent Exhaustion,* PatentlyO.com,
  Mar. 25, 2013,
  *available at*
  http://patentlyo.com/patent/2013/03/international-patent-
  exhaustion.html .............................................................................................11

Dep't of Commerce, *The U.S. Semiconductor Industry*,
  *available at*
  http://selectusa.commerce.gove/industry-
  snapshots/semiconductors................................................................................13

Econs. and Statistics Admin. and U.S. Patent and Trademark Office,
  *Intellectual Property and the U.S. Economy: Industries in Focus*,
  March 2012,
  *available at*
  http://www.uspto.gove/news/publications/IP_Report_March_2012.
  pdf ................................................................................................................23

Jodi LeBolt, *Sales Gone Wrong*, 24 Fed. Cir. B.J. 131 (2014/15) .........................11

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

Mark S. Popofsky & Michael D. Laufert, *Patent Assertion Entities
    and Antitrust: Operating Company Patent Transfers*, The Antitrust
    Source (American Bar Ass'n, 2013),
    *available at*
    http://www.ropesgray.com/files/upload/Antitrust-Attacks-on-
    Patent-Assertion-Entites.PDF ............................................................................26

U.S. Dep't of Justice and Fed. Trade Comm'n, *Antitrust Guidelines
    for the Licensing of Intellectual Property*, Apr. 6, 1995,
    *available at*
    http://www.justice.gov/atr/public/guidelines/0558.htm#t23 ...................... 15, 16

U.S. Fed. Trade Comm'n, *The Evolving IP Marketplace: Aligning
    Patent Notice and Remedies with Competition*, March 2011,
    *available at*
    http://www.ftc.gove/sites/default/files/documents/reports/evolving-
    ip-marketplace-aligning-patent-notice-and-remedies-competition-
    report-federal-trade/110307patentreport.pdf ................................... 12,14, 26, 27

World Intellectual Property Org., *Licensing and Technology Transfer*,
    *available at*
    http://wipo.int/patent-law/en/developments/licensing.html ..............................15

## <u>RULES</u>

Fed. R. App. P. 29(c)(5) ............................................................................................4

**STATEMENT OF IDENTITY AND INTEREST OF *AMICUS CURIAE***

*Amicus curiae* SK hynix Inc., a leading manufacturer and seller of electronic components, has a keen interest in confirming the applicability of the first-sale doctrine to non-U.S. sales authorized under worldwide patent licenses. A clear rule of patent exhaustion for such sales is critical to enable manufacturers and sellers to negotiate the international patent thickets that technology devices must traverse in today's global economy.

SK hynix is one of the world's largest semiconductor companies. The company designs, manufactures, and sells a wide range of computer memory chips and other electronic components incorporating, and incorporated into, patented technology. Its products include DRAM, NAND Flash, and system integrated circuits, which customers located all over the world integrate into multi-component end products, such as computers and mobile devices, sold in multiple countries including the United States. SK hynix is headquartered in Korea, and its business is truly global, encompassing manufacturing facilities in Korea and China and sales and marketing subsidiaries in the United States, Asia (Korea, China, Japan, India, Singapore, Hong Kong, and Taiwan), and Europe (Germany, U.K., Italy, and Belarus).

SK hynix's international sales transactions are structured in multiple ways to accommodate customer needs and other factors. Typically, the company sells and

ships its products to its regional subsidiaries, which in turn resell the products to customers in their regions. In some cases, however, SK hynix sells directly to customers in the United States or other foreign countries, shipping the products directly from Korea to the customer's manufacturing facilities or contract manufacturers in other countries. In other cases, the company's U.S. and other regional subsidiaries make the sale, but SK hynix ships the products directly from Korea to the customer or its contract manufacturer in the same manner as a direct sale.

The electronics components and products that flow through these global sales channels—in particular, semiconductor and memory technologies—are the focus of extensive patenting activity, especially in the United States.  The U.S. Patent and Trademark Office has issued well over 141,000 semiconductor patents and more than 81,500 computer memory and DRAM patents.[1] SK hynix itself holds more than 7,500 U.S.-issued patents for its own inventions and is party to dozens of worldwide patent licenses and cross-licenses.

Like other modern electronics companies, SK hynix depends on its ability to obtain patent licenses that cover all of its activities worldwide. Such worldwide licenses assure coverage under the licensor's U.S. and foreign patents for

---

[1] Results of search of U.S. Patent and Trademark Office database on USPTO classification numbers 438 (Semiconductor device manufacturing: process), 711 (Electrical computers and digital processing systems: memory), and 369 (Dynamic information storage and retrieval).

SK hynix's activities wherever they occur, without the burden and expense to the parties of tracking the location where each device is manufactured, sold, imported, or used, and without the need to determine whether the licensor holds patents covering such activities in those locations. In exchange for this worldwide license coverage, SK hynix pays royalties based on its worldwide sales revenue rather than only the revenue from jurisdictions where the licensor holds relevant patents. Even for devices not manufactured, sold, imported, or used in the United States, SK hynix pays royalties to U.S. patent holders under the worldwide licenses they have granted.

