Nos. 14-1617, -1619

# United States Court Of Appeals
## for
## The Federal Circuit

LEXMARK INTERNATIONAL, INC.,

*Plaintiff-Cross Appellant,*

v.

IMPRESSION PRODUCTS, INC.,

*Defendant-Appellant,*

QUALITY CARTRIDGES, INC., JOHN DOES, 1–20, BLUE TRADING LLC, EXPRINT INTERNATIONAL, INC., LD PRODUCTS, INC., PRINTRONIC CORPORATION, TESEN DEVELOPMENT (HONG KONG) CO. LTD., BENIGNO ADEVA AND HIS COMPANIES,

*Defendants.*

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO IN 10-CV-564 JUDGE MICHAEL R. BARRETT

BRIEF OF AMICUS CURIAE TEXAS INSTRUMENT INC. IN SUPPORT OF NEITHER PARTY AND FOR REVERSAL, in part, OF THE DISTRICT COURT

ROBERT T. HASLAM
NATHAN SHAFFER
COVINGTON & BURLING LLP
333 Twin Dolphin Drive, Suite 700
Redwood Shores, California 94065-1418
Telephone: + 1 (650) 632-4700
Facsimile: + 1 (650) 632-4800
Email:  rhaslam@cov.com

RANGANATH SUDARSHAN
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: +1 (202) 662-6000
Facsimile: +1 (202) 662-6291
Email: rsudarshan@cov.com

Attorneys for Amicus Curiae
Texas Instruments Inc.

## I.    CERTIFICATE OF INTEREST & CORPORATE DISCLOSURE STATEMENT

1.    The full name of every party or amicus represented by me is:

Texas Instruments Inc.

2.    Texas Instruments Inc. is the only real party in interest represented by me.

3.    There is no parent corporation or publicly held company that owns 10 percent or more of Texas Instruments Inc.

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Covington & Burling LLP

Robert T. Haslam
Ranganath Sudarshan
Nathan Shaffer

DATE:  June 19, 2015                     /s/ Robert T. Haslam
                                          Robert T. Haslam

## II.     FEDERAL RULE OF APPELLATE PROCEDURE 29(c)(5) STATEMENT

No party's counsel authored this brief in whole or in part; No party or party's counsel contributed money that intended to fund preparing or submitting this brief; and No person—other than amicus curiae—contributed money that was intended to fund preparing or submitting this brief.

DATE:  June 19, 2015                   /s/ Robert T. Haslam
                                            Robert T. Haslam

## III.  TABLE OF CONTENTS

I.  CERTIFICATE OF INTEREST & CORPORATE DISCLOSURE STATEMENT...........i

II.  FEDERAL RULE OF APPELLATE PROCEDURE 29(c)(5) STATEMENT.................ii

III.  TABLE OF CONTENTS....................................................................................iii

IV.  TABLE OF AUTHORITIES ........................................................................ v

V.  STATEMENT OF IDENTITY AND INTEREST ........................................... 1

VI.  INTRODUCTION AND SUMMARY OF ARGUMENT ................................. 3

VII.  ARGUMENT ................................................................................................ 4

    A.  The Territorial Element of the Patent Exhaustion Rule First Announced in *Jazz Photo* Is Unprecedented and Conflicts with Exhaustion Cases Extending to the 19th Century. ................................................................ 4

        1.  The Issue Decided in *Boesch* Was Not Before the *Jazz Photo* Court. ..................................................................................... 6

        2.  Prior to *Jazz Photo*, Exhaustion Applied to Foreign Sales Authorized by the U.S. Patentee ................................................. 7

        3.  Contract Law, Not Patent Law, Permits Patentees to Exercise Downstream Control Over Patented Articles ........................... 10

    B.  The Supreme Court's Decisions in *Quanta Computer* and *Kirtsaeng* Eliminate All Doubt: The Patent Exhaustion Doctrine Is Robust and Applies Equally to Foreign and Domestic Sales.................................... 13

        1.  *Quanta* Established a Robust Patent Exhaustion Doctrine That Prevents Downstream Assertion of Patent Rights .................................... 13

        2.  *Kirtsaeng* Unequivocally Rejected Use of the Intellectual Property System to Maintain Regional Distribution Systems ................................ 15

        3.  Read Together, *Quanta* and *Kirtsaeng* Confirm That The First Sale Rule Applies to An Authorized Sale Anywhere in the World.................. 16

    C.  Restricting Patent Exhaustion to Sales Made in the United States Will Disrupt the Modern Patent Licensing System ...................................... 18

VIII.　CONCLUSION ................................................................................................ 22

IX.　CERTIFICATE OF COMPLIANCE ................................................................ 23

## IV.    TABLE OF AUTHORITIES

### CASES

*Bauer & Cie v. O'Donnell*,
  229 U.S. 1 (1913)............................................................19, 20, 24, 28

