**2014-1617, -1619**

# United States Court of Appeals
# for the Federal Circuit

LEXMARK INTERNATIONAL, INC.,

*Plaintiff-Cross-Appellant*

*v.*

IMPRESSION PRODUCTS, INC.,

*Defendant-Appellant*

QUALITY CARTRIDGES, INC., JOHN DOES, 1-20, BLUE TRADING LLC,
EXPRINT INTERNATIONAL, INC., LD PRODUCTS, INC.,
PRINTRONIC CORPORATION, TESEN DEVELOPMENT (HONG KONG)
CO. LTD., and BENIGNO ADEVA AND HIS COMPANIES,

*Defendants.*

*Appeals from the United States District Court for the Southern District of Ohio in Case No. 1:10-CV-00564-MRB, Judge Michael R. Barrett*

## BRIEF *AMICUS CURIAE* OF SANDISK CORPORATION IN SUPPORT OF DEFENDANT-APPELLANT IMPRESSION PRODUCTS, INC.

Robert A. Van Nest
Christa M. Anderson
Leo Lam
Steven A. Hirsch
Keker & Van Nest LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone:  415 391 5400
Facsimile:   415 397 7188

*Attorneys for Amicus Curiae
SanDisk Corporation*

June 19, 2015

# CERTIFICATE OF INTEREST

Counsel for the *Amicus Curiae*, SanDisk Corporation, certifies the following (use "None" if applicable; use extra sheets if necessary):

1. The full name of every party or amicus represented by me is:

      SanDisk Corporation

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

      None.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

      None.

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

      **Keker & Van Nest, LLP**
      Steven A. Hirsch
      Robert A. Van Nest
      Christa M. Anderson
      Leo Lam

Dated:  June 19, 2015

                /s/ Steven A. Hirsch

                STEVEN A. HIRSCH
                KEKER & VAN NEST LLP

                *Attorney for Amicus Curiae*
                *SANDISK CORPORATION*

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ........................................................... i

TABLE OF AUTHORITIES.................................................................. iv

STATEMENT OF RELATED CASES ............................................ viii

I.   STATEMENT OF INTEREST ....................................................1

II.  ARGUMENT ................................................................................6

    A.   *Jazz Photo*'s geographic limitation of the
        exhaustion doctrine undermines two policies
        critical to the functioning of a free and
        innovative economy. ...........................................................6

        1.   Compensating patentees once—not
            repeatedly. ................................................................ 6

        2.   Providing certainty to downstream users
            and sellers. .............................................................. 11

    B.   The en banc Court should overrule *Jazz Photo* in
        light of *Kirtsaeng*. ...........................................................14

        1.   *Jazz Photo* gave the exhaustion doctrine a
            geographical interpretation that this Court
            had never articulated before. ................................. 14

        2.   *Kirtsaeng* rejected the geographical
            interpretation of exhaustion. ................................. 16

        3.   Attempts to distinguish *Kirtsaeng* are
            unpersuasive............................................................ 21

    C.   The *Jazz Photo* rule was founded on error. .....................25

        1.   *Jazz Photo* rests on a misreading of *Boesch
            v. Graff*. ................................................................. 25

2. *Jazz Photo*'s concept of extraterritoriality is misconceived. ........................................................ 30

D. At a minimum, the Court should hold that sales made abroad under a worldwide license with no geographic restrictions are not subject to the *Jazz Photo* rule. .............................................................32

III. CONCLUSION ........................................................................35

CERTIFICATE OF SERVICE ................................................36

CERTIFICATE OF COMPLIANCE ....................................38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Burke,*
  84 U.S. 453 (1873) ................................................................ 13

*Bloomer v. McQuewan,*
  55 U.S. 539 (1852) .................................................................. 7

*Boesch v. Graff,*
  133 U.S. 697 (1890) .......................................................... *passim*

*Bowman v. Monsanto Co.,*
  133 S. Ct. 1761 (2013) ............................................................. 8

*Bruckelmyer v. Ground Heaters, Inc.,*
  445 F.3d 1374 (Fed. Cir. 2006) .............................................. 32

*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.,*
  576 F.3d 1348 (Fed. Cir. 2009) .............................................. 11

*Curtiss Aeroplane & Motor Corp. v. United Aircraft Eng'g Corp.,*
  266 F. 71 (2d Cir. 1920) ........................................................ 34

*Decca Ltd. v. United States,*
  544 F.2d 1070 (Ct. Cl. 1976) ................................................. 31

*Evans v. Stephens,*
  544 U.S. 942 (2005) ............................................................... 24

*Fuji Photo Film Co. v. Jazz Photo Corp.,*
  394 F.3d 1368  (Fed. Cir. 2005) ............................................ 15

*Fujifilm Corp. v. Benun,*
  605 F.3d 1366 (Fed. Cir. 2010) ....................................... 15, 16

*Helferich Patent Licensing, LLC v. N.Y. Times Co.,*
  778 F.3d 1293 (Fed. Cir. 2015) .............................................. 22

*Hobbie v. Jennison,*
  149 U.S. 355 (1893) .............................................................. 13

*In re NTP, Inc.,*
  654 F.3d 1279 (Fed. Cir. 2011) ........................................ 32

*Intel Corp. v. ULSI Sys. Tech., Inc.,*
  995 F.2d 1566 (Fed. Cir. 1993) ..................................... 3, 10

*Jazz Photo Corp. v. International Trade Commission,*
  264 F.3d 1094 (Fed. Cir. 2001) ................................... *passim*

*Keeler v. Standard Folding-Bed Co.,*
  157 U.S. 659 (1895) ................................................ 11, 13, 29

*Keurig, Inc. v. Sturm Foods, Inc.,*
  732 F.3d 1370 (Fed. Cir. 2013) ........................................ 12

*Kirtsaeng v. John Wiley & Sons, Inc.,*
  133 S. Ct. 1351 (2012) ............................................... *passim*

*LG Elecs., Inc. v. Hitachi, Ltd.,*
  655 F. Supp. 2d 1036 (N.D. Cal. 2009) ........................... 7, 30

*LifeScan Scotland, Ltd. v. Shasta Techs., LLC,*
  734 F.3d 1361 (Fed. Cir. 2013) ............................... 12, 19, 22

*Maryland v. Baltimore Radio Show,*
  338 U.S. 912 (1950) (Frankfurter, J.) ............................... 24

*Microsoft Corp. v. AT & T Corp.,*
  550 U.S. 437 (2007) ................................................... 31, 38

*Multimedia Patent Trust v. Apple Inc.*, No. 10-CV-2618-H
  KSC,
  2012 WL 6863471 (S.D. Cal. Nov. 9, 2012) ......................... 34

