Nos. 14-1617, 14-1619

I<small>N THE</small>

# United States Court of Appeals
# for the Federal Circuit

---

LEXMARK INTERNATIONAL, INC.,

*Plaintiff-Cross-Appellant*,

v.

IMPRESSION PRODUCTS, INC.,

*Defendant-Appellant*,

QUALITY CARTRIDGES, INC., JOHN DOES, 1-20, BLUE
TRADING LLC, EXPRINT INTERNATIONAL, INC., LD
PRODUCTS, INC., PRINTRONIC CORPORATION, TESEN
DEVELOPMENT (HONG KONG) CO. LTD., BENIGNO
ADEVA AND HIS COMPANIES,

*Defendants*.

---

Appeals from the United States District Court for the Southern District of
Ohio in No. 1:10-cv-00564-MRB, Judge Michael R. Barrett

---

## BRIEF OF INTELLECTUAL PROPERTY PROFESSORS
## AND AMERICAN ANTITRUST INSTITUTE
## AS AMICI CURIAE IN SUPPORT OF DEFENDANT-APPELLANT

---

Phillip R. Malone
Jef Pearlman
Juelsgaard Intellectual Property and
    Innovation Clinic
Mills Legal Clinic at Stanford Law School
559 Nathan Abbott Way
Stanford, CA 94305-8610
Telephone: 650-725-6369
Fax: 650-723-4426

*Attorneys for Amici Curiae*

# CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rules 29(a) and 47.4, counsel for Amici Curiae certifies that:

1.      The full name of every party or amicus represented by me is:

*24 Intellectual Property Professors (See Attachment to Certificate of Interest)*
*American Antitrust Institute*

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

*None*

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

*None*

4.      The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

*Phillip R. Malone and Jef Pearlman*
*Juelsgaard Intellectual Property and Innovation Clinic*
*Mills Legal Clinic, Stanford Law School*


Dated: June 19, 2015

Phillip R. Malone
Juelsgaard Intellectual Property and
    Innovation Clinic
Mills Legal Clinic at Stanford Law School
559 Nathan Abbott Way
Stanford, CA 94305
Telephone: 650-725-6369
Fax: 650-723-4426

*Attorney for Amici Curiae*

## ATTACHMENT TO CERTIFICATE OF INTEREST
## LIST OF LAW PROFESSOR AMICI CURIAE
### (In alphabetical order)

1. Jeremy W. Bock
2. Irene Calboli
3. Michael A. Carrier
4. Andrew Chin
5. Samuel Ernst
6. Shubha Ghosh
7. Ariel Katz
8. Mark A. Lemley
9. Yvette Joy Liebesman
10. Brian J. Love
11. Mark P. McKenna
12. Michael J. Meurer
13. Tyler T. Ochoa
14. Mark R. Patterson
15. Aaron Perzanowski
16. Sarah R. Wasserman Rajec
17. John A. Rothchild
18. Pamela Samuelson
19. Sharon K. Sandeen
20. Kurt M. Saunders
21. Christopher B. Seaman
22. Katherine J. Strandburg
23. Jennifer M. Urban
24. Ryan Vacca

Titles of amici curiae professors and their institutional affiliations, for identification purposes only, are provided in the Appendix.

# TABLE OF CONTENTS

STATEMENT OF INTEREST ..................................................................1

SUMMARY OF ARGUMENT ..............................................................2

ARGUMENT .........................................................................................3

I.  Exhaustion Is a Longstanding Policy That Promotes Diffusion of
    Technology Through Channels of Commerce ....................................3

II. International Patent Exhaustion Is Good Policy and Does Not Entail
    Extraterritorial Application of U.S. Law .........................................6

    A.  *Jazz Photo's* Holding Is Wrong and Cannot Be Sustained ........................7

        1.  The Court in *Jazz Photo* Misread the Only Case It Cited .................7

        2.  *Jazz Photo* Is Inconsistent with Several Earlier Exhaustion Cases ....9

    B.  *Kirtsaeng's* Reasoning Applies Equally in the Patent Context and
        Undermines *Jazz Photo* .....................................................10

        1.  *Kirtsaeng* Rejected the View That International Exhaustion
            Requires Extraterritorial Application of U.S. Law. ........................10

        2.  Copyright and Patent Law Share the Common-Law Roots On
            Which the *Kirtsaeng* Decision Was Based ......................................12

    C.  U.S. Patent Rights Should Be Exhausted By Authorized Sales
        Anywhere in the World ..........................................................13

III. *Quanta* Held That Post-Sale Use Restrictions Cannot Prevent Patent
     Exhaustion and Recognized That Contract Damages Are an Adequate
     Remedy for Patent Holders. ............................................................14

    A.  *Quanta* Effectively Overruled *Mallinckrodt* ............................................15

    B.  Valid Contract Remedies Adequately Protect the Post-Sale Interests
        of Patent Owners .................................................................20

        1.  Contract Remedies Are Available to Enforce Post-Sale Use
            Restrictions .....................................................................20

        2.  Post-Sale Restrictions Must Be Valid Contracts to Be
            Enforceable for Contract Remedies ..................................................21

    C.  Invalid Post-Sale Use Restrictions Are Not Confined to Misuse and
        Antitrust ..........................................................................23

IV. Recognizing International Exhaustion and Disallowing Post-Sale
    Restrictions Will Not Harm Innovation ...........................................25

A.   Overruling *Mallinckrodt* and *Jazz Photo* Would Leave Patentees with Adequate Remedies ................................................................. 25

B.   Preserving the *Jazz Photo* and *Mallinckrodt* Holdings Would Perpetuate Perverse Outcomes ................................................... 28

V.   The Two Questions Presented Are Theoretically and Practically Linked ....... 29

CONCLUSION ................................................................................................ 30

APPENDIX ........................................................................................................ 1

# TABLE OF AUTHORITIES

## CASES

*Adams v. Burke*, 84 U.S. 453 (1873)...............................................................5, 6, 19

*Bauer & Cie. v. O'Donnell*, 229 U.S. 1 (1913) ...........................................................13

*Bloomer v. Millinger*, 68 U.S. 340 (1863) ....................................................................4

*Bobbs-Merrill Co. v. Straus*, 210 U.S. 339 (1908) ....................................................24

*Boesch v. Graff*, 133 U.S. 697 (1890)......................................................................7, 8

*Curtiss Aeroplane & Motor Corp. v. United Aircraft Eng'g Corp.*, 266 F. 71 (2d Cir. 1920) .................................................................................9

*Dickerson v. Matheson*, 57 F. 524 (2d Cir. 1893) .......................................................9

*Fuji Photo Film Co. v. Jazz Photo Corp.*, 394 F.3d 1368 (Fed. Cir. 2005) .................................................................................10

*FujiFilm Corp. v. Benun*, 605 F.3d 1366 (Fed. Cir. 2010)......................................29

*Gen. Talking Pictures Corp. v. W. Elec. Co.*, 304 U.S. 175 (1938) .......................17

