Nos. 14-1617, 14-1619

IN THE

# United States Court of Appeals for the Federal Circuit

LEXMARK INTERNATIONAL, INC.,

*Plaintiff-Cross-Appellant,*

v.

IMPRESSION PRODUCTS, INC., *et al.*,

*Defendant-Appellant.*

*(Full caption on inside cover)*

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO, JUDGE MICHAEL R. BARRETT

## BRIEF OF PUBLIC KNOWLEDGE, THE ELECTRONIC FRONTIER FOUNDATION, THE OPEN SOURCE HARDWARE ASSOCIATION, THE DIGITAL RIGHT TO REPAIR COALITION, AND PUBLIC CITIZEN, INC. AS *AMICI CURIAE* IN SUPPORT OF APPELLANT IMPRESSION PRODUCTS

VERA RANIERI
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
(415) 436-9333
vera@eff.org

CHARLES DUAN
  *Counsel of Record*
SHERWIN SIY
RAZA PANJWANI
PUBLIC KNOWLEDGE
1818 N Street NW, Suite 410
Washington, DC 20036
(202) 861-0020
cduan@publicknowledge.org

*Counsel for amici curiae*

Rev. 050a2268

LEXMARK INTERNATIONAL, INC.,

*Plaintiff-Cross-Appellant,*

v.

IMPRESSION PRODUCTS, INC.,

*Defendant-Appellant*;

QUALITY CARTRIDGES, INC., JOHN DOES, 1–20, BLUE TRADING
LLC, EXPRINT INTERNATIONAL, INC., LD PRODUCTS, INC.,
PRINTRONIC CORPORATION, TESEN DEVELOPMENT (HONG
KONG) CO. LTD., BENIGNO ADEVA AND HIS COMPANIES,

*Defendants.*

## CERTIFICATE OF INTEREST

Pursuant to Rules 29(a) and 47.4 of the Federal Circuit Rules of Practice, counsel of record certifies as follows:

(1) The full name of every party or amicus represented by counsel to this brief is **Public Knowledge, the Electronic Frontier Foundation, the Open Source Hardware Association, the Digital Right to Repair Coalition, and Public Citizen, Inc.**

(2) The above-identified parties are the real parties in interest.

(3) The corporate disclosure statement of Rule 26.1 of the Federal Rules of Appellate Procedure is as follows: There is no parent corporation to or any corporation that owns 10% or more of stock in the above-identified parties or amici curiae.

(4) The names of all law firms and the partners and associates that have appeared for the party in the lower tribunal or are expected to appear for the party in this court are: **Charles Duan, Sherwin Siy, and Raza Panjwani, Public Knowledge, Washington, DC; and Vera Ranieri, Electronic Frontier Foundation, San Francisco, CA**.

Dated: June 19, 2015        /s/ Charles Duan
        _____
        Charles Duan
        *Counsel for amici curiae*

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . iii

INTEREST OF *AMICI CURIAE* . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

I.   Patent Exhaustion Is a Consumer Protection Doctrine That Should Be Broadly Construed to Protect Personal Property Ownership Rights . . . 6

    A.   Copyright and Anti-Circumvention Cases Disapprove of Using Intellectual Property Law to Control Use of Purchased Goods . . . 6

    B.   The Law Has Long Disfavored Limits on Free Alienation of Property to Protect Consumers . . . . . . . . . . . . . . . . . . . . 11

    C.   Patent Exhaustion Promotes Numerous Important Consumer Interests . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

II.  *Jazz Photo* Should Be Overruled, as an International Authorized Sale Should Give Rise to Exhaustion . . . . . . . . . . . . . . . . . . . 17

    A.   *Kirtsaeng*'s Reasoning About the Copyright First Sale Doctrine Applies Without Distinction to Patent Exhaustion . . . . . . . . . 18

    B.   International Exhaustion Is the Preferable Policy, Because It Avoids Anticompetitive Effects . . . . . . . . . . . . . . . . . 22

III. Post-Sale Restrictions on Use of a Product Do Not Abrogate Patent Exhaustion for That Product . . . . . . . . . . . . . . . . . . . . . 24

    A.   *Mallinckrodt*'s Cramped "Implied License" Theory Cannot Fully Embrace *Quanta*'s Broad View of Exhaustion . . . . . . . . . . . 25

    B.   The Conditional Sale Doctrine Permits Manufacturers to Burden Consumers' Use of Purchased Goods Unduly . . . . . . . . . . . 27

    C.   Intellectual Property Law Should Not Become a Vehicle of Contract Enforcement Against Non-Privy Third Parties . . . . . . . . 29

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . 32

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . 33

# TABLE OF AUTHORITIES

### CASES

*Adams v. Burke*,
   84 U.S. (17 Wall.) 453 (1873) . . . . . . . . . . . . . . . . . . . . 25

*Aro Manufacturing Co. v. Convertible Top Replacement Co.*,
   377 U.S. 476 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Atari Games Corp. v. Nintendo of America, Inc.*,
   975 F.2d 832 (Fed. Cir. 1992) . . . . . . . . . . . . . . . . . . . . 10

*Bauer & Cie v. O'Donnell*,
   229 U.S. 1 (1913) . . . . . . . . . . . . . . . . . . . . 13, 21, 25

*Bloomer v. McQuewan*,
   55 U.S. (14 How.) 539 (1852) . . . . . . . . . . . . . . . . . . . . 12

*Bobbs-Merrill Co. v. Straus*,
   210 U.S. 339 (1908) . . . . . . . . . . . . . . . . . . . 12–13, 21

*Boesch v. Gräff*,
   133 U.S. 697 (1890) . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
   509 U.S. 209 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Chamberlain Group, Inc. v. Skylink Technologies, Inc.*,
   381 F.3d 1178 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . 7–8

*Global-Tech Appliances, Inc. v. SEB S.A.*,
   131 S. Ct. 2060 (2011) . . . . . . . . . . . . . . . . . . . . . . . . 21

*Intel Corp. v. ULSI System Technology, Inc.*,
   995 F.2d 1566 (Fed. Cir. 1993) . . . . . . . . . . . . . . . . . . 22

*Jazz Photo Corp. v. International Trade Commission*,
   264 F.3d 1094 (Fed. Cir. 2001) . . . . . . . . . 17–18, 21–23, 31

*Keeler v. Standard Folding Bed Co.*,
    157 U.S. 659 (1895) . . . . . . . . . . . . . . . . . . . . . . . 29

*Kendall v. Winsor*,
    62 U.S. (21 How.) 322 (1859) . . . . . . . . . . . . . . . . . 28

*Kirtsaeng v. John Wiley & Sons, Inc.*,
    133 S. Ct. 1351 (2013) . . . . . . . . . . . . . . . 4, 13, 15, 17–22, 28

