Nos. 14-1617 & 14-1619

## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT
_____

LEXMARK INTERNATIONAL, INC.,

*Plaintiff–Cross-Appellant*

**v.**

IMPRESSION PRODUCTS, INC.,

*Defendant–Appellant*

*(For Continuation of Caption See Inside Cover)*

*Appeal from the United States District Court for the Southern District of Ohio
in Case No. 10-CV-564, Judge Michael R. Barrett*

## CORRECTED *EN BANC* BRIEF OF *AMICUS CURIAE*
## REMANUFACTURING ASSOCIATIONS IN SUPPORT OF APPELLANT
_____

Seth D. Greenstein
CONSTANTINE CANNON, LLP
1001 Pennsylvania Avenue, N.W.
Suite 1300 North
Washington, D.C. 20004
Telephone: 202.204.3500
Facsimile: 202.204.3501
sgreenstein@constantinecannon.com

Counsel for *Amicus Curiae*
International Imaging Technology Council,
Auto Care Association, and Automotive
Parts Remanufacturers Association

Date: June 19, 2015

**QUALITY CARTRIDGES, INC., JOHN DOES, 1-20, BLUE TRADING LLC, EXPRINT INTERNATIONAL, INC., LD PRODUCTS, INC., PRINTRONIC CORPORATION, TESEN DEVELOPMENT (HONG KONG) CO. LTD., BENIGNO AVEDA AND HIS COMPANIES,**

*Defendants.*

## **CERTIFICATE OF INTEREST**

*Amici curiae* International Imaging Technology Council, Auto Care Association, and Automotive Parts Remanufacturers Association are not-for-profit associations that have no parent corporations, and no publicly held corporation owns 10 percent or more of the stock in any of the *amici*.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ................................................................. i

TABLE OF CONTENTS ......................................................................... ii

TABLE OF AUTHORITIES ................................................................ iv

QUESTIONS PRESENTED ...................................................................1

STATEMENT OF INTEREST OF *AMICUS CURIAE* ...........................................2

SUMMARY OF ARGUMENT ................................................................6

ARGUMENT ...........................................................................................8

I.    AN AUTHORIZED SALE, WHEREVER MADE, EXHAUSTS ALL PATENT RIGHTS IN THE VENDED ARTICLE........................................................... 8

    A.    Patent Exhaustion is a Matter of Common Law, Which Has No Geographic Restrictions ...................................................................... 8

    B.    *Jazz Photo* Has No Basis in Supreme Court Precedent ...................................... 10

    C.    Neither the Uruguay Round Amendments Act Nor the TRIPS Agreement Nor Concerns for Extraterritoriality Preclude Exhaustion Upon Foreign Authorized Sales ........................................................................... 11

II.    *QUANTA* REJECTED PATENT-BASED POST-SALE USE RESTRAINTS, THEREBY OVERRULING THE "CONDITIONAL SALES" THEORY OF *MALLINCKRODT* .... 13

    A.    Under *Quanta*, Post-Sale Use Restrictions Cannot Revive Patent Rights Exhausted by Authorized Sale ............................................................ 15

    B.    *Mallinckrodt*'s Conditional Sales Theory was Overruled by *Quanta* .................. 17

    C.    The District Court Correctly Held the Return Program Does Not Affect the Authority to Sell........................................................................ 19

III.   PROPER INTERPRETATION OF THE EXHAUSTION DOCTRINE MAINTAINS SUPREME COURT PRECEDENTS DISTINGUISHING REPAIR FROM RECONSTRUCTION................................................................... 20

A.　　Lexmark's Narrow View of the Patent Exhaustion Doctrine Thwarts the Public's Right to Repair ...................................................................................... 22

B.　　"Conditional Sales" Cases Create Uncertainty in the Courts and the Marketplace, a Trend This Court Should Reverse ................................................. 23

IV.　　THE EXHAUSTION DOCTRINE MAINTAINS CRUCIAL ANTITRUST LAW PROTECTIONS AGAINST ANTICOMPETITIVE CONDUCT ................................... 26

V.　　A CLEAR PATENT EXHAUSTION RULE REMAINS ESSENTIAL TO ROBUST COMMERCE ................................................................................................................ 27

CONCLUSION ................................................................................................................ 28

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ....................................... 30

CERTIFICATE OF SERVICE ................................................................................. 31

# <u>TABLE OF AUTHORITIES</u>

**Page**

**Cases**

*Adams v. Burke,*
 84 U.S. (17 Wall.) 453 (1873) ..................................................... 10, 11, 16

*Aro Mf'g Co. v. Convertible Top Replacement Co.*
 *365 U.S. 336 (1961)* ............................................................ 21, 23

*B. Braun Med. Inc. v. Abbott Labs.,*
 124 F.3d 1419 (Fed. Cir.1997) ..................................................... 15, 16, 18

*Bandag Inc. v. Al Bolser's Tire Stores, Inc.,*
 750 F.2d 903 (Fed. Cir. 1984) ..................................................... 18

*Bauer & Cie. v. O'Donnell,*
 229 U.S. 1 (1913) ............................................................ 9, 10

*Bloomer v. McQuewan,*
 55 U.S. (14 How.) 539 (1852) ............................................................ 16

*Bobbs-Merrill Co. v. Straus,*
 201 U.S. 339 (1908) ............................................................ 9, 10

*Boesch v. Gräff,*
 133 U.S. 697 (1890) ............................................................ 10, 13

*Boston Store of Chicago v. Am. Graphophone Co.,*
 246 U.S. 8 (1918) ............................................................ 10

*Bottom Line Mgmt., Inc. v. Pan Man, Inc.,*
 228 F.3d 1352 (Fed. Cir. 2000) ............................................................ 21

*Bowman v. Monsanto Co.,*
 133 S. Ct. 1761 (2013) ............................................................ 22

iv

*Chafee v. Boston Belting Co.*,
    63 U.S. 217 (1859) ................................................................................ 11

*Dana Corp. v. Am. Precision Co.*,
    827 F.2d 755 (Fed. Cir. 1987) .................................................................. 21

*Dawson Chem. Co. v. Rohm & Haas Co.*,
    448 U.S. 176 (1980) ................................................................................ 23

*Eastman Kodak Co. v. Image Technical Servs. Inc.*,
    504 U.S. 451 (1992) ................................................................... 3, 27, 28

*Ergowerx Int'l LLC v. Maxell Corp. of Am.*,
    18 F. Supp. 3d 430 (S.D.N.Y. 2014) ...................................................... 17

*General Talking Pictures Corp. v. Western Electric Co.*,
    304 U.S. 175 (1938) ........................................................................ 16, 17

*Glass Equip. Dev., Inc. v. Besten, Inc.*, 174 F.3d 1337 (Fed. Cir. 1999) .......... 18

*Helferich Patent Licensing, Inc. v. The New York Times Co.*,
    778 F.3d 1293 (Fed. Cir. 2015) ..................................................... 9, 11, 13

*Henry v. A.B. Dick Co.*, 224 U.S. 1 (1912) ........................................................ 23

*Hewlett-Packard Co. v. Repeat-O-Type Stencil Mfg. Corp.*,
    123 F.3d 1445 (Fed. Cir. 1997), *cert. denied*, 523 U.S. 1022 (1998) ..... 21

*Heyer v. Duplicator Mfg. Co.*,
    263 U.S. 100 (1923) ................................................................................ 21

*Husky Injection Molding Sys. v. R&D Tool & Eng'g*,
    291 F.3d 780 (Fed. Cir. 2002) .................................................................. 21

*Ill. Tool Works Inc. v. Indep. Ink, Inc.*,
    547 U.S. 28 (2006) .................................................................................. 26

*Image Technical Servs., Inc. v. Eastman Kodak Co.*,
    125 F.3d 1195 (9th Cir. 1997) .................................................................. 27

