IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

———————————————

LEXMARK INTERNATIONAL, INC.,

Plaintiff-Cross-Appellant,

v.

IMPRESSION PRODUCTS, INC.,

Defendant-Appellee,

QUALITY CARTRIDGES, INC.; JOHN DOES, 1-20; BLUE TRADING LLC;
EXPRINT INTERNATIONAL, INC.; LD PRODUCTS, INC.; PRINTRONIC
CORPORATION; TESEN DEVELOPMENT (HONG KONG) CO. LTD.; BENIGNO
ADEVA AND HIS COMPANIES,
Defendants

———————————————

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN
DISTRICT OF OHIO, No. 1:10-cv-00564 (Judge Michael R. Barrett)

———————————————

BRIEF FOR THE UNITED STATES OF AMERICA AS AMICUS CURIAE

———————————————


BENJAMIN C. MIZER
*Principal Deputy Assistant*
*Attorney General*

MARK R. FREEMAN
MELISSA N. PATTERSON
*(202) 514-1201*
*Attorneys, Appellate Staff*
*Civil Division, Room 7230*
*U.S. Department of Justice*
*950 Pennsylvania Ave., N.W.*
*Washington, D.C.  20530*

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY ........................................................................... 1

INTEREST OF THE UNITED STATES ................................................... 3

QUESTIONS PRESENTED ............................................................ 4

ARGUMENT ............................................................................... 4

    I.    THIS COURT SHOULD OVERRULE *MALLINCKRODT*
        AND HOLD THAT POST-SALE RESTRICTIONS ARE
        NOT ENFORCEABLE IN PATENT LAW ........................................... 4

        A.    The Supreme Court Has Long Prohibited Enforcement
             Of Post-Sale Restrictions Through Patent Law ............................ 5

        B.    *Mallinckrodt* Is Inconsistent With Supreme Court Precedent ......... 8

    II.    THIS COURT SHOULD RESTORE THE REGIME OF
        MODIFIED INTERNATIONAL PATENT EXHAUSTION
        THAT PREVAILED BEFORE *JAZZ PHOTO* ..................................... 13

        A.    Patent Law Is Quintessentially Territorial ..................................... 14

        B.    Courts Traditionally Permitted U.S. Patentees Expressly
             To Reserve Their U.S. Rights In Foreign Transactions ................ 16

        C.    Congress Has Not Altered The Traditional Rule .......................... 20

        D.    *Kirtsaeng* Does Not Mandate Automatic International
             Patent Exhaustion ...................................................................... 22

        E.    *Jazz Photo* Should Be Overruled To The Extent It Held
             That Foreign Sales Can Never Exhaust U.S. Patent Rights ......... 26

CONCLUSION ........................................................................ 28

CERTIFICATE OF COMPLIANCE WITH
FEDERAL RULE OF APPELLATE PROCEDURE 32(a)

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**                                                                      **Page**

*A. Bourjois & Co. v. Katzel,*
    260 U.S. 689 (1923)..............................................................18

*Adams v. Burke,*
    84 U.S. (17 Wall.) 453 (1873).................................................6, 17, 18

*Aro Mfg. Co. v. Convertible Top Replacement Co.,*
    377 U.S. 476 (1964)................................................................5

*Bloomer v. McQuewan,*
    55 U.S. (14 How.) 539 (1853) ...................................5, 7, 8, 11, 13

*Bobbs-Merrill Co. v. Straus,*
    210 U.S. 339 (1908).............................................................24, 25

*Boesch v. Graff,*
    133 U.S. 697 (1890).......................................... 16, 17, 18, 25

*Boston Store v. American Graphophone Co.,*
    246 U.S. 8 (1918)...............................................................6, 9

*Bowman v. Monsanto Co.,*
    133 S. Ct. 1761 (2013) ........................................................5, 6

*Brown v. Duchesne,*
    60 U.S. (19 How.) 183 (1857) ............................................15

*Chaffee v. Boston Belting Co.,*
    63 U.S. (22 How.) 217 (1859) ............................................12

*Curtiss Aeroplane & Motor Corp. v. United Aircraft Eng'g Corp.,*
    266 F. 71 (2d Cir. 1920)......................................................19

*Deepsouth Packing Co. v. Laitram Corp.,*
    406 U.S. 518 (1972).............................................................15

*Dickerson v. Matheson,*
    57 F. 524 (2d Cir. 1893)......................................................18, 19

*Dickerson v. Tinling,*
    84 F. 192 (8th Cir. 1897) ................................................................ 19

*General Talking Pictures Corp. v. Western Elec. Co.,*
    305 U.S. 124 (1938) ......................................................................... 8

*Golan v. Holder,*
    132 S. Ct. 873 (2012) ..................................................................... 16

*Griffin v. Keystone Mushroom Farm, Inc.,*
    453 F. Supp. 1283 (E.D. Pa. 1978) ............................................... 19

*Harkness v. Russell,*
    118 U.S. 663 (1886) ...................................................................... 12

*Henry v. A.B. Dick Co.,*
    224 U.S. 1 (1912) ............................................................................ 7

*Hobbie v. Jennison,*
    149 U.S. 355 (1893) ................................................................... 6, 12

*Holiday v. Mattheson,*
    24 F. 185 (C.C.S.D.N.Y. 1885) .................................................... 18

*Jazz Photo Corp. v. International Trade Comm'n,*
    264 F.3d 1094 (Fed. Cir. 2001) ........................................... 3, 14, 26

*Kabushiki Kaisha Hattori Seiko v. Refac Tech. Dev. Corp.,*
    690 F. Supp. 1339 (S.D.N.Y. 1988) ............................................. 19

*Keeler v. Standard Folding Bed Co.,*
    157 U.S. 659 (1895) ..................................................... 6, 7, 12, 13, 18

*Kirtsaeng v. John Wiley & Sons, Inc.,*
    133 S. Ct. 1351 (2013) ................................................ 2, 22, 23, 24, 26

*Mallinckrodt, Inc. v. Medipart, Inc.,*
    976 F.2d 700 (Fed. Cir. 1992) .......................... 1, 4, 8, 9, 10, 11, 13

*Microsoft Corp. v. AT&T Corp.,*
    550 U.S. 437 (2007) ...................................................................... 15

*Mitchell v. Hawley,*
    83 U.S. (16 Wall.) 544 (1873) ................................................ 6, 8, 11, 12

