Nos. 14-1617, -1619

# United States Court of Appeals for the Federal Circuit

LEXMARK INTERNATIONAL, INC.,

*Plaintiff-Cross Appellant*,

v.

IMPRESSION PRODUCTS, INC.,

*Defendant-Appellant,*

QUALITY CARTRIDGES, INC., JOHN DOES, 1-20, BLUE TRADING LLC, EXPRINT INTERNATIONAL, INC., LD PRODUCTS, INC., PRINTRONIC CORPORATION, TESEN DEVELOPMENT (HONG KONG) CO. LTD., BENIGNO ADEVA AND HIS COMPANIES,

*Defendants.*

Appeals from the United States District Court for the Southern District of Ohio, Case No. 10-CV-564, Judge Michael R. Barrett

## *EN BANC* BRIEF FOR PLAINTIFF-CROSS APPELLANT LEXMARK INTERNATIONAL, INC.

TIMOTHY C. MEECE
V. BRYAN MEDLOCK
JASON S. SHULL
AUDRA C. EIDEM HEINZE
BANNER & WITCOFF, LTD.
Ten South Wacker Drive
Chicago, IL 60606
Telephone: (312) 463-5000
Facsimile: (312) 463-5720
tmeece@bannerwitcoff.com

STEVEN B. LOY
STOLL KEENON OGDEN PLLC
300 W. Vine Street, Suite 2100
Lexington, KY 40507
Telephone: (859) 231-3000

CONSTANTINE L. TRELA, JR.
ROBERT N. HOCHMAN
SIDLEY AUSTIN LLP
One South Dearborn St.
Chicago, IL 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036
ctrela@sidley.com

BENJAMIN BEATON
JOSHUA J. FOUGERE
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
Telephone: (202) 736-8000
Facsimile: (202) 736-8711

*Counsel for Lexmark International, Inc.*

# CERTIFICATE OF INTEREST

Counsel for Plaintiffs-Appellants certifies the following:

1.    The full name of every party represented by me is:

Lexmark International, Inc.

2.    The name of the real party in interest represented by me is:

Lexmark International, Inc.

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None

4.    The names of all law firms and the partners or associates who appeared for Lexmark International, Inc. in proceedings before the United States District Court for the Southern District of Ohio, or are expected to appear in this Court, are:

SIDLEY AUSTIN LLP
Constantine L. Trela, Jr., Robert N. Hochman, Benjamin Beaton, Joshua J. Fougere

BANNER & WITCOFF LTD
Timothy C. Meece, V. Bryan Medlock, Jason S. Shull, Audra Eidem Heinze, Matthew P. Becker, Neil C. Trueman

STOLL KEENON OGDEN PLLC
P. Douglas Barr, William J. Hunter, Jr., Steven B. Loy, Anthony J. Phelps


DATE:  August 12, 2015            /s/ Constantine L. Trela, Jr.
                                  CONSTANTINE L. TRELA, JR.

i

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ................................................................i

TABLE OF AUTHORITIES ....................................................................v

STATEMENT OF RELATED CASES ....................................................xi

JURISDICTIONAL STATEMENT ..........................................................1

STATEMENT OF ISSUES ......................................................................1

STATEMENT OF THE CASE...................................................................2

I.     Introduction.................................................................................2

II.    Statement of Facts......................................................................5

      A.    Lexmark's Patented Cartridges ............................................5

      B.    The Infringement ...................................................................7

      C.    This Dispute ...........................................................................8

SUMMARY OF ARGUMENT ................................................................10

STANDARD OF REVIEW ....................................................................12

ARGUMENT ........................................................................................12

I.     The Sale Of A Patented Item Outside The United States Presumptively Does Not Exhaust U.S. Patent Rights ...........................................12

      A.    A Foreign Sale Does Not Automatically Exhaust U.S. Patent Rights......................................................................................13

           1.    A sale abroad conveys and compensates a patentee for its right to exclude abroad, not its U.S. rights ...............................13

           2.    Given the distinction between U.S. and foreign patent rights, courts have rejected a rule of automatic international exhaustion ................................................................................16

           3.    Other authorities confirm that a foreign sale does not automatically exhaust U.S. rights ...........................................19

B.    A Foreign Sale May Exhaust U.S. Rights if the Patentee Expressly or Implicitly Authorizes Use Beyond the Country of Sale .................22

C.    *Kirtsaeng* Does Not Require Abandonment of Circuit Precedent in Favor of International Exhaustion........................................27

D.    No Sound Reason Warrants Overturning *Jazz Photo*'s Settled Rule...............................................................................30

    1.    *Jazz Photo* has worked well for nearly fifteen years ...............31

    2.    Adopting mandatory worldwide exhaustion would disrupt U.S. law and the economy ......................................32

    3.    A foreign-exhaustion rule should be imposed, if at all, through the political process ....................................34

II.    The Court Should Reaffirm *Mallinckrodt* And The Rule That Patentees May Control The Scope Of The Patent Rights They Relinquish When Selling Or Licensing Others To Sell Patented Products................................35

A.    Patentees May Transfer Some or All of Their Patent Rights, But Not More ..........................................................36

    1.    Unrestricted domestic sales exhaust U.S. patent rights ...........36

    2.    A patentee may retain some of its rights through valid limitations on the transfer of those rights .................................39

    3.    Some conditions are invalid and unenforceable expansions of patent rights .........................................................43

B.    *Mallinckrodt* and This Case Fit Comfortably Within the Framework Reaffirmed in *Quanta* ......................................44

    1.    *Mallinckrodt* remains good law .................................44

    2.    Lexmark's Return Program does not exhaust its patent rights..............................................................47

C.    Principles of *Stare Decisis* and Sound Policy Confirm That *Mallinckrodt* Is and Should Remain Good Law .................................48

D.    A *Per Se* Exhaustion Rule Has No Valid Justification in Patent Law or Policy ...................................................51

1.     The supposed legal justifications for overruling
       *Mallinckrodt* all amount to meaningless line-drawing .............51

2.     The remaining arguments against *Mallinckrodt* are
       imagined and unpersuasive ......................................................55

CONCLUSION ......................................................................................58

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page**

**Cases**

*A. Bourjois & Co. v. Katzel,*
260 U.S. 689 (1923)....................................................................18

*Adams v. Burke,*
84 U.S. (17 Wall.) 453 (1873) ...................................13, 52, 53

*Ariz.Cartridge Remanufacturers Ass'n v. Lexmark Int'l, Inc.,*
421 F.3d 981 (9th Cir. 2005) .................................................5, 6

*B. Braun Med., Inc. v. Abbott Labs.,*
124 F.3d 1419 (Fed. Cir. 1997) ...............................................41

*Bauer & Cie v. O'Donnell,*
229 U.S. 1 (1913)......................................................................43

*Benun v. Fujifilm Corp.,*
131 S.Ct. 829 (2010).................................................................31

*Bloomer v. McQuewan,*
55 U.S. (14 How.) 539 (1852) ............................................36, 37

*Bobbs-Merrill Co. v. Straus,*
210 U.S. 339, 346 (1908)..........................................................28

*Boesch v. Graff,*
133 U.S. 697 (1890)............................................................10, 17

*Bos. Store of Chi. v. Am. Graphophone Co.,*
246 U.S. 8 (1918)......................................................................43

*Bowman v. Monsanto Co.,*
133 S.Ct. 1761 (2013)...............................................................47

*Chaffee v. Bos. Belting Co.,*
63 U.S. (22 How.) 217 (1859) ..................................................37

*Curtiss Aeroplane & Motor Corp. v. United Aircraft Eng'g Corp.,*
266 F. 71 (2d Cir. 1920) ...........................................................23

*Daimler Mfg. Co. v. Conklin*,
  170 F. 70 (2d Cir. 1909) ...............................................................18, 22, 32

*Deepsouth Packing Co. v. Laitram Corp.*,
  406 U.S. 518 (1972), *superseded by statute on other grounds*,
  Patent Law Amendments Act of 1984, Pub. L. No. 98-622, 98 Stat.
  3383, *as recognized in Microsoft Corp. v. AT&T Corp.*, 550 U.S.
  437 (2007) ....................................................................................14, 16, 19

*Dickerson v. Matheson*,
  57 F. 524 (2d Cir. 1893) .....................................................................21, 25

*Dickerson v. Tinling*,
  84 F. 192 (8th Cir. 1897) ................................................................21, 25, 42

*E. Bement & Sons v. Nat'l Harrow Co.*,
  186 U.S. 70 (1902)..................................................................................39, 52

*First Hartford Corp. Pension Plan & Trust v. United States*,
  194 F.3d 1279 (Fed. Cir. 1999) .................................................................12

*Fuji Photo Film Co. v. Jazz Photo Corp.*,
  394 F.3d 1368 (Fed Cir 2005) ...................................................................16

*Gen. Talking Pictures Corp. v. W. Elec. Co.*,
  304 U.S. 175 (1938)........................................................40, 41, 52, 54

*Gen. Talking Pictures Corp. v. W. Elec. Co.*,
  305 U.S. 124 (1938)...................................................................................40

*Griffin v. Keystone Mushroom Farm*,
  453 F. Supp. 1283 (E.D. Pa. 1978).....................................................18, 19, 24

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
  769 F.3d 1371 (Fed. Cir. 2014), *petition for cert. filed*, 84
  U.S.L.W. 3018 (U.S. June 22, 2015 (No. 14-1513) ....................................15, 16

*Helferich Patent Licensing, LLC v. N.Y. Times Co.*,
  778 F.3d 1293 (Fed. Cir. 2015) .................................................................*passim*

*Hobbie v. Jennison*,
  149 U.S. 355 (1893)...................................................................................40

*Holiday v. Matheson*,
   24 F. 185 (C.C.S.D.N.Y. 1885) ....................................................22, 25

*Jazz Photo Corp. v. ITC*,
   264 F.3d 1094 (Fed. Cir. 2001) ...........................................1, 15, 16, 29

*Jazz Photo Corp. v. ITC*,
   536 U.S. 950 (2002) ....................................................................31

*Jazz Photo Corp. v. United States*,
   439 F.3d 1344 (Fed. Cir. 2006) .........................................................26

*Kabushiki Kaisha Hattori Seiko v. Refac Tech. Dev. Corp.*,
   690 F. Supp. 1339 (S.D.N.Y. 1988) ...................................................23

*Keeler v. Standard Folding Bed Co.*,
   157 U.S. 659 (1895) ................................................................25, 54

*Kimble v. Marvel Entm't, LLC*,
   135 S.Ct. 2401 (2015) ................................................5, 31, 48, 49, 50

*Kirtsaeng v. John Wiley & Sons, Inc.*,
   133 S.Ct. 1351 (2013) ............................................................*passim*

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
   551 U.S. 877 (2007) ......................................................................42

*LifeScan Scot., Ltd. v. Shasta Techs., LLC*,
   734 F.3d 1361 (Fed. Cir. 2013) .........................................................41

*Mallinckrodt, Inc. v. Medipart, Inc.*,
   976 F.2d 700 (Fed. Cir. 1992) ...................................................1, 44, 45

*Microsoft Corp. v. AT&T Corp.*,
   550 U.S. 437 (2007) ................................................................28, 34

*Mitchell v. Hawley*,
   83 U.S. (16 Wall.) 544 (1873) ....................................................*passim*

*Motion Picture Patents Co. v. Universal Film Mfg. Co.*,
   243 U.S. 502 (1917) ................................................................43, 52

*Ninestar Tech. Co. v. ITC*,
   667 F.3d 1373 (Fed. Cir. 2012) .........................................................22

*Ninestar Tech. Co. v. ITC*,
   133 S.Ct. 1656 (2013) (No. 12-552), *denying cert. to*
   667 F.3d 1373 (Fed. Cir. 2012) ...................................................28, 31

*Princo Corp. v. ITC*,
   616 F.3d 1318 (Fed. Cir. 2010) ...........................................41, 50, 56

*Quality King Distribs., Inc. v. L'anza Research Int'l, Inc.*,
   523 U.S. 135 (1998)...................................................................28

*Quanta Computer, Inc. v. LG Elecs., Inc.*,
   553 U.S. 617 (2008)................................................................*passim*

*Rodriguez de Quijas v. Shearson/Am. Express, Inc.*,
   490 U.S. 477 (1989)...................................................................27

*Sanofi, S.A. v. Med-Tech Veterinarian Prods., Inc.*,
   565 F. Supp. 931 (D.N.J. 1983) ................................................23, 25

