**2014-1617, -1619**

In The

# United States Court of Appeals

### For The Federal Circuit

## LEXMARK INTERNATIONAL, INC.,

*Plaintiff – Cross-Appellant*,

**v.**

## IMPRESSION PRODUCTS, INC.,

*Defendant – Appellant,*

## QUALITY CARTRIDGES, INC., JOHN DOES, 1-20, BLUE TRADING LLC, EXPRINT INTERNATIONAL, INC., LD PRODUCTS, INC., PRINTRONIC CORPORATION, TESEN DEVELOPMENT (HONG KONG) CO. LTD., BENIGNO ADEVA AND HIS COMPANIES,

*Defendants.*

## APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO IN CASE NO. 1:10-CV-00564-MRB, JUDGE MICHAEL R. BARRETT.

––––––––––––

## BRIEF OF *AMICUS CURIAE* IMAGING SUPPLIES COALITION IN SUPPORT OF PLAINTIFF/CROSS-APPELLANT

––––––––––––

**Mark Schonfeld**
**Sara Beccia**
**BURNS & LEVINSON LLP**
**125 Summer Street**
**Boston, Massachusetts 02110**
**(617) 345-3000 (Telephone)**
**(617) 345-3299 (Facsimile)**
**mschonfeld@burnslev.com**
**sbeccia@burnslev.com**

*Counsel for Amicus Curiae*

# <u>CERTIFICATE OF INTEREST</u>

Counsel for the amicus curiae Imaging Supplies Coalition certifies the following:

1.     The full name of every party or amicus represented by me is: Imaging Supplies Coalition.

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is: Imaging Supplies Coalition.

3.     All of the parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:  None.

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expect to appear in this court are:  Mark Schonfeld and Sara Beccia of Burns & Levinson LLP.

<u>/s/ Mark Schonfeld               </u>
Mark Schonfeld
Sara Beccia
BURNS & LEVINSON LLP
125 Summer Street
Boston, MA 02110
Telephone: 617-345-3000
Facsimile: 617-345-3299

*Counsel for Imaging Supplies Coalition*

# **TABLE OF CONTENTS**

**Page**

CERTIFICATE OF INTEREST ............................................................ i

TABLE OF CONTENTS ..................................................................... ii

TABLE OF AUTHORITIES ............................................................... iv

STATEMENT OF INTEREST OF *AMICUS CURIAE* ...........................1

SUMMARY OF ARGUMENT ............................................................3

ARGUMENT .....................................................................................5

    I.     This Court Should Not Overrule *Jazz Photo* Because Sales
          Made Outside the U.S. Do Not Exhaust Patent Rights .........................5

         A.     *Kirtsaeng* Rested Solely on Statutory Interpretation of the
              Copyright Act and It Does Not Apply to the Doctrine of
              Patent Exhaustion .....................................................................5

         B.     The Supreme Court Has Declined Several Opportunities
              to Overrule *Jazz Photo* and Did Not Do So *Sub Silentio*
              In *Kirtsaeng* ............................................................................7

         C.     Patents and Copyrights are Different and Should be
              Treated Differently With Respect to Exhaustion of Rights ........9

         D.     Important Policy Considerations Favor the Long-
              Standing Rule That Sales Abroad Do Not Give Rise to
              Patent Exhaustion ...................................................................11

              1.     The Territorial Rule of Exhaustion Properly
                    Incentivizes Innovation in the U.S. and Supports
                    Economic Development ..................................................12

2.  Upholding *Jazz Photo* Allows for Beneficial Global Price Differentiation and Market Segmentation ................................................. 13

3.  A Rule of Territorial Exhaustion Allows Patentees to Meet the Needs of Underdeveloped Markets ............. 15

4.  A Rule of Territorial Exhaustion Aids in Combating Unauthorized Gray Markets and Counterfeiting ................................................. 18

II.  This Court Should Not Overrule *Mallinckrodt* as it is Consistent with Established Law and Matters of Public Policy .......................... 23

A.  *Mallinckrodt* Was Correctly Decided ...................................... 23

B.  *Quanta* Did Not Overrule *Mallinckrodt* ................................... 25

C.  The Health, Safety and Quality Issues in *Mallinckrodt* Support Upholding its Rulings ................................................. 26

D.  The Important Policy Considerations of Research and Development Investment and Efficient Economic Development Are Fostered by Upholding *Mallinckrodt* .......... 27

CONCLUSION ........................................................................................ 30

CERTIFICATE OF FILING AND SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*American Cotton-Tie Co. v. Simmons*,
    106 U.S. 89 (1882)..................................................................23

*B. Braun Med., Inc. v. Abbot Labs.*,
    124 F.3d 1419 (Fed. Cir. 1997) ...........................................27, 28

*Benun v. Fujifilm Corp.*,
    562 U.S. 1109 (2010) (*cert. denied*)...................................8

*Bobbs-Merrill Co. v. Straus*,
    210 U.S. 339 (1908)..................................................................9

*Boesch v. Graff*,
    133 U.S. 697 (1890)..................................................................6

*Brown v. Duchesne*,
    60 U.S. 183 (1856)..................................................................7

*General Talking Pictures Corp. v. Western Electric Co.*,
    304 U.S. 175 (1937)..................................................23, 24, 25, 26

*Jazz Photo Corp. v. ITC*,
    264 F.3d 1094 (Fed. Cir. 2001) ...........................................*passim*

*Jazz Photo Corp. v. ITC*,
    536 U.S. 950 (2002) (*cert. denied*)...................................8

*Kewanee Oil Co. v. Bicron Corp.*,
    416 U.S. 470 (1974)..................................................10, 12, 13

*Kimble v. Marvel*,
    135 S. Ct. 2401 (2015)..................................................................9

iv

*Kirtsaeng v. John Wiley & Sons, Inc.*,
    133 S. Ct. 1351 (2013).................................................................*passim*

*Lifescan Scotland, Ltd. v. Shasta Techs., LLC*,
    734 F.3d 1361 (Fed. Cir. 2013) .....................................................9

*Mallinckrodt, Inc. v. Medipart, Inc.*,
    976 F.2d 700 (Fed. Cir. 1992) .................................................*passim*

*Microsoft Corp. v. AT&T Corp.*,
    550 U.S. 437 (2007)....................................................................14

*Mitchell v. Hawley*,
    83 U.S. 544 (1872)......................................................................23

*Ninestar Tech. Co. v. ITC*,
    133 S. Ct. 1656 (2013) (*cert. denied*)..........................................8

*Quanta Computer v. LG Electronics, Inc.*,
    533 U.S. 617 (2008).................................................................*passim*

