**2014-1617, -1619**

# United States Court of Appeals
# for the Federal Circuit

LEXMARK INTERNATIONAL, INC.,

*Plaintiff-Cross-Appellant*

*v.*

IMPRESSION PRODUCTS, INC.,

*Defendant-Appellant*

QUALITY CARTRIDGES, INC., JOHN DOES, 1-20, BLUE TRADING LLC,
EXPRINT INTERNATIONAL, INC., LD PRODUCTS, INC.,
PRINTRONIC CORPORATION, TESEN DEVELOPMENT (HONG KONG)
CO. LTD., and BENIGNO ADEVA AND HIS COMPANIES,

*Defendants.*

Appeals from the United States District Court for the Southern District of
Ohio in Case No. 1:10-CV-00564-MRB, Judge Michael R. Barrett

**BRIEF OF AMICUS CURIAE INTELLECTUAL PROPERTY OWNERS
ASSOCIATION ON HEARING *EN BANC* IN SUPPORT OF PLAINTIFF-
APPELLEE AND CROSS-APPELLANT LEXMARK**

PHILIP S. JOHNSON, *PRESIDENT*
KEVIN H. RHODES, *CHAIR*
 *AMICUS BRIEF COMMITTEE*
INTELLECTUAL PROPERTY
OWNERS ASSOCIATION
 1501 M Street, N.W.
 Suite 1150
 Washington, D.C. 20005
 (202) 507-4500

ROBERT P. TAYLOR
 *COUNSEL OF RECORD*
RPT LEGAL STRATEGIES PC
 2443 Fillmore Street #332
 San Francisco, CA 94115
 (415) 447-3975
 robert.taylor@rptstrategies.com

*Counsel for Amicus Curiae
Intellectual Property Owners Association*

August 19, 2015

# CERTIFICATE OF INTEREST

Counsel for the Intellectual Property Owners Association certifies the following:

1.      The full name of every party or amicus represented by me is:

**INTELLECTUAL PROPERTY OWNERS ASSOCIATION**

2.      The name of the real party in interest represented by me is:

**INTELLECTUAL PROPERTY OWNERS ASSOCIATION**

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

**INTELLECTUAL PROPERTY OWNERS ASSOCIATION**

4.      The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

**PHILIP S. JOHNSON, KEVIN H. RHODES, & HERBERT C. WAMSLEY**
**INTELLECTUAL PROPERTY OWNERS ASSOCIATION**

**ROBERT P. TAYLOR and**
**RPT LEGAL STRATEGIES PC**

Date: August 19, 2015                    _/s/ Robert P. Taylor_____
                                         Robert P. Taylor

i

# TABLE OF CONTENTS

*Page*

INTEREST OF *AMICUS CURIAE*............................................................1

SUMMARY OF ARGUMENT ................................................................2

ARGUMENT ...........................................................................................5

    I.   *Kirtsaeng* Did Not Overrule *Jazz Photo* and its Progeny. ...................5

        A.   The Supreme Court in *Kirtsaeng* relied primarily on a proper statutory construction of Section 109 of the Copyright Act................................................................5

        B.   The policies that underlie patent exhaustion differ fundamentally from those defining the first sale doctrine in copyright law. ...........................................7

        C.   The *Kirtsaeng* decision does not mention patents or rely on any cases dealing with patent exhaustion. .............................8

        D.   The relevant jurisprudence of this Court is well-established and fully applicable to the facts at issue. .................9

    II.   The Supreme Court Decision in *Quanta* Did Not Overrule this Court's Decision in *Mallinckrodt*.........................................................11

        A.   *General Talking Pictures* established the enforceability of license provisions that restrict the use of patented items. ......................................................................11

        B.   The *Mallinckrodt* decision reflected a straightforward application of *General Talking Pictures* to a summary judgment ruling. ......................................................16

        C.   *General Talking Pictures* was distinguished and reaffirmed in the *Quanta* decision. .............................18

CONCLUSION .......................................................................................22

# TABLE OF AUTHORITIES

*Page*

**Cases**

*Adams v. Burke,*
  84 U.S. 453 (1873) ............................................................................14

*Bauer & Cie v. O'Donnell,*
  229 U.S. 1 (1913) ....................................................................... 13, 14

*Bement v. National Harrow Co.,*
  186 U.S. 70 (1902) ............................................................................12

*Bobbs-Merrill Co. v. Straus,*
  210 U.S. 339 (1908) ............................................................................8

*Boesch v. Graff,*
  133 U.S. 697 (1890) ............................................................................9

*Fuji Photo Film Co., Ltd. v. Jazz Photo Corp,*
  394 F.3d. 368 (Fed. Cir. 2005)............................................................9

*Fujifilm Corp. v. Benun,*
  605 F.3d 1366 (Fed. Cir. 2010)..........................................................10

*General Talking Pictures Corp. v. Western Electric Co.,*
  304 U.S. 175, *affirmed on reh'g,* 305 U.S. 124 (1938) .............................. *passim*

*Jazz Photo Corp. v. International Trade Commission,*
  264 F.3d 1094 (Fed. Cir. 2001)....................................... 2, 3, 5, 9, 22

*Keeler v. Standard Folding Bed Co.,*
  157 U.S. 659 (1895) ..........................................................................13

*Kirtsaeng v. John Wiley & Sons, Inc.,*
  133 S.Ct. 1351 (2012) ................................................................ *passim*

