**14-1617, 14-1619**

IN THE

# United States Court of Appeals

## FOR THE FEDERAL CIRCUIT

————◆◆◆————

LEXMARK INTERNATIONAL, INC.,

*Plaintiff-Cross-Appellant,*

—v.—

IMPRESSION PRODUCTS, INC.,

*Defendant-Appellant,*

QUALITY CARTRIDGES, INC., JOHN DOES, 1-20, BLUE TRADING LLC,
EXPRINT INTERNATIONAL, INC., LD PRODUCTS, INC., PRINTRONIC CORPORATION,
TESEN DEVELOPMENT (HONG KONG) CO. LTD., BENIGNO ADEVA AND HIS COMPANIES,

*Defendants.*

————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
JUDGE MICHAEL R. BARRETT
10-CV-00564-MRB

---

## BRIEF FOR *AMICUS CURIAE* DOLBY LABORATORIES, INC. IN SUPPORT OF PLAINTIFF-CROSS-APPELLANT LEXMARK INTERNATIONAL, INC.

---

GARRARD R. BEENEY
ADAM R. BREBNER
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000

*Attorneys for Amicus Curiae
  Dolby Laboratories, Inc.*

August 19, 2015

## CERTIFICATE OF INTEREST

Pursuant to Fed. Cir. R. 47.4 and Fed. R. App. P. 26.1, counsel for

*Amicus Curiae* Dolby Laboratories, Inc. certifies the following:

1. The full name of every party represented by me is:  Dolby Laboratories, Inc.

2. The name of the real party in interest represented by me is:  N/A.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the parties represented by me are:  None.

4. The names of all law firms and the partners or associates that appeared for the party now represented by me and that are expected to appear in this court are:  Sullivan & Cromwell LLP – Garrard R. Beeney and Adam R. Brebner.


*/s/ Garrard R. Beeney*
Garrard R. Beeney
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004-2498

*Counsel of Record for* Amicus Curiae
*Dolby Laboratories, Inc.*

# TABLE OF CONTENTS

**Page**

Statement of Interest of *Amicus Curiae* ................................................................1

Summary of Argument.............................................................................................2

Argument..................................................................................................................3

I.    The Court Should Not Overrule *Mallinckrodt* ................................................3

    A.    The Supreme Court Has Consistently Upheld the Right of
           Patentees to Grant Limited Authorizations and Its Decision in
           *Quanta* Did Not Change That Rule.......................................................3

    B.    The Holding of *Mallinckrodt* Fits Well Within the Strictures
           Set Out in *General Talking Pictures* and *Quanta* .................................7

    C.    The Holding in *Mallinckrodt* Is Further Supported by the Goals
           of the Patent Act .................................................................................10

II.   The Court Should Not Disturb Its Holding in *Jazz Photo* that for
      Patent Exhaustion to Apply, "The Authorized First Sale Must Have
      Occurred under the United States Patent" ......................................................14

    A.    The Territorial Reach of the Patent Exhaustion Doctrine Is
           Based on the Territorial Limits of Patent Law and Was Not
           Altered by the Supreme Court's Analysis of the Copyright Act
           in *Kirtsaeng* .......................................................................................15

    B.    Other Considerations Relevant to Patent Law Also Militate
           Against Overruling *Jazz Photo* ...........................................................19

    C.    A Rule of National Exhaustion Does Not Limit the Ability of
           Parties to Contract for International Exhaustion.................................24

Conclusion .............................................................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams* v. *Burke,*
  84 U.S. 453 (1873)...........................................................................17

*Boesch* v. *Graff,*
  133 U.S. 697 (1890).................................................................15,16,18

*Carnegie Mellon Univ.* v. *Marvell Tech. Grp., Ltd.,*
  No. 2014-1492, 2015 WL 4639309 (Fed. Cir. Aug. 4, 2015) ......................14,18

*Deepsouth Packing Co.* v. *Laitram Corp.,*
  406 U.S. 518 (1972)..........................................................................16

*E. Bement & Sons* v. *Nat'l Harrow Co.,*
  186 U.S. 70 (1902)............................................................................4,9

*Fuji Photo Film Co.* v. *Jazz Photo Corp.,*
  394 F.3d 1368 (Fed. Cir. 2005) ..........................................................18

*General Talking Pictures Corp.* v. *Western Electric Co.,*
  304 U.S. 175 (1938), *aff'd on reh'g*, 305 U.S. 124 (1938) .......................*passim*

*Golan* v. *Holder,*
  132 S. Ct. 873 (2012).........................................................................20

*Helferich Patent Licensing, LLC* v. *New York Times Co.,*
  778 F.3d 1293 (Fed. Cir. 2015) .................................................17,18,26

*Hewlett-Packard* v. *Repeat-O-Type Stencil Mfg. Co.,*
  123 F.3d 1445 (Fed. Cir. 1997) ..........................................................11

*Itar-Tass Russian News Agency* v. *Russian Kurier, Inc.,*
  153 F.3d 82 (2d Cir. 1998) ................................................................20

*Jazz Photo Corp.* v. *International Trade Commission,*
  264 F.3d 1094 (Fed. Cir. 2001) ...............................................3,14,15,18

*JVC Kenwood Corp.* v. *Arcsoft, Inc.*,
   966 F. Supp. 2d 1003 (C.D. Cal. 2013) ...............................................9

*Kirtsaeng* v. *John Wiley & Sons, Inc.*,
   133 S. Ct. 1351 (2013) .................................................................*passim*

*Lexmark Int'l, Inc.* v. *Ink Techs. Printer Supplies, LLC*,
   No. 1:10-CV-564, 2014 WL 1276133 (S.D. Ohio Mar. 27, 2014) ...................10

*Madstad Eng'g, Inc.* v. *U.S. Patent & Trademark Office*,
   756 F.3d 1366 (Fed. Cir. 2014) ........................................................21

*Mallinckrodt, Inc.* v. *Medipart, Inc.*,
   976 F.2d 700 (Fed. Cir. 1992) ......................................................*passim*

*Microsoft Corp.* v. *AT&T Corp.*,
   550 U.S. 437 (2007) ......................................................................14

*Mitchell* v. *Hawley*,
   83 U.S. 544 (1872) ......................................................................4,18

