**2014-1617, -1619**

# United States Court of Appeals
# for the Federal Circuit

LEXMARK INTERNATIONAL, INC.,

*Plaintiff-Cross-Appellant*

*v.*

IMPRESSION PRODUCTS, INC.,

*Defendant-Appellant*

QUALITY CARTRIDGES, INC., JOHN DOES, 1-20, BLUE TRADING
LLC, EXPRINT INTERNATIONAL, INC., LD PRODUCTS, INC.,
PRINTRONIC CORPORATION, TESEN DEVELOPMENT (HONG KONG)
CO. LTD., and BENIGNO ADEVA AND HIS COMPANIES,

*Defendants.*

*Appeals from the United States District Court for the Southern District of Ohio in
Case No. 1:10-CV-00564-MRB, Judge Michael R. Barrett*

**BRIEF OF *AMICI CURIAE* NOKIA TECHNOLOGIES OY AND NOKIA USA INC. ON
HEARING *EN BANC* IN SUPPORT OF LEXMARK INTERNATIONAL, INC.**

John D. Haynes
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street NW
Atlanta, GA 30309
(404) 881-7000

*Attorneys for Amici Curiae
Nokia Technologies Oy
and Nokia USA Inc.*

August 19, 2015

# CERTIFICATE OF INTEREST

Counsel for *amici curiae* Nokia Technologies Oy and Nokia USA Inc. certifies the following:

**1.     The full name of every party or amicus represented by me is:**

Nokia Technologies Oy and Nokia USA Inc.

**2.     The real name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:**

Not Applicable

**3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:**

Nokia Technologies Oy's and Nokia USA Inc.'s parent corporation is Nokia Corporation.  Nokia Corporation owns 100 percent of the stock in Nokia Technologies Oy and Nokia USA Inc.

**4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this Court are:**

Alston & Bird LLP: John D. Haynes

Dated: August 19, 2015                    /s/John D. Haynes
                                          John D. Haynes

i

# TABLE OF CONTENTS

*Page*

CERTIFICATE OF INTEREST ................................................................. i

TABLE OF CONTENTS ........................................................................ ii

STATEMENT OF IDENTITY AND INTEREST OF *AMICI CURIAE* ................... 1

SOURCE OF AUTHORITY TO FILE .................................................... 2

SUMMARY OF ARGUMENT ............................................................... 3

ARGUMENT ....................................................................................... 6

I.   THE COURT SHOULD UPHOLD THE *JAZZ PHOTO* LINE OF CASES
     HOLDING THAT FOREIGN SALES DO NOT EXHAUST U.S. PATENT
     RIGHTS ................................................................................... 6

          A.   The Court's Territorial Limit on Patent Exhaustion Is Supported by
               Supreme Court Precedent and the Legislative History of the U.S.
               Patent Act ...................................................................... 6

          B.   The Supreme Court's Decision in *Kirtsaeng* Is Not Relevant to the
               Patent Exhaustion Doctrine ............................................. 11

II.  THE COURT SHOULD UPHOLD THE WELL-ESTABLISHED RULE
     THAT CONDITIONAL LICENSES DO NOT GIVE RISE TO U.S.
     PATENT EXHAUSTION ............................................................ 17

          A.   The Court's Decision in *Mallinckrodt* Is Supported by Supreme
               Court Precedent and Other Sections of the Patent Act ................. 17

          B.   The Supreme Court's Decision in *Quanta* Does Not Affect this
               Court's *Mallinckrodt* Decision Because *Quanta* Did Not Address
               Conditional Sales ......................................................... 21

          C.   Neither of the Conditional Sales at Issue in this Case Gives Rise to
               Patent Exhaustion ......................................................... 23

III. ALTERING THE DOCTRINE OF U.S. PATENT EXHAUSTION WILL
     DISRUPT THE EXPECTATIONS OF PATENT OWNERS AND

FOREIGN JURISDICTIONS AND WILL INVITE ADDED
COMPLEXITY AND LITIGATION ............................................................24

    A.   Altering the Scope of the U.S. Patent Exhaustion Doctrine Will
        Upset Existing Patent Licensing Practices ....................................24

    B.   Altering the Doctrine of Patent Exhaustion Will Increase the
        Frequency and Complexity of Patent Litigation ...........................27

CONCLUSION .....................................................................................................29

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*American Cotton-Tie Co. v. Simmons,*
106 U.S. 89 (1882).............................................................................20

*Benun v. Fujifilm Corp.,*
131 S. Ct. 829 (2010)...........................................................................9

*Bobbs-Merrill Co. v. Straus,*
210 U.S. 339 (1908)......................................................................12, 14

*Boesch v. Graff,*
133 U.S. 697 (1890).................................................................7, 8, 14

*Brown v. Duchesne,*
60 U.S. 183 (1856)..............................................................................7

*Buck v. Jewell-LaSalle Realty Co.,*
283 U.S. 191 (1931)...........................................................................16

*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.,*
576 F.3d 1348 (Fed. Cir. 2009) .........................................................18

*Citizens United v. Fed. Election Comm'n,*
558 U.S. 310 (2010)...........................................................................25

*Deepsouth Packing Co. v. Laitram Corp.,*
406 U.S. 518 (1972).................................................................7, 10, 13

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.,*
535 U.S. 722 (2002)...........................................................................24

*Fuji Photo Film Co., Ltd. v. Int'l Trade Comm'n,*
474 F.3d 1281 (Fed. Cir. 2007) ...........................................................9

*Fuji Photo Film Co., Ltd. v. Jazz Photo Corp.,*
394 F.3d 1368 (Fed. Cir. 2005) .......................................................8, 9

*Fujifilm Corp. v. Benun,*
605 F.3d 1366 (Fed. Cir. 2010) ...........................................................9

iv

*General Talking Pictures Corp. v. W. Elec. Co.*,
   305 U.S. 124 (1938).................................................................*passim*

*Helferich Patent Licensing, LLC v. New York Times Co.*,
   778 F.3d 1293 (2015)...............................................................11, 25

*HTC Corp. v. Nokia Corp.*,
   [2013] .........................................................................................28

*Jazz Photo Corp. v. Int'l Trade Comm'n*,
   122 S. Ct. 2644 (2002)..................................................................9

