**Nos. 2014-1617, -1619**

In The

# United States Court of Appeals

For The Federal Circuit

---

LEXMARK INTERNATIONAL, INC.,

*Plaintiff-Cross-Appellant,*

v.

IMPRESSION PRODUCTS, INC.,

*Defendant-Appellant,*

QUALITY CARTRIDGES, INC., JOHN DOES, 1-20, BLUE TRADING LLC, EXPRINT INTERNATIONAL, INC., LD PRODUCTS, INC., PRINTRONIC CORPORATION, TESEN DEVELOPMENT (HONG KONG) CO. LTD., BENIGNO ADVEDA AND HIS COMPANIES

*Defendants.*

---

APPEALS FROM THE U.S. DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO, CASE NO. 1:10-CV-00564-MRB, JUDGE MICHAEL R. BARRETT

---

## BRIEF OF *AMICUS CURIAE* QUALCOMM INCORPORATED IN SUPPORT OF LEXMARK INTERNATIONAL, INC.

David J. Kappos
Roger G. Brooks
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000
dkappos@cravath.com
rgbrooks@cravath.com

*Attorneys for Amicus Curiae*
*Qualcomm Incorporated*

August 19, 2015

## <u>CERTIFICATE OF INTEREST</u>

Pursuant to Rules 26.1 and 29(c)(1) of the Federal Rules of Appellate Procedure and Rule 47.4(a) of this Court's Rules, counsel for *amicus curiae* Qualcomm Incorporated certifies the following:

1.   The full name of every party or *amicus* represented by me is:

     Qualcomm Incorporated

2.   The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

     Qualcomm Incorporated

3.   All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or *amicus curiae* represented by me are:

     None

4.   The names of all law firms and the partners or associates that appeared for the party or *amicus* now represented by me in the trial court or agency or are expected to appear in this Court are:

     David J. Kappos, Cravath, Swaine & Moore LLP
     Roger G. Brooks, Cravath, Swaine & Moore LLP

Dated:  August 19, 2015

by  */s/ Roger G. Brooks*
**Roger G. Brooks**

# TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ................................................................1

SUMMARY OF ARGUMENT .....................................................................4

ARGUMENT ...............................................................................................5

I.    AS A MATTER OF LAW, *MALLINCKRODT* SHOULD NOT BE OVERRULED. ...............................................................................5

    A.    *Quanta* Does Not Require—Or Even Contemplate—Reversal of *Mallinckrodt* ..........................................................................5

    B.    Conditional Licenses Are Consistent With Long-Standing Precedent and Practice. ...........................................................8

    C.    Overruling *Mallinckrodt* Would Create a Perverse Incentive System, Rewarding Dishonest Purchasers. ............................... 11

II.    AS A MATTER OF POLICY, THIS COURT SHOULD PROCEED WITH EXTREME CAUTION. ........................................................ 15

    A.    Changes to the Law of Exhaustion Should Be Made Only As Absolutely Necessary, and Only Incrementally ...................... 15

    B.    The Law Should Not Unnecessarily Restrict the Flexibility of Parties as They Attempt to Negotiate the Most Efficient Allocation and Use of Rights In Intellectual Property. ............ 17

    C.    This Court Should Proceed All the More Cautiously Given the Nuanced Nature of the Policy Goals Underpinning the Exhaustion Doctrine. ............................................................... 20

CONCLUSION. .......................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Burke*, 84 U.S. 453 (1873) ...................................................... 16, 24

*B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419 (Fed. Cir. 1997) ...........9

*Bauer & Cie v. O'Donnell*, 229 U.S. 1 (1913) ........................................... 24

*Baum Research & Dev. Co. v. Univ. of Mass.*, No. 1:02-cv-674, 2009
    U.S. Dist. LEXIS 13150 (W.D. Mich. Feb. 20, 2009) ..............................9

*Bloomer v. Millinger*, 68 U.S. 340 (1863) ........................................... 20, 24

*Bowman v. Monsanto Co.*, 133 S.Ct. 1761 (2013) ................................ *passim*

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S.
    722 (2002) ................................................................................................ 15

*General Talking Pictures Corp. v. Western Electric Co.*, 304 U.S. 175
    (1938) ................................................................................................ *passim*

*General Talking Pictures Corp. v. Western Elec. Co.*, 305 U.S. 124
    (1939) ...................................................................................................... 8, 24

*Henry v. A.B. Dick Co.*, 224 U.S. 1 (1912) ................................................. 24

*Highland v. Russell Car & Snowplow Co.*, 279 U.S. 253 (1929) ............... 17

*Intergraph Hardware Techs. Co. v. Dell Computer Corp.*, No. 2:02-
    CV-312, 2004 U.S. Dist. LEXIS 31463 (E.D. Tex. Sept. 27, 2004)..........9

