Nos. 14-1617, -1619

# United States Court of Appeals
# for the Federal Circuit

———————

LEXMARK INTERNATIONAL, INC.,

*Plaintiff-Cross Appellant*,

v.

IMPRESSION PRODUCTS, INC.,

*Defendant-Appellant,*

QUALITY CARTRIDGES, INC., JOHN DOES, 1–20, BLUE TRADING LLC, EXPRINT INTERNATIONAL, INC., LD PRODUCTS, INC., PRINTRONIC CORPORATION, TESEN DEVELOPMENT (HONG KONG) CO. LTD., BENIGNO ADEVA AND HIS COMPANIES, *Defendants.*

———————

Appeals from the United States District Court for the Southern District of Ohio, Case No. 10-CV-564, Judge Michael R. Barrett

———————

## BRIEF OF INTERDIGITAL, INC. AS AMICUS CURIAE IN SUPPORT OF PLAINTIFF-CROSS APPELLANT

———————

DAVID S. STEUER
MICHAEL B. LEVIN
MAURA L. REES
WILSON SONSINI GOODRICH & ROSATI
650 Page Mill Road
Palo Alto, CA 94304
Telephone: (650) 493-9300
Facsimile:  (650) 565-5100

*Counsel for InterDigital, Inc.*

# CERTIFICATE OF INTEREST

Counsel for amicus curiae certifies the following:

1.     The full name of every party represented by me is:

InterDigital, Inc.

2.     The name of the real party in interest represented by me is:

InterDigital, Inc.

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None

4.     The names of all law firms and the partners or associates who appeared for the party or amicus now represented by me in the trial court or agency, or who are expected to appear in this Court, are:

WILSON SONSINI GOODRICH & ROSATI
David S. Steuer, Michael B. Levin, Maura L. Rees

DATE:  August 19, 2015              /s/ David S. Steuer

# TABLE OF CONTENTS

**Page**

IDENTITY AND INTEREST OF AMICUS CURIAE............................................1

INTRODUCTION ............................................................................................2

ARGUMENT ...................................................................................................4

I.    Foreign Sales Presumptively Do Not Exhaust U.S. Patents ...........4

    A.    U.S. Patent Law Does Not Have Extraterritorial Effect ......................4

    B.    *Kirtsaeng* Does Not Provide a Basis On Which to Overrule *Jazz Photo*.........................................................................................7

    C.    A Rule of International Exhaustion Based on Foreign "Authorized" Sales Would Be Overbroad and Incorrect ......................8

    D.    A Broad and Unconstrained Rule of International Exhaustion Threatens to Give Foreign Countries Unprecedented Control over U.S. Patent Rights ............................................................10

    E.    The Issues Presented In This Appeal Relate to Sales By Patent Owners..................................................................................13

II.   The Supreme Court in *Quanta* Did Not Overrule *Mallinckrodt* ...................14

CONCLUSION ...............................................................................................15

# TABLE OF AUTHORITIES

<u>**Page(s)**</u>

## CASES

*Boesch v. Graff*, 133 U.S. 967 (1890).................................................................7, 8, 9

*Carnegie Mellon Univ. v. Marvell Tech. Group Ltd.*, No. 2014-1492,
    2015 U.S. App. LEXIS 13622 (Fed. Cir. Aug. 4, 2015)..............................4

*Deepsouth Packing Co. v. Laitram Corp.,* 406 U.S. 518 (1972)............................4

*Gen. Talking Pictures Corp. v. W. Elec. Co.*,
    304 U.S. 175 (1938)....................................................................................14

*Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437 (2007)...........................................4

*Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S.Ct. 1351 (2013) ...............................9

*Quanta Comput., Inc. v. LG Elecs., Inc.*, 128 S.Ct. 2109 (2008) ...........................14

## STATUTES

17 U.S.C. § 109 ........................................................................................................7

35 U.S.C. § 271(a) .................................................................................................5, 7

Patent Law Amendments Act of 1984,
    Pub. L. No. 98-622, 98 Stat. 3383 ...............................................................4

