Nos. 2014-1617, -1619

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

LEXMARK INTERNATIONAL, INC.,

*Plaintiff-Cross Appellant*,

*v.*

IMPRESSION PRODUCTS, INC.,

*Defendant-Appellant.*

QUALITY CARTRIDGES, INC., JOHN DOES, 1-20, BLUE TRADING LLC, EXPRINT INTERNATIONAL, INC., LD PRODUCTS, INC., PRINTRONIC CORPORATION, TESEN DEVELOPMENT (HONG KONG) CO. LTD., BENIGNO ADEVA AND HIS COMPANIES,

*Defendants.*

On Appeal from the United States District Court for the Southern District of Ohio, No. 1:10-cv-00564-MRB, Judge Michael R. Barrett

**BRIEF FOR AMICUS CURIAE IBIQUITY DIGITAL CORPORATION IN SUPPORT OF CROSS-APPELLANT LEXMARK INTERNATIONAL, INC.**

KATHI A. COVER
*ASSISTANT GENERAL COUNSEL*
IBIQUITY DIGITAL CORPORATION
6711 Columbia Gateway Drive,
Suite 500
Columbia, MD  21046
(443) 539-4310
*Counsel for Amicus Curiae iBiquity Digital Corporation*

August 19, 2015

# CERTIFICATE OF INTEREST

Counsel for Amicus Curiae iBiquity Digital Corporation certifies the following:

1.    The full name of every party or *amicus* represented by me is:

iBiquity Digital Corporation

2.    The names of the real party in interest represented by me is:

Not applicable

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Bank of America Corporation, a publicly traded company, holds an equitable interest in iBiquity Digital Corporation that could be deemed to exceed a 10 percent interest in certain scenarios.

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

IBIQUITY DIGITAL CORPORATION:  Kathi A. Cover

Dated:  August 19, 2015

/s/ Kathi A. Cover
KATHI A. COVER
*ASSISTANT GENERAL COUNSEL*
IBIQUITY DIGITAL CORPORATION
6711 Columbia Gateway Drive,
Suite 500
Columbia, MD  21046
(443) 539-4310

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTEREST ................................................................. i

TABLE OF AUTHORITIES ................................................................. iii

INTEREST OF THE AMICUS CURIAE .................................................. 1

INTRODUCTION ................................................................................ 3

ARGUMENT ...................................................................................... 5

I.    QUANTA DOES NOT OVERRULE MALLINCKRODT ..................... 5

II.   AS A POLICY MATTER, THE UNCONDITIONAL AUTHORIZED SALE
      DOCTRINE OF QUANTA SHOULD NOT BE EXPANDED TO
      ENCOMPASS CONDITIONAL SALES. ........................................ 8

      A.    iBiquity's License Structure Promotes Innovation and
            Competition ........................................................................ 8

      B.    iBiquity's License Structure Reduces Manufacturing
            Costs And Risks ................................................................. 12

      C.    iBiquity's License Structure Reduces Costs To
            Consumers .......................................................................... 14

      D.    Contract Remedies Alone Are Not Sufficient Protection
            For Patent Licensing Programs .......................................... 16

III.  EXPANDING PATENT EXHAUSTION TO EVERY AUTHORIZED SALE
      EXPANDS THE DOCTRINE BEYOND ITS RATIONALE ................. 17

CONCLUSION ................................................................................. 19

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Adams v. Burke*,
   84 U.S. (17 Wall.) 453 (1873) ............................................................3, 5, 18

*B. Braun Medical, Inc. v. Abbott Laboratories*,
   124 F.3d 1419 (Fed. Cir. 1997) .......................................................11

*E. Bement & Sons v. National Harrow Co.*,
   186 U.S. 70 (1902)..........................................................................5

*General Talking Pictures Corp. v. Western Electric Co.*,
   305 U.S. 124 (1938)........................................................................5

*Helferich Patent Licensing, LLC v. N.Y. Times Co.*,
   778 F.3d 1293 (Fed. Cir. 2015) ....................................................2, 8

