Nos. 14-1617, -1619

# United States Court of Appeals for the Federal Circuit

LEXMARK INTERNATIONAL, INC.,

*Plaintiff-Cross Appellant,*

v.

IMPRESSION PRODUCTS, INC.,

*Defendant-Appellant,*

QUALITY CARTRIDGES, INC., JOHN DOES, 1–20, BLUE TRADING LLC, EXPRINT INTERNATIONAL, INC., LD PRODUCTS, INC., PRINTRONIC CORPORATION, TESEN DEVELOPMENT (HONG KONG) CO. LTD., BENIGNO ADEVA AND HIS COMPANIES,

*Defendants.*

Appeals from the United States District Court for the Southern District of Ohio, Case No. 10-CV-564, Judge Michael R. Barrett

**AMICUS-CURIAE BRIEF OF PROFESSOR THEODORE L. FIELD IN SUPPORT OF LEXMARK INTERNATIONAL, INC.**

Theodore L. Field
Professor of Law
South Texas College of Law
1303 San Jacinto Street
Houston, Texas 77002
(713) 646-1770
tfield@stcl.edu

# CERTIFICATE OF INTEREST

Amicus curiae Theodore L. Field certifies the following:

1.      The full name of the party submitting this brief is:

Theodore L. Field

2.      The name of the real party in interest:

Does not apply

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Does not apply

4.      The names of all law firms and the partners and associates who appeared in proceedings before the United States District Court for the Southern District of Ohio or are expected to appear in this Court, are:

The only person associated with this amicus-curiae brief is Theodore L. Field, Professor of Law, South Texas College of Law.


DATE:  August 19, 2015                  /s/ Theodore L. Field
                                        THEODORE L. FIELD

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ....................................................................i

TABLE OF AUTHORITIES ......................................................................iii

STATEMENT OF INTEREST OF AMICUS CURIAE ............................. vii

SUMMARY OF ARGUMENT .................................................................. 1

ARGUMENT ......................................................................................... 5

I.　The Doctrine of Stare Decisis Should Prevent This Court from Overruling Either *Jazz Photo* or *Mallinckrodt* ................................................. 6

II.　This Court Should Not Overrule *Jazz Photo* in Light of *Kirtsaeng* ...................... 11

　A.　The Historical Background Relied upon by the Supreme Court in *Kirtsaeng* Does Not Apply to Patent Law.................................... 11

　B.　In *Kirtsaeng*, the Supreme Court Did Not Reject the Reasoning of *Jazz Photo* By Rejecting Justice Ginsburg's Reasoning in her Dissent .... 17

III.　This Court Should Not Overrule *Mallinckrodt* in Light of *Quanta* ...................... 18

　A.　The Common Law Allows Restrictions on Sales of Personal Property, So Patent Owners Should Have the Right to Selectively Transfer Patent Rights When Selling Patented Articles .......................... 19

　B.　Because Patent Owners Have the Right to Impose Use Restrictions Through Licenses, Only Unnecessary Formalism Would Prevent Patent Owners from Imposing Use Restrictions Through Sales ............ 23

CONCLUSION ................................................................................... 25

CERTIFICATE OF SERVICE ................................................................ 26

CERTIFICATE OF COMPLIANCE ......................................................... 27

# TABLE OF AUTHORITIES

## CASES

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
 598 F.3d 1336 (Fed. Cir. 2010) (en banc) .............................................. 6, 8, 9, 10

*Bloomer v. McQuewan*,
 55 U.S. (14 How.) 539 (1852) ................................................................ 19

*Brulotte v. Thys Co.*,
 379 U.S. 29 (1964) ................................................................................. 10

*Clairol Inc. v. Cosmetics Plus*,
 325 A.2d 505 (N.J. Sup. Ct. 1974) ....................................................... 20

*De Mattos v. Gibson*,
 45 Eng. Rep. 108 (1859) ................................................................... 19, 20

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
 535 U.S. 722 (2002) .......................................................................... 8, 9, 10

*Gen'l Talking Pictures Corp. v. Western Elec. Co.*,
 305 U.S. 124 (1938) ............................................................................... 23

*Halliburton Co. v. Erica P. John Fund, Inc.*,
 134 S. Ct. 2398 (2014) ............................................................................. 7

*Jazz Photo Corp. v. International Trade Commission*,
 264 F.3d 1094 (Fed. Cir. 2001) ....................................................... 1, 5, 25

*Keeler v. Std. Folding Bed Co.*,
 157 U.S. 659 (1895) ............................................................................... 23

*Kimble v. Marvel Entm't, LLC*,
 135 S. Ct. 2401 (2015) ........................................ 6, 7, 8, 9, 10, 11, 12

*Kirtsaeng v. John Wiley & Sons, Inc.*,
 133 S. Ct. 1351 (2013) ................................................ 1, 5, 12, 17, 18, 25

*Mallinckrodt, Inc. v. Medipart, Inc.*,
 976 F.2d 700 (Fed. Cir. 1992) ........................................................ 1, 5, 25

*Metro. Opera Ass'n v. Wagner-Nichols Recorder Corp.*,
   101 N.Y.S.2d 483 (N.Y. Sup. Ct. 1950) ........................................................ 21

*Microsoft Corp. v. Harmony Computers & Elecs., Inc.*,
   846 F. Supp. 208 (E.D.N.Y. 1994) ............................................................... 23

*Motion Picture Patents Co. v. Universal Film Mfg. Co.*,
   243 U.S. 502 (1917) ..................................................................................... 22

*Nadell & Co. v. Grasso*,
   346 P.2d 505 (Cal. 1959) ............................................................................. 20

*Payne v. Tennessee*,
   501 U.S. 808 (1991) ................................................................................. 8, 10

*Planned Parenthood of Se. Pa. v. Casey*,
   505 U.S. 833 (1992) ....................................................................................... 6

