**2014-1617, -1619**

# United States Court of Appeals
# for the Federal Circuit

---

LEXMARK INTERNATIONAL, INC.,

*Plaintiff-Cross-Appellant*

*v.*

IMPRESSION PRODUCTS, INC.,

*Defendant-Appellant*

QUALITY CARTRIDGES, INC., JOHN DOES, 1-20, BLUE TRADING LLC,
EXPRINT INTERNATIONAL, INC., LD PRODUCTS, INC.,
PRINTRONIC CORPORATION, TESEN DEVELOPMENT (HONG KONG)
CO. LTD., and BENIGNO ADEVA AND HIS COMPANIES,

*Defendants.*

---

*Appeal from the United States District Court for the Southern District of
Ohio in Case No. 1:10-CV-00564-MRB, Judge Michael R. Barrett*

---

## REPLY BRIEF FOR DEFENDANT-APPELLANT
## IMPRESSION PRODUCTS, INC. ON *EN BANC* REVIEW

EDWARD F. O'CONNOR, ESQ.
AVYNO LAW P.C.
6345 Balboa Boulevard
Suite 190
Encino, California 91316
(818) 488.8140

*Counsel for Appellant*

AUGUST 27, 2015

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ....................................................................... ii

I. LEXMARK EXHIBITS A FUNDAMENTAL MISUNDERSTANDING OF THE DIFFERENCE BETWEEN AN AUTHORIZED SALE AND A LICENSE. ................................................. 1

II. This Court Should Hold That A Sale Outside the U.S. Authorized By The U.S. Patentee Exhausts U.S. Patent Rights. .......................................... 4

   A. Supreme Court Precedent Requires That Jazz Photo Be Overruled. ....... 4

   B. Lexmark's Arguments Based On The Territorial Nature Of Patent Law Are Inconsistent With *Kirtsaeng*. ...................................................... 7

   C. Lower Court Precedent Prior To *Jazz Photo* Supports Exhaustion. ...... 11

   D. Lexmark's Arguments Based On Executive Agreements Are Wrong. ......................................................................................... 15

   E. Practical Realities Weigh Heavily Against Lexmark And The Government. ..................................................................................... 16

   F. There Are Many Sound Reasons For Overturning *Jazz Photo*, And *Jazz Photo* Is Not A Settled Rule. ......................................................... 19

III. THE COURT SHOULD OVERRULE *MALLINCKRODT*. ....................... 20

IV. MISCELLANEOUS COMMENTS REGARDING AMICUS BRIEFS .... 23

CONCLUSION ................................................................................... 28

CERTIFICATE OF SERVICE .............................................................. 29

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS ................................................................................ 31

i

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Boesch v. Graff,*
    133 U.S. 697 (1890)................................................................ 7, 12, 19

*Curtiss Aeroplane & Motor Corp. v. United Aircraft Engineering Corp.,*
    266 F. 71 (2d Cir. 1920)................................................. 7, 9, 12, 13, 14

*Dickersen v. Matheson,*
    57 F. 524 (2d Cir. 1893)............................................................. 7, 9, 12

*Dickerson v. Tingling,*
    84 F. 192 (8th Cir. 1897)............................................................. 9, 12, 15

*General Talking Pictures,*
    304 US 175, 58 S.Ct. 849 (1938)............................................ 2, 21, 27

*Griffin v. Keystone,*
    453 F. Supp. 1283 (E.D. Pa. 1978) ..............................................14

*Helferich Patent Licensing, LLC v. N.Y. Times Co.,*
    778 F.3d 1293 (Fed. Cir. 2015)............................................. 9, 10, 11

*Hewlett-Packard v. Repeat-O-Type,*
    123 F.3d 1445 (Fed. Cir. 1997)............................................... 3, 11

*Holiday v. Mattheson,*
    24 F. 185 (C.C.S.D.N.Y. 1885) ............................................. 11, 12

*Jazz Photo Corp. v. International Trade Commission,*
    264 F.3d 1094 (Fed. Cir. 2001)............................3, 4, 7, 11-14, 16, 19, 20, 25, 28

*Keeler v. Standard Folding Bed Co.,*
    157 U.S. 659 (1895) .................................................................. 7, 23

*Kirtsaeng v. John Wiley & Sons, Inc.,*
    133 S. Ct. 1351 (2012)...................................... 1, 4-8, 15, 16, 19, 24, 25

*LifeScan Scot Ltd. v. Shasta Tech, LLC,*
    734 F3d 1361 (Fed. Cir. 2013)...................... 1, 3, 6, 14, 16, 17, 23, 25

*Mallinckrodt, Inc. v. Medi-part, Inc.*,
  976 F.2d 700 (Fed. Cir. 1992)..................................... 6, 14, 20, 22, 24, 26, 27, 28

*Quality King Distribs., Inc. v. L'anza Research Int'l, Inc.*,
  523 U.S. 135 (1998).................................................................................... 5, 26

*Quanta Computer, Inc. v. LG Electronics, Inc.*,
  553 U.S. 617 (2008)................................................................................. 4, 6, 15

*Tessera Inc. v. ITC*,
  646 F.3d 1357 (Fed. Cir. 2011).................................................................... 1, 13

*United States v. Univis*,
  316 U.S. 241, 250 (1942).................................................................................22

**Statutes**

35 U.S.C. § 154(a)(1).........................................................................................8

35 U.S.C. § 271...................................................................................................8

**Other Authorities**

The Science, State, Justice, Commerce,
  and Related Agencies Appropriations Act, 2006,
  Public Law 109-108 (Nov. 22, 2005) ..............................................................16

# ARGUMENTS

I. **LEXMARK EXHIBITS A FUNDAMENTAL MISUNDERSTANDING OF THE DIFFERENCE BETWEEN AN AUTHORIZED SALE AND A LICENSE.**

Lexmark presents its arguments as though there is no difference between a license and an authorized sale. It focuses not on the consequence under patent law of the authorized sale of an article, which is what occurred in this case, but rather on the ability of patentees to *license* less than all of their rights.