SK hynix relies heavily on a U.S. patent system that respects and effectuates these mutually beneficial worldwide licensing arrangements. SK hynix submits this *amicus* brief to explain why a non-U.S. sale authorized by the patent owner under a worldwide license must, as a practical and policy matter, trigger U.S. patent exhaustion. To the extent the *Jazz Photo* decision can be read to suggest otherwise, it creates undesirable uncertainty for licensees and licensors alike, and should be overruled. At a minimum, it should be limited to make clear that non-U.S. sales authorized under a worldwide patent license do trigger exhaustion of U.S. patents, even if other non-U.S. sales do not. Such a rule lends certainty and predictability to parties in their patent licensing negotiations and deters patent

owners, including non-practicing entities ("NPEs"), from pursuing duplicative royalty payments on devices on which royalties have already been paid.[2]

## SOURCE OF AUTHORITY TO FILE

The filing of this brief is authorized by this Court's en banc order, which states that briefs of amicus curiae must "may be filed without consent and leave of court … " April 14, 2015 Order (Dkt. No. 83), at 4.

## QUESTIONS PRESENTED

The Court has posed two questions:

(a)    The case involves certain sales, made abroad, of articles patented in the United States. In light of *Kirtsaeng v. John Wiley & Sons*, 133 S. Ct. 1351 (2012), should this Court overrule *Jazz Photo Corp. v. International Trade Commission*, 264 F.3d 1094 (Fed. Cir. 2001), to the extent it ruled that a sale of a patented item outside the United States never gives rise to United States patent exhaustion?

(b) The case involves (i) sales of patented articles to end users under a restriction that they use the articles once and then return them and (ii) sales of the same patented articles to resellers under a restriction that resales take place under the single-use-and-return restriction. Do any of those sales give rise to patent exhaustion? In light of *Quanta Computer, Inc. v. LG Electronics, Inc.*, 553 U.S. 617 (2008), should this Court overrule *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700 (Fed. Cir. 1992), to the extent it ruled that a sale of a patented article, when the sale is made under a restriction that is otherwise lawful and within the scope of the patent grant, does not give rise to patent exhaustion?

---

[2] No counsel for any of the parties authored this brief in whole or in part. No entity other than *amicus curiae* SK hynix contributed any money to the preparation or submission of this brief. *See* Fed. R. App. P. 29(c)(5).

April 14, 2015 Order (Dkt. No. 83), at 2-3. In this brief, SK hynix addresses the first question by explaining how the *Jazz Photo* line of cases has created uncertainties for companies operating in patent-intensive, global industries, such as the electronics industry. For that reason, the *Jazz Photo* line should be overruled. At a minimum the Court should confirm that *Jazz Photo* does not preclude exhaustion of U.S. patents by non-U.S. sales authorized under a worldwide patent license. SK hynix takes no position on the Court's second question as to the proper effect of license restrictions on the operation of patent exhaustion, except insofar as SK hynix advocates for a ruling that sales made under an *unrestricted* worldwide license exhaust the licensor's patent rights.

## SUMMARY OF ARGUMENT

Most modern electronic devices contain numerous components employing a wide range of patented technology. Many of these components travel across multiple national borders on the path from component manufacturer to consumer product company to retailer to end user. The global nature of today's electronics business makes worldwide patent licensing a necessity. Licensing arrangements entitling patent owners to receive royalties for their U.S. and foreign patents on the licensee's total worldwide sales provide essential benefits to both parties: licensees are free to engage in their global operations without the cumbersome task of tracking the geographic location where each device is manufactured, sold, or

imported; and patent owners are able to collect royalties on all the licensee's sales wherever they occur, without the burden and expense of seeking patent coverage in every country in which the licensee and its customers conduct their geographically-dispersed activities. Worldwide licensing also enables the wider practice and development of patented technology, enhancing the technology's value and promoting further innovation. These efficiencies of worldwide licensing ultimately benefit consumers by expanding the availability of electronics products and reducing their cost.

The benefits of worldwide licensing arrangements would be lost if non-U.S. sales and the attendant royalty payments made under a worldwide license did not trigger exhaustion of the patent owner's U.S. patent rights. Such a rule would leave companies like SK hynix exposed to claims by patent owners for additional compensation on devices, upon their arrival in the United States, for which royalties had already been paid under the parties' freely-negotiated worldwide licenses. In addition, SK hynix's U.S.-based customers and end users of multi-component products that incorporate SK hynix devices would be vulnerable to patent infringement claims, which would subject SK hynix to costly indemnity claims from those parties. These costs would be passed along to SK hynix's direct customers and, ultimately, consumers who purchase multi-component electronic products containing SK hynix devices.