*Bloomer v. McQuewan*,
  55 U.S. (14 How.) 539 (1852) .........................................11, 16, 19, 26

*Bloomer v. Millinger*,
  68 U.S. (1 Wall.) 340 (1863) .............................................................23

*Boesch v. Graff*,
  133 U.S. 697 (1890)................................................................passim

*Curtiss Aeroplane & Motor Corp. v. United Aircraft Eng'g Corp.*,
  266 F. 71 (2d Cir. 1920) .............................................................17, 18

*Fuji Photo Film Co. v. Jazz Photo Corp.*,
  394 F.3d 1368 (Fed. Cir. 2005) ........................................................13

*Fujifilm Corp. v. Benun*,
  605 F.3d 1366 (Fed. Cir. 2010) ........................................................13

*Hobbie v. Jennison*,
  149 U.S. 355 (1893)................................................................11, 16

*In re Innovatio IP Ventures, LLC Patent Litig.*,
  No. 2303, 2013 WL 5593609 (N.D. Ill. Oct. 3, 2013) .....................................28

*Jazz Photo Corp. v. Int'l Trade Com'n*,
  264 F.3d 1094 (Fed. Cir. 2001) ...............................................passim

*Jazz Photo. LG Elecs., Inc. v. Hitachi, Ltd.*,
  655 F. Supp. 2d 1036 (N.D. Cal. 2009)......................................22, 23

*John D. Park & Sons Co. v. Hartman*,
  153 F. 24 (6th Cir.1907) ...................................................................19

*LifeScan Scotland, Ltd. v. Shasta Techs.*,
  LLC, 734 F.3d 1361 (Fed. Cir. 2013)..............................18, 19, 20, 24

*Motion Picture Patents Co. v. Universal Film Mfg. Co.*,
    243 U.S. 502 (1917)............................................................................22

*Omega S.A. v. Costco Wholesale Corp.*,
    776 F.3d 692 (9th Cir. 2015) .............................................................20

*Quality King Distribs., Inc. v. L'anza Research Int'l, Inc.*,
    523 U.S. 135 (1998)............................................................................25

*Quanta Computer, Inc. v. LG Elecs., Inc.*,
    553 U.S. 617 (2008), reaffirmed...................................................passim

*Straus v. Victor Talking Mach. Co.*,
    243 U.S. 490 (1917)............................................................................11

*Tessera, Inc. v. Int'l Trade Com'n*,
    646 F.3d 1357 (Fed. Cir. 2011) ....................................................13, 21

*United States v. Masonite Corp.*,
    316 U.S. 265 (1942)..........................................................12, 15, 18, 29

*United States v. Univis Lens Co.*,
    316 U.S. 241 (1942)..............................................................18, 22, 29

*Vermont v. MPHJ Tech. Invs., LLC*,
    763 F.3d 1350 (Fed. Cir. 2014) .........................................................28

*Wilson v. Sandford*,
    51 U.S. (10 How.) 99 (1850) .............................................................19

**STATUTES**

17 U.S.C. § 109(a) ..................................................................................24

**OTHER AUTHORITIES**

Brian J. Love & James C. Yoon, *Expanding Patent Law's Customer Suit
    Exception*, 93 B.U.L. Rev. 1605, 1605 (2013) ............................28, 29

Const. Art. I, § 8......................................................................................19

## V.    STATEMENT OF IDENTITY AND INTEREST

Texas Instruments ("TI") is a global manufacturing and technology company based in the United States.  TI makes tens of thousands of products that are used to accomplish many different things, such as converting and amplifying signals, interfacing with other devices, managing and distributing power, processing data, canceling noise and improving signal resolution.  Although TI is headquartered in Dallas, Texas, it has design, manufacturing or sales operations related to these products in 35 countries around the world.

TI's business relies on strong, enforceable, and clear intellectual property rights.  As part of its research and development efforts, totaling more than $5 billion over the past five years, TI has developed a strong, broad-based, and continuously growing portfolio of over 40,000 patents.  TI also licenses patent rights from third parties.

TI has a direct interest in the outcome of this case because it relies on a global licensing regime where authorized and unrestricted licensed sales abroad exhaust patent rights.  As both a significant licensor and licensee of intellectual property rights, TI recognizes that patent rights must be clear and subject to universally applicable rules, rather than rules based on variables like the jurisdiction of first sale.  If this court's holding in *Jazz Photo Corp. v. Int'l Trade Com'n*, 264 F.3d 1094 (Fed. Cir. 2001) continues to limit the first sale doctrine to

1

patented articles sold in the United States, the current global patent licensing regime will be clouded with uncertainty.

TI takes no position on whether *Quanta Computer, Inc. v. LG Electronics, Inc.*, 553 U.S. 617 (2008), requires exhaustion of patent rights on patented articles sold subject to a single-use license.