*Ninestar Tech. Co. v. Int'l Trade Comm'n*,
   667 F.3d 1373 (Fed. Cir. 2012),
   *cert. denied*, 133 S. Ct. 1656 (2013) ............................................... 15, 24

*Pfaff v. Wells Elecs., Inc.*,
   525 U.S. 55 (1998) ................................................................................ 9

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
   711 F.3d. 1348 (Fed. Cir. 2013)
   *cert. denied*, 1345 S. Ct. 900 (2014) ...................................................... 30

*Princo Corp. v. Int'l Trade Comm'n*,
   616 F.3d 1318 (Fed. Cir. 2010) (en banc) ............................................ 10

*Quanta Computer, Inc. v. LG Elecs., Inc.*,
   553 U.S. 617 (2008) ..................................................................... *passim*

*Round Rock Research LLC v. SanDisk Corp.*,
   Federal Circuit Case No. 2014–1678 ............................................ 1, 4, 5

*STMicroelectronics, Inc. v. SanDisk Corp.*, No. 4:05CV45,
   2007 WL 951655 (E.D. Tex. Mar. 26, 2007) ........................................ 34

*Tessera, Inc. v. Int'l Trade Comm'n*,
   646 F.3d 1357 (Fed. Cir. 2011) .................................................. 7, 12, 33

*TransCore, LP v. Elec. Transaction Consultants Corp.*,
   563 F.3d 1271 (Fed. Cir. 2009) ............................................................ 10

*Troy v. Samson Mfg. Corp.*,
   758 F.3d 1322 (Fed. Cir. 2014) ................................................. 16, 21, 25

*United States v. Masonite Corp.*,
   316 U.S. 265 (1942) ...................................................................... 7, 8, 10

*United States v. Univis Lens Co.*,
   316 U.S. 241 (1942) .......................................................................... 6, 9

**Statutes**

17 U.S.C. § 109(a) ........................................................ 17, 18, 22

35 U.S.C. § 271(a) ........................................................ 30, 33

**Other Authorities**

4 W. PATRY, COPYRIGHT § 13:22 (2012) .................................... 24

Margaret Barrett, *The United States' Doctrine of Exhaustion:*
   *Parallel Imports of Patented Goods,*
   27 N. KY. L. REV. 911 (2000) .......................... 8, 12, 16, 25, 28

John A. Rothchild, *Exhausting Extraterritoriality,*
   51 SANTA CLARA L. REV. 1187 (2011) ............................ 9, 22, 25, 28, 32

Sarah R. Wasserman Rajec, *Free Trade in Patented Goods:*
   *International Exhaustion for Patents,*
   29 BERKELEY TECH. L. J. 317 (2014) ............................... 23, 25

Harold C. Wegner, *Post-Quanta, Post-Sale Patentee Controls,*
   7 J. MARSHALL REV. INTELL. PROP. L. 682 (2008) .......................... 25, 29

## STATEMENT OF RELATED CASES

Amicus SanDisk Corporation agrees with Appellant's Statement of Related Cases.

# I.    STATEMENT OF INTEREST[1]

This brief supports the position of defendant-appellant Impression

Products, Inc. on Question (a) posed by the Court's En Banc Order.[2] The

En Banc Order notes that this case "involves certain sales, made

abroad, of articles patented in the United States," and then asks:

> In light of *Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S. Ct.
> 1351 (2012), should this court overrule *Jazz Photo Corp. v.
> International Trade Commission*, 264 F.3d 1094 (Fed. Cir.
> 2001), to the extent it ruled that a sale of a patented item
> outside the United States never gives rise to United States
> patent exhaustion?

SanDisk Corporation has a direct and ongoing interest in this

question, which was the subject of the appellee's brief that SanDisk

recently filed in *Round Rock Research LLC v. SanDisk Corp.*, Federal

Circuit Case No. 2014–1678. Although the *Round Rock* appeal was

dismissed when the case settled, the issue remains a live one for

SanDisk as a manufacturer of memory products embodying components

---

[1] No party's counsel authored this brief in whole or in part; no party or
party's counsel contributed money that was intended to fund preparing
or submitting this brief; and no person other than SanDisk contributed
money that was intended to fund preparing or submitting this brief.

[2] "En Banc Order" refers to the Sua Sponte Hearing En Banc Order
entered April 14, 2015 [Doc. 83]. SanDisk derives its authority to file
this brief from that order, which states that "briefs of amici curiae will
be entertained, and . . . may be filed without consent and leave of
court[.]"

1

purchased abroad, and as a major licensor and licensee of memory-related inventions.

SanDisk is a Fortune 500 company, headquartered in Silicon Valley, that designs, develops, and manufactures flash-memory storage solutions and software. SanDisk markets flash-memory products directly to businesses, original-equipment manufacturers, value-added resellers, system integrators, and consumers. It is one of the largest manufacturers of flash memory in the world. Its products are available at 300,000 retail stores in more than 100 countries and are used in data centers as well as in consumer products such as smartphones, tablets, cameras, and laptops.

A truly global company, SanDisk has more than 8,600 employees worldwide; manufacturing facilities in China, Japan and Malaysia; and facilities for sales, operations, administration, and research and development in the United States, China, France, Germany, India, Ireland, Israel, Japan, Korea, Russia, Scotland, Singapore, Spain, Sweden, Taiwan, and the United Arab Emirates. SanDisk holds more than 5,000 patents worldwide, with issued patents in the United States and more than twenty other countries.

SanDisk is therefore directly interested in the development of the law on international patent exhaustion. A SanDisk product sold in the United States includes components that are purchased abroad and may incorporate a multiplicity of patented technologies from a variety of upstream suppliers. The patent-exhaustion doctrine effectively frees product components of patent rights after the first authorized sale, enabling more complex products to be made and sold free of overlapping patent rights. The doctrine is therefore critical to the success of a global technology manufacturer like SanDisk.

The doctrine is equally important to SanDisk as a patent licensor and licensee. Since 1995, SanDisk has entered into numerous patent cross-license agreements with other global technology suppliers, including Intel, Samsung, and Toshiba. The vast majority of these license agreements have been worldwide in scope, reflecting the multinational nature of the licensing parties' businesses. In particular, worldwide patent licenses have given SanDisk and its cross-licensees the freedom to sell their licensed products throughout the world with the certainty that those products will enjoy the benefits of the license protection as they move through the stream of commerce, regardless of

the particular country in which the initial sale occurs. The ability to have a single license confer such worldwide patent peace is very valuable to SanDisk, because it would unduly burden the contracting parties to negotiate and maintain separate patent cross-licenses for each country in which the parties have (or may have) patents. This is especially true where the contracting parties are licensing large patent portfolios that cover multiple countries and are constantly growing and evolving over time.