*Griffin v. Keystone Mushroom Farm, Inc.*, 453 F. Supp. 1283 (E.D. Pa. 1978) .................................................................................10

*Hewlett-Packard v. Repeat-O-Type Stencil Mfg. Co.*, 123 F.3d 1445 (Fed. Cir. 1997)................................................................................22

*Holiday v. Mattheson*, 24 F. 185 (C.C.S.D.N.Y. 1885)...........................................9

*Jazz Photo Corp. v. Int'l Trade Comm'n*, 264 F.3d 1094 (2001)........................6, 7

*Keeler v. Standard Folding-Bed Co.*, 157 U.S. 659 (1895)............................ *passim*

*Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S. Ct. 1351 (2013) ...................... *passim*

*LG Elecs., Inc. v. Hitachi, Ltd.*, 655 F. Supp. 2d 1036 (N.D. Cal. 2009) .............................................................................8, 12, 29

*LifeScan Scotland, Ltd. v. Shasta Techs., LLC*, 734 F.3d 1361 (Fed. Cir. 2013) ............................................................................................ 13, 21

*Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700 (Fed. Cir. 1992) ............. *passim*

*Motion Picture Patents Co. v. Universal Film Mfg. Co.*, 243 U.S. 502 (1917) ................................................................................................ 4, 20, 24

*Ninestar Tech. Co. v. Int'l Trade Comm'n*, 667 F.3d 1373 (Fed. Cir. 2012) ...............................................................................................................29

*Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617 (2008)..................... *passim*

*Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 615 F. Supp. 2d 575 (E.D. Ky. 2009)..................................................................................19

*Straus v. Victor Talking Mach. Co.*, 243 U.S. 490 (1917).............................. 5, 6, 22

*Tessera, Inc. v. Int'l Trade Comm'n*, 646 F.3d 1357 (Fed. Cir. 2011)....... 19, 20, 21

*TransCore, LP v. Elec. Transaction Consultants Corp.*, 563 F.3d 1271 (Fed. Cir. 2009)....................................................................................19

*UMG Recordings, Inc. v. Augusto*, 628 F.3d 1175 (9th Cir. 2011)................. 22, 24

*United States v. Masonite Corp.*, 316 U.S. 265 (1942) ............................................6

*United States v. Univis Lens Co.*, 316 U.S. 241 (1942)............................. 15, 16, 25

## STATUTES

17 U.S.C. § 101 (2006 ed.) .....................................................................................11

17 U.S.C. § 104 (2006 ed.) .....................................................................................11

21 U.S.C. § 381(d) (2015) ......................................................................................27

35 U.S.C. § 271(a) (2015)........................................................................................14

## OTHER AUTHORITIES

Ariel Katz, *The First Sale Doctrine and the Economics of Post-Sale Restraints*, 2014 BYU L. Rev. 55.......................................................................27

E. Coke, *Institutes of the Laws of England* (1628) .................................................12

John A. Rothchild, *Exhausting Extraterritoriality*, 51 Santa Clara L. Rev. 1187 (2011) ...............................................................................8

Mark R. Patterson, *Must Licenses Be Contracts?: Consent and Notice in Intellectual Property*, 40 Fla. St. U. L. Rev. 105 (2012)................................22

Molly Shaffer Van Houweling, *The New Servitudes*, 96 Geo. L.J. 885 (2008) ...............................................................................5

Samuel F. Ernst, *Patent Exhaustion for the Exhausted Defendant: Should Parties Be Able to Contract Around Exhaustion in Settling Patent Litigation?*, 2014 U. Ill. J.L. Tech. & Pol'y 445 .......................................5

Sarah R. Wasserman Rajec, *Free Trade in Patented Goods: International Exhaustion for Patents*, 29 Berkeley Tech. L.J. 317 (2014) ..............................................................................27

Thomas W. Merrill & Henry E. Smith, *Optimal Standardization in the Law of Property: The* Numerus Clausus *Principle*, 110 Yale L.J. 1 (2000) ...............................................................................4

Zechariah Chafee, Jr., *The Music Goes Round and Round: Equitable Servitudes and Chattels*, 69 Harv. L. Rev. 1250 (1956).......................................4

CONSTITUTIONAL PROVISIONS

U.S. Const. art. I, § 8, cl. 8................................................................. 4, 13

# STATEMENT OF INTEREST[1]

Amici law professors are academics who study intellectual property and innovation. Their interest in this case stems from their professional academic interest in guiding the development of law in the way that most benefits society. Amici have no personal interest in the outcome of this case.[2]

Amicus curiae the American Antitrust Institute (AAI) is an independent and nonprofit education, research, and advocacy organization devoted to advancing the role of competition in the economy, protecting consumers, and sustaining the vitality of the antitrust laws. *See* http://www.antitrustinstitute.org. The AAI has long recognized the important role the exhaustion doctrine plays in facilitating competition in product markets driven by intellectual property, including aftermarkets. *See, e.g.,* Brief for Amicus Curiae American Antitrust Institute in Support of Petitioners, *Quanta Computer, Inc. v. LG Electronics, Inc.*, 553 U.S. 617 (2008) (No. 06-937).

---

[1] No party or party's counsel authored any part of this brief or contributed money towards its preparation or submission. No one, other than amici and their counsel, contributed money towards the preparation or submission of this brief. This brief is filed pursuant to this Court's April 14, 2015 Order.

[2] Thanks to Stanford Law School Juelsgaard Intellectual Property and Innovation Clinic certified law student Madeleine Laupheimer for her assistance drafting this brief.

1

## SUMMARY OF ARGUMENT

A patent should provide enough insulation from competition to incentivize innovation, and no more.  Once a patentee has received his reward, the law encourages public use and dissemination of patented articles through the doctrine of patent exhaustion, which limits a patentee's ability to control downstream purchasers after placing a patented article in the stream of commerce.  Once a patentee has authorized the first sale of a patented article, his rights in the subsequent use and disposition of that article are no greater than if it had never been patented.

This Court lost sight of exhaustion's core purpose in *Jazz Photo*, when it held that foreign sales authorized by the patent holder did not trigger exhaustion in the United States.  *Jazz Photo* was based on a misinterpretation of the Supreme Court's opinion in *Boesch* and was inconsistent with the prevailing understanding of exhaustion by earlier courts.  More importantly, the Supreme Court in *Kirtsaeng* rejected the extraterritoriality concerns that motivated *Jazz Photo* and reaffirmed the common-law principles against restraints on alienation that animate both copyright and patent exhaustion.  This Court should realign patent exhaustion doctrine with its underlying rationale and reconcile its approach with Supreme Court precedent.

2

This Court's holding in *Mallinckrodt* is also at odds with Supreme Court precedent. *Quanta* clarified that any authorized sale exhausts patent rights and that any conditions on the sale, if they amount to valid agreements, are properly enforced via contract law, not patent law. The *Mallinckrodt* rule, by contrast, improperly expands patent law to permit monopolies as large as the antitrust laws will allow.