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007) . . . . . . . . . . . . . . . . . . . . . 19

*Lexmark International, Inc.*
    *v. Static Control Components, Inc.* ("*Static Control*"),
    387 F.3d 522 (6th Cir. 2004) . . . . . . . . . . . . . . . . 8–10

*LG Electronics, Inc. v. Bizcom Electronics, Inc.*,
    453 F.3d 1364 (2006) . . . . . . . . . . . . . . . . . . . . 26

*Mallinckrodt, Inc. v. Medipart, Inc.*,
    976 F.2d 700 (Fed. Cir. 1992) . . . . . . . . . . . . . . 24–28, 31

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
    545 U.S. 913 (2005) . . . . . . . . . . . . . . . . . . . . . 21

*Motion Picture Patents Co. v. Universal Film Manufacturing Co.*,
    243 U.S. 502 (1917) . . . . . . . . . . . . . . . . . . . . . 28

*Quanta Computer, Inc. v. LG Electronics, Inc.*,
    553 U.S. 617 (2008) . . . . . . . . . . . . . . . . . 5, 24–27, 29

*Sega Enterprises Ltd. v. Accolade, Inc.*,
    977 F.2d 1510 (9th Cir. 1992) . . . . . . . . . . . . . . . . 10

*Sony Corp. of America v. Universal City Studios, Inc.*,
    464 U.S. 417 (1984) . . . . . . . . . . . . . . . . . . . . . 21

*Storage Technology Corp.*
    *v. Custom Hardware Engineering & Consulting, Inc.*,
    421 F.3d 1307 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . 8, 29

*Straus v. Victor Talking Machine Co.*,
    243 U.S. 490 (1917) . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Univis Lens Co.*,
    316 U.S. 241 (1942) . . . . . . . . . . . . . . . . . . . . . . 25

## STATUTES

17 U.S.C. § 109(a) (2012) . . . . . . . . . . . . . . . . . . . . 12

21 U.S.C. § 381 (2012) . . . . . . . . . . . . . . . . . . . . . 24

35 U.S.C. § 271(a) (2012) . . . . . . . . . . . . . . . . . . . . 21

Digital Millennium Copyright Act (DMCA), 17 U.S.C. § 1201 (2012) . . . 6–8, 10

Robinson-Patman Price Discrimination Act, 15 U.S.C. § 13 (2012) . . . . . . 23

## OTHER SOURCES

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (3d ed. 2006) . . . . . 20

Fred Barbash, *Keurig's K-Cup Screw-up and How It K-pitulated to Angry
Consumers*, Wash. Post (May 7, 2015), http://www.washingtonpost.com/
news/morning-mix/wp/2015/05/07/keurigs-k-cup-screw-up-and-how-it-
k-pitulated-wednesday-to-angry-consumers/ . . . . . . . . . . . . . . . . 14

Zachariah Chafee, *The Music Goes Round and Round: Equitable Servitudes
and Chattels*, 69 Harv. L. Rev. 1250 (1956) . . . . . . . . . . . . . . . 16

Julie E. Cohen, *Reverse Engineering and the Rise of Electronic Vigilantism:
Intellectual Property Implications of "Lock-Out" Programs*, 68 S. Cal. L. Rev.
1091 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Edward Coke, *Institutes of the Lawes of England* (1628) . . . . . . . . . . . 11, 19

*Comments of Electronic Frontier Foundation on Exemption to Prohibition on Circumvention of Copyright Protection Systems* (Copyright Office Feb. 6, 2015), *available at* http://copyright.gov/1201/2015/comments-020615/ InitialComments_longform_EFF_Class21.pdf . . . . . . . . . . . . . . . . 14

*Comments of Farm Hack on Exemption to Prohibition on Circumvention of Copyright Protection Systems* (Copyright Office Feb. 4, 2015), *available at* http://copyright.gov/1201/2015/comments-020615/InitialComments_ ShortForm_FarmHack_class21.pdf . . . . . . . . . . . . . . . . . . . . 15

Sean Flynn et al., *An Economic Justification for Open Access to Essential Medicine Patents in Developing Countries*, 37 J.L. Med. & Ethics 184 (2009), *available at* http://ssrn.com/abstract=2112418 . . . . . . . . . . . . . . . . 23

George L. Haskins, *Extending the Grasp of the Dead Hand: Reflections on the Origins of the Rule Against Perpetuities*, 126 U. Pa. L. Rev. 19 (1977) . . . . 12

James B. Kobak, Jr., *Contracting Around Exhaustion: Some Thoughts About the CAFC's* Mallinckrodt *Decision*, 75 J. Pat. & Trademark Off. Soc'y 550 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Sisule F. Musungu & Cecilia Oh, *The Use of Flexibilities in TRIPS by Developing Countries: Can They Promote Access to Medicines?* (2005), *available at* http://www.who.int/intellectualproperty/studies/TRIPSFLEXI.pdf . . . . . . 23

Mark R. Patterson, *Contractual Expansion of the Scope of Patent Infringement Through Field-of-Use Licensing*, 49 Wm. & Mary L. Rev. 157 (2007) . . . . 26

Mat Smith, *Surprise! People Don't Like Keurig's DRM-Protected Coffeemakers*, Engadget (Feb. 6, 2015), http://www.engadget.com/2015/02/06/ unsurprisingly-people-didn-t-like-keurigs-drm-protected-coffee/ . . . . . . . 14

Richard H. Stern, *Post-Sale Patent Restrictions after* Mallinckrodt—*An Idea in Search of Definition*, 5 Alb. L.J. Sci. & Tech. 1 (1994) . . . . . . . . . . . . 28

Richard H. Stern, *The Unobserved Demise of the Exhaustion Doctrine in U.S. Patent Law:* Mallinckrodt v. Medipart, 15 Eur. Intell. Prop. Rev. 460 (1993) . . 26

Molly Shaffer Van Houweling, *The New Servitudes*, 96 Geo. L.J. 885 (2007)   . . 15

Eric von Hippel, *People Don't Need a Profit Motive to Innovate*, Harv. Bus. Rev., Nov. 2011, *available at* https://hbr.org/2011/11/people-dont-need-a-profit-motive-to-innovate . . . . . . . . . . . . . . . . . . . . . . . . 17

Jayashree Watal, *Access to Essential Medicines in Developing Countries: Does the WTO TRIPS Agreement Hinder It?* (Ctr. for Int'l Dev., Harvard Univ., Science, Technology and Innovation Discussion Paper No. 8, 2000), http://www.cid.harvard.edu/archive/biotech/papers/discussion8.pdf . . . . . . . . 24

## INTEREST OF *AMICI CURIAE*

*Amici curiae*[1] are public interest groups and trade associations who share a common interest in balanced intellectual property rights that protect consumers' rights to use, repair, and resell their personal property.  *Amici* represent a wide range of interests, including consumer advocacy, digital civil liberties, product repair and resale, and access to medicines.