*In re Ciprofloxin Hydrochloride Antitrust Litig.*,
    544 F.3d 1323 (Fed. Cir. 2008) ............................................................. 26

*Int'l Salt Co. v. United States*,
    332 U.S. 392 (1947)................................................................................ 26

*ISO Antitrust Litig.,*
    203 F.3d 1322 (Fed. Cir. 2000) ............................................................. 27

*Jazz Photo Corp. v. Int'l Trade Comm'n*,
    264 F.3d 1094 (Fed. Cir. 2001) ........................................................ *passim*

*Keeler v. Standard Folding-Bed Co.*,
    157 U.S. 659 (1895)........................................................... 14, 16, 25

*Kendall Co. v. Progressive Med. Tech.*,
    85 F.3d 1570 (Fed. Cir. 1996) ......................................................... 21, 24

*Keurig, Inc. v. Sturm Foods, Inc.*,
    732 F.3d 1370 (Fed. Cir. 2013) ....................................................... 16, 24

*Kirtsaeng v. John Wiley & Sons, Inc.*,
    133 S. Ct. 1351 (2013).................................................................... *passim*

*LG Elecs., Inc. v. Bizcom Elecs., Inc.*,
    453 F.3d 1364 (Fed. Cir. 2006) ....................................................... *passim*

*LifeScan Scotland, Ltd. v. Shasta Techs., LLC*,
    734 F.3d 1361 (Fed. Cir. 2013) ......................................................... 8, 18

*Mallinckrodt, Inc. v. Medipart, Inc.*,
    976 F.2d 700 (Fed. Cir. 1992) ........................................................ *passim*

*Mitchell v. Hawley*,
    83 U.S. (16 Wall.) 544 (1873) .............................................................. 17

*Motion Picture Patents Co. v. Universal Film Mfg.*,
    243 U.S. 502 (1917)........................................................................ 23, 27

*Omega, S.A. v. Costco Wholesale Corp.*,
    CV 04-05443 TJH, 2011 WL 8492716

(E.D. Cal. Nov. 9, 2011) (Order and J.),
*aff'd* 776 F.3d. 692 (9th Cir. 2015) ........................................................ 25

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*,
324 U.S. 806 (1945)................................................................................. 26

*Princo Corp. v. Int'l Trade Comm'n*,
563 F.3d 1301 (Fed. Cir. 2009) .............................................................. 18

*Princo Corp. v. Int'l Trade Comm'n*,
616 F.3d 1318 (Fed. Cir. 2010) .............................................................. 18

*Quality King Distributors, Inc. v. L'anza Research Int'l, Inc.*,
523 U.S. 135 (1998)................................................................................. 13

*Quanta Computer, Inc. v. LG Elecs., Inc.*,
553 U.S. 617 (2008).......................................................................... *passim*

*Sage Prods. Inc. v. Devon Indus. Inc.*,
45 F.3d 1575 (Fed. Cir. 1995) ................................................................ 24

*Simpson v. Union Oil Co. of Cal.*,
377 U.S. 13 (1964)................................................................................... 26

*Square D Co. v. Niagara Frontier Tariff Bureau*,
476 U.S. 409 (1986)................................................................................. 26

*Static Control Components v. Lexmark Int'l, Inc.*,
487 F. Supp. 2d 861 (E.D. Ky. 2007)...................................................... 19

*Static Control Components v. Lexmark Int'l, Inc.*,
615 F. Supp. 2d 575 (E.D. Ky. 2009).................................................. *passim*

*Static Control Components v. Lexmark Int'l, Inc.*
697 F.3d 387 (6th Cir. 2012) .................................................................. 20

*Surfco Hawaii v. Fin Control Sys. Pty. Ltd.*,
264 F.3d 1062 (Fed. Cir. 2001), *cert. denied sub nom.*
*Fin Control Sys. Pty. Ltd. v. Surfco Hawaii*,
536 U.S. 939 (June 24, 2002) .................................................................. 21

vii

*United States v. Masonite Corp.,*
    316 U.S. 265 (1942) ............................................................... 26

*United States* v. *Univis Lens Co.,*
    316 U.S. 241 (1942) ....................................................... 11, 16, 26

*United States v. General Elec. Co.,*
    272 U.S. 476 (1926) ............................................................... 10

*Wilbur-Ellis Co. v. Kuther,*
    377 U.S. 422 (1964) ............................................................... 22

*Wilson v. Simpson,*
    50 U.S. (9 How.) 109 (1850) ................................................. 21

## Statutes

17 U.S.C. § 109(a) .......................................................................9

35 U.S.C. § 271 ......................................................................... 11

35 U.S.C. § 271(a) ............................................................... 11, 12

Ohio Rev. Code § 1302-42 ....................................................... 19

## Regulations

40 C.F.R. § 247.16 (2014) ....................................................... 22

## Legislative Materials

Statement of Administrative Action, Uruguay Round Agreements Act of 1994,
    *reprinted in* 1994 U.S.C.C.A.N. 4040 ................................... 13

## Other Authorities

Agreement on Trade Related Aspects of Intellectual Property
    Rights of 1994, *available at* World Trade Organization,
    *https://www.wto.org/english/tratop_e/trips_e/t_agm0_e.htm* ................. 12

Alfred C. Server and William J. Casey, *Contract-Based Post-Sale Restrictions on Patented Products Following Quanta*, 64 Hastings L.J. 561 (Apr. 2013) ........................................................... 17

John F. Duffy and Richard M. Hynes, "Statutory Domain and the Commercial Law of Intellectual Property," 102 Va. L. Rev. ___ (2015), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2599074 ......... 11, 17

Thomas G. Hungar, *Observations Regarding the Supreme Court's Decision in Quanta Computer, Inc. v. L.G. Electronics, Inc.* ("*Mallinckrodt*'s 'conditional sale' rationale is no longer good law."), 49 IDEA – Intell. Prop. L. Rev. 517 (2009) .......................................... 18

U.S. Census Bureau, 2013 Annual Services Report, Table 2: Estimated Revenue by Tax Status for Employer Firms: 2007 through 2013, http://www.census.gov/services/index.html ............................................4

U.S. Environmental Protection Agency, *Comprehensive Procurement Guidelines – Toner Cartridges*, http://www.epa.gov/epawaste/conserve/tools/cpg/products/ nonpaperoffice.htm#toner (last visited June 8, 2015).html ................... 22

## QUESTIONS PRESENTED

1.    The case involves certain sales, made abroad, of articles patented in the United States. In light of *Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S. Ct. 1351 (2013), should this court overrule *Jazz Photo Corp. v. International Trade Commission*, 264 F.3d 1094 (Fed. Cir. 2001), to the extent it ruled that a sale of a patented item outside the United States never gives rise to United States patent exhaustion?

2.    The case involves (i) sales of patented articles to end users under a restriction that they use the articles once and then return them and (ii) sales of the same patented articles to resellers under a restriction that resales take place under the single-use-and-return restriction. Do any of those sales give rise to patent exhaustion? In light of *Quanta Computer, Inc. v. LG Electronics, Inc.*, 553 U.S. 617 (2008), should this court overrule *Mallinckrodt, Inc. v. Medipart, Inc.,* 976 F.2d 700 (Fed. Cir. 1992), to the extent it ruled that a sale of a patented article, when the sale is made under a restriction that is otherwise lawful and within the scope of the patent grant, does not give rise to patent exhaustion?