*Motion Picture Patents Co. v. Universal Film Mfg. Co.*,
   243 U.S. 502 (1917) .................................................... 5, 6, 7, 9, 10, 12

*Providence Rubber Co. v. Goodyear*,
   76 U.S. (9 Wall.) 788 (1870) ........................................................ 11

*Quality King Distributors, Inc. v. L'anza Research International, Inc.*,
   523 U.S. 135 (1998) ..................................................................... 22

*Quanta Computer, Inc. v. LG Elecs., Inc.*,
   553 U.S. 617 (2008) ......................................................... 5, 10, 12, 13

*Reclosable Plastic Bags*,
   Inv. No. 337-TA-22, USITC Pub. No. 801,
   1977 WL 52333 (Jan. 17, 1977) ..................................................... 20

*Sanofi, S.A. v. Med-Tech Veterinarian Prods., Inc.*,
   565 F. Supp. 931 (D.N.J. 1983) ..................................................... 19

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
   464 U.S. 417 (1984) ..................................................................... 24

*United States v. General Elec. Co.*,
   272 U.S. 476 (1926) ............................................................7, 8, 10, 11

*United States v. Line Materials Co.*,
   333 U.S. 287 (1948) ....................................................................... 8

*United States v. Univis Lens Co.*,
   316 U.S. 241 (1942) ...............................................................5, 9, 10

*Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*,
   515 U.S. 528 (1995) ..................................................................... 21

## Treaty:

Paris Convention for the Protection of Industrial Property,
   32 Stat. 1936 (Aug. 25, 1902) ...................................................... 15

**Statutes:**

United States-Australia Free Trade Agreement Implementation Act,
Pub. L. No. 108-286, 118 Stat. 919 (2004) .................................................. 20

United States-Morocco Free Trade Agreement Implementation Act,
Pub. L. No. 108-302, 118 Stat. 1103 (2004) ................................................ 21

United States-Singapore Free Trade Agreement Implementation Act,
Pub. L. No. 108-78, 117 Stat. 948 (2003) ................................................... 21

Uruguay Round Agreement Acts,
Pub. L. No. 103-465, 108 Stat. 4809 (1994) .............................................. 20

Pub. L. No. 109-108 § 631, 119 Stat. 2290 (2005).................................... 21

17 U.S.C. § 109............................................................................20, 22, 23

17 U.S.C. § 109(a) .......................................................................22, 23

19 U.S.C. § 1337(a) ....................................................................... 26

35 U.S.C. § 154(a)(1) ................................................................ 1, 14

35 U.S.C. § 271(a) ..................................................................1, 14, 20

35 U.S.C. § 271(d)(4) .................................................................. 6

**Rule:**

Fed. R. App. P. 29(a)..................................................................... 1

**Legislative Materials:**

H.R. Doc. No. 103-316 (1994),
*reprinted in* 1994 U.S.C.C.A.N. 4040 ................................................ 20

Transcript, *Fiscal Year 2006 Defense Appropriations and Fiscal Year 2006
Science, State and Justice Appropriations Bills:  Hearing Before the H. Comm. On
Appropriations*, 109th Cong., 2005 WL 1350973 (June 7, 2005).................... 21

## INTRODUCTION AND SUMMARY

At the invitation of the Court, the United States respectfully submits this brief pursuant to Federal Rule of Appellate Procedure 29(a).  In the view of the United States, the first authorized sale of a patented article in the United States wholly exhausts the patentee's exclusive rights in that article, notwithstanding any post-sale restriction imposed by the patentee.  But because a sale under foreign law does not require any authority under U.S. patent law, a patentee may sell a patented article abroad while reserving its U.S. patent rights as to that article.

Although not codified in the Patent Act, the principle of patent exhaustion has circumscribed the exclusive rights of patentees for more than 150 years.  A patent confers on the patentee "the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States or importing the invention into the United States."  35 U.S.C. § 154(a)(1).  Whoever does any of these acts "without authority" from the patentee infringes the patent.  35 U.S.C. § 271(a).  But where the patentee has given its "authority" for a sale in the United States of an article embodying the patented invention, the Supreme Court has held that the patentee's exclusive rights in that article are entirely exhausted.  It follows that any post-sale restrictions that a patentee attempts to place on the use or resale of a patented article cannot be enforced through patent law.  To the extent this Court held otherwise in *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700 (Fed. Cir. 1992), that decision should be overruled.

Because patent law is quintessentially territorial, however, foreign sales of a patented article under foreign law do not trigger exhaustion in the same manner. The rights created by U.S. patent law and foreign patent law are independent of each other and may be independently exercised or alienated. Unlike a domestic sale, which cannot lawfully proceed without the U.S. patentee's authorization, the sale overseas of an article embodying an invention patented in the United States does not require the exercise of any exclusive right conferred under U.S. law. Thus, federal courts traditionally permitted a patentee to make foreign sales of its patented invention while reserving its exclusive rights under U.S. patent law, provided the patentee made that reservation expressly. Indeed, we are unaware of any court refusing to enforce such an express reservation. And Congress has erected no barrier to patentees' express reservation of their domestic rights in connection with foreign sales. On the contrary, Congress has enacted legislation approving several international agreements expressly premised on the efficacy of such reservations.

The Supreme Court's decision in *Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S. Ct. 1351 (2013), provides no basis for upsetting this tradition or the political branches' actions. That decision construed a specific phrase in the Copyright Act and responded to concerns that, absent automatic international exhaustion under the text of that provision, rights-holders could forever control the downstream movement of copyrighted material. The Patent Act contains no parallel phrase and poses no analogous risk. *Kirtsaeng* relied, moreover, on the absence of any common-law

2

tradition of respecting reservations of U.S. rights.  In the patent context, however, both the Supreme Court and the courts of appeals historically recognized that authorized sales in foreign jurisdictions did not necessarily exhaust U.S. patent rights.

To the extent this Court held in *Jazz Photo Corp. v. International Trade Commission*, 264 F.3d 1094 (Fed. Cir. 2001), that international sales *never* exhaust patent rights, however, it swept beyond the traditional rule.  Before *Jazz Photo*, courts enforced a default rule of international exhaustion, while at the same time respecting the fundamental territoriality of patent rights by permitting patentees to reserve their national patent rights expressly.  To the extent that *Jazz Photo* precludes exhaustion in circumstances in which the common law would have recognized it, it should be overruled.