*STMicroelectronics, Inc. v. Sandisk Corp.*,
   2007 WL 951655 (E.D. Tex. Mar. 26, 2007) ..................................23

*Straus v. Victor Talking Mach. Co.*,
   243 U.S. 490 (1917)...................................................................43

*Tessera, Inc. v. ITC*,
   646 F.3d 1357 (Fed. Cir. 2011) ................................................16, 23

*United States v. Gen. Elec. Co.*,
   272 U.S. 476 (1926)...................................................................53

*United States v. Masonite Corp.*,
   316 U.S. 265 (1942)...............................................................22, 45

*United States v. Univis Lens Co.*,
   316 U.S. 241 (1942)..........................................................22, 43, 44

*Voda v. Cordis Corp.*,
   476 F.3d 887 (Fed. Cir. 2007) .....................................................14

*Waring v. WDAS Broad. Station*,
   194 A. 631 (Pa. 1937) ...............................................................42

*Wilbur-Ellis Co. v. Kuther*,
    377 U.S. 422 (1964) ................................................................38

**Statutes**

17 U.S.C. § 106(3) ....................................................................27

17 U.S.C. § 109(a) .....................................................................27

21 U.S.C. § 381(d) .....................................................................33

35 U.S.C. § 154 ..............................................................14, 20, 36

35 U.S.C. § 261 ....................................................................39, 41

35 U.S.C. § 271 ...................................................................*passim*

**Administrative Decision**

*In re Semiconductor Chips*,
    2010 WL 686377 (ITC Feb. 4, 2010), *vacated and remanded in part on other*
    *grounds by Tessera, Inc. v. ITC*, 646 F.3d 1357 (Fed. Cir. 2011) .....................16

**Legislative History**

*Full Committee Hearing on the Impact of Intellectual Property on*
    *Entrepreneurship and Job Creation: Hearing Before the H.*
    *Comm. on Small Business*, 111 Cong. (2010) ....................................34

**Foreign Cases**

*De Mattos v. Gibson*, [1859] Eng. Rep. 108 (Ct. Ch.) .............................42

*Incandescent Gas Co. v. Cantelo*, [1895]12 R.P.C. 262 (Eng.) .............................42

**International Agreements**

Paris Convention (1883) ..............................................................14

United States-Morocco Free Trade Agreement (2004) ...........................21

Uruguay Round Agreements Act Statement of Administrative Action,
    1994 U.S.C.C.A.N. 4040 (1994) .......................................................20

Uruguay Round Agreement, Annex 1C (1994) ....................................20

## Scholarly Authorities

1 *Milgrim on Licensing* (2015) ...............................................................39

F. Abbott, *First Report (Final) on the Subject of Parallel Importation*,
1 J. Int'l Econ. L. 607 (1998)......................................................14, 20

M. Boulware *et al.*, *An Overview of Intellectual Property Rights
Abroad*, 16 Hous. J. Int'l L. 441 (1994) ...........................................14

V. Chiappetta, *The Desirability of Agreeing to Disagree*, 21 Mich. J.
Int'l L. 333 (2000)...................................................................................20

J. Erstling & F. Struve, *A Framework for Patent Exhaustion from
Foreign Sales*, 25 Fordham Intell. Prop. Media & Ent. L.J. 499
(2015) .......................................................................................................15

W. Landes & R. Posner, *The Economic Structure of Intellectual
Property Law* (2003)...........................................................................50

G. Rub, *The Economics of* Kirtsaeng v. John Wiley & Sons, Inc., 81
Fordham L. Rev. Res Gestae 41 (2013), *available at*
http://fordhamlawreview.org/assets/res-gestae/volume/
81/41_Rub.pdf ......................................................................................32

S. Wasserman Rajec, *Free Trade in Patented Goods*, 29 Berkeley
Tech. L.J. 317 (2014)...........................................................................20

H.F. Stone, *The Equitable Rights and Liabilities of Strangers to a
Contract*, 18 Colum. L. Rev. 291 (1918).........................................42

## Other Authorities

4 *Verbatim Record of the Proceedings of the Temporary National
Economic Committee* (July 17, 1939)................................................49

DOJ & FTC, *Antitrust Guidelines for the Licensing of Intellectual
Property* (1995).....................................................................................51

FDA, *Regulatory Procedures Manual* (2013) .........................................33

## STATEMENT OF RELATED CASES

No other appeal has been taken in this civil action.

The patented products at issue in this suit are also at issue in litigation pending in the U.S. District Court for the Eastern District of Kentucky. That case, *Static Control Components, Inc. v. Lexmark Int'l, Inc.*, Nos. 02-571, 04-84, has produced multiple decisions of the U.S. Court of Appeals for the Sixth Circuit on questions not relevant to this appeal. *See, e.g.*, 387 F.3d 522 (6th Cir. 2004) (copyright claims); 697 F.3d 387 (6th Cir. 2012) (Lanham Act, antitrust, and state-law claims). The latter decision was affirmed by the Supreme Court. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S.Ct. 1344 (2014) (standing under the Lanham Act).

Counsel for Plaintiff-Cross Appellant Lexmark International, Inc. are not aware of any other cases in this or any other court that will directly affect or be directly affected by this Court's decision in this appeal.

# JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331, 1338(a)-(b).  It entered final judgment resolving all claims on June 24, 2014.  (A1-3.)  Impression filed a notice of appeal on June 26, 2014 (A3918-20), and Lexmark followed on June 27, 2014 (A3925-27).  This Court has jurisdiction under 28 U.S.C. § 1295(a).

# STATEMENT OF ISSUES

1.    The case involves certain sales, made abroad, of articles patented in the United States.  In light of *Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S.Ct. 1351 (2013), should this Court overrule *Jazz Photo Corp. v. ITC*, 264 F.3d 1094 (Fed. Cir. 2001), to the extent it ruled that a sale of a patented item outside the United States never gives rise to United States patent exhaustion?

2.    The case involves (i) sales of patented articles to end users under a restriction that they use the articles once and then return them and (ii) sales of the same patented articles to resellers under a restriction that resales take place under the single-use-and-return restriction.  Do any of those sales give rise to patent exhaustion?  In light of *Quanta Computer, Inc. v. LG Electronics, Inc.*, 553 U.S. 617 (2008), should this Court overrule *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700 (Fed. Cir. 1992), to the extent it ruled that a sale of a patented article, when the sale is made under a restriction that is otherwise lawful and within the scope of the patent grant, does not give rise to patent exhaustion?

## STATEMENT OF THE CASE

### I.    Introduction

This Circuit and the Supreme Court have long permitted licenses and sales that transfer less than all of a patentee's rights.  *Jazz Photo* and *Boesch*, recognizing that U.S. and foreign patent rights are separate and distinct, acknowledge that the sale of a patented product abroad does not automatically transfer U.S. patent rights.  Likewise, *Mallinckrodt* and *General Talking Pictures* allow parties to tailor the scope of the patent rights transferred through a domestic sale.

Under this legal framework, Lexmark sells patented print cartridges pursuant to limited and unlimited licenses in the United States and around the world. Region-specific contracts, labels, and technology make clear that Lexmark cartridges are not licensed for worldwide use and importation.  And both in the United States and abroad, Lexmark offers customers a choice between "Return Program Cartridges" licensed for a single use at a discounted price and "Regular Cartridges," which are unrestricted and licensed for unlimited use at full price. From the moment they leave Lexmark's hands, the cartridges at issue are subject to these territorial and use limitations, which are emblazoned on the cartridge, included in contracts with resellers and end-users, and programmed into microchips embedded in the cartridges themselves.

To Impression, none of this matters.  Despite Lexmark's license restrictions, and without Lexmark's authorization, Impression acquires spent Lexmark-made cartridges, installs hacked microchips, and sells those cartridges in the United States.  Impression's business model, and its position in this case, thus depend on the untenable proposition that *any* sale of a Lexmark cartridge, whether in the U.S. or overseas, *automatically* exhausts all U.S. patent rights in that cartridge.

The defense of patent exhaustion, however, has never swept so broadly or indiscriminately.  As for foreign sales, when Lexmark sells cartridges abroad without restriction—*i.e.*, not subject to the Return Program's single-use condition—those sales may exhaust patent rights in the cartridges.  But the rights exhausted are the *foreign* patent rights that otherwise would bar the unauthorized use of the patented cartridges in that locale, *not* U.S. rights that protect Lexmark's intellectual property in this country and have no effect anywhere else.  Impression conflates foreign and domestic rights in a way that would deprive patentees of U.S. rights whenever a product is sold anywhere.  Although patentees *may* authorize customers to use patented products across national boundaries, a sale abroad does not extinguish U.S. patent rights without some indication that the patentee intended to do so.  The foreign sales here lack any indication that Lexmark intended to relinquish any U.S. patent rights.

On the domestic side, Impression and its *amici* concede that a patentee may sell a *license* that ensures that products made and sold under the license can be

used only for limited purposes or for a limited time. The Supreme Court has made that clear. But they argue that when the patentee sells a *product* embodying the patent, the law prevents the patentee from doing directly what it could do indirectly through licensing. They offer no substantive reason for drawing this stark distinction between licensing and selling. The Supreme Court has never prohibited a patentee from conveying, by way of license *or* sale, only a limited portion of its bundle of patent rights. The proposed distinction between selling and licensing is empty formalism.

Under the law of this Circuit and the Supreme Court, exhaustion protects those who acquire patented products through an "unconditional sale." *Quanta*, 553 U.S. at 626. But it was never meant to rescue those who, like Impression, profit from flouting contractual and territorial limits on patent rights. Nor does anything in the Patent Act demand that all sales must be unconditional and worldwide. When a patentee sells a product in the U.S., the law presumes it conveys its full U.S. patent rights; when it sells overseas, the law presumes it conveys the foreign rights that would otherwise restrict the product's use. But parties may depart from either default rule by contract. And the exhaustion doctrine has respected these "familiar boundaries" for decades. *Helferich Patent Licensing, LLC v. N.Y. Times Co.*, 778 F.3d 1293, 1305 (Fed. Cir. 2015). There is no justification—much less the "superspecial" justification required to overturn "settled precedent" in this area—for forcing patentees or purchasers into one-size-fits-all transactions.

4

*Kimble v. Marvel Entm't, LLC*, 135 S.Ct. 2401, 2409-10 (2015). This Court applied the exhaustion doctrine within its established contours in both *Jazz Photo* and *Mallinckrodt*. It should do so again here.

## II.    Statement of Facts

### A.    Lexmark's Patented Cartridges.

Lexmark International, Inc., develops and manufactures, among other products, laser printers and toner cartridges. (A1893(¶5).) Numerous patents protect Lexmark's innovations. (A1893-96(¶¶6-7, 9).) Those at issue here cover Lexmark's toner cartridges. (*See, e.g.*, A696-99.)

When selling toner cartridges for its printers, Lexmark offers customers a choice between a "Regular Cartridge" and a "Return Program Cartridge." (A2559(¶8).) Customers who buy Regular Cartridges pay full price and are not subject to any restrictions; they may dispose of or reuse the cartridge as they see fit. (*Id.*) *See Ariz. Cartridge Remanufacturers Ass'n v. Lexmark Int'l, Inc.,* 421 F.3d 981, 987-88 (9th Cir. 2005) ("*ACRA*"). Alternatively, for roughly 20 percent less, customers may buy Return Program Cartridges. They agree that, after the toner is exhausted, they will not reuse the cartridge and will return it only to Lexmark for remanufacturing or recycling. *Id.* at 983. The price discount reflects the single-use limitation. (A2559(¶8).)

Lexmark sells Return Program Cartridges directly to end-users and indirectly through licensed resellers. (A2561(¶14).) The Return Program contractually

binds both.  (A2562(¶¶15, 16) (stipulating that "Lexmark has an express and en-forceable" contract with each end-user customer and authorized reseller); *see also* *ACRA*, 421 F.3d at 987-88 & n.6.  Lexmark resellers are authorized to sell Return Program Cartridges, but only subject to the single-use restriction.  (A2562-64(¶¶16-23).)  As a result, whether a customer buys a Return Program Cartridge directly from Lexmark or indirectly through a Lexmark reseller, the single-use re-striction applies (A2559(¶8); A2561(¶14)), and the Return Program thus restricts both sale and use.

The use restriction, moreover, is clearly displayed, in multiple languages, on the outside packaging of a Return Program Cartridge and on the cartridge itself.  (A2561(¶13).)  *See ACRA*, 421 F.3d at 987.  It also appears on Lexmark's website.  (A2561(¶13).)  Before committing to the product, therefore, customers have a choice between a discounted Return Program Cartridge licensed for a single use and a full-price Regular Cartridge licensed for unlimited.  (A2559(¶8); A2564(¶23).)