*Shalala v. Ill. Council on Long Term Care Inc.*,
    529 U.S. 1 (2000)..........................................................................8

*Zino Davidoff S.A. v. CVS Corp.*,
    571 F.3d 238 (2d Cir. 2009) .......................................................22

## **STATUTES**

17 U.S.C. § 102 .............................................................................10

17 U.S.C. § 302 .............................................................................10

35 U.S.C. §§ 101-103......................................................................10

35 U.S.C. §§ 131-135......................................................................10

35 U.S.C. § 154 .............................................................................10

35 U.S.C. § 271 ...............................................................................7

## OTHER AUTHORITIES

Jeffery Atik & Hans Henrik Lidgard, *Embracing Price Discrimination: TRIPS and the Suppression of Parallel Trade in Pharmaceuticals*, 27 U. Pa. J. Int'l Econ. L. 1043, 1058 (2006)..............................................14, 16, 17

Erin Julia Daida Austin, *Reconciling the Patent Exhaustion and Conditional Sale Doctrines in Light of Quanta Computer v. LG Electronics*, 30 Cardozo L. Rev. 2947 (2009) .............................................................................25-26, 29-30

Eucomed Medical Technology, *Eucomed White Paper on the reuse of single use devices*, 6-16 (2009), available at www.eucomed.org/uploads/Modules/ Publications/Eucomed %20White%20Paperon%20the%20Reuse%20of% 20Single%20Use%20Devices.pdf .........................................................................27

Alvin G. Galstain, *Protecting Against the Gray Market in the New Economy*, 22 Loy. L.A. Int'l & Comp. L. 507 (2000)........................15, 19, 20

Robert W. Gomulkiewicz, *The Federal Circuit's Licensing Law Jurisprudence: Its Nature and Influence*, 84 Wash. L. Rev. 199 (2009) ..........24, 26

Shubha Ghosh, *Pills, Patents, and Power; State Creation of Gray Markets As a Limited on Patent Rights*, 14 Fla. J. Int'l L. 217 (2002)............................12, 19

Addie T. Katz, *The Merging of Black and Gray: International Copyright Infringement in the Post-Kirtsaeng Era*, 43 Hofstra Law Review .........................22

KPMG LLP, *Effective Channel Management is Critical in Combating the Gray Market and Increasing Technology Companies' Bottom Line; KPMG Gray Market Study Update*, 3 (2008) ("*Gray Market Study*"), available at www.agmaglobal.org/cms/uploads/whitePapers/7-10-08KPMGWhitePaper GrayMarketStudy.pdf ....................................................................................20, 21

Hillary A. Kremen, *Caveat Venditor: International Application of the First Sale Doctrine*, 23 Syracuse J. Int'l L. & Com. 161 (1997) ............................16

Paul Lansing & Joseph Gabriella, *Clarifying Gray Market Gray Areas*, 31 Am. Bus. L.J. 313 (1993)...................................................................................15

John W. Osborne, *Justice Breyer's Bicycle and the Ignored Elephant of Patent Exhaustion: An Avoidable Collision in Quanta v. LGE*, 7 J. Marshall. Rev. Intell. Prop. L. 245 (2008)............................................24, 25, 29

David R. Sugden, *Gray Markets: Prevention Detection and Litigation*, Oxford University Press (2009).......................................................................*passim*

Jared Tong, *You Pay for What You Get: The Argument for Allowing Parties to Contract Around Patent Exhaustion*, 46 Hous. L. Rev. 1711 (2010) .................29

Michele L. Vockrodt, *Patent Exhaustion and Foreign First Sales: An Analysis and Application of the* Jazz Photo *Decision*, 33 AIPLA Q.J. 189 (2005) ....................................................................................................14, 17

U.S. Dep't of Justice & Fed. Trade Comm'n, *Antitrust Guidelines for the Licensing of Intellectual Property* (1995)................................................................28

U.S. Dep't of Justice & Fed. Trade Comm'n, *To Promote Innovation: The Proper Balance of Competition and Patent Law and Policy* (2003)................28

United Nations Office on Drug & Crime Report on Counterfeit Products (2010), available at https://www.unodc.org/documents/data-and-analysis/tocta/8.Counterfeit_products.pdf ..................................................................... 21-22

## STATEMENT OF INTEREST OF *AMICUS CURIAE*

Imaging Supplies Coalition submits this brief[1] in support of Lexmark International, Inc. to urge the Court to uphold its precedent regarding important issues related to patent exhaustion. This Court's current precedent strikes the proper balance between protecting the rights of patentees and limiting those rights through the exhaustion doctrine.

Imaging Supplies Coalition ("ISC") is a nonprofit organization dedicated to protecting the interests of consumers and original equipment manufacturers ("OEMs") of consumable imaging supplies and equipment. The members of the ISC are: Brother International Corporation, Canon, U.S.A., Inc., Epson America Inc., Hewlett-Packard Company, Lexmark International, Inc., Samsung Electronics America, Inc., Toshiba America Business Solutions Inc. and Xerox Corporation.

Founded in 1994, ISC's mission is to protect its members' customers from misrepresented products and services by seeking the worldwide protection of intellectual property and related assets of stakeholders in the imaging supplies industry. ISC dedicates substantial effort and resources to educate, empower and protect distributors, suppliers and consumers in the battle to eliminate illegal

---

[1]    No counsel for a party authored this brief in whole or in part. No party or party's counsel contributed money intended to fund preparing or submitting the brief. Some members of the ISC (but not including Lexmark International, Inc.) made a monetary contribution intended to fund preparation or submission of this brief. No person -- other than *amicus curiae*, some of its members, or its counsel -- made a monetary contribution to its preparation or submission.

activities in the imaging supplies industry. It accomplishes this mission by training and education, collaboration with law enforcement, public relations activity and supporting the efforts of OEMs and other rights holders to enhance and protect intellectual property rights. In its 19-year history, the ISC has accomplished a great deal in combating infringement and fraud. Its efforts have established ISC as an international force in the imaging supplies industry as well as a leading organization in intellectual property rights protection.

ISC members invest substantial resources and effort in researching and developing new technology for the imaging supplies industry and protecting this new technology through intellectual property rights. To protect these investments, ISC and its members must also spend significant resources fighting infringement. Because consumable imaging supplies and equipment are a repeat market with a ready supply of empty consumed units, infringers and arbitragers have relatively easy access to use patented goods to create an illegal aftermarket in imaging supplies. Consequently, OEMs in the imaging supplies industry must wage a constant battle against unauthorized and infringing activity to protect their valuable intellectual property rights, to maintain the goodwill associated with their brands, and to protect their consumers from inferior products that trade off the OEMs' well-earned reputations.