*Mallinckrodt, Inc. v. Medipart, Inc,*
  976 F.2d 700 (Fed. Cir. 1992)..................................................... *passim*

*Mitchell v. Hawley,*
  16 Wall. 544 ............................................................................. 12, 14

iii

*Motion Picture Patents Co.* v. *Universal Film Co.*,
   243 U.S. 502 (1917) ........................................................................13

*Ninestar Technology Co. v. Intern. Trade Com'n*,
   667 F.3d, 1373 (Fed. Cir. 2012) ......................................................10

*Quanta Computer, Inc. v. LG Electronics, Inc.*,
   553 U.S. 617, 128 S. Ct. 2109 (2008) ......................................... *passim*

*United States v. General Electric Co.*,
   272 U.S. 476 (1926) ........................................................................12

*United States v. Univis Lens Co.*,
   316 U.S. 241 (1942) ........................................................................20

**Statutes**

35 U.S.C. §271(a) ................................................................................14

Copyright Act

   §106(3) ...........................................................................................6

   §109 ......................................................................................... 3, 5, 6

   §109(a) .............................................................................................5

   §602(a)(1) .........................................................................................6

**Rules**

Fed. Circ. R. 29(a) ...............................................................................1

Fed. R. App. P. 29(a) ...........................................................................1

**Other Authorities**

"Antitrust Guidelines for the Licensing of Intellectual Property,"
   romulgated jointly by the Department of Justice and the Federal Trade
   Commission in 1995 .................................................................... 15, 16

The Intellectual Property Owners Association submits this brief as *amicus curiae* pursuant to Fed. R. App. P. 29(a), Fed. Circ. R. 29(a), and this Court's Order dated April 14, 2015, in support of Plaintiff-Appellee and Cross-Appellant Lexmark International, Inc., addressing the questions set forth in the Court's Order.[1]

## INTEREST OF *AMICUS CURIAE*

*Amicus curiae* Intellectual Property Owners Association (IPO) is a trade association representing companies and individuals in all industries and fields of technology that own and license intellectual property rights. IPO's membership includes more than 200 companies and more than 12,000 individuals involved in the association either through their companies or as inventor, author, executive, law firm or attorney members.  Many IPO members are involved in the licensing of patents and will benefit from clarification of the rights of licensors to impose conditions on licensees and users of patented products and services.  Founded in 1972, IPO represents the interests of all owners of intellectual property. IPO regularly represents the interests of its members before Congress and government

---

[1]     No counsel for a party authored this brief in whole or in part, and no such counsel or party made a monetary contribution intended to fund the preparation or submission of this brief.  No person other than the amicus curiae or its counsel made a monetary contribution to its preparation or submission.  IPO files this brief in accordance with the Order issued on April 14, 2015, which states that briefs may be filed without consent or leave of the court.

entities and has filed amicus curiae briefs in this Court and other courts on

significant issues of intellectual property law.  The members of the IPO Board of

Directors, which approved the filing of this brief, are listed in the Appendix.[2]

## SUMMARY OF ARGUMENT

This Court's Order of April 14, 2015 granting hearing *en banc* asked for

briefing on the following two issues:

> (a) The case involves certain sales, made abroad, of articles patented in the United States.  In light of *Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S.Ct. 1351 (2012), should this court overrule *Jazz Photo Corp. v. International Trade Commission*, 264 F.3d 1094 (Fed. Cir. 2001), to the extent it ruled that a sale of a patented item outside the United States never gives rise to United States patent exhaustion?

> (b) The case involved (i) sales of patented articles to end users under a restriction that they use the articles once and then return them and (ii) sales of the same patented articles to resellers under a restriction that resales take place under the single-use-and-return restriction.  Do any of those sales give rise to patent exhaustion?  In light of *Quanta Computer, Inc. v. LG Electronics, Inc.*, 553 U.S. 617 (2008), should this court overrule *Mallinckrodt, Inc. v. Medipart, Inc*, 976 F.2d 700 (Fed. Cir. 1992), to the extent that it ruled that a sale of a patented article, when the sale is made under a restriction that is otherwise lawful and within the scope of the patent grant, does not give rise to patent exhaustion?

**Question a).**  As to Question a), IPO submits that the exhaustion ruling in

*Kirtsaeng* was not intended by the Supreme Court to apply to patented products

---

[2] IPO procedures require approval of positions in briefs by a two-thirds majority of directors present and voting.

and services.  Therefore, the existing and clearly established jurisprudence of this

Court, reflected in the *Jazz Photo* ruling and its progeny, should not be disturbed.

The Supreme Court in *Kirtsaeng* had ample opportunity to equate patent

policy and copyright policy had it intended to do so, and the absence of any

mention of patents is a clear indication that the Court viewed the two bodies of law

as distinct.  It was appropriate for the Supreme Court to confine its focus to

copyright law alone, because many of the policy considerations that underlie

copyright exhaustion differ substantially from those underlying patent exhaustion.

Moreover, the *Kirtsaeng* decision itself is grounded primarily in the statutory

language of Section 109 of the Copyright Act, which was based on considerations

unique to copyright law, whereas the doctrine of patent exhaustion is purely a

creature of decisional law developed in patent cases.  IPO does not believe that this

Court's decisions in *Jazz Photo* and its progeny should be modified with respect to

whether sales by the patent owner in foreign countries exhaust U.S. patent rights.