*Montejo* v. *Louisiana*,
   556 U.S. 778 (2009) ......................................................................27

*Multimedia Patent Trust* v. *Apple Inc.*,
   No. 10-CV-2618, 2012 WL 6863471 (S.D. Cal. Nov. 9, 2012).........................25

*Princo Corp.* v. *Int'l Trade Comm'n*,
   616 F.3d 1318 (Fed. Cir. 2010) ..................................................9,10,13

*Providence Rubber Co.* v. *Goodyear*,
   76 U.S. (9 Wall.) 788 (1870) .........................................................3,4

*Quanta Computer, Inc.* v. *LG Electronics, Inc.*,
   553 U.S. 617 (2008).....................................................................6,7,8

*Robert Bosch, LLC* v. *Pylon Mfg. Corp.*,
   719 F.3d 1305 (Fed. Cir. 2013) .......................................................27

*San Disk Corp.* v. *Round Rock Research LLC*,
   No. C 11-5243, 2014 WL 2700583 (N.D. Cal. June 13, 2014).........................25

-iii-

*Tessera, Inc.* v. *Int'l Trade Comm'n*,
   646 F.3d 1357 (Fed. Cir. 2011) .........................................................25

*United States* v. *Gen. Elec. Co.*,
   272 U.S. 476 (1926).........................................................................4

*Voda* v. *Cordis Corp.*,
   476 F.3d 887 (Fed. Cir. 2007) ...................................................20, 21

**Treaties**

Agreement on Trade-Related Aspects of Intellectual Property Rights,
   Apr. 15, 1994, Marrakesh Agreement Establishing the World
   Trade Organization, Annex 1C, 33 I.L.M. 1197 (1994)...............20,23

Berne Convention art. 5(1) (Paris text 1971)......................................19,20

**Statutes**

35 U.S.C. § 154(a) ..............................................................................2,14

35 U.S.C. § 271(a) ............................................................................14,18

35 U.S.C. § 271(d)(4)...........................................................................9,10

**Legislative Materials**

Innovation Act, H.R. 9, 114th Cong. § 5 (2015) ...................................12

Leahy–Smith America Invents Act,
   Pub. L. No. 112-29, 125 Stat. 284 (2011) .........................................21

**Other Authorities**

Anne Layne-Farrar, *An Economic Defense of Flexibility in IPR
   Licensing: Contracting around First Sale in Multilevel Production
   Settings*, 51 Santa Clara L. Rev. 1149 (2011) ...................................13

David J. Kappos, *Patent Law Harmonization: The Time Is Now*, 3
   Landslide 16 (2011) .........................................................................21

-iv-

Japan Patent Office, *Procedures for Obtaining a Patent Right*,
   http://www.jpo.go.jp/cgi/linke.cgi?url=/tetuzuki_e/t_gaiyo_e/pa_ri
   ght.htm ...........................................................................................21

Kamal Saggi, *Market Power in the Global Economy: The Exhaustion
   and Protection of Intellectual Property*, 123 Econ. J. 131 (2013) ....................23

Margaret A. Boulware *et al.*, *An Overview of Intellectual Property
   Rights Abroad*, 16 Hous. J. Int'l L. 441 (1994) ...................................................21

Mark R. Patterson, *Must Licenses Be Contracts?: Consent and Notice
   in Intellectual Property*, 40 Fla. St. U. L. Rev. 105 (2012)................................12

MPEG LA, *AVC/H.264 FAQ*,
   http://www.mpegla.com/main/programs/AVC/Pages/FAQ.aspx ......................26

Sarah R. Wasserman Rajec, *Free Trade in Patented Goods:
   International Exhaustion for Patents*, 29 Berkeley Tech. L.J. 317
   (2014)...............................................................................................................24

Simone A. Rose, *Patent "Monopolyphobia": A Means of
   Extinguishing the Fountainhead?*, 49 Case W. Res. L. Rev. 509
   (1999)...............................................................................................................12

Vincent Chiappetta, *The Desirability of Agreeing to Disagree: The
   WTO, Trips, International IPR Exhaustion and A Few Other
   Things*, 21 Mich. J. Int'l L. 333 (2000) ............................................................23

World Intellectual Property Organization*, Frequently Asked
   Questions: Patents*,
   http://www.wipo.int/patents/en/faq_patents.html.........................................20,21

## STATEMENT OF INTEREST OF *AMICUS CURIAE*[1]

Since its founding in 1965, Dolby Laboratories, Inc. ("Dolby Labs")

has dedicated itself to research and innovations that have revolutionized

consumers' enjoyment of audio and audio-visual entertainment. Among the many

innovations and technologies Dolby Labs has developed are noise reduction

systems and methods employed by the recording and cinema industries, including

surround sound technology used in cinema and home entertainment systems.

Dolby Labs focuses on the development of cutting-edge technology for

audio/video storage, delivery and playback, and creates interoperable audio/video

systems that are incorporated into products worldwide. As a result of its cutting-

edge inventions, Dolby Labs has been awarded and owns numerous patents.

Dolby Labs widely licenses its unique technology to hundreds of

companies around the globe, including through industry-wide patent pools, to

provide the solutions, services and support these licensees use to create engaging

products and content and premium audio/visual experiences for consumers. As a

developer and licensor of innovative technology, Dolby Labs has a strong interest

in the correct and consistent application of the patent laws that allow it and others

---

[1] No party or party's counsel authored any part of this brief or contributed money towards its preparation or submission. No one, other than *amici* and their counsel, contributed money towards the preparation or submission of this brief. This brief is filed pursuant to the Court's April 14, 2015 order permitting *amicus* briefs "without consent and leave of court."

to innovate and achieve fair value for their investment in research and

development.