*Jazz Photo Corp. v. Int'l Trade Comm'n*,
   264 F.3d 1094 (Fed. Cir. 2001) ...............................................*passim*

*Kirtsaeng v. John Wiley & Sons, Inc.*,
   133 S. Ct. 1351 (2012)...............................................................*passim*

*Kumar v. Pearson Educ., Inc.*,
   133 S. Ct. 1631 (2013).....................................................................9

*Lexmark Int'l, Inc. v. Impression Prods., Inc.*,
   No. 14-1617 (Fed. Cir. Apr. 14, 2015) .............................................23

*Lexmark International, Inc. v. Impression Products, Inc.*,
   2014-1617, -1619 ............................................................................1

*LG Elecs., Inc. v. Bizcom Elecs., Inc.*,
   453 F.3d 1364 (Fed. Cir. 2006) .......................................................22

*Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*,
   744 F.3d 1272 (Fed. Cir. 2014) .......................................................24

*Limelight Networks, Inc. v. Akamai Tech., Inc.*,
   134 S. Ct. 2111 (2014)......................................................................7

*Liu v. Pearson Educ. Inc.*,
   133 S. Ct. 1630 (2013)......................................................................9

*Mallinckrodt, Inc. v. Medipart, Inc.*,
   976 F.2d 700 (Fed. Cir. 1992) ....................................................*passim*

*Microsoft Corp. v. AT&T Corp.*,
  550 U.S. 437 (2007)................................................................................6

*Morrison v. Nat'l Australia Bank Ltd.*,
  561 U.S. 248 (2010)................................................................................6

*Ninestar Tech. Co., Ltd. v. Int'l Trad Comm'n*,
  133 S. Ct. 1656 (2013)...........................................................................9

*Ninestar Tech. Co., Ltd. v. Int'l Trade Comm'n*,
  667 F.3d 1373 (Fed. Cir. 2012) .......................................................8, 9

*Providence Rubber Co. v. Goodyear*,
  76 U.S. 788 (1869)................................................................................20

*Quality King Distributors, Inc. v. L'anza Research International, Inc.*,
  523 U.S. 135 (1998)........................................................................15, 16

*Quanta Computer, Inc. v. LG Elec., Inc.*,
  553 U.S. 617 (2008).....................................................................*passim*

*Rodriguez de Quijas v. Shearson/American Express, Inc.*,
  490 U.S. 477 (1989)........................................................................8, 21

*U.S. v. General Electric*,
  272 U.S. 476 (1926)..............................................................................17

*U.S. v. Masonite Corp.*,
  316 U.S. 265 (1942)..............................................................................18

*U.S. v. Univis Lens Co.*,
  316 U.S. 241 (1942)..............................................................................18

**Statutes**

17 U.S.C. § 106(3) ....................................................................................15

35 U.S.C. §§ 154(a), 271(a) .....................................................................15

**Other Authorities**

5-16 DONALD S. CHISUM, CHISUM ON PATENTS § 16.05 (2015).......................13, 14

6 R. CARL MOY, MOY'S WALKER ON PATENTS § 19:44...........................................26

## STATEMENT OF IDENTITY AND INTEREST OF *AMICI CURIAE*

*Amici curiae* are Nokia Technologies Oy and Nokia USA Inc. (collectively, "Nokia").[1]   Nokia is a global leader and innovator in the telecommunications equipment and services industry.   The Nokia group of companies have cumulatively invested over $70 billion in research and development relating to mobile communications.   As a result of this substantial commitment, Nokia currently owns more than 10,000 patent families.   Nokia continues to invest heavily in research and development and to license and expand its industry-leading patent portfolio.   For example, Nokia continues to develop and license innovations that are powering the next revolution in computing and mobility: the "programmable world" where intelligent connections bring millions of everyday objects online.   This work includes a team of experts in areas including digital healthcare, digital multimedia, imaging and sensing, wireless connectivity and power management, advanced materials, and others.

Nokia and its parent company have been involved in numerous patent cases in U.S. district courts and the U.S. International Trade Commission, both as a plaintiff/complainant and as a defendant/respondent.   These include cases where allegations of patent exhaustion have been made against Nokia and where Nokia

---

[1] No counsel for any of the parties authored any portion of this brief.   No entity other than *amici curiae* Nokia Technologies Oy and Nokia USA Inc. monetarily contributed to the preparation or submission of this brief.   *See* Fed. R. App. P. 29(c)(5).

has made allegations of patent exhaustion against others.  Nokia is a significant patent owner that might seek remedies for patent infringement in district courts or the ITC, including in situations where alleged exhaustion may be an issue.  Nokia is also actively involved in patent licensing, and it considers established exhaustion principles in formulating its licensing strategies.

Nokia's interest in this case is to advocate for clarity and stability in U.S. exhaustion doctrine and to protect flexibility for parties engaged in licensing negotiations.  Clarity and stability ensure contracting parties that their valuable, carefully negotiated agreements will not be undermined by unexpected changes in the U.S. exhaustion doctrine—*e.g.*, through the erosion of its well-established territorial limits or application to more than only unconditional authorizations. Flexibility in licensing fosters economic efficiency.  For example, if parties are forced by a significant change in U.S. exhaustion doctrine to license their patents in a strict "all or nothing" approach—or even something approaching this—it risks pricing certain players out of some technology markets, thus harming incentives and capabilities for innovation.

## SOURCE OF AUTHORITY TO FILE

On April 14, 2015, the Court *sua sponte* ordered rehearing *en banc*.  The Court advised it would entertain briefs of *amici curiae* and that any such amicus briefs may be filed without consent and leave of Court.

2

## SUMMARY OF ARGUMENT

In light of recent Supreme Court decisions, this Court has asked whether it should extend the patent exhaustion doctrine beyond long-established boundaries. Specifically, the Court questions whether it should overrule both: (i) its line of cases recognizing the territorial limit on U.S. patent exhaustion; and (ii) its line of cases confirming that only unconditional sales exhaust U.S. patent rights. Supreme Court precedent, the legislative history of the Patent Act, and important policy considerations demonstrate that the Court should affirm its established exhaustion doctrine.