*Jacobs v. Tempur-Pedic Intern., Inc.*, 626 F.3d 1327 (11th Cir. 2010) ....... 22

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984) .................. 22

*Leegin Creative Leather Products v. PSKS*, 551 U.S. 877 (2007).............. 22

*Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700 (Fed. Cir. 1992) .... *passim*

*Mitchell v. Hawley*, 83 U.S. 544 (1872) ..................................................... 24

*Motion Picture Patents Co. v. Universal Film Manufacturing Co.*, 243 U.S. 502 (1917) .................................................................. 20, 24

*Princo Corp. v. ITC*, 616 F.3d 1318 (Fed. Cir. 2010) .......................... *passim*

*Quanta Computer Inc. v. LG Electronics, Inc.*, 553 U.S. 617 (2008) ... *passim*

*Schofield v. United States Steel Corp.*, No. 2:04-cv-520-PRC, 2006 U.S. Dist. LEXIS 39605 (N.D. Ind. Mar. 31, 2006) .................................9

*Toledo Mack Sales & Service, Inc. v. Mack Trucks, Inc.*, 530 F.3d 204 (3d Cir. 2008).......................................................................... 22

*Town of Concord, Mass. v. Boston Edison Co.*, 915 F.2d 17 (1st Cir. 1990) .................................................................................... 22

*United States v. Univis Lens Co.*, 316 U.S. 241 (1942) ......................... 20, 24

*United States v. Westinghouse Electric Corp.*, 648 F.2d 642 (9th Cir. 1981) ...................................................................................8

## Other Authorities

Herbert Hovenkamp, *Post-Sale Restraints and Competitive Harm: The First Sale Doctrine in Perspective*, 66 N.Y.U. Ann. Surv. Am. L. 487 (2011) ..................................................................... 22

The Boston Consulting Group, *The Mobile Revolution: How Mobile Technologies Drive a Trillion Dollar Impact* (Jan. 15, 2015) ................ 16

# INTEREST OF AMICUS CURIAE[1]

Qualcomm Incorporated ("Qualcomm") is a premier innovator in the cellular communications industry.  In the late 1980s and early 1990s Qualcomm pioneered the use of code division multiple access ("CDMA") technology for the transmission of cellular communications.  CDMA is now the basis for all so-called "3G" cellular standards.  Qualcomm remains a leading developer of cellular technology, employing more than 20,000 engineers worldwide, the majority of whom are in the United States.  Qualcomm also reinvests billions of dollars of its revenues in order to research and invent new technologies.  In 2014 alone, Qualcomm's research and development ("R&D") investments amounted to approximately $5.5 billion.  As a result, Qualcomm has been integral to the development of the "4G" technology that forms the basis for the long-term evolution ("LTE") cellular standards now employed in the United States and elsewhere around the world.  Qualcomm continues to focus its resources on bringing new and innovative mobile technologies to the marketplace.

---

[1] Qualcomm files this brief pursuant to this Court's April 14, 2015 Sua Sponte Hearing En Banc Order (the "En Banc Order").  Qualcomm affirms that no counsel for any party has authored this brief in whole or in part, and that no person other than Qualcomm and its counsel has made a monetary contribution to this brief's preparation or submission.

Qualcomm is also a premier licensing company, and has developed an industry-leading portfolio of technologies embodied in approximately 53,000 patents worldwide, with around 48,000 patent applications pending.  As a result, all major cellular handset manufacturers worldwide have taken royalty-bearing licenses to Qualcomm's patent portfolio.  Licensing fees and royalties account for approximately 30 percent of Qualcomm's revenues, and are an essential means by which Qualcomm recovers and obtains a return on its massive R&D investments.

However, Qualcomm's business activities are not limited to research and licensing.  Qualcomm is also a premier technology company, and is the world's largest supplier of cellular chips, which it sells to customers around the world, who then incorporate them into cellular phones and other devices.

Qualcomm is a licensee as well as a licensor; as a chip supplier, Qualcomm takes licenses from, or enters into mutual non-assert agreements with, other innovator companies in order to protect its chip business from suit.

Qualcomm does not sell single-use/recyclable products like those at issue in this litigation, nor has it granted single-use licenses.  However, because of its complex position in a complex technology industry,

Qualcomm has a strong interest in preserving a flexible licensing system that is able to evolve to suit ever-changing technologies and market realities. Because of its licensing business, which has evolved over more than 20 years and now includes license agreements with every major cellular handset supplier worldwide, Qualcomm also has a strong interest in avoiding disruption to established licensing structures and relationships, and disruption to existing R&D investments built around existing law.