## MISCELLANEOUS

Donald Harris, *TRIPS After Fifteen Years: Success or Failure, as
    Measured By Compulsory Licensing,*
    18 J. Intell. Prop. L. 367 (2011)...................................................................12

## IDENTITY AND INTEREST OF AMICUS CURIAE[1]

InterDigital, Inc. is a Pennsylvania corporation with headquarters in Wilmington, Delaware. It was founded in 1972 with the objective of developing new and innovative wireless technologies. It became a publicly traded company in 1981, and is now a significant commercial research and engineering organization, with research centers in Pennsylvania, New York, California, Canada, England, and South Korea. At the end of 2014, InterDigital, Inc. and its affiliates (hereinafter "InterDigital") had 320 employees, more than 170 of whom are engineers. More than 80% of its engineers hold advanced degrees, with more than 50 Ph.Ds.

For over four decades, InterDigital has been a pioneer in mobile technology and a key contributor to global wireless standards. InterDigital does not manufacture devices; instead it has chosen to focus on innovation through advanced research, often collaborating or partnering with other research-focused organizations on specific projects. InterDigital's R&D efforts have resulted in the company owning a portfolio of approximately 20,000 patents and patent applications, spanning some 50 jurisdictions worldwide, about 90% of which were

---

[1] No counsel for any party authored this brief in whole or in part. No party, party's counsel, or any person other than amicus curiae or its counsel made a monetary contribution intended to fund the preparation or submission of this brief. The filing of amicus briefs was authorized by the Court's April 14, 2015 Order "without consent" or "leave of court." Order at 4.

developed in-house. The primary source of InterDigital's revenue comes from the royalties received from licensing its worldwide portfolio of patents developed by the company's scientists and engineers. InterDigital's past and current licensees have included prominent companies in the mobile wireless space, such as Apple, Samsung, Sony, Panasonic, RIM/Blackberry, HTC, Toshiba, Sanyo, NEC, and Sharp. InterDigital's constant commitment to innovation, and its particular focus on developing new and innovative wireless telecommunication standards, has benefitted markets, technology, and consumers around the globe.

InterDigital's experience in licensing a large global patent portfolio comprised of patents from many countries around the world gives it a unique perspective on the issues of international exhaustion raised in this appeal. The well-understood default rule is that foreign sales do not exhaust a domestic U.S. patent. Patent rights are territorial, and industry patent licensing practices reflect this fact. A new regime of international patent exhaustion would introduce significant uncertainty into established licensing practice, and, in its most extreme form, would have the potential to allow foreign countries to dismantle U.S. patent protection and eviscerate intellectual property rights held by U.S. companies.

## INTRODUCTION

The Court has requested that the parties submit briefing on two issues. <u>First</u>, should the Court overrule *Jazz Photo* in light of *Kirtsaeng*, to the extent *Jazz Photo*

ruled that a foreign sale never gives rise to U.S. patent exhaustion?  Second, should the Court overrule *Mallinckrodt* in light of *Quanta*, to the extent *Mallinckrodt* ruled that a restricted sale that is lawful and within the scope of the patent grant does not give rise to patent exhaustion?

Both of these questions should be answered in the negative.  Regarding the first question, a regime of international patent exhaustion would contravene the presumption against extraterritoriality that exists in patent law.  The territorial nature of patent laws allows individual countries to exercise sovereignty in determining the nature and extent of the exclusive rights granted to patent owners. Undermining the rule against international patent exhaustion has the potential to significantly interfere with national sovereignty, allowing foreign countries to exercise unwarranted control over U.S. patent rights, to the detriment of U.S. patent owners and the nation's innovation economy.   It would be inappropriate and unwise to venture down a path that could give foreign countries—which may be economic competitors at best and hostile enemies at worst—the ability to dictate terms on which patented goods can be imported into and sold in the United States.

Regarding the second question, *Quanta* did not depart from the general rule that only an unconditional sale triggers patent exhaustion.  Accordingly, *Quanta* does not provide a basis on which to overrule *Mallinckrodt*.