*Mallinckrodt, Inc. v. Medipart, Inc.*,
   976 F.2d 700 (Fed. Cir. 1992) ...................................................passim

*Mitchell v. Hawley*,
   83 U.S. (16 Wall.) 544 (1872) ........................................................5

*Quanta Computer, Inc. v. LG Electronics, Inc.*,
   553 U.S. 617 (2008)...................................................................passim

*Princo Corp. v. ITC*,
   616 F.3d 1318 (Fed. Cir. 2010) (en banc) .........................................3

*Providence Rubber Co. v. Goodyear*,
   76 U.S. (9 Wall.) 788 (1870) ..........................................................5

*United States v. General Electric Co.*,
   272 U.S. 476 (1926)........................................................................5

*United States v. Masonite Corp.*,
   316 U.S. 265 (1942).......................................................................18

*United States v. Univis Lens Co.*,
   316 U.S. 241 (1942).......................................................................18

## STATUTES AND RULES

35 U.S.C. § 271(a) .................................................................................16

Fed. R. App. P. 29(c) ...............................................................................1

## OTHER AUTHORITIES

ElBoghdady, Dina, *The Dawn of HD Radio*,
    Washington Post, Nov. 6, 2004 ..........................................................2

Gilroy, Amy, *HD Radio: Will More Awareness Translate To Sales?*,
    TWICE, Dec. 3, 2007 ........................................................................14

Hovenkamp, Herbert, *Post-Sale Restraints and Competitive Harm:*
    *The First Sale Doctrine in Perspective*, 66 N.Y.U. Ann. Surv. Am.
    L. 487 (2011) ...........................................................................16, 17

LaFuze, William, et al., *The Conditional Sale Doctrine in A Post-Quanta*
    *World and Its Implications on Modern Licensing Agreements*, 11 J.
    Marshall Rev. Intell. Prop. L. 295 (2011) ..........................................7

Quain, John R., *Tuning in to HD Radio*,
    U.S. News & World Report, June 14, 2004 ......................................14

# INTEREST OF THE AMICUS CURIAE[1]

This brief supports the position of plaintiff-cross appellant Lexmark International, Inc. on Question (b) posed by the Court's En Banc Order.[2]  The En Banc order states that "[t]he case involves (i) sales of patented articles to end users under a restriction that they use the articles once and then return them and (ii) sales of the same patented articles to resellers under a restriction that resales take place under the single-use-and-return restriction," and then asks:

> Do any of those sales give rise to patent exhaustion?  In light of *Quanta Computer, Inc. v. LG Electronics, Inc.*, 553 U.S. 617 (2008), should this court overrule *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700 (Fed. Cir. 1992), to the extent it ruled that a sale of a patented article, when the sale is made under a restriction that is otherwise lawful and within the scope of the patent grant, does not give rise to patent exhaustion?

iBiquity Digital Corporation ("iBiquity") has a direct and ongoing interest in this question.  iBiquity is the developer of HD Radio™ technology for digital AM and FM radio.  This breakthrough technology has been described as "radio's most

---

[1]    Pursuant to Fed. R. App. P. 29(c), amicus states:  (1) no party's counsel authored this brief in whole or in part; (2) no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and (3) no person other than the amicus curiae contributed money that was intended to fund preparing or submitting this brief.

[2]    "En Banc Order" refers to the sua sponte hearing en banc order entered April 14, 2015 [Doc. 83].  iBiquity derives its authority to file this brief from that order, which states that "briefs of amici curiae will be entertained, and … may be filed without consent and leave of court[.]"

dramatic technological leap since FM broadcasting debuted more than 50 years ago." Dina ElBoghdady, *The Dawn of HD Radio*, Washington Post, Nov. 6, 2004, at E1. HD Radio broadcasters now transmit new, high-quality digital signals simultaneously with traditional analog AM and FM radio signals. The Federal Communications Commission has adopted iBiquity's HD Radio In-Band, On-Channel system as the sole solution for AM and FM digital radio broadcasting in the United States.