*Pratte v. Balatsos*,
   113 A.2d 492 (N.H. 1955) ............................................................................ 21

*ProCD, Inc. v. Zeidenberg*,
   86 F.3d 1447 (7th Cir. 1996) ........................................................................ 23

*Quanta Computer, Inc. v. LG Electronics, Inc.*,
   553 U.S. 617 (2008) ............................................................................. 1, 5, 25

*Robert Bosch, LLC v. Pylon Mfg. Corp.*,
   719 F.3d 1305 (Fed. Cir. 2013) (en banc) ............................................. 6, 8, 9

*Samantar v. Yousuf*,
   130 S. Ct. 2278 (2010) ................................................................................. 12

*Straus v. Victor Talking Mach. Co.*,
   243 U.S. 490 (1917) ..................................................................................... 22

*Tallmadge v. East River Bank*,
   26 N.Y. 105 (1862) ...................................................................................... 20

*Tulk v. Moxhay*,
   41 Eng. Rep. 1143 (1848) ............................................................................ 19

*United States v. Univis Lens Co.,*
  316 U.S. 241 (1942) ................................................................................. 22

*Vasquez v. Hillery,*
  474 U.S. 254 (1986) ................................................................................... 6

*Waring v. WDAS Broad. Station, Inc.,*
  194 A. 631 (Pa. 1937) .........................................................................21, 22

## STATUTES

17 U.S.C. § 109(a) ......................................................................12, 17, 18

35 U.S.C. § 261 ........................................................................................ 19

35 U.S.C. § 271 ........................................................................................ 16

Statute of Monopolies, Statutes at Large, 1623, 21 Jac., c. 3 (Eng.).................13, 14, 16

## OTHER AUTHORITIES

Cardozo, B., *The Nature of the Judicial Process* (1921) ........................... 6

Chafee, Jr., Zeckariah, *Equitable Servitudes on Chattels,*
  41 Harv. L. Rev. 945 (1928) .................................................................. 21

Coke, Edward, *The Third Part of the Institutes of the Laws of England* (William S. Hein Co.
  1986)......................................................................................................... 15

Crane, Daniel A., *Lochnerian Antitrust,*
  1 N.Y.U. J. L. & Liberty 496 (2005) .................................................... 13

Duffy, John F., *Inventing Invention: A Case Study of Legal Innovation,*
  86 Tex. L. Rev. 1 (2007)......................................................................... 15

Ford, Laura R., *Prerogative, Nationalized: The Social Formation of Intellectual Property,*
  97 J. Pat. & Trademark Off. Soc'y 270 (2015) ..................................... 13

Hemnes, Thomas M.S., *Restraints on Alienation, Equitable Servitudes, and the Feudal Nature
  of Computer Software Licensing,*
  71 Denv. U. L. Rev. 577 (1994) ......................................................23, 24

Kozel, Randy J., *Stare Decisis As Judicial Doctrine*,
  67 Wash. & Lee L. Rev. 411 (2010)....................................................... 8

Lemley, Mark A., *Why Do Juries Decide If Patents Are Valid?*,
  99 Va. L. Rev. 1673 (2013) ....................................................... 13, 16

Malament, Barbara, *The "Economic Liberalism" of Sir Edward Coke*,
  76 Yale L.J. 1321 (1967)....................................................... 13

Natelson, Robert G., *Federal Land Retention and the Constitution's Property Clause: The Original Understanding*,
  76 U. Colo. L. Rev. 327 (2005) ....................................................... 13

Rich, Giles S., *Principles of Patentability*,
  28 Geo. Wash. L. Rev. 393 (1960)....................................................... 15

*Selected Writings and Speeches of Sir Edward Coke* (Steve Sheppard ed., 2003) .................. 13

Stone, H.F., *The Equitable Rights and Liabilities of Strangers to a Contract*,
  18 Colum. L. Rev. 291 (1918) ....................................................... 21

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. I, § 8, cl. 8....................................................... 15

## STATEMENT OF INTEREST OF AMICUS CURIAE

Amicus Curiae Professor Theodore L. Field, who is filing pro se, teaches and studies intellectual-property law at South Texas College of Law in Houston, Texas. His interest in this case arises from his professional, academic interest in patent law and intellectual-property law. Professor Field has no personal interest in the outcome of this case.

Authority to file this brief comes from the Court's en-banc briefing order of April 14, 2015, which stated: "Other briefs of amici curiae will be entertained, and any such amicus briefs may be filed without consent and leave of court but otherwise must comply with Federal Rule of Appellate Procedure 29 and Federal Circuit Rule 29."

No party or party's counsel authored any part of this brief. No party or party's counsel contributed any money towards its preparation or submission. No other person contributed any money towards this brief's preparation. The only other entity or person that contributed any money towards this brief's submission is South Texas College of Law, 1303 San Jacinto Street, Houston, Texas 77002.

## SUMMARY OF ARGUMENT

This brief discusses the following three issues. First, the doctrine of stare decisis should prevent this Court from overruling either *Jazz Photo Corp. v. International Trade Commission*, 264 F.3d 1094 (Fed. Cir. 2001), or *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700 (Fed. Cir. 1992). Second, this Court should not overrule *Jazz Photo* in light of *Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S. Ct. 1351 (2013). Third and finally, this Court should not overrule *Mallinckrodt* in light of *Quanta Computer, Inc. v. LG Electronics, Inc.*, 553 U.S. 617 (2008).

### A.    The Doctrine of Stare Decisis Should Prevent This Court from Overruling Either *Jazz Photo* or *Mallinckrodt*

Although many strong substantive arguments exist as to why this Court should reject Impression's invitation to overrule *Jazz Photo* and *Mallinckrodt*, the doctrine of stare decisis is vital to the Court's consideration of both en-banc questions in this case. Indeed, the Court must keep the principles of stare decisis in mind throughout its consideration of all the issues involved in this case.