The authorized sale of a product involves the transfer to the purchaser of title to that product. The purchaser then has the right to do whatever he chooses with that product, without fear of being sued for patent infringement. That fundamental right is well-established in American jurisprudence, and, as has been noted by this Court in *LifeScan Scot Ltd. v. Shasta Tech, LLC,*734 F3d 1361 (Fed. Cir. 2013), is based upon the same statements by Lord Coke which were cited by the Supreme Court in *Kirtsaeng.*

A licensee, on the other hand, generally bargains for and receives the authority to make and sell products (that's products plural), under a license agreement.  In general, the purchaser of products from a licensee stands in the same shoes as a purchaser of the products from the patentee. *See* for example *Tessera Inc. v. ITC,* 646 F.3d 1357 (Fed. Cir. 2011) at 1370 re license to sell.  An

exception, as was the case in *General Talking Pictur*es, is when there is a restriction on what the licensee can sell, and to whom.

Lexmark, in discussing patent rights, refers to them as a bundle of sticks. It argues that the sale of a product constitutes a transfer of that bundle of sticks. That analysis completely misunderstands the nature of patent rights.

A patent right is not an affirmative right. A patent gives the patentee the ability to prevent people from making, using, etc. Those preventive rights are the sticks.

The authorized sale of a product, to a customer, does not involve the transfer of any bundle of sticks (patent rights) to that customer. Rather, the sale causes those sticks to disappear as to the products sold.

In a license situation, by contrast, the licensee may be granted permission to do specific things (such as generally making and selling a patented product) with the understanding that the patentee will not enforce its bundle of sticks—but only as to those rights specifically granted to the licensee

The issue of patent extinguishment usually arises when a licensee, operating under the license, sells products. The issue is not an assertion of patent extinguishment on behalf of the licensee. It is just the opposite.  It is the assertion of patent extinguishment on behalf of the purchaser who purchasers from a licensee.

2

This fundamental misunderstanding of the nature of a patent's bundle of sticks and licensing agreements is at the heart of Lexmark's arguments and at the heart of the mistaken analysis in *Jazz Photo*.

*Jazz Photo* stated that the products in question were not sold under a U.S. patent when they were first sold overseas, and therefore the U.S. patent rights were preserved. The fundamental problem with that statement, of course, is that the patentee does not sell any of its products under its patent. As discussed above, a patent is a negative right; not a positive right. To sell an article under a patent means that the article is sold with the permission of the patentee. That is the case for a licensee. A licensee sells a product under a license to a patent. That license gives the licensee the requisite permission.

The patentee, on the other hand, requires no permission to sell his or her product. The sale by the patentee extinguishes the patent rights. Having paid for the product and obtained title to it, the purchaser has the right as a matter of patent law to do with that product as he or she chooses, regardless of the wishes of the patentee.

That, of course does not preclude a separate contract restricting the purchaser's use or future sale of the product. As was clearly stated by this Court in *LifeScan*, footnote 8 referencing *Hewlett-Packard v. Repeat-O-Type*, 123 F.3d 1445 (Fed. Cir. 1997), any attempts to control a product after it has been sold must

3

be done (if at all) on the basis of an express contract entered into, knowingly, by the purchaser.

## II.    This Court Should Hold That A Sale Outside the U.S. Authorized By The U.S. Patentee Exhausts U.S. Patent Rights.

Much of Lexmark's brief is directed against an argument we do not make: that every sale of an article outside the U.S. by one authorized to sell the article in the place in which it is sold exhausts U.S. patent rights in the article—even when the sale is not authorized by the U.S. patentee or its privy. Our contention is that authorization of the sale by the U.S. patentee or its privy is both necessary and sufficient for exhaustion of U.S. patent rights.

According to Lexmark and the government, authorization of the sale by the U.S. patentee is necessary but not sufficient. They say that exhaustion then becomes a question of contract, but disagree on what the contract must say. The government says an express reservation of U.S. rights is required to avoid exhaustion, while Lexmark says an express relinquishment of rights is needed for exhaustion to occur. The legal flaws and adverse practical consequences of both contract-based approaches are identical.

### A.    Supreme Court Precedent Requires That Jazz Photo Be Overruled.

The Supreme Court's decisions in *Quanta* and *Kirtsaeng* resolve the issue before the Court.

Lexmark argues that *Kirtsaeng* is limited to copyright and is irrelevant in the patent context. But *Kirtsaeng* involves the extinguishment of property rights, and copyrights and patents both are subcategories of property rights.

The Supreme Court in *Kirtsaeng* set forth the general law (the common-law) as enunciated by Lord Coke in 1628. There is nothing in that common-law recitation which refers to either copyrights or patents. The Court went on to make very clear that it would enforce Lord Coke's rule unless there was a statutory exception. The Court then examined the copyright statute to see if there were any exceptions in the statute.