The concerns about a non-exhaustion rule for non-U.S. sales authorized under worldwide licenses are exacerbated by the trend of operating companies transferring their patent portfolios to NPEs. International component manufacturers like SK hynix and customers who integrate their devices into consumer products are the frequent targets of licensing demands and litigation by NPEs. A non-exhaustion rule would incentivize NPEs to attempt to upset existing worldwide licensing bargains in an effort to obtain additional royalties on devices on which royalties have already been paid—as well-publicized litigation brought by NPE's in the wake of the uncertainties created by the *Jazz Photo* illustrates.

To preserve the benefits and efficiencies of worldwide licensing, this Court should establish—by reversing or otherwise clarifying *Jazz Photo*—that non-U.S. sales authorized under worldwide licenses that include U.S. patent rights trigger the exhaustion of U.S. patent rights. Such a rule would respect parties' private licensing bargains, deter attempts by patent owners (including NPEs) to collect duplicative royalties at multiple levels of the supply chain, and obviate the need for component suppliers to structure their business in artificial and inefficient ways, all the while ensuring that the patent owner receives royalties on all licensed devices.

## ARGUMENT

**I.     THE COURT'S *JAZZ PHOTO* LINE OF CASES HAS CREATED UNCERTAINTY THAT THREATENS THE UTILITY OF WORLDWIDE LICENSING ARRANGEMENTS**

The Court's decision to revisit *Jazz Photo* en banc is a significant, positive step towards rectifying the confusion that case and its progeny have caused. Clear, consistent, and predictable application of the rules of patent exhaustion is important to parties engaged in patent licensing transactions.

In the *Jazz Photo* line of cases this Court held, outside the context of worldwide licensing, that sales outside the United States did not trigger patent exhaustion. *See, e.g., Jazz Photo Corp. v. Int'l Trade Comm'n*, 264 F.3d 1094, 1105 (Fed. Cir. 2001). Alarmingly, patent owners have relied upon the *Jazz Photo* cases to argue to this Court and various district courts that even a non-U.S. sale made under an unrestricted worldwide license granted by the patent owner does not exhaust the patent owner/licensor's U.S. patent rights. *See, e.g.*, Non-Confidential Brief of Defendant-Appellant Round Rock Research LLC in *SanDisk Corp. v. Round Rock Research LLC*, Fed. Cir. Case No. 2014-1678, Dkt. 24 ("Round Rock Brief") at pp. 14-15 (non-practicing entity that purchased patents from patentee that had granted a worldwide license argued that "this Court has held that an unrestricted ***foreign*** sale of a patented product by a patentee does ***not*** exhaust the patentee's United States patent rights. . . . Whether products are sold

-8-

by a licensee (as [the appellee] asserts here) or the patentee (as in *Jazz Photo*) is a distinction without a difference.") (citing *Jazz Photo*, 264 F.3d at 1102-05) (emphasis in original);[3] *Multimedia Patent Trust v. Apple Inc.*, No. 10-CV-2618-H (KSC), 2012 U.S. Dist. LEXIS 167479, at *17-18 (S.D. Cal. Nov. 9, 2012) (patentee that granted an "unconditional worldwide license" to Fujitsu argued that the exhaustion defense asserted by Fujitsu's customer "fails as a matter of law because sales occurring outside the United States do not exhaust patent rights, relying on the *Jazz Photo* line of cases …"); *LG Elecs., Inc. v. Hitachi, Ltd.*, 655 F. Supp. 2d 1036, 1045 (N.D. Cal. 2009) (LGE, which granted Intel a worldwide license, argued that Intel's non-U.S. sale of accused products to Hitachi did not exhaust LGE's patents because "the Federal Circuit has previously held that foreign sales of products covered by a United States patent do not serve to exhaust the patent holder's rights with respect to those products," citing *Jazz Photo* and subsequent cases); *ST Microelectronics, Inc. v. SanDisk Corp.*, No. 4:05CV45, 2007 U.S. Dist. LEXIS 21226, at *7 (E.D. Tex. Mar. 26, 2007) (licensor "relies on *Jazz Photo*" in support of its argument that its worldwide license did not give rise to patent exhaustion where licensed party's sales were consummated in Japan).

That the patent owners in these cases were largely unsuccessful in arguing that licensed foreign sales do not trigger patent exhaustion does not seem to have

---

[3] SK hynix filed an amicus brief in support of Appellee SanDisk in the *SanDisk v. Round Rock* appeal.  Case No. 2014-1678, Dkt. No. 63.

deterred patent owners from making that argument in subsequent cases, forcing

parties accused of infringement to suffer the uncertainty and expense of litigating

the issue.[4] And it is likely that many other companies that have found themselves

faced with that argument have settled with the patentee rather than subjecting

themselves (or their customers) to litigation on the exhaustion issue. These cases

illustrate the problematic and unpredictable scenario that *Jazz Photo* has created:  a

worldwide portfolio, including U.S. patents, is licensed; the licensee pays a royalty

on a device for an authorized sale outside of the United States; the device enters

the United States; and the patent holder then demands another payment for the

same device under its U.S. patents, using *Jazz Photo* to attempt to circumvent the

exhaustion doctrine.