## VI.    INTRODUCTION AND SUMMARY OF ARGUMENT

The patent exhaustion or first sale doctrine is a long-established rule that limits the scope of the Patent Act based on common law principles disfavoring restraints on alienation of chattels. *Straus v. Victor Talking Mach. Co.*, 243 U.S. 490, 500–501 (1917) ("[R]estraints upon . . . further alienation [after a sale for full price] . . . have been hateful to the law from Lord Coke's day to ours, because obnoxious to the public interest."); *Bloomer v. McQuewan*, 55 U.S. (14 How.) 539, 549 (1852) ("[W]hen [a patented] machine passes to the hands of the purchaser, it is no longer within the limits of the monopoly.  It passes outside of it, and is no longer under the protection of the act of Congress.").

The Federal Circuit's decision in *Jazz Photo Corp. v. Int'l Trade Com'n*, restricted the patent exhaustion doctrine to sales made in the United States.  264 F.3d 1094, 1105 (Fed. Cir. 2001) (citing *Boesch v. Graff*, 133 U.S. 697, 701–703 (1890)).  *Jazz Photo* arrived at this result by expanding on the Supreme Court's 1890 decision in *Boesch*, a case that had sat largely dormant for many years due to its unusual facts.  Prior to *Jazz Photo*, courts had not interpreted *Boesch* as announcing a territorial version of exhaustion.  Indeed, until *Jazz Photo*, the exhaustion doctrine continued to apply with full force to all sales authorized by the patentee.  *See, e.g.*, *Hobbie v. Jennison*, 149 U.S. 355, 362–63 (1893) (rejecting a territorial interpretation of the patent exhaustion doctrine).

3

In 2013, the Supreme Court decided *Kirtsaeng v. John Wiley & Sons, Inc.*, which applied the same common law principles underlying the patent exhaustion doctrine to copyright, and held that a foreign sale authorized by a U.S. intellectual property rights holder exhausts further rights in that particular article, providing a complete defense to infringement if the article is later imported into the United States.  133 S. Ct. 1351, 1355–56 (2013).

*Jazz Photo*'s territorial version of the exhaustion doctrine is incorrect in light of patent exhaustion's common law history and *Kirtsaeng*'s recent holding.  As explained below, if this Court were to affirm *Jazz Photo*, it would lead to serious restraints on trade, permit patentees to recover multiple royalties on the same products, and otherwise restrict the free flow of trade even when "it may fairly be said that the patentee has received his reward for the use of the article."  *United States v. Masonite Corp.*, 316 U.S. 265, 278 (1942).  TI therefore urges this en banc court to overrule *Jazz Photo*'s holding that the patent exhaustion doctrine is restricted to sales made in the United States.

## VII.  ARGUMENT

### A.  The Territorial Element of the Patent Exhaustion Rule First Announced in *Jazz Photo* Is Unprecedented and Conflicts with Exhaustion Cases Extending to the 19th Century.

*Jazz Photo* announced a new geographical limitation to the patent exhaustion doctrine that conflicts "with the fundamental purpose of patent

4

exhaustion—to prohibit post sale restrictions on the use of a patented article."
*Tessera, Inc. v. Int'l Trade Com'n*, 646 F.3d 1357, 1370 (Fed. Cir. 2011); *Fujifilm Corp. v. Benun*, 605 F.3d 1366, 1370 (Fed. Cir. 2010) (recognizing that the territoriality requirement was first "announced" in *Jazz Photo*).  The Court relied exclusively on the Supreme Court's opinion in *Boesch v. Graff,* 133 U.S. 697, 701–03 (1890), but a close examination of *Boesch* and its common law origins, as well as contemporaneous cases applying *Boesch* and decades of subsequent decisions, shows that *Jazz Photo*'s unqualified territorial requirement was not required, or even strongly supported, by *Boesch*.

*Jazz Photo* applied the first sale rule to disposable film cameras, intended by the patentee and original manufacturer Fuji to be single use, which were later repaired by third parties and resold.  264 F.3d at 1105, 1107.  The sales of new cameras in the U.S. were authorized by the U.S. patentee, and there was no claim that sales of the cameras abroad were without authorization or otherwise unlawful in the first instance.  *Fuji Photo Film Co. v. Jazz Photo Corp.*, 394 F.3d 1368, 1376 (Fed. Cir. 2005) (clarifying that under *Jazz Photo*'s original holding, Fuji had "authorized the international first sales").  The *Jazz Photo* court held that Fuji's patent rights were exhausted for those cameras sold in the United States, but not for those cameras sold abroad, regardless of whether Fuji received a royalty for or authorized the foreign sales.  *Jazz Photo*, 264 F.3d at 1105.