The facts in the recently dismissed *Round Rock* appeal illustrate the immediacy of the international-patent-exhaustion issue for SanDisk. Round Rock is a nonpracticing entity whose predecessor, Micron, granted Toshiba and its subsidiaries a worldwide license to make, use, sell (etc.) a variety of products for the duration of various international and United States patents. The licensed products included certain flash-memory chips. In return, Micron received an identical reciprocal license of Toshiba patents.

SanDisk purchased the licensed memory from Toshiba subsidiaries in Japan and incorporated it into products that SanDisk imported into and sold in the United States. Although Round Rock

could not have sued *Toshiba* for infringing the licensed patents, it believed that it could sue *SanDisk* because SanDisk was not a party to the Toshiba-Micron license but merely a downstream customer that had purchased the licensed memory products outside the United States. *Round Rock*'s assertion thus implicated the *Jazz Photo* rule that sales outside the United States do not exhaust U.S. patent rights.

SanDisk moved for summary judgment of noninfringement on grounds of patent exhaustion, arguing that *Jazz Photo* was distinguishable because it did not involve an unconditional worldwide license. SanDisk also argued that the Supreme Court's *Kirtsaeng* decision had effectively overruled *Jazz Photo*—the very issue posed by Question (a) of the En Banc Order. SanDisk renewed both arguments in Round Rock's appeal.

Given the global nature of SanDisk's business and products, *Round Rock* will not be the last case against SanDisk that turns on the scope and vitality of the *Jazz Photo* rule. For reasons set forth below, SanDisk believes that the *Jazz Photo* rule undermines the important purposes of the exhaustion doctrine and that, in light of *Kirtsaeng*, this Court should overrule *Jazz Photo* to the extent that it held that a sale of

a patented item outside the United States never gives rise to United States patent exhaustion.

## II.  ARGUMENT

### A.  *Jazz Photo*'s geographic limitation of the exhaustion doctrine undermines two policies critical to the functioning of a free and innovative economy.

At least two critical policies underlie the exhaustion doctrine: (1) compensating a patentee once for his patent to spur innovation but not repeatedly so as to undermine the free market; and (2) providing certainty to purchasers and users of patented goods. The *Jazz Photo* rule undermines both these policies.

#### 1.  Compensating patentees once—not repeatedly.

The "declared purpose of the patent law is to promote the progress of science and the useful arts by granting to the inventor a limited monopoly, the exercise of which will enable him to secure the financial rewards for his invention." *United States v. Univis Lens Co.*, 316 U.S. 241, 250 (1942). For the patent system to function as intended, its ends must never be confused with its means. Promoting technical progress is the law's "dominant concern," while rewarding inventors remains "secondary and merely a means to that end." *United States v. Masonite*

*Corp.*, 316 U.S. 265, 278 (1942); *see also Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 626 (2008).

Limitations therefore are placed on the scope and extent of the patent monopoly. As the Supreme Court has explained, "[s]ince patents are privileges restrictive of a free economy, the rights which Congress has attached to them must be strictly construed so as not to derogate from the general law beyond the necessary requirements of the patent statute." *Masonite*, 316 U.S. at 280.

One such limitation is the doctrine of patent exhaustion. Under that doctrine, "the initial authorized sale of a patented item terminates all patent rights to that item." *Quanta*, 553 U.S. at 625. When a patented item "passes to the hands of the purchaser, it is no longer within the limits of the [patent] monopoly. It passes outside of it, and is no longer under the protection of the act of Congress." *Bloomer v. McQuewan*, 55 U.S. 539, 549 (1852). The doctrine's "fundamental purpose" is "to prohibit postsale restrictions on the use of a patented article." *Tessera, Inc. v. Int'l Trade Comm'n,* 646 F.3d 1357, 1370 (Fed. Cir. 2011). The doctrine is so critical to the functioning of a free economy that the Supreme Court rejects arguments that would create

7

an "end-run around exhaustion"—e.g., arguments that method claims are never exhausted, *Quanta*, 553 U.S. at 629–30, or that the mere form "into which the parties ch[oo]se to cast the[ir] transaction" determines whether an authorized first sale has occurred. *Masonite*, 316 U.S. at 278 (holding that patentee cannot avoid exhaustion by employing "del credere agency device" to sell patented articles).

The policy underlying this bar on postsale restrictions is that a patentee should get only one chance—not repeated chances—to extract monopoly profits on a patent from the sale of a patented article. *See generally* Margaret Barrett, *The United States' Doctrine of Exhaustion: Parallel Imports of Patented Goods*, 27 N. KY. L. REV. 911, 912–13 (2000) [hereinafter *Parallel Imports*]. Allowing a patentee to extract additional monopoly profits from downstream purchasers and users of a patented article for which the patentee already has been compensated on that same patent would "result in [more] incentive [for innovation] than Congress wanted" and thus create "a mismatch between invention and reward." *Bowman v. Monsanto Co.*, 133 S. Ct. 1761, 1767–68 (2013). In other words, allowing patent owners to "double-dip" would elevate the law's means (rewarding inventors) above its ends

8

(promoting innovation), and thereby upset the patent system's carefully

crafted balance between "motivating innovation" and "avoiding

monopolies that unnecessarily stifle competition." *Pfaff v. Wells Elecs.,*

*Inc.*, 525 U.S. 55, 63 (1998).

The "single-reward principle" has venerable roots. *See generally*

John A. Rothchild, *Exhausting Extraterritoriality*, 51 SANTA CLARA L.

REV. 1187 (2011) [hereinafter *Exhausting Extraterritoriality*]. Supreme

Court decisions dating back over 150 years[3] have "uniformly

recognized" that the purpose of the patent law "is fulfilled with respect

to any particular article when the patentee *has received his reward* for

the use of his invention by the sale of the article, and that once that

purpose is realized the patent law affords no basis for restraining the

use and enjoyment of the thing sold." *Univis*, 316 U.S. at 251 (emphasis

added). By selling the patented article, the patentee not only parts with

the article itself, but also makes that article "the vehicle for

transferring to the buyer the invention with respect to that article. To

that extent he has parted with his patent monopoly . . . and has

received in the purchase price every benefit of that monopoly which the

---

[3] *See Quanta*, 553 U.S. at 625–26.

patent law secures to him." *Id.* at 252. "As a general matter, the unconditional sale of a patented device exhausts the patentee's right to control the purchaser's use of the device thereafter, on the theory that the patentee has bargained for, and received, the full value of the goods." *Princo Corp. v. Int'l Trade Comm'n*, 616 F.3d 1318, 1328 (Fed. Cir. 2010) (en banc). Exhaustion therefore occurs if it can "fairly be said" that the patentee, by means of an authorized initial sale, "*has received his reward* for the use of the article." *Masonite*, 316 U.S. at 278 (emphasis added).