The rules for which amici advocate will not leave patent owners helpless. They are still free to pursue contract remedies. But once an authorized sale has occurred anywhere in world, the article has passed outside the bounds of the patent monopoly, and patentees may not claim anything more from the patent law.

## ARGUMENT

### I. Exhaustion Is a Longstanding Policy That Promotes Diffusion of Technology Through Channels of Commerce

The time-honored doctrine of patent exhaustion provides that once a patented article is sold by the patentee or someone authorized by the patentee, the patentee's rights in that article are spent. An authorized purchaser may subsequently make full use of or dispose of the article the same way he can dispose of his other, unpatented possessions. This doctrine is deeply rooted in common-law policies against double recovery and restraints on alienation.

Double recovery may occur where a patentee extracts a royalty at two stages of the distribution chain: once when the patented article is first sold, and again

when it is resold.  But where this results in the patentee recovering more than one

monopoly rent, it overcompensates the patent owner in relation to the good he has

provided to society.  As the Supreme Court has recognized, "the primary purpose

of our patent laws is not the creation of private fortunes for the owners of patents,

but is 'to promote the progress of science and the useful arts.'"  *Motion Picture*

*Patents Co. v. Universal Film Mfg. Co.*, 243 U.S. 502, 511 (1917) (quoting U.S.

Const. art. I, § 8, cl. 8).  The doctrine of exhaustion arose to limit the patentee's

rights to what is necessary to incentivize innovation.  Once a patentee has extracted

one monopoly royalty, patent doctrine should encourage dissemination of the

purchased public good to the public.  *See Bloomer v. Millinger*, 68 U.S. 340, 350

(1863) ("[Patentees] are entitled to but one royalty for a patented machine, . . . .").

By limiting patent holders to a single recovery, a clear exhaustion rule

promotes the alienability of patented articles and reduces transaction costs.  Unlike

clear, reliable property rights, idiosyncratic arrangements of rights impose high

information costs on purchasers.  *See* Zechariah Chafee, Jr., *The Music Goes*

*Round and Round: Equitable Servitudes and Chattels*, 69 Harv. L. Rev. 1250, 1261

(1956); Thomas W. Merrill & Henry E. Smith, *Optimal Standardization in the Law*

*of Property: The* Numerus Clausus *Principle*, 110 Yale L.J. 1, 26-28 (2000).  As a

result, the law has almost uniformly found personal property servitudes

unenforceable.  *See* Molly Shaffer Van Houweling, *The New Servitudes*, 96 Geo.

L.J. 885, 906 (2008).  Post-sale restrictions on patented articles present the same

concerns and should be rejected for the same reasons.  *See Straus v. Victor Talking*

*Mach. Co.*, 243 U.S. 490, 501 (1917) ("[I]t must be recognized that not one

purchaser in many would read such a notice, and that not one in a much greater

number, if he did read it, could understand its involved and intricate

phraseology . . . ."); *see also* Samuel F. Ernst, *Patent Exhaustion for the Exhausted*

*Defendant: Should Parties Be Able to Contract Around Exhaustion in Settling*

*Patent Litigation?*, 2014 U. Ill. J.L. Tech. & Pol'y 445, 472 (noting the

information costs associated with multiple royalty transactions involving patented

articles).

The Supreme Court's resistance to geographical restraints on alienation is

evidenced in *Adams v. Burke*, 84 U.S. 453 (1873), and *Keeler v. Standard Folding-*

*Bed Co.*, 157 U.S. 659 (1895).  In both cases, the patentees had assigned the rights

to make, use, and sell patented articles to different manufacturers in different areas

within the United States.  Yet the Court held that when a purchaser bought

patented articles from a manufacturer with rights in one locality, and went on to

use or sell them in another manufacturer's locality, the second manufacturer had no

rights against the user or reseller.  *Keeler*, 157 U.S. at 666 ("[O]ne who buys

patented articles of manufacture from one authorized to sell them becomes

possessed of an absolute property in such articles, unrestricted in time or place.");

5

*Adams*, 84 U.S. at 456-57.  The Supreme Court determined that "[t]he inconvenience and annoyance to the public that an opposite conclusion would occasion are too obvious to require illustration."  *Keeler*, 157 U.S. at 667.

Though many of the Supreme Court's early cases refusing to enforce personal property servitudes involve restraints that amount to price-fixing and tying, their rationale goes beyond the competitive concerns that animate antitrust. *See Straus*, 243 U.S. at 500-01 (striking down a price-fixing license notice attempting "to sell property for a full price, and yet to place restraints upon its further alienation, such as have been hateful to the law from Lord Coke's day to ours, because obnoxious to the public interest").  The information costs discussed above would prevent articles encumbered by unusual restraints from flowing to the highest-value user, resulting in underuse.  Moreover, patentees are not entitled to the maximum monopoly that antitrust laws will allow—only to a monopoly sufficient to incentivize innovation.  *See, e.g.*, *United States v. Masonite Corp.*, 316 U.S. 265, 277-78 (1942) ("In determining whether or not a particular transaction comes within the rule of the *Bloomer* case regard must be had for the dominant concern of the patent system.").

## II.   International Patent Exhaustion Is Good Policy and Does Not Entail Extraterritorial Application of U.S. Law

This Court's holding in *Jazz Photo Corp. v. International Trade Commission*, 264 F.3d 1094 (2001), was misguided, and the Supreme Court in

*Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S. Ct. 1351 (2013), has since undermined the theory that it was based on—namely, that international exhaustion entails extraterritorial application of U.S. law.

### A.  *Jazz Photo's* Holding Is Wrong and Cannot Be Sustained

The *Jazz Photo* court promulgated a rule inconsistent with Supreme Court precedent on the scope of exhaustion doctrine, relying solely on a misreading of a single case.

### 1.    The Court in *Jazz Photo* Misread the Only Case It Cited

In *Jazz Photo*, a panel of this Court erroneously concluded that international sales do not exhaust U.S. patent rights.  The panel's holding is grounded entirely on a cursory, five-sentence analysis that cites a single case, *Boesch v. Graff*, 133 U.S. 697 (1890), as support for the proposition that "[t]o invoke the protection of the first sale doctrine, the authorized first sale must have occurred under the United States patent." *Jazz Photo*, 264 F.3d at 1105 (citing *Boesch*, 133 U.S. at 701-03). But this interpretation misreads *Boesch*, which did not involve an "authorized first sale" by the patent owner.  Patent exhaustion has never been triggered by unauthorized sales.

The *Boesch* patentees held patents on a lamp-burner in both Germany and the United States.  *Boesch*, 133 U.S. at 698-99.  The defendant purchased lamp-burners in Germany from Hecht, who had no license from the patentee, but was

7

entitled to make and sell them in Germany as a "prior user" under German law. *Id.* at 701-02. The Court concluded that

> [t]he right which Hecht had to make and sell the burners in Germany was allowed him under the laws of that country, and purchasers from him could not be thereby authorized to sell the articles in the United States in defiance of the rights of patentees under a United States patent.