Public Knowledge is a non-profit organization dedicated to preserving the openness of the Internet and the public's access to knowledge, promoting creativity through balanced intellectual property rights, and upholding and protecting the rights of consumers to use innovative technology lawfully.  As part of this mission, Public Knowledge advocates on behalf of the public interest for a balanced patent system, particularly with respect to new, emerging technologies.

The Electronic Frontier Foundation is a non-profit civil liberties organization that has worked for more than 20 years to protect consumer interests, innovation, and free expression in the digital world.  EFF and its more than 21,000 dues-paying members have a strong interest in helping the courts and policy-makers strike the appropriate balance between intellectual property and the public interest.

---

[1] This brief is filed pursuant to this Court's *sua sponte* order for rehearing en banc, dated April 14, 2015.  Pursuant to Rule 29(c)(5), no counsel for a party authored this brief in whole or in part, and no counsel or party made a monetary contribution intended to fund the preparation or submission of the brief.  No person or entity, other than *amici*, their members, or their counsel, made a monetary contribution to the preparation or submission of this brief.

The Open Source Hardware Association aims to be the voice of the open hardware community. Open source hardware is hardware whose design is made publicly available so that anyone can study, modify, distribute, make, and sell the design or hardware based on that design. OSHWA works toward ensuring that technological knowledge is accessible to everyone, and encouraging the collaborative development of technology that serves education, environmental sustainability, and human welfare.

The Digital Right to Repair Coalition encompasses more than twenty not-for-profit trade associations, consumer advocacy groups, and environmental advocates who are committed to defending the right to repair, reuse and recycle electronics products and services. As part of that mission, DRTR seeks to promote intellectual property laws that serve the public interest by balancing the needs of copyright holders, patent holders, and the public. DRTR members both buy and sell equipment and parts throughout the global economy. Limitations on the availability of such equipment and parts based on the dead hand of control post-purchase would have a devastating effect on aftermarket technology trading, repair, and services.

Public Citizen, Inc., is a national consumer-advocacy organization based in Washington, D.C., with more than 400,000 members and supporters nationwide. Public Citizen is active before Congress, administrative agencies, and the courts

on a variety of consumer-protection issues. Public Citizen has long been concerned about the effect on consumers of expansive, unjustified and anticompetitive claims of intellectual property rights. Public Citizen is also critically concerned about the availability of affordable medications both in this country and in the developing world, an issue it pursues through its Global Access to Medicines Program. For this reason, it is particularly troubled by unfounded assertions that limiting the patent exhaustion doctrine will somehow enhance consumers' access to medicines.

## SUMMARY OF ARGUMENT

Though by jurisdictional mandate this Court's focus has been on ownership rights in inventions, the present case deals with a much more fundamental type of property: consumer rights in personal objects, bought and sold in commerce. To defend these consumer rights, the doctrine of patent exhaustion must be strongly protected against limitation.

1.   Exhaustion should be construed broadly to protect consumers of purchased goods from overreaching attempts by sellers to extend a dead hand of control against those consumers or even unknowing third parties. The doctrine of patent exhaustion derives from centuries-old common law principles disfavoring restraints on alienability of property. They are principles that have survived

the test of time because they support critical and essential policy objectives of protecting consumer rights, avoiding monopolistic practices, and promoting efficient markets and administrative efficiency.

Given this law and policy favoring free and unburdened ownership of goods, one might expect that courts would look disfavorably upon attempts to use intellectual property law to restrict and burden such ownership, particularly in situations where the intellectual property interest is attenuated. And the jurisprudence bears this out: this Court and many others have time and again rejected attempts by product manufacturers to twist copyright and anti-circumvention laws into monopolistic tools of post-sale control. This Court should not allow patent law to be so twisted either.

2.    In this case, Lexmark attempts to circumvent this central doctrine of patent exhaustion and turn patent law into a lever of consumer restriction in two ways. Both should fail.

First, Lexmark contends that patent exhaustion doctrine should not apply to product sales outside the United States. But the Supreme Court directly rebuffed a precisely analogous argument in *Kirtsaeng v. John Wiley & Sons, Inc.* based on reasoning that is fully applicable to the present case: reasoning based on the historical disapproval of and policy problems with post-sale restraints on use and alienability of purchased goods. Lexmark had the opportunity to receive full

and just compensation for its sale outside the United States; its attempt to get a second bite at the patent royalty apple upon importation of the sold product is nothing more than a consumer-detrimental attempt at price discrimination that cannot be enforced through patent law.

Second, Lexmark suggests that its contractual provisions on the sale of its product were sufficient to circumvent a finding of patent exhaustion. But *Quanta Computer, Inc. v. LG Electronics, Inc.* rejected the notion that a cause for patent infringement could arise in relation to a product after it was sold, regardless of such contractual provisions. To permit an infringement action to go forward could open up a vast range of third parties to liability, many in totally unexpected and economically unproductive ways.

Lexmark may have causes of action under contract law. But to allow a manufacturer to use patent law, a system designed to promote dissemination of new inventions, for purposes of controlling consumers' use of lawfully purchased goods—that is a stretch too far. The common law has looked down upon it, other intellectual property domains have rejected it, and this Court in the context of patent exhaustion should turn it down as well.

## ARGUMENT

## I. Patent Exhaustion Is a Consumer Protection Doctrine That Should Be Broadly Construed to Protect Personal Property Ownership Rights

Patent exhaustion protects the rights of consumers to use and sell their property without unexpected interference from patentees. This doctrine ought to be broadly construed to strongly protect those consumers.

Courts have consistently held that intellectual property rights cannot be leveraged to exert post-sale control over products. These holdings derive from centuries-old common law principles disfavoring restraints on alienability and use of property, and further serve important policy interests of consumer protection. These judicial holdings, common law doctrines, and policy goals should all point this Court toward construing the patent exhaustion doctrine expansively, not permitting the sort of manufactured limitations on the doctrine that Lexmark seeks to introduce in this case.

## A. Copyright and Anti-Circumvention Cases Disapprove of Using Intellectual Property Law to Control Use of Purchased Goods

It is a concerningly commonplace occurrence for companies to call upon intellectual property law not to protect their creative contributions but rather to command a dead hand of control on consumer-purchased commodities. Copyright and the related anti-circumvention prohibitions of the Digital Millennium

Copyright Act (DMCA), 17 U.S.C. § 1201 (2012), have popularly been the basis for such attempts, and this Court and others have repeatedly rejected those over-broad assertions of rights. The regular refusal of courts to turn copyright law and § 1201 into a mechanism of post-sale consumer control should cause this Court to look askance at Lexmark's attempt to do the same with patent law here.