1

# STATEMENT OF INTEREST OF *AMICUS CURIAE*[1]

*Amici* are not-for-profit associations that, *inter alia*, represent the interests of companies that compete against original equipment manufacturers ("OEMs") for sale of replacement parts and consumable goods, and provision of services that constitute lawful repair under the patent laws.[2]

Auto Care Association ("ACA") is a national trade organization of 2,000 members representing more than 150,000 independent businesses that manufacture, distribute, and sell motor vehicle parts, accessories, tools, equipment, materials, and supplies, and perform vehicle service and repair. This independent aftermarket industry contributes more than 2.3 percent to the U.S. gross domestic product. Following expiration of a new car warranty, over 75 percent of car owners patronize independent repair shops rather than new car dealers.

Automotive Parts Remanufacturers Association ("APRA") is the trade association for companies that collect and restore to functionality used motor vehicle parts. APRA represents over 1000 remanufacturers and their suppliers. Parts remanufactured by APRA members are used in automobiles, trucks, buses, and off-highway vehicles such as construction and industrial equipment and farm machinery.

---

[1] No counsel for a party authored this brief in whole or in part, or made a monetary contribution intended to fund preparation or submission of this brief. No person other than *amici*, their members, or counsel made a monetary contribution to its preparation or submission.

[2] Various industries call these repair activities "rebuilding," "recharging," "reconditioning," "customization," or "remanufacturing."

International Imaging Technology Council ("I-ITC") represents the interests of the imaging supplies industry, including companies that buy used cartridges, recharge used toner and inkjet cartridges, retail remanufactured cartridges, and all related industry suppliers.

Products such as automobiles, computers, and computer printers contain removable and consumable parts that can be repaired or refurbished many times. Consumers buy parts and repair services to extend the useful life of these products and enhance the value of their investments. Members of the *amici* satisfy this consumer demand by providing alternative sources for consumable goods, parts, and services at lower cost and of equal or better quality than the OEM. Their products often include improvements compatible with, but not available on, the original equipment. This aftermarket competition based on price, quality, and features constrains OEMs from increasing prices to supracompetitive levels, and spurs innovation in OEM and aftermarket products.

Lawful repair contributes substantially to the American economy:[3]

- The motor vehicle aftermarket industry employs more than 4,000,000 people in the United States. Overall domestic aftermarket sales of automotive products totaled $318.2 billion in 2013. *Amici* estimate more than 10,000 companies in the United States rebuild motor vehicle parts.

---

[3]   *See Eastman Kodak Co. v. Image Technical Servs. Inc.,* 504 U.S. 451, 462 & n.6 (1992).

3

- In 2013 consumers spent more than $16 billion for repair and maintenance of electronic and precision equipment, of which approximately $7 billion was spent for computer and office machine repair and maintenance.[4] An estimated 2,000 domestic businesses recondition and repair office imaging supplies—including laser printer toner cartridges—employing approximately 70,000 workers. Industry observers estimate aftermarket refurbished printer supplies in North America comprise 25-30 percent of the market for monochrome laser printer toner cartridges, up to 10 percent of the market for color laser printer toner cartridges, and approximately 14 percent of the aftermarket for refilled ink jet cartridges, with total annual aftermarket sales of some $3.4 billion.

Remanufacturing also promotes sound environmental policies and conserves resources such as precious metals and petroleum-based plastics. Rebuilding automotive parts typically re-uses 88 percent of the raw material from the original parts, and rebuilding engines saves 50 percent of the energy required to produce a new engine. Reconditioning ink and toner cartridges will keep some 84,000 tons of industrial-grade plastics and metals out of landfills this year.

Companies represented by *amici* run the gamut from large, technologically-sophisticated entities with substantial intellectual property portfolios to small

---

[4]   U.S. Census Bureau, 2013 Annual Services Report, Table 2: Estimated Revenue by Tax Status for Employer Firms: 2007 through 2013, http://www.census.gov/services/index.html  (last visited June. 3, 2015).

operators that service local customers. What these *amici* share is a stake in access to genuine patented articles acquired anywhere in the world, free of restraints on alienation or repair. Without access to OEM products to repair or refurbish, these companies cannot provide competition to OEMs or choices to consumers.

Despite *Quanta*'s broad reaffirmation of patent exhaustion, and *Kirtsaeng*'s rejection of geographic limits upon exhaustion, Lexmark continues to threaten the cartridge remanufacturing industry with infringement suits attempting to re-assert exhausted patent rights over cartridges that can lawfully be repaired. Such threats, if expanded to other products and industries, would have disastrous consequences for the domestic economy—a world in which consumers and aftermarket competitors face infringement liability for repairs performed by anyone but a patentee.

*Amici* respectfully submit this brief so the Court may consider the importance of patent exhaustion to this sector of the American economy, and the destructive impact of narrowing the exhaustion rule upon commerce generally and these aftermarket industries in particular. Patent law and competition best will be served by a bright-line rule, consistent with Supreme Court precedents, that exhausts any right of the patent owner to prevent imports or to apply post-sale use restrictions, following authorized sale of a patented article.

# SUMMARY OF ARGUMENT

Patent exhaustion finds its roots in the common-law refusal to enforce post-sale encumbrances on private property rights. *Kirtsaeng* relied on these common-law principles to reject geographic segmentation of exhaustion. The Supreme Court found exhaustion where the foreign publisher/printer had no right to sell in the United States, and the foreign-made books gave express notice that importation would violate U.S. copyrights. In *Quanta*, the Supreme Court reaffirmed long-standing precedents holding the authorized sale of a patented article exhausts a patentee's right to control post-sale uses of that article. These decisions properly balance exclusive intellectual property rights with the public interests in the free flow of goods and robust competition. They secure consumers' right to re-use, resell, repair, and improve property lawfully acquired through an authorized sale anywhere in the world.

The two lines of cases revisited here en banc impermissibly revive exhausted patent rights based on authorized sales abroad or contractual impositions on post-sale uses, and so cannot be squared with these Supreme Court precedents.

In response to Question 1, *Jazz Photo* should be overruled. The domestic exhaustion holding of *Jazz Photo* lacked support from the sole Supreme Court case it cited, and was dealt the fatal blow in *Kirtsaeng*'s acknowledgement that the common-law roots of patent exhaustion have no geographic limits.

In response to Question 2, *Quanta* held that post-sale use restrictions, or requirements on resellers to pass on such restrictions, are exhausted by the

6

authorized sale. Similarly, *Quanta* annulled *Mallinckrodt*'s "conditional sales" theory. By reversing the reasoning and holding of *Bizcom*,[5] *Quanta* necessarily reversed the reasoning it drew from *Mallinckrodt*. The district courts in this case and in *Static Control*[6] correctly held that *Quanta* overruled *Mallinckrodt sub silentio,* and found Lexmark's reseller agreements and "prebate" label terms indistinguishable from the "conditional sale" license that *Quanta* held unenforceable under patent law.

The "conditional sales" theory impermissibly encroaches upon precedents defining lawful repair. Remanufacturing industries provide valuable service to consumers and contribute billions of dollars to our economy. Post-sale restrictions such as Lexmark's seek to prevent commonplace activities such as repair, upgrading personal computers, and customizing automobiles. Consumers and aftermarket competitors targeted by post-sale restrictions may not know whether the restriction exists or is valid or enforceable. But if Lexmark succeeds here, consumers and aftermarket competitors would be exposed to patent infringement liability solely for fixing broken products they own. Such threats chill competition and pose intolerable risks for entrepreneurial ventures.

Patent exhaustion of post-sale use conditions also restores proper symmetry between patent and antitrust law. Post-sale use restrictions target the patentee's aftermarket competitors, not end-users who ostensibly agree to the take-it-or-leave-

---

[5]   *LG Elecs., Inc. v. Bizcom Elecs., Inc.*, 453 F.3d 1364, 1369 (Fed. Cir. 2006) ("*Bizcom*").

[6]   *Static Control Components v. Lexmark Int'l, Inc.*, 615 F. Supp. 2d 575 (E.D. Ky. 2009).

it terms. By design, they constrain lawful aftermarket competition and undermine antitrust enforcement—thereby restricting consumer choice, increasing prices, and stifling innovation.