## INTEREST OF THE UNITED STATES

The questions presented here implicate the expertise and responsibilities of a wide array of federal agencies and components, including the Commerce Department, the Patent and Trademark Office, the Antitrust Division of the Justice Department, the International Trade Commission, the State Department, the Treasury Department, and the Office of the U.S. Trade Representative, among others.  In its order granting en banc review, this Court invited the Attorney General to file a brief expressing the views of the United States.

3

## QUESTIONS PRESENTED

1.  Whether a U.S. patent owner may impose restrictions on the use or resale of a patented article that are enforceable as a matter of patent law after the first authorized sale of the article in the United States.

2.  Whether and under what circumstances the authorized sale of a patented article in a foreign country exhausts the patent owner's exclusive rights under a United States patent.

## ARGUMENT

### I.     THIS COURT SHOULD OVERRULE *MALLINCKRODT* AND HOLD THAT POST-SALE RESTRICTIONS ARE NOT ENFORCEABLE IN PATENT LAW.

With a single, short-lived exception, the Supreme Court has held for over 150 years that the patent exhaustion doctrine bars a patentee from invoking the patent laws to enforce restrictions on the use or resale of a patented article after the first authorized sale of the article in the United States.  This Court held in *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700 (Fed. Cir. 1992), however, that patentees *can* impose and enforce such restrictions as a matter of patent law, at least where the restriction is "within the scope of the patent grant or otherwise justified," *id.* at 709.  That decision was wrong when it issued, and subsequent Supreme Court decisions have only highlighted the gulf between *Mallinckrodt* and Supreme Court precedent.  The Court should overrule *Mallinckrodt* and affirm that U.S. patent laws cannot be used to effect servitudes on chattels.

4

## A. The Supreme Court Has Long Prohibited Enforcement Of Post-Sale Restrictions Through Patent Law.

Nothing in the text of the Patent Act expressly prevents a patentee from demanding compensation from each downstream user or reseller of an article embodying his invention.  Since 1853, however, the Supreme Court has held that the patentee's statutory right is exhausted by the first authorized sale of such an article.  In *Bloomer v. McQuewan*, 55 U.S. (14 How.) 539 (1853), the Court explained that a purchaser of a patented article "stands on different ground" than one who obtains a license under the patent.  *Id.* at 549.  The latter, the Court explained, "obtains a share in the monopoly . . . derived from, and exercised under" the patent.  *Id.*  But one who purchases a particular article embodying the patent "exercises no rights created by the act of Congress" in using his purchase.  *Id.*  "[W]hen the machine passes to the hands of the purchaser, it is no longer within the limits of the monopoly," but rather "passes outside of it, and is no longer under the protection of the act of Congress."  *Id.*

The Supreme Court has since reiterated these principles in many decisions, each time stressing that a patentee's exclusive rights are wholly exhausted, as to a given article embodying the invention, by the article's first authorized sale.  *See Bowman v. Monsanto Co.*, 133 S. Ct. 1761, 1764 (2013); *Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 625 (2008); *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 497 (1964) (plurality opinion); *United States v. Univis Lens Co.*, 316 U.S. 241, 251-52 (1942); *Motion Picture Patents Co. v. Universal Film Mfg. Co.*, 243 U.S. 502, 508-18 (1917);

5

*Keeler v. Standard Folding Bed Co.*, 157 U.S. 659, 666 (1895); *Hobbie v. Jennison*, 149 U.S. 355, 361-63 (1893); *Adams v. Burke*, 84 U.S. (17 Wall.) 453, 456 (1873).[1]  Of course, the patentee need not sell—or authorize the sale of—articles embodying his patented invention at all.  *See* 35 U.S.C. § 271(d)(4).  But if he does, he may not, as a matter of patent law, withhold from the purchaser the unencumbered right to use or resell them.  *See, e.g., Motion Picture Patents Co.*, 243 U.S. at 514.  "Under the doctrine of patent exhaustion, the authorized sale of a patented article gives the purchaser, or any subsequent owner, a right to use or resell that article."  *Bowman*, 133 S. Ct. at 1764.

This reasoning leaves no room for post-sale restrictions enforceable in infringement actions.  The Supreme Court has stressed that, once the patentee parts with title through an authorized sale in the United States, "[c]omplete title to the implement or machine purchased becomes vested in the vendee by the sale and purchase."  *Mitchell v. Hawley*, 83 U.S. (16 Wall.) 544, 548 (1873); *see also, e.g., Boston Store v. American Graphophone Co.*, 246 U.S. 8, 25 (1918) (patentee's sale places an item "beyond the confines of the patent law" such that he "could not by qualifying restrictions as to use keep under the patent monopoly a subject to which the monopoly no longer applied").  The Court has long made clear that the only way a patentee may impose post-sale conditions is "as a question of contract, and not as one

---

[1] Exhaustion principles do not "allow the purchaser to make *new* copies of the patented invention."  *Bowman*, 133 S. Ct. at 1764 (emphasis added) (holding that exhaustion doctrine did not permit the use of patented seeds to grow more seeds).

6

under the inherent meaning and effect of the patent laws." *Keeler*, 157 U.S. at 666; *see also Bloomer*, 55 U.S. at 549-50. Because contracts require privity, a patentee's insistence on such conditions, even if accepted by the purchaser and not otherwise contrary to law, cannot bind downstream users or resellers of the same article. And the purchaser's failure to comply with such conditions does not constitute patent infringement; contractual conditions are enforceable, if at all, only under contract law.

The lone exception to the Supreme Court's otherwise unwavering view that an authorized sale exhausts the patent right was *Henry v. A.B. Dick Co.*, 224 U.S. 1 (1912). The Court there concluded that "[t]he property right to a patented machine may pass to a purchaser with no right of use, or with only the right to use in a specified way, or at a specified place, or for a specified purpose." *Id.* at 24. Like this Court decades later in *Mallinckrodt*, the Court in *A.B. Dick* reasoned that "[t]his right to sever ownership and use is deducible from the nature of a patent monopoly." *Id.* at 25. *A.B. Dick*, however, was expressly overruled just five years later by *Motion Picture Patents*. *See* 243 U.S. at 514, 518 (criticizing the "failure to distinguish between the rights which are given to the inventor by the patent law" and "rights which he may create for himself by private contract").