The Return Program serves important functions.  First, it facilitates Lexmark's own decades-long recycling and remanufacturing programs by providing a reliable stream of cartridges for those efforts.  (*See* A3968(41:17-25)-A3969(42:1-9).)  It also helps the environment by ensuring that cartridges are properly recycled if they are not reused.  (A3969(10-16).)  *See ACRA*, 421 F.3d at 983-84.

Second, the program protects the quality and reputation of Lexmark's products. Used cartridges refilled by third party "remanufacturers" are prone to malfunctions and poor performance. (*See* A3976(1-15).) Because the malfunctions can appear to involve the printer rather than the cartridge, customers often blame Lexmark rather than the supplier of the knock-off cartridge—leading to warranty claims and fewer future purchases from Lexmark. (A3976(49:21-25)-A3977(50:1-17).)

The microchips in Lexmark's cartridges, before they are hacked, also serve to "regionalize" the cartridges, such that a cartridge sold in Europe, for instance, will not work in a printer sold in North America. (A3942(15:17-25)-A3943(16:1); A3989(1-15).) Regionalization helps Lexmark defend against piracy and gray-market suppliers by making it harder for third parties to use a product sold at a lower price in one market to undercut sales in another, higher-priced market. (A3943(2-11); A3989(1-9).)

**B.    The Infringement.**

Each Return Program Cartridge contains a microchip that enforces the single-use restriction. (A2559-60(¶10).) When all the toner in a Return Program Cartridge is consumed, the chip stores this fact. (*Id.*) If the cartridge is later reinstalled, the chip will inform the printer that the cartridge is empty and disable printing with that cartridge. (*Id.*)

Third parties have hacked Lexmark's microchips and produced replacements that circumvent the single-use license.  (A2560(¶11).)  Those illegitimate chips allow a used Return Program Cartridge sold by a third party to masquerade as an authorized Lexmark cartridge.  (*Id.*)

Companies like Impression and its suppliers gather spent cartridges, install hacked replacement chips, rebuild and refill the cartridges, and sell them for use in Lexmark printers.  (A2559-60(¶¶10-11).)  Although the cartridge may continue to function, the remanufacturing process, if done poorly, results in malfunctions and performance problems, causing Lexmark reputational and financial harm.  (*See* A3976(49:1-25)-A3977(50:1-17).)

The Lexmark cartridges at issue in this case were originally sold in the United States and abroad.  (A1896-99(¶¶11-13); A2557(¶4).)  Third-party remanufacturers, acting without Lexmark's authorization, refurbished and refilled them.  Impression bought those cartridges and sold them in the United States. (A1896-97(¶11); A1905(¶28); A2557(¶4).)  There is no question that, absent exhaustion, Impression's sales infringe Lexmark's patents.  (A2556-57(¶3); *see also* A29-33.)

### C.    This Dispute.

Lexmark sued multiple parties for patent infringement based on sales of unauthorized new "clone" copies of Lexmark's cartridges, and sales of

remanufactured cartridges originally manufactured and sold by Lexmark. (*See* A106-07.)  Every defendant, save Impression, has settled.

Impression filed two motions to dismiss, contending that Lexmark's initial sale of cartridges, domestically and abroad, exhausted Lexmark's U.S. patent rights.

The district court denied one of Impression's motions and granted the other. As to cartridges sold abroad, the court held that *Jazz Photo* precluded Impression's exhaustion defense and had not been overruled by *Kirtsaeng*. (*See* A17-28.)  As to cartridges first sold in this country, the court, based on a mistaken understanding of the record, accepted Impression's argument.  Specifically, the court thought that Lexmark granted resellers blanket authority to sell Return Program Cartridges without restriction, and that Lexmark's domestic sales of cartridges were therefore analogous to Intel's unrestricted sales of processors in *Quanta*. (A14-15.)  Both Lexmark and Impression recognized, however, that Lexmark's contracts and licenses were conditional and in fact did restrict Return Program Cartridges.  The parties jointly asked the court to supplement the record with stipulated facts concerning the Return Program and then either to reconsider its decision or enter final judgment to facilitate appeal. (*See* A2558-59(¶7).)  The district court accepted the stipulated facts, but otherwise declined to revisit its decision. (A34-35.)

## SUMMARY OF ARGUMENT

I.    Patent rights are, by statute and treaty, territorially limited.  A sale of a product abroad does not automatically exhaust a U.S. patent, because a U.S. patent is not implicated by a foreign sale.  By unconditionally selling a product covered by a patent in a particular jurisdiction, the patentee (or its authorized licensee) parts with its exclusivity rights in that jurisdiction.  But because no U.S. patent rights limit a customer's use of a product abroad, a foreign sale does not necessarily transfer U.S. exclusivity rights.  A U.S. patentee can choose to sell rights broader than the rights necessarily conveyed in a foreign sale of the product—and *Jazz Photo* is not to the contrary—but absent such an express conveyance, a foreign sale does not affect U.S. patent rights.  *Kirtsaeng*, which addressed a copyright statute and treaty vastly less territorial in effect, did not purport to alter these fundamental aspects of patent law, or the decisions in *Jazz Photo* and *Boesch v. Graff,* 133 U.S. 697 (1890), that they reflect.

Impression and its *amici* would throw off this longstanding rule and require every sale anywhere in the world to convey—and include compensation for—U.S. patent rights.  This would dramatically intrude on the authority of other nations to determine how to balance the interests of innovators and consumers.  No principle of U.S. patent law or any patent treaty requires such a disregard of national boundaries, within which patent law has always operated, in favor of a single worldwide market.

II.    Domestic sales of products embodying a patent are generally unconditional, which exhausts U.S. patent rights.  But that is a default, not absolute, rule.  The Supreme Court and this Court have long recognized that a patentee may conditionally license the manufacture, sale, and/or use of patented articles that otherwise remain subject to patent-law restrictions.  *Mallinckrodt* applied that settled rule to direct sales by the patentee.  The Supreme Court has never ruled that a patentee cannot retain a portion of its rights when it sells a product directly, just as it can when it grants a limited license for others to sell.  Despite numerous arguments in *Quanta* that a patentee cannot retain any patent rights in a product it sells, the Court held, consistent with *Mallinckrodt* and its own longstanding precedent, only that the patentee's *unconditional* domestic sale of a product exhausts all U.S. patent rights in the product.

Neither Impression nor its *amici* offer any reason to distinguish between licenses and sales.  There is certainly no reason to construe *patent* law to encourage patentees to act as licensors rather than as manufacturers and direct sellers, as Impression's exhaustion rule would do.  There is every reason, by contrast, to maintain the framework under which patentees and their counter-parties have operated for decades: patentees, whether selling or licensing, may limit the scope of the rights they convey.  *Mallinckrodt* remains good law, and, under it, Lexmark's conditional sales and *limited* transfer of rights in Return Program

Cartridges did not convey *unlimited* authority that exhausted all of Lexmark's patent rights.

## STANDARD OF REVIEW

Whether a district court properly granted a motion to dismiss is a question of law reviewed *de novo*. *First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279, 1286-87 (Fed. Cir. 1999).

## ARGUMENT

### I.    The Sale Of A Patented Item Outside The United States Presumptively Does Not Exhaust U.S. Patent Rights.

This Court asked the parties to address whether, in light of *Kirtsaeng,* it should overrule *Jazz Photo* "to the extent it ruled that a sale of a patented item outside the United States *never* gives rise to United States patent exhaustion." *Supra* p. 1 (emphasis added). Impression and its *amici*, however, largely focus on the broader question whether a sale outside the United States *always* exhausts U.S. patent rights. *E.g.*, Impression Br. 2-3.

Lexmark and the United States agree, U.S. Br. 16, and this Court's order does not appear to question, that foreign sales do not necessarily exhaust U.S. patent rights. Because a U.S. patent does not interfere with any article's use abroad, the article's sale abroad neither requires nor implies the release of any U.S. rights. Given the differences between the rights granted under U.S. and foreign patent laws, moreover, a foreign sale presumptively does *not* exhaust U.S. rights. Although patentees can authorize foreign buyers to use, sell, or import patented

12

articles in the United States, there is no evidence or allegation that Lexmark did so here.

## A. A Foreign Sale Does Not Automatically Exhaust U.S. Patent Rights.

### 1. A sale abroad conveys and compensates a patentee for its right to exclude abroad, not its U.S. rights.

The "core notion" of exhaustion, this Court recently reaffirmed, rests on a patentee's compensation for lifting "legal restrictions imposed by the patent statute" that would otherwise run against the buyer. *Helferich*, 778 F.3d at 1301-02. "[W]hen the patentee … receives the consideration for [a machine's] use[,] he parts with the right to restrict that use," and renders the machine "open to the use of the purchaser without further restriction on account of the monopoly." *Adams v. Burke*, 84 U.S. 453, 456 (1873). An unrestricted sale replaces the patentee's statutory right to prevent the use or sale of a product with the buyer's authority to use or sell that product—"eliminat[ing] the legal restrictions on what authorized acquirers 'can do with an article embodying or containing an invention' whose initial sale (or comparable transfer) the patentee authorized." *Helferich*, 778 F.3d at 1301 (quoting *Bowman v. Monsanto Co.*, 133 S.Ct. 1761, 1766 & n.2 (2013)). An unrestricted U.S. sale thus extinguishes the patentee's rights to exclude in the United States.

But the foreign sale of a product patented in the United States does not "remov[e] [the] legal restrictions" imposed by the U.S. patent, *id.*, for those U.S. patent rights do not stand in the way of the product's sale or use abroad. The

13

Patent Act does not operate extraterritorially. *Deepsouth Packing Co. v. Laitram Corp.,* 406 U.S. 518, 531 (1972). To the contrary, the Act speaks in expressly territorial terms: it confers exclusive rights "throughout the United States," bars importation "into the United States," and establishes liability for infringement "within the United States." 35 U.S.C. §§ 154(a)(1), 271(a). This reflects obligations, dating to the 1883 Paris Convention, under which the legal force of a patent issued in one country is limited to that country. Paris Convention, art. 4*bis* (1883) ("Independence of Patents Obtained for the Same Invention in Different Countries: Patents applied for in the various countries of the Union … shall be independent of patents obtained for the same invention in other countries…."); *Voda v. Cordis Corp.*, 476 F.3d 887, 898-99 (Fed. Cir. 2007) (Paris Convention "clearly expresses the independence of each country's sovereign patent systems and their systems for adjudicating those patents.").

The Convention's policy of patent independence reflects both sovereign interests and private rights: different jurisdictions' patent grants often vary considerably in their duration, scope, and available compensation. M. Boulware *et al.*, *An Overview of Intellectual Property Rights Abroad*, 16 Hous. J. Int'l L. 441, 489-91 (1994). Therefore, not only are U.S. and foreign patent rights legally distinct, they often are valued differently. *See* F. Abbott, *First Report (Final) on the Subject of Parallel Importation*, 1 J. Int'l Econ. L. 607, 619 (1998). And because of these differences in "'policy judgments about the relative rights of

14

inventors, competitors, and the public in patented inventions,'" the presumption against extraterritorial application of U.S. patent law "'applies with particular force.'" *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 769 F.3d 1371, 1380 (Fed. Cir. 2014).

As a result, patentees and purchasers look to the distinct rights granted under a foreign patent when selling and buying in that foreign jurisdiction: "because U.S. patent law has no effect outside U.S. territory, the buyer in a foreign jurisdiction can already make, use, sell, and offer for sale the invention claimed in the U.S. patent without the need for any permission from the U.S. patent holder." J. Erstling & F. Struve, *A Framework for Patent Exhaustion from Foreign Sales*, 25 Fordham Intell. Prop. Media & Ent. L.J. 499, 525 (2015). Accordingly, the only "legal restrictions" "lifted" by a foreign sale for purposes of exhaustion, *see Helferich*, 778 F.3d at 1301-02, are those foreign patent rights that stood in the way of the buyer's use abroad. And the price a patentee receives for a foreign sale is compensation for lifting those foreign rights, not rights "under the United States patent." *Jazz Photo I*, 264 F.3d at 1105.