Maintaining strong intellectual property rights and supporting enforcement activities of rights owners are crucial to the ISC's mission. OEMs rely upon their patent rights in making many important business decisions, including decisions related to: investments in research and development for new technology; global product availability and pricing; the structure of licensing agreements, including worldwide royalty payments; intellectual property ownership and portfolio management plans; and patent protection and enforcement, including anti-counterfeiting and gray market prevention. Accordingly, stable and uniform precedent regarding patent rights is important to the ISC, to its members and to the U.S. economy. For these reasons, the ISC submits this brief as *amicus curiae* urging this Court to uphold its precedent on important issues defining the doctrine of patent exhaustion.

## SUMMARY OF ARGUMENT

This Court's existing precedent holds that: (1) patent exhaustion does not arise from authorized sales made overseas (*Jazz Photo Corp. v. ITC*, 264 F.3d 1094 (Fed. Cir. 2001)) and (2) patent rights are not exhausted by sales made under a valid restricted-use license (*Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700 (Fed. Cir. 1992)). The Court should not overrule *Jazz Photo* in light of *Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S. Ct. 1351 (2013), or *Mallinckrodt* in light of *Quanta Computer v. LG Electronics, Inc.*, 533 U.S. 617 (2008). Doing so would

3

impermissibly expand the scope of the *Kirtsaeng* and *Quanta* decisions and would upset long-standing and stable precedent with respect to the patent exhaustion doctrine. This precedent has been relied upon by rights owners in:

    (i)    developing and investing in innovative new products;

    (ii)    supporting the availability of products in less-developed countries through price differentiation and market segmentation;

    (iii)    designing and executing programs against infringement and gray market exploitation; and

    (iv)    structuring and relying upon valid patent license use-restrictions that incentivize innovation, reward research and development, and foster public policies such as public health, safety and quality control.

Neither law nor policy supports overturning the reasoning and rulings set forth in *Jazz Photo* or *Mallinckrodt*. ISC supports Lexmark's position that (1) *Jazz Photo* remains good law despite the Supreme Court's ruling in *Kirtsaeng*, and sales made outside the United States do not give rise to patent exhaustion, and (2) *Mallinckrodt* should not be overruled in light of *Quanta*, and sales made under a lawful and valid use-restriction do not exhaust patent rights.

# ARGUMENT

## I.    This Court Should Not Overrule *Jazz Photo* Because Sales Made Outside the U.S. Do Not Exhaust Patent Rights.

Impression and its *amici* argue that the Supreme Court's ruling in *Kirtsaeng* overrules the long-standing precedent of this Circuit with respect to foreign sales and patent exhaustion. This position is unsupported by law or by policy. The rule of international patent exhaustion advocated by Impression conflicts with existing precedent and the sound reasoning of the Supreme Court, this Court, and others who have considered this issue. Furthermore, important policy considerations warrant upholding the existing precedent of this Court, rather than upending long-standing and stable precedent.

### A.    *Kirtsaeng* Rested Solely on Statutory Interpretation of the Copyright Act and It Does Not Apply to the Doctrine of Patent Exhaustion.

*Kirtsaeng* is a copyright case. The analysis and holding in *Kirtsaeng* that construed five words from the Copyright Act -- "lawfully made under this title" -- as having a non-geographical interpretation simply do not apply to patent exhaustion. *See Kirtsaeng*, 133 S. Ct. at 1358. The Supreme Court examined the history and language of the Copyright Act and did "no more [in *Kirtsaeng*] than try to determine what decision Congress has made" with respect to the exhaustion of rights for works lawfully sold abroad. *Kirtsaeng*, 133 S. Ct. at 1371. Although

Congress may have purposefully delineated international exhaustion in the Copyright Act, it did not do so in the Patent Act.

Importantly, patent exhaustion rules are a product of judicially-made common law. *See Quanta*, 533 U.S. at 625 (discussing the longstanding doctrine of patent exhaustion and its roots in early 19th century cases). For over 150 years, a body of jurisprudence has developed to strike a balance between the limited monopoly granted by a patent and the doctrine of exhaustion by "limit[ing] the patent rights that survive the initial authorized sale of a patented item." *See Quanta*, 553 U.S. at 621. Part of this balance includes the rule of territorial exhaustion set forth in *Jazz Photo* that "United States patent rights are not exhausted by products of foreign provenance. To invoke the protection of the first sale doctrine, the authorized first sale must have occurred under the United States patent." *Jazz Photo*, 264 F.3d at 1105. This territorial exhaustion rule, which originated with the Supreme Court's ruling in *Boesch v. Graff* in 1890, has been relied upon for over a century by courts and by rights holders. *See Boesch v. Graff*, 133 U.S. 697, 701-03 (1890).

Accordingly, analyzing and applying the doctrine of patent exhaustion is <u>not</u> a matter of statutory interpretation as it is under the Copyright Act. There is no analogous language in the Patent Act that can be compared to the five words from

the Copyright Act that were crucial to the ruling in *Kirtsaeng*.[2]  Instead, a long line of binding precedent defines the doctrine of patent exhaustion and informs its application to the issues in *Jazz Photo* and before the Court today.  These patent cases are and should remain good law.

### B.     The Supreme Court Has Declined Several Opportunities to Overrule *Jazz Photo* and Did Not Do So *Sub Silentio* In *Kirtsaeng*.

This Court must decide whether it should take the extraordinary step of overruling its own long-standing patent precedent based upon the Supreme Court's decision in *Kirtsaeng*.  It should not.  Indeed, applying analysis from a copyright case that does not cite or address relevant precedent regarding patent law, does not reference or examine the language and history of the Patent Act, and does not consider the policy implications of applying copyright's international exhaustion rule to patent law, is certainly not what the Supreme Court intended with *Kirtsaeng*.  In *Kirtsaeng*, the Supreme Court addressed exhaustion <u>only</u> in the copyright context, not the patent context, and neither the majority nor the

---

[2]     In fact, if the Court were to examine the Patent Act in an exercise of statutory interpretation similar to that employed in *Kirtsaeng*, support for a territorial exhaustion rule would be found in the express provisions of the Patent Act.  Specifically, the Patent Act includes an express territorial limitation on acts of infringement and sets forth a separate basis for infringement based upon importation of patented articles from abroad.  35 U.S.C. § 271.  These provisions are consistent with the doctrine of territorial patent exhaustion.  Indeed, patent laws "do not, and were not intended to, operate beyond the limits of the United States" and the territorial exhaustion rule of *Jazz Photo* is consistent with that axiom. *Brown v. Duchesne*, 60 U.S. 183, 195 (1856).

dissenting opinion in *Kirtsaeng* ever mentioned patents. *See generally Kirtsaeng*, 133 S. Ct. 1351.