**Question b).**  As to Question b), IPO submits that the Supreme Court's

ruling in *Quanta Computer* should not be read as overruling this Court's decision

in *Mallinckrodt.*  Although the outer limits of the *Quanta* opinion are not entirely

clear, the language with which the Supreme Court distinguished *General Talking

Pictures Corp. v. Western Electric Co.*, 304 U.S. 175, *affirmed on reh'g*, 305 U.S.

- 3 -

124 (1938), shows that the Court did not intend to render unlawful all forms of conditional sales of patented products. The Court distinguished the *Quanta* factual situation from the one in *Talking Pictures,* observing that in the latter case the provision restricting uses to those permitted by the patent owner was found in the license itself, whereas in *Quanta* the license authorizing the sale of patented chips made by the licensee was unconditional. 128 S.Ct. at 2121. To the extent there was any contractual restriction on Quanta's use of microprocessors and chipsets sold by Intel, such restrictions arose solely by way of a side letter and did not affect the patent rights granted by the license. *Id*. The Supreme Court acknowledged the possibility that contractual rights under the license might exist, but none had been alleged by LGE. *Id*. at 2122, n.7.

When it rendered its decision in *Quanta,* the Supreme Court certainly knew of this Court's *Mallinckrodt* decision and the reliance placed on that decision by the patent owning and licensing community. Although the Supreme Court reversed this Court's conclusion in *Quanta* as to exhaustion, the complete absence of any mention of *Mallinckrodt* – particularly when combined with the Court's reaffirmation of *Talking Pictures* – should be viewed as affirmation that properly crafted license restrictions on fields-of-use, customers, resale and the like are to be upheld as long as they do not exceed the lawful scope of the patent.

Nor should there be any difference between the treatment of conditional sales by a licensee and those by a licensor. Where proper notice is given to the purchaser of patented goods whose use or resale is restricted by the patent owner, it would be irrational to reach different results depending on whether the sale was made by the patent owner or by its licensee. As long as the purchaser consents to the restriction at the time of purchase, there is neither unfairness nor impracticality in enforcing such restrictions on the use or resale of patented items.

## ARGUMENT

### I.     *Kirtsaeng* Did Not Overrule *Jazz Photo* and its Progeny.

### A. The Supreme Court in *Kirtsaeng* relied primarily on a proper statutory construction of Section 109 of the Copyright Act.

The Supreme Court's ruling in *Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S. Ct. 1351 (2013), rests almost entirely on the Court's construction of the phrase "lawfully made under this title" found in Section 109(a) of the Copyright Act, a statutory provision added to the Act in 1978 to clarify the reach of the first sale doctrine with respect to copyrighted works. In *Kirtsaeng*, the copyright owner printed and sold books outside the United States. The first inside page contained, along with notice of the publisher's U.S. copyright, a statement that the books were not authorized for resale in the U.S. Notwithstanding this admonition, Defendant-

Appellant Kirtsaeng purchased some of the books in Thailand and resold them in the U.S., thereby precipitating a copyright suit by the publisher.

In defense of its actions, Kirtsaeng argued that he had lawfully purchased the books from the publisher and that, once sold, Section 109 of the Copyright Act extinguished the publisher's right to control resale of the books. The publisher argued that because the sale of a book outside the U.S. was not subject to its U.S. copyright, there could be no exhaustion arising from such sale.

Based on a detailed and extensive inquiry into the origins of Section 109 and its relationship with other provisions in the Copyright Act, most notably Sections 106(3) and 602(a)(1), the Supreme Court concluded that Section 109 was not subject to the same geographical limitations as the publisher's right to assert infringement of its U.S. copyright. The Court's analysis focused initially on the language of Section 109 itself, noting that whether a foreign sale was "lawfully made under" Title 17 was the central question, *i.e.*, whether the phrase contemplated only sales in the U.S. or should be construed more broadly. *Id*. at 1357-58.

To discern the meaning of Section 109, the Court relied on established principles of statutory construction, finding no congressional intent to limit first sale protection on a geographical basis and raising a number of practical problems – "horribles" as some of the briefing called them – that would come into play if

there were such a limitation. *Id.* at 1365-66. Without universal exhaustion arising from the first sale by the copyright owner, the Court envisioned many difficult questions that could arise. *Id.*

### B. The policies that underlie patent exhaustion differ fundamentally from those defining the first sale doctrine in copyright law.

For a variety of reasons, patented inventions are less likely than are books, sculpture, paintings, photographs, software and other objects of copyright protection to trigger the policy considerations relied on in *Kirtsaeng* that require a geographically unlimited exhaustion rule for copyrights. Patent rights, unlike copyrights, do not come into being automatically but must be granted specifically for each country in which they exist, usually after extensive scrutiny by the issuing authority. Patent rights also can vary depending on patent eligible subject matter in different countries, and the scope of patent rights may differ with respect to the same invention, so that what is protected in the United States may not be elsewhere.

Likewise, the settled nature of expectations differs widely between the two forms of protection. One of the reasons cited by the Court for its *Kirtsaeng* ruling was that owners of copyrighted works had, for decades, assumed that there were no geographical limits on their rights to use or display their works. 133 S.Ct. at 1366. No comparable showing as to patented articles is apparent from the *Lexmark*

record, and in light of the case law discussed in Section D, the reverse is more likely the case today.