## SUMMARY OF ARGUMENT

The Constitution provided to Congress the power to "promote the

progress of science and useful arts," U.S. Const. art. I, § 8, cl. 8, and to that end,

Congress enacted the Patent Act, which provides inventors who are granted patents

exclusive rights to make, use, sell or import their inventions, or to license others to

do so, for a limited time.  *See* 35 U.S.C. § 154(a).  Nothing in the Patent Act

requires a patentee to license her invention to others, and there is no statutory

requirement that a license, if granted, must authorize the licensee to perform every

act within the patent grant.  The judicially fashioned doctrine of patent exhaustion

is not to the contrary.  Put simply, patent exhaustion means that once a patentee has

authorized others to perform all the exclusive rights granted to the patentee, the

patentee cannot thereafter seek to control the use of the patented article within the

scope of the authorization that has been granted.  On the other hand, patentees and

licensees are free to define the scope of their licenses within the scope of the

patent.  Indeed, some licensees may not require each of the freedoms to make, use

and/or sell, and may not wish to pay for rights the licensees do not need.  Rights

never granted are not authorized and cannot be subject to exhaustion.  Hence, a

lawful restriction on the scope of a license or limited authorization in a sale or

license grant should be upheld.  This Court's decision in *Mallinckrodt, Inc.* v. *Medipart, Inc.*, 976 F.2d 700 (Fed. Cir. 1992), hews to these principles, and the Court should not overrule this long-standing precedent.

Similarly, the Court should not overrule *Jazz Photo Corp.* v. *International Trade Commission*, 264 F.3d 1094 (Fed. Cir. 2001).  *Jazz Photo* is fully consistent with the territorial limits of United States patent law, United States patent policy and concerns regarding patent enforcement in foreign jurisdictions. *Kirtsaeng* v. *John Wiley & Sons, Inc.*, 133 S. Ct. 1351 (2013), which addressed the statutory first-sale rule applicable to copyrighted works, is not analogous.

## ARGUMENT

## I.  THE COURT SHOULD NOT OVERRULE *MALLINCKRODT*.

### A.  The Supreme Court Has Consistently Upheld the Right of Patentees to Grant Limited Authorizations and Its Decision in *Quanta* Did Not Change That Rule.

The Supreme Court, for nearly 150 years, has expressly affirmed patent holders' ability to license or authorize less than the full set of rights provided to patentees under the patent grant.  In *Providence Rubber Co.* v. *Goodyear*, 76 U.S. (9 Wall.) 788 (1870), the Supreme Court upheld the limited scope of a license in which the patentee, Goodyear, granted defendant licensee the right "to make and sell India-rubber cloth" for the limited purpose of replacing "patent or japanned leather."  76 U.S. (9 Wall.) at 799.  When Goodyear filed a

patent infringement suit alleging that defendants improperly manufactured India-rubber cloth for other uses that were outside the scope of the authorization in the license, the Court affirmed that the license created no defense to infringement and allowed Goodyear's claim to proceed. *Id.* at 799-800.

Subsequent decisions by the Supreme Court consistently recognize the patent holder's ability to enforce patent rights outside of a limited license grant. In *Mitchell* v. *Hawley*, 83 U.S. 544 (1872), while the Court noted the principle that a fully authorized sale of a patented article exhausts the patentee's rights with respect to the article, the Court also upheld a time-limited license which restricted the licensee's right to make and sell the patented machine to the original patent term. *Id.* at 550. In *E. Bement & Sons* v. *Nat'l Harrow Co.*, 186 U.S. 70 (1902), the Supreme Court reiterated that "the rule is, with few exceptions, that any conditions which are not in their very nature illegal . . . imposed by the patentee and agreed to by the licensee for the right to manufacture or use or sell the article, will be upheld by the courts." *Id.* at 91 (finding that license restrictions imposed by the patentee did not violate the Sherman Act); *see also United States* v. *Gen. Elec. Co.*, 272 U.S. 476, 489 (1926) (similarly noting a patentee's right to grant limited licenses and impose "any condition the performance of which is reasonably within the reward which the patentee by the grant of the patent is entitled to secure").

-4-

In *General Talking Pictures Corp.* v. *Western Electric Co.*, 304 U.S. 175 (1938) (*GTP I*), *aff'd on reh'g*, 305 U.S. 124 (1938) (*GTP II*), the Supreme Court reaffirmed these principles and, again, reasoned that a license with restricted scope provided no defense to infringement claims outside the license grant. In that case, AT&T, the owner of patents covering vacuum tube amplifiers, granted two types of licenses to make and sell amplifiers: one for use in theaters and the movie industry, and the other for private use. 304 U.S. at 179. The defendant, intending to use the amplifiers in a commercial theater, purchased the patented amplifiers from a manufacturer whose license was limited to sales for home use. *Id.* at 180. AT&T sued the licensee's customer for infringement. The Court found that the restriction in the license was valid because a patentee may grant conditional licenses that contractually limit the licensee to certain specified uses of the patented technology, so long as the uses are within the scope of the patent claims and thus do not extend the patentee's monopoly beyond that bestowed by the patent grant. *Id.* at 181. The Supreme Court rejected the defendant's patent exhaustion defense, holding that because the manufacturer was only licensed to sell the patented amplifiers for residential use, its sale to the defendant for commercial use in theaters exceeded the scope of its license and was thus unauthorized. *Id.* Thus, the Court found that rights never granted and explicitly withheld could not be exhausted. On rehearing, the Supreme Court reaffirmed the

-5-

patentee's licensing restriction, stating that "where a patented invention is applicable to different uses, the owner of the patent may legally restrict a licensee to a particular field and exclude him from others." *GTP II*, 305 U.S. at 126. Subsequent decisions, both at the Supreme Court and in lower courts, have not cast any doubt on the Supreme Court's holding in *General Talking Pictures*.

In particular, the Supreme Court in *Quanta Computer, Inc.* v. *LG Electronics, Inc.*, 553 U.S. 617 (2008), did not disturb the well-established principles of *General Talking Pictures* and the earlier precedents cited above. In *Quanta*, LG had granted a full license to Intel to make and sell microprocessors and chipsets that employed LG's method patents on certain data processing functions. *Id.* at 623. LG also sought in contractual language to restrict Intel's customers' rights to incorporate the licensed Intel chips in non-Intel devices. *Id.* at 623-24. Intel's microprocessors and chipsets were sold to computer manufacturers who incorporated them into computer systems that practiced the asserted patents. *Id.* at 624. LG sued various computer manufacturers, claiming that the combining of Intel products with non-Intel computer components infringed its method patents. The main question before the Court was whether the patent exhaustion doctrine applied to method claims, which the Court answered in the affirmative. *Id.* at 629. After holding that the sale of Intel's products could exhaust LG's method claims, the Court reiterated the rule that "[e]xhaustion is triggered only by a sale