The Court's first question is whether it should overrule *Jazz Photo Corp. v. Int'l Trade Comm'n,* 264 F.3d 1094 (Fed. Cir. 2001), to the extent it ruled that a sale of a patented item outside the United States never gives rise to U.S. patent exhaustion. The answer is no. Supreme Court precedent has repeatedly emphasized the territorial nature of U.S. patent law, and Congress has refused to disturb this territorial limitation on patent exhaustion. Nothing in the Supreme Court's copyright law decision in *Kirtsaeng v. John Wiley & Sons, Inc.,* 133 S. Ct. 1351 (2012) altered this long-established rule. The fundamentals of the copyright first sale doctrine at issue in *Kirtsaeng* are profoundly different from those of patent exhaustion. Congress has codified copyright's first sale doctrine, while patent exhaustion remains a creature of judicial precedent. Likewise, the common-

3

law histories of each doctrine, and the statutory structures related to them, are distinct and counsel against importing concepts from one into the other. For example, unlike in copyright law, patent law grants to patent owners the distinct right to prohibit others from importing into the United States a patented invention—a right that would be wholly eviscerated if a foreign sale gave rise to patent exhaustion. Unsurprisingly, therefore, when the Supreme Court had the opportunity to consider possible implications of *Kirtsaeng* for patent law, it refused even to grant certiorari.

The Court's second question is whether it should overrule *Mallinckrodt, Inc. v. Medipart, Inc.,* 976 F.2d 700 (Fed. Cir. 1992), to the extent that it ruled that a sale of a patented article made under an otherwise lawful restriction does not give rise to patent exhaustion. Again, the answer is no. Both the Patent Act and Supreme Court precedent support this long-settled rule. The Patent Act grants to patentees numerous independent rights that they may license individually or as a whole. It also acknowledges patentees' ability to impose conditions on licenses. Accordingly, the Supreme Court has long held that conditions may be placed on licenses and sales of patented articles and that such conditional licenses and sales do not exhaust U.S. patent rights. The Supreme Court's decision in *Quanta* has no bearing on this issue, as the Court expressly determined that the license at issue there was *unconditional*.

4

Moreover, disrupting the well-established U.S. law on patent exhaustion will have a significant negative impact on the innovation community. Consistency and stability are fundamental goals in patent law, and are especially important to exhaustion doctrine where parties rely on the courts' past rulings when making long-term licensing decisions. Altering the scope of patent exhaustion would fly in the face of these goals by disrupting the well-settled expectations of the innovation community. Allowing conditional sales or licenses to exhaust U.S. patent rights would frustrate the bargaining positions of licensors and licensees, who often negotiate conditional licenses for a fraction of the price of unconditional licenses. Changes in exhaustion law could also disrupt existing licensing agreements that value the license rights granted based on established exhaustion principles. If exhaustion doctrine is altered to exhaust U.S. patent rights based on foreign sales, a party that paid for only a foreign license under a carefully negotiated license could receive a significant, and unintended, windfall.

Additionally, allowing foreign sales to exhaust U.S. patent rights would alter the strategic considerations of patent owners when determining in which countries to seek patent protection. If the cost of patent protection becomes too high due to the necessity to pursue extensive international protection, it may deter patent owners from investing in the research and development of their inventions. Altering the territorial scope of the U.S. exhaustion doctrine would further

5

discourage innovation by requiring patent owners to invest heavily in regulating *foreign* sales in order to protect their patent rights in the United States. For all of these reasons, this Court should uphold the well-established patent exhaustion doctrines set forth in both the *Jazz Photo* and *Mallinckrodt* line of cases.

## ARGUMENT

I. **THE COURT SHOULD UPHOLD THE *JAZZ PHOTO* LINE OF CASES HOLDING THAT FOREIGN SALES DO NOT EXHAUST U.S. PATENT RIGHTS**

### A. The Court's Territorial Limit on Patent Exhaustion Is Supported by Supreme Court Precedent and the Legislative History of the U.S. Patent Act

This Court's territorial limit on patent exhaustion is grounded in Supreme Court precedent that cannot be overruled by this Court. The Supreme Court follows the "longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 248, 256 (2010) (internal quotations omitted). Absent a clear congressional indication of intent to the contrary, there is a presumption that U.S. laws have no extraterritorial effect. *Id.* This "presumption that United States law governs domestically but does not rule the world *applies with particular force in patent law*." *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 454-55 (2007) (emphasis added). Indeed, this presumption against extraterritoriality "is embedded in the Patent Act itself, which provides that a patent confers exclusive rights in an

6

invention *within the United States*." *Id.* (citing 35 U.S.C. § 154(a)(1)) (emphasis added).

This strong presumption against the exterritorial effect of U.S. patent law has its roots in an 1856 Supreme Court decision, which held that the power granted to Congress by Article I, Section 8 of the Constitution "is domestic in its character, and necessarily confined within the limits of the United States." *Brown v. Duchesne*, 60 U.S. 183, 195 (1856). The Constitution "confers no power on Congress to regulate commerce, or the vehicles of commerce, which belong to a foreign nation." *Id.* The Supreme Court has repeatedly emphasized the territorial nature of U.S. patent law, stating that "[o]ur patent system makes no claim to extraterritorial effect; 'these acts of Congress do not, and were not intended to, operate beyond the limits of the United States.'" *Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518, 531 (1972) (quoting *Brown*, 60 U.S. at 195) (*superseded* by statute, as *recognized* in *Limelight Networks, Inc. v. Akamai Tech., Inc.*, 134 S. Ct. 2111 (2014)).

In 1890, the Supreme Court held that the authorized purchase of a product in a foreign country does not grant the purchasers the right to sell the product in the U.S. in defiance of the rights of a U.S. patentee. *Boesch v. Graff*, 133 U.S. 697, 704 (1890) ("The sale of articles in the United States under a United States patent

cannot be controlled by foreign laws.").[2]   The Supreme Court's *Boesch* decision continues to control in patent exhaustion cases.   *See Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989).   Recognizing this fact, this Court applied the rule set forth in *Boesch* to confirm that "United States patent rights are not exhausted by products of foreign provenance."  *Jazz Photo v. Int'l Trade Comm'n*, 264 F.3d 1094, 1105 (Fed. Cir. 2001).  For the defense of patent exhaustion to apply, "the authorized first sale must have occurred under the United States patent."  *Id.*  And "foreign sales can *never* occur under a United States patent because the United States patent system does not provide for extraterritorial effect."  *Fuji Photo Film Co., Ltd. v. Jazz Photo Corp.* ("*Fuji I*"), 394 F.3d 1368, 1376 (Fed. Cir. 2005) (emphasis added).