Substantial changes to the patent exhaustion doctrine could have significant effects on Qualcomm's business, including on patent licenses Qualcomm has already granted, and on the ability of Qualcomm and its business partners to structure patent licenses to achieve their business aims efficiently and foster a vibrant market for mobile devices. Qualcomm is concerned that any "refinements" to the law of patent exhaustion that might be contemplated in this case could have unintended and damaging effects in high-technology industries such as the cellular industry. Accordingly, Qualcomm offers this brief (a) to provide the Court with a broader context for any consideration of the law of patent exhaustion, and (b) to respectfully urge the Court to proceed with great caution, deciding only that which is necessary to resolve the case before it. On the facts of this case, no change to the law is necessary.

## SUMMARY OF ARGUMENT

In its *en banc* order, this Court posed a very direct question: whether, "in light of" *Quanta Computer Inc. v. LG Electronics, Inc.*, 553 U.S. 617 (2008), *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700 (Fed. Cir. 1992), should be overruled "to the extent it ruled that a sale of a patented article, when the sale is made under a restriction that is otherwise lawful and within the scope of the patent grant, does not give rise to patent exhaustion?" (En Banc Order at 3.)

The answer to this question is no. On the proper facts, numerous precedents of the Supreme Court and of this Court have approved license grants of limited scope associated with a product, and the Supreme Court's decision in *Quanta* announced no revolution and requires no changes to this Court's jurisprudence. In *Quanta*, the Supreme Court, working squarely within long-established exhaustion principles, carefully decided the case on strictly contractual grounds and found that the sale at issue was fully authorized because the license at issue did not contain any conditions that would have prevented exhaustion. The Supreme Court did not impose—and does not even appear to have contemplated—any changes to the scope of the exhaustion doctrine with respect to limited licenses. Various *amici curiae* of Impression, as well as the United States, urge this

Court to use this case to unsettle long-accepted precedent. They have missed the true teaching and example of *Quanta*, which is the great importance of caution and incrementalism in this difficult and pragmatic area of law. This Court should follow *Quanta* and decide nothing more than is strictly necessary to resolve the case before it.

## <u>ARGUMENT</u>

I.    **AS A MATTER OF LAW, *MALLINCKRODT* SHOULD NOT BE OVERRULED.**

A.    ***Quanta* Does Not Require—Or Even Contemplate— Reversal of *Mallinckrodt*.**

Impression and its *amici* would have this Court believe that in *Quanta* the Supreme Court overruled *sub silentio* over 130 years of its own well-established precedent—along with this Court's decision in *Mallinckrodt*—creating an absolute ban on licenses that authorize only a limited scope of usage. It did not. This hypothesis attributes a very strange method of proceeding to the Supreme Court, and ignores what that Court actually said.

On its face, the decision in *Quanta* does not even attempt— much less turn on—any new teaching concerning the intersection of limited licenses and the exhaustion doctrine. On this topic, the Supreme Court merely offered a "history of the patent exhaustion doctrine", *Quanta*, 553

- 5 -

U.S. at 625-28, before turning to the strictly contractual question of whether the sale by Intel was "authorized" by its license from LGE, concluding that it *was*, based on the *absence* of limiting language in the license from LGE to Intel.  *See id.* at 635-37.  Specifically, the Supreme Court found that LGE's rights were exhausted because "Nothing in the License Agreement restricts Intel's rights to sell its microprocessors and chipsets to purchasers who intend to combine them with non-Intel parts."  *Id.* at 636.  The negative implication is clear:  if LGE *had* actually crafted a license agreement that appropriately limited Intel's authorization to sell chips under the patent license, then a sale to a purchaser outside the authorized scope of the license would not have exhausted LGE's patent rights.  But LGE failed to do so, and so the Supreme Court held, *as a matter of contract interpretation*, that Intel's sales to Quanta were in fact unconditionally authorized under the terms of Intel's license from LGE.  *Id.* at 636-37 ("Intel's authority to sell its products embodying the LGE Patents was not conditioned on the notice or on Quanta's decision to abide by LGE's direction in the notice. . . . Intel was authorized to sell its products to Quanta . . . .").

In addition to what it did say, what the Supreme Court did *not* say in *Quanta* confirms the above reading, and renders untenable the hypothesis of Impression and the Government that *Quanta* worked a quiet

revolution and created an absolute ban on restricted licenses. *Quanta* is

notably devoid of any substantive discussion of restricted licenses or the

boundaries of the exhaustion doctrine. It fails to even mention *Mallinckrodt*,

and aside from contrasting the position of LGE with that of the plaintiffs in

*General Talking Pictures Corp. v. Western Electric Co.* ("*General Talking

Pictures I*"), 304 U.S. 175 (1938)—who had granted an enforceable

restricted license—*Quanta* does not even discuss any other leading

precedents regarding restricted licenses. 553 U.S. at 636.