3

In any event, the Court's ruling in this case should be limited to the factual situation presented:  a sale of a product made by the patent owner with license restrictions of the type imposed by Lexmark.  In particular, the situation of a patent owner who authorizes a licensee to sell products under a license with specified terms and conditions is not presented in this appeal.  There are many possible permutations of situations in which a sale by a party who is ***not*** the patent owner may or may not be considered to be "authorized" by the patent owner, or may be authorized only to a certain extent.  These factual circumstances are not before the Court, and a ruling in this case should be carefully tailored to avoid unintended and unwarranted effects on how its holding could be said to apply in other situations.

## ARGUMENT

### I.     Foreign Sales Presumptively Do Not Exhaust U.S. Patents

#### A.     U.S. Patent Law Does Not Have Extraterritorial Effect

The U.S. Patent Act does not have exterritorial effect, a legal principle that has been repeatedly confirmed in case law.  *Deepsouth Packing Co. v. Laitram Corp.,* 406 U.S. 518, 531 (1972), *superseded by statute on other grounds*, Patent Law Amendments Act of 1984, Pub. L. No. 98-622, 98 Stat. 3383, *as recognized in Microsoft Corp. v. AT&T Corp*., 550 U.S. 437 (2007); *Carnegie Mellon Univ. v. Marvell Tech. Group Ltd*., No. 2014-1492, 2015 U.S. App. LEXIS 13622, at *52 (Fed. Cir. Aug. 4, 2015) ("the patent laws, like other laws, are to be understood against a background presumption against extraterritorial reach.").  By its express

terms, the Patent Act is applicable "within the United States." 35 U.S.C. § 271(a). Thus, courts have been clear that U.S. patents do not have extraterritorial effect, and U.S. patent law generally does not provide for infringement liability for sales, manufacture, or use of the patented invention wholly outside the United States.

In light of the presumption against extraterritoriality, it would be inconsistent to introduce a rule of international patent exhaustion in the case of sales outside the United States made by the patentee. Because a patentee is not entitled to obtain damages for infringement of U.S. patents based on entirely foreign activities, a foreign sale by the patent owner should not exhaust U.S. patent rights. Lexmark Br. at 13-15; *see also* AIPLA Amicus Br. at 12 ("If a claim of infringement of a U.S. patent does not apply to extraterritorial uses, and the patentee is not entitled to receive a royalty under the U.S. patent for a non-U.S. sale, then an extraterritorial sale by the patentee cannot eviscerate its U.S. patent rights by triggering exhaustion."). U.S. patent laws are not applicable to foreign sales, so foreign sales by the patentee should not exhaust U.S. patent rights.

Under the Paris Convention, each country's patent system is distinct, and may provide for different rights and remedies. Lexmark Br. at 14. The territorial nature of patent laws significantly affects how patent owners develop their portfolios. In order to obtain patent protection across jurisdictions, patent owners often apply for and obtain patents in multiple countries. This is true for

InterDigital, which owns patents and patent applications in over 50 countries.   In the case of a patent owner with a large portfolio of patents issued in dozens of countries, a sale by the patent owner in one country should not presumptively exhaust anything more than patent rights granted in the country where the sale occurred, to the extent provided for in that country's law.  While a patent owner may choose to grant broader geographical rights in connection with a foreign sale (such as a right of U.S. importation), it should not be deemed to have done so absent express evidence that such a grant was intended.

Like Lexmark, InterDigital agrees with the position of the United States in its amicus brief that patent laws are territorial, and that international exhaustion is therefore not generally triggered by a foreign sale by a patent owner.  Lexmark Br. at 23-24.  However, the United States' position that international exhaustion should be presumed unless the patent holder *reserves* U.S. patent rights is not well-supported.  United States Amicus Br. at 16-20.   Rather, the presumption should be *against* international exhaustion in the case of a foreign sale, except where the patent holder has evidenced an intention to affirmatively grant U.S. patent rights. The rule proposed by the United States would not be consistent with the presumption against extraterritoriality application of U.S. patent laws.