The widespread commercialization of HD Radio technology is directly tied to iBiquity's business model, which involves a licensing structure that spreads risks and costs across two levels in the manufacturing chain. iBiquity's licensing structure comports with the basic principle stated in *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700 (Fed. Cir. 1992)—that a patentee may license some, but not all, of its patent rights to different parties—and generates procompetitive benefits for licensees, consumers, and the general economy.

An examination of iBiquity's licensing structure, and the reasons for it, may be helpful to this Court's examination of question (b) and whether it is proper or desirable on the facts of this case to expand the ***unconditional*** sale doctrine of *Quanta* and erase the long-standing boundary that a ***conditional*** sale places on patent exhaustion, as established by *Mallinckrodt*. *Helferich Patent Licensing, LLC v. N.Y. Times Co.*, 778 F.3d 1293, 1305 (Fed. Cir. 2015) (refusing to expand

the scope of the judicially created doctrine of patent exhaustion because Congress has not granted courts a license to "erase [established] boundaries" and "expand the doctrine into difficult new territory").

## INTRODUCTION

This Court's *en banc* order asks whether "[i]n light of [*Quanta*] this court [should] overrule [*Mallinckrodt*] to the extent it ruled that a sale of a patented article … does not give rise to patent exhaustion?"  The answer is no.

The Supreme Court has long held that patent owners may license some rights while restricting others.  *E.g., Adams v. Burke*, 84 U.S. (17 Wall.) 453, 456 (1873).  In *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700 (Fed. Cir. 1992), this Court reaffirmed that basic principle, and further held that the principle of patent exhaustion did not turn a conditional sale or license into an unconditional one.  *Id.* at 706.  That is, private parties retain the freedom to contract concerning conditions of sale, and can do so without implicating the doctrine of patent exhaustion.  *Id.* As the *en banc* Court later explained, the "'exhaustion' doctrine does not apply . . . to a conditional sale or license, where it is more reasonable to infer that a negotiated price reflects only the value of the 'use' rights conferred by the patentee."  *Princo Corp. v. ITC*, 616 F.3d 1318, 1328 (Fed. Cir. 2010) (en banc).

The Supreme Court's decision in *Quanta Computer, Inc. v. LG Electronics, Inc.*, 553 U.S. 617 (2008), does not vitiate *Mallinckrodt.*  *Quanta* concerned an

***unconditional transfer*** of patent rights, and therefore does not change the law regarding conditional sales. *Quanta* is properly read as allowing for conditions to be drafted to avoid patent exhaustion if they are explicitly described in the license agreement and follow contract law. Indeed, this reading of *Quanta* allows for a market that incentivizes investors to enter into license agreements with companies like iBiquity, who bring new, innovative products to market. iBiquity's licensing structure shows exactly why the holding of *Mallinckrodt* makes sense and should not be disturbed by this Court.

Innovators such as iBiquity should be permitted to structure their patent licensing programs in ways that they and their licensees believe will best promote the further development and commercialization of their inventions. A licensing program such as iBiquity's affords companies seeking to introduce a new technology into the marketplace the ability to share the risks, as well as the rewards, of the new technology. Enabling the creation and proliferation of the digital AM and FM radio industry in the United States, iBiquity's licensing program comports with the fundamental purpose of the patent laws, "[t]o promote the Progress of Science and useful Arts," U.S. Const. art. I, § 8.

# ARGUMENT

## I. *QUANTA* DOES NOT OVERRULE *MALLINCKRODT*

The Supreme Court has long held that patent rights are divisible, and that patent owners may license some rights while withholding others.[3] *See Adams v. Burke*, 84 U.S. (17 Wall.) 453, 456 (1873); *Mitchell v. Hawley*, 83 U.S. 544 (1872). Consistent with this principle, this Court held in *Mallinckrodt* that a "single use only" restriction could be valid and enforceable under the patent laws. 976 F.2d at 706; *see id.* at 709 (concluding that "the district court erred in holding that the restriction on reuse was, as a matter of law, unenforceable under the patent law.").