Importantly, under stare decisis, the Court cannot overturn its precedent in the absence of a special justification. And Impression and its amici have failed to identify any actual, concrete special justification for overruling *Jazz Photo* or *Mallinckrodt*. Moreover, the doctrine of stare decisis is particularly important where companies, in formulating their business models, have come to rely on precedent that for decades has delineated the property rights in their patents. Thus, this Court must be careful to

avoid disrupting the settled expectations of patentees like Lexmark by overruling decades-old precedent like *Jazz Photo* or *Mallinckrodt*, upon which patentees like Lexmark have come to rely. Therefore, the doctrine of stare decisis should prevent this Court from overruling either *Jazz Photo* or *Mallinckrodt*.

## B.    This Court Should Not Overrule *Jazz Photo* in Light of *Kirtsaeng*

This Court should not overrule *Jazz Photo* in light of *Kirtsaeng*. First, *Kirtsaeng* does not apply to patent law because the historical background relied upon by the Supreme Court in deciding the copyright issues in *Kirtsaeng* is not relevant to the patent-law issues in this case. The Supreme Court relied on the writings of Sir Edward Coke (also known as Lord Coke) to establish the common-law history relevant to the doctrine of copyright exhaustion. But citing Lord Coke's writings at that time is not citing anything usefully interpretive of the rights granted by patents today. Lord Coke himself—and England as a whole at that time—evinced a great deal of anti-patent and anti-monopoly sentiment. Moreover, the patent rights that existed at the time were fundamentally different than U.S. and foreign patent rights today. Therefore, *Kirtsaeng*, which relied on the writings of Lord Coke, cannot properly inform this Court's decision in this case concerning patent law.

Second, in *Kirtsaeng*, the Supreme Court did not reject the reasoning of *Jazz Photo* by rejecting Justice Ginsburg's reasoning in her dissenting opinion in *Kirtsaeng*. The rationale that underlies the holding of *Jazz Photo* remains correct. And the

rationale of Justice Ginsburg's dissent in *Kirtsaeng* reflects the same rationale behind the holding of *Jazz Photo*. But the majority of the Supreme Court in *Kirtsaeng* did not reject Justice Ginsburg's rationale in the abstract—the majority only rejected her rationale with respect to the specific statutory-interpretation issues of copyright law that were before the Court. Therefore, the majority's rejection of Justice Ginsburg's arguments in her dissent cannot justify this Court in overruling *Jazz Photo* in light of *Kirtsaeng*.

### C.    This Court Should Not Overrule *Mallinckrodt* in Light of *Quanta*

This Court should not overrule *Mallinckrodt* in light of *Quanta*. First, the common law under which the patent-exhaustion doctrine evolved is consistent with the idea that patent owners can part with some or all of their patent rights when they sell goods covered by their patents. And many U.S. courts have recognized the validity of restrictions on the sales of goods through equitable servitudes on chattels. Thus, viewed against this common-law backdrop, the early Supreme Court cases cited by the parties and various amici do not stand for the proposition that restrictions cannot be placed on patented personal property. Instead, these cases actually hold that the restrictions at issue exceeded the scope of the patent or that the restrictions at issue violated public policy. Therefore, this Court should not overrule *Mallinckrodt*.

Second, in the context of this case, there is no meaningful difference between a sale and a license. Thus, because patent owners have the right to impose use

restrictions through licenses, no reason exists—beyond unnecessary formalism—to prevent patent owners from imposing use restrictions through sales. And mere formalism is not a good reason to distinguish between sales and licenses. Therefore, this Court should not overrule *Mallinckrodt*.

# ARGUMENT

The parties and numerous other amici have comprehensively briefed the issues in this case. Thus, this brief does not aim to present comprehensive arguments concerning the questions presented. Instead, the intent of this brief is to supplement the other briefs in several specific areas.

To that end, this brief discusses the following three issues. First, the doctrine of stare decisis should prevent this Court from overruling either *Jazz Photo Corp. v. International Trade Commission*, 264 F.3d 1094 (Fed. Cir. 2001), or *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700 (Fed. Cir. 1992). Second, this Court should not overrule *Jazz Photo* in light of *Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S. Ct. 1351 (2013), because (1) the historical background relied upon by the Supreme Court in *Kirtsaeng* does not apply to patent law; and (2) the Supreme Court did not reject the reasoning of *Jazz Photo* by rejecting Justice Ginsburg's reasoning in her dissenting opinion in *Kirtsaeng*. Third, and finally, this Court should not overrule *Mallinckrodt* in light of *Quanta Computer, Inc. v. LG Electronics, Inc.*, 553 U.S. 617 (2008) because (1) the common law allows restrictions on sales of personal property, so patent owners should have the right to selectively transfer patent rights when selling patented articles; and (2) because patent owners have the right to impose use restrictions through licenses, only unnecessary formalism would prevent patent owners from imposing use restrictions through sales.

I.    **The Doctrine of Stare Decisis Should Prevent This Court from Overruling Either *Jazz Photo* or *Mallinckrodt***

Many strong substantive arguments exist as to why this Court should reject Impression's invitation to overrule *Jazz Photo* and *Mallinckrodt*. But this brief first addresses the doctrine of stare decisis because the doctrine of stare decisis is vital to the Court's consideration of both en-banc questions in this case. Indeed, throughout its consideration of this case, the Court should take care to view all the questions presented through the lens of stare decisis.