The copyright owner argued that the foreign sales did not occur under the copyright statute, because they occurred overseas, and therefore there was no first sale copyright extinguishment. It claimed that, because a U.S. copyright or a U.S. patent cannot be enforced overseas, sales of patented or copyrighted products overseas cannot extinguish those rights. The Supreme Court rejected that argument out of hand, as it had previously done in the *Quality King Distribs., Inc. v. L'anza Research Int'l, Inc.*, 523 U.S. 135 (1998). See Impressions Opening Br. 8-9. The Supreme Court's analysis, resting on common law principles applicable to both copyright and patent, applies equally in the patent context.

If there was any possible question as to whether the Supreme Court's analysis in *Kirtsaeng* was applicable in the patent context, that answer was clearly

5

supplied by this Court in *LifeScan*. This Court quoted the same passages from Lord Coke upon which the Supreme Court relied in *Kirtsaeng* and stated that those same passages are the basis for the patent extinguishment doctrine.

Lexmark's only reference to *LifeScan* was to an irrelevant footnote in the section of its brief relating to *Mallinckrodt*. The United States Supreme Court decision in *Kirtsaeng* requires that the same rule be applied to first sale extinguishment in patent law.

*Quanta* compels the same result. There, the Supreme Court squarely rejected the contention that ex-U.S. sales of an article by the U.S. patentee do not exhaust the U.S. patent rights. The patentee in that case argued against exhaustion based on the fact that the products were sold overseas. 553 U.S. at 632 n.6. Because the articles sold "outside the country" still "practice[ed] the patent," those sales exhausted the U.S. patent rights. *Id.*

Lexmark relegates *Quanta* to a footnote (page 21 n.3), asserting that *Quanta* explained only that noninfringing use abroad did not defeat a substantial embodiment claim—and said nothing about exhaustion. But the substantial embodiment claim related to the sale for use of a product for its intended purpose, which use constituted infringement. The Court was saying that such a sale would extinguish patent rights. The fact that the Court was referencing a sale for an infringing use abroad would makes sense only in the context of saying that a sale

overseas would extinguish patent rights in the same manner that they would be extinguished by US sale. No other explanation makes sense, and of course Lexmark has offered no such explanation.

Lexmark's reliance on *Boesch* is wholly misplaced. That case involved the sale of articles in Germany by a third party—not the U.S. patentee, not a licensee of the U.S. patentee, and not a party otherwise in privity with the U.S. patentee. 133 U.S. at 701-02. The Supreme Court's decision therefore says nothing about exhaustion based on ex-U.S. sales that are authorized by the U.S. patentee. Both the Supreme Court and lower courts have recognized that *Boesch* is limited to that factual setting. *Keeler v. Standard Folding Bed Co.*, 157 U.S. 659, 665 (1895); *Curtiss*, 267 F. at 77; *Dickerson*, 57 F. at 527.[1]

### B. Lexmark's Arguments Based On The Territorial Nature Of Patent Law Are Inconsistent With *Kirtsaeng*.

Lexmark advances a number of arguments based on the territorial nature of patent law. All are unavailing.

It is, of course, true that patent law is geographically based. The same is true of copyright law. Indeed, the dissenters in *Kirtsaeng* rested on that ground— but it was recognized, but found irrelevant, by a majority of the Supreme Court

---

[1] Lexmark's footnote 7 is bizarre: there is no Supreme Court precedent that requires or even supports *Jazz Photo*. There accordingly is no obstacle to the en banc Court overruling a panel decision.

where, as here, the foreign sale is authorized by the U.S. copyright owner. 133 S. Ct. at 1359 (majority), 1376 (dissent). The same result applies here.

Lexmark also argues that the patent statute contains limitations different from the copyright law that render *Kirtsaeng* irrelevant, presumably because in Lexmark's view they satisfy the Supreme Court's requirement of statutory language negating the common-law rule enunciated by Lord Coke. But the provisions on which Lexmark relies (35 U.S.C. §§ 154(a)(1) & 271) enunciate the basic rights of patentees.  Just as the text "includes no exception for importation-after-purchase" (Lexmark brief 20), it also includes no exception for sales after purchase through an authorized sale within the U.S.—but Lexmark acknowledges that the extra-statutory exhaustion doctrine applies in the latter context.  The statutory provisions therefore are no obstacle to the application of Lord Coke's principles as recognized in *Kirtsaeng*.

Moreover, as Lexmark acknowledges at page 20 of its brief, the legislative history regarding the amendment adding the reference to importation made clear that the amendment did "not affect U.S. law or practice relating to parallel importation."

Lexmark then attempts to argue, apparently, that U.S. law, as of 1994 did not include international exhaustion. That argument is incredible, in light of the fact that the only U.S. Court of Appeals case decided in the 20th century, on the

issue of international exhaustion, clearly and unequivocally held that overseas sales of products extinguish all U.S. patent rights in those products. That case, of course, is *Curtiss.* See also *Dickerson v. Matthesen*, 57 F. 524 (2d Cir. 1893); *Dickerson v. Tingling*, 84 F. 192 (8th Cir. 1897); both of which confirm intentional exhaustion.[2]

Most of Lexmark's argument regarding the territorial nature of patent law (at pages 13-16) rests on general descriptions of patent law's geographic limitations, all of which are equally true of copyright law's geographic limitations. Thus, Lexmark focuses on *Helferich Patent Licensing, LLC v. N.Y. Times Co.,* 778 F.3d 1293 (Fed. Cir. 2015), a case which had nothing to do with international exhaustion.