As several district courts have observed—and as Impression Products and no

doubt many amici supporting its position in this case will analyze in detail—the

recent decisions in *Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617 (2008),

and *Kirtsaeng v. John Wiley & Sons*, 133 S. Ct. 1351 (2013), cast significant doubt

on the continuing viability of the *Jazz Photo* line of cases. *See, e.g.*, *SanDisk Corp.*

---

[4] Perhaps the best evidence that *Jazz Photo* has caused real-world problems is that ten prominent technology companies, representing a broad cross-section of industry participants, filed amicus briefs in support of SanDisk's position in the *SanDisk v. Round Rock* appeal in this Court.  *See* Fed. Cir. Case No. 2014-1678, Dkt. No. 63 (Amicus Brief of SK hynix); Dkt. No. 66 (Amicus Brief of Cisco Systems, Inc., Dell, Inc., Google Inc., LG Electronics Inc., and Newegg Inc.); Dkt. No. 67 (Amicus Brief of Broadcom Corp. and Intel Corp.); and Dkt. No. 70 (Amicus Brief of HTC Corp., HTC America, Inc. and Toshiba Corp.).

*v. Round Rock Research LLC*, No. C 11–5243 RS, 2014 WL 2700583, at \*4 (N.D. Cal. June 13, 2014) ("*Kirtsaeng* provides at least some additional support for the notion that it would be inconsistent with the theoretical underpinnings of the exhaustion doctrine to apply a territorial limitation."); *LG Elecs., Inc.*, 655 F. Supp. 2d at 1046 ("a subsequent Supreme Court decision [*Quanta*] has undercut the theory or reasoning underlying the prior circuit precedent [the *Jazz Photo* line of cases] in such a way that the cases are clearly irreconcilable") (citation and internal quotation marks omitted).

Commentators, too, have noted that the Supreme Court's recent exhaustion jurisprudence undermines *Jazz Photo*. *See, e.g.*, Jodi LeBolt, *Sales Gone Wrong*, 24 Fed. Cir. B.J. 131, 141 (2014/15) ("the Supreme Court's discussion of patent exhaustion [in *Quanta*] generally seemed to implicitly address both the Federal Circuits [sic] departure from the single-reward principle and its imposition of a territoriality requirement on the location of first sale"); *id.* at 145 ("[p]ost-*Kirtsaeng*, the mandate for this reversal of the Federal Circuit's jurisprudence in this area is even more pronounced."); Dennis Crouch, *International Patent Exhaustion,* PatentlyO.com, Mar. 25, 2013 (noting the "simmering … apparent conflict between the Federal Circuit's recent patent decision (rejecting

international exhaustion of patent rights) and the Supreme Court's recent copyright

decision in *Kirtsaeng* (finding international exhaustion of copyrights).").[5]

There is a robust debate—and dangerous uncertainty—as to whether *Jazz Photo* does or should extend to situations where the first non-U.S. sale was authorized under a worldwide license granted by the U.S. patent owner. For the reasons discussed in Section II below, this Court should confirm—by overruling or clarifying *Jazz Photo*—that a non-U.S. sale made under a worldwide license exhausts the patent owner's U.S. patent rights.

## II.   THE FIRST AUTHORIZED SALE OF A PATENTED ARTICLE UNDER A WORLDWIDE LICENSE SHOULD TERMINATE ALL U.S. PATENT RIGHTS IN THAT ARTICLE NO MATTER WHERE THE SALE OCCURS

### A.   Worldwide patent licensing is a necessary and desirable feature of today's global electronics industry

#### 1.   International "patent thickets" surrounding electronics products make worldwide licensing essential

Worldwide licensing is essential to the functioning of the modern electronics industry. The Federal Trade Commission has noted that "IT products are often surrounded by 'patent thickets'—densely overlapping patent rights held by multiple patent owners." U.S. Fed. Trade Comm'n, *The Evolving IP Marketplace: Aligning Patent Notice and Remedies with Competition*, March 2011, at 56 ("*FTC*

---

[5] Available at http://patentlyo.com/patent/2013/03/international-patent-exhaustion.html.

*Evolving IP Marketplace*").[6] The FTC attributes this to several factors, including that IT products usually contain "a multitude of components, each covered by numerous patents." *Id*. at 55.

Adding to this complexity is the economic reality that the activities required to competitively manufacture and sell electronics products are rarely if ever confined to a single country. According to the Department of Commerce, "[i]ncreasingly, semiconductor technology has become global through such channels as overseas patenting, licensing, and other forms of technology transfer, and alliance strategies and international investment." Dep't of Commerce, *The U.S. Semiconductor Industry*.[7] The electronics industry epitomizes what the Supreme Court recently called "the ever-growing importance of foreign trade to America." *Kirtsaeng*, 133 S. Ct. at 1367 (citing World Bank statistics).