5

### 1.    The Issue Decided in *Boesch* Was Not Before the *Jazz Photo* Court.

*Jazz Photo* relied on the Supreme Court's decision in *Boesch*, but that case presented a special situation in which German law created an exception to a patentee's monopoly that did not exist under U.S. law.  133 U.S. at 701.  Under the German patent statute, the patentee's right was subject to an exception applicable to "persons who, at the time of the patentee's application, have already commenced to make use of the invention in the country, or make the preparations necessary for such use."  *Id.*  Hecht, a beneficiary of this exception, lawfully produced and sold lamp burners in Germany that practiced Graff's German patent, but did not legally infringe in that country.  *Id.*  Some of the burners manufactured by Hecht in Germany were imported into the United States.  Graff, the assignee of the U.S. patent, sued Hecht's U.S. customer for infringement of the U.S. patent on the same invention.  *Id.* at 698–99.  Because no exception analogous to the German safe harbor provision existed under U.S. law, the Supreme Court considered "whether a dealer residing in the United States can purchase in another country articles patented there, from a person authorized to sell them, and import them to and sell them in the United States, without the license or consent of the owners of the United States patent."  *Id.* at 702.

*Boesch*, recognizing that a U.S. patentee is legally entitled to recover at least one royalty for each patented article sold in the United States, held that where an

exception to a patentee's rights exists in a foreign jurisdiction, but not under U.S. law, the U.S. patentee is entitled to recover a royalty on the item if it is imported to this country. *Id.* at 703 ("The right which Hecht had to make and sell the burners in Germany was allowed him under the laws of that country, and purchasers from him could not be thereby authorized to sell the articles in the United States *in defiance of the rights of patentees under a United States patent*." (emphasis added)).

In short, *Boesch* presented a question that was not at issue in *Jazz Photo*: whether an exception to infringement under a foreign country's law could be enforced under U.S. law in derogation of the rights of a U.S. patentee. *Boesch* did not consider the effect of U.S. exhaustion rules on a first sale abroad because it was concerned with the operation of foreign law within the United States. *Id.* at 703. For this reason, *Jazz Photo*'s holding—that foreign sales *authorized* by a U.S. patentee cannot exhaust U.S. patent rights—draws little if any support from *Boesch*.

### 2.  Prior to *Jazz Photo*, Exhaustion Applied to Foreign Sales Authorized by the U.S. Patentee

Prior to *Jazz Photo*, the exhaustion cases considered whether "there has been such a disposition of the article that it may fairly be said that the [U.S.] patentee has received his reward for the use of the article." *United States v. Masonite Corp.*, 316 U.S. 265, 278 (1942).  If so, the patented article passed outside the protection

of U.S. patent law. *Bloomer v. McQuewan*, 55 U.S. (14 How.) 539, 549 (1852). Thus, the key consideration in patent exhaustion analysis for over 100 years prior to *Jazz Photo* was whether the U.S. patentee authorized the first sale, thereby receiving one—and only one—royalty for the sale of each patented article.

In *Keeler v. Standard Folding Bed Co.*, the Supreme Court recognized that a sale, whether direct to the consumer or through an authorized licensee, exhausts patent rights. 157 U.S. 659, 666 (1895) ("one who buys patented articles of manufacture from one authorized to sell them becomes possessed of an absolute property in such articles, unrestricted in time or place."). *Keeler* expressly declined to reach the enforceability of post-sale restrictions, but recognized that such restrictions could only "arise as a question of contract, and not as one under the inherent meaning and effect of the patent laws." *Id.*

*Hobbie v. Jennison* held that a sale authorized by the patentee exhausts patent rights, even where the licensee knowingly sold patented articles for use in a region outside the scope of the license agreement. 149 U.S. 355, 363 (1893) (holding a sale in the authorized region exhausted the patent right, and "neither the actual use of the [patented] pipes in Connecticut [outside the licensee's territory], nor a knowledge on the part of the defendant that they were intended to be used there, can make him liable.").

8

In a later case, the Second Circuit held that a U.S. patentee had no cause of action for patent infringement when biplanes manufactured in Canada through a license granted to the British government that were later imported into the U.S. after a first sale in Canada. *Curtiss Aeroplane & Motor Corp. v. United Aircraft Eng'g Corp.*, 266 F. 71, 72 (2d Cir. 1920). The British government possessed a license to manufacture the planes, was not restricted in any way as to use or final disposition of the planes, and paid $4,000,000 to the U.S. patentee for the planes it manufactured. *Id.* at 80. In reaching the conclusion that the U.S. patentee could not recover against the U.S. importer, *Curtiss* applied a venerable common law rule: "When an article is sold without any restriction on the buyer, whether it is manufactured under either one or the other patent, that, in my opinion, as against the vendor gives the purchaser an absolute right to deal with that which he so buys in any way he thinks fit, and of course that includes selling in any country where there is a patent in the possession of and owned by the vendor." *Id.* at 79 (quoting *Societe Anonyme des Manufactures de Glaces v. Tilghman's Sand Blast Company*, 25 L.R. Ch. Div. 1 (1883)); *Kirtsaeng*, 133 S. Ct. at 1363 ("A law that permits a[n intellectual property] holder to control the resale or other disposition of a chattel once sold is . . . 'against Trade and Traffi[c], and bargaining and contracting.'" (quoting 1 E. Coke, Institutes of the Laws of England § 360, p. 223 (1628)).