"Exhaustion is triggered only by a sale *authorized* by the patent holder." *Quanta*, 553 U.S. at 636 (emphasis added) (citing *Univis,* 316 U.S. at 249). Of course, one way to authorize the manufacture, sale, or use of a patented invention is to license it. *See TransCore, LP v. Elec. Transaction Consultants Corp.,* 563 F.3d 1271, 1275–76 (Fed. Cir. 2009). The exhaustion doctrine therefore is triggered not only by the patentee's direct sale of a patented article, but also by the sale of a patented product manufactured by a licensee acting within the scope of its license. *Intel Corp. v. ULSI Sys. Tech., Inc.*, 995 F.2d 1566, 1568 (Fed. Cir. 1993). Again, the single-reward principle forms the

underlying justification, for "[i]f a patent owner . . . licenses a [patented] product" rather than making and selling it directly, "it is not unreasonable to hold that [he] has received his due compensation under the patent . . . ." *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 576 F.3d 1348, 1363 (Fed. Cir. 2009). Accordingly, "when [a] royalty ha[s] *once* been paid to a party entitled to receive" that royalty under a patent license, "the patented article then becomes the absolute, unrestricted property of the purchaser, with the right to sell it as an essential incident of such ownership." *Keeler v. Standard Folding-Bed Co.*, 157 U.S. 659, 664 (1895) (emphasis added).

## 2.    Providing certainty to downstream users and sellers.

The exhaustion doctrine not only prevents a patentee from collecting multiple monopoly rents on the same patent or patent claim; it also affords certainty and predictability to purchasers and sellers of patented goods. Absent a robust patent-exhaustion doctrine, patent infringement claims would "survive numerous transactions regarding the patented good, allowing the force of the patent to intrude deeply into the stream of commerce." *Quanta*, 553 U.S. at 630 n.5 (citation omitted). To this extent, the doctrine is said to be rooted in the law's

11

"general abhorrence of restraints on alienation, and the interference [that] such restraints impose on a free market." *Parallel Imports* at 912; *see also LifeScan Scotland, Ltd. v. Shasta Techs., LLC*, 734 F.3d 1361, 1376 (Fed. Cir. 2013).

Concern for the stability of the purchaser's property rights played an important role in the *Tessera* decision, where this Court rejected as "hollow and unpersuasive" the notion that a sale authorized by a patent license could become retroactively ***un***authorized if the licensee later defaulted on its royalty payment. "That absurd result," the Court explained, "would cast a cloud of uncertainty over every sale, and every product in the possession of a customer of the licensee, and would be wholly inconsistent with the fundamental purpose of patent exhaustion—to prohibit postsale restrictions on the use of a patented article." *Tessera*, 646 F.3d at 1370. Because exhaustion is such "an efficient means for ensuring the termination of the patent right," the Supreme Court refuses to dilute the doctrine so as to "produce uncertainty regarding the rights of both third parties and end users." *Keurig, Inc. v. Sturm Foods, Inc.*, 732 F.3d 1370, 1374–75 (Fed. Cir. 2013).

The exhaustion doctrine further reduces buyer uncertainty by holding that "one who buys patented articles of manufacture from one authorized to sell them becomes possessed of an *absolute property* [right] in such articles, *unrestricted in time or place*." *Keeler*, 157 U.S. at 666 (emphases added). Thus, the Supreme Court has held that one who purchases a patented article from a vendor that has an exclusive license to sell that article within a particular geographic area of the United States can then resell the article anywhere in the United States—even within the very geographic area covered by the vendor's exclusive license—because the authorized first sale purges the article of any restriction imposed by patent law. *See id.*[4]

As discussed below, both of the policies canvassed above—compensating patentees once to avoid a mismatch between innovation and reward, and providing certainty to downstream sellers and users—mandate patent exhaustion based on foreign sales of patented articles as well as domestic sales. By contrast, *Jazz Photo*'s geographical interpretation of the patent-exhaustion doctrine creates a mismatch

---

[4] *See also Hobbie v. Jennison*, 149 U.S. 355, 363 (1893) (first authorized sale of patented pipes freed them of contractually imposed geographical use restriction); *Adams v. Burke*, 84 U.S. 453, 456–57 (1873) (same re: patented coffin-lids).

between innovation and reward by granting the patent owner multiple chances to collect monopoly profits on the same patent or patent claim. It hinders free trade in complex high-technology goods and needlessly encumbers consumer products with duplicative infringement claims.

**B.    The en banc Court should overrule *Jazz Photo* in light of *Kirtsaeng*.**

### 1.    *Jazz Photo* gave the exhaustion doctrine a geographical interpretation that this Court had never articulated before.

The issue in *Jazz Photo* was whether defendants' refurbishment of patented single-use disposable cameras (also known as "lens-fitted film packages" or "LFFPs") had crossed the line between permissible "repair" and prohibited "reconstruction." *See Jazz Photo Corp. v. Int'l Trade Comm'n*, 264 F.3d 1094, 1098–99 (Fed. Cir. 2001).[5] A panel of this Court found patent exhaustion as to repaired cameras "for which the patent right was exhausted by first sale in the United States," but

---

[5] "Underlying the repair/reconstruction dichotomy is the principle of exhaustion of the patent right," because a purchaser's right to repair a patented article derives from the fact that, after an authorized first sale cleanses the article of patent rights, the purchaser owns that article outright and can do whatever he wants with it. *Jazz Photo*, 264 F.3d at 1105. But the right to repair the purchased product does not extend to "construct[ing] an essentially new article on the template of the original, for the right to make the article remains with the patentee." *Id.* at 1102.

not as to repaired cameras "whose prior sale was not in the United States." *Id.* at 1110–11. The Court's reasoning (as clarified by a later panel decision)[6] was that the foreign sales did not exhaust the plaintiff's U.S. patents because (1) under the Supreme Court's 1890 decision in *Boesch v. Graff*, 133 U.S. 697, only articles sold "under [a] United States patent" trigger an exhaustion-based repair defense,[7] and (2) foreign sales can never occur "under a United States patent" because "the United States patent system does not provide for extraterritorial effect."[8]

---

[6] *See Fuji Photo Film Co. v. Jazz Photo Corp.*, 394 F.3d 1368, 1376 (Fed. Cir. 2005).

[7] *See Jazz Photo*, 264 F.3d at 1105.