*Id.* at 703. The Court did *not* hold that a foreign sale *authorized* by the patentee would not trigger the exhaustion doctrine. It held only that the distinctly German prior use right could not preclude the patentee from collecting a royalty when the article was sold in the United States. *See LG Elecs., Inc. v. Hitachi, Ltd.*, 655 F. Supp. 2d 1036, 1047 (N.D. Cal. 2009) ("The present case, in contrast, involves an *authorized* sale made pursuant to a license under a United States patent. *Boesch* does not speak to this issue.").

Five years after *Boesch*, the Supreme Court cemented this appropriately narrow reading in *Keeler*. The Court distinguished *Boesch* not on the basis of the foreign location of the sale, but rather on the basis that "neither the patentee nor any assignee had ever received any royalty or given any license to use the patented article in any part of the United States." *Keeler*, 157 U.S. at 665; *see also* John A. Rothchild, *Exhausting Extraterritoriality*, 51 Santa Clara L. Rev. 1187, 1199-201 (2011).

Thus, *Boesch* does not dictate the holding in *Jazz Photo*, and the Supreme Court's reasoning in *Keeler* suggests that *Boesch* is perfectly consistent with an international exhaustion scheme as long as the U.S. patent owner has authorized the sale.

## 2.    *Jazz Photo* Is Inconsistent with Several Earlier Exhaustion Cases

The Supreme Court in *Keeler* and *Adams* held that a patentee is entitled to be paid only once for the sale of a particular product. This logic applies equally to sales made in foreign countries where the U.S. patent owner receives due compensation.

While the Supreme Court never directly addressed foreign patent exhaustion, early lower court opinions were consistent with the principle that where a patentee has authorized a sale in a foreign country, he cannot enjoin resale in the United States under the patent law. *Curtiss Aeroplane & Motor Corp. v. United Aircraft Eng'g Corp.*, 266 F. 71, 78-79 (2d Cir. 1920) (holding that sale of patented planes in Canada by the owner of U.S. and Canadian patents exhausted U.S. patent rights); *Dickerson v. Matheson*, 57 F. 524, 527-28 (2d Cir. 1893) (relying on *Boesch* to conclude that if the U.S. and foreign patent owners were the same entity, a foreign sale would exhaust the patent, but if they were different, import required permission from the domestic rights holder); *Holiday v. Mattheson*, 24 F. 185, 185-86 (C.C.S.D.N.Y. 1885) (holding that a patentee,

9

having sold an article without restriction in England, could not prevent the purchaser from selling it in the United States). While some decisions suggested that foreign sales would not exhaust a U.S. patent, they rested on the same misreading of *Boesch* as *Jazz Photo*. *See, e.g.*, *Griffin v. Keystone Mushroom Farm, Inc.*, 453 F. Supp. 1283, 1284-86 (E.D. Pa. 1978).

## B. *Kirtsaeng*'s Reasoning Applies Equally in the Patent Context and Undermines *Jazz Photo*

*Kirtsaeng* assuaged concerns that international exhaustion amounts to extraterritorial application of U.S. law. *Kirtsaeng* relied on common-law roots of copyright doctrine that patent law shares; therefore its reasoning is equally applicable in the patent context.

### 1. *Kirtsaeng* Rejected the View That International Exhaustion Requires Extraterritorial Application of U.S. Law.

Cases following *Jazz Photo* articulate a misplaced concern over the extraterritorial application of U.S. law. *See Fuji Photo Film Co. v. Jazz Photo Corp.*, 394 F.3d 1368, 1376 (Fed. Cir. 2005) (holding that "foreign sales can never occur under a United States patent because the United States patent system does not provide for extraterritorial effect."). But that rationale has since been rejected by the Supreme Court in *Kirtsaeng*, which demonstrates that the Court does not consider extraterritorial application of U.S. law a bar to international copyright exhaustion. There is no basis for a different conclusion under patent law.

10

Justice Ginsburg, dissenting in *Kirtsaeng*, advanced the same rationale that underlies *Jazz Photo*. *Kirtsaeng*, 133 S. Ct. at 1376 (Ginsburg, J., dissenting). She argued that allowing sales of foreign-made copies authorized by the copyright holder to trigger exhaustion would amount to an extraterritorial application of United States law because a work could only be "lawfully made under" the Copyright Act in places where the Copyright Act was law. *Id.* at 1376-77.

The majority rejected this approach, interpreting "lawfully made under" the Copyright Act to mean simply that the copy of the work could not be infringing. With respect to extraterritorial application, it wrote only that the Copyright Act is "applicable" to anything "subject to protection" under it, including "unpublished works without regard to the nationality or domicile of the author, and works first published in any one of the nearly 180 nations that have signed a copyright treaty with the United States." *Id.* at 1359 (majority opinion) (emphasis omitted) (quoting 17 U.S.C. §§ 101, 104 (2006 ed.)) (internal quotation marks omitted). In the same way, U.S. law can govern treatment of copies first sold abroad when they reach the United States.

Moreover, the concerns about applying U.S. law extraterritorially are at their peak when extraterritorial conduct is being regulated (e.g., holding that unauthorized sale of a copyrighted work in a foreign country violates U.S. law). In the context of foreign exhaustion, the foreign sale is not itself being regulated; it

11

merely affects how subsequent U.S. activities are regulated.  *See LG Elecs., Inc.*, 655 F. Supp. 2d at 1047 (collecting Supreme Court and Circuit cases).

### 2.    Copyright and Patent Law Share the Common-Law Roots On Which the *Kirtsaeng* Decision Was Based

The Supreme Court in *Kirtsaeng* emphasized the common law roots of copyright's first-sale doctrine and its importance as an economic policy. *Kirtsaeng*, 133 S. Ct. at 1363.  It noted that commentators as far back as the 15th century had recognized "the importance of leaving buyers of goods free to compete with each other when reselling or otherwise disposing of those goods," *id.* (citing 1 E. Coke, *Institutes of the Laws of England* § 360, p. 223 (1628) (commenting on Littleton, *Treatise on Tenures* (circa 1480)), and that "[t]he common-law doctrine makes no geographical distinctions," *id.*  Patent exhaustion doctrine is rooted in the same common law tradition with the same important policy rationale.  Though Congress could limit exhaustion to domestic sales, it has not; thus patent exhaustion is even more informed by the common law tradition than the codified copyright first-sale doctrine.  This common law tradition does not, and logically cannot, support geographical limitations.

The *Kirtsaeng* Court recognized that "a geographical interpretation would fail to further basic constitutional copyright objectives, in particular 'promot[ing] the Progress of Science and useful Arts.'"  *Id.* at 1364 (quoting U.S. Const. art. I,

§ 8, cl. 8) (alteration in original). Patent law arises from the same constitutional clause, and similar concerns apply.