1.   The anti-circumvention provisions of § 1201 generally proscribe attempts to circumvent effective technological measures that protect access to copyrighted works, and courts have repeatedly said that those proscriptions are not to be used purely for exerting future control over goods absent a substantial intellectual property interest nexus.

In *Chamberlain Group, Inc. v. Skylink Technologies, Inc.*, a garage door opener manufacturer claimed that a maker of competing and compatible garage opener transmitters had violated § 1201 because the competing transmitters had circum-vented a technological measure, namely an encrypted garage door opening sig-nal. *See* 381 F.3d 1178, 1185 (Fed. Cir. 2004). But *Chamberlain* rejected this § 1201 theory, because the manufacturer had failed to show substantial injury to under-lying intellectual property rights, and rather asserted § 1201 purely to prevent competition in its consumer products. *See id.* at 1201.

This Court refused to read that statute to allow a manufacturer "to restrict consumers' rights to use its products in conjunction with competing products."

*Id.* To hold otherwise "would allow virtually any company to attempt to leverage its sales into aftermarket monopolies—a practice that both the antitrust laws and the doctrine of copyright misuse normally prohibit." *Id.* (citations omitted). *Chamberlain* thus held that intellectual property protection could not be wielded as a sword to cut off consumer aftermarket decisions.

Following *Chamberlain*, this Court considered whether the maker of a data backup system could maintain a § 1201 claim against a developer of a maintenance program that circumvented the backup system's technological measures to trace errors in that system. *See Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Inc.*, 421 F.3d 1307, 1310 (Fed. Cir. 2005). The backup system maker noted that its contracts with customers prohibited the use of such maintenance programs, but nevertheless this Court found no violation of the DMCA: "The activation of the maintenance code may violate [the backup system manufacturer]'s contractual rights vis-à-vis its customers, but those rights are not the rights protected by copyright law." *Id.* at 1319.

And in a case involving highly similar facts (and one of the same parties) to the present appeal, the Sixth Circuit refused to find a violation of § 1201 by a manufacturer of computer chips that circumvented technological protection measures designed to prevent refilling of printer ink cartridges. *Lexmark Int'l, Inc. v. Static Control Components, Inc.* ("*Static Control*"), 387 F.3d 522, 546–47 (6th Cir. 2004).

In reaching that conclusion, that court noted that nowhere in the legislative history of that statute "did Congress express an interest in creating liability for the circumvention of technological measures designed to prevent consumers from using consumer goods." *Id.* at 549.

Accordingly, courts have consistently held that copyright anti-circumvention law does not authorize post-sale restrictions on commodities not substantially related to the underlying intellectual property right.

2.    Courts have also rejected manufacturers' attempts at post-sale product control through direct copyright infringement suits.

Manufacturers sometimes embed "lock-out codes" in product components (such as toner cartridges or single-serve coffee pods). When those components are installed into the main product (a laser printer or coffee machine), the main product queries the components for the lock-out code, and the product will refuse to operate absent a correct code. *See* Julie E. Cohen, *Reverse Engineering and the Rise of Electronic Vigilantism: Intellectual Property Implications of "Lock-Out" Programs*, 68 S. Cal. L. Rev. 1091, 1094–95 (1995).

Third-party makers of compatible components then install the lock-out code in their components to ensure that the main product will operate, and in several cases the original manufacturer has sued those third-party component makers on the theory that the lock-out code is copyrighted. *See id.* at 1095.

This copyright infringement theory has been uniformly rejected as an improper application of copyright law to stop consumer choice in physical goods. *See Static Control*, 387 F.3d at 536 (code sequence required to operate product held uncopyrightable); *see also Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1524 & n.7 (9th Cir. 1992) (incorporation of unlocking code into came console cartridge deemed fair use); *Atari Games Corp. v. Nintendo of Am., Inc.*, 975 F.2d 832, 840 (Fed. Cir. 1992) (no clear error in district court's conclusion that "the generation of a data stream to unlock a console" was unprotectable idea or process).[2] The purpose of copyright is to promote creation, not to crush competition in consumer goods, and courts have refused to permit copyright to be used to such ends.

Accordingly, with respect to both copyright law and § 1201 of the DMCA, courts consistently refuse to let intellectual property law transmogrify into a post-sale lever of control over consumer products. This Court should similarly refuse to turn patent law into such an undue and anticompetitive mechanism for manufacturers.

---

[2]While *Atari* ultimately found that copyright infringement had occurred, the infringement was copying of computer code that *generated* the unlocking code, not copying of the unlocking code itself, and the Court found that there were multiple ways that the computer code could have been implemented. *See* 975 F.2d at 840.

## B. The Law Has Long Disfavored Limits on Free Alienation of Property to Protect Consumers

An overarching concern about dead hand control over goods after sale to consumers is the consistent theme of the patent exhaustion doctrine, the corresponding copyright first sale doctrine, and the common law of property.

Jurisprudential disapproval of restraints on post-sale use of property derives through at least four centuries of common law. As far back as 1628, Sir Edward Coke, Lord Chief Justice,[3] wrote that a post-sale restraint on alienability is void because it unnecessarily impinges on the free exchange of goods, saying that such restraint "is against Trade and Traffique, and bargaining and contracting between man and man: and it is within the reason of our Author that [the initial sale] should ouster him of all power given to him." 1 Edward Coke, *Institutes of the Lawes of England* § 360, at 223 (1628).

Venerable doctrines of common law similarly protect consumers against post-sale restrictions. The rule against perpetuities, the rule in *Shelley's case*, and the general common law rules against restraints on alienation of real property all reflect a general aversion of the law toward attempts by property sellers to main-

---

[3]According to English practice, Edward Coke held the title of "Lord" only while on the bench, and accordingly would properly be styled "Sir Edward Coke" at the time of publication of his treatise. But American jurisprudence has conventionally used the appellation "Lord Coke," and so that convention is followed subsequently in this brief.

tain a dead hand of control after the sale. *See* George L. Haskins, *Extending the Grasp of the Dead Hand: Reflections on the Origins of the Rule Against Perpetuities*, 126 U. Pa. L. Rev. 19, 20, 31 n.40 (1977).

Patent exhaustion is a direct outgrowth of the general rejection of post-sale restraints and accordingly reflects the same consumer protection rationale. In one of the first cases to articulate the doctrine, the Supreme Court echoed Lord Coke's free market reasoning, finding it improper to "authorize an inventor to recall rights which he had granted to others" through sale of a product. *Bloomer v. McQuewan*, 55 U.S. (14 How.) 539, 554 (1852). Subsequently, in invoking patent exhaustion to refuse to enforce a "License Notice" restricting further sale of a patented device, the Supreme Court called the License Notice "hateful to the law from Lord Coke's day to ours, because obnoxious to the public interest." *Straus v. Victor Talking Mach. Co.*, 243 U.S. 490, 501 (1917).