Finally, a clear rule finding exhaustion upon an authorized sale best serves modern commerce. Products such as cars and computers may be sold and resold repeatedly during their useful life. The millions of businesses and consumers that use e-commerce sites are entitled to know they have the right to resell, purchase, and use what they buy, free from the threat of infringement suits.

<u>ARGUMENT</u>

I.    **AN AUTHORIZED SALE, WHEREVER MADE, EXHAUSTS ALL PATENT RIGHTS IN THE VENDED ARTICLE.**

A.    **Patent Exhaustion is a Matter of Common Law, Which Has No Geographic Restrictions.**

The exhaustion doctrine traces its roots back nearly 400 years, to the time of Lord Coke and "the common law's refusal to permit restraints on alienation of chattels."[7] *Kirtsaeng* applied this common-law exhaustion principle to copies of copyrighted works, and affirmed that a straightforward application of the doctrine encompasses sales of copies lawfully made abroad. *Id.*, 133 S. Ct. at 1363-1364. The exhaustion doctrine promotes competition and consumer rights, "leaving buyers of goods free to compete with each other when reselling or otherwise disposing of those goods." *Id.*, 133 S. Ct. at 1363. Exhaustion frees commercial

---

[7]    *Kirtsaeng*, 133 S. Ct. at 1363 (common-law exhaustion has "an impeccable historic pedigree"); *LifeScan Scotland, Ltd. v. Shasta Techs., LLC*, 734 F.3d 1361, 1376 (Fed. Cir. 2013).

enterprises and the courts from the impossible burdens of determining residual rights or restrictions in goods whose provenance cannot readily be traced. *Id,* 133 S. Ct. at 1363, 1365.

*Kirtsaeng*'s reasoning applies with even greater force to patent exhaustion, for three reasons. <u>First</u>, whereas the Copyright Act codified the first sale exemption from infringement liability,[8] patent law has no statutory exhaustion provision and exists solely as a creation of common law.[9] Thus, the scope of exhaustion under patent law must be coextensive with common-law exhaustion which, as *Kirtsaeng* confirms, "makes no geographic distinctions." *Id.*, 133 S. Ct. at 1363. <u>Second</u>, whatever other differences exist between patent and copyright, for more than 100 years the Supreme Court has recognized no pertinent distinctions between the copyright and patent rights subject to exhaustion:

> Congress had no intention to use the term 'vend' in one sense in the patent act and 'vending' in another in the copyright law. Protection in the exclusive right to sell is aimed at in both instances, and the terms used in the statutes are to all intents the same.

*Bauer & Cie. v. O'Donnell*, 229 U.S. 1, 13 (1913). Consequently, the scope of exhaustion following authorized sale of a patented article or exemption from the respective rights of a patent and copyright owner to control distribution is "to all intents the same." <u>Third</u>, the citation to *Bobbs-Merrill v. Straus*, 210 U.S. 339 (1908) further confirms the applicability and equivalence of exhaustion in the

---

[8]   17 U.S.C. § 109(a).

[9]   *Helferich Patent Licensing, Inc. v. The New York Times Co.*, 778 F.3d 1293, 1305 (Fed. Cir. 2015).

patent and copyright contexts. *Kirtsaeng* , 133 S. Ct. at 1363-1364. The Supreme Court consistently has cited the copyright exhaustion principles animating *Bobbs-Merrill* when invalidating post-sale price restraints under patent law. *See, e.g., United States v. General Elec. Co.*, 272 U.S. 476, 493-494 (1926) (characterizing invalidation of resale price restrictions in patent cases and *Bobbs-Merrill* as applications of exhaustion principles of *Adams v. Burke*, 84 U.S. (17 Wall.) 453 (1873)); *Boston Store of Chicago v. Am. Graphophone Co.*, 246 U.S. 8, 21-23 (1918) (discussing *Bobbs-Merrill* and the equivalence of copyright and patent exhaustion in *Bauer v. O'Donnell*).

### B.    *Jazz Photo* Has No Basis in Supreme Court Precedent.

This Court's decision in *Jazz Photo* has no mooring in Supreme Court precedent, and its reliance on *Boesch v. Graff*, 133 U.S. 697 (1890), is inapposite. In *Boesch*, the manufacturer possessed a prior use right under German law to make and sell the patented articles. The manufacturer's sales in Germany were lawful, but lacked authorization of the patent owner. Thus, at most *Boesch* holds, consistent with Supreme Court precedents prior and since, that an unauthorized sale does not exhaust the patent owner's rights. It does not support the proposition of *Jazz Photo* and its progeny that authorized foreign sales cannot exhaust domestic patent rights, or *Jazz Photo*'s broad conclusion that "the authorized first sale must have occurred under the United States patent." *Id.*, 264 F.3d at 1105.[10]

---

[10] Similarly, the parenthetical following the citation to *Boesch* in *Jazz Photo* merely assumes, without support, that *Boesch* would have required the importer to be licensed by the U.S. patent owner even if the sale in Germany had been authorized.

10

**C.    Neither the Uruguay Round Amendments Act Nor the TRIPS Agreement Nor Concerns for Extraterritoriality Preclude Exhaustion Upon Foreign Authorized Sales.**

At least one commentator attempts to distinguish *Kirtsaeng* by asserting a separate statutory basis to preclude exhaustion. According to this argument, even if the right to exclude others from selling is exhausted, the right to exclude importations, added to Section 271(a) as part of the Uruguay Round Amendments Act of 1994, 108 Stat. 4988, persists.[11] This argument suffers from three fatal flaws.

First, exhaustion does not apply solely to the right to exclude *sales*. An authorized sale extinguishes *all* of a patentee's rights to control use or disposition of that particular article. "[T]he initial authorized sale of a patented item terminates all patent rights to that item." *Quanta*, 553 U.S. at 625. "When the patented machine rightfully passes to the hands of the purchaser from the patentee, or from any other person by him authorized to convey it, the machine is no longer within the limits of the monopoly."[12] And, as this Court recently observed, the purpose of the exhaustion doctrine is "avoiding re-imposition of section 271 constraints on an authorized acquirer… ." *Helferich*, 778 F.3d at 1305. Thus, exhaustion applies to

---

[11]   John F. Duffy and Richard M. Hynes, *Statutory Domain and the Commercial Law of Intellectual Property*, 102 Va. L. Rev. ___ (2015), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2599074 (hereinafter "Duffy").

[12]   *Chafee v. Boston Belting Co.*, 63 U.S. 217, 223 (1859). *See United States* v. *Univis Lens Co.*, 316 U.S. 241, 249 (1942) (authorized sale of an article "is a relinquishment of the patent monopoly with respect to the article sold."); *Adams v. Burke*, 84 U.S. at 456-457 (same).

<u>all</u> patent rights in the vended article.  There is no basis to distinguish exhaustion of importation from the other section 271(a) rights of use, sale, or offers to sell.

<u>Second</u>, Congress added importation (and offers to sell) to section 271(a) to comply with the requirements of Article 28(1)(a) of the Agreement on Trade Related Aspects of Intellectual Property Rights of 1994 (the "TRIPS" Agreement). The contemporaneously-adopted footnote to the word "importing" in Article 28 clarifies that "this right, like all other rights conferred under this Agreement in respect of the use, sale, importation or other distribution of goods, is subject to the provisions of Article 6."  And Article 6 provides, for the purposes of dispute settlement under TRIPS, "*nothing in this Agreement shall be used to address the issue of exhaustion of intellectual property rights*."[13] Thus, the United States and 160 other member countries of the World Trade Organization expressly agreed that the importation right did not prescribe the scope of exhaustion, and that exhaustion of the importation right complies with TRIPS. Accordingly, section 271(a) does not prevent exhaustion of the importation right upon an authorized foreign sale.