In contrast to its consistent refusal to permit patentees to control a domestic purchaser's use of patented articles, the Supreme Court has permitted patentees to place restrictions on the conduct of licensees. *See, e.g., U.S. v. General Elec. Co.*, 272 U.S. 476, 489-90 (1926) (distinguishing the "well settled" rule that post-sale the

patentee "can exercise no future control over what the purchaser may wish to do with the article" from the "different" question of how a patentee may restrict licensees). This distinction stems from the fact that licensees exercise a portion of the patentee's rights, while a validly sold article is "no longer within the limits of the monopoly." *Bloomer*, 55 U.S. at 549-50. Because licensees stand in patentees' shoes, the Supreme Court generally has allowed patentees to restrict their licensees in the same way patentees might restrict their own exercise of their rights. *See General Elec.*, 272 U.S. at 490; *see also General Talking Pictures Corp. v. Western Elec. Co.*, 305 U.S. 124, 127 (1938).[2] In other words, the patentee may specify the circumstances in which a licensee may make an authorized (*i.e.*, noninfringing) sale on the patentee's behalf.   And since an *authorized* first sale of a patented article is a prerequisite to exhaustion, such restrictions on a licensee's conduct may have a practical bearing on the determination whether exhaustion of the patentee's rights has occurred. *See Mitchell*, 83 U.S. at 548-51 (concluding that a licensee's "sale" did not trigger exhaustion where the licensee held only a license to use). But once the first authorized sale has occurred, the patentee may not exercise any further control over the use or resale of that article.

## B. *Mallinckrodt* Is Inconsistent With Supreme Court Precedent.

In *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700 (Fed. Cir. 1992), this Court considered whether a patent owner could enforce—as matter of patent law—a

---

[2] Patentees may not use their power to restrict licensees to unlawfully restrain trade. *See United States v. Line Materials Co.*, 333 U.S. 287, 304 (1948).

restriction limiting the purchaser of a patented device to a single use.  *See id.* at 702.

This Court held that such restrictions on reuse were not "unenforceable under the

patent law" "as a matter of law."  *Id.* at 709.  Rather, the Court stated that a post-sale

restriction could be enforced through an infringement action if it is otherwise "valid[]

… under the applicable law such as the law governing sales and licenses, and if the

restriction on reuse was within the scope of the patent grant or otherwise justified."

*Id.*  This Court thus has since permitted patentees to attach some types of post-sale

conditions on the use of patented articles.

  *Mallinckrodt* cannot be reconciled with Supreme Court precedent.   That

decision is not merely inconsistent with *Quanta*, as Impression Products argues.

*Mallinckrodt* was wrong when it was decided, and the gap between *Mallinckrodt* and the

Supreme Court's precedents has only become more evident in the ensuing years.

  As discussed above, the Supreme Court has made clear that patent exhaustion

is a limit on the substantive scope of U.S. patent rights that cannot be overridden at a

patentee's option.  Indeed, the Supreme Court has repeatedly invoked exhaustion

principles to invalidate explicit restrictions imposed on authorized purchasers.  *See,*

*e.g., Univis*, 316 U.S. at 244, 249-52;[3] *Boston Store*, 246 U.S. at 25; *Motion Picture Patents*,

---

[3] *Mallinckrodt* misreads *Univis* as limited to the proposition that restrictions containing unlawful restraints on trade, such as "price-fixing or tying," cannot be enforced under patent law.  *See Mallinckrodt*, 976 F.2d at 708.  Only after concluding that authorized sales exhausted the patent rights did the Court analyze the antitrust claims.  *See Univis*, 316 U.S. at 251.

243 U.S. at 506-07, 516.  And it has done so without considering whether the putative restriction is "within the scope of the patent grant." *Mallinckrodt*, 976 F.2d at 709. Indeed, the Court has made clear that even the kind of restrictions that might be valid as to licensees cannot be imposed on purchasers.  *Compare Univis*, 316 U.S. at 251 (after the first sale, the patentee has "parted with his right to assert the patent monopoly with respect to" that item "and is no longer free to control the price at which it may be sold"), *with General Elec.*, 272 U.S. at 489-90 (permitting a patentee to impose a sale price restriction on its licensee's authority to sell patented goods).

*Quanta* confirms that *Mallinckrodt* was wrongly decided.  In *Quanta*, the Court reiterated "that the initial authorized sale of a patented item terminates *all patent rights* to that item."  553 U.S. at 625 (emphasis added).  The Court accordingly refused to give effect under the patent laws to a license provision that "specifically disclaimed any license to third parties to practice the patents" in a certain way.  *Id.* at 637.  The Court explained that it was "irrelevant" whether this restriction was effective in denying "third parties … implied licenses" because the exhaustion doctrine "turns only on [the licensee's] *own* license to sell products practicing the … Patents." *Id.* (emphasis added).  Once the Court concluded that Intel's sale of the relevant articles to Quanta was authorized by the patentee (*i.e.*, it was not an act of infringement), the Court concluded that the patents were exhausted.  And it did so without pausing to examine—as this Court would under *Mallinckrodt*—whether the purported license restriction was "within the scope" of the patents.  *See id.*  The only relevant question

10

for the Court was whether the sale to Quanta was authorized. *Mallinckrodt* is irreconcilable with this reasoning.

*Mallinckrodt* is also unpersuasive on its own terms. The Court predicated its approval of post-sale restrictions on Supreme Court decisions, such as *General Talking Pictures,* that involved restrictions placed on *licensees*, not purchasers. *See Mallinckrodt*, 976 F.2d at 704-05 (citing *General Talking Pictures* as "discussing restrictions on use" generally); *id.* at 707 (invoking *Providence Rubber Co. v. Goodyear*, 76 U.S. (9 Wall.) 788 (1870)); *see also* Lexmark Opening Panel Br. at 18, 23, 26-27. But the Supreme Court explained as early as *Bloomer v. McQuewan* that licensees and ordinary purchasers "stand[] on different ground." *Bloomer*, 55 U.S. at 549-50. And in *General Electric*, which was cited in *General Talking Pictures*, the Court could hardly have been more explicit that the patent laws will *not* enforce post-sale restrictions on purchasers: "It is well settled, as already said, that where a patentee makes the patented article, and sells it, he can exercise no future control over what the purchaser may wish to do with the article after his purchase. It has passed beyond the scope of the patentee's rights." 272 U.S. at 489-90.