Treating a foreign sale as exhausting U.S. patent rights would thus permit U.S. law to invade the sovereign authority of foreign nations. A foreign patent may be less valuable than a U.S. patent, or a foreign jurisdiction may offer no patent protection at all for a particular innovation, because that jurisdiction has balanced the interests of consumers and innovators differently than the United

States. *See Halo*, 769 F.3d at 1380. In such circumstances, a product may be sold in a foreign country at a lower price precisely because of that country's different patent entitlement and enforcement policies. Treating foreign sales as exhausting U.S. patent rights would cause foreign prices to increase by effectively requiring foreign purchasers to pay for U.S. rights they may not want. Such an expansionist approach is at odds with the more modest sphere of U.S. law, *see Deepsouth,* 406 U.S. at 531, and the territorial design of the Paris Convention.

### 2. Given the distinction between U.S. and foreign patent rights, courts have rejected a rule of automatic international exhaustion.

Both this Circuit and the Supreme Court recognize that the fundamental distinction between U.S. and foreign patent rights precludes the rule of mandatory international exhaustion Impression seeks. Rather, "[t]o invoke the protection of the first sale doctrine, the authorized first sale must have occurred under the United States patent." *Jazz Photo I*, 264 F.3d at 1105. *Jazz Photo II*, again rejecting automatic international exhaustion, relied on the fact that "the United States patent system does not provide for extraterritorial effect." *Fuji Photo Film Co. v. Jazz Photo Corp.,* 394 F.3d 1368, 1376 (Fed Cir. 2005) ("*Jazz Photo II*") (citing *Int'l Rectifier Corp. v. Samsung Elecs. Co.*, 361 F.3d 1355, 1360 (Fed. Cir. 2004)).[1]

---

[1] *Tessera, Inc. v. ITC*, 646 F.3d 1357 (Fed. Cir. 2011), is not to the contrary because the patentee licensed worldwide use, *infra* n.5, and waived any non-exhaustion argument, *In re Semiconductor Chips*, 2010 WL 686377, *14 n.6 (ITC Feb. 24, 2010). *Contra* Recycling Times Br. 11-14; HTC Br. 17.

16

Both *Jazz Photo* decisions invoked *Boesch v. Graff* to explain why a sale abroad does not exhaust patent rights here. *Boesch* held that the buyer of a patented burner in Germany could not import and sell the burner in the United States, because the foreign sale did not extinguish the U.S. patentee's rights under U.S. law. 133 U.S. at 702. The Court recognized the separate foreign and U.S. rights at issue, expressly distinguishing the buyer's right to "make and sell" the article in Germany "under the laws of that country" from "the rights o[f] patentees under a United States patent." *Id.* at 703.

Impression and its *amici* highlight that the German seller in *Boesch*—whose rights pre-dated the German patent—was not acting on behalf of the U.S. patentee. *Id.* at 701; Impression Br. 10-11. This meant the U.S. patentee never received remuneration from the German sale. That was true, but irrelevant to the Supreme Court's reasoning. *See Jazz Photo II*, 394 F.3d at 1376 ("this court does not read *Boesch* … to limit the exhaustion principle to unauthorized sales"). To the contrary, *Boesch* recognized that, under German law, the seller was "authorized." 133 U.S. at 702. Although his right to sell in Germany was "allowed him under the laws of that country," his purchasers "could not be thereby authorized to sell the articles in the United States in defiance of the rights of patentees under a United States patent." *Id.* The Court would not treat U.S. patent rights as exhausted "without the license or consent of the owner of the United States patent." Sandisk Br. 27.

17

Other courts have also rejected automatic international exhaustion. *Daimler Mfg. Co. v. Conklin*, 170 F. 70, 72 (2d Cir. 1909), enjoined a car buyer, who had purchased in Germany, from using the car in the United States without a license from the U.S. patentee. That German sale—as in *Boesch*—could take the car "out of the monopoly of the German patent," but not "the monopoly of the American patentee who has not sold." *Id.* Likewise, the court in *Griffin v. Keystone Mushroom Farm* held that the purchase and import of U.S.-patented machines in Italy could not defeat the rights of the U.S. patentee in the United States, even though the patentee controlled both the Italian and U.S. patents. 453 F. Supp. 1283, 1285 (E.D. Pa. 1978) (distinguishing country-specific "bundle of rights" conferred by U.S. and Italian patent law). The independence of U.S. and Italian legal rights, not the fact that the patentee received some reward for its invention, was dispositive. *Id.* at 1286. *Cf. A. Bourjois & Co. v. Katzel*, 260 U.S. 689, 692 (1923) (rejecting international trademark exhaustion).

Impression and its *amici* contend that international exhaustion does not entail extraterritorial application of U.S. law, but merely recognizes that an overseas sale occurred. *E.g.*, Impression Br. 8; Costco Br. 18. This is wrong: treating foreign sales as the basis for domestic exhaustion would treat an extraterritorial sale as an exchange involving U.S. patent rights. And because Impression and its *amici* insist that foreign sales *must* involve an exchange of U.S. patent rights *as a matter of U.S. patent law*, there is no getting around the fact that their rule applies U.S. pa-

tent law to foreign transactions. For this reason, rejecting international exhaustion is "the logical and perhaps inescapable corollary of the rule … that the operation of the United States patent laws is as a general matter limited by this nation's boundaries." *Griffin*, 453 F. Supp at 1286. *Cf. Deepsouth*, 406 U.S. at 531 ("Our patent system makes no claim to extraterritorial effect," and "we correspondingly reject the claims of others to such control over our markets.") (citing *Boesch*, 133 U.S. at 703).

Neither does rejecting mandatory international exhaustion facilitate "double recovery." *Contra, e.g.,* Sandisk Br. 8; Recycling Times Br. 14-15. As explained above at pp. 13-16, a foreign sale does not involve "the same patent right" as a U.S. sale. Texas Instruments Br. 20. Even if a U.S. patentee may exercise its U.S. rights in an article only once, IP Profs. Br. 14-15, a patentee exercises no U.S. rights at all by making a foreign sale, *see* U.S. Br. 2, 14, 26. For example, where someone besides the U.S. patentee controls an invention's foreign rights and receives compensation for the product's sale in his own country, a separate U.S. sale produces no duplicative compensation because two separate property rights were transferred. *See Griffin*, 453 F. Supp. at 1286.

### 3.     Other authorities confirm that a foreign sale does not automatically exhaust U.S. rights.

The law is consistent with rejection of Impression's automatic international exhaustion rule in several additional respects. *First*, Congress in 1994 amended the Patent Act to give patentees exclusive authority to bar importation of a patented

invention into the United States.  35 U.S.C. §§ 154(a)(1), 271.  Yet many *amici*

assert an absolute right to bring a product into the United States after buying it

elsewhere.  *E.g.*, Serv. & Comp. Dealers Br. 5-6.  The text of the amendment

includes no exception for importation-after-purchase.  *Amici* insist it does not

affect exhaustion, citing legislative history indicating that the trade agreement

underlying the amendment "does not affect U.S. law or practice relating to parallel

importation."  Uruguay Round Agreements Act Statement of Administrative

Action, 1994 U.S.C.C.A.N. 4040, 4280.  But even crediting this extrinsic

statement, it says nothing about the law pre-amendment.

    *Second*, the Executive Branch understood existing U.S. law *not* to recognize

international exhaustion when it proposed the importation amendment.  In

negotiating the Uruguay Agreement, the United States opposed an international-

exhaustion provision.  *See* Abbott, *supra*, at 609.  The Agreement ultimately left

the exhaustion question for individual countries to decide.  Uruguay Round

Agreement, Annex 1C, TRIPS, art. 6 (1994) ("[N]othing in this Agreement shall

be used to address the issue of the exhaustion of intellectual property rights.").

And previously the United States had successfully resisted mandatory international

exhaustion in NAFTA negotiations.  *See* V. Chiappetta, *The Desirability of

Agreeing to Disagree*, 21 Mich. J. Int'l L. 333, 350-55 (2000).[2]  U.S. opposition to

---

[2] *See also* S. Wasserman Rajec, *Free Trade in Patented Goods*, 29 Berkeley Tech.
L.J. 317, 354-56 (2014).

international exhaustion would make little sense if U.S. law already embodied that rule.

*Third*, other U.S. treaties affirmatively bar mandatory international exhaustion.  Agreements with Morocco, Australia, Singapore, and other countries—negotiated and ratified after the Uruguay Agreement left exhaustion to individual countries—provide that "the exclusive right of the patent owner to prevent importation … without the consent of the patent owner shall not be limited by the sale or distribution of that product outside its territory."  *See, e.g.*, United States-Morocco Free Trade Agreement, art. 15.9.4 (2004).  There is no reason to suppose Congress and the President acted contrary to prevailing U.S. law in entering into binding trade agreements.

*Fourth*, most courts to address the question before *Jazz Photo* applied the same rule.  Decisions enforcing reservations of U.S. patent rights in foreign transactions, such as *Dickerson v. Matheson*, 57 F. 524, 527 (2d Cir. 1893), and *Dickerson v. Tinling*, 84 F. 192, 194 (8th Cir. 1897), are flatly inconsistent with Impression's understanding that pre-*Jazz Photo* caselaw required international exhaustion.  No decisions refusing to give effect to such reservations are cited in the briefs supporting Impression.[3]  *See* U.S. Br. 16.  Decisions enforcing licenses

---

[3] *Quanta's* footnote 6 did not address exhaustion at all, contrary to the arguments of Impression's *amici*, *see* LG Br. 14-16; HTC Br. 16 n.8, but explained that non-infringing use abroad did not defeat a substantial-embodiment claim.  553 U.S. at

that *authorize* U.S. use of patented products are fully consistent with Lexmark's position. *See infra* pp. 22-23. And other decisions supposedly supporting international exhaustion do not involve foreign sales at all. As *Daimler* recognized: "The language of the court" in cases like *Adams*, *Keeler*, and *Hobbie v. Jennison*, suggesting that buyers may use patented products "anywhere" "must be understood to mean to use or sell *within the United States*, the territory which the letters patent cover." 170 F. at 72 (emphasis added).[4]

### B.    A Foreign Sale May Exhaust U.S. Rights if the Patentee Expressly or Implicitly Authorizes Use Beyond the Country of Sale.

1. That a foreign sale does not *automatically* exhaust U.S. patent rights does not mean that it may *never* do so. Nothing in *Jazz Photo* bars exhaustion where a patentee conveys U.S. rights as part of a foreign sale, because *Jazz Photo* did not consider a foreign transaction that authorized use of the patented product beyond the country of sale. *See, e.g.*, SK Hynix Br. 8. Nor did *Jazz Photo* involve an express or implied condition of sale. 264 F.3d at 1108. And the Court's reasoning did not address the potential effect of such an express or implied license.

---

632 n.6. *See also Ninestar Tech. Co. v. ITC*, 667 F.3d 1373, 1378 (Fed. Cir. 2012) (*Quanta* did not undermine *Jazz Photo*).

[4] *See also United States v. Univis Lens Co.,* 316 U.S. 241 (1942) (addressing U.S. sales only); *United States v. Masonite Corp.,* 316 U.S. 265 (1942) (same). The sole decision that contradicts the position embraced by this Court and by Lexmark is *Holiday v. Matheson*, 24 F. 185 (C.C.S.D.N.Y. 1885). But that district court decision predated *Boesch*, and is hardly authoritative.

Nothing in the Patent Act, the Paris Convention, or general principles of contract law prevents patentees from authorizing buyers to use products in other jurisdictions where the seller controls the patent rights. Recognizing that customers may negotiate individual licenses that extend beyond national boundaries differs considerably from extending the reach of U.S. statutory law by effectively mandating that *all* foreign customers pay for U.S. patent rights. Depending on the nature of the product, there may be good reasons for the patentee—by its own choice—to relinquish its rights across multiple jurisdictions. The "absolute" license granted the British government to use intercontinental aircraft during wartime, for example, naturally contemplated and authorized multinational use. *Curtiss Aeroplane & Motor Corp. v. United Aircraft Eng'g Corp.*, 266 F. 71, 77 (2d Cir. 1920). Similarly, where a patent covers one component of a product manufactured across an international supply chain, the parties presumably will negotiate a worldwide license. *Cf.* Sandisk Br. 33-34. Nothing suggests that market forces do not sort out the needs of patentees and their customers in the varied contexts where the question may arise. Lexmark agrees with the Government that patent law should not stand in the way of global or cross-jurisdictional licenses.[5]

---

[5] *See Tessera*, 646 F.3d at 1370 ("unconditional grant" to sell in the United States and elsewhere); *Kabushiki Kaisha Hattori Seiko v. Refac Tech. Dev. Corp.*, 690 F. Supp. 1339 (S.D.N.Y. 1988) (declining to limit contractual right to sell product beyond United States); *STMicroelectronics, Inc. v. Sandisk Corp.*, No. 05-45, 2007

2.  Lexmark and the Government part ways, however, over whether a patentee's foreign sale exhausts a U.S. patent by default, absent any indication that the U.S. patentee intended to relinquish U.S. rights.  Given the territorial scope of national patent rights, and the considerable differences in the protections afforded inventions under the laws of the United States and other countries, a foreign sale presumptively does *not* exhaust U.S. rights.  *See, e.g., Griffin*, 453 F. Supp. at 1286-87.  A multinational license of the sort contemplated by the Government cannot be implied by silence.  The territorial nature of the patent system, *see* U.S. Br. 14-16, contemplates that distinct national patents regularly entail different rights and value, *see supra* pp. 14-16.  With such variation, it is illogical to think most patentees intend a sale anywhere to liberate the product everywhere.  Most products are designed and sold at local prices for local use, and others, like many pharmaceuticals, *infra* pp. 32-33, are even subject to government price controls that distort any true "global" market.