In fact, during the very same term that it considered and ruled in favor of international copyright exhaustion in *Kirtsaeng*, the Supreme Court declined to apply the same international exhaustion principles in patent cases by denying certiorari in *Ninestar Tech. Co. v. ITC*, 133 S. Ct. 1656 (2013) (*cert. denied*). The denial of certiorari in *Ninestar*, which issued within a week of the ruling in *Kirtsaeng*, indicates that the Supreme Court had no intention of upending the current patent exhaustion doctrine by overruling *Jazz Photo*. *See Kirtsaeng*, 133 S. Ct. 1351 (decided on March 19, 2013); *Ninestar*, 133 S. Ct. 1656 (denial of cert. issued on March 25, 2013). Moreover, the Supreme Court had the opportunity to overrule *Jazz Photo* on at least three separate occasions in the past fifteen years, but has declined to do so each time. *See Ninestar*, 133 S. Ct. 1656 (2013) (*cert. denied*); *Benun v. Fujifilm Corp.*, 562 U.S. 1109 (2010) (*cert. denied*); and *Jazz Photo Corp. v. ITC*, 536 U.S. 950 (2002) (*cert. denied*).

To now read *Kirtsaeng* as overruling *Jazz Photo sub silentio* would be inconsistent with the Supreme Court's customary practice. *See Shalala v. Ill. Council on Long Term Care Inc.*, 529 U.S. 1, 18 (2000) ("This Court does not normally overturn … earlier authority *sub silentio*."). Furthermore, the Supreme Court recently emphasized the importance of *stare decisis* to ensure certainty,

consistency, and stability in the administration of justice -- goals that would not be served by reading a ruling on patent exhaustion into *Kirtsaeng*.  *See Kimble v. Marvel*, 135 S. Ct. 2401, 2409 (2015).  Instead, this Court's long-standing precedent of *Jazz Photo* should be preserved and respected.  The Supreme Court's copyright ruling in *Kirtsaeng* does not and should not overrule *Jazz Photo*.

### C.    Patents and Copyrights are Different and Should be Treated Differently With Respect to Exhaustion of Rights.

The goals and functions of patent law and copyright law are distinct.  The Supreme Court recognized this distinction when it first examined the issue of exhaustion and first sale in the copyright context.  *Bobbs-Merrill Co. v. Straus*, 210 U.S. 339, 346 (1908) ("[t]here are such wide differences between the right of multiplying and vending copies of a production protected by the copyright statute and the rights secured to an inventor under the patent statutes").  In light of these differences, copyright cases are not and should not be controlling on substantive issues related to patent law.  *Id*. at 346; *Lifescan Scotland, Ltd. v. Shasta Techs., LLC*, 734 F.3d 1361, 1376 (Fed. Cir. 2013) (noting that copyright cases may reinforce conclusions of patent law, but are not controlling on such matters).

Because patent rights and copyrights are very different, so too are the policy reasons for either strengthening these rights or limiting them through doctrines like exhaustion.  Simply put, copyright protection is easy to get, lasts for a very long time, and requires no formal examination or notice to the public before it takes

effect.  Specifically, copyright applies automatically upon creation of a work, requires only minimal degrees of creativity and originality, and lasts for up to 70 years beyond the death of the author or 120 years from creation.  *See* 17 U.S.C. § 102 (subject matter); 17 U.S.C. § 302 (duration).

Patents are very different.  Patent protection is reserved for novel and useful inventions which must undergo stringent examination and review before patent rights are granted.  35 U.S.C. §§ 101-103 (patentable subject matter); 35 U.S.C. §§ 131-135 (examination).  As a result, patented articles necessarily require more research and investment in up-front development costs, as well as more time and money to obtain patent protection than copyrighted works.  *See Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 481 (1974).  Furthermore, the duration of patent rights (20 years) is much shorter than copyrights, which means that, as compared to authors of copyrighted works, patentees enjoy a relatively short period of exclusivity, especially considering the time and investment required to secure a patent.  *See* 35 U.S.C. § 154 (patent duration).  Finally, the types of creations protected under each regime are very different; copyright law traditionally protects artistic expressions, while patent law protects useful inventions.

These significant differences warrant very different treatment by the courts and the legislature with respect to the rights and limitations of patent and copyright protections.  The justifications for enhancing the protections granted to a life-

saving patented drug or a break-through technology simply do not apply to a novel, text book or photograph that may enjoy the benefits of copyright protection. While both may be important, they serve very different roles in society. Because of these differences, and the different policy considerations discussed below, this Court should not overrule the patent law precedent of *Jazz Photo* because of the Supreme Court's copyright ruling in *Kirtsaeng.*

### D.    Important Policy Considerations Favor the Long-Standing Rule That Sales Abroad Do Not Give Rise to Patent Exhaustion.

Important policy considerations support the domestic exhaustion rule that was put in place by *Jazz Photo* and that remains unchanged by *Kirtsaeng.* Indeed, the relative rights of patentees, competitors and the consuming public are best served by the *Jazz Photo* rule of territorial patent exhaustion. Overruling *Jazz Photo* and instituting a rule of international exhaustion would change the way U.S. patentees do business in today's global economy and would change the U.S. marketplace for the worse -- for both companies and consumers. The current rule of *Jazz Photo* allows OEMs to participate in global trade and yet still protect their significant investment in patented items and inventions and their brand reputation in the U.S. market.

1.     The Territorial Rule of Exhaustion Properly Incentivizes
       Innovation in the U.S. and Supports Economic Development.

The policy goal of incentivizing and rewarding innovation is central to U.S.

patent laws.  *Kewanee*, 416 U.S. at 481 ("The patent laws promote this progress by

offering a right of exclusion for a limited period as an incentive to inventors to risk

the often enormous costs in terms of time, research, and development.").

Intellectual property rights allow patentees to obtain a return on their investment in

new inventions which, in turn, incentivizes further innovation and dedication of

resources to research and development.  *See* Shubha Ghosh, *Pills, Patents, and*

*Power: State Creation of Gray Markets as a Limit on Patent Rights*, 14 Fla. J. Int'l

L. 217, 224 (2002) (noting that the large fixed costs of producing intellectual

property would not be expended unless there was a guarantee of reasonable return

from the investment).

The international exhaustion rule leads to rewards and incentives for the

wrong parties -- the unauthorized importers and arbitragers who take advantage of

lower prices overseas to make a profit and to infringe the rights of U.S. patentees.