### C. The *Kirtsaeng* decision does not mention patents or rely on any cases dealing with patent exhaustion.

Importantly, the decision in *Kirtsaeng* does not mention patents or patent law, nor does the decision rely on any patent exhaustion cases for its rationale. This absence of even a single reference to patents does not appear to be an oversight. The decision contains 22 separate citations to the Supreme Court's seminal ruling in *Bobbs-Merrill Co. v. Straus*, 210 U.S. 339 (1908), wherein a common law version of the "first sale doctrine" for copyrighted works was first established. In *Bobbs-Merrill*, a publishing house sued a retailer claiming that sales of a copyrighted book for less than the minimum price printed inside the cover was copyright infringement. To support this restriction on the resale price of its books, the publisher relied on legal precedents that gave patent owners the right to control the price at which a licensee could sell products manufactured under a patent license. Ruling against the publisher, the Supreme Court rejected the argument that rules applicable patents should apply automatically to copyrights, citing "wide differences between the right of multiplying and vending copies of a production protected by the copyright statute and the rights secured to an inventor under the patent statute …." *Id*. at 342-46. Given this rejection of patent law principles as relevant to copyright exhaustion in the *Bobbs-Merrill* case, it is

- 8 -

unlikely indeed that the *Kirtsaeng* Court intended – *sub silentio* – for its decision to be applicable to patent cases.

## D. The relevant jurisprudence of this Court is well-established and fully applicable to the facts at issue.

This Court has held, consistently and explicitly, that exhaustion of U.S. patent rights does not occur as to goods sold by the patent owner in a foreign country. The Court considered that question directly in *Jazz Photo Corp. v. International Trade Commission*, 264 F.3d 1094 (Fed. Cir. 2001), wherein the Court stated:

> "To invoke the protection of the first sale doctrine, the authorized first sale must have occurred under the United States patent. See *Boesch v. Graff*, 133 U.S. 697, 701-703 (1890)… (a lawful foreign purchase does not obviate the need for license from the United States patentee before importation into and sale in the United States). Our [exhaustion] decision applies only to [products] for which the United States patent right has been exhausted by first sale in the United States. Imported [products] of solely foreign provenance are not immunized from infringement …." *Id.* at 1105.

If there were any doubt about the scope of that ruling, it was eliminated in *Fuji Photo Film Co., Ltd. v. Jazz Photo Corp*, 394 F.3d. 368 (Fed. Cir. 2005), wherein this Court stated unequivocally that its reliance in the earlier *Jazz Photo* case on the Supreme Court's 1890 ruling in *Boesch v. Graff* was not limited to situations in which the foreign sale was by someone other than the patent owner:

> "Jazz … does not escape application of the exhaustion principles because Fuji or its licensees authorized the international first sales of these [products]. The patentee's authorization of an international first sale does

- 9 -

not affect exhaustion of that patentee's rights in the United States." *Id*. at 1376.

Following the Supreme Court's decision in *Quanta Computer, Inc. v. LG Electronics, Inc.*, 128 S.Ct. 2109 (2008), this Court reaffirmed those earlier rulings, noting that "neither the facts nor the law in Quanta Computer concerned the issue of importation into the United States of a product not made or sold **under a United States patent**." *Ninestar Technology Co. v. Intern. Trade Com'n*, 667 F.3d, 1373, 1379 (Fed. Cir. 2012) (emphasis supplied) (affirming a civil penalty for violation of an ITC cease and desist order by a Chinese infringer). *Accord Fujifilm Corp. v. Benun*, 605 F.3d 1366 (Fed. Cir. 2010) (affirming a damage award for unlawful importation).

Nothing in the *Kirtsaeng* opinion states, or even remotely implies, that the Court intended it to upend this well-established precedent. The *Kirtsaeng* opinion neither compels nor suggests that this court apply it to patent law and disrupt the long-settled expectation that the sale of products in a foreign country, whether by the patent owner or someone else and whether or not the sale is made pursuant to a foreign counterpart of a United States patent, does not exhaust any United States patent rights.

## II.    The Supreme Court Decision in *Quanta* Did Not Overrule this Court's Decision in *Mallinckrodt*.

### A. *General Talking Pictures* established the enforceability of license provisions that restrict the use of patented items.

A proper analysis of the *Mallinckrodt* question posed by the *en banc* Order must start with the Supreme Court's 1938 ruling in *General Talking Pictures v. Western Electric Co.*, 304 U.S. 175, *aff'd on reh'g*, 305 U.S. 124 (1938). That case provides a solid foundation for this Court's ruling in *Mallinckrodt* and, as noted in the Section C., below, was expressly acknowledged and reaffirmed by the Supreme Court's *Quanta* decision.

The patents at issue in *Talking Pictures* covered sound amplifiers and were licensed by the patent owner to multiple licensees, with each one allowed to pursue a specified field-of-use. The license restriction relevant to the Supreme Court's decision provided that the licensee was not allowed to sell amplifiers for commercial, as opposed to private, uses. 304 U.S. at 180-82; on reh'g, 305 U.S. at 125-27. The defendant theatre operator, which had purchased its sound system from an entity licensed to sell only for amateur radio applications, argued that the license restriction was not enforceable and that the patent exhaustion doctrine allowed unrestricted use of amplifiers that had been manufactured by a licensee under the patent and sold "in the ordinary channels of trade" for full consideration. *Id.*

The Supreme Court held otherwise, ruling that the amplifiers at issue had not been made and sold "under the patent," because the field-of-use restriction limited the scope of the seller's license to do so. *Id.*; on reh'g, 305 U.S. at 125-27. The Court stated that:

> "Unquestionably, the owner of a patent may grant licenses to manufacture, use or sell upon conditions not inconsistent with the scope of the monopoly. *Bement v. National Harrow Co.*, 186 U.S. 70, 93 and *United States v. General Electric Co.*, 272 U.S. 476, 489. There is here no attempt on the part of the patent owner to extend the scope of the monopoly beyond that contemplated by the patent statute."