-6-

*authorized* by the patent holder." *Id.* at 636 (emphasis added).  In determining

whether the sales-at-issue to defendants were authorized, the Court noted that

unlike the licensing agreement in *General Talking Pictures*, LG's licensing

agreement was not limited and did not restrict Intel's right to sell its

microprocessors and chipsets to purchasers.  Rather, the license broadly permitted

"Intel to 'make, use, [or] sell' products free of LGE's patent claims." *Id.*  Because

Intel's license to sell its products was unconditional and the sales fully authorized,

defendants' purchase of Intel's microprocessors and chipsets exhausted LG's

patent rights, and LG could not later attempt to re-capture the patent right it already

had granted to Intel.  *Id.* at 636–37.  Importantly, although the *Quanta* Court

reaffirmed the application of exhaustion to a "fully authorized sale," the Court did

not disturb its prior rulings dating back to *Providence Rubber* that a limited-scope

license does not immunize an infringement defendant for sales or uses outside the

scope of the limited license.

### B.    The Holding of *Mallinckrodt* Fits Well Within the Strictures Set Out in *General Talking Pictures* and *Quanta.*

Prior to *Quanta*, in *Mallinckrodt, Inc.* v. *Medipart, Inc.*, a panel of this

Court, applying *General Talking Pictures*, found that the patentee could bring a

patent infringement suit when a restriction imposed by the patentee in authorizing

a sale had been violated.  976 F.2d 700, 709 (Fed. Cir. 1992).  As here, the

restriction at issue in *Mallinckrodt* was akin to the field-of-use restriction upheld in

-7-

*General Talking Pictures*, "wherein the field is single (*i.e.*, disposable) use." *Id.* at 703. In short, *Mallinckrodt* stands for the proposition that patentees are entitled to impose conditions or restrictions on licenses or sales of their patented inventions, so long as (i) the condition is within the scope of the patent, and (ii) the condition does not purport to limit rights already granted or authorized.

Nothing in the Supreme Court's *Quanta* decision a decade later—concerning a different, albeit exhaustion-related, issue—altered *Mallinckrodt*. Indeed, although both sides in *Quanta* cited *Mallinckrodt*, the *Quanta* Court saw no need to even mention the decision. The Supreme Court did not express disapproval or condemnation of restrictive licensing or conditional sales arrangements. The reason is simple—*Mallinckrodt* is wholly consistent with *General Talking Pictures*' holding that "the patentee may grant a license 'upon any condition the performance of which is reasonably within the reward which the patentee by the grant of the patent is entitled to secure.'" *GTP II*, 305 U.S. at 127 (quoting *Gen. Elec. Co.*, 272 U.S. at 489); *id.* ("That a restrictive license is legal seems clear.").

Further, in decisions since *Quanta*, this Court and numerous district courts have recognized the continued vitality of the *General Talking Pictures* rule, and Congress has never acted to overrule or limit the *General Talking Pictures* principle. For example, in this Court's *en banc* decision in *Princo Corp.* v.

-8-

*International Trade Commission*, 616 F.3d 1318, 1328 (Fed. Cir. 2010), the full Court cited *Mallinckrodt* and reaffirmed that "express conditions accompanying the sale or license of a patented product, such as field of use limitations, are generally upheld." *See also JVC Kenwood Corp.* v. *Arcsoft, Inc.*, 966 F. Supp. 2d 1003, 1010-11 (C.D. Cal. 2013) (noting that patentees may limit the scope of a license to certain conditions).

The reason the Supreme Court, this Court and the district courts have consistently upheld contractual limitations is grounded in the basic policy objective of patent law—appropriately rewarding inventors for their development of the useful arts through the grant of time-limited periods during which others may not practice an invention absent authorization. It follows from a patentee's exclusive rights that a patentee may choose to make or not make, use or not use, and sell or not sell embodiments of the patent, and may, similarly, limit the forms such embodiments may take or the fields in which they may be used by others. *See E. Bement & Sons*, 186 U.S. at 90-91. Likewise, the patentee may authorize others to do anything the patentee could do through a license, and may limit that license just as a patentee may limit its own activities. *GTP I*, 304 U.S. at 181 ("Patent owners may grant licenses extending to all uses or limited to use in a defined field."); *cf.* 35 U.S.C. § 271(d)(4). And as this Court noted in its *en banc* decision in *Princo*, in the context of a "conditional sale or license . . . it is more reasonable to infer that

-9-

[the] negotiated price reflects only the value of the 'use' rights conferred by the patentee." 616 F.3d at 1328.

**C.    The Holding in *Mallinckrodt* Is Further Supported by the Goals of the Patent Act.**

Upholding *Mallinckrodt* is consistent with the objectives of patent law and the patent exhaustion doctrine, including encouraging licensing and the free flow of patented goods. Although Defendant-Appellant and its *amici* raise the common-law rule against restraints on alienation as a justification for broadening the scope of the patent exhaustion doctrine to override contractual conditions or restrictions (*see, e.g.*, Br. Intellectual Prop. Professors and Am. Antitrust Inst. in Support of Def.-Appellant at 3), this attempt to circumscribe patentees' rights is without merit. As Congress has made clear, patent law gives patent holders a time-limited monopoly over their inventions, including the right to "refuse[] to license or use *any* rights to the patent." 35 U.S.C. § 271(d)(4) (emphasis added). In contrast, the putative concern over restraints is based on a speculative assumption that has no basis in the facts of this case. The record and district court decision make clear that there is no dispute that Lexmark chooses to sell its patented printer cartridges as *either* single-use or multi-use at different price points with unambiguous terms alerting purchasers as to the authorized use. *Lexmark Int'l, Inc.* v. *Ink Techs. Printer Supplies, LLC*, No. 1:10-CV-564, 2014 WL 1276133, at *1 (S.D. Ohio Mar. 27, 2014); A2559(¶ 8); A2561(¶ 13); A2562(¶ 15); Br. Def.-

-10-

Appellant Impression Prods., Inc. on En Banc Review at 2 ("There are no controverted issues of fact.").