This Court has repeatedly reaffirmed the territorial nature of the doctrine of patent exhaustion.  *See, e.g., Ninestar Tech. Co., Ltd. v. Int'l Trade Comm'n*, 667 F.3d 1373, 1377-79 (Fed. Cir. 2012); *Fujifilm Corp. v. Benun* ("*Fuji III*"), 605 F.3d

---

[2] In *Boesch*, the foreign seller was authorized to sell the patented article by the foreign country's law, not by the patentee.  133 U.S. at 701.  However, the Court broadly framed the issue as "whether a dealer residing in the United States can purchase in another country articles patented there, from a person authorized to sell them, and import them to and sell them in the United States, without the license or consent of the owners of the United States patent."  *Id.* at 702.  Thus, *Boesch* remains applicable to any case in which an authorized sale of an article protected by a U.S. patent occurs in a foreign country, as explicitly recognized by this Court in *Jazz Photo*.  264 F.3d at 1105 (citing *Boesch* for the proposition that "a lawful foreign purchase does not obviate the need for license from the United States patentee before importation into and sale in the United States").

8

1366, 1371 (Fed. Cir. 2010) (holding that the Supreme Court's decision in *Quanta Computer, Inc. v. LG Elec., Inc.*, 553 U.S. 617 (2008), "did not eliminate the first sale rule's territoriality requirement"); *Fuji Photo Film Co., Ltd. v. Int'l Trade Comm'n* ("*Fuji II*"), 474 F.3d 1281, 1293 (Fed. Cir. 2007) ("The affirmative defense of repair only applies to products whose patent rights have been exhausted through a first sale in the United States."); *Fuji 1*, 394 F.3d at 1376. A writ of certiorari was sought in three of these cases, and each time the Supreme Court refused to take up the issue or change the law – the most recent occurring after *Kirtsaeng*.[3] *See Ninestar Tech. Co., Ltd. v. Int'l Trad Comm'n*, 133 S. Ct. 1656 (2013); *Benun v. Fujifilm Corp.*, 131 S. Ct. 829 (2010); *Jazz Photo Corp. v. Int'l Trade Comm'n*, 122 S. Ct. 2644 (2002). The Supreme Court's denial of certiorari in these cases indicates that the Justices viewed the issues of patent exhaustion and copyright first sale quite differently and did not see a need to revisit established patent law exhaustion doctrines.

Congress's continued silence on the territorial limits of patent exhaustion also requires adherence to the established rule. As a result of the Supreme Court's strict territorial interpretation of U.S. patent law, Congress must affirmatively act if it wishes to change the scope of the U.S. Patent Act. *See Deepsouth Packing*, 406

---

[3] In contrast, on the same day that it denied certiorari in *Ninestar*, the Court remanded two copyright cases to be considered in light of its decision in *Kirtsaeng*. *See Kumar v. Pearson Educ., Inc.*, 133 S. Ct. 1631 (2013); *Liu v. Pearson Educ. Inc.*, 133 S. Ct. 1630 (2013).

U.S. at 530 (stating that a "clear and certain signal from Congress" is required in order to expand the territorial scope of patent rights). However, in all of the iterations of the Patent Act from 1870 to the present, Congress has never once attempted to expand the territorial scope of the patent exhaustion doctrine.

Congress's silence regarding the territorial scope of the exhaustion doctrine is more telling when compared to Congress's response to other territorial limits placed on section 271. In *Deepsouth Packing*, the Supreme Court held that the right to manufacture a patented combination invention was not infringed under section 271(a) where all substantial parts were made within the U.S. but assembled outside U.S. territory. 406 U.S. at 529-32. The Supreme Court reached its holding by emphasizing that the "patent system makes no claim to extraterritorial effect" because U.S. patent law was not intended to operate outside the United States. *Id.* at 532. Congress, unhappy with this result, responded with the enactment of section 271(f), which provides holders of combination patents a cause of action for infringement where "all or a substantial portion of the components of a patented invention" are supplied from the U.S., even when assembly of those components happens outside the U.S. Patent Law Amendments Act of 1984, Pub. L. 98-622, § 101, 98 Stat. 3383, 3383 (1984). Congress thus acknowledged the territorial restrictions on U.S. patent law, but addressed the problem by changing the statute to address the conduct taking place within the U.S. There has been no such

10

response from Congress regarding this Court's exhaustion precedent. Congress's failure to address the explicit territorial limits placed on the exhaustion doctrine is thus fairly understood as an implicit acceptance of the judiciary's carefully crafted exhaustion precedent. As noted earlier this year by this Court:

> Patent exhaustion is a judicially fashioned doctrine without a specific source in congressionally enacted text stating the terms of this limitation on patent rights….We presume, from Congress's refusal to disturb the existing decisional law of this doctrine (which predated the 1952 Act by nearly a century), an implicit authorization to continue applying the doctrine within its familiar boundaries….But we do not think that Congress has granted the courts a license to erase those boundaries and expand the doctrine into difficult new territory unmapped by lines drawn, or even sketched, by Congress.

*Helferich Patent Licensing, LLC v. New York Times Co.*, 778 F.3d 1293, 1305 (2015) (internal citations omitted). Congress's refusal to alter the Patent Act to address the territorial scope of exhaustion doctrine counsels against any attempt to expand it judicially into the "difficult new territory" at issue here. *Id.*

## B. The Supreme Court's Decision in *Kirtsaeng* Is Not Relevant to the Patent Exhaustion Doctrine

In *Kirtsaeng v. John Wiley & Sons, Inc.*, the Supreme Court held that the first sale doctrine in the Copyright Act applies to copies of copyrighted works lawfully made abroad. 133 S. Ct. 1351 (2013). This Court now asks whether *Kirtsaeng* should be applied to patent law to expand the doctrine of exhaustion so that it applies to patented items sold outside the United States. For many reasons, the answer to this question is no. *Kirtsaeng* has no effect on the well-established

11

precedent of this Court regarding the territorial nature of the patent exhaustion doctrine.