Nothing in this record provides any reason to believe that the

Supreme Court—without providing any rhyme or reason for doing so—

decided to throw long-standing and widespread licensing practices into

disarray and overrule its own precedent, as well as *Mallinckrodt* and its

progeny, by revising the patent exhaustion doctrine to make it absolute and

inflexible. A faithful reading of *Quanta* observes that the Supreme Court

acted cautiously. Instead of wading into the substance of limited license

grants and the scope of the exhaustion doctrine, the Supreme Court instead

applied existing and non-controversial principles of exhaustion to the

specific facts of that case, finding that the license at issue contained no

restriction that prevented exhaustion.

**B.    Conditional Licenses Are Consistent With Long-Standing Precedent and Practice.**

Patent law has long allowed patent owners to grant conditional or restricted licenses (whether stand-alone licenses or the licenses inherent in conditional sales), permitting patentees and licensees the freedom to enter into contracts that preserve the right to invoke patent law remedies against sale or use outside the bounds of the license grant—that is, without exhaustion. In 1939, when the exhaustion doctrine was over 80 years old, the Supreme Court observed in *General Talking Pictures Corp. v. Western Electric Co.* ("*General Talking Pictures II*") that "the practice of granting licenses for a restricted use is an old one. So far as it appears, its legality has never been questioned." 305 U.S. 124, 127 (1939) (internal citation omitted). Just five years ago, in *Princo Corp. v. ITC*, this Court sitting en banc explained that the "'exhaustion' doctrine does not apply . . . to a conditional sale or license, where it is more reasonable to infer that a negotiated price reflects only the value of the 'use' rights conferred by the patentee." 616 F.3d 1318, 1328 (Fed. Cir. 2010) (*en banc*).

Limitations or restrictions on a license grant may take multiple forms. Courts have approved geographic limitations. *See, e.g.*, *United States v. Westinghouse Electric Corp.*, 648 F.2d 642, 647-49, (9th Cir. 1981)

- 8 -

(permitting a licensor to restrict a license grant such that its licensees were not authorized to sell licensed products in the United States). Field of use restrictions have likewise been upheld. *See, e.g.*, *General Talking Pictures I*, 304 U.S. at 181 ("Patent owners may grant licenses extending to all uses *or limited to use in a defined field*.") (emphasis added). And licenses that are restricted or conditioned in some way are common in many industries, and sanctioned in case after case. *See, e.g.*, *B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1426 (Fed. Cir. 1997) ("field of use restrictions . . . are generally upheld"); *Baum Research & Dev. Co. v. Univ. of Mass.*, No. 1:02-cv-674, 2009 U.S. Dist. LEXIS 13150, at *17-19 (W.D. Mich. Feb. 20, 2009) (forbidding licensee from using already-purchased sports-related testing device if license itself were to be revoked); *Schofield v. United States Steel Corp.*, No. 2:04-cv-520-PRC, 2006 U.S. Dist. LEXIS 39605, at *30-33 (N.D. Ind. Mar. 31, 2006) (finding exhaustion did not apply where patentee placed a condition on a license to machine used as part of sheet metal manufacturing process); *Intergraph Hardware Techs. Co. v. Dell Computer Corp.*, No. 2:02-CV-312, 2004 U.S. Dist. LEXIS 31463, at *6-12 (E.D. Tex. Sept. 27, 2004) (recognizing a patentee could restrict licensee from selling individual microprocessors and only permit their sale as part of a full computer system).

Given this widespread and long-standing precedent approving conditional or limited patent licenses, the absolutist positions taken by Impression, its *amici*, and the United States are not justified.  In a flash of rhetoric, the United States asserts that "The Court should overrule *Mallinckrodt* and affirm that U.S. patent laws cannot be used to effect servitudes on chattels."  (Brief of the United States of America as Amicus Curiae at 4 (June 29, 2015) (hereinafter "U.S. Br.")).  "Servitude" is of course a "Bad Thing", and the United States attempts to emotionally equate patent exhaustion with the Thirteenth Amendment.  But this is rhetoric with no meaning.  Both patent law and contracts may impose severe restrictions on what may be done with "chattels".  Patent law may altogether prohibit the use of an unlicensed, infringing article regardless of who made it, sold it, or owns it.  The question at hand is not one of fundamental freedoms and the liberation of "chattels" from "servitude".  The far more mundane and pragmatic question is whether the exhaustion doctrine shall be *expanded* to effectively require that license grants be "all or nothing", by categorically cutting off patent remedies against uses outside the authorized scope of a license even where a product is sold or used in violation of the license terms.