6

**B.    *Kirtsaeng* Does Not Provide a Basis On Which to Overrule *Jazz Photo***

The *Kirtsaeng* decision of the Supreme Court is not on point, and does not require that *Jazz Photo* be overruled. The copyright first sale doctrine is distinct from the patent exhaustion doctrine, and a foreign sale of a particular copy of a copyrighted work need not be subject to the same treatment as a foreign sale of an article embodying a patent. In *Kirtsaeng*, the Supreme Court addressed statutory construction of 17 U.S.C. § 109, which codified the copyright first sale doctrine. By contrast, patent exhaustion is a judge-made doctrine and is not subject to the statutory interpretation the Supreme Court undertook in *Kirtsaeng*. The Patent Act also includes express territorial language limiting its application to activities "within the United States," while this geographical language is absent from the relevant provisions of the Copyright Act. 35 U.S.C. § 271(a). International treaties also demonstrate the differences between copyright and patent in their international application. *See* Lexmark Br. at 30 (noting that Berne Convention copyright treaty largely harmonizes copyright protection across member countries).

A more relevant case concerning the treatment of foreign sales under the patent law, with its presumption against extraterritoriality, is the Supreme Court's decision in *Boesch v. Graff*, 133 U.S. 967 (1890). In that case, the sale of a patented article in Germany did not exhaust U.S rights. As noted by Lexmark, the "Court recognized the separate foreign and U.S. rights at issue, expressly

distinguishing the buyer's right to 'make and sell' the article in Germany 'under the laws of that country' from 'the rights o[f] patentees under a United States patent.'" Lexmark Br. at 17, citing *Boesch*, 133 U.S. at 703. Impression Products and its amici seek to distinguish *Boesch* because the seller in that case was not the U.S. patent holder, but rather derived its right to sell the patented product from German law applicable to German patents. However, the Court's recognition that the sale in Germany was not "under a United States patent" demonstrates that the important distinctions among the patent laws of each country must be maintained in analyzing the effect of a sale on U.S. patent rights. A foreign sale should not be presumed to be "under a United States patent," and should not be found to include U.S. patent rights, except under factual circumstances demonstrating that the patent owner intended such a result. Further, *Boesch* applied a restraint under U.S. patent law against the free importation of goods lawfully acquired abroad. To the extent Impression Products and its amici seek to extend *Kirtsaeng* into the patent realm in support of a principle that no downstream restraints on importation or sale can be imposed on lawful purchasers, such a result cannot be reconciled with *Boesch*. *See* United States Amicus Br. at 25.

### C.    A Rule of International Exhaustion Based on Foreign "Authorized" Sales Would Be Overbroad and Incorrect

The facts of *Boesch* also highlight that there are many ways in which a sale might be characterized as an "authorized" sale. To the extent Impression Products

8

and its amici argue that any "authorized" foreign sale exhausts U.S. patent rights, this formulation is unworkable because of the imprecision of the term "authorized," and it is also overbroad and inconsistent with established law.

It is clear that a foreign sale cannot be considered "authorized" where it is non-infringing simply because the sale occurs outside U.S. territory where U.S. patent rights do not apply. *Kirtsaeng* rejected this proposition in the context of copyright law, finding that "pirated" foreign sales do not trigger the copyright first sale doctrine. *Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S.Ct. 1351, 1361 (2013). Accordingly, *Kirtsaeng* would provide no support for such a theory. A purchaser of a copy of a pirated work sold in a foreign country is not free to distribute that copy in the United States in derogation of the rights of the U.S. copyright owner. In the case of patent law, as reflected in the facts of *Boesch*, foreign patent law may provide that sales in a foreign country are non-infringing (*e.g.,* pursuant to the "prior use" rights in Germany at issue in *Boesch*), but this would not mean that a sale is "authorized" by the patent owner in the sense that the patent owner had expressly permitted it. A form of "authorization" provided by the operation of foreign law should unquestionably apply only to rights arising under foreign patents. As confirmed by the result in *Boesch*, the lawful purchaser of the products from a German seller, who was free of restraints imposed by German patents, remained subject to U.S. patent rights. *Boesch*, 133 U.S. at 699.