*Quanta* does not disturb this holding. In *Quanta*, the Court examined underlying license agreements between LGE and Intel and, finding them to be dispositive, concluded that they broadly authorized Intel to sell licensed products

---

[3]     More than seventy-five years ago, "[t]he practice of granting licenses for a restricted use" was already "an old one." *General Talking Pictures Corp. v. Western Elec. Co.*, 305 U.S. 124, 127 (1938); *see also United States v. General Elec. Co.*, 272 U.S. 476, 490 (1926); *E. Bement & Sons v. National Harrow Co.*, 186 U.S. 70, 91 (1902); *Mitchell v. Hawley*, 83 U.S. (16 Wall.) 544, 548 (1872); *Providence Rubber Co. v. Goodyear*, 76 U.S. (9 Wall.) 788, 799 (1870). Accordingly, "with few exceptions" courts will enforce "any condition[]" in a license granting "the right to manufacture or use or sell [a patented] article." *E. Bement & Sons*, 186 U.S. at 91; *see also General Elec.*, 272 U.S. at 489 (a patent owner may grant a license "upon any condition the performance of which is reasonably within the reward which the patentee by the grant of the patent is entitled to secure").

***without restrictions or conditions.*** As such, LGE's patent rights were exhausted by an unconditional, authorized sale by Intel. 553 U.S. 617, 636.

The *Quanta* Court did not cite—let alone overrule—*Mallinckrodt*. Indeed, the two opinions are not inconsistent. *Mallinckrodt* holds that a one-time use restriction could be enforced through an infringement action if the restriction is otherwise "valid[] … under the applicable law such as the law governing sales and licenses, and if the restriction on reuse was within the scope of the patent grant or otherwise justified." 976 F.2d at 709. The *Quanta* decision did nothing to undermine this reasoning, as the patentee in *Quanta* had not limited, divided, or otherwise conditioned the patent rights it conveyed. As the Supreme Court noted, "[n]othing in the License Agreement restrict[ed] Intel's right to sell its microprocessors and chipsets to purchasers who intend to combine them with non-Intel parts." 553 U.S. at 636-637.

*Quanta's* statement that "the initial authorized sale of a patented item terminates all patent rights to that item" is constrained by the fact that the sale at issue was unconditional. The Court's statement was made in the following context:

> The authorized sale of an article that substantially embodies a patent exhausts the patent holder's rights and prevents the patent holder from invoking patent law to control postsale use of the article. Here, LGE licensed Intel to practice any of its patents and to sell products practicing those patents. Intel's microprocessors and chipsets substantially embodied the LGE Patents because they had no

reasonable noninfringing use and included all the inventive aspects of the patented methods. *Nothing in the License Agreement limited Intel's ability to sell its products practicing the LGE Patents. Intel's authorized sale to Quanta thus took its products outside the scope of the patent monopoly*, and as a result, LGE can no longer assert its patent rights against Quanta.

*Quanta*, 553 U.S. at 638 (emphasis added). As this full passage makes clear, the Court's conclusion—that LGE could no longer assert its patent rights against Quanta—depended on the absence of a condition in the license agreement limiting Intel's ability to sell its products. *Id.*

Conditional sales and restricted licenses were not outlawed by *Quanta*. Instead, the Court reaffirmed that patentees can preserve patent rights so long as they do so explicitly. *See id.*, 553 U.S. at 636-637 ("Nothing in the License Agreement restricts Intel's right to sell its microprocessors and chipsets to purchasers who intend to combine them with non-Intel parts …. In any event, the provision requiring notice to Quanta appeared only in the Master Agreement, and LGE does not suggest that a breach of that agreement would constitute a breach of the License Agreement …. And exhaustion turns only on Intel's own license to sell products practicing the LGE Patents."); *see also* William LaFuze, et al., *The Conditional Sale Doctrine in A Post-Quanta World and Its Implications on Modern Licensing Agreements*, 11 J. Marshall Rev. Intell. Prop. L. 295, 312 (2011) ("the presence of such a condition would have allowed LGE to assert its patent rights against Quanta").