Under the doctrine of stare decisis, "every successful proponent of overruling precedent has borne the heavy burden of persuading the Court that changes in society or in the law dictate that the values served by stare decisis yield in favor of a greater objective." *Vasquez v. Hillery*, 474 U.S. 254, 266 (1986). The doctrine of stare decisis is vitally important in the U.S. judicial system. *See, e.g.*, *Kimble v. Marvel Entm't, LLC*, 135 S. Ct. 2401, 2410–11 (2015); *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 854 (1992); *Robert Bosch, LLC v. Pylon Mfg. Corp.*, 719 F.3d 1305, 1316–17 (Fed. Cir. 2013) (en banc); *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1347 (Fed. Cir. 2010) (en banc). Indeed, "no judicial system could do society's work if it eyed each issue afresh in every case that raised it." *Planned Parenthood*, 505 U.S. at 854 (citing B. Cardozo, *The Nature of the Judicial Process* 149 (1921)). As a result of the doctrine of stare decisis, this Court must "not take [its own] precedent lightly." *Robert Bosch*, 719 F.3d at 1317.

Indeed, the Supreme Court very recently spoke of the importance of stare decisis:

> Overruling precedent is never a small matter. Stare decisis—in English, the idea that today's Court should stand by yesterday's decisions—is a *foundation stone of the rule of law.* Application of that doctrine, although not an inexorable command, is the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process. It also reduces incentives for challenging settled precedents, saving parties and courts the expense of endless relitigation.

*Kimble*, 135 S. Ct. at 2409 (emphasis added) (citations and internal quotation marks omitted).

Importantly, even if this Court were to believe "that the precedent was wrongly decided," the Court cannot overturn that precedent in the absence of a "special justification." *Kimble*, 135 S. Ct. at 2409 (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2407 (2014)). Thus, "[r]especting stare decisis means sticking to some wrong decisions." *Id.* Even "an argument that [the Court] got something wrong—even a good argument to that effect—cannot by itself justify scrapping settled precedent." *Id.*

To be clear, as discussed in Parts II and III below, this brief's position is that *Jazz Photo* and *Mallinckrodt* were not wrongly decided, and that there are no good arguments that the Court got anything wrong in these cases. But even if the Court

were to believe that it did get something wrong in those cases, stare-decisis concerns require additional "special justification" to overturn this settled precedent. *Id.*

And even where a panel decision is at issue rather than an en-banc decision, the principles of stare decisis nonetheless apply. *Robert Bosch,* 719 F.3d at 1316–17 (sitting en banc and refusing to overrule legal doctrine that had never before been considered by the Court en banc). Indeed, this Court has correctly observed that "panel opinions, like en banc opinions, invoke the principle of stare decisis." *Id.* at 1316. Thus, panel decisions are entitled to due respect under the doctrine of stare decisis.

Moreover, the doctrine of stare decisis is particularly important where companies, in formulating their business models, have come to rely on precedent that for decades has delineated the property rights in their patents. *Kimble*, 135 S. Ct. at 2410; *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 739 (2002); *Ariad*, 598 F.3d at 1347; *see also* Randy J. Kozel, *Stare Decisis As Judicial Doctrine*, 67 Wash. & Lee L. Rev. 411, 414 (2010) ("[R]eliance interests are a critical part of what gives stare decisis its value."). Indeed, "[c]onsiderations in favor of stare decisis are at their acme in cases involving property . . . rights, where reliance interests are involved." *Payne v. Tennessee*, 501 U.S. 808, 828 (1991); *accord Kimble*, 135 S. Ct. at 2410 (quoting *Payne*, 501 U.S. at 828). The reason that stare decisis is particularly important where precedents affecting property rights are involved is that "parties are especially likely to rely on such precedents when ordering their affairs." *Kimble* 135 S. Ct. at 2410. Accordingly, the Supreme Court has stated that this Court "must be cautious

before adopting changes that disrupt the settled expectations of the inventing community." *Festo*, 535 U.S. at 739; *accord Ariad*, 598 F.3d at 1347 (quoting *id.*). Thus, this Court must be careful to avoid "disrupt[ing] the settled expectations" of patentees by overruling decades-old precedent upon which patentees have come to rely. *Ariad*, 598 F.3d at 1347.

Under these principles of stare decisis, this Court should not overrule either *Jazz Photo* or *Mallinckrodt*. Impression and its amici have failed to identify any actual, concrete "special justification," which they must do for this Court to overrule either *Jazz Photo* or *Mallinckrodt. Kimble*, 135 S. Ct. at 2409. As Lexmark correctly describes in its brief, Impression and its amici have only identified "hypothetical" problems with *Jazz Photo*, Lexmark Br. 31–32, and they have not "offer[ed] anything close to a 'superspecial' justification for abandoning *Mallinckrodt*," *id.* at 48–51. And just because *Jazz Photo* and *Mallinckrodt* are panel decisions does not prevent them from receiving the due respect they deserve as precedent of this Court. *See Robert Bosch,* 719 F.3d at 1316–17 ("[P]anel opinions, like en banc opinions, invoke the principle of stare decisis."). For these reasons alone, stare decisis should prevent this Court from overruling these cases.

Moreover, stare decisis particularly applies to *Jazz Photo* and *Mallinckrodt* because companies like Lexmark have a reliance interest in this precedent. Lexmark and companies like it have created business models in reliance of the law established years ago in *Jazz Photo* and *Mallinckrodt*. Thus, the property rights of Lexmark and

companies like it are implicated here, which means that the strength of the doctrine of stare decisis is at its peak. *See Payne*, 501 U.S. at 828 ("Considerations in favor of stare decisis are at their acme in cases involving property . . . rights, where reliance interests are involved."). If this Court were to overrule *Jazz Photo* or *Mallinckrodt*, it would be "disrupt[ing] the settled expectations" of patentees like Lexmark, which would be contrary to the admonitions of the Supreme Court. *Festo*, 535 U.S. at 739; *accord Ariad*, 598 F.3d at 1347 (quoting *id.*).