Lexmark claims that *Helfrich* stands for the proposition that the doctrine of exhaustion rests upon the principle that when a patentee sells a patented product he receives compensation for lifting the legal restrictions imposed by the patent statute. Based on that thesis, Lexmark then asserts that when a product is sold abroad, the patentee receives compensation for lifting the legal restrictions imposed by the patent statutes, in place in the country where the products are sold,

---

[2] In fact, if Congress wanted to do what Lexmark says the government wanted done in Uruguay, that would have been the perfect opportunity. The issue of international exhaustion was front and center at that time, and the Administration and Congress could easily have added an amendment to the U.S. patent laws abolishing international exhaustion and specifically overturning *Curtiss*. The fact that they chose not to, is a pretty good indication that they chose not to.

but the patentee does not receive compensation for lifting the legal restrictions in the United States, and therefore the patentee is entitled to additional compensation at such time as the product is sold in the United States.

The fundamental problem with that argument is that *Helferich* makes no such statement. On pg. 13, Lexmark states:

> "The 'core notion' of exhaustion, this court recently reaffirmed rests on a patentees compensation for "lifting legal restrictions imposed by the patent statute" that would otherwise run against the buyer. *Helferich*, 778F. 3d at 1301 – 02."

The only words which actually came out of *Helferich* were the words "core notion" and "lifting legal restrictions imposed by the patent statute". Of particular note is the statement "… **this court recently reaffirmed rests on a patentees compensation for**…" (emphasis added.)   Those words and the substance of those words are nowhere to be found in *Helferich*.

Thereafter, on pgs. 13 – 15 of its brief Lexmark develops the uncontroverted and unremarkable analysis of the fact that one cannot be liable under U.S. patent law for making, using, selling etc. products overseas that do not enter into the United States.

Thereafter on pg. 15 Lexmark sets forth the proposition that:

> "Accordingly, the only 'legal restrictions' 'lifted' by a foreign sale for purposes of exhaustion, see *Helferich*, 778F. 3d at 1301 – 02 are those foreign patent rights that stood in the way of the buyers use abroad. And the price a patentee receives for a foreign sale is

compensation for lifting those foreign rights, not rights 'under the United States patent'."

Once again, the only words in that paragraph which came from *Helferich* are the words "legal restrictions" and "lifted". All of the rest of the words came out of the imagination of Lexmark. The way they are presented however makes it seem as though *Helferich* was the basis for the entire paragraph. A reading of *Helferich* will quickly inform the reader that *Helferi*ch makes no such statements.

Finally, on pgs. 15 and 16 Lexmark makes the rather astonishing assertion that this Court should not allow international exhaustion because "Treating foreign sales as exhausting U.S. patent rights would cause foreign prices to increase by effectively requiring foreign purchasers to pay for US rights they may not want." Is Lexmark honestly suggesting that this Court should base its decision on the prices that foreign purchasers may pay for U.S. patented products abroad? [3]

### C.    Lower Court Precedent Prior To *Jazz Photo* Supports Exhaustion.

Lexmark asserts—incorrectly—that "most courts to address the question before *Jazz Photo* applied the same rule" (Brief, page 21). That is simply wrong.

To begin with, *Holiday v. Mattheson*, 24 F. 185 (C.C.S.D.N.Y. 1885), recognized international exhaustion. Lexmark says (footnote 4, page 22) that

---

[3] On page 24 Lexmark states "With such variation [in patent law], it is illogical to think most patentees intend a sale anywhere to liberate the product everywhere." As this Court determined in *Hewlett-Packard v. Repeat-O-Type* and *LifeScan* (footnote 8), it is irrelevant what the patentee intended.

*Holiday* "predated *Boesch* and is hardly authoritative," but as explained above *Boesch* does not conflict with *Holiday* because it involves a foreign sale by a party unrelated to the U.S. patentee.

Subsequent cases reaffirmed that distinction. Thus, in *Dickerson v. Tingling*, relied on by the government, the Court determined that the sales by the patentee's assignee overseas would have extinguished the patentee's US patent rights, except for the fact that there was a prohibition on the sale of those goods in the United States.

In *Dickerson v. Matheson*, the Court also stated that an overseas sale by the patentee would have extinguished its U.S. patent rights. In that case, however, the sale was by a licensee who did not have a license regarding the patentee's U.S. patent rights. The licensee did have a license under the foreign patent rights, but that was insufficient for the extinguishment of U.S. patent rights.

Both of those cases support the overturning of *Jazz Photo*.

Impression does agree with Lexmark on page 25, wherein it states: "And the discussion of explicit contractual reservations in *Curtiss* was plainly dictum, because that case involved an express authorization" However, what Lexmark, and apparently the government, once again fail to understand is the difference between a license and the sale. The express authorization in *Curtiss* was a license to the British Government to make the airplanes in question. There was no express

12

authorization between the defendant purchaser of those airplanes and the patentee. *Curtiss* therefore rests squarely on the very international exhaustion principle rejected in *Jazz Photo*.

Lexmark is dismissive of *Tessera* stating that it was based upon the existence of an international license and that in any event the issue of international exhaustion was waived. (Lexmark Br. 16 & 23)

This goes once again to Lexmark's failure to understand the difference between a license and a sale. The issue in that case related to the attempts by a purchaser from the licensee to import the product into the United States. The issue did not involve the rights of the licensee, which had international rights to make and sell products.  The issue was whether the purchaser from the licensee, who purchased the products abroad, had the right to import those products because of the international exhaustion of the patentees' patents, resulting from the sale by the international licensee. This Court determined that those overseas sales in fact extinguished the patent rights.