2.    **Worldwide licenses benefit patent owners, licensees, and the public and foster development of patented technologies**

Worldwide patent licenses provide an efficient mechanism for balancing the needs of patent owners and licensees in today's global electronics industry. The protection offered by worldwide patent licenses enables manufacturing companies

---

[6] Available at http://www.ftc.gov/sites/default/files/documents/reports/evolving-ip-marketplace-aligning-patent-notice-and-remedies-competition-report-federal-trade/110307patentreport.pdf.

[7] Available at http://selectusa.commerce.gov/industry-snapshots/semiconductors.

like SK hynix to devote their human and financial resources to practicing and further developing patented technology, rather than navigating international "patent thickets" by tracking the geographic location where each of their activities (such as manufacture, sale, importation, and use) takes place and evaluating whether the licensor has relevant patent coverage in each location.

Worldwide licensing also benefits patent owners, in multiple ways. Under a worldwide license, a licensee typically agrees to pay royalties on *all* of its worldwide sales, rather than paying royalties only on sales in countries where the licensor holds patents covering the licensee's local activities. Without the ability to effectively license global manufacturing and sales activity, U.S. patent owners would have to engage in costly efforts to establish global patent coverage by filing, prosecuting, and maintaining patent applications and patents in multiple foreign countries.

In addition, worldwide licensing increases the value of patented technology by facilitating its exploitation and development. "Invention is only the first step in an often lengthy and expensive development process to bring an innovation to market." *FTC Evolving IP Marketplace* at 69. "Intellectual property typically is one component among many in a production process and derives value from its combination with complementary factors [such as] manufacturing and distribution facilities, workforces, and other items of intellectual property." U.S. Dep't of

Justice and Fed. Trade Comm'n, *Antitrust Guidelines for the Licensing of Intellectual Property*, Apr. 6, 1995 ("*DOJ/FTC Licensing Guidelines*"), § 2.3.[8] "Licensing not only creates an income source for the patentee, but also establishes the legal framework for the transfer of the technology to a wider group of researchers and engineers, who may, in turn, further contribute to the development of the technology concerned." World Intellectual Property Org., *Licensing and Technology Transfer*.[9]

The benefits of worldwide licensing are particularly apparent in the electronics industry, in which many of the companies equipped to utilize and further develop patented technologies through improvements in manufacturing processes and other innovations are located outside the United States. For these companies to play their essential supporting roles in bringing ever more advanced and less expensive electronics products to consumers, they must have the protection offered by worldwide licensing enabling them to engage in such activity.

The public also benefits from widespread licensing of patented inventions. As the Department of Justice and Federal Trade Commission have explained, by integrating licensed intellectual property with complementary factors of

---

[8] Available at http://www.justice.gov/atr/public/guidelines/0558.htm#t23.

[9] Available at http://www.wipo.int/patent-law/en/developments/licensing.html.

production, licensing "can lead to more efficient exploitation of the intellectual property, benefiting consumers through the reduction of costs and the introduction of new products." *DOJ/FTC Licensing Guidelines* § 2.3. Such arrangements not only "increase the value of intellectual property to consumers and to the developers of the technology" but "increase the incentive for its creation and thus promote greater investment in research and development." *Id.*

### 3.    Under worldwide licenses, patent owners are compensated for all licensed articles, regardless of location

The Supreme Court recently reiterated the basis for the patent exhaustion doctrine: "[T]he purpose of the patent law is fulfilled with respect to any particular article when the patentee has received his reward . . . by the sale of the article; once that purpose is realized the patent law affords no basis for restraining the use and enjoyment of the thing sold." *Bowman v. Monsanto Co.*, 133 S. Ct. 1761, 1766 (2013) (citation and internal quotation marks omitted). A rule that non-U.S. sales made under a worldwide license trigger exhaustion accomplishes this objective of limiting the patent owner to a single reward per patented article.

A worldwide license typically includes the licensor's entire portfolio of patents related to a particular technology, including both U.S. patents and patents issued in other countries. Under such a license, the licensee pays royalties on all of its devices, wherever they may travel in the global stream of commerce. Often this payment is in the form of a single up-front lump sum royalty, but the parties

negotiate that royalty payment based on the licensee's worldwide sales revenue, not just its revenues in particular countries where the patent owner has patent coverage. In a hypothetical example, assume that SK hynix is negotiating with Patent Owner for a license under patents that Patent Owner claimed covered SK hynix's Widgets. Assume further that SK hynix expects its worldwide revenue from Widgets sales during the license term to be $100 million, of which 25 percent will come from U.S. sales. If Patent Owner were willing to license its U.S. and foreign patents on Widgets to SK hynix on a worldwide basis, the parties would negotiate a royalty using SK hynix's expected worldwide Widget sales of $100 million as the royalty base. But if the license were to be geographically limited to the United States, the parties would use only SK hynix's expected U.S. sales of $25 million as the royalty base. Without assurance that worldwide licenses will cover all sales regardless of location, prospective licensees such as SK hynix would demand that their royalty payments be tied more closely to the patent owner's patent coverage in each location where the licensee operates, dramatically reducing royalties payable to patent owners.