9

*Curtiss Aeroplane* surveyed existing Supreme Court case law on the exhaustion doctrine, including cases such as *Boesch* and its progeny, and clearly distinguished those cases where there was "no participation whatever by the owner of the [U.S.] patent, either as a party or as a privy, in the putting out of the article which is alleged to infringe" from cases like *Curtiss Aeroplane* where the U.S. patentee *authorized* the first sale.

In *Masonite*, the Supreme Court laid down a concise, complete, and broad rule of patent exhaustion based on decades of common law precedent: "In applying [patent exhaustion] this Court has quite consistently refused to allow the form into which the parties chose to cast the transaction to govern. The test has been whether or not there has been such a disposition of the article that it may fairly be said that the patentee has received his reward for the use of the article." 316 U.S. at 278 (citing *United States v. Univis Lens Co.*, 316 U.S. 241 (1942)). The Supreme Court has never questioned its holding in *Masonite*.

### 3.    Contract Law, Not Patent Law, Permits Patentees to Exercise Downstream Control Over Patented Articles

The Supreme Court's patent exhaustion cases permitted parties to use private contracts to fill the gaps in protection provided under the Patent Act. *See e.g., Keeler*, 157 U.S. at 661 (recognizing contractual limitations on the patent exhaustion doctrine). This Court's precedents follow suit. *LifeScan Scotland, Ltd. v. Shasta Techs.*, LLC, 734 F.3d 1361, 1375 n.8 (Fed. Cir. 2013) (permitting

10

contractual restrictions on use where "the purchaser has made an express

contractual undertaking" (quotation omitted)).  Thus, where a licensee violates the

terms of a license agreement by making unpermitted sales, the patentee has an

action in contract through which it can recover damages, although it does not have

rights under the Patent Act.  *Bloomer v. McQuewan*, 55 U.S. (14 How.) 539, 550

(1852) (citing *Wilson v. Sandford*, 51 U.S. (10 How.) 99 (1850)).

In light of patentees' ability to establish and maintain regional distribution

systems through contract, subject to antitrust or other limitations where applicable,

a central question in this case is whether a geographical approach to the patent

exhaustion doctrine "promote[s] the progress of science and useful arts," or instead

undermines the Constitutional purpose of the patent system by creating duplicative

and uncertain rights.  Const. Art. I, § 8.

It is well-established that intellectual property rights should not be used to

encumber consumer goods after an authorized sale without notice to, and

agreement with, the final purchaser.  *Bauer & Cie v. O'Donnell*, 229 U.S. 1, 16

(1913); *LifeScan*, 734 F.3d at 1377 ("Absent a valid contractual restriction,

restraints upon the downstream use or sale of a patented product 'offend against

the ordinary and usual freedom of traffic in chattels[.]'") (quoting *John D. Park &*

*Sons Co. v. Hartman*, 153 F. 24, 39 (6th Cir.1907)).  Recently, the Ninth Circuit

criticized the use of a small copyrighted design to encumber unpatented and

11

uncopyrighted watches with restrictions unknown to entities who purchased the watches in what otherwise appeared to be a complete and final sale transaction. *See Omega S.A. v. Costco Wholesale Corp.*, 776 F.3d 692, 701–703 (9th Cir. 2015) (Wardlaw, J., concurring) ("Omega had not publicized the Globe Design and was not using it to influence consumers' purchasing decisions.").

*Jazz Photo*'s holding, if left in place, will permit patentees to impose the restraints denied in *LifeScan*, *Bauer & Cie*, and numerous other cases on a *de facto* and unannounced basis. Under *Jazz Photo*, if the patented article is purchased abroad in a transaction authorized by the U.S. patentee, the retail purchaser is liable for infringement. If an identical item is purchased in the U.S. in the same transaction, the retail purchaser is not liable for infringement. In a world where it is not practicable for retail purchasers, and often retailers themselves, to trace the provenance of goods obtained in the global supply chain, *Jazz Photo*'s bipartite rule of territorial patent exhaustion creates uncertainty for consumers who have no way of knowing if use of a particular item implicates potential infringement or not.

At bottom, Lexmark advocates for a position that would permit it to assert downstream control over its patented products even after an authorized first sale, without notice and without the consent of the purchaser. "That absurd result would cast a cloud of uncertainty over every sale, and every product in the possession of a customer of [Lexmark's licensees], and would be wholly inconsistent with the

12

fundamental purpose of patent exhaustion—to prohibit postsale restrictions on the use of a patented article." *Tessera*, 646 F.3d at 1370.