[8] *Fuji Photo Film*, 394 F.3d at 1376 (citation omitted). In two subsequent decisions, this Court rejected arguments that the Supreme Court's 2008 decision in *Quanta* had "eliminated the territoriality requirement for patent exhaustion announced in *Jazz Photo*." *Fujifilm Corp. v. Benun*, 605 F.3d 1366, 1370–72 (Fed. Cir. 2010); *see also Ninestar Tech. Co. v. Int'l Trade Comm'n*, 667 F.3d 1373, 1378–79 (Fed. Cir. 2012), *cert. denied*, 133 S. Ct. 1656 (2013). Below, at Part II.C., we explain why the *Jazz Photo* rule was never well-founded.

*Jazz Photo* thus gave the exhaustion doctrine a geographical interpretation that this Court had never articulated before.[9] Under that interpretation, what matters is whether the first sale *occurred on soil where U.S. law governs*—not that the sale *would have been authorized by U.S. patent law* had it occurred there. The same choice of interpretations was presented in *Kirtsaeng*—and the Supreme Court unequivocally endorsed the nongeographical one. *Kirtsaeng* thus fatally undermines the geographical interpretation announced in *Jazz Photo*. *See Troy v. Samson Mfg. Corp.*, 758 F.3d 1322, 1326 (Fed. Cir. 2014) (collecting cases on implicit overruling).

## 2. *Kirtsaeng* rejected the geographical interpretation of exhaustion.

*Kirtsaeng* arose from a side business set up by an enterprising Cornell mathematics student, Supap Kirtsaeng, who asked his friends and family in Thailand to buy and mail to him cheaper Asian editions of textbooks published by plaintiff Wiley & Sons. Kirtsaeng then resold

---

[9] *See Fujifilm*, 605 F.3d at 1370 (acknowledging that *Jazz Photo* "announced" the territoriality requirement for patent exhaustion); *Parallel Imports* at 927–28 (noting scholarly "disagreement" prior to *Jazz Photo* "about whether the United States follows an 'international exhaustion' or 'territorial exhaustion' doctrine").

the books for a profit in the United States, undercutting the higher prices that Wiley charged for its domestic editions. *Id*. at 1356.

Section 109(a) of the Copyright Act codifies the common-law first-sale doctrine[10] and states in part that "the owner of a particular copy or phonorecord *lawfully made under this title* . . . is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord."[11] After Wiley sued Kirtsaeng for copyright infringement, Kirtsaeng asserted a Section 109(a) defense that the lawful first sale of the books in Thailand had exhausted Wiley's rights under the Copyright Act. *See* 133 S. Ct. at 1357.

In the Supreme Court, Wiley argued that the phrase "lawfully made under this title" in Section 109(a) imposes a geographical limitation that confines the "first sale" doctrine to sales made "'in conformance with the Copyright Act *where the Copyright Act is applicable*." 133 S. Ct. at 1359 (emphasis in original). But Kirtsaeng countered that "lawfully made under this title" imposes a *non*geographic limitation requiring only that the first sale be made "in

---

[10] *See Kirtsaeng*, 133 S. Ct. at 1363.

[11] Emphasis added.

accordance with" or "in compliance with" the Copyright Act—as occurs, for example, where the copies are manufactured abroad with the permission of the copyright owner. *Id.* at 1358.

The Supreme Court sided with Kirtsaeng, concluding that Section 109(a)'s "language, its context, and the common-law history of the 'first sale' doctrine, taken together, favor a *non*-geographical interpretation." *Id.* at 1358 (emphasis in original).

*Kirtsaeng*'s discussion of the statutory phrase "lawfully made *under* this title" is instructive for its implicit rejection of *Jazz Photo*'s "extraterritoriality" rationale. *Jazz Photo* turned on the premise that an authorized first sale outside the United States is not made "under" a U.S. patent. But the *Kirtsaeng* court rejected just such an interpretation of "under" in Section 109(a). Rather, it held that Section 109(a) "says nothing about geography"; that the word "under" can mean "in accordance with"; and that "the nongeographical reading is simple," "promotes a traditional copyright objective (combatting piracy)," and "makes word-by-word linguistic sense." *Id.* at 1358. In so holding, the court rejected the dissenting view that a copy is not lawfully made "under" U.S. law unless made *where U.S. law governs*—even if the

copyright owner consented to or licensed its making. *See id.* at 1376–77 (Ginsburg, J., dissenting). Thus, it could not be clearer that the *Kirtsaeng* court rejected an interpretation of the word "under" that focused on extraterritoriality and that was functionally indistinguishable from the interpretation announced in *Jazz Photo*.

*Kirtsaeng*'s discussion of the history of the first-sale doctrine is equally instructive because that doctrine, like its patent-law twin, originated in judicial decisions. *See Kirtsaeng*, 133 S. Ct. at 1363; *LifeScan*, 734 F.3d at 1376. The court found that the doctrine's common-law history reflected a longstanding judicial concern for "the importance of leaving buyers of goods free to compete with each other when reselling or otherwise disposing of those goods." *Kirtsaeng*, 133 S. Ct. at 1363. The court traced the doctrine back to the English policy against restraints on the alienation of chattels, noting that "American law too has generally thought that competition, including freedom to resell, can work to the advantage of the consumer." *Id.* And the court observed that the doctrine "frees courts from the administrative burden of trying to enforce restrictions upon difficult-to-trace, readily movable goods" and "avoids the selective enforcement inherent in any such

effort." *Id*. The court concluded that "the common-law doctrine makes no geographical distinctions . . . ." *Id*.

The court also surveyed the many practical difficulties likely to arise from giving the first-sale doctrine a geographical interpretation. For example, the court cited the problem of a foreign-made car containing numerous foreign-made software components:

> A geographical interpretation would prevent the resale of, say, a car, without the permission of the holder of each copyright on each piece of copyrighted automobile software. Yet there is no reason to believe that foreign auto manufacturers regularly obtain this kind of permission from their software component suppliers . . . . [And w]ithout that permission a foreign[-]car owner could not sell his or her used car.

*Id*. at 1365. The court concluded that "the practical problems that petitioner and his amici have described are too serious, too extensive, and too likely to come about for us to dismiss them as insignificant—particularly in light of the ever-growing importance of foreign trade to America." *Id*. at 1367.

Like its textual analysis, *Kirtsaeng*'s historical and policy discussions are irreconcilable with *Jazz Photo* and support the judgment below. In the patent field as well as in copyright, the common-

law doctrine of exhaustion prior to *Jazz Photo* "ma[de] no geographical distinctions." *Kirtsaeng*, 133 S. Ct. at 1363. No less than in copyright law, the patent-exhaustion doctrine is grounded in a concern for promoting free markets and consumer welfare; freeing courts from the administrative burden of trying to enforce restrictions on difficult-to-trace, readily movable goods; and preventing the barriers to trade that would arise if a foreign-made article could not be imported without first paying off all the owners of U.S. patents on every invention practiced in that article—a holdup that would allow patent owners to double-dip.