The Court called a rule where "the copyright owner can exercise downstream control even when it authorized the import or first sale" an "absurd result" which "would prevent the resale of, say, a car, without the permission of the holder of each copyright on each piece of copyrighted automobile software" where the car was manufactured abroad with software components purchased from foreign suppliers. *Id.* at 1365-66. If *Jazz Photo* stands, the same "absurd result" will persist in the patent context. Indeed, it would even happen with cars, which contain patented as well as copyrighted components. There is nothing special about patent incentives that justifies this level of downstream control for patentees but not for copyright owners. Indeed, this Court has recognized that "copyright cases inform similar cases under patent law." *LifeScan Scotland, Ltd. v. Shasta Techs., LLC*, 734 F.3d 1361, 1375 n.9, 1376 (Fed. Cir. 2013) (citing *Bauer & Cie. v. O'Donnell*, 229 U.S. 1, 13-14 (1913)) (looking to the "common policies underlying patent exhaustion and the first-sale doctrine" to hold that an authorized transfer of title exhausted the patent even when the item was given away).

### C. U.S. Patent Rights Should Be Exhausted By Authorized Sales Anywhere in the World

This Court should reject its misreading of *Boesch* and overrule *Jazz Photo*, adopting a rule consistent with *Kirtsaeng*. Under the proper rule, a sale authorized

by the U.S. patent holder anywhere in the world would exhaust all U.S. patent rights in that item. *See Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 625 (2008) ("[T]he initial authorized sale of a patented item terminates all patent rights to that item.").  One reward to the patentee preserves incentives to innovate while freeing consumers from restraints on the alienation of their personal property.

Though the right to import is codified in the patent statute, 35 U.S.C. § 271(a) (2015), that right, like the rights to use and sell, is exhausted by an authorized sale.  The right to import would still prevent importation of infringing articles manufactured or sold without the U.S. patent holder's authorization. *Quanta*, 553 U.S. at 636 ("Exhaustion is triggered only by a sale authorized by the patent holder.").  Additionally, patent owners are free to enter into contracts with their manufacturers and distributors restricting import into the United States—they would just be prohibited from using patent law to enforce these contractual terms.

## III. *Quanta* Held That Post-Sale Use Restrictions Cannot Prevent Patent Exhaustion and Recognized That Contract Damages Are an Adequate Remedy for Patent Holders.

*Quanta* makes clear that patentees cannot use post-sale restrictions to avoid exhaustion, but they are free to contract for such restrictions if those contracts are otherwise valid.

14

### A.    *Quanta* Effectively Overruled *Mallinckrodt*

The Supreme Court's opinion in *Quanta* so undermined the foundation of the holding in *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700 (Fed. Cir. 1992) that the *Mallinckrodt* holding can no longer survive.  In *Quanta*, LGE had licensed Intel to make and sell components substantially embodying its patents, but disclaimed any license to Intel's customers to combine those components with non-Intel parts.  *Quanta*, 553 U.S. at 623.  The Court rejected LGE's patent infringement claims because LGE had unconditionally authorized Intel's sales; therefore the patents were exhausted and Intel's customers did not need a license to practice them.  *Id.* at 636-37.  The Court's broad articulation of exhaustion doctrine—that "the initial authorized sale of a patented item terminates all patent rights to that item," *id.* at 625—cannot be reconciled with *Mallinckrodt*'s rule that parties can freely forestall exhaustion with the type of sticker notice at issue here.

First, the Court clarified that the rule it applied in *United States v. Univis Lens Co.*, 316 U.S. 241 (1942) was broader than the interpretation of that case relied upon by *Mallinckrodt*.  Univis sold lens blanks to wholesalers, who were licensed to finish and sell them at a fixed price only to retailers licensed by Univis.  *Univis*, 316 U.S. at 244.  The *Univis* Court held that the patent rights were exhausted by the sale of the original lens blanks; therefore patent law did not prevent the license's pricing terms from being subject to scrutiny under antitrust

15

laws. *Id.* at 249-50. *Mallinckrodt* subsequently limited the *Univis* holding to price-fixing and tying cases, holding that conditions on sale could serve to prevent patent exhaustion as long as those conditions didn't "violate[] some other law or policy." *Mallinckrodt*, 976 F.2d at 708. But the court in *Quanta* made clear that "*Univis* governs this case," despite the absence of allegations of patent misuse or anticompetitive behavior in *Quanta*. *Quanta*, 553 U.S. at 631. Thus, under the *Quanta* Court's reading, *Univis* stands for the much broader proposition that an "authorized sale of an article which is capable of use only in practicing the patent is a relinquishment of the patent monopoly with respect to the article sold." *Id.* (quoting *Univis*, 316 U.S. at 249) (internal quotation mark omitted).

Second, in finding LGE's patent rights exhausted, the *Quanta* Court acknowledged that contract law, not patent law, would be the proper framework under which to enforce post-sale use restrictions. The Court noted:

> [T]he authorized nature of the sale to Quanta does not necessarily limit LGE's other contract rights. LGE's complaint does not include a breach-of-contract claim, and we express no opinion on whether contract damages might be available even though exhaustion operates to eliminate patent damages. See *Keeler v. Standard Folding Bed Co.*, 157 U.S. 659, 666 (1895) ("Whether a patentee may protect himself and his assignees by special contracts brought home to the purchasers is not a question before us, and upon which we express no opinion. It is, however, obvious that such a question would arise as a question of contract, and not as one under the inherent meaning and effect of the patent laws").

*Id.* at 637 n.7.

16

Contract law and patent law provide for separate remedies. A patentee can attempt to contractually enforce a post-sale restriction, but such contract clauses do not prevent patent exhaustion. *Mallinckrodt* had assumed the opposite, concluding that "[u]nless the condition violates some other law or policy (in the patent field, notably the misuse or antitrust law), private parties retain the freedom to contract concerning conditions of sale," and thereby retain their *patent* rights as long as the restriction is "reasonably within the patent grant." *Mallinckrodt*, 976 F.2d at 708 (citation omitted). But *Quanta* makes clear that if there is an authorized sale of an article, no amount of contracting can change the fact that, as far as patent law is concerned, the patent owner's rights in the article have been exhausted.

While the *Quanta* Court acknowledged the continuing validity of *General Talking Pictures Corp. v. Western Electric Co.*, 304 U.S. 175 (1938), that case is consistent with overruling *Mallinckrodt*. *General Talking Pictures* merely stands for the unremarkable proposition that a patent owner may place restrictions on a manufacturer-licensee as to who is authorized to purchase a patented product. *Id.* at 181. In that case, the Court held that a sale to a commercial user under a license to sell only to noncommercial users was not authorized by the patentee. *Id.* ("There is no warrant for treating the sales of amplifiers to petitioner as if made under the patents or the authority of their owner.").

17

Overruling *Mallinckrodt* does not render all restrictions on who is authorized to purchase a patented product unenforceable. Patentees are free to determine whether, when, and to whom to sell their products. They are equally free to negotiate contractual terms of sale with authorized buyers. But once an authorized sale is made, all patent rights are exhausted. Allowing parties to enforce contract rights with patent law remedies after patent rights have been exhausted, as *Mallinckrodt* does, distorts the traditional role of the patent law by making it an enforcer of contracts and, as discussed above, enables restraints on alienation that are untenable under U.S. law.