The copyright analogue of patent exhaustion, the first sale doctrine, *see* 17 U.S.C. § 109(a) (2012), also developed out of these broad consumer protection values. *Bobbs-Merrill Co. v. Straus* held that a minimum resale price restriction could not be enforced through copyright, because "one who has sold a copyrighted article, without restriction, has parted with all right to control the sale of it." 210 U.S. 339, 350 (1908).[4] The Supreme Court reached that result, in part, out of a con-

---

[4]Lexmark contends that *Bobbs-Merrill* rejects a sharing of doctrinal principles between copyright and patent law. Not so: *Bobbs-Merrill* merely found it unnec-

cern for giving the copyright holder unexpected post-sale powers, a concern for giving "a right not included in the terms of the statute" defining copyright. *Id.* at 351. More recently, *Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S. Ct. 1351 (2013), rejected a publisher's attempt to use copyright to block cross-border movement of sold copies of books, specifically citing to Lord Coke on "the importance of leaving buyers of goods free to compete with each other when reselling or otherwise disposing of those goods." *Id.* at 1363.

Accordingly, the common law, patent exhaustion, and copyright first sale have all consistently disfavored attempts by sellers to maintain a dead hand of control on products after sale. Consistent with this venerated legal tradition, this Court should not permit Lexmark to use patent rights to keep its fingers on goods lawfully purchased by consumers.

## C. PATENT EXHAUSTION PROMOTES NUMEROUS IMPORTANT CONSUMER INTERESTS

It is not only the long tradition of common law that supports an expansive reading of patent exhaustion: patent exhaustion provides numerous important practical benefits to consumers.

---

essary to rely on patent exhaustion to develop its copyright first sale doctrine, as first principles about property ownership were sufficient. *See id.* at 346. And just five years later, the Supreme Court *did* rely on *Bobbs-Merrill* to articulate its patent exhaustion doctrine, noting the "strong similarity between and identity of purpose in the two statutes." *Bauer & Cie v. O'Donnell*, 229 U.S. 1, 13 (1913).

1.    Consumers highly value freedom to use purchased products and despise post-sale restrictions on those products, as several recent examples show.

Several months ago, the coffeemaker manufacturer Keurig implemented lock-down technology into the Keurig 2.0 machine, preventing the machine from being used with single-serve coffee cups other than those authorized by Keurig. Consumers were outraged, going so far as to say, "I will never buy another Keurig product. This borders on the unethical forcing people to buy only the K-cups you make." Fred Barbash, *Keurig's K-Cup Screw-up and How It K-pitulated to Angry Consumers*, Wash. Post (May 7, 2015), URL *supra* p. v; *see also* Mat Smith, *Surprise! People Don't Like Keurig's DRM-Protected Coffeemakers*, Engadget (Feb. 6, 2015), URL *supra* p. vi (noting "consumers complaining everywhere online" about Keurig's plan).

Consumers similarly have objected to technological protection measures implemented on vehicles that prevent repairs, as those protection measures amount to post-sale restrictions.  "Vehicle owners expect to have the freedom to repair and tinker with their vehicles, as they have done for decades," argued one *amicus* to this brief, seeking to obtain rights for consumers to overcome such technological locks.  *Comments of Electronic Frontier Foundation on Exemption to Prohibition on Circumvention of Copyright Protection Systems* 16 (Copyright Office Feb. 6, 2015), *available at* URL *supra* p. vi.  And an agricultural advocacy group wrote: "We

stand with a community of farmers . . . whose right to access, understand, and fully utilize their tools should be defended." *Comments of Farm Hack on Exemption to Prohibition on Circumvention of Copyright Protection Systems* (Copyright Office Feb. 4, 2015), *available at* URL *supra* p. vi. These civil society groups vocalized the expectations of consumers in having full, unhindered ownership rights.

2.  Patent exhaustion advances such full ownership rights for consumers. Specifically, exhaustion reduces information costs in buying and selling goods, protects secondary markets, and avoids monopolistic pricing behaviors.

A purchaser of a product does not know whether any patentee has placed a post-sale restriction on the product that impairs the purchaser's right to use or later alienate that product. If that post-sale restriction is enforceable through patent law, then second, third, and further purchasers are all substantially burdened with the administrative cost of inquiring about such restrictions, or risking infringement liability absent such inquiry or in the event of a mistaken assessment. *See, e.g., Kirtsaeng*, 133 S. Ct. at 1363. Indeed, the complexity and remoteness of the post-sale restrictions presents an unnecessary layer of information asymmetry upon even the *initial* purchaser of the encumbered product. *See* Molly Shaffer Van Houweling, *The New Servitudes*, 96 Geo. L.J. 885, 921 (2007).

In part by eliminating those unnecessary administrative costs on purchasers, patent exhaustion allows for consumer-beneficial secondary markets and avoids

anticompetitive price discrimination. Secondary markets offer numerous and social economic benefits to consumers, such as placing lower-cost used goods on the market, allowing purchasers to recoup some of their purchase cost at market rates, and protecting the environment by enabling reuse and recycling. *See* Zachariah Chafee, *The Music Goes Round and Round: Equitable Servitudes and Chattels*, 69 Harv. L. Rev. 1250, 1261 (1956) (describing "policy in favor of mobility" long embraced by personal property law). Without the patent exhaustion doctrine, however, manufacturers would be free to terminate secondary markets by mere conditions upon sale.

Furthermore, secondary markets prevent manufacturers from engaging in price discrimination because such markets enable arbitrage that corrects for such discrimination. While patentees have certain pricing power inherent in their patent rights, patent exhaustion ensures that such power does not extend beyond what the patent monopoly contemplates and into the territory of anticompetitive, anti-consumer behavior.

3.    Patent exhaustion also protects consumers' rights to repair and innovate upon their purchased products.

It is no infringement to repair a patented product, and that right of repair is specifically grounded in patent exhaustion. *See Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 497 (1964). Eroding the patent exhaustion doctrine

could potentially deprive consumers of substantial choice of whether to repair or replace, and it could force them to choose repair options based primarily on patentee authorization rather than price and quality.

Additionally, a great deal of innovation arises from tinkerers: "people and firms who invent things intending to use them rather than sell them." *See* Eric von Hippel, *People Don't Need a Profit Motive to Innovate*, Harv. Bus. Rev., Nov. 2011, *available at* URL *supra* p. vii. Patent exhaustion opens the door to that "freedom to tinker" that fuels user-driven innovation. Failing to protect that innovation, through patent exhaustion and other doctrines, would contravene the public interest purpose of patents to promote progress.