<u>Third</u>, had Congress intended this amendment to alter the historical contours of the exhaustion doctrine or constrain exhaustion in any way—particularly given the focus on exhaustion in TRIPS Articles 6 and 28—surely such an important change would be reflected in the legislative history of the 1994 amendment. Yet, Congressional reports are silent on the amendment, and the Administrative Statement neither prescribes nor limits the scope of exhaustion for patented articles

---

[13]  TRIPS Agreement, *available at* World Trade Organization, https://www.wto.org/english/tratop_e/trips_e/t_agm0_e.htm (emphasis added).

imported into the United States after an authorized sale.[14] This Court may "presume, from Congress's refusal to disturb the existing decisional law of this doctrine (which predated the 1952 Act by nearly a century), an implicit authorization to continue applying the doctrine within its familiar boundaries." *Helferich*, 778 F.3d at 1305. Accordingly, there is no support for an argument that the 1994 amendments were intended to, or did, change common-law exhaustion.

Finally, exhaustion after an authorized foreign sale does not extraterritorially apply domestic patent law. At issue here is whether the U.S. patent exhaustion doctrine prevents a U.S. patent holder from further asserting its rights on U.S. soil against a patented article sold abroad with its direct or indirect authority. Unlike *Boesch*, this case presents no question of whether foreign law trumps U.S. patent rights. *Id.,* 133 U.S. at 703. *Cf. Quality King Distributors, Inc. v. L'anza Research Int'l, Inc.*, 523 U.S. 135, 145 n.14 (1998).[15]

Thus, in response to Question 1, an authorized sale anywhere in the world exhausts the rights of a U.S. patent owner. *Jazz Photo* should be overruled.

## II. *QUANTA* REJECTED PATENT-BASED POST-SALE USE RESTRAINTS, THEREBY OVERRULING THE "CONDITIONAL SALES" THEORY OF *MALLINCKRODT.*

In *Quanta*, the Supreme Court held that an *authorized sale* exhausts all of the patent-holder's rights in the vended article, such that downstream restrictions

---

[14]   Statement of Administrative Action, The Uruguay Round Agreements Act, *reprinted in* 1994 U.S.C.C.A.N. 4040, 4284.

[15]   *Quality King* dispatches as "irrelevant" any argument that Free Trade Agreements influence the scope of exhaustion. *Id.*, 523 U.S. at 153-154 & nn.30-31.

13

on post-sale uses of such article cannot be enforced under patent law. *Id.,* 553 U.S. at 621, 625, 631, 636, 637 & n.7, 638.[16] *Quanta* overruled *Bizcom* which, in turn, relied on the *Mallinckrodt* line of cases that held, *despite* an authorized sale, that post-sale conditions on use (a "conditional sale") could preserve a patentee's rights against exhaustion. *Quanta*'s teaching is clear: an authorized sale terminates the patentee's rights in that article, and renders downstream post-sale use conditions unenforceable under patent law.

The outcome of this appeal is equally clear. Lexmark authorized the cartridge sales to its reseller and end-user customers in the United States and abroad. Lexmark's resellers had "full authority to sell the Return cartridges that practiced Lexmark's patents" and, like Intel in *Quanta*, were merely required to

---

[16]  *Quanta* left open the possibility that a patent owner might retain *contract law* remedies for breach of post-sale conditions, while making clear that *patent law* remedies are unavailable. *Quanta* is only the most recent reflection of the Supreme Court's hostility to use of patent law, rather than contract law, to enforce post-sale restrictions:

> "[O]ne who buys patented articles of manufacture from one authorized to sell them becomes possessed of an absolute property in such articles, unrestricted in time or place. Whether a patentee may protect himself and his assignees by special contracts brought home to the purchasers is not a question before us, and upon which we express no opinion. It is, however, obvious that such a question would arise as a question of contract, and not as one under the inherent meaning and effect of the patent laws."

*Keeler v. Standard Folding-Bed Co.*, 157 U.S. 659, 666 (1895).

14

pass a notice to the end-purchaser.[17] Hence, notices attempting to restrict post-sale recycling activities of the end user "do not prevent patent rights from being exhausted given that the initial sales were authorized and unrestricted."[18] Lexmark does not contest these findings as clearly erroneous. Under *Quanta*, therefore, Lexmark cannot use patent law to prevent otherwise-lawful post-sale use. "[T]he fully authorized sales of the Return Program cartridges to consumers for use in the ordinary pursuits in life took the cartridges outside the scope of the patent monopoly despite the notices contained on those cartridges, and Lexmark may not now rely on patent law to hold Impression Products liable for infringement."[19]

## A.    Under *Quanta*, Post-Sale Use Restrictions Cannot Revive Patent Rights Exhausted by Authorized Sale.

*Quanta* turned on the fundamental distinction between licenses restricting the right to *sell* and post-sale conditions on *use*. Patentholder LG Electronics ("LGE") had not restricted Intel's authority to sell microchips, but attempted by written notices to impose use restrictions on microchip purchasers. This Court found LGE's notice made the sales "conditional" under its prior rulings,[20] and prevented exhaustion. *Bizcom*, 453 F.3d at 1369. The Supreme Court reversed.

---

[17]   Lexmark Br. Addendum, Op. and Order (Oct. 20, 2014) (hereinafter "Opinion") A00014.

[18]   *Id.* The district court in *Static Control* likewise found all Lexmark's cartridge sales were authorized. 615 F. Supp. 2d at 584-585, 588.

[19]   Opinion at A0015. *See also Static Control*, 615 F. Supp. 2d at 584 ("Lexmark attempts to reserve patent rights in its products through post-sale restrictions on use imposed on its customers. This is what *Quanta* says Lexmark cannot do.").

[20]   *B. Braun Med. Inc. v. Abbott Labs.*, 124 F.3d 1419 (Fed. Cir. 1997); *Mallinckrodt, Inc.*

15

Intel's sales were authorized under the license from LGE, and exhausted LGE's rights under patent law to impose post-sale conditions on use of the chips.[21]

The "conditional sales" theory blurs the connate distinctions, embodied from the Supreme Court's earliest exhaustion cases to the present, between restrictions on a licensee's authority to sell and a purchaser's rights after authorized sale. "[W]hen the machine passes to the hands of the purchaser, it is no longer within the limits of the monopoly. It passes outside of it, and is no longer under the protection of the act of Congress." *Bloomer v. McQuewan,* 55 U.S. at 549.  In *Adams v. Burke*, the Supreme Court re-emphasized that geographic restrictions upon a licensee's right to sell could not restrict the purchaser's post-sale right to use the article outside that area. *Id.*, 84 U.S. at 455.

The case principally relied upon by Lexmark, *General Talking Pictures Corp. v. Western Elec. Co.*, 304 U.S. 175 (1938), articulates legal principles fully consistent with *Bloomer*, *Quanta*, and the holding of the district court here. Contrary to Lexmark's arguments, it reached its different result on distinguishable facts. In *General Talking Pictures,* a license to manufacture withheld the right to sell the patented articles to commercial users. *Id.* at 179-180. Any sale by the licensee to commercial users was unauthorized, so could not trigger exhaustion.

---

[21]  *Quanta* also struck down the *Bizcom* (and *Mallinckrodt/B. Braun*) rationale allowing a patent owner to claim royalties at multiple points in the usage chain, as inconsistent with its exhaustion determinations in *Bloomer v. McQuewan,* 55 U.S. (14 How.) 539 (1852), *Adams v. Burke*, *supra, Keeler*, *supra* note 9, at 9, and *Univis Lens*, *supra*. *Cf. Keurig, Inc. v. Sturm Foods, Inc.*, 732 F.3d 1370, 1375 (Fed. Cir. 2013).