*Mallinckrodt*'s reliance on certain references by the Supreme Court to "unconditional sales," or to patentees' ability to make sales "with conditions," was similarly misplaced. *See* 976 F.2d at 707. In *Mitchell v. Hawley*, for example, the Court observed that patent rights are exhausted when the patentee "has himself constructed a machine and sold it without any conditions, or authorized another to construct, sell,

and deliver it … without any conditions." 83 U.S. at 547; *see Keeler*, 157 U.S. at 663 (quoting the foregoing in describing *Mitchell*). But at that time, a "conditional" sale would have been understood as an agreement to sell where title would not convey until the performance of a condition precedent. *See, e.g., Harkness v. Russell*, 118 U.S. 663, 666 (1886) (describing a "conditional sale" as a "mere agreement to sell upon a condition to be performed" in which title passes only when condition precedent is performed). That understanding of "conditional" is consistent with the Supreme Court's other patent-exhaustion cases, which explain that exhaustion is triggered "if a person legally acquires a title to" a patented item (*Chaffee v. Boston Belting Co.*, 63 U.S. (22 How.) 217, 223 (1859)); when a patented item is "lawfully made and sold" (*Hobbie*, 149 U.S. at 363); or upon "the purchase of the article from one authorized by the patentee to sell it" (*Keeler*, 157 U.S. at 666).

*Mallinckrodt* thus simply misread Supreme Court decisions referring to "unconditional sales." Those cases do not imply that patentees may enforce, through infringement suits, restrictions on the use or resale of patented articles following an authorized sale. Rather, by "unconditional sale," the Court merely meant a sale in which title conveyed to the purchaser. Indeed, in *Motion Picture Patents*, the Supreme Court described a sale made subject to purported "restriction[s]" on downstream use as an "unconditional sale." *See Motion Picture Patents*, 243 U.S. at 515-16; *see also Quanta*, 553 U.S. at 626 (quoting this language).

12

Nor can *Mallinckrodt* be reconciled with the Supreme Court's repeated suggestion that contract law provides the only means of enforcing post-sale restrictions on an article. *See, e.g., Keeler*, 157 U.S. at 666; *Bloomer*, 55 U.S. at 549-50; *see also Quanta*, 553 U.S. at 637 n.7 (reserving the question "whether contract damages might be available even though exhaustion operates to eliminate patent damages"). *Mallinckrodt* acknowledged that "[t]he question of whether a license restriction is binding on the purchaser is indeed one of contract law," but went on to assert that "the remedy for breach" of such a contractual condition could include a patent-infringement suit. 976 F.2d at 707 n.6. Yet if that were so, the Supreme Court's repeated suggestion that contract law provides the only permissible avenue for enforcement of such conditions would make little sense.

This Court should overrule *Mallinckrodt* and hold that the first authorized sale in the United States exhausts all patent rights in the article sold, regardless of the patentee's attempt to impose post-sale restrictions by contract. This Court should accordingly conclude that Lexmark's single-use restrictions on its cartridge sales cannot be enforced through patent law.

## II. THIS COURT SHOULD RESTORE THE REGIME OF MODIFIED INTERNATIONAL PATENT EXHAUSTION THAT PREVAILED BEFORE *JAZZ PHOTO*.

Each of the Supreme Court decisions discussed above concerned the legal effect of a sale made with the authority of the patent owner within the United States—that is, a sale that the patent owner was entitled to prevent, but chose instead

13

to authorize. *See* 35 U.S.C. § 271(a). But no authority under United States patent law is necessary for the sale of a patented article in a foreign country. When a U.S. patentee makes or authorizes such a foreign sale, the patentee may convey its authority to import the article into the United States, but it may withhold that authority if it wishes.

This Court's decision in *Jazz Photo Corp. v. International Trade Commission*, 264 F.3d 1094 (Fed. Cir. 2001), correctly recognized that patent law is territorial and that sales consummated under foreign law do not necessarily convey rights under United States patent laws. To the extent the Court held that foreign sales *never* exhaust U.S. patent rights, however, the Court's decision may deny to the purchaser of goods authority that the U.S. patentee did not actually withhold. This Court should therefore reinstate the traditional rule of international patent exhaustion that prevailed before *Jazz Photo*: by default, foreign sales authorized by the U.S. patentee exhaust domestic patent rights, but a U.S. patentee may expressly reserve his U.S. patent rights in such sales.

## A. Patent Law Is Quintessentially Territorial.

As this Court correctly recognized in *Jazz Photo*, patent law is quintessentially territorial in nature. The territorial limits of U.S. patent law are embodied in the very definition of the patent right, *see* 35 U.S.C. § 154(a)(1) (patent confers exclusive rights "throughout the United States"), as well as in the definition of infringing conduct, *see* 35 U.S.C. § 271(a) ("within the United States").

14

The Supreme Court has stressed that the patent laws "do not, and were not intended to, operate beyond the limits of the United States," *Brown v. Duchesne*, 60 U.S. (19 How.) 183, 195 (1857), and that no authority under a United States patent is necessary to make or use the patented invention outside of the jurisdiction of the United States, *see, e.g., Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518, 527 (1972). Indeed, the Court has explained that the traditional presumption against the extraterritorial application of U.S. law "applies with particular force in patent law," in part because foreign law "may embody different policy judgments about the relative rights of inventors, competitors, and the public in patented inventions." *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 454-55 (2007) (internal quotation marks omitted).

The independence of national patent systems, moreover, is one of the defining principles of the international legal regime governing the protection of inventions. The United States has ratified the Paris Convention for the Protection of Industrial Property, originally adopted more than a century ago, which specifically provided in Article 4*bis* that "Patents applied for in the different contracting States … shall be independent of the patents obtained for the same invention in the other States …." 32 Stat. 1936 (Aug. 25, 1902). While international agreements facilitate the ability of inventors in one country to seek patent protection in others, the patent laws of each country are *not* reciprocal in their protections for particular inventions. As every patent attorney knows, the United States may issue a patent while another country denies protection for the same invention, or approves claims significantly different in

15

scope.  In this respect, patent law is different from copyright law, under which

authors automatically "enjoy copyright protection in nations across the globe"

pursuant to the Berne Convention for the Protection of Literary and Artistic Works.