The Government, however, would require "express" reservation of U.S. rights to prevent exhaustion.  It does not cite any reason in policy or law, other than the supposed generic historical disfavor for restraints on alienation, U.S. Br. 26, and ancient caselaw that purportedly requires "express" reservation of rights as a matter of "tradition" (*id.* 20-22).  But none of the five pre-1920 decisions on

---

WL 951655, *3 (E.D. Tex. Mar. 26, 2007) (global license); *Sanofi, S.A. v. Med-Tech Veterinarian Prods., Inc.*, 565 F. Supp. 931, 938 (D.N.J. 1983) ("expectations of the purchaser" were unrestricted worldwide disposition).

which the Government relies actually demands an "express" reservation. *Boesch* did not address reservation of rights at all, but treated the difference between German and U.S. law as dispositive. *See supra* pp. 16-18; *Keeler v. Standard Folding Bed Co.*, 157 U.S. 659, 665 (1895) (describing *Boesch*). *Holiday v. Mattheson* considered "circumstances which *imply*"—not expressly restrict—the buyer's rights outside the jurisdiction of sale. 24 F. at 186 (emphasis added). *Dickerson v. Matheson* and *Dickerson v. Tinling* both featured written reservations of the seller's U.S. patent rights, but neither stated that an express reservation was *necessary* to avoid exhaustion. *See Tinling*, 84 F. at 194-95 (assuming without deciding that foreign sale could exhaust U.S. rights); *Matheson*, 57 F. at 527 (referring to sales "without any restrictions upon the extent of his use or power of sale," but not requiring such restrictions in writing). And the discussion of explicit contractual reservations in *Curtiss* was plainly *dictum*, because that case involved an express *authorization*. 266 F. at 75, 77.[6]

This Court should reject the Government's new "express" drafting requirement. The default rule for foreign transactions silent on their extraterritorial effect should reflect the independent and territorial nature of patent rights. Foreign sales should, by default, affect patent rights granted in that foreign country only.

---

[6] *Sanofi*, 565 F. Supp. at 938, likewise referred to "written restrictions upon … sale," but treated the unrestricted contractual *authorization* as dispositive.

When necessary or efficient, parties can easily negotiate written licenses for broader use.  *E.g.,* Sandisk Br. 32-33.

3.  Even if a reservation requirement applied, however, Lexmark would meet it because Lexmark withheld worldwide use authority.  Impression, which bears the burden to prove its exhaustion defense, *e.g.*, *Jazz Photo Corp. v. United States*, 439 F.3d 1344, 1350 (Fed. Cir. 2006), offered no allegation or evidence that Lexmark's foreign sales authorized U.S. or global use of foreign-sold cartridges. To the contrary, the record establishes that Lexmark's cartridges are technologically "regionalized," such that they work only with printers made for their region of sale, and are labeled and marketed for regional rather than global use.  (A3942(15:17-25)-A3943(16:1); A3989(1-15).)  The only relevant evidence indicates Lexmark intended to withhold authority to use in the United States.

Contrary to the Government's suggestion (at 27), if this Court imposed on Lexmark, for the first time on appeal and contrary to the normal procedures for affirmative defenses like exhaustion, a burden of producing evidence that its U.S. rights were reserved, then Lexmark would be entitled to a remand.  Lexmark could offer additional evidence regarding its contracts, technology, and marketing, which demonstrates Lexmark's reservation of U.S. rights.  The current record does not support a judgment that Lexmark's U.S. rights were exhausted by foreign sales.

### C.    *Kirtsaeng* Does Not Require Abandonment of Circuit Precedent in Favor of International Exhaustion.

*Kirtsaeng* did not overhaul the international patent regime of *Jazz Photo* and *Boesch* in the silent, haphazard manner suggested by Impression and its *amici*.[7] The question in *Kirtsaeng* was whether importation from Thailand of copyrighted textbooks infringed the publisher's rights under the Copyright Act, *see* 17 U.S.C. § 106(3), or was instead protected by the Act's first-sale provision, § 109(a). 133 S.Ct. at 1355-56.

After examining in detail whether a textbook printed and sold abroad was "lawfully made under" the Copyright Act for purposes of the Act's first-sale exception, the Court concluded that the first-sale provision was not limited to sales in the United States. Thus, the foreign textbooks had been "lawfully made" abroad "under" (*i.e.*, consistent with) the U.S. Copyright Act; then sold in Thailand in a transaction that satisfied the Act's first-sale provision; and then resold free of copyright restrictions in the United States. In reaching its decision, the Court considered § 109's distinct text, legislative history, and common-law background, in addition to its practical effects. 133 S.Ct. at 1358, 1364. None of that applies to Impression's infringing sales of Lexmark cartridges.

---

[7] Courts of appeals may not anticipate that the Supreme Court will overrule its own precedent. *See Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989).

*First*, *Kirtsaeng* addressed the Copyright rather than Patent Act, and never mentioned patent law. That is hardly surprising, given that patent and copyright decisions are not interchangeable, *see Bobbs-Merrill Co. v. Straus*, 210 U.S. 339, 346 (1908), and that *Kirtsaeng* turned on a close interpretation of the Copyright Act's distinctive statutory provision regarding first sales, *see* 133 S.Ct. at 1358-64 (construing § 109(a)'s reference to copies "lawfully made under this title").[8] In addition, a copyright owner's right to control importation is subsidiary to the distribution right. *Quality King Distribs., Inc. v. L'anza Research Int'l, Inc.*, 523 U.S. 135 (1998). Critically, the relevant provisions of the Copyright Act impose no geographic limitation on the rights extinguished through a first sale, referring simply to the rights of an '"owner of a copyright under this title"' without respect to location. *See Kirtsaeng*, 133 S.Ct. at 1362.

The Patent Act is different. It contains no analogous provision codifying the exhaustion doctrine—but *does* contain "geographical distinctions," *id.* at 1363, of the sort *Kirtsaeng* found lacking. *Id*; *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 455 (2007) (citing 35 U.S.C. § 154(a)(1)); *see also* 35 U.S.C. § 271. The Patent Act contains a freestanding importation provision (*supra* pp. 19-20), not one derivative of distribution rights. And patent law's exhaustion defense derives from

---

[8] Indeed, the Supreme Court after deciding *Kirstaeng* declined to take even the minimal step of remanding *Ninestar Tech. v. ITC*, which had applied *Jazz Photo* to resolve a question of international patent exhaustion. 133 S.Ct. 1656 (2013) (No. 12-552).

judicial decisions applying, among other things, the Patent Act's recognized lack of extraterritorial force, *e.g., Jazz Photo I*, 264 F.3d at 1105 (considering whether sale abroad was a "'disposition of the article'" that allowed the "'patentee [to] receive[] his reward for the use of the article'"), not the nuanced legislative history exhumed in *Kirtsaeng*. 133 S.Ct. at 1360-62.

*Second*, patent and copyright infringement differ in ways central to the Court's analysis in *Kirtsaeng*. The libraries and museums posited as would-be copyright infringers, for example, have no apparent analog in the patent realm. 133 S.Ct. at 1364-67. Nor are problems of user uncertainty as acute: the duration of a copyright—extraordinarily long and variable according to the life of the author or authors—is much harder to determine than the 20-year life of a patent. And issues such as fair use and parody, in diverse areas like fiction, music, dance, and software, are unique to copyright. Thus, the concerns articulated in *Kirtsaeng* cast no equivalent doubt on the "geographical interpretation" that otherwise applies to the Patent Act. 133 S.Ct. at 1358.

*Finally*, the common-law considerations raised in *Kirtsaeng* and quoted in Impression's brief are not implicated here. The *Kirtsaeng* Court, having found that Congress intended no territorial limit on the Copyright Act's first-sale provision, found further support for Congress's choice in the common law. And to discern the scope of the common law as of 1909, when the provision was first codified, the

Court gazed even further in the past to Lord Coke's 1628 treatise.  *See* 133 S.Ct. at 1363.

Such an exercise would be inapposite under the Patent Act, because that statute, and the cases interpreting its associated exhaustion doctrine, *e.g.*, *Boesch*, repeatedly and expressly "mak[e] … geographical distinctions," *contra* 133 S.Ct. at 1363, eliminating any need to look to distant common law regarding its territorial reach.  Moreover, foreign law affects patent law in an entirely different way than it does copyright.  The rules for acquiring and infringing a copyright are largely harmonized across the 168 parties to the Berne Convention.  And the copyright itself is not conferred by the positive law of individual countries, but inheres in the writing itself, immediately upon creation.  Patent rights, by contrast, must be obtained, maintained, and enforced independently in each jurisdiction, and vary considerably in scope across jurisdictions.  *Supra* pp. 14-16.  Whatever value a 1628 English treatise may have had in supporting *Kirtsaeng*'s conclusion that Congress did not intend to geographically limit the Copyright Act's statutory first-sale doctrine, it finds no purchase in the analysis of the patent exhaustion doctrine's plainly territorial reach.

### D.    No Sound Reason Warrants Overturning *Jazz Photo*'s Settled Rule.

A call to overturn precedent—especially precedent implicating rules of "property (patents) and contracts (licensing agreements)" that parties have used for

years to order their affairs—requires a "superspecial justification" that Impression cannot muster.  *Kimble*, 135 S.Ct. at 2410.

### 1.    *Jazz Photo* has worked well for nearly fifteen years.

The call to abandon *Jazz Photo* is a solution in search of a problem.  This Court and district courts have applied the decision many times without incident. The Supreme Court likewise has declined the chance to review this precedent on numerous occasions.  *Ninestar*, 133 S.Ct. 1656 (No. 12-552); *Benun v. Fujifilm Corp.*, 131 S.Ct. 829 (2010); *Jazz Photo Corp. v. ITC*, 536 U.S. 950 (2002).

The problems Impression and its *amici* ascribe to *Jazz Photo* are hollow and hypothetical.  According to SK Hynix, the "best evidence" of *Jazz Photo*'s problems is the need to track sales by country, which hardly burdens the U.S. economy.  Br. 10 n.4, 14.  The Intellectual Property Professors (at 28-29), apparently unaware of any real problem wrought by *Jazz Photo*, worry over imaginary widgets available for use only on Sundays, ignoring that businesses have scant incentive to antagonize customers with surprising and uneconomical limitations.

That is why the hypothetical example of a Canadian used car driven into America provides no reason to reject *Jazz Photo*.  No rational modern auto manufacturer would sue its customers (or allow its suppliers to do so), incurring the steep costs of prosecuting a patent case in order to halt *de minimis* cross-border

infringement.[9]  To the contrary, manufacturers have every incentive to secure broad supplier licenses and maintain a robust resale market that sustains premium new-car prices.  *See* G. Rub, *The Economics of* Kirtsaeng v. John Wiley & Sons, Inc., 81 Fordham L. Rev. Res Gestae 41, 48-49 (2013).  This Court should not let the hypothetical tail of cross-border hardships wag the practical dog of territorial patents and real market differentiation.

Far from identifying ways in which *Jazz Photo* stunts the economy or limits consumer choice, *amici* demonstrate that parties successfully use contracts, licenses, and other market solutions to meet their needs.  *See, e.g.*, Serv. & Comp. Dealers Int'l Br. 5 (describing importation to relieve hard-drive shortage). SanDisk (at 3) makes clear that the vast majority of its licenses are worldwide, reflecting the multinational nature of its business and the ability to tailor territorial patent rights to global demand.  *Jazz Photo* does not interfere with such licenses and the benefits of certainty and efficiency they may offer.  Multinational companies will continue to navigate the system of territorial patent rights.  *Jazz Photo* has presented no impediment to cross-border commerce.