The "enormous costs in terms of time, research, and development" borne by the

patentee are eroded by gray market arbitragers and unauthorized importers <u>without</u>

a corresponding benefit to the patentee and without recourse under U.S. patent law.

If gray market goods are offered at lower prices than legitimate goods and OEMs

12

are priced out of their own market, they will be less likely to invest in new technology because they will be unable to recoup their investment.

By maintaining the territorial rule of *Jazz Photo*, U.S. patent law serves its goal of promoting innovation and development by patentees, who expend substantial resources and time on research and development to bring new inventions to market.  Fostering these goals furthers growth of the U.S. economy and benefits the consuming public. *See Kewanee*, 416 U.S. at 480 (incentivizing innovation through patent protection leads to "a positive effect on society through the introduction of new products and processes of manufacture into the economy, and the emanations by way of increased employment and better lives for our citizens");  David R. Sugden, *Gray Markets: Prevention Detection and Litigation*, at 51, Oxford University Press (2009) ("[e]nsuring that individuals and companies collect their R&D costs ultimately benefits consumers" whose lives are improved by innovative products).

> 2.    Upholding *Jazz Photo* Allows for Beneficial Global Price Differentiation and Market Segmentation.

An international patent exhaustion doctrine assumes that the sale of a product abroad will yield the desired "single reward" to the patentee.  However, this approach ignores global price differentiation and market differences that are beneficial to worldwide consumers and necessary for patentees' participation in a global market.  Effective global price differentiation requires effective controls on

gray markets, including allowing patentees to enforce their U.S. patent rights against unauthorized imports under the rule of *Jazz Photo*. *See* Jeffery Atik & Hans Henrik Lidgard, *Embracing Price Discrimination: TRIPS and the Suppression of Parallel Trade in Pharmaceuticals*, 27 U. Pa. J. Int'l Econ. L. 1043, 1058 (2006).

Importantly, the level and nature of patent protection in foreign countries may contribute to price differentials in different global markets. In the United States, inventors can rely on a well developed body of patent law and effective enforcement of their patent rights to protect their considerable investments in developing innovative products. In many international markets, however, it is difficult or impossible to register patents and enforce patents rights. *See Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 455 (2007) ("foreign law may embody different policy judgments about the relative rights of inventors, competitors, and the public in patented inventions") (internal quotations omitted). In foreign markets with ineffective or insufficient patent protection, companies that make innovative products must lower their prices to compete with other companies that produce low cost, cloned versions of the same product without the considerable costs of development. *See* Michele L. Vockrodt, *Patent Exhaustion and Foreign First Sales: An Analysis and Application of the* Jazz Photo *Decision*, 33 AIPLA Q.J. 189, 199 (2005).

Price differentiation can also be driven by a number of different economic factors, including fluctuations in currency exchange rates, tax differences, different consumer preferences or abilities to pay, and differing distribution channels.  Alvin Galstian, *Protecting Against the Gray Market in the New Economy*, 22 Loy. L.A. Int'l & Comp. L. Rev. 507 (2000); Paul Lansing & Joseph Gabriella, *Clarifying Gray Market Gray Areas*, 31 Am. Bus. L.J. 313, 314 (1993).  Furthermore, there may be public welfare reasons for encouraging market segmentation and price differentiation.  Specifically, patentees may offer patented articles at a low price in one market to encourage development and growth or to improve health and safety in countries stricken by disease or misfortune.  Market segmentation allows OEMs to participate and compete in a global economy by structuring their pricing in ways that take into consideration <u>all</u> of the factors associated with doing business in that foreign market, including currency fluctuation, patent protection, taxes, distribution channels and public welfare concerns.

3.    A Rule of Territorial Exhaustion Allows Patentees to Meet the Needs of Underdeveloped Markets.

By upholding the rule of *Jazz Photo*, underdeveloped markets will continue to benefit in two important ways: (1) products intended for the lower-priced market will <u>stay</u> in the lower-priced market and be available for those consumers to purchase; and (2) OEMs will be encouraged to continue offering lower-priced goods in less-developed countries because they will be able to recoup investments

and prevent a rampant gray market.  Territorial exhaustion provides patentees with a way to combat the importation of goods priced and intended for a foreign market so that they can continue to sell products at lower prices in these needy countries without the supply being diverted back into the United States.

Many patented products, including life-saving drugs, medical devices and life-changing technology are sold at lower prices in poorer countries to the benefit of people in those countries who could not otherwise afford them.  Left unchecked, however, the gray market takes lower-cost articles supplied to less-developed countries out of those markets for resale in the higher priced markets.  Atik & Lidgard, *Embracing Price Discrimination*, 27 U. Pa. J. Int'l Econ. L. at 1060.  When products are diverted from lower-priced markets to be sold in the U.S., those who need the low prices to afford a patented drug or an innovative technology have no opportunity to buy it before it is swept back into the United States gray market.  Simply put, gray markets and parallel imports "transfer benefits from foreign consumers to importers."  Hillary A. Kremen, *Caveat Venditor: International Application of the First Sale Doctrine*, 23 Syracuse J. Int'l L. & Com. 161, 163 (1997).

Furthermore, OEMs can afford to offer lower prices in less-developed markets only because higher prices in other markets can offset the significant costs of research and development, marketing, and production so that the product

16

remains profitable. Companies that sell patented products in underdeveloped countries need to be able to amortize their investment through sales at higher prices in developed markets where the higher cost can be borne by wealthier consumers. *See* Atik & Lidgar, *Embracing Price Discrimination*, 27 U. Pa. J. Int'l Econ at 1047 ("[t]he willingness of the pharmaceutical industry to distribute drugs at low cost…depends on its confidence that these drugs will not filter back into high priced markets"). Without the ability to price differentiate their products for international markets, OEMs are impeded from competing internationally and may be discouraged from entering developing markets with accessible prices. Vockrodt, *Patent Exhaustion and Foreign First Sales*, 33 AIPLA Q.J. at 200. Making patented inventions available and accessible in less-developed countries, while still allowing patentees to bring these inventions to market and stay profitable, is an important policy justification that supports the *Jazz Photo* rule of territorial exhaustion.

These policy considerations that support different prices in different markets for patented articles are different than those considered (and rejected) by the Supreme Court in the copyright context. *See Kirtsaeng*, 133 S. Ct. at 1371. As discussed above, the nature of articles protected by patent law (pharmaceuticals, new technologies, medical devices) are very different than the types of works protected by copyright law. Specifically, patented items are <u>novel</u> and <u>useful</u>

17

inventions that can benefit societal health and welfare. Because of this, the ability to engage in price differentiation and global segmentation for patented articles is justified by different policy goals, including improving public welfare by encouraging and protecting innovation.