304 U.S. at 181. Both the seller and the theater operator were found to infringe the patent, notwithstanding the license agreement:

> "The [licensee] could not convey to [the theatre operator] what both knew it was not authorized to sell. *Mitchell v. Hawley*, 16 Wall. 544, 550. By knowingly making the sales to [the theatre operator] outside the scope of its license, the [licensee] infringed the patents embodied in the amplifiers. [Citations omitted]. [The theatre operator], having with knowledge of the facts bought at sales constituting infringement, did itself infringe the patents embodied in the amplifiers when it leased them for use as talking picture equipment in theaters."

*Id.* at 181-82[3]

---

[3]    Another issue certified by the Supreme Court was the adequacy of a label license restriction as the basis for holding the theatre operator liable for infringement, along with the licensee. There was no dispute that the theatre operator knew of the license restriction and knew that the sale by the licensee was outside the scope of the seller's license. Therefore, the Court declined to decide whether the "license notice" included with each sale of sound equipment would have been adequate, standing alone, to make the customer liable for infringement. "As petitioner at the time it bought the amplifiers knew that the sales constituted infringement of the patents embodied in them, petitioner's second question, as to effect of the license notice, need not be considered." 304 U.S. at 182.

The dissent by Justice Black, joined by Justice Reed, *Id.* at 183, *et seq.; on reh'g;* 305 U.S. at 128, *et seq.* would have precluded patent owners from imposing any restrictions at all on the uses to which a licensed article could be put after it was sold. In their view, a strict application of the exhaustion doctrine would have trumped any procompetitive benefits that might result from restrictive licensing. Citing *Keeler v. Standard Folding Bed Co*., 157 U.S. 659 (1895), *Bauer & Cie v. O'Donnell*, 229 U.S. 1 (1913) and *Motion Picture Patents Co*. v. *Universal Film Co*., 243 U.S. 502 (1917), the dissent argued that, even though restrictions on use of patented products were common in patent licenses, such restrictions should not be allowed to support patent infringement claims against products sold by licensees:

> "[A] 'common practice … to grant written licenses … restricted to one or more … fields of use' cannot prevent the application of 'that line of cases in which this court from the beginning has held that a patentee who has parted with a patented machine by passing title to a purchaser has placed the article beyond the limits of the monopoly secured by the patent act.'"

305 U.S. at 132.

In rejecting this view, the Supreme Court's majority in *Talking Pictures* necessarily reaffirmed a foundational principle of patent law – a patent owner is permitted to impose reasonable restrictions on its purchasers of patented products with respect to uses that they are permitted to make. The continued viability of that rule has never been revisited nor seriously questioned by the Supreme Court.

- 13 -

The legitimacy of reasonable restrictions on the use and sale of patented products has a sound statutory basis, given that 35 U.S.C. §271(a)[4] recites **separately** the specific rights that are included in the statutory bundle of patent rights – *i.e.*, the rights to exclude others from making using, offering to sell, selling and importing the patented invention.[5]  The only practical way to insure the separability of these rights is to allow patent owners the freedom to license them separately.  This freedom to impose restraints on use and sale was recognized well before *Talking Pictures* and has provided the conceptual foundation for many types of license restrictions, including fields-of-use and territorial limitations.[6]

---

[4]    The relevant portion of §271(a) essentially codified Section 4884 of the Revised Statutes, which defined infringement at the time of *General Talking Pictures*.

[5]    The Supreme Court has long recognized the implications of these separate recitations of rights.  *E.g.*, *Adams v. Burke*, 84 U.S. 453, 456 (1873), where the Court noted that "the right to manufacture, the right to sell, and the right to use are each substantive rights, and may be granted or conferred separately by the patentee."

[6]    *E.g., Bauer & Cie v. O'Donnell*, 229 U.S. 1, 15 (1913) (quoting *Adams*, "Thus, there are several substantive rights, and each is the subject of subdivision, so that one person may be permitted to make, but neither to sell nor use the patented thing. To another may be conveyed the right to sell, but within a limited area, or for a particular use, while to another the patentee may grant only the right to make and use, or to use only for specific purposes."); *Mitchell v. Hawley*, 83 U.S. (16 Wall.) 544, 548 (1873) (Supreme Court affirmed a finding of infringement by one who purchased a patented machine from a licensee that had the right to make and use but did not have the right to sell the machine during the term of the patent.  The Court distinguished the situation before it, where the patent

Such license restrictions are beneficial and pro-competitive, because they allow a patent owner to license a new technology selectively to individual licensees most likely to succeed within a specified field-of-use, territory or customer population. License restrictions also allow the patent owner to create incentives for potential licensees to invest time and resources to the development of their assigned markets, rather than elsewhere. Reasonable restrictions on licensees sometime provide the incentive for patent owners to grant licenses that otherwise might not be possible – for example in situations where the patent owner intends to commercialize its own invention within one market segment but is willing to license others to exploit the invention in other segments. This, of course, was the precise situation in *Talking Pictures*. *See* 304 U.S. at 179. Without an enforceable restriction, a rational patent owner faced with the need to compete with its own licensees or their customers might well decide not to grant the license at all.