There is no evidence of any consumer confusion or that any purchasers believed the single-use cartridges at issue were, in fact, sold as refillable multi-use cartridges. Consequently, there is no reason to limit the freedom to contract of both Lexmark *and* consumers to require that Lexmark sell only multi-use cartridges as a matter of law. Removing end-user choice in the guise of end-user protection would be perverse and harmful.

Further, using patent exhaustion as a blunt tool to provide transactional certainty is unnecessary. The holdings of *General Talking Pictures* and *Mallinckrodt* do not weaken transaction certainty because the patent holder or licensee must, at a minimum, provide adequate notice of any limitations on the patentee's authorization to the purchaser. *See Mallinckrodt*, 976 F.2d at 701, 709; *Hewlett-Packard* v. *Repeat-O-Type Stencil Mfg. Co.*, 123 F.3d 1445, 1453 (Fed. Cir. 1997) ("[A] seller's intent, unless embodied in an enforceable contract, does not create a limitation on the right of a purchaser to use, sell, or modify a patented product."); *see also* Mark R. Patterson, *Must Licenses Be Contracts?: Consent and Notice in Intellectual Property*, 40 Fla. St. U. L. Rev. 105, 116 (2012) (noting licensing and sales restrictions on patented goods generally must meet requirements of contract law to be enforceable). Thus, to the extent that the patent

-11-

exhaustion doctrine is intended to protect consumers and take products that have been purchased for use in the ordinary pursuits of life beyond the control of the patent holder, contract law and the requirement of adequate notice are sufficient to achieve that goal.

Moreover, the danger of end-users purchasing a product sold outside the permissible scope allowed under a license from an unscrupulous infringing seller are, of course, similar to the risks inherent in any purchase of a potentially patented article. To the extent that issue requires a consumer protection remedy, the judge-made patent-exhaustion doctrine is hardly the best tool. *Cf.* Innovation Act, H.R. 9, 114th Cong. § 5 (2015) (proposing a customer-suit exception that provides certain actions against a customer may be stayed so long as the customer agrees to be bound by the results of the suit against the manufacturer).

Further, overruling *Mallinckrodt* may negatively impact technology developers' ability to contract with various parties in a production chain. In today's environment of ubiquitous technology, patented inventions often derive their commercial value from a combination of complementary factors, including "manufacturing and distribution facilities, workforces, advertising and other items of intellectual property." Simone A. Rose, *Patent "Monopolyphobia": A Means of Extinguishing the Fountainhead?*, 49 Case W. Res. L. Rev. 509, 518 (1999). The monetary value attached to different patent rights by various participants in the

production chain may diverge considerably, and it will not be the optimal solution in every case that a single link in the production chain should bear the entire cost of all rights granted by a patent. To the contrary, and particularly in sophisticated high-technology products involving multiple actors producing components and inputs, the ability of patentees to appropriately divide patent rights among different actors in the production chain so that each pays a partial royalty commensurate with the value each actor receives—instead of an aggregate royalty charged to only one party—can be efficient and ensure that no one party in the production process bears the entire cost. *See* Anne Layne-Farrar, *An Economic Defense of Flexibility in IPR Licensing: Contracting around First Sale in Multilevel Production Settings*, 51 Santa Clara L. Rev. 1149, 1176 (2011). Economic efficiencies can be achieved by permitting the market to determine pricing based on the value each player derives from the specific patent rights. *Id*; *see Princo*, 616 F.3d at 1328. On the other hand, using patent exhaustion as a policy tool to *require* that patent licenses take only one form—a full grant exhausting all rights—will necessarily lead to inefficiencies and limit market solutions.[2]

---

[2] Additionally, enabling patent holders to "divide" licensing fees among various users of the rights inherent in the patent grant can help ensure that technology developers are fairly rewarded for their investment by reducing underreporting and increasing transparency and fairness in licensing. Layne-Farrar, *An Economic Defense of Flexibility*, 51 Santa Clara L. Rev. at 1164.

## II. THE COURT SHOULD NOT DISTURB ITS HOLDING IN *JAZZ PHOTO* THAT FOR PATENT EXHAUSTION TO APPLY, "THE AUTHORIZED FIRST SALE MUST HAVE OCCURRED UNDER THE UNITED STATES PATENT."

Patent law is territorial in nature. *See* 35 U.S.C. § 154(a)(1) (patent grants exclusive rights "throughout the United States"), § 271(a) (defining infringement based on conduct "within the United States" or importation "into the United States"). Indeed, the Supreme Court has noted that "[t]he presumption that United States law governs domestically but does not rule the world applies with particular force in patent law." *Microsoft Corp.* v. *AT&T Corp.*, 550 U.S. 437, 454-55 (2007). As this Court recently stated, this "background principle applies not just to identifying the conduct that will be deemed infringing but also to assessing the damages that are to be imposed for domestic liability-creating conduct." *Carnegie Mellon Univ.* v. *Marvell Tech. Grp., Ltd.*, No. 2014-1492, 2015 WL 4639309, at *19 (Fed. Cir. Aug. 4, 2015).

The inherently territorial nature of U.S. patent law mandated the Court's ruling in *Jazz Photo Corp.* v. *International Trade Commission* that to "invoke the protection of the first sale doctrine, the authorized first sale must have occurred under the United States patent." 264 F.3d 1094, 1105 (Fed. Cir. 2001). The Supreme Court's interpretation of the Copyright statute in *Kirtsaeng* does not alter this analysis.

-14-

**A.    The Territorial Reach of the Patent Exhaustion Doctrine Is Based on the Territorial Limits of Patent Law and Was Not Altered by the Supreme Court's Analysis of the Copyright Act in *Kirtsaeng*.**

As stated in this Court's order directing hearing *en banc*, this "case involves certain sales, made abroad, of articles patented in the United States." Docket No. 83. *Jazz Photo* is this Court's leading case on the territorial limits of the patent exhaustion doctrine, and the question before the Court of whether *Jazz Photo* should be overruled must be answered by first looking to the territorial nature of U.S. patent law. The Supreme Court's decision in *Kirtsaeng* v. *John Wiley & Sons, Inc.*, 133 S. Ct. 1351 (2013), which addressed the statutory first-sale doctrine under the Copyright Act, does not alter the rule that United States patent law "does not rule the world" or suggest that U.S. patents should be exhausted by foreign sales without authorization of the patentee. To the contrary, because United States patents, like patents in foreign jurisdictions, are creations of the domestic government, the exclusivity they provide is limited to the territorial purview of the government. (Similarly, rights granted under foreign patents cannot affect or abridge rights granted by U.S. patents.) Such inherently domestic rights cannot be exhausted by foreign sales that do not purport to grant any authorization to make, use or sell in the United States or import into the United States.