### 1. The Supreme Court Has Warned Against Applying Copyright Cases to Patent Law and Offered No Reason to Do So Here

The Supreme Court's analysis in *Kirtsaeng* does not make a single reference to patent law or the patent exhaustion doctrine, nor does it cite a single patent law decision. *See generally id.* This is not surprising, as the Supreme Court has warned against applying copyright principles to related, but distinct, issues of patent law, and vice-versa. *See, e.g., Bobbs-Merrill Co. v. Straus*, 210 U.S. 339, 345-46 (1908). In *Bobbs-Merrill*, the foundational case for the first sale doctrine in copyright, the Supreme Court recognized that "[t]here are such *wide* differences between the right of multiplying and vending copies of a production protected by the copyright statute and the rights secured to an inventor under the patent statutes, that the cases which relate to the one subject are not altogether controlling as to the other." *Id.* at 346 (emphasis added) (internal quotations omitted). *Kirtsaeng,* therefore, is not controlling precedent in the patent context and requires no change in this Court's patent exhaustion precedent. *See id.*

12

## 2. Significant Differences between Copyright Law and Patent Law Preclude Application of *Kirtsaeng*

Copyright law and patent law generally, and patent exhaustion and copyright first sale more specifically, differ in a number of significant ways. *First*, there is a profound difference between the way domestic copyright and patent laws relate to their respective international procurement and enforcement structures. In copyright, rights are secured automatically and internationally upon fixing a work in a tangible medium. *See Kirtsaeng*, 133 S. Ct. at 1359-60 (citing 17 U.S.C. § 104(a)). In contrast, there is no such thing as a worldwide patent, and international patent protection is much more costly and difficult to pursue. As the Supreme Court has acknowledged, "[t]o the degree that [an] inventor needs protection in markets other than those of this country," he must "seek it abroad through patents secured in countries where his goods are being used." *Deepsouth Packing*, 406 U.S. at 531. The structure of patent law thus imposes a more fundamentally territorial boundary than copyright law. *Compare Kirtsaeng*, 133 S. Ct. at 1359-60, *with Deepsouth Packing*, 406 U.S. at 351; *see also* 5-16 DONALD S. CHISUM, CHISUM ON PATENTS § 16.05 (2015).

*Second*, Congress has codified copyright's first sale doctrine in section 109(a) of the Copyright Act, and *Kirtsaeng* was rooted in the interpretation of that provision's text and legislative history. *See generally Kirtsaeng*, 133 S. Ct. at

13

1357-64.  Patent exhaustion, in contrast, is grounded solely in judicial precedent and has not been codified or legislatively revised by Congress.  The statutory language of the codified copyright first sale doctrine "sparked the debate between the majority, concurrence and dissent in *Kirtsaeng*," and thus provided the foundation for the Court's ruling.  5-16 DONALD S. CHISUM, CHISUM ON PATENTS § 16.05 (2015).  In contrast, there is no statutory provision or legislative history of the patent exhaustion doctrine that favors a non-territorial interpretation.

*Third*, the common-law history of the copyright first sale doctrine is distinct from that of the patent exhaustion doctrine.  As previously discussed, the first sale doctrine in copyright law has its roots in *Bobbs-Merill*, which was decided a year before Congress codified the first sale doctrine (*see supra* Sec. I).  210 U.S. 339.  In *Kirtsaeng*, the Court looked to the common-law history of the first sale doctrine, including *Bobbs-Merill*, and determined that this history did not impose a geographical restriction.  *Kirtsaeng*, 133 S. Ct. at 1363.  In sharp contrast, the common-law history of the patent exhaustion doctrine limits it to sales that occur in the United States.  The Supreme Court acknowledged this territorial limitation on patent exhaustion more than 120 years ago in *Boesch*,  133 U.S. at 704, and this Court has consistently applied the limitation since.  *See, e.g. Jazz Photo*, 264 F.3d at 1105.

*Fourth*, the nature of the statutory rights implicated by the first sale and exhaustion doctrines are starkly different with respect to territoriality. *See* John F. Duffy & Richard M. Hynes, *Statutory Interpretation and the Exhaustion Issues in Lexmark v. Impression Products*, Patently-O (May 12, 2015), http://patentlyo.com/patent/2015/05/interpretation-exhaustion-impression.html.  In patent law, there is a freestanding right to prevent importation of a patented item that is distinct from the right to prohibit sales of that item. *See* 35 U.S.C. §§ 154(a), 271(a).  In copyright law, there is no such freestanding importation right. Instead, a copyright owner's exclusive right to import is defined in the Copyright Act to be part of the owner's right to distribute under § 106(3).  17 U.S.C. § 106(3).  This is a crucial distinction, as copyright's codified first sale doctrine specifically points to the distribution right as the right that is exhausted by the first sale of a copyrighted work. *See* 17 U.S.C. § 109(a).

The Copyright Act's lack of an independent right regarding importation further demonstrates that *Kirtsaeng* is inapplicable to patent exhaustion doctrine, where that right exists independently.  In reaching its decision in *Kirtsaeng*, the Supreme Court relied on *Quality King Distributors, Inc. v. L'anza Research International, Inc.*, 523 U.S. 135 (1998).  *Kirtsaeng*, 133 S. Ct. at 1367-69. Indeed, *Quality King* was vital in securing a majority of the Justices.  *Id.* at 1372 (Kagan, J., concurring).  In *Quality King*, the Court held that copyright's first sale

15

doctrine is applicable to imported copies. 523 U.S. at 135. The Court emphasized that the Copyright Act "does not categorically prohibit the unauthorized importation of copyrighted materials … [but instead] provides that such importation is an infringement of the exclusive right to distribute copies under section 106." *Id.* at 144. Based on this statutory interpretation, the Court determined that the importation right must be exhausted whenever the right to distribute is exhausted. *Id.* at 145. Therefore, the fact that copyright law, unlike patent law, does not have a distinct importation right was crucial to the Court's decision in *Quality King* and, subsequently, its decision in *Kirtsaeng*. *Kirtsaeng*, 133 S. Ct. at 1367-69.