The answer, again, is no.  The effort of Impression and the Government to construct an absolute rule that denies all effect to conditions,

- 10 -

restrictions, or limitations in a license once there has been a sale goes beyond the precedents.  The United States accuses this Court in *Mallinckrodt* of misapplying Supreme Court decisions such as *General Talking Pictures I* when giving effect to the bounds of a limited license after sale of the licensed product, asserting that those precedents "involved restrictions placed on *licensees*, not purchasers."  (U.S. Br. at 11.)  But this departs from the facts.  The *General Talking Pictures I* Court focused on the conduct of the *purchaser* who purchased the patented product for a use outside the conditional license grant "knowing the facts" concerning the limitations on the license, and concluded that in part because of the conduct and intent of the *purchaser*, the sale was not authorized by the license, and the purchaser could be pursued for patent infringement.  *See* 304 U.S. at 181-82.  At the very least, under *General Talking Pictures I*, the use *outside* the scope of a conditional license by a purchaser who took with notice of that condition is relevant to the question of whether the sale itself was authorized, and therefore potentially exhausted the licensed patents.

> **C.   Overruling *Mallinckrodt* Would Create a Perverse Incentive System, Rewarding Dishonest Purchasers.**

The Supreme Court's more recent decision in *Bowman v. Monsanto Co.* continues this attention to the conduct and intent of the

purchaser, demonstrating once again that the Supreme Court is not eager to extend the exhaustion doctrine to protect cleverly constructed attempts to invoke exhaustion to facilitate uncompensated use of intellectual property rights.  *See, e.g.*, 133 S.Ct. 1761, 1769 (2013) ("Bowman planted Monsanto's patented soybeans solely to make and market replicas of them, thus depriving the company of the reward patent law provides for the sale of each article.  Patent exhaustion provides no haven for that conduct.").  Yet, the Government's approach would allow just such gaming of the doctrine.

The fact that a sale is made by the patentee rather than by a licensee should not, and as *Bowman* demonstrates does not, change the result in the case of a "dishonest purchaser" who deceitfully purchases with the intent to violate a condition of the sale and its accompanying license.  The law should not reward deceit on the part of purchasers, nor create arbitrary incentives favoring one business model (licensing) over another (direct manufacture and sale) by permitting the assertion of patent rights against those who operate outside the license grant in one case, while prohibiting the assertion of patent rights in the other.

Regardless of the business model chosen by a patentee, an "authorized sale" is a package that requires both a product and license rights. In the case of the licensing business model involved in the *General Talking*

*Pictures I* case, the product was manufactured by a licensee, while the license rights originated with the separate patentee/inventor.  304 U.S. at 179-80.  Because the license grant was expressly limited to sale for residential use, when a purchaser aware of the limited nature of the license purchased with the intent to use the product for a purpose outside the license scope, the sale did not exhaust the patent rights and the patentee remained free to assert its patents against the purchaser—in addition to whatever contractual and patent-law remedies the patentee may have had against the licensee/seller.  *Id.* at 180-81.

In the case of a direct manufacturing business model, the patentee/manufacturer might have offered an amplifier on cheaper terms to residential users than it did to commercial movie exhibitors, with a license grant identically limited solely to residential use, in recognition of the fact that the residential user obtains less benefit from the patented invention than does a commercial user.  If the same purchaser, with the same notice of the scope-of-use limitation to the patent license grant, had purchased the same amplifier with the same bad faith intent to use it for commercial purposes in violation of the explicitly limited license grant—but directly from the patentee, neither precedent, logic, nor policy dictate that the purchaser should walk away clear of patent infringement liability because of the

inventor's choice to exploit his invention himself, rather than licensing it to another manufacturer.

      *Amicus* Qualcomm does not deny that factual scenarios could arise that would warrant some refinement of the holding of *Mallinckrodt*; fact-specific refinement is the history of the exhaustion doctrine. However, this Court should not succumb to the temptation to "fix" exhaustion law by means of a sweeping statement that is likely to prove overbroad in its turn when confronted by the next fact setting. The specific facts of this case present no occasion to craft an adjustment to *Mallinckrodt*. Here—just as in *General Talking Pictures I*—the recited facts suggest that purchasers (both intermediaries and final consumers) and remanufacturers such as Impression were quite aware of the single-use limitation which was a condition for the sale at the discounted price they desired and obtained. *General Talking Pictures I* did not address the situation of the innocent good faith purchaser *unaware* of a limitation in the scope of a license, and it does not appear that the present case presents those facts either. Here—just as in *Princo*—"it is more reasonable to infer that [the] negotiated price reflects only the value of the [limited] 'use' rights conferred by the patentee." 616 F.3d at 1328. With full knowledge of the use restriction applicable to the cartridges at issue, Impression intentionally induced purchasers to resell the product in a

manner and for a purpose outside the use authorized by the license. Had the intention of those purchasers to resell to a refiller such as Impression been known, it is at least consistent with the record below that Lexmark would have refused to make the initial sale. A sale thus induced only by deceit should no more be considered an "authorized sale" than was the sale in *General Talking Pictures I.* Absent such an authorized sale, no question of patent exhaustion arises.