### D.    A Broad and Unconstrained Rule of International Exhaustion Threatens to Give Foreign Countries Unprecedented Control over U.S. Patent Rights

Certainly, foreign countries should not be permitted to unilaterally dictate when products made abroad can be imported and sold in the United States under the U.S. patent law, and under what terms.  Yet the most extreme formulations of international exhaustion, as expressed by some amici in support of Impression Products, have the potential to bring about exactly this result.

The following example illustrates the dangers of a broad and unconstrained rule of international exhaustion.  Assume that a foreign country decides that a particular product is important to its economic or other national interests, and that its local industry for that product must be protected.  The foreign country therefore provides in its laws (whether by legislation, executive action, regulatory proceedings, or judicial decisions) that local manufacturers in that country are entitled to free or nominal-cost licenses for all necessary rights to make and sell the product at issue.  The foreign country then  declares that companies, including U.S. companies, must grant free or nominal-cost licenses to local manufacturers under their patents in that country.

Sales made under such licenses could hardly be considered "authorized" sales that could exhaust U.S. patent rights.  At most, such a law could affect only local patent rights granted in that foreign country.  Yet the most extreme

formulations of international exhaustion, to the effect that "all authorized sales anywhere should always result in exhaustion," could be seen to sweep in sales made under such circumstances. This could not possibly be a proper application of U.S. patent exhaustion, under *Boesch* or otherwise. Such a result would not only be contrary to law, but would seriously harm U.S. interests by handing over control of U.S. patent law to foreign powers that have every incentive to support their own interests over those of the United States. A broad-based rule of international patent exhaustion for U.S. patents would open the floodgates for foreign countries seeking to advantage their local industries at the expense of U.S. patent owners.

Further, if foreign sales occurring under the circumstances in this example were to be deemed to trigger U.S. patent exhaustion, then U.S. companies owning foreign patents would be placed in an untenable position. They could either (1) run the risk that foreign governments will devalue not only their foreign patents, but will effectively destroy their U.S. patent protection as well by providing for nominal-royalty or royalty-free licenses for foreign sales that would exhaust U.S. patent rights; or (2) refrain from filing for patents in foreign countries, and divest or abandon the foreign patents they currently own, in order to avoid such an outcome. Discouraging U.S. companies from protecting their inventions abroad would be incompatible with sound U.S. economic policy, which should seek to

strengthen U.S business and the ability of U.S. companies to compete internationally.

Recent actions by some countries demonstrate that such concerns are not merely theoretical. Countries such as Brazil, Thailand, and India have required compulsory licenses for certain pharmaceutical patents and/or enacted limits on patent protection for pharmaceuticals. *See* Donald Harris, *TRIPS After Fifteen Years: Success or Failure, as Measured By Compulsory Licensing,* 18 J. Intell. Prop. L. 367 (2011). In the mobile wireless space, InterDigital has experienced legal actions in foreign countries that have used local laws in an effort to significantly devalue its patents issued in those countries. Developing countries in particular often have authoritarian governments that do not apply Western standards of due process, do not have an independent judiciary, do not enforce intellectual property rights to the same degree as in the United States or other developed countries, and do not respect intellectual property rights held by U.S. companies. As a result, foreign governments have the ability to control terms of sale occurring in their countries, in ways that are thoroughly inconsistent with U.S. legal principles.

If sales mandated by foreign governments, having interests antagonistic to those of the United States, were allowed to have exhaustive effect on U.S. patent rights, it would be tantamount to handing over the crown jewels of America's

innovation economy to foreign interests.  The territorial nature of patent law does not permit such a result, and in no event should international exhaustion be used as a stepping stone on this dangerous path.