**II.    AS A POLICY MATTER, THE UNCONDITIONAL AUTHORIZED SALE DOCTRINE OF *QUANTA* SHOULD NOT BE EXPANDED TO ENCOMPASS CONDITIONAL SALES**

This Court has been cautious when asked to expand the judicially created doctrine of patent exhaustion into new territory.  *Helferich Patent Licensing, LLC v. N.Y. Times Co.*, 778 F.3d 1293, 1305-1307 (Fed. Cir. 2015).   In this case, the Court should again exercise restraint based on policy considerations enumerated in *Helferich*, such as economic impact and harm to existing patterns of licensing.  *Id.* at 1307.   iBiquity's licensing program demonstrates how conditional transfers, when properly done, promote innovation and competition, and why the Court should not disrupt the settled licensing practices of an industry.

**A.    iBiquity's License Structure Promotes Innovation and Competition**

The widespread commercialization of HD Radio technology is directly tied to iBiquity's business model.  iBiquity, a Maryland-based company with only 120 employees, does not have the capacity to manufacture and sell HD Radio receivers or broadcast equipment.  It simply cannot manufacture such a diverse array of products or meet the volume demand for radios.  Instead, iBiquity established a licensing program that enables chip companies and receiver manufacturers to bring the technology to market.

*(1) iBiquity's Chip Maker Licenses*:  Every HD Radio receiver has a specialized processor that decodes the digital HD Radio waveform received over

the airways.  iBiquity licenses chip makers to manufacture these chips, but otherwise limits the chip makers' rights under the patents in several ways.  *First*, the chip maker may not *use* those chips for any purpose other than testing.  *Second*, chip makers do not have the unconditional right to sell chips.  A chip maker may only transfer chips to an authorized receiver manufacturer that has a valid receiver license with iBiquity.  The chip maker's transfer right is expressly conditioned on this requirement.  In addition, the chip maker may transfer chips to receiver manufacturers pursuant to a *sublicense* of the chip makers' limited use rights.  The chip maker must provide recipients with a specific notice of these limitations of the sublicense.  iBiquity's chip maker license and the notice to sublicensees both state that there is no implied license to sell HD Radio chips, and that unauthorized sales of the chips, alone or as a component of another device, constitutes patent infringement.  In fact, the license specifically disclaims that any sublicense constitutes a sale that would exhaust iBiquity's patent rights, or confers any implied license on the sublicensee.  Licensed chip makers must acknowledge that they have ***not*** received full rights to use, sell, or transfer HD Radio receivers, and that they cannot convey such rights to their customers.  *Finally*, iBiquity expressly reserves specific rights, including the rights to license and receive a royalty from HD Radio receiver manufacturers (i.e. the chip maker's customers).

In addition to these license provisions, iBiquity provides significant technical support to its chip makers. This combination of tailored license rights and technical support provides the consideration for the royalty payment to iBiquity for each chip that is transferred by chip makers to authorized sublicensees.

*(2) iBiquity's Receiver Manufacturer Licenses*: iBiquity licenses receiver manufacturers to make, use, and sell HD Radio receiver products incorporating chips from licensed chip makers. Thus, iBiquity's receiver manufacturer license complements the chip maker license, and it is from this receiver license that a recipient of chips obtains the rights it needs to make, use and sell HD Radio receivers incorporating those chips. Each licensed receiver manufacturer acknowledges that it does not receive an implied license to use or sell HD Radio chips from the chip maker, and instead *receives only a sublicense of the rights granted under the chip maker's license*. The license further grants the licensed receiver manufacturer a royalty-bearing license to make, use, or sell products incorporating the licensed HD Radio patents, but specifically identifies the license from iBiquity as the sole source of the right to use and sell the products. Royalties under iBiquity's receiver manufacturer license are due only upon invoiced sales of licensed products.[4]

---

[4]     iBiquity's licensees are sophisticated businesses, and include (among others) Texas Instruments, NXP (formerly Philips) Semiconductor, Pioneer, Yamaha, JVC-Kenwood, and Panasonic. The fact that these companies have structured their

iBiquity's licensing program has proven remarkably successful, both within the United States and internationally.  As of August 1, 2015, more than 2,000 HD Radio stations were on the air, including stations in every major U.S. city.  There are more than 25 million HD Radio receivers in the marketplace, and every major car manufacturer ships vehicles equipped with HD Radio receivers.  Countries throughout the world, including Argentina, Australia, Bosnia, Brazil, Canada, Czech Republic, France, Germany, Hong Kong, Indonesia, New Zealand, Philippines, Poland, Switzerland, Thailand and Ukraine, have tested or are testing HD Radio broadcasting.  Mexico has adopted HD Radio technology as its digital radio broadcast standard.