Additionally, the Supreme Court's recent holding in *Kimble* should inform this Court's decisions in this case. In *Kimble*, the Supreme Court declined to overrule *Brulotte v. Thys Co.*, 379 U.S. 29 (1964), which "held that a patent holder cannot charge royalties for the use of his invention after its patent term has expired." *Kimble*, 135 S. Ct. at 2405. Despite noting that a number of "courts and commentators have suggested [that the Court] should overrule *Brulotte*," the Court nonetheless refused to do so because of stare decisis. *Id.* at 2406 & n.3. The Court held that the petitioner had failed to supply the "superspecial justification to warrant reversing *Brulotte*." *Id.* at 2410. And the Court also observed that Congress never overruled *Brulotte* through legislation despite having over fifty years to do so. *Id.* at 2409–10.

The situation in *Kimble* greatly resembles the situation in this case. As in *Kimble*, some commentators have suggested that *Jazz Photo* and *Mallinckrodt* were wrongly decided. But, as the Supreme Court held in *Kimble*, that is not enough to warrant the rejection of stare decisis. *See id.* at 2406 & n.3. Also, just like in *Kimble*, the party here

10

seeking to overrule *Jazz Photo* and *Mallinckrodt* cannot provide a "superspecial justification" to warrant doing so, as discussed above. *See id.* at 2410. And finally, just like in *Kimble*, Congress has had ample opportunity to overrule *Jazz Photo* and *Mallinckrodt* should it have believed it necessary to do so. *See id.* at 2409–10; Lexmark Br. 34, 49. Thus, *Kimble* should control in this case and prevent this Court from overruling either *Jazz Photo* or *Mallinckrodt*.

Therefore, for all these reasons, the doctrine of stare decisis should prevent this Court from overruling either *Jazz Photo* or *Mallinckrodt*.

## II.   This Court Should Not Overrule *Jazz Photo* in Light of *Kirtsaeng*

The answer to this Court's first question for en-banc consideration is that the Court should not overrule *Jazz Photo* in light of *Kirtsaeng*. The parties and amici have addressed many issues concerning this question. This brief focuses on only the following two specific arguments relating to this question: (1) the historical background relied upon by the Supreme Court in *Kirtsaeng* does not apply to patent law; and (2) in *Kirtsaeng*, the Supreme Court did not reject the reasoning of *Jazz Photo* by rejecting Justice Ginsburg's reasoning in her dissenting opinion in *Kirtsaeng*.

### A.   The Historical Background Relied upon by the Supreme Court in *Kirtsaeng* Does Not Apply to Patent Law

*Kirtsaeng* does not apply to patent law because the historical background relied upon by the Supreme Court in deciding the copyright issues in *Kirtsaeng* is not relevant

to the patent-law issues in this case. The Supreme Court relied on the writings of Sir Edward Coke (also known as Lord Coke) to establish the common-law history relevant to the doctrine of copyright exhaustion. But Lord Coke himself—and England as a whole at that time—evinced a great deal of anti-patent and anti-monopoly sentiment. Moreover, the patent rights that existed at the time were fundamentally different than U.S. and foreign patent rights today. Therefore, *Kirtsaeng*, which relied on the writings of Lord Coke, cannot properly inform this Court's decision in this case concerning patent law.

In *Kirtsaeng*, the Supreme Court cited Lord Coke's writings from 1628 to support its interpretation of § 109(a) of the Copyright Act. *Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S. Ct. 1351, 1363 (2013). The Court did so to understand pre-statutory, common-law copyright law because where "a statute covers an issue previously governed by the common law, [the Court] must presume that Congress intended to retain the substance of the common law." *Id.* (quoting *Samantar v. Yousuf*, 130 S. Ct. 2278, 2289–90 n.13 (2010)) (internal quotation marks omitted). The Court looked to the writings of Lord Coke to explain what the state of the common law was with respect to whether a "copyright holder [could] control the resale or other disposition of a chattel once sold." *Id.* The Court noted that Lord Coke's writings "explained the common law's refusal to permit restraints on the alienation of chattels." *Id.*

Although Lord Coke's writings from 1628 may have properly informed the Supreme Court's interpretation of the Copyright Act in *Kirtsaeng*, his writings should

not inform this Court's interpretation of the exhaustion doctrine in patent law. Importantly, Lord Coke's writings of 1628 came at a time when "[a]buses of the patent right were common." Mark A. Lemley, *Why Do Juries Decide If Patents Are Valid?*, 99 Va. L. Rev. 1673, 1680 (2013). As a result of these abuses, Parliament passed the Statute of Monopolies in 1623, which "outlawed most patents . . . other than patents for invention." *Id.* (citing Statute of Monopolies, Statutes at Large, 1623, 21 Jac., c. 3, §§ 1, 6 (Eng.)). And Lord Coke was the principal drafter of the Statute of Monopolies. 1 *The Selected Writings and Speeches of Sir Edward Coke* lxi (Steve Sheppard ed., 2003) [hereinafter *Selected Writings of Coke*]; Barbara Malament, *The "Economic Liberalism" of Sir Edward Coke*, 76 Yale L.J. 1321, 1351 (1967). Thus, Lord Coke's writings in 1628 were made at a time when the anti-monopoly and anti-patent sentiments of Lord Coke—and all of England in general—were at a high. *See* Daniel A. Crane, *Lochnerian Antitrust*, 1 N.Y.U. J. L. & Liberty 496, 505–06 (2005) (describing Lord Coke's "anti-monopoly ideology"); Laura R. Ford, *Prerogative, Nationalized: The Social Formation of Intellectual Property*, 97 J. Pat. & Trademark Off. Soc'y 270, 289 (2015) ("The jurist whose name is most closely connected to the early English antimonopoly tradition is Edward Coke."); Robert G. Natelson, *Federal Land Retention and the Constitution's Property Clause: The Original Understanding*, 76 U. Colo. L. Rev. 327, 366 n.178 (2005) (describing Lord Coke as "the most famous exponent of anti-monopoly sentiments").