Lexmark argues that the international exhaustion argument was waived by the patentee, and therefore the case doesn't matter. As stated above, the determination was based on international exhaustion, so the Court did reach that issue. The fact that the patentee did not challenge the right of a legitimate purchaser to import and use products it had legitimately purchased from the

13

patentees licensee, was probably a reflection of its lawyers desire to not make

arguments, which would not pass the straight face test. Although Lexmark was

unable to find the time, in this portion of its brief, to make any reference to *Curtiss*

and *LifeScan* it somehow found the time to cite this court to *Griffin v. Keystone*,

453 F. Supp. 1283 (E.D. Pa. 1978). That case is the only one which is consistent

with *Jazz Photo.* If *Jazz Photo* is invalid law, then so is *Griffin.*

As stated by the Second Circuit in *Curtiss*, page 75:

> "After this country entered the war, the aviation fields in Texas
> and in other states were placed at the disposal of the British authorities
> and were actually used by them as training fields for Canadian
> aviators…If, however, such planes were then brought into the United
> States, and if they contained the plaintiff's manufactured engines. **It
> would be difficult to believe that anyone would seriously contend
> that their introduction involved any violation of the plaintiff's
> patents**." (emphasis added)

The Government is in agreement with Impression that *Mallinckrodt* should

be reversed. The Government takes the position that once a sale takes place, all

patent rights should be extinguished, and any attempt by contract to preserve any

such patent rights, is invalid. As the Government puts it, "once the first authorized

sale has occurred, the patentee may not exercise any further control over the use or

resale of that article." U.S. Br. 8.

Yet, the Government takes exactly the opposite position as it relates to

international sales, and gives no reason why international sales should be handled

any differently, in this regard, than domestic sales. Given that the Government

asserts that a patentee may not assert any post-sale control over a good, it offers no basis whatsoever to suggest that a different rule should apply in the context of international sales.

Essentially the Government is asking this Court to adopt the 1897, 8th Cir. Decision in *Tingling*, a decision rendered long before the electronic and microelectronic industries; the complexities of international commerce; the creation of the ITC, etc.  In essence, a different world.[4]

### D.   Lexmark's Arguments Based On Executive Agreements Are Wrong.

Lexmark also argues, as did the government, that three trade agreements (improperly referred to as treaties) support its position because those agreements allowed for the preservation of U.S. patent rights, by contract, for U.S. patented products sold in the countries with whom we had the agreements. Those three countries are Morocco, Australia, and Singapore.

*Kirtsaeng* very clearly stated that the general common law of exhaustion can be replaced by statute. The three trade agreements were adopted into U.S. law by

---

[4] *Tingling* is contrary to *Quanta* ,which holds that the transfer of title to a product extinguishes all patent rights in that product, and to *Kirtsaeng* which held that place of sale is generally irrelevant to the extinguishment of property rights. *Tingling* gives no rationale for its determination, nor does the government. For this Court to adopt *Tingling* it would have to explain how to reconcile such a determination with *Quanta* and *Kirtsaeng*—that is not possible, because the Supreme Court's rulings completely undermine *Tingling*.

statute, and therefore are exceptions to the common law as set forth by the United States Supreme Court in *Kirtsaeng*.

In addition, as acknowledged by the Government, but ignored by Lexmark, a limitation on the ability to include such provisions in future agreements was subsequently enacted into law. *See* The Science, State, Justice, Commerce, and Related Agencies Appropriations Act, 2006, Public Law 109-108 (Nov. 22, 2005).

### E.    Practical Realities Weigh Heavily Against Lexmark And The Government.

Lexmark's arguments about the disruption of U.S. law and the economy look rather foolish in light of the avalanche of amicus briefs discussing all of the present and future disastrous consequences from *Jazz Photo*. The arguments that patentees may not avail themselves of the advantages of *Jazz Photo* is a nonsensical basis for arguing that patentees should have the authority and the right to avail themselves of those advantages. That argument was also trotted out in *Kirtsaeng*, and was soundly and appropriately rejected by the United States Supreme Court. (Also, pre-*Jazz Photo* there was no parade of horrible as predicted by Lexmark's amici.)

On page 33 of its brief Lexmark discusses the fact that *Kirtsaeng* acknowledged that international copyright exhaustion could make it impossible, or at least difficult, to sell at different prices in different foreign markets. Apparently oblivious to the fact that the Court found that price differentiation issue to be

16

irrelevant to its decision, Lexmark states that such concerns are only enhanced in the patent context. Those concerns were not persuasive to the United States Supreme Court nor to this Court in *LifeScan* and should be of no concern in this case. Those are matters for the legislature, not the courts.

Also on page 33, in footnote 10, Lexmark argues that issues relating to importation of drugs made abroad are appropriate matters for the patent laws as oppose to FDA regulations or other government laws. The idea that social policy is to be made by use of the patent laws is fundamentally inconsistent with the purpose of patent and copyright laws, which is to promote progress in arts and sciences, neither to make fortunes for the owners of intellectual property rights **nor to control prices in other countries**.

As a practical matter, the Government's proposal makes no sense, and if adopted, would wreak havoc in today's world of international trade, and in particular in supply chain management.