Despite the seemingly uncontroversial proposition that worldwide licenses cover all acts by the licensee that would otherwise constitute infringement, including all manufacturing, sales, imports, and other uses, patent owners (including NPEs) have seized on *Jazz Photo* to make a variety of arguments

-17-

seeking to circumvent the patent exhaustion doctrine in the worldwide licensing context. Take, for example, NPE Round Rock Research LLC: in an appeal to this court that was fully briefed but settled before oral argument, Round Rock argued that sales made under a worldwide license granted by Micron (which later sold the relevant patents to Round Rock) did not exhaust Round Rock's patent rights because they occurred outside the United States. In support of its position, Round Rock made several arguments that exemplify how patentees have sought to extend *Jazz Photo* in ways that are incompatible with the fundamental principles underlying the patent exhaustion doctrine.

First, Round Rock argued that the compensation a patent owner received from a licensee for the *right* to sell patented products worldwide did not compensate the patent owner for particular *articles* that were sold outside the United States, and that infringement occurred only when the customer chose to import those articles into this country. Round Rock Brief at 18-19. This argument ignores what the Supreme Court has explained is the proper inquiry for determining whether an authorized sale of a product has exhausted the patentee's rights: "whether the product is 'capable of use only in *practicing* the patent,' not whether those uses are infringing." *Quanta*, 553 U.S. at 632 n.6 (emphasis in original) (quoting *United States v. Univis Lens Co.*, 316 U.S. 241, 249 (1942)). A licensee's authorized sales under its worldwide license of articles capable of use

-18-

only by practicing U.S. patents exhausts those patents regardless of where the sales occur.

Second, Round Rock argued that non-U.S. sales made under a worldwide license do not "use" U.S. patents and thus do not exhaust U.S. patent rights. Round Rock Brief at 21. This argument ignores reality. The value of worldwide licenses, at least in the electronics industry, is driven by U.S. patents. The tens of thousands of U.S. semiconductor and computer memory patents, as well as the significance of the U.S. market for the electronics products, provide the primary motivation for companies such as SK hynix to agree to pay patent owners royalties based on their worldwide sales revenues in exchange for obtaining licenses free of geographical restrictions.

Where a licensee has paid the patent owner for a worldwide license to manufacture, sell, import, and/or devices, the patent owner (or the party to whom it subsequently sells the patents) should not be able to force the licensee or its customers to pay again for the same devices. "Where a patentee unconditionally parts with ownership of an article, it cannot later complain that the approach that it chose results in an inadequate reward and that therefore ordinary principles of patent exhaustion should not apply." *LifeScan Scotland, Ltd. v. Shasta Techs., LLC*, 734 F.3d 1361, 1375 (Fed. Cir. 2013).

**B.     A rule that a non-U.S. sale made under a worldwide license does not exhaust the patent owner's U.S. patent rights would disrupt the licensing bargain, increase costs and inefficiencies, and incentivize NPEs and other patent holders to encroach on licensees' rights and expectations**

A rule that non-U.S. sales authorized under a worldwide license granted by the patent owner do not exhaust the patent owner's U.S. patent rights would have multiple and serious negative consequences. Such a rule would deprive licensees of their bargained-for right to be free of geographic limitations on their business operations. It would expose them to costly indemnity claims from downstream customers upon arrival of devices in the United States, and the costs of dealing with those claims would be passed along to consumers. Licensees would be also be incentivized, indeed forced, to restructure their sales transactions in artificial and inefficient ways in efforts to avoid such claims. Finally, a non-exhaustion rule would incentivize patent owners—particularly NPEs, who frequently acquire entire patent portfolios from operating companies—to try to disrupt settled worldwide licensing relationships to extract duplicative royalties from the supply chain, all to the detriment of licensees, consumers, the court system, and the public.

**1.     To give effect to the bargain struck in worldwide licenses, patent exhaustion should be triggered regardless of the location of the first sale**

Companies have a right to enter into worldwide patent licenses. Patents are property. *See* 35 U.S.C. § 261 (stating that U.S. patents "have the attributes of

personal property."); *see also Carl Schenck, A.G. v. Norton Corp.*, 713 F.2d 782, 786 n.3 (Fed. Cir. 1983) ("The patent right is but the right to exclude others, the very definition of 'property.'"). The owner of a patent has wide latitude to license all or a part of its property rights under the patent on terms and conditions of its choosing. *See, e.g.*, *Gen. Talking Pictures Corp. v. W. Elec. Co.*, 305 U.S. 124, 127 (1938) ("[T]he patentee may grant a license upon any condition the performance of which is reasonably within the reward which the patentee by the grant of the patent is entitled to secure." (citation and internal quotation marks omitted)). This includes the patent holder's right to enter into agreements under which it grants a license under patents obtained in the United States and elsewhere for the licensee to manufacture, sell, and import products throughout the world in exchange for royalty payments on the licensee's worldwide sales. As discussed in Section II.A. above, worldwide licenses benefit both patent owners and licensees and enable patent holders to obtain royalties on a licensee's use of the patented technology regardless of where in the world that use occurs.