**B.    The Supreme Court's Decisions in *Quanta Computer* and *Kirtsaeng* Eliminate All Doubt: The Patent Exhaustion Doctrine Is Robust and Applies Equally to Foreign and Domestic Sales**

**1.    *Quanta* Established a Robust Patent Exhaustion Doctrine That Prevents Downstream Assertion of Patent Rights**

The Supreme Court's recent decision in *Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617 (2008), reaffirmed that the key inquiry in a patent exhaustion analysis is whether the patentee authorized the first sale of the invention-embodying good; if a sale is so authorized, the patentee loses all rights to exercise further downstream control over that item. *Id.* at 630–631 ("Otherwise, patent holders could authorize the sale of computers that are complete with the exception of one minor step—say, inserting the microprocessor into a socket—and extend their rights through each downstream purchaser all the way to the end user."). The Court broadly reiterated that "the primary purpose of our patent laws is not the creation of private fortunes for the owners of patents but is 'to promote the progress of science and useful arts,'" and therefore "the right to vend is exhausted by a single, unconditional sale, the article sold being thereby carried outside the monopoly of the patent law and rendered free of every restriction which the vendor may attempt to put upon it." *Id.* at 626 (quoting from and explaining why the

13

Court rejected post-sale restrictions on patented goods in *Motion Picture Patents Co. v. Universal Film Mfg. Co.*, 243 U.S. 502 (1917)).

*Quanta* clarified that exhaustion applies even where the patentee restricts sale of a good by contract or license, because patent exhaustion "is triggered only by a sale authorized by the patent holder." *Id.* at 637 n.7 (quoting *Keeler*, 157 U.S. at 666) (declining to decide if contractual restrictions on downstream use and distribution survive the exhaustion of patent rights). And the exhaustion analysis is only concerned with whether the goods in question *practice* U.S. patents, not whether they infringe the U.S. patent at the moment of sale: "*Univis* teaches that the question is whether the product is 'capable of use only in practicing the patent,' not whether those uses are infringing. Whether outside the country or functioning as replacement parts, the Intel Products would still be practicing the patent, even if not infringing it." *Id.* at 632 n.6 (quoting *United States v. Univis Lens Co.*, 316 U.S. 241, 249 (1942)).

In a later iteration of the litigation between LG Electronics (LGE) and computer manufacturers similar to Quanta, the same district court that decided the original *Quanta* case determined that the Supreme Court's decision was incompatible with the holding in *Jazz Photo*. *LG Elecs., Inc. v. Hitachi, Ltd.*, 655 F. Supp. 2d 1036, 1047 (N.D. Cal. 2009). *Hitachi* held that the driving principle in *Quanta* was a robust patent first sale doctrine immune from an "end-run around

exhaustion" enabled by territorial restrictions.  *Id.* at 1044–45 (quoting *Quanta*, 553 U.S. at 630).  *Hitachi* reasoned that "[d]rawing . . . a distinction between authorized domestic sales and authorized foreign sales would negate the Supreme Court's stated intent in *Quanta* to eliminate the possibility of a patent holder doing an "end-run" around the exhaustion doctrine by authorizing a sale, thereby reaping the benefit of its patent, then suing a downstream purchaser for patent infringement."  *Id.* at 1046.

### 2.    *Kirtsaeng* Unequivocally Rejected Use of the Intellectual Property System to Maintain Regional Distribution Systems

In *Kirtsaeng*, the Supreme Court rejected, in the strongest possible terms, a copyright holder's contention that intellectual property law protects manufacturers' regional distribution systems.  133 S. Ct. at 1366 (recognizing "the absurd result that the copyright owner can exercise downstream control even when it authorized the import or first sale").  As with copyright, in the patent context "division of territorial markets has been 'primarily a matter of private contract.'"  *Kirtsaeng*, 133 S. Ct. at 1371 (quoting Copyright Law Revision, pt. 2, at 194); *Bloomer v. Millinger*, 68 U.S. (1 Wall.) 340, 351 (1863) ("By a valid sale and purchase the patented machine becomes the private individual property of the purchaser, and is no longer specially protected by the laws of the United States, but by the [property and contract] laws of the State in which it is situated.").  Moreover, both the patent and copyright exhaustion doctrines are derived from the same common law "first

15

sale" doctrine "with an impeccable historical pedigree" relied on in *Kirtsaeng*.

*Kirtsaeng*, 133 S. Ct. at 1363 ("Coke emphasizes the importance of leaving buyers

of goods free to compete with each other when reselling or otherwise disposing of

those goods.  American law too has generally thought that competition, including

freedom to resell, can work to the advantage of the consumer.") (citing 1 E. Coke,

Institutes of the Laws of England § 360, p. 223 (1628)); *LifeScan Scotland, Ltd. v.