### 3.    Attempts to distinguish *Kirtsaeng* are unpersuasive.

For circuit precedent to be "implicitly overruled as inconsistent with intervening Supreme Court authority, . . . 'the issues decided by the [Supreme Court] need not be identical[.]'" *Troy*, 758 F.3d at 1326 (citation omitted). Rather, the Supreme Court "'must have undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable.'" *Id.* (citation omitted). Attempts to distinguish or minimize the impact of the *Kirtsaeng* decision ignore that rule and are for that reason unpersuasive.

One attempted distinction is that *Kirtsaeng* concerned the statutory interpretation of Section 109(a) of the Copyright Act, which has no counterpart in the Patent Act. But this Court rejected that very argument in *LifeScan*, where it observed that, "[a]lthough copyright's first sale doctrine, unlike patent exhaustion, has been codified by statute, . . . the Supreme Court [in *Kirtsaeng*] looked to the doctrine's common law roots to interpret that provision." 734 F.3d at 1376. This Court then discussed *Kirtsaeng*'s analysis of the common-law roots of copyright's first-sale doctrine, concluding that "[t]he common policies underlying patent exhaustion and the first sale doctrine would be significantly undermined by" a rule that a patentee can evade the exhaustion doctrine by giving away a product embodying the patent and then complaining that it had never received its monopoly reward. *Id.*; *see also Helferich Patent Licensing, LLC v. N.Y. Times Co.*, 778 F.3d 1293, 1305–06 (Fed. Cir. 2015) (emphasizing common-law origin of both patent and copyright exhaustion); *Exhausting Exterritoriality* at 1192, 1195. Indeed, the patent and copyright doctrines are inextricably linked, as "many goods are covered by multiple types of intellectual property rights, so that absent adoption of international exhaustion for

patents, the purposes of [*Kirtsaeng*'s] copyright rule would be thwarted when applied to products also covered by patents." Sarah R. Wasserman Rajec, *Free Trade in Patented Goods: International Exhaustion for Patents*, 29 BERKELEY TECH. L. J. 317, 357 (2014) [hereinafter *Free Trade*]. "For these reasons, if international exhaustion in copyright law is defensible, it should be considered in patent law, too." *Id.*

A second purported distinction is that *Kirtsaeng* is irrelevant because U.S. patent laws have no extraterritorial effect, while the Copyright Act does have such effect. But that argument misses the point that the *Kirtsaeng* court found the whole question of extraterritoriality irrelevant (and rejected Justice Ginsburg's contrary view) because it adopted the *non*geographical interpretation that an article made anywhere in the world is lawfully made "under" the Copyright Act if its manufacture *complies* with the Act. And even Justice Ginsburg—for whom the extraterritoriality issue mattered— disagreed with the assertion that the Copyright Act has extraterritorial effect. Indeed, she devoted a lengthy paragraph of her dissent to establishing that "[t]he Copyright Act . . . does *not* apply extraterritorially" in the sense of governing foreign conduct—a

proposition with which the majority voiced no disagreement. *Id*. at 1376 (Ginsburg, J., dissenting) (emphasis added). The fact that the U.S. has signed a copyright treaty with 180 nations proves only that in the absence of special international agreements, the proscriptions imposed by copyright law remain "rigorously territorial." *Id*. (Ginsburg, J., dissenting) (quoting 4 W. PATRY, COPYRIGHT § 13:22, p. 13–66 (2012)).

A third counterargument is that, if the Supreme Court had intended to modify current law on patent exhaustion, it would not have denied the cert petition in *Ninestar*, 667 F.3d 1373, a case involving international patent exhaustion, shortly after deciding *Kirtsaeng*. Of course, denial of certiorari "carries with it no implication whatever regarding the Court's views on the merits of a case which it has declined to review." *Maryland v. Baltimore Radio Show*, 338 U.S. 912, 919 (1950) (Frankfurter, J.); *see also Evans v. Stephens*, 544 U.S. 942, 942 n.1 (2005) (Stevens, J., respecting denial of certiorari). Indeed, the Solicitor General's opposition to the *Ninestar* cert petition argued for reasons unrelated to the merits that the case was "not a suitable vehicle" to decide the exhaustion question. *See* 2013 WL 476284, at p. 8.

In sum: The *Kirtsaeng* decision has so thoroughly "undercut the theory or reasoning" underlying *Jazz Photo*—i.e., its geographical interpretation of the exhaustion doctrine—that the latter decision is now "clearly irreconcilable" with the *Kirtsaeng*'s reasoning and results. *Troy*, 758 F.3d at 1326.

## C.    The *Jazz Photo* rule was founded on error.

Any concerns that the Court might feel about overruling *Jazz Photo* in light of *Kirtsaeng* should be assuaged by the fact that *Jazz Photo* never was well-founded. Rather, it was based on a misreading of the *Boesch* case and a misunderstanding of the presumption against extraterritoriality.

### 1.    *Jazz Photo* rests on a misreading of *Boesch v. Graff.*

*Jazz Photo* rests on a misreading of the Supreme Court's 1890 decision in *Boesch v. Graff*, 133 U.S. 697.[12] In fact, *Boesch* lent no support to the geographical interpretation of exhaustion announced in *Jazz Photo*. Rather, *Boesch* held that U.S. law, not foreign law, governs

---

[12] Commentators concur. *See Parallel Imports* at 943–45; *Exhausting Extraterritoriality* at 1198–1201; *Free Trade* at 348–52, 368: Harold C. Wegner, *Post-Quanta, Post-Sale Patentee Controls*, 7 J. MARSHALL REV. INTELL. PROP. L. 682, 698 (2008) [hereinafter *Post-Quanta*] (observing that *Jazz Photo* relied on *Boesch* "[w]ithout recognition of factual differences").

the question whether a first sale is "authorized" and therefore capable of exhausting a U.S. patent. 133 U.S. at 703. In other words, *Boesch* adopted the same *non*geographical interpretation of exhaustion urged here and approved by the Supreme Court in *Kirtsaeng*.

The facts were as follows. A German named Hecht was preparing to manufacture lamp burners when a German patent application was filed disclosing an invention practiced by Hecht's burners. Hecht forged ahead anyway and manufactured the infringing burners without seeking permission from the patentees, Graff and Schwintzer. Later, Hecht was acquitted at a criminal patent-infringement trial in Germany based on a unique German statute providing that a patent did not affect persons who, at the time of the patent application, already had begun to use, or had made preparations necessary to use, the patented invention in Germany. *Boesch,* 133 U.S. at 698–702.