Finally, the *Quanta* decision endorsed so broad an application of exhaustion doctrine that the Court cannot have expected *Mallinckrodt* to survive. *See Quanta*, 553 U.S. at 621 ("For over 150 years this Court has applied the doctrine of patent exhaustion to limit the patent rights that survive the initial authorized sale of a patented item."). In holding that method patents were subject to exhaustion, the Court recognized the "danger" of a contrary holding which would permit an "end-run around exhaustion." *Quanta*, 553 U.S. at 630. It refused to accept a rule where, "although Intel is authorized to sell a completed computer system that practices the LGE Patents, any downstream purchasers of the system could nonetheless be liable for patent infringement" because such a rule would "violate the longstanding principle that, when a patented item is 'once lawfully made and

18

sold, there is no restriction on [its] use to be implied for the benefit of the patentee.'" *Id.* (quoting *Adams*, 84 U.S. at 457) (alteration in original) (emphasis omitted).  Though articulated in a part of the opinion about the exhaustibility of method patents, the Court's policy concerns against personal property servitudes have equal force when applied to post-sale restrictions.

At least one other court has already held that *Quanta* overruled *Mallinckrodt*.  *Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 615 F. Supp. 2d 575, 585-86 (E.D. Ky. 2009) ("[T]his Court is persuaded that *Quanta* overruled *Mallinckrodt sub silentio*.").  The *Static Control* court, examining the same Lexmark Prebate program at issue in this case, found that "[t]he Supreme Court's broad statement of the law of patent exhaustion simply cannot be squared with the position that the *Quanta* holding is limited to its specific facts."  *Id.* at 586.[3]

---

[3] This Court's panel opinions after *Quanta* are consistent with the conclusion that *Mallinckrodt* was overruled.  *See, e.g.*, *Tessera, Inc. v. Int'l Trade Comm'n*, 646 F.3d 1357, 1370 (Fed. Cir. 2011) ("[T]he fundamental purpose of patent exhaustion [is] to prohibit post[-]sale restrictions on the use of a patented article."); *TransCore, LP v. Elec. Transaction Consultants Corp.*, 563 F.3d 1271, 1277 (Fed. Cir. 2009) (approving exclusion of evidence concerning an oral post-sale restriction because "[t]he only issue relevant to patent exhaustion is whether Mark IV's sales were authorized, not whether TransCore and Mark IV intended, expressly or impliedly, for the covenant [not to sue] to extend to Mark IV's customers").

**B.   Valid Contract Remedies Adequately Protect the Post-Sale Interests of Patent Owners**

Though post-sale restrictions attached to an authorized sale cannot be enforced via patent law, contract remedies are still available and adequate where there is a valid contract.

**1.   Contract Remedies Are Available to Enforce Post-Sale Use Restrictions**

As discussed above, the Supreme Court in *Quanta* specifically pointed to contract remedies to enforce other contract rights where "exhaustion operates to eliminate patent damages." *Quanta*, 553 U.S. at 637 n.7.  The Supreme Court has often suggested that contract remedies may be appropriate where exhaustion renders patent remedies unavailable. *See Motion Picture Patents*, 243 U.S. at 509 ("The extent to which the use of the patented machine may validly be restricted to specific supplies or otherwise by special contract between the owner of a patent and the purchaser or licensee is a question outside the patent law . . . ."); *Keeler*, 157 U.S. at 666 (stating that if there were "special contracts" reciting post-sale restrictions, their interpretation would arise under contract, not patent law).

Similarly, this Court has implicitly recognized the benefits of keeping violations of contract law to contract remedies.  In *Tessera, Inc. v. International Trade Commission*, 646 F.3d 1357 (Fed. Cir. 2011), this Court held that sales authorized under a license agreement did not suddenly become unauthorized (and

20

therefore patent infringements) when the licensee fell behind on its royalty payments. *Id.* at 1370.

Though contract remedies require privity and generally do not allow patentees to obtain injunctions, those limitations are reasonable in light of public policy concerns. A major objective of the first-sale doctrine is to avoid servitudes that run with the product and allow suit against downstream users. *See Kirtsaeng*, 133 S. Ct. at 1363; *LifeScan*, 734 F.3d at 1376-77. The privity requirement places a reasonable limitation on patentees seeking to impose significant transaction costs and restraints on trade on downstream purchasers. And it puts patentees in no worse a position post-sale than the many commercial entities who conduct business without the benefit of a statutory monopoly.

### 2.    Post-Sale Restrictions Must Be Valid Contracts to Be Enforceable for Contract Remedies

The *Mallinckrodt* court recognized that a patentee cannot simply slap a sticker on a product reciting restrictions attached to its use and thereby render nonconforming uses patent infringement. Rather, the sticker must create a valid contract. *Mallinckrodt* did not decide whether the "label license" "met the legal requirements for notice" because that issue was not disputed on appeal, *Mallinckrodt*, 976 F.2d at 701, but noted that the sale must be "validly conditioned under the applicable law such as the law governing sales and licenses" for the restriction to be enforceable, *id.* at 709. *See also LifeScan*, 734 F.3d at 1375 n.8

21

("Although LifeScan points to a notice on its meters' packaging that purportedly requires customers to use LifeScan's test strips . . . our cases make clear that such notices are relevant only if they are 'in the form of a contractual agreement.'" (citation omitted)); *Hewlett-Packard v. Repeat-O-Type Stencil Mfg. Co.*, 123 F.3d 1445, 1453 (Fed. Cir. 1997) ("[A] seller's intent, unless embodied in an enforceable contract, does not create a limitation on the right of a purchaser to use, sell, or modify a patented product."). Thus, even under *Mallinckrodt*, post-sale restrictions are subject to scrutiny under ordinary contract law principles.

Under those principles, "label licenses" that fail to give proper notice and elicit a meaningful manifestation of assent are invalid even for contract purposes. *See* Mark R. Patterson, *Must Licenses Be Contracts?: Consent and Notice in Intellectual Property*, 40 Fla. St. U. L. Rev. 105, 123-24 (2012) (discussing the invalidity of *Mallinckrodt*'s label license as a contractual matter). Arrangements which purport to be licenses but in fact effect a transfer of title are subject to exhaustion. Merely putting a sticker on a product cannot change that result. *See Straus*, 243 U.S. at 500; *see also UMG Recordings, Inc. v. Augusto*, 628 F.3d 1175,1182-83 (9th Cir. 2011) (holding that a restrictive label license attached to an unsolicited promotional CD was in fact a title transfer because merely "accept[ing]" an unsolicited item did not constitute "acceptance" of the license terms). Were it otherwise, car manufacturers could use the patent law to compel

22

drivers to buy their gasoline from the manufacturer on pain of patent infringement suit by the mere artifice of putting a sticker on the gas tank.