Thus, patent exhaustion protects numerous important consumer interests. To best serve those interests, this Court should broadly read the patent exhaustion doctrine and reject limitations on it such as those that Lexmark seeks here.

## II. *Jazz Photo* Should Be Overruled, as an International Authorized Sale Should Give Rise to Exhaustion

In *Jazz Photo Corp. v. International Trade Commission*, 264 F.3d 1094 (Fed. Cir. 2001), this Court held that an authorized sale of a patented product outside the United States did not give rise to patent exhaustion. However, in *Kirtsaeng*, the Supreme Court concluded that an authorized sale of a copyrighted book outside the United States did give rise to copyright exhaustion.

This Court should now overrule *Jazz Photo* in light of *Kirtsaeng*, for two reasons. First, Lexmark's sole argument against applicability of *Kirtsaeng*, namely that the decision was limited to statutory construction of copyright, is flatly contradicted by the Supreme Court's broad appeal to general principles of protecting consumers' interests in property ownership, principles that apply equally to patent as to copyright. Second, international patent exhaustion is a preferable policy as it guarantees patentees fair compensation for authorized sales while avoiding sanctioned price discrimination and unnecessary administrative costs.

## A. *Kirtsaeng*'s Reasoning About the Copyright First Sale Doctrine Applies Without Distinction to Patent Exhaustion

*Kirtsaeng*'s reasoning about the first sale doctrine applies directly to patent exhaustion for two reasons: first, the broad rationales about consumer protection that are the foundation of that decision apply directly to patent law; and second, differences between patent and copyright law only strengthen the applicability of international exhaustion to patent.

1. The Supreme Court's holding in *Kirtsaeng* was based largely upon consideration of the underlying legal rationales for copyright exhaustion, and those rationales apply to patent exhaustion.

The very posing of the question presented in *Kirtsaeng* demonstrates the Supreme Court's focus on broad, general principles:

18

> Putting section numbers to the side, we ask whether the "first sale" doctrine applies to protect a buyer or other lawful owner of a copy . . . lawfully manufactured abroad. Can that buyer bring that copy into the United States (and sell it or give it away) without obtaining permission to do so . . . ?

133 S. Ct. at 1355. These questions are no less relevant in the patent context.

*Kirtsaeng* then cited Lord Coke to demonstrate the centuries-old refusal to recognize lasting restraints on the alienation of chattels. *See id.* at 1363. By treating copyright first sale as a "common-law doctrine with an impeccable historical pedigree," the Supreme Court placed the focus of that copyright doctrine upon the interests of the chattel owner in opposition to the copyright holder: "A law that permits a copyright holder to control the resale or other disposition of a chattel once sold," said the Court, is "similarly against Trade and Traffic, and bargaining and contracting." *Id.* (quoting 1 Coke, *supra*, § 360, at 223) (internal alterations and quotations omitted). The Court applied this reasoning to sale of a book under copyright law, but the reasoning applies with equal force to sale of a toner cartridge under patent law.

Next, *Kirtsaeng* detailed two of the consumer-oriented rationales behind the law's disfavor of restraints of alienation. First, the Court noted "the importance of leaving buyers of goods free to compete with each other when reselling or otherwise disposing of those goods," specifically noting that such competition "can work to the advantage of the consumer." *Id.* (citing *Leegin Creative Leather*

*Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 866 (2007), and 1 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* § 100, at 4 (3d ed. 2006)). Second, the Court reasoned that a broad reading of first sale avoids "the administrative burden of trying to enforce restrictions upon difficult-to-trace, readily movable goods," and thus promotes information efficiency and certainty in personal property ownership. *Id.* at 1363–64.

Both of these rationales apply equally to patent law. International patent exhaustion, just like international first sale for copyright, will promote the same secondary markets and will relieve the same administrative burdens. *See* Section I.C *supra* p. 13. Just as first sale in *Kirtsaeng* prevents the worrying implications of lasting restraints on books, international patent exhaustion here will prevent the worrying implications of invisible restraints tied to patented articles sold outside the United States, restraints that buyers have no clear way of divining.

2.    While patent law exhibits several differences from copyright law relevant to their respective exhaustion doctrines, those differences in fact require application of international patent exhaustion more forcefully.

The lack of a statutory codification of patent exhaustion strengthens *Kirtsaeng*'s applicability here. If patent exhaustion were implemented explicitly in the text of the Patent Act, the text of the statute would control. However, in the absence of statutory limitations, the doctrine is subject to common law de-

velopment. Common law doctrines of copyright and patent law have historically drawn from each other, due to the "historic kinship" of the two doctrines. *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 439 (1984); *see, e.g., Bauer & Cie v. O'Donnell*, 229 U.S. 1, 13 (1913) (applying copyright first sale doctrine of *Bobbs-Merrill* to patent); *Sony*, 464 U.S. at 439–42 (importing patent "substantial noninfringing uses" doctrine into copyright); *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 935–37 (2005) (importing patent inducement into copyright); *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2070 (2011) (citing *Grokster* in assessing patent inducement law).

Additionally, the wide scope of infringement of patents suggests that international exhaustion is strongly necessary. Patents can be infringed by merely using a patented article. *See* 35 U.S.C. § 271(a) (2012). So while one will not infringe copyrights by reading a paperback book, one may infringe patents by using patented items. Lack of international patent exhaustion thus potentially affects a wide range of consumers, thus multiplying the consumer protection rationales that motivated the *Kirtsaeng* Court.

Accordingly, *Kirtsaeng* applies with at least equal, if not more, force to patent exhaustion, and this Court should overrule *Jazz Photo*.

## B. International Exhaustion Is the Preferable Policy, Because It Avoids Anticompetitive Effects

As a matter of policy, the international exhaustion contemplated by *Kirtsaeng* is better than the nationalized regime of *Jazz Photo*. Patent owners have equal opportunity under either policy to receive fair compensation for authorized sales, but international exhaustion avoids substantial effects against public policy and the consumer good.

As *Jazz Photo* explains, exhaustion depends on whether or not there has been such a disposition of the article that it may fairly be said that the patentee has received his reward for the use of the article. 264 F.3d at 1105 (quoting *Intel Corp. v. ULSI Sys. Tech., Inc.*, 995 F.2d 1566, 1568 (Fed. Cir. 1993)).[5] Wherever goods are sold under license, the patentee has been compensated at the price reached through negotiation with the licensee, regardless of where the sale occurs. The patentee is free to account, in its pricing, for the eventual arbitrage of the licensed products within or beyond the borders of the country of manufacture and sale. International exhaustion thus allows for fair compensation of the patent holder.