16

Further evidence that *General Talking Pictures* turned on this distinction can be found in its citation to another case where a licensee lacked the authority to sell. In *Mitchell v. Hawley*, 83 U.S. (16 Wall.) 544 (1873), a license explicitly provided that licensee "shall not, in any way, or form, dispose of, sell, or grant any license to use the said machines" beyond the initial patent term. *Id.* at 549. The licensee "never had any power to sell a machine so as to withdraw it indefinitely from the operation of the franchise secured by the patent." *Id.* at 551. Accordingly, "[Respondent in *Mitchell*] could not convey to petitioner what both knew it was not authorized to sell." 304 U.S. at 181 (citation omitted). Accordingly, *General Talking Pictures* and *Mitchell* merely illustrate the reverse corollary to *Quanta*: No exhaustion results from an unauthorized sale. [22] It provides no authority for *Mallinckrodt's* "conditional sales" theory.

### B.    *Mallinckrodt's* Conditional Sales Theory was Overruled by *Quanta*.

Both courts that have directly considered the question,[23] and the majority of commentators,[24] concur that *Quanta* overruled the "conditional sales" theory of

---

[22]   That Court declined to address post-sale use conditions, inasmuch as the sales were unauthorized. *Id.*, 304 U.S. at 177.

[23]   Opinion, A0015; *Static Control,* 615 F. Supp. 2d at 585-586 ("*Quanta* overruled *Mallinckrodt sub silentio*. The Supreme Court's broad statement of the law of patent exhaustion simply cannot be squared with the position that the *Quanta* holding is limited to its specific facts. Further, the Federal Circuit relied in part on *Mallinckrodt* in reaching its decision in … the decision the Supreme Court reversed in *Quanta*"); *see also Ergowerx Int'l LLC v. Maxell Corp. of Am.*, 18 F. Supp. 3d 430, 448 (S.D.N.Y. 2014).

[24]   *See, e.g.,* Duffy, at 48-49; Alfred C. Server and William J. Casey, *Contract-Based Post-Sale Restrictions on Patented Products Following Quanta*, 64 Hastings

*Mallinckrodt*. By squarely reversing *Bizcom*'s application of the "conditional sales" theory, *Quanta* necessarily rejected the same holding in the cases upon which *Bizcom* relied—*Mallinckrodt* and *B. Braun*.[25] That rejection becomes evident when applying *Quanta*'s exhaustion rule to the facts of *Mallinckrodt*: an authorized sale to the hospitals would exhaust the patentee's right and render the "single use only" restriction unenforceable under patent law.

It is irrelevant, as Lexmark has argued, that *Quanta* did not reverse *Mallinckrodt* by name. *Quanta* reversed a second aspect of *Bizcom* by holding exhaustion applicable also to method patents;[26] and there can be no dispute that *Quanta* thereby overruled *sub silentio* this Court's prior cases holding the contrary.[27] The same is true here: *Quanta* overruled *Mallinckrodt*'s "conditional sales" theory.

---

L.J. 561, 596 (Apr. 2013);  Thomas G. Hungar, *Observations Regarding the Supreme Court's Decision in Quanta Computer, Inc. v. L.G. Electronics, Inc.* ("*Mallinckrodt*'s 'conditional sale' rationale is no longer good law."), 49 IDEA – Intell. Prop. L. Rev. 517, 533 (2009).  *See also*, Brief for the United States as Amicus Curiae Supporting Petitioners*, Quanta Computer Inc. v. L.G. Elecs.* No. 06-937, at 20-24 (U.S., Nov. 2007),
http://www.justice.gov/osg/briefs/2007/3mer/1ami/2006-0937.mer.ami.pdf.
[25]   This Court's subsequent citation of *B. Braun* and *Mallinckrodt* in *Princo Corp. v. Int'l Trade Comm'n*, 616 F.3d 1318 (Fed. Cir. 2010) (en banc), does not determine the outcome here. *Princo* concerns patent misuse in a patent pool license, not patent exhaustion upon authorized sales. References to exhaustion in the en banc opinion are dictum; the panel opinion did not discuss exhaustion at all. *Princo Corp. v. Int'l Trade Comm'n*, 563 F.3d 1301 (Fed. Cir. 2009).
[26]   *See, LifeScan Scotland, Ltd., supra* note 7, at 8.
[27]   *See*, *Glass Equip. Dev., Inc. v. Besten, Inc.*, 174 F.3d 1337 (Fed. Cir. 1999); *Bandag Inc. v. Al Bolser's Tire Stores*, *Inc.*, 750 F.2d 903 (Fed. Cir. 1984).

18

### C.    The District Court Correctly Held the Return Program Does Not Affect the Authority to Sell.

Both district courts to review Lexmark's infringement claims held Lexmark authorized the cartridge sales to its resellers and customers. Opinion A0014; *Static Control,* 615 F. Supp. 2d at 585. Lexmark did not appeal that finding as clearly erroneous. Thus, the district court correctly concluded, the Return terms are downstream post-sale use restrictions that are exhausted upon authorized sale, and cannot be enforced under patent law.

First, Lexmark's authorized sales occur before purchasers accept any use restrictions.[28] Purchasers pay for and own full title to the cartridge.[29] By its terms, the Return Program "agreement" comes into existence only *after* the sale, when a consumer opens the box or installs the cartridge: "Opening this package or using the patented cartridge inside confirms your acceptance of the following license

---

[28]    Sales of Lexmark Prebate cartridges were unconditional. Anyone could walk into a store carrying Lexmark Prebate cartridges and purchase one. Anyone could purchase Lexmark Prebate cartridges directly from Lexmark through its website. *No potential buyer was required to agree to abide by the Prebate terms before purchasing a cartridge.*

*Static Control,* 615 F. Supp. 2d at 585 (emphasis added).

[29]  Ohio Rev. Code § 1302-42 (2012). Although the terms purport to restrict the end-user's ability to recycle through third parties such as remanufacturers or charities, end-users obtain full title and to the cartridge from Lexmark or resellers. "Under the Prebate program, customers have three options for their empty cartridges: keep them, throw them in the trash, or return them to Lexmark." *Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 487 F. Supp. 2d 861, 871 (E.D. Ky. 2007).

agreement." Lexmark Br. 8. Thus, Lexmark's post-sale condition has no effect until *after* the authorized sale to end-users.

Second, Lexmark's terms address only post-sale *use* not the authority to *sell*. They purport to limit only what the end-user can do with a used cartridge; specifically, that a consumer wishing to recycle a used cartridge should return it to Lexmark.[30]

Thus, the district court correctly concluded Lexmark's terms did not affect the authority to sell; and the Return Program post-sale use restriction, like the notices in *Bizcom* or *Mallinckrodt*, is unenforceable under patent law.

## III.  PROPER INTERPRETATION OF THE EXHAUSTION DOCTRINE MAINTAINS SUPREME COURT PRECEDENTS DISTINGUISHING REPAIR FROM RECONSTRUCTION.