*Golan v. Holder*, 132 S. Ct. 873, 878 (2012).

## B. Courts Traditionally Permitted U.S. Patentees Expressly To Reserve Their U.S. Rights In Foreign Transactions.

Given the uniquely territorial nature of patent law, it is unsurprising that before

*Jazz Photo*, the prevailing rule permitted patentees to reserve their U.S. rights while

approving sales under foreign law, so long as they reserved them expressly.  Where a

patentee authorized a foreign sale *without* explicitly reserving his authority under U.S.

law, courts held those rights exhausted, deeming the patentee to have conveyed with

the foreign transaction all of the authority he was empowered to convey.  But because

no authority under U.S. patent law is necessary to consummate a foreign transaction,

courts allowed patentees to make such sales while expressly reserving their U.S. rights.

To our knowledge, no U.S. court has ever refused to respect such an express

reservation.

The Supreme Court first and last directly addressed a foreign sale's effect on

U.S. patent rights in *Boesch v. Graff*, 133 U.S. 697 (1890).  The Court described the

question before it as "whether a dealer residing in the United States can purchase in

another country articles patented there, from a person authorized to sell them, and

import them to and sell them in the United States, without the license or consent of

the owners of the United States patent." *Boesch*, 133 U.S. at 702. The Court answered this question in the negative, reasoning that a foreign entity's right to "make and sell" the patented products abroad "was allowed him under the laws of that country, and purchasers from him could not be thereby authorized to sell the articles in the United States." *Id.* at 703. The Court emphasized that a sale authorized under only foreign law could not affect "the rights of patentees *under a United States patent.*" *Id.* (emphasis added).

Critics of *Jazz Photo*, which relied on *Boesch*, have emphasized that *Boesch* did not involve authorization given under foreign law by the U.S. patent holder; rather, a provision of German law gave the seller the right "to make and sell" the patented products in Germany because he had begun manufacturing such products prior to the application for a German patent. *See Boesch*, 133 U.S. at 701. But that critique overlooks the basic rationale of the Court's decision, which rested not on the nature of the German law that permitted the sale but on the independence of the rights granted under the United States patent laws. The Court stressed that the initial manufacture and sale occurred "under the laws of [another] country," not "under a United States patent." *Id.* at 703. Indeed, the Court explicitly reconciled *Boesch* with its previous refusal, in *Adams v. Burke*, 84 U.S. (17 Wall.) 453 (1873), to approve territorial distinctions *within* the United States. The Court noted its holding in *Adams* that the authorized sale of a patented article gives the purchaser "'the right to use it anywhere, without reference to other assignments of territorial rights by the same

17

patentee.'" *Boesch*, 133 U.S. at 703 (quoting *Adams*, 84 U.S. at 455). But the Court reasoned that "[t]he right which [the foreign seller] had to make and sell the burners in Germany was allowed him under the laws of that country," and thus that foreign authorization said nothing about U.S. patent rights. *Id.* And in a subsequent case, the Supreme Court similarly described *Boesch* as distinguishing between foreign sales by "a person authorized there to sell them" on the one hand, and "the sale of articles in the United States under a United States patent" on the other, explaining that the latter "cannot be controlled by foreign laws." *Keeler*, 157 U.S. at 665; *see also A. Bourjois & Co. v. Katzel*, 260 U.S. 689, 692 (1923) (explaining in a trademark case that "[o]wnership of [specific] goods … does not necessarily carry the right to sell them at all in a given place" and that "[i]f the goods were patented in the United States a dealer who lawfully bought similar goods abroad from one who had a right to make and sell them there could not sell them in the United States").

Following *Boesch*, courts permitted U.S. patentees to reserve their U.S. rights when making or approving a foreign sale. The Second Circuit concluded that a foreign sale "without any restrictions" by a holder of both U.S. and foreign patents meant the purchaser could "use or sell [the article] in this country." *Dickerson v. Matheson*, 57 F. 524, 527 (2d Cir. 1893); *see also Holiday v. Mattheson*, 24 F. 185, 185 (C.C.S.D.N.Y. 1885). But the Second Circuit held that "[a] purchaser in a foreign country of an article patented in that country and also in the United States, from a licensee *under the foreign patent only***, does not give the purchaser a right to import the

18

article into, and to sell it in, the United States." *Matheson*, 57 F. at 527 (emphasis

added). *See also Curtiss Aeroplane & Motor Corp. v. United Aircraft Eng'g Corp.*, 266 F. 71,

77 (2d Cir. 1920) (distinguishing foreign sales with and without reservations). The

Eighth Circuit followed suit, holding that where the patented item was purchased "in

a foreign country … subject to the express condition that it should not be imported

into the United States, or sold within their limits, the exclusive right to sell the

patented article within the United States …was not abridged by that purchase."

*Dickerson v. Tinling*, 84 F. 192, 194 (8th Cir. 1897) (concluding that domestic

exhaustion cases involving post-sale territorial restrictions "do not rule" cases

involving foreign sales).

Subsequently, several district courts similarly indicated U.S. patentees can

preserve their domestic rights in authorizing foreign sales. In *Griffin v. Keystone*

*Mushroom Farm, Inc.*, 453 F. Supp. 1283 (E.D. Pa. 1978), for example, the court

rejected an attempt "to extend beyond national borders" the domestic exhaustion rule

and found "no authority supporting the position[] that the identity of the plaintiff as

the patentee in both the United States and Italy justifies a departure from the *Boesch*

rule." *Id.* at 1284-85. *See also Sanofi, S.A. v. Med-Tech Veterinarian Prods., Inc.*, 565 F.

Supp. 931, 938 (D.N.J. 1983) (distinguishing *Griffin* "because here the sale abroad was

made by the patent holder itself without restriction").[4]  The International Trade

Commission reached the same conclusion.  *See Reclosable Plastic Bags*, Inv. No. 337-TA-

22, USITC Pub. No. 801, 1977 WL 52333 at *6 (Jan. 17, 1977) (Final) (opining that

"patent rights in the United States cannot be diminished by the importation of

reclosable plastic bags made by a licensee under a corresponding patent in another

country").