### 2.    Adopting mandatory worldwide exhaustion would disrupt U.S. law and the economy.

If the foreign sale of a patented article is held to automatically exhaust U.S. patent rights, the natural consequences are increased gray-market importation and

---

[9] In any event, *Daimler Mfg. v. Conklin*, 170 F. 70, answers this hypothetical consistent with *Jazz Photo*.

one-size-fits-all global pricing.  Rather than today's market differentiation (a response to variable patent protection and purchasing power around the world), under the rule advanced by Impression, foreign prices will rise in response to the threat of U.S. importation.  Such forced harmonization of global prices is at odds with a regime of territorial rights in which patent issuance, enforcement, and duration vary by country.  *Supra* pp. 14-16.

*Kirtsaeng* itself acknowledged that extending copyright exhaustion to foreign sales would "make it difficult, perhaps impossible" to sell at different prices in different foreign markets, according to demand and purchasing power. *See* 133 S.Ct. at 1370.  Such concerns are only enhanced in the patent context, where life-saving drugs and critical technological infrastructure are at stake.[10]  The *Kirtsaeng* Court perceived itself bound by a statute that contained no geographic distinction.  *Id.*  But no provision of the Patent Act requires this Court to ignore the troubling distributional consequences of Impression's proposed rule.

---

[10] 21 U.S.C. § 381(d), under which the *Government* may block re-importation of drugs, is no substitute for the *patentee*'s authority to enforce patent rights through infringement suits.  *Contra* LGE Br. 8 n.3.  And § 381(d), which affects only *re*-importation of U.S.-manufactured drugs, not importation of drugs made abroad, is subject to a personal-use exception and discretionary Government enforcement addressed to safety rather than patent concerns.  FDA, *Regulatory Procedures Manual* § 9-1, -2 (2013).

### 3.    A foreign-exhaustion rule should be imposed, if at all, through the political process.

Many of the policy-driven views of Impression and its *amici* resemble arguments from trade negotiations.  Their position—that U.S. patentees should automatically forfeit patent rights after a sale anywhere in the world—makes little sense, given the importance of intellectual property to the United States' knowledge-based economy.  The officials charged with setting U.S. trade and economic policy evidently disagree with Impression's prescription of expanded exhaustion.  Congress has declined to revise the rule of *Jazz Photo*, despite calls to do so, and despite significant intervening revisions to the Patent Act.  *See, e.g.*, *Hearing on the Impact of Intellectual Property on Entrepreneurship and Job Creation, H. Comm. on Small Business*, 111th Cong. 58-60 (2010).  Congress can respond to unpopular patent-law decisions when it sees fit.  *See, e.g., Microsoft*, 550 U.S. at 456-59.  Likewise, the Executive has the ability to pursue new or altered trade pacts if it wants to reverse course from the multiple agreements precluding mandatory exhaustion already in force.  *Supra* pp. 20-21.

Courts should not undertake to reverse these policies.  Institutionally, courts are ill-suited to weigh tradeoffs between market differentiation and parallel importation—which could radically alter the distribution and pricing of goods around the world.  That is a job for the political branches, and it is a job they have been doing for decades.  This Court should again adhere to "the broader judicial

practice of generally maintaining the contours of property rights in the absence of legislative prescriptions." *Helferich*, 778 F.3d at 1305.

## II.    The Court Should Reaffirm *Mallinckrodt* And The Rule That Patentees May Control The Scope Of The Patent Rights They Relinquish When Selling Or Licensing Others To Sell Patented Products.

With respect to domestic sales, everyone agrees that the unrestricted transfer or sale of a patented article exhausts the patentee's U.S. rights in that article. But it does not follow that all patented articles must enter the stream of commerce unrestricted by any patent rights. That is because everyone also agrees that a patentee can grant a limited license to a third party to make and sell patented articles that remain restricted in various ways (*e.g.,* where and how a patented product may be used or sold). The question this case asks with respect to domestic sales is this: may a patentee, when it sells a patented item itself, impose the same limits on that item as it may impose through a third party selling the identical article under a limited license? No Supreme Court ruling, including *Quanta*, requires distinguishing conditional sales of products from conditional sales of licenses. And as this Court appreciated in *Mallinckrodt*, there is no principled basis for concluding that a patentee may not achieve in one step (by making and selling itself) what it can undeniably achieve in two (by licensing patent rights to a third party who then sells goods embodying those rights).

### A.    Patentees May Transfer Some or All of Their Patent Rights, But Not More.

### 1.    Unrestricted domestic sales exhaust U.S. patent rights.

The domestic sale of a patented product is presumptively unrestricted and therefore exhausts any U.S. patent rights in that product.  The Patent Act grants patentees a set of rights to "exclude others from making, using, offering for sale, or selling the invention," and provides that someone who "makes, uses, offers to sell, or sells" the invention "without authority" infringes those rights.  35 U.S.C. §§ 154(a)(1), 271(a).  Under those provisions, a patentee may transfer the unconditional authority to make, use, and sell the invention, or a patentee may make a patented article and then transfer the unconditional authority to use and (re)sell that article.  Either way, once the patentee relinquishes all of its U.S. rights by an unconditional sale in the U.S., that "initial authorized sale of a patented item terminates all patent rights to that item." *Quanta*, 553 U.S. at 625.

For more than 150 years, the Supreme Court has consistently held that parties cannot retain U.S. patent rights in a product after unconditionally selling or transferring that item in this country. *Bloomer v. McQuewan*, 55 U.S. (14 How.) 539 (1852), is an early example.  There, at the time the patentee sold two patented machines, the patent was set to expire on a particular date.  Congress subsequently extended the patent term. *Id.* at 547-48.  The purchaser nevertheless could not be sued for infringement for using the machines during the extended term because the "right to construct and use the[] machines, had been purchased and paid for

36

*without any limitation* as to the time for which they were to be used." *Id.* at 553 (emphasis added); *see also id.* (purchaser had "purchased the *absolute and unlimited* right from the inventor") (emphasis added).

The Court confirmed 20 years later that *Bloomer*'s exhaustion principle depended on an unrestricted sale. *Mitchell v. Hawley*, 83 U.S. (16 Wall.) 544 (1873), involved a patented machine that was sold before Congress extended the patent term and then used during the extended period. Unlike in *Bloomer*, however, the seller was a licensee whose rights were limited to the patent's original term. *Id.* at 549. That restriction precluded exhaustion: "the instrument of conveyance from the patentee to [the licensee], which describes all the title he ever had, expressly" stated the restriction, and the licensee therefore could not "convey [to the purchaser] any better title than he own[ed]." *Id.* at 550. An unrestricted sale would have exhausted patent rights: when a patentee "has himself constructed a machine and sold it *without any conditions*, or authorized another to construct, sell, and deliver it, or to construct and use and operate it, *without any conditions*, and the consideration has been paid to him for the thing patented, the rule is well established that the patentee must be understood to have parted to that extent with all his exclusive right, and that he ceases to have any interest whatever in the patented machine." *Id.* at 547 (emphasis added); *see also Chaffee v. Bos. Belting Co.*, 63 U.S. (22 How.) 217, 224 (1859) ("having failed to establish any

right or license to use their machinery during the extended term…, [defendants] appear in the record as naked infringers").[11]

The Supreme Court has repeatedly reaffirmed this default rule. *E.g.*, *Wilbur-Ellis Co. v. Kuther*, 377 U.S. 422, 425 (1964) (distinguishing a limited-use license from "sales … outright, without restriction"). And the common law has long imposed the same background assumption. Indeed, Lord Coke explained that someone who gave or sold "'his whole interest'" in an article could not restrain its future alienation "'because his whole interest … [wa]s out of him.'" *Kirtsaeng*, 133 S.Ct. at 1363 (omission in original) (quoting 1 E. Coke, *Institutes of the Laws of England* § 360, at 223 (1628)). Relinquishing one's "whole interest" in an article necessarily relinquishes any rights to continued control over that article.

*Quanta* is just the latest iteration. As a matter of contract interpretation, *Quanta* held that the LGE license authorized Intel to sell products employing the LGE patents without any condition upon how Intel's customers used those products. 553 U.S. at 636-37. Instead, Intel's authority to sell LGE-patented

---

[11] Some *amici* contend that the Court used "without any conditions" in *Mitchell* to reference an installment sale or other "agreement to sell where title would not convey until the performance of a condition precedent." U.S. Br. 12; Costco Br. 25-26 & n.6. This view has never been expressed by the Supreme Court, and cannot be reconciled with *Mitchell*'s discussion of licensees (who do not take title in what they make subject to conditions precedent) in the same passage, 83 U.S. (16 Wall.) at 549, or with *Quanta*, which emphasized that "[n]o *conditions* limited Intel's authority to sell," 553 U.S. at 637 (emphasis added), without any suggestion that "conditions" referred to installment sales or other conditions precedent to title passing.

products to the accused infringer, Quanta, was unrestricted and subject to "[n]o conditions" under Intel's contract with LGE. *Id.* at 637. Because a "'single, unconditional sale'" in the U.S. exhausts a patentee's U.S. rights, the result in 2008 was no different than it was 150 years earlier: "patent exhaustion prevent[ed] LGE from further asserting its patent rights." *Id.* at 626, 637.

### 2. A patentee may retain some of its rights through valid limitations on the transfer of those rights.

That domestic sales of patented articles are presumptively unconditional and unrestricted does not mean that they are necessarily unconditional and unrestricted. On the contrary, courts' repeated reference to unconditional sales reflects that a patentee, by imposing conditions on a sale, may transfer a subset of its U.S. patent rights to a domestic acquirer without transferring—and thus exhausting—all of those rights. "[N]ot every purchase provides a free ticket to future use." 1 *Milgrim on Licensing* § 2.31 (2015).

Restrictions can take many forms, but "the rule is, with few exceptions, that any conditions which are not in their very nature illegal with regard to this kind of property, imposed by the patentee and agreed to by the licensee for the right to manufacture or use or sell the article, will be upheld by the courts." *E. Bement & Sons v. Nat'l Harrow Co.*, 186 U.S. 70, 91 (1902). Some conditions divide exclusivity rights geographically. *See, e.g.*, 35 U.S.C. § 261. Even when a patentee's attempt to do so fell short, in *Hobbie v. Jennison*, the Court explained that "[i]t is easy for a patentee to protect himself and his assignees when he

39

conveys exclusive rights under the patent for particular territory. He can take care to bind every licensee or assignee, if he gives him the right to sell articles made under the patent, by imposing conditions which will prevent any other licensee or assignee from being interfered with." 149 U.S. 355, 363 (1893).

Other restrictions concern the duration for which a patented article can be used. That is *Mitchell*. The patentee conveyed limited rights to his licensee, who sold to end-users, who then infringed when their use exceeded the limits imposed by the patentee. 83 U.S. (16 Wall.) at 549-50. The licensee could not "convey [to purchasers] any better title than he own[ed]." *Id.* at 550.

Patentees may also impose restrictions on *how* patented goods in the stream of commerce can be used. In *General Talking Pictures Corp. v. Western Electric Co.*, the patentee licensed another company to manufacture and sell amplifiers for non-commercial use only, even though the amplifiers were also capable of commercial use. 304 U.S. 175, 179-80 (1938). After the licensee violated that restriction by selling amplifiers to a commercial user, the patentee sued that purchaser—who undoubtedly had title to the machines in question—for infringement. *Id.* at 180. Because the non-commercial use condition limited the scope of the rights exhausted by the sale, and did not "extend the scope of the [patent] monopoly," *id.* at 181, the commercial use was unauthorized and thus infringing. As the Court held on rehearing, "a restrictive license is legal." 305 U.S. 124, 127 (1938). *General Talking Pictures*—which indisputably remains

good law—squarely rejected the proposition that patent law forbids restricted sales that limit a purchaser's use of a product. 304 U.S. at 180-82 (rejecting dissent position).

This Court has consistently recognized the same "familiar boundaries" of the exhaustion doctrine. *Helferich*, 778 F.3d at 1305. After *Quanta*, the *en banc* Court explained that the "'exhaustion' doctrine does not apply … to a conditional sale or license, where it is more reasonable to infer that a negotiated price reflects only the value of the 'use' rights conferred by the patentee." *Princo Corp. v. ITC*, 616 F.3d 1318, 1328 (Fed. Cir. 2010) (en banc). Then, in *LifeScan Scotland Ltd. v. Shasta Technologies, LLC*, the Court distinguished between an "unconditional transfer of ownership as opposed to a conditional sale or license" for purposes of exhaustion. 734 F.3d 1361, 1375 n.8 (Fed. Cir. 2013). Likewise, in *B. Braun Medical, Inc. v. Abbott Laboratories*, this Court held that "an expressly conditional sale" subject to a "'restrictive license'" did not exhaust the seller's patent rights. 124 F.3d 1419, 1426 (Fed. Cir. 1997).