Indeed, life-saving or life-changing inventions can make a huge impact on the economy and public welfare. However, these inventions also require substantial investment to bring to market and are priced so that those costs can be recovered. By keeping in place a rule of patent law that allows and encourages market segmentation, patentees can lower the price in these less-developed markets so that consumers there have access to these new inventions and still recover the return on their investment through higher prices in wealthier markets. Such beneficial new inventions might not be available to consumers in a less-developed market without price differentiation or market segmentation. The policy justifications for supporting increased accessibility and further development of patented articles for the benefit of the public are stronger in the context of patented new technologies than in the context of copyrighted textbooks.

4.    A Rule of Territorial Exhaustion Aids in Combating Unauthorized Gray Markets and Counterfeiting.

Intellectual property rights, particularly patent rights, are important tools in OEMs' ongoing battle against counterfeiting and unauthorized parallel imports. OEMs must be able to continue to rely upon their patent rights as an integral tool

18

in preventing unauthorized gray market goods from entering the U.S. market. Under the existing rule of *Jazz Photo*, the gray market is checked by rights of patent owners. *See* Ghosh, *Pills, Patents, and Power;*, 14 Fla. J. Int'l L. at 222 ("Gray markets in the United States are extremely rare when patent law comes into play"). If *Jazz Photo* is overruled, the gray market for goods is likely to increase because unauthorized importers of parallel goods will no longer face the risk of a patent infringement suit. *Id.* This increased and uncontrolled gray market will lead to negative consequences contrary to public policy, including (1) harm to the consuming public; (2) damage to the rights and interest of OEMs; and (3) threats to the health of the economy and the safety of the public. *See* Sugden, *Gray Markets*, at 5-6 (discussing the "host of significant risks" associated with gray market goods).

Specifically, consumers of unauthorized gray market goods will suffer. Gray market goods are often different from authorized imports or domestic goods in material ways. *See* Galstain, *Protecting Against the Gray Market*, 22 Loy. L.A. Int'l & Comp. L. at 510. For example, foreign goods may be altered to comply with different health and safety codes for varying markets, or they may be designed or marketed differently to account for regional or cultural differences or languages. *Id.* While consumers may be initially attracted by lower prices of gray market goods, that attraction usually turns to disappointment -- or worse -- when

the product fails to function properly, fails to meet local health or safety

requirements, or when consumers are unable to have the unauthorized product

serviced or repaired by the OEM or an authorized reseller.  *Id.*; KPMG LLP,

*Effective Channel Management is Critical in Combating the Gray Market and*

*Increasing Technology Companies' Bottom Line; KPMG Gray Market Study*

*Update*, 3 (2008) ("*Gray Market Study*"), available at www.agmaglobal.org/

cms/uploads/whitePapers/7-10-08KPMGWhitePaperGrayMarketStudy.pdf

(purchasers of gray market technology products risk data loss and business

interruption).

Gray markets also harm OEMs.  When OEMs are cut out of the distribution

channel through the sale and re-importation of foreign goods, quality control over

these goods is virtually impossible.  KPMG, *Gray Market Study* at 7 ("OEMs

generally have no visibility into unauthorized sales and cannot ensure that products

sold are new, authentic, undamaged goods and are properly installed and

supported.").  This loss of control over quality and safety issues, as well as the

disappointed consumers described above, inevitably leads to erosion of the OEMs'

goodwill.  Galstain, *Protecting Against the Gray Market*, 22 Loy. L.A. Int'l &

Comp. L. at 510.

Furthermore, gray markets drive down the prices OEMs and authorized resellers can charge to stay competitive in their own market. *See* KPMG, *Gray Market Study* at 9 (reporting poll results that say many gray market prices are more than 25 percent lower than average authorized distribution channel prices). With an uncontrolled gray market, OEMs and authorized resellers have to price their U.S. products lower to compete with the unauthorized foreign goods sold in the U.S. at low prices by gray market dealers. Sugden, *Gray Markets* at 41. Because unauthorized importers do not have research and development costs or the expenses of marketing, customer support, and product quality control that OEMs have (and often require of their authorized resellers), the gray market dealers can price their imported products much lower and still turn a profit. This allows gray market dealers to get a "free ride" at the expense of the OEMs' reputation and goodwill and in competition with OEMs and authorized resellers.

Another dangerous result of an unchecked gray market is a corresponding increase in counterfeit or "black market" goods and a decrease in the effectiveness of anti-counterfeiting efforts and laws. Sugden, *Gray Markets* at 6 ("[o]ne of the most significant consequences of an unchecked gray market is the commingling of gray and black market products"). The risks to public health and safety posed by the counterfeit market are well-documented and pervasive. *See* United Nations Office on Drug & Crime Report on Counterfeit Products (2010), available at

https://www.unodc.org/documents/data-and-analysis/tocta/8.

Counterfeit_products.pdf (reporting on the link between counterfeiting and serious

offenses such as drug trafficking, smuggling, money laundering, tax evasion,

corruption).  Gray market goods are often mixed with and sold through the same

channel as black market goods, making it difficult to distinguish the two.  Sugden,

*Gray Markets* at 53.  As a result, it is easier for counterfeiters to import illegal

goods into the United States and more difficult for OEMs and law enforcement to

determine whether goods coming into or being offered for sale in the U.S. are gray

market goods or counterfeits.  *See* Addie T. Katz, *The Merging of Black and Gray:*

*International Copyright Infringement in the Post-Kirtsaeng Era*, 43 Hofstra Law

Review at 293;  Sugden, *Gray Markets* at 52; *see also*, *Zino Davidoff S.A. v. CVS*

*Corp.*, 571 F.3d 238 (2d Cir. 2009) (prominent retailer selling both gray market

and counterfeit versions).

 If *Jazz Photo*'s rule of territorial exhaustion is overruled, the U.S. market for

gray and counterfeit goods will increase, with serious repercussions to health,

safety and public welfare.  Good public policy requires a legal framework that

prevents unauthorized importation of patented articles and supports efforts to keep

potentially dangerous knockoffs and unauthorized foreign imports from entering

the market.

**II.    This Court Should Not Overrule *Mallinckrodt* as it is Consistent with Established Law and Matters of Public Policy.**

In *Mallinckrodt*, this Court ruled that patent exhaustion does not apply to sales made under a lawful and valid use-restriction.  *Mallinckrodt*, 976 F.2d at 709. This Court is considering whether to overrule its decision in *Mallinckrodt* in light of the Supreme Court's recent ruling in *Quanta*.  It should not do so because *Mallinckrodt* is well-grounded in both law and policy and its ruling is not in conflict with *Quanta*.  Indeed, respecting patentees' freedom to contract with respect to their patent rights (including the freedom to make conditional sales like those at issue in *Mallinckrodt*) benefits public welfare through wider dissemination of patented technology, greater quality and safety control, and lower prices.