The pro-competitive benefits of conditional licenses are noted in "Antitrust Guidelines for the Licensing of Intellectual Property," promulgated jointly by the Department of Justice and the Federal Trade Commission in 1995:

---

owner had clearly restricted the right of a licensee to sell machines, from one "where the sale is absolute, and without any conditions" and the buyer would therefore be free to treat the machine as his or her "private, individual property." *Id.*

- 15 -

"Field-of-use, territorial, and other limitations on intellectual property licenses may serve procompetitive ends by allowing the licensor to exploit its property as efficiently and effectively as possible. These various forms of exclusivity can be used to give a licensee an incentive to invest in the commercialization and distribution of products embodying the licensed intellectual property and to develop additional applications for the licensed property." §2.3.

## B. The *Mallinckrodt* decision reflected a straightforward application of *General Talking Pictures* to a summary judgment ruling.

In *Mallinckrodt*, a panel of this Court analyzed the exhaustion doctrine in the context of a patented "nebulizer" sold to hospitals and used for allowing patients to inhale a radioactive or therapeutic material for diagnostic or therapeutic purposes. The district court had granted summary judgment assuming the following facts: 1) plaintiff Mallinckrodt sold the nebulizer with a "single use only" label restriction attached to the device itself and had included a copy of the notice with packaging materials for the device; 2) the hospital to which the device was sold, despite knowledge that Mallinckrodt intended through its terms of sale to prohibit multiple uses of the device, nevertheless sent used devices to defendant Medipart for sterilization and reloading with the diagnostic material; and 3) like the hospital, Medipart was also aware of the use restriction imposed by Mallinckrodt. 976 F.2d at 701-02.

Mallinckrodt sued Medipart, alleging patent infringement and several other causes of action. The district court granted summary judgment for the defendant as to patent infringement, ruling as a matter of law that the patent exhaustion

doctrine nullified any effect of the label restriction on the hospital's right to reuse the nebulizer.  The district court also entered an injunction against Mallinckrodt's sending of a revised notice, which triggered this Court's interlocutory jurisdiction.

This Court reversed the injunction and remanded for further consideration of the question of patent exhaustion.  Relying principally on *Talking Pictures,* the Court held that the exhaustion doctrine could not be applied to defeat infringement without first determining whether Mallinckrodt's efforts to control the reuse of its devices were contractually binding as a restriction on use similar to the one approved by the Supreme Court:

> "We conclude that the district court erred in holding that the restriction on reuse was, as a matter of law, unenforceable under the patent law.  If the sale of the [nebulizer] was validly conditioned under the applicable law such as the law governing sales and licenses, and if the restriction on reuse was within the scope of the patent grant or otherwise justified, then violation of the restriction may be remedied by action for patent infringement."

976 F.2d at 709.  The Court thus remanded the matter for further consideration of the contractual arrangement between Mallinckrodt and its customer.

In its *Mallinckrodt* ruling, this Court also addressed the argument made by Medipart that a distinction should be drawn between a license restriction on the use of a patented article sold to the customer of a licensee and the same restriction imposed directly by a patent owner on its own customer who purchased the same article.  *Id.* at 705.  This Court saw no viable basis for drawing such a distinction, and indeed it is difficult to find one.  The important question is not which seller

- 17 -

imposed the restriction, the patent owner or its licensee, but whether the restriction itself runs contrary to some legal policy found in either patent law, antitrust law or principles of equity. A restriction on the use and/or resale by a purchases of patented products represents an exception to the exhaustion doctrine that is dependent upon a proper contract provision and proper notice to the restricted purchaser. The ability to satisfy these conditions is the same whether imposed directly by the patent owner or through a license provision. To the extent such a provision serves a beneficial or pro-competitive purpose, the effect will be similar in both cases.

The *Mallinckrodt* Court also observed that drawing a purely formalistic line between restrictions on customers of the patent owner and customers of its licensees would be pointless, because it could easily be avoided. *Id*. This is clearly the case. For example, a patent owner that might otherwise sell directly to customers and impose use or resale restrictions as a condition of the sale could easily create a separate corporate entity to become a licensee-seller and accomplish the same result by indirection. IPO submits that there is nothing to be gained by engaging in formalistic distinctions of this type.