The Supreme Court recognized the distinct nature of U.S. and foreign patent laws over 100 years ago in *Boesch* v. *Graff*, 133 U.S. 697 (1890), in which

-15-

the Court held that the defendant's purchase and importation of a patented lamp

burner from Germany did not exhaust a U.S. patentee's right to assert an

infringement claim.  In *Boesch*, the vendor of the lamp burner in Germany

acquired the right to make and sell the lamp through a distinct provision of German

patent law that allowed those who were practicing or preparing to practice the

invention at the time of filing to continue their activities without the patentee's

permission.  133 U.S. at 701.  Thus, despite the fact that the vendor's sales were

authorized as a matter of law in Germany, the lamps could not be imported into the

U.S. without authorization from the U.S. patentee.  *Id.* at 703; *see also Deepsouth*

*Packing Co.* v. *Laitram Corp.*, 406 U.S. 518, 531 (1972) ("Our patent system

makes no claim to extraterritorial effect . . . and we correspondingly reject the

claims of others to such control over our markets.").[3]

      Fundamental differences between the patent exhaustion doctrine and

the statutory first-sale rule for copyrighted works preclude transposing *Kirtsaeng*

to the issue here.  In particular, *Kirtsaeng* turned on the interpretation of the phrase

"lawfully made under this title" in § 109(a) of the Copyright Act, which language

---

[3] *Amici* LG Electronics, *et al.* read *Boesch* too narrowly, suggesting that the Court
in that case rejected exhaustion simply because the foreign sale was not authorized
by the U.S. patentee.  Br. LG Elec., Inc., *et al.* at 22.  In fact, the Court's decision
was not so limited and was grounded in the territorial nature of U.S. and German
patent laws; as the court explained:  "[t]he sale of articles in the United States
under a United States patent cannot be controlled by foreign laws."  133 U.S. at
703.

governed the scope of the statute's application. 133 S. Ct. at 1357. In the dispute

in *Kirtsaeng*, the copyright holder, John Wiley & Sons, argued that "lawfully made

under this title" referred to copyrighted works manufactured where subject to the

copyright laws, *i.e.*, within the United States where the Copyright Act applies;

while the defendant, Kirtsaeng, contended that the phrase encompassed all copies

"made 'in accordance with' or 'in compliance with' the Copyright Act," regardless

of the place of manufacture. *Id.* at 1357-58. That is, the defendant argued that the

statutory text necessarily implied a "non-geographic" reading. *Id.* at 1358. After

examining the text of § 109(a), the statutory context and the common-law

backdrop of the first-sale doctrine in some detail, the Court found that "Kirtsaeng's

nongeographical reading is the *better reading of the [Copyright] Act*." *Id.*

(emphasis added).

Nowhere in the opinion did the Court mention patent law or patent

exhaustion. This is not surprising. Unlike the first-sale rule in § 109(a), patent

exhaustion is a judicially created doctrine with nothing to say about the phrase

"lawfully made under this title," a concept not found in the Patent Act. *See*

35 U.S.C. §§ 1, *et seq.*; *see also Helferich Patent Licensing, LLC* v. *New York*

*Times Co.*, 778 F.3d 1293, 1305 (Fed. Cir. 2015) ("Patent exhaustion is a judicially

fashioned doctrine without a specific source in congressionally enacted text stating

the terms of this limitation on patent rights."); *Adams* v. *Burke*, 84 U.S. 453, 456

(1873); *Mitchell* v. *Hawley*, 83 U.S. at 547.  Instead, the territorial "line" for

purposes of patent law is drawn by 35 U.S.C. § 271(a); that section "states a clear

definition of what conduct Congress intended to reach—making *or* using *or* selling

in the United States *or* importing into the United States, even if one or more of

those activities also occur abroad."  *Carnegie Mellon*, 2015 WL 4639309 at *20.

       The first-sale doctrine was first codified in the Copyright Act of 1909,

approximately twenty years after the Supreme Court had already ruled in *Boesch*

that a lawful foreign sale did not terminate United States patent rights.  Of course,

in the ensuing 100 years, Congress could have enacted a similar statute to codify

the extent of patent exhaustion—and, if it deemed advisable, could have

supplanted the rule in *Boesch*—but it has never done so.  Instead, Congress left

untouched court holdings which have consistently rejected a scheme of automatic

international exhaustion.  *Boesch*, 133 U.S. at 703; *Jazz Photo*, 264 F.3d at 1105;

*Fuji Photo Film Co.* v. *Jazz Photo Corp.*, 394 F.3d 1368, 1376 (Fed. Cir. 2005).

Thus, the Court may "presume, from Congress's refusal to disturb the existing

decisional law of [the patent exhaustion] doctrine (which predated the 1952 Act by

nearly a century), an implicit authorization to continue applying the doctrine within

its familiar boundaries."  *Helferich*, 778 F.3d at 1305.

-18-

### B.    Other Considerations Relevant to Patent Law Also Militate Against Overruling *Jazz Photo*.

In addition to the differences between domestic copyright and patent laws discussed above, there are also significant differences in the international regimes that exist for protecting copyrighted works and patents that militate in favor of preserving the rule against extraterritorial exhaustion in the patent context. Although there are many similarities in national patent laws, particularly among countries that have agreed to international patent standards by treaty, differences remain, and inventions patentable in one nation may not be protected in another or may receive a different level of protection. Moreover, a significant and complex system exists to allow a patent applicant to select those nations in which she seeks to protect her innovations. The patchwork system of international patent protection stands in stark contrast to the long-standing international regime for copyright in which the same "work," as opposed to potentially different patent claims, defines the scope of protection.

The Berne Convention for the Protection of Literary and Artistic Works, first signed in 1886, created a uniform system of copyright protection globally. The Convention requires its signatories to provide the same protection to works originating in other member States as the signatory grants to the works of its

own nationals.[4]  *See* Berne Convention art. 5(1) (Paris text 1971); *Itar-Tass*

*Russian News Agency* v. *Russian Kurier, Inc.*, 153 F.3d 82, 89 (2d Cir. 1998).