In contrast, if patent law's freestanding importation right was subject to exhaustion, Congress's decision to create that separate right would be meaningless. Congress could have simply combined the importation right with other rights in the Patent Act, such as sale or use, as it did with the combination of distribution and importation in the Copyright Act. [4]   It did not. Thus, the structure of the Patent Act supports continued imposition of a territorial limitation on the doctrine of patent exhaustion.

---

[4] Because the patent importation right is separate from the set of rights traditionally subject to exhaustion, this right is analogous to the public performance right in copyright, which the Supreme Court has held is not subject to the first sale doctrine. *Buck v. Jewell-LaSalle Realty Co.*, 283 U.S. 191, 196-97 (1931).

16

## II.   THE COURT SHOULD UPHOLD THE WELL-ESTABLISHED RULE THAT CONDITIONAL LICENSES DO NOT GIVE RISE TO U.S. PATENT EXHAUSTION

### A.   The Court's Decision in *Mallinckrodt* Is Supported by Supreme Court Precedent and Other Sections of the Patent Act

In *Mallinckrodt, Inc. v. Medipart, Inc.*, the Federal Circuit ruled that a sale of a patented article, made under a restriction that is otherwise lawful and within the scope of the U.S. patent grant, does not give rise to patent exhaustion. 976 F.2d 700, 708-09 (Fed. Cir. 1992). The *Mallinckrodt* ruling is supported by common sense, the Patent Act, and Supreme Court precedent and should not be overruled.

The *Mallinckrodt* rule makes basic sense because U.S. patent rights cannot be deemed exhausted, thus precluding further exercise of the patentee's statutory rights, unless *all* of the rights conferred under a U.S. patent have been relinquished. If valid conditions are placed on a license permitting the sale of a patented article, the patent owner retains rights under the U.S. patent, and treating those rights as exhausted would therefore contravene the Patent Act. *See U.S. v. General Electric*, 272 U.S. 476, 489 (1926).

Further, exhaustion doctrine applies only where the patentee has received fair compensation for use of its patented technology. As the Supreme Court has explained, the form of the transaction does not govern alone, but rather "[t]he test

17

has been whether or not there has been such a disposition of the article that it may fairly be said that the patentee has *received his reward* for the use of the article." *U.S. v. Masonite Corp.*, 316 U.S. 265, 278 (1942) (emphasis added); *see also Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 576 F.3d 1348, 1363 (Fed. Cir. 2009) (observing that exhaustion doctrine "considers whether a patent owner has been fully compensated when a sale or license of his invention has occurred"). This results from the fact that "the purpose of the patent law is fulfilled with respect to any particular article when the patentee has received his reward for the use of his invention…." *U.S. v. Univis Lens Co.*, 316 U.S. 241, 251 (1942).  It follows that a patentee's right cannot be exhausted absent a full reward for use of the patented invention.  Any other conclusion would impede a fundamental purpose of the U.S. patent system. *Id.*

Conditional sales cannot trigger U.S. patent exhaustion because the patentee has not been fully compensated by such a sale.  When a sale is conditional, the buyer receives less than the full rights of the U.S. patent, and the patentee receives less than the full reward for the patented invention by, for example, charging a lower price or rate for these sales.  Allowing conditional sales or licenses to exhaust U.S. patent rights would place severe restrictions on the ability of a patentee to separately license individual rights granted by the Patent Act and would likely result in smaller market participants being denied any rights under a patent

18

for fear that a conditional grant would somehow result in exhaustion of the entire bundle of patent rights granted by statute.

The *Mallinckrodt* rule is also consistent with other sections of the Patent Act. Section 154 recites "[e]very patent shall contain . . . a grant for the term of seventeen years . . . of the right to exclude others from making, using, or selling the invention throughout the United States. . . ." 35 U.S.C. § 154. In *Mallinckrodt*, the Federal Circuit determined that the right conferred by Section 154 "may be waived in whole or in part." 976 F.2d at 703. The Court found that this interpretation of Section 154 is in line with the general rule recognized by the Supreme Court "that any conditions which are not in their very nature illegal with regard to this kind of property, imposed by the patentee and agreed to by the licensee for the right to manufacture or use or sell the [patented] article, will be upheld by the courts." *Id.* (citing *E. Bement & Sons v. National Harrow Co.*, 186 U.S. 70, 91 (1902)).

As *Mallinckrodt* recognizes, the Supreme Court has upheld on multiple occasions the enforceability of lawful conditional licenses and sales of patented products. *See Mallinckrodt*, 976 F.2d at 704-705, 706-707. For example, in *General Talking Pictures Corp. v. W. Elec. Co.*, the patentee authorized the licensee to make and sell amplifiers embodying the patented invention for a specified use – home radios. *General Talking Pictures Corp. v. W. Elec. Co.,* 305 U.S. 124, 126 (1938). The license was granted to Transformer Company, which

19

manufactured amplifiers for use in theaters and sold these amplifiers to Pictures Corporation. *Id.* The Supreme Court found the restriction in the license to be enforceable, and both Transformer Company and Pictures Corporation were liable for patent infringement. *Id.* at 127. The Court said that "the patentee may grant a license 'upon any condition the performance of which is reasonably within the reward which the patentee by the grant of the patent is entitled to secure.'" *Id.* (citing *General Electric*, 272 U.S. at 489). The Supreme Court therefore explicitly held that conditional licenses do not exhaust a U.S. patent. *Id.*

Similarly, in *Providence Rubber Co. v. Goodyear*, the patentee granted a restricted license to Chaffee to "make and sell India-rubber cloth, to be used in the place, and for the purposes, of patent or japanned leather." *Providence Rubber Co. v. Goodyear,* 76 U.S. 788, 799 (1869). The Court found the condition enforceable and held that when Providence Rubber used India-rubber cloth to manufacture rubber shoes (a use that fell outside the scope of the license), the manufacturer infringed the asserted patent. *Id.* at 799-800. In reaching this conclusion, the Court emphasized that "the practical construction which the parties themselves have given to a contract . . . is always entitled to great weight." *Id.* at 799. Further, in *American Cotton-Tie Co. v. Simmons*, the Court held that suit for patent infringement could be brought against persons who refurbished ties for reuse when the ties were initially sold with the notice "Licensed to use once only." *American*

20

*Cotton-Tie Co. v. Simmons,* 106 U.S. 89 (1882). Applying U.S. patent exhaustion to conditional licenses would violate the ruling in each of these Supreme Court decisions. *See Rodriquez de Quijas*, 490 U.S. at 484.