## II.    AS A MATTER OF POLICY, THIS COURT SHOULD PROCEED WITH EXTREME CAUTION.

### A.    Changes to the Law of Exhaustion Should Be Made Only As Absolutely Necessary, and Only Incrementally.

The Supreme Court emphasized in *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 739 (2002), that in the pragmatic field of patent law, "courts must be cautious before adopting changes that disrupt the settled expectations of the inventing community." But more than a hundred years ago, the Supreme Court was even more emphatic with respect to the law of patent exhaustion in particular, admonishing that, when dealing with the boundaries of the patent exhaustion doctrine, "[t]he vast pecuniary results involved in such cases, as well as the public interest, admonish [courts] to proceed with care, and to decide in each

case no more than what is directly in issue." *Adams v. Burke*, 84 U.S. 453, 455 (1873).

These stakes have only risen over the last 140 years. Commerce is now vastly larger, increasingly global, and involves vastly more complex technologies. An immeasurably larger proportion of this nation's wealth consists of intellectual property, and this wealth is dependent on an extensive and diverse network of licensing relationships and rights. Crucially, patent licensing is now the lifeblood of high technology industries that generate revenues in the trillions of dollars. Indeed, $3.3 trillion in global revenues were generated by the cellular industry alone in 2014.[2] Billions are invested in research and development annually in the cellular industry to make this all possible, and billions in royalty revenues are received annually.

Against this complex and hugely important real-world background, it is important to pause and recognize that the exhaustion doctrine, like all patent law, is concerned with pragmatic incentives and

---

[2] The Boston Consulting Group, *The Mobile Revolution: How Mobile Technologies Drive a Trillion Dollar Impact* (Jan. 15, 2015), *available at* https://www.bcgperspectives.com/content/articles/telecommunications_technology_business_transformation_mobile_revolution/.

- 16 -

efficiencies.  It is not concerned with fundamental rights or abstract justice.

Therefore, the exhaustion doctrine is a place for cautious, incremental, fact-

driven evolution, not for sweeping gestures or revolutions.  Broad

pronouncements are very likely to have unintended consequences, and,

given the complexity and scale of the relationships, licenses, and corporate

investment decisions and business models which have been constructed in

reliance on existing law and precedents, unintended consequences are more

likely than not to be harmful ones.

> **B.     The Law Should Not Unnecessarily Restrict the Flexibility of Parties as They Attempt to Negotiate the Most Efficient Allocation and Use of Rights In Intellectual Property.**

As noted above, change is *per se* hazardous in areas of law on

which extensive commerce relies.  But more than that, change which would

further restrict the ability of private parties to order their commercial

relationships by contract should be approached with particular caution.  Our

legal system broadly favors freedom of contract—permitting parties to

allocate rights among themselves as they deem efficient.  *Highland v.

Russell Car & Snowplow Co.*, 279 U.S. 253, 261 (1929) ("It is everywhere

recognized that the freedom of the people to enter into and carry out

contracts in respect of their property and private affairs is a matter of great

public concern and that such liberty may not lightly be impaired.").  This

- 17 -

flexibility has allowed parties across numerous industries to adapt their

contractual relationships in ways that allow them to efficiently allocate

rights in intellectual property.

      The diverse practices of technology industries with respect to

licensing and commercializing patented inventions illustrate the importance

of flexibility in the law.  Some companies adopt a pure research and

licensing approach to funding R&D and commercializing the resulting

inventions, and do not directly sell any products.  Many other companies do

not license their patents, but rather use them to exclude competitors and

differentiate their products.  These companies recover their R&D

investments through profits on their product sales.  Still other companies,

including Qualcomm, have adopted a hybrid model of licensing patents

broadly, rather than using them to exclude, but also obtaining revenues from

product sales.

      To move from general principles to the policy of the case at

hand, what Impression, its *amici*, and the Government seek is a legal rule

which will have the effect of categorically banning single-use sales of

products capable of being recycled and resold by third parties[3]—regardless of the economic needs and the contractual agreements of the patentee-seller and the licensee-purchaser.  This rule would no doubt benefit Impression, but there is no reason to believe that it is sound policy in the big picture, and some reason to believe that it is not.

Such a step will either reduce return on investment in innovation relating to reusable products by reducing sales of disposable/reyclable "original equipment" units by the patentee—in which case less investment and innovation in such areas can be expected—or it will require innovators to achieve their returns by charging much more up front for the capital equipment (*e.g.*, the printer, the medical testing device), since they will sell many fewer disposable units.  A larger up-front capital equipment cost may make cutting-edge technology entirely inaccessible to smaller businesses with limited capital, or to poorly funded rural hospitals.