### E.    The Issues Presented In This Appeal Relate to Sales By Patent Owners

There are many permutations of how sales and licenses may be accomplished by U.S. patent holders in the context of international commerce. Lexmark is a patent owner that sells products pursuant to a restricted license with specific terms.  The Court should therefore address its decision to this factual situation, and should decline the invitation of Impression Products and its amici to adopt broad and unworkable standards that reach situations far outside the facts presented here.

For example, the seller may be the patent holder, who "authorizes" the sale by carrying it out, with or without conditions of sale or accompanying license terms.  A patent holder may license third parties to make sales under the terms and conditions of the license.  A patent holder who authorizes sales by third parties in a foreign country may own patents issued in the foreign country and in the United States, and the foreign sale could be expressly authorized by the patentee under patents in the country of sale, under U.S. patents, or both.  Whether U.S. patent rights are included in connection with a foreign sale should depend on the facts of the case.  A blanket, one-size-fits-all rule that deems U.S. patent rights to be

13

always exhausted in the context of any foreign sale would be unwarranted, and would deprive parties of the flexibility to structures sales and/or licenses in the most efficient way and in the manner that meets the business goals of the parties. This, in turn, would hinder international commerce, to the detriment of U.S. patent holders and the nation's innovation economy that depends on their contributions.

## II.    The Supreme Court in *Quanta* Did Not Overrule *Mallinckrodt*

In *Quanta,* the Supreme Court primarily addressed the extent to which sales of products that partially embody patents can lead to patent exhaustion.  *See Quanta Comput., Inc. v. LG Elecs., Inc.*, 128 S.Ct. 2109, 2118-21 (2008). Secondarily, the Court considered whether Intel's sale of products to Quanta exhausted the patent rights Intel had licensed from LG due to the allegedly restricted nature of LG's license.  In answering this question, the Supreme Court followed the precedent of *General Talking Pictures*, pursuant to which the Court held that licensors may grant restricted licenses, and that sales by the licensee outside the scope of the license do not trigger patent exhaustion.  *Gen. Talking Pictures Corp. v. W. Elec. Co*., 304 U.S. 175 (1938).

Accordingly, the Supreme Court analyzed the LG-Intel license, and found that "[n]othing in the License Agreement restricts Intel's right to sell its microprocessors and chipsets to purchasers who intend to combine them with non-Intel parts." *Quanta*, 128 S.Ct. at 2121.  In light of the unrestricted sales provided

14

for by the license agreement, the Court found patent exhaustion. However, *Quanta* did not suggest that restricted sales would equally lead to exhaustion, and indeed it applied the ordinary rule that only unconditional sales trigger exhaustion. The permissibility of the restricted sales in *Mallinckrodt* that did not lead to patent exhaustion is not contradicted by *Quanta*.

## CONCLUSION

The Court should answer the questions presented for *en banc* consideration in the negative. A rule of international patent exhaustion would represent a significant and unwarranted departure from settled principles of U.S. patent law that do not allow for extraterritorial application. In its most extreme form, international patent exhaustion has the potential to hand the "keys of the kingdom" of U.S. patent law over to foreign governments, with resulting harm to the nation's interests. Further, *Quanta* did not find or even suggest that conditional, restricted sales should lead to patent exhaustion.

Dated:  August 19, 2015                           Respectfully submitted,

                                                   /s/ David S. Steuer
                                                  DAVID S. STEUER
                                                  MICHAEL B. LEVIN
                                                  MAURA L. REES
                                                  WILSON SONSINI GOODRICH &
                                                  ROSATI
                                                  650 Page Mill Road
                                                  Palo Alto, CA 94304

15

Telephone: (650) 493-9300
Facsimile: (650) 565-5100

*Counsel for InterDigital, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of August, 2015, I caused the foregoing Opening Brief of Plaintiff-Cross Appellant to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit through the Court's CM/ECF system.


/s/ David S. Steuer

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) and the Rules of this Court, because it contains 3627 words as determined by the Microsoft Word 2010 word-processing system used to prepare the brief, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using the Microsoft Word 2010 word-processing system in 14-point Times New Roman font.

/s/ David S. Steuer
DAVID S. STEUER