This robust and competitive market for receiver products is a direct result of iBiquity's licensing program, which has enabled chip companies to produce differentiated chip platforms.  If iBiquity had to reserve all of its patent rights for licensing only to the receiver manufacturers, iBiquity would have had to create the chip platform itself, leading to delayed creation of the market, fewer options for

---

patent licensing agreements with iBiquity in this way is powerful evidence that the royalty structure is an efficient risk allocation structure that benefits the licensees. *See B. Braun Med. Inc. v. Abbott Labs.*, 124 F.3d 1419, 1426 (Fed. Cir. 1997) ("In such a transaction, it is more reasonable to infer that the parties negotiated a price that reflects only the value of the "use" rights conferred by the patentee.  As a result, express conditions accompanying the sale or license of a patented product are generally upheld.") (citations omitted).

consumers, and significant inefficiencies. In short, eliminating the market for multiple chip platforms would have reduced innovation and competition and increased the cost of end products to consumers.

**B.    iBiquity's License Structure Reduces Manufacturing Costs And Risks**

Chip makers and receiver manufacturers incurred risk and startup costs by manufacturing new HD Radio receiver products when there was no certainty that the technology would be a success. iBiquity designed its patent licensing structure to limit those risks and promote the introduction and expansion of its new technology.

At the chip level, iBiquity minimizes the chip makers' patent licensing costs by charging a reduced royalty rate in exchange for limited patent rights. Likewise, receiver manufacturers do not pay for the full value of iBiquity's inventions because the royalty expense is shared with the chip makers. Spreading the royalty across these two levels prevents any one level from bearing the full burden of this expense.

If iBiquity were required by the patent exhaustion doctrine to collect a single royalty from chip makers (and no royalty from receiver manufacturers), it would significantly increase the cost of chips. Chip makers might well have viewed a license with a substantial up-front royalty as too expensive and risky, and as a

result, may have decided not to take a license or produce any chips at all.  If that had happened, HD Radio technology might never have come to market.

Even if chip makers were willing to pay a high royalty in return for an unlimited license, the resulting cost of the chips to receiver manufacturers might well have been too high to justify entering the market.  Chip makers frequently mark-up the price of their chips so as to recover a multiple of the cost of producing the chips.  A substantial increase in the royalty cost to chip makers thus could have resulted in a chip cost that exceeded the combined cost of the chip plus the receiver manufacturer's royalty.  Receiver manufacturers could well have found the chips too expensive to justify an investment in producing receivers, particularly in the early stages of the technology, when sales of HD Radio receivers were just beginning.  A rigid limitation on the licensing options available to patentees thus could have blocked HD Radio technology from getting off the ground.[5]

iBiquity has also borne much of the risk itself of bringing this technology to market.  Receiver manufacturers defer making any royalty payments until the completed HD Radio receiver is actually sold.  Because iBiquity does not realize the full value of its invention until a product reaches the market, the license

---

[5]    If chip makers realized that receiver manufacturers were unwilling to buy chips at a price that includes a full royalty plus the chip maker's mark-up, the chip maker would quickly cease producing chips, or would decline to produce them in the first place.

structure shifts some of the risk that the receiver will not sell from the manufacturers back to iBiquity.

iBiquity and its corporate predecessors have invested over three hundred million dollars in developing the patented HD Radio technology, and iBiquity continues to employ numerous engineers and scientists to further develop the technology. If companies in iBiquity's position were forced to collect a single, diminished royalty in order to commercialize their technology, some highly beneficial innovations such as HD Radio technology might never be developed at all.