13

The text of Lord Coke's Statute of Monopolies itself reveals his anti-patent and anti-monopoly sentiment. The Statute began by wiping out all existing patents:

> [A]ll monopolies and all commissions, grants, licenses, charters, and *letters patents heretofore made or granted* . . . of or for the sole buying, selling, making, working, or using of anything within this realm or the dominion of Wales are altogether contrary to the laws of this realm, and so are and shall be *utterly void and of none effect*, and in no wise to be put in use or execution.

Statute of Monopolies § 1 (emphasis added). A later section of the Statute allowed an exception for future patents on inventions:

> [L]etters patents . . . for the term of fourteen years or under, hereafter to be made, of the sole working or making of any manner of new manufactures within this realm . . . to the true and first inventor . . . and inventors of such manufactures, . . . so as also they be not contrary to the law nor mischievous to the state by raising prices of commodities at home, or hurt of trade, or generally inconvenient . . . but that the same shall be of such force as they should be if this act had never been made . . . .

*Id.* § 6.

Even though the Statute of Monopolies allowed for new patents on inventions to be granted after the enactment of the Statute, Lord Coke's anti-patent sentiment continued to reveal itself in his commentaries. For example, seizing on language in § 6 of the Statute that disallowed patents if they were "mischievous to the state . . . or generally inconvenient," Lord Coke wrote that a patent should not be granted on a particular "new type of mill" because the mill "would have replaced workers and thus threatened 'to turn so many labouring men to idleness.'" John F. Duffy, *Inventing*

14

*Invention: A Case Study of Legal Innovation*, 86 Tex. L. Rev. 1, 29 (2007) (quoting Edward Coke, *The Third Part of the Institutes of the Laws of England* 183–84 (William S. Hein Co. 1986) (1641) [hereinafter Coke, *Third Part*]). Thus, this writing shows that Lord Coke viewed patent rights with suspicion.

Such reasoning reflects that Lord Coke was not concerned with promoting innovation through patents, *see id.*, as our current U.S. system is designed to do, *see* U.S. Const. art. I, § 8, cl. 8. Indeed, Lord Coke believed that instead of promoting innovation, the purpose of granting patents was, at least in part, to "reward inventors for their hard work." Duffy, *supra*, at 31. But this rationale is at odds with the U.S. Constitution's command that patent law must "promote the Progress of . . . useful Arts," U.S. Const. art. I, § 8, cl. 8, rather than merely reward hard work.

Additionally, Lord Coke's anti-patent sentiment revealed itself again when he "encouraged courts to disfavor patents for improvements to existing technology." Duffy, *supra*, at at 32. In his commentaries, Lord Coke reasoned that an invention involving merely an incremental improvement over existing technology was merely "to put a new button to an old coat: and it is much easier to adde then [sic] to invent." *Id.* (quoting Coke, *Third Part*, *supra*, at 184). But such a narrow view of patent rights conflicts with the broader purpose of U.S. patent law to promote innovation of all kinds—including incremental innovation. *See* Giles S. Rich, *Principles of Patentability*, 28 Geo. Wash. L. Rev. 393, 399 (1960) (describing "progress in the useful arts" as being "made by the constant increment of improvements on what we already have").

Moreover, the exception in Lord Coke's Statute of Monopolies that allowed for new patents on inventions to be granted after the enactment of the Statute differed from patent rights today. The exception provided only that a patent could give the "true and first inventor" an exclusive right to the "sole working or making" of the invention, and only as to "new manufactures." Statute of Monopolies § 6. A patent in Lord Coke's time after the Statute of Monopolies did not include the exclusive right to sell, offer to sell, or import the patented invention. *See* 35 U.S.C. § 271. Thus, Lord Coke viewed patent rights as a much different form of protection than what the United States provides today. And during the same period after the Statute of Monopolies, only the King could revoke patents. Lemley, *supra*, at 1681. This fact further demonstrates how much different patent rights were at the time.

Thus, citing Lord Coke's writings at that time is not citing anything usefully interpretive of the rights granted by patents today because patents did not exist in the same form at that time. Patent rights were different in 1628 than they are today. And anti-patent and anti-monopoly sentiment was at a high. Because the holding of *Kirtsaeng* relies on the common law as expressed by Lord Coke's writings in 1628, and the common law of 1628 does not fit with the rights of modern patents, *Kirtsaeng* is not applicable to the issue of exhaustion in patent law today. Therefore, *Kirtsaeng* cannot require this Court to overrule *Jazz Photo*.

**B.      In *Kirtsaeng*, the Supreme Court Did Not Reject the Reasoning of *Jazz Photo* By Rejecting Justice Ginsburg's Reasoning in her Dissent**

The rationale that underlies the holding of *Jazz Photo* remains correct. And the rationale of Justice Ginsburg's dissent in *Kirtsaeng* reflects the same rationale behind the holding of *Jazz Photo*, as amici Intellectual Property Professors and American Antitrust Institute point out in their brief. IP Profs. Br. 11. According to these amici, in Justice Ginsburg's dissent, "[s]he argued that allowing sales of foreign-made copies authorized by the copyright holder to trigger exhaustion would amount to an extraterritorial application of United States law because a work could only be 'lawfully made under' the Copyright Act in places where the Copyright Act was law." *Id.* These amici incorrectly contend that the majority of the Supreme Court in *Kirtsaeng* rejected this rationale, *id.*, and they incorrectly argue that this "rejection" shows that the rationale of *Jazz Photo* "articulate[s] a misplaced concern over the extraterritorial application of U.S. law," *id.* at 10.