The first stopping point for products that are first sold overseas and thereafter imported into the United States, is Customs.

Customs becomes involved when the ITC issues an exclusion order. Exclusion orders prohibit the importation of products which infringe certain patents. Exclusion orders do not get into the details of whether or not those products were previously sold and the legal significance of any such sales. Even

17

more to the point, the customs officers who seize products have no understanding of the legal issues and have no legal training, particularly as to patent law.

Under the Government's proposal, a customs officer would have the obligation to determine whether or not there had been any contractual reservation of U.S. patent rights in a product sold overseas. The officer would then have the obligation of reviewing and interpreting those contracts. Suppose the contracts were between a Japanese company (which had U.S. patents on the products in question) and a Chinese company. Would the customs officer be required to interpret the contract under the law of China? Would the customs officer be required to interpret the contract under the law of Japan? Would the Customs' officer be required to determine which law applies?

Assuming the products purchased in China were parts necessary for the making of a product in Korea, and that the products were sold to a Korean company. Would the Korean company be bound by the contract between the Japanese and the Chinese company? Who is supposed to make that determination? Is that another question for Customs?

If the Korean company were to ship its products to the United States, who has the initial responsibility of investigating any and all contracts up and down the supply chain. Is that a responsibility of Customs? Is that a responsibility of the U.S. purchaser of the Korean products?

18

As has been noted by the many amicus briefs in this case, many products include thousands of patented products as components. It would be literally impossible for people up and down the supply chain to investigate and analyze all of the contracts up and down the chain. See e.g. briefs of *Quanta*; *LG Electronics*, et al; *Texas Instruments* and many others.

The only thing which makes any sense is to apply *Kirtsaeng* as a bright line, so there is no ambiguity and those who purchase products up and down the supply chain, including importers and consumers do not have to be concerned that someone is going to come out of the shadows and sue them for patent infringement for use, sale, etc. for a product previously sold by that selfsame shadow lurker.

## F.    There Are Many Sound Reasons For Overturning *Jazz Photo*, And *Jazz Photo* Is Not A Settled Rule.

The idea that *Jazz Photo* is a settled rule is remarkable indeed. It has only been the law since 2001, and it has been horribly disruptive since its inception, and, as can be seen from the amicus briefs, it has been widely and roundly and appropriately criticized as having no foundation in settled law.  **Not only that, but it was decided *sua sponte*, which means no one in that case even raised the issue.**

*Jazz Photo* was based upon a complete misunderstanding of *Boesch*. Since that time *Jazz Photo* has been used to seize millions of dollars of products, in particular in the spent inkjet cartridge business, and to impose millions of dollars in

19

fines. In the *Ninestar v. ITC* case alone, *Ninestar* was fined $11 million for importing old spent used and discarded print cartridges, which had previously been sold by Epson, and for which Epson had been fully paid. That case alone was an outrageous abuse of a doctrine created out of a case that had no legal basis or justification.

*Jazz Photo* has worked for nearly 15 years—but only to enrich OEMs in the printer industry. What Lexmark is attempting to do in this case is a perfect example of how *Jazz Photo* will continue to work for OEMs, at the expense of those who would refurbish print cartridges, and even more importantly at the expense of consumers who ordinarily would have every right to refill their cartridges. Anyone who has had to purchase refill cartridges, is fully aware of the abusive pricing of those cartridges.[5]

## III.    THE COURT SHOULD OVERRULE *MALLINCKRODT*.

In light of the convincing position taken by the government with respect to conditional licenses (U.S. Br. 4-13), Lexmark's efforts to rehabilitate *Mallinckrodt* are unavailing. Lexmark misunderstands the relationship between a patentee and a licensee, it attempts to ignore the Supreme Court's plain rejection of conditional

---

[5] *Jazz Photo* and *Mallinckrodt* are not entitled to deference under stare decisis because they are contrary to subsequent Supreme Court decisions.

sales, and it is silent as to the Supreme Court's clear instruction that any post-sale restrictions must rely on contract—not patent—rights.

*First*, Lexmark's argument turns on a demonstrably false premise—that, when a patentee issues a limited license to a licensee, the patentee may subsequently enforce restrictions as to the use of the good by downstream purchasers. Lexmark Br. 35, 53. This stems from Lexmark's misapprehension of *General Talking Pictures v. Western Electric Company* 304 US 175, 179 – 80 (1938). There, because the license did not allow for commercial sales, the licensee lacked the right to sell commercial uses; therefore the purchaser did *not* take good title. It was not a restriction on the *good*, but a restriction on the licensee's right to sell. Far from establishing that patent law permits "limit[s] [on] a purchaser's use of a product" (Lexmark Br. 41), on rehearing, the Supreme Court expressly noted that it was *not* addressing this issue. 305 U.S. at 125.

Thus, contrary to Lexmark's straw man, Impression does not argue that "'authorized' sales by licensees may convey only a subset" of patent rights. Lexmark 53. Quite the contrary. Just as a patentee can decide to whom it will sell its own products, it can place similar restrictions on licensees who, by virtue of the license, stand in the shoes of the patentee. But once an authorized sale has been made—regardless of whether the sale is made by a patentee or a licensee—*no* post-sale restrictions are permissible.