To permit patent owners who have agreed to accept royalty payments based on licensees' worldwide revenues from the patented articles to then seek a second round of royalties from those licensees or others downstream in the supply chain upon arrival of those same articles in the United States would upset the licensing bargain. This Court has previously cautioned that where a patent owner granted an

unrestricted license "presumably for consideration it believed to be valuable at that time," it "cannot now renege on that grant to avoid its consequences." *Intel Corp. v. ULSI Sys. Tech.*, 995 F.2d 1566, 1569 (Fed. Cir. 1993) (holding that "broad terms of the license agreement" authorizing the licensee to sell the chips at issue gave rise to an exhaustion defense). Similarly, a patent owner who voluntarily relinquishes the right to assert territorial limitations on the licensee's activities, in exchange for payment of royalties based on the licensee's sales regardless of where they occur, should not later be permitted to recapture that right by arguing that non-U.S. sales made under a worldwide license covering the U.S. patents do not exhaust the U.S. patent rights.

Enforcement of such bargains does not cause U.S. patent law to operate extraterritorially. It merely gives effect to a bargained-for contract under which the patent owner is compensated once for the worldwide rights it has conferred.

### 2.    A non-exhaustion rule would increase costs to American companies and consumers

A rule that non-U.S. sales made under a worldwide license do not trigger patent exhaustion would severely diminish the recognized benefits of worldwide patent licensing. Such a rule would incentivize NPEs and other patent owners to seek duplicative royalties at multiple levels of the supply chain, increasing costs to American companies and consumers and contravening the longstanding U.S. patent law policy that patentees should be permitted to take their reward only once.

The U.S. Patent and Trademark Office has determined that IP-intensive industries, including the semiconductor and electronic component industries, "are a major part of U.S. trade." Econs. and Statistics Admin. and U.S. Patent and Trademark Office, *Intellectual Property and the U.S. Economy: Industries in Focus*, March 2012, at 53.[10] In 2010, computers and peripheral equipment accounted for 6.7 percent of all imports of IP-intensive industries; these imports included those "by foreign producers under U.S. licenses." *Id*. at 54. Such imports result in the payment to U.S. companies of tens of billions of dollars in royalties and license fees and also benefit American consumers:

> Imports tend to increase market competition and thus lower prices, making some products affordable to more American consumers. Likewise, many imports are intermediate inputs for American industries which make their finished products more competitive.

*Id*. A narrow application of U.S. patent exhaustion allowing patentees to collect duplicative royalties at multiple points in the supply chain for the same product would discourage imports under worldwide licenses and diminish the resulting consumer benefits.

A non-exhaustion rule would also increase the transaction costs of supplying component parts—costs that ultimately must be passed on to end users. For example, when SK hynix's customers are accused of patent infringement, they

---

[10] Available at
http://www.uspto.gov/news/publications/IP_Report_March_2012.pdf.

commonly seek indemnification from their parts suppliers. Operating under a worldwide patent license, SK hynix might sell memory chips incorporating patented technology to a customer in China, which then integrates the chips into computer products imported into the United States for sale.  In dozens of instances each year, customers like the Chinese manufacturer/importer are then sued for infringement in the United States. They in turn seek indemnity from SK hynix, even though SK hynix has already paid royalties for the sale and use of the accused chips under worldwide patent licenses covering the U.S. patents. Under a framework in which authorized sales outside the United States do not clearly exhaust the U.S. patent rights, it is difficult if not impossible for SK hynix to evaluate such indemnity claims. Under the current uncertain state of the law, SK hynix incurs significant costs every year investigating indemnification claims and defending its customers in U.S. patent litigation.  These are deadweight costs that could be eliminated, or at least significantly reduced, by a clear rule that authorized non-U.S. sales under a worldwide patent license exhaust U.S. patent rights.

### 3.    A non-exhaustion rule would inefficiently elevate form over substance

A rule under which licensees and their customers would be exposed to royalty demands for devices originally sold outside the United States, even where the licensee had paid royalties on those same devices under a worldwide license,

would impose other unnecessary costs and inefficiencies. If the licensee under a worldwide license imported the accused devices into the United States. and sold them to customers here, either directly or through an U.S.-based intermediary, no one would dispute that the royalty payments on those sales would exhaust the patent owner's rights under its U.S. patents. Exactly the same should be true where the licensee sells the devices to a customer outside the United States and that customer does the importing, a form of transaction presumably dictated by efficiency.  In both cases, the licensee would pay royalties on the devices under its worldwide license.  Only the form of the sale, not its substance, would change.

There is no principled reason why a licensee who has paid for a worldwide license should be forced to resort to inefficient and artificial restructuring of the form in which makes its sales in order to avoid liability for duplicative royalty obligations. The Supreme Court has "consistently refused to allow the form into which the parties chose to cast the transaction to govern" whether the transaction triggers exhaustion.  *United States v. Masonite Corp.*, 316 U.S. 265, 278 (1942); *see also Quanta*, 553 U.S. at 630 (cautioning against any "end-run around exhaustion").  The sales transactions in both of the examples given above should trigger exhaustion.