Shasta Techs., LLC*, 734 F.3d 1361, 1375 n.9 (Fed. Cir. 2013) ("The Supreme

Court has frequently explained that copyright cases inform similar cases under

patent law.").

### 3.    Read Together, *Quanta* and *Kirtsaeng* Confirm That The First Sale Rule Applies to An Authorized Sale Anywhere in the World

There is little doubt that the first sale doctrine applies equally to patent and

copyright, derives from the same common law principles in both contexts, and the

development of one informs the other.  *Bauer & Cie v. O'Donnell*, 229 U.S. 1, 13

(1913) ("In providing for grants of exclusive rights and privileges to inventors and

authors we think Congress had no intention to use the term 'vend' in one sense in

the patent act and 'vending' in another in the copyright law.  Protection in the

exclusive right to sell is aimed at in both instances, and the terms used in the

statutes are to all intents the same.").  *Kirtsaeng* determined the meaning of a

statute passed by Congress, 17 U.S.C. § 109(a), but rested its holding on the key

16

principle that the common law exhaustion doctrine was not limited to sales made in the United States. 133 S. Ct. at 1363 ("a straightforward application of [the common law first sale doctrine] would not preclude the first sale defense from applying to authorized copies made overseas." (quotation omitted)). Nor does application of the first sale doctrine to goods first manufactured and sold abroad violate the presumption against extraterritorial application of U.S. law, because the rule is only applied where a plaintiff seeks to enforce a right in *U.S. courts*. *Quality King Distribs., Inc. v. L'anza Research Int'l, Inc.*, 523 U.S. 135, 145 n.14 (1998) ("[T]he owner of goods lawfully made under the Act is entitled to the protection of the first sale doctrine in an action in a United States court even if the first sale occurred abroad. Such protection does not require the extraterritorial application of the Act.").

The only difference between patent and copyright law in this context is that Congress codified the first sale doctrine in the Copyright Act (without disturbing its non-geographical common law application), while in the patent context the first sale doctrine continues to be based on judicial decisions applying common-law principles. In both contexts, however, the first sale doctrine applies to both foreign and domestic sales. Clarifying any possible ambiguity is *Quanta*'s clear re-affirmance that *authorization* of a sale by the U.S. patentee is dispositive, and exhausts the patentee's exclusive right to vend. 553 U.S. at 637.

17

### C.   Restricting Patent Exhaustion to Sales Made in the United States Will Disrupt the Modern Patent Licensing System

Applying *Jazz Photo*'s broad holding[1] calls into question important aspects of the modern patent licensing regime.  If the *Jazz Photo* standard is endorsed *en banc*, it will lead to restrictions on trade that the Supreme Court identified as "intolerable consequences" that result from a geographical application of the first sale doctrine.  *Kirtsaeng*, 133 S. Ct. at 1364–1366.  Global manufacturers like TI will find it difficult to guarantee their downstream customers' freedom from potential infringement actions based on those customers' incorporation of otherwise licensed technology.

For example, TI and other similarly situated licensees may have to begin negotiating licenses that not only authorize their own sales and manufacturing, but also the downstream activities of their customers related to "foreign provenance" products.  Requiring licensees to negotiate for such downstream use violates the basic tenet of first sale exhaustion.  *Bloomer v. McQuewan*, 55 U.S. (14 How.) 539, 549 (1852) ("[W]hen a machine passes to the hands of a purchaser, it is no longer within the limits of the monopoly; it passes outside of it[.]").  Moreover, it may force licensees like TI to provide additional consideration for such

---

[1] *Jazz Photo*, 264 F.3d at 1105 ("United States patent rights are not exhausted by products of foreign provenance. To invoke the protection of the first sale doctrine, the authorized first sale must have occurred under the United States patent.").

downstream rights that they otherwise would not have to provide. In essence, licensees would have to pay more for, and incur additional transaction costs related to, post-sale conduct that should by definition be non-infringing. And to the extent a licensor is not willing to grant such downstream rights, this could create the incongruous situation of a patentee suing downstream customers of an *authorized* licensee for doing nothing more than incorporating *licensed* technology into their own products.

The interests of the patentee, licensee, and purchaser are all better represented by a robust non-territorial patent exhaustion doctrine. From TI's standpoint as a licensor, TI can collect royalties under one global license from a licensee without the added complexity of negotiating separate downstream agreements for purchasers based on jurisdiction of sale. Likewise, in its manufacturing activities, TI can rely on component suppliers' licensing agreements with patentees to ensure that resultant products are not subject to downstream patent restrictions—without delving into the details of numerous third party licensing agreements to determine under what circumstances the license extends past the first sale. Finally, as a licensee, TI can sell licensed goods and assure its customers that the patent rights that TI has already licensed cannot be asserted downstream, regardless of the provenance of the "first sale."