The patentees later obtained a U.S. patent on the same invention. *Id.* at 698. The defendants purchased some burners from Hecht in Germany and, without the consent of the U.S. patent owners, imported them to the United States and sold them there. The patentees successfully sued Boesch and his business partner in the Northern

District of California for infringing the U.S. patent, and the Supreme Court affirmed the judgment of liability. *Id.* at 698-99, 702-03.

In the relevant part of its opinion, the Supreme Court rejected the defense of patent exhaustion—but not on the ground that a sale on foreign soil can never exhaust a U.S. patent. Rather, the court framed the question before it as being "whether a dealer residing in the United States can purchase in another country articles patented there, from a person authorized to sell them [in that foreign country], and import them to and sell them in the United States, *without the license or consent of the owners of the United States patent.*" *Id.* at 702 (emphasis added). After reviewing several patent-exhaustion precedents, the court concluded that "[t]he right which Hecht had to make and sell the burners in Germany was allowed him under the laws of *that* country, and purchasers from him could not be thereby authorized to sell the articles in the United States in defiance of the rights of patentees under a United States patent." *Id* at 703 (emphasis added). The court added that "[a] prior foreign patent operates under our law to limit the duration of the subsequent patent here, but that is all. *The sale of*

*articles in the United States under a United States patent cannot be controlled by foreign laws.*" *Id.* (emphasis added).

In other words, *Boesch* held there was no *authorized* first sale of the burners for purposes of U.S. patent law—*not* because the sale occurred in Germany, but because Hecht had not obtained the U.S. patent owner's "license or consent" and the German prior-user statute that rendered the German patent unenforceable against Hecht had no bearing on the enforceability of the U.S. patent against the defendants. The patent owners in *Boesch* therefore never received *any* monopoly profits for their U.S. patents on the imported articles. They didn't even get to "single-dip," let alone double-dip—so there was no exhaustion. *See Parallel Imports* at 936-37; *Exhausting Extraterritoriality* at 1199–1200.

The holding in *Boesch* was absolutely consistent with the non-geographical interpretation of exhaustion approved in *Kirtsaeng* because it equated the sale of an article "under a United States patent" with a sale *authorized* by United States patent law. Nothing in *Boesch* endorsed the competing geographical interpretation of exhaustion, which restricts the sale of an article "under a United States patent" to a

sale authorized by United States patent law *and consummated in the United States*. Indeed, if the *Boesch* court had intended to announce a geographical interpretation of exhaustion, it need not have said anything about Hecht's burner sales being "allowed [only] by the laws of" Germany; the limited reach of German patents; or the impermissibility of U.S. sales under U.S. patents being "controlled by foreign laws." All it need have said is that foreign sales can never be made "under a United States patent" because U.S. patent laws have no extraterritorial effect. But *Boesch* said no such thing.[13]

The Supreme Court confirmed this reading of *Boesch* five years later in *Keeler*, where it explained that *Boesch* "held that the sale of articles in the United States under a United States patent cannot be controlled by foreign laws. In this case neither the patentee nor any assignee had ever received *any* royalty or given any license to use the patented article in any part of the United States." 157 U.S. at 664–65

---

[13] One commentator goes further, asserting that "*Boesch* has *nothing to do with patent exhaustion* because there was no patent right, German or otherwise, that was exercised. *Boesch* dealt with the right of a party to import and sell in the United States a patent-protected stove from Germany where the manufacturer of the German stove was *exempt* from patent infringement under German law due to the operation of a prior user right statute." *Post-Quanta* at 698 (second emphasis in original).

(emphasis added); *see also LG Elecs., Inc. v. Hitachi, Ltd.*, 655 F. Supp. 2d 1036, 1046–47 (N.D. Cal. 2009) (characterizing *Boesch* as holding that "unauthorized" foreign sale did not exhaust U.S. patent). Again, *Keeler* did not endorse or even articulate the geographical interpretation of exhaustion. But *Jazz Photo* made no mention of *Keeler*'s reading of *Boesch*.

*Boesch* was the only authority that *Jazz Photo* cited for its exhaustion holding. But *Boesch* lent that holding no support. This Court, sitting en banc, should overrule *Jazz Photo*.

## 2.    *Jazz Photo*'s concept of extraterritoriality is misconceived.

It is of course "axiomatic that U.S. patent law does not operate extraterritorially *to prohibit infringement* abroad." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.,* 711 F.3d. 1348, 1371 (Fed. Cir. 2013) (emphasis added), *cert. denied*, 1345 S. Ct. 900 (2014). Rather, the Patent Act prohibits anyone "without authority" from making, using, offering to sell, or selling a patented invention "within the United States." 35 U.S.C. § 271(a). Thus, "United States Patent Laws are territorial in their application and by their own terms are not infringed by acts in foreign countries that would be infringements at

home." *Decca Ltd. v. United States*, 544 F.2d 1070, 1072–73 (Ct. Cl. 1976) (per curiam).

As previously mentioned, however, one premise of the holding in *Jazz Photo* is that treating foreign sales as sales "under a United States patent" somehow constitutes the extraterritorial application of U.S. patent law. That rationale is mistaken because citing foreign sales to support an exhaustion defense does not regulate foreign conduct.

Indeed, citing foreign sales as a shield to *defeat* a claim that U.S. patent laws were violated is the very opposite of citing foreign sales as a sword to *prosecute* a claim that U.S. patent laws were violated. Citing foreign sales as the basis for a U.S. infringement claim violates "[t]he presumption that United States law governs domestically but does not rule the world." *Microsoft Corp. v. AT & T Corp.*, 550 U.S. 437, 454 (2007). It disrespects the sovereignty of foreign nations whose law "'may embody different policy judgments about the relative rights of inventors, competitors, and the public in patented inventions.'" *Id.* at 455. But recognizing that foreign sales authorized by the patentee can exhaust U.S. patents does neither of those things. It does not seek to regulate, much less penalize, any foreign conduct. *See Exhausting*

*Extraterritoriality* at 1228–37.[14] This aspect of *Jazz Photo* never made

sense—another reason why this en banc Court should overrule the case.

## D.  At a minimum, the Court should hold that sales made abroad under a worldwide license with no geographic restrictions are not subject to the *Jazz Photo* rule.

Question (a) of the En Banc Order asks whether the Court should

overrule *Jazz Pho*to "to the extent that" it ruled that a sale of a

patented item outside the United States "never" gives rise to United

States patent exhaustion. As argued above, SanDisk believes that the

correct answer to that question is "yes."