Contract law remains available to patentees who wish to impose lawful restrictions on buyers. But the contracts must be real contracts, not just unilateral announcements of policy of the sort at issue in *Mallinckrodt*.

### C.   Invalid Post-Sale Use Restrictions Are Not Confined to Misuse and Antitrust

By allowing patentees, via contractual conditions of sale, to avoid exhaustion and extend the reach of the patent law to anything that isn't otherwise illegal, the court in *Mallinckrodt* improperly cabined the Supreme Court's holdings on exhaustion. *Mallinckrodt* specifically distinguished *Motion Picture Patents Co.* by relegating its holding to cases involving patent misuse. *Mallinckrodt*, 976 F.2d at 708 ("However, this is not a price-fixing or tying case, and the *per se* antitrust and misuse violations found in the *Bauer* trilogy and *Motion Picture Patents* are not here present."). But *Motion Picture Patents* is not so limited.

The Supreme Court emphasized longstanding policies, discussed above, against personal property servitudes and double recovery. It noted that patent law did not allow a patentee

> to send its machines forth into the channels of trade of the country subject to conditions as to use or royalty to be paid, to be imposed thereafter at the discretion of such patent owner. The patent law furnishes no warrant for such a practice, and the cost, inconvenience,

23

and annoyance to the public which the opposite conclusion would
occasion forbid it.

*Motion Picture Patents*, 243 U.S. at 516.  Additionally, the Court provided that the

inventor is entitled only to

> the exclusive use of just what his inventive genius has discovered.  It
> is all that the statute provides shall be given to him and it is all that he
> should receive, for it is the fair as well as the statutory measure of his
> reward for his contribution to the public stock of knowledge.

*Id.* at 513.  This case cannot be viewed solely as a patent misuse case; rather these

principles are broadly applicable to exhaustion cases.

Furthermore, cases originally about the intersection of antitrust and

exhaustion have been expanded to exhaustion generally.  *See Quanta*, 553 U.S. at

635-36 (relying on *Univis*, a case about whether a patent monopoly prevented

application of antitrust laws to price-fixing license clauses, in a case unrelated to

antitrust or misuse); *see also UMG*, 628 F.3d at 1179-80, 1183 (relying on the

price-fixing case *Bobbs-Merrill Co. v. Straus*, 210 U.S. 339 (1908) in a first-sale

copyright case unrelated to antitrust).  The *Quanta* Court held that LGE's patent

rights were exhausted without any reference at all to patent misuse or antitrust

principles, focusing instead on whether the sale was authorized.  *See Quanta*, 553

U.S. *passim*.  The key point was the authorized nature of the sale, not the specific

character of the conditions.

Accordingly, the validity of post-sale restrictions enforced via patent law does not hinge on whether they violate antitrust law or constitute patent misuse. Where parties contract for post-sale restrictions, those contract terms are outside the protection of the monopoly and subject to antitrust scrutiny just as any other contract terms would be. *See Univis*, 316 U.S. at 250 ("Hence the patentee cannot control the resale price of patented articles which he has sold, either by resort to an infringement suit, or, consistently with the Sherman Act . . . , by stipulating for price maintenance by his vendees."). But once a sale is authorized, post-sale restrictions are simply ineffective to restore patent rights.

## IV. Recognizing International Exhaustion and Disallowing Post-Sale Restrictions Will Not Harm Innovation

Overruling *Mallinckrodt* and *Jazz Photo* leaves patentees with adequate contract remedies; not doing so leaves open absurd results.

### A. Overruling *Mallinckrodt* and *Jazz Photo* Would Leave Patentees with Adequate Remedies

Lexmark asserts that a ban on its end-run around exhaustion would prevent it from ensuring the quality of its printer cartridges because third-party manufacturers do a poor job, leading to customer complaints against Lexmark. Corrected Opening Brief of Plaintiff-Cross Appellant Lexmark Int'l Inc. at 10-14, Nos. 14-1617, 14-1619 (Fed. Cir. Oct. 21, 2014). But patent law has nothing to

25

say about the maintenance of Lexmark's brand. Lexmark, like any manufacturer of unpatented articles, is free to control its products using contract terms.

Lexmark also contends that international exhaustion would harm patentees' ability to price discriminate. *Id.* at 53. Similar concerns were expressly rejected by the *Kirtsaeng* Court as outside the realm of copyright law. *Kirtsaeng*, 133 S. Ct. at 1370 ("[W]e can find no basic principle of copyright law that suggests that publishers are especially entitled to [price discriminate.]"). Patent law likewise does not guarantee patentees such an ability. International patent exhaustion will not prevent patent owners from using contract law to engage in appropriate and otherwise legal price discrimination, just as copyright owners and other market participants are expected to do.

Price discrimination allows manufacturers to increase profits by exploiting differences in markets' demand—charging a high price in markets that will bear it while still making sales at lower prices in lower-demand markets. The pharmaceutical industry is an example of a market where the ability to price discriminate may arguably have value. It might sometimes permit patent owners to sell important drugs in developing countries at lower prices without undermining their ability to reap large rewards for their innovation in high-price markets.[4] But

---

[4] For arguments that the current domestic exhaustion scheme does not improve welfare generally, see Sarah R. Wasserman Rajec, *Free Trade in Patented Goods:*

international exhaustion will not stop patent owners from continuing to reap the benefits, if any, of price discrimination—it will merely restrict them to using contract law instead of patent remedies.

In fact, a company's patent gives it strong bargaining power to negotiate for contract terms that restrict import into the United States.  Also, many foreign distributors are repeat players with reputational incentives, not just contract law incentives, to honor their contractual agreements.  In the small world of big pharma, for example, it is likely that a breach of contract with even one pharmaceutical company would make it difficult for a foreign distributor ever to get more business.  Finally, while international exhaustion might make it more difficult for drug companies to prevent some individual end-users in developing countries from selling their products in the United States, it is unlikely that individuals, acting without assistance from contractually-bound distributors, could ever obtain enough products for a significant gray market.  Furthermore, for prescription drugs first manufactured in the United States and sold abroad, FDA law explicitly prohibits their re-importation by anyone other than the manufacturer regardless of patent status.  21 U.S.C. § 381(d) (2015).

---

*International Exhaustion for Patents*, 29 Berkeley Tech. L.J. 317, 361-67 (2014). With respect to pharmaceuticals specifically, see Ariel Katz, *The First Sale Doctrine and the Economics of Post-Sale Restraints*, 2014 BYU L. Rev. 55, 80-81.

Thus, a rule of international exhaustion would confine patent law to its proper scope by limiting restraints on alienation that run with the patented article while allowing patentees to retain appropriate levels of quality control and price discrimination under contract law.