---

[5]In contrast, where foreign sale of an article is not authorized by the U.S. patentee, exhaustion should not occur. *Boesch v. Gräff* involved a situation where the patented article had *not* been sold under license, as the seller of the article was a third party with no license to the relevant patents. *See* 133 U.S. 697, 699 (1890). That no patent exhaustion was deemed to have occurred after an *unauthorized* sale in *Boesch* merely underscores the view that exhaustion should occur after an *authorized* sale.

The real effect of international patent exhaustion, then, is that it prevents anti-consumer price discrimination. Besides representing a pure windfall to manufacturers at the expense of consumer dollars, price discrimination can be the basis of anticompetitive acts, as antitrust laws recognize. *See* Robinson-Patman Price Discrimination Act, 15 U.S.C. § 13 (2012); *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 219–20 (1993). If foreign sales do not exhaust patent rights, then patentees will be free to use differential pricing to extract super-monopolistic rents by country without the check of free market arbitrage.

Lexmark and at least one *amicus* claim that the *Jazz Photo* rule is beneficial because it theoretically can lower prices for pharmaceuticals in developing countries. *See* Lexmark Opening Br. 55 n.17; AIPLA Br. 15–17. But actual empirical evidence contradicts that premise. For one thing, "drug prices in very poor countries are often not particularly low" due to large income disparities in such countries, which incentivize drug manufacturers to cater to only the wealthiest populations there. Sean Flynn et al., *An Economic Justification for Open Access to Essential Medicine Patents in Developing Countries*, 37 J.L. Med. & Ethics 184, 190 (2009), *available at* URL *supra* p. vi. Furthermore, it is not price discrimination that enables access to medicines in developing nations; case studies find that it is international exhaustion that reduces prices and ameliorates the crisis of access to affordable medicines. *See* Sisule F. Musungu & Cecilia Oh, *The Use of Flexibil-*

*ities in TRIPS by Developing Countries: Can They Promote Access to Medicines?* 30 (2005), *available at* URL *supra* p. vi; Jayashree Watal, *Access to Essential Medicines in Developing Countries: Does the WTO TRIPS Agreement Hinder It?* 4–5 (Ctr. for Int'l Dev., Harvard Univ., Science, Technology and Innovation Discussion Paper No. 8, 2000), URL *supra* p. vii.

And in any event, patent exhaustion law, which affects all industries and products, is not the right vehicle to address the specific needs of the pharmaceutical industry. Agencies like the FDA already have authority to regulate drug importation. *See, e.g.,* 21 U.S.C. § 381 (2012). To the extent that it is desirable to prevent drug re-importation to permit for lower prices abroad, that is a job for Congress and the FDA, not patent law.

Insofar as price discrimination can act against the public and consumer interest, it would certainly be a perverse result for patent exhaustion, a doctrine intended to protect the consumer interest, to actively enable such negative behavior. International patent exhaustion avoids that undesirable consequence, and accordingly it is the better policy.

## III. Post-Sale Restrictions on Use of a Product Do Not Abrogate Patent Exhaustion for That Product

This Court should hold *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700 (Fed. Cir. 1992), overruled in view of *Quanta Computer, Inc. v. LG Electronics, Inc.*, 553

U.S. 617 (2008), for at least three reasons. First, *Mallinckrodt* treated patent exhaustion as a type of "implied license" to use a patented item, but the expansive exhaustion doctrine contemplated in *Quanta* and other cases proves that implied license theory inadequate. Second, the conditional sale doctrine of *Mallinckrodt* cannot be squared with the common law's and the exhaustion doctrine's aversion to the anticompetitive and anti-consumer practices that post-sale restraints cause. Third, to the extent that Lexmark has a legitimate right to enforce its post-sale encumbrances, that right can and must be enforced through contract law, not intellectual property law that was designed for wholly different purposes.

## A.  *Mallinckrodt*'s Cramped "Implied License" Theory Cannot Fully Embrace *Quanta*'s Broad View of Exhaustion

The word "exhaustion" implies a complete and utter termination of force, and for over a hundred years the understanding of patent exhaustion has fit that model. *Quanta* stated that "the initial authorized sale of a patented item terminates *all patent rights to that item*." 553 U.S. at 625 (emphasis added). Other cases are equally forceful in asserting that patent exhaustion causes total evaporation of patent rights. *See, e.g., United States v. Univis Lens Co.*, 316 U.S. 241, 250 (1942) ("the patentee may not thereafter . . . control the use or disposition of the article"); *Adams v. Burke*, 84 U.S. (17 Wall.) 453, 456 (1873) (upon sale, patentee "parts with the right to restrict that use"); *Bauer & Cie*, 229 U.S. at 17 ("The right

to vend conferred by the patent law has been exercised, and the added restriction is beyond the protection and purpose of the act.").

But in *Mallinckrodt*, the Federal Circuit permitted patentees to use the device of a "conditional sale," allowing them to revive and reassert patent rights after the product had fully and irrevocably changed hands. *See* 976 F.2d at 708. This view upends patent exhaustion, turning it from a termination of rights, as the Supreme Court described it, into a mere "implied license" to those rights, revocable at the will of the patentee. This view cannot be squared with Supreme Court precedents.[6]

Notably, this Court relied upon the *Mallinckrodt* doctrine to hold that patent exhaustion did not apply to computer microprocessors sold under conditions prohibiting downstream combination of those microprocessors with other components. *See LG Elecs., Inc. v. Bizcom Elecs., Inc.*, 453 F.3d 1364, 1369 (2006). It was this very ruling that was reversed in *Quanta. See* 553 U.S. at 637.

Patent exhaustion is thus far broader, stronger, and more absolute than the weak and easily revocable "implied license" conception of *Mallinckrodt*. Accordingly, that case cannot stand as good law, and should be overruled.

---

[6]*See* Mark R. Patterson, *Contractual Expansion of the Scope of Patent Infringement Through Field-of-Use Licensing*, 49 Wm. & Mary L. Rev. 157, 168–71 (2007); James B. Kobak, Jr., *Contracting Around Exhaustion: Some Thoughts About the CAFC's* Mallinckrodt *Decision*, 75 J. Pat. & Trademark Off. Soc'y 550, 554–59 (1993); Richard H. Stern, *The Unobserved Demise of the Exhaustion Doctrine in U.S. Patent Law:* Mallinckrodt v. Medipart, 15 Eur. Intell. Prop. Rev. 460, 461 (1993).