The aftermarket competitors represented by the *amici* engage in lawful repair, and provide consumers with high quality products and services at competitive prices. Inherent in the district court's finding of non-infringement in this case is that the defendants engage in permissible repair. *Static Control*

---

[30]   Lexmark Br. 8 ("RETURN EMPTY CARTRIDGE TO LEXMARK FOR RECYCLING. … Following this initial use, you agree to return the empty cartridge only to Lexmark for recycling"). Lexmark amended the terms to address only recycling and not "remanufacturing." *Compare Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 697 F.3d 387, 396 (2012); *Static Control*, 615 F. Supp. 2d at 577 n.3. Under the current Return terms, remanufacturing would not be infringement even under Lexmark's theory.

explicitly held remanufacture of used Lexmark cartridges constituted lawful repair, not infringing reconstruction—a holding Lexmark did not appeal.[31]

The doctrine of noninfringing repair is nearly as old as the American industrial revolution. "Since [1850], it has been the established law that a patentee has not 'a more equitable right to force the disuse of the machine entirely, on account of the inoperativeness of a part of it, than the purchaser has to repair, who has, in the whole of it, a right of use.'"[32] Permissible repair has been found in a wide range of commercial products and services.[33] This distinction protects the

---

[31]  *Id.*, 615 F. Supp. 2d at 588. *See also*, *Hewlett-Packard Co. v. Repeat-O-Type Stencil Mfg. Corp.*, 123 F.3d 1445 (Fed. Cir. 1997), *cert. denied*, 523 U.S. 1022 (1998) (modifying ink jet cartridges for resale constitutes repair).

[32]  *Heyer v. Duplicator Mfg. Co.*, 263 U.S. 100, 101 (1923) (machine owner could buy replacement bands other than from patent owner), citing *Wilson v. Simpson,* 50 U.S. (9 How.) 109, 123 (1850) (owner of a patented planing machine could replace worn-out cutting blades).

[33]  Automobiles:  *Aro Mf'g Co. v. Convertible Top Replacement Co. 365 U.S. 336 (1961)* (replacement convertible tops) and *Dana Corp. v. Am. Precision Co.,* 827 F.2d 755 (Fed. Cir. 1987) (rebuilt automobile clutches).

Surfboards: *Surfco Hawaii v. Fin Control Sys. Pty. Ltd.*, 264 F.3d 1062 (Fed. Cir. 2001), *cert. denied sub nom. Fin Control Sys. Pty. Ltd. v. Surfco Hawaii*, 536 U.S. 939 (June 24, 2002) (replacement fins).

Medical Devices: *Kendall Co. v. Progressive Med. Tech.,* 85 F.3d 1570, 1576 (Fed. Cir. 1996) (replacing unspent parts).

Injection Molding Machinery: *Husky Injection Molding Sys. v. R&D Tool & Eng'g*, 291 F.3d 780 (Fed. Cir. 2002).

Kitchen:  *Bottom Line Mgmt., Inc. v. Pan Man, Inc*., 228 F.3d 1352, 1355 (Fed. Cir. 2000) (resurfacing cooking plates).

Disposable Cameras: *Jazz Photo*, 264 F.3d at 1098-99 (approving eight-step repair process).

patent owner against only those who re-make the invention anew,[34] while

promoting the paramount public interest in commerce pertaining to patented goods.

## A. Lexmark's Narrow View of the Patent Exhaustion Doctrine Thwarts the Public's Right to Repair.

Thousands of businesses that customize and repair products and supply

replacement parts, including those represented by *amici*, provide vital services to

the domestic economy. Automotive parts businesses repair hundreds of reusable

parts (e.g., transmissions, alternators, brakes, clutches, and controlled velocity

joints), and repair shops customize and upgrade car engines using aftermarket

parts. Suppliers in the imaging industry repair toner and ink-jet cartridges for

business and home office use with specialized mechanical parts and microchips

that regulate and upgrade printing operations. Consumers upgrade computers by

adding storage, memory, and graphics processing and gaming boards.

Consumers benefit from aftermarket competition through lower prices,

higher quality, and competitive features. Acquisition guidelines of federal

agencies, state and municipal governments, and corporations express preferences

for purchase of refurbished and recycled products.[35] In all likelihood, printers used

---

[34] *See Wilbur-Ellis Co. v. Kuther*, 377 U.S. 422, 424 (1964) ("'reconstruction' in this context has the special connotation of those acts which would impinge on the patentee's right 'to exclude others from making,' 35 U.S.C. 154, the article."). *Cf. Bowman v. Monsanto Co.*, 133 S. Ct. 1761 (2013) (replication not subject to exhaustion).

[35] *See* 40 C.F.R. § 247.16 (2014); U.S. Environmental Protection Agency, *Comprehensive Procurement Guidelines – Toner Cartridges*, http://www.epa.gov/epawaste/conserve/tools/cpg/products/nonpaperoffice.htm#toner (last visited June 8, 2015).

by this Court run on remanufactured toner cartridges such as those produced by members of the *amici*.

But these businesses need clearly-defined rules to avoid the "disastrous or even lethal consequences" of patent infringement suits:

> [B]usinessmen are certainly entitled to know when they are committing an infringement.… But to what avail these congressional precautions if this Court, by its opinions, would subject small businessmen to the devastating uncertainties of nebulous and permissive standards of infringement under which courts could impose treble damages upon them….[36]

The patent exhaustion doctrine provides that necessary guidance, and protects the right to repair against anticompetitive restraints. By contrast, the "conditional sales" theory trammels the rights of a patentee's competitors and the public to repair patented articles and replace unpatented components. Preserving the right to repair provides another reason to give *Quanta* its full effect, by overruling *Mallinckrodt*.

### B.    "Conditional Sales" Cases Create Uncertainty in the Courts and the Marketplace, a Trend This Court Should Reverse.

Predictably,[37] the sea change of *Mallinckrodt* emboldened patent owners like Lexmark to adopt post-sale tactics designed to stymie aftermarket competition.

---

[36]  *Aro*, 365 U.S. at 358-359 (Black, J., concurring). *Cf. Kirtsaeng*, 133 S. Ct. at 1365 (geographical limits on exhaustion could subject retailers to "the disruptive impact of the threat of infringement suits.).

[37]  *See Dawson Chem. Co. v. Rohm & Haas Co.*, 448 U.S. 176, 190 (1980), describing the rapid adoption of conditional licensing, and the ensuing corrosive effects on commerce arising from *Henry v. A.B. Dick Co.*, 224 U.S. 1 (1912) – a result soon reversed by *Motion Picture Patents v. Universal Film Mfg. Co.,* 243 U.S. 502, 515 (1917).

*Quanta* should have put an end to these intrusions on open commerce. Yet Lexmark and others persist in arguing that *Mallinckrodt* justifies patent infringement liability for otherwise-lawful repair, to the detriment of consumers and competition.[38]

Post-sale use restrictions like Lexmark's block the wheels of commerce. Although repair and supplies businesses can read patents to evaluate whether their activities constitute repair and not reconstruction, they cannot know whether products and components are subject to post-sale restrictions. As this Court's decisions illustrate, no business can predict whether restrictive legends nearly identical to the notice in *Mallinckrodt* are valid or enforceable.[39] Consequently, even if consumers and aftermarket competitors actually see purported post-sale restrictions, they cannot know under a "conditional sales" theory whether or how those terms affect their right under patent law to repair devices they lawfully own. Until the law is fully settled, those who supply and repair products with replaceable parts will unjustly be subjected to threats of infringement litigation, and consumers will bear the costs of this market confusion sown by the patent owner.

---

[38]  *See also, Keurig*, 732 F.3d at 1374 (describing attempted restriction on use of competing coffee cartridges as an "end-run around exhaustion").

[39]  *See, e.g., Kendall Co.*, 85 F.3d at 1575 (finding permissible repair by replacing with aftermarket parts a pressure sleeve sold in packaging marked "FOR SINGLE PATIENT USE ONLY"); *Sage Prods. Inc. v. Devon Indus. Inc.*, 45 F.3d 1575, 1578 (Fed. Cir. 1995) (finding repair by aftermarket replacement of used, but not spent, containers marked "single use only").

Aftermarket competitors need a bright-line test for exhaustion to stimulate investment and promote lawful commerce. Suppliers and servicers—including many small, family-owned enterprises—can readily evaluate their business plans under familiar principles of contract law. If they cannot reasonably assess their risks under patent law, then the threat of infringement litigation, increased damages, attorney fee awards, and injunctions will stifle investment and chill competition. *Quanta*'s clear test enables repair and customization businesses to compete with confidence. Reversal of *Mallinckrodt*'s "conditional sales" theory will provide needed certainty to aftermarket repair industries, promote consumer benefit and competition, and reduce the risk of unwarranted patent infringement litigation–without depriving patent owners of benefits earned from an authorized sale.