### C. Congress Has Not Altered The Traditional Rule.

Congress has not altered this traditional rule.  Unlike in the copyright context,

*see* 17 U.S.C. § 109, Congress has never codified patent exhaustion principles, let alone

mandated international patent exhaustion.[5]  To the contrary, Congress in legislation

has approved several free trade agreements whose provisions, consistent with the

traditional rule, obligate the United States to give patentees the ability to sell patented

---

[4] In *Kabushiki Kaisha Hattori Seiko v. Refac Technology Development Corp.*, 690 F. Supp. 1339 (S.D.N.Y. 1988), the court suggested a contrary rule.  *See id.* at 1342.  But that case did not involve a foreign sale in which a patentee had expressly reserved his U.S. patent rights.

[5] In 1994, Congress amended 35 U.S.C. § 271(a) to provide for the first time that "import[ation] into the United States" "without authority" constitutes infringement.  *See* Uruguay Round Agreement Acts, Pub. L. No. 103-465, § 533(a)(1), 108 Stat. 4809, 4988.  While this provision underscores Congress's intent to provide remedies against unauthorized importation, it does not specifically address international exhaustion.  *See, e.g.*, H.R. Doc. No. 103-316, at 656, 981 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4280 ("The Agreement … does not affect U.S. law or practice relating to parallel importation of products protected by intellectual property rights.").

products abroad yet expressly reserve their rights to prevent importation of the foreign-sold articles. *See* United States-Australia Free Trade Agreement Implementation Act, Pub. L. No. 108-286, 118 Stat. 919 (2004) (Art. 17.9.4 of implemented agreement); United States-Morocco Free Trade Agreement Implementation Act, Pub. L. No. 108-302, 118 Stat. 1103 (2004) (Art. 15.9.4 of implemented agreement); *see also* United States-Singapore Free Trade Agreement Implementation Act, Pub. L. No. 108-78, 117 Stat. 948 (2003) (Art. 16.7.2 of implemented agreement).[6] To be sure, after approving these agreements, Congress enacted various appropriations riders precluding the negotiation of similar provisions in future trade agreements, apparently to obviate concerns specific to particular industries. *See, e.g.*, Pub. L. No. 109-108 § 631, 119 Stat. 2290, 2344 (2005); Transcript, *Fiscal Year 2006 Defense Appropriations and Fiscal Year 2006 Science, State and Justice Appropriations Bills: Hearing Before the H. Comm. On Appropriations*, 109th Cong., 2005 WL 1350973 (June 7, 2005). But Congress did not repeal the legislation approving the previous free trade agreements or otherwise alter the underlying law reflected in those agreements. The political branches' approval, reflected in legislation enacted by Congress and signed by the President, of free trade agreements consistent with *Jazz Photo* and the traditional rule of international patent exhaustion provides a

---

[6] The full text of these agreements is available on the U.S Trade Representative's website, www.ustr.gov.

powerful reason for the Court to refrain from departing from that rule. *Cf. Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 539 (1995) (warning that "courts should be most cautious before interpreting … domestic legislation in such manner as to violate international agreements").[7]

### D. *Kirtsaeng* Does Not Mandate Automatic International Patent Exhaustion.

In *Kirtsaeng v. John Wiley & Sons, Inc.,* 133 S. Ct. 1351 (2013), the Supreme Court construed the Copyright Act's codification of the first-sale doctrine, 17 U.S.C. § 109(a), to implement a worldwide first-sale rule for copyrighted works. *See* 133 S. Ct. at 1358. That decision, which did not discuss *Boesch* or mention patent law, warrants neither a departure from the traditional rule permitting patentees to reserve their U.S. patent rights when approving foreign sales nor a repudiation of the international agreements the political branches have made consistent with that tradition.

---

[7] In *Quality King Distributors, Inc. v. L'anza Research International, Inc.*, 523 U.S. 135, 153-54 (1998), the Supreme Court declined to interpret the exhaustion provision of the Copyright Act, 17 U.S.C. § 109, in light of certain international agreements that did not require congressional approval. In the Court's view, the agreements there at issue could not illuminate the Copyright Act's meaning because "none ha[d] been ratified by the Senate" and because they postdated the enactment of section 109. *See* 523 U.S. at 153-54. The Court also noted that when the Executive Branch signed those agreements, a court of appeals had already "adopt[ed] a position contrary to that subsequently endorsed by the Executive Branch." *Id.* at 154 n.31. The international agreements at issue here, by contrast, were approved by Congress in legislation and are entirely consistent with both longstanding judicial implementation of international patent exhaustion principles and *Jazz Photo*.

The question presented in *Kirtsaeng* was "whether the words 'lawfully made under this title' restrict the scope of [the Copyright Act's] § 109(a)'s 'first sale' doctrine geographically." 133 S. Ct. at 1357. The copyright holder argued that the word "under" in Section 109(a) means "subject to," so that a particular copy of a copyrighted work is "made under this title" only if its manufacture is governed by Title 17. Because Title 17 regulates only those acts of copying that occur within the United States, that interpretation would have had the practical effect of confining Section 109(a) to U.S.-made copies. But because section 109(a) does not provide any alternative basis for exhaustion, the Court faced the prospect that copyrighted works made overseas might be immune from exhaustion altogether, yielding a scheme of "perpetual downstream control" by copyright owners over works imported into the United States. *Kirtsaeng*, 133 S. Ct. at 1371; *see also id.* at 1360; *id.* at 1373 (Kagan, J. concurring). To avoid that result, the Court held that the phrase "lawfully made under this title" refers to copies "made 'in accordance with' or 'in compliance with' the Copyright Act," 133 S. Ct. at 1358, thereby sweeping section 109(a)'s exhaustion rule to all copies of a copyrighted work made by or with the approval of the copyright owner anywhere in the world.

That holding has no bearing on the scope of international exhaustion in the patent context. There is no similar provision in the Patent Act; as already discussed, the exhaustion principle in the patent laws has never been separately codified, but has subsisted as a judicial gloss on the substantive rights conferred by a United States

patent.  And there is no concomitant risk of "perpetual downstream control" over patented goods:  whether or not a patentee has withheld its U.S. rights in approving a foreign sale, the first authorized sale of the patented article within the United States (including an authorized importation) will exhaust the patentee's exclusive rights in that article under U.S. law, just as it has for more than 150 years.