All of this, moreover, is consistent with the common-law origins of the exhaustion doctrine. The law treats both patents and articles embodying a patent as personal property, *e.g.*, 35 U.S.C. § 261; *McQuewan*, 55 U.S. (14 How.) at 550, and it has long been true—notwithstanding Lord Coke's 17th Century position— that transfers of personal property can carry restrictions. During the formative 19th Century, for example, English law recognized use restrictions on chattels and

patented chattels.  *See, e.g.*, *Incandescent Gas Co. v. Cantelo*, [1895] 12 R.P.C. 262, 264 (Eng.) (patentee has the right "to impose his own conditions [and i]t does not matter how unreasonable or how absurd the conditions are"); *De Mattos v. Gibson*, [1859] 45 Eng. Rep. 108 (Ct. Ch.) (enforcing previous acquirer's contract "to use and employ the property for a particular purpose in a specified manner" against subsequent purchaser).  American courts, too, have allowed "restrictive agreements to personal property when not regarded as an unlawful restraint of trade or in violation of public policy."  H.F. Stone, *The Equitable Rights and Liabilities of Strangers to a Contract*, 18 Colum. L. Rev. 291, 310 (1918); *see, e.g.*, *Waring v. WDAS Broad. Station*, 194 A. 631 (Pa. 1937).[12]

Embodying these same principles, patent law's exhaustion doctrine is straightforward, logical, and firmly implanted.  As one of Impression's *amici* put it, "[t]he owner of a patent has wide latitude to license all or a part of its property rights under the patent on terms and conditions of its choosing."  SK Hynix Br. 21; *see also Tinling*, 84 F. at 195 ("a patentee has the same right and power to sell the patented article upon conditions or with restrictions that he has to sell it at all").  And once a patentee transfers less than all of its rights, downstream purchasers cannot possibly acquire more than their counter-party is authorized to convey.

---

[12] The general aversion to alienation restraints is "[u]sually associated with land, not chattels, [and] arose from restrictions removing real property from the stream of commerce for generations."  *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 888 (2007).

*Mitchell*, 83 U.S. (16 Wall.) at 550.  To borrow the classic hornbook metaphor, if the patentee sells one of three sticks to a licensee or distributor, that party has only one stick to resell; it cannot transform one stick into three.

### 3.  Some conditions are invalid and unenforceable expansions of patent rights.

Although patentees can sell fewer than all of the sticks in the patent bundle, patent law does not allow them to increase the number of sticks by attaching improper conditions to patented articles.  Conditions that expand, rather than limit, patent rights cannot be enforced through infringement actions.

Most cases concerning patentee efforts to enlarge patent rights involve antitrust issues like tying or price fixing.  Before 35 U.S.C. § 271(d)(5) allowed certain tying arrangements in licenses and sales, the Supreme Court did not generally permit patentees to condition use of a patented item upon use of unpatented items, because that would, "in effect, extend the scope of its patent monopoly."  *Motion Picture Patents Co. v. Universal Film Mfg. Co.*, 243 U.S. 502, 516 (1917).  Price-restriction cases proceed along the same lines, because patent law's exclusivity rights do not include a right to fix prices for all time.  *See, e.g.*, *Bos. Store of Chi. v. Am. Graphophone Co.*, 246 U.S. 8, 23-24 (1918); *Straus v. Victor Talking Mach. Co.*, 243 U.S. 490 (1917); *Bauer & Cie v. O'Donnell*, 229 U.S. 1 (1913).

*United States v. Univis*, 316 U.S. 241, a favorite of Impression's *amici*, belongs to the same crowd.  It was a Sherman Act case brought by the Government

43

to enjoin a licensing program through which Univis sought to set resale prices for eyeglass lenses.  The Court held that Univis's patents did not inoculate the attempted price-fixing scheme.  As the critical part of the analysis explains, "[n]o one would doubt that if the patentee's licensee had sold the blanks to a wholesaler or finishing retailer, *without more*, the purchaser would not infringe by grinding and selling them," because the "[s]ale of a lens blank by the patentee or by his licensee is … in itself both a complete transfer of ownership of the blank … and a license to practice the final stage of the patent procedure."  *Id.* at 249, 251 (emphasis added).  But in the transactions at issue, notwithstanding the "license to practice" the invention, there *was* "more" in the form of an "added stipulation … fixing resale prices."  *Id.*  And because such a stipulation "derives no support from the patent," Univis could not use its patents to shield the unlawful sales.  *Id.* at 251.

These cases decided nothing about patentees (like Lexmark who transfer fewer, and do not attempt to exercise more, than all their existing rights.  In fact, these cases ultimately rest on the same proposition that undergirds *Mitchell*, its progeny, and this case:  just as a limited licensee cannot exercise or convey more rights than it has, neither can a patentee.

### B.    *Mallinckrodt* and This Case Fit Comfortably Within the Framework Reaffirmed in *Quanta*.

#### 1.    *Mallinckrodt* remains good law.

*Mallinckrodt* involved an expressly conditional sale that withheld rather than expanded patent rights.  The plaintiff patented, manufactured, and sold a medical

device.  976 F.2d at 702.  Each device carried the label "Single Use Only," and if that label created a license agreement (a question the Court remanded to the district court), the license obliged hospitals to dispose of the device after one use.  When some hospitals instead transferred the devices to a company that "reconditioned" them for reuse, the patentee sued the remanufacturer.  *Id.*  This Court, carefully considering the long line of precedent discussed above (*supra* § II.A), recognized that the "clear[ly]" "legal" practice of limiting patent licenses was not ineffective just because the unconditional domestic sale of a patented product exhausts U.S. patent rights.  *Id.* at 704-05.  A single-use license served, in effect, as a lease that lasted until the medical device had been used once.  By recognizing that conditional sales may incorporate enforceable use restrictions, this Court affirmed the rights of patentees and licensees to bargain over the scope of a patented item's use.

This Court acknowledged that *General Talking Pictures* and other precedent involved a first sale by a licensee rather than the patentee, but "discern[ed] no reason" why the outcome should turn on that "formalistic distinction[]."  *Id.* at 705.  That makes perfect sense, and aligns with the Supreme Court's own explanation that, in patent exhaustion cases, it "has quite consistently refused to allow the form into which the parties chose to cast the transaction to govern."  *United States v. Masonite Corp.*, 316 U.S. at 278.  The form of the transfer may differ between *General Talking Pictures* and *Mallinckrodt*, but its substance does not:  in both, the

45

patentee validly withheld some of its rights in the patented articles being sold. *Infra* § II.D.1.

Quanta did not overrule or even shake this precedent, and it provides no reason to jettison the settled rule that *Mallinckrodt* applied. Indeed, Impression and many of its *amici* primarily assert that "*Mallinckrodt* was wrongly decided in the first instance," rather than arguing that *Quanta* undermined *Mallinckrodt*. Impression Br. 17-22. For its part, the Government does not hide its belief that "*Mallinckrodt* was wrong when it was decided" and declares only that *Quanta* "confirms" this view. U.S. Br. 9-13; *see also* U.S. Br. 31, *Bowman*, 2013 WL 137188 ("In deciding *Quanta*, the Court did not explicitly overrule the Federal Circuit's 'conditional sale' doctrine or even cite *Mallinckrodt*.").

What *Quanta* actually "confirms," however, is that a licensee cannot "'convey … what both [parties] kn[o]w it [i]s not authorized to sell,'" and that a "'single, unconditional sale'" exhausts a patentee's rights. 553 U.S. at 626, 636; *see also supra* § II.A.1. Those unremarkable propositions do not require torpedoing longstanding precedent about conditional sales, enforceable use restrictions, and limited licenses. In *Quanta* and again in *Bowman*, the Supreme Court ignored a number of requests to write *Mallinckrodt*'s obituary. This Court should too.

### 2.    Lexmark's Return Program does not exhaust its patent rights.

Because *Quanta* left *Mallinckrodt* alone, Impression and its *amici* are effectively forced to try to squeeze this case into the first half of the question presented—namely, whether the particular sales at issue here give rise to patent exhaustion.  They do not.

Conditional sales subject to the Return Program incorporate a valid restriction on both sale and use and, accordingly, do not exhaust Lexmark's patent rights.  *Supra* § II.A.  It is undisputed—indeed, stipulated—that Lexmark's resellers and end-user customers agreed to an express and enforceable contract incorporating the terms of the Return Program, under which customers accepted a license to use the cartridge only once in exchange for a lower up-front price.  (*See* A2559(¶8); A2562-64(¶¶15-23).)  Either counterparty could buy a Regular Cartridge instead, with no license restrictions, at full price.  (*See* A2559 (¶8).)  The parties' stipulation reflects the posture in which the case arrives at this Court, and it should be the posture in which the case leaves:  because binding licenses limit the use of Return Program Cartridges, Lexmark has not conveyed an unlimited right to use the cartridges.[13]

---

[13] Nor does the fact that Lexmark transfers its cartridges in sale transactions preclude including as a term of such transactions a license limiting the purchaser's rights.  As the Supreme Court has recognized, sales and licenses are not necessarily mutually exclusive.  *See, e.g.*, *Mitchell*, 83 U.S (16.Wall.) 544; *Bowman*, 133 S.Ct. at 1764; *id.* at 1767 n.3 ("We do not here confront a case in which Monsanto (or an

The affirmative defense of patent exhaustion does not, therefore, remove Impression's conduct from the reach of section 271(a).  Exhaustion protects parties who acquire patented products *with* unconditional authority, removing them from the category of infringers who proceed "without authority."  35 U.S.C. § 271(a).  Impression, however, uses patented products "without authority" from Lexmark and is thus liable for patent infringement.

Impression's contrary position rests entirely on its assertion that the first sale of a cartridge is "unrestricted" and thus exhausts Lexmark's rights.  Impression Br. 21-22.  But that is flatly contrary to the record.  Surely, the sales to end-users who opt for the Return Program are restricted.  (A2562(¶15.))  As for sales to resellers, the parties both agree—and asked the district court to correct its mistaken contrary understanding—that Lexmark's sales to resellers are also restricted.  (A14, A34-35.)  Because the district court's judgment is unsupported on the law (*supra* § II.A), and the facts (§ II.B), it should be reversed.

### C.     Principles of *Stare Decisis* and Sound Policy Confirm That *Mallinckrodt* Is and Should Remain Good Law.

Returning to the broader question, there are many good reasons not to overrule *Mallinckrodt*, beginning with *stare decisis*.  Approaching this case as if the question presented reset the clock to 1992, Impression and its *amici* skip right around the imposing hurdle they face.  Impression does not and cannot offer

---

affiliated seed company) sold Roundup Ready to a farmer without an express license agreement.").

anything close to a "superspecial" justification for abandoning *Mallinckrodt*. *Kimble*, 135 S.Ct. at 2409-10.

Not only that, but patent exhaustion's perimeter has resisted erosion for some time now. The Government has been trying for decades. At least as early as the 1930s, it told the Supreme Court that exhaustion should not be "avoided either by license or by the terms of sale, so as to permit the patentee to control the use of the patented article." U.S. Br. 32, *Gen. Talking Pictures*, 1938 WL 39344. Having lost there, the Justice Department recommended to Congress that "[r]estrictions in respect of price, production, use, or geographical areas … be unconditionally outlawed." 4 *Verbatim Record of the Proceedings of the Temporary National Economic Committee* 641-42 (July 17, 1939). Then came a series of requests that the Supreme Court reexamine prior cases. *See, e.g.*, U.S. Br. 70 & n.32, *Ethyl Gasoline Corp. v. United States*, 1939 WL 48829 (citing *General Talking Pictures*'s dissent to argue "a need exists to curtail the rights of a patentee to insert in license agreements restrictive provisions which run against the world"); U.S. Br. 33-40, *Automatic Radio Mfg. Co. v. Hazeltine Research*, 1950 WL 78703 ("The Rule of the General Talking Pictures Case Should Be Reexamined"); U.S. Br. 20-24, *Quanta*, 2007 WL 3353102 (arguing *Mallinckrodt* was wrong); U.S. Br. 30-33, *Bowman*, 2013 WL 137188 (same). In none of these instances did the Court or Congress take the bait. This Court should not either. *See Kimble*, 135 S.Ct. at 2409-10; *Helferich*, 778 F.3d at 1305-06.