**A.    *Mallinckrodt* Was Correctly Decided.**

*Mallinckrodt* follows a long line of Supreme Court cases that permit restricted conditional sales or licenses without triggering exhaustion of patent rights.  *See General Talking Pictures Corp. v. Western Electric Co.*, 304 U.S. 175 (1937); *American Cotton-Tie Co. v. Simmons*, 106 U.S. 89 (1882);  *Mitchell v. Hawley*, 83 U.S. 544 (1872).  The rule of *Mallinckrodt* is clear, well-reasoned and consistent with over a decade of related Supreme Court precedent.  The *Mallinckrodt* decision carefully analyzed existing precedent, distinguished those cases in which restrictions on use were held unenforceable because they resulted in unlawful price fixing or anti-competitive tying, and relied upon the Supreme

23

Court's ruling in *General Talking Pictures* to find that valid conditional sales did not exhaust patent rights. *See* Robert W. Gomulkiewicz, *The Federal Circuit's Licensing Law Jurisprudence: Its Nature and Influence*, 84 Wash. L. Rev. 199, 224 (2009) (noting that the *Mallinckrodt* decision cites more than twenty Supreme Court cases and that it would be hard to argue that this Court ignored Supreme Court case law in *Mallinckrodt*).

The result in *Mallinckrodt* is consistent with established principles of law and with relevant policy considerations. Importantly, the type of single use restriction at issue in *Mallinckrodt* does not prevent the purchaser from using the article transferred under license for its intended purpose. John W. Osborne, *Justice Breyer's Bicycle and the Ignored Elephant of Patent Exhaustion: An Avoidable Collision in Quanta v. LGE*, 7 J. Marshall. Rev. Intell. Prop. L. 245, 261 (2008). The restriction was not an attempt to unlawfully extend the scope of the patents at issue. *Id.* (the asserted claim covered the device sold and there was no attempt to expand the scope to cover something not patented). Furthermore, the rule in *Mallinckrodt* does not allow for double dipping and collecting separate royalties for the same article. *Id.* (noting "the royalty received by the patentee in Mallinckrodt was bargained for based on a single use of the patented article"). Instead, "*Mallinckrodt* simply recognized and upheld common field of use restrictions which have been part of patent licensing for hundreds of years in

complete accord with Supreme Court precedent." *Id.* at 283.  Consistent with

Supreme Court precedent and widespread industry practices, valid use restrictions

that are "within the scope of the patent grant or otherwise justified" do not exhaust

patent rights.  *Mallinckrodt*, 976 F.2d at 709.

### B.    *Quanta* Did Not Overrule *Mallinckrodt*.

In *Quanta*, the Supreme Court determined that an <u>unconditional</u> first sale

exhausted patent rights.  *Quanta*, 553 U.S. at 638.  A key part of the Supreme

Court's analysis and application of the patent exhaustion doctrine in *Quanta* was

determining whether the first sale in the case included any valid restrictions or

conditions.  *See Quanta*, 553 U.S. at 636.  Indeed, the Supreme Court emphasized

no fewer than three times that the initial authorized sale in *Quanta* was

unconditional and exhaustion therefore applied.  *Id.*  Specifically, the Court found

that "[the license agreement] broadly permits Intel to 'make, use, [or] sell'

products free of LGE's patent claims," that "Intel's authority to sell its products

embodying the LGE Patents was not conditioned on [notice of restrictions or

compliance with such notice]" and that "[n]o conditions limited Intel's authority to

sell products substantially embodying the patents."  *Quanta*, 553 U.S. at 636-67.

*Quanta* dealt with an unconditional sale; *Mallinckrodt* did not.  Accordingly,

*Quanta* does not conflict with the precedent set by *General Talking Pictures* and

followed by *Mallinckrodt*.  *See* Erin Julia Daida Austin, *Reconciling the Patent*

*Exhaustion and Conditional Sale Doctrines in Light of Quanta Computer v. LG Electronics*, 30 Cardozo L. Rev. 2947, 2974 (2009) ("[g]iven that the unanimous *Quanta* opinion does not overrule *General Talking Pictures* but rather distinguishes it, the conditional sale doctrine should still be viewed as good law"); Gomulkiewicz, *The Federal Circuit's Licensing Law Jurisprudence*, 84 Wash. L. Rev. at 237 (concluding that the Supreme Court in *Quanta* "quietly affirmed *Mallinckrodt* and its progeny"). Accordingly, this Court should not overrule *Mallinckrodt*.

### C.    The Health, Safety and Quality Issues in *Mallinckrodt* Support Upholding its Rulings.

The facts of *Mallinckrodt* highlight the important health, quality and safety issues that weigh in favor of allowing conditional sales without exhausting patent rights. *Mallinckrodt* involved patented mist inhalers for diagnostic and therapeutic uses related to lung conditions. *Mallinckrodt*, 976 F.2d at 701-02. The inhaler units were sold with a restriction that they were for a single use only. *Id.* The defendant collected used inhaler units, refilled and "reconditioned" them and resold the units to the medical community. *Id.* at 702.

Not only did "reconditioning" and resale infringe upon the plaintiff's patent rights, the single use restriction was designed to avoid important and potentially life-threatening consequences. *See Mallinckrodt*, 976 F.2d at 702. Unless the inhaler units were limited to a single use, there were risks of infections, disease

transmission, material instability, and decreased diagnostic performance. *Id.* These potential issues with reuse of medical devices are common. *See* Eucomed Medical Technology, *Eucomed White Paper on the reuse of single use devices*, 6-16 (2009), available at www.eucomed.org/uploads/Modules/Publications/Eucomed%20White%20Paperon%20the%20Reuse%20of%20Single%20Use%20Devices.pdf (discussing the benefits of single use devices in the medical field and the risks of reprocessing them). In its ruling in *Mallinckrodt*, the Court recognized that the single use restriction was a valid way of addressing these crucial concerns for public safety. Use restrictions like those in *Mallinckrodt* allow OEMs to protect consumers from potential ill effects associated with the unauthorized reuse of their products.

### D. The Important Policy Considerations of Research and Development Investment and Efficient Economic Development Are Fostered by Upholding *Mallinckrodt*.