## C. *General Talking Pictures* was distinguished and reaffirmed in the *Quanta* decision.

In *Quanta Computer, Inc. v. LG Electronics, Inc.*, 128 S.Ct. 2109 (2008), the Supreme Court held that unconditional sales of microprocessors and chipsets

(collectively "chips") by Intel Corporation, a licensee under the LGE patents at issue, had exhausted the relevant LGE patent rights and that LGE therefore had no right to pursue infringement claims against Quanta Computer and other Intel customers who had combined the licensed chips with other components to create and sell computers.  The LGE-Intel license agreement itself did not limit the customers to which Intel could sell its chips nor did it limit the uses to which Intel's customers could put the products.  The license agreement did contain a provision stating that no license was being extended to any of Intel's customers.  A separate contract between Intel and LGE required Intel to inform purchasers of its chips that they might need a separate license from LGE to combine Intel chips with non-Intel parts, and insofar as the record shows, that provision was complied with. 128 S.Ct. at 2114.[7]

LGE brought infringement suits against Quanta and other Intel customers based on patents covering the combination of Intel's chips with other components. The district court granted summary judgment based on the exhaustion doctrine,

---

[7]    The agreement also stated that the doctrine of patent exhaustion was fully applicable.  As noted by the Supreme Court:

"The License Agreement purports not to alter the usual rules of patent exhaustion, however, providing that, '[n]otwithstanding anything to the contrary contained in this Agreement, the parties agree that nothing herein shall in any way limit or alter the effect of patent exhaustion that would otherwise apply when a party hereto sells any of its Licensed Products.'"

which this Court reversed.  This Court analyzed the exhaustion question as a one of implied license, and finding no implied license running from LGE to Intel's customers, held that there was no exhaustion of LGE's patent rights in light of the language of the license and particularly the side agreement between Intel and LGE. This Court relied specifically on its prior ruling in *Mallinckrodt* and on *Talking Pictures* to reach that conclusion.

In reversing, the Supreme Court reviewed the history of the exhaustion doctrine and particularly its applicability to the specific situation before the Court in which the licensed chips sold by Intel were not specifically covered by the system patents being asserted against Quanta and others.  The Supreme Court relied on *United States v. Univis Lens Co.*, 316 U.S. 241 (1942) to hold, first, that the exhaustion doctrine does not depend on the existence of an implied license, but operates as a limitation on the patent right itself.  128 S.Ct. 2116-17.  Second, the Court held that exhaustion applies as much to method patents as to apparatus patents.  *Id*. at 2117-18.  Third, the Court held that even though the chips sold by Intel were not expressly covered by the patent claims being asserted against Intel's customers, exhaustion would nevertheless apply because the only use for the chips was to incorporate them into the systems accused of infringement.  *Id*. at 2118-21.

More directly germane to the issues presently before this Court, LGE cited *Talking Pictures* to argue that its license to Intel, combined with their

contemporaneous side contract, imposed limits on the extent to which Intel's

customers could use and resell the products sold by Intel.  More specifically, LGE

argued that incorporation of Intel's chips into computers without a separate license

was prohibited by the terms of its license to Intel.  *Id*. at 2121-22.  The Supreme

Court disagreed, ruling that *Talking Pictures* was inapplicable, because the license

agreement was not conditional and allowed Intel to make unrestricted sales of its

chips to anyone.  The Court explained its conclusion as follows:

> "LGE overlooks important aspects of the structure of the Intel-LGE
> transaction.  Nothing in the **License Agreement** restricts Intel's right to sell
> its microprocessors and chipsets to purchasers who intend to combine them
> with non-Intel parts. … To be sure, LGE did require Intel to give notice to
> its customers, including Quanta, that LGE had not licensed those customers
> to practice its patents.  But neither party contends that Intel breached the
> agreement in that respect. … In any event, the provision requiring notice to
> Quanta appeared only in [a side agreement], and LGE does not suggest that
> a breach of that agreement would constitute a breach of the License
> Agreement.  Hence, Intel's authority to sell its products embodying the LGE
> Patents was not conditioned on the notice or on Quanta's decision to abide
> by LGE's directions in that notice. … [E]xhaustion turns only on Intel's own
> license to sell products practicing the LGE Patents."

*Id*. at 2121 (emphasis supplied).

The Supreme Court did not suggest that it was overruling the *Talking*

*Pictures* case or limiting it in any way.  To the contrary, the Court appears to have

accepted the continuing viability of *Talking Pictures* as a precedent allowing the

imposition of reasonable restrictions on use and resale of patented products by

- 21 -

customers with respect to fields-of-use, territories, market segments and the like, when such restrictions are agreed upon in a license agreement.

The Supreme Court decision in *Quanta* does not mention this Court's decision in *Mallinckrodt* at all, nor, given the disposition that the Court made of the conditional sales argument by LGE, was there any need for it to do so. Accordingly, there is no basis in the *Quanta* opinion for believing that the Supreme Court intended to overrule *Mallinckrodt* or that it would do so today.

## CONCLUSION

For reasons set forth herein, IPO does not read *Kirtsaeng* as overruling or otherwise casting doubt on this Court's conclusions in *Jazz Photo* and its progeny. Patent rights are limited territorially by the nationality of the issuing agency, and it would be extraordinary to say that sales outside the U.S. could exhaust U.S. patent rights as a matter of law.

Nor does IPO believe there is any basis for believing that the Supreme Court's *Quanta* decision was intended to overrule this Court's *Mallinckrodt* ruling or its own precedent in *Talking Pictures*. To the contrary, the Supreme Court seems to have gone out of its way to reaffirm the underlying rule in that case, which is entirely consistent with the need to use a rule of reason approach to analyze restrictions on use and resale imposed by a patent owner. IPO strongly urges this Court to preserve freedom to contract to the maximum extent possible,

because that will provide the parties to licenses and sales contracts maximum

flexibility to arrive at commercially feasible and pro-competitive arrangements.