There are over 150 signatories to the Convention, which the United States joined in

1989.  *See Golan* v. *Holder*, 132 S. Ct. 873, 877-78 (2012) (discussing the

Convention).

       The international community has attempted to harmonize national

patent laws but with far less success than in the copyright field, and for good

reasons.  The Agreement on Trade-Related Aspects of Intellectual Property Rights

(TRIPs), a product of the World Trade Organization, is the leading agreement on

international patent protection, and requires each WTO member's national laws to

provide certain minimum substantive patent rights.  Agreement on Trade-Related

Aspects of Intellectual Property Rights, Apr. 15, 1994, Marrakesh Agreement

Establishing the World Trade Organization, Annex 1C, 33 I.L.M. 1197 (1994)

(hereinafter TRIPs Agreement); *see Voda* v. *Cordis Corp.*, 476 F.3d 887, 899 (Fed.

Cir. 2007) (discussing TRIPs).  Unlike the global protection afforded to

copyrighted works under the Berne Convention, there is no global system of

protecting patented inventions.  *See* World Intellectual Property Organization,

*Frequently Asked Questions: Patents*, http://www.wipo.int/patents/en/faq_patents

---

[4] In addition, member States generally must provide protection for a copyrighted
work *independent* of the existence of protection in the work's country of origin.

-20-

.html ("At present, you cannot obtain a universal 'world patent' or 'international patent.' Patents are territorial rights."). Inventors must apply for patent protection in the various countries and regions where they seek to preserve exclusivity over their inventions. *See id.* ("[A]n application for a patent must be filed, and the patent granted and enforced, in each country in which you seek patent protection for your invention, in accordance with the law of that country."); *Voda*, 476 F.3d at 899 ("Like the Paris Convention, nothing in the PCT or the Agreement on TRIPS contemplates or allows one jurisdiction to adjudicate patents of another.").

Moreover, there remain great divides on the substantive aspects of national patent laws, such as patentable subject matter, prior art, novelty, and non-obviousness. *See, e.g.*, David J. Kappos, *Patent Law Harmonization: The Time Is Now*, 3 Landslide 16, 17 (2011).[5] Indeed, it was only very recently with the passage of the Leahy–Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011), that the U.S. harmonized such matters as the "first-to-file" principle with general practice in the rest of the world. *See Madstad Eng'g, Inc.* v. *U.S. Patent & Trademark Office*, 756 F.3d 1366, 1368 (Fed. Cir. 2014) (discussing

---

[5] *See also* Margaret A. Boulware *et al.*, *An Overview of Intellectual Property Rights Abroad*, 16 Hous. J. Int'l L. 441, 450 (1994) (noting some utility model patents and industrial design patents available in foreign countries need only be novel); Japan Patent Office, *Procedures for Obtaining a Patent Right*, http://www.jpo.go.jp/cgi/linke.cgi?url=/ tetuzuki_e/t_gaiyo_e/pa_right.htm (substantive examination of patentability includes determination of whether "the claimed invention is liable to contravene public order and morality").

adoption of first-to-file rule). In part, the lack of success in harmonizing national

patent laws is due to the varying national views on the objectives of patent law.

Patent laws implicate complex policy concerns upon which nations have not been

able to fully agree.

For example, where a patentee lacks or has more limited rights in a

foreign jurisdiction, including due to differences in law or enforcement

mechanisms, the sale of a patented article in that jurisdiction should not exhaust

the patentee's U.S. patent rights where there is no indication that the patentee

intended to relinquish U.S. rights through a foreign transaction. To hold otherwise

would work injustice on many U.S. patentees that have reasonably relied on *Jazz

Photo*'s national exhaustion rule and, prospectively, would diminish the public

benefits of the national and international patent regimes in both foreign

jurisdictions where such transactions may occur (where a patentee might choose to

cease sales to avoid redirection of goods to the U.S.) and in the U.S. (where

innovation would be devalued by a lack of ability to protect against grey market

importation).

In contrast, maintaining a national exhaustion rule enhances

incentives for innovation by allowing patent holders to license or price patented

technology according to the country of sale. As numerous economists have noted,

a rule of international exhaustion, whereby sales in one country will exhaust the

patentee's exclusive rights in another, can force patentees to elevate the price of products or licenses in lower-income nations (or withdraw completely from lower-income markets) to prevent others from profiting in the price differential between lower-income and higher-income countries. *See, e.g.*, Kamal Saggi, *Market Power in the Global Economy: The Exhaustion and Protection of Intellectual Property*, 123 Econ. J. 131, 135 (2013). The end result is to "average out" the market price so that patentees (or their licensees) will make fewer sales overall and certain consumers in lower-income countries will lose the ability to purchase and use the patented good. *Id.*[6]

The implications of adopting an international exhaustion rule are not merely a matter for academic debate. The issue was hotly contested by trade representatives in TRIPs negotiations, who ultimately agreed to disagree, with the TRIPs agreement stating: "[N]othing in this Agreement shall be used to address the issue of the exhaustion of intellectual property rights." TRIPs agreement art. 6; *see also* Vincent Chiappetta, *The Desirability of Agreeing to Disagree: The WTO,*

---

[6] While a mandatory international exhaustion rule could result in short-term benefits to certain consumers in wealthier nations through a reduction in prices, such consumers would also face a long-term "cost" in the form of a reduction in the incentive to innovate. In all events, a fine balancing of policy considerations and off-setting welfare gains and losses nationally and internationally is more appropriately a matter for the legislative and executive branches of government than the courts.

*Trips, International IPR Exhaustion and a Few Other Things*, 21 Mich. J. Int'l L. 333, 346 (2000).

More recently, reports on the negotiation of the Trans-Pacific Partnership Agreement ("TPP") have noted that the "United States has opposed a rule of international exhaustion." Sarah R. Wasserman Rajec, *Free Trade in Patented Goods: International Exhaustion for Patents*, 29 Berkeley Tech. L.J. 317, 356 (2014). The lack of consensus on the wisdom of adopting a regime of international exhaustion—and the U.S. government's rejection of the rule in international negotiations—strongly counsels against imposing a sweeping change through judicial action. *Cf. Kirtsaeng*, 133 S. Ct. at 1385 (Ginsburg, J., dissenting) (noting that the Court's ruling "risks undermining the United States' credibility on the world stage" when "the Government has urged our trading partners to refrain from adopting international-exhaustion regimes").