### B. The Supreme Court's Decision in *Quanta* Does Not Affect this Court's *Mallinckrodt* Decision Because *Quanta* Did Not Address Conditional Sales

In *Quanta Computer Inc. v. LG Electronics, Inc.*, the Court reaffirmed that an authorized, *unrestricted* sale of a patented good triggers U.S. patent exhaustion. 553 U.S. 617 (2008). However, the court did not address the question of whether exhaustion applies to an authorized *conditional* sale. The *Quanta* opinion therefore does not address the central issue presented in *Mallinckrodt,* nor does it overrule the Supreme Court's holdings in cases like *General Talking Pictures* that exhaustion does not apply to conditional sales.

The Court in *Quanta* interpreted the sale and licensing contracts at issue and found the license to be unconditional and the sale authorized. *Id.* at 636-37. In its analysis, the Court distinguished *Quanta* from *General Talking Pictures* by pointing out that the petitioner, by arguing that *General Talking Pictures* should apply to the license agreement in *Quanta*, overlooked important differences between the agreements in *General Talking Pictures* and *Quanta*. *Id.* In distinguishing the *General Talking Pictures* precedent, the court explicitly stated that "*[n]othing in the License Agreement restricts Intel's right to sell* its

microprocessors and chipsets to purchasers who intend to combine them with non-Intel parts." *Id.* at 636 (emphasis added). Further, the court recognized that *"[n]o conditions limited Intel's authority to sell* products substantially embodying the patents." *Id.* at 637 (emphasis added). The Court thus construed the agreement at issue in *Quanta* as an unconditional license to sell the patented products and therefore held that *General Talking Pictures* did not apply. *Id.* at 636-37.

That the Court did not mention *Mallinckrodt* in its *Quanta* opinion further supports the reading of *Quanta* as addressing an unconditional license to sell patented products. In the underlying decision reviewed by the Supreme Court in *Quanta*, the Federal Circuit relied on *Mallinckrodt* to discuss the applicability of U.S. patent exhaustion to conditional licenses. *LG Elecs., Inc. v. Bizcom Elecs., Inc.*, 453 F.3d 1364, 1369 (Fed. Cir. 2006) (citing *Mallinckrodt*, 976 F.2d at 708). The Federal Circuit explained that the exhaustion doctrine does not apply to an expressly conditional sale or license. *Id.* (citing *Mallinckrodt* and *B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419 (Fed. Cir. 1997)). That reasoning remains intact. The Supreme Court's decision in *Quanta* disagreed with the Federal Circuit's premise that the license at issue placed conditions on the initial sale. *Quanta*, 553 U.S. at 636-37. Once the Supreme Court found that the initial authorization was *not* conditional, it distinguished the reasoning of *Mallinckrodt* and *General Talking Pictures* as applying only to conditional sales. *Id.*

22

### C.     Neither of the Conditional Sales at Issue in this Case Gives Rise to Patent Exhaustion

The present case involves (i) sales of patented articles to end users under a restriction that they use them once and then return them and (ii) sales of the same patented articles to resellers under the restriction that all resales take place under the single-use-and-return restriction.  Order at 2, *Lexmark Int'l, Inc. v. Impression Prods., Inc.*, No. 14-1617 (Fed. Cir. Apr. 14, 2015).  The Court asks whether either of these sales gives rise to patent exhaustion.  *Id.*  The answer is no.

Both of the sales at issue in this case place lawful conditions on the initial purchaser of the patented article.  The first sale places a use-and-return restriction directly on the purchaser of the patented article, and the second sale places a restriction on the purchaser of the patented article that authorizes the initial purchaser to resell the article only when the article is subsequently sold under the use-and-return restriction.  In both circumstances, the initial authorization is expressly conditioned by placing lawful restrictions on the scope of the authorization granted to the initial purchaser.  These sales are therefore controlled by *General Talking Pictures* and *Mallinckrodt*, which hold that such lawful restrictions do not give rise to U.S. patent exhaustion.  *See General Pictures*, 305 U.S. at 126-27; *Mallinckrodt*, 976 F.2d at 708-09.

The Supreme Court's ruling in *Quanta* has no bearing on these conditional sales because, as discussed above, the agreement in question in *Quanta* imposed no

23

conditions on the rights of the initial purchaser of the patented articles. *Quanta*, 553 U.S. at 636. Instead, a separate provision in that agreement attempted to control the rights of downstream users *without* limiting the initial purchaser's rights. *Id.* The initial authorization in *Quanta* was, therefore, unconditional. *Id.* In contrast, the initial authorizations provided in the present fact patterns are expressly restricted and therefore cannot give rise to U.S. patent exhaustion.

### III. ALTERING THE DOCTRINE OF U.S. PATENT EXHAUSTION WILL DISRUPT THE EXPECTATIONS OF PATENT OWNERS AND FOREIGN JURISDICTIONS AND WILL INVITE ADDED COMPLEXITY AND LITIGATION

#### A. Altering the Scope of the U.S. Patent Exhaustion Doctrine Will Upset Existing Patent Licensing Practices

Consistency and stability are fundamental policy goals in patent law, as evidenced by the formation of the Federal Circuit:

> The purposes of consistency and stability that underlie *stare decisis* led to the formation of the Federal Circuit, now thirty years past, to provide consistency and stability to the patent law: 'The central purpose is to reduce the widespread lack of uniformity and uncertainty of legal doctrine that exist in the administration of patent law,' H.R. Rep. 97-312, at 23 (1981), in view of the importance of technology-based advance to the nation's economy, *id.*; S. Rep. 97-275, at 6 (1981) (same).

*Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*, 744 F.3d 1272, 1282 (Fed. Cir. 2014). In line with these important policy goals, the Supreme Court has cautioned that courts should be hesitant to disrupt the expectations of the innovation community. *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,

535 U.S. 722, 724 (2002) ("[C]ourts must be cautious before adopting changes that disrupt the settled expectations of the inventing community.").