---

[3] It is true that even if exhaustion applies, a seller will retain the nominal right to pursue contract claims against individual purchasers.  But the purchasers will often be a diffuse set, each with only a very limited amount of damages for breach of contract at stake, rendering this remedy largely illusory, and single-use limitations effectively unenforceable if this is the only remedy.  By contrast, patent remedies against the remanufacturer which is the party primarily profiting from the use outside the license scope can provide an effective remedy and thus make single-use license limitations meaningful.

These are deep waters.  Whether there is a "right" answer, or whether unrestricted sales and licenses may be more advantageous for one user, and single-use sales and accompanying licenses more advantageous for another, is a question for economists—or better yet, for free negotiation between private parties.  Except as absolutely required by statute (which, of course, says nothing about patent exhaustion) or precedent, prudence suggests that this Court should not impose a one-size-fits-all answer.

**C.    This Court Should Proceed All the More Cautiously Given the Nuanced Nature of the Policy Goals Underpinning the Exhaustion Doctrine.**

While the judicially created exhaustion doctrine wandered for a time into the intellectual realm of antitrust policy,[4] its core and most durable policy justification has been a desire to preclude "double charging" by patentees.  *See, e.g.*, *Bloomer v. Millinger*, 68 U.S. 340, 350 (1863) (the patentee is "entitled to but one royalty for a patented machine").

But whether a patentee is "double charging" is actually a very fact-specific question, as this Court recognized in *Princo* when it observed that where only a limited or conditional license has been granted, "it is more

---

[4] *See, e.g.*, *Motion Picture Patents Co. v. Universal Film Manufacturing Co.*, 243 U.S. 502, 516-17 (1917) (preventing use of licensing terms to enable price maintenance); *United States v. Univis Lens Co.*, 316 U.S. 241, 250-51 (1942) (same).

reasonable to infer that a negotiated price reflects only the value of the 'use' rights conferred by the patentee." 616 F.3d at 1328. Where this is the case, then a purchaser who uses the product outside the license grant is appropriating patent rights for which the inventor has not been compensated even *once*. The courts' symmetrical desire to avoid this type of uncompensated expropriation of patent rights exactly explains the Supreme Court's holding in *General Talking Pictures I*, as well as its recent holding in *Bowman*, in which it refused to permit the exhaustion doctrine to protect a farmer who attempted a complex and intentional maneuver to take advantage of the patent holder's innovative seeds without paying the patent holder for its invention, 133 S.Ct. at 1767-69.

Indeed, it is worth noting that modern economic theory has concluded—and the Supreme Court has accepted—that absent special circumstances such as surprise, a monopolist (here, the holder of the legal monopoly that is a patent grant) *cannot* increase its total "take" by charging at (or imposing restrictions at) more than one level in the chain of commerce, because the initial "payors" (here, licensees) will not be willing

to pay as much if they anticipate further downstream charges or restrictions.[5]

So important has this theoretical realization been that, in the area of antitrust law, practices that were once deemed *per se* violations of the Sherman Act—such as vertical agreements restricting price or allocating markets—are now examined under a fact-specific rule-of-reason analysis.[6]

---

[5] "In the 1950s, this leverage theory of monopoly tying was largely discredited by Chicago School writers . . . . [I]n any multi-stage distribution chain there is but a single monopoly profit to be earned. . . . The first sale doctrine was historically justified by a variation of the leverage theory, but the Chicago School showed that one who owns a patented good subject to subsequent downstream resales or uses as a component in another product can charge a price in the primary transaction that gives it the full markup that is available from downstream purchasers or other users."  Herbert Hovenkamp, *Post-Sale Restraints and Competitive Harm: The First Sale Doctrine in Perspective*, 66 N.Y.U. Ann. Surv. Am. L. 487, 514-15 (2011); *see also Town of Concord, Mass. v. Boston Edison Co.*, 915 F.2d 17, 23 (1st Cir. 1990) ("[T]he extension of monopoly power from one to two levels does not *necessarily*, nor in an *obvious* way, give a firm added power to raise prices.  As several members of the Supreme Court have pointed out, a 'widely accepted' (albeit 'counterintuitive') economic argument supports the conclusion of many commentators that 'there is but one maximum monopoly profit to be gained from the sale of an end product'.") (citing *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 36 (1984) (O'Connor, J., concurring in the judgment).