### C. iBiquity's License Structure Reduces Costs To Consumers

iBiquity's licensing program also benefits consumers, by encouraging manufacturers to produce products that embody innovative new technologies that otherwise might not make it to market at all. Once a new product is successfully introduced into the marketplace and purchased by a sufficient number of "early adopters," economies of scale take hold and allow more units to be produced at a lower price, inducing more consumers to purchase the product.[6] But this "virtuous

---

[6] This has been true for HD Radio technology. The first HD Radio receivers marketed to consumers were priced from $500 to $1000; HD Radio receivers are now available for as little as $69.95. *See* John R. Quain, *Tuning in to HD [R]adio*, U.S. News & World Report, June 14, 2004; Amy Gilroy, *HD Radio: Will More Awareness Translate To Sales?*, TWICE, Dec. 3, 2007.

cycle" cannot take hold unless the initial products can be brought to market. iBiquity's patent licensing structure is an efficient way to overcome this barrier.

This approach also benefits consumers by reducing that portion of a finished receiver's selling price attributable to manufacturer markups. When a chipmaker determines the selling price of a chip, it imposes a markup based on its costs, including any royalty it must pay. The receiver manufacturer in turn imposes its own markup based on its costs, including the cost of the chip. The royalty at the chip level is therefore marked up twice by the time a finished product reaches a consumer. Minimizing the royalty at the chip level therefore minimizes the pass-through cost of the royalty to consumers.

iBiquity's licensing program also has provided consumers with a wider choice of products in the marketplace, because iBiquity was able to enter into agreements with multiple chip makers and receiver manufacturers who have produced a variety of differentiated products. If iBiquity had been required to collect a single royalty, many manufacturers might have declined to enter into licensing agreements with iBiquity, resulting in fewer choices for consumers—or no choices at all.

### D.    Contract Remedies Alone Are Not Sufficient Protection For Patent Licensing Programs

If *Quanta* is found to overrule *Mallinckrodt*, it would block enforcement of conditional transfers or sales under patent law.[7]  The consequence of this outcome would be severe for licensors: all restraints would become unenforceable by way of patent infringement actions, and companies such as iBiquity would be limited to actions under state contract law.

Infringement actions are superior to contract suits for many reasons.  *First*, contract remedies would likely be limited to expectation damages, whereas patent infringement damages can be the reasonable royalty together with interest and costs or up to treble damages plus attorneys fees for willful infringers.  Herbert

---

[7]    *Quanta's* footnote 7 does not mandate contract-only remedies.  Rather, it contemplates that restrictions in a properly drafted license may be enforceable through state contract **and** federal patent infringement actions.  *See Quanta*, 553 U.S. at 637, n.7 ("We note that the authorized nature of the sale to Quanta does not necessarily limit LGE's other contract rights.  LGE's complaint does not include a breach-of-contract claim, and we express no opinion on whether contract damages might be available even though exhaustion operates to eliminate patent damages.").  This is consistent with the long-standing proposition that private parties are free to negotiate contracts as they see fit, including imposing conditions on the sale of goods.  That a product happens to be patented does not nullify those contractual limitations; rather, a patentee has the statutory right to enforce these conditions through an action for patent infringement against "whoever without authority" treads upon the make, use, or sell rights expressly retained by the patentee.  35 U.S.C. § 271(a).  *Mallinckrodt* correctly ruled that when such a restriction is "within the scope of the patent grant or otherwise justified, then violation of the restriction may be remedied by action for patent infringement." 976 F.2d at 709.

- 16 -

Hovenkamp, *Post-Sale Restraints and Competitive Harm: The First Sale Doctrine in Perspective*, 66 N.Y.U. Ann. Surv. Am. L. 487, 543 (2011).  The increased potential liability for patent infringement creates an incentive for licensees not to breach their agreements.  *Second*, most contract actions would be filed in state court unless there is diversity jurisdiction in federal court.  *Id.* at 544.  By contrast, a patent infringement suit could be filed in a single federal court against all infringers, with all appeals going to this Court.  *Id. Third*, contract actions can only be brought against parties to the contract or those in privity.  *Id.* at 497-498.  Patent infringement actions can run against all who infringe an intellectual property right, including those who knowingly induce or contribute to the infringements of others.  *Id.*

As a result of all these differences, a licensee would have little incentive not to breach its license agreements, if an infringement remedy is not available to the licensor.  The Court should reject an expansion of the patent exhaustion doctrine that would result in such an outcome.