But the majority of the Supreme Court in *Kirtsaeng* did not reject Justice Ginsburg's rationale in the abstract—the majority only rejected her rationale with respect to the specific statutory-interpretation issues of copyright law that were before the Court. Indeed, everywhere in *Kirtsaeng* where the Court explicitly refers to Justice Ginsburg's dissenting opinion, the Court criticizes it only for how it relates to these specific statutory-interpretation issues. *See Kirtsaeng*, 133 S. Ct. at 1359 (criticizing a particular interpretation of the word "under" in 17 U.S.C. § 109(a)); *id.* at 1364

(criticizing Justice Ginsburg's method of interpreting the geographical limitations of § 109(a)); *id.* at 1366 (criticizing Justice Ginsburg's "textual readings" of § 109(a) as "not defensible" on statutory-interpretation grounds); *id.* at 1368 (criticizing Justice Ginsburg's interpretation of 17 U.S.C. § 106(3) as "'significantly curtail[ing]' § 109(a)'s effect"); *id.* at 1370 (criticizing Justice Ginsburg's reliance on particular legislative history in interpreting § 109(a)); *id.* at 1371 (criticizing Justice Ginsburg's dissent because it fails to show "congressional intent in 1976" when Congress enacted § 109(a)); *id.* (criticizing Justice Ginsburg's dissent because a previous interpretation of § 109(a) by the Court conflicted with her arguments). Thus, nothing in the majority's rejection of Justice Ginsburg's arguments in her dissent directly or indirectly rejects the rationale behind *Jazz Photo*. Therefore, the majority's rejection of Justice Ginsburg's arguments in her dissent cannot justify this Court in overruling *Jazz Photo* in light of *Kirtsaeng*.

## III. This Court Should Not Overrule *Mallinckrodt* in Light of *Quanta*

The answer to this Court's second question for en-banc consideration is that the Court should not overrule *Mallinckrodt* in light of *Quanta*. The parties and amici have addressed many issues concerning this question. This brief focuses on only the following two specific arguments relating to this question: (1) the common law allows restrictions on sales of personal property, so patent owners should have the right to selectively transfer patent rights when selling patented articles; and (2) because patent

owners have the right to impose use restrictions through licenses, only unnecessary formalism would prevent patent owners from imposing use restrictions through sales.

## A.   The Common Law Allows Restrictions on Sales of Personal Property, So Patent Owners Should Have the Right to Selectively Transfer Patent Rights When Selling Patented Articles

The common law under which the patent-exhaustion doctrine evolved is consistent with the idea that patent owners can part with some or all of their patent rights when they sell goods covered by their patents. Patents themselves "have the attributes of personal property." 35 U.S.C. § 261. And patented articles themselves are also personal property. *Bloomer v. McQuewan*, 55 U.S. (14 How.) 539, 550 (1852) (holding that after a sale, a patented "implement or machine becomes [the purchaser's] private, individual property"). Thus, the right of patent owners to selectively transfer patent rights follows from the common-law right to place restrictions on sales of personal property.

Importantly, the common law has long allowed for sellers of both real and personal property to place restrictions on those sales. In England in 1848, the English Chancery Court recognized that sellers may place restrictions on the sales of real property through equitable servitudes on land. *See Tulk v. Moxhay*, 41 Eng. Rep. 1143 (1848). Soon after, the same court recognized that sellers may place restrictions on the sales of personal property through equitable servitudes on chattels. *See De Mattos v. Gibson*, 45 Eng. Rep. 108 (1859). In *De Mattos*, the court reasoned:

> Reason and justice seem to prescribe that, at least as a general rule, *where a man, by gift or purchase, acquires property from another, with knowledge of a previous contract*, lawfully and for valuable consideration made by him with a third person, to use and employ the property for a particular purpose in a specified manner, the acquirer shall not, to the material damage of the third person, in opposition to the contract and inconsistently with it, use and employ the property in a manner not allowable to the giver or seller. This rule, *applicable alike in general as I conceive to moveable and immoveable property,* and recognized and adopted, as I apprehend, by the English law, may, like other general rules, be liable to exceptions arising from special circumstances; but I see at present no room for any exception in the instance before us.

*Id.* at 110 (emphasis added).

Soon after, U.S. courts began recognizing the propriety of restrictions on property sales. As in England, courts first recognized the validity of restrictions on sales of land. For example, in 1862, the Court of Appeals of New York recognized the propriety of equitable servitudes on land. *Tallmadge v. East River Bank*, 26 N.Y. 105 (1862) (holding that "the ground of the equity in favor of . . . prior grantees, arising from the circumstances and assurances under which they took their conveyances and paid their money; which equity attaches to the remaining lots, and can and ought to be enforced against the defendant, taking with notice, or under circumstances equivalent to notice, of the equity in favor of the plaintiffs").

Since then, many U.S. courts have also recognized the validity of equitable servitudes on chattels. *See, e.g., Clairol Inc. v. Cosmetics Plus*, 325 A.2d 505 (N.J. Sup. Ct. 1974); *Nadell & Co. v. Grasso*, 346 P.2d 505 (Cal. 1959); *Pratte v. Balatsos*, 113 A.2d 492

(N.H. 1955); *Metro. Opera Ass'n v. Wagner-Nichols Recorder Corp.*, 101 N.Y.S.2d 483 (N.Y. Sup. Ct. 1950), *aff'd*, 279 A.D. 632 (N.Y. App. Div. 1951). *See generally* Zeckariah Chafee, Jr., *Equitable Servitudes on Chattels*, 41 Harv. L. Rev. 945 (1928). Indeed, "[t]he tendency in the United States has been to apply the doctrine of restrictive agreements to personal property when not regarded as an unlawful restraint of trade or in violation of public policy." H.F. Stone, *The Equitable Rights and Liabilities of Strangers to a Contract*, 18 Colum. L. Rev. 291, 310 (1918).