21

On page 45 of its brief, Lexmark argues that the single use only label created a license agreement. In reality, that label was not a license agreement at all. As discussed supra license agreements usually involve the licensee stepping into the shoes, in whole or in part, of the patentee. The licensee usually makes and sells products under the license. Slapping a label on a product which is sold in the normal stream of commerce is an attempt to control the use of a product after sale. Calling the attempted restriction on use by a purchaser, a license, is a misnomer. The fact of the matter is that it was uncontroverted that the products in *Mallinckrodt*, as is the case with the products in the case at bar, were sold (i.e. title was transferred) to the purchasers. The district court in both *Mallinckrodt* and the case at bar got it right. Slapping a restrictive use label on a product should have absolutely no legal effect.

*Second*, Lexmark is wrong  in asserting that Supreme Court decisions (*see*, *e.g.*, U.S. Br. 5-6),  squarely rejecting restrictive licenses,  apply only in the context of patent-tying. Lexmark Br. 43-44. In *Univis*, (where the Plaintiff attempted to assert patent rights for a Defendant violating post-sale restrictions) the U.S Supreme Court , stated  that the "sale of [an article] exhausts the monopoly in that article and the patentee may not thereafter, by virtue of his patent, control the use or disposition of the article." *United States v. Univis*, 316 U.S. 241, 250 (1942). While *Univis* arose in the tying context, the Supreme Court later relied on this

statement of exhaustion principles in *Quanta*, stating that "*Univis* governs" as to exhaustion generally. *Quanta*, 553 U.S. at 631. The Supreme Court has clearly held that a patent grant does *not* allow post-sale restrictions. Lexmark offers no reasoned argument to the contrary.[6]

*Third*, Lexmark misunderstands the consistent statements by the Supreme Court that any post-sale restriction on goods are limited to contracts—not the patent laws. *See* U.S. Br. 13. This is not an issue of "overlap[ping]" causes of action. Lexmark Br. 55. Quite to the contrary, the Supreme Court has plainly held that while "a patentee may protect himself and his assignees by special contracts brought home to the purchasers," [i]t is, however, obvious that such a question would arise as a question of contract, and *not as one* under the inherent meaning and effect of the patent laws." *Quanta*, 553 U.S. at 637 n.7 (quoting *Keeler v. Standard Folding Bed Co.*, 157 U.S. 659, 666 (1895)).

## IV.    MISCELLANEOUS COMMENTS REGARDING AMICUS BRIEFS

1.    As a first order, it is notable that, consistent with Lexmark, none of the Lexmark amicus briefs discuss what this Court said, in *LifeScan,* regarding the fact that Lord Coke's writings formed the basis and the underpinning of the patent

---

[6] This was the same decision the Supreme Court reached in *Motion Picture Patents Company v. Universal Film Manufacturing Company,* 37 S.Ct. 416 (1917), wherein a patentee's assignee attempted to assert, in an infringement action, its rights under a label license.

exhaustion doctrine, in the same way that they formed the basis and the underpinning of the copyright extinguishment doctrine.

2.    The second attribute, that all of the amicus briefs have in common, is that all of them attempt to equate product sales with licenses.

Of particular interest is the amicus brief of the Intellectual Property Owners' Association. On page 18 it states:

> "The *Mallinckrodt* Court also observed that drawing a purely formalistic line between restrictions on customers of the patent owner and customers of its licensees would be pointless, because it could easily be avoided. This is clearly the case, for example, a patent owner that might otherwise sell directly to customers and impose use or resale restrictions as a condition of the sale could easily create a separate entity to become a licensee – seller and accomplish the same result by indirection."

Of course, such an artifice would not accomplish the same thing. As discussed above, the licensee sells a product under the patent (Again, a licensee can sell under a patent, the patentee does not. A patentee does not need a license or permission to sell its own product). When the licensee sells a product and transfers title to a purchaser, he stands in the same shoes as the patentee. Accordingly, when that product is sold, all patent rights are extinguished, whether the product is sold by the patentee, or the patentee's licensee.

3.    The third attribute is that the arguments made by the amici were already made to the U.S. Supreme Court in *Kirtsaeng* and were rejected.

24

4.     In the brief filed by Medical Device Manufacturers Association, it argues that patent infringement claims are essential for ensuring compliance with post sale restrictions, on medical devices, for safety and health reasons. On page 10 it argues that contract remedies are not sufficient because some re-processors (not in privity) obtain devices from the hospitals. That is a perfect example of an inappropriate use of the patent laws. The patent laws are to promote the progress of science and useful arts. The patent laws are not there for safety purposes. That's the province of the FDA and Congress generally. In addition, there is no reason that medical device suppliers cannot have individual contracts with hospitals which provide that the hospitals may not sell those devices to third parties, thereby providing the Medical Device Associations members with remedies.

5.     Pharma argues the importance of maintaining *Jazz Photo's* holding of no international exhaustion because, it says, it needs to use the patent laws to protect it from the importation of its own pharmaceuticals sold abroad, by those to whom it has sold them. It needs to do this in order to allow it to engage in its charitable work abroad. Once again, this is not the job of the patent laws, and these arguments about special market pricing were raised in *Kirtsaeng* and appropriately rejected. There is no reason presented as to why there should be one rule regarding segmented pricing for copyrights and another rule for segmented pricing for patents. Again, this issue was addressed, by this Court, in *LifeScan*. Pharma does

acknowledge that the government, in particular the FDA, has provided that pharmaceutical products, produced in the United States may not be imported into the United States by anyone other than their original manufacturer. That of course is the proper role of government. If the government believes that other special protections need to be provided to Pharma, then it can adopt such other special protections. It is not the job of patent law to provide such special protections.[7]

6.    In the brief filed by Nokia , it completely misses the point of *Quality King*. On page 16 it states that "Therefore, the fact that copyright law, unlike patent law, does not have a distinct importation right was crucial to the Courts decision…." The reference by the Court to importation was that importation would be an infringement, as a subcategory of distribution, unless there was a previous exhaustion of copyright rights.  It then held there was exhaustion because of the prior sale overseas.