4.    **A rule that authorized non-U.S. sales do not trigger exhaustion would incentivize patent owners—particularly NPEs—to seek duplicative royalties**

Commentators have noted a growing trend in which operating companies have sold thousands of patents to NPEs. *See* Mark S. Popofsky & Michael D. Laufert, *Patent Assertion Entities and Antitrust: Operating Company Patent Transfers*, The Antitrust Source (American Bar Ass'n, 2013),[11] at 1 and authorities cited therein. Given the prevalence of worldwide licensing in the patent-dense electronics industry in which many of these patent transfers have taken place, no doubt many of the patents involved in those transactions were subject to existing worldwide licenses. When patents remain in the hands of operating companies, those companies have an incentive to enter into patent licenses and cross-licenses to ensure their own freedom to operate. *See FTC Evolving IP Marketplace* at 56. But once NPEs purchase the patents, the incentives change: NPEs pursue the singular goal of maximizing the return on their patent investment by aggressive licensing and litigation. As Justice Kennedy presciently observed in 2006, "[a]n industry has developed in which firms use patents not as a basis for producing and selling goods but, instead, primarily for obtaining license fees." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 396 (2006) (Kennedy, J., concurring).

---

[11] Available at http://www.ropesgray.com/files/upload/Antitrust-Attacks-on-Patent-Assertion-Entities.PDF.

The FTC has explained that "[p]atents in the IT industry are often bought, sold and licensed as assets whose value depends on the amount of rent that can be extracted from manufacturers already using the technology." *FTC Evolving IP Marketplace* at 58. But companies that purchase patents take them subject to existing licenses. *Datatreasury Corp. v. Wells Fargo & Co.*, 522 F.3d 1368, 1372 (Fed. Cir. 2008) (noting "general proposition that because the owner of a patent cannot transfer an interest greater than that which it possesses, an assignee takes a patent subject to the legal encumbrances thereon."). Put simply, NPEs cannot assert the patents they purchase against companies that are licensed unless they can devise a way to overcome the licenses. NPEs therefore have powerful incentives to advocate for the narrow interpretation of licenses, leaving them a more open field on which to play their royalty extraction game.  A too-narrow application of the patent exhaustion doctrine would help NPEs circumvent worldwide licenses granted by the original patent holders and demand duplicative royalties on products on which royalties have already been paid.

A rule that would enable patent owners to demand additional royalties from customers of licensees who have already paid for worldwide licenses intended to insulate their customers and themselves from additional payment demands would upset settled expectations among the parties to worldwide patent licenses. The Supreme Court has cautioned that "the primary purpose of our patent laws is not

the creation of private fortunes for the owners of patents but is to promote the progress of science and useful arts." *Quanta*, 553 U.S. at 626 (citation and internal quotation marks omitted). Enforcing a patent owner's decision to accept greater royalties in exchange for licensing its U.S. patents on a worldwide basis strikes the proper balance.

## CONCLUSION

For the reasons discussed above and in Impression Products' brief, the Court should reverse *Jazz Photo* or at a minimum confirm that it does not extend to situations where a non-U.S. sale is made under a worldwide license. The Court should instead rule that such sales exhaust the patent holder's U.S. patent rights. Such a rule is fully consistent with the legal underpinnings of and Supreme Court precedent regarding the long-standing patent exhaustion doctrine, as Impression Products and other amici will explain. Such a rule also provides parties engaged in licensing with clear and predictable guidance on how to structure and price their licensing transactions, honors parties' private licensing bargains, and eliminates the need for licensees to engage in costly and inefficient restructuring of transactions solely to avoid non-exhaustion claims. A rule that licensed non-U.S. sales exhaust the patentee's U.S. patent rights protects customers against interference with their property rights in goods they have purchased from licensed manufacturers. And such a rule disincentivizes efforts by NPEs and other patent holders to extract

duplicative royalty payments to which they are not entitled, which if successful

would increase costs to consumers and ultimately impair the further development

and use of patented technologies.

Respectfully submitted,

*/s/ Charles C. Lifland*
Charles C. Lifland

June 19, 2015

## CERTIFICATE OF SERVICE

I hereby certify that on June 19, 2015, counsel of record were served with a copy of the foregoing by electronic means.

Dated: June 19, 2015

By: /s/ *Charles C. Lifland*
Charles C. Lifland

Counsel for *Amicus Curiae* SK hynix Inc.

# CERTIFICATE OF COMPLIANCE

1.      The brief complies with the type-volume limitation of Fed. R. App. P.
32(a)(7)(B).

     The brief contains 6,486 words, excluding the parts of the brief exempted by
Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P.
32(a)(5).

     The brief has been prepared in a proportionally spaced typeface using
Microsoft Word in 14-Point Times New Roman


Dated: June 19, 2015


By: /s/ *Charles C. Lifland*
Charles C. Lifland

Counsel for *Amicus Curiae* SK hynix Inc.