By contrast, under *Jazz Photo*'s territorial regime, the patentee could recover twice for the same patent right—the exact thing proscribed by the Supreme Court's longstanding exhaustion cases and specifically analyzed and rejected in *Kirtsaeng* as contrary to common law principles equally applicable to patent and copyright. *Kirtsaeng*, 133 S. Ct. at 1363; *Bauer*, 229 U.S. at 13.

The harm to consumers from an en banc endorsement of *Jazz Photo* is potentially severe. Imagine a consumer who purchases a fully licensed product while traveling abroad, and returns to the United States with that item. Even though the good was licensed at the point of sale, the right to use the item remains unexhausted once it is brought into the United States, making the consumer's use of the item an act of infringement. In *Kirtsaeng*, the Court acknowledged that copyright claims against end-users were largely hypothetical, 133 S. Ct. at 1366. But not so with patent litigation, where individual consumers such as small businesses and non-profits are known targets. *See, e.g.*, *In re Innovatio IP Ventures, LLC Patent Litig.*, No. 2303, 2013 WL 5593609, 1 (N.D. Ill. Oct. 3, 2013) (suing "coffee shops, hotels, restaurants, supermarkets, large retailers, transportation companies, and other commercial users of wireless internet technology"); *see Vermont v. MPHJ Tech. Invs., LLC*, 763 F.3d 1350, 1352 (Fed. Cir. 2014) (threatening suit against "various business and non-profit organizations"); Brian J. Love & James C. Yoon, *Expanding Patent Law's*

20

*Customer Suit Exception*, 93 B.U.L. Rev. 1605, 1605 (2013) ("Nonpracticing patent holders . . . have collectively sued thousands of alleged patent infringers in cases that generally settle for less than the cost of mounting even the slightest defense. Suits like these overwhelmingly target the numerous resellers and end users of allegedly infringing products rather than the accused products' original manufacturers.").

The concerns raised by Amici and relied on by the Court in *Kirtsaeng* apply equally in the patent context. Just as with copyright, "[t]echnology companies tell us that automobiles, microwaves, calculators, mobile phones, tablets, and personal computers contain [patentable inventions]." *Kirtsaeng*, 133 S. Ct. at 1365. Likewise, "[r]etailers tell us that over $2.3 trillion worth of foreign goods were imported in 2011. American retailers buy many of these goods after a first sale abroad. And, many of these items bear, carry, or contain [patentable inventions]." *Id.* ("Thus, we believe that the practical problems that petitioner and his amici have described are too serious, too extensive, and too likely to come about for us to dismiss them as insignificant—particularly in light of the ever-growing importance of foreign trade to America.").

*Jazz Photo*'s holding allows double remuneration to patentees in conflict with Supreme Court cases like *Univis*, *Masonite*, and *Quanta*. At bottom, the territorial rule of *Jazz Photo* creates confusing and unworkable restraints on

otherwise alienable goods.  A better rule, and the only practicable rule in today's global economy, is the one explained and applied in *Kirtsaeng*, which applies the first sale doctrine to sales *authorized* by the U.S. patentee regardless of where the sale happens to take place.

## VIII.      CONCLUSION

For the foregoing reasons, Texas Instruments urges the Court to hold that the patent exhaustion doctrine is not restricted to patented articles first sold in the United States, and to overrule *Jazz Photo*'s contrary holding.

## IX.    CERTIFICATE OF COMPLIANCE

I certify that this brief contains 5,036 words excluding the corporate

disclosure statement, table of contents, table of citations, and certificates of counsel

as determined by Microsoft Office 2010, the word processing system used to

prepare the brief, and therefore complies with Federal Rules of Appellate

Procedure 29(d) and 32(a)(7)(B).

This brief complies with the requirements of Federal Rules of Appellate

Procedure 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally

spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.


DATE:  June 19, 2015                              /s/ Robert T. Haslam
                                                    Robert T. Haslam

Form 30

**FORM 30. Certificate of Service**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

# CERTIFICATE OF SERVICE

I certify that I served a copy on counsel of record on
by:

Jun 19, 2015

☐ US mail
☐ Fax
☐ Hand
☒ Electronic Means
    (by email or CM/ECF)

Robert T. Haslam

/s/  Robert T. Haslam

Name of Counsel                          Signature of Counsel

Law Firm    Covington & Burling LLP

Address    333 Twin Dolphin Drive, Suite 700

City, State, ZIP    Redwood Shores, CA 94065

Telephone Number    650.632.4700

FAX Number    650.632.4800

E-mail Address    rhaslam@cov.com

NOTE: For attorneys filing documents electronically, the name of the filer
under whose log-in and password a document is submitted must be preceded
by an "/s/" and typed in the space where the signature would otherwise appear.
Graphic and other electronic signatures are discouraged.