But the phrasing of Question (a) suggests that the en banc Court

might uphold *Jazz Photo* "to the extent that" the decision leaves the

door open to international patent exhaustion under specified

circumstances—i.e., "sometimes" rather than "never."

---

[14] Supporting an infringement defense by citing foreign events or documents is nothing new in patent law. For example, under 35 U.S.C. § 102(b), a foreign printed publication can invalidate a patent or prevent it from being issued. *See, e.g.*, *Bruckelmyer v. Ground Heaters, Inc.*, 445 F.3d 1374, 1375 (Fed. Cir. 2006) (holding that Canadian patent application was "printed publication"); *In re NTP, Inc.*, 654 F.3d 1279, 1297 (Fed. Cir. 2011) (same re: document found in Norwegian university library). But no one would suggest that citing a foreign printed publication to invalidate or deny a patent constitutes the extraterritorial application of U.S. law.

If the Court takes that approach, SanDisk urges it to clarify that one such circumstance is when sales are made abroad under a worldwide license that contains no geographic restrictions on the authorized activities. That holding would accord with the principle that the Patent Act only bars making, using, offering to sell, or selling patented technology "without authority," whereas conducting those activities under a license means doing them "with authority." *See* 35 U.S.C. § 271(a). As this Court succinctly put it: "The proper focus is on whether the sales were authorized." *Tessera,* 646 F.3d at 1370.

A rule that a sale anywhere in the world exhausts U.S. patent rights if that sale was authorized by such an unconditional worldwide license comports with the reasonable expectations of the licensing parties, who are likely to be dealing in mobile goods that cross national borders. Conversely, the failure to recognize exhaustion in those circumstances would unfairly extend the patent monopoly, disrupt those reasonable expectations, unduly hinder the licensee's rights, and stifle international trade.

The Second Circuit recognized nearly a century ago that granting an unconditional patent license for a highly mobile article that is

expected to cross international borders exhausts the patentee's rights to

block importation of that article into the United States or to receive

damages for such importation. *See Curtiss Aeroplane & Motor Corp. v.*

*United Aircraft Eng'g Corp.*, 266 F. 71 (2d Cir. 1920). And two recent

district-court decisions likewise hold that patent exhaustion results

from foreign sales made under a negotiated license that expressly

authorizes sales of the licensed technology anywhere in the world. *See*

*Multimedia Patent Trust v. Apple Inc.*, No. 10-CV-2618-H KSC, 2012

WL 6863471 (S.D. Cal. Nov. 9, 2012); *STMicroelectronics, Inc. v.*

*SanDisk Corp.*, No. 4:05CV45, 2007 WL 951655 (E.D. Tex. Mar. 26,

2007).

The results reached in these cases could coexist with a restricted

reading of *Jazz Photo*. The basic premise of that case was that only

sales "under a United States patent" can exhaust U.S. patent rights.

The mere sale of a patented article outside of the U.S. was not made

"under a United States patent" and therefore was held not to have

exhausted U.S. patent rights. But where the licensing parties

negotiated for an unconditional worldwide license, sales made pursuant

to that license are authorized sales "under" all of the licensed patents—including the U.S. patents—wherever the sale may occur.

## III.   CONCLUSION

For all the reasons stated above, and in light of the Supreme Court's *Kirtsaeng* decision, the en banc Court should overrule *Jazz Photo* to the extent that it ruled that a sale of a patented item outside the United States never gives rise to United States patent exhaustion.

Dated:  June 19, 2015

Respectfully submitted,

/s/ Steven A. Hirsch
ROBERT A. VAN NEST
CHRISTA M. ANDERSON
LEO LAM
STEVEN A. HIRSCH
KEKER & VAN NEST LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone: 415 391 5400
Facsimile: 415 397 7188

*Attorneys for Amicus Curiae*
*SANDISK CORPORATION*

# United States Court of Appeals
## for the Federal Circuit

*Lexmark International, Inc. v. Ink Technologies Printer*, 2014-1617, -1619

## CERTIFICATE OF SERVICE

I, Elissa Matias, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by KEKER & VAN NEST LLP, Attorneys for Amicus Curiae, SanDisk Corporation to print this document. I am an employee of Counsel Press.

On **June 19, 2015,** counsel has authorized me to electronically file the foregoing **Brief for Amicus Curiae** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to all counsel registered as CM/ECF users, including any of the following:

Edward F. O'Connor
(principal counsel)
AVYNO LAW P.C.
6345 Balboa Boulevard
Suite 190
Encino, California 91316
(818) 488.8140
*Counsel for Appellant*

Timothy Colin Meece
(principal counsel)
Auda Carol Eidem Heinze
Bryan Medlock, Jr.
Jason S. Shull
Banner & Witcoff, Ltd.
Ten South Wacker Drive
Chicago, IL 60606
312-463-5420
tmeece@bannerwitcoff.com
aheinze@bannerwitcoff.com
bmedlock@bannerwitcoff.com
jshull@bannerwitcoff.com
*Counsel for Cross-Appellant*

Steven B. Loy
Stoll, Keenon & Park, LLP
300 West Vine Street, Suite 2100
Lexington, KY 40507-1380
859-231-3000
steven.loy@skofirm.com
*Counsel for Cross-Appellant*

Constantine L. Trela, Jr.
Sidley Austin LLP
Bank One Plaza
1 South Dearborn Street
Chicago, IL 60603
312-853-7000
ctrela@sidley.com
*Counsel for Cross-Appellant*

Benjamin Beaton
Sidley Austin LLP
1501 K Street, NW
Washington, DC 20005
202-736-8000
bbeaton@sidley.com
*Counsel for Cross-Appellant*

Two paper copies will also be mailed to the above principal counsel when paper copies are sent to the Court. Any counsel for Amici Curiae appearing at the time of this filing will be served only via the email notice from the CM/ECF system.

Upon acceptance by the Court of the e-filed document, 31 paper copies will be filed with the Court within the time provided in the Court's rules.

June 19, 2015

/s/ Elissa Matias
Counsel Press

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, the undersigned certifies that:

1. This brief complies with the type-volume limitation of FED. R. APP. P. 29(d) and 32(a)(7)(B) because this brief contains 6,937 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii), as determined by the word processing system used to generate the brief.

2. This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2003 in Century Schoolbook font, 14 point.

Dated: June 19, 2015                 Respectfully Submitted,


                                     /s/ Steven A. Hirsch
                                     STEVEN A. HIRSCH
                                     KEKER & VAN NEST LLP
                                     *Attorney for Amicus Curiae*
                                     *SANDISK CORPORATION*