## B. Preserving the *Jazz Photo* and *Mallinckrodt* Holdings Would Perpetuate Perverse Outcomes

John Wiley & Sons tried to argue to the *Kirtsaeng* Court that the parade of horribles advanced by Kirtsaeng and his amici were "artificially invented," proved by the fact that, though the law had been settled, they had not yet occurred. *Kirtsaeng*, 133 S. Ct. at 1366. The Court pronounced itself "less sanguine," because the lack of harm could be due to lack of enforcement by copyright holders, noting that "a copyright law that can work in practice only if unenforced is not a sound copyright law." *Id.* The same is true of a sound patent law.

Whether or not this Court considers the restrictions on refilling printer cartridges in this case a "horrible," or believes it likely that a patent holder would inhibit a Canadian buyer's right to sell his used car in the United States by means of post-sale restraints on alienation, a law that works in practice but not in theory is unsound—causing "uncertainty," "selective enforcement," and "disrespect" for the law. *Id.* As it stands, a patentee could make it a condition of sale that a consumer use its patented widget only on Sundays, and sue him for patent infringement if he forgets the day of the week. The fact that no patentee has done this yet is not a

reason to keep a rule that allows it. Just because the status quo has not resulted in outrageous lawsuits does not mean patentees won't be more aggressive in the future or that the law should afford them such expansive and problematic rights.

## V.    The Two Questions Presented Are Theoretically and Practically Linked

Though addressing distinct legal questions, *Kirtsaeng* and *Quanta* are thematically linked by their broad language supporting exhaustion. There are parties and lower courts so struck by the broad announcement in support of exhaustion in *Quanta*, a case presenting purely domestic issues, that they believe it requires international exhaustion. *See LG Elecs.*, 655 F. Supp. 2d at 1046 ("Drawing such a distinction between authorized domestic sales and authorized foreign sales would negate the Supreme Court's stated intent in *Quanta* to eliminate the possibility of a patent holder doing an 'end-run' around the exhaustion doctrine . . . ."); *see also Ninestar Tech. Co. v. Int'l Trade Comm'n*, 667 F.3d 1373, 1378 (Fed. Cir. 2012) (rejecting Ninestar's argument that *Quanta* overruled *Jazz Photo*); *FujiFilm Corp. v. Benun*, 605 F.3d 1366, 1371-72 (Fed. Cir. 2010) (rejecting Benun's similar argument). This Court should consider that the questions it rules on in this case are both, at bottom, about what degree of protection the patent law provides in pursuit of innovation. The rest can be left to ordinary commercial law.

Practically, so long as one end-run around exhaustion persists, patentees will take advantage of it. If *Mallinckrodt* falls and *Jazz Photo* stands, patentees will be encouraged to sell first overseas in order to extract a second royalty when items enter the United States. If *Jazz Photo* falls and *Mallinckrodt* stands, patentees will be able to use conditions of sale to effectively prevent international patent exhaustion. This potential outcome illustrates the disproportionate power of the *Mallinckrodt* rule to allow patentees to bypass settled doctrines of patent exhaustion, based on critical policy determinations, with contract terms and yet retain patent remedies.

## CONCLUSION

For the aforementioned reasons, this Court should (1) overrule *Jazz Photo* in light of *Kirtsaeng* and (2) hold that *Quanta* overruled *Mallinckrodt*.

Phillip R. Malone
Jef Pearlman
Juelsgaard Intellectual Property and
    Innovation Clinic
Mills Legal Clinic at Stanford Law School
559 Nathan Abbott Way
Stanford, CA 94305
Telephone: 650-725-6369
Fax: 650-723-4426

*Attorneys for* Amici Curiae

# CERTIFICATE OF SERVICE

I certify that I served a copy on counsel of record on June 19, 2015 by

Electronic Means (by CM/ECF).

Phillip R. Malone
Juelsgaard Intellectual Property and
    Innovation Clinic
Mills Legal Clinic at Stanford Law School
559 Nathan Abbott Way
Stanford, CA 94305
Telephone: 650-725-6369
Fax: 650-723-4426
E-mail: pmalone@law.stanford.edu

*Attorney for Amici Curiae*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e). The brief contains 7000 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5)(A) and the type styles requirements of Federal Rule of Appellate Procedure 32(a)(6).  The brief has been prepared in a proportionally spaced typeface using Microsoft Word for Windows 2013, in 14 point Times New Roman font.

Phillip R. Malone
Juelsgaard Intellectual Property and
    Innovation Clinic
Mills Legal Clinic at Stanford Law School
559 Nathan Abbott Way
Stanford, CA 94305
Telephone: 650-725-6369
Fax: 650-723-4426

*Attorney for Amici Curiae*

# APPENDIX

Amici Curiae law professors are listed below. Affiliation is provided for identification purposes only, and the brief does not reflect the views of the listed institutions.

Jeremy W. Bock
Assistant Professor of Law
The University of Memphis Cecil C. Humphreys School of Law

Irene Calboli
Professor of Law, Texas A&M University School of Law (effective Fall 2015)
Visiting Professor, Singapore Management University School of Law

Michael A. Carrier
Distinguished Professor
Rutgers Law School

Andrew Chin
Associate Professor of Law
UNC School of Law

Samuel Ernst
Assistant Professor
Dale E. Fowler School of Law at Chapman University

Shubha Ghosh
George Young Bascom Professor in Business Law
University of Wisconsin Law School

Ariel Katz
Associate Professor
Innovation Chair, Electronic Commerce
Faculty of Law, University of Toronto

Mark A. Lemley
William H. Neukom Professor of Law
Director, Stanford Program in Law, Science, and Technology
Stanford Law School

Yvette Joy Liebesman
Associate Professor of Law
Saint Louis University School of Law

Brian J. Love
Assistant Professor
Co-Director, High Tech Law Institute
Santa Clara University School of Law

Mark P. McKenna
Associate Dean for Faculty Development
Professor of Law and Notre Dame Presidential Fellow
Notre Dame Law School

Michael J. Meurer
Abraham and Lillian Benton Scholar and Professor of Law
Boston University School of Law

Tyler T. Ochoa
Professor of Law
High Tech Law Institute
Santa Clara University School of Law

Mark R. Patterson
Professor of Law
Fordham University School of Law

Aaron Perzanowski
Associate Professor of Law
Case Western Reserve University School of Law

Sarah R. Wasserman Rajec
Assistant Professor of Law
William & Mary Law School

John A. Rothchild
Associate Professor
Wayne State University School of Law

Pamela Samuelson
Richard M. Sherman Distinguished Professor of Law
Co-Director, Berkeley Center for Law and Technology
University of California-Berkeley, School of Law

Sharon K. Sandeen
Professor of Law
Hamline University School of Law

Kurt M. Saunders
Professor of Business Law
California State University, Northridge

Christopher B. Seaman
Assistant Professor of Law
Washington and Lee University School of Law

Katherine J. Strandburg
Alfred B. Engelberg Professor of Law
New York University School of Law

Jennifer M. Urban
Assistant Clinical Professor of Law
Director, Samuelson Law, Technology & Public Policy Clinic
University of California-Berkeley, School of Law

Ryan Vacca
Associate Professor
Director of the Center for Intellectual Property Law & Technology
The University of Akron School of Law