## B. The Conditional Sale Doctrine Permits Manufacturers to Burden Consumers' Use of Purchased Goods Unduly

Besides being inconsistent with *Quanta*, the conditional sale doctrine of *Mallinckrodt* effectively allows manufacturers unilaterally to abrogate all of the consumer benefits of patent exhaustion. Lexmark's effort here is just one example of the mischief that *Mallinckrodt* unleashed by ushering in an era of chattel servitudes backed by patent law.

Although the accused infringers here are remanufacturers, the conditional sale doctrine opens up the remarkable possibility that Lexmark could bring patent infringement suits *against Lexmark's own customers* who lawfully purchased products from authorized vendors. This is because *Mallinckrodt* allows Lexmark to use a "single use" notice as a contract to trump the patent exhaustion principle. *See* 976 F.2d at 709.

Demonstrating the particular strangeness of the *Mallinckrodt* doctrine, the single-use restriction appears to come into effect at the time that a Lexmark toner cartridge is opened, not at the time it is purchased. *See* Lexmark Opening Br. 8. If such a restriction were enforceable, it would mean that an unrestricted authorized sale could suddenly become conditional, potentially months or years after money and product changed hands. These bizarre results show how the conditional sale concept of *Mallinckrodt* is at odds with the consumer-protective patent exhaustion doctrine.

Because the conditional sale doctrine makes every consumer a potential infringer, it is not surprising that the doctrine also works directly against the consumer interest. As noted previously, patent exhaustion benefits consumers by protecting secondary markets, enabling the right to repair, and permitting for user-driven innovation. *See* Section I.C *supra* p. 13. But "single use only" and "not for resale" labels and notices precisely annihilate these benefits. Furthermore, patent exhaustion avoids administrative costs of tracing goods. *See Kirtsaeng*, 133 S. Ct. at 1363–64. But allowing patent rights to spring forth unexpectedly due to a purchaser's activities creates the exact administrative inefficiency that the law has sought to avoid.

*Mallinckrodt* thus hands a windfall to patent owners with no corresponding public gain, a "wealth transfer from customers to the patentee." Richard H. Stern, *Post-Sale Patent Restrictions after* Mallinckrodt*—An Idea in Search of Definition*, 5 Alb. L.J. Sci. & Tech. 1, 10–11 (1994). Under first principles of patent law, "the limited and temporary monopoly granted to inventors was never designed for their exclusive profit or advantage." *See Motion Picture Patents Co. v. Universal Film Mfg. Co.*, 243 U.S. 502, 511 (1917) (quoting *Kendall v. Winsor*, 62 U.S. (21 How.) 322, 327–28 (1859)). Holding to those principles requires rejecting the conditional sale doctrine of *Mallinckrodt* that currently gives patentees such an unfair advantage.

## C. Intellectual Property Law Should Not Become a Vehicle of Contract Enforcement Against Non-Privy Third Parties

Though the anticompetitive behaviors described above are undesirable and against the public interest, Lexmark and at least one *amicus* suggest that it is within the manufacturer's rights to undertake such practices with respect to its products. *See* discussion *supra* p. 23. Perhaps this is so, but to the extent that it is, the manufacturer's proper vehicle of enforcement is contract, not patent law.

Many sorts of post-sale restrictions can be enforced through contract, though emphatically not through intellectual property law. *Quanta* specifically noted that "the authorized nature of the sale to Quanta does not necessarily limit LGE's other contract rights," even though that authorized sale triggered exhaustion. 553 U.S. at 637; *see also Keeler v. Standard Folding Bed Co.*, 157 U.S. 659, 666 (1895) (finding it "obvious" that limitations on use of patented article would "arise as a question of contract, and not [under] the patent laws"); *Storage Tech.*, 421 F.3d at 1319 (discussed *supra* p. 8).

And it should come as no surprise that contract law, and not patent law, is the correct avenue for these sorts of arrangements. Contract law is designed to permit broad and diverse agreements between two parties in privity with each other. Its purpose is to allow private entities to discover and negotiate deals to the best advantage of themselves, and so contract law allows for a wider range of permissible arrangements.

Patent law is not like that. Its purpose is not merely to advantage individual parties, but rather to bring about the public good of innovation—"to promote," as the Constitution says, "the Progress of Science and the useful Arts." Taken alone, a patent is a powerful right, far more powerful than a contract because of its ability to reach unknown, unrelated, and unexpecting third parties. Left unchecked, the patent right could expansively encroach upon that public interest and have the reverse effect of harming society.

That is why doctrines like patent exhaustion exist: to ensure that patent law remains carefully tailored to promoting progress rather than constraining consumers. These fundamental doctrines, these values so central to a functioning and advancing society, should guide this Court in its decision today.

## CONCLUSION

For the foregoing reasons, this Court should hold *Jazz Photo* overruled and reverse the district court on the first question, and hold *Mallinckrodt* overruled and affirm the district court's holding on the second question.

Respectfully submitted,

Dated: June 19, 2015

/s/ Charles Duan

CHARLES DUAN
   *Counsel of Record*
SHERWIN SIY
RAZA PANJWANI
PUBLIC KNOWLEDGE
1818 N Street NW, Suite 410
Washington, DC 20036
(202) 861-0020
cduan@publicknowledge.org

VERA RANIERI
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
(415) 436-9333
vera@eff.org

*Counsel for amici curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 32(a)(7)(B), 28.1(e)(2), and 29(d). The brief contains **6,820** words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using the *xelatex* typesetting system, in the font Linux Libertine.


Dated: June 19, 2015                    */s/ Charles Duan*
                                        Charles Duan
                                        *Counsel for amici curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on June 19, 2015, I caused the foregoing **Brief of Public Knowledge, the Electronic Frontier Foundation, the Open Source Hardware Association, the Digital Right to Repair Coalition, and Public Citizen, Inc. as *Amici Curiae* in Support of Appellant Impression Products** to be electronically filed with the Clerk of the Court using CM/ECF, which will automatically send email notification of such filing to the following counsel of record:

| | |
|---|---|
| Timothy Colin Meece | tmeece@bannerwitcoff.com |
| Audra Carol Eidem Heinze | aheinze@bannerwitcoff.com |
| Bryan Medlock, Jr. | bmedlock@bannerwitcoff.com |
| Jason Steven Shull | jshull@bannerwitcoff.com |
| Banner & Witcoff, Ltd. | |
| | |
| Benjamin Beaton | bbeaton@sidley.com |
| Constantine L. Trela, Jr. | ctrela@sidley.com |
| Sidley Austin LLP | |
| | |
| Steven B. Loy | steven.loy@skofirm.com |
| Stoll, Keenon & Park, LLP | |
| | |
| Edward F. O'Connor | eoconnor@avynolaw.com |
| Avyno Law, P.C. | |

Dated: June 19, 2015

*/s/ Charles Duan*

Charles Duan
*Counsel for amici curiae*