Accordingly, attempts to impose patent-based post-sale use restrictions should be considered null and void.[40]  As the Supreme Court observed in *Keeler*: "The inconvenience and annoyance to the public that an opposite conclusion would occasion are too obvious to require illustration."  157 U.S. at 667.

---

[40]  In certain cases, such attempts may constitute patent misuse. *Cf. Omega, S.A. v. Costco Wholesale Corp.*, CV 04-05443 TJH, 2011 WL 8492716 (E.D. Cal. Nov. 9, 2011) (Order and J.), *aff'd* 776 F.3d. 692 (9th Cir. 2015) (granting summary judgment, on remand of case involving copyright first sale doctrine, that plaintiff committed copyright misuse by engraving a copyrighted image on the reverse of a watch solely to enforce against unauthorized importation).

## IV.   THE EXHAUSTION DOCTRINE MAINTAINS CRUCIAL ANTITRUST LAW PROTECTIONS AGAINST ANTICOMPETITIVE CONDUCT.

Affirming exhaustion also preserves the equilibrium between patent and antitrust law. A patent "by its very nature is anticompetitive";[41] in effect, a limited monopoly to exclude others from manufacture, use, and sale of an invention.[42] As an exception to policies favoring free competition, the right to exclude should be construed to the limits of patent law, but no further. "Since patents are privileges restrictive of a free economy, the rights which Congress has attached to them must be strictly construed so as not to derogate from the general law beyond the necessary requirements of the patent statute."[43]

This Court's "conditional sales" cases impermissibly remove the antitrust law safeguards that protect consumers and the markets. Allowing post-sale conditions to override patent exhaustion, after full title to the articles passes to the purchaser, condones anticompetitive exclusion of otherwise-lawful competition and eliminates antitrust remedies against a patentee's otherwise-unlawful conduct. *Quanta*'s rule restores that balance: a patent owner remains free to remedy

---

[41]   *In re Ciprofloxin Hydrochloride Antitrust Litig.*, 544 F.3d. 1323, 1333 (Fed. Cir. 2008).  *Accord, Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 816 (1945) ("a patent is an exception to the general rule against monopolies and to the right to access to a free and open market").

[42]   *Ill. Tool Works Inc. v. Indep. Ink, Inc.,* 547 U.S. 28, 44 (2006), quoting *Int'l Salt Co. v. United States*, 332 U.S. 392, 395 (1947).

[43]   *United States v. Masonite Corp.,* 316 U.S. 265, 280 (1942) (citing *Univis Lens*, decided the same day); *see also, Simpson v. Union Oil Co. of Cal.,* 377 U.S. 13, 24 (1964); *Square D Co. v. Niagara Frontier Tariff Bureau*, 476 U.S. 409, 421 (1986) (exemptions from antitrust laws are "strongly disfavored").

26

breaches of a valid agreement, but cannot raise patent law to bar relief against anticompetitive conduct.[44]

Post-sale use restrictions may advance pecuniary interests of the patent owner, but profit maximization is not the ultimate aim of the patent laws.[45] The "conditional sales" theory diminishes the protective shield of antitrust, with no countervailing procompetitive or public interest benefit. It should be reversed by this Court.

## V.    A CLEAR PATENT EXHAUSTION RULE REMAINS ESSENTIAL TO ROBUST COMMERCE.

Reaffirming *Quanta*'s clear rule is vital to the free flow of commerce in a society where patented articles are ubiquitous. Ecommerce affords unprecedented opportunities to resell and repair used goods. Consumers buy and sell used products online, from small computer parts to fleets of cars and trucks, through websites such as ebay.com and Craig's List. These ecommerce sites enable businesses and consumers to comparison shop based on prices and terms, and better ascertain the ongoing costs of operating a product throughout its useful life. Accurate information in the hands of the purchaser fosters robust competition in

---

[44] *Cf., Image Technical Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1216 (9th Cir. 1997) (finding Kodak's policy to deny competitors spare parts was anticompetitive, where patent-based justifications for its conduct were pretextual). *See Eastman Kodak,* 504 U.S. at 461; *ISO Antitrust Litig.,* 203 F.3d 1322, 1327 (Fed. Cir. 2000).

[45] *See*, *e.g.*, *Motion Picture Patents Co.*, 243 U.S. at 510-511. *Cf. Kirtsaeng,* 133 S. Ct. at 1370-1371 ("no basic principle of copyright law" entitles copyright owners to discriminatorily price in different geographic markets).

27

both primary markets and aftermarkets. By contrast, post-sale restrictions that divest consumers of their right to repair or resell ripple uncertainty throughout the downstream economy. They artificially raise prices, and deprive consumers of point-of-purchase information as to the true costs of repairing and upgrading their equipment, thus allowing would-be monopolists to exploit information imbalances to unfair advantage.[46]

As a matter of public policy, lawful aftermarket commerce thrives where the patent exhaustion doctrine leaves room for robust competition, and where consumers and competitors can know in advance whether their conduct is lawful. Any other result discourages investment in noninfringing complementary products and services, and denies consumers the benefits of fair and open competition: lower prices and more innovation.

## CONCLUSION

Supreme Court exhaustion doctrine draws a clear demarcation between patent rights and commercial freedom. *Kirtsaeng* confirms that the common-law roots of patent exhaustion have no geographic restrictions; and *Quanta* clarifies that exhaustion trumps post-sale use restrictions on a patented article after authorized sale. Businesses and consumers will benefit from reaffirmation of these complementary bright-line rules.

---

[46] *See Eastman Kodak,* 504 U.S. at 473-476 (describing how inability to ascertain total cost of ownership at time of purchase exposes end users to supracompetitive pricing).

28

Therefore, this Court should, as to Question 1, overrule *Jazz Photo* to the extent it ruled that a sale of a patented item outside the United States never gives rise to United States patent exhaustion; and, as to Question 2, hold that authorized sales exhaust any patent rights to enforce post-sale restrictions, both as to Lexmark's resellers and end-users, and overrule the contrary holding in *Mallinckrodt*.

Dated: June 19, 2015                    Respectfully submitted,


                                        */s/ Seth D. Greenstein*
                                        Seth D. Greenstein
                                        CONSTANTINE CANNON, LLP
                                        1001 Pennsylvania Avenue, N.W.
                                        Suite 1300 North
                                        Washington, D.C. 20004
                                        202.204.3500

                                        Counsel for *Amicus Curiae*
                                        International Imaging Technology Council,
                                        Auto Care Association, and Automotive
                                        Parts Remanufacturers Association

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) because this brief contains 6999 words, excluding the parts of the brief

exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this

brief has been prepared in a proportionally spaced typeface using Microsoft Word

in 14-point Times New Roman font.

*/s/ Seth D. Greenstein*

SETH D. GREENSTEIN
CONSTANTINE CANNON LLP
1001 Pennsylvania Ave., N.W.
Suite 1300 North
Washington, D.C. 20004
(202) 204-3500

*Counsel for Amicus Curiae*

June 19, 2015

30

## **CERTIFICATE OF SERVICE**

I certify that on June 25, 2015 the foregoing Corrected document was served

on all parties or their counsel of record through the CM/ECF system.

*/s/ Seth D. Greenstein*

SETH D. GREENSTEIN

CONSTANTINE CANNON LLP

1001 Pennsylvania Ave., N.W.

Suite 1300 North

Washington, D.C. 20004

(202) 204-3500

*Counsel for Amicus Curiae*