In urging that *Kirtsaeng* abrogated *Jazz Photo*, Impression Products does not focus on the actual *holding* of the case.  Rather, it relies on the majority's discussion of the operation of the common law and the general disfavor with which courts historically have viewed restraints on the alienation of chattels.  *See Kirtsaeng*, 133 S. Ct. at 1363.  But that discussion must be understood in the context of the question before the Court, which concerned the operation of first-sale principles in copyright law and the possibility of perpetual downstream control over the distribution of imported copyrighted works.  Indeed, the Court made clear it was not applying the common law principles Impression Products invokes in a vacuum, but rather looking to American courts' implementation of those principles in the copyright context.  *See Kirtsaeng*, 133 S. Ct. at 1363 (emphasizing that the Court could not find any geographical distinction in *Bobbs-Merrill Co. v. Straus*, 210 U.S. 339 (1908), "where this Court first applied the 'first sale' doctrine").

The Court did not mention, and could not have intended to resolve, international exhaustion in the materially different context of patent law.  As the Court has itself emphasized, patent and copyright law "are not identical twins," and

courts must exercise "caution . . . in applying doctrine formulated in one area to the other." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 439 n.19 (1984); *see also Bobbs-Merrill Co.*, 210 U.S. at 345-46 ("disclaiming any intention to indicate our views as to what would be the rights of parties in circumstances similar to the present case under the patent laws"). And as already discussed, the courts applying international patent exhaustion principles *did* allow U.S. patentees to make foreign sales while reserving U.S. rights. Particularly given the actual question before the Court in *Kirtsaeng*, there is no reason to believe that the Court silently (and needlessly) considered and rejected the very different tradition concerning international exhaustion of patent rights.

Particularly telling is that the Court in *Kirtsaeng* made no mention of *Boesch*, which upheld a patent-law restraint on the free importation into the United States of goods lawfully purchased abroad. *Kirtsaeng* therefore cannot have intended its discussion of general principles disfavoring restraints on the alienation of chattels to encompass the importation of patented goods. Indeed, while the Court correctly noted that its copyright decision in *Bobbs-Merrill* contained no reference to geographical distinctions, *Boesch* contained precisely such a discussion, including a careful distinction of the Court's earlier rejection of territorial distinctions within the United States in *Adams v. Burke*. *See Boesch*, 133 U.S. at 703.

25

For all of these reasons, the Court should reject Impression Products'
contention that *Kirtsaeng* silently abrogated *Jazz Photo* and the traditional rule that
prevailed for more than a century.

### E.  *Jazz Photo* Should Be Overruled To The Extent It Held That Foreign Sales Can Never Exhaust U.S. Patent Rights.

This Court should overrule *Jazz Photo*, however, to the extent the Court held
that foreign sales *never* exhaust U.S. patent rights.  *See* 264 F.3d at 1105.  While no
authority under U.S. law is required to consummate a foreign sale, there is nothing in
the nature of a foreign sale that logically precludes a U.S. patentee from conveying, as
part of the foreign transaction, the patentee's authority to import the patented
invention into the United States or to resell it for such importation.  *Cf.* 19 U.S.C.
1337(a) (prohibiting the sale for importation into the United States of articles that
infringe a U.S. patent).  And the general disfavor with which the law regards restraints
on the alienation of chattels—as well as the Court's invocation of the way in which
American courts have applied this principle, *Kirtsaeng*, 133 S. Ct. at 1363—counsels in
favor of the traditional rule that a simple foreign sale, made without any reservation of
U.S. patent rights, should be deemed to convey all of the authority that the U.S.
patentee can provide to the purchaser.  To the extent the *Jazz Photo* rule defeats
exhaustion in these circumstances, it effectively denies to the purchaser of goods
authority that the U.S. patentee may not at the time have intended to withhold.  This
Court should therefore reinstate the traditional rule of international patent exhaustion

that prevailed before *Jazz Photo*: by default, foreign sales authorized by the U.S. patentee exhaust domestic patent rights, but a U.S. patentee may expressly reserve his U.S. patent rights in such sales.

The United States is not aware of any indication in the record of this case that Lexmark expressly reserved any U.S. patent rights in making its foreign cartridge sales. If it did not, this Court should conclude that Lexmark's U.S. patent rights were exhausted by its foreign sales. If the record is silent on that score, this Court should remand to the district court for further factfinding.

## CONCLUSION

For the foregoing reasons, this Court should overrule *Mallinckrodt* and modify the rule of *Jazz Photo*.

Respectfully submitted,

BENJAMIN C. MIZER
  *Principal Deputy Assistant*
  *Attorney General*

MARK R. FREEMAN
/s/ Melissa N. Patterson
MELISSA N. PATTERSON
  *(202) 514-1201*
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7230*
  *U.S. Department of Justice*
  *950 Pennsylvania Ave., N.W.*
  *Washington, D.C.  20530*

JUNE 2015

## CERTIFICATE OF COMPLIANCE WITH
## FEDERAL RULE OF APPELLATE PROCEDURE 32(a)

I hereby certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Garamond, a proportionally spaced font.

I further certify that this brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(d) and 32(a)(7)(B) because it contains 6,991 words, excluding the parts of the brief exempted under Rule 32(a)(7)(B)(iii), according to the count of Microsoft Word.

/s/Melissa N. Patterson
MELISSA N. PATTERSON

## CERTIFICATE OF SERVICE

I hereby certify that on June 29, 2015, I electronically filed this brief with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system.  I further certify that I will cause paper copies to be filed with the Court within five days of the Court's acceptance of the brief.

The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system, except the following, who will be served by U.S. Mail:

Frederick M. Abbott
Florida State University College of Law
425 West Jefferson Street
Tallahassee, FL 32301

Margreth Barrett
University of California - Hastings College of Law
PO Box 347
The Sea Ranch, CA 95497

Tihua Huang
Cadwalader, Wickersham & Taft LLP
700 6th Street NW
Washington, DC 20001

Lisa K. Jorgenson
American Intellectual Property Law Association
241 18th Street, South
Suite 700
Arlington, VA 22202

David F. Ryan
1214 Albany Post Road
Croton-On-Hudson, NY 10529

Meenakshi Kala Sarvaiya
SoCal IP Law Group LLP
310 N Westlake Boulevard
Suite 120
Westlake Village, CA 91362

Owais Ahmed Siddiqui
Winston & Strawn LLP
8361 Orange Haven Place
San Diego, CA 92129

/s/Melissa N. Patterson
MELISSA N. PATTERSON