49

*Stare decisis* considerations also reinforce other reasons why the Court should not disturb *Mallinckrodt*. For starters, even "a reasonable possibility that parties have structured their business transactions in light of" the decision supports its continued vitality, *Kimble*, 135 S.Ct. at 2410, because "an expansion of exhaustion doctrine could do harm to existing patterns of licensing," *Helferich*, 778 F.3d at 1307. That is surely the case here. *Amici* explain, for example, how companies rely on and implement the flexibility that limited licensing and sales practices allow. *See, e.g.*, Licensing Exec. Soc'y Br. 10-18; AIPLA Br. 26-30. Impression's one-size-fits-all approach would erase these options.

More than that, conditional sales and limited licenses facilitate consumer choice because they allow customers like Lexmark's to buy (and pay for) whatever product (here, single- or unlimited-use cartridges) best suits their needs. And price differentials reflect what the patentee conveys: for a "conditional sale or license, … it is more reasonable to infer that a negotiated price reflects only the value of the 'use' rights conferred by the patentee." *Princo*, 616 F.3d at 1328; *see also* W. Landes & R. Posner, *The Economic Structure of Intellectual Property Law*, 381-82 (2003) (limited-use license simply means patentee "will not be able to charge as high a license fee because the product will have a shortened useful life; so there is no economically meaningful sense in which the prohibition 'extends' the patent"). And, although "[t]he patent laws—unlike the [antitrust laws]—do not aim to maximize competition," *Kimble,* 135 S.Ct. at 2413, the Government's own

antitrust guidelines (ironically) acknowledge that such limited transactions are pro-competitive because they "allow[] the licensor to exploit its property as efficiently and effectively as possible."  DOJ & FTC, *Antitrust Guidelines for the Licensing of Intellectual Property* § 2.3 (1995).

Use restrictions may not make sense on occasion, but this is not one of them. Vertically integrating manufacturing and sales works for Lexmark's business, as does a multi-tiered licensing and pricing system that accounts for divergent customer needs.  Patent law is and should be flexible enough to allow Lexmark and other patentees to efficiently operate their businesses.

### D.    A *Per Se* Exhaustion Rule Has No Valid Justification in Patent Law or Policy.

In hope of securing authorization for Impression's expressly unauthorized infringement-based business model, Impression and its *amici* try to reshape the exhaustion doctrine into a rule that is both unsupported and unnecessary.  None of their arguments holds up.

### 1.    The supposed legal justifications for overruling *Mallinckrodt* all amount to meaningless line-drawing.

Impression and its *amici* advance a theory that begins with the proposition that "the initial authorized sale of a patented item terminates all patent rights to that item."  *Quanta*, 553 U.S. at 625.  But to get from there to a rule that draws a line in the sand between cases like *General Talking Pictures* (indisputably OK) and *Mallinckrodt* (allegedly not OK), they fabricate supposed distinctions between the

51

selling patentee and the licensing patentee and between the right to use and the right to make or sell. Close scrutiny exposes this artifice for what it is.

To begin with, underlying certain of Impression's arguments—including the apparent belief that the "stream of commerce" automatically swallows up all patent rights associated with patented articles (*e.g.*, Impression Br. 22)—is the notion that a patentee's ability to convey "use" rights is somehow materially different than the ability to transfer rights to "sell" or "make." That is wrong: "[t]he statutory authority to grant the exclusive right to 'use' a patented machine is not greater, indeed it is precisely the same, as the authority to grant the exclusive right to 'vend.'" *Motion Picture Patents*, 243 U.S. at 516. Surely that is why conditions "for the right to manufacture *or* use *or* sell [patented] article[s]" will generally be upheld, *Bement*, 186 U.S. at 91 (emphases added), why "[t]he right to manufacture, the right to sell, and the right to use … may be granted or conferred separately by the patentee," *Adams*, 84 U.S. (17 Wall.) at 456, and why articles in the stream of commerce can carry enforceable restrictions on use, *e.g.*, *Gen. Talking Pictures*, 304 U.S. 175.

With no support in the statute, the argument against *Mallinckrodt* gropes for a distinction between sales and licenses. The Government, straining to explain *General Talking Pictures*, contends that "[i]n contrast to its consistent refusal to permit patentees to control a domestic purchaser's use of patented articles, the Supreme Court has permitted patentees to place restrictions on the conduct of

52

licensees." U.S. Br. 7.  That is so, the Government maintains, "[b]ecause licensees stand in patentees' shoes" and thus can be directed by the patentee to specify what is and is not an "authorized" sale.  *Id.* at 8; *see also* Ass'n of Med. Device Reprocessors Br. 13.  But the Government never explains why the patentee who specifies what is and is not an authorized "use" cannot direct purchasers in the same way.  Nor does it explain why it makes sense to assume, as the argument necessarily does, that *every* sale by a patentee is "authorized" to convey *all* patent rights in a product, while "authorized" sales by licensees may convey only a subset of those rights.

Such a bizarre regime—in which every patentee who wishes to transfer limited rights would be forced to abandon manufacturing or to set up a separate entity with a limited license to make and sell the product—is unsupportable. Impression and its *amici* pluck superficially juicy quotations from Supreme Court decisions.  Context, however, is everything.  Whatever the cited cases say as a *descriptive* matter, none holds that a "sale" necessarily precludes patentees from conveying only limited patent rights and thus prohibits consolidating into one transaction what *General Talking Pictures* says patentees can achieve in two.  *See, e.g.*, *supra* § II.A (discussing cases); *Adams*, 84 U.S.  (17 Wall.) at 456 (rejecting infringement claim against purchaser because patentee's transfer of rights restricted the assignee but not a subsequent purchaser; it was not "within the reason of the contract to say that [the article] could only be used within the [limited

territory]"); *Keeler*, 157 U.S. 659 (same); *United States v. Gen. Elec. Co.*, 272 U.S. 476, 489 (1926) (citing *Bloomer*, *Adams*, *Mitchell*, and *Keeler*). These authorities do not support a rigid rule of law that prevents patentees from conveying a limited set of patent rights in patented articles, unless they act through limited licensees rather than directly.[14]

Trying one last tack, Impression and some *amici* argue that so-called "post-sale" restrictions are *per se* unenforceable, but "pre-sale" conditions might not be. *See, e.g.*, U.S. Br. 6, 11; Remfg. Ass'n Br. 14; Google Br. 32 n.12. This is just word games. Requiring as a condition of sale that a product be used once is no more a "post-sale" restriction than, for example, a requirement not to use a product after a certain date, *e.g.*, *Mitchell*, 83 U.S. (16 Wall.) 544, or not to use a product commercially, *e.g.*, *Gen. Talking Pictures*, 304 U.S. 175. In each instance, the possibility that the user would run afoul of the restriction and thus infringe depends in some way on whether particular "post-sale" events materialize. But that plainly does not make the restrictions unenforceable. Limitations like these are inherent in the terms of the transfer such that violating them means using the patented article "without authority" and thus infringing. 35 U.S.C. § 271(a).

---

[14] Some *amici* suggest that "title" to the patented article necessarily carries with it unrestricted use rights. *E.g.*, U.S. Br. 6; Ass'n of Med. Device Reprocessors Br. 8; Remfg. Ass'n Br. 26. But a purchaser who buys from a limited licensee unquestionably has title to the product, but plainly does not have unrestricted rights. *E.g., Gen. Talking Pictures*, 304 U.S. 175; *id.* at 186 (Black, J., dissenting) (infringing purchaser had title to amplifiers).

In the end, far better than empty formalism is the rule *Quanta* embraces: patent exhaustion depends upon the specific transactions at issue. 553 U.S. at 636-37. If a patentee conveyed all the rights it has to the acquirer of a patented article, the patentee has exhausted its rights in that article and cannot pursue infringement claims based on it. But that does not mean that a patentee who, like Lexmark, does not convey all of its rights must be treated as if it had.

### 2. The remaining arguments against *Mallinckrodt* are imagined and unpersuasive.

Impression and its *amici* also offer unfounded policy contentions seeking to undermine *Mallinckrodt*. First, they argue that contract law is Lexmark's only hope. *See, e.g.*, Impression Br. 17 (calling this the "fundamental problem" with *Mallinckrodt*). The short answer is that this is not an argument in favor of a rule; it is an assertion aimed at easing fears about adopting a rule. And it is, in any event, meritless. Causes of action often overlap, and there is no reason the (limited) availability of one (breach-of-contract) should have anything to do with the availability of another (patent infringement). Nor can the contention be squared with cases like *General Talking Pictures* and *Mitchell*, in which license violations resulted in patent-law remedies. *Supra* § II.A.

Second, *amici* invoke the overworked refrain that exhaustion precludes patentees from extracting double recoveries. "But that principle has never served as an independent test for determining whether exhaustion applies." *Helferich*, 778 F.3d at 1308. Nor does it help Impression, because breaking up patent rights and

the accompanying reward does not mean that a patentee has recovered twice for the same thing. *Supra* pp. 13-16. On the contrary, "a negotiated price reflects only the value of the 'use' rights conferred by the patentee." *Princo*, 616 F.3d at 1328. Lexmark's Return Program Cartridges—like leased items—are priced lower than unlimited-use cartridges because the buyer acquires limited rights. That pricing structure does not produce double recoveries any more than an auto maker extracts double recoveries for a car patent through a series of leases.

Third, some *amici* express concern—through implausible hypotheticals—about subjecting unwitting consumers to infringement liability. *See, e.g.*, Computer & Commc'ns Indus. Ass'n Br. 4. But the Supreme Court long ago declared that the rule precluding sellers from conveying more rights than they possess means that "[n]otice to the purchaser in such a case is not required." *Mitchell*, 83 U.S. (16 Wall.) at 550. Because patent infringement is a strict-liability offense, the concern, to the extent it exists, arises whenever infringing products are sold in commerce, whether they are new copies or unauthorized remanufactures.

In any event, whatever pull concerns about such strict liability may have in the abstract, they have none here. Impression knows exactly what it is doing when it acquires Lexmark cartridges, ignores the enforceable license, and installs hacked microchips so that it can sell the cartridges contrary to the license restrictions. Impression is the polar opposite of an unwitting consumer.

Remaining objections are equally flimsy.  Contentions that, for example, a win for Lexmark would "chill" commerce, *e.g.*, Ass'n of Med. Device Reprocessors Br. 23, ignore that *Mallinckrodt* has been the law for over 20 years. Commerce has not ground to a halt, and there is no reason for this Court—as opposed to Congress—to rewrite the law on the speculative presumption that such dire consequences take at least a quarter-century to materialize.  *Mallinckrodt* was and remains correct.

## CONCLUSION

The Court should affirm the judgment of infringement with respect to cartridges first sold abroad, reverse the judgment of non-infringement with respect to Return Program Cartridges sold in the United States, and remand for entry of judgment in favor of Lexmark.

Dated:  August 12, 2015

Respectfully submitted,

/s/ Constantine L. Trela, Jr.

TIMOTHY C. MEECE
V. BRYAN MEDLOCK
JASON S. SHULL
AUDRA C. EIDEM HEINZE
BANNER & WITCOFF, LTD.
Ten South Wacker Drive
Chicago, IL 60606
Telephone: (312) 463-5000
tmeece@bannerwitcoff.com

CONSTANTINE L. TRELA, JR.
ROBERT N. HOCHMAN
SIDLEY AUSTIN LLP
One South Dearborn St.
Chicago, IL 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036
ctrela@sidley.com

STEVEN B. LOY
STOLL KEENON OGDEN PLCC
300 W. Vine Street, Suite 2100
Lexington, KY 40507
Telephone: (859) 231-3000

BENJAMIN BEATON
JOSHUA J. FOUGERE
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
Telephone: (202) 736-8000
Facsimile: (202) 736-8711

*Counsel for Lexmark International, Inc.*

58

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of August, 2015, I caused the foregoing *En Banc* Brief For Plaintiff-Cross Appellant to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit through the Court's CM/ECF system.

/s/ Constantine L. Trela, Jr.
CONSTANTINE L. TRELA, JR.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) and the Rules of this Court, because it contains 13,847 words as determined by the Microsoft 2007 word-processing system used to prepare the brief, excluding the parties of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using the Microsoft Word 2007 word-processing system in 14-point Times New Roman font.

/s/ Constantine L. Trela, Jr.
CONSTANTINE L. TRELA, JR.