The rule in *Mallinckrodt* recognizes the complexities of patent licensing in today's economy and allows for transactions that acknowledge the importance of rewarding patentees for their investment and development of new technologies. The policy rationale underlying the patent exhaustion doctrine is that rights are exhausted once a "patentee has bargained for, and received, an amount equal to the full value of the goods." *B. Braun Med., Inc. v. Abbot Labs.*, 124 F.3d 1419, 1426 (Fed. Cir. 1997). This rationale does not apply, however, to a conditional sale or

license that includes use restrictions. Instead, "it is more reasonable to infer that the parties negotiated a price that reflects only the value of the 'use' rights conferred by the patentee." *Id.*

The recognition that patentees may reserve certain of their rights within the scope of their patent grant respects the exclusive rights granted by the award of a patent. Overruling *Mallinckrodt* would weaken the rights of patentees in a way that could significantly change the way businesses prioritize and invest in new technology and inventions. *See* U.S. Dep't of Justice & Fed. Trade Comm'n, *To Promote Innovation: The Proper Balance of Competition and Patent Law and Policy*, Chapter 1, p. 1 (2003) ("FTC Innovation Report") (recognizing that stable and strong patent policy "encourages prospective inventors to invest time and money in inventions, because a patent's grant of the exclusive right to make, sell and use the invention for a certain period of time can allow inventors to realize returns sufficient to encourage initial investments"). Indeed, "field-of-use, territorial, and other limitations on intellectual property licenses may serve pro-competitive ends by allowing the licensor to exploit its property as efficiently and effectively as possible." U.S. Dep't of Justice & Fed. Trade Comm'n, *Antitrust Guidelines for the Licensing of Intellectual Property*, at 5 (1995).

Patented articles often require millions of dollars in research and development and years of development to bring to the marketplace. *See* FTC

Innovation Report at Chapter 3, p. 5 (summarizing testimony from pharmaceutical industry representatives regarding the substantial amount in development costs, often over the course of 10-15 years to bring a new drug product to market), at Chapter 3, p. 15 (summarizing testimony from biotechnology industry representatives regarding the immense research and development spending and the difficulties in commercializing biotechnology innovation).  In light of these costs, OEMs rely on patent rights and carefully structured licensing arrangements as a way to reduce transaction costs, promote new ideas, and mitigate losses in revenue that they may experience due to after-market arbitrage.  *See* Osborne, *Justice Breyer's Bicycle*, 7 J. Marshall Rev. Intell. Prop. L. at 246 (overruling *Mallinckrodt* "would be a major change in the law and would significantly affect longstanding licensing practices which have served to facilitate the efficient dissemination of patented technologies"); Jared Tong, *You Pay for What You Get: The Argument for Allowing Parties to Contract Around Patent Exhaustion*, 46 Hous. L. Rev. 1711, 1733-34 (2010) ("If the patent system was created to adequately reward inventors for their inventions and encourage innovation, then surely arbitrage undermines one of the pillars of the patent system.").

Furthermore, use restrictions may allow the patentee to exploit its patent rights in different markets or in new and innovative applications without fear of weakening or jeopardizing its patent rights.  Austin, *Reconciling the Patent Exhaustion and*

29

*Conditional Sale Doctrines*, 30 Cardozo L. Rev. at 2976 ("Field-of-use restrictions can facilitate the ability of the patentee to exploit its patent rights in different markets, technologies, or applications, with end users benefiting from this wider exploitation.").

The rule in *Mallinckrodt* recognizes that patent licenses and sales of patented products are complex and motivated by important economic, policy, and product health and safety concerns.  Allowing patentees to consider these important aspects of each transaction and to retain certain rights through valid use-restrictions, rather than imposing an "all or nothing" approach to patent rights, is an important aspect of U.S. patent law that has been relied upon by patentees and licensees and should be upheld by this Court.

## CONCLUSION

This Court should not overrule *Jazz Photo* or *Mallinckrodt*.  The Supreme Court's rulings in *Kirtsaeng* and *Quanta* do not apply and the long-standing precedent of this Court should stand.

Respectfully submitted,

/s/ Mark Schonfeld

Mark Schonfeld
Sara Beccia
BURNS & LEVINSON LLP
125 Summer Street
Boston, MA 02110
Telephone: 617-345-3000
Facsimile: 617-345-3299
mschonfeld@burnslev.com
sbeccia@burnslev.com

*Counsel for Imaging Supplies Coalition*

Dated: August 18, 2015

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this 18th day of August, 2015, I caused this Brief of

*Amicus Curiae* Imaging Supplies Coalition in Support of Plaintiff/Cross-Appellant

to be filed electronically with the Clerk of the Court using the CM/ECF System,

which will send notice of such filing to the following registered CM/ECF users:

Edward F. O'Connor, I
Avyno Law, P.C.
6345 Balboa Boulevard, Suite 190
Encino, California  91316
(949) 291-2894
eoconnor@avynolaw.com

*Counsel for Defendant – Appellant*

Timothy Colin Meece
Audra Carol Eidem Heinze
Bryan Medlock, Jr.
Jason Steven Shull
Banner & Witcoff, Ltd.
Ten South Wacker Drive
Chicago, Illinois  60606
(312) 463-5420
tmeece@bannerwitcoff.com
aheinze@bannerwitcoff.com
bmedlock@bannerwitcoff.com
jshull@bannerwitcoff.com

Benjamin Beaton
Joshua J. Fougere
Sidley Austin LLP
1501 K Street, NW
Washington, DC 20005
(202) 736-8000
bbeaton@sidley.com
jfougere@sidley.com

Steven B. Loy
STOLL, KEENON & PARK, LLP
300 West Vine Street, Suite 2100
Lexington, Kentucky 40507
(859) 231-3000
steven.loy@skofirm.com

Constantine L. Trela, Jr.
Robert N. Hochman
SIDLEY AUSTIN LLP
Bank One Plaza
1 South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000
ctrela@sidley.com
rhochman@sidley.com

*Counsel for Plaintiff – Cross-Appellant*

Any counsel for Amici Curiae appearing at the time of this filing will be

served via the email notice from the CM/ECF system. Upon acceptance by the

Clerk of the Court of the electronically filed document, the required number of

copies of the Brief of *Amicus Curiae* Imaging Supplies Coalition in Support of

Plaintiff/Cross-Appellant will be hand filed at the Office of the Clerk, United

States Court of Appeals for the Federal Circuit in accordance with the Federal

Circuit Rules.

/s/ Mark Schonfeld
*Counsel for Imaging Supplies Coalition*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

    [ X ] this brief contains [*6,800*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

    [     ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    [ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

    [     ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: <u>August 18, 2015</u>    <u>/s/ Mark Schonfeld             </u>
                                             *Counsel for Imaging Supplies Coalition*