Respectfully submitted,

Date: August 19, 2015

/s/ Robert P. Taylor
Robert P. Taylor
RPT Legal Strategies PC
2443 Fillmore Street # 332
San Francisco, California 94115

*Counsel for Amicus Curiae
Intellectual Property Owners
Association*

# APPENDIX

# APPENDIX[1]

## Members of the Board of Directors
## Intellectual Property Owners Association

Steven Arnold
  Micron Technology, Inc.

Edward Blocker
  Koninklijke Philips N.V.

Tina M. Chappell
  Intel Corp.

William J. Coughlin
  Ford Global Technologies LLC

Robert DeBerardine
  Sanofi-Aventis

Anthony DiBartolomeo
  SAP AG

Daniel Enebo
  Cargill, Inc.

Barbara A. Fisher
  Lockheed Martin

Louis Foreman
  Enventys

Scott M. Frank
  AT&T

David A. Frey
  Rolls-Royce Corp.

Darryl P. Frickey
  Dow Chemical Co.

Krish Gupta
  EMC Corporation

Henry Hadad
  Bristol-Myers Squibb Co.

Carl B. Horton
  General Electric Co.

Michael Jaro
  Medtronic, Inc.

Philip S. Johnson
  Johnson & Johnson

Charles M. Kinzig
  GlaxoSmithKline

David J. Koris
  Shell International B.V.

William Krovatin
  Merck & Co., Inc.

Allen Lo
  Google Inc.

Timothy Loomis
  Qualcomm, Inc.

[1]IPO procedures require approval of positions in briefs by a two-thirds majority of directors present and voting.

Thomas P. McBride
    Monsanto Co.

Steven W. Miller
    Procter & Gamble Co.

Micky Minhas
    Microsoft Corp.

Douglas K. Norman
    Eli Lilly and Co.

Salvatore Pace
    Praxair, Inc.

Richard F. Phillips
    Exxon Mobil Corp.

Dana Rao
    Adobe Systems Inc.

Kevin H. Rhodes
    3M Innovative Properties Co.

Curtis Rose
    Hewlett-Packard Co.

Matthew Sarboraria
    Oracle USA Inc.

Manny Schecter
    IBM Corp.

Steven J. Shapiro
    Pitney Bowes Inc.

Dennis C. Skarvan
    Caterpillar Inc.

Daniel J. Staudt
    Siemens Corp.

Brian K. Stierwalt
    ConocoPhillips

Brian Suffredini
    United Technologies Corp.

James J. Trussell
    BP America, Inc.

Roy Waldron
    Pfizer, Inc.

Michael Walker
    DuPont

BJ Watrous
    Apple Inc.

Stuart L. Watt
    Amgen, Inc.

Jon D. Wood
    Bridgestone Americas Holding,
    Inc.

Michael Young
    Roche, Inc.

## United States Court of Appeals
## for the Federal Circuit

*Lexmark International, Inc. v. Ink Technologies Printer*, 2014-1617, -1619

### CERTIFICATE OF SERVICE

I, Robyn Cocho, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by counsel for Amicus Curiae, Intellectual Property Owners Association, to print this document. I am an employee of Counsel Press.

On **August 19, 2015,** counsel has authorized me to electronically file the foregoing **Brief for Amicus Curiae** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to all counsel registered as CM/ECF users, including any of the following:

Edward F. O'Connor
(principal counsel)
AVYNO LAW P.C.
6345 Balboa Boulevard
Suite 190
Encino, California 91316
(818) 488.8140
*Counsel for Appellant*

Timothy Colin Meece
(principal counsel)
Auda Carol Eidem Heinze
Bryan Medlock, Jr.
Jason S. Shull
Banner & Witcoff, Ltd.
Ten South Wacker Drive
Chicago, IL 60606
312-463-5420
tmeece@bannerwitcoff.com
aheinze@bannerwitcoff.com
bmedlock@bannerwitcoff.com
jshull@bannerwitcoff.com
*Counsel for Cross-Appellant*

Steven B. Loy
Stoll, Keenon & Park, LLP
300 West Vine Street, Suite 2100
Lexington, KY 40507-1380
859-231-3000
steven.loy@skofirm.com
*Counsel for Cross-Appellant*

Constantine L. Trela, Jr.
Sidley Austin LLP
Bank One Plaza
1 South Dearborn Street
Chicago, IL 60603
312-853-7000
ctrela@sidley.com
*Counsel for Cross-Appellant*

Benjamin Beaton
Joshua J. Fougere
Sidley Austin LLP
1501 K Street, NW
Washington, DC 20005
202-736-8000
bbeaton@sidley.com

*Counsel for Cross-Appellant*

Two paper copies will also be mailed to the above principal counsel when paper copies are sent to the Court. Any counsel for Amici Curiae appearing at the time of this filing will be served only via the email notice from the CM/ECF system.

Upon acceptance by the Court of the e-filed document, 31 paper copies will be filed with the Court within the time provided in the Court's rules.

August 19, 2015                                          /s/ Robyn Cocho
                                                        Counsel Press

# CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, the undersigned certifies that:

1. This brief complies with the type-volume limitation of FED. R. APP. P. 29(d) and 32(a)(7)(B) because this brief contains 5,736 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii), as determined by the word processing system used to generate the brief.

2. This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2003 in Times New Roman font, 14 point.

Dated:  August 19, 2015                   /s/ Robert P. Taylor
                                          Robert P. Taylor
                                          RPT Legal Strategies PC
                                          *Counsel for Amicus Curiae*
                                          *Intellectual Property Owners Association*