### C.    A Rule of National Exhaustion Does Not Limit the Ability of Parties to Contract for International Exhaustion.

In the brief of the United States Attorney General as *amicus curiae*, the Attorney General proposes that *Jazz Photo* be overruled to the extent that it never allows for international exhaustion. Br. United States as *Amicus Curiae* at 3, 14. The Attorney General proposes that the default rule should be international exhaustion, with parties able to limit the application of the rule by contract. *Id.* That proposal is inconsistent with existing law, *see* pp. 14-18 *supra*, and the settled

expectations of U.S. patentees. (And to the extent that the government favors such a rule for policy reasons, that is a matter for Congress, not the courts.)

Unlike the Attorney General's proposal, if the default remains the *Jazz Photo* rule of national exhaustion, buyers and sellers of articles sold abroad and intended for foreign markets will have no need to change their practices to avoid the risk of grey market importation. Likewise, in circumstances where goods are sold or licensed abroad with the expectation that the goods may reach the U.S., parties may manifest their intentions by contracting to authorize such sales under any applicable U.S. patents, and the courts have repeatedly recognized the validity of such arrangements. *See Tessera, Inc.* v. *Int'l Trade Comm'n*, 646 F.3d 1357, 1369-71 (Fed. Cir. 2011) (holding that Tessera's unconditional licenses to foreign firms exhausted Tessera's U.S. patent rights); *San Disk Corp.* v. *Round Rock Research LLC*, No. C 11-5243, 2014 WL 2700583, *3-*4 (N.D. Cal. June 13, 2014) (distinguishing *Jazz Photo* where worldwide license demonstrated that the patentee had already bargained for and received compensation for the right to make and sell the patented technology worldwide); *Multimedia Patent Trust* v. *Apple Inc.*, No. 10-CV-2618, 2012 WL 6863471, at *5 (S.D. Cal. Nov. 9, 2012) (same). For example, the present *amicus*, Dolby Labs, participates in a number of industry-wide standard licensing programs offered through patent pooling. Many, if not all, of those programs are designed to provide licensees with global

"coverage" by providing inclusive licenses in all countries in which the patent-holder licensor holds patents relating to the relevant technology. *See, e.g.*, MPEG LA, *AVC/H.264 FAQ*, http://www.mpegla.com/main/programs /AVC/Pages/FAQ.aspx.[7] There is no need to alter the existing scope of patent exhaustion doctrine when market participants currently can freely bargain for international exhaustion through contracts.

Further, because international transactions in goods generally require a greater degree of documentation for customs and trade purposes—and international sales or licenses encompassing a worldwide market can be expected to encompass a higher volume of articles—permitting parties to opt-in to international exhaustion, rather than requiring opt-out for transactions intended to be solely domestic, is more sensible as a practical matter and consistent with "real world" solutions that businesses have adopted.

The market-driven and court-approved adoption of the "opt-in" model for international exhaustion recognized by extant case law highlights that the potential benefits of "international exhaustion" in appropriate circumstances are

---

[7] The structure of these and other global patent licensing programs relies, in part, on the guidance of *Quanta*, *General Talking Pictures* and the prior decisions of this Court as to the scope of patent exhaustion in the United States. For this reason, too, the Court should be reluctant to disturb settled law in this area. *See also Helferich*, 778 F.3d at 1307 ("Caution about expanding the reach of exhaustion is of a piece with the broader judicial practice of generally maintaining the contours of property rights in the absence of legislative prescriptions.").

already available where needed.  This too further counsels against adopting a new rule overruling *Jazz Photo* that would alter settled expectations with uncertain consequences in the United States and internationally.[8]

---

[8] The principle of *stare decisis* also calls for this Court to reaffirm both *Mallinckrodt* and *Jazz Photo*.  Neither the ruling of *Mallinckrodt* nor *Jazz Photo* has proved unworkable such that they should be overruled.  *See Montejo* v. *Louisiana*, 556 U.S. 778, 792 (2009) ("[T]he fact that a decision has proved 'unworkable' is a traditional ground for overruling it.").  Other factors, including "the antiquity of the precedent, the reliance interests at stake" and the strength of the prior precedent's reasoning, all discussed above, also counsel against overruling these two decisions.  *Id.* at 792-93; *see also Robert Bosch, LLC* v. *Pylon Mfg. Corp.*, 719 F.3d 1305, 1316-17 (Fed. Cir. 2013) (noting that the age of an existing panel precedent is a reason for declining to overrule the case).

## CONCLUSION

For the foregoing reasons, Dolby Labs, as *amicus curiae*, respectfully submits that the *en banc* Court should reaffirm this Circuit's long-standing precedent in the panel decisions in *Mallinckrodt* and *Jazz Photo*.

Dated:  August 19, 2015

Respectfully submitted,

*/s/ Garrard R. Beeney*
Garrard R. Beeney
Adam R. Brebner
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
Telephone  (212) 558-4000
Facsimile  (212) 558-3588

*Counsel for* Amicus Curiae *Dolby Laboratories, Inc.*

-28-

## CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 32(a)

I hereby certify that this brief complies with the requirements of

Federal Rules of Appellate Procedure 32(a)(5) and (6) because it has been prepared

in 14-point Times New Roman, a proportionally spaced typeface.

I further certify that this brief complies with the type-volume

limitation of Fed. R. App. P. 29(d) and 32(a)(7)(B) because it contains 6559 words,

excluding the parts of the brief exempted under Fed. R. App. P. 32(a)(7)(B)(iii)

and Federal Circuit Rule 32(b), according to the count of Microsoft Word 2010.

Dated:  August 19, 2015

*/s/ Garrard R. Beeney*
Garrard R. Beeney

*Counsel for* Amicus Curiae *Dolby Laboratories, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on August 19, 2015, I caused this brief to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system.

Dated:  August 19, 2015

/s/ Garrard R. Beeney
Garrard R. Beeney

*Counsel for* Amicus Curiae *Dolby Laboratories, Inc.*