U.S. patent exhaustion law is presently settled, based on cases dating back to the nineteenth century: the exhaustion doctrine is limited to unconditional, authorized sales within the United States. *See Jazz Photo*, 264 F.3d at 1105; *Mallinckrodt*, 976 F.2d at 708-09. Existing licenses have been entered into based upon this well-established doctrine. As the Supreme Court has stated, "reliance interests are important considerations in property and contract cases, where parties may have acted in conformance with existing legal rules in order to conduct transactions." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 365 (2010). If this Court were to, in our view wrongly, alter the basic territoriality doctrine of U.S. patent exhaustion, or modify the rule that exhaustion arises only upon an unconditional authorization, it will upset many carefully negotiated bargains. This could amount to a judicially created windfall for some contracting parties, while ambushing U.S. patent holders with the abolishment of previously secure rights. Indeed, this Court recently warned that "an expansion of exhaustion doctrine could do harm to existing patterns of licensing." *Helferich*, 778 F.3d at 1307.

For example, under existing precedent, a patent owner could enter into a global license agreement under which the patent owner granted license rights under patents in any country where the licensee itself sold products implementing the

patented invention and the licensee paid for only the patent rights in those countries where its sales were made. If the licensee then sold products in a foreign country pursuant to the license, that sale would be licensed under the foreign patents, but would not exhaust any U.S. patent rights under existing exhaustion doctrine. If existing U.S. exhaustion doctrine were altered to eliminate the territorial restriction, the licensee in this scenario could sell the products outside the U.S., and the purchaser could then import those products into the U.S. and resell them without paying anything for the U.S. license rights needed to authorize U.S. sales. Because the license rights granted did not value the license based on the U.S. patent rights needed for U.S. sales, such a change in exhaustion law would disrupt the parties' agreement and provide an improper windfall to the licensee by granting U.S. patent rights that it did not pay for in the license, to the detriment of the U.S. patent owner.

Further, as discussed above, patentees who grant conditional licenses do not receive the full value of their U.S. patent rights because the licensee only pays for a certain subset of those rights. Similarly, as a result of the variability of the patent protections afforded by different countries, "it can be practically impossible for an owner of United States patent rights in an invention to extract the value of those rights when a patented article is sold elsewhere." 6 R. CARL MOY, MOY'S WALKER ON PATENTS § 19:44. If foreign or conditional sales or licenses resulted in U.S.

26

patent exhaustion, patentees would be forced to significantly alter current licensing practices. Specifically, in order to recoup the full value of their U.S. patent rights, patentees would have to charge more for limited conveyances of their rights or simply refuse to grant such limited licenses. These increased obstacles to licensing would likely result in more disputes that cannot be resolved through private negotiations, causing both a significant disruption in patent licensing and a corresponding increase in infringement litigation.

### B. Altering the Doctrine of Patent Exhaustion Will Increase the Frequency and Complexity of Patent Litigation

The territorial limit on U.S. patent exhaustion fosters simplicity and clarity of adjudication. The scope of patent protection and the standards for determining infringement in each country vary greatly. If U.S. patent exhaustion is allowed to turn on the status of patent protection in a foreign country, patent owners would be required to obtain patents in every potential foreign market. This would invite added complexity and litigation over issues including the status of foreign patent rights, if any, the nature of foreign sales, and the extent of any authorization provided by the licensor in a foreign market. Dealing with these issues may also increase litigation costs, for example, by requiring parties to provide trial courts with expert assistance on foreign law. The current, well-established U.S. exhaustion doctrine avoids these issues.

27

Additionally, altering the scope of U.S. patent exhaustion could lead to an increase in contract disputes over existing licenses. As previously discussed, many parties have entered into existing licenses based on the understanding that only unconditional domestic sales can exhaust U.S. patent rights. If these limits on U.S. patent exhaustion were to abruptly change, negotiated deals may need to be unraveled and parties may seek to reform existing contracts based on mistake of law or other appropriate approaches.

Finally, foreign jurisdictions rely on the territorial nature of the U.S. patent exhaustion doctrine, and foreign courts make decisions about the scope of the exhaustion doctrine based on the expectation that the United States restricts application of the doctrine to its own territorial reach, while respecting the exhaustion rules of other sovereign nations. *See HTC Corp. v. Nokia Corp.*, [2013] EWHC (Pat.) 3247 ¶¶ 168, 179-80, 184-88 (Oct. 30, 2013) (U.K.), available at http://www.bailii.org/ew/cases/EWHC/Patents/2013/3247.pdf. Altering the territorial scope of the exhaustion doctrine would frustrate not only the expectations of patent owners, but also the expectations of foreign jurisdictions.

## CONCLUSION

For the foregoing reasons, as well as those stated in Plaintiff-Cross-Appellant's and supporting *amici* briefs, the Court should uphold the long-settled rule – upon which many existing transactions have been based – that only unconditional, authorized sales in the United States exhaust U.S. patent rights.

Respectfully submitted,

/s/ John D. Haynes
John D. Haynes
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street NW
Atlanta, GA 30309
(404) 881-7000

*Attorneys for Amici Curiae
Nokia Technologies Oy
and Nokia USA Inc.*

**UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT**

*Lexmark International, Inc. v. Impression Products, Inc.*, 2014-1617, -1619

**CERTIFICATE OF SERVICE**

Undersigned counsel hereby certifies that on August 19, 2015, the foregoing

BRIEF OF *AMICI CURIAE* NOKIA TECHNOLOGIES OY AND NOKIA USA

INC. IN SUPPORT OF LEXMARK INTERNATIONAL, INC. was filed using the

Court's CM/ECF system, which will send notice of such filing to all registered

CM/ECF users.

By: /s/John D. Haynes
      John D. Haynes
      ALSTON & BIRD LLP
      *Attorney for Amici Curiae Nokia*
      *Technologies Oy and Nokia USA Inc.*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.      This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 32(a)(7)(B) and 29(d).  This brief, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), contains 6,833 words.

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).  This brief, including footnotes, has been prepared in a proportionally spaced typeface using Microsoft Word, in 14 Point Times New Roman.

Dated:  August 19, 2015

By: /s/John D. Haynes
John D. Haynes
ALSTON & BIRD LLP
*Attorney for Amici Curiae Nokia Technologies Oy and Nokia USA Inc.*