[6] *See Leegin Creative Leather Products v. PSKS*, 551 U.S. 877, 907 (2007) (holding that "[v]ertical price restraints are to be judged according to the rule of reason"); *Jacobs v. Tempur-Pedic Intern., Inc.*, 626 F.3d 1327, 1336 (11th Cir. 2010) ("After *Leegin* . . . courts must evaluate vertical resale price maintenance agreements using the rule of reason."); *Toledo Mack Sales & Service, Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 225 (3d Cir. 2008) ("[T]he legality of a vertical agreement that imposes a restriction on the

It is interesting to note the extent to which the courts' common sense and sense of equity long anticipated this modern economic theory. A monopolist *can* "double dip" where there is "surprise"—where the initial payor thought it was obtaining all needed rights. A monopolist *cannot* "double dip" where there is full information at the time of the first transaction. And indeed, the question of full information versus surprise is an important thread in the exhaustion case law. *Compare Bloomer* (exhaustion bars a surprise second charge levied on a licensee who had previously purchased "all rights") *with General Talking Pictures I* and *Bowman* (infringers who knowingly and intentionally obtained and used products for uses outside the license grant not protected by exhaustion).

While the courts thus have a good record of "doing equity" in individual exhaustion cases, their record of attempting to articulate broad theoretical statements of the doctrine that will render the doctrine more "mechanical" is less happy. Although of course not an "official" indicator, it is striking that a tour through the Supreme Court's cases treating patent exhaustion takes one through a forest of yellow or red "flags" in the West

_____

dealer's ability to sell the manufacturer's product is governed by the rule of reason.").

- 23 -

reports, marking an unusually acute pattern of questioning, qualifying, and even overruling the attempts of each successive generation to bring "clarity" to patent exhaustion.[7] This unsatisfactory historical experience may explain the Supreme Court's extremely cautious approach in *Quanta*. The Supreme Court scrupulously avoided making new law or announcing new policy concerning the exhaustion doctrine in *Quanta*. Except to the extent absolutely necessary to decide a specific case before it, this Court should do the same. At least in the case of a purchaser (direct or indirect) that took with knowledge of a single-use restriction, the rule of *Mallinckrodt* is consistent with the Supreme Court's decision in *General Talking Pictures I,* with the principles articulated by this Court in *Princo*, and with the goal of adequate compensation for patentees that underpins the Supreme Court's decision in *Bowman*. As a result, this case presents no occasion to substantially revisit—much less to categorically overturn—*Mallinckrodt.*

---

[7] All of the following precedents are designated by Westlaw as having been distinguished, questioned, or overruled in subsequent cases: *Bloomer v. Millinger*, 68 U.S. 340 (1863); *Mitchell v. Hawley*, 83 U.S. 544 (1872); *Adams v. Burke*, 84 U.S. 453 (1873); *Henry v. A.B. Dick Co.*, 224 U.S. 1 (1912); *Bauer & Cie v. O'Donnell*, 229 U.S. 1 (1913); *Motion Picture Patents Co. v. Universal Film Mfg. Co.*, 243 U.S. 502 (1917); *General Talking Pictures Corp. v. Western Elec. Co.*, 305 U.S. 124 (1939); *General Talking Pictures Corp. v. Western Electric Co.*, 304 U.S. 175 (1938); *United States v. Univis Lens Co.*, 316 U.S. 241 (1942).

## CONCLUSION

For the reasons set forth above, this Court should not overrule

*Mallinckrodt* "to the extent it ruled that a sale of a patented article, when the

sale is made under a restriction that is otherwise lawful and within the scope

of the patent grant, does not give rise to patent exhaustion."


Dated:  August 19, 2015

<div style="margin-left:auto; width:50%;">

By:   */s/ Roger G. Brooks*
_____

David J. Kappos
Roger G. Brooks
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000
dkappos@cravath.com
rgbrooks@cravath.com

*Attorneys for Amicus Curiae*
*Qualcomm Incorporated*

</div>

## CERTIFICATE OF SERVICE

I hereby certify that on August 19, 2015, I caused a copy of the Brief of *Amicus Curiae* Qualcomm Incorporated in Support of Lexmark International, Inc. to be electronically filed with the Clerk of the Court using the Court's CM/ECF system, which will automatically send email notification of such filing to counsel of record.

By:   */s/ Roger G. Brooks*
     **Roger G. Brooks**

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure 29(c)(7) and 32(a)(7)(C), I hereby certify:

1.     this brief complies with the type-volume limitation set forth in Rules 29(d) and 32(a)(7)(B) of the Federal Rules of Appellate Procedure in that this brief contains 5,447 words, excluding those parts of the brief exempted from the type-volume calculation by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Rule 32(b) of this Court's Rules; and

2.     this brief complies with the typeface and type-style requirements of Rules 32(a)(5) and 32(a)(6) of the Federal Rules of Appellate Procedure in that this brief is formatted in Microsoft Word 2007 using a proportionally spaced typeface in 14-point Times New Roman font.

Dated:  August 19, 2015

By:    */s/ Roger G. Brooks*
                            **Roger G. Brooks**