## III.  EXPANDING PATENT EXHAUSTION TO EVERY AUTHORIZED SALE EXPANDS THE DOCTRINE BEYOND ITS RATIONALE

Reading *Quanta* to create a *per se* rule that every authorized sale— conditional or not—exhausts all patent rights would expand patent exhaustion well beyond its rationale.  In explaining the basis for exhaustion, the Supreme Court has indicated that the Patent Act's purpose of providing incentives to innovation is

"fulfilled," *United States v. Univis Lens Co.*, 316 U.S. 241, 251 (1942), when a patent owner has "received *all* the royalty or consideration which he claims for the use of his invention," *Adams*, 84 U.S. (17 Wall.) at 456 (emphasis added). Put another way, "[t]he test" for exhaustion is whether "it may fairly be said that the patentee has received his reward for the use of the article." *United States v. Masonite Corp.*, 316 U.S. 265, 278 (1942).

There are many circumstances in which a patent owner cannot receive an adequate reward for the use of its invention if the first authorized sale of any article embodying that invention renders unenforceable all patent restrictions on its use. iBiquity's patent licensing program illustrates the point. In bringing its technology to market, iBiquity faced a significant challenge common to many inventors: it lacked the financial resources, capacity, and experience necessary to produce a range of new products, and so had to persuade other companies, including manufacturers of chips and receivers, to invest in the technology before it had been accepted by, or even introduced to, consumers. As discussed *supra*, iBiquity overcame this challenge by creating a licensing program that promoted innovation and competition and reduced risks and costs. If the manufacturing companies who have licensed iBiquity's technology had been unwilling to invest the resources needed to produce HD Radio chips and receivers, HD Radio technology might

never have come to market and the Constitutional directive "to promote the Progress of Science and useful Arts" would not have been fulfilled.

## CONCLUSION

*Quanta* does not compel this Court to overrule *Mallinckrodt* or to adopt a *per se* rule that every authorized sale—conditional or not—exhausts all patent rights. Companies should be permitted to structure their patent licensing programs in ways that they and their licensees believe will best promote the further development and commercialization of their inventions and be able to enforce those licenses through patent infringement actions, thus bringing new technologies to market to the benefit of the national economy and consumers.

Respectfully submitted,

/s/ Kathi A. Cover
KATHI A. COVER
*ASSISTANT GENERAL COUNSEL*
IBIQUITY DIGITAL CORPORATION
6711 Columbia Gateway Drive,
Suite 500
Columbia, MD  21046
(443) 539-4310

*Counsel for Amicus Curiae iBiquity Digital Corporation*

August 19, 2015

## CERTIFICATE OF SERVICE

I hereby certify that, on this 19th day of August, 2015 I filed the foregoing

Brief for Amicus Curiae iBiquity Digital Corporation in Support of Cross-

Appellant Lexmark International, Inc. with the Clerk of the United States Court of

Appeals for the Federal Circuit via the CM/ECF system, which will send notice of

such filing to all registered CM/ECF users.


/s/ Kathi A. Cover
KATHI A. COVER
IBIQUITY DIGITAL CORPORATION
6711 Columbia Gateway Drive,
Suite 500
Columbia, MD  21046
(443) 539-4310

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 29(d), Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32(b).

1.     Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(a)(7)(B), the brief contains 3,824 words.

2.     The brief has been prepared in proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman font.  As permitted by Fed. R. App. P. 32(a)(7)(C), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

/s/ Kathi A. Cover
KATHI A. COVER
*ASSISTANT GENERAL COUNSEL*
IBIQUITY DIGITAL CORPORATION
6711 Columbia Gateway Drive,
Suite 500
Columbia, MD  21046
(443) 539-4310

August 19, 2015