For example, in 1937, the Supreme Court of Pennsylvania held that a restriction on personal property is enforceable if it does not violate public policy and the user has notice. *Waring v. WDAS Broad. Station, Inc.*, 194 A. 631, 637–38 (Pa. 1937). In *Waring*, an orchestra leader allowed a record company to record his orchestra's music in exchange for a fee. *Id.* at 632. The record company sold records of this music to the public, and each record carried a label that said, "Not licensed for radio broadcast." *Id.* at 633. But a radio station purchased one of these records and broadcast it. *Id.* The orchestra leader sued the radio station for violating the no-broadcasting restriction. *Id.* The court held that the restriction placed on the records was valid and enforceable. *Id.* at 637–38. The court reasoned:

> Where public policy or some other determinative consideration is not involved, *why should the law adopt an immutable principle that no restrictions, reservations, or limitations can ever be allowed to accompany the sale of an article of personal property?* As a matter of fact, *there have been many cases, notably in England, in which restrictive covenants and conditions accompanying the alienation of chattels have been enforced.* . . . It is

21

true that in addition to the question of public policy other factors may weigh against the imposition of such restrictions in many, perhaps most, instances. . . . There is no reason, however, why an ancient generalization of law should be held invariably to apply to cases in which *modern conditions of commerce and industry and the nature of new scientific inventions make restrictions highly desirable.*

*Id.* (emphasis added).

Thus, viewed against this common-law backdrop, the early Supreme Court cases cited by the parties and various amici do not stand for the proposition that restrictions cannot be placed on patented personal property. Instead, these cases actually hold that the restrictions at issue exceeded the scope of the patent, *see, e.g., Straus v. Victor Talking Mach. Co.*, 243 U.S. 490, 501 (1917) (resale price restriction); *United States v. Univis Lens Co.*, 316 U.S. 241, 251 (1942) (same), or that the restrictions at issue violated public policy, *see, e.g., Motion Picture Patents Co. v. Universal Film Mfg. Co.*, 243 U.S. 502, 519 (1917) (tying restriction). But these cases do not hold that patent owners can never place restrictions on the sale of patented articles.

Patent owners can part with some or all of their patent rights when they sell goods covered by their patents. Where they part with all their patent rights, they have made unconditional sales of their patented items, and exhaustion should apply. But where they part with less than all their patent rights, they have properly made conditional sales of their patented items, and exhaustion should not apply. Therefore, the reasoning of *Mallinckrodt* is correct, and this Court should thus not overrule *Mallinckrodt.*

**B.    Because Patent Owners Have the Right to Impose Use Restrictions Through Licenses, Only Unnecessary Formalism Would Prevent Patent Owners from Imposing Use Restrictions Through Sales**

In the context of this case, there is no meaningful difference between a sale and a license. Thus, because patent owners have the right to impose use restrictions through licenses, no reason exists—beyond unnecessary formalism—to prevent patent owners from imposing use restrictions through sales. And mere formalism is not a good reason to distinguish between sales and licenses.

The Supreme Court has recognized that a patentee has the right to impose use restrictions via a license. *See, e.g.*, *Gen'l Talking Pictures Corp. v. Western Elec. Co.*, 305 U.S. 124, 127 (1938); *Keeler v. Std. Folding Bed Co.*, 157 U.S. 659, 661–62 (1895). And such a license that includes a use restriction is not a sale. *See, e.g.*, *ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447, 1455 (7th Cir. 1996); *Microsoft Corp. v. Harmony Computers & Elecs., Inc.*, 846 F. Supp. 208, 213 (E.D.N.Y. 1994). The key difference between a sale and a license is apparently the retention of title: where the seller passes title to the buyer, then the transaction is a sale; and where the seller retains title, then the transaction is a license. But commentators have recognized that "the retention of 'title' in the 'licensor' is little more than a legal fiction." Thomas M.S. Hemnes, *Restraints on Alienation, Equitable Servitudes, and the Feudal Nature of Computer Software Licensing*, 71 Denv. U. L. Rev. 577, 581 (1994). Indeed, even in a so-called licensing transaction, "the licensee assumes practical ownership of a copy, under the legal

fiction that its possession is a mere bailment." *Id.* If the only difference between a sale and a license is really a legal fiction, then the only reason to distinguish between the two is merely formalism. Because patent owners have the right to impose use restrictions through licenses, then no real reason exists to prevent patent owners from imposing use restrictions through sales. Therefore, this Court should not overrule *Mallinckrodt.*

## CONCLUSION

This Court should not overrule *Jazz Photo Corp. v. International Trade Commission*, 264 F.3d 1094 (Fed. Cir. 2001), in light of *Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S. Ct. 1351 (2013). And the Court should not overrule *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700 (Fed. Cir. 1992), in light of *Quanta Computer, Inc. v. LG Electronics, Inc.*, 553 U.S. 617 (2008).

Dated: August 19, 2015                    Respectfully submitted,

/s/ Theodore L. Field
THEODORE L. FIELD
Professor of Law
South Texas College of Law
1303 San Jacinto Street
Houston, Texas 77002-7006
Telephone: (713) 646-1770
tfield@stcl.edu

## CERTIFICATE OF SERVICE

I hereby certify that on August 19, 2015, I caused this **AMICUS-CURIAE BRIEF OF PROFESSOR THEODORE L. FIELD IN SUPPORT OF LEXMARK INTERNATIONAL, INC.,** to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit through the Court's CM/ECF system.


/s/ Theodore L. Field
THEODORE L. FIELD

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rules of Appellate Procedure 29(d) and 32(a)(7)(B) and the Federal Circuit Rules because it contains 6,283 words as determined by the Microsoft Word 2010 software used to prepare the brief, excluding the parties of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 14-point Garamond font.

/s/ Theodore L. Field
THEODORE L. FIELD