7.    Ibiquity, in its brief, argues that it's licensing program, wherein it licenses chip manufacturers to make chips under its patent and restricts their rights to sell those chips to those who have a separate agreement with Ibiquity, would be in jeopardy should this Court overturn *Mallinckrodt*. An analysis of its program

---

[7] The FDA does extend Pharma additional rights through ANDA

however, makes clear that its program is essentially the same as the program of the patentee in *General Talking Pictures*.[8]

The problem with *Mallinckrodt* is that it goes way beyond *General Talking Pictures* and allows so-called conditional sales of products, sold by those who are without restriction as to whom they can sell those products. The so-called conditional sales are not really conditional sales. A conditional sale is, for example, an agreement for deed, whereby the sale itself is conditioned upon certain conditions precedent prior to the transfer of title. Other than *Mallinckrodt* and its progeny, there is nothing in patent law which allows for post-sale use and sale restrictions under the rubric of a "conditional sale".

8.    Finally, in the brief filed by Biotechnology Industry Organization and CropLife International, it admits on page 31 the very motivation that is behind the positions of Lexmark and its amici.

> "Contrary to the government's argument, the remedies afforded by contract law do not adequately protect those interests in enforcing use restrictions. **There is often no privity between the patent owner and downstream users or purchasers**. In those circumstances contract law provides **no** remedy, whereas patent law does insure that use restrictions can be enforced against a party engaging in unauthorized use." (emphasis added in part)

---

[8] There is nothing to prevent Ibiquity from enforcing its contract rights against those who purchase its patented chips from its licensee.

That of course is precisely the problem with these restrictive use labels. They are intended to misuse the patent laws by allowing a patentee to control downstream use by those who didn't even purchase the product from the patentee or the patentee's licensee. That is the overarching concern which has been presented by so many of the amici for Impression. **That is at the heart of the concerns about supply chain management.**

## CONCLUSION

*Jazz Photo* and *Mallinckrodt* are bad law. They were both incorrectly decided in the first instance. Both cases undermine the well-established bright line doctrine of patent exhaustion, by creating exceptions that allow patentees to continue their ability to enforce patents on products which they have already sold. By extending patent rights beyond their legitimate reach, they have caused confusion, uncertainty and injustice.

The District Court's decision should be reversed as to *Jazz Photo* and affirmed as to *Mallinckrodt*. The law on international exhaustion should be no different than the law on exhaustion as it relates to U.S. sales.

Respectfully submitted,

/s/ Edward F. O'Connor
Edward F. O'Connor, Esq.
AVYNO LAW P.C.
6345 Balboa Blvd., Suite 190
Encino, California 91316

28

# United States Court of Appeals
# for the Federal Circuit

*Lexmark International, Inc. v. Ink Technologies Printer*, 2014-1617, -1619

## CERTIFICATE OF SERVICE

I, Robyn Cocho, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by AVYNO LAW P.C., Attorneys for Appellant to print this document.  I am an employee of Counsel Press.

On **August 27, 2015,** counsel has authorized me to electronically file the foregoing **Reply Brief for Defendant-Appellant** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to all counsel registered as CM/ECF users, including any of the following:

Timothy Colin Meece
(principal counsel)
Auda Carol Eidem Heinze
Bryan Medlock, Jr.
Jason S. Shull
Banner & Witcoff, Ltd.
Ten South Wacker Drive
Chicago, IL 60606
312-463-5420
tmeece@bannerwitcoff.com
aheinze@bannerwitcoff.com
bmedlock@bannerwitcoff.com
jshull@bannerwitcoff.com

Benjamin Beaton
Sidley Austin LLP
1501 K Street, NW
Washington, DC 20005
202-736-8000
bbeaton@sidley.com

Steven B. Loy
Stoll, Keenon & Park, LLP
300 West Vine Street, Suite 2100
Lexington, KY 40507-1380
859-231-3000
steven.loy@skofirm.com

Constantine L. Trela, Jr.
Sidley Austin LLP
Bank One Plaza
1 South Dearborn Street
Chicago, IL 60603
312-853-7000
ctrela@sidley.com

Two paper copies will also be mailed to the above principal counsel on this date. Any counsel for Amici Curiae appearing at the time of this filing will be served only via the email notice from the CM/ECF systsem.

Upon acceptance by the Court of the e-filed document, 31 paper copies will be filed with the Court within the time provided in the Court's rules.

August 27, 2015                          /s/Robyn Cocho
                                         Counsel Press

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).

  X   The brief contains 6,728 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii),or

_____ The brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

  X   The brief has been prepared in a proportionally spaced typeface using MS Word 2013 in a 14 point Times New Roman font or

_____ The brief has been prepared in a monospaced typeface using _____ _____in a ___ characters per inch_____ font.

August 27, 2015_____            /s/ Edward F. O'Connor_____
                                                      Edward F. O'Connor, Esq.
                                                      AVYNO LAW P.C.
                                                     Counsel for Appellant